JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br> vs. <br><br> AARON MICHAEL SHAMO, <br><br> Defendant. | Case No. 2:16-cr-631DAK <br><br> **MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE EVIDENCE** <br><br> Judge Dale A. Kimball |

The United States of America, by and through Michael Gadd, Special Assistant United States Attorney, submits this memorandum in opposition to the defendant's request that the Court exclude testimony and unspecified evidence that relates to the internet, cryptocurrency, PGP encryption, or the overdose death of R.K. in Daly City, California, on June 13, 2016. The United States urges the Court to deny the defendant's motion because 1. the United States can and will lay appropriate foundation for its exhibits; 2. the expert testimony of Special Agent Guy Gino about the Dark Net, Cryptocurrency, and PGP encryption will be particularly helpful to the jury as it considers the fact testimony and exhibits in this case; and 3. just as evidence of a homicide would not be unfairly prejudicial in a homicide case, evidence of distribution resulting in death is not unfairly prejudicial to the defendant, who is charged in Count 6 with distributing Fentanyl that resulted in R.K.'s death.

**Table of Contents**

1. STATEMENT OF FACTS ................................................................................................. 2
    1.1   Dark Net and Sigaint Exhibits ................................................................................ 2
    1.2   Expert Testimony of Guy Gino ............................................................................... 6
    1.3   Daly City Overdose Witnesses ............................................................................... 7
2. ARGUMENT .................................................................................................................... 9
    2.1   The United States' witnesses can and will lay sufficient foundation for the Dark Net and Sigaint exhibits. ................................................................................................. 9
    2.2   By definition, the proposed Dark Net and Sigaint exhibits are not hearsay. .............. 11
    2.3   The expert testimony of Special Agent Guy Gino and evidence of R.K.'s overdose death will not violate Rule 403 ............................................................................. 14
        2.3.1   Special Agent Gino's testimony does not violate rule 403. ...................... 15
        2.3.2   Evidence about R.K.'s overdose death does not violate rule 403 ............. 16
3. CONCLUSION ............................................................................................................... 19

**1.   STATEMENT OF FACTS**

**1.1   Dark Net and Sigaint Exhibits**

1.   This case involves an international Drug Trafficking Organization (DTO), run by Aaron SHAMO, which manufactured controlled substances, namely fake oxycodone pills made with Fentanyl and counterfeit Xanax tablets. The DTO distributed these controlled substances to other individuals for purposes of further distribution throughout the United States and elsewhere using their storefront, "PHARMA-MASTER," on the Dark Net[1] marketplace AlphaBay, and by using the U.S. Mail. Mr. Shamo set up the storefront on AlphaBay and controlled the proceeds earned by Pharma-Master on AlphaBay.

---

[1] Dark Net sites operate on the Dark Web, which cannot be accessed without special software, and the Dark Net is a smaller part of the Deep Web.  The Deep Web is an area of the internet not accessible using typical search engines like Google and accounts for approximately 96% of the internet.  The Surface Web or Normal Web, on the other hand, accounts for just 4% of the internet.  The majority of internet users are only familiar with the existence of the Surface Web.

2

2. The United States has signaled it intends to seek admission of the following proposed exhibits that were captured from the Dark Net or from an email service that could be accessed through the Dark Net, Sigaint. Sigaint was a Dark Net email service that advertised it protected its users' locations and identities.

| Ex. No. | Description |
|---|---|
| 15.00 | Pharma-Master store feedback screenshots (366 pages) |
| 15.01 | Pharma-Master store feedback screenshots (negative and neutral) |
| 15.02 | Pharmamaster.xls (a chart of the transactions with feedback) |
| 15.02 | Pharmamaster feedback summary table |
| 15.03 | Screenshots of feedback from Trustworthy Money |
| 15.04 | Screenshots of what they sell on AlphaBay |
| 15.05 | Sigaint email inbox contents for "Passthepeas" |
| 15.06 | Sigaint email sent box contents for "DRW99" |
| 15.07 | Sigaint email sent box contents for "Passthepeas" |
| 15.08 | Sigaint email trash folder contents for "DRW99" |
| 15.09 | Screenshots of Pharma-Master orders for 100 M30s or A 215s |
| 15.10 | Screenshots of Pharma-Master orders for 250 M30s or A215s |
| 15.11 | Screenshots of Pharma-Master orders for 500 M30s or A 215s |
| 15.12 | Screenshots of Pharma-Master orders for 1,000 M30s or A 215s |
| 15.13 | Screenshots of Pharma-Master orders for 1,100 M30s or A 215s |
| 15.14 | Screenshots of Pharma-Master orders for 2,000 M30s or A 215s |
| 15.15 | Screenshots of Pharma-Master orders for 5,000 M30s or A 215s |
| 15.16 | Screenshots of Pharma-Master orders for 10,000 M30s or A 215s |
| 15.17 | Screenshots of Pharma-Master orders for 20,000 M30s or A 215s |
| 15.18 | Screenshots of sales to Trustworthy Money for 10,000 fake oxy pills |
| 15.19 | Screenshots of sales to Trustworthy Money for 2,000 fake oxy pills |
| 15.20 | Screenshots of Pharma-Master orders for 1000 Alprazolam (Xanax) |
| 15.21 | Screenshots of Pharma-Master orders for 2,000 Alprazolam (Xanax) |

| | |
|---|---|
| 15.22 | Screenshots of Pharma-Master orders for 5,000 Alprazolam (Xanax) |
| 15.23 | Screenshots of Pharma-Master orders for 10,000 Alprazolam (Xanax) |
| 15.24 | Screenshots of Pharma-Master orders for 20,000 Alprazolam (Xanax) |
| 15.25 | Screenshot of Pharma-Master feedback from Stakbandz |
| 15.26 | Mario Noble interview - video file (12-7-2016 interview and Camtasia) |
| 15.27 | Sigaint email links from "Passthepeas" account (Get USPS links) |
| 15.28 | 9/26/2016-11/22/2016 Postal labels from links in Ex. 15.27 |
| 19.02 | Screenshot of Trustworthy Money profile on AlphaBay |

3. For United States' proposed exhibits 15.00, 15.01, 15.02, 15.03, and 19.01, the United States will call HSI Investigative Analyst Robin Biundo to lay foundation for the exhibits to be admitted. Ms. Biundo will testify that as an analyst that helps investigate major Dark Net marketplace vendors, she accesses Dark Net marketplaces several times each week. During the period when the exhibits were created, Ms. Biundo accessed AlphaBay on a daily basis as part of her duties. Ms. Biundo had her own AlphaBay account that she used to access AlphaBay; she also accessed AlphaBay at times using accounts that had been surrendered to her and other agents by criminal suspects.

4. Ms. Biundo and her team accessed AlphaBay and captured the screenshots in the proposed exhibits. She will testify that the screenshots are true and accurate representations of what she saw on AlphaBay with her own eyes.

5. Ms. Biundo and her team took voluminous data from the screenshots in proposed exhibits 15.00 and 15.01 and compiled the data to create proposed exhibit 15.02, a chart and summary of Pharma-Master transactions for which she was able to capture feedback from Pharma-Master's store page on AlphaBay.

6. For proposed exhibits 15.05 through 15.08, Ms. Biundo will testify that she and her team accessed, with consent, the Sigaint email accounts used by Ms. Tonge, Ms. Bustin, and Mr. Noble—three of Mr. Shamo's co-conspirators. Ms. Biundo will testify that those emails and screenshots in proposed exhibits 15.05 through 15.08 are true and accurate representations of the decrypted emails viewed in and captured from the Sigaint email accounts used by Ms. Tonge, Ms. Bustin, and Mr. Noble. Likewise, Ms. Tonge, Ms. Bustin, and Mr. Noble can testify that their emails contained in those exhibits are true and accurate.

7. For United States' proposed exhibits 15.04, and 15.09 through 15.25, HSI Special Agent Adam Koeneman will lay foundation sufficient for the exhibits to be admitted. SA Koeneman will testify that he accessed AlphaBay as part of his duties. When he accessed AlphaBay to capture these exhibits, he also relied upon one of Mr. Shamo's co-defendants, Mario Noble, who gave SA Koeneman the ability to use Noble's AlphaBay account to access AlphaBay and some of the Pharma-Master store admin pages. SA Koeneman will testify, like Ms. Biundo, that the screenshots he captured are true and accurate representations of what he saw on AlphaBay with his own eyes.

8. For United States' proposed exhibit 15.26, SA Koeneman along with other agents sat down with Mr. Noble and audio and video recorded Mr. Noble as he took them onto Pharma-Master's page on AlphaBay. SA Koeneman will testify that the audio and video are true and accurate recordings of what he both saw and heard that day.

9. For United States' proposed exhibit 15.27 and 15.28, HSI Special Agent Dan Ashment will testify that he, with permission, accessed the Sigaint account used by Ms. Tonge and Ms. Bustin. SA Ashment will explain that he took photographs of the computer screen as he viewed emails that contained links to print postage labels (15.27). SA Ashment will testify that

he clicked the links and printed the postage labels (15.28). SA Ashment will testify that the photographs he took and the postage labels he printed from the email links are true and accurate representations of what he saw with his own eyes.

10. In addition to admitting these exhibits, the United States anticipates eliciting testimony from agents, analysists, and co-conspirators about communications over Sigaint accounts, AlphaBay, Pharma-Master, and encryption methods.

**1.2  Expert Testimony of Guy Gino**

11. The United States has provided notice that it intends to call HSI Special Agent Guy Gino to provide expert testimony on the following subjects:

    a. PGP Encryption;

    b. Cryptocurrency, including Bitcoin;

    c. The Dark Net; and

    d. Dark Net Marketplaces, including AlphaBay;

12. SA Gino's testimony will come relatively early in the United States' case-in-chief. His testimony is designed to educate the jury so that they will have the proper context in which to place the fact testimony they hear and exhibits they consider. To aid his testimony, SA Gino has prepared a PowerPoint presentation.

13. SA Gino will testify that AlphaBay, like many Dark Net Marketplaces, worked to overcome the distrust inherent in online transactions, but which is amplified on Dark Net transactions where vendors and buyers enjoy some anonymity. For example, AlphaBay operated as an escrow service between buyers and vendors, employed moderators to settle disputes between buyers and vendors, and allowed buyers to post feedback on a vendor's store page. The feedback was accompanied by transaction data, including the item purchased by the buyer, the

price, quantity, and date, all of which was generated by AlphaBay. The feedback and transactional data displayed on a vendor's store page was not optional for the vendor. Sellers were required to post a bond with AlphaBay to begin selling goods and services on AlphaBay. Sellers were also given a trust rating by AlphaBay.

**1.3   Daly City Overdose Witnesses**

14. The United States intends to elicit the following testimony and admit the following exhibits regarding the death of R.K. in Daly City, California, on June 13, 2016.

15. United States' proposed exhibit 18.00 was gathered from proposed exhibit 14.54. Proposed exhibit 14.54 shows all the Pharma-Master customer order sheets located on Mr. Shamo's iMac computer. United States' proposed exhibit 18.00 shows two orders from R.K.'s address in Daly City to Pharma-Master for drugs Pharma-Master listed on AlphaBay as "Roxy-Oxycodone 30mg."

16. The orders were made on April 13, 2016, and June 6, 2016. Each order was for ten pills.

17. USPIS Inspector Megan Moore, who is a custodian of records for the Postal Service, will testify that the package containing the June order was shipped on June 9, 2016, from Midvale, Utah. The package arrived at R.K.'s residence at approximately 3pm on June 11, 2016.

18. Tori Grace, who was dating R.K.'s roommate and who was friends with R.K. will testify that she and her boyfriend arrived at R.K.'s residence at approximately 10:30pm on June 12, 2016. Ms. Grace saw R.K. had been drinking. Ms. Grace and her boyfriend hung out with R.K. in R.K.'s bedroom.  Ms. Grace watched as R.K. crushed up two blue pills and snorted them. Ms. Grace knew that the pills had been ordered online and contained Fentanyl.

19. Ms. Grace saw R.K. start to exhibit some of the symptoms of an opiate high. Ms. Grace heard R.K. ask Ms. Grace and her boyfriend to check on him. R.K. then laid down on his bed and went to sleep. Ms. Grace and her boyfriend checked on R.K. approximately every 15 minutes for two hours. Ms. Grace at one point noticed that R.K.'s breathing slowed. Ms. Grace saw her boyfriend roll R.K. into the recovery position as R.K. slept.

20. The following morning, Ms. Grace learned from her boyfriend that R.K. had overdosed and died.

21. Daly City Police Officer Sandra Sabins will testify that she and her partner received the call on the morning of the 13th to go to R.K.'s residence to check on an overdose report. Officer Sabins will testify that she entered the residence, spoke with Ms. Grace's boyfriend, viewed R.K., who was deceased, and took pictures of the crime scene. A few of those pictures comprise United States' proposed exhibit 18.01.

22. R.K.'s body was taken to the coroner's office, where Dr. Thomas Rogers performed an autopsy. Dr. Rogers will testify that there was no other cause of death other than intoxication from the drugs found in R.K.'s blood toxicology report. Bill Posey, the toxicologist who analyzed R.K.'s blood, will testify about his results: he found alcohol, a cocaine metabolite, a cocaine cutting agent, and Fentanyl in R.K.'s blood.

23. Dr. Stacey Hail, who studies overdose causes of death and who teaches and practices medicine, reviewed the case, including Dr. Rogers' and Bill Posey's reports. Dr. Hail will testify that despite having ethanol and a cocaine metabolite present in his bloodstream, Fentanyl intoxication was the but-for cause of death of R.K.

**2.    ARGUMENT**

**2.1    The United States' witnesses can and will lay sufficient foundation for the Dark Net and Sigaint exhibits.**

United States' proposed exhibits 15.00 through 15.28 and 19.02 should be admitted because the United States will offer testimony from witnesses who viewed the contents of the exhibits and will testify that the exhibits contain true and accurate representations of matters about which the witnesses have personal knowledge. In order to authenticate a piece of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Federal Rule of Evidence 901(a). Testimony of a witness with knowledge that an item is what it is claimed to be satisfies the requirement. Federal Rule of Evidence 901(b)(1).

Authentication is not a particularly high hurdle and proponent need not rule out contrary possibilities. *United States v. Brewer*, 630 F.2d 795, 801 (10th Cir. 1980); *United States v. Jardina*, 747 F.2d 945 (5th Cir. 1984); *United States v. Dhinsa*, 243 F.3d 635, 658-59 (2d Cir. 2001). Although not preferred, authentication "can be accomplished without the direct testimony of either a custodian or a percipient witness," such as when "appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances…provide sufficient indicia of reliability." *United States v. Paulino*, 13 F.3d 20, 22-25 (1st Cir. 1994). The opponent's "'merely raising the possibility . . . of tampering is not sufficient to render evidence inadmissible.'" *United States v. Thomas*, 294 F.3d 899, 905 (7th Cir. 2002).

Once the authentication standard is met, lack of proof of connection, etc., goes to weight, not admissibility. *United States v. Hernandez-Herrera*, 952 F.2d 342, 44 (10th Cir. 1991);

9

*United States v. Santana*, 898 F.2d 821, 824 (1st Cir. 1990); *United States v. Long*, 857 F. 2d 436, 441-42 (8th Cir. 1988).

The defense's argument—that screenshots and video captures from Dark Net sites cannot be authenticated—has been previously advanced, unsuccessfully, in the criminal case against the founder of the first modern Dark Net Marketplace, Silk Road. In *United States v. Ulbricht,* Ulbricht argued that screenshots from various websites and Silk Road forum posts were electronic in nature and could not be verified as being what they purported to be. *United States v. Ulbricht*, 79 F. Supp. 3d 466, 487 (S.D.N.Y. 2015). Ulbricht relied upon *United States v. Vayner*, where the Second Circuit held the admission of a page of "the Russian equivalent of Facebook" to be error due to insufficient authentication. *Id. citing Vayner*, 769 F.3d 125 (2d Cir. 2014). But the court in *Ulbricht* declined to follow *Vayner*, reasoning that *Vayner* dealt with the issue of whether the government could prove Mr. Vayner authored the social media page, not whether the page existed. *Id*. The court in Ulbricht refused to exclude the government's screenshots, reasoning that "evidence may be authenticated in many ways" and "the 'type and quantum' of evidence necessary to authenticate a web page will always depend on context." *Id. citing Vayner*. The Ulbricht court also noted that its home circuit had expressed skepticism that authentication of evidence derived from the internet required "greater scrutiny" than authentication of any other record. *Id*.[2]

In this case, HSI Investigative Analyst Robin Biundo, HSI Special Agent Adam Koeneman, and HSI Special Agent Dan Ashment will lay the foundation to show that the proposed exhibits captured from the Dark Net or Sigaint are true and accurate representations of

---

[2] The defense has argued that the United States' Dark Web evidence cannot be admitted under FRE 902. The United States is not seeking to have the exhibits in paragraph 2 admitted under rule 902.

what they purport to be. These witnesses are each percipient witnesses; they personally, physically saw those Dark Net and Sigaint pages prior to capturing them as images. The witnesses are Dark Net savvy; Ms. Biundo, in particular, accessed AlphaBay every day during the main portion of the investigation. The defense has suggested no tangible, specific reason to believe any of the exhibits (or the Dark Net and Sigaint web pages) had been tampered with. The testimony of these percipient witnesses is all that is required under Rule 901 for the Court to admit United States' proposed exhibits 15.00 through 15.28 and 19.02 into evidence.

**2.2     By definition, the proposed Dark Net and Sigaint exhibits are not hearsay.**

The defense also argues that "Dark Web evidence and other internet evidence constitute hearsay," but the proposed exhibits listed in paragraph 2, above, are excluded from the definition of hearsay because they are variously statements by the defendant, adopted admissions of the defendant, or statements by co-conspirators made in furtherance of the conspiracy. Doc. 171, at 2. Hearsay is a statement, other than one made by the declarant while testifying at the trial or in a hearing, offered in evidence to prove the truth of the matter asserted. Federal Rules of Evidence 801(c).

Because a statement is offered to prove a proposition does not mean that the declarant has asserted that proposition. *United States v. Cesario-Ayala*, 576 F.3d 1120, 1129 (10th Cir. 2009)(statement that I've got your money not hearsay even though offered to show relationship between speaker and defendant); *United States v. Rodriguez-Lopez*, 565 F.3d 312 (6th Cir. 2009)(calls to defendant asking for heroin not hearsay when offered to circumstantially show participation in conspiracy, irrespective of truth); *United States v. Oguns*, 921 F.2d 442, 448-49 (2d Cir. 1990)(question whether apples had arrived not hearsay as circumstantial evidence of conspiracy - need not be admitted under coconspirator rule).

By definition, admissions by a party-opponent are not hearsay. FRE 801(d)(2)(A). Likewise, adoptive admissions by a party opponent are not hearsay. FRE 801(d)(2)(B).

Declarants must be human; machines and computer code cannot be a declarant. *United States v. Lamons*, 532 F.3d 1251, 1262-63 (11th Cir. 2008) (computer generated billing records not a statement, therefore Confrontation Clause not implicated); *United States v. Washington*, 498 F.3d 225 (4th Cir. 2007) (data from chromatograph not hearsay and therefore not testimonial); *United States v. Hamilton*, 413 F.3d 1138, 1142-43 (10th Cir. 2005) (automatically generated computer headed information not hearsay).

The Sigaint email exhibits, 15.05 through 15.08, contain emails between Mr. Shamo and Ms. Tonge/Ms. Bustin, Mr. Crandall, and Mr. Noble, his co-defendants. The emails to or from Mr. Shamo are properly admitted as statements by a party opponent. The emails between Mr. Shamo's co-defendants were all done in furtherance of the conspiracy to distribute controlled substances, as is discussed in the United States' response to Mr. Shamo's request for a *James* hearing.

The AlphaBay screenshots and video capture exhibits likewise are not hearsay because they contain statements by a party opponent and his adopted admissions or contain statements the declarant did not offer for the truth of the matter asserted. Mr. Shamo set up his storefront on AlphaBay and authored its listings. Feedback was posted as Mr. Shamo sold his products. For example, here is a row of feedback and transaction data from proposed exhibit 15.00:



Here, the transactional data was supplied by AlphaBay—not a person, but computer code. The transactional data shows that a buyer with first letter "t" and last letter "y" bought drugs listed on Pharma-Master's storefront (by Mr. Shamo) as "Roxy – Oxycodone 30 mg X

2,000." In plain speak, the buyer, later identified as J.G. who used the moniker trustworthymoney, bought two thousand Fentanyl-laced fake oxycodone pills. The purchase price, converted by AlphaBay from Bitcoin to USD, is also listed: $10,003.50.

Finally, the buyer submitted his feedback to AlphaBay: "fe best vendor on dnm for oxys." Again, in plain speak, the buyer encourages other buyers to "fe," meaning finalize early their transactions with Pharma-Master rather than leaving payment pending in the escrow serivice provided by AlphaBay—an act that expresses trust and confidence in the fidelity of a vendor. The buyer shares his opinion that Pharma-Master is the best Dark Net Marketplace vendor for oxycodone pills.

Mr. Shamo received more than three hundred pages of positive feedback on Pharma-Master's page on AlphaBay. AlphaBay generally, and Mr. Shamo specifically, used buyer feedback as a way to enhance Pharma-Master's goodwill; it allowed other buyers, especially cautious new buyers, to feel more comfortable buying from Pharma-Master on AlphaBay. Mr. Shamo understood that feedback from buyers was part of the terms of doing business on AlphaBay. His year-long efforts to sell drugs on AlphaBay indicate his adoption of the feedback left by buyers.

The feedback is not posted to prove the truth of the matter asserted. It is posted to engender trust and goodwill for reliable vendors. Negative feedback, conversely, is posted to warn potential buyers and drive those buyers away towards reliable vendors. Markets thrive on the free exchange of information. AlphaBay was no exception.

The tranactional data, of course, cannot be hearsay because computer code cannot be a declarant.

The defense only dedicated one line in its motion claiming these exhibits contained hearsay. Because the defense has not signaled its objection to any particular exhibit, the United States will not include additional specific examples of how each exhibit is not hearsay. If the Court would prefer to have the United States explain each exhibit's admissibility, the United States would be happy to do so.

**2.3 The expert testimony of Special Agent Guy Gino and evidence of R.K.'s overdose death will not violate Rule 403.**

Special Agent Gino's expert testimony regarding the Dark Net, PGP Encryption, Cryptocurrency (including Bitcoin), the Dark Net, and Dark Net Marketplaces, including AlphaBay, is crucial for the jury as it labors to understand and consider the fact testimony and exhibits it will receive from many of the United States' witnesses. Likewise, evidence about the overdose death of R.K. will not unfairly prejudice Mr. Shamo.

Rule 403 is a rule of inclusion, not of exclusion. *United States v. Norton*, 867 F.2d 1354 (11th Cir. 1989); the rule carries a strong presumption for admissibility. *United States v. Grant*, 256 F.3d 1146, 1155 (11th Cir. 2001). "Within limits delineated in the Federal Rules of Evidence, the government is entitled to introduce all relevant, probative evidence at its disposal. The defense cannot be heard to complain that the government has produced too much evidence of guilt." *United States v. Burgess*, 576 F.3d 1078, 1098 (10th Cir. 2009). Relevant evidence should seldom be excluded. *United States v. Naranjo*, 710 F.2d 1465, 1469 (10th Cir. 1983). Evidence that damages the defendant's case is not evidence constituting unfair prejudice. *United States v. Chalan*, 812 F.2d 1302 (10th Cir. 1987); *United States v. Medina*, 755 F.2d 1269 (7th Cir. 1985). Only unfair prejudice, that is, prejudice that suggests a decision on an emotional rather than an evidentiary basis, is prohibited by the rule. *Naranjo*; *supra*.

14

Law enforcement agents, or even cooperating witnesses, may provide expert testimony on the practices of criminals. *United States v. Garza*, 566 F.3d 1194, 1199 (10th Cir. 2009)(use of firearms in drug trade); *United States v. McCollum*, 802 F.2d 344 (9th Cir. 1986) (mail fraud schemes); *United States v. Gil*, 58 F.3d 1414 (9th Cir. 1995) (modus operandi of drug traffickers); *United States v. Patterson*, 819 F.2d 1495 (9th Cir. 1987) (operation of narcotics distribution organizations); *United States v. Oreira*, 29 F.3d 185 (5th Cir. 1994) (workings of "giro" houses); *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1134-1138 (10th Cir. 2014) (alien smuggling operation and whether transportation away from border furthers alien's presence in U.S.). The "helpfulness" prong of admissibility—would a juror understand the evidence without specialized knowledge—is key. *Id.*; *United States v. McDonald*, 933 F.2d 1519, 1522 (10th Cir. 1991) (evidence of expert that of significance of drug facts and items associated with the drug trade proper subject for expert testimony dependent upon specialized knowledge).

### 2.3.1 Special Agent Gino's testimony does not violate rule 403.

Without Special Agent Gino's testimony, the jurors will be presented with, to use the example from the previous section, a row of feedback from Exhibit 15.00 and will have no way to understand and consider the importance of its contents. After listening to Special Agent Gino's testimony explaining how Dark Net marketplaces generally, and AlphaBay specifically, work and how transactions are conducted in Bitcoin, the jurors will have a basic understanding of how AlphaBay relies on feedback to generate goodwill for its vendors, how the feedback rows include a buyer's statement and transactional data, and what the components of the feedback mean.

15

Like with Dark Net Marketplaces and Cryptocurrency, if the jurors do not first learn the basics about PGP encryption, the jurors will not have a context into which they can consider exhibits and statements by co-defendants about using public and private PGP keys to encrypt communications with co-conspirators and with customers. For example, the final email in proposed exhibit 15.07 was sent to Ms. Tonge and Ms. Bustin to help teach them how to comply with Mr. Shamo's and Mr. Crandall's expectation that communications between co-conspirators, especially when the emails contained daily order lists or parcel tracking numbers, should be encrypted using PGP encryption. Without Special Agent Gino's testimony, the jurors will not have a context in which to consider the exhibit and the testimony about the exhibit from Ms. Tonge and Ms. Bustin.

Just as an expert in a more traditional narcotics case might testify about the manner, methods, and means employed by a Mexico-based drug trafficking organization, Special Agent Gino will testify about the manner, methods, and means employed by drug traffickers on the Dark Net. Contrary to the defendant's assertions, his testimony will be particularly helpful, even essential, to the jury.

Finally, to the defense's assertion that Special Agent Gino's testimony will be cumulative, the United States simply indicates that it intends to call Special Agent Gino relatively early in its case-in-chief.

### 2.3.2 Evidence about R.K.'s overdose death does not violate rule 403.

Just as evidence of a homicide would not be unfairly prejudicial in a homicide case, evidence of distribution resulting in death is not unfairly prejudicial to the defendant, who is charged in Count 6 with distributing Fentanyl that resulted in R.K.'s death. Rule 403 is a rule of inclusion. The defense's logic—overdose evidence is inflammatory and cannot be admitted in an

overdose trial—if true, would make it impossible to hold any distributor accountable for the overdose deaths he caused.

The statement of facts regarding R.K.'s death, proffered above, should allow the Court to determine under rule 104 that there is sufficient evidence to allow the facts surrounding R.K.'s death to be presented to the jury. To orders to R.K.'s address were found on the defendant's iMac computer (not the Dark Net). Pharma-Master's Fentanyl-laced fake oxycodone pills came to R.K.'s residence one day. R.K. consumed two pills the following night. He was found dead the next morning. An exceptionally qualified expert will testify that Fentanyl intoxication was the but-for cause of R.K.'s death. The United States submits that the evidence proves Mr. Shamo's guilt as to Count 6 beyond a reasonable doubt. It certainly meets the threshold standard in rule 104.

The defense has asserted that the United States indicated it considered Mr. Shamo to be "on par" with two of his co-conspirators, Mr. Paz and Mr. Crandall. Doc. 171, at 5. That does not accurately reflect the United States' views. The United States is unsure how the defense came to that mistaken understanding. The United States has previously submitted to the Court the following organizational chart for the charged co-conspirators, showing the most-culpable defendant, Mr. Shamo, on top.



Had the evidence available to the United States been able to support a conviction against Mr. Paz or Mr. Crandall for engaging in a continuing criminal enterprise, the United States would have pursued that charge, consistent with the Department of Justice's charging policy.

And because the defense has asserted a charging disparity between Mr. Shamo and his co-defendants regarding Count 6, Distribution Resulting in Death, the United States submits that it offered all of the charged defendants an opportunity to change their pleas prior to presenting Count 6 to the Grand Jury with the assurance that it would not seek distribution-resulting-in-death counts against any defendant who pleaded guilty to his or her charges prior to the facts underlying count 6 being presented to the Grand Jury. Mr. Shamo was treated fairly.

3.  **CONCLUSION**

For the foregoing reasons, the United States urges the Court to deny the defendant's motion to exclude evidence.

DATED this 21st day of December, 2018.

JOHN W. HUBER
United States Attorney


 */s/Michael Gadd*
MICHAEL GADD
Special Assistant United States Attorney