JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| UNITED STATES OF AMERICA, Plaintiff, vs. AARON MICHAEL SHAMO, Defendant. | Case No. 2:16-cr-00631-DAK MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE PHOTOGRAPHS OF R.K. Judge Dale A. Kimball |
|---|---|

      The United States, by and through Michael Gadd, Special Assistant United States Attorney, urges the Court to deny the defendant's motion to exclude photographs of its deceased victim, R.K.[1] The photographs of R.K. that the United States intends to admit into evidence have important, probative value, and the risk of unfair prejudice is fairly low.

STATEMENT OF FACTS

1. The defendant and his co-conspirators manufactured Fentanyl-laced fake Oxycodone and other illicit drugs.

---

[1] In his motion filed as Doc. 203, the defendant also moved the Court to exclude references to more than eighty of the defendant's customers who have died from drug overdoses. For clarity, the United States has responded to that request in a separate memorandum filed contemporaneously to this memorandum.

2. The defendant, with help from his co-conspirators, sold those drugs on the Dark Net, including on AlphaBay.

3. R.K. and his roommate, G.L., ordered Fentanyl-laced fake Oxycodone pills from PHARMA-MASTER, the defendant's AlphaBay storefront, in April 2016, and again on June 6, 2016.

4. The June 6th order was for ten pills that PHARMA-MASTER advertised as Roxy-Oxycodone. The June 6th order was processed and shipped out of Utah on June 9th.

5. It arrived at R.K. and G.L.'s residence on June 11th.

6. On June 12th, in the late evening, R.K. crushed and snorted two of the Fentanyl-laced fake Oxycodone pills in his room.

7. R.K. began exhibiting the effects almost immediately. R.K. asked G.L. and G.L.'s girlfriend to check on him while R.K. laid down in bed. R.K. fell asleep shortly thereafter.

8. G.L. rolled R.K. into the recovery position in an effort to prevent R.K. from asphyxiating should R.K. vomit during the night. G.L. and his girlfriend went to sleep.

9. The following morning, G.L. found R.K. in bed, still in the recovery position. R.K. was cold to the touch and G.L. called for help. Medical personnel arrived shortly thereafter and pronounced R.K. dead.

10. The local police department took photographs while at the scene as part of their investigation. The United States has marked photographs of R.K. and the scene of his death as proposed exhibit 18.01. The three pages showing some portion R.K.'s deceased body from proposed Exhibit 18.01 are as follows:







11. R.K.'s body was taken to the coroner's office, where Dr. Thomas Rogers performed an autopsy. Dr. Rogers determined that there was no other cause of death other than intoxication from the drugs found in R.K.'s blood toxicology report. Bill Posey, the toxicologist who analyzed R.K.'s blood, found alcohol, a cocaine metabolite, a cocaine cutting agent, and Fentanyl in R.K.'s blood.

12. Dr. Stacey Hail, who studies overdose causes of death and who teaches and practices medicine, reviewed the case, including Dr. Rogers' report and Bill Posey's report. Dr. Hail concluded that despite having ethanol and a cocaine metabolite present in his bloodstream, Fentanyl intoxication was the but-for cause of death of R.K.

13. Dr. Hail wrote a report that contained her findings. Dr. Hail included several pictures from the scene of R.K.'s death, including the close-up photo above that shows blood and mucus on R.K.'s face.

14. The death-scene pictures helped Dr. Hail form her expert opinion. She wrote:

The opioid toxidrome presents with pinpoint pupils, central nervous system (CNS) depression and respiratory depression or apnea (cessation of breathing.) Death occurs by falling asleep and ultimately apnea. In other words, opioid toxic patients go to sleep, eventually stop breathing, and die. They are most often found dead in bed. . . . **RK had blood, mucus, fluids and gastric contents about his face, nose and mouth consistent with opioid intoxication.** RK's lung parenchyma was prominently congested and edematous--also consistent with opioid intoxication. (emphasis added).

15. Dr. Hail concluded her report:

RK was found dead on 6/13/2016 after snorting 2 pills of fentanyl. RK did not die while demonstrating any signs of the toxidrome associated with cocaine use. RK's autopsy did not reveal the typical findings that are associated with sudden death in acute or chronic cocaine use. RK did not have a tongue laceration or abrasion from a cocaine-induced seizure. RK did have pulmonary edema which is associated with an opioid death. Evidence revealed that he snorted 2 fentanyl pills, fell asleep and died consistent with the opioid toxidrome. RK would not have died but for the fentanyl.

16. R.K.'s death is listed in the Indictment in several places.

17. The defendant is charged with Engaging in a Continuing Criminal Enterprise (Count 1), Aiding and Abetting the Distribution of a Controlled Substance Resulting in Death (Count 6), and eleven other counts. Count 6 specifically lists the death of R.K. on June 13, 2016.

18. Count 1, Engaging in a Continuing Criminal Enterprise, lists a series of predicate offenses, including:

- Conspiracy to Distribute a Controlled Substance Resulting in Death, which specifically cites to R.K.'s death on June 13, 2016; and
- The violation alleged in Count 6, Aiding and Abetting the Distribution of a Controlled Substance Resulting in Death.

ARGUMENT

The United States urges the Court to deny the defendant's request to exclude pictures of R.K. The United States has narrowed down its pictures to three photographs that depict some portion of R.K.'s deceased body. The photographs have important evidentiary value to the United States generally, and specifically to the testimony of its expert, Dr. Stacey Hail. The three photographs do not incite the passion of those who view them to a degree that a jury might make an emotion decision rather than a decision based upon the evidence.

Rule 403 is a rule of inclusion, not of exclusion; the law favors admission of all relevant evidence. *United States v. Watson*, 766 F.3d 1219, 1241 (10th Cir. 2014)(internal citations omitted). The rule carries a strong presumption for admissibility. *United States v. Grant*, 256 F.3d 1146, 1155 (11th Cir. 2001). "Within limits delineated in the Federal Rules of Evidence, the government is entitled to introduce all relevant, probative evidence at its disposal." *United States v. Burgess,* 576 F.3d 1078, 1099 (10th Cir. 2009). Relevant evidence should seldom be excluded; the application of Rule 403 should be "cautious and sparing." *United States v. Naranjo*, 710 F.2d 1465, 1469 (10th Cir. 1983).

Evidence that damages the defendant's case is not evidence constituting unfair prejudice. *United States v. Chalan*, 812 F.2d 1302, 1308 (10th Cir. 1987). Only unfair prejudice, that is,

prejudice that suggests a decision on an emotional rather than an evidentiary basis, is prohibited by the rule. *Naranjo*; *supra; United States v. Nevels*, 490 F.3d 800, 805 (10th Cir. 2007) (internal citations omitted). "In performing the [Rule] 403 balancing, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *Nevels*, 490 F.3d at 805.

A trial court properly admitted photographs that depicted severe injuries in conjunction with the testimony of a pathologist because the photographs were a substantial aid in illustrating the testimony of the pathologist. *United States v. Soundingsides*, 820 F.2d 1232, 1243 (10th Cir. 1987). In *Soundingsides*, the primary cause of death was a blunt force injury to the head of the victim. *See id.* at 1234. The prosecution sought to admit photos that displayed the victim's severe injuries in graphic detail. *See id.* Defense counsel objected on the grounds that "the photographs and slides were "not necessarily relevant," and were "so outrageous that they are much more likely to inflame the jury than to produce any appropriate evidence." *Id.* at 1243. The court ruled that although the photos were "undeniably gruesome," they had considerable probative value in proving the nature of [the victim's] injuries and the cause of her death. *See id.* The Tenth Circuit held that "[i]n light of this probative worth, their admission was not unduly prejudicial." *Id.*

Photographs that showed the victim's head and body face down in a pool of blood were not more prejudicial than probative because, although gruesome, they allowed the medical examiner to show the extent of the various injuries to the victim. *Wilson v. Sirmons*, 536 F.3d 1064, 1115 (10th Cir. 2008), *opinion reinstated sub nom., Wilson v. Workman*, 577 F.3d 1284 (10th Cir. 2009). In *Wilson v. Sirmons*, Wilson was convicted of first-degree murder and robbery with a dangerous weapon for his role in a murder of a convenience store clerk. *See id.* at 1072. Wilson challenged the admission of photographs admitted at trial that showed the victim's body

8

at the crime scene as more prejudicial than probative. *See id.* at 1114. On habeas review, the 10th circuit ruled that the photographs were gruesome, but still relevant to the case because they allowed the medical examiner to show where the murder weapon caused the injuries and the extent of the injuries. *See id.* at 1115.

Other courts have held similarly. *See also Williams v. Trammell*, 782 F.3d 1184, 1203 (10th Cir. 2015) (concluding that "photographs of a victim's body, while gruesome, can be relevant when they depict the extent of injuries"); *United States v. Naranjo*, 710 F.2d 1465, 1468 (10th Cir. 1983) ("gruesomeness alone does not make photographs inadmissible"); *United States v. Fields*, 483 F.3d 313, 355 (5th Cir. 2007)(gruesome photographs were probative because they helped the jury understand the medical examiner's testimony and supported his theory of the case); *United States v. Collins*, 368 F. App'x 517, 521 (5th Cir. 2010) (probative value of photographs outweighed prejudicial impact where the photos corroborated medical examiner's testimony about the cause of death); *United States v. Davidson*, 122 F.3d 531, 538 (8th Cir. 1997) (gruesome autopsy photographs were properly admitted when they helped explain the testimony of the doctor that performed the autopsy).

The United States asks the Court to deny the defendant's motion to exclude the highly-probative photographs of R.K.'s deceased body that the United States seeks to introduce. The close-up picture of R.K.'s face shows signs—blood and mucus—that Dr. Hail recognized as symptomatic of opioid intoxication. Dr. Hail relied upon that picture when determining that Fentanyl was R.K.'s but-for cause of death. The United States will ask the jury to consider that same evidence, the blood and mucus on R.K.'s face, when they decide whether Fentanyl was the but-for cause of death. The jury needs to see the photograph in order to make an informed decision.

The picture of R.K. on the carpet shows his position in the room. He was next to the bed where he died. The two black dots show where EMS personnel tried to save him and also help explain why his body was moved from his bed. It also gives spatial context for the third picture.

The third picture, which depicts R.K.'s legs, gives additional context to where R.K. died with respect to the USPS envelope that contained the defendant's drugs and the battery and toot-straw R.K. used to crush up and snort the defendant's pills. The USPS envelope is on top of the trash can near R.K.'s feet. The battery and toot-straw were found on R.K.'s desk, pictured in the background.

None of the pictures evokes an overpowering emotional response. There are no open, gaping wounds. There is little blood. These three pictures are not equal to the gruesomeness of the photographs in *Soundingsides* or *Wilson*. They should be admitted.

The United States has worked to cull down its available pictures to three that show R.K.'s deceased body; because there are only three pictures, there is little chance of overwhelming the jury with blood or gore. The pictures being proffered by the United States are probative in nature and necessary for the testimony of the expert witness supporting the charge of Count 6.

Rule 403 is a rule of inclusion. These pictures represent some of the United States' best evidence for Count 6 and two of the predicate offenses listed in Count 1. The pictures should not be excluded.

Respectfully submitted this 10th day of May, 2019.

                            JOHN W. HUBER
                            United States Attorney

                            */s/ Michael Gadd*
                            MICHAEL GADD
                            Special Assistant United States Attorney