Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
**SKORDAS & CASTON, LLC**
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

Attorneys for Defendant

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> AARON MICHAEL SHAMO, et. al., <br><br> Defendant. | **MOTION FOR MISTRIAL** <br><br> Case No. 2:16-CR-00631 DAK <br><br> Judge Dale A. Kimball |

Aaron Michael Shamo, by and through counsel, hereby motions this Court for a mistrial and discharge of the jury prior to the rendering of any verdict. In support of this motion, the Defendant alleges as follows:

## STATEMENT OF RELEVANT FACTS

1. On April 26, 2019, Defendant filed a Motion in Limine requesting this Court limit the Government's ability to discuss or mention overdose deaths alleged to be related to the events charged in the indictment, with the exception of the death of R.K. for which Mr. Shamo was actually charged.

2. On May 10, 2019, the Government responded to that Motion and argued that the subject of overdose victims was necessary to certain charges in the indictment even beyond the "death resulting" count tied to R.K.

3. The Government argued that the overdose deaths of E.B., C.V., and G.K. were necessary to paint a clear picture of the predicate offenses to Count1- Continuing Criminal Enterprise.

4. The Government also argued that investigators needed to be able to explain why E.B., C.V., and G.K were not interviewed by investigators. The Government made the same argument as to G.L., the roommate of R.K.

5. On May 17, 2019, the Defendant replied to that response outlining the concerns of prejudice under Rule 403, the lack of necessity, and the clear indication that the Government intends to outline the deaths of G.L., E.B., C.V., and G.K in the same manner it intends to outline the death of R.K.

6. On May 29, 2019, the matter came before the Court for a motion hearing. There was some discussion on the record concerning the Government's needs to indicate the reason for the investigator's inability to interview E.B., C.V., and G.K and why G.L. was not being called to testify at trial.

7. The Court's minute entry from that hearing indicates: "The Government agrees that it won't tie overdose deaths of unavailable witnesses to Defendant or say that the death resulted

from overdoses."

8. During the jury trial on August 20, 2019, the Government called Agent Virginia Keys with the Food and Drug Administration as a witness during its case-in-chief. Attachment A contains the specific portions of this examination that are of issue in this motion.

9. During direct examination of Agent Keys, SAUSA Gadd referred to the family of G.K. while the family could be heard audibly crying and gasping in the pews adjacent to the jury.

10. Agent Keys then got emotional on the stand while testifying about these individuals who had died.

11. Defense Counsel objected to the inquiry and counsel approached the bench for a conference at sidebar; wherein, the Court indicated they believed SAUSA Gadd had gone beyond the scope of the necessary inquiry regarding those deaths and tying them to the Defendant.

12. Following the Bench Conference, SAUSA Gadd continued his direct examination of Agent Keys and inquired as to the remaining two parties, C.V. and E.B., then continued a similar inquiry regarding G.L. before continuing in the same inquiry relating to the only alleged victim, R.K. Attachment A contains the relevant portions of this inquiry as well.

13. Even after leaving the witness stand, Agent Keys continued to tear up in the presence of the jury.

## ARGUMENT

"[C]ourts of justice may discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *United States v. Taylor,* F.2d 1177, 1178 (10th Cir. 1979). A motion for mistrial should be granted in circumstances where the error

tends to deprive the Defendant of a fair trial. *United States v. Burch,* 48 F.3d 1233, 1247 (10th Cir. 1995). Where a cautionary instruction is insufficient to cure the error and "the character of the testimony is such that it will create so strong an impression on the minds of the jurors that they will be unable to disregard it in their consideration of the case" a mistrial is appropriate. *United States v. Morgan,* 748 F.3d 1024, 1039 (10th Cir. 2014) (citing *Maestas v. United States,* 341 F.3d 493, 496 (10th Cir. 1965)).

In *Taylor* the Defendant's motion for a mistrial was denied where an officer testified that he had previously "worked a case" on the defendant, the trial court later ruled the evidence of such inadmissible, and the trial court took specific steps to limit the impact of the ambiguous statement. *United States v. Taylor,* F.2d 1177. In *Burch* the trial court's denial of a motion for mistrial was upheld where the basis of that motion rested solely on the judicial officer's derogatory comments to counsel regarding counsel's lack of competency and not in relation to the evidence before the jury. *United States v. Burch,* 48 F.3d 1233. In *Morgan,* the trial court's denial of a motion for mistrial was upheld where the offending statements, though innocuous, were excluded, stricken from the record, and a cautionary jury instruction was sufficient to undo the prejudicial impact. *United States v. Morgan,* 748 F.3d 1024.

In *Maestas,* the trial court's denial of multiple motions for a mistrial were overturned where those motions were based on multiple statements of witnesses regarding prior incarceration and prior criminal conduct. *Maestas v. United States,* 341 F.3d 493. The *Maestas* court reasoned that part of the need for a mistrial as the appropriate remedy came from the fact that there were multiple improper statements made despite proper instruction on the limitations of such statements. *Id.*

In the instant matter, a mistrial and discharge of the jury is the proper remedy as the

Defendant has been deprived of his constitutional right to a fair trial. The Government's inquiry regarding overdose deaths exceeds even the limitations outlined in *Maestas*. The Court was specific in its ruling during the pre-admission hearing- the Government was prohibited from mentioning other overdose deaths and/or tying the Defendant to other overdose deaths with the exception of the single count involving R.K. The exchange between Agent Keys and Government's Counsel took place in the presence of the jury and clearly implied the overdose death of three of the customers of PharmaMaster. Government Counsel's inquiry about whether or not the family of G.K. had been interviewed and whether or not they were present in the Courtroom was strategically designed to garner an emotional response from Agent Keys and G.K.'s family and it did in fact elicit an emotional response from both parties.

The concerns regarding substantial and unfair prejudice were clearly outlined prior to the pre-admission hearing and the Court concurred at that time that there was a significant enough concern and the need to inquire further into other overdose death had limited probative value. Additionally, these inquiries were conducted in the same manner as the inquiry regarding the only alleged victim, R.K. The implication clearly being that these overdose deaths were connected to the purchases alleged to have occurred on PharmaMaster.

In this particular instance, under the totality of the circumstances a cautionary jury instruction would be ineffective to cure the intentional error committed by the Government in addressing these overdose deaths in the manner and capacity in which they were addressed. It was not one overdose death that was mentioned, it was three; it was not a simple passing reference to three overdose deaths, it was a reference to those individuals being "real people" who died and at least one of their families being present; it was also coupled with a witness who became emotional on the stand and a family audibly crying in the Courtroom at the mention of

their deceased relative. Counsel for the Government made certain to note for the jury the presence of the family in the Courtroom, which elicited the emotional response from both the Agent being examined and the family. As outlined in *Morgan,* undoubtedly "the character of the testimony [was] such that it [created] so strong an impression on the minds of the jurors that they will be unable to disregard it in their consideration of the case." 748 F.3d 1024, 1039. No such cautionary jury instruction can protect the rights of the accused under such egregious circumstances.

The testimony proffered and the circumstances under which it was proffered left such a clear impression that even the Court noted the implication was Mr. Shamo was responsible for each one of the deaths being discussed. Counsel for the Government's follow-up inquiry after direction from the Court was similarly insufficient to undo the significant harm caused by the prejudicial inquiry and implications. As previously outlined, Rule 403's exclusionary impact is proper where the proffered evidence has a tendency to suggest a decision on improper basis. *United States v. Watson,* 766 F.3d 1219, 1242 (10th Cir. 2004). The prejudicial impact must be evaluated in conjunction with the probative value. There was limited probative value in explaining to a jury why certain witnesses were not available to testify at trial. There was no probative value in explaining to the jury that a witness was unavailable for trial as a result of dying from a drug overdose. There was no cause for doing so in the same course of discussing the one death for which the Defendant was in fact charged, with the exception of attempting to tie the Defendant to those deaths in the same manner. This is further supported by the unnecessary inquiry into the presence of the family in the Courtroom. The effect of this improper inquiry is to deprive the Defendant of the right to a fair trial by suggesting to the jury Mr. Shamo is guilty of such egregious uncharged offenses and allowing such hostility to suggest an ultimate

verdict on an improper basis. There is no effective and sufficient way to cure that error.

WHEREFORE, the defendant moves the Court for a mistrial and discharge of the jury prior to the rendering of any verdict in order to preserve the Defendant's right to a fair trial.

Respectfully Submitted this 22nd day of August, 2019.

/s/ Gregory G. Skordas
Gregory G. Skordas

/s/ Kaytlin V. Beckett
Kaytlin v. Beckett

/s/ Daryl P. Sam
Daryl P. Sam

## CERTIFICATE OF SERVICE

I hereby certify that on the August 22, 2019, I electronically filed a true and correct copy of the foregoing **MOTION FOR MISTRIAL**, with the Clerk of the Court using CM/ECF system, which sent notification of such filing to the following:

S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Kent Burggraaf
kburggraaf@agutah.gov

/s/ Sabrina Snow-Legal Secretary

SKORDAS & CASTON, LLC

# ATTACHMENT A

1    Q.    For the large purchasers, so for this
2  purchaser for example, Trustworthy Money, who is
3  purchasing 10,000 of the Fentanyl pills, what did you
4  and other agents do to further investigation into
5  these types of large purchases?
6    A.    When we reviewed all of the pages -- there's
7  1,984 pages of customer orders.  And, as we reviewed
8  them, we pulled out the orders of -- the larger orders
9  that were clearly not personal use orders, and we sent
10 leads all over the United States to different law
11 enforcement jurisdictions so that they could follow up
12 on those cases because that was clearly supplies for a
13 dealer in that area.
14   Q.    And that took care of the large orders, but
15 I'm hoping you and I can talk about some of the small
16 order customers.
17   A.    Uh-huh.
18   Q.    Have you personally investigated more than 90
19 of the small order customers?
20   A.    I did personally investigate over 90 of the
21 small orders of clients -- or customers.
22   Q.    I want to focus just on five who are
23 mentioned in the Indictment.
24   A.    Okay.
25   Q.    So if we could start first with Gavin

1   Keblish.  If we could look at page 748.  Do you see
2   his name at the top there?
3       A.   I do.
4       Q.   Can you explain what was ordered in that
5   transaction?
6       A.   I can.  Gavin Keblish, his address is 54
7   Seatuck Avenue in East Port, New York.  He went under
8   the moniker AJM6753.  He ordered Roxy Oxy, 30
9   milligrams.  He ordered 40 of them on May 5, 2016, and
10  had priority mail for that package.
11      Q.   And then let's look at one more order.  If we
12  could go to page 1,214.  There's an extra zero in
13  there.  Thanks.
14           What did he order on that date?
15      A.   He ordered M-box 30 Oxycodone, 30 milligrams.
16  He ordered 20 of those using the moniker AJM6753 and
17  had them sent to him at the 54 Seatuck Avenue, East
18  Port, New York address.
19      Q.   Did you look into Mr. Gavin Keblish?
20      A.   I did.
21      Q.   Did you speak with detectives in this area?
22      A.   I did.
23      Q.   Did you speak to his family?
24      A.   I did.
25      Q.   They are here in the courtroom with us?

1    A.    They are.
2    Q.    Was Gavin a real person?
3    A.    He was.
4    Q.    Did you speak to Gavin to confirm that he
5    ordered the Fentanyl-laced fake oxycodone from
6    Pharma-Master?
7    A.    I did not.
8    Q.    Why not?
9    A.    He's dead.
10   Q.    Let's talk about Conner Valenter.  Could we
11   look at page 450.  Do you see his name on there near
12   the bottom?
13   A.    I do.
14   Q.    What was ordered on that date, February 23?
15   A.    Conner ordered Fentanyl Roxy Oxycodone, 30
16   milligrams, one pill on February 23 of 2016, using the
17   moniker Spitta.
18   Q.    Could we look at page 489.  What did he order
19   on February 25?
20   A.    He ordered Fentanyl Roxy Oxycodone, 30
21   milligrams, eight pills, under the moniker Spitta, and
22   he had them sent to his address in Seattle,
23   Washington.
24   Q.    And, finally, could we look at page 563.
25   What did he order on March 3?

1        A.   He ordered Fentanyl Roxy Oxycodone, 30
2   milligram, five tablets using the same moniker of
3   Spitta, and he had them sent to his address in Seattle
4   Washington.
5        Q.   Did you look into Mr. Conner Valenter?
6        A.   I did.
7             MR. SKORDAS:   Your Honor, could we approach?
8             THE COURT:   Yes.
9      (Conference among the Court and the attorneys at the
10         bench outside of the hearing of the jury.)
11            THE COURT:   These aren't the people who you
12   are claiming the homicide count on, are they?
13            MR. SKORDAS:   No.
14            MR. GADD:   So the homicide count, his name is
15   Ruslan Kluyev.
16            THE COURT:   RK?
17            MR. GADD:   Yes, RK.   These people are charged
18   in the Indictment; specifically, Mr. Shamo distributed
19   drugs to them.   So this was our -- our written motions
20   that were done I think in April and May, where the
21   ruling was we couldn't mention the other customers who
22   are now dead from an overdose, those folks whose names
23   are in the Indictment and Mr. Shamo is charged with
24   distributing drugs that did go to them.   I can ask my
25   agent if she interviewed them because that's a major

1   investigative step that any investigator would take.
2   She was ordered by Your Honor to not mention that
3   their death was an overdose.  In fact, you will notice
4   we are not going into the death at all.
5           MR. SKORDAS:  You've got to be kidding me.
6           MS. BECKETT:  The ruling was very contrary on
7   the overdose deaths, and it was specific to:  They are
8   allowed to discuss Gregory Lee, who was an overdose,
9   who was investigated because they weren't able to
10  interview him.  He is not here testifying.  That was
11  what was allowed.  They are very, very, very far over
12  the line when they have a family out here crying in
13  the courtroom, and it's clear that the indication is
14  that he was an overdose death.  Your Honor's ruling
15  was very clear in that regard.
16          THE COURT:  I don't have the order with me, I
17  don't think, but I thought -- I thought you were going
18  to -- I guess I thought there would be a stipulation:
19  The reason we didn't call -- these people weren't
20  investigated.  They weren't called because they were
21  dead.  That's not really -- I mean, you're leaving
22  more of an impression they died of an overdose and
23  you're trying to connect it to Shamo.
24          MR. SKORDAS:  Of course he is.
25          MR. GADD:  I'm happy to ask her right now,

```
 1   these four men we are talking about were not --
 2   Mr. Shamo was not charged with causing their deaths.
 3   We will make it very clear.
 4              THE COURT:  Yeah, you should do it.  But then
 5   what else do you need to do?
 6              MS. BECKETT:  That doesn't fix it.
 7              MR. GADD:  I still need to prove the counts
 8   in the Indictment, the people distributing drugs to
 9   these people.  The Grand Jury charged it.  I've got to
10   ask these questions.  I will clarify to make it very
11   clear he is not charged with causing their deaths.
12              MR. SKORDAS:  But you can ask if he
13   distributed drugs to them, and you can show that.
14              But when he then asked:  Why didn't you
15   interview them -- he didn't ask that about a single
16   other person who allegedly received drugs -- so that
17   she can say, "Because they are dead."  That clearly
18   violates the order of this Court.
19              THE COURT:  It seems to me it does.
20              MR. GADD:  We have asked other people.  Jared
21   Gillespie, the other person named in the Indictment,
22   he was interviewed.  That was the question we asked.
23   These are just the people named in the Indictment.
24   The Grand Jury charged it.  It's part of what I have
25   to prove.
```

1         MS. BECKETT:  You're two steps beyond that
2    when you have family in the courtroom and when you ask
3    him whether or not the family is present.  You asked
4    whether or not they were present in the courtroom.
5         MR. GADD:  Yes, I did.
6         MS. BECKETT:  You have gone way over what the
7    Court's ruling was on the overdose.
8         MR. SKORDAS:  I think we need to make a
9    motion outside the presence of the jury at the next
10   break.
11        MR. GADD:  Let's take a minute and look up
12   the order or the minutes.  This is clearly what was
13   talked about at the hearing.
14        THE COURT:  I didn't envision it going this
15   way.  I envisioned it, you can say, "These people were
16   charged in the Indictment."
17        MR. GADD:  Yes.
18        THE COURT:  "We couldn't interview them
19   because they are not here.  They are dead."
20        MR. GADD:  I did ask that.
21        THE COURT:  Why do you need to ask anything
22   else, I guess is my question.
23        MR. GADD:  Oh, because we have set this up --
24   because in order for them to be guilty, he has to send
25   it to a real person.  How do you prove that they are a

```
 1    real person?  You have to investigate it.  Right?  You
 2    talk to detectives who talk to family if you can't
 3    find the person.
 4            THE COURT:  Okay.  So you're entitled to give
 5    evidence that he sent it to him, but the problem is,
 6    you are tying that to the deaths.  You've got to say
 7    something about you're not charging him with the death
 8    of this person.
 9            MR. GADD:  I will do that right now.
10            MR. SKORDAS:  In fact, he did, and if this
11    was a real person.  She answered yes.  At that time
12    the inquiry is over.  Instead, he continues and asks:
13            Did you interview him?
14            No.
15            Why not?
16            Because he's dead.
17            And his whole family is here?
18            You've got to be kidding me, Judge.  This is
19    outrageous.  I'm sorry.
20            THE COURT:  You're going to ask for a
21    mistrial, and I'm going to deny it.
22            MR. SKORDAS:  I understand.  I need to,
23    though.
24            THE COURT:  You don't need to get anymore
25    than that he sent them to him.  Why do we need to know
```

```
 1   anything else?
 2           MR. GADD:  I understand what the Court has
 3   said, and I'll limit myself to it.
 4           THE COURT:  All right.
 5           MR. GADD:  Okay.
 6           (Proceedings continued in open court.)
 7           THE COURT:  Go ahead, Mr. Gadd.
 8       Q.  BY MR. GADD: Special Agent Keys, let's
 9   clarify so that we're abundantly clear.  The people
10   that we're going to talk about, starting with
11   Mr. Keblish, now Mr. Valenter, they are named in the
12   Indictment, but Mr. Shamo has not been charged with
13   causing their death?
14       A.  That is correct.  They were his customers.
15       Q.  Let's take -- if you'll excuse me, I forgot
16   which question I left off on.
17       A.  Right.  I don't remember.
18       Q.  Let me circle back, and I'll make sure we get
19   the important ones.
20       A.  Okay.
21       Q.  You looked into Mr. Conner Valenter?
22       A.  I did.
23       Q.  Was he a real person?
24       A.  He was.
25       Q.  Let's talk about Edward Blatz.  There is a
```

```
 1    number of orders here.  We don't need to necessarily
 2    look at them all, but let's look at the first.  We
 3    have page 417.  Do you see the order there for Ed
 4    Blatz?
 5         A.   I do.
 6         Q.   What was ordered?
 7         A.   He ordered Roxy Oxycodone, 30 milligrams, two
 8    tablets on February 21 using the moniker Veldgear, and
 9    he had it shipped to him in Washington, D.C.
10         Q.   Now let's jump to the last, if we could look
11    at page 624, and then it goes on to the next page.
12    You can see that there?
13         A.   Yes.
14         Q.   What did he order this time?
15         A.   He ordered Roxy Oxycodone, 30 milligrams, 40
16    tablets, on April 5, 2016, under the moniker Veldgear.
17    And he had it shipped to the same address in
18    Washington, D.C.
19         Q.   Did you look into Mr. Edward Blatz?
20         A.   I did.
21         Q.   Was he a real person or just a name on a
22    page?
23         A.   He was a real person.
24         Q.   If we could look at Exhibit 18.01.  And if we
25    could look at page 2.  Who is that?
```

1   A.   This is Gregory Lee.

2   Q.   Did you also find orders sent to his address?

3   A.   I did.

4   Q.   If we could look at -- jumping back to

5  Exhibit 14.30, if we could look at 664.  And then it

6  goes on to the next page, so if you could highlight

7  the bottom.  Perfect.  If you could call that out for

8  us.

9       What was ordered on April 12?

10  A.   So April 12 shows that he ordered Roxy

11 Oxycodone, 30 milligrams, one tablet, but it was

12 combined with a second order the next day of Roxy

13 Oxycodone, 30 milligrams, ten tablets, using the

14 moniker T-Wad.  And it was sent to Gregory Lee at 3

15 Midvale Drive, Daly City, California.

16  Q.   Let's look at one additional order.  This is

17 on page 862.  And then it goes on -- like the previous

18 one, it goes on to the next page.  So there's the top

19 half.  Do you see what was ordered there?

20  A.   I do.  He ordered Roxy Oxycodone, 30

21 milligrams, 10 tablets, on June 6, 2016, using the

22 moniker T-Wad, and it was sent to Gregory Lee at his

23 Midvale Drive address in Daly City.

24  Q.   That Midvale Drive is what you see here?

25  A.   Yes.

1   Q.   Was Mr. Lee a real person?
2   A.   He was.
3        MR. GADD:   If I can have just one moment?
4        THE COURT:   Sure.
5        MR. GADD:   Nothing further.  Thank you.
6        THE COURT:   You thank you, Mr. Gadd.
7        You may cross examine, Mr. Skordas.
8        MR. SKORDAS:   Thank you, Your Honor.
9                    CROSS EXAMINATION
10  BY MR. SKORDAS:
11  Q.   Agent Keys, were you involved in this
12  investigation even after November, when Mr. Shamo was
13  taken into custody?
14  A.   I was.
15  Q.   And did you help other agents serve a search
16  warrant on a house in Cottonwood Heights in February
17  of 2017?
18  A.   I did.
19  Q.   And that was some, I guess, two and a half or
20  three months after Aaron was taken into custody,
21  correct?
22  A.   Yes.
23  Q.   And you served the search warrant on the home
24  that Aaron had previously lived, correct?
25  A.   I served it on the garage of the home that he