JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: kburggraaf@agutah.gov / kent.burggraaf@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, **Plaintiff,** vs. AARON MICHAEL SHAMO, **Defendant.** | Case No. 2:16-cr-00631-DAK MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR A MISTRIAL Judge Dale A. Kimball |

The United States, by and through Kent A. Burggraaf, Special Assistant United States Attorney, provides the following memorandum in opposition to the Defendant's Motion for a Mistrial (Doc. 265) and Supplement (Doc. 272), in accordance with Rule 26.3, of the Federal Rules of Criminal Procedure. The Defendant has not demonstrated that a mistrial is a manifest necessity. Rule 26.3 is specifically intended to allow for suggested alternatives to declaring a mistrial. In addition to putting forth its arguments against declaring a mistrial, the United States proposes some suggested alternatives for the Court to consider.

//

//

STATEMENT OF FACTS

1. Earlier this year, the Defendant moved to prohibit the United States' from making reference at trial to all but one of the overdose deaths of his customers. Doc. 203.

2. The United States agreed to the possibility it would be unfairly prejudicial to make reference to all or most of the overdose deaths of the Defendant's customers, but asked the Court to deny the Defendant's motion with respect to four of the Defendant's customers who were named as customers in the Second Superseding Indictment. Doc. 212, at 5.

3. Those four customers were E.B., C.V., and G.K.—and G.L., who was R.K.'s roommate and friend. *Id*.

4. The United States explained that the Defendant was charged in the Second Superseding Indictment with Aiding and Abetting the Distribution of Fentanyl to E.B., C.V., and G.K. *Id*. at 3.

5. G.L., the United States explained, was the roommate of R.K. and the person to whom the package of Fentanyl-laced fake oxycodone was addressed. *Id*. at 4.

6. The United States explained that it would not present evidence that the Defendant's pills were the cause of death for E.B., C.V., and G.K; the United States agreed that it would not present evidence that E.B., C.V., and G.K. died from drug overdoses. *Id*. at 7.

7. The United States wrote that it intended to briefly ask its investigator whether she interviewed E.B., C.V., and G.K. when she investigated the Defendant's distribution of Fentanyl to them. To that question, the investigator, the United States explained, would simply respond that her investigation revealed each of the individuals was deceased and their respective dates of death, and, accordingly, she did not interview E.B., C.V., or G.K. because all three individuals were deceased prior to the beginning of her investigation. *Id*.

8.      In like manner, the United States explained that while there was little risk that G.L.'s death would be wrongly attributed to the Defendant, it intended to elicit testimony that he, too, was deceased. *Id*.

9.      The United States argued that there was little prejudicial effect in having an investigator explain why she could not interview customers; conversely, the United States argued, it was highly important for the investigator to explain why she did not interview those four men—otherwise the jury would be left to wonder why the investigation was apparently incomplete with regards to the charges that the Defendant aided and abetted the distribution of Fentanyl to E.B., C.V., and G.K., and ultimately to G.L.'s roommate, R.K. *Id*.

10.     On May 29, 2019, the Court addressed the Defendant's motion to prevent reference to customers who died from overdoses:

> THE COURT:     We'll give a limiting instruction on that, so that it is clear that he is not being charged with those deaths.
>
> MS. BECKETT:   Your Honor, on that I believe we also agreed we would not refer to those as overdose deaths, just simply deceased or unavailable to testify or be interviewed.  I believe that was the discussion that occurred.
>
> THE COURT:     I think it was.  Mr. Gadd?
>
> MR. GADD:      That is my memory as well.

Exhibit 1, Partial Transcript of Motion Hearing, May 29, 2019, at 12-13.

11.     On May 29, 2019, the Court's minute entry reflected the following, in relation to the Defendant's motion to exclude evidence related to the overdose deaths:  "Defendant's [203] Motion to Exclude Evidence is DENIED.  The government agrees that it won't tie deaths of unavailable witnesses to Defendant or say that the deaths resulted from overdoses." Doc. 226.

12.     Prior to the May 2019 pre-admission hearing, the United States and the Defendant each proposed that the plea documents for Luke Paz be marked and admitted as an exhibit at trial; the Defendant marked Mr. Paz's Statement in Advance of Plea as Defendant's exhibit 6f. *See* attached Exhibit 2, Defense Exhibit List, at 1.

13.     In the restitution section of Mr. Paz's plea agreement, the United States redacted out the number of deceased customers to the families of whom Mr. Paz requested his forfeited drug proceeds be given. *See* Government's Trial Exhibit 23.06, which the United States labeled as "Paz SIAP redacted."

14.     The Defendant did not redact Mr. Paz's plea agreement in their proposed exhibit.

15.     On August 20, 2019, the United States called Special Agent Keys to testify at the Defendant's trial.  Special Agent Keys testified about several unrelated subjects prior to testifying about the Defendant's customers.  Exhibit 3, Transcript of SA Key's Trial Testimony, at 1-20.

16.     Special Agent Keys explained that she spearheaded efforts to investigate the Defendant's customers. *Id*. at 20.

17.     Special Agent Keys explained that investigative leads were sent to law enforcement agents and agencies throughout the United States for the Defendant's large-order customers. *Id*. at 22.

18.     Special Agent Keys testified that she personally investigated many of the Defendant's smaller-order customers. *Id*.

19.     Special Agent Keys explained that investigations into the customers began by looking at the list of customers' preferred shipping names and addresses but, as an investigator, she was presented with a problem: in many similar instances, customers do not use their real name. *Id*. at 20-21.

20.     She explained that, at first, the name associated with the customer's shipping address did not mean anything to her—more investigation was required because sometimes customers used fake identities, aliases, straw purchasers, or package receivers. *Id*.

21.     From there, the United States entered into the questions that prompted the Defendant's motion for a mistrial:

> Q. So if we could start first with [G.K.]. If we could look at page 748. Do you see his name at the top there?
>
> A. I do.
>
> Q. Can you explain what was ordered in that transaction?
>
> A. I can. [G.K.], his address is 54 Seatuck Avenue in East Port, New York. He went under the moniker AJM6753. He ordered Roxy Oxy, 30 milligrams. He ordered 40 of them on May 5, 2016, and had priority mail for that package.
>
> Q. And then let's look at one more order. If we could go to page 1,214. There's an extra zero in there. Thanks. What did he order on that date?
>
> A. He ordered M-box 30 Oxycodone, 30 milligrams. He ordered 20 of those using the moniker AJM6753 and had them sent to him at the 54 Seatuck Avenue, East Port, New York address.
>
> Q. Did you look into Mr. [G.K.]?
>
> A. I did.
>
> Q. Did you speak with detectives in this area?
>
> A. I did.
>
> Q. Did you speak to his family?
>
> A. I did.
>
> Q. They are here in the courtroom with us?
>
> A. They are.
>
> Q. Was [G.K.] a real person?
>
> A. He was.

Q. Did you speak to [G.K.] to confirm that he ordered the Fentanyl-laced fake oxycodone from Pharma-Master?

A. I did not.

Q. Why not?

A. He's dead.

Q. Let's talk about [C.V.]. Could we look at page 450. Do you see his name on there near the bottom?

A. I do.

Q. What was ordered on that date, February 23?

A. [C.V.] ordered Fentanyl Roxy Oxycodone, 30 milligrams, one pill on February 23 of 2016, using the moniker Spitta.

Q. Could we look at page 489. What did he order on February 25?

A. He ordered Fentanyl Roxy Oxycodone, 30 milligrams, eight pills, under the moniker Spitta, and he had them sent to his address in Seattle, Washington.

Q. And, finally, could we look at page 563.

What did he order on March 3?

A. He ordered Fentanyl Roxy Oxycodone, 30 milligram, five tablets using the same moniker of Spitta, and he had them sent to his address in Seattle, Washington.

Q. Did you look into Mr. [C.V.]?

A. I did.

MR. SKORDAS: Your Honor, could we approach?

THE COURT: Yes.

Exhibit 3, at 22-25.

22. During the side bar the Court expressed concern that the jury might be left with the impression that G.K. and the other customers died from overdoses and that the Defendant was connected to their deaths. The Court ordered the United States to clarify for the jury that the Defendant was not charged with causing the deaths of the four men. Counsel for the defense argued that the United States' inquiry regarding these customers should be limited to whether the

customers were, in fact, real people. Counsel for the Defendant indicated he would move for a mistrial. The Court indicated the motion for a mistrial would be denied.[1] *See Id*. at 25-30.

23. The United States clarified with its next question that the Defendant was not charged with causing the deaths of those customers (other than R.K.) who were named in the Indictment:

> Q: Special Agent Keys, let's clarify so that we're abundantly clear. The people that we're going to talk about, starting with Mr. [G.K.], now Mr. [C.V.], they are named in the Indictment, but Mr. Shamo has not been charged with causing their death?
>
> A. That is correct. They were his customers.
>
> *Id*. at 30.

24. For the remaining customers, the United States limited its inquiry to only whether each customer was a real person, as counsel for the Defendant suggested. *See Id*. at 30-33.

25. Neither counsel for the United States nor Special Agent Keys mentioned R.K., the overdose victim in Count 6, during the direct examination.

26. At no point during the direct examination did the undersigned counsel for the United States observe Special Agent Keys cry.

27. At no point during the direct examination did the undersigned counsel for the United States hear gasps or audible crying from the gallery.

28. Families of several of the Defendant's deceased customers have attended the trial, including the family of G.K. It has been reported to the undersigned counsel that some of those people observing the trial have, at various times throughout the trial, cried quietly in the gallery.

---

[1] Specifically the Court stated: "You're going to ask for a mistrial, and I'm going to deny it." Exhibit 3, at 29.

29.     Within in the first day or two of trial, the prosecution team met and discussed the substance of the material that might have an impact on the Defendant's customers' families that may be attending the trial, including the family of G.K.

30.     The prosecution team assigned one of its staff to consult with known family members of the Defendant's customers in attendance and advise them of the nature of testimony that would be heard and the need to maintain proper decorum in the courtroom.

31.     The United States, through its victim coordinator, made arrangements to help some of the victims cover the costs of attending the trial. It is anticipated that one or more of these family members of G.K., as well as some of the family members of the Defendant's other known customers (both living and deceased) will make or submit statements at the Defendant's sentencing, if the Defendant is convicted.

32.     In earlier testimony, HSI Intelligence Analyst Robin Biundo was asked whether another name on the "daily order sheets"—A.L.—was a real person, based upon the investigation her task force conducted in Oregon. Ms. Biundo was also asked to identify J.G., the drug dealer who hired A.L. to be his package receiver, from a photo taken during her investigation.

ARGUMENT

The Court was correct when it denied the Defendant's motion for a mistrial, in that: (1) The United States' questions to its witness, Special Agent Keys, and her answers did not violate the Court's order or the United States' prior agreement. (2) During Special Agent Keys' testimony, there was no mention that any of the deceased customers of Pharma-Master died from overdoses. (3) There was no claim that the Defendant was responsible for the deaths of his deceased customers. (4) Crime victims have a right to be in the courtroom. (5) Mr. Paz's Statement in

Advance of Plea does not violate the Court's order or the United States' agreement.

I.     SPECIAL AGENT KEYS TESTIMONY DID NOT VIOLATE THE COURT'S PRIOR ORDER, NOR WAS THE PROBATIVE VALUE SUBSTANTIALLY OUTWEIGHED BY UNFAIR PREJUDICE

During its examination of Special Agent Keys, the United States was presenting evidence based upon its agreement and the parties' and Court's concurrence resulting in the denial of the Defendant's motion to exclude at the hearing on May 29, 2019. Like with A.L. and J.G., the United States was eliciting testimony that G.K., to whom the Defendant has been charged with aiding and abetting the distribution of Fentanyl, was a real person and that G.K. was really his name and not an aliases or false identity. In compliance with the minute entry and agreement of the United States, when asking Special Agent Keys about G.K., the United States did not elicit testimony that G.K.'s death was an overdose death, nor did it ask questions tying G.K.'s death to the Defendant. *See* Exhibit 3, at 22-25.

Relevant evidence and testimony presented at trial as part of the United States' case-in-chief is inherently prejudicial to the Defendant (though not implying that such evidence is *unfairly* prejudicial to the point of *substantially outweighing* its probative value). The mere fact that testimony is presented that the Defendant was investigated, and individual witnesses were sought out, for alleged criminal conduct is prejudicial against the Defendant. Rule 403 of the Federal Rules of Evidence stands for the principal that relevant evidence, or evidence and testimony with probative value, is admissible, except where its "probative value is substantially outweighed" by, among other things, its unfair prejudicial effect, misleading the jury, or confusing the issues.

Here, the evidence of the death of a potential key witness, G.K., a customer of the Defendant and identified in Count I of the Second Superseding Indictment, is probative. That evidence is an important part of the United States' case-in-chief because the United States does not have possession of the drugs that the Defendant sent to G.K. Further, the United States cannot call G.K. to confirm that he ordered and received the Fentanyl-laced pills from Pharma-Master. There is probative value to explaining to the jury why they are not hearing from a key witness to the alleged criminal conduct. The United States' evidence regarding the predicate offense involving distribution to G.K. (as well as the offenses regarding C.V. and E.B.) is supported by less evidence, compared to other offenses. For nearly all the other predicate offenses, the United States has physical evidence (such as the drugs) it has presented to the jury.

When concerns were expressed during the testimony of Special Agent Keys, the United States sought to ensure the jury was not misled or confused by: (1) clarifying with Special Agent Keys before the jury that the Defendant was not charged with causing the deaths of customers (other than R.K.) named in the indictment; and (2) limiting its inquiry into the remaining customers to asking whether they were real people, as counsel for the Defendant suggested during the side bar.

The jury heard evidence that G.K. is dead. The jury has not heard any evidence that C.V. or E.B. are dead.[2] The jury heard testimony about G.L.'s death, when Counsel for the Defendant questioned G.L.'s girlfriend about G.L.'s death. The questions about G.L.'s death propounded by

---

[2] The sidebar and the Defendant's motion for a mistrial sidetracked the previously concurred upon evidence to be presented at trial, as discussed in the hearing on May 29, 2019, namely that the deaths of C.V. and E.B. would also be mentioned in testimony, while not linking them to the Defendant nor mentioning them as overdoses.

defense counsel contradict the argument about the Defendant being unfairly prejudiced by mention of G.K.'s death and inability to be interviewed—asking witnesses questions regarding deceased or unavailable witnesses was not unfairly prejudicial to the Defendant.

In its May 29, 2019, ruling denying the Defendant's motion to exclude evidence, the Court considered the potential for misleading the jury by this probative information coming out at trial, indicating a limiting instruction would be sufficient to address the possibility of unfair prejudice by testimony that G.K., C.V., E.B., and G.L. were dead (without mentioning the cause of death or tying them to the Defendant). This contemplated limiting instruction has not yet been given, though the United States followed up the sidebar discussion with asking Special Agent Keys whether the Defendant was charged with the death of G.K., confirming he was not and was only being referenced as a customer of the Defendant.

Contrary to the Defendant's representations of the Court's ruling and findings at the May 29, 2019, hearing, it was contemplated and discussed previously that the jury would hear that G.K., C.V., E.B., and G.L. were dead.[3]  *See* Exhibit 1, at 12-13. The Court concurred that testimony

---

[3] During the sidebar, Counsel for the Defendant misrepresented the Court's order, stating: "The ruling was very contrary on the overdose deaths, and it was specific to: They are allowed to discuss [G.K.], who was an overdose, who was investigated because they weren't able to interview him. He is not here testifying. That was allowed. They are very, very, very far over the line when they have a family out here crying in the courtroom, and it's clear that the indication is that he was an overdose death. Your Honor's ruling was very clear in that regard." Exhibit 3, at 26. Defense counsel appears to misconstrue the fact that the Defendant's motion to exclude was previously denied by the Court. *See* Doc. 226. The United States agreed at the May 29, 2019 hearing (i.e., effectively a stipulation) what it would not do, as noted in the Court's minute entry. *See id.* The United States has complied with that stipulation.
Counsel for the Defendant further argued during the sidebar: "…But when he then asked: Why didn't you interview them - - he didn't ask that about a single other person who allegedly received drugs - - so that she can say, 'Because they are dead.' That clearly violates the order of this Court." Exhibit 3, at 27. Defense counsel's assertion of a clear violation of the Court's order is actually

regarding the deaths had probative value for explaining the lack of interview or testimony from those individuals, which is what prompted the discussion of a limiting instruction to balance any potential for unfair prejudice. Counsel for the defense seemed to concur with the Court, specifically stating that the witnesses would not speak of the deaths as overdose deaths, referencing the deceased's unavailability to testify or be interviewed (Counsel for the Defendant indicated referencing them as the "deceased"). Exhibit 1, at 12. The Defendant's argument for a mistrial seems to rely on the simplicity of the Court's minute entry, overlooking the denial of the Defendant's motion, without the context that supported the United States' stipulation. *See* Exhibit 1, at 12-13; *compare* Doc. 226. The parties and the Court ultimately concurred with the fact that the death and unavailability of those mentioned in the Second Superseding Indictment would be part of testimony at trial, without referencing them as overdoses or linking their deaths to the Defendant. *See* Exhibit 1, at 12-13; Doc. 226.

This is not a circumstance where the probative value of the testimony is substantially outweighed by unfair prejudice. *See* Rule 403, Federal Rules of Evidence. However, to fully resolve any potential prejudice that might exist because the jury learned that G.K. is dead, the United States proposes the Court follow the same course the Court outlined at the May 29, 2019, hearing—instruct the jury that no evidence was presented that connected the Defendant with G.K.'s death; and the reason the jury learned of G.K.'s death was so that it would understand why

---

contrary to the Court's order denying the Defendant's prior motion and the United States agreement. *See* Exhibit 1, at 12-13; *and see* Doc. 226.
Further implication by defense counsel that having a victim's family in the courtroom during Special Agent Keys testimony was a violation of the Court's order denying their motion is not well-founded. *See* Exhibit 3, at 28; *compare* Exhibit 1, at 12-13 and Doc. 226. Such a finding would be contrary to the Crime Victims' Act, 18 U.S.C. § 3771.

G.K. was not interviewed or called to testify at trial. The Court could instruct the jury further that it should draw no inferences from the testimony that G.K. is dead. This would satisfy the Court's direction at the May 29th hearing (i.e., that a limiting instruction would be given). *See* Exhibit 1, at 12. The United States has included herewith a proposed limiting instruction for this purpose, as Exhibit 4.

II.   THE EMOTIONAL STATE OF A TESTIFYING WITNESS AND THE PRESENCE OF FAMILY MEMBERS OF ONE OF THE DEFENDANT'S DECEASED CUSTOMERS ARE NOT A PROPER BASIS FOR A MISTRIAL

In relation to the Defendant's assertion of an emotional state which the defense perceived as coming from a family member(s) of one of the Defendant's customers, Rule 615 of the Federal Rules of Evidence specifically does not authorize the exclusion of "a person authorized by statute to be present". The "court shall not order any victim of an offense excluded from the trial of a Defendant accused of that offense because such victim may, during the sentencing hearing, make a statement or present any information in relation to the sentence. 18 U.S.C. § 3510(a). The Crime Victims' Rights Act, 18 U.S.C. § 3771(a), includes a victim's "right not to be excluded from any such court proceeding".[4] Furthermore, eliciting an emotional response from a witness–is not grounds for a mistrial.[5]

---

[4] A crime victim is defined as "a person directly and proximately harmed as a result of the commission of a Federal offense". 18 U.S.C. § 3771(e). In the case of a deceased crime victim (e.g., G.K.), family members of the decedent "may assume the crime victim's rights". *Id.*
[5] After orally moving for a mistrial, or alluding to the same, during the sidebar on August 20, 2019, the Defendant filed its Motion for Mistrial. Doc. 265. The Defendant supplemented its motion on August 27, 2019. Doc. 272.

The Defendant has raised the issue of the United States helping to pay for accommodations and travel expenses for the family members of a deceased customer of the Defendant. It is anticipated some of these family members will provide statement(s) at the Defendant's sentencing, if convicted. The United States, through its victim coordinator, routinely helps provide for travel and accommodations in situations similar to this one.

### III.   REFERENCE TO PAGE SEVEN OF MR. PAZ'S STATEMENT IN ADVANCE OF PLEA, IN ITS REDACTED STATE, WAS NOT MADE NOR WAS IT PUBLISHED TO THE JURY

The Defendant's supplement to its prior motion for a mistrial appears to overlook the fact that his motion to exclude evidence about overdose deaths was denied. *See* Doc. 203 and 226. The Defendant asserts that Mr. Paz's Statement in Advance of Plea (Government's Exhibit 23.06) was insufficiently redacted and therefore caused an undue prejudicial impact requiring a mistrial. The Defendant failed to acknowledge that he, himself, proposed that an unredacted copy be given as an exhibit at trial. However, the United States did redact the number of overdose victims from Mr. Paz's Statement in Advance of Plea, without specific direction from the Court. This was done to avoid the specific question of its probative value being substantially outweighed by unfair prejudice, and in the spirit of the United States' agreement/stipulation regarding testimony about overdoses. Government's Exhibit 23.06—the redacted plea agreement—was admitted into evidence without objection from the Defendant. Doc. 250, Order Admitting the United States' Exhibits.[6]

---

[6] The Court's Order states, in part: "On May 17, 2019, the Court admitted all the uncontested exhibits proposed by the United States. (Doc. 219) Those uncontested exhibits were admitted with

During the examination of Mr. Paz, the United States did not question Mr. Paz about nor publish to the jury page seven (7), which contained the following language and redaction: "g. Restitution. …To date, the United States has identified approximately [REDACTED] Pharma-Master customers who are now deceased. Whether it was Pharma-Master pills that killed the decedents or Pharma-Master's pills fed the decedents' addictions until death took them, I agree that restitution should be made to their family or next-of-kin." Government's Exhibit 23.06, at 7. The United States avoided this page, but did not outright remove or redact it, because it had already been admitted as an exhibit.[7]

If the Court deems it prudent, the United States would stipulate to the removal or further redaction of page seven (7) of Mr. Paz's Statement in Advance of Plea (Government's Exhibit 23.06) prior to the full set of digital exhibits being provided to the jury (e.g., the text of the whole page could be redacted, if desired).

//

//

---

the understanding that they cannot be challenged at trial for insufficient foundation. However, the defense may still object at trial to those previously uncontested exhibits based upon other objections such as hearsay, rule 404b, or rule 403 objections." Doc. 250.

[7] During the direct examination of Mr. Paz, counsel for the United States reviewed a digital copy of Mr. Paz's Statement in Advance of Plea with Mr. Paz, specifically directing that particular pages be put up on the screen. The following pages were displayed and published to the jury, while questions related thereto were asked of Mr. Paz: 1, 2, 4, 5; and page 13-14 (Plea Supplement). No other pages were published or displayed to the jury. During the cross examination of Mr. Paz, Counsel for the Defendant also used and published Government's Exhibit 23.06; however, they also did not reference or display page seven (7) of the exhibit.

Neither the Defendant's motion, nor his supplement, allude to the fact that the United States actually referenced or published to the jury the contents of page seven (7) of Mr. Paz's Statement in Advance of Plea. The Defendant's assertion appears to rely merely on the method of redaction and inclusion of page seven (7) in Government's Exhibit 23.06. *See* Doc. 265 and 272.

## CONCLUSION

WHEREFORE, because the Defendant has not demonstrated that a mistrial is a manifest necessity, the United States respectfully requests that the Court uphold its prior ruling of May 29, 2019, and its denial of the Defendant's motion for a mistrial and consider giving the jury the limiting instruction proposed as a feasible alternative to mistrial.

Furthermore, the United States respectfully requests the Court's decision in regard to the inclusion, removal, or further redaction of page seven (7) of Government's Exhibit 23.06 prior to the digital copy being provided to the jury (again, as a feasible alternative to a mistrial).

Respectfully submitted this 28th day of August, 2019.

JOHN W. HUBER
United States Attorney

　/s/ Kent A. Burggraaf
Kent A. Burggraaf
Special Assistant United States Attorney