1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4    _____

                                    )

5    UNITED STATES OF AMERICA,       )

                                    )

6              Plaintiff,            )

                                    )

7       -vs-                         )     2:16-CR-631 DK

                                    )

8    AARON MICHAEL SHAMO, et al.,    )

                                    )

9              Defendants.           )

     _____)

10

11

12

13

14          BEFORE THE HONORABLE DALE KIMBALL

15             DATE:  AUGUST 20, 2019

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17            TESTIMONY OF VIRGINIA KEYS

18

19

20

21

22

23

24

25          Reporter:  REBECCA JANKE, CSR, RPR, RMR
                        (801) 521-7238

EXHIBIT 3

2

```
 1

 2                    A P P E A R A N C E S

 3

 4    FOR THE PLAINTIF      UNITED STATE'S ATTORNEY'S OFFICE

 5                          BY:  MICHAEL GADD, ESQ.

 6                               VERNON G. STEJSKAL, ESQ.

 7                               KENT A. BURGGRAAF, ESQ.

 8                          111 SOUTH MAIN STREET, 1800

 9                          SALT LAKE CITY, UTAH  84111

10

11

12

13    FOR THE DEFENDANT:     SKORDAS & CSTON, LLC

14                          BY:  GREGORY G. SKORDAS, ESQ.

15                               KAYTLIN V. BECKETT, ESQ.

16                          560 SOUTH 300 EAST, 225

17                          SALT LAKE CITY, UTAH 84111

18

19                          DARYL P. SAM, PLLC

20                          BY:  DARYL P. SAM, ESQ.

21                          5955 SOUTH REDWOOD ROAD, 102

22                          SALT LAKE CITY, UTAH 84123

23

24

25
```

```
 1    AUGUST 20, 2019                    SALT LAKE CITY, UTAH

 2                     P R O C E E D I N G S

 3                         *  *  *

 4            (Testimony of Agent Virginia Keys)

 5            THE COURT:  You may step down, thank you, and

 6    you may be excused.  The government may call it's next

 7    witness.

 8            MR. GADD:  Your Honor, the United States

 9    calls Special Agent Virginia Keys.

10                      VIRGINIA KEYS,

11    the witness hereinbefore named, being first duly

12    cautioned and sworn or affirmed to tell the truth, the

13    whole truth, and nothing but the truth, was examined

14    and testified as follows:

15            THE CLERK:  Please state your name and spell

16    it for the record.

17            THE WITNESS:  My name is Virginia Keys.

18    V-i-r-g-i-n-i-a.  K-e-y-s.

19            THE COURT:  You may proceed, Mr. Gadd

20            MR. GADD:  Thank you, sir.

21                    DIRECT EXAMINATION

22    BY MR. GADD:

23       Q.  Special Agent Keys, are you prepared to

24    testify about your part in the investigation of the

25    drug distribution activities of this defendant and his
```

1   co-conspirators?

2        A.    I am.

3        Q.    Before we do that, I just want to give the

4   jury a very brief summary about your background and

5   your experience.  Could you tell us a little about

6   yourself.

7        A.    Sure.  I'm a single mom, and I've lived in

8   Utah for a little over five years, and I enjoy

9   gardening and I like to play volleyball.

10       Q.    Thanks.  Could you tell us about maybe your

11  education and your background?

12       A.    Sure.  After I got divorced in 2004, I went

13  back to school, and I finished my bachelor's degree in

14  inter-disciplinary studies.  My disciplines are

15  accounting and business and communications with an

16  emphasis in international law enforcement surveillance

17  and cryptography.

18            I continued on my with my master's degree,

19  and I -- my master's is in criminal justice with an

20  emphasis in cyber crime.  And during my master's

21  program, I was recruited by the government to become a

22  special agent for IRS Criminal Investigations.  After

23  I graduated, IRS CI sent me to training with my

24  children in Georgia, and I put them in school while I

25  was doing my training.  We were there for six months.

1    During the -- that was at the Federal Law

2    Enforcement Training Center, or the FLETC is what it's

3    called for short.  During the time I was there, I

4    learned about the law.  I learned about arrest

5    warrants, search warrants, report writing,

6    interviewing, defensive tactics, all the things that

7    we were going to need to do our job as special agents.

8    And then, after I finished that training, I

9    came back to Washington State, and I worked for IRS

10   Criminal Investigation as a special agent for a little

11   over seven years before they transferred me to Utah.

12   I was here a little over two years with them before I

13   transferred over to FDA Office of Criminal

14   Investigations.  For short, I'll just say OCI because

15   it's easier.  And I have been with them for a little

16   over three years.

17   During the training that I had with IRS,

18   before I transferred over, my investigations included

19   gun smuggling, prostitution, Ponzi schemes, money

20   laundering schemes, drug smuggling, those types of

21   crimes.  And then, with FDA, my investigations include

22   investigating misbranding, adulteration, tampering,

23   counterfeit drugs that contaminate the drug supply.

24   And then, part of my responsibilities as well, is to

25   investigate overdoses and overdose deaths associated

1   with those cases.

2       Q.   You said FLETC and it just reminded me, the

3   law enforcement -- the federal law enforcement loves

4   its acronyms.  Is that fair to say?

5       A.   It does.

6       Q.   If I fall into that habit of using acronyms,

7   will you correct me?

8       A.   Sure.

9       Q.   Okay.  So when people find out you're a law

10  enforcement agent in the Food and Drug Administration,

11  do you get quizzical looks?

12      A.   I do.  I actually get razzed pretty good.  A

13  lot of people ask me if I'm just there to keep their

14  food safe.  But there's a little bit more to it than

15  that.

16      Q.   For sure.  For sure.  Let's talk for a minute

17  about this exhibit right here.  This is true

18  Oxycodone, isn't it?

19      A.   It is.

20      Q.   Did you obtain -- oh, and maybe for the

21  record, this is Exhibit 24.00.  Did you obtain true

22  Oxycodone pills from Actavis?

23      A.   I did.

24      Q.   Did you also obtain true Oxycodone pills from

25  Mallinckrodt?

1    A.   I did.  The Mallinckrodt pills are stamped or

2    embossed with an M box and then the Actavis are

3    stamped with an A-215.

4    Q.   I'm holding Exhibit 24.  These are those

5    pills you obtained, right?

6    A.   That is correct.

7         MR. GADD:  Your Honor, at this time I would

8    like to take a moment and pass these around the jury.

9         THE COURT:  All right.

10        (Jurors looking at Exhibit 24.)

11        THE WITNESS:  You can touch them if you want,

12   if it's easier to see the embossment.  I'll just make

13   sure and count them when I get that back.

14        THE COURT:  Don't take any out.

15   Q.   By MR. GADD:  I said two names there, Actavis

16   and Mallinckrodt.  Those are the pharmaceutical

17   companies that sell these pills?

18   A.   They are.  They are registered with the FDA

19   and approved to manufacture the actual Oxycodone pills

20   for distribution in the United States.

21   Q.   And for these real Oxycodone pills, the

22   active pharmaceutical ingredient is Oxycodone,

23   correct?

24   A.   Oxycodone, yes.

25   Q.   Let's take a minute and just do a little bit

EXHIBIT 3

8

1    of housekeeping.  So the FDA, the Food and Drug

2    Administration, it has a chemistry lab, correct?

3        A.   It does.  It's called the Forensic Chemistry

4    Center.

5        Q.   Did you arrange for some of the pills from

6    Mr. Shamo and some of the punches and dies from

7    Mr. Shamo, did you arrange for those to be sent from

8    the DEA lab to your -- the FDA lab?

9        A.   I did.

10       Q.   I just want to read those through so that

11   they are clear in the record, and what I'll do is I'll

12   read not our court exhibit number, but I'll read the

13   DEA drug exhibit number, and then at the end, I want

14   to ask you if I got them right.

15            So in this category of items that you

16   arranged for the FDA lab to test, I show that we have

17   DEA Exhibit Number 14, 34, 64, 123, 193, 85, 95.01,

18   95.02, 96, 136, 174.01, 174.02, 188, 54, 15, 97, 126,

19   173, 185, 177, 178 and 179.  Does that sound correct?

20       A.   It does.

21       Q.   And we heard some about this yesterday,

22   right?

23       A.   We did.

24       Q.   The chemists were talking about how some of

25   the items that they had tested or sampled had bits

1    removed so that they could go into special programs,

2    correct?

3         A.   Correct.

4         Q.   All right.  Let's jump back into it.  Could

5    we look at 1706.  Can you see that on your screen?

6         A.   I do.

7         Q.   Could you point out for the jury Alex Tebbs?

8         A.   Sure.  So if you look at the bottom row, the

9    third row, the farthest to the right, Ms. Tebbs has

10   the red hair, and she's the very last one in that row.

11        Q.   What role did Ms. Tebbs play in Mr. Shamo's

12   organization?

13        A.   She was the pseudo-executive assistant for

14   him.  She would also run errands.  She would clean his

15   house, different tasks that he would ask her to do.

16   And that also includes helping him try to get into

17   other businesses.

18        Q.   Have you reviewed the text messages that were

19   captured between Ms. Tebbs and Mr. Shamo?

20        A.   I have.

21        Q.   Could we look at 14.04.  Could you read that

22   to the jury.

23        A.   Sure.  The "local user" is Mr. Shamo, and the

24   gray box is Ms. Tebbs or Alex.

25             Mr. Shamo:  Hey, Alex, any news on the

1   T-shirt bis?

2          Alex:  He hasn't said anything yet.  Do you

3   want me to offer him a price?

4          Mr. Shamo:  Yeah.  Offer 5K and see what he

5   says.  I want to get the ball rolling on it.  BTC is

6   doing really well, so the sooner I get a bis up, the

7   better.

8          As you've heard, BTC is short for BitCoin.

9          Alex:  Okay.  Perfect.  I'll text him now.

10          Alex:  Also, if it's cool with you, I can get

11   your watches fixed today and drop off the dry clean

12   and come down tomorrow.  I asked him what he thinks,

13   so we'll see what he says.

14          Mr. Shamo:  Yeah.  No pressure on when you

15   come down.

16          Alex:  Okay.  Perfect.  I just figured I

17   would have more stuff done by tomorrow.  It would be a

18   little more productive, lol.  When I go on lunch in

19   about half an hour, I'll call the food bank and get

20   some time set up.

21          MR. SHAMO:  Oh, yeah.  Need that done for

22   sure, lol.  I have some paperwork I might need filled

23   out for this class I need.  I might send you in to do

24   it.  Also, I need to get a dentist appointment.  Can

25   you maybe find one close by to me and get one set up?

1        Q.   Let's talk for just a minute about the offer

2    for the T-shirt business.   Are you aware of other

3    instances where Mr. Shamo tried to buy a legitimate

4    business through which he could launder drug money?

5        A.   Yes.

6        Q.   Let's look at 14.06.   Can you read this one

7    as well?

8        A.   Yes.   Again, Mr. Shamo is in blue, and Alex

9    is in the gray.

10            Mr. Shamo:   Both.   I had someone drive me to

11   the airport and asked them to leave the truck keys on

12   the counter.   That obviously didn't happen.   If you

13   can do the dishes in the sink and get a shoe rack that

14   I pointed out, that would be great.   I forgot to

15   transfer BTC -- or BitCoin -- over to my online

16   wallet, so I can't set up the trade today.   I can't

17   remember what else, but I'll have to get you more cash

18   to get Legal Zoom going.   What time was the detail

19   appointment at?   Hey, I need you to run some paperwork

20   into Prime For Life for me.   They are open 'til 9 p.m.

21   most nights, so anytime in the next few days would be

22   great if you can.   Also, I'm moving forward with the

23   gym this week and meeting with the owner in the next

24   few days for lunch, so I'll really need some legal

25   paperwork set up soon for that.   Most likely we'll use

1    Legal Zoom since it's easy.  Also, can you get the

2    shoe rack that I picked out and reschedule the

3    appointment for the detailing?  I was pissed.  Allie

4    took the keys to the truck, so sorry about that, but

5    let me know your thoughts and coordination for this.

6         Allie:  No big deal at all, lol.  I already

7    left after I tried to call.  It was my cousin's

8    birthday party, so I went to that, ha, ha.  But, yes,

9    I'll get on that.  What shoe rack was it you wanted?

10   Would you like me to get hold of Legal Zoom?  I

11   rescheduled for this Saturday, so no biggy, and I'll

12   get started on the paperwork.  You just want a

13   contract between you two saying you will be part

14   owner.  Any other details I need to know?

15        Mr. Shamo:  Yeah.  It will be a startup for

16   the gym since it's not legal yet, but I'll get more

17   details, how he wants us to set it up in the next few

18   days.  Also figure out a name for the one shirt bis.

19   I want to get that started soon.  Ugh.  It's going to

20   be a super busy week for me.  Let me know what day you

21   can come down to do the paperwork for Prime For Life.

22   Carpet cleaners this week.  Please try and set up for

23   Thursday or Friday.

24        Q.   The date on these messages that you've just

25   read, it's June of 2016, correct?

EXHIBIT 3

 1      A.   Correct.

 2      Q.   Let's look at just one or two more.  Could we

 3   look at 14.05.  Ms. Tebbs' role wasn't just running

 4   errands or trying to set up businesses that he could

 5   purchase or launder his money through?

 6           MR. SKORDAS:  Objection to counsel's

 7   characterization of laundering money.

 8           THE COURT:  Objection -- what's the question

 9   -- sustained.

10      Q.   BY MR. GADD:  I probably should throw a

11   question in there.  I will.  In what we are about to

12   read here in 14.05, did you see additional steps that

13   the defendant asked Ms. Tebbs to take in her work for

14   him?

15      A.   I did.  He wanted her to also make BitCoin

16   trades for him.

17      Q.   Let's read that, would you?

18      A.   Mr. Shamo is in the blue.  Alex is in the

19   gray again.

20           Mr. Shamo:  Hey, my biggest BTC trader is in

21   town tomorrow.  Think you can make the trade for me?

22           Alex:  Yes.  I can definitely do that.  I'm

23   free tomorrow, so any time morning sometime would be

24   best.

25           Mr. Shamo:  Awesome.  I'll set it up.

EXHIBIT 3

1    Alex:  Sorry.  I'm at work.  I can call you

2    around 5 or 6 if that's okay.  Are you going to do

3    Vegas?

4    Mr. Shamo:  Okay.  I'm going.  Can I send you

5    my card info and you buy the 9:50 flight?

6    Alex:  Yes.  For tonight?

7    Mr. Shamo.  Yes.

8    Alex:  Okay.  Southwest, right?

9    Q.   And then let's look at one other.  Let's look

10   at 14.07.  This will be our last one for Ms. Tebbs.

11   In addition to engaging her to trade BitCoin, did she

12   also buy stamps at his request?

13   A.   She did.

14   Q.   Let's look at this now, and could you read

15   this for us?

16   A.   Yes.  Again, Mr. Shamo is in blue.  Alex is

17   in gray.

18   Mr. Shamo:  I need those stamps ASAP.  Can I

19   get your bank account info so I can drop cash in?

20   Alex:  Yes.  Give me a sec.  My account

21   number is 2910962 and I am at Golden West.  It's Alex

22   Tebbs on the account.

23   Mr. Shamo:  I've been down south most of my

24   day and haven't had a chance to get it.  I might just

25   give you cash when you come down next.  Meh.  Also,

1   don't hate me, but I have another watch to do, lol.

2   I'll talk to you.

3         Alex:  I can get order it -- I'm sorry -- I

4   can just order it, and you can just pay me back.  What

5   exactly is it?  I'm fine.  I'm used to it now.

6         Mr. Shamo:  Lol.  Priority stamped the 6.451,

7   I think.  I need 1,000 of them, so it will be around 7

8   K, if you can front that.

9   Q.   When you see in there the 6.451, what does

10  that mean, if anything, to you?

11  A.   That's a priority stamp that actually

12  includes the tracking amount and stuff in the price.

13  Q.   And is that the price, $6.45?

14  A.   It is.

15  Q.   Let's turn away from Ms. Tebbs now, and let's

16  talk about eBay items.  So, did you help analyze

17  Mr. Shamo's computers and data that was received

18  either from subpoenas or search warrants?

19  A.   I did.

20  Q.   All right.  Could we look at Exhibit 17.09.

21  Do you recognize this?

22  A.   I do.

23  Q.   Did you compile a list of some relevant items

24  that were, to use their phrase, won or purchased on

25  eBay?

1    A.   I did.

2    Q.   Let's look at these items that you flagged.

3    Can you walk us through what each of the columns

4    means?

5    A.   Sure.  When you look on the left, that's the

6    purchase date and time of the auction.  One of the

7    things about eBay is when you -- you have two choices.

8    You can either actually be involved in an auction and

9    make bids and compete against other people to try to

10   win the bid, or you can just have a buy now feature,

11   and even if you do the buy now feature, eBay still

12   lists it as you winning the auction.

13        So the second column is the auction title,

14   basically the product that was being either won or

15   purchased immediately, then the buyer's shipping

16   address, the shipping city of the buyer and the buyer

17   shipping name.

18   Q.   Can you tell us these -- each row is

19   something that he purchased, correct?

20   A.   Correct.

21   Q.   Can you walk us through the rows and what

22   they are?

23   A.   Sure.  So let's start at the bottom just for

24   chronological purposes.  So on June 6 of 2015, at

25   16:49, he won or purchased the USPS new 1999 USS

1    Arizona Memorial priority mail express stamp sheet of

2    ten.  It was shipped to 1383 East Murphy's Lane in

3    Salt Lake City, and the buyer's shipping name is Aaron

4    Shamo.

5         The next line up, July 8 of 2015, at 16:52,

6    he purchased USPS new 1999 USS Arizona memorial

7    priority mail express stamp, sheet of ten.

8         THE COURT:  A little bit slower so she can

9    take it down.

10        THE WITNESS:  Sorry.  He had it shipped to

11   1383 East Murphy's Lane in Salt Lake City, and the

12   buyer shipping name is Aaron Shamo.

13   Q.   BY MR. GADD: So let me jump in for just a

14   moment.  As we work our way up, there's going to be

15   several types of dies and stamps, but could you talk

16   specifically about the first and third row and then if

17   you want to do it chronologically, maybe we do the

18   third row first?

19   A.   Sure.  So, if you go up, it's the third row

20   from the top.  In December -- on December 26, 2015, at

21   16:06, he won or purchased the molds of A-215 for

22   tablet press pill press die pill maker TDP 0/1.5/5/6.

23   He had it shipped to 7939 South Titian Street in

24   Cottonwood Heights.  Buyer shipping name is Aaron

25   Shamo.  And the top line.  On March 12 of 2016, at

EXHIBIT 3

1    21:45, he won the shipping from USA, A-215 die for

2    tablet press pill press TDP 0/1.5/5/6.  He had it

3    shipped to 7939 South Titian Street, Cottonwood

4    Heights.  Buyer shipping name is Aaron Shamo.

5         Q.   In addition to this chart you've created, I

6    want to look at a couple other exhibits.  Can we now

7    turn to Mr. Shamo's emails.  This would be exhibit

8    21.34.  And then if we could go to page 4.  Do you

9    recognize this?

10        A.   I do.

11        Q.   What are we looking at here?

12        A.   This is the PayPal receipt for Mr. Shamo's

13   purchase of one of the A-215 pill dies.  He spent, all

14   total, $124 for it.

15        Q.   Then, if we could advance ahead to page 76.

16        A.   This is -- whoops.

17        Q.   Sorry.  Were you going to say something on

18   the previous one or this one?

19        A.   This one.

20        Q.   Okay.  Please, tell us what it is.

21        A.   This is another receipt for that second pill

22   die for the A-215 pill die for his pill press.  He

23   spent a total of $124 for this one as well, through

24   PayPal.

25        Q.   Let's look at one last set of emails.  Could

1    we look at Exhibit 21.08.  And if we could go down to

2    page 20.  Do you recognize this?

3        A.   I do.

4        Q.   What is this we're looking at?

5        A.   This is eBay, another basic receipt from eBay

6    showing the pill die that he ordered, the A-215.  The

7    estimated delivery date was going to be Thursday,

8    March 24th, to Thursday, April 7, and it shows his

9    $124 payment through PayPal for it.

10       Q.   As long as we've got the picture up, let me

11   and you a question about the face of the punch in the

12   picture.  Why is it backwards?

13       A.   Because when it actually smashes in the pill

14   press together, then it's readable for the person who

15   is looking at it, so it has to backwards on the punch

16   die.

17       Q.   And the punches and on the face of the

18   punches that we have seized in this exhibit, I believe

19   it's 13.13, the boxes of dies, you had a chance to

20   actually look at those, correct?

21       A.   I did.

22       Q.   Did you see that similar backwards, as we

23   read it, looking down at it?

24       A.   I did.

25       Q.   Let's look at one last page in this exhibit.

1    Could we go to page 30.

2          What's this we're looking at?

3          A.    This is another eBay receipt showing that he

4    purchased it as a guest, that Aaron Shamo purchased it

5    as a guest.  He paid $124 through PayPal for it, and

6    it's the other mold for the A-215 pill punch that goes

7    in the pill press.

8          Q.    Thanks.  I want to change gears one last time

9    entirely.  Such is the life of a case agent.  Let's

10   talk for a minute now about customers of Mr. Shamo's.

11   Did you spearhead agents' efforts to investigate

12   Pharma-Master's customers?

13         A.    I did.

14         Q.    Could we look at Exhibit 14.30.  And if we

15   could look at page 1,854.  We have had this exhibit up

16   quite a bit for the jury.  This is the combined daily

17   order sheets, correct?

18         A.    It is.

19         Q.    And I just wanted to pull out this page to

20   talk about kind of what you saw as an investigator.

21   So we're highlighting now this sale going to Alivia

22   Luckcuck, who there has been some testimony about.

23   When you first started looking at these 1900 pages of

24   orders, did the name on the shipping address, did it

25   mean anything to you?

EXHIBIT 3

1    A.    No, not necessarily, because as an

2  investigator, in a lot of cases with drug trafficking

3  organizations, sometimes when -- when there are

4  customers orders such as this, they don't use their

5  real name, so we didn't know who all was real and who

6  wasn't.

7    Q.    So when you say they don't use their real

8  name, sometimes it's maybe a fake identity they use?

9    A.    True, yes.

10    Q.    Or an alias?

11    A.    Correct.

12    Q.    Did some people use straw purchasers?

13    A.    Yes.

14    Q.    And maybe we could just define that.  What's

15  a straw purchaser?

16    A.    So a straw purchaser is somebody who the

17  leader of the organization has purchase an item and

18  have it sent to them or sent to somebody else so it

19  sends another layer of anonymity away from the leader

20  of the organization.

21    Q.    And then there's been testimony that at least

22  some people used package receivers, correct?

23    A.    Correct.

24    Q.    And Ms. Luckcuck is a package receiver?

25    A.    She is.

1    Q.   For the large purchasers, so for this

2    purchaser for example, Trustworthy Money, who is

3    purchasing 10,000 of the Fentanyl pills, what did you

4    and other agents do to further investigation into

5    these types of large purchases?

6    A.   When we reviewed all of the pages -- there's

7    1,984 pages of customer orders.  And, as we reviewed

8    them, we pulled out the orders of -- the larger orders

9    that were clearly not personal use orders, and we sent

10   leads all over the United States to different law

11   enforcement jurisdictions so that they could follow up

12   on those cases because that was clearly supplies for a

13   dealer in that area.

14   Q.   And that took care of the large orders, but

15   I'm hoping you and I can talk about some of the small

16   order customers.

17   A.   Uh-huh.

18   Q.   Have you personally investigated more than 90

19   of the small order customers?

20   A.   I did personally investigate over 90 of the

21   small orders of clients -- or customers.

22   Q.   I want to focus just on five who are

23   mentioned in the Indictment.

24   A.   Okay.

25   Q.   So if we could start first with Gavin

1    Keblish.  If we could look at page 748.  Do you see

2    his name at the top there?

3         A.   I do.

4         Q.   Can you explain what was ordered in that

5    transaction?

6         A.   I can.  Gavin Keblish, his address is 54

7    Seatuck Avenue in East Port, New York.  He went under

8    the moniker AJM6753.  He ordered Roxy Oxy, 30

9    milligrams.  He ordered 40 of them on May 5, 2016, and

10   had priority mail for that package.

11        Q.   And then let's look at one more order.  If we

12   could go to page 1,214.  There's an extra zero in

13   there.  Thanks.

14             What did he order on that date?

15        A.   He ordered M-box 30 Oxycodone, 30 milligrams.

16   He ordered 20 of those using the moniker AJM6753 and

17   had them sent to him at the 54 Seatuck Avenue, East

18   Port, New York address.

19        Q.   Did you look into Mr. Gavin Keblish?

20        A.   I did.

21        Q.   Did you speak with detectives in this area?

22        A.   I did.

23        Q.   Did you speak to his family?

24        A.   I did.

25        Q.   They are here in the courtroom with us?

1    A.   They are.

2    Q.   Was Gavin a real person?

3    A.   He was.

4    Q.   Did you speak to Gavin to confirm that he

5    ordered the Fentanyl-laced fake oxycodone from

6    Pharma-Master?

7    A.   I did not.

8    Q.   Why not?

9    A.   He's dead.

10   Q.   Let's talk about Conner Valenter.  Could we

11   look at page 450.  Do you see his name on there near

12   the bottom?

13   A.   I do.

14   Q.   What was ordered on that date, February 23?

15   A.   Conner ordered Fentanyl Roxy Oxycodone, 30

16   milligrams, one pill on February 23 of 2016, using the

17   moniker Spitta.

18   Q.   Could we look at page 489.  What did he order

19   on February 25?

20   A.   He ordered Fentanyl Roxy Oxycodone, 30

21   milligrams, eight pills, under the moniker Spitta, and

22   he had them sent to his address in Seattle,

23   Washington.

24   Q.   And, finally, could we look at page 563.

25   What did he order on March 3?

1      A.   He ordered Fentanyl Roxy Oxycodone, 30

2    milligram, five tablets using the same moniker of

3    Spitta, and he had them sent to his address in Seattle

4    Washington.

5      Q.   Did you look into Mr. Conner Valenter?

6      A.   I did.

7           MR. SKORDAS:  Your Honor, could we approach?

8           THE COURT:  Yes.

9    (Conference among the Court and the attorneys at the

10        bench outside of the hearing of the jury.)

11          THE COURT:  These aren't the people who you

12   are claiming the homicide count on, are they?

13          MR. SKORDAS:  No.

14          MR. GADD:  So the homicide count, his name is

15   Ruslan Kluyev.

16          THE COURT:  RK?

17          MR. GADD:  Yes, RK.  These people are charged

18   in the Indictment; specifically, Mr. Shamo distributed

19   drugs to them.  So this was our -- our written motions

20   that were done I think in April and May, where the

21   ruling was we couldn't mention the other customers who

22   are now dead from an overdose, those folks whose names

23   are in the Indictment and Mr. Shamo is charged with

24   distributing drugs that did go to them.  I can ask my

25   agent if she interviewed them because that's a major

1   investigative step that any investigator would take.

2   She was ordered by Your Honor to not mention that

3   their death was an overdose.  In fact, you will notice

4   we are not going into the death at all.

5          MR. SKORDAS:  You've got to be kidding me.

6          MS. BECKETT:  The ruling was very contrary on

7   the overdose deaths, and it was specific to:  They are

8   allowed to discuss Gregory Lee, who was an overdose,

9   who was investigated because they weren't able to

10  interview him.  He is not here testifying.  That was

11  what was allowed.  They are very, very, very far over

12  the line when they have a family out here crying in

13  the courtroom, and it's clear that the indication is

14  that he was an overdose death.  Your Honor's ruling

15  was very clear in that regard.

16         THE COURT:  I don't have the order with me, I

17  don't think, but I thought -- I thought you were going

18  to -- I guess I thought there would be a stipulation:

19  The reason we didn't call -- these people weren't

20  investigated.  They weren't called because they were

21  dead.  That's not really -- I mean, you're leaving

22  more of an impression they died of an overdose and

23  you're trying to connect it to Shamo.

24         MR. SKORDAS:  Of course he is.

25         MR. GADD:  I'm happy to ask her right now,

EXHIBIT 3

1   these four men we are talking about were not --

2   Mr. Shamo was not charged with causing their deaths.

3   We will make it very clear.

4          THE COURT:  Yeah, you should do it.  But then

5   what else do you need to do?

6          MS. BECKETT:  That doesn't fix it.

7          MR. GADD:  I still need to prove the counts

8   in the Indictment, the people distributing drugs to

9   these people.  The Grand Jury charged it.  I've got to

10  ask these questions.  I will clarify to make it very

11  clear he is not charged with causing their deaths.

12         MR. SKORDAS:  But you can ask if he

13  distributed drugs to them, and you can show that.

14         But when he then asked:  Why didn't you

15  interview them -- he didn't ask that about a single

16  other person who allegedly received drugs -- so that

17  she can say, "Because they are dead."  That clearly

18  violates the order of this Court.

19         THE COURT:  It seems to me it does.

20         MR. GADD:  We have asked other people.  Jared

21  Gillespie, the other person named in the Indictment,

22  he was interviewed.  That was the question we asked.

23  These are just the people named in the Indictment.

24  The Grand Jury charged it.  It's part of what I have

25  to prove.

EXHIBIT 3

1          MS. BECKETT:  You're two steps beyond that

2   when you have family in the courtroom and when you ask

3   him whether or not the family is present.  You asked

4   whether or not they were present in the courtroom.

5          MR. GADD:  Yes, I did.

6          MS. BECKETT:  You have gone way over what the

7   Court's ruling was on the overdose.

8          MR. SKORDAS:  I think we need to make a

9   motion outside the presence of the jury at the next

10   break.

11          MR. GADD:  Let's take a minute and look up

12   the order or the minutes.  This is clearly what was

13   talked about at the hearing.

14          THE COURT:  I didn't envision it going this

15   way.  I envisioned it, you can say, "These people were

16   charged in the Indictment."

17          MR. GADD:  Yes.

18          THE COURT:  "We couldn't interview them

19   because they are not here.  They are dead."

20          MR. GADD:  I did ask that.

21          THE COURT:  Why do you need to ask anything

22   else, I guess is my question.

23          MR. GADD:  Oh, because we have set this up --

24   because in order for them to be guilty, he has to send

25   it to a real person.  How do you prove that they are a

1   real person?  You have to investigate it.  Right?  You

2   talk to detectives who talk to family if you can't

3   find the person.

4        THE COURT:  Okay.  So you're entitled to give

5   evidence that he sent it to him, but the problem is,

6   you are tying that to the deaths.  You've got to say

7   something about you're not charging him with the death

8   of this person.

9        MR. GADD:  I will do that right now.

10        MR. SKORDAS:  In fact, he did, and if this

11   was a real person.  She answered yes.  At that time

12   the inquiry is over.  Instead, he continues and asks:

13        Did you interview him?

14        No.

15        Why not?

16        Because he's dead.

17        And his whole family is here?

18        You've got to be kidding me, Judge.  This is

19   outrageous.  I'm sorry.

20        THE COURT:  You're going to ask for a

21   mistrial, and I'm going to deny it.

22        MR. SKORDAS:  I understand.  I need to,

23   though.

24        THE COURT:  You don't need to get anymore

25   than that he sent them to him.  Why do we need to know

1   anything else?

2           MR. GADD:  I understand what the Court has

3   said, and I'll limit myself to it.

4           THE COURT:  All right.

5           MR. GADD:  Okay.

6           (Proceedings continued in open court.)

7           THE COURT:  Go ahead, Mr. Gadd.

8       Q.   BY MR. GADD: Special Agent Keys, let's

9   clarify so that we're abundantly clear.  The people

10  that we're going to talk about, starting with

11  Mr. Keblish, now Mr. Valenter, they are named in the

12  Indictment, but Mr. Shamo has not been charged with

13  causing their death?

14      A.   That is correct.  They were his customers.

15      Q.   Let's take -- if you'll excuse me, I forgot

16  which question I left off on.

17      A.   Right.  I don't remember.

18      Q.   Let me circle back, and I'll make sure we get

19  the important ones.

20      A.   Okay.

21      Q.   You looked into Mr. Conner Valenter?

22      A.   I did.

23      Q.   Was he a real person?

24      A.   He was.

25      Q.   Let's talk about Edward Blatz.  There is a

1     number of orders here.  We don't need to necessarily

2     look at them all, but let's look at the first.  We

3     have page 417.  Do you see the order there for Ed

4     Blatz?

5          A.   I do.

6          Q.   What was ordered?

7          A.   He ordered Roxy Oxycodone, 30 milligrams, two

8     tablets on February 21 using the moniker Veldgear, and

9     he had it shipped to him in Washington, D.C.

10         Q.   Now let's jump to the last, if we could look

11    at page 624, and then it goes on to the next page.

12    You can see that there?

13         A.   Yes.

14         Q.   What did he order this time?

15         A.   He ordered Roxy Oxycodone, 30 milligrams, 40

16    tablets, on April 5, 2016, under the moniker Veldgear.

17    And he had it shipped to the same address in

18    Washington, D.C.

19         Q.   Did you look into Mr. Edward Blatz?

20         A.   I did.

21         Q.   Was he a real person or just a name on a

22    page?

23         A.   He was a real person.

24         Q.   If we could look at Exhibit 18.01.  And if we

25    could look at page 2.  Who is that?

1      A.   This is Gregory Lee.

2      Q.   Did you also find orders sent to his address?

3      A.   I did.

4      Q.   If we could look at -- jumping back to

5    Exhibit 14.30, if we could look at 664.  And then it

6    goes on to the next page, so if you could highlight

7    the bottom.  Perfect.  If you could call that out for

8    us.

9           What was ordered on April 12?

10     A.   So April 12 shows that he ordered Roxy

11   Oxycodone, 30 milligrams, one tablet, but it was

12   combined with a second order the next day of Roxy

13   Oxycodone, 30 milligrams, ten tablets, using the

14   moniker T-Wad.  And it was sent to Gregory Lee at 3

15   Midvale Drive, Daly City, California.

16     Q.   Let's look at one additional order.  This is

17   on page 862.  And then it goes on -- like the previous

18   one, it goes on to the next page.  So there's the top

19   half.  Do you see what was ordered there?

20     A.   I do.  He ordered Roxy Oxycodone, 30

21   milligrams, 10 tablets, on June 6, 2016, using the

22   moniker T-Wad, and it was sent to Gregory Lee at his

23   Midvale Drive address in Daly City.

24     Q.   That Midvale Drive is what you see here?

25     A.   Yes.

EXHIBIT 3

1    Q.   Was Mr. Lee a real person?

2    A.   He was.

3         MR. GADD:  If I can have just one moment?

4         THE COURT:  Sure.

5         MR. GADD:  Nothing further.  Thank you.

6         THE COURT:  You thank you, Mr. Gadd.

7         You may cross examine, Mr. Skordas.

8         MR. SKORDAS:  Thank you, Your Honor.

9                   CROSS EXAMINATION

10   BY MR. SKORDAS:

11   Q.   Agent Keys, were you involved in this

12   investigation even after November, when Mr. Shamo was

13   taken into custody?

14   A.   I was.

15   Q.   And did you help other agents serve a search

16   warrant on a house in Cottonwood Heights in February

17   of 2017?

18   A.   I did.

19   Q.   And that was some, I guess, two and a half or

20   three months after Aaron was taken into custody,

21   correct?

22   A.   Yes.

23   Q.   And you served the search warrant on the home

24   that Aaron had previously lived, correct?

25   A.   I served it on the garage of the home that he

1    had lived in.

2        Q.   Okay.  And you -- you found some items in the

3    home, correct?

4        A.   In the garage.

5        Q.   All right.  In the garage.  I'm sorry.

6        A.   Sorry.  I have to be specific.

7        Q.   That's all right.  And among those items was

8    a crate that had a press in it.  Correct?

9        A.   Correct.  The DEA, during the search warrant,

10   had taken the press out of the crate, but the crate

11   was still in the garage.

12       Q.   Of the home?

13       A.   Correct.

14       Q.   And you seized the crate?

15       A.   Yes.  Parts of it, yes.

16       Q.   Especially this part?

17       A.   Yes.

18       Q.   What is this part?

19       A.   This is one of the sides of the wooden crate

20   that the press came in.

21       Q.   And for the record, I'm showing you

22   Government's Exhibit 13.14, I think?

23       A.   That's correct.

24       Q.   And there's an addressee on that crate,

25   correct?

EXHIBIT 3

1    A.   Yes.

2    Q.   Who's the addressee?

3    A.   Luke Paz.

4    Q.   At what address?

5    A.   Hold on.  I got to look through the tape.

6  The address is 1500 Woodland Avenue, in Salt Lake

7  City, Utah.

8    Q.   And that crate was found in February in

9  Cottonwood Heights, correct?

10   A.   In the garage at the Titian Way home, yes.

11        MR. SKORDAS:  I believe that's all I have,

12  Your Honor.

13        THE COURT:  Thank you.

14        Any redirect?

15        MR. GADD:  No, sir.  Thank you.

16        THE COURT:  Thank you.

17        You may step down, Ms. Keys.  Thank you.  You

18  may call your next witness.

19

20

21

22

23

24

25   (Whereupon the testimony of Agent Keys was concluded.)

EXHIBIT 3

```
1

2                    REPORTER'S CERTIFICATE

3    STATE OF UTAH              )

4                               ) ss.

5    COUNTY OF SALT LAKE        )

6

7            I, REBECCA JANKE, do hereby certify that I

8    am a Certified Court Reporter for the State of Utah;

9            That as such Reporter I attended the hearing

10   of the foregoing matter on August 20, 2019, and

11   thereat reported in Stenotype all of the testimony and

12   proceedings had, and caused said notes to be

13   transcribed into typewriting, and the foregoing pages

14   numbered 1 through 35 constitute a full, true and

15   correct record of the proceedings transcribed.

16           That I am not of kin to any of the parties

17   and have no interest in the outcome of the matter;

18           And hereby set my hand and seal this 21st

19   day of August, 2019.

20

21

22

23           _____

24           REBECCA JANKE, CSR, RPR, RMR

25
```