JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: kburggraaf@agutah.gov / kent.burggraaf@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. AARON MICHAEL SHAMO, Defendant. | Case No. 2:16-cr-00631-DAK MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS Judge Dale A. Kimball |

The United States, by and through Kent A. Burggraaf, Special Assistant United States Attorney, provides the following memorandum in opposition to the Defendant's Motion to Dismiss (Doc. 275). The United States opposes the Defendant's motion in that (1) it does not outline prosecutorial misconduct as alleged, (2) it does not show the United States used undue influence to dissuade witnesses from testifying, and (3) the Defendant did not make a plausible showing that Ms. Noriega's, Mr. Penrose's, or Ms. Grant's testimony would have been material and favorable to his defense, and not merely cumulative to other witnesses' testimony.

//

//

## STATEMENT OF RELEVANT FACTS

1.      On May 5, 2017, co-defendant Drew Crandall and his fiancé, Sasha Grant, were interviewed by law enforcement in Hawaii. HSI Special Agents Ashment and Koeneman interviewed Mr. Crandall, while Ms. Grant was interviewed by other agents.

2.      On or about June 8, 2017, counsel for the United States and Ms. Grant's attorney spoke by phone about Ms. Grant cooperating with law enforcement, by way of one or more debrief interviews. The United States sent a proposed proffer agreement to Ms. Grant's attorney to review. At the time, counsel for the United States expressed that he did not intend to seek an indictment against Ms. Grant.[1]

3.      On June 16, 2017, Sasha Grant entered into a proffer agreement with the United States (sometimes referred to as a "Queen-for-a-day" agreement) and submitted to a pair of interviews by law enforcement. Ms. Grant and her attorney were provided this agreement in advance of the meeting with law enforcement to consider. The cooperation agreement included the following standard terms:

> 1.      During the proffer, Ms. Grant agrees to provide accurate, truthful, and complete information, and not to withhold any information concerning the matters about which the United States inquires…
>
> 2.      Except as set forth in paragraphs 3 and 4 below, no statements Ms. Grant makes during her proffer will be admissible against her in the Government's case-in-chief in any future federal criminal proceeding, other than in a prosecution for perjury, false statement, or obstruction of justice. This is the only limitation on the use of these statements.
>
> 3.      Notwithstanding the foregoing paragraph, there will be no limitation on the right of the United States to make derivative use of the information provided by Ms. Grant during her proffer…
>
> 4.      The United States will be free to use the statements and information provided by Ms. Grant, including any information which may be directly or indirectly derived

---

[1] Ms. Grant was not listed as a witness for the United States.

therefrom, for impeachment, cross-examination, or rebuttal should Ms. Grant testify in a future civil or criminal proceeding or grand jury session. Thus, in the event Ms. Grant is at any time a witness at a trial or before a grand jury, and she offers testimony different from any statements made or other information provided during the proffer, the United States may impeach or otherwise examine Ms. Grant concerning any prior statement made or other information provided by her.

5. Notwithstanding paragraph 2, above, if Ms. Grant knowingly and intentionally provides information which is materially false, misleading, or designed to obstruct justice, the United States may, without any limitation, use all statements and information provided by her in any civil or criminal proceedings against her.

6. This Agreement is limited to the statements made by Ms. Grant at the time of the proffer and does not apply to any statements made by Ms. Grant at any other time, whether oral, written, or recorded.

7. Ms. Grant's proffer is made in accordance with the understandings set forth herein. No promises, agreements, or understandings exist between the parties other than those set forth herein. No promises, agreements, or understandings exist between the parties other than those set forth in this Agreement and no modification shall have effect unless executed in writing by the parties with the same formalities as in this Agreement.

4. On November 26, 2018, the Defendant provided his "Proposed Witness List," which contained approximately sixty (60) names.

5. On April 16, 2019, the Defendant again provided his "Proposed Witness List," this time with approximately sixty-four (64) names. Approximately ten (10) of the individuals included on the Defendant's list were also included on the witness list for the United States, leaving fifty-four (54) different witness for the United States to consider in preparation for trial.

6. On June 19, 2019, counsel for the United States emailed to counsel for the Defendant (copying all three defense attorneys) the following:

> We just spoke with Greg [Skordas] and I wanted to loop you in. There are several witnesses on your list (but not on our list) that face some criminal exposure. We're worried that if they're called to testify, they'll invoke. At least one of their attorneys, Nathan Crane (who represents Gabby Noriega), told me that she won't testify for anyone unless we figure out a plea agreement first. But the risk we face in entering plea agreements with some of these witnesses is that we'll look like we're trying to dirty up your witnesses. So after talking it over with Greg, we've agreed to try to enter plea agreements, if possible, with people like

3

> Gabby (i.e., who are now represented). And we agree not to impeach people like Gabby (witnesses who plead between now and trial) with their plea agreements.
> Greg said the defense would send us a short list of witnesses who you strongly want to call but who may face criminal exposure. We'll try to figure out plea deals, if possible, that makes it so those witnesses can testify without the risk of having them invoke.

7. The United States moved forward with the only defense witnesses identified as potentially on the Defendant's "short list," Ana Gabriela Noriega (a.k.a., Gabby Noriega). After negotiations with Mr. Crane, Ms. Noriega was charged by Felony Information on June 10, 2019.

8. On July 11, 2019, Ms. Noriega entered a plea, pursuant to a negotiated Statement in Advance of Plea, which was signed and accepted by the Court. [As anticipated and intended, Ms. Noriega's case was quickly resolved, for the purpose of allowing her to testify in this matter unencumbered by her criminal involvement with the Defendant.]

9. On July 9, 2019, counsel for the Defendant emailed counsel for the United States the following in response to the email on June 19, 2019, regarding the "short list":

> "I apologize for just getting back to you on this. We were in the process of getting you a short list and then I failed to follow up on it. I will let you know as soon as we have it."

10. Up to the date of jury selection on August 9, 2019, the Defendant did not provide the United States with the anticipated "short list", leaving a large list of potential witness with possible criminal exposure. It was not feasible for the United States to attempt to resolve all other potential criminal liability of the remaining individuals on the Defendant's Proposed Witness List, especially when considering the Defendant's speedy trial rights and a trial date of June 17, 2019, subsequently continued upon Defendant's motion to August 12, 2019. *See* Doc. 224 & 231.

11. On August 7, 2019, a representative of counsel for the Defendant, Gabriela Mena, emailed counsel for the United States the following, copying the defense attorneys involved on the email (continued on the next page):

> As stated in the email sent June 19, 2019 titled US v. Shamo; your witness list, Gabby Noriega was a witness listed on defense's witness list who was ultimately indicted. Defense would like to know whether any other person on defense's witnesses list has been charged criminally. Due to time sensitivity of the trial starting on Monday it would be greatly appreciated if we receive a response by the end of the business day Thursday August 8, 2019.

12.   That same day, August 7, 2019, counsel for the United States emailed the following response to Ms. Mena's inquiry:

> "Shamo, Crandall, Paz, Tonge, Bustin, Noble, Gygi, Noriega (who you mentioned), and Gillespie were all charged for conduct related to this case. And I think that is what you're asking about, right? Or were you asking if I've checked to see if your witnesses have prior convictions?"

No further response was received from Ms. Mena or defense counsel on this subject.

13.   On August 9, 2019, counsel for the Defendant presented their list of potential witnesses to the court and jury pool (i.e., effectively the "short list" in that it included about thirteen witnesses instead of sixty-four).  Sasha Grant, Ana Gabriela Noriega, and Miles Penrose were part of the Defendant's list of potential witnesses.

14.   On August 14, 2019, a day upon which it was anticipated Drew Crandall would testify (though he did not testify until August 15, 2019), Sasha Grant was observed in the courtroom. Counsel for the United States approached counsel for the Defendant about her presence, since she was on the Defendant's witness list.  Defense counsel initially stated that it was okay if she remained, because the defense was not anticipating calling her to testify in the Defendant's case-in-chief.  Subsequently defense counsel did ask her to step out of the courtroom, indicating she may be called to testify.

15. On August 19, 2019, counsel for Defendant brought to the attention of the Court that they still needed the Clerk of the Court to issue subpoenas for their witnesses which had not yet been served, upon which the Court directed the Clerk of the Court to do so. *See* Doc. 257.

16. On August 23, 2019, counsel for Miles Penrose appeared and proffered that his client would be invoking his Fifth Amendment right. The Court asked for input from the parties about the proffer; neither party objected, and Mr. Penrose was not called to testify in the Defendant's case-in-chief.

17. On Friday evening, August 23, 2019, counsel for the Defendant emailed to counsel for the United States that they would be calling the following individuals to testify, once the United States had concluded its case-in-chief:

    a. Monday (August 26, 2019): Dustin Samualian (or Samuelian)[2]; Rebecca Shamo; and Ana Gabriela Noriega.

    b. Tuesday (August 27, 2019): Sasha Grant; Christopher Kenny[3]; Stephanie Shamo Arbelaez; and the Defendant.

18. On the morning of Monday, August 26, 2019, during the final witness for the United States, counsel for the Defendant conferred with counsel for the United States during a break in the testimony of HSI Special Agent Ashment. Counsel for the United States indicated he would give defense counsel wide latitude in questioning Special Agent Ashment during cross-examination. Defense counsel expressed that the allowance for broad questions would allow him to avoid calling

---

[2] Mr. Samuelian was ultimately not called to testify during the Defendant's case-in-chief.
[3] Counsel for the Defendant emailed subsequently informing counsel for the United States of their inability to serve Christopher Kenny and he was not called to testify in the Defendant's case-in-chief.

as many witnesses as he might otherwise call once the United States rested. Defense counsel then questioned Special Agent Ashment about the initial interview with Sasha Grant by other agents, having him read contents of a report into the record, which content he did not author.

19. During the cross-examination of Agent Ashment on August 26, 2019, he was questioned about individuals interviewed by other investigators and asked to read from investigative reports written by other agents. As part of his testimony, on cross-examination, Agent Ashment testified about or read into the record reports about Sasha Grant.

20. On the afternoon of Monday, August 26, 2019, after some communication in and after court between defense counsel and counsel for the United States, counsel for the United States emailed to defense counsel to confirm their only anticipated witness for the following day was the Defendant. Defense counsel emailed back: "We will also be calling Sasha Grant."

21. On the evening of Monday, August 26, 2019, counsel for the United States received the following email from counsel for Sasha Grant:

> "The defense for Aaron is asking Sasha by subpoena to testify Tuesday morning [August 27, 2019] at 830am. I wanted to make sure she is still immune from issues so long as she does not vary from the investigation. She was ok testifying and will not change any of her testimony, she just worries that Kaitlyn or Darrel Sam [counsel for the Defendant] will twist it and make her look bad. I did not know what to tell her since she gave that testimony under protection and is merely repeating it again without varying the answer, so it too should still be protected as far as she is concerned, especially since the testimony is against Aaron and Drew and really does not help them but helps your case. I just need assurance she is still protected and no charges will come against her. Please let me know. I am coming down in the morning. Thanks."

22. Counsel for the United States replied to Ms. Grant's attorney the same evening, as follows:

> "The proffer agreement covered Ms. Grant's statements during the two interviews held at the [United States Attorney's Office]. It does not cover statements made at trial. Immunity

7

       at trial requires an immunity agreement signed by our US Attorney, John Huber. I'm not sure if John's in Utah…"[4]

23.    A few hours later, Ms. Grant's attorney sent an email reply to counsel for the United States:

       "Thanks, if there is no immunity I suppose she will need to take the fifth, but her testimony actually helps your side. Not sure why defense wants it except to spread the guilt and focus from Shamo."

24.    On the morning of August 27, 2019, counsel for the United States spoke with Ms. Grant's attorney, in the presence of the Defendant's attorney, Mr. Sam. It was explained that the proffer agreement covered Ms. Grant as to disclosures made during her proffer interviews with law enforcement, but not for disclosures outside those interviews. At this point, for the first time, a request for immunity for Ms. Grant's testimony was requested. Counsel for the United States placed a phone call to the U.S. Attorney's Office to inquire about getting immunity for Ms. Grant to testify that day. The response was that it would not be able to happen within that short of notice, due to the approvals needed in processing the request. *See* Reporter's Transcript of Proceedings, August 27, 2019, attached as Exhibit 1, at 12-13.

25.    Before the Court on the morning of August 27, 2019, counsel for Sasha Grant appeared and proffered an invocation of Ms. Grant's Fifth Amendment right to not testify, providing the following information to the Court. *See Id.*, at 8-9.

       a.    Counsel for Ms. Grant was not aware that the prior cooperation agreement only covered Ms. Grant for statements she made during her prior interviews with law enforcement. *Id.* at 8; *but see* ¶¶ 2-3, and 22.

---

[4] *See* ¶ 3 ("This Agreement is limited to the statements made by Ms. Grant at the time of the proffer and does not apply to any statements made by Ms. Grant at any other time, whether oral, written, or recorded.").

    b. Counsel for Ms. Grant was not made aware Ms. Grant was going to be called to testify until late Sunday night, August 25, 2019, when he was notified by counsel for co-defendant Drew Crandall. Exhibit 1, at 8.

    c. Ms. Grant and her attorney met with counsel for Defendant the afternoon of August 26, 2019. During the meeting, about 2:00 p.m., counsel for Defendant stated they would not be calling Ms. Grant to testify. At about 3:00 p.m., counsel for Defendant said they would still like to talk to Ms. Grant. *Id.*

    d. After that, counsel for Ms. Grant contacted counsel for the United States to clarify the issue of immunity. *Id.*, at 8-9. *See also* ¶¶ 21-23 (outlining the specific emails exchanged).

26. Before the Court on the morning of August 27, 2019, counsel for Ana Gabriela Noriega appeared and proffered an invocation of Ms. Noriega's Fifth Amendment right to not testify, providing the following information to the Court. *See* Exhibit 1, at 9-10.

    a. Counsel for Ms. Noriega was recently contacted by counsel for the Defendant regarding acceptance of a subpoena for Ms. Noriega to testify. However, counsel for Ms. Noriega never received a subpoena. *Id.*, at 9.

    b. Federal agents contacted Ms. Noriega on May 8, 2019, informing her that criminal charges were going to be filed. Ms. Noriega hired legal counsel two days later. Counsel for Ms. Noriega then contacted counsel for the United States and a resolution to Ms. Noriega's case was worked out, wherein Ms. Noriega entered a guilty plea to Conspiracy to Commit Money Laundering. *Id. See also* ¶¶ 6-8.

      c. Counsel for Ms. Noriega acknowledged the limited authority of the counsel for the United States ("the government's hands are tied as to the District of Utah") and could not give immunity against state charges or charges outside the District of Utah. He further acknowledged that the activities with which Ms. Noriega may have been involved are far reaching, and therefore charges could be filed in any state. Exhibit 1, at 14-15.

27.    In response to Ms. Noriega's and Ms. Grant's invocation of their Fifth Amendment right, and assertions made by defense counsel, counsel for the United States explained the following:

      a. The United States had anticipated the issue of the defense witnesses invoking their right not to testify, which prompted the prosecutions efforts to reach out to the defense team in advance of trial to discuss the potential criminal exposure of some of the proposed defense witnesses. Exhibit 1, at 11; *see also* ¶¶ 4-12.

      b. A shorter witness list was anticipated from defense counsel, which would enable the United States to attempt to work something out with those witnesses that would allow them to testify, either through testimonial immunity or a plea deal. Exhibit 1, at 11.

      c. That is what happened in the case of Ms. Noriega; the intent was to enable her to testify which is why her plea agreement states that the United States would not seek further indictment for any other drug offense for which the United States Attorney's Office was aware of at that time. *Id.*, at 11-12.

      d. The prosecution team has been extremely careful not to act in a way that would influence a witness for the defense; counsel for the United States has tried to be as

        hands off as possible, including by not even contacting attorneys representing defense witnesses; that was left to defense counsel. *Id.*, at 12.

    e. The process for granting a defense witness immunity for their testimony involved a process, which could not happen quickly. *Id.*, at 13.

    *See also* ¶¶ 5-13, and 20-24.

28. Counsel for Ms. Noriega further explained to the Court that notwithstanding the plea agreement in place, Ms. Noriega may face criminal exposure for her testimony outside the District of Utah, and there was no agreement with the State of Utah, which is why she invoked her Fifth Amendment right. Exhibit 1, at 14-15.

ARGUMENT

    The Court should deny the Defendant's Motion to Dismiss (Doc. 275) because the Defendant has not demonstrated prosecutorial misconduct. The Defendant has failed to show the United States used undue influence to dissuade defense witnesses from testifying. *See United States v. Portillos*, 714 Fed. Appx. 889 (10th Cir. 2017). The Defendant has also failed to make a plausible showing that Ms. Noriega's, Mr. Penrose's, or Ms. Grant's testimony would have been "material and favorable" to his defense, "and not merely cumulative to other witnesses' testimony". *See id.*

//

//

//

I. THE UNITED STATES DID NOT SUBSTANTIALLY INTERFERE WITH THE DECISION OF DEFENSE WITNESSES TO TESTIFY, NOR DID IT USE UNDUE INFLUENCE TO DISSUADE THEM FROM TESTIFYING

The Defendant has a constitutional right to present a defense; that is essential to a fair trial. U.S. Const. Amend. VI. *See United States v. Portillos*, 714 Fed.Appx. 889, 893 (10th 2017); *see also United States v. Serrano*, 406 F.3d 1208, 1214 (10th Cir. 2005). "That right, 'however, is not absolute'; courts have held that 'a defendant's right to present a defense does not include the right to compel a witness to waive his Fifth Amendment privilege.'" *Portillos*, at 893 (*citing Serrano*, at 1215). "That said, the government cannot substantially interfere with a defense witness's decision to testify." *Id.* The United States has not used undue influence to dissuade Sasha Grant, Ana Gabriela Noriega, or Miles Penrose from testifying, nor did it exert substantial interference with the defense witnesses' decisions whether to testify.

"Interference is substantial when the government actor actively discourages a witness from testifying through threats of prosecution, intimidation, or coercive badgering." *Serrano*, at 1216 (*citing United States v. Crawford*, 707 F.2d 447, 449 (10th Cir. 1983)). "The potential for unconstitutional coercion by a government actor significantly diminishes, however, if a defendant's witness elects not to testify after consulting an independent attorney." *Id.*

In *U.S. v. Portillos*, the Tenth Circuit Court affirmed the district court's ruling that the government did not use undue influence to dissuade witnesses from testifying. *Portillos*, at 894. In *Portillos*, the defendant was alleged to be part of a tax fraud scheme. *Id.* at 890. The defendant claimed that there was selective and vindictive prosecution based on the fact that four other women involved in the overall scheme were not indicted. *Id.* at 890-891. The defendant called these other

four witnesses to testify at trial. *Id.* at 891.  Prior to trial, government agents interviewed the four defense witnesses, and in the interview said that Ms. Portillos was suggesting that they might be involved in the tax fraud scheme.  *Id.*  The agent informed each of the four defense witnesses of their right to testify, their right to counsel, and the penalties of perjury.  *Id.*  The defendant stated that this interview interfered with her witnesses.  At trial one witness sought counsel and invoked the Fifth Amendment; the other three women did not, and only one was called to testify.  *Id.*

In their holding that the government had not substantially interfered with defense witnesses, the Tenth Circuit Court of Appeals affirmed the lower court's ruling that meeting with defense witnesses and informing them of their potentially criminal liability and the penalties of perjury did not constitute substantial interference.  *Id.* at 894.  The lower court's reasoning relied on the fact that "there was never any suggestion that a witness should not testify."  *Id.*  The court "ruled that informing the witnesses of their right to counsel, of their right not to incriminate themselves, and of the penalties for perjury did not have the effect of chilling the witnesses."  *Id.*; *cf. Serrano*, at 1212 n. 1 (rejecting the notion that a prosecutor raised witness self-incrimination solely to gain tactical advantage at trial, noting that prosecutors have an ethical obligation to advise unrepresented witnesses of their possible need for counsel and of their right against self-incrimination).  In *Portillos*, only one of the defense witnesses invoked her Fifth Amendment privilege, which decision was made after consulting her own attorney, "which weighs against a finding of coercion."  *Portillos*, at 894; *see also Serrano*, at 1216.  The United States did not seek to dissuade Ms. Grant, Ms. Noriega, or Mr. Penrose not to testify.  In Ms. Noriega's case, the United States actually attempted to facilitate her ability to testify.

Here, the Defendant has asserted that the United States has substantially interfered with three of their witnesses: Sasha Grant; Miles Penrose; and Ana Gabriela Noriega. However, the Defendant's assertion is made without supportive facts. Like *Portillo*, each of the three defense witnesses named in their motion were represented by counsel when making the decision whether to testify, which weighs against a finding of coercion on the part of the United States. *See Portillos*, at 894. Mr. Penrose and Ms. Grant have been represented for quite some time. Ms. Noriega was advised to get an attorney when approached by law enforcement in May 2019.

The Defendant raises, as an act of substantial interference, the fact that the United States offered to work out plea deals with proposed defense witnesses. The United States was under no obligation to offer plea deals or immunity to any of the defense witnesses. However, the prosecution team was willing to help, where feasible, to ensure the Defendant's ability to call his desired witnesses if it could be determined which of the sixty-four (64) witnesses listed were actually going to testify.[5]

In relation to the issue of whether to testify or not in this case, government agents and the prosecution team did not communicate with Ms. Grant, Ms. Noriega, or Mr. Penrose directly once represented by counsel. No conversation was had with Mr. Penrose or his attorney about him being named as a defense witness or whether to testify. The only discussions regarding Ms. Grant

---

[5] Realistically, the United States could not attempt to resolve all known criminal liabilities amongst the fifty-three witnesses (the witnesses not in common with the United States witness list, and excluding the Defendant). For many of the witnesses listed by the Defendant, there was known issues of criminal liability; however, the investigations into each had not been completed. Ultimately, the Defendant only called a fraction of its sixty-four (64) initially listed witnesses, and only appeared to be inclined to call half of the witnesses (i.e., six) it listed during the selection of the jury.

being named as a defense witness and whether to testify were had through her attorney, which communication was prompted by her attorney's initiation; the substance of those communications is outlined in the Statement of Relevant Facts. *See* ¶¶ 21-24.

In relation to Ms. Noriega, counsel for the United States was transparent with Ms. Noriega's attorney about the reason for negotiating a resolution to her case before a Felony Information was filed (i.e., to permit her to testify in the Defendant's case-in-chief without further criminal liability for the known offenses related to the Defendant's case). Ms. Noriega was also the cited example in the communication between counsel for the Defendant and counsel for the United States when discussing Defendant's Proposed Witness List, beginning in June of this year. After government agents advised Ms. Noriega to seek legal counsel in May 2019, no contact was made with her directly, nor discussion had with her in relation to the decision to testify or not. *See* ¶¶ 6-8, 11-12, and 26-28.

At no point did the United States attempt to induce a witness not to testify, nor badger or intimidate them. The mere fact that the United States provided immunity during Ms. Grant's proffer interviews does not require that the United States further provide testimonial or transactional immunity. Nonetheless, when immunity was requested for Ms. Grant by counsel for the Defendant, the United States inquired as to its feasibility on short notice. The United States also attempted to help, but failed in the case of Ms. Noriega, by working with her attorney. However, had the United States not charged or offered a plea deal to Ms. Noriega, she would have still been in the same situation as to whether to testify or invoke her right not to testify (albeit with additional criminal liability to consider). This is the exact circumstances in which Mr. Penrose was situated—no plea deal; no immunity; and possible criminal liability. The United States did

not engage any of the three named individuals in a discussion as to whether to testify or not; such discussions were limited to communication with their respective attorneys and therefore presumptively not coercive.

## II. THE DEFENDANT DID NOT MAKE A PLAUSIBLE SHOWING THAT MS. NORIEGA'S, MR. PENROSE'S OR MS. GRANT'S TESTIMONY WOULD HAVE BEEN MATERIAL AND FAVORABLE TO HIS DEFENSE

The Tenth Circuit Court explained in *Portillos* that "a defendant must make a plausible showing that a witness's testimony would have been material and favorable to his or her defense, and not merely cumulative to other witnesses' testimony, before he or she can demonstrate a denial of due process. *Portillos* at 894 (*citing United States v. Caballero*, 277 F.3d 1235, 1241 (10th Cir. 2002)). "It is not enough to show 'the mere potential for favorable testimony' or to 'merely point to any conceivable benefit' from a witness's testimony." *Id.* (quoting *United States v. Iribe-Perez*, 129 F.3d 1167, 1173 (10th Cir. 1997)). Here, the Defendant has failed to make a plausible showing that Ms. Noriega's, Mr. Penrose's, or Ms. Grant's testimony would have been material and favorable to his defense, and not just merely cumulative to other witnesses' testimony.

In the Defendant's motion, the Defendant asserts: "Mr. Shamo was not able to call [Ms. Noriega] as a witness and undercut the Government's assertion that she played some major role in the drug trafficking organization as [the Defendant's] executive assistant." Doc. 275 at 4. This is an example of the Defendant citing to a "mere potential for favorable testimony." The Defendant does not provide aspects of Ms. Noriega's anticipated testimony that would have actually undercut the case against the Defendant. While Ms. Noriega was part of the Defendant's drug trafficking organization, she was not merely one of five individuals over which the Defendant was considerer

16

a manager, leader, administrator, and organizer.  There were multiple witnesses which pointed to the Defendant as the leader and organizer of an organization involving approximately twenty-three (23) individuals.  *See* Gov.t's Trial Exhibit 17.06, Chart of Defendant's Drug Trafficking Organization, attached as Exhibit 2.  Thus, the United States case against the Defendant related to his role as leader and organizer did not rest on Ms. Noriega being a subordinate in the Defendant's drug trafficking organization.  Had Ms. Noriega testified for the purpose outlined in the Defendant's motion, it would not have materially supported the Defendant's defense, but would have been merely cumulative to the substance of the Defendant's testimony, and the testimony of the witnesses in the United States' case-in-chief, detailing Ms. Noriega's involvement as the Defendant's executive assistant in the drug trafficking organization.[6]

Like Ms. Noriega, in the case of Mr. Penrose, the Defendant asserted he "was not able to call Mr. Penrose to prove otherwise [i.e., that Mr. Penrose was involved in money laundering and funding the drug trafficking organization from the outset] or undercut the Government's theory that [] Mr. Penrose worked at the behest of Mr. Shamo as opposed to under his own discretion and benefit."  Doc. 275 at 4-7.  This is the extent of the Defendant's outline of the potential testimony of Mr. Penrose; such a limited assertion does not go beyond "the mere potential for favorable

---

[6] *See* Exhibit 1, at 88-89.  The Defendant testified of Ms. Noriega's activities, acting as the Defendant's executive assistant, including looking into properties in Puerto Rico and the Caribbean in which the Defendant could invest his drug proceeds.  This did not negate Ms. Noriega's role as represented in the United States' case-in-chief, but actually supported it.
*See also* Exhibit 1, at 91-92 (the Defendant confirms his ongoing payment obligation to Ms. Noriega, as his employee).

17

testimony' or to 'merely point to any conceivable benefit' from a witness's testimony". *See Portillos* at 894.[7]

In the case of Ms. Grant, the Defendant mischaracterizes the evidence and testimony presented to the jury. Mr. Crandall's testimony was that he left the drug trafficking organization in the Fall of 2015 to travel with Ms. Grant. He further testified that in the Spring of 2016 he sought further payment from the Defendant as part of the Defendant's and his "buyout" agreement (i.e., the Defendant agreed to buyout Mr. Crandall from the drug trafficking organization). Mr. Crandall testified that in the Summer of 2016 he returned to the organization, this time as an employee and not a junior partner as before.

The Defendant's motion asserts that Mr. Crandall: (1) "perhaps" never fully ended his involvement in the Defendant's organization; (2) he had a continual drug habit while traveling abroad; (3) he was smart enough to keep his name off the bitcoin wallets[8]; and (4) he was involved as early as May 2016. *See* Doc. 275 at 5-6. While it is unknown whether Ms. Grant would have

---

[7] Testimony of a co-defendant, Drew Crandall, established that Mr. Penrose was an early investor in the Defendant's drug trafficking organization, Mr. Penrose having invested $10,000 which was used by the Defendant to purchase narcotics for resale. Mr. Crandall testified that Mr. Crandall received $30,000 several months later as a return on his investment. Testimony of IRS agent Jeff Fletcher and the testimony of Brennda Kurstin, a former employee of Mr. Penrose, outlined the financial dealings of Mr. Penrose and the Defendant, in an effort to conceal drug proceeds in the purchase of a vehicle from Mr. Penrose's business, iDrive. The Defendant's motion does not assert how Mr. Penrose's testimony would specifically negate the other witnesses' testimony. The United States' case-in-chief did not portray the Defendant in a managerial role over Mr. Penrose, but merely showed Mr. Penrose's involvement in certain aspects of the drug trafficking organization.
[8] *But see* Exhibit 1 at 92 (the Defendant testifies and confirms that he paid Mr. Crandall bi-weekly and that he didn't pay him more, because Mr. Crandall didn't need it—i.e., the Defendant was in control of the drug proceeds and paying Mr. Crandall at that point as an employee).

testified to these points (i.e., there is nothing other than the Defendant's assertions in his motion), presuming she would have, the Defendant's defense would not have benefited from this testimony.

During Mr. Crandall's testimony, it was shown that he played a key role as a junior partner to the Defendant; his own testimony demonstrated he had used drugs; Mr. Crandall's testimony demonstrated he was smart and computer savvy. Further, if Mr. Crandall was more heavily re-involved in the organization in May of 2016, or if he never fully left the drug trafficking organization, that would not change the culpability of the Defendant, because such facts do not demonstrate that the Defendant did not commit the criminal conduct alleged in the Indictment. It would merely show that Mr. Crandall was also more culpable within the organization, while not negating the Defendant's role and culpability.[9] Special Agent Ashment, during cross examination, read at length from interview reports regarding Ms. Grant, which put into evidence many of the points the Defendant claims Ms. Grant would have covered in her testimony. Because Ms. Grant would have testified about those things which Mr. Crandall and others had testified, her testimony would have been cumulative to the testimony presented in the United States' case-in-chief, and not any more favorable to the Defendant's defense than testimony already presented.

As in *Portillos*, the Defendant has made assertions that Ms. Noriega's, Mr. Penrose's, and Ms. Grant's testimony would have helped his defense, by merely characterizing their potential

---

[9] The Defendant's motion asserts: "That date [May 2016] is of particular importance as Mr. Crandall was not charged with the death resulting count due to his statements that he was not re-involved until July 1, 2016." Doc. 275 at 6. The Defendant seemed to rely on the defense that if other co-defendants were not charged fairly or on par with his charges, then he must not be guilty of the charges either. This would not be a proper inference upon which the jury would make a decision as to the Defendant's guilt (e.g., "it's unfair that Mr. Crandall wasn't also charged, so don't hold the Defendant guilty"); it also negates the fact that the Grand Jury decided the charges upon which the Defendant should be indicted.

testimony as "critical" and could have aided in the to undercut the Government's case. However, "[t]his is not enough to plausibly show materiality," especially when the Defendant still had many others on his Potential Witness List within his ability to call and testify in his defense. *See Portillos* at 894. The Defendant has failed to show prejudice from interference and the Defendant has not been denied his due process rights to a fair trial.

## CONCLUSION

The United States respectfully requests the Court deny the Defendant's Motion to Dismiss, in that the Defendant has failed to show prosecutorial misconduct by the United States. Specifically, the Defendant has not shown: (1) that the United States used undue influence to dissuade Ms. Noriega, Mr. Penrose, or Ms. Grant from testifying; and (2) the Defendant failed to make a plausible showing that the testimony of Ms. Noriega, Mr. Penrose, or Ms. Grant would have been material and favorable to his defense, and not merely cumulative to other witnesses' testimony. Therefore, the Defendant has not been prejudiced nor his due process rights infringed.

Respectfully submitted this 4th day of September, 2019.

JOHN W. HUBER
United States Attorney

 */s/ Kent A. Burggraaf*
Kent A. Burggraaf
Special Assistant United States Attorney