JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>vs.<br><br>AARON MICHAEL SHAMO,<br><br>   Defendant. | Case No. 2:16-cr-00631-DAK<br><br>MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR A JUDGEMENT OF ACQUITTAL<br><br>Judge Dale A. Kimball |

The United States, by and through Michael Gadd, Special Assistant United States

Attorney, provides the following memorandum in opposition to the defendant's motion for a

judgment of acquittal. The Court should deny the defendant's motion because the evidence

presented by the United States (1) satisfied all the elements for Count 1, Engaging in a

Continuing Criminal Enterprise; (2) proved fentanyl was the but-for cause of death of R.K.; and

(3) proved that the fentanyl that killed R.K. came from the defendant and his co-conspirators.[1]

---

[1] Other than an unsupported, fleeting statement, the defendant has not alleged that the proof was insufficient as to Counts 2-5, 7-13. This response will be limited to the proof for Counts 1 and 6. If the Court would like the United States to outline the facts that proved the violations charged in Counts 2-5, 7-13, it would be happy to do so.

ARGUMENT

Motions for judgements of acquittal are governed by Federal Rule of Criminal Procedure 29, which reads:

> a) Before Submission to the Jury. After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.
>
> (b) Reserving Decision. The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

When reviewing the denial of a motion for judgment of acquittal based on insufficient evidence, courts of appeals view the evidence in the light most favorable to the government and determine whether there was sufficient evidence from which a jury could find the defendant guilty beyond a reasonable doubt. *United States v. Johnson*, 120 F.3d 1107, 1108 (10th Cir. 1997); *United States v. Edgmon*, 952 F.2d 1206, 1209 (10th Cir. 1991); *United States v. Berry*, 931 F.2d 671, 673 (10th Cir. 1991). "The [sufficiency] test is the same, whether applied by the appellate court or by the trial court in ruling on a motion for judgment of acquittal." *United States v. Hooks*, 780 F.2d 1526, 1531 n.1 (10th Cir. 1986).

And although trial courts have heard the evidence, they cannot weigh the evidence or assess credibility of witnesses when determining if the evidence presented was sufficient. *Burks v. United States*, 437 U.S. 1, 16, (1978).

**Count 1—Engaging in a Continuing Criminal Enterprise**

      To submit the case to the jury, the United States was first required to present evidence that met the following elements of the offense for Count 1:

> *First*: the defendant violated the Controlled Substances Act as charged in the list of underlying violations to Count 1;
> *Second*: the defendant engaged in a continuing series of at least three violations of the Controlled Substances Act that began on a date unknown to the Grand Jury, but at least by July 8, 2015, and continued to at least November 22, 2016;
> *Third*: the defendant committed these violations in concert (or by common design or plan) with five or more other persons;
> *Fourth*: the defendant was an organizer, supervisor, or manager of those five persons; and
> *Fifth*: the defendant obtained substantial income or resources from the series of violations.

      Additionally, for this case, the United States was also required to present evidence that proved the following elements:

> 1) the conspiracy to distribute Fentanyl involved twelve kilograms or more of a mixture or substance containing a detectable amount of Fentanyl; and
> 2) the defendant is the principal administrator, organizer, or leader of the enterprise or is one of several such principal administrators, organizers, or leaders.

      To satisfy its burden of proof, the United States offered more than two weeks of testimony and evidence. Here is a non-exhaustive summary of the evidence that touched upon Count 1.

      Testimony revealed that the defendant's continuing criminal enterprise began with collaboration between the defendant and Drew Crandall but quickly grew to include dozens of co-conspirators. The defendant purchased pill tableting machines, sometimes called pill presses, dies and punches to mark pills so the markings would match those of legitimate pharmaceutical drugs, and inert pill ingredients, such as binding agents and colors. Some items, such as the binding agents and colors were purchased legally, and other inputs, such as Fentanyl and

Alprazolam, were purchased and imported into the United States illicitly. To avoid detection, the defendant and Crandall had many of their inputs shipped to nominees or straw purchasers. The defendant and Crandall paid their nominees and straw purchasers for their assistance.

The inputs would then be pressed into pills that had the appearance of legitimate pharmaceuticals. The fake oxycodone-type pills and the counterfeit Alprazolam tablets were sold on the Dark Web at a significant profit. Once sold, the defendant and Crandall used co-conspirators to package the pills and ship the pills to Pharma-Master's customers. From July 2015 through November 2016, Alexandrya Tonge and Katherine Bustin packaged pill orders, affixed shipping labels and postage to their packages, and (as the operation grew) passed off the packages to a runner—Sean Gygi—who would drop the packages off at post offices and blue boxes throughout the valley. Crandall trained Tonge and Bustin to use fictitious names and addresses for return addresses on the packages of pills they filled.

The defendant also employed a co-conspirator, Mario Noble, to provide online customer support.  In addition to corresponding with customers online, Noble would, at times, assist the defendant by building a daily order list that included customers' shipping addresses and the type and quantity of drugs purchased by each customer. Noble or the defendant would send the daily order list to Tonge and Bustin using a secure email service, Sigaint; they would also encrypt their messages to each other. Noble stepped away from his role during September 2016 but returned shortly thereafter on a part-time basis.

Crandall, who had been travelling abroad since November 2015 after telling co-conspirators that the defendant was buying him out of their partnership, began again to actively work for the defendant in the defendant's continuing criminal enterprise in the summer of 2016;

Crandall, like Noble, provided online customer support and processed orders.  Crandall was paid a wage for his customer service work.

The organization used encrypted communication apps to communicate with each other and relied on PGP encryption methods to communicate with customers. Members of the criminal enterprise frequently communicated on the mobile application known as Telegram. On July 8, 2015, Crandall shared a dark web email account with Tonge and Bustin for them to use, and then emailed instructions regarding PGP encryption to Tonge and Bustin. Crandall instructed Tonge and Bustin to delete the email, but a copy of the email was preserved and viewed by law enforcement.[2]

When Crandall left the United States in November 2015, Luke Paz began pressing pills with the defendant. Paz had previously served as a nominee/straw purchaser for the organization. Paz and the defendant developed the recipe for the Fentanyl-laced fake oxycodone pills sold by Pharma-Master on Alphabay. Paz would mix the inert ingredients; the defendant maintained control over the Fentanyl and how much Fentanyl should be added to each batch of pills. Paz continued to press pills for the organization until the defendant's arrest on November 22, 2016.

Sales on the Dark Web marketplace were conducted in Bitcoin, a decentralized virtual currency. The defendant, Crandall, and Paz expended a fair amount of effort converting their Bitcoins into fiat currency, which could be used to support their lifestyles and pay their co-conspirators, among other things.

Testimony covered how these sites in the exhibit pictured below, all of which were visited by the defendant, aided his efforts to Engage in a Continuing Criminal Enterprise. For example, Sigaint (top row) was an email service accessed through the dark net (or, at times

---

[2]July 8, 2015, is the date by which the CCE crime alleged in Count 1 had begun.

through the clear net) that the defendant and his subordinates used to email encrypted

communications to each other. Specifically, the defendant and his subordinates used Sigaint's

email service to send daily order sheets, reshipment lists, and package tracking information.

| URLs from N60 | |
|---|---|
| **Item** | **Date and time** |
| http://sigaintevyh2rzvw.onion/mail/ | 10/21/2015 11:41:58PM |
| https://blockchain.info/wallet/#/home | 11/21/2016 7:14:30 PM |
| http://www.uline.com/Product/ViewCart/Checkout | 8/28/2016 6:14:52 PM |
| http://www.aliexpress.com/item/mold-die-for-tablet-press-machine-XANAX-stamp-Customized-punch/575414328.html | 8/25/2015 5:57:48 PM |
| http://www.aliexpress.com/item/Single-Punch-Tablet-Press-Pill-Making-Machine-Maker-TDP-5/323140046301.html | 9/8/2015 8:55:26 PM |
| http://m.aliexpress.com/item/32411614623.html | 9/23/2015 5:01:59 PM |
| https://drugs-forum.com/forum/forumdisplay.php?f=3 | 10/5/2016 12:44:32 AM |
| http://stopoverdose.org/faq.htm | 9/24/2016 6:16:14 PM |
| https://www.aliexpress.com/store/product/ZP-9E-Rotary-Tablet-Press-Machine-PLC-type-Tablet-press-machine-Tablet-pressing-pharmaceutical-machinery-equipment/803578_32523581224.html | 10/25/2016 5:16:01 PM |
| https://www.youtube.com/watch?v=9Xi4A8S23Xo | 10/17/2016 11:53:40 PM |
| http://www.aliexpress.com/item-img/ZP8-Intelligent-Rotary-Tablet-Press-pills-making-pill-press-tablet-making-press-machine/501357268.html?spm=2114.12010108.1000017.2.jAVfD3 | 8/23/2016 4:53:05 PM |
| https://www.youtube.com/watch?v=28rJqi-7pEY | 10/17/2016 11:56:00 PM |
| https://www.westernunion.com/us/en/login.html | 7/11/2016 6:29:38 PM |
| http://abraxasdegupusel.onion/login | 10/21/2015 11:42:00 PM |
| http://alphabaywyjrktqn.onion/index.php | 1/21/2016 7:35:58 PM |

1

GOVERNMENT EXHIBIT
**14.32**
2:16CR 631 DAK

The defendant bought pill presses and pill press components off of AliExpress. He sold

his pills on AlphaBay. Blockchain.info hosted a bitcoin wallet used by the defendant. The jury

heard testimony about each of these sites and how visiting those sites aided the defendant as he

organized, managed, and led his criminal enterprise.

| GOOGLE SEARCH TERMS FROM N60SSD | |
|---|---|
| MBB Mylar bags | Clonazepam namebrand |
| 1.5 tdp die | ritalin |
| clonazepam | buy naloxone online |
| silk road onion | amazon redeem |
| bitcoin wallet | bip32 public key |
| TheCryptoStore | aliexpress whois |
| m 30 pill | 1771 laurelhurst |
| diezepam | buy anything with bitcoin |
| adderall 30mg | diazepam 10mg |
| diazepam | clonazepam |
| hidemyass proxy | 2.83495231 kilograms |
| fentanyl | private jet service salt lake city |
| roxy pill | die presse |
| fentanyl | bitcoin wallet |
| m s2 blue pill | Ritalinic acid |
| cross pill white | m 4 pill |
| uline | pill die |
| clonazepam | m 15 pill |
| Acetylfentanyl | roxy fently |
| 1MZsmXgMZvq15eaYgcHQvqpqHLdV18s | ritalin die |
| FRL | multibit classic |
| pre-mixed excipient | bitcoin wallet |
| m 15 ritalin | multibit classic download |
| lorazepam | darkmarketnews |
| bitcoin qt | adderall cas number |
| bitcoin wallet | ritalin mold |
| 25 mg adderall | pill press die |
| m 15 pill | amazon redeem |
| ritalin | fentanyl |
| yellow op 40 | 1771 Laurelhurst Drive, Salt Lake City, UT |
| roxy fently | Lorazepam |
| Clonazepam name brand | multibit classic to multibit hd |
| ritalin die | darkmarketnews |
| fentanyl marquis test | ritalin mold |
| Ritalinic acid | bitcoin assistance |
| btce hacked | Meclonazepam vs clonazepam |
| yellow op 40 | btce hacked |
| amazon redeem | roxy 30mg |
| ritalin m 30 | btce hacked |
| pgp key C250E47EDEB3D752 | ritalin m 20 |

1

GOVERNMENT
EXHIBIT
**14.44**
2:16CR 631 DAK

Testimony explained how these google searches, conducted by the defendant, helped him organize, lead, and conduct his criminal enterprise. The jury heard evidence that each of the sophisticated techniques used by the defendant could be learned simply by "googling it." The defendant learned his drug trafficking tradecraft through doggedly researching topics, such as those listed in exhibit 14.44, online.

Testimony explained how the defendant used this manual, and other sources of information, to guide how his criminal enterprise shipped drugs through the mail in an effort to avoid law enforcement detection.

## How to ship drugs

**Point For Safe Shipping**

**An interesting thread that was posted on reddit today: http://www.reddit.com/r/SilkRoad/comments/1rhq7z/safe_shippingwhat_is_it/**

**Following a great AMA thread with a postal worker: http://www.reddit.com/r/reloaded/comments/1rdgb0?sort=hot**

**I would take these adivices with a grain of Salt but its a great sum up of the information thats been floating around this topic on the forums:**

**=====**

**This is based off extensive research of FBI, DEA and Customs manuals.**

**Safe shipping**

**What it is**

**Safe shipping means packaging and mailing products in ways that minimize risk for all involved. Safe shipping is more than packaging a product to reduce risk of interception, it is also using techniques to avoid liability for the shipper and recipient for any seized products.**

**List of things customs looks for**

**The following is a list of things customs uses to screen for suspicious parcels. A suspicious attribute of a parcel is called a flag. A single flag is often not much of a problem, but the more flags a package has the higher the chances it will be intercepted.**

1. **No return address**
2. **Restrictive markings (such as writing "Personal!" on the envelope)**
3. **Misspelled words**
4. **Poorly typed or written text**
5. **Excessive postage**

GOVERNMENT EXHIBIT
**14.39**
2:16CR 631 DAK



This chart, and an abundance of testimony about those pictured on it, showed the

defendant's role as principal leader, organizer, and administrator of his criminal enterprise. The

testimony also showed how the defendant maintained control over the drug proceeds; paid for

expenses, such as ingredients, equipment, and wages; decided what to sell and how much to

charge for his products; recruited and trained subordinates; and directed the actions of his

subordinates pictured on the chart. The defendant had a leadership role over more than twenty

co-conspirators. Those co-conspirators who testified all identified the defendant as the leader of

the criminal enterprise. And their testimony coupled with the exhibits showed the defendant was

the principal leader, organizer, and administrator. He had no boss. He was everyone else's boss.

The defendant's uninterrupted involvement in the criminal enterprise was unmatched by any of

his subordinates.



Pictures including these, and testimony about them, showed that the defendant made substantial income. Agents seized $1,657,373 USD that belonged to the defendant. Agents also seized 513.15 Bitcoin from the defendant's bitcoin wallets. Testimony established that the defendant earned more than 3,000 Bitcoins between November 2015 and November 2016. The defendant had no legitimate source of income after the first quarter of 2015.

The jury heard testimony and saw exhibits, such as 6.00, below, and the 7-, 8-, and 9-series exhibits, that showed how the defendant aided and abetted the distribution of controlled substances. Evidence showed that the defendant, or an employee like Mario Noble, would gather orders from the dark net and send those orders to the defendant's shipping team, Ms. Tonge and Ms. Bustin. The defendant kept the shipping team well stocked with drugs. The shipping team packaged the drugs for shipment. From the summer of 2016 onward, Mr. Gygi placed the packages into the U.S. mail stream.

## SEIZED OUTBOUND PACKAGES

| Date Obtained | Addressee | State | Number of Pills | Controlled Substance | Markings |
|---|---|---|---|---|---|
| 11/18/2016 | R.L. | MA | 20000 | Fentanyl | A 215 |
| 11/18/2016 | B.W. | AL | 2000 | Fentanyl | A 215 |
| 11/18/2016 | J.H. | OH | 2000 | Fentanyl | A 215 |
| 11/18/2016 | Y.C. | OH | 1100 | Fentanyl | A 215 |
| 11/18/2016 | F.C. | AK | 1000 | Fentanyl | A 215 |
| 11/18/2016 | P.T.A.C. | MD | 1000 | Fentanyl | M/30 |
| 11/18/2016 | L.S. | MN | 1000 | Fentanyl | M/30 |
| 11/18/2016 | S.W. | NC | 1000 | Fentanyl | A 215 |
| 11/18/2016 | D.A. | NJ | 1000 | Fentanyl | A 215 |
| 11/18/2016 | N.L. | NJ | 1000 | Fentanyl | A 215 |
| 11/18/2016 | V.R. | WA | 1000 | Fentanyl | A 215 |
| 11/18/2016 | G.M. | NV | 500 | Fentanyl | A 215 |
| 11/18/2016 | L.F. | PA | 500 | Fentanyl | M/30 |
| 11/18/2016 | S.R. | WA | 200 | Fentanyl | M/30 |
| 11/18/2016 | D.P. | MA | 150 | Fentanyl | A 215 |
| 11/18/2016 | R.B. | OH | 150 | Fentanyl | A 215 |
| 11/18/2016 | P.F. | IL | 100 | Fentanyl | A 215 |
| 11/18/2016 | CBS.I., M.W. | KS | 100 | Fentanyl | A 215 |
| 11/18/2016 | M.J. | KY | 100 | Fentanyl | A 215 |
| 11/18/2016 | F.O. | LA | 100 | Fentanyl | M/30 |
| 11/18/2016 | M.L. | NC | 100 | Fentanyl | A 215 |
| 11/18/2016 | M.S. | NC | 100 | Fentanyl | A 215 |
| 11/18/2016 | J.P. | PA | 100 | Fentanyl | A 215 |
| 11/18/2016 | T.M. | CT | 60 | Fentanyl | M/30 |
| 11/18/2016 | J.T. | OR | 50 | Fentanyl | M/30 |
| 11/18/2016 | A.M. | MT | 40 | Fentanyl | M/30 |
| 11/18/2016 | D.L.G. | MT | 40 | Fentanyl | A 215 |
| 11/18/2016 | M.M. | NY | 30 | Fentanyl | M/30 |
| 11/18/2016 | J.M. | MD | 27 | Fentanyl | A 215 |
| 11/18/2016 | J.M. | IL | 22 | Fentanyl | M/30 |
| 11/18/2016 | A.B. | CO | 20 | Fentanyl | M/30 |
| 11/18/2016 | A.G. | KY | 20 | Fentanyl | A 215 |
| 11/18/2016 | M.P. | MN | 16 | Fentanyl | A 215 |
| 11/18/2016 | J.T. | OR | 14 | Fentanyl | M/30 |
| 11/18/2016 | N.A. | CA | 12 | Fentanyl | A 215 |
| 11/18/2016 | T.E. | SC | 12 | Fentanyl | M/30 |
| 11/18/2016 | A.T. | VA | 12 | Fentanyl | M/30 |
| 11/18/2016 | M.J. | CA | 11 | Fentanyl | M/30 |
| 11/18/2016 | J.R. | CT | 11 | Fentanyl | A 215 |
| 11/18/2016 | A.B. | MO | 11 | Fentanyl | M/30 |
| 11/18/2016 | L.P. | NY | 11 | Fentanyl | M/30 |
| 11/18/2016 | J.G. | NY | 11 | Fentanyl | M/30 |
| 11/18/2016 | B.S. | OH | 11 | Fentanyl | A 215 |
| 11/18/2016 | K.M.T.T.S.T.R. | OK | 11 | Fentanyl | M/30 |

GOVERNMENT
EXHIBIT
6.00
2:16CR 631 DAK

Page 1



001-005-002-00021



001-005-002-00182

Testimony and exhibits were presented that showed that DEA chemists weighed and tested more than 12,000 grams of fentanyl seized in the investigation. The testimony also showed that the defendant was in actual or constructive possession of all the Fentanyl seized (or had ordered the Fentanyl from China).



Additionally, the evidence showed that all the fake oxycodone pills sold by the defendant contained Fentanyl. The jury heard testimony that the defendant notified potential dark net customers that his pills contained Fentanyl—although the defendant had three names for his Fentanyl pills sold on AlphaBay and only one name used the word Fentanyl.

## Pharma-Master Feedback Totals

**Revenue:**             $2,817,520.93
**Total Items:**         872,659
**Total Transactions:**  5589

|                                     | Total Orders | Total Quantity | Total Value      |
|-------------------------------------|--------------|----------------|------------------|
| **Fentanyl-laced Fake Oxycodone**   | **3,491**    | **458,946**    | **$2,472,040.73** |
| *sold as: M Box*                    | 871          | 210,752        | $1,005,760.73    |
| *sold as: Roxy*                     | 2,244        | 242,985        | $1,417,272.82    |
| *sold as: Fentanyl*                 | 376          | 5,209          | $49,007.18       |
| **Counterfeit Xanax**               | **1,652**    | **405,701**    | **$283,039.42**  |

DEA Chemists testified that the defendant's Fentanyl pills weighed just over 100mg each. Feedback-linked sales showed the defendant sold more than 458,000 fentanyl-laced fake oxycodone, as shown in Exhibit 15.02a, above. That equates to 45,894 grams of a mixture or substance containing a detectable amount of Fentanyl.[3]

The defendant's criminal enterprise engaged in a practice of shipping more pills than a customer ordered—as a way of engendering positive online customer feedback and to prevent customer complaints, which were labor-intensive to resolve. The true number of pills shipped is higher than these sales figures indicate for that reason. These sales figures above also do not account for sales in which the transaction was "auto-finalized." Testimony established that the

---

[3] The fake oxycodone pills containing Fentanyl seized in this investigation weighed just over 100mg each. The "Roxys"—those pills that were stamped A 215—weighed slightly over 100mg per pill. The "M boxes"—those pills that were stamped with an "M" with a box around it on one side and a "30" on the other side—weighed slightly more than the Roxys.
For ease of math and to give the benefit of small variation in weight from pill to pill to the defendant, the jury was encouraged to give each fake-oxycodone pill containing Fentanyl a weight of 100mg for purposes of calculating aggregate amounts.

defendant had more than one thousand additional orders on AlphaBay that were not captured in the feedback because the sales were auto-finalized.

The data from the feedback showed that Pharma-Master on AlphaBay sold Alprazolam as early as December 22, 2015, and Fentanyl-laced fake oxycodone as early as February 3, 2016.


The defendant manufactured counterfeit pills and supervised and assisted in the manufacturing of the Fentanyl pills. The defendant's Alprazolam pill press, pictured below, was running when agents executed a search warrant on his residence on November 22, 2016:



Testimony and exhibits, such as the one below, showed that the defendant maintained constructive possession over his Fentanyl pills even when stored at the residence of his shipping team, Ms. Tonge and Ms. Bustin. Here is the largest single exhibit of Fentanyl pills seized during this investigation; it contained approximately 74,000 Fentanyl pills, and it was discovered at the Tonge/Bustin residence on November 22, 2016.



001-006-003-00205

The defendant, under his Pharma-Master vendor account, sold drugs to both addicts and redistributors. For redistributors who bought large quantities, the price-per-pill would be lower than consumers who purchased one, ten, or even one hundred pills at a time.

One of Pharma-Master's largest customers, who went by the online handle "Trustworthy Money," was arrested in the District of Oregon. The jury was shown this picture of Jared Gillespie, aka "Trustworthy Money":


(Exhibit 19.03)

The jury heard that Trustworthy Money encouraged other Dark Web customers to buy from Pharma-Master. In one online feedback post, Trustworthy Money wrote, "basic economics will tell u to put all your money back in to re-upping. don't spend hella money[.] put all that shit back into pharmas pills cuz these will make u a millionare under a year[,] guarantee[.]" (Exhibit 15.00)

Agents found many of the criminal enterprise's daily orders sheets on the defendant's iMac computer. Those daily order sheets were compiled into Exhibit 14.30. That exhibit showed orders submitted by customers, both dealers and addicts.

From customer addresses recovered during the investigation, agents determined that the defendant and his subordinates distributed drugs through the US Mail to every dot on this map:



Each dot is a destination zip code for the packages the defendant and his subordinates sent to customers. With some frequency, a zip code had several packages sent it to from the defendant and his subordinates in his continuing criminal enterprise.

The jury heard that the active investigation of this case began when Customs and Border Patrol seized a package of Fentanyl addressed to one of the defendant's nominees, Ryan Jensen, in June of 2016 (Count 2). Agents later obtained a search warrant to search Jensen's residence. Jensen agreed to cooperate with the investigation. Jensen led agents to Sean Gygi.

On November 8, 2016, Postal Inspectors seized an inbound packages of alprazolam addressed to Sean Gygi (Count 3).

On November 17, 2016, a search warrant was executed at Gygi's residence; Gygi began cooperating with investigators. Gygi explained that he was in possession of an unopened package that belonged to the defendant. Gygi gave consent for the agents to seize the package, which contained Fentanyl (Count 4). Gygi explained he worked for the defendant by picking up packages from the defendant's shipping team and dropping the outbound packages off at Postal Service drop boxes throughout the valley.

On November 18, 2016, and again on November 20, 2016, Gygi accepted packages from Tonge and Bustin at the direction of the investigators. During those two days, the investigators seized more than 120 packages containing pills pressed with Alprazolam or Fentanyl. Gygi also recorded a conversation with the defendant at the agents' direction. The investigators applied for search warrants based upon probable cause that drugs and paraphernalia would be located in the defendant's residence and in Tonge's and Bustin's residence.

On November 22, 2016, investigators executed the warrants at the defendant's residence and at Tonge's and Bustin's residence. In the defendant's residence, investigators discovered a pill press that was running in a basement room, pills containing Fentanyl (Count 5), tablets containing Alprazolam, and three additional pill presses—one of which was still in a crate in the garage. The running pill press was producing counterfeit Alprazolam tablets (Count 7).

Investigators also seized $1,227,773 in US currency from the home. The defendant, who had his gloves and mask in his pocket, was arrested.

Tonge's and Bustin's residence yielded additional Fentanyl-laced fake oxycodone pills (also Count 5), counterfeit Alprazolam pills, packaging and shipping materials, and additional currency.

According to some co-conspirators, Crandall and his then-girlfriend fled the country in November 2015 because Crandall's girlfriend was spooked by some aspect of the conspiracy. From November 2015 until May 5, 2017, Crandall and his girlfriend lived abroad, touring through Asia and staying for months in New Zealand and Australia. Crandall and his girlfriend paid for their travel, at least in part, by using proceeds from the Pharma-Master DTO.

The day after the defendant's arrest, Crandall's girlfriend reached out to Noble—a friend and former co-worker—to enquire how he was doing. Noble did not respond. Crandall then took steps to erase his social media presence. Crandall alerted Alphabay that Pharma-Master had been compromised—specifically that the owner of the account had been arrested; the Pharma-Master vendor account was banned.

In summary, the United States presented evidence sufficient to meet all the elements for Count 1, Engaging in a Continuing Criminal Enterprise.

**Count 6—Aiding and Abetting the Distribution of Fentanyl that Resulted in Death**

To submit the case to the jury, the United States was first required to present evidence

that met the following elements of the offense for Count 6:

> *First*: the defendant's co-conspirator(s) knowingly or intentionally distributed a
> controlled substance on or about June 6 through June 13, 2016, as charged;
> *Second*: the substance was in fact Fentanyl;
> *Third*: the death of R.K. resulted from use of the Fentanyl distributed by the
> defendant's co-conspirators; (i.e. Fentanyl was the but-for cause of death); and
> *Fourth*: the defendant aided and abetted his co-conspirator(s) in the commission
> of the offense.

To satisfy its burden of proof, the United States offered testimony and exhibits from no

fewer than seven witnesses. Here is a non-exhaustive summary of the evidence that touched

upon Count 6:

Testimony established that R.K. and G.L. lived at 3 Midvale Drive in Daly City,

California, in June of 2016. Those two roommates ordered Fentanyl-laced fake oxycodone pills

from Pharma-Master on AlphaBay. From Exhibit 14:30:

Roxy - Oxycodone 30 mg X10
Sale # 2742764 - Item # 91505 - Jun 6, 2016 - 10:50 - to twad

Postage: Priority Mail - 4 days - USD 7.75
Quantity: 1

GREGORY LEE

3 MIDVALE DR
DALY CITY CA 94015-2105

The order was placed on June 6. Postal records, verified by the tracking logs of Ms. Tonga and Ms. Bustin, show that the package left Utah on June 9, 2016, and was delivered to R.K.'s residence on June 11, 2016, at 3pm.

The jury heard testimony that the following evening, June 12, 2016, R.K. crushed up and snorted two of the Fentanyl pills. He began to exhibit the physical effects and laid down in his bed. R.K. asked G.L. and G.L.'s girlfriend to check on him.

The last time they checked on R.K. that night, they rolled R.K. into the recovery position. R.K. sounded as if he was snoring in his sleep.

The following morning R.K. was found dead and an investigation began. Here is R.K.'s bed where he died.





 R.K.'s body was close to a garbage can inside his room. On top of the can, officers found and

photographed a priority mail envelope with a Utah return address (Ex 17.01, p8):



The jury heard evidence that the defendant purchased stamps identical to the stamp on the envelope in the month of June 2016. The defendant also directed several of his subordinates to purchase stamps during the same time period.

In exhibit 14.15, the defendant explained to one of his customer service employees that they never changed the shipping name and address provided by customers—they just copied and pasted the addresses into the daily order sheets.

An autopsy was performed; the autopsy ruled out causes of death other than the drugs in R.K.'s blood at the time of his death. His toxicology results showed R.K. had Fentanyl, alcohol, cocaine metabolites, and a cocaine-cutting agent in his blood, as follows:

Blood Ethyl Alcohol = 0.19 grams%

Cocaine                   = Negative
Benzoylecgonine           = 0.23   mg/L
Ecgonine Methyl Ester = Present
Cocaethylene              = Present

Levamisole                = Present

Fentanyl                  = 0.009 mg/L

Dr. Stacey Hail, a medical toxicologist, reviewed R.K.'s case and testified as to her expert opinion of the cause of death. She testified that R.K. would not have died but for the Fentanyl he ingested.

Dr. Hail testified that with an opioid death, as opposed to a Cocaine metabolite-caused death, patients go to sleep and die. Dr. Hail explained that alcohol would have no significant effect on the respiratory depression that precedes an opioid-caused death, nor would alcohol in the amounts consumed by R.K. cause death.

Dr. Hail testified that the level of Fentanyl found in the defendant's blood was not especially helpful in drawing a conclusion as to the cause of death; she explained that there is no defined lethal level:

> We are not using what would be called a lethal level. And normally -- and I apologize because a lot of times when I tell lawyers this, it's like I'm telling them there's no such thing as Santa Claus. As toxicologists, we don't care about the number in these circumstances and there is no defined lethal level, not to be mixed up with the lethal dose. There is definitely a dose that somebody can take that can be lethal. But we're talking about concentrations in the body. When we're talking about opioids, when we're talking about cocaine metabolite, most drugs that we talk about, we are not looking at the number. It does not mean very much in living patients and it means even less in dead patients. (Transcript of Dr. Hail's Testimony, at 23).

There was no evidence presented that R.K. had another source of Fentanyl.

In summary, the evidence that the defendant's Fentanyl pills were the but-for cause of R.K.'s death was sufficient for Count 6 to be presented to the jury.


CONCLUSION

The evidence presented at trial, through testimony and through the exhibits, satisfied the elements of Counts 1 and Count 6, the only two counts challenged by the defendant's motion for a judgement of acquittal. The Court should deny the defendant's motion.


Respectfully submitted this 4th day of August, 2019.

JOHN W. HUBER
United States Attorney

 */s/ Michael Gadd*
MICHAEL GADD
Special Assistant United States Attorney