1           IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4    _____
                                     )
5    UNITED STATES OF AMERICA,       )
                                     )
6              Plaintiff,            )
                                     )
7       -vs-                         )   2:16-CR-631 DK
                                     )
8    AARON MICHAEL SHAMO, et al.,    )
                                     )
9              Defendants.           )
     _____)

10

11

12

13

14

15        BEFORE THE HONORABLE DALE KIMBALL

16            DATE:  AUGUST 27, 2019

17     REPORTER'S TRANSCRIPT OF PROCEEDINGS

18               JURY TRIAL

19

20

21

22

23

24

25       Reporter:  REBECCA JANKE, CSR, RPR, RMR
                    (801) 521-7238

```
 1
 2                      A P P E A R A N C E S
 3
 4   FOR THE PLAINTIF       UNITED STATE'S ATTORNEY'S OFFICE
 5                          BY:  MICHAEL GADD, ESQ.
 6                               VERNON G. STEJSKAL, ESQ.
 7                               KENT A. BURGGRAAF, ESQ.
 8                          111 SOUTH MAIN STREET, 1800
 9                          SALT LAKE CITY, UTAH  84111
10
11
12
13   FOR THE DEFENDANT:     SKORDAS & CSTON, LLC
14                          BY:  GREGORY G. SKORDAS, ESQ.
15                               KAYTLIN V. BECKETT, ESQ.
16                          560 SOUTH 300 EAST, 225
17                          SALT LAKE CITY, UTAH 84111
18
19                          DARYL P. SAM, PLLC
20                          BY:  DARYL P. SAM, ESQ.
21                          5955 SOUTH REDWOOD ROAD, 102
22                          SALT LAKE CITY, UTAH 84123
23
24
25
```

1    AUGUST 27, 2019                    SALT LAKE CITY, UTAH

2                    P R O C E E D I N G S

3                          *  *  *

4         THE COURT:  Good morning, everyone.

5         MR. STEJSKAL:  Good morning.

6         THE COURT:  Where are we?

7         MR. SKORDAS:  Your Honor, we have a couple

8    of -- a couple of matters we just wanted to bring to

9    the Court's attention before you bring the jury in.

10   We have, I think, one or two witnesses today.  I think

11   we should be done with the defense case by noon today.

12        THE COURT:  Does that include the defendant?

13        MR. SKORDAS:  Yes.

14        MS. BECKETT:  Sorry, Your Honor, just to

15   clarify.  We have -- technically, there are two

16   attorneys that will be proffering before the Court and

17   then I believe just one witness that will be

18   testifying.

19        MR. SKORDAS:  Right.  And that witness is

20   Aaron Shamo.

21        THE COURT:  All right.  Let me suggest

22   something, then.  We do these proffers and the

23   defendant today.  Tomorrow we have a settlement of the

24   instruction conference and you people can get ready

25   for your closing arguments and bring the jury back on

4

1    Thursday.

2            MR. SKORDAS:  Is that okay?

3            MR. STEJSKAL:  Sure.

4            MR. SKORDAS:  That's fine, Your Honor.  That

5    makes a lot of sense.

6            THE COURT:  What about it?

7            MR. STEJSKAL:  That's fine, Your Honor.

8            THE COURT:  That will give you time to

9    streamline your closing arguments from four hours each

10   to two and a half or something.  And do you have --

11   you handed them our --

12           THE CLERK:  Yes.

13           THE COURT:  So you have now the Court's

14   notions about instructions and verdict form.

15           MR. SKORDAS:  Correct.

16           THE COURT:  But you'll need time to review

17   that and think about it, and we can hold a hearing in

18   the morning and get that squared away.

19           MR. SKORDAS:  Very well.  That makes a lot of

20   sense.

21           THE COURT:  Does that work for everyone?

22           MR. STEJSKAL:  Yes.  That works, Your Honor,

23   thank you.

24           THE COURT:  Do you want the jury to see the

25   proffers?

1           MR. SKORDAS:  No.  I don't think so.

2           THE COURT:  Probably not, right?

3           MR. SKORDAS:  And we need just a few minutes,

4  but otherwise we're ready to go.

5           THE COURT:  All right.

6           MS. BECKETT:  Your Honor, can we approach

7  briefly?

8           THE COURT:  Approach?  Yes.

9     (Conference among the Court and counsel out of the

10               hearing of anyone else.)

11          MS. BECKETT:  I want to make a record really

12  quickly for the Court because we have that motion for

13  a mistrial that we had filed.

14          THE COURT:  Yes.

15          MS. BECKETT:  And some information came to us

16  through Mr. Shamo's family, that they believed the

17  government was actually paying for the family of

18  whatever alleged victim it was that cried during that

19  cross examination of Agent Keys, and I clarified with

20  counsel, and the government is essentially paying for

21  that family to be present here during this trial.

22  They are assisting.

23          THE COURT:  So you're adding that on your

24  motion for mistrial?

25          MS. BECKETT:  Correct.  But we wanted to make

1    a record of that for the Court because we think that's

2    an essential issue that needed to be brought up and

3    put on the record.

4          THE COURT:  You were going to respond --

5    there you are.  You were going to respond to the -- I

6    need a program -- to the motion for mistrial?

7          MR. GADD:  Right.  We have written a rough

8    draft.  We're just waiting for the transcript from

9    May, from Ed who got into town yesterday.  I talked to

10   Ed.  He said he was working on it, and he said he

11   would have it today.

12         THE COURT:  Now can you comment on this

13   additional --

14         MR. GADD:  I would be happy to do it in

15   writing or now.  I would say the United States helps

16   various victims in various cases and I recognize that

17   the family involved, while their child is mentioned in

18   the Indictment, it's not the family of RK, who most of

19   our focus has been on.

20         THE COURT:  All right.

21         MR. GADD:  But it's probably worth

22   mentioning, there are several families who have

23   observed each day of Court who have children who were

24   customers of Mr. Shamo's and who are now deceased.

25   Some of them we didn't even know about.  I mean,

1  that's -- it's frankly a little embarrassing.  We're

2  still finding out people who were affected by this.

3          THE COURT:  Anything else?

4          MS. BECKETT:  I just wanted to make that

5  clear for the record.  I think that's going to be very

6  problematic.

7          THE COURT:  All right.  Are we going to --

8  where is the -- I don't know you.

9          MS. MADDEN:  Gabriel Madden, one of the

10 associates who has been helping on defense.

11         THE COURT:  Well, welcome.

12         So, are we are ready with these proffers?

13         MS. BECKETT:  Yes.  Thank you, Your Honor.

14         THE COURT:  Then we'll get the jury.

15         (Proceedings continued in open court.)

16         MS. BECKETT:  We have two attorneys here.

17 The first attorney is Marlin Grant, who is counsel for

18 Sasha Grant, who we intended to call as a witness

19 today.  But he is here essentially to make a proffer

20 and sort of give a timeline as to when he was informed

21 that Ms. Grant would no longer have immunity if she

22 were to testify before the Court.  So if we could hear

23 from him first.

24         THE COURT:  All right.

25         You can just stand at the podium.

1          MR. GRANT:  Oh, right here?

2          THE COURT:  Yeah.

3          MR. GRANT:  Okay.  Good morning.  My name is

4    Marlin Grant.  I'm the attorney for Sasha Grant.  I

5    became involved when she landed in Hawaii about two

6    years ago.  I was involved also with the July -- or I

7    guess it was the June 16th and 15th investigation into

8    the -- and the 17th by the prosecution's office.

9    Sasha made a proffer of evidence at that time.  That

10   immunity was granted only for that hearing apparently.

11   We were under the impression that it would be for any

12   further testimony in the case.  I did not receive

13   information that she was even going to be called as a

14   witness until late Sunday night from Jim Bradshaw,

15   attorney for Drew Crandall.

16          On Monday, I talked to the defense counsel

17   and arranged to have them at least talk to Sasha.  In

18   the middle of that, they said, well, we're not going

19   to use her testimony.  I got that notice about 2:00

20   o'clock on Monday.  And then at about 3:00 o'clock,

21   they said:  No, we would still like to talk to her.

22          So they talked to her at 4:00 o'clock.

23          THE COURT:  This is yesterday?

24          MR. GRANT:  This is yesterday.  After that I

25   called or sent an email to Mike Gadd to say:  Look,

1   does she have immunity for tomorrow?  They want to

2   have her testify at 8:30 in the morning.

3          And he says:  It's doubtful.  Let me talk to

4   you in the morning.

5          And apparently they called Mr. Huber this

6   morning to see if immunity could be granted, and that

7   could not.  So that's the timeline, and I'm invoking

8   the Fifth Amendment privilege for my client not to

9   testify today.

10          THE COURT:  Thank you.

11          MS. BECKETT:  I would just like to clarify on

12   that, Your Honor.  It was our impression that actually

13   Mr. Bradshaw was going to accept service of the

14   subpoena for Ms. Grant, which is why it did not make

15   it to Mr. Grant initially.

16          And the next attorney is Nathan Crane on

17   behalf of Anna Gabriel Noriega.

18          THE COURT:  Mr. Crane?

19          MR. CRANE:  Good morning, Your Honor.

20          THE COURT:  Good morning.

21          MR. CRANE:  I was contacted recently by the

22   defense indicating they wanted to serve a subpoena on

23   my client, asking if I would accept service.  I

24   indicated I would.  I have not -- although a subpoena

25   did not come, as I talked to my client about

1     testifying today and discussing her rights, she

2     indicated she wanted to invoke her Fifth Amendment

3     rights today at this hearing -- or at this trial, and

4     she is not under subpoena, but we would accept

5     service, and I was told her presence would not be

6     needed today and I could come today.

7          I have also been asked to give a brief

8     timeline of when I became involved.  My understanding

9     is that Ms. Gabriel Noriega was contacted by federal

10    agents on May 8, 2019, approximately, and told that

11    criminal charges were going to be filed against her

12    very soon.  She hired me two days later.  I then

13    contacted the prosecution's team, and we were able to

14    work out a resolution of her case wherein, on July 11,

15    2019, she plead guilty to conspiracy to commit money

16    laundering.  And that's where we stand right now.

17          THE COURT:  Thank you, Mr. Crane.

18          MR. CRANE:  Thank you.

19          THE COURT:  Any comments from the government

20    or the defense?

21          MS. BECKETT:  Just briefly one thing, Your

22    Honor.  We had initially listed Gabriel Noriega as a

23    witness at the end of last year and when the trial was

24    initially scheduled to begin in January of this year.

25    And there was some correspondence between our office

1    and the prosecutor's office about whether or not they

2    needed to get plea agreements in place and in order to

3    get these individuals to be able to testify.  And I

4    think that's become a problem, so I just wanted to get

5    a record of that.

6            THE COURT:  All right.  Thank you.

7            Mr. Gadd, do you want to say something about

8    this?

9            MR. GADD:  I do.

10           THE COURT:  You better hang on, Mr. Crane.

11   You might want to say something else.

12           MR. GADD:  We anticipated this problem would

13   happen months and months ago, so, as a prosecution

14   team, we reached out to the defense and said:  Several

15   of the people on your witness list face criminal

16   exposure, and if you give us a short list of people

17   that you want to call as witnesses, we'll see if we

18   can work out something that allows them to testify

19   whether that's, you know, some sort of testimonial

20   immunity or a plea deal.

21           In the case of Ms. Noriega, that's a main

22   part of the reason why we've tried to work out a plea

23   deal.  She has pleaded guilty.  In her guilty plea

24   document, the United States has agreed not to seek

25   Indictment against her for any other drug offense for

1   which the United States Attorney's Office for the

2   District of Utah is aware at the time that it was

3   signed back in, I believe, July.  Our intention in

4   going through all that was to actually make it so that

5   she could be a witness.

6         We want to be extremely careful that our

7   actions aren't viewed as trying to influence witnesses

8   the defense wants to call.  We have tried to be as

9   hands off as we absolutely could, including by not

10  even contacting their attorneys when we had a sense

11  that they might be subpoenaed.  We left that to the

12  defense to handle.  My goal this morning was to

13  explain where we stood with Ms. Noriega.

14        I think what I would like to do is have

15  Mr. Stejskal talk through kind of some of the events

16  that led up to where we are at with the testimony of

17  Ms. Grant since, if she were to testify, she would be

18  his witness.

19        THE COURT:  All right.

20        MR. STEJSKAL:  Very briefly on that, Your

21  Honor.  So, as Mr. Gadd stated, the United States

22  reached out to defense counsel, the defense team a

23  couple months ago, before the previous trial

24  scheduling and said:  If you have any witnesses that

25  you plan on calling, let us know and we'll work

1   through the process.  And Ms. Grant was never listed

2   as a potential witness.  No contact from the defense

3   team about working with her.  We first got that

4   indication late last night.  I talked to the U.S.

5   Attorney's Office this morning and was informed that

6   it's a process to get somebody immunity for their

7   testimony.  It takes approval through DC.  It takes

8   the U.S. Attorney, John Huber's approval, and that's

9   not something that can happen with the snap of a

10  finger and so the timing on that just doesn't work

11  out.

12          We're disappointed that defense counsel

13  didn't reach out earlier.  We have done what we can to

14  assist with the process, but it appears at this point

15  that if she needs to invoke her Fifth Amendment

16  privilege, we can not grant immunity at this time.

17          THE COURT:  Thank you.

18          Ms. Beckett, anything else?

19          MS. BECKETT:  Yeah.  Your Honor, I would like

20  to make a few things very clear.  These individuals

21  were interviewed in 2017.  The government was more

22  than aware of their potential criminally liability.

23  Sasha Grant and Anna Gabriel Noriega were listed as

24  witnesses as early as November of last year when we

25  provided our first witness list.  There was no qualms

1    about that.  They were very aware of that.

2              And, on top of that, in terms of Sasha Grant,

3    when Drew Crandall testified, we clarified with the

4    prosecutors over here that we were going to ask her

5    ourselves to leave the courtroom because we intended

6    to call her as a witness, and that was over a week

7    ago.  At that point in time, they were more than aware

8    that we intended to call her as a witness and did

9    nothing in that regard and made no comment about

10   concerns regarding her immunity or anything at that

11   point.  And, as her attorney specifically stated, it

12   wasn't until last night that he became aware that

13   apparently the immunity she had did not apply to this

14   particular proceeding.  We would just like to make

15   that as part of the record.

16             THE COURT:  Thank you.

17             Mr. Crane, do you want to say anything else?

18   Apparently you do.

19             MR. CRANE:  Your Honor, the only thing I

20   would add, while I agree with the prosecution that the

21   government's hands are tied as to the District of

22   Utah, it does not cover charges -- we have no

23   agreement with the State of Utah.  We have no

24   agreement with any other district.  This is a

25   far-reaching -- mails are involved.  It really could

1    be filed in any state, arguably, and so that's

2    ultimately why we have decided to invoke the Fifth

3    today.

4              THE COURT:  Thank you.

5              MR. CRANE:  Thank you, Your Honor.

6              THE COURT:  Anything else from the United

7    States?

8              MR. GADD:  No, sir.  Thank you.

9              THE COURT:  Thank you.

10             All right.  We'll get the jury and proceed.

11             MR. CRANE:  May I be excused, sir?

12             THE COURT:  You may.

13             MR. CRANE:  Thank you.

14             THE COURT:  And this is your last witness,

15    right?

16             MR. SKORDAS:  Correct.

17             THE CLERK:  All rise, please.

18             (Whereupon the jury enters the courtroom.)

19             Court will resume session.  You may be

20    seated.

21             THE COURT:  Good morning again, ladies and

22    gentlemen of the jury.  Thank you for your work.  This

23    is how we are going to proceed.  The government is

24    going to call -- or excuse me.  The defense is going

25    to call the defendant, and he will be the last

1    witness.  We should finish him by or before noon, do

2    you think?

3            MR. SKORDAS:  Yes.

4            THE COURT:  And we're going to take -- you're

5    going to take tomorrow off.  We aren't.  We're going

6    to settle the instructions and the verdict form, and

7    the lawyers will get a little more time to streamline

8    their closing arguments, we hope, down to manageable

9    proportions.  So, after you're excused today, you will

10   be back here on Thursday at 8:30 for instructions and

11   closing arguments.

12           You may proceed.

13           MR. SKORDAS:  Thank you, Your Honor.  The

14   defense calls Aaron Shamo.

15           THE COURT:  Come forward and be sworn,

16   please.

17                     AARON SHAMO,

18   the witness hereinbefore named, being first duly

19   cautioned and sworn or affirmed to tell the truth, the

20   whole truth, and nothing but the truth, was examined

21   and testified as follows:

22           THE CLERK:  Please come around to the witness

23   box.  Please state your name and spell it for the

24   record.

25           THE WITNESS:  Yes.  Aaron Shamo.  A-a-r-o-n.

 1    S-h-a-m-o.

 2              THE COURT:  You may proceed, Mr. Skordas.

 3                       DIRECT EXAMINATION

 4    BY MR. SKORDAS:

 5        Q.    Aaron, I'm going to help you avoid what you

 6    just did, and I'm going to have you just pull that up.

 7        A.    Okay.

 8        Q.    Aaron, would you tell the jury where you

 9    currently reside.

10        A.    Salt Lake County -- or jail.

11        Q.    How long have you been there?

12        A.    Oh, man.  I've been there since November,

13    right before Thanksgiving.  And then --

14        Q.    Go ahead.

15        A.    Oh.  And then I was at Weber County for about

16    two -- I mean, two and something years.

17        Q.    Weber County Jail?

18        A.    Yeah.

19        Q.    You've been incarcerated continually since

20    your arrest in November of 2016, correct?

21        A.    Yes.  That's correct.

22        Q.    And when you were arrested in November of

23    2016, how old were you?

24        A.    26.

25        Q.    How old are you now?

1      A.   I'm 29.

2      Q.   What's your level of education?

3      A.   High school, freshman of college.  I mean, we

4   call that completing, so a tiny bit of college.

5      Q.   Where did you go to high school?

6      A.   I went -- part of it was high school in

7   Mountain Point in Arizona and then the rest --

8      Q.   Did you --

9      A.   -- was --

10      Q.   Did you ultimately graduate?  I'm sorry.  Did

11   you ultimately graduate from high school?

12      A.   I did, yes.

13      Q.   I'm sorry.  Go ahead.

14      A.   Thanks to going to a boarding school or,

15   yeah, a school for I guess troubled kids, and I

16   graduated high school there.

17      Q.   Where was that?

18      A.   That was in south Utah, La Verkin, Utah.

19      Q.   After that, did you attend college?

20      A.   Yes, I did.

21      Q.   Where?

22      A.   Utah Valley University.

23      Q.   Just briefly, would you tell the jury about

24   your life before you went to high school.

25      A.   Yeah.  So I love video games, kind of grew up

1   on video games, grew up with friends, I guess,

2   troubled friends I guess you could say.  Kind of was

3   getting into trouble.  I was smoking weed, and my

4   parents were really not having it.  They are really

5   good parents in case you couldn't see.  I grew up

6   really strong L.D.S, square parents.  And so, with me

7   going out and smoking weed is definitely a violation

8   of the religion and so they weren't too approval of

9   it.

10          And so, I mean, there's a lot of things going

11  on in my life, like, as far as emotion-wise, I guess I

12  was just bouncing around trying to find myself and

13  really just kind of stuck to a habit that really

14  wasn't good for me and so my parents saw that,

15  intervened and took me to a boarding school, south of

16  Utah.

17      Q.   Did you struggle in school before then?

18      A.   Oh, yeah.  Yeah.  Like I -- my mind was

19  always scattered.  It was everywhere.  So I didn't

20  really stay focused in school.  I was too busy on

21  other things such as video games.  That was more, I

22  don't know, multi-tasking, I guess you could say, like

23  I had a hard time sitting down.  I was later diagnosed

24  with something, I mean, but as -- it made sense

25  because as a kid, like, I just didn't -- like, I knew

1    where I wasn't doing well in school, but it was just

2    like I just accepted it.  Like, okay, school is just

3    not for me.  I don't know.  Does that answer it?

4        Q.  Yes.  That was great.  When did you start

5    school at Utah Valley?

6        A.  '08.  It was right after boarding school.  I

7    had a few classes to finish up for high school.  And

8    then I made the move to Utah just -- just bare, not

9    knowing anyone, just moving up here.  Only my sister

10   was going to college.  She was going to B.Y.U. at the

11   time.  It seemed like a good environment, as well as I

12   could get into snow boarding, so I set up my classes

13   to snow board every other day, like a class, like,

14   Monday, Wednesday and Friday and then snow board on

15   Tuesdays and Thursdays, so it was kind of a win-win

16   situation.

17       Q.  Did you find work at eBay at some point?

18       A.  Yeah.  Yeah.  That came much later.  It was

19   actually thanks to my co-defendant, Drew, who got me

20   the job.  He actually helped me with one of my first

21   good jobs, which was before that, at Teleperformance.

22   We can't really say we worked for Apple, but it was an

23   umbrella company that worked at Apple or doing Apple

24   products.  And so he got me that job, and then later

25   on Drew actually initially got me the eBay job as

1    well.

2         Q.    What was the name of the first company?

3         A.    Teleperformance U.S.A.

4         Q.    Where were they located?

5         A.    Lindon, Utah, so down south.  It was just

6    north of Orem about ten minutes.

7         Q.    What did you do there?

8         A.    There we troubleshoot Mac computers, so if

9    you see the back of an iMac and it says, "call Apple,"

10   you pick up the phone and you dial, and you'd get one

11   of us.  And so we were instructed on how to just

12   basically troubleshoot, which I mean Macs at the time

13   were amazing computers, and so most of the time it was

14   grandma calling how to close a window.  The computer

15   wasn't turning on so, you know, is it plugged in?  Oh,

16   that's the problem.  Okay.  You know, so it was -- it

17   was a lot of just troubleshooting, and, you know, they

18   gave us some Apple discounts, and I was, you know,

19   obsessed with Apple, so it kind of went hand-in-hand.

20        Q.    Had you quit Utah Valley by then, or was it

21   overlapping?

22        A.    Yeah.  I was -- I was going in and out of

23   school.  So, I mean, my first semester -- I have a bad

24   trend of going to school, doing, you know, pretty good

25   as far as when we start out, knowing my teachers, and

1    then getting really sidetracked, distracted or in a

2    relationship that just tanks my -- the end of the

3    semester and so, because of that, my grades really

4    suffered.

5          And, you know, so then I come to my parents

6    and I say:  Okay, let's -- what about next year?

7          And they are like:  Well, you should probably

8    retake, you know, these classes if this is what you

9    want to do in life.

10          I go:  Okay.

11          So a lot of it was retakes.  And so I think I

12   was just working at the time.

13   Q.   How did Drew help you get that job, this

14   first job that you've --

15   A.   The first job?

16   Q.   Yeah.  At Teleperformance.

17   A.    Yeah.  He was already working for the company

18   and so, basically, most of these companies that are

19   actually pretty good, and they want people just like

20   that individual, and so references, it goes a long

21   way.  And so he -- he put in the recommendation.

22   There's actually one time in my training class where I

23   had failed a test.  You have to get, I think, 70

24   percent or 80 percent on all the tests, and I had

25   failed one.  So he talked to the trainer, and I was

1    able to retake it and, you know, complete the training

2    and then get the rest of the -- or get on to the job.

3        Q.   Tell the jury about your transition from

4    Teleperformance to eBay.

5        A.   Yeah.  Let's see.  Teleperformance because I

6    was there for I think a year or two.  I think I moved

7    back to Arizona for just a summer to hang out with my

8    parents, and it was kind of hard on me because I

9    didn't -- it was one of those moments where I realized

10   I missed being home for quite a bit, and so, I mean,

11   this is just a side story, but, so, leaving -- so I

12   went home for just a few months as a lot of kids do,

13   and then when I wanted to go back to Salt Lake, my mom

14   actually, you know, on the side out of the airport,

15   she cried.  She was like:  Are you sure you don't want

16   to stay?

17           And I was like:  Yeah, I'm pretty sure.  I

18   think I've got to go back to Utah.

19           Arizona was just a bad environment for me.

20   And so I needed to just be out of the state, really.

21   And so when I came back, I was looking for work, and

22   Drew eventually, he got hired on to eBay and at some

23   point he, same thing, put in a recommendation and got

24   me the job.

25       Q.   What did you do at eBay?

1      A.    At eBay, it's -- it's kind of like what the

2    Judge is doing up here now, is just a lot of

3    mediating.  And so eBay, when you have a complaint

4    with an item you open up a resolution, and so from

5    there -- so say you have a bad item, you know, you

6    tell the seller you have a bad item.  The seller

7    disagrees and says the item is pretty good and you

8    got, you know, a good item.  And the buyer still says

9    he has a bad item.  So what, you know, they do is open

10    up a resolution.  We tell the buyer to -- or eBay

11    tells the buyer to go and return the item and then a

12    lot of where we come in is the sellers calling in and

13    complaining that they had a return and that the money

14    is over in the buyer's hands.  And so, it's just kind

15    of a lot of walking through buyers and sellers on how

16    to mediate on terms.

17      Q.    How long were you there?

18      A.    I was there for two years, I believe.

19            MR. SKORDAS:  May I, Your Honor?

20            THE COURT:  You may.

21            MR. SKORDAS:  It's gone.  Where is your

22    poster?

23            MR. BURGGRAAF:  We can call it up.

24            MR. SKORDAS:  Okay.

25      Q.    BY MR. SKORDAS:  Aaron, can you see that

1    poster in front of you?

2         A.   Yeah.  Yes, I can.

3         Q.   Can you tell us --

4              THE COURT:  Why don't we identify the

5    exhibit.

6              MR. SKORDAS:  Sorry.  This is Exhibit 17.06.

7              THE COURT:  Thank you.

8         Q.   BY MR. SKORDAS:  It's a diagram or a group of

9    photos that the government created.  I want you to go

10   and start on the second row and tell the jury, from

11   your experience at eBay, who you met there on that

12   second row.

13        A.   Yeah.  I met --

14        Q.   We talked about Drew Crandall.

15        A.   Yeah.  Drew Crandall, I mean, obviously.

16   Noble, Tonge, Bustin and Gygi.

17        Q.   All worked at eBay?

18        A.   All worked at eBay, yeah.

19        Q.   Mario Noble, Drew Crandall, Ms. Tonge, Bustin

20   and Gygi?

21        A.   Uh-huh.

22        Q.   Yes?

23        A.   Yes.

24        Q.   And on the bottom row, are there any eBay

25   employees that you met?

1    A.    I don't believe so.  I know -- I think

2    Edwards was working there, but I -- that was Drew's

3    friend, that wasn't mine.  And no, I don't know any of

4    them if they were working at eBay.

5    Q.    All right.  Thank you.  Why did you leave

6    eBay?

7    A.    Kind of a trend I had.  I mean, Drew was, I

8    mean, by best friend at the time.  I mean, we car

9    pooled together.  We -- you know, after the gas

10   station we would go get, you know, gummies together.

11   And so all of a sudden, when he got fired, he would --

12   he had a pretty gnarly temper.  He would put the

13   customers on hold and start swearing up a storm and

14   then take them off and then continue the process as if

15   nothing happened.  So, over time, I think one or two

16   of the times slipped where he might have swore at

17   customers.  I might have watered down the story,

18   but -- and so he was eventually let go.

19        And I, at the time, I mean, we lived at Orem.

20   We lived at -- it's east Salt Lake.  We lived at

21   Millcreek together.  And so now I didn't have my

22   carpool buddy, and it was kind of unfair.  I was like,

23   well, why am I going to work and you're not?  So, at

24   the time, it didn't make sense to me, and so I left

25   shortly after Drew.

1       Q.   How did your learn what you now know about

2   computers?

3       A.   Well, I mean, Drew's a genius.  He's taught

4   me quite a bit.  I mean, I've also self-taught myself,

5   you know, a bit about computers.  You kind of have to,

6   with, I mean, how much stuff trends because, I mean,

7   one day, you know, something is cool.  The next

8   there's a new program, so it's kind of hard to keep

9   up.  But it was actually cool.  I know they talked

10  about how my computer had a solid state hard drive

11  into the Mac.  Drew was actually the one that helped

12  pop off my Mac.  We disassembled it together and, with

13  his help, I was able to get a solid state hard drive

14  on top of the normal hard drive, and so it seemed

15  pretty easy getting it undone, but with a lot of help,

16  he -- you know, he -- he was actually the one that put

17  it back together.  So, a lot of things, he was way

18  more on top of than I was.

19      Q.   You grew up in a household with just sisters,

20  correct?

21      A.   Yes.

22      Q.   And you were the baby?

23      A.   Yeah.

24      Q.   The youngest?

25      A.   Yeah.

1     Q.   I guess you're always the baby.  Did you --

2  did you feel any sort of brotherly attachment to Drew

3  and some of these other folks that you were hanging

4  out with?

5     A.   Yeah.  I mean, I didn't have any other older

6  brothers.  I didn't really have role models.  I mean,

7  during -- I mean, most of the time I grew up, I didn't

8  even really have parents.  Most of it, I was just

9  figuring it out.  You know, from boarding school

10  straight to college.  You know, from doing my laundry,

11  I, you know, turned to my roommate.  I'm, like:  Well,

12  what do I do?

13          So he showed me how to do cold, cold, so I

14  washed all my clothes cold, cold because I, you know,

15  didn't want to mess up colors.  And so Drew was

16  definitely -- he was older than me.  We met long

17  boarding -- well, it was called free boarding, long

18  boarding, skate boarding.  We met that way, and he had

19  a lot of the same interests with me as far as video

20  games went, and so there's definitely some attachment.

21  And, you know -- and I still consider him my brother

22  today, I guess.

23     Q.   Let's -- I guess let's cut to the chase.  How

24  did you and whoever get started in the drug

25  distribution business?

1    A.    Uh-huh.  So Drew kind of touched on it a

2    little bit.  So, I was living paycheck-to-paycheck.  I

3    was working at eBay.  I was saving a little bit and,

4    you know, just kind of coasting in life.  And Drew was

5    really struggling as far as money goes and so he was

6    looking to find, you know, more income.  He was using

7    a lot of the -- you see the commercials like check for

8    cash and quick payday loans because he needed stuff

9    immediately and then he would have to pay it back and

10   so he was just working further down into the hole.

11        And so he -- I mean, I, you know, was mining

12   BitCoins at the time.  I had a huge -- it's called a

13   K&C miner that, you know, was just a plug and play.

14   You just plug it in, it gets my BitCoins.

15   Q.    What is it' called?

16   A.    K&C miner.  It's like a giant metal box.  It

17   was -- during the raid, it was actually in the

18   hallway, and I was like:  Oh, there it is.

19        And so I'd run a couple miners at the time.

20   A few Antminers, that miner.  And so I was, you know,

21   dabbling in BitCoins.  I thought it was a really cool

22   thing.  I kind of saw a future in it.  And so --

23   Q.    About -- sorry, Aaron.

24   A.    Oh.

25   Q.    About what period of time are we now talking?

1    What year would you say or what years?

2       A.   Oh, man.  I know it's, I mean, 2014, 2015.  I

3    couldn't tell you.

4       Q.   All right.  Go ahead, then.

5       A.   Yeah.  And so, since I was kind of using

6    BitCoins and kind of thinking it was kind of like a

7    new technology wave.  And Drew -- like we both had an

8    adderall prescription and so --

9       Q.   You both had an adderall prescription?

10      A.   Yeah, yeah.

11      Q.   All right.

12      A.   Because, I mean, afterwards I got diagnosed

13   with ADHD, but it was kind of too late because I, you

14   know, wasn't really going back to college, so I kind

15   of realized, like, oh, yeah, this helps.  And so,

16   there is a markup on it as far as, you know, if we

17   could get it off online.  And so we piled in our

18   Adderall.  I piled in, you know, the BitCoins that I

19   was kind of saving up, and then he piled in some

20   money, and we went ahead and opened up a store front.

21      Q.   Selling what?

22      A.   Selling Adderall.

23      Q.   And how did you obtain the Adderall that you

24   sold?

25      A.   It was through a doctor.

1        Q.   A doctor?

2        A.   Yeah, a doctor.  I drove down to a sports

3    medicine doctor down in Provo, and he was just the guy

4    to just prescribe it.  I had to go to a psychiatrist,

5    or I might be wrong in the name, but he had to

6    diagnose me properly and then -- so, you know, once a

7    month I could go down and get it checked out, so then

8    I had a steady supply.  And I know --

9        Q.   A steady -- excuse me.  A steady supply of

10   Adderall that was being prescribed to you personally?

11       A.   Yes.

12       Q.   Not given to you by a doctor --

13       A.   Yeah.

14       Q.   -- to sell?

15       A.   Yeah.  Prescribed.

16       Q.   All right.  Go ahead.

17       A.   Yeah.  And so it was kind of a win-win

18   situation.  It helped Drew.  I, you know, thought it

19   was cool.  And so we went ahead and moved on and sold

20   Adderall, and it made kind of a comfortable, like,

21   extra 900, 1200 bucks a month, so that's how it

22   started.

23       Q.   And then what was the next step, if you will?

24       A.   Next step is -- I mean, I think with money

25   comes greed, and so, all of a sudden, you know, Drew

```
 1   realizes he's digging out of the hole.  At the time,
 2   we are still at eBay and so I'm -- you know, to me
 3   it's just -- it's just, whatever.  I'm like:  Cool, I
 4   can buy some Vans.  You know, I didn't really think
 5   much of it and -- and so it kind of got pushed, like:
 6   Well, I'm getting this far out of the hole.  Let's
 7   continue.
 8           Because he was really working on his student
 9   loans.  My -- I was really blessed.  My parents helped
10   me out, and they were paying for my college, so I
11   didn't have the burden of student loans.  And so I
12   thought this was a really great idea to help my
13   friend, you know, and do something that I thought was
14   completely harmless.
15       Q.   And so what did you do?  What was the next
16   step that you did?
17       A.   Oh, sorry, yeah.  So the next step, so we
18   kind of talked about what -- what's available.  And it
19   really connects you to certain things that you
20   wouldn't normally ever see.  And so the next step is,
21   I believe we ordered like a hundred grams of Molly,
22   MDMA, and we started out that way because it's -- I
23   guess from where it's made, it's dirt cheap, and so
24   then we were able to obtain it here, and it's a party
25   drug and so you're able to make, you know, a bit more
```

1    money on it.  And from there --

2        Q.    Aaron, how did you obtain the Molly?  How did

3    you get started acquiring the product?

4        A.    So --

5        Q.    And I don't want you to get any individual in

6    trouble, but just generally how did you get it?

7        A.    Yeah.  So, I mean, it's used right through

8    the dark net market, and, you know, since BitCoins was

9    the thing, you could pay BitCoins and then they would

10   just ship it out to you and, at the time, I think it

11   was just either in my name or Drew's name.  It was --

12   we didn't really think anything of it.  It was just in

13   our names.

14       Q.    What did you have to do with it to sell it?

15       A.    So, at first we just sold it in gram bags,

16   and then Drew kind of did the math and, you know, we

17   realized, you know, it's not going to be in pill form,

18   but you could put it in caps, so if you crushed it up

19   and then sit there and just tap it and put it in caps,

20   then you could actually, you know, sell it, and it's

21   more better for the next guy.  It's -- and it's better

22   for markup as well.  And so, you know, moving from

23   that, you know, because it comes in a crystal form so

24   you just crush it up, you know, put it in the capsules

25   and sell it that way.

1       Q.   How did you find the customers?

2       A.   And so -- right.  Everything was done on the

3  marketplace, so all we had to do was just put up a

4  listing and say this is what we have.  And so, any

5  time, you know, orders would come through, I would

6  pass it off, and Drew would ship it.  And then he

7  would come up with new and different ways on how to,

8  you know, make it undetectable through the mail, mail

9  system.

10      Q.   Like what?

11      A.   So, I mean, there was a little bit of talk

12 about stuff online, like, you know, and we had to

13 think, like, okay, you know, the mail system is pretty

14 busy.  What's something that can just move on through

15 that wouldn't be looked at twice?  And so, you know,

16 something like candy bars that we could end up, you

17 know, pulling out Airheads, stuff like that, and use

18 a -- like a sampling food company to then ship it.

19 That way, you know, they open it up, the candy bar is

20 there, it's just pretty much taped or glued, and then

21 they have their product at that point.

22      Q.   Were you or Drew or others using some of the

23 product also?

24      A.   Yeah.  Yeah.  I -- I was using the MDMA.  We

25 had Ambien at one point, which is a sleeper.  I had a

1    really tough time.  I would -- so, with the eBay

2    shift, it was later in the afternoon, so I would get

3    off from work, go work out, take pre-workout, get all

4    hyped up, go to the gym, and then, once you're done

5    with the pump, the caffeine is still streaming through

6    my blood stream and so then, all of a sudden, you

7    know, I'm back at home and I'm wide awake and so I

8    would use -- you know, I would kind of -- I would try

9    Ambien.  It wasn't really for me.  I didn't like it.

10            You know, we had gotten GHB so I used that

11   for a little bit.  I ended up didn't liking it, but

12   yeah, we had, like, MDMA, which, I mean, because back

13   then, a lot of pills were being pressed in Ecstasy,

14   and you really don't know what's in it, and so it's

15   kind of a guess like, well, I hope it's going to be

16   okay.  Or, what we later found out is, if you have a

17   mandolin marquis test is you could do a color code and

18   see how it -- what colors pop up as to what's being

19   cut.

20            And so since we knew exactly, you know, this

21   is MDMA, all of a sudden we know, it's -- what exactly

22   we're taking.  And so, I mean, in my strange mind, I

23   thought, you know, we're not dealing with the cut.

24   They are not putting methamphetamine in it.  And so I

25   thought it was a bit safer.  And so we were able to

1    also sell it to our friends at really low prices just

2    because, you know, it was just a friend, like, I don't

3    want to make money off of you, you know, let's just

4    have fun.  And so I was able to sell -- we didn't sell

5    GHB to anyone.  It was sold online, though.  And,

6    yeah, we sold just a little bit of MDMA, just to our

7    close friends and MDMA online.

8         Q.   Did you sell Ambien?

9         A.   Yes.  I mean, at one point we had, like,

10   Modafinil, which is kind of like a -- like an

11   Adderall.  We had obtained -- one of our friends had a

12   prescription for Ritalin, and he needed money and so

13   he was:  Hey, let me sell you my Ritalin.

14             Okay.  That's fine.

15             So we would buy his Ritalin.  And my friend,

16   Mike Hanson, same thing.  He, you know, he was

17   struggling with money, and, you know, he was, like:

18   Man, let me sell you my Adderall.  You're making money

19   off of Adderall, right?

20             He didn't understand or know how.  He just

21   knew I had mentioned it before.  Yeah.  Sure.  Let me

22   help you out.  I'll buy it.  You know, that's no

23   problem.

24             So I was able to buy his Adderall and, again,

25   sell it online.

1     Q.   Then obviously you evolved into other drugs,

2     correct?

3     A.   Yeah.  Over -- over time, it -- it definitely

4     involved -- or evolved.  Things kind of got a little

5     hairy.  We -- I mean, not everything was all rosy.

6     What we ended up doing is, so, they kind of mentioned

7     on another testimony is that there were marketplaces

8     that would just shut down, pull out or just leave and

9     so we kind of got screwed on not just one but multiple

10    occasions.  And so there could have been anywhere

11    between 10, $20,000 that was sitting in escrow and so

12    we would just completely get wiped out.  And so all we

13    would have is just, like:  Okay.  Well, this is all we

14    got.  I guess we'll just start again.

15         And so I can't remember the question.

16    Q.   That's okay.  You were paying some money to

17    get some product from some illegal distributors, I

18    guess, and they got closed down so you lost the money

19    that was in escrow.  Is that what you're saying?

20    A.   Yeah.  That's correct.

21    Q.   But you did ultimately evolve into this huge

22    operation, Aaron, correct?

23    A.   Correct.

24    Q.   So, tell the jury, and take your time to walk

25    us through selling Molly and a couple Adderalls to

1   selling fake Oxy.

2       A.   Yeah.  So with money comes greed, and so at

3   that point, I remember -- so I'm going to jump into

4   the time frame of obtaining the single pill press that

5   would just punch down and pop out one pill at a time.

6   And so, you know, because I didn't know anything of

7   it.  And, you know, I was -- we were -- at the time

8   we're getting Zanax from another country.  I believe

9   it was India.  And so Drew came up with the idea of,

10  well, we could just press it.  And so I'm, like, okay.

11  And so in his brainyac brain of his, you know, he's,

12  like, it's just a simple -- you know, it's just

13  simple.  It's an algorithm.  And so he did the math.

14          And he's like, we could easily find out

15  what -- you know, if we, you know, rule out the active

16  ingredient, we could find what else we need to put

17  into it.  And so at first we started with just the

18  microcrystalline cellulose in the product and realized

19  that wasn't going to work.  And then --

20      Q.   Why?

21      A.   You need more active -- or not active.  You

22  need more chemicals in it.  There's, like, an

23  anti-caking agent, a lubricant.  There's a lot of

24  stuff that kind of goes into it.  And so I -- I

25  remember, like, being stuck.  He's being frustrated.

```
 1   He -- and so I remember finding a company that sold a

 2   one bag -- you know it -- you know, one bag fits all,

 3   like, it's like this is what you need, assuming that

 4   that's exactly -- you know, it comes canned, as like

 5   the solution, and so, you know, I was, like, okay,

 6   let's try this.

 7          I gave it to Drew, and Drew, you know, was

 8   able to make it work.  And a lot of swearing and

 9   frustration and, you know, he was able to pop out to

10   what we initially were aiming for, which was Zanax at

11   the time.  And then he was able to do the same thing

12   with MDMA.  And so Drew was dating a girl, Sasha, and

13   so she eventually, like my girlfriend, found out what

14   we were doing.  I mean, she's like:  You quit your

15   job.  What are you doing?

16          I'm, like:  Trading BitCoins.

17          And I was trading BitCoins on the side, but

18   it wasn't very heavily, and so, eventually, you know,

19   things kind of get out.  And Drew's girl wasn't really

20   okay with it.  And so, over time, it did evolve from

21   Zanax, but it didn't move over to any other products

22   until, I mean, Luke pretty much got involved.

23      Q.   Okay.  And you talked about this first pill

24   press that you bought.  How did you find it?

25      A.   I mean, good question.  I think it was just
```

1    some back page to some -- excuse me -- some Chinese

2    website that was offering the press.  Again, we didn't

3    know anything what we were doing or what it was about,

4    and eventually, we're, like, okay, well let's -- you

5    know, it's pretty expensive.  Let's dive into it.  I

6    mean, we weren't really being paid all that much from

7    the proceeds.  It was kind of like working on a

8    minimum wage for a long time.  And so we're, like,

9    let's see if this works.

10          And once we were able to obtain that, then,

11   you know, the process kind of evolved from there, I

12   should say.

13        Q.   If you could bring up 17.06 again.

14          Before we get to Mr. Paz, you did start

15   working with some of these people, correct, on the

16   Zanax, or maybe I'm wrong.  Tell me how that evolved.

17        A.   Yeah.  Yeah.  So, at the time, the girls

18   Tonge and Bustin, they were involved, and so they were

19   involved with the Zanax as well.  I don't believe

20   Noble was.  I mean, I think Gygi was just drop.  I

21   mean, we only had, like, Gygi and maybe one or two

22   drops at the time, like, they were just accepting, you

23   know, packages and delivering.  So it was, I mean,

24   fairly small, nothing that's up there like it is right

25   now.

```
 1           And it's funny because each drop, I wouldn't
 2    even mention to anyone, they would approach me and
 3    say:  What do I have to do for money?
 4           And I would say:  Well, if you want, you
 5    could just accept this and deliver it.
 6           Yeah.  Yeah.  Let's keep doing that.
 7           So it just continued to evolve as, you know,
 8    more and more people wanted to, you know, what are you
 9    doing?  Let me in, whatever you're doing.
10           I'm, like, okay.
11           And so from there -- so Tonge and Bustin,
12    Drew showed them how to ship, showed them how to
13    disguise, showed them pretty much everything, he
14    showed them the BitCoin wallets, the email.  He showed
15    them -- it was basically like, you know, because
16    they -- I guess I could take a step back.  So Tonge
17    and Bustin approached me at one point, and they were
18    like, hey, we have our mom's prescription.  We want to
19    sell it to you.
20           And I said, well, it's not really my thing,
21    but, you know, if it will really help, you know, you
22    guys out, I'll order it -- I'll buy it off you and
23    then we'll just do it on line.
24           So, slowly, you know, at one point, I bought
25    my friend's B.M.W.  He was trying to buy a house and
```

1    so, you know, it was just a 2008 and so it wasn't

2    anything crazy or special, so they saw me with the car

3    and they were like, well, what do we have to do to

4    like, you know, to get into this?

5         And so I was like, look, you know, you could

6    talk to Drew, and, I mean, if this is something you

7    want to do, then, you know, you could go ahead and I

8    guess get started because I didn't know what they

9    should be doing past a drop.  I was like, well, I

10   mean, website is taken care of.  Drew is doing all the

11   shipping, postage, running around, errands.  And then,

12   as far as cashouts, Drew was doing a bunch of them,

13   and I think I was doing some of the side, and so at

14   the time, Drew kind of saw this as an opportunity to

15   kind of -- kind of pivot, I guess.  And so, from the

16   Zanax over is this is when Drew was about to leave the

17   country.

18        And so I remember him saying -- so, we had

19   had a lot of talks, a lot of talks about what was

20   happening.  There's a lot of frustration going on, a

21   lot of, I guess we won't say butting heads.  He was

22   dating his girl, which turned in to be his fiance.

23   And I thought she was really cool.  She was an

24   alcoholic, he was a pot head, so their two problems

25   kind of collided and I guess made sense and so he was

1    saying:  She wants to travel the country.

2            And I was like:  Okay, cool.

3            And he was like:  Well, I want to go.

4            I was like:  All right.  That's cool.  Well,

5    what do we need to do?

6            He goes:  Sasha doesn't like what I'm doing.

7            And so I was like:  Okay.  What do I need to

8    do?  What do I --

9            And he's like:  You know, I want you to tell

10   everyone I'm bought out.

11           And, you know, at the time I think he had

12   20,000.  I had pulled out, I think -- I can't remember

13   what I paid for the boat, but I think it was around

14   20,000 as well because I had bought a boat with my

15   friend Miles.  And so once we kind of got the

16   transition, he showed Luke how to run the machine.  He

17   showed -- I mean, I didn't.  He's like:  Here, Aaron,

18   you know, why don't you try to understand this.

19           So I'm sitting there, and he's turning knobs

20   and showing him how to run this.  And Luke's looking

21   at me, and I'm looking at Luke like, well, I hope you,

22   you know, understand this.

23           And so eventually, you know, that was the

24   transition.  Drew left the country.  Luke kind of took

25   over, took the, you know, the pill press spot.  The

1  girls were now shipping.  I was, again, just, you

2  know, running the website, which, you know, processing

3  orders over, moving them down and getting them over to

4  the shipping company or to the girls.  And, you know,

5  and we had a lot of bumps on the road.  There was a

6  lot of issues that would come with his transition out

7  of the country.

8          And so really, when it came down to, I mean,

9  the reason for, you know, this whole thing is, for the

10  Fentanyl Roxy's was, at the time, I was being trained

11  by the gentleman that's second from the left, Kenny.

12  He -- you know, I don't know if he owned the gym or if

13  he was a personal trainer.

14      Q.   When you say you were being trained by him,

15  you mean he was your trainer, your physical trainer?

16      A.   Yeah.  Yeah.  Yes.

17      Q.   Okay.  You transitioned into Kenny there.

18  You finally got me there.  So, go ahead.

19      A.   Yeah.  Sorry.  And so he was -- you know,

20  Miles had mentioned to him like, hey, this guy, you

21  know, Aaron could get anything.  You know, I have a

22  friend that could get anything you want.  And really

23  it was just I had found the Dark Web and, you know, I

24  would, you know, do small things for friends like if

25  my friend needed a certain antibiotics.  He's like:

1    Dude, I don't have time to go to the doctor.

2           I'm just:  Go to the doctor.

3           He's like:  Dude, can you help me out?

4           And so I'd get him antibiotics, something

5    really simple.  And so anyway, Chris kind of heard

6    that, and he's like:  Hey, I was working with this

7    other guy over here and, you know, they kind of talked

8    about Fentanyl, a Roxy at a time.  And there was a

9    falling out.

10          And so he was really leaning into me like:

11   You should really do this.  And he's like:  Well, what

12   can you get?

13          And I'm like:  Well, I -- you know, Zanax.

14          And so at the time he was, you know, buying

15   Zanax and selling it and so that kind of happened

16   several times.  And so eventually, you know, after so

17   many conversations, so many goings, he -- you know, I

18   started bringing up to other people.  You know, I

19   said:  Okay.  Is this -- it this a possibility?  Is

20   this -- I don't really know anything about it.  I have

21   never done a pain pill.  I have never taken opiates.

22   I've, you know, stayed away from that my whole life.

23   And so this is kind of new to me.  I don't know how I

24   feel.

25          And it -- at the time Luke was on board.  He

1    just came back from Vivant, and usually the Vivant

2    sell is, go sell for the summer.  You come back and

3    then, you know, you've got a lot of money.  You flash

4    a lot of cash.  So he had just got back, had a BMW.

5    So I was like:  Oh, man, are you doing good?

6         He was like:  No.  I paid off all my debts

7    from the time I wasn't doing good.  So his real push

8    was, well, I really want to make some money.

9         And so I -- you know, Zanax was something

10   that I would take on occasion.  I would, you know,

11   bite a little corner and then take it for sleep, and,

12   you know, it's kind of a cool feeling to feel through

13   your bloodstream, you know, so it's like:  Zanax, not

14   so bad, you know.

15        And so he -- the thing that we organized out

16   because of how many payment kind of worked, is he

17   wanted to get paid not so much for like a percentage.

18   I was like:  Well, how do you want to get paid?

19        He said --

20        You know, do you want a percentage of what's

21   being sold?  Do you want a percentage?

22        He goes:  I want a fixed amount of work being

23   done, so anything that I make, I get paid.  I get, you

24   know, money.

25   Q.   You're talking about Mr. Paz now?

1      A.   Yeah.  Mr. Paz at this point.  And so, you

2  know, with Zanax, he's, you know, the markup is so low

3  that, I mean, these things are being sold for 50 cents

4  to a dollar, and it's -- you know, there's not much of

5  a markup, so his sweat and tears of all day work turns

6  into -- I mean, it's still a substantial amount of

7  money, but, you know, when we're kind of talking about

8  this possibility, he's saying this would be great.

9  Let's, you know -- and so I -- again, I kind of tossed

10  it in my head.  I'm like -- it took a long time for me

11  to come around and actually do it.

12         I mean, as you can see, it took months

13  from -- you know, the whole time I was talking to

14  Chris, the whole time, between --

15      Q.   This is Kenny?

16      A.   Oh, yeah, Kenny.

17      Q.   Okay.

18      A.   And so, it kind of took a long transition.

19  And so I had actually -- you know, Drew was having

20  fun.  He was out there.  He was really enjoying life.

21  And I had actually reached out to him and I had gotten

22  his opinion.  I said:  What do you think about this?

23         And I think he said something along the lines

24  like:  Well, you know, you've got to follow the money.

25             And so I was like:  Okay, you know.  And so

1    at that point, we went ahead and decided to move

2    forward.  And so I had ordered the A-215 die.

3        Q.   Aaron, when you say we decided to go forward,

4    who is the "we" at that point?

5        A.   I mean, it was -- it's hard because you

6    can't -- you can't really say one moves with -- you

7    know, it's everyone kind of -- it's kind of like at

8    this point, we're all friends.  We're all moving

9    together.  And so it wasn't just this person's

10   deciding.  It's, you know, okay, let's go ahead and do

11   this because it's -- in the end, everyone is

12   succeeding.  Everyone is, you know, doing better.  I'm

13   seeing the switch in people's lives where they are

14   stressed and now they are more comfortable and so, you

15   know, I kind of brought it up.

16            And so I believe it came down to, I mean,

17   Luke, Drew and I.  I mean, I brought it up to the

18   girls, but they -- I mean, they don't really care.

19   They are just, you know, putting things in and

20   shipping it out and so it didn't really bother them.

21   And so they were just worried about -- because at

22   first we -- we didn't have any really money to pay

23   them on a weekly basis.  So I'm like:  I promise you

24   I'll get you this.

25            And they are like:  Okay.  You know, just

1    give me the paycheck.

2           Because I was like:  Do you want a percentage

3    because I'd rather do that so then you can ride the

4    lows and highs.

5           And they're like:  No, no, no.  Just put me

6    on the weekly.

7           So I'm, like, okay.  So, at that point, it

8    became, you know, let's go ahead and do that.  And so,

9    not knowing anything about it, we used the -- again,

10   the canned substance.  We were just taking it and

11   throwing it in and, you know, we -- the only blue dye

12   that I knew was a dark blue and so Luke actually

13   figured out if you could just take literally just your

14   hands, and it's just a small flick, and you would

15   literally just put a few particles in.  And when you

16   shake that up with everything in it, that will give it

17   just the light blue.  So at first they were, you know,

18   too blue, too light.  But eventually he was able to

19   kind of find, you know, a good balance on that.

20       Q.   What was Chris Kenny's involvement in terms

21   of the Fentanyl and the opioids?

22       A.   As far as the Fentanyl and opioids, he was --

23   he was the connection into, I guess, Utah, and, you

24   know, through word of mouth, I've heard -- you know,

25   it kind of went from there.  But he was just the one

1    guy that -- I mean, it was his idea the whole time

2    that he was kind of leaning on me, saying, you know,

3    this is what you need to be doing.  This is -- you

4    know, there's money to be made, and, you know, so, at

5    that point, he was really kind of leaning on me to

6    move towards that.

7            And to be honest, I, you know, actually liked

8    the Zanax.  That's why I kept it on.  And so that was

9    like my thing, you know.  We used a GG 249.  I think

10   it was an out-of-the-country look.  And, you know,

11   it's something -- because I've seen the American bars,

12   and I don't really, you know, like them too much, so I

13   liked the GG 247.  And so with him, he was, I guess,

14   kind of like the outlet.  I mean, it was kind of the

15   start, the idea, and, you know, from there he was also

16   buying in decent quantities.

17       Q.   Drew had told his girlfriend and others that

18   he sort of was bought out of the business, but in fact

19   he remained, correct?

20       A.   Yeah.  That's correct, so --

21       Q.   Go ahead.

22       A.   So, I mean, like I said, he was my brother,

23   and I wanted to do anything that I could for him, and

24   I mean, like with my girlfriend, I -- you know, when

25   she found out, I was like:  Well, sucks, but this is

1    what I'm doing.

2          And we kind of argued on that and eventually

3    broke it off.  And so with him, he wanted to go a

4    different direction.  He said:  I really want to marry

5    this girl.

6          And I was like:  Cool.  I -- you know,

7    proceed.

8          And so we sat down and we talked, and he's

9    like:  Okay.  You know, let's -- I need everyone to

10   know, you know, that I'm, you know, moving out of the

11   country.

12         It was kind of like a public stunt in a

13   sense, and so, you know, he got to travel.  And then

14   the idea was is that he was really pushing because I

15   was like:  Yeah, man, just whatever I can do to help,

16   let me know.

17         And he was like:  Well, how about I come back

18   in like a few months, and, you know, I'll press for a

19   month, and you guys will be good and then you can just

20   surf on that for awhile.

21         And so I'm like:  Sure, I mean, yeah, that

22   sounds, you know, logical.  And so his idea was to

23   come back and then, you know, save up some money so

24   that way I could pitch it to him and then he could go

25   ahead and jump back and continue his surfing around

1   the world.  And --

2       Q.   How did you -- how did you exchange money

3   with Drew while he was on the other side of the world?

4       A.   I mean, it just depended.  If he needed bills

5   paid, I could, you know, write through, slip it on to

6   his bank account.  I could -- I mean, for the most

7   part, I just sent him BitCoins.  I mean, you could

8   receive it anywhere in the world.  It wouldn't matter

9   if it came from my account or the actual marketplace

10  itself.  Marketplace was actually a little bit safer

11  because they had a tumbling service embedded into it,

12  and so that way he could go ahead and use that, in a

13  sense.

14      Q.   What do you mean the marketplace?

15      A.   Well, the dark net market website.

16      Q.   So he was able to access the BitCoins from

17  this operation, if you will, through that?

18      A.   Yeah.  In a sense.  I mean, if he would send

19  me a message and say:  This is what I need.

20           You know, it only would take just an hour to

21  send it through.  And so he wasn't too interested on

22  being hands on, on the actual marketplace itself

23  because, you know, he was -- you know, he had dealt

24  with the marketplace.  He would buy weed and stuff off

25  of it like, you know, when we sold weed at the time,

1    that was his doing.  He was like:  Well, we can buy a

2    pound and, you know, then if I smoke weed, it's only

3    $3 a gram.  And, you know, he would kind of do the

4    math in that sense.

5            And so, I mean, at the time, he didn't have,

6    I guess, direct access.  He had, like, kind of a side

7    access, but, like, the first account that we had, one

8    time -- you know, sometime in the months, he's like:

9    I need -- I want to look at something.

10           So, you know, I shot him the password.  It

11   wasn't an issue.  Yeah.  Here you go.  Go ahead and

12   jump, you know, on, and, you know, whatever you need

13   to check out.

14           So it wasn't that he was blocked from it.  It

15   was just, he -- I don't think he had any interest.

16       Q.   What was Luke Paz doing while Drew was

17   traveling the world?

18       A.   Well, Luke, he -- so at first he came back.

19   He had a couple months that he was, you know, kind of

20   work free.  So, at that sense he was getting trained

21   by Drew and then pressing.  And then once he found the

22   formula, the, you know, Fentanyl Roxy's, then, you

23   know, that's basically what he did is he would come

24   over, press, bounce, and then he also did some

25   traveling, too, with -- they did pre-season, so you go

1    out for the pre-season, go sell, and then you would

2    come back.  And so that way, for his mind, he wanted

3    to be out of the public eye, and he wanted to, you

4    know, at least keep a facade of selling, even if he

5    was or wasn't.

6        Q.   You mean selling legitimately through the

7    company that he was working for?

8        A.   Yes.  That's correct.

9        Q.   And you said the name of that company but

10   I've forgotten it already.

11       A.   I think it's Vivant Security.

12       Q.   All right.  Take us up to 2016 then.  What

13   was happening in the -- maybe the five or six months

14   before your arrest.

15       A.   Five or six months, things kind of really

16   picked up.  I mean, things were never really great

17   from the start, but they finally kind of moved

18   forward.  So, at that point, you know, Luke wanted

19   to -- because, I mean, he got -- he got a fixed rate

20   of everything that was being made, so we kind of moved

21   up to a pill press such as the one that you see in

22   front.  So it was easier.  It was faster.  It was more

23   accurate.  And -- oh, crap.  I forgot what I was going

24   to say.

25       Q.   That's okay.  That's okay.  It was a dumb

1    question anyway, but I'm trying to get you up to

2    November of 2016, but let's start with a couple months

3    prior to that.

4        A.    Okay.

5        Q.    Your business picked up, and you were

6    starting to buy bigger -- or at least a bigger or two

7    pill press, correct?

8        A.    Yes.

9        Q.    And your market was getting bigger?

10       A.    Yeah.  I mean, it's how -- I mean, you could

11   you kind of control the market in a sense.  I mean, in

12   a sense, we're kind of getting flooded with more

13   orders.  I mean, on the screen, the girls were getting

14   pretty frustrated.  They were on, you know, on an

15   income, and they said:  Look, we're so busy.  Why

16   don't you, you know, just do the logical thing and

17   instead of selling singles and tens and 20's, just

18   move up to hundreds and thousands.  That makes sense.

19   That would be easier.

20            So, I mean, in my mind, I'm like:  Well, is

21   that what you guys want?

22            They are like:  Yeah.  It would be less

23   packages.  And they said, you know, and besides, it's

24   more money.  We would all benefit.

25            And so it was kind of a transition saying,

1    okay, you know, and this is what I kind of do.  I go

2    to Luke and I say:  So is -- you know, is this what

3    you want to do, though?

4         Yeah, of course, I mean, you know, because

5    the more we get out, it's better for us, you know,

6    we'll have an indated mind (as spoken).  Let's do

7    this.

8         You know, so I, you know, kind of go to

9    the -- he was kind of grandfathered on this whole

10   thing.  I say:  You know, is this what we should be

11   doing.

12        He says:  You know, you got to follow the

13   money.

14        So it was kind of like, let's -- I guess

15   that's what we're going to do.  I mean, it's really --

16   really stupid kind of thinking about it now.  I mean,

17   really shameful, too, but, you know, at that time,

18   about halfway through, that's when things kind of

19   started picking up.

20        And several months into that, it went from

21   kind of a hobby into something that I was kind of --

22   my eyes were a little too big, and I was like:  This

23   isn't what, you know, I expected at all.  Like it went

24   from, you know, something so small, you know, back

25   then, into, you know, something like this now.  And,

1    like, so, when we had the two machines, I would press

2    the Zanax.  If you noticed, there was two chairs.  I

3    would press the Zanax.  It's real easy.  It's just

4    the -- I mean, Drew already set up the mathematics.

5    So it was just bag the Zanax.  And Luke would actually

6    help set up the -- I don't want to say coordinates,

7    but the knobs.

8          And so, at that point -- and you could see,

9    there's a bunch of powder around it, which is really

10   embarrassing because there's, like, something that

11   comes down as a flap, that keeps the powder from

12   spilling in, and in my rush, I just screwed it down

13   and went, when Luke is the one that kind of sits there

14   and eyeballs it and really sets it on, so that way

15   it's really perfect and there is no powder that's

16   spilling.  And then, at that time, Luke is right next

17   to me, and he's pressing the Roxy's.

18        Q.   And were the presses basically the same, or

19   how were they different?

20        A.   I mean, they're -- they are the same in

21   similar ways, but, I mean, it was kind of like getting

22   into something new and, at that point, kind of

23   interesting, I mean, so his was just basic, like the

24   speed valve was just this little tiny knob, and the

25   one that I was using, there was an LCD screen that

1    could even give a pill count, what you're doing, and

2    then you could adjust the speed, though it kind of

3    sucked, like the more basic one was, I guess, in a

4    sense better, but that's as far as I know.

5        Q.   At this time, were you and Drew and Luke

6    getting most of your income from BitCoin, then?

7        A.   Yes.  That's correct.

8        Q.   But the girls, as you've described them, and

9    perhaps some of the others were getting paid in cash;

10   is that right?

11       A.   Yeah.

12       Q.   So tell the jury how you were converting --

13   and I know we've heard it a hundred times -- the

14   BitCoin to cash.

15       A.   I mean -- so there's various ways -- I mean,

16   back then, especially when we first started, I mean,

17   you would have to almost beg someone to take BitCoins,

18   like -- and we were overpaying people to just take

19   them, like:  Look, we'll give you a $50 break.  Just

20   take them.

21            And so, over time, it kind of evolved.  I

22   mean, nowadays, companies like New Egg and, I don't

23   know, they take BitCoin, so it's, you know, a little

24   bit more fluid currency.  So, back then, we had --

25   there is a kiosk that was a BitCoin kiosk that we

1    could use as well as it was pretty much all

2    peer-to-peer.  And then there was BitStamp.  So, I

3    mean, it just kind of varied as far as, like, when we

4    would cash out.

5         Q.   And you would cash out periodically to pay

6    some of these other people that didn't want to deal

7    with BitCoins, they wanted cash?

8         A.   Yeah.  They didn't understand it.  I mean,

9    Drew explained it to the girls, but they were like:

10   And then what?

11             You know, and so they were like:  Just -- I

12   just want money.

13             And we're like:  Okay.  That's fine.  Just

14   here.  Take it.  Take money.  That's easier.

15        Q.   How did -- let's talk about some of the other

16   people -- Mario Noble get involved?

17        A.   Mario Noble, I think was referred by, I mean,

18   Sasha, Drew's girl.  They had an idea of, you know,

19   packages coming in because, I mean, that's, you know,

20   again, you know, I took Molly at times.  I thought it

21   was cool and so, you know, then we would give it to

22   our friends, and so they had an idea that drugs

23   were coming in and put two and two together.  That

24   makes sense.  And so Sasha went ahead and referred

25   Noble and said:  Hey, you know --

1          Because he was complaining about money.  And

2     he's like:  Ah, you know, I'm paycheck-to-paycheck,

3     like, I'm in debt, you know, credit cards.

4          And so, through him, he kind of approached

5     us.  I don't know if I talked to him first or Drew,

6     but he basically got the rundown of, okay, go ahead

7     and accept packages and you could receive money.

8          Q.   What about Mr. Gygi?

9          A.   Same thing.  He was Drew's friend.  I thought

10    he was a little odd.  He was very closed with him and

11    his girlfriend, and that was -- he was on the vetter

12    side with eBay, so I guess he sat close to Drew, and

13    so Drew hooked him on being a drop.  And then, you

14    know, he didn't get more involved until the girls were

15    saying:  Look, we don't want to go to post offices.

16    We don't want to pick up stamps.  We don't want to do

17    this.

18          And that's when I approached Gygi and said:

19    Hey?  Is this something you want to do?  I mean, you

20    could just go pick up some postage.  You could just

21    drop it off in some blue boxes.

22          You know, I think -- you know, and at the

23    time I think he got fired from eBay as well and so he

24    was really kind of starving.  He was kind of not

25    really doing well as an individual and so I said --

1    you know, I mean, things just kind of weirdly meshed

2    together.  It was just like, well, this is what they

3    want.  Is that -- you know, do you want to try it out?

4           Yeah.  Yeah.  Why not?

5           So, okay, that's cool.

6           And I believe -- I mean, Drew was, you know,

7    out of the country so it was just, like, yeah.  Let's

8    do that.  We had excess income, so we were up to kind

9    of get him, you know, accepting drops and moving

10   postage every day.

11      Q.   What were you doing with your income that you

12   were making?

13      A.   Good question.  I mean --

14      Q.   Storing it in your sock drawer?

15      A.   Yeah.  Yeah.  I mean, as you can see, my cars

16   weren't new.  The B.M.W. was bought from one of my

17   friends, Ben, and, I mean, and then right towards the

18   end, another instance, my friend Roy, he was selling

19   his car.  I remember, you know, kind of checking out

20   the car.  He was selling it to Miles, and I was

21   looking at it, and I was like:  Well, is it awesome?

22          And he was like:  Yeah.  It's pretty awesome.

23          And I was like:  Yeah, you know, let's do it.

24   I'll buy the truck.  But, I mean, I didn't like to be

25   super flashy.  I, you know, started out buying some

1  designer things and then all of a sudden people kind

2  of change.  They treat you different.  They just

3  expect things more out of you, like, say, if we were

4  at a concert and, you know, they are like:  Oh, he's

5  going to get shots, and they kind of look at me.

6          And I'm just like, I need to stop wearing

7  these clothes.

8          And so I kind of just spent it on casual

9  vacations.  I didn't really splurge on anything

10  except, you know, there was a TV and, you know, and

11  then I tried to be more mature and I bought some

12  furniture.  And that's basically it.

13      Q.  Just sort of a diversion for just a minute.

14  Your mother testified to a duffel bag of cash that was

15  delivered to her and another packet of cash that was

16  apparently delivered to one of your sisters.  Can you

17  tell the jury about those?

18      A.  Yeah.  And so they were really encouraging me

19  to save my money at the time, and I was not against

20  it.  I mean, I was a kid.  I mean, I kind of still

21  view myself as a kid.  And so I thought that was a

22  great idea.  I was dating someone at the time, so we

23  drove down to Pine Valley in the truck that I bought.

24  You know, I was like: Hey, let's try out the truck.

25          You know, and so, you know, I was able to,

1  you know, deliver a duffel bag of money to them.

2         And they were kind of surprised, and I was

3  like, you know, here it is, you know, just hang on to

4  it.  If I ever come up with an investment or need it

5  for anything, you know, it's a way that I just won't

6  spend it.  So they accepted it at that time.

7         Another time is when my sister was driving

8  through Utah.  She stopped by the house.  You know, I

9  hadn't spent too much time with her little kids which

10 were really cute.  It was -- they look just like my

11 sister and her husband at the time.  And so, you know,

12 I took advantage of the opportunity.  I said:  You're

13 going to parents' house, right?

14         Yeah.

15         Hang on.

16         You know, so I, you know, filled up a -- just

17 one of those gym bags that, you know, have the

18 shoestring and it was just tied up, and I was like:

19 Well, you could bring this down, right?

20         She kind of looks at me like:  Yeah, we could

21 take it down.

22         I'm like:  Okay.  Cool.

23         So I was able to, I guess, in a sense,

24 through, you know, what my parents would suggest is

25 saving money.

1    Q.   So you -- you didn't intend for these to be

2    gifts to your sister or your parents.  It was just you

3    sort of rat-holing it for a rainy day or something

4    like that; is that fair?

5    A.   Yes.  That's correct.

6         MR. SKORDAS:  May I have just a minute, Your

7    Honor?

8         THE COURT:  Yes.

9         MR. SKORDAS:  I apologize, Your Honor.

10        THE COURT:  I didn't hear what he said.

11        MR. SKORDAS:  I apologize.

12        THE COURT:  Oh.  Apology accepted.

13        MR. SKORDAS:  Could we go to Exhibit 783,

14   please.

15        THE COURT:  783?

16   Q.   BY MR. SKORDAS:  Can you blow the four

17   packages up a little bit for me, Yvette.

18        Aaron, do you see that?

19   A.   Yes, I do.

20   Q.   How did you get to that?  How did you get to

21   that?  And I'll indicate that this is a picture that

22   shows packages with, it looks likes thousands of pills

23   in each one.  There even is a handwritten note that

24   says, I think, 2,000 or something on each one.

25   A.   Yeah.  I mean, things kind of exploded and, I

1    mean, it's really a good question because, I mean,

2    it's one of those things where everyone is benefiting

3    from more.  And so it wasn't just, like, the girls

4    wanted less shipments.  You know, Luke wanted more

5    money.  I, you know, was cool with whatever.  I mean,

6    I'm not going to lie.  Money is cool, so I was like:

7    Why not?

8              And, at the time, Drew was traveling the

9    world.  And so, if it was up to me, I would have

10   pushed down and kept it mom and pop.  You're able to

11   work with people a lot more closely on it, but it's --

12   it just kind of, I guess, progressed in that

13   direction.  It's one thing led to another.

14       Q.   Thank you.  Earlier you said something that I

15   hadn't heard before.  You said we were -- maybe I

16   mischaracterized it.  You said something like:  We

17   were looking for the end, or you were thinking there

18   was an end.

19       A.   Yeah.

20       Q.   What did that look like to you?

21       A.    It was December.  We were coming up as, you

22   know, when can we unplug?  Like, what's -- you know,

23   this isn't a lifestyle.  I -- I honestly felt, like,

24   hollow.  I wasn't a human being, like, I wasn't happy.

25   You know, I could wear cool clothes, but I was just

1    like:  Man, I'm a piece of shit.

2          So, it kind of came to a point where I was

3    talking with Luke.  And Luke was like:  Look, we need

4    to be done with this.

5          And I was like:  Yeah, I wanted that last

6    year.  And this is where I'm at, you know.

7          And it's just -- you know, one thing led to

8    another of, you know, when we wanted to stop, it's

9    like, well, this person -- you know, Drew -- Drew

10   needs this much money, you know.  So it's like, okay,

11   well, we got to keep going.  It's like, well, okay,

12   you know, now I just need to be a little bit more

13   comfortable.  So we kept going.  And so at the end

14   point, which was kind of funny, is -- not funny.  It

15   was -- it was just right there, and so I was looking

16   at it.  And I kind of talked to even Gygi about

17   moving -- marijuana was legal over in Colorado and so

18   I had an idea about moving up.

19         And then, you know, we had talked about

20   ending, but at the same time it was always the back

21   door of:  Well, let's take a break for a long time and

22   maybe get back to it.  But the end was, you know,

23   ideally in December.

24      Q.   Talk to us about the day of November 22,

25   2016.  What happened that day?

```
 1        A.    SWAT, multiple agencies kicked down my door,

 2   and I was arrested.

 3        Q.    Were you home?

 4        A.    Yes, I was.

 5        Q.    Who else was there?

 6        A.    No one else.

 7        Q.    Where were you when they kicked down the

 8   door?

 9        A.    I was coming out from the basement.

10        Q.    What had you been doing?

11        A.    So, at the time, I was waiting for Luke to

12   get there.  He is pretty lazy, so I mass-texted his

13   phone, and then I was actually down there pressing

14   Zanax at the time.

15        Q.    Were you taken into custody?

16        A.    Yeah.  Yeah.  I was taken into custody.

17        Q.    And you have been in custody ever since then,

18   correct?

19        A.    Yeah.  Yeah.  I have been in custody ever

20   since.

21        Q.    Why didn't Luke show up that day?

22        A.    I'm assuming just dodged a bullet because

23   they came at 10:00 o'clock.  He's always late.

24        Q.    10 a.m.?

25        A.    Yeah, 10 a.m.  And so I honestly don't know,
```

1    so, I mean, it was just me, so that's where they

2    rested their hat.

3            MR. SKORDAS:  Would this be a good time for a

4    short break, Your Honor?

5            THE COURT:  Yes.  We'll be in recess for

6    about 15 minutes.

7            THE CLERK:  All rise, please.

8            (Whereupon the jury leaves the courtroom.)

9            THE COURT:  This is the day, remember, I have

10   problems starting at noon.

11           MR. SKORDAS:  Very well, yes.

12           THE COURT:  I need to be gone about ten to

13   noon.  This has been a long-standing problem, but if

14   we're not done with this witness today, we'll bring

15   him -- I mean, he'll finish Thursday morning before we

16   do the instructions and closing.

17           MR. SKORDAS:  That's fine.

18           THE COURT:  Given there is no sense bringing

19   the jury in for -- it wouldn't be very long.

20           MR. SKORDAS:  Right.

21           THE COURT:  -- testimony on Wednesday.  All

22   right.

23           MR. SKORDAS:  Yes, sir.  Thank you, Judge.

24                   (Short recess.)

25           THE COURT:  Should we get the jury and

1    proceed?

2         MR. SKORDAS:  Yes.  We're ready.

3         THE CLERK:  All rise for the jury.

4         (Whereupon the jury enters the courtroom.)

5          Please be seated.

6         THE COURT:  You may proceed, Mr. Skordas.

7         MR. SKORDAS:  Thank you, Judge.

8    Q.   BY MR. SKORDAS:  Aaron, I probably should

9    have just asked you these before the break because I'm

10   almost done.  You testified earlier, right at the

11   outset, that you have been in jail continuously since

12   November of 2016, correct?

13   A.   Yes.  That's correct.

14   Q.   Have you had occasion to have cellmates or

15   roommates who had drug problems?

16   A.   Yeah.  It's an eye-opening experience.

17   It's -- they come in and they are miserable.  They

18   look miserable.  And they are coming off.  Some of

19   them are throwing up.  I've seen an old man take a

20   crap where it hits the wall, like it's really not a

21   pretty scene.  To see it firsthand -- I mean, I was

22   never around addiction really, and so I never got to

23   see anything like that, and so seeing someone go

24   through the struggles was really intense.

25         I mean, a lot of them are abusing meth.  A

1   lot of them are abusing heroin.  And it's just -- they

2   are sucked up.  They are a hundred -- I mean, these

3   guys should be 180 pounds, and they are 120, 130, and

4   they are coming in.  And when they are coming to jail,

5   they are finally getting the nutrition that they need.

6   As far as heroin, they are either sick, their body has

7   gotten so used to it in taking it so long and

8   increasing the doses, that they just -- you know, when

9   they drop off -- I mean, I don't want to publicly, you

10  know, shame the jails I was at, but, you know, they

11  kind of give them a Gatorade and say:  Well, all

12  right, you know.

13       It's kind of like, so, they are just left

14  there, like just miserable.  And, you know, and then

15  watching this, like, Dude, it's horrible.  And I ask

16  them, you know, simple questions, because I, you know

17  I'm like:  Why?  Why do you do this?

18       You know, and they can't really give me a

19  straight answer, and I kind of see that it just takes

20  over their life.

21       And you just don't see that when someone

22  orders something.  They praise it.  A guy here, you

23  know, it's excellent.  You're the best.  Like, you

24  know, my doctor pulled me off of this.  I didn't know

25  what I was going to do.

1          And so you don't see the ripple that it has

2    on these people and families that come in and they are

3    just so frustrated with these individuals.  And I'm

4    trying to talk to them because it's so simple, like

5    obviously this isn't working, you know, like, it's

6    just so basic.  Why don't you just do something

7    different?  And you're so miserable in jail that, you

8    know, it's just like:  God, this sucks.  It's like

9    you're just sitting there, like you're eating crappy

10   food, you're not with your family.

11         And then they're just talking about, like,

12   when I get out, like, man, it's going to be so nice to

13   just, you know, have a relief because it's just like a

14   horrible process.

15         And you just watch people just jump right

16   back into it, or they have a speech of like:  I'm

17   never coming back.  I'm never going to go do it again.

18         And you see them weeks later.  They are like:

19   I just wanted to get high one time.

20         And I got to see the struggle, and it's just

21   brutal to see what they are doing and to see such --

22   you know, when I got into it, you know, people would

23   message me back and forth, and, you know, it was -- it

24   went from what I thought was a blessing of, you know,

25   I can't get prescribed this because, you know, I'm a

1    lawyer and they could take it as a judgment call, you

2    know.

3          Or I can't get prescribed this because, you

4    know, whatever this says, you know, and if people

5    don't have insurance, it's a high cost.  Or like, you

6    know, going through the doctor, the psychiatrist.  My

7    parents, you know, I was blessed that they are able to

8    help walk me through the process, and, you know, I was

9    on their insurance until 26.

10         And so, at the beginning, it was, you know,

11   we could have Ambien.  We could have Adderall, and so

12   if they needed just, you know, maybe this is something

13   for them that they could try.  And, you know, it's

14   outside of, you know, the controlled process that it

15   seemed like -- it seemed like a good idea.  It was a

16   win-win situation.  It was something that they could

17   benefit from.  And, you know, I felt like I was doing

18   something positive, you know, even -- yeah.

19         So, to answer your question, seeing firsthand

20   completely changed -- completely changed my mind.  You

21   know, afterwards the opioid epidemic hit and the

22   broadcasting, the gruesome effects of what happens,

23   because before, it was just, you know -- it was just,

24   you know, this is a prescribed pain killer.  This is

25   what companies are making.  It's okay.  It's -- sorry

1   to lose it, but, you know, it's one of the worst life

2   lessons.  And it's not okay, you know.  I'm seeing

3   it's enabling something that, as I would tell people

4   so often, it's not working.

5          Anyhow, so I got to see, you know, them

6   coming off the streets or, you know, people that came

7   from, you know, they're in a company or a huge

8   baseball player, it doesn't matter who, and they hit

9   rock bottom, you know.  And I have seen that

10  firsthand.

11         MR. SKORDAS:  That's all I have, Your Honor.

12         THE COURT:  Thank you, Mr. Skordas.

13         You may cross examine.

14         MR. GADD:  If I could have just two minutes.

15  Thank you.  My hope is taking that couple minutes will

16  mean I'm up here for less time.

17                    CROSS EXAMINATION

18  BY MR. GADD:

19      Q.   Good morning.

20          THE COURT:  Speak up.

21      Q.   BY MR. GADD:  Good morning.

22      A.   Good morning.

23      Q.   Let's start with an easy one.  You have a

24  password you like to use, Molly Dog, right?

25      A.   Yeah.

1    Q.   And it's not that you were referring to the

2    drug Molly, right?

3    A.   Yeah.

4    Q.   You were referring to an actual dog?

5    A.   Yeah.  My pet growing up was actually a

6    golden retriever who was named Molly.

7    Q.   It's just a coincidence that you were later

8    using Molly, correct, or MDMA?

9    A.   Yeah.  The name came later down the line, you

10   know.  Rappers kind of do that, so, yeah.

11   Q.   Sure.  Let's try another one that I hope will

12   be an easy one for you.  Could we look at Exhibit

13   14.38.  Do you remember seeing this?

14   A.   Yeah.  I remember seeing it here in court.

15   Q.   So, Ms. Laughter, if you can just give us the

16   chart, if you can call that up.

17        So this is the potency chart that was found

18   on your computer, along with all the other passwords

19   that were some variation of Molly Dog.  This chart was

20   useful, right?

21   A.   Yeah.  There was a lot of prescriptions

22   there.

23   Q.   And I mean useful because you were trying to

24   stick Fentanyl in a pill that you were marketing to

25   look like you Oxycodone.  You needed something like

1    this, right?

2         A.   I mean, yeah, really the chart wasn't really

3    helpful, but, I mean, I see where you're going with

4    it, yeah.

5         Q.   Not as helpful as the it could have been

6    because you had some other issues at play, right?

7    It's not like exact science, right?

8         A.   Yeah.

9         Q.   You remember Special Agent Jeff Bryan, the

10   retired DEA agent.  He talked about your process, and

11   he made a comparison to like making chocolate chip

12   cookies.  Do you remember that?

13        A.   Uh, yeah.

14        Q.   You remember too many chocolate chips go into

15   a cookie and somebody ends up dead.  Do you remember

16   that?

17        A.   If he said that, okay.

18        Q.   This was for you to try to figure out how

19   many chocolate chips to put in your cookies, right?

20        A.   I mean, really the chart wasn't really

21   useful.  It was -- I guess what you're kind of leaning

22   on is, we started on, you know, a super low dose, and

23   we, you know, gave it to Chris.  And he had, you know,

24   said:  Okay, let me test it.

25             And then he's -- from there he's like:  A

```
 1    little bit stronger.  A little bit stronger.

 2         So it wasn't really --

 3    Q.   You kind of walked it up, right?

 4    A.   Yeah, so it kind of walked up from that

 5    point.

 6    Q.   By the end, do you remember how much Fentanyl

 7    you were putting in each pill?

 8    A.   I don't.  I know the ball park range.

 9    Q.   Go ahead and tell us.

10    A.   It's about a milligram.

11    Q.   The other problem you had with making these

12    cookies is how pure the chocolate was, right?  I mean,

13    you're not getting your Fentanyl from a pharmaceutical

14    company, right?

15    A.   Well, it --

16    Q.   Right?

17    A.   Yeah.

18    Q.   Let's look -- here.  I'll show you.  Let's

19    look at Exhibit 301.

20         And then if you could highlight the top for

21    us there.  So this is one of those packages that we

22    seized, the test results from, right?

23    A.   Yeah.

24    Q.   This is the Mausia package from the middle of

25    November?
```

1      A.   Uh-huh.

2      Q.   Do you see the substance purity line there?

3      A.   I do see that, yes.

4      Q.   80 percent?

5      A.   Yeah.

6      Q.   That's how pure the chocolate is in your

7 chocolate chip cookies, right?

8      A.   Uh-huh.

9      Q.   What happens when you get one that's 50

10 percent?

11      A.   Obviously the effects aren't going to be as

12 great.

13      Q.   Customers complain?

14      A.   Yeah, sure.

15      Q.   You've got to change your recipe?

16      A.   I mean, you have to hear more than one ear,

17 but, I mean --

18      Q.   Yeah.  One complaint is not enough, but if

19 you get a bunch of complaints, they are saying this

20 whole batch of chocolate chips aren't any good, you're

21 going to have to change your recipe, right?

22      A.   Yeah, but through the whole thing, it was

23 pretty consistent.  There was never anything -- it was

24 always -- I mean, we would get advice to put it up,

25 and I would say:  Just keep it where it's at or tailor

```
1    it down.  It's not one of those things we really
2    wanted to push the envelope on.
3        Q.   You say it was consistent, but you didn't
4    have the ability to test for purity levels, did you?
5        A.   No, we did not.
6        Q.   At one point, you reached out to a company to
7    see if they would do GCMS testing for you, but nobody
8    was willing to test your Fentanyl pills, right?
9        A.   No.  We never asked.
10       Q.   You needed constant feedback to try to get a
11   sense for not only how many chocolate chips were going
12   in your cookies, but how strong the chocolate was,
13   right?
14       A.   Yeah.
15       Q.   Constant feedback?
16       A.   It wasn't that we needed it, it was just
17   always at hand.
18       Q.   You tested your MDMA pills before you used
19   them?
20       A.   Yes.
21       Q.   And you talked about how you had a color
22   test.  I think you called it a Marquis test, right?
23       A.   Yeah.
24       Q.   And if you put a little bit in, shake it up,
25   see what color it is, that will tell you roughly what
```

```
 1   the active pharmaceutical ingredient is, right?

 2       A.   Yeah.  Eyedroppers.  So you would put it on a

 3   clean plate and it would color on -- yeah.

 4       Q.   Were you doing that for your Fentanyl as

 5   well?

 6       A.   Yeah.  We would make sure that, coming in,

 7   Fentanyl was the actual ingredient.

 8       Q.   And your customers down the line, were they

 9   testing it?

10       A.   I honestly am not sure.

11       Q.   Let's look at Exhibit 14.44.  We can stay

12   here on the first page.  Do you recall this?

13       A.   Just my computer's Google search.

14       Q.   Right, Google searches from your computer,

15   but not all of them?

16       A.   Yeah.

17       Q.   You know better than anyone how many times

18   you searched things?

19       A.   Uh-huh.

20       Q.   Were you surprised when you heard testimony

21   that it was thousands of searches?

22       A.   No.  I mean, I'm a closet nerd.  I mean, if

23   you have any question, you know, Google is there.

24       Q.   And that's how you learned a lot of this,

25   right?  I mean, you learned by research?
```

80

1      A.   Trial and error, yeah.

2      Q.   Sure.  You see the right column, third one

3  down?

4      A.   Which one?

5      Q.   Do you see it now?

6      A.   The third one down?

7      Q.   Uh-huh.

8      A.   Naloxone?

9      Q.   Yeah.

10      A.   Okay.

11      Q.   Did you buy it?

12      A.   No.

13      Q.   You thought about buying it?

14      A.   Sorry?

15      Q.   You thought about buying it?

16      A.   I mean, again, it could have just popped up

17  as one of the Google searches.  A lot of things auto

18  populate and so a lot of, you know, what I was doing

19  is, I mean, you can see just on the top one there is

20  Clonazepam, you know, and so there's a lot of

21  research.

22      Q.   Clonazepam is a benzo?

23      A.   Yeah.  And so that's a benzo --

24      Q.   Naloxone.

25      THE COURT:  Let him finish his answer before

1    you question.

2         Q.   BY MR. GADD:   You go ahead.

3         A.   I can't even tell you what Naloxone is, to be

4    honest.

5         Q.   But you visited the website.   You went to

6    stopoverdose.org.

7         A.   Yeah.   You definitely hand-picked selected a

8    few websites that I visited.

9         Q.   There was many, wasn't there?

10        A.   Yeah.   I mean, there was a lot of video games

11   I searched.   I would watch Twitch TV, and my computer

12   was openly available, so if any search needed to be

13   done, you know, it could be done.

14        Q.   You watched the DEA video that talked about

15   the dangers of Fentanyl and the need to have Naloxone

16   present?

17        A.   Uh-huh.

18        Q.   And you heard from Dr. Hale.   She talked

19   about Naloxone, sold as Narcan, N-a-r-c-a-n.   You

20   watched a 50-minute-long video made by VICE, where you

21   learned about the dangers of Fentanyl, where you

22   watched addicts shoot up.   And that's why you searched

23   it, isn't it?

24        A.   It was being advertised.   I think it just

25   came out, and it was kind of around the time -- I

1    mean, I'm pretty sure it was around October.  It was

2    kind of -- like, it was a new thing.  I mean, Fentanyl

3    was, I mean, before, just a research chemical.  So,

4    the only thing I knew was it was just, you know, just

5    like a pain killer.  And so, yeah, Naloxone came out

6    around that time.  I was looking at, you know, what

7    the mark was.

8         Q.   And you were worried.  You know, you had

9    powdered Fentanyl in your home.  You were using it in

10   a pill press.  There's a risk, right?

11        A.   I mean, this sounds kind of dumb, but, I

12   mean, we didn't really think of the risk.

13        Q.   You had a mask.  You wore gloves.  There's

14   gloves on your shelves.  You were worried about the

15   risk, right?

16        A.   Yeah.  We were also wearing gloves.  The mask

17   kind of made your face sweaty, so it was one of those

18   things we sometimes wore, but I guess, to be honest,

19   it's just like the agent said, you know, what we came

20   to understand is when it's airborne and so if it's in

21   the air.  So everything -- you know, even when Luke

22   would pour it, I remember him saying that he would

23   hold his breath and go ahead and do the process.

24        Q.   So you knew it was a danger when it was

25   airborne?

1      A.    I mean, just like anything.  I mean, you

2   know, if there's a ton of Zanax in the air, it's like,

3   you know, that's -- you know, it can't be good.

4      Q.    It's going to make you feel relaxed if

5   there's a ton of Zanax in the air?

6      A.    Yeah, sure.

7      Q.    And if there's a ton of Fentanyl in the air?

8      A.    Yeah.  Then that's something to be

9   considered.

10      Q.    You're going to go sleep, aren't you?

11      A.    Yeah.

12      Q.    And you may not wake up, will you?

13      A.    Yeah.  Too much of the chemical, yeah.

14      Q.    Let's talk for a minute about your

15   motivation.

16      A.    Uh-huh.

17      Q.    You indicated greed was a motivation?

18      A.    Yeah.

19      Q.    A love of money was a motivation?

20      A.    Uh-huh.

21      Q.    There's probably more to it than just that,

22   though, isn't there?

23      A.    Yeah.  I mean with money comes a lifestyle.

24   You get accustomed to things.  It's hard to break off

25   of.  There is a saying in jail where it's like if you

1    drive a BMW, you can't go back to a Toyota.  It's

2    just, you know, and so you kind of get accustomed to

3    things and, you know, how things are going, and, you

4    know, at the time I thought money was really important

5    in life.  It, you know, defines someone.

6         Q.   You say "accustomed," but that's not the word

7    you used when you told your mom.  You said "addicted"

8    to her.  Do you remember that?  You told her that's

9    what you were addicted to.

10        A.   Yeah, sure.

11        Q.   A lifestyle?

12        A.   If there's an alcohol anonymous or if there's

13   a money anonymous, I'd definitely sit down and, you

14   know, be present at the meeting.

15        Q.   Let's look at 14.19.  And if we could go to

16   the second page and then call up the last box.

17             These are notes that you typed in.  This is

18   from January 1, 2016.  You see starting in the body,

19   you wrote this to yourself?

20        A.   Yeah.

21        Q.   "Love you Shamo.  You're such a great guy and

22   everyone loves you, LOL.  Today is the first day of

23   2016.  Let's do it right.  I will over achieve.  I

24   will overcome, and I will be F'ing rich.  Every girl

25   will love me.  They will want me.  They will need me.

```
 1   Focus.  Every small detail matters.  I want that girl
 2   from Snow Globe to like me.  She will love me.  She
 3   doesn't know it yet, but she will be obsessed with
 4   me."
 5            "Life is great.  Life is amazing.  I honestly
 6   can't wait to live it.  Gonna make 250 K in the next
 7   few months easy."
 8            That's what you wrote?
 9   A.   Yeah.  I was pretty big on The Secret.  So, I
10   mean, you know, at the time I wasn't feeling like such
11   a great guy, so I was saying it.  You know, it's
12   almost like hoping that it's going to be.
13   Q.   Is that why you pay people in jail to say
14   these things to you?
15   A.   I mean, jail is a pretty awful place.
16   Q.   That's not how you described it in your phone
17   calls.  Do you remember your first video chat with
18   your girlfriend Ellie?  Do you remember what you told
19   her about jail?
20   A.   Yeah.  I'm pretty sure it's probably
21   something.  I think I remember being energetic,
22   bouncing off the walls.
23   Q.   It's like living in a college dorm.  Do you
24   remember saying that?
25   A.   Yeah, sure.
```

1     Q.   It's like having a bunch of roommates.   We

2     stay up 'til, like, 4 a.m. playing cards, sleep in,

3     bunch of cool guys.

4          Do you remember that?

5     A.   Yeah.   She was going through a rough time as

6     well as I was, so it's like, if I'm not strong, how

7     can she be strong?   And, to be honest, I was really

8     hoping to hang on to her, and just over the years it

9     just completely deteriorated.

10    Q.   Circling back on this idea of motivation.

11    Greed was certainly a motivator, but you had something

12    to prove, didn't you?

13    A.   Yeah, in a sense, like, I mean, prove to my

14    friends that, you know, I was as good a friend as they

15    wanted me to be, sure.

16    Q.   Oh, no.   You had something to prove about

17    your potential, right?

18    A.   I mean, when you're saying all these really

19    great, positive things, yeah, that does sound good.

20    Q.   You had something to prove to your family,

21    right?

22    A.   Sure.

23    Q.   When you talked about Luke Paz pressing Zanax

24    in the early days of his involvement, you described it

25    as he had -- he was putting forward sweat and tears,

1    and you went on to say that he wasn't making a lot,

2    but then you kind of took a pause and said:  I mean,

3    it was still a substantial amount of money.

4         But I don't think we ever heard you say how

5    much was he making in those early just Zanax days?

6    What was that substantial amount of money?

7    A.    I mean, we're talking just a few thousand

8    dollars, like it's -- I guess substantial is just

9    outside of what you're normally making at a normal

10   job, I guess.

11   Q.    I think we can agree on that definition.

12   Let's talk about your lifestyle.  There's been some

13   testimony about your trips to Las Vegas?

14   A.    Yeah, sure.

15   Q.    You liked to go to Las Vegas?

16   A.    Yeah.  It became something of a routine with

17   the friends I was with, yeah.

18   Q.    And it was routine?

19   A.    On occasion, yeah.

20   Q.    Routine means frequently, right?

21   A.    Yeah.  I mean, we -- I guess we would always

22   find the excuse or someone would find the excuse to

23   go, so, yeah we went.

24   Q.    Your employees got annoyed that you were gone

25   so often, didn't they?

1    A.   I mean, there was always groaning in a lot of

2  places, yeah.

3    Q.   Do you remember at one point telling your mom

4  that you did some damage to your wallet in Las Vegas?

5    A.   Yeah, sure.  I mean, you take $5,000 and you

6  leave empty-handed.  You know, it's kind of -- it's

7  not a good feeling.

8    Q.   Did you say 5,000?

9    A.   Yeah.

10   Q.   And sometimes it was more?

11   A.   I mean, sometimes it -- it went a little

12  upwards, but I mean it just depended.

13   Q.   Sure.  And on March 22 of 2016, you told your

14  mom it was 7,000 on that last trip.  That was

15  possible, right?

16   A.   Sure.

17   Q.   You wouldn't have had a reason to lie to your

18  mom, would you?

19   A.   No.

20   Q.   You had Ms. Gabby Noriega look into real

21  estate you while you were on a trip to Puerto Rico?

22   A.   Yeah.

23   Q.   You liked Puerto Rico?

24   A.   It was beautiful, yeah.

25   Q.   You thought you might want to buy a home

1    there?

2         A.   Sure.  Yeah.

3         Q.   A beach house.  One there and one in Mexico,

4    right?  That was the plan?

5         A.   I wouldn't say Mexico.  I only went there

6    once.  It wasn't really something I was looking at.

7         Q.   But you did say Mexico to Gabby?

8         A.   I mean, if I threw out the suggestion, sure I

9    could own up to it.

10        Q.   And you also asked her to look at some of the

11   islands in the Caribbean, correct?

12        A.   At the time, we were just on a cruise and so

13   we went out to several of the islands and then we

14   stopped right at Puerto Rico, and it was just kind of

15   the one trip, and I was really amazed how, I mean,

16   different it was, you know, inland of America to, you

17   know, something so, I guess, different.

18        Q.   And you had a million dollars in your

19   dresser, and you had to spend it on something, right?

20        A.   Sure.

21        Q.   We talked a little bit about Luke Paz's money

22   from Zanax.  Let's take a minute and talk about Drew

23   Crandall's money in 2016.  So he leaves end of 2015,

24   right, November, 2015?

25        A.   Uh-huh.

1    Q.    And then, in 2016, that's the year you were

2    arrested.  Let's talk about that year.

3    A.    Yeah.

4    Q.    You indicated that it was sometimes safer to

5    send money just directly from your AlphaBay wallet to

6    Drew, right?

7    A.    Yeah.

8    Q.    Because AlphaBay used a tumbler?

9    A.    Yeah.

10    Q.    You've heard testimony from these agents that

11    they could see the transaction go from your AlphaBay

12    wallet to your wallet?

13    A.    Okay.  I mean, that would make sense.  They

14    used a tumbler from AlphaBay.  I don't know how it

15    works, but I mean --

16    Q.    And everyone thinks that they had a tumbler,

17    right?  I mean, you didn't just make that up, right?

18    A.    No.

19    Q.    It's on Readit, or was at the time?

20    A.    Yeah.

21    Q.    AlphaBay was taken down.  You knew that,

22    right?

23    A.    Yeah, sometime they were.  When I was in jail

24    I learned that.

25    Q.    Would it surprise to you learn that they

1    actually didn't use a tumbler?

2        A.   Yeah.  It kind of would.

3        Q.   These agents testified they could see it go

4    from your AlphaBay wallet to your wallet, on HMO.  How

5    could they see that with a tumbler?

6        A.   I'm not too tech savvy, so I don't know.

7        Q.   This is your part of the organization,

8    though.  You're the you BitCoin guy.  You're the Dark

9    Web guy.  You searched Tumblers, MultiBit,

10   Mimblewimble.  You searched them all.  You had Readit

11   posts where you were looking at whether or not --

12           MR. SKORDAS:  I object.  This isn't a

13   question.  This is counsel testifying.

14           THE COURT:  What's the question?

15       Q.   BY MR. GADD:  Again, would you be surprised

16   to learn that AlphaBay did not use a tumbler?

17       A.   Yeah.  Absolutely.

18       Q.   So now, let's talk about Drew Crandall's

19   money.

20       A.   Uh-huh.

21       Q.   How much did you send to him in 2016?

22       A.   I honestly couldn't tell you.  Things were

23   obviously moving pretty fast.  I mean, you saw from

24   even Gabby's timeline, when, you know, you threw up a

25   text, and it's like:  Oh, you know, you should have

1    got me money last week.

2          Why didn't you tell me?  You know, so I

3    couldn't put a number on it.

4        Q.   Yeah.  I remember that part.  It was October,

5    right, 2016?

6        A.   Uh-huh.

7        Q.   Do you remember November 8, 2016, you put

8    $2700 in Drew's account?

9        A.   Sure.  That sounds about right.

10       Q.   That would have been his bi-weekly wage,

11   right?

12       A.   It's what he asked me to do, yeah.

13       Q.   Did you ever send a hundred-thousand dollars

14   to him?

15       A.   Well, he didn't need a hundred-thousand

16   dollars.

17       Q.   Let's talk for a minute about blame.  Did you

18   testify that it was Ms. Tonge and Ms. Bustin's fault

19   that you transitioned from the one and the ten and the

20   hundred-pill orders to the hundred-thousand,

21   ten-thousand-pill orders?

22       A.   I won't say fault.  But I know that's how you

23   look at things.  It was definitely a group decision.

24   I mean, it's something that, you know, I'm trying to

25   own up to what I do, so I contributed to that as well.

1    I mean, I didn't have any objections at the time.  No

2    one was, you know, screaming, "stop."  You know,

3    everyone was benefiting.

4        Q.   And was it Chris Kenny's fault that you

5    decided to sell fake oxycodone?

6        A.   If there is one entity that would be removed,

7    then, yeah, we would have never ever gone in that

8    direction.

9        Q.   And was it Chris Kenny's fault that you

10   stuffed those fake Oxycodone pills with Fentanyl?

11       A.   Off of his suggestion, I guess that's true.

12       Q.   And was it Luke Paz's fault that he was lazy

13   and running late on November 22, and that's why some

14   hat got rested on you?  Is it Luke's fault?

15       A.   Well, that's what I have been telling myself

16   for the last couple of years in jail, sure.

17       Q.   Was it also Luke's fault that your volume of

18   sales went up?

19       A.   No.  I mean that's, you know, the website's

20   doing.

21       Q.   Was it Luke's fault that you got faster

22   machines?

23       A.   I mean, it was a contributing decision, sure.

24       Q.   Was it Drew Crandall's fault that you started

25   pressing Zanax in the first place?

1    A.   That I would probably say was true, yeah.

2    Q.   And your package receivers or you called them

3  drops, was it their fault for receiving packages?

4    A.   It was a choice.

5    Q.   They were never asking for it?

6    A.   Well, yeah, they approached me.

7    Q.   Everyone approached you?

8    A.   Pretty much towards the middle or end, every

9  single person approached me.

10    Q.   You never reached out to anyone to ask them

11  to be a drop?

12    A.   Well, of course, at the beginning that's what

13  we did is we reached out to a few, yeah.

14    Q.   And towards the middle and towards the end?

15    A.   I mean, at that point, it wasn't so much that

16  we needed it.  It was just people were willing to do

17  it.

18    Q.   Everybody wanted more money.  It was their

19  fault that this thing took off?

20    A.   Sure.  Myself included.

21    Q.   And where did that money end up?

22    A.   Well, in your hands.

23    Q.   $1.2 million was found in your sock drawer,

24  right?

25    A.   Yeah.

1    Q.   Almost a half million dollars was in your

2    parents' closet, right?

3        A.   That's correct.

4        Q.   More than 500 BitCoin has been identified,

5    accessed and seized from wallets in your sole

6    possession and control, right?

7        A.   Yes.  That's correct.

8        Q.   There would have been more money had your

9    lifestyle been different, right?

10       A.   I mean, it depends at the point when you're

11   talking about.  There's times when, sure, I would

12   definitely spend.

13       Q.   We talked about Vegas.  We talked about

14   Puerto Rico, a trip to Tahoe, right?  You took a trip?

15       A.   Yeah, we drove to Tahoe.

16       Q.   California --

17       A.   Yeah we've --

18       Q.   -- on the beach?

19       A.   -- been there a handful of -- you know.

20       Q.   Spring break in Mexico?

21       A.   Yeah.  Again, we drove down.

22       Q.   You liked to go to clubs?

23       A.   Well, it's kind of moved to -- a lot of the

24   music is going into the clubs.  There's not so much

25   concerts, so, yeah, concerts.

1      Q.   Concerts?   Clubs?

2      A.   Yeah.

3      Q.   You wouldn't just go to clubs, though, you

4   wanted to buy a table at the club, right?

5      A.   So, depends who's playing, of course, and

6   depends if, you know, there's going to be a group of

7   us, as friends.   As a friend group, we had a pretty

8   tight-knitted friend group.   If we were all going to

9   be there, it seemed only logical to do that.

10     Q.   Tables are a status symbol, right?

11     A.   It's a little bit away from the crowd.   You

12   get some space.   So, sure.

13     Q.   It's a status symbol, right?

14     A.   I mean, yeah, you could look at that.

15     Q.   All those trips, the concerts, tables, bottle

16   service, that was all paid for with drug proceeds,

17   wasn't it?

18     A.   Just about, yeah.

19     Q.   Could we look at 17.06.   Let's take a minute

20   on the second row here.   You talked about your

21   tight-knit group of friends, your friends that would

22   go to the club with you, friends that would chip in on

23   the table or sit at your table when you bought it?

24     A.   Uh-huh.

25     Q.   Mr. Noble is not one of the cool kids, is he?

1    A.   He was there.

2    Q.   You would invite him?

3    A.   Yeah.  Of course I would.

4    Q.   Make him feel good?

5    A.   Yeah.  He was a friend.

6    Q.   He wanted to spend time with you.  He's not

7  one of the cool kids, is he?

8    A.    To be honest, the two on the bottom, Roy

9  Stephans and Perry, they really didn't really care for

10  him too much.  He would take a bit of Molly and get

11  really sweaty, and then he would try to have a bro

12  moment, but, you know, I always -- I always let him

13  there.  I mean, he was a friend.  I wouldn't let the

14  other friends just kick him off for no reason.

15    Q.   You kept him under your wing?

16    A.   Yeah.  We were friends.

17    Q.   Drew Crandall, kind of the same way, isn't

18  he?

19    A.    I have known Drew for a long time, yeah.

20    Q.   The cool kids didn't like Drew, did they?

21    A.    There was definitely conflictions.  Luke

22  didn't like Drew.  Actually, I mean, a lot of them,

23  like Mike.  Mike and Drew never got along, so, yeah,

24  there's always conflictions.

25    Q.   Sean Gygi, not one of the cool kids, right?

1        A.    Well, he was Drew's friend.  I only would see

2    him at the clubs and stuff, and, you know, since he

3    was Drew's friend, we would invite him in, say:  Hey,

4    come have a drink with us, you know, and we could fist

5    bump together.

6        Q.    Take him under your wing?

7        A.    Yeah.  We were spending time together.

8        Q.    Were Ms. Tonge and Ms. Bustin ever cool

9    enough to hang out at your table?

10       A.    Absolutely.  I invited them every time.

11       Q.    And the cool kids, did they like Ms. Tonge

12   and Ms. Bustin?

13       A.    It wasn't so much of a say.  I mean, they

14   were more of a stay-at-home, watch a TV show, because

15   trust me, I would try to get them out.

16       Q.    But they liked you, right?  They wanted to be

17   your friend?

18       A.    Sure, we're all friends.

19       Q.    Let's talk about amounts.  You've seen our

20   chart, right, feed-back linked sales.  You know how

21   many pills were at least recorded in the feedback,

22   right?

23       A.    I'm assuming so.

24       Q.    But there were more pills, Fentanyl pills

25   than just those, correct?

1        A.    I have no idea.

2        Q.    You had the auto-feedback pills that don't

3    show up in our rows of feedback that you sold to those

4    people as well, right?

5        A.    I couldn't tell you.

6        Q.    You sold off line.  And by that, I mean to

7    Mr. Kenny, right?

8        A.    Yeah.  That was the initial.

9        Q.    If you had a bad batch, you would have to

10   reship pills, right?

11       A.    I mean, reships often on multiple occasions,

12   but not a bad batch.

13       Q.    Or for some other reason?

14       A.    Yeah.  For whatever reason.

15       Q.    You would have to reship those pills?

16       A.    Sure.

17       Q.    So let's you and I talk about totals.  How

18   many pills did you sell to Chris Kenny?

19       A.    I couldn't tell you.  It depends the week.

20   One month I'm dropping off, you know, 5,000 Xanax

21   bars, and then he's asking for 500 Roxy's, or it could

22   be later in 2016, he's asking for a thousand.  I mean,

23   it just -- I couldn't tell you.

24       Q.    Did you ever take him 10,000?

25       A.    I have no idea.

1    Q.   You would be the one to deliver, right?

2    A.   Yeah, sure.

3    Q.   You didn't count the pills before you

4    delivered them?

5    A.   No.  I never counted the pills.

6    Q.   Weigh them out?

7    A.   Yeah.  Luke would actually weigh them out.  I

8    would throw them in a gym bag, and the way the

9    exchange happened was basically gym bag for cash, but

10   he was always behind.

11   Q.   You would have to keep track of how many

12   pills you gave him, right?

13   A.   As a rough idea, sure.

14   Q.   That's how you know how much money he owes

15   you, right?

16   A.   Well, it's also on a -- once you get to that

17   point, it's really a trusting situation, so, yeah.

18   Q.   Which is all the more reason to keep records,

19   right?

20   A.   I mean, it would have been a smart idea to

21   have a record, yeah.

22   Q.   You kept records, right?

23   A.   Unfortunately, no.  I didn't keep records on

24   that.

25   Q.   You have notes where you write things like:

1   Chris owes 95 K.

2       You have seen that, right?

3       A.   Yeah.  I was venting in a journal and needed

4   to keep it on top of my head.

5       Q.   Or you might forget?

6       A.   Yeah.  Sure.

7       Q.   So how many pills do you think you sold Chris

8   Kenny?

9       A.   I honestly have no idea.

10      Q.   How much money do you think he gave you?

11      A.   I mean, to be honest, everything happened so

12  fast, it gets to a point when everything is pretty

13  much a blur.  It's -- you don't even know -- I mean, I

14  couldn't even tell you, like, even the agents that

15  stopped at my house, they would ask, you know:  So is

16  there any money in the house?

17          Yeah.  There's money.

18          Well, how much money?

19          And an honest guess would have been, I think

20  around 700,000.  And for you to tell me 1.2 million is

21  like, I guess, I had, you know, 1.2 million in the

22  house.  I guess that's what it was.

23      Q.   You were making so much money you couldn't

24  keep track of it?

25      A.   I mean, things -- it wasn't so much, it was

1    just there was no track.

2        Q.   You had two money counters, and you couldn't

3    keep track of it?

4        A.   Well, one was pretty crappy, so, I mean, just

5    like anything, you want to get something a little bit

6    nicer that doesn't stick.

7        Q.   Do you feel any remorse other than for

8    getting caught?

9        A.   Of course I feel remorse.  Around the time --

10   I mean, let's say, if we had the media spree of opioid

11   epidemic, I would have ceased immediately.  It's --

12   you know, it's an eye-opening experience.  It's -- I

13   wasn't aware.  To me, addiction was -- you know, I

14   used cocaine sometimes, and, you know, it's something

15   I could pick up and put down.  It was my understanding

16   that cocaine is addicting so, you know, this chemical

17   is something of addiction, and I didn't know of what

18   degree.

19       Q.   Do you feel any remorse that your actions

20   furthered other people's additions?

21       A.   Yeah.  From seeing it firsthand, it -- I

22   mean, I testified earlier about it.  It's really a sad

23   situation.

24       Q.   And you fell like you were just trying to

25   help.  I think that's what you said, isn't it?

1      A.   Yeah.

2      Q.   People couldn't get these prescriptions

3   anymore from their doctor, and you were there to help

4   them?

5      A.   Yeah.  And in the messaging system, that

6   happened on multiple occasions, where they said they

7   are in a panicky state and they didn't know what to

8   do.

9      Q.   You were just trying to be a friend?

10     A.   Yeah.

11     Q.   Can we look at 783.

12          That guy just needed a friend?

13     A.   Well, when things --

14          THE COURT:  What's the question?  That wasn't

15   a question.

16     Q.   BY MR. GADD:  Did that guy just need a

17   friend?

18     A.   He might have a lot of friends, assuming from

19   the pill count.  I don't know.

20          MR. GADD:  Nothing further.

21          THE COURT:  Thank you, Mr. Gadd.

22          Redirect, Mr. Skordas?

23          MR. SKORDAS:  I'm sorry, Judge.  Nothing

24   further.

25          THE COURT:  Thank you.  You may step down,

1    Mr. Shamo.

2          And you rest?

3          MR. SKORDAS:  Yes, Your Honor.  Defense

4    rests.

5          THE COURT:  Ladies and gentlemen of the jury,

6    you're free 'til 8:30 on Thursday morning, where you

7    will receive the instructions from the Court and

8    listen to the closing arguments of the lawyers and

9    then begin to deliberate.

10          Don't talk to anyone about the case, read,

11   listen, watch anything about it.  Don't let anyone

12   talk to you about it.  And we'll see you at -- have a

13   nice day tomorrow, and we'll see you at 8:30 on

14   Thursday morning.  Thank you very much.

15          THE CLERK:  All rise, please.

16          (Whereupon the jury leaves the courtroom.)

17          THE COURT:  We'll see the lawyers or at least

18   some of them from each side at 10 a.m. tomorrow

19   morning.  Nobody else needs to be here.

20          MR. GADD:  Thank you, Your Honor.

21          THE COURT:  Unless they want to sleep through

22   an instruction conference.  At 10 in this courtroom.

23   Thank you.  We'll be in recess until 10 in the

24   morning.

25          (Whereupon the proceedings were concluded.)

1

2                    REPORTER'S CERTIFICATE

3    STATE OF UTAH            )

4                             ) ss.

5    COUNTY OF SALT LAKE      )

6

7            I, REBECCA JANKE, do hereby certify that I

8    am a Certified Court Reporter for the State of Utah;

9            That as such Reporter I attended the hearing

10   of the foregoing matter on August 27, 2019, and

11   thereat reported in Stenotype all of the testimony and

12   proceedings had, and caused said notes to be

13   transcribed into typewriting, and the foregoing pages

14   numbered 1 through 104 constitute a full, true and

15   correct record of the proceedings transcribed.

16           That I am not of kin to any of the parties

17   and have no interest in the outcome of the matter;

18           And hereby set my hand and seal this 28th

19   day of August, 2019.

20

21

22

23

24           _____

25           REBECCA JANKE, CSR, RPR, RMR