IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>AARON MICHAEL SHAMO,<br><br>    Defendant. | MEMORANDUM DECISION AND ORDER<br><br>Case No. 2:16CR631DAK<br><br>Judge Dale A. Kimball |

This matter is before the court on Defendant Aaron Michael Shamo's Motion for Judgment of Acquittal [Docket No. 271] and Motion to Dismiss [Docket No. 275]. The United States has filed a memorandum in opposition to the motions. Because the time for filing replies has passed, the court considers the motions fully briefed.

### Motion for Judgment of Acquittal

Defendant argues that the evidence presented by the United States was insufficient to sustain a conviction on Counts 1 and 6 of the Second Superseding Indictment. When reviewing a motion for judgment of acquittal based on insufficient evidence, courts view the evidence in the light most favorable to the government and determine whether there was sufficient evidence from which a jury could find the defendant guilty beyond a reasonable doubt. *United States v. Johnson*, 120 F.3d 1107, 1108 (10th Cir. 1997); *United States v. Hooks*, 780 F.2d 1526, 1531 n.1 (10th Cir. 1986). Because the court reserved decision on the motion, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b). Moreover, the court

cannot weigh the evidence or assess credibility of witnesses when determining if the evidence the United States presented was sufficient. *Burks v. United States*, 437 U.S. 1, 16 (1978).

Under Count 1, Engaging in a Continuing Criminal Enterprise, the United States presented extensive evidence of the drug organization and the roles of individual participants. The agents' initial seizures of packages, led them to straw man package drops and couriers who provided access to the organization's distribution and communication methods. When agents searched Defendant's house, he was engaged in pressing counterfeit Xanax, had a mask and gloves on him, and over a million dollars in cash. Investigators also seized his electronic devices, which included extensive information regarding Defendant's involvement in the drug distribution operation. Defendant conducted extensive internet searches related to the drug distribution organization, he emailed and texted co-conspirators with directions and oversight, and he controlled the full Pharma-Master account on AlphaBay and the Bitcoin wallets associated with it. Moreover, investigators obtained texts and emails from co-conspirators that corroborated co-conspirators' testimony regarding the individuals' roles in the organization. This evidence demonstrated that Defendant organized, supervised or managed far more than five subordinates. The seized packages and computer information related to Pharma-Master's operations on the AlphaBay marketplace also provided evidence of the scope of the operation. Furthermore, the United States presented evidence that Defendant had no other source of income. All of this evidence demonstrated that there were numerous controlled substances violations, involving Defendant and more than five of his subordinates, which generated substantial income for Defendant. Because the evidence satisfied the elements of a continuing criminal enterprise, the court properly sent Count 1 to the jury for consideration.

With respect to the sentencing factors associated with the continuing criminal enterprise count, the United States presented evidence from which a jury could conclude that Defendant was the, or one of several, principal leaders, organizers, and administrators, and the distribution of Fentanyl exceeded 12 kilograms. Viewing the evidence in the light most favorable to the United States, as the court is required to do, the United States presented evidence that Defendant started the organization with Crandall, who was only a 1/3 interest partner. Defendant bought Crandall out when Crandall left the country. Defendant then negotiated a payment structure with Paz for his role in pressing pills and converting crypto-currency to cash. Everyone testified that they negotiated with Defendant regarding their pay and level of involvement in the organization. Defendant controlled the money and made the ultimate executive decisions. Defendant did not have a boss. In addition, the packages agents seized contained more than 12 kilograms of a substance containing Fentanyl, and the orders on AlphaBay indicate that Defendant sold more than 45 kilograms of Fentanyl-laced pills. The United States also presented evidence that Defendant maintained constructive possession over his Fentanyl-laced pills even when they were stored at the shipping team's home. Therefore, the United States presented sufficient evidence to support the enhanced sentencing findings related to the continuing criminal enterprise charge, and the court appropriately sent the issue to the jury.

Under Count 6, Aiding and Abetting the Distribution of Fentanyl that resulted in Death, the United States presented evidence that R.K. obtained Fentanyl from Defendant's organization. R.K.'s roomate placed the order, the order was tracked to their address, R.K.'s friend witnessed him crush two blue pills and snort them, she heard R.K. making noises she thought was snoring, R.K. died that night or next morning, the package from Defendant's organization was in R.K.'s

room where he died, and Fentanyl was found in his blood during the autopsy. Dr. Stacey Hail, a medical toxicologist, testified that R.K. would not have died but for the Fentanyl he ingested. The other drugs and alcohol in R.K.'s system would not have caused his death. The snoring sounds R.K.'s friend heard indicates he had the respiratory depression that precedes an opioid-caused death. The blood and mucus on R.K.'s face also indicated respiratory depression. A jury could have relied on this evidence to conclude that R.K.'s taking of the Fentanyl, that Defendant aided and abetted in the distribution of, was the but-for cause of R.K.'s death. Accordingly, it was appropriate for the court to present Count 6 to the jury for consideration. Therefore, the court denies Defendant's Motion for a Judgment of Acquittal.

## Motion to Dismiss

Defendant moves the court to dismiss the case based on alleged prosecutorial misconduct in violation of Defendant's due process rights under the Sixth Amendment. Defendant asserts that the United States discouraged defense witnesses–Ana Gabriela Noriega, Miles Penrose, and Sasha Grant–from testifying. All three potential defense witnesses appeared during trial and invoked their Fifth Amendment rights out of concern for potential criminal exposure.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; [and] to have compulsory process for obtaining witnesses in his favor." U.S. Const. Amend. VI. "The right of a defendant to establish a defense by presenting his own witnesses is a fundamental element of Due Process." *United States v. Crawford*, 707 F.2d 447, 449 (10th Cir. 1983). The defendant's right "'however, is not absolute'; courts have held that 'a defendant's right to present a defendant does not include the right to compel a witness to waive his [or her] Fifth Amendment privilege.'" *United States v.*

*Portillos*, 714 Fed. Appx. 889, 893 (10th Cir. 2017).

"That said, the government cannot substantially interfere with a defense witness's decision to testify." *Id.* "Interference is substantial when the government actor actively discourages a witness from testifying through threats of prosecution, intimidation, or coercive badgering." *United States v. Serrano*, 406 F.3d 1208, 1214 (10th Cir. 2005). "The potential for unconstitutional coercion by a government actor significantly diminishes, however, if a defendant's witness elects not to testify after consulting an independent attorney." *Id.*

In this case, all three potential defense witnesses were represented by counsel when making their decisions not to testify. The United States did not communicate with the three witnesses directly once they were represented by counsel. And, the United States did not directly engage any of the three potential witnesses in a discussion as to whether to testify or not.

Defendant claims that the United States failed to work out plea deals or immunity agreements with proposed defense witnesses. The United States was under no obligation to offer plea deals or immunity to any witness. Defendant identified 64 potential witnesses, 54 of whom were not on the United States' witness list. Although the United States offered to help work out plea deals with proposed witnesses if Defendant narrowed down the list, Defendant never identified specific witnesses for the United States and did not reduce his witness list to twelve until jury selection. By that date, the United States was not in a position to reach a plea deal or immunization agreement with the witnesses prior to their proposed testimony.

The United States worked out a plea deal with Noriega to enable her to testify, but her counsel was concerned about her criminal exposure outside of this district and for non-drug-related offenses. The United States' attempt to help cannot be considered coercive or intimidating.

5

She merely had a very cautious attorney representing her interests and she chose to follow his counsel. The United States was not obligated to work out a global plea deal that covered every potential basis for Noriega's criminal exposure. In addition, the United States' grant of immunity to Grant during her proffer interviews clearly stated that her immunity was only for those interviews. The United States was not hiding the scope of the immunity or playing games–the scope of the immunity was in writing.

Furthermore, Defendant has not shown that these witnesses would have been material and favorable to his defense. Defendant claims that Noriega's testimony would have undercut the United States' assertion that she played a major role in the drug trafficking organization as Defendant's executive assistant. But there were text messages that she could not have denied. She could not have denied that Defendant was responsible for paying her. She could not have denied the text requests Defendant sent to her. Her role in the organization appears to be quite clear in the text messages. Defendant does not claim that these texts were taken out of context. Defendant himself testified as to Noriega's role, portraying himself as a sometimes absent-minded boss, but boss nonetheless.

Defendant also claims that Penrose was unable to testify and prove that he was not engaged in money laundering and did not work at Defendant's behest. But the United States did not assert that Penrose worked or operated under Defendant's direction or supervision. He was not necessary for the jury's finding of five subordinates under the continuing criminal enterprise charge. In addition, Defendant has never made any suggestion that Penrose was the one and only principal or leader of the organization. Rather, the testimony at trial was that Penrose was an initial financial investor in the organization when Defendant and Crandall started out and that he

sold Defendant a truck at a later date. Crandall testified that Penrose was an initial investor, and Brenda Kurstin testified as to the truck purchase. Defendant did not dispute this testimony in his own testimony or on cross examination of those witness. Moreover, Defendant does not explain how or why Penrose would have been able to refute Crandall's testimony as to the initial investment or Kurstin's testimony regarding the truck purchase.

As to Grant, Defendant claims that she would have testified that Crandall never fully ended his involvement in the organization, had a continual drug habit while traveling abroad, was smart enough to keep his name off the Bitcoin wallets, and was re-involved with the organization as early as May 2016. There was substantial evidence at trial that Crandall was smarter than Defendant, that he maintained connections with Defendant while abroad when he was trying to get his full alleged buy-out, and that he used marijuana and possibly other drugs. Defendant does not explain how any of this would have changed Defendant's culpability on any of the charges. There is substantial documentary evidence demonstrating that Crandall was not a full partner, especially after he left the country. Crandall returned to do customer service work remotely and was paid less than Noble, while Defendant and Paz were making millions of dollars. Defendant never testified that Crandall was a full partner or his smarter superior, or that he never left the organization. If Grant testified to such, her testimony would not have corroborated or even be consistent with Defendant's testimony. Even those claims would not have lessened Defendant's own culpability under the CCE as one of several principal administrators, leaders, or organizers of the organization. Crandall's alleged earlier re-involvement date of May 2016 is also irrelevant to Defendant's culpability on the death-resulting charge. The fact that Defendant thinks Crandall could have also been charged with the count has nothing to do with his own charges. Moreover,

Special Agent Ashment read lengthy portions from Grant's interview reports. There is no suggestion that Grant would have testified differently at trial than she did during her proffer interviews. Her attorney confirmed that she would testify the same as she did in her interviews; he was only concerned that she did not have an immunity agreement for that testimony at trial. Given Defendant's access to large portions of her interview through Special Agent Ashment's testimony, Defendant has not shown that her testimony would have been material and not merely cumulative. "It is not enough to show 'the mere potential for favorable testimony' or to 'merely point to any conceivable benefit' from a witness's testimony." *Portillos*, 714 Fed. Appx. at 894.

## Conclusion

Based on the above reasoning, Defendant's Motion for Judgment of Acquittal [Docket No. 271] is DENIED and Motion to Dismiss [Docket No. 275] is DENIED.

DATED this 20th day of September, 2019.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge