1              IN THE UNITED STATES DISTRICT COURT

2                      DISTRICT OF UTAH

3                      CENTRAL DIVISION

4

5   UNITED STATES OF AMERICA,    )

6              Plaintiff,        )

7      vs.                       )   Case No.  2:16-CR-631-DAK

8   AARON MICHAEL SHAMO,         )

9              Defendant.        )

10  _____)

11

12           BEFORE THE HONORABLE DALE A. KIMBALL

13      --------------------------------------

14                    August 12, 2019

15                      Jury Trial

16           Testimony of Sean Michael Gygi

17

18

19

20

21

22

23

24  REPORTED BY: Patti Walker, CSR, RPR, CP    801-364-5440

25  351 South West Temple, #8.431, Salt Lake City, Utah  84101

```
 1                        A P P E A R A N C E S

 2

 3

 4    For Plaintiff:              Michael Gadd
                                  Vernon G. Stejskal
 5                                Kent A. Burggraaf
                                  U.S. ATTORNEY'S OFFICE
 6                                111 South Main Street, #1100
                                  Salt Lake City, Utah  84111
 7

 8
      For Defendant:              Gregory G. Skordas
 9                                Kaytlin V. Beckett
                                  SKORDAS & CASTON LLC
10                                560 South 300 East, #225
                                  Salt Lake City, Utah  84111
11

12                                Daryl P. Sam
                                  DARYL P SAM PLLC
13                                5955 S. Redwood Road, #102
                                  Salt Lake City, Utah  84123
14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                              I N D E X

2    Witness               Examination By            PAGE

3    Sean Michael Gygi     Mr. Gadd  (Direct)            4

4                          Mr. Sam  (Cross)             36

5                          Mr. Gadd  (Redirect)         45

6                          Mr. Sam  (Recross)           49

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1      SALT LAKE CITY, UTAH; MONDAY, AUGUST 12, 2019; 8:00 A.M.
 2               (Proceedings not transcribed)
 3               MR. GADD:  Your Honor, the United States calls
 4   Sean Gygi.
 5               THE COURT:  Come forward and be sworn, please,
 6   right up here in front of the clerk of the court.
 7                           SEAN GYGI,
 8           Having been duly sworn, was examined
 9                   and testified as follows:
10               THE CLERK:  Come around to the witness box here.
11               Please state your name and spell it for the
12   record.
13               THE WITNESS:  Sean Michael Gygi.  S-e-a-n,
14   M-i-c-h-a-e-l, G-y-g-i.
15               THE COURT:  You may proceed, Mr. Gadd.
16               MR. GADD:  Thank you, sir.
17               I pulled that water away not because I don't want
18   you to have water, but because it was the prior witness's.
19   If you need it, it's just on your right.
20                        DIRECT EXAMINATION
21   BY MR. GADD:
22   Q    Mr. Gygi, are you prepared to testify about your part
23   in the investigation of drug packages that are linked to
24   this defendant, Mr. Shamo?
25   A    Yes, I am.
```

1    Q    Before we do that, could you tell us a little bit about

2    yourself?

3    A    I can.  My name is Sean Gygi, as I stated.  I've lived

4    in Utah about 15 years.  Love the place.  Currently work as

5    a workforce management analyst for a call center in Sandy.

6    And no kids, but love dogs.

7    Q    Thanks.

8         Do you know Mr. Shamo?

9    A    I do.

10   Q    What was your relationship like with Mr. Shamo in 2016?

11   A    In 2016, that was the time where we were both involved

12   in the criminal enterprise that's been described.

13   Q    Did you have a social relationship at all or was it all

14   work?

15   A    We definitely had a social relationship as well.  It

16   was to the effect of going out to concerts and clubs

17   together, occasionally hanging out together, although not as

18   much in 2016 as 2015.

19   Q    I'm going to show you a chart.  I'm going to put it up

20   next to you.

21            MR. GADD:  And then could we look at the

22   organization chart on the screen as well.

23   BY MR. GADD:

24   Q    When you look at this chart, 17.06, will you tell us

25   who else you knew at the time, 2015, 2016?

1  A    Yes.  I definitely new Mario Noble.  I recognize Luke

2  Paz, although I didn't interact with him on very many

3  occasions.  Drew Crandall, Tonge and Bustin, and Jessica

4  Frankham.

5  Q    And we won't talk about Ms. Frankham much, but let's

6  just briefly cover it.  How did you know her?

7  A    She is my girlfriend.  I've known her about five years

8  now.

9  Q    Did she also receive packages from Mr. Shamo?

10  A    She did.

11  Q    And did he pay her or pay you for those packages?

12  A    He paid her.

13  Q    Let's talk for a minute about how you were recruited.

14  Do you recall when you first started accepting packages on

15  Mr. Shamo's behalf?

16  A    I believe it would have been in 2015.

17  Q    And how did you get involved?

18  A    At first it was -- it seemed to be fairly innocent,

19  nothing to the effect of what it ended up being.

20  Specifically was asked if I was okay receiving packages that

21  would be addressed to myself every once in a while.  It

22  wasn't described what would be in them, but I understood

23  that it wasn't exactly legal.

24  Q    Thinking back, how many packages do you think you

25  received from Mr. Shamo?

1  A     It's hard to say for sure.  I had estimated that it was

2  probably in the range of 30 to 50 packages overall.

3  Q     Let's talk about one of those packages.

4            MR. GADD:  Can we look at 2.03.

5  BY MR. GADD:

6  Q     Can you see that there?

7  A     I can.

8  Q     I'm also going to show you 2.02.

9            Now the jurors can't see the box there, 2.02, very

10 well.  Can you explain what it is that's inside that bag?

11 A     Yes.  It's what I would consider to be a normal postal

12 package.  It's very obviously addressed from China to

13 myself.

14 Q     The box and the bag, is that what we're looking at on

15 the screen in front of you?

16 A     Yes.

17 Q     It has your name on it?

18 A     That's correct.

19 Q     And your address, at least at the time?

20 A     Yes, that's correct.

21 Q     The other packages you received, somewhere between 30

22 and 50, did they look like this?

23 A     They weren't all in cardboard boxes.  Some of them were

24 in bubble wrapped envelopes, but they were all fairly

25 similar in size.

1    Q    You had some indication of what at least a few of those

2    packages had in them, right?

3    A    Not the ones from China.  The ones that were sent

4    domestically before that, I definitely had seen the contents

5    of some of them.

6    Q    So maybe unpack that a little bit for the jury.  Can

7    you talk about the difference between domestic and the ones

8    from China?

9    A    I can.  Prior to late 2015, when Drew Crandall left the

10   country to go on an extended trip, the packages that we had

11   received were -- they were cardboard boxes generally, but

12   they were all addressed from within the United States.  And

13   on -- I can think of at least two to three separate

14   occasions, they were opened in front of me and contained

15   things like marijuana or LSD.

16   Q    Then the change took place, right?  Is that when

17   Mr. Crandall left?

18   A    That's correct.

19   Q    And the packages after he left, what were they like?

20   A    They were like the ones sitting in front of me.

21   Q    There was a second package in November of 2016 that was

22   shown to you during questioning, correct?

23   A    That is correct.

24   Q    Let's fill in the story up until that point.  In

25   November of 2016, agents executed a search warrant at your

1   residence, right?

2   A    That is correct.

3   Q    And were you asked to sit down and speak with them?

4   A    Yes.  I was -- I was taken separately to a location

5   downtown, which I believe it was the DEA headquarters here,

6   although I'm not entirely sure.

7   Q    Did it have kind of the curves above the windows?

8   A    That sounds right, yes.

9   Q    You went into the basement?

10  A    I don't think we went into the basement.  It was the

11  first floor.

12  Q    The main floor?

13  A    Yeah.

14  Q    Sure.  And you sat down and you spoke with the agents,

15  right?

16  A    Correct.

17  Q    At some point during that interview, did they ask you

18  if they could look inside a package that they had caught?

19  A    Yes, they did.

20  Q    Let's look at 5.03 now.  Then I also want to show you

21  5.02.

22       You've got 5.02 in the bag.  The jurors can't see that

23  one as well, but we've got 503 here up on the screen.  Is

24  this the same package?

25  A    Yes.  They do appear to be the same.

1    Q     And on that package, it's shipped to your name,

2    correct?

3    A     That is correct.

4    Q     And your address at the time?

5    A     That is correct.

6    Q     When a package like this made it to you, it wasn't

7    caught.  When it made it to you, what would you do with it?

8    A     At that point I would inform Shamo that I had received

9    the package and needed to meet up to exchange that for

10   payment.

11   Q     Let's talk for just a minute about payment.  You kind

12   of drew a line when Mr. Crandall left in terms of how the

13   packages changed.  Did payment change?

14   A     Yes, fairly significantly.

15   Q     Tell us how so.

16   A     When Mr. Crandall was involved, I was being paid 50 to

17   $100 per package.  After he left, it wasn't an immediate

18   change, but within, I would say, two months, the payment

19   increased to two to $300 per package.

20   Q     How were you paid?

21   A     In cash or through Venmo.

22   Q     When you needed to exchange a package for money, where

23   would you do it?

24   A     Generally at Mr. Shamo's home.

25   Q     And on those 2016 packages, the China packages, did

1    Mr. Shamo ever tell you what was inside?

2    A    No.

3    Q    Was anyone ever with Mr. Shamo when you would exchange

4    packages for money?

5    A    I don't recall specifically, but I don't believe so.

6    Q    Let's talk about the transition that you took from

7    being just a package receiver to more full-time

8    responsibility.  At some point you changed, right?

9    A    That's accurate.

10   Q    What was it that you became?

11   A    I would be -- I guess you could call it a courier or a

12   runner.  I was picking up packages and dropping them off at

13   various post office collection bins.

14   Q    When did you make the change?

15   A    I believe that would have been June or July 2016,

16   sometime around there.

17   Q    Why did you take that additional role?

18   A    I had lost my job earlier that year and I needed money.

19   Q    Did Mr. Shamo pay pretty well?

20   A    Yes, very well.

21   Q    How much was he paying you to be a runner?

22   A    $2,000 every other week.

23   Q    Was he on time with his payments?

24   A    I can't really recall a time where he wasn't -- where

25   he was late.

```
 1   Q    So let's talk for a minute about your role as a runner

 2   or a courier.  How frequently would you go and pick up

 3   packages?

 4   A    Five to six nights per week.

 5   Q    From whom would you pick up the packages?

 6   A    It wasn't -- I didn't know who it was at the time.  It

 7   was merely just an address where I would pick up packages

 8   from the porch, though I came to know who they were later

 9   on.

10   Q    That address, was that in Daybreak?

11   A    Yes, that's correct.

12   Q    And where would you take the packages once you picked

13   them up?

14   A    It's changed each night.  I would determine where they

15   needed to go based on the return addresses on the packages.

16   For example, if the return address was Cottonwood Heights, I

17   would find collection bins or post offices nearby that ZIP

18   code or address.

19   Q    How did you know to do that?

20   A    It was something that had been explained briefly when I

21   began doing this, not specifically how to find the

22   locations, but rather just to -- how to know, roughly, where

23   to go.

24   Q    What was the problem with taking a package that had a

25   Midvale return address and shipping it from Provo?
```

```
 1   A     I believe the concern there was to obfuscate where the
 2   packages were originating.
 3   Q     So if it had a Midvale return address, where would you
 4   look for the blue collection box?
 5   A     Nearby Midvale.
 6   Q     I mentioned the blue collection boxes.  You dropped off
 7   there, correct?
 8   A     That's correct.
 9   Q     How about a post office, did you ever go inside?
10   A     Yes.  There came a time where there were packages that
11   were too large to fit in the blue collection bins, and at
12   that point I began using post office lobbies.
13   Q     Did it make you nervous to go inside the post office?
14   A     Absolutely.
15   Q     Why?
16   A     Because I understood -- I understood maybe not what was
17   included, but that it wasn't aboveboard.
18   Q     Let's talk now about cooperating with agents.  There
19   was a turning point where you started cooperating with these
20   agents.  What caused it?
21   A     When I was questioned and had a search warrant served,
22   I answered some questions that day, but was certainly
23   reluctant to tell the whole story.  I went home the night
24   that I had been questioned and really took a long time to
25   think about what the right thing to do was.  And after
```

1   learning that there was Fentanyl included in these packages,

2   I really understood that I couldn't do anything but put a

3   stop to what had been going on.  People were obviously going

4   to be getting hurt and that wasn't something I was okay

5   with.

6   Q     Did you recognize the name Fentanyl when they said it?

7   A     I did.  I had heard of it before.

8   Q     Up until that point, and I'm talking now about not

9   inbound packages but the ones that you were shipping out,

10   what did you think those packages had in them?

11   A     I was under the impression that they were the same type

12   of things that I had known were included in packages before,

13   marijuana, LSD, Ecstasy, Xanax, that kind of stuff.

14   Q     The following morning, November 18th, did you reach out

15   to the agents that you had interviewed with?

16   A     I did.  It was one of the first things I did waking up

17   that morning.

18   Q     And they met up with you again, right?

19   A     They did, fairly quickly.

20   Q     When you spoke with them that following day,

21   November 18th, did you agree to record a conversation with

22   Mr. Shamo?

23   A     I did, yes.

24   Q     Where did that conversation take place?

25   A     I was in my apartment complex in Mr. Shamo's vehicle, I

```
 1   believe his BMW.

 2              MR. GADD:  Could we look at Exhibit 17.01.

 3              Let's go ahead and play it once through.

 4              Just a moment.  I think our sound might be off.

 5              Your Honor, what if we took a quick, five-minute

 6   break?  We'll diagnose the sound issue, and there's one

 7   other thing I'd like to address with Your Honor.

 8              THE COURT:  It's impossible to only take a

 9   five-minute break with a jury.  Do you want to address

10   something at side-bar?

11              MR. GADD:  Both.  To fix the sound and also --

12   because the exhibit is the audio recording.  The transcript

13   just helps it.

14              THE COURT:  Let's see if we can get the sound

15   going here.

16              Rule number one with gizmos is if something can go

17   wrong, it will.

18              We could take our second break, which is usually a

19   longer break, bring some food up for the jury.  But it won't

20   be up until 11:30.

21              MR. SKORDAS:  That might make sense.

22              THE COURT:  If we break now, we're probably

23   looking at ten to 12:00.

24              MR. GADD:  If we could do that, that would be

25   great.
```

1           THE COURT:  Okay.  Let's do that.

2           MR. GADD:  Great.

3           (Jury excused)

4           (Proceedings not transcribed)

5           (Recess)

6           (Jury present)

7           THE COURT:  You may proceed, Mr. Gadd.

8           MR. GADD:  Thank you, sir.

9    BY MR. GADD:

10   Q    Mr. Gygi, with any luck, the court IT professionals

11   have solved our sound issue.  So let's maybe just talk about

12   where we were when we left off and then we'll jump back into

13   this.

14        So on November 18, you contacted the agents to indicate

15   that there was more to the story you wanted to tell them,

16   right?

17   A    That is correct.

18   Q    And you spoke with them?

19   A    Yes.

20   Q    From that point onward, have you been truthful with

21   them?

22   A    Yes, absolutely.

23   Q    On that morning, November 18th, did they ask you to

24   record a conversation with Mr. Shamo?

25   A    Yes, they did.

1    Q    And the conversation, did that take place -- I believe

2    you said in his BMW?

3    A    Yes, parked at my apartment complex.

4         MR. GADD:  Let's now, if we can, read and listen

5    to Exhibit 17.01.

6              (Audio recording played)

7    BY MR. GADD:

8    Q    Do you remember making that recording?

9    A    Yes, I do.

10   Q    Were you nervous at all to record it?

11   A    Yes, quite nervous.

12   Q    There were a few things you talked about in there that

13   I want to bring up and have you, if you can, explain for the

14   jury.

15   A    All right.

16   Q    Near the beginning, Mr. Shamo indicated that he went

17   live.  What did you understand that to mean?

18   A    My understanding at the time was that packages were

19   being prepared.  I wasn't sure if that had meant that

20   product had run out at the time or if it was merely just a

21   temporary break.

22   Q    You indicated to him at one point that you had missed

23   the prior night because of an emergency.  There was no

24   emergency, though, right?

25   A    That's correct.

1    Q    Instead, what were you doing that prior night?

2    A    I was wrestling with my decision what to do the next

3    day after being interviewed by the agents throughout the

4    day.

5    Q    This was just an audio recording, so we couldn't see

6    what was happening, but were you paid by Mr. Shamo during

7    that conversation?

8    A    Yes, I was.

9    Q    Did he pay you in cash?

10   A    Yes.

11   Q    You referenced plans that had to do with Colorado.

12   What were your plans?

13   A    Well, the plans were, a fair amount of time before

14   this, at minimum, several months, Mr. Shamo and I had

15   discussed setting up a location to ship packages outside of

16   Utah.

17   Q    Who's idea was it?

18   A    It was Mr. Shamo's idea to expand beyond the state,

19   though Colorado was my suggestion.

20   Q    Why was Colorado important for you?

21   A    My girlfriend has family out there, so it would have

22   been an easy place to get settled, and her and I had both

23   talked about, outside of this venture, wanting to move out

24   there.

25   Q    Was it important to Mr. Shamo that the new shipper be

1    in a different state?

2    A    Yes, though the specific state wasn't quite as

3    important as it being outside of Utah.

4    Q    We heard you negotiating about a biweekly amount.  Was

5    that the amount he was going to pay you?

6    A    Yes, that's correct.

7    Q    And it was $3,000, correct?

8    A    Yes, that is correct.

9    Q    Was that more than you were receiving to be the runner?

10   A    It was, yes.

11   Q    He talked to you about a separate room.  What did you

12   understand from that?

13   A    My understanding was that the people preparing

14   shipments would want to have a room that was solely

15   dedicated to that purpose so that it wouldn't be anything

16   that anyone else used for any other purpose.

17   Q    He talked about that's how his shipping team did it.

18   Had you ever been inside of Ms. Tonge's and Ms. Bustin's

19   residence?

20   A    No.

21   Q    You hadn't seen the room that they used, then?

22   A    No, I hadn't.

23   Q    Towards the end there, he wants you to check on that

24   one thing and you clarified about a package.  What was going

25   on there?

1    A      There was a package that -- I can't recall if it had

2    specifically said it was delivered or undeliverable, but

3    either way, it was a package that I was supposed to have

4    received by that point and I had not yet gotten it.

5    Q      By that point was law enforcement seizing some of the

6    packages coming to you?

7    A      Yes.

8    Q      Let's talk now about the night of November 18th, 2016,

9    so the day after you first met those agents.  Did you take

10   agents along with you as you picked up packages that night?

11   A      I did, yes.

12   Q      What did you drive to pick up the packages?

13   A      It was a car that my girlfriend and I shared.

14   Q      And did the agents, did they ride with you or follow

15   behind you?  Where were they?

16   A      They followed behind in a separate vehicle.

17   Q      Did you lead them to Ms. Tonge's and Ms. Bustin's

18   residence?

19   A      I did, yes.

20   Q      Once you gathered up the packages, what did you do?

21   A      I believe after securing the packages in the car, we

22   drove back to the South Jordan Police Department.  I led the

23   way and the agents followed.

24   Q      And then once at the police department, did they take

25   possession of those packages?

```
 1   A     Yes.

 2   Q     I want to show you Exhibit 7.00.  Will you take a look

 3   inside that box.

 4         What do you see?

 5   A     I see envelopes that I recognize as the same address --

 6   return address, names, and type that I was used to dropping

 7   off and shipping out.

 8   Q     Maybe just for the jury, because they're having a

 9   harder time seeing that than you are, can you show them what

10   else is inside the box?

11         What do you have there?

12   A     This is a larger box that I was used to shipping out

13   occasionally.

14   Q     That size box, would that fit in a blue collection bin?

15   A     I do not believe so.

16   Q     If you could, maybe just tip it down and give the jury

17   a sense for how many packages or boxes came in that.

18   A     (Indicating)

19             MR. GADD:  Could we look at 7.01.

20   BY MR. GADD:

21   Q     Once you arrived at the police station, the packages,

22   the parcels, the envelopes, those were turned over to the

23   agents, correct?

24   A     Yes, they were.

25   Q     And this picture that you're seeing here, does that
```

1  also look like the packages that you had picked up that

2  night?

3  A    Yes, it does.

4  Q    There's approximately 79 packages, correct?

5  A    That appears to be correct.

6  Q    Was that more than a normal amount?

7  A    It was more than a normal amount for a single night,

8  though considering I had not shipped out the night prior,

9  this does add up as the amount for two nights.

10 Q    There are different sizes.  You showed some in the box

11 and then we can see some in the picture.  Do you see on the

12 right side the envelopes, the priority mail envelopes?

13 A    I do, yes.

14 Q    Is that something you would typically pick up from the

15 residence in Daybreak?

16 A    Yes.

17 Q    You showed us the larger package that you can see kind

18 of in the foreground there.  In the background, in the

19 middle, there's boxes with smaller, but they're definitely

20 boxes.  Was that a common size as well?

21 A    Yes, it was.

22 Q    That was the first night you took the agents along to

23 pick up packages.  You did one more time, right?

24 A    That is correct.

25 Q    Was it two nights later --

1          MR. GADD:  Oh, thank you, Yvette.

2    BY MR. GADD:

3    Q    You can see those smaller boxes a little closer there.

4    Do you remember shipping that size specifically?

5    A    Correct.

6    Q    And you recall just now a return address from the ones

7    you looked at, and that made me think of this.  You talked

8    briefly to the jury about reading the return address and

9    then going to a blue collection box near there.  Who told

10   you to do that?

11   A    Mr. Shamo gave me a basic rundown of the process.  His

12   explanation, I believe, I don't recall the exact specifics,

13   but it was something to the effect that the return address

14   would change with each batch that was going out and I would

15   need to find collection bins that I can't use nearby that

16   address.  I wasn't given specifics on how to find the

17   collection bins, but that was my understanding.

18   Q    You're resourceful.  You figured out how to find

19   collections bins, right?

20   A    I did.

21   Q    How did you find them?

22   A    I would use the USPS mobile application and look up

23   collection boxes that were nearby the address that was

24   provided.

25   Q    The second night you went along to pick up -- or you

1    brought the agents along to pick up packages, that was

2    November 20th, 2016, right?

3    A     That sounds correct.

4    Q     Did you text with one of the shippers to set a time

5    when you would come pick them up?

6    A     Yes.  That was the normal process.

7    Q     Let's look, if we could, at 17.04.

8          Do you recognize what we're looking at there?

9    A     I do, yes.

10   Q     Is this a screen shot -- or maybe even better, a

11   picture of a screen?

12   A     Yes.  It's a photograph of a conversation on my phone.

13   Q     Your phone.  And then up at the top it says Katy.

14   Who's Katy?

15   A     That would have been Katy Bustin, I believe.

16   Q     Did you know her last name by that point?

17   A     I did.  I had interacted with her in our time both

18   being employed at eBay.

19   Q     And I think you indicated at some point you started to

20   figure out who the shippers were.  How did you figure out

21   that Ms. Bustin was one of the shippers?

22   A     I recalled that Ms. Bustin had interacted with both

23   Mr. Crandall and Mr. Shamo at and outside of eBay, and just

24   kind of put two and two together about who that was.

25   Q     Could you read the series of text messages for us?

1    A    Yes.  From myself:  Do you know when stuff is going to

2    be ready today?  I've got a family thing tonight, so I'd

3    prefer to get it done early, if possible.  From Katy:  Yeah.

4    Let me see when Shamo is planning on having orders for us.

5    I replied with a thumbs up.  Katy replied:  What time do you

6    need it by?  I stated:  The family thing is at seven, so if

7    I'm done by then, that would be great.  Katy replied:  Okay.

8    I might just have you pick up yesterday's.  Haven't heard

9    from Shamo.  And I replied:  That's great.  I'll do that if

10   it gets to be around six and you haven't heard from him.

11   Q    If you could keep going there.

12   A    Katy replied:  Sounds good.  They're going to Lehi,

13   though.  Need more time.  Just message me when you want to

14   come.  I replied:  No, that's fine.  I'm going south for my

15   family anyways.  And she replied:  Sounds good, with an

16   emoji.  Should be ready at five.  You want them now or in an

17   hour?  I replied:  Sweet.  I'll come by at six and grab

18   everything.  She replied:  Perfect.  And then about an hour

19   later she replied -- or, excuse me, about 45 minutes later,

20   she replied:  They're out for you whenever.  Going to Lehi

21   and Riverton.  Riverton drop is only eight packages thin.

22   Q    Let's take a minute and look at that last message from

23   Katy.  Going to Lehi and Riverton.  What did you understand

24   that to mean?

25   A    I understood that there were two separate batches of

1    packages with two separate return addresses with -- return

2    addresses in those specific cities.

3    Q    And then she indicates Riverton drop is only eight

4    packages thin.  Will you kind of translate that for the

5    jury.

6    A    Yes.  My understanding of that was the batch of

7    packages that was addressed to Riverton was smaller than a

8    normal batch, being only eight packages.  I can't remember

9    specifically how much an average batch was.  Maybe 20 to 30

10   packages, if I were to guess.

11   Q    So on that night, had you not been working with the

12   agents, it would have required you to go to two different

13   cities to find blue collection bins, correct?

14   A    That's correct.

15   Q    But rather than go to Lehi and Riverton, did you go and

16   pick up these packages?

17   A    Yes.  I went and picked them up the same as the

18   previous trip with the agents.

19   Q    Same as before, your car, right?

20   A    Correct.

21   Q    And they followed behind?

22   A    That's correct.

23   Q    And did you take the packages to the police station

24   again?

25   A    Yes.

```
 1   Q    And that's where the agents took possession of them?

 2   A    That is correct.

 3   Q    Let me show you Exhibit 8.

 4              THE COURT:  Exhibit which?

 5              MR. GADD:  This is Exhibit 8.00.

 6              And if we can also look at 8.03 on the screen.

 7   BY MR. GADD:

 8   Q    Go ahead and take just a moment and look through those.

 9        Do you recognize those?

10   A    Yes, I do.

11   Q    What are they?

12   A    They appear to be the same type of packages that I was

13   accustomed to shipping.

14   Q    You can see on the screen these packages laid out.  Do

15   these appear to be the same packages as what's been folded

16   down flat inside that box?

17   A    It's hard to say without confirming the addresses on

18   them, but yes, they do match the size, shape, and amount

19   that I would expect.

20   Q    So here there's just over 43 packages and parcels.  Was

21   that a more normal size amount for a pickup night?

22   A    For a single night, yes, it was slightly more than

23   normal.

24   Q    You get the three sizes here in this picture as well,

25   the large box and backs, and then the medium and the small.
```

1    Were those normal sizes?

2    A     Yes.

3    Q     They're all priority mail.  Do you remember a time when

4    you weren't shipping priority mail?

5    A     I don't recall anything specific about the shipping

6    methods.

7    Q     Were you ever asked to take it to anywhere other than

8    like a post office or a blue collection bin?

9    A     No.  Those were the only locations that were used.

10   Q     Never FedEx?

11   A     No.

12   Q     Never UPS?

13   A     No.

14   Q     Let's talk a minute about Mr. Shamo's residence.  Have

15   you ever been to Mr. Shamo's residence on Titian Way in

16   Cottonwood Heights?

17   A     Yes, many times.

18   Q     How often would you say you've been there?

19   A     At the time that we were working together, once every

20   two to three weeks would be a guess for me.

21   Q     Were you going there for business or social?  Why would

22   you go to his house?

23   A     It was almost entirely business, though I do recall a

24   handful of times that it was not business related.

25              MR. GADD:  Could we look at 17.02.

```
 1   BY MR. GADD:
 2   Q    Can you see that on your screen?
 3   A    I can.
 4   Q    I'm going to zoom in there on the top.
 5        Do you see your name on it?
 6   A    I do.
 7   Q    What is this?  Do you know?
 8   A    This appears to be a --
 9   Q    Do you want to zoom out?  Would that help?
10   A    No.  It just appears to be, I would guess, an invoice
11   for a package that was shipped to me from Canada.
12   Q    Did you leave this in Mr. Shamo's residence when you
13   were there for business?
14   A    If it matches the type of packages that I received from
15   Canada for Mr. Shamo, then yes.
16   Q    Oh, I see, meaning if it were inside a package you gave
17   to him, it might have gotten in there that way?
18   A    Correct.
19   Q    But you never actually put your fingers on this
20   document, right?
21   A    Not that I can recall at any time.
22   Q    Can you think of any other reason why a document with
23   your name on it might end up in Mr. Shamo's residence?
24   A    No.
25   Q    Let's look -- if we could look at the bottom half for
```

1    just a minute.

2        Do you see there in description it says inert

3    excipient, microcystalline cellulose.  Do you know what

4    microcystalline cellulose is?

5    A    No, I don't.

6    Q    I want to turn now and talk a little bit about evidence

7    taken from Mr. Shamo's devices.

8            MR. GADD:  Could we look at 13.09, pages 30 or

9    31 -- well, we'll look at them both.

10   BY MR. GADD:

11   Q    Did you ever go inside Mr. Shamo's home office?

12   A    Yes.  I recall going in there a handful of times.

13   Q    Did it look about like this?

14   A    That seems to be correct.

15   Q    Did you ever use either computer that was there?

16   A    No.

17   Q    There's a document that was found on his iMac, this one

18   right here.  I want to ask you some questions about it.

19           MR. GADD:  Can we look at 14.35.

20   BY MR. GADD:

21   Q    Do you recognize this first page of the document?

22   A    I recognize it from when we had briefed about this

23   earlier, but I do not specifically know what it was.

24   Q    You didn't write this document, did you?

25   A    No.

```
 1                MR. GADD:  Can we look at the next page.

 2   BY MR. GADD:

 3   Q     Do you see your name on that one?

 4   A     I do, yes.

 5   Q     And was that your address at the time?

 6   A     Yes, it was.

 7   Q     Is that an address at which you received packages from

 8   Mr. Shamo?

 9   A     Yes, it was.

10   Q     And you have no idea how it got on his computer?

11   A     I would assume that it had been on his computer if it

12   was used to procure these packages.

13   Q     Let's take just a minute now and talk about the -- I'll

14   call it the deal.

15                MR. GADD:  Could we look at 23.02.

16   BY MR. GADD:

17   Q     Do you recognize this document?

18   A     Yes, I do.

19   Q     This is your statement in advance of plea of guilty and

20   plea agreement between you and the United States, correct?

21   A     That is correct.

22   Q     At the end of this -- and we'll scroll through it in a

23   minute -- you signed this document?

24   A     I did.

25   Q     In court?
```

1    A      Yes.

2    Q      For pleading guilty?

3    A      Correct.

4    Q      Here on the first page, this letter --

5           MR. GADD:  If you could pull up paragraph number

6    one.

7    BY MR. GADD:

8    Q      Did you, in fact, plead guilty to Counts 2, 3, 6 and 12

9    of the superseding indictment?

10   A      I did, yes.

11   Q      Were any of the charges that you faced dismissed?

12   A      No, they were not.

13   Q      You pled as charged?

14   A      Correct.

15   Q      By pleading as charged, were you trying to take full

16   responsibility?

17   A      I was.

18          MR. GADD:  If we can zoom back out now.

19   BY MR. GADD:

20   Q      There's this statement in advance of plea, but then at

21   the end of it is an addendum.

22          MR. GADD:  If we can scroll through to the

23   addendum.

24          Okay.  Starting here.

25

1    BY MR. GADD:

2    Q    This is -- for lack of a better term, this is the

3    agreement between you and the United States, correct?

4    A    Yes, that's correct.

5    Q    Picking up in the second paragraph, does it say the

6    defendant, that's you, agrees to testify truthfully and

7    completely for the United States in any subsequent court

8    hearing or trial relating to this case if called upon?

9    A    It does.

10   Q    Did you agree to wait to be sentenced until all the

11   remaining defendants in your case had been sentenced?

12   A    Yes, I did.

13          MR. GADD:   Then if we could go to the next page,

14   that top paragraph.

15   BY MR. GADD:

16   Q    If you testify truthfully and completely, was it the

17   agreement that the United States would present your

18   cooperation to the court -- that's Judge Kimball, correct?

19   A    Yes.

20   Q    -- for his consideration at your sentencing under that

21   Sentencing Guideline 5K1.1, and did you understand that to

22   mean that if you had a minimum mandatory sentence for one of

23   the counts you pleaded guilty, there would no longer be a

24   minimum mandatory sentence?

25   A    That is my understanding, yes.

1   Q    And then it says the United States also agrees not to

2   charge or seek a charge against you for death resulting

3   violations of -- and then Title 21 United States Code

4   841(a)(1) -- that may arise out of the continuing

5   investigation into overdose deaths tied to the Pharma-Master

6   drug sales.  That was your understanding as well, correct?

7   A    Yes, that's correct.

8   Q    Was there any other agreement?

9   A    Not to my knowledge, no.

10  Q    You understand that one day soon you're going to be

11  standing here and Judge Kimball will be sentencing you?

12  A    I do.

13  Q    Is it your understanding that I, United States, we are

14  going to tell Judge Kimball everything you did wrong?

15  A    Yes.

16  Q    And then everything you did to help make it right?

17  A    Yes.

18  Q    You understand that the sentence is 100 percent up to

19  Judge Kimball?

20  A    I do.

21  Q    Let's talk now about the hard questions.

22       In 2016, when you were picking up packages off the

23  doorstep in Daybreak, you knew those packages probably

24  contained drugs, didn't you?

25  A    I did.

```
 1   Q     So why did you help Aaron Shamo?
 2   A     I helped because at the time when this began, my
 3   understanding of the operation was something that I was -- I
 4   was told and made to believe wasn't going to be harming
 5   anyone, and it was easy money to make.  It was something
 6   that I believed would be not necessarily in the right, but
 7   also not in the wrong.  And when it obviously transformed
 8   into what it became, I became extremely distraught and
 9   uncomfortable with what had happened.
10   Q     You say you became distraught and uncomfortable, but
11   when?  When was the first time you realized what was going
12   on?
13   A     I would say it was when I was questioned by agents that
14   had a search warrant, when they made it clear that this was
15   Fentanyl that was being prepared and shipped.
16   Q     Last question.  Who was your boss?
17   A     Can you clarify what you are asking?
18   Q     That was a bad question so it wasn't the last.
19         When it came to picking up the packages, putting them
20   in the mail stream, who was your boss?
21   A     Aaron Shamo, without a doubt.
22   Q     Did you have any other bosses?
23   A     I would say Drew Crandall would have qualified as that
24   at the time when I had known he was involved.
25   Q     Back in 2015?
```

1    A     Correct, before he left the country.

2    Q     But in 2016, any bosses?

3    A     Other than Aaron Shamo, no.

4               MR. GADD:  No further questions.  Thank you.

5               THE COURT:  Thank you.

6               Defense may cross-examine.

7                         CROSS-EXAMINATION

8    BY MR. SAM:

9    Q     Hello, Mr. Gygi.  I'm going to introduce myself to you

10   for the first time -- I wasn't here on Friday -- Daryl Sam,

11   and I represent the defendant, Mr. Shamo.  I appreciate you

12   being here today and I know that it's a big day.

13         So I'd like to ask you a few questions and ask you

14   about your life a little bit.  You started off by saying you

15   have a dog; is that right?

16   A     Two, yes.

17   Q     You've got two dogs.  Okay.  And you value that pretty

18   highly, I guess, in your personal life.

19         You also snowboard too; is that correct?

20   A     It's been a while, but yes.

21   Q     You were snowboarding back in 2016, I guess, when you

22   had that conversation with Mr. Shamo.  You were discussing

23   that, right?

24   A     That's correct.

25   Q     In fact, before that eventful day on November 17th when

```
 1    law enforcement came, you had already started planning to go
 2    to Colorado; is that right?
 3    A    Yes.
 4    Q    That plan was in the works?
 5    A    It was, correct.
 6    Q    And part of that was you talked about -- when you
 7    talked to Mr. Shamo, you talked about an Epic Pass as well;
 8    is that right?
 9    A    That's correct.
10    Q    So Colorado was a great destination for you; is that
11    right?
12    A    Correct.  I didn't have that pass at the time, but that
13    was what I was planning.
14    Q    And then you also stated earlier that you were there
15    when packages were opened; is that correct?
16    A    Correct.  I don't believe that was in 2016, but rather
17    2015.
18    Q    So early on you were getting packages and you would
19    open them in the presence of Mr. Shamo; is that right?
20    A    I wasn't the one who opened them, but I was present
21    when they were opened, yes.
22    Q    And was Mr. Crandall there as well?
23    A    Absolutely.
24    Q    And was that because you were using what was in the
25    package; is that correct?
```

1  A    While I was using those drugs, I was not using the ones

2  that specifically came from those packages.

3  Q    But those are substances that you were using?

4  A    Yes.

5  Q    LSD, marijuana --

6  A    That's correct.

7  Q    -- cocaine; is that correct?

8  A    Not cocaine.

9  Q    Not cocaine.  Okay.

10      So in May of 2017, you interviewed with agents; is that

11  right?

12  A    In May, yes, that is correct.

13  Q    About six months after.

14      And just to clarify too, there was a search on

15  November 17th of your home, is that correct, of 2016?

16  A    Yes, that's correct.

17  Q    And you were not detained at that point; is that right?

18  A    I was -- I voluntarily went for questioning.  I was not

19  detained.

20  Q    So you got to sleep in your own bed that night?

21  A    After it had been tossed around, yeah.

22  Q    And have you ever spent a night in jail?

23  A    I have not.

24  Q    You never have?

25  A    No.

1   Q    Okay.  And then six months later, approximately in May

2   of 2017, you sat down with agents --

3   A    Yes.

4   Q    -- and spoke with them; is that right?

5   A    Yes, that is correct.

6   Q    Okay.  And you opened up with the agents at that point

7   and talked about a lot of things.

8        You stated that you left eBay in January of 2015; is

9   that correct?

10  A    I believe -- yes, January 2015, that's correct.

11  Q    And did you pick up other work after that in 2015 --

12  other regular full-time employment?

13  A    No.  My employment consisted entirely of the operation

14  that had been run by Mr. Shamo and the others.

15  Q    So you were depending totally, financially, on the

16  operation; is that correct?

17  A    That is correct.

18  Q    And at that point, in January 2015, you were a receiver

19  of packages; is that right?

20  A    That is correct.

21  Q    And you testified you were making about 50 to $100 at

22  that point, per package; is that right?

23  A    That's correct as well.

24  Q    So you were making about 100 to $200 a month at that

25  point; is that correct?

```
 1   A     That seems like an appropriate number, yes.

 2   Q     Not a lot to live on at that point?

 3   A     No.  I had other money saved that I was using for

 4   living expenses.

 5   Q     Okay.  And as things progressed, you pushed Mr. Shamo

 6   for more work; is that right?

 7   A     I did exactly that.  I brought up the request for more

 8   work later on in 2015 when my savings began to run low.

 9   Q     So you had some savings, and when things started to get

10   tight, you approached Mr. Shamo about more work?

11   A     Yes, that's correct.

12   Q     That was about what time, mid 2015?

13   A     I would say it was probably about May or June that I

14   approached him, and then June or July that I began acting as

15   a courier, a runner.

16   Q     Okay.  So was it June 2015 you started acting as a

17   courier.  How much did you get paid at that point?

18   A     That was $2,000 every other week.

19   Q     So beginning in June 2015, you're making about 4,000 a

20   month?

21   A     Yes.

22   Q     Okay.  And you stated that you didn't come to know

23   about the Fentanyl until the day of the search when you were

24   told; is that correct?  Is that your testimony?

25   A     That is correct.
```

1   Q    And you started making more money doing this.  And what

2   was the volume like in June of 2015?

3   A    Can you clarify what volume you're asking about?

4   Q    Well, the volume of how many -- the amount of packages

5   that you were moving.

6   A    Receiving or shipping?

7   Q    Shipping.

8   A    I would estimate that there was, by my recollection,

9   about 20 to 30 packages per night, five to six nights per

10  week.

11  Q    Okay.  And at the end here, there were about -- what

12  was the volume when you helped investigators on

13  November 18th?

14  A    If I recall correctly, it was roughly the same.  Maybe

15  slightly more than that.  Maybe it had bumped up to about 30

16  to 40 packages per night, but I believe it was still right

17  around 30 being the average.

18  Q    Okay.

19       MR. SAM:  If we could pull up Exhibit 23 -- I

20  believe it's 23.02.  If we can pull that up.

21       This is a copy of your plea agreement.

22       If we could go to page two.  Actually, let's go

23  back to page one.

24  BY MR. SAM:

25  Q    Count 2, conspiracy to distribute Fentanyl, you pled

1    guilty to that; is that correct?

2    A    I did, yes.

3    Q    And why did you plead guilty to that if you had not had

4    knowledge of it?

5    A    I believe I pled guilty to that because that was the

6    agreement that the United States government had reached with

7    myself and my attorney.  If I recall correctly, they had not

8    wanted to budge on any of those charges.

9    Q    It could have been maybe they didn't believe you, but

10   that was a moment of truth that came to you on

11   November 17th?

12   A    That could be the case, yeah.

13   Q    Because you were making substantial money from this and

14   it was a livelihood for you; is that correct?

15   A    It was, absolutely.

16   Q    And you had aspirations of going to Colorado and

17   getting an Epic Pass, and kind of continuing on this path;

18   is that right?

19   A    Yes.

20   Q    Okay.  And then on page two, if we could go down to the

21   potential penalties of what you can get.  It's your

22   understanding that just for pleading to conspiracy to

23   distribute Fentanyl, you could get ten years --

24   A    Yes, I understand.

25   Q    -- as a minimum mandatory?

1    A    That was made clear at my change of plea.

2    Q    And a life maximum -- a life top, right?

3    A    Correct.

4    Q    And so it's your hope in coming here today and

5    testifying, and then also entering this plea, is that you

6    hope to avoid any substantial sentence; is that right?

7    A    Well, I understand that actions have consequences.  So

8    I only hope that my sentence is fair considering my

9    cooperation and my actions.

10    Q    I mean, you're fortunate to be alerted right off the

11    bat as this was all coming down and had that opportunity.

12    Do you feel fortunate that you were in that position?

13    A    Yes.  I feel fortunate that I was given a chance to do

14    the right thing.

15    Q    Would you take Mr. Shamo as somebody that would be able

16    to be smart enough to run a drug organization?

17    A    I would take him as someone who's smart enough to

18    maintain the operation on his own.

19    Q    So between Drew Crandall and Aaron Shamo, as far as the

20    technicality of pressing pills and putting formulas

21    together, who would you say would be better at that?

22    A    I don't know.  I don't know either of their expertise

23    when it comes to chemistry, so things like putting together

24    formulas.  But as far as the other half of your question, I

25    would say Mr. Crandall was more in tune with what that would

1    require.

2    Q    In fact, when you interviewed with agents in May of

3    2017, you said that, correct, that you felt that

4    Mr. Crandall would have the knowledge to do things where

5    Mr. Shamo would not, as far as pressing pills?

6    A    I don't recall specifically stating anything about

7    pressing pills, but I do recall in my testimony agreeing --

8    or, excuse me, not my testimony, my interview with agents,

9    agreeing that Mr. Crandall was smarter for that kind of

10   stuff.

11   Q    And it's your opinion that Mr. Shamo would not be able

12   to run this operation without some major help?

13   A    That's my opinion, that he wouldn't be able to set up

14   the operation without additional help.  Running it is

15   another question entirely.

16   Q    So your testimony is running -- or that setting it up,

17   he would not have the expertise in doing that?

18   A    That is correct.

19   Q    You felt like Crandall was there in the beginning and

20   kind of got things off the ground, then?

21   A    Yes, I definitely do.

22   Q    And without Crandall, this would have never turned into

23   this?

24   A    I think that's a fair assessment, yes.

25             MR. SAM:  Just a moment.

```
 1               THE COURT:  Sure.
 2               MR. SAM:  I have no further questions, Your Honor.
 3               THE COURT:  Thank you.
 4               Redirect?
 5                         REDIRECT EXAMINATION
 6    BY MR. GADD:
 7    Q    The first thing I wanted to bring up was just to
 8    clarify.  There were a few questions you got asked and a few
 9    responses that referred to you acting as a courier in 2015.
10    So I was hoping we could clarify the date.  Was it 2015 or
11    2016 that you started?
12    A    Can you clarify when it was that the search warrant was
13    served?
14    Q    So if the search warrant was November of 2016, how many
15    months before that would you have started?
16    A    It would have been June or July 2016, not 2015.
17    Q    So for the questions that you were asked, it was
18    talking about 2015.
19         Your time as a courier was just a few months, right?
20    A    That is accurate, yes.
21    Q    And that was 2016?
22    A    Correct.
23               MR. GADD:  Could we look at 23.02 again, and could
24    we go to paragraph 11.
25    //
```

1    BY MR. GADD:

2    Q    You got asked a question about not knowing it was

3    Fentanyl and still pleading guilty.  Let's look at paragraph

4    11 together.

5         So as part of your statement in advance of plea,

6    there's facts in there, and you stipulate and agree that the

7    following facts accurately describe your conduct.  That's

8    part of it, correct?

9    A    Yes, that is correct.

10   Q    I want to ask you again, after I read through this, if

11   it's still true.  In 2015, I agreed with Aaron Shamo and

12   other co-conspirators to accept packages of drugs addressed

13   to me at my address.  I would then transfer the drug

14   packages to Shamo.  Shamo paid me for each package I

15   accepted on his behalf.  I continued to accept packages on

16   Shamo's behalf in 2016.

17        On November 17th, 2016, one of those packages -- sent

18   from China and addressed to me at my address -- was seized

19   by law enforcement after it entered the United States Mail

20   system.  The package contained more than 40 grams of

21   Fentanyl.  I knew the packages I had been receiving

22   contained controlled substances.  I also knew that the

23   packages would enter the United States -- they were being

24   shipped to me from China.

25        In 2016, I became a runner for Shamo's organization.

1    Approximately five nights a week, I would drive to the

2    residence of Tonge and Bustin and pick up packages and

3    envelopes, all within the District of Utah, that were ready

4    to be mailed in the U.S. Postal system.  The packages and

5    envelopes contained drugs.  I would then drop off the

6    packages and envelopes at post offices scattered throughout

7    the Salt Lake Valley.  I staggered the post offices from

8    which I sent the packages in an attempt to avoid detection

9    by law -- if we can jump to the next page -- enforcement.

10   The packages I mailed contained both Fentanyl-laced pills

11   and alprazolam tablets.  I continued to ship packages and

12   envelopes of drugs for the Shamo organization until

13   November 2016.

14       My co-conspirators and I each had a role to play and we

15   relied upon each other to meet our common objective:  To

16   earn money by selling drugs.  I knowingly and voluntarily

17   involved myself with Shamo and my other co-conspirators.  It

18   was my free choice to do so.

19       Is any of that untrue?

20   A    No.  That is completely true.

21   Q    You got asked questions about Mr. Shamo's ability, his

22   aptitude.  Specifically I think you said that you weren't

23   sure he would have the ability to set up an organization

24   that led to these types of results, correct?

25   A    Correct.

1    Q    But you talked about running and maintaining it.  Why

2    do you say that he might be capable of running or

3    maintaining it?

4    A    Well, because setting it up would require a lot of

5    specialized technical knowledge about how to access the dark

6    web where the drugs were sold, how to set up accounts, all

7    that kind of stuff.

8         As far as maintaining, I believe it would be fair to

9    say that just about anyone could be taught how to maintain

10   something that has already been built.

11   Q    So in a sense you have given the jurors an opinion

12   about Mr. Shamo's ability, his aptitude?

13   A    That's correct.

14   Q    If you found out that Mr. Shamo was the one who did all

15   the setting up on the dark web, would it change your

16   opinion?

17   A    Yes.  It would definitely change my opinion.

18   Q    If you saw the thousands of Internet searches he did on

19   these and related topics, would it change your opinion?

20   A    It very well could, yes.

21   Q    And to be fair, no one has shown you those Internet

22   searches, right?

23   A    That's correct.

24   Q    Did you see, either on the news or elsewhere, the money

25   that came out of his house?

1    A    Yes.  I recall seeing that on the news.

2    Q    What did you think when you saw that?

3    A    I was astounded at the sheer volume of cash that was on

4    hand, both in total amount and number of bills, how large

5    the amount was.

6              MR. GADD:  Nothing further.  Thank you.

7              THE COURT:  Thank you, Mr. Gadd.

8              Recross, Mr. Sam?

9                        RECROSS-EXAMINATION

10   BY MR. SAM:

11   Q    So you were asked about maintaining or keeping up this

12   operation, correct?

13   A    Correct.

14   Q    As far as this operation goes, the reason why you're

15   here to take responsibility is it would have been impossible

16   for something like this to be run without some structure,

17   without somebody like you picking up the drugs and going out

18   throughout the valley and dropping them off in different

19   locations; is that correct?

20   A    Correct.  There was quite a bit of structure in how the

21   operation was handled and built.

22   Q    There's a lot of detailed instructions as far as your

23   responsibility.  You were being paid $4,000 a month to go

24   drop off packages, correct?

25   A    Correct.

1    Q    So you had a -- and I wanted a clarification too, in

2    that when you were wired with Mr. Shamo and had that

3    conversation that we went through, you made the statement

4    that you were going to get paid 3,000 biweekly.  Is that

5    what you said in there?  Do you remember that?

6    A    I believe I asked for clarification about how much,

7    asking if it was either four or 5,000, and Mr. Shamo

8    clarified that normally it would be 2,500, and he would make

9    it 3,000 for me.

10   Q    Okay.  And what was the time period?  So you're saying

11   four or 5,000 a month?

12   A    No, biweekly.

13   Q    Oh, biweekly.  And when you say biweekly, what did that

14   mean, twice a week or twice a month?

15   A    Twice a month, every other week.

16   Q    Okay.  I just wanted a clarification on that, how much

17   money we're talking about.  But we're talking about between

18   five or $6,000 a month is what you were anticipating going

19   to Colorado to do this?

20   A    I would say I was anticipating, at the start of that

21   conversation and prior to this, that it would be between six

22   and $10,000 all together per month.  Mr. Shamo clarified

23   that it would be 6,000 all together per month.

24   Q    So that was something that you were comfortable with,

25   and that's why you're taking responsibility here, because

1    that was a substantial position in the company -- or the

2    operation, and you would be compensated for it, and you

3    recognize that that was something that was a major part of

4    the operation?

5    A     Yes.  I definitely understood the seriousness of my --

6    what my responsibility would be in the operation with that.

7    Q     And you were just one -- you were just one part of the

8    organization; is that your understanding?  There was a lot

9    of other things going on?

10   A     Yes, correct.

11   Q     And that's why you say as far as Mr. Shamo setting this

12   up, he wouldn't have had the ability to set this all up on

13   his own?

14   A     That's how I've testified, yes, correct.

15   Q     And there were other things -- you were going to take

16   over a position of shipper, what Ms. Tonge and Ms. Bustin

17   were doing, in Colorado; is that right?  You would fill that

18   role in Colorado?

19   A     That was my understanding as well, yes.

20   Q     And had you been trained in that?  Did you know what

21   that fully was going to entail?

22   A     No, I did not.

23   Q     Okay.  But you understood that it was somewhat intense,

24   from your observation?

25   A     Can you clarify what you mean by intense?

1    Q    Well, I mean it was substantial.  You were involved

2    with picking up packages.  So you'd pick up 20 to 30

3    packages a night; is that correct?

4    A    That is correct.

5    Q    And so there was some work that had to be done to

6    produce that?

7    A    Correct.  My understanding was it would be preparing

8    those packages.

9    Q    As far as the detail of how that all happened, you

10   didn't know at this point; is that correct?

11   A    I didn't get any specifics about that.

12   Q    But you expected to get some training if you were going

13   to Colorado, that you would be prepped on that, what the

14   details of that would be?

15   A    Correct.

16   Q    Okay.  All right.

17        I don't have any further questions for you.

18             THE COURT:  Thank you.

19             Are we done with this witness?

20             MR. GADD:  Please.

21             THE COURT:  You may be excused.  Thank you.

22             (Proceedings not transcribed)

23

24

25

1                   C E R T I F I C A T E

2

3

4          I hereby certify that the foregoing matter is

5   transcribed from the stenographic notes taken by me and is a

6   true and accurate transcription of the same.

7

8

9

10

11

12

13

14

15

16   PATTI WALKER, CSR-RPR-CP      DATED: 10-31-19
     Official Court Reporter
17   351 South West Temple, #8.431
     Salt Lake City, Utah  84101
18   801-364-5440

19

20

21

22

23

24

25