IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION


In re:                    )
                          )
UNITED STATES OF          )
AMERICA,                  )
                          )
        Plaintiff,        )
                          )
vs.                       )   Case No.
                          )   2:16-CR-00631DAK
AARON MICHAEL SHAMO,      )
                          )
        Defendant.        )
                          )
_____  )




BEFORE THE HONORABLE DALE A. KIMBALL

August 14, 2019


JURY TRIAL


Trial Testimony of:

Alexandrya Tonge

Katherine Bustin

**Appearances of Counsel:**

For the Plaintiff:     Kent A. Burggraaf
                            S. Michael Gadd
                            Attorney at Law
                            Utah Attorney General's Office
                            348 E. South Temple
                            Salt Lake City, Utah 84111

                            Vernon G. Stejskal
                            Attorney at Law
                            US Attorney's Office
                            111 S. Main Street
                            Suite 1800
                            Salt Lake City, Utah 84111

For the Defendant:     Gregory G. Skordas
                            Kaytlin V. Beckett
                            Attorney at Law
                            Skordas & Caston
                            560 South 300 East
                            Suite 225
                            Salt Lake City, Utah 84111

                            Daryl P. Sam
                            Attorney at Law
                            Daryl P. Sam PLLC
                            5955 South Redwood Road
                            Suite 102
                            Salt Lake City, Utah 84123

Court Reporter:

          Laura W. Robinson, RPR, FCRR, CSR, CP
                  351 South West Temple
                  8.430 U.S. Courthouse
                Salt Lake City, Utah 84101
                    (801)328-4800

```
                    I N D E X
```

Examinations                                              Page

**ALEXANDRYA TONGE**
CONTINUED DIRECT EXAMINATION                                  4
BY MR. STEJSKAL
CROSS-EXAMINATION                                           18
BY MS. BECKETT
REDIRECT EXAMINATION                                        33
BY MR. STEJSKAL
RECROSS-EXAMINATION                                         36
BY MS. BECKETT
**KATHERINE BUSTIN**                                         37
DIRECT EXAMINATION                                          38
BY MR. STEJSKAL
CROSS-EXAMINATION                                           53
BY MR. SKORDAS

| | | |
|---|---|---|
| | 1 | Salt Lake City, Utah                    August 14, 2019 |
| | 2 | (8:38 a.m.) |
| | 3 | THE COURT:  The jury is here.  Are we ready |
| | 4 | to proceed? |
| 00:41:07 | 5 | MR. GADD:  Yes, Your Honor. |
| | 6 | THE COURT:  All right.  We'll get them.  The |
| | 7 | witness may resume the stand assuming she is here. |
| | 8 | MR. STEJSKAL:  She is here, she is just in |
| | 9 | the other room. |
| 00:42:23 | 10 | (Jury returned.) |
| | 11 | THE COURT:  Good morning ladies and gentlemen |
| | 12 | of the jury.  Thank you for being here.  Thank you |
| | 13 | for being prompt.  We appreciate your work. |
| | 14 | You may proceed, Mr. Stejskal. |
| 00:42:59 | 15 | MR. STEJSKAL:  Thank you, Your Honor. |
| | 16 | (Whereupon, Ms. Alexandrya Tonge resumed |
| | 17 | the witness stand having been previously |
| | 18 | sworn.) |
| | 19 | **CONTINUED DIRECT EXAMINATION** |
| 00:43:00 | 20 | BY MR. STEJSKAL: |
| | 21 | Q.   Ms. Tonge, we were talking yesterday a little bit |
| | 22 | about the financial arrangements and I believe you |
| | 23 | said your pay from Mr. Shamo increased over time; is |
| | 24 | that correct? |
| 00:43:18 | 25 | A.   It is. |

1    Q.   And you said you were paid in cash but there were

2    also other methods with which you were paid?

3    A.   Yes.

4    Q.   And let's specifically refer to Venmo.  Were you

00:43:28   5    ever paid by Venmo?

6    A.   Yeah, on a couple of occasions.

7    Q.   Tell me what Venmo is?

8    A.   It is an electronic form of receiving money.  So

9    you can send it from your bank account to someone

00:43:38   10    else's user name and they can transfer it to their

11    personal bank account.

12    Q.   So instead of handing cash, it is some kind of

13    electronic transfer?

14    A.   Correct.

00:43:47   15    Q.   Okay.  Let's pop up Exhibit 16.02.  Can you see

16    that there in front of you?

17    A.   Yes.

18    Q.   And in the left hand column there do you see your

19    name in several places highlighted in blue?

00:44:05   20    A.   Yes.

21    Q.   And then there are payments in another column

22    that says debit.  Do you see those?

23    A.   Yes.

24    Q.   And then in the column next to that there are

00:44:22   25    some comments do you see those, too, like halfway

1   down the page "obey my dog"?

2   A.   Yeah.

3   Q.   Can you tell us what that is about?

4   A.   Just funny comments that he would add to the

00:44:37   5   message that he was sending with the money.

6   Q.   So they're not really what it's about, it is just

7   kind of funny comments then?

8   A.   Correct, yeah.

9   Q.   What are those payments for?

00:44:46   10   A.   Um, for either payment for just normal or

11   reimbursement for purchasing things at the post

12   office.

13   Q.   And by payment "for normal", what do you mean by

14   that?

00:44:59   15   A.   Um, what he would pay us to do, what we were

16   doing shipping out drugs.

17   Q.   Okay.  So basically wages for your work?

18   A.   Yeah.

19   Q.   And those $500 amounts there in the middle in

00:45:11   20   September of 2015, is that kind of a normal payment

21   you would have received at that time for your work?

22   A.   Yes.

23   Q.   Let's go to the second page.  There is a few more

24   down there, there is a 625, another 500, do you see

00:45:32   25   those?

6

A.   Yeah.

Q.   Again, are those consistent with payment for your work?

A.   Yes.

Q.   Then there is some totals at the bottom.  Do you see next to your name there it says, total for you 5,950.  Were you making that kind of money over the course of this?

A.   Yeah, it seems about right.

Q.   You said some of this might have been reimbursement for other things?

A.   Yeah, purchasing postage, priority stamps at the post office if we needed to do that.

Q.   So sometimes you would do that with your own money and get reimbursed?

A.   Correct.

Q.   By whom?

A.   By Aaron.

Q.   And how would you communicate with him to get reimbursed?

A.   Through telegram to let him know this is what we spent so if you could send that.

Q.   And would he always pay you back?

A.   Yeah.

Q.   Now, you're aware that there was cash seized from

1    your home on November 22nd of 2016?

2    A.   Yes.

3    Q.   Approximately $19,000 or 19,500?

4    A.   Yes.

00:46:45    5    Q.   What was that cash from?

6    A.   Payments from Aaron for doing what we were doing.

7    Q.   So that money came in cash and sometimes you guys

8    just stored it away there at the house?

9    A.   Yeah.

00:46:57    10   Q.   If we can look at 11.00, photo 6.  So that is in

11   your home?

12   A.   Yes.

13   Q.   In the bedroom?

14   A.   Yeah.

00:47:15    15   Q.   Is that Ms. Bustin's drawer or yours?

16   A.   Ms. Bustin's.

17   Q.   Okay.  And then let me see, there were the --

18   let's look at 23, picture 23.  Do you see the money

19   in the nightstand drawer there?

00:47:39    20   A.   Yes.

21   Q.   Okay.  That was also in your home.  And then

22   picture 24.  And that is your side, your nightstand?

23   A.   Yes.

24   Q.   Okay.  So that was just money you had around?

00:47:54    25   A.   It wasn't deposited.  We were just kind of

1    keeping it.

2    Q.   You had spent some of the money that Mr. Shamo

3    paid you over the course of these events too,

4    correct?

00:48:05    5    A.   Yes.

6    Q.   So you made money off of this, your role in this

7    operation, correct?

8    A.   Yes.

9    Q.   Did you see pictures of or hear about the money

00:48:18   10    taken from Mr. Shamo's home?

11    A.   Yes.

12    Q.   And do you recall roughly how much that was?

13    A.   Over a million in cash.

14    Q.   Did you and Ms. Bustin have anywhere near that

00:48:27   15    amount?

16    A.   No.

17    Q.   How come you guys didn't have that much?

18    A.   I wasn't even remotely aware of the amount this

19    was bringing in.

00:48:45   20    Q.   Were you in charge of the money?

21    A.   No.

22    Q.   Did money come directly to you from customers?

23    A.   No.

24    Q.   Did Bitcoin come directly to you from customers?

00:48:55   25    A.   No.

```
         1   Q.   Let's look at Exhibit 23.07.  This is your

             2   Statement in Advance of Plea of Guilty or essentially

             3   your guilty plea.  Do you recall that?

             4   A.   Yes.

00:49:22     5   Q.   And did you, in fact, plead guilty to every

             6   charge against you in this case?

             7   A.   I did.

             8   Q.   Did you go over that with your attorney?

             9   A.   I did.

00:49:34    10   Q.   And did you enter that guilty plea with a full

            11   understanding of what you were doing?

            12   A.   Yes.

            13   Q.   Was there any specific sentencing agreement that

            14   you would get probation or you would get no jail or

00:49:46    15   you would get ten years or anything like that?

            16   A.   No.

            17   Q.   Did you agree to testify truthfully in any

            18   hearing or case that came up in this matter?

            19   A.   Yes.

00:50:02    20   Q.   Why did you decide to do that?

            21   A.   I knew what we were involved in was wrong and we

            22   had made poor choices and I just wanted the

            23   opportunity to own up to that.

            24   Q.   Okay.  Do you also have hope that the judge will

00:50:22    25   consider this in determining what your punishment
```

```
 1   will be from this?
 2   A.   Yeah.
 3   Q.   Have you testified truthfully?
 4   A.   Yes.
 5   Q.   It was also part of the agreement that you
 6   wouldn't be charged with any death that resulted in
 7   this case; is that correct?
 8   A.   Correct.
 9   Q.   Now, you knew nothing about that during your
10   participation, correct?
11   A.   Correct.
12   Q.   It's also true that you have no stake in the
13   outcome, correct?
14   A.   Correct.
15   Q.   Doesn't matter what happens as long as you tell
16   the truth?
17   A.   Yes.
18   Q.   You expect to get sentenced after this is over,
19   correct?
20   A.   Yes.
21   Q.   After this trial is over?
22   A.   Yes.
23   Q.   Did you have other consequences other than this
24   criminal charge because of your involvement in this
25   case?
```

1    A.    Yeah, um, I lost my job.

2    Q.    That was at eBay?

3    A.    Yes.

4    Q.    You were essentially fired?

00:51:27    5    A.    Yup.

6    Q.    Why did they say they did that?

7    A.    Just our involvement in this case.

8    Q.    Okay.

9    A.    Um, I received a general under other than

00:51:39    10   honorable discharge from the military.

11   Q.    And the military was important to you, correct?

12   A.    (Witness crying) extremely.

13   Q.    Very important to you.  You served six years

14   honorably?

00:52:08    15   A.    Yes.

16   Q.    And you were also going to school to become a

17   helicopter pilot; is that correct?

18   A.    Correct.

19   Q.    That is gone as well?

00:52:18    20   A.    Yes.

21   Q.    So there have been consequences already from your

22   actions in this?

23   A.    Yes.

24   Q.    And you expect additional consequences from your

00:52:26    25   sentencing?

1    A.    Yes.

2    Q.    After reflecting on this and kind of

3    understanding the scope of all that was involved in

4    this organization, you have empathy for others who

00:52:39    5    may have been affected by this?

6    A.    Yeah, absolutely.

7    Q.    Tell us about that?

8    A.    I wasn't, you know, fully aware of the alteration

9    of the drugs and what was being sent and sold as

00:52:54    10    something else.  And when we found that out November

11    22nd when we were interviewed, and talking to

12    Homeland Security and the post office inspector, they

13    told us the severity of what was being used and I

14    felt badly.

00:53:26    15    Q.    Let's talk about a couple more things.  Let's

16    look at Exhibit 14.30.  Here is the first page.  Can

17    you tell us what that is?

18    A.    Yeah.  An order sheet.  It looks like for Xanax

19    bars.

00:53:50    20    Q.    Is this -- this is just one page but is this a

21    typical order sheet as they came to you?

22    A.    Yes.

23    Q.    From Mr. Shamo?

24    A.    Yes.

00:53:58    25    Q.    Let's look at Page 862.  If you can look at that

1    bottom entry there what does that say?

2    A.   It says "sale of Roxy or Oxycodone".

3    Q.   And how many?

4    A.   Ten.

00:54:19    5    Q.   And in what strength?

6    A.   30 milligram.

7    Q.   Were these always 30 milligrams?

8    A.   Yeah, I think so.

9    Q.   Okay.  And what does that postage part mean?

00:54:30    10    A.   They paid for priority mail.

11    Q.   And what is the name at the bottom there?

12    A.   Gregory Lee.

13    Q.   If we can go to the very next page.  There at the

14    top, that is a continuation of that address?

00:54:47    15    A.   Yes.

16    Q.   So did you and Ms. Bustin send a package to that

17    if you were fulfilling these orders?

18    A.   Yes.

19    Q.   And again, that date looked like June 6th of

00:54:58    20    2016?

21    A.   Yeah.

22    Q.   I'm going to hand you next what has been marked

23    or admitted as Government's Exhibit 11.05.  Can you

24    tell us what that is?

00:55:26    25    A.   Sheets of tracking information from packages that

14

1    were sent out and then a customer name notated next

2    to it to know what tracking was assigned to which

3    customer.

4    Q.   While we're looking at that, can you pull up

00:55:42    5    11.00, Page 9, please.  If you could highlight by the

6    glove there?  On the screen is essentially the same

7    thing maybe not the same page, but the same thing

8    you're talking about there?

9    A.   Yes.

00:56:01    10    Q.   Again, what are those?

11    A.   Tracking numbers from the postage that was used

12    for a package that was sent out and a customer name

13    notated in the exhibit.

14    Q.   Explain that to us.  It looks like stickers, the

00:56:16    15    black part?

16    A.   Yeah.  So it was a tracking number that could be

17    used with priority mail and you can pull one part of

18    the sticker off and put it on the package and then

19    one part is for your reference to reference the

00:56:28    20    tracking on that shipment.

21    Q.   And then on the end of that it looks like

22    handwritten names?

23    A.   Yeah.  My handwriting, um, writing names of the

24    customers that that tracking number referenced.

00:56:40    25    Q.   What was the purpose of keeping this information?

A.   To know if there was an issue with a package that was sent if it didn't arrive or it arrived.

Q.   So if there was a problem somebody gave you a name you could reference these sheets and figure out the tracking number for that order?

A.   Yes.  Yup.

Q.   Looking at 11.5 in front of you, there is a column that is going up and down as it is facing you. Can you see that?

A.   Yes.

Q.   What's the first name in that first column on your left?

A.   Gregory Lee.

Q.   And is there a tracking label next to that?

A.   There is.

Q.   And what does that indicate to you?

A.   That that package was shipped out.

Q.   Thank you.  And let's next look at Exhibit 18.01, photo 8.  Do you recognize that?

A.   Yes.

Q.   What is that?

A.   That was the first stages of sending out packages with a return address and a name that was random and then a "to address" referencing the order that was given to us to ship out.

1  Q.   So in the upper left, that Erin Sandoval, that's

2  the return address?

3  A.   Yes.

4  Q.   That is just a name that you made up?

00:57:59  5  A.   Yes.

6  Q.   Or came up with in some way?

7  A.   Yes.

8  Q.   But the "to", that's the actual customer?

9  A.   Yes.

00:58:05  10  Q.   That the drugs were sent to?

11  A.   Yes.

12  Q.   Okay.  Thank you.  Let's try to understand your

13  role.  Did you organize this operation?

14  A.   No.

00:58:20  15  Q.   Who did?

16  A.   Um, Aaron and Drew.

17  Q.   And after Drew left, who was kind of charge of

18  the organization?

19  A.   Aaron.

00:58:28  20  Q.   Did you recruit anyone to participate?

21  A.   No.

22  Q.   Did you manage anyone to supervise their

23  day-to-day activities?

24  A.   No.

00:58:42  25  Q.   Do you believe you knew everybody else that was

1  involved in this organization?

2  A.   No.

3  Q.   Why do you say that?

4  A.   When I saw the -- all of the names listed or

5  read, you know, there was 20 people involved.  I had

6  no idea.

7  Q.   So your role was limited to exactly what you

8  explained, packaging and shipping the drugs?

9  A.   Yes.

10  Q.   And putting them in the boxes for a while and

11  then that got taken from you?

12  A.   Correct.

13  Q.   Based on all that you know, who was in charge of

14  this operation?

15  A.   Aaron Shamo.

16       MR. STEJSKAL:  Thank you.  That's all of the

17  questions I have.

18       THE COURT:  Thank you Mr. Stejskal.  You may

19  cross-examine, Ms. Beckett.

20                    **CROSS-EXAMINATION**

21  BY MS. BECKETT:

22  Q.   Ms. Tonge, I believe it was your testimony that

23  you began your involvement with this organization in

24  2015; is that correct?

25  A.   Correct.

00:58:53 (line 5)
00:59:15 (line 15)
00:59:22 (line 20)
00:59:50 (line 25)

18

1    Q.   When in 2015?

2    A.   Approximately April or March.

3    Q.   And I believe it was also your testimony that you

4    approached Aaron Shamo and asked how you could be

01:00:06    5    involved, correct?

6    A.   How I could make money from him whatever he was

7    doing, involved in.

8    Q.   So your intention was to find a way to make some

9    easy money?

01:00:17    10   A.   To make extra money, yeah.

11   Q.   You were still working at the time, correct?

12   A.   Correct.

13   Q.   I believe at that point in time your testimony

14   was that you were living in Riverton?

01:00:24    15   A.   Yes.

16   Q.   With your girlfriend at the time Katie Bustin?

17   A.   Bustin, yeah.

18   Q.   And your mother?

19   A.   Yes.

01:00:32    20   Q.   Were you renting a home out there?

21   A.   I was, yup.

22   Q.   The three of you?

23   A.   Yes.

24   Q.   Any other adults in that home?

01:00:40    25   A.   No.

1    Q.   And at some point in I believe 2016 you moved

2    from Riverton to Daybreak; is that correct?

3    A.   It was in 2015.

4    Q.   End of 2015, middle of 2015?

01:00:54    5    A.   June.

6    Q.   June of 2015?

7    A.   Yes.

8    Q.   So not long after you started in this

9    organization you were able to move from Riverton to

01:01:01    10   Daybreak?

11   A.   Correct.

12   Q.   And you moved into a separate home from your

13   mother?

14   A.   Rented a town home, yeah.

01:01:08    15   Q.   And your mother had a town home or house she was

16   renting or purchased?

17   A.   A townhouse that she purchased.

18   Q.   I believe your testimony was that towards the end

19   of this organization you were making roughly 3,500

01:01:28    20   every two weeks between the two of you; correct?

21   A.   Correct.

22   Q.   With that money you also paid off your truck;

23   correct?

24   A.   I did not.

01:01:41    25   Q.   Your truck is not paid off?

1    A.    It was not.

2    Q.    Your truck is currently not paid off?

3    A.    Um, the truck that I had at the time was a loan.

4    I sold that truck and I was given a truck from work

01:01:54    5    that I currently drive that is paid off but it was

6    not paid off by me.

7    Q.    You had a car as well, correct?

8    A.    Correct.

9    Q.    You were paying on that during this time period

01:02:05   10    as well, correct?

11   A.    Yes.

12   Q.    So you and your girlfriend made enough money to

13   move into a town home at Daybreak and pay on two

14   vehicles during this time period, correct?

01:02:18   15   A.    Yes.

16   Q.    I believe it is also your testimony that your

17   initial contact after you approached Aaron Shamo was

18   Drew Crandall; is that correct?

19   A.    We talked to him as well, yes, but never directly

01:02:33   20   to just Drew.

21   Q.    Drew never came over to your home?

22   A.    He did.

23   Q.    So you did speak directly with Drew Crandall?

24   A.    Correct, but he wasn't just someone that we were

01:02:45   25   only working with, we were working with both parties.

1   Q.   Drew is the person who showed you how to package

2   these items for shipping, correct?

3   A.   He did.

4   Q.   He showed you how to operate the heat sealer?

01:02:56   5   A.   He did.

6   Q.   Came over to your home on a regular basis?

7   A.   For about two weeks.

8   Q.   Showed you how to find return addresses?

9   A.   Drop a pin on a map, yup.

01:03:10   10   Q.   Showed you how to find blue boxes or post office

11   boxes or post office places to drop these packages

12   off?

13   A.   Just said find blue boxes in these areas.

14   Q.   He instructed you on how to do that, correct?

01:03:24   15   A.   Sure.

16   Q.   I believe it was also your testimony that Drew is

17   the one who set up the "Pass the Peas" e-mail account

18   for you; is that correct?

19   A.   Correct.

01:03:47   20   Q.   Did you forfeit any assets?

21   A.   The money in the home.

22   Q.   So just the 1,900 --

23   A.   19,000.

24   Q.   19,500?

01:03:58   25   A.   Yes.

1    Q.    That's not all of the money you made during this

2    organization though, was it?

3    A.    No, it was not.

4    Q.    You made a significant amount of money, correct?

01:04:06    5    A.    In comparison I would say no.

6    Q.    I did not ask in comparison.  You made a

7    significant amount of money, correct?

8    A.    I made money, yes.

9    Q.    You were still working during this time period,

01:04:19    10    correct?

11    A.    Correct.

12    Q.    You had a salary from your job plus all of this

13    roughly 3,500 every two weeks between you and

14    Ms. Bustin, correct?

01:04:26    15    A.    3,500 at the end, not throughout.

16    Q.    You essentially managed your own schedule during

17    all of this though, correct?

18    A.    Yes.

19    Q.    And there were multiple times where you contacted

01:04:41    20    either Aaron or Drew Crandall and complained about

21    the amount of work you had to do, correct?

22    A.    Correct.

23    Q.    And when you needed any sort of assistance you

24    received the assistance you needed, correct?

01:04:55    25    A.    Correct.

```
 1   Q.   At some point in time you decided you did not
 2   want to be the party who was dropping off these
 3   packages, correct?
 4   A.   Correct.
 5   Q.   And you essentially asked for somebody else to
 6   come fulfill that role, correct?
 7   A.   Yes.
 8   Q.   That individual was Sean Gygi, correct?
 9   A.   Yes.
10   Q.   And he became your point of contact and you would
11   let him know when to pick up packages, correct?
12   A.   When we had finished processing we would just say
13   hey they're ready for you.
14   Q.   And you would tell him to come get them?
15   A.   We would just let him know that they were ready
16   so that he could come get them.
17   Q.   And you would let him know where they needed to
18   be dropped off?
19   A.   He would see the address from the label and he
20   would know which area it needed to be taken to.
21   Q.   There was never a point in time when you told him
22   these may need to go to Lehi or these may need to go
23   to Sandy or some other area?
24   A.   I may have referenced the city.
25   Q.   I believe it was also your testimony that you
```

01:05:06   5
01:05:14   10
01:05:25   15
01:05:33   20
01:05:50   25

1    began in the military in 2013; is that correct?

2    A.    Yes.

3    Q.    And you were discharged in 2019, correct?

4    A.    Correct.

01:06:01    5    Q.    Your testimony was that you were -- were you

6    active duty during that time period?

7    A.    National Guard.

8    Q.    Just reserves?

9    A.    Yes.

01:06:08    10    Q.    So for almost the entirety of your military

11    career you were involved in this organization?

12    A.    For two years of the six.

13    Q.    When did you plead guilty in this case?

14    A.    In June of 2018.

01:06:28    15    Q.    You were going to school during this time period

16    too, correct?

17    A.    Correct.

18    Q.    You wanted to become a helicopter pilot?

19    A.    Yes.

01:06:39    20    Q.    I'm going to ask that question again.  You wanted

21    to become a helicopter pilot, correct?

22    A.    Yes.

23    Q.    So in November of 2016 when you were stopped by

24    police officers or agents in this case, you had a lot

01:06:50    25    to lose, correct?

```
         1   A.   Yes.

         2   Q.   You had a girlfriend?

         3   A.   Yes.

         4   Q.   A career?

01:06:57 5   A.   Yes.

         6   Q.   A family?

         7   A.   Yes, yup.

         8   Q.   A mother you wanted to take care of?

         9   A.   Yup.

01:07:03 10  Q.   You were also trying to purchase a home?

         11  A.   Correct.

         12  Q.   When agents approached you, you told them

         13  anything they needed to hear, correct?

         14  A.   I told them the truth.

01:07:28 15  Q.   At the end of 2016 when you were approached by

         16  agents, at that point in time was Drew Crandall

         17  involved in the organization?

         18  A.   He was, yes.

         19  Q.   You had contact with him through e-mail and

01:07:41 20  telegram?

         21  A.   On occasion, yes.

         22  Q.   Are you familiar with Luke Paz?

         23  A.   I know the name, yes.

         24  Q.   Are you familiar with his role in this

01:07:56 25  organization?
```

26

|         |    |                                                              |
|---------|----|--------------------------------------------------------------|
|         | 1  | A.    Mostly.                                                 |
|         | 2  | Q.    What is your understanding of Luke Paz's role in       |
|         | 3  | this organization?                                           |
|         | 4  | A.    He pressed pills with Aaron.                           |
| 01:08:05 | 5 | Q.    What kind of pills did Luke Paz press?                 |
|         | 6  | A.    The oxycodone fentanyl pills.                          |
|         | 7  | Q.    At some point in time did Aaron Shamo express         |
|         | 8  | frustration to you about not having access to the            |
|         | 9  | formula for the fentanyl pills?                              |
| 01:08:19 | 10 | A.    He did.                                               |
|         | 11 | Q.    Who did he say had that formula?                       |
|         | 12 | A.    Luke.                                                  |
|         | 13 | Q.    Did he say that that formula -- without having        |
|         | 14 | that formula he was unable to actually press the             |
| 01:08:28 | 15 | pills himself?                                              |
|         | 16 | A.    Correct.                                               |
|         | 17 | Q.    And that he was frustrated that Luke held onto        |
|         | 18 | that formula and kept it from him?                           |
|         | 19 | A.    Yes, because he wanted to do that himself.            |
| 01:08:44 | 20 | Q.    I believe we looked at a couple of invoices on       |
|         | 21 | some of these exhibits, do you remember those?               |
|         | 22 | A.    Yes.                                                   |
|         | 23 | Q.    You created some of those invoices, correct?          |
|         | 24 | A.    I did.                                                 |
| 01:08:54 | 25 | Q.    You had kind of free range on what those looked       |

1    like, correct?

2    A.   Correct.

3    Q.   I believe part of your testimony was that you and

4    Katie wanted to leave this organization and that

01:09:09    5    Aaron had offered you a down payment on a home to

6    keep you around.  Is that your testimony?

7    A.   Correct.

8    Q.   Do you remember a time in 2000 -- it may have

9    been 2015 but possibly early 2016 when there was an

01:09:24    10    incident involving your dog?

11    A.   Yes.

12    Q.   Can you tell me what that was?

13    A.   Um, yes.  He had gotten into the room where we

14    kept all of the products and ingested an MDMA pill.

01:09:37    15    Q.   Do you remember approaching Aaron and telling him

16    that you needed a home with a backyard so you could

17    continue to manufacture pills and not put your

18    animals at risk?

19    A.   I don't remember that, no.

01:09:48    20    Q.   Would it surprise you if a conversation like that

21    occurred?

22    A.   I know we talked to him about the dog getting

23    hurt, but no, it wouldn't.

24    Q.   Do you remember complaining to Aaron about the

01:10:01    25    number of orders you had to fulfill or Drew about the

1  number of orders you had to fulfill?

2  A.   Yes.

3  Q.   Do you remember suggesting to either Drew or

4  Aaron that potentially shipping in bulk was a better

01:10:14  5  idea for you, Katie, and the organization?

6  A.   No.

7  Q.   You also testified that you received money

8  through Venmo, not just cash, correct?

9  A.   Correct.

01:10:28  10  Q.   And that you also had your own Bitcoin wallet; is

11  that correct?

12  A.   To purchase postage only, yes.

13  Q.   But you knew how to use that Bitcoin wallet,

14  correct?

01:10:39  15  A.   Yes, correct.

16  Q.   There has been some testimony about Aaron leaving

17  or some individual leaving drugs or items in your

18  truck and that's where you would retrieve them from.

19  Does that sound correct to you?

01:10:59  20  A.   Correct.

21  Q.   Did Aaron ever have a key fob for your truck?

22  A.   He had the pin code for the door.

23  Q.   But not the key fob, correct?

24  A.   Correct.

01:11:09  25  Q.   Did that pin code make the lights in your truck

1    flash on and off when you enter the code?

2    A.   I don't know if the lights flash.

3    Q.   Like with a key fob, do you know what?

4    A.   Yeah, I -- I don't recall but sure.

01:11:25   5    Q.   Is it also consistent with your testimony that

6    you and Katie did actually use those gel caps to

7    manufacture MDMA pills for shipping, correct?

8    A.   Correct.

9    Q.   So you weren't just involved in shipping, you

01:11:39   10   actually manufactured those pills?

11   A.   That's not manufacturing it's just putting the

12   powder that is already there in to a capsule.  It is

13   not making them.  It is -- I think it is different.

14   There is not a formula involved or any other

01:11:52   15   additions.

16   Q.   Taking it from one form to another in order to

17   sell it en masse?

18   A.   Sure.

19   Q.   Is that correct?

01:12:00   20   A.   I think it's a different terminology.  There's

21   not a formula.  It is taking one powder and putting

22   it into a capsule instead of adding different

23   ingredients.

24   Q.   Ms. Tonge, I didn't ask you if there was a

01:12:17   25   formula involved, I asked if you took the product

1  from one form, put it into another, and then shipped

2  it out for sale?

3  A.   Yes.

4  Q.   Since you were stopped on November 22nd, 2016,

01:12:32  5  did you spend time in jail?

6  A.   I did not.

7  Q.   As a matter of fact, you got married since that

8  date, correct?

9  A.   I did.

01:12:47  10  Q.   After you pled guilty in this case, did you have

11  any other interviews with the government?

12  A.   I have.

13  Q.   How many interviews have you had?

14  A.   One.

01:13:01  15  Q.   I believe we looked at your Statement in Advance

16  of Plea?

17  A.   Yes.

18  Q.   Were you offered any incentive for cooperating

19  with the government?

01:13:12  20  A.   Not at the beginning, no, I was not.

21  Q.   When you entered that plea?

22  A.   I was.

23  Q.   You were offered both leniency for cooperating as

24  well as told that you would not be charged with a

01:13:26  25  death resulting count, correct?

1    A.    Correct.

2    Q.    If we can look at Exhibit 14.30.  Do you have the

3    page number on that very large exhibit.  Do you have

4    a page number down at the bottom of this exhibit?

01:13:53    5    That is an order you fulfilled, correct?

6    A.    Correct.

7    Q.    So an order you shipped, correct?

8    A.    Correct.

9    Q.    Are you aware that the government is alleging

01:14:01    10    that this shipment to Gregory Lee is the basis for

11    the death resulting count in this case?

12    A.    I am.

13    Q.    But you're not charged with that?

14    A.    Correct.

01:14:14    15    Q.    In fact, you agreed to plead guilty so that you

16    would not be charged with that, correct?

17    A.    I pled guilty because I knew what I did was

18    wrong.

19    Q.    And part of that agreement entailed you not being

01:14:23    20    charged with a death resulting count, correct?

21    A.    Correct.

22        MS. BECKETT:  Just one second, Your Honor.

23    Those are all of the questions I have.  Thank you.

24        THE COURT:  Thank you.  Redirect,

01:14:46    25    Mr. Stejskal?

**REDIRECT EXAMINATION**

BY MR. STEJSKAL:

Q.   Let me just clear up a couple of things just so we're all understanding here.  You were asked how many other interviews you had with the government and I believe you answered one, correct?

A.   Since the guilty plea, yeah.

Q.   Since the guilty plea, that was the question, okay.

A.   Yes.

Q.   And that was in preparation for trial?

A.   Correct.

Q.   When you pled guilty, it was explained to you that the judge would consider all of your conduct in this whole matter, correct?

A.   Correct.

Q.   And that -- to your understanding did that include the fact that somebody died?

A.   Yeah.

Q.   You weren't specifically charged with that but that would be considered, correct?

A.   Correct.

Q.   When did your cooperation start with the United States law enforcement?

A.   November 22nd when I was pulled over.

01:15:12
01:15:21
01:15:37
01:15:46
01:15:58

33

1   Q.   Basically from the moment you were pulled over?

2   A.   Yes.

3   Q.   Describe that again your interaction with the

4   officer that pulled you over?

01:16:09  5   A.   I just -- he knew -- he asked me if I knew why I

6   was being pulled over.  He was in an unmarked vehicle

7   and he wasn't wearing a uniform and I told him what I

8   did.  I requested that he not breakdown our door,

9   that I would let him in and show him anything that he

01:16:28  10   needed to see.

11   Q.   And then you interviewed with some other agents

12   that same day?

13   A.   I did.

14   Q.   Did anybody promise you anything at that time?

01:16:36  15   A.   No.

16   Q.   You cooperated fully just based on what you said

17   that you wanted to cooperate?

18   A.   Correct.

19   Q.   One other clarification.  I had asked you if you

01:16:48  20   recruited anyone.  Are you familiar with a person by

21   the name of Elise Christensen?

22   A.   I am.

23   Q.   Who is that?

24   A.   A friend from eBay.

01:16:59  25   Q.   Maybe the term "recruited" wasn't the right

1  terminology, but did you speak with Ms. Christensen

2  about this or refer her to someone?

3  A.  I did, yeah.  To receive packages to get that

4  money to be a drop basically for Aaron.

01:17:16  5  Q.  How did you assist in that relationship?

6  A.  Um, just gave her the information and passed that

7  along to Aaron because he had needed another person

8  to kind of fulfill that spot.

9  Q.  And did you have any negotiation with

01:17:32  10  Ms. Christensen about what she would be paid?

11  A.  I did not.

12  Q.  Or how to do it?

13  A.  No.

14  Q.  Who did that?

01:17:37  15  A.  Aaron told me this is how much she could get from

16  doing that.  So as soon as she gets a package she can

17  let me know or you can bring it to me for her.

18  Q.  When you say "let me know", let you know or let

19  Mr. Shamo know?

01:17:53  20  A.  Let Mr. Shamo know or let myself know.

21       MR. STEJSKAL:  Thank you.  That's all of the

22  questions.

23       THE COURT:  Thank you.  Any re-cross?

24       MS. BECKETT:  Yes.  Just briefly, Your Honor.

01:18:09  25  Your Honor, if I may approach.

1          THE COURT:  You may.

2                **RECROSS-EXAMINATION**

3    BY MS. BECKETT:

4    Q.   I have placed an exhibit next to you, I believe

01:18:32    5    it is 17.06.  If I could have you look at that,

6    Ms. Tonge.  On that chart, who are you familiar with?

7    A.   Um, Noble, Shamo, Paz, Crandall, myself, Bustin,

8    Gygi, and Christensen.

9    Q.   I believe it was your testimony just now that you

01:18:59    10   essentially referred Elise Christensen to Mr. Shamo;

11   is that correct?

12   A.   Yes.

13   Q.   And that if she received a package on Mr. Shamo's

14   behalf, she could let you know about that package?

01:19:11    15   A.   Correct.

16   Q.   And you would retrieve that package from her and

17   provide it to either Mr. Shamo or Mr. Crandall?

18   A.   Provide it to Aaron, yeah.

19   Q.   If we could go back to that 14.30 exhibit.

01:19:39    20   You're familiar with this exhibit, correct?

21   A.   Correct.

22   Q.   Those are essentially daily order sheets?

23   A.   Correct.

24   Q.   Was your testimony that you were not aware that

01:19:53    25   fentanyl was being used in these pills; is that

1    correct?

2    A.   Fentanyl was being used in pills that were

3    marketed as something other than that, correct.

4    Q.   But you were aware that there was fentanyl,

01:20:03    5    correct?

6    A.   I saw on the pages.  I was unaware of what it

7    was.

8    Q.   You were unaware of what fentanyl was?

9    A.   Correct.

01:20:15    10    Q.   Until somebody in this case told you?

11    A.   The severity of that, yes.

12          MS. BECKETT:  That's all I have.  Thank you.

13          THE COURT:  Thank you.  Anything else?

14          MR. STEJSKAL:  No.

01:20:26    15          THE COURT:  You may step down.  Thank you and

16    you may be excused.  The government may call its next

17    witness.

18          MR. STEJSKAL:  The government will call Katie

19    Bustin.

01:20:54    20          THE COURT:  Come forward and be sworn,

21    please.

22          THE CLERK:  Please raise your right hand.

23                **KATHERINE LAUREN ANNE BUSTIN,**

24    called as a witness at the request of the Defendant,

01:21:02    25          having been first duly sworn, was examined

1                   and testified as follows:

2          THE WITNESS:  I do.

3          THE CLERK:  Come around to the witness box

4    here (indicating).  Please state your name and spell

01:21:28   5    it for the record.

6          THE WITNESS:  It is Katherine Lauren Anne

7    Bustin, K-A-T-H-E-R-I-N-E L-A-U-R-E-N A-N-N-E

8    B-U-S-T-I-N.

9          THE COURT:  You may proceed, Mr. Stejskal.

01:21:47   10          MR. STEJSKAL:  Thank you, Your Honor.

11                     **DIRECT EXAMINATION**

12    BY MR. STEJSKAL:

13    Q.   Where do you work?

14    A.   I work at Main Street Office Furniture.

01:21:54   15    Q.   With Ms. Tonge?

16    A.   Yes.

17    Q.   What do you do there?

18    A.   I am the designer and space planner.

19    Q.   What kinds of customers do you guys have?

01:22:03   20    A.   Mostly commercial businesses, offices trying to

21    get cubicals and their offices set up.

22    Q.   How long have you worked there?

23    A.   Um, a little over two years.

24    Q.   Where did you previously work?

01:22:16   25    A.   I worked at eBay.

1    Q.    How long did you work there?

2    A.    For a little over six years.

3    Q.    So you started when?

4    A.    Um, August 2011.

01:22:28    5    Q.    And when did you quit working there?

6    A.    Um, June 2017.

7    Q.    And you were let go as a result of your

8    involvement in this case, correct?

9    A.    Yes.

01:22:48    10    Q.    Tell us about some of the people that you met at

11    eBay that were involved in this?

12    A.    Um, I first met Aaron.  I think we were on the

13    same team together and we had kind of become work

14    friends and his friend Drew would come over and

01:23:07    15    visit.  So in proximity I would talk to him as well.

16    Q.    Just at work or did you socialize outside of

17    work?

18    A.    Just at work.

19    Q.    At some point you became Facebook friends I

01:23:19    20    guess?

21    A.    Yeah.

22    Q.    But as far as going to pubs with those guys and

23    stuff?

24    A.    No, it wasn't my scene really so --

01:23:26    25    Q.    And so you struck up a casual work relationship

1  with Mr. Shamo and Mr. Crandall?

2  A.   Yes.

3  Q.   And was there something about that that turned

4  into this?

01:23:39   5  A.   Yeah.  Um, I had driving Drew home one night and

6  he had kind of told me a few things, not necessarily

7  any specifics, but I kind of had an idea of what they

8  were kind of doing.  I also knew that Aaron was

9  planning on leaving eBay and I didn't know how he

01:24:00   10  could do that with not having a job and paying all of

11  the bills still.

12  Q.   So did you end up meeting with Mr. Shamo and

13  Mr. Crandall about becoming involved?

14  A.   Yes.  I don't recall who approached who, but,

01:24:18   15  yes, we talked about it and Aaron had asked if we

16  wanted to be a drop is what he called it to receive

17  packages at our home address.

18  Q.   And did you agree to do that?

19  A.   Yes.

01:24:30   20  Q.   And did you and Ms. Tonge receive several

21  packages that way?

22  A.   Yes.  We received, I think, four or five of them.

23  Q.   And what did you do with those?

24  A.   We weren't allowed to open them, we just brought

01:24:43   25  them straight to Aaron .

1    Q.    And what were you paid for those?

2    A.    Um, from what I recall we were paid about $100 a

3    package.  So sometimes we would get a few at a time.

4    Q.    Paid in cash?

01:24:57    5    A.    Yes.

6    Q.    Did you eventually become involved in the

7    organization in a different way?

8    A.    Yes.  Over probably another five months or so,

9    um, again I don't recall who approached who, but

01:25:15    10    there was an opportunity to make a little bit more

11    money and do a few more things so they kind of

12    explained that to us, Aaron and Drew, and we kind of

13    got started from there.

14    Q.    Okay.  Before I forget, you talk about an Aaron

01:25:30    15    Shamo that you knew and were involved with in these

16    activities.  Can you identify him for the jurors?

17    A.    Yes.  He is over here, far right.

18    Q.    Describe him a little bit.

19    A.    Um, I don't really have my glasses on so I can't

01:25:45    20    see him clearly, but he is wearing a black suit,

21    possibly a black tie.

22         THE COURT:  I didn't hear what you said.

23         MR. SKORDAS:  I was just going to say we'll

24    stipulate that she knows Aaron.

01:25:54    25         THE COURT:  Thank you.

1          MR. STEJSKAL:  Thank you.

2     Q.   (By Mr. Stejskal) I'm sorry, what was the further

3     work then that you had agreed to do?

4     A.   Originally it was to start shipping out some

01:26:10   5     product.  Um, we still didn't know a whole lot at the

6     beginning, but we made an agreement that Drew would

7     come over and kind of show us the ropes of how to

8     ship things and how to get them sent out.

9     Q.   And he did that and you guys watched?

01:26:26   10    A.   Yes.  He would come over -- I think he came over

11    maybe three or four times and helped us learn how to

12    package and make it safe to go through the mail.

13    Q.   In addition to packaging, what else did he show

14    you about how to get the orders and that kind of

01:26:45   15    stuff?

16    A.   Um, he worked with Alex on setting up an account

17    on the computer through the Dark Web.  I didn't do

18    anything on the computer much so I didn't know a

19    whole lot about how they set that up, um, but that's

01:27:00   20    how he kind of explained how to do it.

21    Q.   Okay.  Let's talk about you then.  So how did you

22    divide up the duties between you and Ms. Tonge at the

23    beginning there?

24    A.   Um, the first time that Drew came over he just

01:27:13   25    kind of told us one person will package, the other

1  person will do orders, it is probably just easier

2  that way.  So it just happened to be that I was doing

3  the sorting and Alex was doing the labels and

4  packaging.

01:27:27  5  Q.   What do you mean by sorting?

6  A.   I would look at the order sheets that Alex would

7  print out and I would sort and count the pills, put

8  them in packages, and I would hand them back to Alex

9  and she would seal them in the package and put

01:27:40  10  postage on it.

11  Q.   And then at the beginning you guys were also

12  responsible for getting them in the postal system?

13  A.   Yes.  In the beginning we would drive them around

14  to random blue boxes and as well as dropping them off

01:27:52  15  in the bins at the post office.

16  Q.   When you started, what size of packages were you

17  doing and kind of how many?

18  A.   In the beginning it was pretty small.  We were

19  doing maybe sets of 10 or 20 in a little package but

01:28:11  20  it got bigger from there.  But originally it was only

21  a few at a time.

22  Q.   And as far as how many packages at night would

23  you guys do?

24  A.   In the beginning probably maybe 10 to 20 orders a

01:28:23  25  night.

1   Q.   And did that progress as time went by?

2   A.   Yes, yeah, very much.

3   Q.   At some point did Mr. Crandall leave the country?

4   A.   He did.  I am not quite sure of the time frame

01:28:38   5   that he left, but I remember he wanted to travel

6   around with his girlfriend Sasha at the time and he

7   was going to get paid out from Aaron so he could go

8   travel.

9   Q.   And did he in fact leave?

01:28:53   10   A.   Yes.

11   Q.   After Mr. Crandall left, who was your main

12   contact with as far as running your part of this

13   operation?

14   A.   It was always Aaron that we communicated with

01:29:10   15   after Drew was gone.

16   Q.   Before him would you communicate with both of

17   them when Drew was around?

18   A.   Yes.

19   Q.   And did the types of drugs you were shipping out

01:29:26   20   change after Drew left?

21   A.   They did.  Um, after he left, Aaron had started

22   or had a contact of some kind that wanted him to

23   start shipping out oxy or what I thought were oxy --

24   Oxycodone.  And from that point, we mostly shipped

01:29:46   25   that and kind of left behind some of the other pills

1    that were originally being shipped.

2    Q.   So those weren't as profitable or weren't --

3    A.   Just weren't as popular, yeah.

4    Q.   Did you have any contact with customers?

01:30:00    5    A.   No.  There were some messages on orders we got,

6    but we never reached out to any customer.

7    Q.   Did you get any payment from customers?

8    A.   No, it was always through Aaron.

9    Q.   Did you have anything to do with the Dark Web?

01:30:13    10   A.   No.  Myself I did not.

11   Q.   So if I understand what you're saying, orders

12   would come to you and you guys would fill them?

13   A.   Yes.

14   Q.   You described counting pills at the beginning

01:30:30    15   when there were 10 or 20 or whatever.  Um, would you

16   physically hand count those one, two, three four and

17   put them in a package?

18   A.   Yes.

19   Q.   Did that eventually change?

01:30:40    20   A.   Yes.  Once the orders got bigger, um, Aaron would

21   provide us with scales and we could you know count

22   out ten and weigh how much that was and then just do

23   the math from there if it was a large order.

24   Q.   And who told you how to do that?

01:30:56    25   A.   Um, from what I recall, it was Aaron.

Q.   And so describe that.  There were some orders I
think I saw of 2,000 and 5,000.  How would you
prepare those for packaging and delivery?

A.   Um, at first I would try and do the math right,
um, and just weigh them out.  But it was just so much
and it was taking up so much of our evenings that we
-- I would just kind of assume or guess how much
would be in a package and if it looked right just
send it.

Q.   And you got some feedback sometimes or saw some
feedback that you were putting too many in?

A.   Yes.  Um, Aaron would reach out and let us know
that extras are fine for customers and it's nice to
do that, but sometimes people were saying they had
like 100 or more extras and that is just because I
wasn't counting them.

Q.   And was Aaron upset about that?

A.   Um, I don't know if I would say he was upset.  He
seemed maybe annoyed just because that's his profit
and his pills that he has made.  So I don't think he
was really ever upset about it, but I don't think he
was happy about it.

Q.   He kind of told you to be more careful?

A.   Yes.

Q.   There seemed to be an abundance of pills.  Did

1    you guys ever run short?

2    A.   Um, from what I can recall, I don't think we did.

3    Um, Aaron would supply us with pills pretty regularly

4    so most of the time we didn't run out.  If we did,

01:32:44   5    then he would reach out to the customers and let them

6    know it will be a day or two late.

7    Q.   And we saw photos of the search warrant and there

8    were kind of pills on the floor and stuff and pills

9    in the vacuum cleaner.  Do you recall that?

01:33:00   10    A.   Yes.

11    Q.   Were those accurate pictures?  Was that kind of

12    how the house was at the time?

13    A.   Yes.  It was something that we didn't have

14    passion about, we didn't really care about it.  So if

01:33:10   15    we dropped a pill or there was something on the

16    ground, we would just vacuum it up.  We weren't

17    counting individual pills.

18    Q.   So you weren't accountable to Mr. Shamo for each

19    and every pill?

01:33:20   20    A.   Correct.

21    Q.   There were so many that it didn't --

22    A.   It was hard to keep track of anything that's why

23    he would reach out sometimes when we had large orders

24    but, um, or large extras on orders.  But other than

01:33:34   25    that, he didn't count every pill so we didn't either.

1    Q.   And was there -- were there sometimes re-ships?

2    A.   Yes.  Some people would say that maybe they got

3    the product and it was smashed so they couldn't take

4    them or that they just didn't get the package at all

01:33:51    5    so we would have to re-ship out to that address.

6    Q.   Did you at times have concerns or reservations

7    about doing this and ask to get out of it?

8    A.   Yes.  Um, (witness crying) a few months before,

9    sorry, a few months before we were caught, I had just

01:34:47   10    a horrible feeling and I wanted to be done

11    completely, um, but was persuaded otherwise to just

12    keep going with it.

13    Q.   Did you have conversations with Mr. Shamo about

14    that and what not?

01:35:07   15    A.   Yes.  Um, we had told him -- Alex and I had told

16    him that we were very uncomfortable, that we didn't

17    want to do it any more.  I was paranoid from the

18    beginning.  Um, I kept asking for less

19    responsibilities or less public places to go and --

01:35:29   20    but instead he -- Aaron would offer, you know, time

21    off, paid time off, or he offered to give us money to

22    buy a house.  And that was something that we were

23    looking to do, so that was a huge incentive.  We

24    wanted to, you know, build a life.  So...

01:35:48   25    Q.   And somewhere towards the end you had surgery on

1    your wrists?

2    A.   I did, yes.  I had a cyst on both of my wrists.

3    So the day that we were arrested I had just had a

4    surgery just a few days before that.

01:36:07   5    Q.   During that time Ms. Tonge had to kind of do

6    things on her own?

7    A.   Yes.  She would do the orders and I couldn't

8    really do much.  I couldn't move my wrists very much

9    so I wouldn't -- I didn't do them for the last

01:36:25   10   probably three weeks, I would say, up to the time we

11   were caught.  So...

12   Q.   And all that time you were feeling like you

13   wanted to quit?

14   A.   Yes.

01:36:37   15   Q.   November 22nd of 2016, you remember that day well

16   I assume?

17   A.   Yes.

18   Q.   What happened that day?

19   A.   Um, that was the day that our house was raided.

01:36:50   20   Um, I was in bed and Alex luckily was able to let

21   them into the house rather than breaking in and they

22   came in and flipped our house and searched everything

23   and brought us in for questioning.

24   Q.   And were you cooperative at that time?

01:37:10   25   A.   Yes.

1    Q.   How so?

2    A.   Um, I just told the truth.  As soon as they

3    brought us in I gave up everything I knew.

4    Q.   Were you emotional at that time?

01:37:22    5    A.   Yeah, very much.

6    Q.   Did you have any agreement at that time about

7    what was going to happen to you?

8    A.   No.

9    Q.   But you told them any way?

01:37:33    10    A.   Yes.

11    Q.   How come?

12    A.   I didn't want to be in this from the beginning so

13    I knew it was something that I just needed to clear

14    up and tell the truth and just get out of it

01:37:48    15    completely.

16    Q.   Let's look at Exhibit 23.00.  Do you recognize

17    that?

18    A.   Yes.

19    Q.   That is the front page of your guilty plea?

01:38:07    20    A.   Yes.

21    Q.   Did you in fact plead guilty in this matter?

22    A.   I did.

23    Q.   Did you plead to every charge that was charged

24    against you?

01:38:15    25    A.   Yes.

```
 1    Q.   Did you have any specific sentencing agreement

 2    about what is going to happen to you?

 3    A.   No.

 4    Q.   Did you also enter into a cooperation agreement?

 5    A.   Yes.

 6    Q.   And in that you agreed to tell the truth in any

 7    further court proceeding against anyone else,

 8    correct?

 9    A.   Yes.

10    Q.   Have you done that?

11    A.   Yes.

12    Q.   Part of the agreement was that you would not be

13    charged with the death that resulted from this

14    organization; is that correct?

15    A.   Correct.

16    Q.   But you understood that the judge will consider

17    all of your conduct and everything that happened as a

18    result of this organization in determining what

19    happens to you, correct?

20    A.   Yes.

21    Q.   Do you have any stake in the outcome of this

22    proceeding?

23    A.   No.

24    Q.   All you were told is to tell the truth, correct?

25    A.   Yes.
```

1    Q.    Did you have any -- other than this criminal

2    charge any other consequences from your involvement

3    in this?

4    A.    Um, aside from losing my job, no.

01:39:25    5    Q.    Okay.  You were fired from your job?

6    A.    Yes.

7    Q.    And probably some friends and family kind of had

8    some --

9    A.    Luckily no family.  My family has been very

01:39:35    10    supportive but I lost a lot of friends.

11    Q.    Did you organize this operation?

12    A.    No.

13    Q.    Did you manage anyone, supervise their day-to-day

14    activities?

01:39:57    15    A.    No.

16    Q.    Did you know that others were involved?

17    A.    Um, yes, just a few people, but yes.

18    Q.    When you say just a few people, did you -- do you

19    think you knew everybody that was involved in this

01:40:12    20    organization?

21    A.    No.

22    Q.    Why do you say that?

23    A.    Um, I just saw the sign.  I didn't realize there

24    were that many people at all.

01:40:21    25    Q.    Based on what you did and what you know, who was

52

1    in charge of this operation?

2    A.   Aaron was.

3    Q.   Why do you say that?

4    A.   He was the one who did all of the communicating,

01:40:31    5    he made the financial decisions, he is the one who

6    started the account on the Dark Web, he created this

7    whole thing and taught others.

8         MR. STEJSKAL:   Thank you.   That's all of the

9    questions I have.

01:40:48    10        THE COURT:   Thank you.   Thank you

11   Mr. Stejskal.   Mr. Skordas, you may cross-examine.

12        MR. SKORDAS:   Thank you, Your Honor.

13                    **CROSS-EXAMINATION**

14   BY MR. SKORDAS:

01:40:54    15   Q.   Hi.

16   A.   Hi.

17   Q.   My name is Greg Skordas and I'm Aaron's attorney.

18   We haven't met before, have we?

19   A.   I don't think so.

01:41:01    20   Q.   Or spoken?

21   A.   No.

22   Q.   Um, you know Drew Crandall, correct?

23   A.   Yes.

24   Q.   Do you see his picture on there?

01:41:07    25   A.   Yes.

1    Q.    Kind of a give away but his name is underneath

2    it.   Is that the fellow you know as Drew Crandall?

3    A.    Yes.

4    Q.    And I think your testimony was that you knew

01:41:19    5    Aaron and Drew through your employment there at eBay;

6    correct?

7    A.    Correct.

8    Q.    And that the introduction into this mess you got

9    yourself into was first from a drive home you had

01:41:33    10   with you and Drew, correct?

11   A.    Partially.  He didn't tell me a whole lot from

12   there.  Um, he just had a lot of envelopes in his

13   backpack and I was curious and he was very vague in

14   what he said.  But it later came to light from Aaron

01:41:48    15   of what more specifically what they were doing.

16   Q.    And you were, of course, reluctant to get

17   involved in this, correct?

18   A.    I was, yes.

19   Q.    And although Alex is a dear friend of yours, she

01:42:03    20   sort of took the laboringor on a lot of this; is that

21   fair?

22   A.    Um, partially.  Um, I would say that she is a

23   little bit more money driven, money stresses her out

24   a little bit more than it does me, but we both made

01:42:19    25   the decision.  So...

1   Q.   But, for example, the packages that were

2   delivered to your house were always in her name and

3   not yours; correct?

4   A.   In the beginning, yes, the packages that Aaron

01:42:31   5   would have shipped to us were addressed to Alex.

6   Q.   And that was your choice, right?  You wanted to

7   keep your involvement as little as possible?

8   A.   Correct.  Alex and I talked about it, yes.

9   Q.   And you were taken into custody or at least taken

01:42:50   10   to the South Jordan Police Department on November

11   22nd, correct?

12   A.   Yes.

13   Q.   And that's the first time that anyone in law

14   enforcement had addressed you about this whole thing;

01:43:02   15   correct?

16   A.   Correct.

17   Q.   You were interviewed separate from Alex?

18   A.   Yes.

19   Q.   And you were interviewed by a police officer or

01:43:11   20   two or three?

21   A.   Correct, yes.

22   Q.   And you described your involvement in this to the

23   best you could, correct?

24   A.   Yes.

01:43:19   25   Q.   You told them that you were receiving parcels

```
 1    from all over the country, correct?

 2    A.   Yes.

 3    Q.   From Florida, from Taiwan, domestic and

 4    international, I think is what you told the

 5    investigators; is that fair?

 6    A.   Yes.

 7    Q.   And that was correct?

 8    A.   Uh-huh (affirmative).

 9    Q.   And that you would -- either you or Alex would

10    drive these parcels after you got them to the house,

11    correct?

12    A.   To Aaron and Drew's house.  Every once in a while

13    Aaron would come and pick them up from us if we were

14    busy.

15    Q.   So when the government was talking to you, you

16    kept referring to it as Aaron's house.  But you knew

17    it was Aaron and Drew's house, correct?

18    A.   They lived together in the beginning, yes.

19    Q.   And when you were delivering packages to them,

20    they were living together, correct?

21    A.   Yes.

22    Q.   And that you were paid 100 or 200 or something

23    per package when you would make those deliveries,

24    correct?

25    A.   Correct, yes.
```

1    Q.   But at some point you or -- you and Alex or maybe

2    Alex seized an opportunity to make more money; is

3    that fair?

4    A.   Yes.

01:44:33    5    Q.   Right or wrong that's what you decided to do,

6    correct?

7    A.   Correct.

8    Q.   And you decided to get involved in sort of the

9    shipping and packaging part of this?

01:44:43    10   A.   Right.

11   Q.   Correct?

12   A.   Right.

13   Q.   And Drew came to your house over the course of

14   several days and walked you through that process;

01:44:51    15   correct?

16   A.   He did in the beginning, yes.

17   Q.   He taught you how to do that?

18   A.   Yes.

19   Q.   He taught you how to get the labels and get the

01:45:00    20   packages and put things together, correct?

21   A.   Originally we didn't have labels we were just

22   doing postage, actual stamps from the post office.

23   Later, the shipping labels was an idea of Aaron's

24   after Drew had left.

01:45:16    25   Q.   I think what you told the police was that Drew

1   showed you and Alex how to package the pills properly

2   so product was not damaged during shipment; is that

3   fair?

4   A.   Correct, yes.

01:45:27  5   Q.   And that Drew directed you and Alex to put the

6   pills in mylar bags because they could not be x-rayed

7   and to include an invoice in each package; is that

8   correct?

9   A.   Yes.

01:45:38  10   Q.   When you told the officers that on November 22nd

11   you were trying to tell the truth, correct?

12   A.   Yes.

13   Q.   You were scared out of your wits, weren't you?

14   A.   Yeah.

01:45:45  15   Q.   You were -- you were anxious to curry a little

16   favor from law enforcement, isn't that a fair

17   statement?

18   A.   I'm not sure if I would say a favor, but I was

19   just trying to come clean.

01:45:57  20   Q.   You didn't go to jail that night, did you?

21   A.   No.

22   Q.   And you knew that the keys to that jail were

23   somewhat in your pocket by your cooperation?

24   A.   I actually didn't know.  I thought I was going to

01:46:11  25   jail.  They didn't tell me if I was or was not.

1   Q.   But you know today that had you told them that

2   night you didn't want to speak with them you would

3   have gone to jail?

4   A.   I assumed so.

01:46:26   5   Q.   Crandall also directed you how to sort of change

6   up the invoices once in a while, correct, so that

7   they would show different products?

8   A.   Yeah.  He mentioned in the beginning to switch up

9   the invoices so that way, you know, if it were ever

01:46:45   10   looked at it would be different than other product.

11   Q.   And what you told officers, and I'm not trying to

12   put words in your mouth, I'm reading the report here,

13   so if I'm wrong correct me, was that Crandall worked

14   with you four or five times and then he continued to

01:47:01   15   teach you?

16   A.   In the beginning he would teach us kind of things

17   about the post office.  If I recall correctly, um,

18   his girlfriend worked for the post office and she

19   knew kind of what could be x-rayed or not x-rayed.

01:47:17   20   So he would originally teach us.  After that, when he

21   left, we had to switch up a whole lot of stuff.  But

22   in the beginning he did teach us.

23   Q.   You keep talking about "in the beginning".  Was

24   there a time when Drew got out of the picture?

01:47:30   25   A.   Yes.  He decided to travel with his girlfriend

```
        1   Sasha.  I don't know exactly the timeframe, but when

        2   he left, Aaron basically took over everything that he

        3   would have been doing with us and taught us

        4   everything else from that point on.

01:47:48 5   Q.   I want to show you an exhibit that has been

        6   previously entered, it is 15.05, and have you go to

        7   Page 5 of that.  And can you make the top part pretty

        8   -- do you see those names at the top?

        9   A.   Yes.

01:48:23 10  Q.   And so if you look at the third line it says the

       11   date?

       12   A.   Yes.

       13   Q.   What is the date that this was sent?

       14   A.   November 20th, 2016.

01:48:33 15  Q.   And that is two days before you were arrested?

       16   A.   Yes.

       17   Q.   Or at least questioned, correct?

       18   A.   Yes.

       19   Q.   And who is "Shortbread 66"?

01:48:42 20  A.   I don't know actually.

       21   Q.   You don't know who that is?

       22   A.   I don't.  I didn't do any of the e-mailing or

       23   anything online.

       24   Q.   Do you know who "Pass the Peas" is?

01:49:01 25  A.   Um, that is the account that Aaron set up for us
```

1    to receive e-mails.

2    Q.   That is you guys?

3    A.   Yes.

4    Q.   No matter who set it up, that is your account,

01:49:11    5    right?

6    A.   Right.

7    Q.   Who is "American Steam"?

8    A.   I don't know.

9    Q.   If I were to tell you that "Shortbread 66" is

01:49:18   10    Drew Crandall, and "American Steam" is Aaron Shamo,

11   would that surprise you or does that seem consistent

12   with your recollection today?

13   A.   It seems consistent because when Drew was out of

14   the country, he, I assume, possibly ran out of money

01:49:35   15   and he wanted to get back in.  So for a while it

16   looks like he was sending the pages to us.

17   Q.   It looks like, and correct me if I'm wrong, but

18   he is sending you pages two days before the police

19   come to your house?

01:49:53   20   A.   On this day, yes.

21   Q.   Isn't this the type of message that you guys were

22   receiving fairly regularly during that time?

23   A.   Um, I honestly don't recognize it because I never

24   did the e-mails.

01:50:08   25   Q.   Was that Alex's duties?

1   A.   Correct, yes.

2   Q.   And you had a separate function in this?

3   A.   Yes.

4   Q.   Thank you.  I think you told officers at the time

01:50:27   5   that Crandall, Drew Crandall, showed Alex how to

6   access the e-mail account, decrypt the order

7   fulfillment list, and print the information; is that

8   accurate?

9   A.   Yes, correct, when he was training us in the

01:50:43   10   beginning.

11   Q.   You told them that you don't -- you didn't have

12   knowledge of the Dark Web and that Drew taught you

13   that part of it, correct?

14   A.   Um, from what I remember, I think that's

01:50:59   15   accurate.  He didn't teach me any of it, so the only

16   thing that relates to that I don't know if Alex was

17   more taught by Drew or Aaron.  I'm not quite sure.

18   Q.   Did Aaron come to your house and show you how to

19   package things?

01:51:19   20   A.   After -- I mean we saw both of them quite often.

21   Q.   Both Aaron and Drew?

22   A.   Yes.

23   Q.   What period of time are you talking about?

24   A.   This was before Drew left to travel.  We would

01:51:35   25   see them both at their home together or if they ever

1    came to give us money.  They were friends so they

2    were together quite a lot.

3    Q.   And sorry I didn't mean to cut you off, actually

4    I did.  I just wanted to ask you another question.

01:51:53    5    When was it that you recall that Drew left?

6    A.   I really don't know if I remember.  I can't

7    remember what time it was specifically.

8    Q.   Do you remember telling officers on November 22nd

9    that Drew taught Alex to randomly pick a spot on the

01:52:19    10   map, list the address, and make up a name for the

11   return address?

12   A.   Yes.

13   Q.   And that Drew told her to keep it as random as

14   possible just so it is somewhere throughout the Salt

01:52:29    15   Lake valley?

16   A.   Correct.

17   Q.   Is that accurate?

18   A.   Yes.

19   Q.   You told the truth when you told them that?

01:52:33    20   A.   Yes.

21   Q.   How did you and Alex decide amongst yourselves

22   how the money was going to be divided up?

23   A.   Um, when we ever got payment it was just an equal

24   split.  Normally from the beginning talking to Drew

01:53:01    25   and Aaron, they both said, you know, we'll pay you

```
 1   each this much.  Any time there was an increase it
 2   was always an equal increase so we always got paid
 3   the same amount.
 4   Q.   When you started working with Drew and Aaron,
 5   where did you live?
 6   A.   Um, we were considered --
 7   Q.   I don't need to know the exact address but what
 8   city?
 9   A.   When we were drops we were in Riverton.
10   Q.   Did you ultimately move?
11   A.   Yes, we moved to Daybreak.
12   Q.   Was that a nicer place?
13   A.   Yes.
14   Q.   Was that, in part, based on the fact that you had
15   an increased income?
16   A.   Um, I don't know.  I don't remember if it was
17   something that we could afford before that.  We were
18   still drops at the time so we weren't making a whole
19   lot to make a difference.
20   Q.   But when you became more than drops you could
21   afford a lot more, couldn't you?
22   A.   Yes.  Mostly bills and school, but yes.
23   Q.   You were making about $7,000 a month?
24   A.   Um, that seems like a lot but I know it was
25   probably close to that.
```

64

1   Q.   $3,500 every other week, does that make more

2   sense?

3   A.   I think so.

4   Q.   Was that always in cash?

01:54:19   5   A.   Yes.

6   Q.   Just sort of showed up in -- whose truck was it

7   with the key fob, yours or Alex's?

8   A.   It was Alex's truck.

9   Q.   And the money would show up in the truck?

01:54:29   10   A.   Yes.  Or we would meet up or Aaron would come

11   over to our house and give it to us.

12   Q.   Could we look at 23.00, please.  Ms. Bustin, I am

13   going to show you something that you have already

14   looked at and this is your Plea Agreement.  Do you

01:54:47   15   see that?

16   A.   Yes.

17   Q.   It is dated or at least it is stamped by this

18   court on June 7th of 2018, correct?

19   A.   Correct.

01:54:56   20   Q.   Is that the day you pled guilty?

21   A.   Um, I would assume so.

22   Q.   So 14 months ago?

23   A.   I honestly can't remember.  I'm not great with

24   dates, but it sounds that it could be right.

01:55:12   25   Q.   And in 14 months you haven't been sentenced?

A.   Correct.

Q.   You haven't been back to this court to decide what your punishment will be, correct?

A.   Correct.

01:55:21   Q.   And that's because that decision is in large part based on your participation today, correct?

A.   Um, I don't know that it's based off of that or just we're just here.  If I had no promises or anything I would still be here.  So I don't know if 01:55:46 -- I don't think anything would be different.

Q.   Well, you haven't been sentenced yet?

A.   Correct.

Q.   You don't know what your punishment is going to be, correct?

01:55:54   A.   Correct.

Q.   You're hoping that the punishment will be as less as possible, correct?

A.   I would hope so.

Q.   And part of that expectation is based on your 01:56:05 testimony today, correct?

A.   I guess yeah I would say yes.

Q.   There is no reason, is there, ma'am, to put the sentencing over for over 14 months, is there, except for you to come in here and testify against Aaron 01:56:19 Shamo?

1    A.    That makes sense, yes.

2    Q.    Well, according to this plea agreement, if you

3    look at the top there, it says you're pleading

4    guilty, and I'm looking at Paragraph 1, make it

01:56:39    5    bigger, please, that you're pleading guilty to Counts

6    2, 3, 8, 12, and 13 of the Superseding Indictment,

7    correct?

8    A.    Yes.

9    Q.    So you pled guilty to five counts?

01:56:51    10    A.    Yes.

11    Q.    Out of the 13.  And you weren't charged with all

12    of the 13 but you pled to these five, correct?

13    A.    Correct.

14    Q.    And so Count 1, for example, we can see sort of

01:57:04    15    at the bottom there is conspiracy to distribute

16    fentanyl, do you see that?

17    A.    Yes.

18    Q.    And, in fact, you did conspire to distribute

19    fentanyl, correct?

01:57:12    20    A.    Yes.

21    Q.    You were packaging fentanyl and sending it out,

22    correct?

23    A.    Of what we thought was Oxycodone, but yes.

24    Q.    But some of the shipping labels actually

01:57:23    25    identified this as fentanyl, didn't they, or did you

1    not see those?

2    A.   I think there were some on the order pages, um, I

3    don't know much about medication of any kind so I

4    assumed they were just the same thing.

01:57:35   5    Q.   So you at least had some written information sent

6    to you that you were distributing fentanyl, correct?

7    A.   Yes.

8    Q.   Can we go to the later counts, please.  I

9    appreciate it, Yvette.  So it looks like the next

01:57:56   10   count you pled to is conspiracy to distribute

11   Alprazolam.  Did you know you were distributing

12   Alprazolam?

13   A.   Yes.

14   Q.   And then possession of fentanyl with intent to

01:58:09   15   distribute.  Do you see that?

16   A.   Yes.

17   Q.   And then let's look at the next -- use of the

18   U.S. Mail in furtherance of a drug trafficking

19   offense.  Do you see that?

01:58:21   20   A.   Yes.

21   Q.   And finally conspiracy to commit money

22   laundering?

23   A.   Correct, yes.

24   Q.   Those are the counts you pled to?

01:58:28   25   A.   Yes.

1    Q.   Can we look at the -- is there an addendum on

2    this.  Can we look at the addendum please, that is

3    the last page or two.  There we go.  Do you see this?

4    A.   Yes.

01:58:43    5    Q.   This is -- let's go back one page, I'm sorry, two

6    pages.  Do you see the signature there?

7    A.   Yes.

8    Q.   That's your signature, correct?

9    A.   Correct.

01:58:54    10   Q.   And that signature, because you weren't sure of

11   the date earlier is June 7th of 2018.  Does that

12   refresh your recollection?

13   A.   Yes.

14   Q.   So that is when you signed this?

01:59:04    15   A.   Yes.

16   Q.   It looks like you had an attorney there that day?

17   A.   Correct.

18   Q.   You probably signed it in this very building,

19   didn't you?

01:59:11    20   A.   Yes.

21   Q.   Maybe not this particular court but in front of a

22   judge?

23   A.   Yes.

24   Q.   And said guilty and you read this over and what

01:59:16    25   not?

69

1   A.   Uh-huh.

2   Q.   Yes?

3   A.   Yes.

4   Q.   Can't do uh-huh, it makes her crazy.  The

5   addendum, the next couple of pages, indicates that

6   you're to testify completely and truthfully and if

7   you do you're not going to be charged with other

8   offenses.  Do you understand that?

9   A.   Yes.

10  Q.   And that is significant to you, isn't it?

11  A.   Yes.

12  Q.   It is significant because those other offenses

13  could carry additional penalties?

14  A.   Correct.

15  Q.   Significant additional penalties, correct?

16  A.   Yes.

17  Q.   You talked to your attorney about that?

18  A.   Yes.

19  Q.   And I won't ask you what he told you, but you

20  understand that some of the other charges were much

21  more serious?

22  A.   Yes.

23  Q.   And it's only smart on your part and your

24  attorney's to avoid those, correct?

25  A.   Yes.

1   Q.   I mean you're hoping you don't do any prison at

2   all I assume?

3   A.   I hope so, yes.

4   Q.   And I think you answered this but let me ask you

02:00:18   5   again.  Since November 22nd of 2016, how much time

6   have you done in custody?

7   A.   Zero.

8           MR. SKORDAS:  That's all I have, Your Honor.

9           THE COURT:  Redirect, Mr. Stejskal?

02:00:33   10           MR. STEJSKAL:  No, Your Honor.

11           THE COURT:  Thank you.  Since there is no

12   redirect, there will be no re-cross.  You may step

13   down and you may be excused and we'll take our first

14   break.  Try to get back in in about 15 minutes.

02:00:46   15           THE CLERK:  All rise, please.

16           (Jury left the courtroom.)

17           THE COURT:  We'll be in recess.  Thank you.

18           (Recess.)

19           (Whereupon, the trial continued but

20            was not transcribed.)

21

22

23

24

25

1          **REPORTER'S CERTIFICATE**

2

3          I, Laura W. Robinson, Certified Shorthand

4    Reporter, Registered Professional Reporter and Notary

5    Public within and for the County of Salt Lake, State

6    of Utah, do hereby certify:

7          That the foregoing proceedings were taken

8    before me at the time and place set forth herein and

9    were taken down by me in shorthand and thereafter

10   transcribed into typewriting under my direction and

11   supervision;

12         That the foregoing pages contain a true and

13   correct transcription of my said shorthand notes so

14   taken.

15         In witness whereof I have subscribed my name

16   this 18th day of November, 2019.

17

18                    _____

19                    Laura W. Robinson

20                    RPR, FCRR, CSR, CP

21

22

23

24

25