1              IN THE UNITED STATES DISTRICT COURT

2                      DISTRICT OF UTAH

3                      CENTRAL DIVISION

4

5    UNITED STATES OF AMERICA,    )

6              Plaintiff,         )

7        vs.                      )   Case No.  2:16-CR-631-DAK

8    AARON MICHAEL SHAMO,         )

9              Defendant.         )

10   _____)

11

12         BEFORE THE HONORABLE DALE A. KIMBALL

13       --------------------------------------

14                  August 21, 2019

15                    Jury Trial

16    Testimony of Brennda Kurstin, Jeff Fletcher, Jeff Bryan

17

18

19

20

21

22

23

24   REPORTED BY: Patti Walker, CSR, RPR, CP     801-364-5440

25   351 South West Temple, #8.431, Salt Lake City, Utah  84101

```
 1                        A P P E A R A N C E S

 2

 3

 4   For Plaintiff:              Michael Gadd
                                 Vernon G. Stejskal
 5                               Kent A. Burggraaf
                                 U.S. ATTORNEY'S OFFICE
 6                               111 South Main Street, #1100
                                 Salt Lake City, Utah  84111
 7

 8
     For Defendant:              Gregory G. Skordas
 9                               Kaytlin V. Beckett
                                 SKORDAS & CASTON LLC
10                               560 South 300 East, #225
                                 Salt Lake City, Utah  84111
11

12                               Daryl P. Sam
                                 DARYL P SAM PLLC
13                               5955 S. Redwood Road, #102
                                 Salt Lake City, Utah  84123
14

15

16

17

18

19

20

21

22

23

24

25
```

1                         I N D E X

2    Witness                 Examination By              PAGE

3    Brennda Kurstin         Mr. Stejskal  (Direct)         4

4                            Mr. Sam  (Cross)              11

5    Jeff Fletcher           Mr. Stejskal  (Direct)        13

6                            Ms. Beckett  (Cross)          53

7                            Mr. Stejskal  (Redirect)      59

8    Jeff Bryan              Mr. Stejskal  (Direct)        62

9                            Mr. Skordas  (Cross)         106

10                           Mr. Stejskal  (Redirect)     115

11                           Mr. Skordas  (Recross)       118

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    SALT LAKE CITY, UTAH; WEDNESDAY, AUGUST 21, 2019; 8:30 A.M.
 2              (Proceedings previously transcribed and under
 3    separate cover.)
 4              THE COURT:  You may call your next witness,
 5    Mr. Stejskal.
 6              MR. STEJSKAL:  The United States next calls
 7    Brennda Kurstin.
 8              THE COURT:  Come forward and be sworn, please.
 9    Stejskal.
10                        BRENNDA KURSTIN,
11              Having been duly sworn, was examined
12                    and testified as follows:
13              THE CLERK:  Please state your name and spell it
14    for the record.
15              THE WITNESS:  It's Brennda Kurstin.
16    B-r-e-n-n-d-a, K-u-r-s-t-i-n.
17              THE COURT:  Go ahead.
18              MR. STEJSKAL:  Thank you, Your Honor.
19                        DIRECT EXAMINATION
20    BY MR. STEJSKAL:
21    Q    Good morning, and thanks for coming.
22         Tell us a little bit about yourself.
23    A    My name is Brennda.  I don't know what I'm supposed to
24    say, just I work in the used car industry as an office
25    manager.
```

1    Q    And that's why you're here this morning, correct?

2    A    Correct.

3    Q    Did you formerly work at a car dealership named IDrive?

4    A    I did.

5    Q    You no longer work there at this point?

6    A    I do not.

7    Q    What was the time frame in which you worked at IDrive?

8    A    It was December of '15 until October of '18.

9    Q    What were your duties at IDrive?

10   A    I was office manager.  I did accounting, bookkeeping,

11   and title work.

12   Q    And, again, what type of business is IDrive?

13   A    It is used car sales.

14   Q    So other than you as the office manager, and

15   bookkeeper, and accounting, who else worked there?

16   A    There's two owners, Nate Reynolds and Miles Penrose.

17   And then they had a few salesmen, some lot techs, mechanics,

18   just kind of your full auto body.

19   Q    In your duties as the office manager and bookkeeper,

20   did you help process and keep track of the paperwork that

21   went with used car sales?

22   A    Right, yep.

23            MR. STEJSKAL:  Let's pull up 16.11.

24   BY MR. STEJSKAL:

25   Q    Did you have a role in a sale of a vehicle from IDrive

```
 1   to an individual by the name of Aaron Shamo?

 2   A    I would have processed the title work for any vehicle

 3   sales and collected any documents from the salesmen.

 4   Q    Do you recall what kind of vehicle was sold in that

 5   particular transaction?

 6   A    We sold trucks, so an '11 F350.

 7   Q    Do you recall that?

 8   A    Well, I don't know the vehicle particularly.

 9   Q    Bur you recall processing the paperwork?

10   A    Correct.  Yeah, I do.

11   Q    And do you keep a file, then, with the paperwork in it?

12   A    Yes.

13   Q    And this document was part of that file?

14   A    It was.

15            MR. STEJSKAL:  Let's zoom back out, please.

16   BY MR. STEJSKAL:

17   Q    Generally, the numbers on right side of that document,

18   what do those numbers indicate?

19   A    That equals the sales price of the vehicle and any fees

20   associated with the vehicle purchase that we would collect

21   from the customer.

22   Q    You then were given documents to support the payments

23   of vehicles, correct?

24   A    Correct.

25            MR. STEJSKAL:  Let's next look at 16.12.
```

1    BY MR. STEJSKAL:

2    Q     Do you recognize these documents?

3    A     I do.

4    Q     What are they?  First talk about the top one that says

5    Wells Fargo Bank.

6    A     So that's the check from the customer to be part of the

7    payment to the purchase of the vehicle.

8    Q     And do you see the date on that?

9    A     Yeah.  5-5-16.

10   Q     Is that the date that the vehicle transaction took

11   place?

12   A     It was.

13   Q     Give us the details of when the vehicle was coming in

14   and then going out.  Where did it come from and where did it

15   go?

16   A     So this truck we took in on trade.  So it came from a

17   customer, Roy Stevens, where we get a trade-in.  We get the

18   vehicle, we negotiate, you know, the trade-in price, and

19   then do the payoff.  This one was kind of an already

20   predetermined sale where the customer already had a buyer

21   for the vehicle.  So it was a pretty quick turnaround for

22   the trade-in.

23   Q     So what do you mean by the customer had a buyer for the

24   vehicle?

25   A     So he had a friend who was going to purchase the truck,

1    but we were just going to facilitate the sale so he could

2    get -- the initial person buying our truck would get sales

3    tax credit for their trade-in.

4    Q    And you mentioned the name Miles Penrose.  Who's

5    Mr. Penrose.

6    A    He was an owner of IDrive.

7    Q    And did he know either of the individuals that were

8    involved in this truck transaction?

9    A    He did.

10   Q    Who did he know?

11   A    As far as I know, he knew both parties in the

12   transaction.

13   Q    You said the seller was a -- I just lost the name.

14   A    It's Roy Stephens.

15   Q    And the buyer was whom?

16   A    Aaron Shamo.

17   Q    So that Wells Fargo check at the top there, who's that

18   from?

19   A    That's from Aaron.

20   Q    And the amount?

21   A    14,000.

22   Q    Now that wasn't the full payment for the vehicle,

23   correct?

24   A    Correct.

25   Q    Do you recall the total purchase price of the vehicle?

1    A    I want to say it was almost 40,000.  I don't know the

2    exact price.  I'd have to go back to the contract.

3              MR. STEJSKAL:  Let's go back to the previous page

4    and look at 16.11.  Maybe blow up the figures on the side

5    there.

6              THE WITNESS:  Yeah.  So the total cost would be

7    about 42,615.

8    BY MR. STEJSKAL:

9    Q    So 14,000 was partial payment for the vehicle?

10   A    Correct.

11   Q    And we saw a second check there.  What was that?

12   A    That's a check that was given to me by Miles Penrose

13   for an additional payment for the vehicle.

14   Q    So that also went towards the purchase price of the

15   vehicle?

16   A    Yes.

17   Q    And what did you learn about the circumstances of that

18   check?

19   A    Miles was giving me a payment because they had split

20   the purchase of a boat, and so those were the funds that he

21   owed Aaron for the money they received from the boat sale.

22   Q    So when you say they, it was Mr. Penrose and Mr. Shamo

23   had purchased a boat together?

24   A    Correct.

25   Q    And this was money from that?

1    A    Yes.

2    Q    Were there additional funds, then, applied to the

3    purchase of the vehicle?

4    A    Yes.  There was also a cash payment.

5            MR. STEJSKAL:  And let's look at 16.13.

6    BY MR. STEJSKAL:

7    Q    What is that?

8    A    So when I received cash for vehicle sales, I would make

9    a quick copy of it and sign it with the dates so that I

10   would know with the bank deposit, that that's where the cash

11   needs to be allocated, what vehicle was to be -- the

12   bookkeeping side would go to.

13   Q    So this is an amount of cash given to you by whom?

14   A    I was given it by Miles Penrose.

15   Q    And he got it from?

16   A    Aaron Shamo.

17           MR. STEJSKAL:  Let's go back to 16.11 again, and

18   highlight the numbers again, if you would.

19   BY MR. STEJSKAL:

20   Q    In line number 19 there, there's a line that says total

21   payments 18,200.  Do you see that?

22   A    I do.

23   Q    Now that's different from the check from Mr. Penrose,

24   which is 19,200; isn't that correct?

25   A    Correct.

```
 1   Q     Tell us about the circumstances of that.

 2   A     They wanted the cash payment to be less than 10,000.

 3   Q     So that was just recorded in that manner?

 4   A     Right.  They didn't update the contract.  It was

 5   just -- Miles just had let me know that he was going to

 6   write the check for a higher dollar amount.

 7   Q     After receiving the funds, both the two checks and the

 8   cash payment, what did you do to process the transaction?

 9   A     The checks and cash were deposited into the Chase Bank

10   account that's under IDrive's name.

11   Q     And then you watched to make sure the checks cleared?

12   A     Correct.  And then I just process the title paperwork

13   for the vehicle.

14   Q     So who drove the vehicle off the lot?

15   A     I wasn't there.  I assume the customer would drive it

16   off.

17   Q     Thank you.

18              MR. STEJSKAL:  That's all the questions for this

19   witness.

20              THE COURT:  Thank you.

21              You may cross-examine.

22              Mr. Sam.

23                          CROSS-EXAMINATION

24   BY MR. SAM:

25   Q     I just have a couple of questions.
```

```
 1          So any decisions you made as far as having to account
 2   for this, was that given to you by the owners, or where did
 3   that come from?
 4   A    Right.  That was by Miles Penrose.
 5   Q    And the customer wouldn't have given you any
 6   instruction on how to account for that?
 7   A    Correct.  I was given that instruction by Miles.
 8   Q    Okay.
 9          MR. SAM:  I have no further questions.
10          THE COURT:  Thank you.
11          Any redirect?
12          MR. STEJSKAL:  No, Your Honor.
13          THE COURT:  Thank you.  You may step down, and you
14   may be excused.
15          You may call your next witness.
16          MR. STEJSKAL:  The United States would next call
17   Special Agent Jeff Fletcher.
18          THE COURT:  Come forward and be sworn, please.
19                         JEFF FLETCHER,
20            Having been duly sworn, was examined
21               and testified as follows:
22          THE CLERK:  Please state your name and spell it
23   for the record.
24          THE WITNESS:  My name is Jeff Fletcher.  J-e-f-f.
25   Fletcher, F-l-e-t-c-h-e-r.
```

1                              DIRECT EXAMINATION

2    BY MR. STEJSKAL:

3    Q      Your occupation, please?

4    A      I'm a special agent with IRS Criminal Investigations.

5    I guess I don't need to tell you what IRS stands for.

6    Q      Describe for us your educational background.

7    A      I have a bachelor's degree in international finance

8    from Brigham Young University.

9    Q      And what training did you receive to become an

10   investigator with the IRS?

11   A      As a special agent with IRS, we attend the Federal Law

12   Enforcement Training Center.  We do two and a half months of

13   basic law enforcement training, which includes firearms,

14   defensive tactics, doing general investigations.  A lot of

15   other agencies attend that first part.

16        The second part of our training includes financial

17   investigations.  We investigate crimes like money

18   laundering, tax evasion structuring.  If a crime involves

19   money, we would investigate it.

20        Training at the Federal Law Enforcement Training

21   Center, we are taught about the statutes pertaining to the

22   financial crimes we investigate.  We learn to follow the

23   money, how to track and trace proceeds of the illegal

24   activity, how to reconstruct income using various methods,

25   using bank account records, using net worth and assets, and

1   also via cash expenditures.

2   Q    Do you have any specific certifications with regard to

3   your training and investigative duties?

4   A    Yes, I do.

5   Q    What would that be?

6   A    I'm a certified anti-money laundering specialist, a

7   member of CAMs.

8   Q    Tell us about your experience as a financial

9   investigator with the IRS.

10  A    Yeah.  I've been a special agent with IRS Criminal

11  Investigations for 24 years.  Part of that, actually, I was

12  a tax auditor.  So I audited businesses.  But as a special

13  agent with IRS Criminal Investigations, for the last 20

14  years I have been investigating organized crime, drug task

15  force cases, working mostly with the DEA, Homeland Security,

16  FBI.  And now I've even expanded my horizons.  I'm working

17  with U.S. Postal and FDA on this case.

18  Q    And generally speaking here first, tell us about your

19  duties with IRS.  What types of things do you do to conduct

20  these investigations?

21  A    We look at the money.  We look at financial records.

22  We look at assets.  We look at cars, houses purchased.  You

23  know, we follow the money two different directions.  We can

24  follow -- in a drug situation, we can follow the drugs

25  sometimes to the cash obtained from the drugs.  But

1    oftentimes we can't do that, so we look at assets and we

2    follow the assets, which might lead to the drugs too.

3    Q    In your capacity as a special agent with the IRS, did

4    you become involved in this investigation of Aaron Shamo and

5    others?

6    A    Yes, I did.

7    Q    What was your specific role in this investigation?

8    A    The financial investigation aspects of the case,

9    looking at bank accounts, financial transactions.  In this

10   case it was obviously cryptocurrency.  Looking at assets,

11   cars, any assets that were purchased and any cash that was

12   seized.

13   Q    Through your extensive training and many years of

14   experience, did you become familiar with the terms used in

15   investigating money laundering and financial offenses?

16   A    Yes, I have.

17   Q    Let's define a few of those terms so everybody

18   understands what we're talking about when we get into this.

19   First the term money laundering, can you tell us what money

20   laundering is?

21   A    Yeah.  Basically it's taking money that is dirty money

22   from illegal activity and a process of conducting financial

23   transactions to make that money appear to be clean.  A lot

24   of times you'll have a large amount of cash.  You go in and

25   plop that cash down to buy a house, the bank is going to ask

1    you questions.  So you want to make that money look like

2    it's come from a legitimate source.

3    Q    Are you familiar with the term promotion --

4    A    Yes, I am.

5    Q    -- in the aspect of money laundering and financial

6    investigations?

7    A    Yes.

8    Q    Explain for the jury the term promotion.

9    A    A promotion is basically taking proceeds from an

10   illegal activity, drug distribution, and using that money to

11   keep the business going.  It could be purchasing more drugs.

12   It could be paying an employee to make shipments for you.

13   It could be -- let's see -- paying rent on a house that

14   you're using to store drugs, paying a phone bill on a phone

15   that you use to make communications with other people in the

16   organization.  So anything that keeps that drug organization

17   moving.

18   Q    Are you familiar with the term concealment?

19   A    Yes, I am.

20   Q    Can you explain that term for us?

21   A    Concealment is where -- there's three terms we use.

22   It's placement, layering, and integration.  In concealment,

23   what the individual who has money from illegal activities

24   wants to do is try to distance themselves from those illegal

25   funds.  They don't want people to know that the funds came

1    from illegal activity.  So they try to conduct multiple

2    transactions to distance themselves.  They may use

3    transactions with nominee names, with other individuals.

4    They may set up bank accounts with other people's names.

5    They may conduct several transactions in several different

6    bank accounts.  So the further they can get from that money,

7    the better for them, so that law enforcement doesn't detect

8    that this money is from illegal proceeds.

9    Q    Are you familiar with the term specified unlawful

10   activity, or SUA?

11   A    Yes, I am.

12   Q    Explain that term for the jury.

13   A    That's a list of codified crimes that are considered

14   crimes for the purposes of money laundering.  There's -- not

15   every crime is a crime for money laundering.  There's wire

16   fraud.  There's drug distribution.  Tax evasion isn't one of

17   those crimes that is a specified unlawful activity.  So

18   there's a specific list of those crimes.

19   Q    And many of those involve controlled substance

20   offenses, correct?

21   A    Yes, they do.

22   Q    Are you familiar with the term financial transaction?

23   A    Yes, I am.

24   Q    Tell us what that means.

25   A    A financial transaction is just a movement of funds.

1    Movement of funds could be depositing cash into a bank
2    account.  It could be paying an individual for a car, paying
3    an individual for work.  That's pretty much a financial
4    transaction.
5    Q    How about the term financial institution?
6    A    Yeah.  Financial institution is actually codified.  In
7    Title 31 5312(a), there's a list of businesses that are
8    considered financial institutions.
9         First of all, we all think of a bank.  A bank is a
10   financial institution.  But that also talks about car
11   dealerships, businesses that sell vehicles, jewelry shops,
12   real estate agencies.  Those are all considered financial
13   institutions for purpose of money laundering.
14   Q    Just by law that's how the --
15   A    By law, yes.
16   Q    How about the term interstate commerce or affecting
17   interstate commerce?
18   A    Yeah.  Interstate commerce is business from one state
19   to the other, so it affects multiple states.  For example,
20   banks are FDIC insured, and transactions in one -- and
21   they're chartered in multiple states.  Like Wells Fargo is
22   chartered in various states.  So to place or deposit funds
23   into Wells Fargo, for example, does affect interstate
24   commerce because you can wire funds through the bank --
25   through Wells Fargo from one bank in, say, Utah to a bank in

1   California.

2   Q    So those are our terms.

3        How did you become involved, then, in the investigation

4   of Aaron Shamo and his associates?

5   A    I was called by one of the agents of the DEA, and he

6   told me that they were looking at this organization and that

7   there potentially could be some money involved.

8   Q    And did you learn what type of operation they were

9   running as far as selling drugs on the street versus selling

10  drugs in a different way?

11  A    Yeah.  We learned that Mr. Shamo owned a storefront on

12  AlphaBay, known as Pharma-Master, and that this was an

13  online storefront that sold pills.

14  Q    And were you able to determine in what type or what

15  form payment was received in that market?

16  A    Yeah.  AlphaBay received funds in a cryptocurrency

17  known as Bitcoin.

18  Q    Tell us about Bitcoin.  What is that?

19  A    Bitcoin -- I've learned quite a bit over the last

20  couple years about Bitcoin.  But Bitcoin is a cryptcurrency.

21  It's a decentralized currency.  When you think of the U.S.

22  dollar, that's backed by the U.S. government.  Cryptcurrency

23  isn't.  It's a decentralized cryptcurrency and it involves

24  two different keys, a private key and a public key.  The

25  public key is like a wallet.  You have your money.  The

1    private key -- I think it was explained by

2    Special Agent Gino -- is kind of like the PIN number to your

3    debit card and so not everybody can see that.  It's private.

4    Q    We'll get into that more in a little bit.

5         In the initial part of your investigation, did you

6    locate a wallet connected with the AlphaBay account that was

7    attributed to Aaron Shamo?

8    A    Yes, I did.

9    Q    How did you find that wallet?

10   A    Yeah.  On January 14th, 2017, myself and

11   Special Agent Keys went and talked to Mr. Aaron Shamo's

12   landlord.  Shamo was living at -- had been living at 7939

13   Titian Way in Cottonwood Heights.  So we interviewed his

14   landlord.

15   Q    And were you given a document of an exchange between

16   Mr. Shamo and the landlord, Mr. Lapin?

17   A    Yeah, we were.  We were given an e-mail that was sent

18   to Mr. Lapin by Mr. Shamo that talked about his source of

19   income to be able to pay the rent, and that e-mail also

20   included his Bitcoin wallet.

21   Q    Let's look at Exhibit 21.18, the second page of that.

22   Can you identify that for us, please?

23   A    Yes.  That is the e-mail.

24   Q    Who is the e-mail from?

25   A    It's from airshamu4@hotmail.com.

1    Q     Who is it to?

2    A     Jeremylapin@hotmail.com.

3    Q     You just talked about identifying a Bitcoin wallet.

4    How did you do that from this document?

5    A     Well, we identified it because it's in the e-mail.

6    Mr. Shamo is saying, hey, here's our incoming Bitcoin

7    wallet.  Any profits made come here first, then

8    distrusted -- I think he meant distributed -- to investors,

9    my two employees, and myself.  And then it's got the wallet

10   address beginning in 1Hmo and ending in kdq.  It also said

11   it should come up as U.S. dollars, but if it's not, then it

12   will say.

13   Q     Well, that looks like a link, that yellow line down.

14   So what does that link to?

15   A     The blue -- yeah.  That's the link to his Bitcoin

16   address.

17   Q     So by clicking on that, the landlord could see some

18   information that relates to a Bitcoin wallet?

19   A     Yes.

20   Q     What's the date on that e-mail?

21   A     It's November 13th, 2015.

22   Q     Based on your investigation, was that around or just

23   before the time that Mr. Shamo moved into that Titian Way

24   house?

25   A     Yes, it is.

1    Q    Looking at that Bitcoin wallet number that you've

2    identified, starting at 1Hmo, did that have further

3    significance in your financial investigation?

4    A    Yes.  That was the Bitcoin wallet that was used to

5    receive funds from the AlphaBay's Darknet market store,

6    Pharma-Master.

7    Q    Let's talk specifically, then, about that Pharma-Master

8    store and that wallet.  Were you present when there was a

9    spreadsheet of sales and income from Pharma-Master kind of

10   showing the money that was coming in?

11   A    Yes, based on the feedback.

12   Q    Let's look at Exhibit 15.02.A.  Do you recognize that?

13   A    Yes, I do.

14   Q    How does that relate to your financial investigation?

15   A    It shows that there were -- this is based on

16   feedback -- 5,589 transactions.  The revenue was over

17   $2.8 million.

18   Q    And was part of your financial investigation to track

19   or trace money to either find it still in existence or

20   figure out where it went or where it came from?

21   A    That's what we try to do, yes.

22   Q    You testified that the Pharma-Master account was set up

23   to receive money in Bitcoin, correct?

24   A    Yes.

25   Q    Is Bitcoin easy to spend?

1  A    Not really.  I mean, most places don't take Bitcoin for

2  transactions.  I know you can buy a Tesla with a Bitcoin.

3  But generally speaking, no.  It's a little more difficult to

4  spend.

5  Q    To be clear, there are some businesses that do accept

6  Bitcoin?

7  A    There are a few, yes.

8  Q    Does converting Bitcoin to cash make it easier to

9  spend?

10  A    Yes, it would.

11  Q    Explain that.

12  A    I mean, most people take cash.  Cash is U.S. dollars

13  currency.  Unless you spend a large amount, no one is going

14  to question small dollar amounts of cash.  It's widely

15  accepted everywhere pretty much.

16  Q    Does converting Bitcoin to cash also assist in

17  concealing the source of the funds?

18  A    Yes, it does.

19  Q    Explain that, please.

20  A    Well, converting Bitcoin to cash -- it depends on how

21  the Bitcoin is converted obviously.  But once you take

22  Bitcoin -- there's a blockchain so it can be followed to a

23  degree.  But once you convert that Bitcoin into cash, it's

24  hard to follow the cash.  Cash is what we call fungible.

25  It's indistinguishable.  It's -- I mean, you can't really

1  tell one dollar from another.  You can't follow it.  So it's

2  difficult to follow cash.

3  Q    You talked about converting Bitcoin to cash.  What are

4  the ways in which one can convert Bitcoin into cash?

5  A    Yeah, there's three ways.  The first is the commercial

6  online Bitcoin exchanges.  A couple of those are Bitstamp

7  and Coinbase.  Those are regulated.  There's paperwork.

8  There's a paper trail.  It's pretty easy to convert Bitcoin

9  through those exchanges.

10 Q    And the fees for those?

11 A    The fees are about one to two percent.  Not too high.

12 Q    You said there are three ways.  That was one.  What

13 else?

14 A    The other way is the peer to peer Bitcoin exchange.  I

15 think it's been talked about, LocalBitcoins.com.  Peer to

16 peer is where a person that has Bitcoin wants some cash, or

17 vice versa, and so they meet up.  There's been testimony

18 where individuals -- Mr. Crandall would have cash and would

19 meet with individuals that had Bitcoin that wanted to

20 purchase the Bitcoin.  So they would just make that

21 exchange.  In those situations, there is no paper trail.

22 Q    Explain that a little better.  What do you mean by

23 there is no paper trail?

24 A    There's no -- like Bitstamp, the money goes through an

25 exchange.  We can follow that money.  But when an individual

1    meets another person on the street and they exchange Bitcoin

2    for cash, there's no way we know who provided the Bitcoin,

3    who provided the cash.

4    Q    So it's anonymous?

5    A    It's anonymous, yes.

6    Q    And you said there were three methods.  What was the

7    other one?

8    A    The other one is the Bitcoin ATMs.  It's an ATM.  There

9    is a paper trail with the Bitcoin ATMs.  Probably less than

10   the online commercial Bitcoin exchanges who are regulated,

11   but there's still a paper trail.

12   Q    Did Mr. Shamo use any of these particular conversion

13   methods to exchange his Bitcoin for cash?

14   A    He used the peer to peer.  He used LocalBitcoins.com.

15   He met individuals on the street.  Mr. Crandall also met

16   people on the street and converted the Bitcoin to cash so

17   they could spend it.

18   Q    And based on your investigation, were large amounts

19   converted?

20   A    Yes.

21   Q    What kind of amounts?

22   A    Millions.  I mean over a million.

23   Q    Did agents ultimately end up seizing large amounts of

24   cash?

25   A    Yes, they did.

1    Q     Let's look at Exhibit 13.09, photo number five.   What
2    is that?
3    A     That's the picture of cash in Mr. Shamo's dresser
4    drawer that was seized during the search warrant on
5    November 22nd, 2016.
6    Q     And do you recall approximately how much money was
7    seized on that date from Mr. Shamo's residence?
8    A     It was over $1.2 million.   The cash was located in two
9    dresser drawers, two safes, and a nightstand.
10   Q     Do you recall some testimony about Mr. Shamo informing
11   agents about trading in his Bitcoin for cash right around
12   that time?
13   A     Yes.   When Mr. Shamo was arrested, he told agents that
14   he had just recently exchanged about 700 -- in excess of
15   $700,000 of Bitcoin for the cash.
16   Q     Is the conversion of Bitcoin to cash considered a money
17   laundering transaction?
18   A     It is.
19   Q     Explain that for us.   Why is that?
20   A     It's a financial transaction.   It's with U.S. currency.
21   So it's basically -- and it depends on how they're doing it,
22   but if it's a peer to peer, it's Bitcoin for cash.   It's a
23   transaction with proceeds from illegal activity with the
24   intent to either conceal or disguise the proceeds.
25   Q     Was there also a sum of cash seized or turned over in

```
 1    Arizona in March of 2017?
 2    A    Yes, there was.
 3    Q    Let's look at Exhibit 16.04, photo number four.  Can
 4    you identify that for us?
 5    A    Yeah.  That is approximately $429,000 cash that was
 6    turned over voluntarily by Mike and Rebecca Shamo to U.S.
 7    Postal Inspector Andrea Brandon.
 8    Q    And is that evidence of a money laundering transaction?
 9    A    It is evidence of money laundering, yes.  And the
10    statement attached to the consent form said that this money
11    was hand delivered by Aaron Shamo to them.
12    Q    And how is that significant in your investigation of
13    Mr. Shamo as far as money laundering?
14    A    It shows that Mr. Shamo obtained the cash.  We know
15    that his source from the online store was cryptocurrency.
16    So it obviously had to be converted into cash.
17    Q    Was there also a sum of money obtained from a Luke Paz?
18    A    There was.
19    Q    Let's look at photo 16.16.  What is that?
20    A    It's a bag of cash.
21    Q    And was that the cash that was obtained from Mr. Paz?
22    A    Yeah.  Mr. Paz turned over cash on two occasions in
23    August of 2018.  One amount was approximately $671,000, and
24    the other amount was approximately $134,000.
25    Q    Did you do any research on Aaron Shamo to determine if
```

1    he had other sources of income other than the Pharma-Master,

2    AlphaBay website?

3    A    Yes.  I looked at his employment to see if he had a

4    legitimate job.

5    Q    How did you do that research?

6    A    I pulled up the Utah Department of Workforce Services

7    database.

8    Q    What is the Department of Workforce Services?

9    A    It's a database.  If someone is employed and working

10   and receiving wages in the State of Utah, this database has

11   your quarterly wages and amounts of those wages.

12   Q    Am I on there?

13   A    Are you?  Yeah.  You get paid by the government.  It's

14   in Utah.

15   Q    It keeps track of everybody?

16   A    Yes.  If you're working, getting a wage in Utah, you

17   should be on that database, yes.

18           THE COURT:  What's the relevance of your being on

19   there?

20           MR. STEJSKAL:  I was just curious.  I didn't know

21   anybody was keeping track of me.

22           THE WITNESS:  I can pull you up.  But I can't pull

23   your tax returns.

24   BY MR. STEJSKAL:

25   Q    Let's look at Exhibit 16.10.  Can you identify -- I

1   guess page two.  Can you identify that for us, please?

2   A    Yeah.  That is a certified copy of the Workforce

3   Services for Mr. Aaron Shamo.

4   Q    And the time period on that appears to be what?

5   A    The date that I did the pull or --

6   Q    The time period covered from the Workforce Services

7   report.

8   A    It looks like the second quarter of 2009 through the

9   first quarter of 2015.

10  Q    And when did you run this report?

11  A    You'd have to let me see the bottom of the page so I

12  can remember that.  Let's see.

13  Q    Let me just ask it this way.  Did you run it after

14  Mr. Shamo was arrested?

15  A    Yeah.  It was November or December of 2017 -- or 2016.

16  Excuse me.

17  Q    There's a date on the screen now.

18  A    Oh, that's the certified copy, yeah.  The certified

19  copy is 12-24, 2018.  I actually ran it prior to that.

20  Q    You ran it in the course of your investigation in 2017?

21  A    Yes.

22  Q    So does that account for all income through the time of

23  his arrest in late 2016, November of 2016?

24  A    That accounts for all of the wages that he received in

25  the State of Utah, from employers in the State of Utah.

1    Q     And what does this report indicate as far as income for

2    Mr. Shamo?

3    A     The relevancy is that it shows that he was receiving

4    wages from eBay starting the third quarter of 2013, and that

5    his last wage was from eBay in the first quarter of 2015 in

6    the dollar amount of $1,573 for that quarter.

7    Q     No legitimate income reported after that?

8    A     No.

9    Q     Let's talk about a few specific transactions, then,

10   that Mr. Shamo was involved in.  Let's first talk about a

11   transaction with IDrive on May 5th of 2016.  Are you

12   familiar with that transaction?

13   A     Yes, I am.

14   Q     Let's look at Exhibit 16.11.  Can you identify that for

15   us?

16   A     Yeah.  That's the retail sales agreement Ms. Kurstin

17   just spoke about.  It's the purchase of a 2011 Ford F350

18   from IDrive, Utah.

19   Q     And the purchaser name there at the top?

20   A     Aaron Shamo.

21   Q     Let's look at 16.12.  What do you see on that page?

22   A     Two checks.  One from Wells Fargo Bank -- that's the

23   bank account ending in 4284, which is Aaron Shamo's bank

24   account -- in the amount of $14,000 to IDrive.  The other

25   check is a check from Mr. Shamo's friend, Miles Penrose, in

```
 1   the amount of 19,200.
 2   Q    And then 16.13 that you saw with Ms. Kurstin also
 3   showed some cash that was involved in this transaction?
 4   A    Yes.  $9,420 in cash.
 5   Q    Let's go back to 16.12, specifically referring to the
 6   check from Mr. Shamo there.  What bank did that come from?
 7   A    Wells Fargo Bank.
 8   Q    Did you do any investigation into accounts by
 9   Mr. Shamo?
10   A    Yes.  I found that he did have a Wells Fargo bank
11   account ending in number 4284.
12   Q    And that was what this check was written from?
13   A    Yes, it was.
14   Q    Let's look at Exhibit 16.21 and talk about your review
15   of Mr. Shamo's account.  What is this?
16   A    That's a summary of the deposit items into Mr. Shamo's
17   bank account at Wells Fargo.
18   Q    Looking at or around the date of May 5th when this
19   truck was purchased, are there any items that stand out to
20   you around that time?
21   A    Yeah.  Can you go to that page?  Actually that's the
22   wrong year.
23   Q    Sorry.  20 --
24   A    16.
25   Q    -- 16.
```

1   A     May of 2016.

2   Q     Page four.  I'm sorry.

3   A     Yes.  So on 5-4, 2016, there was a cash deposit in the

4   amount of $7,500.  And on May 5th, 2016, there's another

5   cash deposit in the amount of $5,000 just prior to the check

6   being written for $14,000.

7   Q     So cash is being deposited into that bank account in an

8   amount enough to cover that check that was written to

9   IDrive, correct?

10  A     Correct.

11  Q     What is the monetary transaction, then, as it relates

12  to IDrive and the purchase of that F350 truck?

13  A     It's the check for the $14,000 from Mr. Shamo's bank

14  account to IDrive.

15  Q     And what's the financial institution involved in that

16  transaction?

17  A     Wells Fargo is the financial institution that the bank

18  was -- that the check was written from.

19  Q     And the effect on interstate commerce?

20  A     Again, Wells Fargo is FDIC insured.  They're chartered

21  in various states, so you can send wires from state to

22  state.  So that affects interstate commerce.

23  Q     And the check was for 14,000.  Is there anything

24  significant about that amount?

25  A     It's over $10,000.

1    Q    And why is that significant?

2    A    Because the statute 18 U.S.C. 1957 requires a monetary

3    transaction with a financial institution in an amount over

4    $10,000.

5    Q    Did you do some further examination of Mr. Shamo's bank

6    account?

7    A    Yes, I did.

8    Q    Let's look at Exhibit 16.21.  Can you identify that for

9    us, please?

10   A    Yeah.  It's another summary of his bank account.  It

11   shows money coming in and also funds being expended out of

12   that account.

13   Q    Give us a summary of that.  What did you determine from

14   this examination of Mr. Shamo's bank account?

15   A    First of all, on the deposit side, I analyzed the

16   deposits from the date of February of 2016 through November

17   of 2016, and I found that there were approximately 55 cash

18   deposits into the account totaling just over $88,000.

19   Eleven of those cash deposits were deposited in out of state

20   banks.

21   Q    What kind of states, if you recall?

22   A    There was California, Florida, Maryland, North

23   Carolina.

24   Q    And could you tell from the bank statement and your

25   research what funds from this account, what kind of things

1   they were used to pay for?

2   A    Yeah.  A lot of the funds went to pay Venmo.  There

3   were wires to MoneyGram, wires to Western Union, and also

4   wires to debit card purchases to the U.S. Postal Service.

5   Q    And also to IDrive?

6   A    And then the check to IDrive, yes.

7        There was also a check in the amount of $23,000 to the

8   IRS.

9   Q    He didn't have any reported income on the Workforce

10  Services?

11  A    Correct -- well, he had -- in 2015, he had $1500.

12  Q    Did you search for other accounts of Mr. Shamo?

13  A    I did search for other accounts, yes.

14  Q    And what results?

15  A    I didn't find any.  There was a savings account

16  attached to this with minimal activity, but no other bank

17  accounts for Mr. Shamo that I found.

18  Q    So this appeared to be, from your research, the primary

19  account activity?

20  A    Yeah.  There was an E-Trade account, Ameritrade

21  account -- stock account also that I found.

22  Q    Let's shift gears for a minute and talk about Drew

23  Crandall.  Are you familiar with Drew Crandall from the

24  investigation?

25  A    Yes, I am.

1   Q    Are you aware that he was part of Mr. Shamo's drug

2   tracking organization?

3   A    Yes, I am aware of that.

4   Q    Did you investigate his finances?

5   A    I did.

6   Q    Tell us about that investigation.

7   A    I found that Mr. Crandall had a bank account at America

8   First Credit.  As I was going through his account, I found

9   some deposits from Bitstamp, which is one of those

10  commercial online Bitcoin exchanges.  I found some cash

11  deposits also.  It seemed like in 2015 there was probably

12  about 11 to $12,000 worth of cash deposits in his bank

13  account.

14  Q    Did you also search for other accounts with regard to

15  Mr. Crandall?

16  A    I did.

17  Q    Any other accounts found?

18  A    No.

19  Q    So did you review the account, then, that you just

20  referred to?

21  A    I did.

22  Q    Did you obtain a bank statement for that account?

23  A    Yes.  I obtained bank statements for that account for

24  three years.

25  Q    Let's look at 16.22.  Can you identify that for us,

1    please?

2    A    It looks like a bank to bank transfer in the amount of

3    $3,013.

4    Q    I'm not talking about the yellow line, just generally

5    what the document is.

6    A    Okay.  You threw me off there.

7        Yeah, that's his America First Credit Union bank

8    statements.

9    Q    From your analysis, describe the money flow as you kind

10   of reviewed the bank account and what was going in and what

11   was going out.

12   A    For Mr. Crandall's bank account, really I saw

13   occasional, sporadic cash deposits.  I was really looking at

14   the dates of November 2016 -- excuse me, November, December

15   of 2015 through November of 2016.  One thing I did see was

16   the wires in from Bitstamp and some cash deposits.

17   Q    Let's talk more generally now.  Were you present when

18   Mr. Crandall testified as to his financial activity?

19   A    Yes, I was.

20   Q    And as you reviewed this bank statement, is it

21   consistent with Mr. Crandall's testimony?

22   A    It is.

23   Q    You said you identified some transactions associated

24   with Bitcoin.  Are you familiar with Bitstamp?

25   A    Yes.

1    Q      What's Bitstamp?

2    A      Bitstamp is one of those commercial online Bitcoin

3    exchanges where there is an actual paper trail.

4    Q      Are there Bitstamp transactions associated with

5    Mr. Crandall's account?

6    A      There are.  There's three -- actually four.  Three

7    during this time frame of December to November --

8    December 15th through November 2016.

9    Q      Let's look first at Exhibit 16.05.  Can you identify

10   that for us?

11   A      Yes.  That is a wire transfer from Bitstamp on

12   April 19th, 2016 in the amount of $3,013.

13   Q      Do you recall the circumstances of that, according to

14   Mr. Crandall?

15   A      Yes.  Backing up a little bit, Mr. Crandall stated that

16   when he decided to leave to travel abroad with his

17   girlfriend, he wanted to be bought out of the drug business

18   with Mr. Shamo.  They negotiated an amount of $40,000.

19         Mr. Crandall stated that prior to leaving, he was

20   provided Bitcoin from Mr. Shamo in the dollar equivalent of

21   about $20,000.  He said that he would get amounts -- Bitcoin

22   amounts of about $10,000.  He would meet with people on the

23   street.  He would convert that Bitcoin into the cash.  He

24   would keep $5,000 and he would give $5,000 to Mr. Shamo.  He

25   basically -- he did say I was helping him launder money.

1          He did that four different times from September through

2   November when he left the States.  So he was able to get

3   approximately $20,000 of the $40,000 that was owed to him

4   before he left the country.

5   Q    So he was still owed money when he left the country?

6   A    He was still owed $20,000.

7   Q    So tell us about this specific transaction from April

8   of 2016.

9   A    So Mr. Crandall in his testimony stated that this 3,013

10  was part of Mr. Crandall cashing in the Bitcoin that he had

11  received from Mr. Shamo in April of 2016.

12  Q    Are you familiar with the term tumbler?

13  A    Yes.

14  Q    What's a tumbler?

15  A    A tumbler is a way to anonymize or basically cut the

16  trail of the blockchain, which makes it difficult to follow

17  the movement of the Bitcoin.

18  Q    And did Mr. Crandall indicate that the money was sent

19  through a tumbler?

20  A    Yeah.  Mr. Crandall stated that when he received the

21  Bitcoin from Mr. Shamo, Mr. Shamo ran it through a tumbler

22  and then into his Bitcoin account.

23  Q    So that was the first.  You said there were three, I

24  believe, in this time period.

25          Let's next look at Exhibit 16.06.  Can you identify

1   that for us, please?

2   A     Yeah.  That is a deposit on August 4th, 2016 in the

3   amount of $5,343 from Bitstamp into Mr. Crandall's America

4   First Credit Union account.

5   Q     Do you recall from Mr. Crandall the circumstances of

6   that money?

7   A     Yeah.  He said that that dollar amount actually

8   consisted of two things.  It consisted of part of the

9   Bitcoins that he received as a payout prior, and then also

10  it consisted of approximately $22,400, which represented his

11  wages for working for Mr. Shamo doing customer service

12  support for Pharma-Master in the month of July, which is

13  when Mr. Crandall stated that he started working again for

14  Pharma-Master.

15  Q     So does this payment from Mr. Shamo to Mr. Crandall

16  constitute a money laundering transaction?

17  A     Yes, it does.  It constitutes promotion money

18  laundering.

19  Q     Explain that.  Why is that?

20  A     Because Mr. Crandall was working for Mr. Shamo.  He was

21  doing customer service on his storefront, on AlphaBay, known

22  as Pharma-Master.  So this is payment for him to do the

23  customer service, to actually answer questions and help

24  people with issues that they had on their pill purchases.

25  Q     You mentioned a third Bitstamp transfer.  Let's look at

1    16.07.  Would you identify that for us, please?

2    A    Yeah.  That is a deposit on September 22nd, 2016 in the

3    amount of $2,508 into Drew Crandall's America First Credit

4    Union bank account.

5    Q    And what did you learn about that amount of money being

6    transferred from Mr. Shamo to Mr. Crandall?

7    A    Mr. Crandall stated that that was, again, payment for

8    his wages for working as customer service on Pharma-Master

9    for the prior month, which would have been the month of

10   August.

11   Q    Does this transaction also constitute money laundering,

12   in your professional opinion?

13   A    Yes, it does.

14   Q    Explain.

15   A    It is a payment and promotion of the illegal activity

16   with funds that were derived from Bitcoin through

17   Pharma-Master.

18   Q    Did you go back, then, and look at Mr. Crandall's

19   account statement to show that these funds actually came

20   through that America First account?

21   A    I did.

22   Q    Did you verify all three of those transactions?

23   A    Yes.

24   Q    Did you also look into cash deposits of Mr. Crandall's

25   account?

1    A    Yeah, I did look at the cash deposits.

2        One thing that I was curious about was Mr. Crandall was

3    busy traveling the world with his girlfriend, but there were

4    cash deposits into his bank account while he was gone.  So I

5    wanted to know who was making those cash deposits.

6    Q    What did you do to investigate those deposits?

7    A    I contacted America First and asked if I could get

8    photo images of all the deposits that were being made into

9    the account so I could find out who was doing that.

10   Luckily, they keep those images for 90 days, so I barely

11   made that cutoff.

12   Q    What did you then receive from America First?

13   A    I received two photo images of transactions that show

14   individuals making deposits into Drew Crandall's America

15   First Credit Union account.

16   Q    Let's look first, then, at Exhibit 16.09.  Identify

17   that for us, please.

18   A    Yeah.  That's a picture of Mr. Shamo making a deposit

19   into Drew Crandall's bank account at America First Credit

20   Union.  It says the Cottonwood branch, which is not far from

21   Mr. Shamo's house.

22   Q    In addition to the photo, did you obtain anything else

23   from America First that showed that this monetary

24   transaction actually occurred?

25   A    I got the financial statements that show the dollar

1    amount.

2    Q    Did you get the deposit slip?

3    A    Yes.

4    Q    And did that show that amount being deposited into

5    Mr. Crandall's account?

6    A    It did.

7    Q    And you said you also got the bank statement?

8    A    Yes.

9    Q    Can we look at Exhibit 16.22.

10   A    It's not the yellow.

11   Q    Our date here is November 8th of 2016.

12        Let me scroll down a couple of pages.

13        What do you see on this page?

14   A    It shows a deposit at the Cottonwood Heights branch for

15   $2,700.

16   Q    Does that match the information on the photograph that

17   we just observed?

18   A    Yes, it does.

19   Q    Based on your investigation of Mr. Shamo's drug

20   trafficking organization, how did Mr. Shamo obtain that cash

21   that he deposits into Mr. Crandall's account?

22   A    Based on my investigation and testimony, he obtained

23   that cash by converting the cryptocurrency Bitcoin, meeting

24   individuals with cash, and exchanging his cryptocurrency for

25   cash.

1    Q    Did you learn from Mr. Crandall what that $2700 payment

2    was for?

3    A    Yeah.  Mr. Crandall stated in his testimony that that

4    $2700 cash deposit made by Mr. Shamo into his bank account

5    was for doing customer service on Pharma-Master, his wages

6    basically.

7    Q    Does that constitute money laundering?

8    A    Yes, it does.

9    Q    In what way?

10   A    It's promotion, again.  He's paying an individual to

11   help keep his business running by doing customer support.

12   Q    Does this particular manner of transaction also have

13   indications of concealment?

14   A    Yes, it does.

15   Q    Describe that for us.

16   A    It's very hard to track and trace the proceeds of the

17   illegal activity when he takes the Bitcoin, meets people on

18   the street, gets the cash, and then surreptitiously goes

19   into the bank and makes a deposit of the cash into his bank

20   account.

21   Q    Let's talk about another specific transaction from

22   November 22nd of 2016.  Did you obtain a second photo from

23   America First Credit Union?

24   A    Yes, I did.

25   Q    Let's look at Exhibit 16.08.  Can you identify that for

1    us, please.

2    A    Yeah.   That's a picture of an individual who's tied to

3    Salt Lake City Bitcoins.   Through my investigation, I

4    identified him as Scott Wilkes.   He is making a $900 deposit

5    into Drew Crandall's America First bank account.

6    Q    Did you cross-reference his photo with

7    Mr. Crandall's bank statement to see that this transaction

8    took place?

9    A    Yes, I did.

10   Q    Let's go to 16.22 again and look at that.   The date is

11   November 22nd of 2016.

12   A    That shows the $900 deposit into the Salt Lake Metro

13   Branch of America First Credit Union, which is pretty close

14   to where Scott Wilkes resides.

15   Q    Again, explain for us who Scott Wilkes is and what his

16   business is.

17   A    Scott Wilkes is an individual who posts on

18   LocalBitcoin.com that he's looking for Bitcoin and that he

19   has cash.   He has individuals who he meets with that need

20   Bitcoin or cash, and he is the intermediary for those.   He

21   owns Salt Lake City Bitcoins.

22   Q    So in these transactions, the Bitstamp transactions and

23   these two cash deposits, it appears that -- well, it's not

24   the last one.   The three Bitstamp transactions and the one

25   with the photograph of Aaron Shamo depositing money, those

1   appear to have involved both Mr. Shamo and Mr. Crandall; is

2   that correct?

3   A     Yes, that is correct.

4   Q     So are they both responsible for money laundering based

5   on those transactions?

6   A     Yes, they are.

7   Q     They both took part in those transactions.

8   A     They both conducted financial transactions.

9   Q     In addition to all the items of money laundering,

10  instances of money laundering that you just testified to,

11  were there other transactions specifically involving

12  promotion?

13  A     Yes, there were.

14  Q     Let's first talk about Ms. Tonge and Ms. Bustin as they

15  relate to Mr. Shamo.  Were there promotion transactions that

16  you identified with those individuals?

17  A     Yes.  Ms. Tonge and Ms. Bustin were purchasing stamps

18  and shipping labels.  The testimony was that Mr. Shamo would

19  move Bitcoin to a wallet controlled by the two women and

20  they would use that wallet to purchase shipping labels

21  through GetUSPS.com.

22  Q     And some of that -- or much of that involved Bitcoin?

23  A     Yes, it did.  Ms. Tonge and Ms. Bustin stated in their

24  testimony that they were purchasing approximately $500 worth

25  of stamps twice a week.

1    Q    Were there also transactions involving the payment of

2    wages to Ms. Tonge and Ms. Bustin?

3    A    Yeah.  Ms. Tonge and Ms. Bustin stated that initially

4    they were being paid $1,000 each per month.  That was

5    negotiated originally with Mr. Crandall and Mr. Shamo.  But

6    later on, they were being paid, toward the last few months,

7    $3,500 each per month for doing the processing of the

8    Pharma-Master website, processing the pills and packaging

9    those.  And initially they were also sending those boxes out

10   to different post office mail containers.

11   Q    Did you do some investigation involving Venmo

12   transactions as well?

13   A    Yes, I did.

14   Q    And what did you find on that?

15   A    I found that Mr. Shamo was using his bank account at

16   Wells Fargo to fund his Venmo account, and that he was using

17   his Venmo account to pay Tonge and Bustin.

18   Q    Does that constitute money laundering, in your opinion?

19   A    Yes, it does.

20   Q    How so?

21   A    Mr. Shamo -- it's a lot of work, but he's taking

22   Bitcoin, meeting people on the street, converting that to

23   cash, depositing that cash into his bank account, and then

24   moving that cash from his bank account -- now it's in his

25   account, to his Venmo account, and then using that to pay

1  Tonge and Bustin.

2  Q    You talked about postage.  Did you find any specific

3  instances where Mr. Shamo used his bank accounts to buy the

4  postage himself?

5  A    Yes, I did.

6  Q    Let's look at Exhibit 16.20.  What are we looking at in

7  16.20?

8  A    It's a spreadsheet that was created from his Wells

9  Fargo bank account.  It shows deposits and expenses.

10  Q    And does it indicate what those expenses were for?

11  A    Yes.  Oftentimes it does.

12  Q    And what was the date on the postal transaction that

13  you identified?

14  A    I want to say it was May of 2016.

15  Q    May or June of 2016?

16  A    Yeah.

17  Q    Let me refer you to June 24th of 2016 on the statement

18  here and see if you can identify it.

19       In the blue there in about the middle of the page.

20  A    Yeah.  It shows a debit card purchase on June 24th,

21  2016 for $1,032 to the U.S. Postal Service.

22  Q    Again, that came directly from Mr. Shamo's account to

23  the Postal Service?

24  A    Yes, it did.

25  Q    Is that a money laundering transaction?

1    A    Yes, it is.

2    Q    In what way?

3    A    It's proceeds from illegal activity laundered through

4    his bank account and then used to purchase stamps, which are

5    promoting his business.  The stamps are used to send the

6    pills that were ordered from the customers of Pharma-Master.

7    Q    We're on the subject of promotion.  We could refer to

8    that chart next to you, 17.06.  There were some others

9    identified involved in the drug trafficking organization.

10   Are you familiar with those people?

11   A    Yes.  Yes, I am.

12   Q    Let's talk about a few of those.  Let's talk about

13   Mr. Gygi who's there on the far right in the first full row

14   under Mr. Shamo.  What was your investigation with regard to

15   money transferred from Mr. Shamo to Mr. Gygi?

16   A    Mr. Gygi worked as a courier.  He was the individual

17   who would pick up packages from Tonge and Bustin and ship

18   those out using different mail collection boxes throughout

19   Salt Lake County.  He was paid $4,000 a month by Mr. Shamo,

20   in cash, for doing that.

21   Q    And does that constitute promotion?

22   A    Yes, it does.

23   Q    Let's talk about Mr. Noble.  Did you do some

24   investigation as to financial transactions involving

25   Mr. Shamo to Mr. Noble?

1    A    Yeah.  Mr. Noble, as he stated, worked customer service

2    for Pharma-Master also, and he was paid $1600 a month by

3    Mr. Shamo, in cash.  He did say he took, I think, September

4    off.

5    Q    And does that involve promotion, then?

6    A    Yes, it does.

7    Q    Let's talk generally about the others on that document

8    that we heard testimony were receiving -- the word drops,

9    were receiving money for getting packages at their homes.

10   How does that relate to the promotion of money laundering?

11   A    Yeah.  Mr. Shamo's providing them cash to receive

12   packages and those packages are used to either -- to

13   manufacture the pills.  He was receiving fentanyl and

14   ingredients from Press Club to help make the pills.

15   Q    The indictment contains an allegation of conspiracy to

16   commit money laundering.  Are you familiar with that?

17   A    Yes, I am.

18   Q    Are you familiar with the term conspiracy?

19   A    Yes.

20   Q    Tell us about that.  What does it mean by conspiracy?

21   A    Conspiracy is usually an agreement by one or more

22   individuals.  In this conspiracy to money launder is

23   agreements between Mr. Shamo, Mr. Crandall, specifically

24   Tonge and Bustin to launder money to help further the

25   enterprise.  There was an agreement with several

1    individuals.  Mr. Noble agreed to perform work in exchange

2    for being paid.  Mr. Crandall, same thing, testified that he

3    was being paid $2,400 a month to do customer service.  Tonge

4    and Bustin agreed to be paid by Mr. Shamo.  Mr. Shamo would

5    drop off cash in their truck or provide them the cash.  So

6    they had an agreement to work for the organization and also

7    an agreement to receive cash.

8    Q    And based on your investigation, these weren't written

9    agreements, these were just agreements among individuals to

10   do these certain things?

11   A    Yes.

12   Q    In exchange for payment, correct?

13   A    Correct.

14   Q    You heard from Mr. Crandall, Ms. Tonge, Ms. Bustin that

15   they pled guilty to conspiracy to launder money, correct?

16   A    Yes.

17   Q    What were their roles, then, in this money laundering

18   with Mr. Shamo?

19   A    Tonge and Bustin helped purchase stamps, shipping

20   labels.  I think I mentioned before, they were individuals

21   who processed the orders from Pharma-Master, got them ready.

22   Initially they also shipped those out.

23       Mr. Noble provided customer support for Pharma-Master.

24   He answered phone calls.  Then Mr. Gygi was a courier.  He

25   would take the packages that Tonge and Bustin would leave on

1    their doorstep and he would go deposit those into the

2    different mailboxes.

3         Am I missing anybody?

4    Q    Probably, but we covered those.

5         Based on law enforcement's investigation, specifically

6    your financial investigation into this drug trafficking

7    organization, who primarily controlled the money generated

8    by AlphaBay and Pharma-Master?

9    A    Mr. Shamo controlled the money.  All the money went

10   through Mr. Shamo.  He owned the Bitcoin wallet that

11   received the funds from Pharma-Master.

12   Q    And we saw a sum of money with Mr. Paz.  Setting that

13   aside for a minute, where was the majority of the money

14   found when law enforcement took down the organization?

15   A    It was found in Mr. Shamo's house at Titian Way in

16   Cottonwood Heights.

17   Q    And the Bitcoin as well, where was that found?

18   A    It was found on Mr. Shamo's computer.

19   Q    And in his wallets?

20   A    And in his wallets on his computer and his phones.

21              MR. STEJSKAL:  May I have a moment, Your Honor?

22              THE COURT:  Yes.

23              THE WITNESS:  That's a lot of sticky notes.

24              MR. STEJSKAL:  No.  There's only two.

25   //

```
 1  BY MR. STEJSKAL:
 2  Q    One's a clarification.  It was heard that you testified
 3  that Noble answered phone calls.  Is that your
 4  recollection -- is that your recollection of what happened?
 5  A    No.  He didn't answer phone calls.  He answered
 6  e-mails.  He had access to the Pharma-Master, in part, and
 7  he was able to respond to e-mails.  He even mentioned that
 8  he had some premade up e-mails to different responses.  So,
 9  sorry, no.  He didn't answer phone calls.
10  Q    So that was just a misstatement?
11  A    Yes.
12  Q    We heard some testimony about a Miles Penrose and the
13  fact that he owned IDrive.  Is Mr. Penrose depicted on
14  17.06, the government's exhibit?
15  A    Yes, he is.
16  Q    Where is he?
17  A    He's on the bottom left row.
18  Q    And is that who you spoke with when you investigated
19  the IDrive transaction?
20  A    Yes.
21  Q    So this is the same person?
22  A    Yes, it is.
23  Q    And is he also the individual we talked about earlier
24  that invested in the drug trafficking business?
25  A    Yes, he is.
```

1          MR. STEJSKAL:  No further questions.

2          THE COURT:  Thank you, Mr. Stejskal.

3          Defense may cross-examine.  Ms. Beckett.

4          MS. BECKETT:  I only have one sticky note and it's

5    from Mr. Skordas.

6          THE WITNESS:  Oh, good.  It's going to be short.

7          MS. BECKETT:  No.  These are just Mr. Skordas

8    reminding me to talk slower for the court reporter.

9                        CROSS-EXAMINATION

10   BY MS. BECKETT:

11   Q    So I believe it was your testimony that you were

12   present for the interview of Jeremy Lapin?

13   A    Yes.

14   Q    He's the landlord for the Titian Way residence,

15   correct?

16   A    That is correct, yes.

17   Q    He owned that home?

18   A    Yes, he did.

19   Q    When you interviewed him, did he tell you anybody else

20   was on the lease for that home at Titian Way?

21   A    Yes.  He said Luke Paz was also on the lease.

22   Q    And that he had signed that lease in 2016, correct?

23   A    That is correct.  He said that he'd only seen Luke Paz

24   there one time during the whole time that he'd been on the

25   lease.

```
1    Q    But Mr. Lapin wasn't around all that often, was he?

2    A    I assume not.  Like a landlord, probably doing work on

3    the house occasionally.

4    Q    Could we look at Government's Exhibit 21.18, page two.

5    It's an e-mail you indicated came from Mr. Shamo to Jeremy

6    Lapin.  That particular e-mail says, hey, here is our

7    incoming Bitcoin wallet, correct?

8    A    It does.

9    Q    It does not say here is my Bitcoin wallet, correct?

10   A    It says our.

11   Q    Refers to investors, employees, and himself?

12   A    Yes.

13   Q    I believe part of your testimony is that Mr. Paz had

14   some involvement in these cash transactions, correct?

15   A    I didn't testify to that.  I did say that we received

16   cash that was voluntarily surrendered by Mr. Paz.

17   Q    Are you aware of Mr. Paz's involvement in converting

18   large amounts of Bitcoin to cash?

19   A    Yes.

20   Q    You're aware that he was an individual who would meet

21   people for peer to peer transactions and receive a

22   significant amount of cash?

23   A    Yes.  I'm aware that he was helping Mr. Shamo launder

24   his money.

25   Q    And your testimony was that Mr. Paz turned over a
```

1    little over $800,000 in cash, correct?

2    A     That is correct, yes.

3    Q     And that wasn't until August of 2018, correct?

4    A     Yes.

5    Q     A significant amount of time after November of 2016

6    when Mr. Shamo was arrested, correct?

7    A     That's over a year, yeah.

8    Q     Almost two years?

9    A     Almost two.

10   Q     But he still had $800,000 in cash?

11   A     Mr. Paz did, yes.

12   Q     You testified that Mr. Crandall conducted some -- had

13   some cash deposits made into his bank account; is that

14   correct?

15   A     That is correct, yes.

16   Q     And Mr. Crandall was able to track the user down online

17   from a foreign country to deposit cash into his account,

18   correct?

19   A     I'm not sure about that.  Can you repeat that question?

20   Q     Do you know where Mr. Crandall was when he had Scott

21   Wilkes deposit money into his bank account?

22   A     He was in Asia, I'm pretty sure.

23   Q     So nowhere near Salt Lake?

24   A     That's correct, yes.

25   Q     But he was able to track somebody down here in the Salt

1   Lake valley to deposit money into his account?

2   A     Yeah.  I think he stated that he had found someone on

3   LocalBitcoin.com, and that was Scott Wilkes with Salt Lake

4   City Bitcoins.

5   Q     And he was able to track that person down pretty

6   quickly, correct?

7   A     Yeah, on the Internet.

8   Q     The same day that Mr. Shamo was arrested, correct?

9   A     That is correct, yes.

10  Q     Is that, as you referred to previously, a sign of

11  concealment?

12  A     Yes.  It is concealment, money laundering by

13  Mr. Crandall.

14  Q     And that particular transaction was not really

15  associated with Mr. Shamo, correct?

16  A     The funds had come from Mr. Shamo, yes, they did.  So

17  it is associated with Mr. Shamo.

18  Q     According to Mr. Crandall, that money came from

19  Mr. Shamo?

20  A     According to Mr. Crandall, yes.

21  Q     If Mr. Crandall were using these peer to peer Bitcoin

22  transactions, I believe it was your testimony there wouldn't

23  be a paper trail, correct?

24  A     On the three Bitstamp transfers into his bank account,

25  that is correct.  On the cash deposits into his account, no,

1   there was no paper trail.

2   Q    Part of your testimony is that Mr. Crandall said he

3   would make these $10,000 Bitcoin transactions, and 5,000 of

4   that would go to Mr. Shamo and that he would keep 5,000 for

5   himself?

6   A    Yes.  He said he was helping Mr. Shamo launder money.

7   Q    Is there any proof that he gave that money back to

8   Mr. Shamo and didn't keep it for himself?

9   A    Just the testimony.

10  Q    The same goes for his testimony that the money he was

11  receiving was simply wages, correct?

12  A    Well, he said that the money he was receiving was

13  partly wages, but he was also receiving money that was

14  payout for the business prior.  So it was wages and payout,

15  depending on when he received it.

16  Q    But that was based just on his statements to you,

17  correct -- or his statements in general?

18  A    Yeah.  Those statements were corroborated by the

19  financial transactions also.

20  Q    The fact that they were wages was corroborated by the

21  financial transactions?

22  A    No, the fact of the amounts.  He said that he was paid

23  approximately $2400 a month.  There were several

24  transactions pretty close to that same amount.

25  Q    Are you aware that Mario Noble testified to actually

1    being an individual who recruited people to essentially work

2    in this organization?

3    A    He stated that he helped get people to receive packages

4    as drops.  He did say that.

5    Q    Specifically, I believe that was individuals with the

6    last name of Vance and Bruner.  Does that sound correct?

7    A    That sounds correct.  I'm not 100 percent sure, but

8    that's correct.

9    Q    I apologize.  I almost cut you off.

10        Do you remember Mr. Noble stating that he, in fact,

11   received money and benefited from that?

12   A    Yes, he did.  I think it was like $100.

13   Q    Is that money laundering?

14   A    It actually is, yes, promotion.

15   Q    Not just a conspiracy to commit, but actual money

16   laundering itself, correct?

17   A    Money laundering and a conspiracy because Mr. Shamo is

18   also involved in giving Mario Noble the cash, which moved on

19   to those drops.  So it's part of the conspiracy with

20   Mr. Shamo.

21   Q    Based on the testimony just of Mario Noble, though,

22   correct?

23   A    There were other drops.  In the drops that Mario Noble

24   recruited, it is just based on his testimony, yes.

25   Q    The same for Ms. Tonge?  I believe there was testimony

```
 1    that she recruited an individual by the name of Elise

 2    Christensen?

 3    A    I don't remember that testimony.  Sorry.

 4    Q    That's not a problem.

 5              MS. BECKETT:  Just one second, Your Honor.

 6              THE COURT:  Yes.

 7              MS. BECKETT:  I have no further questions,

 8    Your Honor.

 9              THE COURT:  Thank you, Ms. Beckett.

10              Mr. Stejskal, redirect.

11                         REDIRECT EXAMINATION

12    BY MR. STEJSKAL:

13    Q    Let's go back to 21.18, page two, that e-mail.  The

14    line about the Bitcoin wallet, what does it refer to the

15    employees belonging to?

16    A    Can you repeat that question?  I didn't quite

17    understand it.

18    Q    It says our Bitcoin wallet.  Why don't you just read

19    the line again.

20    A    Okay.  Here's our incoming Bitcoin wallet.  Any profits

21    made come here first and distrusted to investors, my two

22    employees, and myself.

23    Q    So that statement is from Mr. Shamo based on the --

24    A    Yeah, to Mr. Lapin.

25    Q    So he's saying Mr. Shamo's two employees, correct?
```

```
 1   A    Yes.

 2   Q    Now you said the purpose of this e-mail was to rent

 3   property from Mr. Lapin based on your investigation,

 4   correct?

 5   A    Yeah.  He's needing to show Mr. Lapin that he has a

 6   source of income to pay his rent.  Mr. Lapin is not going to

 7   allow him to rent a house without a source of income.

 8   Q    So based on your investigation, did Mr. Shamo lie about

 9   having legitimate income in Bitcoin?

10   A    Yes, he did.  He often told people that he was either

11   trading Bitcoin or mining Bitcoin and that was the source of

12   his income.

13   Q    Are you familiar with Luke Paz?

14   A    Yes, I am.

15   Q    Did Luke Paz have another residence where he lived

16   during the period of this trafficking organization?

17   A    Yes, he did.

18   Q    Did you receive any indication during your

19   investigation that Mr. Paz lived at this Titian Way address?

20   A    No, I did not.  Just the rental contract with his name

21   on it.  But again, interviewing the landlord, the landlord

22   said he almost never saw him there.  I think one time.

23   Q    Did Mr. Paz have legitimate employment throughout this

24   period, and specifically when this e-mail was sent?

25   A    Yeah.  He worked for a couple of different home
```

1   security system companies.  He was selling home security

2   systems.  A lot of times he was in Texas and Louisiana

3   selling those security systems.

4   Q    So based on that, he, unlike Mr. Shamo, could provide

5   employment records to the landlord to rent an apartment --

6   or a house, correct?

7   A    Yes, that is correct.

8   Q    Thank you.

9           MR. STEJSKAL:  That's all the questions I have.

10          THE COURT:  Any recross?

11          MS. BECKETT:  No, Your Honor.  Thank you.

12          THE COURT:  Thank you.  You may step down.

13          Do you want to start another witness or take a

14   second break?

15          MR. STEJSKAL:  Probably second break, Your Honor.

16   It's been about an hour and a half.

17          THE COURT:  Okay.  We'll be in recess for about 30

18   minutes.

19          (Jury excused)

20          (Recess)

21          (Jury present)

22          THE COURT:  You may call your next witness,

23   Mr. Stejskal.

24          MR. STEJSKAL:  Thank you, Your Honor.

25          The United States next calls Jeff Bryan.

```
 1              THE COURT:  Come forward and be sworn, please.
 2                          JEFF BRYAN,
 3         Having been duly sworn, was examined
 4              and testified as follows:
 5              THE CLERK:  Please state your name and spell it
 6   for the record.
 7              THE WITNESS:  Jeff Brian.  J-e-f-f-, B-r-y-a-n.
 8              THE COURT:  You may proceed.
 9              MR. STEJSKAL:  Thank you, Your Honor.
10                          DIRECT EXAMINATION
11   BY MR. STEJSKAL:
12   Q    Your occupation?
13   A    I'm a financial investigator for the Drug Enforcement
14   Administration.  I'm a contract employee.
15   Q    And how long have you been doing that?
16   A    About a year and a half -- a little over a year and a
17   half.
18   Q    What were you doing before that?
19   A    Prior to that, I was a DEA agent, a special agent,
20   since 1991.
21   Q    And I'm not used not to calling you special agent
22   because you've been a special agent for a long time.  Can I
23   still call you that?
24   A    Nope.
25   Q    Retirement must be good.
```

1    A    It is.

2    Q    Tell us about your educational background.

3    A    I graduated with a bachelor's degree from the

4    University of Utah in sociology, with a certificate of

5    criminology.

6    Q    And following that education, did you go directly into

7    DEA?

8    A    Yes, I did.

9    Q    Tell us about your training, then, upon becoming a DEA

10   agent and then continuing that training.  And let's split

11   that a little bit between your training with regard to drug

12   trafficking and kind of separate training with regard to

13   financial investigations and money laundering because I

14   believe those are two different aspects of what you've done

15   over your career.

16   A    New special agents are trained at the Quantico DEA

17   Academy.  We're co-located with the FBI there.  We have our

18   own training academy because we're trained differently, and

19   our training is approximately four months.  It varies from

20   year to year, depending on who's in charge and what they're

21   being trained on, but it's about four months long.

22        In that training, we are trained with all kinds of

23   investigative techniques, interviewing, surveillance, report

24   writing.  We're trained on defensive tactics and firearms,

25   everything that we need to know to do our job when we get

1   assigned to our location.

2   Q    And then after receiving that initial training that all

3   agents receive, have you received other trainings in either

4   your specialty or just periodic updates?

5   A    Yes.  Throughout an agent's career, you have the

6   opportunity to go to in-service training, and a lot of it is

7   personal preference on what kind of investigations you want

8   to try to do or what you have an aptitude for.  And so I was

9   trained initially -- not too long after the academy, I was

10  trained in clandestine laboratories.  So I became certified

11  to enter laboratories with all the suits on, and the SCBAs,

12  and dismantle methamphetamine laboratories.

13       And then I became a site safety instructor.  So that's

14  another certification where when we would dismantle a

15  laboratory, because of the toxic nature of the chemicals and

16  the by-products of methamphetamine labs, we would have to

17  designate an area for that cleanup, and safe zones, and

18  clean zones, and dirty zones, and they were progressive.  So

19  we were trained on how to do that to keep the environment

20  safe and people safe while we processed the evidence of a

21  lab.  And that's just one example.

22       There are other trainings on conspiracy, for example,

23  what is a conspiracy and how do you investigate a conspiracy

24  investigation.  There were trainings of different interview

25  techniques that are more specialized than we reached in the

1    academy.  And those are throughout an agent's career.

2         I attended a training not too long before I retired

3    because I didn't know I was going to retire.  So throughout

4    an agent's career, we receive this in-service training that

5    is put on either by the Department of Justice or other

6    government entities, or by companies, such as a company -- I

7    attended a training from Coinbase.  An individual from the

8    company called Coinbase, which is a virtual exchange

9    company, a virtual currency exchange company, came out and

10   trained us on what virtual currency is and how it's used.

11   So those kinds of trainings are typically what an agent goes

12   through and that I participated in as well throughout my 28

13   years.

14        And along with those, we also are trained in financial

15   investigations.

16   Q    Let me stop you for a second before you go into the

17   financial side.  There's one more from the drug side I'd

18   like to highlight, and that's pharmaceutical drug training?

19   A    Yes.  So at different periods of an agent's career,

20   drugs and their -- the drug of choice for a community or a

21   society kind of evolves and changes.  When I first hired on,

22   cocaine was very popular.  And shortly after that, LSD was

23   very popular.  And then after that, methamphetamine

24   absolutely took over and we were all focused on

25   methamphetamine.

1           And then what was your question?

2    Q    Your training with regard to pharmaceutical drugs and

3    how it became that.

4    A    Sorry.  So in 2009, it became very apparent that a lot

5    of pharmaceuticals were being diverted and abused.  And so

6    DEA started to focus heavily on the pharmaceutical industry

7    and how it's being diverted on the street.  So at that time

8    I attended a pharmaceutical drug training.  Because as

9    agents, we have a -- DEA is kind of divided in two parts.

10   We have the special agents, which is the criminal

11   investigation side, and we have diversion, which is the

12   regulatory side of DEA.  So they work with the doctors and

13   their licenses, and the pharmacies and the legal production

14   and dissemination of legal pharmaceutical drugs, and that is

15   controlled by DEA as well.  So we have a criminal side and

16   we have an administrative side.

17          And so at that time, as an agent I hadn't worked with

18   pharmaceutical drugs very much, and it became -- people

19   started trafficking pharmaceuticals, so we had to treat

20   pharmaceuticals just like any other street drug.  And so on

21   the criminal side of the house, we started to investigate

22   pharmaceutical diversion.  So I attended a training on

23   pharmaceuticals.

24   Q    And then let's talk about the financial side as well.

25   It looks like you received training in money laundering

1    investigations, asset forfeiture, a specific financial

2    investigation seminar.  Tell us a little bit about your

3    training in that part.

4    A    Yes.  So throughout the course of an investigation,

5    oftentimes people who traffic in narcotics or drugs, they

6    make a lot of money, and sometimes it's hard to hide that

7    money.  And we try to seize assets that are derived from the

8    elicit proceeds of that trafficking activity.  So we receive

9    training on how that happens, how do people conceal their

10   money, how do they accumulate assets, and how do they try to

11   hide them so it doesn't look like it belongs to them, and

12   how did they move their money back and forth.  So we receive

13   training on that.

14   Q    In addition to your training, you have vast experience

15   since -- I believe you said 1991, correct?

16   A    Yes.

17   Q    Explain for the jury kind of the progression of your

18   career, how you moved into different areas as you became a

19   more experienced agent.

20   A    Okay.  As I said, when I first hired on, cocaine was

21   very prevalent here in Utah.  I hired on here.  My first

22   area was here in Utah.  And as an agent, we go undercover

23   and we purchase drugs so that we can testify to the fact

24   that we purchased drugs from an individual or from an

25   organization.  And that's called a controlled purchase,

1   which means we're purchasing illegal substances, but it's

2   controlled.  We're using official, authorized government

3   funds for that.  And we never do it by ourselves.  We have a

4   whole group of people that are there observing, and

5   watching, and protecting as we are undercover.  It's not

6   like TV where people go to parties and things like that.  We

7   never use or simulate the use of drugs when we're

8   undercover.  It's strictly a business proposition or

9   business deal.

10          So we do a lot of that in DEA.  We purchase drugs from

11   trafficking organizations.  And I did that a lot as a

12   younger agent.  And then in 1998, I was selected to go to

13   Sao Paulo, Brazil for a four-year period where I worked

14   primarily cocaine trafficking from cartels in Colombia,

15   Bolivia, and Peru, who were using Brazil as a transit

16   country to send cocaine to the United States and other parts

17   of world.  So I did that for four years.

18          Then I was able to come back to Salt Lake, which was

19   kind of unusual to get the same spot twice, but I was

20   fortunate, and came back to Salt Lake and worked traditional

21   drugs again, methamphetamine and cocaine.  And also at that

22   time Ecstasy became very popular.  This was in the early

23   2000s.  Ecstasy is MDMA.  So I worked a lot of Ecstasy

24   cases.

25          Then I was selected to be on what was called a FIT

1    team, which is a financial investigations team, and it was a

2    task force within the DEA.  And there were several agencies

3    that were involved, including IRS, and some local

4    departments.  And we concentrated and focused on drug

5    trafficking organizations that were highly successful, that

6    had a lot of assets and were moving a lot of money.  So we

7    focused on kind of the bigger organizations so that we could

8    go after them financially and follow the money, sometimes

9    back to the drugs.  So I did that for a period of about

10   three and a half to four years.

11        And then near the end of 2009 or beginning of 2010,

12   that's when pharmaceutical diversion became very prevalent

13   and prominent, and it became a real problem that DEA

14   recognized.  So we formed a group within the DEA called the

15   TDS, or the tactical diversion squad, and I became a member

16   of the tactical diversion squad in 2010.  And that's when we

17   started focusing primarily -- my group, anyway, started

18   focusing primarily on the diversion of pharmaceutical drugs.

19        Most commonly and most prevalent, it was oxycodone,

20   because that is kind of the pharmaceutical that is most

21   sought after on the street is oxycodone.  And so I did that

22   until the beginning of 2018 when I retired.

23   Q    And you couldn't stay away, so you came back to DEA as

24   a contract financial investigator?

25   A    That's right.

1    Q    Twenty however many years wasn't enough.  Okay.

2         So you have experience both domestic and international,

3    correct?

4    A    Yes.

5    Q    And you've done investigations from small individuals

6    or organizations up to -- I think you said cartel activity

7    when you were in Brazil?

8    A    Yes.

9    Q    And during those investigations and throughout your

10   career, have you developed expertise in a lot of things that

11   are involved with drug trafficking?

12   A    Yeah.  And a lot of that is just on-the-job training.

13   We go to training, in-service training, but really to

14   understand and to become a good investigator, a lot of it is

15   just trial and error, and experience.  And so that's what

16   you develop.  And any investigator who has -- any police

17   officer who does that for an amount of time develops those

18   abilities to be able to investigate and recognize and put a

19   case together.

20   Q    Part of that experience was in types of drugs and

21   dealing with different drugs over the years?

22   A    Yes.

23   Q    And lately that has evolved into pharmaceuticals?

24   A    Yes.

25   Q    What types of drugs are we talking about when we're

1   talking about the pharmaceutical area and the tax diversion

2   squad?

3   A    I think I mentioned the most common -- or the most

4   sought after is oxycodone.

5        Now oxycodone is the generic term for the drug

6   oxycodone.  Much like Ibuprofen is a generic term.  The

7   brand name for Ibuprofen would be Advil or Motrin, for

8   example.  So oxycodone would be the Ibuprofen.  It's an

9   analgesic.  It's a painkiller.  It's very effective and a

10  very good, effective drug, but it has a high potential for

11  abuse and addiction.

12       So some of the names for oxycodone would be -- you may

13  have heard of Oxycontin.  When the pharmaceutical thing

14  first took off, Oxycontin was the most sought after pill.

15  They were called Oxy 80s because they contained

16  80 milligrams of oxycodone, and they were a time-release

17  pill.  So if you took the pill like you were supposed to as,

18  for example, a cancer patient would take Oxycontin 80s, it

19  was a timed release.  So it had 80 milligrams.  That's a lot

20  of oxycodone, but it was released over a period of time so

21  they didn't have to keep taking pills throughout the day to

22  kill their pain.

23       Well, drug abusers soon realized that there was a lot

24  of drug in those, and so they would crush them and snort

25  them, or smoke them, and it was a huge problem because they

1    were very addictive.

2         So that is -- a brand name would be Oxycontin.  Or

3    Percocet has oxycodone in it.  Or Roxicodone has oxycodone

4    in it.  So those are brand names.  But the pill that

5    we're -- or the drug or the active ingredient we're talking

6    about is oxycodone.  Those are very sought after.

7         There are other pharmaceutical pills that are also

8    abused, such as Xanax, or on the street they're called

9    Xannie bars because they look like a bar, like a Tylenol

10   bar.  And there are other pharmaceuticals that are also

11   abused.  But most of the illicit desire or the illicit use

12   of pharmaceuticals is for narcotics or painkillers, or more

13   specifically oxycodone.

14   Q    And opioids?

15   A    And it is an opioid, the oxycodone is.

16   Q    You described that early in your career you were

17   primarily involved with what I would call traditional

18   investigative techniques, undercover work, use of

19   confidential informants, conducting surveillance, those

20   types of things; is that right?

21   A    Yes.

22   Q    Did you and, I guess, law enforcement generally evolve

23   into more sophisticated techniques like tracking of

24   vehicles, phones, computers, financial investigations?

25   A    Yes.  We try to keep up with technology.  Usually the

1    traffickers are ahead of us with apps and things like that

2    to conceal their communications and things like that.  But

3    we try to keep up and we use things like vehicle trackers,

4    and we have to have a warrant to put that on a vehicle.

5         We still employ the use of traditional investigation

6    techniques such as going in and buying the drugs.  There's

7    no better evidence than actually seizing or buying drugs

8    from the individual who is trafficking it.  And then we

9    conduct interviews and we try to find out who's in charge,

10   whose drugs were they, and then we try to corroborate that

11   evidence through other means, through bank records, through

12   rental car records, and things like that.  So the

13   information that we gather investigatively, we always try to

14   corroborate by other means.

15   Q    So throughout combining your training and your lengthy

16   career, have you developed expertise into the common methods

17   and means that drug traffickers employ to carry on drug

18   trafficking?

19   A    Yes.

20   Q    Have you testified as an expert before with regard to

21   drug trafficking?

22   A    Yes, I have.

23   Q    And so that's why we have you here today is to testify

24   to some general concepts and trends in drug trafficking; is

25   that correct?

1    A    Yes.

2    Q    You were in the tactical diversion squad when you were

3    at DEA, but you didn't have a whole lot of direct

4    involvement with the investigation of Aaron Shamo in this

5    case, correct?

6    A    I did not.  I had some other cases.  I assisted

7    sometimes with evidence processing and things like that, but

8    I was not the case agent.

9    Q    So using your expertise, let's talk about a few things

10   to try to help the jury understand drug trafficking and

11   other things.  What are some things that all drug

12   trafficking organizations must have?  Let's talk first about

13   source of supply.

14   A    Okay.  Well, in order to traffic drugs, you have to

15   have the drugs, and whether these are illicit drugs like

16   cocaine, and methamphetamine, and heroin, and now the big

17   focus is on pharmaceutical drugs, in order to be a drug

18   trafficking organization, you have to obtain the drugs in

19   order to sell them.  That would be the first requirement I

20   would think.

21   Q    And are there a couple ways to do that?  You can

22   probably either buy them or make them?

23   A    Yes.  You know, historically, methamphetamine was made

24   here in the U.S.  And here in Utah specifically,

25   methamphetamine was manufactured, and we had a huge

1   methamphetamine lab problem here in Utah, so much so that

2   when we started to get methamphetamine that would come from

3   Mexico, they knew -- and we knew this from our

4   investigations and interviews, and listening to phones, we

5   knew that the individuals who were bringing the

6   methamphetamine to Utah, they had to bring pure

7   methamphetamine because the Utah drug users demanded that it

8   be high quality methamphetamine.  So that was kind of an

9   anomaly.

10          But yes, they either have to purchase the drugs already

11   made or they have to manufacture those drugs.

12   Q    And in what ways can drugs be manufactured?

13   A    Well, you have to have the ingredients.  It's kind of

14   like baking cookies.  You have a recipe and you need the

15   ingredients that are on that recipe, and then you need

16   certain equipment.  For drugs, for pills, for example, you

17   have to have the active ingredient, in this case oxycodone,

18   or something that is similar to oxycodone and other opiates,

19   such as fentanyl, and you need other materials, such as

20   binders that hold the tablets together, and there are other

21   materials.

22          But then you also need equipment, such as presses and

23   dies that actually imprint an imprint on the pills

24   themselves to make them appear to be legitimate manufactured

25   pills by pharmaceutical companies.

1      So yes, they have to be manufactured in a way that is

2   similar to the real pills in order to be sold on the street.

3   Q    So all drug trafficking organizations need a source of

4   supply, correct?

5   A    They need a source of supply?  Yes.

6   Q    How about a way to market or sell it to others?

7   A    Yes.  So a drug trafficking organization is really just

8   like any other business.  They're just selling an illicit

9   product.  They need their product to sell and they need

10  people to sell them, or they need people to transport the

11  product to where they're going to sell them, and then they

12  need people who are going to buy them.  And drug trafficking

13  organizations work the very same way as a legitimate

14  business.  So there is someone in charge of making that

15  happen and there are people that have delegated

16  responsibilities to do their part.

17  Q    Is it fair to say that over the course of your career

18  you've investigated many drug traffickers and drug

19  trafficking organizations?

20  A    Yes.

21  Q    Do they come in different structures and sizes?

22  A    Yes.

23  Q    Explain that for us.

24  A    Well, I'll use the analogy again of a legitimate

25  business.  You have Amazon.com that is huge all over the

1    world and there's one guy in charge.  But you also have

2    businesses, like a landscaping business that started up by a

3    father and his son, and they hire some neighborhood kids,

4    and they might employ 15 people, but that's considerably

5    smaller than Amazon.com.  And there's an unlimited range of

6    different kinds of businesses and sizes of businesses, and

7    it's just like that with drug trafficking.

8         Some businesses -- some drug traffickers start out on

9    their own.  They have enough capital to get it going to

10   purchase their initial drugs and sell it.  And some need

11   some investors to be able to buy the product or buy the

12   equipment needed to manufacture, and things like that.  So

13   if you compare it to a regular legitimate business, it's

14   very similar.  They're just selling an illicit product that

15   is illegal.

16   Q    So regardless of the organization, then, and the size

17   of the organization, there are certain roles that need to be

18   carried out in order to make the operation successful?

19   A    Yes.

20   Q    And if I understood you, sometimes one person can

21   handle everything?

22   A    Yes.  A smaller organization would be one person goes

23   and buys the drugs from whoever his source of supply is, and

24   then sells it to his customers all by himself and keeps all

25   the profits.

1      Other organizations may employ others to help them with

2  that, and it could be as simple as, hey, will you go rent

3  this car for me.  And then they use that car to go to

4  California and pick up drugs and come back.  And their name

5  isn't on that rental car agreement, but someone else's is,

6  and they would pay that person a nominal fee to do that for

7  them.

8      That's just an example of the creativity and the amount

9  of diversion and different ways that a drug trafficking

10 organization can work.  It's really as far as their

11 imagination can go and how much they want to succeed and how

12 successful they want to be.

13 Q   So tell us about the evolution of a developing drug

14 trafficking organization, that maybe it starts off small

15 with a single individual, and then as it expands, the

16 different roles that need to be filled.

17 A   Okay.  Typically it's not hard to imagine how someone

18 gets into drug trafficking.  Many get into drug trafficking

19 because they are using the drug themselves -- not all, some

20 don't, and they do it primarily for the monetary reasons of

21 drug trafficking.

22     But a lot of drug trafficking organizations start

23 because they have to go buy the pills, or the drug, whatever

24 kind of drug of choice that they have, but it's expensive.

25 It's not hard at all to have a hundred dollar a day drug

1    habit.  And so in order to supplement their income enough to

2    be able to buy their drug, they buy a little bit extra and

3    sell it.  And so that's sometimes how it starts.  They're

4    doing it just to support their own habit.  And then

5    oftentimes it becomes -- they become familiar with the

6    individuals who are supplying the drug and they start buying

7    more and more and more, and pretty soon they're buying

8    enough that they have so many customers that they can't

9    handle them all, so they go into business with someone, and

10   that person then handles some of the customers and the

11   original person handles some of the customers.

12       Or a drug trafficking organization is a couple of

13   buddies that say, hey, let's do this.  I've got this much

14   money and you've got this much money, let's put it together

15   and go buy a kilo of cocaine, or whatever the drug of choice

16   is, and that's how they start.

17       So it generally starts small, because you have to build

18   reputation with the source of supply and you have to build

19   up a customer base just like any other business.  And as it

20   grows, more people become employed and tasks become

21   delegated to them, and there's someone who is in charge of

22   making those decisions.  And that's kind of how it evolves.

23   Q    Let's talk about that last concept, then, of somebody

24   being in charge.  What types of things does the person in

25   charge be responsible for or remain responsible for?  Let's

 1    talk first about defining the scope of the operation.

 2    A    Well, again, it's relative to the size of the

 3    organization.  But whoever is in charge is making the

 4    decisions on who does what, who is delegated for what, where

 5    does the money come from and where does the money go, who

 6    keeps the money, who uses that money in furtherance of the

 7    business.  They promote the business with their illicit

 8    proceeds.  And so that person who was in charge makes those

 9    kinds of decisions, personnel, things that are purchased for

10    the business, such as manufacturing equipment, or vehicles,

11    or plane tickets, or rental cars.  Those are all decisions

12    that are made by the person in charge or who he delegates

13    that to, or she.

14    Q    So if I understood you correctly, they will define

15    what's being sold?

16    A    Uh-huh.  (Affirmative)

17    Q    They'll procure a source of supply?

18    A    They'll set the price of those drugs.  They're

19    ultimately in charge just like someone who runs a business.

20    Q    And when these other roles are filled, who hires those

21    people to fill those other roles?

22    A    The person in charge, the leader, organizer of that

23    organization.

24    Q    How about the money and the profits, who controls the

25    money and the profits?

1 A That individual would also be in charge ultimately of

2 the money, and typically they would receive the bulk of the

3 proceeds, but they have to share it with people who are

4 doing some of the work or they wouldn't do it either.  So

5 that person is in charge of the funds, of the proceeds of

6 the incoming and outgoing, and they typically will delegate

7 jobs to others, and they may give people more authority than

8 others.  They're in charge so they decide that.

9 Q Is it often structured like a business where the

10 leader, organizer is like the CEO and they make the most

11 money and then money kind of trickles down?

12 A Typically it is, yes.  And the leader, organizer

13 sometimes is very hands off.  They don't want to be around

14 the drugs at all.  Once they get to a certain point, they

15 delegate everything.  Other leaders, organizers are very

16 involved, and they want to be involved, and they want to be

17 hands-on, just like -- we've all had bosses who let us do

18 our job and we have bosses who are right involved with us

19 and kind of managing us.  So the same thing with drug

20 trafficking organizations.

21 Q Let's talk a little bit about traditional drug

22 trafficking organizations, the seller on the street corner

23 versus -- are you familiar with online drug trafficking?

24 A Yes.

25 Q Can you kind of compare and contrast?

1    A    Yes.  So traditional drug trafficking operations, they

2    generally sell their product locally because they deliver it

3    hand to hand and they receive the money hand to hand.  So

4    they communicate however they're going to communicate, on an

5    app, or on a telephone, or in person, and they will make

6    arrangements to meet an individual to purchase a certain

7    amount of drug for a certain amount of money.  That price is

8    negotiated, and they will meet them and do the exchange in

9    person.

10        An online drug trafficking business isn't like that.

11   There still is product and there still has to be an

12   exchange, but it's generally not done in person.  Funds are

13   transferred either by Venmo, or by Bitcoin, or depositing

14   into bank accounts.  There's a lot of ways to move money to

15   another location.  And then that individual who purchased

16   that drug receives that drug either in the mail or another

17   type of courier service.  So it's not a face-to-face

18   meeting, but it's an online transaction, just like you would

19   order something from Amazon.

20   Q    Let's talk real quickly and briefly about that delivery

21   service.  So online, are you familiar with them using the

22   Postal Service?

23   A    Yes.

24   Q    It's been sadly joked that the Postal Service is the

25   largest drug distributor in the United States.

1    A     Unfortunately, it might be true.

2    Q     Tell us about your experience with the Postal Service

3    being used by drug trafficking organizations to deliver

4    narcotics.

5    A     Well, it's also joked that sometimes it's not very

6    reliable, but in actuality, the Postal Service is very

7    reliable.  And drug traffickers will use the Postal Service

8    for a couple of reasons.  They prefer the Postal Service.

9    That doesn't mean that they don't use UPS and FedEx, and

10   other couriers, but generally they prefer the Postal

11   Service.  One reason is the sheer volume.  Millions and

12   millions and millions of letters and packages per day are

13   sent through the U.S. Mail.  And so the sheer volume alone

14   helps a small package with a few pills in it get through

15   without any detection at all.  That's one reason.  It's just

16   a -- it's a needle in a haystack.

17        The other reason is once that package is mailed, for

18   law enforcement to open that package, it requires a search

19   warrant, and it's sometimes difficult to get a search

20   warrant for a package when you suspect what's in there but

21   you don't have any probable cause to give to a judge stating

22   why you believe that there's pills in there, unless you've

23   done an investigation and you know this individual is

24   sending packages via mail and you can articulate that in an

25   affidavit and then get a search warrant.  But that's not a

1   ten-minute thing.  It requires a lot of effort and work.

2   And so that's another reason that the Postal Service is

3   used.

4        Another reason that the Postal Service is used is

5   traffickers -- it's possible to purchase postage with

6   Bitcoin.  They can purchase the postage fees with Bitcoin.

7        So those are three reasons that I know of why

8   traffickers prefer U.S. mail.

9   Q    Let's talk a little bit also about the price of drugs.

10  Are there various factors that affect the price of drugs in

11  any given area at any given time?

12  A    Yes.  There are a lot of factors that determine how

13  much a drug costs in a particular area.  The first, of

14  course, will be supply and demand.  Just like any other

15  business, supply and demand drives the price of goods.  But

16  there are other factors in the drug world that also affect

17  the price of drugs.  The first would be the purity of the

18  drug, how pure is that drug.

19       Now if you have a mid level cocaine trafficker who is

20  buying three or four ounces of cocaine at a time to

21  redistribute, and typically they'll sell it like a gram at a

22  time.  So 28 grams in an ounce, and they have three or four,

23  that's a hundred or so grams of cocaine.  So they buy it in

24  ounces and they divide it up into grams to sell.  The purity

25  of that drug will help determine the price of the drug.

1    If they're selling grams that are very high purity,
2    somewhere around 85 or 90 percent pure cocaine, that's worth
3    a lot more than grams that have been cut with another inert
4    substance, such as inositol, or some other substance.  And
5    they sometimes will do that because this person that buys
6    three or four ounces will then get their three or four
7    ounces and they will add three or four ounces of this inert
8    material.  Now instead of three or four ounces, they have
9    six or eight ounces that they can divide up and sell.  So
10   they've essentially doubled their product -- doubled the
11   amount of their product, but it's not as pure.  So on the
12   street, it's hard to know exactly how pure the drug is going
13   to be.
14       So that brings up the next factor in the price of
15   drugs, and that's how well you know your dealer, what your
16   relationship with your dealer is.  If it's someone that
17   you've been dealing with for a long time and you know that
18   they don't cut their cocaine, you're willing to pay a higher
19   price for that.  Also in knowing your dealer, it might be a
20   personal friend, or a family member, or a high school buddy,
21   and typically they get a little price break.  Your
22   relationship with your source of supply is very important in
23   determining the price.
24       Another factor that determines the price of street
25   drugs is the proximity to where it's being sold to where the

1   drug is manufactured or purchased.  So historically, if you

2   wanted a good price on methamphetamine, you drove to San

3   Diego and picked it up yourself and brought it back.  If you

4   wanted a pound of methamphetamine delivered to you, it was

5   going to be more expensive because there was the cost and

6   the risk of someone else driving it back to you and

7   delivering it to you.  So the proximity to the source of

8   supply is also a factor.

9        Another factor in determining the price of drugs will

10  be the consistency or frequency that you purchase that drug

11  from your source of supply.  There are traffickers who have

12  just a few customers and they know every Thursday this guy

13  is going to want two ounces, and this is guy is going to

14  want three ounces, and they have set amounts, and they know

15  they're good for it every time and they always bring their

16  money.

17       So the frequency and the consistency also determines

18  the price because he knows -- that drug dealer knows that

19  they're going to get their money on that day.  And so the

20  purchaser will say, hey, I'm a good customer.  I've been

21  with you for a year and a half and you know I'm on time

22  every time and I bring my money every time, so I want a

23  price break because there's less risk.  So they'll typically

24  get a price break.

25       Another factor is the quantity.  Just like going to

1    Costco, things are sometimes cheaper there because you have

2    to buy two great big ketchups instead of one little one, and

3    by volume it's a lot cheaper.  Even though you're spending

4    more up front, by volume you're getting more ketchup per

5    dollar than if you were to go buy a small one at Smith's,

6    for example.  So quantity is a very important factor in

7    determining the price of drugs on the street.

8         There are retail prices and there are wholesale prices,

9    and those are all relative to the size of the drug

10   trafficking organization.  A huge drug trafficking

11   organization would consider a hundred pounds to be a

12   wholesale price.  A small drug trafficker organization would

13   maybe consider a pound of methamphetamine to be a wholesale

14   price.

15        So it's all relative to the location, to the purity of

16   the drug, to the relationship with the dealer, and the

17   supply and demand in that area.

18        Right now the price of methamphetamine is as low as

19   I've ever seen it in my entire career.  In 2008, I

20   personally purchased one pound of methamphetamine.  It was

21   very pure, it came right from Mexico because we had a

22   tracker on the car that went and picked it up.  One pound of

23   methamphetamine was $25,000.  Just a couple of weeks ago,

24   our office purchased a pound of methamphetamine for less

25   than 3,000.

1          So you see there are so many factors, and right now the

2     supply and demand dictates the price of that.  So those are

3     some of the factors that determine the price of drug on the

4     street.  And pharmaceuticals follow those same, exact

5     rules -- or factors.

6     Q    Let me drill down just a little bit on a couple of

7     those, one being the location and transportation costs.  So

8     how has online sales made that different where the cost of

9     transportation maybe are different using the Postal Service,

10    or whatever other means?

11    A    Well, there's cost of shipping the pills, but it also

12    sometimes is balanced out by the quantity.  So a person is

13    going to have to pay postage, so they're willing to pay a

14    little bit more for their pill.  Now if these are real

15    oxycodone pills, or authentic pills, those are typically a

16    little bit more than a counterfeit pill would be because

17    they are harder to get.  They're the real deal.  They have

18    real oxycodone in them, so they're going to be a little bit

19    more.  And you add the price of shipping on that, it could

20    be a little bit more.

21         However, if you're willing to buy several hundred or

22    even a thousand pills at a time, you're going to get a

23    wholesale price.  And as long as that money hits the account

24    and you ship it, then that's a good -- that's a wholesale

25    price and you're going to get a much, much better deal as

1    long as you develop that rapport and reputation with your

2    source of supply and he knows the money will be there.

3         Does that answer your question?

4    Q    It does.  And let me drill down on one other one, and

5    that's the buyer-seller relationship and the trust factor or

6    risk factors involved there.  Typically in a traditional

7    drug trafficking organization, you meet the guy on the

8    corner so you see him.  Online, that's a little bit

9    different.  So how does the trust relationship factor work

10   online?

11   A    Okay.  So it works very similar to street trafficking.

12   For example, if an agent goes undercover and is introduced

13   to a source of supply by -- usually an informant, generally

14   the first time you make a buy from an individual, you're

15   going to pay a little bit more than you will the third or

16   fourth time because now he sees, okay, this guy is good for

17   the money, shows up, he always has the money with him.  It

18   goes without a hitch, everything is safe, no cops.  So then

19   after a while they lower the price.

20        Well, online, you don't get that face-to-face rapport,

21   but what you do have online is kind of like Yelp.  On these

22   dark web -- these dark web vendor sites, customers leave

23   reviews for the people that they purchase the drugs from,

24   and so they have user names online.  And a customer would

25   say -- the black oxy king maybe is his name.  Black oxy

1    king -- I'm just making that up -- is a really good vendor.

2    Every time I get my pills on time.  Every time they're

3    authentic.  Or he's the cheapest and I always get my pills.

4    They leave reviews just like you would at a restaurant.

5        So a first time buyer will go on those dark websites

6    and they'll look at reviews of someone and they'll say,

7    okay, I'm going to try this one.  Because there's a real

8    risk there of sending your money to someone -- you don't

9    even know where they are in the world, and you're sending

10   them money with the expectation of getting drugs back.  So

11   those reviews become very important.

12   Q    And for the vendor, then, who's selling the drugs, that

13   becomes very important to them to maintain positive reviews?

14   A    Yes.  Yeah, just like eBay or any other website.

15   Q    Let's talk a little bit about the pharmaceutical drugs

16   themselves and what we're selling -- some trafficking

17   organizations sell.  So what are controlled substances?

18   A    Controlled substances are substances that are

19   controlled by the government, and there are different

20   schedules of controlled substances, from Schedule 1 down to

21   Schedule 5, I believe.

22       So oxycodone, for example, is a Schedule 2 drug.

23   Fentanyl is also a Schedule 2 drug, and it's controlled

24   because of its ability or proponents to be addictive or

25   abused.  And it also takes into account whether there's a

1    legitimate medical purpose for that drug.  So a Schedule 2

2    drug typically is a drug that's produced pharmaceutically,

3    that has a very specific medical need and use, but it's a

4    Schedule 2 because there is a high potential for it to be

5    abused or that it has a highly addictive property.

6          So those are some of the factors that go into

7    determining how a controlled substance is scheduled.  But a

8    controlled substance is, simply put, a substance that is

9    controlled by the government for those reasons.

10   Q    And oxycodone and fentanyl are both controlled

11   substances, correct?

12   A    Yes.

13   Q    In addition to price, let's talk about value.  Have you

14   specifically been involved in investigations and learn the

15   pricing of pharmaceuticals, such as oxycodone, in the black

16   market?

17   A    Yes.

18   Q    Tell us about that.  What's the pricing like for

19   oxycodone?

20   A    Okay.  So now we're talking about real oxycodone, not

21   counterfeit oxycodone.  Oxycodone is obtained from a

22   pharmacy.  It's very common to get prescribed oxycodone

23   after a surgery because it is a very good and effective

24   painkiller.  And there are people who get oxycodone

25   prescriptions monthly.  So I'm going to use this just as an

1   example.  This isn't the person who goes to the dentist and

2   gets four oxycodone pills to get him through the next day.

3   This is someone who purchases oxycodone tablets every month

4   because they're prescribed by a doctor every single month.

5   So it's not uncommon at all for someone like that to get 120

6   oxycodone tablets per month.  So that's four per day.  All

7   right.

8        When they go to the pharmacy with a prescription signed

9   by a doctor, so it's legitimate, and they go to the

10  pharmacy, without insurance, oxycodone tablets are somewhere

11  between $1.50 and $3 per tablet here in Utah at the local

12  pharmacies.  There's $1.50 to a $3 price, without

13  insurance, if they were paying cash price, which a lot of

14  people do.  They pay cash for their pills.

15       So now they walk away with 120 oxycodone pills.  If

16  they're selling those retail on the street, not wholesale,

17  if they sold the entire 120, they would get less.  But if

18  they're selling them just two, or three, or four at a time

19  to someone, they can get $30 a pill for those.  So that's a

20  significant profit per pill.

21       So a prescription that they walked out of the pharmacy

22  paying $200 for is now worth about $3600.  And it's not

23  uncommon at all for someone to get that prescription and, in

24  this world we live in, they realize how much that's worth,

25  and that's a pretty good supplement to your income if you

1    sell your pills to someone every month.  Unfortunately,

2    there are a lot of people that do it because there are a lot

3    of people that want those pills and they're willing to pay

4    for them.  So that's the legitimate market.

5         Now if you're buying them wholesale, you might get them

6    for as low as 15 or 12, depending on all of those factors

7    that we talked about, your relationship, your proximity to

8    the source, the supply and demand, and all those other

9    factors they will determine.  So here in Salt Lake, right

10   now, you can pay easily $30 per pill if you're are buying

11   them retail on the street.

12   Q    Legitimate oxycodone pills are controlled, you said, by

13   the federal government?

14   A    Yes.

15   Q    And they can only be obtained by a prescription?

16   A    Yes.

17   Q    So people can't obtain say a thousand of those unless

18   prescribed by a doctor, and that's typically more than what

19   a doctor would prescribe?

20   A    Yes.

21   Q    So have drug traffickers in the black market used other

22   things as a substitute for oxycodone in order to take

23   advantage of the demand?

24   A    Yes.  So in order to get there, let me just kind of

25   explain how that evolved.

1          So a drug trafficking organization may find or recruit

2     people to go get prescriptions.  They go in and say my back

3     hurts chronically.  I can't get through the day without some

4     pain pills, and they find a doctor who will prescribe them

5     pills.  And a drug trafficking organization may recruit 15

6     or 20 of these people who are getting 120 pills per month,

7     and each month they give them money to go in and get their

8     pills and go to the pharmacy and pay for them, and that is a

9     drug trafficking organization.

10         And sometimes they even fraudulently produce the

11    prescription.  It's not a real prescription, but they're

12    forged, and they're very good, and they go to the pharmacy

13    and pass it as a real scrip and they can get their pills

14    that way.

15         Now other trafficking organizations have figured out

16    that they can manufacture the pills that are very popular.

17    The oxycodone pills, for example, the two most common and

18    most popular here in Utah, and pretty much across the

19    country, are what we call the Ms or the As.  And they're

20    both blue.  They're called blues on the street.  They're

21    both blue.  They're both round.  The Ms are made by a

22    company named Mallinckrodt, and they have a square imprinted

23    on it with an M, a block M inside the square, and on the

24    flip side of that pill, there's a 30 with an underscore.

25    The As have an A on the round pill at the top with an

1    underscore and then a 215.  So they're called A 215.  Or

2    they're called As, or they're Ms.

3        And drug seekers or users have a preference of which

4    they like.  If they smoke them, some of them like the Ms

5    better than the As because of the flavor.  Some of them

6    snort them and they like the As over the Ms because it

7    doesn't burn as much, or whatever their preference is.  So,

8    again, that would factor into the price of those drugs

9    because one might be sought after by an individual more than

10   another.

11       So the manufacturer of the counterfeit pills, they try

12   to simulate those exact pills.  So when they manufacture

13   them, they put blue dye in the pill, and they make them

14   round.  They have a press that presses these pills, and the

15   press has dies, on the bottom and on the top, that imprint

16   either the M or the A, and the underscore, and the 215 and

17   the 30.  They imprint that on the pill, and then spit it

18   out.  And it's a press that goes pretty quick.

19       So that's how they've been able to manufacture these

20   fentanyl pills that don't contain any oxycodone at all.  But

21   fentanyl is a synthetic opiate, so the effect is very

22   similar to the oxycodone pill.  So a person who is addicted

23   to opiates can take that fentanyl pill and may think that

24   it's oxycodone because it gives them kind of the same

25   effect.

```
 1   Q    Is there a high demand for these opioids, specifically
 2   these pills, on the street?
 3   A    Oh, yes.  That's why we have this epidemic right now.
 4   Q    Based on your training and experience in investigating
 5   cases, tell us about the profit margin with fentanyl as
 6   opposed to oxycodone.
 7   A    Okay.  With fentanyl, they are not purchasing the
 8   oxycodone.  They're purchasing the fentanyl, which is much
 9   more -- I guess the word would be powerful.  It's a hundred
10   times more powerful than morphine.  So fentanyl is actually
11   measured in micrograms, not milligrams.  Oxycodone is
12   measured in milligrams, and Oxy 30 has 30 milligrams of the
13   active ingredient of oxycodone.  Fentanyl is measured in
14   micrograms.  So milligrams is a thousandth of a gram.  A
15   microgram is a millionth of a gram.  So that's a big
16   difference.  That's how much more potent fentanyl is.
17        So a person that wants to manufacture fentanyl-laced,
18   counterfeit Oxy pills will purchase fentanyl on the dark
19   web.  The dark web is essentially a black market Amazon.com,
20   that you can get guns, and explosives, and drugs, and
21   whatever you want on the dark web.
22        So it's not very hard to purchase fentanyl, and it
23   generally comes from China.  They get it shipped to someone,
24   or themselves, and then they take that fentanyl and they mix
25   it together, just like cookies, if they have the recipe, and
```

1    they make these pills for a lot cheaper than they can buy

2    them on the street if they were real oxycodone.  So the

3    profit margin is huge in fentanyl pills because you're

4    kicking them out by the thousands and you're not paying,

5    even the pharmaceutical -- the pharmacy price for them, the

6    cash price, you're spitting them out for pennies on the

7    dollar as compared to buying real oxycodone pills.

8    Q     Because of that potency of fentanyl and the measurement

9    in micrograms, how important is quality control in the

10   manufacture of pills?

11   A     Well, real oxycodone manufacturers are -- they have to

12   be able to certify that there is exactly 30 milligrams of

13   active ingredient.  And I keep saying 30 milligrams because

14   it's the Oxy 30s.  That's kind of what we're talking about,

15   the 30 milligram tablets.  They know that there is precisely

16   30 milligrams of active ingredient in each pill, because

17   those manufacturing companies have very low tolerances of

18   margin of error, and they're mixed in equipment that makes

19   sure that the drug is mixed evenly, and when those pills are

20   produced, each pill has the exact amount in it.

21         With clandestinely manufactured pills, that's not being

22   done in a controlled environment, in a laboratory.  It's

23   being done in a basement or a bedroom of a home in blenders,

24   and then it's put in a hopper where it goes into the pill

25   press.  So one pill may have high concentration of fentanyl

1    and another pill hardly has any at all.  So there's a

2    tremendous risk there of quality control.  There is no

3    quality control.  Some pills have a lot and some pills might

4    not have any.

5    Q    And given the powerful nature of this, risk can be

6    lethal?

7    A    Yes.

8    Q    Are you familiar with drug trafficking organizations

9    testing for quality on third parties?

10   A    I am.

11   Q    Tell us about how that works.

12   A    I'm trying to remember what year, but it was maybe four

13   years ago, we just first started seeing counterfeit produced

14   oxycodone tablets, at least here in Utah, and it was one of

15   the very first manufacturing labs -- pill manufacturing labs

16   that we took off.  We did a search warrant on a hotel on

17   State Street down in Sandy.  And they had a pill press in

18   there, and there was blue powder everywhere.  And we knew

19   what we had, so we did a warrant.  We all got in our suits

20   and we went and processed all the evidence and, sure enough,

21   they were producing Oxy -- counterfeit Oxy 30 tablets.  They

22   were using fentanyl and there was fentanyl in there, which

23   is very dangerous because it's so potent that if you're

24   exposed to it even through your skin, you can OD on it.  You

25   can overdose on it.  So we have to take very serious

```
 1   precautions in processing the evidence in a situation like
 2   that.
 3        During the interviews of the suspects in that case, we
 4   learned that the individual who was manufacturing those
 5   pills, he had no idea how powerful those pills were because
 6   it's not an exact science.  He's not doing it in a
 7   laboratory.  He was doing it in a hotel room.
 8        So he would make a batch of pills, and he was curious
 9   as to how powerful those pills were, so he had addicts who
10   were friends who he was giving those pills to to test.  And
11   he would give them to them for free.  That was the caveat,
12   that you can have them for free but you have to tell me how
13   you feel, which is very dangerous, and some of them OD'd.
14   So he was actually testing the strength of his pills on his
15   own friends who were addicts.  So they were more than
16   willing to try the drug and give him that feedback so that
17   they could get their fix.  It was a very, very sad
18   situation.
19   Q    And with regard to online marketplaces, you're saying
20   that some of the feedback has to do with quality control,
21   correct?
22   A    Yes.  So if they're real oxycodone, those online
23   vendors who are selling legitimate Oxy pills, they're
24   selling them illegally, but they're real pills.  They tout
25   that on their site.  Mine are not fake.  I sell real
```

1    oxycodone.  And people that get them know that they're real

2    because they can usually tell by looking at the pills.  But

3    definitely when they take the pill, they can tell that it's

4    real oxycodone, and they'll give feedback.

5         And some vendors will make sure that everybody gets the

6    real stuff and not the fake stuff.  Other vendors are very

7    up front about the fact that they are counterfeit pills.

8    And other vendors try to put off counterfeit pills as real,

9    legitimate oxycodone.  So there's the whole spectrum there.

10             MR. STEJSKAL:  May I have just a moment,

11   Your Honor?

12             THE COURT:  Sure.

13   BY MR. STEJSKAL:

14   Q    Let's talk specifically about the term continuing

15   criminal enterprise, or CCE.  Are you familiar with that

16   term?

17   A    Yes.  It's a statute, a federal statute.

18   Q    Have you investigated or been involved in the

19   investigation of cases that were termed continuing criminal

20   enterprises, or CCEs?

21   A    Yes, I have.  I have been a case agent on a couple of

22   those.

23   Q    Tell us generally what that statute is.

24   A    The CCE statute, or continuing criminal enterprise, is

25   a statute that specifies a certain level of trafficking,

1     leader of a trafficking organization.  So there are a couple

2     of factors that have to be present in order to charge

3     continuing criminal enterprise.  One of those is there has

4     to be a leader, organizer, someone who is in charge of the

5     organization, and they're typically the person that is

6     charged with that statute.  Even though the overall

7     conspiracy may involve 20 other people, generally the CCE is

8     charged for the leader, organizer of that group.  Now that's

9     one factor.  There has to be a leader, organizer.

10         The other is they have to have at least five

11    individuals --

12              MR. SKORDAS:  Your Honor, I'm going to object.

13    This is a legal conclusion and something for the jury.

14              THE COURT:  He can testify as to his

15    understanding, I think, generally, but he can't give a legal

16    opinion.  Are you asking him for a legal opinion?

17              MR. STEJSKAL:  I'm not asking him for a legal

18    opinion, no.  Let me ask another question and we'll go that

19    way.

20              THE COURT:  All right.

21    BY MR. STEJSKAL:

22    Q    Based on your training and experience, what specific

23    facts or areas would apply to a principal administrator,

24    organizer, or leader?  What kinds of things would that

25    person do?

1          MR. SKORDAS:  Same objection.

2          THE COURT:  Overruled.  He can testify as to his

3     understanding and experience.

4          THE WITNESS:  My understanding is the leader,

5     organizer would be the person in charge of the decisions,

6     who gets hired, what the prices are, who rents the vehicles.

7     They delegate -- the very things that we've been talking

8     about would be a leader, organizer.

9     BY MR. STEJSKAL:

10    Q    And to involve five other persons, five or more other

11    persons, what type of roles would five other persons or

12    would more people fill?

13    A    So my understanding of the statute means that --

14         MR. SKORDAS:  Same objection, Your Honor.

15         THE COURT:  You can have a continuing objection.

16         MR. SKORDAS:  Thank you.

17         THE WITNESS:  My understanding would be that there

18    have to be five individuals that worked under the employ of

19    that leader, organizer.  So they would be people that may

20    purchase equipment in their names.  They may be people that

21    ship the drugs, or drive somewhere to deliver the drugs, or

22    pick the drugs up.  They may be people who are in charge of

23    collecting money.  As I've said, there are so many different

24    types of organizations and facets of a drug trafficking

25    organization, just like any other business, that leader,

1    organizer would delegate those types of activities to the

2    people under them.

3    BY MR. STEJSKAL:

4    Q    And another requirement is that the leader, organizer

5    obtains substantial income or resources from the operation?

6    A    Yes.

7    Q    Explain that for us.  How do they obtain resources from

8    the operation?

9    A    Well, the operation, of course, in the case of drug

10   trafficking, is the actual trafficking of illegal drugs, and

11   the proceeds that are gained from that are illicit proceeds.

12   And as I understand it, this statute requires that those

13   proceeds be substantial, and I think that's all it says.

14   It's a relative term, substantial.  But the proceeds have to

15   be substantial in order to charge the CCE.

16   Q    So based on your experience, is a million dollars

17   substantial?

18   A    Yes.

19   Q    Let's talk lastly about the term conspiracy.  You said

20   you obtained specific training on conspiracy, correct?

21   A    Yes.

22   Q    And you've investigated a number of conspiracy cases

23   throughout your career?

24   A    I have.

25   Q    Conspiracy requires an agreement between people.  Is

1   that your understanding?

2   A    Yes.  It was defined to me as a conspiracy is an

3   agreement between two or more individuals, and then in order

4   to be a criminal conspiracy, that agreement would be to

5   break the law.  And so a conspiracy is where two or more, or

6   a group of people conspire together to accomplish something

7   like drug trafficking, and each individual in that

8   conspiracy is not required to know what the other

9   individuals' roles are.

10       They know, for example, you are in the conspiracy if

11  you know that your job is only to rent cars every single

12  week to drive to San Diego to pick up drugs, and you rent

13  the cars.  That's all you do.  You don't even drive them.

14  Your job is to rent that car.  That's your part of the

15  conspiracy.  You are now a co-conspirator.

16       So each individual in a conspiracy has a part in that

17  crime that's being perpetrated, and each individual doesn't

18  have to know what the other individual is doing, but they

19  can still be part of the conspiracy.

20  Q    And often it's up to the leader, organizer to kind of

21  define those roles?

22  A    Of course.

23  Q    Is there often, in your experience, a written contract

24  of this agreement?

25  A    I've never seen one.

```
 1   Q    So how does the agreement take place?
 2   A    It's usually verbally.  Sometimes they don't even
 3   specify it.  It just starts happening.  You know, hey --
 4   they just start doing it and they're good at it, or it
 5   worked and so they do it again.  Sometimes it just becomes
 6   their role.  Oftentimes -- they don't sit down and have a
 7   board meeting and say, okay, here's what we're going to do.
 8   We're taking a different approach to this.  It's very fluid
 9   and it just evolves into an organization and everybody has
10   their role that's defined by someone.
11            MR. STEJSKAL:  One moment, Your Honor?
12            THE COURT:  Yes.
13   BY MR. STEJSKAL:
14   Q    In a conspiracy investigation, based on your
15   experience, is there always a single leader or a role
16   sometimes divided?
17   A    Roles are divided.
18   Q    Explain that.
19   A    Well, oftentimes there are partners, and sometimes
20   partners stay together for a long time and other times
21   partners start disagreeing on how things are done.
22        I did a case a few years ago where it started out with
23   two partners, and the one just finally said I'm out, and the
24   other just kept going with all of the previous customers,
25   and everything was kept going.  The one just left and he got
```

```
 1   bought out, but the organization continued.  But he was
 2   still part of the conspiracy and he was an equal partner
 3   until that certain date when he voluntarily left the
 4   conspiracy and completely got out of the drug trafficking
 5   business.  So he was a co-conspirator until that time and he
 6   was an equal partner until that time.
 7   Q    And you've seen different organizations that operate
 8   differently?
 9   A    Yes.
10   Q    Again, you said they come in different structures and
11   sizes?
12   A    Just like businesses, yep.
13   Q    Thank you.
14        MR. STEJSKAL:  That's all the questions at this
15   time, Your Honor.
16        THE COURT:  Thank you.
17        You may cross-examine, Mr. Skordas.
18                     CROSS-EXAMINATION
19   BY MR. SKORDAS:
20   Q    Mr. Bryan, did you say you started at the DEA in 1991?
21   A    Yes.
22   Q    And you started here in Salt Lake?
23   A    Yes, sir.
24   Q    When you started at the DEA, you started as a field
25   agent, or something with that title?
```

1    A     Special agent, yes.

2    Q     Special agent.  And did you start sort of on the

3    street, so to speak, trying to do hand-to-hand buys and

4    trying to find individuals that were selling drugs?

5    A     Yes.

6    Q     And you would go to clubs, or places like that to do

7    that?

8    A     Typically we don't do that too much.  That's kind of a

9    dangerous thing to do, and it's not very fruitful in terms

10   of -- we go out in clubs and how do you know who you're

11   buying from, and it's dangerous.  When we make undercover

12   purchases, it's very controlled, generally.  So we usually

13   get introduced by someone.

14   Q     And you'd be introduced by someone to an individual who

15   was going to distribute drugs to you, correct?

16   A     Yes.

17   Q     And you'd have some government money that controlled

18   part of the controlled buy and exchange that for the drugs?

19   A     Yes.

20   Q     And then you would arrest the person that gave you the

21   drugs eventually, at some point, right?

22   A     Uh-huh, (Affirmative).  Sometimes.  Sometimes we'd see

23   where they're getting the drugs and we try to go up the

24   chain from there.

25   Q     Because that's the goal of all of this, isn't it?

```
 1    A     Yes.

 2    Q     Is to find out where the drugs are coming from?

 3    A     Yes.

 4    Q     Tell the jury why -- well, did you say you worked in

 5    the cocaine area for a while?

 6    A     Yes.

 7    Q     And did that take you to Brazil?

 8    A     Yes.

 9    Q     And tell the jury why you went to Brazil.

10    A     Well, I went to Brazil because I had lived there

11    before.  I already spoke the language, and there was an

12    opportunity to work there.  So I took my family down there

13    and worked.  It wasn't because I wanted to work cocaine.  It

14    was I wanted to broaden my scope of investigations.  But

15    that's what we were working down there, was cocaine.

16    Q     But the DEA sent you there because the cocaine was

17    coming from Brazil -- or from Colombia I think you said?

18    A     Yes.  It was used as a transit country.

19    Q     And from Venezuela, correct?

20    A     Yeah, other South American countries.  There are 26

21    major seaports along the east coast of Brazil, and they try

22    to get the cocaine to those seaports to go all over the

23    world, and we tried to intercept those loads in concert with

24    the Brazilian Federal Police.  We didn't work unilaterally

25    down there.  And we tried to intercept those loads before
```

```
 1    they got on those boats.
 2    Q    Because your end game is to get the source of supply,
 3    correct?
 4    A    That's correct.
 5    Q    That's the ultimate bad guy, correct?
 6    A    Yes.
 7    Q    And in the cocaine industry, that bad guy was in
 8    Colombia, correct?
 9    A    Well, we would go up the chain as far as we could, but
10    ultimately most of the cartels were in Colombia.
11    Q    And you testified about meth and that most of the
12    cartels for meth were in Mexico?
13    A    They're now in Mexico.  The meth started here in the
14    U.S.  That's a U.S. homegrown product.
15    Q    It is now?
16    A    It was, back in the biker days.
17    Q    Because people can make meth?
18    A    Make it.  So the source of supply is here.  So they
19    were manufacturing it.
20    Q    I'm sorry.  I'll quit cutting you off.
21    A    That's okay.
22    Q    Because you can buy, arguably, legal products, set up a
23    little meth lab in your basement and make something that's
24    illegal, correct?
25    A    Yes, back then you could.  Now some of those products
```

```
 1    that you need to manufacture methamphetamine are controlled
 2    as well.
 3    Q    The precursors?
 4    A    Yes.
 5    Q    But cocaine isn't something you make in your basement,
 6    is it?
 7    A    No.
 8    Q    And neither is fentanyl, is it?
 9    A    No.
10    Q    So to get the source of supply, the DEA sends you,
11    sometime in the '90s, I guess, or early 2000s, to Brazil to
12    try to chase that down, correct?
13    A    Yes.  My job was to try to get the cocaine before it
14    was shipped to other parts of the world, primarily the U.S.
15    Q    And prescription drugs, the source of supply is China
16    often, correct?
17    A    No.  Prescription drugs, it's pharmaceutical companies
18    that produce it.  They are legally producing the
19    pharmaceutical drugs, and they're all over the world.
20    Q    What about fentanyl?
21    A    Fentanyl is -- if you're buying it illicitly?
22    Q    Right.
23    A    Yes.  Typically fentanyl is purchased on the dark
24    web -- if someone is buying it illicitly, they purchase it
25    on the dark web, and generally it comes from China.
```

```
 1    Q     So those are the bad guys, right, that are making the
 2    illegal drug?
 3    A     Uh-huh.  (Affirmative)  Well, it's made legally.
 4    They're probably diverting it.
 5    Q     Well, I suppose in Colombia in 2000 you could make
 6    cocaine legally.  You just can't send it to America,
 7    correct?
 8    A     Well, I'm sure fentanyl is probably produced here in
 9    America as well in a controlled environment and it's used
10    for pharmaceuticals.  Diversion is -- the term diversion is
11    used to specify a product that has -- that there's a
12    controlled chain.  So a pharmaceutical company may produce
13    fentanyl or oxycodone, and then they sell it to -- the
14    manufacturer sells it to a company.
15    Q     I'm going to cut you off.  I'm not talking about a
16    pharmaceutical company that's manufacturing cocaine, or
17    methamphetamine, or fentanyl.  I'm talking about an illegal
18    distributor.
19    A     Of fentanyl?
20    Q     Of any of those things.
21    A     Okay.
22    Q     That's who you want, isn't it?
23    A     Yes.
24    Q     Okay.  So fentanyl --
25    A     An illegal distributor of those things.
```

1    Q    Absolutely.  It's coming from China?

2    A    Well, the pills aren't coming from China.  The fentanyl

3    is.

4    Q    That's what I said, fentanyl.

5    A    Okay.

6    Q    In whatever form.

7    A    Okay.

8    Q    And by the same token, I guess marijuana at some point

9    was coming from other locales, right?

10    A    Yes.

11    Q    Where was that coming from during your time at the DEA?

12    A    Some from Mexico.  The high quality marijuana was grown

13    in the northwest of our country, northwest United States.  A

14    lot of marijuana comes from South America, but it doesn't

15    come up here because it's not worth shipping up here all the

16    way.  But countries in South America produce it as well for

17    local distribution.  So marijuana can grow just about

18    anywhere.

19    Q    What about LSD?

20    A    LSD is typically produced in San Francisco

21    clandestinely.  Historically, in the United States, the

22    epicenter is San Francisco for some reason.

23    Q    And it's made by some lab that makes LSD?

24    A    Yes, a clandestine lab.

25    Q    And Ecstasy, where does that come from?

```
 1   A     Ecstasy generally comes --
 2   Q     I'm not trying to quiz you.
 3   A     It generally comes from Europe, the Netherlands.
 4   Q     I'm asking you these questions because I don't know the
 5   answers.
 6   A     That's okay.
 7   Q     When you would work at the DEA and you arrested
 8   individuals who were selling you drugs, it was not uncommon
 9   that they didn't know the name of the person they were
10   getting the drugs from, correct?
11   A     Is it not uncommon?
12   Q     Right.
13   A     No.  They usually know who they're getting the drugs
14   from.
15   Q     And did they know who that person was getting the drugs
16   from?
17   A     Maybe not.
18   Q     And did they know who was manufacturing the drugs?
19   A     Maybe, maybe not.
20   Q     Did they know the folks in Colombia that were bringing
21   the drugs?
22   A     Well, I gave you an example of a pound of
23   methamphetamine that I purchased.  That individual knew
24   exactly who was producing that meth.  But I've purchased a
25   lot of drugs where they had no idea who was producing the
```

```
 1    drug.  So, again, it's just like a business.  They're so
 2    different.  Some do and some don't.
 3    Q    But the folks that are running the cartel are only
 4    successful if nobody knows who they are.  It's no fun going
 5    to jail because --
 6    A    The people that are running the cartels?
 7    Q    Right.
 8    A    Well, that level, most people do know who's running the
 9    cartels.  It's no secret who runs the cartels.
10    Q    There's no secret to you who's running the cartel, but
11    to the guy on the street that's just handing you the drugs,
12    they don't know.
13    A    They don't care.
14    Q    Right.
15    A    Yeah.
16    Q    And they don't get a letter from whoever are latest
17    drug lord in Colombia is saying, Dude, we'd sure love you to
18    help us out here, do they?
19    A    No.  They don't need to.
20    Q    You talked about the use of Bitcoin a little bit --
21    A    Uh-huh. (Affirmative)
22    Q    -- and you said that the U.S. Postal Service is often
23    used because it accepts Bitcoin?
24    A    So you don't buy stamps with Bitcoin.  But if you have
25    a -- there are drug trafficking organizations that ship
```

1    drugs via the U.S. Postal Service, and they can print their

2    own postage, and they have to purchase -- you purchase it in

3    advance, and then you can print the postage.  And it is

4    possible to purchase that postage with Bitcoin.  It's

5    possible.  Not all drug traffickers do that.  In fact, I

6    don't know very many that do, but it's possible.

7    Q    But people who are selling oranges or shoes can buy

8    their stamps using Bitcoin too, correct?

9    A    Sure.

10   Q    It's not just limited to illegal organizations?

11   A    No.  No.  Bitcoin is not illegal.

12   Q    Right.  That was the question I should have asked you

13   first.

14             MR. SKORDAS:  I believe that's all I have,

15   Your Honor.

16             THE COURT:  Thank you, Mr. Skordas.

17             Any redirect?

18             MR. STEJSKAL:  Briefly, Your Honor.

19                        REDIRECT EXAMINATION

20   BY MR. STEJSKAL:

21   Q    So as a long-term member of DEA, you are aware of DEA,

22   the United States Drug Enforcement Administration, and what

23   targets they identify generally, correct?

24   A    Yes.

25   Q    Are you familiar with the term CPOT, C-P-O-T?

```
 1   A     Yes.

 2   Q     What is that?

 3   A     That is a priority target, meaning the DEA has

 4   identified certain priority targets that are like major.

 5   Now I talked about the different sizes of organizations.  A

 6   CPOT would be a CEO of Costco or a CEO of Target.  Those are

 7   huge organizations and those CPOTs are who DEA has

 8   identified as the leaders of those organizations.

 9   Q     Has DEA identified Chinese fentanyl suppliers as CPOTs?

10   A     Yes.

11   Q     And does DEA have investigations into Chinese fentanyl

12   suppliers?

13   A     Yes.

14   Q     Because those investigations exist, does that mean DEA

15   should not investigate pill suppliers in the United States

16   that use that fentanyl?

17   A     No.

18   Q     Why not?

19   A     Because it's being sold here.  The pills are being

20   manufactured here and sold here.  We don't get a lot of

21   cooperation from China when it comes to those

22   investigations, believe it or not.  So the fentanyl that is

23   purchased from them here clandestinely and then used to

24   produce pills, that's what's being sold on the streets of

25   the United States and here in Utah, and everywhere else.
```

```
 1          So yes, when those pills are produced with that
 2     fentanyl, we have to find the people that are producing
 3     those pills with that fentanyl and stop it.  That's what we
 4     try to do.
 5     Q    So what's the ultimate goal of DEA?  Are you familiar
 6     with the terms disrupt and dismantle?
 7     A    Yes.
 8     Q    What does that mean?
 9     A    Well, we disrupt and dismantle as high up the chain as
10     we can.  That's what we try to do.  So if a drug trafficking
11     organization is kind of a smaller organization, maybe five
12     people, and we dismantle that organization and all five of
13     them go to jail, that trafficking organization was disrupted
14     and dismantled.
15          Now if there's a big, very large organization that we
16     would -- you know, compared to a large department store, for
17     example, if we're comparing to legitimate businesses, if we
18     took off the managers of several stores, we're disrupting
19     it, but we haven't completely dismantled it.  But we're
20     disrupting it.  We would try to get to the very, very top
21     guy that we can to dismantle it, but sometimes we can only
22     disrupt.  Does that answer your question?
23     Q    Just because you don't get the top guy, that doesn't
24     mean you shouldn't target the second guy?
25     A    No.
```

```
 1   Q     And DEA has made Chinese fentanyl suppliers a priority

 2   target?

 3   A     Yes.

 4   Q     Thank you.

 5              THE COURT:  Thank you.

 6              Any recross, Mr. Skordas?

 7                      RECROSS-EXAMINATION

 8   BY MR. SKORDAS:

 9   Q     And those suppliers still exist today, don't they?

10   A     Yes.

11              MR. SKORDAS:  Nothing further, Your Honor.

12              THE COURT:  Thank you.  You may step down.

13              THE WITNESS:  Thank you, Your Honor.

14              THE COURT:  We'll start tomorrow at 8:30.

15              Thank you again, ladies and gentlemen of the jury.

16   We so appreciate you, and we'll see you tomorrow.

17              (Jury excused)

18              THE COURT:  Have a nice evening.

19              (Whereupon, the trial was continued to Thursday,

20   August 22, 2019 at 8:30 a.m.)

21

22

23

24

25
```

1                    C E R T I F I C A T E

2

3

4          I hereby certify that the foregoing matter is

5    transcribed from the stenographic notes taken by me and is a

6    true and accurate transcription of the same.

7

8

9

10

11

12

13

14

15

16   PATTI WALKER, CSR-RPR-CP      DATED: 11-19-19
     Official Court Reporter
17   351 South West Temple, #8.431
     Salt Lake City, Utah  84101
18   801-364-5440

19

20

21

22

23

24

25