1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4    _____

08:07:24                                    )
5    UNITED STATES OF AMERICA,          )
                                        )
6              Plaintiff,               )
                                        )
08:07:24   7      -vs-                  )    2:16-CR-631 DK
                                        )
8    AARON MICHAEL SHAMO, et al.,       )
                                        )
9              Defendants.              )
08:07:24   _____)
10

11

12

13

08:07:24  14       BEFORE THE HONORABLE DALE KIMBALL

15          DATE:  AUGUST 16, 2019

16       REPORTER'S TRANSCRIPT OF PROCEEDINGS

17        CROSS EXAMINATION OF MARIO NOBLE

18

08:07:24  19

20

21

22

23

08:07:24  24

25          Reporter:  REBECCA JANKE, CSR, RPR, RMR
                       (801) 521-7238

```
 1
 2                        A P P E A R A N C E S
 3
 4      FOR THE PLAINTIF        UNITED STATE'S ATTORNEY'S OFFICE
08:07:24  5                         BY:  MICHAEL GADD, ESQ.
 6                               VERNON G. STEJSKAL, ESQ.
 7                               KENT A. BURGGRAAF, ESQ.
 8                          111 SOUTH MAIN STREET, 1800
 9                          SALT LAKE CITY, UTAH  84111
08:07:24 10
11
12
13      FOR THE DEFENDANT:      SKORDAS & CSTON, LLC
14                         BY:  GREGORY G. SKORDAS, ESQ.
08:07:24 15                          KAYTLIN V. BECKETT, ESQ.
16                          560 SOUTH 300 EAST, 225
17                          SALT LAKE CITY, UTAH 84111
18
19                          DARYL P. SAM, PLLC
08:07:24 20                  BY:  DARYL P. SAM, ESQ.
21                          5955 SOUTH REDWOOD ROAD, 102
22                          SALT LAKE CITY, UTAH 84123
23
24
08:07:24 25
```

|  |  |  |
|---|---|---|
|  | 1 | AUGUST 16, 2019                    SALT LAKE CITY, UTAH |
|  | 2 | P R O C E E D I N G S |
|  | 3 | * * * |
|  | 4 | THE COURT:  Is there some question we need to |
| 08:32:26 | 5 | talk about? |
|  | 6 | MR. STEJSKAL:  Your Honor, following the |
|  | 7 | testimony yesterday, I was approached by Mr. Crandall's |
|  | 8 | father, and Mr. Crandall's father informed me that he |
|  | 9 | recognized one of the jurors from having worked together |
| 08:32:46 | 10 | at the LDS Church in some capacity many years ago.  I |
|  | 11 | think he said five, seven, nine years ago.  He said they |
|  | 12 | were not friends outside of work.  They weren't even close |
|  | 13 | at work.  The juror had never met Drew Crandall, but he |
|  | 14 | just wanted to let us know, and I wanted to let the Court |
| 08:33:05 | 15 | know that there was -- he did inform me of that. |
|  | 16 | THE COURT:  Okay.  Anybody think that's an issue, |
|  | 17 | a problem? |
|  | 18 | MR. SKORDAS:  I don't think it's an issue, Your |
|  | 19 | Honor. |
| 08:33:14 | 20 | THE COURT:  Obviously the juror -- the father is |
|  | 21 | not a witness and so the juror didn't know him, and |
|  | 22 | Crandall is not that unusual a name. |
|  | 23 | MR. SKORDAS:  Right. |
|  | 24 | THE COURT:  I don't think it's a problem.  And |
| 08:33:30 | 25 | neither of you do? |

4

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 08:33:40 | 5 |

MR. SKORDAS:  Correct.

MR. STEJSKAL:  Correct, Your Honor.

THE COURT:  Thank you, though, for bringing it to the Court's attention.  The jury is here and we're ready to proceed, correct?

MR. GADD:  Yes.

MR. SKORDAS:  Yes, Your Honor.

THE CLERK:  All rise.

(Whereupon the jury enters the courtroom.)

THE COURT:  Good morning again, ladies and gentlemen of the jury.  Well, we've almost got through another week.

Mr. Sam, you may proceed with your cross examination.

MR. SAM:  All right.  Thank you.

CROSS EXAMINATION

BY MR. SAM:

Q.   Mr. Noble, good morning.  Appreciate your coming back this morning to finish up here.

If we could start off where are we left off with the government's direct and go to Exhibit 23.05.  If you could pull that up.

And you remember this document from yesterday, I'm sure?

A.   Yes.

1        Q.    Okay.   And you're aware of it.   And if we could

2    go -- highlight the two counts.   And I think it's just on

3    the first page there -- that you plead to.   So, as you

4    remember, you plead to conspiracy to distribute Fentanyl

08:36:37  5    and conspiracy to distribute Alprazolam?

6        A.    Yes.

7        Q.    Is that correct?   And you understood what the

8    penalties, potential penalties for those were?

9        A.    When I plead guilty, yes.

08:36:49  10        Q.    To what you plead guilty to?

11        A.    Yes.

12        Q.    Okay.   And then if we could go to the last page,

13    second to the last page of the 23.05 and then the sealed

14    addendum.   Yeah.

08:37:05  15          So, at the bottom of that, it was your

16    understanding that, by pleading to those charges, that you

17    would not be charged with the death-resulting count; is

18    that correct?

19        A.    That is correct.

08:37:16  20        Q.    Okay.

21          And then, if we could go to paragraph 11 in the

22    23.05.   And I think that's page 3 or 4.   Page 3.   Okay,

23    yeah.

24          In paragraph 11, there is -- what you agreed to

08:37:44  25    your involvement in this operation; is that correct?   Is

1    that your understanding?

2        A.    Yes.

3        Q.    Okay.  And if I could have you read that, and

4    maybe we'll pause as you go through that, but starting in

08:37:58  5    February, 2016, will you read that.

6        A.    In February, 2016, I was contacted by Aaron Shamo

7    in Utah who expressed to me his desire for me to become

8    the backbone of a store in Alpha Bay, a Dark Net

9    marketplace.  Shamo recruited me to be in charge of

08:38:19  10   customer service and processing orders of various

11   controlled substances, including alprazolam tablets and

12   pills marked with oxycodone but which contained fentanyl.

13   Aaron Shamo created a profile for me, Dr. Wario, and gave

14   me partial access to Pharma-Master, Aaron Shamo's store on

08:38:36  15   Alpha Bay.

16        My access allowed me to process orders and

17   correspond with customers as Pharma-Master, but I had no

18   access to the BitCoins or other account rights.  I

19   continued to provide these services during 2016.

08:38:49  20   Eventually I was unable to keep up with the demands of my

21   assignment, so Aaron Shamo hired another person whose name

22   I learned was Drew to help with my responsibilities.

23        Q.    And if I could pause right there.  You stated

24   that you were -- had the assignment of customer service

08:39:06  25   and that there was some point that somebody else came on,

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 08:39:13 | 5 |

1    is that right?

2         A.    That's correct.

3         Q.    Whose name you learned was Drew; is that right?

4         A.    That is correct.

5         Q.    And how did you learn that?

6         A.    Through a conversation with Shamo.

7         Q.    Okay.  At what point was that?  Do you

8    remember -- in I think in your testimony yesterday you

9    stated that you -- you weren't told by Shamo that Drew was

10   involved?

11        A.    I was told that Drew Crandall was not involved.

12        Q.    Okay.  Okay.  So there's a distinguishment there.

13   You were told that somebody by the name of Drew was

14   involved?

15        A.    Correct.  I asked him -- two Drew's that I knew

16   that he knew.  I asked him if it was those two gentlemen,

17   and he told me no.

18        Q.    Okay.  And that was your testimony.  He told you

19   no, that it was --

20        A.    It wasn't Drew Crandall, and it wasn't the other

21   Drew that we both knew.

22        Q.    So it was your understanding that there was a

23   Drew that you were not familiar with?

24        A.    Correct.

25        Q.    Is that correct?  So the identity of that other

person you did not know, you just had the name Drew, who
was not Drew Crandall or the other individual that you
both knew?

    A.   That's correct.

    Q.   Okay.  And then, if you'll keep reading.

    A.   I stopped working for Pharma-Master for a short
time, but when my expenses mounted in October, 2016, I
contacted Aaron Shamo and again asked for work.  Aaron
Shamo said that the other customer support person had been
falling behind and agreed to hire me part-time.  For my
part-time work, Aaron Shamo paid me $800 every two weeks.
I worked part-time for Pharma-Master until the store was
shut down in November 2016.  When I worked for
Pharma-Master, part of my daily duties included pulling
together a list of customers, their mailing addresses, and
the types and quantities of drugs they ordered.  Once I
created the list, I would send it to a -- send it in an
encrypted form through an email account Aaron Shamo
created for me to co-conspirators who were responsible for
packaging the orders, affixing mailing labels and postage.

        During the time period I worked for
Pharma-Master, I processed thousands of customer service
responses for both tablets containing Alprazolam and pills
containing fentanyl.  I processed customer service
responses for much more than 400 grams of fentanyl.

```
 1        Q.   Okay.  And I'll stop you there.  So there's a --
 2   there's a line through orders in that paragraph, correct?
 3        A.   Correct.
 4        Q.   And you changed that to customer service
 5   responses?
 6        A.   That was my main responsibility, yes.
 7        Q.   Okay.  So that was your main responsibility, but
 8   you were a part of the orders, too; is that correct?
 9        A.   I did ask -- or I did process some of the orders,
10   yeah.
11        Q.   Okay.  So you were -- in your testimony
12   yesterday, there was testimony that you gave that you sent
13   the orders to the shippers, correct, and encrypted email?
14        A.   Correct.
15        Q.   Okay.  So -- so, the customer service responses
16   was just changed because that was your main -- your main
17   duty with the organization; is that right?
18        A.   To correspond with the amounts listed in that
19   statement, the customer service responses was more
20   applicable.
21        Q.   Okay.  When it says thousands?
22        A.   Correct.
23        Q.   Right.  Okay.  So how many orders did you
24   process?  Not thousands, I guess?  Is that why it changed?
25        A.   Yeah.  I couldn't tell you an exact number now,
```

08:41:40    5
08:41:51   10
08:42:03   15
08:42:19   20
08:42:29   25

but it wasn't that many, no.

Q.   Okay.   All right.   Thank you.   And then if you'll finish the last paragraph?

A.   My co-conspirators and I each had a role to play, and we relied upon on each other to meet our common objective, to earn money by selling drugs.  I knowingly and voluntarily involved myself with Pharma-Master and my co-conspirators.  It was my free choice to do so.

Q.   Okay.  And that's why you're here today, because you -- you plead to -- you have taken responsibility, correct?

A.   Correct.

Q.   And you understand the gravity of the situation. The penalty for conspiracy to distribute fentanyl is a ten-year minimum mandatory, maximum life.  You understand that?

A.   I do.

Q.   Okay.

A.   Like I said yesterday, it was one of the worst decisions I made in my life, but I did make the decision, yes.

Q.   Right.  Now, if we could -- if we could go to Exhibit 15.06, and I believe this was your email sent box; is that correct, as you look at that?

A.   Yes.

1    Q.   Okay.  And so these emails were what you used to

2  send to the shippers when you did process an order; is

3  that correct?

4    A.   That's correct.

08:43:47   5    Q.   Okay.  And if we could -- if we could go to page

6  50 and 51 -- or the bottom of 50, first, very bottom

7  there.  There was -- this was dated June 7 when you sent

8  an email to the shippers, right?  Passthepeas were if the

9  shippers, correct?

08:44:09  10    A.   Correct.

11    Q.   Okay.  And then if we could go to page 51 at the

12  top, down to the attachment.  Yes.

13        So -- so this is a continuation of that page, and

14  it -- the attachment, what does that read?

08:44:25  15    A.   Are you asking where it says attachments at the

16  bottom?

17    Q.   Right.

18    A.   So 6-6.txt.

19    Q.   And what did that mean 6-6?

08:44:36  20    A.   That would have been the date.

21    Q.   Okay.  So 6/6.  And what year was this?

22    A.   2016.

23    Q.   Okay.  And were you aware of what orders were

24  encrypted in this email?

08:44:46  25    A.   I mean, I was the one that compiled them and

encrypted it, so yeah.

Q.   Okay.  So you had it printed out and encrypted it
and sent it?

A.   Yeah.  I had a soft copy, yeah.

08:44:58   Q.   Okay.  Are you aware that there is an order in
there that the government is claiming a death resulted as
a result of a shipment made from this organization?

A.   I did not know that.

Q.   You didn't know that.  Okay.  But you knew you
08:45:08   could be charged with that?

A.   When?

Q.   When you negotiated your deal with the
government, you knew that you could be charged with a
death-resulting count?

08:45:18   A.   I was under the understanding that, with the
plea, that I would not be charged with that.

Q.   Correct.  Correct.  That's why you entered the
plea; is that right?

A.   Correct.  Part of the reason, but yeah.

08:45:30   Q.   Right.  And if there was -- the government is
claiming a death-resulting count against Mr. Shamo on this
order.  And you participated in this order; is that
right?

A.   That's correct.

08:45:41   Q.   Correct.  Right?  And so -- and by pleading

1    today, you avoided that charge?

2        A.    Correct.

3        Q.    Okay.   Thank you.   If we could.   I did want to

4    ask you a couple of questions about this candy laced drug

08:46:03    5    business and about how that came about.   And I think you

6    testified that it was in January of 2016 or so that that

7    was being talked about or discussed.   Can you tell me a

8    little bit more about that, how that came about?

9        A.    Yeah.   So when Shamo originally approached me, he

08:46:23    10    stated that he wanted to get a second store started on

11    Alpha Bay but that he wanted somebody else to be the

12    primary runner, manager of it.   So essentially my job

13    duties would have been to manage the sales and do customer

14    service and to process the orders.   And then he would be

08:46:40    15    the one supplying the product.

16        Q.    Okay.   And was that something that was mutual

17    between the both of you, that you were both kind of

18    excited about that?

19        A.    At the time, when he approached me and, you know,

08:46:53    20    we talked about the amount of money and stuff that could

21    be made from it, it was something that I wanted to move

22    forward with.

23        Q.    Okay.   And you were quite excited about that,

24    right, in the discussions and the -- with Mr. Shamo?

08:47:07    25        A.    I don't know if I would use the word "excited,"

14

```
         1   but I was willing to move forward.

         2       Q.   Right.  Right.  And that's how it started as far

         3   as getting on the Tor browser and getting involved with

         4   the Dark Net --

08:47:20 5       A.   Correct.

         6       Q.   -- with this business, correct?

         7       A.   That's right.

         8       Q.   And then it didn't -- it didn't turn into

         9   anything, correct?

08:47:28 10      A.   Nothing at all.

        11       Q.   Okay.  If we could go to Exhibit 17.08, pull that

        12   up.

        13           And do you recognize this document?

        14       A.   I do?

08:47:45 15      Q.   Okay.  And what is?

        16       A.   Most of it is the canned responses that I had for

        17   customer service requests.

        18       Q.   Okay.  And who created this list?

        19       A.   Who did?  I did.

08:47:56 20      Q.   You did.  Okay.  And that was part of your

        21   responsibilities of customer service for the organization;

        22   is that correct?

        23       A.   Correct.  My responsibility was to respond to

        24   customer requests, and I felt the most efficient way to do

08:48:07 25  that was to create canned responses since we were getting
```

1  a lot of the same questions.

2      Q.   Okay.  And that kind of made your job easier,

3  correct?  You would get a complaint, and you would have a

4  list of responses, and you could just plug those in?

08:48:21  5      A.   Correct.

6      Q.   Is that correct?  Okay.  And there -- I believe

7  there's about five pages here, four or five pages of

8  responses.  Does that sound right?

9      A.   Yeah.  There was a good number of them.

08:48:33  10      Q.   There was quite a bit.  Okay.

11           And if we could go to page 2 and go to the

12  response of:  How much Fent?

13           If we could do that one down to:  Thanks, PM.

14           Yeah.  So if you'll read this one.

08:48:49  15      A.   We understand, being sure to know what you are

16  purchasing -- yeah.  We understand being sure to know what

17  you're purchasing, unfortunately we do not discuss our

18  formula or processes for many reasons.  We would say that

19  the effects of one of our Fent Roxies is equal to the

08:49:07  20  effects of a 30 milligram Roxy.  Hope this helps.  Thanks.

21  PM.

22      Q.   Okay.  Now, again, so this helps you respond to

23  complaints or questions that you received from customers,

24  correct?

08:49:20  25      A.   Correct.

1    Q.    Okay.  And how did this canned response -- how

2    was that created?

3    A.    I mean, I was getting questions about how much

4    Fent was in each pill and what the effects were and things

08:49:32    5    like that, so I reached out to Shamo because I had no idea

6    the process of the making the pills or anything like that,

7    so I asked him, and this was essentially his response, was

8    that we don't talk about the formula or the process.  And

9    I took what he said and put a customer service spin on it

08:49:50   10    and created this canned response.

11    Q.    Okay.  So you asked Mr. Shamo, "How do we respond

12    to this, what's the fromula?"

13    Because people were asking you, right?

14    A.    Correct.

08:49:59   15    Q.    What's the formula?  And Mr. Shamo's response

16    was, "We don't want to give specifics," basically; is that

17    correct?

18    A.    Yeah.  He didn't want someone to take his formula

19    and start using it as their own.

08:50:11   20    Q.    Okay.  And so even though you never got a formula

21    from Mr. Shamo --

22    A.    No.

23    Q.    -- is that right?  Okay.  And is it possible that

24    Mr. Shamo, himself didn't have the formula?

08:50:23   25    A.    I don't think so.

1      Q.    Okay.   You believe he did have the formula?

2      A.    Yeah.   I mean, I saw the pill presses in his

3    house.   He was telling me that he was pressing the pills

4    from those.   You know, the context of that, I would assume

08:50:37   5    that he was the one doing it.

6      Q.    As far as you know, you never saw a formula?

7      A.    I didn't.

8      Q.    And you don't know if Mr. Shamo was actually

9    putting that formula together or who may have put that

08:50:50   10    formula together; is that correct?

11      A.    That's correct.

12      Q.    You have no idea.   Your involvement with the

13    formula was basically getting questions from the

14    customers?

08:50:58   15      A.    And giving them this response.

16      Q.    And then going to Mr. Shamo and Mr. Shamo telling

17    you, "Just tell them it's equal to the effect of a 30

18    milligram Roxy."

19      A.    Correct.

08:51:14   20      Q.    Correct?   If we could go to Exhibit 14.15 and

21    just the first page of that.

22         What is this page here?   Do you recognize this

23    from yesterday?

24      A.    I believe this would have been the first time

08:51:33   25    that Shamo and I had communicated on Telegram.

1    Q.    Okay.  And, in general, right?  This was

2    Telegram.  These were your Telegram messages, correct?

3    A.    Correct.

4    Q.    I think it was your testimony yesterday that when

08:51:47   5    you were arrested at eBay or taken in for questioning at

6    eBay on November 22, that you were alerted by your

7    co-workers that Homeland Security was at the front desk

8    looking for you; is that right?

9    A.    That is correct.

08:52:03   10    Q.    And on your way down or in the process of coming

11    to meet them, you deleted this; is that right?

12    A.    That is correct.

13    Q.    Okay.  So I'm curious here, just wondering, how

14    did the government get this information when you deleted

08:52:20   15    it?

16    A.    From what I understand, this is Shamo's side.

17    Q.    Okay.  So this is Shamo's.  Yours was not

18    recovered, correct?

19    A.    Correct.

08:52:27   20    Q.    Okay.  So this was -- yours was deleted, correct?

21    A.    That's right.

22    Q.    If we would go to page 43 of this document.

23          And there's -- this is all communication between

24    you and Mr. Shamo, right, texting back and forth.

08:52:43   25          And if we could go to the bottom of:  I just put

in 12 hours today.

So, this response here from Mr. Shamo, "I put in a 12-hour today pressing and filling orders and getting stuff locally," was that common for Mr. Shamo to be saying, "I'm working hard here.  I'm really busy and I'm trying to get product out."  Or --

A.   At the beginning, yeah.

Q.   Okay.

A.   Once he kind of diversified, like it seemed like he had more people involved, it seemed like he had a lot more free time.

Q.   Okay.  So maybe at the first, when you first got involved, it was pretty common for him to be --

A.   Doing a lot.

Q.   -- putting in long days and working hard.  Okay.  And as far as others involved, you said at first that he didn't -- he mentioned the name Drew, but he didn't -- he didn't tell you Drew Crandall, correct?

A.   I didn't know anybody else that was involved, but we had had conversations about him expanding his business.

Q.   Okay.  And maybe bringing others on?

A.   Correct.  But I just never knew their -- who they were.

Q.   Right.  And at the conversations of bringing

1    others on, too, you were involved in actively

2    participating with having drops made to other individuals,

3    friends of yours, correct?

4        A.   Correct.

08:54:11   5        Q.   And not individuals that knew Mr. Shamo?

6        A.   Correct.

7        Q.   Right.  They were yours.  In fact you -- you were

8    kind of a middleman between Mr. Bruner and Kayla.  What

9    was Kayla's last name?

08:54:27  10        A.   Kayla was Bruner.  It was Jordan Burnell.

11        Q.   Jordan Burnell, yeah.  And they were your

12   friends, correct?

13        A.   That is correct.

14        Q.   And you kind of insulated them from Mr. Shamo; is

08:54:42  15   that fair to say?

16        A.   He asked for drops.  He asked me to be a drop,

17   and I told him I didn't want stuff going to my mom's

18   house, but I could talk to people and see if I could

19   recruit people to work under me, kind of like an MLM, if

08:54:56  20   you will.

21        Q.   Okay.  Not necessarily insulating them, but you

22   were kind of a middleman?

23        A.   Right.

24        Q.   Okay.  But you did want to protect them, correct?

08:55:05  25        A.   Of course.

|        |    |                                                                              |
|--------|----|------------------------------------------------------------------------------|
|        | 1  | Q.    And you didn't want them too involved.  In fact,                        |
|        | 2  | you have conversations on this text, on the Telegram with                     |
|        | 3  | Mr. Shamo about nothing illegal is being dropped at my                        |
|        | 4  | friends house, correct?                                                       |
| 08:55:19 | 5  | A.    Yeah.                                                                 |
|        | 6  | Q.    It was just filler, right?                                              |
|        | 7  | A.    That's what he was telling me, yeah.                                    |
|        | 8  | Q.    You were kind of wanting to make -- you wanted to                       |
|        | 9  | make that clear, that you didn't want illegal material                       |
| 08:55:31 | 10 | going to your friends' houses?                                             |
|        | 11 | A.    Right.                                                                  |
|        | 12 | Q.    Okay.  As far as Telegram, too, that's something                        |
|        | 13 | that you used before, right?  It wasn't -- Mr. Shamo                          |
|        | 14 | didn't introduce you to Telegram; is that right?                              |
| 08:55:49 | 15 | A.    Right.                                                               |
|        | 16 | Q.    Who introduced you to Telegram?                                         |
|        | 17 | A.    Sasha Grant.                                                            |
|        | 18 | Q.    Okay.  Sasha.  And you knew Sasha from how long?                        |
|        | 19 | A.    Six years ago.                                                          |
| 08:55:58 | 20 | Q.    Okay.  So --                                                         |
|        | 21 | A.    We were together a long time ago.                                       |
|        | 22 | Q.    So you knew Sasha before you knew Drew Crandall                         |
|        | 23 | or before you knew Aaron Shamo; is that right?                                |
|        | 24 | A.    That is correct.                                                        |
| 08:56:06 | 25 | Q.    Okay.  And it was several years before that she                      |

22

1    introduced you to Telegram; is that right?

2         A.   That's right.

3         Q.   Okay.  In fact, I think in your Grand Jury

4    testimony you said that you used that with Drew Crandall

08:56:17  5    as well, right?

6         A.   I had communicated with him, yeah.

7         Q.   And as far as your use of marijuana, that's

8    something you communicated through -- with Drew

9    Crandall?

08:56:26  10        A.   That's correct.  That's how I originally had

11   downloaded Telegram was to communicate with him to pick up

12   marijuana, yeah.

13        Q.   Right.  Okay.  And then, as far as Luke Paz, did

14   that name ever -- you socialized with Luke Paz, correct?

08:56:46  15        A.   When I was around Shamo, Luke was around a lot,

16   yeah.

17        Q.   Okay.  And so did Mr. Shamo ever mention the name

18   of Luke Paz as being part of this organization?

19        A.   He did not.

08:56:56  20        Q.   Okay.  It was kind of like Drew Crandall, right?

21   He never -- that name never came up as far as being

22   involved in this operation?

23        A.   Yeah.  It sounds like my name was the only one

24   that he told people.

08:57:10  25        Q.   You felt like he was throwing your name around?

         1          A.    Correct.

         2          Q.    I mean, that was true with the shippers as well;

            is that correct?

         4          A.    That's what it sounds like.

08:57:24 5          Q.    Okay.  So, on the day that he got arrested, you

         6    got a message from either Drew Crandall or Sasha Grant; is

         7    that right?

         8          A.    You said the day that he got arrested?

         9          Q.    I'm sorry.  The day he got arrested, the day that

08:57:38 10   you got questioned?

        11          A.    Correct.  And, yes, I did get a message.

        12          Q.    Okay.  And who was that from?

        13          A.    Sasha Grant.

        14          Q.    Sasha Grant.  And in what format -- she didn't

08:57:48 15   send you a Telegram, I guess?

        16          A.    No.  It was over Snapchat.

        17          Q.    Okay.  So it was over a common social media site.

        18    Okay.  And did you respond to that?

        19          A.    I did not.

08:57:59 20         Q.    Okay.  And why didn't you respond?

        21          A.    I was with lawyers at the time, and they told me

        22    not to.

        23          Q.    Okay.  So did you suspect, at that time, that

        24    Sasha knew something?

08:58:13 25         A.    Yeah.

```
 1        Q.   But before that, you had no idea; is that
 2   correct?
 3        A.   No idea of what?
 4        Q.   That Sasha would have any connection with this?
 5        A.   Well, like she had told me previously, back in --
 6   toward the end of 2015, kind of before I got involved with
 7   Shamo, that there was stuff going on with Drew and
 8   Shamo.
 9        Q.   Okay.  So there was -- there may have been some
10   indication that Drew Crandall was still involved?
11        A.   Not still involved, no.
12        Q.   Okay.  So -- so, Sasha contacting you, did that
13   give you an indication that maybe Drew was involved, then,
14   again?
15        A.   No.
16        Q.   Okay.  So it wasn't uncommon for you to get a
17   message from Sasha, then?
18        A.   It seemed like a pretty tight friend group, so
19   for her to be messaging me the day that Shamo got picked
20   up was not a surprise to me because I'm sure there were
21   people that she knew that had heard that Shamo had gotten
22   picked up and had spread the word.
23        Q.   Okay.  So, as far as you know, in your
24   involvement in this, Mr. Shamo was the base of this
25   organization; is that correct?
```

08:58:24
08:58:40
08:58:59
08:59:17
08:59:42

1  A. That's correct.

2  Q. And if there were others that were instructing

3 Mr. Shamo, you would not know?

4  A. I would not.

08:59:51 5  Q. All right.  So, as far as Burnell and Bruner, you

6 as a middleman, you gained financially from that; is that

7 correct?

8  A. I did.

9  Q. And how much did you make?

09:00:35 10  A. It was 150 per package.

11  Q. And approximately how many drops did you do?

12  A. I can recall three to four.

13  Q. I think in your Grand Jury testimony you said

14 that you did about nine with one and three with another.

09:00:57 15 Does that sound right?

16  A. That's not what I remember.

17  Q. Okay.  So maybe you misunderstood when you were

18 in front of the Grand Jury?

19  A. It's possible.  I also remember -- I don't

09:01:08 20 remember, rather, how the packages were paid for, if that

21 makes sense, because I remember there were multiple boxes

22 that came in one shipment, and I'm not sure how much Shamo

23 actually paid me for that.

24  Q. There may have been a discount if three or four

09:01:26 25 packages came at once or something?

A.   Possible.

Q.   You just don't remember; is that right?

A.   That's right.

Q.   Okay.  So there may have been a total of --

09:01:34   A.   Of nine packages.

Q.   -- 9 to 12 packages themselves, but only four or five actual transfers?

A.   Right.  Transfers is a good word.  Yeah.

Q.   Okay.  Okay.  Can you tell us who else you

09:01:55   communicated with, with Telegram to Mr. Shamo? Mr. Crandall, you've mentioned?

A.   The other person that I remember is Kelly McGraff.

Q.   Kelly McGraff?

09:02:06   A.   Correct.

Q.   Okay.  And is that the only other person?

A.   That's the only person I can recall.

Q.   Okay.  And what was the purpose of communicating with Kelly McGraff through Telegram?

09:02:16   A.   I was organizing picking up MDMA.

Q.   Okay.  So transfer of drugs?

A.   Correct.

Q.   Okay.  And as far as drug use goes, you were using drugs during this while you were performing the

09:02:40   duties of Mr. Shamo and during this period of time; is

that correct?

    A.   Yeah.

    Q.   In fact, you had asked Mr. Shamo for some drugs or some --

    A.   That's how it all started, yeah.

    Q.   And so that's something you participated in.  You did get questioned on November 22, correct?

    A.   Uh-huh.  Yes.

    Q.   Okay.  And -- and then you were later indicted in May of 2016; is that right?

    A.   It would have been May of 2017.

    Q.   Or 2017.  Correct.

    A.   But yes.

    Q.   Right.  And at that point, you went before a Judge, and you asked to be released, right, and there was a chance that you might be detained at that point?

    A.   Correct.

    Q.   Okay.  But you weren't -- you didn't spend a night in jail on November 22.  You didn't go to jail when you came back on the Indictment in May of 2017; is that right?

    A.   That's right.

    Q.   Okay.  And so you haven't spent a night in jail on this case; is that correct?

    A.   That's correct.

1     Q.    Okay.  And as far as drug use goes, when you came

2   on your Indictment, you were released.  You were on what

3   was called pretrial release; is that right?

4     A.    That is correct.

09:03:56   5     Q.    Okay.  And under that pretrial release, you had

6   certain conditions to meet; is that right, and maintain,

7   correct?

8     A.    That is correct.

9     Q.    Okay.  And have you been able to maintain those

09:04:08   10   conditions?

11     A.    Not all of them.

12     Q.    Okay.  What conditions have you not met?

13     A.    I was requested to not use drugs.

14     Q.    Okay.  And you have failed on those conditions,

09:04:22   15   then?

16     A.    That's correct.

17     Q.    Okay.  How many times?

18     A.    A handful.

19     Q.    Okay.  Like more than ten?

09:04:36   20     A.    Yeah.

21     Q.    Okay.  More than 15, or --

22     A.    I did have possession of a THC pen, so I did use

23   that, but, yes, more than 15 times, yes.

24     Q.    So you have been working with the probation

09:04:54   25   office on that; is that right?

```
09:05:02

09:05:12

09:05:23

09:05:36
```

1    A.    That is correct.

2    Q.    Okay.  And you haven't been back in court to

3    question your detention because of that?

4    A.    I have not.

5    Q.    All right.  You have been able to work that out

6    with your probation officer?

7    A.    Correct.

8    Q.    Okay.  And as you sit here today, are you

9    impaired?

10    A.    I am not.

11    Q.    Okay.  So you're of sound mind, and yesterday as

12    well; is that correct?

13    A.    That is correct.

14    Q.    Okay.

15         I have no further questions.

16         THE COURT:  Thank you, Mr. Sam.

17         Mr. Gadd, you may redirect.

18         MR. GADD:  Nothing further.  Thank you, Your

19    Honor.

20         THE COURT:  Thank you.  You can step down,

21    Mr. Noble, and you can be excused.

22

23

24

25         (Whereupon the testimony was completed.)

1

2                        REPORTER'S CERTIFICATE

3    STATE OF UTAH            )

4                            ) ss.

5    COUNTY OF SALT LAKE      )

6

7            I, REBECCA JANKE, do hereby certify that I am a

8    Certified Court Reporter for the State of Utah;

9            That as such Reporter I attended the hearing of

10   the foregoing matter on August 18, 2019, and thereat

11   reported in Stenotype all of the testimony and proceedings

12   had, and caused said notes to be transcribed into

13   typewriting, and the foregoing pages numbered 1 through 29

14   constitute a full, true and correct record of the

15   proceedings transcribed.

16           That I am not of kin to any of the parties and

17   have no interest in the outcome of the matter;

18           And hereby set my hand and seal this 18th day of

19   December, 2019.

20

21

22

23

24        _____

25        REBECCA JANKE, CSR, RPR, RMR