1                 IN THE UNITED STATES DISTRICT COURT

2                         DISTRICT OF UTAH

3                        CENTRAL DIVISION

4

5    UNITED STATES OF AMERICA,        )

6              Plaintiff,             )

7    vs.                              )     Case No. 2:16-CR-631DAK

8    AARON MICHAEL SHAMO,             )

9              Defendant.             )

10   _____)

11

12

13              BEFORE THE HONORABLE DALE A. KIMBALL

14          ------------------------------------

15                      August 26, 2019

16

17                        Jury Trial

18

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2

 3    For Plaintiff:          S. MICHAEL GADD
                              348 East South Temple
 4    `                        Salt Lake City, Utah

 5                            VERNON G. STEJSKAL
                              111 South Main Street
 6                            Suite 1800
                              Salt Lake City, Utah
 7
                              KENT A. BURGGRAAF
 8                            348 East South Temple
                              Salt Lake City, Utah
 9

10    For Defendant:          GREGORY G. SKORDAS
                              KATYLIN V. BECKETT
11                            560 South 300 East
                              Suite 225
12                            Salt Lake City, Utah

13                            DARYL P. SAM
                              5955 South Redwood Road
14                            Suite 102
                              Salt Lake City, Utah
15

16

17

18

19

20

21

      Court Reporter:         Ed Young
22                            351 South West Temple
                              Room 3.302
23                            Salt Lake City, Utah 84101-2180
                              801-328-3202
24                            ed_young@utd.uscourts.gov

25
```

```
1

2                        I N D E X

3

       Witness                 Examination              Page
4      -------                 -----------              ----

5      Daniel Ashment          Mr. Gadd (Direct)           4
       Daniel Ashment          Mr. Skordas (Cross)        56
6      Daniel Ashment          Mr. Gadd (Redirect)       103

7

8

9

10

11

12

13

14

15

16     Exhibit                                       Received
       -------                                       --------
17

18

19

20

21

22

23

24

25
```

```
 1   August 26, 2019                                  8:30 a.m.

 2                    P R O C E E D I N G S

 3

 4            THE COURT:  Good morning.

 5            Are you ready to proceed?

 6            MR. SKORDAS:  Yes, Your Honor.

 7            THE COURT:  You may resume the stand.

 8            (WHEREUPON, the jury enters the proceedings.)

 9            THE COURT:  Welcome back, ladies and gentlemen of

10   the jury.  We appreciate your promptness and your work.  Let

11   me remind you that you're not to talk with anyone about the

12   case or permit anyone to speak to you about it.  We'll

13   proceed.

14            You may proceed, Mr. Gadd.

15            MR. GADD:  Thank you, sir.

16                      DANIEL ASHMENT

17            Having been previously sworn, was examined

18                 and testified as follows:

19                 DIRECT EXAMINATION (Cont.)

20   BY MR. GADD

21   Q.   Good morning.

22   A.   Good morning.

23   Q.   When we left off on Friday we were talking about the

24   individuals on the chart to your left, correct?

25   A.   Correct.
```

1    Q.   I am going to change gears now and talk about some

2    topics and ask you questions about what you found as you

3    looked through the defendant's devices.

4         Could we first start with drug income?  You worked with

5    Special Agent Slagle in this case, right?

6    A.   Yes.

7    Q.   You heard the evidence about seizing Bitcoin from

8    wallets found and accessed on the defendant's devices?

9    A.   I did, yes.

10   Q.   Did you find additional evidence of Mr. Shamo's income

11   from selling drugs as you looked through his electronic

12   devices?

13   A.   Yes.  There were numerous instances of income from

14   distributing and selling drugs, yes.

15   Q.   Let's look through a few of those exhibits.

16             MR. GADD:  Could we start with Exhibit 14.22?

17             THE COURT:  14?

18             MR. GADD:  Yes.  14.22.

19             (WHEREUPON, Exhibit 14.22 was played.)

20   BY MR. GADD

21   Q.   Should we try that one more time?

22   A.   It was not working on this monitor.  It is up there

23   now.

24             MR. GADD:  Could you folks see?

25             Let's try that one more time.

```
 1              (WHEREUPON, Exhibit 14.22 was played.)

 2    BY MR. GADD

 3    Q.    How many money counters were found at the defendant's

 4    residence during the search?

 5    A.    We found two money counters during the search of his

 6    residence.

 7    Q.    Let's look at Exhibit 14.34.

 8          Do you recognize this?

 9    A.    I do, yes.

10    Q.    Was this found on his iMac computer?

11    A.    It was.

12    Q.    What are we looking at there?

13    A.    It is a price structure for different types of pills.

14    At the top you see the M box and then a quantity would be

15    times ten and then you see a pricing structure.  It would be

16    $110.  And then on the bottom row you would see the Roxy and

17    the pricing structure for that.  So as you go down this list

18    you'll see 100 -- X-100, so 100 pills would be $850.  Then

19    250 would be $2,400.  So as they would sell larger

20    quantities of the pills -- you get down to 10,000 in the M

21    box, which would be as little as $40,000 or $4 per pill.

22          Also, the same with the Roxy pills, starting out at 100

23    would be $859, and then down to 10,000 pills would be

24    $40,000 or $4 per pill.

25    Q.    Let's talk for a minute about an e-mail with his
```

```
 1   landlord.
 2              MR. GADD:  Could we look at 21.18?  Go to page 2.
 3   BY MR. GADD
 4   Q.   Do you recognize this?
 5   A.   I do, yes.
 6   Q.   This has come up previously in testimony, correct?
 7   A.   Correct.
 8   Q.   This is an e-mail from the defendant to his potential
 9   landlord, Mr. Lapin?
10   A.   It is.
11   Q.   In there he indicates that he has a wallet, correct?
12   A.   Yes.
13   Q.   Read the line where he says, hey, here is --
14   A.   Hey, here is our incoming Bitcoin wallet.  Any profits
15   made come here first and then distrusted to investors, my
16   two employees and myself.
17   Q.   What is the date that he sent that?
18   A.   November -- Friday, November the 13th of 2015.
19   Q.   Then there is a link that's shown in blue.  Is the last
20   part of that link that starts 1 H.M.O., is that his wallet
21   address?
22   A.   That is his wallet address, yes.
23   Q.   This was his main wallet, correct?
24   A.   Yes, it was.
25   Q.   Down below that link he writes it should come up.  Will
```

1    you read that?

2    A.    It should come up as U.S.D., U.S. dollars, but if not,

3    then it will say -- then it has the total received below

4    that.

5    Q.    What is the total there?

6    A.    1,443 Bitcoins plus some decimals.

7    Q.    You have looked at this wallet --

8    A.    I have.

9    Q.    -- a lot?

10   A.    A lot, yes.

11   Q.    So 1,443 Bitcoin as of November 13th, 2015?

12   A.    Yes.

13   Q.    Once Mr. Shamo was arrested no more Bitcoin went into

14   his main wallet, did it?

15   A.    No, they did not.

16   Q.    And he was arrested a year and -- so 53 weeks after

17   this, correct?

18   A.    Yes, he was.

19   Q.    Once he was arrested you were still able to see the

20   total amount of Bitcoin that had gone into his main wallet,

21   correct?

22   A.    That is correct, we were.

23   Q.    So 53 weeks after he sent this, was the total received

24   in that wallet approximately 4,459 Bitcoin?

25   A.    Yes.  That is my memory.  Over 3,000 additional

1   Bitcoins had come into the wallet.

2   Q.   In a one-year period?

3   A.   In a one-year period, yes.

4   Q.   Let's talk for a minute about gift cards.  Did you find

5   evidence that Mr. Shamo was using Bitcoin to buy gift cards

6   as a way to disguise his drug income?

7   A.   Yes.  We found evidence of gift cards all over the

8   place.  There were numerous gift cards on the computer.

9   Q.   We won't look at all of them, but let's look at just

10  one or two of the exhibits.  Let's look at Exhibit 21.12.

11  Then go to page 2.

12       Is this an example of a gift card?

13  A.   This is an example of one of the gift cards we found,

14  yeah.

15  Q.   If we could look -- how many of these do we do?  Do

16  pages 5, 8 and 11.

17       Another gift card?

18  A.   This is another gift card, yes.

19  Q.   Another?

20  A.   Another Amazon gift card for $500.

21  Q.   This keeps going and going, right?

22  A.   Yeah.  Numerous different types of gift cards

23  throughout, yes.

24  Q.   Let's do one more.

25            MR. GADD:  Could we look at Exhibit 21.13?  Then

1    if we could look at maybe page 2.  Thank you.

2    BY MR. GADD

3    Q.    Do you see that name at the top there?

4    A.    Yes.

5    Q.    Gyft with a y?

6    A.    Yes.

7    Q.    What is Gyft?

8    A.    It is a website you can go to to purchase different

9    types of gift cards.

10   Q.    If we could look at just a handful of these.  This is

11   page 2.  Could we look at page 6?  Page 10.

12   A.    Another Amazon gift card and an additional Amazon gift

13   cart.

14   Q.    Page 14.

15   A.    This is a BestBuy gift card for $500.

16   Q.    Did you see evidence of Mr. Shamo using gift cards in

17   his role as leader of the organization?

18   A.    Yes.  We saw evidence and also testimony from

19   individuals involved in the organization that they were paid

20   with gift cards that Mr. Shamo had purchased.

21   Q.    Can Bitcoin be traded directly for gift cards?

22   A.    Yes, it can.

23   Q.    Let's talk for just a minute about the silver bars.

24   Did you find evidence that the defendant was making

25   investments in hard currency?

1   A.   Yes.

2   Q.   Let's look at just one or two of those.  How about

3   Exhibit 21.19, page 2.

4        What is this we're looking at?

5   A.   So this is a receipt from J.M. Bullion for one kilo

6   silver bar.  The total for the bar was $680 plus shipping

7   and handling.

8   Q.   And then if we could look at Exhibit 21.41.

9        This is the metadata, correct?

10  A.   Correct.

11  Q.   And then page 3 here --

12  A.   This is a receipt for an additional silver bar.  You

13  can see that the payment method used on that receipt was a

14  Bitcoin payment.  The total was $684.14 shipped to Mr. Shamo

15  at 7939 South Titian Street.

16  Q.   We jumped through the e-mails kind of fast.  It

17  probably makes sense to explain this.

18            MR. GADD:  Could we look at page 1 real fast?

19  BY MR. GADD

20  Q.   I said this is the metadata.  What does that mean?

21  A.   So the metadata is information that -- when our

22  computer forensic agents, when they create an image for a

23  file they give it to the case agents in that file and the

24  metadata is basically data about data.  So this is data

25  about the image that we found on that computer and it has

1    several different things in it.  I am not the expert on

2    that, but it has several different factors showing where

3    this came from on the image that we have been given.

4    Q.    And it would be like things you might expect in the

5    header of an e-mail, right?

6    A.    Correct.  Yes.

7    Q.    The to and from and the date and the subject line?

8    A.    Yes.

9    Q.    That is all here?

10   A.    Yes.

11   Q.    And we get it in this format because of the software

12   system that is used to search?

13   A.    That is correct.

14   Q.    All of the e-mail exhibits have this, correct?

15   A.    Yes.

16   Q.    We are just skipping over it?

17   A.    Yes.

18   Q.    To be clear, all these e-mails came from the

19   defendant's e-mail account?

20   A.    Yes, they did.

21   Q.    Let's talk for a minute about his boat and his truck.

22   Did you find evidence that the defendant used drug proceeds

23   to purchase his truck?

24   A.    We did, yes.

25   Q.    Likewise, did you find evidence that the defendant used

1  drug proceeds to purchase his part of his boat?

2  A.   Yes, we did.

3  Q.   Let's look at those exhibits.  If we could start with

4  14.25.

5       Like on Friday, are the blue text bubbles, is that the

6  defendant?

7  A.   The blue would be the defendant, Mr. Shamo, yes.

8  Q.   And then if we could read those, and maybe we'll do

9  half and then half.

10      Could you read those?

11 A.   Yes.  Mr. Shamo says boats and ho's, within a moji.

12 Then the reply, yes, indeed.  I am pumped for the boat.  Mr.

13 Shamo says same here.  I did some damage to my wallet while

14 in Vegas, but I should be ready for it in a few days.

15      Okay.  Cool.  We just need to figure it out before

16 Friday or we'll lose that deposit.  Mr. Shamo replies, yeah,

17 I have the Bitcoins, it is just pulling it to cash is the

18 issue.  I might use Mile's 18K, and then I get 10K tomorrow

19 from a trade, so that alone should be okay.  I have it, but

20 need it in cash.  It's complicated, L.O.L.

21           MR. GADD:  Could we look at 14.23?

22 BY MR. GADD

23 Q.   It is upside down, but does that appear to be the boat?

24 A.   Yes, it does.

25 Q.   That is sent from the person with whom he is

1    communicating.  We ought to point out who that is.  Jump

2    away from this for a second.

3              MR. GADD:  Can we pull up 17.06?

4    BY MR. GADD

5    Q.   These text messages about the boat that we have been

6    reading, are they with Mr. Roy Stephens?

7    A.   Yes.  They are with Mr. Roy Stephens who is directly

8    underneath Paz on the bottom row there.

9    Q.   Were you able to determine what his role was in Mr.

10   Shamo's organization?

11   A.   Yes.  Mr. Stephens was recruited by Mr. Shamo and paid

12   by Mr. Shamo to be a package receiver for the drug

13   trafficking organization.

14   Q.   He was interviewed as well?

15   A.   He was.

16   Q.   In addition to receiving packages, was he also a friend

17   of Mr. Shamo?

18   A.   Yes, they were friends also.

19   Q.   They went in on this boat together?

20   A.   Went in on a boat and --

21             MR. GADD:  Let's pick up the last boat message.

22   Could we look at Exhibit 14.24?

23   BY MR. GADD

24   Q.   Then if you want to read that to us --

25   A.   Okay.  Mr. Stephens says it is going to be so fun.

1    Want to come out at about 5:00?  Mr. Shamo replies I don't

2    know if I will be able to make it out tonight, but I

3    definitely want to see the boat soon, maybe in the next few

4    days.  Mr. Stephens replies, okay, sounds good.  Mr. Shamo

5    says, what is our boat, a 2015 Moomba?  Mr. Stephens

6    replies, yup, Moomba Mojo.

7    Q.   Let's talk for a minute about his truck.

8         MR. GADD:  Could we look at Exhibit 14.26?

9    BY MR. GADD

10   Q.   And then if you could read that top half and then the

11   bottom half to us.

12   A.   Mr. Stephens says that is what Miles sent me for the

13   truck.  Tell Shamo I need a check -- sorry.  It looks like

14   this one, the second one got sent before the first one.  It

15   should start out with the second text there.  Mr. Stephens

16   says tell Shamo I need a check for $25,582.  Then Mr.

17   Stephens says that is what Miles sent me for the truck.

18   Q.   Can I jump in?

19   A.   Go ahead.

20   Q.   Do you see this sometimes when someone forwards a text

21   from another person?

22   A.   Oftentimes you see it where when one shows up before

23   the other, yes.

24   Q.   And they are within three seconds?

25   A.   Yes.

1    Q.    Pick up with Mr. Shamo's response.

2    A.    Yes.  Then Mr. Shamo says, wait.  How much is the

3    truck?  I thought it was 32K.  Mr. Stephens replies, 40,

4    meaning 40,000.  Mr. Shamo says, okay.  I'll need two more

5    days to pull out more Bitcoin.  Mr. Stephens replies, okay,

6    no problem.

7    Q.    Let's talk for a minute about gambling.  There has been

8    some testimony that the defendant liked to gamble.  Did you

9    see evidence of that in his e-mails?

10   A.    Yes.  There were several e-mails indicative of gambling

11   in his e-mails.

12         MR. GADD:  Let's look at Exhibit 21.43.  If we

13   could look at page 2.

14   BY MR. GADD

15   Q.    What is this?

16   A.    This is an e-mail to Mr. Shamo from the website

17   wintrillions.com.  Wintrillions.com is a gambling website

18   that you can go to.  Something that I noted in this e-mail

19   is his login was airshamu4@hotmail.com, which is his e-mail

20   address.  And also the password, mollydog3 which, as Agent

21   Slagle indicated, was a common password that Mr. Shamo used.

22   Q.    He seemed to like variations on that one theme,

23   correct?

24   A.    Correct.

25   Q.    Some sort of molly dog and then a three and some other

1    numbers and sometimes an exclamation point?

2    A.   Several instances of that, yes.

3    Q.   Let's look at one more of these gambling e-mails.

4         MR. GADD:   Let's look at Exhibit 21.03.

5    BY MR. GADD

6    Q.   What is this?

7    A.   This is an e-mail to Mr. Shamo also regarding cloudbet.

8    Cloudbet is a website that you can go to to gamble

9    cryptocurrency and Bitcoin specifically.

10   Q.   Read just the top box to us.

11   A.   Sure.  Hi, airshamu4@hotmail.com.  Welcome.  And we

12   would personally like to thank you for choosing to open an

13   account with cloudbet.  At cloudbet we offer an array of

14   sporting events, live casino and online casino games

15   totaling to more than 200, making for a more exciting and

16   thrilling experience for our passionate Bitcoin players.

17   Q.   On this broader subject of drug income, let's talk for

18   just a minute about Mr. Shamo's clothing and other household

19   expenses.

20        Did you see the exhibit and hear testimony that the

21   defendant has had no legitimate income since the first

22   quarter of 2015?

23   A.   Yes, I did.

24   Q.   Did you find evidence in his e-mails of spending that

25   showed substantial disposable income?

```
 1   A.   Yes.

 2   Q.   Let's look at a few.

 3            MR. GADD:   Could we look at Exhibit 21.06?   Then

 4   if we could go to page 2.

 5   BY MR. GADD

 6   Q.   What is this?

 7   A.   This is a receipt to Mr. Shamo, and if you look it says

 8   Dear Mr. Shamo, your order has been acknowledged.   Then at

 9   the bottom it is for Diesel Buster, a pair of jeans that

10   were $278 jeans.

11   Q.   Do you own any jeans that cost 300?

12   A.   No, I do not.

13            MR. GADD:   Let's look at Exhibit 21.20.   Page 2.

14   BY MR. GADD

15   Q.   What is this?

16   A.   This is a communication from Molly Maid for cleaning

17   services at his residence.

18            MR. GADD:   Let's look at Exhibit 21.30.   I think

19   we might be zoomed in a hair, and if we could zoom out --

20   BY MR. GADD

21   Q.   Can you tell what that is?

22   A.   Yes.   This is a receipt from overstock.com for an

23   88-inch television.

24            MR. GADD:   Then, lastly, could we look at 21.32?

25   BY MR. GADD
```

1   Q.   What is this?

2   A.   This is a receipt from R.C. Willey for $2,200 --

3   approximately $2,200 for a bedroom set that he purchased.

4   Q.   This was purchased in approximately April of 2016?

5   A.   Yes, purchased in April of 2016 and sent to his home on

6   Titian Street.

7   Q.   Let's change gears now and not talk about income so

8   much, but could we talk about his oversight of the

9   manufacturing process?

10  A.   Sure.

11  Q.   Did you find evidence on his devices that the defendant

12  kept a list of addresses of many of his package receivers?

13  A.   Yes, he did.

14  Q.   Let's take a look.

15        MR. GADD:  Could we go to 14.35, and then start

16  there at the bottom where it says Jessica Gleave.  Go on to

17  the second page.

18  BY MR. GADD

19  Q.   Do you recognize these names?

20  A.   I do, yes.  These names are part of the drug

21  trafficking organization.  They would be the package

22  receiver, drops, or in the case of Mr. Gygi, the courier for

23  the organization.

24  Q.   He started out as a drop, correct?

25  A.   He did, yes.

```
 1   Q.   Was this list found on the defendant's iMac?

 2   A.   It was.

 3   Q.   Let's talk specifically about some efforts that the

 4   defendant took to conceal his purchases.  Did you find

 5   evidence in his e-mails that he was attempting to conceal

 6   the nature of his payments when he would purchase

 7   ingredients?

 8   A.   Yes, we did.

 9   Q.   Let's look at just a few of those.

10        MR. GADD:  Could we look at Exhibit 21.04?  Go to

11   page 3.

12   BY MR. GADD

13   Q.   On a lot of these e-mails, my hope is that we will read

14   them roughly chronologically.  So usually that means

15   starting at the end and working our way up.

16        Here on page 3 are you able to tell what he is doing?

17   A.   Yes.  So on page 3 you can see just up at the top it

18   says regards from coinsfer.com, c-o-i-n-s-f-e-r dot com, and

19   you can see the Tablet Press Club formula 5,000 for one

20   kilogram, so Coinsfer was a way that you can use Bitcoin to

21   have another person purchase products to conceal the true

22   identity of the buyer.

23   Q.   And Coinsfer provides a service for a fee?

24   A.   Yes.

25   Q.   Now, if we can go up to the bottom of page 2, which
```

1    will give us the next part of that, and if you can read --

2    maybe for all of our benefit, can you just summarize what

3    Coinsfer is after here?

4    A.    Sure.   On this one I believe Mr. Shamo had asked about

5    pricing and Coinsfer had a limit that they were able to get

6    to.   So they say as ludicrous as these laws and regulations

7    are, we must make every effort to comply with them so as to

8    avoid legal issues.   Then they talk to him about the amount

9    of what he was purchasing, and it was going to be over the

10   $1,000 per day amount that they were able to use at that

11   time.

12             MR. GADD:   If we can zoom out -- and then if we

13   can go up just one e-mail, so the middle of this page now.

14   BY MR. GADD

15   Q.    This is going to be Mr. Shamo's response to their

16   clarifications, correct?

17   A.    Sure.

18   Q.    Would you read his response?

19   A.    Mr. Shamo says thank you for getting back to me so

20   fast.   Is there any way to receive a higher limit?   I notice

21   your website used it a few times and I hope I can use it

22   long term, but really want to make purchases higher than

23   $1,000 at a time.   This is a perfectly legal item that I'm

24   trying to purchase.   I am not trying to use it for a

25   legitimate purpose.   It will be used for my pre-workout

1    company that I'm starting shortly so I am very excited to be

2    working with you closely on this.  Please walk me through

3    how we can make this happen.  I'm only confused on the part

4    with the temp card.  Is this card just to use during

5    checkout on the company's website?

6         Also, why are you only allowed $1,000 per day?  I can

7    transfer the full amount via Bitcoin to speed up the

8    process.  Just provide a Bitcoin address and I can transfer

9    immediately.  Thank you, Aaron.

10   Q.   This wasn't the only example of Mr. Shamo trying to use

11   a service like this to hide his purchases, correct?

12   A.   Correct.

13   Q.   Let's look at another one.  Let's look at 21.15.

14        Do you recognize this?

15   A.   I do, yes.

16   Q.   What is this?  What are we looking at?

17   A.   This is communications from All For B.T.C., and at the

18   bottom you can see there, and All For B.T.C. was a service

19   similar to Coinsfer where you could use Bitcoin to pay the

20   company and they would purchase products for you using their

21   credit card or some other means to conceal the identity of

22   who was purchasing those products.

23   Q.   This is addressed to Sean Gygi, correct?

24   A.   Correct.

25   Q.   But it is an e-mail that came to the defendant's

1   account?

2   A.   It was.

3   Q.   Let's see if we can connect the dots.

4           MR. GADD:   Can we look at 21.37?  Can we look at

5   page 2?

6   BY MR. GADD

7   Q.   Is this a forward from All For Bitcoin?

8   A.   It is, yes.

9   Q.   I want to ask you a couple questions about that.  You

10  see who it is from.  It is an invoice, right?

11  A.   Correct.

12  Q.   From Press Club Nutrition?

13  A.   Yes.

14  Q.   Is that kind of the business behind

15  tabletpressclub.com?

16  A.   It is.  Tabletpressclub.com, yes.

17  Q.   Do you see payment info --

18  A.   Yes, I do.

19  Q.   -- whose credit card is listed?

20  A.   So it is listed as a Visa under the credit card and the

21  name is Martin Mischke, M-i-s-c-h-k-e.

22  Q.   Does that name mean anything to you?

23  A.   No, it does not.

24  Q.   I think you heard Special Agent Koeneman on his

25  cross-examination say something to the effect of we

1    interviewed a lot of people.  Is that true?  Did you

2    interview a lot of people?

3    A.    We did interview a lot of people, yes.

4    Q.    A lot of people?

5    A.    Yes.

6    Q.    This name never came up?

7    A.    Martin Mischke never came up, no.

8    Q.    Are you able to see the date on the invoice at the top?

9    A.    Yes.  October 13th of 2016.

10   Q.    This is for that same Formula 5000 that he prefers

11   buying from Tablet Press Club, right?

12   A.    Correct.  At the bottom in the gray you can see the

13   item and what that was, Tablet Press Club, Formula 5000, one

14   kilogram, and then the quantity would be 40.

15   Q.    40 kilograms?

16   A.    40 kilograms of that, yes.

17   Q.    In structuring his purchases like this, did it help Mr.

18   Shamo to remain anonymous?

19   A.    It does, yes.

20   Q.    His name is nowhere on this invoice, correct?

21   A.    No.

22   Q.    But he still got all of the product?

23   A.    Correct.  It is not in the payment information.  It is

24   not in the shipping information, nowhere on here.

25   Q.    Let's talk for a minute about quality control under

1  this larger umbrella of his oversight of the manufacturing

2  process.  There was a time early on when a bad batch of

3  Alprazolam led to the defendant being banned from a

4  different dark net market, correct?

5  A.   Correct.

6  Q.   Did you see evidence that the defendant took steps to

7  try to ensure that his Alprazolam pills actually contained

8  Alprazolam?

9  A.   Yes, we did.  Alprazolam and other pills he attempted

10  to ensure that that is what it contained, yes.

11  Q.   Let's look at just two of those exhibits.  Let's look

12  at 21.05.

13      Do you recognize this?

14  A.   I do.

15      MR. GADD:  I guess we can highlight the whole

16  thing.

17  BY MR. GADD

18  Q.   The defendant is asked a question kind of in the middle

19  of the screen there, right?

20  A.   Yes.

21  Q.   What was it that he asked?

22  A.   He is asking this company if they do purity in drug

23  testing.

24  Q.   Will you read what he said?

25  A.   Sure.  It says, hey, do you guys do purity in drug

1    testing?  Nothing illegal, but I have a friend that gave me

2    a few Xanax pills, and I just wanted to see the purity and

3    see if they are what he says they are.  Is there a way to do

4    this?  Thanks.

5    Q.    And then their response is at the top.

6    A.    Their response and they reply, dear sir, we can only

7    accept controlled substances from D.E.A. registered

8    entities.  Our base cost for G.C.M.S. analysis is $350.

9    Q.    Let's look at one more.

10            MR. GADD:  Could we look at 21.11?  Go to the next

11    page.

12   BY MR. GADD

13   Q.    Do you recognize this?

14   A.    I do, yes.

15   Q.    What is this?

16   A.    This is a receipt for test kits for benzodiazepines and

17   Xanax is a type of benzodiazepine.

18   Q.    Specifically the Alprazolam, right?

19   A.    Correct.  Alprazolam.  It also has an ecstasy test kit

20   on here.

21   Q.    How did he pay for these test kits?

22   A.    Bitcoin, through Bitcoin.  You can see at the bottom,

23   the second line up, the payment method was Bitcoin.

24   Q.    Let's talk about punches and punch tips and dies and

25   things of that nature.

1    Even though he employed Luke Paz to help him press, did

2    you find evidence that Mr. Shamo maintained some control

3    over buying parts and supplies for the pill presses?

4    A.   Yes, we did.

5    Q.   Let's look at just a few of those exhibits.

6        MR. GADD:   Could we go to 21.21?   Then if we can

7    start all the way at the end.

8    BY MR. GADD

9    Q.   We'll go through a number of them back and forth.   We

10   won't hit them all.   If we do this right, we will be

11   chronological.   Between you and me and Ms. Lauder, my hope

12   is that we'll be able to follow it.   Okay.

13       The e-mail you see on the screen there, the first

14   e-mail, what is happening here?

15   A.   So this e-mail is from a Chinese company who is

16   reaching out to Mr. Shamo and saying that they are able to

17   create replica dies or dies for Xanax -- Xanax dies and also

18   for A-215, which are a type of fake Oxycodone pills that the

19   drug trafficking organization was pressing.

20   Q.   And then they indicate kind of their prices for each?

21   A.   Correct.

22       MR. GADD:   If we can scroll up, so now we would be

23   at the bottom of the next page.

24   BY MR. GADD

25   Q.   Do you see there at the bottom, kind of the bottom main

1  block, is that Mr. Shamo's response?

2  A.   Yes.  Mr. Shamo replied to that e-mail from the Chinese

3  company.

4  Q.   Would you read what he wrote?

5  A.   Yes.  So the Chinese company was named Cost Business as

6  you can see in the line up above.  The subject is ZP-12

7  rotary tablet press machine.  Mr. Shamo replied to that

8  e-mail and he said sounds good.  I would like both dies

9  made.  Do you accept Bitcoin as payment?  I would like you

10  to get started immediately, and the mold would be for a

11  Z-P-9-A mini rotary tablet press.

12  Q.   There are two things in that e-mail that will be themes

13  as we go throughout the rest of them, right?  Specifically,

14  payment and then whether or not their product will fit his

15  machine, right?

16  A.   Correct.  Throughout the series of e-mails you see both

17  of those, yes.

18  Q.   Now, you can see at the top of the page we're looking

19  at on the screen, and it scrolls up to the next one, and why

20  don't we actually scroll up.  Okay.

21       What is their response there?

22  A.   So their response is, hello, friend.  So sorry, friend.

23  The payment -- we can't accept Bitcoin.  We just accept

24  Western Union and T.T. payment.

25       Should I read the whole thing?

1    Q.    That is probably good.

2    A.    Okay.

3    Q.    They give him, if he wants to order, the name to wire

4    it to?

5    A.    How he is able to pay, yes.

6    Q.    Sure.

7    A.    They also give the Western Union information below, the

8    name and also the country for Western Union payment.

9    Q.    Why don't we keep scrolling up and we'll see his

10   response to whether or not he can send it Western Union.

11         Right there.

12   A.    Mr. Shamo said he couldn't do Western Union and asked

13   them if he could do MoneyGram.

14   Q.    Then did he indicate which of the molds he wanted?

15   A.    And that he would like to buy A-215 first and then the

16   Xanax mold.  Again, the A-215 is the fake Oxycodone where

17   they were using Fentanyl as the active ingredient.

18   Q.    Let's keep scrolling up and let's see what their

19   response is to his request to send it by MoneyGram.

20         Do you see that there?

21   A.    Yes.  Then Cost Business, the Chinese company, replied

22   that it is no problem to pay by MoneyGram.  Then they again

23   reiterate what he is purchasing, which would be the replica

24   dies or just the dies, giving the pricing structure and then

25   the name on MoneyGram that he can send it to.

```
 1   Q.   That name, the first name that is Q-i and the last name
 2   that is C-h-e-n, we're going to see that in a few minutes,
 3   right?
 4   A.   We will, yes.
 5   Q.   Let's keep going up.  The next one up is Mr. Shamo at
 6   the top there, right?
 7   A.   Correct.
 8   Q.   And he is sending them indications that he has sent the
 9   money?
10   A.   That he has paid for it, yes.
11   Q.   Let's keep going.
12        They have a question for him at the bottom of this
13   page, correct?
14   A.   Correct.
15   Q.   What is their question for him?
16   A.   Their question is that they want him to send the name
17   that he is using for MoneyGram so they are able to withdraw
18   that money.
19   Q.   And then if we go up -- he does not answer their
20   question initially, correct?
21   A.   There was a little bit of confusion.  He was
22   thinking -- well, he replied with the place he wanted it to
23   be sent.
24   Q.   That is one of his package receivers, right?
25   A.   Correct.  Julian Mausia is a package receiver for the
```

1   drug trafficking organization.

2   Q.   And then at the top of this page they ask their

3   question a second time, correct?

4   A.   Correct.

5   Q.   They essentially want to know what name?

6   A.   Yes.  They are just asking for the MoneyGram

7   information rather than where it is to be sent.

8         MR. GADD:  If we could scroll up one more, we'll

9   see his response.

10  BY MR. GADD

11  Q.   This time he will answer their question, right?

12  A.   He answers the question this time for MoneyGram and

13  says the MoneyGram sender's name is Aaron Shamo and the

14  country is the United States.  Therefore, they could

15  withdraw that money.

16  Q.   Then he repeats what package receiver he wants this

17  sent to, right?

18  A.   Then he repeats that he wants it sent to Mr. Mausia,

19  and then he asks a question at the bottom and says how much

20  was the Xanax mold?  I'm ready to buy that.

21        MR. GADD:  Scroll up one more page.  Let's see

22  their response.  Perfect.

23  BY MR. GADD

24  Q.   What was it that they told him?

25  A.   So they said the bank is closed during the weekend, but

1    they will be able to get the payment after the weekend and

2    then they will start to work on his order for the two dies

3    as soon as they can.

4    Q.   And then if he wants to buy the additional mold they

5    are giving him the Xanax price and who to send the money to?

6    A.   Correct.  The total price for Xanax was going to be

7    $2,000.

8    Q.   So back in the beginning I mentioned there were the two

9    themes and you said, yes, payment was a theme and then

10   whether or not their parts would fit his machine.

11       We're going to get into that with this next one, I

12   believe, correct?

13   A.   Yes.

14           MR. GADD:  Scroll up and see what Mr. Shamo sent

15   to the business.  A little higher.  Go all the way to the

16   next line.  There you are.

17   BY MR. GADD

18   Q.   What did Mr. Shamo write to them?

19   A.   He replied that he could wait on the Xanax mold and he

20   was hitting his limits for MoneyGram.  MoneyGram has a

21   certain amount of money that you're able to send during

22   specific time periods and he said I hit my monthly sending

23   limits, but he wanted the A-215 die as quickly as possible.

24   Q.   And then in regard to whether or not their product fits

25   his machine, what did he --

 1   A.   He sent a link to the pill press that he was requesting

 2   the die for at the bottom as well as the picture that you

 3   see there.

 4   Q.   That is his pill press, right?

 5   A.   It is.

 6        MR. GADD:  If we can go up to the next page and

 7   we'll go to the middle, to Mr. Shamo.  If we keep scrolling,

 8   Mr. Shamo is going to ask for an update right here in the

 9   middle.

10   BY MR. GADD

11   Q.   Are you able to see that?

12   A.   Correct.  Yes.

13   Q.   Is the date on this April 12, 2016?  So 2016, 4-12?

14   A.   Yes.

15   Q.   What was it that he asked for?

16   A.   He again asked for the status of the A-215 mold and

17   wanted it as quickly as he could get it.

18   Q.   And then they are going to respond at the top of this

19   page.

20        Do you see that there?

21   A.   Yes.

22   Q.   What is their response?

23   A.   They said they checked the status of it and they will

24   send the order on April 21st and they will send him

25   tracking.  As I was reviewing this e-mail, one thing that

1    stood out to me was that middle line and I will just read it

2    if that is okay?

3    Q.    Sure.

4    A.    Recently the United States Customs supervision of this

5    product is very strict.  Can you allow us to ship the goods

6    by E.M.S. delivery for you?  E.M.S. will be safe and easy to

7    pass the U.S. Customs delivery to your home.  As a Customs

8    agent this stood out to me very specifically.  We see this

9    all the time where international actors are trying to bypass

10   Customs and get illegal products through to the United

11   States.

12             MR. GADD:  Let's keep scrolling up.  We're going

13   to hit one of those metadata pages and we have to jump to

14   the top of 21 for our next e-mail.

15   BY MR. GADD

16   Q.    Right there at the top do you see hello, friend?

17   A.    Yes.

18   Q.    And then below that Mr. Shamo's response.  Let's start

19   with his response and then theirs.

20   A.    Mr. Shamo replied, yes, that works, whatever is the

21   safety --

22   Q.    Safest?

23   A.    Whatever is the safest.  Sorry.

24   Q.    You go ahead.

25   A.    Cost Business replied hello, friend.  Yes, the E.M.S.

1   will be safe and easy than D.H.L. to pass the U.S. Customs

2   delivery to your home.

3   Q.   I don't mean to pick a scab, but he did get his dies

4   and punches.  He got a whole crate full of them?

5   A.   Yes, he did, that we recovered.

6        MR. GADD:  Let's jump to the top of 18.  One more.

7   There we are.

8   BY MR. GADD

9   Q.   In the middle there that is their response, correct?

10   A.   Correct.

11   Q.   Would you read that for us?

12   A.   Yes.  They reply hello, friend.  Today we sent your

13   order.  The E.M.S. tracking number is -- it gives the

14   number -- and you will receive it on next Friday.  Please

15   check it.  Thanks.  Any questions, please let us know.

16   Q.   Then they have one more follow-up e-mail above that one

17   and let's read that.

18   A.   The follow-up e-mail says hello, friend.  The parcel

19   has arrived your city.  Please make the phone to your local

20   post office to receive it A.S.A.P. when you receive our

21   message, because if you don't call back to your local post

22   office to receive the parcel before April 30th, the U.S.A.

23   U.S.P.S. company will return the parcel to sender.  We sent

24   the picture of shipping info for you.  Please check it.

25   Q.   That picture is in fact attached and we just scrolled

1    past it, right?

2    A.   Correct, we just scrolled past that.

3    Q.   Let's look very briefly at the bottom page there, 19.

4         They have sent him a screen shot of his tracking?

5    A.   Yes.

6    Q.   If we look at the bottom of that screen shot -- sorry.

7         MR. GADD:  I think we'll have to zoom out just a

8    hair to see where that is coming from.

9    BY MR. GADD

10   Q.   If we look at the bottom, are you able to see where the

11   package originated?

12   A.   Yes, it originated in China.

13        MR. GADD:  From here could we jump to the top of

14   page 9, the next in order?

15   BY MR. GADD

16   Q.   Do you see at the very top there, hello, my friend?

17   A.   Yes.

18   Q.   Can you read that one?

19   A.   Hello, my friend.  I'm happy you already received the

20   parcel.  Today our company pressed some Xanax pills by our

21   ZP-9 machine.  We took some picture.  They are all pressed

22   by our Xanax replica dies.  I'm very happy to share with

23   you.  Please see my attached photos.

24   Q.   And they sometimes have the habit of replying to old

25   e-mails, right?

1    A.    They do, yes.

2    Q.    That is why you get this other one below it?

3    A.    Yes.

4    Q.    Let's just look briefly at their attached photos.  This

5    is pages 11 through 16.  We can just kind of maybe one at a

6    time jump through them.

7          The e-mails go on from here, correct?

8    A.    They do, yes.

9    Q.    I think that that is probably enough.  Let's leave it

10   there.

11         Let's talk for a minute about wire transfers.  We saw

12   in that group of e-mails a name, the first and last name

13   that the Chinese company wanted money sent to.

14   A.    Yes.

15   Q.    Did you find other evidence besides just those e-mails

16   that the defendant was engaged in wiring money to China?

17   A.    Yes.  We found several instances of that.

18   Q.    Let's look at a few.  Let's look at 21.27.  Go to page

19   3.  This is MoneyGram, correct?

20   A.    Yes, this is MoneyGram.

21   Q.    To whom is the defendant sending money?

22   A.    On this the receiver information is about in the middle

23   of the page, and it is that same name that we had seen in

24   those e-mails.  Qi Chen is how I would pronounce it.

25   Q.    Q-i?

1    A.   Q-i, C-h-e-n.  Yes.

2    Q.   Then if we zoom out, how much money did he send?

3    A.   On this one it was approximately $1,495.

4    Q.   This is approximately March of 2016, correct?

5    A.   Yes.  Correct.

6    Q.   Let's look at a couple more.

7         MR. GADD:  Let's try 21.42.  Go to page 2 here.

8  BY MR. GADD

9    Q.   Is this a Western Union money transfer?

10   A.   Yes, it was.

11   Q.   Also going to China?

12   A.   Yes.

13   Q.   You can see the amount just at the bottom here,

14 correct?

15   A.   Correct.

16   Q.   It is $1,100?

17   A.   Yes, approximately.

18   Q.   Could we also look at page 10 on this exhibit?  This is

19 another transfer to China, correct?

20   A.   Yes, it was.

21   Q.   And then it goes on to page 11.  Then you can see the

22 amount there, right, $2,500?

23   A.   Yes, approximately $2,500.  On the previous page you

24 can see it was coming from Mr. Shamo.

25   Q.   These are relatively clear.  Let's see if we can muddy

```
 1    things up now.

 2              MR. GADD:  Can we look at Exhibit 14.45?  Okay.

 3    BY MR. GADD

 4    Q.   Have you seen this before?

 5    A.   I have seen this before, yes.

 6    Q.   Have you ever had that experience where you go to take

 7    a picture with your cell phone and you accidentally hit

 8    video?

 9    A.   I have done that before, yes.

10    Q.   And you just take like a one-second video?

11    A.   Yes.

12    Q.   This is a one-second video --

13    A.   It is.

14    Q.   -- of a screen?

15    A.   Correct.

16    Q.   We have done our best to try and capture it here.  Is

17    this a Western Union payment to China?

18    A.   This is a Western Union payment to China.

19    Q.   For, I believe, roughly $2,100?

20    A.   Correct.  You have to squint just a little bit to see

21    that.  The video makes it a little more clear.

22    Q.   This screen shot is right as he is pulling away on the

23    video, right?

24    A.   Correct.

25    Q.   Up at the top, the second full line down, can you see
```

1    what he is ordering?

2    A.   Boy, with these screens it makes it worse.  Yeah, that

3    word right there is Fentanyl H.C.L.

4    Q.   Fentanyl.

5    A.   Fentanyl hydrochloride, yes.

6    Q.   From China?

7    A.   From China.

8    Q.   Let's move away from that one.

9         Let's talk for a minute about the defendant's -- Mr.

10   Shamo's drug education.  Did you see evidence on the

11   defendant's devices of his efforts to learn to tradecraft of

12   a dark net drug trafficker?

13   A.   As we reviewed Mr. Shamo's devices, we saw thousands of

14   references to perfecting the tradecraft associated with drug

15   distribution.

16   Q.   Did you find any instances that the defendant made

17   efforts to learn how to avoid law enforcement detection?

18   A.   Yes, we did.

19   Q.   Let's look through just a handful of the exhibits from

20   his devices starting with 14.31.

21        Do you recognize that?

22   A.   I do, yes.

23   Q.   What are we looking at?

24   A.   This is a chart that we compiled with just some of the

25   Reddit U.R.L.s that Mr. Shamo had looked up.

1   Q.   Will you just explain briefly what Reddit is?

2   A.   Yes.  Reddit is a discussion forum.  It is a website

3   you can go to for discussions and you can go to different

4   sub Reddits they call it, and each sub Reddit is devoted to

5   a different topic, and you can basically look up anything

6   that you want on Reddit.  If you like cars you can look at a

7   sub Reddit for that.

8        In this instance if you like the dark net, you can look

9   up and read about a sub Reddit devoted specifically to the

10  dark net and to distributing drugs.

11  Q.   Let's walk through maybe the first two rows and explain

12  what they mean and then we'll read kind of the topic or the

13  name of the sub Reddit article.

14  A.   Sure.

15  Q.   Will you just explain kind of this U.R.L. on the top.

16  A.   So the U.R.L. is reddit.com and then the sub Reddit

17  would be research chemicals, and then comments and the

18  comments would be regarding a snuff grinder on this one.

19  Q.   What is a snuff grinder?

20  A.   A snuff grinder would be something that you can grind

21  up different types of drugs for consumption.

22  Q.   Let's take one more.  Read the second one down for us.

23  A.   The second one again would be reddit.com.  All of these

24  are reddit.com, and the sub Reddit would be related to dark

25  net markets.  On this specific dark net market that we're

1    looking at, it is a vendor review for Xanax Prime, 500 hulk

2    Xanax bars.

3    Q.    And then if we could just focus on like the name of the

4    article, will you read down this chart of selected Reddit

5    U.R.L.s to tell us the types of thing he is reading?

6    A.    Sure.  Going third down, the type of article would be

7    here are some of the main methods that police use.  Buyers,

8    stop using your real name and e-mail.  Fentanyl Reagent

9    Test.  Cash out Bitcoin two months before buying a house.

10   TumbleBit versus Mimblewimble.

11   Q.    I probably should jump in for just a minute.  What are

12   those.

13   A.    TumbleBit?

14   Q.    Yes.

15   A.    TumbleBit is a way to tumble bit coins so that you make

16   it so it is difficult to trace where they came from, so you

17   receive -- for instance, you receive Bitcoins on the dark

18   net and they come to your wallet, and then you want to send

19   them out to someone else, but you don't want them to know

20   that it came from the dark net, so you send it to a tumbler,

21   and then that kind of basically spins around and makes it

22   confusing so that they can't trace where they came from.

23   Q.    Does that tumbler, does it kind of, in your example,

24   mix your Bitcoin with everybody else's Bitcoin and then

25   spits it out in small bits?

```
1    A.    Yes, it does.

2    Q.    There are two above that.  The Fentanyl test, what is

3    that?

4    A.    A Fentanyl Reagent Test would be to test for the

5    presence and purity of Fentanyl.

6    Q.    Kind of like a do-it-yourself at home type of a kit?

7    A.    Yes.

8    Q.    Keep going.

9    A.    The next one after TumbleBit was AlphaBay account

10   frozen.  Below that don't let other people know what you did

11   last.  Is Bitcoin Blender safe to use still?  Stories of

12   people getting busted.  Let's learn from.  Then a super list

13   and then below that warning no configuration file found

14   using U.S.B.

15   Q.    So this is no longer in the dark net market sub Reddit.

16   This is a different sub Reddit?

17   A.    Correct.

18   Q.    What sub Reddit is it?

19   A.    This sub Reddit is different.  At the very bottom line,

20   this is the sub Reddit Tails.

21   Q.    Is Tails an operating system?

22   A.    It is.

23   Q.    How is it used?

24   A.    Tails is an operating system that you can plug into

25   your computer to make it so there are no tracks related to
```

1    what you're doing on your computer.  It uses a T.O.R.

2    browser and different encryptions to hide the things that

3    people are doing.

4    Q.    Is it typically on some sort of portable storage device

5    like a U.S.B. stick?

6    A.    Yes.

7    Q.    All right.  Let's look at some more.  Did you find

8    evidence that the defendant took steps to determine the

9    relative potency of Fentanyl?

10   A.    Yes, we did.

11   Q.    Let's go to 14.38.

12         What is it we're looking at here?

13   A.    This is an opioid potency comparison list and it shows

14   several different types of opioids, and then it is a chart

15   regarding dosages and how long it takes to affect --

16   Q.    We have heard some testimony from two medical doctors

17   about relative potency, correct?

18   A.    Yes, we have.

19   Q.    The defendant found this on the internet?

20   A.    Yes.

21   Q.    This was just on his iMac?

22   A.    Correct.

23   Q.    Specifically are there rows in the chart for both

24   oxycodone and Fentanyl?

25   A.    Yes, there are.  The oxycodone is the second row down

1    and Fentanyl on the fourth row down on the left-hand side.

2    Q.    Did you find evidence that the defendant took steps to

3    determine how best to avoid law enforcement detection of

4    drugs shipped through the United States mail?

5    A.    Yes, we did.

6    Q.    Let's look at that.

7            MR. GADD:   Could we go to 14.39?

8    BY MR. GADD

9    Q.    What is this?

10   A.    This is a manual on how to ship drugs.   Again, as a

11   Customs agent, I found this interesting.

12   Q.    This was found on his iMac?

13   A.    Yes.

14           MR. GADD:   Could we go to page 4 within this

15   manual?

16   BY MR. GADD

17   Q.    Do you see there near the top packaging tips for

18   senders?

19   A.    I do, yes.

20   Q.    How about just reading the first eight or so.

21   A.    Okay.   So it is talking about -- this is for how to

22   ship drugs through the mail.   Labeling.   Use a real return

23   address but make sure it has no connection to you.   Ensure

24   the zip code used is the same one of the drop box you plan

25   to send the package from.   A generally sound practice is to

1    use the legitimate address of an apartment complex but do

2    not specify an actual number.

3        Two.  Change return addresses, especially the name sent

4    from on a semi frequent basis.  The name used should be

5    generic but not overly common.

6        Three.  Keep the front of the package as clean as

7    possible.  It should have no markings other than a shipping

8    and return address.

9        Four.  Double-check to make sure all information is

10   correct.  Also ensure that all words are spelled correctly.

11       Five.  Both addresses should be typed and printed, not

12   handwritten.  Ensure the printer used has minimal connection

13   to you, paid for in cash from a friend and not used for

14   other things.

15       Six.  Exact postage should be applied neatly to the

16   package.

17       Seven.  Do not seal the package with tape.

18       Eight.  Use self-adhesive envelopes and stamps.

19   Q.  We are not necessarily trying to train anyone on how to

20   commit crime, but is this good advice?

21   A.  This is unfortunately very good advice, yes.

22   Q.  This is what the defendant's employees were doing,

23   right?

24   A.  Correct.

25   Q.  Changing the name on the return address, picking a real

1    address, verifying that all of the information is correct,

2    they were doing all of those things?

3    A.    Yes, they were.

4    Q.    This was found on the defendant's computer?

5    A.    It was.

6    Q.    Did you find evidence that the defendant took steps to

7    determine how best to launder his drug proceeds?

8    A.    Yes, we did.

9    Q.    Look at 14.42.  We won't go through all of this one,

10   but what is this document called?

11   A.    This is a document entitled 100-percent original money

12   laundering method.

13   Q.    Maybe if you just want to read the top two lines for

14   us.

15   A.    Sure.  This guide will anonymously and effectively

16   convert your dirty Bitcoins into clean cash.

17   Q.    That is good.

18        The defendant had a number of different ways he tried

19   to launder his drug proceeds, correct?

20   A.    Correct.

21   Q.    We have talked about some of the documents that you

22   found on the defendant's computer and his phones but mostly

23   the computer, but were you also able to look for evidence of

24   research he had done online to try to learn how to run his

25   criminal enterprise?

1    A.   Yes, we did.

2    Q.   Did you help create a chart that shows some of the many

3    websites that he visited?

4    A.   Yes, we did.

5         MR. GADD:  Let's pull up 14.32.

6    BY MR. GADD

7    Q.   This is just a small selection of the websites he

8    visited, right?

9    A.   Correct.

10   Q.   Will you walk us through what the websites are?

11   A.   Sure.  At the top line there you can see the Sigaint

12   website address.  Again, this was the encrypted e-mail that

13   they used to communicate with each other to facilitate the

14   drug trafficking.

15        The second line is blockchain.info access wallet.  That

16   would be the block chain which is related to the

17   cryptocurrency and to the Bitcoin wallets.  The next line

18   would be Uline.  Again, Uline is where shipping products and

19   different things of that nature were purchased.  Below that

20   we have AliExpress.  We have three U.R.L.s there related to

21   AliExpress, which were related to the purchasing of the pill

22   presses and the punches, dies and molds and things of that

23   nature.

24        Below that we have a drugs forum, just a forum that you

25   can go to to learn about illicit drugs and their effect and

1   a lot of things that you want to know and don't want to know

2   about drugs.  Below that would be stopoverdose.org, which is

3   a website related to preventing and stopping overdoses.

4   Q.   If someone had powder Fentanyl in their house and they

5   were using it in a machine that sometimes created dust in

6   the air, would that be a valuable website to look through?

7   A.   That would be very valuable, yes.

8   Q.   All right.  Please keep going.

9   A.   Below that, again, is AliExpress.  AliExpress is kind

10  of like an Amazon -- a Chinese Amazon website basically

11  where you can purchase many different types of things.

12       Below that we have a YouTube video.  There are two

13  YouTube videos on this chart.

14  Q.   What is the first one?  Did you go and look?

15  A.   So I believe the first one was related to -- let me

16  think for just one minute.

17  Q.   Was it the --

18  A.   It was a D.E.A. informational video that showed the

19  dangers of Fentanyl.  So the D.E.A. put out a video for law

20  enforcement and others to show the dangers associated with

21  Fentanyl.

22       That other YouTube video, which is below the AliExpress

23  pill press line, again, was a V.I.C.E. Video --

24  Q.   Sorry.  What is V.I.C.E.?

25  A.   So a V.I.C.E. Video is -- it is like a documentary.  It

1    is kind of like an informational video, and this one in

2    particular was related to Fentanyl and the dangers

3    associated with it.

4    Q.    Go ahead.

5    A.    And then we have Western Union, a way to transfer money

6    overseas.  Below that, the second line from the bottom is

7    Abraxas.  Abraxas was a dark net marketplace, one of the

8    original that they used.  Then, of course, the last line is

9    the AlphaBay dark net website.

10   Q.    My memory is that we go on to the next page, but I

11   think we can leave it here.

12   A.    Sure.

13   Q.    There has been testimony that organizing and running

14   the defendant's organization would not require the defendant

15   to be especially smart.  Do you recall more than one witness

16   explaining that a particular task or aspect of the

17   defendant's work could be learned simply by Googling it?

18   A.    I do, yes.

19   Q.    Did you find evidence that the defendant used Google

20   searches to guide his efforts to build his criminal

21   enterprise?

22   A.    Yes.  We found thousands of Google searches related to

23   this criminal enterprise.

24   Q.    Did you help create a chart showing just some of those

25   relevant search terms that he used?

```
 1   A.   We did, yes.

 2            MR. GADD:  Could we look at 14.44?

 3   BY MR. GADD

 4   Q.   It is hard to narrow down the number of search terms to

 5   put in one exhibit, correct?

 6   A.   Correct.

 7   Q.   Let's just go through the first six pages.  Here is

 8   kind of how I'm hoping it will work.  If Ms. Lauder will

 9   just take us kind of a row a second and move fairly quickly

10   through it, and as you see a search term that stands out,

11   will you just call it out and explain what it is?

12   A.   Sure.

13   Q.   Okay.

14   A.   On the first page you can see HideMyAssProxy, which is

15   a way to conceal your identity.  You can see numerous

16   searches related to Fentanyl, roxy pill, you can see

17   clonazepam, lorazepam, roxy, Fentanyl, and you can see a

18   Google search for Fentanyl marquee test.  You can see Google

19   searches for Bitcoin, Bitcoin assistance.  You can see

20   credit card searches.  You can see on this second page M-30

21   round pill.

22        Again, we had to cull out numerous instances of the

23   word Fentanyl.  This is not exhaustive.  This list is just a

24   sampling of the Google searches that we discovered on his

25   devices.
```

1    Mylar envelopes.  Remember, Mylar envelopes were the

2    envelopes that were used to -- that they felt couldn't be

3    x-rayed and to package the drugs in.  You can see references

4    to pounds to kilograms, to weighing different types of

5    drugs.  MultiBit Classic on the bottom left on this page,

6    and you can see a Google search for that.  MultiBit Classic

7    would be a type of Bitcoin wallet.

8        Again, there are numerous instances related to

9    clonazepam, and these are types of benzodiazepines that are

10   related to Alprazolam, which is one of the products being

11   pressed.

12   Q.   There was one there, D.H.L. tracking?

13   A.   D.H.L. tracking related to tracking different shipments

14   as they come into the country.

15   Q.   Would it be the heavier shipments that had to go

16   D.H.L.?

17   A.   Yes.  Most of the heavier shipments were related to

18   D.H.L. -- sorry, were shipped via D.H.L.

19       You can see dark market new, a search for that, and

20   just numerous searches related to dark net markets.

21   Q.   Let me ask you about the top one here on page 3, the

22   right side.  The Fentanyl marquee test.

23   A.   The Fentanyl marquee test, again, that is a test to

24   determine if it is truly Fentanyl.  Again, as the

25   organization had received bad Xanax or a bad batch before,

1   they wanted to ensure that they were receiving real Fentanyl

2   and the true product.

3   Q.   I mean, that could ruin months and months of his work,

4   right?

5   A.   Correct.  Yes.

6   Q.   He spent a lot of time and effort building up his trust

7   level and his feedback, and a bad batch of Fentanyl may have

8   ruined all of that?

9   A.   Yeah.  As Agent Gino testified, feedback is all

10  important on the dark net market.  It is people purchasing

11  illicit products and people selling illicit products, and

12  not a lot of trust in that community.  So the one way to

13  kind of make that work is through feedback of other

14  individuals who have had success purchasing those illegal

15  products.

16      As we continue to go down the list, again, additional

17  searches for Fentanyl, additional searches for online

18  wallets, import private key related to Bitcoin wallets,

19  Bitstamp.  As we learned, Bitstamp was an online currency

20  exchange for Bitcoin.  Adoral and roxy --

21  Q.   It just goes on and on?

22  A.   -- and copovidone, another ingredient in pills.

23  Q.   Maybe we don't need to go all the way to page 6.  You

24  have wore me out.

25  A.   Me too.

1    Q.    This is an exhibit and it is in evidence and the jury

2    will have all of it, correct?

3    A.    Correct, they will.

4    Q.    You searched his devices pretty thoroughly, correct?

5    A.    Yes.

6    Q.    What sense did you get regarding Mr. Shamo's efforts?

7    A.    This was an individual who was devoted and tireless in

8    learning and perfecting his skill in dark net markets and in

9    distributing illicit substances.  Over and over and over

10   there were manuals, there was research done regarding how to

11   not get caught by law enforcement, how to create pills and

12   drugs, how to ship them through the mail and perfecting the

13   art of the dark net markets.  It was thousands and thousands

14   of searches related to that.

15   Q.    Let's take up a related topic.  Let's talk about his

16   distribution.

17            MR. GADD:  Could we look at Exhibit 17.05?

18   BY MR. GADD

19   Q.    What is this?

20   A.    This is a map that we created.  Each of those yellow

21   dots is a zip code that PharmaMaster shipped illicit drugs

22   to.  If you take those dots that are on the map and you

23   click on them, and we'll see this, but you can explode it

24   out to all of the different orders that were shipped to that

25   specific zip code.

1    Q.   Let's show an example.  Go to page 2.

2    A.   Can I just say --

3    Q.   Yes.  Go ahead.

4    A.   Of interest is that every state in the union has a

5    yellow dot on it and multiple yellow dots on it.  These

6    drugs were shipped to every state in the United States.

7    Q.   Including the two we don't see here, right, Hawaii and

8    Alaska?

9    A.   Correct.  Yes.

10   Q.   Let's look at page 2.

11        What is this we're looking at?

12   A.   So this is one of those zip codes.  I believe this was

13   in --

14   Q.   It is Daly City?

15   A.   Daly City.  Yes, this is Daly City, California, and

16   this is one of those yellow dots that we have clicked on

17   showing each of the orders that was placed to Daly City,

18   California.

19   Q.   One of those orders would have been Rusian's order?

20   A.   Yes, it would have.

21   Q.   Can we look at page 3?  What is this?

22   A.   So this is a close-up of the eastern United States just

23   showing each of the packages shipped -- each of the zip

24   codes.  Sorry.  Each one of these yellow dots is just a zip

25   code that a drug package was shipped to.

1    Q.    And then if we could go to the next page, do you

2    recognize that?

3    A.    I do, yes.  This is Sparks, Nevada.  We just chose one

4    to show everybody.  This is just the shipments to just

5    Sparks, Nevada, those red dots.

6    Q.    And then if we can go to the last page, what are we

7    looking at here?

8    A.    This is just a close-up of the western United States.

9    You can see the dots follow population lines related to

10   areas such as San Francisco, San Diego, Salt Lake, along

11   interstates and things of that nature.  Phoenix.

12            MR. GADD:  If I could have just one moment?

13            I have no further questions.  Thank you.

14            THE COURT:  Do you want to take a break or do you

15   want to start?

16            MR. SKORDAS:  It is up to you, Your Honor.

17            THE COURT:  Let's begin.  Go ahead.

18            MR. SKORDAS:  Thank you.

19                      CROSS-EXAMINATION

20   BY MR. SKORDAS

21   Q.    Agent Ashment, you indicated at one point in your

22   direct examination that you had interviewed a lot of people.

23   Do you recall that?

24   A.    Yes, I do.

25   Q.    And you were probably the lead agent on a lot of these

1    interviews.  Is that fair?

2    A.    Yes.  We interviewed numerous individuals.

3    Q.    And some interviews that occurred back in November of

4    2016 with the two women that are to the left of

5    Mr. Crandall, correct?

6    A.    Yes.

7    Q.    Ms. Tonge and Ms. Bustin?

8    A.    Yes.

9    Q.    Do you recall that interview?

10   A.    I do.

11   Q.    Do you recall going to their home on November 22nd of

12   that year to interview them?

13   A.    I do recall that, yes.

14   Q.    You attended that interview with a couple of other

15   agents including Inspector Henderson from the United States

16   Postal Service, correct?

17   A.    That is correct, yes.  I interviewed Ms. Tonge and she

18   interviewed Ms. Bustin.

19   Q.    And during parts of those interviews you spoke with Ms.

20   Bustin as well.

21        Is that fair?

22   A.    Yes, I have spoken with Ms. Bustin also.

23   Q.    When you spoke with Ms. Tonge she gave you what is

24   called a consent to search, correct?

25   A.    That is correct, yes.

```
 1    Q.    And allowed you to look into her computer.  Do you
 2    recall that?
 3    A.    Yes.
 4    Q.    And when you looked at that computer you went into her
 5    dark web e-mail address that she utilized to communicate
 6    with Aaron Shamo, correct?
 7    A.    That is not correct.  No.
 8    Q.    What did you do?
 9    A.    Are you asking regarding the dark net e-mail?
10    Q.    Yes.
11    A.    So on the dark net e-mail she gave us a login and
12    password, and then I was able to use that login and password
13    to log in to the dark net, to that e-mail address, yes.
14    Q.    And what you found is that she had this e-mail address
15    called passthepeas@sigaint.org.
16          Do you recall that?
17    A.    I do recall that, yes.
18    Q.    She used that address to communicate with Shamo, Drew
19    Crandall and Mario Noble, correct?
20    A.    Yes, that is correct.
21    Q.    That is what you found, correct?  I can show you a
22    report if that would help.
23    A.    That would be great.  Yeah.
24               MR. SKORDAS:  May I, Your Honor?
25               THE COURT:  Yes.
```

1    BY MR. SKORDAS

2    Q.   I don't intend to offer these as exhibits, but if it

3    will help you refresh your recollection, the first report

4    there is a 50-page report.

5         Do you see that?

6    A.   I do, yes.

7    Q.   I'm on page 2 of 50, paragraph 3.

8    A.   Okay.

9    Q.   Do you see that?

10   A.   I do, yes.

11   Q.   And what you wrote there was that during the interview

12   Tonge agreed verbally and in writing -- in written form,

13   rather, sign an I.C.E. form called a consent to search.

14   That is what we have been talking about a little bit,

15   correct?

16   A.   Correct.

17   Q.   And that she used that to communicate with Aaron Shamo,

18   Drew Crandall and Mario Noble?

19   A.   Sorry.  Which paragraph are you looking at on that?

20   Q.   The same one, just kind of following along your

21   writing, the next sentence.

22   A.   Yes.  Correct.

23   Q.   What she told you was that Shamo retrieved drug orders

24   from the dark web, correct?

25   A.   Correct.

```
1   Q.    And decrypted the orders and sent them to her e-mail
2   address, this pass the peas, correct?
3   A.    That is correct.
4   Q.    And then she and Bustin would use that to figure out
5   what they were supposed to do, correct?
6   A.    Yes.
7   Q.    And then they would package and ship the orders that
8   Shamo had given them, correct?
9   A.    Yes.
10  Q.    She indicated to you that she had worked at eBay with a
11  number of the individuals who were on this exhibit to your
12  left, correct?
13  A.    That is correct, yes.
14  Q.    Including Mario Noble?
15  A.    Yes.
16  Q.    And she indicated that in terms of this organization,
17  Noble answered e-mails relating to the purchase of drugs
18  from AlphaBay for Shamo, correct?
19  A.    Sorry.  What was that question?
20  Q.    I'm looking at what would be the fourth paragraph there
21  and the last sentence.  Maybe you could just read that for
22  us starting with Bustin stated --
23  A.    Bustin stated that she knew an eBay employee, Noble,
24  who answered e-mails related to drug purchases on AlphaBay
25  for Shamo.
```

1   Q.   And then in the next paragraph she said that she

2   believed that the e-mail account was accessed using a T.O.R.

3   browser.

4        Do you see that?

5   A.   Yes.  I recall that, yes.

6   Q.   How did she indicate that she was made familiar with

7   how to access that?

8        Actually, why don't you just read the next sentence for

9   us.

10  A.   That is the second sentence?

11  Q.   The last sentence of that paragraph.

12  A.   Okay.

13  Q.   Bustin stated --

14  A.   Bustin stated that Crandall showed Tonge how to access

15  that e-mail account, decrypt the order fulfillment list and

16  then print the information.

17  Q.   And then the next sentence, if you don't mind.

18  A.   Sure.  Bustin stated Shamo texted her and Tonge to

19  notify them that an e-mail had been sent, and Tonge would

20  then print that e-mail using the method shown by Crandall.

21  Q.   At this point in time Aaron Shamo was in custody,

22  correct?

23  A.   Yes.

24  Q.   And Drew Crandall was sort of nowhere to be found.  Is

25  that fair?

1    A.    Correct.  Yeah.  I mean we had an idea, but yes.

2    Q.    Were you also present during any of the interview with

3    Ms. Noble?  Excuse me, Mr. Noble.

4    A.    Yes.  Yes, I was.

5    Q.    He indicated that he also utilized this T.O.R. browser

6    to log in to the dark web to conduct business, correct?

7    A.    That is correct, yes.

8    Q.    And he utilized his personal computer to conduct

9    business for this organization, correct?

10   A.    Correct.

11   Q.    You had a follow-up interview with Mr. Noble on

12   December 7th of 2016.

13         Do you recall that?

14   A.    I believe on -- I might need to refresh my memory, but

15   that would be with a different agent.

16   Q.    If you would look -- I'm on page 3 here.  If you would

17   look at what is the fifth full paragraph there starting with

18   Noble stated that he processed --

19   A.    Sure.

20   Q.    He told you that he processed 20 to 50 orders daily,

21   correct?

22   A.    Correct.

23   Q.    And that he would compile daily order sheets and

24   encrypt them and send it to a secure e-mail which is

25   basically Tonge and Bustin's e-mail address, correct?

1    A.   Correct.

2    Q.   Noble told you that his operation in terms of this was

3    to place these orders and he would receive an encrypted

4    order and decrypt it and using his private key, copy it and

5    paste it onto a notepad, correct?

6    A.   He did not say he placed the order, though, just for

7    clarification.

8    Q.   What did he say?

9    A.   The other that you said, so he would send it to the

10   shipping team via his secure e-mail and --

11   Q.   What did he do?  Just tell the jury what Noble did.

12   A.   He would process -- he was customer service.  He was

13   granted surrogate access or shared access to AlphaBay.  Mr.

14   Shamo allowed him to have basically the customer service end

15   of access to the PharmaMaster storefront.

16   Q.   Do you recall going into Mr. Noble's Sigaint account

17   there on the next page, page 450?

18   A.   Yes.

19   Q.   In fact, you copied quite a large number of his

20   unencrypted e-mails, correct?

21   A.   Correct.  Yes.

22   Q.   Those go on for probably 10 or 20 pages, correct?

23   A.   That is correct, yes.

24   Q.   You got all of those off of Mario Noble's computer,

25   right?

1    A.   Yes.  Off of the his drw99sigaint.org e-mail address.

2    Q.   And if you would go to the last one, which is on page

3    19 of 50, do you see that one?

4    A.   Hold on a second.

5    Q.   Page 19 of 50.

6    A.   Okay.  I'm there.

7    Q.   There was one sent on it looks like March 15th and I

8    think we're in 2016.

9         Do you see that?

10   A.   Yes.

11   Q.   Who did you decide was drw99?

12   A.   Drw99 is the e-mail address that Mario Noble was using,

13   the Sigaint e-mail address that Mario Noble was using.

14   Q.   That was an e-mail directly from Mario Noble to Tonge

15   and Bustin, correct?

16   A.   I don't recall specifically asking him about

17   this e-mail particularly, but he did use that e-mail

18   address, yes.

19   Q.   But this particular printout looks to be one such

20   e-mail, correct, from him to them, correct?

21   A.   It is from drw99@sigaint to passthepeas@sigaint, yes.

22   Q.   Do you recall an interview with Drew Crandall on

23   December 13th of 2017?

24   A.   I recall interviewing him.  The exact date -- I will

25   take your word for it.

1    Q.   Well, if it will help, it is on that same page toward

2    the middle.  I'm just using your report, sir.

3    A.   The interview is on this page right here?  Okay.

4    Q.   Do you see that?

5    A.   Yes.

6    Q.   In December of 2017 Crandall admitted that he

7    communicated with Shamo, Bustin and Tonge via this Sigaint

8    process to process orders through the dark web and AlphaBay,

9    correct?

10   A.   Yes.  That is correct.

11   Q.   Earlier that month you had gone through the dark web

12   e-mail account for Tonge and Bustin.

13        Do you recall that?

14   A.   Yes.  Several agents went through that e-mail account,

15   yes.  Including me, yes.

16   Q.   And you printed it looks like page after page after

17   page of those as well.

18        Do you see that?

19   A.   I do, yes.

20   Q.   In fact, it goes from page -- I think we were on 19 --

21   all the way to page -- to almost the end of your report.

22        Do you see that?

23   A.   Yes, I do.

24   Q.   Page 48?

25   A.   Yes.

1    Q.   I want you to turn to page 49 of that.

2    A.   Okay.

3    Q.   Do you see that last e-mail there toward the bottom?

4    It is pretty long.

5    A.   I do, yes.

6    Q.   What is that?

7    A.   This is an e-mail from passthepeas@sigaint.org to

8    passthepeas@sigaint.onion.

9    Q.   Actually this is some instructions that they got from

10   Drew Crandall, isn't it?  Take a minute and read it.

11   A.   Yes, that is correct.

12   Q.   Would you read to the jury the instructions that Drew

13   Crandall gave them on July 8th, 2015?

14   A.   Sure.  Here is the A.S.C. file attached to this.  Open

15   the G.P.G. key chain program from your applications folder.

16   Then at the top go to file import and choose this file you

17   have downloaded.  Now when you have a text file to send to

18   us, right click on the bottom of that menu and choose

19   services, G.P.G. encrypt file.  Then in the box that comes

20   up you should choose jean001 key in the top box to encrypt

21   the file with.  The bottom box is for signing your message,

22   which means Aaron can detect any evidence of tampering with

23   the encryption.  For now don't worry about that.  Delete

24   this after reading and importing this A.S.C. file.

25   Q.   When you interviewed Crandall in June of 2017 he, in

1    fact, admitted sending that, correct?

2    A.   Yes, to my recollection.

3    Q.   I want to go back for a minute and talk to you a little

4    bit more, and then I will move on from Tonge and Bustin,

5    about your interview with them.  I'm looking at the second

6    report there that you have got.  It is a much shorter one,

7    eight pages.

8    A.   Okay.

9    Q.   If I were to go to the first page of that or maybe the

10   second page, it looks like this is more of the interview

11   with Tonge and Bustin from November 22nd, 2016.

12   A.   Okay.

13   Q.   Do you see that?

14   A.   I do.  Is that the highlighted section?

15   Q.   Yes.

16   A.   Okay.

17   Q.   Did I highlight that?

18   A.   It looks like it.

19   Q.   I didn't mean to.  I'm sorry.

20   A.   That is all right.

21   Q.   Does that say page 3 of 8?

22   A.   Yes, it does.

23   Q.   Okay.  If you look at the top of page 3 of 8 there is

24   some indications as to your conversation with Ms. Tonge.

25        Do you see that?

1   A.   Yes, I do.

2   Q.   It starts out in the first paragraph, maybe the second

3   line down, and says approximately two years ago Shamo stated

4   that Bustin and Tonge could become a drop, where Shamo would

5   have packages sent via commercial courier services to their

6   house located in South Jordan.   Shamo and Crandall would pay

7   them approximately two to $300 for receiving each package.

8        Correct?

9   A.   That is what it states, yes.

10  Q.   That is what they told you?

11  A.   Correct.

12  Q.   And she further told you that she looked at some of

13  these packages and she felt that they were probably illegal,

14  and she noticed that they were coming from different

15  jurisdictions, from Florida, overseas, China and that type

16  of thing, correct?

17  A.   Yes.

18  Q.   And she indicated that -- at least Ms. Tonge indicated

19  that her mother was ill so she went to Shamo and Crandall to

20  try to see how she could make more money helping them,

21  correct?

22  A.   Yes, she did state that.

23  Q.   Then she stated that Shamo and Crandall allowed her to

24  become more involved, correct?

25  A.   Correct.

1    Q.   So that she could make more money?

2    A.   Yes.

3    Q.   In fact, they were sort of upgraded to more than just

4    shipping.  They were packaging, correct?

5    A.   Yes.  They would package the drugs, yes.

6    Q.   Who showed them how to package the drugs?

7    A.   In the beginning it was Mr. Crandall that came over and

8    showed them how to package the drugs.

9    Q.   In fact, according to your report he came over there

10   nightly and instructed them how to package the narcotics in

11   order to ship them out to customers from the dark web,

12   correct?

13   A.   Yes.  As I recall that was for a short period of time.

14   Q.   Nightly, correct?

15   A.   Yes.  In the beginning it was nightly for a few nights.

16   Q.   He also showed them how to wrap the packages, correct?

17   A.   Yes.

18   Q.   And taught them how to use the vacuum sealer and Mylar

19   bags that he told them would make the narcotics

20   undetectable, correct?

21   A.   Yes, he did help teach them how to do that.

22   Q.   She told you that part of the reason that she and Ms.

23   Bustin got involved was because Shamo's and Crandall's

24   respective girlfriends didn't want to get involved in this,

25   correct?

1   A.   I do recall both girlfriends.  Well, I recall Ms. Grant

2   saying that she did not want to get involved in this, yes.

3   Q.   When they first started packaging, according to your

4   notes, they used padded envelopes or priority mail with

5   regular stamps, but then Crandall had them do something a

6   little different, correct?

7   A.   They did use padded envelopes initially, yes.

8   Q.   In fact, Crandall brought them envelopes and stamps

9   that he preferred them to use, correct?

10  A.   Initially.  In the very beginning that is what

11  happened, yes.

12  Q.   And if they were shipping supplies on their own, they

13  were reimbursed by Crandall and Shamo, correct?

14  A.   Yes.  They did receive reimbursement for products that

15  they bought with their own money, yes.

16  Q.   I read this report pretty thoroughly and I don't see

17  anywhere on there where it says initially only.  I mean,

18  this looks like I am just reading your report, sir.

19  A.   This would be according to additional interviews, so

20  this is November 22nd, 2016, if I remember right, when this

21  interview occurred, and this would be according to

22  interviews that happened later and conversations later.  So

23  initially, yes, this is --

24  Q.   This is the information that you had when you

25  interviewed these two females?

1    A.    That is correct.  Yes, initially on November 22nd this

2    was the information that we had and we learned additional

3    information later.

4    Q.    And they told you that they would then sort of drop off

5    these packages in what I call a mailbox, but a blue box,

6    correct?

7    A.    Yes.

8    Q.    And that, in fact, Crandall instructed them to use

9    fictitious company names as the shippers on the packages,

10   correct?

11   A.    Yes.

12   Q.    Do you see that, that you wrote down on there?

13   A.    I recall that, yes.

14   Q.    It does not say initially, does it?

15   A.    On this report it does not say initially, no.

16   Q.    They told you about their involvement with a fellow

17   named Sean Gygi, correct?

18   A.    Yes, they did.

19   Q.    They told you that they sort of wanted to minimize

20   their involvement in this, so they wanted to have a runner

21   or somebody else that would help do part of the literal

22   legwork, correct?

23   A.    Yes.

24   Q.    That is what Mr. Gygi's initial role was?

25   A.    His initial role would be a package receiver for the

1  organization but, yes, he did progress to that.

2  Q.   In fact, they were setting up packages for Gygi as

3  recently as November 20th of that year, two days before you

4  interviewed them, correct?

5  A.   Correct.

6       MR. SKORDAS:  I just have a couple more on this

7  issue, Judge, and then we can take a break, but I have quite

8  a bit more.

9       THE COURT:  Finish this issue and then we'll take

10  a break.

11       MR. SKORDAS:  Okay.

12  BY MR. SKORDAS

13  Q.   Go to the bottom of page 5 of that report.

14       Are you with me?

15  A.   Yes.

16  Q.   The last paragraph.

17  A.   Yes.

18  Q.   Ms. Tonge told you guys that there were messages on her

19  phone on the Telegram app from Crandall, correct?

20  A.   Correct.

21  Q.   It does not say initially, does it?

22  A.   It does not say initially, no.

23  Q.   She stated that Crandall was in Laos with Sasha, and

24  that is his girlfriend, right?

25  A.   Correct.  We knew he was in Laos or we suspected it.

1   Q.   And that from there he was in fact sending them

2   messages on the dark web related to this, correct?

3   A.   Yes.  She says specifically like customer service on

4   the dark web related to narcotics orders.

5   Q.   She had the impression, didn't she, that in fact

6   Crandall was coming back to the United States in May of

7   2017.

8        Do you see that?

9   A.   A few paragraphs down?

10  Q.   The top of page 6.

11  A.   It is hard for me to recall directly just --

12  Q.   That is why I gave you the report.

13  A.   As the investigation proceeded we learned additional

14  information is why, so I'm just thinking back to this time

15  when we initially started this, yeah.

16  Q.   Well, I'm trying to help you here with your own report.

17  A.   Thank you.  Which paragraph?

18  Q.   Top of page 6.

19  A.   Okay.

20  Q.   She told you that Crandall had indicated or at least

21  she had the impression that he was coming back to the United

22  States in May of 2017?

23  A.   That is correct, yes.

24  Q.   They told you that in fact a fellow named Mario Noble

25  got involved with this organization as well, correct?

1    A.   Yes, they did.

2    Q.   And they told you Mario Noble's role, which was

3    basically to sort of deal with customer complaints and take

4    care of that type of thing?

5    A.   Yes.  It seems, as I recall, that they had a limited

6    knowledge of his role, but I do believe they did say

7    customer service type issues, yes.

8    Q.   They also told you a little about about Luke Paz.

9         Do you recall that?

10   A.   I do recall his name being mentioned in this report,

11   yes.

12   Q.   And they told you that Luke Paz helped by pressing

13   pills at his home -- at Shamo's home on 7939 Titian Street

14   in Cottonwood Heights, correct?

15   A.   That is correct.

16   Q.   Paz had worked for Vivint and traveled -- at least he

17   told them that he was working for Vivint and traveled often,

18   but they thought it was strange that he was home so much and

19   in Shamo's house, correct?

20   A.   Correct.

21   Q.   They told you that Shamo, Crandall, Noble, Gygi, Sasha,

22   herself and Bustin -- and this is Ms. Tonge -- all met while

23   they were working at eBay?

24   A.   Yes.

25             MR. SKORDAS:  This is probably a good time for a

 1    break.
 2              THE COURT:  We'll take a break and be in recess
 3    until 10:30.
 4              (WHEREUPON, the jury leaves the proceedings.)
 5              THE COURT:  10:30.
 6              (Recess)
 7              THE COURT:  Let's get the jury and proceed.
 8              (WHEREUPON, the jury enters the proceedings.)
 9              THE COURT:  You may proceed, Mr. Skordas.
10              MR. SKORDAS:  Thank you, Your Honor.
11    BY MR. SKORDAS
12    Q.   Dan, I was just told that we're putting everybody to
13    sleep this morning, so I'm going to pick it up here a little
14    bit.
15    A.   Thank goodness.  No.
16    Q.   Yes.  I will try to do better.
17         I put some reports in front of you and they are much
18    shorter than the 50-pager that we just did.  I think they
19    are all about three or four pages.  What I tried to do is
20    put them in sequential order in terms of your interviews
21    with six other individuals, if I could just go through those
22    quickly with you.
23    A.   Okay.
24    Q.   The top one is a report of an interview that you had
25    with a woman named Sadie Gurley.

1        Do you see that?

2    A.   I do, yes.

3    Q.   Who is Sadie Gurley?

4    A.   Sadie Gurley is Luke Paz's wife now.

5    Q.   At the time you interviewed her in December of 2016,

6    she was his girlfriend, correct?

7    A.   Yes.  At the time she was his girlfriend.

8    Q.   She had indicated that they were looking for work or

9    Paz was trying to get some employment in Texas, it looks

10   like from your interview down here?

11   A.   Yes.  I believe he was selling for his company, and I

12   believe it was Vivint or that company in Texas.

13   Q.   Where did this interview with Sadie Gurley take place?

14   A.   This was at Emily Mitchell's residence where Sadie

15   Gurley was staying.

16   Q.   Who interviewed her?

17   A.   I did.

18   Q.   With who else?

19   A.   With a task force officer, Vincent, a Homeland Security

20   investigations task force officer.

21   Q.   If I were to tell you, and I think I already have, that

22   it was December 13th of 2016, does that seem right?

23   A.   That does, yes.

24   Q.   She described Paz as Shamo's best friend, correct?

25   A.   She did, yes.  Well --

1    Q.   Go ahead.

2    A.   Yes.  I would believe that, yeah, as a good friend or

3    best friend.  Yeah.

4    Q.   I can show you, if it helps.

5    A.   That is great.

6    Q.   It is the bottom of page 2 there, the last line, last

7    sentence, last paragraph.

8    A.   She felt Paz was Shamo's best friend.  Perfect.

9    Q.   She was not, at least when you interviewed her,

10   claiming much knowledge as to what was going on here between

11   Paz and Shamo and everybody else, correct?

12   A.   No.  She didn't claim much knowledge.

13   Q.   And as you sit here today that is probably true, that

14   she was kept out of this in some part.  Is that fair?

15   A.   I think that is fair to say.

16   Q.   She was not indicted or anything that you know of?

17   A.   No.

18   Q.   Never spent a day in jail or anything like that?

19   A.   No.

20   Q.   She told you that she was dating Paz during the time

21   leading up to your interview with her?

22   A.   She did, yes.

23   Q.   And she said that Paz was usually at Shamo's residence

24   a few times a week, correct?

25   A.   Yes.

```
 1   Q.   She allowed you to take a look at her cell phone during

 2   that interview.

 3        Do you recall that?

 4   A.   I do recall that, yes.

 5   Q.   Why were you interested in looking at her cell phone?

 6   A.   Communications mostly.  We would be looking for

 7   communications to see what knowledge she would have of what

 8   was going on.

 9   Q.   In fact, you found one communication that probably

10   didn't make you too happy, correct?

11   A.   Yes, we did.

12   Q.   She had told Mr. Paz that you guys were on your way

13   over to interview her or something to that effect, correct?

14   A.   Yes.  I recall that she sent a text message to Mr. Paz

15   saying law enforcement was there to interview --

16   Q.   You talked to her about Luke Paz's finances and how he

17   spent money.

18        Do you recall that?

19   A.   I do recall that, yes.

20   Q.   She told you that he was a big gambler, at least a

21   regular gambler, correct?

22   A.   Yes, she did.

23   Q.   And that he had lost more than $1,000 at a time

24   gambling.

25        Do you recall that?
```

1    A.   Yes.  When we pressed her on amounts of money, she did

2    say she had seen him lose upwards of $1,000 gambling.

3    Q.   She also described that he gave her money periodically

4    to help her out with her bills?

5    A.   She did say that also, yes.

6    Q.   You were interested in finding out Mr. Paz's finances,

7    if he was getting money from this organization, correct?

8    A.   Yes, we were.  We were very --

9    Q.   I'm sorry.

10   A.   We were very interested in that, yes.

11   Q.   In fact, you confirmed that, correct, through her?

12   A.   Confirmed?  Excuse me?

13   Q.   You confirmed that, that Paz collected a fair amount of

14   money?

15   A.   I don't believe during this interview she stated that

16   he had collected a fair amount of money.

17   Q.   She stated that he had blown a fair amount of money

18   gambling and whatnot, correct?

19   A.   Yes, that he had spent more than $1,000 gambling.  It

20   also goes on to say that she had seen Shamo spend

21   approximately $5,000 in Las Vegas also.

22   Q.   Right.  These guys were spending a fair amount of

23   money, correct?

24   A.   Correct.

25   Q.   I want to draw your attention to another interview you

```
 1    had with a person named Preston Mitchell on January 19th of

 2    2017.

 3         Do you see that?

 4    A.   I do.

 5    Q.   Do you recall that?

 6    A.   I do recall that, yes.

 7    Q.   Who is Preston Mitchell?

 8    A.   Lyle Preston Mitchell is Emily Mitchell's father.

 9    Q.   Who is Emily Mitchell?

10    A.   Emily Mitchell was -- so Lyle actually I believe owned

11    the home that they were staying in, and Emily is his

12    daughter and she lived there at the time also.

13    Q.   It was a home that you actually served a warrant at,

14    correct?

15    A.   It was, yes.

16    Q.   When you served that warrant, was that on or about the

17    same day that you interviewed him in January of 2017?

18    A.   No.  As I recall, Mr. Mitchell found out who I was

19    through other law enforcement officers and called me on the

20    phone at a later time, if I remember right.

21         No.  On January 19th -- sorry.  You are correct.  It

22    was a phone call.  It was not in person during the warrant.

23    Q.   I apologize.

24         He told you that during that summer, and that would

25    have been 2016, that he had seen five or six packages
```

1   delivered to Paz at that address, his Woodland address,

2   correct?

3   A.   That is correct, yes.  Well, yes, that is correct.

4   Q.   I am not trying to trick you.

5   A.   I know.

6   Q.   It is your report.

7   A.   I just want to be thorough and detailed.

8   Q.   I appreciate that.  I think everyone does.  Thank you.

9        He described a specific particular incident during the

10  summer of 2016, correct, involving a large package?

11  A.   Yes, he did.

12  Q.   He told you that the delivery driver showed up with a

13  large crate that was addressed to Luke Paz?

14  A.   Correct.

15  Q.   Do you recall that?

16  A.   Yes, I do.

17  Q.   And that it was big and that it was heavy?

18  A.   Correct.

19  Q.   He asked Luke Paz what it was?

20  A.   He did.

21  Q.   And Paz lied to him?

22  A.   Yes.

23  Q.   He told him it was a transmission?

24  A.   That is correct.

25  Q.   That the two of them loaded onto somebody's car or

1   truck or something like that?

2   A.   He did.  I also recall Mr. Paz telling me later that

3   this was inaccurate what Mr. Mitchell had said, but --

4   Q.   Well, he certainly didn't tell him it was a pill press,

5   right?

6   A.   No, he did not.

7   Q.   He told you sort of similar to what Ms. Tonge said,

8   which was that Luke Paz claimed to have employment through

9   some solar company but he was sure home a lot, correct?

10  A.   Correct.

11  Q.   He thought that that was a little bit unusual?

12  A.   That is correct.

13  Q.   Later on in 2017 you finally had the opportunity to

14  interview Drew Crandall.

15       Do you recall that?

16  A.   I do, yes.

17  Q.   That would have been on May 5th of 2017?

18  A.   That is correct.

19  Q.   Where was that interview?

20  A.   That interview would have been in Hawaii.

21  Q.   Where?

22  A.   What island?

23  Q.   Yes.  Where were you?

24  A.   We were at the international airport in Hawaii.

25  Q.   And you were allowed to utilize a room or something

1    like that to do these interviews, correct?

2    A.    That is correct.  Yes, they have an interview room at

3    the airport.

4    Q.    And you interviewed both Crandall and his

5    girlfriend/fiancee, Ms. Grant?

6    A.    Yes, we did.  We interviewed both of them.

7    Q.    You learned that they were there to get married, right?

8    A.    Yes.

9    Q.    As far as you know that never occurred, did it?

10   A.    Not as far as I know.

11   Q.    Because Drew Crandall was hooked up sometime that day?

12   A.    He was arrested that day, yes.

13   Q.    And not allowed to attend his own wedding, so to speak?

14   A.    That is correct.

15   Q.    Mr. Crandall told you that he and Sasha had been living

16   overseas for about 18 months prior to that time, correct?

17   A.    Correct.  Yes.

18   Q.    That they had gone to New Zealand?

19   A.    Yes.

20   Q.    Later moved to Australia?

21   A.    Correct.  Through several Asian countries, yes.

22   Q.    And traveled through several Asian countries including

23   Thailand, Laos, Cambodia, Malaysia, Singapore and Indonesia?

24   A.    Yes, that is correct.

25   Q.    He told you some things, Mr. Crandall did, that you

1    later learned were not true.

2         Isn't that fair?

3    A.   That is fair to say, yes.

4    Q.   Not the least of which was that he claimed during this

5    interview in Hawaii that he was gainfully employed and tried

6    to make it -- I won't say what he was trying to do.  He

7    indicated to you that he had a better source of income than

8    you later learned he actually did, correct?

9    A.   He was employed overseas --

10   Q.   Right.

11   A.   -- at different jobs, yes.

12   Q.   But not at the rate of pay that he was claiming?

13   A.   I don't recall how much he claimed he made overseas,

14   but I do recall that he said that he had a job or different

15   jobs overseas, several different jobs overseas.

16   Q.   He talked to you about spending money, including the

17   costs of this very wedding that he was going to Hawaii for,

18   correct?

19   A.   Yes.  As I recall, he said his parents had given them

20   money and her parents had also given them money.

21   Q.   And he told you that that amounted to a portion of the

22   wedding costs and that he paid the balance, correct?

23   A.   Correct.  I believe they give him approximately 10,000,

24   if I remember correctly.

25   Q.   You chitchatted with him about his personal life and I

1    suppose sort of get to know you kinds of things.

2        Do you recall that?

3    A.   I do recall that, yes.

4    Q.   He told you that he was close to getting a degree in

5    mechanical engineering at the University of Utah?

6    A.   I believe he said that he was three years away, but he

7    had different obstacles in his path.  Yes.

8    Q.   At one point during your interview with him -- I take

9    it from your report that you must have become frustrated

10   that he was not being truthful with you?

11   A.   You know, as I testified earlier, it is very common for

12   defendants to not be truthful with law enforcement, when

13   they are confronted with crimes, with rationalization,

14   justifications, initially that is how it works.  Then we

15   eventually get to the truth most of the time.  We try our

16   best.

17   Q.   But you're certainly not justifying the initial lies,

18   are you?

19   A.   Oh, no.  No.  What I'm saying is that this is just --

20   this is common, every day.  One of the sayings amongst law

21   enforcement is how do you know someone is lying?  It is

22   because they are opening their mouth.  It happens regularly

23   is what I'm saying.

24   Q.   And it happened with Mr. Crandall?

25   A.   It did.

1    Q.    Repeatedly?

2    A.    There were lies told, yes.

3    Q.    Specifically you were asking about finances and his

4    money and where he kept money.

5          Do you recall that?

6    A.    I do recall that, yes.

7    Q.    He told you that he had depleted all of his savings

8    that he and Sasha had, and that he had a couple of bank

9    accounts in both Australia and New Zealand.

10         Do you recall that?

11   A.    I do recall him saying that.

12   Q.    You asked him about Bitcoins.

13         Do you recall that?

14   A.    I do.

15   Q.    And he told you that he did not have and never had

16   owned digital or cryptocurrency.

17         Do you recall that?

18   A.    Yes.  Then he said that he owned one Bitcoin early on,

19   later on, yes.

20   Q.    Both of those were lies, correct?

21   A.    That is correct.  I mean, he did own one, but he owned

22   more than one.  Yes.

23   Q.    Good point.

24         He told you that he had one Bitcoin and that he had

25   spent $5 on it after you pressed him, correct?

```
 1    A.    That is correct.  He said early on he had invested in

 2    one Bitcoin and spent very little money, maybe -- I will

 3    trust you if you say $5.

 4    Q.    That was after he told you at first that he had no

 5    Bitcoins?

 6    A.    That is correct.

 7    Q.    And then you pushed him and he said, okay, I have one

 8    that cost me five bucks?

 9    A.    Correct.

10    Q.    Something like that?

11    A.    Yes.

12    Q.    He told you that he didn't even know how Bitcoins

13    worked, correct?

14    A.    Let me turn to where you are --

15    Q.    Sure.

16    A.    Which paragraph are we on?

17    Q.    Page 4 of 5.

18    A.    Last paragraph?

19    Q.    Second to the last paragraph.

20    A.    Okay.

21    Q.    There is a line that begins he said that he didn't

22    know --

23    A.    He had had a coin or two like when it was worth $2,

24    yes.

25    Q.    And he said he didn't know exactly how Bitcoins worked?
```

1   A.   That is correct.

2   Q.   That was another lie, correct?

3   A.   He didn't have a wallet address anymore and didn't have

4   the ability to get to it.

5   Q.   Well, my question was that he indicated that -- I'm

6   looking at the second paragraph from the bottom on page 4.

7   A.   Okay.

8   Q.   He said that he didn't know exactly how Bitcoins

9   worked.

10      Do you see that?

11   A.   Okay.  Yes, I do.

12   Q.   He told you that?

13   A.   But he knew you needed a unique wallet address that

14   stored your money, yes.

15   Q.   He knew how Bitcoins worked.  He had cashed them out?

16   A.   Correct.

17   Q.   And it wasn't just one $5 Bitcoin, correct?

18   A.   Correct.

19   Q.   You learned that?

20   A.   Yes.

21   Q.   He told you that he had not made money while he was

22   overseas in any other way than what he had described to you,

23   which was by working odd jobs and that type of thing,

24   correct?

25   A.   Correct.

1   Q.   That was another lie, wasn't it?

2   A.   Yes, that was a lie.

3   Q.   He was getting paid through this organization much of

4   the time he was overseas, wasn't he?

5   A.   Yes, he was.

6   Q.   He was getting paid in Bitcoins and other things,

7   correct?

8   A.   If I can clarify, I believe from the middle of 2016 he

9   was getting paid through this organization after he

10  reentered it.

11  Q.   I'm asking you about an interview you had with him in

12  May of 2017.

13  A.   Yes.

14  Q.   At that point he was and had been for several months

15  getting money from this organization, correct?

16  A.   Yes.

17  Q.   Even though he is halfway across the planet?

18  A.   That is correct, yes.

19  Q.   How long did your interview with Drew Crandall go that

20  day?  Do you recall?

21  A.   It does not seem -- it was maybe a couple hours at

22  most, I would say.  It wasn't terribly long.

23  Q.   Is it safe to say that he sort of played dumb on the

24  whole -- that Aaron Shamo has been arrested for the last

25  couple of months?

1    A.   I would say it is safe to say that.  I would say it is

2    safe to say I played a little dumb, too, during that

3    interview.

4    Q.   Right.  But that is your job, correct?

5    A.   Depends on who you ask.

6    Q.   You're not dumb.  You're very bright.

7         His role in this interview isn't to lie to you?

8    A.   No.

9    Q.   Do you recall interviewing Sasha Grant at the same

10   time, during that same period of time?

11   A.   I didn't interview her, but she was interviewed during

12   that same period of time, yes.

13   Q.   You have seen that interview?

14   A.   Yes.  I have seen the report, yes.

15   Q.   If you look at the reports that say Grant at the top, I

16   think --

17   A.   Okay.

18   Q.   This was the same day, correct, May 5th?

19   A.   Correct.  Yes.

20   Q.   If you look at page 2 of that right in the middle it

21   says Special Agent Keys reported the following.

22   A.   Okay.

23   Q.   Do you see that?

24   A.   I do see that.

25   Q.   It makes it appear from at least Special Agent Keys

1    that you, Dan Ashment, interviewed Sasha Grant.

2    A.   Can I read it?

3    Q.   Sure.  On the above date and time --

4    Q.   Wait.  Wait.

5    A.   Sorry.

6           THE COURT:  If you are going to read it for the

7    record, you need to slow down.  If you are going to read it

8    to yourself --

9           THE WITNESS:  Sorry.  Which should I do?  I will

10   read it to myself maybe.

11          MR. SKORDAS:  You are sort of torturing the

12   reporter here.  Read it to yourself.

13          THE COURT:  Read it to yourself as fast as you

14   want.

15          THE WITNESS:  Thank you, Your Honor.  Okay.

16   BY MR. SKORDAS

17   Q.   It appears at least from that portion that you were in

18   some part of some interview with Sasha Grant.

19        Do you recall that?

20   A.   Yes.  So as the case agent on this investigation, I

21   would have popped in and out of Ms. Grant's interview also.

22   Yes.

23   Q.   You knew that she and Drew Crandall had arrived in

24   Hawaii for a wedding?

25   A.   Yes.

1    Q.   And that they had arrived on or about the 5th, which

2    was the date of this interview of May of 2017?

3    A.   I did know that, yes.

4    Q.   And the wedding was like a week away on the 12th?

5    A.   That is correct.

6    Q.   And that the two of them were there and going to spend

7    a week sort of traipsing around Hawaii prior to their

8    wedding, correct?

9    A.   Yes, they were.

10   Q.   They were going to stay on Kauai and in Honolulu.

11        Do you recall that?

12   A.   I knew they were coming to Hawaii to get married and to

13   visit different places, yes.

14   Q.   She showed you her wedding ring, didn't she?

15   A.   I don't recall that specifically.

16   Q.   Okay.  I won't ask you anymore than this, but do you

17   see that whoever interviewed her and wrote this report made

18   some reference to the wedding ring at the bottom of page 2?

19   A.   Page 2.  Okay.  Yes, I do see the reference to that.

20   Q.   You were not personally aware of that wedding ring?

21   A.   I don't know that I recall or paid attention, honestly.

22   Q.   Somebody thought enough about the wedding ring to make

23   it part of their report, though, didn't they?

24   A.   Yes.

25   Q.   You knew that their plans after the wedding were to go

1   back to Australia.

2       Do you recall that?

3   A.   I do recall that, yes.

4   Q.   They were not planning to come here to Utah to live or

5   anything like that?

6   A.   Yes.  I remember that, yes.

7   Q.   In fact, they didn't even have tickets to Utah.  Their

8   flights were Australia to Hawaii and then back?

9   A.   Yes.  My understanding was that they were going to

10   return to Australia.

11   Q.   She also confirmed some of the things that Drew did,

12   which is that they had traveled to these various countries

13   in Asia.

14       Do you recall that?  I'm looking at page 3, the second

15   paragraph.

16   A.   Yes.

17   Q.   She had visited Thailand, Laos, Cambodia, Malaysia,

18   Singapore and Bali?

19   A.   Yes.

20   Q.   She indicated that she was pretty exhausted because

21   they had been to six countries in three months?

22   A.   That is correct.

23   Q.   And she even described some of the things that they did

24   while they were there at these various countries.

25       Do you see that?

```
 1    A.   I do see that.

 2    Q.   Events and festivals and parties and yoga and

 3    restaurants?

 4    A.   Yes.

 5    Q.   All the things that cost money, correct?

 6    A.   Yes, all those things would cost money.

 7    Q.   If you go to page 5, and I don't know if you were part

 8    of this conversation, but she told agents that Drew was,

 9    quote, good with computers.

10         Do you see that?

11    A.   Which paragraph?

12    Q.   Page 5, the second paragraph, first line.

13    A.   Yes, I do see that.

14    Q.   She said that she is not very good with computers but

15    that Drew is.

16    A.   Correct.

17    Q.   In fact, she said he is really good with computers.  Do

18    you see that in the last sentence of that paragraph?

19    A.   Yes.  That is what it says.

20    Q.   She told you a little bit about her personal life and

21    she told you that she, in fact, had worked for the postal

22    service for a while.

23         Do you see that?

24    A.   Yes.  The fourth paragraph down, yes.  I do recall that

25    from the investigation.
```

1    Q.   In fact, she had been to China before to study abroad

2    and teaching English?

3    A.   The report does say that, yes.

4    Q.   In terms of her working and supporting themselves, she

5    also told you that there was at least one three-month period

6    while they were there when they were traveling so much that

7    neither of them was able to work.  That is the fifth

8    paragraph, second sentence.

9    A.   Correct.

10   Q.   If you go to page 5 there -- excuse me.  Page 6.  Do

11   you see that first paragraph that began on the prior page?

12   A.   Okay.

13   Q.   If you would read the sentence that begins Grant said,

14   that second line.

15   A.   Grant said before they left the U.S., Crandall was

16   working at Data2 Logistics.

17   Q.   Go ahead.  The next sentence, please.

18   A.   Data2 Logistics is a data shipment company and Crandall

19   had a case manager, account manager type position.

20   Q.   She was asked about Bitcoins also the same as Drew

21   Crandall.

22        Do you recall that?  I'm now on page 7.

23   A.   Okay.

24   Q.   Seven out of 8.  We're heading for home.

25        Do you see that?

```
 1    A.    Yes, I do.

 2    Q.    The fourth paragraph beginning with she said she has

 3    not done Bitcoins but Crandall has.

 4    A.    Yes.

 5    Q.    And that she claimed that she didn't know anything

 6    about Bitcoins, correct?

 7    A.    Correct.  That is what the report says, yes.

 8    Q.    This is while Drew Crandall is in the next room telling

 9    you all that he does not have anything to do with Bitcoins,

10    correct?

11    A.    That is correct.

12    Q.    She said that Drew Crandall actually tried to explain

13    the Bitcoin process to her, but he would use technical words

14    and she didn't even understand what he was talking about.

15          Do you recall that?

16    A.    Yes, I can see that in the report.

17    Q.    He told her that he had been -- that he had had

18    Bitcoins for some time and in fact invested in them.

19          Right?

20    A.    Yes.  That is what the report says, yes.

21    Q.    And that he was sort of knowledgeable and sort of

22    treated Bitcoins like some of us might the stock market and

23    was sort of watching how they fluctuated almost like an

24    investment.

25          Do you see that?
```

1   A.   I do see that.

2   Q.   She said that Drew would cash in his Bitcoins for cash,

3   but he didn't tell her what he was doing with the cash.

4        Is that correct?

5   A.   Yes.

6   Q.   And in the last two sentences of that paragraph she

7   told you all that Crandall was able to use Bitcoin to help

8   them travel the world, sold a bunch of them, which she

9   thought was cool and travel money.

10        Do you see that?

11   A.   I do see that.

12   Q.   Is that your recollection of how your conversation with

13   the other agents went?

14   A.   Yes.  So, like I said, I was mainly focused on

15   interviewing Drew Crandall at the time, and she was being

16   interviewed simultaneously.  So I would have been in and out

17   depending on how things were going with the interviews at

18   that time.  From my recollection and from reading this

19   report and knowing the agent, yes.

20   Q.   Finally, she described Crandall as a nerdy guy who

21   enjoys playing video games and trading Bitcoin.  That is how

22   she described him, correct?

23   A.   Yes.

24   Q.   I want to draw your attention now to a search warrant

25   that you were part of the execution of in February of 2017

1    at the Titian Way residence.

2         Do you recall that?

3    A.   So I was part of the Open View Lane search warrant and

4    I was interviewing the girls at the time and going on

5    through additional interviews with Mario and package

6    receivers that night.

7    Q.   So you were not part of the search warrant where you

8    interviewed Mr. Lapin, the landlord to Mr. Shamo and Paz?

9    A.   That would have been other agents.

10   Q.   Okay.

11   A.   If I might clarify that, I am not sure if he was at the

12   second search warrant on Titian Way when Agent Keys did the

13   search warrant on the garage.

14   Q.   Right.

15   A.   So I was at that search warrant and was part of that

16   search warrant.  So just to clarify, the first -- the

17   initial search warrant on November 22nd I was at the other

18   residence, and then the second search warrant I did join in

19   that search warrant.

20   Q.   What was found during that search warrant?

21   A.   A crate.  I mean, we found numerous things, but a crate

22   was also found there.

23   Q.   The crate had an address label on it, correct?

24   A.   Correct.

25   Q.   Who was it addressed to?

1   A.   It was addressed to Mr. Paz.

2   Q.   At a different address?

3   A.   Correct.

4   Q.   But it was there in the house that he and Shamo had

5   rented or had some deal with Mr. Lapin on, correct?

6   A.   So as I recall from our interview with Mr. Lapin, Luke

7   had signed the lease, but all the other interviews have

8   indicated that he did not live at that residence.

9   Q.   If you would look at page 3 of 6 of that report, the

10  one that says Lapin on the top, it describes a bunch of

11  photographs that were taken.

12       Do you see that?

13  A.   I do, yes.

14  Q.   Did you observe any of the items that are depicted or

15  described here in these photographs?

16  A.   Yes.

17  Q.   Specifically if you would look at the top of page 4,

18  that is the door to the crate that you have just described,

19  correct?

20  A.   Correct.

21  Q.   And you already described this, that it was sent to

22  Luke Paz at a Woodland Avenue address?

23  A.   Correct.

24  Q.   It has a phone number.  Do you see that, 801-404-3235?

25  A.   I do, yes.

1    Q.   Did you ever find out whose phone number that was?

2    A.   Yes.  I would have to verify, but I believe that is

3    Mr. Paz's.

4    Q.   Down below image 0026, what is that?

5    A.   The description is a photograph of one shipping crate

6    wall which was inscribed with a black marker U.S.A. and

7    beneath that a phone number and under this was written Luke

8    Paz MB-2.  Then it goes on.

9    Q.   And images number 28 through 35, do you see that?

10   A.   I do.

11   Q.   It included a shipment or at least some packing

12   information addressed to a Jessica Gleave in Provo.

13   A.   Correct.

14   Q.   She was another drop, correct, that we have already

15   talked about?

16   A.   She was, yes.

17   Q.   Going further down there -- well, I will try to make

18   this quick.  There are about ten other packages and

19   photographs that you describe or at least that are described

20   here, starting with the third paragraph of page 5, FedEx

21   tracking number 810?

22   A.   Okay.

23   Q.   I will try to go through these quickly.

24   A.   Okay.

25   Q.   It is a shipment from Thailand on October 22nd to Luke

1    Paz, correct?

2    A.    China, I believe, rather than Thailand.  The shipment

3    went to Luke Paz.

4    Q.    Thailand Street.  The street is called Thailand or

5    something like that.

6          A 40-kilogram package?

7    A.    Sorry.  I was looking at the next one down.  Yeah,

8    Thailand Street from China, yes, 40 kilograms.  Yes.

9    Q.    That was October 22nd of 2016, right?

10   A.    Yes.

11   Q.    And another one is dated November 3rd, 2016 in the next

12   paragraph?

13   A.    Yes.

14   Q.    Also a package delivered to Luke Paz, correct?

15   A.    Correct.

16   Q.    From China?

17   A.    Yes.  Correct.

18   Q.    265 kilograms?

19   A.    Yes.

20   Q.    That is a big item?

21   A.    Yes.  I mean, that is heavy.

22   Q.    A heavy item.  July 15th, 2016, the next paragraph --

23   A.    Yes.

24   Q.    Do you see that?

25   A.    I do see that, yes.

1    Q.   A 48-kilogram package delivered to Luke Paz?

2    A.   Yes, I do see that.

3    Q.   The next one down is April 6th, 2016.

4         Do you see that?

5    A.   Yes, I do see that.

6    Q.   A 45-kilogram package delivered to Luke Paz?

7    A.   Yes, I see that.

8    Q.   All of these are at 1500 Woodland Avenue, correct?

9    A.   Yes.

10   Q.   And coming from China?

11   A.   Correct.

12   Q.   The next one down is March 30th, 2016, a 96-kilogram

13   package to Luke Paz?

14   A.   I do see that, yes.

15   Q.   And the next one down is dated June 15th, 2016?

16   A.   Yes.

17   Q.   Another package to Luke Paz.

18        Do you see that?  At least it was to that same address

19   at 1500 Woodland Avenue.

20   A.   Okay.  To the same address, yes.

21   Q.   And then without going through each one, you found at

22   least three more, June of '16, a 265-kilogram package, and,

23   finally, in December of 2015 a large commercial pill press.

24        Do you see those?

25   A.   Can I clarify?

1   Q.   Sure.

2   A.   The large commercial pill press was seized by Customs

3   and border protection in Memphis at that time.

4   Q.   But it was a package --

5   A.   It was not to anyone in this organization.  It was a

6   clarification of types of packages seized at that point.

7   Q.   All right.  But the other ones were all addressed to

8   and ostensibly received by Luke Paz at 1500 Woodland Avenue,

9   correct?

10  A.   They were addressed to Luke Paz at that address.

11  Q.   You finally got to interview Luke Paz, right?

12  A.   Yes.

13  Q.   And when did that interview take place?

14  A.   Do I have a report?

15  Q.   Sure.

16  A.   If I remember right, it was -- so, yeah, July of 2018.

17  Q.   July of 2018, correct?

18  A.   That is correct, yes.

19  Q.   Is that in terms of your knowledge the first time he

20  was interviewed?

21  A.   Yes.

22          MR. SKORDAS:  May I have just a minute, Your

23  Honor?

24          THE COURT:  You may.

25          MR. SKORDAS:  That is all that I have, Your Honor.

```
 1                THE COURT:  Redirect.
 2                      REDIRECT EXAMINATION
 3    BY MR. GADD
 4    Q.    I won't show you any reports.
 5          From November of 2015 to November of 2016 someone's
 6    wallet received 3,000 Bitcoin from AlphaBay.  Whose wallet
 7    was it?
 8    A.    That was Mr. Shamo's wallet.
 9                MR. GADD:  That's all that I have.  Thank you.
10                THE COURT:  Any recross?
11                MR. SKORDAS:  No, Your Honor.
12                THE COURT:  Thank you.
13                You may step down.
14                MR. GADD:  Your Honor, the United States rests.
15                THE COURT:  Thank you.
16                (Proceedings continue.)
17
18
19
20
21
22
23
24
25
```

```
 1
 2              Mr. Skordas.
 3              MR. SKORDAS:  Could we approach briefly --
 4              THE COURT:  Yes.
 5              MR. SKORDAS:  -- just to see how you want to
 6    proceed from here?
 7              THE COURT:  Come over here.
 8              (WHEREUPON, a bench conference was begun.)
 9              MR. SKORDAS:  So we knew that they were going
10    until Tuesday, and I'm not making excuses, and we do have at
11    least one witness ready, but I think all we could put on
12    today is one witness.  It is going to end a little bit
13    earlier.  I thought they would probably be resting tomorrow.
14              THE COURT:  And remember we're here until just
15    before noon tomorrow.
16              MR. SKORDAS:  Then we would probably rest some
17    time early Wednesday.  We are going to put SAR RAOE on
18    STAPBT would go awhile PWRAFPLT PWRAPLT with nets early?
19              THE COURT:  679 no.  So I don't TPOEU how.
20              THE COURT:  What do you want to do today?
21              MR. SKORDAS:  I am sort of asking everybody.  I
22    mean, I have got Becky Shamo prepared to testify.  I need to
23    formally make a motion at this point, but I guess we can
24    reserve that.
25              THE COURT:  You can.
```

```
 1              THE COURT:  And then --

 2              THE COURT:  Or you can make it.

 3              MR. SKORDAS:  Right.  I understand.

 4              MR. GADD:  I brought my response.  I'm ready.

 5              MR. SKORDAS:  I would assume so.

 6              THE COURT:  You're reserving on the motion?

 7              MR. SKORDAS:  Correct.

 8              THE COURT:  So do we want to take a break or are

 9   you ready to proceed?

10              THE COURT:  If we can have ten minutes I will

11   switch folders and be ready to go or we can go now.

12              THE COURT:  How long will she take?

13              MR. SKORDAS:  20, 30 minutes.  I prefer to do it

14   after a break.

15              THE COURT:  Elizabeth, lunch is probably not

16   ready, I don't think.  It is too early for their lunch.

17              When does lunch come up?

18              THE CLERK:  Noon.

19              MR. SKORDAS:  All right.  We may be done by then.

20              THE COURT:  Well, that is all right.

21              MR. SKORDAS:  Can we have a ten-minute break and

22   we'll try to finish by noon?

23              THE COURT:  We can do that.  If we take a

24   ten-minute break, which really means 11:30, do you think we

25   can complete her and cross by noon?
```

```
 1                MR. GADD:  I won't have very much on cross.

 2                MR. SKORDAS:  See will be short.  She will be

 3      quick.

 4                THE COURT:  And then you want to wait for the next

 5      witness?

 6                MR. SKORDAS:  Correct.

 7                THE COURT:  They bring lunch a few minutes before

 8      noon.  They would have to wait, I guess.  Are you saying end

 9      for the day after that?

10                MR. GADD:  He is saying end for the day.

11                THE COURT:  They can still eat their lunch, of

12      course.

13                MR. GADD:  One last question.  We have agreed

14      previously that Mr. and Mrs. Shamo may stay in the courtroom

15      and then his sister came in and we said no problem and we

16      don't mind if she watches.  She is family.  Do you have a

17      problem if for the mom's testimony if we asked the sister to

18      just step outside?

19                THE COURT:  Is she going to testify?

20                MR. SKORDAS:  I don't mind.

21                THE COURT:  Just for that one --

22                MR. SKORDAS:  That is fine.

23                THE COURT:  Do you want the father?

24                MR. SKORDAS:  Correct.

25                MR. GADD:  We're happy to have him in.
```

```
1              THE COURT:  Tomorrow you would go with the
2    defendant or somebody else?
3              MR. SKORDAS:  Yes.
4              THE COURT:  Sounds like the sister will --
5              MR. SKORDAS:  I missed the memo about quitting
6    early.  I don't remember you saying that.
7              MR. GADD:  We talked about that.
8              THE COURT:  I was just wondering if I had been
9    crazy.  Which of us is going --
10             MR. SKORDAS:  I am just --
11             THE COURT:  I have a judges meeting that I have to
12   go to.
13             MR. SKORDAS:  We'll try to make use of our time
14   better than we are today.  Maybe I can even get Aaron
15   started tomorrow.
16             MR. GADD:  And possibly the sister today?
17             MS. BECKETT:  She flew in after a 13 hour shift as
18   a nurse.  She could use some rest.
19             THE COURT:  We are way ahead of schedule.  We
20   don't need to hurry anything.  That is not an issue.
21             MR. SKORDAS:  We may close on Thursday.
22             MR. GADD:  I can't imagine that we'll have much.
23             THE COURT:  We have to settle on the instructions,
24   but we'll probably do those tomorrow I would think.
25             MR. GADD:  Okay.
```

1          THE COURT:  You want ten minutes?

2          MR. SKORDAS:  Right.

3          THE COURT:  And then we'll call a witness.

4          MR. SKORDAS:  Right.

5          THE COURT:  And then you'll finish with that

6     witness and finish for the day?

7          MR. SKORDAS:  Correct.

8          THE COURT:  Anything else you want to put on the

9     record here?

10          MR. GADD:  No.  Thank you.

11          (WHEREUPON, the bench conference was concluded.)

12          THE COURT:  As you heard, the United States has

13     rested its case.  There is always some time necessary in

14     between, so what we're going to do is take a ten-minute

15     break and come back and the defense is going to put on one

16     witness day and that witness will be crossed and then you

17     can have lunch and then go home today.  Tomorrow we'll go

18     from 8:30 to noon.  I think we're going to get this to you

19     probably Thursday.

20          Is that what we're predicting?  Although Thursday,

21     if it is Thursday there would be instructions and closing

22     arguments and then you would start to deliberate.  The good

23     news is this isn't going to take four weeks, unless your

24     deliberations take a week or more.  All right.

25          Take ten minutes and get a drink and go to the

1    bathroom and whatever you need to do and we'll start at

2    11:30.

3                (WHEREUPON, the jury leaves the proceedings.)

4                THE COURT:  We'll proceed in ten minutes and

5    you'll arrange the witnesses and all.

6                (Recess)

7                THE COURT:  Are we all back?

8                Let's go get them.

9                (WHEREUPON, the jury enters the proceedings.)

10               THE COURT:  The defense may call its first

11   witness.

12               MR. SKORDAS:  The defense calls Becky Shamo.

13               THE COURT:  Come forward and be sworn, please.

14                         REBECCA SHAMO

15               Having been duly sworn, was examined

16                    and testified as follows:

17               THE WITNESS:  Rebecco Shamo, R-e-b-e-c-c-a, Shamo,

18   S-h-a-m-o.

19               THE COURT:  You may proceed, Mr. Skordas.

20                       DIRECT EXAMINATION

21   BY MR. SKORDAS

22   Q.   May I call you Becky?

23   A.   You may.

24   Q.   Where do you currently live?

25   A.   Phoenix, Arizona.

```
1    Q.   With who?

2    A.   My husband.  We're empty nesters.

3    Q.   Pardon me?

4    A.   My husband --

5    Q.   Empty nesters.  No kids at home.

6    Q.   And your husband's name?

7    A.   Michael Shamo.  Mike.

8    Q.   He is sitting in the courtroom today?

9    A.   He is.

10   Q.   And you have been able to sit through this entire

11   trial, correct?

12   A.   Yes.  Forced to, yes.  No.  I have been able to sit

13   through the entire trial, yes.

14   Q.   Meaning it was a nice gesture on the government's part

15   to allow you to stay in the trial --

16   A.   Extremely.

17   Q.   -- because witnesses typically are not allowed to watch

18   each other's testimony.

19   A.   True.

20   Q.   Well, before we get into that, would you just tell the

21   jury a little bit about yourself.  Sure.  I was actually

22   born in Texas, so I was the only one in my family that was a

23   pure blooded born and raised Texan, but I have very long

24   history with genealogy in the Salt Lake Valley.  14 out of

25   16 great grandparents crossed the plains into the Salt Lake
```

1    Valley.  My great, great grandfather was the first mayor of

2    Salt Lake City, Jedediah Morgan Grant, so I have a very long

3    history there.  I still have a lot of family in the valley.

4    My parents were here and raised four kids and moved to Texas

5    and then they had me, the Texan.  My husband and I now live

6    in Phoenix.  We have four children, three girls and then a

7    boy, the last one being Aaron, and so that way I get to call

8    Aaron -- I tell him he is my favorite son.  He says I'm your

9    only son, so then I say, well, you're still my family son.

10   We live in Phoenix now.

11   Q.   Where was Aaron born?

12   A.   Aaron was actually born in when we lived in Kearns,

13   Utah.  We lived in Utah after we got married for about 13

14   years, part of it in Kearns and then the other part up in

15   Centerville, so Aaron was actually born in Kearns.

16   Q.   Was he raised in the Kearns or Davis County areas?

17   A.   Yes, in Davis County.  We moved shortly after he was

18   born out of Kearns and moved to Centerville.  We lived in

19   Centerville for four years and then San Antonio for three

20   and then Phoenix for the last 22 or so.

21   Q.   I may have asked you this, but how long have you and

22   Mike been married?

23   A.   I didn't say.  We have been married 40 years.

24   Q.   What kind of work do you do?

25   A.   I am a stay at home mom.  I have kind of that 40 years

1  of stay-at-home mom experience.  I have always been at home,

2  but I work very hard at home.  I am also an avid genealogist

3  and seamstress.

4  Q.  And Aaron is your baby?

5  A.  He is.

6  Q.  Would you describe to the jury Aaron's sort of

7  upbringing just generally and don't use any medical terms.

8  You can avoid that?

9  A.  I will avoid that.  Aaron is a cute kid but he didn't

10  talk.  I had three girls, the oldest I taught to read at

11  then age of three.  The other two not so much.  They didn't

12  quite do that so well.  Aaron, on the other hand, didn't

13  talk until he was three years old.  We thought it was

14  because his sisters maybe talked for him, but at the age of

15  two I determined that this was not going well so I taught

16  him sign language.  So we started out with the Whitmore and

17  it would be do you want more water?  Do you want more milk?

18  Do you want more juice?  I don't know sign language, but we

19  kind of picked it up kind of along the way picked up the

20  words we wanted.  I don't understand -- are you done?  We

21  use that one with the grandkids now.  Are you done?  Are you

22  thirsty?  Are you hungry?  Yes.  No.  Stop.  That works

23  really work in church.  Sit down now.

24      Those were the words that I -- so because of that I was

25  able to communicate with him.  When he was three he started

1    to talk more and he couldn't say the Rs in the middle of the

2    word, world, girl.  It was really hard when you named your

3    child Aaron, and so it always came out Awon.  He struggled

4    with speaking.  As a result of that it was like in

5    kindergarten, first, second, third grade he was in speech

6    therapy classes and they would pull him out for speech

7    therapy and then they would pull him out for tutoring.  We

8    had a lot of tutoring.

9        In fourth grade they actually called and said we want

10   to put him in speech therapy and I said no.  No more.  I'll

11   actually move to New York or Boston and he will fit right

12   in.  Eventually he got to say the pesky Rs and was able to

13   say those words.

14   Q.   Where did he go to elementary and junior high and high

15   school?

16   A.   In Phoenix.  Elementary actually started in San Antonio

17   where they really like to pull you out for individual

18   tutoring.  Then we moved to Phoenix.  He was in those

19   schools and always -- we struggled all the way through.  No

20   surprises there.  We struggled.  If you don't talk realy

21   early, we know now, if you don't talk real early you don't

22   learn to speak and then you fail to read and then you are

23   far behind and we would constantly -- you know, they would

24   send home spelling lists and I would look at them and go,

25   huh, that is great.  Second grade.  I remember looking at

1    spelling lists going, well, where are the three words that

2    we can do, because we were still working on sight words.  We

3    were still working on just basic words, and to have somebody

4    say here is the -- spell the word after and spell the word

5    world and spell the -- okay, the word the is there and we

6    can do the.  I just ignored the spelling words.  It was a

7    struggle.  You play catch up the whole way through school.

8    Q.    It sounds like you and Mike and your family moved a

9    little bit.  Why was that?

10   A.    Work.  Through work.  Mike changed jobs from San

11   Antonio Phoenix, but still in the medical industry and so it

12   was just work related.

13   Q.    What kind of work did Mike do or does he do?

14   A.    Currently he is a semiretired heart valve salesman.

15   Q.    He sales products for a company that assists doctors

16   with heart valves?

17   A.    Yes.

18   Q.    How long did Aaron live with you, until what age?

19   A.    Ah --

20   Q.    If you recall.

21   A.    Well, are you saying -- because he lived with us until

22   he was 16 and then he went to a residential program.

23         Is that what you're asking?

24   Q.    Yes.

25   A.    Okay.

1   Q.   At 15 we actually sent him to a wilderness program

2   called Anasazi based out of Phoenix.  That is a nine week

3   program.  It is not a residential program.  Then when he was

4   16 then we sent him to a residential program -- actually in

5   La Verkin, Utah.  It is no longer running or whatever, but

6   it was a really good, excellent program there.  He was gone

7   for 21 months in the residential program and then he

8   graduated that before he turned 18.  He came home for a bit

9   and then he would be in and out, went up to U.V.U., came

10  home for a couple of months, went back up, kind of in and

11  out and in and out.

12  Q.   Did you maintain pretty regular communication with him

13  during all this time?

14  A.   Not so much.  You know, it is a -- he is a boy and boys

15  don't communicate with the parents so much.  He was going to

16  college part of the time, and so once and awhile, mostly

17  holidays, you know --

18  Q.   How did he do in college?

19  A.   Well, I paid for a lot of classes that didn't get

20  finished and, you know, he did fairly well.  I'm not sure

21  how many we actually passed.  He didn't pass rock climbing.

22  Really?  He couldn't pass rock climbing.

23  Q.   Did there come a time prior to November of 2016 when

24  Aaron was arrested that he brought you some cash?

25  A.   Yes.

1    Q.   Describe that to the jury.

2    A.   We had been asking him to save your money, please save

3    your money.  He said I don't like banks.  I said, you know,

4    please save your money.  He said, well, if I bring you some

5    cash would you hold it for me?  We said sure.  Okay.  Good.

6    He is going to save some money.  So he brought us some money

7    in a bag and we threw it in the closet.  It was like --

8    Q.   Describe that.

9    A.   Describe?

10    Q.   I am sure it was green, but what was it?  Tell the jury

11    about the money.  Was it something that you could stick in

12    your pocket?

13    A.   No.  It was like -- you know those little shoe bag

14    things, tennis shoes -- I think it was like a shoe baggy

15    thing so we brought it home and threw it in the closet.

16    Q.   What did you do with it?

17    A.   Threw it in the closet.

18    Q.   After that?

19    A.   I didn't do anything with it.  It just sat there until

20    he was arrested and then we thought --

21    Q.   Then what did you do?

22    A.   I'm sorry.  Through our attorney we contacted the

23    government and said, you know, we have had this money, so

24    the offered to come and get it.  So we met with -- we had

25    already met with Jeff and Megan, Jeffrey Fletcher and Megan,

1    who is now Moore, but they were already gone, and so they

2    had two postal agents, and I saw them earlier, who came by

3    the house.  We had put it into one of those little small

4    boxes, Amazon Prime boxes, so we stuck it in that and we

5    gave it over to them.

6    Q.   A picture that I think the jury saw was of the box

7    being opened or a box opened and it had I think two rows of

8    cash and then some bubble pack above it.

9         Do you recall that?

10   A.   Yes, so it didn't roll around inside.

11   Q.   But you packed it that way?

12   A.   Yes.

13   Q.   It didn't come to you that way?

14   A.   No.  No, we packaged it that way.

15   Q.   Why?

16   A.   So we could seal it up and hand it off.

17   Q.   Okay.  What did you do with the money before you

18   packaged it that way?  Did you account for it in anyway?

19   A.   I did.

20   Q.   What did you do?

21   A.   I didn't quite -- we want to trust the government.  I

22   counted it.  I didn't change any of the -- because it

23   wrappings on it, but I didn't change any of that, and I

24   counted it so that I would know however much I had handed

25   over to the government actually made it to the government.

1    Q.    In fact, that is what happened?

2    A.    That is what happened.  So when they left I said please

3    give me an accounting so that I know how much we are handing

4    over to you.

5    Q.    And their number was the same as yours?

6    A.    It was the same, yes.

7    Q.    Let me ask you this.  After Aaron brought you the money

8    in the bag, did you and Mike use any of it?

9    A.    No.

10   Q.    Why not?

11   A.    It is not ours.

12   Q.    You assumed it was Aaron's?

13   A.    Well, of course it was Aaron's.  He gave it to us to

14   keep.

15   Q.    Not to have?

16   A.    No.

17   Q.    Was there another bit of money that he brought you?  We

18   have heard some discussion about a $10,000 transfer.

19   A.    You know, I actually don't remember that.

20   Q.    We have also seen some evidence that he mailed you some

21   wine.  Do you recall that?

22   A.    Yes.  It was one side or the other of when he was

23   arrested, and I can't remember which one, and we get this

24   box in the mail and it comes from a winery.  It is probably,

25   you know, like -- I don't know.  Maybe not quite that big.

1    It is like this big.  It is like this is so random, and so

2    we just put it off to the side because we didn't know what

3    to the with it because we don't drink, and so then when he

4    was arrested I actually opened it to see what was inside,

5    and I kind of lifted everything out and everything does not

6    go back in the way it is supposed to, so the lids are still

7    kind of -- I have it upstairs under the desk.

8    Q.    It is still there?

9    A.    Yes.

10   Q.    In Arizona?

11   A.    In Arizona, yeah.  I figured that the government --

12   they had taken everything of Aaron's and either confiscated

13   or destroyed it and he didn't have any personal possessions

14   at all, and I figured they would come for that or they would

15   at least ask me what the box was so I didn't want to get rid

16   of it, so I kept it and I still have it.  If you would like

17   it I would be happy to give it to you.  I figured they would

18   come and get the wine because they had taken everything else

19   of Aaron's.

20   Q.    It ages, so hang onto it.

21   A.    I'm sorry?

22   Q.    It ages.

23   A.    It ages.  Hang onto the wine?

24   Q.    Yeah.

25   A.    No.  They never came for it.  They can.  I still have

1    it.  I don't even know what kind it is.  It just came from a

2    winery.  I don't know if it is any good or not.  Sorry.

3    Q.   You have been able to sit here I think for most or

4    maybe even all of the trial, correct, Becky?

5    A.   I have been here, yes.

6    Q.   And I assume you have learned some things that you

7    didn't know before?

8    A.   That is true.

9    Q.   I mean, I am just wondering in terms of Aaron and what

10   you know about him, what is your impression of what you have

11   heard over the last couple of weeks?

12   A.   You know, it is a hard thing.  As a parent you love

13   your child and you want the best for them.  You want to

14   strangle them at times, so it is hard to listen to this.  It

15   is really hard to listen to the characterization, because I

16   know that he struggled growing up and I know when he was a

17   pre-teen I found that if I said something to him I couldn't

18   get him to pay attention, maybe, maybe not, but I found --

19   this works actually, that if you touch them on their

20   shoulder or their arm, call them by name, that Aaron would

21   then look at me and I would know I had his attention.

22        I would say Aaron, and he would look at me and I could

23   get his attention.  I listen to this and I think, you

24   know -- it is hard to listen to, some of the

25   characterizations, because you can't stay focused on so many

1    things.  You know, he is very distracted Ted.  It is -- he

2    is my son.  I love him.  You know, I still want to strangle

3    him, but at the same time I know that some of the things

4    that -- he does not understand innuendo or suggestion or

5    sarcasm.  So if I would say, gee, it would be really good if

6    you cleaned your room he would think, yeah, it probably

7    would be but he didn't do it.  It wasn't a command.  It

8    wasn't a real suggestion.

9        I would have to say very direct that you have to do

10   this.  I had to tell his elementary school teachers, you

11   know, don't ask him if he understands, because he learned

12   early on that people want you to -- adults want you to nod

13   your head, so if they say do you understand and he would

14   go -- [nodding gesture] -- and he might not have understood.

15   So when they started actually asking him questions then they

16   realized he didn't get some of what was going on.  So we

17   learned that one early.  I had to say it straight.  You

18   can't -- innuendo, sarcasm, facetiousness does not work.

19   Say it straight.  If you expect something you just say it

20   straight and then he will understand.  So, you know, yes, I

21   differently learned some stuff here that I didn't know.

22   Actually plenty of stuff I didn't know.

23   Q.   Including the fact that Aaron did some incredibly dumb

24   and maybe bad things, correct?

25   A.   Incredibly dumb, incredibly bad, so many things that

1    you think what were we thinking?  You know, why would you do
2    that?  Why would you associate with these people?  He never
3    was really good at choosing friends and eventually still
4    isn't, you know, so --
5    Q.   You have been able to maintain some level of
6    communication with him in the last three years, correct?
7    A.   Yes.  Yes.  Even though it costs you money every time
8    you communicate with somebody in jail or do anything for
9    them at jail, we have maintained money on our phones so he
10   can call us anytime.  Sometimes it is a couple times a week.
11   Most the time it is a couple times a week.  So he calls --
12   especially last year I was diagnosed with stage two breast
13   cancer, so he would call and see how I was doing.  He was
14   very concerned.
15   Q.   You have not been able to be physically with him for
16   almost three years?
17   A.   Right.  Up at Weber they have a really lousy system --
18   Q.   The Weber County Jail?
19   A.   Weber County Jail.  He was first in Weber County Jail.
20   I don't know which way I'm pointing.  It was Weber County
21   Jail and it is a video.  You are actually in the jail and it
22   is still a video.  It is a really lousy screen.  He got
23   moved down in probably January to Salt Lake County and it is
24   better.  So it is a barrier so we actually have barrier
25   visits which is really nice.  You can't touch them, but you

1    have a barrier visit which is better than the video system

2    up in Weber County.

3    Q.    When was the last time you did touch him?

4    A.    Let's see.  I don't know.  2016.  He was supposed to

5    come down for Thanksgiving and he was picked up three days

6    before Thanksgiving.  The Christmas before that maybe.

7              MR. SKORDAS:  That is all that I have, Your Honor.

8              THE COURT:  Thank you.

9              Cross-examination.

10                        CROSS-EXAMINATION

11   BY MR. GADD

12   Q.    I'm sorry we're meeting again under these

13   circumstances.  I hope you don't blame yourself.  It is

14   clear that you love him and you would do anything for him.

15             THE COURT:  I can't hear you, Mr. Gadd.

16             MR. GADD:  Sorry.

17   BY MR. GADD

18   Q.    It is clear that you love him and you do and you have

19   said that.

20   A.    Yes, I have.

21   Q.    You tell him that in your phone calls?

22   A.    Yes, I do.

23   Q.    There is nothing that you wouldn't do for him?

24   A.    Do you mean as a mother?

25   Q.    Yes, as a mother.

```
1    A.   I would always stand by him.  He is my son.  I love
2    him.
3    Q.   Sure.  I don't want to ask you many questions.  Mr.
4    Skordas asked you about the money.
5    A.   Uh-huh.
6    Q.   When we met back in 2017 and when you talked with those
7    agents with your attorney present, you told them that Aaron
8    had brought you the money when you were on vacation in Utah?
9    A.   Uh-huh.  Yes.
10   Q.   The place outside of St. George.  I am blanking on the
11   name.  Pine Valley?
12   A.   Yes.
13   Q.   That was not 100 percent true though.
14   A.   Yes, it is.
15   Q.   Did you know your attorney called me afterward?  Did
16   you know he called to clarify that Aaron hadn't actually
17   given all the money just to you and Mike?  Did he tell you
18   he was calling me?
19   A.   I'm sorry?
20   Q.   Did Scott, your attorney, did he tell you he was going
21   to call and clarify that?
22   A.   I have no idea.
23   Q.   There was a phone call with you and Mr. Shamo, the
24   defendant, Aaron, and he was pretty mad at you for handing
25   over his money.
```

1    Do you remember him being mad?

2  A.   He was.

3  Q.   He told you that the money was in two places not just

4  one and then you said, well, that is not what we told them,

5  is it?

6  A.   I do not recall that.

7  Q.   You told the jury briefly about that annoying system

8  and that is something that you and I can agree on.  It is an

9  annoying system where you talk to the defendants in jail,

10  especially the one in Weber County, right?

11  A.   Yes.

12  Q.   And it says at the beginning that this is recorded.  On

13  April 6th, 2017, Mr. Shamo, the defendant, said to you,

14  like, you know, there are two occasions for what you gave

15  over, right?  You know that there is two pieces of that?

16  And then you reply, yes, I know, and we didn't say that,

17  though, did we?  He was still pretty mad at you at that

18  point.  So when the agents heard that they were a little

19  concerned and they called your attorney and he clarified it.

20  Do you want to tell everyone where the other part of the

21  money came from?

22  A.   Well, your question was what was the money that Aaron

23  gave to us so I answered that.

24  Q.   Sure.  I'm not looking to cause any problem, I really

25  am not, but was there somewhere else that he had the money?

1    A.   I believe there was an occasion that he -- that our

2    daughter Mary Ann had gone to visit him in Utah, and so he

3    said I have a backpack to send to mom and dad and she took

4    it and threw it in the car with her three children and they

5    went on vacation and drove it down, so, yes.

6    Q.   I am really not trying to cause you anymore pain.

7    Could it be that maybe that part of the story was left out

8    because you were just trying to shield your daughter from,

9    you know, all of this and the investigation and all of that?

10   A.   Well, the question was, sir -- the question was what

11   was the money that Aaron gave to us and that is the money

12   that he gave to us.  He did give some money to Mary,

13   although she didn't know what it was.  She actually gave it

14   over to us and didn't know what was in it.  She threw it in

15   the back with the kids and traveled down, and so through

16   her, if you want to be technical about it, then through her

17   we received a little bit of additional money there.

18   Q.   In fact, you talked for a minute about some of the

19   efforts that you went to to teach Aaron to read and things

20   like that and not to use sarcasm.  He grew up though, right?

21   A.   I don't believe I taught him not to do sarcasm.  I

22   don't know how you teach people not to do sarcasm.

23   Q.   For sure and that was probably just a bad question.

24   You remember just explaining that you tried not to use

25   sarcasm with him?

1    A.   I found it didn't work.

2    Q.   Right.

3    A.   I tried.  It didn't work.

4    Q.   And he grew up?

5    A.   He did grow up.  Was there more to that question?

6    Q.   Yes.  In another one of those jail calls that was

7    recorded record you and he are talking and your husband is

8    on the phone with you.  Would you sometimes call, you know,

9    the two of you call Aaron together or vice versa?

10   A.   He only calls us.  That is the only way that works in

11   jail.

12   Q.   And you both talk to him?

13   A.   If we are both there at home.

14   Q.   You are talking about plans for once he gets out and

15   businesses and things that he wants to get involved in and

16   he says this to you, doesn't he?  He says I'm really good at

17   analyzing.  I don't know if I told you this, but I was even

18   looking at a little thing of ibuprofen.  Like here in the

19   jail they charge us for ibuprofen, a bottle of ibuprofen,

20   and I'm sitting there like, you know, analyzing, okay, so a

21   bottle you buy in bulk, it is like cutting it down to 10 to

22   30 cents, and the ibuprofen ingredients you have

23   microcrystaline cellulose and you have a binder and you a

24   have a mixer and you have basically all of this stuff and

25   the raw materials for the main ingredient in ibuprofen

1  itself by the kilo you can buy it for like 30 bucks to 40

2  bucks.  Cheap.  So then you're making ibuprofen extremely

3  cheap and I could undercut the market just -- then he goes

4  on.

5      Do you remember having that conversation with him?

6  A.   Vaguely.

7  Q.   On May 7th, 2017?

8  A.   That still does not mean I remember it.  We have a lot

9  of conversations.

10         MR. GADD:  I have nothing further.  Thank you.

11         THE COURT:  Thank you.

12         Any redirect?

13         MR. SKORDAS:  Just one question.

14                  REDIRECT EXAMINATION

15  BY MR. SKORDAS

16  Q.   Becky, did you withhold any money or anything besides

17  the wine that Aaron gave you that may have been the proceeds

18  of this matter?

19  A.   No.

20         THE COURT:  Thank you.  You may step down.  Thank

21  you.

22         Did you want to call another witness?

23         THE COURT:  Yes.  It will be brief.  She is

24  outside.

25         THE COURT:  All right.

1           Come forward and be sworn, please.

2                STEPHANIE SHAMO ARBELAEZ

3           Having been duly sworn, was examined

4                and testified as follows:

5           THE WITNESS:  Stephanie Shamo Arbelaez.

6   Stephanie, S-t-e-p-h-a-n-i-e, Shamo, S-h-a-m-o, Arbelaez,

7   A-r-b-e-l-a-e-z.

8           THE COURT:  You may proceed, Ms. Beckett.

9                DIRECT EXAMINATION

10  BY MS. BECKETT

11  Q.   Stephanie, thank you for being here.  I'm going to give

12  you a cautionary instruction, because you and I have the

13  same tendency to speak very fast, and so for our illustrious

14  court reporter if we could slow down between the two of us

15  this will go a lot better.

16  A.   I will definitely try.

17  Q.   Stephanie, how do you know Aaron Shamo?

18  A.   So Aaron is my baby brother.  Sorry.  I am eight years

19  older than him, so I used to carry him around on my hip when

20  he was born.

21  Q.   Is it safe to say you kind of helped raise him a little

22  bit?

23  A.   Yeah.  I used to drive him around.  I took him to

24  school.  I watched him get bullied all growing up and I have

25  watched it again in this courtroom.

1    Q.   I imagine being here is -- you are okay.   Take a deep

2    breath.

3         I imagine being here is not easy for you.

4    A.   I flew in this morning because everybody needs somebody

5    on their side.

6    Q.   Because of the age difference between you and Aaron,

7    you got to see him grow up --

8    A.   Yeah.

9    Q.   -- and got to see him through junior high and all those

10   awkward years that we all experience.   Tell the jury for me

11   what Aaron's junior high experience was like from your

12   perspective and how he made friends and what kind of kid he

13   was.

14   A.   Aaron -- he kind of struggled finding friends.   He was

15   a little heavier and so he played video games.   He did -- he

16   got bullied and he would come home and tell us -- there are

17   three of us older girls, and so we would get pretty

18   defensive when anybody kind of bullied him.   You know, I

19   don't have kids of my own, but like Aaron was like my

20   favorite.   I'm sorry.   I did not expect to cry.

21        He was dragged around to all of our soccer games and

22   all of our events and he always like -- I think what is

23   really hard about sitting up here is you always want to say

24   like that somebody is perfect and don't want to show that

25   they have any faults, and I think the hard thing is Aaron

```
1    would have done anything to have friends.  I watched that
2    and I watched him like try to fit in.  If he was told to
3    wear Hollister he would wear Hollister.  If his friends or
4    anybody he met was wearing black he would wear all black and
5    so I saw him evolve over the years.
6    Q.   Is it safe to describe him as a people pleaser?
7    A.   Oh, yeah.
8    Q.   I assume he did with this his older sisters, too?
9    A.   Oh, yeah.  It is hard to have three older sisters.  I
10   feel bad for him.
11   Q.   Would you describe Aaron as organized?
12   A.   No.
13   Q.   Agents interviewed last year?
14   A.   Uh-huh.  In my pajamas.  Yes, those two, they showed
15   up.  I work three nights a week pretty much and they showed
16   up and I was actually sleeping in my pajamas, but they came
17   knocking.  And, you know, it is funny, like, maybe I
18   shouldn't have talked to them but I wanted them to see Aaron
19   came from a good family.  I'm so sorry.  Oh, my gosh.
20   Q.   It is okay.  Take a deep breath and take a second if
21   you need it.
22        You have heard some things in this courtroom about your
23   baby brother that I imagine were difficult to hear?
24   A.   Yeah.
25   Q.   But you sit here today and would acknowledge that some
```

1    of the things -- some of the choices that he made were not

2    great?

3    A.   Yeah.

4    Q.   But you're here.  Why?

5    A.   I think one of the hardest things is I wanted this to

6    be fair.  I wanted a fair trial.  Not once did they

7    interview Aaron.  They didn't ever ask to talk to him

8    without a lawyer.  You want to believe in the legal system

9    and a family member who does not get a chance to actually

10   give their side -- I just wanted it to be far.  Whatever it

11   is I want it fair.

12   Q.   Stephanie, what do you do for a living?

13   A.   I am a nurse in a hospital in Reno.

14   Q.   So you take care of people for a living?

15   A.   I do.  I get to love people regardless of the decisions

16   they make.  I don't have to decide or find any fault.  I

17   just love them and help them get better.

18        MS. BECKETT:  If I could have just a minute, Your

19   Honor?

20        THE COURT:  Yes.

21   BY MS. BECKETT

22   Q.   Stephanie, we have heard some testimony throughout this

23   trial that Aaron and his friends and some of the individuals

24   took trips to Vegas and Tahoe.

25        Are you aware of some of those trips?

1    A.   Yeah.  I lived in Vegas for eight years.  Aaron used to

2    come and stay with me with his friends all the time.  In

3    Tahoe he actually came and stayed and I went to Snow Globe.

4    It is a music festival that I got us tickets for.  I got

5    free tickets.  We went and went to Snow Globe together.  We

6    would go to concerts together and I am able to spend time

7    with my brother.  So on some of these trips I was surprised

8    that he came and stayed with me.  He was at my house with

9    his friends.  I know some of these guys that have been on

10   here, because they have come over several times.

11              MS. BECKETT:  I have no further questions, Your

12   Honor.

13              THE COURT:  Thank you, Ms. Beckett.

14              Cross-examination?

15              MR. BURGGRAAF:  No questions, Your Honor.

16              THE COURT:  Thank you.

17              Thank you.  You may step down.

18              Your next witness will start tomorrow, right?

19              MR. SKORDAS:  Yes.  I apologize, Your Honor.

20              THE COURT:  All right.  Ladies and gentlemen of

21   the jury, thank you again for your work and attention.  All

22   of the rules apply about talking and not talking and so on.

23   We'll see you at 8:30 in the morning.  Tomorrow, remember,

24   we will just go to noon tomorrow.

25              Thank you.

1               (WHEREUPON, the jury leaves the proceedings.)

2          THE COURT:   We'll be in recess on this matter

3     until 8:30 tomorrow.

4               (Proceedings adjourned.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25