JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| UNITED STATES OF AMERICA, Plaintiff, vs. AARON MICHAEL SHAMO, Defendant. | Case No. 2:16-cr-00631-DAK  MEMORANDUM IN SUPPORT OF THE UNITED STATES' MOTION FOR RESTITUTION  Judge Dale A. Kimball |
|---|---|

The United States previously moved the Court to enter the restitution amounts below as part of its Judgment. The defendant owes the following amounts as restitution to the following victims and/or victims' representatives:

| Amount | Victim/Representative/Insurer | Purpose |
|---|---|---|
| $24,625.00 | T. K. | Funeral and related expenses for G.K.; lost income |
| $29,698.57 | L.V. | Lost income |
| $12,724.32 | J. L. | Damages at Titian Way house not covered by insurance |
| $47,226.08 | United Insurance Group | Insured damages at Titian Way house |
| $18,193.00 | R. R. | Damage to personal property at Titian Way house |
| TOTAL: $132,466.97 | | |

The United States' restitution requests are lawful and appropriate in this case for the following reasons: (1) the offenses of conviction, including the predicate offenses to Count One, are the type for which the Court is authorized by law to order restitution; (2) the Court should find by a preponderance of the evidence that the defendant caused the harm for which restitution is ordered; (3) the victims are identifiable and each identified victim falls under the statutory definition of "victim"; (4) the restitution sought by the United States corresponds with losses which are recoverable by law; and (5) the United States will submit a restoration request seeking to have forfeited assets from this case applied toward the restitution obligations.

Before analyzing the restitution requests, the United States first submits the following brief proffer of evidence.

**1. Proffered Evidence[1]**

1. The defendant and his co-conspirators manufactured Fentanyl-laced fake oxycodone pills in a room in the basement of the defendant's residence on Titian Way. They sold the majority of those pills on the darknet under the vendor name Pharma-Master.

2. The defendant was leasing the Titian Way residence from J.L., his landlord.

3. On information and belief, J.L. obtained insurance on the residence on Titian Way through United Insurance Group.

4. The defendant permitted R.R., a friend of the defendant's then-girlfriend, to store personal property in a room at the residence to help facilitate R.R.'s move, with minor dependents, out of the state.

5. G.K. ordered sixty Fentanyl-laced pills from Pharma-Master. Some of the pills were sold as

---

[1] The rules of evidence do not appear to apply; given the current pandemic and the general orders in the District of Utah, the United States requests to proceed by proffer. Fed. R. Evid. 1101(d)(3).

Roxy-Oxycodone 30mg; the rest of the pills were sold as M Box 30-Oxycodone 30mg. The last known order, for twenty pills, was placed on August 3, 2016. On the evening of August 12, 2016, G.K. went out with friends, but became separated from his group. A passerby found him the following morning dead in the grass outside an apartment complex. Police officers found pills marked as if they were oxycodone pills on G.K.'s person. G.K. died with Fentanyl, Alprazolam, and Ethanol in his system. He was 23.

6. C.V. ordered fourteen Fentanyl-laced pills from Pharma-Master marked as Roxy-Oxycodone 30mg. The last known order was placed on March 3, 2016. C.V. overdosed and died on March 25, 2016, after using drugs with a friend in his apartment the prior evening. The friend found C.V. dead on the 25th. C.V. died with Cocaine, Fentanyl, and Alprazolam in his system. He was 24.

7. When agents executed a search warrant at the defendant's residence on Titian Way on November 22, 2016, the warrant was executed by agents in Hazmat protective gear including self-contained breathing apparatuses. After the warrant was completed, the county health department condemned the residence because of the toxic nature of Fentanyl.

8. On information and belief, much of the non-evidentiary personal property inside of the residence on Titian Way, including the personal property that R.R. stored there, was disposed of by abatement contractors. J.L. and his insurance company spent thousands of dollars to restore the property to a point where the health department would remove its order.

9. J.L., R.R., and the representatives for G.K. and C.V. have submitted restitution requests and supporting documents. Those requests and supporting documents have been contemporaneously filed under seal because they contain personal identifying information. The sealed exhibits containing the requests are as follows: J.L. and United Insurance Group

(Exhibit A); R.R. (Exhibit B); G.K. (Exhibit C); and C.V. (Exhibit D).

10. Other victims either did not respond to requests by victim advocates from the United States Attorney's Office or chose not to seek restitution for other reasons.

11. J.L. (who received assistance from United Insurance Group) submitted a spreadsheet showing losses that came as a result of the lost rent and restoration costs. To date, those losses have not been disputed by the defense.

12. Agents first learned about R.R. from the defendant's parents. In a 2017 interview, the defendant's parents expressed their desire to see R.R. receive restitution. R.R.'s impact statement shows she harbored some misgivings towards the United States. She sought $50,000 USD in restitution without documentation. After many unheeded requests for documentation, R.R. recently indicated she did not have receipts or other documentation.

13. R.R., at the United States' suggestion, built a spreadsheet to itemize her personal property stored at Titian Way that was destroyed. R.R. included links to similar items currently available for sale to give an estimate of the value of the property she lost. The total estimated loss for her personal property on the spreadsheet is $18,193 USD.

14. R.R.'s spreadsheet drew the loudest objection from the defense. In particular, the defense took issue with R.R.'s requested restitution for a set of wine glasses, each of which costs thirty dollars.

15. The parents of G.K. submitted restitution requests for funeral expenses and two-to-four weeks of lost wages as they dealt with the unimaginable horror of burying their child.

16. The parents of C.V. requested restitution for money they loaned to C.V. to finance his education, a total of $29,698.57. C.V.'s mother indicated looking at other documents, such as funeral receipts, caused her trauma anew.

**2. Offenses**

The defendant's offenses of conviction, including the predicate offenses to Count One, are offenses for which the Court may order restitution. The defendant was convicted of Engaging in a Continuing Criminal Enterprise (Count One); the jury specifically determined that the defendant's distribution of Fentanyl to C.V. and G.K. were predicate offenses to Count One. The jury also unanimously determined the defendant's agreement with others to distribute Fentanyl was a predicate offense. In total, the jury found more than one hundred predicate offenses, including many of the substantive counts in the Second Superseding Indictment for which they also found the defendant guilty.

Engaging in a Continuing Criminal Enterprise and the predicate offenses found by the jury are some of the offenses for which the Court is authorized to order restitution under Title 18, United States Code, Section 3663.[2] Section 3663 is sometimes referred to as the discretionary restitution statute, drawing a distinction from Section 3663A, which governs cases where restitution is mandatory.

For offenses that involve, as an element of the offense, a scheme, conspiracy, or pattern of criminal activity, such as Count One, Engaging in a Continuing Criminal Enterprise, and several of its predicate offenses, the Court can order restitution for "any person directly harmed by the defendant's conduct."[3]

---

[2] 18 U.S.C. §3663(a).
[3] 18 U.S.C. §3663(a)(2).

### 3. Direct and proximate causation

The Court should find by a preponderance of the evidence that Mr. Shamo and his co-conspirators caused the harm that underlies the restitution requests. The United States has the burden to prove losses sustained by victims by a preponderance of the evidence.[4] Victims are those who have been directly and proximately harmed.[5]

The Supreme Court, in *Hughey v. United States*, once held that restitution was limited to losses caused by the underlying offense of conviction.[6] The first half of the holding, that some causation was required, was unremarkable. But the second half of the holding, that restitution could only be ordered for losses caused by the offense of conviction, caused a major stir. That same year, 1990, Congress amended Section 3663 and expanded the definition of a victim to include all harmed in the course of a scheme, conspiracy, or pattern of criminal activity for any offense that has as an element either a scheme, conspiracy, or pattern of criminal activity.[7]

In interpreting a companion restitution statute that likewise requires direct and proximate cause, the Supreme Court explained the "proximate causation" requirement has two components: a factual, causal connection between the offense and the injury (cause-in-fact), and a limitation on recovery for remote damages (proximate cause).[8] The Supreme Court explained that restitution did not require "strict but-for causation," which would effectively undermine Congressional intent to compensate crime victims and punish criminals.[9]

---

[4] 18 U.S.C. §3664(e); see also *United States v. Richard*, 738 F.2d 1120, 1122 (10th Cir 1984) (citing 18 U.S.C. §3580, which was recodified as 18 U.S.C. §3664).
[5] 18 U.S.C. §3663(a)(2).
[6] *Hughey v. U.S.*, 495 U.S. 411, 419 (1990).
[7] See Pub. L. No. 101-647, 104 Stat. 4789, 4863, Section 2509 (Nov. 29, 1990), codified at 18 U.S.C. §3663(a)(2), which was passed in response to *Hughey v. U.S.*, 495 U.S. 411 (1990).
[8] *Paroline v. United States,* 134 S. Ct. 1710, 1719 (2014).
[9] *Id.* at 1727.

In cases like this one, where the defendant acts in concert with co-conspirators, the actions of co-conspirators do not absolve a defendant from responsibility to pay restitution; so long as the conduct was within the offense of conviction. Instead, acts committed by co-conspirators often cause harms for which restitution should be ordered. For example, in *United States v. Teehee*, the defendant was convicted of trafficking in 39 unauthorized long-distance Sprint cards that the defendant sold to 8 or 10 other individuals, resulting in a loss to Sprint of over $600,000.[10] The defendant claimed that some of the losses were the result of "the independent actions of other persons who had acquired US Sprint access codes from other sources,"[11] but the Tenth Circuit held that the defendant's "criminal activity was not confined to his own phone use; through his sales activity, appellant caused significant downstream activity."[12] Courts are willing to award restitution to victims who were indirectly injured by a defendant's conduct, particularly in cases where a scheme or pattern of criminal activity was involved.[13]

Courts have taken an expansive view towards inclusion of harms for restitution purposes. For example, in *United States v. Richard*, Richard was ordered to make restitution to a bank of the amount taken in a bank robbery and not recovered, even though the defendant argued that the unrecovered funds may have been stolen by another, who used the robbery as a cover.[14] The Tenth Circuit held that the United States need not prove that the defendant was directly

---

[10] *United States v. Teehee*, 893 F.2d 271, 274 (10th Cir. 1990).
[11] *Id*. (quoting from the defendant's brief).
[12] *Id*. at 275.
[13] *See, e.g., United States v. Sapp*, 53 F.3d 1100 (10th Cir. 1995) (defendant's failure to tell the first bank the amount of credit (fraudulently) obtained from the second bank caused a loss to the first bank, which would not have discounted debt if it knew the amount of credit available from the second bank).
[14] *United States v. Richard*, 738 F.2d 1120, 1123 (10th Cir 1984).

7

responsible for the loss; it was enough that the defendant "created the circumstances under which that could occur."[15]

For G.K. and C.V., the decedents, their deaths were directly and proximately caused by the defendant and his co-conspirators. Each bought Fentanyl-laced fake oxycodone from Pharma-Master shortly before his death. Each decedent purchased pills that purported to be oxycodone—there is no evidence to suggest they knew the defendant and his co-conspirators were lacing the pills with Fentanyl. Each died with Fentanyl in his blood.

By disguising Fentanyl to look like oxycodone, a much less potent opioid, the defendant and his co-conspirators directly caused the deaths of G.K. and C.V.[16] The defendant and his co-conspirators certainly "created the circumstances under which" their deaths could occur, like in *Richard*.[17] And the defendant cannot avoid his duty to pay restitution because his subordinates pressed the pills, packaged the pills, and shipped the pills. Like the incremental acts in *Teehee*, the actions of pressing, packaging, and shipping were not only foreseeable, they were inherent in the defendant's enterprise.

The deaths of G.K. and C.V. were not too remote to absolve the defendant from responsibility. Any reasonable person in the defendant's position would have recognized the nearly certain risk of causing overdose deaths among his customers. The defendant, himself, knew about the overdose danger his pills were creating. Trial testimony from Luke Paz revealed that an early batch of Fentanyl-laced fake oxycodone was too potent and might have led to a local overdose death. The defendant only renewed his Fentanyl manufacturing after being

---

[15] *Id.*

[16] It should be noted that the restitution law does not require but-for causation, unlike the law in regard to Count 6, Distribution of a Controlled Substance Resulting in Death. *See Paroline* 134 S. Ct. at 1727, discussed above.

[17] *Richard*, 738 F.2d at 1123.

assuaged by his co-conspirator, Chris Kenny, who claimed the overdose was not their collective fault. The defendant received feedback indicating customers were "getting sick"—coded language for overdosing. The defendant searched obituary records and eventually waived off the warnings.

As noted in the United States' Sentencing Memorandum, the defendant watched a DEA roll call video about the dangers of Fentanyl to law enforcement. The Defendant also accessed a feature-length documentary on Fentanyl abuse. The defendant knew the risk he was creating, but he continued to sell Fentanyl-laced pills in ever-increasing amounts.

With respect to the loss to physical property suffered by J.L. and R.R., the damage was direct and proximate. Mixing Fentanyl powder inside the home was a recipe for disaster. The defendant and his co-defendants understood the risk; they wore personal protective equipment when mixing Fentanyl powder with other ingredients.

The manufacture of controlled substances in the house on Titian Way was the direct cause of R.R.'s and J.L.'s losses. The defendant caused their losses, and those losses were foreseeable and not too remote to prevent recovery.

**4. Identifiable Victims**

The victims (or for the deceased victims, their representatives) listed in the United States restitution request qualify as the types of victims for whom the Court may order restitution. "[T]he term "victim" means a person . . . harmed as a result of the commission of an offense for which restitution may be ordered including . . . any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."[18]

The Court can order restitution to those who compensated a victim, such as insurers, but

---

[18] 18 U.S.C. §3663(a)(2).

direct victims have to be paid in full first.[19] A victim's estate can receive restitution and family members of deceased victims can assume the victim's restitution rights.[20]

J.L., R.R., G.K., and C.V. were all properly identified as victims. The parents of the decedents are lawfully standing in the place of their deceased sons. United Insurance Group is a third-party compensator entitled to restitution under Section 3664(j)(1), but only after victims are paid in full.

### 5. Recoverable Losses

The restitution sought by the United States is for losses recoverable by statute. Section 3663 allows the Court to award restitution for losses for damage to property, lost income, and funeral costs and related services, among other categories.[21]

An exact calculation of actual loss is not required.[22] Calculating restitution can be an inexact science; Courts should seek to reach an "expeditious, reasonable determination by resolving uncertainties with a view toward achieving fairness to the victim."[23]

Courts have allowed representatives or family members of a deceased victim to assume the lost income award for the victim, if lost income can be reasonably determined by a preponderance of evidence.[24] Moreover, the Tenth Circuit has upheld a restitution award to

---

[19] 18 U.S.C. §3664A(j)(1).
[20] 18 U.S.C. §3663(a)(1)(A) & (a)(2).
[21] 18 U.S.C. §3663(b)(3).
[22] *United States v. Davis*, 60 F.3d 1479, 1485 (10th Cir. 1995); *see* U.S.S.G. §5E1.1.
[23] *Davis*, 60 F.3d at 1485 (*citing United States v. Brewer*, 983 F.2d 181, 185 (10th Cir. 1993) and U.S.S.G. §5E1.1, comment (1995)). The language in U.S.S.G. §5E1.1 currently explains that the Court can forgo ordering restitution when "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." That is not the case here.
[24] *See United States v. Bedonie*, 317 F. Supp.2d 1285 (D. Utah 2004). Such an award might ordinarily be too complicated, and thereby fit the "complication" exception to imposition of restitution for non-violent offenses under either §3663(a)(1)(B)(ii) (*United States v. Fountain*,

survivors of a deceased victim, finding the survivors themselves were victims "directly and proximately harmed" by the offense of conviction.[25]

The parents of G.K. seek restitution for funeral expenses including flowers. Those losses are specifically named in the statute and are rarely contested. The statute allows for restitution to be ordered for lost income for the victim, and that right, under Tenth Circuit case law, can be assumed by G.K.'s parents. Their very reasonable request for restitution for 2-weeks (for his mother) and 4-weeks (for his father) of lost income—time during which they suffered the unimaginable loss of their son and attended to his burial—should be awarded.

The parents of C.V. have requested restitution for their loans to C.V. to finance his education. Of note, they have not requested reimbursement for the forty-thousand dollars they *gave* to C.V. to also help finance his education. They have not requested restitution for funeral expenses, perhaps feeling it a duty and obligation that they wished to bear themselves. In the restitution request, his mother cited to the trauma of going through documents related to his death.

The Court should grant their reasonable request. The United States submits that the request can fit under the lost income category of restitution, just like the lost wages for G.K.'s

---

768 F.2d 790 (7th Cir. 1985), cert. denied, 475 U.S. 1124 (1986)) but such an "exception" is not applicable to violent crimes (§3663(c)(3)). The legislative history for the original bodily injury-lost income provision in the Victim and Witness Protection Act provides some indication that lost income might have been anticipated for deceased victims. *See* S.Rep. 97-532, *31-32, 1982 U.S.C.C.N. 2515, **2537-38; *see also United States v. Pizzichiello*, 272 F.3d 1232 (9th Cir. 2001) (upholding restitution to the deceased victim's mother that included the victim's lost wages).

[25] *United States v. Checora*, 175 F.3d 782 (10th Cir. 1999). The court did not provide any analysis of the basis of the subsistence award, which was in effect lost future income. It should be noted that the court in *Bedonie*, *supra*, while noting a potential basis for finding the survivors themselves victims in their own right, did not reach the issue because its outcome would not affect the amount of restitution to be imposed.

11

parents.

J.L.'s losses (most of which were compensated by United Insurance Group) are losses for damage to property. The damage included having the home on Titian Way condemned by the Health Department for a period of time during which restoration efforts were undertaken. J.L. should be compensated for all the losses he claimed.

J.L. claimed $1,500 in legal fees for costs he incurred dealing with his insurance company. Those costs appear to have been reasonably foreseeable—as many people dealing with insurance companies after a disaster can sadly attest. If the Court declines to grant restitution for J.L.'s attorney fees, the United States requests the restitution ordered payable to United Insurance Group be reduced by $1,500 USD.

R.R. likewise has made a claim for damage to property. The United States expects honesty and candor from victims. It has no reason to doubt the itemized list of personal property R.R. lost when the home was condemned. It sees little value in nit-picking individual pieces of R.R.'s property, whether they be expensive wine glasses or doll houses for her minor dependents. The total restitution R.R. sought, approximately eighteen thousand dollars, appears reasonable.

**6. Restoration Request**

Recognizing the defendant is now serving a life sentence and his ability to pay restitution will be limited, the United States will petition the Money Laundering and Asset Recovery Section of the Department of Justice to have forfeited drug proceeds in this case applied towards the defendant's restitution obligations, if restitution is ordered by the Court. That request is referred to as a restoration request.

Under Section 3663, the Court must determine "whether" to order restitution, considering

the amount of the loss sustained by each victim and the financial circumstances of the defendant.[26] The Court does not appear to have the option to order partial restitution, as section 3663(d) incorporates section 3664(f)(1)(A), which requires full restitution. In cases with several co-defendants, the Tenth Circuit has stated a preference for the imposition of joint and several liability.[27]

By submitting a restoration request to the Department of Justice, the United States hopes to quickly discharge the defendant's restitution obligations by using previously forfeited assets to pay restitution. The undersigned prosecutor has been informed that the Department of Justice grants restoration requests with some frequency, especially in cases like this in which the defendant will have a limited ability to pay off his restitution obligations.

Respectfully submitted this 2nd day of November, 2020.

JOHN W. HUBER
United States Attorney

/s/ *Michael Gadd*
MICHAEL GADD
Special Assistant United States Attorney

---

[26] 18 U.S.C. §3663(a)(1)(B)(i). The defendant has the burden of proving his financial resources. *See* 18 U.S.C. §3664(e).
[27] *United States v. Gottleib*, 140 F.3d 865, 873-74 (10th Cir. 1998).