IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

```
In re:                    )
                          )
UNITED STATES OF          )
AMERICA,                  )
                          )
        Plaintiff,        )
                          )
vs.                       )    Case No.
                          )    2:16-CR-00631DAK
AARON MICHAEL SHAMO,      )
                          )
        Defendant.        )
                          )
_____    )
```

BEFORE THE HONORABLE DALE A. KIMBALL

May 31, 2019

Motion Hearing

**Appearances of Counsel:**

For the Plaintiff:      Kent A. Burggraaf
S. Michael Gadd
Attorney at Law
Utah Attorney General's Office
348 E. South Temple
Salt Lake City, Utah 84111

Vernon G. Stejskal
Attorney at Law
US Attorney's Office
111 S. Main Street
Suite 1800
Salt Lake City, Utah 84111

For the Defendant:      Gregory G. Skordas
Kaytlin V. Beckett
Attorney at Law
Skordas & Caston
560 South 300 East
Suite 225
Salt Lake City, Utah 84111

Daryl P. Sam
Attorney at Law
Daryl P. Sam PLLC
5955 South Redwood Road
Suite 102
Salt Lake City, Utah 84123

Court Reporter:

Laura W. Robinson, RPR, FCRR, CSR, CP
351 South West Temple
8.430 U.S. Courthouse
Salt Lake City, Utah 84101
(801)328-4800

1          Salt Lake City, Utah May 31, 2019

2                    (9:05 a.m.)

3          THE COURT:  We're here again this morning in

4     *United States of America versus Aaron Shamo,*

09:12:21  5     2:16-CR-631.  For the Government, Mr. Kent Burggraaf,

6     Mr. Vernon Stejskal, and Mr. Michael Gadd.  You're

7     back there I couldn't see you.

8          The Defendant is present and represented by

9     his counsel Mr. Greg Skordas, Mr. Daryl Sam, and

09:12:42 10    Ms. Kaytlin Beckett.

11         What do you want to do first today?

12         MS. BECKETT:  Your Honor, we do have

13    Mr. Wheeler here so I think it might be appropriate

14    to put him on the stand and deal with the motion to

09:13:00 15    continue.

16         THE COURT:  Very good.  Mr. Wheeler, come

17    forward and be sworn right here in front of the clerk

18    of court.

19         THE CLERK:  Please raise your right hand.

09:13:09 20              **ERIC WHEELER,**

21    called as a witness at the request of the Defendant,

22        having been first duly sworn, was examined

23              and testified as follows:

24         THE WITNESS:  Yes.

09:13:18 25         THE CLERK:  Please take the stand.  Please

159

1    state your name and spell it for the record.

2              THE WITNESS:  Eric Wheeler, E-R-I-C

3    W-H-E-E-L-E-R.

4              THE COURT:  You may proceed, Ms. Beckett.

09:13:44  5              MS. BECKETT:  Thank you, Your Honor.

6                        **DIRECT EXAMINATION**

7    BY MS. BECKETT:

8    Q.   Mr. Wheeler, you were contacted by our office

9    about how long ago to assist in this case?

09:13:54 10    A.   I believe the first e-mail interaction between

11    you and I was March 29th, yeah, late March early

12    April.

13    Q.   And our specific request for assistance in this

14    case dealt with what, do you remember?

09:14:07 15    A.   I think when I spoke to you originally you had

16    mentioned that you had a number of hard drives or the

17    hard drive images that you wanted me to analyze and

18    essentially give it to you in a form that you could

19    search it and essentially create your exhibits for

09:14:26 20    trial.

21    Q.   And you do that quite often, correct?

22    A.   Yeah, I do that quite often.

23    Q.   How long have you been doing that for?

24    A.   About 15 years.

09:14:35 25    Q.   Is that a lot in the federal court system?

1      A.    Yes.

2      Q.    So you were retained to look at those particular

3      hard drives and images.  And about what time did you

4      receive, if you know, did you receive those external

09:14:51 5   hard drives or images to review?

6      A.    I think I got the hard drive -- I actually had a

7      trial, when you called me I was in the middle of

8      prepping for a trial in Centennial, Colorado, and so

9      I wanted to take the hard drive with me so I could

09:15:05 10  look at it in the evenings and kind of get started.

11     Um, but, yeah, I think I -- I think it was probably

12     early April late in the week.

13     Q.    And when you received those hard drives, what is

14     your process in, I guess, dealing with the

09:15:24 15  information you're provided?  How do you start that

16     process?

17     A.    Well, the first process I prioritize, I will ask

18     you what, you know, what you're looking for or what

19     is the -- what are you -- what is the important stuff

09:15:39 20  on here.  And then I just essentially begin at the

21     top.  I make an index, I will write down the images

22     as I'm going through them, and I'll say, you know, a

23     E01 file is usually the image type that I'll work

24     with.  There are a few other variations of the image

09:16:00 25  file types but E01 is the most common especially when

1    I'm working with the RCFL that the government cases

2    that they usually give me L1s.  And then I will just

3    kind of take a hard drive, plug it into the software,

4    the software that I use, and then it will take a

09:16:15  5    little while for it to index and to load into the

6    software, and then I will essentially organize it and

7    export the files as a -- that we need.

8         I mean I'll -- the file, the software, is

9    very useful in the way that it organizes the files so

09:16:35  10    that we can extract them by file type and things like

11    that.

12   Q.  When you export those files into, I believe you

13   said a database, is that for other individuals to

14   review?

09:16:45  15   A.  Exactly, yeah.  Because ultimately not everybody

16   has this forensic software that can load these E01

17   files and the ultimate goal is to give it to you in a

18   form that is useful.  Because if I were to just give

19   you what they would call logical images which is just

09:17:05  20   dragging and dropping everything from these computers

21   onto hard drives and giving it to you, it would just

22   be millions and millions and millions of just files

23   that you would have to try to review and you wouldn't

24   be able to, you know, find anything.  It would just

09:17:17  25   be a giant needle in the haystack.

1    Q.   So you used the phrase an E01 file.  Can you

2    explain to the court what an E01 file is?

3    A.   An E01 file is created when you -- I mean the

4    process that I go through is when someone seizes a

09:17:34  5    hard drive or if something needs to be imaged, you

6    use an imaging software and the imaging software that

7    I use is FTK viewer, or FTK imager, and you take a

8    what they call a write blocker which is essentially a

9    brick that has an input and an output, and then one

09:17:56 10    end is where you plug a hard drive after you extract

11    it from a computer, and then on the outside that you

12    plug it into your laptop and that prevents any data

13    from being transferred to the evidence on the

14    original hard drive because the hard drive you want

09:18:12 15    to maintain its integrity so that you don't -- it is

16    evidence, you don't want it to change at all.  And

17    then the output file that you get after it extracts

18    all of the data from it and makes it what they call a

19    physical image or a forensic image or E01 file, it

09:18:28 20    should be an exact clone of the hard drive including

21    deleted files and slack space and everything that you

22    would have.

23    Q.   Is it safe to say that a forensic imager or an

24    E01 file is created of a hard drive so that you are

09:18:41 25    not manipulating the actual hard drive and preserving

163

1   the hard drive itself, instead of messing with that,

2   you can use the E01 file to review it?

3   A.   That's exactly right.  And that's why you have

4   the write blocker.  So that the original hard drive

09:18:54   5   the integrity of it remains and you don't have to

6   work from it.

7   Q.   Mr. Wheeler, I apologize I got a little bit ahead

8   of myself.  Can we talk a little bit about your

9   qualifications.  What is it -- how did you start

09:19:07   10   getting involved in doing this type of work?

11   A.   Well, I graduated from Utah State with a degree

12   in graphics and this was back in 2001 and I started

13   working for a company that did a lot of trial

14   demonstratives and things like that.  And I quickly

09:19:25   15   became their IT manager I suppose you would call me.

16   And the individual I was working with was doing a lot

17   of trial presentations and things like that and

18   working with trial preparations and eDiscovery was

19   just kind of up and coming.  So they had me go to a

09:19:43   20   few different training and I got certified in some of

21   the software that you use including this access data

22   and the Forensic ToolKit and, um, I, you know,

23   LexisNexis, I got certified in LexisNexis there,

24   their software as well.  There is a few different

09:20:01   25   eDiscovery tools they have as well.  And I mean there

164

1    is -- there is -- now there is quite a bit, but back

2    then there was probably just a handful.

3    Q.   And how many trials would you say you have been

4    involved in if you had to estimate?

09:20:13 5    A.   Well trials, I -- I have probably -- I could

6    probably in my head do the math I think I probably

7    average five to eight trials a year, it has tapered

8    down a little bit, but I would say probably 100, 120

9    trials.

09:20:31 10   Q.   And for cases that don't go to trial where you

11   just assist in this forensic review or computer

12   analysis, how many of those would you say you have

13   been involved in?

14   A.   Hundreds.  Hundreds of them.

09:20:44 15   Q.   Over the last 15 years you said, I believe?

16   A.   Yes.  Yes.

17         MS. BECKETT:  Okay.  I am more than happy to

18   go into Mr. Wheeler's qualifications if the Court

19   would like some more clarification on that or if that

09:20:55 20   is necessary at this point, Your Honor.

21         THE COURT:  I don't think it is necessary at

22   this point.

23         MS. BECKETT:  Thank you, Your Honor.

24   Q.   (By Ms. Beckett)  So let's get back to this E01

09:21:03 25   file.  So when you received that E01 file, I believe

1        you said it is your process to take that information

2        and put it into a format that is easy for some of us

3        attorneys or paralegals a little easier for us to

4        process.  And what does that entail?

09:21:19   5    A.   So after I have extracted all of the files that I

6        deem that could be potentially useful for trial from

7        the image, I then what they call process them which

8        is it means that you go through and you OCR them

9        which means extract the text, if there is text to

09:21:38  10    extract, read the characters, creates a text file

11       that goes with each file, image it, meaning it is

12       also a different image, this is called tiffing or

13       something which then creates a kind of a copy of the

14       file so you are not working from the native, there is

09:21:52  15    also something you can call a native review which

16       just means the original file like if you're working

17       with an Excel spreadsheet, you know, the file

18       extension type would be XLS or XLX.

19       Q.   So if you double click to open that --

09:22:08  20            THE COURT:  Don't talk at the same time.

21       Q.   (By Ms. Beckett)  I apologize, Your Honor.  If

22       you double click to open one of those images in its

23       native format if it were an excel file it would open

24       as an excel file?

09:22:18  25    A.   Yeah, in excel or something like that.

1    Q.   If it were a pdf it would open in a pdf format?

2    A.   Yes, and in Acrobat, yeah.

3    Q.   So it is a fairly detailed process you would say?

4    A.   Yeah.  The process is a somewhat arduous.  I mean

09:22:34  5    there is a lot of protocol that you do.  And the

6    reason why is so you don't lose anything, you don't

7    miss anything.  And, um, like I say, ultimately you

8    want to get it to the lawyers, to the counsel, in a

9    form that is useful to them.

09:22:52  10    Q.   When you were first provided the hard drives in

11    this particular matter, do you remember the amount of

12    data that was on the hard drive that you received?

13    A.   Um, from you?

14    Q.   Correct.

09:23:06  15    A.   I think the total amount was somewhere around six

16    terabytes.

17    Q.   And that included what?

18    A.   I think there was three folders on the root of

19    the hard drive and one said to be reviewed and then

09:23:25  20    one was a backup from the original, I think the

21    manufacturer of the hard drive, and then there was

22    another one that said Shamo.  And then within each of

23    those, I think that for -- for the first folder

24    contained Paz or Paz's hard drives and computers, and

09:23:47  25    Crandall stuff as well.

1    Q.   And you were specifically asked to review those,

2    correct?

3    A.   Yes.

4    Q.   After you received that information, did you make

09:23:57  5    what we would call a native file request to the U.S.

6    Attorney's Office?

7    A.   Yes.

8    Q.   And what is a native file request?

9    A.   Well, the native file request is -- was done, it

09:24:08  10    is something that I usually do when I am working with

11    a government case, is originally they would try to

12    give me load files so .dat files from their -- they

13    would extract from their database so we would be able

14    to work from the same exhibits or the same files on

09:24:25  15    each side and have a copy.  But there was a -- there

16    was a problem with, you know, work product and so

17    they said well let's just, you know, to avoid the

18    problem of having to, you know, maybe use someone's

19    work product they would just give me the native files

09:24:42  20    and then I would create my own database from it.

21    Q.   Is that something that you commonly do, make

22    native file requests?

23    A.   I think I have done it in every trial I have done

24    with the government.

09:24:53  25    Q.   Did you receive native files in this case?

```
 1    A.   I did.

 2    Q.   About how many native files did you receive?

 3    A.   I think after I loaded the files into a database

 4    I think it was around 6,500.

 5    Q.   Around early May of this year do you remember

 6    receiving an e-mail from co-counsel on this case

 7    Daryl Sam?

 8    A.   Yes.

 9    Q.   Do you remember that e-mail regarding exhibits?

10    A.   Yes.

11    Q.   Do you remember what Mr. Sam asked of you in that

12    e-mail?

13    A.   I think he was inquiring to me as to he couldn't

14    find a specific document and so I was saying all

15    right, well let me go look into the database that I

16    created and see if I can find it in the native files

17    that the Government had given to us, you know,

18    because I'm assuming that at the very least it is

19    going to be there, and I couldn't find anything.  And

20    I am like, well, there is a few variables that go in

21    to the reason why you wouldn't be able to find an

22    exhibit, perhaps it got a bad OCR, it couldn't read

23    the text very well or, you know, something like that.

24    So then I started to kind of inquire around where the

25    -- where the files had come from and I called the
```

09:25:05  5
09:25:20 10
09:25:35 15
09:25:47 20
09:26:03 25

1     U.S. Attorney's Office and asked them if they could

2     give me a little bit more of a roadmap where they got

3     these files from.

4     Q.   And these particular files, do you recall what

09:26:17 5     these exhibits were that Mr. Sam asked you about?

6     A.   I mean I didn't -- it seems like a lot of

7     screenshots of phones and note files or screenshots

8     of note files from phones or mobile devices.

9     Q.   And when you contacted the U.S. Attorney's

09:26:35 10    Office, did they inform you where they had retrieved

11    those particular exhibits from.

12    A.   I believe the first thing -- they weren't exactly

13    sure but then I think they came to the conclusion

14    that they were on Luke Paz's iMac or the image of his

09:26:51 15    iMac.

16    Q.   And when you were told that, what did you do?

17    A.   I quickly went to my files and looked in the iMac

18    -- the first thing -- my worst nightmare is missing

19    something, you know, so I was like, oh, great, I

09:27:04 20    missed some really important files.  So I went to

21    look into the -- the iMac folder because there was

22    actually a folder that said Luke Paz's iMac.  And in

23    it there was nothing.  There was literally 10

24    gigabytes of like some photos and there was 3 DMG

09:27:20 25    files which is essentially a backup file.

170

1 Q. Was there an E01 file in there?

2 A. There was no E01 file.

3 Q. There was no forensic image of that iMac?

4 A. No, there was not.

09:27:30 5 Q. Did you then inquire of our office as to whether

6 or not we had a copy of the E01 file?

7 A. Yes, I think that was that day was -- I called

8 you, as well, and asked if you had something -- I

9 think what I asked is what was in your Luke Paz iMac

09:27:45 10 folder and that you had the exact same thing as me.

11 Q. We compared those files and they were the same?

12 A. Yes.

13 Q. After that, did you make contact with the U.S.

14 Attorney's Office again?

09:27:54 15 A. I did.  I think I then spoke to Mike over there,

16 or I got an e-mail transfer I mean a correlation with

17 him and he confirmed that they had come from the iMac

18 image and I said well, I don't have an iMac image.

19 And that he was saying that you had one.  And then I

09:28:14 20 called I think I called you again and we were looking

21 together on your -- on the original hard drives that

22 you received from the Government.

23 Q. Do you remember receiving some e-mail

24 correspondence from the U.S. Attorney's Office

09:28:24 25 regarding what they believe the proper file size

171

1   should have been of those particular files?

2   A.   I do think -- and it is very common.  I mean one

3   of the first things you will do, if you want to make

4   sure that you have a good image or a good, you know,

09:28:39  5   a good copy of a folder, is to check the file size.

6   And I think that in that e-mail correlation he had

7   mentioned somewhere around 1.8 terabytes or something

8   like that.

9   Q.   And that was significantly less than what you had

09:28:52  10   at that point in time, correct?

11   A.   Well, that -- the 1.8 terabyte of just Paz stuff

12   was more than I had.  I mean I -- my total of his

13   stuff with all of his files and stuff was, I think,

14   around one terabyte.

09:29:09  15   Q.   Did you request a new copy of that information or

16   that forensic image from the U.S. Attorney's Office?

17   A.   I did.  I knew that it was important and I wanted

18   to make sure I knew trial was coming up and I wanted

19   to make sure that you guys had this stuff so could

09:29:27  20   you review it and, you know, you could use it for

21   trial.

22   Q.   How long would it take you to go through your

23   process with just 1.8 terabytes of information?

24   A.   Well, like I guess it depends on how many hours a

09:29:39  25   day I work on it.  I mean I think I have been working

1    on it, you know, a few hours a day.  I have other

2    projects so I haven't been working around the clock

3    and I'm not going to, you know, pretend that I have

4    been, but I think that in the last month I have gone

09:29:53  5    through about, I think about that, about two

6    terabytes of stuff.

7    Q.   Because you have the other cases that you have to

8    work on, you have other things that -- this isn't

9    your top priority?

09:30:05  10   A.   Yeah.  And the process it takes a while.  You

11   take the E01 file and it takes a little while to load

12   into the software.  And if it is a really big file it

13   will take overnight.  And then the next day I will

14   come in or I'll remote in to my work computer and

09:30:19  15   I'll start to kind of analyze it and go through it.

16   And then like I say, extracting files and kind of

17   looking and seeing what is on the hard drive.

18   Q.   Did you ultimately receive or were you ultimately

19   able to make contact with the U.S. Attorney's Office

09:30:35  20   and request a new copy of a hard drive or of those

21   hard drives?

22   A.   Yes.  I -- that same day I ran to the store and I

23   grabbed as big an external hard drive as I could

24   find, an eight terabyte, because I wanted to make

09:30:50  25   sure that I had a good copy of the E01s.  And I was

1    also anxious that the files that I actually had might

2    have some problems as well so I wanted to make sure

3    that I had good copies and I wanted to go directly to

4    the Government.  So I dropped off a hard drive for

09:31:05  5    them to copy the files they had for me.

6    Q.   Do you remember receiving an e-mail from the U.S.

7    Attorney's Office about whether or not they still had

8    the original hard drives that our files had been

9    copied from?

09:31:18  10   A.   I think I vaguely remember them saying that it

11   had been a while and they might have retired them or

12   I can't remember the term that they used so they

13   weren't even -- I think they thought they might have

14   had to back everything up to tape and it would have

09:31:33  15   been kind of a process for them to get the original

16   E01 files.

17   Q.   Do you remember a follow-up e-mail from the U.S.

18   Attorney's Office where they indicated that they in

19   fact had located those hard drives?

09:31:43  20   A.   Yes.

21   Q.   And do you remember a follow-up e-mail from the

22   U.S. Attorney's Office where they indicated that

23   those hard drives actually contained that Luke Paz

24   iMac but it was split over three separate hard

09:31:58  25   drives?

1    A.   Yes, I think I remember that.  Yeah.

2    Q.   And you provided the U.S. Attorney's Office with

3    an external hard drive, correct?

4    A.   Yes.

09:32:05  5    Q.   And how large was that external hard drive?

6    A.   Eight terabyte.

7    Q.   When you ultimately -- when did you ultimately

8    receive the -- your eight terabyte hard drive back

9    from the U.S. Attorney's Office?

09:32:18 10    A.   I think it took a little while because I mean

11    that is a lot of data and, um, I think it took over

12    the weekend.  I mean I think it was about 4 or 5 days

13    for them to copy everything over.

14    Q.   Do you estimate you had it maybe Tuesday or

09:32:34 15    Wednesday of this week?

16    A.   Yes.

17    Q.   Were you able to review the information they gave

18    you on that hard drive?

19    A.   Well, as soon as I had the hard drive, I quickly

09:32:42 20    ran and plugged it in just to make sure that it was

21    different because I was having nightmares that I had

22    missed something, you know.  So the first thing I did

23    was I plugged it in to look at it and compare what

24    you had given me with what they had just given me.

09:32:55 25    And the first thing I noticed was what they had just

175

1    given me was about three times as large.

2    Q.   In size?

3    A.   In file size.

4    Q.   Were you able to locate the Luke Paz iMac folder?

09:33:10   5    A.   I could not find that same folder.  There was not

6    a folder in there called Luke Paz iMac.  But there

7    was, on the root of the hard drive, a folder called

8    image which I am assuming is the Luke Paz iMac.

9    Q.   How large was that file?

09:33:26   10   A.   That file was about, I think itself, about three

11   terabytes.

12   Q.   Significantly larger than the 1.9 terabytes,

13   correct?

14   A.   Yes.

09:33:37   15   Q.   And that 1.9 or 1.8 terabytes was supposed to

16   represent everything the U.S. Attorney's Office said

17   they had regarding both Drew Crandall and Luke Paz,

18   correct?

19   A.   Yes.

09:33:49   20   Q.   How long would it take you to process the nearly

21   three terabytes of data just on Mr. Paz's iMac to get

22   it to a format for our office to review?

23   A.   Well, I mean a lot of it depends on the files

24   that are on the hard drive.  I mean sometimes you get

09:34:07   25   a lot of movies, a lot of music and things like that,

1      but you -- just to -- just to give you some ideas, I

2      mean three terabytes of data if you were to take that

3      and put it into like a library, that's a roomful of

4      documents.

09:34:24  5   Q.   For an attorney to review it though it would need

6      to be in a format to be able to even tell what those

7      files are, correct?

8      A.   Exactly.  Like I say, lawyers don't have the

9      software and the software is expensive to use to even

09:34:38  10  look at E01 files and to extract them and extract

11     files from them.  So for me to get into a database,

12     that much, and I mean it is hard to estimate.  I mean

13     I guess that it took me about a month to do two

14     terabytes of stuff, provided I work around the clock

09:34:57  15  it would take me a few weeks, I would say, and then

16     that would just be the first step and then I would

17     send it out to get processed and then I would receive

18     it back within probably a few days or maybe a week

19     and then I would load it into a database and then you

09:35:13  20  and your office could analyze it.

21     Q.   All right.  I'm going to have you backtrack a

22     little bit.  So the original hard drive that you

23     received from our office, the file sizes on there

24     were significantly smaller, correct?

09:35:28  25  A.   Yes.  And I have a -- I'm sorry I keep reaching

177

1    for my bag, I have got a list of everything on here

2    if I could use it for better reference on the file

3    sizes.

4    Q.   Would that help refresh your recollection?

09:35:40  5    A.   Yes, it would.

6    Q.   Feel free to look at that.  So you have a

7    document in front of you, correct?

8    A.   Yes, I have a little bit of a spreadsheet that I

9    made.

09:35:54  10   Q.   I believe that was attached to the motion that

11   was filed yesterday, but I do have physical copies

12   for the Court if that is helpful at all.  I believe

13   you guys have seen that.

14           MR. BURGGRAAF:  I have a copy.

09:36:06  15          THE COURT:  That was attached, right?

16           MS. BECKETT:  Correct, Your Honor.

17   Q.   (By Ms. Beckett) So you have two separate dates

18   on here.  At the tope I believe it says discovery

19   received 4-1?

09:36:17  20   A.   Yes.

21   Q.   And then discovery received 5-28?

22   A.   Yes.

23   Q.   And then you just did a general comparison of the

24   size difference under the size category, correct?

09:36:26  25   A.   Yes.

178

1    Q.   What was your overall conclusion about the size

2    difference just for the information regarding Mr. Paz

3    and Mr. Crandall?

4    A.   Well, the first thing I noticed is that we did

09:36:35  5    have quite a bit of the same files and the E01 files

6    did match up with what you had given me.  And as I

7    went through I even -- they even had the same serial

8    number and the Bates numbers that were assigned to

9    them.  But then I noticed there were two files in

09:36:53  10   particular that were extremely big that I had not

11   seen before and that was the image file and then a

12   Seagate external hard drive.

13   Q.   Do you remember an e-mail correspondence from the

14   U.S. Attorney's Office that indicated there was a

09:37:07  15   need for verification and specific software to

16   transfer computer files?

17   A.   Yes.

18   Q.   Is it a requirement to have verification and

19   specific software and/or specific software to

09:37:16  20   transfer computer files like that?

21   A.   I mean I don't know if you would say required, I

22   use one myself.  But I mean it is just essentially

23   just to verify that you -- that you copied everything

24   over and I do it when there are particularly large

09:37:31  25   hard drives that I'm trying to copy.

179

1    Q.   If there were an issue with verifying the proper

2    copying of computer files from one hard drive to

3    another, would you see an entire E01 file missing or

4    would it look differently than just an entire missing

09:37:47   5    E01 file?

6    A.   No.   No usually what you'll see is that it will

7    keep the folder name but the contents of the folder

8    will be empty or missing a few files so they wouldn't

9    line up.   Meaning if there was a problem when you

09:37:59   10    were copying the files, then the -- the folders would

11    say the same name but the file size would be

12    different.

13    Q.   But you've indicated from your report here that

14    there were only two complete items missing, there

09:38:13   15    weren't random files, there were two complete files

16    that were just --

17    A.   Yes, exactly.   And I also noted that on the hard

18    drive that you had originally given me there was a

19    Luke Paz iMac folder which was not contained on what

09:38:29   20    they had given me.

21    Q.   Completely different file name?

22    A.   Completely different folder name, yeah.

23    Q.   Do you remember contacting the U.S. Attorney's

24    Office about an encrypted image on the hard drive we

09:38:40   25    provided you?

180

1    A.   Yes, I did.

2    Q.   Was that an E01 file?

3    A.   It was.

4    Q.   And that E01 file would be just a forensic image

09:38:51   5    of a computer?

6    A.   Yes, it is a -- specifically, I have it right

7    here, Mac Book Pro and then I have the number that

8    was given by the government L2_002A.

9    Q.   Is that a large file?

09:39:02   10   A.   Yes.   It is 181 gigabytes.

11   Q.   Who did that particular forensic image attach to?

12   What defendant in this case or co-conspirator?

13   A.   That's Paz as well.

14   Q.   When you contacted the U.S. Attorney's Office to

09:39:14   15   ask them about why that image was encrypted, what

16   were you informed?

17   A.   I think the first thing they said was nothing

18   they had was encrypted, and then I said okay, well,

19   um, you know, maybe I got a bad, I don't know, they

09:39:27   20   said they didn't have anything encrypted.   And then I

21   think I received another e-mail saying that their

22   version was encrypted as well.

23   Q.   Who creates an E01 file?

24   A.   Whoever seizes the hard drive.

09:39:45   25   Q.   Because as we established earlier the purpose of

181

1   having an E01 file is for a forensic review of the

2   computer?

3   A.   Exactly, yeah.  People don't make E01s of their

4   own computers.

09:39:55 5   Q.   Does it require a certain amount of technical or

6   computer knowledge to create an E01 file.

7   A.   Well, it takes a little bit but it also takes the

8   software that it needs for that.

9   Q.   And that is expensive software?

09:40:05 10   A.   The imaging software is not as expensive, the

11   analysis software is.

12   Q.   Have you ever come across an E01 file that was

13   created by a defendant?

14   A.   I don't think he would use it.  No, I have not.

09:40:20 15   Q.   Because normally an individual would just have a

16   copy of their own hard drive they wouldn't need a

17   forensic image, correct?

18   A.   Yeah, and I don't think that they would trust an

19   image that was created by a defendant of their own

09:40:30 20   computer.

21   Q.   And if you have a forensic image, is it common

22   practice to encrypt that forensic image once you make

23   it?

24   A.   It is not uncommon.  I mean I get encrypted files

09:40:43 25   from the government quite a bit.  Their security is

1    pretty locked down.

2    Q.   So it would be your opinion that the encryption

3    that occurred on that particular file was something

4    that was done by a forensic reviewer?

09:40:55  5    A.   Yeah, I would imagine that that would have to.

6             MS. BECKETT:   If I could have just one

7    second, Your Honor.

8             THE COURT:   Sure.

9             MS. BECKETT:   I have no further questions at

09:41:19 10    this time, Your Honor.

11            THE COURT:   Thank you, Ms. Beckett.

12    Mr. Burggraaf, you may cross-examine.

13            MR. BURGGRAAF:   May I have just a moment,

14    Your Honor?

09:41:33 15            THE COURT:   Sure.

16                     **CROSS EXAMINATION**

17    BY MR. BURGGRAAF:

18    Q.   Good morning, Mr. Wheeler.

19    A.   Good morning.

09:41:48 20    Q.   You had mentioned you had a conversation with

21    someone at the U.S. Attorney's Office.   At one point

22    you mentioned Mr. Gadd.   Is it possible that you also

23    spoke with myself, Kent Burggraaf?

24    A.   Yeah, I think we had a conference call when I was

09:42:03 25    in my car, yeah.

1    Q.   Okay.  That would confirm my memory as well.

2            A few questions.  First I just want to jump

3    back to your qualifications.  Can you tell me what

4    forensic computer software certifications you have

09:42:22  5    other than from AD Lab?

6    A.   Um, I have access data the Forensic ToolKit, is

7    that what you're talking about from the AD Lab?

8    Q.   So other than that, do you have certifications in

9    any other computer forensic software?

09:42:37 10    A.   Not forensic software, no.

11    Q.   Do you have experience using any other forensic

12    software?

13    A.   Yeah, like say LexisNexis has a software called

14    Law that does essentially the same thing but I

09:42:51 15    wouldn't know that -- I don't know that I would

16    classify it as a forensic software, it is more of an

17    eDiscovery tool or processing tool.

18    Q.   Would you consider computer forensics different

19    than dealing with eDiscovery?

09:43:04 20    A.   Yeah in -- in some sense.  Usually forensics you

21    work from a physical image or a forensic image and

22    you are dealing with deleted files and sometimes you

23    have to do things like decrypt things and create a

24    dictionary of hard drives and things like that.

09:43:22 25    Q.   Um, you mentioned that you have been involved

1    with between 100 and 120 trials; is that correct?

2    A.   Presented for, yeah, that's been in trial

3    presenting for about 120 cases.

4    Q.   Of those cases, how many times have you testified

09:43:41  5    as a computer expert?

6    A.   Um, probably just three or four times.

7    Q.   And of those three or four times, how many times

8    were you testifying in federal court?

9    A.   I think every time.

09:43:57 10    Q.   Every time, okay.  Do you have any publications

11    related to computer forensics?

12    A.   No.

13    Q.   How many computer forensic examinations have you

14    done of a computer?

09:44:12 15    A.   How many forensic examinations?  I would probably

16    say close to 50.

17    Q.   And how about of cell phones?

18    A.   When you say -- I mean 50 cases.  So how many

19    total like actual devices?

09:44:26 20    Q.   Yeah.  How many devices have you gone through the

21    process that you described?

22    A.   Hundreds.  Hundreds of them.

23    Q.   Hundreds.  And what was the software that you --

24    well, let me clarify, did you use FTK, Forensic

09:44:39 25    ToolKit, for each one of those?

1    A.   Essentially.  There is also a software that the

2    government will give me quite a bit that I use is

3    Cellebrite as well.

4    Q.   Now, do you use Cellebrite for computer images?

09:44:53  5    A.   No, that's for cell phones and things like that.

6    Q.   So when you're talking about hundreds of computer

7    forensic examinations, are you lumping in cell phones

8    as well?

9    A.   Yes.

09:45:01  10    Q.   So excluding the cell phone forensic

11    examinations, how many computer?

12    A.   I would still say hundreds.  I mean usually there

13    is less cell phones, there will be a few on there,

14    but, yeah, I probably would say -- I mean I probably

09:45:14  15    see a lot less cell phones than I do hard drives.

16    Q.   Have you used any -- as far as the computers go,

17    have you ever used forensic software other than

18    Forensic ToolKit to perform your examinations?

19    A.   I have tried a few others.  There is a lot of

09:45:30  20    proprietary or a lot of software that people will

21    create themselves, that they will -- I'll get

22    promotions for and I'll give them a shot.  I have

23    tried, I think, a few.  I'm trying to think of some

24    of the names.  WestLaw has one that I used.  There is

09:45:48  25    a few other software for, you know, undeleting

186

1    software, undeleting files that you have on the

2    computer.  And there is, I think, a few other

3    decryption software that I have used but I found that

4    FTK -- I mean it is the same software that the

09:46:04  5    government uses essentially.

6    Q.    What version of FTK do you use?

7    A.    The most recent.  I can't remember what version

8    it is, but if you have your dongle they -- you would

9    receive updates yearly or quite often actually.

09:46:19 10    Q.    When using the most recent version, how do you

11    account for any bugs in the software?

12    A.    Accounting for bugs?  Can you be more specific?

13    Q.    Well, they come up with new versions of software

14    because they find bugs in the software.  Is that one

09:46:35 15    reason for it?

16    A.    Or they have new features.  Or I mean just like

17    your iTunes you would get updates quite often.

18    Q.    Are you aware of the errors or prior bugs in

19    Forensic -- the Forensic ToolKit software?

09:46:47 20    A.    I think most of the problems are stability.  If

21    you're loading files sometimes the software will

22    freeze or crash.

23    Q.    So in using the most recent version it would be a

24    little bit difficult to know right up front what bugs

09:47:01 25    exist in the software.  Is that an accurate

1    statement?

2    A.   Yeah.  I don't usually read the logs of the

3    updates in detail.  Sometimes it will just tell you,

4    give you a list of things that potentially people

09:47:15  5    have had problems with.  Like I say, the -- the main

6    issues that I have had problems with is maybe

7    stability.  I haven't had any problems with the --

8    with the -- I mean other bugs than that.

9    Q.   When you used the most recent version, do you

09:47:29 10    download a new copy each time you use it?

11    A.   I think it automatically will download for you.

12    The way the software works is that it gives you a

13    dongle or a USB like a kind of like a flash drive

14    that you plug into your computer and it has all the

09:47:43 15    license information on it.  So if you have that

16    plugged into a computer, it will automatically update

17    your license.  I mean you can change the settings on

18    the -- on your software so that you will, you know,

19    you can say yes or no to an update to the software

09:47:58 20    but I always just let it update by itself.

21    Q.   Do you ever review the bug reports for the

22    software?

23    A.   No.  Like I say, I don't usually read them.

24    Q.   So you're not aware of the past bug issues with

09:48:13 25    the software when you're utilizing it?

1    A.   If you have a specific bug I probably am not

2    aware of it.

3    Q.   As far as using FTK, what do you do to verify

4    that it is working correctly and not changing or

09:48:30  5    modifying metadata or the data generally?

6    A.   Well, I've never had it change metadata on a file

7    when it exports it.  That is the whole reason why it

8    works from an image.  And then the software is

9    designed to maintain that integrity.  I mean it

09:48:46 10    creates hashtag -- MD5 Hash files after you create an

11    image so that you make sure that you don't do that,

12    that you're not -- I mean that's really important

13    that you don't work directly from the original hard

14    drives because you don't want the meta files and the

09:49:02 15    metadata all to be modified in any way.

16    Q.   What is an MD5 Hash?

17    A.   A hash is -- essentially it is a hexadecimal like

18    code that you first before you image a hard drive, it

19    creates a MD5 Hash of the data on that hard drive and

09:49:21 20    it essentially is a -- I mean like a 32 character

21    number that, you know, both letters and numbers.  And

22    then after you image the file, you run it again.  And

23    if the two MD5 files match up, then you know you have

24    a good image.

09:49:37 25    Q.   Is there any error rate with an MD5 Hash?

189

1          THE COURT:  What?

2          THE WITNESS:  I think there is.

3          MR. BURGGRAAF:  I'm sorry?

4          THE COURT:  Error rate.

09:49:48  5    Q.   (By Mr. Burggraaf)  Yes, error rate, Your Honor.

6    A.   I think they did mention there was a slight

7    error, but I don't know of any other more accurate

8    way of verifying an image than an MD5.  In fact, I

9    think that every time the government gives me an E01

09:49:59 10   file there is usually an MD5 file in that same

11   folder.

12   Q.   Okay.  What type of work station do you use for

13   processing an E01 file?

14   A.   I've just been using my windows machine that I

09:50:15 15   have at my office and it's pretty good, it is an i7,

16   it is good computer.  I also have a Xeon server that

17   I have used if I use very large stuff.  But, um, my

18   i7 does handle it pretty well.  I think it just

19   depends on how good your hard drive re-grid is, it

09:50:34 20   helps.

21   Q.   On your i7, is that what you intend to use to

22   examine the image file that you referenced on direct?

23   A.   Yes.

24   Q.   Is that a stand-alone work station?

09:50:45 25   A.   Yes.

1    Q.   So while that's processing, do you use it for

2    anything else?

3    A.   You can use it for other things, for everything

4    else.  I know that the government, one thing that is

09:50:54    5    neat about the Access Data Software is you can also

6    do something called farming, which I -- I don't.  You

7    have to have multiple licenses of the software and

8    the software is relatively expensive, but that's the

9    way you could process it, the only way you could

09:51:08   10    process it faster than with an individual stand-alone

11    computer.

12    Q.   Do you know the specs of that i7 that you're

13    using?

14    A.   I can't tell you the megahertz of it.  I know it

09:51:21   15    is a couple of years old but I think it is a 4600k.

16    I think that's the -- that is the processor number.

17    Q.   Um, do you know the -- do you know the size of

18    the RAM, R-A-M, all caps?

19    A.   I think I have about 32.  Yeah, 32 gigs of RAM.

09:51:44   20    Q.   And do you know how many cores, C-O-R-E-S, the

21    CPU has?

22    A.   I think it is an eight core but I can't remember

23    exactly.

24    Q.   Are you aware of what the minimum specs are for

09:51:55   25    the current version of Forensic ToolKit?

1    A.   No, but I -- usually they go back quite a ways.

2    I mean I'm sure my soft -- my computer meets the

3    minimum requirements.

4    Q.   Have you -- so you're not aware that the current

09:52:15  5    minimum specs for Forensic ToolKit version 6.3

6    require 48 cores for the CPU, 96 gig of RAM, and an

7    operating system drive of 7200?

8    A.   Now, are you referring to Lab, FTK Lab, or FTK

9    Kit, like just a plain Forensic ToolKit?

09:52:39 10    Q.   Tool, Forensic ToolKit?

11    A.   Yeah, I would imagine that sounds like you would

12    have to use a server.

13    Q.   But you aren't intending to use a server in this

14    case?

09:52:48 15    A.   No.

16    Q.   What happens with that kind of software as far as

17    the time to process when you're not using a computer

18    with the minimum specs that they outline?

19    A.   Well, I mean you would start to see a lot more

09:53:02 20    crashing and things like that.  Essentially you

21    wouldn't be able to load things because the computer

22    wouldn't be able to handle that amount of data.

23    Q.   Would it slow down the process if it actually

24    works?

09:53:17 25    A.   Yeah, I think it would probably slow down quite a

192

1    bit.

2    Q.   I mean with the processing speed, if you don't

3    have a sufficient processing speed that means that

4    the process is going to take longer.

09:53:27  5    A.   Yeah.

6    Q.   Okay.

7            MR. BURGGRAAF:   If I may approach, Your

8    Honor.

9            THE COURT:   You may.

09:53:36 10    Q.   (By Mr. Burggraaf)   Mr. Wheeler, I have handed

11    you what the Government has used to document an

12    inventory of several Addonics hard drives.   On Page 1

13    if you would look there is a part circled in red?

14    A.   Yeah.

09:54:14 15    Q.   What does that say?

16    A.   Image.

17    Q.   On your direct testimony you stated that on the

18    recent hard drive or the files that were given to you

19    that there was a file called image; is that correct?

09:54:26 20    A.   A folder.   Yeah, a folder called image.

21    Q.   If you look down below that, do you recognize --

22    I assume you have already looked at that image file;

23    is that right?

24    A.   I looked at the size of it, I started putting it

09:54:39 25    into my computer but I haven't really analyzed it

1    yet.

2    Q.   Did you look inside of the folder though and see

3    any of those files that you see down below that is

4    circled image folder?

09:54:50 5    A.   Yes, there were E01 files in there and I did see

6    that they -- yes, they also had that folder Disc 2,

7    2008 which I think is the date I think it was copied.

8    Q.   If you would turn to the second page, there is a

9    second file folder circled.  Do you see that?

09:55:07 10   A.   Yes.

11   Q.   And what is the title on that?

12   A.   Image continued I think or miles -- is that an I?

13   Q.   The one that is specifically circled?

14   A.   Oh, just image continued, yeah.

09:55:21 15   Q.   Okay.  Now within that image continued folder,

16   there is several files down below.  Do you recognize

17   those file types?

18   A.   Yeah.

19   Q.   And what type of files are those?

09:55:33 20   A.   FSA, SFB, and things like that.

21   Q.   Okay.  Thank you.  If I may retrieve it.

22        Now, I want to just address a couple of

23   points that you brought up while defense counsel was

24   asking you questions.  How current is your Forensic

09:56:08 25   ToolKit certification?

194

1    A.    How current is it?  Well, I haven't got it

2    renewed, is that what you mean, since I originally

3    was certified.

4    Q.    Yes.

09:56:19 5    A.    I think in my training -- yeah, I haven't got

6    retrained.

7    Q.    So when is your certification for that?

8    A.    When?  I would say when the -- when the software

9    was relatively new.  I think it was probably -- it

09:56:36 10    has been probably 12 years or so.

11    Q.    Have you had any followup training for Forensic

12    ToolKit since you were originally certified?

13    A.    No, I have not.

14    Q.    You said that new versions often times have new

09:56:54 15    features; is that right?

16    A.    Yeah.

17    Q.    But you haven't been trained on any of those new

18    features; is that correct?

19    A.    I have not been specifically trained on any of

09:57:03 20    the new features.

21    Q.    You mentioned that you received hard drives, and

22    you said towards the beginning of April you received

23    hard drives from defense counsel with approximately

24    six terabytes of data; is that right?

09:57:17 25    A.    So repeat that question again.

195

1    Q.   You said that at the beginning of April you

2    received hard drives from the defense counsel that

3    included about six terabytes of data.  Is that

4    correct?

09:57:30  5    A.   I received one external hard drive that contained

6    multiple images of hard drives on it.

7    Q.   Okay.  So one hard drive and that is all you

8    received from defense counsel initially?

9    A.   Exactly.

09:57:43  10    Q.   Okay.  Did you prepare that hard drive prior to

11    files being transferred to it?

12    A.   Prepare it in what way?

13    Q.   Like what condition did it come to you in?  Did

14    it already have data on it or was it a blank hard

09:57:56  15    drive and then you made a copy of something?

16    A.   No.  The hard drive was just given to me with

17    data on it.

18    Q.   Okay.  So the E01 files and other files that were

19    on the hard drive, were you the one who did any sort

09:58:08  20    of copying from the drives that defense counsel had

21    in their possession?

22    A.   No, I was not.

23    Q.   Okay.  And you said in response to defense

24    counsel's question about verification, um, you said

09:58:23  25    it is not necessary but that you use a verification

196

1    process to confirm files copy over correctly; is that

2    right?

3    A.   I do.

4    Q.   Why -- why do you use that verification process?

09:58:35  5    A.   Well, it's anybody that has worked with a logical

6    computer images, meaning the file, just dragging and

7    dropping sometimes you get errors and sometimes

8    things don't copy over correctly.

9    Q.   Okay.  When you have dealt with eDiscovery

09:58:53 10    before, are you normally the one who transfers or

11    copies files over that are provided by the other

12    side?

13    A.   No.  Usually the Government will give them to me.

14    Sometimes the Government will make a copy and then

09:59:06 15    give one to me and one to counsel, but seldom do I do

16    it.

17    Q.   So in your practice, how often is it that defense

18    counsel makes the copy of the large discovery data?

19    A.   I think it is fairly common.

09:59:21 20    Q.   Okay.  And have you come across an error like

21    this before when that has happened where files have

22    been missing?

23    A.   Yeah, I think it happens sometimes, yeah.

24    Q.   Okay.  You mentioned that when you contacted the

09:59:35 25    U.S. Attorney's Office that they may have mentioned

1 that the hard drives may have been backed up to tape.

2 Who did you speak to when they referenced tape?

3 A. I think it was Dave Ewan, sorry that's a lawyer's

4 name of mine.  I'm trying to remember the name of

10:00:00 5 the -- I can -- he used to work at the RCFL.  I'm

6 drawing a blank on his name, but I called the RCFL

7 directly and asked them and then they --

8 Q. In this case you called the RCFL?

9 A. Yeah, because I wanted to make sure I had a good

10:00:18 10 image, that I had everything that I needed.

11 Q. And so you spoke to someone at the RCFL not the

12 U.S. Attorney's Office?

13 A. I think I spoke to someone at the U.S. Attorney's

14 Office first, Randy Kim, sorry, that's his name,

10:00:30 15 Randy Kim, and then, um, they -- they were kind of at

16 a loss because they didn't know that, you know, where

17 the file -- where the hard drives were potentially,

18 and whether or not they even still had them.  And so

19 then I said well, you know, I'll call Randy and see

10:00:46 20 if -- because I have a somewhat good working

21 relationship with Randy who is head of the RCFL over

22 the local office, he is now gone, but I talked to

23 him.

24 Q. So in speaking with Randy Kim, was he the one

10:00:59 25 that referenced the backup tape?

198

1    A.   He said it was likely that they probably retired

2    the drives and probably backed everything up or

3    archived it to tape which is fairly common.

4    Q.   But he is no longer at the local RCFL?

10:01:11    5    A.   Not locally, yeah.  I think he was promoted,

6    yeah.

7    Q.   Okay.  You mentioned you received a native file

8    from the U.S. Attorney's Office.  How large -- or the

9    native files.  How large were those native files?

10:01:24   10    A.   The native files were probably only about 15 gig.

11    Q.   And what did they include?

12    A.   The actual file types?  It was, I think, mostly

13    pdfs.  I think there was a few other -- I think some

14    Excel and Word docs, mostly things like that.

10:01:41   15    Q.   And when was that request for the native files?

16    A.   I think it was right when I got back from trial.

17    I think that would have been mid-April.

18    Q.   You said that you received an e-mail from Daryl

19    Sam.  When did you receive that e-mail?

10:01:57   20    A.   Which e-mail?

21    Q.   The one where he asked about certain trial

22    exhibits?

23    A.   Um, I think it was last week.  I think it was

24    early last week.

10:02:08   25    Q.   You hadn't received an e-mail prior to last week?

199

1    A.   Not concerning exhibits.  I had just given them

2    one of the productions and then I was showing them

3    how to use that database and the search things, and

4    he inquired to me as to whether or not I could find

10:02:23  5    some exhibits that he couldn't locate.

6    Q.   Was Mr. Sam the one who gave you that hard drive

7    to review at the end of April?

8    A.   No.

9    Q.   Who was it that provided you with that hard

10:02:36  10   drive?

11   A.   Um, Kaytlin Beckett.

12   Q.   Okay.  And referencing -- you said that there

13   were on this eight terabyte drive that was given to

14   you, there weren't eight terabytes worth of data, is

10:02:57  15   that right?  Sorry, let me clarify.  The copy that

16   was given to you by the U.S. Attorney's Office on

17   your eight terabyte drive?

18   A.   Yes.

19   Q.   The terabyte -- the eight terabyte drive didn't

10:03:09  20   have eight terabytes of data, is that correct?

21   A.   No, it was not full.  No.

22   Q.   You mentioned there were certain file folders one

23   including an image file, correct?

24   A.   The folder that had the name image, yes.

10:03:21  25   Q.   Okay.  And you also saw folders one titled Drew

200

1    Crandall, is that accurate?

2    A.   Yes.

3    Q.   And one titled Paz, in all caps.  Does that sound

4    correct?

10:03:32  5    A.   That is correct.

6    Q.   Were there any iMac files within either the Drew

7    Crandall or Paz?

8    A.   I think Crandall may have had an iMac as well.  I

9    can look here.  I see a Mac book I think a Mac.

10:03:49  10   Yeah, I think he had a -- it looks like some Mac

11   memory which is relatively small, I don't know if

12   that is a full image of a computer.  Um, yeah, but I

13   can't remember any other folders that had the name

14   iMac in it.  I think there was a few Mac books or Mac

10:04:06  15   memory.  There is an iPad mini in here, I think a few

16   iPhones.

17   Q.   You referenced an encrypted image, an E01 file.

18   Are you familiar with the cost of FTK imager?

19   A.   Yes, I am.

10:04:23  20   Q.   And what is that cost?

21   A.   The imager is free.

22   Q.   How about magnet imager?  What's the cost of that

23   are you familiar?

24   A.   I haven't used it.

10:04:32  25   Q.   Okay.  Are you aware that that is also a free

1    software for imaging a drive?

2    A.   Yeah.  The -- yeah.

3    Q.   If there is a virtual machine operating on a

4    computer, how do the files from the virtual machine

10:04:45  5    appear in an E01 file?

6    A.   In a virtual machine?

7    Q.   If you have got a -- let's say you have got an

8    iMac --

9    A.   Yeah.

10:04:54  10    Q.   -- that is also running a virtual machine?

11    A.   Yeah.

12    Q.   If you do an image of that computer as a whole,

13    not just the virtual machine but the computer as a

14    whole, how do the virtual machine files appear?

10:05:08  15    A.   Well, the parallel files, is that what you mean,

16    for the operating system is a different --

17    Q.   Parallels would be an example of a virtual

18    machine.  So if those files are password protected on

19    the virtual machine, how do they appear when you

10:05:22  20    image the computer as a whole?

21    A.   I would imagine another E01 for the operating

22    system.

23    Q.   And if they're password protected on the virtual

24    machine, how do those files appear?

10:05:31  25    A.   They would be encrypted I mean.  But like I say,

1    the image wouldn't be encrypted, I think the files

2    would be, but the image wouldn't be.

3    Q.   So do you have any experience dealing with

4    virtual machines and there -- and how they are

10:05:49  5    encrypted in -- that is kind of essentially a shell

6    inside of the computer?

7    A.   I haven't done too much of the like the imaging

8    of a -- well, I have done some but usually they're

9    servers and usually they haven't had any problem with

10:06:03 10   encryption on those things even though they are

11   encrypted and I mean every computer has an

12   encryption, that's why you log into it.  Your have

13   pin number or whatever that log into.  But like I

14   say, I've never had a secondary E01 file encrypted

10:06:19 15   whereas the primary was not.

16   Q.   So to be clear, you don't have experience with a

17   virtual machine?

18   A.   No, I don't.

19   Q.   Files being encrypted while the rest of the

10:06:29 20   computer files are unencrypted?

21   A.   Well, when you say computer files, I mean there

22   is always encrypted files on -- I mean a lot of

23   these, even software, will encrypt files so that you

24   don't damage your computer.  And, you know, that's

10:06:43 25   the purpose of running a dictionary against it.  When

1    you load an E01 file, one of the first things you do

2    is you run a dictionary and go through and it

3    captures key strokes and things like that, and with

4    the software.  And then any encrypted file you have

10:06:59   5    will appear in red and it will say this is encrypted

6    and then you can run the dictionary against it and

7    then it will decrypt it.  But as far as the image, I

8    mean you can't even -- an image you can't create a

9    dictionary from an image because you can't even open

10:07:12   10    the image if it is encrypted.  But if it was

11    encrypted with File Vault specifically, which is I

12    think a software that the Government uses, but I

13    don't know, but maybe it could be somebody encrypted

14    it.

10:07:24   15    Q.   Are you aware that File Vault is a commonly used

16    encryption program?

17    A.   There is a lot of different encryption software.

18         MR. BURGGRAAF:  Your Honor, at this time, in

19    relation to the motion to continue, I don't have any

10:07:36   20    further questions.  I do have questions related to

21    the *Daubert* aspect or the *Daubert* motion.

22         I would qualify that by saying that part of

23    the *Daubert* hearing probably can't be taken care of

24    until a report is filed.

10:07:53   25         THE COURT:  That seems to me like a better

1    time to do it.

2             MR. BURGGRAAF:  And I may have another

3    question or two if you can give me just a minute.

4             THE COURT:  All right.

10:08:15  5    Q.   (By Mr. Burggraaf) On the initial hard drive

6    provided to you by Ms. Beckett, how many devices

7    would you say that accounts for?

8    A.   Just Paz's stuff or everything?

9    Q.   Everything.

10:08:30  10   A.   Well, you can see here just the Paz stuff alone

11   is probably 30 or 40 different machines and then

12   there is quite a few others that were also on there

13   as well.  I would say maybe 80 different variations

14   of images and hard drive back ups and things.

10:08:51  15   Q.   And did you process every one of those?

16   A.   I haven't finished -- I haven't gone through

17   everything yet, no.

18   Q.   So are you aware of the -- scratch that.

19             As far as the files that were provided to

10:09:08  20   you that you have opened this week, the only files

21   that aren't there are -- that weren't previously

22   provided to you, there is only two of them, is that

23   right.

24   A.   Yes.

10:09:22  25             MR. BURGGRAAF:  Just one moment, Your Honor.

1          (Brief pause in proceedings.)

2          MR. BURGGRAAF:  So Your Honor, as I

3    mentioned, I think the other *Daubert* related

4    questions are probably more appropriate once we have

10:09:51  5    a report.  I would anticipate we would need a report

6    related beyond just computer forensics, we would also

7    be needing a report related to the other items

8    mentioned in the notice of expert.  There is dark web

9    related references and cryptocurrency that I'm

10:10:09  10   inclined to ask him questions today if you would

11   like, but I think a report would be appropriate

12   first.

13          THE COURT:  A report would be appropriate

14   first because then we would know what to ask about.

10:10:17  15   You really don't know that until you see what he

16   intends to testify about, right?

17          MR. BURGGRAAF:  I agree.

18          THE COURT:  All right.  Redirect?

19          MS. BECKETT:  Yes, Your Honor, just briefly.

10:10:24  20                **REDIRECT EXAMINATION**

21   BY MS. BECKETT:

22   Q.  Mr. Wheeler, Mr. Burggraaf asked you a question

23   about some bugs in the FTA software -- FTK software.

24   Would a bug in the FTK software create a bad copy of

10:10:53  25   a hard drive in our office that matched a hard drive

1      that you received?

2      A.   Yeah.  You can't -- if you have no image to load

3      into the software, there is no way that you could

4      have a bug that would produce any sort of wrong

10:11:08  5      output.

6      Q.   So regardless of any bug in the FTK software,

7      that image of the Luke Paz iMac was not the correct

8      size, right?

9      A.   Yeah.

10:11:26  10     Q.   Is the image that you received from the

11     Government, the other image regarding Mr. Paz's

12     computer not the iMac but I believe it's a Mac Book,

13     is that image still encrypted?

14     A.   I haven't checked.  I wanted to look at that one,

10:11:41  15     but I can see that I received another copy of it.

16     Q.   Mr. Burggraaf asked you some questions about

17     updates and certification regarding the FTK software.

18     Do you remember those questions?

19     A.   Yes.

10:11:55  20     Q.   Now you stated that you had not updated your

21     certification on the FTK software.  Do you have any

22     problems using the FTK software?

23     A.   No.  Usually the certification is for training.

24     If you want to train somebody else, you can actually

10:12:11  25     charge people to train the software yourself and

1    things like that.

2            And as far as the changes in features, I

3    mean they're usually -- it is still pretty similar.

4    It has essentially the same process it always has, I

10:12:26  5    mean a few different, you know, like a little faster,

6    you know, it will run a little bit more smoothly,

7    but, you know, I haven't had any problem.

8    Q.   So the certification is not necessary would be

9    your opinion?

10:12:38  10   A.   I wouldn't -- to use the software is pretty

11   intuitive.

12   Q.   Now I believe you looked at a document, you're

13   reviewing your summary of the two separate files that

14   you received?

10:12:49  15   A.   Yeah.

16   Q.   If the file transfers themselves of that

17   particular forensic image had been a bad copy because

18   of verification or not having the proper software,

19   would the entire hard drive look like this or would

10:13:09  20   it look differently?

21   A.   Well that's -- that's one of the reasons why I

22   included file paths so you could see that the names

23   of the folders are even different and different

24   places.  And although they, like you say, when you

10:13:23  25   copied them or whatever copy you had given me,

1    whoever made that copy, the majority of the files

2    copied over just fine and they were the exact same

3    thing although they were in different places.  But

4    like I say, the strange thing was the -- the Luke Paz

10:13:40  5    iMac folder was not -- there was no folder name with

6    that and then the new folder was called image so --

7    Q.   And there were how many computers and devices

8    that were on here?

9    A.   Like I say, I think including the other

10:13:55  10    discovery, other than Paz's and such, I think it was

11    probably about 80 computers and phones.

12    Q.   But the only one that did not transfer was the

13    image of Mr. Paz's iMac, correct?

14    A.   Apparently, yeah.

10:14:11  15    Q.   Is that something that in your opinion would be a

16    result of a lack of verification or software?

17    A.   No.  If it was a copying problem, the folder name

18    would still be the same, just the contents would be

19    different, the file sizes.  I mean even the image

10:14:26  20    names would be the same, I mean you would just have a

21    bad image.  Because the E01 file, the one when you

22    image a computer, especially a large computer like

23    this, I mean you can see that most hard drives people

24    have are, you know, very large terabytes.  You want

10:14:41  25    to break down the E01 into usable pieces because you

1    don't ever get an E01 file that's a terabyte.  I mean

2    it would be really hard to manage a file that large.

3    So the software breaks it down into 30 or 40

4    different subparts.

10:14:56    5    Q.   So when you received the correspondence from the

6    U.S. Attorney's Office indicating the files size was

7    that 1.8 or 1.9 terabytes, did you believe that that

8    would have included all of these devices that relate

9    to Drew Crandall and Luke Paz?

10:15:13   10    A.   Are you referring to the e-mail that was given

11   saying to compare the two?

12   Q.   Correct.

13   A.   I would assume, yeah.

14   Q.   Does 1.9 or 1.8 terabytes account for the

10:15:25   15   information that you received this week?

16   A.   No.  Because I would assume that if you had a bad

17   copy that you had made, it would have been like -- it

18   would have still had everything else, it would have

19   been probably 1.2 or something terabyte.  But the

10:15:38   20   difference -- I mean the image that we received

21   wasn't even 1.9 alone, it was 2.8.

22   Q.   The image of the one computer?

23   A.   Exactly.  So the e-mail said we are -- our folder

24   is 1.9.  Kaytlin, could you check against your folder

10:15:54   25   and see if it is the same size.  And then when I

1    received the image, it was actually 2.8 just for the

2    iMac image alone.

3    Q.   But the combination of the Crandall and the Paz

4    file was how much by your calculation?

10:16:10 5    A.   The total was 4.4 terabytes of everything.

6    Q.   And just I believe --

7    A.   Sorry, I think I misspoke.  6.2.

8    Q.   Which is significantly larger than 1.9 or 1.8,

9    correct?

10:16:25 10   A.   Yes.

11   Q.   About how long would it take you to process just

12   the 2.83 terabytes of the one computer?

13   A.   Well, like I say, I mean it depends on what is on

14   the computer.  I mean if I get, you know, OST or

10:16:39 15   e-mail files, it could be millions of e-mails, I mean

16   literally millions of e-mails to go through with that

17   and I'm not sure if these guys used Outlook, I

18   haven't seen too many OST or PST files, but I would

19   imagine that it would take me a couple of weeks to go

10:16:55 20   through everything and I'm also, you know, now I'm

21   worried that there is some stuff I have may have

22   missed, you know, I am going to go through it with a

23   fine tooth comb.

24        MS. BECKETT:  That's all I have, Your Honor.

10:17:08 25   Thank you.

211

1    THE COURT:  Any redirect?

2    MR. BURGGRAAF:  If I may, Your Honor?

3    THE COURT:  Or yeah, re-cross.

4      **RECROSS-EXAMINATION**

10:17:12 5 BY MR. BURGGRAAF:

6 Q.  When you referenced the files that you received

7 as of this week, you confirmed that there was a Drew

8 Crandall folder and a Paz folder, all caps?

9 A.  Yes.

10:17:25 10 Q.  Did you -- combined, do you know what the file

11 size of those two are combined?

12 A.  You mean to compare with what I originally

13 received or --

14 Q.  No, just those two file folders and their

10:17:38 15 contents, do you know what the sizes are combined?

16 A.  Well, you can subtract the 2.8 from the 6.2, so a

17 little less than four.

18 Q.  Are you actually aware that those two combined

19 are less than 1.98 terabytes?

10:17:57 20 A.  I would take your word for it.

21 Q.  Okay.  You mentioned process time.  If you had

22 additional assistance is there a way to cut that

23 process time down?

24 A.  Yeah.  I mean -- I mean, well, I mean you can

10:18:17 25 only have the computer open on one device at a time.

1    I mean I suppose if I had multiple licenses I could

2    essentially -- I'm trying to think if whether or not

3    actually probably not because the only thing that

4    would make it faster is like you said, if the

10:18:34 5    recommended computer, not the minimal computer but

6    the recommended computer, would just make the absorb

7    -- I mean the initial absorbing of the image and

8    loading into the software faster.

9    Q.   So related to process time, if you had a faster

10:18:51 10   computer at your disposal, would that -- would that

11   help to speed up the process time?

12   A.   I suppose, yeah.  It would probably make it a

13   little faster.  Instead of taking eight hours to

14   absorb it would probably take six or five.

10:19:05 15   Q.   In your work have you worked with portable case

16   files before?

17   A.   Yeah.  Yeah.

18   Q.   Have you worked with an Axiom Portable case file

19   before?

10:19:14 20   A.   No, not particularly.

21   Q.   Your ultimate end goal, you said, was to get the

22   files in a usable format for paralegals and attorneys

23   to be able to use.  Is that right?

24   A.   Yes.

10:19:28 25   Q.   Would it -- would it speed up the process if a

1    portable case file was given, was provided?

2    A.   I suppose if it contained -- I mean, yeah.

3    Essentially it would be what I was requesting

4    initially for a year of natives, you know,

10:19:49  5    essentially the same thing.  I mean that would be

6    nice.  I mean even when I requested -- when they were

7    making this second copy of the hard drive I again

8    requested I'm like, you know, those exhibits that

9    Daryl had asked me to find weren't even in the

10:20:06  10   original batch of natives that were given me, and

11   they weren't even Bates numbered.  So I was like

12   could I get those as well to make sure that we have

13   everything?  Because ultimately, the most important

14   thing for me is not -- I mean, I just want to make

10:20:19  15   sure they have everything and make sure that they

16   have -- I don't care whose fault -- I mean you can

17   blame me and say I did something wrong, essentially

18   that's the first thing I always think.  You know, I'm

19   like okay, I must have done something wrong, let me

10:20:30  20   go back into it again.  But, um, yeah, I mean I just

21   -- if you want to help me out great.  Great, please.

22   Q.   So if we gave you -- if the Government gave you

23   the files in a portable case file, wouldn't that be

24   in a usable format that you could then just verify

10:20:46  25   and hand off to defense counsel?

1      A.   That would be very useful.  Again, assuming

2      though I mean what you guys deem is important is also

3      different from what they might deem is important.

4      But that would help, I'm sure it would.

10:20:57   5      Q.   Hence, if you were able to verify and confirm

6      that it was properly created, the portable case file

7      was properly created?

8      A.   Yeah.

9               MR. BURGGRAAF:  No further questions.

10:21:07  10               THE COURT:  Thank you.  Anything else?

11               MS. BECKETT:  No, Your Honor.

12               THE COURT:  You may step down, Mr. Wheeler.

13      Thank you.

14               THE WITNESS:  Thanks.

10:21:14  15               THE COURT:  Now do you want to talk to me

16      about the continuance?  Let me tell you what I'm

17      really not interested in.  I don't care about blame,

18      that doesn't make any difference to me.  In most of

19      these cases there is blame here and blame there and

10:21:33  20      human error and all sorts of misunderstandings.  What

21      I care about is can -- can this Defendant, if we

22      proceed on the 17th of June, can this Defendant

23      receive a fair trial?

24               As I understand it, the Government is

10:21:51  25      contending in part that there is a CCE as we call it,

1      a Continuing Criminal Enterprise, correct me if I'm

2      wrong, and that this Defendant is a leader of it.

3      And that makes a lot of difference whether you're

4      involved in it or a leader of it.

10:22:08   5              And what if, and I don't know what is in

6      there, and I don't know if you do, but they don't,

7      and what if we go ahead on the 17th of June, and as

8      the defense is able to get through these files it

9      turns out that -- that I guess they're claiming or

10:22:31  10     going to suggest or argue that Paz or Crandall or

11     perhaps somebody else was actually the leader, and

12     there is a lot of evidence about that and it's not

13     available to them on the 17th of June.

14              We don't want to have a trial and then have

10:22:48  15     to have another trial after reversal, so talk to me

16     about -- about the realistic possibilities here.  I

17     would rather have a fair trial than a quick trial

18     even though I know that this has dragged on and we

19     have -- drugged, dragged --

10:23:06  20              MS. BECKETT:  At this point we can use both

21     of those, Your Honor.

22              THE COURT:  I think they're both acceptable,

23     I'm not sure which is preferred.  Anyway, talk to me

24     about that.  That's what I'm interested in.

10:23:20  25              MS. BECKETT:  Your Honor, I think you hit

1    the nail on the head.  With the CCE count there are

2    multiple issues that we're looking at.  What makes

3    the potential punishment in this case so high is a

4    couple of things, the money, and the type of drug and

10:23:35  5    the amount of drug.

6         The two exhibits that the Government has

7    pulled from Mr. Paz's iMac discuss both money and

8    specifically the fentanyl.  And part of Mr. Shamo's

9    defense deals with who was actually responsible for

10:23:49 10    those things and what his role is.  As Your Honor

11    pointed out, a continuing criminal enterprise charge

12    requires the Government to establish a significant

13    number of those elements and I think we are at a

14    significant disadvantage and Mr. Shamo runs a risk of

10:24:02 15    not having a fair trial if we are not allowed to

16    examine that computer in its entirety.

17         And part of that concern for me comes from

18    the fact that those two documents reference specific

19    dates which makes me think there are more documents

10:24:16 20    that outline more dates.  And I think that undercuts

21    Mr. Shamo's role and I also think it significantly

22    undercuts his connection to the actual fentanyl which

23    is the drug in question here.

24         THE COURT:  Or as least it may.

10:24:32 25         MS. BECKETT:  Correct.  That is our

1    position.  And that's what our big concern is.  And

2    that is why when we discovered that the Government

3    actually had Mr. Paz's computer in their possession,

4    which did not happen until the end of 2018, we wanted

10:24:44  5    to have that reviewed.  That has been our intention.

6    That is one of the specific purposes in which we

7    retained a computer forensic examination of those

8    hard drives was to look specifically at Mr. Paz's

9    electronic devices.  And for us not to have that at

10:24:59  10    this point is too much of a risk and I don't think

11    that Mr. Shamo would have a fair trial if we weren't

12    at least allowed a proper amount of time to not only

13    process the data but to have legal eyes look at it

14    and analyze the information that's there.

10:25:16  15              THE COURT:  Thank you.  Mr. Burggraaf?

16              MR. BURGGRAAF:  And Your Honor, I think that

17    the motion to continue essentially contains two

18    issues and I think the Court is very aware that

19    essentially we're looking at adequate effective

10:25:30  20    preparation for trial.  And that one of the main

21    issues is making sure that the defense is able to

22    effectively and adequately prepare for trial.

23              THE COURT:  But I assume the Government

24    would have the concern there as well.

10:25:45  25              MR. BURGGRAAF:  We want them prepared and to

1 have the opportunity to look at that, those files,

2 just like they do.  But I have one separate issue

3 that in ruling on the motion to continue, we would be

4 asking the Court make a finding that there actually

10:25:59 5 wasn't a *Brady* related violation.

6     THE COURT:  That there what?

7     MR. BURGGRAAF:  That there wasn't a *Brady*

8 related violation, just merely because the allegation

9 is there and then repeated in the reply.  But in

10:26:08 10 regards to helping the defense to have time to

11 effectively review it, I would propose a solution

12 that allows for us to go forward on the 17th.

13 Essentially, we continue the *Daubert* Examination of

14 Mr. Wheeler until he has had an opportunity to

10:26:27 15 provide a report and direct him to actually provide a

16 report.  The State, or excuse me, the United States

17 would stipulate to not calling Mr. Paz in their case

18 in chief up until defense has had the opportunity to

19 review, to make a full review of the iMac files.

10:26:50 20     THE COURT:  One of the problems is we don't

21 know exactly how long it will take them to do that.

22     MR. BURGGRAAF:  And Mr. Wheeler spoke to two

23 weeks to provide them with -- to provide the files in

24 a file format that they could then start reviewing.

10:27:05 25 I would propose the one of two options.  Either one,

1          we direct that additional CJA funds be provided so

2          that they can get either additional help or

3          processing speeds so they can speed that up, or the

4          other alternative --

10:27:21  5                THE COURT:  That would only take about two

6          weeks to get that approved.

7                MR. BURGGRAAF:  The other alternative which

8          I think may be preferable, which has two parts to it,

9          but essentially it is the United States giving them a

10:27:32 10         processed file which we could do within a -- within

11         probably within a day or two we could give them a

12         processed file so they could start looking through

13         now.  Or if they're not comfortable receiving a

14         processed file, then Mr. Wheeler in conjunction with

10:27:49 15         our expert could come and utilize one of their higher

16         speed computers that would allow them to create a

17         file format that would be usable within less than a

18         week.  But that would allow defense, within a week,

19         to be looking through these computer files and they

10:28:09 20         can verify, it is not merely two exhibits that come

21         from Mr. Paz's iMac, there are multiple.  There is a

22         section of them that have been admitted.  And so I

23         think that that second option might be preferable.

24         It would allow Mr. Wheeler to be involved if he wants

10:28:23 25         to, or alternatively if they're comfortable with us

1    providing a processed file format that they can just

2    start immediately looking through we could do that as

3    well and that would allow us to keep the trial date

4    on schedule.  We wouldn't call Mr. Paz until they

10:28:37 5    have given us the confirmation they have had the

6    opportunity to go through the files.

7            THE COURT:  What is your reaction to the

8    second proposal?

9            MS. BECKETT:  The extended time frame or the

10:28:49 10    assistance, Your Honor, I apologize.

11            THE COURT:  The first proposal was to get

12    more money and more help which I have no confidence

13    in.  At least -- at least in the timetable we're

14    dealing with.

10:29:04 15            MS. BECKETT:  And that would be our concern

16    as well.

17            THE COURT:  The second proposal was to get

18    you a bunch of, in my language, souped up gizmos and

19    more help from the U.S. Attorney -- the U.S.

10:29:17 20    Attorney's Office.

21            MS. BECKETT:  Our big concern there is, Your

22    Honor, that even if we agree that the Government is

23    not calling Luke Paz --

24            THE COURT:  That was part of it as well.

10:29:29 25            MS. BECKETT:  -- until a certain amount of

1    time, I don't know that Luke Paz is the only person

2    that I'm going to have concerns and questions about

3    based on the information from that computer.  I

4    understand that this case has languished.  I think

10:29:42  5    obviously this side of the courtroom understands that

6    a little bit more personally dealing with the

7    defendant who is -- who has been incarcerated the

8    entire time.  But I don't see how I can ethically

9    agree that it's okay to go forward on the 17th and

10:29:59 10    just hope I don't find something about somebody that

11    has already been called and then have to recall that

12    person because something subsequently comes up.

13         This is a conspiracy case that deals with

14    multiple defendants.  In fact, Mr. Paz is not even a

10:30:13 15    defendant in this case, he was a defendant in another

16    case.  So my concern is that there is information in

17    there that may deal with people other than just

18    Mr. Paz.

19         THE COURT:  Nobody wants to get this done

10:30:26 20    more quickly than I do, I don't think, but I am very

21    concerned.  Mr. Burggraaf?

22         MR. BURGGRAAF:  Your Honor, I believe

23    that --

24         THE COURT:  Again, I'm not blaming anybody.

10:30:38 25         MR. BURGGRAAF:  No.  And I agree we're in

1     in --

2              THE COURT:  And I make a finding that there

3     were no *Brady* or *Giglio* violations.

4              MR. BURGGRAAF:  Um, Your Honor --

10:30:47  5          THE COURT:  Does that calm your heart some?

6              MR. BURGGRAAF:  It makes it pitter patter a

7     little bit faster so that helps.  What I -- what I

8     think Ms. Beckett is referencing though more goes to

9     their theory, their defense theory, which would allow

10:31:03 10   them to recall those witnesses which they have

11    listed, um, but I would stipulate that once that

12    review is completed, that they can recall any of the

13    United States witnesses for the purpose of further

14    questioning if they found it was needed.

10:31:18 15          THE COURT:  What do you say to that?

16             MS. BECKETT:  I think it would create the

17    same hiccup that -- that a general continuance would

18    create in that it will still expand the timeframe and

19    push it out further depending upon who we do and

10:31:35 20   don't have to recall.

21             THE COURT:  It might take longer to try.

22    And I hate to continue it, but I could start a trial

23    on August 12th, then you can all tell me you have got

24    trips to Europe planned.

10:31:56 25          MR. BURGGRAAF:  The difficulty we have

```
 1      nailing down a date right now if we were to continue

 2      it is we have quite a few individuals from

 3      out-of-state, and 45 witnesses to coordinate

 4      schedules with.  I know of one of our witnesses for

 5      sure that we need to give greater notice than merely

 6      pushing it to the 12th.

 7              THE COURT:  Than the 12th of August?

 8              MR. BURGGRAAF:  Yes.

 9              THE COURT:  You're saying if I'm going to

10      move it I need to move it further, is that what

11      you're telling me?

12              MR. BURGGRAAF:  Well, what I would suggest

13      is if you're going to move it say to August 12th,

14      that maybe we have a status conference next week so

15      that gives us a week to confirm with witnesses

16      whether they --

17              THE COURT:  That's fair enough.

18              MR. BURGGRAAF:  -- whether they can make it

19      available or not.

20              THE COURT:  I have to be in Washington on

21      Monday, Tuesday, and Wednesday, but we could have a

22      status conference Thursday or Friday.

23              THE CLERK:  Friday.

24              THE COURT:  Friday.  I think -- I think I

25      have to move it and the reason is, again, no
```

10:32:10 (line 5)
10:32:26 (line 10)
10:32:37 (line 15)
10:32:44 (line 20)
10:32:55 (line 25)

224

1    violations.  Um, this is -- this is a serious case

2    with serious implications and serious potential

3    penalties as we all know.  And I just think that --

4    that they need perhaps a more measured timeframe to

10:33:21  5    review these documents and decide how they really

6    want to attack and defend.  And I am so reluctant to

7    do this, I feel like I have accumulated split

8    personalities here.  But, all right, so I am going to

9    move it to August 12th, is the second Monday in

10:33:48 10   August, is that right?

11                THE CLERK:  Yes.

12                THE COURT:  Subject to the witness problem.

13   I can't do it in September.  I could do it in October

14   if we need to -- if August doesn't work.

10:34:02 15                MR. BURGGRAAF:  And I know that at least one

16   of our experts has an issue with October.  So if

17   August 12th moving forward doesn't work then we will

18   look at some other dates.

19                THE COURT:  All right.  Does the -- do the

10:34:20 20   witnesses you're talking about or the witness you're

21   talking about, are they -- are they the October

22   person or persons, are they unavailable all month

23   or --

24                MR. BURGGRAAF:  That is Mr. Gino which you

10:34:34 25   heard from yesterday, he is actually in trial that

1          month.

2                    THE COURT:  Yes.  I see.  So it may be all

3          month.

4                    MR. BURGGRAAF:  He expressed to us

10:34:40  5    yesterday, knowing that we were arguing a motion to

6          continue if it was continued that October would be

7          out because he has a four or five-week jury trial.

8                    THE COURT:  All right.  Next Friday we will

9          see you at what time?

10:34:50  10                   THE CLERK:  At 11:00 a.m.

11                   THE COURT:  11:00 a.m.  Friday.  Now let me

12         make a couple of other comments here.  I ruled on

13         those pictures yesterday.  I should suppose warn the

14         defense that I can envision a circumstance that your

10:35:13  15   cross might elicit those pictures allowable on a

16         rebuttal.  Just so you understand that is a risk.

17                   MS. BECKETT:  Understood, Your Honor.

18                   THE COURT:  And Mr. Wheeler is going to

19         provide a report.  I suppose it is less urgent now

10:35:31  20   about the timing and then Mr. Shafto or Ms. Shafto.

21                   MS. BECKETT:  Correct, Your Honor, it is

22         anticipated we will have that pretty quickly as well.

23                   THE COURT:  A report will be forthcoming.

24         And then we'll see whether we have to have *Daubert*

10:35:43  25   hearings.  And you're still going to get me, at some

1    point now less urgent, a summary of the indictment,

2    right?

3                MS. BECKETT:  Yes, Your Honor.

4                MR. BURGGRAAF:  Yes, Your Honor.

10:35:53  5                THE COURT:  And at some point what

6    instructions you can agree on and what ones you're

7    contesting and why.  All right.  I can't think of

8    anything else but you can.

9                MR. BURGGRAAF:  I sure can, Your Honor.

10:36:06 10   Just because we are continuing the trial date we

11   would ask that the Court exclude time.  As has been

12   made evident, it is a complex case, there is a volume

13   of discovery and the Defense needs additional time.

14               THE COURT:  Well, and the Defense has made

10:36:21 15   the motion.  So you're right, it is a complex case,

16   they need the time, they have made the motion, the

17   time is clearly excluded under the Speedy Trial Act.

18               MR. BURGGRAAF:  Would you like us to prepare

19   an order to that effect?

10:36:33 20               THE COURT:  Yes, would you please.  All

21   right.  Anything else?

22               MS. BECKETT:  No, Your Honor.

23               MR. STEJSKAL:  No, Your Honor.

24               MR. BURGGRAAF:  Will we be receiving a new

10:36:43 25   trial order?

227

1          THE COURT:  Yes.  We will do a new trial

2     order.  Yes.

3              MR. BURGGRAAF:  Okay.  Thank you.

4              THE COURT:  Thank you.  We'll be in recess.

10:36:49   5     And I -- I am sorry I did that, but I think it is the

6     right thing to do.

7              MR. STEJSKAL:  Thank you, Your Honor.

8              MS. BECKETT:  Thank you, Your Honor.

9              (Whereupon, Court adjourned at 10:36 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   **REPORTER'S CERTIFICATE**

2

3          I, Laura W. Robinson, Certified Shorthand

4    Reporter, Registered Professional Reporter and Notary

5    Public within and for the County of Salt Lake, State

6    of Utah, do hereby certify:

7          That the foregoing proceedings were taken

8    before me at the time and place set forth herein and

9    were taken down by me in shorthand and thereafter

10   transcribed into typewriting under my direction and

11   supervision;

12         That the foregoing pages contain a true and

13   correct transcription of my said shorthand notes so

14   taken.

15         In witness whereof I have subscribed my name

16   this 14th day of December, 2020.

17

18              _____

19              Laura W. Robinson

20              RPR, FCRR, CSR, CP

21

22

23

24

25