IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

```
In re:                  )
                        )
UNITED STATES OF        )
AMERICA,                )
                        )
        Plaintiff,      )
                        )
vs.                     )   Case No.
                        )   2:16-CR-00631DAK
AARON MICHAEL SHAMO,    )
                        )
        Defendant.      )
                        )
_____  )
```

BEFORE THE HONORABLE DALE A. KIMBALL

August 14, 2019

JURY TRIAL

**Appearances of Counsel:**

For the Plaintiff:    Kent A. Burggraaf
                            S. Michael Gadd
                            Attorney at Law
                            Utah Attorney General's Office
                            348 E. South Temple
                            Salt Lake City, Utah 84111

                            Vernon G. Stejskal
                            Attorney at Law
                            US Attorney's Office
                            111 S. Main Street
                            Suite 1800
                            Salt Lake City, Utah 84111

For the Defendant:    Gregory G. Skordas
                            Kaytlin V. Beckett
                            Attorney at Law
                            Skordas & Caston
                            560 South 300 East
                            Suite 225
                            Salt Lake City, Utah 84111

                            Daryl P. Sam
                            Attorney at Law
                            Daryl P. Sam PLLC
                            5955 South Redwood Road
                            Suite 102
                            Salt Lake City, Utah 84123

Court Reporter:

        Laura W. Robinson, RPR, FCRR, CSR, CP
               351 South West Temple
               8.430 U.S. Courthouse
            Salt Lake City, Utah 84101
                (801)328-4800

I N D E X

EXAMINATION                                            PAGE

**ALEXANDRYA TONGE**
CONTINUED DIRECT EXAMINATION                           371
BY MR. STEJSKAL
CROSS-EXAMINATION                                      385
BY MS. BECKETT
REDIRECT EXAMINATION                                   400
BY MR. STEJSKAL
RECROSS-EXAMINATION                                    403
BY MS. BECKETT
**KATHERINE LAUREN ANNE BUSTIN**                       404
DIRECT EXAMINATION                                     405
BY MR. STEJSKAL
CROSS-EXAMINATION                                      420
BY MR. SKORDAS
**ERIC BREYER**                                        439
DIRECT EXAMINATION                                     439
BY MR. BURGGRAAF
CROSS-EXAMINATION                                      489
BY MR. SAM
**CAMERON THOR**                                       494
DIRECT EXAMINATION                                     494
BY MR. BURGGRAAF
CROSS-EXAMINATION                                      518
BY MR. SKORDAS
**JACOB NATTRESS**                                     523
DIRECT EXAMINATION                                     524
BY MR. BURGGRAAF

1     **Salt Lake City, Utah                    August 14, 2019**

2                          **(8:38 a.m.)**

3               THE COURT:  The jury is here.  Are we ready

4     to proceed?

08:40:17  5               MR. GADD:  Yes, Your Honor.

6               THE COURT:  All right.  We'll get them.  The

7     witness may resume the stand assuming she is here.

8               MR. STEJSKAL:  She is here, she is just in

9     the other room.

08:41:33 10               (Jury returned.)

11               THE COURT:  Good morning ladies and

12     gentlemen of the jury.  Thank you for being here.

13     Thank you for being prompt.  We appreciate your work.

14               You may proceed, Mr. Stejskal.

08:42:09 15               MR. STEJSKAL:  Thank you, Your Honor.

16               (Whereupon, Ms. Alexandrya Tonge resumed

17                the witness stand having been previously

18                sworn.)

19                    **CONTINUED DIRECT EXAMINATION**

08:42:10 20               BY MR. STEJSKAL:

21     Q.   Ms. Tonge, we were talking yesterday a little bit

22     about the financial arrangements and I believe you

23     said your pay from Mr. Shamo increased over time; is

24     that correct?

08:42:28 25     A.   It is.

371

1    Q.   And you said you were paid in cash but there were

2    also other methods with which you were paid?

3    A.   Yes.

4    Q.   And let's specifically refer to Venmo.  Were you

08:42:38  5    ever paid by Venmo?

6    A.   Yeah, on a couple of occasions.

7    Q.   Tell me what Venmo is?

8    A.   It is an electronic form of receiving money.  So

9    you can send it from your bank account to someone

08:42:48  10    else's user name and they can transfer it to their

11    personal bank account.

12    Q.   So instead of handing cash, it is some kind of

13    electronic transfer?

14    A.   Correct.

08:42:57  15    Q.   Okay.  Let's pop up Exhibit 16.02.  Can you see

16    that there in front of you?

17    A.   Yes.

18    Q.   And in the left hand column there do you see your

19    name in several places highlighted in blue?

08:43:14  20    A.   Yes.

21    Q.   And then there are payments in another column

22    that says debit.  Do you see those?

23    A.   Yes.

24    Q.   And then in the column next to that there are

08:43:32  25    some comments do you see those, too, like halfway

1    down the page "obey my dog"?

2    A.   Yeah.

3    Q.   Can you tell us what that is about?

4    A.   Just funny comments that he would add to the

08:43:46  5    message that he was sending with the money.

6    Q.   So they're not really what it's about, it is just

7    kind of funny comments then?

8    A.   Correct, yeah.

9    Q.   What are those payments for?

08:43:55  10    A.   Um, for either payment for just normal or

11    reimbursement for purchasing things at the post

12    office.

13    Q.   And by payment "for normal", what do you mean by

14    that?

08:44:08  15    A.   Um, what he would pay us to do, what we were

16    doing shipping out drugs.

17    Q.   Okay.  So basically wages for your work?

18    A.   Yeah.

19    Q.   And those $500 amounts there in the middle in

08:44:21  20    September of 2015, is that kind of a normal payment

21    you would have received at that time for your work?

22    A.   Yes.

23    Q.   Let's go to the second page.  There is a few more

24    down there, there is a 625, another 500, do you see

08:44:41  25    those?

          1    A.   Yeah.

          2    Q.   Again, are those consistent with payment for your

          3    work?

          4    A.   Yes.

08:44:49  5    Q.   Then there is some totals at the bottom.  Do you

          6    see next to your name there it says, total for you

          7    5,950.  Were you making that kind of money over the

          8    course of this?

          9    A.   Yeah, it seems about right.

08:45:10 10    Q.   You said some of this might have been

         11    reimbursement for other things?

         12    A.   Yeah, purchasing postage, priority stamps at the

         13    post office if we needed to do that.

         14    Q.   So sometimes you would do that with your own

08:45:22 15    money and get reimbursed?

         16    A.   Correct.

         17    Q.   By whom?

         18    A.   By Aaron.

         19    Q.   And how would you communicate with him to get

08:45:29 20    reimbursed?

         21    A.   Through telegram to let him know this is what we

         22    spent so if you could send that.

         23    Q.   And would he always pay you back?

         24    A.   Yeah.

08:45:38 25    Q.   Now, you're aware that there was cash seized from

```
 1    your home on November 22nd of 2016?

 2    A.   Yes.

 3    Q.   Approximately $19,000 or 19,500?

 4    A.   Yes.

 5    Q.   What was that cash from?

 6    A.   Payments from Aaron for doing what we were doing.

 7    Q.   So that money came in cash and sometimes you guys

 8    just stored it away there at the house?

 9    A.   Yeah.

10    Q.   If we can look at 11.00, photo 6.  So that is in

11    your home?

12    A.   Yes.

13    Q.   In the bedroom?

14    A.   Yeah.

15    Q.   Is that Ms. Bustin's drawer or yours?

16    A.   Ms. Bustin's.

17    Q.   Okay.  And then let me see, there were the --

18    let's look at 23, picture 23.  Do you see the money

19    in the nightstand drawer there?

20    A.   Yes.

21    Q.   Okay.  That was also in your home.  And then

22    picture 24.  And that is your side, your nightstand?

23    A.   Yes.

24    Q.   Okay.  So that was just money you had around?

25    A.   It wasn't deposited.  We were just kind of
```

08:45:55
08:46:07
08:46:25
08:46:48
08:47:03

375

1    keeping it.

2    Q.   You had spent some of the money that Mr. Shamo

3    paid you over the course of these events too,

4    correct?

08:47:14  5    A.   Yes.

6    Q.   So you made money off of this, your role in this

7    operation, correct?

8    A.   Yes.

9    Q.   Did you see pictures of or hear about the money

08:47:28 10    taken from Mr. Shamo's home?

11    A.   Yes.

12    Q.   And do you recall roughly how much that was?

13    A.   Over a million in cash.

14    Q.   Did you and Ms. Bustin have anywhere near that

08:47:37 15    amount?

16    A.   No.

17    Q.   How come you guys didn't have that much?

18    A.   I wasn't even remotely aware of the amount this

19    was bringing in.

08:47:55 20    Q.   Were you in charge of the money?

21    A.   No.

22    Q.   Did money come directly to you from customers?

23    A.   No.

24    Q.   Did Bitcoin come directly to you from customers?

08:48:05 25    A.   No.

1   Q.   Let's look at Exhibit 23.07.  This is your

2   Statement in Advance of Plea of Guilty or essentially

3   your guilty plea.  Do you recall that?

4   A.   Yes.

08:48:32   5   Q.   And did you, in fact, plead guilty to every

6   charge against you in this case?

7   A.   I did.

8   Q.   Did you go over that with your attorney?

9   A.   I did.

08:48:43   10   Q.   And did you enter that guilty plea with a full

11   understanding of what you were doing?

12   A.   Yes.

13   Q.   Was there any specific sentencing agreement that

14   you would get probation or you would get no jail or

08:48:56   15   you would get ten years or anything like that?

16   A.   No.

17   Q.   Did you agree to testify truthfully in any

18   hearing or case that came up in this matter?

19   A.   Yes.

08:49:11   20   Q.   Why did you decide to do that?

21   A.   I knew what we were involved in was wrong and we

22   had made poor choices and I just wanted the

23   opportunity to own up to that.

24   Q.   Okay.  Do you also have hope that the judge will

08:49:32   25   consider this in determining what your punishment

377

1    will be from this?

2    A.   Yeah.

3    Q.   Have you testified truthfully?

4    A.   Yes.

08:49:48  5    Q.   It was also part of the agreement that you

6    wouldn't be charged with any death that resulted in

7    this case; is that correct?

8    A.   Correct.

9    Q.   Now, you knew nothing about that during your

08:49:59 10    participation, correct?

11    A.   Correct.

12    Q.   It's also true that you have no stake in the

13    outcome, correct?

14    A.   Correct.

08:50:10 15    Q.   Doesn't matter what happens as long as you tell

16    the truth?

17    A.   Yes.

18    Q.   You expect to get sentenced after this is over,

19    correct?

08:50:18 20    A.   Yes.

21    Q.   After this trial is over?

22    A.   Yes.

23    Q.   Did you have other consequences other than this

24    criminal charge because of your involvement in this

08:50:28 25    case?

```
 1    A.   Yeah, um, I lost my job.

 2    Q.   That was at eBay?

 3    A.   Yes.

 4    Q.   You were essentially fired?

 5    A.   Yup.

 6    Q.   Why did they say they did that?

 7    A.   Just our involvement in this case.

 8    Q.   Okay.

 9    A.   Um, I received a general under other than

10    honorable discharge from the military.

11    Q.   And the military was important to you, correct?

12    A.   (Witness crying) extremely.

13    Q.   Very important to you.  You served six years

14    honorably?

15    A.   Yes.

16    Q.   And you were also going to school to become a

17    helicopter pilot; is that correct?

18    A.   Correct.

19    Q.   That is gone as well?

20    A.   Yes.

21    Q.   So there have been consequences already from your

22    actions in this?

23    A.   Yes.

24    Q.   And you expect additional consequences from your

25    sentencing?
```

08:50:37 (line 5)
08:50:48 (line 10)
08:51:18 (line 15)
08:51:27 (line 20)
08:51:35 (line 25)

1       A.   Yes.

2       Q.   After reflecting on this and kind of

3    understanding the scope of all that was involved in

4    this organization, you have empathy for others who

08:51:48   5    may have been affected by this?

6       A.   Yeah, absolutely.

7       Q.   Tell us about that?

8       A.   I wasn't, you know, fully aware of the alteration

9    of the drugs and what was being sent and sold as

08:52:04  10    something else.  And when we found that out November

11    22nd when we were interviewed, and talking to

12    Homeland Security and the post office inspector, they

13    told us the severity of what was being used and I

14    felt badly.

08:52:36  15    Q.   Let's talk about a couple more things.  Let's

16    look at Exhibit 14.30.  Here is the first page.  Can

17    you tell us what that is?

18    A.   Yeah.  An order sheet.  It looks like for Xanax

19    bars.

08:52:59  20    Q.   Is this -- this is just one page but is this a

21    typical order sheet as they came to you?

22    A.   Yes.

23    Q.   From Mr. Shamo?

24    A.   Yes.

08:53:08  25    Q.   Let's look at Page 862.  If you can look at that

1    bottom entry there what does that say?

2    A.   It says "sale of Roxy or Oxycodone".

3    Q.   And how many?

4    A.   Ten.

08:53:29  5    Q.   And in what strength?

6    A.   30 milligram.

7    Q.   Were these always 30 milligrams?

8    A.   Yeah, I think so.

9    Q.   Okay.  And what does that postage part mean?

08:53:39  10   A.   They paid for priority mail.

11   Q.   And what is the name at the bottom there?

12   A.   Gregory Lee.

13   Q.   If we can go to the very next page.  There at the

14   top, that is a continuation of that address?

08:53:56  15   A.   Yes.

16   Q.   So did you and Ms. Bustin send a package to that

17   if you were fulfilling these orders?

18   A.   Yes.

19   Q.   And again, that date looked like June 6th of

08:54:07  20   2016?

21   A.   Yeah.

22   Q.   I'm going to hand you next what has been marked

23   or admitted as Government's Exhibit 11.05.  Can you

24   tell us what that is?

08:54:35  25   A.   Sheets of tracking information from packages that

1    were sent out and then a customer name notated next

2    to it to know what tracking was assigned to which

3    customer.

4    Q.   While we're looking at that, can you pull up

08:54:52  5    11.00, Page 9, please.  If you could highlight by the

6    glove there?  On the screen is essentially the same

7    thing maybe not the same page, but the same thing

8    you're talking about there?

9    A.   Yes.

08:55:11  10    Q.   Again, what are those?

11    A.   Tracking numbers from the postage that was used

12    for a package that was sent out and a customer name

13    notated in the exhibit.

14    Q.   Explain that to us.  It looks like stickers, the

08:55:26  15    black part?

16    A.   Yeah.  So it was a tracking number that could be

17    used with priority mail and you can pull one part of

18    the sticker off and put it on the package and then

19    one part is for your reference to reference the

08:55:37  20    tracking on that shipment.

21    Q.   And then on the end of that it looks like

22    handwritten names?

23    A.   Yeah.  My handwriting, um, writing names of the

24    customers that that tracking number referenced.

08:55:50  25    Q.   What was the purpose of keeping this information?

1    A.    To know if there was an issue with a package that

2    was sent if it didn't arrive or it arrived.

3    Q.    So if there was a problem somebody gave you a

4    name you could reference these sheets and figure out

08:56:04   5    the tracking number for that order?

6    A.    Yes.  Yup.

7    Q.    Looking at 11.5 in front of you, there is a

8    column that is going up and down as it is facing you.

9    Can you see that?

08:56:12   10    A.    Yes.

11    Q.    What's the first name in that first column on

12    your left?

13    A.    Gregory Lee.

14    Q.    And is there a tracking label next to that?

08:56:21   15    A.    There is.

16    Q.    And what does that indicate to you?

17    A.    That that package was shipped out.

18    Q.    Thank you.  And let's next look at Exhibit 18.01,

19    photo 8.  Do you recognize that?

08:56:44   20    A.    Yes.

21    Q.    What is that?

22    A.    That was the first stages of sending out packages

23    with a return address and a name that was random and

24    then a "to address" referencing the order that was

08:57:00   25    given to us to ship out.

1  Q.   So in the upper left, that Erin Sandoval, that's

2  the return address?

3  A.   Yes.

4  Q.   That is just a name that you made up?

08:57:08 5  A.   Yes.

6  Q.   Or came up with in some way?

7  A.   Yes.

8  Q.   But the "to", that's the actual customer?

9  A.   Yes.

08:57:15 10  Q.   That the drugs were sent to?

11  A.   Yes.

12  Q.   Okay.  Thank you.  Let's try to understand your

13  role.  Did you organize this operation?

14  A.   No.

08:57:30 15  Q.   Who did?

16  A.   Um, Aaron and Drew.

17  Q.   And after Drew left, who was kind of charge of

18  the organization?

19  A.   Aaron.

08:57:38 20  Q.   Did you recruit anyone to participate?

21  A.   No.

22  Q.   Did you manage anyone to supervise their

23  day-to-day activities?

24  A.   No.

08:57:52 25  Q.   Do you believe you knew everybody else that was

1    involved in this organization?

2    A.   No.

3    Q.   Why do you say that?

4    A.   When I saw the -- all of the names listed or

08:58:03  5    read, you know, there was 20 people involved.  I had

6    no idea.

7    Q.   So your role was limited to exactly what you

8    explained, packaging and shipping the drugs?

9    A.   Yes.

10    Q.   And putting them in the boxes for a while and

11    then that got taken from you?

12    A.   Correct.

13    Q.   Based on all that you know, who was in charge of

14    this operation?

08:58:24 15    A.   Aaron Shamo.

16         MR. STEJSKAL:  Thank you.  That's all of the

17    questions I have.

18         THE COURT:  Thank you Mr. Stejskal.  You may

19    cross-examine, Ms. Beckett.

08:58:32 20              **CROSS-EXAMINATION**

21         BY MS. BECKETT:

22    Q.   Ms. Tonge, I believe it was your testimony that

23    you began your involvement with this organization in

24    2015; is that correct?

08:59:00 25    A.   Correct.

1   Q.   When in 2015?

2   A.   Approximately April or March.

3   Q.   And I believe it was also your testimony that you

4   approached Aaron Shamo and asked how you could be

08:59:16  5   involved, correct?

6   A.   How I could make money from him whatever he was

7   doing, involved in.

8   Q.   So your intention was to find a way to make some

9   easy money?

08:59:26  10   A.   To make extra money, yeah.

11   Q.   You were still working at the time, correct?

12   A.   Correct.

13   Q.   I believe at that point in time your testimony

14   was that you were living in Riverton?

08:59:34  15   A.   Yes.

16   Q.   With your girlfriend at the time Katie Bustin?

17   A.   Bustin, yeah.

18   Q.   And your mother?

19   A.   Yes.

08:59:42  20   Q.   Were you renting a home out there?

21   A.   I was, yup.

22   Q.   The three of you?

23   A.   Yes.

24   Q.   Any other adults in that home?

08:59:50  25   A.   No.

1    Q.   And at some point in I believe 2016 you moved

2    from Riverton to Daybreak; is that correct?

3    A.   It was in 2015.

4    Q.   End of 2015, middle of 2015?

09:00:04  5    A.   June.

6    Q.   June of 2015?

7    A.   Yes.

8    Q.   So not long after you started in this

9    organization you were able to move from Riverton to

09:00:10  10   Daybreak?

11   A.   Correct.

12   Q.   And you moved into a separate home from your

13   mother?

14   A.   Rented a town home, yeah.

09:00:17  15   Q.   And your mother had a town home or house she was

16   renting or purchased?

17   A.   A townhouse that she purchased.

18   Q.   I believe your testimony was that towards the end

19   of this organization you were making roughly 3,500

09:00:38  20   every two weeks between the two of you; correct?

21   A.   Correct.

22   Q.   With that money you also paid off your truck;

23   correct?

24   A.   I did not.

09:00:50  25   Q.   Your truck is not paid off?

1    A.    It was not.

2    Q.    Your truck is currently not paid off?

3    A.    Um, the truck that I had at the time was a loan.

4    I sold that truck and I was given a truck from work

09:01:04  5    that I currently drive that is paid off but it was

6    not paid off by me.

7    Q.    You had a car as well, correct?

8    A.    Correct.

9    Q.    You were paying on that during this time period

09:01:15  10    as well, correct?

11    A.    Yes.

12    Q.    So you and your girlfriend made enough money to

13    move into a town home at Daybreak and pay on two

14    vehicles during this time period, correct?

09:01:27  15    A.    Yes.

16    Q.    I believe it is also your testimony that your

17    initial contact after you approached Aaron Shamo was

18    Drew Crandall; is that correct?

19    A.    We talked to him as well, yes, but never directly

09:01:43  20    to just Drew.

21    Q.    Drew never came over to your home?

22    A.    He did.

23    Q.    So you did speak directly with Drew Crandall?

24    A.    Correct, but he wasn't just someone that we were

09:01:54  25    only working with, we were working with both parties.

1    Q.   Drew is the person who showed you how to package

2    these items for shipping, correct?

3    A.   He did.

4    Q.   He showed you how to operate the heat sealer?

09:02:06  5    A.   He did.

6    Q.   Came over to your home on a regular basis?

7    A.   For about two weeks.

8    Q.   Showed you how to find return addresses?

9    A.   Drop a pin on a map, yup.

09:02:19 10    Q.   Showed you how to find blue boxes or post office

11    boxes or post office places to drop these packages

12    off?

13    A.   Just said find blue boxes in these areas.

14    Q.   He instructed you on how to do that, correct?

09:02:34 15    A.   Sure.

16    Q.   I believe it was also your testimony that Drew is

17    the one who set up the "Pass the Peas" e-mail account

18    for you; is that correct?

19    A.   Correct.

09:02:57 20    Q.   Did you forfeit any assets?

21    A.   The money in the home.

22    Q.   So just the 1,900 --

23    A.   19,000.

24    Q.   19,500?

09:03:08 25    A.   Yes.

1    Q.    That's not all of the money you made during this

2    organization though, was it?

3    A.    No, it was not.

4    Q.    You made a significant amount of money, correct?

09:03:16  5    A.    In comparison I would say no.

6    Q.    I did not ask in comparison.  You made a

7    significant amount of money, correct?

8    A.    I made money, yes.

9    Q.    You were still working during this time period,

09:03:28  10   correct?

11   A.    Correct.

12   Q.    You had a salary from your job plus all of this

13   roughly 3,500 every two weeks between you and

14   Ms. Bustin, correct?

09:03:36  15   A.    3,500 at the end, not throughout.

16   Q.    You essentially managed your own schedule during

17   all of this though, correct?

18   A.    Yes.

19   Q.    And there were multiple times where you contacted

09:03:51  20   either Aaron or Drew Crandall and complained about

21   the amount of work you had to do, correct?

22   A.    Correct.

23   Q.    And when you needed any sort of assistance you

24   received the assistance you needed, correct?

09:04:05  25   A.    Correct.

1    Q.    At some point in time you decided you did not

2    want to be the party who was dropping off these

3    packages, correct?

4    A.    Correct.

09:04:15   5    Q.    And you essentially asked for somebody else to

6    come fulfill that role, correct?

7    A.    Yes.

8    Q.    That individual was Sean Gygi, correct?

9    A.    Yes.

09:04:24   10    Q.    And he became your point of contact and you would

11    let him know when to pick up packages, correct?

12    A.    When we had finished processing we would just say

13    hey they're ready for you.

14    Q.    And you would tell him to come get them?

09:04:34   15    A.    We would just let him know that they were ready

16    so that he could come get them.

17    Q.    And you would let him know where they needed to

18    be dropped off?

19    A.    He would see the address from the label and he

09:04:42   20    would know which area it needed to be taken to.

21    Q.    There was never a point in time when you told him

22    these may need to go to Lehi or these may need to go

23    to Sandy or some other area?

24    A.    I may have referenced the city.

09:04:59   25    Q.    I believe it was also your testimony that you

1    began in the military in 2013; is that correct?

2    A.   Yes.

3    Q.   And you were discharged in 2019, correct?

4    A.   Correct.

09:05:10  5    Q.   Your testimony was that you were -- were you

6    active duty during that time period?

7    A.   National Guard.

8    Q.   Just reserves?

9    A.   Yes.

09:05:17  10   Q.   So for almost the entirety of your military

11   career you were involved in this organization?

12   A.   For two years of the six.

13   Q.   When did you plead guilty in this case?

14   A.   In June of 2018.

09:05:38  15   Q.   You were going to school during this time period

16   too, correct?

17   A.   Correct.

18   Q.   You wanted to become a helicopter pilot?

19   A.   Yes.

09:05:48  20   Q.   I'm going to ask that question again.  You wanted

21   to become a helicopter pilot, correct?

22   A.   Yes.

23   Q.   So in November of 2016 when you were stopped by

24   police officers or agents in this case, you had a lot

09:06:00  25   to lose, correct?

```
 1    A.   Yes.

 2    Q.   You had a girlfriend?

 3    A.   Yes.

 4    Q.   A career?

 5    A.   Yes.

 6    Q.   A family?

 7    A.   Yes, yup.

 8    Q.   A mother you wanted to take care of?

 9    A.   Yup.

10    Q.   You were also trying to purchase a home?

11    A.   Correct.

12    Q.   When agents approached you, you told them

13    anything they needed to hear, correct?

14    A.   I told them the truth.

15    Q.   At the end of 2016 when you were approached by

16    agents, at that point in time was Drew Crandall

17    involved in the organization?

18    A.   He was, yes.

19    Q.   You had contact with him through e-mail and

20    telegram?

21    A.   On occasion, yes.

22    Q.   Are you familiar with Luke Paz?

23    A.   I know the name, yes.

24    Q.   Are you familiar with his role in this

25    organization?
```

09:06:06 — line 5
09:06:13 — line 10
09:06:37 — line 15
09:06:50 — line 20
09:07:06 — line 25

1    A.    Mostly.

2    Q.    What is your understanding of Luke Paz's role in

3    this organization?

4    A.    He pressed pills with Aaron.

09:07:14  5    Q.    What kind of pills did Luke Paz press?

6    A.    The oxycodone fentanyl pills.

7    Q.    At some point in time did Aaron Shamo express

8    frustration to you about not having access to the

9    formula for the fentanyl pills?

09:07:29 10    A.    He did.

11    Q.    Who did he say had that formula?

12    A.    Luke.

13    Q.    Did he say that that formula -- without having

14    that formula he was unable to actually press the

09:07:37 15    pills himself?

16    A.    Correct.

17    Q.    And that he was frustrated that Luke held onto

18    that formula and kept it from him?

19    A.    Yes, because he wanted to do that himself.

09:07:54 20    Q.    I believe we looked at a couple of invoices on

21    some of these exhibits, do you remember those?

22    A.    Yes.

23    Q.    You created some of those invoices, correct?

24    A.    I did.

09:08:04 25    Q.    You had kind of free range on what those looked

1    like, correct?

2    A.   Correct.

3    Q.   I believe part of your testimony was that you and

4    Katie wanted to leave this organization and that

09:08:19  5    Aaron had offered you a down payment on a home to

6    keep you around.  Is that your testimony?

7    A.   Correct.

8    Q.   Do you remember a time in 2000 -- it may have

9    been 2015 but possibly early 2016 when there was an

09:08:34  10   incident involving your dog?

11   A.   Yes.

12   Q.   Can you tell me what that was?

13   A.   Um, yes.  He had gotten into the room where we

14   kept all of the products and ingested an MDMA pill.

09:08:46  15   Q.   Do you remember approaching Aaron and telling him

16   that you needed a home with a backyard so you could

17   continue to manufacture pills and not put your

18   animals at risk?

19   A.   I don't remember that, no.

09:08:58  20   Q.   Would it surprise you if a conversation like that

21   occurred?

22   A.   I know we talked to him about the dog getting

23   hurt, but no, it wouldn't.

24   Q.   Do you remember complaining to Aaron about the

09:09:10  25   number of orders you had to fulfill or Drew about the

1    number of orders you had to fulfill?

2    A.   Yes.

3    Q.   Do you remember suggesting to either Drew or

4    Aaron that potentially shipping in bulk was a better

09:09:24  5    idea for you, Katie, and the organization?

6    A.   No.

7    Q.   You also testified that you received money

8    through Venmo, not just cash, correct?

9    A.   Correct.

09:09:38 10    Q.   And that you also had your own Bitcoin wallet; is

11    that correct?

12    A.   To purchase postage only, yes.

13    Q.   But you knew how to use that Bitcoin wallet,

14    correct?

09:09:48 15    A.   Yes, correct.

16    Q.   There has been some testimony about Aaron leaving

17    or some individual leaving drugs or items in your

18    truck and that's where you would retrieve them from.

19    Does that sound correct to you?

09:10:08 20    A.   Correct.

21    Q.   Did Aaron ever have a key fob for your truck?

22    A.   He had the pin code for the door.

23    Q.   But not the key fob, correct?

24    A.   Correct.

09:10:19 25    Q.   Did that pin code make the lights in your truck

1    flash on and off when you enter the code?

2    A.   I don't know if the lights flash.

3    Q.   Like with a key fob, do you know what?

4    A.   Yeah, I -- I don't recall but sure.

09:10:35  5    Q.   Is it also consistent with your testimony that

6    you and Katie did actually use those gel caps to

7    manufacture MDMA pills for shipping, correct?

8    A.   Correct.

9    Q.   So you weren't just involved in shipping, you

09:10:48 10    actually manufactured those pills?

11    A.   That's not manufacturing it's just putting the

12    powder that is already there in to a capsule.  It is

13    not making them.  It is -- I think it is different.

14    There is not a formula involved or any other

09:11:02 15    additions.

16    Q.   Taking it from one form to another in order to

17    sell it en masse?

18    A.   Sure.

19    Q.   Is that correct?

09:11:10 20    A.   I think it's a different terminology.  There's

21    not a formula.  It is taking one powder and putting

22    it into a capsule instead of adding different

23    ingredients.

24    Q.   Ms. Tonge, I didn't ask you if there was a

09:11:27 25    formula involved, I asked if you took the product

1    from one form, put it into another, and then shipped

2    it out for sale?

3    A.   Yes.

4    Q.   Since you were stopped on November 22nd, 2016,

09:11:41  5    did you spend time in jail?

6    A.   I did not.

7    Q.   As a matter of fact, you got married since that

8    date, correct?

9    A.   I did.

09:11:56  10    Q.   After you pled guilty in this case, did you have

11    any other interviews with the government?

12    A.   I have.

13    Q.   How many interviews have you had?

14    A.   One.

09:12:10  15    Q.   I believe we looked at your Statement in Advance

16    of Plea?

17    A.   Yes.

18    Q.   Were you offered any incentive for cooperating

19    with the government?

09:12:22  20    A.   Not at the beginning, no, I was not.

21    Q.   When you entered that plea?

22    A.   I was.

23    Q.   You were offered both leniency for cooperating as

24    well as told that you would not be charged with a

09:12:36  25    death resulting count, correct?

1    A.   Correct.

2    Q.   If we can look at Exhibit 14.30.  Do you have the

3    page number on that very large exhibit.  Do you have

4    a page number down at the bottom of this exhibit?

09:13:03   5    That is an order you fulfilled, correct?

6    A.   Correct.

7    Q.   So an order you shipped, correct?

8    A.   Correct.

9    Q.   Are you aware that the government is alleging

09:13:11   10    that this shipment to Gregory Lee is the basis for

11    the death resulting count in this case?

12    A.   I am.

13    Q.   But you're not charged with that?

14    A.   Correct.

09:13:23   15    Q.   In fact, you agreed to plead guilty so that you

16    would not be charged with that, correct?

17    A.   I pled guilty because I knew what I did was

18    wrong.

19    Q.   And part of that agreement entailed you not being

09:13:33   20    charged with a death resulting count, correct?

21    A.   Correct.

22         MS. BECKETT:  Just one second, Your Honor.

23    Those are all of the questions I have.  Thank you.

24         THE COURT:  Thank you.  Redirect,

09:13:56   25    Mr. Stejskal?

### REDIRECT EXAMINATION

BY MR. STEJSKAL:

Q.   Let me just clear up a couple of things just so
we're all understanding here.  You were asked how
many other interviews you had with the government and
I believe you answered one, correct?

A.   Since the guilty plea, yeah.

Q.   Since the guilty plea, that was the question,
okay.

A.   Yes.

Q.   And that was in preparation for trial?

A.   Correct.

Q.   When you pled guilty, it was explained to you
that the judge would consider all of your conduct in
this whole matter, correct?

A.   Correct.

Q.   And that -- to your understanding did that
include the fact that somebody died?

A.   Yeah.

Q.   You weren't specifically charged with that but
that would be considered, correct?

A.   Correct.

Q.   When did your cooperation start with the United
States law enforcement?

A.   November 22nd when I was pulled over.

1   Q.   Basically from the moment you were pulled over?

2   A.   Yes.

3   Q.   Describe that again your interaction with the

4   officer that pulled you over?

09:15:19  5   A.   I just -- he knew -- he asked me if I knew why I

6   was being pulled over.  He was in an unmarked vehicle

7   and he wasn't wearing a uniform and I told him what I

8   did.  I requested that he not breakdown our door,

9   that I would let him in and show him anything that he

09:15:37  10   needed to see.

11   Q.   And then you interviewed with some other agents

12   that same day?

13   A.   I did.

14   Q.   Did anybody promise you anything at that time?

09:15:46  15   A.   No.

16   Q.   You cooperated fully just based on what you said

17   that you wanted to cooperate?

18   A.   Correct.

19   Q.   One other clarification.  I had asked you if you

09:15:58  20   recruited anyone.  Are you familiar with a person by

21   the name of Elise Christensen?

22   A.   I am.

23   Q.   Who is that?

24   A.   A friend from eBay.

09:16:08  25   Q.   Maybe the term "recruited" wasn't the right

1    terminology, but did you speak with Ms. Christensen

2    about this or refer her to someone?

3    A.   I did, yeah.   To receive packages to get that

4    money to be a drop basically for Aaron.

09:16:26  5    Q.   How did you assist in that relationship?

6    A.   Um, just gave her the information and passed that

7    along to Aaron because he had needed another person

8    to kind of fulfill that spot.

9    Q.   And did you have any negotiation with

09:16:42  10   Ms. Christensen about what she would be paid?

11   A.   I did not.

12   Q.   Or how to do it?

13   A.   No.

14   Q.   Who did that?

09:16:47  15   A.   Aaron told me this is how much she could get from

16   doing that.   So as soon as she gets a package she can

17   let me know or you can bring it to me for her.

18   Q.   When you say "let me know", let you know or let

19   Mr. Shamo know?

09:17:03  20   A.   Let Mr. Shamo know or let myself know.

21            MR. STEJSKAL:   Thank you.   That's all of the

22   questions.

23            THE COURT:   Thank you.   Any re-cross?

24            MS. BECKETT:   Yes.   Just briefly, Your

09:17:19  25   Honor.   Your Honor, if I may approach.

```
 1              THE COURT:  You may.
 2                   RECROSS-EXAMINATION
 3              BY MS. BECKETT:
 4     Q.   I have placed an exhibit next to you, I believe
 5     it is 17.06.  If I could have you look at that,
 6     Ms. Tonge.  On that chart, who are you familiar with?
 7     A.   Um, Noble, Shamo, Paz, Crandall, myself, Bustin,
 8     Gygi, and Christensen.
 9     Q.   I believe it was your testimony just now that you
10     essentially referred Elise Christensen to Mr. Shamo;
11     is that correct?
12     A.   Yes.
13     Q.   And that if she received a package on Mr. Shamo's
14     behalf, she could let you know about that package?
15     A.   Correct.
16     Q.   And you would retrieve that package from her and
17     provide it to either Mr. Shamo or Mr. Crandall?
18     A.   Provide it to Aaron, yeah.
19     Q.   If we could go back to that 14.30 exhibit.
20     You're familiar with this exhibit, correct?
21     A.   Correct.
22     Q.   Those are essentially daily order sheets?
23     A.   Correct.
24     Q.   Was your testimony that you were not aware that
25     fentanyl was being used in these pills; is that
```

1    correct?

2    A.   Fentanyl was being used in pills that were

3    marketed as something other than that, correct.

4    Q.   But you were aware that there was fentanyl,

09:19:13  5    correct?

6    A.   I saw on the pages.  I was unaware of what it

7    was.

8    Q.   You were unaware of what fentanyl was?

9    A.   Correct.

09:19:25  10    Q.   Until somebody in this case told you?

11    A.   The severity of that, yes.

12              MS. BECKETT:  That's all I have.  Thank you.

13              THE COURT:  Thank you.  Anything else?

14              MR. STEJSKAL:  No.

09:19:35  15              THE COURT:  You may step down.  Thank you

16    and you may be excused.  The government may call its

17    next witness.

18              MR. STEJSKAL:  The government will call

19    Katie Bustin.

09:20:03  20              THE COURT:  Come forward and be sworn,

21    please.

22              THE CLERK:  Please raise your right hand.

23              **KATHERINE LAUREN ANNE BUSTIN,**

24     called as a witness at the request of the Defendant,

09:20:11  25        having been first duly sworn, was examined

```
 1                    and testified as follows:
 2              THE WITNESS:  I do.
 3              THE CLERK:  Come around to the witness box
 4    here (indicating).  Please state your name and spell
 5    it for the record.
 6              THE WITNESS:  It is Katherine Lauren Anne
 7    Bustin, K-A-T-H-E-R-I-N-E L-A-U-R-E-N A-N-N-E
 8    B-U-S-T-I-N.
 9              THE COURT:  You may proceed, Mr. Stejskal.
10              MR. STEJSKAL:  Thank you, Your Honor.
11                      DIRECT EXAMINATION
12              BY MR. STEJSKAL:
13    Q.   Where do you work?
14    A.   I work at Main Street Office Furniture.
15    Q.   With Ms. Tonge?
16    A.   Yes.
17    Q.   What do you do there?
18    A.   I am the designer and space planner.
19    Q.   What kinds of customers do you guys have?
20    A.   Mostly commercial businesses, offices trying to
21    get cubicals and their offices set up.
22    Q.   How long have you worked there?
23    A.   Um, a little over two years.
24    Q.   Where did you previously work?
25    A.   I worked at eBay.
```

09:20:37  (line 5)
09:20:57  (line 10)
09:21:04  (line 15)
09:21:12  (line 20)
09:21:26  (line 25)

1    Q.    How long did you work there?

2    A.    For a little over six years.

3    Q.    So you started when?

4    A.    Um, August 2011.

5    Q.    And when did you quit working there?

6    A.    Um, June 2017.

7    Q.    And you were let go as a result of your

8    involvement in this case, correct?

9    A.    Yes.

10   Q.    Tell us about some of the people that you met at

11   eBay that were involved in this?

12   A.    Um, I first met Aaron.  I think we were on the

13   same team together and we had kind of become work

14   friends and his friend Drew would come over and

15   visit.  So in proximity I would talk to him as well.

16   Q.    Just at work or did you socialize outside of

17   work?

18   A.    Just at work.

19   Q.    At some point you became Facebook friends I

20   guess?

21   A.    Yeah.

22   Q.    But as far as going to pubs with those guys and

23   stuff?

24   A.    No, it wasn't my scene really so --

25   Q.    And so you struck up a casual work relationship

1    with Mr. Shamo and Mr. Crandall?

2    A.   Yes.

3    Q.   And was there something about that that turned

4    into this?

5    A.   Yeah.  Um, I had driving Drew home one night and

6    he had kind of told me a few things, not necessarily

7    any specifics, but I kind of had an idea of what they

8    were kind of doing.  I also knew that Aaron was

9    planning on leaving eBay and I didn't know how he

10   could do that with not having a job and paying all of

11   the bills still.

12   Q.   So did you end up meeting with Mr. Shamo and

13   Mr. Crandall about becoming involved?

14   A.   Yes.  I don't recall who approached who, but,

15   yes, we talked about it and Aaron had asked if we

16   wanted to be a drop is what he called it to receive

17   packages at our home address.

18   Q.   And did you agree to do that?

19   A.   Yes.

20   Q.   And did you and Ms. Tonge receive several

21   packages that way?

22   A.   Yes.  We received, I think, four or five of them.

23   Q.   And what did you do with those?

24   A.   We weren't allowed to open them, we just brought

25   them straight to Aaron .

1    Q.   And what were you paid for those?

2    A.   Um, from what I recall we were paid about $100 a

3    package.  So sometimes we would get a few at a time.

4    Q.   Paid in cash?

09:24:06  5    A.   Yes.

6    Q.   Did you eventually become involved in the

7    organization in a different way?

8    A.   Yes.  Over probably another five months or so,

9    um, again I don't recall who approached who, but

09:24:25  10   there was an opportunity to make a little bit more

11   money and do a few more things so they kind of

12   explained that to us, Aaron and Drew, and we kind of

13   got started from there.

14   Q.   Okay.  Before I forget, you talk about an Aaron

09:24:39  15   Shamo that you knew and were involved with in these

16   activities.  Can you identify him for the jurors?

17   A.   Yes.  He is over here, far right.

18   Q.   Describe him a little bit.

19   A.   Um, I don't really have my glasses on so I can't

09:24:54  20   see him clearly, but he is wearing a black suit,

21   possibly a black tie.

22            THE COURT:  I didn't hear what you said.

23            MR. SKORDAS:  I was just going to say we'll

24   stipulate that she knows Aaron.

09:25:04  25            THE COURT:  Thank you.

```
 1              MR. STEJSKAL:  Thank you.

 2    Q.   (By Mr. Stejskal) I'm sorry, what was the further

 3    work then that you had agreed to do?

 4    A.   Originally it was to start shipping out some

 5    product.  Um, we still didn't know a whole lot at the

 6    beginning, but we made an agreement that Drew would

 7    come over and kind of show us the ropes of how to

 8    ship things and how to get them sent out.

 9    Q.   And he did that and you guys watched?

10    A.   Yes.  He would come over -- I think he came over

11    maybe three or four times and helped us learn how to

12    package and make it safe to go through the mail.

13    Q.   In addition to packaging, what else did he show

14    you about how to get the orders and that kind of

15    stuff?

16    A.   Um, he worked with Alex on setting up an account

17    on the computer through the Dark Web.  I didn't do

18    anything on the computer much so I didn't know a

19    whole lot about how they set that up, um, but that's

20    how he kind of explained how to do it.

21    Q.   Okay.  Let's talk about you then.  So how did you

22    divide up the duties between you and Ms. Tonge at the

23    beginning there?

24    A.   Um, the first time that Drew came over he just

25    kind of told us one person will package, the other
```

09:25:19  5
09:25:35  10
09:25:55  15
09:26:10  20
09:26:22  25

409

1      person will do orders, it is probably just easier

2      that way.  So it just happened to be that I was doing

3      the sorting and Alex was doing the labels and

4      packaging.

09:26:37  5      Q.   What do you mean by sorting?

6      A.   I would look at the order sheets that Alex would

7      print out and I would sort and count the pills, put

8      them in packages, and I would hand them back to Alex

9      and she would seal them in the package and put

09:26:49 10      postage on it.

11      Q.   And then at the beginning you guys were also

12      responsible for getting them in the postal system?

13      A.   Yes.  In the beginning we would drive them around

14      to random blue boxes and as well as dropping them off

09:27:02 15      in the bins at the post office.

16      Q.   When you started, what size of packages were you

17      doing and kind of how many?

18      A.   In the beginning it was pretty small.  We were

19      doing maybe sets of 10 or 20 in a little package but

09:27:20 20      it got bigger from there.  But originally it was only

21      a few at a time.

22      Q.   And as far as how many packages at night would

23      you guys do?

24      A.   In the beginning probably maybe 10 to 20 orders a

09:27:33 25      night.

1    Q.   And did that progress as time went by?

2    A.   Yes, yeah, very much.

3    Q.   At some point did Mr. Crandall leave the country?

4    A.   He did.  I am not quite sure of the time frame

09:27:48  5    that he left, but I remember he wanted to travel

6    around with his girlfriend Sasha at the time and he

7    was going to get paid out from Aaron so he could go

8    travel.

9    Q.   And did he in fact leave?

09:28:03 10    A.   Yes.

11    Q.   After Mr. Crandall left, who was your main

12    contact with as far as running your part of this

13    operation?

14    A.   It was always Aaron that we communicated with

09:28:20 15    after Drew was gone.

16    Q.   Before him would you communicate with both of

17    them when Drew was around?

18    A.   Yes.

19    Q.   And did the types of drugs you were shipping out

09:28:35 20    change after Drew left?

21    A.   They did.  Um, after he left, Aaron had started

22    or had a contact of some kind that wanted him to

23    start shipping out oxy or what I thought were oxy --

24    Oxycodone.  And from that point, we mostly shipped

09:28:56 25    that and kind of left behind some of the other pills

1      that were originally being shipped.

2      Q.   So those weren't as profitable or weren't --

3      A.   Just weren't as popular, yeah.

4      Q.   Did you have any contact with customers?

09:29:09  5      A.   No.  There were some messages on orders we got,

6      but we never reached out to any customer.

7      Q.   Did you get any payment from customers?

8      A.   No, it was always through Aaron.

9      Q.   Did you have anything to do with the Dark Web?

09:29:23  10     A.   No.  Myself I did not.

11     Q.   So if I understand what you're saying, orders

12     would come to you and you guys would fill them?

13     A.   Yes.

14     Q.   You described counting pills at the beginning

09:29:40  15     when there were 10 or 20 or whatever.  Um, would you

16     physically hand count those one, two, three four and

17     put them in a package?

18     A.   Yes.

19     Q.   Did that eventually change?

09:29:49  20     A.   Yes.  Once the orders got bigger, um, Aaron would

21     provide us with scales and we could you know count

22     out ten and weigh how much that was and then just do

23     the math from there if it was a large order.

24     Q.   And who told you how to do that?

09:30:06  25     A.   Um, from what I recall, it was Aaron.

1    Q.   And so describe that.   There were some orders I

2    think I saw of 2,000 and 5,000.   How would you

3    prepare those for packaging and delivery?

4    A.   Um, at first I would try and do the math right,

09:30:26 5    um, and just weigh them out.   But it was just so much

6    and it was taking up so much of our evenings that we

7    -- I would just kind of assume or guess how much

8    would be in a package and if it looked right just

9    send it.

09:30:45 10    Q.   And you got some feedback sometimes or saw some

11    feedback that you were putting too many in?

12    A.   Yes.   Um, Aaron would reach out and let us know

13    that extras are fine for customers and it's nice to

14    do that, but sometimes people were saying they had

09:31:01 15    like 100 or more extras and that is just because I

16    wasn't counting them.

17    Q.   And was Aaron upset about that?

18    A.   Um, I don't know if I would say he was upset.   He

19    seemed maybe annoyed just because that's his profit

09:31:20 20    and his pills that he has made.   So I don't think he

21    was really ever upset about it, but I don't think he

22    was happy about it.

23    Q.   He kind of told you to be more careful?

24    A.   Yes.

09:31:33 25    Q.   There seemed to be an abundance of pills.   Did

1    you guys ever run short?

2    A.   Um, from what I can recall, I don't think we did.

3    Um, Aaron would supply us with pills pretty regularly

4    so most of the time we didn't run out.  If we did,

09:31:53  5    then he would reach out to the customers and let them

6    know it will be a day or two late.

7    Q.   And we saw photos of the search warrant and there

8    were kind of pills on the floor and stuff and pills

9    in the vacuum cleaner.  Do you recall that?

09:32:09  10   A.   Yes.

11   Q.   Were those accurate pictures?  Was that kind of

12   how the house was at the time?

13   A.   Yes.  It was something that we didn't have

14   passion about, we didn't really care about it.  So if

09:32:20  15   we dropped a pill or there was something on the

16   ground, we would just vacuum it up.  We weren't

17   counting individual pills.

18   Q.   So you weren't accountable to Mr. Shamo for each

19   and every pill?

09:32:30  20   A.   Correct.

21   Q.   There were so many that it didn't --

22   A.   It was hard to keep track of anything that's why

23   he would reach out sometimes when we had large orders

24   but, um, or large extras on orders.  But other than

09:32:43  25   that, he didn't count every pill so we didn't either.

1    Q.   And was there -- were there sometimes re-ships?

2    A.   Yes.  Some people would say that maybe they got

3    the product and it was smashed so they couldn't take

4    them or that they just didn't get the package at all

09:33:01  5    so we would have to re-ship out to that address.

6    Q.   Did you at times have concerns or reservations

7    about doing this and ask to get out of it?

8    A.   Yes.  Um, (witness crying) a few months before,

9    sorry, a few months before we were caught, I had just

09:33:56 10    a horrible feeling and I wanted to be done

11    completely, um, but was persuaded otherwise to just

12    keep going with it.

13    Q.   Did you have conversations with Mr. Shamo about

14    that and what not?

09:34:17 15    A.   Yes.  Um, we had told him -- Alex and I had told

16    him that we were very uncomfortable, that we didn't

17    want to do it any more.  I was paranoid from the

18    beginning.  Um, I kept asking for less

19    responsibilities or less public places to go and --

09:34:39 20    but instead he -- Aaron would offer, you know, time

21    off, paid time off, or he offered to give us money to

22    buy a house.  And that was something that we were

23    looking to do, so that was a huge incentive.  We

24    wanted to, you know, build a life.  So...

09:34:57 25    Q.   And somewhere towards the end you had surgery on

415

1  your wrists?

2  A.   I did, yes.  I had a cyst on both of my wrists.

3  So the day that we were arrested I had just had a

4  surgery just a few days before that.

09:35:17  5  Q.   During that time Ms. Tonge had to kind of do

6  things on her own?

7  A.   Yes.  She would do the orders and I couldn't

8  really do much.  I couldn't move my wrists very much

9  so I wouldn't -- I didn't do them for the last

09:35:35  10  probably three weeks, I would say, up to the time we

11  were caught.  So...

12  Q.   And all that time you were feeling like you

13  wanted to quit?

14  A.   Yes.

09:35:46  15  Q.   November 22nd of 2016, you remember that day well

16  I assume?

17  A.   Yes.

18  Q.   What happened that day?

19  A.   Um, that was the day that our house was raided.

09:36:00  20  Um, I was in bed and Alex luckily was able to let

21  them into the house rather than breaking in and they

22  came in and flipped our house and searched everything

23  and brought us in for questioning.

24  Q.   And were you cooperative at that time?

09:36:19  25  A.   Yes.

1    Q.   How so?

2    A.   Um, I just told the truth.  As soon as they

3    brought us in I gave up everything I knew.

4    Q.   Were you emotional at that time?

09:36:31  5    A.   Yeah, very much.

6    Q.   Did you have any agreement at that time about

7    what was going to happen to you?

8    A.   No.

9    Q.   But you told them any way?

09:36:43  10    A.   Yes.

11    Q.   How come?

12    A.   I didn't want to be in this from the beginning so

13    I knew it was something that I just needed to clear

14    up and tell the truth and just get out of it

09:36:58  15    completely.

16    Q.   Let's look at Exhibit 23.00.  Do you recognize

17    that?

18    A.   Yes.

19    Q.   That is the front page of your guilty plea?

09:37:17  20    A.   Yes.

21    Q.   Did you in fact plead guilty in this matter?

22    A.   I did.

23    Q.   Did you plead to every charge that was charged

24    against you?

09:37:25  25    A.   Yes.

1    Q.   Did you have any specific sentencing agreement

2    about what is going to happen to you?

3    A.   No.

4    Q.   Did you also enter into a cooperation agreement?

09:37:37  5    A.   Yes.

6    Q.   And in that you agreed to tell the truth in any

7    further court proceeding against anyone else,

8    correct?

9    A.   Yes.

09:37:45  10   Q.   Have you done that?

11   A.   Yes.

12   Q.   Part of the agreement was that you would not be

13   charged with the death that resulted from this

14   organization; is that correct?

09:37:59  15   A.   Correct.

16   Q.   But you understood that the judge will consider

17   all of your conduct and everything that happened as a

18   result of this organization in determining what

19   happens to you, correct?

09:38:10  20   A.   Yes.

21   Q.   Do you have any stake in the outcome of this

22   proceeding?

23   A.   No.

24   Q.   All you were told is to tell the truth, correct?

09:38:23  25   A.   Yes.

1  Q.   Did you have any -- other than this criminal

2  charge any other consequences from your involvement

3  in this?

4  A.   Um, aside from losing my job, no.

09:38:35  5  Q.   Okay.  You were fired from your job?

6  A.   Yes.

7  Q.   And probably some friends and family kind of had

8  some --

9  A.   Luckily no family.  My family has been very

09:38:45  10  supportive but I lost a lot of friends.

11  Q.   Did you organize this operation?

12  A.   No.

13  Q.   Did you manage anyone, supervise their day-to-day

14  activities?

09:39:07  15  A.   No.

16  Q.   Did you know that others were involved?

17  A.   Um, yes, just a few people, but yes.

18  Q.   When you say just a few people, did you -- do you

19  think you knew everybody that was involved in this

09:39:21  20  organization?

21  A.   No.

22  Q.   Why do you say that?

23  A.   Um, I just saw the sign.  I didn't realize there

24  were that many people at all.

09:39:31  25  Q.   Based on what you did and what you know, who was

419

1    in charge of this operation?

2    A.   Aaron was.

3    Q.   Why do you say that?

4    A.   He was the one who did all of the communicating,

09:39:41  5    he made the financial decisions, he is the one who

6    started the account on the Dark Web, he created this

7    whole thing and taught others.

8         MR. STEJSKAL:  Thank you.  That's all of the

9    questions I have.

09:39:58  10        THE COURT:  Thank you.  Thank you

11   Mr. Stejskal.  Mr. Skordas, you may cross-examine.

12        MR. SKORDAS:  Thank you, Your Honor.

13                    **CROSS-EXAMINATION**

14        BY MR. SKORDAS:

09:40:03  15   Q.   Hi.

16   A.   Hi.

17   Q.   My name is Greg Skordas and I'm Aaron's attorney.

18   We haven't met before, have we?

19   A.   I don't think so.

09:40:10  20   Q.   Or spoken?

21   A.   No.

22   Q.   Um, you know Drew Crandall, correct?

23   A.   Yes.

24   Q.   Do you see his picture on there?

09:40:17  25   A.   Yes.

1    Q.    Kind of a give away but his name is underneath

2    it.   Is that the fellow you know as Drew Crandall?

3    A.    Yes.

4    Q.    And I think your testimony was that you knew

09:40:28  5    Aaron and Drew through your employment there at eBay;

6    correct?

7    A.    Correct.

8    Q.    And that the introduction into this mess you got

9    yourself into was first from a drive home you had

09:40:43  10   with you and Drew, correct?

11   A.    Partially.  He didn't tell me a whole lot from

12   there.  Um, he just had a lot of envelopes in his

13   backpack and I was curious and he was very vague in

14   what he said.  But it later came to light from Aaron

09:40:57  15   of what more specifically what they were doing.

16   Q.    And you were, of course, reluctant to get

17   involved in this, correct?

18   A.    I was, yes.

19   Q.    And although Alex is a dear friend of yours, she

09:41:13  20   sort of took the laboringor on a lot of this; is that

21   fair?

22   A.    Um, partially.  Um, I would say that she is a

23   little bit more money driven, money stresses her out

24   a little bit more than it does me, but we both made

09:41:29  25   the decision.  So...

```
 1    Q.   But, for example, the packages that were
 2    delivered to your house were always in her name and
 3    not yours; correct?
 4    A.   In the beginning, yes, the packages that Aaron
 5    would have shipped to us were addressed to Alex.
 6    Q.   And that was your choice, right?  You wanted to
 7    keep your involvement as little as possible?
 8    A.   Correct.  Alex and I talked about it, yes.
 9    Q.   And you were taken into custody or at least taken
10    to the South Jordan Police Department on November
11    22nd, correct?
12    A.   Yes.
13    Q.   And that's the first time that anyone in law
14    enforcement had addressed you about this whole thing;
15    correct?
16    A.   Correct.
17    Q.   You were interviewed separate from Alex?
18    A.   Yes.
19    Q.   And you were interviewed by a police officer or
20    two or three?
21    A.   Correct, yes.
22    Q.   And you described your involvement in this to the
23    best you could, correct?
24    A.   Yes.
25    Q.   You told them that you were receiving parcels
```

09:41:40  5
09:42:00 10
09:42:12 15
09:42:20 20
09:42:29 25

1       from all over the country, correct?

2       A.   Yes.

3       Q.   From Florida, from Taiwan, domestic and

4       international, I think is what you told the

09:42:42    5       investigators; is that fair?

6       A.   Yes.

7       Q.   And that was correct?

8       A.   Uh-huh (affirmative).

9       Q.   And that you would -- either you or Alex would

09:42:53    10      drive these parcels after you got them to the house,

11      correct?

12      A.   To Aaron and Drew's house.  Every once in a while

13      Aaron would come and pick them up from us if we were

14      busy.

09:43:06    15      Q.   So when the government was talking to you, you

16      kept referring to it as Aaron's house.  But you knew

17      it was Aaron and Drew's house, correct?

18      A.   They lived together in the beginning, yes.

19      Q.   And when you were delivering packages to them,

09:43:17    20      they were living together, correct?

21      A.   Yes.

22      Q.   And that you were paid 100 or 200 or something

23      per package when you would make those deliveries,

24      correct?

09:43:32    25      A.   Correct, yes.

1    Q.   But at some point you or -- you and Alex or maybe

2    Alex seized an opportunity to make more money; is

3    that fair?

4    A.   Yes.

09:43:43  5    Q.   Right or wrong that's what you decided to do,

6    correct?

7    A.   Correct.

8    Q.   And you decided to get involved in sort of the

9    shipping and packaging part of this?

09:43:53 10    A.   Right.

11    Q.   Correct?

12    A.   Right.

13    Q.   And Drew came to your house over the course of

14    several days and walked you through that process;

09:44:00 15    correct?

16    A.   He did in the beginning, yes.

17    Q.   He taught you how to do that?

18    A.   Yes.

19    Q.   He taught you how to get the labels and get the

09:44:09 20    packages and put things together, correct?

21    A.   Originally we didn't have labels we were just

22    doing postage, actual stamps from the post office.

23    Later, the shipping labels was an idea of Aaron's

24    after Drew had left.

09:44:26 25    Q.   I think what you told the police was that Drew

1    showed you and Alex how to package the pills properly

2    so product was not damaged during shipment; is that

3    fair?

4    A.   Correct, yes.

09:44:36  5    Q.   And that Drew directed you and Alex to put the

6    pills in mylar bags because they could not be x-rayed

7    and to include an invoice in each package; is that

8    correct?

9    A.   Yes.

09:44:47  10    Q.   When you told the officers that on November 22nd

11    you were trying to tell the truth, correct?

12    A.   Yes.

13    Q.   You were scared out of your wits, weren't you?

14    A.   Yeah.

09:44:54  15    Q.   You were -- you were anxious to curry a little

16    favor from law enforcement, isn't that a fair

17    statement?

18    A.   I'm not sure if I would say a favor, but I was

19    just trying to come clean.

09:45:06  20    Q.   You didn't go to jail that night, did you?

21    A.   No.

22    Q.   And you knew that the keys to that jail were

23    somewhat in your pocket by your cooperation?

24    A.   I actually didn't know.  I thought I was going to

09:45:20  25    jail.  They didn't tell me if I was or was not.

1    Q.   But you know today that had you told them that

2    night you didn't want to speak with them you would

3    have gone to jail?

4    A.   I assumed so.

09:45:35  5    Q.   Crandall also directed you how to sort of change

6    up the invoices once in a while, correct, so that

7    they would show different products?

8    A.   Yeah.  He mentioned in the beginning to switch up

9    the invoices so that way, you know, if it were ever

09:45:55  10    looked at it would be different than other product.

11    Q.   And what you told officers, and I'm not trying to

12    put words in your mouth, I'm reading the report here,

13    so if I'm wrong correct me, was that Crandall worked

14    with you four or five times and then he continued to

09:46:10  15    teach you?

16    A.   In the beginning he would teach us kind of things

17    about the post office.  If I recall correctly, um,

18    his girlfriend worked for the post office and she

19    knew kind of what could be x-rayed or not x-rayed.

09:46:26  20    So he would originally teach us.  After that, when he

21    left, we had to switch up a whole lot of stuff.  But

22    in the beginning he did teach us.

23    Q.   You keep talking about "in the beginning".  Was

24    there a time when Drew got out of the picture?

09:46:39  25    A.   Yes.  He decided to travel with his girlfriend

1    Sasha.  I don't know exactly the timeframe, but when

2    he left, Aaron basically took over everything that he

3    would have been doing with us and taught us

4    everything else from that point on.

09:46:57  5    Q.   I want to show you an exhibit that has been

6    previously entered, it is 15.05, and have you go to

7    Page 5 of that.  And can you make the top part pretty

8    -- do you see those names at the top?

9    A.   Yes.

09:47:33 10    Q.   And so if you look at the third line it says the

11    date?

12    A.   Yes.

13    Q.   What is the date that this was sent?

14    A.   November 20th, 2016.

09:47:42 15    Q.   And that is two days before you were arrested?

16    A.   Yes.

17    Q.   Or at least questioned, correct?

18    A.   Yes.

19    Q.   And who is "Shortbread 66"?

09:47:51 20    A.   I don't know actually.

21    Q.   You don't know who that is?

22    A.   I don't.  I didn't do any of the e-mailing or

23    anything online.

24    Q.   Do you know who "Pass the Peas" is?

09:48:10 25    A.   Um, that is the account that Aaron set up for us

1    to receive e-mails.

2    Q.   That is you guys?

3    A.   Yes.

4    Q.   No matter who set it up, that is your account,

09:48:20  5    right?

6    A.   Right.

7    Q.   Who is "American Steam"?

8    A.   I don't know.

9    Q.   If I were to tell you that "Shortbread 66" is

09:48:28  10   Drew Crandall, and "American Steam" is Aaron Shamo,

11   would that surprise you or does that seem consistent

12   with your recollection today?

13   A.   It seems consistent because when Drew was out of

14   the country, he, I assume, possibly ran out of money

09:48:44  15   and he wanted to get back in.  So for a while it

16   looks like he was sending the pages to us.

17   Q.   It looks like, and correct me if I'm wrong, but

18   he is sending you pages two days before the police

19   come to your house?

09:49:02  20   A.   On this day, yes.

21   Q.   Isn't this the type of message that you guys were

22   receiving fairly regularly during that time?

23   A.   Um, I honestly don't recognize it because I never

24   did the e-mails.

09:49:18  25   Q.   Was that Alex's duties?

428

1    A.    Correct, yes.

2    Q.    And you had a separate function in this?

3    A.    Yes.

4    Q.    Thank you.  I think you told officers at the time

09:49:36  5    that Crandall, Drew Crandall, showed Alex how to

6    access the e-mail account, decrypt the order

7    fulfillment list, and print the information; is that

8    accurate?

9    A.    Yes, correct, when he was training us in the

09:49:53  10   beginning.

11   Q.    You told them that you don't -- you didn't have

12   knowledge of the Dark Web and that Drew taught you

13   that part of it, correct?

14   A.    Um, from what I remember, I think that's

09:50:09  15   accurate.  He didn't teach me any of it, so the only

16   thing that relates to that I don't know if Alex was

17   more taught by Drew or Aaron.  I'm not quite sure.

18   Q.    Did Aaron come to your house and show you how to

19   package things?

09:50:28  20   A.    After -- I mean we saw both of them quite often.

21   Q.    Both Aaron and Drew?

22   A.    Yes.

23   Q.    What period of time are you talking about?

24   A.    This was before Drew left to travel.  We would

09:50:45  25   see them both at their home together or if they ever

1    came to give us money.  They were friends so they

2    were together quite a lot.

3    Q.   And sorry I didn't mean to cut you off, actually

4    I did.  I just wanted to ask you another question.

09:51:02  5    When was it that you recall that Drew left?

6    A.   I really don't know if I remember.  I can't

7    remember what time it was specifically.

8    Q.   Do you remember telling officers on November 22nd

9    that Drew taught Alex to randomly pick a spot on the

09:51:29  10   map, list the address, and make up a name for the

11   return address?

12   A.   Yes.

13   Q.   And that Drew told her to keep it as random as

14   possible just so it is somewhere throughout the Salt

09:51:38  15   Lake valley?

16   A.   Correct.

17   Q.   Is that accurate?

18   A.   Yes.

19   Q.   You told the truth when you told them that?

09:51:43  20   A.   Yes.

21   Q.   How did you and Alex decide amongst yourselves

22   how the money was going to be divided up?

23   A.   Um, when we ever got payment it was just an equal

24   split.  Normally from the beginning talking to Drew

09:52:11  25   and Aaron, they both said, you know, we'll pay you

430

1    each this much.  Any time there was an increase it

2    was always an equal increase so we always got paid

3    the same amount.

4    Q.   When you started working with Drew and Aaron,

09:52:25  5    where did you live?

6    A.   Um, we were considered --

7    Q.   I don't need to know the exact address but what

8    city?

9    A.   When we were drops we were in Riverton.

09:52:36  10    Q.   Did you ultimately move?

11    A.   Yes, we moved to Daybreak.

12    Q.   Was that a nicer place?

13    A.   Yes.

14    Q.   Was that, in part, based on the fact that you had

09:52:43  15    an increased income?

16    A.   Um, I don't know.  I don't remember if it was

17    something that we could afford before that.  We were

18    still drops at the time so we weren't making a whole

19    lot to make a difference.

09:53:00  20    Q.   But when you became more than drops you could

21    afford a lot more, couldn't you?

22    A.   Yes.  Mostly bills and school, but yes.

23    Q.   You were making about $7,000 a month?

24    A.   Um, that seems like a lot but I know it was

09:53:18  25    probably close to that.

1    Q.   $3,500 every other week, does that make more

2    sense?

3    A.   I think so.

4    Q.   Was that always in cash?

09:53:28  5    A.   Yes.

6    Q.   Just sort of showed up in -- whose truck was it

7    with the key fob, yours or Alex's?

8    A.   It was Alex's truck.

9    Q.   And the money would show up in the truck?

09:53:39  10   A.   Yes.  Or we would meet up or Aaron would come

11   over to our house and give it to us.

12   Q.   Could we look at 23.00, please.  Ms. Bustin, I am

13   going to show you something that you have already

14   looked at and this is your Plea Agreement.  Do you

09:53:56  15   see that?

16   A.   Yes.

17   Q.   It is dated or at least it is stamped by this

18   court on June 7th of 2018, correct?

19   A.   Correct.

09:54:05  20   Q.   Is that the day you pled guilty?

21   A.   Um, I would assume so.

22   Q.   So 14 months ago?

23   A.   I honestly can't remember.  I'm not great with

24   dates, but it sounds that it could be right.

09:54:22  25   Q.   And in 14 months you haven't been sentenced?

1     A.   Correct.

2     Q.   You haven't been back to this court to decide

3     what your punishment will be, correct?

4     A.   Correct.

09:54:30 5   Q.   And that's because that decision is in large part

6     based on your participation today, correct?

7     A.   Um, I don't know that it's based off of that or

8     just we're just here.  If I had no promises or

9     anything I would still be here.  So I don't know if

09:54:56 10  -- I don't think anything would be different.

11    Q.   Well, you haven't been sentenced yet?

12    A.   Correct.

13    Q.   You don't know what your punishment is going to

14    be, correct?

09:55:04 15  A.   Correct.

16    Q.   You're hoping that the punishment will be as less

17    as possible, correct?

18    A.   I would hope so.

19    Q.   And part of that expectation is based on your

09:55:14 20  testimony today, correct?

21    A.   I guess yeah I would say yes.

22    Q.   There is no reason, is there, ma'am, to put the

23    sentencing over for over 14 months, is there, except

24    for you to come in here and testify against Aaron

09:55:29 25  Shamo?

1     A.    That makes sense, yes.

2     Q.    Well, according to this plea agreement, if you

3     look at the top there, it says you're pleading

4     guilty, and I'm looking at Paragraph 1, make it

09:55:49  5     bigger, please, that you're pleading guilty to Counts

6     2, 3, 8, 12, and 13 of the Superseding Indictment,

7     correct?

8     A.    Yes.

9     Q.    So you pled guilty to five counts?

09:56:01 10     A.    Yes.

11     Q.    Out of the 13.  And you weren't charged with all

12     of the 13 but you pled to these five, correct?

13     A.    Correct.

14     Q.    And so Count 1, for example, we can see sort of

09:56:13 15     at the bottom there is conspiracy to distribute

16     fentanyl, do you see that?

17     A.    Yes.

18     Q.    And, in fact, you did conspire to distribute

19     fentanyl, correct?

09:56:22 20     A.    Yes.

21     Q.    You were packaging fentanyl and sending it out,

22     correct?

23     A.    Of what we thought was Oxycodone, but yes.

24     Q.    But some of the shipping labels actually

09:56:33 25     identified this as fentanyl, didn't they, or did you

1    not see those?

2    A.   I think there were some on the order pages, um, I

3    don't know much about medication of any kind so I

4    assumed they were just the same thing.

09:56:45 5    Q.   So you at least had some written information sent

6    to you that you were distributing fentanyl, correct?

7    A.   Yes.

8    Q.   Can we go to the later counts, please.  I

9    appreciate it, Yvette.  So it looks like the next

09:57:05 10   count you pled to is conspiracy to distribute

11   Alprazolam.  Did you know you were distributing

12   Alprazolam?

13   A.   Yes.

14   Q.   And then possession of fentanyl with intent to

09:57:19 15   distribute.  Do you see that?

16   A.   Yes.

17   Q.   And then let's look at the next -- use of the

18   U.S. Mail in furtherance of a drug trafficking

19   offense.  Do you see that?

09:57:31 20   A.   Yes.

21   Q.   And finally conspiracy to commit money

22   laundering?

23   A.   Correct, yes.

24   Q.   Those are the counts you pled to?

09:57:37 25   A.   Yes.

1    Q.   Can we look at the -- is there an addendum on

2    this.  Can we look at the addendum please, that is

3    the last page or two.  There we go.  Do you see this?

4    A.   Yes.

09:57:52 5    Q.   This is -- let's go back one page, I'm sorry, two

6    pages.  Do you see the signature there?

7    A.   Yes.

8    Q.   That's your signature, correct?

9    A.   Correct.

09:58:03 10   Q.   And that signature, because you weren't sure of

11   the date earlier is June 7th of 2018.  Does that

12   refresh your recollection?

13   A.   Yes.

14   Q.   So that is when you signed this?

09:58:13 15   A.   Yes.

16   Q.   It looks like you had an attorney there that day?

17   A.   Correct.

18   Q.   You probably signed it in this very building,

19   didn't you?

09:58:20 20   A.   Yes.

21   Q.   Maybe not this particular court but in front of a

22   judge?

23   A.   Yes.

24   Q.   And said guilty and you read this over and what

09:58:26 25   not?

1    A.   Uh-huh.

2    Q.   Yes?

3    A.   Yes.

4    Q.   Can't do uh-huh, it makes her crazy.  The

09:58:35  5    addendum, the next couple of pages, indicates that

6    you're to testify completely and truthfully and if

7    you do you're not going to be charged with other

8    offenses.  Do you understand that?

9    A.   Yes.

09:58:48 10    Q.   And that is significant to you, isn't it?

11    A.   Yes.

12    Q.   It is significant because those other offenses

13    could carry additional penalties?

14    A.   Correct.

09:58:56 15    Q.   Significant additional penalties, correct?

16    A.   Yes.

17    Q.   You talked to your attorney about that?

18    A.   Yes.

19    Q.   And I won't ask you what he told you, but you

09:59:04 20    understand that some of the other charges were much

21    more serious?

22    A.   Yes.

23    Q.   And it's only smart on your part and your

24    attorney's to avoid those, correct?

09:59:15 25    A.   Yes.

437

1    Q.   I mean you're hoping you don't do any prison at

2    all I assume?

3    A.   I hope so, yes.

4    Q.   And I think you answered this but let me ask you

5    again.  Since November 22nd of 2016, how much time

6    have you done in custody?

7    A.   Zero.

8              MR. SKORDAS:  That's all I have, Your Honor.

9              THE COURT:  Redirect, Mr. Stejskal?

10             MR. STEJSKAL:  No, Your Honor.

11             THE COURT:  Thank you.  Since there is no

12   redirect, there will be no re-cross.  You may step

13   down and you may be excused and we'll take our first

14   break.  Try to get back in in about 15 minutes.

15             THE CLERK:  All rise, please.

16             (Jury left the courtroom.)

17             THE COURT:  We'll be in recess.  Thank you.

18             (Recess.)

19             THE COURT:  We'll get the jury in and

20   proceed.  You have your next witness, I assume?

21             MR. BURGGRAAF:  Yes.

22             THE COURT:  You can be --

23             THE CLERK:  All rise.

24             (Whereupon, the jury returned to

25             the courtroom.)

1          THE COURT:  The Government may call its next

2    witness.

3          MR. BURGGRAAF:  The United States would call

4    Special Agent Eric Breyer.

5          THE COURT:  Come forward and be sworn,

6    please.  Right there is good.

7          THE CLERK:  Please raise your right hand.

8                      **ERIC BREYER,**

9    called as a witness at the request of the Plaintiff,

10        having been first duly sworn, was examined

11                  and testified as follows:

12          THE WITNESS:  I do.

13          THE CLERK:  Please come around to the

14    witness stand.

15          Please state your name and spell it for the

16    record.

17          THE WITNESS:  Eric Breyer, E-R-I-C

18    B-R-E-Y-E-R.

19          THE COURT:  You may proceed, Mr. Burggraaf.

20          MR. BURGGRAAF:  Thank you.

21                  **DIRECT EXAMINATION**

22          BY MR. BURGGRAAF:

23    Q.   Thank you for being here this morning.  What is

24    your current occupation?

25    A.   I am a Special Agent with the Drug Enforcement

1    Administration.

2    Q.    How long have you been with the Drug Enforcement

3    Administration?

4    A.    For 20 years.

10:21:56  5    Q.    And while working there, what have been your job

6    responsibilities?

7    A.    Since assigned to the Salt Lake City office, I

8    have worked drug investigations, dismantling criminal

9    organizations, and also focusing a majority of my

10:22:09 10    time on clandestine laboratory investigations.

11    Q.    What do you mean by clandestine lab

12    investigations?

13    A.    Primarily it involves the production or packaging

14    or redistribution of drugs such as methamphetamine,

10:22:26 15    pill pressing tableting operations, things of that

16    nature.

17    Q.    And what education, training and experience do

18    you have that helps you to fulfill your job

19    responsibilities?

10:22:35 20    A.    All agents go through the basic academy at

21    Quantico, Virginia, and then -- that is a 16-week

22    process, um, and then for advanced training, we

23    return to Quantico for clandestine laboratory

24    investigator's training which is another 40-hour week

10:22:50 25    of work.  We also do site safety which helps you

440

1    manage and run these hazardous material sites.  There

2    is also a tactical operations in hazardous

3    environments as well.

4    Q.   Do you have any special assignments or

10:23:05 5    designations with the Drug Enforcement

6    Administration?

7    A.   I'm currently assigned as the clandestine

8    laboratory program coordinator for the Denver Field

9    Division.

10:23:14 10   Q.   And how long have you had that assignment?

11   A.   Two years.

12   Q.   What's the overall goal of drug investigations

13   conducted by the DEA?

14   A.   To identify and dismantle drug organizations.

10:23:27 15   Q.   And based on your training and experience, are

16   all drug trafficking organizations structured,

17   organized, in the same way?

18   A.   No, sir, they have variations.

19   Q.   Okay.  What did you do to prepare for your

10:23:40 20   testimony today?

21   A.   Reviewed photographs and reports from the

22   operation.

23   Q.   Okay.  And we're going to speak a little bit

24   about the HEAT team.  Can you tell me what the HEAT

10:23:51 25   team is?

1    A.    That is a local group called the Hazardous

2    Environment Action Team.  Our primary goal is to

3    assist with dismantling, entering and processing

4    hazardous material drug sites related to production,

10:24:08  5    packaging, and anything where we might have to wear

6    protective equipment while handling all of the items.

7    Q.    So what is your role with the HEAT team?

8    A.    The team leader.

9    Q.    And how long have you had that role?

10:24:19 10    A.    Um, since the inception of the team in 2016.

11    Q.    And do you provide training to other HEAT team

12    members?

13    A.    Yes, sir.

14    Q.    How often do you do that?

10:24:29 15    A.    We try to get some form of training relevant to

16    the operations once a quarter, so three to four times

17    a year, hopefully.

18    Q.    What is required of the HEAT team members in

19    order to begin and be assigned to the HEAT team?

10:24:43 20    A.    All of them have to have gone through the basic

21    clan lab investigator's course at Quantico, Virginia.

22    Again, the 40-hour class.  It is also preferred that

23    they attend the site safety operation so they

24    understand the larger scheme.  We also have the

10:24:59 25    additional with tactical operations and there is also

1    an advance school called Level A Operations in

2    California that is a three-day class for high hazard

3    environments.

4    Q.   Why, it may be intuitive, but why is so much

10:25:17  5    training required before or to participate on the

6    HEAT team?

7    A.   The regulations that govern wearing protective

8    equipment, respirators, self-contained breathing

9    apparatus and chemical suits are all governed by OSHA

10:25:33 10    and DEA has adopted though.  So therefore before we

11    can allow anyone to start wearing all this equipment,

12    they have to attend this advanced training to get

13    them certified to do so.

14           Frequently, the environments that we can

10:25:44 15    move into have high amounts of flammable solvents,

16    toxic vapors, troublesome powders that require

17    wearing protective equipment.  Therefore, the agents

18    and officers have to have attended that training.

19    Q.   I want to jump to this case.  How did you become

10:26:02 20    involved in the investigation of Aaron Shamo?

21    A.   As the team leader for the HEAT, I was asked to

22    assist with the tactical operation for the search

23    warrant on Titian Way.  And if we were to find any

24    hazardous material, the subsequent processing of that

10:26:18 25    scene.

1    Q.   Do you know why the HEAT team was expected to be

2    a part of the search at Titian Way?

3    A.   As I understand it, the operation was suspected

4    to include -- well it was known to include

5    counterfeit tablets that may include fentanyl which

6    is a hazardous material when ingested.  The thought

7    was that this location may involve a pill pressing

8    operation where those tablets were being made.

9    Q.   So the HEAT team helped in the search of the home

10    on Titian Way on November 22nd, 2016, correct?

11    A.   Yes, that's right.

12    Q.   Prior to that, what familiarity in training had

13    you and other HEAT team members had in relation to

14    fentanyl?

15    A.   Training and experience has -- was evolving

16    through 2016 as we were seeing fentanyl pop up around

17    the country.  Utah was slowly starting to see some of

18    it in both overdoses and distribution so we began to

19    try to focus on being prepared for that eventuality.

20    We had had one incident in Sandy earlier that year

21    that involved a pill press where several officers

22    were unexpectedly exposed to the powders.  From that,

23    we decided we needed to be a little bit more prepared

24    and proactive when handling some of these operations

25    like the pill press.

Q.   When you were invited to participate in the
search of the home on Titian Way, did you take any
extra measures or research anything to familiarize
yourself with what you expected to find in the home?

A.   I tried to familiarize myself with what pill
pressing operations might involve, the machinery we
might be looking for, what type of powders we might
see, um, both controlled substances and, um,
additional items necessary to make pills.  So just
general research for that type.

Q.   Had -- well, tell me what you expected to find in
the home by being -- by the HEAT team being invited
to participate?

A.   Based on my research I expected, if we were to
find a pill press, we would find some form of active
ingredient, whatever that drug might be, um, some
form of inactive agreement that the basic stuff that
makes up a pill, sugars and cellulose and things like
that, just what we would expect to find on those
devices as we would find them.  Some type of
measuring system to weigh out and some type of mixing
systems.

Q.   Up to the point of that search in 2016, had the
HEAT team undertaken this type of a search
previously?

1    A.    The HEAT team had not.  We were formed after that

2    discovery of the pill press in Sandy where we were

3    assisting state and locals.  It was formed after that

4    incident to try to be prepared for another one.

10:29:12   5    Q.    What plans or precautions were taken to prepare

6    for the search on Titian Way?

7    A.    Based on our concerns that we would be dealing

8    with large amounts of powder or potentially with a

9    controlled substance that we were concerned with, we

10:29:27  10    made contact with both local hazardous material teams

11    for the fire department and the National Guard Civil

12    Support Team whose job is primarily to respond for

13    unknown chemical environments just so that they could

14    help us in the event we would need some form of

10:29:43  15    decontamination or additional expertise for something

16    that we may not be familiar with.

17    Q.    Did the HEAT team mobilize on November 22nd,

18    2016, for this search?

19    A.    Yes, we did.

10:29:55  20    Q.    What -- you mentioned the fire department and the

21    civil service unit of the --

22    A.    Civil Support Team for the National Guard.

23    Q.    For the National Guard, were there any other

24    agencies involved that day?

10:30:09  25    A.    State and local officers, Cottonwood Heights

1    Police Department was out there as well, and all of

2    the associated investigating groups.

3    Q.   And how many members of the HEAT team mobilized

4    on that day?

10:30:20  5    A.   Um, I believe 14.

6    Q.   What was Unified Fire's role in being on site?

7    A.   To provide us emergency or decontamination in the

8    event that we were covered in any type of an unknown

9    substance both in the emergency setting, during the

10:30:36 10    initial operation, and then the subject of processing

11    and handling all of the evidence they were there to

12    help us get out of personal protective gear without

13    getting it on to our skin or into our respiratory

14    system.

10:30:49 15    Q.   So you kind of hinted at the process, but walk me

16    through the process for decontamination?

17    A.   Once you have been into what you suspect to be a

18    hazardous environment, you do your best to identify

19    what that substance might be, if you can.  As you

10:31:03 20    come out, you're still in your protective gear,

21    whether that is your mask or the breathing system.

22    Your decontamination line will have already been

23    established because you do have limited amount of air

24    in that tank so you are kind of on the clock.

10:31:16 25    They'll move you through, start with a basic wipe

447

1      down of your equipment to remove excess equipment,

2      any radios or anything that you might have, and start

3      moving you through the decon line which will include

4      a spray down to try to track down any material,

10:31:32   5      especially if it is a dry powder, wipe that out and

6      then start cutting you out of the suit as you

7      continue to move step by step through the line.  The

8      last thing you do is take off your respiratory

9      protection once you have moved through and cleared

10:31:44  10     your suit.

11     Q.   You mentioned cutting out of the suit.  Why are

12     the members of the team cut out of their suits?

13     A.   They're a disposable suit and it is easier to cut

14     out of the back of the suit.  Typically when you're

10:31:58  15     handling things you get dirty on the front so it

16     tends to be easier and safer to cut a person out of

17     the back of the suit and let it fall away then you're

18     less likely to spread any of that contamination onto

19     the person in the suit.

10:32:09  20     Q.   I want you to walk me through what the HEAT team

21     did on November 22nd.  If you can start at the

22     beginning, what happened when you first mobilized?

23     A.   We had -- we met at a prearranged location in

24     Cottonwood or Cottonwood Heights I believe at the

10:32:26  25     police department.  All of the personnel arrived,

1    brought their equipment.  Um, we began the process of

2    getting all of the people who were going to go into

3    the residence suited up into protective gear which is

4    both the chemical suit, gloves, the respiratory

10:32:41  5    protection in addition to their tactical equipment.

6    It was kind of a dual mission we have to protect

7    ourselves from unknowns, but also be prepared to do

8    the search warrant.

9         So at that staging location it took probably

10:32:54  10    about 20 to 30 minutes to get everyone into that

11    equipment.  It takes time to get into it, to tape up

12    all of the interfaces so we don't have a gap between

13    your mask and the suit where you would have some

14    exposed skin.  Once everyone was suited up, we made

10:33:10  15    sure our support personnel were in position to run

16    the perimeter security of the location and that

17    decontamination was also prepared to help us in the

18    event we had any kind of an emergency.  We then

19    loaded up into the vehicle, moved to the residence,

10:33:24  20    and initiated the search warrant.

21    Q.   I want to show you a couple of photos from

22    Government's Exhibit 13.01.  If we could look at the

23    first photo.  Can you describe to me what is being

24    depicted in this photo?

10:33:40  25    A.   This is personnel at the staging site getting

449

1    suited up in the chemical suits.  The gray suit that

2    you see -- of course.  The personnel are getting

3    suited up in the gray chemical protective suits.  You

4    can see several in different stages of getting the

10:33:56  5    equipment on.

6    Q.   And if we can move to Photo 7, what are we

7    looking at here?

8    A.   This is looking south on Titian Way toward the

9    target location which is just a little bit further up

10:34:12 10    in the picture.  I don't think you can actually see

11    it from here.

12    Q.   Do you know what the purpose of the crime scene

13    tape and all of the vehicles are?

14    A.   That set the further limit for the area of

10:34:25 15    operation and the response vehicles that have shown

16    up to support -- civil support team brought several

17    vehicles, the hazardous material team brought several

18    vehicles as well.  I think that is actually a toilet

19    trailer right there (indicating) in front of the SUV.

10:34:40 20    Q.   Okay.  Let's go to the Photo 2, please, of 13.01.

21    What are we looking at here?

22    A.   This is post entry.  The team has finished

23    clearing the residence and now they're moving over to

24    the decontamination area.  That trailer to the left

10:34:57 25    is part of Unified Fire's hazmat response team and

1    that is where they will do the bulk of the

2    decontamination.  So the agents outside are just

3    standing by waiting for the system to get set up and

4    they will then move inside.  They have already taken

10:35:12   5    off their tactical equipment and set it aside.

6    Q.  So let's back up just a little bit.  You said

7    that after you were at the staging site you moved to

8    the home on Titian Way.

9    A.  Yes, that's right.

10:35:24   10   Q.  Walk me through what happened once you -- once

11   the HEAT team arrived at Titian Way?

12   A.  As we arrived at Titian Way, we had agents who

13   are already observing the residence.  We had other

14   officers who were assisting us who would set a

10:35:40   15   perimeter around the residence to watch exits.  As

16   they were in position, then our team exited the

17   vehicle, moved up to the front of the door.  As you

18   can see with these breathing apparatus, it can be

19   hard to make yourself heard from any distance.  In a

10:35:56   20   room it is fine, but try to be loud it is not very

21   effective.  So we had two officers who were not in

22   any protective gear assist us at the front door with

23   a bull horn.

24        I was first at the door, I knocked on the

10:36:07   25   door, for the knock and announce component.  One of

1    the officers without protective gear was announcing

2    police, search warrant.  Police, search warrant.

3    After little more than a minute or so, we breached

4    the door, since there had been no response.  We

10:36:23  5    continued to make announcements for a couple of

6    minutes.  After a few moments, I noticed a subject

7    come up from the basement, he was cooperative, um,

8    came out with his hands up.  He was passed back

9    further back to the rest of the team.  We then slowly

10:36:41 10    began moving into and clearing the rest of the

11    residence from both first floor and basement.

12    Q.   You mentioned that there was an individual that

13    came up from the basement.  Do you recognize that

14    individual in the courtroom today?

10:36:53 15    A.   Yes, I do.

16    Q.   And where is he seated?

17    A.   Right there.

18    Q.   Can you define what he is wearing?

19    A.   Um, dark suit, dark tie.

10:37:02 20          MR. BURGGRAAF:  If the record can reflect

21    that Agent Breyer has identified the Defendant.

22          THE COURT:  It will.

23    Q.   (By Mr. Burggraaf)  As you are at the front door,

24    um, you mentioned earlier tactical gear.  What type

10:37:18 25    of tactical gear did you have and what was the

1    purpose of it?

2    A.    Um, I was equipped with both soft body armor and

3    a plate carrier on the outside with both holster

4    police markings, spare magazines, handcuffs, and I

10:37:33    5    was also carrying a ballistic shield.  And the rest

6    of the officers behind me were similarly equipped but

7    only one other officer had a ballistic shield.  A

8    couple also had their carvings, their short rifles.

9    Q.    What was the purpose of this entry, of entering

10:37:50   10    the residence at this time?

11    A.    Just to perform the service of the search

12    warrant.  To execute or -- to clear the residence and

13    do a protective sweep to ensure that there was no

14    additional personnel so that we could then search for

10:38:05   15    evidence.

16    Q.    Okay.  So you're at the front door, Mr. Shamo has

17    been brought -- has been passed along back.  How does

18    it proceed from there?

19    A.    Um, from there I took several steps in.  I was

10:38:18   20    right at the top of the stairway to the basement and

21    held my position.  The rest of the team moved through

22    the upstairs, through the kitchen, into the back

23    bedrooms.  We just tried to do one floor at a time

24    instead of flooding the whole thing rather slow and

10:38:33   25    methodical with all of the equipment that we have on.

453

1          Once the first floor was cleared, the team

2     joined back on me and we pushed down into the

3     basement.  I got to the basement, headed to the

4     right.  There was a large living room there, cleared

10:38:47 5     that, and then I rejoined the rest of the group and

6     started moving down the hallway toward the north side

7     of the basement all of the way to the last door.

8     Q.   So when you say you turned around and moved down

9     to the other side of the basement, is that -- you're

10:39:00 10     going down the stairs, is that to the left?

11     A.   Um, initially when I got to the bottom of the

12     stairs I turned right and the rest of the team was

13     working on some of the rooms to the left.  My job was

14     done then I rejoined them and started moving to the

10:39:15 15     left and took my turn in the flow and ended up into

16     the last room, the closed door at the end of the

17     hallway.

18     Q.   So once you're at the closed door at the end of

19     the hallway, what happened?

10:39:25 20     A.   Myself and one other agent opened the door,

21     entered, I moved off to the right.  It was a very

22     small room but had some machinery in there that

23     limited our movement so only two of us were able to

24     get in.  I cleared the closet, my partner came in

10:39:44 25     with me, we made sure there was no additional

1    personnel in the room or any other subjects.

2    Q.   I want to show you Exhibit 13.09 photo 10.  Can

3    you tell me what we're looking at here?

4    A.   This is the view that I had as soon as that door

10:40:02  5    came open into that back bedroom.

6    Q.   And what was your impression when you -- when the

7    door was first opened and you saw the contents of the

8    room?

9    A.   That that is a pill press.

10:40:13  10    Q.   Okay.  Let's move on to Photo 11 of the same

11    exhibit.  Um, tell me what we're looking at here?

12    A.   Just a slight bit to the right further into the

13    room there is a large desk chair or office chair in

14    the way but the rest of the room as it moves further

10:40:29  15    to the right.

16    Q.   So photo 12, tell me what we're looking at here?

17    A.   This is against that far -- I believe it is the

18    east wall, again a little bit more to the right, just

19    above another small pill press that is on the floor

10:40:45  20    but this was the bookshelves above it.

21    Q.   At this point when you're sweeping the residence,

22    is any evidence being seized or removed?

23    A.   No.  No.  At that point our purpose is really

24    just to ensure there are no additional people left

10:41:02  25    inside of the residence.

1    Q.   If we could go to the next photo, what are we

2    looking at here?

3    A.   The last bit of the room right before the closet

4    to the right is a closet with a bi-fold door and this

10:41:14  5    is the second pill press and the second chair.

6    Q.   When preparing for entering this home, did you

7    expect to find more than one press?

8    A.   No.

9    Q.   If we can move on to the next photo, what are we

10:41:29 10    looking at here?

11    A.   Partial view of the closet.  This is about as far

12    as we could get into the room.  This is not a very

13    big room so with the chairs and the machinery, we

14    could only get in a few steps especially with all of

10:41:41 15    our equipment.

16    Q.   And Photo 16, what are we looking at here?

17    A.   This is some type of a dolly, I think a furniture

18    dolly also in that room just against the closet with

19    a respiratory -- or a respirator hanging on it.

10:42:00 20    Q.   I want to take you back to when you first entered

21    the home and Mr. Shamo came up from the basement.  In

22    what condition was he in when he came out of the

23    home?

24    A.   As I recall, I think he was just wearing a

10:42:12 25    T-shirt and shorts and maybe some shoes or

1        flip-flops.

2        Q.   Did he have on any sort of protective gear?

3        A.   Not that I observed.

4        Q.   Okay.  Next photo.  What are we looking at here?

10:42:27  5    A.   This is that first pill press that was directly

6        inside of the door as it came open.  You can see

7        there is quite a bit of powder both in the hopper and

8        then some around the base of it and then the LCD

9        screen looks to be on.

10:42:42 10    Q.   Was this -- is this an accurate depiction of the

11       condition of that press when you entered the room?

12       A.   Yes, it is.

13       Q.   If we can go to the next photo, this Photo 18,

14       what are we looking at here?

10:42:55 15    A.   This is like just a basket directly below the

16       pill press that appears to contain tablets, squares,

17       Xanax style tablets or rectangular.

18       Q.   And Photo 19 of 13.09, what are we looking at

19       here?

10:43:13 20    A.   This is just behind that pill press.  This is a

21       V-mixer used for putting two different types of dry

22       materials together.  When it's turned on, it rotates

23       and gently and gradually mixes the substance for

24       however long you would like it to run.

10:43:28 25    Q.   13.09, 20, what are we looking at here?

A.    Sorry this is little bit further to the right.
Again, it is -- that is a corner of the smaller pill
press and there is another V-mixer back behind that
smaller one.

10:43:46  Q.    And 13.09-21?

A.    That is a better picture of the smaller mixer
against the wall.

Q.    13.09-22, what are we looking at here?

A.    This is on the shelf just above there it looks
10:44:00  like there are different color powders, um, and a bag
of -- it looks to be some kind of a packaging maybe
for coffee, I didn't really know.  But it appeared to
be coffee, I think cava I think coffee.

Q.    Do you know what the red bottle to the left of
10:44:17  that bag what its purpose was?

A.    I believe it is a lubricant for one of the
systems.

Q.    Okay.  If we can go to the next photo.  What are
we looking at here?

10:44:28  A.    This is also a box that was in the room.  The bag
to the front says lactose.  Lactose is a common
ingredient in just general pill composition.

Q.    So after seeing the contents of the two pill
presses, and the room in general, what was your
10:44:51  impression of the potential risks?

1       A.    Um, that we needed to pull back out, do a more

2       detailed assessment of what we were seeing.  Like I

3       said, the tactical operations really looking for

4       personnel doing a quick visual assessment of what we

10:45:07  5       see but not a detailed one.  So we needed to get a

6       more detailed assessment of the threats we were going

7       to be encountering as we had to process this.

8       Q.   So after doing this initial sweep in these grey

9       hazard suits, what happened?

10:45:20  10      A.   Our team pulled out, went through the

11      decontamination process.  We requested assistance

12      from civil support team for the Level A which was the

13      highest level of protection.  We have several agents

14      who were certified and able to go in in that level of

10:45:35  15      protection, but we figured we would need some

16      assistance with that.  So we were on standby until

17      they were able to respond and assist us with that

18      highest level of protection.

19      Q.   I want to show you Exhibit 13.01 photo 3.  What

10:45:51  20      are we looking at here?

21      A.   This is another point of the decontamination

22      process.  Teams are moving, people are moving through

23      getting decontaminated, moving out of their suits,

24      getting a short break.  It is a bit of stress on the

10:46:06  25      body being in that.  Even in November, it can be

459

1    very, very hot in all of that material.

2    Q.   So why were both the HEAT team and the National

3    Guard Civil Support Team included that day on the

4    search?

5    A.   The Level A training at that time we only had, I

6    think, three or four people who were certified to

7    that level but the National Guard has an extensive

8    number.  So we're looking for assistance with more

9    people who can help with that.  They also have

10   different instrumentation that can do air monitoring

11   to see if there is any airborne concerns.  And they

12   also they do quite a bit of decontamination as well.

13   Q.   I want to take you to Photo 6 of this same

14   Exhibit 13.01.  What are we looking at here?

15   A.   That is one of our officers getting ready to go

16   into the Level A, just kind of interim.  He has to

17   wear the breathing tank underneath the system so that

18   way you can't see -- you can see a little bit of the

19   orange on the bottom there.  His suit is orange and

20   he's about to pull it up and over.

21   Q.   I want to take you to Photo 4.  You mentioned his

22   suit was orange.  Was it actually yellow?

23   A.    His is yellow the -- well, we have two.  There

24   are both orange and yellow suits.  The National

25   Guards are orange so we borrowed one of their suits

1    as well.

2    Q.   You mentioned Level A multiple times.  What is

3    the difference between these yellow and orange suits

4    versus the gray ones that you initially went in with?

10:47:36   5    A.   So the Level A provides the maximum amount of

6    protection for both the personnel and their equipment

7    by isolating it from all vapors, particles, liquids,

8    um, that might be encountered.  So it is the maximum

9    level of protection that can be afforded and still

10:47:52   10    work in these environments.

11           Level B is what we elected to use for the

12    operation for the entry only because as you can see

13    in these suits, it is really hard to do anything else

14    other than walk around and manipulate a few things.

10:48:04   15    Q.   Have you look at Photo 5.  What are we looking at

16    here?

17    A.   That is one person fully loaded up in the Level A

18    and another person, as you can see in the orange

19    suit, getting suited up also but that is one of the

10:48:17   20    suits we borrowed from the National Guard.

21    Q.   And if we can go back to the photo before, um,

22    Photo 4, do you recognize the individuals in this

23    photo?

24    A.   Yes.  In the four that is Cameron Thor, he is a

10:48:31   25    Task Force Officer, and that is myself in the

1    background.

2    Q.   So it appears that you're suiting up to go in

3    Level A suits.  Did you end up going in the home in

4    the Level A suit?

10:48:44  5    A.   No, my suit failed.  The zipper broke as they

6    were trying to get it pulled up which happens from

7    time to time on just this equipment.  So my suit

8    failed.  We didn't have a back up so I didn't get to

9    goes in in the Level A.

10:48:58  10    Q.   Why wouldn't you have had a backup suit?

11    A.   Just the cost of the suits.  We hadn't gotten

12    enough of them in yet.  It was a slow process to get

13    the funding for these.

14    Q.   And why were Level A suits, being more

10:49:10  15    protective, why were they not used when you performed

16    the initial entry into Mr. Shamo's home?

17    A.   They just provide a lot of additional bulk and it

18    doesn't really make it feasible to move smoothly

19    through a residence when you're trying to handle

10:49:24  20    weapons, suspects, or become involved in any kind of

21    an altercation.  It would be a significant liability.

22    Q.   Once the -- once the individuals were suited up

23    in these Level A hazard suits, what happened?

24    A.   Um, they both took video and camera equipment,

10:49:42  25    some air monitoring equipment moved back into the

462

1    residence, checked all rooms and all floors for

2    whatever they could detect and did photos and videos

3    of the entire place.

4    Q.   What were you doing during this time?

10:49:54  5    A.   I was outside helping to prepare for what follow

6    on work we might need to do, briefing up other

7    personnel as to what their roles would be after they

8    came out from the Level A.

9    Q.   After the Level A assessment, then what happened?

10:50:11  10   A.   We determined that while there was a large amount

11   of powder, we were concerned about that.  We didn't

12   find any toxic vapors or liquids that we were

13   especially concerned about, so we elected then to

14   scale back to Level B once again for the rest of the

10:50:27  15   processing.

16   Q.   And just for clarification, the justification for

17   scaling back to Level B?

18   A.   Is we did not find any toxic vapors that would

19   indicate someone is actually producing or

10:50:40  20   synthesizing a drug there.  We didn't find any

21   hazardous liquids that we were concerned about that

22   the Level B suit couldn't manage.

23   Q.   The Level B suits are the gray suits?

24   A.   Yes, that's right.

10:50:51  25   Q.   Before re-entering in the Level B suits, what

1    plan was made as far as re-entering the residence and

2    performing an additional search?

3    A.   We reviewed the video in the still photos to see

4    what were areas of greatest concern which tended to

10:51:09  5    be that single basement room.   There were a few other

6    items that we were -- needed to focus on as well, but

7    we elected to process the entire first floor before

8    moving to the basement so that we could move through

9    that without disturbing what was the greatest threat

10:51:27  10   in the basement as opposed to doing the opposite way

11   which we were afraid we would be spreading

12   contamination to the other parts of the house while

13   we were trying to process.

14   Q.   So tell me what the HEAT team did at that point

10:51:38  15   once that strategy was formulated?

16   A.   Um, we assembled a team to go back in, Level B,

17   took in our evidence bags and started working.   I

18   believe initially we started in the basement or in

19   the upstairs bedroom, the master bedroom.

10:51:53  20   Q.   And did you suit up in a Level B suit this time?

21   A.   Yes, I did.

22   Q.   Were you part of that search team that re-entered

23   the home?

24   A.   Yes.

10:52:01  25   Q.   And how many team members re-entered the home at

464

1    that point?

2    A.   We would rotate four at a time.  We had

3    additional personnel but to run too many people in

4    just tends to get cluttered and after a certain time

10:52:18  5    people need to come out, it is better to rotate fresh

6    personnel in as opposed to six or eight at once.

7    Q.   I want to show you Photo 11 of Exhibit 13.01.  Do

8    you recognize this?

9    A.   Yes.

10:52:31  10    Q.   What is this photo depicting?

11    A.   This is one of our officers, Task Force Officer

12    Thor assisting Task Force Officer Daryl Daine to get

13    suited up for Level B to go back into the residence.

14    Q.   What time of day is this?

10:52:49  15    A.   Early evening.

16    Q.   So tell me how much time were you at the Titian

17    Way residence performing this search?

18    A.   From initial entry to the time we finished I

19    believe was over 12 hours.

10:53:04  20    Q.   Okay.  What were -- as you re-entered the team or

21    the team re-enters the residence, what was searched

22    and seized first?

23    A.   We moved back in to the master bedroom.  During

24    the Level A assessment, officers had discovered a

10:53:20  25    large amount of U.S. currency.  The goal was to bring

1     that and secure that first so that it no longer

2     presents any concerns or issues when we're moving the

3     rest of the items around.  So that was the first goal

4     was to collect the currency, put it in bags, and take

10:53:37  5     it back out to the evidence person out front.

6     Q.    I want to show you Exhibit 13.09, Photo 25.  Do

7     you recognize this photo?

8     A.    Yes, this is in the master bedroom.

9     Q.    And Photo 3, what are we looking at here?

10:53:59 10     A.    That is one of the lower drawers on that dresser

11     full of U.S. currency.

12     Q.    And Photo 4, what are we looking at here?

13     A.    One of the bundles that came out of that drawer.

14     Q.    Now, it looks like there is a hand that's holding

10:54:13 15     the bundle up with orange sleeves.  At what point

16     were these photos taken?

17     A.    This would have been during the Level A entry and

18     assessment.

19     Q.    These photos, do they accurately represent what

10:54:26 20     you found when you went back in --

21     A.    Yes.

22     Q.    -- in Level B suits?

23     A.    Yes, sir.

24     Q.    If we could go to Photo 5.  What are we looking

10:54:33 25     at here?

1    A.    This is the top drawer for another dresser

2    directly beside the other dresser also in the master

3    bedroom.

4    Q.    And Photo 6?

10:54:42 5    A.    This was a drawer from one of the nightstands.

6    Q.    Photo 10.   13.01-10, what are we looking at here?

7    A.    This is one of the bags of currency coming out of

8    the residence to be transferred to the next person in

9    the chain of custody.

10:55:11 10    Q.    When you say one of the bags, how many bags were

11    there?

12    A.    I don't recall exactly, but there were several

13    three, four.   I don't remember the exact number.

14    Q.    So you started to search in this master bedroom.

10:55:22 15    What other items of interest were located and seized?

16    A.    In the closet there were two money counting

17    machines, there were a couple of safes, there were

18    several electronic devices.   I think there was a

19    laptop and some USB devices.

10:55:40 20    Q.    I'm showing you what has been marked as

21    Government's Exhibit 13.03.   Do you recognize these

22    items?

23    A.    Those are money counters.

24    Q.    Are these the ones that were found that day?

10:55:54 25    A.    I believe so.

1    Q.   I want to just back up.  The money gets brought

2    out of the house and you're starting to bring other

3    seized items out of the house.  What's the process

4    for seizing the items and bringing them out of the

5    house?

6    A.   As the team is coming out, our job is to bring it

7    out to a person who was making an inventory of all of

8    the items that are there.  Since we really don't have

9    dexterity to do it.  As they record where the items

10   were found, we're then transferred to the next person

11   and that continues the chain of custody until it is

12   submitted either for testing at the lab or long term

13   storage.

14   Q.   If we can look at Exhibit 13.01, Photo 9.  What

15   are we looking at here?

16   A.   This is an example of one of us, I can't tell if

17   that is me or not, coming out of the house describing

18   what evidence we found and passing it off to Task

19   Force Officer Nattress here who is sitting at the

20   table making lists.

21   Q.   If we can look at Photo 13.09-30.  You mentioned

22   there was some safes in the master bedroom.  Were the

23   safes open?

24   A.   They were closed when they were in the closet.

25   Q.   Did you help to remove those?

1      A.    I did not.

2      Q.    Did you ever see the contents?

3      A.    No, sir.

4      Q.    Okay.  13.09, Photo 26.  Does this accurately

10:57:22  5   represent the closet in the master bedroom?

6      A.    Yes, it does.

7      Q.    And it looks like there is the cash counting

8      machines and then a blank spot next to it.  Do you

9      know what was -- was anything there in the blank spot

10:57:36 10   next to it?

11     A.    I believe that is where the safes were located.

12     Q.    Okay.  On the first floor that was being searched

13     first, were there any other bedrooms or a study that

14     was searched?

10:57:45 15   A.    Directly adjacent to the master bedroom was a

16     study, an office with several computers, and filing

17     cabinets.  And there was one other bedroom, also

18     upstairs, that seemed just for general storage.  We

19     didn't find anything of note in that storage bedroom.

10:58:04 20   Q.    I want to show you Exhibit 13.09, Photo 31.  What

21     is this?

22     A.    This is a photograph of the office adjacent to

23     the master bedroom.

24     Q.    And if we can look at Photo 32 as well, perhaps

10:58:19 25   if you put them side-by-side.  Sorry for telling you

1    that on the fly.  That is a -- we can just look at

2    Photo 32 and that will be fine.  This photo seems a

3    little bit blurry, but what additional items are

4    depicted in this photo as compared to the prior

10:59:02  5    photo?

6    A.   This is -- this is taken from the doorway looking

7    into the office.  You can see there is a small wood

8    cabinet right in the front that appeared to be an

9    older, I don't know if it is an antique type of

10:59:13 10    pressing machine, um, and then the rest of the desk

11    has the computers and the filing cabinets.

12    Q.   Same exhibit but Photo 1.  Is this what's inside

13    of the cabinet?

14    A.   Yes.  Yes, that's right.

10:59:30 15    Q.   And then if you will back up to Photo 31.  From

16    this room, what items of interest that were covered

17    by the warrant were seized?

18    A.   Um, the computers, the electronic devices, and

19    inside the drawers there -- we found some silver --

10:59:51 20    silver bars and some unknown powders in metal

21    packaging.

22    Q.   As you walked into the courtroom today, did you

23    notice this computer here on the table?

24    A.   Yes.

11:00:01 25    Q.   It is marked as Government's Exhibit 13.04.  Did

1    that computer come from that room?

2    A.   I believe so, yes.

3    Q.   And you mentioned some silver bars.  Were those

4    seized?

11:00:14  5    A.   Yes.

6    Q.   I am showing you what's been marked as

7    Exhibit 13.07.  Do you recognize those?

8    A.   Yes.  Those appear to be the bars that we found

9    inside of the filing cabinet.

11:00:40  10           MR. BURGGRAAF:  Permission, Your Honor, to

11    publish these to the jury?

12           THE COURT:  You may.

13    Q.   (By Mr. Burggraaf)  In your experience, had this

14    type of silver bars been found at drug trafficking

11:01:30  15    search warrant sites?

16    A.   I have never come across silver bars before.

17    Q.   When you first retrieved those bars, did you find

18    them to be deceptively heavy?

19    A.   Yes.

11:02:07  20    Q.   What items covered by the search warrant were

21    found in the kitchen?

22    A.   Inside a drawer in the kitchen we found a couple

23    of additional bags of an unknown white powder along

24    with it looks to be the box of -- a box that they

11:02:25  25    came packaged in with a shipping label.

1    Q.   I want to show you Exhibit 13.09 Photo 27 and

2    then we'll go to 28 and 29 as we talk about them.

3              What are we looking at here?

4    A.   This is that drawer just under the countertop

11:02:40  5    that has the box with the white powder and both of

6    the packages, both the pink one and the brown one

7    were found right there as well and I believe there is

8    additional powder inside of the brown and tan

9    packaging as well.

11:02:55  10    Q.   Were all of these items seized?

11    A.   Yes.

12    Q.   Let's look at Photo 28.  Is this the brown

13    package, the side that you were referencing?

14    A.   Yes, that's right.

11:03:05  15    Q.   So it appears there was some sort of powder in an

16    additional bag inside of that; is that correct?

17    A.   Right.

18    Q.   Photo 29.  Why was this documented?

19    A.   That's the box that the powders were found in.

11:03:20  20    Whether that is -- we just took that because it may

21    have been what they were actually shipped in.

22    Q.   And can you read the name to whom it was shipped

23    to?

24    A.   Jessica Gleave.

11:03:35  25    Q.   I want to walk through some additional photos,

1    see what you can tell me about them.

2             In this same Exhibit 13.09 Photo 2, what are

3    we looking at here?

4    A.   This is in the basement.  There is a long closet

5    right at the base of the stairs where we found

6    several items to include a large amount of presses

7    and dies that are associated with pill pressing

8    equipment.

9    Q.   And you say this was in the basement or was

10   this --

11   A.   The basement.

12   Q.   -- or upstairs?

13   A.   The basement.

14   Q.   Okay.  Photo 7, what are we looking at here?

15   A.   This is, it is on the side, a packaging of -- I'm

16   trying to read it, also found in the basement, we

17   found several boxes of a white powder in one of the

18   bedrooms marked with various ingredients, one of them

19   like microcrystalline cellulose and things of that

20   nature.  Like a pre-mix for pill pressing.

21   Q.   And how did you know that they were a pre-mix for

22   pill pressing?

23   A.   Some of the research I have been looking into as

24   how people would produce pills I found you could

25   either buy individual components or there were some

1    vendors who would sell a pre-mix of all of the things

2    together so that would cut down the time for

3    processing.

4    Q.   If we could go to Photo 8.  Is this an image of

5    one of the same bags we were looking at previously?

6    A.   Yes, that's right.

7    Q.   And if we can look at Photo 9.  What are we

8    looking at here?

9    A.   Those are the boxes we found in the bedroom,

10   basement bedroom, next to the room with the pill

11   press that had those white powder packages that you

12   just showed.

13   Q.   Let's look at Photo 24.  What are we looking at

14   here?

15   A.   This was a crate found also in the basement that

16   we opened, a wooden shipping crate, that had

17   additional pill punches and dies for different types

18   of machines.

19   Q.   I would like you, if you -- if he may, Your

20   Honor, to step down from the stand.  There are four

21   boxes up here all identified as Government's

22   Exhibit 13.13.

23        If you would take a look at what is in each

24   of those boxes, I would suggest if you are going to

25   handle them you may want to use gloves.  And once you

474

1    have had a chance to look in each of those boxes you

2    can head back up to the stand.

3            THE COURT:  Do you want to look?

4    Q.  (By Mr. Burggraaf)  Before taking the stand,

11:06:54  5    would you mind picking up one or more of the contents

6    of one of the boxes and show it to the jury.  Are

7    there any other smaller components?

8            THE CLERK:  The jury over here (indicating)

9    can't see.

11:07:15  10    Q.  (By Mr. Burggraaf)  So yeah, if you will just

11    walk down.

12            Are there any other smaller components

13    within those boxes?  If you will do the same like

14    manner and show those to the jury.

11:07:36  15    A.  (Witness so complying.)

16            MR. SKORDAS:  May we see it?

17    Q.  (By Mr. Burggraaf)  And Agent Breyer, if you will

18    go back up to the witness stand and I'll ask you a

19    few questions about that.

11:08:05  20            Did you recognize the contents of those four

21    boxes?

22    A.  Yes, sir.

23    Q.  What was in there?

24    A.  Um, punches and dies, pill presses utilize

11:08:15  25    multiple pieces, they're punches that slam together.

1      And the die that sets the size and the shape of the

2      pill.  So it is a mixture of punches and dies.

3      Q.   Were the contents of this photo within those

4      boxes?

11:08:29  5      A.   Yes.

6      Q.   About how many, if you were going to put an

7      estimation, how many punches are within those boxes?

8      A.   50.

9      Q.   Were they all located in the exact same location

11:08:43  10     when performing the search?

11     A.   They were either located in that closet or

12     somewhere in the basement area.

13     Q.   You mentioned that searching the room with the

14     pill presses in it was left until the end.  I want to

11:08:58  15     talk through that a little bit.  How did you and the

16     other HEAT team members go about searching that room

17     for evidence?

18     A.   Once we moved into the room we decided that the

19     first thing would be to collect as much of the powder

11:09:13  20     and contain that.  So as we're moving other things

21     around we don't continue to make as much of a mess.

22     So we collected and contained the powder.

23     Representative samples were taken from that and then

24     it was moved upstairs outside to the evidence

11:09:26  25     processing.

1  Q.   And to clarify, in fact we can show Exhibit 13.09

2  Photo 17, you mentioned collecting powder.  From

3  where did you collect the powder?

4  A.   From the hopper, the device on top.  And what we

11:09:42  5  could get from the side.  Eventually we were going to

6  need to move these machines and we wanted to minimize

7  how much we would be spreading contamination so we

8  tried to scrape off as much as we could.

9  Q.   So in collecting the powder, how did you collect

11:09:56  10  it?

11  A.   Into buckets.

12  Q.   And once the powder was collected, then what was

13  done with it?

14  A.   It was taken upstairs.  We would take a sample

11:10:07  15  and then the rest was set aside for later processing

16  once the hazardous material response company arrived.

17  Q.   Was the same process for collecting a sample done

18  on both pill presses?

19  A.   Yes.

11:10:24  20  Q.   And the collection of the powder collected in the

21  same manner?

22  A.   Yes.

23  Q.   Were those mixed between the two presses at all

24  when collecting?

11:10:33  25  A.   No.  No.  The one press is clearly white powders,

1     the other is clearly blue, so we kept them separate.

2     Q.   What other items then, after collecting these

3     powders, what other items were then seized?

4     A.   Um, we found on one of the upper shelves two

11:10:51  5     small baggies full of light blue tablets, top left

6     shelf.  There were a few more of those white

7     microcrystalline cellulose formula bags that we found

8     from the other room.  There were some scales.  There

9     was a scale behind one of the chairs, I think, and

11:11:10  10    whatever pill press -- whatever items we could pull

11    off the pill press to include the dies and punches

12    out of the machines themselves.

13    Q.   So let me walk you through a few of these other

14    photos and maybe you can identify some of the items

11:11:23  15    that were seized.  If we can go to Photo -- Exhibit

16    13.09, Photo 19.  Was this machine seized?

17    A.   Yes.

18    Q.   Was it logged into evidence?

19    A.   Yes.

11:11:46  20    Q.   The machine itself.  What about in the bucket

21    below there.  Were there any contents in the bucket?

22    A.   It was a white loose powder.

23    Q.   What was done with that powder?

24    A.   That was seized also.

11:12:00  25    Q.   When you say seized, it was ultimately taken out

1    of the home.  Do you know whether it was logged into

2    evidence versus Envirocare removing these items?

3    A.    Samples were logged into evidence and the large

4    amounts of powder were later on adulterated and

11:12:19 5    disposed of as hazardous waste.

6    Q.    Earlier you mentioned Envirocare.  What is

7    Envirocare?

8    A.    Envirocare is our hazardous waste disposal

9    corporation that comes to handle all of the hazardous

11:12:32 10    waste, dispose of it, whether that might be landfill,

11    incineration, or whatever OSHA recommends or

12    requires.  But we use those any time we have a

13    hazardous material site.

14    Q.    Let's look at Photo 21 of the same exhibit.  Was

11:12:51 15    that small industrial mixer seized?

16    A.    Yes.

17    Q.    It was removed from that room?

18    A.    Yes, it was.

19    Q.    Let's look at photo 13.09-11.  What in this

11:13:04 20    image, in this photo, can you see that you recall

21    being removed?

22    A.    On the top shelf there in the corner with the

23    green top are the small Ziploc bags that had the blue

24    pills, some of the contents from that.  Most of this

11:13:22 25    was seized, some was kept for evidence, some was

1     destroyed as contaminated such as any hard material.

2     The scale would have also been taken for destruction.

3     Q.   I want to show you what has been marked as

4     exhibit Government's Exhibit 12.07.   There are two

11:13:58  5     Government Exhibits in there but I particularly want

6     to ask you about the pills that are contained in

7     there.   Do you recognize those?

8     A.   Yes.   Those appear to be the pills that we took

9     from that room.

11:14:09  10    Q.   And let's look at Photo 18 of Exhibit 13.09.

11    What are we looking at here?

12    A.   This is another picture of the tablets directly

13    below that first pill press in the little basket.

14    Q.   I would like to show you what has been marked as

11:14:48  15    Government's Exhibit 12.05.   Do you recognize what is

16    in that bag?

17    A.   Yes.   Those appear to be the items that were in

18    the basket.

19    Q.   It seems in this photo that we're looking at in

11:15:16  20    13.09 that there appears to be another bag on the

21    bottom.

22    A.   Yes, that's right.

23    Q.   Does the exhibit that you're looking at up there,

24    12.05, also include the pills from that bag?

11:15:29  25    A.   Yes.

1    Q.   Did you seize any additional powders from that

2    room or elsewhere in the house?

3    A.   We also found, I believe, one or -- I can't

4    remember how many bags from the office upstairs as

11:16:09  5    well like in a small Mylar type of metallic bag.  I'm

6    not -- I'm sure we seized some, I just don't recall

7    how many.

8    Q.   Okay.  If we can look at Photo 13.09.  Um, sorry.

9    Exhibit 13.09, Photo 12.  The items on the top shelf,

11:16:32 10    were they seized?

11    A.   I believe those were more of the bags marked as

12    the formula that we found from the other room.  So we

13    had several that we seized for analysis, but not all

14    I think just maybe three bags.

11:16:53 15    Q.   Um, what did you do with the presses once you had

16    concluded search and seizing other items in the room?

17    A.   Once we had finished with all of the evidence

18    gathering from the residence, we did a second sweep

19    to make sure.  We then employed the Envirocare, the

11:17:11 20    waste disposal team.  We had removed all of the

21    punches and all of the dies but then the items just

22    became bulk hazardous waste so they had to be removed

23    from the residence and disposed of.  So they had to

24    be carted up the stairs and packaged for disposal.

11:17:26 25    Q.   So you said the punches and dies had been

1    removed.  Are we talking about from the pill presses

2    themselves?

3    A.   Yes, that's correct.

4    Q.   Tell me about that.  How did you go about

11:17:36  5    removing the punches and dies from the pill presses?

6    A.   You have to disassemble the system to actually

7    get them out.  We didn't have suitable tools but we

8    did find suitable tools in the -- in that same room

9    to disassemble it.  So we were able to pull it apart,

11:17:51  10    pull out the dies and punches.

11    Q.   What did you do with those punches and dies?

12    A.   Those were submitted as evidence.

13    Q.   And why did you submit those into evidence?

14    A.   They were contaminated but they also just come

11:18:03  15    out of a machine that was at the scene that we

16    believe was used for processing the tablets.  So we

17    wanted to use that as evidence to see if we could get

18    trace examination off of the material.

19    Q.   Either through research, training, or merely

11:18:20  20    through removing these punches from the machine, did

21    you become familiar with how -- what kind of motion

22    or how these punches worked inside of the machines?

23    A.   In a general way, yes.

24    Q.   If you could maybe demonstrate to the jury and

11:18:35  25    explain how you think the punches were working inside

1    those machines?

2    A.   The die will sit stationary in the system.  It

3    sets the pill size.  But the punches, based on this

4    type or any type expand and contract and they will

5    come together with force to compress all of the

6    powder together as the material moves in through the

7    hopper it will separate and the pill pops out.  This

8    little sweeper that puts in a little bit more powder

9    and then the next one comes around.  The rotary type

10   tends to have more punches and they can come through

11   repeatedly as opposed to the single punch which is

12   just one at a time.  So they move in a rotary fashion

13   that's why there are typically multiple punches in

14   each system.

15   Q.   Throughout the search of Mr. Shamo's home on this

16   day, what entry and exit points were being used by

17   the search term?

18   A.   Only the front door.

19   Q.   Were anyone other than the search team going in

20   and out of the home?

21   A.   No.  Just the civil support team for the initial

22   assessment and then after that it was the search team

23   and then Envirocare at the end with the waste

24   disposal.

25   Q.   Was the garage ever searched?

1    A.    Yes, it was.

2    Q.    Is there an entry between the garage to the

3    interior of the home?

4    A.    No.

11:19:50  5    Q.    Did anyone ever use a rear exit for removing

6    evidence?

7    A.    No.

8    Q.    When was the garage searched?

9    A.    Later on through the evening while we were

11:20:00 10    working inside I think personnel were able to crawl

11    through a window to get into the garage.

12    Q.    Did you observe the contents of the garage?

13    A.    Yes.

14    Q.    If we can look at Exhibit 13.09, Photo 33.  What

11:20:16 15    are we looking at here?

16    A.    Located in the garage was a large shipping crate,

17    a wood crate, and inside of it was this device

18    (indicating).

19    Q.    I'm going to highlight for you what has been

11:20:27 20    marked as 13.08 and 13.12 Government's Exhibits.  Do

21    you recognize these items?

22    A.    Yes.  Those are the components that were in that

23    crate.

24    Q.    And as you were going through and searching the

11:20:49 25    home, did you look through paperwork in addition to

484

1     other items?

2     A.   I did not.  I focused on the material.

3     Q.   Did other members of the search team look through

4     any paperwork?

11:21:01  5     A.   I believe so.

6     Q.   And at the conclusion of the search, did you find

7     any evidence or items in the home that led you to

8     believe that anyone else was residing in the home

9     other than Mr. Shamo?

11:21:13  10    A.   No, sir.

11    Q.   Have you been involved in other investigations of

12    drug trafficking organizations that utilize the

13    darknet for distribution?

14    A.   Yes.

11:21:25  15    Q.   Have you been involved in other investigations

16    involving drug trafficking organizations where there

17    were ten or fewer key members?

18    A.   Yes.

19    Q.   In those investigations that you have been

11:21:36  20    involved with, have you seen organizations with more

21    than one leader or organizer?

22    A.   Yes, I have.

23    Q.   In your experience in the -- is the leader or

24    leaders of a drug trafficking organization always

11:21:52  25    what you would consider masterminds or do the leaders

1    or the leaders sometimes employ skill sets of others

2    to conduct business of the organization?

3    A.   They take on a variety of roles.  I mean some are

4    more involved, some are more hands on and some

11:22:10  5    utilize other skill sets from other people.

6    Q.   In very small organizations isn't it common that

7    sometimes a leader may also act as a courier and

8    manufacturer and distributor?

9    A.   Yes.

11:22:23  10    Q.   Leaders in smaller organizations, it would be

11    fair to say, that they often times wear multiple hats

12    as far as responsibilities?

13    A.   Yes, that's true.

14    Q.   At what point in the life span of a drug

11:22:39  15    trafficking organization does the leader or leaders

16    shift to more of a management or executive role that

17    allows them to be more insulated?

18    A.   I guess it really depends on the size and the

19    scope of the organization and how hands off that

11:22:53  20    person wants to be.  I don't know that there is a

21    particular life that actually happens in every

22    instance.

23        MR. BURGGRAAF:  Okay.  If I may have one

24    moment, Your Honor.

11:23:03  25        THE COURT:  You may.

1          MR. BURGGRAAF:  Your Honor, if it is

2     permissible, I would like to allow -- essentially

3     publish the pill press with the box of contents to

4     the jury by allowing them to step up closer and take

11:23:38 5     -- have a closer inspection.

6          THE COURT:  They can do that.  Go ahead.

7          (Whereupon, the jury left the jury box and

8               looked at the Government's exhibit.)

9          MR. BURGGRAAF:  If any members of the jury

11:24:24 10    want to try to actually move it or touch it, we do

11    have gloves up towards the front there.

12         THE COURT:  Okay.  Thanks.  That is the

13    field trip for this trial I guess.

14         MR. BURGGRAAF:  I was going to suggest we

11:25:31 15    take a field trip to the home, but I guess that is

16    out for today.

17    Q.   (By Mr. Burggraaf) Can we go back to -- well,

18    before we move on from this Agent Breyer, did you

19    help move this press or any of the other two presses

11:25:46 20    in the basement?

21    A.   Yes, I did.

22    Q.   Explain what it was like to move them?

23    A.   Well, I'm sure it is not 800 pounds but it feels

24    like it.  That one was just difficult to move in the

11:25:57 25    garage being still on the pallet in the box.  We had

1    to use a flatbed tow trunk with a winch to drag it

2    out.

3              The ones in the basement were also difficult

4    and awkward.  It took several of us to drag them up

11:26:13 5    just because of the size and the weight and the odd

6    shape of it.

7    Q.   I want to look back at a photo in Exhibit 13.09,

8    Photo 10.  The jury may have observed this, I thought

9    it might be beneficial for you to explain it.  It

11:26:33 10   looks like there is almost kind of a black halo or

11   what not around these photos.  Can you explain why

12   that is?

13   A.   The system that we were using to take the

14   pictures is just a digital camera but with a dive

11:26:47 15   case on the outside of it.  If the dive case gets

16   dirty it is very easy to clean and you're not

17   exposing your camera to any materials.  And this is

18   just a standard hazmat type of camera that we

19   borrowed from the National Guard for these photos.

11:27:01 20   Q.   So in the investigation into Aaron Shamo, are you

21   familiar with all facets and aspects of the

22   investigation?

23   A.   No, sir.

24   Q.   Would it be a fair characterization to say that

11:27:14 25   your involvement in the investigation into this drug

1     trafficking organization was limited in scope?

2     A.   Yes.

3     Q.   Did it extend much beyond the day that this

4     search was performed?

11:27:27 5     A.   No, it did not.

6          MR. BURGGRAAF:  No further questions.

7          THE COURT:  Thank you.  You may

8     cross-examine.  Mr. Sam?

9          MR. SAM:  Yes.

11:27:35 10                   **CROSS-EXAMINATION**

11          BY MR. SAM:

12     Q.   Agent Breyer, I just have a few questions for

13     you.

14     A.   Yes, sir.

11:27:42 15     Q.   And just going back on this pill press that was

16     out in the garage; is that correct?

17     A.   Yes, that is correct.

18     Q.   That is where it was located.  Did you -- were

19     you there when it was first found or were there other

11:27:54 20     agents?

21     A.   I was not there when it was first found.  I was

22     there later on when we were helping to move it.  I

23     was inside of the house at the time.

24     Q.   Okay.  And according to that picture, it looked

11:28:05 25     like there was a crate or it was -- and do you know

1     was it inside of a crate when it was found or --

2     A.   It was inside of a crate when it was found, yes.

3     Q.   Okay.  And whether there was a manifest or

4     documentation on the outside, were you aware of that

11:28:20  5     or --

6     A.   I am not aware of what was on the outside for a

7     manifest.

8     Q.   To your knowledge, it was opened up?

9     A.   Yes, I believe so.

11:28:28  10     Q.   Okay.  All right.

11          And then I wanted to go just ask you a few

12     questions about the protocol that day.  You, in your

13     testimony, you said that earlier that year in Sandy

14     you had an experience with hazmat team and had

11:28:48  15     learned some things from that.  Is that right?

16     A.   Yes, that's right.

17     Q.   And so as you go you had special training but you

18     also learned from prior searches certain protocol; is

19     that correct?

11:29:01  20     A.   Yes.

21     Q.   And so in the report, and I think you have

22     testified to this, that you initially went in with a

23     Level B hazard suit; is that correct?

24     A.   Yes.

11:29:13  25     Q.   And then there is an initial sweep and then the

Level A team or the suits came on.  I think you
testified yours didn't work; is that right?

A.   Right.

Q.   And tell me a little bit about that.  They went
in and they took some sampling or what happened at
that point?

A.   Well, for the Level A team they would take in
both air monitoring equipment which measures for
general hazards as far as solvents and volatile
chemicals.  That's kind of a generic type of air
monitoring equipment but that is the basis of what
the air monitoring that was done.  And then it was
just trying to do a more detailed look at what items
were in there and how best to formulate a plan of
action after that.

Q.   Okay.  And so there is an initial assessment --
there was the A team made -- there was an assessment
made after that; is that correct?

A.   Yes.

Q.   And from what assessment was made, it was
determined that you could go back to the Level B
suits; is that correct?

A.   Yes, that's right.

Q.   Okay.  And the pictures there to they showed the
pill press and the pills that were produced there.

491

1    Do you know what sort of -- what those pills were?

2    A.   The white ones appeared to be the rectangular

3    shaped similar to a Xanax or Alprazolam tablet that

4    we thought we would see.

11:30:36  5    Q.   Okay.  And that powder there was probably not as

6    big a concern as other material?

7    A.   Well, it still presented an unknown.  We have an

8    assumption of what we're seeing but since we really

9    don't have the chemical analysis we still give it a

11:30:52 10    significant concern for us.  So while we think we

11    know what it is, we still expect it is dangerous to

12    us so that is why we keep the protective clothing on.

13    Q.   Okay.  And if there would have been higher risk,

14    you would have been in Level A to collect -- take out

11:31:13 15    the powders then, is that right, instead of Level B?

16    A.   Yeah.  The Level A is if we would have seen

17    someone actually producing some type of material

18    using chemistry in a laboratory set up.  That's what

19    usually Level A is designed for.

11:31:29 20    Q.   So airborne contamination?

21    A.   Airborne vapor and liquid splash protection.

22    Q.   Okay.  Is that what you experienced in Sandy

23    before earlier in the year that there was that level

24    of concerns?  Is that why you had that protocol?

11:31:46 25    A.   No.  That is just the DEA's protocol.  As

1      fentanyl was moving across the country, the initial

2      protocol was start with Level A for assessment, make

3      an adjustment as necessary.  So it wasn't really just

4      our call to jump to Level A, it's just the DEA

11:32:02  5      protocol nationwide.

6      Q.   Okay.  And so on that day on November 22nd, there

7      wasn't -- there wasn't the level of fentanyl in the

8      home to be concerned to be a Level A; is that

9      correct?

11:32:15  10     A.   The level of fentanyl synthesis as in actually

11     producing it at a chemistry level, no.

12               MR. SAM:  Okay.  All right.  Just one

13     second.

14               (Brief pause in proceedings.)

11:33:18  15               MR. SAM:  I don't have any further

16     questions, Your Honor.

17               THE COURT:  Thank you, Mr. Sam.

18               Redirect, Mr. Burggraaf?

19               MR. BURGGRAAF:  No questions, Your Honor.

11:33:26  20               THE COURT:  You may step down and you may be

21     excused.  And you may call your next witness.

22               MR. BURGGRAAF:  The United States would call

23     Agent Cameron Thor.

24               THE COURT:  Come forward and be sworn,

11:33:47  25     please.

1          THE CLERK:  Just right here.

2                      **CAMERON THOR,**

3      called as a witness at the request of the Plaintiff,

4          having been first duly sworn, was examined

11:33:58  5                  and testified as follows:

6          THE WITNESS:  Yes, I do.

7          THE COURT:  Come around to the witness box.

8          THE CLERK:  Please state your name and spell

9      it for the record.

11:34:17 10          THE WITNESS:  Cameron Thor, C-A-M-E-R-O-N

11     T-H-O-R.

12                   **DIRECT EXAMINATION**

13          BY MR. BURGGRAAF:

14     Q.   Thank you for being here today.  Where are you

11:34:27 15     currently employed?

16     A.   The City of Park City.

17     Q.   How long have you been employed there?

18     A.   Approximately nine and a half years.

19     Q.   And while employed with the City of Park City,

11:34:38 20     have you had any special assignments during that

21     time?

22     A.   I have.  I was in regular investigations, which

23     is crimes against property, crimes against person,

24     things of that nature, and then from there I

11:34:51 25     transferred to the DEA Task Force.

1    Q.    And were you a Task Force Officer then with the

2    DEA?

3    A.    Yes, sir, I was.

4    Q.    What were your responsibilities and caseload like

11:35:02   5    when you were a Task Force Officer for the DEA?

6    A.    My responsibilities were anything drug related

7    really, case initiation, witness interviews, report

8    writing, surveillance, undercover drug purchases, um,

9    controlled drug purchases with confidential sources

11:35:26  10    or informants, evidence processing.  Everything for

11    drug investigation from start to finish basically.

12    Q.    Did you receive any specialized training when you

13    became a Task Force Officer?

14    A.    I did.

11:35:41  15    Q.    What type of training did you receive.

16    A.    Um, well, the DEA is a unique place.  A lot of

17    the training I received was specific to their -- how

18    they would do things, their work flow.  I was

19    certified Level B and Level A in site safety for clan

11:36:01  20    lab.  Quite a bit of training as far as warrant

21    service and just tactics, that nature.

22    Q.    Did you become part of the HEAT team at some

23    point?

24    A.    I did.

11:36:17  25    Q.    As an investigator, a Task Force Officer with the

1    DEA, is it fair to say that their overarching goal is

2    to disrupt and dismantle drug trafficking

3    organizations as a whole?

4    A.   Yes, sir, that's exactly what I was taught.  Our

11:36:31  5    primary focus was to dismantle.  That was the goal.

6    At minimum though, we were -- we intended on at least

7    disrupting these organizations.

8    Q.   So in the cases that you handled, did you ever

9    have the opportunity to take down and arrest one or

11:36:50  10    more leaders of the same organization?

11    A.   Yes.  Yes, I did.

12    Q.   Was the organization completely dismantled at

13    that point?

14    A.   Yes.  On the regional level, um, best I could say

11:37:07  15    is yes.  My cases that I personally worked were

16    dismantled, most of them, some were just disrupted.

17    Q.   Okay.  And when you say just disrupted, how did

18    the organization operate after that?

19    A.   Um, one particular case, as hard as I tried, I

11:37:30  20    could not -- I could not obtain any probable cause to

21    arrest who I believed was ultimately responsible.

22    And so at that point, I had partnered with ICE and

23    HSI because I knew that this individual was an

24    aggravated re-entry and so I -- it was within the

11:37:53  25    context or the scope of the actual drug investigation

1    it was only disrupted but that was my way of

2    essentially dismantling it.

3    Q.   Is it fair to say that cartel type drug

4    trafficking organizations may operate differently

11:38:09  5    than local online drug trafficking organizations?

6    A.   With my experience, my cases, um, I didn't deal

7    with the online type drug trafficking cases.  The

8    best I could say is I had one case, for instance, it

9    was an ecstasy case where an undercover officer was

11:38:38  10   introduced online, but beyond that, my cases were

11   what I would consider traditional, where it was

12   basically heroin or a meth case and it wasn't -- it

13   wasn't done online.

14   Q.   Okay.  I want to direct you more to the

11:38:56  15   investigation involving Mr. Shamo.  What did you do

16   to prepare for your testimony today?

17   A.   I walked myself through the -- through my

18   involvement.  I watched a video that I took on

19   11-22-16, 2016, inside of the residence on Titian, I

11:39:20  20   believe that is how it is pronounced, Titian Way.

21   Q.   It has been pronounced about three or four

22   different ways.  However you want to pronounce it.

23   A.   The address up in Cottonwood Heights.

24   Q.   Yes.  Had you been involved with the

11:39:34  25   investigation prior to the search on Titian Way?

1    A.   I had no involvement prior to the search on that

2    day.

3    Q.   So how did you become involved with the search

4    that day?

11:39:42 5    A.   Just by virtue of my role on the HEAT team.  I

6    don't know if we even had -- I don't think it was

7    even named the HEAT team when we did it, necessarily.

8    It was just kind of a loose acronym.  But, again,

9    just by my certification that's what -- that's what

11:39:58 10   got me involved.  I was certified to go into a

11   hazardous environment.

12   Q.   And what did you expect to find when executing

13   the search warrant?

14   A.   You never know.  I knew the case had something to

11:40:12 15   do with some pills.  Um, so typically on a search

16   warrant we're looking for evidence of whatever the

17   crime is.  In this case, pills, um, and proceeds,

18   things of that nature.

19        I know with my cases, um, typically in a

11:40:31 20   heroin or a meth case, we're looking for pay-owe

21   sheets, electronic devices that might have evidence

22   preserved on them, things of that nature.  So I

23   expected that kind of stuff.

24   Q.   Okay.  I want to show you what has been marked as

11:40:43 25   Government's Exhibit 13.01, Photo 2.  Do you

1    recognize this photo?

2    A.   I do.

3    Q.   Are you in this photo?

4    A.   It is tough to say.  I -- I certainly recognize

11:41:02 5    the two on the right.  I don't know who is wearing

6    the lab equipment in this particular photo.  I might

7    be one of them, I might not.

8    Q.   What is this photo depicting?

9    A.   This -- I believe that is the -- the house in the

11:41:15 10   background is the house across the street from our --

11   or the target address.  And this is just sort of the

12   -- I see on the left there is the -- I think it was

13   Unified did the decontamination.  They have a trailer

14   that is basically you walk through and as you go

11:41:32 15   through they cut you out of your suit and wipe you

16   down and everything else, and wash you off.  And so I

17   believe that is the decon trailer.  And just some --

18   just some raid gear leaning against the table and on

19   the lawn there.

11:41:49 20   Q.   Were you part of the initial HEAT team that

21   entered the home?

22   A.   Yes, sir, I was.

23   Q.   What was the purpose of entering the home at that

24   time?

11:41:56 25   A.   The initial entry, the purpose, was to make

1      contact and remove anybody who might be inside of the

2      residence.  And also secondary to that to secure the

3      residence meaning that if there is anything that

4      could potentially catch fire or blow up, that's with

11:42:20  5      any warrant that we serve, it is not to search, it is

6      nothing like that, we just want to make sure the

7      house is secure.

8      Q.   In this initial entry, did you go in the

9      basement?

11:42:29  10      A.   Yes, sir, I did.

11      Q.   What did you observe when you were in the

12      basement?

13      A.    In the basement, it is a -- it is a single-family

14      dwelling.  I think it was a rambler with a basement.

11:42:40  15      And in the basement there were a couple of bedrooms,

16      a family-type room with a big sofa.  And then at the

17      end of the hall, there was a door that was closed.

18      And then inside of that, that room, we found several

19      items.  There was a -- there are a couple of pill

11:43:02  20      presses, there was a lot of powders and substances

21      that I didn't know what they were.  The wall had a

22      plum or purple color wall that was -- that had powder

23      residue all over it.  There was residue every where.

24      Every item, the chair that was in there, the pill

11:43:22  25      press, um, every item in there was caked with a

1        residue.

2        Q.   I want to show you what has been marked as

3        Exhibit 13.09, Photo 10.  Is this the image of what

4        you saw when you first entered this room?

11:43:40  5        A.   Yes, sir.

6        Q.   I can see, as you described, it appears that

7        there is stuff caked on the walls and other items

8        within the room.  What were your impressions and

9        thoughts as you observed the conditions and contents

11:43:53 10        of this room?

11        A.   Wow.  Um, I -- I have never seen anything like it

12        or even been shown anything like it.  Um, again, the

13        substances I don't know what they are.  In my

14        training, if it is an unknown substance, you need to

11:44:12 15        treat it as if it is -- as if it is kind of a worse

16        case scenario because you don't know what it is.  And

17        this was sort of, in my mind, the worse case scenario

18        where I opened the door and it was -- it was a couple

19        thoughts really.  The first thought is when you're

11:44:30 20        serving a search warrant you know there is something

21        in the residence but you never know really what you

22        are going to find.  As soon as Agent Breyer opened

23        the door, I knew that this is what we were looking

24        for.  And second to that was, again, wow, um, powder

11:44:43 25        every where.

```
 1    Q.   Did you feel like your prior training had

 2    adequately prepared you for the mental and emotional

 3    impact of seeing this room?

 4    A.   The training that -- my training wasn't really,

 5    as far as the emotional side of it, the training sort

 6    of leaves that out, that's just for each individual

 7    person that is I think that is their individual

 8    experience.  And in my case, with my training, it

 9    was, if I may just touch on it real quick, I attended

10    two trainings for approximately two weeks in

11    Quantico, Virginia, and then a third training out in

12    the firefighters or the Los Angeles County

13    Firefighters Training Facility.  And with that they

14    talked a lot about the substances and using caution,

15    putting the suits on and safely getting out of it.

16         And so while you're being trained on that,

17    obviously the impression is made that use extreme

18    caution.  But they don't talk about how you're going

19    to feel when you see or come across anything.  And so

20    I'm not certain how to quite answer that question,

21    but I know as far as my emotions when I opened this

22    door were, again, here it is.  And wow, this is

23    certainly a high risk of exposure of whatever this

24    substance is.  As you can see, it is all over, it is

25    caked on everything in there.
```

11:45:02 (line 5)
11:45:23 (line 10)
11:45:41 (line 15)
11:45:57 (line 20)
11:46:17 (line 25)

1    Q.   So after this initial entry into Mr. Shamo's

2    residence, then what happened?

3    A.   Then we all -- we all backed out of the residence

4    and then we waited.  We had established a hot zone, a

11:46:36  5    warm zone, and a cold zone.  And this was the hot

6    zone.  The warm zone is where we start taking off our

7    firearms and putting things to where they can be

8    decontaminated.  And then the cold zone is where it

9    is on the other side of the decontamination line and

11:46:51 10    so we were all on air and we all just basically

11    stayed on air just sitting on the porch, sitting on

12    the lawn, trying to stay cool and it was in November

13    but when you're in those suits, you're pouring sweat.

14    And then we were just sort of triaging who had the

11:47:08 15    most air.  And unfortunately for me, I had the bigger

16    tank, I had the most air, and I was one of the last

17    people to be decon'd, I guess second to last.

18    Q.   Did you discuss the strategy at that point as to

19    how to search the home or what the next step --

11:47:31 20    A.   The next step was to do a what we -- what the

21    plan was, and I believe it was Agent Breyer and maybe

22    some of the National Guard people, but the plan was

23    to send people in in a fully encapsulated suit

24    because obviously there was certainly something there

11:47:57 25    to go in and do sort of an assessment of, of what is

1    really there.  Because, again, the initial -- the

2    initial entry is just we're not searching, we just

3    want to make sure nobody is in there and nothing is

4    on the stove that is going to go bang or anything

11:48:11  5    like that.

6              And so when we came out, the plan was

7    basically okay, somebody is going to go in and we're

8    going to take some photos and take some video so that

9    we can then back out and put together a plan of how

11:48:24  10   -- how the scene is going to be processed.

11   Q.   I want to show you what has been marked as 13.01

12   Photo 4.  Is this you putting on a Level A hazard

13   suit?

14   A.   That is.

11:48:39  15   Q.   Can we go to Photo 5.  What are we looking at

16   here?

17   A.   That is me in, excuse me, that is me in the Level

18   A fully encapsulated suit, and National Guard

19   personnel, DEA personnel, and I believe the orange

11:48:57  20   suit rather is Agent Hansen or Anson getting ready

21   also.

22   Q.   And so it looks like you're preparing to go in

23   the home to do this Level A assessment.  How did you

24   feel about re-entering the home and particularly the

11:49:11  25   basement room?

1    A.    How did I feel?  Um, it was exciting.  I was

2    excited to put on the suit and go in.  I was nervous.

3    I was excited, I was nervous.  I was getting ready to

4    go back in there in the suit and just do my part.

11:49:34  5    Q.    What made you nervous?

6    A.    What made me nervous was the conditions, were the

7    conditions in that room.

8    Q.    Did you have a specific assignment as you

9    re-entered the home in the Level A suit?

11:49:46  10    A.    Yes, sir.  My assignment was I was given a GoPro,

11    I think it was actually a GoPro brand camera that had

12    a -- had a case around it so it could be decon'd and

13    wiped down and a little handle.  And my assignment

14    was to go in and video -- video everything in the --

11:50:04  15    in the residence.  Not just the room, but the entire

16    residence.

17    Q.    I am going to show you what has been marked as

18    Government's Exhibit 13.00, the video from the

19    interior of this home.  Did you have a chance to

11:50:17  20    review this beforehand?

21    A.    Yes, sir.

22    Q.    Does it accurately portray what you observed that

23    day?

24    A.    Absolutely.

11:50:24  25    Q.    As we play this video, um, I would like you to --

505

1    beforehand is there much to the audio as far as what

2    we can hear?

3    A.   There is nothing to the audio.  Um, these suits,

4    I know I look like I'm in a moon suit or something,

11:50:41  5    but before that I have got a CBA self-contained

6    breathing apparatus.  My CBA.  I believe I had a

7    radio, like a police radio walkie-talkie type radio

8    in the suit.  It is fully encapsulated so you have

9    got -- you have got this breathing mask on top of you

11:51:02  10   that really muffles everything, and then you are

11   hooked to air.  Because as soon as they zip up that

12   suit, you're on air.  There is no air in that suit,

13   you cannot breath, it is fully encapsulated, and you

14   get real claustrophobic in it.  And then again on top

11:51:17  15   of this mask, you have got the suit itself.  And so

16   no, as far as communication and hearing and anything,

17   there is no -- I don't believe there is any narrating

18   because you would have to holler.  And again it would

19   sound extremely muffled.

11:51:31  20   Q.   So as we play this video and to make good use of

21   the jury's time, what I would like to do is just ask

22   you to narrate what we're seeing in the video as it

23   moves along.

24   A.   Okay.

11:51:44  25   Q.   If we can go ahead and play Exhibit 13.00.

A.   So real quick, there are four of us, Special

Agent Ron Anson, two National Guard.  I was paired up

with Special Agent Ron Anson, he's the one in the --

one of the guys in orange.

Q.   If you will talk a little bit slower and I will

ask that the volume be turned down.  If you will talk

slower so that she can catch what you're saying.

A.   Okay.  So I believe this is Special Agent Ron

Anson.  He was partnered up with me in the orange

suit, and then there were two other individuals and

they were National Guard employees.

     Now I'm walking down the hall on the main

floor and there is the National Guard guys.  Okay

this is -- this is the master bedroom, or at least

was designated and my impression this was the master

bedroom.  There is dressers on the left here.  Again,

I'm just trying to get an overview of everything with

the video so that the people out in the trailer who

are not wearing protective equipment can see.  And

there is a lot of money.  I opened the drawer and the

top drawer there on the right and there is stacks of

bills two deep.

Q.   Had you seen something like that before?

A.   No.  I have never seen that much money before.

Not even close.

507

1    Q.   So as you're searching through these other

2    drawers, are you kind of hoping to find more?

3    A.   I am not expecting to find more.  I can't say

4    that I was hoping to find more.  I can't say I was

11:53:28  5    hoping to find anything.  I was just going in there

6    with the camera and just trying to get as much of a

7    snapshot of what was inside so that Agent Breyer and

8    the other -- the rest of the team could make a -- put

9    together an effective plan.

11:53:44  10          So again, I'm just going through and just

11    kind of sifting through items just to make sure I can

12    capture any sort of hazards or anything like that.

13    Q.   Are you seizing items at this point?

14    A.   No, I didn't seize any items and I didn't take

11:53:59  15    custody of any items.  There is a couple of items

16    that I did move that I am happy to talk about.

17    Q.   When we get to that point in the video, we'll

18    have you go ahead and explain that.

19    A.   Okay.  And there is another drawer full of money.

11:54:22  20    Q.   What are you doing at that point?

21    A.   I think that was Ron Anson out in the hall and I

22    opened it up and said look, look at this.  Similar to

23    when we opened the door downstairs and there is sort

24    of a wow factor, again, that is a lot of money.  I

11:54:38  25    have never seen anything close to that much.  So

508

1    obviously we need to pay special attention to that

2    because that is -- that is likely going to be

3    involved or within the scope of the warrant.

4    Q.   What is the overall purpose for this video?

5    A.   The overall purpose is, again, it's just -- it's

6    an assessment where I can go through and try to

7    capture what is in this residence.  Because the first

8    time we're looking for people and then we're looking

9    for immediate hazards.  In this case, I'm just trying

10   to capture the 360-degree of the residence so that

11   they can watch it outside and put together sort of a

12   plan of attack, if you will, how they want to process

13   the scene.

14   Q.   What are we looking at here?

15   A.   It looks like personal use substance.  I don't

16   know what the substance is.  There is paraphernalia.

17   You've got the baggies, a white powder and a folded

18   or rolled up dollar bill which is typical, I have

19   seen that before, just for snorting a substance.

20   Q.   As you conducted this search and assessment, did

21   you see any evidence of there being any other

22   occupant in the home other than Mr. Shamo?

23   A.   I don't recall seeing anything like that.  Um,

24   that wasn't on my mind.  I was just trying to be sort

25   of the robot with the camera.  I wasn't looking to

1    form opinions and I didn't know, again I wasn't

2    familiar with the case, I didn't know -- I didn't

3    know Mr. Shamo, didn't know him or any of his

4    associates or any of that.

5    Q.   Is it fair to say that your role in the

6    investigation into Mr. Shamo was quite limited in

7    scope?

8    A.   I think that's accurate.

9    Q.   Did you have much involvement outside of the

10   search on this day?

11   A.   I had no involvement other than -- other than

12   this day and I was -- this isn't really -- I guess it

13   is a search of sort, but, again, it is just -- it is

14   more of an assessment.  Looking for where the hazards

15   are and looking kind of just 360.  As far as the rest

16   of the investigation I had zero involvement.

17   Q.   What are we looking at here?

18   A.   Just another drawer with just a lot of loose

19   currency.  I believe that is Special Agent Anson.

20   That might actually be one of the guard guys because

21   those two were paired up.

22          So this is in the closet.  There are a

23   couple of safes there.  When we serve search

24   warrants, in my experience we're looking for a lot of

25   the warrants we're looking for again drug proceeds

1    and what better place to keep them than in a safe.

2    So that obviously registered to me.

3    Q.   In your prior experience had you found -- had you

4    ever found, during a search warrant, two money

11:58:32  5    counters?

6    A.   Money counters, I have seen money counters.  I

7    have never -- I don't believe I have seen two.  I

8    can't honestly swear to that as a fact but I don't

9    recall ever seeing more than one.  And even then when

11:58:47  10   you would see one it was rare.

11   Q.   Having seen the two drawers with money, as well

12   as the night stand and the two cash counters with the

13   two safes, what was your impression as far as the

14   scale of the potential drug trafficking operation?

11:59:05  15   A.   It was lucrative, was my impression.  As far as

16   the scale, how big the actual effort was, I didn't

17   really form an opinion.  The two things in my mind is

18   this room is a big deal and this is a lot of money.

19   Q.   So what's happening at this point?

11:59:27  20   A.   At this point, Ron Anson, forgive me, Special

21   Agent Anson picked up one of the safes and carried it

22   towards the front door.  I picked up the second safe,

23   that is what I'm doing right here in a moment, and I

24   carried it towards the front door also.  Reason

11:59:46  25   being, it didn't appear to be contaminated.  Um, it

1    was -- I don't know if opportunistic is the right

2    word, but it was sort of an opportunistic way of

3    picking it up and moving it to a safer atmosphere to

4    where that could be addressed separately as to how to

12:00:05    5    -- how to get into the safe.  I had no intent on

6    personally opening the safe or anything like that.  I

7    just wanted to bring it down closer to the door.

8    Q.   Were there other items other than the safes that

9    were moved towards the front door during this Level A

12:00:20   10    assessment?

11    A.   Yes, sir.

12    Q.   What other items were brought out?

13    A.   There was a room right next to the room

14    downstairs, forgive me, the room at the end of the

12:00:32   15    hall, the contaminated room with the purple paint on

16    the walls, there is a room right next to that, I

17    believe there was a bed in it.  And inside of the

18    closet of that room there were a couple or few, two

19    or three, maybe even four boxes, cardboard boxes,

12:00:55   20    that had -- one of them was open and it had a white

21    powder substance in it and so I made the assumption

22    that they all contained the same thing and so those

23    were brought up as well.

24    Q.   What are we looking at here?

12:01:10   25    A.   What we're looking at right here is it appears to

512

1    me kind of like a hand-crank type pill press.  It had

2    residue on it.  I don't know what the residue was.

3    Q.   Is this room still on the first floor of the

4    home?

12:01:32  5    A.   I believe this is.  I believe this is at the end

6    of the hall on the first floor.  It may seem silly

7    going through these areas that don't appear to be

8    contaminated in a Level A suit, but given the

9    toxicity of the, you know, some of these unknown

12:02:10  10   substances or substances such as fentanyl and other

11   synthetic opioids, we just operate under the

12   assumption until we know otherwise that the entire

13   house is contaminated to some degree.  So that is why

14   even these less or not contaminated rooms are still

12:02:34  15   treated as such.

16   Q.   Did you see Mr. Shamo as he was brought out of

17   the residence?

18   A.   Yes, sir, I did.

19   Q.   And what was his condition when he was brought

12:02:46  20   out?

21   A.   His condition?  His physical --

22   Q.   What did you observe when he was brought out as

23   far as his appearance?

24   A.   He was wearing plain clothes.  He was called out

12:03:00  25   and we brought him out and sort of passed him down

1    the stick or the chain, and he was sat down on the --

2    I don't know if he was sat down, he was handed off to

3    one of the agents or Task Force Officers who were not

4    wearing the Level B chemical suits.

12:03:25   5    Q.   At this point, as you're going through the Level

6    A assessment, what is the next step to be taken?

7    A.   Go downstairs.

8    Q.   Is that, to the left, is that the family room

9    that had been referenced?

12:03:59  10    A.   Yes, sir.  It's around the corner, to the left of

11    this view, is just a typical family -- family room.

12    Q.   When you've executed search warrants in the past,

13    do initial entry type videos are they common

14    practice?

12:04:25  15    A.   No, not in my experience.

16    Q.   Not in your experience.  To be clear, we are --

17    we have just looked at a family room.  This is

18    November and there was a Christmas tree up, is that

19    right?

12:04:54  20    A.   You will have to forgive me.  Maybe we need to

21    rewind it.

22    Q.   No, I'll just withdraw that question.

23          Did you identify any items of interest in

24    this area or in the family room?

12:05:20  25    A.   I don't believe so.

1    Q.   For the benefit of the record, it appears that

2    was more or less a utility room of sorts in the

3    basement.

4    A.   So that, okay, so here is the room to the left.

12:06:24  5    In the closet and on the floor there is an unknown --

6    I do not know what this substance is.  I'm just --

7    what I'm trying to do with the camera is, and I

8    didn't do a very good job of it, but I was hoping to

9    capture that label to where if it was freeze framed

12:06:42  10   or paused, Agent Breyer and some of the National

11   Guard folks could identify it.  And I believe I spoke

12   a bit earlier, this was the box that was opened.  And

13   there were several other boxes similar to this inside

14   of the closet.  And these are the boxes that I

12:07:00  15   carried upstairs along with the safe because I knew

16   that they hadn't been opened, um, not to minimize the

17   danger of it, but I figured that was something that

18   would be safe enough that I could carry closer to the

19   door while I still had oxygen.

12:07:25  20   Q.   So at this point, now where are we headed to?

21   A.   This is, as you can see, this is the room that I

22   spoke about earlier with the presses in it.

23   Q.   Is it still in the same condition, more or less,

24   as when you and Agent Breyer first entered it?

12:07:41  25   A.   Absolutely.  When Agent Breyer and I first

515

1    entered it we didn't disrupt anything.  We just,

2    again, we just peeked in to make sure nobody was in

3    there and there was nothing exigent that had to be

4    mitigated before we backed out of there.

12:07:53   5    Q.   What are we looking at as we go through this

6    room?

7    A.   There's a pill press, you may need to pause it,

8    I'm kind of shaky, but there is a pill press.  It

9    looks like there is a hopper that collects pills

12:08:08  10    right there on the sort of center right, very bottom.

11    I don't know what these pills are, I don't know what

12    the substance is in this hopper up here with the

13    white powder and then the bin with the substance.

14    There is obviously powder residue all over the place.

12:08:25  15    I am not intimately familiar with the operation of

16    how a pill press works.  To this day I'm not.  But at

17    this time, it's my understanding that you have got a

18    hopper and substances go in, they get stamped and it

19    spits out pills.  And that appears to be what I'm

12:08:41  20    seeing here.  There are substances in the top, and

21    there are pills at the end, and then there is a

22    little computer screen that I would assume is where

23    you calibrate or what not.  But again, that would

24    just be my assumption.

12:09:02  25    Q.   What else are we seeing in this room, if you will

1    describe it as you pan around.

2    A.   Okay.   Obviously there is the buckets with the

3    substances, there is a trash bag.   I don't know if

4    that is the -- what is in it is just packaging

12:09:20  5    material that has been used.   I am thinking, I don't

6    know for sure, but that is what I believe I see at

7    least that day.   Here is the other pill press,

8    similar to the one I just described.   Um, jars,

9    unknown pills right there (indicating), unknown to me

12:09:40 10    I should say.

11         Again, I'm just trying to get an assessment

12    so that we can formulate how are we going to safely

13    remove this and safely package and preserve this

14    without exposing anybody.   More bags with white

12:09:59 15    unknown substance all along the top.   Quite a bit of

16    it, from my experience.

17    Q.   Did you have any thoughts about your Level A suit

18    and how it was functioning at this stage?

19    A.   Yeah.   When I went in here, I felt like a pioneer

12:10:16 20    of sorts.   This was -- this was a dangerous

21    environment.   Again, I don't know what this material

22    is.   Um, as I sit here, I can't swear to what this

23    material is.   I wasn't involved in the collection or

24    testing of it.   But this was -- this was a lot of it.

12:10:36 25    It was caked all over everything.   I would assume it

1    was in the carpet, it was -- it was everywhere.  And

2    I was wearing a suit that, as I had been told, was

3    airtight and sealed, but it still -- it is a

4    nerve-wracking experience being in there with all of

12:10:54  5    this substance every where even despite the suit.

6              MR. BURGGRAAF:  If I may have a moment, Your

7    Honor.

8              THE COURT:  Yes.

9              MR. BURGGRAAF:  No further questions, Your

12:11:05  10    Honor.

11             THE COURT:  Do you have any questions?

12             MR. SKORDAS:  Very brief, Your Honor.

13             THE COURT:  Let's finish it and then we'll

14    take our break.

12:11:14  15             MR. SKORDAS:  Thank you.

16                       **CROSS-EXAMINATION**

17             BY MR. SKORDAS:

18    Q.  Agent Breyer, you indicated that you were not

19    looking for evidence or signs of other occupants in

12:11:25  20    the house, correct?

21    A.  Evidence or other signs of occupants?

22    Q.  Yes.  Of other people who may have been living in

23    the house at that time.

24    A.  That is correct.  That is not -- let me clarify.

12:11:39  25    When we initially go in, yes, we're looking for other

1    occupants.  We're looking for anybody.

2    Q.   People, right?

3    A.   But I believe within the -- the way I interpreted

4    the initial question was, was I -- was I looking to

12:11:51  5    see if there were other people this being their

6    primary residence and, no, I was not.

7    Q.   Or people who received mail there?

8    A.   No, sir.  I wasn't looking for that.

9    Q.   Or, in fact, mail that is there that was

12:12:05  10    addressed to other individuals.  You weren't looking

11    for that either, correct?

12    A.   No, sir.

13    Q.   No identification or anything like that?

14    A.   No, sir.  I was -- I wasn't looking for residency

12:12:17  15    documents or anything like that.  I was looking for,

16    again, sort of an overview of how -- of what was kind

17    of where and how it was going to be processed,

18    collected, removed, and so on.

19    Q.   As I understand the sequence, you make some

12:12:35  20    initial entry into your gray suits, you decide there

21    is something more going on, you step out and you put

22    the big goofy suits on, is that fair?

23    A.   That's -- that's fair.

24    Q.   That's when you took the video, correct?

12:12:51  25    A.   When I went in the second time, yes, sir, when I

519

1    took the video.

2    Q.   And then at some point you decided that it wasn't

3    hazardous that -- so hazardous that you needed those

4    suits and then you came back in with the regular

12:13:03 5    suits.  Is that what you did?

6    A.   No, sir.  I -- I wasn't involved in that process.

7    I did the assessment with the camera, and then I

8    brought that out and then I was taken out of the

9    suit.  And from that point forward, I was more of a

12:13:17 10    support role.  I did not make any decisions myself on

11    how the evidence was going to be removed and

12    processed.

13    Q.   Right.  And I wasn't asking about the decisions.

14    Did you go back into the house I guess I should have

12:13:30 15    asked?

16    A.   No, sir, I did not.

17    Q.   That was the second time you went in?

18    A.   The second time was it.  After that, I helped

19    tape off those -- because the certification isn't

12:13:40 20    just to go in in a suit, it is also being able to

21    tape off and seal these suits.  And so I was more of

22    a support role where I taped off and sealed the suits

23    and changed oxygen tanks and things like that.

24    Q.   How long were you there all tolled?

12:13:55 25    A.   I don't know how long time wise.  I know that I

1    was there on the initial raid so I was one of the

2    first ones there, um, and I remained into the

3    evening.

4    Q.   I just have one other question.  You indicated

12:14:14  5    that -- or maybe you didn't, but you do drug

6    interdiction for Park City also?

7    A.   I have done drug interdiction, yes, sir.

8    Q.   And --

9    A.   I don't do it any more currently.

12:14:26  10   Q.   I guess I have a couple of questions.  You said

11   that you were frustrated with one of the situations

12   that you had because you were trying to get to the

13   person you thought was the leader of the organization

14   and you couldn't.  Do you recall saying that in your

12:14:39  15   early testimony today?

16   A.   Yes, sir.

17   Q.   Was that a DEA matter or a Park City matter, do

18   you recall?

19   A.   I recall.  It was a DEA case that I was working.

12:14:48  20   Q.   Why was it difficult to find that person?

21   A.   To find him or to --

22   Q.   To get the probable cause, to get the evidence

23   that you needed?

24   A.   Okay.  It was difficult in this particular case,

12:15:01  25   um, let me back up a moment.  A lot of the cases I

1    worked, and I'm not saying that's how this case was

2    worked, I don't know how this case was worked, but

3    with the cases I worked a lot of what I did was

4    through phone calls.  Looking to see who is calling

12:15:21 5    who, when placing orders and thing likes that.

6          And so in this particular case, the phone

7    calls led me to an individual and then after that

8    after we picked off the individual who we basically

9    caught red-handed, we -- I started monitoring some of

12:15:42 10    the customers that had been sourced by the individual

11    I arrested and this individual began making stops at

12    the same houses.  And so I had written -- I wrote a

13    search warrant for a phone.  The phone was out of use

14    the next day.  I wrote a warrant for a car.  The car

12:16:00 15    was sold to somebody down in Spanish Fork the next

16    day.  I mean it was extremely -- that particular case

17    I wrote, I want to say, 26 search warrants in that

18    case, and I had exhausted everything.  And, again,

19    given his status, I figured this was a way of --

12:16:18 20    another way of stopping the case.  So....

21          MR. SKORDAS:  That's all I have.

22          THE COURT:  Thank you.  Anything else,

23    Mr. Burggraaf.

24          MR. BURGGRAAF:  No questions, Your Honor.

12:16:31 25          THE COURT:  Thank you, you may step down.

1   And you are excused.  We will take our second break.

2   I think realistically it will probably be about

3   quarter to one when we get started again.

4           (Whereupon, the jury left the courtroom.)

12:17:10  5           THE COURT:  Court is in recess.  Thank you.

6           (Recess.)

7           THE COURT:  Are we ready to get the jury in

8   and proceed?

9           MR. SKORDAS:  Yes, Your Honor.

12:51:56  10           THE COURT:  All right, we'll do that.

11           (Whereupon, the jury returned

12            to the courtroom.)

13           THE COURT:  Do we have a witness here ready

14   to go.

12:52:53  15           MR. BURGGRAAF:  Yes, Your Honor.

16           THE COURT:  The Government may call its next

17   witness.

18           MR. BURGGRAAF:  Your Honor, the Government

19   would call Jake Nattress.

12:53:36  20           THE COURT:  Come forward and be sworn,

21   please.

22           THE CLERK:  Just right here.  Please raise

23   your right hand.

24                   **JACOB NATTRESS**,

12:53:44  25    called as a witness at the request of the Plaintiff,

523

1          having been first duly sworn, was examined

2                  and testified as follows:

3          THE WITNESS:  Yes.

4          THE CLERK:  If you will just come around

5   here (indicating).  Please state your name and spell

6   it for the record.

7          THE WITNESS:  Jacob Nattress, J-A-C-O-B,

8   Nattress, N-A-T-T-R-E-S-S.

9          THE COURT:  You may proceed, Mr. Burggraaf.

10          MR. BURGGRAAF:  Your Honor, we may need a

11   moment.  The defense is coordinating to ensure that

12   none of their witnesses are still in the courtroom

13   that have been excluded.

14          THE COURT:  I'm having trouble hearing you.

15          MR. BURGGRAAF:  Defense is taking a moment

16   to ensure that none of their witnesses are still in

17   the courtroom.

18          THE COURT:  All right.

19          MR. BURGGRAAF:  Thank you, Your Honor.

20   Ready to proceed.

21          THE COURT:  Go ahead.

22                  **DIRECT EXAMINATION**

23          BY MR. BURGGRAAF:

24   Q.   Thank you for being here, Agent Nattress.  Where

25   are you currently employed?

1    A.    I'm employed by the Salt Lake City Police

2    Department.

3    Q.    And how long have you been employed there?

4    A.    Just over 10 years.

12:55:35 5    Q.    While employed with the Salt Lake City Police

6    Department, have you had any special assignments?

7    A.    Yes.

8    Q.    What assignments have you had?

9    A.    I worked for the narcotics unit within Salt Lake

12:55:46 10   City PD, and then I have also been assigned, which is

11   where I currently am, to the DEA's Narcotic Task

12   Force.

13   Q.    Are you a DEA Task Force Officer then?

14   A.    I am.

12:55:56 15   Q.    And how long have you had that assignment?

16   A.    A little over five years.

17   Q.    As a Task Force Officer, what are your job

18   responsibilities and your typical caseload?

19   A.    I'm specifically assigned to the TDS squad which

12:56:09 20   is tactical diversion squad.  So we're in charge of

21   the -- of stopping the elicit distribution of

22   pharmaceutical pills.

23   Q.    And when you became a Task Force Officer, did you

24   receive any additional specialized training or

12:56:26 25   education?

A.    Yeah, there were several schools I went through,

TFO school, Task Force Officer School, and then a TDS

school, the tactical diversion squad.  And then I

have also done a clandestine laboratory school as

well.

THE COURT:  Be sure you speak up and right

into the mic.

Q.   (By Mr. Burggraaf)  I assume that they

appropriately attempted to indoctrinate you with the

DEA philosophy through that training?

A.    Yes.  There are lots of forms and different ways

of doing things that we had to learn.

Q.   And are you familiar with the overall goal of

drug investigations when working with the DEA, DEA

administration?

A.    Yes.  Their main goal is to disrupt and -- now

that I'm on the stand I can't think of the other

word, disrupt and dismantle drug trafficking

organizations.

Q.   When you have been the case agent on cases as a

Task Force Officer, have you ever focused on one

person to the exclusion of other individuals in an

organization?

A.    Usually you go after as much of the organization

as you can get evidence on.

1   Q.   Based on your training and experience are all

2   drug trafficking organizations the same as far as

3   size and structure?

4   A.   No.   They vary pretty widely.

12:57:45  5   Q.   Based on your experience, do cartel related drug

6   trafficking organizations, are they comparable to

7   Dark Web or web based drug trafficking organizations?

8   A.   Not typically, no.

9   Q.   I want to focus now in on your involvement in the

12:58:02  10   investigation of Aaron Shamo.   What did you do to

11   prepare to testify today?

12   A.   I read through reports that I had produced and

13   that others had produced and went through exhibits.

14   Q.   Did you become -- or were you involved with the

12:58:19  15   search of Mr. Shamo's residence on Titian Way on

16   November 22nd, 2016?

17   A.   Yes.   I was in charge of collecting all of the

18   evidence that came out of the house.

19   Q.   Walk me through your involvement that morning.

12:58:33  20   Tell me what happened and what you did?

21   A.   So I stood by while the tactical team that had

22   safety -- they had taken safety precautions and had

23   worn hazardous protection suits, I can't think of the

24   right words right now, sorry, they had basically

12:58:55  25   safety gear to be able to serve the warrant in a --

1      in a hazardous environment.

2              So I waited in the area until it was

3      secured, until all of the individuals inside of the

4      home were taken out of the home and then a search was

12:59:09 5      able to be -- to be conducted at that point.

6      Q.   So at that point, once they had come out in their

7      hazard suits and given you the okay, what did you do?

8      A.   I set up a table on the front lawn and began to

9      accept the evidence items that came out of the home

12:59:29 10     from the search.

11     Q.   From where you were positioned with that table,

12     were you there the whole day?

13     A.   Yes.

14     Q.   From that vantage point, could you see all of the

12:59:40 15     individuals entering and exiting the home?

16     A.   Yes.  I was on the -- set up on the front lawn

17     directly in front of the front door.  And all of the

18     evidence that came out of the house, came out of the

19     front door.

12:59:52 20     Q.   Was there any exception to that?

21     A.   The only exception was the garage which is

22     separated from the house.  There is no entry or exit

23     into the garage from the house and so there was a

24     garage door that was opened up and there were some

01:00:06 25     other things inside like the pill press that is

1    standing before us.

2    Q.   So you're set up at this table in the front yard.

3    Tell me about the process of how evidence is brought

4    to you and what you do with it?

01:00:20 5    A.   So it was -- because of the contamination concern

6    of inside of the laboratory, inside of the house, the

7    team that had the protective suits on, they would bag

8    and double bag the items that were seized from the

9    home, and then they would bring them out to me at the

01:00:37 10    table.  I would document those items on a list, um,

11    sorry I thought you were -- did you say something?

12    Q.   No.

13    A.   Sorry, I was hearing my own echo.

14         So anyway, I would -- I would document each

01:00:51 15    item on the line sheet that I -- that I was

16    preparing, one for a receipt for the person that we

17    were seizing it from, and also for our records to

18    record the items that were taken out of the home.

19    Q.   So the bags in which the evidence was brought to

01:01:08 20    you in, were they transparent?

21    A.   They were.

22    Q.   And how did you know where the items came from?

23    A.   The individuals that would bring them to me would

24    tell me where in the house they were -- they were

01:01:20 25    found in.

1    Q.   Now, the individuals that you mentioned are in

2    these hazard suits.  Could you clearly hear when they

3    were explaining where they came from?

4    A.   Yes.

01:01:30   5    Q.   Okay.  I want to walk through some of these items

6    that were seized from Mr. Shamo's home on Titian Way.

7    As we do, some of them are going to be photos and

8    I'll just ask you maybe to describe them for the jury

9    where the item was seized and any other information

01:01:48   10   you know about the item seized.

11            So we'll start with --

12   A.   Okay.

13   Q.   -- a few photos.  Government's Exhibit 12.00.

14   Can you tell me what this item is?

01:02:03   15   A.   It appears to be powder that was taken out of the

16   home.

17   Q.   And are you aware of where the powder came from?

18   A.   Not off of memory, but I did write it on that

19   line sheet.

01:02:18   20   Q.   Would it help you to refresh your recollection to

21   look at that line sheet?

22   A.   Yes.

23   Q.   Did you take other -- before I bring that to you,

24   did you take other notes in the process of this

01:02:35   25   search warrant to document what was going on?

A.   Yes.  I have my report that I wrote on the actual

search warrant at the Titian Way address, and I

printed off the reports for the drug and nondrug

exhibits as well as a line sheet that basically shows

all of the items that we picked up from the lab to

bring to Court.

Q.   Okay.

          MR. BURGGRAAF:  Just one moment, Your Honor.

          THE COURT:  Yes.

Q.   (By Mr. Burggraaf)  Agent Nattress, if you will

take a look at the line sheet that you have

referenced in regards to the powders that are

depicted in this photo and once you have had a chance

to refresh your recollection if you will tell me

where you documented that this powder came from?

A.   Yeah, could you zoom in on the evidence tag so I

can see the number there.

          So 168 is the number that I assigned to it.

Okay.  So this was found in the -- in the master

bedroom nightstand.

Q.   And if we can move to Exhibit 12.01.  Can you

tell me what this is?

A.   Yes.  This is, again, another white powder that

was found from the home.  And if I can refer back to

my notes --

531

1    Q.   If that will help refresh your recollection.

2    A.   Is this 169, is that what is on the tag?

3    Q.   Yes.

4    A.   Okay.  So it was a powder found in the office

01:05:19  5    file drawer.

6    Q.   And if we can move to Exhibit 12.02.  Can you

7    tell me what this is?

8    A.   Yes.  So referring back to my notes again, the

9    document that is Exhibit 170.

01:05:48  10    Q.   And where was it located?

11    A.   Let's see here.  Okay, here we go.  So that was

12    in the kitchen.

13    Q.   And if we can move to -- that would be right,

14    that is 12.02.  If we can move to 12.03.  And can you

01:06:15  15    tell me what -- what this was and or what this is and

16    where it was located?

17    A.   Yes.  So again referring to my notes, it was a

18    powder found in the Mylar bag that was in the front

19    room cabinet drawer.

01:06:28  20    Q.   If we can look at 12.04.  What is this item that

21    was seized and where was it located?

22    A.   So there were several bags of white powder that

23    were found in the basement closet at the bottom --

24    located at the bottom of the stairs.

01:06:48  25    Q.   And 12.05.  Let me -- that is not appropriate.

1    Hold off on that.  As you were receiving items on

2    that front table, did you receive any pills that were

3    brought out from the house?

4    A.   Yes.

01:07:03  5    Q.   What types of pills did you receive?

6    A.   There were pills that were pressed to -- they

7    were counterfeit pills pressed to look like

8    Alprazolam pills as well as more pills that were

9    pressed to appear to be Oxycodone pills.

01:07:21  10    Q.   And where did the pills that appeared to look

11    like Alprazolam pills come from?

12    A.   So those were found in a basket that was just

13    below the hopper -- or just below the -- one of the

14    operating pill presses in the basement of the home.

01:07:36  15    It was set up to catch the pills as it came out of

16    the press.

17    Q.   And where did the suspected Oxycodone

18    pills located?

19    A.   Those were found on a shelf inside of that same

01:07:48  20    room where the pill presses were.

21    Q.   If we can look at exhibit -- Government's Exhibit

22    12.08, and actually it just caught the corner of my

23    eye.  If I can take you back to that prior Exhibit

24    12.04.  This, as with some of these other powder

01:08:14  25    exhibits there has been different labels and what not

1    put on them, what do you understand U-47700 to mean?

2    A.    Yes.  On the -- on the label this is actually a

3    sticker that the lab put on it and it's cautionary

4    risk U-47700 is a substance that acts like an opioid,

01:08:37  5    it is more powerful than fentanyl.  It, however, it's

6    not an opioid and so the same resuscitation can't be

7    used as with an opioid overdose so it is just a very

8    strong opioid like substance.

9    Q.    And how are you familiar with that?

01:08:53 10    A.    I have had training on the substance.

11    Q.    Okay.  Now, let's move to Government's

12    Exhibit 12.08.  Can you tell me what this is that was

13    brought to you and where it was located?

14    A.    It looks like 175, again, referring to my sheet,

01:09:12 15    is a white powder found in the press room bookshelf.

16    So the room where the presses were located on a

17    bookshelf.

18    Q.    And again, if we look at Exhibit 12.10.

19    A.    Again, referring to my notes, it was powder that

01:09:32 20    was found in a bottle on the room where the presses

21    were and it was on the floor inside of that room.

22    Q.    When you were brought powders, were the full

23    volume of powders secured for evidence?

24    A.    Not in all cases.  Where there were bulk

01:09:51 25    quantities of these powders we would just take a core

1    sample.

2    Q.   Why was the full volume of the powder not

3    secured?

4    A.   We were advised, just because of the danger of

01:10:01  5    the -- of these substances in the powder form and

6    possible contamination because of that danger, just

7    to take a sample that we could control in a bottle

8    and the rest of it was disposed.

9    Q.   I want to show you what has been marked as

01:10:19  10   Government's Exhibit 12.11, it is a physical exhibit.

11   Can you tell me what that item is and where it was

12   located?

13   A.   Yes.  So this was -- these are vials that the

14   laboratory provided.  Because they took -- so we

01:10:50  15   seized the punches and the dies from the different

16   pill presses, from the two pill presses that were

17   operational in the basement.  And this exhibit is,

18   let's see, this one is from one of the -- so they

19   took residue from those punches and dies and tested

01:11:10  20   that residue and that's what these vials are is they

21   contain the residue that was taken.  And this exhibit

22   was found to contain fentanyl.

23   Q.   You may be jumping ahead just -- just a tad, if

24   you're looking at that exhibit what drug exhibit

01:11:29  25   number is --

535

1          MS. BECKETT:  Your Honor, I'm going to make

2     an objection really quick.  I believe he has

3     testified just now that to test results of what was

4     on there and I don't think he has laid any ability

01:11:36  5     for him to testify as to test results at this point

6     so I would ask that that be stricken.

7          THE COURT:  There is no foundation for that,

8     that's correct, isn't it?

9          MR. BURGGRAAF:  Yeah.  I would stipulate to

01:11:47 10     having it stricken.

11          THE COURT:  Yeah.  Disregard the last

12     statement.  It is stricken from the record.

13          MS. BECKETT:  Thank you.

14          THE COURT:  That objection is sustained.

01:11:55 15     Q.   (By Mr. Burggraaf)  In regards to that exhibit,

16     what is the drug exhibit number that you assigned to

17     it?

18     A.   177.

19     Q.   And in reflecting -- in reviewing your line sheet

01:12:07 20     where you documented what items were, where does it

21     say where this item was located?

22     A.   It was taken from inside of one of the operating

23     pill presses in the basement.

24     Q.   Is that what your line sheet says?

01:12:19 25     A.   Let me see here.  Oh, I'm mistaken.  So this

536

1    is -- this is actually from the press room floor.  So

2    these were -- these were -- these were punches and

3    dies that were not inside of the -- any of the pill

4    presses, these were separated and they were on the

01:12:43  5    floor inside of that room.

6    Q.   And we have heard testimony about many other

7    punches and dies that were secured for evidence.  Why

8    were these dies not secured in the same boxes as the

9    others?

01:13:00 10    A.   Just because they were in the open, in the room

11    that was heavily contaminated.

12    Q.   Okay.  I want to show you drug Exhibit 178 and

13    179.  And let me clarify, this is Government's

14    Exhibit 12.12 and 12.14.  Do you recognize these two

01:14:03 15    exhibits?

16    A.   Yes.

17    Q.   What are they?

18    A.   So 178 is the one in here which is also some

19    vials.  This is the one I was mistaking the previous

01:14:11 20    for.  These are vials that were -- that the lab took

21    samples of the residue -- of the residue that was on

22    the -- on the punch and die that were found inside

23    one of the pill press.

24    Q.   And the other one is laying flat there?

01:14:26 25    A.   Is the same from the other pill press.

1    Q.   So what is your understanding as to why the one

2    is in a secure tote and the other one is not?

3    A.   I was advised by the assistant lab director when

4    we picked these exhibits up from the laboratory that

01:14:44   5    178 here contained -- was tested and was found to

6    contain fentanyl.

7    Q.   You didn't confirm that yourself?

8              MS. BECKETT:   Your Honor, I am going to

9    object, again.   We are going down a road that there

01:14:54  10    is no need to go down.   He can't testify to test

11    results.

12              THE COURT:   You can't testify as to the test

13    results or what the lab told you.

14              THE WITNESS:   Okay.

01:15:01  15    Q.   (By Mr. Burggraaf)   Did the lab allow you to take

16    the exhibit in the tote separate from the other

17    exhibit that is in the tote?

18    A.   What do you mean?

19    Q.   Did they allow -- did they require that it be

01:15:13  20    placed in the tote?

21    A.   Yes, they did.

22    Q.   But the other exhibit they did not?

23    A.   Correct.

24    Q.   Okay.   I now want to take a look at Government's

01:15:49  25    Exhibits 12.16 and 12.18 together.   Can you tell me

1    where these exhibits came from and what they are?

2    A.   Yes.  So I assigned them Exhibit 180 and 181.

3    They were core samples of the powders that were found

4    inside the hoppers that fed into the pill press

01:16:19  5    machines, the same machines that the pill dies were

6    taken from.

7    Q.   So as you're sitting at the table in front of

8    Mr. Shamo's home and receiving evidence, what other

9    types of evidence was brought to you?

01:16:34  10    A.   Again, there were various powders, pills, there

11    was money, there was money counters, there were

12    silver bars.  There were many punch and die sets.

13    There were -- there were two different safes that

14    also contained money inside of them and some other

01:17:04  15    various items.

16    Q.   I want to show you what has been marked as

17    Government's Exhibit 13.05.  What is that item and

18    where was it located?

19    A.    It is a cell phone that was found, if I can refer

01:17:28  20    to my notes again, I assigned it Exhibit N-61.  So

21    this was found inside the office.

22    Q.   At the conclusion of the execution of the search

23    warrant, what did you do?

24    A.   With this exhibit I kept it in my possession and

01:17:52  25    took it, as well as all of the other exhibits, back

539

1    to the DEA district office building and then stored

2    the items inside of a locked evidence storage room.

3    Q.   Was this evidence further processed in the days

4    following?

01:18:07  5    A.   Yes.  It took several days to process all of the

6    evidence just because of the magnitude of the

7    different -- or the bulk size of the different

8    evidence items that we seized.  And so over the next

9    few days, we processed and wrote reports and packaged

01:18:24 10    the items.

11    Q.   What was done with the cash seized?

12    A.   It was taken to a money counting service and they

13    counted the money and then took possession of it and

14    provided a check, I believe.

01:18:39 15    Q.   Do you recall the approximate amount of the money

16    that was processed?

17    A.   It was a little over 1.2 million.

18    Q.   On November 22nd during the execution of the

19    search warrant, were any vehicles seized?

01:18:55 20    A.   Yes.

21    Q.   What vehicles were seized?

22    A.   There was a Ford F-350 that was in the driveway

23    that was registered to Aaron Shamo.  There was a BMW

24    car.  There was, I believe, there was two separate

01:19:08 25    motorcycles also that were seized.

1    Q.   In the ensuing days after the search of

2    Mr. Shamo's residence, were there any other items in

3    this case that you processed?

4    A.   Yes, there were.

01:19:21  5    Q.   What other items or evidence did you process?

6    A.   On the day that the warrant was served on the

7    Titian Way address, there was information gained that

8    there were other packages that had been shipped out

9    that day.  So Postal Inspector Megan Moore and Lance

01:19:41 10    Howell tracked down those packages that were shipped

11    out that day and were able to find them and take

12    custody of them and then they were brought to us to

13    package and to process as exhibits as well.

14    Q.   And as you're processing these exhibits, what did

01:19:57 15    you do?

16    A.   We separated the boxes and then the packing slips

17    that were inside of the boxes from the drug items or

18    the drug evidence items because there we store them

19    separately.  So the drugs were packaged as one

01:20:13 20    exhibit and then the boxes and the packing slip and

21    the contents of the packaging were packaged

22    separately.

23    Q.   And prior to separating these different types of

24    evidence, did you document what was in each package

01:20:29 25    by photo?

541

A.   Yes.

Q.   I want to walk you through those photos.  If we can look at Government's Exhibit 9.20, and we'll just start with the first photo and I'll ask you to tell me what it is that we're looking at here.

A.   So this is one of the boxes that was seized from the -- from the postal service.  It contained these bags of many pills and then also had this packing slip that appeared to be a packing slip from a coffee company for coffee beans.  And the drugs were stored inside of these Mylar bags that you can see underneath the pills.  And then, of course, the box that it was shipped in and the label.

Q.   It appears there is a number on the top of the box, 184.  What does that signify?

A.   We just -- we packaged the boxes and then the shipping label separately.  But to be able to discern which shipping labels were packaged in which box, we wrote a number that matched on the box and the packing slip that coincided with the drug exhibit that was found inside of that box.

Q.   So to be clear, is the 184 the drug exhibit number that was assigned to the pills that were contained within the package?

A.   Correct.

542

1   Q.   If we can maybe zoom into the bottom left side of

2   the bags that are down there.  When you first opened

3   these packages, did you write anything on the

4   packages contained inside?

01:22:07 5   A.   No.

6   Q.   I want you to take note of, it looks like what

7   would be some writing on the upper right corner of

8   two of those bags of pills.  Was this common to see

9   amongst the packages the contents of the packages?

01:22:23 10   A.   Yes, it was.

11   Q.   What did you take these numbers to signify?

12   A.   We understood that these numbers were the amount

13   of pills contained in each of those bags.

14   Q.   When you came to the DEA as a Task Force Officer,

01:22:36 15   was any of your training that you received used to

16   instruct you on recognizing the different types of

17   pills that might be part of your investigations?

18   A.   Yes.  And then also through experience of years

19   of doing investigations with these pharmaceutical

01:22:54 20   pills we began -- we -- I recognize some pills due to

21   those investigations that we have had.

22   Q.   These pills here, what did you suspect them to

23   be?

24   A.   They appeared to be Alprazolam due to the

01:23:08 25   markings that were on them and then the shape of the

1    pill.

2    Q.   And if we can go to the next photo, tell me what

3    we're looking at here.

4    A.   Again, more of the same shipping box with the

01:23:22  5    pills inside that were contained inside of the box

6    and then a packing slip alongside it.

7    Q.   And that number 185, what does that signify?

8    A.   It's the drug exhibit that we assigned the pills

9    that were contained inside of that box.

01:23:37  10   Q.   And then the next photo?  What are we looking at

11   here?

12   A.   So these are counterfeit Oxycodone pills that

13   were also found inside of that shipping box.

14   Q.   And the 186?

01:23:55  15   A.   Is the drug exhibit number that was assigned to

16   those pills.

17   Q.   It looks like there, again, is a number written

18   on the upper corner of the bag down below.  What did

19   you take that to mean?

01:24:06  20   A.   The number is 5,000.  We understood that that bag

21   would contain approximately 5,000 pills.

22   Q.   Now, based on the training that you said that you

23   had and the experience identifying pharmaceutical

24   pills, what did you suspect these pills to be?

01:24:21  25   A.   Oxycodone because of the M-30 that was printed on

544

1      them.

2      Q.   The next photo.  Tell me what is here?

3      A.   Again, more Alprazolam or counterfeit Alprazolam

4      pills that were inside of a box that went through the

01:24:40  5      U.S. Postal Services.

6      Q.   What is the location that this package was

7      intended to be sent to?

8      A.   It looks like Daly City, California.

9      Q.   Okay.  And the next photo, what are we looking at

01:24:59 10      here?

11      A.   Again, more pills that appear to be counterfeit

12      Oxycodone, 30-milligram pills, and the box that they

13      were shipped in.

14      Q.   Did you review these photos before coming to

01:25:12 15      testify today?

16      A.   Yes.

17      Q.   Why?

18      A.   To prepare for trial.

19      Q.   And when you reviewed these photos were the

01:25:22 20      numbers written on the box on the invoice consistent

21      with the drug exhibit number assigned to the

22      contents?

23      A.   Yes.

24      Q.   I am going to ask that we just go through the

01:25:35 25      remaining photos pausing for about five seconds, if

1    we may, and if anything distinguishing different than

2    what you have already testified to is appropriate if

3    you will describe what we're looking at?

4    A.   Okay.

01:26:21  5    Q.   It appears that the numbers that were written on

6    the packaging as well as the invoice went from 184 to

7    203, is that accurate?

8    A.   Yes.

9    Q.   You mentioned that you separated out the invoices

01:26:42  10   and the actual packages from the other contents.  I

11   would like to show you what has been marked as

12   Government's Exhibit Number 9.21.  Are these the

13   invoices from those photos?

14   A.   Yes.

01:27:18  15   Q.   I am going to show you what has been marked as

16   Government's Exhibit 9.22.  Is this the exterior

17   packaging of what was depicted in those photos?

18   A.   Yes.

19   Q.   In regards to -- in regards to the drug exhibits

01:27:56  20   that were received when you were at the table in

21   front of Mr. Shamo's home, and the ones that you

22   processed that were contained in these packages, what

23   did you ultimately end up doing with them?

24   A.   So we packaged them and prepared them to be sent

01:28:13  25   to the lab to be tested as well as to be stored.

1    Because of the danger of fentanyl, we -- and the

2    large quantity of the items that we seized, the

3    powders and the different pills and not knowing what

4    some of those substances were, we actually drove

01:28:29  5    those exhibits to the lab in California and where

6    they were -- where the custody of those were

7    transferred to the laboratory for storage and for

8    testing.

9    Q.   I'm going to show you a tote containing multiple

01:28:47  10    government exhibits.  For your benefit, and the

11    record, I want to list what those are.  Government

12    Exhibit 9.00, DEA Drug Exhibit 184; Drug Exhibit

13    9.01, DEA Drug Exhibit 185; Government's Exhibit

14    9.04, DEA Exhibit 187; Government's Exhibit 9.06, DEA

01:29:08  15    Drug Exhibit 189; Government's Exhibit 9.09, Drug

16    Exhibit -- DEA Drug Exhibit Number 192 and

17    Government's Exhibit 9.18, DEA Drug Exhibit 202.

18         If you will take a moment and if you need to

19    stand up and do so, if you would take a look at each

01:29:49  20    of those exhibits and if would you like to hold them

21    up so the jury can get a sense of what it is that

22    you're looking at.  Having looked at each of those,

23    do you recognize the exhibits?

24    A.   Yes, these are some of the exhibits that were

01:30:36  25    found inside of that packaging that we just went

                1    through.

                2    Q.   Are these the suspected Alprazolam pills that

                3    were in the photos that we went through?

                4    A.   Yes.

01:30:48        5    Q.   And were these transported to the DEA lab?

                6    A.   Yes.

                7    Q.   How did they get back here today?

                8    A.   I transported them back here to Court.

                9    Q.   And when did you do that?

01:30:57       10    A.   It was last, let's see, last week we brought them

               11    back on Wednesday, I believe.

               12    Q.   And --

               13    A.   So we brought those back to the DEA Office and

               14    then we have been bringing them to Court from the

01:31:14       15    DEA's storage for court purposes.

               16    Q.   When you went to the DEA lab in California, how

               17    did they know what to give you?

               18    A.   I believe the attorney Mike Gadd provided the

               19    laboratory with a list of the exhibits that were

01:31:31       20    needed for Court.  I believe he requested all of the

               21    drug exhibits but only some they were allowed to give

               22    back to them.

               23    Q.   Okay.  I'm going to show you another tote

               24    containing multiple government exhibits.  For the

01:31:45       25    benefit of the record, I am going to list those out.

1        Government's Exhibit 9.03, DEA Drug Exhibit 186;

2        Government's Exhibit 9.05, DEA Drug Exhibit 188;

3        Government's Exhibit 9.07, DEA Drug Exhibit 190;

4        Government's Exhibit 9.08, DEA Drug Exhibit 191;

01:32:12   5        Government's Exhibit 9.10, DEA Drug Exhibit 193; DEA

6        -- or sorry, Government's Exhibit 9.12, DEA Drug

7        Exhibit 194; Government's Exhibit 9.13, DEA Drug

8        Exhibit 195; Government's Exhibit 9.14, DEA Drug

9        Exhibit 198; Government's Exhibit 9.15, DEA Drug

01:32:41   10        Exhibit 199; Government's Exhibit 9.16, DEA Drug

11        Exhibit 200; Government's Exhibit 9.17, DEA Drug

12        Exhibit 2.01 -- sorry 201.  Government's

13        Exhibit 9.19, DEA Drug Exhibit 203.

14                Do you recognize that tote?

01:33:45   15        A.   Yes.

16        Q.   Were you present at the DEA lab when that tote

17        was filled?

18        A.   Yes.

19        Q.   And what is contained within that tote?

01:33:56   20        A.   So if I can refer back to my notes.

21        Q.   If that will help refresh your recollection

22        please do so.

23        A.   So this is the line sheet that was from -- that

24        we use at the lab to document the exhibits that we

01:34:11   25        that we were taking.  So this one was -- we labeled

549

1    this as batch number five and it has those exhibits

2    on that sheet so it would be Exhibits 184 -- well

3    let's see here.  Not 184, it would be this

4    Exhibit 186, 188, 190, 191, 193, 194, 195, 198, 199,

01:34:47 5    200, 201, and 203.

6    Q.   It appears that the prior tote that we went

7    through you were permitted to take those pills

8    without the tote being secured, is that correct?

9    A.   That's correct.

01:35:01 10   Q.   But this tote the lab did not permit you to take

11   unsecured?

12   A.   Correct.

13   Q.   But you were there as it was loaded; is that

14   right?

01:35:09 15   A.   Yes.

16   Q.   Did you verify the contents?

17   A.   Yes.

18   Q.   Let me remove that from you.  I am going to

19   present you with another tote.

01:35:25 20   A.   Okay.

21   Q.   I'm actually going to present you with two totes

22   because I believe they relate to the last questions.

23   A.   Okay.

24   Q.   I brought to you two totes that each have a

01:36:11 25   sticky note on the top.  Can you tell me what those

1    sticky notes say?

2    A.   It is Batch 1 and Batch 1.5.

3    Q.   Do you know what those numbers signify?

4    A.   Yes.  This was a group of drug exhibits that --

01:36:27  5    so it was basically a batch that we were asked to put

6    together and because they didn't all contain in one

7    tote we had to split it up into two.

8    Q.   On top of one of those totes is a yellow

9    Government's exhibit sticker or paper.  Are all of

01:36:44 10    the numbers that are listed on there in -- do they

11    all begin with 7?

12    A.   Yes.

13    Q.   Were you present when these totes were filled at

14    the DEA lab in California?

01:36:59 15    A.   Yes.

16    Q.   Who dictated what would go in these totes?

17    A.   I would read off the exhibit number and then

18    Jason Simpson was there with me, he is another Task

19    Force Officer, and then the assistant lab director

01:37:13 20    was assisting us as well.  So I would read off the

21    exhibit, they would find it and then put it in the

22    tote that it belonged.  And I would watch and make

23    sure that they put the correct exhibit into the right

24    tote.

01:37:25 25    Q.   We have seen other totes where the exhibits are

1    readily accessible.  Would the lab allow you to take

2    the exhibits within these totes without sealing them

3    up the way they are now?

4    A.   No.

01:37:45  5    Q.   But you're sure of what the contents of those

6    totes are?

7    A.   Yes.

8    Q.   I'm getting a little bit of my workout this

9    afternoon.  I have just presented you with a separate

01:38:28 10    tote.  Is there a sticky note on top of that tote?

11    A.   There is.  It says number 2, as in batch number

12    2.

13    Q.   And what does that signify to you?

14    A.   That is the second set of pills that we were

01:38:41 15    asked to bring to Court.

16    Q.   There is a government's exhibit sticker or paper

17    on the top.  Do all of the numbers listed thereafter

18    begin with an 8?

19    A.   Yes.

01:38:55 20    Q.   Previously we heard testimony that specified

21    which of the 8 series exhibits were in there.  Were

22    you present when this tote was filled?

23    A.   Yes.

24    Q.   And who dictated what would go in that tote?

01:39:10 25    A.   I did as well as -- as well as the other two

552

1    members that I previously explained.

2    Q.   Did you confirm the accuracy of the contents of

3    this tote before it was sealed?

4    A.   Yes.

01:39:20  5    Q.   Would the lab let you take these contents -- let

6    me clarify.  Would the lab personnel allow you to

7    take these contents away from the lab without it

8    being sealed?

9    A.   No.

01:39:34  10    Q.   I'm going to bring you another tote, this one

11    being the 10 series.  Previously we have heard

12    testimony about the exhibit numbers that are within

13    this tote but if you would look at the government

14    exhibit number or sticker on top, do all of the

01:40:10  15    exhibit numbers begin with 10?

16    A.   Yes, they do.

17    Q.   And is there a sticky note on top of that tote?

18    A.   There is.  It says batch number 3.

19    Q.   And what does that signify to you?

01:40:20  20    A.   A set of exhibits that were to be put together.

21    Q.   And were you present when this tote was packed?

22    A.   Yes.

23    Q.   And who dictated what would go inside of this

24    tote?

01:40:34  25    A.   It is in the same manner as the other totes.  I

1    read off the exhibits that belonged in this tote and

2    verify that they were put in there.

3    Q.   And would the lab take -- allow you to take the

4    contents of this tote without it being sealed?

01:40:49  5    A.   No.

6    Q.   I'm going to retrieve that one and I think we

7    have one more.  Is there a sticky note on top of that

8    tote?

9    A.   There is.

01:41:36 10    Q.   And what are the exhibit numbers that are listed

11    on the government's sticker?

12    A.   It says batch number 4 on the sticky note and on

13    the government's sticker it has exhibit -- Government

14    Exhibit 12.07 and 12.12.

01:41:50 15    Q.   This seems to have a considerably less number of

16    items placed inside.  Who dictated the contents of

17    this tote?

18    A.   I was -- so again I was asked to lump these two

19    together in the same tote and I made sure that the

01:42:07 20    correct exhibits were put into this tote.

21    Q.   And you were there prior to it being sealed up?

22    A.   Yes.

23    Q.   Would the lab allow you to take these exhibits

24    away without the tote being sealed.

01:42:18 25    A.   No.

1    Q.   I am going to retrieve that.

2              MR. BURGGRAAF:  If I may have a moment, Your

3    Honor.

4              THE COURT:  You may.

01:42:53  5    Q.   (By Mr. Burggraaf)  Of all of the totes that you

6    picked up at the lab that were sealed, is it fair to

7    say that you were the one who dictated what the

8    contents of each of those would be?

9    A.   Yes.

01:43:06 10    Q.   And you were present when they were loaded?

11    A.   Yes.

12    Q.   And the lab would not allow you to take any of

13    those, the contents of those sealed totes, without

14    them being sealed?

01:43:16 15    A.   Correct.

16    Q.   Beyond the involvement of what you have testified

17    to today, is it fair to say that you played a limited

18    role in further investigation into Mr. Shamo?

19    A.   Yes.  I wasn't privy to a bulk of the

01:43:37 20    investigation, I just assisted in various parts.

21    Q.   So was your portion of the investigation limited

22    in scope?

23    A.   Yes.

24              MR. BURGGRAAF:  No further questions.

01:43:48 25              THE COURT:  Thank you.  Ms. Beckett, you may

555

1      cross-examine.

2              MS. BECKETT:  I have no questions for this

3      witness, Your Honor.

4              THE COURT:  You may step down and you're

01:43:54  5      excused if you want to be.  You can stay or go as you

6      please. Should we start another witness?

7              MR. STEJSKAL:  Your Honor, the next witness

8      will be lengthy, and by that I mean over an hour.

9      The witness is in custody and the marshals will have

01:44:13 10      to bring him.  Whatever the Court wants to do for

11      scheduling, we're ready to go with him if the Court

12      wants to go forward.  If the Court doesn't want to

13      break up his testimony we can start in the morning.

14      That's completely up to you.

01:44:23 15              THE COURT:  Let's start with him at 8:30 in

16      the morning.

17              MR. STEJSKAL:  That's fine.

18              THE COURT:  All right.  Ladies and gentlemen

19      of the jury, thank you again.  Be safe.  Don't talk

01:44:33 20      to anybody about the case and we'll see you at

21      8:30 in the morning.

22              THE CLERK:  All rise, please.

23              (Whereupon, the jury left the courtroom.)

24              THE COURT:  We'll be in recess on this

01:45:09 25      matter until 8:30 tomorrow morning.

1          MR. SKORDAS:  Thank you, Your Honor.

2          MR. GADD:  Thank you, Your Honor.

3          (Whereupon, trial adjourned for the

4           day at 1:45 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **REPORTER'S CERTIFICATE**

2

3            I, Laura W. Robinson, Certified Shorthand

4    Reporter, Registered Professional Reporter and Notary

5    Public within and for the County of Salt Lake, State

6    of Utah, do hereby certify:

7            That the foregoing proceedings were taken

8    before me at the time and place set forth herein and

9    were taken down by me in shorthand and thereafter

10   transcribed into typewriting under my direction and

11   supervision;

12           That the foregoing pages contain a true and

13   correct transcription of my said shorthand notes so

14   taken.

15           In witness whereof I have subscribed my name

16   this 10th day of December, 2020.

17

18                    _____

19                    Laura W. Robinson

20                    RPR, FCRR, CSR, CP

21

22

23

24

25