1              IN THE UNITED STATES DISTRICT COURT

2                         DISTRICT OF UTAH

3                         CENTRAL DIVISION

4

5   UNITED STATES OF AMERICA,     )

6              Plaintiff,         )

7       vs.                       )   Case No.  2:16-CR-631-DAK

8   AARON MICHAEL SHAMO,          )

9              Defendant.         )

10  _____)

11

12          BEFORE THE HONORABLE DALE A. KIMBALL

13     ---------------------------------------

14                     August 12, 2019

15                       Jury Trial

16

17

18

19

20

21

22

23

24  REPORTED BY: Patti Walker, CSR, RPR, CP     801-364-5440

25  351 South West Temple, #8.431, Salt Lake City, Utah  84101

```
 1                    A P P E A R A N C E S

 2

 3

 4   For Plaintiff:              Michael Gadd
                                 Vernon G. Stejskal
 5                               Kent A. Burggraaf
                                 U.S. ATTORNEY'S OFFICE
 6                               111 South Main Street, #1100
                                 Salt Lake City, Utah  84111
 7

 8
     For Defendant:              Gregory G. Skordas
 9                               Kaytlin V. Beckett
                                 SKORDAS & CASTON LLC
10                               560 South 300 East, #225
                                 Salt Lake City, Utah  84111
11

12                               Daryl P. Sam
                                 DARYL P SAM PLLC
13                               5955 S. Redwood Road, #102
                                 Salt Lake City, Utah  84123
14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                              I N D E X

2    Witness               Examination By              PAGE

3    Jamie Pimental        Mr. Gadd   (Direct)          55

4    Chris Amidan          Mr. Gadd   (Direct)          60

5    Ryan Jensen           Mr. Gadd   (Direct)          65

6                          Mr. Skordas  (Cross)         73

7                          Mr. Gadd   (Redirect)        77

8                          Mr. Skordas  (Recross)       77

9    Sean Gygi             Mr. Gadd   (Direct)          80

10                         Mr. Sam  (Cross)            118

11                         Mr. Gadd   (Redirect)       127

12                         Mr. Sam  (Recross)          132

13   Ely Hebert            Mr. Stejskal  (Direct)      138

14

15

16

17

18

19

20

21

22

23

24

25
```

1    SALT LAKE CITY, UTAH; MONDAY, AUGUST 12, 2019; 8:30 A.M.

2                    (Proceedings not transcribed)

3              THE COURT:  The government may proceed with its

4    opening statement.

5              MR. GADD:  Thank you, Your Honor.

6              Death, drugs, and money, that's why we're here.

7    That man right there, Mr. Aaron Michael Shamo, founded and

8    led an organization dedicated to the distribution of drugs.

9    Mr. Shamo and his employees, they made their own drugs.

10   They pressed together drugs, specifically drugs that were

11   almost identical to Oxycodone.  Oxycodone is a painkiller.

12   But Mr. Shamo's fake Oxycodone contained Fentanyl.  Fentanyl

13   is a powerful synthetic opioid.  Mr. Shamo sold his Fentanyl

14   pills online.  In 2016, he sold hundreds of thousands of

15   Fentanyl pills.  He made millions of dollars.  And

16   Mr. Shamo's Fentanyl killed a man.  That's why we're here.

17             In the short time I have with you this morning, I

18   want to first review the time line of this case.  And then

19   once we've done that, I want to talk to you about the

20   evidence that you're going to hear over the next four weeks

21   as it relates to these other topics you see on the screen.

22   If at any point you don't see something on the screen, if

23   you'll just raise your hand.  That's true now or for any

24   time at trial.

25             In the beginning, Mr. Shamo started selling drugs

1    with a roommate, a friend of his, Drew Crandall.  That's who

2    you see pictured there.  Mr. Crandall was a junior partner,

3    a one-third partner, meaning Mr. Crandall got one-third of

4    the profits, Mr. Shamo got two.  And they divided up their

5    roles.  Mr. Shamo was in charge of listing the drugs for

6    sale online.  He was in charge of customer service.  He was

7    in charge of order processing.  He made the decision on what

8    drugs they were going to sell and acquiring those drugs so

9    that they could sell them.  And, lastly, Mr. Shamo accepted

10   payment for the drugs.

11           The payment for drugs bought online comes in the

12   form of cryptocurrency, and you're going to hear about one

13   particularly in this case.  That's Bitcoin.

14           His partner, his friend, Drew Crandall, was in

15   charge of packaging the drugs and then shipping those drugs,

16   once they had a customer who made a purchase.  And then

17   towards the end of his hands-on involvement, Mr. Crandall

18   worked with Mr. Shamo to develop a process and a recipe for

19   pressing pills.  Specifically they made counterfeit Xanax

20   that looked almost identical to the ones you see pictured

21   there.

22           But in 2015, Mr. Crandall got spooked.  Two things

23   happened.  The first is his girlfriend lost her job because

24   of her association with Mr. Shamo and Mr. Crandall.  And

25   then, second, Mr. Shamo ordered some drugs delivered to

1    their address in the name of a roommate.  Those drugs got

2    caught in the mail.  The roommate was questioned by law

3    enforcement.  And that was enough for Mr. Crandall and he

4    said I'm out.  So he made plans with his girlfriend to leave

5    the United States.

6          Mr. Shamo agreed to buy him out.  They negotiated

7    a price.  Settled on 30,000.  And then over the next months,

8    Mr. Shamo worked to find replacements for his one-time

9    partner.  Together, they hired and trained these two women,

10   Alex Tonge and Katie Bustin, to take over packaging the

11   drugs and then shipping the drugs.

12         Later, in November of 2015, shortly before

13   Mr. Crandall was going to fly overseas, Mr. Shamo hired his

14   very close friend, Luke Paz, to take over pressing the

15   pills.

16         In that same month, November 2015, Mr. Shamo went

17   to a new website where you can buy drugs online.  The

18   website is called AlphaBay.  Mr. Shamo created an account on

19   AlphaBay so that he could be a seller.  He named his

20   account, his storefront Pharma-Master.  Much of the evidence

21   you're going to hear over the next four weeks will come from

22   Mr. Shamo's drug sales as Pharma-Master.

23         Working together, Mr. Shamo, and his new employee,

24   Mr. Paz, developed a process and a recipe to create those

25   fake Oxycodone pills I mentioned, the ones that contained

1   Fentanyl.  They're fakes.  Looked almost identical to the

2   real thing, like you see pictured here.  Mr. Shamo sold

3   those Fentanyl pills on AlphaBay.

4        AlphaBay kept records.  So agents and analysts

5   went back, captured as much of the records as they could,

6   and then they put it in a table here for you.  What you're

7   looking at, if you look on the left column, that's the date.

8   So this first page you're looking at here, this is his sales

9   in January 2016.  The next column over, you can see a first

10  and last initial for the user name of the purchaser.  Then

11  you can see what price they paid.  Each row, of course, is

12  its own sale.  Then there's a column for dose.  That was as

13  it was supplied online by Mr. Shamo.  The quantity of pills

14  that they purchased.  Lastly, under the column that says

15  sold as, this was the name Mr. Shamo gave the drugs that he

16  was selling.  So as you look down that far right column, you

17  can see in January of 2016, most of Mr. Shamo's drug sales

18  were his counterfeit Xanax.

19       By the end, in November of 2016, if you look in

20  that same right column, most of his drug sales were his

21  Fentanyl pills, and he had three different names under which

22  he would sell his Fentanyl pills.  So if you're in the far

23  right column and you look down at the bottom, second one up,

24  you can see there it says Fentanyl, Roxy-Oxycodone.  So

25  sometimes right in the listing he would tell his would-be

1   customers that his product contained Fentanyl.  And then

2   that next word, Roxy, that's a street name for a particular

3   type of Oxycodone.

4          Other times he would list his drugs, but he

5   wouldn't include Fentanyl in the title.  So if you look one

6   row up, you can see it says Roxy-Oxycodone.

7          Then the third way he would list his Fentanyl

8   pills, if you go up six, seven rows, you see M Box 30.

9   That's another street name for a type of Oxycodone pill, and

10  it gets its name for how the pill is stamped when it's

11  pressed together by the pharmaceutical company.  He sold

12  this Fentanyl in those three ways.

13         As he and Mr. Paz worked on their process and

14  their recipe and perfected their fakes, his sales

15  skyrocketed.  By the end, you can notice in the quantity

16  column, he's no longer selling one, ten, 100 pills

17  exclusively.  He has large orders.  You can see in the

18  middle of the page there, there's a single order for 10,000

19  pills.  The row right above that, that's the same purchaser.

20  That purchaser on one day purchased 12,000 of the M Box 30s,

21  Mr. Shamo's Fentanyl pills.

22         Mr. Shamo, of course, couldn't do this alone.  He

23  had the help that I've mentioned before.  He had these folks

24  working for him.  But in the spring of 2016, he hired

25  additional help.  He hired this man, a close friend, someone

1  he could trust, Mario Noble, a former coworker of his, and

2  he hired Mr. Noble to do online customer support, and then

3  to also help with order processing when Mr. Shamo was away.

4          Mr. Shamo solicited his old friend, Drew Crandall,

5  who was living overseas, and brought him on board in the

6  summer of 2016 to also help with customer support as their

7  sales continued to take off.

8          In the summer, two women, Ms. Tonge and

9  Ms. Bustin, they started to get burned out.  They would have

10  to not only package the pills but put the postage label on,

11  address the packages, and then they were taking it to blue

12  collection boxes, the post office boxes that they put around

13  the community.  So Mr. Shamo hired this man, another trusted

14  associate of his, Sean Gygi, to take over that last part of

15  Ms. Tonge's and Ms. Bustin's role.

16          So most nights of the week, Mr. Gygi would show up

17  at a doorstep in Daybreak, and he would pick up packages and

18  envelopes, and then take those himself to the blue

19  collection boxes and drop them off.

20          You're going to hear from the people that you see

21  pictured there, starting with Mr. Paz, and then the bottom

22  row.  Mr. Shamo's organization was bigger even than this.

23          We've talked about most of the people in the

24  middle row here.  Let's take just a minute and talk about

25  the two people on the left.  So you see Gabby Noriega on the

1    far left.  Mr. Shamo hired her to be the functional

2    equivalent of his executive assistant.  She would run

3    errands, pick up groceries, grab Cafe Rio.  But she was also

4    asked to do things like buy postage, $6,000 worth of postage

5    at a time, so that you could make sure that Ms. Tonge and

6    Ms. Bustin always had enough postage to keep the process

7    running.

8          Next to her, Mr. Kenny, Chris Kenny.  Mr. Shamo,

9    most of his customers were online, but he did have a local

10   customer, Mr. Kenny, and it was through Mr. Kenny that he

11   got feedback early on about his fake pills.  So Mr. Kenny

12   would, for example, tell him how the pills worked in

13   relation to a legitimate Oxycodone pill.

14         Then on the bottom row, far left, Miles Penrose.

15   Early on, Mr. Shamo and Mr. Crandall, they were cash poor,

16   and their friend Miles Penrose, who at the time owned part

17   of a used truck dealership, he invested $10,000 in their

18   drug distribution activities.  Over a period of months, they

19   paid him back $30,000.  Mr. Penrose will also come up in

20   this trial because he helped them launder some of their drug

21   money, including selling Mr. Shamo his truck.

22         Then bottom row, far right, with the dyed red hair

23   is Alex Tebbs.  She had a role very similar to Ms. Noriega,

24   but for a shorter period of time.  She would buy stamps for

25   Mr. Shamo at his request, and then get reimbursed.  Then she

1   also helped him in a failed attempt to try to buy a T-shirt

2   business.  He was looking for a legitimate business through

3   which he could launder his drug money.

4          The rest of the people you see on the bottom row,

5   they were all package receivers.  I mentioned he had the one

6   package that came to his roommate that got caught.  There

7   was risk for Mr. Shamo any time he tried to import drugs

8   from overseas, and specifically Fentanyl from China.  So

9   Mr. Shamo hired everyone else on the bottom row to receive

10  packages on his behalf.  And for two or $300 per package,

11  with no questions asked, they would turn it over to

12  Mr. Shamo so that he could import the ingredients he needed

13  to press his pills.

14         By the fall of 2016, Mr. Shamo, who was helped at

15  times by Mr. Paz, spent a fair amount of his effort

16  converting his drug money, his Bitcoin, into cash, into

17  dollars.  Most of those transactions were relatively small,

18  but they found some Bitcoin buyers out of California who

19  were willing to do larger transactions.  The largest single

20  transaction they engaged in, one transaction was for

21  $400,000.

22         By November of 2016, Mr. Shamo's days would have

23  been largely consumed with pressing pills with Luke Paz,

24  converting Bitcoin to cash with Paz and others, order

25  processing, and customer service.  Even though he had hired

1    Mr. Noble and Mr. Crandall, he still had a hand in it.

2    Whenever they would run into a problem, they would flag the

3    issue for him and he made final decisions.  He had to make

4    sure that Ms. Tonge and Ms. Bustin stayed fully supplied

5    both on postage and on drugs so that they could keep the

6    process running.

7            I mentioned there was some risk in importing

8    Fentanyl from China, and that's eventually how Mr. Shamo was

9    caught.  It was this package right here that led to his

10   arrest.  Looking in now, you can see that that package is

11   addressed to Ryan Jensen in Midvale.  Ryan Jensen is one of

12   those package receivers.  You can see there it comes from

13   China.  This package came through the international mail

14   facility in Long Beach.  So that's where it hit sovereign

15   soil here.

16           The Customs and Border Protection watches packages

17   as they come in, and some of the officers from Customs and

18   Border Protection checked this package.  They opened it up.

19   They found a Mylar bag.  Inside that Mylar bag, a plastic

20   bag, and inside of that, white powder.  That powder was

21   tested by a scientist at the DEA laboratory and they

22   confirmed that it was Fentanyl.

23           The agents built up a case and an investigation

24   against Jensen, the man whose name was on the package.  And

25   by November 1st of 2016, they had enough in their

investigation that they were able to apply for and then
receive a search warrant.  They executed the search warrant
at his house.  They interviewed Mr. Jensen, and he
confessed.  He told them that he was accepting packages on
Mr. Shamo's behalf.  Mr. Shamo was a friend of his.
Mr. Shamo would pay him two, $300 for every package he
received.  And Mr. Jensen told the investigators about other
people that he suspected were doing the same thing.

        One of those people was Sean Gygi.  About a week
later, at this point, agents, postal inspectors, all working
together, they were watching the mail closely for any
packages from China coming to Mr. Shamo's associates, and
they caught this one that you see there, addressed to
Mr. Gygi.  With a search warrant, they opened it up.  They
looked inside.  They saw this inner packaging, kind of the
cartoon character packaging, and then inside of that powder.
That was tested.  It's Alprazolam.  That's the
pharmaceutical ingredient in the counterfeit Xanax pills.

        At the same time period, they caught one
additional package going to Mr. Gygi.  Inside of it, the
same packaging, the cartoon character.  This one had a
slightly different powder in it.  Tested, and it was
Fentanyl.

        With that, agents had enough to apply for and
receive a search warrant for Mr. Gygi's residence.  They

1   executed the warrant, and then they interviewed him.  He was

2   hesitant at first.  There was a moment in the interview

3   where the agents told him that he had been accepting

4   packages that contained Fentanyl, and the agents watched as

5   his countenance changed.

6         When the interview was over, they let him go.  He

7   went home that night and thought long and hard.  And the

8   next morning he called up the agents and said we need to

9   talk.  He told them that not only was he accepting packages

10  from Mr. Shamo but, earlier that year, he had been hired to

11  do more.  He had been hired as a runner.  He told the agents

12  about this porch in Daybreak where he would go most nights

13  of the week and pick up boxes, and then take those boxes and

14  put them into the mail.

15        He agreed to do two things.  First, he agreed to

16  have a conversation with Mr. Shamo and record the

17  conversation and talk about -- Mr. Shamo paid him during the

18  conversation, he got paid every two weeks $2,000 -- and then

19  to talk about their future plans.  You're going to hear that

20  recording during the trial.  And then, second, he agreed to

21  take the agents with him that night to pick up packages off

22  that doorstep in Daybreak, the doorstep of Ms. Tonge and

23  Ms. Bustin.

24        So they went out that night.  He had missed the

25  night before.  And so when he got the packages and then

1    turned them over to the agents, there were 79 packages and

2    envelopes, total.  Here they are spread out, which you can

3    see there is the largest boxes in the back, and the medium

4    size boxes in the middle, and then priority mail envelopes

5    in the front.

6            Here's looking inside one of the boxes.  When the

7    agents opened the boxes, they found Mylar bags and then an

8    invoice.  You can see that at the bottom of your screen.

9    It's for Jamaica green coffee.  It's meant to be coffee

10   beans.  Inside of the Mylar bags, plastic bags.  And then

11   the plastic bags contained pills that were confirmed

12   Fentanyl.  This one box is just shy of 20,000 pills.  You

13   can see that in the second red box there.

14           Here's looking at a couple more seized that night.

15   More pills.  You can see the addresses that these are being

16   shipped to.  This going to New York, New York.

17           Mr. Gygi took the agents out two nights later for

18   another pickup, this time just over 40 packages and parcels.

19   Here's one of the large boxes they got that night.  This was

20   tested.  It has Fentanyl.  You can see that in the red box.

21   This other drug you see in the red box with the parentheses

22   ANPP at the end, this is a Fentanyl precursor.  So this

23   Fentanyl is created in a chemistry lab in China and then

24   shipped over here.  The precursor wasn't fully synthesized,

25   and the DEA tests are sensitive enough that they were able

1    to pick it up in addition to the Fentanyl that Mr. Shamo was

2    putting inside of his pills.

3            Here's more from that second night with Mr. Gygi's

4    help.  Not all the packages were large.  Here's a priority

5    mail envelope.

6            By November 22nd, the agents had enough that they

7    applied for and received a search warrant to search

8    Ms. Tonge's and Ms. Bustin's residence in Daybreak.  When

9    they got inside, this is what they found.  Pills all over

10   the floor.  Packaging material.  You can see the name there,

11   Uline.  Uline is a company that sells packaging material,

12   including Mylar bags.  Postage, padded envelopes, priority

13   mailboxes you can see in the pile there.  A digital scale.

14   A large stock of drugs.  There's a plastic tote there full

15   of drugs.  On top of that, more bags of the Fentanyl pills.

16   Pills on the bed.  Here's their vacuum.  The pills would

17   spill on the floor.  They'd just vacuum them up.

18           The drugs were taken from the residence, taken to

19   the DEA where they were photographed, tagged, bagged, and

20   then sent to the lab.  Those drugs, what you're seeing in

21   the picture, that's what's here in front of us.  These

22   totes, specifically the sealed totes -- you can see, for

23   example, this one is taped around it.  The sealed ones

24   contain his Fentanyl pills, the unsealed ones, everything

25   else.

1        This is the largest single exhibit, the largest

2   one place where pills were gathered during this

3   investigation.  It's this one right here.  That one exhibit,

4   that one has more than 74,000 pills in it.

5        At the same time the agents were executing that

6   warrant, another group of agents executed a warrant on

7   Mr. Shamo's residence.  He lived on Titian Way in Cottonwood

8   Heights.  Because of the strong suspicion that he was

9   pressing Fentanyl, powdered Fentanyl inside of his home, the

10  warrant had to be executed by agents wearing HAZMAT gear.

11  Many agencies and local police departments were involved.

12  For example, you get the DEA and their HAZMAT team.  They

13  were also supported by Homeland Security Investigations,

14  Postal Inspection Service, Food and Drug Administration, the

15  IRS as a criminal investigative team.  They were helping

16  with the financial side of the investigation.  The fire

17  department was on hand to help decontaminate, and then for

18  rescues, if needed.  The National Guard has a HAZMAT team

19  that came out to help, and it took all the help.  Here they

20  are getting ready.

21       When they got inside, they found an old, single

22  punch pill press, in a wood cabinet, not being used.  They

23  found a brand new industrial size pill press in a crate in

24  the garage, which hadn't been used.  They found boxes, and

25  inside the boxes that same cartoon character packaging, and

1    then bags of powders.  They found boxes and boxes of this

2    formula 5,000.  This is the ingredients going into the

3    pills.  You can see there most of it, that top line, is

4    microcrystalline cellulose.  But it also has some other

5    ingredients.  There were kilograms of it in these boxes in a

6    closet.

7           Let me orient you on this picture.  So you're

8    looking down at HAZMAT boots, and then this is a crate using

9    the stainless steel pry bar behind the lid of the crate.

10   They popped open the lid.  The crate looks like it has

11   bricks inside, but that box is on its end.  They pulled one

12   out, took the lid off and set it down so you could see what

13   was inside the box.  The cylinders in that box, those are

14   punches that go into the press.  So the punches come

15   together.  And then there's a metal plate called a die in

16   the middle that's holding the powder.  The punches come

17   together with force and it presses together the pill.

18          The tip of the punch is embossed so that when it

19   presses together, it leaves an imprint on the pill.  Those

20   are here, and you'll get to see them.

21          Here's more, the punches on this shelf.  These

22   punches would wear out over time, which is why he was buying

23   more and more of them.

24          In the basement they found a room that was

25   lockable and it had a pill press running.  If you look at

1   the wall, you can see the powder on the wall.  Then closer

2   up, you can see powder spilling out onto the shelf of the

3   pill press.

4          Now looking around the room, you can see mason

5   jars and lids on that back table.  Mr. Shamo and whomever

6   was helping him press, either Mr. Crandall before and then

7   Mr. Paz who he hired after, they would shake up the

8   ingredients in those mason jars.  That's how they'd mix

9   their ingredients before putting them into the press.

10          You can see dies, colors, bags of pills on the

11   shelves.  Zooming in here, you can see the white bottle with

12   the red that says relaX.  It's a lubricant for machine

13   parts.  The presses' moving parts had to be lubricated.

14   Every time they replaced one of the punches, they would have

15   to lubricate that before it went back in.  More ingredients.

16          They took some precautions.  When Mr. Shamo was --

17   when the agents made entry into his home as part of the

18   search warrant, he was downstairs.  They called him up, and

19   then passed him out so he could be decontaminated and then

20   taken into custody.  He had gloves and his mask on him when

21   he came up.

22          Here's the other side of the room.  That's the

23   Fentanyl press.  Looking closer, the powder, the

24   ingredients, the binding agents, the colors, the Fentanyl,

25   once it's all mixed up, it would go into this hopper on top,

1    and then go down through the funnel into kind of like the

2    bowl in the middle.  Then powder is moved around that bowl

3    and the punches work.  It's a rotary press, so there's lots

4    of punches and it's running around like this.  Every time a

5    pill is punched and pressed together, it goes down the chute

6    you can see coming down the bottom of the photo, and then

7    into a net at the very bottom of the photo.

8           Much of what was in this room was contaminated.

9    It was destroyed.  It's hazardous.  But the agents took

10   samples.  And then they also pulled out the punches so that

11   the punch and the punched tip could be tested by the lab.

12   The punches that came out of this press, the lab, they did a

13   residue test on and it was confirmed Fentanyl.

14          The agents didn't stop their search there.  They

15   continued to look in places they normally look during

16   searches, including in his dresser.  In his top drawer, they

17   didn't find clothes.  In his bottom drawer, he had cash.

18   Here's one of those stacks, for example.  Cash in drawers

19   like this one.  He had a safe full of cash.  $1.2 million in

20   cash pulled out of his home.

21          They also seized electronic devices, and much of

22   the evidence you're going to hear over the next four weeks

23   comes from Mr. Shamo's electronics, specifically an iMac

24   computer, that one, and then two of his cell phones.  He had

25   an iPhone 6S and then an iPhone 7.

1              The agents worked late into the night processing

2     Mr. Shamo's house.  I mentioned that they took samples of

3     the powders before things were destroyed.  That's what you

4     see going on here.  Anytime there was evidence that could be

5     removed from the home, it would have to be picked up by

6     someone in their full gear, including their self-contained

7     breathing apparatus, brought outside for decontamination.

8     And then everything coming out of the house came to this

9     table that you see here where agents and supervisors checked

10    it in and then put them in the larger evidence bags.

11             Here's money, for example, coming out the house.

12             Agents worked late at this search warrant, but

13    they also worked late based on investigation they learned

14    from Ms. Tonge and Ms. Bustin.  So at Ms. Tonge's and

15    Ms. Bustin's search warrant, as a part of that they

16    interviewed both Ms. Tonge and Ms. Bustin, and they too

17    confessed.  They told the agents that they were packaging

18    and shipping these pills for Mr. Shamo; that Mr. Shamo was

19    their boss; that he had been paying them to do it.  And they

20    told the agents that they suspected an old coworker of

21    theirs might also be involved, Mario Noble.

22             So a couple agents went to where Mr. Noble worked,

23    and they asked at the front desk for Mr. Noble so they could

24    ask him some questions.  The front desk told Mr. Noble that

25    there were some special agents there to see him.  So as he

1    walked up, he erased Telegram, a communication app that he

2    had used with Mr. Shamo.  He erased it off his phone.

3            Once he sat down with the agents, he also

4    confessed.  And later that night, he took two of the

5    agents -- sat down with them, and took them online,

6    specifically onto AlphaBay.  And because Mr. Noble had been

7    doing customer service, he had shared access to some of the

8    Pharma-Master pages, and he was able to take them on, show

9    them what he had been working on, and allow them to take

10   screen shots that night so they wouldn't lose some of the

11   evidence.

12           Ms. Tonge and Ms. Bustin, in their interviews,

13   also told the agents one thing that gave them alarm.  They

14   said that the prior night, because Mr. Gygi was gone, they

15   took packages to blue collection boxes.  So a postal

16   inspector raced out.  Ms. Tonge and Ms. Bustin, they had

17   described the packages.  They would never put their return

18   address on it.  They would always pick one randomly off a

19   map, and then they would make up a name for the return

20   address line.  This time the name were all the same.  So

21   they told the agents what name to look for.  They told them

22   there would be 20 packages, and the postal inspector was

23   able to gather up all 20 before they got dispersed through

24   the mail stream.

25           Here's a couple of those last 20.  A box here,

1    Fentanyl pills.  These like all the others, Fentanyl.

2                Shortly after Mr. Shamo's arrest, his friend, Drew

3    Crandall, living overseas, notified AlphaBay, said

4    Pharma-Master has been compromised, it needs to be shut

5    down.

6                In January of 2017, the agents, working with now

7    the cooperating co-conspirators and building their own

8    investigation, had enough information to apply for and

9    receive three search warrants to search places where Mr. Paz

10   was known to sometimes reside.  That process of searching

11   his residences began discussions between Mr. Paz and his

12   attorney and these agents.  During that process, Mr. Paz

13   turned over his drug money, in total, just under $800,000.

14   He was getting paid a percentage for every pill that he

15   pressed.

16               In March of 2017, Mr. Shamo's parents turned over

17   money he had left with his family, in total, just shy of an

18   additional $430,000.

19               Let's take a minute now and let's talk about

20   Darknet markets.  You're going to hear specifically from a

21   special agent who, because of his training and experience,

22   is able to offer opinions that you can consider, and he's

23   going to talk about Darknet markets in some detail.  I want

24   to give you just the briefest overview of the evidence

25   you're going to hear.

1          Darknet markets, that name, those were the

2    websites where Mr. Shamo was selling his drugs.  The

3    Darknet, it's a corner of the Internet.  You need a special

4    browser, an Internet browser to get on there.  And then you

5    also need a user name and password to enter the markets.

6    This one that you see pictured here, this is the first sort

7    of commonly known Darknet markets, Silk Road.  And Darknet

8    markets have some characteristics in common.

9          So, for example, you can see the categories on the

10   left of the items that are for sale.  In the middle, that's

11   going to be the featured product descriptions, so you can

12   click on one of those and then make a purchase.  And then

13   lastly, user information on top.

14         When drugs were purchased on the Darknet, they

15   were purchased with cryptocurrency.  The cryptocurrency

16   you're going to hear about in this case is Bitcoin.

17         This is AlphaBay, the market where Mr. Shamo was

18   selling drugs in 2016.  You can see there the URL, the

19   address.  It says AlphaBay.  Then there's some nonsense

20   letters followed by dot onion.  When you think about the

21   websites that you're going to on the Surface Web, you go to

22   places that are dot com, or dot org, or maybe dot gov.  If

23   you want to go to a Darknet market, you're flicking for dot

24   onion websites and you need a specific browser to get there.

25         Then on the left, these are the items for sale.

1   This screen shot is showing counterfeit items.  The next one

2   here, these are drug items for sale.

3           AlphaBay made money on every transaction on its

4   site.  It took a cut.  AlphaBay had the incentive to try to

5   increase the amount of transactions.  But on the Darknet,

6   anonymity is key, and buyers feel hesitancy to buy online,

7   to send their Bitcoins to a vendor who's anonymous for fear

8   they won't get their product back.  So AlphaBay took some

9   steps to try to alleviate some of the concern a potential

10  buyer might have, and most of it had to do with feedback.

11  In addition to feedback, AlphaBay worked as an escrow

12  service.  But for now, let's talk just about the feedback.

13          So a potential buyer could go on to AlphaBay and

14  look at a seller.  They could see that -- for example, this

15  seller, on the number one there, had 94 percent positive

16  feedback over the last 12 months.

17          Then if you're looking at the second arrow, number

18  two, not only could you see the percent positive over the

19  last 12 months, but they would break it down by one month,

20  six months, 12 months so you could look for trends.

21          Customers would rate sellers based on their -- now

22  if you're looking at number three -- their stealth, and what

23  they mean by stealth is how expertly a seller packages and

24  ships drugs to avoid law enforcement detection.  Customers

25  would also rate sellers based on the quality and the value.

1              And then lastly, number four, customers were

2      allowed to leave comments, feedback.  So you can see the top

3      row of feedback here at the bottom, that customer wrote

4      perfect.  But it's not 2016.  It's 2013.

5              Then if you look underneath that, that tells you

6      what product they're referring to.  It's Microsoft Office.

7      You can see the price there in dollars.  So they pay in

8      Bitcoin, but AlphaBay would display it in dollars.  Six and

9      a half dollars for Microsoft Office, and the date and time

10     of the purchase.

11             Even if a customer didn't want to type in

12     comments, AlphaBay would still generate a row for every

13     transaction.  So if you look at the bottom two rows, those

14     customers left no comment, but AlphaBay generates a row.  So

15     A potential buyer can see a seller's individual sales, how

16     much they're selling, what people are paying, the date on

17     which they're making sales.  That same date, it was there

18     for Pharma-Master, and that's how the agents created this

19     chart that shows his sales for 2016 that you saw earlier.

20             This specifically is one of the 366 pages of

21     feedback that the agents were able to capture for

22     Mr. Shamo's drug sales.  So let's look at just a few of the

23     comments his customers left.

24             I heart you.  I really do.  Absolute perfection

25     again.  Very discreet shipping.  No worry there.  Product

1    looks great.  Some think they feel stronger than a regular

2    30.  That's good, though.  Just be careful if you don't have

3    a tolerance.  Thanks.  Be back soon.  Take care.  Enjoy

4    life.  That customer, you can see below, they bought 100 of

5    his Fentanyl pills, specifically the ones that he labeled

6    M Box 30s.

7            Here's another.  There is no one better to do

8    business with.  I have done thousands, and this fact is

9    indisputable.  Thank you, Pharma-Master.  This person bought

10   another hundred of his Fentanyl pills.  Fantastic service.

11   I'll be back.  This person bought ten pills.

12           Agents and analysts took this feedback and the

13   sales data, they added it all up, and from the feedback we

14   were able to capture, Mr. Shamo sold $2.8 million worth of

15   drugs in 2016, more than 800,000 pills and more than 5500

16   transactions.

17           Let's focus now just for a moment on his Fentanyl

18   pills.  Just the Fentanyl sales.  Almost 3500 transactions,

19   more than 450,000 Fentanyl pills, and he made $2.4 million.

20           I mentioned he had the three ways of listing his

21   Fentanyl pills.  So this breaks down by how he would

22   describe them.  When he labeled it an M Box or an M Box 30,

23   he had 871 orders, but those were larger orders.  So you

24   look at the total quantity, 210,000 pills, and just from his

25   M Boxes, he made a million dollars.

1          When he labeled it as a Roxy -- and you can see

2     what a Roxy looks like.  It's that A215.  That's the other

3     name you'll hear it described as.  When he labeled it as

4     just a Roxy, more orders, 2200, but smaller orders.  So the

5     total quantity, 242,000 pills, and he made 1.4 million just

6     off of Roxys.

7          Lastly, when he would put in his listing right in

8     the title that his pills contained Fentanyl, 376 orders,

9     just over 5,000 pills, just under $50,000.

10          Let's talk about the evidence you're going to hear

11     with respect to Mr. Shamo's oversight.  Mr. Shamo maintained

12     oversight even as he hired employees, including on ordering

13     ingredients and parts.  So here he's corresponding with his

14     executive assistant, Ms. Gabby Noriega.  He said, hey, did

15     you order the stearic acid from the link I sent you?  I

16     needed it specifically from Pyro Chem Labs because they

17     don't triple press stearic acid.  He gives her the link.

18     This is the link I sent.  Did you order it from this, Pyro

19     Chem Labs?  Then she clarifies, on to the next page, yeah,

20     I'll get you the address in a sec, but this is urgent for

21     the stearic acid.  I'm on a very large time crunch.  Gabby.

22     And then she indicates that she's made the purchase.

23          A little later in time he tells her, we need

24     cornstarch, lactose -- he needs another bucket of lactose,

25     and more stearic acid ASAP.  Get ordering.  Also half bag

1    Ziploc bags.  The snack size ones.  Then she's catching up.

2    Okay.  Some stearic acid should be coming like any day now.

3    I ordered some not that long ago, I thought.  How much more

4    cornstarch do you want?  Then he clarifies.  Focus on

5    lactose first.  Order like 30 to 50 pounds.  Then more

6    stearic acid.  We should be okay on cornstarch for a little

7    bit.

8              He asks her a little later did you order the

9    filler from tabletpress.com?  It's a Canadian company where

10   he's buying that microcrystalline cellulose.  And then he

11   says, to TJ Edwards.  TJ Edwards is one of his package

12   receivers, this man right here.  Then he says, also when's

13   your payday?  And then to those two questions, Ms. Noriega

14   responds not yet just because you said you would check to

15   make sure that was right and I didn't hear back from you.

16   And then when's payday?  It was Sunday.  Okay.  You've got

17   to remind me of these things, LOL.  This month's been crazy.

18             Mr. Shamo was also in charge in ordering parts,

19   specifically the dies and the punches.  So he got an e-mail

20   from a Chinese manufacturer.  They indicated they got his

21   e-mail at the Aliexpress store, and asked if he was

22   interested in good A215 or good Xanax replica dies.  And

23   when they say dies, they mean not just the dies but the

24   punches.  He responds, sounds good.  I would like both made.

25   And then asks do you accept Bitcoin as payment?  I'd like

1    you to get started immediately.  And then he clarifies the

2    type of press that he's using.  They tell him that they

3    cannot accept Bitcoin.  They only accept Western Union and

4    wire transfers.  Then they confirm, do you want to order the

5    A215 and the Xanax replica dies?  Then they talk about the

6    specifications for his press.  They work it out.  He

7    indicates that the MoneyGram will be coming in his name, but

8    the dies, the punches, they need to be sent to Julian

9    Mausia, this man right here, another one of his package

10   receivers.

11        There was evidence found in Mr. Shamo's devices

12   about payments he made to China.  This is $2100.  That's for

13   Fentanyl.  This is a money gram, $1400, going to China.

14   Then $1100 also going to China.  Mr. Shamo maintained

15   oversight on quality control, how much Fentanyl.  And how

16   did Mr. Shamo figure out how much Fentanyl to put inside his

17   pills?  Research.  This was found on his computer.

18   Something he found online.  You can see there it's a

19   comparison.  It compares, among other things, Oxycodone and

20   Fentanyl.

21        I mentioned that he was getting feedback from this

22   local dealer.  Mr. Shamo had a note in one of his phones.

23   The date on it is February of 2016, so right when he's in

24   the process of creating and perfecting fake Fentanyl pills,

25   and at the bottom of that note, this is what he wrote -- or

copied.  Okay.  So these are the best so far.  They smoke
perfect and they snort and slide.  Slide means how it is
traced along aluminum foil as they smoke it, heat it up from
the bottom.  The color being speckled won't fly so that
needs to be fixed, but you already knew that.  My boy smoked
two in a row and barely got high.  So a bit stronger is
going to be a must, bro.  But all in all these are f'g close
to being money in the bank, man.  You did it, bro.

Mr. Shamo's oversight over quality control
continued.  This is February of 2016.  Even by the end,
November of 2016, they are still having issues with quality
control.  Here's customer service, Mario Noble.  He says to
Mr. Shamo, his boss, you hearing complaints on the recent
batch?  Mr. Shamo:  No.  Batch of what?  I haven't read
messages all week.  Noble:  Got a couple of complaints about
the M Box 30s it looks like.  So Mr. Shamo says sticky them.
That means flag it for me so it won't go down in the chute.
I'll look at it tomorrow -- or I'll look at them tomorrow.

Then a little later in November, the other
customer service agent at this point, Drew Crandall, tells
Mr. Shamo, getting complaints about the last batch of
M Boxes from before vacation.  Are making people sick.  Only
halfway through messages and I already have four people
saying stuff about it.  Then he asked his boss, should I
just tell them to suck it up or should we reship 50 percent?

1   Mr. Shamo in response, partway through that first line,

2   yeah, let's do a 50 percent reship for those guys.  Just

3   give a pill count for reships that go out so I can keep

4   track.

5          Then he changes subjects.  He says, also Sean is

6   my runner for mail.  So he's just revealed a member of his

7   organization to another member.  I haven't heard a response

8   from him since yesterday.  And the Sean he's referring to is

9   Mr. Gygi.  If you still talk to him -- because Mr. Gygi and

10   Mr. Crandall knew each other from before -- can you reach

11   out and see if he's okay.  You look at the date on that

12   message, November 18th.  The day prior was the date Mr. Gygi

13   met the agents.  But the night of the 17th is when Mr. Gygi

14   was thinking long and hard about what he should do.  The

15   morning of the 18th is when he agreed to cooperate.  And the

16   night of the 18th was the first night he took the agents

17   along to collect the pills.

18          Mr. Shamo kept oversight over customer service and

19   order processing, even though he had people helping him.  He

20   had to train them.  So, for example, Mario Noble asked, yo.

21   Roxy just means replica Oxycodone, right?  Mr. Shamo:  Mine

22   does, yeah.  I only sell replica.  Yeah.  But Roxys are an

23   official drug, right?  The R just means it's a replica?  No.

24   Roxy is a real drug made from real Oxycodone.  Mine are made

25   with a substitute.  His substitute was Fentanyl.  Mr. Noble:

 1   Oh, okay.

 2          I mentioned that agents seized his electronic

 3   devices, including the iMac.  From the iMac, agents were

 4   able to find 1984 pages of orders.  So whomever was doing

 5   order processing, usually Mr. Shamo, sometimes Mr. Noble,

 6   they would take the orders that came in online and then they

 7   would create this document.  It's a text file.  You see the

 8   dotted dashed lines there?  Each block there is an

 9   individual sale.  So they would copy in the top four rows

10   from AlphaBay.  And then a buyer, when they made a purchase,

11   they would have to submit that name and address to which

12   they wanted their pills sent.

13          The order processor, Mr. Shamo usually, but

14   Mr. Noble when he was helping, would copy that information

15   from the buyer, put it in the text file, and this document,

16   the daily order sheet, was encrypted and sent to Ms. Tonge

17   and Ms. Bustin, and they would work right off this document

18   to package the pills.  So they knew what a buyer wanted, how

19   much they wanted, what address they wanted it sent to, and

20   then those pills would go out in the mail.  From these 1984

21   pages that were taken from Mr. Shamo's computer, the agents

22   were able to plot by ZIP code everywhere he sent drugs in

23   2016.  Every dot on that map is a ZIP code to which

24   Mr. Shamo and his employees sent drugs.

25          Let's talk about money.  I mentioned that

1    Mr. Shamo spent a fair amount of effort converting his
2    Bitcoin, his drug money, into cash that he could spend and
3    use.  Here's one of many examples you're going to see
4    through the trial.  So at the top, that's Mr. Shamo in the
5    blue.  He says, hey, it's airshamo4 from localbitcoins.
6    Airshamo4 is his user name.  Localbitcoins is a website that
7    brings together people who want to buy and people who want
8    to sell Bitcoin.  Mr. Shamo says, I'm finally feeling above
9    water.  Can you meet around 5:30?  His potential buyer says,
10   yeah, I can do that.  Give me an address.  Mr. Shamo,
11   Starbucks, Cottonwood Heights.  Buyer says that sounds fine.
12   I'll be there.  They both get caught in traffic.

13           Now moving to the next page, the buyer arrives and
14   then Mr. Shamo arrives.  He says, sorry, traffic got me too.
15   Buyer says, all good.  I'm on to the couch.  Mr. Shamo:
16   Thanks.  I'm getting off the freeway now.  See you in a
17   second.  That next message, the one that starts 1HBE2Q,
18   that's the buyer sending Mr. Shamo the wallet address he
19   wants Mr. Shamo to send Bitcoins to.

20           And all apparently goes well because eight days
21   later, the buyer reaches out to him again and says, hey, do
22   you have any more coins to sell.  He's looking to buy around
23   5,000.  Mr. Shamo says, I'm getting my car fixed.  If not
24   tonight, tomorrow.  Then the buyer says, okay.  Just let me
25   know when you find out.  How much do you have available you

 1  could sell?  Mr. Shamo writes, 15k.  I'll have more next

 2  week.

 3          All of Mr. Shamo's efforts to cash out Bitcoin

 4  resulted in $1.2 million in his house.  It's all drug money.

 5  There's Mr. Shamo's 1.2 million as it's going into the bank

 6  at Loomis.  The $430,000 turned over by his parents, all

 7  drug money.  Mr. Paz's cash, $800,000, all money.

 8          Mr. Shamo purchased this truck from his friend, an

 9  early investor, Miles Penrose.  Paid for it with drug money.

10  He bought silver bars.  You can see right there.  He used

11  Bitcoin to pay for it.  He didn't even have to exchange it

12  into cash in order to buy his silver bars.

13          Mr. Shamo was still holding cryptocurrency,

14  specifically Bitcoin, at the time of his arrest.  To date --

15  and it's not finished, but to date the agents have

16  identified and seized from Mr. Shamo's accounts 535 Bitcoin.

17  On the date of his arrest, a Bitcoin was worth almost $750.

18          Mr. Shamo had to pay wages to his employees.

19  Sometimes for Mr. Crandall, he would pay him in Bitcoins

20  since Mr. Crandall was overseas.  But he got late on one of

21  his payments and so Shamo went himself to deposit money into

22  Mr. Crandall's account.  That's what you see on the picture

23  there.  He put $2700 in Mr. Crandall's account as payment

24  for his work doing customer service.

25          Then Mr. Shamo used this drug money to support his

1    lifestyle.  He, with friends, bought a boat and a truck to

2    pull it.  Here he is in his boat on the lake with Paz.  He

3    bought an 88-inch TV, a $2,000 bedroom set.  Took trips.

4    This is a beach in California.  He also went to spring break

5    in Mexico.  Multiple trips to Las Vegas.  On a cruise with

6    Luke Paz and their girlfriends.  Fine wine.  Port calls.

7    All of it was paid for with drug money.

8            You're going to hear from several of the people on

9    the screen.  It's anticipated that you're going to hear from

10   Mario Noble.  He's going to tell you that Mr. Shamo hired

11   him, that Mr. Shamo trained him, that Mr. Shamo paid him,

12   that Mr. Shamo was his boss.

13           You're going to hear from Luke Paz.  He's going to

14   tell you Mr. Shamo hired him.  Mr. Shamo and Mr. Crandall

15   trained him, that the two of them worked together, that they

16   had an agreement that he would get a percentage of the price

17   for each pill that he pressed, and that Mr. Shamo paid him,

18   and Mr. Shamo was his boss.

19           You're going to hear from Drew Crandall.  He's

20   going to tell you in the beginning he was a junior partner

21   with Mr. Shamo, but Mr. Shamo bought him out.  And when he

22   came back, he was an employee doing customer service online

23   overseas.  Mr. Shamo paid him.  Mr. Shamo was the final

24   decision maker.

25           You're going to hear Ms. Tonge and Ms. Bustin.

1    They're going to tell you that they were initially recruited

2    by Mr. Shamo and Mr. Crandall.  And once Mr. Crandall left,

3    Mr. Shamo was the boss.  Mr. Shamo paid them.  Mr. Shamo

4    either brought them postage or sent them Bitcoins so they

5    could purchase postage.  Mr. Shamo kept them supplied with

6    drugs.  And Mr. Shamo and his employees would give them the

7    daily order sheets so they would know to whom to send the

8    drugs.

9        You're going to hear from Mr. Gygi.  He was a

10   package receiver before.  After his friend, Mr. Crandall, is

11   gone, Mr. Shamo approaches him about taking a larger role.

12   He recruits him to be the runner, the courier.  Mr. Shamo

13   paid him.  Mr. Shamo had plans with Mr. Gygi to expand his

14   role in the organization.

15       It's also anticipated you'll hear from Mr. Jensen.

16   Mr. Jensen's package was the first package caught, the

17   package that led to Mr. Shamo's arrest.  He's going to tell

18   you that Mr. Shamo paid him.  He considered Mr. Shamo a

19   friend.  And he received those packages on Mr. Shamo's

20   behalf.

21       You'll also hear from this woman, Jessica Gleave.

22   She's going to talk about the packages that she and her

23   boyfriend, next to her, Julian Mausia, received at

24   Mr. Shamo's request, on his behalf, and that he paid them

25   two, $300 per package for every package they received.

1          You saw our witness list Friday.  The only thing I

2    wanted to mention about it is we have some witnesses who,

3    because of their education, their training, or experience,

4    they have the ability to offer an opinion that you can

5    consider.  For example, this special agent will be the one

6    that talks about the Darknet, and cryptocurrency, and the

7    types of encryption they used.  These other witnesses

8    underlined in yellow, they're similar.

9          You're going to hear from computer forensic

10   witnesses, scientists and chemists from two different

11   laboratories.  They're going to talk about what was in the

12   pills and how good the fakes were.

13         You're going to hear from a doctor, a Ph.D, with

14   the Food and Drug Administration who was part of the team

15   that reviewed Fentanyl for use in hospital settings, and

16   he'll talk about some of the dangers of Fentanyl.

17         Then lastly, the three on the right.  Dr. Thomas

18   Rogers performed an autopsy.  Bill Posey, below him, helped

19   Dr. Rogers with toxicology analysis.  Then lastly,

20   Dr. Stacey Hail, who is a forensic pathologist, and I'll

21   talk about her in just a moment.

22         Let's finish now talking about Mr. Shamo's

23   customers.  Mr. Shamo sold his drugs to other drug dealers.

24   This is a sale for 5,000 of his Fentanyl pills.  That

25   purchaser is a drug dealer.  Another 5,000, 10,000, 20,000

1    of the counterfeits.

2            Let's talk about one drug dealer in particular

3    that you're going to hear more about in this case.  His user

4    name was Trustworthy Money.  Here's 10,000 pills to

5    Trustworthy Money.  Another 10,000 sold by Mr. Shamo to

6    Trustworthy Money.  Another 10,000.  Here's Trustworthy

7    Money and the daily order sheets that we've talked about

8    that, when Mr. Noble was helping, Mr. Noble would create.

9    Trustworthy Money sends a message, it says, fifth row down,

10   I messaged you about getting 2k extra pills if I buy this.

11   So 12,000 total.  You said to let you know so you could let

12   the shipping team know.  Please let them know.  Thank you.

13   I really appreciate it.  As soon as it's marked ship, I'll

14   partially release 35k.  By that he means the money is in

15   escrow at AlphaBay and he'll release it to Mr. Shamo as soon

16   as Mr. Shamo marks that it shipped.

17           Mr. Trustworthy Money gives Pharma-Master the name

18   and address he wants his pills shipped to.  He also uses a

19   package receiver.  So that's not him.  That's a real person,

20   Alivia Luckcuck, and then her address.  Trustworthy Money is

21   this guy.  His real him is Jared Gillespie.  He's fanned out

22   $100 bills in front of him.  He has a money counter.  You'll

23   notice on the table over here, Mr. Shamo has two money

24   counters.

25           Mr. Shamo sold to drug dealers.  He also sold to

1   drug users, and there's one I want to talk about now.

2          These two orders go to the same user.  So when

3   you're looking at this, you can see the sales information

4   from AlphaBay.  Second row, all the way to the right, it

5   says to and then T-W-A-D.  That's the user, Twad.  You can

6   see the name and address that that user wanted the pills

7   sent to.  And then for that top order, that's ten pills.

8   The listing is for one pill.  The quantity is ten.  So

9   that's ten pills.  It's going to 3 Midvale Drive in Daly

10  City, California.  Daly City is a suburb of San Francisco.

11         The second order, on the bottom now, is in June,

12  specifically June 6th, 2016.  Same user, same shipping

13  address, also for ten pills.  The package that contained

14  those ten pills was tracked.  So postal inspectors were able

15  to tell that it shipped out of Utah on June 9th, 2016, and

16  arrived at 3 Midvale Drive in Daly City on June 11th.

17         That address, 3 Midvale Drive, had these three

18  people at it.  The guy in the middle, that's Gregory Lee,

19  whose name was on the shipping request.  To his left, with

20  the funny sunglasses, that's Ruslan Kluyev, but his friends

21  called him Russ.  And then the woman here, Ms. Tori Grace,

22  is Greg Lee's girlfriend.  Mr. Lee, Russ, they're roommates.

23  Ms. Grace sometimes would spend the night there with them.

24         I mentioned that the package arrived June 11th,

25  2016.  The very next night, June 12th, Greg and Tori arrived

home after eating dinner with Greg's family, and they found

Russ -- he was there to meet them.  It was clear he had been

drinking.  They went into his bedroom to hang out with him

for a little while.  They watched Russ, their friend, crush

up two blue pills that they knew were Fentanyl.  He crushed

them up with that battery.  They watched Russ, their friend,

snort those pills using the rolled up sticky note you see

there.  They watched as their friend Russ started exhibiting

the effects almost immediately.  Russ laid down on his bed

and asked Tori and Greg to check on him that night.

Fentanyl is an opioid.  Opioids are central

nervous system depressants.  Taken too much and you shut

down.

Greg and Tori were nervous.  They checked on him

several times that night before they went to bed.  The last

time going in to check on him, Tori watched as her

boyfriend, Greg, rolled their friend into the recovery

position.  It's a way to arrange a body so that if someone

unconscious were to vomit, they won't asphyxiate.

Tori thought that Russ's breathing was slowing,

but Greg dismissed it.  The following morning, Tori got up

and went to work.  It was while she was at work that she

found out that Russ was dead.

Police were called.  An investigation began.

Here's his bed.  You can see his glasses.  There's Russ.

1    You can see the desk behind him where the battery and the

2    sticky note were.  Then just inside of that door, there's a

3    garbage can.  On the top of that garbage can, there's a

4    priority mail envelope, and that envelope came from Utah.

5              An autopsy was ordered.  A toxicology analysis was

6    part of that autopsy.  They looked at what was in his blood

7    at the time of Russ's death.  They found that he had alcohol

8    on board.  He was negative for cocaine, but he did have

9    cocaine metabolite and a cocaine cutting agent.  But then at

10   the bottom there, you see that he had Fentanyl in his

11   system.

12             Dr. Stacey Hail, she's a medical doctor.  She

13   still works in an ER.  She teaches, and then she studies how

14   drugs and classes of drugs affect the human body in an

15   overdose.  She reviewed Russ's case.  She's going to take

16   the stand in this trial and she's going to tell you that

17   having reviewed it, and based on her training and

18   experience, and her education, it's her opinion that

19   Fentanyl was the but for cause of Russ's death.  Meaning but

20   for the fact that he ingested the Fentanyl that night, he

21   wouldn't have died.

22             Death, drugs, and money, that's why we're here.

23             At the conclusion of this case, after you've heard

24   all of this evidence and much more, one of my partners on

25   the case, Mr. Vernon Stejskal here, is going to stand up in

1   front of you and ask you to return a verdict of guilty to

2   every count.  That will be the only verdict that's

3   consistent with the evidence.

4           Thank you.

5           THE COURT:  Thank you, Mr. Gadd.

6           Want to take a break before your opening?

7           MR. SKORDAS:  It's up to you, Your Honor.  I'm

8   ready to go.  I won't be quite as long, but a break might be

9   in order.

10          THE COURT:  We'll be in recess until five or ten

11  after ten.

12          (Jury excused)

13          (Recess)

14          THE COURT:  Ready to proceed?

15          MR. SKORDAS:  Yes, Your Honor.

16          THE COURT:  Get the jury.

17          (Jury present)

18          THE COURT:  Mr. Skordas, you may proceed with your

19  opening statement.

20          MR. SKORDAS:  Thank you, Your Honor.

21          Counsel, members of the jury, before I start, I

22  want to introduce someone that you missed on Friday, and

23  that's our colleague Daryl Sam, who did get his daughter

24  successfully married off, and he'll be here for the balance

25  of the trial.

```
 1              I'm going to start by saying something that I
 2     don't recall saying in opening statements before and it
 3     might come as a surprise to some of you, but one of the
 4     parting remarks that counsel made in his opening is that in
 5     a couple of weeks, one of his associates is going to get up
 6     and ask you to find Aaron Shamo guilty on these counts.
 7     We're going to agree with some of that.  We think that the
 8     evidence will support that he's guilty of some of these
 9     counts.  That might come as a surprise.
10              We think the evidence will support the notion that
11     he's guilty of many of these counts, that he was involved in
12     this drug ring, that he participated in the drug ring, and
13     that he should be held responsible for that.  And he has
14     maintained that from the beginning and will maintain that in
15     the next three weeks before you.
16              There are a couple of things -- Elizabeth, if you
17     could help me.  You're ahead of me -- that we don't agree
18     with in terms of the government, and when you listen to the
19     evidence, listen closely to some of these concepts because
20     Aaron Shamo did not cause the death or create the death of
21     another individual.  Aaron Shamo is not, as the evidence
22     will show, the kingpin of a large drug organization.  And
23     the government will no doubt prance this diagram in front of
24     you repeatedly during this trial, and we invite that.  In
25     fact, we would ask that you look at it in a little bit
```

1   different way.

2          Count 1 of the information that you'll hear is the

3   one that is sort of a kingpin count, if you will.  It

4   requires that the government show that he was a leader, that

5   he was a mastermind, that he was the kingpin, if you will,

6   of this organization.  And that's what they intend to prove

7   is, based on their understanding of what's going on, that

8   he's at the top and all these other folks down here at the

9   bottom, they work for Aaron Shamo.

10          Counsel has indicated that he's going to call some

11   witnesses, most importantly, and maybe in the beginning

12   here, Drew Crandall.  When you hear from Drew Crandall, here

13   are some things you're going to learn, that he worked for

14   eBay customer service in IT; that he has a background in

15   computers and IT support; that he studied mechanical

16   engineering in college; that at the time after that he was

17   in debt to the tune of $45,000; and that while he was in

18   college, he began selling his own prescription medication to

19   individuals, his own Adderall; that he got involved in the

20   manufacturing and shipping of pills to make money to pay for

21   his significant college debt.

22          He helped establish the online marketplace and

23   shipping procedures for this group.  He's knowledgeable in

24   Bitcoin.  He took the proceeds from drug sales and traveled

25   around the world with his fiancee.  He trained Luke Paz to

1     act as his replacement, and that he was still receiving,

2     accessing, and using proceeds from this as late as

3     April 2017.  He was arrested in May 2017 when he returned to

4     get married in Hawaii.  What's the significance of that?

5             The significance of that, members of the jury, as

6     you'll hear, is that in April of 2017, Aaron Shamo had been

7     in jail for five months.  He's there today.  He'll sleep

8     there tonight.  And he's been there every day since

9     November 22nd of 2016, every day.

10            When Drew Crandall is receiving access and using

11    proceeds in April 2017, the evidence will show he certainly

12    wasn't doing it with the direction, or help, or assistance

13    of Aaron Shamo because he was in the Weber County Jail.

14    When Drew Crandall was arrested in May of 2017 to get

15    married in Hawaii, Aaron Shamo was in the Weber County Jail,

16    not directing anything or anyone.

17            Drew Crandall, you will learn, members of the

18    jury, through his own testimony and those of the agents,

19    lied when he was interviewed by the agents about his

20    involvement, lied about his assets to the investigators when

21    he was questioned about what he had done here.

22            You'll learn a concept that you've probably all

23    understood since high school, which is plea bargaining.

24    You'll learn that Mr. Crandall plea bargained this case.  He

25    pled guilty to three counts.  Aaron Shamo, as you know,

1    members of the jury, is charged with 13.  He pled to

2    conspiracy to distribute Fentanyl, Alprazolam, and

3    conspiracy to commit money laundering.  He was never charged

4    with the continuing criminal enterprise count, the kingpin

5    count, if you will.  And he agreed to plead guilty in order

6    to avoid any risk of being convicted of a death resulting

7    count.

8              Counsel told you that you'll be hearing from Luke

9    Paz, and that's true, and here's what you'll learn from Luke

10   Paz.  He became friends with Aaron Shamo through a group

11   called Mario Kart 64, and you'll learn what that means, and

12   basically replaced Drew Crandall while he was traipsing

13   around the world with his girlfriend.  He ordered and

14   received a pill press.  He developed the formula for making

15   the Fentanyl based drugs and kept it in his possession.  He

16   kept a ledger of his manufacturing of Fentanyl based drugs,

17   and paid himself with Bitcoin and currency exchanges -- the

18   organized Bitcoin currency exchanges.  He was arrested in

19   April of 2018, after Aaron Shamo had been in custody for

20   over 18 months.  Luke Paz will come in probably through that

21   back door.  He hasn't spent a day in jail.  And when he was

22   arrested, he had $800,000 in cash and 32 and change in

23   Bitcoin.

24             You'll learn that Luke Paz, when he was questioned

25   by investigators for the government, lied about his

1   involvement, lied about his assets.  And he was allowed to

2   plead guilty to two counts of knowing and intentional

3   adulteration of drugs while held for sale, Fentanyl, and

4   conspiracy to commit laundering.  He was never charged with

5   a serious death resulting count.  He was never charged with

6   a serious kingpin count, the continuing criminal enterprise.

7          Counsel told you that you'll hear from Sean Gygi.

8   That's true.  But here's what you'll hear about and from

9   Sean Gygi, that he worked at eBay with Drew Crandall and

10  Aaron.  He delivered pills to Ms. Bustin and Ms. Tonge --

11  who we'll talk about in just a minute -- for packaging.  He

12  received pills from those same two women and delivered them

13  to different addresses.  He received at least $4,000 a

14  month, had packages and drug manufacturing materials

15  delivered to his home on multiple occasions, and made $300

16  for every package delivered to his home.

17         What did he do?  He lied to the investigators when

18  he was questioned.  He lied about his assets.  He lied about

19  his involvement in this enterprise.  And he was allowed to

20  plead guilty.  He was allowed to plea bargain to conspiracy

21  to distribute Fentanyl, Alprazolam, aiding and abetting in

22  the importation of a controlled substance, and the use of

23  mail in furtherance of a drug offense.  He too, like

24  everyone else, except Aaron Shamo, was never charged with a

25  continuing criminal enterprise count, and he agreed to plead

1   guilty to avoid the death resulting count.

2          Counsel told you about Mario Noble, who you will

3   also hear from.  Mario Noble has got a little more

4   involvement in some things.  He's trying to run his own

5   business.  He became involved in this organization through

6   Drew Crandall's friend, Sasha.  He opened his own

7   marketplace on the Internet to sell candy laced with drugs.

8   He tried online marketplace of his own, was making at least

9   $3,000 a month in salary, had access to the entire

10  Pharma-Master page on AlphaBay, and dealt with every aspect

11  of customer service.  He had the ability to manage money

12  coming and going from the Pharma-Master account and dictated

13  his own hours and schedule.

14          What did he get?  Conspiracy to distribute

15  Fentanyl and Alprazolam.  Never charged as a leader,

16  organizer.  Agreed to plead guilty to avoid the death

17  resulting count.

18          Ms. Bustin and Ms. Tonge, you've heard quite a bit

19  about them.  You'll see them all on this chart here.  I

20  won't go through every one.  They also worked at eBay with

21  Drew and Aaron.  They packaged and prepared drugs for

22  shipping.  They made their own schedule.  They requested

23  more jobs and money on multiple occasions.  They made at

24  least $2,000 a month and upwards of $3500 a month for

25  packaging.  And when they were arrested, members of the

1   jury, they had 75,000 Fentanyl pills in their home.

2          They were questioned by investigators in this

3   case.  They lied about their involvement.  They lied about

4   their assets.  They pled guilty to conspiracy to distribute

5   Fentanyl, Alprazolam, possession of Fentanyl with the intent

6   to distribute, the use of the U.S. Mail in furtherance of a

7   drug trafficking offense, and conspiracy to commit money

8   laundering.  Again, they were never charged with a

9   continuing criminal enterprise, leadership role, and they

10  agreed to plead guilty to avoid the death resulting count.

11          Jessica Gleave, offered full immunity from any

12  future prosecution.  Nothing.  Pled guilty to nothing.

13          Ryan Jensen, who you'll hear from today, offered

14  full immunity from any future prosecution.

15          Although in a criminal case in America the

16  defendant doesn't need to testify, you'll hear from Aaron.

17  You'll hear from his family members.  And you'll hear from

18  his -- by family members, I mean his mother and sister.  And

19  here's what you'll learn about Aaron, that he's learning

20  disabled, he had severe ADHD, and a processing disorder;

21  that he was roommates after college with Drew Crandall; and

22  that in college, like Drew Crandall, he began selling his

23  own prescription medication along with Drew.

24          He was arrested November 22nd, 2016, awaiting

25  trial, and has been sitting in jail since that day.  Longer

1    than all the other people in this chart combined.

2         When he gets arrested, there are no Fentanyl pills

3    found in his home.  Never in possession of the formula for

4    possessing Fentanyl.  Importantly, members of the jury, he

5    was never interviewed by the investigators in this case.

6    And as you'll see, some of the co-defendants and some of the

7    people that will be testifying -- as you'll hear I should

8    say, will tell you that Aaron just wasn't capable of

9    organizing or running an organization like this without

10   substantial assistance.

11        The government, early on in this case, November of

12   2016, created this chart.  It's about a three-year-old

13   chart.  And their argument this morning is that Aaron

14   founded and led this organization.  Their argument this

15   morning and their statements are that he was the leader of

16   this.  And counsel said Aaron did this, and Aaron directed

17   that, and Aaron did this, and Aaron was in charge of that.

18   But when you listen to the evidence, you'll find that that's

19   not the case.  When you hear the witnesses testify, you will

20   see that that was not the case.

21        It's an unfortunate role that we play as defense

22   attorneys in a criminal case because we have to wait until

23   the government puts his case on.  That's just the way it

24   works in America.  It's worked for hundreds of years.  But I

25   would ask you, members of the jury, to withhold judgment on

this case until you've heard the entirety of the evidence.
I would ask you to not form an opinion today or tomorrow,
certainly not based on the statements of counsel this
morning, but to wait until you hear all the evidence.

Wait until you see the big picture -- which has
now disappeared -- because what you'll see is that Luke Paz
pressed 480,000 Fentanyl pills.  He has not spent any time
in jail.  He cut a plea deal.

Drew Crandall, still benefiting from drug sales,
as I indicated, as late as April 2017, he cut a plea deal.

Mario Noble started his own drug marketplace,
which failed.  He's not in jail.  He cut a deal.

Ms. Tonge, found with nearly 75,000 Fentanyl
pills, she's not in jail.  She cut a deal, as did her
associate, Ms. Bustin -- by the way, I have their names
backwards here -- who also cut a deal.  Never went to jail.

Mr. Gygi derives substantial income from
importation and shipment of illegal narcotics.  Not in jail.
Middleman between multiple parties.  Not in jail.  Cut a
plea deal.

The only person on trial, members of the jury, is
Aaron Shamo.  The only person who is left standing, if you
will, is Aaron Shamo.  The reason for that, as you'll see,
is that the government decided early on that he was somehow
the kingpin of this organization and his head needed to

1    roll.

2           We've told you earlier -- I've told you earlier

3    that he will admit to his conduct here, and we will agree

4    with Mr. Stejskal in our closing that he should be convicted

5    of some of these counts, but not all of them.  He didn't

6    have a plea deal, and he was never interviewed by

7    investigators.

8           This is a trial that is scheduled to go about

9    three or four weeks.  I believe it could be a little bit

10   less than that.  I don't think this trial is going to take

11   that long.  I say that because Aaron's owning what he did.

12   And we can flash all the styrofoam or plastic containers in

13   front of you all and bounce them around, but we know what

14   they are.  We'll agree to what they are, and we'll agree to

15   how they came into possession of certain individuals.  We'll

16   agree how the government got these.  But the evidence will

17   not establish, members of the jury, that Aaron Shamo caused

18   the death of another or that he was the organizer, leader,

19   mastermind of this organization.  Just the opposite.

20          So please keep an open mind.  Keep from forming a

21   final opinion until you hear all the evidence, and that

22   might be a couple of weeks from now.  Remember the

23   instructions that the Judge has given, instructions about

24   the presumption of innocence, because in America, in 2019,

25   an accused is presumed innocent until the government

1    establishes proof beyond a reasonable doubt to each and

2    every element of the offense.

3          Keep in mind, as the Judge instructed you this

4    morning and will instruct you again, that the government

5    carries the burden of proof.  The defense doesn't have to

6    put on any evidence at all, even though we will.  Keep in

7    mind, members of the jury, as the Judge has instructed you

8    and will continue to instruct you, that unless and until you

9    find beyond a reasonable doubt each and every element of

10   those offenses, you have a legal and moral obligation to

11   find Aaron Shamo not guilty.  And at the end of the day, at

12   the end of the month, at the end of the trial, that's what

13   the evidence will show.

14         Thank you.

15         THE COURT:  Thank you, Mr. Skordas.  The

16   government may call its first witness.

17         MR. GADD:  Thank you, Your Honor.  The United

18   States calls Officer Jaime Pimentel.

19         THE COURT:  Come forward and be sworn right here

20   in front of the clerk of the court.

21                    JAIME PIMENTEL,

22          Having been duly sworn, was examined

23               and testified as follows:

24         THE CLERK:  Come up to the witness box.

25         If you could please state your name and spell it

1    the record.

2            THE WITNESS:  Jaime Pimentel.  J-a-i-m-e,

3    P-i-t-e-n-t-e-l.

4            THE COURT:  You may proceed, Mr. Gadd.

5                    DIRECT EXAMINATION

6    BY MR. GADD:

7    Q    Good morning.  How are you?

8    A    Good.

9    Q    Are you prepared to talk this morning about your part

10   in the investigation of a drug package that's linked to this

11   defendant over my shoulder here, Mr. Shamo?

12   A    Yes, I am.

13   Q    Before we do that, I'd like to give the jury just a

14   brief summary of your background and experience.  Can you

15   tell us a little bit about yourself?

16   A    Yes.  I'm a U.S. Customs and Border Protection Officer.

17   I've been doing that for about 18 years, and mainly dealing

18   with the interdiction of parcels that contain everything

19   from counterfeit merchandise to live cobras, and narcotics.

20   We see it all.

21   Q    Where is it that you work?

22   A    I work at the international mail facility in Torrance.

23   It's one of six mail facilities throughout the country where

24   shipments from all over the world arrive.

25   Q    And Torrance, I suspect most know, but Torrance is --

1    A     Los Angeles, California.

2    Q     Let's talk for a minute about a Fentanyl mail package.

3    Do you recall the very first package of Fentanyl from China

4    that you caught?

5    A     I do.

6    Q     Approximately when did you catch it?

7    A     June of 2016.

8    Q     When you caught the package, what did you do?  Can you

9    walk us through the process?

10   A     Yes.  I was actually the lead officer of the mail

11   facility.  My job was to train new officers that were coming

12   into our building and train them on how to find illicit

13   substances and products, utilize the X-ray system.  And in

14   this particular case, the package was traveling through an

15   X-ray system and I saw it, and I pulled it, and I took a

16   couple of minutes to explain to the new officer, hey, look,

17   this is what it looks like.  This is, you know, what we're

18   specifically looking for.

19   Q     I'm going to show you Exhibit 1.02.  And as you're

20   looking at that, we'll look at 1.03 as well.

21         Do you recognize that?

22   A     Yes, I do.

23   Q     What are you looking at there?

24   A     It's a typical mail parcel that arrives from China.

25   It's got a generic label, generic description and

1    declaration.

2    Q     Is that the package we've been talking about, the first

3    one you caught?

4    A     Yes, sir.

5    Q     And then you can see on your screen there a picture.

6    Is that the same thing?

7    A     Yes.

8    Q     So the package and the bag is what you see on the

9    screen?

10   A     Yes, sir.

11   Q     Once you flagged it in the X-ray machine, can you walk

12   us through the process of opening it up and seeing what's

13   inside?

14   A     The most important thing when you're opening a package

15   like this is obviously the safety concern for us.  So

16   secondly would be evidence preservation.  We're not trying

17   to hack into a package so as to not disturb the contents.

18        Once you open it and you just -- in this particular

19   case, it was a white powder in a foil package.  You want to

20   take a really small sample.  So we have a testing area in

21   our facility where we would open up this package

22   specifically.  You are extracting a really small sample,

23   less than a tenth of a gram, and you put it onto a machine

24   that analyzes the actual chemical.

25        We take that data and we send it to our lab chemists,

1    and they are the ones that reply to us via e-mail, hey, this

2    substance is said to contain a presumptive for Fentanyl.

3    Q    This was your first time catching Fentanyl, correct?

4    A    No.  I've caught it before, but this was specifically

5    the first time that I've caught it from China in this

6    fashion.  Normally you would see ampoules in a Fentanyl

7    liquid.  Those would be coming out of Eastern Europe.

8    Q    And thank you for clarifying.  The first time on the

9    powder?

10   A    Yes.

11   Q    Once you were notified that it was Fentanyl, did you

12   contact Homeland Security Investigations?

13   A    Yes.  I work closely with Homeland Security.  They're

14   our investigative agency.  U.S. Customs and Border

15   Protection is an interdiction agency.  Homeland Security

16   takes over the investigation once we discover, in this

17   particular case, a narcotic.  We inform them of what we

18   have, and then they take over the investigation from there.

19   Q    In this case the drugs, they went to the DEA lab,

20   correct?  The package like this, Exhibit 102, is that what

21   you turned over to Homeland Security Investigations?

22   A    Yes.

23          MR. GADD:  If I could have just one moment.

24   BY MR. GADD:

25   Q    So I can clarify the record, we've been looking at

1  photos here.  That's 1.03.

2      And then the last question.  You indicated you caught

3  this package in June.  Was it June 23rd, 2016?

4  A    Yes, sir.

5          MR. GADD:  No further questions.  Thanks.

6          THE COURT:  According to my records, these were

7  previously admitted into evidence, correct?

8          MR. GADD:  Yes, sir.

9          THE COURT:  You may cross-examine.

10         MS. BECKETT:  We have no questions for this

11  witness, Your Honor.

12         THE COURT:  Thank you, Ms. Beckett.

13         You may step down.

14         THE COURT:  Should he be excused, then?

15         MR. GADD:  Please, yes.

16         THE COURT:  You can come or go as you please.

17  You're excused.

18         You may call your next witness.

19         MR. GADD:  Your Honor, the United States calls

20  Drug Enforcement Administration Special Agent Christopher

21  Amidan.

22         THE COURT:  Come forward and be sworn, please,

23  right here in front of the clerk of court.

24  //

25  //

```
 1                    CHRISTOPHER AMIDAN,

 2               Having been duly sworn, was examined

 3                   and testified as follows:

 4            THE CLERK:  If you will state your name and spell

 5   it for the record.

 6            THE WITNESS:  My name is Chris Amidan.  C-h-r-i-s,

 7   A-m-i-d-a-n.

 8            THE COURT:  Go ahead, Mr. Gadd.

 9                     DIRECT EXAMINATION

10   BY MR. GADD:

11   Q    Good morning.

12   A    Good morning.

13   Q    Thank you for coming up.

14   A    Anytime.

15   Q    Are you prepared to testify about your part in the

16   investigation of drug importing activities of this defendant

17   over my shoulder, Mr. Aaron Shamo?

18   A    Yes, I am.

19   Q    Before we do that, I want to just take a moment and

20   give the jury a summary of your background and experience.

21   Can you tell us a little bit about yourself?

22   A    Yes.  I'm a special agent with the United States Drug

23   Enforcement Administration.  Prior to that -- I grew up

24   here.  I've spent most of my life here in Utah.

25        In approximately 2009, February, I attended the DEA
```

1    Academy, where I was trained in drug trafficking patterns,

2    United States drug law, drug identification, surveillance,

3    countersurveillance techniques, and special weapons and

4    tactics training.  From there, I came back here, spent

5    approximately 90 days, I believe.

6         And then from there, I was stationed at the Los Angeles

7    field division in Los Angeles, California, where I spent

8    approximately eight years.  There we did anything from

9    simple narcotics cases to gang cases, to Title III

10   conspiracy investigations.  And then I spent eight years

11   there.

12        And my last two years, I've been stationed at the

13   Las Vegas district office in Las Vegas, Nevada, where I'm

14   currently stationed.

15             THE COURT:  Mr. Gadd, excuse me.

16             Ms. Beckett, I called you Ms. Bennett.  It's

17   Ms. Beckett, and I'm sorry.

18             MS. BECKETT:  Not a problem, Your Honor.

19             THE COURT:  Maybe I was thinking of Pride and

20   Prejudice, or something.  I don't know.

21             Pardon me.  Go ahead.

22   BY MR. GADD:

23   Q    Let's talk for just a minute now about a Fentanyl

24   package that was addressed to Ryan Jensen.  At some point

25   were you asked by DEA agents up here to go pick up drugs

```
 1    from the Department of Homeland Security?

 2    A    Yes, I was.

 3    Q    Can you tell us a little bit about that?

 4    A    Yeah.  I believe it was September 28th, 2016, I

 5    received a call -- I think it was TFO Dennis Power, if I

 6    remember correctly -- asking if I could go down to Long

 7    Beach and retrieve a Fentanyl -- a suspected Fentanyl

 8    package for them.

 9    Q    Can we look at Exhibit 1.00.

10         Do you see that there on the screen?

11    A    Yes, I do.

12    Q    You've had a chance to review this before, correct?

13    A    Yes, I did.

14    Q    Your name is on the tag right there?

15    A    Yes, it is.

16    Q    Is this the Fentanyl that you picked up?

17    A    Yes, it is.

18    Q    Can you talk to us just briefly about picking up the

19    Fentanyl and then what you did with it.

20    A    Yep.  So on that day, myself and Special Agent Rob

21    Blair went down to the Long Beach facility and met with

22    Special Agent Abosi, and CBP Officer Todd Erickson.  At that

23    point they gave us the -- they transferred their evidence

24    bag with the suspected exhibit inside, the suspected

25    Fentanyl.  And at that same time there, myself and Rob
```

1    Blair, we placed it within two evidence bags for safety

2    reasons.  That's why we did two.

3         Shortly after that, we transported it to the Los

4    Angeles field division where we packaged it for shipping.

5    And then later that day myself and my group supervisor

6    shipped it to, via FedEx, the western lab, which I believe

7    is in San Francisco.

8    Q    Or just outside, right?

9    A    Yeah, I think so.

10   Q    So the Fentanyl you picked up, you indicated you double

11   bagged it.  Had you had much experience with Fentanyl prior

12   to this?

13   A    We had not.  We'd been hearing about it a lot on the

14   east coast, like the northeast, but that was my first

15   experience with it.

16   Q    Were you worried?

17   A    A little bit, not too much.  I trusted if it was bagged

18   twice, I was safe.

19   Q    Did you talk to the chemists at the lab the processes

20   to keep it safe?

21   A    Yes.  They just said don't let it get airborne.

22   Q    And maybe just so everyone is on the same page, we have

23   an agreement that we're not bringing any powder into the

24   courtroom.  That's why you're looking at this picture.

25   A    Correct.

 1            MR. GADD:  Nothing further for this witness.

 2  Thank you.

 3            THE COURT:  Thank you, Mr. Gadd.

 4            Any cross-examination?

 5            MR. SAM:  We have nothing for this witness,

 6  Your Honor.

 7            THE COURT:  Thank you, Mr. Sam.

 8            You may step down, and you're excused.

 9            MR. SAM:  Thank you.

10            THE COURT:  You may call your next witness.

11            MR. GADD:  Your Honor, the United States calls

12  Ryan Jensen.

13            THE COURT:  Come forward and be sworn, please,

14  right up here in front of the clerk of court.

15            Again, I assume the references to exhibits, that

16  they are already previously admitted unless there is some

17  objection that comes up.

18            MR. GADD:  Correct.

19            THE COURT:  Thank you.

20                       RYAN JENSEN,

21           Having been duly sworn, was examined

22                 and testified as follows:

23            THE CLERK:  If you'll just come around to the

24  witness box.

25            Please state your name and spell it for the

1    record.

2             THE WITNESS:  Ryan Jensen.  R-y-a-n, J-e-n-s-e-n.

3             THE COURT:  You may proceed, Mr. Gadd.

4                          DIRECT EXAMINATION

5    BY MR. GADD:

6    Q     Good morning.

7    A     Good morning.

8    Q     Thank you for coming.

9          There's water there.  Tissues, only if you need to blow

10   your nose.  And if at any point you need a break, just let

11   me know, okay?

12   A     Okay.

13   Q     Are you, Mr. Jensen, prepared to testify about your

14   part in the investigation of a drug package that was linked

15   to this defendant right here, Mr. Shamo?

16   A     Yes, I am.

17   Q     Before we do that, could you tell us a little bit about

18   yourself?

19   A     Yeah.  My name is Ryan Jensen.  I'm 27 years old.  I

20   grew up in Utah most of my life.  Moved around a couple of

21   times, but ultimately stayed in Utah.  Probably will the

22   rest of my life.

23         I love the outdoors, pretty adventurous.  Anything that

24   has an engine, you can find me doing that.

25   Q     Thanks.

```
1          Do you know Mr. Shamo?

2    A     I do.

3    Q     How did you meet?

4    A     In December of 2015, I believe, I met through a mutual

5    friend.  We went to Park City Live a couple of times, a

6    couple of concerts, and since then we became friends.

7    Q     So when you think back to 2016, can you describe your

8    relationship with Mr. Shamo in terms of how much was

9    friendship and how much was business?

10   A     Yeah.  Just friendship.  We went to Vegas, went to bars

11   together, boating.  And as far as business goes, it was just

12   more a couple of packages were sent to my house, and that

13   was it.  But despite that, the majority of it was just

14   hanging out.

15   Q     Let's talk for a minute about packages and specifically

16   how you got involved.  So you indicated you received

17   packages.  Was that on Mr. Shamo's behalf?

18   A     Yes.

19   Q     How did you first get involved?

20   A     I believe after a time in Vegas -- we had spent quite a

21   bit of money, and I said I don't have that much money to be

22   able to afford those things.  And he said there's a way you

23   can make money.  I can just send a couple packages to your

24   house, pay you 200 bucks, and I was like, oh, sure, sounds

25   good.
```

1    Q    You mentioned this briefly, but let's now talk
2    specifically about packages.  How many packages do you
3    remember receiving?
4    A    I remember receiving packages on two separate
5    occasions.
6    Q    And on those occasions, how many packages total?
7    A    Maybe three.
8    Q    I want to show you Exhibit 1.03, and that's going to
9    come up on that screen in front of you.
10       This is the package that we caught on its way to you,
11   and I want to ask you some questions about it.
12       Your other packages, the ones that we didn't catch, did
13   they look like this one?
14   A    Yes, they did.
15   Q    They had your name on it?
16   A    Yes.  The same from person.  It seemed pretty similar,
17   yeah.
18   Q    Okay.  So you mentioned the from.  Were those other
19   packages from China, do you remember?
20   A    Yes.
21   Q    And that's your name and your address at the time,
22   correct?
23   A    Yes, it is.
24   Q    Did the amount you received for the packages, did it
25   change at all or was it constant every time?

1    A    Constant.

2    Q    When you got a package in, where would you exchange it

3    with Mr. Shamo?

4    A    His house.

5    Q    Did Mr. Shamo ever tell you what was inside of the

6    packages?

7    A    Nope.  He said never to open the boxes.

8    Q    Was anyone ever with Mr. Shamo when you'd drop off the

9    packages?

10   A    Yeah, Luke Paz.

11   Q    On more than one occasion?

12   A    Yeah.

13   Q    Did you think Luke Paz was involved in this?

14   A    No.

15   Q    Did you also order supplies online for Mr. Shamo?

16   A    Yes, I did.

17   Q    When you made that order, where were you?

18   A    At my house.

19   Q    Did he take you onto a website?

20   A    He told me to go to a website.  He gave me a website to

21   go to.

22   Q    And where was he when you were making the order?

23   A    Not with me.  I don't know where he was.

24   Q    He told you what he was looking for?

25   A    Yeah.

1    Q    And then did you pay for those ingredients you were

2    buying?

3    A    Yes, I did.

4    Q    Did he reimburse you?

5    A    Yes, he did.

6    Q    And paid you for doing it?

7    A    Yep.

8    Q    Let's talk for a minute not about your house but about

9    his house, Mr. Shamo's residence.  Have you ever been to

10   Mr. Shamo's residence on Titian Way in Cottonwood Heights?

11   A    Yes, I have.

12   Q    How often would you say you went there?

13   A    Pretty frequently for maybe four or five, six months.

14   Never more than in his living room or his kitchen.

15           MR. GADD:  Can we look at 1703.

16   BY MR. GADD:

17   Q    This document was found inside his house.  Do you

18   recognize it?

19   A    No, I don't.

20   Q    Do you see your name on it in the middle there?

21   A    Yes, I do.

22   Q    Do you think you could have left this document at his

23   house?

24   A    No.  No.

25   Q    If you look up near the top, the shipper or exporter,

1    the Press Club Nutrition dba, or doing business as, Press

2    Club, do you recognize any of those names?

3    A    Yeah.  I think it's similar to the website I purchased

4    it from.  So it could have been in the box when I gave it to

5    him.

6    Q    And then if we can zoom out for just a moment.  Down at

7    the bottom half where it says description -- now at the top

8    of your screen -- excipient microcrystalline cellulose.  Do

9    you know what microcrystalline cellulose is?

10   A    No.

11   Q    Did Mr. Shamo ever tell you he was pressing pills?

12   A    No, he never told me he was pressing pills, but I

13   suspected it was more like MDMA, Ecstasy.

14   Q    You say MDMA.  Is that methylenedioxymethamphetamine?

15   A    I think.

16   Q    And you said Ecstasy.  That's a street name for it,

17   right?

18   A    Yeah.

19   Q    As other street names, like Molly?

20   A    Molly or Ecstasy.

21   Q    Did Mr. Shamo ever tell you he was pressing pills with

22   Fentanyl?

23   A    No.  I didn't know what it was actually.

24   Q    Now let's talk for a minute about a search warrant that

25   was executed at your residence.  So we'll change gears just

1    a little bit.

2         You had been receiving a few packages, and then a

3    package didn't show up in the mail, right?

4    A    Yeah.

5    Q    Did you alert Mr. Shamo when that package didn't show

6    up?

7    A    I don't remember too well.  I remember, I think,

8    something didn't show up and I said, hey, box didn't show

9    up, and he said don't worry about it.  It happens.

10   Q    November 1st, 2016, were you stopped while you were

11   driving your vehicle?

12   A    I was, early in the morning going to work.

13   Q    And you met some agents who told you they were about to

14   execute a search warrant at your residence, correct?

15   A    Yeah.

16   Q    You sat down and spoke with agents that day, right?

17   A    I did.

18   Q    Were you honest with them?

19   A    I was.

20   Q    Did you tell them about Mr. Shamo?

21   A    I did.

22   Q    About your arrangement with him?

23   A    Yep.

24   Q    From that day until now, have you kept in contact with

25   the agents?

1  A     I have.

2  Q     Have you kept being honest?

3  A     Yes.

4  Q     Let's look at 2303.  Do you recognize this?

5  A     I do.

6  Q     This is an immunity agreement, correct?

7  A     Yes.

8  Q     In this agreement the United States has promised not to

9  use your testimony today against you in a future proceeding,

10 correct?

11 A     Correct.

12 Q     And you agree to tell the truth?

13 A     Yes.

14 Q     Your attorney has also been told that as of now there

15 are no plans to seek charges against you for the package

16 that came in your name?

17 A     Correct.

18 Q     There's no other deals, backdoor deals, nothing like

19 that, right?

20 A     No.

21 Q     Okay.  Now let's talk for just a minute about maybe the

22 harder questions.

23        Did you suspect the packages contained drugs?

24 A     I suspected they did, but I was never told they did.

25 Q     And why did you help Aaron Shamo?

 1   A    Two, 300 bucks.  I asked him if they contained anything

 2   illegal.  He said no.  Though I may have suspected it, two

 3   or $300 bucks, being sent to my house, easy money.

 4           MR. GADD:  Your Honor, I have no further questions

 5   at this time.

 6           THE COURT:  Thank you, Mr. Gadd.

 7           You may cross-examine, Mr. Skordas.

 8           MR. SKORDAS:  Yvette, could you get us 1.03 again.

 9   please.

10                       CROSS-EXAMINATION

11   BY MR. SKORDAS:

12   Q    Mr. Jensen, you testified previously that that was a

13   package that you didn't receive, correct?

14   A    Correct.

15   Q    But you had previously received similar packages?

16   A    Correct.

17   Q    And you didn't open those packages?

18   A    No.

19   Q    You have no idea what was inside those packages --

20   A    No.

21   Q    -- as you sit here today?

22   A    Correct.

23   Q    How many prior packages do you think you received?

24   A    Maybe three.

25   Q    And you got $200 for each one?

1    A     Yeah.

2    Q     So you believe you got about $600?

3    A     Yep.

4    Q     In what form?

5    A     Cash.

6    Q     So you think that your involvement in this was three

7    packages and $600.  Does that seem right?

8    A     Correct.

9    Q     And not once did you look at anything to see what was

10   in those packages?

11   A     No.

12   Q     This package here looks like it's from some location in

13   China.  Is that consistent with what the other packages were

14   or did you look that close?

15   A     I believe so.  I didn't -- I don't have a perfect

16   memory of it, but I believe that's pretty similar.

17            MR. SKORDAS:  And, again, Yvette, if you could

18   turn to 2303 for just a minute.

19   BY MR. SKORDAS:

20   Q     Mr. Jensen, at some point early in these proceedings

21   you engaged a lawyer, correct?

22   A     Correct.

23   Q     Mr. David Jordan?

24   A     Correct.

25   Q     And you and David Jordan came to an agreement with the

1   government that if you testified today, you wouldn't be

2   prosecuted, correct?

3   A    Correct.

4   Q    And this agreement looks to be dated June of this year.

5   Does that seem right?

6   A    Yes.

7           MR. SKORDAS:  And, Yvette, if you could turn to

8   the second page of that.

9   BY MR. SKORDAS:

10  Q    It looks like it was, in fact, dated just like a week

11  or so ago.  August, does that seem right?

12  A    Yeah.  That's when I first signed it.

13  Q    That's when you first signed it?

14  A    So that's when I signed it officially.

15  Q    But you had been working with the government prior to

16  that?

17  A    Correct.

18  Q    And it's your understanding that so as long as you

19  testify in court today, you will never be prosecuted for

20  what you did, correct?

21  A    For my testimony, correct.

22  Q    And, in fact, you haven't been prosecuted for anything?

23  A    Correct.

24  Q    Never spent a minute in jail?

25  A    No.

1    Q    Never spent a second in handcuffs?

2    A    No.

3    Q    Did you give a statement early on back in October or

4    November of 2016 to the government when this package didn't

5    arrive at your house?

6    A    Yes, I did.

7    Q    And have you continued to work with them since that

8    time?

9    A    Yes, I have.

10   Q    But you didn't have an agreement with them until a week

11   ago?

12   A    It actually -- I believe December of last year, working

13   with Michael Gadd, he had told me they'd work an agreement

14   with me.  And then I engaged a lawyer in June to make

15   everything official, just to make sure I know what I'm

16   doing.  But this has been in the works for a while.

17   Q    Because you've been working with the government for a

18   while?

19   A    Correct.

20   Q    In fact, you've been working with the government for

21   almost three years now?

22   A    Yes.

23   Q    And met with their agents and given them information in

24   exchange for you not being prosecuted, correct?

25   A    Correct.

1           MR. SKORDAS:  That's all I have, Your Honor.

2           THE COURT:  Thank you.

3           Any redirect?

4           MR. GADD:  Just very briefly.

5                     REDIRECT EXAMINATION

6    BY MR. GADD:

7    Q    When you first confessed and talked to the agents,

8    there was no prosecutor around, right?

9    A    No.

10   Q    Just you and the agents.  No deal, then?

11   A    No.

12   Q    But you still told the truth?

13   A    Yeah.  There was no deal.  I didn't even know the deal

14   was coming until December or so.

15   Q    And you were encouraged to hire an attorney so that you

16   could make that decision, correct?

17   A    Yeah.

18           MR. GADD:  Nothing further.

19           THE COURT:  Thank you.

20           Any recross?

21           MR. SKORDAS:  Just briefly.

22                     RECROSS-EXAMINATION

23   BY MR. SKORDAS:

24   Q    By deal, you mean you're not going to get prosecuted,

25   correct?

1   A    That's my understanding through that deal.

2   Q    But you understood that deal prior to June 19th of this

3   year, correct?

4   A    Not in its entirety.  Like I didn't really know what --

5   interpreted what it meant.

6   Q    And you knew that you weren't going to get prosecuted

7   back in December of 2018, correct?

8   A    I didn't know.  I didn't entirely know, no.  I had

9   never seen this agreement until June.

10  Q    That's not what I asked you.  My question was in your

11  conversations with the agents, you were told -- and you

12  asked -- that you'd not be prosecuted, correct?

13  A    I did ask that, yes.

14  Q    It wasn't the first time it showed up suddenly in June

15  of this year?

16  A    Correct.

17          MR. SKORDAS:  That's all I have, Your Honor.

18          THE COURT:  Thank you.

19          You may step down, Mr. Jensen.

20          I assume he can be excused?

21          MR. GADD:  Please.

22          MR. SKORDAS:  No objection.

23          THE COURT:  Thank you.

24          You may call your next witness.

25          MR. GADD:  Your Honor, could we take just a moment

1    to get them to arrive.  We're moving a little faster than we

2    anticipated.

3            THE COURT:  It's too early for the quick lunch

4    break.  When do you expect them?

5            MR. GADD:  They've arrived.

6            THE COURT:  Good.

7            MR. GADD:  Your Honor, the United States calls

8    Sean Gygi.

9            THE COURT:  Come forward and be sworn, please,

10   right up here in front of the clerk of the court.

11                        SEAN GYGI,

12           Having been duly sworn, was examined

13                   and testified as follows:

14           THE CLERK:  Come around to the witness box here.

15           Please state your name and spell it for the

16   record.

17           THE WITNESS:  Sean Michael Gygi.  S-e-a-n,

18   M-i-c-h-a-e-l, G-y-g-i.

19           THE COURT:  You may proceed, Mr. Gadd.

20           MR. GADD:  Thank you, sir.

21           I pulled that water away not because I don't want

22   you to have water, but because it was the prior witness's.

23   If you need it, it's just on your right.

24   //

25   //

```
 1                        DIRECT EXAMINATION
 2   BY MR. GADD:
 3   Q    Mr. Gygi, are you prepared to testify about your part
 4   in the investigation of drug packages that are linked to
 5   this defendant, Mr. Shamo?
 6   A    Yes, I am.
 7   Q    Before we do that, could you tell us a little bit about
 8   yourself?
 9   A    I can.  My name is Sean Gygi, as I stated.  I've lived
10   in Utah about 15 years.  Love the place.  Currently work as
11   a workforce management analyst for a call center in Sandy.
12   And no kids, but love dogs.
13   Q    Thanks.
14        Do you know Mr. Shamo?
15   A    I do.
16   Q    What was your relationship like with Mr. Shamo in 2016?
17   A    In 2016, that was the time where we were both involved
18   in the criminal enterprise that's been described.
19   Q    Did you have a social relationship at all or was it all
20   work?
21   A    We definitely had a social relationship as well.  It
22   was to the effect of going out to concerts and clubs
23   together, occasionally hanging out together, although not as
24   much in 2016 as 2015.
25   Q    I'm going to show you a chart.  I'm going to put it up
```

1    next to you.

2              MR. GADD:   And then could we look at the

3    organization chart on the screen as well.

4    BY MR. GADD:

5    Q    When you look at this chart, 17.06, will you tell us

6    who else you knew at the time, 2015, 2016?

7    A    Yes.   I definitely new Mario Noble.   I recognize Luke

8    Paz, although I didn't interact with him on very many

9    occasions.   Drew Crandall, Tonge and Bustin, and Jessica

10   Frankham.

11   Q    And we won't talk about Ms. Frankham much, but let's

12   just briefly cover it.   How did you know her?

13   A    She is my girlfriend.   I've known her about five years

14   now.

15   Q    Did she also receive packages from Mr. Shamo?

16   A    She did.

17   Q    And did he pay her or pay you for those packages?

18   A    He paid her.

19   Q    Let's talk for a minute about how you were recruited.

20   Do you recall when you first started accepting packages on

21   Mr. Shamo's behalf?

22   A    I believe it would have been in 2015.

23   Q    And how did you get involved?

24   A    At first it was -- it seemed to be fairly innocent,

25   nothing to the effect of what it ended up being.

1    Specifically was asked if I was okay receiving packages that
2    would be addressed to myself every once in a while.  It
3    wasn't described what would be in them, but I understood
4    that it wasn't exactly legal.
5    Q    Thinking back, how many packages do you think you
6    received from Mr. Shamo?
7    A    It's hard to say for sure.  I had estimated that it was
8    probably in the range of 30 to 50 packages overall.
9    Q    Let's talk about one of those packages.
10                MR. GADD:  Can we look at 2.03.
11   BY MR. GADD:
12   Q    Can you see that there?
13   A    I can.
14   Q    I'm also going to show you 2.02.
15        Now the jurors can't see the box there, 2.02, very
16   well.  Can you explain what it is that's inside that bag?
17   A    Yes.  It's what I would consider to be a normal postal
18   package.  It's very obviously addressed from China to
19   myself.
20   Q    The box and the bag, is that what we're looking at on
21   the screen in front of you?
22   A    Yes.
23   Q    It has your name on it?
24   A    That's correct.
25   Q    And your address, at least at the time?

1   A    Yes, that's correct.

2   Q    The other packages you received, somewhere between 30

3   and 50, did they look like this?

4   A    They weren't all in cardboard boxes.  Some of them were

5   in bubble wrapped envelopes, but they were all fairly

6   similar in size.

7   Q    You had some indication of what at least a few of those

8   packages had in them, right?

9   A    Not the ones from China.  The ones that were sent

10  domestically before that, I definitely had seen the contents

11  of some of them.

12  Q    So maybe unpack that a little bit for the jury.  Can

13  you talk about the difference between domestic and the ones

14  from China?

15  A    I can.  Prior to late 2015, when Drew Crandall left the

16  country to go on an extended trip, the packages that we had

17  received were -- they were cardboard boxes generally, but

18  they were all addressed from within the United States.  And

19  on -- I can think of at least two to three separate

20  occasions, they were opened in front of me and contained

21  things like marijuana or LSD.

22  Q    Then the change took place, right?  Is that when

23  Mr. Crandall left?

24  A    That's correct.

25  Q    And the packages after he left, what were they like?

```
1    A    They were like the ones sitting in front of me.

2    Q    There was a second package in November of 2016 that was

3    shown to you during questioning, correct?

4    A    That is correct.

5    Q    Let's fill in the story up until that point.   In

6    November of 2016, agents executed a search warrant at your

7    residence, right?

8    A    That is correct.

9    Q    And were you asked to sit down and speak with them?

10   A    Yes.   I was -- I was taken separately to a location

11   downtown, which I believe it was the DEA headquarters here,

12   although I'm not entirely sure.

13   Q    Did it have kind of the curves above the windows?

14   A    That sounds right, yes.

15   Q    You went into the basement?

16   A    I don't think we went into the basement.   It was the

17   first floor.

18   Q    The main floor?

19   A    Yeah.

20   Q    Sure.   And you sat down and you spoke with the agents,

21   right?

22   A    Correct.

23   Q    At some point during that interview, did they ask you

24   if they could look inside a package that they had caught?

25   A    Yes, they did.
```

1  Q    Let's look at 5.03 now.  Then I also want to show you

2  5.02.

3       You've got 5.02 in the bag.  The jurors can't see that

4  one as well, but we've got 503 here up on the screen.  Is

5  this the same package?

6  A    Yes.  They do appear to be the same.

7  Q    And on that package, it's shipped to your name,

8  correct?

9  A    That is correct.

10 Q    And your address at the time?

11 A    That is correct.

12 Q    When a package like this made it to you, it wasn't

13 caught.  When it made it to you, what would you do with it?

14 A    At that point I would inform Shamo that I had received

15 the package and needed to meet up to exchange that for

16 payment.

17 Q    Let's talk for just a minute about payment.  You kind

18 of drew a line when Mr. Crandall left in terms of how the

19 packages changed.  Did payment change?

20 A    Yes, fairly significantly.

21 Q    Tell us how so.

22 A    When Mr. Crandall was involved, I was being paid 50 to

23 $100 per package.  After he left, it wasn't an immediate

24 change, but within, I would say, two months, the payment

25 increased to two to $300 per package.

```
1   Q      How were you paid?

2   A      In cash or through Venmo.

3   Q      When you needed to exchange a package for money, where

4   would you do it?

5   A      Generally at Mr. Shamo's home.

6   Q      And on those 2016 packages, the China packages, did

7   Mr. Shamo ever tell you what was inside?

8   A      No.

9   Q      Was anyone ever with Mr. Shamo when you would exchange

10  packages for money?

11  A      I don't recall specifically, but I don't believe so.

12  Q      Let's talk about the transition that you took from

13  being just a package receiver to more full-time

14  responsibility.  At some point you changed, right?

15  A      That's accurate.

16  Q      What was it that you became?

17  A      I would be -- I guess you could call it a courier or a

18  runner.  I was picking up packages and dropping them off at

19  various post office collection bins.

20  Q      When did you make the change?

21  A      I believe that would have been June or July 2016,

22  sometime around there.

23  Q      Why did you take that additional role?

24  A      I had lost my job earlier that year and I needed money.

25  Q      Did Mr. Shamo pay pretty well?
```

1   A    Yes, very well.

2   Q    How much was he paying you to be a runner?

3   A    $2,000 every other week.

4   Q    Was he on time with his payments?

5   A    I can't really recall a time where he wasn't -- where

6   he was late.

7   Q    So let's talk for a minute about your role as a runner

8   or a courier.  How frequently would you go and pick up

9   packages?

10   A    Five to six nights per week.

11   Q    From whom would you pick up the packages?

12   A    It wasn't -- I didn't know who it was at the time.  It

13   was merely just an address where I would pick up packages

14   from the porch, though I came to know who they were later

15   on.

16   Q    That address, was that in Daybreak?

17   A    Yes, that's correct.

18   Q    And where would you take the packages once you picked

19   them up?

20   A    It's changed each night.  I would determine where they

21   needed to go based on the return addresses on the packages.

22   For example, if the return address was Cottonwood Heights, I

23   would find collection bins or post offices nearby that ZIP

24   code or address.

25   Q    How did you know to do that?

1  A    It was something that had been explained briefly when I

2  began doing this, not specifically how to find the

3  locations, but rather just to -- how to know, roughly, where

4  to go.

5  Q    What was the problem with taking a package that had a

6  Midvale return address and shipping it from Provo?

7  A    I believe the concern there was to obfuscate where the

8  packages were originating.

9  Q    So if it had a Midvale return address, where would you

10 look for the blue collection box?

11 A    Nearby Midvale.

12 Q    I mentioned the blue collection boxes.  You dropped off

13 there, correct?

14 A    That's correct.

15 Q    How about a post office, did you ever go inside?

16 A    Yes.  There came a time where there were packages that

17 were too large to fit in the blue collection bins, and at

18 that point I began using post office lobbies.

19 Q    Did it make you nervous to go inside the post office?

20 A    Absolutely.

21 Q    Why?

22 A    Because I understood -- I understood maybe not what was

23 included, but that it wasn't aboveboard.

24 Q    Let's talk now about cooperating with agents.  There

25 was a turning point where you started cooperating with these

1    agents.  What caused it?

2    A    When I was questioned and had a search warrant served,

3    I answered some questions that day, but was certainly

4    reluctant to tell the whole story.  I went home the night

5    that I had been questioned and really took a long time to

6    think about what the right thing to do was.  And after

7    learning that there was Fentanyl included in these packages,

8    I really understood that I couldn't do anything but put a

9    stop to what had been going on.  People were obviously going

10   to be getting hurt and that wasn't something I was okay

11   with.

12   Q    Did you recognize the name Fentanyl when they said it?

13   A    I did.  I had heard of it before.

14   Q    Up until that point, and I'm talking now about not

15   inbound packages but the ones that you were shipping out,

16   what did you think those packages had in them?

17   A    I was under the impression that they were the same type

18   of things that I had known were included in packages before,

19   marijuana, LSD, Ecstasy, Xanax, that kind of stuff.

20   Q    The following morning, November 18th, did you reach out

21   to the agents that you had interviewed with?

22   A    I did.  It was one of the first things I did waking up

23   that morning.

24   Q    And they met up with you again, right?

25   A    They did, fairly quickly.

1   Q    When you spoke with them that following day,

2   November 18th, did you agree to record a conversation with

3   Mr. Shamo?

4   A    I did, yes.

5   Q    Where did that conversation take place?

6   A    I was in my apartment complex in Mr. Shamo's vehicle, I

7   believe his BMW.

8           MR. GADD:  Could we look at Exhibit 17.01.

9           Let's go ahead and play it once through.

10          Just a moment.  I think our sound might be off.

11          Your Honor, what if we took a quick, five-minute

12   break?  We'll diagnose the sound issue, and there's one

13   other thing I'd like to address with Your Honor.

14          THE COURT:  It's impossible to only take a

15   five-minute break with a jury.  Do you want to address

16   something at side-bar?

17          MR. GADD:  Both.  To fix the sound and also --

18   because the exhibit is the audio recording.  The transcript

19   just helps it.

20          THE COURT:  Let's see if we can get the sound

21   going here.

22          Rule number one with gizmos is if something can go

23   wrong, it will.

24          We could take our second break, which is usually a

25   longer break, bring some food up for the jury.  But it won't

```
 1   be up until 11:30.

 2                MR. SKORDAS:  That might make sense.

 3                THE COURT:  If we break now, we're probably

 4   looking at ten to 12:00.

 5                MR. GADD:  If we could do that, that would be

 6   great.

 7                THE COURT:  Okay.  Let's do that.

 8                MR. GADD:  Great.

 9                (Jury excused)

10                THE COURT:  Did you say you had something you

11   needed to take up?

12                MR. GADD:  Two things.

13                THE COURT:  Do we need to wait for the clerk to

14   get back in?

15                MR. GADD:  Probably.

16                THE COURT:  All right.

17                There she is.

18                Go ahead.

19                MR. GADD:  I think the Court probably caught this

20   as opening statements were going on.  The Court ruled on a

21   motion in limine back in May where we had asked the Court to

22   preclude the defense from charging comparisons between

23   co-defendants.  Much of the defense's opening statement was

24   drawing those comparisons that the Court ruled --

25                THE COURT:  I'm looking at your chart, the chart
```

 1   in your exhibit.  Do you know what I'm talking about?

 2             MR. GADD:  Of the people?

 3             THE COURT:  No.  No.  I'm looking at the chart

 4   about permitted and not permitted.

 5             MR. GADD:  Yes, sir.  Yes, sir.  The filed one.

 6             THE COURT:  Charges permitted.  Charges and

 7   potential sentences for testifying co-conspirators?

 8             MR. GADD:  Yes, sir.

 9             THE COURT:  That's permitted.  What are you saying

10   he shouldn't have done?

11             MR. GADD:  The comparison is pointing out that

12   they're not charged with other crimes, specifically CCE or

13   the death resulting offense, Count 1 and Count 6.

14             THE COURT:  Mr. Skordas.

15             MR. SKORDAS:  We're happy to ask each one of them

16   that individually if that's what it's going to take.

17             THE COURT:  I'm not sure I understand what you're

18   complaining about.

19             MR. GADD:  Yes, sir.  I'll try to be more clear.

20             The Court ruled that they could not draw

21   comparisons between Mr. Shamo, who's charged in Count 1 and

22   Count 6, and the other defendants who are not.  But since

23   those comparisons have been drawn, I'm asking for a curative

24   instruction.  I think we can model it similar to the

25   instruction that we've proposed in the final jury

1    instructions or we tell the jurors now so that they're not

2    laboring under a false impression for the next four weeks,

3    that it's not their role to decide or judge the charges and

4    that they should not draw those comparisons.

5              THE COURT:  Mr. Skordas.

6              MR. SKORDAS:  Your Honor, our understanding was

7    that it was really sentencing comparisons that we were

8    staying away from, but the government can argue whatever it

9    wants.  We were just going through what we believe the facts

10   will be when these individuals each testify.  We're entitled

11   to do that.  I'd be happy to bring all their attorneys in,

12   if that's what you want, but there was a very clear intent

13   by everybody to avoid those two counts.

14             MR. GADD:  The problem there is none of them faced

15   the CCE count.  That's why drawing the comparison is

16   impermissible.

17             THE COURT:  Well, but you can point that out,

18   can't you, on the testimony?

19             MR. GADD:  Yes, certainly.  My request is that we

20   have a short instruction now so that the jury doesn't think

21   for the next four weeks, or when we get to the individual

22   cooperators' testimony, that part of what they are supposed

23   to consider is the grand jury's decision on whom to charge

24   with what or to draw comparisons between co-defendants and

25   what charges the grand jury indicted them on.

1          THE COURT:  In your own chart -- do you know what

2    I'm talking about?  In your own brief --

3          MR. GADD:  Yes, sir.

4          THE COURT:  -- you say permitted, and I agreed

5    with this, charges and potential sentences for testifying

6    co-conspirators for purposes of impeachment.

7          MR. GADD:  Yes, sir.

8          THE COURT:  Isn't that what he did?  Isn't that

9    permitted?

10         MR. GADD:  Yes, that is permitted.  It's the

11   inverse that's not permitted.

12         THE COURT:  Which is what?

13         MR. GADD:  Pointing out what they were not charged

14   with and then drawing comparisons.

15         THE COURT:  I don't know that I ruled on that.

16         MR. GADD:  I would be happy to take a minute this

17   afternoon when court is adjourned and try to put what I'm

18   trying to say in writing and hopefully make it more clear.

19         THE COURT:  All right.  So far I don't think he

20   has violated this chart.  If I'm wrong, then I'm sure you'll

21   point it out.

22         MR. GADD:  The second issue I'd like to address is

23   his contention that the defendant was never interviewed.  So

24   I've instructed our agents not to bring up that when they

25   tried to interview the defendant, he invoked his right to

1   remain silent.  But by making it a point of contention that

2   was never interviewed, unlike the other co-defendants, we

3   think the jurors need to hear the full story, that he was

4   given the opportunity and refused.

5           THE COURT:  They do, don't they, if they tried to

6   interview him and he invoked his right?

7           You said he was never interviewed?

8           MR. SKORDAS:  Correct.

9           THE COURT:  They say they tried to interview him

10  and couldn't.

11          MR. SKORDAS:  Early on.  And we tried for three

12  years to interview with them and they wouldn't.  So if they

13  want to open that up, let's open the whole thing up.  We

14  have been begging them for an interview for three years,

15  Your Honor.  I'll testify to that.

16          THE COURT:  Mr. Gadd.

17          MR. GADD:  We'll have a hard time with an attorney

18  as a witness.

19          THE COURT:  Yes.  Yeah.  We're not going to do

20  that.

21          MR. GADD:  I see it as an open door, but because

22  it's a sensitive issue dealing with Fifth Amendment rights,

23  I wanted to bring it up first with the Court to make sure

24  that we were okay to briefly ask our agents if they asked to

25  interview him and if he refused.  And we'll try to phrase it

 1   such that we don't implicate his constitutional rights.

 2   We'll just indicate that he chose not to.

 3           THE COURT:  If you do that, Mr. Skordas is going

 4   to want to bring up through -- I guess Mr. Shamo, if he

 5   testifies, and it sounds like he's going to --

 6           MR. GADD:  If Mr. Shamo has personal knowledge,

 7   I'm sure he could testify to that.

 8           THE COURT:  -- that at some point he wanted an

 9   interview.

10           You can do what you said you wanted to do and then

11   you can do what I suggested you could do.

12           MR. GADD:  Those were the two things.  Thank you,

13   Your Honor.

14           THE COURT:  You haven't convinced me on the first

15   thing.  You do understand that, right?

16           MR. GADD:  Yes, sir.  I'll look at it again.

17           THE COURT:  All right.

18           Now we're probably looking at five to 12.

19           We'll be in recess.

20           (Recess)

21           THE COURT:  Where are we on the fight we ended

22   with?

23           MR. GADD:  No further resolution.

24           THE COURT:  Were you complaining about what he

25   said during his opening statement or something he's asked a

1    witness?

2            MR. GADD:  Just the opening statement.

3            THE COURT:  But you didn't object at the time

4    either.

5            MR. GADD:  No, sir, chose not to object out of a

6    professional courtesy.

7            THE COURT:  But you're not objecting to anything

8    he's asked a witness yet?

9            MR. GADD:  I have not made an objection, no.

10            THE COURT:  Precisely, again, what do you think he

11    should not have said in his opening statement?

12            MR. GADD:  Drawing a comparison between the

13    charges Mr. Shamo faces and those faced by his

14    co-defendants.  Charging decisions at their core are made by

15    the grand jury.  Mr. Shamo was charged with Count 1, CCE.

16    His other co-defendants weren't.  It's not for this jury to

17    try to rejudge what the grand jury did or didn't do.

18            So I fully agree that they can talk about what

19    someone pleaded guilty to and then minimum and maximum

20    sentences as impeachment.  It was that next step, drawing

21    the comparison between who got charged in Count 1 and who

22    didn't that I saw as impermissible.

23            THE COURT:  Mr. Skordas.

24            MR. SKORDAS:  Your Honor, the grand jury, as this

25    Court knows, issues indictments based on evidence presented

1   to it by the United States Attorney's Office.  Had they

2   sought an indictment for the CCE count, they would have

3   received that.  But they didn't.

4          THE COURT:  But isn't it true that we usually

5   don't get into the charging decisions in a trial?

6          MR. SKORDAS:  Yes.

7          THE COURT:  What would your curative be?

8          MR. GADD:  We have a couple Pattern Instructions,

9   the Tenth Circuit Pattern Instructions that I think hit

10  right on this point.  And I apologize for not pulling those

11  numbers.  They're two of the instructions that we proposed

12  as final instructions.  So my thought is maybe this

13  afternoon I could try to draft up something that's neutral

14  but explains to the jury their role and specifically

15  indicates that making those comparisons is not within their

16  role, and then just explaining it to them perhaps tomorrow

17  morning.

18         THE COURT:  Well, take a shot at it.  And run it

19  by -- I mean send it to him, send it to me.  We'll talk

20  about it tomorrow.

21         MR. GADD:  Will do.  Thank you, sir.

22         THE COURT:  Let's get the jury and proceed.

23         (Jury present)

24         THE COURT:  You may proceed, Mr. Gadd.

25         MR. GADD:  Thank you, sir.

```
 1   BY MR. GADD:

 2   Q    Mr. Gygi, with any luck, the court IT professionals

 3   have solved our sound issue.  So let's maybe just talk about

 4   where we were when we left off and then we'll jump back into

 5   this.

 6        So on November 18, you contacted the agents to indicate

 7   that there was more to the story you wanted to tell them,

 8   right?

 9   A    That is correct.

10   Q    And you spoke with them?

11   A    Yes.

12   Q    From that point onward, have you been truthful with

13   them?

14   A    Yes, absolutely.

15   Q    On that morning, November 18th, did they ask you to

16   record a conversation with Mr. Shamo?

17   A    Yes, they did.

18   Q    And the conversation, did that take place -- I believe

19   you said in his BMW?

20   A    Yes, parked at my apartment complex.

21            MR. GADD:  Let's now, if we can, read and listen

22   to Exhibit 17.01.

23                   (Audio recording played)

24   BY MR. GADD:

25   Q    Do you remember making that recording?
```

1  A    Yes, I do.

2  Q    Were you nervous at all to record it?

3  A    Yes, quite nervous.

4  Q    There were a few things you talked about in there that

5  I want to bring up and have you, if you can, explain for the

6  jury.

7  A    All right.

8  Q    Near the beginning, Mr. Shamo indicated that he went

9  live.  What did you understand that to mean?

10  A    My understanding at the time was that packages were

11  being prepared.  I wasn't sure if that had meant that

12  product had run out at the time or if it was merely just a

13  temporary break.

14  Q    You indicated to him at one point that you had missed

15  the prior night because of an emergency.  There was no

16  emergency, though, right?

17  A    That's correct.

18  Q    Instead, what were you doing that prior night?

19  A    I was wrestling with my decision what to do the next

20  day after being interviewed by the agents throughout the

21  day.

22  Q    This was just an audio recording, so we couldn't see

23  what was happening, but were you paid by Mr. Shamo during

24  that conversation?

25  A    Yes, I was.

1    Q    Did he pay you in cash?

2    A    Yes.

3    Q    You referenced plans that had to do with Colorado.

4    What were your plans?

5    A    Well, the plans were, a fair amount of time before

6    this, at minimum, several months, Mr. Shamo and I had

7    discussed setting up a location to ship packages outside of

8    Utah.

9    Q    Who's idea was it?

10   A    It was Mr. Shamo's idea to expand beyond the state,

11   though Colorado was my suggestion.

12   Q    Why was Colorado important for you?

13   A    My girlfriend has family out there, so it would have

14   been an easy place to get settled, and her and I had both

15   talked about, outside of this venture, wanting to move out

16   there.

17   Q    Was it important to Mr. Shamo that the new shipper be

18   in a different state?

19   A    Yes, though the specific state wasn't quite as

20   important as it being outside of Utah.

21   Q    We heard you negotiating about a biweekly amount.  Was

22   that the amount he was going to pay you?

23   A    Yes, that's correct.

24   Q    And it was $3,000, correct?

25   A    Yes, that is correct.

```
 1   Q    Was that more than you were receiving to be the runner?
 2   A    It was, yes.
 3   Q    He talked to you about a separate room.  What did you
 4   understand from that?
 5   A    My understanding was that the people preparing
 6   shipments would want to have a room that was solely
 7   dedicated to that purpose so that it wouldn't be anything
 8   that anyone else used for any other purpose.
 9   Q    He talked about that's how his shipping team did it.
10   Had you ever been inside of Ms. Tonge's and Ms. Bustin's
11   residence?
12   A    No.
13   Q    You hadn't seen the room that they used, then?
14   A    No, I hadn't.
15   Q    Towards the end there, he wants you to check on that
16   one thing and you clarified about a package.  What was going
17   on there?
18   A    There was a package that -- I can't recall if it had
19   specifically said it was delivered or undeliverable, but
20   either way, it was a package that I was supposed to have
21   received by that point and I had not yet gotten it.
22   Q    By that point was law enforcement seizing some of the
23   packages coming to you?
24   A    Yes.
25   Q    Let's talk now about the night of November 18th, 2016,
```

1     so the day after you first met those agents.  Did you take

2     agents along with you as you picked up packages that night?

3     A     I did, yes.

4     Q     What did you drive to pick up the packages?

5     A     It was a car that my girlfriend and I shared.

6     Q     And did the agents, did they ride with you or follow

7     behind you?  Where were they?

8     A     They followed behind in a separate vehicle.

9     Q     Did you lead them to Ms. Tonge's and Ms. Bustin's

10    residence?

11    A     I did, yes.

12    Q     Once you gathered up the packages, what did you do?

13    A     I believe after securing the packages in the car, we

14    drove back to the South Jordan Police Department.  I led the

15    way and the agents followed.

16    Q     And then once at the police department, did they take

17    possession of those packages?

18    A     Yes.

19    Q     I want to show you Exhibit 7.00.  Will you take a look

20    inside that box.

21          What do you see?

22    A     I see envelopes that I recognize as the same address --

23    return address, names, and type that I was used to dropping

24    off and shipping out.

25    Q     Maybe just for the jury, because they're having a

```
 1   harder time seeing that than you are, can you show them what
 2   else is inside the box?
 3        What do you have there?
 4   A    This is a larger box that I was used to shipping out
 5   occasionally.
 6   Q    That size box, would that fit in a blue collection bin?
 7   A    I do not believe so.
 8   Q    If you could, maybe just tip it down and give the jury
 9   a sense for how many packages or boxes came in that.
10   A    (Indicating)
11             MR. GADD:  Could we look at 7.01.
12   BY MR. GADD:
13   Q    Once you arrived at the police station, the packages,
14   the parcels, the envelopes, those were turned over to the
15   agents, correct?
16   A    Yes, they were.
17   Q    And this picture that you're seeing here, does that
18   also look like the packages that you had picked up that
19   night?
20   A    Yes, it does.
21   Q    There's approximately 79 packages, correct?
22   A    That appears to be correct.
23   Q    Was that more than a normal amount?
24   A    It was more than a normal amount for a single night,
25   though considering I had not shipped out the night prior,
```

1    this does add up as the amount for two nights.

2    Q    There are different sizes.  You showed some in the box

3    and then we can see some in the picture.  Do you see on the

4    right side the envelopes, the priority mail envelopes?

5    A    I do, yes.

6    Q    Is that something you would typically pick up from the

7    residence in Daybreak?

8    A    Yes.

9    Q    You showed us the larger package that you can see kind

10   of in the foreground there.  In the background, in the

11   middle, there's boxes with smaller, but they're definitely

12   boxes.  Was that a common size as well?

13   A    Yes, it was.

14   Q    That was the first night you took the agents along to

15   pick up packages.  You did one more time, right?

16   A    That is correct.

17   Q    Was it two nights later --

18        MR. GADD:  Oh, thank you, Yvette.

19   BY MR. GADD:

20   Q    You can see those smaller boxes a little closer there.

21   Do you remember shipping that size specifically?

22   A    Correct.

23   Q    And you recall just now a return address from the ones

24   you looked at, and that made me think of this.  You talked

25   briefly to the jury about reading the return address and

```
 1   then going to a blue collection box near there.  Who told
 2   you to do that?
 3   A    Mr. Shamo gave me a basic rundown of the process.  His
 4   explanation, I believe, I don't recall the exact specifics,
 5   but it was something to the effect that the return address
 6   would change with each batch that was going out and I would
 7   need to find collection bins that I can't use nearby that
 8   address.  I wasn't given specifics on how to find the
 9   collection bins, but that was my understanding.
10   Q    You're resourceful.  You figured out how to find
11   collections bins, right?
12   A    I did.
13   Q    How did you find them?
14   A    I would use the USPS mobile application and look up
15   collection boxes that were nearby the address that was
16   provided.
17   Q    The second night you went along to pick up -- or you
18   brought the agents along to pick up packages, that was
19   November 20th, 2016, right?
20   A    That sounds correct.
21   Q    Did you text with one of the shippers to set a time
22   when you would come pick them up?
23   A    Yes.  That was the normal process.
24   Q    Let's look, if we could, at 17.04.
25        Do you recognize what we're looking at there?
```

1    A    I do, yes.

2    Q    Is this a screen shot -- or maybe even better, a

3    picture of a screen?

4    A    Yes.  It's a photograph of a conversation on my phone.

5    Q    Your phone.  And then up at the top it says Katy.

6    Who's Katy?

7    A    That would have been Katy Bustin, I believe.

8    Q    Did you know her last name by that point?

9    A    I did.  I had interacted with her in our time both

10   being employed at eBay.

11   Q    And I think you indicated at some point you started to

12   figure out who the shippers were.  How did you figure out

13   that Ms. Bustin was one of the shippers?

14   A    I recalled that Ms. Bustin had interacted with both

15   Mr. Crandall and Mr. Shamo at and outside of eBay, and just

16   kind of put two and two together about who that was.

17   Q    Could you read the series of text messages for us?

18   A    Yes.  From myself: Do you know when stuff is going to

19   be ready today?  I've got a family thing tonight, so I'd

20   prefer to get it done early, if possible.  From Katy:  Yeah.

21   Let me see when Shamo is planning on having orders for us.

22   I replied with a thumbs up.  Katy replied:  What time do you

23   need it by?  I stated:  The family thing is at seven, so if

24   I'm done by then, that would be great.  Katy replied:  Okay.

25   I might just have you pick up yesterday's.  Haven't heard

1   from Shamo.  And I replied:  That's great.  I'll do that if

2   it gets to be around six and you haven't heard from him.

3   Q    If you could keep going there.

4   A    Katy replied:  Sounds good.  They're going to Lehi,

5   though.  Need more time.  Just message me when you want to

6   come.  I replied:  No, that's fine.  I'm going south for my

7   family anyways.  And she replied:  Sounds good, with an

8   emoji.  Should be ready at five.  You want them now or in an

9   hour?  I replied:  Sweet.  I'll come by at six and grab

10  everything.  She replied:  Perfect.  And then about an hour

11  later she replied -- or, excuse me, about 45 minutes later,

12  she replied:  They're out for you whenever.  Going to Lehi

13  and Riverton.  Riverton drop is only eight packages thin.

14  Q    Let's take a minute and look at that last message from

15  Katy.  Going to Lehi and Riverton.  What did you understand

16  that to mean?

17  A    I understood that there were two separate batches of

18  packages with two separate return addresses with -- return

19  addresses in those specific cities.

20  Q    And then she indicates Riverton drop is only eight

21  packages thin.  Will you kind of translate that for the

22  jury.

23  A    Yes.  My understanding of that was the batch of

24  packages that was addressed to Riverton was smaller than a

25  normal batch, being only eight packages.  I can't remember

```
 1    specifically how much an average batch was.  Maybe 20 to 30
 2    packages, if I were to guess.
 3    Q    So on that night, had you not been working with the
 4    agents, it would have required you to go to two different
 5    cities to find blue collection bins, correct?
 6    A    That's correct.
 7    Q    But rather than go to Lehi and Riverton, did you go and
 8    pick up these packages?
 9    A    Yes.  I went and picked them up the same as the
10    previous trip with the agents.
11    Q    Same as before, your car, right?
12    A    Correct.
13    Q    And they followed behind?
14    A    That's correct.
15    Q    And did you take the packages to the police station
16    again?
17    A    Yes.
18    Q    And that's where the agents took possession of them?
19    A    That is correct.
20    Q    Let me show you Exhibit 8.
21           THE COURT:  Exhibit which?
22           MR. GADD:  This is Exhibit 8.00.
23           And if we can also look at 8.03 on the screen.
24    BY MR. GADD:
25    Q    Go ahead and take just a moment and look through those.
```

1         Do you recognize those?

2    A    Yes, I do.

3    Q    What are they?

4    A    They appear to be the same type of packages that I was

5    accustomed to shipping.

6    Q    You can see on the screen these packages laid out.  Do

7    these appear to be the same packages as what's been folded

8    down flat inside that box?

9    A    It's hard to say without confirming the addresses on

10   them, but yes, they do match the size, shape, and amount

11   that I would expect.

12   Q    So here there's just over 43 packages and parcels.  Was

13   that a more normal size amount for a pickup night?

14   A    For a single night, yes, it was slightly more than

15   normal.

16   Q    You get the three sizes here in this picture as well,

17   the large box and backs, and then the medium and the small.

18   Were those normal sizes?

19   A    Yes.

20   Q    They're all priority mail.  Do you remember a time when

21   you weren't shipping priority mail?

22   A    I don't recall anything specific about the shipping

23   methods.

24   Q    Were you ever asked to take it to anywhere other than

25   like a post office or a blue collection bin?

1    A     No.  Those were the only locations that were used.

2    Q     Never FedEx?

3    A     No.

4    Q     Never UPS?

5    A     No.

6    Q     Let's talk a minute about Mr. Shamo's residence.  Have

7    you ever been to Mr. Shamo's residence on Titian Way in

8    Cottonwood Heights?

9    A     Yes, many times.

10   Q     How often would you say you've been there?

11   A     At the time that we were working together, once every

12   two to three weeks would be a guess for me.

13   Q     Were you going there for business or social?  Why would

14   you go to his house?

15   A     It was almost entirely business, though I do recall a

16   handful of times that it was not business related.

17           MR. GADD:  Could we look at 17.02.

18   BY MR. GADD:

19   Q     Can you see that on your screen?

20   A     I can.

21   Q     I'm going to zoom in there on the top.

22         Do you see your name on it?

23   A     I do.

24   Q     What is this?  Do you know?

25   A     This appears to be a --

1    Q    Do you want to zoom out?  Would that help?

2    A    No.  It just appears to be, I would guess, an invoice

3    for a package that was shipped to me from Canada.

4    Q    Did you leave this in Mr. Shamo's residence when you

5    were there for business?

6    A    If it matches the type of packages that I received from

7    Canada for Mr. Shamo, then yes.

8    Q    Oh, I see, meaning if it were inside a package you gave

9    to him, it might have gotten in there that way?

10   A    Correct.

11   Q    But you never actually put your fingers on this

12   document, right?

13   A    Not that I can recall at any time.

14   Q    Can you think of any other reason why a document with

15   your name on it might end up in Mr. Shamo's residence?

16   A    No.

17   Q    Let's look -- if we could look at the bottom half for

18   just a minute.

19        Do you see there in description it says inert

20   excipient, microcystalline cellulose.  Do you know what

21   microcystalline cellulose is?

22   A    No, I don't.

23   Q    I want to turn now and talk a little bit about evidence

24   taken from Mr. Shamo's devices.

25             MR. GADD:  Could we look at 13.09, pages 30 or

```
 1   31 -- well, we'll look at them both.
 2   BY MR. GADD:
 3   Q    Did you ever go inside Mr. Shamo's home office?
 4   A    Yes.  I recall going in there a handful of times.
 5   Q    Did it look about like this?
 6   A    That seems to be correct.
 7   Q    Did you ever use either computer that was there?
 8   A    No.
 9   Q    There's a document that was found on his iMac, this one
10   right here.  I want to ask you some questions about it.
11            MR. GADD:  Can we look at 14.35.
12   BY MR. GADD:
13   Q    Do you recognize this first page of the document?
14   A    I recognize it from when we had briefed about this
15   earlier, but I do not specifically know what it was.
16   Q    You didn't write this document, did you?
17   A    No.
18            MR. GADD:  Can we look at the next page.
19   BY MR. GADD:
20   Q    Do you see your name on that one?
21   A    I do, yes.
22   Q    And was that your address at the time?
23   A    Yes, it was.
24   Q    Is that an address at which you received packages from
25   Mr. Shamo?
```

```
1    A     Yes, it was.

2    Q     And you have no idea how it got on his computer?

3    A     I would assume that it had been on his computer if it

4    was used to procure these packages.

5    Q     Let's take just a minute now and talk about the -- I'll

6    call it the deal.

7               MR. GADD:  Could we look at 23.02.

8    BY MR. GADD:

9    Q     Do you recognize this document?

10   A     Yes, I do.

11   Q     This is your statement in advance of plea of guilty and

12   plea agreement between you and the United States, correct?

13   A     That is correct.

14   Q     At the end of this -- and we'll scroll through it in a

15   minute -- you signed this document?

16   A     I did.

17   Q     In court?

18   A     Yes.

19   Q     For pleading guilty?

20   A     Correct.

21   Q     Here on the first page, this letter --

22              MR. GADD:  If you could pull up paragraph number

23   one.

24   BY MR. GADD:

25   Q     Did you, in fact, plead guilty to Counts 2, 3, 6 and 12
```

1  of the superseding indictment?

2  A    I did, yes.

3  Q    Were any of the charges that you faced dismissed?

4  A    No, they were not.

5  Q    You pled as charged?

6  A    Correct.

7  Q    By pleading as charged, were you trying to take full

8  responsibility?

9  A    I was.

10        MR. GADD:  If we can zoom back out now.

11  BY MR. GADD:

12  Q    There's this statement in advance of plea, but then at

13  the end of it is an addendum.

14        MR. GADD:  If we can scroll through to the

15  addendum.

16        Okay.  Starting here.

17  BY MR. GADD:

18  Q    This is -- for lack of a better term, this is the

19  agreement between you and the United States, correct?

20  A    Yes, that's correct.

21  Q    Picking up in the second paragraph, does it say the

22  defendant, that's you, agrees to testify truthfully and

23  completely for the United States in any subsequent court

24  hearing or trial relating to this case if called upon?

25  A    It does.

```
 1   Q    Did you agree to wait to be sentenced until all the
 2   remaining defendants in your case had been sentenced?
 3   A    Yes, I did.
 4            MR. GADD:  Then if we could go to the next page,
 5   that top paragraph.
 6   BY MR. GADD:
 7   Q    If you testify truthfully and completely, was it the
 8   agreement that the United States would present your
 9   cooperation to the court -- that's Judge Kimball, correct?
10   A    Yes.
11   Q    -- for his consideration at your sentencing under that
12   Sentencing Guideline 5K1.1, and did you understand that to
13   mean that if you had a minimum mandatory sentence for one of
14   the counts you pleaded guilty, there would no longer be a
15   minimum mandatory sentence?
16   A    That is my understanding, yes.
17   Q    And then it says the United States also agrees not to
18   charge or seek a charge against you for death resulting
19   violations of -- and then Title 21 United States Code
20   841(a)(1) -- that may arise out of the continuing
21   investigation into overdose deaths tied to the Pharma-Master
22   drug sales.  That was your understanding as well, correct?
23   A    Yes, that's correct.
24   Q    Was there any other agreement?
25   A    Not to my knowledge, no.
```

```
 1   Q    You understand that one day soon you're going to be
 2   standing here and Judge Kimball will be sentencing you?
 3   A    I do.
 4   Q    Is it your understanding that I, United States, we are
 5   going to tell Judge Kimball everything you did wrong?
 6   A    Yes.
 7   Q    And then everything you did to help make it right?
 8   A    Yes.
 9   Q    You understand that the sentence is 100 percent up to
10   Judge Kimball?
11   A    I do.
12   Q    Let's talk now about the hard questions.
13        In 2016, when you were picking up packages off the
14   doorstep in Daybreak, you knew those packages probably
15   contained drugs, didn't you?
16   A    I did.
17   Q    So why did you help Aaron Shamo?
18   A    I helped because at the time when this began, my
19   understanding of the operation was something that I was -- I
20   was told and made to believe wasn't going to be harming
21   anyone, and it was easy money to make.  It was something
22   that I believed would be not necessarily in the right, but
23   also not in the wrong.  And when it obviously transformed
24   into what it became, I became extremely distraught and
25   uncomfortable with what had happened.
```

```
 1   Q    You say you became distraught and uncomfortable, but
 2   when?  When was the first time you realized what was going
 3   on?
 4   A    I would say it was when I was questioned by agents that
 5   had a search warrant, when they made it clear that this was
 6   Fentanyl that was being prepared and shipped.
 7   Q    Last question.  Who was your boss?
 8   A    Can you clarify what you are asking?
 9   Q    That was a bad question so it wasn't the last.
10        When it came to picking up the packages, putting them
11   in the mail stream, who was your boss?
12   A    Aaron Shamo, without a doubt.
13   Q    Did you have any other bosses?
14   A    I would say Drew Crandall would have qualified as that
15   at the time when I had known he was involved.
16   Q    Back in 2015?
17   A    Correct, before he left the country.
18   Q    But in 2016, any bosses?
19   A    Other than Aaron Shamo, no.
20             MR. GADD:  No further questions.  Thank you.
21             THE COURT:  Thank you.
22             Defense may cross-examine.
23                       CROSS-EXAMINATION
24   BY MR. SAM:
25   Q    Hello, Mr. Gygi.  I'm going to introduce myself to you
```

1    for the first time -- I wasn't here on Friday -- Daryl Sam,

2    and I represent the defendant, Mr. Shamo.  I appreciate you

3    being here today and I know that it's a big day.

4        So I'd like to ask you a few questions and ask you

5    about your life a little bit.  You started off by saying you

6    have a dog; is that right?

7    A    Two, yes.

8    Q    You've got two dogs.  Okay.  And you value that pretty

9    highly, I guess, in your personal life.

10       You also snowboard too; is that correct?

11   A    It's been a while, but yes.

12   Q    You were snowboarding back in 2016, I guess, when you

13   had that conversation with Mr. Shamo.  You were discussing

14   that, right?

15   A    That's correct.

16   Q    In fact, before that eventful day on November 17th when

17   law enforcement came, you had already started planning to go

18   to Colorado; is that right?

19   A    Yes.

20   Q    That plan was in the works?

21   A    It was, correct.

22   Q    And part of that was you talked about -- when you

23   talked to Mr. Shamo, you talked about an Epic Pass as well;

24   is that right?

25   A    That's correct.

```
 1    Q    So Colorado was a great destination for you; is that
 2    right?
 3    A    Correct.  I didn't have that pass at the time, but that
 4    was what I was planning.
 5    Q    And then you also stated earlier that you were there
 6    when packages were opened; is that correct?
 7    A    Correct.  I don't believe that was in 2016, but rather
 8    2015.
 9    Q    So early on you were getting packages and you would
10    open them in the presence of Mr. Shamo; is that right?
11    A    I wasn't the one who opened them, but I was present
12    when they were opened, yes.
13    Q    And was Mr. Crandall there as well?
14    A    Absolutely.
15    Q    And was that because you were using what was in the
16    package; is that correct?
17    A    While I was using those drugs, I was not using the ones
18    that specifically came from those packages.
19    Q    But those are substances that you were using?
20    A    Yes.
21    Q    LSD, marijuana --
22    A    That's correct.
23    Q    -- cocaine; is that correct?
24    A    Not cocaine.
25    Q    Not cocaine.  Okay.
```

1          So in May of 2017, you interviewed with agents; is that

2    right?

3    A    In May, yes, that is correct.

4    Q    About six months after.

5          And just to clarify too, there was a search on

6    November 17th of your home, is that correct, of 2016?

7    A    Yes, that's correct.

8    Q    And you were not detained at that point; is that right?

9    A    I was -- I voluntarily went for questioning.  I was not

10   detained.

11   Q    So you got to sleep in your own bed that night?

12   A    After it had been tossed around, yeah.

13   Q    And have you ever spent a night in jail?

14   A    I have not.

15   Q    You never have?

16   A    No.

17   Q    Okay.  And then six months later, approximately in May

18   of 2017, you sat down with agents --

19   A    Yes.

20   Q    -- and spoke with them; is that right?

21   A    Yes, that is correct.

22   Q    Okay.  And you opened up with the agents at that point

23   and talked about a lot of things.

24         You stated that you left eBay in January of 2015; is

25   that correct?

1    A    I believe -- yes, January 2015, that's correct.

2    Q    And did you pick up other work after that in 2015 --

3    other regular full-time employment?

4    A    No.  My employment consisted entirely of the operation

5    that had been run by Mr. Shamo and the others.

6    Q    So you were depending totally, financially, on the

7    operation; is that correct?

8    A    That is correct.

9    Q    And at that point, in January 2015, you were a receiver

10   of packages; is that right?

11   A    That is correct.

12   Q    And you testified you were making about 50 to $100 at

13   that point, per package; is that right?

14   A    That's correct as well.

15   Q    So you were making about 100 to $200 a month at that

16   point; is that correct?

17   A    That seems like an appropriate number, yes.

18   Q    Not a lot to live on at that point?

19   A    No.  I had other money saved that I was using for

20   living expenses.

21   Q    Okay.  And as things progressed, you pushed Mr. Shamo

22   for more work; is that right?

23   A    I did exactly that.  I brought up the request for more

24   work later on in 2015 when my savings began to run low.

25   Q    So you had some savings, and when things started to get

1    tight, you approached Mr. Shamo about more work?

2    A    Yes, that's correct.

3    Q    That was about what time, mid 2015?

4    A    I would say it was probably about May or June that I

5    approached him, and then June or July that I began acting as

6    a courier, a runner.

7    Q    Okay.  So was it June 2015 you started acting as a

8    courier.  How much did you get paid at that point?

9    A    That was $2,000 every other week.

10   Q    So beginning in June 2015, you're making about 4,000 a

11   month?

12   A    Yes.

13   Q    Okay.  And you stated that you didn't come to know

14   about the Fentanyl until the day of the search when you were

15   told; is that correct?  Is that your testimony?

16   A    That is correct.

17   Q    And you started making more money doing this.  And what

18   was the volume like in June of 2015?

19   A    Can you clarify what volume you're asking about?

20   Q    Well, the volume of how many -- the amount of packages

21   that you were moving.

22   A    Receiving or shipping?

23   Q    Shipping.

24   A    I would estimate that there was, by my recollection,

25   about 20 to 30 packages per night, five to six nights per

1    week.

2    Q    Okay.  And at the end here, there were about -- what

3    was the volume when you helped investigators on

4    November 18th?

5    A    If I recall correctly, it was roughly the same.  Maybe

6    slightly more than that.  Maybe it had bumped up to about 30

7    to 40 packages per night, but I believe it was still right

8    around 30 being the average.

9    Q    Okay.

10          MR. SAM:  If we could pull up Exhibit 23 -- I

11   believe it's 23.02.  If we can pull that up.

12          This is a copy of your plea agreement.

13          If we could go to page two.  Actually, let's go

14   back to page one.

15   BY MR. SAM:

16   Q    Count 2, conspiracy to distribute Fentanyl, you pled

17   guilty to that; is that correct?

18   A    I did, yes.

19   Q    And why did you plead guilty to that if you had not had

20   knowledge of it?

21   A    I believe I pled guilty to that because that was the

22   agreement that the United States government had reached with

23   myself and my attorney.  If I recall correctly, they had not

24   wanted to budge on any of those charges.

25   Q    It could have been maybe they didn't believe you, but

1    that was a moment of truth that came to you on

2    November 17th?

3    A    That could be the case, yeah.

4    Q    Because you were making substantial money from this and

5    it was a livelihood for you; is that correct?

6    A    It was, absolutely.

7    Q    And you had aspirations of going to Colorado and

8    getting an Epic Pass, and kind of continuing on this path;

9    is that right?

10   A    Yes.

11   Q    Okay.  And then on page two, if we could go down to the

12   potential penalties of what you can get.  It's your

13   understanding that just for pleading to conspiracy to

14   distribute Fentanyl, you could get ten years --

15   A    Yes, I understand.

16   Q    -- as a minimum mandatory?

17   A    That was made clear at my change of plea.

18   Q    And a life maximum -- a life top, right?

19   A    Correct.

20   Q    And so it's your hope in coming here today and

21   testifying, and then also entering this plea, is that you

22   hope to avoid any substantial sentence; is that right?

23   A    Well, I understand that actions have consequences.  So

24   I only hope that my sentence is fair considering my

25   cooperation and my actions.

1    Q    I mean, you're fortunate to be alerted right off the

2    bat as this was all coming down and had that opportunity.

3    Do you feel fortunate that you were in that position?

4    A    Yes.  I feel fortunate that I was given a chance to do

5    the right thing.

6    Q    Would you take Mr. Shamo as somebody that would be able

7    to be smart enough to run a drug organization?

8    A    I would take him as someone who's smart enough to

9    maintain the operation on his own.

10   Q    So between Drew Crandall and Aaron Shamo, as far as the

11   technicality of pressing pills and putting formulas

12   together, who would you say would be better at that?

13   A    I don't know.  I don't know either of their expertise

14   when it comes to chemistry, so things like putting together

15   formulas.  But as far as the other half of your question, I

16   would say Mr. Crandall was more in tune with what that would

17   require.

18   Q    In fact, when you interviewed with agents in May of

19   2017, you said that, correct, that you felt that

20   Mr. Crandall would have the knowledge to do things where

21   Mr. Shamo would not, as far as pressing pills?

22   A    I don't recall specifically stating anything about

23   pressing pills, but I do recall in my testimony agreeing --

24   or, excuse me, not my testimony, my interview with agents,

25   agreeing that Mr. Crandall was smarter for that kind of

1    stuff.

2    Q    And it's your opinion that Mr. Shamo would not be able

3    to run this operation without some major help?

4    A    That's my opinion, that he wouldn't be able to set up

5    the operation without additional help.  Running it is

6    another question entirely.

7    Q    So your testimony is running -- or that setting it up,

8    he would not have the expertise in doing that?

9    A    That is correct.

10   Q    You felt like Crandall was there in the beginning and

11   kind of got things off the ground, then?

12   A    Yes, I definitely do.

13   Q    And without Crandall, this would have never turned into

14   this?

15   A    I think that's a fair assessment, yes.

16            MR. SAM:  Just a moment.

17            THE COURT:  Sure.

18            MR. SAM:  I have no further questions, Your Honor.

19            THE COURT:  Thank you.

20            Redirect?

21                      REDIRECT EXAMINATION

22   BY MR. GADD:

23   Q    The first thing I wanted to bring up was just to

24   clarify.  There were a few questions you got asked and a few

25   responses that referred to you acting as a courier in 2015.

1    So I was hoping we could clarify the date.  Was it 2015 or

2    2016 that you started?

3    A   Can you clarify when it was that the search warrant was

4    served?

5    Q   So if the search warrant was November of 2016, how many

6    months before that would you have started?

7    A   It would have been June or July 2016, not 2015.

8    Q   So for the questions that you were asked, it was

9    talking about 2015.

10    Your time as a courier was just a few months, right?

11    A   That is accurate, yes.

12    Q   And that was 2016?

13    A   Correct.

14    MR. GADD:  Could we look at 23.02 again, and could

15    we go to paragraph 11.

16    BY MR. GADD:

17    Q   You got asked a question about not knowing it was

18    Fentanyl and still pleading guilty.  Let's look at paragraph

19    11 together.

20    So as part of your statement in advance of plea,

21    there's facts in there, and you stipulate and agree that the

22    following facts accurately describe your conduct.  That's

23    part of it, correct?

24    A   Yes, that is correct.

25    Q   I want to ask you again, after I read through this, if

1    it's still true.  In 2015, I agreed with Aaron Shamo and

2    other co-conspirators to accept packages of drugs addressed

3    to me at my address.  I would then transfer the drug

4    packages to Shamo.  Shamo paid me for each package I

5    accepted on his behalf.  I continued to accept packages on

6    Shamo's behalf in 2016.

7        On November 17th, 2016, one of those packages -- sent

8    from China and addressed to me at my address -- was seized

9    by law enforcement after it entered the United States Mail

10   system.  The package contained more than 40 grams of

11   Fentanyl.  I knew the packages I had been receiving

12   contained controlled substances.  I also knew that the

13   packages would enter the United States -- they were being

14   shipped to me from China.

15       In 2016, I became a runner for Shamo's organization.

16   Approximately five nights a week, I would drive to the

17   residence of Tonge and Bustin and pick up packages and

18   envelopes, all within the District of Utah, that were ready

19   to be mailed in the U.S. Postal system.  The packages and

20   envelopes contained drugs.  I would then drop off the

21   packages and envelopes at post offices scattered throughout

22   the Salt Lake Valley.  I staggered the post offices from

23   which I sent the packages in an attempt to avoid detection

24   by law -- if we can jump to the next page -- enforcement.

25   The packages I mailed contained both Fentanyl-laced pills

1    and alprazolam tablets.  I continued to ship packages and

2    envelopes of drugs for the Shamo organization until

3    November 2016.

4         My co-conspirators and I each had a role to play and we

5    relied upon each other to meet our common objective:  To

6    earn money by selling drugs.  I knowingly and voluntarily

7    involved myself with Shamo and my other co-conspirators.  It

8    was my free choice to do so.

9         Is any of that untrue?

10   A    No.  That is completely true.

11   Q    You got asked questions about Mr. Shamo's ability, his

12   aptitude.  Specifically I think you said that you weren't

13   sure he would have the ability to set up an organization

14   that led to these types of results, correct?

15   A    Correct.

16   Q    But you talked about running and maintaining it.  Why

17   do you say that he might be capable of running or

18   maintaining it?

19   A    Well, because setting it up would require a lot of

20   specialized technical knowledge about how to access the dark

21   web where the drugs were sold, how to set up accounts, all

22   that kind of stuff.

23        As far as maintaining, I believe it would be fair to

24   say that just about anyone could be taught how to maintain

25   something that has already been built.

1    Q    So in a sense you have given the jurors an opinion

2    about Mr. Shamo's ability, his aptitude?

3    A    That's correct.

4    Q    If you found out that Mr. Shamo was the one who did all

5    the setting up on the dark web, would it change your

6    opinion?

7    A    Yes.  It would definitely change my opinion.

8    Q    If you saw the thousands of Internet searches he did on

9    these and related topics, would it change your opinion?

10   A    It very well could, yes.

11   Q    And to be fair, no one has shown you those Internet

12   searches, right?

13   A    That's correct.

14   Q    Did you see, either on the news or elsewhere, the money

15   that came out of his house?

16   A    Yes.  I recall seeing that on the news.

17   Q    What did you think when you saw that?

18   A    I was astounded at the sheer volume of cash that was on

19   hand, both in total amount and number of bills, how large

20   the amount was.

21             MR. GADD:  Nothing further.  Thank you.

22             THE COURT:  Thank you, Mr. Gadd.

23             Recross, Mr. Sam?

24   //

25   //

RECROSS-EXAMINATION

BY MR. SAM:

Q    So you were asked about maintaining or keeping up this operation, correct?

A    Correct.

Q    As far as this operation goes, the reason why you're here to take responsibility is it would have been impossible for something like this to be run without some structure, without somebody like you picking up the drugs and going out throughout the valley and dropping them off in different locations; is that correct?

A    Correct.  There was quite a bit of structure in how the operation was handled and built.

Q    There's a lot of detailed instructions as far as your responsibility.  You were being paid $4,000 a month to go drop off packages, correct?

A    Correct.

Q    So you had a -- and I wanted a clarification too, in that when you were wired with Mr. Shamo and had that conversation that we went through, you made the statement that you were going to get paid 3,000 biweekly.  Is that what you said in there?  Do you remember that?

A    I believe I asked for clarification about how much, asking if it was either four or 5,000, and Mr. Shamo clarified that normally it would be 2,500, and he would make

1  it 3,000 for me.

2  Q    Okay.  And what was the time period?  So you're saying

3  four or 5,000 a month?

4  A    No, biweekly.

5  Q    Oh, biweekly.  And when you say biweekly, what did that

6  mean, twice a week or twice a month?

7  A    Twice a month, every other week.

8  Q    Okay.  I just wanted a clarification on that, how much

9  money we're talking about.  But we're talking about between

10  five or $6,000 a month is what you were anticipating going

11  to Colorado to do this?

12  A    I would say I was anticipating, at the start of that

13  conversation and prior to this, that it would be between six

14  and $10,000 all together per month.  Mr. Shamo clarified

15  that it would be 6,000 all together per month.

16  Q    So that was something that you were comfortable with,

17  and that's why you're taking responsibility here, because

18  that was a substantial position in the company -- or the

19  operation, and you would be compensated for it, and you

20  recognize that that was something that was a major part of

21  the operation?

22  A    Yes.  I definitely understood the seriousness of my --

23  what my responsibility would be in the operation with that.

24  Q    And you were just one -- you were just one part of the

25  organization; is that your understanding?  There was a lot

1    of other things going on?

2    A    Yes, correct.

3    Q    And that's why you say as far as Mr. Shamo setting this

4    up, he wouldn't have had the ability to set this all up on

5    his own?

6    A    That's how I've testified, yes, correct.

7    Q    And there were other things -- you were going to take

8    over a position of shipper, what Ms. Tonge and Ms. Bustin

9    were doing, in Colorado; is that right?  You would fill that

10   role in Colorado?

11   A    That was my understanding as well, yes.

12   Q    And had you been trained in that?  Did you know what

13   that fully was going to entail?

14   A    No, I did not.

15   Q    Okay.  But you understood that it was somewhat intense,

16   from your observation?

17   A    Can you clarify what you mean by intense?

18   Q    Well, I mean it was substantial.  You were involved

19   with picking up packages.  So you'd pick up 20 to 30

20   packages a night; is that correct?

21   A    That is correct.

22   Q    And so there was some work that had to be done to

23   produce that?

24   A    Correct.  My understanding was it would be preparing

25   those packages.

```
1    Q    As far as the detail of how that all happened, you
2    didn't know at this point; is that correct?
3    A    I didn't get any specifics about that.
4    Q    But you expected to get some training if you were going
5    to Colorado, that you would be prepped on that, what the
6    details of that would be?
7    A    Correct.
8    Q    Okay.  All right.
9         I don't have any further questions for you.
10             THE COURT:  Thank you.
11             Are we done with this witness?
12             MR. GADD:  Please.
13             THE COURT:  You may be excused.  Thank you.
14             Ready for more witnesses?
15             MR. STEJSKAL:  The next witness will be rather
16   lengthy and take the rest of the day.  So I don't know how
17   the Court wants to do that as far as charging forward.
18             THE COURT:  I was thinking we'd try to go to about
19   quarter after 2:00, or 2:30.  Will it take longer than that?
20             MR. STEJSKAL:  I'm not sure.
21             THE COURT:  All right.
22             It's been pointed out to me that I don't take
23   enough restroom breaks for the jury.  So if we're going to
24   go another hour or hour and 15 minutes or so, any of you
25   want to go and take a break, do it.
```

 1              I see no people moving.

 2              MR. GADD:  I might take Your Honor up on that.

 3              THE COURT:  All right.  Let's take a seven-minute

 4    break or so.

 5              (Jury excused)

 6              THE COURT:  Just hang on a second, Mr. Gadd, if

 7    you can.

 8              On this thing we've been talking over, I ruled

 9    somewhere along the way that people can leave.

10              You don't need to keep standing and listening to

11    this if you don't want to.

12              I'm looking at document 218, which is the chart on

13    page seven of the government's reply to defendant's response

14    in opposition to motion for order that was filed on the 17th

15    of May.  Do you know the document I'm talking about?

16              MR. SKORDAS:  Yes.

17              THE COURT:  What I'm trying to do as well as I can

18    is police the boundaries between permitted and not

19    permitted, which is sometimes maybe not as clear as it might

20    be, but that's what I'm trying to do.  I'm not persuaded yet

21    that we need any curative instruction.  And if one of you

22    thinks the other is violating this, you ought to object and

23    then we can talk about it.

24              Anyway, that's generally what I'm trying to do.

25              MR. GADD:  Certainly.  Would it help if I put just

```
 1   something very quickly in writing?  And perhaps as I'm
 2   writing it, I'll realize my error and I won't submit it.
 3   But if I can make sense of it and put it in writing, could I
 4   submit that?
 5             THE COURT:  Yeah, that would be fine, and I'll
 6   have it in the morning when I get here.
 7             MR. GADD:  Thank you.
 8             THE COURT:  Now go to the bathroom, if you need
 9   to.
10             (Recess)
11             (Jury present)
12             THE COURT:  Mr. Stejskal, you may call your next
13   witness.
14             MR. STEJSKAL:  Thank you, Your Honor.  I would
15   call Agent Ely Hebert.
16             THE COURT:  Come forward and be sworn, please.
17                          ELY HEBERT,
18              Having been duly sworn, was examined
19                   and testified as follows:
20             THE CLERK:  Come to the witness box.
21             Please state your name and spell it for the
22   record.
23             THE WITNESS:  My name is Ely Hebert.  Spelled
24   E-l-y.  Last name is spelled H-e-b-e-r-t.
25             THE COURT:  You may proceed, Mr. Stejskal.
```

1                        DIRECT EXAMINATION

2    BY MR. STEJSKAL:

3    Q     Your occupation, please.

4    A     I'm a special agent with the Drug Enforcement

5    Administration.

6    Q     Commonly referred to as the DEA?

7    A     That's correct.

8    Q     How long have you been with the DEA?

9    A     Next May will be 17 years.

10   Q     All in Salt Lake?

11   A     No, sir.  I was originally assigned to San Ysidro,

12   California, and after that Casper, Wyoming, and then Salt

13   Lake City.

14   Q     And San Ysidro, that's near San Diego?

15   A     That's correct.

16   Q     Did you receive specific training in order to become a

17   DEA agent?

18   A     When I joined DEA in 2003, I went to the DEA Academy in

19   Quantico, Virginia, where they trained us to investigate

20   drug trafficking organizations.

21   Q     And what kinds of things specifically?  Surveillance,

22   undercover, that type of stuff?

23   A     That's correct, surveillance, undercover drug

24   identification, report writing, things of that nature.

25   Q     And did you receive periodic updated trainings as your

1    career progressed?

2    A    Yes, sir.

3    Q    Some of that in Quantico, some of that in Denver, some

4    of that in other places?

5    A    Correct.  We have training in various places throughout

6    the country as things arise.  For example, I went to a

7    financial investigation seminar in San Francisco, updating

8    our training.

9    Q    And tell me about your experience, then, throughout

10   your career with the DEA.  What kind of things did you

11   investigate?

12   A    When I was in California, I was a -- our enforcement

13   group, we investigated pretty much everything.  We did

14   wiretap investigations.  We did gang investigations.  You

15   know, it was -- San Ysidro is very close to the Mexican

16   border, so we did across border investigations,

17   international controlled deliveries where if drugs would

18   come up into the United States, we would deliver them and

19   see where they were going, and continue on from there.

20   Q    And during your lengthy career, had there been drug

21   trends where one drug is kind of popular and then all of a

22   sudden there's a new or different drug that becomes popular?

23   A    There does seem to be cyclical things that occur.  For

24   example, when I started in San Ysidro, methamphetamine was a

25   big thing.  After several years, that reduced a little bit,

```
 1    and now it seems to have come back.  So things of that
 2    nature, they do change.
 3    Q    And how long have you been in the Salt Lake office?
 4    A    Since 2012.
 5    Q    And between 2012 and the present day, did you receive
 6    any special assignment or special group to investigate a
 7    particular type of drug?
 8    A    So I currently work in the DEA, what's called the
 9    tactical diversion squad.
10    Q    And tell us what you mean by tactical diversion squad.
11    A    What we do in the tactical diversion squad is we
12    investigate diverted pharmaceuticals.  For example, if
13    people are getting pills such as Oxycodone from doctors and
14    then they're selling them on the street, we would
15    investigate things like that.  Or if people are making pills
16    on their own, we investigate -- we're commonly called the
17    pill group.  So that's what we focus on.  That's what we do.
18    Q    And there are a number of other agents and officers
19    from other police agencies that work with you in that group,
20    correct?
21    A    DEA has task force officers.  For example, right now we
22    have officers from the Salt Lake City Police Department.
23    We've had officers from South Jordan, the other local
24    agencies that work with us.
25    Q    And as a DEA agent, do you also work with other federal
```

1    agents in your investigations?

2    A     Yes.  For example, one of our team members right now is

3    the United States Postal Inspector, and she is part of our

4    group currently.

5    Q     You've also worked with the FBI, correct?

6    A     Yes, sir.

7    Q     You've worked with Homeland Security?

8    A     Yes.

9    Q     You've worked with Customs and Border Protection.

10    A     Correct.

11    Q     You've worked with ATF on firearm type issues?

12    A     Yes, if they arise.

13    Q     I'm sure there are others that I'm not mentioning.

14         Anyway, it's a collaborative effort to work on the

15    diversion or manufacturing of what could be pills or

16    pharmaceutical drugs?

17    A     Absolutely.  We need resources from every agency.  In

18    my experience, the cases that I've worked, most of those

19    cases start at the local level.  A patrol officer might find

20    something in a car, for example, something like that, and

21    then we can assist them because we have different resources.

22    Q     So sometimes other agencies will turn to the DEA and

23    say this is what I've got, can you help?

24    A     Yes.

25    Q     And is that a little bit of how your involvement or

1    DEA's involvement into this investigation originated?

2    A    Yes, it is.

3         I was working with my partner, TFO Dennis Power, who

4    was --

5    Q    By TFO, you mean task force officer?

6    A    I'm sorry.  Task Force Officer Power.  He was employed

7    at the time by South Jordan Police Department, and became a

8    task force officer with us.  He had worked with an HSI

9    agent, Dan Ashment, and they had collaborated to start this

10   investigation.  HSI Agent Ashment had received some

11   information from his office in California, which began with

12   Customs and Border Protection seizing a package.

13   Q    And what was ultimately in that package?

14   A    That package contained Fentanyl.

15   Q    Let's pull up Exhibit 1.03.  Do you recognize that?

16   A    Yes, I do.

17   Q    What is that?

18   A    That's an original package in this investigation that

19   was addressed to Ryan Jensen in Midvale, Utah.

20   Q    And is that the second page?

21   A    Yes, sir.

22   Q    There's three pages to this.  If we can scroll through

23   those.

24        So it was addressed to Ryan Jensen.  And what was given

25   to DEA to investigate, then?

1    A    I'm sorry.  Given to who?

2    Q    Was the package itself, not the contents but the box

3    actually --

4    A    The box was sent from California to Salt Lake.  Then

5    the contents, the powder, was sent to the laboratory in

6    California.

7            MR. STEJSKAL:  And, Your Honor, may I just

8    continuously approach with these exhibits without asking

9    permission?

10           THE COURT:  You may.

11           MR. STEJSKAL:  I appreciate that.  Thank you.

12   BY MR. STEJSKAL:

13   Q    I'm going to hand you Exhibit 1.02.

14        Can you identify that, please.

15   A    Yes.  This is the package identified -- this is the

16   actual box identified in the picture that was sent from

17   California to Salt Lake.

18   Q    And so the jury understands, there's always stickers on

19   these envelopes we've got.  What's the DEA process as far as

20   receiving evidence and documenting so we keep track of

21   things?

22   A    In this particular example, Task Force Officer Power

23   and I went to the HSI -- Homeland Security Investigations

24   Office, which is located in West Valley, and we acquired

25   this box from HSI Agent Ashment, brought it back to our

1    office, and we processed it as evidence.  That means placing

2    it in this bag.  We write our names on it, the date it was

3    acquired, the exhibit number, in this case N1.  N stands for

4    nondrug, since this isn't a drug exhibit, and this was

5    number one in this investigation.

6         We also sign, date, and initial the top.  This is a

7    self-sealing envelope.  So after we sign and date it, we

8    take off the sticky part and fold it over, and then we place

9    it in our nondrug evidence room.

10   Q    And DEA here in Salt Lake has a secure nondrug evidence

11   room that keeps all this stuff and only very limited DEA

12   employees have access, correct?

13   A    That's correct.  We have different evidence custodians.

14   In this case it would be a nondrug case custodian who took

15   possession of this item.  We turn it over on a form.

16   Q    And then you talk about the sealings.  So you sign over

17   the seal, and then any time that package is opened, there's

18   a process you go through to keep track of who opened it and

19   when?

20   A    That's correct.  This particular package has not been

21   reopened, but there's even the picture of scissors there.

22   So we just cut along there.  And we would take it out if we

23   needed to, which happened with other exhibits in this case.

24   And then we would reseal it, and would write down that we

25   resealed it, and the date.  And then we would put a new

1    evidence sticker on and heat seal it across the bottom.

2    Q    So, again, 1.02 that you have, the physical box there,

3    that's the same thing we're looking at as 1.03 on the

4    screen, the photos, correct?

5    A    Yes, that's correct.  The numbers match.

6    Q    So DEA Salt Lake was given this package with this

7    information, with the Jensen address on there, and requested

8    to follow up with the investigation, correct?

9    A    That's correct.

10   Q    And so DEA did some research and surveillance and tried

11   to figure out who this Jensen was and what he was about?

12   A    Correct.

13   Q    Ultimately was there a search warrant on Mr. Jensen's

14   house on November 1st of 2016?

15   A    Yes, there was.

16   Q    And really nothing of significance found?

17   A    We did not remove evidence from Mr. Jensen's house at

18   that time, no, sir.

19   Q    And describe Mr. Jensen's attitude, cooperation, lack

20   thereof on that date.

21   A    Mr. Jensen cooperated.  He was -- we first conducted a

22   traffic stop on him after he left his house.  Agent Bryan,

23   who's now retired, and TFO Power approached him in his

24   vehicle.  He cooperated.  We went -- actually wound up going

25   in through his garage because he had given us the code to

1   his garage.  So we didn't force entry.  And we went inside.

2   We encountered some of his roommates.

3        As I noted, we didn't take any evidence.  And he spoke

4   with investigators at that time.  Not myself, I did not

5   speak with -- I did not interview him at that time.

6   Q    And partners at DEA were also conducting an

7   investigation to try to figure out the common link of

8   packages in this investigation?

9   A    Yes, sir.

10  Q    And what was determined?

11  A    I'm sorry?

12  Q    Was there a common link among the packages coming to

13  Salt Lake as far as -- let me ask a different question.

14       November 16th of 2016, did Homeland Security give you

15  guys another package?

16  A    Yes, sir.

17  Q    And do you recall who that was addressed to?

18  A    I believe that one was Sean Gygi.

19  Q    Let's look at Exhibit 3.00.

20       MR. STEJSKAL:  If we could get closer up on that.

21  BY MR. STEJSKAL:

22  Q    So this one says location acquired, Utah County.

23  A    I'm sorry.  I was incorrect.  This one was Julian

24  Mausia.

25  Q    M-a-u-s-i-a?

1    A    Correct.

2    Q    He pronounces it Mausia, as far as you know?

3    A    As far as I know.

4    Q    Okay.  And what was in that package?

5    A    Mr. Mausia was stopped in Utah County, and I believe at

6    a traffic stop that I wasn't involved with.  I'd have to see

7    the report on this.

8    Q    Homeland Security gave you this package?

9    A    Correct.

10   Q    And your name is there with Task Force Officer Power

11   processing this, correct?

12   A    Correct.

13   Q    And you ultimately sent this one to the DEA lab?

14   A    Yes.

15   Q    And that turned out to be Fentanyl as well?

16   A    Correct.

17   Q    Now let's talk about the next one, which you've already

18   referred to.  Let's look at Exhibit 2.03.

19        Do you recognize that?

20   A    Yes, sir.

21   Q    Who's that addressed to?

22   A    To Sean Gygi.

23   Q    Okay.  And that's my fault for being a little out of

24   order here.

25        So that was November 15th of 2016?

```
 1    A     Yes.

 2    Q     And that was given to you and Task Force Officer Power

 3    for investigation?

 4    A     Correct.

 5    Q     Let's look at the next page.  Where does that come

 6    from?

 7    A     It comes from China Post.

 8    Q     And did that have any significance to you at this point

 9    in the investigation?

10    A     Yes.  We already had this package that went to Ryan

11    Jensen, also from China.

12    Q     So there was a pattern here, correct?

13    A     Yes, sir.

14    Q     All right.  Let's go through the rest of these photos

15    here.

16          What's that showing?

17    A     That's showing the package to Sean Gygi where we put it

18    on a scale -- it was put on a scale.

19    Q     Okay.  And it was relatively heavy?

20          Anyway, 7.6.  And then that was the contents there?

21          Next page.

22    A     Yes, that was inside.

23    Q     What is that?

24    A     This is a package that was inside of a box.  It has

25    some lettering in a different language.  It has some English
```

1    on it.

2    Q    Next page.

3        That's the back apparently?

4    A    Back of a package, yes, sir.

5    Q    Next page.

6        And what is that?

7    A    This is a powder that was inside of that package that

8    was inside of the box.  It had AL on it already written out.

9    Q    And that was sent to the DEA lab?

10   A    It was.

11   Q    And what was that determined to be?

12   A    It was determined to be Alprazolam.

13   Q    And what is Alprazolam, based on your training in

14   pharmaceuticals?

15   A    It's the ingredient to make Xanax.

16   Q    I will show you 2.02.

17       Can you tell us what that is?

18   A    This is the actual box that was sent to Sean Gygi which

19   contained the Alprazolam.

20   Q    So that's what we've been looking at here in the photos

21   on the screen?

22   A    Yes, sir.

23   Q    So that was November 15th that you were given this

24   package with Mr. Gygi's name on it.  How did the

25   investigation of Mr. Gygi progress?

1    A    Task Force Officer Power ended up doing a search

2    warrant for the residence of Mr. Gygi.

3    Q    And that would be the address on the package there?

4    A    Yes, this one in Midvale.  It's 1003 Floret Lane,

5    apartment 14-L, in Midvale, Utah.

6    Q    So a search warrant was conducted on his residence

7    there?

8    A    It was.

9    Q    Was Mr. Gygi there?

10    A    He was.

11    Q    And describe the interactions with him.

12    A    We conducted a search warrant in his residence.  We did

13    find some drug items, including various petals of marijuana.

14    And we spoke with him.  He agreed to come to the office for

15    an interview.

16    Q    And he was interviewed at the office?

17    A    That's correct, at the DEA office.

18    Q    And at that interview was he told what was in the

19    packages?

20    A    During the course of that interview we did inform

21    Mr. Gygi that there was Fentanyl inside of the packages,

22    yes, sir.

23    Q    And what was his reaction?

24    A    He was surprised.  He had told us that he thought it

25    was MDMA, club drugs.

1   Q    That's what he had said at the interview up to that

2   point?

3   A    Yes, sir.

4   Q    And, again, what was his reaction?  Did his demeanor

5   change at all?

6   A    It did.  He was -- I don't know if you want to say

7   surprised.

8   Q    Okay.  And he was allowed to leave.  He was not

9   arrested at that point, correct?

10  A    That's correct.

11  Q    Did law enforcement have more contact with Mr. Gygi,

12  then, the next day?

13  A    Before Mr. Gygi left, I told him that -- we told him to

14  call us, and I believe I gave him TFO Power's phone number

15  before he left our office.

16  Q    Okay.  And did he then call the next day?

17  A    Yes.

18  Q    And was he interviewed?

19  A    He was.

20  Q    And what did he say?

21  A    We went out to his residence again and met him there,

22  where he told us he wasn't aware that it had been Fentanyl

23  and he wanted to cooperate with us.

24  Q    And gave a fairly detailed statement about what he had

25  been up to?

1    A    He did.  He said that he was shipping packages and that

2    he was being paid to do that.

3    Q    Did he identify some of the people he was involved

4    with?

5    A    He said -- he mentioned a female that he knew by the

6    name of Katy, and that he would pick up the packages from

7    her.  He identified Mr. Shamo and said he was working with

8    him.  He agreed to contact Mr. Shamo at that time.

9    Q    And did agents then set up a meeting between Mr. Gygi

10   and Mr. Shamo?

11   A    Yes.  Mr. Gygi was able to contact Mr. Shamo and ask

12   him to come over to his apartment.

13   Q    And is that the recording that we heard in court

14   earlier today?

15   A    Yes, sir.  Mr. Gygi met Mr. Shamo in the parking lot of

16   the apartment complex and got into his vehicle, and that's

17   where the recording occurred.

18   Q    And where were you while this was taking place?

19   A    I was inside Mr. Gygi's apartment.

20   Q    And were you equipped with something that allowed you

21   to overhear the conversation?

22   A    He was -- yes.  We could hear the conversation from

23   where we were with the recording device.

24   Q    And were there other officers also around to kind of

25   ensure nothing went wrong?

1   A    Task Force Officer Power was with me, and also Task

2   Force Officer Fife from West Valley City.

3   Q    So you heard what was said on that recording about

4   setting up further business in Colorado?

5   A    Yes, sir.

6   Q    And did you and Task Force Officer Power then come up

7   with a further investigative plan with regard to this

8   organization?

9   A    Mr. Gygi agreed that he would pick up the packages in

10   South Jordan for us while we were with him.

11   Q    Okay.  So explain what he told you about how that

12   pickup was set up, in general, leading up to this date.

13   A    He would be contacted by Katy, and she would tell him

14   when the packages were ready.  At that point he would go

15   over there and pick them up at the residence.  Once he had

16   picked them up, he would take them to various post offices

17   throughout the valley.

18   Q    You started to say that you arranged with him to do a

19   normal pickup on November 18th of 2016?

20   A    Yes, sir.

21   Q    And where were you situated in relation to Mr. Gygi

22   when that happened?

23   A    We followed him in his own vehicle.  TFO Power and I

24   followed him out there.  We had a surveillance team set up.

25   So we would follow him out there, and there we'd get to a

1    point where -- because we did not want people to know that

2    we were with him -- we would hand him off to the next

3    surveillance person who was parked on the street out there

4    in South Jordan.

5    Q    In any event, after you picked him up, he was under

6    continued surveillance?

7    A    Yes, sir.

8    Q    So all the packages got back to -- where did you guys

9    take them?

10   A    To the South Jordan Police Department.

11   Q    And you and Task Force Officer Power addressed a few of

12   them there?

13   A    We brought them inside and opened up some of them to

14   see what the contents were.

15   Q    And generally what did you see?

16   A    We saw pills, appearing to be Xanax pills and oxycodone

17   pills.

18   Q    And color-wise, what do those look like?

19   A    The oxycodone pills -- or Fentanyl pills appeared to be

20   blue.  They were blue.  And the Xanax bars, is what they're

21   called, is white.

22   Q    And shape-wise?

23   A    The Xanax bars are oblong and the Fentanyl pills are

24   round.

25   Q    Okay.  And then ultimately what happened to those

 1  packages?

 2  A     They were put into evidence and sent to the lab.

 3  Q     So take them back to DEA for processing there?

 4  A     Yes, sir.

 5  Q     We'll get into that in a little more detail here, but

 6  let's kind of complete the narrative here a little bit.

 7        So November 18th, that was a Friday, and Mr. Gygi

 8  picked up the packages that night, as you described,

 9  correct?

10  A     Correct.

11  Q     Then did officers put together an investigative plan to

12  further this investigation?

13  A     He informed us that they did those package pickups five

14  to six nights a week.  So after we did the first one, we

15  were going to do another pickup on that Sunday night before

16  we did another pickup.

17  Q     And that gave agents time to kind of put an operation

18  plan together and get more people there to make sure this

19  all went smoothly, correct?

20  A     Yes, sir.

21  Q     So Mr. Gygi was instructed not to do a pickup on

22  Saturday, the day in between?

23  A     Correct.

24  Q     So tell us about Sunday, then, Sunday, November 20th.

25  Was Gygi with you guys?

```
 1    A     He met us at the South Jordan Police Department.

 2    Q     And were there some text messages exchanged?

 3    A     Yes.  Text messages between him and the female he knew

 4    as Katy.

 5    Q     Let's briefly look at 17.04.

 6          Do you recall seeing these text messages?

 7    A     Yes, sir.

 8    Q     And Task Force Officer Power took a photo of Mr. Gygi's

 9    phone with these messages?

10    A     That's correct.

11    Q     And the contents of these are he'll pick them up about

12    six o'clock, correct?

13    A     Yeah, before seven.  Yes, sir.

14    Q     Was that part of the officers orchestrating this?

15    A     Yes.

16    Q     Tell us how that worked, or why?

17    A     So we had Mr. Gygi reach out to Katy via text message

18    to see if we could arrange the pickup on the 20th.

19    Q     And kind of arrange the timing under your terms?

20    A     Yes, sir.

21    Q     Tell us how that went down.

22    A     It was very similar to the previous operation that we

23    had done on the 18th.  We set up surveillance at the

24    residence, since we already knew where it was, in South

25    Jordan.  And the surveillance team, we followed Mr. Gygi out
```

1    there, and he picked up more packages -- more similar

2    packages from the doorstep of the residence.

3    Q    So the packages are already on the doorstep when

4    Mr. Gygi arrives?

5    A    Yes, sir.

6    Q    And he just walks up, picks them up, brings them to his

7    car?

8    A    That's correct.

9    Q    And then what did you guys -- what happened to the

10   packages from the doorstep?

11   A    Again, we took those back to the South Jordan Police

12   Department, opened some of them, verified the contents,

13   placed them into evidence.  They were also ultimately sent

14   to the DEA laboratory.

15   Q    Did you know what the contents of these pills were,

16   like that they were Fentanyl and Alprazolam?

17           MR. SKORDAS:  I'll object without foundation,

18   Your Honor.

19           THE COURT:  Let's get an answer to the first

20   question and then ask him how he knows.

21   BY MR. STEJSKAL:

22   Q    Did agents suspect what was in these packages?

23   A    If you look at the pills, the white ones look like they

24   appear to be Xanax and the blue ones appear to be Oxycodone.

25   I don't know what they are until the lab tests them.

1    Q    Did agents make a further investigative plan, then,

2    going forward after those packages were picked up on the

3    20th?

4    A    The plan after that moving forward was to conduct a

5    search warrant at that residence where the packages were

6    picked up and then also at the residence of Mr. Shamo.

7    Q    Was there some urgency to conducting these search

8    warrants soon?

9    A    Because we believed that this organization was involved

10   in Fentanyl, we wanted to make sure that we stopped it as

11   soon as we could.

12   Q    And obviously you were aware of the Tonge and Bustin

13   Daybreak residence from seeing Gygi pick up packages there,

14   correct?

15   A    Yes, sir.

16   Q    Tell us about agents' knowledge of the Shamo residence

17   and how that fit in at this point.

18   A    Mr. Gygi had informed us about Mr. Shamo, and we had

19   previously identified Mr. Shamo's address.  Our intel

20   analyst connected some of the dots from the shipping

21   information and also from social media of Mr. Jensen and

22   Mr. Shamo, or friends, and things of that nature.  So we

23   identified Mr. Shamo's residence in Cottonwood Heights.  And

24   one of our agents went by to verify the vehicles that were

25   in the driveway registered to Mr. Shamo, and we conducted

1    surveillance at his residence on the night that he met with

2    Gygi.  He was followed over from that location.

3    Q    And which night was that?

4    A    That was the 18th -- or the morning of the 18th.

5    Q    Okay.  So agents were watching the Shamo residence?

6    A    Yes, sir.

7    Q    So were search warrants successfully obtained, then,

8    and signed by a judge?

9    A    They were, yes, sir.

10   Q    And where did they serve those search warrants?

11   A    The search warrants were served at the residence of

12   Tonge and Bustin on Open View Lane in South Jordan and also

13   on Titian Way in Cottonwood Heights, the residence of

14   Mr. Shamo.

15   Q    And we'll get into detail on that, but let's first

16   start with the packages that we just talked about from Gygi,

17   picking those up with agents watching.

18        Let's first look at Exhibit 7.00, which is this box.

19   A    Sure.

20   Q    Can you tell us what that is?

21   A    These are the mailed packages that contain the pills

22   that were got from the residence of Tonge and Bustin on the

23   November 18th, multiple packages.

24   Q    How did those packages get separated from the contents

25   of those packages?

```
 1    A    Well, when we processed them, we pulled out the bags of
 2    pills so we could send the pills to the lab.
 3    Q    And then kept all the boxes in a --
 4    A    We kept all the boxes.  We wound up actually making a
 5    chart with all the names on it that were on the packages.
 6    Q    From the address labels?
 7    A    Correct.
 8    Q    Let's look at Exhibit 7.01.
 9         So 7.00, the boxes you have there, that was from the
10    November 18th, the first pickup of packages by Mr. Gygi?
11    A    Yes, sir.
12    Q    What's 7.01 here?
13    A    This is a picture of these packages at the South Jordan
14    Police Department.
15    Q    Again, I see a couple of them open.  So is that what
16    you were talking about, that you guys opened a couple of
17    them?
18    A    Yes, sir.
19    Q    Then let's look at 7.02.  And what is that?
20    A    This is a picture of these packages -- also these
21    packages after we brought it over to the DEA office.
22    Q    And does that lay them out so you can kind of get a
23    scope of how many we're talking about here?
24    A    Yes, sir.
25    Q    Let's look at 7.83.
```

1        So I think this is going to be a series.  Let me get

2   that box out of your way.

3   A    Sure.

4   Q    Tell us what we're looking at here in 7.83.

5   A    So this is one of the boxes that was seized on the

6   18th.  The 14 on the bottom of the invoice is our exhibit

7   number for this one.  So it's Exhibit 14, all these pills

8   for that exhibit.  And then that's the box that contained

9   those pills.

10  Q    So did you assist Task Force Office Power in processing

11  these items?

12  A    Yes, sir.

13  Q    So tell us how that went about.

14  A    So when we would open the package, we would get one of

15  our evidence bags, similar to the one I showed you, like the

16  ones here on the table, and we would put the pills in the

17  evidence bag, seal it, label it for shipping to the lab.

18  Q    Okay.  And you went through that with each one of these

19  packages that was seized after Mr. Gygi took it from the

20  residence on November 18th?

21  A    Yes, sir.  Each package is a different exhibit.

22  Q    And what's the paper there on the bottom that has the

23  14 on it?

24  A    This is an invoice.  This organization made up their

25  own invoices, and this would say Jamaica green coffee.  They

1   would package the pills that are in these Ziploc bags inside

2   of Mylar bags so you can see it, which would be similar to

3   what a bag of coffee would come in, and then also put the

4   invoice inside of that package.

5   Q    So I'm going to hand you 7.84.

6       Can you tell us what that is?

7   A    These are the actual invoices that were inside the

8   boxes.  For example, this one is 14, which is the 14 that's

9   in this picture here.

10   Q    So there appears to be a number of those in that

11   exhibit 7.84?

12   A    Yes, sir.

13   Q    Tell me about the process.  How did they get

14   accumulated like that?

15   A    So every time we opened a package, we would take the

16   invoice out of the package, and we just wound up stacking

17   them together.  They were turned into their own exhibit.

18   Q    And tell me about the numbering system.  That one has

19   a 14.  If we scroll on the pictures, looking at the screen

20   again, it looks like it has a 15?

21   A    Yes.  I explained, you know, the number that we just

22   wrote down to keep track of which exhibit this came out

23   of -- this invoice came out of.  Each one of these invoices

24   has a different number on it.

25   Q    All right.  Let's scroll through some of these

1    pictures, then.

2         So this one appears to be a -- there were a few of

3    those really large boxes?

4    A    Yes, sir.

5    Q    And those seem to have more contents than the smaller

6    ones obviously, correct?

7    A    Correct.

8    Q    Let's just scroll through these pictures kind of

9    slowly.

10        So what's that one?

11   A    Exhibit 17.

12   Q    And what are we looking at at the bottom there?

13   A    These are the oblong white pills that have the

14   appearance of being Xanax.

15   Q    And, again, ultimately this was all sent to the lab.

16   That's what you guys were doing in processing these,

17   correct?

18   A    Yes, sir.

19   Q    Let's just scroll through here.

20        What number is that?

21   A    Exhibit 18, also the white bars.

22             MR. STEJSKAL:  Can we zoom in on the white ones on

23   the bottom.

24   BY MR. STEJSKAL:

25   Q    Do you see those black numbers on the upper right-hand

1    corner of those bags?

2    A    Yes, sir.

3    Q    Do you know what those mean?

4    A    I believe that this -- those numbers were already

5    written on the bags.  I believe it's to account for how many

6    Xanax bars in this case are actually inside of each bag.

7    Q    So agents didn't write those numbers on there.  That's

8    as they were found?

9    A    Correct.

10        Exhibit 19.

11   Q    Let's just scroll on through here.

12   A    Exhibit 20, Exhibit 21, Exhibit 22, Exhibit 23, Exhibit

13   24, Exhibit 25, Exhibit 26, Exhibit 27, Exhibit 28, Exhibit

14   29, Exhibit 30, Exhibit 31, Exhibit 32, Exhibit 33, Exhibit

15   34, Exhibit 35, Exhibit 36, Exhibit 37, Exhibit 38, Exhibit

16   40, Exhibit 41, Exhibit 43, Exhibit 44, Exhibit 45, Exhibit

17   47, Exhibit 48, Exhibit 49, Exhibit 50, Exhibit 51, Exhibit

18   52, Exhibit 53, Exhibit 54, Exhibit 55, Exhibit 56, Exhibit

19   57, Exhibit 58.

20   Q    Let's stop on that one for just a second.

21        So that one has two numbers.  Why is that?

22   A    So when we do drug exhibits, we separate each pill.

23   For example, if there's ten different colored pills, we

24   would have to create ten different exhibits.  So in this

25   case, there's two different kinds of pills inside of this

 1    package.  So we separated them into different exhibits.

 2    Q    And's that's for DEA keeping track and for the lab to

 3    work with, correct?

 4    A    Yes, sir.

 5            MR. STEJSKAL:  Go ahead, Yvette.

 6            THE WITNESS:  Exhibit 60, Exhibit 61, Exhibit 62,

 7    Exhibit 63, Exhibit 64, Exhibit 65, Exhibit 66, Exhibit 67,

 8    Exhibit 68, Exhibit 69, Exhibit 71, Exhibit 72, Exhibit 73,

 9    Exhibit 74, Exhibit 75, Exhibit 76, Exhibit 77, Exhibit 78,

10    Exhibit 79, Exhibit 80, Exhibit 81, Exhibit 82, Exhibit 83,

11    Exhibit 84, Exhibit 85, Exhibits 86 and 87, Exhibit 88,

12    Exhibit 90, Exhibit 92, Exhibit 93, Exhibit 94.

13    BY MR. STEJSKAL:

14    Q    So this took some time to process.

15    A    Yes, sir.

16    Q    And you, according to DEA system, have to do that very

17    meticulously to account for everything that's there,

18    correct?

19    A    Correct.

20    Q    And these were all from the November 18th pickup,

21    correct?

22    A    Yes, sir.

23    Q    Now as you said, all these were ultimately sent to the

24    lab, the DEA lab?

25    A    That's correct.

```
 1    Q     Which is where?

 2    A     It's in Pleasanton, California.

 3    Q     Which is right near San Francisco?

 4    A     San Francisco.

 5    Q     And how did they get out there, do you recall?

 6    A     These ones I believe were driven out by some people in

 7    our group.

 8    Q     Okay.  And each one of these photos we looked at

 9    obviously corresponds to the drugs pictured in those photos,

10    correct?

11    A     Yes, sir.

12    Q     You see numerous totes and bags here on the table to my

13    right.

14    A     Yes, sir.

15    Q     Have you gone through the contents of all of those?

16    A     I have gone through the Alprazolam ones.  The Fentanyl

17    pills are sealed.

18    Q     And that's these over here with the tape around them?

19    A     Correct.

20    Q     And that's a health and safety issue?

21    A     Yes, sir.

22    Q     But you're able to see the numbers on those by looking

23    through the tote?

24    A     Yes.

25    Q     And my question is this, then.  So all these got
```

1  transported to the lab and they've come back to us for court

2  here today, correct?

3  A    Correct.

4  Q    So in order to complete the record and make sure the

5  jury understands, we've kind of got to talk about each one

6  of these exhibits to make sure that they all match up to the

7  pictures.  So we're talking about Exhibit 7.03 to 7.82.

8        What's the best way to do this?  Let's see.

9            THE COURT:  I assume that's a rhetorical question?

10           MR. STEJSKAL:  You assume correctly, Your Honor.

11 BY MR. STEJSKAL:

12 Q    Well, let's just do it this way.  I'll have you look at

13 the tote.  So, for example, peering into that tote in front

14 of you there, do you see Exhibit 14?

15 A    Yes, sir, I do.  Exhibit 14 is right here.

16 (Indicating)

17 Q    And what does that contain?

18 A    It contains the blue Fentanyl pills.

19 Q    And same appearance as in the photo up on the screen,

20 correct?

21 A    Yes, sir.

22 Q    And so essentially we've got all those items in the

23 tote, and we can't pull them out, but they match up to

24 the --

25 A    That's correct.  Obviously I can't see the exhibit

1   numbers on all the bags, but they do appear in here.

2   Q    And looking at the -- use 14 as an example.  There's a

3   white label on that that says Exhibit 14?

4   A    Yes.

5   Q    People sign that?

6   A    They do.

7   Q    Okay.  Talk about that.

8   A    So in this case it would have been TFO Power and

9   myself, which means we put the pills inside the bag, we

10  signed it at the top, we also signed it down here, dated it,

11  sealed it, and then it got sent to the lab.

12  Q    So with each one of these exhibits, the numbers that

13  you guys assign, for example, Exhibit 14, that then matches

14  up to the number the lab uses from then on in the case,

15  correct?

16  A    Correct.

17  Q    So you saw some lab reports that came back on these

18  drugs saying what they were, correct?

19  A    Yes, sir.

20  Q    And does the lab then match up the numbers as you

21  submitted them to the drug exhibit?

22  A    Yes.

23  Q    In addition to those in the sealed tote, there were

24  also Alprazolam exhibits seized on November 18th, correct?

25  A    That's correct.

1    Q    And those are in this other tote?

2    A    Yes, sir.

3    Q    Why don't you pull one of those out and explain one of

4    those to us.

5    A    We'll just go in order.  This is Exhibit 15.  So it

6    would have just come right after.  The exhibit numbers

7    aren't assigned to any specific drug, just specific

8    exhibits.

9         So this one is also -- TFO Power and I put it in the

10   bag, we signed it at the top, dated it, sealed it, filled

11   out the information here, sent it to the lab.

12        On the bottom part here is the lab use.  That's where

13   they say that they opened it.  So they opened it on this

14   date for analysis.  They resealed it.  There's an evidence

15   bag here where they signed it, put the case number, the

16   date, and then they would heat seal the bottom.  So it's a

17   heat seal again.

18   Q    And then the same thing with the packages seized on

19   November 20th from Mr. Gygi that he picked up, same process?

20   A    Yes, sir, same process.

21   Q    So let's first look at Exhibit 8.00.

22        Can you tell us what that is?

23   A    Yes, sir.  This is the second set of packaging that we

24   got.  This was from the 20th.  Each one of these -- each one

25   of these envelopes is going to a different person.

1        This one -- for example, this one is going to

2   Mississippi, Florida, New York, so on and so forth.

3   Q    Let's look at photo 8.03.  Can you tell us what that

4   is?

5   A    This is the picture of the packages -- of these

6   packages lined up on the table at the DEA office in Salt

7   Lake City.

8   Q    So, again, that was immediately before you and TFO

9   Power were opening them and processing them and sending them

10  to the lab?

11  A    That's correct.

12  Q    Let's go through the same process with Exhibit 8.02.

13  Tell us what that is.

14  A    This is a box that we got on the 20th.  It's addressed

15  to an address in Portland, Oregon.

16  Q    And there was some further investigation done on that,

17  correct?

18  A    Yes, sir.  There was an HSI investigation going on, a

19  separate one going on in Oregon about a distributor up

20  there.

21  Q    Let's scroll through these photos real quick.

22       What's that one?

23  A    This is Exhibit 95.

24  Q    And what does that appear to be on the bottom of 95?

25  A    It appears to be the blue Fentanyl pills.

1    Q    And, again, those were sent to the lab and analyzed by

2    them?

3    A    That's correct.

4    Q    Can we focus in on the bottom again, and those black

5    numbers up in the right corners of those?

6    A    Those were written on the bags already.

7    Q    And, again, what does that appear to be in the upper

8    right?

9    A    I can see this one in the corner.  It says M5,000.

10   Q    And then what did that appear to be to you?

11   A    A lot of the pills in this case were stamped with an M,

12   which is a common stamp used on an actual prescription for

13   Oxycodone.

14   Q    Okay.  And the numbers seem to be the count?

15   A    Yeah, it appears.  I mean I can't be certain.

16        Exhibit 96, Exhibit 97, Exhibit 98, Exhibit 99, Exhibit

17   100, Exhibit 101, Exhibit 102, Exhibit 103, Exhibit 104,

18   Exhibit 105, Exhibit 106, Exhibit 107, Exhibit 108, Exhibit

19   109, Exhibit 110, Exhibit 111, Exhibit 113, Exhibit 114,

20   Exhibit 115, Exhibit 116, Exhibit 117, Exhibit 118, Exhibit

21   121, Exhibit 122, Exhibit 123, Exhibit 124, Exhibit 125,

22   Exhibit 126, Exhibit 127, Exhibit 128, Exhibit 129, Exhibit

23   130, Exhibit 131, Exhibit 132, Exhibit 133, Exhibit 134,

24   Exhibit 135, Exhibit 136, Exhibit 137, Exhibit 138.

25   Q    And, again, there are drugs that were sent to the lab

1   that correspond to all those pictures, correct?

2   A    Yes, sir.

3   Q    Let me hand you 8.01.

4          THE COURT:   What is it?   I didn't hear you.

5          MR. STEJSKAL:   8.01.

6   BY MR. STEJSKAL:

7   Q    Can you tell us what that is?

8   A    These are the invoices that we removed from those boxes

9   that were sealed on -- that were received on the 20th.   So

10  the second set.

11  Q    So same process as the others.   As you opened these

12  packages, you took the invoices out?

13  A    Yes, that's correct.   We took them out and stacked them

14  together and made them a separate exhibit.

15  Q    A nondrug exhibit as opposed to going with the drugs?

16  A    Correct.

17  Q    Let's now look at this tote.   Just looking through

18  there, can you identify those?

19  A    Yes, sir.   These are the blue Fentanyl pills that were

20  in the packages that were picked up on November 20th.

21  Q    I guess for clarity, maybe the best way to do this is

22  to look at the government's exhibit sticker or the top, that

23  yellow one on the very top of the tote --

24  A    I see it.

25  Q    -- and reference all the exhibits that are in there by

1  number so our record is clear as to what all we're looking

2  at.  I think that clarify things.

3  A     Yes, sir.  8.04, 8.06, 8.10, 8.12, 8.15, 8.17, 8.21,

4  8.22, 8.25, 8.26, 8.27, 8.28, 8.30, 8.31, 8.34, 8.38, 8.40,

5  8.41, 8.43, 8.45, 8.46, and 8.47.

6  Q     So now that we've got everybody confused.  So the 8.0

7  numbers are the court numbers, correct?

8  A     Yes, sir.  Those are the court numbers, which are

9  different than our DEA exhibit numbers.

10 Q     But they correspond to each other.  So, in other words,

11 8.04 corresponds to one of the exhibits inside?

12 A     Yes, sir.

13 Q     Okay.

14        THE COURT:  Unless you're about done, pick a good

15 stopping point in the next few minutes.

16        MR. STEJSKAL:  Let's just finish these and we'll

17 get a good stopping point.

18 BY MR. STEJSKAL:

19 Q     I'm handing you another tote.  Can you identify those?

20 A     These are the pills that have the appearance of Xanax,

21 the white oblong ones.  This, for example, is Exhibit 97.

22 This was also sent to the lab.  This was also opened by the

23 lab and resealed by the lab.

24 Q     Is it easy enough to go through and read the court

25 numbers for those just so our record is clear?

```
 1   A    Yes, sir.  This is 8.08, 8.09, 8.11, 8.13, 8.14, 8.16,
 2   8.18, 8.19, 8.23, 8.24.  This is 8.20, 8.29, 8.33, 8.35,
 3   8.36, 8.37, 8.39, 8.42, and 8.44.
 4          MR. STEJSKAL:  We probably need to go through that
 5   with the seven series again, but maybe this is a good
 6   breaking point.
 7          THE COURT:  All right.  Thank you.
 8          Ladies and gentlemen of the jury, thank you very
 9   much for your work and attention.  We appreciate you.  We'll
10   excuse you until 8:30 in the morning.  You know the rules
11   about not talking, listening, watching, so on.  And don't
12   get in any wrecks.  We'll see you tomorrow morning about
13   8:30.
14          (Jury excused)
15          THE COURT:  We'll see you also, Mr. Hebert, at
16   8:30 in the morning.
17          THE WITNESS:  Yes, sir.
18          THE COURT:  Thank you, everyone.  We'll be in
19   recess until 8:30 tomorrow morning.
20          (Whereupon, the trial was continued to Tuesday,
21   August 13, 2019, at 8:30 a.m.)
22
23
24
25
```

1                    C E R T I F I C A T E

2

3

4          I hereby certify that the foregoing matter is

5   transcribed from the stenographic notes taken by me and is a

6   true and accurate transcription of the same.

7

8

9

10

11

12

13

14

15

16   PATTI WALKER, CSR-RPR-CP      DATED: 12-14-2020
     Official Court Reporter
17   351 South West Temple, #8.431
     Salt Lake City, Utah  84101
18   801-364-5440

19

20

21

22

23

24

25