1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4
     UNITED STATES OF AMERICA,        )
5                                     )
               Plaintiff,             )
6                                     )
          vs.                         )
7                                     )
     AARON MICHAEL SHAMO,             )   Case No:  2:16CR00631
8                                     )
               Defendant,             )
9                                     )
                                      )
10   _____    )

11

12

13

14

15

16
                 BEFORE THE HONORABLE DALE A. KIMBALL
17
                        August 13, 2019
18
                          JURY TRIAL
19
                        PAGES 175-367
20

21

22

23                        Reported by:

24            KELLY BROWN HICKEN, RPR, RMR

25                      801-521-7238

```
 1                        APPEARANCES OF COUNSEL

 2

 3    FOR THE UNITED STATES:          OFFICE OF THE US ATTORNEY

 4                                    BY:  S. MICHAEL GADD

 5                                         VERNON STEJSKAL

 6                                         KENT A. BURGGRAFF

 7                                         Attorneys at Law

 8                                    111 SOUTH MAIN ST STE 1800

 9                                    SALT LAKE CITY, UTAH 84111

10

11    FOR THE DEFENDANT:              SKORDAS & CASTON

12                                    BY:  GREGORY G. SKORDAS

13                                         KAYTLIN V. BECKETT

14                                         Attorneys at Law

15                                    560 SOUTH 300 EAST STE 225

16                                    SALT LAKE CITY, UTAH

17

18

19

20

21

22

23

24

25
```

1                        I   N   D   E   X

2   WITNESS                  EXAMINATION BY              PAGE

3   ELY HEBERT               DIRECT (cont'd) BY STEJSKAL 180

4                            CROSS BY SKORDAS            201

5                            REDIRECT BY STEJSKAL        210

6                            RECROSS BY SKORDAS          212

7

8   JESSICA GLEAVE           DIRECT BY GADD              214

9                            CROSS BY BECKETT            228

10

11  JOSHUA FIFE              DIRECT BY STEJSKAL          237

12                           CROSS BY SKORDAS            254

13

14  MICHAEL HAMIDEH          DIRECT BY STEJSKAL          257

15                           CROSS BY BECKETT            304

16                           REDIRECT BY STEJSKAL        309

17

18  ALEXANDRYA MARI TONGE    DIRECT BY STEJSKAL          313

19

20

21

22

23

24

25

```
 1                SALT LAKE CITY, UTAH, TUESDAY, AUGUST, 13, 2019
 2                            *   *   *   *   *
 3                (Whereupon, the following proceedings were
 4                          held at the bench:)
 5                THE COURT:  Good morning.
 6                MR. SKORDAS:  Good morning, Judge.
 7                THE COURT:  I reviewed this.  You saw it overnight?
 8                MR. SKORDAS:  Yes.
 9                THE COURT:  It's a 10th Circuit instruction.  I
10      think I have to give this.  If you want to make a record
11      against me giving it?
12                MR. SKORDAS:  No.  I mean, if that's your ruling I
13      understand.  I don't think that we did anything in our opening
14      that warranted such an instruction, but I understand the
15      Court's concern in an abundance of caution.
16                THE COURT:  I am concerned.  I think -- I tend to
17      sort of agree with you in the sense that I think what the jury
18      will remember from that opening statement is that potentially
19      he was involved in a continuing criminal enterprise and he
20      shouldn't be charged with -- should be convicted of homicide.
21      I think that's the general takeaway.  But you did compare the
22      charges to some extent, and that might be a problem.
23                MR. SKORDAS:  I understand.
24                THE COURT:  I'm not going to highlight anything you
25      said.  I'm just going to say, I need to give you one more
```

1    preliminary instruction.

2              MR. SKORDAS:  You're going to do that today as we

3    start the trial?

4              THE COURT:  Yes.

5              MR. SKORDAS:  Okay.  I think that draws some unfair

6    attention to it, but I also understand that.  So I don't know

7    how else you would do it.

8              THE COURT:  I don't really, either.

9              MR. GADD:  Hopefully with a separation of a day

10   there's less unfair attention.

11             THE COURT:  I think it will perceived as some

12   instruction that I forgot to give them yesterday.

13             MR. SKORDAS:  Okay.  All right.

14             THE COURT:  I think that's the way it is more

15   likely is to be perceived.

16             MR. SKORDAS:  That's fair.  Thank you, Judge.

17             THE COURT:  Thank you both.

18             (Whereupon, the following proceedings were

19        held in open court:)

20             THE COURT:  We'll bring in the jury and proceed.

21             (Whereupon, the jury returned to the court

22        proceedings.)

23             THE COURT:  Good morning again, ladies and

24   gentlemen of the jury.  Thank you for your promptness and

25   attention.  I need to give you one more preliminary

1    instruction.

2            You are here to decide in this trial whether the

3    government has proved beyond a reasonable doubt that the

4    defendant is guilty of the crimes charged, crime or crimes

5    charged.  It is not up to you to decide whether anyone who is

6    not on trial in this case should be prosecuted for the crime

7    or crimes charged.  The fact that another person also may be

8    guilty is no defense to a criminal charge.  The question of a

9    possible guilt of others should not enter into your thinking

10   as you decide whether this defendant has been proved guilty of

11   the crime or crimes charged.

12           Thank you, you may proceed, Mr. Stejskal.

13           MR. STEJSKAL:  Thank you, Your Honor.

14                      ELY HEBERT,

15        called as a witness at the request of Plaintiff,

16         having been previously duly sworn, was examined

17                 and testified further as follows:

18                 DIRECT EXAMINATION (Continued)

19   BY MR. STEJSKAL:

20       Q.   Let's first clean up a couple things from yesterday

21   and then get back to chronological order.

22           So let's talk first about November 17th, the day

23   that Mr. Gygi was first spoken to.  Was there a second package

24   that was given to you on that date?

25       A.   Yes, there was.

```
 1          Q.    And who was that given to you by?

 2          A.    Agent Ashment.

 3          Q.    Homeland Security?

 4          A.    Homeland Security, yes, sir.

 5          Q.    And let's look at 5.00.  Do you recognize that?

 6          A.    Yes, sir.

 7          Q.    What is that?

 8          A.    That is the contents that was in the package.

 9          Q.    And Mr. Gygi spoke about that package yesterday.

10    And that was addressed to him?

11          A.    Yes, sir.

12          Q.    Then moving to November 18th of 2016, you testified

13    that there were a number of packages that you observed

14    Mr. Gygi take from the porch area of the other women's home?

15          A.    We observed that.  I didn't observe that portion

16    myself because I explained yesterday we would hand them off to

17    the next surveillance team so they wouldn't see us.  Yes, sir.

18                THE COURT REPORTER:  I'm sorry.  I couldn't hear

19    you.

20                THE COURT:  Speak up and right into the mic.

21                THE WITNESS:  Yes, sir.

22                THE COURT:  What was the last part of your answer?

23                THE WITNESS:  I didn't see him pick up the packages

24    myself.  That would have been somebody else on our

25    surveillance team.
```

1         Q.    BY MR. STEJSKAL:  But then you went to South Jordan

2    with Task Force Officer Power to process all of those

3    packages?

4         A.    Yes, sir.

5         Q.    And we went through the photographs of those

6    yesterday; correct?

7         A.    We did.

8         Q.    And I'm going to show you the actual physical items

9    from those packages to make sure we have a record clear about

10   what we were talking about.

11        A.    Yes, sir.

12        Q.    So first I handed you that sealed tote.  Can you

13   tell us what's in that?

14        A.    There are drug exhibits containing Fentanyl pills.

15        Q.    And again, are the stickers on the side that show

16   those are the ones you processed?

17        A.    Yes, sir.

18        Q.    And now I'm going to have you read the yellow

19   sticker on the top with the numbers on there to tell us what's

20   all in that.

21        A.    So we went through and made a list of the item --

22   the exhibits that were in here, and they're written on the top

23   here.  And those would be Exhibits 7.10, 7.11, 7.14, 7.17,

24   7.18, 7.20, 7.21, 7.22, 7.25, 7.27, 7.28, 7.29, 7.30, 7.33,

25   7.34, 7.35, 7.36, 7.37, 7.38, 7.39, 7.40, 7.41, 7.42, 7.45,

```
 1    7.46, 7.47, 7.48, 7.52, 7.53, 7.54, 7.56, 7.57, 7.58, 7.60,

 2    7.61, 7.62, 7.66, 7.67, 7.68, 7.69, 7.70, 7.71, 7.73, 7.74,

 3    7.75, 7.76, 7.78, 7.79, 7.80, 7.81 and 7.82.

 4         Q.   Thank you.  And again, those have different numbers

 5    that the lab used.  Those are the court numbers that you just

 6    read off; correct?

 7         A.   That's correct.

 8         Q.   And the lab numbers are approximately, what, 14?

 9    12?  The photographs we went through yesterday.

10         A.   Yes.  I see 14 here.  14 is here, for example.

11         Q.   Okay.  And again, these are all Fentanyl exhibits

12    in that tub?

13         A.   Yes, sir.

14         Q.   And I have now handed you a second tub.  Can you

15    identify that for us, please?

16         A.   This is a tub filled with the counterfeit Xanax

17    pills from the exhibits.

18         Q.   And again, those are from the seizures from the

19    11-18 packages?

20         A.   That's correct.

21         Q.   And can you detail those for us by sticker number,

22    I guess?

23         A.   Yes, sir.  I'm just getting these in order.

24              This first one here is 7.05, 7.07, 7.08, 7.09,

25    7.12, 7.13, 7.23.  They're a little out of order.  I
```

1    apologize.  7.15, 7.16, 7.19, 7.24, 7.31, 7.32, 7.43, 7.51,

2    7.49, 7.50, 7.59, 7.63, 7.64, 7.65, 7.72 and 7.77.

3        Q.   Thank you.  Those are from November 18th.

4    Yesterday you went through a series from November 20th;

5    correct?

6        A.   Yes, sir.

7        Q.   And that was in those other totes?

8        A.   Yes, sir.

9        Q.   We were calling the 8 series?

10       A.   Yes, sir.

11       Q.   Was there a third set of packages that the women

12   prepared that Mr. Gygi was unable to deliver?

13       A.   Yes, sir.

14       Q.   You heard testimony yesterday that, from Mr. Gygi

15   that they ended up being seized by the Postal Inspector?

16       A.   That's correct.

17       Q.   Did those packages end up being processed by DEA,

18   as well?

19       A.   They did.  They ended up being processed by us.

20       Q.   And there were approximately 20 more?

21       A.   Yes, sir.

22       Q.   Let's look at Government's Exhibit 6.00.  Did DEA

23   prepare anything kind of tabulating what was seized from the

24   packages on those three different seizures, November 18th,

25   November 20th and then the later ones that the Postal Service

1    seized?

2         A.   Yes, sir.  We had made a chart.  We got all the

3    packages that we had gotten with the names and locations.  And

4    we made a chart of the date, which is on the left-hand column;

5    the addressee, we used initials for people's names; the states

6    that they were going to; the number of pills; what pills they

7    were; and the markings that were on the pills.

8         Q.   So looking at that first column on the first page

9    there, those were all obtained on --

10        A.   On November 18th, 2016.

11        Q.   And those are the packages you just detailed from

12   that first tote.

13        A.   The second series, yes, sir.

14        Q.   And what was the controlled substance in those?

15        A.   Those were the Fentanyl pills.

16        Q.   The second column says:  Addressee with initials.

17   Tell me where that information was obtained from.

18        A.   We just took it off the address labels that were

19   printed on the postal packages.  So those are just initials of

20   the person that they were supposed to be shipped to.

21        Q.   And how about that third column, the state?

22        A.   Those are the -- those are the different states

23   that they were to be sent out to.

24        Q.   And did DEA later compile a map kind of showing

25   dots about which states these all went to?

1          A.    Yes, sir.

2          Q.    Let's look at the second page.

3                The date column on that?

4          A.    It's still the 18th.  November 18th, 2016.

5          Q.    Okay.  And then the third column -- or I'm sorry.

6     I guess it's the fifth column, the type of drug?

7          A.    Yeah.  One, two, three, four, five.  These are the

8     stamps.  So these are the markings that were actually

9     imprinted on the pills.

10         Q.    Okay.  The column to the left of that starts with,

11    Fentanyl at the top?

12         A.    Yes.  The Fentanyl pills and then pills that we

13    sent that weren't tested, and then Alprazolam pills on the

14    bottom portion.

15         Q.    And looking in the middle there, those first two

16    Alprazolam entries, what's the quantity there?

17         A.    10,000 each.

18         Q.    And those were some of the big bags that you just

19    showed; correct?

20         A.    Yes, sir.

21         Q.    In that second tote?

22         A.    Correct.

23         Q.    Let's look at the third page.  First, what's the

24    date column?

25         A.    These are the ones we picked up on November 20th of

1    2016.

2        Q.   And those were in the tote that you detailed

3    yesterday before we closed for the day.

4        A.   Correct.  The 8 series.

5        Q.   And so looking at that first entry on the top, how

6    many pills were in that delivery?

7        A.   16,000 Fentanyl pills.

8        Q.   And then scrolling to the fourth page.  What is

9    that?

10       A.   It's a continuation of the previous page -- oh --

11   yeah, the stuff we had compiled.  That is the packages that

12   you were just referencing that were -- they were brought to a

13   post office, but the Postal Inspection Service was able to get

14   those before they left.

15       Q.   Okay.  And looking at the first couple Alprazolam

16   entries towards the bottom, how many pills were in those first

17   two?

18       A.   50,000 and 50,000.

19       Q.   And those are going to what states?

20       A.   Alabama and California.

21       Q.   So Government's Exhibit 6 that we just looked at,

22   that is a compilation of how many days of packages?

23       A.   Three days, sir.

24       Q.   And again, those were intercepted, so they did not

25   actually get delivered to the intended recipients; correct?

1          A.    That's correct.

2          Q.    Let's next talk about November 22nd, 2016.  Do you

3     remember that date?

4          A.    Yes, sir.

5          Q.    Happened on that day?

6          A.    We conducted search warrants, two search warrants.

7     One on Titian Way, Cottonwood Heights; and the other one on

8     Openview Lane in South Jordan, Utah.

9          Q.    And whose home was on Titian Way?

10         A.    Aaron Shamo.

11         Q.    And whose home was in South Jordan?

12         A.    Katie -- Bustin and Tonge as I know them.

13         Q.    There's references over there.

14         A.    I'm sorry.  Yes.  Bustin and Tonge.

15         Q.    Were you in attendance at one of those search

16    warrant services?

17         A.    I was, on Titian Way at Shamo's residence.

18         Q.    Do you recall approximately what time of day entry

19    was made?

20         A.    Approximately 11:00 a.m.

21         Q.    And describe who made entry into the home.

22         A.    We have what's known as a HEAT Team.  Those are the

23    guys that dress up in the suits.  They're certified to work

24    with chemicals.  They put the suits on.  They go in with a

25    search warrant and deal with the chemicals.  I'm not on that

1  team.  They're the ones that conducted the entry of the

2  residence.

3        Q.   So did you go into the home?

4        A.   I went into the home later at night to help remove

5  some heavy equipment with a rope, but I was not part of going

6  into the pill room or anything like that.

7        Q.   That was because you didn't have hazardous

8  materials suit.

9        A.   Correct.

10       Q.   Did you encounter the defendant Mr. Shamo?

11       A.   Yes, sir.

12       Q.   Describe that.

13       A.   When TFO Power and I arrived on the scene I walked

14  up the driveway of the residence, and that's when I first

15  encountered Mr. Shamo in the driveway.  He was standing next

16  to his garage.

17       Q.   And did you take action with regard to Mr. Shamo?

18       A.   Yes, sir.  They had brought him out.  It was cold

19  outside.  Mr. Shamo was only wearing shorts and a T-shirt, so

20  initially I put him in the back of his own truck, which was

21  parked in the driveway.  And then we wound up transporting

22  him.  He was decontaminated, and then we transported him to

23  the jail.

24       Q.   Okay.  Tell us about the decontamination process.

25  Why do we do that and what happened?

1    A.    That's also the responsibility of the HEAT Team, so

2    there was a station set up, and they would decontaminate

3    people.  It's not something that I am part of so.  We brought

4    him over to the truck where they were at, and they processed

5    him.

6    Q.    And were any items taken from Mr. Shamo?

7    A.    Mr. Shamo had an iPhone with him when he was

8    arrested.

9    Q.    Any safety gear he may have had?

10   A.    I was told he had gloves in his pocket and a mask.

11   Q.    I'm going to hand you what's been marked as

12   Government's Exhibit 13.06.  Can you tell us what that is?

13   A.    This is the iPhone that Mr. Shamo had with him.

14   Q.    And what did you do with that?

15   A.    After we brought Mr. Shamo to the jail we brought

16   this phone back to the office and processed it as evidence.

17   We later turned it over to Homeland Security investigations.

18   That's why it has this.  They opened it.

19   Q.    Did Mr. Shamo make any spontaneous statements about

20   his activities?

21   A.    When we were in the driveway, he asked what we

22   knew.  And then when we were driving him he made a comment

23   about he had just cashed in some Bitcoin in excess of what he

24   thought was 700,000.

25   Q.    And did he make any other inquiries about

1    assistance you might need?

2         A.   He was wondering if we wanted to know about the

3    people in China.

4         Q.   Ultimately where did you take Mr. Shamo?

5         A.   To Davis County Jail.

6         Q.   After that encounter, did you return to Titian Way,

7    the home?

8         A.   We did, yes, sir.

9         Q.   And where did you park?

10        A.   By that time there was many vehicles on the street.

11   The Hazmat teams were there, the fire department, the National

12   Guard team.  So TFO Power parked his vehicle at the end

13   because we couldn't get any further, so halfway down the

14   street, I guess.

15        Q.   Describe the rest of the scene when you got there

16   as far as evidence processing, what was going on.

17        A.    We went back towards the front of the residence.

18   And on the front, on the front yard some of our agents and

19   officers had set up portable tables.  And so the HEAT Team,

20   the guys in the Hazmat suits, were going in the house and

21   doing the actual search, would bring items out to the table.

22   The agents and officers at the table would write down what was

23   being brought out.

24        Q.   Did you and Task Force Officer Power end up with

25   any particular items that night?

191

1          A.    There was money that came out of the house, which
2     we transported back to the office.
3          Q.    Okay.  Let's look at Exhibit 13.10.  Can you tell
4     us what that is?
5          A.    Yes.  This appears to be one of the bags of money
6     that was brought out of the residence.
7          Q.    Let's look at 13.11.  Can you identify that?
8          A.    This is the money on the table at our office, at
9     the DEA office in Salt Lake City.
10          Q.    So how did the money get back to the office?
11          A.    We brought in a TFO Power's car.
12          Q.    Can we look at 13.01 of the very last photo?
13                Can you identify that?
14          A.    This is the back of TFO Power's Expedition that we
15     put the money in to transport to the office.
16          Q.    Was it counted on the scene?
17          A.    No, sir.  We don't count the money on scene.
18          Q.    Why not?
19          A.    So we don't make any errors.
20          Q.    And is there a rule about how many people need to
21     take the money so nothing disappears?
22          A.    Two people go with the money.
23          Q.    And that was you and Task Force Officer Power?
24          A.    That's correct.
25          Q.    And did you successfully get all the money back to

1   DEA?

2          A.   Yes, sir.

3          Q.   So go back to 13.11.

4               So how is it processed at DEA?

5          A.   So we brought it back.  This gentleman that's

6    actually in the picture in the suit, he's retired now, but he

7    was our what's called high value drug custodian.  So we put

8    this money in evidence bags, just like the evidence bags I've

9    been showing you.  Bigger than this one.  Signed it, sealed

10   it, put it in a -- we have a high value safe that's located

11   inside of our secure evidence room.  So we put it in the bags.

12   We went down there with Agent Anson, who put it in this extra

13   safe.

14         Q.   And it stays secure until further process.

15         A.   That's correct.

16         Q.   Let's look at 16.17.

17              Can you identify that photo for us?

18         A.   This is the money at Loomis.  We bring it to

19   Loomis.  They have a vault.  They count the money for us to

20   process.  We turn it over to them, and they give us a receipt.

21         Q.   And basically cut a check to the government for the

22   value?

23         A.   At this point after we bring the money to Loomis

24   they give us a receipt.  This money goes into the custody of

25   the US marshals, so we don't ever deal with this again after

1    this point.

2          Q.   And they get the accurate count then at Loomis?

3          A.   Correct.

4          Q.   And do you recall either exactly or approximately

5    how much money was there?

6          A.   It was just over $1.2 million.

7          Q.   Again, that was seized from where?

8          A.   From the residence of Mr. Shamo on Titian Way.

9          Q.   The processing of the evidence at DEA was fairly

10   extensive; correct?

11         A.   Yes, sir.

12         Q.   There's kind of a whole team of people to make sure

13   everything was counted and accounted for?

14         A.   Yes.  We work in groups with multiple agents and

15   officers.

16         Q.   And you assisted with some of that processing;

17   correct?

18         A.   That's correct.

19         Q.   I think you talked previously about how the

20   evidence process works where you seal things in evidence bags

21   and sign that?

22         A.   Yes, sir.

23         Q.   Can you explain that just briefly again how that

24   works?

25         A.   Well, for example, with this phone, we brought it

                                                              194

1    back, brought this back to the office, then we put it in this

2    bag and write the information, the case number, the exhibit

3    number, date, the location that it was acquired, who acquired

4    it, who sealed it, who witnessed it.  And then the sealer and

5    witness also signed the top before it's folded over.  I told

6    you guys about that yesterday.  And then again this was

7    reopened by Homeland Security.  So they opened it and resealed

8    it.

9          Q.   And the purpose of doing that is to make sure

10    everything is accounted for.

11          A.   Yes, sir.

12          Q.   Were there additional packages that came in after

13    the search warrant was processed or the search warrants were

14    executed?

15          A.   From South Jordan?  I'm not sure what you're

16    referring to.

17          Q.   Did you receive or pick up additional packages, not

18    that same day but days after the search warrant was executed?

19          A.   Oh, yes, sir.  Yes, sir.

20          Q.   Let's talk specifically about November 25th of

21    2016.

22          A.   Yes, sir.

23          Q.   What happened on that day?

24          A.   TFO Power was contacted by Mr. Mausia who's here.

25    He had cooperated with us, but he had received another package

1    so he wanted to turn that over to us.  Him and his girlfriend

2    Jessica Gleave lived in Utah County.  So TFO Power and I met

3    them in Draper, at McDonald's in Draper just on the west side

4    of the freeway.  Julian, Mr. Mausia turned the package over to

5    us.

6         Q.   And what did you do with that?

7         A.   We brought it back to our office to process.

8         Q.   Okay.  Let's look at Exhibit 4.00.

9              Can you identify that for us, please?

10        A.   This was the contents of the package that we picked

11   up from Mr. Mausia.

12        Q.   And again, your signature is on there as witnessed

13   by?

14        A.   Yes, sir.

15        Q.   And let's look at Exhibit 4.02.  Sorry.

16        A.   Just real quick, sir.  That writing in those

17   interior packages, that's not something we did.  That's

18   something that the lab would have done.  There's a lot of

19   writing on those bags.

20        Q.   I hand you 4.02.

21        A.   Yes, sir.

22        Q.   Can you identify that for us, please?

23        A.   This is the package that we picked up on the 25th

24   from Mr. Mausia.

25        Q.   And can you see the label on it?

1          A.    I can see the label.  It was -- it was blacked out

2    and Sharpied.  But if you look closely you can see it that

3    it's his name on there.

4          Q.    As the receiver?

5          A.    Yes, sir.

6          Q.    And let's next refer to November 28, 2016.  Did you

7    receive any other contact on that date with regard to

8    packages?

9          A.    TFO Power again received a message, this time

10   Miss Jessica Gleave had received a package, and they wanted to

11   turn it over to us.  So we went down and met them at the same

12   location, the McDonald's, and received that package.

13         Q.    I'm going to hand you what's been marked as

14   Government's Exhibit 4.05.

15         A.    Yes, sir.

16         Q.    Can you identify that for us, please?

17         A.    This is a package from China post addressed to

18   Jessica Gleave, Provo, Utah.

19         Q.    Does that appear to be the one that you took

20   possession of on November 28th, 2016?

21         A.    Yes, sir, it does.

22         Q.    How can you tell?

23         A.    We date it on the front November 28th, 2016.

24         Q.    And what happened to that after it came into your

25   guys' possession?

197

1          A.    We brought it back to the office, sealed it in this

2    bag and put it in our nondrug evidence room.

3          Q.    And the contents?

4          A.    The contents were processed, sent to the lab.

5          Q.    And let's look at Exhibit 4.03.  Can you identify

6    that for us?

7          A.    This is the bag that was sent to the lab.

8          Q.    That contains the contents of --

9          A.    That's what was inside of this box.

10         Q.    Ultimately how did all the drugs get to the lab?

11         A.    They were driven out to California by some of our

12   officers in our group.

13         Q.    And is that how drugs normally get to the lab?

14         A.    We can drive them out, we can hand deliver them or

15   we can send them through FedEx.

16         Q.    And there's special protocols for Fentanyl.

17         A.    Special protocols for Fentanyl.  This was the first

18   time that a lot of us were dealing with Fentanyl, so we were

19   being extra cautious, and that's why they were driven out by

20   two people.

21         Q.    Did you have occasion to assist FDA Agent Keys with

22   a search warrant later on in the garage?

23         A.    Yes, sir, I did.

24         Q.    Describe that for us.

25         A.    Agent Keys wrote a followup search warrant for the

 1    garage.

 2          Q.    What garage?

 3          A.    On Titian Way, the garage of Mr. Shamo, because it

 4    was believed there was further evidence in the garage.

 5          Q.    And this was when approximately?

 6          A.    I believe it was February 10th of 2017.

 7          Q.    And what, if anything, was located there?

 8          A.    Inside of the garage we removed a piece of wood

 9    that appeared to come off of a crate.

10          Q.    Okay.  And I'll hand you what's been marked as

11    Government's Exhibit 13.14.  Would you identify that for us,

12    please?

13          A.    This is the piece of wood that we took out of the

14    garage on Titian Way at Mr. Shamo's house.  I packaged it in

15    bubble wrap so people wouldn't get splinters.

16          Q.    And describe the markings on it.

17          A.    This was addressed to Luke Paz in Salt Lake City,

18    Utah.

19          Q.    And how about the markings in red up there on the

20    top?

21          A.    There's some foreign, I don't know if it's Chinese.

22    I don't know.  But that's what it appears to be up here in

23    red.

24          Q.    And I'm sorry.  Did you describe what that was?  It

25    appears to be the side of a crate or something?

1    A.    Side of a crate.  We had removed an unused pill

2    press from the garage, which was inside of a wooden crate.

3    Q.    And what happened to that item then after agents

4    first encountered it there in the garage?

5    A.    We brought this back to the DEA office and

6    processed it in as evidence and put it in the nondrug evidence

7    room.

8    Q.    How long have you been a DEA agent?

9    A.    It will be 17 years in May.

10    Q.    And how long have you worked with the tactical

11    diversion squad specifically investigating pills and

12    pharmaceuticals and the like?

13    A.    Let's see.  About five years.

14    Q.    And prior to November -- this investigation how

15    many Fentanyl cases had you been involved in in the Utah area?

16    A.    There's one other that I can recall.  It was on

17    State Street in a hotel.

18    Q.    And then this was kind of the second one?

19    A.    Yes, sir.

20    Q.    And based on the cases you've worked on and seen in

21    the pharmaceutical area, is this a big case in terms of

22    quantity?

23    A.    Yes, sir.  I've never seen this many pills in one

24    place in one case.

25    Q.    And how about in terms of geographic scope of

1    distribution?

2          A.    Yeah.  It was every -- pretty much everywhere in

3    the country, you guys saw the map yesterday about the ZIP

4    codes that it was sent to across the United States.

5          Q.    Thank you.

6                That's all the questions for this witness at this

7    time.

8                THE COURT:  Thank you, Mr. Stejskal.

9                Mr. Skordas, you may cross-examine.

10               MR. SKORDAS:  Thank you, Your Honor.

11                          CROSS-EXAMINATION

12   BY MR. SKORDAS:

13         Q.    Mr. Hebert, did I say that right?

14         A.    It's Hebert, but either way, sir.

15         Q.    Hebert, I apologize.

16         A.    No problem.

17         Q.    And in your 17 years of DEA you've worked other

18   types of drug rings, however; correct?

19         A.    Yes, sir correct.

20         Q.    Besides Fentanyl?

21         A.    Yes, sir.

22         Q.    You've worked probably meth distribution?

23         A.    That's correct.  A lot of meth.

24         Q.    Cocaine distribution?

25         A.    Yes, sir.

201

1          Q.    Even marijuana distribution?

2          A.    That's correct.

3          Q.    And you're familiar with the concept of what we

4    call a conspiracy; correct?

5          A.    Yes, sir.

6          Q.    And it's true, is it not, that in a drug

7    distribution ring it takes a village, it takes a group, it

8    takes a number of individuals to make that conspiracy work;

9    correct?

10         A.    To be successful, yes, sir.

11         Q.    And the goal of the DEA in investigating these is

12   often or maybe always to get to the top, to get the person at

13   the very top; correct?

14         A.    Yes, sir.

15         Q.    And that's the prize, isn't it?  Isn't that what

16   you really want to do?

17         A.    To get to the top guy, yes.

18         Q.    But the top guy is usually pretty hard to find,

19   isn't he or she?

20         A.    They can be, yes, sir.

21         Q.    Because they're often not known by the other

22   members of the conspiracy; correct?

23         A.    They do what they can to insulate themselves

24   typically, yes, sir.

25         Q.    Sometimes they don't even live in the jurisdiction

1    where the crime is taking place; correct?

2          A.    That's correct.

3          Q.    And their names are not known to others who are

4    maybe running or taking drugs or distributing them to people

5    like that; correct?

6          A.    Yeah.   And they try to insulate themselves.

7    They'll have, you know, a boss and what sometimes is referred

8    to as lieutenants and so on and so forth.   Yes, sir.

9          Q.    And it's not uncommon in these conspiracies that

10    you have individuals doing certain roles in certain

11    jurisdictions; correct?

12          A.    Correct.

13          Q.    Now in this situation, you served I think I counted

14    at least four or five search warrants; is that fair?

15          A.    That's fair.

16          Q.    Maybe more; correct?

17          A.    (Witness indicates by nodding head up and down.)

18          Q.    And could you pull up 13.10, please?

19                At least in this search warrant of Aaron's place it

20    looks like you had a pretty impressive group of helpers to

21    serve that warrant; correct?

22          A.    There were quite a few, yes, sir.

23          Q.    Would this be the case in other warrants that were

24    served?  Were there other individuals involved?

25          A.    Yes, sir.

1        Q.   And often more than just a few people; correct?

2        A.   Correct.

3        Q.   In fact, in this service of the warrant on the

4    Shamo residence, you described probably dozens of people that

5    were there; is that fair?

6        A.   There were quite a few there, yes, sir.

7        Q.   And that would have been consistent with the other

8    search warrants except maybe more individuals involved in the

9    Shamo search; correct?

10       A.   Yes, sir.

11       Q.   As I was figuring out what you've done here, it

12   looked like the first search warrant you prepared or at least

13   assisted in was on Ryan Jensen; is that right?

14       A.   Yes, sir.

15       Q.   And that's because he's sort of first in time;

16   correct?

17       A.   Correct.

18       Q.   He's -- well, in terms of the conspiracy, what

19   would you describe his role as?

20       A.   Recipient.  I mean, he was a recipient of packages.

21       Q.   And you guys were tipped off by some folks in

22   California that there were some packages there.  And you found

23   his address over there in Midvale, and you served a search

24   warrant on him; correct?

25       A.   Yes, sir.

1          Q.   And, in fact, he's sort of driving away when you go

2     to serve it, and somebody has to stop him in his car and bring

3     him back.

4          A.   Correct.

5          Q.   Nothing is found in that search warrant; correct?

6          A.   That's correct.

7          Q.   And in terms of time, and correct me if I'm wrong,

8     sir, it looks like Sean Gygi may have been the next warrant

9     that you served.

10         A.   I believe that's what occurred, yes, sir.

11         Q.   And he's also in the Midvale area but in a

12    different location from Mr. Jensen.

13         A.   Different location.

14         Q.   And Mr. Gygi's role in this, if you could

15    articulate it for the jury here?

16         A.   He was heavily involved in this.

17         Q.   He's running drugs?

18         A.   Yes, sir.

19         Q.   He's delivering drugs?

20         A.   (Witness indicates by nodding head up and down.)

21         Q.   He's making arrangements?

22         A.   (Witness indicates by nodding head up and down.)

23         Q.   He's pretty active in this; correct?

24         A.   Yes.  Very.

25         Q.   To the extent where he's doing multiple runs almost

1   daily; correct?

2          A.   Almost daily, yes, sir.

3          Q.   And he was forthcoming when you guys went and

4   chatted with him; correct?

5          A.   Not initially, sir.

6          Q.   But ultimately.

7          A.   But ultimately, yes.

8          Q.   Same with Mr. Jensen.

9          A.   Correct.

10         Q.   They provided you significant information; correct?

11         A.   They did.

12         Q.   By the way, if you look at that chart there you'll

13   see a couple of other individuals, Messrs. Paz and Crandall.

14   You didn't serve search warrants on those two gentlemen, did

15   you?

16         A.   No, I did not.

17         Q.   That's because you didn't even know about them at

18   this time; correct, when you're serving these warrants in

19   November of 2016?

20         A.   I wasn't, no, sir.

21         Q.   And so you wouldn't have any basis to get their

22   information; correct?

23         A.   Not at that time.

24         Q.   You also served a warrant, a couple of warrants it

25   looks like on November 22nd.  And we'll get to Aaron's in a

1    minute.  But you served a search warrant over there in

2    South Jordan on Katie Bustin and Alex Tonge; correct?

3          A.   There were some of our investigators over there

4    serving a search warrant, yes, sir.

5          Q.   And you're aware of what happened there; correct?

6          A.   I'm aware.

7          Q.   How would you describe to the jury their role in

8    this enterprise?

9          A.   They were intimately involved in this operation,

10   sir, doing the processing, shipping, they would have to get

11   the pills, put them in the bags, create invoices, ship them

12   out.

13         Q.   And you've spoken today about Mr. Mausia?

14         A.   Yes, sir.

15         Q.   In Utah County and Orem?

16         A.   Correct.  In Provo.

17         Q.   Excuse me.  Go ahead.

18         A.   Nothing.  I just said Provo.

19         Q.   And he had an active role in this, as well;

20   correct?

21         A.   He also received packages.

22         Q.   He didn't require a search warrant.  He was

23   forthcoming after you guys contacted him; correct?

24         A.   Correct.

25         Q.   And the same would be true for Ms. Gleave?

1          A.    Yes, sir.

2          Q.    Also forthcoming, gave you what you wanted.  You

3    probably would have executed a search warrant on those two

4    places had they not been, but they agreed; correct?

5          A.    Yeah.  There's no way to know, sir.

6          Q.    All right.  And you also served at least one search

7    warrant and it sounds like a second one in February on

8    Aaron Shamo; correct?

9          A.    There was, yes.

10         Q.    Now, when agents served the warrant on Mr. Shamo he

11   was downstairs in the basement; correct?

12         A.    That's my understanding.

13         Q.    He didn't answer the door immediately; correct?

14         A.    No, sir.

15         Q.    And, in fact, they had to use some force to open

16   that door; correct?

17         A.    I believe they called him out -- I was not the

18   HEAT Team so I wasn't at the door.

19         Q.    I understand.  If I were to tell you that there's a

20   report that says that they knocked on the door for a minute

21   announcing their presence with a loudspeaker.  When nobody

22   responded a ram was forced to force entry into the home, would

23   that be consistent with what you observed when you got to the

24   home?

25         A.    That would be my understanding.  Again I wasn't

1    watching the door.

2          Q.   And the reason for that that they had to wait is

3    because Aaron is downstairs in the basement; correct?

4          A.   I don't know.  That's my understanding from what I

5    was told.

6          Q.   He's downstairs in the basement running this little

7    press making pills; correct?  So he didn't hear the doorbell

8    ring.

9          A.   I don't know, sir.  I can't answer that.

10         Q.   Have you read the reports that were prepared in

11    connection with the execution of that search warrant?

12         A.   I've been through the reports yes, sir.

13         Q.   In fact, you went to the house; correct?

14         A.   Yes, sir.

15         Q.   Did you see the press?

16         A.   I saw the press after -- well, after we cleared,

17    there's an environmental care team that removes pieces from

18    the basement.  They went in.  So I saw some of it as they were

19    removing it.

20         Q.   Okay.  There weren't a lot of drugs taken from that

21    home, were there?

22         A.   There was -- there were -- I saw pictures of the

23    room.  There were pills in a net that was next to one of the

24    presses.

25         Q.   Right.

1          A.    That was removed.   There were powders removed from

2     the residence.

3          Q.    The pills -- or the powder that would have been

4     used to make the pills in the press; correct?

5          A.    Yes, sir.

6          Q.    Did you, in fact, take Aaron to the Davis County

7     Jail?

8          A.    We did.

9          Q.    You personally?   It was in a car that you were in?

10         A.    In a car that I was in, yes, sir.

11               MR. SKORDAS:   That's all I have, Your Honor.

12               THE COURT:   Thank you, Mr. Skordas.

13               Any redirect, Mr. Stejskal?

14               MR. STEJSKAL:   Briefly, Your Honor.   Thank you.

15                         REDIRECT EXAMINATION

16    BY MR. STEJSKAL:

17         Q.    You were asked about conspiracies and kind of the

18    intricacy of those.

19         A.    Yes, sir.

20         Q.    Do you remember that line of questioning?

21         A.    I do.

22         Q.    Are all conspiracies alike, drug conspiracies?

23         A.    No, sir.

24         Q.    Are some more sophisticated than others?

25         A.    Absolutely.

1    Q.   Give us a little detail on that.

2    A.   Some organizations might communicate with

3    cellphones or radios.  Some of the investigations I've seen

4    lately have a lot to do with the Dark Web, people ordering,

5    using Bitcoins, communicating with encrypted apps and things

6    of that nature.

7    Q.   And you were questioned about sometimes the boss is

8    in a different location?

9    A.   Yes, sir.

10   Q.   Is that always the case?

11   A.   Not always the case.

12   Q.   You were questioned about how the boss is sometimes

13   anonymous and other people don't know the boss.  Is that

14   always the case?

15   A.   No, that's not always the case.

16   Q.   We talked about other search warrants specifically

17   Mr. Jensen, Mr. Gygi.  How much money was taken from the

18   Jensen residence on the search warrant?

19   A.   No money.

20   Q.   How much money was taken from Mr. Gygi's residence

21   on his search warrant?

22   A.   No money.

23   Q.   Anything found?

24   A.   In Mr. Gygi's residence there were some drug

25   exhibits.

```
 1          Q.   I'm sorry.  Money-wise?
 2          A.   Oh, there was some cash that he had, yes, sir.
 3          Q.   Small amounts, though?
 4          A.   Yes.
 5          Q.   Okay.  So none was taken from those two.  How about
 6     the Shamo residence on Titian Way, any money taken from there?
 7          A.   Quite a bit, sir.
 8          Q.   Thank you.
 9               That's all the questions I have.
10               THE COURT:  Any recross, Mr. Skordas?
11                         RECROSS-EXAMINATION
12     BY MR. SKORDAS:
13          Q.   Agent Hebert, in your experience with conspiracies
14     I take it you've learned that some are more successful than
15     others; correct?
16          A.   Yes, sir.
17          Q.   And a more successful one would be one where the
18     lord or the kingpin doesn't make his name or whereabouts known
19     to the runners and the people that are out there in the field;
20     correct?
21          A.   I would say that's more successful for the boss,
22     yes, sir.
23          Q.   That's how it runs better; isn't that true?
24          A.   I don't know if it runs better, per se, but....
25          Q.   Well, better for the conspiracy; not better for the
```

```
 1    rest of us, I assume; correct?

 2         A.   Yes, sir.

 3              MR. SKORDAS:  That's all I have, Your Honor.

 4              THE COURT:  Thank you.  You may step down.  Thank

 5    you.

 6              THE WITNESS:  Thank you, Your Honor.

 7              THE COURT:  I assume this witness may be excused?

 8              MR. SKORDAS:  No objection.

 9              MR. STEJSKAL:  Yes, Your Honor.

10              THE COURT:  Come and go as you please.

11              And you may call your next witness.

12              MR. GADD:  Your Honor, the United States calls

13    Jessica Gleave.

14              THE COURT:  Somebody is getting her, I assume?

15              MR. GADD:  It's always an act of faith when you

16    announce something like that.

17              THE COURT:  Come forward and be sworn, please,

18    right here in front of the clerk of court.  Right here.

19              THE CLERK:  Please raise your right hand.

20                        JESSICA GLEAVE,

21         called as a witness at the request of Plaintiff,

22            having been first duly sworn, was examined

23                   and testified as follows:

24              THE WITNESS:  I do.

25              THE CLERK:  Come around to the witness box right
```

1     here.

2                 Please state your name and spell it for the record.

3                 THE WITNESS:  Jessica Gleave.  J-E-S-S-I-C-A,

4     G-L-E-A-V-E.

5                 THE COURT:  Go ahead, Mr. Gadd.

6                 MR. GADD:  Thank you, sir.

7                           DIRECT EXAMINATION

8     BY MR. GADD:

9         Q.   Good morning.

10        A.   Good morning.

11        Q.   Thank you for coming this morning.  Are you

12    prepared to testify about your part in the investigation of

13    drug packages that are linked to Mr. Aaron Shamo?

14        A.   Yes.

15        Q.   Before we do that could you tell us just a little

16    bit about yourself?

17        A.   My name is Jessica Gleave.  I grew up in Arizona.

18    I was going to school, moved here when I was 19 to go to

19    school for dental hygiene and then decided to pursue a career

20    in eyelash extensions.  And I decided I loved it here, so I

21    stayed here and have been here ever since.

22        Q.   Let's talk for a minute about relationships.  Do

23    you know Mr. Shamo?

24        A.   Yes.

25        Q.   There's a chart right next to you, you can see

                                                              214

1 there.  That's Exhibit 17.06.  Who else do you know on this

2 chart?

3    A. I know Luke Paz and Drew Crandall.

4    Q. And how about on the bottom row?  Who do you know

5 on the bottom row?

6    A. Julian Mausia, and I recognize a couple other

7 people, but I don't necessarily know them.

8    Q. And for these jurors will you point out your

9 picture on the chart?

10    A. I'm just right here.

11    Q. You mentioned the gentleman next to you on the

12 chart, Mr. Mausia.  And I think you say Mausia?

13    A. Mausia, yeah.

14    Q. Mausia.  I'll do better.  What was your

15 relationship with Mr. Mausia in 2016?

16    A. We were boyfriend/girl friend.

17    Q. Are you still now?

18    A. No.

19    Q. What type of relationship did you have with

20 Mr. Shamo?  Was it a social relationship?

21    A. Yeah.  We were good friends.

22    Q. You'd hang out together?

23    A. Yeah.

24    Q. Go to clubs together?

25    A. Yes.

1       Q.    Party together?

2       A.    Yes.

3       Q.    Travel together?

4       A.    Occasionally, yes.

5       Q.    At some point in your relationship with Mr. Shamo

6    it transitioned from being strictly a social relationship to a

7    business relationship of sorts; correct?

8       A.    Yes.

9       Q.    Did you accept packages on Mr. Shamo's behalf?

10      A.    Yes.

11      Q.    Can you tell us how you first got involved with

12   that?

13      A.    It came to my attention that my -- Julian was

14   accepting packages for him and he had told me about it, and so

15   eventually I decided that I wanted to, as well, and that's how

16   I found out about it.

17      Q.    When Mr. Mausia first told you that he was

18   accepting packages from Mr. Shamo how did you feel about it?

19      A.    I was mad.

20      Q.    Why were you mad?

21      A.    Because he had lied about it to me, and he was my

22   serious boyfriend that I was in love with so I was hurt, and

23   one of my good friends, so I felt mad about it.  But....

24      Q.    You knew there was something to these packages

25   then?

1          A.    What do you mean?

2          Q.    They weren't maybe legal?

3          A.    Possibly, yeah.  I didn't know.  But, yeah, I

4    thought maybe.

5          Q.    Did you try to talk Julian out of it?

6          A.    I honestly don't remember.  I was mad, but

7    obviously I ended up doing it, as well, so I wasn't that upset

8    about it, but....

9          Q.    And when you finally made that decision to receive

10   packages yourself what was your arrangement with Mr. Shamo?

11         A.    So I would get a package just randomly, they would

12   just come.  And whenever I received one I would let him know,

13   and then he would either come pick it up or I would bring it

14   to him in exchange for money.

15         Q.    How much money would he pay you for a package?

16         A.    2- to $300.

17         Q.    Did he pay you in cash?

18         A.    Yes.

19         Q.    And when you would exchange the packages where

20   would you exchange them?

21         A.    He would either come pick them up from me or I

22   would bring them to him.  It was different every time.

23         Q.    Did Mr. Shamo ever tell you what was inside of the

24   packages that you were receiving?

25         A.    No.

1      Q.    Was anyone ever with Mr. Shamo when you'd exchange

2    packages for money?

3      A.    No.  Occasionally there would be -- well, like I

4    said, we were friends so occasionally sometimes we would

5    exchange them before we would go out or whatever we do, so

6    there would be friends there.  But not anyone there specific,

7    no.

8      Q.    Looking back how many packages total do you think

9    you received from Mr. Shamo?

10     A.    Probably around 10 to 15 packages.

11     Q.    And I know you won't know the exact number, but how

12   many packages do you know of that Julian received?

13     A.    I honestly don't know because he didn't tell me

14   about it, so I legitimately don't know.

15     Q.    Don't know an exact number.  Do you have an

16   estimate?

17     A.    It had to have been more, around 10 to 15 is what I

18   received, and he received more than that because he had been

19   doing it longer.  So I would say more than 10 to 15.

20     Q.    Was there a schedule to it, or did they come

21   randomly?  What was your experience?

22     A.    It was just randomly.  There wasn't really a set

23   schedule.  It would just be legitimately totally random.

24     Q.    You mentioned that you knew Luke Paz and Drew

25   Crandall.  Did you interact with them socially, as well?

218

1          A.    Yeah.

2          Q.    Did they ever pay you money for packages?

3          A.    No.

4          Q.    Let's talk about a package that was taken at Texas

5     Roadhouse.  I want to show you an, Exhibit 3.02.

6                Now, the jurors won't be able to see that well, so

7     I need you to be essentially their eyes for a moment.  Who's

8     name is on the package?

9          A.    Julian Mausia.

10         Q.    When you look at that package does that look like

11    the type of packages that came in your name?

12         A.    Yes.

13         Q.    Does that package look like it came from China?

14         A.    It says China on here.  I'm not really sure where

15    it came from.  But other than the label itself saying China,

16    so yes.

17         Q.    Do you remember any of your labels saying China?

18         A.    A lot of them were in other languages, so it could

19    have been in Chinese, but I'm not really sure.  But....

20         Q.    Do you remember in the November of 2016 being asked

21    to come to Texas Roadhouse and then this package was taken?

22    Do you remember that experience?

23         A.    Being asked by Julian?

24         Q.    Were you asked by Julian to come bring the car?

25         A.    Yeah.

1        Q.   Can you tell the jurors just briefly kind of what

2    happened there?

3        A.   So I had dropped off, me and my boyfriend at the

4    time both were servers at Texas Roadhouse, and I dropped him

5    off to work.  We were sharing his car at the time because my

6    car, I was in the process of getting a new one.  And then so I

7    dropped him off running some errands.  And then like an hour

8    or two into the shift he said, I'm done.  Come pick me up.

9    And I said, okay.  And I went and picked him up.

10            And then I was cut off by -- I looked -- I parked

11   the car and looked up, and there's all these black trucks in

12   front of me and agents knocking on my window and asking me

13   where the package was, which I wasn't even aware it was in the

14   car at the time.  So....

15       Q.   Had Julian not told you that that package was in

16   the car?

17       A.   No.

18       Q.   You had a chance to spend some time with those

19   agents that night; right?

20       A.   Yes.

21       Q.   Maybe longer than you would have liked?

22       A.   Yeah.

23       Q.   But at some point you started to cooperate with

24   them to answer their questions; correct?

25       A.   Yeah.

1           Q.   Did you make the change when you were told about

2      the potential seriousness of what was inside of these

3      packages?

4           A.   Yes.

5           Q.   The follow day, you met with some additional

6      agents; right?

7           A.   Yes.

8           Q.   And as part of a conversation there, did you agree

9      to notify them if more packages arrived for you?

10          A.   Yes.

11          Q.   And that, in fact, happened; right?

12          A.   Yeah.

13          Q.   For you and Julian.  Let me show you first

14     Exhibit 4.02, and then I think I'll also bring 4.05 at the

15     same time.

16               So the jury heard about this just a minute ago so I

17     won't belabor it too much with you, but let's just briefly

18     explain what happened here.  So another package came 4.02;

19     correct?

20          A.   Yes.

21          Q.   And you and Julian decided to call and turn that

22     one over.

23          A.   Yes.

24          Q.   And you met agents and turned it over to them?

25          A.   So it looks like 4.02 is the one that Julian

1    received, so I'd actually never seen this one because I was

2    out of town for Thanksgiving.  But this one was the one that I

3    turned over.

4         Q.   Let's talk about that one, 4.05.

5         A.   Yeah.

6         Q.   That arrived.  And did you make the phone call or

7    did Julian to the agents?

8         A.   No.  I did.

9         Q.   And did you agree upon a place where you would meet

10   to turn the package over?

11        A.   Yes.

12        Q.   Where did you meet?

13        A.   We just met at a McDonald's like right above,

14   30 minutes from here just around the Point of the Mountain in

15   Draper.  I gave it to them there.

16        Q.   I want to talk to you now about another package,

17   this one found at Mr. Shamo's residence.  Had you previously

18   before his arrest been to Mr. Shamo's residence?

19        A.   Yes.

20        Q.   And when I say his residence, I mean the one on

21   Titian Way in Cottonwood Heights.  Is that the one you're

22   thinking of?

23        A.   Yes.

24        Q.   Could we look at Exhibit 13.09?  And then two of

25   the pages in there, Page 28, and then we'll look at Page 29.

1    Here we go.

2              Do you recognize the package in that picture;

3    right?  You can see that there?  It's on your screen?

4         A.   Yes.

5         Q.   And now if we can look at 29 so we can see a label.

6    Can we go one more?  There we go.

7              Do you see your name on that?

8         A.   Yes.

9         Q.   Is that an address that you at one point lived at?

10        A.   Yes, it is.

11        Q.   Is that an address that Mr. Shamo sent packages to

12   in your name?

13        A.   Yes.

14        Q.   How did a package with your name end up inside his

15   house?

16        A.   I delivered this package personally to him.

17        Q.   I want to ask you now about an exhibit from

18   Mr. Shamo's computer.  This one.

19             Can we look at Pages 30 and 31?  Sorry about that.

20   That one right there.  You got it.

21             Okay.  Did you ever go inside this room, his home

22   office?

23        A.   So I've seen a few rooms in his house.  I've never

24   seen it -- I'm not sure if it was set up this way when I was

25   in there, so honestly I don't know.

1         Q.    The rooms you did go in, did you see his TV?   Maybe

2    downstairs, did you ever see that?

3         A.    Yes.

4         Q.    The big TV?

5         A.    Yes.

6         Q.    You'd been upstairs through the front door in the

7    living room area?

8         A.    Yes.

9         Q.    I'm not sure on this room.   How about a room that

10   was locked sometimes with kind of reddish burgundy walls and

11   two pill presses inside of it, did you ever see that room?

12        A.    No.

13        Q.    Did you ever hear noises when you were hanging out

14   there, kind of pounding noises?

15        A.    No.

16        Q.    Okay.   Now back to this.   There's a document found

17   on the computer, and I want to ask you some questions about

18   it.  So, Ms. Laughter, if we could look at 14.35.

19             Take just a moment and take a look at that.   That's

20   the first page.  As you look at that, do you recognize this

21   document from something prior to November 22nd, 2016?

22        A.    I honestly don't.

23        Q.    If you look at the very bottom of this first page

24   and as we go onto the second page, it has your name on it;

25   right?

1      A.   Yeah.

2      Q.   And that's the beginnings of your address; right?

3      A.   Yeah.

4      Q.   Can we look the second page briefly?  And then how

5  about the name right below this one?  Do you recognize

6  Mr. Mausia's name?

7      A.   Yes.

8      Q.   And is that an address that you knew him to reside

9  at at one point?

10     A.   Honestly I don't know what his address was, but if

11  that's what it was, then, yes.

12     Q.   You didn't write this document, though, did you?

13     A.   No.

14     Q.   Can we zoom out one last time?

15          How about any of the other names or addresses on

16  there, are these people you know?

17     A.   I recognize two of the names just from knowing some

18  of his friends.  But I don't know them personally, and I

19  wouldn't consider myself friends with them.

20     Q.   Which are the two names that you recognized?

21     A.   I recognize Clint Perry and Roy Stevens, and that's

22  just because we have a big giant group of friends that we used

23  to go out with a lot.  That's where I recognize the names

24  from.

25     Q.   When you would communicate with Mr. Shamo, so

1    changing gears now again, when you would communicate with him

2    about, you know, about a package arriving or meeting up, how

3    would you communicate with him?

4          A.   We would either text or talk over an app called

5    Telegram.

6          Q.   Why Telegram?

7          A.   Because it's just what he told me to contact him

8    on, and we had been talking over it for years as friends.  And

9    it's just what he told me he preferred communications on.

10         Q.   Was it that same for Julian?

11         A.   Yes.

12         Q.   Could we look at 14.14?  And then specifically if

13   we could go down to Page 6.

14              This is Telegram communications between Shamo and

15   Julian, but you're mentioned here and I want to ask you about

16   it.  So picking up at the top where the contacts saved as

17   Julian, Jessica's friend writes:  A really heavy one just came

18   in.  And then the owner of the phone, AS writes:  Nice.  Hey,

19   I want to see if Jess can get that packed tonight.  I might

20   head down tomorrow instead.  Is that cool?

21              Did you ever have an instance that you can recall

22   where Mr. Shamo would wait to pick up packages until he could

23   pick up one from both of you?

24         A.   Yes.

25         Q.   Let's take a minute now and talk about immunity.

1    So could we look at 23.04?

2              This is an immunity agreement; correct?

3    A.    Yes.

4    Q.    First written in June, but you signed it yesterday;

5    correct?

6    A.    Yes.

7    Q.    You needed an attorney, before you can think

8    through this and make a decision you needed advice from an

9    attorney before you were going to sign it; right?

10   A.    I was definitely going to sign it before the

11   attorney, but yeah.

12   Q.    One of us wanted you to have an attorney; right?

13   A.    Yeah.

14   Q.    And the court appointed an attorney for you?

15   A.    Yes.

16   Q.    Are you comfortable with the terms in this

17   agreement?

18   A.    Yes.

19   Q.    Essentially you've agreed to testify, and the

20   United States has agreed not to use what you say against you

21   so long as you tell the truth.

22   A.    Yes.

23   Q.    I've also told your attorney that the United States

24   doesn't have plans to seek a charge against you for those

25   packages that you're looking at right there; correct?

1          A.   Yes.

2          Q.   Since that meeting with the agents, so November of

3     2016 until now, have you stayed in contact with the agents?

4          A.   Yes.

5          Q.   Have you been truthful with them?

6          A.   Yes.

7          Q.   Let's talk now about maybe some of the harder

8     questions.  You know the packages probably contained drugs;

9     right?

10         A.   Not necessarily drugs, but something illegal, yes.

11         Q.   So why did you help Aaron Shamo?

12         A.   For money purposes only.

13         Q.   Would you have helped him if you knew the packages

14    contained Fentanyl?

15         A.   No.

16              MR. GADD:  No further questions.  Thank you.

17              THE COURT:  Thank you, Mr. Gadd.

18              You may cross-examine Ms. Beckett.

19              MS. BECKETT:  Yes, Your Honor.

20                        CROSS-EXAMINATION

21    BY MS. BECKETT:

22         Q.   Ms. Gleave, thank you for being here today.  Would

23    it be a correct assessment to say that you're uncomfortable

24    being here today?

25         A.   It's not my favorite place to be, but I'm here

1    willingly.

2         Q.   You were pretty good friends with Aaron, weren't

3    you?

4         A.   Yes.

5         Q.   You guys knew each other for several years;

6    correct?

7         A.   Yes.

8         Q.   In fact, he dated your cousin for several years;

9    correct?

10        A.   Yes.

11        Q.   What's her name?

12        A.   Jillian Waltham.

13        Q.   Is that how you became friends through Jillian?

14        A.   Yes.

15        Q.   And you guys partied together?

16        A.   Yes.

17        Q.   Went out clubbing together?

18        A.   Yes.

19        Q.   Socialized a lot?

20        A.   Yes.

21        Q.   Before you ever became involved --

22        A.   Yeah.

23        Q.   -- in the events you're talking about here today;

24    correct?

25        A.   Yes.

1        Q.    And, in fact, it was you that approached Aaron

2    wanting to be involved; correct?

3        A.    Honestly I don't know.  I don't remember.

4        Q.    You remember discovering that your boyfriend at

5    that time Julian Mausia was receiving packages; correct?

6        A.    Yes.

7        Q.    And it was your testimony that you were upset that

8    he was receiving packages?

9        A.    Yes.  When I originally found out, yes.

10        Q.    Why were you upset that he was receiving packages?

11        A.    Because he lied to me about it and to my really

12    good friends doing something behind my back, so I wasn't

13    necessarily thrilled about it.

14        Q.    So he lied about receiving packages or the contents

15    of those packages?

16        A.    No.  He lied to me about receiving packages.

17    Neither me or Julian ever knew what was inside of them.  It

18    was a don't ask, don't tell policy.

19        Q.    But you were mad that he received mail?

20        A.    Yes.

21        Q.    We talked a little bit a second ago about you and

22    Aaron having a group of friends that would party together.  Is

23    that a correct assessment of your testimony?

24        A.    Yes.

25        Q.    What kind of partying did you do?

1      A.   What do you mean?

2      Q.   Go to clubs?

3      A.   Yes.

4      Q.   Are you a drug user?

5      A.   Occasionally.  Not avid drug user.

6      Q.   Ever tried cocaine?

7      A.   Yes.

8      Q.   Roxy?

9      A.   Yes.

10      Q.   Weed?

11      A.   Yes.

12      Q.   Xanax?

13      A.   Yes.

14      Q.   During this time period that you were receiving

15   packages and prior to that, you did those drugs?

16      A.   More prior to that, but yes.

17      Q.   And at that point in time you were working as a

18   server for Texas Roadhouse; correct?

19      A.   Yes.

20      Q.   Did you make a lot of money as a server?

21      A.   I wouldn't say a lot of money, but I do okay.

22      Q.   So when the opportunity arose for you to make more

23   money you jumped at it; correct?

24      A.   Yeah.

25      Q.   And after learning that your boyfriend at the time

1    was making money receiving packages you thought that was a

2    good option for you; correct?

3         A.   Not a good option, but an option, yes.

4         Q.   As opposed to getting another job?

5         A.   Yes.

6         Q.   Easy money for you?

7         A.   Yeah.

8         Q.   Even though you had some inkling about what was in

9    those packages it didn't really matter because it was easy

10   money; correct?

11        A.   Yes.

12        Q.   That's why you never questioned it?

13        A.   Yes.

14        Q.   I believe it was your testimony that you had used

15   the Telegram app to communicate with Mr. Shamo even before you

16   were involved in the events that you are discussing today; is

17   that correct?

18        A.   Yes.

19        Q.   So it was an app that you guys uses even as

20   friends; correct?

21        A.   Yes.

22        Q.   Just a preferred method of communication, I believe

23   you called it?

24        A.   Yes.

25        Q.   This exhibit that you're looking at right here next

1    to you, these photos, I apologize, I do not know the number on

2    that one.

3              MR. GADD:  17.06.

4              MS. BECKETT:  17.06, thank you.

5         Q.   BY MS. BECKETT:  I believe you stated that you know

6    Mr. Paz and Mr. Crandall; is that correct?

7         A.   On these photos?

8         Q.   Correct.

9         A.   Yes.

10        Q.   How are you familiar with Luke Paz?

11        A.   We all became friends at the exact same time like

12   nine years ago.  We all met in Provo.

13        Q.   How are you familiar with Mr. Crandall?

14        A.   He was a weird friend of Aaron's that we met.

15        Q.   Are you aware of Mr. Paz' role in this

16   organization?

17        A.   I wasn't, no.  And I'm honestly still not.

18        Q.   What about Mr. Crandall's?

19        A.   No.

20        Q.   I believe you discussed briefly a scenario where

21   you were stopped outside of Texas Roadhouse.  Do you remember

22   that part of your testimony?

23        A.   Yes.

24        Q.   You were detained by agents; correct?

25        A.   Yes.

1          Q.    Were you uncomfortable at that point in time?

2          A.    I mean, yeah.

3          Q.    It's okay.  It's expected.  Did you initially tell

4     the agents what your involvement was?

5          A.    No.

6          Q.    You withheld that information?

7          A.    Yes.

8          Q.    But later you decided to inform them what you

9     believed your role was?

10         A.    Yes.

11         Q.    During initial conversations with agents did they

12    ever tell you that if you cooperated that you would not be

13    charged?

14         A.    Yes.

15         Q.    Did that occur at that first meeting after Texas

16    Roadhouse?

17         A.    Yes.

18         Q.    They told you at that point in time that if you

19    cooperated you would not be charged?

20         A.    Honestly it was a real long time ago.  If it

21    wasn't, I don't know.

22         Q.    It was around that time period?

23         A.    I don't know.  Yeah.

24         Q.    Okay.

25         A.    I don't know if it was the exact night, but it was

1    around that time period, yes.

2         Q.   So you knew almost immediately if you told them

3    about other people that you would be safe; correct?

4         A.   Yes.  But that means that I don't really know

5    anything about anyone else, so....

6         Q.   So you gave them the only name you knew.

7         A.   I didn't give them any name.  It was told to me.

8    And so I started cooperating.

9         Q.   You gave them Aaron Shamo's name, though; correct?

10        A.   I didn't give them anyone's name.  It was told to

11   me.

12        Q.   Aaron Shamo's name was told to you?

13        A.   Yes.

14        Q.   If we can go to Exhibit 23.04.  I believe that's

15   the immunity agreement.

16             You signed this yesterday; correct?

17        A.   Yes.

18        Q.   And this essentially solidifies what you were told

19   from the outset; correct?

20        A.   Yes.

21        Q.   Have you ever spent a day in jail?

22        A.   Yes, I have.

23        Q.   On this charge?

24        A.   No.

25        Q.   On this case?

```
 1          A.    No.
 2          Q.    So when agents initially detained you outside of
 3    Texas Roadhouse you were allowed to go home and think about
 4    it.
 5          A.    Yes.
 6          Q.    Then come back with any information you had later;
 7    correct?
 8          A.    Yes.
 9                MS. BECKETT:  Just one second, Your Honor.
10                THE COURT:  Sure.
11                (Time lapse.)
12                MS. BECKETT:  I have no further questions.
13                THE COURT:  Thank you, Ms. Beckett.
14                Mr. Gadd, any redirect?
15                MR. GADD:  Nothing further.  Thank you.
16                THE COURT:  Thank you.  You may step down, and
17    you're excused.
18                THE WITNESS:  Thank you.
19                THE COURT:  You can come and go as you please.
20                Let's take our first break.  We'll reconvene about
21    quarter after 10:00.
22                (Whereupon, the jury left the court proceedings.)
23                THE COURT:  We'll be in recess until 10:15.
24                (Recess.)
25                THE COURT:  Are we ready to proceed?
```

```
 1                    MR. SKORDAS:  Yes.

 2                    THE COURT:  Let's get the jury and proceed.

 3                    (Whereupon, the jury returned to the court

 4          proceedings.)

 5                    THE COURT:  The government may call its next

 6      witness.

 7                    MR. STEJSKAL:  United States will next call

 8      Officer Josh Fife.

 9                    THE COURT:  Come forward and be sworn, please,

10      right in front of the clerk of court.

11                    THE CLERK:  Please raise your right hand.

12                            JOSHUA FIFE,

13          called as a witness at the request of Plaintiff,

14              having been first duly sworn, was examined

15                    and testified as follows:

16                    THE WITNESS:  I do.

17                    THE CLERK:  Just come around to the witness box.

18                    Please state your name and spell it for the record.

19                    THE WITNESS:  Joshua Fife, J-O-S-H-U-A, F-I-F-E.

20                    THE COURT:  You may proceed, Mr. Stejskal.

21                    MR. STEJSKAL:  Thank you.

22                            DIRECT EXAMINATION

23      BY MR. STEJSKAL:

24          Q.    Your occupation?

25          A.    Police officer.
```

1         Q.    For what organization?

2         A.    For West Valley City Police Department.

3         Q.    How long have you been in law enforcement?

4         A.    Coming up on 10 years.

5         Q.    All with West Valley?

6         A.    Yes, sir.

7         Q.    Any special assignments during your tenure as a

8    police officer with West Valley?

9         A.    Yes.  I was assigned in 2014 to the DEA's Narcotics

10   Task Force here in Salt Lake City.  Since then I've been moved

11   back in a narcotics and fugitive apprehension role.

12        Q.    Tell us about your assignment as a task force

13   officer with the DEA.  What were your duties as part of that,

14   just generally speaking?

15        A.    To investigate drug trafficking organizations,

16   individuals involved in the sale, distribution, purchase of

17   narcotics.

18        Q.    And you would work with other officers from DEA and

19   other law enforcement agencies in doing that; correct?

20        A.    Correct.  I was assigned to the tactical diversion

21   squad, which was generally pharmaceuticals and controlled

22   substances and investigating those.

23        Q.    And so your assignments took you outside of

24   West Valley, and you investigated those types of crimes?

25        A.    Correct.

1      Q.    Probably both in Utah and even outside?

2      A.    Correct.

3      Q.    Do you have specific training with regard to drug

4   investigations?

5      A.    I do.

6      Q.    Tell us just a little bit about that.

7      A.    So I've been through basic drug investigator school

8   put on by DEA; diversion school which is held back at their

9   headquarters in Virginia; other trainings that the Utah

10  Narcotic Officer Association puts on, Midwest counter drug

11  training center, various courses that deal with trafficking as

12  well as the organizations themselves, the trends that go on

13  inside of that business.

14     Q.    Did they deal somewhat with drug identification?

15     A.    They do.

16     Q.    So you can kind of tell what you run into on the

17  streets in your investigations?

18     A.    Correct.

19     Q.    How about specifically with regard to surveillance

20  techniques?

21     A.    Also that.

22     Q.    Have you been trained on that?

23     A.    I have.

24     Q.    Tell us generally about surveillance, what it is

25  and what the purpose is.

1          A.    Most surveillance is reconnaissance base, so it's

2     gathering intelligence, discovering the actions or the

3     happenings inside these organizations, who's tied to whom, at

4     what level you can assess based on their action and what level

5     they're in an organization, and mostly just discovering

6     locations tied with people.

7          Q.    So often times you're given an assignment to kind

8     of go watch a place or watch a person and see what's going on.

9          A.    Correct.

10         Q.    Specifically what was your assignment on

11    November 18th of 2016 in the evening hours?  Do you recall

12    that date?

13         A.    I do.  I was assigned to establish surveillance at

14    a location in South Jordan and simply see what happened, who

15    arrived and document the actions.

16         Q.    And do you recall an address or what the

17    development is at least in South Jordan?

18         A.    I believe it's Openview Lane, if that's correct.

19         Q.    Okay.

20         A.    Yeah.  I don't recall the exact house number, not

21    offhand, but....

22         Q.    But the name of the development?

23         A.    I --

24         Q.    Daybreak?

25         A.    Daybreak, yeah.  I didn't know if there was a

1    specific development inside Daybreak, but it's Daybreak.

2         Q.   So around 7:26 p.m. is when you set up?

3         A.   Correct.

4         Q.   And were you in communication with other officers

5    that evening?

6         A.   I was via radio.

7         Q.   Tell us how the radio system works.

8         A.   So each individual is assigned a radio.  We talk

9    openly by using plain speak between us and just convey what

10   we're seeing and what we're observing, who may be there if,

11   you know, an identification is possible or positive.

12        Q.   So on that evening are there other officers

13   assigned in various roles to the surveillance operation?

14        A.   There were.

15        Q.   Do you know where other officers were?

16        A.   Yes.  So some were in Cottonwood Heights.  I don't

17   know the exact house number, but I know that they established

18   there to establish surveillance and see if and what type of

19   connection there was between the place that I was assigned to

20   to conduct surveillance and where they were at.

21        Q.   And the place in Cottonwood Heights, that was a

22   target's house?

23        A.   Yes.

24        Q.   Do you recall the guy's name?

25        A.   Aaron Shamo.

1        Q.    So after you set up at the Daybreak area did you
2    receive communication over the radio about activities in
3    Cottonwood Heights?
4        A.    I did.
5        Q.    What did you hear?
6        A.    So there was -- one of the agents that was there
7    conducting surveillance in Cottonwood Heights relayed that a
8    vehicle was backing out of the driveway, and then that agent
9    as well as another followed that vehicle off.
10       Q.    Okay.  And where did they track it to?
11       A.    They tracked it directly to the street north of me
12   and kind of did what we'll call a handoff where they maintain
13   surveillance until I have visual of that vehicle.  So they
14   tracked it all the way to where I was at.
15       Q.    And did they describe the vehicle?
16       A.    It was a BMW.  I believe it was black, a dark
17   color.
18       Q.    So were you watching for that, then?
19       A.    Correct, I was.
20       Q.    And did you see it arrive at your location?
21       A.    I did.
22       Q.    Roughly what time do you recall?
23       A.    I would guess around 7:45 or shortly after -- or
24   sorry -- shortly before.
25       Q.    And describe them as you first lay eyes on the BMW

1    what you observed.

2         A.   So it pulled to the side of the road in front of

3    me, so I was facing to the south.  It pulled to the south of

4    me, pulled over, and I watched as the driver got out from the

5    driver door.  There was a red truck parked across the street a

6    little bit north of it by a couple yards right in front of the

7    house.  And as the driver got out, he was carrying a gym bag,

8    like a weighted gym bag.  The lights to the truck flashed as

9    if somebody had a key phone and were unlocking it.  And then

10   the driver of that BMW walks over with the bag and places it

11   inside the red truck.

12        Q.   You're in a location approximately where in

13   relation to these activities?

14        A.   I'm in the north, to the north where this is

15   occurring on the west side of the road parked next to kind of

16   an open area.  I estimate it was maybe 50 yards away, if that.

17   But....

18        Q.   And are you in a marked or unmarked unit?

19        A.   Unmarked.

20        Q.   Just inside your car watching this?

21        A.   Yeah, correct.

22        Q.   Do you have any specialized equipment to assist you

23   in seeing things?

24        A.   I did.  I was using binoculars at the time.

25        Q.   And is part of surveillance to avoid being detected

1    that you're there?

2         A.   Right.  Good surveillance.

3         Q.   Did you do any of that to blend in?

4         A.   I did.  I was actually seated in the rear.  So I

5    was in an F150.  I was seated in the rear seat, and it was

6    pretty heavily tinted.  So no ambient light could come in or

7    emit from the truck.

8         Q.   So you watched the BMW pull up.  The male exited

9    carrying a gym bag.  And then describe what happened.

10        A.   The lights to the truck kind of flashed.  I'd

11   assumed it was to unlock.  The driver of the BMW then takes

12   the bag and puts it in the F150 and walks away from the F150

13   after shutting the door.  And the lights flash and gets back

14   in the BMW and then leaves south.

15        Q.   Fairly quick activity there?

16        A.   Yeah.  It was -- it was a constant movement.  As I

17   was putting it out I was keying up the radio and giving out

18   the details.

19        Q.   And you're sharing this information over the radio

20   with others?

21        A.   Correct.

22        Q.   So the BMW leaves somewhere around 7:45, I believe

23   you said.

24        A.   Correct.

25        Q.   Do you stay there and conduct further surveillance?

 1          A.    I did.

 2          Q.    What's the next thing of significance that you

 3   observe with regard to the residence that you're watching?

 4          A.    So the area between some of the buildings doesn't

 5   have street lights, so it's -- a female appears who was

 6   walking on the north -- it's kind of -- it runs southeast to

 7   northwest, so I would call it the north side of that sidewalk

 8   just appears.  I don't know if it was between some buildings

 9   or from a residence around the backside.  But she appears,

10   walks down the sidewalk, gets keys out, unlocks the front

11   door, goes into the house and --

12          Q.    And that's the house you were watching?

13          A.    Correct.

14          Q.    So somebody entered, a female entered that house --

15          A.    Correct.

16          Q.    -- using a key.

17          A.    Correct.

18          Q.    Then what did you observe?

19          A.    So after a little while she comes out with boxes,

20   makes a second trip for I believe it was envelopes and then

21   locks the house again.

22          Q.    Where were those boxes and envelopes placed?

23          A.    They were put on the porch, kind of on the north

24   side of the porch, against the wall.  It's a small, I don't

25   know, 6-by-5 foot landing.  So I call it a porch, but it's

1    actually pretty small just enough to stand on, so....

2         Q.   So then you said after she put the boxes out there

3    then what happened?

4         A.   She walks back down the sidewalk.

5         Q.   Carrying anything?

6         A.   I don't recall if she was or not.

7         Q.   Okay.  And then describe her movements from there.

8         A.   So she kind of just disappears back around again.

9         Q.   Anything in relation to the red truck that you

10   earlier observed?

11        A.   I don't recall if it's at that point that the

12   lights flash again on the truck.  I'd have to look at my

13   report.  But I remember that when she was near it it was

14   pretty apparent since there was no one else around that she

15   also had control of the truck either via key fob or somehow,

16   so....

17        Q.   And the lights flash like --

18        A.   Yeah.  Like the orange parking lights when you lock

19   or unlock a vehicle.

20        Q.   So that female again walks down the sidewalk out of

21   your view.

22        A.   Yeah.  I don't know if it was the ambient light

23   wasn't strong enough or what, maybe there was a turn in there,

24   but it kind of disappears out of view.

25        Q.   Then what if anything of significance happened in

1     relation to the house that you watched?

2          A.    So the same female comes back with another female.

3          Q.    Okay.  Hold on.  In-between that, before the

4     females return does anything happen with regard to the

5     packages?

6          A.    Yes.  They were picked up.  Is that what you're

7     talking about?  Sorry.

8          Q.    So were you maintaining radio contact with the rest

9     of the team?

10         A.    I was.

11         Q.    Okay.  And what did you learn was going to happen?

12         A.    The packages were going to be picked up, yeah, by

13    an individual.

14         Q.    And did you observe that occur?

15         A.    I did.

16         Q.    Did you recognize the individual that picked them

17    up?

18         A.    I believe it was a South Jordan confidential

19    source, yeah.

20         Q.    And again, it was called out over the radio so you

21    were aware of the other officer's actions.

22         A.    Correct.

23         Q.    So those packages got picked up and placed where?

24         A.    The individual took them and put them in their car.

25         Q.    And then drove off?

1      A.    Yeah.  And then drove off down the road.

2      Q.    Okay.  Then what else happened in relation to the

3  house you were watching?

4      A.    So that's when the two females came back.  The

5  first one that I already observed that brought the packages

6  out, she walked back with another female.

7      Q.    Did you know who those two people were?

8      A.    I don't believe at the time that I did, but I later

9  recognized them or ID'd them.

10     Q.    As whom?

11     A.    I don't know how to pronounce the last name.

12  Tonge, is that the correct pronunciation?

13     Q.    And you can look at that.  Do you recognize anybody

14  on there?

15     A.    Yes.  So this was the -- this one Tonge was the

16  first female that had come and put the packages out, and then

17  she arrived later with Bustin.  Am I pronouncing that

18  correctly?  Okay.  So Tonge and Bustin walked back up toward

19  the house.

20     Q.    So we're now around 9:00 p.m., and those two women

21  you observed walking back towards the house.

22     A.    Correct.

23     Q.    What did you observe?

24     A.    So I believe it was Bustin went to the door and

25  used the keys to get in.  The lights flashed again on the

1    I150, the red one, and Tonge goes to the front passenger side

2    and removes the bag, kind of pulls it out and walks back to

3    the door.

4         Q.   Anything you observed about the way she carried

5    that bag?

6         A.   Yeah.  It was -- it looked like it was heavy for

7    her frame, kind of weighted and, you know, walking as if you

8    have a heavy suitcase on one side, you're going to be leaning

9    on that one side you're trying to offset that weight.

10        Q.   Where did Ms. Tonge proceed with the bag?

11        A.   So they go inside the house, and watching you can

12   see them through an upstairs, it's kind of the northwest

13   window.  It's got -- I want to say it's either a slider or a

14   large window floor length.  And so the lights come on

15   upstairs.  I can see them walking to a side bedroom, which is,

16   if I were to look at the house I'm looking at the window, the

17   large window, it's off to the left from my vantage point.  It

18   looks like, I don't know, three- or four-foot window, a

19   standard bedroom window.

20        Q.   And this is a two-story dwelling?

21        A.   It is.

22        Q.   So you observed them go immediately to that bedroom

23   or room that you just described.

24        A.   Correct.

25        Q.   And then what?

1    A.   So the lights had come on in that room, and it's, I

2    don't know, a couple minutes.  And then that room -- or that

3    light shuts off eventually, and then the house goes dark.  So

4    dark not like every single light off, but you could tell that

5    they weren't moving around or anything in the house.

6    Q.   So you watched it for a little while until the

7    light went out?

8    A.   Correct.

9    Q.   And then ended surveillance?

10   A.   Correct.

11   Q.   Did you participate, then, in a search warrant

12   executed on that same home that you just described watching on

13   November 22nd of 2016?

14   A.   I did.

15   Q.   What was your role on that date?

16   A.   I was assigned then as the searcher, one of the

17   searchers inside the home to look for the items listed on the

18   warrant.

19   Q.   And as a searcher, you don't move stuff, you just

20   locate stuff?

21   A.   Correct.

22   Q.   And then somebody else takes over from there; is

23   that right?

24   A.   Right.

25   Q.   At the search warrant, then, on November 22nd did

1     you get a good look at the layout of the home --

2          A.   I did.

3          Q.   As compared to your -- surveillance --

4          A.   Yes.

5          Q.   -- on the 18th?

6          A.   Yes.

7          Q.   So can you describe for us which room the lights

8     came on where they took the gym bag?

9          A.   All right.  So if you're upstairs and if you walk

10    upstairs in the house there's kind of a kitchen area, and then

11    off to the left was that large window that I had seen, it's

12    kind of a dining area.  It goes down the hallway past that,

13    and on the left was the first room that I had seen the light

14    come on.  It looked like a small bedroom or office.

15         Q.   And that's where they went?

16         A.   Correct.

17         Q.   Okay.  And what was the -- what did that room look

18    like, the interior, as far as it was used for?

19         A.   Yeah.  So it had some bins as well as a bunch of

20    shipping boxes.  It had a computer desk in there, a vacuum.

21    It looked like there was kind of like a scoop in one of the

22    bins, and they were just filled with pills during the search

23    warrant.

24         Q.   Okay.  Let's look at Exhibit 11.0.  Let's look at

25    Photo 9.

1          Do you recognize that?

2     A.   I do.

3     Q.   What is that?

4     A.   This desk here is sitting in front of a window that

5     I had seen the light come on.  This is taken from inside that

6     bedroom that from my initial vantage point was on the left

7     side of that large window.  This is the room they walked into

8     that night that I had seen in surveillance.

9     Q.   What do you see off to the right side of that

10    picture?

11    A.   A big old, it's a box full of pills.

12    Q.   Let's look at Picture 10.  What's that?

13    A.   Same thing.  Ziplocs filled with small blue pills.

14    Q.   Okay.  And let's look at Photo 22.

15         Do you recognize that?

16    A.   I do.  I can't tell the location on it, where it

17    was taken, but I do remember this being inside the same room.

18    Possibly in the closet that was in the far corner.

19    Q.   What was your reaction when you first saw these

20    items?

21    A.   I've never seen that many pills in one spot in my

22    life, so I was pretty shocked.

23    Q.   Did you end up being involved in the processing or

24    transporting drug items to the DEA lab?

25    A.   I did.

1    Q.   And when was that?  Early December?

2    A.   Sounds about right, yeah.

3    Q.   And how did you get those items to the lab?

4    A.   The truck that I was assigned at the time had a

5    tonneau cover on it.  Just due to shipping restrictions and

6    general health concerns we couldn't ship that amount of

7    evidence so we had to drive it.

8    Q.   And you took somebody with you so there was always

9    two people?

10   A.   I did.

11   Q.   When you got to the lab was the processing and

12   intake fairly meticulous?

13   A.   It was.  It took quite a while just because of the

14   amount of exhibits that we had had or items of evidence.

15   Q.   To summarize you basically had to sign a form for

16   each one of the drug exhibits that you dropped off there;

17   correct?

18   A.   Yeah.  It seems like the federal government has

19   forms for everything, and there's definitely triplicate for

20   all of them.  So we signed for every single one of the bags.

21   Q.   So you were responsible for signing off on that

22   that, in fact, got to the lab; correct?

23   A.   Correct.

24   Q.   Thank you.

25        That's all the questions I have at this time.

253

1                    THE COURT:  Thank you, Mr. Stejskal.

2               Mr. Skordas, you may cross-examine.

3               MR. SKORDAS:  Thank you, Judge.

4                         CROSS-EXAMINATION

5    BY MR. SKORDAS:

6          Q.   Officer Fife -- or Agent Fife, did you say that you

7    still do drug interdiction for West Valley City?

8          A.   I don't do interdiction.  Just kind of smaller

9    investigations, I'd say, smaller than this.

10         Q.   Are you currently a detective with West Valley?

11         A.   I am.

12         Q.   And prior to becoming a detective with West Valley

13   or maybe concurrent with that for sometime you were assigned

14   for some period of time to the DEA; correct?

15         A.   Correct.

16         Q.   And that would be the time that this all took

17   place.

18         A.   Correct.

19         Q.   And you had some training with the DEA prior to

20   that time or perhaps with West Valley on investigating and

21   surveillance and whatnot of drug raids; correct?

22         A.   Correct.

23         Q.   And you still continue in that in some respect.

24         A.   In some respect, yes.

25         Q.   Are you familiar with sort of concepts that they

```
 1    call, for example, a drug kingpin?  Have you ever heard that
 2    before?
 3         A.   Sure.
 4         Q.   And that would be the head of an organization;
 5    correct?
 6         A.   Correct.
 7         Q.   Isn't that ultimately who your target is when
 8    you're doing a drug investigation?
 9         A.   Generally, yeah.
10         Q.   It's the top prize, isn't it?
11         A.   Sure.
12         Q.   Are you familiar with a somewhat more interrogatory
13    concept called a mule?
14         A.   Yes.
15         Q.   What's a mule?  Tell the jury what a mule is.
16         A.   So mules are to carry loads, either drug loads or
17    bulk cash.  Anything really that the organization wants them
18    to carry or needs to move they move.
19         Q.   And it's safe to say in your experience that a
20    kingpin and the mule are different people; correct?
21         A.   Generally yes.
22         Q.   It wouldn't make sense to do it any other way;
23    would it?
24         A.   In most circumstances it wouldn't make sense.
25         Q.   Did you see the person that was driving the black
```

1    BMW?

2         A.   From my vantage point and given the lighting I

3    could make out that it was an adult male, most likely

4    Caucasian, but that was about it.

5         Q.   You can't identify him today?

6         A.   I can't, no.

7         Q.   Do you recognize Aaron Shamo over here?

8         A.   I actually have never met him.  No.

9         Q.   Do you recognize him as the individual that was

10   operating the BMW that day?

11        A.   No, I can't.  I can't say I do.

12             MR. SKORDAS:  That's all I have, Your Honor.

13             THE COURT:  Thank you, Mr. Skordas.

14             Any redirect?

15             MR. STEJSKAL:  No, Your Honor.

16             THE COURT:  Thank you.  You may step down.  And you

17   may be excused.

18             Government may call its next witness.

19             MR. STEJSKAL:  We call Officer Michael Hamideh.

20             THE COURT:  Come forward and be sworn, please,

21   right here in front of the clerk of court.

22             THE CLERK:  Please raise your right hand.

23                      MICHAEL HAMIDEH,

24         called as a witness at the request of Plaintiff,

25             having been first duly sworn, was examined

1                    and testified as follows:

2                    THE WITNESS:  I do.

3                    THE CLERK:  Come around to the witness box.

4                    Please state your name and spell it for the record.

5                    THE WITNESS:  Michael Hamideh, H-A-M-I-D-E-H.

6                    THE COURT:  You may proceed, Mr. Stejskal.

7                    MR. STEJSKAL:  Thank you, Your Honor.

8                         DIRECT EXAMINATION

9    BY MR. STEJSKAL:

10        Q.    Your occupation?

11        A.    I'm currently the safety and security director at a

12   private school.

13        Q.    How long have you been doing that?

14        A.    For about four months.

15        Q.    What was your career prior to that?

16        A.    So for eight months prior to that I worked at a

17   credit union in their corporate security division.  But prior

18   to that I was a police officer.

19        Q.    For what organization?

20        A.    For the Salt Lake City Police Department.

21        Q.    And how long were you in law enforcement?

22        A.    I was in law enforcement for about 22 years.

23        Q.    All with Salt Lake City?

24        A.    No.  I had some time with West Valley and

25   Highway Patrol, as well.

1        Q.    And during your assignment with West Valley did you
2   have any specialized assignments?
3        A.    At West Valley I was in patrol.
4        Q.    Okay.  And then towards the end of that assignment
5   did you have an assignment with DEA?
6        A.    No.  I actually -- so I worked in West Valley from
7   about 1995 to 2000, and in 2000 I went to Salt Lake City
8   Police Department.
9        Q.    Sorry.  I wasn't listening.  Yeah, West Valley was
10  first and then Salt Lake.  And while you were at Salt Lake did
11  you have any special assignments?
12       A.    I did.
13       Q.    What was that?
14       A.    I had multiple special assignments.  But of the
15  22 years 14 years were with investigations.  I worked homicide
16  as well as federal narcotics.
17       Q.    And talk about your training in narcotics
18  specifically.
19       A.    So my experience in narcotics, I never worked at
20  the local level of narcotics.  I went directly to the DEA in
21  about 2004, and there I had basic training for task force
22  officers, clandestine lab training, money laundering training.
23  I was initially part of a money laundering unit.  And multiple
24  trainings on search warrants and the like.
25       Q.    In search warrants, specifically writing and the

1    execution, as well?

2         A.   That's correct.

3         Q.   Talk a little bit about report writing.

4         A.   So the DEA writes reports differently than

5    Salt Lake City, and so I went to a report writing class to

6    learn how they wrote reports in the DEA system and using their

7    software and their methods of report writing.

8         Q.   Did you also have some education while in homicide

9    as far as writing thorough reports and how to document

10   everything?

11        A.   I had some, but actually switched how I wrote my

12   reports.  All my years as a police officer were in first

13   person, and I end up writing my reports in third person, and

14   to me it was so valuable I continued that when I went back to

15   Salt Lake City and worked as a homicide investigator.

16        Q.   What's the purpose of writing a good police report?

17        A.   The purpose is to document the details of what you

18   did, what you observed, and you try hard to capture

19   everything.  And so part of that would be whether -- I would

20   do a specific assignment to do a certain thing, and we'll use

21   everything that we can to capture that so we can preserve

22   those details for a situation like this at court.

23        Q.   Okay.  So did you write a thorough report in this

24   case?

25        A.   I did.

1          Q.   And did you review that report prior to your

2     testimony here?

3          A.   I have.

4          Q.   And did that help refresh your recollection of the

5     events from a couple years ago?

6          A.   It has.

7          Q.   And that's part of the purpose of writing a

8     thorough report; correct?

9          A.   Absolutely.

10         Q.   Tell us about your assignment with DEA.  What was

11    that assignment?

12         A.   So my first assignment at DEA was four years.  From

13    2004 to about 2008 I worked as part of the financial

14    investigations team.  So we did all the regular work.  I did a

15    lot of undercover where I was the person buying the drugs.  So

16    we did all of the traditional work of investigating

17    agencies -- or organizations.  However, we also looked at the

18    financial component of it.  So that was my first four years.

19              And then in I believe it was 2013 I came back for

20    another five years.  And in those five years I worked as a

21    pharmaceutical investigator, but had already done -- I had

22    experience in homicide.  So part of my assignment was to

23    return and look at overdose deaths, as well.  And so it was a

24    pharmaceutical investigator as part of the tactical -- I'm

25    sorry.  I'm forgetting the name of our little squad.  But we

1    basically did pharmaceutical investigations.

2         Q.   TDS?

3         A.   Tactical Diversion Squad, that's correct.

4         Q.   If I heard you correctly, you had kind of taken an

5    interest in an assignment in pharmaceuticals prior to the DEA

6    assignment; correct?

7         A.   I investigated overdose deaths as a homicide

8    investigator in Salt Lake City.  And what we do as a homicide

9    investigator, it's not only murders but in Salt Lake City in

10   particular it's the intentional and unintentional deaths.  So

11   we investigated any death in Salt Lake City that came through

12   our purview.  And so part of that was narcotics.

13        Q.   Let's talk specifically now about your duties on

14   November 22nd of 2016.  What was your assignment with DEA or

15   with Salt Lake City at that time?

16        A.   So I was assigned to the DEA.  Even though I was a

17   Salt Lake City officer I was cross-deputized, so I worked with

18   the DEA.  So everything that I did was under DEA protocol.

19   And at that time I was assigned to gather the evidence at the

20   search -- at a search warrant that was going to be conducted

21   at a residence at 11469 South Openview Lane.

22        Q.   Which is in Daybreak in South Jordan?

23        A.   That's correct.

24        Q.   And were you briefed on kind of an operational plan

25   of what was to go on that day?

1          A.   That's correct.  Before we go in we're briefed.  We

2     look at the search warrant.  The search warrant gives us the

3     parameters of what we are looking for, and that allows us

4     to -- basically it allows us to search in certain areas where

5     it's probable to find those items.  So we reviewed -- I

6     reviewed the search warrant in that briefing.

7          Q.   And so you had at least a general knowledge of what

8     was to be expected or expected to be confronted in that house.

9          A.   That's right.  So actually we were part of a team,

10    and I wasn't an intimate part of this investigation.  I had my

11    own cases.  But as a team we help each other when the work is

12    just too great for one person to do.  So when I went in, my

13    knowledge was based on the search warrant and those things

14    that I was going to do at -- what I was looking for at the

15    search warrant.

16         Q.   And did you maintain radio contact or other contact

17    with the team that was assigned to that search warrant?

18         A.   Yeah.  Basically these things are dynamic.  And as

19    someone that didn't know every aspect of the investigation

20    there was times that I would make phone calls to make sure, to

21    see if this evidence was pertinent.  We wanted to just stay

22    within the guidelines of the search warrant.

23         Q.   So a search warrant was to take place roughly

24    9:00 a.m. that morning?

25         A.   That's correct.

1          Q.    And describe what happened prior to making entry

2     into the home.

3          A.    So the Utah County Major Crimes Task Force as well

4     as Homeland Security and the postal inspectors were going to

5     serve the search warrant.  So they were the ones that would

6     make entry into the home and serve it.  So one of their

7     sergeants had established surveillance.  About 8:00 a.m. he

8     established surveillance on the home.  And about 9 o'clock is

9     when he saw two people that he recognized as Alexandrya Tonge

10    and Katherine Bustin enter a red Ford F150.  And so they

11    stayed with that vehicle and eventually stopped the vehicle,

12    but they lost a little visual contact with the vehicle for

13    about five minutes.  And when they came back, when they

14    regained that contact only the driver Alexandrya Tonge was in

15    the vehicle.

16         Q.    Okay.  And did that Utah County officer have some

17    interaction with her at that traffic stop?

18         A.    Yes.  So he stopped her for an improper lane change

19    and spoke to her.  And basically he was in plain clothes, and

20    so, you know, not in a uniform, and that was part of their

21    conversation.  And he explained that the traffic stop was one

22    part, but there was a larger part and the federal agents

23    wanted to speak with her.  And at that point she became

24    cooperative and ultimately took -- went back to the home,

25    asked -- we advised her of the search warrant and asked

                                                              263

1     that -- she asked that they wouldn't do damage, so she

2     provided a key for the entry.

3          Q.   And officers were able to enter using her keys;

4     correct?

5          A.   That's right, officers entered using the keys.

6          Q.   And did they locate Miss Bustin?

7          A.   Yes.  Inside the residence was Katherine Bustin as

8     well as a couple dogs.  And she was concerned about her dogs.

9          Q.   And you moved those off to the patio area?

10         A.   That's right.  The dogs were in a little kennel,

11    and I moved them out to the porch.

12         Q.   And Miss Bustin was taken into custody without

13    incident; correct?

14         A.   That's correct.

15         Q.   As was Ms. Tonge?

16         A.   That's correct.

17         Q.   What was your assignment, then, with regard to the

18    execution of the search warrant?

19         A.   So my assignment was that of a finder.  So we have

20    multiple agents and officers that were locating things and so

21    mine was to document as we found these items.  So one of the

22    first things that we did is the team would make entry and they

23    made sure that everything was secure, and then they exit the

24    residence.  And so part of my job was again to document

25    everything.  So I went through with a camera.  I had a little

1    video recorder on the camera, and videotaped what I call the

2    initial walk-through.

3         Q.   What's the purpose of that?

4         A.   That's to show the residence in the state that it

5    was when we made entry.

6         Q.   And that's before any searching takes place

7    essentially.

8         A.   That's correct.  It's before any searching take

9    place.  However, in this case there was some movement of items

10   before the initial walk-through.

11        Q.   And you're referring to the firearms?

12        A.   That's correct.

13        Q.   Tell us what happened there.

14        A.   So the master bedroom was located in the northeast

15   part of the home.  And an officer for safety purposes found

16   these firearms, multiple long guns and some handguns and

17   pistols, and put them up on top of the bed.  Rendered them

18   secure, so in other words, make sure there was no ammunition

19   in the guns.  It's not exactly protocol, but this officer felt

20   that that's what was needed.  So I made sure to take photos

21   and also talk to the officer and document what the officer

22   did.

23        Q.   So you did the walk-through of the video, took a

24   video of the house?

25        A.   That's correct.  I did a walk-through.  There was

1    some explanation.  I would narrate a little bit, but it was

2    just a walk-through.

3         Q.   And you used the term finder I believe for your

4    assignment.

5         A.   Yes.

6         Q.   And you used the term I think searcher --

7         A.   Yes.

8         Q.   -- or locator?  What was their role then, the

9    searchers or locators?

10        A.   So the searchers as well know what we're looking

11   for as far as what the parameters of what the warrant allows

12   us.  And basically what we're looking for is fruits or

13   instrumentalities, evidence of the alleged crimes.  So they're

14   looking for, you know, in this case they would have been

15   looking for mailing documents, shipping records, drugs,

16   packaging, anything to that extent.  And so they're now --

17   generally everyone will get assigned a room, and they'll

18   thoroughly and completely go through that particular area.

19        Q.   And, Officer Fife, you're familiar with him?

20        A.   Yes.

21        Q.   And he was one of those searchers or locaters;

22   correct?

23        A.   That's correct.

24        Q.   And how does that differ from you as the finder?

25   What is your particular role in evidence?

1          A.   So what they do is they will find a certain item

2     and they'll call out for the finder.  And then I come over,

3     photograph that piece of evidence in its original location.  I

4     document where that evidence was taken from.  For example, if

5     it was from the top drawer of a nightstand on the right side

6     of the bed, that's the kind of stuff that I would annotate on

7     the side of the bag that we're going to use.  So, you know,

8     this particular case, and search warrants in general have a

9     lot of items that we seize so we want to make sure we

10    attribute where we found those items.

11          So that was my job was to do that.  And then I

12    would then take it then to Cameron Bowman who was part of our

13    team, and he would catalog these items and assign them an

14    exhibit number.

15          Q.   We used to use the term scribe or cataloger.  That

16    was Mr. Bowman's role?

17          A.   That's correct.

18          Q.   And he would assign them a DEA number and basically

19    bag them for further process?

20          A.   Actually I'm the one that bagged them, and he would

21    actually again assign it a number and catalog it.

22          Q.   Let's go through some photographs.  You said you

23    took photographs of items in place at this residence on

24    November 22nd?

25          A.   I did.

1        Q.    Let's go to Exhibit 11.00.

2              Here's Photograph 1.  Can you identify that for us?

3        A.    Yeah.  This is -- these were what I recognized as

4   Xanax pills or Alprazolam, 2 milligram Alprazolam pills, and I

5   recognized them by the shape and everything.  This is in the

6   northwest bedroom, which was where the majority of the

7   evidence was taken.

8        Q.   And did officers move these at all, or is this a

9   photograph in its original state as officers entered?

10       A.   Yeah.  This is a photograph as they're processing.

11  So they would say, they would call for me and I would come

12  over and would take -- I took the picture.

13       Q.   Let's look at Item 2.  Can you identify that?

14       A.   Yeah.  This is a package.  It's Uline.  It's a box.

15  And for me the importance of this box was it was addressed to

16  Aaron Shamo, which I was aware was another person in this

17  investigation, and it was actually -- it is addressed, to his

18  address, 7939 Titian Drive, and that's his residence, and that

19  became important to me.

20       Q.   Okay.  Picture 3.

21       A.   And these are the contents of the box, which are

22  packaging material, lots of packaging material.

23       Q.   It looks like 4.

24       A.   And this is just further detail of what was in that

25  box, as you can see are plastic bags.

1    Q.    And what significance, if any, did that have to a

2    drug investigation to you?

3    A.    I recognize those bags from my experience and

4    training as bags used to ship -- they're consistent with bags

5    that are used to ship drugs.

6    Q.    Drugs are placed in those bags when they're

7    delivered to someone?

8    A.    That's right.

9    Q.    Let's look at 5.

10   A.    These also are -- these are bags and also

11   consistent with what I'd seen used to ship drugs.

12   Q.    They call mylar bags?

13   A.    Yeah, mylar bags.

14   Q.    And you based on your training and experience have

15   an indication of why people use these?

16   A.    Yeah.  So the mylar, they basically -- they believe

17   that it can better conceal the drugs from different methods

18   that law enforcement, that law enforcement have to try to

19   identify the drugs.

20   Q.    Like x-rays or dogs or whatever else?

21   A.    Yeah.

22   Q.    Let's look at 6.

23   A.    So this is a dresser drawer that's in the master

24   bedroom, which is the northeast bedroom.  And there was cash

25   inside this particular drawer.  And ultimately this is the

1    place that we located all the cash in the residence.

2         Q.   So this was a separate bedroom from the photos we

3    were previously looking at.

4         A.   That's right.  So the northwest bedroom is where we

5    had seen most of the packaging and processing was occurring,

6    and northwest or master bedroom looked like a typical bedroom.

7         Q.   Where people slept?

8         A.   That's right.  There was a bed, dresser, there was

9    even an attached bathroom and shower, closet, attached master

10   closet.

11        Q.   So none of that stuff was in the first bedroom that

12   you just indicated that looked more like a workroom?

13        A.   That's right.  So in the north west bedroom we

14   found a lot of different items, so that's where there was a

15   lot of evidence of the packaging and the processing and the

16   completing of orders.

17        Q.   And this is probably a photo taken after agents

18   removed the socks and other personal items from the door just

19   to get a picture of the money; correct?

20        A.   That's correct.

21        Q.   Let's look at the next picture, 7.  Can you

22   identify that?

23        A.   Yeah.  This is another -- it's a label -- it's a

24   receipt for, a bag for packaging items.  But for me there were

25   two things that were important.  It was showing again that

1    these are packaging materials, but again Aaron Shamo and his

2    residential address was on that label.  And obviously we were

3    in separate locations, so that's why I took it.

4         Q.   So Mr. Shamo again was the "shipped to" address of

5    this particular document.

6         A.   That's right.

7         Q.   And there's a "sold to" and a name on the left side

8    of that.  Obviously you can read that now.  Did you recognize

9    that name at the time of the location of this item?

10        A.   At the time I did not.  The only name I recognized

11   was Aaron Shamo.

12        Q.   And I want to hand you Exhibit 11.01.  Can you

13   identify that for us?

14        A.   Yes.  This is the item that's in the picture.

15        Q.   So that's just a copy that was -- that is the

16   original of what was seized as shown in this picture?

17        A.   Yes.

18        Q.   Okay.  Let's next go to the picture, 8, next

19   picture.  What is that?

20        A.   So this is that computer and some of the -- on top

21   of the computer is a laptop, and on top of the computer -- on

22   top of that is an order sheet.  And this again is in that

23   northwest bedroom.

24        Q.   Again the kind of workroom?

25        A.   That's right.

1          Q.   Okay.  If you could zoom in on the top of that

2     laptop.  Maybe a little more.

3               Can you see that close up?

4          A.   I can.

5          Q.   What does that look like to you?

6          A.   So this was one sheet of many sheets, similar

7     sheets, and they appear to be computer-generated order forms.

8     So on this sheet was, for example, Roxy, Oxycodone, and then

9     it would have the strength, 30 milligrams.  And then it would

10    have an address -- well, the quantity, and then it would have

11    a shipper, the person's name, and then the address.  And those

12    addresses were all over the US.  So we seized multiple of

13    these packages -- I'm sorry, these documents.

14         Q.   Zoom back out, please.

15              And this is how that item was located when you guys

16    executed the search warrant on November 22nd?

17         A.   That's right.  So what would happen is if someone

18    saw this and they recognized it as possible evidence, and they

19    called me over.  And I would come and photograph it and would

20    annotate on the bag what room it came from and take the

21    evidence.

22         Q.   So that appeared to be what they were working on at

23    the time, essentially, not physically in the room, but

24    that's --

25         A.   Yeah.  It was in its current location there on the

1    top.

2            Q.    And what's the black thing underneath the laptop?

3            A.    It's a printer.

4            Q.    Okay.  And to the right of that picture there are

5    it looks like a number of white rectangular items?

6            A.    Yes.  So there were a lot of US Postal shipping

7    envelopes as well as I even located US postal receipts.  And

8    so I knew that that was a component -- I'm also familiar with

9    that's a way that a lot of times these types of drugs are

10   shipped.

11           Q.    Okay.  And it looks like there was a fair number of

12   those.

13           A.    There's a lot of them.

14           Q.    And those were seized -- I don't remember if those

15   were --

16           A.    No.  So we documented -- there's a balance.  You

17   can take a ton of things, and then we have to get those things

18   back to the individuals.  We have to safeguard it.  So in my

19   estimation that's why we didn't seize all of the packaging

20   materials or all of this.  We felt that a photograph would

21   suffice.

22           Q.    And below those priority mail packages, what are

23   those things?  No.  Just to the very right of the screen.

24   Yeah.

25           A.    So there -- if you look -- well, okay.  There's a

1    couple things on here.  There's the tape that they would, you

2    know, that could be used.  But if you look there's an invoice

3    also to the left.  It's a coffee-type receipt.  And so I saw

4    that as important, as well.  From my training and experience

5    in these types of cases they'll label it one thing other than

6    the drugs themselves, and so it could be labeled coffee or

7    some other item.  So we seized that, as well.

8         Q.   Okay.  And to the right of the invoices, they are

9    kind of in the middle, those are black things?

10        A.   Oh, there's the mylar bags.  I'm sorry.  I have a

11   bit of a glare.  I can't see.  It's not as bright.

12        Q.   So basically a bunch of items set up for packaging?

13        A.   Yes.

14        Q.   Okay.  Thank you.  I guess I've got -- I'm going to

15   hand you 11.03.  Can you tell us what that is, please?

16        A.   Yeah.  This is one of those order forms that I

17   mentioned that had Roxy or Oxycodone, the strength of that

18   drug, the quantity and a name and an address.

19        Q.   And can you tell from the envelope where that was

20   located?

21        A.   This was in that northwest bedroom, clear drawer.

22   It was from the northwest bedroom.

23        Q.   Okay.  Let's look at the next picture, 9.  Can you

24   identify that, please?

25        A.   This is also in the northwest bedroom.  And there

1     to the right of the picture you can see a lot of bags that

2     have these blue pills that I recognized, a scale, and then

3     also some bubble wrap.

4          Q.   And what's the significance, if any, of bubble

5     wrap?

6          A.   Bubble wrap can be used to disguise those pills so

7     that you're not feeling the actual pill in the package, and

8     also to protect the pills.

9          Q.   The significant of the scale, if any?

10         A.   So with this, with a large volume, and ironically

11    we do the same thing, we don't count every pill initially.

12    We'll weigh it out.  So, for example, we weigh out gross

13    grams, and that would include all of the packaging.  And in

14    large scale organizations where volume is part of it,

15    sometimes you weigh pills out instead of actually counting

16    them.  You'll know that a certain amount of pills weighs a

17    certain amount.

18         Q.   Let's go to the next photo.  What's that?

19         A.   This was highly significant to me.  I recognize

20    these are pills that resemble immediate release Oxycodone, and

21    there's a particular detail on the pills that becomes -- that

22    was very important to me.

23         Q.   Tell us about that.

24         A.   So these pills were stamped to represent

25    30-milligram immediate release Oxycodone.  It's immediate

1      release.  And in particular they were stamped with an M, that

2      would represent Mallinckrodt, or an A215, which is Actavis.

3      Those, when I would deal with informants and people on the

4      street, those were two highly sought after forms of this

5      immediate release Oxycodone.  For whatever reason they

6      preferred these.  There's all sorts of other types, but these

7      are, they're the ticket item.  They're very sought after.

8               I actually at the time could tell you, you know,

9      what the value, the street value was of those pills.  So this

10     quantity to see that amount was shocking for me.

11          Q.   Okay.  That was based on your experience in

12     investigating these type of cases.  Is this a big one?

13          A.   Yes.  Absolutely.  I had international cases, and I

14     didn't yield this much.  I didn't get that much.  To see that

15     much of an alleged Oxycodone pill is staggering.

16          Q.   Let's look at Exhibit 11 or the next picture, I

17     guess, Picture 11.  What's that?

18          A.   Those same pills.  And then off to the side are

19     what are representing Xanax or Alprazolam, those 2 milligram,

20     those white pills are, they call them Xanny bars, but they're

21     representing Xanax.

22          Q.   And this appears to be after the agents pulled them

23     out of that tote and kind of laid them out to get a better

24     view?

25          A.   That's correct.

276

1   Q. Okay.  Let's look at the next picture then.  What's

2 that?

3   A. These are the same pills.  There's some packaging.

4 There's just a different view of those same pills.  Again,

5 this is in that northwest bedroom.

6   Q. And again, this is agents pulling stuff out to kind

7 of get a better photo about what they're taking out of boxes

8 or totes?

9   A. That's correct.  We're trying hard at this point.

10 There's so much, and there are people -- everyone's waiting on

11 me.  I'm the slow part of this process.  But again, I want to

12 document as well as we can so that we can have this moment.

13 So, yeah.  That's just them working through.

14   Q. Okay.  Next picture, 13.  What's that?

15   A. This is in that northwest bedroom, and these are

16 just loose pills.  And again, those are stamped with the M or

17 the A215 to represent the Oxycodone 30-milligram immediate

18 release.

19   Q. So after agents removed all of those bags that we

20 saw earlier there's just a bunch of loose ones in the bottom.

21   A. That's right.

22   Q. Next picture.

23   Does that better show what you're talking about

24 with the stamps on them?

25   A. Yeah.  If you look right towards the center there's

1     an A and 215, and then there's an M where you -- see that

2     A215?  Again that's the Actavis.  That's stamped to represent

3     an Actavis immediate release 30-milligram Oxycodone pill.

4     These used to be higher doses of immediate release that you

5     could buy, and now it's been taken down to only 30 milligrams.

6     So that's the highest dosage you can get on the street --

7     anywhere.  And so these are highly sought after.  And that's

8     the Mallinckrodt, the M and the 30, you can see on the other

9     side, it shows both sides of it.

10          Q.   And based on your training and experience there's

11    really not a lot of effect difference of the two pills, they

12    appear to be mixed together here like they sent them out in

13    the same.

14          A.   Yeah.  Again, my experience is when people, you

15    know, when users are using these are highly sought after.

16    There seems to be a large group of people that like to use

17    these particular pills for whatever reason.

18          Q.   Next photo.  What's that?

19          A.   So this is a vacuum cleaner that was in that room,

20    and we did not vacuum the room.  But you'll see inside there

21    are a bunch of pills.  Mainly there were some Oxycodone, but

22    there's mainly Alprazolam, those white Xanax bars.  That's

23    what you're seeing there.  There's a few of the Oxycodone, but

24    it was just -- that's the contents of that vacuum cleaner, and

25    we did not vacuum.

1          Q.   Let's look at that next photo.  Basically it's a

2     close-up and we were zooming in on before.

3          A.   Yeah.  You can see there's one blue pill and those

4     white pills were again.  And each -- so ultimately we took

5     these out, and the way that we process is that each -- we

6     can't mix the drugs together so we separated this out, and

7     each of the type of drugs became their own exhibit.

8          Q.   And just to give perspective, you said you were

9     aware of the value of one of these pills at that time?

10         A.   That's right.

11         Q.   And what would that be?

12         A.   So my -- it ranged from at the low end $22 a pill

13    to right up to the $30 a milligram.  Undercover, for example,

14    when I did undercover and I bought 100 pills, the best I could

15    negotiate was $25 a pill.  And I told this guy, you're killing

16    me.  How am I supposed to do it?  And he said, you know, I

17    don't need to sell it to you.

18              So I knew from personal experience doing undercover

19    work as well as using informants and what we were paying for

20    these pills, if, in fact, they were Oxycodone that was the

21    street value of them.

22         Q.   And these are just vacuumed up.

23         A.   These are vacuumed up.

24         Q.   Okay.  Next picture.  Identify that.

25         A.   So that is a tote.  And in the tote again you're

1    going to see that mylar.  It's for the packaging.  Those

2    orange pills are stamped with a Dp and a 30, which is

3    Adderall.  And Adderall is a Schedule II narcotic.  It's a

4    stimulant.  And there's a high -- there's a good market for

5    that, sadly among some of our universities.  And so then also

6    there is the Oxycodone or those pills that are representing

7    Oxycodone.

8        Q.   And under that there's packaging, as well?

9        A.   Right.  There's your plastic bags and all the

10   different packaging.

11       Q.   Next photo.  Can you identify that for us?

12       A.   This is a closet that's in that same northwest

13   bedroom.  And again, it's just showing a lot of the packaging.

14   There were the padded envelopes and again your bubble wrap,

15   all -- just a lot more packaging.  There was -- it was just a

16   lot of packaging.  Even in my estimation this was a

17   significant amount.

18       Q.   Closets, garages, there's just stuff?

19       A.   All over.  Yeah.  In the garage there was also some

20   more packaging.

21       Q.   Okay.  Next photo.  What do we see here?  You've

22   got that glare still up there?

23       A.   Yeah.  It's just not --

24       Q.   That's a close-up at the top.

25       A.   Yeah.  So those are -- what we're seeing here is

1    you have the pills in the background, and this is -- it's

2    looking like, I can't be exactly sure, but that looks like one

3    of the order sheets that have the drug and individual.

4         Q.   Zoom out.  And then, yeah, zoom in by that bottom

5    by the glove.

6              Can you see what those are?

7         A.   You know, I can't.  I'm sorry.

8         Q.   Let me hand you what's been marked as 11.05.  That

9    might give you a better look.  Can you see what that is?

10        A.    Yeah.  These are United States Postal Office

11   tracking numbers for packaging, and there were a lot of them.

12   And I know to the investigator the value of that tracking

13   information.

14        Q.   Okay.  So is 11.05, the exhibit that you've got in

15   front of you, does that match what's in the photograph here in

16   the bottom right, generally speaking tracking numbers?

17        A.   Yes.

18        Q.   And can you see in that packaging?  What do you

19   mean by tracking number?  What part of that is a tracking

20   number?

21        A.   There's a series of numbers at the top, and it's

22   actually labeled that there's a series of tracking numbers at

23   the top.  And those are tracking numbers.  And then off to the

24   side are handwritten notes of people's names.

25        Q.   Okay.  Next photo.  What's that?

1          A.    This is also in that northwest bedroom, and this is

2     just more packaging material.

3          Q.    Various different packing items.  Okay.

4                Next picture.  What's that?

5          A.    This is also in the northwest bedroom, and it's

6     another scale, as well as it's among all the packaging.  But,

7     yeah, it's another digital scale.

8          Q.    Okay.  Next picture.  What about that one?

9          A.    And this is also in the northwest bedroom, and that

10    is a large bag of those pills that are stamped to represent

11    the Xanax, the 2-milligram Xanax, and the Oxycodone.  And

12    those are the blue pills.

13         Q.    So this is not the picture from the tote that we

14    saw earlier.

15         A.    Yeah.  This is another, this is another group.

16         Q.    Next picture.

17         A.    So this is the bedroom, and this is the master

18    bedroom.  And inside this bedroom there were a couple

19    nightstands.  And you could see there's cash that's at the top

20    of that nightstand.

21         Q.    Just in the drawer there.

22         A.    In the drawer.

23         Q.    Okay.  And that's on from our vantage point the

24    left side of the bed.

25         A.    That's right.

```
 1          Q.    Next picture.  What's that?
 2          A.    That's the same bedroom, that's the master bedroom,
 3    the northeast bedroom.  And in this bedroom there is -- I'm
 4    sorry.  Here there's also cash and some Alprazolam.
 5          Q.    And again from our perspective this is from the
 6    right side of the bed.
 7          A.    That's correct.
 8          Q.    And Alprazolam you're referring to are those white
 9    oblong --
10          A.    Yeah.  That's those Xanax representing 2-milligram
11    Xanax pills.
12          Q.    Okay.  Next photo.  What do we see there?
13          A.    So this is what we saw before but just zoomed out.
14    This is the little closet area in that northwest bedroom, just
15    again showing the packaging.  Not all of this stuff was
16    seized.  So when you see a lot of these pictures it's we need
17    to try to capture what was there visually since we're not
18    seizing it.
19          Q.    So here at the very bottom of this photo is white,
20    "priority mail" it says on there?
21          A.    Uh-huh (affirmative).
22          Q.    What are those?
23          A.    They're priority -- it's those envelopes, the
24    US Postal envelopes -- I'm sorry.  This is a box.  This is
25    showing a box, and it's a Priority Mail box, not the envelope.
```

1       Q.   These boxes are bigger than the envelopes.

2       A.   Yes.

3       Q.   Used for larger packages.

4       A.   Yes.  But it's still US Postal.

5       Q.   And zoom back out.  And there appears to be a stack

6   of those in there?

7       A.   Yes.

8       Q.   Next photo?

9       A.   It's a heat sealer.  And in a case like this where

10  there's a lot of the plastic-type packaging.  This is just a

11  way to seal that.

12      Q.   How does a heat sealer work?

13      A.   So basically it's plugged in.  The black area heats

14  up, and it closes.  It's used as seal plastic, both sides of

15  the plastic bags.

16      Q.   So if pills are in a bag it would seal the bag shut

17  so it wouldn't scatter throughout the package.

18      A.   That's correct.

19      Q.   Next photo.  What's that?

20      A.   For some reason this is really dark.  My computer

21  screen is really dark.  But this appears to be the northwest

22  bedroom.  And it's more Alprazolam, the Xanax pills.

23      Q.   Just scattered loose on the carpet?

24      A.   Yeah.

25      Q.   Okay.  Next photo?

1          A.    These are postage.  They're postal stamps.

2          Q.    And what significance, if any, did that have in the

3     investigation?

4          A.    Well, there were indications that these things were

5     being shipped by Postal Service, so this would be used to pay

6     for that shipping.

7          Q.    Next photo.  What's that?

8          A.    So this is -- there's a white package in there, and

9     it's from China.  And these -- it's addressed to Aaron Shamo

10    at 7913 Tatian Street.  But this is really common for us to

11    find things that are labeled one thing, in this case it says

12    silver aluminum, but it's not that.  So again it was addressed

13    to Aaron Shamo but yet located at their home.

14         Q.    And there's really nothing in there anymore

15    drug-wise of significance in that package.

16         A.    That's right.

17         Q.    The significance is the address label.

18         A.    Yes.

19         Q.    Next photo.  What's that?

20         A.    This is an invoice.  And I recognize this as

21    possibly being something that's put in to divert the attention

22    from what it actually is.

23         Q.    Okay.  Next photo.

24         A.    And these are rolls, printer-type rolls that would

25    be, they're attached to a small printer, like a label-type

1    printer?

2         Q.   Okay.  So a roll of labels?

3         A.   Yes.

4         Q.   Okay.  Next photo.  What's that?

5         A.   This is a receipt to the South Jordan Post Office.

6    And, you know, here's a Priority Mail.  And you can see, you

7    know, there's quantity that are shipped.  And there's the

8    price.  And so again, this is part of what I saw as evidence

9    of what was occurring.

10        Q.   Looking up in the upper left-hand corner what's the

11   date?

12        A.   April 23rd, 2016.

13        Q.   So that's significantly before the date that you're

14   actually executing this search warrant.

15        A.   Yeah.  We're on November 22nd.

16        Q.   On the quantity there it says, 90 Priority Mail

17   stamps or items?

18        A.   Yeah.  Yeah.  I don't know exactly what that was,

19   if that's shipping or if they're buying, whatever they were

20   doing.  But I recognize the postal component to this, to the

21   organization.

22        Q.   Okay.  Next photo?  What's that?  Zoom it in a

23   little.

24        A.   Oh, it's a vacuum sealer.  And I apologize again.

25   This screen is super dark.  You don't see very well.

1          Q.    Some of the photos are actually dark, too.

2                So that's another vacuum sealer?

3          A.    Yes.

4          Q.    And you already described how that worked.  This

5    looks like maybe a newer one.

6                Next photo.  What's that?

7          A.    I believe these are labels.

8          Q.    Okay.  Next photo?

9          A.    And these are those multiple sheets that I was

10   telling you about what appears to be orders.  It lists the

11   drug, the strength, the quantity and the name and addresses

12   all over the US.

13         Q.    And I'm going to hand you now what has been marked

14   as Exhibit 11.02.  Can you identify that for us, please?  It

15   might be hard to manipulate inside the envelope, but hopefully

16   you can kind see.

17         A.    So these did come out of the northwest bedroom.  It

18   is folded, unfortunately, but I can see through here there's a

19   paper -- there's a mark on there handwritten, and I can see it

20   appears to be what's these photos here -- I'm sorry, what's in

21   the photo.

22         Q.    Are you comfortable opening it?

23         A.    I'm sorry?

24         Q.    Are you comfortable cutting it open to make sure we

25   know what it is?  Mylar?

1          A.    This is -- I have exactly the one that's in the

2    picture is right there.

3          Q.    And there are a number of pages that look similar

4    to that.

5          A.    Yeah.  And that's what I was saying.  There's

6    multiple of these computer-generated papers, which is

7    important to me.

8          Q.    I've got to fold them again to get them back in

9    there.  However, you do it.

10         A.    Yes, sir.  We've got it right this time.

11         Q.    And again looking on the screen at those they

12   appear to be descriptions of drugs and quantities and such?

13         A.    That's right.  You can see Roxy or Oxycodone,

14   30 milligram, which is again the highest dose of immediate

15   release, and the quantity and the name.  And some of them --

16   well, actually, you see $8, $7, US dollars.

17         Q.    Next to the words Priority Mail?

18         A.    That's correct.

19         Q.    And then you also see the addresses there.

20         A.    That's right.  The part to me, again, just the

21   volume that was located there as well as the fact that this

22   was all over the US was significant to me.

23         Q.    Next photo.  What are we looking at there?

24         A.    There's a label printer, and this is again in the

25   northwest bedroom.  And in here are just more packaging

1    material.

2         Q.   And that appears to be that maybe those rolls of

3    labels would fit in this label maker?

4         A.   Yeah.  From my estimation it appeared that those

5    labels could be put in that roll just by the size.

6         Q.   Next photo?

7         A.   That is that label maker, printer.

8         Q.   Okay.  Next photo?

9         A.   And these are padded envelopes again in that same

10   closet.  And again, we're trying to capture just the volume of

11   packaging material.

12        Q.   So you see different kinds, the yellow ones there,

13   the bottom right corner, something different?

14        A.   Yes.

15        Q.   Next page?

16        A.   So this was located there.  Inside here there's a

17   little clear vial.  The little clear vial had pills that were

18   consistent with Ritalin.  And the blue ones were not the

19   pills -- were not the Oxycodone.  I did not know what those

20   were.

21        Q.   Okay.  So you took a picture of them just to make

22   sure we could figure it out?

23        A.   That's right.  And we seized them, as well.

24        Q.   Okay.  Next picture?

25        A.   These are gelatin caps.  And from my experience

1      these can also be, they can put material -- or they can put

2      the drugs in a powder form and make capsules with that.

3              Q.    Okay.  That's something you've seen in other

4      investigations?

5              A.    That's right.

6              Q.    Next photo?

7              A.    And again, this is just showing, it's Uline.  It's

8      the packaging.  And it's addressed to Aaron Shamo at

9      7939 Titian Street.

10             Q.    Again this was found at the Daybreak house?

11             A.    That's right.  This was found at the 11469 Openview

12     Lane.

13             Q.    Next photo.  What's that?

14             A.    It's that Uline box.  It has the packaging material

15     in there.

16             Q.    What's the address on that?

17             A.    It's the 7939 Titian Street, which is Aaron Shamo's

18     location.

19             Q.    Anything different about the "ship to" on this?

20             A.    Yeah.  There's an Eric, a different shipper -- I'm

21     sorry -- different person receiving it.

22             Q.    And then the bottom line, "attention"?

23             A.    I'm sorry?

24             Q.    Then under the street address what does it say?

25     Attention?

1          A.    Oh, Attention Aaron Shamo, yes.

2          Q.    So just a little bit different than the direct

3    ones?

4          A.    Yes.

5          Q.    Next picture.  What's that?

6          A.    So this is just some more labeling as part of the

7    packaging.  But I found it interesting that they were labeled

8    fragile, and pills are fragile.  So....

9          Q.    It's just a bunch of stickers that say fragile on

10   it?

11         A.    That's correct.  Just another component of the

12   shipping.

13         Q.    Can you zoom in on the address label on the left

14   side of the box?  Yeah.  That one.

15               Can you see that?

16         A.    That one says Aaron Shamo, 7939 South Titian

17   Street.

18         Q.    Okay.  Next photo.  What's that?

19         A.    And these are shipping labels.  Again more shipping

20   stuff, packaging.

21         Q.    Okay.  Next photo.  What's that?

22         A.    I believe this is mylar, the mylar bags.

23         Q.    Ship to whom?

24         A.    Aaron Shamo, 7939 South Titian.

25         Q.    And up in the upper right-hand corner can you see a

1    ship date?

2         A.    I can.  It's September 1st, 2016.

3         Q.    Okay.  Next photo.  What's that?

4         A.    These are also tracking stickers that would go on a

5    package.  There were a lot of these.

6         Q.    Okay.  And those can be peeled off of here and

7    basically placed on the package?

8         A.    Yeah.  They're taken off and adhered to the

9    package.

10        Q.    That's all of our photographs in Exhibit 11.

11              After you finished taking photographs of things as

12   the finder, you said you took these items to whom?

13        A.    I took -- I transported the items back to our

14   office.

15        Q.    Sorry.  There was another processing step.  After

16   you took the pictures of them in the rooms, you gave them to

17   Mr. Bowman --

18        A.    I'm sorry?

19        Q.    -- for documenting?

20        A.    Yeah.  That's correct.  So basically what I would

21   do is as something was found, I would give it to Mr. Bowman.

22   He would catalog it and he had it in a box.  And so

23   Mr. Bowman, I wasn't walking around with all of those items.

24   We actually had them stationary.  He was set up at a table

25   inside the location.

1         Q.    Okay.  And gave them all a DEA number?

2         A.    That's right.

3         Q.    And then you took them back for processing?

4         A.    That's right.

5         Q.    Did you assist in the processing of the drug

6    exhibits or process them yourself?

7         A.    I did.  I did.  We took photos, and I signed the

8    sealed portion and put them in the bags.  And that was a

9    Special Agent Robert Marcy helped with that process.

10        Q.    Let's first look at the photographs of those, and

11   then we'll look at the physical exhibits themselves.

12              So let's look at the next picture, 48.  Did I make

13   you start over?  11.00, yeah.  48.

14              And can you identify that for us?

15        A.    Yeah.  These are items that were taken out of the

16   northwest bedroom.  And this is showing all of the Alprazolam

17   or the Xanax.  So those were stamped or made to represent

18   Xanax, 2 milligrams.

19        Q.    And it says Exhibit 140 there at the bottom?

20        A.    That's correct.

21        Q.    How does that get there, and what does that mean?

22        A.    Basically that's assigned by Cameron, and so it

23   identifies these items and gives us a point of reference to

24   show that this is, these items were taken from a particular

25   location at a specific time and date.

1          Q.   Okay.  So let's look at the next photo.

2               What are we looking at here?

3          A.   These are all the Oxycodone, those pills that were

4     stamped to represent immediate release Oxycodone pills.  And

5     this is from the northwest bedroom.  It is shown as

6     Exhibit 139, and our case number.

7          Q.   And the next photo?

8          A.   And this also is showing Oxycodone pills, and it's

9     Exhibit 141, and these were taken from that northwest bedroom.

10         Q.   Some of those were in the earlier picture with the

11    tote, and some of them were in the earlier picture in the big

12    garbage bag?

13         A.   In the bag, that's right.

14         Q.   Next photo.  What's that?

15         A.   And this also came out of the northwest bedroom,

16    and this is, it's Alprazolam.  The Xanax.

17         Q.   And these are just photos of the processing and

18    assigning them numbers; is that correct?

19         A.   That's correct.

20         Q.   Prior to packaging and getting them tested.

21         A.   That's right.

22         Q.   Next photo.  What's that?

23         A.   Basically it's the same thing.  Some of these bags

24    had a few pills.  And then we even located bags that had M10,

25    and we would find 10 pills in there.  So this is just as it

1     was out of that -- as we were further processing this

2     evidence.  They came out of the northwest bedroom.

3            Q.   Okay.  Next photo?

4            A.   Yeah.  These right here, these little black marks

5     on there you're seeing right there, M10, and you can see the

6     10 pills, but this is just basically us now breaking the

7     evidence down further to document it.

8            Q.   And again, you guys didn't write those M10 and

9     100 numbers.

10           A.   No.

11           Q.   That was as found?

12           A.   As found.

13           Q.   Next photo?

14           A.   These --

15           Q.   Just a close-up with different markings?

16           A.   Yeah.  I don't recognize the exact pill.

17           Q.   Okay.  Next photo?

18           A.   These are the contents of the vacuum cleaner.  And

19     this is what we broke out into separate -- into individual

20     groups of the pills.

21           Q.   So we saw the vacuum cheaper earlier with the bag,

22     I guess.

23           A.   That's right.  These are the contents all together.

24           Q.   Okay.  And then let's go to the next photo.

25           A.   And this is the Oxycodone that we picked out from

1    that.

2           Q.   And you said the value of those was approximately

3    what?

4           A.   So on the street the value could be anywhere from

5    22 to $30 a pill.

6           Q.   And these, this little, this bag of them on the

7    right was seized from the vacuum cleaner filter.

8           A.   That's correct.

9           Q.   Having been vacuumed up.  Okay.

10               Now let's go to the physical exhibits and show you

11   the drugs that were seized from the residence.  The 10 series,

12   I handed you that series of exhibits, can you identify -- I

13   guess from the top, can you identify the number on the yellow

14   sticker of what exhibits are in there?  Just read the numbers,

15   if you would.

16          A.   Okay.  So this is Government's Exhibit 10.00,

17   10.03, 10.05, 10.06, 10.09, and 10.19.

18          Q.   And we can't open that --

19               THE COURT:  Mr. Stejskal, pick a good stopping

20   point in the next few minutes.

21               MR. STEJSKAL:  Okay.

22               THE COURT:  Unless you're about done with this

23   witness.

24               MR. STEJSKAL:  I am about done, yes.

25               THE COURT:  Then there's cross, so it probably

 1    doesn't make any difference.

 2            MR. STEJSKAL:  Right.  I can finish here within the

 3    next few minutes.

 4            THE COURT:  All right.

 5        Q.   BY MR. STEJSKAL:  In looking through the tote you

 6    can see some of the DEA labels through there.  Can you

 7    identify what's in there?

 8        A.   So I can directly see one label.  It's Exhibit 139.

 9    And it says it's acquired by me.  And it's South Jordan, Utah,

10    on November 22nd, 2016.  It's also sealed by me on

11    November 22nd, and witnessed by Robert Marcy, who is a special

12    agent.  It has a lab number.

13        Q.   And so the photos were of you processing these, and

14    the sticker is of you putting your name on there signing and

15    sealing for delivery to the lab; correct?

16        A.   That's correct.

17        Q.   And that contains the Oxycodone or the Fentanyl

18    items that we observed in the photographs.

19        A.   What I can see is Exhibit 139.  I'm not familiar

20    with what the court exhibits are.

21        Q.   If you flip around you can see a couple other

22    stickers.  But they are hard to see.

23        A.   Yeah.

24        Q.   And let's get the other 10 series.  10 series is in

25    here.  Your name is on that.  Let's talk about the 10s.

1                    Go ahead.  Can you identify those by sticker

2     number, the yellow?

3          A.    This is Government's Exhibit 10.04.

4          Q.    And what is that?

5          A.    These are Alprazolam pills from the northwest

6     bedroom.

7          Q.    Okay.  And if you'll just do that item by item,

8     just identify by yellow sticker number what they are.

9          A.    This is 12.05.  And --

10         Q.    Sorry.  We don't want the 12.  Just the 10.

11         A.    Just the 10s?

12         Q.    Yeah.

13         A.    So this is 10.08, Exhibit 146, and these were in a

14    blue bin in the northwest bedroom.  These are the white pills

15    that I saw on that, in the picture.

16         Q.    Okay.

17         A.    10.10, and this was in the tote.  These are those

18    Alprazolam pills that came out of the northwest bedroom.

19    10.20, and this is -- these are Alprazolam pills, some broken,

20    but these are in the master bedroom.  10.18, and these are

21    labeled Adderall, but this came out of the northwest bedroom.

22                    This is 10.17.  These are from -- these are the

23    Adderall pills from the northwest bedroom.  10.16, and these

24    are Alprazolam pills from the northwest bedroom.  10.15, these

25    are Alprazolam pills from the northwest bedroom.  10.14, these

1    are the unidentified blue pills, I don't know what they are

2    but they came from the northwest bedroom.  10.13, and these

3    are Alprazolam.  And these came from the bed, the northeast

4    main, the master bedroom.

5         10.12, and this was also from the master bedroom.

6    These are all Alprazolam pills.  And this is from the

7    northwest bedroom.  And these are Exhibit 10.11, and these are

8    Ritalin -- or Adderall pills.  10.02, it says this is

9    Exhibit 140, and this came out of that northwest bedroom, as

10   well.

11        Q.   Is there a yellow sticker on that one?

12        A.   I'm sorry.  10.02.

13        Q.   Thank you.

14        A.   10.24 are the Ritalin pills.  It came out of the

15   master bedroom.  10.23, this is suspected LSD tablets -- paper

16   that came out of the northwest bedroom.  10.22 is more of that

17   paper, and it came out of the northwest bedroom.  10.21, it's

18   an unknown blue substance, and it came out of the northwest

19   bedroom, as well.  That's all in the box.

20        Q.   Okay.  Thank you.

21        I may have a dozen more questions.  Why don't we

22   break here, and we'll put this stuff away.

23        THE COURT:  We'll take our second break.  We'll

24   take this one for about 30 minutes.

25        THE CLERK:  All rise, please.

```
 1                    (Whereupon, the jury left the court proceedings.)

 2                    THE COURT:  We'll be in recess until about 25 past.

 3                    (Recess.)

 4                    THE COURT:  We'll get the jury and proceed?

 5                    MR. SKORDAS:  Yes, Your Honor.

 6                    THE COURT:  Thank you.

 7                    (Whereupon, the jury returned to the court

 8            proceedings.)

 9                    THE COURT:  You may proceed, Mr. Stejskal.

10                    MR. STEJSKAL:  Thank you, Your Honor.

11                    I hope all the jurors can hear me.  I was told over

12        the break that I was talking into a broken microphone on this

13        side, so I will try to speak in the microphone on this side

14        that is actually working.

15                    Can everybody hear me just fine?  If you ever

16        can't, please raise your hand because you need to hear

17        everything that is said on both sides.  So I appreciate that.

18                    THE COURT:  Another application of the gizmo rule.

19                    MR. STEJSKAL:  Never supposed to work?

20                    THE COURT:  If something can go wrong it probably

21        will.

22                    Pardon me.  Go ahead.

23                    MR. STEJSKAL:  The only one in the whole place that

24        doesn't work, apparently.

25            Q.   BY MR. STEJSKAL:  You talked somewhat about your
```

1    experience in drug trafficking investigations, and it's fairly

2    extensive; correct?

3         A.   Yes.

4         Q.   Over your 22-year career you've kind of had several

5    stints, two with DEA and some other narcotic experience?

6         A.   It's total of nine years with DEA.

7         Q.   Did you have a chance to kind of take a look at

8    this investigation with regard to your involvement there at

9    the Tonge and Bustin residence?

10        A.   Yeah.  My part of this was basically just at the

11   residence and then with regard to the search warrant.

12        Q.   Okay.  And you said there were items of

13   significance as they relate to a drug conspiracy that you

14   physically located at the Tonge and Bustin residence; correct?

15        A.   There were items that I saw as important.  And when

16   I say that, I saw that as important because in my mind it was

17   triggering certain experiences that I realized spoke -- it was

18   related to the evidence and why it was evidence.

19        Q.   Okay.  And let's talk specifically about some of

20   those items.  Obviously the pills had great significance.

21        A.   The volume, the volume of pills that were located

22   here was a lot.  I haven't seen that much in my career, of

23   Oxycodone.

24        Q.   And apparently -- not apparently.  The stuff

25   ultimately turned out to be Fentanyl.  Have you been in many

301

1    Fentanyl investigations?

2         A.   Yes.  I'm very familiar with Fentanyl.

3         Q.   And these were Fentanyl pills, these Oxy pills.

4    Have you seen that volume of Fentanyl in your career?

5         A.   No.  Part of my experience when it comes to the

6    Fentanyl pills was related to overdose deaths.  So I was aware

7    that it took only a fraction of a pill in some cases.  And I

8    had a case where it only took a fraction of a pill to

9    contribute significantly to this person's death.

10        Q.   The other thing you explained significant on these

11   pictures were packaging materials, and there seem to be a lot

12   of those and a lot of different types.  What significance, if

13   any, did that have?

14        A.   So the significance that I saw with the packaging

15   was it was a large amount of pills, and it seemed to

16   correspond with the amount of packaging that we saw.  And so

17   you rarely see the mother load when it comes to Oxycodone.

18   It's not like some of the other drugs that we would like with

19   meth or coke where you would see these large volumes.  My

20   experience is this is more by volume that you see this, not

21   quantity.

22             So when I saw that amount of pills with those

23   amount of -- that amount of packaging, that was telling me

24   with my experience is that that's high volume.  And then along

25   with seeing the order forms, it was just complex.  All of that

 1    evidence to me suggested that the organization was complex.

 2    It was -- there were different facets and components to it.

 3         Q.   I guess corollary to that question, is given its

 4    value could that be run in your opinion just by these couple

 5    people at that house?

 6         A.   So my experience with that is larger, more complex

 7    drug organizations, compartmentalized locations and people.

 8    And when I saw we recovered $19,520 in cash from the

 9    Bustin-Tonge residence, that number, that amount of cash

10    sounds like a lot but not when it correlates with these pills.

11    Even at $7 a pill, from what I saw there, there should have

12    been more cash.

13              So that suggested to me with my training and

14    experience is that that is a location dedicated to packaging

15    and shipping.  The cash component, the organization would

16    likely have somewhere else.  And if there's a place where

17    things were being made it was not here.  It seemed like it was

18    just the place where packaging and shipping occurred.

19         Q.   And then you referred to or we looked at boxes of

20    shipping materials that had both Aaron Shamo's name on them as

21    the shipped to and in one instance at least Gabby Noriega's

22    name as the ordering person.  What significance, if any, did

23    that have finding those at this other non-Shamo residence?

24         A.   I don't know, Gabi had no significance to me.  But

25    what was significant to me was Aaron Shamo and the 7939 Titian

                                                                    303

1       Street address, finding evidence that was addressed and

2       shipped there, and now at the secondary location to me was

3       consistent with what my training is that these larger complex

4       organizations have different compartments of the organization

5       that have different functions.  It's a way that they insulate

6       themselves from law enforcement detection.  They can't keep

7       everything.  It's not -- it's not -- basically it's not wise

8       to keep everything in one location.

9            Q.   Thank you.

10                That's all the questions I have.

11                THE COURT:  Thank you, Mr. Stejskal.

12                You may cross-examine, Miss Beckett.

13                          CROSS-EXAMINATION

14      BY MS. BECKETT:

15           Q.   Will you pronounce your last name for me before I

16      say it incorrectly?

17           A.   Hamideh.  Like an apple a day, but a Hamideh.

18           Q.   I will be sure not to forget that.

19                Okay.  So let's -- Mr. Stejskal took you through

20      some photos, I believe it was Exhibit 11, is that what it was?

21      Those photos were taken at Openview Lane; is that correct?

22           A.   Yes.

23           Q.   That is the residence of Katherine Bustin and

24      Alex Tonge, whose name I am probably saying incorrectly?

25           A.   That's correct.

1       Q.   Not Aaron Shamo's residence; correct?

2       A.   That's correct.  Well, no.  I found at that

3  residence Alexandrya Tonge had a military ID and a driver's

4  license.  And there was a lot of other residential documents

5  that would suggest that it was their home.

6       Q.   So you would believe that it was their home; right?

7       A.   That's correct.

8       Q.   In going through some of those photos there was a

9  picture of some gel caps, and I'm not sure what photo that was

10 in that very large exhibit.  Do you remember that?

11      A.   Yes, I do.

12      Q.   Those gel caps are not for shipping, are they?

13      A.   No.  Those gel caps are generally filled with a

14 substance.  What I've seen it in my training experience is

15 they're filled with substances that are usually produced at

16 that shipper's or that preparer's place.  And so those are

17 used to -- basically it's an ingestion method.

18      Q.   So that would be part of a manufacturing process,

19 not just a shipping process; correct?

20      A.   That's correct.

21      Q.   So I believe you also discussed that you have a

22 rather extensive career in law enforcement with at least nine

23 years at the DEA and extended experience in narcotics; is that

24 correct?

25      A.   Just the -- my narcotics experience is with the

1    DEA, so it's nine years of DEA.

2         Q.   The nine years.  And I believe your very recent

3    portion of your testimony indicated that you have extensive

4    knowledge in the structuring of drug trafficking organizations

5    and the complexity of some of those structures; is that

6    correct?

7         A.   Yes.

8         Q.   Are you familiar with the colloquial term kingpin?

9         A.   Yeah.

10        Q.   What would be your understanding of the concept of

11   drug kingpin?

12        A.   The kingpin is, basically it refers to the head of

13   an organization, the one who is at the top.

14        Q.   And I believe your testimony was that generally a

15   kingpin or somebody further up the chain would attempt to

16   insulate themselves, your words; correct?

17        A.   So it's the organization that insulates different

18   components of the function of the organization.  So the cash

19   might go one place, product will go one place to be packaged,

20   distributors might be at another place.  It's a way that they

21   kind of diversify and spread some of the liability.

22        Q.   But generally those kingpins at the top would be

23   more insulated than other parties; correct?

24        A.   Yeah.  Generally your kingpin is going to be

25   someone who has a lot of knowledge and is able to, has risen

1    to that level.  They just don't get there, but they've had

2    some experience.  And then that person puts that experience

3    forward and is able to direct it.

4         Q.   They're usually fairly sophisticated?

5         A.   Well, they have a lot of experience in the area.

6    As far as sophisticated I wouldn't say that necessarily.  And

7    for that I'm referring to the illicit -- my experience also

8    includes the illicit drugs, the meth, cocaine, that sort of

9    thing.  So when I look at those kingpins it might be a little

10   different.

11        Q.   So if we focus on the events now and allegations

12   and what's alleged in this particular case I believe you

13   referred to this drug trafficking organization as complex;

14   right?

15        A.   That's correct.

16        Q.   So someone at the head of that particular

17   organization would probably have a decent amount of

18   sophistication behind them?

19        A.   Yes.

20        Q.   Are you familiar with the concept of a mule?

21        A.   Yes.

22        Q.   What's a mule in your understanding?

23        A.   So a mule is basically someone who's going to just

24   transport the drugs.  They're basically the person that's

25   going to take the drugs from one place to another.  And, so,

1    yeah.  They're more transportation.  They're not a huge

2    component in the day-to-day structure or decisions that are

3    made.

4         Q.   In multiple of the photos that we went through in

5    Exhibit 11 Aaron Shamo's name is listed on packages; correct?

6         A.   That's correct.

7         Q.   Would that indicate somebody who is insulated from

8    a drug trafficking organization?

9         A.    It's a little tough to -- so the reason I struggle

10   a little is because it's impossible to -- even the big cases

11   that I've investigated it's impossible to completely isolate

12   yourself or insulate yourself.  And so it's consistent that,

13   you know, it's something that is legal, to have packaging is

14   legal.  So if you're going to expose yourself to some

15   liability, which is common to expose yourself, you've got to

16   be willing to expose yourself to a limited liability like that

17   with a legal product, if that makes sense.

18        Q.   I understand.

19        A.   Okay.

20             MS. BECKETT:  Just one second, Your Honor.

21             (Time lapse.)

22        Q.   BY MS. BECKETT:  I believe you indicated there was

23   roughly $19,500 in cash taken from the Openview Lane

24   residence; is that correct?

25        A.   I believe there was $19,520.

1        Q.    And it was your testimony that that didn't seem

2    like a significant amount of cash; correct?

3        A.    Almost.  When I -- when I looked at the volume of

4    pills that were there, that didn't seem significant enough for

5    the volume of pills that were there.  So if that many pills

6    were there there should be have been more money if this was,

7    in fact, just a single organization operating out of this

8    location.

9        Q.    Are you aware that it's alleged that in this case

10   most the transactions occurred through cryptocurrency?

11       A.    Just a little.  I'm not super aware of it.  I was

12   somewhat aware.

13       Q.    So if those transactions occurred through

14   cryptocurrency it would still make sense that there is not a

15   lot of cash at hand; is that correct?

16       A.    That's correct.

17            MS. BECKETT:  That's all I have, Your Honor.

18            THE COURT:  Thank you, Ms. Beckett.

19            Is there any redirect, Mr. Stejskal?

20            MR. STEJSKAL:  Thank you, Your Honor.

21                         REDIRECT EXAMINATION

22   BY MR. STEJSKAL:

23       Q.    In your experience drug trafficking organizations

24   organize themselves differently; correct?

25       A.    Yes.

1        Q.    Some have different people doing different roles

2    and different ways of structuring things; correct?

3        A.    That's right.   There really isn't a one size fits

4    all.   It's dependent on the drug, where it's being transported

5    from.   There's a lot of factors that would dictate how the

6    organization runs.

7        Q.    You said you had four years experience as a

8    financial investigator with the DEA?

9        A.    Yes.

10       Q.    So you're experienced in analyzing the financial

11   aspects of drug trafficking organizations; correct?

12       A.    Yes.

13       Q.    You used the term mule.   In your experience how are

14   mules usually paid?

15       A.    So I was asked to define mule, and a mule is

16   generally paid in cash.   Or my experience is they're paid in

17   cash as it relates it specifically with illicit drug

18   organizations.

19       Q.    A lot of cash?   Are they the people with all the

20   money?   The couriers?   The mules?

21       A.    No.   The mules have a specific job, and it's to

22   move the drugs.   And they are paid accordingly.   It will be

23   significantly less than what the total profits would be that

24   we've been able to prove or identify in these type of cases.

25   It's significantly less.

1          Q.   So the way drug trafficking organizations work the

2     goal is to make money for everybody; right?

3          A.   The goal is to generally, yes, to make money.

4          Q.   And who usually makes the most money, the person at

5     the bottom of the organization or the person at the top of the

6     organization?

7          A.   It's the person at the top of the organization.

8          Q.   So in your experience in investigations if you find

9     a large some of money often that indicates their role or their

10    place in the hierarchal structure; is that fair to say?

11         A.   Yeah.

12         Q.   Explain that for us.

13         A.   So usually when you find -- my experience has been

14    that those that are in the inner circle or a significant part

15    of the organization that's where your cash will be.  Most of

16    the money and the accessibility to that money will be there.

17    They're the ones that will have the knowledge.  That person is

18    intimately involved and significantly involved in the

19    organization.

20         Q.   And if that person controls the money and pays

21    others who work in the organization, is that also an

22    indication of where they fit in the hierarchy?

23         A.   Yes and no.  Basically that could be.  It depends

24    on the organization.  But that also could be someone's

25    specific role.  And it will be significantly higher than the

```
 1    mule, but there are organizations that have people that are

 2    strictly over the finances.  They will pay people, and they're

 3    interested with moving the money all the different ways

 4    ultimately back to the source.

 5         Q.   Thank you.

 6              No further questions.

 7              THE COURT:  Thank you.

 8              Any further recross?

 9              MS. BECKETT:  No, Your Honor.

10              THE COURT:  Thank you.  Thank you, Mr. Hamideh.

11    You can be excused.

12              THE WITNESS:  Thank you, Your Honor.

13              THE COURT:  Government may call its next witness.

14              MR. STEJSKAL:  We call Alex Tonge.

15              THE COURT:  Come forward and be sworn, please,

16    right up here in front of the clerk of court.

17              THE CLERK:  Please raise your right-hand.

18                        ALEXANDRYA MARIE TONGE,

19           called as a witness at the request of Plaintiff,

20              having been first duly sworn, was examined

21                     and testified as follows:

22              THE WITNESS:  I do.

23              THE CLERK:  Come around to the witness box here.

24              Please state your name and spell it for the record.

25              THE WITNESS:  It's Alexandrya Marie Tonge.
```

```
 1    A-L-E-X-A-N-D-R-Y-A, M-A-R-I-E, T-O-N-G-E.

 2              THE COURT:  You may proceed, Mr. Stejskal.

 3              MR. STEJSKAL:  Thank you, Your Honor.

 4                        DIRECT EXAMINATION

 5    BY MR. STEJSKAL:

 6         Q.   Your current occupation?

 7         A.   I'm an install manager at Main Street Office

 8    Furniture.

 9              THE COURT:  You need to speak up and right into the

10    microphone so everybody can hear you.

11         Q.   BY MR. STEJSKAL:  How about your previous

12    employment before that?

13         A.   I worked at ebay in business development.

14         Q.   And how long did you work at ebay?

15         A.   For five years.

16         Q.   Over what time period?

17         A.   August 2012 through August 2017 -- or May 2017.

18         Q.   And you also have some military experience?

19         A.   I do.

20         Q.   What's that?

21         A.   I served six years in the Utah National Guard.

22         Q.   Over what time period?

23         A.   2013 through 2019.

24         Q.   Do you know Katie Bustin?

25         A.   I do.
```

1        Q.    How do you know her?

2        A.    She's my wife.

3        Q.    And did the two of you work together at ebay back

4    in those years that you mentioned?

5        A.    Yes, we did.

6        Q.    And how did you -- did you form a relationship

7    while you were there?

8        A.    Yes.  We were friends at first, and it formed

9    beyond that later.

10        Q.    Through your employment at ebay, did you come to

11    know a man by the name of Aaron Shamo?

12        A.    I did, yes.

13        Q.    How did you come to know him?

14        A.    Through Katie.  He worked on a team with her there.

15    So he was in the same department that I was working in at that

16    time.

17        Q.    And what did you know of him or about him at that

18    time?

19        A.    Just that he was, you know, regular guy working at

20    ebay.

21        Q.    How about a gentleman named Drew Crandall?

22        A.    Yes.  Worked in the same department.

23        Q.    As you or as --

24        A.    So at that time we all worked in the same

25    department.

1        Q.    Okay.  And what do you know about him?

2        A.    Same kind of thing.  Just someone that worked

3    there.

4        Q.    At some point did you and Miss Bustin become more

5    involved with Aaron Shamo in business relations?

6        A.    Yeah.  So when Aaron had left ebay he continued

7    living what seemed like a pretty normal lifestyle, didn't seem

8    to struggle with money, so we were kind of interested in what

9    business venture he was doing outside of ebay in order to do

10   that.

11       Q.    And how did you guys try to figure that out?

12       A.    Katie had asked Aaron, what are you up to?  What

13   are you doing?  How are you making money?  How are you living?

14   Type of thing.

15       Q.    And what response?

16       A.    He had mentioned that he was trading Bitcoin and

17   making money that way.  So....

18       Q.    Okay.  Anything beyond that that you became

19   involved in?

20       A.    Yes.  So we, you know, had kind of expressed

21   interest in getting involved, so he mentioned that he could

22   ship packages directly to us.  And if we brought them to him

23   he would give us a couple hundred bucks a package.

24       Q.    Do you recall where you had that conversation with

25   Mr. Shamo?

 1          A.    In his BMW somewhere in Midvale, initially.

 2          Q.    Any more talk about what was in those packages or

 3     why he wanted you to do that?

 4          A.    Not at that time.  I chose to kind of not push

 5     beyond that initially to find out what was in that.

 6          Q.    Okay.  What were your instructions then as far as

 7     doing that for him?

 8          A.    Don't open the packages, just bring them to him at

 9     his house, let him now, hey, we got one, and meet up

10     somewhere.

11          Q.    Did that seem at all fishy to you when you started

12     doing that?

13          A.    Yeah.  Yeah.  It seemed, you know, kind of strange

14     that he would want something shipped somewhere else instead of

15     to him.

16          Q.    But you agreed to do it, anyway?

17          A.    Yeah.

18          Q.    How come?

19          A.    I was kind of in a tight position financially.

20          Q.    Take your time.

21                So because of that you decided you would go ahead

22     and no questions asked?

23          A.    Yeah.

24          Q.    Who told you what you would be paid and how you

25     would be paid?

1         A.    Aaron was who we communicated with.

2         Q.    And before I forget, can you identify Aaron Shamo

3    in the courtroom here today?

4         A.    Yeah.  He's sitting in the black suit over there,

5    black tie.

6         Q.    At the end of counsel table?

7               MR. STEJSKAL:  May the record reflect that this

8    witness has identified the defendant Aaron Shamo?

9               THE COURT:  Yes.

10              MR. STEJSKAL:  Thank you, Your Honor.

11        Q.    BY MR. STEJSKAL:  How many packages do you believe

12   you received in that manner?

13        A.    Four to five packages.

14        Q.    And how would they come?

15        A.    So initially they would just, a little random.  I

16   mean, shipped in a brown box with what seemed like a normal

17   shipping label.  Chinese writing on some of them.  Envelopes.

18        Q.    And you would receive them.  And then what would

19   you do with them once they came in your possession?

20        A.    Katie would reach out to Aaron and say, hey, we've

21   got a package.  When do you want to meet up so we can give it

22   to you?

23        Q.    When would you meet Mr. Shamo to deliver those

24   packages?

25        A.    We met him in his car or at his out in SugarHouse.

```
 1          Q.   How would you get paid?

 2          A.   In cash.

 3          Q.   By whom?

 4          A.   By Aaron.

 5          Q.   And who were those packages addressed to?

 6          A.   I believe they were addressed to Katie.

 7          Q.   And did you move sometime in 2015?

 8          A.   We did, yes.  We lived in Riverton, and we moved to

 9    South Jordan in Day Break.

10          Q.   And can you tell us the address?

11          A.   Yeah.  116 -- 11469 South Open View Drive.  Sorry.

12          Q.   And just for perspective that's the place that the

13    police ultimately came to?

14          A.   Yes.  Yeah.

15          Q.   While you were living at that residence, were you

16    still having some financial difficulties?

17          A.   Yes.  They had minimized.  Initially my mom was

18    sick.  She was in the hospital for six months.  She's a single

19    parent, so it was just me and her, and so I felt, you know,

20    the need to try to take care of her.  So we had initially been

21    living together in Riverton, and she got her own place in

22    South Jordan.

23          Q.   Your mom did, and you guys got your own place.

24          A.   Yeah.

25          Q.   Did there come an opportunity to make more money
```

1     with Mr. Shamo?

2          A.    Yes.

3          Q.    How did that come about?

4          A.    In a conversation that myself, Katie, Aaron and

5     Drew had to do more for kind of what they were trying to build

6     and give us a background on what they were doing.

7          Q.    Do you recall approximately when that conversation

8     took place?

9          A.    I believe in May of 2015 or June shortly after we

10    had moved to South Jordan.

11         Q.    Okay.  And do you recall where that conversation

12    took place?

13         A.    Yes.  In the basement of the SugarHouse where Aaron

14    and Drew lived.

15         Q.    And what was the proposition?  What was the

16    business arrangement?

17         A.    That we would package product for them and ship it

18    out to, you know, buyers that are purchasing from them online.

19         Q.    And how were you going to get paid?

20         A.    In cash.

21         Q.    Do you recall how much initially was promised?

22         A.    I believe we started at a thousand a month or a

23    thousand every two weeks, so a thousand per person per month.

24         Q.    Okay.  And who would pay you?

25         A.    Aaron would pay us.

1          Q.    So how did you get started or trained in performing

2     that operation?

3          A.    After that conversation at the residence they said

4     that they would set up a time to bring, you know, product over

5     to our house so that they could teach us how to do it.  And so

6     that was scheduled.  And Drew's actually the one that brought

7     all of that product over.

8          Q.    Okay.  So initially Drew came over to your house in

9     Daybreak?

10          A.    Yes.

11          Q.    Drew Crandall?

12          A.    Yes.

13          Q.    And what did he bring and what did he show you?

14          A.    Brought a tote full of drugs to ship out, brought

15     envelopes, mylar bags, heat press, postage.

16          Q.    And at that period of time how was communication to

17     take place between you and Mr. Shamo?

18          A.    Via Telegram.

19          Q.    Tell us what Telegram is.

20          A.    It's a texting app that can be used in an

21     encryption mode.  It's not detectable or easily readable.

22          Q.    So in lay terms how does that work?  So if you send

23     a text what happens?

24          A.    So it's just -- from my understanding, so it's just

25     sent almost like a normal text but you open a different app.

```
 1    But it's kind of a locked -- it's a locked down app.  You've
 2    got to be able to erase everything or send secret messages so
 3    instead of your phone.  You know, anyone in the government can
 4    have access to that or see messages or whatever.  It allows
 5    for that not to happen.
 6         Q.   So the idea is it's more secure or secret than
 7    regular text messages.
 8         A.   Correct.
 9         Q.   Whose idea was it to communicate through that
10    program?
11         A.   Aaron's.
12         Q.   Did he specifically tell you guys?
13         A.   Yeah.  He showed us the app to download and kind of
14    how to use it.
15         Q.   And gave you instructions that that's what you were
16    to communicate with?
17         A.   Yes.
18         Q.   Is there also something called Sigaint?
19              THE COURT:  Called what?
20              MR. STEJSKAL:  Sigaint, S-I-G-A-I-N-T.
21         Q.   BY MR. STEJSKAL:  Does that sound right?
22         A.   Yes.
23         Q.   What's that?
24         A.   It's an e-mail on the Dark Web.  So like a Gmail,
25    but in an area that's nondetectable.
```

1    Q.   So in lay terms sort of like the Telegram app for

2  text messages it's sort of that for e-mail?

3    A.   Correct.

4    Q.   Let's look at Exhibit 15.07.  Just looking at that

5  page there can you tell us what that is?

6    A.   Yeah.  That's what the e-mail interface looked

7  like.

8    Q.   That's --

9    A.   I believe that was ours.  It's the, pass the peas.

10    Q.   Tell us what you mean by that.  It says

11  passthepeas@sigaint.org.  What is that?

12    A.   That was the e-mail address that was given to us to

13  use.

14    Q.   Given to you by whom?

15    A.   By Aaron.

16    Q.   And that's how you were to receive e-mail messages?

17    A.   Correct.

18    Q.   Let's go all the way to the last page.  It might be

19  a blank page, so it might be the second-to-the-last page.  And

20  starting at subject there, if you can focus that in.

21    A.   So that was how to get everything set up so we

22  could have access to it from our computer at our house.

23    Q.   So reading that down there, the text, it's

24  basically, here's what you've got to do?

25    A.   Yeah.

1          Q.   So did you guys receive this message?

2          A.   We did receive it.  Drew sent it to himself and set

3     it up on our computer.

4          Q.   At your house?

5          A.   Correct.

6          Q.   And then kind of showed you how to use it?

7          A.   Right.

8          Q.   What does it mean by, open the GPG Keychain

9     program?

10         A.   So that's the program to use to read encrypted

11    message that are sent as documents.

12         Q.   So you have to be some kind of a key to be able to

13    un-encrypt and read these messages?

14         A.   Yes.  It's kind of like a USB key that you click

15    and put in.

16         Q.   And you were given that by then?

17         A.   Correct.

18         Q.   You said your address was, pass the peas; correct?

19         A.   Yes.

20         Q.   Do you recall what Mr. Shamo's was?

21         A.   American Steam, I believe?

22         Q.   Okay.  And again, what kind of things would you

23    communicate with Mr. Shamo over this e-mail system?

24         A.   Orders were sent via this e-mail.  Or if there were

25    things that needed to be addressed like if there was a

1     customer service issue, it would be sent through here.

2         Q.   Okay.  All right.  So let's shut that down.

3         So when this operation, I guess when you initially

4     got involved here it looks like in June or July of 2015, tell

5     us what kind of packaging materials you were using at that

6     time.

7         A.   Priority envelopes, non-padded, and mylar bags to

8     put the product in.

9         Q.   So some of those yellow padded envelopes?

10        A.   It ended up being, yeah.

11        Q.   Okay.  So you said mylar bags.  Any other things

12     that you can think of?

13        A.   Like a makeshift invoice to put in with the

14     package.

15        Q.   Okay.  Let's look at Exhibit 11.00, 031.

16        Do you recognize that?

17        A.   I do, yes.

18        Q.   What is that?

19        A.   An invoice that we created to include with the

20     shipment that was sent out.

21        Q.   Okay.  Were you given instructions on using

22     invoices?

23        A.   Yes.  When Drew came over initially he had brought

24     some that they had already created to send out with their

25     packages.  I assumed they were already using it, so he kind of

1    brought over a format to use.

2         Q.   Did you change that over time?

3         A.   I did, yeah.

4         Q.   Why?

5         A.   Just kind of break things up, change how things are

6    going out.  There were concerns of packages being, you know,

7    intercepted, then change would happen.

8         Q.   Were you given instruction on that?

9         A.   Yeah.  Drew, you know, had mentioned, maybe we need

10   to change it up, not keep things the same.

11        Q.   And after Drew left the organization, did you

12   receive instructions from someone else?

13        A.   Yes.  Aaron kind of recommended, let's try coffee

14   beans in packages or Legos in packages to kind of change

15   what's being sent.

16        Q.   Let's also look at 7.02, I guess the first page.

17   Nope.  Let's try the second page.  There's a series of photos.

18   Is this 7.03?  Never mind.  Let's skip that for now.  Let's

19   look at 11.00, Page 26.

20             In the bottom left corner there we see some

21   Cheez-its and some cookies and things.  Do you see that?

22        A.   Yes.

23        Q.   What's that about?

24        A.   So we also used that because they are made of mylar

25   to put product actually in with those food items and then

1    reseal it and send those out.

2        Q.   So you talked about so there's cookies here,

3    there's chips.  It was the mylar bags that you wanted to put

4    the pills in?

5        A.   Yes.

6        Q.   And this is again towards the beginning of this in

7    the summer of 2015?

8        A.   Yes.

9        Q.   Did that change over time that you kind of quit

10   using these?

11       A.   Yeah.  Aaron had mentioned several complaints of,

12   you know, people getting cookies that were all spilled

13   everywhere, whatever, so we decided to change that.

14       Q.   Okay.  And you mentioned coffee beans a second ago.

15   Tell me about that.

16       A.   So inside the just the normal mylar bags we added

17   coffee beans.  So he ordered coffee beans somewhere online and

18   brought them over for us to use.

19       Q.   When you say "he" who was that?

20       A.   Aaron.

21       Q.   And it was like a giant bag of coffee beans?

22       A.   Yeah.  It was a burlap sack with coffee beans.

23       Q.   And you put a few in each package?

24       A.   Yes.

25       Q.   And that was per his instructions?

1       A.    Correct.

2       Q.    Talk about postage.  How did that work at the

3  beginning?

4       A.    So initially we would get the envelopes from the

5  post office and then have priority stamps.  And so we would

6  just stamp the envelope with that postage.

7       Q.    And were there times that you used regular stamps,

8  too?

9       A.    Yeah.  If we needed to increase the amount of

10  postage on that package.

11       Q.    Okay.  Let's look at 11.00, 029.

12             Do you recognize those being found at your house?

13       A.    Yes.  They were kind of I believe a counterfeit

14  postage that was purchased online rather than instead of

15  trying to get postage from the post office.

16       Q.    So who were those given to you by?

17       A.    By Aaron.

18       Q.    Okay.  And apparently they didn't work because they

19  were counterfeit?

20       A.    Yeah.  So we had several that were never used.

21       Q.    So just kind of put them in the closet?

22       A.    Yeah.

23       Q.    Okay.  Let's next look at Photo 33.  If we could

24  zoom in a little bit.

25             Can you tell what that is?

1    A.   Yes.  That's a receipt from the post office for

2    purchasing priority mail stamps.

3    Q.   And those look like a fairly sizeable dollar

4    amounts there.  It looks like $580.50 on the top line.  Tell

5    us about the amounts of postage you were going through.

6    A.   We purchased that probably twice a week.  So

7    sometimes Aaron would purchase it and give it to us.

8    Sometimes Drew would purchase it.  Sometimes we would purchase

9    it and get reimbursed on Venmo.

10   Q.   Okay.  But that was an important part of what you

11   were doing having postage available.

12   A.   Correct.

13   Q.   Couldn't really do your job without it.

14   A.   Right.

15   Q.   Did the postage get even more sophisticated later

16   on in your participation?

17   A.   Yes.  There was a website on the Dark Web that you

18   could purchase actual shipping labels and print them out, and

19   it had to have the address going and coming.  And it would

20   include the postage.  And you would purchase it via Bitcoin.

21   Q.   And how did you get turned onto that?

22   A.   So Drew suggested that we use that.  Aaron set us

23   up with the website, set us up with a Bitcoin wallet and would

24   transfer Bitcoin to us in order to purchase the postage.

25   Q.   Do you recall what the website was called?

1           A.   Getusps.com.

2           Q.   Did you also try to track packages?

3           A.   Yes.

4           Q.   And let's look at Photo 47.

5                Do you recognize that?

6           A.   Yeah.  Tracking is free to use if you use a

7      priority envelope.

8           Q.   Okay.  And those were found at your house on the

9      search warrant.  Do you recognize why those are there?

10          A.   Yes.  When we were doing postage that you buy at

11     the post office we would include a tracking label on each

12     package and then keep the bottom portion and write the

13     customer name with it so that if issues arose that could be

14     referenced.

15          Q.   If I understood you correctly you would save the

16     tracking number so if something came up you could figure out

17     from the tracking number what package it was that had

18     concerns.

19          A.   Correct.  See if it been delivered or not.

20          Q.   Okay.  Let's look at Photo 32 and Photo 37 and

21     Photo 38.  Can you tell us what those are?

22          A.   Those are label printers to use when using like

23     USPS because it would print on a sticker basically so you can

24     stick that to the envelope or box.

25          Q.   So it would print out the address and you would

1    just paste it on there.

2         A.   Correct.

3         Q.   Did you guys do that?

4         A.   We could never get it to work properly.

5         Q.   So how did you use it instead?

6         A.   Just used a printer, just a normal standard printer

7    and printed it out that way.

8         Q.   So you ended up with some extra labels that you

9    couldn't use?

10        A.   Yeah.  Label makers, yeah.

11        Q.   In the closet with everything else?

12        A.   Yeah.

13        Q.   How did you figure out return addresses?

14        A.   So when Drew came over initially he said just pick

15   a random address on Google Maps near the post office you want

16   to use at that time and use that as a return address.  So

17   every time was different.  Every day was different.

18        Q.   And did you kind of do that then?

19        A.   Yeah.  Uh-huh (affirmative).  Once he kind of

20   showed us how to do that he didn't come over every day, and I

21   took that over.

22        Q.   And were those individuals or companies or how did

23   you do that?

24        A.   So we kind of matched it with the invoice that we

25   were using, and we would use a company name.  But initially we

1    would just think of a random first and last name.

2         Q.   So like many things this seems to progress over

3    time, so at the beginning you used individual names and later

4    on you decided it would be company names?

5         A.   Correct.  Yeah.

6         Q.   Were you given some instruction on that?

7         A.   Yeah.  Just to make it more professional, you know,

8    conversations with Aaron on, what could we do to ensure

9    packages were arriving and not a red flag in a post office.

10        Q.   So would it be fair that he kind of gave you

11   directions on that?

12        A.   Yes.

13        Q.   And then how did that relate to where the packages

14   would be dropped off for delivery?

15        A.   So we would find post offices in that area.  So if

16   it's in South Jordan we would try to find blue boxes and post

17   offices in that area and drop it off like that.

18        Q.   And at the beginning here that we're talking about

19   the summer of 2015 and going forward from there, was that one

20   of you and Miss Bustin's tasks, as well, was to actually drop

21   them off?

22        A.   Yes.

23        Q.   This sounds kind of time consuming.

24        A.   Very.

25        Q.   Tell us about that.  How time consuming?

1         A.   At the beginning, you know, maybe an hour or two a

2    night, plus drop-off time.  And it progressed to three, four,

3    five hours depending on how many orders were happening that

4    day.

5         Q.   So you seem to say that there were fewer orders at

6    the beginning and the order numbers increased as time went on?

7         A.   Yes.

8         Q.   How about package sizes, did that seem to increase,

9    too, as time went on?

10        A.   Exponentially, yeah.

11        Q.   What do you mean by that?

12        A.   Initially maybe somebody was buying five or 10 of

13   something, and then we were shipping out hundreds and

14   thousands to one person.

15        Q.   By the end?

16        A.   Yeah.

17        Q.   You guys were still working at ebay, then, 2015

18   into 2016?

19        A.   Up until our indictment, yes.

20        Q.   And so how did that affect your quality of life, I

21   guess, working at ebay and doing this?

22        A.   Not much free time.  So working, going to school

23   full-time and doing this, as well.  Didn't leave for much of

24   social life outside of that.

25        Q.   Let's look at Exhibit 11.  Let's do Page 2.

1                 Do you see that "ship to" address on there?

2          A.    Yes.  Aaron's address in Cottonwood.

3          Q.    And this was found with the search warrant at your

4    house.  So how did you come in possession of this thing?

5          A.    It was something that he ordered that we needed

6    paper, labels or something of that nature, and then brought it

7    over to our house.

8          Q.    Okay.  Let's look at Page 3.  Page 4.  There we go.

9                What's that?

10         A.    Mylar bags.

11         Q.    Page 5.  That's not Page 5.  That's Page 6, I

12   think.  That's Page 6.  Page 7.

13               What are we looking at there?

14         A.    The desk that we sat at to do orders.

15         Q.    And on the right side, those white things?

16         A.    The priority envelopes that we used.

17         Q.    So you used a bunch of those?

18         A.    Yeah.

19         Q.    42.  See that address again?

20         A.    Yep.

21         Q.    So was it fairly common for Mr. Shamo to order that

22   and bring that stuff over to you?

23         A.    Yes.  Yeah.

24         Q.    That's really how you got most or all of that

25   stuff?

1      A.   Yeah.  Very seldom did we purchase something

2  ourselves.

3      Q.   Was that 42?  43, same thing.  And 44.  Remember

4  those stickers?

5      A.   Yeah.  Aaron toyed around with the idea of putting

6  those on packages so that things weren't crushed or again just

7  change the look of the package that was going through.

8      Q.   And that was kind of early on you quit using those,

9  too?

10     A.   Yeah.

11     Q.   How come?

12     A.   Just seemed like more time for us.

13     Q.   Now, you said Mr. Crandall, Drew, had initially

14  brought stuff over to you guys and showed you how to run

15  things.

16     A.   Yeah.

17     Q.   And I believe you said that was in like late summer

18  of 2015?

19     A.   Yes.

20     Q.   Was there some point that Mr. Crandall planned to

21  leave or was leaving the country?

22     A.   Yeah.  Later that year in November he was getting

23  ready to go to New Zealand and do a working visa there.

24     Q.   What did you know about that?  Where did you learn

25  about that from?

```
 1         A.    I learned that from Aaron.  And he mentioned that

 2    he bought Drew out for 30,000 to take over fully himself.

 3         Q.    Okay.  And did Drew end up leaving then?

 4         A.    He did, yes.

 5         Q.    Where did that conversation take place about buying

 6    Drew out and those things?

 7         A.    At our house in our office.

 8         Q.    And did that have any effect or change on what you

 9    guys were going to be required to do, you and Ms. Bustin?

10         A.    Just assumed, you know, kind of more work less one

11    person running around to get things.  So Aaron would have to

12    be more involved in getting product to us or making decisions

13    and things like that.

14         Q.    Did your pay change over time?

15         A.    It did, yes.

16         Q.    Explain that.

17         A.    I think we had, you know, mentioned we were doing a

18    lot.  We're spending this much time.  I feel like getting more

19    money is worth it for him, for Aaron to pay us.  And I think

20    also if he felt discontent from us, that was kind of a

21    Band-Aid for him.  Give me some more money or let me pay you

22    more, try to fix things there with us that.

23         Q.    Did you complain at all to Aaron that it was taking

24    too much time or it was too hard?

25         A.    Yeah, absolutely.
```

1          Q.   Tell us about that.

2          A.   Just conversations about, you know, if he didn't

3    get any mail to us til 8:00 or 9:00 and we had three hours of

4    work to do, you know, it was areas of frustration with him.

5    And it got to the point where we just kind of said, you know,

6    we don't really want to do this anymore.  It's too much.  It's

7    too much pressure to do this.  And his response was, kind of

8    upset, you know, you can't do that to me.  You can't just

9    leave.  And at least let me get somebody in your position.

10   You can help train them.  I'll give you money for a

11   downpayment on a house, whatever I can do, type of response.

12         Q.   And this is later on in the --

13         A.   Yeah.  It was October, November, right before

14   everything came to a head.

15         Q.   Okay.  We'll get more into that later.  We'll try

16   to stay on progression here a little bit.

17         A.   Yeah.

18         Q.   So tell us about what you were shipping.  So at the

19   beginning do you recall what kind of items you were shipping?

20         A.   Yeah.  Yeah.  We shipped weed or Ecstacy, LSD.

21         Q.   By weed you mean marijuana?

22         A.   Yes.

23         Q.   What's Ecstacy?

24         A.   Party drug.

25         Q.   And what kinds of amounts were you shipping those

1    things?

2         A.    Small amounts.  You know, even one or two things at

3    a time or maybe 10 for a larger order, stuff like that.  So

4    nothing extensive.

5         Q.    Okay.  Let's look at Photo 41 on 11.00.

6               Do you recognize that?

7         A.    Yes.  Those were used to capsule MDMA.

8         Q.    And did you guys do that or did somebody else?

9         A.    Initially Aaron or Drew did it.  They came

10   pre-done, but that was something else that we had to do.

11        Q.    And again, that was towards the beginning of your

12   involvement in this organization?

13        A.    Correct.

14        Q.    And then you guys quit doing that.

15        A.    Yeah.

16        Q.    So like these like many things ended up in the

17   closet?

18        A.    Yeah.

19        Q.    Okay.  So marijuana, LSD, MDMA.  Eventually did you

20   move on to other things that you were shipping?

21        A.    Yeah.  Xanax was the next kind of big thing.

22        Q.    Tell us what that was.  What does that look like?

23        A.    Little white bar made of powder.

24        Q.    And tell us about order sizes towards the beginning

25   of Xanax.

1   A.   They were, you know, still kind of small, but they

2   increased pretty easily, it seemed like.

3   Q.   And did you seem to do a lot of that?

4   A.   Yeah.

5   Q.   Did that become one of the primary products?

6   A.   Yes.

7   Q.   In fact, was that the primary product before Drew

8   left?

9   A.   Yes.

10   Q.   After Drew left, did the products change again?

11   A.   They did.

12   Q.   What happened?

13   A.   They turned into little blue capsules, circular

14   capsules that were M Box, is what they were termed.

15   Q.   And did you know what M Box or Oxycodone was?

16   A.   He just said it was like Oxycodone.

17   Q.   Did you know outside of that from an injury or

18   something else what Oxycodone pills were?

19   A.   Yes.

20   Q.   How did you know?

21   A.   Previous relationship, been used.  Injury or when

22   my mom was in the hospital that's what she used.

23   Q.   So you had seen those before?

24   A.   Yeah.

25   Q.   And they were Oxycodone?

```
 1         A.    Yeah.

 2         Q.    When this started, did you have any reason to

 3    suspect that these were something other than Oxycodone?

 4         A.    No.

 5         Q.    And did you feel comfortable shipping those?

 6         A.    Yeah.  I mean, to some extent.

 7         Q.    Did Mr. Shamo give you an explanation for why he

 8    was sending these to people?

 9         A.    Yeah.  He kind of initially played off his, you

10    know, I'm a white collar drug dealer.  I'm trying to help

11    people that can't get medicine in a formal way that still need

12    it.

13         Q.    And did you believe that or did you think about

14    that some more?

15         A.    I did, you know, initially believe that seemed

16    right to me.  I mean, I also was trying to make myself feeling

17    better about what I was involved in.  So he kind of has a very

18    charismatic way of explaining things or, you know, trying to

19    calm you down and make you feel like, no, that's what we're

20    doing.  It's okay.

21         Q.    "He" meaning Aaron?

22         A.    Yes.

23         Q.    That's what he told you, and that sounded

24    believable?

25         A.    Yeah.
```

1      Q.   Did you come to change that view based on what you

2   were doing and quantities?

3      A.   Yeah.  Absolutely.  That's kind of what brought on

4   discontent.

5      Q.   Tell us about that.  How did you kind of conclude

6   differently?

7      A.   Doing that, you know, number of pills seemed

8   strange to me that someone would want to buy, you know, 1,000,

9   2,000, 5,000 pills for an injury or, you know, something of

10  that nature.

11     Q.   Let's talk about pill press.  Do you know what that

12  is?

13     A.   Aaron and Drew showed us the pill press that was

14  used for Xanax initially when we were shipping that out.

15     Q.   Where was that located when you saw it?

16     A.   In the SugarHouse.

17     Q.   On Murphy's Lane?

18     A.   Yeah.

19     Q.   Where in the house, do you recall?

20     A.   In the basement in a storage room off a door in

21  Aaron's room and downstairs.

22     Q.   And you said they were -- so that was before Drew

23  left, so they were only pressing Xanax at that time to your

24  knowledge?

25     A.   Correct.

1          Q.    How was the sales done to your knowledge?  How was

2     contact made with customers?

3          A.    Through an online platform similar to ebay but on

4     the Dark Web.

5          Q.    Who ran that?

6          A.    Aaron ran that.

7          Q.    And how would that work, then?  Walk us through the

8     process of how somebody orders and get drugs.

9          A.    I assume -- I never saw the site online, but

10    ordering through finding a listing basically saying, I want to

11    buy that, providing information, Aaron receives the address,

12    the order info and then passes that along.

13         Q.    To whom?

14         A.    To myself and Katie.

15         Q.    And then what would you guys do?

16         A.    Package the order that was referenced with the

17    address.

18         Q.    And then what?

19         A.    Ship it out.

20         Q.    And initially that was you guys, and then later

21    somebody else took over that role?

22         A.    Yeah.

23         Q.    How was the money controlled?  Did you guys get

24    money directly from these sales?

25         A.    No.  We just got paid every other week in cash from

1    Aaron.

2         Q.   How did that cash get to you?  Like physically did

3    he pay you in cash with his hand?

4         A.   Yeah.  There were times if he was, you know, around

5    when we were home he would come in and give it to us then, or

6    he would put it in my truck.

7         Q.   So who was in charge of this operation?  Who gave

8    you instructions on how to do things?

9         A.   Aaron.

10        Q.   Now let's be clear.  Before Drew left Drew had some

11   involvement in that; correct?

12        A.   Yeah.  He had a role.

13        Q.   Okay.  And then after Drew left was it exclusively

14   Aaron?

15        A.   Yeah.  We didn't communicate with anyone else.

16        Q.   Did you know anyone in the organization?

17        A.   Knew of them, yeah.  Kind of put two and two

18   together to know who was involved.

19        Q.   Give us an example.

20        A.   Sean Gygi was the person that picked packages up

21   from us to drop them off.

22        Q.   Did you have much communication with Gygi?

23        A.   Just to let him know orders were ready.

24        Q.   How did you communicate with him?

25        A.   Katie would text him via Telegram and let him know.

1          Q.    Anybody else you knew in the organization?

2          A.    Yeah.  Mario Noble.

3          Q.    And how did you come to know that Mr. Noble was

4     part of the organization?

5          A.    Just kind of by chance.  Process of elimination in

6     a conversation that he had with Katie at work.  He saw the

7     Telegram app on her phone and kind of questioned, oh, why do

8     you use that?  What do you use that for?  And we knew that

9     Aaron and Mario were pretty good buddies.  Aaron kind of tried

10    to take him out and take him under his wing to help him with

11    girls and stuff like that.  So we kind of figured that is who

12    else would be involved.

13         Q.    Did you have any other contact with Mr. Noble?

14         A.    He would e-mail -- any customer service issues and

15    questions he would e-mail.

16         Q.    And we'll get to that specifically a little bit

17    later.

18               Did Mr. Shamo move from that SugarHouse location to

19    somewhere else?

20         A.    Yeah.  He moved to Cottonwood Heights.

21         Q.    And was that shortly after Drew left the country,

22    Mr. Crandall?

23         A.    Yes.

24         Q.    Have you been to the Cottonwood Heights home?

25         A.    I have.

343

1          Q.    What was that like?

2          A.    Pretty nice house.  But I'd only been in the living

3     room mostly and then into an office once.

4          Q.    Okay.  And did you know what was occurring over

5     there?

6          A.    I'm assuming -- I assumed the manufacturing of the

7     products that he was bringing to us.

8          Q.    Did Mr. Shamo upgrade your equipment at times when

9     something would break or you needed something else?

10         A.    Yeah.  Uh-huh (affirmative).

11         Q.    Let's look at Page 27 of 11.00.

12               What's that?

13         A.    It's a heat press to reseal or seal mylar bags.

14         Q.    What was the purpose of doing that?

15         A.    So nothing came out of that package so it was

16    sealed tight, air tight.

17         Q.    Okay.  Let's look at 34.

18               It's kind of a dark picture, but can you see that?

19         A.    Yeah.  That was the initial heat press that was

20    used.

21         Q.    Okay.

22         A.    Didn't work very well.

23         Q.    Had lots of frustrations with that one?

24         A.    Yeah.

25         Q.    So how did you get the other one?  How did you get

344

1    upgraded?

2         A.   Just by telling Aaron, hey, this really isn't

3    working for us.  Can you find another machine that we can use?

4         Q.   And he would take care of you when you had issues

5    like that?

6         A.   Yeah.  Yeah.

7         Q.   Let's look at Page 21.

8              Do you recognize that silver thing?

9         A.   Yeah.  It's a scale that we used to kind of weigh

10   out pills instead of having to count out 100, 200.

11        Q.   Let's look at 9.

12             What's that there on the right?

13        A.   Another version of a scale.  Better.

14        Q.   That's a better one?

15        A.   Yeah.

16        Q.   Okay.  So is that another upgrade that was provided

17   to you?

18        A.   Yes.

19        Q.   Why did you need a better scale?

20        A.   To be more precise so we weren't sending too much

21   or too little.

22        Q.   And as quantities increased did that become more

23   important?

24        A.   Absolutely, yeah.

25        Q.   So that silver one in Photo 21 just like everything

1    ended up in the closet?

2         A.   Yeah.

3         Q.   What was Mr. Shamo's demeanor like?  How did he act

4    around you?

5         A.   Very charismatic.  You know, fun to be around,

6    friendly, happy.

7         Q.   Did he try to solve your problems when you'd come

8    up with issues?

9         A.   Yeah.  Yeah.  You know, he was definitely a yes man

10   and wanted to take care of anything we brought up.

11        Q.   Did he sometimes give you extra money?

12        A.   Yeah.  Yeah.  You know, if we were -- did a lot of

13   orders or kind of complaining about the time being spent he

14   would give a couple extra hundred dollars.  I know you guys

15   are working hard, and here's a little bit extra to say thank

16   you.

17        Q.   Tell us about the progression in pay.  So I think

18   you said you guys were getting 500 or 1,000 at the beginning.

19   How did that progress?

20        A.   Normally in, you know, every couple months, a

21   couple hundred dollars more, I don't remember the exact

22   increments, but I know we ended up at $3500 biweekly.

23        Q.   Between the two of you?

24        A.   Correct.

25        Q.   So roughly 7,000 a month between the two of you?

1      A.   Yes.

2      Q.   And that was towards the end you said?

3      A.   Yeah.  It was only the last couple months, maybe.

4      Q.   And things had more or less steadily progressed

5  from the beginning to that point?

6      A.   Yeah.

7      Q.   Was that mostly in response to Mr. Shamo's

8  generosity, to you guys complaining, to the workload shifting?

9  What was the reason for those?

10     A.   A little bit of everything.  Obviously he saw the

11 amount of orders coming in, and we talked about it and would

12 ask, hey, you know, can we get a little extra money every

13 month?  We're doing a lot.  He said, yeah, yeah, we'll work on

14 it.  I'll think about it and I'll let you know.  And then

15 raises would come.

16     Q.   Okay.  At some point during 2016 did you tell

17 Mr. Shamo you were done delivering to the post offices?

18     A.   Yes.

19     Q.   Tell us about that conversation.

20     A.   It was a conversation that Katie and I had, and she

21 just wanted to minimize our involvement continuously and

22 expressed frustration to have to do what seemed like

23 everything.  So we reached out and said, you know, we would

24 really like someone to be a runner and take packages so we

25 don't have to do that, as well, minimize our involvement or,

347

1    you know, risk.

2         Q.   When you say you reached out you reached out to

3    whom?

4         A.   To Aaron.

5         Q.   And had a conversation with him about it?

6         A.   Correct, yeah.

7         Q.   And what was his response?

8         A.   He said, yeah, I'll find a runner for you.  I'll

9    see, you know, there's probably someone who wants to be more

10   involved that could be a perfect fit that can do that.

11        Q.   Did that end up happening?

12        A.   Yes.

13        Q.   Who did he get?

14        A.   Sean Gygi.

15        Q.   What was the timeframe of Mr. Gygi taking over that

16   role roughly?

17        A.   Handful of months before November, so not too long

18   but several months.

19        Q.   Handful of months, probably the summer of 2016?

20        A.   Yeah.

21        Q.   And again, how would that work?  How would you

22   communicate with Mr. Gygi?

23        A.   Once we finished packing orders for that day Katie

24   would send a message via Telegram to Sean to let him know they

25   were ready.

1        Q.    So by that time were orders getting bigger?

2        A.    Yeah.  A lot bigger.  A lot more orders, you know,

3    50, 60, 70 orders a day and large quantities.

4        Q.    Did you guys still have to package and prepare all

5    of those for shipping?

6        A.    Correct.  Yeah.

7        Q.    How would you get the packages to Mr. Gygi?

8        A.    We would put them in boxes on the front porch, and

9    then he would pick them up from the porch.

10       Q.    How would you communicate to them?

11       A.    Telegram.

12       Q.    Again can you explain briefly what that is?

13       A.    Encrypting messaging through a specific app.

14       Q.    Tell us about how the drugs that you were shipping

15   would get to your house.

16       A.    So either Aaron would bring them over in a duffle

17   bag or a box or he would put them in my truck either at --

18   that was parked at ebay or parked in front of our house.

19       Q.    And how would he have access to your truck?

20       A.    Via pin pad on the door.

21       Q.    So you didn't have to be there?

22       A.    No.

23       Q.    You could just --

24       A.    Drop it off, yeah.

25       Q.    And I'm sorry.  You said a duffle bag?

1          A.    Yeah.

2          Q.    Often times that's how drugs would get to you?

3          A.    Correct.  Yeah.

4          Q.    So would you have frequent contact with Mr. Shamo

5     when the drugs were delivered, or was it more often that he

6     would do it that way and just kind of give them to you in your

7     truck?

8          A.    It was more often that he would give it to us in

9     the truck because with orders being as large as they were and

10    frequent as they were it needed to happen more often, and he

11    said he would be running behind on getting it pressed and

12    would try to get it out to us.

13         Q.    And you guys were working full-time at ebay at that

14    time?

15         A.    We were, yes.

16         Q.    Was he working at that time?

17         A.    He was not.

18         Q.    So this was his thing?

19         A.    Full-time, yeah.

20         Q.    Tell me about customer service.  So how -- would

21    you put the addresses in the computer to make the shipping

22    labels?

23         A.    Correct.  Yeah.  Based on an e-mail that was sent

24    to us with the order information.

25         Q.    Okay.  You would type it into that USPS?

1     A.   Yes.

2     Q.   And what kind of response would you get from that

3     program?

4     A.   It would either say it was a valid address or this

5     is actually the correct zip code or address unknown.

6     Q.   And by address unknown it's like an invalid address

7     that you shouldn't ship to.  Is that your interpretation?

8     A.   Yeah.

9     Q.   What would you do with those?

10    A.   Just keep a record of them and then send it back

11    via e-mail and say, this address isn't valid.

12    Q.   Who would you send those to?

13    A.   Back to Aaron.

14    Q.   By what means?

15    A.   By the Sigaint or whatever.

16    Q.   Sigaint.  I'm not sure exactly either, but the

17    e-mail?

18    A.   Yeah.

19    Q.   And then would Mr. Shamo get back to you on how to

20    deal with those address issues?

21    A.   Yeah.  He would reach out to the customer or have

22    someone reach out to the customer to get a correct address,

23    and then say, these are the updated addresses.  Now you can

24    ship that order.

25    Q.   And were there other customer service issues you

351

1    deal with, as well?

2          A.    None that we really dealt with, but they were

3    messages that we would see in an e-mail that he would include,

4    you know, happy customers or, hey, can you throw in a sample

5    of this, or, can you send extras?

6          Q.    And how were the roles between you and Ms. Bustin

7    separated?  What did you guys kind of do?

8          A.    So I would do all the addressing, labeling, put the

9    invoice in, pull the orders and un-encrypt them.  And then she

10   would have a paper in front of her of what the order was, and

11   she would count it out and put it in a mylar and press it and

12   give it to me.

13         Q.    And seal it back in the envelope and ready to be

14   shipped in a box?

15         A.    Yeah.

16         Q.    Let's look at Photo 8 from 11.00.  And if you could

17   focus in on that paper on top of the --

18               Can you tell us what that is?

19         A.    That's what the printout of the orders would look

20   like once it was unencrypted.

21         Q.    So how would it get unencrypted again?

22         A.    Through an encryption key on the computer that we

23   had.

24         Q.    So you were given the key to un-encrypt encrypted

25   e-mail; correct?

1       A.    Yes.

2       Q.    And you would put the key in and un-encrypt it?

3       A.    Correct.

4       Q.    And then this is what would printout?

5       A.    Yeah.

6       Q.    Looking specifically, I know this is kind of hard

7    to see, but can you explain the lines on this?  So let's

8    look -- let's start on the bottom one where it says, M Box.

9    Do you see that down there?

10      A.    Yeah.

11      Q.    Explain what that means down there.

12      A.    So that was -- we knew that as the blue pill that

13   had a square on it with an M imprinted.  That I'm assuming

14   what the terminology would be on the website that he used

15   times 5,000 and the quantities that was being shipped, order

16   number, date it was ordered and customer, user name, and then

17   how it was to be shipped.

18      Q.    Meaning priority mail?

19      A.    Yeah.

20      Q.    Most of these seem to say.

21      A.    Yeah.  There were very few that requested

22   expedited.

23      Q.    And if they did what would you do with that?

24      A.    Put it in a blue envelope, and it would ship

25   faster.

1    Q.   And they would tell you the shipping price, and you

2    would have to put that amount of postage on it?

3    A.   Yes.

4    Q.   So looking at this particular order form do you see

5    the date on these orders?

6    A.   Yeah.  November 19th, 2016.

7    Q.   Okay.  And it looks like there's four of them on

8    this page.  Can you see the quantities?

9    A.   Yeah.  They're all 5,000.

10   Q.   And is that what you were doing at this time?  This

11   is a few days before the police came.

12   A.   Correct.  Yeah.  That was a current order that had

13   been shipped out.

14   Q.   I'm going to hand you these two exhibits.  Let's

15   look first at what's marked as 11.03.  Can you tell us what

16   that is?

17   A.   So that was an order sheet that had been completed.

18   Q.   And that was found at your residence there?

19   A.   (Witness indicates by nodding head up and down.)

20   Q.   How can you tell it's been completed?

21   A.   So the kind of squiggly mark over the order was

22   Katie's way of saying that item was done.  And there's tally

23   marks for what's been counted so she could keep track.

24   Q.   And let's look at the other one I handed you, which

25   I think is 11.02.  Is that what the yellow sticker says?

1  A. Yes.

2  Q. Flip that over and look at the back.

3   What is that?

4  A. So same thing.  Completed orders from September

5 with the same mark just shown that they had been done,

6 counted.

7  Q. Let's look at Page 36 of the photos.

8   Do you see that on the screen?

9  A. Yeah.  Same page.

10  Q. Same page as 11.02, the front page that you're

11 looking at there?

12  A. Yes.

13  Q. I'm sorry.  Tell us again what those pink pen marks

14 mean.

15  A. That's Katie's way of just notating that that order

16 had been counted and done.

17  Q. And it looks like these are from September of 2016?

18  A. Yes.

19  Q. And what are the quantities on these?

20  A. 2,000 and 1,000, 1100.

21  Q. Is that normal quantities at that time?

22  A. Yeah.

23  Q. Were problems fairly frequent, meaning would you

24 have to communicate with Mr. Shamo almost daily on this stuff?

25  A. Yeah.  We definitely communicated daily.  Address

1    issues, needing Bitcoin transfer to purchase postage, needing

2    more product or more bags to put things in.

3         Q.   And how would those communications take place?

4         A.   All via Telegram.

5         Q.   And was Mr. Shamo pretty good at responding to your

6    concerns?

7         A.   Yeah.  He was good.  If he didn't respond, then we

8    would send an emoji in a normal text message to try to get him

9    to look at Telegram.

10        Q.   I think you testified previously that you and

11   Ms. Bustin were uncomfortable at times with what you were

12   doing?

13        A.   Yeah.  We definitely tried to compartmentalize what

14   we were doing, you know, whatever took place in the office

15   where we packaged.  And that's where, we didn't talk about it

16   outside of that or tried not to to try to live as normal as

17   possible.  I mean, obviously it was our choice to be involved,

18   but we kind of felt stuck, felt like it was something that we

19   had to do or, you know, really needed to do.  So we tried to

20   keep it as separate from our life as possible, told no one

21   that we were involved.

22        Q.   Did you make efforts to quit or leave the

23   organization?

24        A.   We did, yeah.  Especially in a couple weeks before

25   everything happened, we, you know had said, we really don't

1   want to be involved anymore.  We just can't do it.  I need you

2   to come get everything.  And had said, you can't do that to

3   me.  At least let me try to find a replacement.  You can train

4   them and get them set up.  Like if you do that I'll help you

5   with a downpayment on your house, and tried to kind of ease

6   that frustration.

7           Q.   Did he know that house was important to you?

8           A.   Yeah.

9           Q.   How so?

10          A.   He knew it was something that we wanted to do for

11   ourselves and put our life on, you know, a better track.

12          Q.   So leading up to when the police came in November

13   of 2016, did Mr. Shamo drop off some drugs on November 18th,

14   which would have been a day Mr. Gygi was involved?

15          A.   Yeah.  He put them in our truck right outside our

16   house in a duffle bag.

17          Q.   Was that normal?

18          A.   Yeah.

19          Q.   How would you know that there were drugs in your

20   truck?

21          A.   He would send a message via Telegram letting us

22   know he made the drop and it was in place.

23          Q.   Since the truck was locked you would just get them

24   when you were there?

25          A.   Yeah.

1    Q.   How did the drugs come to you?

2    A.   Normally in small Ziploc bags inside larger Ziploc

3    bags and then that inside a duffle bag.

4    Q.   On November 18th, so this is four days before the

5    police came, five days, did you put out packages for Mr. Gygi

6    as normal?

7    A.   We did.

8    Q.   And notify him via Telegram?

9    A.   Correct.

10   Q.   Did he come and get those?

11   A.   He did, yeah.

12   Q.   How did you know?  Did he communicate with you by

13   Telegram that he got them, or did you just see that that he

14   were gone?

15   A.   I think we just saw that they were gone.  The boxes

16   were empty, so we would take them back in the house.  But with

17   them being at our front door we could hear when someone was

18   there.

19   Q.   That's what I was getting at.  Yeah.  7.03?  The

20   first page has got them all on a table.  That one.

21        So looking at that, does that appear to be how many

22   packages you would have put out on the 18th?

23   A.   Yeah.  It seems like a normal --

24   Q.   And it looks like it's a mix.  So tell us about the

25   different sizes there.

1          A.    Smaller orders in the envelopes, orders that would

2    fit in a small box and then larger orders in the larger boxes

3    just based on how much would fit.

4          Q.    The quantities --

5          A.    Correct.

6          Q.    -- that would fit?

7          A.    Yeah.

8          Q.    Okay.  And then let's look at 8.02.  8.01.  Not a

9    picture.

10              You also put out a bunch the packages on the 20th.

11    So two days before the police came; correct?

12          A.    Correct.

13          Q.    And that was a large number of packages similar to

14    what we just looked at.

15          A.    Yes.

16          Q.    And again, all different sizes based on quantity.

17          A.    Correct.

18          Q.    Did that take some time to process and put those

19    together?

20          A.    Yeah.  Several hours.

21          Q.    8.03.  Thank you.

22              Does that look like then the packages that you

23    would have put out on the 20th?

24          A.    Yeah.

25          Q.    Let's look at Exhibit 15.05, Exhibit -- I'm sorry,

```
 1    Page 7.
 2              So do you recognize generally this what we're
 3    looking at here?
 4         A.   Yeah.  That would be an e-mail from Aaron, which is
 5    American Steam, and has the encrypted message at the bottom,
 6    which is the orders, and a little message from him.
 7         Q.   Can you read that message for us up there?
 8         A.   Yeah.  Happy weekend.  I'll try to come over and
 9    drop stuff, with a smiley face.
10         Q.   What's the smiley face?
11         A.   Aaron's way of sending a smiley face.
12         Q.   Kind of his thing?  He often did that in these
13    messages?
14         A.   Yes.
15         Q.   And what does that mean, I'll try to come over
16    tomorrow and drop stuff.  You're reading that.  What does that
17    mean to you?
18         A.   Bring product, bring pills and drop it off.
19         Q.   And the gibberish at the bottom, what did you say
20    that is?
21         A.   It's an encrypted message with the orders.
22         Q.   Let's look at 15.05.  Can you tell us what that is?
23         A.   Yeah.  That's the download available for the
24    orders, the shipping labels from Get USPS.
25         Q.   Again, so that's again on this encrypted e-mail
```

 1    system, and it's Get USPS talking about shipping labels.

 2         A.   Yeah.

 3         Q.   And you're receiving or sending message on this.

 4    Pass the peas is you?

 5         A.   Yes.

 6         Q.   So you're receiving this message?

 7         A.   Correct.

 8         Q.   Let's scroll to Page 2.

 9              So you see the date on that is November 22nd?

10         A.   Yeah.

11         Q.   And obviously you remember that day.  What is this

12    message mean here?  It says, hey, first half.

13         A.   So we pulled orders, but only some of them and sent

14    it over, because he wanted to get them done and didn't want to

15    wait till whatever time to get them.

16         Q.   And when you say "he," who are you talking about?

17         A.   Aaron.

18         Q.   And is that who American Steam is up there?

19         A.   Yes.

20         Q.   That was his e-mail address?

21         A.   Yeah.

22         Q.   So sometimes he would send you part orders so you

23    could get working on them and send them later?

24         A.   Send the rest, yeah.

25         Q.   Let's look at Page 5.  There's a different "from"

1     up there.  Do you see that?

2          A.    Yeah.

3          Q.    It says shortbread 66?

4          A.    Yes.

5          Q.    Do you know who that is?

6          A.    Drew.

7          Q.    Drew Crandall?

8          A.    Correct.

9          Q.    And how long had he had that address?

10         A.    I don't know when he set that up, but that was what

11    he was using when he was abroad to try to help with customer

12    service issues.

13         Q.    So was there a period where Drew was kind of out

14    and you never saw anything from Drew?

15         A.    Yeah.  He was completely gone.

16         Q.    And then did he come back in to do customer

17    service?

18         A.    Yeah.  Aaron mentioned that they kind of needed

19    more money abroad and offered, you know, him to help with

20    something simple like this instead of -- nothing physical, but

21    could pull orders or help handle customer service.

22         Q.    And you were told or became aware that

23    Shortbread 66 was Drew Crandall?

24         A.    Correct.

25         Q.    And when he came back in you started getting

1   e-mails from him.

2       A.   Yes.

3       Q.   What does this mean?  It says subject says,

4   reshipped 11/20.  What does that mean to you?

5       A.   So unhappy customers.  We need to reship the same

6   order again.

7       Q.   Either the product was bad or it didn't show up or

8   there was just some problem?

9       A.   Correct.  Yeah.

10      Q.   Would Drew tell you what the problem was or just

11  tell you how to fix it?

12      A.   Just tell us how to fix it.

13      Q.   And it says attachments in there, and there are two

14  text files there.  Do you know what that means?

15      A.   Yeah.  One encrypted message to pass the peas,

16  which is us, and then one to Pharma, which was Aaron.

17      Q.   What do you mean by encrypted message?

18      A.   With the order information so we knew which orders

19  were shipping out again.

20      Q.   I see.  So whatever was being shipped those are the

21  instructions in the encrypted gibberish there at the bottom?

22      A.   Correct.

23      Q.   Which you had the key to un-encrypt?

24      A.   Yes.

25      Q.   And to your knowledge Mr. Shamo had that, too?

1      A.    Yes.

2      Q.    November 21st, so the day before the police came,

3    was there an occasion that Mr. Gygi wasn't coming so you had

4    to do some work yourself?

5      A.    Yeah.  We had to package the orders and drop them

6    off ourselves.

7      Q.    So you guys did that and dropped them at the postal

8    boxes?

9      A.    I did, yeah.

10     Q.    You did.  Okay.  Roughly how many packages, if you

11   recall?

12     A.    40, maybe.  Somewhere around there.

13     Q.    And at that time were you using the same return

14   address?

15     A.    Yeah.

16     Q.    Do you recall what that was?

17     A.    I think it was in West Jordan at that time.  But I

18   don't remember.

19     Q.    Because that's where you recall dropping the

20   packages off?

21     A.    Yeah.  Correct.

22     Q.    Let's look at Exhibit 9.20.  And if you could,

23   yeah, focus in on that address label.

24           Do you recognize that address label?

25     A.    Yeah.  So build it up was what the return name was

1    at the time because we were going to add Legos to the packages

2    to ship out with it.

3         Q.   So that sounded like a company name that would make

4    sense with Legos?

5         A.   Yeah.

6         Q.   And at that time did you put that same return

7    address on all the packages?

8         A.   I did, yes.

9         Q.   So you ended up talking to the police then when

10   they came on November 22nd.

11        A.   Yes.

12        Q.   Did you specifically tell them about that return

13   address?

14        A.   Yeah.  And I told them where they were dropped off

15   so that they could take them before they were picked up to be

16   shipped out.

17        Q.   Let's talk then specifically about November 22nd.

18   Day started normal.

19        A.   Yeah, fairly normal.

20        Q.   Day didn't end normal.

21        A.   Right.

22        Q.   I guess let's start with you were pulled over in

23   your truck that morning?

24        A.   I was.  I was on my way to school and was pulled

25   over coming out of Daybreak on the hill.

1     Q.   And where were you going to school at that time?

2     A.   Utah Helicopter in West Jordan.

3     Q.   Studying what?

4     A.   Flight rotorcraft.

5     Q.   You were going to be a helicopter pilot?

6     A.   I was, yeah.

7     Q.   So you were pulled over by an officer.  And were

8  you cooperative from the beginning?

9     A.   Yeah, absolutely.  As soon as he asked, you know,

10  why do you think I'm pulling you over?  I'm not in a uniform.

11  I'm not in a marked vehicle.  And I said, I know.  I know why.

12     Q.   And so did you talk to him a little bit?

13     A.   Yeah.  You know, he asked me where Katie was.  And

14  that morning she was getting milk from my mom's house, which

15  is about six doors down.  So I told him that.  And I said,

16  please don't, you know, kick down my door.  I'll let you in.

17  Whatever you need me to do, I can do.

18     Q.   And so you did go back and, in fact, let the police

19  into your home with the keys.

20     A.   Yes.

21     Q.   And Ms. Bustin was in there?

22     A.   She was, yeah.

23     Q.   And they kind of took her aside, as well?

24     A.   Correct.

25     Q.   And then they searched your home pretty thoroughly;

1      correct?

2             A.   Yes.

3             Q.   And meanwhile you guys were being interviewed by

4      other officers there.

5             A.   We were, yeah.

6             Q.   I want to walk through a few of these photos from

7      your house, so --

8             THE COURT:  I've got a calendar that starts at

9      2:30.  How much more time do you have?

10            MR. STEJSKAL:  I don't believe I certainly couldn't

11      finish direct and cross by 2:30.

12            THE COURT:  How much more time on direct?

13            MR. STEJSKAL:  Probably at least 20 minutes.

14            THE COURT:  Better start in the morning with it.

15      Jurors have been in for over an hour and a half now.  All

16      right.

17            So thank you, ladies and gentlemen of the jury.  I

18      appreciate your work.  You know the rules about talking to

19      people or anyone.  And be safe.  We'll see you at 8:30 in the

20      morning.

21            (Whereupon, the jury left the court proceedings.)

22            THE COURT:  We'll be in recess on this matter until

23      8:30 tomorrow.  Thank you.

24            (Whereupon, the court proceedings were concluded.)

25                              *   *   *   *   *

1     STATE OF UTAH          )

2                            ) ss.

3     COUNTY OF SALT LAKE  )

4            I, KELLY BROWN HICKEN, do hereby certify that I am

5     a certified court reporter for the State of Utah;

6            That as such reporter, I attended the hearing of

7     the foregoing matter on August 13, 2019, and thereat reported

8     in Stenotype all of the testimony and proceedings had, and

9     caused said notes to be transcribed into typewriting; and the

10    foregoing pages number from 175 through 367 constitute a full,

11    true and correct report of the same.

12            That I am not of kin to any of the parties and have

13    no interest in the outcome of the matter;

14            And hereby set my hand and seal, this _____ day of

15    _____ 2020.

16

17

18

19

20                     _____
                             KELLY BROWN HICKEN, CSR, RPR, RMR
21

22

23

24

25