1               IN THE UNITED STATES DISTRICT COURT

2                        DISTRICT OF UTAH

3                        CENTRAL DIVISION

4

5    UNITED STATES OF AMERICA,    )

6              Plaintiff,         )

7       vs.                       )  Case No.  2:16-CR-631-DAK

8    AARON MICHAEL SHAMO,         )

9              Defendant.         )

10   _____)

11

12          BEFORE THE HONORABLE DALE A. KIMBALL

13        --------------------------------------

14                     August 21, 2019

15                       Jury Trial

16

17

18

19

20

21

22

23

24   REPORTED BY: Patti Walker, CSR, RPR, CP    801-364-5440

25   351 South West Temple, #8.431, Salt Lake City, Utah  84101

```
1                        A P P E A R A N C E S

2

3

4   For Plaintiff:              Michael Gadd
                                Vernon G. Stejskal
5                               Kent A. Burggraaf
                                U.S. ATTORNEY'S OFFICE
6                               111 South Main Street, #1100
                                Salt Lake City, Utah  84111
7

8
    For Defendant:             Gregory G. Skordas
9                              Kaytlin V. Beckett
                               SKORDAS & CASTON LLC
10                             560 South 300 East, #225
                               Salt Lake City, Utah  84111
11

12                             Daryl P. Sam
                               DARYL P SAM PLLC
13                             5955 S. Redwood Road, #102
                               Salt Lake City, Utah  84123
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          I N D E X
 2   Witness              Examination By              PAGE
 3   Stacey Hail          Mr. Gadd  (Direct)          1229
 4                        Ms. Beckett  (Cross)        1267
 5                        Mr. Gadd  (Redirect)        1284
 6   Brennda Kurstin      Mr. Stejskal  (Direct)      1289
 7                        Mr. Sam  (Cross)            1296
 8   Jeff Fletcher        Mr. Stejskal  (Direct)      1298
 9                        Ms. Beckett  (Cross)        1338
10                        Mr. Stejskal  (Redirect)    1344
11   Jeff Bryan           Mr. Stejskal  (Direct)      1347
12                        Mr. Skordas  (Cross)        1391
13                        Mr. Stejskal  (Redirect)    1400
14                        Mr. Skordas  (Recross)      1403
15
16
17
18
19
20
21
22
23
24
25
```

```
 1    SALT LAKE CITY, UTAH; WEDNESDAY, AUGUST 21, 2019; 8:30 A.M.
 2                          PROCEEDINGS
 3              THE COURT:  Good morning, ladies and gentlemen of
 4    the jury.  Welcome back.  It occurs to me that yesterday
 5    must have felt like you were back in school and had the joy
 6    of unexpectedly being let out early.
 7              We'll proceed.
 8              MR. GADD:  Your Honor, the United States calls
 9    Dr. Stacey Hail.
10              THE COURT:  Come forward and be sworn, please.
11                          STACEY HAIL,
12              Having been duly sworn, was examined
13                    and testified as follows:
14              THE CLERK:  Please state your name and spell it
15    for the record.
16              THE WITNESS:  Good morning.  My name is
17    Dr. Stacey, it's S-t-a-c-e-y, Hail, H-a-i-l, like a
18    hailstorm.
19              THE COURT:  You may proceed, Mr. Gadd.
20              MR. GADD:  Thank you, sir.
21                       DIRECT EXAMINATION
22    BY MR. GADD:
23    Q    Good morning.
24    A    Good morning.
25    Q    If we could, I'm hoping this morning we could go first
```

1   over your background.  Can you tell us where you work?

2   A    Yes.  I am an emergency physician and a medical

3   toxicologist.  I work at Parkland Hospital in Dallas, Texas,

4   where they took JFK when he was shot.

5   Q    Parkland is a particularly busy hospital, correct?

6   A    Parkland is the single busiest emergency department in

7   the entire country.

8   Q    When you're wearing your emergency room medicine hat,

9   can you describe for the jury what a typical day is like for

10  you.

11  A    Well, in the Parkland emergency room, I'm serving as

12  attending physician.  I see patients on my own, but I also

13  supervise emergency medicine residents and students.  And,

14  of course, in the emergency department, we see all comers.

15  So I manage heart attacks, strokes, overdoses, traumas, you

16  name it.  Anything that presents to the emergency department

17  is in my scope of practice.

18  Q    This morning you've come to us from Texas, correct?

19  A    Correct.

20  Q    But you visited Utah recently?

21  A    Yes.  It's actually kind of strange to be here working

22  because most of the time when I fly into Salt Lake City,

23  it's for a vacation.  And we were just here two weeks ago.

24  And we come in the winter and the summer.  Utah is our

25  favorite place to come.

1    Q    You mentioned teaching just a little bit.  Do you, in
2    fact, hold a teaching position at the University of Texas
3    Southwestern.
4    A    Yes.  I am an associate professor at the University of
5    Texas Southwestern.  I am a UT Southwestern employee and we
6    staff the Parkland emergency room.  So kind of like Harvard
7    faculty, they staff Massachusetts General.  So it's the same
8    kind of process.  I'm a faculty at University of Texas
9    Southwestern, but I work out of Parkland.
10   Q    And when you're teaching medical students, how much of
11   that takes place in the classroom as opposed to the
12   emergency room?
13   A    Some of it takes place in the classroom, and we have
14   weekly emergency medicine conferences.  But most of the time
15   in the medical setting, our teaching is at the bedside of
16   the patient.
17   Q    You also work one additional place, correct?
18   A    Yes.  I work at the North Texas Poison Center.
19   Q    When you're working for the poison center, what's a
20   typical day like?
21   A    Well, the way that it works, when I take call for the
22   poison center is it is 24/7 call for an entire week.  And
23   the way that that works is we have toxicology fellows in
24   training, and we take calls from all over North Texas.  And
25   it's not just a mom or a dad calling the poison center

1    because their child drank bleach, or something like that.

2    We take phone calls from doctors and nurses around the

3    region that are requesting consultation for how to manage a

4    poisoned patient.

5         And every day in the poison center we have toxicology

6    rounds where we have a roundtable discussion talking about

7    patients that have been poisoned and how to manage them, and

8    we do lectures.  And then we see bedside consultations at

9    Parkland, at our children's hospital, and university because

10   obviously we can't do bedside rounds at every hospital all

11   over North Texas.

12   Q    We've talked a little bit about your background and

13   kind of what a typical day might be like for each of the

14   different hats that you wear.  There's much more to your

15   resume, correct?

16   A    Correct.

17   Q    You're board certified.  You're on various groups.  You

18   teach.  You train.  All of those things, correct?

19   A    Correct.

20   Q    If it's okay, I want to skip ahead away from the board

21   certifications and things like that and I want to talk for a

22   minute about your work as an expert, both consulting and as

23   a witness.  Have you consulted and offered opinions in cases

24   prior to this one?

25   A    Yes.

Q    Was that both as an emergency room physician and also a medical toxicologist?

A    Yes.  I've provided opinions in emergency medicine malpractice cases before, both on the plaintiff's side and the defense side.  But then also, as you can imagine, there are many legal cases that involve drugs, chemicals, poisons, any murder case that involves someone poisoning somebody. So there are far more cases that involve toxicology poisons, and I offer expertise in those as well.

Q    In a typical case where someone has asked you to come and give them an opinion, do those cases always go to trial like this one?

A    No.

Q    But you've testified in courtrooms before, correct?

A    Correct.

Q    In fact, this has been kind of a busy year for you?

A    Yes.

Q    How many times have you testified in a courtroom this spring and summer?

A    This is my eighth trial since April 29th.  It's a busy opioid epidemic.

Q    We've talked about a term medical toxicologist, and could you just take a minute and explain to the jurors the difference between a medical toxicologist and a toxicologist Ph.D.

1    A     Yes, I'm glad you asked that.

2              JUROR:  Could we move this a little?  Not all the

3    jury can see the witness.

4              THE COURT:  Yes.  Thank you.

5    BY MR. GADD:

6    Q     Same question as before, could you explain the

7    difference between a medical toxicologist and a toxicologist

8    Ph.D.?

9    A     That's an important question to understand because a

10   lot of people are confused that, oh, you're an emergency

11   physician, but you're also a toxicologist.  We don't

12   understand how that works.  But just like in internal

13   medicine, you can do a residency in internal medicine and

14   then do a fellowship in cardiology, or a fellowship in

15   pulmonology.  There are actually fellowships after emergency

16   medicine, and one of those fellowships is medical

17   toxicology.  And it's because, if you think about it, where

18   do most poisonings show up?  If somebody overdoses, they

19   come to the emergency department.  If someone gets bitten by

20   a venomous snake, they show up in the emergency department.

21   If somebody drinks a poison, they show up in the emergency

22   department.

23        So medical toxicology is part of emergency medicine,

24   and we do not work in the laboratory.  I was a chemistry

25   major, but I no longer play with gas chromatographs and all

1    of the things in the laboratory anymore.  I am managing

2    patients.  I am a medical doctor.  I treat poisoned

3    patients.  My interaction is with a patient who is

4    intoxicated or poisoned, not a test tube of blood or urine.

5        A forensic toxicologist that has a Ph.D is a laboratory

6    person and their interaction with a patient is a test tube

7    of blood or urine, whereas me, the medical toxicologist,

8    interacts with the patient.

9    Q    And this is along those same lines, but could you

10   explain for us just the difference between someone like

11   yourself, a medical toxicologist, and perhaps a forensic

12   pathologist?

13   A    A forensic pathologist -- and the word forensic --

14   there's nothing magical about the word forensic.  Forensic

15   just means that you are doing something for legal purposes.

16   So I am a toxicologist.  I guess in the sense that I'm

17   sitting right here in a court means that I'm acting as a

18   forensic toxicologist in a way.

19       A pathologist is a physician that when they graduate

20   from medical school, their years of training are

21   specifically with patients that are dead.  They never once

22   interact with a living patient.  They interact with a body.

23   They look at tissues under the microscope.  They can look at

24   blood.  They can look at urine, but they never are treating

25   a patient that is alive.

1          My job as an emergency physician and a medical
2     toxicologist is to make sure that my patient doesn't get to
3     meet that pathologist.
4     Q    And aside from seeing a living patient, are there other
5     things that make your specialty different from those other
6     two that I mentioned?
7     A    Well, basically the same thing.  My patients are
8     living.  And I use a methodology when I look at dead
9     patients to figure out why someone has died.  But most
10    importantly, pathologists do not have any medical toxicology
11    training.  They don't take any of the rotations or the
12    coursework to learn about medical toxicology and hone in the
13    skills that is necessary to figure out which drug does what
14    kind of intoxication.
15    Q    I'd like to talk about the methodology that you
16    mentioned.  And I wonder if it would be helpful if you were
17    to explain for the jury, and for the rest of us, some of the
18    terms you use in your work as a medical toxicologist.
19    A    Sure.
20    Q    Would you be willing -- and this is kind of why we were
21    blocking your view -- would you be willing to come to our
22    whiteboard here and just walk us through some of the
23    bread-and-butter terms that you use as a medical
24    toxicologist?
25    A    Sure.  May I step down?

1   Q      Please.

2          Please go ahead.

3   A      There is a bread-and-butter term that we use in medical

4   toxicology, and this is exactly how I teach my doctors in

5   training at the poison center, and the word is toxidrome.

6   Toxidrome is toxic plus syndrome mashed together in one

7   word.

8          And if there's anything I say today, this may be the

9   one thing to remember.  A toxidrome is the most important

10  term in medical toxicology.  When you listen to the news,

11  you hear about celebrities that overdose, and you get the

12  sense that an overdose is an overdose is an overdose.  But

13  that is not true.  From a medical toxicology standpoint, I

14  spent two years learning how one kind of overdose looks

15  different from another.  So the definition of a toxidrome is

16  the constellation of signs or symptoms that are unique to a

17  group of substances.

18  Q      And there are several types of toxidromes, correct?

19  A      There are a number of toxidromes that we learn about

20  and focus on, and the first one is sympathomimetic.

21  Q      I'm glad you said it.

22  A      Sympathomimetic is the toxidrome that mimics your

23  sympathetic nervous system.  Your sympathetic nervous system

24  is your fight-or-flight nervous system.  So drugs like

25  cocaine or meth mimic your sympathetic nervous system.  They

1    rev up your fight-or-flight nervous system.

2    Q    So for a patient you see in the ER who's experiencing

3    the sympathomimetic toxidrome, what does it look like?  What

4    do you see?

5    A    And this is very important because this is the crux of

6    medical toxicology, what does the intoxicated patient look

7    like.  So the features of the sympathomimetic toxidrome are,

8    first and foremost, agitation.  They are acting crazy.

9    Secondly, they have big pupils.  They are very sweaty.  They

10   have an elevated heart rate.  They have an elevated blood

11   pressure.  And then they ultimately can develop seizures and

12   cardiac arrhythmias, which is what causes death.  So this is

13   a very distinct toxidrome.

14        So when I work in the emergency department and I see

15   somebody high on cocaine, or high on meth, or high on bath

16   salts -- you may have heard of those -- they are very, very

17   difficult to control, they are very agitated, and it

18   requires a number of resources, nurses and police officers

19   to hold them down because it can be very unsafe for us as

20   physicians to get close to them.

21   Q    Can we talk about that, the next toxidrome that you see

22   somewhat frequently in your work in the emergency

23   department.

24   A    So we're going to talk now about the opioid toxidrome,

25   and the opioid toxidrome looks much, much different from the

1   sympathomimetic toxidrome.  So the opioid toxidrome involves

2   opiates and opioids.

3   Q    Can you maybe, just for our benefit, can you explain

4   the difference between those two words, opiates and opioids?

5   A    Right.  An opiate comes directly from the poppy plant.

6   Do you remember the scene from Wizard of Oz, they're running

7   through the field of poppies, and what happens?  They start

8   getting very, very sleepy.  That's because a poppy is

9   papaverine somniferum, like somnolent, getting sleepy.  So

10  any of the substances that come straight from the poppy are

11  opiates.

12      Now if you take one of those substances, like opium, or

13  morphine, or codeine, and you take it into a laboratory, and

14  you tinker with those molecules, those are called

15  semisynthetic opioids.  Once it no longer comes from the

16  poppy itself, it is an opioid.

17      And then if you derive from scratch in a laboratory a

18  new chemical that doesn't come from the poppy at all, then

19  that is a synthetic opioid.  So Fentanyl is completely

20  synthetic.  It is derived completely out of the laboratory.

21  Q    Thank you for explaining that.

22      When you're working in the emergency department and

23  someone comes in and they're experiencing the opioid

24  toxidrome, what sort of things do you observe?

25  A    So the way that an opioid toxic patient looks is they

1    have pinpoint pupils.  This is a very dramatic finding.  So

2    when someone comes -- we're all used to seeing our pupils as

3    a normal size and depending on how much light is let in.

4    But an opioid toxic patient, their pupils are so tiny, you

5    almost can't see their pupils at all.  It's actually pretty

6    strange.

7         The other finding is central nervous system -- I'm

8    abbreviating that, CNS -- depression.  So this is your

9    brain, and that involves looking sleepy to being completely

10   unconscious.

11        The third finding in the opioid toxidrome is

12   respiratory depression.  This basically means that you

13   breathe slower and slower until you develop what we call

14   apnea, which is when you stop breathing, and that is how you

15   die.  So opioid toxic patients go to sleep and die.

16        Sympathomimetic patients are agitated, acting crazy,

17   and have a sudden cardiac arrest.  This happens over a

18   little bit more time.

19   Q    You talked a bit about respiratory depression, and I

20   wanted to ask you a question about a phrase in your report

21   agonal breathing.  Could you kind of explain where that fits

22   in?

23   A    So the thing that happens in any patient who is

24   unconscious, for whatever reason, whether it's head trauma

25   or unconsciousness from an opioid, is you no longer protect

1    your airway.  When we are awake every day, we hold our

2    airway open.  We don't think about it, but we do.  Then

3    there's some people at night, when they get sleepy and

4    they're sleeping deep, they start snoring.  That's because

5    they're kind of unconscious, they're not protecting their

6    airway, and you develop an obstructive breathing pattern.

7    So the tissue collapses on itself, and as you're breathing

8    past it, it makes a noise.

9         And so my husband is one of these people that does

10   this.  And what happens when he starts snoring at night, you

11   give him a kick, he wakes up a little bit, he opens up that

12   obstruction, and he stops snoring.

13        Now let me make this clear.  This is not actually

14   snoring.  It sounds like snoring, but it's much worse.  The

15   airway collapses on itself and it creates obstruction.  And

16   so the opioid toxic patient has to breathe past that

17   obstruction, and so it makes a sound that we call agonal

18   breathing.  Agonal does not mean in agony necessarily.  It's

19   just a style of breathing from the brain.  Laypeople,

20   inevitably, whenever they're around an opioid toxic patient,

21   will describe it as snoring.

22   Q    Snoring, heavy snoring, things like that?

23   A    Can you get a little closer to the mike?

24   Q    Sorry.

25   A    Thanks.

1    Q    Do they describe it as snoring, heavy snoring, loud

2    snoring?  Do you hear things like that?

3    A    Yeah, anything to describe -- because I've never seen a

4    layperson say, oh, yes, they were agonally breathing.  What

5    it sounds like is snoring to the layperson.

6    Q    After a person stops breathing, how soon after does

7    death occur?

8    A    Say that again.

9    Q    After a person stops breathing, how soon after does

10   death occur?

11   A    Well, what happens as an opioid toxic patient's

12   breathing gets slower and slower and there is obstruction

13   that occurs, this is a death that happens over minutes to

14   hours.  Now there are some opioids that are so potent that

15   it can be more rapid.  It depends on the potency and the

16   dose that was taken.

17        But as we were talking about the obstruction that

18   happens, what's important about this obstruction is it

19   requires a lot of pressure to breathe past it.  So if you

20   try this, if you plug your nose and close your mouth and try

21   to take a breath, you're going to feel a sensation inside of

22   your chest trying to overcome that 100 percent obstruction,

23   and that's negative pressure in your lungs.  What that does

24   is it draws fluid into the lungs, and this is pulmonary

25   edema.

1        So, inevitably, in almost any opioid death I see, there

2   is pulmonary edema.  This is fluid.  It's drawn out of the

3   capillaries in the lungs.  And it's bloody.  And it could be

4   pink tinged.  Sometimes it's very foamy looking, but it is

5   fluid in the lungs, and this is because death has taken some

6   time to develop as they are breathing past that obstruction

7   and slower and slower over time.

8        So pulmonary edema is not part of the toxidrome per se,

9   but it is a consequence of the toxidrome, and that is what I

10  see invariably in all pulmonary -- in all opioid toxic

11  deaths.

12  Q    With the rise of Fentanyl use, what are you seeing as

13  an emergency room physician?

14  A    Fentanyl is a very potent opioid.  And just to express

15  how potent, we assign morphine that you take by mouth, which

16  in medicine by mouth is abbreviated PO.  So PO morphine gets

17  a label one.  Heroin, depending on how you use it, maybe

18  like 1.5 to three oxycodone, maybe 1.5 to five, just

19  depending on how you use the drug, if you crush it versus

20  inject it.  So those are some examples of the potency.

21       Fentanyl, we assign the number 100.  So Fentanyl is 100

22  times more potent than PO morphine.  So in these

23  circumstances, we see this central nervous system depression

24  happen pretty quickly with Fentanyl.  They slump over

25  wherever they are.  With all of the heroin deaths I've seen,

1    they have time to get comfortable in their recliner or get

2    comfortable in bed and go to sleep.  But a lot of times in

3    these Fentanyl overdoses, they may be slumped over in the

4    bathroom stall at McDonald's.  That's how fast sometimes the

5    central nervous system depression can occur.  But this

6    respiratory depression takes longer and that's why we still

7    see the pulmonary edema.  We see it in living patients that

8    live to come to the emergency.  And we are also requiring

9    higher doses of Narcan to get these people back.

10   Q    Do you just want to take a minute and explain what

11   Narcan is?

12   A    Narcan is the antidote for opioid toxicity.  Narcan is

13   the trade name.  Naloxone is the generic name.  And you can

14   give Narcan up the nose.  You can put it down an

15   intratracheal tube if the patient is intubated.  Most of the

16   time we inject it.  And what happens is within seconds, it

17   specifically reverses the central nervous depression and

18   respiratory depression from an opioid.

19        Narcan does not reverse cocaine.  Narcan does not

20   reverse Xanax.  Narcan does not reverse anything other than

21   an opioid.  And what's important is once the patient is

22   already dead, Narcan does not have the Lazarus effect.  It

23   does not raise the patient from the dead.

24   Q    For a patient who's built up some tolerance to opioids,

25   how does that tolerance affect the timing of the central

1    nervous system depression, the respiratory depression, and

2    ultimate death?

3    A    When tolerances happen in an addict of some kind, it

4    takes larger doses to get the effect they used to have, and

5    it can take longer for these symptoms to display themselves.

6    Q    There are other toxidromes you use in your work,

7    correct?

8    A    Correct.

9    Q    I wonder if there's just maybe one more we could talk

10   about this morning.  Could you talk about the sedative

11   hypnotic toxidrome?

12   A    The sedative hypnotic toxidrome is what we see with

13   people that overdose on sedatives.

14        Now in the 1960s, there were very toxicologically

15   interesting sedatives.  Marilyn Monroe died from Nembutal,

16   which is a barbiturate.  Elvis Presley died from Placidyl,

17   or eth clyro vinyl, which is a sedative.  These kinds of

18   sedatives have respiratory depression associated with them.

19   But somewhere along the way, we have gotten better with

20   designing our antianxiety agents and our other types of

21   antidepressants.

22        So nowadays, when we're talking about benzodiazepines,

23   things like Xanax, or Valium, even in massive overdose,

24   which I see all the time, people coming in after taking an

25   entire bottle of Xanax, they have CNS depression.  But the

1   important thing is they do not have respiratory depression.

2       Now because these are sedatives and they cause you to

3   relax, when you are relaxed, you do breathe a little slower,

4   okay.  But that's not what I'm talking about.  Respiratory

5   depression is a very significant finding in opioid overdoses

6   because it works at certain receptors in the brain to cause

7   you to slow your breathing and stop breathing.  Just by

8   virtue of relaxing and breathing slower is not respiratory

9   depression.  So there is not significant respiratory

10  depression with sedative hypnotics like benzodiazepine.

11      I'm also going to put alcohol into this category

12  Because alcohol also works at the same receptors that we're

13  talking about in this toxidrome.  So even though somebody

14  can drink a ton of alcohol and get drunk as a skunk, they

15  may be passed out, they do not have the respiratory

16  depression associated with it like you see with opioids.

17      And think about it.  The only time that we really hear

18  about people that die from alcohol poisoning are college

19  kids playing drinking games.  And it's so rare and

20  significant it makes the news, and that's because they have

21  gone into this stratosphere with their alcohol level.  But

22  most drinking, including heavy drinking, does not cause

23  respiratory depression.

24  Q    This may be a good point if you want to resume the

25  stand.  I want to ask you some additional questions about

1    how you treat patients in the emergency room.  And thank you

2    for explaining that.

3            What you've just taught us isn't just academic,

4    right?

5    A    No.

6    Q    Do you live and breathe this?

7    A    Yes.  This is everyday emergency medicine and medical

8    toxicology in every emergency department across the entire

9    country.

10   Q    So if you're in the emergency department and you have a

11   heroin overdose come in and they're barely breathing, do you

12   base your treatment on numbers?

13   A    No, and that would be ridiculous.  Imagine a patient

14   coming in who has pinpoint pupils, who is unconscious and

15   barely breathing, and my colleagues and I sit around and go,

16   oh, we must get that heroin level back to decide what we're

17   going to do with this patient.

18       First of all, it would take a while to get that level

19   back.  Secondly, the patient would be dead by the time we

20   got that level back, and even when we get that level back, I

21   wouldn't know what it means because it's different in

22   everybody.  There are wide ranges that cause toxicity,

23   depending on sex, and genetics, and tolerance, and other

24   issues.  So never do we say let's get this level and see

25   what to do in a patient like that.  We would give Narcan.

1    We treat the patient, not a number.

2    Q    And when we talk about levels, blood levels, drug

3    levels, what is it specifically that you refer to that

4    you're not using in that setting?

5    A    We are not using what would be called a lethal level.

6    And normally -- and I apologize because a lot of times when

7    I tell lawyers this, it's like I'm telling them there's no

8    such thing as Santa Claus.  As toxicologists, we don't care

9    about the number in these circumstances and there is no

10   defined lethal level, not to be mixed up with the lethal

11   dose.  There is definitely a dose that somebody can take

12   that can be lethal.  But we're talking about concentrations

13   in the body.  When we're talking about opioids, when we're

14   talking about cocaine metabolite, most drugs that we talk

15   about, we are not looking at the number.  It does not mean

16   very much in living patients and it means even less in dead

17   patients.

18   Q    For that same scenario where you're working in the

19   emergency department and a heroin overdose comes in and

20   they're barely breathing, do you try to gather information

21   not just what you see but also about kind of their history?

22   A    Right.  Certainly if we see a patient that has pinpoint

23   pupils, unconscious and barely breathing, we are managing

24   that patient, giving them Narcan, supporting their airway.

25   But we're also gathering data from the EMS personnel that

1    come in, by family that may come in, and that is part of

2    getting the history as we do in all kinds of emergency

3    patients.

4    Q    Let's turn our attention to the reason we've asked you

5    to come here, the death of Ruslan Kluyev.  Were you asked to

6    review his death?

7    A    Yes.

8    Q    Are you familiar with the but for cause standard?

9    A    Yes, I am.

10   Q    Did you reach a conclusion as to the but for cause of

11   Ruslan's death?

12   A    Yes.  Ruslan would not have died but for the Fentanyl.

13   Q    Can you walk us through your methodology for reaching

14   that conclusion?

15   A    Yeah.  As I stated previously, I'm aware of a but for

16   cause of death standard and cause of death opinions in

17   federal court.  And what that means is that you have to come

18   up with an opinion that this person would not have died but

19   for a certain reason.

20        And I am a medical toxicologist, but I am not stuck in

21   a toxicology tunnel vision.  Because I'm an emergency

22   physician and I see patients that suffer from trauma, I

23   first look for any reason to believe that somebody died from

24   trauma, and I need to rule out trauma.  And in this case, I

25   ruled out trauma.

1    The next thing is to rule out natural causes of death,

2    things that cause sudden death.  So cancer is not a sudden

3    death.  That's a long death.  Looking for things that would

4    cause sudden death, like a heart attack, or a stroke, or a

5    pulmonary embolism, something along those lines, and rule

6    out natural causes of death.

7    Then I turn my attention to the toxicology.  So when I

8    am coming up with a but for cause of death, I'm not having

9    tunnel vision.  I am looking for all the different reasons

10   that somebody could experience sudden death.

11   Q    And as part of your research for this case, did you

12   review the police reports?

13   A    Yes.

14   Q    Did you review the autopsy report?

15   A    Yes.

16   Q    And the findings of the medical examiner's office?

17   A    Yes.

18   Q    The toxicology results that were included in them?

19   A    Yes.

20   Q    Did you review witness statements?

21   A    Yes.

22   Q    Photos from the scene of the death?

23   A    Yes.

24   Q    Let's talk through some of those things.  First if we

25   could talk about the autopsy.  Did you specifically review

1    the report written by the autopsy surgeon, Dr. Thomas

2    Rogers?

3    A    Yes.

4    Q    What did the autopsy reveal?

5    A    The autopsy revealed that there were no signs of

6    trauma, there were no signs of sudden death from natural

7    causes, and ultimately the cause of death was mixed drug

8    intoxication.

9    Q    Let's talk for a minute about the toxicology results.

10            MR. GADD:  Ms. Louder, if we could look at 18.02.

11   BY MR. GADD:

12   Q    While that's popping up on your screen, did you review

13   the toxicology results from Mr. Kluyev's blood that was

14   taken during the autopsy?

15   A    Yes.

16   Q    If we could zoom in on that same section we were

17   looking at yesterday, could we go line by line through these

18   results?

19   A    Yes.

20   Q    What's blood ethyl alcohol?

21   A    Ethyl alcohol is ethanol or just alcohol, and this

22   would be from the vodka that he was reportedly drinking the

23   night of his death.

24   Q    As long as we're on this topic, in your report there's

25   a missing number one, correct?

```
 1  A     Correct.
 2  Q     So with that correction, the additional number one, can
 3  you tell us how many standard alcoholic beverages that this
 4  blood alcohol concentration would equate to?
 5  A     Yes.  So with the caveat that alcohol concentrations
 6  are very handwavy, I have consulted on a number of DWI cases
 7  and a number of what are called dram shop cases, that any
 8  kind of alcohol calculations are not as exact as I wish they
 9  would be.  And so when I say this, with the caveat that this
10  is a handwavy calculation.
11        So .19 is approximately 12.5 standard alcoholic
12  beverages in this case, mainly because I'm taking about a
13  three-hour time frame where I don't think he was drinking,
14  which is once he used the Fentanyl and he was placed in the
15  fetal position for three hours, and so you metabolize off
16  three drinks.  So I add that back in.  So it is at least
17  12.5 alcoholic beverages.  In my report I accidentally left
18  the one off and put 2.5.  It is 12.5.
19  Q     You've talked to us about how you treat living
20  patients.  Do you have people come into the ER who are at
21  .19?
22  A     Oh, absolutely.  Whereas this seems like an impressive
23  number, and it is, I'm not advocating for heavy drinking,
24  but I think a lot of people have a sense -- you said in Utah
25  it's .05 to drive, correct?
```

```
 1   Q    Yeah.

 2   A    So in Utah.  In other places, it's .08.  It's not like

 3   you are not intoxicated at all at .049 and then you

 4   magically become intoxicated at .05.  I think studies show

 5   there's an impairment even lower than .05.  But the point is

 6   how somebody deals with this intoxication, how they show it.

 7   It looks different based on somebody's tolerance.  And I'm

 8   not saying that that means that they can drive above .05 or

 9   above .08.  The point is is how they demonstrate signs of

10   intoxication.  And so somebody coming into the emergency

11   department with .19 could look very normal to an emergency

12   physician.

13        We play a game in the ER, guess the drug guy's alcohol

14   level, and we don't do very well with that.  And that's

15   because my record is .534.  So not .0534, .534.  And not

16   only was this guy not acting intoxicated, he was actually

17   withdrawing.

18        We see every day in the emergency department numbers in

19   the 300s, the 200s.  So this is definitely a high level, but

20   this is not a level that would at all be something to be

21   concerned about causing death.

22   Q    .534?

23   A    Yes.

24   Q    That's two and a half times what we see here, right?

25   A    Right.
```

```
 1    Q     And your patient was alive?

 2    A     Yes.

 3    Q     Let's look at the next one down, cocaine.  I suppose

 4    that one doesn't have to be defined, but could you maybe

 5    take the next one down that I don't dare try to pronounce.

 6    A     So that's benzoylecgonine, or BE is how we

 7    traditionally abbreviate it.

 8          Cocaine is a pretty fast acting drug, and it oftentimes

 9    gets metabolized to these other things that we see here.  So

10    the BE.  The ecgonine methyl ester is EME.  And cocaethylene

11    is when cocaine combines with ethanol.  So these are all

12    metabolites of cocaine.

13          Cocaine is what is active.  These other metabolites are

14    not as active.  So the fact that cocaine has already come

15    and gone says a lot about where he was in the midst of his

16    intoxication.  But frequently cocaine is metabolized very

17    quickly.

18    Q     So if we're talking now about cocaine and the

19    sympathomimetic toxidrome, would you expect to see -- for

20    someone experiencing those signs and symptoms, you know, the

21    agitation, the sweatiness, the big pupils, the elevated

22    heart rate, maybe it was a case where it was, you know, a

23    sudden death when they were arrested by the police,

24    something like that, would you expect to get results back

25    and see cocaine was negative?
```

1    A    No.  In someone who is acutely intoxicated like that,

2    we would expect to see the cocaine to be -- the cocaine

3    cocaine to be present.

4    Q    Every body is a little different, but let me see if I

5    can ask it this way.  How fast does an average living body

6    metabolize cocaine?

7    A    Well, of course, that's an impossible question to

8    answer because it always depends on the dose.  The saying in

9    toxicology, the dose makes the poison.  And drug dealers

10    don't have very good quality control, so we never really

11    know what dose is actually being taken.  So I don't think

12    anybody could really answer that question.  But overall,

13    cocaine gets metabolized very quickly.

14    Q    Is it faster or slower -- other things being equal in

15    terms of, you know, purity and things like that, is it

16    faster or slower than the metabolization rate for heroin?

17    A    So heroin, believe it or not, is the trade name for

18    diacetylmorphine.  Diacetylmorphine was discovered or

19    invented in the late 1800s by Bayer Pharmaceuticals, the

20    same people that make aspirin, so Bayer aspirin.  They were

21    the ones that named heroin heroin.  So heroin is the trade

22    name for diacetylmorphine.  Diacetylmorphine has a very

23    fleeting half life.  I have never once, ever, ever, ever,

24    seen diacetylmorphine in a dead body.  Because it's so fast,

25    it gets metabolized very quickly.

1      There is a metabolite called 6-monoacetylmorphine, or

2  6-MAM is how it's abbreviated.  That's not around too long

3  either, but you generally can find it in urine or -- not

4  necessarily the blood.  And then most of the time in heroin

5  deaths, we see just morphine because that's what it gets

6  metabolized to.  So cocaine gets metabolized pretty quickly,

7  but I still see cocaine postmortem.  I have never seen

8  diacetylmorphine as a molecule postmortem.

9  Q    I think you mentioned this, but I wanted to kind of

10  drill down on it.  So how does the physiological effect of a

11  cocaine metabolite, such as BE or EME, how does that differ

12  from the physiological effect of cocaine?

13  A    These metabolites are not as active as cocaine.

14  Cocaine is what causes this sympathomimetic toxidrome.

15  Q    We've talked about cocaethylene.  Could we take the

16  next one down that starts with an L.

17  A    Levamisole is a drug that is for worms, and this is not

18  FDA approved in the United States.  It is used in like

19  Mexico and South America to treat different kinds of

20  parasitic infections, and for some reason it's been used to

21  cut cocaine.

22  Q    You see this with some frequency, correct?

23  A    I've seen it a number of times.  I don't know why they

24  use it to cut cocaine because I don't think it adds anything

25  to the high.  It's probably just readily available, but it

1   doesn't really have any effects that cause toxicity except

2   for chronic toxicity.  Like someone who is taking it for a

3   long-term parasitic infection will develop a decline in

4   their white blood cell count, so they are unavailable to

5   fight infections as well.  But that's a chronic issue with

6   people that are taking it as prescribed.

7   Q    So we've talked now about cocaine metabolite and this

8   cocaine cutting agent.  Do you have an opinion as to whether

9   the cocaine metabolite or the cocaine cutting agent killed

10  Ruslan Kluyev?

11  A    The cocaine nor any of the metabolites caused or

12  contributed to his death.  They did not cause or contribute

13  to his death.

14  Q    Let's take the bottom row, then, Fentanyl.  We talked

15  about it briefly.  Can you maybe just explain to the jury

16  what exactly Fentanyl is?

17  A    Fentanyl is 100 times more potent than PO morphine.  It

18  is a synthetic opioid, and it has traditionally been used in

19  medicine for cancer pain, like Fentanyl patches.  And as an

20  emergency physician, whenever I do procedures, I give

21  Fentanyl all the time for reducing fractures, or putting a

22  shoulder back in place.  We use Fentanyl for pain.  We give

23  it intravenously.  Little kids will be given Fentanyl

24  lollipops in the ER for pain control.  So Fentanyl has been

25  traditionally used in medicine for treating pain.

1      Unfortunately, over the last several years, Fentanyl

2  has found its way into the illegal drug market, and because

3  it's much more potent than heroin ever was, we are seeing

4  deaths across the entire country.

5  Q    If Fentanyl is that dangerous, in your experience, why

6  do people risk using it?

7  A    In many circumstances, they don't even know that

8  Fentanyl is present.  It may be Fentanyl tainted heroin, or

9  it may just be that heroin is completely replaced by

10  Fentanyl, or it may be in these counterfeit pills and they

11  don't know.  However, for individuals that do know that it's

12  Fentanyl, they are doing what's called chasing the dragon.

13  Q    Can you explain that term?

14  A    When somebody uses an opioid for the first time, they

15  develop euphoria.  Euphoria is what brings them back for

16  more every time.  However, as time goes on, the brain

17  chemistry changes and they will never find that euphoria

18  again, but they don't give up trying.  They want to find it

19  and they'll use bigger doses of the same drug, or they will

20  seek out other drugs that are more potent to try to find

21  that euphoria.  So that is called chasing the dragon.  They

22  are always looking for that high that they had the first

23  time.

24  Q    When we look at the toxicology results, next to

25  Fentanyl on the right side of the screen, there's a drug

1    level reported.  Is there any significance in that level to

2    you as a medical toxicologist?

3    A    No.  The significance is that it is not a false

4    positive.  Whenever I see a quantitative result, meaning

5    that there is a number or a concentration, that means that

6    it is no chance for a false positive.  When you see results

7    like present or positive, that is a qualitative result.

8    There is always a chance that it could be a false positive.

9    But when you see a concentration, it is definitely that this

10   Fentanyl is present.  It is not cross-reacting with

11   something.  But the number in and of itself is there's no

12   defined lethal level.

13             MR. GADD:  Could we zoom out for a minute.

14             So just above the two signatures, this kind of

15   standard report from Central Valley Toxicology, could you

16   zoom in.  Do you see where it says blood Fentanyl, and

17   ranges, and effective, and potentially toxic?  So down that

18   next grouping.

19   BY MR. GADD:

20   Q    When you say to the jury there's no set defined level,

21   that's a reference to something like this that might show up

22   in a report, correct?

23   A    Correct.

24   Q    There's no intellectual honesty or dishonesty from a

25   toxicologist who has this just in the standard kind of form

1    report, right?

2    A     There are a couple of things that involve why these

3    ranges need to be looked at with a grain of salt.  Number

4    one, a lot of times on these toxicology reports, they are

5    reporting ranges in living patients.  So these are

6    antemortem levels.  You can't compare an antemortem drug

7    level to a postmortem drug level.  It's apples and oranges.

8    So it's not appropriate to say our postmortem level is

9    .0009, or whatever, and we're comparing it to this range

10   that's listed here because that range could be for living

11   patients, and there is no defined lethal level as I said

12   before.

13   Q     Could we take a minute and talk about reports and

14   witness statements that you reviewed in researching your

15   conclusion?

16   A     Yes.

17   Q     Did you specifically read the police reports created in

18   Daly City that dealt with the death scene, and the

19   interviews, and things of that nature?

20   A     Yes.

21   Q     Did you learn in those reports that two witnesses

22   watched Ruslan crush and snort two Fentanyl pills prior to

23   laying down in his bed on the night of his death?

24   A     Yes.  Their testimony was that he had crushed these

25   pills with a yellow battery and snorted it through a rolled

1  up blue Post-it note.

2  Q     Do you know whether the physiological effect would

3  change if someone were to crush up a fake pill containing

4  Fentanyl and snort it versus if they were to ingest the fake

5  pill containing Fentanyl?

6  A     So anytime you crush up any pill, it's a pretty

7  dangerous practice, whether it's pharmaceutical or fake.

8  Basically what you're doing is getting a bolus, or an all at

9  once dose through your nose, which you absorb things through

10 your nose very quickly, which is why people do that.  If you

11 take a pill by mouth, it's going to take some time to

12 digest.

13       The other thing is there are a lot of pills, depending

14 on the engineering of the matrix that the pill is made, some

15 of them are designed to slowly release drug over time, and

16 if you crush that up, you've completely destroyed that

17 matrix and you're getting the whole dose all at one time.

18 So whether it's designed to be trickling into your blood

19 system over time or meant to just take as a pill, whenever

20 you crush up any pill and snort it, it's dangerous.

21 Q     You've referred to pills that are designed for kind of

22 an extended release effect, correct?

23 A     Correct.

24 Q     Those are made by pharmaceutical companies?

25 A     Yes.

```
 1   Q    Do you know if it takes a fair amount of sophistication
 2   to make a pill that has an extended release?
 3   A    I would think so.
 4   Q    Let's talk for a moment about pictures at the scene of
 5   Ruslan's death.
 6            MR. GADD:  Could we look at 1801, page six.
 7   BY MR. GADD:
 8   Q    Can you see that on your screen?
 9   A    Yes.
10   Q    Is this one of the pictures that you considered?
11   A    Yes.
12   Q    What stands out to you when you look at this?
13   A    There are fluids on the bedcovers there.  And
14   oftentimes in opioid overdoses, we will see something called
15   a foam cone.  Now you remember we talked about pulmonary
16   edema earlier as a consequence of an opioid overdose or an
17   opioid toxicity.  That pulmonary edema will come out the
18   airway, so that means it will come out the mouth and nose,
19   and because it is mixing with air, it looks very foamy.
20   Like I guess the milk on a cappuccino, they put air through
21   it.  So whenever you put air through a fluid, it's going to
22   get foamy.
23        Because he was placed in a fetal position instead of on
24   his back, you wouldn't have seen the foam cone because that
25   fluid would have just poured out.  So what you see on this
```

1    bed is blood tinged pulmonary edema.

2              MR. GADD:  Could we look at page seven.

3    BY MR. GADD:

4    Q    Is this also a picture that you considered when you

5    were coming to your conclusion?

6    A    Yes.  This was after he was moved off of the bed onto

7    the floor, and because of rigor mortis, he was still in the

8    fetal position that he had been placed in.

9    Q    There's an additional picture I'd like to show you that

10   we're not publishing out of respect to the victim, and once

11   I show you, I'd like to ask you some questions about it.

12         Do you recognize that picture?

13   A    Yes.

14   Q    Is that a picture that you relied on when you were

15   forming your conclusion?

16   A    Yes.

17   Q    What, when you look at that picture -- maybe we should

18   take it in two steps.  Could you describe for the jurors

19   what you see in that picture?

20   A    This picture is of his face, and it has a great deal of

21   secretions, blood tinged fluid, mucus, material all over his

22   face.  And this is a combination of any material that could

23   have been in his stomach that could have come out, but it is

24   also the pulmonary edema as it emanates out of the body as

25   he's dying and once he's dead.

```
 1   Q     Would you ever expect to see a pulmonary edema with a
 2   cocaine overdose?
 3   A     Not so much because with cocaine you have someone who
 4   is very agitated and they have a sudden cardiac arrest.
 5   That is something very quick so there is not time for
 6   pulmonary edema to develop.  Whereas in an opioid death, as
 7   they breathe slower and slower and slower over time and then
 8   they stop breathing, the heart is still beating for, you
 9   know, some length of time after you stop breathing.  So this
10   is a death that takes place over time, and that's why we see
11   pulmonary edema and other secretions in these opioid cases
12   as opposed to somebody who drops dead in police custody or
13   drops dead due to cocaine.
14   Q     When you were telling the jury your conclusion, you
15   used the phrase but for.  Can you just circle back with me
16   and describe what but for causation means in a case like
17   this?
18   A     Yes.  In the circumstance, the medical examiner called
19   the cause of death mixed drug intoxication, and I find that
20   to be a very intellectually honest cause of death.  I
21   believe that medical examiners should say that and list out
22   all the drugs that are found postmortem because, number one,
23   they may not necessarily know all of the evidence and all of
24   the perimortem circumstances.  That word perimortem
25   circumstances is very important because that's what paints
```

1   the picture of the toxidromes.

2        They may not have that information when they are coming

3   up with a cause of death, so they call it mixed drug

4   intoxication, which I am absolutely fine with because they

5   have not been trained in medical toxicology.

6        My job as a medical toxicologist is to review all of

7   the information and determine what were the perimortem

8   circumstances.  What did somebody look like as they were

9   dying.  And from that information and the evidence provided,

10  everything that I reviewed, I come up with the but for cause

11  of death, if I can, and that is, specifically in this case,

12  that Ruslan would not have died but for the Fentanyl.

13  Q    You give opinions in a fair number of cases.  People

14  reach out to you seeking your opinion, correct?

15  A    Correct.

16  Q    For instances like this where the question is whether

17  or not a drug was a but for cause of death, approximately

18  what percentage of the time are you able to find a but for

19  cause?

20  A    Approximately 50/50.  I obviously review a lot of cases

21  for the Department of Justice, and part of that is because

22  there are actually fewer than 300 board certified medical

23  toxicologists in the country.  So we are actually a pretty

24  rare commodity compared to the number of drug cases.  There

25  are very few of us that are medical toxicologists and even

 1   fewer that even like talking to you lawyers.  So I get a lot

 2   of calls from the Department of Justice.

 3        When the Department of Justice asks me to look for a

 4   but for cause of death, probably 50 percent of the time I

 5   tell them that this case does not have all the evidence to

 6   meet that but for standard.

 7   Q    I believe you recently testified at a sentencing in one

 8   of those very cases, right, where you could not make that

 9   conclusion?

10   A    Correct.  When I am reviewing a case and there may be a

11   hole in the evidence, or some missing pieces of information,

12   or what I would call a fly in the ointment to make a but for

13   cause of death, the benefit of the doubt goes to the

14   defendant, and I will not meet that but for cause of death

15   standard.

16        A couple weeks ago I went to West Virginia, which is

17   the ground zero of the opioid epidemic for a number of

18   reasons, and didn't testify in a trial but testified in a

19   sentencing hearing about the fact that it was not but for,

20   but more likely than not.

21            MR. GADD:  If I could have just one moment?

22            THE COURT:  Yes.

23            MR. GADD:  Nothing further.  Thank you.

24            THE COURT:  Ms. Beckett, you may cross-examine.

25   //

```
 1                        CROSS-EXAMINATION
 2    BY MS. BECKETT:
 3    Q    Dr. Hail, you're being paid for your testimony today,
 4    correct?
 5    A    Correct.
 6    Q    What's your hourly rate?
 7    A    I believe in this case it's 550 an hour.
 8    Q    And who's paying that?
 9    A    The Department of Justice.
10    Q    Do you have any federal government contracts?
11    A    Yes.
12    Q    How many federal government contracts do you have?
13    A    I'm not sure.  A lot.
14    Q    More than ten?
15    A    Uh-huh, yes.
16    Q    More than 20?
17    A    Probably.
18    Q    Over the course of your career, more than 50?
19    A    Probably.
20    Q    How often in a criminal case have you testified on
21    behalf of a defendant?
22    A    In a federal court case of this nature none.
23    Q    Never?
24    A    Correct.  I do consult with defense attorneys around
25    the country, but none of those cases have ever gone to
```

1    trial.

2    Q    I believe Mr. Gadd just asked you how many times -- or

3    he discussed briefly that there have been times where you

4    have not found a but for cause.  Would that be a correct

5    recitation of what just occurred?

6    A    Right.  Approximately 50 percent of the time.

7    Q    And you can't put a number on how many times you

8    haven't found a but for cause?

9    A    Well, I have been reviewing cases related to opioid

10   epidemic issues with the federal government since 2008, and

11   sometimes these contracts are a quick one hour of my time to

12   say no, this does not meet but for, and sometimes they are

13   larger engagements with more complicated cases.  And

14   sometimes one doctor case may have 25 deaths out of their

15   practice.

16        So I have reviewed hundreds and hundreds of opioid

17   deaths over the last decade, and I obviously have not kept

18   tabs on exactly how many, but it is about half the time I

19   say it meets but for and half the time that it does not.

20   Q    So the answer is no, you don't know how many times

21   you've testified that --

22   A    I can't give you an exact number.

23   Q    How many times have you found a but for cause?

24   A    I don't know the exact number.  But like I said, I've

25   reviewed hundreds of cases and about half the time it meets

1    the but for standard.  And even amongst those cases, they

2    don't always go to trial.

3    Q    I believe you testified that what makes you unique and

4    qualified to testify is that you have a lot of hands-on

5    experience with patients, correct?

6    A    Correct.

7    Q    Hands-on experience with the opioid epidemic --

8    A    Yes.

9    Q    -- in an emergency medical setting, correct?

10   A    Correct.

11   Q    Did you touch a victim in this case?

12   A    No.

13   Q    Examine a body?

14   A    No.

15   Q    Examine blood?

16   A    No.

17   Q    Examine any organs?

18   A    No.

19   Q    Touch anything other than a report?

20   A    No.

21   Q    I believe your report and the report of the medical

22   examiner, or pathologist in this case, mentions pulmonary

23   edema; is that correct?

24   A    Correct.

25   Q    I believe you went over this a little bit, but if you

1    could, just explain briefly what pulmonary edema is.

2    A    Pulmonary edema is fluid that leaks out of the

3    capillaries and can be present in the lungs.  We've already

4    talked about that.

5    Q    I believe you testified that part of pulmonary edema

6    comes from that negative pressure in the lungs; is that

7    correct?

8    A    Correct.  As an opioid toxic patient is breathing

9    slower and against an obstruction, they have to work hard to

10   work against that obstruction, and it creates negative

11   pressure in the lungs that draws fluid into the lungs.

12   Q    But it can be any kind of obstruction that can create

13   pulmonary edema, correct?

14   A    Not necessarily.  I mean if somebody is choking, they

15   could potentially have obstruction that causes pulmonary

16   edema.  I haven't ever seen that before.  But typically we

17   see this kind of pulmonary edema related to negative

18   pressure from the way that the patient is breathing as they

19   die.

20   Q    If somebody aspirates vomit into their lungs, could

21   that create an obstruction that then leads to pulmonary

22   edema?

23   A    That's not the same kind of obstruction.  Aspiration is

24   something that goes into the airways and it can cause an

25   inflammatory response.  But unless there is some massive

1   food particle that is obstructing an airway, it is not the

2   same kind of obstruction.

3   Q    If someone has apnea and aspirates vomit into their

4   airway, could that cause pulmonary edema?

5   A    No.  Aspiration in the lungs is not pulmonary edema.

6   Q    That was not my question.

7        If somebody has apnea and aspirates vomit into their

8   airway, can that then lead to pulmonary edema?

9   A    I answered that a couple questions ago.  Most of the

10  time no.  If there is some huge chunk of steak, perhaps,

11  that obstructs up high and the person is breathing against

12  that, then perhaps.  But the obstruction has already

13  occurred by the time aspiration is occurring.

14  Q    Explain that.  The obstruction has occurred by the time

15  somebody is aspirating, explain that.

16  A    Well, your question was they've stopped breathing

17  completely, and what I'm describing is a specific

18  physiological issue that as someone is still breathing as

19  they die, they're creating that negative pressure that

20  causes pulmonary edema.  Your question was apnea, which is

21  not breathing, thus hence they are not creating a negative

22  pressure.

23  Q    So if somebody is struggling to breathe, say snoring or

24  that agonal breathing that you were discussing previously,

25  could that lead to that obstruction and pulmonary edema?

```
 1   A     Right.  That's what we've been talking about today.

 2   Q     So yes?

 3   A     Yes.

 4   Q     I believe you testified a little bit about multiple

 5   drug toxicity; is that correct?

 6   A     Correct.

 7   Q     Can alcohol exacerbate symptoms of multiple drug

 8   toxicity?

 9   A     I'm sorry.  Can you repeat that?

10   Q     Can alcohol exacerbate symptoms of multiple drug

11   toxicity?

12   A     Well, it depends on what drugs you're talking about.

13   Q     Cocaine.

14   A     Cocaine can, combined with alcohol, cause cocaethylene,

15   which was one of the substances.  So that is cocaine plus

16   ethanol causes cocaethylene.  So in that sense it can

17   enhance the effects of the cardiotoxicity of cocaine.

18         The alcohol does not necessarily cause someone to be

19   more sympathomimetic.  In fact, to some degree, alcohol may

20   cause someone to come down from cocaine toxicity.

21   Q     How about alcohol and Fentanyl?

22   A     Alcohol could potentially enhance the respiratory

23   depressant effects, but the opioid has to be present.  So,

24   for example, I'm going to use -- well, we'll use alcohol

25   since you asked it.  Alcohol can certainly enhance
```

1    respiratory depression from an opioid, but you have to have

2    that opioid present to have that respiratory depression

3    enhanced.  Because remember I said that alcohol does not

4    have significant respiratory depression in and of itself.

5    It may enhance it.  It may enhance oxycodone.  It may

6    enhance heroin.  But in those situations, those are lower

7    potency opioids.

8          In a setting with Fentanyl, Fentanyl is so potent and a

9    stand-alone cause of death -- and all of these opioids are

10   stand-alone causes of death -- and you might enhance the

11   respiratory depression from the Fentanyl but, remember,

12   Fentanyl is 100 times more potent than morphine.  And so to

13   say that alcohol enhances the respiratory depression of

14   Fentanyl is to say you have a shotgun wound to your heart,

15   which is the Fentanyl, and a pinprick hole to your heart,

16   which is the alcohol, and focusing in on that pinprick.

17   Q     So the answer is yes, alcohol can increase those

18   effects, correct?

19   A     And just like I explained --

20   Q     It's a yes or no question, Dr. Hail.

21   A     Subtly enhance.

22   Q     Thank you.

23         What was the original use of Fentanyl?

24   A     Well, as I described before, Fentanyl has been used

25   traditionally in medicine for pain.

1  Q     What's a common dose for that?

2  A     About 25 micrograms is what we would start with

3  intravenously.

4  Q     Micrograms per what, liter?

5  A     It's a dose, not a concentration.

6  Q     Okay.  So how would that show up in the blood work, the

7  original dose?

8  A     If you give a 25 microgram dose of Fentanyl?

9  Q     Uh-huh.

10 A     I don't know.

11 Q     You don't know what that number would look like?

12 A     As I was saying, we don't send drug levels in the

13 medical setting because they don't mean anything.  There are

14 certain references that you can look at that will show what

15 a 25 microgram dose might look like.  The way it works is

16 you give the dose intravenously.  It spikes high and then it

17 goes down low again.  And those numbers can be quite a wide

18 range in living patients.

19 Q     Is chronic opioid use a greater risk factor for

20 overdose?

21 A     It can be.  I mean, remember, you can use heroin one

22 time and die.  You can use heroin for 25 years and die.

23 Q     Is someone who has recently relapsed after coming clean

24 at greater risk for overdose?

25 A     Perhaps.  It depends on how long that they've been

1    clean.

2        It's interesting, your brain can start healing, for

3    lack of a better term, and lose its tolerance to some of

4    these drugs.  And then yes, somebody who has been clean for

5    some length of time may use the dose they used to use and

6    have a tendency to overdose.

7    Q    You work in an emergency medical setting at a hospital

8    most of the time, correct?

9    A    Emergency department and the poison center.

10   Q    And earlier you testified that you have a lot of

11   hands-on experience with patients, correct?

12   A    Correct.

13   Q    When you make a diagnosis, I believe it was your

14   testimony that you prefer to do those hands-on examinations,

15   correct?

16   A    Correct.

17   Q    For an individual who is drinking heavily, they

18   sometimes have an inability to protect their airway?

19   A    If they are comatose from their drinking.

20   Q    They lay down?

21   A    If they reach levels like we talked about before, like

22   in a drinking game where they become comatose, then yes,

23   they cannot protect their airway.

24   Q    That's why you place somebody in the recovery position

25   is because you don't want them to aspirate and they would be

1    able to better protect their airway, correct?

2    A    Just in general or from alcohol?

3    Q    In general.

4    A    In general, if somebody is comatose and they're not

5    protecting their airway in the emergency department setting,

6    we would intubate them.  We don't put them in the recovery

7    position.

8    Q    If you were at your house drinking with a friend and

9    you were concerned that they may have overdone it but you

10   didn't want to take them to a hospital, would it be common

11   practice maybe for somebody to put them in a recovery

12   position?

13   A    I don't know what the common practice is for that.

14   Q    What is the recovery position, Dr. Hail?

15   A    A recovery position is to put somebody on their side so

16   should they vomit or should they have any kind of secretions

17   from their airway, the fluids can roll out of their airway.

18   Q    Can people who are long-term drug users have issues

19   with sleep apnea?

20   A    Sleep apnea is a completely different process than

21   opioid toxicity.

22   Q    Dr. Hail, that was not my question.  I would ask that

23   you please respond to the question I'm asking you.

24   A    Okay.  Repeat your question.

25   Q    Can chronic drug use create issues of sleep apnea?

```
 1   A     Not necessarily.  That question doesn't make a lot of
 2   sense.
 3   Q     Part of your testimony earlier is that pulmonary edema
 4   is not specifically part of the toxidrome you've discussed;
 5   is that correct?
 6   A     It is a consequence of the toxidrome, not a feature of
 7   the toxidrome.
 8   Q     Because pulmonary edema can come from other things,
 9   correct, than just opioid use?
10   A     Right.  There are a number of different physiological
11   mechanisms for pulmonary edema to occur.
12   Q     Did you create a report in this case that was provided
13   to the government?
14   A     Yes.
15   Q     Are you familiar with the language in that report?
16   A     Yes.
17   Q     Do you remember in that report specifically stating
18   that drug concentrations must not be interpreted in a
19   vacuum?
20   A     Correct.
21   Q     Do you still believe that?
22   A     Yes.
23   Q     Do you also remember in that report where you quoted
24   that there's no defined lethal level for drugs?
25   A     Correct.
```

1  Q    Do you still believe that?

2  A    Yes.

3  Q    In your report you also stated that mixed drug

4  intoxication, as in this case, these opinions are

5  intellectually honest because most medical examiners do not

6  always have all the case specific details to elucidate which

7  drug was most responsible for causing the death.  Do you

8  remember stating that?

9            THE COURT:  You probably need to slow down.

10            MS. BECKETT:  I apologize, Your Honor.  I will.  I

11  can restate that.

12  BY MS. BECKETT:

13  Q    These opinions are intellectually honest because most

14  medical examiners do not always have all the case specific

15  details to elucidate which drug was most responsible for

16  causing the death.  Do you remember stating that?

17  A    Yes.

18  Q    Do you still believe that?

19  A    Yes.

20  Q    You believe that you are more qualified to offer an

21  opinion than the doctor who actually medically examined the

22  body in this case?

23  A    Sorry.  You are really talking fast.

24  Q    You believe that you are more qualified to give an

25  opinion on this issue than the doctor who examined the

1     alleged victim's body?

2     A     Yes.

3     Q     Do you remember stating in your report impairment,

4     intoxication, and cause of death are not determined by drug

5     concentrations alone?

6     A     Yes.

7     Q     Do you still believe that?

8     A     Yes.

9     Q     What is hypoventilation?

10    A     Hypoventilation is a word.  Hypo means low.

11    Ventilation means to breathe in and out.  And so

12    hypoventilation is not just necessarily breathing slower,

13    but it is also ineffective respiration, that you are not

14    effectively breathing in and you are not effectively

15    breathing out.

16    Q     Is that common with alcohol intoxication?

17    A     It can be.

18    Q     If you had a patient in your hospital who came in and

19    they were exhibiting signs of alcohol intoxication and

20    opioid use, or potential opioid overdose, would you only

21    treat the opioid symptoms?

22    A     Yes.

23    Q     You wouldn't treat anything for the alcohol

24    intoxication?

25    A     There is no antidote for alcohol intoxication.

1   Q    You wouldn't do anything to treat anything related to

2   the alcohol intoxication?

3   A    Well, and please be fair.  You understand that alcohol

4   intoxication is a very wide range of symptoms.  Nine times

5   out of ten, the drunk, homeless guy that gets brought to me

6   in the emergency department just gets a bed to go sleep it

7   off, and we do absolutely nothing.  So, you know, it depends

8   on what you mean.  And if someone is coming in with alcohol

9   and an opioid, we're most concerned about the opioid because

10  that's what can potentially cause death, not the alcohol.

11  Q    So if the hypoventilation is related to the alcoholism

12  and the opioids, you would only treat the opioids?

13  A    Right, because in that situation that you're

14  describing, the opioid is what's causing the

15  hypoventilation.  Hypoventilation and respiratory depression

16  are probably terms that could be used interchangeably.

17  Q    I believe you stated that you were able to rule out all

18  other causes with the exception of Fentanyl in this case; is

19  that correct?

20  A    Correct.

21  Q    You did so without touching a victim?

22  A    Correct.

23  Q    Looking at a body?

24  A    Correct.

25  Q    I believe it was also your testimony that the cocaine

1    use of the victim was not a problem in this case?

2    A    I didn't say it was not a problem.  I said it was not

3    the but for cause of death.

4    Q    So it had no impact in what he may or may not have been

5    experiencing?

6    A    What I said was that he was not displaying signs and

7    symptoms of sympathomimetic toxicity.

8    Q    I believe we also discussed a cutting agent that is not

9    FDA approved in the United States.  I'm not going to say

10   that drug name because I will say it incorrectly, but I

11   believe it starts with an L.

12   A    Well, truth be told, I may potentially be saying it

13   incorrectly as well.  There is a bit of discussion amongst

14   ourselves in toxicology whether it's levamisole or

15   levamisole.  So I won't hold you to it if you don't hold me

16   to it.

17   Q    So it was also your testimony that the presence of that

18   particular non-FDA approved drug was not problematic or

19   causational of any of the effects or symptoms that the

20   alleged victim in this case was experiencing?

21   A    Correct.

22   Q    And the alcohol intoxication was also not problematic?

23   A    Correct.

24   Q    The prosecutor had you look at a photo of some

25   bedsheets in this case, and I won't bring that photo back

1    up.  Did you examine those bedsheets yourself?

2    A    No.

3    Q    So you don't actually know what was on them, correct?

4    A    I did not examine the bedsheets.

5         MS. BECKETT:  If we could look at Government's

6    Exhibit 18.02.  If I could have you just look at the blood

7    Fentanyl.  If I could have you highlight that.

8    BY MS. BECKETT:

9    Q    Do you see where it says potentially toxic, greater

10   than .010 micrograms per liter?

11   A    Milligrams per liter, and yes, I see that.

12   Q    Are you aware of what the actual levels were in this

13   case?

14   A    .009.

15   Q    Less than that?

16   A    Yes.

17   Q    What does effective level mean on here?

18   A    I suppose by saying effective, that whoever created

19   this document is indicating some type of therapeutic level.

20   And as you can see from this range, this is what I was

21   saying before when I was asked about what the level would be

22   and I said I don't know.  That .0003 to .010 is a wide range

23   over a huge exponential number of numbers.  So I suspect

24   that in this particular case it is referring to what would

25   be considered therapeutic, and this is what we would say is

```
 1   a wide therapeutic index.  This is a huge range.
 2   Q    You don't have any other drug level on Mr. Kluyev, do
 3   you, other than the .0009?
 4   A    I'm sorry.  Can you repeat the question?  I'm not sure
 5   I understand what you're talking about.
 6   Q    There was not another drug level given for this
 7   Fentanyl, correct?  The only number we have is the .009.
 8   A    Right.  This was sent on femoral blood.
 9   Q    I believe your testimony earlier, you used the phrase
10   not so much when asked whether or not edema occurs with a
11   cocaine death.  Do you remember saying that?
12   A    Yes.
13   Q    But it has happened?
14   A    I was referring to the activity of the metabolites.
15   The cocaine is what is active.  The metabolites are not.
16   Q    I don't believe that answered my question.  I believe
17   what I asked you was has edema ever occurred with a cocaine
18   death?
19   A    Not that you see very frequently.  I can't say never
20   because there are situations where somebody who has
21   developed sympathomimetic toxicity and they may develop
22   acute heart failure because of the effects of the cocaine
23   could potentially develop pulmonary edema.  It's a different
24   kind of pulmonary edema from a different kind of mechanism.
25            MS. BECKETT:  Just a second, Your Honor.
```

```
 1                THE COURT:  Sure.
 2   BY MS. BECKETT:
 3   Q    Did you review a document titled Verdict of the Coroner
 4   in this case?
 5   A    Entitled what?
 6   Q    Verdict of the Coroner.
 7   A    I don't specifically recall a verdict of the coroner.
 8                MS. BECKETT:  Your Honor, if I may approach?
 9                THE COURT:  You may.
10                THE WITNESS:  Oh, okay.  Yes.
11   BY MS. BECKETT:
12   Q    You're familiar with that?
13   A    Yes.
14   Q    What was the determination of the coroner in this case?
15   A    It says that this death was due to multiple drug
16   intoxication.
17   Q    Thank you.
18                MS. BECKETT:  I have no further questions,
19   Your Honor.
20                THE COURT:  Thank you, Ms. Beckett.
21                Mr. Gadd, redirect?
22                MR. GADD:  Please.
23                        REDIRECT EXAMINATION
24   BY MR. GADD:
25   Q    There was a moment just a minute ago when you were
```

1    answering a question and you were cut off, and I did my best

2    to write it down.  I think the question was something like

3    can chronic drug use create sleep apnea.  It was the

4    question that didn't make a lot of sense.  Do you remember

5    that question?

6    A    Yes.

7    Q    Can you explain the rest of what you were going to say,

8    why it didn't make sense?

9    A    Well, sleep apnea is a disease entity just in and of

10   itself.  And there are individuals who may have morbid

11   obesity.  There may be individuals that have problems with

12   their brain centrally that can cause sleep apnea.  And so

13   these individuals who have absolutely nothing to do with

14   drug toxicity or anything, just a completely different

15   thing, require those masks at night called the CPAP masks

16   that you might see like on TV, and that pushes the air in.

17   And so these people do have a type of obstruction that

18   causes them to snore, and it is snoring, and this positive

19   pressure opens up the airway so that they don't have that

20   obstruction when they're breathing.

21        But there is nothing specific to suggest that a chronic

22   drug user, in general, is going to develop sleep apnea over

23   time.  That's not an appropriate causation discussion, which

24   is why I said that the question didn't make sense.

25   Q    There was some discussion about how in a rare

1   circumstance like if someone had a big piece of steak, I

2   think was your term, that got caught in their throat, that

3   could create an obstruction that might mimic some of these

4   other effects, correct?

5   A     Correct.

6   Q     That's something that's looked for in an autopsy,

7   right?

8   A     Right.

9   Q     You talk about your methodology, and autopsy surgeons

10  have a methodology.  They look for specific things like

11  that, correct?

12  A     Correct.  And there was no piece of steak or something

13  that was mentioned in the airways, which you would see in a

14  choking death.  Of course, in a choking death, you are going

15  to typically have history from the people surrounding the

16  patient that said we were at a restaurant and then suddenly

17  they grabbed their neck, and no matter what we did, we

18  couldn't relieve the obstruction and they stopped breathing

19  and they died.

20        The important thing as a physician is we take a

21  history, and we obtain data.  You don't just take one piece

22  of data in a vacuum.  You have to make a reasonable

23  conclusion what the diagnosis is.  And I make diagnoses

24  every single day, and cause of death is a diagnosis.  But I

25  don't have to cut people open from stem to stern to make a

1    diagnosis.  We take a history.  We have imaging studies.

2    And, of course, the history is the most important part of

3    coming up with a diagnosis.

4    Q    We've been looking at the toxicology results signed by

5    one of our prior witnesses, Mr. Bill Posey, who has a

6    bachelor's degree and a science major, although I can't

7    remember which.  In referring to those types of results,

8    you've said a phrase I want to ask you about, levels don't

9    mean much in a living patient, and I think you've said they

10   mean even less in a deceased patient.

11   A    Yes.

12   Q    Can you kind of explain why that's the case.

13   A    Yes.  This is an important thing to understand because

14   as we are all sitting here living, our heart is pumping, and

15   so our blood is mixing all around our body.  So it is

16   homogenous.  It should be the same.  So if I draw a drug

17   level from a scalp vein, or from your subclavian vessel

18   right here, or straight into your heart, or in your femoral

19   vessel, or in your toe vein, in a living person, those

20   numbers should all be close to the same within laboratory

21   error.

22        But in a dead person, the heart has stopped, and that

23   blood is no longer mixing.  And so the blood just pools in

24   the gravity locations.  That's lividity.  That's why

25   whenever you see pictures of dead bodies, they're purple on

the underside of their body, if they're laying on their back

of course.

So part of dying is the putrefaction process.  When you

die, your cells die and those cells burst open.  That's

called autolysis.  Whatever is inside those cells comes out

wherever it is.  So drugs don't just hang out in the blood.

They cross the blood-brain barrier into the brain.  They go

into tissue.  They go into fat.

So essentially wherever you draw blood in a dead

patient, using my prior example, like the scalp, or the toe,

or the heart, you're going to get different answers for that

number, which is part of the reason why you don't hang your

hat on the number.  Because if in this case Ruslan's femoral

level was .009, but if it had been drawn from somewhere

else, you might have had a completely different number.  You

could potentially have a wide range of numbers.  So that's

why it is not appropriate to rely on that one number, but

for sure that Fentanyl is there.

MR. GADD:  Nothing further.  Thank you.

THE COURT:  Thank you.

Recross, Ms. Beckett?

MS. BECKETT:  No further questions, Your Honor.

THE COURT:  Thank you.

Thank you.  You may step down.

We'll take our first break.  We'll be in recess

```
 1   for about 20 minutes.
 2            (Recess)
 3            You may call your next witness, Mr. Stejskal.
 4            MR. STEJSKAL:  The United States next calls
 5   Brennda Kurstin.
 6            THE COURT:  Come forward and be sworn, please.
 7   Stejskal.
 8                      BRENNDA KURSTIN,
 9            Having been duly sworn, was examined
10                 and testified as follows:
11            THE CLERK:  Please state your name and spell it
12   for the record.
13            THE WITNESS:  It's Brennda Kurstin.
14   B-r-e-n-n-d-a, K-u-r-s-t-i-n.
15            THE COURT:  Go ahead.
16            MR. STEJSKAL:  Thank you, Your Honor.
17                     DIRECT EXAMINATION
18   BY MR. STEJSKAL:
19   Q    Good morning, and thanks for coming.
20        Tell us a little bit about yourself.
21   A    My name is Brennda.  I don't know what I'm supposed to
22   say, just I work in the used car industry as an office
23   manager.
24   Q    And that's why you're here this morning, correct?
25   A    Correct.
```

```
 1   Q    Did you formerly work at a car dealership named IDrive?
 2   A    I did.
 3   Q    You no longer work there at this point?
 4   A    I do not.
 5   Q    What was the time frame in which you worked at IDrive?
 6   A    It was December of '15 until October of '18.
 7   Q    What were your duties at IDrive?
 8   A    I was office manager.  I did accounting, bookkeeping,
 9   and title work.
10   Q    And, again, what type of business is IDrive?
11   A    It is used car sales.
12   Q    So other than you as the office manager, and
13   bookkeeper, and accounting, who else worked there?
14   A    There's two owners, Nate Reynolds and Miles Penrose.
15   And then they had a few salesmen, some lot techs, mechanics,
16   just kind of your full auto body.
17   Q    In your duties as the office manager and bookkeeper,
18   did you help process and keep track of the paperwork that
19   went with used car sales?
20   A    Right, yep.
21          MR. STEJSKAL:  Let's pull up 16.11.
22   BY MR. STEJSKAL:
23   Q    Did you have a role in a sale of a vehicle from IDrive
24   to an individual by the name of Aaron Shamo?
25   A    I would have processed the title work for any vehicle
```

```
 1    sales and collected any documents from the salesmen.

 2    Q    Do you recall what kind of vehicle was sold in that

 3    particular transaction?

 4    A    We sold trucks, so an '11 F350.

 5    Q    Do you recall that?

 6    A    Well, I don't know the vehicle particularly.

 7    Q    Bur you recall processing the paperwork?

 8    A    Correct.  Yeah, I do.

 9    Q    And do you keep a file, then, with the paperwork in it?

10    A    Yes.

11    Q    And this document was part of that file?

12    A    It was.

13              MR. STEJSKAL:  Let's zoom back out, please.

14    BY MR. STEJSKAL:

15    Q    Generally, the numbers on right side of that document,

16    what do those numbers indicate?

17    A    That equals the sales price of the vehicle and any fees

18    associated with the vehicle purchase that we would collect

19    from the customer.

20    Q    You then were given documents to support the payments

21    of vehicles, correct?

22    A    Correct.

23              MR. STEJSKAL:  Let's next look at 16.12.

24    BY MR. STEJSKAL:

25    Q    Do you recognize these documents?
```

```
 1   A     I do.
 2   Q     What are they?  First talk about the top one that says
 3   Wells Fargo Bank.
 4   A     So that's the check from the customer to be part of the
 5   payment to the purchase of the vehicle.
 6   Q     And do you see the date on that?
 7   A     Yeah.  5-5-16.
 8   Q     Is that the date that the vehicle transaction took
 9   place?
10   A     It was.
11   Q     Give us the details of when the vehicle was coming in
12   and then going out.  Where did it come from and where did it
13   go?
14   A     So this truck we took in on trade.  So it came from a
15   customer, Roy Stevens, where we get a trade-in.  We get the
16   vehicle, we negotiate, you know, the trade-in price, and
17   then do the payoff.  This one was kind of an already
18   predetermined sale where the customer already had a buyer
19   for the vehicle.  So it was a pretty quick turnaround for
20   the trade-in.
21   Q     So what do you mean by the customer had a buyer for the
22   vehicle?
23   A     So he had a friend who was going to purchase the truck,
24   but we were just going to facilitate the sale so he could
25   get -- the initial person buying our truck would get sales
```

```
 1   tax credit for their trade-in.
 2   Q    And you mentioned the name Miles Penrose.  Who's
 3   Mr. Penrose.
 4   A    He was an owner of IDrive.
 5   Q    And did he know either of the individuals that were
 6   involved in this truck transaction?
 7   A    He did.
 8   Q    Who did he know?
 9   A    As far as I know, he knew both parties in the
10   transaction.
11   Q    You said the seller was a -- I just lost the name.
12   A    It's Roy Stephens.
13   Q    And the buyer was whom?
14   A    Aaron Shamo.
15   Q    So that Wells Fargo check at the top there, who's that
16   from?
17   A    That's from Aaron.
18   Q    And the amount?
19   A    14,000.
20   Q    Now that wasn't the full payment for the vehicle,
21   correct?
22   A    Correct.
23   Q    Do you recall the total purchase price of the vehicle?
24   A    I want to say it was almost 40,000.  I don't know the
25   exact price.  I'd have to go back to the contract.
```

```
 1              MR. STEJSKAL:  Let's go back to the previous page
 2    and look at 16.11.  Maybe blow up the figures on the side
 3    there.
 4              THE WITNESS:  Yeah.  So the total cost would be
 5    about 42,615.
 6    BY MR. STEJSKAL:
 7    Q    So 14,000 was partial payment for the vehicle?
 8    A    Correct.
 9    Q    And we saw a second check there.  What was that?
10    A    That's a check that was given to me by Miles Penrose
11    for an additional payment for the vehicle.
12    Q    So that also went towards the purchase price of the
13    vehicle?
14    A    Yes.
15    Q    And what did you learn about the circumstances of that
16    check?
17    A    Miles was giving me a payment because they had split
18    the purchase of a boat, and so those were the funds that he
19    owed Aaron for the money they received from the boat sale.
20    Q    So when you say they, it was Mr. Penrose and Mr. Shamo
21    had purchased a boat together?
22    A    Correct.
23    Q    And this was money from that?
24    A    Yes.
25    Q    Were there additional funds, then, applied to the
```

1    purchase of the vehicle?

2    A    Yes.  There was also a cash payment.

3         MR. STEJSKAL:  And let's look at 16.13.

4    BY MR. STEJSKAL:

5    Q    What is that?

6    A    So when I received cash for vehicle sales, I would make

7    a quick copy of it and sign it with the dates so that I

8    would know with the bank deposit, that that's where the cash

9    needs to be allocated, what vehicle was to be -- the

10   bookkeeping side would go to.

11   Q    So this is an amount of cash given to you by whom?

12   A    I was given it by Miles Penrose.

13   Q    And he got it from?

14   A    Aaron Shamo.

15        MR. STEJSKAL:  Let's go back to 16.11 again, and

16   highlight the numbers again, if you would.

17   BY MR. STEJSKAL:

18   Q    In line number 19 there, there's a line that says total

19   payments 18,200.  Do you see that?

20   A    I do.

21   Q    Now that's different from the check from Mr. Penrose,

22   which is 19,200; isn't that correct?

23   A    Correct.

24   Q    Tell us about the circumstances of that.

25   A    They wanted the cash payment to be less than 10,000.

```
 1   Q     So that was just recorded in that manner?
 2   A     Right.  They didn't update the contract.  It was
 3   just -- Miles just had let me know that he was going to
 4   write the check for a higher dollar amount.
 5   Q     After receiving the funds, both the two checks and the
 6   cash payment, what did you do to process the transaction?
 7   A     The checks and cash were deposited into the Chase Bank
 8   account that's under IDrive's name.
 9   Q     And then you watched to make sure the checks cleared?
10   A     Correct.  And then I just process the title paperwork
11   for the vehicle.
12   Q     So who drove the vehicle off the lot?
13   A     I wasn't there.  I assume the customer would drive it
14   off.
15   Q     Thank you.
16         MR. STEJSKAL:  That's all the questions for this
17   witness.
18         THE COURT:  Thank you.
19         You may cross-examine.
20         Mr. Sam.
21                      CROSS-EXAMINATION
22   BY MR. SAM:
23   Q     I just have a couple of questions.
24         So any decisions you made as far as having to account
25   for this, was that given to you by the owners, or where did
```

```
 1  that come from?
 2  A    Right.  That was by Miles Penrose.
 3  Q    And the customer wouldn't have given you any
 4  instruction on how to account for that?
 5  A    Correct.  I was given that instruction by Miles.
 6  Q    Okay.
 7            MR. SAM:  I have no further questions.
 8            THE COURT:  Thank you.
 9            Any redirect?
10            MR. STEJSKAL:  No, Your Honor.
11            THE COURT:  Thank you.  You may step down, and you
12  may be excused.
13            You may call your next witness.
14            MR. STEJSKAL:  The United States would next call
15  Special Agent Jeff Fletcher.
16            THE COURT:  Come forward and be sworn, please.
17                      JEFF FLETCHER,
18            Having been duly sworn, was examined
19                   and testified as follows:
20            THE CLERK:  Please state your name and spell it
21  for the record.
22            THE WITNESS:  My name is Jeff Fletcher.  J-e-f-f.
23  Fletcher, F-l-e-t-c-h-e-r.
24  //
25  //
```

                          DIRECT EXAMINATION

BY MR. STEJSKAL:

Q     Your occupation, please?

A     I'm a special agent with IRS Criminal Investigations.

I guess I don't need to tell you what IRS stands for.

Q     Describe for us your educational background.

A     I have a bachelor's degree in international finance

from Brigham Young University.

Q     And what training did you receive to become an

investigator with the IRS?

A     As a special agent with IRS, we attend the Federal Law

Enforcement Training Center.  We do two and a half months of

basic law enforcement training, which includes firearms,

defensive tactics, doing general investigations.  A lot of

other agencies attend that first part.

      The second part of our training includes financial

investigations.  We investigate crimes like money

laundering, tax evasion structuring.  If a crime involves

money, we would investigate it.

      Training at the Federal Law Enforcement Training

Center, we are taught about the statutes pertaining to the

financial crimes we investigate.  We learn to follow the

money, how to track and trace proceeds of the illegal

activity, how to reconstruct income using various methods,

using bank account records, using net worth and assets, and

1    also via cash expenditures.

2    Q    Do you have any specific certifications with regard to

3    your training and investigative duties?

4    A    Yes, I do.

5    Q    What would that be?

6    A    I'm a certified anti-money laundering specialist, a

7    member of CAMs.

8    Q    Tell us about your experience as a financial

9    investigator with the IRS.

10   A    Yeah.  I've been a special agent with IRS Criminal

11   Investigations for 24 years.  Part of that, actually, I was

12   a tax auditor.  So I audited businesses.  But as a special

13   agent with IRS Criminal Investigations, for the last 20

14   years I have been investigating organized crime, drug task

15   force cases, working mostly with the DEA, Homeland Security,

16   FBI.  And now I've even expanded my horizons.  I'm working

17   with U.S. Postal and FDA on this case.

18   Q    And generally speaking here first, tell us about your

19   duties with IRS.  What types of things do you do to conduct

20   these investigations?

21   A    We look at the money.  We look at financial records.

22   We look at assets.  We look at cars, houses purchased.  You

23   know, we follow the money two different directions.  We can

24   follow -- in a drug situation, we can follow the drugs

25   sometimes to the cash obtained from the drugs.  But

```
 1   oftentimes we can't do that, so we look at assets and we
 2   follow the assets, which might lead to the drugs too.
 3   Q    In your capacity as a special agent with the IRS, did
 4   you become involved in this investigation of Aaron Shamo and
 5   others?
 6   A    Yes, I did.
 7   Q    What was your specific role in this investigation?
 8   A    The financial investigation aspects of the case,
 9   looking at bank accounts, financial transactions.  In this
10   case it was obviously cryptocurrency.  Looking at assets,
11   cars, any assets that were purchased and any cash that was
12   seized.
13   Q    Through your extensive training and many years of
14   experience, did you become familiar with the terms used in
15   investigating money laundering and financial offenses?
16   A    Yes, I have.
17   Q    Let's define a few of those terms so everybody
18   understands what we're talking about when we get into this.
19   First the term money laundering, can you tell us what money
20   laundering is?
21   A    Yeah.  Basically it's taking money that is dirty money
22   from illegal activity and a process of conducting financial
23   transactions to make that money appear to be clean.  A lot
24   of times you'll have a large amount of cash.  You go in and
25   plop that cash down to buy a house, the bank is going to ask
```

```
 1   you questions.  So you want to make that money look like
 2   it's come from a legitimate source.
 3   Q    Are you familiar with the term promotion --
 4   A    Yes, I am.
 5   Q    -- in the aspect of money laundering and financial
 6   investigations?
 7   A    Yes.
 8   Q    Explain for the jury the term promotion.
 9   A    A promotion is basically taking proceeds from an
10   illegal activity, drug distribution, and using that money to
11   keep the business going.  It could be purchasing more drugs.
12   It could be paying an employee to make shipments for you.
13   It could be -- let's see -- paying rent on a house that
14   you're using to store drugs, paying a phone bill on a phone
15   that you use to make communications with other people in the
16   organization.  So anything that keeps that drug organization
17   moving.
18   Q    Are you familiar with the term concealment?
19   A    Yes, I am.
20   Q    Can you explain that term for us?
21   A    Concealment is where -- there's three terms we use.
22   It's placement, layering, and integration.  In concealment,
23   what the individual who has money from illegal activities
24   wants to do is try to distance themselves from those illegal
25   funds.  They don't want people to know that the funds came
```

1    from illegal activity.  So they try to conduct multiple

2    transactions to distance themselves.  They may use

3    transactions with nominee names, with other individuals.

4    They may set up bank accounts with other people's names.

5    They may conduct several transactions in several different

6    bank accounts.  So the further they can get from that money,

7    the better for them, so that law enforcement doesn't detect

8    that this money is from illegal proceeds.

9    Q    Are you familiar with the term specified unlawful

10   activity, or SUA?

11   A    Yes, I am.

12   Q    Explain that term for the jury.

13   A    That's a list of codified crimes that are considered

14   crimes for the purposes of money laundering.  There's -- not

15   every crime is a crime for money laundering.  There's wire

16   fraud.  There's drug distribution.  Tax evasion isn't one of

17   those crimes that is a specified unlawful activity.  So

18   there's a specific list of those crimes.

19   Q    And many of those involve controlled substance

20   offenses, correct?

21   A    Yes, they do.

22   Q    Are you familiar with the term financial transaction?

23   A    Yes, I am.

24   Q    Tell us what that means.

25   A    A financial transaction is just a movement of funds.

1    Movement of funds could be depositing cash into a bank

2    account.  It could be paying an individual for a car, paying

3    an individual for work.  That's pretty much a financial

4    transaction.

5    Q    How about the term financial institution?

6    A    Yeah.  Financial institution is actually codified.  In

7    Title 31 5312(a), there's a list of businesses that are

8    considered financial institutions.

9         First of all, we all think of a bank.  A bank is a

10   financial institution.  But that also talks about car

11   dealerships, businesses that sell vehicles, jewelry shops,

12   real estate agencies.  Those are all considered financial

13   institutions for purpose of money laundering.

14   Q    Just by law that's how the --

15   A    By law, yes.

16   Q    How about the term interstate commerce or affecting

17   interstate commerce?

18   A    Yeah.  Interstate commerce is business from one state

19   to the other, so it affects multiple states.  For example,

20   banks are FDIC insured, and transactions in one -- and

21   they're chartered in multiple states.  Like Wells Fargo is

22   chartered in various states.  So to place or deposit funds

23   into Wells Fargo, for example, does affect interstate

24   commerce because you can wire funds through the bank --

25   through Wells Fargo from one bank in, say, Utah to a bank in

1   California.

2   Q    So those are our terms.

3        How did you become involved, then, in the investigation

4   of Aaron Shamo and his associates?

5   A    I was called by one of the agents of the DEA, and he

6   told me that they were looking at this organization and that

7   there potentially could be some money involved.

8   Q    And did you learn what type of operation they were

9   running as far as selling drugs on the street versus selling

10  drugs in a different way?

11  A    Yeah.  We learned that Mr. Shamo owned a storefront on

12  AlphaBay, known as Pharma-Master, and that this was an

13  online storefront that sold pills.

14  Q    And were you able to determine in what type or what

15  form payment was received in that market?

16  A    Yeah.  AlphaBay received funds in a cryptocurrency

17  known as Bitcoin.

18  Q    Tell us about Bitcoin.  What is that?

19  A    Bitcoin -- I've learned quite a bit over the last

20  couple years about Bitcoin.  But Bitcoin is a cryptcurrency.

21  It's a decentralized currency.  When you think of the U.S.

22  dollar, that's backed by the U.S. government.  Cryptcurrency

23  isn't.  It's a decentralized cryptcurrency and it involves

24  two different keys, a private key and a public key.  The

25  public key is like a wallet.  You have your money.  The

```
 1   private key -- I think it was explained by
 2   Special Agent Gino -- is kind of like the PIN number to your
 3   debit card and so not everybody can see that.  It's private.
 4   Q    We'll get into that more in a little bit.
 5        In the initial part of your investigation, did you
 6   locate a wallet connected with the AlphaBay account that was
 7   attributed to Aaron Shamo?
 8   A    Yes, I did.
 9   Q    How did you find that wallet?
10   A    Yeah.  On January 14th, 2017, myself and
11   Special Agent Keys went and talked to Mr. Aaron Shamo's
12   landlord.  Shamo was living at -- had been living at 7939
13   Titian Way in Cottonwood Heights.  So we interviewed his
14   landlord.
15   Q    And were you given a document of an exchange between
16   Mr. Shamo and the landlord, Mr. Lapin?
17   A    Yeah, we were.  We were given an e-mail that was sent
18   to Mr. Lapin by Mr. Shamo that talked about his source of
19   income to be able to pay the rent, and that e-mail also
20   included his Bitcoin wallet.
21   Q    Let's look at Exhibit 21.18, the second page of that.
22   Can you identify that for us, please?
23   A    Yes.  That is the e-mail.
24   Q    Who is the e-mail from?
25   A    It's from airshamu4@hotmail.com.
```

1    Q     Who is it to?

2    A     Jeremylapin@hotmail.com.

3    Q     You just talked about identifying a Bitcoin wallet.

4    How did you do that from this document?

5    A     Well, we identified it because it's in the e-mail.

6    Mr. Shamo is saying, hey, here's our incoming Bitcoin

7    wallet.  Any profits made come here first, then

8    distrusted -- I think he meant distributed -- to investors,

9    my two employees, and myself.  And then it's got the wallet

10   address beginning in 1Hmo and ending in kdq.  It also said

11   it should come up as U.S. dollars, but if it's not, then it

12   will say.

13   Q     Well, that looks like a link, that yellow line down.

14   So what does that link to?

15   A     The blue -- yeah.  That's the link to his Bitcoin

16   address.

17   Q     So by clicking on that, the landlord could see some

18   information that relates to a Bitcoin wallet?

19   A     Yes.

20   Q     What's the date on that e-mail?

21   A     It's November 13th, 2015.

22   Q     Based on your investigation, was that around or just

23   before the time that Mr. Shamo moved into that Titian Way

24   house?

25   A     Yes, it is.

1  Q    Looking at that Bitcoin wallet number that you've

2  identified, starting at 1Hmo, did that have further

3  significance in your financial investigation?

4  A    Yes.  That was the Bitcoin wallet that was used to

5  receive funds from the AlphaBay's Darknet market store,

6  Pharma-Master.

7  Q    Let's talk specifically, then, about that Pharma-Master

8  store and that wallet.  Were you present when there was a

9  spreadsheet of sales and income from Pharma-Master kind of

10  showing the money that was coming in?

11  A    Yes, based on the feedback.

12  Q    Let's look at Exhibit 15.02.A.  Do you recognize that?

13  A    Yes, I do.

14  Q    How does that relate to your financial investigation?

15  A    It shows that there were -- this is based on

16  feedback -- 5,589 transactions.  The revenue was over

17  $2.8 million.

18  Q    And was part of your financial investigation to track

19  or trace money to either find it still in existence or

20  figure out where it went or where it came from?

21  A    That's what we try to do, yes.

22  Q    You testified that the Pharma-Master account was set up

23  to receive money in Bitcoin, correct?

24  A    Yes.

25  Q    Is Bitcoin easy to spend?

```
1   A    Not really.  I mean, most places don't take Bitcoin for

2   transactions.  I know you can buy a Tesla with a Bitcoin.

3   But generally speaking, no.  It's a little more difficult to

4   spend.

5   Q    To be clear, there are some businesses that do accept

6   Bitcoin?

7   A    There are a few, yes.

8   Q    Does converting Bitcoin to cash make it easier to

9   spend?

10  A    Yes, it would.

11  Q    Explain that.

12  A    I mean, most people take cash.  Cash is U.S. dollars

13  currency.  Unless you spend a large amount, no one is going

14  to question small dollar amounts of cash.  It's widely

15  accepted everywhere pretty much.

16  Q    Does converting Bitcoin to cash also assist in

17  concealing the source of the funds?

18  A    Yes, it does.

19  Q    Explain that, please.

20  A    Well, converting Bitcoin to cash -- it depends on how

21  the Bitcoin is converted obviously.  But once you take

22  Bitcoin -- there's a blockchain so it can be followed to a

23  degree.  But once you convert that Bitcoin into cash, it's

24  hard to follow the cash.  Cash is what we call fungible.

25  It's indistinguishable.  It's -- I mean, you can't really
```

1    tell one dollar from another.  You can't follow it.  So it's

2    difficult to follow cash.

3    Q    You talked about converting Bitcoin to cash.  What are

4    the ways in which one can convert Bitcoin into cash?

5    A    Yeah, there's three ways.  The first is the commercial

6    online Bitcoin exchanges.  A couple of those are Bitstamp

7    and Coinbase.  Those are regulated.  There's paperwork.

8    There's a paper trail.  It's pretty easy to convert Bitcoin

9    through those exchanges.

10   Q    And the fees for those?

11   A    The fees are about one to two percent.  Not too high.

12   Q    You said there are three ways.  That was one.  What

13   else?

14   A    The other way is the peer to peer Bitcoin exchange.  I

15   think it's been talked about, LocalBitcoins.com.  Peer to

16   peer is where a person that has Bitcoin wants some cash, or

17   vice versa, and so they meet up.  There's been testimony

18   where individuals -- Mr. Crandall would have cash and would

19   meet with individuals that had Bitcoin that wanted to

20   purchase the Bitcoin.  So they would just make that

21   exchange.  In those situations, there is no paper trail.

22   Q    Explain that a little better.  What do you mean by

23   there is no paper trail?

24   A    There's no -- like Bitstamp, the money goes through an

25   exchange.  We can follow that money.  But when an individual

1    meets another person on the street and they exchange Bitcoin

2    for cash, there's no way we know who provided the Bitcoin,

3    who provided the cash.

4    Q    So it's anonymous?

5    A    It's anonymous, yes.

6    Q    And you said there were three methods.  What was the

7    other one?

8    A    The other one is the Bitcoin ATMs.  It's an ATM.  There

9    is a paper trail with the Bitcoin ATMs.  Probably less than

10   the online commercial Bitcoin exchanges who are regulated,

11   but there's still a paper trail.

12   Q    Did Mr. Shamo use any of these particular conversion

13   methods to exchange his Bitcoin for cash?

14   A    He used the peer to peer.  He used LocalBitcoins.com.

15   He met individuals on the street.  Mr. Crandall also met

16   people on the street and converted the Bitcoin to cash so

17   they could spend it.

18   Q    And based on your investigation, were large amounts

19   converted?

20   A    Yes.

21   Q    What kind of amounts?

22   A    Millions.  I mean over a million.

23   Q    Did agents ultimately end up seizing large amounts of

24   cash?

25   A    Yes, they did.

1    Q    Let's look at Exhibit 13.09, photo number five.  What

2    is that?

3    A    That's the picture of cash in Mr. Shamo's dresser

4    drawer that was seized during the search warrant on

5    November 22nd, 2016.

6    Q    And do you recall approximately how much money was

7    seized on that date from Mr. Shamo's residence?

8    A    It was over $1.2 million.  The cash was located in two

9    dresser drawers, two safes, and a nightstand.

10   Q    Do you recall some testimony about Mr. Shamo informing

11   agents about trading in his Bitcoin for cash right around

12   that time?

13   A    Yes.  When Mr. Shamo was arrested, he told agents that

14   he had just recently exchanged about 700 -- in excess of

15   $700,000 of Bitcoin for the cash.

16   Q    Is the conversion of Bitcoin to cash considered a money

17   laundering transaction?

18   A    It is.

19   Q    Explain that for us.  Why is that?

20   A    It's a financial transaction.  It's with U.S. currency.

21   So it's basically -- and it depends on how they're doing it,

22   but if it's a peer to peer, it's Bitcoin for cash.  It's a

23   transaction with proceeds from illegal activity with the

24   intent to either conceal or disguise the proceeds.

25   Q    Was there also a sum of cash seized or turned over in

1    Arizona in March of 2017?

2    A    Yes, there was.

3    Q    Let's look at Exhibit 16.04, photo number four.  Can

4    you identify that for us?

5    A    Yeah.  That is approximately $429,000 cash that was

6    turned over voluntarily by Mike and Rebecca Shamo to U.S.

7    Postal Inspector Andrea Brandon.

8    Q    And is that evidence of a money laundering transaction?

9    A    It is evidence of money laundering, yes.  And the

10   statement attached to the consent form said that this money

11   was hand delivered by Aaron Shamo to them.

12   Q    And how is that significant in your investigation of

13   Mr. Shamo as far as money laundering?

14   A    It shows that Mr. Shamo obtained the cash.  We know

15   that his source from the online store was cryptocurrency.

16   So it obviously had to be converted into cash.

17   Q    Was there also a sum of money obtained from a Luke Paz?

18   A    There was.

19   Q    Let's look at photo 16.16.  What is that?

20   A    It's a bag of cash.

21   Q    And was that the cash that was obtained from Mr. Paz?

22   A    Yeah.  Mr. Paz turned over cash on two occasions in

23   August of 2018.  One amount was approximately $671,000, and

24   the other amount was approximately $134,000.

25   Q    Did you do any research on Aaron Shamo to determine if

1   he had other sources of income other than the Pharma-Master,

2   AlphaBay website?

3   A   Yes.  I looked at his employment to see if he had a

4   legitimate job.

5   Q   How did you do that research?

6   A   I pulled up the Utah Department of Workforce Services

7   database.

8   Q   What is the Department of Workforce Services?

9   A   It's a database.  If someone is employed and working

10   and receiving wages in the State of Utah, this database has

11   your quarterly wages and amounts of those wages.

12   Q   Am I on there?

13   A   Are you?  Yeah.  You get paid by the government.  It's

14   in Utah.

15   Q   It keeps track of everybody?

16   A   Yes.  If you're working, getting a wage in Utah, you

17   should be on that database, yes.

18          THE COURT:  What's the relevance of your being on

19   there?

20          MR. STEJSKAL:  I was just curious.  I didn't know

21   anybody was keeping track of me.

22          THE WITNESS:  I can pull you up.  But I can't pull

23   your tax returns.

24   BY MR. STEJSKAL:

25   Q   Let's look at Exhibit 16.10.  Can you identify -- I

```
 1    guess page two.  Can you identify that for us, please?

 2    A    Yeah.  That is a certified copy of the Workforce

 3    Services for Mr. Aaron Shamo.

 4    Q    And the time period on that appears to be what?

 5    A    The date that I did the pull or --

 6    Q    The time period covered from the Workforce Services

 7    report.

 8    A    It looks like the second quarter of 2009 through the

 9    first quarter of 2015.

10    Q    And when did you run this report?

11    A    You'd have to let me see the bottom of the page so I

12    can remember that.  Let's see.

13    Q    Let me just ask it this way.  Did you run it after

14    Mr. Shamo was arrested?

15    A    Yeah.  It was November or December of 2017 -- or 2016.

16    Excuse me.

17    Q    There's a date on the screen now.

18    A    Oh, that's the certified copy, yeah.  The certified

19    copy is 12-24, 2018.  I actually ran it prior to that.

20    Q    You ran it in the course of your investigation in 2017?

21    A    Yes.

22    Q    So does that account for all income through the time of

23    his arrest in late 2016, November of 2016?

24    A    That accounts for all of the wages that he received in

25    the State of Utah, from employers in the State of Utah.
```

1    Q    And what does this report indicate as far as income for

2    Mr. Shamo?

3    A    The relevancy is that it shows that he was receiving

4    wages from eBay starting the third quarter of 2013, and that

5    his last wage was from eBay in the first quarter of 2015 in

6    the dollar amount of $1,573 for that quarter.

7    Q    No legitimate income reported after that?

8    A    No.

9    Q    Let's talk about a few specific transactions, then,

10   that Mr. Shamo was involved in.  Let's first talk about a

11   transaction with IDrive on May 5th of 2016.  Are you

12   familiar with that transaction?

13   A    Yes, I am.

14   Q    Let's look at Exhibit 16.11.  Can you identify that for

15   us?

16   A    Yeah.  That's the retail sales agreement Ms. Kurstin

17   just spoke about.  It's the purchase of a 2011 Ford F350

18   from IDrive, Utah.

19   Q    And the purchaser name there at the top?

20   A    Aaron Shamo.

21   Q    Let's look at 16.12.  What do you see on that page?

22   A    Two checks.  One from Wells Fargo Bank -- that's the

23   bank account ending in 4284, which is Aaron Shamo's bank

24   account -- in the amount of $14,000 to IDrive.  The other

25   check is a check from Mr. Shamo's friend, Miles Penrose, in

```
 1   the amount of 19,200.
 2   Q    And then 16.13 that you saw with Ms. Kurstin also
 3   showed some cash that was involved in this transaction?
 4   A    Yes.  $9,420 in cash.
 5   Q    Let's go back to 16.12, specifically referring to the
 6   check from Mr. Shamo there.  What bank did that come from?
 7   A    Wells Fargo Bank.
 8   Q    Did you do any investigation into accounts by
 9   Mr. Shamo?
10   A    Yes.  I found that he did have a Wells Fargo bank
11   account ending in number 4284.
12   Q    And that was what this check was written from?
13   A    Yes, it was.
14   Q    Let's look at Exhibit 16.21 and talk about your review
15   of Mr. Shamo's account.  What is this?
16   A    That's a summary of the deposit items into Mr. Shamo's
17   bank account at Wells Fargo.
18   Q    Looking at or around the date of May 5th when this
19   truck was purchased, are there any items that stand out to
20   you around that time?
21   A    Yeah.  Can you go to that page?  Actually that's the
22   wrong year.
23   Q    Sorry.  20 --
24   A    16.
25   Q    -- 16.
```

1    A    May of 2016.

2    Q    Page four.  I'm sorry.

3    A    Yes.  So on 5-4, 2016, there was a cash deposit in the

4    amount of $7,500.  And on May 5th, 2016, there's another

5    cash deposit in the amount of $5,000 just prior to the check

6    being written for $14,000.

7    Q    So cash is being deposited into that bank account in an

8    amount enough to cover that check that was written to

9    IDrive, correct?

10   A    Correct.

11   Q    What is the monetary transaction, then, as it relates

12   to IDrive and the purchase of that F350 truck?

13   A    It's the check for the $14,000 from Mr. Shamo's bank

14   account to IDrive.

15   Q    And what's the financial institution involved in that

16   transaction?

17   A    Wells Fargo is the financial institution that the bank

18   was -- that the check was written from.

19   Q    And the effect on interstate commerce?

20   A    Again, Wells Fargo is FDIC insured.  They're chartered

21   in various states, so you can send wires from state to

22   state.  So that affects interstate commerce.

23   Q    And the check was for 14,000.  Is there anything

24   significant about that amount?

25   A    It's over $10,000.

```
 1    Q    And why is that significant?
 2    A    Because the statute 18 U.S.C. 1957 requires a monetary
 3    transaction with a financial institution in an amount over
 4    $10,000.
 5    Q    Did you do some further examination of Mr. Shamo's bank
 6    account?
 7    A    Yes, I did.
 8    Q    Let's look at Exhibit 16.21.  Can you identify that for
 9    us, please?
10    A    Yeah.  It's another summary of his bank account.  It
11    shows money coming in and also funds being expended out of
12    that account.
13    Q    Give us a summary of that.  What did you determine from
14    this examination of Mr. Shamo's bank account?
15    A    First of all, on the deposit side, I analyzed the
16    deposits from the date of February of 2016 through November
17    of 2016, and I found that there were approximately 55 cash
18    deposits into the account totaling just over $88,000.
19    Eleven of those cash deposits were deposited in out of state
20    banks.
21    Q    What kind of states, if you recall?
22    A    There was California, Florida, Maryland, North
23    Carolina.
24    Q    And could you tell from the bank statement and your
25    research what funds from this account, what kind of things
```

1  they were used to pay for?

2  A    Yeah.  A lot of the funds went to pay Venmo.  There

3  were wires to MoneyGram, wires to Western Union, and also

4  wires to debit card purchases to the U.S. Postal Service.

5  Q    And also to IDrive?

6  A    And then the check to IDrive, yes.

7       There was also a check in the amount of $23,000 to the

8  IRS.

9  Q    He didn't have any reported income on the Workforce

10 Services?

11 A    Correct -- well, he had -- in 2015, he had $1500.

12 Q    Did you search for other accounts of Mr. Shamo?

13 A    I did search for other accounts, yes.

14 Q    And what results?

15 A    I didn't find any.  There was a savings account

16 attached to this with minimal activity, but no other bank

17 accounts for Mr. Shamo that I found.

18 Q    So this appeared to be, from your research, the primary

19 account activity?

20 A    Yeah.  There was an E-Trade account, Ameritrade

21 account -- stock account also that I found.

22 Q    Let's shift gears for a minute and talk about Drew

23 Crandall.  Are you familiar with Drew Crandall from the

24 investigation?

25 A    Yes, I am.

```
 1    Q    Are you aware that he was part of Mr. Shamo's drug
 2    tracking organization?
 3    A    Yes, I am aware of that.
 4    Q    Did you investigate his finances?
 5    A    I did.
 6    Q    Tell us about that investigation.
 7    A    I found that Mr. Crandall had a bank account at America
 8    First Credit.  As I was going through his account, I found
 9    some deposits from Bitstamp, which is one of those
10    commercial online Bitcoin exchanges.  I found some cash
11    deposits also.  It seemed like in 2015 there was probably
12    about 11 to $12,000 worth of cash deposits in his bank
13    account.
14    Q    Did you also search for other accounts with regard to
15    Mr. Crandall?
16    A    I did.
17    Q    Any other accounts found?
18    A    No.
19    Q    So did you review the account, then, that you just
20    referred to?
21    A    I did.
22    Q    Did you obtain a bank statement for that account?
23    A    Yes.  I obtained bank statements for that account for
24    three years.
25    Q    Let's look at 16.22.  Can you identify that for us,
```

1   please?

2   A    It looks like a bank to bank transfer in the amount of

3   $3,013.

4   Q    I'm not talking about the yellow line, just generally

5   what the document is.

6   A    Okay.  You threw me off there.

7        Yeah, that's his America First Credit Union bank

8   statements.

9   Q    From your analysis, describe the money flow as you kind

10  of reviewed the bank account and what was going in and what

11  was going out.

12  A    For Mr. Crandall's bank account, really I saw

13  occasional, sporadic cash deposits.  I was really looking at

14  the dates of November 2016 -- excuse me, November, December

15  of 2015 through November of 2016.  One thing I did see was

16  the wires in from Bitstamp and some cash deposits.

17  Q    Let's talk more generally now.  Were you present when

18  Mr. Crandall testified as to his financial activity?

19  A    Yes, I was.

20  Q    And as you reviewed this bank statement, is it

21  consistent with Mr. Crandall's testimony?

22  A    It is.

23  Q    You said you identified some transactions associated

24  with Bitcoin.  Are you familiar with Bitstamp?

25  A    Yes.

1    Q     What's Bitstamp?

2    A     Bitstamp is one of those commercial online Bitcoin

3    exchanges where there is an actual paper trail.

4    Q     Are there Bitstamp transactions associated with

5    Mr. Crandall's account?

6    A     There are.  There's three -- actually four.  Three

7    during this time frame of December to November --

8    December 15th through November 2016.

9    Q     Let's look first at Exhibit 16.05.  Can you identify

10   that for us?

11   A     Yes.  That is a wire transfer from Bitstamp on

12   April 19th, 2016 in the amount of $3,013.

13   Q     Do you recall the circumstances of that, according to

14   Mr. Crandall?

15   A     Yes.  Backing up a little bit, Mr. Crandall stated that

16   when he decided to leave to travel abroad with his

17   girlfriend, he wanted to be bought out of the drug business

18   with Mr. Shamo.  They negotiated an amount of $40,000.

19        Mr. Crandall stated that prior to leaving, he was

20   provided Bitcoin from Mr. Shamo in the dollar equivalent of

21   about $20,000.  He said that he would get amounts -- Bitcoin

22   amounts of about $10,000.  He would meet with people on the

23   street.  He would convert that Bitcoin into the cash.  He

24   would keep $5,000 and he would give $5,000 to Mr. Shamo.  He

25   basically -- he did say I was helping him launder money.

1          He did that four different times from September through

2    November when he left the States.  So he was able to get

3    approximately $20,000 of the $40,000 that was owed to him

4    before he left the country.

5    Q    So he was still owed money when he left the country?

6    A    He was still owed $20,000.

7    Q    So tell us about this specific transaction from April

8    of 2016.

9    A    So Mr. Crandall in his testimony stated that this 3,013

10   was part of Mr. Crandall cashing in the Bitcoin that he had

11   received from Mr. Shamo in April of 2016.

12   Q    Are you familiar with the term tumbler?

13   A    Yes.

14   Q    What's a tumbler?

15   A    A tumbler is a way to anonymize or basically cut the

16   trail of the blockchain, which makes it difficult to follow

17   the movement of the Bitcoin.

18   Q    And did Mr. Crandall indicate that the money was sent

19   through a tumbler?

20   A    Yeah.  Mr. Crandall stated that when he received the

21   Bitcoin from Mr. Shamo, Mr. Shamo ran it through a tumbler

22   and then into his Bitcoin account.

23   Q    So that was the first.  You said there were three, I

24   believe, in this time period.

25          Let's next look at Exhibit 16.06.  Can you identify

1    that for us, please?

2    A    Yeah.  That is a deposit on August 4th, 2016 in the

3    amount of $5,343 from Bitstamp into Mr. Crandall's America

4    First Credit Union account.

5    Q    Do you recall from Mr. Crandall the circumstances of

6    that money?

7    A    Yeah.  He said that that dollar amount actually

8    consisted of two things.  It consisted of part of the

9    Bitcoins that he received as a payout prior, and then also

10   it consisted of approximately $22,400, which represented his

11   wages for working for Mr. Shamo doing customer service

12   support for Pharma-Master in the month of July, which is

13   when Mr. Crandall stated that he started working again for

14   Pharma-Master.

15   Q    So does this payment from Mr. Shamo to Mr. Crandall

16   constitute a money laundering transaction?

17   A    Yes, it does.  It constitutes promotion money

18   laundering.

19   Q    Explain that.  Why is that?

20   A    Because Mr. Crandall was working for Mr. Shamo.  He was

21   doing customer service on his storefront, on AlphaBay, known

22   as Pharma-Master.  So this is payment for him to do the

23   customer service, to actually answer questions and help

24   people with issues that they had on their pill purchases.

25   Q    You mentioned a third Bitstamp transfer.  Let's look at

1    16.07.  Would you identify that for us, please?

2    A    Yeah.  That is a deposit on September 22nd, 2016 in the

3    amount of $2,508 into Drew Crandall's America First Credit

4    Union bank account.

5    Q    And what did you learn about that amount of money being

6    transferred from Mr. Shamo to Mr. Crandall?

7    A    Mr. Crandall stated that that was, again, payment for

8    his wages for working as customer service on Pharma-Master

9    for the prior month, which would have been the month of

10   August.

11   Q    Does this transaction also constitute money laundering,

12   in your professional opinion?

13   A    Yes, it does.

14   Q    Explain.

15   A    It is a payment and promotion of the illegal activity

16   with funds that were derived from Bitcoin through

17   Pharma-Master.

18   Q    Did you go back, then, and look at Mr. Crandall's

19   account statement to show that these funds actually came

20   through that America First account?

21   A    I did.

22   Q    Did you verify all three of those transactions?

23   A    Yes.

24   Q    Did you also look into cash deposits of Mr. Crandall's

25   account?

```
 1   A     Yeah, I did look at the cash deposits.

 2         One thing that I was curious about was Mr. Crandall was

 3   busy traveling the world with his girlfriend, but there were

 4   cash deposits into his bank account while he was gone.  So I

 5   wanted to know who was making those cash deposits.

 6   Q     What did you do to investigate those deposits?

 7   A     I contacted America First and asked if I could get

 8   photo images of all the deposits that were being made into

 9   the account so I could find out who was doing that.

10   Luckily, they keep those images for 90 days, so I barely

11   made that cutoff.

12   Q     What did you then receive from America First?

13   A     I received two photo images of transactions that show

14   individuals making deposits into Drew Crandall's America

15   First Credit Union account.

16   Q     Let's look first, then, at Exhibit 16.09.  Identify

17   that for us, please.

18   A     Yeah.  That's a picture of Mr. Shamo making a deposit

19   into Drew Crandall's bank account at America First Credit

20   Union.  It says the Cottonwood branch, which is not far from

21   Mr. Shamo's house.

22   Q     In addition to the photo, did you obtain anything else

23   from America First that showed that this monetary

24   transaction actually occurred?

25   A     I got the financial statements that show the dollar
```

```
 1    amount.
 2    Q    Did you get the deposit slip?
 3    A    Yes.
 4    Q    And did that show that amount being deposited into
 5    Mr. Crandall's account?
 6    A    It did.
 7    Q    And you said you also got the bank statement?
 8    A    Yes.
 9    Q    Can we look at Exhibit 16.22.
10    A    It's not the yellow.
11    Q    Our date here is November 8th of 2016.
12         Let me scroll down a couple of pages.
13         What do you see on this page?
14    A    It shows a deposit at the Cottonwood Heights branch for
15    $2,700.
16    Q    Does that match the information on the photograph that
17    we just observed?
18    A    Yes, it does.
19    Q    Based on your investigation of Mr. Shamo's drug
20    trafficking organization, how did Mr. Shamo obtain that cash
21    that he deposits into Mr. Crandall's account?
22    A    Based on my investigation and testimony, he obtained
23    that cash by converting the cryptocurrency Bitcoin, meeting
24    individuals with cash, and exchanging his cryptocurrency for
25    cash.
```

1    Q    Did you learn from Mr. Crandall what that $2700 payment

2    was for?

3    A    Yeah.  Mr. Crandall stated in his testimony that that

4    $2700 cash deposit made by Mr. Shamo into his bank account

5    was for doing customer service on Pharma-Master, his wages

6    basically.

7    Q    Does that constitute money laundering?

8    A    Yes, it does.

9    Q    In what way?

10   A    It's promotion, again.  He's paying an individual to

11   help keep his business running by doing customer support.

12   Q    Does this particular manner of transaction also have

13   indications of concealment?

14   A    Yes, it does.

15   Q    Describe that for us.

16   A    It's very hard to track and trace the proceeds of the

17   illegal activity when he takes the Bitcoin, meets people on

18   the street, gets the cash, and then surreptitiously goes

19   into the bank and makes a deposit of the cash into his bank

20   account.

21   Q    Let's talk about another specific transaction from

22   November 22nd of 2016.  Did you obtain a second photo from

23   America First Credit Union?

24   A    Yes, I did.

25   Q    Let's look at Exhibit 16.08.  Can you identify that for

1   us, please.

2   A     Yeah.   That's a picture of an individual who's tied to

3   Salt Lake City Bitcoins.   Through my investigation, I

4   identified him as Scott Wilkes.   He is making a $900 deposit

5   into Drew Crandall's America First bank account.

6   Q     Did you cross-reference his photo with

7   Mr. Crandall's bank statement to see that this transaction

8   took place?

9   A     Yes, I did.

10  Q     Let's go to 16.22 again and look at that.   The date is

11  November 22nd of 2016.

12  A     That shows the $900 deposit into the Salt Lake Metro

13  Branch of America First Credit Union, which is pretty close

14  to where Scott Wilkes resides.

15  Q     Again, explain for us who Scott Wilkes is and what his

16  business is.

17  A     Scott Wilkes is an individual who posts on

18  LocalBitcoin.com that he's looking for Bitcoin and that he

19  has cash.   He has individuals who he meets with that need

20  Bitcoin or cash, and he is the intermediary for those.   He

21  owns Salt Lake City Bitcoins.

22  Q     So in these transactions, the Bitstamp transactions and

23  these two cash deposits, it appears that -- well, it's not

24  the last one.   The three Bitstamp transactions and the one

25  with the photograph of Aaron Shamo depositing money, those

1    appear to have involved both Mr. Shamo and Mr. Crandall; is

2    that correct?

3    A    Yes, that is correct.

4    Q    So are they both responsible for money laundering based

5    on those transactions?

6    A    Yes, they are.

7    Q    They both took part in those transactions.

8    A    They both conducted financial transactions.

9    Q    In addition to all the items of money laundering,

10   instances of money laundering that you just testified to,

11   were there other transactions specifically involving

12   promotion?

13   A    Yes, there were.

14   Q    Let's first talk about Ms. Tonge and Ms. Bustin as they

15   relate to Mr. Shamo.  Were there promotion transactions that

16   you identified with those individuals?

17   A    Yes.  Ms. Tonge and Ms. Bustin were purchasing stamps

18   and shipping labels.  The testimony was that Mr. Shamo would

19   move Bitcoin to a wallet controlled by the two women and

20   they would use that wallet to purchase shipping labels

21   through GetUSPS.com.

22   Q    And some of that -- or much of that involved Bitcoin?

23   A    Yes, it did.  Ms. Tonge and Ms. Bustin stated in their

24   testimony that they were purchasing approximately $500 worth

25   of stamps twice a week.

1   Q    Were there also transactions involving the payment of

2   wages to Ms. Tonge and Ms. Bustin?

3   A    Yeah.  Ms. Tonge and Ms. Bustin stated that initially

4   they were being paid $1,000 each per month.  That was

5   negotiated originally with Mr. Crandall and Mr. Shamo.  But

6   later on, they were being paid, toward the last few months,

7   $3,500 each per month for doing the processing of the

8   Pharma-Master website, processing the pills and packaging

9   those.  And initially they were also sending those boxes out

10  to different post office mail containers.

11  Q    Did you do some investigation involving Venmo

12  transactions as well?

13  A    Yes, I did.

14  Q    And what did you find on that?

15  A    I found that Mr. Shamo was using his bank account at

16  Wells Fargo to fund his Venmo account, and that he was using

17  his Venmo account to pay Tonge and Bustin.

18  Q    Does that constitute money laundering, in your opinion?

19  A    Yes, it does.

20  Q    How so?

21  A    Mr. Shamo -- it's a lot of work, but he's taking

22  Bitcoin, meeting people on the street, converting that to

23  cash, depositing that cash into his bank account, and then

24  moving that cash from his bank account -- now it's in his

25  account, to his Venmo account, and then using that to pay

1    Tonge and Bustin.

2    Q    You talked about postage.  Did you find any specific

3    instances where Mr. Shamo used his bank accounts to buy the

4    postage himself?

5    A    Yes, I did.

6    Q    Let's look at Exhibit 16.20.  What are we looking at in

7    16.20?

8    A    It's a spreadsheet that was created from his Wells

9    Fargo bank account.  It shows deposits and expenses.

10   Q    And does it indicate what those expenses were for?

11   A    Yes.  Oftentimes it does.

12   Q    And what was the date on the postal transaction that

13   you identified?

14   A    I want to say it was May of 2016.

15   Q    May or June of 2016?

16   A    Yeah.

17   Q    Let me refer you to June 24th of 2016 on the statement

18   here and see if you can identify it.

19        In the blue there in about the middle of the page.

20   A    Yeah.  It shows a debit card purchase on June 24th,

21   2016 for $1,032 to the U.S. Postal Service.

22   Q    Again, that came directly from Mr. Shamo's account to

23   the Postal Service?

24   A    Yes, it did.

25   Q    Is that a money laundering transaction?

```
 1   A    Yes, it is.

 2   Q    In what way?

 3   A    It's proceeds from illegal activity laundered through

 4   his bank account and then used to purchase stamps, which are

 5   promoting his business.  The stamps are used to send the

 6   pills that were ordered from the customers of Pharma-Master.

 7   Q    We're on the subject of promotion.  We could refer to

 8   that chart next to you, 17.06.  There were some others

 9   identified involved in the drug trafficking organization.

10   Are you familiar with those people?

11   A    Yes.  Yes, I am.

12   Q    Let's talk about a few of those.  Let's talk about

13   Mr. Gygi who's there on the far right in the first full row

14   under Mr. Shamo.  What was your investigation with regard to

15   money transferred from Mr. Shamo to Mr. Gygi?

16   A    Mr. Gygi worked as a courier.  He was the individual

17   who would pick up packages from Tonge and Bustin and ship

18   those out using different mail collection boxes throughout

19   Salt Lake County.  He was paid $4,000 a month by Mr. Shamo,

20   in cash, for doing that.

21   Q    And does that constitute promotion?

22   A    Yes, it does.

23   Q    Let's talk about Mr. Noble.  Did you do some

24   investigation as to financial transactions involving

25   Mr. Shamo to Mr. Noble?
```

```
 1   A    Yeah.  Mr. Noble, as he stated, worked customer service
 2   for Pharma-Master also, and he was paid $1600 a month by
 3   Mr. Shamo, in cash.  He did say he took, I think, September
 4   off.
 5   Q    And does that involve promotion, then?
 6   A    Yes, it does.
 7   Q    Let's talk generally about the others on that document
 8   that we heard testimony were receiving -- the word drops,
 9   were receiving money for getting packages at their homes.
10   How does that relate to the promotion of money laundering?
11   A    Yeah.  Mr. Shamo's providing them cash to receive
12   packages and those packages are used to either -- to
13   manufacture the pills.  He was receiving fentanyl and
14   ingredients from Press Club to help make the pills.
15   Q    The indictment contains an allegation of conspiracy to
16   commit money laundering.  Are you familiar with that?
17   A    Yes, I am.
18   Q    Are you familiar with the term conspiracy?
19   A    Yes.
20   Q    Tell us about that.  What does it mean by conspiracy?
21   A    Conspiracy is usually an agreement by one or more
22   individuals.  In this conspiracy to money launder is
23   agreements between Mr. Shamo, Mr. Crandall, specifically
24   Tonge and Bustin to launder money to help further the
25   enterprise.  There was an agreement with several
```

1    individuals.  Mr. Noble agreed to perform work in exchange
2    for being paid.  Mr. Crandall, same thing, testified that he
3    was being paid $2,400 a month to do customer service.  Tonge
4    and Bustin agreed to be paid by Mr. Shamo.  Mr. Shamo would
5    drop off cash in their truck or provide them the cash.  So
6    they had an agreement to work for the organization and also
7    an agreement to receive cash.
8    Q    And based on your investigation, these weren't written
9    agreements, these were just agreements among individuals to
10   do these certain things?
11   A    Yes.
12   Q    In exchange for payment, correct?
13   A    Correct.
14   Q    You heard from Mr. Crandall, Ms. Tonge, Ms. Bustin that
15   they pled guilty to conspiracy to launder money, correct?
16   A    Yes.
17   Q    What were their roles, then, in this money laundering
18   with Mr. Shamo?
19   A    Tonge and Bustin helped purchase stamps, shipping
20   labels.  I think I mentioned before, they were individuals
21   who processed the orders from Pharma-Master, got them ready.
22   Initially they also shipped those out.
23       Mr. Noble provided customer support for Pharma-Master.
24   He answered phone calls.  Then Mr. Gygi was a courier.  He
25   would take the packages that Tonge and Bustin would leave on

1    their doorstep and he would go deposit those into the

2    different mailboxes.

3         Am I missing anybody?

4    Q    Probably, but we covered those.

5         Based on law enforcement's investigation, specifically

6    your financial investigation into this drug trafficking

7    organization, who primarily controlled the money generated

8    by AlphaBay and Pharma-Master?

9    A    Mr. Shamo controlled the money.  All the money went

10   through Mr. Shamo.  He owned the Bitcoin wallet that

11   received the funds from Pharma-Master.

12   Q    And we saw a sum of money with Mr. Paz.  Setting that

13   aside for a minute, where was the majority of the money

14   found when law enforcement took down the organization?

15   A    It was found in Mr. Shamo's house at Titian Way in

16   Cottonwood Heights.

17   Q    And the Bitcoin as well, where was that found?

18   A    It was found on Mr. Shamo's computer.

19   Q    And in his wallets?

20   A    And in his wallets on his computer and his phones.

21             MR. STEJSKAL:  May I have a moment, Your Honor?

22             THE COURT:  Yes.

23             THE WITNESS:  That's a lot of sticky notes.

24             MR. STEJSKAL:  No.  There's only two.

25   //

```
 1  BY MR. STEJSKAL:

 2  Q    One's a clarification.  It was heard that you testified

 3  that Noble answered phone calls.  Is that your

 4  recollection -- is that your recollection of what happened?

 5  A    No.  He didn't answer phone calls.  He answered

 6  e-mails.  He had access to the Pharma-Master, in part, and

 7  he was able to respond to e-mails.  He even mentioned that

 8  he had some premade up e-mails to different responses.  So,

 9  sorry, no.  He didn't answer phone calls.

10  Q    So that was just a misstatement?

11  A    Yes.

12  Q    We heard some testimony about a Miles Penrose and the

13  fact that he owned IDrive.  Is Mr. Penrose depicted on

14  17.06, the government's exhibit?

15  A    Yes, he is.

16  Q    Where is he?

17  A    He's on the bottom left row.

18  Q    And is that who you spoke with when you investigated

19  the IDrive transaction?

20  A    Yes.

21  Q    So this is the same person?

22  A    Yes, it is.

23  Q    And is he also the individual we talked about earlier

24  that invested in the drug trafficking business?

25  A    Yes, he is.
```

```
 1              MR. STEJSKAL:  No further questions.
 2              THE COURT:  Thank you, Mr. Stejskal.
 3              Defense may cross-examine.  Ms. Beckett.
 4              MS. BECKETT:  I only have one sticky note and it's
 5   from Mr. Skordas.
 6              THE WITNESS:  Oh, good.  It's going to be short.
 7              MS. BECKETT:  No.  These are just Mr. Skordas
 8   reminding me to talk slower for the court reporter.
 9                         CROSS-EXAMINATION
10   BY MS. BECKETT:
11   Q    So I believe it was your testimony that you were
12   present for the interview of Jeremy Lapin?
13   A    Yes.
14   Q    He's the landlord for the Titian Way residence,
15   correct?
16   A    That is correct, yes.
17   Q    He owned that home?
18   A    Yes, he did.
19   Q    When you interviewed him, did he tell you anybody else
20   was on the lease for that home at Titian Way?
21   A    Yes.  He said Luke Paz was also on the lease.
22   Q    And that he had signed that lease in 2016, correct?
23   A    That is correct.  He said that he'd only seen Luke Paz
24   there one time during the whole time that he'd been on the
25   lease.
```

1 Q But Mr. Lapin wasn't around all that often, was he?

2 A I assume not.  Like a landlord, probably doing work on

3 the house occasionally.

4 Q Could we look at Government's Exhibit 21.18, page two.

5 It's an e-mail you indicated came from Mr. Shamo to Jeremy

6 Lapin.  That particular e-mail says, hey, here is our

7 incoming Bitcoin wallet, correct?

8 A It does.

9 Q It does not say here is my Bitcoin wallet, correct?

10 A It says our.

11 Q Refers to investors, employees, and himself?

12 A Yes.

13 Q I believe part of your testimony is that Mr. Paz had

14 some involvement in these cash transactions, correct?

15 A I didn't testify to that.  I did say that we received

16 cash that was voluntarily surrendered by Mr. Paz.

17 Q Are you aware of Mr. Paz's involvement in converting

18 large amounts of Bitcoin to cash?

19 A Yes.

20 Q You're aware that he was an individual who would meet

21 people for peer to peer transactions and receive a

22 significant amount of cash?

23 A Yes.  I'm aware that he was helping Mr. Shamo launder

24 his money.

25 Q And your testimony was that Mr. Paz turned over a

```
 1   little over $800,000 in cash, correct?

 2   A    That is correct, yes.

 3   Q    And that wasn't until August of 2018, correct?

 4   A    Yes.

 5   Q    A significant amount of time after November of 2016

 6   when Mr. Shamo was arrested, correct?

 7   A    That's over a year, yeah.

 8   Q    Almost two years?

 9   A    Almost two.

10   Q    But he still had $800,000 in cash?

11   A    Mr. Paz did, yes.

12   Q    You testified that Mr. Crandall conducted some -- had

13   some cash deposits made into his bank account; is that

14   correct?

15   A    That is correct, yes.

16   Q    And Mr. Crandall was able to track the user down online

17   from a foreign country to deposit cash into his account,

18   correct?

19   A    I'm not sure about that.  Can you repeat that question?

20   Q    Do you know where Mr. Crandall was when he had Scott

21   Wilkes deposit money into his bank account?

22   A    He was in Asia, I'm pretty sure.

23   Q    So nowhere near Salt Lake?

24   A    That's correct, yes.

25   Q    But he was able to track somebody down here in the Salt
```

1    Lake valley to deposit money into his account?

2    A    Yeah.  I think he stated that he had found someone on

3    LocalBitcoin.com, and that was Scott Wilkes with Salt Lake

4    City Bitcoins.

5    Q    And he was able to track that person down pretty

6    quickly, correct?

7    A    Yeah, on the Internet.

8    Q    The same day that Mr. Shamo was arrested, correct?

9    A    That is correct, yes.

10   Q    Is that, as you referred to previously, a sign of

11   concealment?

12   A    Yes.  It is concealment, money laundering by

13   Mr. Crandall.

14   Q    And that particular transaction was not really

15   associated with Mr. Shamo, correct?

16   A    The funds had come from Mr. Shamo, yes, they did.  So

17   it is associated with Mr. Shamo.

18   Q    According to Mr. Crandall, that money came from

19   Mr. Shamo?

20   A    According to Mr. Crandall, yes.

21   Q    If Mr. Crandall were using these peer to peer Bitcoin

22   transactions, I believe it was your testimony there wouldn't

23   be a paper trail, correct?

24   A    On the three Bitstamp transfers into his bank account,

25   that is correct.  On the cash deposits into his account, no,

1   there was no paper trail.

2   Q    Part of your testimony is that Mr. Crandall said he

3   would make these $10,000 Bitcoin transactions, and 5,000 of

4   that would go to Mr. Shamo and that he would keep 5,000 for

5   himself?

6   A    Yes.  He said he was helping Mr. Shamo launder money.

7   Q    Is there any proof that he gave that money back to

8   Mr. Shamo and didn't keep it for himself?

9   A    Just the testimony.

10  Q    The same goes for his testimony that the money he was

11  receiving was simply wages, correct?

12  A    Well, he said that the money he was receiving was

13  partly wages, but he was also receiving money that was

14  payout for the business prior.  So it was wages and payout,

15  depending on when he received it.

16  Q    But that was based just on his statements to you,

17  correct -- or his statements in general?

18  A    Yeah.  Those statements were corroborated by the

19  financial transactions also.

20  Q    The fact that they were wages was corroborated by the

21  financial transactions?

22  A    No, the fact of the amounts.  He said that he was paid

23  approximately $2400 a month.  There were several

24  transactions pretty close to that same amount.

25  Q    Are you aware that Mario Noble testified to actually

1    being an individual who recruited people to essentially work

2    in this organization?

3    A    He stated that he helped get people to receive packages

4    as drops.  He did say that.

5    Q    Specifically, I believe that was individuals with the

6    last name of Vance and Bruner.  Does that sound correct?

7    A    That sounds correct.  I'm not 100 percent sure, but

8    that's correct.

9    Q    I apologize.  I almost cut you off.

10        Do you remember Mr. Noble stating that he, in fact,

11   received money and benefited from that?

12   A    Yes, he did.  I think it was like $100.

13   Q    Is that money laundering?

14   A    It actually is, yes, promotion.

15   Q    Not just a conspiracy to commit, but actual money

16   laundering itself, correct?

17   A    Money laundering and a conspiracy because Mr. Shamo is

18   also involved in giving Mario Noble the cash, which moved on

19   to those drops.  So it's part of the conspiracy with

20   Mr. Shamo.

21   Q    Based on the testimony just of Mario Noble, though,

22   correct?

23   A    There were other drops.  In the drops that Mario Noble

24   recruited, it is just based on his testimony, yes.

25   Q    The same for Ms. Tonge?  I believe there was testimony

```
 1   that she recruited an individual by the name of Elise
 2   Christensen?
 3   A     I don't remember that testimony.  Sorry.
 4   Q     That's not a problem.
 5            MS. BECKETT:  Just one second, Your Honor.
 6            THE COURT:  Yes.
 7            MS. BECKETT:  I have no further questions,
 8   Your Honor.
 9            THE COURT:  Thank you, Ms. Beckett.
10            Mr. Stejskal, redirect.
11                      REDIRECT EXAMINATION
12   BY MR. STEJSKAL:
13   Q     Let's go back to 21.18, page two, that e-mail.  The
14   line about the Bitcoin wallet, what does it refer to the
15   employees belonging to?
16   A     Can you repeat that question?  I didn't quite
17   understand it.
18   Q     It says our Bitcoin wallet.  Why don't you just read
19   the line again.
20   A     Okay.  Here's our incoming Bitcoin wallet.  Any profits
21   made come here first and distrusted to investors, my two
22   employees, and myself.
23   Q     So that statement is from Mr. Shamo based on the --
24   A     Yeah, to Mr. Lapin.
25   Q     So he's saying Mr. Shamo's two employees, correct?
```

1    A    Yes.

2    Q    Now you said the purpose of this e-mail was to rent

3    property from Mr. Lapin based on your investigation,

4    correct?

5    A    Yeah.  He's needing to show Mr. Lapin that he has a

6    source of income to pay his rent.  Mr. Lapin is not going to

7    allow him to rent a house without a source of income.

8    Q    So based on your investigation, did Mr. Shamo lie about

9    having legitimate income in Bitcoin?

10   A    Yes, he did.  He often told people that he was either

11   trading Bitcoin or mining Bitcoin and that was the source of

12   his income.

13   Q    Are you familiar with Luke Paz?

14   A    Yes, I am.

15   Q    Did Luke Paz have another residence where he lived

16   during the period of this trafficking organization?

17   A    Yes, he did.

18   Q    Did you receive any indication during your

19   investigation that Mr. Paz lived at this Titian Way address?

20   A    No, I did not.  Just the rental contract with his name

21   on it.  But again, interviewing the landlord, the landlord

22   said he almost never saw him there.  I think one time.

23   Q    Did Mr. Paz have legitimate employment throughout this

24   period, and specifically when this e-mail was sent?

25   A    Yeah.  He worked for a couple of different home

```
 1   security system companies.  He was selling home security
 2   systems.  A lot of times he was in Texas and Louisiana
 3   selling those security systems.
 4   Q    So based on that, he, unlike Mr. Shamo, could provide
 5   employment records to the landlord to rent an apartment --
 6   or a house, correct?
 7   A    Yes, that is correct.
 8   Q    Thank you.
 9            MR. STEJSKAL:  That's all the questions I have.
10            THE COURT:  Any recross?
11            MS. BECKETT:  No, Your Honor.  Thank you.
12            THE COURT:  Thank you.  You may step down.
13            Do you want to start another witness or take a
14   second break?
15            MR. STEJSKAL:  Probably second break, Your Honor.
16   It's been about an hour and a half.
17            THE COURT:  Okay.  We'll be in recess for about 30
18   minutes.
19            (Jury excused)
20            (Recess)
21            (Jury present)
22            THE COURT:  You may call your next witness,
23   Mr. Stejskal.
24            MR. STEJSKAL:  Thank you, Your Honor.
25            The United States next calls Jeff Bryan.
```

```
 1                THE COURT:  Come forward and be sworn, please.
 2                          JEFF BRYAN,
 3            Having been duly sworn, was examined
 4                  and testified as follows:
 5                THE CLERK:  Please state your name and spell it
 6    for the record.
 7                THE WITNESS:  Jeff Bryan.  J-e-f-f, B-r-y-a-n.
 8                THE COURT:  You may proceed.
 9                MR. STEJSKAL:  Thank you, Your Honor.
10                          DIRECT EXAMINATION
11    BY MR. STEJSKAL:
12    Q    Your occupation?
13    A    I'm a financial investigator for the Drug Enforcement
14    Administration.  I'm a contract employee.
15    Q    And how long have you been doing that?
16    A    About a year and a half -- a little over a year and a
17    half.
18    Q    What were you doing before that?
19    A    Prior to that, I was a DEA agent, a special agent,
20    since 1991.
21    Q    And I'm not used not to calling you special agent
22    because you've been a special agent for a long time.  Can I
23    still call you that?
24    A    Nope.
25    Q    Retirement must be good.
```

1    A     It is.

2    Q     Tell us about your educational background.

3    A     I graduated with a bachelor's degree from the

4    University of Utah in sociology, with a certificate of

5    criminology.

6    Q     And following that education, did you go directly into

7    DEA?

8    A     Yes, I did.

9    Q     Tell us about your training, then, upon becoming a DEA

10   agent and then continuing that training.  And let's split

11   that a little bit between your training with regard to drug

12   trafficking and kind of separate training with regard to

13   financial investigations and money laundering because I

14   believe those are two different aspects of what you've done

15   over your career.

16   A     New special agents are trained at the Quantico DEA

17   Academy.  We're co-located with the FBI there.  We have our

18   own training academy because we're trained differently, and

19   our training is approximately four months.  It varies from

20   year to year, depending on who's in charge and what they're

21   being trained on, but it's about four months long.

22         In that training, we are trained with all kinds of

23   investigative techniques, interviewing, surveillance, report

24   writing.  We're trained on defensive tactics and firearms,

25   everything that we need to know to do our job when we get

1   assigned to our location.

2   Q    And then after receiving that initial training that all

3   agents receive, have you received other trainings in either

4   your specialty or just periodic updates?

5   A    Yes.  Throughout an agent's career, you have the

6   opportunity to go to in-service training, and a lot of it is

7   personal preference on what kind of investigations you want

8   to try to do or what you have an aptitude for.  And so I was

9   trained initially -- not too long after the academy, I was

10  trained in clandestine laboratories.  So I became certified

11  to enter laboratories with all the suits on, and the SCBAs,

12  and dismantle methamphetamine laboratories.

13       And then I became a site safety instructor.  So that's

14  another certification where when we would dismantle a

15  laboratory, because of the toxic nature of the chemicals and

16  the by-products of methamphetamine labs, we would have to

17  designate an area for that cleanup, and safe zones, and

18  clean zones, and dirty zones, and they were progressive.  So

19  we were trained on how to do that to keep the environment

20  safe and people safe while we processed the evidence of a

21  lab.  And that's just one example.

22       There are other trainings on conspiracy, for example,

23  what is a conspiracy and how do you investigate a conspiracy

24  investigation.  There were trainings of different interview

25  techniques that are more specialized than we reached in the

1    academy.  And those are throughout an agent's career.

2        I attended a training not too long before I retired

3    because I didn't know I was going to retire.  So throughout

4    an agent's career, we receive this in-service training that

5    is put on either by the Department of Justice or other

6    government entities, or by companies, such as a company -- I

7    attended a training from Coinbase.  An individual from the

8    company called Coinbase, which is a virtual exchange

9    company, a virtual currency exchange company, came out and

10   trained us on what virtual currency is and how it's used.

11   So those kinds of trainings are typically what an agent goes

12   through and that I participated in as well throughout my 28

13   years.

14       And along with those, we also are trained in financial

15   investigations.

16   Q    Let me stop you for a second before you go into the

17   financial side.  There's one more from the drug side I'd

18   like to highlight, and that's pharmaceutical drug training?

19   A    Yes.  So at different periods of an agent's career,

20   drugs and their -- the drug of choice for a community or a

21   society kind of evolves and changes.  When I first hired on,

22   cocaine was very popular.  And shortly after that, LSD was

23   very popular.  And then after that, methamphetamine

24   absolutely took over and we were all focused on

25   methamphetamine.

```
 1          And then what was your question?
 2  Q    Your training with regard to pharmaceutical drugs and
 3  how it became that.
 4  A    Sorry.  So in 2009, it became very apparent that a lot
 5  of pharmaceuticals were being diverted and abused.  And so
 6  DEA started to focus heavily on the pharmaceutical industry
 7  and how it's being diverted on the street.  So at that time
 8  I attended a pharmaceutical drug training.  Because as
 9  agents, we have a -- DEA is kind of divided in two parts.
10  We have the special agents, which is the criminal
11  investigation side, and we have diversion, which is the
12  regulatory side of DEA.  So they work with the doctors and
13  their licenses, and the pharmacies and the legal production
14  and dissemination of legal pharmaceutical drugs, and that is
15  controlled by DEA as well.  So we have a criminal side and
16  we have an administrative side.
17          And so at that time, as an agent I hadn't worked with
18  pharmaceutical drugs very much, and it became -- people
19  started trafficking pharmaceuticals, so we had to treat
20  pharmaceuticals just like any other street drug.  And so on
21  the criminal side of the house, we started to investigate
22  pharmaceutical diversion.  So I attended a training on
23  pharmaceuticals.
24  Q    And then let's talk about the financial side as well.
25  It looks like you received training in money laundering
```

1    investigations, asset forfeiture, a specific financial

2    investigation seminar.  Tell us a little bit about your

3    training in that part.

4    A    Yes.  So throughout the course of an investigation,

5    oftentimes people who traffic in narcotics or drugs, they

6    make a lot of money, and sometimes it's hard to hide that

7    money.  And we try to seize assets that are derived from the

8    elicit proceeds of that trafficking activity.  So we receive

9    training on how that happens, how do people conceal their

10   money, how do they accumulate assets, and how do they try to

11   hide them so it doesn't look like it belongs to them, and

12   how did they move their money back and forth.  So we receive

13   training on that.

14   Q    In addition to your training, you have vast experience

15   since -- I believe you said 1991, correct?

16   A    Yes.

17   Q    Explain for the jury kind of the progression of your

18   career, how you moved into different areas as you became a

19   more experienced agent.

20   A    Okay.  As I said, when I first hired on, cocaine was

21   very prevalent here in Utah.  I hired on here.  My first

22   area was here in Utah.  And as an agent, we go undercover

23   and we purchase drugs so that we can testify to the fact

24   that we purchased drugs from an individual or from an

25   organization.  And that's called a controlled purchase,

1   which means we're purchasing illegal substances, but it's

2   controlled.  We're using official, authorized government

3   funds for that.  And we never do it by ourselves.  We have a

4   whole group of people that are there observing, and

5   watching, and protecting as we are undercover.  It's not

6   like TV where people go to parties and things like that.  We

7   never use or simulate the use of drugs when we're

8   undercover.  It's strictly a business proposition or

9   business deal.

10   So we do a lot of that in DEA.  We purchase drugs from

11   trafficking organizations.  And I did that a lot as a

12   younger agent.  And then in 1998, I was selected to go to

13   Sao Paulo, Brazil for a four-year period where I worked

14   primarily cocaine trafficking from cartels in Colombia,

15   Bolivia, and Peru, who were using Brazil as a transit

16   country to send cocaine to the United States and other parts

17   of world.  So I did that for four years.

18   Then I was able to come back to Salt Lake, which was

19   kind of unusual to get the same spot twice, but I was

20   fortunate, and came back to Salt Lake and worked traditional

21   drugs again, methamphetamine and cocaine.  And also at that

22   time Ecstasy became very popular.  This was in the early

23   2000s.  Ecstasy is MDMA.  So I worked a lot of Ecstasy

24   cases.

25   Then I was selected to be on what was called a FIT

1    team, which is a financial investigations team, and it was a

2    task force within the DEA.  And there were several agencies

3    that were involved, including IRS, and some local

4    departments.  And we concentrated and focused on drug

5    trafficking organizations that were highly successful, that

6    had a lot of assets and were moving a lot of money.  So we

7    focused on kind of the bigger organizations so that we could

8    go after them financially and follow the money, sometimes

9    back to the drugs.  So I did that for a period of about

10   three and a half to four years.

11        And then near the end of 2009 or beginning of 2010,

12   that's when pharmaceutical diversion became very prevalent

13   and prominent, and it became a real problem that DEA

14   recognized.  So we formed a group within the DEA called the

15   TDS, or the tactical diversion squad, and I became a member

16   of the tactical diversion squad in 2010.  And that's when we

17   started focusing primarily -- my group, anyway, started

18   focusing primarily on the diversion of pharmaceutical drugs.

19        Most commonly and most prevalent, it was oxycodone,

20   because that is kind of the pharmaceutical that is most

21   sought after on the street is oxycodone.  And so I did that

22   until the beginning of 2018 when I retired.

23   Q    And you couldn't stay away, so you came back to DEA as

24   a contract financial investigator?

25   A    That's right.

```
 1   Q     Twenty however many years wasn't enough.  Okay.
 2         So you have experience both domestic and international,
 3   correct?
 4   A     Yes.
 5   Q     And you've done investigations from small individuals
 6   or organizations up to -- I think you said cartel activity
 7   when you were in Brazil?
 8   A     Yes.
 9   Q     And during those investigations and throughout your
10   career, have you developed expertise in a lot of things that
11   are involved with drug trafficking?
12   A     Yeah.  And a lot of that is just on-the-job training.
13   We go to training, in-service training, but really to
14   understand and to become a good investigator, a lot of it is
15   just trial and error, and experience.  And so that's what
16   you develop.  And any investigator who has -- any police
17   officer who does that for an amount of time develops those
18   abilities to be able to investigate and recognize and put a
19   case together.
20   Q     Part of that experience was in types of drugs and
21   dealing with different drugs over the years?
22   A     Yes.
23   Q     And lately that has evolved into pharmaceuticals?
24   A     Yes.
25   Q     What types of drugs are we talking about when we're
```

1    talking about the pharmaceutical area and the tax diversion

2    squad?

3    A    I think I mentioned the most common -- or the most

4    sought after is oxycodone.

5         Now oxycodone is the generic term for the drug

6    oxycodone.  Much like Ibuprofen is a generic term.  The

7    brand name for Ibuprofen would be Advil or Motrin, for

8    example.  So oxycodone would be the Ibuprofen.  It's an

9    analgesic.  It's a painkiller.  It's very effective and a

10   very good, effective drug, but it has a high potential for

11   abuse and addiction.

12        So some of the names for oxycodone would be -- you may

13   have heard of Oxycontin.  When the pharmaceutical thing

14   first took off, Oxycontin was the most sought after pill.

15   They were called Oxy 80s because they contained

16   80 milligrams of oxycodone, and they were a time-release

17   pill.  So if you took the pill like you were supposed to as,

18   for example, a cancer patient would take Oxycontin 80s, it

19   was a timed release.  So it had 80 milligrams.  That's a lot

20   of oxycodone, but it was released over a period of time so

21   they didn't have to keep taking pills throughout the day to

22   kill their pain.

23        Well, drug abusers soon realized that there was a lot

24   of drug in those, and so they would crush them and snort

25   them, or smoke them, and it was a huge problem because they

1    were very addictive.

2        So that is -- a brand name would be Oxycontin.  Or

3    Percocet has oxycodone in it.  Or Roxicodone has oxycodone

4    in it.  So those are brand names.  But the pill that

5    we're -- or the drug or the active ingredient we're talking

6    about is oxycodone.  Those are very sought after.

7        There are other pharmaceutical pills that are also

8    abused, such as Xanax, or on the street they're called

9    Xannie bars because they look like a bar, like a Tylenol

10   bar.  And there are other pharmaceuticals that are also

11   abused.  But most of the illicit desire or the illicit use

12   of pharmaceuticals is for narcotics or painkillers, or more

13   specifically oxycodone.

14   Q    And opioids?

15   A    And it is an opioid, the oxycodone is.

16   Q    You described that early in your career you were

17   primarily involved with what I would call traditional

18   investigative techniques, undercover work, use of

19   confidential informants, conducting surveillance, those

20   types of things; is that right?

21   A    Yes.

22   Q    Did you and, I guess, law enforcement generally evolve

23   into more sophisticated techniques like tracking of

24   vehicles, phones, computers, financial investigations?

25   A    Yes.  We try to keep up with technology.  Usually the

1    traffickers are ahead of us with apps and things like that

2    to conceal their communications and things like that.  But

3    we try to keep up and we use things like vehicle trackers,

4    and we have to have a warrant to put that on a vehicle.

5         We still employ the use of traditional investigation

6    techniques such as going in and buying the drugs.  There's

7    no better evidence than actually seizing or buying drugs

8    from the individual who is trafficking it.  And then we

9    conduct interviews and we try to find out who's in charge,

10   whose drugs were they, and then we try to corroborate that

11   evidence through other means, through bank records, through

12   rental car records, and things like that.  So the

13   information that we gather investigatively, we always try to

14   corroborate by other means.

15   Q    So throughout combining your training and your lengthy

16   career, have you developed expertise into the common methods

17   and means that drug traffickers employ to carry on drug

18   trafficking?

19   A    Yes.

20   Q    Have you testified as an expert before with regard to

21   drug trafficking?

22   A    Yes, I have.

23   Q    And so that's why we have you here today is to testify

24   to some general concepts and trends in drug trafficking; is

25   that correct?

1   A     Yes.

2   Q     You were in the tactical diversion squad when you were

3   at DEA, but you didn't have a whole lot of direct

4   involvement with the investigation of Aaron Shamo in this

5   case, correct?

6   A     I did not.  I had some other cases.  I assisted

7   sometimes with evidence processing and things like that, but

8   I was not the case agent.

9   Q     So using your expertise, let's talk about a few things

10  to try to help the jury understand drug trafficking and

11  other things.  What are some things that all drug

12  trafficking organizations must have?  Let's talk first about

13  source of supply.

14  A     Okay.  Well, in order to traffic drugs, you have to

15  have the drugs, and whether these are illicit drugs like

16  cocaine, and methamphetamine, and heroin, and now the big

17  focus is on pharmaceutical drugs, in order to be a drug

18  trafficking organization, you have to obtain the drugs in

19  order to sell them.  That would be the first requirement I

20  would think.

21  Q     And are there a couple ways to do that?  You can

22  probably either buy them or make them?

23  A     Yes.  You know, historically, methamphetamine was made

24  here in the U.S.  And here in Utah specifically,

25  methamphetamine was manufactured, and we had a huge

1    methamphetamine lab problem here in Utah, so much so that

2    when we started to get methamphetamine that would come from

3    Mexico, they knew -- and we knew this from our

4    investigations and interviews, and listening to phones, we

5    knew that the individuals who were bringing the

6    methamphetamine to Utah, they had to bring pure

7    methamphetamine because the Utah drug users demanded that it

8    be high quality methamphetamine.  So that was kind of an

9    anomaly.

10        But yes, they either have to purchase the drugs already

11    made or they have to manufacture those drugs.

12    Q    And in what ways can drugs be manufactured?

13    A    Well, you have to have the ingredients.  It's kind of

14    like baking cookies.  You have a recipe and you need the

15    ingredients that are on that recipe, and then you need

16    certain equipment.  For drugs, for pills, for example, you

17    have to have the active ingredient, in this case oxycodone,

18    or something that is similar to oxycodone and other opiates,

19    such as fentanyl, and you need other materials, such as

20    binders that hold the tablets together, and there are other

21    materials.

22        But then you also need equipment, such as presses and

23    dies that actually imprint an imprint on the pills

24    themselves to make them appear to be legitimate manufactured

25    pills by pharmaceutical companies.

1          So yes, they have to be manufactured in a way that is
2     similar to the real pills in order to be sold on the street.
3     Q    So all drug trafficking organizations need a source of
4     supply, correct?
5     A    They need a source of supply?  Yes.
6     Q    How about a way to market or sell it to others?
7     A    Yes.  So a drug trafficking organization is really just
8     like any other business.  They're just selling an illicit
9     product.  They need their product to sell and they need
10    people to sell them, or they need people to transport the
11    product to where they're going to sell them, and then they
12    need people who are going to buy them.  And drug trafficking
13    organizations work the very same way as a legitimate
14    business.  So there is someone in charge of making that
15    happen and there are people that have delegated
16    responsibilities to do their part.
17    Q    Is it fair to say that over the course of your career
18    you've investigated many drug traffickers and drug
19    trafficking organizations?
20    A    Yes.
21    Q    Do they come in different structures and sizes?
22    A    Yes.
23    Q    Explain that for us.
24    A    Well, I'll use the analogy again of a legitimate
25    business.  You have Amazon.com that is huge all over the

1    world and there's one guy in charge.  But you also have

2    businesses, like a landscaping business that started up by a

3    father and his son, and they hire some neighborhood kids,

4    and they might employ 15 people, but that's considerably

5    smaller than Amazon.com.  And there's an unlimited range of

6    different kinds of businesses and sizes of businesses, and

7    it's just like that with drug trafficking.

8         Some businesses -- some drug traffickers start out on

9    their own.  They have enough capital to get it going to

10   purchase their initial drugs and sell it.  And some need

11   some investors to be able to buy the product or buy the

12   equipment needed to manufacture, and things like that.  So

13   if you compare it to a regular legitimate business, it's

14   very similar.  They're just selling an illicit product that

15   is illegal.

16   Q    So regardless of the organization, then, and the size

17   of the organization, there are certain roles that need to be

18   carried out in order to make the operation successful?

19   A    Yes.

20   Q    And if I understood you, sometimes one person can

21   handle everything?

22   A    Yes.  A smaller organization would be one person goes

23   and buys the drugs from whoever his source of supply is, and

24   then sells it to his customers all by himself and keeps all

25   the profits.

1      Other organizations may employ others to help them with

2 that, and it could be as simple as, hey, will you go rent

3 this car for me.  And then they use that car to go to

4 California and pick up drugs and come back.  And their name

5 isn't on that rental car agreement, but someone else's is,

6 and they would pay that person a nominal fee to do that for

7 them.

8      That's just an example of the creativity and the amount

9 of diversion and different ways that a drug trafficking

10 organization can work.  It's really as far as their

11 imagination can go and how much they want to succeed and how

12 successful they want to be.

13 Q    So tell us about the evolution of a developing drug

14 trafficking organization, that maybe it starts off small

15 with a single individual, and then as it expands, the

16 different roles that need to be filled.

17 A    Okay.  Typically it's not hard to imagine how someone

18 gets into drug trafficking.  Many get into drug trafficking

19 because they are using the drug themselves -- not all, some

20 don't, and they do it primarily for the monetary reasons of

21 drug trafficking.

22      But a lot of drug trafficking organizations start

23 because they have to go buy the pills, or the drug, whatever

24 kind of drug of choice that they have, but it's expensive.

25 It's not hard at all to have a hundred dollar a day drug

habit.  And so in order to supplement their income enough to
be able to buy their drug, they buy a little bit extra and
sell it.  And so that's sometimes how it starts.  They're
doing it just to support their own habit.  And then
oftentimes it becomes -- they become familiar with the
individuals who are supplying the drug and they start buying
more and more and more, and pretty soon they're buying
enough that they have so many customers that they can't
handle them all, so they go into business with someone, and
that person then handles some of the customers and the
original person handles some of the customers.

Or a drug trafficking organization is a couple of
buddies that say, hey, let's do this.  I've got this much
money and you've got this much money, let's put it together
and go buy a kilo of cocaine, or whatever the drug of choice
is, and that's how they start.

So it generally starts small, because you have to build
reputation with the source of supply and you have to build
up a customer base just like any other business.  And as it
grows, more people become employed and tasks become
delegated to them, and there's someone who is in charge of
making those decisions.  And that's kind of how it evolves.
Q    Let's talk about that last concept, then, of somebody
being in charge.  What types of things does the person in
charge be responsible for or remain responsible for?  Let's

1    talk first about defining the scope of the operation.

2    A    Well, again, it's relative to the size of the

3    organization.  But whoever is in charge is making the

4    decisions on who does what, who is delegated for what, where

5    does the money come from and where does the money go, who

6    keeps the money, who uses that money in furtherance of the

7    business.  They promote the business with their illicit

8    proceeds.  And so that person who was in charge makes those

9    kinds of decisions, personnel, things that are purchased for

10   the business, such as manufacturing equipment, or vehicles,

11   or plane tickets, or rental cars.  Those are all decisions

12   that are made by the person in charge or who he delegates

13   that to, or she.

14   Q    So if I understood you correctly, they will define

15   what's being sold?

16   A    Uh-huh.  (Affirmative)

17   Q    They'll procure a source of supply?

18   A    They'll set the price of those drugs.  They're

19   ultimately in charge just like someone who runs a business.

20   Q    And when these other roles are filled, who hires those

21   people to fill those other roles?

22   A    The person in charge, the leader, organizer of that

23   organization.

24   Q    How about the money and the profits, who controls the

25   money and the profits?

1    A    That individual would also be in charge ultimately of

2    the money, and typically they would receive the bulk of the

3    proceeds, but they have to share it with people who are

4    doing some of the work or they wouldn't do it either.  So

5    that person is in charge of the funds, of the proceeds of

6    the incoming and outgoing, and they typically will delegate

7    jobs to others, and they may give people more authority than

8    others.  They're in charge so they decide that.

9    Q    Is it often structured like a business where the

10   leader, organizer is like the CEO and they make the most

11   money and then money kind of trickles down?

12   A    Typically it is, yes.  And the leader, organizer

13   sometimes is very hands off.  They don't want to be around

14   the drugs at all.  Once they get to a certain point, they

15   delegate everything.  Other leaders, organizers are very

16   involved, and they want to be involved, and they want to be

17   hands-on, just like -- we've all had bosses who let us do

18   our job and we have bosses who are right involved with us

19   and kind of managing us.  So the same thing with drug

20   trafficking organizations.

21   Q    Let's talk a little bit about traditional drug

22   trafficking organizations, the seller on the street corner

23   versus -- are you familiar with online drug trafficking?

24   A    Yes.

25   Q    Can you kind of compare and contrast?

1    A    Yes.  So traditional drug trafficking operations, they

2    generally sell their product locally because they deliver it

3    hand to hand and they receive the money hand to hand.  So

4    they communicate however they're going to communicate, on an

5    app, or on a telephone, or in person, and they will make

6    arrangements to meet an individual to purchase a certain

7    amount of drug for a certain amount of money.  That price is

8    negotiated, and they will meet them and do the exchange in

9    person.

10        An online drug trafficking business isn't like that.

11   There still is product and there still has to be an

12   exchange, but it's generally not done in person.  Funds are

13   transferred either by Venmo, or by Bitcoin, or depositing

14   into bank accounts.  There's a lot of ways to move money to

15   another location.  And then that individual who purchased

16   that drug receives that drug either in the mail or another

17   type of courier service.  So it's not a face-to-face

18   meeting, but it's an online transaction, just like you would

19   order something from Amazon.

20   Q    Let's talk real quickly and briefly about that delivery

21   service.  So online, are you familiar with them using the

22   Postal Service?

23   A    Yes.

24   Q    It's been sadly joked that the Postal Service is the

25   largest drug distributor in the United States.

1    A    Unfortunately, it might be true.

2    Q    Tell us about your experience with the Postal Service

3    being used by drug trafficking organizations to deliver

4    narcotics.

5    A    Well, it's also joked that sometimes it's not very

6    reliable, but in actuality, the Postal Service is very

7    reliable.  And drug traffickers will use the Postal Service

8    for a couple of reasons.  They prefer the Postal Service.

9    That doesn't mean that they don't use UPS and FedEx, and

10   other couriers, but generally they prefer the Postal

11   Service.  One reason is the sheer volume.  Millions and

12   millions and millions of letters and packages per day are

13   sent through the U.S. Mail.  And so the sheer volume alone

14   helps a small package with a few pills in it get through

15   without any detection at all.  That's one reason.  It's just

16   a -- it's a needle in a haystack.

17        The other reason is once that package is mailed, for

18   law enforcement to open that package, it requires a search

19   warrant, and it's sometimes difficult to get a search

20   warrant for a package when you suspect what's in there but

21   you don't have any probable cause to give to a judge stating

22   why you believe that there's pills in there, unless you've

23   done an investigation and you know this individual is

24   sending packages via mail and you can articulate that in an

25   affidavit and then get a search warrant.  But that's not a

```
 1    ten-minute thing.  It requires a lot of effort and work.
 2    And so that's another reason that the Postal Service is
 3    used.
 4         Another reason that the Postal Service is used is
 5    traffickers -- it's possible to purchase postage with
 6    Bitcoin.  They can purchase the postage fees with Bitcoin.
 7         So those are three reasons that I know of why
 8    traffickers prefer U.S. mail.
 9    Q    Let's talk a little bit also about the price of drugs.
10    Are there various factors that affect the price of drugs in
11    any given area at any given time?
12    A    Yes.  There are a lot of factors that determine how
13    much a drug costs in a particular area.  The first, of
14    course, will be supply and demand.  Just like any other
15    business, supply and demand drives the price of goods.  But
16    there are other factors in the drug world that also affect
17    the price of drugs.  The first would be the purity of the
18    drug, how pure is that drug.
19         Now if you have a mid level cocaine trafficker who is
20    buying three or four ounces of cocaine at a time to
21    redistribute, and typically they'll sell it like a gram at a
22    time.  So 28 grams in an ounce, and they have three or four,
23    that's a hundred or so grams of cocaine.  So they buy it in
24    ounces and they divide it up into grams to sell.  The purity
25    of that drug will help determine the price of the drug.
```

1          If they're selling grams that are very high purity,

2    somewhere around 85 or 90 percent pure cocaine, that's worth

3    a lot more than grams that have been cut with another inert

4    substance, such as inositol, or some other substance.  And

5    they sometimes will do that because this person that buys

6    three or four ounces will then get their three or four

7    ounces and they will add three or four ounces of this inert

8    material.  Now instead of three or four ounces, they have

9    six or eight ounces that they can divide up and sell.  So

10   they've essentially doubled their product -- doubled the

11   amount of their product, but it's not as pure.  So on the

12   street, it's hard to know exactly how pure the drug is going

13   to be.

14         So that brings up the next factor in the price of

15   drugs, and that's how well you know your dealer, what your

16   relationship with your dealer is.  If it's someone that

17   you've been dealing with for a long time and you know that

18   they don't cut their cocaine, you're willing to pay a higher

19   price for that.  Also in knowing your dealer, it might be a

20   personal friend, or a family member, or a high school buddy,

21   and typically they get a little price break.  Your

22   relationship with your source of supply is very important in

23   determining the price.

24         Another factor that determines the price of street

25   drugs is the proximity to where it's being sold to where the

drug is manufactured or purchased.  So historically, if you
wanted a good price on methamphetamine, you drove to San
Diego and picked it up yourself and brought it back.  If you
wanted a pound of methamphetamine delivered to you, it was
going to be more expensive because there was the cost and
the risk of someone else driving it back to you and
delivering it to you.  So the proximity to the source of
supply is also a factor.

Another factor in determining the price of drugs will
be the consistency or frequency that you purchase that drug
from your source of supply.  There are traffickers who have
just a few customers and they know every Thursday this guy
is going to want two ounces, and this is guy is going to
want three ounces, and they have set amounts, and they know
they're good for it every time and they always bring their
money.

So the frequency and the consistency also determines
the price because he knows -- that drug dealer knows that
they're going to get their money on that day.  And so the
purchaser will say, hey, I'm a good customer.  I've been
with you for a year and a half and you know I'm on time
every time and I bring my money every time, so I want a
price break because there's less risk.  So they'll typically
get a price break.

Another factor is the quantity.  Just like going to

1   Costco, things are sometimes cheaper there because you have

2   to buy two great big ketchups instead of one little one, and

3   by volume it's a lot cheaper.  Even though you're spending

4   more up front, by volume you're getting more ketchup per

5   dollar than if you were to go buy a small one at Smith's,

6   for example.  So quantity is a very important factor in

7   determining the price of drugs on the street.

8        There are retail prices and there are wholesale prices,

9   and those are all relative to the size of the drug

10  trafficking organization.  A huge drug trafficking

11  organization would consider a hundred pounds to be a

12  wholesale price.  A small drug trafficker organization would

13  maybe consider a pound of methamphetamine to be a wholesale

14  price.

15       So it's all relative to the location, to the purity of

16  the drug, to the relationship with the dealer, and the

17  supply and demand in that area.

18       Right now the price of methamphetamine is as low as

19  I've ever seen it in my entire career.  In 2008, I

20  personally purchased one pound of methamphetamine.  It was

21  very pure, it came right from Mexico because we had a

22  tracker on the car that went and picked it up.  One pound of

23  methamphetamine was $25,000.  Just a couple of weeks ago,

24  our office purchased a pound of methamphetamine for less

25  than 3,000.

1      So you see there are so many factors, and right now the

2  supply and demand dictates the price of that.  So those are

3  some of the factors that determine the price of drug on the

4  street.  And pharmaceuticals follow those same, exact

5  rules -- or factors.

6  Q    Let me drill down just a little bit on a couple of

7  those, one being the location and transportation costs.  So

8  how has online sales made that different where the cost of

9  transportation maybe are different using the Postal Service,

10 or whatever other means?

11 A    Well, there's cost of shipping the pills, but it also

12 sometimes is balanced out by the quantity.  So a person is

13 going to have to pay postage, so they're willing to pay a

14 little bit more for their pill.  Now if these are real

15 oxycodone pills, or authentic pills, those are typically a

16 little bit more than a counterfeit pill would be because

17 they are harder to get.  They're the real deal.  They have

18 real oxycodone in them, so they're going to be a little bit

19 more.  And you add the price of shipping on that, it could

20 be a little bit more.

21      However, if you're willing to buy several hundred or

22 even a thousand pills at a time, you're going to get a

23 wholesale price.  And as long as that money hits the account

24 and you ship it, then that's a good -- that's a wholesale

25 price and you're going to get a much, much better deal as

1    long as you develop that rapport and reputation with your
2    source of supply and he knows the money will be there.

3         Does that answer your question?
4    Q    It does.  And let me drill down on one other one, and
5    that's the buyer-seller relationship and the trust factor or
6    risk factors involved there.  Typically in a traditional
7    drug trafficking organization, you meet the guy on the
8    corner so you see him.  Online, that's a little bit
9    different.  So how does the trust relationship factor work
10   online?
11   A    Okay.  So it works very similar to street trafficking.
12   For example, if an agent goes undercover and is introduced
13   to a source of supply by -- usually an informant, generally
14   the first time you make a buy from an individual, you're
15   going to pay a little bit more than you will the third or
16   fourth time because now he sees, okay, this guy is good for
17   the money, shows up, he always has the money with him.  It
18   goes without a hitch, everything is safe, no cops.  So then
19   after a while they lower the price.

20        Well, online, you don't get that face-to-face rapport,
21   but what you do have online is kind of like Yelp.  On these
22   dark web -- these dark web vendor sites, customers leave
23   reviews for the people that they purchase the drugs from,
24   and so they have user names online.  And a customer would
25   say -- the black oxy king maybe is his name.  Black oxy

```
 1    king -- I'm just making that up -- is a really good vendor.

 2    Every time I get my pills on time.  Every time they're

 3    authentic.  Or he's the cheapest and I always get my pills.

 4    They leave reviews just like you would at a restaurant.

 5         So a first time buyer will go on those dark websites

 6    and they'll look at reviews of someone and they'll say,

 7    okay, I'm going to try this one.  Because there's a real

 8    risk there of sending your money to someone -- you don't

 9    even know where they are in the world, and you're sending

10    them money with the expectation of getting drugs back.  So

11    those reviews become very important.

12    Q    And for the vendor, then, who's selling the drugs, that

13    becomes very important to them to maintain positive reviews?

14    A    Yes.  Yeah, just like eBay or any other website.

15    Q    Let's talk a little bit about the pharmaceutical drugs

16    themselves and what we're selling -- some trafficking

17    organizations sell.  So what are controlled substances?

18    A    Controlled substances are substances that are

19    controlled by the government, and there are different

20    schedules of controlled substances, from Schedule 1 down to

21    Schedule 5, I believe.

22         So oxycodone, for example, is a Schedule 2 drug.

23    Fentanyl is also a Schedule 2 drug, and it's controlled

24    because of its ability or proponents to be addictive or

25    abused.  And it also takes into account whether there's a
```

1    legitimate medical purpose for that drug.  So a Schedule 2

2    drug typically is a drug that's produced pharmaceutically,

3    that has a very specific medical need and use, but it's a

4    Schedule 2 because there is a high potential for it to be

5    abused or that it has a highly addictive property.

6         So those are some of the factors that go into

7    determining how a controlled substance is scheduled.  But a

8    controlled substance is, simply put, a substance that is

9    controlled by the government for those reasons.

10   Q    And oxycodone and fentanyl are both controlled

11   substances, correct?

12   A    Yes.

13   Q    In addition to price, let's talk about value.  Have you

14   specifically been involved in investigations and learn the

15   pricing of pharmaceuticals, such as oxycodone, in the black

16   market?

17   A    Yes.

18   Q    Tell us about that.  What's the pricing like for

19   oxycodone?

20   A    Okay.  So now we're talking about real oxycodone, not

21   counterfeit oxycodone.  Oxycodone is obtained from a

22   pharmacy.  It's very common to get prescribed oxycodone

23   after a surgery because it is a very good and effective

24   painkiller.  And there are people who get oxycodone

25   prescriptions monthly.  So I'm going to use this just as an

example.  This isn't the person who goes to the dentist and
gets four oxycodone pills to get him through the next day.
This is someone who purchases oxycodone tablets every month
because they're prescribed by a doctor every single month.
So it's not uncommon at all for someone like that to get 120
oxycodone tablets per month.  So that's four per day.  All
right.

When they go to the pharmacy with a prescription signed
by a doctor, so it's legitimate, and they go to the
pharmacy, without insurance, oxycodone tablets are somewhere
between $1.50 and $3 per tablet here in Utah at the local
pharmacies.  There's $1.50 to a $3 price, without
insurance, if they were paying cash price, which a lot of
people do.  They pay cash for their pills.

So now they walk away with 120 oxycodone pills.  If
they're selling those retail on the street, not wholesale,
if they sold the entire 120, they would get less.  But if
they're selling them just two, or three, or four at a time
to someone, they can get $30 a pill for those.  So that's a
significant profit per pill.

So a prescription that they walked out of the pharmacy
paying $200 for is now worth about $3600.  And it's not
uncommon at all for someone to get that prescription and, in
this world we live in, they realize how much that's worth,
and that's a pretty good supplement to your income if you

1   sell your pills to someone every month.  Unfortunately,

2   there are a lot of people that do it because there are a lot

3   of people that want those pills and they're willing to pay

4   for them.  So that's the legitimate market.

5        Now if you're buying them wholesale, you might get them

6   for as low as 15 or 12, depending on all of those factors

7   that we talked about, your relationship, your proximity to

8   the source, the supply and demand, and all those other

9   factors they will determine.  So here in Salt Lake, right

10  now, you can pay easily $30 per pill if you're are buying

11  them retail on the street.

12  Q    Legitimate oxycodone pills are controlled, you said, by

13  the federal government?

14  A    Yes.

15  Q    And they can only be obtained by a prescription?

16  A    Yes.

17  Q    So people can't obtain say a thousand of those unless

18  prescribed by a doctor, and that's typically more than what

19  a doctor would prescribe?

20  A    Yes.

21  Q    So have drug traffickers in the black market used other

22  things as a substitute for oxycodone in order to take

23  advantage of the demand?

24  A    Yes.  So in order to get there, let me just kind of

25  explain how that evolved.

1        So a drug trafficking organization may find or recruit

2   people to go get prescriptions.  They go in and say my back

3   hurts chronically.  I can't get through the day without some

4   pain pills, and they find a doctor who will prescribe them

5   pills.  And a drug trafficking organization may recruit 15

6   or 20 of these people who are getting 120 pills per month,

7   and each month they give them money to go in and get their

8   pills and go to the pharmacy and pay for them, and that is a

9   drug trafficking organization.

10       And sometimes they even fraudulently produce the

11   prescription.  It's not a real prescription, but they're

12   forged, and they're very good, and they go to the pharmacy

13   and pass it as a real scrip and they can get their pills

14   that way.

15       Now other trafficking organizations have figured out

16   that they can manufacture the pills that are very popular.

17   The oxycodone pills, for example, the two most common and

18   most popular here in Utah, and pretty much across the

19   country, are what we call the Ms or the As.  And they're

20   both blue.  They're called blues on the street.  They're

21   both blue.  They're both round.  The Ms are made by a

22   company named Mallinckrodt, and they have a square imprinted

23   on it with an M, a block M inside the square, and on the

24   flip side of that pill, there's a 30 with an underscore.

25   The As have an A on the round pill at the top with an

1    underscore and then a 215.  So they're called A 215.  Or

2    they're called As, or they're Ms.

3         And drug seekers or users have a preference of which

4    they like.  If they smoke them, some of them like the Ms

5    better than the As because of the flavor.  Some of them

6    snort them and they like the As over the Ms because it

7    doesn't burn as much, or whatever their preference is.  So,

8    again, that would factor into the price of those drugs

9    because one might be sought after by an individual more than

10   another.

11        So the manufacturer of the counterfeit pills, they try

12   to simulate those exact pills.  So when they manufacture

13   them, they put blue dye in the pill, and they make them

14   round.  They have a press that presses these pills, and the

15   press has dies, on the bottom and on the top, that imprint

16   either the M or the A, and the underscore, and the 215 and

17   the 30.  They imprint that on the pill, and then spit it

18   out.  And it's a press that goes pretty quick.

19        So that's how they've been able to manufacture these

20   fentanyl pills that don't contain any oxycodone at all.  But

21   fentanyl is a synthetic opiate, so the effect is very

22   similar to the oxycodone pill.  So a person who is addicted

23   to opiates can take that fentanyl pill and may think that

24   it's oxycodone because it gives them kind of the same

25   effect.

```
 1    Q    Is there a high demand for these opioids, specifically
 2    these pills, on the street?
 3    A    Oh, yes.  That's why we have this epidemic right now.
 4    Q    Based on your training and experience in investigating
 5    cases, tell us about the profit margin with fentanyl as
 6    opposed to oxycodone.
 7    A    Okay.  With fentanyl, they are not purchasing the
 8    oxycodone.  They're purchasing the fentanyl, which is much
 9    more -- I guess the word would be powerful.  It's a hundred
10    times more powerful than morphine.  So fentanyl is actually
11    measured in micrograms, not milligrams.  Oxycodone is
12    measured in milligrams, and Oxy 30 has 30 milligrams of the
13    active ingredient of oxycodone.  Fentanyl is measured in
14    micrograms.  So milligrams is a thousandth of a gram.  A
15    microgram is a millionth of a gram.  So that's a big
16    difference.  That's how much more potent fentanyl is.
17         So a person that wants to manufacture fentanyl-laced,
18    counterfeit Oxy pills will purchase fentanyl on the dark
19    web.  The dark web is essentially a black market Amazon.com,
20    that you can get guns, and explosives, and drugs, and
21    whatever you want on the dark web.
22         So it's not very hard to purchase fentanyl, and it
23    generally comes from China.  They get it shipped to someone,
24    or themselves, and then they take that fentanyl and they mix
25    it together, just like cookies, if they have the recipe, and
```

1    they make these pills for a lot cheaper than they can buy

2    them on the street if they were real oxycodone.  So the

3    profit margin is huge in fentanyl pills because you're

4    kicking them out by the thousands and you're not paying,

5    even the pharmaceutical -- the pharmacy price for them, the

6    cash price, you're spitting them out for pennies on the

7    dollar as compared to buying real oxycodone pills.

8    Q    Because of that potency of fentanyl and the measurement

9    in micrograms, how important is quality control in the

10   manufacture of pills?

11   A    Well, real oxycodone manufacturers are -- they have to

12   be able to certify that there is exactly 30 milligrams of

13   active ingredient.  And I keep saying 30 milligrams because

14   it's the Oxy 30s.  That's kind of what we're talking about,

15   the 30 milligram tablets.  They know that there is precisely

16   30 milligrams of active ingredient in each pill, because

17   those manufacturing companies have very low tolerances of

18   margin of error, and they're mixed in equipment that makes

19   sure that the drug is mixed evenly, and when those pills are

20   produced, each pill has the exact amount in it.

21         With clandestinely manufactured pills, that's not being

22   done in a controlled environment, in a laboratory.  It's

23   being done in a basement or a bedroom of a home in blenders,

24   and then it's put in a hopper where it goes into the pill

25   press.  So one pill may have high concentration of fentanyl

1    and another pill hardly has any at all.  So there's a

2    tremendous risk there of quality control.  There is no

3    quality control.  Some pills have a lot and some pills might

4    not have any.

5    Q    And given the powerful nature of this, risk can be

6    lethal?

7    A    Yes.

8    Q    Are you familiar with drug trafficking organizations

9    testing for quality on third parties?

10   A    I am.

11   Q    Tell us about how that works.

12   A    I'm trying to remember what year, but it was maybe four

13   years ago, we just first started seeing counterfeit produced

14   oxycodone tablets, at least here in Utah, and it was one of

15   the very first manufacturing labs -- pill manufacturing labs

16   that we took off.  We did a search warrant on a hotel on

17   State Street down in Sandy.  And they had a pill press in

18   there, and there was blue powder everywhere.  And we knew

19   what we had, so we did a warrant.  We all got in our suits

20   and we went and processed all the evidence and, sure enough,

21   they were producing Oxy -- counterfeit Oxy 30 tablets.  They

22   were using fentanyl and there was fentanyl in there, which

23   is very dangerous because it's so potent that if you're

24   exposed to it even through your skin, you can OD on it.  You

25   can overdose on it.  So we have to take very serious

```
 1   precautions in processing the evidence in a situation like
 2   that.
 3          During the interviews of the suspects in that case, we
 4   learned that the individual who was manufacturing those
 5   pills, he had no idea how powerful those pills were because
 6   it's not an exact science.  He's not doing it in a
 7   laboratory.  He was doing it in a hotel room.
 8          So he would make a batch of pills, and he was curious
 9   as to how powerful those pills were, so he had addicts who
10   were friends who he was giving those pills to to test.  And
11   he would give them to them for free.  That was the caveat,
12   that you can have them for free but you have to tell me how
13   you feel, which is very dangerous, and some of them OD'd.
14   So he was actually testing the strength of his pills on his
15   own friends who were addicts.  So they were more than
16   willing to try the drug and give him that feedback so that
17   they could get their fix.  It was a very, very sad
18   situation.
19   Q    And with regard to online marketplaces, you're saying
20   that some of the feedback has to do with quality control,
21   correct?
22   A    Yes.  So if they're real oxycodone, those online
23   vendors who are selling legitimate Oxy pills, they're
24   selling them illegally, but they're real pills.  They tout
25   that on their site.  Mine are not fake.  I sell real
```

1    oxycodone.  And people that get them know that they're real

2    because they can usually tell by looking at the pills.  But

3    definitely when they take the pill, they can tell that it's

4    real oxycodone, and they'll give feedback.

5        And some vendors will make sure that everybody gets the

6    real stuff and not the fake stuff.  Other vendors are very

7    up front about the fact that they are counterfeit pills.

8    And other vendors try to put off counterfeit pills as real,

9    legitimate oxycodone.  So there's the whole spectrum there.

10            MR. STEJSKAL:  May I have just a moment,

11   Your Honor?

12            THE COURT:  Sure.

13   BY MR. STEJSKAL:

14   Q    Let's talk specifically about the term continuing

15   criminal enterprise, or CCE.  Are you familiar with that

16   term?

17   A    Yes.  It's a statute, a federal statute.

18   Q    Have you investigated or been involved in the

19   investigation of cases that were termed continuing criminal

20   enterprises, or CCEs?

21   A    Yes, I have.  I have been a case agent on a couple of

22   those.

23   Q    Tell us generally what that statute is.

24   A    The CCE statute, or continuing criminal enterprise, is

25   a statute that specifies a certain level of trafficking,

1   leader of a trafficking organization.  So there are a couple
2   of factors that have to be present in order to charge
3   continuing criminal enterprise.  One of those is there has
4   to be a leader, organizer, someone who is in charge of the
5   organization, and they're typically the person that is
6   charged with that statute.  Even though the overall
7   conspiracy may involve 20 other people, generally the CCE is
8   charged for the leader, organizer of that group.  Now that's
9   one factor.  There has to be a leader, organizer.
10       The other is they have to have at least five
11  individuals --
12            MR. SKORDAS:  Your Honor, I'm going to object.
13  This is a legal conclusion and something for the jury.
14            THE COURT:  He can testify as to his
15  understanding, I think, generally, but he can't give a legal
16  opinion.  Are you asking him for a legal opinion?
17            MR. STEJSKAL:  I'm not asking him for a legal
18  opinion, no.  Let me ask another question and we'll go that
19  way.
20            THE COURT:  All right.
21  BY MR. STEJSKAL:
22  Q    Based on your training and experience, what specific
23  facts or areas would apply to a principal administrator,
24  organizer, or leader?  What kinds of things would that
25  person do?

```
 1              MR. SKORDAS:  Same objection.
 2              THE COURT:  Overruled.  He can testify as to his
 3    understanding and experience.
 4              THE WITNESS:  My understanding is the leader,
 5    organizer would be the person in charge of the decisions,
 6    who gets hired, what the prices are, who rents the vehicles.
 7    They delegate -- the very things that we've been talking
 8    about would be a leader, organizer.
 9    BY MR. STEJSKAL:
10    Q    And to involve five other persons, five or more other
11    persons, what type of roles would five other persons or
12    would more people fill?
13    A    So my understanding of the statute means that --
14              MR. SKORDAS:  Same objection, Your Honor.
15              THE COURT:  You can have a continuing objection.
16              MR. SKORDAS:  Thank you.
17              THE WITNESS:  My understanding would be that there
18    have to be five individuals that worked under the employ of
19    that leader, organizer.  So they would be people that may
20    purchase equipment in their names.  They may be people that
21    ship the drugs, or drive somewhere to deliver the drugs, or
22    pick the drugs up.  They may be people who are in charge of
23    collecting money.  As I've said, there are so many different
24    types of organizations and facets of a drug trafficking
25    organization, just like any other business, that leader,
```

1    organizer would delegate those types of activities to the

2    people under them.

3    BY MR. STEJSKAL:

4    Q    And another requirement is that the leader, organizer

5    obtains substantial income or resources from the operation?

6    A    Yes.

7    Q    Explain that for us.  How do they obtain resources from

8    the operation?

9    A    Well, the operation, of course, in the case of drug

10   trafficking, is the actual trafficking of illegal drugs, and

11   the proceeds that are gained from that are illicit proceeds.

12   And as I understand it, this statute requires that those

13   proceeds be substantial, and I think that's all it says.

14   It's a relative term, substantial.  But the proceeds have to

15   be substantial in order to charge the CCE.

16   Q    So based on your experience, is a million dollars

17   substantial?

18   A    Yes.

19   Q    Let's talk lastly about the term conspiracy.  You said

20   you obtained specific training on conspiracy, correct?

21   A    Yes.

22   Q    And you've investigated a number of conspiracy cases

23   throughout your career?

24   A    I have.

25   Q    Conspiracy requires an agreement between people.  Is

1  that your understanding?

2  A     Yes.  It was defined to me as a conspiracy is an

3  agreement between two or more individuals, and then in order

4  to be a criminal conspiracy, that agreement would be to

5  break the law.  And so a conspiracy is where two or more, or

6  a group of people conspire together to accomplish something

7  like drug trafficking, and each individual in that

8  conspiracy is not required to know what the other

9  individuals' roles are.

10     They know, for example, you are in the conspiracy if

11  you know that your job is only to rent cars every single

12  week to drive to San Diego to pick up drugs, and you rent

13  the cars.  That's all you do.  You don't even drive them.

14  Your job is to rent that car.  That's your part of the

15  conspiracy.  You are now a co-conspirator.

16     So each individual in a conspiracy has a part in that

17  crime that's being perpetrated, and each individual doesn't

18  have to know what the other individual is doing, but they

19  can still be part of the conspiracy.

20  Q     And often it's up to the leader, organizer to kind of

21  define those roles?

22  A     Of course.

23  Q     Is there often, in your experience, a written contract

24  of this agreement?

25  A     I've never seen one.

```
 1   Q     So how does the agreement take place?
 2   A     It's usually verbally.  Sometimes they don't even
 3   specify it.  It just starts happening.  You know, hey --
 4   they just start doing it and they're good at it, or it
 5   worked and so they do it again.  Sometimes it just becomes
 6   their role.  Oftentimes -- they don't sit down and have a
 7   board meeting and say, okay, here's what we're going to do.
 8   We're taking a different approach to this.  It's very fluid
 9   and it just evolves into an organization and everybody has
10   their role that's defined by someone.
11               MR. STEJSKAL:  One moment, Your Honor?
12               THE COURT:  Yes.
13   BY MR. STEJSKAL:
14   Q     In a conspiracy investigation, based on your
15   experience, is there always a single leader or a role
16   sometimes divided?
17   A     Roles are divided.
18   Q     Explain that.
19   A     Well, oftentimes there are partners, and sometimes
20   partners stay together for a long time and other times
21   partners start disagreeing on how things are done.
22         I did a case a few years ago where it started out with
23   two partners, and the one just finally said I'm out, and the
24   other just kept going with all of the previous customers,
25   and everything was kept going.  The one just left and he got
```

1    bought out, but the organization continued.  But he was

2    still part of the conspiracy and he was an equal partner

3    until that certain date when he voluntarily left the

4    conspiracy and completely got out of the drug trafficking

5    business.  So he was a co-conspirator until that time and he

6    was an equal partner until that time.

7    Q    And you've seen different organizations that operate

8    differently?

9    A    Yes.

10   Q    Again, you said they come in different structures and

11   sizes?

12   A    Just like businesses, yep.

13   Q    Thank you.

14        MR. STEJSKAL:  That's all the questions at this

15   time, Your Honor.

16        THE COURT:  Thank you.

17        You may cross-examine, Mr. Skordas.

18                    CROSS-EXAMINATION

19   BY MR. SKORDAS:

20   Q    Mr. Bryan, did you say you started at the DEA in 1991?

21   A    Yes.

22   Q    And you started here in Salt Lake?

23   A    Yes, sir.

24   Q    When you started at the DEA, you started as a field

25   agent, or something with that title?

1    A    Special agent, yes.

2    Q    Special agent.  And did you start sort of on the

3    street, so to speak, trying to do hand-to-hand buys and

4    trying to find individuals that were selling drugs?

5    A    Yes.

6    Q    And you would go to clubs, or places like that to do

7    that?

8    A    Typically we don't do that too much.  That's kind of a

9    dangerous thing to do, and it's not very fruitful in terms

10   of -- we go out in clubs and how do you know who you're

11   buying from, and it's dangerous.  When we make undercover

12   purchases, it's very controlled, generally.  So we usually

13   get introduced by someone.

14   Q    And you'd be introduced by someone to an individual who

15   was going to distribute drugs to you, correct?

16   A    Yes.

17   Q    And you'd have some government money that controlled

18   part of the controlled buy and exchange that for the drugs?

19   A    Yes.

20   Q    And then you would arrest the person that gave you the

21   drugs eventually, at some point, right?

22   A    Uh-huh, (Affirmative).  Sometimes.  Sometimes we'd see

23   where they're getting the drugs and we try to go up the

24   chain from there.

25   Q    Because that's the goal of all of this, isn't it?

1    A    Yes.

2    Q    Is to find out where the drugs are coming from?

3    A    Yes.

4    Q    Tell the jury why -- well, did you say you worked in

5    the cocaine area for a while?

6    A    Yes.

7    Q    And did that take you to Brazil?

8    A    Yes.

9    Q    And tell the jury why you went to Brazil.

10   A    Well, I went to Brazil because I had lived there

11   before.  I already spoke the language, and there was an

12   opportunity to work there.  So I took my family down there

13   and worked.  It wasn't because I wanted to work cocaine.  It

14   was I wanted to broaden my scope of investigations.  But

15   that's what we were working down there, was cocaine.

16   Q    But the DEA sent you there because the cocaine was

17   coming from Brazil -- or from Colombia I think you said?

18   A    Yes.  It was used as a transit country.

19   Q    And from Venezuela, correct?

20   A    Yeah, other South American countries.  There are 26

21   major seaports along the east coast of Brazil, and they try

22   to get the cocaine to those seaports to go all over the

23   world, and we tried to intercept those loads in concert with

24   the Brazilian Federal Police.  We didn't work unilaterally

25   down there.  And we tried to intercept those loads before

1    they got on those boats.

2    Q    Because your end game is to get the source of supply,

3    correct?

4    A    That's correct.

5    Q    That's the ultimate bad guy, correct?

6    A    Yes.

7    Q    And in the cocaine industry, that bad guy was in

8    Colombia, correct?

9    A    Well, we would go up the chain as far as we could, but

10   ultimately most of the cartels were in Colombia.

11   Q    And you testified about meth and that most of the

12   cartels for meth were in Mexico?

13   A    They're now in Mexico.  The meth started here in the

14   U.S.  That's a U.S. homegrown product.

15   Q    It is now?

16   A    It was, back in the biker days.

17   Q    Because people can make meth?

18   A    Make it.  So the source of supply is here.  So they

19   were manufacturing it.

20   Q    I'm sorry.  I'll quit cutting you off.

21   A    That's okay.

22   Q    Because you can buy, arguably, legal products, set up a

23   little meth lab in your basement and make something that's

24   illegal, correct?

25   A    Yes, back then you could.  Now some of those products

```
 1    that you need to manufacture methamphetamine are controlled
 2    as well.
 3    Q    The precursors?
 4    A    Yes.
 5    Q    But cocaine isn't something you make in your basement,
 6    is it?
 7    A    No.
 8    Q    And neither is fentanyl, is it?
 9    A    No.
10    Q    So to get the source of supply, the DEA sends you,
11    sometime in the '90s, I guess, or early 2000s, to Brazil to
12    try to chase that down, correct?
13    A    Yes.  My job was to try to get the cocaine before it
14    was shipped to other parts of the world, primarily the U.S.
15    Q    And prescription drugs, the source of supply is China
16    often, correct?
17    A    No.  Prescription drugs, it's pharmaceutical companies
18    that produce it.  They are legally producing the
19    pharmaceutical drugs, and they're all over the world.
20    Q    What about fentanyl?
21    A    Fentanyl is -- if you're buying it illicitly?
22    Q    Right.
23    A    Yes.  Typically fentanyl is purchased on the dark
24    web -- if someone is buying it illicitly, they purchase it
25    on the dark web, and generally it comes from China.
```

```
 1   Q    So those are the bad guys, right, that are making the
 2   illegal drug?
 3   A    Uh-huh.  (Affirmative)  Well, it's made legally.
 4   They're probably diverting it.
 5   Q    Well, I suppose in Colombia in 2000 you could make
 6   cocaine legally.  You just can't send it to America,
 7   correct?
 8   A    Well, I'm sure fentanyl is probably produced here in
 9   America as well in a controlled environment and it's used
10   for pharmaceuticals.  Diversion is -- the term diversion is
11   used to specify a product that has -- that there's a
12   controlled chain.  So a pharmaceutical company may produce
13   fentanyl or oxycodone, and then they sell it to -- the
14   manufacturer sells it to a company.
15   Q    I'm going to cut you off.  I'm not talking about a
16   pharmaceutical company that's manufacturing cocaine, or
17   methamphetamine, or fentanyl.  I'm talking about an illegal
18   distributor.
19   A    Of fentanyl?
20   Q    Of any of those things.
21   A    Okay.
22   Q    That's who you want, isn't it?
23   A    Yes.
24   Q    Okay.  So fentanyl --
25   A    An illegal distributor of those things.
```

1    Q    Absolutely.  It's coming from China?

2    A    Well, the pills aren't coming from China.  The fentanyl

3    is.

4    Q    That's what I said, fentanyl.

5    A    Okay.

6    Q    In whatever form.

7    A    Okay.

8    Q    And by the same token, I guess marijuana at some point

9    was coming from other locales, right?

10   A    Yes.

11   Q    Where was that coming from during your time at the DEA?

12   A    Some from Mexico.  The high quality marijuana was grown

13   in the northwest of our country, northwest United States.  A

14   lot of marijuana comes from South America, but it doesn't

15   come up here because it's not worth shipping up here all the

16   way.  But countries in South America produce it as well for

17   local distribution.  So marijuana can grow just about

18   anywhere.

19   Q    What about LSD?

20   A    LSD is typically produced in San Francisco

21   clandestinely.  Historically, in the United States, the

22   epicenter is San Francisco for some reason.

23   Q    And it's made by some lab that makes LSD?

24   A    Yes, a clandestine lab.

25   Q    And Ecstasy, where does that come from?

```
 1   A     Ecstasy generally comes --
 2   Q     I'm not trying to quiz you.
 3   A     It generally comes from Europe, the Netherlands.
 4   Q     I'm asking you these questions because I don't know the
 5   answers.
 6   A     That's okay.
 7   Q     When you would work at the DEA and you arrested
 8   individuals who were selling you drugs, it was not uncommon
 9   that they didn't know the name of the person they were
10   getting the drugs from, correct?
11   A     Is it not uncommon?
12   Q     Right.
13   A     No.  They usually know who they're getting the drugs
14   from.
15   Q     And did they know who that person was getting the drugs
16   from?
17   A     Maybe not.
18   Q     And did they know who was manufacturing the drugs?
19   A     Maybe, maybe not.
20   Q     Did they know the folks in Colombia that were bringing
21   the drugs?
22   A     Well, I gave you an example of a pound of
23   methamphetamine that I purchased.  That individual knew
24   exactly who was producing that meth.  But I've purchased a
25   lot of drugs where they had no idea who was producing the
```

```
 1   drug.  So, again, it's just like a business.  They're so
 2   different.  Some do and some don't.
 3   Q    But the folks that are running the cartel are only
 4   successful if nobody knows who they are.  It's no fun going
 5   to jail because --
 6   A    The people that are running the cartels?
 7   Q    Right.
 8   A    Well, that level, most people do know who's running the
 9   cartels.  It's no secret who runs the cartels.
10   Q    There's no secret to you who's running the cartel, but
11   to the guy on the street that's just handing you the drugs,
12   they don't know.
13   A    They don't care.
14   Q    Right.
15   A    Yeah.
16   Q    And they don't get a letter from whoever are latest
17   drug lord in Colombia is saying, Dude, we'd sure love you to
18   help us out here, do they?
19   A    No.  They don't need to.
20   Q    You talked about the use of Bitcoin a little bit --
21   A    Uh-huh. (Affirmative)
22   Q    -- and you said that the U.S. Postal Service is often
23   used because it accepts Bitcoin?
24   A    So you don't buy stamps with Bitcoin.  But if you have
25   a -- there are drug trafficking organizations that ship
```

1    drugs via the U.S. Postal Service, and they can print their

2    own postage, and they have to purchase -- you purchase it in

3    advance, and then you can print the postage.  And it is

4    possible to purchase that postage with Bitcoin.  It's

5    possible.  Not all drug traffickers do that.  In fact, I

6    don't know very many that do, but it's possible.

7    Q    But people who are selling oranges or shoes can buy

8    their stamps using Bitcoin too, correct?

9    A    Sure.

10   Q    It's not just limited to illegal organizations?

11   A    No.  No.  Bitcoin is not illegal.

12   Q    Right.  That was the question I should have asked you

13   first.

14            MR. SKORDAS:  I believe that's all I have,

15   Your Honor.

16            THE COURT:  Thank you, Mr. Skordas.

17            Any redirect?

18            MR. STEJSKAL:  Briefly, Your Honor.

19                      REDIRECT EXAMINATION

20   BY MR. STEJSKAL:

21   Q    So as a long-term member of DEA, you are aware of DEA,

22   the United States Drug Enforcement Administration, and what

23   targets they identify generally, correct?

24   A    Yes.

25   Q    Are you familiar with the term CPOT, C-P-O-T?

1    A    Yes.

2    Q    What is that?

3    A    That is a priority target, meaning the DEA has

4    identified certain priority targets that are like major.

5    Now I talked about the different sizes of organizations.  A

6    CPOT would be a CEO of Costco or a CEO of Target.  Those are

7    huge organizations and those CPOTs are who DEA has

8    identified as the leaders of those organizations.

9    Q    Has DEA identified Chinese fentanyl suppliers as CPOTs?

10   A    Yes.

11   Q    And does DEA have investigations into Chinese fentanyl

12   suppliers?

13   A    Yes.

14   Q    Because those investigations exist, does that mean DEA

15   should not investigate pill suppliers in the United States

16   that use that fentanyl?

17   A    No.

18   Q    Why not?

19   A    Because it's being sold here.  The pills are being

20   manufactured here and sold here.  We don't get a lot of

21   cooperation from China when it comes to those

22   investigations, believe it or not.  So the fentanyl that is

23   purchased from them here clandestinely and then used to

24   produce pills, that's what's being sold on the streets of

25   the United States and here in Utah, and everywhere else.

1        So yes, when those pills are produced with that

2    fentanyl, we have to find the people that are producing

3    those pills with that fentanyl and stop it.  That's what we

4    try to do.

5    Q    So what's the ultimate goal of DEA?  Are you familiar

6    with the terms disrupt and dismantle?

7    A    Yes.

8    Q    What does that mean?

9    A    Well, we disrupt and dismantle as high up the chain as

10   we can.  That's what we try to do.  So if a drug trafficking

11   organization is kind of a smaller organization, maybe five

12   people, and we dismantle that organization and all five of

13   them go to jail, that trafficking organization was disrupted

14   and dismantled.

15       Now if there's a big, very large organization that we

16   would -- you know, compared to a large department store, for

17   example, if we're comparing to legitimate businesses, if we

18   took off the managers of several stores, we're disrupting

19   it, but we haven't completely dismantled it.  But we're

20   disrupting it.  We would try to get to the very, very top

21   guy that we can to dismantle it, but sometimes we can only

22   disrupt.  Does that answer your question?

23   Q    Just because you don't get the top guy, that doesn't

24   mean you shouldn't target the second guy?

25   A    No.

```
 1   Q    And DEA has made Chinese fentanyl suppliers a priority
 2   target?
 3   A    Yes.
 4   Q    Thank you.
 5              THE COURT:  Thank you.
 6              Any recross, Mr. Skordas?
 7                         RECROSS-EXAMINATION
 8   BY MR. SKORDAS:
 9   Q    And those suppliers still exist today, don't they?
10   A    Yes.
11              MR. SKORDAS:  Nothing further, Your Honor.
12              THE COURT:  Thank you.  You may step down.
13              THE WITNESS:  Thank you, Your Honor.
14              THE COURT:  We'll start tomorrow at 8:30.
15              Thank you again, ladies and gentlemen of the jury.
16   We so appreciate you, and we'll see you tomorrow.
17              (Jury excused)
18              THE COURT:  Have a nice evening.
19              (Whereupon, the trial was continued to Thursday,
20   August 22, 2019 at 8:30 a.m.)
21
22
23
24
25
```

1                   C E R T I F I C A T E

2

3

4           I hereby certify that the foregoing matter is

5    transcribed from the stenographic notes taken by me and is a

6    true and accurate transcription of the same.

7

8

9

10

11

12

13

14

15

16   PATTI WALKER, CSR-RPR-CP       DATED: 12-14-2020
     Official Court Reporter
17   351 South West Temple, #8.431
     Salt Lake City, Utah  84101
18   801-364-5440

19

20

21

22

23

24

25