```
 1                IN THE UNITED STATES DISTRICT COURT
 2                        DISTRICT OF UTAH
 3                        CENTRAL DIVISION
 4
 5  UNITED STATES OF AMERICA,   )
 6            Plaintiff,        )
 7     vs.                      )  Case No.  2:16-CR-631-DAK
 8  AARON MICHAEL SHAMO,        )
 9            Defendant.        )
10  _____)
11
12           BEFORE THE HONORABLE DALE A. KIMBALL
13        ---------------------------------------
14                      October 15, 2020
15                        Sentencing
16
17
18
19
20
21
22
23
24  REPORTED BY: Patti Walker, CSR, RPR, CP    801-364-5440
25  351 South West Temple, #8.431, Salt Lake City, Utah  84101
```

A P P E A R A N C E S

For Plaintiff:           Michael Gadd
                         Vernon G. Stejskal
                         Kent A. Burggraaf
                         U.S. ATTORNEY'S OFFICE
                         111 South Main Street, #1100
                         Salt Lake City, Utah  84111


For Defendant:           Gregory G. Skordas
                         Kaytlin V. Beckett
                         SKORDAS & CASTON LLC
                         560 South 300 East, #225
                         Salt Lake City, Utah  84111


                         Daryl P. Sam
                         DARYL P SAM PLLC
                         5955 S. Redwood Road, #102
                         Salt Lake City, Utah  84123

1    SALT LAKE CITY, UTAH; THURSDAY, OCTOBER 15, 2020; 10:00 A.M.
2                           PROCEEDINGS
3              THE COURT:  Good morning.  Welcome, everyone.
4              It's interesting to see people actually here.
5    We've been doing almost all our work on Zoom.  It's good to
6    have some people in here.  Thank you for distancing and
7    having your masks.
8              My name is Dale Kimball, and I have presided and
9    continue to preside over this case.  So we'll call the case.
10   This is the case of United States of America vs. Aaron
11   Shamo, 2:16-CR-631.  The defendant is present and
12   represented by his counsel, Mr. Greg Skordas.  The United
13   States is represented by Mr. Michael Gadd, Mr. Vernon
14   Stejskal, Mr. Kent Burggraaf.
15             Is that correct?
16             MR. GADD:  Yes, Your Honor.
17             THE COURT:  Let me tell you preliminarily what I
18   have reviewed and talk a little bit about the types of
19   sentencings that we do here.
20             I've read all the letters that were sent to me.
21   I've read the presentence report.  I've read the sentencing
22   memoranda of the parties.  I've read recommendations from
23   probation, and I've thought a lot about this matter.
24             Let me say first a word about the different types
25   of sentences that we do here.  It may clarify some things

1 for you.

2 First let me say that a few of the letters I
3 received suggested that I give the death penalty in this
4 case. That was never on the table. I don't know whether it
5 was ever considered by what we call Main Justice or the
6 local U.S. Attorney's Office. But if it had been and they
7 had decided to prosecute the case in that way, then I would
8 have had to have been notified and we would have had to have
9 qualified a death penalty jury before that could be a
10 possibility, and that never happened. So the death penalty
11 has never been on the table as far as I'm concerned. Like I
12 say, I'm not privy to nor do I have any right to know what
13 prior considerations were.

14 Now back to the sentencings and the type we do
15 generally. We have what we call guideline sentences. The
16 United States Sentencing Commission provides various
17 sentencing guidelines based on criminal history, and defense
18 levels, and the guidelines are instructive and we're
19 supposed to consider them very seriously, but we do have
20 discretion to go upward beyond the upward guideline range or
21 down below a guideline range. We have to articulate our
22 reasons, but we have the discretion to do so. And those are
23 actually most of our cases, and we, federal judges, have a
24 lot of discretion in those cases.

25 Another type of case is what we call 11(c)(1)(C)

1  based on the Federal Rules of Criminal Procedure where the
2  parties suggest either a sentence or a sentence range, and
3  there we have discretion to either adopt the recommendation
4  and sentence at the suggested sentence level or within the
5  range of the suggested range of the sentence. If we decide
6  to reject the submission and decide to sentence either above
7  the recommended sentence or sentence range, then the
8  defendant has the right to withdraw his or her plea of
9  guilty and we're back to square one, or if we decide to
10 sentence below the suggested sentence or the suggested
11 sentence range, then the government has the right to
12 withdraw the arrangement and we're back to square one.
13         But that takes us to a third type of sentence, and
14 that's what this case is. Where a statute passed by
15 Congress provides a mandatory minimum sentence or also
16 called a minimum mandatory sentence, we, as federal judges,
17 have no discretion to go below the mandatory minimum
18 sentence. And if we do, we would be quickly reversed by the
19 United States Court of Appeals for the Tenth Circuit.
20         There are arguments that such sentences are
21 unjust, that they don't really consider properly the things
22 we ought to take into account in terms of policy, and
23 protection, and rehabilitation, and a variety of other
24 things that we're supposed to worry about. But in this kind
25 of a case I don't have the discretion to go below the

1 mandatory minimum or, if you prefer, the minimum mandatory
2 sentence.
3 　　　　　Mr. Shamo was charged in an indictment that
4 alleged 13 counts. The jury hung on one of the counts.
5 That means they didn't agree either to acquit or convict.
6 They convicted on the other 12, and one of those, I think it
7 was Count 1, was being a leader or organizer of a continuing
8 criminal enterprise -- we call it CCE -- that has five or
9 more people. He was convicted of that and the mandatory
10 minimum is life, and I have no discretion. I thought it
11 might be helpful for you to understand that.
12 　　　　　Mr. Skordas, what do you want to tell me?
13 　　　　　MR. SKORDAS: Thank you, Judge. It's good to see
14 you again, by the way.
15 　　　　　THE COURT: It's good to see you.
16 　　　　　MR. SKORDAS: I agree with everything you just
17 said and I understand the position you're in today, but I
18 just want to say a few things anyway.
19 　　　　　I don't believe for a minute when Congress enacted
20 the continuing criminal enterprise statute that they ever
21 figured that we would be dealing with a mentally ill
22 26-year-old drug dealer. And it's hard to imagine,
23 Your Honor, anyone ever selling drugs of any quantity
24 without the potential for being charged with a continuing
25 criminal enterprise statute. It's just part of the way that

1 that business works.

2 But I think Congress relied on the good work of
3 the prosecutors to have some discretion, and to do the right
4 thing, and to take into account a 26-year-old first time
5 offender, who is mentally ill, and not make the type of
6 Draconian decision that was made here.

7 I know we're not going to persuade anybody to
8 anything today, but it's a tragedy what happened here. It's
9 an absolute tragedy.

10 Aaron is going to spend the rest of his life in
11 prison. I think had we had the opportunity to poll those 12
12 jurors and ask them if that was a just result, we would have
13 had unanimity that it's not, and, in fact, it's not. But
14 it's where we are.

15 It's unfortunate where we are in this country.
16 And even our president has told us, what is called the First
17 Step Act, that we've taken drug offender cases too far.
18 Even the Utah legislature has backed off on those, because
19 we house drug offenders in ways that are so cruel.

20 And I think there's some recognition in this
21 country, unfortunately too little, too late, for Aaron
22 Shamo, that that makes no sense at all because what we're
23 saying is that he is completely incapable of rehabilitation,
24 that he's completely incapable of any salvation, and that
25 he's completely incapable of ever being a productive member

1   of society, all three of which are untrue.

2   We struggled with the trial. I think that the
3   jury did what they needed to do given the evidence that was
4   presented to them. We argued -- and I know it doesn't
5   matter -- nothing I say matters today, Your Honor -- that
6   there's going to be a tremendous disparity in sentencing.
7   And I don't say that, as the government might hope, so that
8   you'll give the other defendants a harsh sentence. Nobody
9   deserves a harsh sentence in this case. And by harsh I mean
10  life in prison, or some period of time where we're all just
11  old and tired when we get out of prison. But Aaron is going
12  to suffer that.

13  And I don't mean to imply for one minute that you
14  should punish the other defendants in an unduly harsh manner
15  just so the government can get what it wants here, which is
16  what I consider to be an unduly harsh sentence.

17  We negotiated with the government in good faith.
18  We surrendered millions of dollars in cryptocurrency. In
19  fact, I think the presentence report defines it as
20  $5.3 million. We did that with an understanding that there
21  would be some recognition for that, and that understanding
22  was completely untrue, Your Honor.

23  We offered to come in and sit down and do a
24  debrief with the government, and they took us up on the
25  offer but they didn't. That offer and acceptance was again

1    completely untrue, Your Honor -- completely untrue.

2    　　　　So we sit here today and Aaron is going to go to
3    prison for the rest of his life, a mentally ill, now
4    29-year-old man who is barely competent and who sold drugs.
5    And the government has produced 90, or whatever, people who
6    are going to say, well, they died as a result of this, and
7    the Court has indicated that, in fact, the jury did not find
8    that. Not one. Not one.

9    　　　　And they've submitted these restitution numbers,
10   which I don't want to get into today, but tens of
11   thousands -- over $100,000 in restitution, including people
12   who want to be reimbursed for their wineglasses, for their
13   dresses, for their weed whackers. It's a product of having
14   Aaron surrender these millions of dollars and telling
15   people, hey, we've got all this money out there for you, so
16   we're going to have a restitution hearing and it will be
17   just as painful as today. And the Court may very well have
18   your hands tied at that one as well.

19   　　　　But make no mistake, Your Honor, this was not a
20   just prosecution, and I think that we're all worse off for
21   it.

22   　　　　THE COURT: Thank you, Mr. Skordas.

23   　　　　Mr. Gadd.

24   　　　　MR. GADD: Your Honor, we have a mother of one of
25   Mr. Shamo's deceased customers here with us who would like

1  to address the Court.  She will be the only victim who
2  speaks.  The rest have submitted on their letters.  After
3  she speaks, I'd like to just address the Court very briefly.
4              THE COURT:  All right.  You'd like her to speak
5  first?
6              MR. GADD:  Please.
7              THE COURT:  All right.
8              Come forward, please.
9              MS. KEBLISH:  My name is Tova Keblish, the mother
10 of Gavin Keblish.  I'm here with James, Gavin's father.
11             We would like to thank Judge Kimball for giving us
12 the time to speak here today.  I'd also like to mention the
13 incredible prosecuting team, federal agents, detectives, and
14 all the officers and agents involved.  They worked so hard
15 on getting the unspoken justice.  We truly appreciate all of
16 them.  They put their blood, sweat, and tears, along with
17 endless time and energy, and we appreciate that.
18             Gavin was our only child.  Gavin was taken from us
19 four years ago, August 13th, 2016, having two detectives
20 come to our door, something that no one should endure.
21 These photos are some of our last family photos we have of
22 our son.  Memories is something we would never have again
23 past his 23rd birthday.
24             We need to see the faces and the face of the
25 person responsible for killing.  Your customers, your

1  victims were not just numbers, e-mails.  There were people
2  behind them.  As you hid behind your screen name, your
3  business name, Gavin was an incredible person, intelligent,
4  smart, funny, loud, larger than life, with lots of love to
5  give to anyone.
6            He raced motocross from age five to 18.  That was
7  something we enjoyed as a family every weekend.  He
8  graduated from Albany University and became an incredible
9  counselor for difficult children in state foster care.  He
10 made them feel important because in his eyes they were, and
11 he wanted to help them and help so many others.
12           Gavin endured an injury, and as you can see from
13 the photos, it was quite a long haul of surgeries.  He
14 suffered through the pain while they reopened his legs --
15 his leg to hope to heal it and heal it better.  This was a
16 young person trying to get over excruciating physical pain.
17 The pain made him vulnerable to people like you, a predator.
18           He found your site thinking it was getting
19 Oxycodone, but he received a legal dose of Fentanyl.  As we
20 sat here in the courtroom last August and listened to all
21 the testimony, the hardest was to hear it was easy money.
22 How easy was it to know that you were killing people, even
23 after you were told it makes people sick?  People were dying
24 from it.  Your comment was tell them to suck it up, or send
25 another batch.  You denied my son the right to live.

 1                You have given us and so many others a new
 2     horrific life.  We will never experience our son's marriage,
 3     have grandchildren, or hear his voice ever again.  We miss
 4     his hugs the most.  I do not understand why I am still here
 5     and my son is not.
 6                Parents should never have to bury their children.
 7     The pain is so unbearable at times.  You have ripped out our
 8     hearts and destroyed them.  There is not enough pain that
 9     you think you've ever endured to have the pain that we have
10     gone through and what you have done to me and so many
11     others.
12                As the jury was unable to see you hand the pills
13     to the now dead customers, they could not charge you with
14     the death charge, but you know you did kill them.
15                Comments that were made during the trial that
16     Aaron was a dumb kid were false.  You were smart enough to
17     put together this whole organization.  You were smart even
18     to know what you were doing.  Shipping counterfeit pills,
19     you shipped thousands of people their death sentence.  You
20     were making your own homemade instant death pill.
21                There are always what-ifs in life.  I live it
22     every day.  I hope you think 24/7.  You may be saying I
23     didn't make him take it.  I didn't kill him.  But you did.
24     You created this worldwide business.  You made it and you
25     had it shipped.

1          All those involved had something to do with the
2   death of my son.  If you made it, if you packed it, if you
3   mailed it, I feel you are part of killing my son.  You all
4   should take blame and responsibility, and all knew exactly
5   what you were doing.
6          Your partners are still out there.  Some of them
7   got married, some have child, and have a life, something you
8   took away from my son along with so many others.  Not only
9   their lives you destroyed, it is the family, friends and
10  people that they could have helped.
11         I will never forgive you for starting this
12  organization or any of the others that wanted to make easy
13  money.  I hope you, Aaron Shamo, and all the others involved
14  think every remaining day of their earthly being what you
15  have done to Gavin's family and so many others.
16         THE COURT:  Thank you.
17         Mr. Gadd.
18         MR. GADD:  Your Honor, for Mr. Shamo and his
19  co-conspirators, his deceased customers were faceless names
20  on a page.  To them those faceless names on a page
21  represented filthy riches by selling poison disguised as
22  medicine, but not to us.  To us, to the United States, to
23  the trial prosecutors, to the investigators, and analysts,
24  they have never been faceless names on a page.
25         We gave our very best effort in the investigation

1  and prosecution of this case, motivated by the knowledge
2  that they were never faceless names on a page. They were
3  brothers, sisters, sons, daughters, fathers, friends, loved
4  by many, unique, mourned, individuals missed.
5  　　　　　　The letters from their families are haunting.
6  They stand as a witness to the terrible evil committed by
7  the defendant and his co-conspirators.
8  　　　　　　It has been our singular honor to seek justice on
9  behalf of the deceased. Our efforts in that endeavor have
10 been consecrated efforts. By the Court's sentence today,
11 the families of Mr. Shamo's customers will see justice done.
12 　　　　　　We extend our deepest sympathies to the families
13 of the deceased. We wish we could pull into an embrace each
14 person mourning the loss of one of Mr. Shamo's customers and
15 tell them how much we care.
16 　　　　　　We recognize that even a just sentence like this
17 one, even a just sentence cannot restore what was lost, but
18 it is our deep hope that seeing justice done will help to
19 heal the hearts of those who are hurting.
20 　　　　　　Thank you.
21 　　　　　　THE COURT: Thank you, Mr. Gadd.
22 　　　　　　Mr. Shamo, you're being sentenced and you have
23 every right to speak if you want to. Of course, you're not
24 required to if you don't. Would you like to say anything?
25 　　　　　　MR. SHAMO: Yes.

1             THE COURT: Go right ahead.

2             You don't need to stand. Just speak into the
3    microphone there.

4             MR. SHAMO: I'm embarrassed by my actions. As I
5    look back, I can't believe I did what I did. What started
6    off as a small hobby turned into a business, and ended up a
7    lot bigger than what anyone intended. I had friends and
8    enabled them to do illegal things, and together we created a
9    monster. I didn't know the dangers of what we were doing.
10   I ran the site, handled logistics, pressed Xanax, and
11   exchanged Bitcoins of cash.

12            At the time I thought I was doing some good as we
13   were swarmed with positive feedback and praise. I was
14   wrong. What I didn't see was the addiction behind it, the
15   sabotage in people's lives, and how it could possibly affect
16   them and their families. I saw when I came to jail all the
17   above and the ugly truth it provides. People really do get
18   addicted.

19            During my crime, I got lost in the money and the
20   lifestyle it brings. I benefited from my friend pressing
21   fent roxys, and the Xanax I pressed, as we sold them online
22   in Utah. I'm deeply sorry and regret the decisions I made.
23   I've made a fool of myself and brought embarrassment to my
24   family that will never be able to wash away.

25            Now I'm going to prison and I don't think I'll

```
 1   ever get out.  I'm sorry for my actions.  I own up to it.  I
 2   feel terrible for everything and I'm paying the ultimate
 3   price for it.
 4            Thank you.
 5            THE COURT:  Thank you, Mr. Shamo.
 6            Mr. Skordas, anything else you want to say?
 7            MR. SKORDAS:  No.  Thank you, Judge.
 8            THE COURT:  Do you want me to make a
 9   recommendation for placement?
10            MR. SKORDAS:  Yes, Your Honor.  His family is in
11   the Arizona area and he's asked for that facility.
12            THE COURT:  Anything else?
13            MR. GADD:  No, Your Honor.  Thank you.
14            THE COURT:  Well, as I stated earlier, there's a
15   mandatory minimum here.
16            It is the judgment of the Court that the
17   defendant, Aaron Michael Shamo, is placed in the custody of
18   the Federal Bureau of Prisons for a period of life.  No
19   fine.  A $1200 special assessment fee because he was
20   convicted of 12 different counts.  It's $100 a count.  And
21   the Court recommends placement in a federal correctional
22   facility in Arizona to facilitate family visitation.
23            We've set a restitution hearing, I think.  When is
24   that?
25            MS. TOSCANO:  November the 19th at 10:00 a.m.
```

```
 1              THE COURT:  Mr. Shamo has the right to be present
 2   at that hearing, right?  But we've got to make sure he's not
 3   transported before then.  All right?
 4              MR. GADD:  Yes, Your Honor.
 5              MR. SKORDAS:  Your Honor, Mr. Shamo has indicated
 6   that he would waive his appearance at that.  I don't know
 7   whether that's doable, but he just indicated to me that he
 8   would do that.
 9              THE COURT:  He can waive that if he wants to.
10              MR. SKORDAS:  Is that true, Aaron?
11              MR. SHAMO:  Yeah, that's true.
12              THE COURT:  If they've transported him by then,
13   then it won't matter.  We'll proceed with the restitution
14   hearing.
15              And I'd appreciate some briefing on the
16   restitution, that I get maybe a week before the hearing at
17   the latest, from each of you.
18              MR. GADD:  Yes, Your Honor.
19              THE COURT:  All right.
20              If there is nothing else, thank you all.
21              Court will be in recess.
22              MR. GADD:  Your Honor, could I ask one more thing?
23              THE COURT:  I guess there is something else.
24              MR. GADD:  The forfeiture attorneys in our office,
25   who are much smarter than I am at this, have asked that I
```

1    ask the Court to announce the forfeiture at sentencing to
2    comply with the statute.  The Court has previously ordered
3    the forfeiture in March of this year.  I brought a copy of
4    the Court's order.  But I'm told that if the Court announces
5    it at sentencing, that will be in compliance with the
6    statute.
7               THE COURT:  All right.  What do you want me to
8    announce?
9               MR. GADD:  If I could present this Exhibit A.
10   This is a list of what was forfeited.
11              THE COURT:  I thought we had done this.
12              All right.  So the property forfeited to the
13   United States of America is -- you want me to read this I
14   take it?
15              MR. GADD:  Read or adopt.
16              THE COURT:  I will adopt it.  Let's spare the pain
17   of reading it.
18              So this Exhibit A is adopted, and the prior order
19   is adopted as a current order of the Court relating to
20   property forfeited to the United States of America by the
21   defendants in this case.
22              Anything else?
23              MR. GADD:  No, sir.  Thank you.
24              THE COURT:  Thank you all.
25              We'll be in recess in this matter.

```
 1              MR. SKORDAS:  Thank you, Judge.
 2              (Whereupon, the proceeding was concluded.)
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1            C E R T I F I C A T E

2

3

4        I hereby certify that the foregoing matter is

5   transcribed from the stenographic notes taken by me and is a

6   true and accurate transcription of the same.

7

8

9

10

11

12

13

14

15

16  PATTI WALKER, CSR-RPR-CP      DATED: 12-14-2020
    Official Court Reporter
17  351 South West Temple, #8.431
    Salt Lake City, Utah  84101
18  801-364-5440

19

20

21

22

23

24

25