IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION


UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
        vs.                     )
                                )
AARON MICHAEL SHAMO,            )   Case No:  2:16CR00631
                                )
            Defendant,          )
                                )
                                )
_____   )


BEFORE THE HONORABLE DALE A. KIMBALL

MAY 30, 2019

VOLUME II

PAGES 81-156



Reported by:

KELLY BROWN HICKEN, RPR, RMR

801-521-7238

```
 1                    APPEARANCES OF COUNSEL

 2

 3    FOR THE UNITED STATES:            OFFICE OF THE US ATTORNEY
                                        BY:  S. MICHAEL GADD
 4                                           VERNON STEJSKAL
                                             KENT A. BURGGRAFF
 5                                           Attorneys at Law
                                        111 SOUTH MAIN ST STE 1800
 6                                      SALT LAKE CITY, UTAH 84111

 7    FOR THE DEFENDANT:                SKORDAS & CASTON
                                        BY:  GREGORY G. SKORDAS
 8                                           KAYTLIN V. BECKETT
                                             Attorneys at Law
 9                                      560 SOUTH 300 EAST STE 225
                                        SALT LAKE CITY, UTAH
10                      I N  D  E  X

11    WITNESS               EXAMINATION BY            PAGE

12    GUY GINO              DIRECT BY GADD            84
                            CROSS BY SAM              103
13                          REDIRECT BY GADD          108

14    SANDRA SABINS         DIRECT BY STEJSKAL        111
                            CROSS BY BECKETT          119
15
      ROBIN BIUNDO          DIRECT BY GADD            122
16                          CROSS BY BECKSTEAD        131
                            REDIRECT BY GADD          139
17
                  EXHIBITS RECEIVED INTO EVIDENCE
18    GOVERNMENT'S        PAGE
      17.07               110
19    18.01               119
      15.00,15.01,15.02
20    15.02,19.01,19.02
      19.03               143
21    18.02               144

22

23

24

25
```

```
 1                SALT LAKE CITY, UTAH, THURSDAY, MAY 30, 2019

 2                              *   *   *   *   *

 3                THE COURT:  We're here this morning in the matter

 4     of the United States of America vs. Aaron Shamo, 2:16-CR-631.

 5     The United States is represented by Mr. Michael Gadd,

 6     Mr. Vernon Stejskal and Mr. Kent Burggraaf.  The defendant is

 7     present and represented by his counsel Mr. Greg Skordas,

 8     Mr. Daryl Sam and Ms. Kaytlin Beckett.

 9                Go ahead.  You have a witness?

10                MR. GADD:  I do, Your Honor.  The United States

11     calls Special Agent Guy Gino.

12                THE COURT:  Come forward and be sworn, please,

13     right up here in front of the clerk of court.

14                THE CLERK:  Please raise your right hand.

15                              GUY GINO,

16           called as a witness at the request of Plaintiff,

17              having been first duly sworn, was examined

18                    and testified as follows:

19                THE WITNESS:  I do.

20                THE CLERK:  Please state your name and spell it for

21     the record.

22                THE DEFENDANT:  Guy Gino, G-U-Y, G-I-N-O.

23                THE COURT:  You may proceed, Mr. Gadd.

24                MR. GADD:  Thank you, sir.

25     //
```

```
 1                     DIRECT EXAMINATION

 2    BY MR. GADD:

 3         Q.   Special Agent Gino, for whom do you work?

 4         A.   I work for Homeland Security Investigations.

 5         Q.   How long have you worked for HSI?

 6         A.   I've been employed by HSI since 2003.  Prior to

 7    that I was employed the US Border Patrol since 1996.

 8              MR. GADD:  I've previously filed a notice of expert

 9    for Special Agent Gino, and so my intention is not to cover

10    all of his qualifications here but to rely on that, unless the

11    Court would like me to go into it more extensively.

12              THE COURT:  You don't need to.

13              MR. GADD:  Thank you.

14         Q.   BY MR. GADD:  I have a CD here with your initials

15    on it.  Did you have a chance to review the PowerPoint exhibit

16    on this CD this morning?

17         A.   All of them, yes.

18         Q.   So there's three PowerPoint presentations, and

19    they're accurate.  They are your PowerPoints you created to

20    show the jury as part of your testimony; correct?

21         A.   That is correct.

22         Q.   Let's take a minute and look through them.  I

23    believe you have control now of the screen.  Could we take a

24    minute first and look at the PowerPoint that covers pgp

25    encryption.
```

1            MR. SAM:  Mine is on.  Yours is not.

2            MR. SKORDAS:  Daryl's is, but ours isn't.

3            MR. GADD:  They are.

4            MR. SKORDAS:  There's a little light on.

5            THE COURT:  You can rely on me for rulings, but for

6    no technical advice.

7            MR. SKORDAS:  These youngsters can figure it out.

8            THE CLERK:  I'm not aware how it is working today.

9            MR. SKORDAS:  Well, we can just use the one behind.

10           THE CLERK:  I honestly don't know.

11           THE COURT:  Go ahead.

12           MR. SKORDAS:  Aaron and I are just going to sit

13   back here where we can see them.

14           THE COURT:  That's no problem.  That's fine.

15           MR. SKORDAS:  Thank you, Judge.  We're ready.

16           THE COURT:  All right.  Go ahead, Mr. Gadd.

17      Q.   BY MR. GADD:  So my intention is not to go through

18   all of your testimony.  We provided the PowerPoints

19   previously, but we provided them as a PDF, and I have some

20   animation on this one.  So I want to show the Court and the

21   defense in particular the animation just so there's no

22   surprises.  Do you mind moving us forward on your slides until

23   we get to the animation?

24      A.   Sure.

25           (Showing slides.)

1          Q.    Thank you.

2                So to add to the record we've just watched all of

3    the slides that have animation in the pgp encryption

4    PowerPoint.  Could we look next at the darknet markets

5    PowerPoint?

6          A.    Sure.

7          Q.    And my goal here is to say, my goal is to show the

8    videos that are embedded in the PowerPoint.  That way the

9    Court, in particular the defense have the ability to know

10   exactly what your testimony will be.

11               According to my notes the first video is Slide 14.

12   Can you show us that slide?

13         A.    Yes.

14               (Slide 14 was played.)

15         Q.    BY MR. GADD:  Can we next look at Slide 17?

16         A.    Yes.

17               (Slide 17 was played.)

18         Q.    BY MR. GADD:  There's a couple more videos I want

19   to show, and they're in your next set of slides here in your

20   next presentation on digital currency.  While you're moving to

21   it, I'd like to ask you a question.

22         A.    Okay.

23         Q.    You have slides that we're going to explain to the

24   jury some of these basic concepts that are not well understood

25   by the population, things like pgp encryption, things like

1    darknet markets and how they work, the Tor browser, the deep

2    web versus the darknet.  These videos that you've embedded

3    into your presentation and the animation, did you stick those

4    in in an effort to better educate the jury?

5         A.   Yes.

6         Q.   Do the videos represent your opinions on these

7    subjects?  So, for example, we watched just now that news

8    report where someone in the report, I think the person who

9    clearly was from North Carolina because he said it was all

10   gravy but he wanted his real name not used, he said there's

11   not much the police can do about it.  Does that part

12   necessarily reflect your opinion?

13        A.   No.

14        Q.   In fact, you spend your whole career trying to

15   interdict, disrupt, dismantle and present cases that lead to

16   successful prosecutions for crimes committed on the darknet or

17   with cryptocurrency; correct?

18        A.   Yes, sir.

19        Q.   The video in your opinion is still educational for

20   the jurors, though.

21        A.   It is.

22        Q.   Let's take a minute, and let's look at digital

23   currency.  Could we specifically look at Slide 10?

24             (Slide 10 is played.)

25        Q.   BY MR. GADD:  Let's take a minute, and let's pick

1    it up at roughly Slide 34.  And rather than just show this

2    final video, I want if you could you to give us some context

3    for how transactions take place using digital currency.

4         A.    Okay.  To understand how a transaction takes place

5    with digital currency you first have to understand that a

6    transaction occurs between two parties, and they both need to

7    have software downloaded to a device, which is the digital

8    currency wallet.  Without the wallet, the transaction cannot

9    take place.

10        This transaction between two parties is broadcast

11   on the network for that currency.  In this instance we'll talk

12   about Bitcoin.  The way that Bitcoin works to verify a

13   transaction it's validated by individuals who run software on

14   their computers.  Those individuals are known as Bitcoin

15   miners.  Mining is a distributed consensus system that's used

16   to confirm and validate all transactions.  Or if I would send

17   a transaction to you we would both have the software, we would

18   initiate a transaction that would be broadcast over the

19   network to these miners.  Part of my transmission of sending

20   you the digital currency would have embedded in it

21   cryptography.  Specifically within that cryptography is

22   algorithm.  And the algorithm is used to digitally confirm

23   that I'm the rightful controller of the wallet, it's my

24   wallet.  There's a value on it that's been broadcast to the

25   network previously, and that the algorithm that is sent to

1    verify that would include all previous validated algorithms of

2    all prior transactions ever conducted on this network, the

3    coin network.  When a transaction is verified by these miners,

4    they get posted on a public ledger known as the Blockchain.

5            The miners are integral to the Bitcoin network in

6    not only approving these transactions, but their actions of

7    doing so, they do so for what is known as miner fees.  And

8    what happens is if my algorithm and in layman's terms is, say

9    it's math one plus one, the first miner that's able to solve

10   that algorithm wins what's called the miner fee, which is a

11   small portion of the value that's being transferred.  All the

12   other miners that were attempting to solve that first

13   ultimately come up with the same answer, and that's known as

14   confirmations.  And confirmations constantly post after the

15   transaction has already gone from Party A to Party B.  This

16   verification is posted on the Blockchain.  Each transaction

17   that occurs between individuals, each time it's updated on the

18   Blockchain, it's data.  This data fits what's called a block,

19   which is limited by size.  Ultimately that block will be full.

20   It will reach the peak amount that it can contain, and it

21   will -- the system will start to create a new block.

22           But prior to doing that, it will hold a lottery.

23   Every individual, every miner that had won the miner fees is

24   entered into this lottery.  The winner of the lottery receives

25   newly minted Bitcoin, and that's how new Bitcoin enter into

1    this economy.  So the miner's job is important because it's

2    not only verification, without the miners there is no

3    verification, and it's for introducing new digital -- new

4    Bitcoin into their economy.  That's where they get the name

5    from.  It's easier to show with an overview slide, and of

6    course the movie.

7         Q.   I want to go to those, but just a question for you

8    on what we've talked about so far.  You indicated that Bitcoin

9    miners are individuals.  They can also be institutions, for

10   example, right?  Like a bank might set up an ability to mine

11   because there's some profit to be gained if you win the

12   lottery; right?

13        A.   Yes.  Now the trend that we split Bitcoin is miner

14   pools, which is software, additional software that people sign

15   an agreement that they are part of this pool and they allow

16   the combined computer power to try to solve these very

17   lengthy, very difficult algorithms.  And with the more

18   computers working on these algorithms the better probability

19   is for them to be able to solve them first and have a chance

20   on the lottery.  So it could be an individual, or it could be

21   an entity that is providing software.  But ultimately everyone

22   needs to have some type of device connected to the network.

23        Q.   Let's move forward.  I'd like to look at your

24   overview slide on the video.  Let's keep looking at it.  Do

25   you want to just walk us through this overview?

    1          A.    Sure.  And this is a 30,000 foot view of what I was

    2     explaining.  The transactions initiated via a wallet, which is

    3     software.  That transaction is broadcast to the network.

    4     Random nodes on the network verify, in this instance it those

    5     are the miners.  Miners broadcast the transaction to the

    6     network after they validate that it is legitimate.  The miners

    7     bundle the transaction and a new block is generated.  That is

    8     where the lottery instant occurs.  The new Bitcoin is

    9     generated and awarded to the miner who wins the lottery.

   10     Ultimately in the transaction, that block chain is

   11     broadcasted, and the transaction shows it's been verified on

   12     the block chain for the digital currency.

   13          That's what occurs between Person A and B,

   14     confirmation times average around 10 minutes.  It really

   15     depends on the activity on the network.  Sometimes it can take

   16     longer; sometimes it can be short.

   17          Q.    And then if you'll take us through to the next.

   18          A.    This video helps explain how Blockchain works,

   19     which is the public ledger for all.  Each Blockchain is

   20     representative of the public ledger for that specific

   21     cryptocurrency.

   22          Q.    Okay.

   23          (Video was played.)

   24          Q.    BY MR. GADD:  Since you are our proposed expert

   25     witness you are going to be the one to educate the jury on

1    these issues.  But you also understand our investigation.

2    You've advised, you've participated in it.  Part of the reason

3    we're showing the jurors this information about digital

4    currency like Bitcoin and the Blockchain is because our

5    evidence came from the Blockchain, at least some of it;

6    correct?

7         A.   That's correct.

8         Q.   Let's take a minute and let's talk about how an

9    investigator or even just someone in the public analyzes this

10   public information that is the Blockchain.  Are you familiar

11   with Block explorers?

12        A.   Yes.

13        Q.   What is block explorers?

14             THE COURT:  A what?

15             MR. GADD:  Block explorers.

16             THE COURT:  Thank you.

17        Q.   BY MR. GADD:  What does a block explorer look like?

18        A.   I can show you.  A block explorer is what is used

19   to search for transactions on a specific currency's

20   Blockchain.  There are many of them.  Since the Blockchain is

21   public it's out in the public, it's open-sourced.  Block

22   explorer is a tool, usually a web page that allows you to look

23   up specific transactions.

24        Q.   Can you show us one that you use that you trust?

25        A.   Sure.  I use, it's called Blockchain.com.  It used

1    to be known as Blockchain.info.  So on this specific site --

2         Q.   Can I pause you for a second?

3              Are you able to see it there?  Do you also see it

4    on the monitor?

5         A.   You know what, let me duplicate my display.

6         Q.   Okay.  I can see it.

7         A.   Okay.

8         Q.   You folks can see it?

9         A.   As you can see up top here that I'm highlighted,

10   that's the address.  It's a web address that you can go to.

11   And at this specific site that I use, if you scroll to the

12   bottom you have the option of going to a Bitcoin explorer,

13   ethereum explorer, ethereum being another form of

14   cryptocurrency, and Bitcoin cash explorer.  So this one has

15   three.  I'll open up the Bitcoin explorer.

16              You can search address, transaction, ID, or a

17   specific block number.  It shows the most recent blocks that

18   have been confirmed.  You can also see in realtime

19   transactions that have been confirmed.  This, of course, is a

20   transaction hash and the amount of the quantity.  If I was to

21   click on a specific hash like this, it's not confirmed yet

22   because it just happened.  The miners are solving the

23   algorithm.  But there's information about the transaction on

24   here, specifically the originating address, the destination

25   address, the estimated amount in form of Bitcoin as well as if

93

1    I hover over the transaction it will give me a US dollar

2    amount or value of the Bitcoin at the time of transaction.

3         Q.   And you see that there listed when you hover;

4    right?  It's showing both the dollar amount, the day and the

5    time in zulu time; correct?

6         A.   Correct.  And also it will show the fees that the

7    miners have received.  So in this instance for this

8    transaction, which it looks like it's for $39.24 cents, this

9    fee is $3.12.  It's estimated and will remain estimated until

10   the transaction is confirmed.

11        Q.   You mentioned that you could look up a particular

12   wallet.  Do you have ready access to the defendant's main

13   wallet that begins 1HMO?

14        A.   I do.

15        Q.   Can we look at his main wallet then?

16        A.   Sure.

17        Q.   Okay.  So that's our address there, 1HMO?

18        A.   Right.  And it ends in lower case kdq.

19        Q.   Okay.  So kind of walk us through what we're

20   looking at here in his wallet using a block explorer.

21        A.   Sure.  This exhibit, what I did is I took the

22   address, I had this saved so I can walk right back through the

23   steps I took.  So we'll close out of here.  This was the page

24   we were on.

25        Q.   Okay.

1          A.    I paste the address into the search engine, and I

2     get to the same page I was just at.  And it will identify the

3     address, and it will show the number of transactions in the

4     life of this address.  And here it tells me that there were

5     6,323 transactions.  That's both inbound transactions as well

6     as outbound transactions.  It will give me the final balance.

7     It will also give me the amount of Bitcoin it has received as

8     a lifetime.

9          Q.    Just for fun let's hover over that total received

10    and see what it's worth today had he saved all of his money.

11    Let's see.

12         A.    I have to do it this way and route it.

13         Q.    We have to go to the bottom?

14         A.    I have to go to the bubble and change -- if you

15    click on it you can change it from Bitcoin to cash.

16         Q.    Okay.

17         A.    So for that top field right there.  It would have

18    been worth over $39 million.

19         Q.    At today's exchange?

20         A.    At today's value, which I believe it is in the

21    range of $8,000.

22         Q.    I just looked at it, and it looked maybe like 8700.

23         A.    Okay.

24         Q.    And to be fair, that's obviously worth much more

25    for Bitcoin now than when the defendant was earning his

1    Bitcoin from AlphaBay?

2         A.    Right.  On the individual transactions, I only do

3    accounting in the form of Bitcoin in my investigations.

4         Q.    Sure.

5         A.    But for each individual transaction, for instance,

6    we'll take the last transaction out of the wallet, which it

7    looks like on that date it would be one of the government

8    seizures.

9         Q.    Exactly.

10        A.    If I click on the actual transactions, hash ID,

11   which is where my curser is up here, that takes me to the

12   specific transaction.  And if I hover over the amount of

13   Bitcoin that was sent to the government, follow it, that would

14   give me the value at the time of the transaction as well as

15   the time.  So that's the US dollar value at time of

16   transaction between defendant's wallet to the government

17   seizure wallet.

18        Q.    And maybe just for some context, the date on here

19   is September 13th, 2017.  That's one of the days in which

20   investigators had discovered and found access to the

21   defendant's wallet supplied for a seizure warrant, and were

22   seizing money from it.  This transaction is law enforcement

23   sending money from the defendant's wallet to a law enforcement

24   wallet; correct?

25        A.    Correct.

1          Q.   And the several transactions below are the same.

2     They just did it in incremental pieces.  That way if something

3     went wrong they wouldn't lose a whole lot of money, just a lot

4     of money.

5          A.   Correct.

6          Q.   I want to ask -- and part of the reason I'm asking

7     for more detail in this instance because of a question that

8     came up yesterday.  There was a question about whether we had

9     a witness who could lay foundation for how we can know the

10    historical value of a Bitcoin on the dates in the past, such

11    as the date of seizure, or the date of defendant's arrest.

12    You've shown us one way.  For example, this is date of the

13    seizure, and that's giving us the value at the time seized.

14         How about for other dates or the day of his arrest

15    where we don't necessarily have a transaction that we can

16    point to?  If I were to ask you, how can you determine the

17    historical value of a Bitcoin on a given day in the past,

18    where would you go look?

19         A.   I can look at numerous sites.  Since we're on this

20    site, I can show you where they post it on this site, and then

21    I can show you the site that I use in my investigations

22    because of the way it presents the data, if you would like.

23         Q.   Let's do, please.

24         A.   Okay.  So on this site I click on Blockchain and go

25    to their main page.  And I'm looking for charts under the data

                                                                    97

1       column.  And I would go based off market price.  So on all

2       these, and you can put it in a search engine that says

3       historical Bitcoin US dollar value or Bitcoin yen value,

4       wherever you would like to see what the value is, and you

5       would get dozens of site.  I believe Yahoo! Finance has one.

6       I believe all the type of traditional financial sites,

7       Bloomberg, I believe that they all have the data, historical

8       data that's been posted on public ledger.

9               But here it looks like this is just going.  So

10      we're going to do all time, I can click on that, and that will

11      change the feature on this.  And as I hover and move my cursor

12      over the lines it shows the dates and the value.

13      Q.   And can I jump in?  I just want to make sure that

14      the record is clear on this.  So we're looking at

15      Blockchain.com.  We're now looking at a line graph that

16      extends from the beginning of Bitcoin in roughly 2009 all the

17      way until the present.

18              Okay.  Go ahead.  And can you kind of explain value

19      as you go along the line?

20      A.   Right.  And as I go along the line it increases in,

21      you know, the dates.  It goes from 2009 to current.  And as

22      you can see it tracks the value of Bitcoin.  And this specific

23      site takes the value off an average of multiple marketplaces.

24      So this is good for visual to get a feel or to go to a

25      location quickly.  So you have a specific date you want me to

1    at least look on here?

2         Q.   Yeah.  Let's try, for example, July 3rd, 2018.

3    That happens to be the date that the United States took

4    custody of the Bitcoins that belong to one of Mr. Shamo's

5    codefendants or coconspirators, Lou Paz.

6         A.   You said what?

7         Q.   July 3rd, 2018.

8         A.   Okay.  Let's go to July 2018.  That's where I am at

9    here.  I'll look to see if one of the data points could be

10   July 3rd.

11        Q.   It looks like you're real close there.

12        A.   Okay.  It's between two data points.  And this

13   happens.  This is why I go to another site.  So July.

14        Q.   Go back a little.

15        A.   July the 3rd.

16        Q.   Yeah, to the 3rd.

17        A.   Okay.  So this is right here.  So this looks like

18   it's July 3rd, but it's between the July 2nd data point and

19   July 5th data point.  So I would go to a different site in

20   this instance.

21        Q.   You indicated there's a site that you prefer;

22   correct?

23        A.   I would go to one that I prefer because it's easier

24   to view.  I'll go to a site known as coinmarketcap.com.  And

25   this site has a list of all cryptocurrencies, and that's the

1    resource I would use.

2        Q.   To be fair, there are many cryptocurrencies;

3    correct?

4        A.   Over 2,000.  So let me go to Bitcoins and click

5    there.  I believe it's under tools, historical.  I'm trying to

6    find.  Historical data right here.  So if I click on the

7    cryptocurrency, which is Bitcoin, and I click on the tab for

8    historical data, as I scroll down, my experience of using this

9    I lose the columns up top.  So I do a little trick that I -- I

10   post a picture, that's the bar, of just what the columns are

11   so I can assist me.  I'll just go back to it.  So what I

12   normally do is take a snap of this top portion.

13       Q.   And that's so you can see the column headings when

14   you're scrolling?

15       A.   Yes, sir.  And I just right there.  And which is

16   the date you would like?  It's the same one?  Would that work?

17       Q.   Yeah.  Look first at July 3rd, 2018.

18       A.   I have to change the setting to all time.

19       Q.   Make it for all time?

20       A.   All time.

21       Q.   There you go.

22       A.   So on the top one here, we'll be right underneath

23   day, would be July 3rd, it shows the opening amount and the

24   closing amount.  But what I like about this especially for my

25   investigations is I can see what the value of Bitcoin was for

1    that day, the lowest value as well as its highest.  And the

2    range here as you can tell is between just a little bit over

3    $200 it looks like from the low value to the high value.

4    Since Bitcoin value is constantly changing, we have to

5    describe it within a range.

6         Q.   And when you say Bitcoin's value that's with

7    respect to the US dollar both of which are constantly

8    changing.

9         A.   Yes, sir.

10        Q.   Let's look at a couple more since we've got you

11   here.  Could you show us October 11th, 2017?  This is another

12   date that some of Mr. Shamo's Bitcoin was received by the

13   United States.

14        A.   You said October 11, 2017?

15        Q.   2017, yeah.  So we've got to go up one year.  There

16   you are.

17        A.   There it is up on top.

18        Q.   So your high is just over 4800, the low is 4750ish,

19   and it closed at $4,826?

20        A.   Yeah.  It looks like it's a range of 122, $122 for

21   that day.

22        Q.   Just a minute ago when we were looking at the block

23   explorer we found one of the seizures from the defendant's

24   wallet, and we looked at the value there.  But as long as

25   we're here could you take us to just a month before?  It's

1    September 12th through the 14th of 2017?

2         A.   So it would be these three.

3         Q.   And these were three days over which seizures from

4    the defendant's wallets took place.

5         A.   Uh-huh (affirmative).

6         Q.   So your high is somewhere between 43 and 3900ish,

7    and then it closes about the same.

8         A.   Yes.  For the three days I would say that the low

9    is 3153.  Yeah.  It looks like the lowest amount.  And the

10   highest amount would be 43.  So about $1200 difference.

11        Q.   Let's look at one last date, if you don't mind, for

12   us.  It's the date of the defendant's arrest, so

13   November 22nd, 2016.  It is just down a hair.  Oh, no.  I'm

14   sorry I misled you.  You were in the right spot.

15        A.   There it is.  November 22nd.  It looks like the

16   difference for that day is, the low was $736.53, and the high

17   was $753.87 per Bitcoin.

18        Q.   I appreciate you walking us through this.  The

19   school teacher in me knows that it's hard to do math on the

20   whiteboard with everyone watching, and I think the same

21   applies to running through an investigation in front of an

22   entire courtroom, so I appreciate that.

23             Your Honor, at this time I move to admit

24   United States 17.07.  These are the slides that Special Agent

25   Gino has prepared.  It's a demonstrative exhibit that's going

1    to education the jury as part of his expert testimony.

2                    THE COURT:  You want to cross-examine?

3                    MR. SKORDAS:  This is Mr. Sam's witness, Your

4    Honor.

5                    THE COURT:  You want to cross-examine?

6                    MR. SAM:  Yes, Your Honor.

7                    THE COURT:  Let's have him cross, and then I'll

8    rule.

9                            CROSS-EXAMINATION

10   BY MR. SAM:

11        Q.   I have a question regarding Mr. Shamo's access to

12   his Bitcoin wallet and when he would have had access to that.

13   Would he have had access to that any time after his arrest, or

14   do you have that information?

15        A.   I don't know if he had access to a computer or to a

16   device or to anything, so I don't know.

17        Q.   That's not any information that you gathered, then,

18   is whether his wallet was accessed after his arrest or --

19        A.   Oh, I mean, I can take a look.

20        Q.   That's something that could easily be --

21        A.   Whether it was Mr. Shamo that accessed it or

22   someone else I don't know.

23        Q.   But did you track that at all whether his Bitcoin

24   wallet was accessed after his arrest or --

25        A.   We looked at the Blockchain and set it at all

1     transactions, and I believe on the specific wallet that we

2     just looked at I believe that the transaction that occurred,

3     based off the date of arrest there was a transaction that

4     occurred just prior to the arrest within 24 hours, as I

5     recall.  We can look on the Blockchain right now if you want.

6          Q.   Okay.  Yeah.  Maybe we can do that, if you can show

7     us that.

8               THE COURT:  Is your question, was it accessed after

9     defendant's arrest?

10              MR. SAM:  That is my question.  And I'm

11    determining -- he's saying there was one access prior to his

12    arrest, and --

13              THE COURT:  That's what I thought he said.

14              THE WITNESS:  So the date of arrest was

15    November 22, 2017?

16         Q.   BY MR. SAM:  '16.

17         A.   I'm sorry.  2016.  So what I would do is put the

18    address in, and the address is up here, go through all the

19    transactions that that address has ever had.  And for this

20    specific wallet address I would go to past the government's

21    seizures.  Okay.  So that's November 21st, 2016.  Let's see

22    when this one was.  Let me see if there's any others.  I

23    believe this will -- okay.  September 13th.  And then we go

24    the previous transaction looks like November 21st, and that

25    would be right here.  November 21st.  So I would go to that

                                                             104

1    specific transaction.  And, yes.  It looks like there was a

2    shifting.  It was -- let me change the view on this to make

3    the page a little bit.  On this specific transaction in

4    looking at this it would tell me that this top address

5    received 136.9 Bitcoin, and then the address that we have, the

6    defendant's address received .038 Bitcoin in change.  So there

7    was a transaction that was conducted and posted onto the

8    Blockchain.  November 21st, 2016, at 13:46, zulu time, so I'm

9    not sure what the change of time zone is out over here.  But

10   this transaction did occur prior to the arrest.

11        Q.   Prior to the arrest.  And then the next transaction

12   would have been --

13        A.   Those are government seizures.

14        Q.   -- government seizures.  So there was no

15   intervening transactions?

16        A.   From this address.

17        Q.   Okay.  All right.  When you say "this address," how

18   many addresses did you look at?

19        A.   A wallet.  A wallet can have unlimited amount of

20   addresses.

21        Q.   Okay.  I wanted to ask you questions about the

22   PowerPoint presentation --

23        A.   Sure.

24        Q.   -- that you put together.  It's a lengthy

25   PowerPoint presentation.  What was the purpose of putting that

1    together?

2         A.   To educate everyone in the courtroom since this is

3    so new.  For me just to talk about it, you need visuals.  You

4    need people to be able to see what it is.  And it's just

5    explaining each portion of what I would be talking about.

6    It's to aid in the education of everyone here.

7         Q.   Okay.  And have you used that PowerPoint in other

8    presentations that you've presented on these topics?

9         A.   That PowerPoint, those slides come from

10   presentations I give to the private sector, to law

11   enforcement, and I use similar slides in other type of

12   settings, whether it be educating federal public defenders,

13   US Attorney's Office as well as aids for other testimony.

14        Q.   Okay.  And as far as putting that together to

15   videos that you found -- is that something you put together

16   yourself or was it somebody assisting you?

17        A.   No.  Those are presentations.  All of that content

18   that's on there I put together.

19        Q.   Okay.  And so you searched out the news program or

20   the Bitcoin presentation, the pgp, those -- I mean, how did

21   you find those?

22        A.   All the information on this is open-sourced.  It's

23   on the Internet through public search indexes.  I fell into

24   this back in 2013, and to work cases that we had, I had to

25   educate myself.  Most agencies, in fact, everyone had a

 1   learning curve that they had to accomplish for the cases that
 2   started back then.  The slides that we have here I put
 3   together, and they constantly evolve to what's going on
 4   currently.  And I'm constantly updating it, trying to make the
 5   learning curve easier for those that receive the training, to
 6   help them understand it.  So I hope that answers the question.
 7       Q.   Yeah.  I guess I'd like to ask you, I mean, because
 8   for the most part your training agencies are different than
 9   the private sector on these topics.  And that's where you used
10   the PowerPoint?
11       A.   Not in the private sector.  We've had private
12   sector attendees for, say, like financial compliance.  But my
13   training is for law enforcement and to aid them in either
14   current or future investigations they may uncover, to allow
15   them to know what they are looking at and to understand it.
16       Q.   Okay.  All right.  You had stated that you don't
17   necessarily agree with what's being said in the videos, or I
18   can't remember exactly how that --
19       A.   I don't agree with what their witness stated in
20   regards to law enforcement can't really do anything about it.
21   The video itself, the reason why I use it is it explains how
22   easy it is to download a program and gives a good with visual
23   explanation of how the darknet works.  And I use it prior to
24   my slides so that it's fresh in everyone that observes it
25   mind.  I do not agree with the fact that law enforcement can't

1    do anything about it.  And I do not agree with the point where

2    they said that in Bitcoin it's virtually untraceable.  The

3    coin is traceable if you know what you're doing.

4            Q.   Okay.

5                 I don't have any further questions, Your Honor.

6                 THE COURT:  Thank you.

7                 Do you have any further questions?

8                 MR. GADD:  Just one.

9                         REDIRECT EXAMINATION

10   BY MR. GADD:

11           Q.   Maybe two.  The first question is just along --

12                THE COURT:  A lawyer just never has one question.

13                MR. GADD:  I know.  I shouldn't have said that.

14           Q.   BY MR. GADD:  Along those same lines there's a

15   small aspect of the video that don't, that aren't consistent

16   with the opinions you're going to offer to the jury.  But

17   we're going to explain that during your presentation.

18           A.   Yes.

19           Q.   And then the second and last question.  You

20   indicated that a wallet can have almost an infinite number of

21   addresses.  And that's true, isn't it?

22           A.   Correct.

23           Q.   It's a clever bit of mathematics that makes it so

24   one wallet can create an infinite number of addresses, but

25   that address points back to one wallet; right?

1          A.    Yes.   Wallet is essentially, we don't see the

2     wallet.   We see its address.

3          Q.    Right.

4          A.    The address, and as we explain on the Blockchain,

5     we have the address that's sending coin and the address that's

6     receiving it.   Those are public addresses.   Those aren't --

7     and the reason they're public is they are created, see this

8     address, which all of these are the same, sent coin to these

9     two addresses.   On the Blockchain they're just public

10    addresses.   The public addresses for both wallets, we don't

11    know what the wallet's identifier is.   But we know that if

12    there was a public address created it was created -- it's a

13    public key that was created by the private key of the software

14    for the wallet.

15            So the way I describe it is a hub and spoke.   A hub

16    on a bicycle tire, a hub is the wallet, it's a private key.

17    We never see that on any type of public ledger because it's

18    private.   What we do see is the spoke it creates to do the

19    transaction.

20            So if my wallet was going to broadcast to the

21    network that your wallet were going to do a transaction, you

22    would click receive on your wallet and your hub or private key

23    would create a spoke, and the network would see your spoke.   I

24    do the same thing.   And when I send the coin from the spoke

25    that my private key or the public key that my private key

1      created that's what's broadcast.  That's what everyone sees.

2      And that's what we see.

3              So when the question is, can you tell from this

4      Blockchain if any coins came out of that wallet after the

5      fact?  From this Blockchain I can just tell what coins came

6      out of that -- from that specific address.

7         Q.   And this address we're looking at that begins 1HMO,

8      that is the defendant's main address?

9         A.   Correct.

10        Q.   Okay.  No further questions, thank you.

11        THE COURT:  Thank you.

12        Any other questions, Mr. Sam?

13        MR. SAM:  I have no further questions.

14        THE COURT:  Thank you.  17.07 may be admitted.

15      (Whereupon, Government's Exhibit 17.07 was admitted.)

16        MR. GADD:  Thank you, Your Honor.  May this witness

17    be excused?

18        THE COURT:  You may step down, and you may be

19    excused.  You can go and come as if you please.

20        THE WITNESS:  Thank you, Your Honor.

21        MR. GADD:  And I may help him for a minute pull

22    together his electronics before we call our next witness.

23        THE COURT:  All right.  Apparently you can't go

24    yet.

25        (Time lapse.)

1          THE COURT:  Calling your next witness,

2    Mr. Stejskal?

3          MR. STEJSKAL:  I am once we're ready here.  I guess

4    we are.  I call Sandra Sabins.

5          THE CLERK:  Please raise your right-hand.

6                     SANDRA SABINS,

7        called as a witness at the request of Plaintiff,

8           having been first duly sworn, was examined

9                  and testified as follows:

10         THE WITNESS:  I do.

11         THE CLERK:  Please state your name and spell it for

12   the record.

13         THE WITNESS:  Sandra Sabins.  S-A-N-D-R-A,

14   S-A-B-I-N-S.

15         THE COURT:  You may proceed, Mr. Stejskal.

16         MR. STEJSKAL:  Thank you, Your Honor.

17                  DIRECT EXAMINATION

18   BY MR. STEJSKAL:

19      Q.   We're going to talk about good old fashion

20   pictures, which is a little easier to understand.

21           Your occupation, please?

22      A.   I'm a police officer for Daily City in California.

23      Q.   And where is Daily City in relation to major cities

24   we may recognize by name?

25      A.   It's right next to San Francisco.

1          Q.    And how long have you been a police officer?

2          A.    29 years.

3          Q.    Were you a police officer in June of 2016 for that

4     same organization?

5          A.    Yes, I was.

6          Q.    What were your duties at that time?

7          A.    I was assigned to the patrol division.

8          Q.    And did you have occasion to respond to an incident

9     at 3 Midvale Drive in Daily City, California, was it

10    June 12th of 2016?  June 11th?

11         A.    13th.

12         Q.    13th, sorry.  Did you have an occasion to respond

13    on June 13th of that year?

14         A.    I did.

15         Q.    Describe the nature of the callout.

16               THE COURT:  What year?

17               MR. STEJSKAL:  2016.

18               THE COURT:  Thank you.

19               THE WITNESS:  A subject in full arrest.

20         Q.    BY MR. STEJSKAL:  And by full arrest what do you

21    mean?

22         A.    It can mean anything.  Generally full arrest

23    meaning he is unresponsive.

24         Q.    Like cardiac arrest or close to death?

25         A.    Yes.

1       Q.   So did you respond to that address?

2       A.   Yes, I did.

3       Q.   And what did you see upon your arrival there?

4       A.   We were met by the Daily City Fire Department who

5  were first to respond who found a male subject unresponsive.

6       Q.   And is this in an apartment or residence at that

7  location?

8       A.   A single family dwelling.

9       Q.   Did you enter that residence?

10      A.   I did.

11      Q.   And what did you see inside?

12      A.   It was a two-story residence.  The subject who was

13 in full arrested was in one of the bedrooms lying on the

14 floor.

15      Q.   Did you talk to anyone living I guess there at the

16 residence?

17      A.   I did.  I spoke to the subject's roommate.

18      Q.   And do you recall the name?

19      A.   Gregory Lee.

20      Q.   And just very generally what did you learn from

21 Mr. Lee?

22      A.   I learned that the night before the subject had

23 ingested Fentanyl, and they had -- he had -- he was

24 intoxicated also at the time, and then everyone went to bed.

25      Q.   And apparently when he got up the roommate was

1    unresponsive?

2         A.    Correct.

3         Q.    And then police were called?

4         A.    Correct.

5         Q.    As part of your duties as an officer that day, did

6    you take photographs?

7         A.    I did.

8         Q.    Let's pop up Government's Exhibit 18.01.  Let's

9    start on Page 2 instead of Page 1.

10             Let me first of all I guess kind of set the tone.

11    So did you move anything prior to taking photographs of the

12    scene?

13        A.    I did not.

14        Q.    Is that part of your training and experience in

15    taking photographs of a suspected possible crime scene?

16        A.    Yes, it is.

17        Q.    You just take pictures of what is there at the time

18    you are taking pictures.

19        A.    Correct.

20        Q.    Okay.  Looking at this photograph, do you recognize

21    that?

22        A.    I do.

23        Q.    And what is that?

24        A.    That is the reporting party, the roommate

25    Gregory Lee.

1         Q.    Next page.  I guess there's two on one page, so

2    that would be Photograph 3.  Do you recognize that?

3         A.    I do.

4         Q.    And what is that?

5         A.     That is the desk that was located in the subject's

6    bedroom where he was found.

7         Q.    Okay.  And again, there's a lot of things sitting

8    on that desk.  None of that was moved or altered.  You just

9    took a picture as it appeared when you got there.

10        A.    That's correct.

11        Q.    Next page.  Do you recognize that photograph?

12        A.    I do.

13        Q.    What is that?

14        A.    A picture of a battery.

15        Q.    And that appears to be on the previous photograph

16   so that's just a close-up of an item on that desk?

17        A.    Yes.

18        Q.    Next page.  Do you recognize that?

19        A.    I do.

20        Q.    And what is that?

21        A.    Two credit cards and a piece of rolled up paper.

22        Q.    Okay.  Did you determine the significance of these

23   items you're taking photographs of at the time, or were you

24   just generally taking photographs of items that may be of

25   significance based on your experience?

1    A.   At the time I was just taking photographs of the

2    room as I found it.

3    Q.   Okay.  Next page.  Do you recognize that

4    photograph?

5    A.   I do.

6    Q.   What is that?

7    A.   That is the bed of the deceased subject where he

8    was found next to.

9    Q.   Next page.  Do you recognize that photograph?

10   A.   I do.

11   Q.   What is that?

12   A.   The deceased as I saw him.

13   Q.   And give us some context within the room where the

14   body is lying in relation to the desk or the bed.

15   A.   He's lying parallel to his bed.  His head is facing

16   east.

17   Q.   And do you see the little dots on the pictures

18   there?  There's one the arm at the top and another one down in

19   the stomach area.

20   A.   Yes.

21   Q.   Do you know what those are?

22   A.   The electrodes that the fire department had placed

23   on him to determine he had no heartbeat.

24   Q.   So obviously they had done that before you had

25   taken these pictures.

116

1          A.   Correct.

2          Q.   Next photo.  Do you recognize that?

3          A.   Yes, sir.

4          Q.   What is that?

5          A.   Closer photograph of the deceased face as he was

6     found.

7          Q.   Okay.  Next photograph.  Do you recognize that

8     photograph?

9          A.   I do.

10          Q.   And what is that?

11          A.   Just a larger shot of the bedroom to give you

12     context to where the bed would be, where the deceased would

13     be, the desk.

14          Q.   And so we don't see the face in this photograph.

15     The bed is up next to his face so it would be to the right of

16     what we're looking at in this photograph.

17          A.   Correct.

18          Q.   And one more photograph.  Do you recognize that?

19          A.   I do.

20          Q.   What is that?

21          A.   A picture of an envelope that I found laying on top

22     of the garbage can in his room.

23          Q.   Okay.  Can we back up one more photo?  The one

24     before that.

25               Does that envelope appear in this graph?

1        A.    It does.

2        Q.    Where?

3        A.    In the lower left corner.

4              THE COURT:  Excuse me.  Where is it?

5              THE WITNESS:  The lower left corner.

6              THE COURT:  The lower left corner?  Thank you.

7        Q.    BY MR. STEJSKAL:  And then scrolling way back to

8   the very first photograph.  Is that a photograph of the

9   deceased basically in a living state?  So that photograph was

10  not taken that date, but that is just a living picture of the

11  person who ended up being the decedent.

12       A.    It is.

13       Q.    So do all of these pictures fairly and accurately

14  depict what you observed then on June 13th of 2016 as you

15  entered that bedroom?

16       A.    They do.

17       Q.    Were there any alterations or anything made to

18  these photographs as you observed them today that make things

19  look different than the photograph that you actually took?

20       A.    No.

21       Q.    This morning -- actually yesterday you viewed a

22  disk containing the pictures and put your initials on that; is

23  that correct?

24       A.    I did.

25       Q.    And does the disk contain a fair and accurate

1    compilation of these photographs that we just viewed?

2        A.   It does.

3            MR. STEJSKAL:  At this time I would offer

4    Government's Exhibit 18.01, which consists of the photographs

5    on this disk.

6            THE COURT:  I suggested yesterday I don't have any

7    problem with any of them except perhaps the face.  So all of

8    the photographs can come in, and I'll think about the face

9    photograph.

10           MR. STEJSKAL:  Thank you, Your Honor.

11      (Whereupon, Government's Exhibit 18.01 was received.)

12           MR. SKORDAS:  Your Honor, this is Ms. Beckett's

13   witness.

14                         CROSS-EXAMINATION

15   BY MS. BECKETT:

16       Q.   Ms. Sabins, is it Sabins?  Am I saying that

17   correctly?

18       A.   Sabins, yes.

19       Q.   Is it officer?

20       A.   Yes.

21       Q.   Officer Sabins.  So when you arrived on the scene

22   at, I believe it was 3 Midvale Drive, the deceased individual

23   was already lying on the floor in the bedroom; is that

24   correct?

25       A.   Correct.

119

1          Q.   And you interviewed the roommate, I believe his

2     name was Gregory Lee; is that correct?

3          A.   Correct.

4          Q.   Was it Gregory Lee that had moved the individual to

5     the floor?  Or do you know who it was?

6          A.   The fire personnel had told us that's where he

7     found him on the floor.

8          Q.   Did you have any conversations with Mr. Lee about

9     whether or not he was the individual who may have moved the

10    deceased party to the floor?

11         A.   I did not.

12         Q.   Did you have any conversations with Gregory Lee

13    about whether or not he had actually placed the deceased

14    victim in what's called a recovery position?

15         A.   I did not.

16         Q.   Did you have any conversations with Gregory Lee

17    about whether or not he had actually been in that room and

18    where the deceased individual was found?

19         A.   He had been in the room.

20         Q.   That morning?

21         A.   That morning.

22         Q.   The night before?

23         A.   I don't know where they had ingested the drugs the

24    night before.  I don't know what room.

25         Q.   But it would be your testimony that at least the

                                                              120

1    body itself had been moved prior to your photos being taken;

2    correct?  Not by you personally, but at least by Mr. Lee or

3    the fire department?

4         A.   The fire personnel found him on the floor there.

5    They only moved him to the extent where they put the

6    electrodes on him to determine whether there was heartbeat.

7         Q.   I believe there is a photo in here of an envelope

8    that was found in that room.  Do you recall that photo?

9         A.   I do.

10        Q.   The name on that particular photo -- thank you.

11   The name on that envelope, and that is Greg Lee, the

12   roommate's name; correct?

13        A.   Correct.

14             MS. BECKETT:  Those are all the questions I have,

15   Your Honor.

16             THE COURT:  Thank you.

17             Anything else, Mr. Stejskal?

18             MR. STEJSKAL:  No, Your Honor.

19             THE COURT:  You may step down.

20             I assume this witness may be excused if she wants

21   to be?

22             MR. STEJSKAL:  Please, Your Honor.

23             THE COURT:  All right.

24             MR. GADD:  United States calls Intelligent Analyst

25   Robin Biundo.

                                                            121

1          THE COURT:  Come forward and be sworn, please.

2          THE CLERK:  Please raise your right hand.

3                    ROBIN BIUNDO,

4     called as a witness at the request of Plaintiff,

5          having been first duly sworn, was examined

6                  and testified as follows:

7          THE WITNESS:  I do.

8          THE CLERK:  Please state your name and spell it for

9     the record.

10          THE DEFENDANT:  My name is Robin Biundo.  It's

11     R-O-B-I-N.  Last name is B-I-U-N-D-O.

12          THE COURT:  Go ahead, Mr. Gadd.

13          MR. GADD:  Thank you.

14                    DIRECT EXAMINATION

15     BY MR. GADD:

16          Q.   Ms. Biundo, for whom do you work?

17          A.   I work for Homeland Security Investigations out of

18     Portland, Oregon.

19          Q.   How long have you worked for HSI?

20          A.   In September it will be 10 years.

21          Q.   You helped in the investigation of this case;

22     correct?

23          A.   That's correct.

24          Q.   And you had a companion case in Oregon against a

25     defendant named Jared Gillespie; correct?

122

```
 1           A.    That's correct.

 2           Q.    I want to ask you about some exhibits that you

 3    helped pull together.  Can we look first at Exhibit 15.00?

 4                 Do you recognize this exhibit?

 5           A.    I do.

 6           Q.    This is feedback from Pharma Master's page on

 7    AlphaBay; correct?

 8           A.    That's correct.

 9           Q.    And it's approximately 366 or -67 pages; correct?

10           A.    That's correct.

11           Q.    This are screen shots that you and your team took

12    to try to capture the data that was on AlphaBay; right?

13           A.    Yes.

14           Q.    As you reviewed these screen shots yesterday, did

15    they match what you recall seeing with your own eyes when you

16    took the screen shots and when you were investigating the

17    case?

18           A.    Yes, they did.

19                 MR. GADD:  I move to admit Exhibit 15.00, feedback

20    screen shots.

21                 THE COURT:  Any objections, or do you want to wait

22    until after you cross?

23                 MS. BECKETT:  I would like to cross before.

24                 MR. GADD:  Should I move through mine?

25                 THE COURT:  Go through them, and then we'll --
```

1           MR. GADD:  Okay.  I'll do that.

2           Can we look next at 15.01?

3      Q.   BY MR. GADD:  This is very similar to the first

4  exhibit except this is not positive feedback.  This is

5  negative or neutral feedback; correct?

6      A.   That's correct.

7      Q.   And like before, you and your team took these

8  screen shots?

9      A.   Yes, we did.

10      Q.   And you had a chance to review them including the

11  disk that I left over here.  You reviewed the contents of the

12  disk and initialed the contents of the disk that contained

13  these exhibits; correct?

14      A.   That's correct.

15      Q.   Does this exhibit, these screen shots, do they

16  accurately represent what you saw with your own eyes as you

17  were investigating this case?

18      A.   Yes.

19      Q.   Let's look again or now at 15.02.  Thank you.

20           So those last two exhibits, that is quite a bit of

21  data; correct?

22      A.   Yes, it was.

23      Q.   And you and your team, you took data from those

24  exhibits and put it into a spreadsheet?

25      A.   Yes.

1    Q.   And this chart represents that data in spreadsheet

2    form; correct?

3    A.   That's correct.

4    Q.   There's approximately 171 pages to your chart and

5    thousands of rows of data?

6    A.   Yes.

7    Q.   And then if we could look at 15.02, the next kind

8    of the summary of it.

9         Do you recognize this summary of your chart?

10   A.   Yes, I do.

11        THE COURT:  Explain why you have two 15.02s, at

12   least on my sheet here.

13        MR. GADD:  Yeah.  In my head they were all going to

14   fit together as one, but they didn't fit well on the screen,

15   so I split them into two.  That's a bad explanation right now.

16        THE COURT:  Okay.

17        MR. GADD:  But it's just so much easier to read

18   when it's this size.

19   Q.   BY MR. GADD:  This summary that we're looking at

20   now, this is an accurate summary of the data in that chart;

21   correct?

22   A.   Yes, it is.

23   Q.   And the chart came from the first two exhibits what

24   you captured online?

25   A.   Yes.

125

1        Q.   In this chart you have things like revenue at the

2   top, total items, total transactions, and then as we go down

3   the left side that is the chart's now based on that item being

4   offered for sale; right?  So at the top Fentanyl laced with

5   fake Oxycodone?

6        A.   Correct.

7        Q.   He didn't, of course, describe his products that

8   way in the data you looked at; right?  He sold them as other

9   names.

10        A.   Yes.

11        Q.   And we've got those listed in italics below,

12   M Box and Roxy.  Sometimes the listings would indicate it was

13   Fentanyl; correct?

14        A.   Correct.

15        Q.   And there's also counterfeit Xanax below those.

16             To the best of your knowledge, is the summary and

17   the chart an accurate representation of the data that you

18   captured in Exhibits 15.00 and 15.01?

19        A.   Yes, it is.

20        Q.   Can we again look at 19.00?

21             Do you recognize this picture?

22        A.   Yes, I do.

23        Q.   We mentioned just a minute ago that your part of

24   this investigation focused on Mr. Shamo, but it also focused

25   on a man in Oregon who was a customer of Mr. Shamo; correct?

```
1         A.   Yes.

2         Q.   His name was Jared Gillespie?

3         A.   Yes.

4         Q.   But online he went by Trustworthy Money.

5         A.   Correct.

6         Q.   And you see that on the top of the photo here;

7    right?  Trustworthy Money?

8         A.   Uh-huh (affirmative).

9         Q.   Do you see other things in this photo based on

10   experience on AlphaBay and as an investigator?

11        A.   Yes.  Besides the Trustworthy Money I recognize a

12   pin code that could be used on AlphaBay.

13        Q.   Is that the six digits just below it?

14        A.   Yes.

15        Q.   And then how about at the bottom, is that an

16   account recovery pass phrase?

17        A.   Yes, it is.

18        Q.   By your training?

19        A.   From my experience yes.

20        Q.   This picture was taken of Mr. Gillespie's phone;

21   correct?

22        A.   Yes, it was.

23        Q.   And this is not a screen shot.  This is someone who

24   holds the phone and then takes a picture probably using

25   another phone.
```

```
 1          A.    Correct.

 2          Q.    Do you have any reason to believe that this picture

 3    is not an accurate representation of what Mr. Gillespie's

 4    phone was showing that day?

 5          A.    No.

 6          Q.    Can we look at 19.01?

 7                I maybe should have mentioned this before, although

 8    I've written about you and I know the Court's seen it once.

 9    During your investigation you went on AlphaBay every working

10    day; correct?

11          A.    Correct.

12          Q.    You had your own AlphaBay log in?

13          A.    Yes, I did.

14          Q.    And then as investigators you also took over

15    suspects' accounts and used them to log in from time to time,

16    as well; right?

17          A.    The agents did, yeah.

18          Q.    Data agents?

19          A.    Yes.

20          Q.    In this instance you've logged into AlphaBay and

21    taken a screen shot; correct?

22          A.    Yes.

23          Q.    So this is Trustworthy Money's profile on AlphaBay;

24    that's what we're looking at; right?

25          A.    Correct.
```

1        Q.   You saw this with your own eyes.  Is this screen

2   shot that we are now looking at a true and accurate

3   representation of what you saw with your own eyes?

4        A.   Yes, it is.

5        Q.   Can we look at 19.02?

6        Is this a summary of the feedback that

7   Mr. Gillespie who went by Trustworthy Money left on AlphaBay?

8        A.   Yes, it is.

9        Q.   You researched all the feedback that he had left on

10  AlphaBay; correct?

11       A.   Yes, I did.

12       Q.   And then you created this chart?

13       A.   Yes.

14       Q.   Is this summary chart, is it a true and accurate

15  summary of the data you saw on AlphaBay as you researched what

16  Mr. Gillespie had written?

17       A.   Yes, it is.

18       Q.   Maybe just for context let's look for a minute at

19  your chart.  In the final column to the right you've got the

20  vendor.  He didn't just buy from Pharma Master; correct?

21       A.   That's correct, he did not.

22       Q.   There was at least I believe two other vendors that

23  he purchased from from time to time?

24       A.   Yes.  Chemical Point and I think Dbaggins was the

25  other one.

1   Q. Can we scroll to the last page of the chart?

2   You summed up how much money Mr. Gillespie spent on

3 AlphaBay, at least from data you had feedback for; correct?

4   A. Yes.

5   Q. And it was this bolded number; correct?  Just over

6 $301,000?

7   A. Correct.

8   Q. Can we look now at 19.03?

9   Is this a picture of Mr. Gillespie?

10   A. Yes, it is.

11   Q. That picture was found during your -- and I mean

12 "your," your investigative team when I say "your."  That

13 picture was found during your investigation of Mr. Gillespie;

14 correct?

15   A. Yes, it was.

16   Q. Is this an accurate picture for how he looks?  And

17 is that him --

18   A. Yes.

19   Q. -- to the best of your knowledge?

20   A. Yes.

21   Q. And is he surrounding himself with cash?

22   A. Yes, he is.

23   Q. Does it appear to be a money counter at the bottom

24 of the photo?

25   A. Yes.  Down at the bottom right-hand side, yes.

1          Q.    And this version that we're looking at, this is a

2     picture taking of a screen.  We can kind of see some shadow

3     and reflection in that screen; correct?

4          A.    That's correct.

5          Q.    And maybe even a mouse down at the bottom hovering

6     over the money counter.

7                Your Honor, I move to admit all of the exhibits

8     that we've talked about, and I recognize that they'll be

9     crossed.

10               THE COURT:  Wait for cross and then I'll rule.

11               Miss Beckett?

12                              CROSS-EXAMINATION

13    BY MS. BECKETT:

14         Q.    And I apologize.  But if you could say your last

15    name one more time before I say it incorrectly.

16         A.    Biundo.

17         Q.    Biundo.  Okay.  Thank you.

18               So I believe the first exhibit the government

19    showed was Exhibit 15.01.  Yeah.  If we could look at that.

20               I believe we referred to these as screen shots; is

21    that correct?

22         A.    Correct.

23         Q.    These are essentially just screen graphs that are

24    printed either to PDF or just straight printed; correct?

25         A.    Yes.

1       Q.    Okay.  The information contained in these right

2   next to little green dots on there, did you verify any of the

3   information on any of the statements that were made?

4       A.    Verified them?  Can you explain?

5       Q.    Yes.  Did you reach out or make contact with the

6   parties or the individuals leaving the comments on here?

7       A.    Not individually.  I did verify with Trustworthy

8   Money since he was one who left comments back.  And when you

9   have leave a comment from a buyer's perspective, it's going to

10  show up both on the vendor account and on the buyer account.

11  So I did match up that on those specific to Trustworthy Money.

12      Q.    So specifically you were able to verify the

13  individuals who are leaving these comments?  And it was a

14  specific person who left these comments or left this feedback;

15  is that your testimony?

16      A.    I would say yes on that; because I was able to

17  verify Trustworthy Money's comments on Pharma Master's page.

18      Q.    And Trustworthy Money is who?

19      A.    Jared Gillespie.

20      Q.    Solely Jared Gillespie?

21      A.    In this instance to my knowledge, yes.

22      Q.    He was the only person who had access to the

23  Trustworthy Money account to leave the feedback?

24      A.    To my knowledge, yes.

25      Q.    To your knowledge, is Jared Gillespie a codefendant

132

1    in this case?

2         A.   Not that I'm aware of.

3         Q.   Are you familiar with the concept of false

4    feedback?

5         A.   In what way?

6         Q.   When you're using, say, Pharma Master or AlphaBay,

7    any of these online markets, it's common practice for sellers

8    to do better if they receive positive feedback.  Would you say

9    that's correct?

10        A.   Sure.

11        Q.   And to have less profits if they have negative

12   feedback?

13        A.   Correct.

14        Q.   And you have a significant familiarity with these

15   online marketplaces; correct?

16        A.   Yes.

17        Q.   In your review of online marketplaces have you ever

18   seen where an online seller has false feedback, false positive

19   comments left on their page with the specific purpose of

20   increasing their marketability and their profits or their

21   perception to other people who are purchasing from them?

22        A.   Not to my knowledge.

23        Q.   You've never seen that?

24        A.   Not to my knowledge, no.

25        Q.   Now, in reviewing 15.02, this is a summary exhibit;

133

1     correct?

2          A.    Correct.

3          Q.    Now these dollar amounts that you're seeing on

4     here, were those taken specifically from the Trustworthy Money

5     account itself or --

6          A.    No.  These were taken from Pharma Master's page.

7          Q.    Okay.  I apologize.  I meant to say Pharma Master.

8                Did you verify those price amounts, those dollar

9     amounts on there?

10         A.    Yes.  They were straight from the feedback left on

11    the page.

12         Q.    They were from the feedback?

13         A.    Yes.

14         Q.    Did you verify that those amounts actually

15    exchanged hands, or was it simply that it was written in the

16    feedback that it was that amount?

17         A.    It was on the feedback on the amount for that

18    purchase.  The day that they purchased that was the amount

19    that was there.

20         Q.    But you did not verify whether or not that amount

21    actually exchanged hands say through the Bitcoin process or

22    through verifying that.  Did you do that?

23         A.    No, I did not do that.

24         Q.    The same for the quantity and weight amount, did

25    you ever verify the quantity and weight amount other than

1    through that feedback?

2         A.   Other than looking at Trustworthy Money's account

3    and comparing it to Pharma Master that would be the way that I

4    verified at least his purchases.

5         Q.   But you never saw the quantity or weight outside of

6    looking at Trustworthy Money's account or the Pharma Master's

7    page?

8         A.   Correct.

9         Q.   So you never actually looked at the physical drugs

10   in question.

11        A.   Correct.

12        Q.   And the same for the dollar amount.  You never

13   reviewed anything in that regard, either; correct?

14        A.   Right.

15        Q.   And this is a summary exhibit that you personally

16   put together?

17        A.   Me and then a couple other analysts in my office,

18   yes.

19        Q.   If we could look at the second 15.02.

20             And the same goes for these; correct?  You didn't

21   verify these dollar amounts on here?

22        A.   No.  They came from the Pharma Master page and

23   totals from there.

24        Q.   And total and quantity, as well; correct?

25        A.   Yes.

135

1          Q.    If we could look at 19.00.

2                I believe it was your testimony that this is a

3     picture of Jared Gillespie's phone.

4          A.    Yes.

5          Q.    Did you take this photo?

6          A.    I did not take this photo.

7          Q.    Were you present when that photo was taken?

8          A.    No.  I was not present in the room.

9          Q.    If we could look at 19.01.

10               I believe it was your testimony that you took over

11    the Trustworthy Money account?

12         A.    That's incorrect.  I did not take over the account.

13         Q.    You were able to access it?

14         A.    I accessed the public facing page of his account.

15         Q.    Okay.  And that is what this is, the public facing

16    page?

17         A.    Correct.

18         Q.    Is that where you verified all of those amounts is

19    from the public facing page?

20         A.    On whose account?

21         Q.    Earlier your testimony was that you verified the

22    amounts and the feedback from Trustworthy Money to

23    Pharma Master; correct?

24         A.    Correct?  Those were all on public facing.

25         Q.    Those were all on public facing?

1        A.   Correct.

2        Q.   So you didn't have a log in for Trustworthy Money

3   when you verified those amounts or looked at those amounts?

4        A.   I did not.

5        Q.   Did you ever at any point in time have access to

6   the account itself where you could take it over,

7   Trustworthy Money's account?

8        A.   I did not.

9        Q.   Will you look at 19.02?

10       I believe we have dollar amounts on here, as well?

11       A.   Correct.

12       Q.   Did you verify those dollar amounts through making

13   sure that those amounts actually exchanged hands, whether it

14   be through Bitcoin or some other fashion?

15       A.   No, I did not.

16       Q.   Solely from transactions you saw in a public

17   facing?

18       A.   On the feedback page, yes.

19       Q.   Same for the drug amount?

20       A.   Correct.

21       Q.   If we could look at 19.03.

22       I believe it was your testimony this is a photo of

23   a computer screen?

24       A.   Uh-huh (affirmative).

25       Q.   Did you take that photo?

1           A.    I did not take that photo.

2           Q.    Were you present when that photo was taken?

3           A.    No, I was not.

4                 MS. BECKETT:  Those are all the questions I have,

5     Your Honor.

6                 THE COURT:  Thank you.

7                 MS. BECKETT:  I do have specific objections.

8                 THE COURT:  All right.  Anything else?

9                 MR. GADD:  I may wait until I hear the objections.

10                MS. BECKETT:  Then I will come right back, Your

11    Honor.

12                I think some of the objections I have here, Your

13    Honor, is that the information in here, although she's

14    authenticating she's the individual who created them, I don't

15    think that we can authenticate information in the fashion that

16    it's being authenticated right now.  And I have some clear

17    issues with hearsay obviously.  I'm not sure we're going down

18    that road yet.

19                But the 15.02, I think she's made it pretty clear

20    that she's just looking at the public facing page.  She can't

21    verify the amounts on those summary exhibits short of what was

22    on a public facing page.  And I have the same concern with any

23    of those exhibits that was dollar amounts and pill amounts.

24    And that makes me very nervous to having that information

25    admitted without being able to verify that in some other

1       fashion that I don't think has been verified here today.

2                   THE COURT:  Thank you.

3                   Mr. Gadd?

4                   MR. GADD:  Can we pull up 15.00?

5                              REDIRECT EXAMINATION

6       BY MR. GADD:

7            Q.   Trustworthy Money actually has feedback on this

8       first page, doesn't he?  Can you give us the third row from

9       the bottom?

10                  So the top one in that picture:  Basic economics

11      will tell you to put all of your money back into re-upping.

12      Don't spend hella money, put all that shit back in the

13      Pharma's pills cause these will made you a millionaire under a

14      year guaranteed.

15                  And then if you can zoom in but give us the piece

16      on the right that indicates the first and last letter of the

17      person who left feedback.  Yep, that's great.

18                  And then you see the TY there.  That's Trustworthy

19      Money, isn't it?

20           A.   That's correct.

21           Q.   During the investigation we actually caught one, at

22      least one of the packages going to Trustworthy Money.  And

23      that was used in your case against him, as I recall; correct?

24           A.   Correct.

25           Q.   So not only did you see him making purchases

                                                                      139

1    through the feedback but you and the other agents caught the

2    package of Fentanyl pills going to Mr. Gillespie.  He used the

3    nominee of course, and that's shown in our other exhibits,

4    like you have this, the old number 1448 and we've renumbered

5    it.  But it's right in there; right?  His nominee Alivia

6    Luckuck?

7         A.   Correct.

8         Q.   And you caught that package physically put -- and

9    when I say you, the investigation, caught that package and

10   physically put hands on the pills coming from Mr. Shamo and

11   his co-conspirators to your target Mr. Gillespie.

12        A.   That's correct.

13        Q.   There was some talk about not being able to see

14   money go from Mr. Shamo's hands -- or excuse me --

15   Mr. Gillespie's hands directly to Mr. Shamo.  But AlphaBay

16   acts as an escrow; right?

17        A.   Correct.

18        Q.   So Mr. Gillespie, he never paid Mr. Shamo directly

19   that we know of; right?  He would pay AlphaBay, the money sits

20   in escrow; right?

21        A.   Yes.

22        Q.   And then when the transaction is completed, when

23   Mr. Shamo carries through his half of the bargain and ships

24   the pills and they arrive, Mr. Gillespie can then go finalize

25   the transaction which releases his money from escrow to

1    Mr. Shamo; correct?

2         A.   That's correct.

3         Q.   Mr. Gillespie, in some of his feedback that you

4    reviewed he would encourage others to finalize early, as I

5    recall?

6         A.   That's correct.

7         Q.   That was his way of trying to tell everyone, you

8    can trust Mr. Shamo and Pharma Master, they're going to come

9    through for you.  You don't need wait to see this whole thing

10   play out.  Just finalize early.

11        A.   Correct, yeah.

12        Q.   For that reason because there's an escrow involved

13   there would be at least to your knowledge, correct, there

14   would be no way to trace money directly from Mr. Gillespie to

15   Mr. Shamo.

16        A.   Right.

17        Q.   The escrow AlphaBay takes a cut of every

18   transaction, according to your understanding; right?

19        A.   Yes, they do.

20        Q.   So this idea of false feedback it would be

21   unprofitable for Mr. Shamo to go and create his own

22   transaction, ship himself pills just so he can leave himself

23   good feedback; right?

24        A.   Yes.

25        Q.   He would lose money on every transaction doing

141

    1    that.

    2         A.    Yes.

    3         Q.    Is that partly why in your investigation you don't

    4    see false feedback happening here?

    5         A.    That would be correct, yeah.

    6              MR. GADD:  Your Honor, we've written about some of

    7    the issues that have come up including authentication and

    8    hearsay.  I'll grab the court document number.

    9              So the defendant's initial motion was Document 171.

   10    We wrote our response in Document 176.  I don't intend to

   11    rehash any of that since we've covered it once.  As I

   12    understood the objections they were to false authentication,

   13    and we have a percipient witness who has firsthand knowledge

   14    and then verifying the amounts.  I think we discussed in

   15    testimony here why the amounts that you see are what our

   16    exhibit is.  To the extent that because there was an escrow

   17    involved we can't show direct movement of proceeds from a drug

   18    dealer to his drug supplier.  I would say it goes to weight,

   19    not admissibility.

   20              And the fact of the matter is Mr. Shamo had no

   21    legitimate income since 2015.  But when we hit his house we

   22    got more than $1 million in cash, when we found most if not

   23    all of his cryptocurrency wallets, we got more than

   24    500 Bitcoins, which at the time was quite a bit more valuable

   25    than when he was arrested.

1          We also obtained money from his parents and

2     obtained money from his coconspirators.  All of that money

3     came from drug sales on AlphaBay, and that's the money.  So to

4     the arguments that I think were raised those are my responses.

5     Thank you.

6          THE COURT:  Thank you.  Any other questions for

7     this witness?

8          MS. BECKETT:  No, Your Honor.

9          THE COURT:  I think as we reviewed the material

10    earlier, too, these objections mostly go to weight.  So those

11    will be admitted.  That's 15.00.  I didn't think 15.00 was

12    objected to, by the way, but maybe I was mistaken.  15.01,

13    15.02 and 15.02, 19.00, 01 and 02 and 03.

14          (Whereupon, Government's Exhibits 15.00, 15.01,

15          15.02, 15.02, 19.00, 19.01, 19.02 and 19.03 were

16          received.)

17          You may step down.

18          I assume this witness may be excused.

19          MR. GADD:  Please.

20          THE COURT:  We probably ought to take a break.  Do

21    you have more witnesses?

22          MR. GADD:  We don't have any more witnesses.

23          THE COURT:  Do you have any witnesses you want to

24    call today?

25          MR. SKORDAS:  No, Your Honor.

1             THE COURT:  What else can we accomplish here today?

2             MR. GADD:  By my count all of the United States

3     exhibits have been admitted except one.  It's 18.02.  It's a

4     toxicology report by a toxicologist named Bill Posey.  When we

5     received the defendant's exhibit list they also listed this as

6     an exhibit and it didn't make sense to bring Mr. Posey out all

7     the way out to -- and he's not a government employee so

8     there's additional cost to the government when we bring him.

9     It didn't make sense to bring him.

10            So I offer it.  If it's objected to I'm happy to

11    strike it.  But since we both have it on our list I think it

12    can probably come in.

13            THE COURT:  You offer it, but if it's objected to

14    what?

15            MR. GADD:  It can be stricken.  Our case doesn't

16    live and die on it.

17            MR. SKORDAS:  Sorry.  Yvette, could you pull it up

18    for us?

19            MS. BECKETT:  Your Honor, I don't think we would be

20    objecting to that at this point.

21            THE COURT:  Okay.  So 18.02 will be admitted, as

22    well.  Unless there's some really good objection later, I take

23    it.

24        (Whereupon, Government's Exhibit 18.02 was received.)

25            MS. BECKETT:  Later good objection is all I'll

                                                              144

1    reserve at this point.

2              THE COURT:  I didn't hear you.  Excuse me.

3              MS. BECKETT:  A later good objection is all I'll

4    reserve, but I don't think there will be one of those.

5              THE COURT:  So anything else we can cover today

6    that would be useful?

7              MR. GADD:  It's our intention to create now a final

8    exhibit that has all of our exhibits on it that we can give

9    the Court, the court reporter, the defense so we have one good

10   copy.  The Court has indicated that there is a picture of our

11   decedent RK that the Court's not comfortable with.  I'm happy

12   to give the Court more time, but I'm also happy to withdraw

13   that one picture if it means that we can bring the disk and

14   give everyone a copy.

15             THE COURT:  Well, for now why don't you withdraw

16   it.

17             MR. GADD:  So we'll withdraw the close up that

18   shows mucous and a little bit of blood in terms of the

19   pictures with the decedent on the ground next to his bed.

20   Does the Court have a sense one way or the other, is that one

21   included?

22             THE COURT:  I think I told you you could include

23   all of the pictures except the face.

24             MR. GADD:  Okay.  We'll include that one.  Thank

25   you.  On the disk --

```
 1                    THE COURT:  Wait a minute.

 2                    Miss Beckett?

 3                    MS. BECKETT:  Just to clarify, there were three

 4       photos.  Two of them did show the individual's face, and one

 5       of them was just the lower half of the body.  And I just want

 6       to clarify which ones you're talking about, because I believe

 7       the Court admitted the proximity photo, which was the lower

 8       half.  There's the head to torso, and there's the up close of

 9       the face, and the head and torso shows almost exact same as

10       the face.

11                    THE COURT:  Let's pull those up again.

12                    MR. GADD:  18.01.

13                    THE COURT:  Now that one, is that the one you're

14       talking about?

15                    MR. GADD:  So let's call this Number 1.  And can

16       you show us the next two?  So let's just give them numbers.

17       So 1, 2.

18                    THE COURT:  That's the one I have a problem with.

19                    MR. GADD:  And that's 3 here.  And it's Number 2

20       that we'll cut.

21                    THE COURT:  But you have -- you're still arguing

22       about the other one with the face?

23                    MS. BECKETT:  Just those first two photos, Your

24       Honor.  Those were our concerns.  I think they essentially

25       show the same image.  One is just a more up close version of
```

1       it.  So our concern with it is the same for both photos.

2                   THE COURT:  Take them both out.

3                   MR. GADD:  Okay.  We'll remove both.  On the disk

4       we're following the description that we have in our exhibit

5       list.  I found one instance where I felt like maybe I was

6       characterizing evidence, and so we've tried to make it neutral

7       again.  That was in the 14s.

8                   It's 14.06.  The name he had used ended with

9       Bitcoin trades and laundering businesses.  And laundering in

10      my mind is a characterization, so we're switching that to

11      other businesses.

12                  THE COURT:  That's probably good.  Mr. Skordas,

13      they all appreciate that, too.

14                  MR. GADD:  On a few of them, my names were just too

15      long for the disk so we're truncating when we run out of

16      space.  But other than that the names won't change.  And we'll

17      do our best to have a disk, a copy for everyone when we meet

18      again tomorrow morning.

19                  The last thing I was hoping to bring up with the

20      Court is as we were talking yesterday afternoon we started to

21      feel nervous about the number of prospective jurors that the

22      Court's going to call.  Because the case has received some

23      publicity and because of the nature of the opioid epidemic

24      where most people we know has at least someone close to them

25      overdosed and otherwise affected.

1          So I was hoping we could take a minute and talk

2     with the Court to try and get a sense of what type of

3     potential juror will be excluded based on either knowledge of

4     the case or if they've had someone close to them who has been

5     affected by opioids.

6          THE COURT:  Let's start with -- what number,

7     Elizabeth, were you --

8          THE CLERK:  75 is what we discussed.

9          THE COURT:  We talked about that.  That gives us

10    45 extra jurors.  I mean, everybody knows something about

11    opioids and opioid epidemic.  So if we had to have people who

12    never heard of it we would never get anybody to serve on a

13    jury.  I suppose if closer that, some close friend or family

14    member has had problems then we might be running into

15    difficulty.  A lot of people might have heard of the case in

16    passing, but that doesn't seem to me to disqualify them.  But

17    I'd be interested in your views about that.

18          MR. SKORDAS:  We agree, Your Honor.  I think you

19    just have to go on a person-by-person analysis.  And even if

20    they've heard of the case or have family or close friends or

21    someone that has been affected the issue is whether or not

22    they can put that aside and set that aside and be fair.

23          I don't know what you're getting at, Mike.

24          MR. GADD:  Just a conversation.

25          THE COURT:  You think 75 is not sufficient?

1          MR. GADD:  It was our worry.  But part of that

2     worry is just an unknown about how the Court and the defense

3     would feel about a prospective juror, for example, who may

4     have had a cousin, a friend from high school who overdosed,

5     something like that.  And what I'm gathering is it will be

6     that second question that we ask that is most important.  Not

7     do you know someone, but can you be fair.  Can you treat

8     Mr. Shamo fairly?

9          THE COURT:  And we'll have --

10         Mr. Stejskal, you look like you have a comment,

11    unless you were just standing and stretching your legs.

12         MR. STEJSKAL:  I was just going to frame the issue

13    as concisely as possible, our conversation yesterday.

14    Essentially it's that, that a lot of people have been affected

15    by opioids, so we'll ask them about that in a voir dire

16    examination.  The fear is once we tell people this is a

17    four-week, this is a month-long trial.  Can you be fair?  Can

18    you set this aside?  You're going to get people leaning

19    towards, no, I can't set this aside if I've got to sit here

20    for four weeks.

21         That was really what our conversation was and our

22    fear that even with 75 people you might be get an excess of

23    people who answer that question in such a way that they have

24    to be excluded even though maybe that's not the most accurate

25    answer.  That was our fear.  So I'll just put that before the

1    Court.  That's why we were talking about it.

2             THE COURT:  You wanted to say something?

3             MS. BECKETT:  I also -- I think I could propose a

4    resolution, Your Honor.  We were going to reach out to your

5    chambers, anyway, and see if Your Honor would be comfortable

6    doing a written voir dire in advance.  That way we can sort of

7    come together on questions we want to ask and some of the

8    questions we think might be problematic from both sides.

9             THE COURT:  How soon could you do that?

10            MS. BECKETT:  As soon as you would like.  Maybe by

11   Monday, if that's acceptable, Your Honor.

12            THE COURT:  We could probably do that.

13            Couldn't we send it out?

14            THE CLERK:  Yeah.  I don't know what stage she's

15   already done.  An initial kind of review of timing like people

16   who can be there for multiple weeks, and so she has a pool

17   already.  So I don't know.  I don't know the logistics of it.

18   I have to talk to Kris Porter.

19            THE COURT:  She's got a pool that she's already

20   screened for time.

21            THE CLERK:  Uh-huh (affirmative).

22            THE COURT:  And 75 people?

23            THE CLERK:  Uh-huh (affirmative).

24            THE COURT:  Although they don't yet know what kind

25   of case it is?

1           THE CLERK:  No.  No.

2           THE COURT:  How difficult is it for her to send out

3   something that would have something to do with the nature of

4   the case?

5           THE CLERK:  Well, I know she's sending out the

6   official summons.  Her plan was to do it Friday.  She's

7   waiting for you to rule on the motion to continue.  I think

8   she had concerns that it was going to be later than Friday.  I

9   assume she would send the questionnaire with maybe the

10  summons.

11          THE COURT:  You never answered the question.  You

12  don't want any continuance; right?

13          MR. GADD:  No.

14          THE COURT:  And I asked you a question yesterday

15  that I'm not sure I got answered, which was, if, big if, I

16  gave you one how much would you want?

17          MR. SKORDAS:  We didn't answer that.  But I think

18  Mr. Wheeler could answer that tomorrow.  And he's going to be

19  here and he's going to testify.  But my guess is it's probably

20  in the 60- to 90-day range.

21          THE COURT:  So a brief continuance you don't think

22  would do you any good, like a week or something like that?

23          MS. BECKETT:  At this point I could say a week

24  would not be enough time, Your Honor.  But the amount of

25  information we received yesterday just on the one computer

1    that we are concerned about is almost 4 terabytes, which is a

2    significant amount of information.  And that is just one of

3    the things that we received that we did not previously have.

4          But Mr. Wheeler can give more context about with

5    his understanding and knowledge how long it takes to process

6    that information is far more advanced than mine.

7          THE COURT:  Remind me.  I read your material.  You

8    basically are saying that the difficulty is they didn't get it

9    unlocked to get the information when they should have and

10    could have.  Am I saying that right?

11          MR. GADD:  Yeah.  Essentially what we're saying is

12    there's been a week delay because of either one or two errors

13    took place; either it wasn't copied correctly or wasn't given

14    correctly to their expert Mr. Wheeler.  But the delay has only

15    been a week.  Miss Beckett indicated that we've given

16    Mr. Wheeler some more data.  That's true.  We gave him what he

17    said he was missing.  But then he also had some additional

18    requests for us.  He said, hey, as long as you're putting that

19    on a hard drive, would you add a few other things to make it

20    easier for me?

21          But this is all data that was provided six months

22    ago.  And his initial, I don't want to put words in his mouth,

23    and I know he will be here tomorrow, when he was blocking out

24    his work, he started this roughly on May 21st, and the mistake

25    cost him a week.  We got him the new drive on May 28th.

1          So it seems that his plan was to have it done in a

2     week, and we've cost him a week because of some combination of

3     errors, and I'm not in any way looking to place blame.  But

4     we've corrected it, and it's a one-week delay.  That's all.

5               THE COURT:  What do you say to that?

6               MS. BECKETT:  That's an inaccurate characterization

7     of what occurred.  Mr. Wheeler was given the data from our

8     office the earliest we were allowed to give it to him after we

9     had to seek the budget approval.  And as soon as he obtained

10    it he started reviewing it.  And he looked at a specific

11    computer that is Mr. Paz's iMac, which is the government did

12    not have until end of last year.  That was not part of the

13    original 11 terabytes that they referenced at the bottom of

14    their certificate of compliance.  It was a separate computer.

15    And that is the one we wanted to review for an exceptional

16    long period of time.  And when Mr. Wheeler was given that the

17    file folder that he had that we also received and that I

18    looked at and so did our legal assistant was less than a

19    terabyte.  It was less than 1 terabyte on the files that we

20    had.

21         She relayed that information to him.  He looked at

22    it, assumed for whatever reason, for whatever technical reason

23    that information was all that was on that computer and

24    proceeded to review the other information.  He's been doing

25    that since the end of March.  And then when we received the

1       government's exhibit list that had two things on it, he

2       contacted the government's office and essentially asked them

3       where these documents came from because they didn't have Bates

4       stamps and it wasn't clear and we didn't have it.  At that

5       point in time we were informed that it came off the exact

6       computer that we were looking at and didn't have.

7               And that one week, that was the May 21st.  That's

8       when he contacted them and said, you guys must have something

9       we don't have because here's the files I have.  He called me.

10      We verified that we had the same information in our office.

11      There's correspondence back and forth regarding this issue

12      that says that computer itself is only 1.98 terabytes.  That

13      computer, just that computer is not 1.98 terabytes.  It's just

14      under 4 terabytes.  And that's the 4 terabytes that I'm

15      talking about, that he has to review just that computer.

16              The amount of information that he received in total

17      was 5.95 terabytes.  But we're only asking to be able to

18      review that computer that is just under 4 terabytes.  He can

19      obviously give more context to that tomorrow, but it is not

20      just a one-week delay.  It is a significant delay because the

21      reason we retained him was to review those computers, and then

22      we discovered we didn't have the entirety of those computers.

23              And that's the problem.  That's the issue.  It's

24      going to take some time to process the data, create reviewable

25      information and then to have an attorney review it.  That's

                                                                    154

1     not a one-week delay in any way, shape or form.

2                THE COURT:  Mr. Gadd?

3                MR. GADD:  I think it makes sense to have

4     Mr. Wheeler come tomorrow.  I know we disagree with the

5     numbers and the timing.  But I think at this point it makes

6     sense to have him take the stand and hear from him.  We will

7     likely put on a witness who can explain how much time it would

8     take to process the data.

9                THE COURT:  All right.  Who else do we have besides

10    perhaps that last one and Mr. Wheeler tomorrow?

11               MR. GADD:  I believe that's it, Your Honor.

12               MR. SKORDAS:  Agreed.

13               THE COURT:  I'm glad to be reminded, I'm happy to

14    be reminded that 75 has been screened for time.  So maybe

15    since they've already been screened for time, Mr. Stejskal,

16    maybe they'll be less likely to be looking for an out on

17    subject matter ground.

18               MR. STEJSKAL:  I agree with that.  That's very

19    helpful that they've been screened for that already so they're

20    not people looking for an out or that have a reason other than

21    that to be out.

22               THE COURT:  Maybe we should -- maybe we can try to

23    get her to get five more.

24               THE CLERK:  Okay.

25               THE COURT:  Maybe go to 80.

1           THE CLERK:  Okay.

2           MR. GADD:  I appreciate that.  Thank you.

3           THE COURT:  All right.  We'll see you tomorrow at

4    9:00.  Thank you.

5           MR. SKORDAS:  Thank you, Your Honor.

6        (Whereupon, the court proceedings were concluded.)

7                     *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    STATE OF UTAH         )

2                          ) ss.

3    COUNTY OF SALT LAKE  )

4              I, KELLY BROWN HICKEN, do hereby certify that I am

5    a certified court reporter for the State of Utah;

6              That as such reporter, I attended the hearing of

7    the foregoing matter on May 30, 2019, and thereat reported in

8    Stenotype all of the testimony and proceedings had, and caused

9    said notes to be transcribed into typewriting; and the

10   foregoing pages number from 81 through 156 constitute a full,

11   true and correct report of the same.

12             That I am not of kin to any of the parties and have

13   no interest in the outcome of the matter;

14             And hereby set my hand and seal, this _____ day of

15   _____ 2020.

16

17

18

19

20             _____
                    KELLY BROWN HICKEN, CSR, RPR, RMR
21

22

23

24

25
```