1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4    _____
                                    )
5    UNITED STATES OF AMERICA,      )
                                    )
6            Plaintiff,             )
                                    )
7        -vs-                       )    2:16-CR-631 DK
                                    )
8    AARON MICHAEL SHAMO, et al.,   )
                                    )
9            Defendants.            )
     _____)

10

11

12

13

14    BEFORE THE HONORABLE DALE KIMBALL

15    DATE:  AUGUST 20, 2019

16    REPORTER'S TRANSCRIPT OF PROCEEDINGS

17    JURY TRIAL

18    (Pages 1141 through 1225)

19

20

21

22

23

24

25    Reporter:  REBECCA JANKE, CSR, RPR, RMR
                  (801) 521-7238

```
 1
 2                       A P P E A R A N C E S
 3
 4   FOR THE PLAINTIF      UNITED STATE'S ATTORNEY'S OFFICE
 5                             BY:  MICHAEL GADD, ESQ.
 6                                  VERNON G. STEJSKAL, ESQ.
 7                                  KENT A. BURGGRAAF, ESQ.
 8                             111 SOUTH MAIN STREET, 1800
 9                             SALT LAKE CITY, UTAH  84111
10
11
12
13   FOR THE DEFENDANT:     SKORDAS & CSTON, LLC
14                             BY:  GREGORY G. SKORDAS, ESQ.
15                                  KAYTLIN V. BECKETT, ESQ.
16                             560 SOUTH 300 EAST, 225
17                             SALT LAKE CITY, UTAH 84111
18
19                             DARYL P. SAM, PLLC
20                             BY:  DARYL P. SAM, ESQ.
21                             5955 SOUTH REDWOOD ROAD, 102
22                             SALT LAKE CITY, UTAH 84123
23
24
25
```

1143

INDEX

WITNESSES                   EXAMINATION                  PAGE


DAVID SLAGLE                Cross by Skordas              1144
                           Redirect by Burggraff         1155
                           Recross by Skordas            1157

VIRGINIA KEYS              Direct by Gadd                1158
                           Cross by Skordas              1185

TORI GRACE                 Direct by Gadd                1188
                           Cross by Sam                  1198

SANDRA SABINS             Direct by Gadd                1206

BILL POSEY                Direct by Gadd                1211
                           Cross by Skordas              1216
                           Redirect by Gadd              1219

THOMAS ROGERS             Direct by Gadd                1221

```
1    AUGUST 20, 2019                       SALT LAKE CITY, UTAH

2                        P R O C E E D I N G S

3                               * * *

4          THE COURT:  Good morning.  Are we ready to proceed?

5          MR. GADD. Yes, Your Honor.

6          MR. SKORDAS:  Yes, Your Honor.

7          THE COURT:  Mr. Slagle can resume the stand.

8          THE CLERK:  All rise, please.

9          (Whereupon the jury enters the courtroom.)

10         Court is now in session.  You may be seated.

11         THE COURT:  Good morning, Ladies and Gentlemen of

12   the Jury.  Thank you for your work and thank you for being

13   prompt.

14         Mr. Skordas, you may cross examine Mr. Slagle.

15         MR. SKORDAS:  Thank you, Your Honor.

16                        CROSS EXAMINATION

17   BY MR. SKORDAS

18   Q.      Good morning, Mr. Slagle.

19   A.      Good morning, sir.

20   Q.      It appears from your resume that you have

21   substantial experience and training in computer forensics

22   and retrieving information off of computers and that type of

23   thing.  Is that fair?

24   A.      I have training in it, I guess.

25   Q.      Don't be shy.
```

1    A.      I have specialized training within mobile and PC's.

2    Q.      And is that mostly what you do?

3    A.      No.  It's not all what I do.  I carry a case load,

4    so I investigate and work my own cases, but yeah, at least

5    50 percent of the time, I do computer forensics.

6    Q.      And in connection with your training in computer

7    forensics, have you had training in recovering lost data

8    from computers or things that have attempted to have been

9    deleted from computers?

10   A.      That is part of the computer forensic training is

11   the lost data, which you may call carving.

12   Q.      Carving?

13   A.      It's a way that we recover lost data.

14   Q.      Very well.  And you've also apparently had some

15   training in -- or maybe it was self taught, but in

16   recovering or getting information about the Dark Web,

17   especially cryptocurrency.  Is that fair?

18   A.      Yeah.  That was a new experience for me in this

19   case.

20   Q.      And I'm reading your reports, and it looks like

21   some of it was arguably trial and error for you?

22   A.      That's fair to say.

23   Q.      But you generally did a fairly good job of

24   recovering and collecting a lot of the Bitcoins that you

25   talked about yesterday?

1146

1   A.      I feel like we did a pretty good job.

2   Q.      I think everyone would agree with that, sir.  And

3   you started, I think, your testimony yesterday talking about

4   this Exhibit 13.04, which is the iMac.  Do you see that?

5   A.      Yes.

6   Q.      And 13.05, which was the iPhone 6s?

7   A.      Yes.

8   Q.      And 13.06, which was the iPhone 7, correct?

9   A.      Correct.

10  Q.      And basically your testimony yesterday, as I

11  understand it, was in large part based on information you

12  had been able to recover from those three devices?

13  A.      That is correct.

14  Q.      If you would turn to your left there, there is a

15  picture of a bunch of folks there.  Especially on the

16  middle, second row, there's a picture of some fellow named

17  Crandall.  Do you see that?

18  A.      Yes, I do.

19  Q.      Would you tell the jury what information you were

20  able to download and obtain from Mr. Crandall's computer.

21  A.      We were able to conduct an image of Mr. Crandall's

22  computer, and we went -- and that image was provided to the

23  case agent for review.

24  Q.      Okay.  But not you?

25  A.      No.  I processed the case.  I didn't examine it.

1  So, in this case, where we had a lot of electronic --

2  electronic evidence, what we had to do was what you do in

3  the medical field in triage, the most, like, ones that are

4  just glaring, obvious, you triage those, get those off to

5  the case agent.  Or there were other agents assisting, so I

6  would process and provide them in a format that was easy for

7  the agents to go through, and so they would do the

8  examination part of it.

9  Q.      And specifically, as it relates to Mr. Crandall, do

10  you know when his computer and other equipment would have

11  been seized and examined?

12  A.      I don't have the exact date in front of me.

13  Q.      It would have been at least several months after

14  the Shamo items were seized, correct?

15  A.      That is correct.

16  Q.      And there is another picture there of a fellow

17  named Paz.  Would you tell the jury what you were able to

18  locate off of his computer?

19  A.      Again, with Paz, I was brought a computer image,

20  meaning this is a bit-to-bit copy of the drive that was in

21  Mr. Paz's computer.  I was -- the case agent requested that

22  I process it and put it in a viewable format so that he

23  could examine the contents, and I did that.  I did that.

24  Q.      And, again, his computer or cell phone or whatever

25  else was seized would have been some months or perhaps even

1   years after Mr. Shamo was taken into custody, correct?

2   A.      That would be correct.

3   Q.      Going down there, how about Mr. Noble?  What were

4   you able to get off of his computer?

5   A.      Mr. Noble's, again, same thing.  I processed it and

6   provided an image for deeper analysis and examination to

7   agents in the case.

8   Q.      Same with -- would you say the same would be true

9   for Mr. Gygi?

10  A.      I don't believe I actually looked at Gygi's one.

11  That may have been -- that may have been one that we imaged

12  and gave off to the case agent.

13  Q.      It may have been one that you didn't image at all,

14  correct?

15  A.      I don't -- I don't recall.  I'd have to see the

16  evidence number.

17  Q.      Do you recall ever seeing a report as it relates to

18  his computer?

19  A.      No, I don't.

20  Q.      Mr. Noble's?

21  A.      I gave the case agent the information, and if he

22  found something that was of relevance, he would bring it

23  back to me for further review.

24  Q.      Okay.  But my question was, have you ever seen a

25  report generated as it relates to an inspection of

1    Mr. Noble's computer?

2    A.       No.

3    Q.       Mr. Paz's computer?

4    A.       No, I have not.

5    Q.       Mr. Crandall's computer?

6    A.       No, I have not.

7    Q.       How about Ms. Tonge's computer?

8    A.       No, I have not.

9    Q.       Do you know if that was even seized or looked at?

10   A.       I do.

11   Q.       And how about Ms. Bustin's computer?  Have you ever

12   seen a report or any information as it relates to that?

13   A.       I have not.

14   Q.       And I'll just ask you one more, Ms. Noriega's

15   computer?

16   A.       No, I have not.

17   Q.       You saw, however, and in your testimony yesterday

18   some reference to Ms. Noriega, correct, at least one email

19   address with her name on it?

20   A.       I did.

21   Q.       And you saw yesterday at least one Bitcoin account

22   that had the name Tonge associated with it, correct?

23   A.       I did.

24   Q.       But you, personally, didn't examine any of those --

25   at least those two females' computers or cell phones or

1    anything like that?

2    A.        I did not do any of the analysis.

3    Q.        And without being repetitive -- I guess I'll be

4    repetitive.  You're not even aware of anyone who examined

5    the computers or cell phones of those two, females.

6    A.        I actually do know that a case agent was able to go

7    through those -- those -- those images and review them.

8    Q.        Those two, Noriega and Bustin?

9    A.        Bustin and Tonge.

10   Q.        Okay.

11   A.        And Noriega's image of his computer, once

12   processed, and it was put in a readable format.  I know that

13   agents on the case reviewed that evidence.

14   Q.        You also testified to the substantial efforts you

15   took to -- and I'll try to make it a little simpler, mostly

16   for me, but to get the Bitcoins out of one wallet and into

17   the government's wallet, correct?

18   A.        Correct.

19   Q.        And the reason you do that is so that you can -- so

20   that the government can hold those and so that no one will

21   be able to discard them or get rid of them or anything like

22   that?

23   A.        That's true.

24   Q.        And you did that, it looks like from your report,

25   in 2017, correct?

1151

1    A.        Yes.

2    Q.        In fact, it looks like your reports are mostly

3    dated September 7 of 2017, correct?

4    A.        Correct.

5    Q.        That was about ten months after Aaron had been

6    arrested?

7    A.        Correct.

8    Q.        And in those ten months, you were unable to find

9    any evidence that anyone had gone into those accounts and

10   deleted anything or gotten rid of anything or hid anything

11   from Mr. Shamo's computers, correct?

12   A.        As far as that investigative process, that's a

13   little bit beyond the scope of my involvement in the Bitcoin

14   investigation.

15   Q.        But it didn't appear that anyone had attempted, in

16   any way, to sell off Bitcoins in the ten months prior to the

17   time that you were able to seize them and put them in the

18   government's wallet, correct?

19   A.        Again, that would be beyond the scope of my

20   involvement.  There were agents that specifically looked at

21   the blockchain analysis, and that was beyond the scope of my

22   involvement.  My involvement was to locate the Bitcoin and

23   attempt to seize those items.

24   Q.        Okay.  But I'm -- I'll ask it a third time, and

25   I'll be more careful.  You, personally, were never made

1    aware of anyone altering that Bitcoin wallet?

2    A.       I don't believe I was.

3    Q.       And when the government seizes property; you seize

4    this, for example, you take it and you put it in the

5    evidence room.  But when you seize a Bitcoin wallet, it's a

6    little different, isn't it?

7    A.       It's completely different.

8    Q.       And you explained that pretty well yesterday.  And

9    the government takes those items and puts them in their -- I

10   guess you created your own Bitcoin wallet.  Is that fair?

11   A.       We did.

12   Q.       And you -- do you know what happened with those

13   Bitcoins?

14   A.       I do.

15   Q.       Tell the jury what happened to those Bitcoins.

16   A.       The government liquidated that, the Bitcoin,

17   pursuant to an agreement with the defendant.

18   Q.       The government was able to sell off the Bitcoins,

19   correct?

20   A.       Yes.  The government did.

21   Q.       And at the time the government sold off the

22   Bitcoins, you're aware that the value of Bitcoin was

23   substantially greater than it was November 22, 2016, when

24   Aaron Shamo was taken into custody?

25   A.       I believe the date that we actually liquidated the

1  Bitcoin was many months after the seizure, and the market

2  had shot up from the date that we seized them,

3  significantly, almost tripled.

4  Q.      Have you been involved in situations, as a federal

5  agent, when assets have been forfeited in the past?

6  A.      I have.

7  Q.      And you're aware, aren't you, that there's some

8  give and take in that, in terms of the accused's rights, as

9  they have due process rights to their property as well,

10 correct?

11 A.      I am, by no means, a forfeiture attorney, so you

12 may be going out of what I may have actual legal experience

13 with.

14 Q.      I understand, and I won't ask you a legal opinion,

15 but you seem quite knowledgeable.  It's unusual, isn't it,

16 that an accused will forfeit his property before he's even

17 spent a single day in trial?

18 A.      I could not speak to that, as far as it being

19 unusual.  It's -- again, it's beyond the scope of my

20 involvement in this case.

21 Q.      But the government isn't allowed to forfeit

22 property until and after an individual is convicted of a

23 crime unless --

24       MR. BURGGRAAF:  Objection, Your Honor.  I believe

25 this calls for a legal opinion.

1    THE COURT:  Well, I guess you can ask him about his

2   understanding, but if you're calling for a legal conclusion,

3   the objection is sustained.

4        So, what do you want from him?

5        MR. SKORDAS:  His experience, just a factual

6   conclusion.

7        THE COURT:  You go ahead.

8        THE WITNESS:  Can you repeat the question, please.

9   Q.     BY MR. SKORDAS:  If I can remember it.  In your

10  experience in forfeiture items -- in forfeiture cases, the

11  government doesn't typically -- isn't typically allowed to

12  forfeit another person's property until they are convicted

13  of something, correct?

14  A.     Again, that is going to be beyond the scope, and

15  within my agency we deal with criminal forfeitures and civil

16  forfeitures, and the rules vary on both of those, so it

17  would be very difficult to go into the details of that.

18  Q.     But you're aware that, at the time you sold off

19  these Bitcoins or the government sold off and liquidated the

20  Bitcoins, that was done with the blessing of Aaron Shamo?

21  A.     That was my understanding.

22       MR. SKORDAS:  That's all I have, Your Honor.

23       THE COURT:  Thank you, Mr. Skordas.

24       Mr. Burggraaf, any redirect?

25                      REDIRECT EXAMINATION

1    MR. BURGGRAAF:

2    Q.       Agent Slagle, defense counsel asked you about what

3    you are aware of and not aware of.  Are you aware of the

4    liquidated Bitcoins actually being forfeited at this stage,

5    or is that beyond the scope of your involvement?

6    A.       That would be generally beyond -- that is beyond

7    the scope of my involvement.  My involvement was to seize

8    them and provide them to the case agent, and that was my

9    involvement.

10   Q.       Are you aware that Mr. Shamo agreed to allow the

11   Bitcoin to be sold off?

12   A.       That is what I've heard; however, that's what I've

13   read in the newspaper.

14   Q.       Okay.  So you're not actually aware of whether

15   that's actually been forfeited prior to this trial or not?

16   A.       I am actually aware of that because of discussions

17   with the case agent.

18   Q.       You were asked about the value of the Bitcoin as

19   compared to when Mr. Shamo was arrested to when you finally

20   seized the Bitcoin itself.

21   A.       Yes.

22   Q.       You mentioned that the value, I assume in U.S.

23   dollars, went up almost triple.  In between the time when

24   Mr. Shamo was arrested and when the Bitcoin -- the Bitcoins

25   were actually seized, was that at the highest point?

1   A.      No.

2   Q.      So, the Bitcoin value had actually been higher at

3   some point?

4   A.      Yes.  I believe it went to almost 20,000 at one

5   point.

6   Q.      So if Bitcoin has increased to a certain value --

7   well, in your familiarity with cryptocurrency, does it just

8   continue to rise, or does it more ebb and flow as far as

9   value?

10  A.      That might actually be beyond the scope of my

11  involvement.  I just know that it's a volatile currency.

12  Q.      Okay.  And is it fair to say that, because you're

13  not the case agent, you follow more or less what the scope

14  of your assignment is as defined by the case agent?

15  A.      Exactly.  The case agent determines what he needs

16  me to do in the case.

17  Q.      So your examination of Mr. Shamo's devices would

18  have been, at least preliminarily -- or rather the triage

19  would have been at the case agent's direction?

20  A.      Yes.  The case agent triaged the case, determined

21  the priority, and that's what I was assigned to.

22  Q.      And, as far as the other computers mentioned, did

23  you not examine them and pass on the digital content because

24  that was the direction provided to you by the case agent?

25  A.      That would have been the direction.

1    MR. BURGGRAAF:  No further questions.

2    THE COURT:  Thank you.  Any recross, Mr. Skordas?

3                    RECROSS EXAMINATION

4  BY MR. SKORDAS:

5  Q.      Are you aware today of any of the fluctuations in

6  the Bitcoin market at the time that these were sold?

7  A.      Can you clarify that?

8  Q.      Yeah.  At the time that the Bitcoins that you spoke

9  of yesterday were liquidated, are you aware of what was

10 happening with the Bitcoin market at that time?

11 A.      I am.

12 Q.      And it was rising and falling, correct?

13 A.      At the time of seizure, it was rising.  The falling

14 didn't happen until probably the next year.

15 Q.      Right.  And the government was interested in buying

16 low and selling high, correct?

17    MR. BURGGRAAF:  Objection, Your Honor.  It calls

18 for speculation on the government's part.

19    THE COURT:  Sustained.

20    MR. SKORDAS:  That's all I have, Your Honor.

21    THE COURT:  Thank you, Mr. Skordas.

22    Are we done with this witness?

23    MR. BURGGRAAF:  Yes, Your Honor.

08:53:08  24    THE COURT:  You may step down.  Thank you.  And you

25 may be excused.

1    The government may call it's next witness.

2    MR. GADD:  Your Honor, the United States calls

3    Special Agent Virginia Keys.

4                        VIRGINIA KEYS,

5    the witness hereinbefore named, being first duly cautioned

6    and sworn or affirmed to tell the truth, the whole truth,

7    and nothing but the truth, was examined and testified as

8    follows:

08:53:40    9    THE CLERK:  Please state your name and spell it for

10   the record.

11   THE WITNESS:  My name is Virginia Keys.

12   V-i-r-g-i-n-i-a.  K-e-y-s.

13   THE COURT:  You may proceed, Mr. Gadd

08:53:58   14   MR. GADD:  Thank you, sir.

15                      DIRECT EXAMINATION

16   BY MR. GADD:

17   Q.      Special Agent Keys, are you prepared to testify

18   about your part in the investigation of the drug

19   distribution activities of this defendant and his

20   co-conspirators?

21   A.      I am.

22   Q.      Before we do that, I just want to give the jury a

23   very brief summary about your background and your

24   experience.  Could you tell us a little about yourself.

25   A.      Sure.  I'm a single mom, and I've lived in Utah for

1   a little over five years, and I enjoy gardening and I like

2   to play volleyball.

08:54:28   3   Q.      Thanks.  Could you tell us about maybe your

4   education and your background?

5   A.      Sure.  After I got divorced in 2004, I went back to

6   school, and I finished my bachelor's degree in

7   inter-disciplinary studies.  My disciplines are accounting

8   and business and communications with an emphasis in

9   international law enforcement surveillance and cryptography.

10          I continued on my with my master's degree, and I --

11   my master's is in criminal justice with an emphasis in cyber

12   crime.  And during my master's program, I was recruited by

08:54:59   13   the government to become a special agent for IRS Criminal

14   Investigations.  After I graduated, IRS CI sent me to

15   training with my children in Georgia, and I put them in

16   school while I was doing my training.  We were there for six

17   months.

18          During the -- that was at the Federal Law

19   Enforcement Training Center, or the FLETC is what it's

20   called for short.  During the time I was there, I learned

21   about the law.  I learned about arrest warrants, search

08:55:29   22   warrants, report writing, interviewing, defensive tactics,

23   all the things that we were going to need to do our job as

24   special agents.

25          And then, after I finished that training, I came

1160

```
          1    back to Washington State, and I worked for IRS Criminal
          2    Investigation as a special agent for a little over seven
          3    years before they transferred me to Utah.  I was here a
          4    little over two years with them before I transferred over to
          5    FDA Office of Criminal Investigations.  For short, I'll just
          6    say OCI because it's easier.  And I have been with them for
08:55:58  7    a little over three years.
          8          During the training that I had with IRS, before I
          9    transferred over, my investigations included gun smuggling,
         10    prostitution, Ponzi schemes, money laundering schemes, drug
         11    smuggling, those types of crimes.  And then, with FDA, my
         12    investigations include investigating misbranding,
         13    adulteration, tampering, counterfeit drugs that contaminate
         14    the drug supply.  And then, part of my responsibilities as
08:56:28 15    well, is to investigate overdoses and overdose deaths
         16    associated with those cases.
         17    Q.      You said FLETC and it just reminded me, the law
         18    enforcement -- the federal law enforcement loves its
         19    acronyms.  Is that fair to say?
         20    A.      It does.
         21    Q.      If I fall into that habit of using acronyms, will
         22    you correct me?
         23    A.      Sure.
         24    Q.      Okay.  So when people find out you're a law
         25    enforcement agent in the Food and Drug Administration, do
```

1161

08:56:58  1    you get quizzical looks?

2    A.      I do.  I actually get razzed pretty good.  A lot of

3    people ask me if I'm just there to keep their food safe.

4    But there's a little bit more to it than that.

5    Q.      For sure.  For sure.  Let's talk for a minute about

6    this exhibit right here.  This is true Oxycodone, isn't it?

7    A.      It is.

8    Q.      Did you obtain -- oh, and maybe for the record,

9    this is Exhibit 24.00.  Did you obtain true Oxycodone pills

10   from Actavis?

11   A.      I did.

08:57:28  12   Q.      Did you also obtain true Oxycodone pills from

13   Mallinckrodt?

14   A.      I did.  The Mallinckrodt pills are stamped or

15   embossed with an M box and then the Actavis are stamped with

16   an A-215.

17   Q.      I'm holding Exhibit 24.  These are those pills you

18   obtained, right?

19   A.      That is correct.

20           MR. GADD:  Your Honor, at this time I would like to

21   take a moment and pass these around the jury.

08:57:55  22           THE COURT:  All right.

23           (Jurors looking at Exhibit 24.)

24           THE WITNESS:  You can touch them if you want, if

25   it's easier to see the embossment.  I'll just make sure and

1162

1    count them when I get that back.

2              THE COURT:  Don't take any out.

08:58:47  3    Q.       By MR. GADD:  I said two names there, Actavis and

4    Mallinckrodt.  Those are the pharmaceutical companies that

5    sell these pills?

6    A.       They are.  They are registered with the FDA and

7    approved to manufacture the actual Oxycodone pills for

8    distribution in the United States.

9    Q.       And for these real Oxycodone pills, the active

09:00:27 10    pharmaceutical ingredient is Oxycodone, correct?

11    A.       Oxycodone, yes.

12    Q.       Let's take a minute and just do a little bit of

13    housekeeping.  So the FDA, the Food and Drug Administration,

14    it has a chemistry lab, correct?

15    A.       It does.  It's called the Forensic Chemistry

16    Center.

17    Q.       Did you arrange for some of the pills from

18    Mr. Shamo and some of the punches and dies from Mr. Shamo,

19    did you arrange for those to be sent from the DEA lab to

09:00:59 20    your -- the FDA lab?

21    A.       I did.

22    Q.       I just want to read those through so that they are

23    clear in the record, and what I'll do is I'll read not our

24    court exhibit number, but I'll read the DEA drug exhibit

25    number, and then at the end, I want to ask you if I got them

1163

1    right.

2          So in this category of items that you arranged for

3    the FDA lab to test, I show that we have DEA Exhibit Number

09:01:26    4    14, 34, 64, 123, 193, 85, 95.01, 95.02, 96, 136, 174.01,

5    174.02, 188, 54, 15, 97, 126, 173, 185, 177, 178 and 179.

6    Does that sound correct?

7    A.       It does.

09:01:59    8    Q.       And we heard some about this yesterday, right?

9    A.       We did.

10   Q.       The chemists were talking about how some of the

11   items that they had tested or sampled had bits removed so

12   that they could go into special programs, correct?

13   A.       Correct.

14   Q.       All right.  Let's jump back into it.  Could we look

15   at 17.06.  Can you see that on your screen?

16   A.       I do.

17   Q.       Could you point out for the jury Alex Tebbs?

09:02:29   18   A.       Sure.  So if you look at the bottom row, the third

19   row, the farthest to the right, Ms. Tebbs has the red hair,

20   and she's the very last one in that row.

21   Q.       What role did Ms. Tebbs play in Mr. Shamo's

22   organization?

23   A.       She was the pseudo-executive assistant for him.

24   She would also run errands.  She would clean his house,

25   different tasks that he would ask her to do.  And that also

1164

09:02:58   1   includes helping him try to get into other businesses.

2   Q.      Have you reviewed the text messages that were

3   captured between Ms. Tebbs and Mr. Shamo?

4   A.      I have.

5   Q.      Could we look at 14.04.  Could you read that to the

6   jury.

7   A.      Sure.  The "local user" is Mr. Shamo, and the gray

8   box is Ms. Tebbs or Alex.

09:03:28   9        Mr. Shamo:  Hey, Alex, any news on the T-shirt bis?

10        Alex:  He hasn't said anything yet.  Do you want me

11   to offer him a price?

12        Mr. Shamo:  Yeah.  Offer 5K and see what he says.

13   I want to get the ball rolling on it.  BTC is doing really

14   well, so the sooner I get a bis up, the better.

15        As you've heard, BTC is short for BitCoin.

16        Alex:  Okay.  Perfect.  I'll text him now.

17   Alex:  Also, if it's cool with you, I can get your watches

09:03:58   18   fixed today and drop off the dry clean and come down

19   tomorrow.  I asked him what he thinks, so we'll see what he

20   says.

21        Mr. Shamo:  Yeah.  No pressure on when you come

22   down.

23        Alex:  Okay.  Perfect.  I just figured I would have

24   more stuff done by tomorrow.  It would be a little more

25   productive, lol.  When I go on lunch in about half an hour,

1165

1    I'll call the food bank and get some time set up.

2            MR. SHAMO:  Oh, yeah.  Need that done for sure,

3    lol.  I have some paperwork I might need filled out for this

09:04:26   4    class I need.  I might send you in to do it.  Also, I need

5    to get a dentist appointment.  Can you maybe find one close

6    by to me and get one set up?

7    Q.        Let's talk for just a minute about the offer for

8    the T-shirt business.  Are you aware of other instances

9    where Mr. Shamo tried to buy a legitimate business through

10    which he could launder drug money?

11    A.        Yes.

12    Q.        Let's look at 14.06.  Can you read this one as

13    well?

09:04:55   14    A.        Yes.  Again, Mr. Shamo is in blue, and Alex is in

15    the gray.

16            Mr. Shamo:  Both.  I had someone drive me to the

17    airport and asked them to leave the truck keys on the

18    counter.  That obviously didn't happen.  If you can do the

19    dishes in the sink and get a shoe rack that I pointed out,

20    that would be great.  I forgot to transfer BTC -- or BitCoin

21    -- over to my online wallet, so I can't set up the trade

22    today.  I can't remember what else, but I'll have to get you

23    more cash to get Legal Zoom going.  What time was the detail

09:05:27   24    appointment at?  Hey, I need you to run some paperwork into

25    Prime For Life for me.  They are open 'til 9 p.m. most

1166

1  nights, so anytime in the next few days would be great if

2  you can.  Also, I'm moving forward with the gym this week

3  and meeting with the owner in the next few days for lunch,

4  so I'll really need some legal paperwork set up soon for

5  that.  Most likely we'll use Legal Zoom since it's easy.

6  Also, can you get the shoe rack that I picked out and

7  reschedule the appointment for the detailing?  I was pissed.

09:05:59  8  Allie took the keys to the truck, so sorry about that, but

9  let me know your thoughts and coordination for this.

10       Allie:  No big deal at all, lol.  I already left

11  after I tried to call.  It was my cousin's birthday party,

12  so I went to that, ha, ha.  But, yes, I'll get on that.

13  What shoe rack was it you wanted?  Would you like me to get

14  hold of Legal Zoom?  I rescheduled for this Saturday, so no

15  biggy, and I'll get started on the paperwork.  You just want

16  a contract between you two saying you will be part owner.

09:06:28  17  Any other details I need to know?

18       Mr. Shamo:  Yeah.  It will be a startup for the gym

19  since it's not legal yet, but I'll get more details, how he

20  wants us to set it up in the next few days.  Also figure out

21  a name for the one shirt bis.  I want to get that started

22  soon.  Ugh.  It's going to be a super busy week for me.  Let

23  me know what day you can come down to do the paperwork for

24  Prime For Life.  Carpet cleaners this week.  Please try and

25  set up for Thursday or Friday.

|   |   |
|---|---|
| 09:06:59 | 1 Q.      The date on these messages that you've just read, |
|  | 2 it's June of 2016, correct? |

1  Q.      The date on these messages that you've just read,

2  it's June of 2016, correct?

3  A.      Correct.

4  Q.      Let's look at just one or two more.  Could we look

5  at 14.05.  Ms. Tebbs' role wasn't just running errands or

6  trying to set up businesses that he could purchase or

7  launder his money through?

8          MR. SKORDAS:  Objection to counsel's

9  characterization of laundering money.

10          THE COURT:  Objection -- what's the question --

11  sustained.

12  Q.      BY MR. GADD:  I probably should throw a question in

13  there.  I will.  In what we are about to read here in 14.05,

14  did you see additional steps that the defendant asked

15  Ms. Tebbs to take in her work for him?

16  A.      I did.  He wanted her to also make BitCoin trades

17  for him.

18  Q.      Let's read that, would you?

19  A.      Mr. Shamo is in the blue.  Alex is in the gray

20  again.

21          Mr. Shamo:  Hey, my biggest BTC trader is in town

22  tomorrow.  Think you can make the trade for me?

23          Alex:  Yes.  I can definitely do that.  I'm free

24  tomorrow, so any time morning sometime would be best.

25          Mr. Shamo:  Awesome.  I'll set it up.

```
 1          Alex:  Sorry.  I'm at work.  I can call you around
 2   5 or 6 if that's okay.  Are you going to do Vegas?
 3          Mr. Shamo:  Okay.  I'm going.  Can I send you my
 4   card info and you buy the 9:50 flight?
 5          Alex:  Yes.  For tonight?
 6          Mr. Shamo.  Yes.
 7          Alex:  Okay.  Southwest, right?
 8   Q.     And then let's look at one other.  Let's look at
 9   14.07.  This will be our last one for Ms. Tebbs.  In
10   addition to engaging her to trade BitCoin, did she also buy
11   stamps at his request?
12   A.     She did.
13   Q.     Let's look at this now, and could you read this for
14   us?
15   A.     Yes.  Again, Mr. Shamo is in blue.  Alex is in
16   gray.
17          Mr. Shamo:  I need those stamps ASAP.  Can I get
18   your bank account info so I can drop cash in?
19          Alex:  Yes.  Give me a sec.  My account number is
20   2910962 and I am at Golden West.  It's Alex Tebbs on the
21   account.
22          Mr. Shamo:  I've been down south most of my day and
23   haven't had a chance to get it.  I might just give you cash
24   when you come down next.  Meh.  Also, don't hate me, but I
25   have another watch to do, lol.  I'll talk to you.
```

09:08:29 (line 9)
09:08:59 (line 20)

1    Alex:  I can get order it -- I'm sorry -- I can

2  just order it, and you can just pay me back.  What exactly

3  is it?  I'm fine.  I'm used to it now.

4    Mr. Shamo:  Lol.  Priority stamped the 6.451, I

09:09:30  5  think.  I need 1,000 of them, so it will be around 7 K, if

6  you can front that.

7  Q.    When you see in there the 6.451, what does that

8  mean, if anything, to you?

9  A.    That's a priority stamp that actually includes the

10  tracking amount and stuff in the price.

11  Q.    And is that the price, $6.45?

09:10:00  12  A.    It is.

13  Q.    Let's turn away from Ms. Tebbs now, and let's talk

14  about eBay items.  So, did you help analyze Mr. Shamo's

15  computers and data that was received either from subpoenas

16  or search warrants?

17  A.    I did.

18  Q.    All right.  Could we look at Exhibit 17.09.  Do you

19  recognize this?

20  A.    I do.

21  Q.    Did you compile a list of some relevant items that

22  were, to use their phrase, won or purchased on eBay?

23  A.    I did.

09:10:28  24  Q.    Let's look at these items that you flagged.  Can

25  you walk us through what each of the columns means?

1170

1  A.      Sure.  When you look on the left, that's the
2  purchase date and time of the auction.  One of the things
3  about eBay is when you -- you have two choices.  You can
4  either actually be involved in an auction and make bids and
5  compete against other people to try to win the bid, or you
6  can just have a buy now feature, and even if you do the buy
09:10:59  7  now feature, eBay still lists it as you winning the auction.
8          So the second column is the auction title,
9  basically the product that was being either won or purchased
10  immediately, then the buyer's shipping address, the shipping
11  city of the buyer and the buyer shipping name.
12  Q.      Can you tell us these -- each row is something that
13  he purchased, correct?
14  A.      Correct.
15  Q.      Can you walk us through the rows and what they are?
16  A.      Sure.  So let's start at the bottom just for
09:11:28  17  chronological purposes.  So on June 6 of 2015, at 16:49, he
18  won or purchased the USPS new 1999 USS Arizona Memorial
19  priority mail express stamp sheet of ten.  It was shipped to
20  1383 East Murphy's Lane in Salt Lake City, and the buyer's
21  shipping name is Aaron Shamo.
22          The next line up, July 8 of 2015, at 16:52, he
23  purchased USPS new 1999 USS Arizona memorial priority mail
09:12:00  24  express stamp, sheet of ten.
25          THE COURT:  A little bit slower so she can take it

1171

1    down.

2        THE WITNESS:  Sorry.  He had it shipped to 1383 East

3    Murphy's Lane in Salt Lake City, and the buyer shipping name

4    is Aaron Shamo.

5    Q.      BY MR. GADD: So let me jump in for just a moment.

6    As we work our way up, there's going to be several types of

7    dies and stamps, but could you talk specifically about the

8    first and third row and then if you want to do it

09:12:26    9    chronologically, maybe we do the third row first?

10   A.      Sure.  So, if you go up, it's the third row from

11   the top.  In December -- on December 26, 2015, at 16:06, he

12   won or purchased the molds of A-215 for tablet press pill

13   press die pill maker TDP 0/1.5/5/6.  He had it shipped to

09:12:57   14   7939 South Titian Street in Cottonwood Heights.  Buyer

15   shipping name is Aaron Shamo.  And the top line.  On March

16   12 of 2016, at 21:45, he won the shipping from USA, A-215

17   die for tablet press pill press TDP 0/1.5/5/6.  He had it

18   shipped to 7939 South Titian Street, Cottonwood Heights.

09:13:28   19   Buyer shipping name is Aaron Shamo.

20   Q.      In addition to this chart you've created, I want to

21   look at a couple other exhibits.  Can we now turn to

22   Mr. Shamo's emails.  This would be Exhibit 21.34.  And then

23   if we could go to page 4.  Do you recognize this?

24   A.      I do.

25   Q.      What are we looking at here?

09:13:56  1   A.      This is the PayPal receipt for Mr. Shamo's purchase

2   of one of the A-215 pill dies.  He spent, all total, $124

3   for it.

4   Q.      Then, if we could advance ahead to page 76.

5   A.      This is -- whoops.

6   Q.      Sorry.  Were you going to say something on the

7   previous one or this one?

8   A.      This one.

9   Q.      Okay.  Please, tell us what it is.

10  A.      This is another receipt for that second pill die

09:14:28  11  for the A-215 pill die for his pill press.  He spent a total

12  of $124 for this one as well, through PayPal.

13  Q.      Let's look at one last set of emails.  Could we

14  look at Exhibit 21.08.  And if we could go down to page 20.

15  Do you recognize this?

16  A.      I do.

09:14:59  17  Q.      What is this we're looking at?

18  A.      This is eBay, another basic receipt from eBay

19  showing the pill die that he ordered, the A-215.  The

20  estimated delivery date was going to be Thursday,

21  March 24th, to Thursday, April 7, and it shows his $124

22  payment through PayPal for it.

23  Q.      As long as we've got the picture up, let me and you

24  a question about the face of the punch in the picture.  Why

09:15:30  25  is it backwards?

1173

1    A.        Because when it actually smashes in the pill press

2    together, then it's readable for the person who is looking

3    at it, so it has to backwards on the punch die.

4    Q.        And the punches and on the face of the punches that

5    we have seized in this exhibit, I believe it's 13.13, the

6    boxes of dies, you had a chance to actually look at those,

7    correct?

8    A.        I did.

9    Q.        Did you see that similar backwards, as we read it,

10   looking down at it?

09:15:59   11   A.        I did.

12   Q.        Let's look at one last page in this exhibit.  Could

13   we go to page 30.

14             What's this we're looking at?

15   A.        This is another eBay receipt showing that he

16   purchased it as a guest, that Aaron Shamo purchased it as a

17   guest.  He paid $124 through PayPal for it, and it's the

09:16:25   18   other mold for the A-215 pill punch that goes in the pill

19   press.

20   Q.        Thanks.  I want to change gears one last time

21   entirely.  Such is the life of a case agent.  Let's talk for

22   a minute now about customers of Mr. Shamo's.  Did you

23   spearhead agents' efforts to investigate Pharma-Master's

24   customers?

25   A.        I did.

1174

| | |
|---|---|
| | 1 |
| 09:16:57 | 2 |
| | 3 |
| | 4 |
| | 5 |
| | 6 |
| | 7 |
| | 8 |
| 09:17:27 | 9 |
| | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| | 15 |
| | 16 |
| | 17 |
| 09:17:59 | 18 |
| | 19 |
| | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| | 25 |

Q.        Could we look at Exhibit 14.30.  And if we could
look at page 1,854.  We have had this exhibit up quite a bit
for the jury.  This is the combined daily order sheets,
correct?

A.        It is.

Q.        And I just wanted to pull out this page to talk
about kind of what you saw as an investigator.  So we're
highlighting now this sale going to Alivia Luckcuck, who
there has been some testimony about.  When you first started
looking at these 1900 pages of orders, did the name on the
shipping address, did it mean anything to you?

A.        No, not necessarily, because as an investigator, in
a lot of cases with drug trafficking organizations,
sometimes when -- when there are customers orders such as
this, they don't use their real name, so we didn't know who
all was real and who wasn't.

Q.        So when you say they don't use their real name,
sometimes it's maybe a fake identity they use?

A.        True, yes.

Q.        Or an alias?

A.        Correct.

Q.        Did some people use straw purchasers?

A.        Yes.

Q.        And maybe we could just define that.  What's a
straw purchaser?

1175

A.        So a straw purchaser is somebody who the leader of
the organization has purchase an item and have it sent to
them or sent to somebody else so it sends another layer of
anonymity away from the leader of the organization.

Q.        And then there's been testimony that at least some
people used package receivers, correct?

A.        Correct.

Q.        And Ms. Luckcuck is a package receiver?

A.        She is.

Q.        For the large purchasers, so for this purchaser for
example, Trustworthy Money, who is purchasing 10,000 of the
Fentanyl pills, what did you and other agents do to further
investigation into these types of large purchases?

A.        When we reviewed all of the pages -- there's 1,984
pages of customer orders.  And, as we reviewed them, we
pulled out the orders of -- the larger orders that were
clearly not personal use orders, and we sent leads all over
the United States to different law enforcement jurisdictions
so that they could follow up on those cases because that was
clearly supplies for a dealer in that area.

Q.        And that took care of the large orders, but I'm
hoping you and I can talk about some of the small order
customers.

A.        Uh-huh.

Q.        Have you personally investigated more than 90 of

1176

1    the small order customers?

2    A.       I did personally investigate over 90 of the small

3    orders of clients -- or customers.

4    Q.       I want to focus just on five who are mentioned in

5    the Indictment.

6    A.       Okay.

7    Q.       So if we could start first with Gavin Keblish.  If

09:19:50    8    we could look at page 748.  Do you see his name at the top

9    there?

10    A.       I do.

11    Q.       Can you explain what was ordered in that

12    transaction?

13    A.       I can.  Gavin Keblish, his address is 54 Seatuck

14    Avenue in East Port, New York.  He went under the moniker

15    AJM6753.  He ordered Roxy Oxy, 30 milligrams.  He ordered 40

09:20:25    16    of them on May 5, 2016, and had priority mail for that

17    package.

18    Q.       And then let's look at one more order.  If we could

19    go to page 1,214.  There's an extra zero in there.  Thanks.

20           What did he order on that date?

21    A.       He ordered M-box 30 Oxycodone, 30 milligrams.  He

09:20:59    22    ordered 20 of those using the moniker AJM6753 and had them

23    sent to him at the 54 Seatuck Avenue, East Port, New York

24    address.

25    Q.       Did you look into Mr. Gavin Keblish?

1177

```
 1   A.      I did.

 2   Q.      Did you speak with detectives in this area?

 3   A.      I did.

 4   Q.      Did you speak to his family?

 5   A.      I did.

 6   Q.      They are here in the courtroom with us?

 7   A.      They are.

 8   Q.      Was Gavin a real person?

 9   A.      He was.

10   Q.      Did you speak to Gavin to confirm that he ordered

11   the Fentanyl-laced fake oxycodone from Pharma-Master?

12   A.      I did not.

13   Q.      Why not?

14   A.      He's dead.

15   Q.      Let's talk about Conner Valenter.  Could we look at

16   page 450.  Do you see his name on there near the bottom?

17   A.      I do.

18   Q.      What was ordered on that date, February 23?

19   A.      Conner ordered Fentanyl Roxy Oxycodone, 30

20   milligrams, one pill on February 23 of 2016, using the

21   moniker Spitta.

22   Q.      Could we look at page 489.  What did he order on

23   February 25?

24   A.      He ordered Fentanyl Roxy Oxycodone, 30 milligrams,

25   eight pills, under the moniker Spitta, and he had them sent
```

09:21:28 (line 8)
09:21:57 (line 16)
09:22:25 (line 22)

1178

```
              1    to his address in Seattle, Washington.
09:22:54      2    Q.        And, finally, could we look at page 563.  What did
              3    he order on March 3?
              4    A.        He ordered Fentanyl Roxy Oxycodone, 30 milligram,
              5    five tablets using the same moniker of Spitta, and he had
              6    them sent to his address in Seattle Washington.
              7    Q.        Did you look into Mr. Conner Valenter?
              8    A.        I did.
              9              MR. SKORDAS:  Your Honor, could we approach?
             10              THE COURT:  Yes.
09:29:54     11     (Conference among the Court and the attorneys at the bench
             12                  outside of the hearing of the jury.)
             13              THE COURT:  These aren't the people who you are
             14    claiming the homicide count on, are they?
             15              MR. SKORDAS:  No.
             16              MR. GADD:  So the homicide count, his name is
             17    Ruslan Kluyev.
             18              THE COURT:  RK?
             19              MR. GADD:  Yes, RK.  These people are charged in
             20    the Indictment; specifically, Mr. Shamo distributed drugs to
             21    them.  So this was our -- our written motions that were done
             22    I think in April and May, where the ruling was we couldn't
             23    mention the other customers who are now dead from an
             24    overdose, those folks whose names are in the Indictment and
             25    Mr. Shamo is charged with distributing drugs that did go to
```

1  them.  I can ask my agent if she interviewed them because

2  that's a major investigative step that any investigator

3  would take.  She was ordered by Your Honor to not mention

4  that their death was an overdose.  In fact, you will notice

5  we are not going into the death at all.

6         MR. SKORDAS:  You've got to be kidding me.

7         MS. BECKETT:  The ruling was very contrary on the

8  overdose deaths, and it was specific to:  They are allowed

9  to discuss Gregory Lee, who was an overdose, who was

10 investigated because they weren't able to interview him.  He

11 is not here testifying.  That was what was allowed.  They

12 are very, very, very far over the line when they have a

13 family out here crying in the courtroom, and it's clear that

14 the indication is that he was an overdose death.  Your

15 Honor's ruling was very clear in that regard.

16        THE COURT:  I don't have the order with me, I don't

17 think, but I thought -- I thought you were going to -- I

18 guess I thought there would be a stipulation:  The reason we

19 didn't call -- these people weren't investigated.  They

20 weren't called because they were dead.  That's not really --

21 I mean, you're leaving more of an impression they died of an

22 overdose and you're trying to connect it to Shamo.

23        MR. SKORDAS:  Of course he is.

24        MR. GADD:  I'm happy to ask her right now:  These

25 four men we are talking about were not -- Mr. Shamo was not

1    charged with causing their deaths.

2           We will make it very clear.

3           THE COURT:  Yeah, you should do it.  But then what

4    else do you need to do?

5           MS. BECKETT:  That doesn't fix it.

6           MR. GADD:  I still need to prove the counts in the

7    Indictment, the people distributing drugs to these people.

8    The Grand Jury charged it.  I've got to ask these questions.

9    I will clarify to make it very clear he is not charged with

10   causing their deaths.

11          MR. SKORDAS:  But you can ask if he distributed

12   drugs to them, and you can show that.

13          But when he then asked:  Why didn't you interview

14   them -- he didn't ask that about a single other person who

15   allegedly received drugs -- so that she can say, "Because

16   they are dead."

17          That clearly violates the order of this Court.

18          THE COURT:  It seems to me it does.

19          MR. GADD:  We have asked other people.  Jared

20   Gillespie, the other person named in the Indictment, he was

21   interviewed.  That was the question we asked.  These are

22   just the people named in the Indictment.  The Grand Jury

23   charged it.  It's part of what I have to prove.

24          MS. BECKETT:  You're two steps beyond that when you

25   have family in the courtroom and when you ask him whether or

1    not the family is present.  You asked whether or not they

2    were present in the courtroom.

3          MR. GADD:  Yes, I did.

4          MS. BECKETT:  You have gone way over what the

5    Court's ruling was on the overdose.

6          MR. SKORDAS:  I think we need to make a motion

7    outside the presence of the jury at the next break.

8          MR. GADD:  Let's take a minute and look up the

9    order or the minutes.  This is clearly what was talked about

10   at the hearing.

11         THE COURT:  I didn't envision it going this way.  I

12   envisioned it, you can say, "These people were charged in

13   the Indictment."

14         MR. GADD:  Yes.

15         THE COURT:  "We couldn't interview them because

16   they are not here.  They are dead."

17         MR. GADD:  I did ask that.

18         THE COURT:  Why do you need to ask anything else, I

19   guess, is my question.

20         MR. GADD:  Oh, because we have set this up --

21   because in order for them to be guilty, he has to send it to

22   a real person.  How do you prove that they are a real

23   person?  You have to investigate it.  Right?  You talk to

24   detectives who talk to family if you can't find the person.

25         THE COURT:  Okay.  So you're entitled to give

1182

```
 1    evidence that he sent it to him, but the problem is, you are
 2    tying that to the deaths.  You've got to say something about
 3    you're not charging him with the death of this person.
 4           MR. GADD:  I will do that right now.
 5           MR. SKORDAS:  In fact, he did, and if this was a
 6    real person.  She answered yes.  At that time the inquiry is
 7    over.  Instead, he continues and asks:  Did you interview
 8    him?
 9           No.
10           Why not?
11           Because he's dead.
12           And his whole family is here?
13           You've got to be kidding me, Judge.  This is
14    outrageous.  I'm sorry.
15           THE COURT:  You're going to ask for a mistrial, and
16    I'm going to deny it.
17           MR. SKORDAS:  I understand.  I need to, though.
18           THE COURT:  You don't need to get anymore than that
19    he sent them to him.  Why do we need to know anything else?
20           MR. GADD:  I understand what the Court has said,
21    and I'll limit myself to it.
22           THE COURT:  All right.
23           MR. GADD:  Okay.
24               (Proceedings continued in open court.)
25           THE COURT:  Go ahead, Mr. Gadd.
```

09:29:55

1183

1    Q.        BY MR. GADD: Special Agent Keys, let's clarify so

2    that we're abundantly clear.  The people that we're going to

3    talk about, starting with Mr. Keblish, now Mr. Valenter,

4    they are named in the Indictment, but Mr. Shamo has not been

5    charged with causing their death?

09:30:29   6    A.        That is correct.  They were his customers.

7    Q.        Let's take -- if you'll excuse me, I forgot which

8    question I left off on.

9    A.        Right.  I don't remember.

10   Q.        Let me circle back, and I'll make sure we get the

11   important ones.

12   A.        Okay.

13   Q.        You looked into Mr. Conner Valenter?

14   A.        I did.

15   Q.        Was he a real person?

16   A.        He was.

09:30:54   17   Q.        Let's talk about Edward Blatz.  There is a number

18   of orders here.  We don't need to necessarily look at them

19   all, but let's look at the first.  We have page 417.  Do you

20   see the order there for Ed Blatz?

21   A.        I do.

22   Q.        What was ordered?

23   A.        He ordered Roxy Oxycodone, 30 milligrams, two

09:31:28   24   tablets on February 21 using the moniker Veldgear, and he

25   had it shipped to him in Washington, D.C.

1184

1    Q.        Now let's jump to the last, if we could look at

2    page 624, and then it goes on to the next page.  You can see

3    that there?

4    A.        Yes.

5    Q.        What did he order this time?

09:31:59    6    A.        He ordered Roxy Oxycodone, 30 milligrams, 40

7    tablets, on April 5, 2016, under the moniker Veldgear.  And

8    he had it shipped to the same address in Washington, D.C.

9    Q.        Did you look into Mr. Edward Blatz?

10   A.        I did.

11   Q.        Was he a real person or just a name on a page?

12   A.        He was a real person.

09:32:28   13   Q.        If we could look at Exhibit 18.01.  And if we could

14   look at page 2.  Who is that?

15   A.        This is Gregory Lee.

16   Q.        Did you also find orders sent to his address?

17   A.        I did.

18   Q.        If we could look at -- jumping back to Exhibit

09:32:57   19   14.30, if we could look at 664.  And then it goes on to the

20   next page, so if you could highlight the bottom.  Perfect.

21   If you could call that out for us.

22             What was ordered on April 12?

23   A.        So April 12 shows that he ordered Roxy Oxycodone,

09:33:28   24   30 milligrams, one tablet, but it was combined with a second

25   order the next day of Roxy Oxycodone, 30 milligrams, ten

1185

1    tablets, using the moniker T-Wad.  And it was sent to

2    Gregory Lee at 3 Midvale Drive, Daly City, California.

3    Q.      Let's look at one additional order.  This is on

09:33:51  4    page 862.  And then it goes on -- like the previous one, it

5    goes on to the next page.  So there's the top half.  Do you

6    see what was ordered there?

7    A.      I do.  He ordered Roxy Oxycodone, 30 milligrams, 10

8    tablets, on June 6, 2016, using the moniker T-Wad, and it

9    was sent to Gregory Lee at his Midvale Drive address in Daly

10   City.

11   Q.      That Midvale Drive is what you see here?

12   A.      Yes.

09:34:29  13   Q.      Was Mr. Lee a real person?

14   A.      He was.

15           MR. GADD:  If I can have just one moment?

09:34:42  16           THE COURT:  Sure.

17           MR. GADD:  Nothing further.  Thank you.

18           THE COURT:  You thank you, Mr. Gadd.

19           You may cross examine, Mr. Skordas.

09:35:28  20           MR. SKORDAS:  Thank you, Your Honor.

21                        CROSS EXAMINATION

22   BY MR. SKORDAS:

23   Q.      Agent Keys, were you involved in this investigation

24   even after November, when Mr. Shamo was taken into custody?

25   A.      I was.

1186

```
 1    Q.       And did you help other agents serve a search

 2    warrant on a house in Cottonwood Heights in February of

 3    2017?

 4    A.       I did.

 5    Q.       And that was some, I guess, two and a half or three

 6    months after Aaron was taken into custody, correct?

 7    A.       Yes.

 8    Q.       And you served the search warrant on the home that

 9    Aaron had previously lived, correct?

10    A.       I served it on the garage of the home that he had

11    lived in.

12    Q.       Okay.  And you -- you found some items in the home,

13    correct?

14    A.       In the garage.

15    Q.       All right.  In the garage.  I'm sorry.

16    A.       Sorry.  I have to be specific.

17    Q.       That's all right.  And among those items was a

18    crate that had a press in it.  Correct?

19    A.       Correct.  The DEA, during the search warrant, had

20    taken the press out of the crate, but the crate was still in

21    the garage.

22    Q.       Of the home?

23    A.       Correct.

24    Q.       And you seized the crate?

25    A.       Yes.  Parts of it, yes.
```

09:35:59 (line 8)

09:36:28 (line 19)

```
 1    Q.      Especially this part?

 2    A.      Yes.

 3    Q.      What is this part?

 4    A.      This is one of the sides of the wooden crate that

 5    the press came in.

 6    Q.      And for the record, I'm showing you Government's

 7    Exhibit 13.14, I think?

 8    A.      That's correct.

 9    Q.      And there's an addressee on that crate, correct?

10    A.      Yes.

11    Q.      Who's the addressee?

12    A.      Luke Paz.

13    Q.      At what address?

14    A.      Hold on.  I got to look through the tape.  The

15    address is 1500 Woodland Avenue, in Salt Lake City, Utah.

16    Q.      And that crate was found in February in Cottonwood

17    Heights, correct?

18    A.      In the garage at the Titian Way home, yes.

19            MR. SKORDAS:  I believe that's all I have, Your

20    Honor.

21            THE COURT:  Thank you.

22            Any redirect?

23            MR. GADD:  No, sir.  Thank you.

24            THE COURT:  Thank you.

25            You may step down, Ms. Keys.  Thank you.
```

09:37:00 (line 10)
09:37:28 (line 18)

1188

```
            1         You may call your next witness.
            2         MR. GADD:  Your Honor, the United States calls Tori
09:38:07    3    Grace.
            4         THE COURT:  Come forward and be sworn, please,
            5    right up here at the podium.
            6                       TORI GRACE,
            7    the witness hereinbefore named, being first duly cautioned
            8    and sworn or affirmed to tell the truth, the whole truth,
            9    and nothing but the truth, was examined and testified as
            10   follows:
09:38:15   11         THE CLERK:  If you'll just come to the witness box.
            12   Please state your name and spell it for the record.
            13        THE WITNESS:  Tori Grace.  T-o-r-i.  G-r-a-c-e.
            14        THE COURT:  Go ahead.
            15                    DIRECT EXAMINATION
            16   BY MR. GADD:
            17   Q.        Ms. Grace, are you prepared to testify about the
            18   death of your friend Russ?
            19   A.        Yes.
09:38:58   20   Q.        Before we do that, I'd like to give the jury just a
            21   very brief idea of kind of your background.  Can you tell us
            22   a little bit about yourself?
            23   A.        I live in the San Francisco Bay area.  Right now I
            24   work full time, and I'm getting ready to go back to school
            25   to study anthropology.
```

1189

```
 1   Q.      Back in 2016, you were in school, correct?

 2   A.      Uh-huh.

 3   Q.      Were you at San Francisco State?

 4   A.      Yes.

 5   Q.      After Russ' death, did you move home?

 6   A.      I did.

 7   Q.      And school starts next week?

 8   A.      Yes.

 9   Q.      Can we look at 18.01 again.

10           Who is that?

11   A.      Russ.

12   Q.      That's the name that he preferred to go by, right?

13   A.      Yes.

14   Q.      Was his full name Ruslan Kluyev?

15   A.      Yes.

16   Q.      Did you know his family?

17   A.      I meet his parents after he passed.

18   Q.      Could we look at page 2.

19           Who is that?

20   A.      It was Gregg.

21   Q.      Was his full name Gregory Lee?

22   A.      (Witness nods.)

23   Q.      How did you and Gregg meet?

24   A.      We met through two mutual friends while I was still

25   in high school.
```

09:39:29  (line 7)
09:40:00  (line 15)
09:40:31  (line 25)

1190

```
 1              THE COURT:  Can you hear her?
 2              You need to speak up right into the microphone, if
 3      you would, please.
 4      Q.      BY MR. GADD: You can adjust it if you want.  I'll
 5      repeat that last question, so we make sure everyone heard.
 6      How did you and Gregg meet?
 7      A.      We met through two mutual friends while I was in
 8      high school.
 9      Q.      And at some point you started dating, correct?
10      A.      Yes.
11      Q.      Do you remember the first time you met Russ?
12      A.      Vaguely, yes.
13      Q.      How did you meet him?
14      A.      Gregg and I met him in San Francisco.
15      Q.      He and Gregg knew each other, correct?
16      A.      Yes.  They met online.
17      Q.      And at some point, did Russ move in with Gregg?
18      A.      Yes, he did.
19      Q.      Was that at their address, 3 Midvale Drive in Daly
20      City?
21      A.      Yes.
22      Q.      If it's okay, I want to talk just a minute about
23      drug use.  Did Russ and Gregg use drugs?
24      A.      Yes, they did.
25      Q.      Did you sometimes use with them?
```

09:40:58 (line 13)

09:41:27 (line 23)

1191

```
 1    A.        I did.

 2    Q.        How many days have you been clean?

 3    A.        Since Gregg passed.  About two years, two and a

 4    half years.

 5    Q.        Russ, specifically, what sort of drugs did he use?

 6    A.        He used anything he could get his hands on.

 7    Q.        Did you ever see them go online to buy their drugs?

 8    A.        Only a few times.

 9    Q.        Do you remember what website they went to?

10    A.        AlphaBay.

11    Q.        When they would order drugs online, how would the

12    drugs arrive?

13    A.        Through the mail.

14    Q.        Did you actually see packages arrive?

15    A.        I've only seen two packages.

16    Q.        What did the packages look like?

17    A.        Like U.S.P.S. envelopes.

18    Q.        Did you get to see what was inside the packages?

19    A.        Only a couple times, the only two times that they

20    came.

21    Q.        What did you -- what did you see inside the

22    packages?

23    A.        They were usually packaged in, like, miscellaneous

24    items in, like, these little metallic pouches.

25    Q.        And inside the pouch, what did the -- what did the
```

```
              1   drugs look like?
09:42:56      2   A.      The drugs that I saw both times were MDMA.
              3   Q.      And you recognized it because you had seen it
              4   before?
              5   A.      Yes.
              6   Q.      Could we talk for a minute about June 12, 2016, so
              7   the night before Russ' death.  Were you and Gregg out that
              8   night?
              9   A.      Uh-huh.
             10   Q.      Had you been eating dinner somewhere?
             11   A.      Yeah.  At his parents' house.
09:43:28     12   Q.      And then did you go back to Gregg and Russ'
             13   residence?
             14   A.      Yes.
             15   Q.      About what time of day or night was it when you got
             16   back to that residence?
             17   A.      So, around 10:30, 11.
             18   Q.      In the evening?
             19   A.      In the evening.
             20   Q.      Were you met there by Russ?
             21   A.      Yeah.  He let us in.
             22   Q.      Did it appear to you he had been drinking?
             23   A.      Yeah.
             24   Q.      It was fairly obvious?
09:43:57     25   A.      Yeah.  He was still pouring himself more drinks
```

```
 1   when we got there.

 2   Q.       Do you happen to remember what he had been

 3   drinking?

 4   A.       Vodka.

 5   Q.       That night, did you and Gregg hang out with Russ

 6   for a little while?

 7   A.       Yeah.  Only for about 15 minutes.

 8   Q.       Was it inside of his room?

 9   A.       Uh-huh.

10   Q.       If we could look at page 3.  Do you recognize this?

11   A.       Yes.

12   Q.       What is it?

13   A.       Russ's desk.

14   Q.       Was it inside his room?

15   A.       Yes.

16   Q.       While you were hanging out with him, did you see

17   him grind up two pills?

18   A.       Yes.

19   Q.       Do you know what type of pills they were?

20   A.       Some kind of opiate.  I knew that.

21   Q.       Did you get to see the pills?

22   A.       I only saw them, like, after he had crushed them.

23   Q.       Do you know where he got the pills?

24   A.       I assumed he got them online.

25   Q.       Could we look at page 4.
```

09:44:30 (line 12)

09:44:58 (line 24)

1194

```
 1            Do you know what that is?
 2   A.       That's what he used to crush them up, yeah.
 3   Q.       It's a battery, right?
 4   A.       Yeah.
 5   Q.       And they would crush them on the desk?
 6   A.       Yeah.
 7   Q.       Could we look at page 5.
 8            What's that?
 9   A.       It's what he used to snort the drugs.
10   Q.       And, specifically, is it kind of the blue rolled up
11   note?
12   A.       Yeah.  It's a Post-it note.
13   Q.       I want to ask you some questions about Russ
14   specifically, so if we could look at page 1.  And maybe --
15   you are the best witness to clarify this.  What's he
16   wearing?
17   A.       He was really into all tech stuff, so I actually
18   don't know what it is.
19   Q.       Just sunglasses and then something else?
20   A.       Yeah.
21   Q.       But he didn't always wear that, right?
22   A.       No.
23   Q.       Okay.  So that night, June 12, were you concerned
24   about Russ snorting two pills?
25   A.       Yes, I was.
```

09:45:28 (line 10)
09:45:58 (line 19)

1195

```
 1    Q.       Why?

 2    A.       Because he was already drinking.

 3    Q.       Did he show any signs of use after he snorted them?

 4    A.       Yeah.

 5    Q.       What did you observe?

 6    A.       He immediately started to, like, nod, so, like,

 7    fall asleep and wake up, and he couldn't stand up anymore.

 8    Q.       Did he lay down?

 9    A.       He did, yeah.

10    Q.       Were you and Gregg asked to check on him?

11    A.       Yeah.  He did ask us that.

12    Q.       And did you check on him?

13    A.       Yeah.

14    Q.       When you would check on him, what sort of things

15    were you looking or listening for?

16    A.       That he was still breathing.

17    Q.       How many times do you think you checked on him that

18    night?

19    A.       I checked on him about four or five times, but

20    Gregg went in there, like, two more times more than I did.

21    Q.       But when you were watching him, did you notice

22    anything about his breathing?

23    A.       He seemed to be breathing like he always did when

24    he slept.  He was a loud snorer, so every time we went in,

25    he was still snoring pretty loudly.
```

09:46:28 (line 6)
09:46:58 (line 15)
09:47:28 (line 25)

1196

1   Q.        The last time you went in, did you and Gregg roll

2   him into the recovery position?

3   A.        We did, yeah.

4   Q.        Can you just briefly explain to the jurors what the

5   recovery position is?

6   A.        It's where you lay the person on their side and

7   have their leg go over their body and then their head rest

8   on their elbow facing down.

9   Q.        Why did you do that?

09:47:58   10   A.        In case he threw up, and we didn't want him to

11   choke on his own throw up.

12   Q.        Let's talk about the following morning, so June 13,

13   2016.  What did you do that morning?

14   A.        I got up and went to work.

15   Q.        And when did you find out that Russ had passed?

16   A.        About two after -- two hours after I started my

17   shift.

09:48:27   18   Q.        You have a good support system, correct?

19   A.        Uh-huh.

20   Q.        Your mom is here today supporting you?

21   A.        (Witness nods.)

22   Q.        If I could just ask you about two more pictures.

23         If we could look at page 7.

24         Do you recognize the room.

25   A.        Yes.

1197

1    Q.        Is that Russ' room?

2    A.        (Witness nods.)

3    Q.        And maybe just so I can help the court reporter,

09:48:59  4    you nodded your head in the affirmative, correct?

5    A.        Yes.

6    Q.        Do you see what looks like a garbage can in the

7    foreground on the left side of the photo?

8    A.        Yes, I do.

9    Q.        And do you see the envelope on top?

10   A.        Yes.

11   Q.        I want to show you a closer look at the envelope.

12             Could we look at page 8.

13             Do you recognize this envelope?

14   A.        I don't.  No.

09:49:28  15   Q.        Did you have any friends in Sandy, Utah?

16   A.        No.

17   Q.        Do you know if Gregg had any friends in Sandy,

18   Utah?

19   A.        No, he didn't.

20   Q.        Russ?

21   A.        No.

22             MR. GADD:  No further questions.  Thank you.

23             THE COURT:  Thank you.

24             You may cross examine, Mr. Sam.

25                          CROSS EXAMINATION

BY MR. SAM:

Q.      Ms. Grace, thanks for being here today.  And I just want to ask you a few questions about Russ and Gregg.  On that day, on June 13, that was your first day of work; is that right?

A.      It was, yeah.

Q.      Where were you working at?

A.      Philz Coffee in San Francisco.

Q.      Okay.  And you received a call from Gregg that day?

A.      Uh-huh.

Q.      Telling you what happened to Russ?

A.      Yeah.

Q.      Okay.  And then, later on that day, you got one or two calls from Daly City police; is that right?

A.      Yes.

Q.      Okay.  And they asked you to come in to talk; is that right?

A.      Uh-huh.

Q.      So, I think you received one call from Officer Sabins.  Do you remember that?

A.      Yes.

Q.      And then another one from Officer Garrett, I think. And then he actually picked you up and took you to the Daly City Police Department that day; is that correct?

A.      Yes.

1199

1    Q.        I think on the way there, too, your mother called

2    you or you called your mother?

09:51:00  3    A.        Uh-huh.

4    Q.        Because she was concerned about the situation; is

5    that right?

6    A.        Yes.

7    Q.        Okay.  And you -- and so you gave two interviews

8    to -- there's one that day with the Daly City Police

9    Department and then, approximately two years later, some

10   agents from Utah came and interviewed you at your home; is

11   that correct?

12   A.        Yes.

09:51:27  13   Q.        Okay.  And I just wanted to review with you what --

14   your friendship with Russ and kind of some of the things

15   that were going on.  He was a heavy drug user; is that

16   right?

17   A.        He was.

18   Q.        And I think you told the Daly City Police that he

19   used -- he was a recovering heroin addict; is that right?

20   A.        Yeah, he was.

21   Q.        But he was using all kinds of drugs and alcohol.

09:52:01  22   And in that -- and he put a lot of pressure on his peers,

23   including you and others, to participate in drug use; is

24   that right?

25   A.        Uh-huh.

1   Q.      Okay.  And you had a knowledge about Fentanyl,

2   correct, before this day, before you came home with -- or

09:52:26   3   went to Gregg and Russ's apartment, you had knowledge of

4   Fentanyl before that; is that right?

5   A.      Yes.

6   Q.      And had you seen Gregg or Russ use Fentanyl before

7   that time?

8   A.      Not before that time, no.

9   Q.      Okay.  But you had heard about it and you

10  understood the effects of it?

11  A.      Yes.

12  Q.      Okay.  And your testimony was that you -- when you

13  came home and you found Russ, he had drank a whole bottle of

14  vodka.  Is that your testimony?

15  A.      Yes.

09:52:58   16  Q.      And that you were concerned, at that point, when

17  you went into his room with him and he was crushing up

18  pills, what he said was Fentanyl.  And why were you

19  concerned after observing him drinking alcohol with him

20  crushing up Fentanyl pills?

21  A.      Because I know that mixing those two kinds of

22  things can be very deadly.

23  Q.      Yeah.  Okay.  So it's very dangerous.  You

24  understood that?

25  A.      Uh-huh.

1201

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|            | 1  | Q.       You and Gregg both knew that, so you were -- did |
| 09:53:29   | 2  | you try to stop him or anything? |
|            | 3  | A.       We did, yeah. |
|            | 4  | Q.       Okay.  And then -- then you saw the effects of it, |
|            | 5  | and you eventually put him in a recovery position; is that |
|            | 6  | right? |
|            | 7  | A.       Yeah. |
|            | 8  | Q.       Have you had a situation like that before, where |
|            | 9  | you have put either Russ or a friend in that position? |
|            | 10 | A.       That was the first time. |
|            | 11 | Q.       Okay.  But that's something that you knew was |
| 09:53:57   | 12 | something that would be preventative if there were a |
|            | 13 | problem? |
|            | 14 | A.       Yeah. |
|            | 15 | Q.       And so you were trying to help him out with that. |
|            | 16 | I just want to ask you about Gregg.  And I know these are |
|            | 17 | sensitive topics, but Gregg passed away less than a year |
|            | 18 | after Russ; is that right? |
|            | 19 | A.       Yes. |
| 09:54:29   | 20 | Q.       And you were not present when Gregg passed away; is |
|            | 21 | that right? |
|            | 22 | A.       No, I wasn't. |
|            | 23 | Q.       Okay.  One of your good friends -- I apologize. |
|            | 24 | One of your good friends was there, Nicole and Sean, and it |
| 09:54:47   | 25 | was maybe kind of a similar situation.  And I wanted to ask |

1202

```
1    you about your statement when the -- when agents came and

2    met with you in 2018.  You stated that, after Russ died,

3    that you and Gregg kind of started to drift apart.  Is that

4    right?

5    A.      Uh-huh.

6    Q.      And why was that?

7    A.      Because Gregg continued to use, and I thought it

8    was dumb after, like, what his friend had just gone through.

9    Q.      Okay.  And you knew it was dangerous, risky

10   behavior.  In fact, I think you told agents, too, when you

11   met with them in 2018, that you and Gregg said that you were

12   both concerned for Russ because there was alcohol involved,

13   and you said that the risk was too high?

14   A.      Uh-huh.

15   Q.      To be involved with taking other drugs in that

16   situation?

17   A.      Yeah.

18   Q.      And I'm sure your mother is a good influence for

19   you.

20   A.      Uh-huh.

21   Q.      I know that from her contacting you when you

22   were -- on that day when Russ passed away, and I'm sure she

23   was concerned because she didn't want something like that to

24   happen to you.  So I'd just encourage you to keep up the

25   good work and keep up and encourage, you know, your college
```

09:55:30  (line 8)
09:55:58  (line 15)
09:56:23  (line 24)

1   and things, and there's a lot of potential for you, and I

2   encourage you to keep on that path, so...

3   A.        Thank you.

4            MR. SAM:  I don't have any other questions.

5            THE COURT:  Thank you, Mr. Sam.

6            Any redirect?

7            MR. GADD:  No, Your Honor.

8            Thank you very much.

09:56:58   9            THE COURT:   You may step down, and you're excused.

10   Let's take our first break, and we'll be in recess until

11   about quarter after 10.

09:57:53   12           THE CLERK:  All rise, please.

13            (Whereupon the jury leaves the courtroom.)

09:57:53   14                    (Bench conference.)

15            THE COURT:  If you're going to make a motion for a

16   mistrial, it's better that it's in writing.

17            MR. SKORDAS:  That's fine.

18            THE COURT:  You'll get a better record, and you

19   guys can respond to it, so you'll have a paper record, and

20   it will be better.

21            MR. SKORDAS:  Very well.  I'll get that done, but I

22   want the record to show that we intend to make a motion for

23   a mistrial based on what we think is the government's

09:58:27   24   violation of this Court's order in Document Number 226,

25   where the Court indicated that the government agrees that it

1204

1  will not tie deaths of unavailable witnesses to the death or

2  say that the deaths resulted from overdose -- from

3  overdoses.

4        I think that the government -- and I'll probably

5  have to get a record of what happened, but I think the

6  government continued to violate the Court's order even after

09:58:57   7  we took a side bar and asked that he discontinue that line

8  of questioning.

9        THE COURT:  There may have been some violation

10  earlier.  I don't think he violated it after.  And I'm

11  probably going to deny your motion, but I want you to have

12  the record that you want.

13        MR. SKORDAS:  Very well.  Okay.  Thank you.

14        THE COURT:  And in the context of this overall

09:59:25   15  trial, I think the violation may not make much difference,

16  if any, but you're entitled to a record that you're

17  satisfied with, and you're entitled to your record, too.

18        MR. GADD:  Certainly.  We'll make our objection

19  when they make it.

20        THE COURT:  Thank you both.

21        MR. SKORDAS:  Thank you, Your Honor.

22        MR. GADD:  Thank you.

10:01:16   23            (Bench conference concluded.)

10:13:19   24        THE COURT:  Are you ready to proceed?

25        MR. GADD:  Yes, sir.

1205

1    THE COURT:  We'll get the jury and proceed.

2    THE CLERK:  All rise, please.

3    (Whereupon the jury enters the courtroom.)

4    Please be seated.

5    THE COURT:  Have you got a witness ready?

10:18:42    6    MR. GADD:  I do.

7    THE COURT:  The government may call its next

8    witness.

10:20:00    9    MR. GADD:  Your Honor, the United States calls

10    officer Sandra Sabins.

11    THE COURT:  Come forward and be sworn, please.

12                   SANDRA SABINS,

13    the witness hereinbefore named, being first duly cautioned

14    and sworn or affirmed to tell the truth, the whole truth,

15    and nothing but the truth, was examined and testified as

16    follows:

10:20:13    17    THE CLERK:  Please come around here.  Please State

18    your name and spell it for the record.

19    THE WITNESS:  Sandra Sabins.  S-a-n-d-r-a.

20    S-a-b-i-n-s.

21    THE COURT:  You may proceed, Mr. Gadd.

22    MR. GADD:  Thank you, sir.

23

24

25                   DIRECT EXAMINATION

```
 1    BY MR. GADD:

 2    Q.      Are you prepared to testify about your part in the

 3    investigation of Russlan Klyuev's overdose death?

 4    A.      Yes, I am.

 5    Q.      Before we do that, I want to give the jury over

 6    here just a summary of your background and your experience.

 7    Can you tell us a little bit about yourself?

 8    A.      Yes.  I am employed by the Daly City Police

 9    Department for approximately 30 years, originally assigned

10    to the patrol division, the community policing unit, station

11    supervisor and now patrol.

12    Q.      And there is light at the end of the tunnel for

13    you, right?

14    A.      Yes.

15    Q.      You're going to retire at some point?

16    A.      Yes.

17    Q.      Congratulations.  I want to talk to you about June

18    13, 2016.  Were you working that day?

19    A.      Yes, I was.

20    Q.      Did you go do 3 Midvale Drive in Daly City?

21    A.      Yes, I did.

22    Q.      Why did you go there?

23    A.      A report of a subject in full arrest.

24    Q.      And full arrest means?

25    A.      He was deceased.
```

10:20:58   (line 5)

10:21:29   (line 18)

1207

```
 1    Q.        Is that what you found when you arrived?

 2    A.        Yes, I did.

 3    Q.        As part of your duties that day, you took a number

 4    of pictures at the scene of the death, correct?

 5    A.        Correct.

 6    Q.        If we could just briefly look through those.  Could

 7    we go to 18.01 and then page 3.

 8              Do you recognize that?

 9    A.        Yes, I do.

10    Q.        And that's one of the pictures that was taken that

11    day, correct?

12    A.        Correct.

13    Q.        Was this in the room with the deceased?

14    A.        It was.

15    Q.        Could we look at page 4.  Is that also a picture

16    you took?

17    A.        Yes.

18    Q.        How did you know to take that picture?

19    A.        I photographed the desk in its entirety.

20    Q.        At that point, you didn't know it had anything to

21    do with the death, correct?

22    A.        I did not.

23    Q.        Could we look at page 5.

24              What's this that's pictured there?

25    A.        Also items that were on his desk.  A piece of
```

10:21:59 (line 6)
10:22:29 (line 18)

1208

1    rolled up paper and two plastic credit cards.

10:22:59    2    Q.        At the time that you were taking the pictures, did

3    you have a sense that it was possibly an overdose death?

4    A.        Possibly.

5    Q.        Would these items on the desk, would they stick out

6    to you as a police officer and an investigator?

7    A.        Yes.

8    Q.        What are the cards sometimes used for?

9    A.        Crushing substances.

10    Q.        And then the rolled up paper?

11    A.        Ingesting the substance.

12    Q.        Could we look at page 6.

10:23:30    13            What's this?

14    A.        The deceased's bed.

15            THE COURT:  Can you speak up a little, please.

16            THE WITNESS:  The bed that the deceased -- was in

17    his room.

18    Q.        BY MR. GADD:  If you want, that will move, so you

19    can pull the base towards you if it helps.  Okay.  On the

20    bed, it appears that there's some glasses?

21    A.        Yes.

22    Q.        And that's how you remember it?

23    A.        Yes.

24    Q.        And then it also appears that there might be a

25    stain.  Do you remember that?

1209

```
        1    A.        Yes.

10:23:57  2    Q.        Could we look at page 7.  And if you'll zoom out

        3    just a little.

        4              Do you recognize this?

        5    A.        Yes, I do.

        6    Q.        Can you tell us what we are looking at?

        7    A.        The deceased on the floor in his room.

        8    Q.        Is that the desk in the background?

        9    A.        Yes, it is.

       10    Q.        And, then over on the left, it appears that there's

       11    a trash can just inside the door.  Is that how you remember

       12    it?

       13    A.        Yes, I do.

       14    Q.        And then if we could look at page 8.

10:24:30 15              I want to take you now to this picture.  Why take a

       16    picture of this item?

       17    A.        I photographed the room in its entirety.

       18    Q.        You didn't know, at this point, that this

       19    photograph might lead you to Salt Lake City at one point in

       20    the future?

       21    A.        I did not.

       22    Q.        I'm going to ask you a few questions about some

       23    pictures that we're not showing out of respect.  Do you

10:24:57 24    remember what the decedent Mr. Klyuev's face looked like

       25    when you arrived?
```

1210

1    A.        I do.

2    Q.        Could you describe his face to the jury.

3    A.        His face was covered in a type of mucous and a

4    blood substance that appeared to be coming from his nose.

5    Q.        Did you see any signs, when you were investigating,

6    of foul play?

7    A.        No, I did not.

10:25:28   8    Q.        Was Mr. Klyuev's body turned over to the medical

9    examiner's office for an autopsy?

10    A.        Yes, it was.

11    Q.        Can we go back -- Ms. Laughter, can we go back to

12    18.01 and look at page 7, I believe.

13              So, I asked you about the kind of the closeup of

10:26:00   14    the envelope, but I failed to tie it together.  That picture

15    we saw on the closeup, the next page, page 8, is that

16    envelope here in page 7?

17    A.        Yes.

18    Q.        Where is it?

19    A.        It's on top of the trash can.

20              MR. GADD:  Thank you.  No further questions.

21              THE COURT:  Thank you, Mr. Gadd.

22              You may cross examine.

23              MR. SKORDAS:  We have no questions of this witness,

24    Your Honor, thank you.

25              THE COURT:  Thank you.  You may step down, and you

|  | 1 | may be excused.  You may call your next witness. |

10:26:27  2    MR. GADD:  Your Honor, the United States calls Bill

3    Posey.

4    THE COURT:  Come forward and be sworn, please,

5    right up here at the podium

6    BILL POSEY,

7    the witness hereinbefore named, being first duly cautioned

8    and sworn or affirmed to tell the truth, the whole truth,

9    and nothing but the truth, was examined and testified as

10   follows:

10:27:16  11    THE CLERK:  Please come come around to the witness

12   box.  Please state your name and spell it for the record,

13   please

10:27:29  14    THE WITNESS:  My name is Bill Posey.  P-o-s-e-y.

15    THE COURT:  Go ahead, Mr. Gadd.

16    MR. GADD:  Thank you, sir.

17    DIRECT EXAMINATION

18   BY MR. GADD:

19   Q.    Mr. Posey, are you prepared to testify about the

20   toxicology analysis you conducted on blood from Russlan

21   Klyuev?

22   A.    I am.

23   Q.    Before we do that, I want to just give the jury a

24   summary of your background and your experience.  Can you

25   tell us about your medical education and background?

1212

10:27:57    1    A.        I have a Bachelor of Science Degree in Microbiology

2    and a minor in chemistry.  I have more than 40 years of

3    experience.  I published on six occasions in scientific

4    journals.  I'm a member of the California Association of

5    Toxicologists, and I'm a member of the American Academy of

6    Forensic Science.  I have also received an award of

7    recognition for contributions to the field by the American

8    Academy.

10:28:29    9    Q.        Have you had the chance to testify previously in

10    court hearings?

11    A.        I have.

12    Q.        And somewhat extensively?

13    A.        Yes.

14    Q.        If we could talk about the analysis you performed

15    in this case.  Did you in fact perform analysis on blood

16    from Russlan Klyuev on June 17 Of 2016?

17    A.        Yes.

18    Q.        Could we look at Exhibit 18.02.

10:28:58   19              Are you able to see that on your screen?

20    A.        I am.

21    Q.        Could you walk the jury through your results here?

22    A.        In the results, we were asked to do a routine drug

23    screen, which included specific classes of drugs.  And they

24    are listed there as being ethyl alcohol, cocaine

10:29:23   25    metabolites, Fentanyl, levamisole were detected.  And then

1213

1    there was no opiates, PCP, amphetamines, barbiturates,

2    benzodiazepines, methadone, tricyclic antidepressants or

3    carisoprodol detected, nor was there any acetone detected.

4    Q.      So, let's -- I probably got ahead of myself there a

5    little.  Let me come back and I'll ask you just a few

6    questions about what you've told us.  Maybe first let's

7    start with the blood sample.  From whom did you receive it?

10:29:59  8    A.      It was from the San Mateo coroner's office.

9    Q.      And it's labeled, so you know whose blood you're

10   testing and analyzing, correct?

11   A.      Correct.

12   Q.      Was the label on it for Klyuev, comma, Russlan?

13   A.      Yes.

14   Q.      And then some associated case numbers, correct?

15   A.      Yes.

16   Q.      You took that blood, and how, specifically, did you

17   test it for these controlled substances?

10:30:25  18   A.      Well, the alcohol testing was done using the gas

19   chromatograph with a flame ionization detector.  In

20   California, it's the method, standard method used to

21   determine alcohols in biological samples.

22           The drugs were screened by one approach, typically

10:30:54  23   using a class-specific screening method, often antibody

24   based.  An example would be cocaine would be an individual

25   class in which cocaine and its metabolites would be

1214

1   detectable.  The Fentanyl that was detected was screened by

2   a method called high pressure liquid chromatography using a

10:31:25  3   time-of-flight detector.  That -- each positive test

4   generates a second test in which known standards and

5   controls are prepared, and the sample is run and identified

6   and quantitated using that method.

7         The method of quantitation with the drugs was high

8   pressure liquid chromatography with a mass spectrometer

9   detector.

10:31:58  10  Q.     So if we're looking here at a call out, a blown up

11  version of your results --

12        Ms. Laughter, could we now call out further,

13  starting with blood ethyl alcohol and then going down to

14  Fentanyl, just kind of that box there.  Up just a little.

15        Everything else on the page is negative, right?

10:32:28  16  This is -- this is the part that you got some positives in,

17  correct?

18  A.     Correct.

19  Q.     All right.  Let's just focus here now, this top

20  one, blood ethyl alcohol.  Is that what you test for when

21  somebody has a DUI?

22  A.     Yes, but we also look for other alcohols, but

23  primarily what you find is the drinking type of alcohol,

24  which is ethyl alcohol.

25  Q.     And so, like, you know, if someone had a DUI and

1215

10:32:59   1   they were .19, it would be what we see here?

2   A.       Correct.

3   Q.       And then the next down, cocaine.  That was

4   negative?

5   A.       Yes.

6   Q.       The next three lines down, are those three cocaine

7   metabolites?

8   A.       They are.

9   Q.       The next one after that starts with l-e-v?

10   A.       Levamisole.

11   Q.       You notice I let you say it.

12   A.       Pardon?

13   Q.       You notice I let you say it.

14   A.       Yeah.

10:33:28   15   Q.       Thank you.  That's present.  You found that in his

16   blood, correct?

17   A.       Correct.

18   Q.       Do you know if that's sometimes used as, like, a

19   cocaine cutting agent?

20   A.       Yes, as a matter of investigation purposes, we find

21   that this particular cutter usually comes from cocaine that

22   has been cut in South America.  Other areas where cocaine is

23   produced, they don't use this as a cutter.

24   Q.       And then the last one on your list there is

25   Fentanyl, correct?

|  | 1 | A. | Correct. |

```
            1    A.      Correct.

            2    Q.      And that's also positive?

10:34:00    3    A.      It is.

            4    Q.      If I could have just one moment?

            5            THE COURT:  Sure.

            6            MR. GADD:  Nothing further.  Thank you.

            7            THE COURT:  Thank you.  You may cross examine,

            8    Mr. Skordas.

            9            MR. SKORDAS:  Thank you, Your Honor.

           10                      CROSS EXAMINATION

           11    BY MR. SKORDAS:

           12    Q.      Good morning, Mr. Pose.

           13    A.      Good morning.

10:34:27   14    Q.      My name is Greg Skordas, and I'm the attorney for

           15    Aaron Shamo.  I need to ask you a few questions if I could,

           16    also, and I'd ask if we could go back to that Exhibit 18.02.

           17    Are you familiar, generally, with levamisole?  Is that how

           18    you pronounce it?

           19    A.      Yes.

           20    Q.      What is it?  What was it made for?

           21    A.      It's anti-worm medication.

           22    Q.      Right.  It's for people that have tape worms?

           23    A.      Correct.

           24    Q.      Or something like that?

10:34:59   25    A.      Used more so in animal purposes such as goats and
```

1217

1    sheep.

2    Q.        It's actually not even something that's prescribed

3    anymore in America, correct?  It's not on the --

4    A.        I'm not certain of that.  It's still used for

5    veterinarians in America, but I don't know about humans.

6    Q.        It has its own toxic effects, correct?

7    A.        It can, yes.

10:35:28    8    Q.        And you indicated earlier that it's also a cutting

9    agent that is something that's used to maybe enhance or

10   increase the toxicity or whatever of cocaine.  Is that fair?

11   Toxicity might not --

12   A.        I'm not aware that it's used to be beneficial in

13   any way.  It's just used to -- since it's a white powder and

14   readily available to a lot of people, at least in South

10:35:59    15   America it's used to cut the drug down so that they can

16   market it more efficiently.

17   Q.        Right.  And the other items that you've listed

18   here?

19             Could we highlight those a little better, just the

20   same thing you did before, Yvette.

21             The benzo, that was also found in the system?

22   A.        Benzoylecgonine, yes.

10:36:29    23   Q.        That's a derivative -- or excuse me.  It's  a

24   metabolite of cocaine?

25   A.        Correct.

1218

```
      1   Q.        And the methyl ester that's also present, that's

      2   also a metabolite of cocaine?

      3   A.        It is.

      4   Q.        And cocaethylene?

      5   A.        Cocaethylene.

      6   Q.        Thanks.  Same thing?

      7   A.        It's a metabolite, but it's only formed when

      8   alcohol has already been consumed.

10:36:57  9   Q.        And you did a -- it appears to be a quantitative

     10   analysis of some of these drugs as well, correct?

     11   A.        I did.

     12   Q.        For example, the alcohol content you say is 0.19

     13   grams percent?

     14   A.        Correct.

     15   Q.        You're a resident of California?

     16   A.        Yes.

     17   Q.        And the legal limit in California for operating a

     18   vehicle is less than half of that, correct?

     19   A.        It's a .08 correct.

     20   Q.        Right.  .08?

     21   A.        Correct.

     22   Q.        So it's almost two and a half times the legal

     23   limit?

     24   A.        Yes.

10:37:30 25   Q.        And in Utah, it would be even more than that if our
```

1219

1    legal limit is .05?

2    A.        Correct.

3    Q.        Four times the legal limit?

4    A.        Yes.

5    Q.        And you did the same thing with the benzo.  You did

6    a quantitative analysis of that, correct?

7    A.        Yes.

8    Q.        And the Fentanyl?

9    A.        Yes.

10   Q.        And the Fentanyl was found to be, it looks like

11   nine thousandths of a milligram per liter?

12   A.        Correct.  If you wanted to convert that to

10:37:57   13   nanograms per mill, it would be 9 nanograms per mill.

14   Q.        All right.  Thank you.

15             That's all I have, Judge.

16             THE COURT:  Thank you.

17             Any redirect?

18             MR. GADD:  Just very quickly.

19             If we can keep this one up.  Thanks.

20                       REDIRECT EXAMINATION

21   BY MR. GADD:

22   Q.        You don't just do toxicology analysis for deceased

23   patients, correct?

24   A.        Correct.

25   Q.        You sometimes do DUI cases, correct?

1220

1    A.      Yes.

2    Q.      What's the highest blood ethyl alcohol content you

10:38:29   3    have seen in a DUI case for a living patient?

4    A.      I have seen individuals up over a .4.

5            MR. GADD:  Thank you.  No further questions.

6            THE COURT:  Thank you.

7            Any further recross?

8            MR. SKORDAS:  No, Your Honor.

9            THE COURT:  Thank you.  You may step down, and you

10   may be excused if you want to be.

11           You may call your next witness.

12           MR. GADD:  Your Honor, the United States calls

10:38:55   13   Dr. Thomas Rogers.

14           THE COURT:  Come forward and be sworn, please,

15   right up here by Mr. Gadd.

16                          THOMAS ROGERS,

17   the witness hereinbefore named, being first duly cautioned

18   and sworn or affirmed to tell the truth, the whole truth,

19   and nothing but the truth, was examined and testified as

20   follows:

10:39:31   21           THE CLERK:  Please come around to the witness box

22   here.  Please state your name and spell it for the record.

23           THE WITNESS:  Thomas Rogers.  T-h-o-m-a-s.

24   R-o-g-e-r-s.

25           THE COURT:  Go ahead, Mr. Gadd.

1221

<pre>
                         DIRECT EXAMINATION
</pre>

BY MR. GADD:

10:39:59   Q.      Dr. Rogers, are you prepared to testify about an
autopsy you conducted on Russlan Klyuev?

A.      Yes, on a person identified to me as such.

Q.      And before we go into that, I want to talk first
about your background and your experience.  Could you tell
us, what is your medical education and background?

A.      I attended medical school at the University of
California in San Francisco.  I did a one-year general
surgery internship at the County Hospital in San Francisco.

10:40:30   I did a one-year general surgery residency at the University
of Virginia.  I did a four-year pathology residency at
Kaiser Hospital in San Francisco.  I a did a one-year
forensic pathology residency at the Institute of Forensic
Sciences in Oakland.

Q.      That's a lot of school.  You work as an autopsy
surgeon, correct?

A.      Yes, I do.

10:41:00   Q.      Approximately how many autopsies have you
performed?

A.      I estimate it to be between 14 and 16,000.

Q.      And is it safe to assume you've testified
previously?

A.      Yes, I have.

```
           1    Q.        A considerable amount?

           2    A.        Hundreds of times.

           3    Q.        Let's -- if we could, let's move into the autopsy

           4    that you performed that relates to this case.  Did you

10:41:26   5    perform an autopsy on Russlan Klyuev on June 15, 2016?

           6    A.        Yes.  On an individual identified to me as such.

           7    Q.        And can you -- can you walk us through kind of the

           8    process of the autopsy and what sort of things you're

           9    looking for?

          10    A.        Basically, the autopsy starts with an external

          11    examination, and this means examining the body literally

          12    from head to foot, looking for any findings on -- that might

10:41:58  13    be on the outside of the body.  Once this is completed, an

          14    internal examination is performed.  The body is opened.

          15    Major internal organs are removed and examined.  Also

          16    samples, including blood, are obtained during this part of

          17    the autopsy.  Eventually a cause of death is formulated.

10:42:28  18    Q.        As you -- as you conducted your inspection of the

          19    outside of the body, that includes the clothing they are

          20    wearing, correct?

          21    A.        Yes, sir.

          22    Q.        And then the clothing is removed and you inspect

          23    the outside of their body before opening them up?

          24    A.        That's correct.  The body is undressed.

          25    Q.        Did you see any signs of foul play?
```

1223

10:42:55

1   A.        No.  I saw nothing that I would consider to be foul

2   play, meaning there was no obvious trauma, blunt injuries,

3   gun shot wounds, stab wounds, things of that nature.

4   Q.        And then, once you went through the autopsy and

5   looked at his major organs and inside of his body, did you

6   see any signs, any indications that this was something other

7   than an overdose death?

8   A.        His internal organs appeared normal to me.

10:43:27   9   Q.        As part of the autopsy process, did you take blood

10   samples from his body to have those analyzed?

11   A.        Yes, I did.

12   Q.        If we could look again at Exhibit 18.02.  You, in

13   fact, know Bill Posey, correct?

14   A.        I have talked to him on the telephone numerous

15   times.  I do not know him personally, and today was the

10:43:58   16   first time I had ever set eyes on him.

17   Q.        Okay.  Did you -- did you receive his report, his

18   results, when a blood sample is sent to him?

19   A.        Yes, I did.

20   Q.        And if we could zoom in again on the parts that are

21   positive, starting with blood ethyl alcohol and going down

22   to Fentanyl.

23            Did you consider this as part of your overall

10:44:26   24   duties in forming an opinion on the cause of death?

25   A.        Yes, I did.

1224

1    Q.      Did you come to an opinion as to the cause of his

2    death?

3    A.      Yes.

4    Q.      What was your opinion?

5    A.      In my opinion, the cause of death was multiple drug

6    intoxication.

7    Q.      And specifically, the drugs we're looking at on the

8    screen?

9    A.      Yes.

10   Q.      There was nothing that caused his death other than

11   drugs?

12   A.      No.

13           MR. GADD:  If I could have just one moment.

10:45:00  14           THE COURT:  Sure.

15           MR. GADD:  No further questions.  Thank you.

16           THE COURT:  Thank you.

17           Defense may cross examine.

18           MR. SKORDAS:  No questions, Your Honor.

19           THE COURT:  Thank you.  You may step down, Doctor.

20           THE WITNESS:  Thank you, Your Honor.

21           THE COURT:  You may be excused.  And you may call

22   your next witness.

23           MR. GADD:  Your Honor, we have reached the end of

24   our witnesses for today.  We have moved much faster than

10:45:26  25   anticipated.  Our next witness is flying in tonight.

1225

1    THE COURT:  Do you want to wait for lunch before
2  you go home?
3        All right.  So nothing else we can really
4  accomplish today, I take it?
5        MR. GADD:  No, sir.  If we could pick it up in the
6  morning.
7            THE COURT:  All right.
8        Well, don't communicate about the case or let
9  anyone communicate with you.  Have a longer day than normal
10 outside of here, and we'll see you at 8:30 in the morning.
11       I might say that there is often this difficulty,
10:45:58 12 particularly when witnesses are coming in from out of town.
13 This is not that unusual, and they have to try to estimate
14 how long it's going to take, and, you know, we all estimate
10:46:09 15 imperfectly.  So see you tomorrow morning.  Have a nice day.
16           THE CLERK:  All rise, please.
17       (Whereupon the jury leaves the courtroom.)
18           THE COURT:  We'll see you bright and early tomorrow
19 morning.  Let me talk to the lawyers a second off the
20 record.
21           (Discussion off the record.)
22
23
24
25   (Whereupon the proceedings were concluded for the day.)

1

2                          REPORTER'S CERTIFICATE

3    STATE OF UTAH            )

4                            ) ss.

5    COUNTY OF SALT LAKE      )

6

7            I, REBECCA JANKE, do hereby certify that I am a

8    Certified Court Reporter for the State of Utah;

9            That as such Reporter I attended the hearing of

10   the foregoing matter on August 20, 2019, and thereat

11   reported in Stenotype all of the testimony and proceedings

12   had, and caused said notes to be transcribed into

13   typewriting, and the foregoing pages numbered 1141 through

14   1225 constitute a full, true and correct record of the

15   proceedings transcribed.

16           That I am not of kin to any of the parties and

17   have no interest in the outcome of the matter;

18           And hereby set my hand and seal this 20th day of

19   December, 2020.

20

21

22

23

24           _____

25           REBECCA JANKE, CSR, RPR, RMR