1          IN THE UNITED STATES DISTRICT COURT

2                    DISTRICT OF UTAH

3                    CENTRAL DIVISION

4

5   UNITED STATES OF AMERICA,      )

6            Plaintiff,            )

7   vs.                            )     Case No. 2:16-CR-631DAK

8   AARON MICHAEL SHAMO,           )

9            Defendant.            )

10  _____)

11

12

13       BEFORE THE HONORABLE DALE A. KIMBALL

14       ------------------------------------

15                    May 29, 2019

16                    Volume I

17                    Motion Hearing

18

19

20

21

22

23

24

25

```
 1                      A P P E A R A N C E S

 2

 3    For Plaintiff:             S. MICHAEL GADD
                                 348 East South Temple
 4                               Salt Lake City, Utah

 5                               VERNON G. STEJSKAL
                                 111 South Main Street
 6                               Suite 1800
                                 Salt Lake City, Utah
 7
                                 KENT A. BURGGRAAF
 8                               348 East South Temple
                                 Salt Lake City, Utah
 9

10    For Defendant:            GREGORY G. SKORDAS
                                KATYLIN V. BECKETT
11                              560 South 300 East
                                Suite 225
12                              Salt Lake City, Utah

13                              DARYL P. SAM
                                5955 South Redwood Road
14                              Suite 102
                                Salt Lake City, Utah
15

16

17

18

19

20

21
      Court Reporter:           Ed Young
22                              351 South West Temple
                                Room 3.302
23                              Salt Lake City, Utah 84101-2180
                                801-328-3202
24                              ed_young@utd.uscourts.gov

25
```

```
 1                          I N D E X

 2    Witness                 Examination By              Page
      -------                 --------------              -----
 3
      Megan Moore             Mr. Stejskal (Direct)        22
 4    Megan Moore             Mr. Skordas (Cross)          30

 5    David Anthony Slagle    Mr. Burggraaf (Direct)       35
      David Anthony Slagle    Mr. Skordas (Cross)          40
 6
      Daniel Ashment          Mr. Gadd (Direct)            49
 7
      Adam Koeneman           Mr. Gadd (Direct)            58
 8
      Dennis Power            Mr. Stejskal (Direct)        71
 9


10
      Exhibit                                          Received
11    -------                                          --------

12    Plaintiff's Exhibit 18.00                            30
      Plaintiff's Exhibits 14.30 and 14.40                 35
13    Plaintiff's Exhibit 16.00                            48
      Plaintiff's Exhibit 15.03                            51
14    Plaintiff's Exhibit 15.27                            53
      Plaintiff's Exhibit 17.08                            54
15    Plaintiff's Exhibit 17.05                            55
      Plaintiff's Exhibit 21.00 through 21.44              58
16    Plaintiff's Exhibit 15.04                            61
      Plaintiff's Exhibit 15.05                            63
17    Plaintiff's Exhibits 15.06, 15.07 and 15.08          64
      Plaintiff's Exhibit 15.09 through 15.17              65
18    Plaintiff's Exhibits 15.18 and 15.19                 66
      Plaintiff's Exhibits 15.20 through 15.24             67
19    Plaintiff's Exhibit 15.25                            69
      Plaintiff's Exhibit 15.26                            71
20    Plaintiff's Exhibit 17.04                            78

21

22

23

24

25
```

```
 1   May 29, 2019                                9:00 a.m.

 2                    P R O C E E D I N G S

 3

 4        THE COURT:  We're here this morning in the matter

 5   of United States of America vs. Aaron Shamo, 2:16-CR-631.

 6   The United States is represented by Mr. Michael Gadd,

 7   Mr. Vernon Stejskal and Mr. Kent Burggraaf.

 8        Correct?

 9        MR. GADD:  Correct, Your Honor.

10        THE COURT:  The defendant is present and

11   represented by his counsel, Mr. Greg Skordas, Mr. Daryl Sam

12   and Ms. Kaytlin Beckett.

13        MR. SKORDAS:  That is correct, Your Honor.

14        THE COURT:  All right.  I have a briefed motion on

15   the request for a continuance by the defendant.  Does one of

16   you want to talk about that?

17        MS. BECKETT:  Your Honor, at this point in time we

18   would still like to file a reply brief on that.  I believe

19   the government just filed their responsive brief yesterday,

20   and we had talked with Mr. Gadd about having Eric Wheeler

21   here when that motion is argued so that he can give some

22   context to that.

23        THE COURT:  About what?

24        MR. SKORDAS:  Mr. Wheeler -- Eric Wheeler, he

25   would like to be here for that hearing.  He can give some
```

1    context to the issue of the forensic review and how long it

2    is actually going to take to process that data, because the

3    information that has currently been provided is not

4    accurate, and we would request we be able to argue that on

5    Friday.  I believe we still have hearing time that should be

6    available on Friday if that is possible, Your Honor.

7              THE COURT:  Will he be here Friday?

8              MS. BECKETT:  Yes, he can be here Friday.

9              THE COURT:  All right.  So you want that heard

10   Friday?

11             MS. BECKETT:  That would be preferable, yes, Your

12   Honor.

13             THE COURT:  That is okay with me.

14             Is that okay with you?

15             MR. GADD:  Yes, Your Honor.

16             THE COURT:  So Friday we'll argue that and hear

17   testimony from Mr. Wheeler.

18             MS. BECKETT:  Correct, Your Honor.

19             THE COURT:  All right.  What do you want to take

20   up next?

21             MR. GADD:  We're ready to lay foundation for the

22   contested exhibits if the Court is willing to hear that.

23             THE COURT:  What about the motions in limine that

24   are outstanding?

25             MR. GADD:  I'm ready to argue on all of them.

```
1              THE COURT:  Do you care about the order?

2              MR. SKORDAS:  No, Your Honor.

3              THE COURT:  We talked at the last hearing about

4     the government's motion regarding sentence, the sentences or

5     possible sentences.

6              Do you want to say anything else about that?

7              MR. GADD:  No, sir.

8              MS. BECKETT:  No, Your Honor.

9              THE COURT:  Ms. Beckett?

10             MS. BECKETT:  No.

11             THE COURT:  All right.  I will tell you how I feel

12    about that.  I think the government's chart on page 7 of its

13    reply brief is correct.  That is what I will permit and/or

14    prohibit.

15             Do you see the chart?

16             MS. BECKETT:  I don't know if I have that in front

17    of me, Your Honor.  I apologize.

18             THE COURT:  I can't hear you.

19             MS. BECKETT:  I don't know that I have that in

20    front of me, Your Honor.  I apologize.

21             THE COURT:  Now, with respect to the government's

22    motion to strike the expert, Kelly Shafto, the current

23    situation is not satisfactory, but is he going to -- he or

24    she?

25             MR. SKORDAS:  She.
```

1          THE COURT:  Is she going to provide a report?

2          MS. BECKETT:  Your Honor, I believe it is her

3    intention to do so.  I have not received that report from

4    her, but essentially what she has been charged with and what

5    she has been doing in this case involves interviewing the

6    witnesses and, more specifically, involving the death

7    resulting count and some of the information that has come to

8    our attention, and I believe she does intend to provide a

9    report on that.

10         THE COURT:  Well, can you get the government a

11   report at least by, say, a week from now?

12         MS. BECKETT:  Yes, Your Honor.  That is not a

13   problem.

14         THE COURT:  And then do we need to have a further

15   hearing or you can consult with them if you have some issues

16   with the report?

17         MR. GADD:  If we could plan on that -- we'll

18   consult with them, and we will look at the report and

19   consult with them, and I think worst case scenario, we may

20   ask the Court for a Daubert hearing on one of the afternoons

21   of trial.

22         THE COURT:  All right.

23         MR. GADD:  Thank you.

24         THE COURT:  Motion to strike Dr. Terry Haddix.

25   Again, we need a report.

1          MS. BECKETT:  Your Honor, at this time I don't

2    think we're going to be calling Dr. Haddix as a witness.  It

3    is my understanding that we will not be calling her.

4          THE COURT:  I guess that takes care of that motion

5    then.

6          MS. BECKETT:  Yes, Your Honor.

7          THE COURT:  Motion to strike Eric Wheeler.  He is

8    going to be testifying in a couple of days; is that right?

9          MS. BECKETT:  I apologize, Your Honor.  What was

10   that?

11         THE COURT:  Eric Wheeler is going to be here

12   testifying Friday?

13         MS. BECKETT:  Correct.

14         THE COURT:  Do we need a Daubert hearing with him?

15   There is no indication in what has been disclosed so far

16   about his experience with the dark web for instance.

17         MR. GADD:  I would like a hearing.  What I worry

18   about is the one-week delay in his processing Luke Paz's

19   computer may make it so he is not fully able to testify at

20   Friday's hearing.

21         On the other hand, nothing between now and then

22   will change his relationship and his expertise on things on

23   the dark net, and so if we could perhaps use his Friday

24   testimony as a Daubert hearing and then come back to it if,

25   for example, he comes up with some novel or untested theory

1    as it relates to computer forensics and Mr. Paz's computer,

2    that would be our request.

3              MR. SKORDAS:  That is fine.

4              THE COURT:  That makes sense, doesn't it?  You're

5    okay with that?

6              MR. SKORDAS:  Yes.

7              THE COURT:  All right.  Do we start with that on

8    Friday, first thing, at 9:00?

9              MR. SKORDAS:  I think that we should be done with

10   the other parts of your presentation by Friday so we

11   probably can start right away.

12             MR. GADD:  Worst case scenario, we have one

13   witness who is serving a search warrant in Las Vegas who was

14   planning to be back for Friday morning, but I have a feeling

15   that his exhibits may be admitted today and we won't need

16   him Friday.

17             THE COURT:  Okay.  Let's see.  Defendant's motions

18   regarding the dark web, P.G.P., sigaint e-mail, dark net

19   marketplace, AlphaBay, et cetera, what do you want to say

20   about that?

21             MR. SAM:  Your Honor, with the information that we

22   have been getting in and the hard drive that came in

23   yesterday, we would like by the end of next week to respond

24   to that.

25             THE COURT:  To renew or respond to that motion?

1    All right.  But it is your motion.  Do you mean bolster it?

2            MR. SAM:  Yes, to supplement what we have filed.

3            THE COURT:  Mr. Gadd?

4            MR. GADD:  I just wanted to make sure we are all

5    on the same page.  The Court's referring to the motion filed

6    as document 171 on December --

7            THE COURT:  I am.

8            MR. GADD:  -- 1st, so six and a half months ago

9    roughly?

10           MR. SAM:  I'm sorry.  I'm getting mixed up.  The

11   exhibit -- the motion for the extension on exhibits, we did

12   provide the government the exhibits last Friday.  Maybe I

13   am --

14           THE COURT:  You two better talk for a minute.

15           MR. SAM:  Your Honor, if we could reserve that

16   until Friday --

17           THE COURT:  Friday?

18           MR. SAM:  Yes, if there is any oral argument to be

19   made on that.

20           THE COURT:  I think preliminarily it looks to me

21   as though, assuming the government can authenticate the

22   documents through their agents, which it appears they would

23   do, then that motion would be denied.

24           MR. SAM:  That would be my understanding too, Your

25   Honor, if there is something that can't be authenticated --

1          THE COURT:  All right.  Let's see.  You're

2    objecting to Guy Gino's testimony?

3          MR. GADD:  That was part of the same motion, that

4    document 171.  It is partway --

5          THE COURT:  That is the second part.

6          MR. GADD:  Yes, sir.

7          THE COURT:  I guess right now I don't see why he

8    can't do what the government proposes that he do and testify

9    to, so I'm denying that motion preliminarily.  I will listen

10   to more argument if you want to.

11         MR. SAM:  Your Honor, that would be acceptable to

12   us at this point.  If there is anything with authentication

13   that we object to, we'll raise it.

14         THE COURT:  Thank you.

15         Motion to exclude ecurrency dollar amounts.  I

16   don't see any reason to do that except that I don't know

17   what the auction value would have to do with anything.  That

18   is not relevant, is it?

19         MR. GADD:  The defense has suggested in their

20   reply that perhaps we should be limited to the value on the

21   date of the seizure, the value on the date of acquisition

22   or -- I think it was just those two.  Or the value on the

23   date of his arrest.  I think those were the three that they

24   were interested in.  As we looked at it, we thought that is

25   fair and we're happy to limit ourselves to that.

1          THE COURT:  All right.  That makes sense to me.

2     You get a partial grant and a partial denial on that.

3          MR. GADD:  I will say, so they are not caught off

4     guard, that the value on the date of the seizure is also

5     substantially high.  Bitcoin, as you can see from our

6     response, Bitcoin was trending up when we seized it and was

7     on its way back down when we sold it and is still going to

8     be quite high.  I think we can ameliorate all of these

9     concerns by just explaining to the jury that exchange rates

10    fluctuate and they shouldn't hold it against Mr. Shamo that

11    he happened to make a very good illicit investment.

12         THE COURT:  Now, did you just say something

13    different than what you had previously agreed to in your

14    prior statement?

15         MR. GADD:  No.  The agreement stays.  I don't want

16    to catch them off guard when they hear the number or the

17    value on the date that it was seized because it will also be

18    high.  I didn't look it up last night, but it will be high.

19         THE COURT:  You have agreed on the three dates.

20         Ms. Beckett?

21         MS. BECKETT:  Yes, Your Honor.

22         I would just like to clarify.  I think our request

23    in our motion also included that we would like substantial

24    information on how they are establishing the amounts that

25    they are referencing, whether that be the historical data or

1  somebody who can actually talk about the historical data

2  itself in terms of the exchange rates for Bitcoin.  So if

3  they are going to talk about the actual amount at the time

4  it was seized, we would like to have somebody on the stand

5  who can actually talk about the historical amount and what

6  the exchange rate was at that point in time.  That would be

7  our request.  Or if they want to do it at the point in time

8  of the transaction, we would need that information still.

9           MR. GADD:  We'll lay that foundation testimony

10  through our expert, Guy Gino.

11           THE COURT:  Now, when you were here before I think

12  we talked about the people who are now not available to

13  testify because they are not alive and that you are not

14  claiming that the defendant has any responsibility for,

15  correct?

16           MR. GADD:  Yes.

17           THE COURT:  We'll give a limiting instruction on

18  that, so that it is clear that he is not being charged with

19  those deaths.

20           MS. BECKETT:  Your Honor, on that I believe we

21  also agreed we would not refer to those as overdose deaths,

22  just simply deceased or unavailable to testify or be

23  interviewed.  I believe that was the discussion that

24  occurred.

25           THE COURT:  I think it was.

1          Mr. Gadd?

2          MR. GADD:  That is my memory as well.

3          THE COURT:  Let's talk about the pictures for a

4    minute.

5          MS. BECKETT:  I think we laid a significant amount

6    of testimony on this before, but our concern with the photos

7    that have been proposed, even the narrowed number, is they

8    are not necessary and they are fairly gruesome and I believe

9    those were provided to the Court.

10         THE COURT:  Yes.

11         MS. BECKETT:  Our concern is that showing those

12   photos when there is not a necessity for the information

13   that they contain is unnecessary and, as we outlined, very

14   much unduly prejudicial.

15         THE COURT:  Thank you.

16         MR. GADD:  As I think about the attorneys on the

17   case, I am going to guess most of us have had cases with

18   photos far worse.  That has certainly been my experience.  I

19   suspect that is Mr. Skordas's experience.  These just are

20   not that bad.

21         We have narrowed it down to three.  They have

22   significant, important, probative value to our case, and

23   specifically to a very difficult aspect of our case and that

24   is proving but for causation of death.  These photos were

25   relied on specifically by our expert, Dr. Hail.  Not only

1   did she rely on them, she even included the close-up picture

2   in her report.  This is some of our very best evidence that

3   Fentanyl was the but for cause of death.

4          Her role is educational.  She is going to try to

5   teach the jurors in the limited time she has on the stand

6   that you can tell, through a combination of physiological

7   effects and an autopsy and through years and years of

8   training and experience and education and studying it, what

9   drugs killed someone.  The physiological effects are

10  apparent in the photos.  I don't see a way for us to prove

11  it without the photos.  We have tried to limit it to just

12  these three.

13         THE COURT:  Well, she could describe it, couldn't

14  she?

15         MR. GADD:  It is just not the same.  You know, I

16  think colloquially --

17         THE COURT:  Colloquially.

18         MR. GADD:  -- we say a picture is worth one

19  thousand words and certainly that is the case here.  We have

20  cited a number of examples where courts allowed pictures far

21  worse than these in order to help a forensic expert explain

22  the nature and the cause of death.

23         THE COURT:  Ms. Beckett?

24         MS. BECKETT:  Your Honor, I think there are two

25  issues that we're looking at.  First, we have already

1    conceded that we are not bringing in another expert who is

2    going to argue the issue of whether or not it was a Fentanyl

3    overdose.  That I think negates part of the government's

4    argument.

5            The other side of that is that Ms. Hail, the

6    expert who is referring to these photos, she didn't conduct

7    any examination of the victim in the case.  She reviewed

8    reports.  She can discuss those reports.  She can discuss

9    those reports the same way she can discuss those photos

10   without giving those to the jury.

11           The flip side of that, Your Honor, is that there

12   are causational elements you have to look at for a death

13   resulting count and the government is ignoring the other

14   side of that.  Without going too far down the road of what

15   evidence we will be bringing forward in that regard,

16   essentially what they are guaranteeing by showing these

17   types of photos to the jury is nullifying the other side of

18   that argument by seeing a young man who is deceased, an up

19   close photo of a deceased individual's face in two separate

20   shots, and then his body on the floor next to a bed after it

21   has been moved.  I don't see how those have any other impact

22   than unduly prejudicial.  I don't think they are necessary

23   and I think Your Honor is correct in pointing out that Ms.

24   Hail can simply say what she saw and what she reviewed

25   without showing that to the jury.

1          THE COURT:  One of the photos I would call a

2    proximity photo and I don't have any problem with that.

3    Preliminarily, I'm inclined only to let that one in, but I

4    will keep thinking about that.

5          What do you want to do next?

6          The proximity photo sort of sets the room up.  I

7    don't think it is unduly prejudicial.

8          MR. GADD:  Is that the photo that just shows the

9    lower half of his body?

10         The defendants provided the United States with its

11   exhibit list and we appreciate them doing that.  To the

12   extent that the United States has some specific objections

13   to the exhibits related to foundation, how would the Court

14   like us to proceed?  Should we file those?  Should we

15   address it at this hearing?  What is the best path forward?

16         THE COURT:  Well, we can address it now if you

17   want.  It might make more sense to file your objections,

18   though.

19         MR. GADD:  I will do that.  I think it would help

20   to see the foundation.  I hate to object saying, well, there

21   is no foundation when they have not had a chance to put any

22   on, but I think there are significant foundation objections,

23   and so I would like to go through those.  I'm happy to put

24   it in writing and maybe that is the best path forward.

25         THE COURT:  It may be, but if you want to proceed,

1   I will let you.

2          MR. GADD:  I will do it in writing.  That makes

3   more sense.

4          THE COURT:  All right.

5          MR. GADD:  On this green sheet of paper I have

6   what has been the standing plea offer from the United

7   States.  I don't want to get into it much, but after a pair

8   of Supreme Court cases a couple years ago, Lefler and Frye,

9   it became incumbent on the government shortly before trial

10  to just quickly put on the record a few things.

11         Mr. Shamo now has a chance to look at that and it

12  will show his case number, today's date, and then the very

13  short prior offer and it is just three lines.  I wonder if

14  the Court would be willing to just inquire briefly and

15  ensure that he has received the offer, that he had a chance

16  to consider it and ask any questions that he wanted to his

17  attorney, and that he has a reason, in his mind a good

18  reason to reject the offer, and then with those three things

19  covered, the only thing I would add is that the offer will

20  expire at the end of the day today.

21         THE COURT:  Do you have any objection?

22         MS. BECKETT:  I would like to briefly make a

23  record in that regard, Your Honor.

24         THE COURT:  All right.

25         MS. BECKETT:  There has been conversation back and

1    forth between our office and the U.S. Attorney's Office

2    regarding this particular offer, and we actually

3    counteroffered them at a certain point with a range that was

4    different than this.  The range I believe that we suggested

5    was between 28 -- down to 28 or 25 years and they are still

6    allowed to argue up to life in prison which, in our opinion,

7    is commensurate with some of the other coconspirators who

8    are on the same level of culpability or that the government

9    has alleged are on the same level of culpability as

10   Mr. Shamo.

11        MR. GADD:  I don't mean to interrupt other than to

12   say my preference would be that we not go into the details

13   and the specifics of the offer consistent with Rule 410, but

14   just for Mr. Shamo to say that he has received the offer, he

15   has had a chance to consider it and ask any questions that

16   he would like to to his attorneys and that in his mind he

17   has a good reason to reject the offer.  That is all.

18        MS. BECKETT:  I see no reason to not make a record

19   of that, Your Honor.  There is specific information that

20   has been brought before this Court right now.  We are making

21   a record in that regard, but we are not objecting to an

22   inquiry as to whether or not Mr. Shamo has had an

23   opportunity to question his counsel and inquire about this.

24        MR. SKORDAS:  Mr. Shamo, you received the offer?

25        MR. SHAMO:  Yes.  I just received the offer.

1          THE COURT:  And do you understand it?

2          MR. SHAMO:  Yes, I understand it.

3          THE COURT:  All right.  Have you had a chance to

4    question your lawyers about it?

5          MR. SHAMO:  I'm sorry?

6          THE COURT:  Have you had an opportunity to

7    question your lawyers about it, to talk to them about it?

8          MR. SHAMO:  Yes, I have.

9          THE COURT:  In your mind, and you don't need to

10   tell me any reasons, but in your mind at least to this point

11   you feel like you have sound reasons for not accepting it?

12         MR. SHAMO:  Yes.

13         THE COURT:  Thank you.

14         MR. GADD:  Thank you, Your Honor.

15         I notice the defendant said that he had just

16   received the offer.  I thought we might want to clarify just

17   for the record that he received this green sheet of paper

18   that we'll put into our case file and hopefully never have

19   to use again, but the offer was made approximately six

20   months ago and I believe that is when he first received the

21   offer.  I just wanted to clarify.

22         THE COURT:  Is that essentially correct, you

23   received it before today?

24         MR. SHAMO:  Yeah.  It is one that was discussed.

25         THE COURT:  Okay.  Thank you.

1          MR. GADD:  Other than calling witnesses and laying

2   foundation for exhibits, I don't have anything else to

3   address.

4          Thank you.

5          THE COURT:  What about you, Mr. Skordas?

6          MR. SKORDAS:  No, Your Honor.

7          THE COURT:  Well, let's call them then.

8          MR. STEJSKAL:  We'll start with Exhibit 18.00.

9          THE COURT:  Let's see.  What do I need a copy of?

10  Where am I supposed to be looking here?

11         MR. STEJSKAL:  On the screen, I think.

12         THE COURT:  And you're calling --

13         MR. STEJSKAL:  Agent Megan Moore.

14         THE COURT:  Come forward and be sworn, please,

15  right up here in front of the clerk

16                        MEGAN MOORE

17              Having been sworn, was examined

18                  and testified as follows:

19         THE WITNESS:  Megan Moore, M-e-g-a-n, M-o-o-r-e.

20         THE COURT:  Go ahead, Mr. Stejskal.

21         Where are you starting?

22         MR. STEJSKAL:  Exhibit 18.00.

23         THE COURT:  Okay.

24         MR. STEJSKAL:  Sorry.  We are not going in

25  numerical order.  We are just going in the order that makes

1   sense to us.

2          THE COURT:  You're trying to make sure I stay

3   awake, correct?

4          MR. STEJSKAL:  Preliminarily for the Court, there

5   was no specific objection to this exhibit.  It was more a

6   general objection of anything to do with the death in Daly

7   City was objected to, just so the Court is aware that I'm

8   just going to lay the foundation.

9                    DIRECT EXAMINATION

10  BY MR. STEJSKAL

11  Q.   Ms. Moore, your occupation, please.

12  A.   Postal inspector.

13  Q.   With what organization?

14  A.   The United States Postal Inspection Service.

15  Q.   How long have you been a postal inspector?

16  A.   Just under five years.

17  Q.   Did you receive specific training with regard to your

18  duties as a postal inspector?

19  A.   Yes, I did.

20  Q.   Very generally, tell us a little bit about that.

21  A.   In July of 2014 I began a 12-week training program at

22  our academy in Potomac, Maryland.  This training combines

23  law enforcement and the postal service and the statutes that

24  we investigate.

25  Q.   Tell us about your experience as a postal inspector.

1    What are your duties?

2    A.    The Postal Inspection Service -- the mission of the

3    agency is to protect all entities of the postal service from

4    criminal activity.  This includes our customers, our

5    employees, our facilities and the mail stream.  I work

6    primarily in narcotics and firearms trafficking

7    investigations.

8    Q.    Have you had experience in those types of

9    investigations over your five years with the Postal

10   Inspector Service?

11   A.    Yes.

12   Q.    Can you tell us, looking at the screen there and

13   Government's Exhibit 18.00 -- can you identify what that is?

14   A.    Yes.  Would you like me to expand?

15   Q.    Just generally tell us what that is first.

16   A.    This is a spreadsheet showing the activity of a

17   specific parcel shipped from Midvale, Utah to Daly City,

18   California.

19   Q.    Have you seen this exhibit before?

20   A.    Yes, I have.

21   Q.    How did you obtain the information on this Exhibit

22   18.00?

23   A.    Through the course of the investigation I ran a query

24   on the Daly City address, this 3 Midvale Drive listed in the

25   document.  I saw in that query that on June 9th of 2016 a

1    parcel shipped from Midvale -- was shipped from Midvale,

2    Utah to Daly City.

3        I took the tracking number from that query that was

4    placed on that parcel and I ran it against our data

5    warehouse.  That is what we call it.  It holds all postal

6    data associated with our parcel shipments.

7    Q.   Explain what a tracking number is with the postal

8    service.

9    A.   A tracking number is placed on a mail piece.  It is a

10   service that a customer pays for when they select certain

11   types of mail.  It is most common with express mail and

12   priority mail.

13   Q.   What information does one obtain by querying the

14   tracking number?

15   A.   The tracking number can show all movements of that

16   parcel throughout the mail stream from its origin to its

17   destination.

18   Q.   Are you as a postal inspector familiar with the postal

19   records system, the computer system that maintains this

20   information?

21   A.   Yes.

22   Q.   And do you know where that is maintained?

23   A.   It is maintained in a data repository that we are able

24   to access in the postal service.

25   Q.   Have you used that repository before?

1    A.    Yes.  I have obtained information from that repository.

2    Q.    In what way?  When you make a query, why do you do

3    that?

4    A.    I do that to find the details associated with packages.

5    In most cases that is why I would use that.  That is to

6    assist us with investigations.

7    Q.    Are the records in the postal service computer system

8    kept in the regular course of postal business?

9    A.    Yes.

10   Q.    For what purpose would the postal service keep those?

11   A.    As I mentioned, one service that a customer is afforded

12   when they pay for certain types of mail services is the

13   transparency of the package from the origin to the

14   destination.  So for that reason and for the transparency to

15   the customer, this data is maintained in the postal service

16   database.

17   Q.    When is the record made in the postal service database

18   in relation to the activity that creates it?  In other

19   words, for example, on the top line of Government's Exhibit

20   18 there is a column that says scanned.  What does that mean

21   in relation to getting information into the postal system?

22   A.    That means that that item would have been scanned using

23   that tracking number.  That scanner information is then

24   uploaded and it's put into this database within 24 hours of

25   the activity.

1   Q.   Is there anything outside the normal course of

2   regularly conducted postal business as it relates to this

3   specific package?  In other words, was something done

4   related to the criminal investigation or is this information

5   just in there based on the package itself?

6   A.   This information is in there based on the package.

7   Q.   And you didn't query the tracking number for this

8   information until well after the arrest of individuals in

9   this case, correct?

10  A.   That is correct.

11  Q.   And the information was just maintained in the

12  database?

13  A.   It is maintained for two years.

14  Q.   Based on your training and experience as a postal

15  inspector and looking at the information on Government's

16  Exhibit 18, is that the normal route of a package from

17  Midvale, Utah to Daly City, California or a normal route?

18  A.   Yes.

19  Q.   You were an agent involved in this overall

20  investigation with regard to packages being shipped,

21  allegedly drug packages to numerous places in the United

22  States, correct?

23  A.   Correct.

24  Q.   And you became quite familiar with the shipping methods

25  of this particular organization?

```
1    A.    Correct.

2    Q.    Based on your knowledge of the investigation, is this

3    two-day shipping that is indicated in the second column from

4    the right, is that consistent with the normal practices of

5    this drug trafficking organization?

6    A.    Yes.

7    Q.    Let's go through a little bit the information on

8    Government's Exhibit 18 and specifically I guess line by

9    line of what this means.   The top lines seem to say it was

10   scanned for accept or pickup in Midvale, Utah.

11         Is that correct?

12   A.    That is correct.

13   Q.    And where would that have happened?  In other words, is

14   that at the post office or can you tell from that

15   information where the scan was?

16   A.    I was able to confirm that that took place by a postal

17   employee on the street at a blue collection box.

18   Q.    And is a blue collection box drop-off consistent with

19   the methods of this particular drug trafficking

20   organization?

21   A.    Yes.

22   Q.    Then there are a few other entries.  If you just want

23   to walk us down that column, there is a system generated and

24   that it departs from the post office.  Just walk us through

25   that briefly.
```

1    A.    That is correct.  A system generated scan -- you can

2    see the first one says scanned and that was a manual scan

3    the system generated.  That means it is an automatic scan

4    that is applied to a parcel.  This system would assume -- or

5    it knows to automatically update the parcel after it is

6    accepted and it would have departed -- through the normal

7    course of mailing, it would have departed the post office on

8    or about that time on that day.

9    Q.    Okay.  And then next?

10   A.    Next is it was processed through a U.S.P.S. facility in

11   Salt Lake City, which is common.  All parcels in the area

12   are moved to that facility for sorting and then sent to

13   their respective processing centers in other cities.

14   Q.    And then it gets to Richmond, California?

15   A.    That is correct.

16   Q.    How does it get there?

17   A.    I would assume by a truck.

18   Q.    A postal transport?

19   A.    Yes.  It couldn't have gone on a plane.

20   Q.    All this says is it got there and it was scanned in at

21   that location?

22   A.    Correct.

23   Q.    And then after that there are a few other entries

24   before it is delivered?

25   A.    Correct.  The arrival at unit would mean it arrived at

1    the post office that services the delivery address.   Then

2    the final scan is that it was successfully delivered.

3    Q.   And it was delivered where?

4    A.   It was delivered to 3 Midvale Drive in Daly City,

5    California.

6    Q.   Did law enforcement in Daly City, California find a

7    package at the 3 Midvale Drive address that was consistent

8    with the tracking information here in Government's Exhibit

9    18.00?

10   A.   The photo that I saw of that package was the same

11   postal service type used to ship that package and this

12   package.   It was the priority mail service.

13   Q.   And it was coming from Utah to that address in Daly

14   City --

15   A.   Correct.

16   Q.   -- on that same date range?

17        Is this tracking system from which the information on

18   Government's Exhibit 18 is obtained, is that relied on by

19   millions of postal customers kind of every day?

20   A.   Yes.

21   Q.   Again, the information is kept in the regular course of

22   postal business?

23   A.   Yes.

24             MR. STEJSKAL:   I would offer Government's Exhibit

25   18.00.

```
 1              THE COURT:  Received.
 2              (Plaintiff's Exhibit 18.00 was
 3               received into evidence.)
 4              THE COURT:  Do you want to cross?
 5              MR. SKORDAS:  May I have just a minute?
 6         May I?
 7              THE COURT:  Sure.
 8              MR. STEJSKAL:  Just for the clerk, so the plan is
 9    to have these individual disks with the exhibits on them and
10    actually admit the actual disks.  So if I can ask one more
11    question?
12    BY MR. STEJSKAL
13    Q.    That is, did you previously look at the image on this
14    disk, Government's Exhibit 18.00, and initial the disk as a
15    true and accurate copy of Exhibit 18.00?
16    A.    Yes.
17              MR. STEJSKAL:  That is what I will end up
18    offering, Your Honor.
19              THE COURT:  Mr. Skordas.
20                        CROSS-EXAMINATION
21    BY MR. SKORDAS
22    Q.    I have a couple of questions about how you got here
23    today.  You testified to Mr. Stejskal that you had some
24    knowledge about this particular enterprise.
25         Can you describe what that is?
```

1   A.   Do you mean the data system from which this was pulled?

2   Q.   I am sorry, no.  The folks in Utah.

3   A.   Correct.  I was one of the case agents that

4   investigated this case prior to Mr. Shamo's arrest.

5   Q.   Beginning approximately when?

6   A.   Beginning approximately -- knowing that --

7   Q.   The year is fine.

8   A.   2016.

9   Q.   And in response to what did you begin that

10  investigation?

11  A.   We were notified that the mail was being used to

12  transport the alleged narcotics in this case.

13  Q.   Did you track obviously other items than what is

14  spelled out here in Exhibit 18.00?

15  A.   I reviewed a number of items that were shipped by the

16  organization.

17  Q.   Over what period of time, if you recall?

18  A.   Over months.

19  Q.   In 2016?

20  A.   That is correct.

21  Q.   And this represents one of those several packages that

22  you tracked?

23  A.   That is correct, yes.

24  Q.   How many would you say you tracked?

25  A.   Gosh --

```
1    Q.    Just roughly.

2    A.    Do you mean any that I have reviewed or specifically

3    went into the system and tracked?

4    Q.    That you specifically went into the system to track

5    during that period of time when you created Exhibit 18.00.

6    A.    I can't recall.

7    Q.    More than a dozen?

8    A.    I am not sure.

9    Q.    That is fine.

10   A.    I don't want to confuse what I reviewed with what I

11   specifically tracked, if that makes sense.

12   Q.    That is fine.

13   A.    Okay.

14   Q.    And then after the charges were filed, I suppose the

15   government contacted you and asked for a more thorough

16   explanation of what you had been tracking.

17         Is that fair?

18   A.    That is correct.

19   Q.    That was a poorly worded question.

20         How many of these items did you ultimately track, if

21   you know, now looking back?

22   A.    I can't recall.

23              MR. SKORDAS:  I believe that's all that I have,

24   Your Honor.

25              THE COURT:  Thank you, Mr. Skordas.
```

```
 1              Anything else, Mr. Stejskal?

 2              MR. STEJSKAL:  No, Your Honor.

 3              THE COURT:  All right.  I don't see any problem

 4    with that exhibit.

 5              Are you going to ask her about other exhibits?

 6              MR. STEJSKAL:  No.  That was the only exhibit

 7    through Ms. Moore.

 8              THE COURT:  You may step down.

 9              I assume she may be excused?

10              MR. STEJSKAL:  Do you want these?

11              THE CLERK:  Yes.

12              THE COURT:  Any objection to her being excused?

13              MR. SKORDAS:  No, Your Honor.

14              MR. BURGGRAAF:  Your Honor, the next two exhibits

15    that I would like to address are Exhibits 14.30 and 14.40.

16    Both of these exhibits, as you will see from the exhibit

17    list, actually are categorized as items found on the

18    defendant's computer or phones.  Previously the Court

19    admitted all of the other 14 level series of exhibits.

20    Prior to the hearing --

21              THE COURT:  You are talking about 14.30 and 14.40.

22    Is that correct?

23              MR. BURGGRAAF:  That is correct, Your Honor.

24              Prior to the May 17th hearing, the Court made a

25    ruling in regard to James statements.  Sorry.  Prior to that
```

1    we didn't have a ruling on the James statements.  Mr. Gadd

2    in making this chart for the Court with the highlighting, he

3    highlighted 14.30 and 14.40 because they contained James

4    statements, not because they were objected to on any other

5    grounds.  We submitted this, even though the Court had ruled

6    on James statements, and based on the Court's ruling that

7    the government's proffer was sufficient, I would move to

8    admit these two exhibits as it relates to the same source.

9              THE COURT:  Now, you probably object to my ruling

10   that the proffer was sufficient and that objection is

11   preserved.  Is there anything else that you want to say

12   about it?

13             I believe the proffer was sufficient and,

14   therefore, these would be admitted, but I don't want to do

15   away with your objection.  I assume you will want to

16   preserve it.

17             MR. SKORDAS:  No, Your Honor.

18             THE COURT:  What does that mean, no?

19             MR. SKORDAS:  Sorry.  I am listening to two people

20   at the same time.

21             THE COURT:  That is usually a problem.

22             MR. SKORDAS:  I should just be listening to one

23   and that is you.

24             THE COURT:  I don't know.  It might be more

25   important to listen to your partner.

 1              MS. BECKETT:  Your Honor, I think we will reserve

 2     any other issues we may have with it during trial and we'll

 3     move forward from there.

 4              THE COURT:  All right.

 5              MR. BURGGRAAF:  So those will be admitted, Your

 6     Honor, at least as to foundation?

 7              THE COURT:  Yes.

 8              (Plaintiff's Exhibits 14.30 and 14.40

 9               were received into evidence.)

10              MR. BURGGRAAF:  The next exhibit that we would

11     like to address is Exhibit 16.00.  For that purpose we would

12     call Agent David Slagle.

13              THE COURT:  Come forward and be sworn, please,

14     right here in front of the clerk of court.

15                        DAVID ANTHONY SLAGLE

16              Having been duly sworn, was examined

17                   and testified as follows:

18              THE WITNESS:  David Anthony Slagle.  It is S as in

19     Sam, l-a-g-l-e.

20              THE COURT:  Go ahead.

21                        DIRECT EXAMINATION

22     BY MR. BURGGRAAF

23     Q.   Agent Slagle, where are you currently employed?

24     A.   Department of Homeland Security, Homeland Security

25     Investigations.

1    Q.    How long have you been employed with the Department of

2    Homeland Security?

3    A.    With Homeland Security since 2003.

4    Q.    What are your responsibilities in that position?

5    A.    As a special agent I am tasked with investigating

6    violations of the law as it relates to statutes that

7    Homeland Security Investigations would enforce.

8    Q.    Do you have any specialized responsibility as compared

9    to other agents with H.S.I.?

10   A.    I do.

11   Q.    What are those?

12   A.    I am a computer forensic agent as well, so that would

13   entail the examination, the seizure, the handling, and,

14   again, the subsequent examination of digital evidence items.

15   Q.    Have you been involved in asset seizures through your

16   tenure with H.S.I.?

17   A.    I have.

18   Q.    Have those asset seizures involved e-currency, Bitcoin

19   or other non -- currencies?

20   A.    Yes, they have.

21   Q.    Do you know on how many occasions you have been

22   involved with that type of investigation or seizure?

23   A.    This case would be my first one.

24   Q.    And have you had opportunities to conduct these kinds

25   of seizures since the beginning of this case?

1    A.    Me personally no, but I have helped other agents with

2    the seizure of cryptocurrencies.

3    Q.    What training or experience have you received in

4    relation to cryptocurrency and computer forensics?

5    A.    With computer forensics I have gone to the Homeland

6    Security basic computer forensic evidence recovery training

7    that is provided to H.S.I. special agents, Secret Service

8    special agents and I.R.S. special agents.  I have also

9    subsequently gone to the advanced computer forensics

10   recovery training and multiple tool specific training in

11   addition to certain specialized areas.

12        As far as the cryptocurrency training, I hate to say it

13   but there is not a lot out there at this point, and it has

14   kind of been a new technology that we have all been learning

15   as it develops.

16   Q.    You mentioned that this is the first case that you

17   became involved with that included the seizure of

18   cryptocurrency.  What did you do in this case to help with

19   the seizure of the cryptocurrency?

20   A.    What I did is located the wallets or the accounts

21   actually, identified the amount of cryptocurrency inside of

22   those accounts, and successfully moved them to a government

23   owned hardware wallet that would be used for asset

24   forfeiture proceedings.

25   Q.    Now, you mentioned that this was the first time that

1    you were involved.  Did you do anything to document what you

2    just described?

3    A.   The tools create transaction logs and transaction I.D.s

4    and I took a few screen shots to kind of document how the

5    process went.

6         Again, like I said, at that point there was not a lot

7    of guidance out there.  This was kind of new as far as the

8    whole seizure aspect of the cryptocurrency.  At the time it

9    was just starting to head up and it was continuing to head

10   up.  It was actually heading up earlier, but this was a new

11   technology that we were kind of dealing with.

12        Conventionally we generally deal with like a fiat

13   currency that we will see, or property.  This was new for us

14   and I wanted to document it to show it to other agents, the

15   techniques that were used.

16   Q.   You have before you on the screen Government's Exhibit

17   16.00.

18        Do you recognize that screen shot?

19   A.   I do.

20   Q.   Is this one of the screen shots that you took during

21   the process of seizing the cryptocurrency in this case?

22   A.   It is.

23   Q.   There are ten other screen shots that go along with

24   this one.  Have you had a chance to review them?

25   A.   I have.

```
 1              MR. BURGGRAAF:  Your Honor, I don't know if I need
 2    to cycle through each of those so that Agent Slagle can
 3    verify --
 4              THE COURT:  Are they all part of --
 5              MR. BURGGRAAF:  They are all part of 16.00.  There
 6    are 11 total.
 7              THE COURT:  Yes.
 8    BY MR. BURGGRAAF
 9    Q.   Agent Slagle, look at each of those and we'll pause on
10    each one for just a brief moment.
11         We have hit the last one here.
12         Agent Slagle, in looking through those, is there any
13    one of those slides that we need to turn back to?
14    A.   I'm familiar with every single one of them.
15    Q.   Do each of these slides accurately depict what you saw
16    on your computer screen as you seized the Bitcoin that are
17    noted on the slides?
18    A.   Yes.  That would be what I saw.
19              MR. BURGGRAAF:  If I may, Your Honor?
20              THE COURT:  You may.
21    BY MR. BURGGRAAF
22    Q.   Agent Slagle, I have handed you a disk.
23         Do you recognize that disk?
24    A.   I do.
25    Q.   Have you had the chance to review the contents?
```

1   A.   I have.

2   Q.   There are I believe some initials on the front of that

3   disk.

4        Are those your initials?

5   A.   They are.

6   Q.   What do the initials signify to you?

7   A.   That I have received the materials on this disk, that I

8   have reviewed those materials, and I agree with what is on

9   this disk.

10        MR. BURGGRAAF:  Your Honor, I move to admit

11   Government's Exhibit 16.00.

12        THE COURT:  Let's see what the cross reveals.

13        MR. SKORDAS:  Is 16.00 the disk itself?

14        MR. BURGGRAAF:  16.00 contains the prior admitted

15   exhibits plus 16.00.

16        MR. SKORDAS:  Okay.

17        THE COURT:  The 11 screen shots?

18        MR. BURGGRAAF:  That is correct.

19        THE COURT:  Go ahead, Mr. Skordas.

20                      CROSS-EXAMINATION

21   BY MR. SKORDAS

22   Q.   Would you describe to the Court how you located this

23   wallet?

24   A.   It is not one wallet.  It is a combination of wallets

25   and each one of the wallets has a different process to

1    identify them.  I don't know if I'm going into investigative

2    techniques as far as accessing private --

3    Q.    We don't want to know any trade secrets, but --

4    A.    I discovered the private key which are essentially --

5    that is your password into it.  That is how the

6    cryptocurrency wallets work.

7    Q.    In this particular instance what did you locate?

8    A.    I located public and private keys that we gained access

9    to so that we can see what the contents are, whether it be

10   the Bitcoin or Bitcoin cash.

11   Q.    How were you able to identify the amount of the

12   cryptocurrency?

13   A.    You can go to a website -- multiple websites actually.

14   Blockchain.info is one of them.  You enter the public key

15   which is -- so it is your account number for your bank

16   account.  You throw in your public key and unlike your bank

17   account, anybody in the world can see it.  So I throw in the

18   public key and I can -- and you can kind of see transactions

19   and things likes that.

20        To get into the account -- we can see the transactions,

21   but to get into the actual account, we have to have the

22   private key to see what is still in the account.  But for

23   transactions in and out of the account we can use the public

24   key to verify those.

25   Q.    Did you ultimately obtain the private key?

1    A.   Yes, we did.

2    Q.   How did you get that?

3    A.   It is an investigative technique that if the Court

4    wants me to disclose I can.

5    Q.   You don't need to.

6         You were ultimately able to obtain that?

7    A.   We were.  That is the only way that we were able to

8    gain access to the cryptocurrency.

9    Q.   Is that the only way you were able to transfer the

10   cryptocurrency to the wallet, if you will, into the

11   government's wallet?

12   A.   That is correct.

13   Q.   How did you perform that operation?

14   A.   That was a little bit more of a complicated process.

15   Again, the first time trying to figure stuff out --

16   Q.   The only time?

17   A.   It is the only time.  It was not like something that

18   was out there on the internet that you can Google.  It is a

19   process that you have to figure out through different

20   methods to figure out what is the best method to obtain

21   those and securely move them without exposing your private

22   keys or seed words, which anybody around the world if they

23   had access to that private key they could steel the funds

24   before we had access to seize them.  So we had to use

25   certain techniques above and beyond what a normal person

```
 1   would use to secure the money and to make sure that it was
 2   not lost or stolen.
 3            MR. SKORDAS:  Could we scroll through these?
 4   BY MR. SKORDAS
 5   Q.   I would like you to tell me briefly or tell the Court
 6   briefly what each of these represent starting with --
 7            MR. SKORDAS:  This is 16.00?
 8            MR. BURGGRAAF:  They are all 16.00.  This is page
 9   2.
10   BY MR. SKORDAS
11   Q.   Page 2 of 16.00.
12   A.   This is a wallet and from the description it belonged
13   to Tonge, which was a member of the Shamo D.T.O.
14   Q.   T-o-n-g-e?
15   A.   T-o-n-g-e.  In that wallet there was not a lot
16   apparently from what I'm reading there, and then the amount
17   that we sent is in the top, and then there is a mining fee
18   that is paid to the miners within the Bitcoin kind of
19   decentralized network.
20   Q.   A transaction fee?
21   A.   I guess you could call it a transaction fee.  They call
22   it a mining fee.  It is paid to the miners.  What it does is
23   it pays the people that verify the Block Chain ledger.  It
24   verifies that this amount is leaving this wallet and it is
25   kind of like when you have your debit card.  You use it and
```

1    there is somebody that updates your records on your bank

2    account.  It is not real cash.  It is just money that is on

3    the computer for the bank and it changes the ledger that

4    says you have so much in your account.

5         That is what the miners do is they update the Block

6    Chain which is the ledger so that everybody in the whole

7    infrastructure of the Bitcoin decentralized network know --

8    so you can't double spend and things like that.

9    Q.   Page 3, please.  What is that?

10   A.   That would be identified as Shamo's bread wallet.  A

11   bread wallet is a type of software and generally I think it

12   is actually only found on mobile devices, and that is the

13   amount of Bitcoin that we seized.  Again, that is the mining

14   fee that we paid.

15   Q.   Are each of the subsequent pages similar to that?

16   Let's go to --

17   A.   We can go through them.  This one is going to be a

18   different wallet.  Multibit is a software based wallet.

19             MR. SKORDAS:  Page 5, please, or the next page.

20             THE WITNESS:  Okay.  This one is -- although it

21   says Shamo treasure, and that was what I identified it, the

22   treasure device is the government hardware wallet.  It

23   actually looks like a U.S.B.  So it is not online and it is

24   not connected when it is in storage.  It is a hardware

25   wallet that we placed funds into that we would subsequently

1    give to the U.S. marshals for asset forfeiture proceedings.

2    BY MR. SKORDAS

3    Q.   Are you familiar with the four boxes there under legacy

4    account number one and what they represent?

5    A.   I know what the program tells me they represent, but I

6    didn't write the software so I couldn't speak to what the

7    intentions of the developers were for those boxes.  I can

8    see it tells me the balance.  This other one tells me the

9    rate and what it is currently.  I don't know what the

10   expense is.  I imagine that is probably something for

11   somebody that uses it as a constant device that they use to

12   make expenditures through.  Income I would assume, and I am

13   going out on a limb, that that is what probably has come

14   into the wallet.

15   Q.   Next, please.

16        Could we go back one page?  I'm sorry.

17        Do you see a date on that?  Do you know the date when

18   this would have been created?

19   A.   It would have been created the day that the screen

20   shot -- the access data would have and I believe this one

21   would have been October 11th.

22   Q.   Of?

23   A.   2017.

24   Q.   Does that mean that on October 11th of 2017 the rate of

25   Bitcoin would have been $4,861?

1    A.    It appears so.

2    Q.    Are you aware that that is a fluctuating number?

3    A.    I am very aware of that.

4    Q.    Have you observed those fluctuations over the years?

5    A.    I have.

6    Q.    And they are significant, aren't they?

7    A.    It depends on what you call significant.  There are

8    fluctuations.

9    Q.    So your opinion is that that shot was on or about

10   October 11th of 2017?

11   A.    I believe so.  They are all taken that date that I

12   seized them and I believe that that was the date.

13   Q.    All of these are?

14   A.    I believe all of these are taken on that same date.  If

15   not, within a day or two range.

16   Q.    Very well.  What is the next exhibit?  What does that

17   demonstrate for us, sir?

18   A.    That is just showing that there were transactions going

19   into that account.  B.C.H. is not Bitcoin.  So before we

20   were looking at Bitcoin transactions.

21   Q.    What is B.C.H.?

22   A.    B.C.H. is Bitcoin cash.  Bitcoin cash is an

23   alternative -- it is called an alt currency because it is

24   not the main cryptocurrency.  It is an alternative

25   cryptocurrency to Bitcoin, and Bitcoin cash is all currency

1    that was created as a result of the hard fork with Bitcoin.

2    Q.    Which means?

3    A.    Which means when that hard fork created in the Block

4    Chain was changed, everybody that owned Bitcoin on this date

5    and this wallet received the alternative cryptocurrency.  So

6    free money is basically what it is.  That one day they got

7    it and that was the result of the actual hard fork within

8    the Bitcoin Block Chain.

9             MR. SKORDAS:  Could we go to the next exhibit,

10   please.

11   BY MR. SKORDAS

12   Q.    Do you see that?

13   A.    I do.

14   Q.    This appears to be a different date and a different

15   rate.

16        Is that fair?

17   A.    I would say so.

18   Q.    There are some dates on the top right and there is a

19   rate listed there under your account number.  Does that help

20   you in deciding when or how this document was created?

21   A.    It does help me.  I can say September 12th, 2017.

22   Q.    Next.  I think we have already talked about that.

23        Do you see that on the right?

24   A.    Yes.

25   Q.    What is that?

1   A.   That is just showing the tools that I used to seize the

2   money or seize the cryptocurrency from the wallet that was

3   covered under the warrant, and on the right is going to be

4   the government's treasure, B.C.H., and we talked about

5   Bitcoin cash and that is just showing the tools I was using

6   to move them to.

7           MR. SKORDAS:  That's all that I have, Your Honor.

8           THE COURT:  Thank you.

9           Anything else?

10          MR. BURGGRAAF:  No, Your Honor.

11          THE COURT:  16 is admitted.

12          (Plaintiff's Exhibit 16.00 was

13           received into evidence.)

14          THE COURT:  You may step down.

15          An unrelated question, did your father practice

16   law in Salt Lake?

17          THE WITNESS:  He did not.  He was in real estate.

18          THE COURT:  Different David Slagle.  All right.

19          MR. GADD:  Your Honor, the United States calls

20   Special Agent Daniel Ashment.

21          THE COURT:  Come forward and be sworn right up

22   here in front of the clerk of court.

23                  DANIEL ASHMENT

24         Having been duly sworn was examined

25           and testified as follows:

1              THE WITNESS:  Daniel Ashment, A-s-h-m-e-n-t.

2                      DIRECT EXAMINATION

3  BY MR. GADD

4  Q.   Special Agent Ashment, do you work for Homeland

5  Security Investigations?

6  A.   I do.

7  Q.   How long have you worked there?

8  A.   Approximately ten years.

9  Q.   You're one of the case agents on this case, right?

10  A.   Yes.

11  Q.   You were given a disk this morning with your exhibits

12  on it, correct?

13  A.   Correct.

14  Q.   Did you have a chance to review those?

15  A.   I did.

16  Q.   Are the exhibits on this disk true and accurate

17  representations of the exhibits that you gathered throughout

18  the investigation?

19  A.   Yes, they are.

20  Q.   These are your initials on the disk?

21  A.   Correct.

22  Q.   Let's talk first about Exhibit 15.03.

23       Do you recognize 15.03?

24  A.   I do.

25  Q.   Are these postal label attachments that you pulled off

```
 1   of Sigaint?

 2   A.   Yes, they are.

 3   Q.   And Sigaint is S-i-g-a-i-n-t, correct?

 4   A.   Correct.

 5   Q.   That is an e-mail service, correct?

 6   A.   Correct.

 7   Q.   It is accessed through Tor?

 8   A.   Correct.

 9   Q.   And Tor is T-o-r?

10   A.   You can also access it on the clear web.

11   Q.   You accessed it on the clear web, correct?

12   A.   Correct.

13   Q.   In order to find Exhibit 15.03, did you use Alexandrya

14   Tonge's login --

15   A.   Yes.

16   Q.   -- to her Sigaint e-mail account?

17   A.   Yes.

18   Q.   When you went in did you see e-mails to Ms. Tonge?

19   A.   Yes.

20   Q.   And those e-mails contained attachments, correct?

21   A.   Correct.

22   Q.   The e-mails were postal labels?

23   A.   Yes.

24   Q.   And the attachments are what we're looking at here,

25   correct?
```

```
 1    A.    Correct.

 2    Q.    You had a chance to look through 15.03.  Are all of

 3    these pages in 15.03 true and accurate representations of

 4    what you saw when you took screen shots and when you went in

 5    and viewed those e-mails and attachments?

 6    A.    Yes, they are, and printouts of the attachments.

 7    Q.    You printed them out?

 8    A.    Yes.

 9    Q.    Thank you for clarifying.

10           MR. GADD:  I would move to admit 15.03.

11           THE COURT:  Let's see what the cross is.

12           MR. SKORDAS:  No objection.

13           THE COURT:  Admitted.

14           (Plaintiff's Exhibit 15.03 was

15            received into evidence.)

16           MR. GADD:  Could we have 15.27?

17    BY MR. GADD

18    Q.    Those were the printouts.  These are the screen shots,

19    correct?

20    A.    Correct.

21    Q.    When I say screen shot, you actually took a picture of

22    a screen?

23    A.    Correct, much to my chagrin.

24    Q.    But we were nervous, right?  We were nervous we would

25    lose this data and you were hustling, right, to just capture
```

```
 1   anything --

 2   A.   I was worried we would lose a lot of data, yeah.

 3   Q.   And eventually we lost some of this data, right?

 4   A.   Yeah.

 5   Q.   Sigaint is defunct now, right?

 6   A.   Right.

 7   Q.   Same with AlphaBay, right?

 8   A.   Yes.

 9   Q.   This is Sigaint, correct?  Let's just look here at this

10   first page on 15.27.  You can see the subject and it says

11   batch order and then some letters and numbers, but then you

12   see from, usps.com to passthepeas@sigaint.org.

13   A.   Correct.

14   Q.   Passthepeas, that is Ms. Tonge, correct?

15   A.   Correct.

16   Q.   That is the account that you were using to access this

17   to take the pictures?

18   A.   Correct.

19   Q.   You have had a chance to look at all of the pages in

20   this exhibit, correct?

21   A.   Yes.

22   Q.   These are true and accurate representations of what you

23   saw with your own eyes that day?

24   A.   They are, yes.

25            MR. GADD:  I would move to admit 15.27.
```

```
 1              MR. SKORDAS:  No objection.

 2              THE COURT:  Admitted.

 3              (Plaintiff's Exhibit 15.27 was

 4               received into evidence.)

 5              MR. GADD:  Can we look at 17.08?

 6              THE COURT:  17.08?

 7              MR. GADD:  Yes, sir.

 8  BY MR. GADD

 9  Q.   Do you recognize 17.08?

10  A.   I do, yes.

11  Q.   These are canned responses from Mr. Noble, correct?

12  A.   Yes.

13  Q.   His role in the organization was customer service?

14  A.   Correct.

15  Q.   What you see here -- these are just, you know, when he

16  needed to reply to someone and rather than have to type it

17  out each time, he just had it ready to go on this sheet,

18  correct?

19  A.   Yes.

20  Q.   Mr. Noble gave you consent to search his computer?

21  A.   Yes.

22  Q.   That is where you found this?

23  A.   Correct.  Yes.

24  Q.   Does this document accurately represent what you saw

25  with your own eyes when you conducted the search of his
```

```
 1    computer?

 2    A.   Yes, it does.

 3              MR. GADD:  I would move to admit 17.08.

 4              THE COURT:  Any objection?

 5              MR. SKORDAS:  No, Your Honor.

 6              THE COURT:  17.08 is received.

 7              (Plaintiff's Exhibit 17.08 was

 8               received into evidence.)

 9              MR. GADD:  I just want to verify for myself, I

10    believe 14.03 was previously admitted today.

11              THE COURT:  14.30.

12              MR. GADD:  3-0.

13              Ms. Lauder, could we look at 17.05?

14    BY MR. GADD

15    Q.   Do you recognize 17.05?

16    A.   I do, yes.

17    Q.   This is a map that shows dots on it, right?

18    A.   Correct.

19    Q.   Each dot is a zip code that you found the defendant had

20    sent a drug package to.  When I say the defendant I mean his

21    coconspirators as well.

22    A.   Yes.

23    Q.   The dot does not represent each package.  The dot

24    represents the zip codes, correct?

25    A.   Correct.
```

```
 1   Q.   Let's look through just briefly a couple of the pages
 2   in 17.05.
 3        Let's stop there.  You can see the yellow dots and then
 4   you see it expanded with the red dots, correct?
 5   A.   Yes.
 6   Q.   Those are all packages going to a single zip code,
 7   right?
 8   A.   Yes.
 9   Q.   That is why it is expanded out?
10   A.   Yes.
11   Q.   You helped create this map, correct?
12   A.   Correct.
13   Q.   You went through and spot-checked and verified that the
14   dots are in the right places, that there is a package, at
15   least one, sent to every zip code for which you have a dot
16   here?
17   A.   I did, yes.
18            MR. GADD:  Your Honor, this is a demonstrative
19   exhibit and I would move to admit it.
20            THE COURT:  Any objection?
21            MR. SKORDAS:  No, Your Honor.
22            THE COURT:  17.05 is admitted.
23            (Plaintiff's Exhibit 17.05 was
24             received into evidence.)
25            MR. GADD:  Could we look at 21.00?
```

```
 1   BY MR. GADD

 2   Q.    21.00 are e-mails from Mr. Shamo's Hot Mail account,

 3   correct?

 4   A.    Correct.

 5   Q.    In order to obtain the Hot Mail data you sent a search

 6   warrant to Microsoft, right?

 7   A.    Yes.

 8   Q.    And Microsoft runs Hot Mail?

 9   A.    Yes.

10   Q.    Microsoft gathered up your data for the search warrant

11   and then they made it available to you on the cloud, right?

12   A.    Yes.

13   Q.    They sent you a link?

14   A.    Yes.

15   Q.    Did you use a computer forensic analyst similar to

16   Mr. Slagle who just testified, did you use an analyst to

17   take the data using the link and plug it into a search

18   program that you like to use?

19   A.    Yes, we did.

20   Q.    That search program is called AXIOM, correct?

21   A.    Yes.

22   Q.    Magnet AXIOM?

23   A.    Yes, Magnet.

24   Q.    That is essentially what we're looking at here, right?

25   We are seeing metadata from your search program that is
```

1    telling you about the details of the e-mail.

2         Then if we look at the next page is the body of the

3    e-mail, correct?

4    A.   Yes.  Correct.

5    Q.   That is going to be true not just for 21.00 but all of

6    the 21 series, right?  So from 21.00 all the way down to

7    21.44, these are e-mails from Hot Mail that you obtained

8    through a search warrant?

9    A.   Correct.

10   Q.   You personally went through AXIOM and identified these

11   e-mails?

12   A.   I did.

13   Q.   And they all came from that data provided by Microsoft?

14   A.   Yes, they did.

15   Q.   From Mr. Shamo's Hot Mail account?

16   A.   Yes.

17   Q.   All these e-mails are on your disk?

18   A.   They are.

19   Q.   And you have reviewed it and initialed it and these are

20   true and accurate representations of what you received from

21   Microsoft, correct?

22   A.   They are.

23         MR. GADD:  Your Honor, I would move to admit

24   Exhibits 21.00 through the end of that series, 21.44.

25         THE COURT:  Any objection?

```
 1              MR. SKORDAS:  No, Your Honor.

 2              THE COURT:  21.00 through 21.44 are admitted.

 3              (Plaintiff's Exhibits 21.00 through

 4               21.44 were received into evidence.)

 5              MR. GADD:  Your Honor, I have nothing further for

 6    this witness.  Thank you.

 7              THE COURT:  Do you want to do any cross on this

 8    witness?

 9              MR. SKORDAS:  No, Your Honor.  Thank you.

10              THE COURT:  You may step down.

11              MR. GADD:  Your Honor, the United States calls

12    Special Agent Adam Koeneman.

13              THE COURT:  Adam what?

14              MR. KOENEMAN:  I will spell it.

15              THE COURT:  Okay.  That would be helpful.

16                          ADAM KOENEMAN

17               Having been duly sworn, was examined

18                    and testified as follows:

19              THE WITNESS:  Adam Koeneman, K-o-e-n-e-m-a-n.

20              THE COURT:  Go ahead, Mr. Gadd.

21                        DIRECT EXAMINATION

22    BY MR. GADD

23    Q.   For whom do you work?

24    A.   I work for Homeland Security Investigations.

25    Q.   How long have you worked for H.S.I.?
```

1    A.    Approximately seven years.

2    Q.    Before that you were border patrol, correct?

3    A.    I worked for the enforcement removal operation section

4    of I.C.E.

5    Q.    Thank you.

6          Prior to that you served in the United States military,

7    correct?

8    A.    I did for approximately 12 years.

9    Q.    Special Agent Koeneman, I want to show you -- I have

10   probably always said it wrong.  It is Koeneman?

11   A.    It is Koeneman for no good reason.

12   Q.    We have known each other a while.  I'm embarrassed.

13         Special Agent Koeneman, I want to show you a series of

14   exhibits and you have had a chance to look at them all

15   today, right?

16   A.    Yes, sir.

17   Q.    You looked through this disk and they have your

18   exhibits and you have initialed it, correct?

19   A.    Yes.

20   Q.    The exhibits on this disk are true and accurate,

21   correct?

22   A.    They are, sir.

23              MR. GADD:  Could we look first at 15.04.

24   BY MR. GADD

25   Q.    Do you recognize this?

```
1    A.    I do.

2    Q.    This has several pages and it is a series of screen

3    shots of what they sell on AlphaBay, correct?

4    A.    That is correct, sir.

5    Q.    We were mentioning with Special Agent Ashment just a

6    minute ago that there was some concern that you would lose

7    this data early on in the investigation, right?

8    A.    Absolutely.

9    Q.    That we would be locked out of AlphaBay or AlphaBay

10   would fold and go under and we would lose data, correct?

11   A.    That is correct.

12   Q.    So very early on in the investigation you took a number

13   of screen shots just to document what you were seeing,

14   right?

15   A.    Absolutely.

16   Q.    That includes what we are looking at here.  This is not

17   Mr. Shamo's products.  This is just an example of what they

18   sell on AlphaBay?

19   A.    Yes, sir.

20   Q.    Are these screen shots true and accurate

21   representations of what you saw the day you took them?

22   A.    Yes.

23         MR. GADD:  I would move to admit 15.04 as a

24   demonstrative exhibit.

25         MR. SKORDAS:  May I just ask what date this was
```

```
 1   taken?
 2              THE COURT:  You may ask that.
 3              MR. SKORDAS:  If you know, sir.
 4              THE WITNESS:  I believe it was 11-22, 2016 at
 5   approximately 9:54 p.m.
 6              MR. SKORDAS:  No objection.
 7              THE COURT:  15.04 is received.
 8              (Plaintiff's Exhibit 15.04 was
 9               received into evidence.)
10              MR. GADD:  Thank you, Ms. Lauder.
11   BY MR. GADD
12   Q.   Let's talk about that.  That is the day Mr. Shamo was
13   arrested, correct?
14   A.   11-22, 2016, yes, sir.
15   Q.   It was a pretty busy day?
16   A.   It was very busy.
17   Q.   At some point during that day you and the other case
18   agents learned about Mr. Noble's involvement, correct?
19   A.   Yes, we did.
20   Q.   And you went to interview him and you took screen shots
21   that day and you used his account access to get in here,
22   right?
23   A.   We did.
24   Q.   Let's look at 15.05.  This document contains screen
25   shots and then the contents of e-mails from Sigaint,
```

1    correct?

2    A.    Yes, sir.

3    Q.    We mentioned Sigaint just a minute ago, but this

4    specifically is the passthepeas in-box, correct?

5    A.    That is correct.

6    Q.    You can see that on the first page there it says in-box

7    passthepeas, right?

8    A.    Correct.

9    Q.    Passthepeas was Ms. Tonge and also her partner Ms.

10   Buston, correct?

11   A.    That is correct.

12   Q.    You obtained access using their log-in information,

13   correct?

14   A.    We did.

15   Q.    And then this document is both the screen shots and the

16   contents and it includes both the contents that we can read

17   and also communications that have been encrypted, correct?

18        Let's scroll down and we'll show him one.  This page is

19   good.

20   A.    The first page was the open source and the second page

21   is the encryption.

22   Q.    So the encryption is kind of the second half of this

23   page, right?  It says begin P.G.P. message and then we get a

24   whole bunch of nonsense?

25   A.    Yes, sir.

1    Q.    You have had a chance to review this Exhibit 15.05.   Is

2    this a true and accurate representation of what you saw when

3    you logged in to that e-mail account and started to gather

4    up data?

5    A.    Yes, sir, it is.

6            MR. GADD:  I move to admit 15.05.

7            MR. SKORDAS:  Your Honor, I asked counsel

8    previously if they intend to call Mr. Noble and he has

9    indicated that they do --

10           MR. GADD:  We do.

11           MR. SKORDAS:  -- and that was part of the reason

12   we didn't object prior, and I assume that that would be true

13   for Ms. Tonge.

14           MR. GADD:  That is correct.

15           MR. SKORDAS:  With that, we wouldn't have an

16   objection.

17           THE COURT:  15.05 is received.

18           (Plaintiff's Exhibit 15.05 was

19            received into evidence.)

20   BY MR. GADD

21   Q.   The next three are very similar.  So 15.06, 15.07 and

22   15.08 and let me just talk about those and then we'll deal

23   with them all at the same time.

24       15.06 is the sent box from the Sigaint account that

25   belonged to Mr. Noble.  It is DRW99.  He was a video gamer,

1    right, and so he was into Dr. Wario and that is kind of the

2    genesis for that.

3        And then for 07, the passthepeas sent box, and 08,

4    DRW99, trash folder, you had a chance to review those three

5    exhibits when you looked through the disk, right?

6    A.   I did.

7    Q.   In each case did you access their Sigaint account using

8    their log-in and did you gather up the data, and is the data

9    in these exhibits true and accurate representations of what

10   you saw and gathered?

11   A.   It is.

12           MR. GADD:  I would move to admit 06 and 07 and 08

13   in the 15 series.

14           MR. SKORDAS:  No objection.

15           THE COURT:  15.06 and 15.07 and 15.08 are

16   received.

17               (Plaintiff's Exhibits 15.06, 15.07 and

18                15.08 were received into evidence.)

19           MR. GADD:  Can we look at 15.09?

20   BY MR. GADD

21   Q.   Starting with 15.09 and moving down to 15.17, you have

22   screen shots of relatively large orders.  These are the

23   Fentanyl pills and then a little later on we'll talk about

24   Alprazolam.

25       That same night that you were there taking screen

1    shots, you started to go through and find these large

2    orders, right, to document them?

3    A.   Yes, sir, we did.

4    Q.   These screen shots that you took -- so from 15.09, and

5    this is the order for 100 Fentanyl pills at the time, all

6    the way down to 15.17, which were significantly larger

7    orders of Fentanyl pills, those are screen shots you took

8    and you have had a chance to review them.  Are they true and

9    accurate representations of what you saw that day when you

10   were taking these screen shots?

11   A.   Yes, sir, they are.

12            MR. GADD:  I would move to admit 15.09 through

13   15.17.

14            MR. SKORDAS:  No objection.

15            THE COURT:  15.09 through 15.17 are admitted.

16            (Plaintiff's Exhibits 15.09 through

17             15.17 were received into evidence.)

18            THE COURT:  By admitted means admitted into

19   evidence, if you don't understand that.

20            MR. GADD:  Yes, sir.  15.18, please.

21   BY MR. GADD

22   Q.   So 15.18 and 15.19 are screen shots that show sales to

23   one particular customer that went by the moniker trustworthy

24   money.

25            Do you recall these?

1    A.    I do, sir.

2    Q.    This was a suspect who was apprehended and prosecuted

3    in Oregon, correct?

4    A.    That is correct.

5    Q.    By fellow agents of yours at Homeland Security

6    Investigations?

7    A.    Yes, sir.

8    Q.    These screen shots, are they true and accurate

9    representations of what you saw that day when you were

10   taking screen shots?

11   A.    Yes, sir, they are.

12             MR. GADD:  I would move to admit 15.18 and 15.19.

13             MR. SKORDAS:  No objection.

14             THE COURT:  15.18 and 15.19 are received.

15             (Plaintiff's Exhibits 15.18 and

16             15.19 were received into evidence.)

17             MR. GADD:  Could we look at 15.20?

18   BY MR. GADD

19   Q.    Starting here with 15.20 and going down to 15.24, you

20   have taken the screen shots but rather than Fentanyl pills,

21   you have focused on Alprazolam which is Xanax, correct?

22   A.    Xanax, yes, sir.

23   Q.    You had a chance to review these as well.  Are these

24   screen shots true and accurate representations of what you

25   saw and what you captured that day?

```
 1    A.    They are, sir.

 2              MR. GADD:  I would move to admit 15.20 through

 3    15.24.

 4              MR. SKORDAS:  No objection.

 5              THE COURT:  15.20 through 15.24 are received into

 6    evidence.

 7              (Plaintiff's Exhibits 15.20 through

 8               15.24 were received into evidence.)

 9    BY MR. GADD

10    Q.    When you were working with Mr. Noble, you had some

11    questions for him that night and you got on the subject of,

12    you know, did any of your customers when you were doing

13    customer service, did they complain about the pills or were

14    people getting sick, overdoses and things of that nature,

15    correct?

16    A.    Yes, sir.

17              MR. GADD:  Could we look at 15.25?

18              Could you help us zoom in at the bottom and

19    feedback -- yes, right about there.

20    BY MR. GADD

21    Q.    Do you recognize this screen shot?

22    A.    I do.

23    Q.    This was one on that night that you were directed to

24    and that you took a screen shot of, right?

25    A.    That is correct.
```

1    Q.   In this case it is a customer that went by the moniker

2    stack bands?

3    A.   Yes.

4    Q.   And he indicated that he or she wants money in escrow

5    because people are getting sick?

6    A.   Yes, sir.

7    Q.   This is a screen shot you took.  Is it a true and

8    accurate representation of what you saw that night?

9    A.   Yes, sir, it is.

10             MR. GADD:  I would move to admit 15.25.

11             MR. SKORDAS:  May I have just a minute, Your

12   Honor?

13             THE COURT:  Yes.

14             MR. SKORDAS:  Could we lay a little more

15   foundation as to where he got these screen shots from?

16             THE COURT:  Yes.

17             MR. GADD:  I'm happy to do so.

18   BY MR. GADD

19   Q.   You were with Mr. Noble, correct?

20   A.   I was.

21   Q.   You used his AlphaBay log-in to get into AlphaBay?

22   A.   I did.

23   Q.   His log in wasn't just for AlphaBay, but he had

24   surrogate access to the Pharma Master storefront that Mr.

25   Shamo maintained, correct?

```
 1    A.    That is correct, sir.
 2    Q.    That is how he was able to perform his customer service
 3    duties?
 4    A.    That is exactly right.
 5    Q.    And you were in Mr. Shamo's feedback when you took this
 6    screen shot, correct?
 7    A.    Yes, sir, I was.
 8                 MR. GADD:  Move to admit.
 9                 MR. SKORDAS:  No objection.
10                 THE COURT:  15.25 is received.
11                 (Plaintiff's Exhibit 15.25 was
12                  received into evidence.)
13                 MR. GADD:  Could we look at 15.26?
14    BY MR. GADD
15    Q.    This one will be a little bit trickier because this is
16    the audio and video interview that you reviewed.
17          Do you remember meeting subsequently with Mr. Noble?
18    A.    I do, sir.
19    Q.    You and the agents working with you did a screen
20    capture like a video of what was happening on the screen,
21    correct?
22    A.    That is right, sir.
23    Q.    And then you also audio recorded what was being said?
24    A.    Yes, sir.
25    Q.    And the combination of those two we have marked as
```

1   15.26.  Have you had a chance to review that this morning?

2   A.    Yes, I did.

3   Q.    Is the audio and the video an accurate representation

4   of what you heard and said and saw that day?

5   A.    Yes, sir, it is.

6           MR. GADD:  I would move to admit 15.26.

7           THE COURT:  Any objection?

8           MR. SKORDAS:  No, Your Honor.

9           THE COURT:  15.26 is received into evidence.

10          (Plaintiff's Exhibit 15.26 was

11           received into evidence.)

12          MR. GADD:  If I can just take a moment and make

13  sure I have not missed one.

14          I have nothing further for this witness.

15          THE COURT:  Do you have any questions?

16          MR. SKORDAS:  No, Your Honor.

17          THE COURT:  You may step down.

18          It is about 10:30.  We have been going since 9:00.

19  Let's take a 15-minute break.  We'll see you at a quarter to

20  11:00.

21          (Recess)

22          THE COURT:  You may call your next witness.

23          MR. STEJSKAL:  I call Agent Dennis Power.

24          THE COURT:  Come forward and be sworn, please.

25  //

```
 1                         DENNIS POWER
 2              Having been duly sworn, was examined
 3                    and testified as follows:
 4              THE WITNESS:  Dennis Power, D-e-n-n-i-s,
 5   P-o-w-e-r.
 6              THE COURT:  Go ahead, Mr. Stejskal.
 7                      DIRECT EXAMINATION
 8   BY MR. STEJSKAL
 9   Q.   Your occupation, please.
10   A.   I am a retired police officer currently employed with
11   the D.E.A. as a financial investigator.
12   Q.   Prior to your retirement what was your employment?
13   A.   A police officer for South Jordan City and I was
14   deputized as a task force agent with the D.E.A. here in Salt
15   Lake.
16   Q.   What were the periods as a task force officer with the
17   D.E.A.?
18   A.   I was there for three years starting in 1995 or --
19   sorry.  That is when I started my police career.
20        I started with the D.E.A. in 2015.
21   Q.   Were you then a task force officer with the D.E.A.
22   throughout 2016 and into 2017 that involved the
23   investigation of Mr. Shamo and others?
24   A.   Yes.
25   Q.   Were you one of the lead case agents with the D.E.A. on
```

```
 1   the case?
 2   A.   Yes.
 3   Q.   Very generally speaking, what were your duties with
 4   regard to this specific case?
 5   A.   I was co-case agent with Agent Ely Herbert on this
 6   case, investigating basically a package that came in the
 7   mail.
 8   Q.   And what you believed to be drug trafficking, correct?
 9   A.   Correct.
10   Q.   Let's just move right ahead to Government's Exhibit
11   17.04 which is up on your screen there.
12        Do you recognize that?
13   A.   Yes.
14   Q.   Very generally speaking, what is it?
15   A.   This is a photograph of a text conversation between two
16   people.
17   Q.   Who are the two people?
18   A.   The text is from our confidential source that we
19   obtained with the South Jordan police for this case.
20   Q.   Give us the name.  He is no longer a confidential
21   source.
22   A.   That is Gygi and his communications with Katy Bustin.
23   Q.   Gygi is G-y-g-i?
24   A.   Yes.
25   Q.   First name Sean?
```

```
 1   A.    Sean, yes.

 2   Q.    What were the circumstances of your contact with

 3   Mr. Gygi?  Was a search warrant executed at his residence on

 4   November 17th of 2016?

 5   A.    Yes.

 6   Q.    How did you leave that with him after the search

 7   warrant at his residence?

 8   A.    We basically said that if he had any new information or

 9   anything else he wanted to tell us to please give us a call.

10   Q.    Did he ultimately do that a couple days later?

11   A.    He did.  On November 20th he called us and asked to

12   meet with us and we met with him at the South Jordan Police

13   Department.

14   Q.    Generally speaking, what was nature of your interaction

15   with Mr. Gygi on that date?

16   A.    He explained that he was tasked with delivering

17   packages for Aaron Shamo and that he was due to pick up some

18   packages that day, and said he was about to be asked to pick

19   up packages and wanted to tell us what happened and how he

20   got involved with this case.

21   Q.    Did he say who he would pick up the packages from?

22   A.    He gave the name of Katy, the female that he would

23   communicate with about package pickup times.

24   Q.    How would he communicate with Katy?

25   A.    Through a text, but it was through an app, a phone
```

1    application that would protect his text and it wouldn't

2    document it with the phone company.

3    Q.   Sort of like encryption or sort of like the texts would

4    disappear or can you explain how that worked?

5    A.   Many apps work the same, but this app would allow the

6    communications not to be saved on the phone, and could not

7    be saved by the phone company, and also gave them the

8    opportunity to not let the screen be photographed.

9         For example, if on your phone you wanted to document

10   what you're looking at, you can do a screen shot.  It is

11   usually by hitting the volume button and the power button

12   and a screen shot would set on your phone and you would save

13   it as a photo.  This app would actually stop that from

14   happening, or it would let the other user know that, hey,

15   the text had been screen shotted.

16   Q.   You said you recognized Government's Exhibit 17.04 that

17   is in front of you.  Where did you first see that or obtain

18   that?

19   A.   This is a picture I took with my phone to document the

20   text between Gygi and Katy.  The reason we took a picture

21   with my phone is we were worried about Katy knowing that we

22   were documenting the conversation and we didn't want her to

23   see that he screen shotted the phone.  It was basically to

24   protect him from being known that we're documenting the

25   text.

1    Q.    So you actually took a physical picture with your

2    camera --

3    A.    Correct.

4    Q.    -- of Mr. Gygi's phone basically sitting on a table?

5    A.    Yes.

6    Q.    That is what we see on the brown edges is basically a

7    table that his phone was sitting on?

8    A.    Yes.  The reason why it is two pictures is we scrolled

9    down to get the full day's conversation.

10   Q.    So based on your conversations with Mr. Gygi, this was

11   the conversation that was going on on November 20th of 2016

12   between he and this Katy?

13   A.    Yes.  While we were sitting with him in the police

14   department he was still communicating with Katy to arrange a

15   pickup time.

16   Q.    Now, give us some context for that.  Was that something

17   that he normally did?

18   A.    According to him, he picked up six times a week so they

19   communicated daily on pickup times and locations on where

20   the packages were to be dropped off so this was normal

21   conversation.  We didn't ask him to say anything specific

22   other than to arrange a pickup for that day.

23        So if you read the communications it is basically them

24   talking about, hey, I have something going on.  Can we

25   arrange a time?  Then them picking a location where the

1    packages are to be dropped off.

2    Q.   So from Government's Exhibit 17.04, who is texting the

3    green bubble and who is texting the white bubble?

4    A.   Let me make sure.

5         So the green bubble is Gygi and the white bubble is

6    Katy responding to him.

7    Q.   And so you viewed this conversation and took a picture

8    of it, correct?

9    A.   Correct.

10   Q.   Did any action occur that was consistent with this

11   conversation?

12   A.   The last communication was essentially to go ahead and

13   pick up packages.  We also had somebody performing

14   surveillance on the house where Katy lived, and a female was

15   observed leaving the house and putting packages on the

16   porch.

17   Q.   Did Mr. Gygi then go pick those up?

18   A.   We did follow him to the house where he put the

19   packages in his trunk and we followed him back to the police

20   department and took custody of the packages at the police

21   department.

22   Q.   So is this a fair and accurate representation, this

23   meaning Government's Exhibit 17.04, of what you observed and

24   took a picture of on that date?

25   A.   Yes.

1    Q.    For context, are Mr. Gygi and this Katy, based on your

2    investigation, coconspirators in this enterprise?

3    A.    Yes.

4    Q.    What were their respective roles based on your

5    investigation?

6    A.    Gygi was to deliver packages and Katy was to prepare

7    the packages and put the quantity in and put the labels on

8    them.

9    Q.    When you say deliver, Mr. Gygi would pick them up from

10   Katy and place them in the mail stream?

11   A.    Physically put them in different post office locations,

12   yes.

13   Q.    Following your photograph of these text messages, what

14   did you do to preserve this?

15   A.    The pictures were put into the D.E.A. case file and put

16   on a disk and put into D.E.A. evidence.

17   Q.    I'm going to hand you this exhibit which is a disk.

18   Are your initials on that?

19   A.    Yes.

20   Q.    Does that indicate that you reviewed this disk and that

21   the exhibit on there fairly and accurately shows the picture

22   that you took of these texts?

23   A.    Yes.

24           MR. STEJSKAL:  I would offer Government's Exhibit

25   17.04 at this time.

```
1              THE COURT:  Any objection?

2              MR. SKORDAS:  No, Your Honor.

3              THE COURT:  17.04 is received.

4              (Plaintiff's Exhibit 17.04 was

5               received into1 evidence.)

6              MR. STEJSKAL:  I have no further questions for

7    this witness.

8              THE COURT:  Do you have any questions?

9              MR. SKORDAS:  No, Your Honor.

10             THE COURT:  You may step down.

11             MR. GADD:  Your Honor, those are all of our

12   in-town witnesses.  In Mr. Power's case, and he is actually

13   an out-of-town witness now, but he came early enough that we

14   were able to call him today.  We have a few witnesses flying

15   in for tomorrow morning, but we don't have anything more for

16   the Court today.

17             THE COURT:  Do you have anything else today?

18             MR. SKORDAS:  No, Your Honor.  Thank you.

19             THE COURT:  Tomorrow you have some witnesses and

20   they will be here at 9:00?

21             MR. GADD:  Yes, sir.

22             THE COURT:  Then Friday we will have Mr. Wheeler

23   here.

24             When were you going to file a reply brief on the

25   continuance motion?
```

1          MS. BECKETT:  We can file that tomorrow, Your

2     Honor, by the end of tomorrow.

3          THE COURT:  So maybe we can take that up Friday

4     too.

5          MR. GADD:  Yes.

6          MS. BECKETT:  That would be our intention.

7          THE COURT:  Now, if I gave you a continuance, how

8     much of a continuance do you want?

9          MS. BECKETT:  Your Honor, that is the problem.

10    The only e-mail I have from Mr. Wheeler, who just received

11    the information yesterday, is that there are roughly six

12    terabytes worth of data, which is five terabytes more than

13    we were provided previously, and he is working diligently to

14    review that, but it is going to take some time.  I don't

15    have a specific number on that, which is what I'm hoping to

16    have on Friday is a more specific number of how much time he

17    is going to take.

18         THE COURT:  Friday, day after tomorrow?

19         MS. BECKETT:  Correct.

20         THE COURT:  And you don't think any continuance is

21    justified?

22         MR. GADD:  If there is a continuance that needs to

23    happen, it may be the Daubert hearing to give Mr. Wheeler

24    more time.  He has been set back a week and we're happy to

25    give him an extra week or even three weeks or four weeks and

1    we could have the hearing --

2              THE COURT:  We could do it late afternoon of a

3    trial day I suppose.

4              We'll see you tomorrow at 9:00.  Thank you.

5              We'll be in recess.

6              (Proceedings adjourned.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25