1              IN THE UNITED STATES DISTRICT COURT

2                        DISTRICT OF UTAH

3                        CENTRAL DIVISION

4

5    UNITED STATES OF AMERICA,       )

6              Plaintiff,            )

7    vs.                             )      Case No. 2:16-CR-631DAK

8    AARON MICHAEL SHAMO,            )

9              Defendant.            )

10   _____)

11

12

13           BEFORE THE HONORABLE DALE A. KIMBALL

14           -------------------------------------

15                      August 26, 2019

16

17                        Jury Trial

18

19

20

21

22

23

24

25

1                    A P P E A R A N C E S

2

3    For Plaintiff:              S. MICHAEL GADD
                                 348 East South Temple
4                                Salt Lake City, Utah

5                                VERNON G. STEJSKAL
                                 111 South Main Street
6                                Suite 1800
                                 Salt Lake City, Utah
7
                                 KENT A. BURGGRAAF
8                                348 East South Temple
                                 Salt Lake City, Utah
9

10   For Defendant:             GREGORY G. SKORDAS
                                KATYLIN V. BECKETT
11                               560 South 300 East
                                 Suite 225
12                               Salt Lake City, Utah

13                               DARYL P. SAM
                                 5955 South Redwood Road
14                               Suite 102
                                 Salt Lake City, Utah
15

16

17

18

19

20

21
     Court Reporter:            Ed Young
22                               351 South West Temple
                                 Room 3.302
23                               Salt Lake City, Utah 84101-2180
                                 801-328-3202
24                               ed_young@utd.uscourts.gov

25

```
                        I N D E X


Witness                   Examination              Page
-------                   -----------              ----

Daniel Ashment            Mr. Gadd (Direct Cont.)   1737
Daniel Ashment            Mr. Skordas (Cross)       1789
Daniel Ashment            Mr. Gadd (Redirect)       1837

Rebecca Shamo             Mr. Skordas (Direct)      1843
Rebecca Shamo             Mr. Gadd (Cross)          1857
Rebecca Shamo             Mr. Skordas (Redirect)    1862

Stephanie Shamo Arbelaez Ms. Beckett (Direct)      1863
```

```
Exhibit                                       Received
-------                                       --------
 (No exhibits received.)
```

```
 1   August 26, 2019                              8:30 a.m.

 2                      P R O C E E D I N G S

 3

 4            THE COURT:  Good morning.

 5            Are you ready to proceed?

 6            MR. SKORDAS:  Yes, Your Honor.

 7            THE COURT:  You may resume the stand.

 8            (WHEREUPON, the jury enters the proceedings.)

 9            THE COURT:  Welcome back, ladies and gentlemen of

10   the jury.  We appreciate your promptness and your work.  Let

11   me remind you that you're not to talk with anyone about the

12   case or permit anyone to speak to you about it.  We'll

13   proceed.

14            You may proceed, Mr. Gadd.

15            MR. GADD:  Thank you, sir.

16                      DANIEL ASHMENT

17            Having been previously sworn, was examined

18                  and testified as follows:

19                 DIRECT EXAMINATION (Cont.)

20   BY MR. GADD

21   Q.   Good morning.

22   A.   Good morning.

23   Q.   When we left off on Friday we were talking about the

24   individuals on the chart to your left, correct?

25   A.   Correct.
```

1    Q.   I am going to change gears now and talk about some

2    topics and ask you questions about what you found as you

3    looked through the defendant's devices.

4         Could we first start with drug income?  You worked with

5    Special Agent Slagle in this case, right?

6    A.   Yes.

7    Q.   You heard the evidence about seizing Bitcoin from

8    wallets found and accessed on the defendant's devices?

9    A.   I did, yes.

10   Q.   Did you find additional evidence of Mr. Shamo's income

11   from selling drugs as you looked through his electronic

12   devices?

13   A.   Yes.  There were numerous instances of income from

14   distributing and selling drugs, yes.

15   Q.   Let's look through a few of those exhibits.

16             MR. GADD:  Could we start with Exhibit 14.22?

17             THE COURT:  14?

18             MR. GADD:  Yes.  14.22.

19             (WHEREUPON, Exhibit 14.22 was played.)

20   BY MR. GADD

21   Q.   Should we try that one more time?

22   A.   It was not working on this monitor.  It is up there

23   now.

24             MR. GADD:  Could you folks see?

25             Let's try that one more time.

```
 1              (WHEREUPON, Exhibit 14.22 was played.)

 2   BY MR. GADD

 3   Q.   How many money counters were found at the defendant's

 4   residence during the search?

 5   A.   We found two money counters during the search of his

 6   residence.

 7   Q.   Let's look at Exhibit 14.34.

 8        Do you recognize this?

 9   A.   I do, yes.

10   Q.   Was this found on his iMac computer?

11   A.   It was.

12   Q.   What are we looking at there?

13   A.   It is a price structure for different types of pills.

14   At the top you see the M box and then a quantity would be

15   times ten and then you see a pricing structure.  It would be

16   $110.  And then on the bottom row you would see the Roxy and

17   the pricing structure for that.  So as you go down this list

18   you'll see 100 -- X-100, so 100 pills would be $850.  Then

19   250 would be $2,400.  So as they would sell larger

20   quantities of the pills -- you get down to 10,000 in the M

21   box, which would be as little as $40,000 or $4 per pill.

22        Also, the same with the Roxy pills, starting out at 100

23   would be $859, and then down to 10,000 pills would be

24   $40,000 or $4 per pill.

25   Q.   Let's talk for a minute about an e-mail with his
```

1     landlord.

2              MR. GADD:  Could we look at 21.18?  Go to page 2.

3     BY MR. GADD

4     Q.   Do you recognize this?

5     A.   I do, yes.

6     Q.   This has come up previously in testimony, correct?

7     A.   Correct.

8     Q.   This is an e-mail from the defendant to his potential

9     landlord, Mr. Lapin?

10    A.   It is.

11    Q.   In there he indicates that he has a wallet, correct?

12    A.   Yes.

13    Q.   Read the line where he says, hey, here is --

14    A.   Hey, here is our incoming Bitcoin wallet.  Any profits

15    made come here first and then distrusted to investors, my

16    two employees and myself.

17    Q.   What is the date that he sent that?

18    A.   November -- Friday, November the 13th of 2015.

19    Q.   Then there is a link that's shown in blue.  Is the last

20    part of that link that starts 1 H.M.O., is that his wallet

21    address?

22    A.   That is his wallet address, yes.

23    Q.   This was his main wallet, correct?

24    A.   Yes, it was.

25    Q.   Down below that link he writes it should come up.  Will

1  you read that?

2  A.   It should come up as U.S.D., U.S. dollars, but if not,

3  then it will say -- then it has the total received below

4  that.

5  Q.   What is the total there?

6  A.   1,443 Bitcoins plus some decimals.

7  Q.   You have looked at this wallet --

8  A.   I have.

9  Q.   -- a lot?

10  A.   A lot, yes.

11  Q.   So 1,443 Bitcoin as of November 13th, 2015?

12  A.   Yes.

13  Q.   Once Mr. Shamo was arrested no more Bitcoin went into

14  his main wallet, did it?

15  A.   No, they did not.

16  Q.   And he was arrested a year and a week -- so 53 weeks

17  after this, correct?

18  A.   Yes, he was.

19  Q.   Once he was arrested you were still able to see the

20  total amount of Bitcoin that had gone into his main wallet,

21  correct?

22  A.   That is correct, we were.

23  Q.   So 53 weeks after he sent this, was the total received

24  in that wallet approximately 4,459 Bitcoin?

25  A.   Yes.  That is my memory.  Over 3,000 additional

1    Bitcoins had come into the wallet.

2    Q.   In a one-year period?

3    A.   In a one-year period, yes.

4    Q.   Let's talk for a minute about gift cards.  Did you find

5    evidence that Mr. Shamo was using Bitcoin to buy gift cards

6    as a way to disguise his drug income?

7    A.   Yes.  We found evidence of gift cards all over the

8    place.  There were numerous gift cards on the computer.

9    Q.   We won't look at all of them, but let's look at just

10   one or two of the exhibits.  Let's look at Exhibit 21.12.

11   Then go to page 2.

12        Is this an example of a gift card?

13   A.   This is an example of one of the gift cards we found,

14   yeah.

15   Q.   If we could look -- how many of these do we do?  Do

16   pages 5, 8 and 11.

17        Another gift card?

18   A.   This is another gift card, yes.

19   Q.   Another?

20   A.   Another Amazon gift card for $500.

21   Q.   This keeps going and going, right?

22   A.   Yeah.  Numerous different types of gift cards

23   throughout, yes.

24   Q.   Let's do one more.

25             MR. GADD:  Could we look at Exhibit 21.13?  Then

1    if we could look at maybe page 2.  Thank you.

2    BY MR. GADD

3    Q.   Do you see that name at the top there?

4    A.   Yes.

5    Q.   Gyft with a y?

6    A.   Yes.

7    Q.   What is Gyft?

8    A.   It is a website you can go to to purchase different

9    types of gift cards.

10   Q.   If we could look at just a handful of these.  This is

11   page 2.  Could we look at page 6?  Page 10.

12   A.   Another Amazon gift card and an additional Amazon gift

13   card.

14   Q.   Page 14.

15   A.   This is a BestBuy gift card for $500.

16   Q.   Did you see evidence of Mr. Shamo using gift cards in

17   his role as leader of the organization?

18   A.   Yes.  We saw evidence and also testimony from

19   individuals involved in the organization that they were paid

20   with gift cards that Mr. Shamo had purchased.

21   Q.   Can Bitcoin be traded directly for gift cards?

22   A.   Yes, it can.

23   Q.   Let's talk for just a minute about the silver bars.

24   Did you find evidence that the defendant was making

25   investments in hard currency?

1   A.   Yes.

2   Q.   Let's look at just one or two of those.  How about

3   Exhibit 21.19, page 2.

4        What is this we're looking at?

5   A.   So this is a receipt from J.M. Bullion for one kilo

6   silver bar.  The total for the bar was $680 plus shipping

7   and handling.

8   Q.   And then if we could look at Exhibit 21.41.

9        This is the metadata, correct?

10  A.   Correct.

11  Q.   And then page 3 here --

12  A.   This is a receipt for an additional silver bar.  You

13  can see that the payment method used on that receipt was a

14  Bitcoin payment.  The total was $684.14 shipped to Mr. Shamo

15  at 7939 South Titian Street.

16  Q.   We jumped through the e-mails kind of fast.  It

17  probably makes sense to explain this.

18           MR. GADD:  Could we look at page 1 real fast?

19  BY MR. GADD

20  Q.   I said this is the metadata.  What does that mean?

21  A.   So the metadata is information that -- when our

22  computer forensic agents, when they create an image for a

23  file they give it to the case agents in that file and the

24  metadata is basically data about data.  So this is data

25  about the image that we found on that computer and it has

```
 1   several different things in it.

 2        I am not the expert on that, but it has several

 3   different factors showing where this came from on the image

 4   that we have been given.

 5   Q.   And it would be like things you might expect in the

 6   header of an e-mail, right?

 7   A.   Correct.  Yes.

 8   Q.   The to and from and the date and the subject line?

 9   A.   Yes.

10   Q.   That is all here?

11   A.   Yes.

12   Q.   And we get it in this format because of the software

13   system that is used to search?

14   A.   That is correct.

15   Q.   All of the e-mail exhibits have this, correct?

16   A.   Yes.

17   Q.   We are just skipping over it?

18   A.   Yes.

19   Q.   To be clear, all these e-mails came from the

20   defendant's e-mail account?

21   A.   Yes, they did.

22   Q.   Let's talk for a minute about his boat and his truck.

23   Did you find evidence that the defendant used drug proceeds

24   to purchase his truck?

25   A.   We did, yes.
```

1    Q.   Likewise, did you find evidence that the defendant used

2    drug proceeds to purchase his part of his boat?

3    A.   Yes, we did.

4    Q.   Let's look at those exhibits.  If we could start with

5    14.25.

6         Like on Friday, are the blue text bubbles, is that the

7    defendant?

8    A.   The blue would be the defendant, Mr. Shamo, yes.

9    Q.   And then if we could read those, and maybe we'll do

10   half and then half.

11        Could you read those?

12   A.   Yes.  Mr. Shamo says boats and ho's, within a moji.

13   Then the reply, yes, indeed.  I am pumped for the boat.  Mr.

14   Shamo says same here.  I did some damage to my wallet while

15   in Vegas, but I should be ready for it in a few days.

16        Okay.  Cool.  We just need to figure it out before

17   Friday or we'll lose that deposit.  Mr. Shamo replies, yeah,

18   I have the Bitcoins, it is just pulling it to cash is the

19   issue.  I might use Mile's 18K, and then I get 10K tomorrow

20   from a trade, so that alone should be okay.  I have it, but

21   need it in cash.  It's complicated, L.O.L.

22             MR. GADD:  Could we look at 14.23?

23   BY MR. GADD

24   Q.   It is upside down, but does that appear to be the boat?

25   A.   Yes, it does.

1   Q.   That is sent from the person with whom he is

2   communicating.  We ought to point out who that is.  Jump

3   away from this for a second.

4           MR. GADD:  Can we pull up 17.06?

5   BY MR. GADD

6   Q.   These text messages about the boat that we have been

7   reading, are they with Mr. Roy Stephens?

8   A.   Yes.  They are with Mr. Roy Stephens who is directly

9   underneath Paz on the bottom row there.

10  Q.   Were you able to determine what his role was in Mr.

11  Shamo's organization?

12  A.   Yes.  Mr. Stephens was recruited by Mr. Shamo and paid

13  by Mr. Shamo to be a package receiver for the drug

14  trafficking organization.

15  Q.   He was interviewed as well?

16  A.   He was.

17  Q.   In addition to receiving packages, was he also a friend

18  of Mr. Shamo?

19  A.   Yes, they were friends also.

20  Q.   They went in on this boat together?

21  A.   Went in on a boat and --

22          MR. GADD:  Let's pick up the last boat message.

23  Could we look at Exhibit 14.24?

24  BY MR. GADD

25  Q.   Then if you want to read that to us --

1   A.   Okay.   Mr. Stephens says it is going to be so fun.

2   Want to come out at about 5:00?   Mr. Shamo replies I don't

3   know if I will be able to make it out tonight, but I

4   definitely want to see the boat soon, maybe in the next few

5   days.   Mr. Stephens replies, okay, sounds good.   Mr. Shamo

6   says, what is our boat, a 2015 Moomba?   Mr. Stephens

7   replies, yup, Moomba Mojo.

8   Q.   Let's talk for a minute about his truck.

9        MR. GADD:   Could we look at Exhibit 14.26?

10  BY MR. GADD

11  Q.   And then if you could read that top half and then the

12  bottom half to us.

13  A.   Mr. Stephens says that is what Miles sent me for the

14  truck.   Tell Shamo I need a check -- sorry.   It looks like

15  this one, the second one got sent before the first one.   It

16  should start out with the second text there.   Mr. Stephens

17  says tell Shamo I need a check for $25,582.   Then Mr.

18  Stephens says that is what Miles sent me for the truck.

19  Q.   Can I jump in?

20  A.   Go ahead.

21  Q.   Do you see this sometimes when someone forwards a text

22  from another person?

23  A.   Oftentimes you see it where one shows up before the

24  other, yes.

25  Q.   And they are within three seconds?

1    A.   Yes.

2    Q.   Pick up with Mr. Shamo's response.

3    A.   Yes.  Then Mr. Shamo says, wait.  How much is the

4    truck?  I thought it was 32K.  Mr. Stephens replies, 40,

5    meaning 40,000.  Mr. Shamo says, okay.  I'll need two more

6    days to pull out more Bitcoin.  Mr. Stephens replies, okay,

7    no problem.

8    Q.   Let's talk for a minute about gambling.  There has been

9    some testimony that the defendant liked to gamble.  Did you

10   see evidence of that in his e-mails?

11   A.   Yes.  There were several e-mails indicative of gambling

12   in his e-mails.

13          MR. GADD:  Let's look at Exhibit 21.43.  If we

14   could look at page 2.

15   BY MR. GADD

16   Q.   What is this?

17   A.   This is an e-mail to Mr. Shamo from the website

18   wintrillions.com.  Wintrillions.com is a gambling website

19   that you can go to.  Something that I noted in this e-mail

20   is his login was airshamo4@hotmail.com, which is his e-mail

21   address.  And also the password mollydog3 which, as Agent

22   Slagle indicated, was a common password that Mr. Shamo used.

23   Q.   He seemed to like variations on that one theme,

24   correct?

25   A.   Correct.

```
 1   Q.   Some sort of molly dog and then a three and some other

 2   numbers and sometimes an exclamation point?

 3   A.   Several instances of that, yes.

 4   Q.   Let's look at one more of these gambling e-mails.

 5            MR. GADD:  Let's look at Exhibit 21.03.

 6   BY MR. GADD

 7   Q.   What is this?

 8   A.   This is an e-mail to Mr. Shamo also regarding cloudbet.

 9   Cloudbet is a website that you can go to to gamble

10   cryptocurrency and Bitcoin specifically.

11   Q.   Read just the top box to us.

12   A.   Sure.  Hi, airshamo4@hotmail.com.  Welcome.  And we

13   would personally like to thank you for choosing to open an

14   account with cloudbet.  At cloudbet we offer an array of

15   sporting events, live casino and online casino games

16   totaling to more than 200, making for a more exciting and

17   thrilling experience for our passionate Bitcoin players.

18   Q.   On this broader subject of drug income, let's talk for

19   just a minute about Mr. Shamo's clothing and other household

20   expenses.

21        Did you see the exhibit and hear testimony that the

22   defendant has had no legitimate income since the first

23   quarter of 2015?

24   A.   Yes, I did.

25   Q.   Did you find evidence in his e-mails of spending that
```

1    showed substantial disposable income?

2    A.   Yes.

3    Q.   Let's look at a few.

4         MR. GADD:  Could we look at Exhibit 21.06?  Then

5    if we could go to page 2.

6    BY MR. GADD

7    Q.   What is this?

8    A.   This is a receipt to Mr. Shamo, and if you look it says

9    Dear Mr. Shamo your order has been acknowledged.  Then at

10   the bottom it is for Diesel Buster, a pair of jeans that

11   were $278 jeans.

12   Q.   Do you own any jeans that cost $300?

13   A.   No, I do not.

14        MR. GADD:  Let's look at Exhibit 21.20.  Page 2.

15   BY MR. GADD

16   Q.   What is this?

17   A.   This is a communication from Molly Maid for cleaning

18   services at his residence.

19        MR. GADD:  Let's look at Exhibit 21.30.  I think

20   we might be zoomed in a hair, and if we could zoom out --

21   BY MR. GADD

22   Q.   Can you tell what that is?

23   A.   Yes.  This is a receipt from overstock.com for an

24   88-inch television.

25        MR. GADD:  Then, lastly, could we look at 21.32?

```
 1    BY MR. GADD
 2    Q.   What is this?
 3    A.   This is a receipt from R.C. Willey for $2,200 --
 4    approximately $2,200 for a bedroom set that he purchased.
 5    Q.   This was purchased in approximately April of 2016?
 6    A.   Yes, purchased in April of 2016 and sent to his home on
 7    Titian Street.
 8    Q.   Let's change gears now and not talk about income so
 9    much, but could we talk about his oversight of the
10    manufacturing process?
11    A.   Sure.
12    Q.   Did you find evidence on his devices that the defendant
13    kept a list of addresses of many of his package receivers?
14    A.   Yes, he did.
15    Q.   Let's take a look.
16         MR. GADD:  Could we go to 14.35, and then start
17    there at the bottom where it says Jessica Gleave.  Go on to
18    the second page.
19    BY MR. GADD
20    Q.   Do you recognize these names?
21    A.   I do, yes.  These names are part of the drug
22    trafficking organization.  They would be the package
23    receiver, drops, or in the case of Mr. Gygi the courier for
24    the organization.
25    Q.   He started out as a drop, correct?
```

1    A.   He did, yes.

2    Q.   Was this list found on the defendant's iMac?

3    A.   It was.

4    Q.   Let's talk specifically about some efforts that the

5    defendant took to conceal his purchases.  Did you find

6    evidence in his e-mails that he was attempting to conceal

7    the nature of his payments when he would purchase

8    ingredients?

9    A.   Yes, we did.

10   Q.   Let's look at just a few of those.

11            MR. GADD:  Could we look at Exhibit 21.04?  Go to

12   page 3.

13   BY MR. GADD

14   Q.   On a lot of these e-mails my hope is that we will read

15   them roughly chronologically, so usually that means starting

16   at the end and working our way up.

17        Here on page 3 are you able to tell what he is doing?

18   A.   Yes.  So on page 3 you can see just up at the top it

19   says regards from coinsfer.com, c-o-i-n-s-f-e-r dot com, and

20   you can see the Tablet Press Club formula 5,000 for one

21   kilogram, so Coinsfer was a way that you can use Bitcoin to

22   have another person purchase products to conceal the true

23   identity of the buyer.

24   Q.   And Coinsfer provides a service for a fee?

25   A.   Yes.

1    Q.    Now, if we can go up to the bottom of page 2, which

2    will give us the next part of that, and if you can read --

3    maybe for all of our benefit can you just summarize what

4    Coinsfer is after here?

5    A.    Sure.  On this one I believe Mr. Shamo had asked about

6    pricing and Coinsfer had a limit that they were able to get

7    to.  So they say as ludicrous as these laws and regulations

8    are, we must make every effort to comply with them so as to

9    avoid legal issues.

10       Then they talk to him about the amount of what he was

11   purchasing, and it was going to be over the $1,000 per day

12   amount that they were able to use at that time.

13           MR. GADD:  If we can zoom out -- and then if we

14   can go up just one e-mail, so the middle of this page now.

15   BY MR. GADD

16   Q.    This is going to be Mr. Shamo's response to their

17   clarifications, correct?

18   A.    Sure.

19   Q.    Would you read his response?

20   A.    Mr. Shamo says thank you for getting back to me so

21   fast.  Is there any way to receive a higher limit?  I notice

22   your website used it a few times and I hope I can use it

23   long term, but really want to make purchases higher than

24   $1,000 at a time.  This is a perfectly legal item that I'm

25   trying to purchase.  I am not trying to use it for a

1   legitimate purpose.  It will be used for my pre-workout

2   company that I'm starting shortly so I am very excited to be

3   working with you closely on this.  Please walk me through

4   how we can make this happen.  I'm only confused on the part

5   with the temp card.  Is this card just to use during

6   checkout on the company's website?

7        Also, why are you only allowed $1,000 per day?  I can

8   transfer the full amount via Bitcoin to speed up the

9   process.  Just provide a Bitcoin address and I can transfer

10  immediately.  Thank you, Aaron.

11  Q.   This wasn't the only example of Mr. Shamo trying to use

12  a service like this to hide his purchases, correct?

13  A.   Correct.

14  Q.   Let's look at another one.  Let's look at 21.15.

15       Do you recognize this?

16  A.   I do, yes.

17  Q.   What is this?  What are we looking at?

18  A.   This is communications from all4btc, and at the bottom

19  you can see it there, and all4btc was a service similar to

20  Coinsfer where you could use Bitcoin to pay the company and

21  they would purchase products for you using their credit card

22  or some other means to conceal the identity of who was

23  purchasing those products.

24  Q.   This is addressed to Sean Gygi, correct?

25  A.   Correct.

```
1    Q.   But it is an e-mail that came to the defendant's

2    account?

3    A.   It was.

4    Q.   Let's see if we can connect the dots.

5              MR. GADD:  Can we look at 21.37?  Can we look at

6    page 2?

7    BY MR. GADD

8    Q.   Is this a forward from all4btc?

9    A.   It is, yes.

10   Q.   I want to ask you a couple questions about that.  You

11   see who it is from.  It is an invoice, right?

12   A.   Correct.

13   Q.   From Press Club Nutrition?

14   A.   Yes.

15   Q.   Is that kind of the business behind

16   tabletpressclub.com?

17   A.   It is.  Tabletpressclub.com, yes.

18   Q.   Do you see payment info?

19   A.   Yes, I do.

20   Q.   Whose credit card is listed?

21   A.   So it is listed as a Visa under the credit card and the

22   name is Martin Mischke, M-i-s-c-h-k-e.

23   Q.   Does that name mean anything to you?

24   A.   No, it does not.

25   Q.   I think you heard Special Agent Koeneman on his
```

```
1    cross-examination say something to the effect of we

2    interviewed a lot of people.  Is that true?  Did you

3    interview a lot of people?

4    A.   We did interview a lot of people, yes.

5    Q.   A lot of people?

6    A.   Yes.

7    Q.   This name never came up?

8    A.   Martin Mischke never came up, no.

9    Q.   Are you able to see the date on the invoice at the top?

10   A.   Yes.  October 13th of 2016.

11   Q.   This is for that same Formula 5000 that he prefers

12   buying from Tablet Press Club, right?

13   A.   Correct.  At the bottom in the gray you can see the

14   item and what that was, Tablet Press Club, Formula 5000, one

15   kilogram, and then the quantity would be 40.

16   Q.   40 kilograms?

17   A.   40 kilograms of that, yes.

18   Q.   In structuring his purchases like this, did it help Mr.

19   Shamo to remain anonymous?

20   A.   It does, yes.

21   Q.   His name is nowhere on this invoice, correct?

22   A.   No.

23   Q.   But he still got all of the product?

24   A.   Correct.  It is not in the payment information.  It is

25   not in the shipping information, nowhere on here.
```

 1   Q.   Let's talk for a minute about quality control under

 2   this larger umbrella of his oversight of the manufacturing

 3   process.  There was a time early on when a bad batch of

 4   Alprazolam led to the defendant being banned from a

 5   different dark net market, correct?

 6   A.   Correct.

 7   Q.   Did you see evidence that the defendant took steps to

 8   try to ensure that his Alprazolam pills actually contained

 9   Alprazolam?

10   A.   Yes, we did.  Alprazolam and other pills he attempted

11   to ensure that that is what it contained, yes.

12   Q.   Let's look at just two of those exhibits.  Let's look

13   at 21.05.

14        Do you recognize this?

15   A.   I do.

16           MR. GADD:  I guess we can highlight the whole

17   thing.

18   BY MR. GADD

19   Q.   The defendant is asked a question kind of in the middle

20   of the screen there, right?

21   A.   Yes.

22   Q.   What was it that he asked?

23   A.   He is asking this company if they do purity and drug

24   testing.

25   Q.   Will you read what he said?

1    A.    Sure.  It says, hey, do you guys do purity and drug

2    testing?  Nothing illegal, but I have a friend that gave me

3    a few Xanax pills, and I just wanted to see the purity and

4    see if they are what he says they are.  Is there a way to do

5    this?  Thanks.

6    Q.    And then their response is at the top.

7    A.    Their response and they reply, dear sir, we can only

8    accept controlled substances from D.E.A. registered

9    entities.  Our base cost for G.C.M.S. analysis is $350.

10   Q.    Let's look at one more.

11         MR. GADD:  Could we look at 21.11?  Go to the next

12   page.

13   BY MR. GADD

14   Q.    Do you recognize this?

15   A.    I do, yes.

16   Q.    What is this?

17   A.    This is a receipt for test kits for benzodiazepines and

18   Xanax is a type of benzodiazepine.

19   Q.    Specifically the Alprazolam, right?

20   A.    Correct.  Alprazolam.  It also has an Ecstasy test kit

21   on here.

22   Q.    How did he pay for these test kits?

23   A.    Bitcoin, through Bitcoin.  You can see at the bottom,

24   the second line up, the payment method was Bitcoin.

25   Q.    Let's talk about punches and punch tips and dies and

1    things of that nature.

2         Even though he employed Luke Paz to help him press, did

3    you find evidence that Mr. Shamo maintained some control

4    over buying parts and supplies for the pill presses?

5    A.   Yes, we did.

6    Q.   Let's look at just a few of those exhibits.

7              MR. GADD:  Could we go to 21.21?  Then if we can

8    start all the way at the end.

9    BY MR. GADD

10   Q.   We'll go through a number of them back and forth.  We

11   won't hit them all.  If we do this right we will be

12   chronological.  Between you and me and Ms. Lauder my hope is

13   that we'll be able to follow it.  Okay.

14        The e-mail you see on the screen there, the first

15   e-mail, what is happening here?

16   A.   So this e-mail is from a Chinese company who is

17   reaching out to Mr. Shamo and saying that they are able to

18   create replica dies or dies for Xanax -- Xanax dies and also

19   for A-215, which are a type of fake Oxycodone pills that the

20   drug trafficking organization was pressing.

21   Q.   And then they indicate kind of their prices for each?

22   A.   Correct.

23             MR. GADD:  If we can scroll up, so now we would be

24   at the bottom of the next page.

25   BY MR. GADD

1    Q.   Do you see there at the bottom, kind of the bottom main
2    block, is that Mr. Shamo's response?
3    A.   Yes.  Mr. Shamo replied to that e-mail from the Chinese
4    company.
5    Q.   Would you read what he wrote?
6    A.   Yes.  So the Chinese company was named Kos Business as
7    you can see in the line up above.  The subject is ZP-12
8    rotary tablet press machine.  Mr. Shamo replied to that
9    e-mail and he said sounds good.  I would like both dies
10   made.  Do you accept Bitcoin as payment?  I would like you
11   to get started immediately, and the mold would be for a
12   Z-P-9-A mini rotary tablet press.
13   Q.   There are two things in that e-mail that will be themes
14   as we go throughout the rest of them, right?  Specifically,
15   payment and then whether or not their product will fit his
16   machine, right?
17   A.   Correct.  Throughout the series of e-mails you see both
18   of those, yes.
19   Q.   Now, you can see at the top of the page we're looking
20   at on the screen, and it scrolls up to the next one, and why
21   don't we actually scroll up.  Okay.
22        What is their response there?
23   A.   So their response is, hello, friend.  So sorry, friend.
24   The payment -- we can't accept Bitcoin.  We just accept
25   Western Union and T.T. payment.

```
1          Should I read the whole thing?

2    Q.    That is probably good.

3    A.    Okay.

4    Q.    They give him, if he wants to order, the name to wire

5    it to?

6    A.    How he is able to pay, yes.

7    Q.    Sure.

8    A.    They also give the Western Union information below, the

9    name and also the country for Western Union payment.

10   Q.    Why don't we keep scrolling up and we'll see his

11   response to whether or not he can send it Western Union.

12         Right there.

13   A.    Mr. Shamo said he couldn't do Western Union and asked

14   them if he could do MoneyGram.

15   Q.    Then did he indicate which of the molds he wanted?

16   A.    And that he would like to buy the A-215 first and then

17   the Xanax mold.  Again, the A-215 is the fake Oxycodone

18   where they were using Fentanyl as the active ingredient.

19   Q.    Let's keep scrolling up and let's see what their

20   response is to his request to send it by MoneyGram.

21         Do you see that there?

22   A.    Yes.  Then Kos Business, the Chinese company, replied

23   that it is no problem to pay by MoneyGram.  Then they again

24   reiterate what he is purchasing, which would be the replica

25   dies or just the dies, giving the pricing structure and then
```

1   the name on MoneyGram that he can send it to.

2   Q.   That name, the first name that is Q-i and the last name

3   that is C-h-e-n, we're going to see that in a few minutes,

4   right?

5   A.   We will, yes.

6   Q.   Let's keep going up.  The next one up is Mr. Shamo at

7   the top there, right?

8   A.   Correct.

9   Q.   And he is sending them indications that he has sent the

10  money?

11  A.   That he has paid for it, yes.

12  Q.   Let's keep going.

13       They have a question for him at the bottom of this

14  page, correct?

15  A.   Correct.

16  Q.   What is their question for him?

17  A.   Their question is that they want him to send the name

18  that he is using for MoneyGram so they are able to withdraw

19  that money.

20  Q.   And then if we go up -- he does not answer their

21  question initially, correct?

22  A.   There was a little bit of confusion.  He was

23  thinking -- well, he replied with the place he wanted it to

24  be sent.

25  Q.   That is one of his package receivers, right?

1   A.   Correct.  Julian Mausia is a package receiver for the

2   drug trafficking organization.

3   Q.   And then at the top of this page they ask their

4   question a second time, correct?

5   A.   Correct.

6   Q.   They essentially want to know what name?

7   A.   Yes.  They are just asking for the MoneyGram

8   information rather than where it is to be sent.

9          MR. GADD:  If we could scroll up one more, we'll

10  see his response.

11  BY MR. GADD

12  Q.   This time he will answer their question, right?

13  A.   He answers the question this time for MoneyGram and

14  says the MoneyGram sender's name is Aaron Shamo and the

15  country is the United States.  Therefore, they could

16  withdraw that money.

17  Q.   Then he repeats what package receiver he wants this

18  sent to, right?

19  A.   Then he repeats that he wants it sent to Mr. Mausia,

20  and then he asks a question at the bottom and says how much

21  was the Xanax mold?  I'm ready to buy that.

22          MR. GADD:  Scroll up one more page.  Let's see

23  their response.  Perfect.

24  BY MR. GADD

25  Q.   What was it that they told him?

1   A.   So they said the bank is closed during the weekend, but

2   they will be able to get the payment after the weekend and

3   then they will start to work on his order for the two dies

4   as soon as they can.

5   Q.   And then if he wants to buy the additional mold they

6   are giving him the Xanax price and who to send the money to?

7   A.   Correct.  The total price for Xanax was going to be

8   $2,000.

9   Q.   So back in the beginning I mentioned there were the two

10  themes and you said, yes, payment was a theme and then

11  whether or not their parts would fit his machine.

12       We're going to get into that with this next one, I

13  believe, correct?

14  A.   Yes.

15            MR. GADD:  Scroll up and see what Mr. Shamo sent

16  to the business.  A little higher.  Go all the way to the

17  next line.  There you are.

18  BY MR. GADD

19  Q.   What did Mr. Shamo write to them?

20  A.   He replied that he could wait on the Xanax mold and he

21  was hitting his limits for MoneyGram.  MoneyGram has a

22  certain amount of money that you're able to send during

23  specific time periods and he said I hit my monthly sending

24  limits, but he wanted the A-215 die as quickly as possible.

25  Q.   And then in regard to whether or not their product fits

1    his machine, what did he --

2    A.   He sent a link to the pill press that he was requesting

3    the die for at the bottom as well as the picture that you

4    see there.

5    Q.   That is his pill press, right?

6    A.   It is.

7         MR. GADD:  If we can go up to the next page and

8    we'll go to the middle to Mr. Shamo.  If we keep scrolling,

9    Mr. Shamo is going to ask for an update right here in the

10   middle.

11   BY MR. GADD

12   Q.   Are you able to see that?

13   A.   Correct.  Yes.

14   Q.   Is the date on this April 12, 2016?  So 2016, 4-12?

15   A.   Yes.

16   Q.   What was it that he asked for?

17   A.   He again asked for the status of the A-215 mold and

18   wanted it as quickly as he could get it.

19   Q.   And then they are going to respond at the top of this

20   page.

21        Do you see that there?

22   A.   Yes.

23   Q.   What is their response?

24   A.   They said they checked the status of it and they will

25   send the order on April 21st and they will send him

1    tracking.  As I was reviewing this e-mail, one thing that

2    stood out to me was that middle line and I will just read it

3    if that is okay?

4    Q.   Sure.

5    A.   Recently the United States Customs supervision of this

6    product is very strict.  Can you allow us to ship the goods

7    by E.M.S. delivery for you?  E.M.S. will be safe and easy to

8    pass the U.S. Customs delivery to your home.  As a Customs

9    agent this stood out to me very specifically.  We see this

10   all the time where international actors are trying to bypass

11   Customs and get illegal products through to the United

12   States.

13        MR. GADD:  Let's keep scrolling up.  We're going

14   to hit one of those metadata pages and we have to jump to

15   the top of 21 for our next e-mail.

16   BY MR. GADD

17   Q.   Right there at the top do you see hello, friend?

18   A.   Yes.

19   Q.   And then below that Mr. Shamo's response.  Let's start

20   with his response and then theirs.

21   A.   Mr. Shamo replied, yes, that works, whatever is the

22   safety --

23   Q.   Safest?

24   A.   Whatever is the safest.  Sorry.

25   Q.   You go ahead.

1    A.    Kos Business replied, hello, friend.  Yes, the E.M.S.

2    will be safe and easy than D.H.L. to pass the U.S. Customs

3    delivery to your home.

4    Q.    I don't mean to pick a scab, but he did get his dies

5    and punches.  He got a whole crate full of them?

6    A.    Yes, he did, that we recovered.

7            MR. GADD:  Let's jump to the top of 18.  One more.

8    There we are.

9    BY MR. GADD

10   Q.    In the middle there that is their response, correct?

11   A.    Correct.

12   Q.    Would you read that for us?

13   A.    Yes.  They reply, hello, friend.  Today we sent your

14   order.  The E.M.S. tracking number is -- it gives the

15   number -- and you will receive it on next Friday.  Please

16   check it.  Thanks.  Any questions, please let us know.

17   Q.    Then they have one more follow-up e-mail above that one

18   and let's read that.

19   A.    The follow-up e-mail says, hello, friend.  The parcel

20   has arrived your city.  Please make the phone to your local

21   post office to receive it A.S.A.P. when you receive our

22   message, because if you don't call back to your local post

23   office to receive the parcel before April 30th, the U.S.A.

24   U.S.P.S. company will return the parcel to sender.  We sent

25   the picture of shipping info for you.  Please check it.

1    Q.   That picture is in fact attached and we just scrolled

2    past it, right?

3    A.   Correct, we just scrolled past that.

4    Q.   Let's look very briefly at the bottom page there, 19.

5         They have sent him a screen shot of his tracking?

6    A.   Yes.

7    Q.   If we look at the bottom of that screen shot -- sorry.

8         MR. GADD:  I think we'll have to zoom out just a

9    hair to see where that is coming from.

10   BY MR. GADD

11   Q.   If we look at the bottom, are you able to see where the

12   package originated?

13   A.   Yes, it originated in China.

14        MR. GADD:  From here could we jump to the top of

15   page 9, the next in order?

16   BY MR. GADD

17   Q.   Do you see at the very top there, hello, my friend?

18   A.   Yes.

19   Q.   Can you read that one?

20   A.   Hello, my friend.  I'm happy you already received the

21   parcel.  Today our company pressed some Xanax pills by our

22   ZP-9 machine.  We took some picture.  They are all pressed

23   by our Xanax replica dies.  I'm very happy to share with

24   you.  Please see my attached photos.

25   Q.   And they sometimes have the habit of replying to old

1    e-mails, right?

2    A.    They do, yes.

3    Q.    That is why you get this other one below it?

4    A.    Yes.

5    Q.    Let's just look briefly at their attached photos.  This

6    is pages 11 through 16.  We can just kind of maybe one at a

7    time jump through them.

8          The e-mails go on from here, correct?

9    A.    They do, yes.

10   Q.    I think that that is probably enough.  Let's leave it

11   there.

12         Let's talk for a minute about wire transfers.  We saw

13   in that group of e-mails a name, the first and last name

14   that the Chinese company wanted money sent to.

15   A.    Yes.

16   Q.    Did you find other evidence besides just those e-mails

17   that the defendant was engaged in wiring money to China?

18   A.    Yes.  We found several instances of that.

19   Q.    Let's look at a few.  Let's look at 21.27.  Go to page

20   3.  This is MoneyGram, correct?

21   A.    Yes, this is MoneyGram.

22   Q.    To whom is the defendant sending money?

23   A.    On this the receiver information is about in the middle

24   of the page, and it is that same name that we had seen in

25   those e-mails.  Qi Chen is how I would pronounce it.

1   Q.   Q-i?

2   A.   Q-i, C-h-e-n.  Yes.

3   Q.   Then if we zoom out, how much money did he send?

4   A.   On this one it was approximately $1,495.

5   Q.   This is approximately March of 2016, correct?

6   A.   Yes.  Correct.

7   Q.   Let's look at a couple more.

8        MR. GADD:  Let's try 21.42.  Go to page 2 here.

9   BY MR. GADD

10  Q.   Is this a Western Union money transfer?

11  A.   Yes, it was.

12  Q.   Also going to China?

13  A.   Yes.

14  Q.   You can see the amount just at the bottom here,

15  correct?

16  A.   Correct.

17  Q.   It is $1,100?

18  A.   Yes, approximately.

19  Q.   Could we also look at page 10 on this exhibit?  This is

20  another transfer to China, correct?

21  A.   Yes, it was.

22  Q.   And then it goes on to page 11.  Then you can see the

23  amount there, right, $2,500?

24  A.   Yes, approximately $2,500.  On the previous page you

25  can see it was coming from Mr. Shamo.

```
 1    Q.    These are relatively clear.  Let's see if we can muddy

 2    things up now.

 3              MR. GADD:  Can we look at Exhibit 14.45?  Okay.

 4    BY MR. GADD

 5    Q.    Have you seen this before?

 6    A.    I have seen this before, yes.

 7    Q.    Have you ever had that experience where you go to take

 8    a picture with your cell phone and you accidentally hit

 9    video?

10    A.    I have done that before, yes.

11    Q.    And you just take like a one-second video?

12    A.    Yes.

13    Q.    This is a one-second video --

14    A.    It is.

15    Q.    -- of a screen?

16    A.    Correct.

17    Q.    We have done our best to try and capture it here.  Is

18    this a Western Union payment to China?

19    A.    This is a Western Union payment to China.

20    Q.    For, I believe, roughly $2,100?

21    A.    Correct.  You have to squint just a little bit to see

22    that.  The video makes it a little more clear.

23    Q.    This screen shot is right as he is pulling away on the

24    video, right?

25    A.    Correct.
```

1   Q.   Up at the top, the second full line down, can you see

2   what he is ordering?

3   A.   Boy, with these screens it makes it worse.  Yeah, that

4   word right there is Fentanyl H.C.L.

5   Q.   Fentanyl.

6   A.   Fentanyl hydrochloride, yes.

7   Q.   From China?

8   A.   From China.

9   Q.   Let's move away from that one.

10       Let's talk for a minute about the defendant's -- Mr.

11  Shamo's drug education.  Did you see evidence on the

12  defendant's devices of his efforts to learn the tradecraft

13  of a dark net drug trafficker?

14  A.   As we reviewed Mr. Shamo's devices we saw thousands of

15  references to perfecting the tradecraft associated with drug

16  distribution.

17  Q.   Did you find any instances that the defendant made

18  efforts to learn how to avoid law enforcement detection?

19  A.   Yes, we did.

20  Q.   Let's look through just a handful of the exhibits from

21  his devices starting with 14.31.

22       Do you recognize that?

23  A.   I do, yes.

24  Q.   What are we looking at?

25  A.   This is a chart that we compiled with just some of the

1    Reddit U.R.L.s that Mr. Shamo had looked up.

2    Q.    Will you just explain briefly what Reddit is?

3    A.    Yes.  Reddit is a discussion forum.  It is a website

4    you can go to for discussions and you can go to different

5    sub Reddits they call it, and each sub Reddit is devoted to

6    a different topic, and you can basically look up anything

7    that you want on Reddit.  If you like cars you can look at a

8    sub Reddit for that.

9        In this instance if you like the dark net, you can look

10   up and read about a sub Reddit devoted specifically to the

11   dark net and to distributing drugs.

12   Q.    Let's walk through maybe the first two rows and explain

13   what they mean and then we'll read kind of the topic or the

14   name of the sub Reddit article.

15   A.    Sure.

16   Q.    Will you just explain kind of this U.R.L. on the top.

17   A.    So the U.R.L. is reddit.com and then the sub Reddit

18   would be research chemicals, and then comments and the

19   comments would be regarding a snuff grinder on this one.

20   Q.    What is a snuff grinder?

21   A.    A snuff grinder would be something that you can grind

22   up different types of drugs for consumption.

23   Q.    Let's take one more.  Read the second one down for us.

24   A.    The second one again would be reddit.com.  All of these

25   are reddit.com, and the sub Reddit would be related to dark

1    net markets.  On this specific dark net market that we're

2    looking at it is a vendor review for Xanax Prime, 500 hulk

3    Xanax bars.

4    Q.   And then if we could just focus on like the name of the

5    article, will you read down this chart of selected Reddit

6    U.R.L.s to tell us the types of thing he is reading?

7    A.   Sure.  Going third down the type of article would be

8    here are some of the main methods that police use.  Buyers,

9    stop using your real name and e-mail.  Fentanyl Reagent

10   Test.  Cash out Bitcoin two months before buying a house.

11   TumbleBit versus Mimblewimble.

12   Q.   I probably should jump in for just a minute.  What are

13   those.

14   A.   TumbleBit?

15   Q.   Yes.

16   A.   TumbleBit is a way to tumble bit coins so that you make

17   it so it is difficult to trace where they came from, so you

18   receive -- for instance, you receive Bitcoins on the dark

19   net and they come to your wallet, and then you want to send

20   them out to someone else, but you don't want them to know

21   that it came from the dark net, so you send it to a tumbler,

22   and then that kind of basically spins around and makes it

23   confusing so that they can't trace where they came from.

24   Q.   Does that tumbler, does it kind of, in your example,

25   mix your Bitcoin with everybody else's Bitcoin and then

1    spits it out in small bits?

2    A.    Yes, it does.

3    Q.    There are two above that.  The Fentanyl test, what is

4    that?

5    A.    A Fentanyl Reagent Test would be to test for the

6    presence and purity of Fentanyl.

7    Q.    Kind of like a do-it-yourself at home type of a kit?

8    A.    Yes.

9    Q.    Keep going.

10   A.    The next one after TumbleBit was AlphaBay account

11   frozen.  Below that don't let other people know what you did

12   last.  Is Bitcoin Blender safe to use still?  Stories of

13   people getting busted.  Let's learn from.  Then a wiki super

14   list and then below that, warning, no configuration file

15   found using U.S.B.

16   Q.    So this is no longer in the dark net market sub Reddit.

17   This is a different sub Reddit?

18   A.    Correct.

19   Q.    What sub Reddit is it?

20   A.    This sub Reddit is different.  At the very bottom line,

21   this is the sub Reddit Tails.

22   Q.    Is Tails an operating system?

23   A.    It is.

24   Q.    How is it used?

25   A.    Tails is an operating system that you can plug into

1  your computer to make it so there are no tracks related to

2  what you're doing on your computer.  It uses a T.O.R.

3  browser and different encryptions to hide the things that

4  people are doing.

5  Q.  Is it typically on some sort of portable storage device

6  like a U.S.B. stick?

7  A.  Yes.

8  Q.  All right.  Let's look at some more.  Did you find

9  evidence that the defendant took steps to determine the

10 relative potency of Fentanyl?

11 A.  Yes, we did.

12 Q.  Let's go to 14.38.

13     What is it we're looking at here?

14 A.  This is an opioid potency comparison list and it shows

15 several different types of opioids, and then it is a chart

16 regarding dosages and how long it takes to effect --

17 Q.  We have heard some testimony from two medical doctors

18 about relative potency, correct?

19 A.  Yes, we have.

20 Q.  The defendant found this on the internet?

21 A.  Yes.

22 Q.  This was just on his iMac?

23 A.  Correct.

24 Q.  Specifically are there rows in the chart for both

25 Oxycodone and Fentanyl?

```
 1    A.    Yes, there are.  The Oxycodone is the second row down
 2    and Fentanyl on the fourth row down on the left-hand side.
 3    Q.    Did you find evidence that the defendant took steps to
 4    determine how best to avoid law enforcement detection of
 5    drugs shipped through the United States mail?
 6    A.    Yes, we did.
 7    Q.    Let's look at that.
 8          MR. GADD:  Could we go to 14.39?
 9    BY MR. GADD
10    Q.    What is this?
11    A.    This is a manual on how to ship drugs.  Again, as a
12    Customs agent I found this interesting.
13    Q.    This was found on his iMac?
14    A.    Yes.
15          MR. GADD:  Could we go to page 4 within this
16    manual?
17    BY MR. GADD
18    Q.    Do you see there near the top packaging tips for
19    senders?
20    A.    I do, yes.
21    Q.    How about just reading the first eight or so.
22    A.    Okay.  So it is talking about labeling.  This is for
23    how to ship drugs through the mail.  Labeling.  Use a real
24    return address but make sure it has no connection to you.
25    Ensure the zip code used is the same one of the drop box you
```

1    plan to send the package from.  A generally sound practice

2    is to use the legitimate address of an apartment complex but

3    do not specify an actual number.

4        Two.  Change return addresses, especially the name sent

5    from on a semi frequent basis.  The name used should be

6    generic but not overly common.

7        Three.  Keep the front of the package as clean as

8    possible.  It should have no markings other than a shipping

9    and return address.

10       Four.  Double-check to make sure all information is

11   correct.  Also ensure that all words are spelled correctly.

12       Five.  Both addresses should be typed and printed, not

13   handwritten.  Ensure the printer used has minimal connection

14   to you, paid for in cash from a friend and not used for

15   other things.

16       Six.  Exact postage should be applied neatly to the

17   package.

18       Seven.  Do not seal the package with tape.

19       Eight.  Use self-adhesive envelopes and stamps.

20   Q.   We are not necessarily trying to train anyone on how to

21   commit crime, but is this good advice?

22   A.   This is unfortunately very good advice, yes.

23   Q.   This is what the defendant's employees were doing,

24   right?

25   A.   Correct.

1   Q.   Changing the name on the return address, picking a real

2   address, verifying that all of the information is correct,

3   they were doing all of those things?

4   A.   Yes, they were.

5   Q.   This was found on the defendant's computer?

6   A.   It was.

7   Q.   Did you find evidence that the defendant took steps to

8   determine how best to launder his drug proceeds?

9   A.   Yes, we did.

10  Q.   Look at 14.42.  We won't go through all of this one,

11  but what is this document called?

12  A.   This is a document entitled 100-percent original money

13  laundering method.

14  Q.   Maybe if you just want to read the top two lines for

15  us.

16  A.   Sure.  This guide will anonymously and effectively

17  convert your dirty Bitcoins into clean cash.

18  Q.   That is good.

19       The defendant had a number of different ways he tried

20  to launder his drug proceeds, correct?

21  A.   Correct.

22  Q.   We have talked about some of the documents that you

23  found on the defendant's computer and his phones but mostly

24  the computer, but were you also able to look for evidence of

25  research he had done online to try to learn how to run his

1   criminal enterprise?

2   A.   Yes, we did.

3   Q.   Did you help create a chart that shows some of the many

4   websites that he visited?

5   A.   Yes, we did.

6        MR. GADD:  Let's pull up 14.32.

7   BY MR. GADD

8   Q.   This is just a small selection of the websites he

9   visited, right?

10  A.   Correct.

11  Q.   Will you walk us through what the websites are?

12  A.   Sure.  At the top line there you can see the Sigaint

13  website address.  Again, this was the encrypted e-mail that

14  they used to communicate with each other to facilitate the

15  drug trafficking.

16       The second line is blockchain.info access wallet.  That

17  would be the block chain which is related to the

18  cryptocurrency and to the Bitcoin wallets.  The next line

19  would be uline.  Again, uline is where shipping products and

20  different things of that nature were purchased.  Below that

21  we have aliexpress.  We have three U.R.L.s there related to

22  aliexpress, which were related to the purchasing of the pill

23  presses and the punches, dies and molds and things of that

24  nature.

25       Below that we have Drugs Forum, just a forum that you

1  can go to to learn about illicit drugs and their effect and

2  a lot of things that you want to know and don't want to know

3  about drugs.  Below that would be stopoverdose.org, which is

4  a website related to preventing and stopping overdoses.

5  Q.   If someone had powder Fentanyl in their house and they

6  were using it in a machine that sometimes created dust in

7  the air, would that be a valuable website to look through?

8  A.   That would be very valuable, yes.

9  Q.   All right.  Please keep going.

10 A.   Below that, again, is aliexpress.  Aliexpress is kind

11 of like an Amazon -- a Chinese Amazon website basically

12 where you can purchase many different types of things.

13      Below that we have a YouTube video.  There are two

14 YouTube videos on this chart.

15 Q.   What is the first one?  Did you go and look?

16 A.   So I believe the first one was related to -- let me

17 think for just one minute.

18 Q.   Was it the --

19 A.   It was a D.E.A. informational video that showed the

20 dangers of Fentanyl.  So the D.E.A. put out a video for law

21 enforcement and others to show the dangers associated with

22 Fentanyl.

23      That other YouTube video, which is below the aliexpress

24 pill press line, again, was a V.I.C.E. Video --

25 Q.   Sorry.  What is V.I.C.E.?

1  A.   So a V.I.C.E. video is -- it is like a documentary.  It

2  is kind of like an informational video, and this one in

3  particular was related to Fentanyl and the dangers

4  associated with it.

5  Q.   Go ahead.

6  A.   And then we have Western Union, a way to transfer money

7  overseas.  Below that, the second line from the bottom is

8  Abraxas.  Abraxas was a dark net marketplace, one of the

9  original that they used.  Then, of course, the last line is

10  the AlphaBay dark net website.

11  Q.   My memory is that we go on to the next page, but I

12  think we can leave it here.

13  A.   Sure.

14  Q.   There has been testimony that organizing and running

15  the defendant's organization would not require the defendant

16  to be especially smart.  Do you recall more than one witness

17  explaining that a particular task or aspect of the

18  defendant's work could be learned simply by Googling it?

19  A.   I do, yes.

20  Q.   Did you find evidence that the defendant used Google

21  searches to guide his efforts to build his criminal

22  enterprise?

23  A.   Yes.  We found thousands of Google searches related to

24  this criminal enterprise.

25  Q.   Did you help create a chart showing just some of those

1    relevant search terms that he used?

2    A.   We did, yes.

3         MR. GADD:  Could we look at 14.44?

4    BY MR. GADD

5    Q.   It is hard to narrow down the number of search terms to

6    put in one exhibit, correct?

7    A.   Correct.

8    Q.   Let's just go through the first six pages.  Here is

9    kind of how I'm hoping it will work.  If Ms. Lauder will

10   just take us kind of a row a second and move fairly quickly

11   through it, and as you see a search term that stands out,

12   will you just call it out and explain what it is?

13   A.   Sure.

14   Q.   Okay.

15   A.   On the first page you can see hidemyassproxy, which is

16   a way to conceal your identity.  You can see numerous

17   searches related to Fentanyl, roxy pill, you can see

18   Clonazepam, Lorazepam, roxy, Fentanyl, and you can see a

19   Google search for Fentanyl marquis test.  You can see Google

20   searches for Bitcoin, Bitcoin assistance.  You can see

21   credit card searches.  You can see on this second page M-30

22   round pill.

23        Again, we had to cull out numerous instances of the

24   word Fentanyl.  This is not exhaustive.  This list is just a

25   sampling of the Google searches that we discovered on his

1    devices.

2         Mylar envelopes.  Remember, Mylar envelopes were the

3    envelopes that were used to -- that they felt couldn't be

4    x-rayed and to package the drugs in.  You can see references

5    to pounds to kilograms, to weighing different types of

6    drugs.  MultiBit Classic on the bottom left on this page,

7    and you can see a Google search for that.  MultiBit Classic

8    would be a type of Bitcoin wallet.

9         Again, there are numerous instances related to

10   Clonazepam, and these are types of benzodiazepines that are

11   related to Alprazolam, which is one of the products being

12   pressed.

13   Q.   There was one there, D.H.L. tracking?

14   A.   D.H.L. tracking related to tracking different shipments

15   as they come into the country.

16   Q.   Would it be the heavier shipments that had to go

17   D.H.L.?

18   A.   Yes.  Most of the heavier shipments were related to

19   D.H.L. -- sorry, were shipped via D.H.L.

20        You can see darkmarketnew, a search for that, and just

21   numerous searches related to dark net markets.

22   Q.   Let me ask you about the top one here on page 3, the

23   right side.  The Fentanyl marquis test.

24   A.   The Fentanyl marquis test, again, that is a test to

25   determine if it is truly Fentanyl.  Again, as the

1    organization had received bad Xanax or a bad batch before,

2    they wanted to ensure that they were receiving real Fentanyl

3    and the true product.

4    Q.    I mean, that could ruin months and months of his work,

5    right?

6    A.    Correct.  Yes.

7    Q.    He spent a lot of time and effort building up his trust

8    level and his feedback, and a bad batch of Fentanyl may have

9    ruined all of that?

10   A.    Yeah.  As Agent Gino testified, feedback is all

11   important on the dark net market.  It is people purchasing

12   illicit products and people selling illicit products and not

13   a lot of trust in that community, so the one way to kind of

14   make that work is through feedback of other individuals who

15   have had success purchasing those illegal products.

16        As we continue to go down the list, again, additional

17   searches for Fentanyl, additional searches for online

18   wallets, import private key related to Bitcoin wallets,

19   Bitstamp.  As we learned, Bitstamp was an online currency

20   exchange for Bitcoin.  Adoral and roxy --

21   Q.    It just goes on and on?

22   A.    -- and Copovidone, another ingredient in pills.

23   Q.    Maybe we don't need to go all the way to page 6.  You

24   have wore me out.

25   A.    Me too.

1    Q.   This is an exhibit and it is in evidence and the jury

2    will have all of it, correct?

3    A.   Correct, they will.

4    Q.   You searched his devices pretty thoroughly, correct?

5    A.   Yes.

6    Q.   What sense did you get regarding Mr. Shamo's efforts?

7    A.   This was an individual who was devoted and tireless in

8    learning and perfecting his skill in dark net markets and in

9    distributing illicit substances.  Over and over and over

10   there were manuals, there was research done regarding how to

11   not get caught by law enforcement, how to create pills and

12   drugs, how to ship them through the mail and perfecting the

13   art of the dark net markets.  It was thousands and thousands

14   of searches related to that.

15   Q.   Let's take up a related topic.  Let's talk about his

16   distribution.

17            MR. GADD:  Could we look at Exhibit 17.05?

18   BY MR. GADD

19   Q.   What is this?

20   A.   This is a map that we created.  Each of those yellow

21   dots is a zip code that PharmaMaster shipped illicit drugs

22   to.  If you take those dots that are on the map and you

23   click on them, and we'll see this, but you can explode it

24   out to all of the different orders that were shipped to that

25   specific zip code.

1   Q.   Let's show an example.  Go to page 2.

2   A.   Can I just say --

3   Q.   Yes.  Go ahead.

4   A.   Of interest is that every state in the union has a

5   yellow dot on it and multiple yellow dots on it.  These

6   drugs were shipped to every state in the United States.

7   Q.   Including the two we don't see here, right, Hawaii and

8   Alaska?

9   A.   Correct.  Yes.

10   Q.   Let's look at page 2.

11        What is this we're looking at?

12   A.   So this is one of those zip codes.  I believe this was

13   in --

14   Q.   It is Daly City?

15   A.   Daly City.  Yes, this is Daly City, California, and

16   this is one of those yellow dots that we have clicked on

17   showing each of the orders that was placed to Daly City,

18   California.

19   Q.   One of those orders would have been Ruslan's order?

20   A.   Yes, it would have.

21   Q.   Can we look at page 3?  What is this?

22   A.   So this is a close-up of the eastern United States just

23   showing each of the packages shipped -- each of the zip

24   codes.  Sorry.  Each one of these yellow dots is just a zip

25   code that a drug package was shipped to.

1    Q.    And then if we could go to the next page, do you

2    recognize that?

3    A.    I do, yes.  This is Sparks, Nevada.  We just chose one

4    to show everybody.  This is just the shipments to just

5    Sparks, Nevada, those red dots.

6    Q.    And then if we can go to the last page, what are we

7    looking at here?

8    A.    This is just a close-up of the western United States.

9    You can see the dots follow population lines related to

10   areas such as San Francisco, San Diego, Salt Lake, along

11   interstates and things of that nature.  Phoenix.

12             MR. GADD:  If I could have just one moment?

13             I have no further questions.  Thank you.

14             THE COURT:  Do you want to take a break or do you

15   want to start?

16             MR. SKORDAS:  It is up to you, Your Honor.

17             THE COURT:  Let's begin.  Go ahead.

18             MR. SKORDAS:  Thank you.

19                       CROSS-EXAMINATION

20   BY MR. SKORDAS

21   Q.    Agent Ashment, you indicated at one point in your

22   direct examination that you had interviewed a lot of people.

23   Do you recall that?

24   A.    Yes, I do.

25   Q.    And you were probably the lead agent on a lot of these

1    interviews.  Is that fair?

2    A.   Yes.  We interviewed numerous individuals.

3    Q.   And some interviews that occurred back in November of

4    2016 with the two women that are to the left of

5    Mr. Crandall, correct?

6    A.   Yes.

7    Q.   Ms. Tonge and Ms. Bustin?

8    A.   Yes.

9    Q.   Do you recall that interview?

10   A.   I do.

11   Q.   Do you recall going to their home on November 22nd of

12   that year to interview them?

13   A.   I do recall that, yes.

14   Q.   You attended that interview with a couple of other

15   agents including Inspector Henderson from the United States

16   Postal Service, correct?

17   A.   That is correct, yes.  I interviewed Ms. Tonge and she

18   interviewed Ms. Bustin.

19   Q.   And during parts of those interviews you spoke with Ms.

20   Bustin as well.

21        Is that fair?

22   A.   Yes, I have spoken with Ms. Bustin also.

23   Q.   When you spoke with Ms. Tonge she gave you what is

24   called a consent to search, correct?

25   A.   That is correct, yes.

1   Q.   And allowed you to look into her computer.  Do you

2   recall that?

3   A.   Yes.

4   Q.   And when you looked at that computer you went into her

5   dark web e-mail address that she utilized to communicate

6   with Aaron Shamo, correct?

7   A.   That is not correct.  No.

8   Q.   What did you do?

9   A.   Are you asking regarding the dark net e-mail?

10  Q.   Yes.

11  A.   So on the dark net e-mail she gave us a login and

12  password, and then I was able to use that login and password

13  to log in to the dark net, to that e-mail address, yes.

14  Q.   And what you found is that she had this e-mail address

15  called passthepeas@sigaint.org.

16       Do you recall that?

17  A.   I do recall that, yes.

18  Q.   She used that address to communicate with Shamo, Drew

19  Crandall and Mario Noble, correct?

20  A.   Yes, that is correct.

21  Q.   That is what you found, correct?  I can show you a

22  report if that would help.

23  A.   That would be great.  Yeah.

24            MR. SKORDAS:  May I, Your Honor?

25            THE COURT:  Yes.

```
 1   BY MR. SKORDAS
 2   Q.   I don't intend to offer these as exhibits, but if it
 3   will help you refresh your recollection, the first report
 4   there is a 50-page report.
 5        Do you see that?
 6   A.   I do, yes.
 7   Q.   I'm on page 2 of 50, paragraph 3.
 8   A.   Okay.
 9   Q.   Do you see that?
10   A.   I do, yes.
11   Q.   And what you wrote there was that during the interview
12   Tonge agreed verbally and in writing -- in written form,
13   rather, sign an I.C.E. form called a consent to search.
14   That is what we have been talking about a little bit,
15   correct?
16   A.   Correct.
17   Q.   And that she used that to communicate with Aaron Shamo,
18   Drew Crandall and Mario Noble?
19   A.   Sorry.  Which paragraph are you looking at on that?
20   Q.   The same one, just kind of following along your
21   writing, the next sentence.
22   A.   Yes.  Correct.
23   Q.   What she told you was that Shamo retrieved drug orders
24   from the dark web, correct?
25   A.   Correct.
```

1  Q.   And decrypted the orders and sent them to her e-mail

2  address, this passthepeas, correct?

3  A.   That is correct.

4  Q.   And then she and Bustin would use that to figure out

5  what they were supposed to do, correct?

6  A.   Yes.

7  Q.   And then they would package and ship the orders that

8  Shamo had given them, correct?

9  A.   Yes.

10  Q.   She indicated to you that she had worked at eBay with a

11  number of the individuals who were on this exhibit to your

12  left, correct?

13  A.   That is correct, yes.

14  Q.   Including Mario Noble?

15  A.   Yes.

16  Q.   And she indicated that in terms of this organization,

17  Noble answered e-mails relating to the purchase of drugs

18  from AlphaBay for Shamo, correct?

19  A.   Sorry.  What was that question?

20  Q.   I'm looking at what would be the fourth paragraph there

21  and the last sentence.  Maybe you could just read that for

22  us starting with Bustin stated --

23  A.   Bustin stated that she knew an eBay employee, Noble,

24  who answered e-mails related to drug purchases on AlphaBay

25  for Shamo.

1   Q.   And then in the next paragraph she said that she

2   believed that the e-mail account was accessed using a T.O.R.

3   browser.

4        Do you see that?

5   A.   Yes.  I recall that, yes.

6   Q.   How did she indicate that she was made familiar with

7   how to access that?

8        Actually, why don't you just read the next sentence for

9   us.

10  A.   That is the second sentence?

11  Q.   The last sentence of that paragraph.

12  A.   Okay.

13  Q.   Bustin stated --

14  A.   Bustin stated that Crandall showed Tonge how to access

15  that e-mail account, decrypt the order fulfillment list and

16  then print the information.

17  Q.   And then the next sentence, if you don't mind.

18  A.   Sure.  Bustin stated Shamo texted her and Tonge to

19  notify them that an e-mail had been sent, and Tonge would

20  then print that e-mail using the method shown by Crandall.

21  Q.   At this point in time Aaron Shamo was in custody,

22  correct?

23  A.   Yes.

24  Q.   And Drew Crandall was sort of nowhere to be found.  Is

25  that fair?

1    A.   Correct.  Yeah.  I mean we had an idea, but, yes.

2    Q.   Were you also present during any of the interview with

3    Ms. Noble?  Excuse me, Mr. Noble.

4    A.   Yes.  Yes, I was.

5    Q.   He indicated that he also utilized this T.O.R. browser

6    to log into the dark web to conduct business, correct?

7    A.   That is correct, yes.

8    Q.   And he utilized his personal computer to conduct

9    business for this organization, correct?

10   A.   Correct.

11   Q.   You had a follow-up interview with Mr. Noble on

12   December 7th of 2016.

13        Do you recall that?

14   A.   I believe on -- I might need to refresh my memory, but

15   that would be with a different agent.

16   Q.   If you would look -- I'm on page 3 here.  If you would

17   look at what is the fifth full paragraph there starting with

18   Noble stated that he processed --

19   A.   Sure.

20   Q.   He told you that he processed 20 to 50 orders daily,

21   correct?

22   A.   Correct.

23   Q.   And that he would compile daily order sheets and

24   encrypt them and send it to a secure e-mail which is

25   basically Tonge and Bustin's e-mail address, correct?

1    A.    Correct.

2    Q.    Noble told you that his operation in terms of this was

3    to place these orders and he would receive an encrypted

4    order and decrypt it and using his private key copy it and

5    paste it onto a notepad, correct?

6    A.    He did not say he placed the order, though, just for

7    clarification.

8    Q.    What did he say?

9    A.    The other that you said, so he would send it to the

10   shipping team via his secure e-mail and --

11   Q.    What did he do?  Just tell the jury what Noble did.

12   A.    He would process -- he was customer service.  He was

13   granted surrogate access or shared access to AlphaBay.  Mr.

14   Shamo allowed him to have basically the customer service end

15   of access to the PharmaMaster storefront.

16   Q.    Do you recall going into Mr. Noble's Sigaint account

17   there on the next page, page 450?

18   A.    Yes.

19   Q.    In fact, you copied quite a large number of his

20   unencrypted e-mails, correct?

21   A.    Correct.  Yes.

22   Q.    Those go on for probably 10 or 20 pages, correct?

23   A.    That is correct, yes.

24   Q.    You got all of those off of Mario Noble's computer,

25   right?

```
 1   A.   Yes.  Off of the his drw99sigaint.org e-mail address.

 2   Q.   And if you would go to the last one, which is on page

 3   19 of 50, do you see that one?

 4   A.   Hold on a second.

 5   Q.   Page 19 of 50.

 6   A.   Okay.  I'm there.

 7   Q.   There was one sent on it looks like March 15th and I

 8   think we're in 2016.

 9        Do you see that?

10   A.   Yes.

11   Q.   Who did you decide was drw99?

12   A.   Drw99 is the e-mail address that Mario Noble was using,

13   the Sigaint e-mail address that Mario Noble was using.

14   Q.   That was an e-mail directly from Mario Noble to Tonge

15   and Bustin, correct?

16   A.   I don't recall specifically asking him about

17   this e-mail particularly, but he did use that e-mail

18   address, yes.

19   Q.   But this particular printout looks to be one such

20   e-mail, correct, from him to them, correct?

21   A.    It is from drw99@sigaint to passthepeas@sigaint, yes.

22   Q.   Do you recall an interview with Drew Crandall on

23   December 13th of 2017?

24   A.   I recall interviewing him.  The exact date -- I will

25   take your word for it.
```

1    Q.   Well, if it will help it is on that same page toward

2    the middle.   I'm just using your report, sir.

3    A.   The interview is on this page right here?   Okay.

4    Q.   Do you see that?

5    A.   Yes.

6    Q.   In December of 2017 Crandall admitted that he

7    communicated with Shamo, Bustin and Tonge via this Sigaint

8    process to process orders through the dark web and AlphaBay,

9    correct?

10   A.   Yes.   That is correct.

11   Q.   Earlier that month you had gone through the dark web

12   e-mail account for Tonge and Bustin.

13        Do you recall that?

14   A.   Yes.   Several agents went through that e-mail account,

15   yes.   Including me, yes.

16   Q.   And you printed it looks like page after page after

17   page of those as well.

18        Do you see that?

19   A.   I do, yes.

20   Q.   In fact, it goes from page -- I think we were on 19 --

21   all the way to page -- to almost the end of your report.

22        Do you see that?

23   A.   Yes, I do.

24   Q.   Page 48?

25   A.   Yes.

1    Q.   I want you to turn to page 49 of that.

2    A.   Okay.

3    Q.   Do you see that last e-mail there toward the bottom?

4    It is pretty long.

5    A.   I do, yes.

6    Q.   What is that?

7    A.   This is an e-mail from passthepeas@sigaint.org to

8    passthepeas@sigaint.onion.

9    Q.   Actually this is some instructions that they got from

10   Drew Crandall, isn't it?  Take a minute and read it.

11   A.   Yes, that is correct.

12   Q.   Would you read to the jury the instructions that Drew

13   Crandall gave them on July 8th, 2015?

14   A.   Sure.  Here is the A.S.C. file attached to this.  Open

15   the G.P.G. key chain program from your applications folder.

16   Then at the top go to file import and choose this file you

17   have downloaded.  Now when you have a text file to send to

18   us, right click on the bottom of that menu and choose

19   services, G.P.G. encrypt file.  Then in the box that comes

20   up you should choose jean001 key in the top box to encrypt

21   the file with.  The bottom box is for signing your message,

22   which means Aaron can detect any evidence of tampering with

23   the encryption.  For now don't worry about that.  Delete

24   this after reading and importing this A.S.C. file.

25   Q.   When you interviewed Crandall in June of 2017 he, in

1    fact, admitted sending that, correct?

2    A.   Yes, to my recollection.

3    Q.   I want to go back for a minute and talk to you a little

4    bit more, and then I will move on from Tonge and Bustin,

5    about your interview with them.  I'm looking at the second

6    report there that you have got.  It is a much shorter one,

7    eight pages.

8    A.   Okay.

9    Q.   If I were to go to the first page of that or maybe the

10   second page, it looks like this is more of the interview

11   with Tonge and Bustin from November 22nd, 2016.

12   A.   Okay.

13   Q.   Do you see that?

14   A.   I do.  Is that the highlighted section?

15   Q.   Yes.

16   A.   Okay.

17   Q.   Did I highlight that?

18   A.   It looks like it.

19   Q.   I didn't mean to.  I'm sorry.

20   A.   That is all right.

21   Q.   Does that say page 3 of 8?

22   A.   Yes, it does.

23   Q.   Okay.  If you look at the top of page 3 of 8 there is

24   some indications as to your conversation with Ms. Tonge.

25        Do you see that?

```
 1   A.   Yes, I do.

 2   Q.   It starts out in the first paragraph, maybe the second

 3   line down, and says approximately two years ago Shamo stated

 4   that Bustin and Tonge could become a drop, where Shamo would

 5   have packages sent via commercial courier services to their

 6   house located in South Jordan.  Shamo and Crandall would pay

 7   them approximately two to $300 for receiving each package.

 8        Correct?

 9   A.   That is what it states, yes.

10   Q.   That is what they told you?

11   A.   Correct.

12   Q.   And she further told you that she looked at some of

13   these packages and she felt that they were probably illegal,

14   and she noticed that they were coming from different

15   jurisdictions, from Florida, overseas, China and that type

16   of thing, correct?

17   A.   Yes.

18   Q.   And she indicated that -- at least Ms. Tonge indicated

19   that her mother was ill so she went to Shamo and Crandall to

20   try to see how she could make more money helping them,

21   correct?

22   A.   Yes, she did state that.

23   Q.   Then she stated that Shamo and Crandall allowed her to

24   become more involved, correct?

25   A.   Correct.
```

1    Q.   So that she could make more money?

2    A.   Yes.

3    Q.   In fact, they were sort of upgraded to more than just

4    shipping.  They were packaging, correct?

5    A.   Yes.  They would package the drugs, yes.

6    Q.   Who showed them how to package the drugs?

7    A.   In the beginning it was Mr. Crandall that came over and

8    showed them how to package the drugs.

9    Q.   In fact, according to your report he came over there

10   nightly and instructed them how to package the narcotics in

11   order to ship them out to customers from the dark web,

12   correct?

13   A.   Yes.  As I recall that was for a short period of time.

14   Q.   Nightly, correct?

15   A.   Yes.  In the beginning it was nightly for a few nights.

16   Q.   He also showed them how to wrap the packages, correct?

17   A.   Yes.

18   Q.   And taught them how to use the vacuum sealer and Mylar

19   bags that he told them would make the narcotics

20   undetectable, correct?

21   A.   Yes, he did help teach them how to do that.

22   Q.   She told you that part of the reason that she and Ms.

23   Bustin got involved was because Shamo's and Crandall's

24   respective girlfriends didn't want to get involved in this,

25   correct?

1    A.    I do recall both girlfriends.  Well, I recall Ms. Grant

2    saying that she did not want to get involved in this, yes.

3    Q.    When they first started packaging, according to your

4    notes, they used padded envelopes or priority mail with

5    regular stamps, but then Crandall had them do something a

6    little different, correct?

7    A.    They did use padded envelopes initially, yes.

8    Q.    In fact, Crandall brought them envelopes and stamps

9    that he preferred them to use, correct?

10   A.    Initially.  In the very beginning that is what

11   happened, yes.

12   Q.    And if they were shipping supplies on their own they

13   were reimbursed by Crandall and Shamo, correct?

14   A.    Yes.  They did receive reimbursement for products that

15   they bought with their own money, yes.

16   Q.    I read this report pretty thoroughly and I don't see

17   anywhere on there where it says initially only.  I mean,

18   this looks like I am just reading your report, sir.

19   A.    This would be according to additional interviews, so

20   this is November 22nd, 2016, if I remember right when this

21   interview occurred, and this would be according to

22   interviews that happened later and conversations later.  So

23   initially, yes, this is --

24   Q.    This is the information that you had when you

25   interviewed these two females?

1    A.    That is correct.  Yes, initially on November 22nd this

2    was the information that we had and we learned additional

3    information later.

4    Q.    And they told you that they would then sort of drop off

5    these packages in what I call a mailbox, but a blue box,

6    correct?

7    A.    Yes.

8    Q.    And that, in fact, Crandall instructed them to use

9    fictitious company names as the shippers on the packages,

10   correct?

11   A.    Yes.

12   Q.    Do you see that, that you wrote down on there?

13   A.    I recall that, yes.

14   Q.    It does not say initially, does it?

15   A.    On this report it does not say initially, no.

16   Q.    They told you about their involvement with a fellow

17   named Sean Gygi, correct?

18   A.    Yes, they did.

19   Q.    They told you that they sort of wanted to minimize

20   their involvement in this, so they wanted to have a runner

21   or somebody else that would help do part of the literal

22   legwork, correct?

23   A.    Yes.

24   Q.    That is what Mr. Gygi's initial role was?

25   A.    His initial role would be a package receiver for the

1  organization but, yes, he did progress to that.

2  Q.   In fact, they were setting up packages for Gygi as

3  recently as November 20th of that year, two days before you

4  interviewed them, correct?

5  A.   Correct.

6           MR. SKORDAS:  I just have a couple more on this

7  issue, Judge, and then we can take a break, but I have quite

8  a bit more.

9           THE COURT:  Finish this issue and then we'll take

10 a break.

11          MR. SKORDAS:  Okay.

12 BY MR. SKORDAS

13 Q.   Go to the bottom of page 5 of that report.

14      Are you with me?

15 A.   Yes.

16 Q.   The last paragraph --

17 A.   Yes.

18 Q.   Ms. Tonge told you guys that there were messages on her

19 phone on the Telegram app from Crandall, correct?

20 A.   Correct.

21 Q.   It does not say initially, does it?

22 A.   It does not say initially, no.

23 Q.   She stated that Crandall was in Laos with Sasha, and

24 that is his girlfriend, right?

25 A.   Correct.  We knew he was in Laos or we suspected it.

1   Q.   And that from there he was in fact sending them

2   messages on the dark web related to this, correct?

3   A.   Yes.  She says specifically like customer service on

4   the dark web related to narcotics orders.

5   Q.   She had the impression, didn't she, that in fact

6   Crandall was coming back to the United States in May of

7   2017.

8        Do you see that?

9   A.   A few paragraphs down?

10  Q.   The top of page 6.

11  A.   It is hard for me to recall directly just --

12  Q.   That is why I gave you the report.

13  A.   As the investigation proceeded we learned additional

14  information is why, so I'm just thinking back to this time

15  when we initially started this, yeah.

16  Q.   Well, I'm trying to help you here with your own report.

17  A.   Thank you.  Which paragraph?

18  Q.   Top of page 6.

19  A.   Okay.

20  Q.   She told you that Crandall had indicated or at least

21  she had the impression that he was coming back to the United

22  States in May of 2017?

23  A.   That is correct, yes.

24  Q.   They told you that in fact a fellow named Mario Noble

25  got involved with this organization as well, correct?

1    A.   Yes, they did.

2    Q.   And they told you Mario Noble's role, which was

3    basically to sort of deal with customer complaints and take

4    care of that type of thing?

5    A.   Yes.  It seems, as I recall, that they had a limited

6    knowledge of his role, but I do believe they did say

7    customer service type issues, yes.

8    Q.   They also told you a little about about Luke Paz.

9         Do you recall that?

10   A.   I do recall his name being mentioned in this report,

11   yes.

12   Q.   And they told you that Luke Paz helped by pressing

13   pills at his home -- at Shamo's home on 7939 Titian Street

14   in Cottonwood Heights, correct?

15   A.   That is correct.

16   Q.   Paz had worked for Vivint and traveled -- at least he

17   told them that he was working for Vivint and traveled often,

18   but they thought it was strange that he was home so much and

19   in Shamo's house, correct?

20   A.   Correct.

21   Q.   They told you that Shamo, Crandall, Noble, Gygi, Sasha,

22   herself and Bustin -- and this is Ms. Tonge -- all met while

23   they were working at eBay?

24   A.   Yes.

25              MR. SKORDAS:  This is probably a good time for a

```
 1   break.
 2              THE COURT:  We'll take a break and be in recess
 3   until 10:30.
 4              (WHEREUPON, the jury leaves the proceedings.)
 5              THE COURT:  10:30.
 6              (Recess)
 7              THE COURT:  Let's get the jury and proceed.
 8              (WHEREUPON, the jury enters the proceedings.)
 9              THE COURT:  You may proceed, Mr. Skordas.
10              MR. SKORDAS:  Thank you, Your Honor.
11   BY MR. SKORDAS
12   Q.   Dan, I was just told that we're putting everybody to
13   sleep this morning, so I'm going to pick it up here a little
14   bit.
15   A.   Thank goodness.  No.
16   Q.   Yes.  I will try to do better.
17        I put some reports in front of you and they are much
18   shorter than the 50-pager that we just did.  I think they
19   are all about three or four pages.  What I tried to do is
20   put them in sequential order in terms of your interviews
21   with six other individuals, if I could just go through those
22   quickly with you.
23   A.   Okay.
24   Q.   The top one is a report of an interview that you had
25   with a woman named Sadie Gurley.
```

1          Do you see that?

2    A.   I do, yes.

3    Q.   Who is Sadie Gurley?

4    A.   Sadie Gurley is Luke Paz's wife now.

5    Q.   At the time you interviewed her in December of 2016,

6    she was his girlfriend, correct?

7    A.   Yes.  At the time she was his girlfriend.

8    Q.   She had indicated that they were looking for work or

9    Paz was trying to get some employment in Texas it looks like

10   from your interview down here?

11   A.   Yes.  I believe he was selling for his company, and I

12   believe it was Vivint or that company in Texas.

13   Q.   Where did this interview with Sadie Gurley take place?

14   A.   This was at Emily Mitchell's residence where Sadie

15   Gurley was staying.

16   Q.   Who interviewed her?

17   A.   I did.

18   Q.   With who else?

19   A.   With a task force officer, Vincent, a Homeland Security

20   investigations task force officer.

21   Q.   If I were to tell you, and I think I already have, that

22   it was December 13th of 2016, does that seem right?

23   A.   That does, yes.

24   Q.   She described Paz as Shamo's best friend, correct?

25   A.   She did, yes.  Well --

1    Q.   Go ahead.

2    A.   Yes.  I would believe that, yeah, as a good friend or

3    best friend.  Yeah.

4    Q.   I can show you, if it helps.

5    A.   That is great.

6    Q.   It is the bottom of page 2 there, the last line, last

7    sentence, last paragraph.

8    A.   She felt Paz was Shamo's best friend.  Perfect.

9    Q.   She was not, at least when you interviewed her,

10   claiming much knowledge as to what was going on here between

11   Paz and Shamo and everybody else, correct?

12   A.   No.  She didn't claim much knowledge.

13   Q.   And as you sit here today that is probably true, that

14   she was kept out of this in some part.  Is that fair?

15   A.   I think that is fair to say.

16   Q.   She was not indicted or anything that you know of?

17   A.   No.

18   Q.   Never spent a day in jail or anything like that?

19   A.   No.

20   Q.   She told you that she was dating Paz during the time

21   leading up to your interview with her?

22   A.   She did, yes.

23   Q.   And she said that Paz was usually at Shamo's residence

24   a few times a week, correct?

25   A.   Yes.

```
 1    Q.    She allowed you to take a look at her cell phone during
 2    that interview.
 3          Do you recall that?
 4    A.    I do recall that, yes.
 5    Q.    Why were you interested in looking at her cell phone?
 6    A.    Communications mostly.  We would be looking for
 7    communications to see what knowledge she would have of what
 8    was going on.
 9    Q.    In fact, you found one communication that probably
10    didn't make you too happy, correct?
11    A.    Yes, we did.
12    Q.    She had told Mr. Paz that you guys were on your way
13    over to interview her or something to that effect, correct?
14    A.    Yes.  I recall that she sent a text message to Mr. Paz
15    saying law enforcement was there to interview --
16    Q.    You talked to her about Luke Paz's finances and how he
17    spent money.
18          Do you recall that?
19    A.    I do recall that, yes.
20    Q.    She told you that he was a big gambler, at least a
21    regular gambler, correct?
22    A.    Yes, she did.
23    Q.    And that he had lost more than $1,000 at a time
24    gambling.
25          Do you recall that?
```

1   A.   Yes.  When we pressed her on amounts of money she did

2   say she had seen him lose upwards of $1,000 gambling.

3   Q.   She also described that he gave her money periodically

4   to help her out with her bills?

5   A.   She did say that also, yes.

6   Q.   You were interested in finding out Mr. Paz's finances,

7   if he was getting money from this organization, correct?

8   A.   Yes, we were.  We were very --

9   Q.   I'm sorry.

10  A.   We were very interested in that, yes.

11  Q.   In fact, you confirmed that, correct, through her?

12  A.   Confirmed?  Excuse me?

13  Q.   You confirmed that, that Paz collected a fair amount of

14  money?

15  A.   I don't believe during this interview she stated that

16  he had collected a fair amount of money.

17  Q.   She stated that he had blown a fair amount of money

18  gambling and whatnot, correct?

19  A.   Yes, that he had spent more than $1,000 gambling.  It

20  also goes on to say that she had seen Shamo spend

21  approximately $5,000 in Las Vegas also.

22  Q.   Right.  These guys were spending a fair amount of

23  money, correct?

24  A.   Correct.

25  Q.   I want to draw your attention to another interview you

1  had with a person named Preston Mitchell on January 19th of

2  2017.

3      Do you see that?

4  A.  I do.

5  Q.  Do you recall that?

6  A.  I do recall that, yes.

7  Q.  Who is Preston Mitchell?

8  A.  Lyle Preston Mitchell is Emily Mitchell's father.

9  Q.  Who is Emily Mitchell?

10  A.  Emily Mitchell was -- so Lyle actually I believe owned

11  the home that they were staying in, and Emily is his

12  daughter and she lived there at the time also.

13  Q.  It was a home that you actually served a warrant at,

14  correct?

15  A.  It was, yes.

16  Q.  When you served that warrant, was that on or about the

17  same day that you interviewed him in January of 2017?

18  A.  No.  As I recall, Mr. Mitchell found out who I was

19  through other law enforcement officers and called me on the

20  phone at a later time, if I remember right.

21      No.  On January 19th -- sorry.  You are correct.  It

22  was a phone call.  It was not in person during the warrant.

23  Q.  I apologize.

24      He told you that during that summer, and that would

25  have been 2016, that he had seen five or six packages

1   delivered to Paz at that address, his Woodland address,

2   correct?

3   A.   That is correct, yes.  Well, yes, that is correct.

4   Q.   I am not trying to trick you.

5   A.   I know.

6   Q.   It is your report.

7   A.   I just want to be thorough and detailed.

8   Q.   I appreciate that.  I think everyone does.  Thank you.

9        He described a specific particular incident during the

10  summer of 2016, correct, involving a large package?

11  A.   Yes, he did.

12  Q.   He told you that the delivery driver showed up with a

13  large crate that was addressed to Luke Paz?

14  A.   Correct.

15  Q.   Do you recall that?

16  A.   Yes, I do.

17  Q.   And that it was big and that it was heavy?

18  A.   Correct.

19  Q.   He asked Luke Paz what it was?

20  A.   He did.

21  Q.   And Paz lied to him?

22  A.   Yes.

23  Q.   He told him it was a transmission?

24  A.   That is correct.

25  Q.   That the two of them loaded onto somebody's car or

1    truck or something like that?

2    A.   He did.  I also recall Mr. Paz telling me later that

3    this was inaccurate what Mr. Mitchell had said, but --

4    Q.   Well, he certainly didn't tell him it was a pill press,

5    right?

6    A.   No, he did not.

7    Q.   He told you sort of similar to what Ms. Tonge said,

8    which was that Luke Paz claimed to have employment through

9    some solar company but he was sure home a lot, correct?

10   A.   Correct.

11   Q.   He thought that that was a little bit unusual?

12   A.   That is correct.

13   Q.   Later on in 2017 you finally had the opportunity to

14   interview Drew Crandall.

15        Do you recall that?

16   A.   I do, yes.

17   Q.   That would have been on May 5th of 2017?

18   A.   That is correct.

19   Q.   Where was that interview?

20   A.   That interview would have been in Hawaii.

21   Q.   Where?

22   A.   What island?

23   Q.   Yes.  Where were you?

24   A.   We were at the international airport in Hawaii.

25   Q.   And you were allowed to utilize a room or something

1   like that to do these interviews, correct?

2   A.   That is correct.  Yes, they have an interview room at

3   the airport.

4   Q.   And you interviewed both Crandall and his

5   girlfriend/fiancee, Ms. Grant?

6   A.   Yes, we did.  We interviewed both of them.

7   Q.   You learned that they were there to get married, right?

8   A.   Yes.

9   Q.   As far as you know that never occurred, did it?

10  A.   Not as far as I know.

11  Q.   Because Drew Crandall was hooked up sometime that day?

12  A.   He was arrested that day, yes.

13  Q.   And not allowed to attend his own wedding, so to speak?

14  A.   That is correct.

15  Q.   Mr. Crandall told you that he and Sasha had been living

16  overseas for about 18 months prior to that time, correct?

17  A.   Correct.  Yes.

18  Q.   That they had gone to New Zealand?

19  A.   Yes.

20  Q.   Later moved to Australia?

21  A.   Correct.  Through several Asian countries, yes.

22  Q.   And traveled through several Asian countries including

23  Thailand, Laos, Cambodia, Malaysia, Singapore and Indonesia?

24  A.   Yes, that is correct.

25  Q.   He told you some things, Mr. Crandall did, that you

1    later learned were not true.

2         Isn't that fair?

3    A.   That is fair to say, yes.

4    Q.   Not the least of which was that he claimed during this

5    interview in Hawaii that he was gainfully employed and tried

6    to make it -- I won't say what he was trying to do.  He

7    indicated to you that he had a better source of income than

8    you later learned he actually did, correct?

9    A.   He was employed overseas --

10   Q.   Right.

11   A.   -- at different jobs, yes.

12   Q.   But not at the rate of pay that he was claiming?

13   A.   I don't recall how much he claimed he made overseas,

14   but I do recall that he said that he had a job or different

15   jobs overseas, several different jobs overseas.

16   Q.   He talked to you about spending money, including the

17   costs of this very wedding that he was going to Hawaii for,

18   correct?

19   A.   Yes.  As I recall, he said his parents had given them

20   money and her parents had also given them money.

21   Q.   And he told you that that amounted to a portion of the

22   wedding costs and that he paid the balance, correct?

23   A.   Correct.  I believe they gave him approximately 10,000,

24   if I remember correctly.

25   Q.   You chitchatted with him about his personal life and I

1    suppose sort of get to know you kinds of things.

2        Do you recall that?

3    A.   I do recall that, yes.

4    Q.   He told you that he was close to getting a degree in

5    mechanical engineering at the University of Utah?

6    A.   I believe he said that he was three years away, but he

7    had different obstacles in his path.  Yes.

8    Q.   At one point during your interview with him -- I take

9    it from your report that you must have become frustrated

10   that he was not being truthful with you?

11   A.   You know, as I testified earlier it is very common for

12   defendants to not be truthful with law enforcement when they

13   are confronted with crimes with rationalization,

14   justifications, initially that is how it works.  Then we

15   eventually get to the truth most of the time.  We try our

16   best.

17   Q.   But you're certainly not justifying the initial lies,

18   are you?

19   A.   Oh, no.  No.  What I'm saying is that this is just --

20   this is common, every day.  One of the sayings amongst law

21   enforcement is how do you know someone is lying?  It is

22   because they are opening their mouth.  It happens regularly

23   is what I'm saying.

24   Q.   And it happened with Mr. Crandall?

25   A.   It did.

1    Q.   Repeatedly?

2    A.   There were lies told, yes.

3    Q.   Specifically you were asking about finances and his

4    money and where he kept money.

5         Do you recall that?

6    A.   I do recall that, yes.

7    Q.   He told you that he had depleted all of his savings

8    that he and Sasha had, and that he had a couple of bank

9    accounts in both Australia and New Zealand.

10        Do you recall that?

11   A.   I do recall him saying that.

12   Q.   You asked him about Bitcoins.

13        Do you recall that?

14   A.   I do.

15   Q.   And he told you that he did not have and never had

16   owned digital or cryptocurrency including Bitcoins.

17        Do you recall that?

18   A.   Yes.  Then he said that he owned one Bitcoin early on,

19   later on, yes.

20   Q.   Both of those were lies, correct?

21   A.   That is correct.  I mean, he did own one, but he owned

22   more than one.  Yes.

23   Q.   Good point.

24        He told you that he had one Bitcoin and that he had

25   spent $5 on it after you pressed him, correct?

1    A.    That is correct.  He said early on he had invested in

2    one Bitcoin and spent very little money, maybe -- I will

3    trust you if you say $5.

4    Q.    That was after he told you at first that he had no

5    Bitcoins?

6    A.    That is correct.

7    Q.    And then you pushed him and he said, okay, I have one

8    that cost me five bucks?

9    A.    Correct.

10   Q.    Something like that?

11   A.    Yes.

12   Q.    He told you that he didn't even know how Bitcoins

13   worked, correct?

14   A.    Let me turn to where you are --

15   Q.    Sure.

16   A.    Which paragraph are we on?

17   Q.    Page 4 of 5.

18   A.    Last paragraph?

19   Q.    Second to the last paragraph.

20   A.    Okay.

21   Q.    There is a line that begins he said that he didn't

22   know --

23   A.    He had had a coin or two like when it was worth $2,

24   yes.

25   Q.    And he said he didn't know exactly how Bitcoins worked?

1    A.   That is correct.

2    Q.   That was another lie, correct?

3    A.   He didn't have a wallet address anymore and didn't have

4    the ability to get to it.

5    Q.   Well, my question was that he indicated that -- I'm

6    looking at the second paragraph from the bottom on page 4.

7    A.   Okay.

8    Q.   He said that he didn't know exactly how Bitcoins

9    worked.

10        Do you see that?

11   A.   Okay.  Yes, I do.

12   Q.   He told you that?

13   A.   But he knew you needed a unique wallet address that

14   stored your money, yes.

15   Q.   He knew how Bitcoins worked.  He had cashed them out?

16   A.   Correct.

17   Q.   And it wasn't just one $5 Bitcoin, correct?

18   A.   Correct.

19   Q.   You learned that?

20   A.   Yes.

21   Q.   He told you that he had not made money while he was

22   overseas in any other way than what he had described to you,

23   which was by working odd jobs and that type of thing,

24   correct?

25   A.   Correct.

1    Q.   That was another lie, wasn't it?

2    A.   Yes, that was a lie.

3    Q.   He was getting paid through this organization much of

4    the time he was overseas, wasn't he?

5    A.   Yes, he was.

6    Q.   He was getting paid in Bitcoins and other things,

7    correct?

8    A.   If I can clarify, I believe from the middle of 2016 he

9    was getting paid through this organization after he

10   reentered it.

11   Q.   I'm asking you about an interview you had with him in

12   May of 2017.

13   A.   Yes.

14   Q.   At that point he was and had been for several months

15   getting money from this organization, correct?

16   A.   Yes.

17   Q.   Even though he is halfway across the planet?

18   A.   That is correct, yes.

19   Q.   How long did your interview with Drew Crandall go that

20   day?  Do you recall?

21   A.   It does not seem -- it was maybe a couple hours at

22   most, I would say.  It wasn't terribly long.

23   Q.   Is it safe to say that he sort of played dumb on the

24   whole -- that Aaron Shamo has been arrested for the last

25   couple of months?

1    A.   I would say it is safe to say that.  I would say it is

2    safe to say I played a little dumb, too, during that

3    interview.

4    Q.   Right.  But that is your job, correct?

5    A.   Depends on who you ask.

6    Q.   You're not dumb.  You're very bright.

7         His role in this interview isn't to lie to you?

8    A.   No.

9    Q.   Do you recall interviewing Sasha Grant at the same

10   time, during that same period of time?

11   A.   I didn't interview her, but she was interviewed during

12   that same period of time, yes.

13   Q.   You have seen that interview?

14   A.   Yes.  I have seen the report, yes.

15   Q.   If you look at the reports that say Grant at the top, I

16   think --

17   A.   Okay.

18   Q.   This was the same day, correct, May 5th?

19   A.   Correct.  Yes.

20   Q.   If you look at page 2 of that right in the middle it

21   says Special Agent Keys reported the following.

22   A.   Okay.

23   Q.   Do you see that?

24   A.   I do see that.

25   Q.   It makes it appear from at least Special Agent Keys

```
 1   that you, Dan Ashment, interviewed Sasha Grant.

 2   A.   Can I read it?

 3   Q.   Sure.

 4   A.   At the above date and time Agent --

 5   Q.   Wait.  Wait.

 6   A.   Sorry.

 7           THE COURT:  If you are going to read it for the

 8   record you need to slow down.  If you are going to read it

 9   to yourself --

10           THE WITNESS:  Sorry.  Which should I do?  I will

11   read it to myself maybe.

12           MR. SKORDAS:  You are sort of torturing the

13   reporter here.  Read it to yourself.

14           THE COURT:  Read it to yourself as fast as you

15   want.

16           THE WITNESS:  Thank you, Your Honor.  Okay.

17   BY MR. SKORDAS

18   Q.   It appears, at least from that portion, that you were

19   in some part of some interview with Sasha Grant.

20        Do you recall that?

21   A.   Yes.  So as the case agent on this investigation I

22   would have popped in and out of Ms. Grant's interview also.

23   Yes.

24   Q.   You knew that she and Drew Crandall had arrived in

25   Hawaii for a wedding?
```

1    A.    Yes.

2    Q.    And that they had arrived on or about the 5th, which

3    was the date of this interview, of May of 2017?

4    A.    I did know that, yes.

5    Q.    And the wedding was like a week away on the 12th?

6    A.    That is correct.

7    Q.    And that the two of them were there and going to spend

8    a week sort of traipsing around Hawaii prior to their

9    wedding, correct?

10   A.    Yes, they were.

11   Q.    They were going to stay on Kauai and in Honolulu.

12         Do you recall that?

13   A.    I knew they were coming to Hawaii to get married and to

14   visit different places, yes.

15   Q.    She showed you her wedding ring, didn't she?

16   A.    I don't recall that specifically.

17   Q.    Okay.  I won't ask you anymore than this, but do you

18   see that whoever interviewed her and wrote this report made

19   some reference to the wedding ring at the bottom of page 2?

20   A.    Page 2.  Okay.  Yes, I do see the reference to that.

21   Q.    You were not personally aware of that wedding ring?

22   A.    I don't know that I recall or paid attention, honestly.

23   Q.    Somebody thought enough about the wedding ring to make

24   it part of their report, though, didn't they?

25   A.    Yes.

```
 1   Q.   You knew that their plans after the wedding were to go

 2   back to Australia.

 3        Do you recall that?

 4   A.   I do recall that, yes.

 5   Q.   They were not planning to come here to Utah to live or

 6   anything like that?

 7   A.   Yes.  I remember that, yes.

 8   Q.   In fact, they didn't even have tickets to Utah.  Their

 9   flights were Australia to Hawaii and then back?

10   A.   Yes.  My understanding was that they were going to

11   return to Australia.

12   Q.   She also confirmed some of the things that Drew did,

13   which is that they had traveled to these various countries

14   in Asia.

15        Do you recall that?  I'm looking at page 3, the second

16   paragraph.

17   A.   Yes.

18   Q.   She had visited Thailand, Laos, Cambodia, Malaysia,

19   Singapore and Bali?

20   A.   Yes.

21   Q.   She indicated that she was pretty exhausted because

22   they had been to six countries in three months?

23   A.   That is correct.

24   Q.   And she even described some of the things that they did

25   while they were there at these various countries.
```

1        Do you see that?

2    A.   I do see that.

3    Q.   Events and festivals and parties and yoga and

4    restaurants?

5    A.   Yes.

6    Q.   All the things that cost money, correct?

7    A.   Yes, all those things would cost money.

8    Q.   If you go to page 5, and I don't know if you were part

9    of this conversation, but she told agents that Drew was,

10   quote, good with computers.

11        Do you see that?

12   A.   Which paragraph?

13   Q.   Page 5, the second paragraph, first line.

14   A.   Yes, I do see that.

15   Q.   She said that she is not very good with computers but

16   that Drew is.

17   A.   Correct.

18   Q.   In fact, she said he is really good with computers.  Do

19   you see that in the last sentence of that paragraph?

20   A.   Yes.  That is what it says.

21   Q.   She told you a little bit about her personal life and

22   she told you that she, in fact, had worked for the postal

23   service for awhile.

24        Do you see that?

25   A.   Yes.  The fourth paragraph down, yes.  I do recall that

1    from the investigation.

2    Q.    In fact, she had been to China before to study abroad

3    and teaching English?

4    A.    The report does say that, yes.

5    Q.    In terms of her working and supporting themselves, she

6    also told you that there was at least one three-month period

7    while they were there when they were traveling so much that

8    neither of them was able to work.  That is the fifth

9    paragraph, second sentence.

10   A.    Correct.

11   Q.    If you go to page 5 there -- excuse me.  Page 6.  Do

12   you see that first paragraph that began on the prior page?

13   A.    Okay.

14   Q.    If you would read the sentence that begins Grant said,

15   that second line.

16   A.    Grant said before they left the U.S., Crandall was

17   working at Data2 Logistics.

18   Q.    Go ahead.  The next sentence, please.

19   A.    Data2 Logistics is a data shipment company and Crandall

20   had a case manager, account manager type position.

21   Q.    She was asked about Bitcoins also the same as Drew

22   Crandall.

23         Do you recall that?  I'm now on page 7.

24   A.    Okay.

25   Q.    Seven out of 8.  We're heading for home.

1          Do you see that?

2    A.    Yes, I do.

3    Q.    The fourth paragraph beginning with she said she has

4    not done Bitcoins but Crandall has --

5    A.    Yes.

6    Q.    -- and that she claimed that she didn't know anything

7    about Bitcoins, correct?

8    A.    Correct.  That is what the report says, yes.

9    Q.    This is while Drew Crandall is in the next room telling

10   you all that he does not have anything to do with Bitcoins,

11   correct?

12   A.    That is correct.

13   Q.    She said that Drew Crandall actually tried to explain

14   the Bitcoin process to her, but he would use technical words

15   and she didn't even understand what he was talking about.

16         Do you recall that?

17   A.    Yes, I can see that in the report.

18   Q.    He told her that he had been -- that he had had

19   Bitcoins for some time and in fact invested in them.

20         Right?

21   A.    Yes.  That is what the report says, yes.

22   Q.    And that he was sort of knowledgeable and sort of

23   treated Bitcoins like some of us might the stock market and

24   was sort of watching how they fluctuated almost like an

25   investment.

1      Do you see that?

2   A.   I do see that.

3   Q.   She said that Drew would cash in his Bitcoins for cash,

4   but he didn't tell her what he was doing with the cash.

5      Is that correct?

6   A.   Yes.

7   Q.   And in the last two sentences of that paragraph she

8   told you all that Crandall was able to use Bitcoin to help

9   them travel the world, sold a bunch of them which she

10  thought was cool and travel money.

11     Do you see that?

12  A.   I do see that.

13  Q.   Is that your recollection of how your conversation and

14  with the other agents went?

15  A.   Yes.  So, like I said, I was mainly focused on

16  interviewing Drew Crandall at the time and she was being

17  interviewed simultaneously.  So I would have been in and out

18  depending on how things were going with the interviews at

19  that time.

20     From my recollection and from reading this report and

21  knowing the agent, yes.

22  Q.   Finally, she described Crandall as a nerdy guy who

23  enjoys playing video games and trading Bitcoin.  That is how

24  she described him, correct?

25  A.   Yes.

1    Q.   I want to draw your attention now to a search warrant

2    that you were part of the execution of in February of 2017

3    at the Titian Way residence.

4         Do you recall that?

5    A.   So I was part of the Open View Lane search warrant and

6    I was interviewing the girls at the time and going on

7    through additional interviews with Mario and package

8    receivers that night.

9    Q.   So you were not part of the search warrant where you

10   interviewed Mr. Lapin, the landlord to Mr. Shamo and Paz?

11   A.   That would have been other agents.

12   Q.   Okay.

13   A.   If I might clarify that, I am not sure if he was at the

14   second search warrant on Titian Way when Agent Keys did the

15   search warrant on the garage.

16   Q.   Right.

17   A.   So I was at that search warrant and was part of that

18   search warrant.

19        So just to clarify, the first -- the initial search

20   warrant on November 22nd I was at the other residence, and

21   then the second search warrant I did join in that search

22   warrant.

23   Q.   What was found during that search warrant?

24   A.   A crate.  I mean, we found numerous things, but a crate

25   was also found there.

1    Q.   The crate had an address label on it, correct?

2    A.   Correct.

3    Q.   Who was it addressed to?

4    A.   It was addressed to Mr. Paz.

5    Q.   At a different address?

6    A.   Correct.

7    Q.   But it was there in the house that he and Shamo had

8    rented or had some deal with Mr. Lapin on, correct?

9    A.   So as I recall from our interview with Mr. Lapin, Luke

10   had signed the lease, but all the other interviews have

11   indicated that he did not live at that residence.

12   Q.   If you would look at page 3 of 6 of that report, the

13   one that says Lapin on the top, it describes a bunch of

14   photographs that were taken.

15        Do you see that?

16   A.   I do, yes.

17   Q.   Did you observe any of the items that are depicted or

18   described here in these photographs?

19   A.   Yes.

20   Q.   Specifically if you would look at the top of page 4,

21   that is the door to the crate that you have just described,

22   correct?

23   A.   Correct.

24   Q.   And you already described this, that it was sent to

25   Luke Paz at a Woodland Avenue address?

1    A.    Correct.

2    Q.    It has a phone number.  Do you see that, 801-404-3235?

3    A.    I do, yes.

4    Q.    Did you ever find out whose phone number that was?

5    A.    Yes.  I would have to verify, but I believe that is

6    Mr. Paz's.

7    Q.    Down below image 0026, what is that?

8    A.    The description is a photograph of one shipping crate

9    wall which was inscribed with a black marker U.S.A. and

10   beneath that a phone number and under this was written Luke

11   Paz MB-2.  Then it goes on.

12   Q.    And images numbers 28 through 35, do you see that?

13   A.    I do.

14   Q.    It included a shipment or at least some packing

15   information addressed to a Jessica Gleave in Provo.

16   A.    Correct.

17   Q.    She was another drop, correct, that we have already

18   talked about?

19   A.    She was, yes.

20   Q.    Going further down there -- well, I will try to make

21   this quick.  There are about ten other packages and

22   photographs that you describe or at least that are described

23   here, starting with the third paragraph of page 5, FedEx

24   tracking number 810?

25   A.    Okay.

1    Q.    I will try to go through these quickly.

2    A.    Okay.

3    Q.    It is a shipment from Thailand on October 22nd to Luke

4    Paz, correct?

5    A.    China, I believe, rather than Thailand.  The shipment

6    went to Luke Paz.

7    Q.    Thailand Street.  The street is called Thailand or

8    something like that.

9          A 40-kilogram package?

10   A.    Sorry.  I was looking at the next one down.  Yeah,

11   Thailand Street from China, yes, 40 kilograms.  Yes.

12   Q.    That was October 22nd of 2016, right?

13   A.    Yes.

14   Q.    And another one is dated November 3rd, 2016 in the next

15   paragraph?

16   A.    Yes.

17   Q.    Also a package delivered to Luke Paz, correct?

18   A.    Correct.

19   Q.    From China?

20   A.    Yes.  Correct.

21   Q.    265 kilograms?

22   A.    Yes.

23   Q.    That is a big item?

24   A.    Yes.  I mean, that is heavy.

25   Q.    A heavy item.  July 15th, 2016, the next paragraph --

1    A.   Yes.

2    Q.   Do you see that?

3    A.   I do see that, yes.

4    Q.   A 48 kilogram package delivered to Luke Paz?

5    A.   Yes, I do see that.

6    Q.   The next one down is April 6th, 2016.

7         Do you see that?

8    A.   Yes, I do see that.

9    Q.   A 45 kilogram package delivered to Luke Paz?

10   A.   Yes, I see that.

11   Q.   All of these are at 1500 Woodland Avenue, correct?

12   A.   Yes.

13   Q.   And coming from China?

14   A.   Correct.

15   Q.   The next one down is March 30th, 2016, a 96 kilogram

16   package to Luke Paz?

17   A.   I do see that, yes.

18   Q.   And the next one down is dated June 15th, 2016?

19   A.   Yes.

20   Q.   Another package to Luke Paz.

21        Do you see that?  At least it was to that same address

22   at 1500 Woodland Avenue.

23   A.   Okay.  To the same address, yes.

24   Q.   And then without going through each one you found at

25   least three more, June of '16, a 265 kilogram package and,

1    finally, in December of 2015 a large commercial pill press.

2         Do you see those?

3    A.   Can I clarify?

4    Q.   Sure.

5    A.   The large commercial pill press was seized by Customs

6    and border protection in Memphis at that time.

7    Q.   But it was a package --

8    A.   It was not to anyone in this organization.  It was a

9    clarification of types of packages seized at that point.

10   Q.   All right.  But the other ones were all addressed to

11   and ostensibly received by Luke Paz at 1500 Woodland Avenue,

12   correct?

13   A.   They were addressed to Luke Paz at that address.

14   Q.   You finally got to interview Luke Paz, right?

15   A.   Yes.

16   Q.   And when did that interview take place?

17   A.   Do I have a report?

18   Q.   Sure.

19   A.   If I remember right, it was -- so, yeah, July of 2018.

20   Q.   July of 2018, correct?

21   A.   That is correct, yes.

22   Q.   Is that in terms of your knowledge the first time he

23   was interviewed?

24   A.   Yes.

25            MR. SKORDAS:  May I have just a minute, Your

```
 1   Honor?

 2                THE COURT:  You may.

 3                MR. SKORDAS:  That is all that I have, Your Honor.

 4                THE COURT:  Redirect.

 5                       REDIRECT EXAMINATION

 6   BY MR. GADD

 7   Q.   I won't show you any reports.

 8        From November of 2015 to November of 2016 someone's

 9   wallet received 3,000 Bitcoin from AlphaBay.  Whose wallet

10   was it?

11   A.   That was Mr. Shamo's wallet.

12                MR. GADD:  That's all that I have.  Thank you.

13                THE COURT:  Any recross?

14                MR. SKORDAS:  No, Your Honor.

15                THE COURT:  Thank you.

16                You may step down.

17                MR. GADD:  Your Honor, the United States rests.

18                THE COURT:  Thank you.

19                Mr. Skordas.

20                MR. SKORDAS:  Could we approach briefly --

21                THE COURT:  Yes.

22                MR. SKORDAS:  -- just to see how you want to

23   proceed from here?

24                THE COURT:  Come over here.

25                (WHEREUPON, a bench conference was begun.)
```

1          MR. SKORDAS:  So we knew that they were going

2   until Tuesday, and I'm not making excuses, and we do have at

3   least one witness ready, but I think all we could put on

4   today is one witness.  It is going to end a little bit

5   earlier.  I thought they would probably be resting tomorrow.

6          THE COURT:  And remember we're here until just

7   before noon tomorrow.

8          MR. SKORDAS:  Then we would probably rest some

9   time early Wednesday.  We are going to put -- on the stand

10  and that would go awhile.

11         THE COURT:  What do you want to do today?

12         MR. SKORDAS:  I am sort of asking everybody.  I

13  mean, I have got Becky Shamo prepared to testify.  I need to

14  formally make a motion at this point, but I guess we can

15  reserve that.

16         THE COURT:  You can, or you can make it.

17         MR. SKORDAS:  Right.  I understand.

18         MR. GADD:  I brought my response.  I'm ready.

19         MR. SKORDAS:  I would assume so.

20         THE COURT:  You're reserving on the motion?

21         MR. SKORDAS:  Correct.

22         THE COURT:  So do we want to take a break or are

23  you ready to proceed?

24         MR. SKORDAS:  If we can have ten minutes I will

25  switch folders and be ready to go or we can go now.

```
 1                THE COURT:  How long will she take?

 2                MR. SKORDAS:  20, 30 minutes.  I prefer to do it

 3     after a break.

 4                THE COURT:  Elizabeth, lunch is probably not

 5     ready, I don't think.  It is too early for their lunch.

 6                When does lunch come up?

 7                THE CLERK:  Noon.

 8                MR. SKORDAS:  All right.  We may be done by then.

 9                THE COURT:  Well, that is all right.

10                MR. SKORDAS:  Can we have a ten-minute break and

11     we'll try to finish by noon?

12                THE COURT:  We can do that.  If we take a

13     ten-minute break, which really means 11:30, do you think we

14     can complete her and cross by noon?

15                MR. GADD:  I won't have very much on cross.

16                MR. SKORDAS:  She will be short.  She will be

17     quick.

18                THE COURT:  And then you want to wait for the next

19     witness?

20                MR. SKORDAS:  Correct.

21                THE COURT:  They bring lunch a few minutes before

22     noon.  They would have to wait, I guess.  Are you saying end

23     for the day after that?

24                MR. GADD:  He is saying end for the day.

25                THE COURT:  They can still eat their lunch, of
```

1    course.

2              MR. GADD:  One last question.  We have agreed

3    previously that Mr. and Mrs. Shamo may stay in the courtroom

4    and then his sister came in and we said no problem and we

5    don't mind if she watches.  She is family.  Do you have a

6    problem if for the mom's testimony if we asked the sister to

7    just step outside?

8              THE COURT:  Is she going to testify?

9              MR. SKORDAS:  I don't mind.

10             THE COURT:  Just for that one --

11             MR. SKORDAS:  That is fine.

12             THE COURT:  Do you want the father --

13             MR. SKORDAS:  Correct.

14             MR. GADD:  We're happy to have him in.

15             THE COURT:  Tomorrow you would go with the

16   defendant or somebody else?

17             MR. SKORDAS:  Yes.

18             THE COURT:  Sounds like the sister will --

19             MR. SKORDAS:  I missed the memo about quitting

20   early.  I don't remember you saying that.

21             MR. GADD:  We talked about that.

22             THE COURT:  I was just wondering if I was going

23   crazy.  Which of us is going --

24             MR. SKORDAS:  I am just --

25             THE COURT:  I have a judge's meeting that I have

 1  to go to.

 2          MR. SKORDAS:  We'll try to make use of our time

 3  better than we did today.  Maybe I can even get Aaron

 4  started tomorrow.

 5          MR. GADD:  And possibly the sister today?

 6          MS. BECKETT:  She flew in after a 13 hour shift as

 7  a nurse.  She could use some rest.

 8          THE COURT:  We are way ahead of schedule.  We

 9  don't need to hurry anything.  That is not an issue.

10          MR. SKORDAS:  We may close on Thursday.

11          MR. GADD:  I can't imagine that we'll have much.

12          THE COURT:  We have to settle on the instructions,

13  but we'll probably do those tomorrow I would think.

14          MR. GADD:  Okay.

15          THE COURT:  You want ten minutes?

16          MR. SKORDAS:  Right.

17          THE COURT:  And then we'll call a witness?

18          MR. SKORDAS:  Right.

19          THE COURT:  And then you'll finish with that

20  witness and finish for the day?

21          MR. SKORDAS:  Correct.

22          THE COURT:  Anything else you want to put on the

23  record here?

24          MR. GADD:  No.  Thank you.

25          (WHEREUPON, the bench conference was concluded.)

1         THE COURT:  As you heard, the United States has

2    rested its case.  There is always some time necessary in

3    between, so what we're going to do is take a ten-minute

4    break and come back and the defense is going to put on one

5    witness day and that witness will be crossed and then you

6    can have lunch and then go home today.  Tomorrow we'll go

7    from 8:30 to noon.  I think we're going to get this to you

8    probably Thursday.

9         Is that what we're predicting?  If it is Thursday

10   there would be instructions and closing arguments and then

11   you would start to deliberate.  The good news is this isn't

12   going to take four weeks, unless your deliberations take a

13   week or more.  All right.

14        Take ten minutes and get a drink and go to the

15   bathroom and whatever you need to do and we'll start at

16   11:30.

17        (WHEREUPON, the jury leaves the proceedings.)

18        THE COURT:  We'll proceed in ten minutes and

19   you'll arrange the witnesses and all.

20        (Recess)

21        THE COURT:  Are we all back?

22        Let's go get them.

23        (WHEREUPON, the jury enters the proceedings.)

24        THE COURT:  The defense may call its first

25   witness.

```
1            MR. SKORDAS:  The defense calls Becky Shamo.

2            THE COURT:  Come forward and be sworn, please.

3                         REBECCA SHAMO

4            Having been duly sworn, was examined

5                    and testified as follows:

6            THE WITNESS:  Rebecco Shamo, R-e-b-e-c-c-a, Shamo,

7   S-h-a-m-o.

8            THE COURT:  You may proceed, Mr. Skordas.

9                      DIRECT EXAMINATION

10  BY MR. SKORDAS

11  Q.   May I call you Becky?

12  A.   You may.

13  Q.   Where do you currently live?

14  A.   Phoenix, Arizona.

15  Q.   With who?

16  A.   My husband.  We're empty nesters.

17  Q.   Pardon me?

18  A.   My husband --

19  Q.   Empty nesters?  Is that what you said?

20  A.   Empty nesters.  No kids at home.

21  Q.   And your husband's name?

22  A.   Michael Shamo.  Mike.

23  Q.   He is sitting in the courtroom today?

24  A.   He is.

25  Q.   And you have been able to sit through this entire
```

1   trial, correct?

2   A.   Yes.  Forced to, yes.  No.  I have been able to sit

3   through the entire trial, yes.

4   Q.   Meaning it was a nice gesture on the government's part

5   to allow you to stay in the trial --

6   A.   Extremely.

7   Q.   -- because witnesses typically are not allowed to watch

8   each other's testimony.

9   A.   True.

10  Q.   Well, before we get into that, would you just tell the

11  jury a little bit about yourself.

12  A.   Sure.  I was actually born in Texas, so I was the only

13  one in my family that was a pure blooded born and raised

14  Texan, but I have a very long history with genealogy in the

15  Salt Lake Valley.  Fourteen out of 16 great grandparents

16  crossed the plains into the Salt Lake Valley.  My great,

17  great grandfather was the first mayor of Salt Lake City,

18  Jedediah Morgan Grant, so I have a very long history there.

19       I still have a lot of family in the valley.  My parents

20  were here and raised four kids and moved to Texas and then

21  they had me, the Texan.  My husband and I now live in

22  Phoenix.  We have four children, three girls and then a boy,

23  the last one being Aaron, and so that way I get to call

24  Aaron -- I tell him he is my favorite son.  He says I'm your

25  only son, so then I say, well, you're still my favorite son.

1    We live in Phoenix now.

2    Q.   Where was Aaron born?

3    A.   Aaron was actually born when we lived in Kearns, Utah.

4    We lived in Utah after we got married for about 13 years,

5    part of it in Kearns and then the other part up in

6    Centerville, so Aaron was actually born in Kearns.

7    Q.   Was he raised in the Kearns or Davis County areas?

8    A.   Yes, in Davis County.  We moved shortly after he was

9    born out of Kearns and moved to Centerville.  We lived in

10   Centerville for four years and then San Antonio for three

11   and then Phoenix for the last 22 or so.

12   Q.   I may have asked you this, but how long have you and

13   Mike been married?

14   A.   I didn't say.  We have been married 40 years.

15   Q.   What kind of work do you do?

16   A.   I am a stay-at-home mom.  I have kind of that 40 years

17   of stay-at-home mom experience.  I have always been at home,

18   but I work very hard at home.  I am also an avid genealogist

19   and seamstress.

20   Q.   And Aaron is your baby?

21   A.   He is.

22   Q.   Would you describe to the jury Aaron's sort of

23   upbringing just generally and don't use any medical terms.

24   You can avoid that.

25   A.   I will avoid that.  Aaron is a cute kid but he didn't

1    talk.  I had three girls, the oldest I taught to read at the
2    age of three.  The other two not so much.  They didn't quite
3    do that so well.  Aaron, on the other hand, didn't talk
4    until he was three years old.  We thought it was because his
5    sisters maybe talked for him, but at the age of two I
6    determined that this was not going well and so I taught him
7    sign language.

8        So we started out with the Whitmore.  It would be do
9    you want more water?  Do you want more milk?  Do you want
10   more juice?  I don't know sign language, but we kind of
11   picked it up kind of along the way picked up the words we
12   wanted.  I don't understand -- are you done?  We use that
13   one with the grandkids now.  Are you done?  Are you thirsty?
14   Are you hungry?  Yes.  No.  Stop.  That works really work in
15   church.  Sit down now.

16       Those were the words that I -- so because of that I was
17   able to communicate with him.  When he was three he started
18   to talk more and he couldn't say the Rs in the middle of the
19   word, world, girl.  It was really hard when you named your
20   child Aaron, and so it always came out Awon.  He struggled
21   with speaking.  As a result of that it was like in
22   kindergarten, first, second, third grade he was in speech
23   therapy classes and they would pull him out for speech
24   therapy and then they would pull him out for tutoring.  We
25   had a lot of tutoring.

1     In fourth grade they actually called and said we want

2     to put him in speech therapy and I said no.  No more.  I'll

3     actually move to New York or Boston and he will fit right

4     in.  Eventually he got to say the pesky Rs and was able to

5     say those words.

6     Q.   Where did he go to elementary and junior high and high

7     school?

8     A.   In Phoenix.  Elementary actually started in San Antonio

9     where they really like to pull you out for individual

10    tutoring.  Then we moved to Phoenix.  He was in those

11    schools and always -- we struggled all the way through.  No

12    surprises there.  He struggled.  If you don't talk real

13    early -- we know now if you don't talk real early you don't

14    learn to speak and then you don't learn to read and then you

15    are far behind and we would constantly -- you know, they

16    would send home spelling lists and I would look at them and

17    go, huh, that is great.

18    Second grade.  I remember looking at spelling lists

19    going, well, where are the three words that we can do,

20    because we were still working on sight words.  We were still

21    working on just basic words, and to have somebody say here

22    is the -- spell the word after and spell the word world and

23    spell the -- okay, the word the is there and we can do the.

24    I just ignored the spelling words.  It was a struggle.  You

25    play catch up the whole way through school.

1    Q.   It sounds like you and Mike and your family moved a

2    little bit.  Why was that?

3    A.   Work.  Through work.  Mike changed jobs from San

4    Antonio to Phoenix, but still in the medical industry and so

5    it was just work related.

6    Q.   What kind of work did Mike do or does he do?

7    A.   Currently he is a semiretired heart valve salesman.

8    Q.   He sales products for a company that assists doctors

9    with heart valves?

10   A.   Yes.

11   Q.   How long did Aaron live with you, until what age?

12   A.   Ah --

13   Q.   If you recall.

14   A.   Well, are you saying -- because he lived with us until

15   he was 16 and then he went to a residential program.

16        Is that what you're asking?

17   Q.   Yes.

18   A.   Okay.

19   Q.   At 15 we actually sent him to a wilderness program

20   called Anasazi based out of Phoenix.  That is a nine week

21   program.  It is not a residential program.  Then when he was

22   16 then we sent him to a residential program -- actually in

23   La Verkin, Utah.  It is no longer running or whatever, but

24   it was a really good, excellent program there.  He was gone

25   for 21 months in the residential program and then he

1    graduated that before he turned 18.

2        He came home for a bit and then he would be in and out,

3    went up to U.V.U., came home for a couple of months, went

4    back up, kind of in and out and in and out.

5    Q.   Did you maintain pretty regular communication with him

6    during all this time?

7    A.   Not so much.  You know, it is a -- he is a boy and boys

8    don't communicate with the parents so much.  He was going to

9    college part of the time, and so once and awhile, mostly

10   holidays, you know --

11   Q.   How did he do in college?

12   A.   Well, I paid for a lot of classes that didn't get

13   finished and, you know, he did fairly well.  I'm not sure

14   how many he actually passed.  He didn't pass rock climbing.

15   It was, like, really?  Who couldn't pass rock climbing?

16   Q.   Did there come a time prior to November of 2016 when

17   Aaron was arrested that he brought you some cash?

18   A.   Yes.

19   Q.   Describe that to the jury.

20   A.   We had been asking him to save your money, please save

21   your money.  He said I don't like banks.  I said, you know,

22   please save your money.  He said, well, if I bring you some

23   cash would you hold it for me?  We said sure.  Okay.  Good.

24   He is going to save some money.  So he brought us some money

25   in a bag and we threw it in the closet.  It was like --

1    Q.   Describe that.

2    A.   Describe?

3    Q.   I am sure it was green, but what was it?  Tell the jury

4    about the money.  Was it something that you could stick in

5    your pocket?

6    A.   No.  It was like -- you know those little shoe bag

7    things, tennis shoes -- I think it was like a shoe baggy

8    thing, so we brought it home and threw it in the closet.

9    Q.   What did you do with it?

10   A.   Threw it in the closet.

11   Q.   After that --

12   A.   I didn't do anything with it.  It just sat there until

13   he was arrested and then we thought --

14   Q.   Then what did you do?

15   A.   I'm sorry.  Through our attorney we contacted the

16   government and said, you know, we have had this money, so

17   they offered to come and get it.  So we met with -- we had

18   already met with Jeff and Megan, Jeffrey Fletcher and Megan,

19   who is now Moore, but they were already gone, and so they

20   had two postal agents, and I saw them earlier, who came by

21   the house.  We had put it into one of those little small

22   boxes, Amazon Prime boxes, so we stuck it in that and we

23   gave it over to them.

24   Q.   A picture that I think the jury saw was of the box

25   being opened or a box opened and it had I think two rows of

```
 1   cash and then some bubble pack above it.

 2          Do you recall that?

 3   A.    Yes, so it didn't roll around inside.

 4   Q.    But you packed it that way?

 5   A.    Yes.

 6   Q.    It didn't come to you that way?

 7   A.    No.  No, we packaged it that way.

 8   Q.    Why?

 9   A.    So we could seal it up and hand it off.

10   Q.    Okay.  What did you do with the money before you

11   packaged it that way?  Did you account for it in anyway?

12   A.    I did.

13   Q.    What did you do?

14   A.    I didn't quite -- we want to trust the government.  I

15   counted it.  I didn't change any of the -- because it had

16   wrappings on it, but I didn't change any of that, and I

17   counted it so that I would know that however much I had

18   handed over to the government actually made it to the

19   government.

20   Q.    In fact, that is what happened?

21   A.    That is what happened.  So when they left I said please

22   give me an accounting so that I know how much we are handing

23   over to you.

24   Q.    And their number was the same as yours?

25   A.    It was the same, yes.
```

```
 1   Q.   Let me ask you this.  After Aaron brought you the money

 2   in the bag, did you and Mike use any of it?

 3   A.   No.

 4   Q.   Why not?

 5   A.   It is not ours.

 6   Q.   You assumed it was Aaron's?

 7   A.   Well, of course it was Aaron's.  He gave it to us to

 8   keep.

 9   Q.   Not to have?

10   A.   No.

11   Q.   Was there another bit of money that he brought you?  We

12   have heard some discussion about a $10,000 transfer.

13   A.   You know, I actually don't remember that.

14   Q.   We have also seen some evidence that he mailed you some

15   wine.  Do you recall that?

16   A.   Yes.  It was one side or the other of when he was

17   arrested, and I can't remember which one, and we get this

18   box in the mail and it comes from a winery.  It is probably,

19   you know, like -- I don't know.  Maybe not quite that big.

20   It is like this big.  It is like this is so random.

21        So we just put it off to the side because we didn't

22   know what to do with it because we don't drink, and so then

23   when he was arrested I actually opened it to see what was

24   inside, and I kind of lifted everything out and everything

25   does not go back in the way it is supposed to, so the lids
```

1    are still kind of -- I have it upstairs under the desk.

2    Q.   It is still there?

3    A.   Yes.

4    Q.   In Arizona?

5    A.   In Arizona, yeah.  I figured that the government --

6    they had taken everything of Aaron's and either confiscated

7    it or destroyed it and he didn't have any personal

8    possessions at all, and I figured they would come for that

9    or they would at least ask me what the box was so I didn't

10   want to get rid of it, so I kept it and I still have it.

11        If you would like it I would be happy to give it to

12   you.  I figured they would come and get the wine because

13   they had taken everything else of Aaron's.

14   Q.   It ages, so hang onto it.

15   A.   I'm sorry?

16   Q.   It ages.

17   A.   It ages.  Hang onto the wine?

18   Q.   Yeah.

19   A.   No.  They never came for it.  They can.  I still have

20   it.  I don't even know what kind it is.  It just came from a

21   winery.  I don't know if it is any good or not.  Sorry.

22   Q.   You have been able to sit here I think for most or

23   maybe even all of the trial, correct, Becky?

24   A.   I have been here, yes.

25   Q.   And I assume you have learned some things that you

1   didn't know before?

2   A.   That is true.

3   Q.   I mean, I am just wondering in terms of Aaron and what

4   you know about him, what is your impression of what you have

5   heard over the last couple of weeks?

6   A.   You know, it is a hard thing.  As a parent you love

7   your child and you want the best for them.  You want to

8   strangle them at times, so it is hard to listen to this.  It

9   is really hard to listen to the characterization, because I

10  know that he struggled growing up and I know when he was a

11  pre-teen I found that if I said something to him I couldn't

12  get him to pay attention, maybe, maybe not, but I found --

13  this works actually that if you touch them on their shoulder

14  or their arm and call them by name, that Aaron would then

15  look at me and I would know I had his attention.

16       I would say Aaron and he would look at me and I could

17  get his attention.  I listen to this and I think, you

18  know -- it is hard to listen to some of the

19  characterizations, because he can't stay focused on so many

20  things.  You know, he is very distracted.  It is -- he is my

21  son.  I love him.  You know, I still want to strangle him,

22  but at the same time I know that some of the things that --

23  he does not understand innuendo or suggestion or sarcasm.

24  So if I would say, gee, it would be really good if you

25  cleaned your room.  He would think, yeah, it probably would

1  be, but he didn't do it.  It wasn't a command.  It wasn't a

2  real suggestion.

3       I would have to say very direct that you have to do

4  this.  I had to tell his elementary school teachers, you

5  know, don't ask him if he understands, because he learned

6  early on that people want you to -- adults want you to nod

7  your head.  So if they say do you understand and he would

8  go -- [nodding gesture] -- and he might not have understood.

9  So when they started actually asking him questions then they

10 realized he didn't get some of what was going on.

11      So we learned that one early on.  I had to say it

12 straight.  You can't -- innuendo, sarcasm, facetiousness

13 does not work.  Say it straight.  If you expect something

14 you just say it straight and then he will understand.  So,

15 you know, yes, I differently learned some stuff here that I

16 didn't know.  Actually plenty of stuff I didn't know.

17 Q.   Including the fact that Aaron did some incredibly dumb

18 and maybe bad things, correct?

19 A.   Incredibly dumb, incredibly bad, so many things that

20 you think what were we thinking?  You know, why would you do

21 that?  Why would you associate with these people?  He never

22 was really good at choosing friends and eventually still

23 isn't, you know, so --

24 Q.   You have been able to maintain some level of

25 communication with him in the last three years, correct?

```
 1   A.    Yes.  Yes.  Even though it costs you money every time
 2   you communicate with somebody in jail or do anything for
 3   them at jail, we have maintained money on our phones so he
 4   can call us anytime.  Sometimes it is a couple times a week.
 5   Most the time it is a couple times a week.  So he calls --
 6   especially last year I was diagnosed with stage two breast
 7   cancer, so he would call and see how I was doing.  He was
 8   very concerned.
 9   Q.    You have not been able to be physically with him for
10   almost three years?
11   A.    Right.  Up at Weber they have a really lousy system --
12   Q.    The Weber County Jail?
13   A.    Weber County Jail.  He was first in Weber County Jail.
14   I don't know which way I'm pointing.  It was Weber County
15   Jail and it is video.  You are actually in the jail and it
16   is still a video.  It is a really lousy screen.  He got
17   moved down in probably January to Salt Lake County and it is
18   better.
19        So it is a barrier so we actually have barrier visits
20   which is really nice.  You can't touch them, but you have a
21   barrier visit, which is better than the video system up in
22   Weber County.
23   Q.    When was the last time you did touch him?
24   A.    Let's see.  I don't know.  2016.  He was supposed to
25   come down for Thanksgiving and he was picked up three days
```

1    before Thanksgiving.  The Christmas before that maybe.

2              MR. SKORDAS:  That is all that I have, Your Honor.

3              THE COURT:  Thank you.

4              Cross-examination.

5                        CROSS-EXAMINATION

6    BY MR. GADD

7    Q.   I'm sorry we're meeting again under these

8    circumstances.  I hope you don't blame yourself.  It is

9    clear that you love him and you would do anything for him.

10             THE COURT:  I can't hear you, Mr. Gadd.

11             MR. GADD:  Sorry.

12   BY MR. GADD

13   Q.   It is clear that you love him and you do and you have

14   said that.

15   A.   Yes, I have.

16   Q.   You tell him that in your phone calls?

17   A.   Yes, I do.

18   Q.   There is nothing that you wouldn't do for him?

19   A.   Do you mean as a mother?

20   Q.   Yes, as a mother.

21   A.   I would always stand by him.  He is my son.  I love

22   him.

23   Q.   Sure.  I don't want to ask you many questions.  Mr.

24   Skordas asked you about the money.

25   A.   Uh-huh.

1    Q.   When we met back in 2017 and when you talked with those

2    agents with your attorney present, you told them that Aaron

3    had brought you the money when you were on vacation in Utah?

4    A.   Uh-huh.  Yes.

5    Q.   The place outside of St. George.  I am blanking on the

6    name.  Pine Valley?

7    A.   Yes.

8    Q.   That was not 100 percent true though.

9    A.   Yes, it is.

10   Q.   Did you know your attorney called me afterward?  Did

11   you know he called to clarify that Aaron hadn't actually

12   given all the money just to you and Mike?  Did he tell you

13   he was calling me?

14   A.   I'm sorry?

15   Q.   Did Scott, your attorney, did he tell you he was going

16   to call and clarify that?

17   A.   I have no idea.

18   Q.   There was a phone call with you and Mr. Shamo, the

19   defendant, Aaron, and he was pretty mad at you for handing

20   over his money.

21        Do you remember him being mad?

22   A.   He was.

23   Q.   He told you that the money was in two places not just

24   one and then you said, well, that is not what we told them,

25   is it?

1    A.    I do not recall that.

2    Q.    You told the jury briefly about that annoying system

3    and that is something that you and I can agree on.  It is an

4    annoying system where you talk to the defendants in jail,

5    especially the one in Weber County, right?

6    A.    Yes.

7    Q.    And it says at the beginning that this is recorded.  On

8    April 6th, 2017, Mr. Shamo, the defendant, said to you,

9    like, you know, there are two occasions for what you gave

10   over, right?  You know that there is two pieces of that?

11   And then you replied, yes, I know.  And we didn't say that,

12   though, did we?  He was still pretty mad at you at that

13   point.

14        So when the agents heard that they were a little

15   concerned and they called your attorney and he clarified it.

16   Do you want to tell everyone where the other part of the

17   money came from?

18   A.    Well, your question was what was the money that Aaron

19   gave to us so I answered that.

20   Q.    Sure.  I'm not looking to cause any trouble, I really

21   am not, but was there somewhere else that he had the money?

22   A.    I believe there was an occasion that he -- that our

23   daughter Mary Ann had gone to visit him in Utah, and so he

24   said I have a backpack to send to mom and dad and she took

25   it and threw it in the car with her three children and they

1    went on vacation and drove it down, so, yes.

2    Q.    I am really not trying to cause you anymore pain.

3    Could it be that maybe that part of the story was left out

4    because you were just trying to shield your daughter from,

5    you know, all of this and the investigation and all of that?

6    A.    Well, the question was, sir -- the question was what

7    was the money that Aaron gave to us and that is the money

8    that he gave to us.  He did give some money to Mary,

9    although she didn't know what it was.

10        She actually gave it over to us and didn't know what

11   was in it.  She threw it in the back with the kids and

12   traveled down, and so through her, if you want to be

13   technical about it, then through her we received a little

14   bit of additional money there.

15   Q.    You talked for a minute about some of the efforts that

16   you went to to teach Aaron to read and things like that and

17   not to use sarcasm.  He grew up though, right?

18   A.    I don't believe I taught him not to do sarcasm.  I

19   don't know how you teach people not to do sarcasm.

20   Q.    For sure.  That was probably just a bad question.  You

21   remember just explaining that you tried not to use sarcasm

22   with him?

23   A.    I found it didn't work.

24   Q.    Right.

25   A.    I tried.  It didn't work.

1    Q.   And he grew up?

2    A.   He did grow up.  Was there more to that question?

3    Q.   Yeah.  In another one of those jail phone calls that is

4    recorded you and he are talking and your husband is on the

5    phone with you.  Would you sometimes call, you know, the two

6    of you call Aaron together or vice versa?

7    A.   He only calls us.  That is the only way that works in

8    jail.

9    Q.   And you both talk to him?

10   A.   If we are both there at home.

11   Q.   You are talking about plans for once he gets out and

12   businesses and things that he wants to get involved in and

13   he says this to you, doesn't he?  He says I'm really good at

14   analyzing.  I don't know if I told you this, but I was even

15   looking at a little thing of ibuprofen.  Like here in the

16   jail they charge us for ibuprofen, a bottle of ibuprofen,

17   and I'm sitting there like, you know, analyzing, okay, so a

18   bottle you buy in bulk, it is like cutting it down to 10 to

19   30 cents, and the ibuprofen ingredients you have

20   microcrystaline cellulose and you have a binder and you have

21   a mixer and you have basically all of this stuff and the raw

22   materials for the main ingredient in ibuprofen itself by the

23   kilo you can buy it for like 30 bucks to 40 bucks.  Cheap.

24   So then you're making ibuprofen extremely cheap and I could

25   undercut the market just -- then he goes on.

```
 1        Do you remember having that conversation with him?
 2   A.   Vaguely.
 3   Q.   On May 7th, 2017?
 4   A.   That still does not mean I remember it.  We have a lot
 5   of conversations.
 6            MR. GADD:  I have nothing further.  Thank you.
 7            THE COURT:  Thank you.
 8            Any redirect?
 9            MR. SKORDAS:  Just one question.
10                      REDIRECT EXAMINATION
11   BY MR. SKORDAS
12   Q.   Becky, did you withhold any money or anything besides
13   the wine that Aaron gave you that may have been the proceeds
14   of this matter?
15   A.   No.
16            THE COURT:  Thank you.  You may step down.  Thank
17   you.
18            Did you want to call another witness?
19            MR. SKORDAS:  Yes.  It will be brief.  She is
20   outside.
21            THE COURT:  All right.
22            Come forward and be sworn, please.
23                    STEPHANIE SHAMO ARBELAEZ
24          Having been duly sworn, was examined
25                   and testified as follows:
```

```
 1            THE WITNESS:  Stephanie Shamo Arbelaez.
 2   Stephanie, S-t-e-p-h-a-n-i-e, Shamo, S-h-a-m-o, Arbelaez,
 3   A-r-b-e-l-a-e-z.
 4            THE COURT:  You may proceed, Ms. Beckett.
 5                    DIRECT EXAMINATION
 6   BY MS. BECKETT
 7   Q.   Stephanie, thank you for being here.  I'm going to give
 8   you a cautionary instruction, because you and I have the
 9   same tendency to speak very fast, and so for our illustrious
10   court reporter if we could slow down between the two of us
11   this will go a lot better.
12   A.   I will definitely try.
13   Q.   Stephanie, how do you know Aaron Shamo?
14   A.   So Aaron is my baby brother.  Sorry.  I am eight years
15   older than him, so I used to carry him around on my hip when
16   he was born.
17   Q.   Is it safe to say you kind of helped raise him a little
18   bit?
19   A.   Yeah.  I used to drive him around.  I took him to
20   school.  I watched him get bullied all growing up and I have
21   watched it again in this courtroom.
22   Q.   I imagine being here is -- you are okay.  Take a deep
23   breath.
24        I imagine being here is not easy for you.
25   A.   I flew in this morning because everybody needs somebody
```

 1    on their side.

 2    Q.    Because of the age difference between you and Aaron,

 3    you got to see him grow up --

 4    A.    Yeah.

 5    Q.    -- and got to see him through junior high and all those

 6    awkward years that we all experience.  Tell the jury for me

 7    what Aaron's junior high experience was like from your

 8    perspective and how he made friends and what kind of kid he

 9    was.

10    A.    Aaron -- he kind of struggled finding friends.  He was

11    a little heavier and so he played video games.  He did -- he

12    got bullied and he would come home and tell us -- there are

13    three of us older girls, and so we would get pretty

14    defensive when anybody kind of bullied him.  You know, I

15    don't have kids of my own, but like Aaron was like my

16    favorite.  I'm sorry.  I did not expect to cry.

17        He was dragged around to all of our soccer games and

18    all of our events and he always like -- I think what is

19    really hard about sitting up here is you always want to say

20    like that somebody is perfect and don't want to show that

21    they have any faults, and I think the hard thing is Aaron

22    would have done anything to have friends.  I watched that

23    and I watched him like try to fit in.

24        If he was told to wear Hollister, he would wear

25    Hollister.  If his friends or anybody he met was wearing

1    black, he would wear all black and so I saw him evolve over

2    the years.

3    Q.   Is it safe to describe him as a people pleaser?

4    A.   Oh, yeah.

5    Q.   I assume he did with this his older sisters, too?

6    A.   Oh, yeah.  It is hard to have three older sisters.  I

7    feel bad for him.

8    Q.   Would you describe Aaron as organized?

9    A.   No.

10   Q.   Agents interviewed you last year?

11   A.   Uh-huh.  In my pajamas.  Yes, those two, they showed

12   up.  I work three nights a week pretty much and they showed

13   up and I was actually sleeping in my pajamas, but they came

14   knocking.  And, you know, it is funny, like, maybe I

15   shouldn't have talked to them, but I wanted them to see

16   Aaron came from a good family.

17        I'm so sorry.  Oh, my gosh.

18   Q.   It is okay.  Take a deep breath and take a second if

19   you need it.

20        You have heard some things in this courtroom about your

21   baby brother that I imagine were difficult to hear?

22   A.   Yeah.

23   Q.   But you sit here today and would acknowledge that some

24   of the things -- some of the choices that he made were not

25   great?

1    A.    Yeah.

2    Q.    But you're here.  Why?

3    A.    I think one of the hardest things is I wanted this to

4    be fair.  I wanted a fair trial.  Not once did they ever

5    interview Aaron.  They didn't ever ask to talk to him

6    without a lawyer.  You want to believe in the legal system,

7    and a family member who does not get a chance to actually

8    give their side -- I just want it to be far.  Whatever it is

9    I want it fair.

10   Q.    Stephanie, what do you do for a living?

11   A.    I am a nurse in a hospital in Reno.

12   Q.    So you take care of people for a living?

13   A.    I do.  I get to love people regardless of the decisions

14   they make.  I don't have to decide or find any fault.  I

15   just love them and help them get better.

16          MS. BECKETT:  If I could have just a minute, Your

17   Honor?

18          THE COURT:  Yes.

19   BY MS. BECKETT

20   Q.    Stephanie, we have heard some testimony throughout this

21   trial that Aaron and his friends and some of the individuals

22   took trips to Vegas and Tahoe.

23          Are you aware of some of those trips?

24   A.    Yeah.  I lived in Vegas for eight years.  Aaron used to

25   come and stay with me with his friends all the time.  In

1   Tahoe he actually came and stayed and I went to Snow Globe.

2   It is a music festival that I got us tickets for.  I got

3   free tickets.  We went and went to Snow Globe together.

4       We would go to concerts together and I am able to spend

5   time with my brother.  So on some of these trips I was

6   surprised that he came and stayed with me.  He was at my

7   house with his friends.  I know some of these guys that have

8   been on here, because they have come over several times.

9           MS. BECKETT:  I have no further questions, Your

10  Honor.

11          THE COURT:  Thank you, Ms. Beckett.

12          Cross-examination?

13          MR. BURGGRAAF:  No questions, Your Honor.

14          THE COURT:  Thank you.

15          Thank you.  You may step down.

16          Your next witnesses start tomorrow, right?

17          MR. SKORDAS:  Yes.  I apologize, Your Honor.

18          THE COURT:  All right.  Ladies and gentlemen of

19  the jury, thank you again for your work and attention.  All

20  of the rules apply about talking and not talking and so on.

21  We'll see you at 8:30 in the morning.  Tomorrow, remember we

22  will just go to noon tomorrow.

23          Thank you.

24          (WHEREUPON, the jury leaves the proceedings.)

25          THE COURT:  We'll be in recess on this matter

1    until 8:30 tomorrow.

2              (Proceedings adjourned.)