1              IN THE UNITED STATES DISTRICT COURT

2                       DISTRICT OF UTAH

3                       CENTRAL DIVISION

4

5    UNITED STATES OF AMERICA,       )

6             Plaintiff,             )

7    vs.                             )     Case No. 2:16-CR-631DAK

8    AARON MICHAEL SHAMO,            )

9             Defendant.             )

10   _____)

11

12

13           BEFORE THE HONORABLE DALE A. KIMBALL

14           ------------------------------------

15                     May 17, 2019

16

17        Status Conference on Pretrial and Trial Issues

18

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2

 3    For Plaintiff:          S. MICHAEL GADD
                              348 East South Temple
 4                            Salt Lake City, Utah

 5                            VERNON G. STEJSKAL
                              111 South Main Street
 6                            Suite 1800
                              Salt Lake City, Utah
 7
                              KENT A. BURGGRAAF
 8                            348 East South Temple
                              Salt Lake City, Utah
 9

10    For Defendant:          GREGORY G. SKORDAS
                              KATYLIN V. BECKETT
11                            560 South 300 East
                              Suite 225
12                            Salt Lake City, Utah

13

14

15

16

17

18

19

20

21
      Court Reporter:         Ed Young
22                            351 South West Temple
                              Room 3.302
23                            Salt Lake City, Utah 84101-2180
                              801-328-3202
24                            ed_young@utd.uscourts.gov

25
```

```
 1    May 17, 2019                              11:00 p.m.

 2                    P R O C E E D I N G S

 3

 4         THE COURT:  We're here this morning in the matter

 5    of the United States of America versus Aaron Shamo,

 6    2:16-CR-631.  The United States is represented by

 7    Mr. Michael Gadd, Mr. Vernon Stejskal and Mr. Kent

 8    Burggraaf.  The defendant is not present and is not required

 9    to be present and is represented by Mr. Gregory Skordas and

10    Ms. Kaytlin Beckett.

11         Correct?

12         MR. SKORDAS:  Yes, Your Honor.

13         THE COURT:  All right.  Thank you for being here.

14         First I want to talk about the length of the

15    trial.  It seems to me that 23 days would be plenty of time

16    to put on this evidence to get this case tried.  That is

17    five weeks minus the 4th and 5th of July.

18         Here is how I see it.  On the first day, and that

19    is the 17th of June, we would pick a jury and have opening

20    statements, limited to an hour and a half and shorter would

21    probably be plenty of time enough, but you can have an hour

22    and a half each.

23         The last day would be instructions and closing

24    arguments.  Again, an hour and a half ought to be enough.

25    That leaves 21 days for evidence.  The government has the
```

 1  burden so I will give them 11 and you can have ten.  No
 2  cross-examination -- I have never done this before, but I
 3  can see this trial lasting all summer and I don't have all
 4  summer.  No cross-examination will be longer than the direct
 5  except under extraordinary circumstances.
 6          Now, decide which witnesses you really need and
 7  which ones you really want to call.  I run an 8:30 to 2:00
 8  or 2:30 day.  There will be a couple of days when we can
 9  probably go all day.  Now, if there is something
10  extraordinary that happens and you can convince me that we
11  actually need more time, I will at least consider it.
12          Let's see.
13          MR. SKORDAS:  What we're talking about, Your
14  Honor, and I think you'll be pleased --
15          THE COURT:  I like to be pleased.
16          MR. SKORDAS:  -- is that the defense's case does
17  not require ten days.
18          THE COURT:  How many days do you require?
19          MR. SKORDAS:  I am offering him one or two of our
20  days.
21          THE COURT:  I am pleased.  You're right.
22          MR. SKORDAS:  Michael is suggesting that maybe he
23  can do his case in 12 days.
24          MR. GADD:  Yes.  Our last witness is a medical
25  doctor that works an E.R. schedule and teaches and so we

```
1    scheduled her about four months in advance and she is

2    planning on July 3rd.

3              THE COURT:  Is that the 12th day?

4              MR. GADD:  I believe the 12th, yes.

5              THE COURT:  Well, you can trade days, too, if you

6    need to on witnesses.  Okay.  That will work.

7              I am pleased, Mr. Skordas.

8              MR. GADD:  I deeply appreciate it and we will be

9    done on the 3rd.

10             THE COURT:  That gives you, what, eight or nine

11   days?

12             MR. SKORDAS:  Yes.  We can do our case in five or

13   six days, guaranteed.

14             THE COURT:  I am even more pleased.  All right.

15             Let's see here.  Do we need alternate jurors?

16             MR. GADD:  Yes, please.

17             THE COURT:  I can go down I think to 11.  If we

18   only had 12 and somebody got run over during the trial I

19   could go to 11.  I don't think I can go below 11 in a

20   criminal case.

21             Do you want one or two alternates?

22             MR. SKORDAS:  I think one is plenty, but I will

23   leave it up to the state.

24             MR. GADD:  The risk --

25             THE COURT:  The United States.  You said the
```

1    state.

2            MR. SKORDAS:  I am in the wrong building.  I

3    apologize.

4            MR. GADD:  Mr. Burggraaf and I understood exactly

5    what he meant because we are employed by the state.  The

6    risk adverse side of the room wonders if we could have two

7    alternates.

8            THE COURT:  Sure.

9            MR. SKORDAS:  That is fine.

10            THE COURT:  So that means we start with a base of

11    30, because you have six preemptories and, Mr. Skordas, you

12    have ten, so that is 16 and 14, 30, and we're getting, what,

13    75 or so?

14            THE CLERK:  75.

15            THE COURT:  That ought to be doable.

16            All right.  What about witness exclusion?

17            MR. SKORDAS:  We're going to ask that the Court

18    invoke the exclusionary rule.  I assume the government will

19    also.

20            MR. GADD:  We do.  There may be some exceptions

21    that we can work out now, but --

22            THE COURT:  What about experts?

23            MR. GADD:  We would like to keep our experts in

24    and case agents.  I know the defense has put Mr. Shamo's

25    parents on their list and, of course, we won't object if

1    they stay in for the trial.

2            THE COURT:  And your experts.  Usually we leave

3    experts in.

4            MR. SKORDAS:  Yes.  That is fine.

5            THE COURT:  And the parents?

6            MR. GADD:  I can't tell the parents not to come.

7    I think they should be allowed to stay.

8            THE COURT:  Witness exclusion except for the

9    defendant's parents and your experts and witness exclusion

10   except for your case agent and experts.

11           MR. GADD:  Thank you, sir.

12           THE COURT:  The defendant wants to wear a suit,

13   which he can do at trial, but, otherwise, no, because

14   without a jury he does not need a suit and it just causes

15   problems for the marshals.

16           MR. SKORDAS:  Agreed.

17           THE COURT:  Now, have you seen the government's

18   exhibit list?

19           MR. SKORDAS:  Yes.

20           THE COURT:  That is the kind of exhibit list we

21   need from you.

22           MR. SKORDAS:  Very well.

23           THE COURT:  Can you get it within a week?

24           MS. BECKETT:  I believe Mr. Sam and I were working

25   on that and we thought we could have it by the 24th, Your

1    Honor.

2              THE COURT:  All right.  Good.

3              Now, I need you to take a shot, each of you, at a

4    summary of the indictment.  Not long after I came over here

5    a very experienced assistant U.S. attorney told me that I

6    had to read the entire indictment.  I was happy to find out

7    that he was not very often wrong but he was wrong about

8    that.  I don't have to.

9              That was Wayne Dance if you're curious.  Mr. Dance

10   was a very good lawyer and like a judge he always thought he

11   was right, but he was not right about that.

12             I would like a summary of the indictment that I

13   can read in five to seven minutes and you can each give me

14   one or you can agree on one.  If you each give me one, I

15   will pick the one I like or amalgamate them.  I am talking

16   about what I read to the jury as part of the voir dire.

17   That is what I'm talking about.

18             MR. SKORDAS:  I think that would be very easy to

19   get done.  I think the government can provide a copy and

20   we'll look it over.

21             THE COURT:  Good enough.

22             Now, some of these motions I think I can rule on.

23   Let's talk for a minute about this potential sentence.  What

24   is it you really want to do, Mr. Skordas, with respect to

25   talking about sentencing, possible sentences?

1          MS. BECKETT:  Your Honor, I can speak to that a

2     little bit.

3          THE COURT:  All right.

4          MS. BECKETT:  I think the government's original

5     motion kind of misconstrues what we are trying to do.

6     Obviously we don't want to tell the jury and we know we are

7     barred from telling the jury that there is a mandatory life

8     sentence for Mr. Shamo, that there is the potential for

9     that, but what we do want to be able to address is that

10    there is a significant disparity, given the conduct of

11    specifically Mr. Crandall and Mr. Paz, and the

12    acknowledgments that have been made by the government in

13    terms of what their conduct is and how it relates to Mr.

14    Shamo's conduct, and because they will be called as

15    witnesses, we think we are entitled to address their role

16    and the plea agreements that are very favorable to them,

17    that have been offered to them in terms of bias and

18    motivation to limit what they are saying their role was.

19         THE COURT:  You're certainly entitled to do the

20    last two things.  You are entitled to cross-examine them on

21    their role and you're entitled to cross-examine them about

22    bias and you're entitled to cross-examine them on what they

23    expect and if they are getting anything for their testimony.

24         Anything else you want to tell me?

25         MS. BECKETT:  That was our main concern.  They

1   have not obviously been sentenced and we would like to be

2   able to ask them whether or not they -- that their

3   understanding is that they will be sentenced after Mr. Shamo

4   is sentenced, if he is in fact sentenced, because that is

5   our understanding that the government's intention is to

6   raise their potential sentences based on the sentence they

7   believe they can get on Mr. Shamo.

8          Without really going down the road of what Mr.

9   Shamo is looking at, we do want to be able to address that

10  their sentencing has been delayed, and specifically in Mr.

11  Paz's situation, that he has been out on pretrial release

12  the entire time despite the fact that his conduct is similar

13  to Mr. Shamo's and possibly even more egregious in our

14  opinion.

15         THE COURT:  Thank you.

16         What do you say to that?

17         MR. GADD:  I don't believe the Court or the

18  defense has had a chance to see it, but we replied to their

19  response just maybe 30 minutes ago.  The Court picked up

20  quickly that --

21         THE COURT:  I am quick, but not that quick.

22         MR. GADD:  No.  Maybe it makes sense to take what

23  we say here under advisement and then have a chance to look

24  at it.  So just now the Court recognized that some of the

25  things Ms. Beckett was talking about are permissible areas

1    of inquiry and argument and others are not.  As I looked

2    through their response to my initial motion, I saw two

3    categories, things permissible and not permissible, so I

4    tried in the reply to break them down into categories.  I

5    think --

6            THE COURT:  We'll look at that and then I will

7    rule later on on it.

8            MR. GADD:  Thank you.

9            THE COURT:  All right.  We have talked about the

10   exhibit list.

11           Now, on these experts we have a motion to strike

12   Shafto, a motion to strike Haddix, and they are not briefed

13   yet fully, a motion to strike Wheeler and a request for a

14   Daubert hearing.  Do we need Daubert hearings on Shafto or

15   Haddix or can I rule on the briefs when I get them?

16           MR. GADD:  We don't feel like we know what their

17   opinions are or the basis, so we just can't say whether or

18   not we would like to request one until we find out what are

19   they actually going to testify to.  What are they going to

20   say?  How do they arrive at those opinions?

21           THE COURT:  All right.  Which one of you wants to

22   give me a minute on that?

23           MS. BECKETT:  So I think part of this is it has

24   been pretty clear in the notices that we did provide Your

25   Honor that I think --

```
 1              THE COURT:  Clear what?

 2              MS. BECKETT:  Ms. Haddix's testimony will deal

 3      specifically with the death resulting count and the

 4      conclusions made by the government's expert and the basis

 5      for those opinions.  It is going to address those.  I think

 6      that was pretty clear in our notice.  We have not received a

 7      report from her.

 8              I do not believe a Daubert hearing would be of any

 9      value on Ms. Shafto.  Her opinion is going to be based on

10      the general background of the investigation.  She was a

11      narcotics officer for Unified P.D. and very recently retired

12      and I think, again, her notice was very clear in what her

13      testimony would entail.  She does not plan to provide

14      specifically a report.

15              In terms of Mr. Wheeler, I may want to have a

16      further discussion with Mr. Gadd about this as to what they

17      are actually requesting the Daubert hearing on before we

18      need to schedule that.

19              THE COURT:  All right.  Now, what do you folks

20      envision about what we will be doing on the three days that

21      you asked for in hearings at the end of May?  I suppose we

22      could use part of it for any Daubert hearing that we needed,

23      right?

24              MR. SKORDAS:  Yes.

25              THE COURT:  Okay.  What else?
```

1          MR. GADD:  Your Honor, I have been telling my

2     potential witnesses for the hearing that if they are in

3     state we will likely call them on the 29th, and if they are

4     out of state we'll call them on the 30th.  My hope was to

5     save open the 31st for oral argument on motions or a Daubert

6     hearing or things of that nature.

7          I have given the Court and the defense a copy of

8     our proposed exhibits.  I just wanted to briefly talk about

9     the highlighting in it in answer to the Court's most recent

10     question.  Some of the highlighting, like on the first page

11     you can see yellow.

12          THE COURT:  Yes.

13          MR. GADD:  That is stuff I would like to address

14     later in the hearing.  As you flip through, for example, on

15     page 8 --

16          THE COURT:  Eight?

17          MR. GADD:  Starting on page 8 there is some very

18     light green highlighting.

19          THE COURT:  I see it.

20          MR. GADD:  And then more so on page 9, quite a bit

21     on page 9 and a fair amount on page 10 and then all of page

22     11.  The green highlighted exhibits are the exhibits that

23     the defense has objected to.  We went with not just their

24     most recent motions, but the motions filed last November and

25     December, and --

1          THE COURT:  The light green highlights are

2     objected to?

3          MR. GADD:  Yes, Your Honor.

4          Your Honor gave us an order at the beginning of

5     April saying any party challenging an exhibit as

6     inadmissible at the preadmission hearing must make a

7     specific written objection to the exhibit and submit the

8     objection as part of a motion in limine and in accordance

9     with the motion in limine deadlines.  Those have been

10    objected to and we will be prepared to put on the foundation

11    and then we can argue about the objections.

12         THE COURT:  The rest are not objected to; is that

13    correct?

14         MR. SKORDAS:  That is correct.

15         THE COURT:  Thank you for that.

16         MR. GADD:  We're hopefully narrowing it down some.

17         THE COURT:  Good.

18         MR. GADD:  My request would be, since they have

19    not been objected to, that the Court admit the other

20    exhibits so I can call off those witnesses and we can focus

21    just on the exhibits that they take issue with.

22         THE COURT:  That makes sense to me.

23         MR. SKORDAS:  And to us, Your Honor.

24         THE COURT:  So the unobjected to exhibits in the

25    government's exhibit list are admitted and they will be

1      admitted into evidence and the ones that we have a question

2      about are the ones outlined in light green.

3                  MR. GADD:  Yes, Your Honor.

4                  THE COURT:  All right.

5                  MR. SKORDAS:  Well, I guess they are admitted in

6      terms of foundation.  We won't have a foundation objection,

7      but if we have -- I don't know that we would, but if there

8      is some relevancy issue based on how the evidence is

9      presented, we would like to preserve that.

10                 THE COURT:  I understand that.

11                 MR. SKORDAS:  We were trying to save the Court a

12     bunch of foundation witnesses.

13                 THE COURT:  That pleases me, too.  Foundation,

14     that is important to get out of the way.

15                 MR. GADD:  Sure.  I think that is fair.  If we are

16     three days into the hearing and I put up an exhibit and they

17     say, wait a minute, that is 404(b).  I think that is a fair

18     argument for them to make at that point.

19                 THE COURT:  So the three days will be foundation

20     on the objected to exhibits --

21                 MR. GADD:  Yes, Your Honor.

22                 THE COURT:  -- and any Daubert hearings that we

23     need?

24                 MR. SKORDAS:  Correct.

25                 THE COURT:  Right?

1          MR. GADD:  Yes, Your Honor.

2          THE COURT:  All right.

3          Do you have any more questions about that?

4          THE CLERK:  No.

5          MR. SKORDAS:  It won't take three days, Your

6     Honor.

7          MR. GADD:  I agree.  Because we have already

8     started scheduling flights and things, and since more of my

9     witnesses are from out of state than in state, I wonder if

10    we could just start on the morning of those three days and

11    work until we are done and then maybe pick it up the next

12    morning rather than change all of the flights?

13         THE COURT:  Yes, that is fine.

14         MR. SKORDAS:  Yes, that is fine.

15         THE COURT:  That makes sense.

16         Now, it seems to me that the proffer on the James

17    hearing is more than sufficient.  I don't see any necessity

18    for a James hearing.

19         Do you want to put something on the record to

20    preserve an objection on that?  I mean, I have had a few

21    James hearings over the years and I have held a few times

22    that the proffer was sufficient and that I didn't need it.

23         MR. SKORDAS:  We're fine with that, Your Honor.

24         THE COURT:  All right.

25         Now, motion 171, excluding, and motion 202, they

```
 1    are part of the light green stuff, right?

 2            MR. GADD:  I am afraid I will have to pull up the

 3    docket quickly, but I believe yes.  We took motions from

 4    last year and this year and tried to make sure we captured

 5    all of them in that light green highlight.

 6            THE COURT:  Now, with respect to the three

 7    customers or three people -- I guess I don't know whether

 8    they are customers or not -- the three people who are dead,

 9    the government does not claim that the defendant has any

10    responsibility for those three people as I understand it.

11            Right?

12            MR. SKORDAS:  Correct.

13            THE COURT:  But I think they are entitled to

14    explain why they are not calling them so it does not look

15    like they had a witness they could call and they didn't.

16            MS. BECKETT:  I think we would agree with that and

17    we have not filed our final reply brief on that, but the

18    concern there is still mentioning it as an overdose death

19    itself.  I think saying that they are unavailable is fine,

20    but in the context of a case that deals with a death

21    resulting count, I think it leads to the potential for a

22    very improper inference, even with a limiting instruction if

23    we discuss it as an overdose death.

24            THE COURT:  It is okay in your view to say that

25    they are dead and they can't testify because they are dead,
```

```
 1   but not to refer to it as an overdose death?

 2           MR. SKORDAS:  That would be our request, yes, Your

 3   Honor.

 4           THE COURT:  What is wrong with that?

 5           MR. GADD:  Nothing.  We'll do that.

 6           THE COURT:  All right.  I guess I could say that

 7   the government is not claiming, with respect to these

 8   deaths, that the defendant has any responsibility for them.

 9   You're not claiming --

10           MR. GADD:  We are not.

11           THE COURT:  Now, these pictures -- it is not fully

12   briefed yet, is it?  I will think about that some more.  Why

13   do you really need pictures?  You have got testimony about

14   what happened and where everything was and who did what.

15           MR. GADD:  So for these three pictures, and we

16   really worked hard to narrow it down to just three, because

17   no one wants to look at pictures of deceased people and I

18   understand that.

19           The close-up of his face is integral to the

20   testimony of our E.R. doctor that I mentioned.  She studies

21   and teaches on forensic pathology as it relates to which

22   drug killed them and why.  So, for example, if someone dies

23   of a cocaine overdose, they won't look like the face in that

24   picture.  It is going to be different.  She is going to look

25   for different physiological clues.
```

1          The picture is a textbook opioid overdose and it

2    has to deal with opioids being a central nervous system

3    depressant and how the respiratory system starts to shut

4    down and it creates blood and mucus as their body is

5    fighting for air.  It is integral to her testimony.  This is

6    how she will teach the jury how they can know beyond a

7    reasonable doubt that it was an opioid, not any of the other

8    drugs on board that --

9          THE COURT:  You seek three pictures, not just one,

10   right?

11         MR. GADD:  The close-up of his face and then the

12   second is his deceased body on the ground next to his bed.

13   That one is important to me because people frequently die

14   from opioid overdoses asleep.  In fact, he died in his bed,

15   but the picture we have, from the police officers who showed

16   up on the scene, shows him on the floor.  We just need that

17   picture to be able to explain that while he was found on his

18   bed face down in a pool of blood, he was moved by the

19   paramedics off of the bed, and you can see the two points

20   where they tried to shock his heart.

21         Then the third picture only shows his legs and

22   that picture shows spacial proximity.  The battery, it is

23   like a large lithium battery, the battery he used to crush

24   up the pills, and I call it a tube straw, and I hope that is

25   the right name.  It is a Post-It note that he has rolled up,

1    so the Post-It note that he used to sniff the pills and the

2    package that the pills came in are all in that picture.   It

3    shows just how close -- one of the issues we're going to

4    have at trial is did he really take Mr. Shamo's pills that

5    night or did the pills come from somewhere else?   The

6    spacial proximity between his dead body and the package from

7    Mr. Shamo's coconspirators, where they are maybe two feet

8    away, that will be some of our best and most important

9    evidence.

10              THE COURT:   Thank you.

11              Ms. Beckett?

12              MS. BECKETT:   I have multiple concerns with that,

13   Your Honor.   I think there is other evidence that we cited

14   in our brief that deals with the causational issue there.   I

15   think part of that causational issue will outweigh the

16   probative value of those photos.

17              In terms of the medical information, those photos

18   were not specifically taken by that doctor.   There are

19   reports that she has obviously relied on, and that she can

20   say she relied on, that talk about the contents of those

21   photos and what was found when this individual died.   I

22   think that that is enough to establish those elements of her

23   testimony without bringing those particular photos in.

24              In terms of the other two photos, the proximity

25   argument does not -- I don't think that that is even

1    remotely relevant to what we're dealing with.  I say that

2    based on the information just proffered by Mr. Gadd, which

3    is if his body was moved, as they are acknowledging, then

4    the proximity issue does not really make sense in that

5    argument.  In one photo they are saying he was moved but in

6    another photo they are saying it is in approximation to

7    where these items were.  I don't think that that holds up.

8    I think that they are putting individuals on who can testify

9    or they believe can testify to those issues without the

10   presence of those photos, and I think we run a very serious,

11   serious risk of that improper inference if we are to show a

12   jury those photos with the limited amount of causational

13   evidence in terms of the actual drugs that were snorted and

14   the history of the individual who did in fact overdose,

15   which are some issues that we intend to cross-examine and

16   bring up during the trial.

17             THE COURT:  Thank you both.  I won't rule on that

18   yet.  There is still another brief to come in on that, I

19   believe.

20             MS. BECKETT:  Correct, Your Honor.

21             THE COURT:  All right.  Let's see here.

22             When are they supposed to file with the court the

23   list of exhibits?  Is it the morning of trial?

24             THE CLERK:  We already took care of that.

25             THE COURT:  What about notifying each other about

1  who you're going to call a reasonable amount of time in

2  advance.  Have you agreed on that?

3          MR. GADD:  I don't believe it was objected to.

4          THE COURT:  Is it the day before by 4:00?  Is that

5  what it was?

6          MR. GADD:  Yes, Your Honor.  We're real flexible

7  on the time.

8          THE COURT:  Excuse me?

9          MR. GADD:  I apologize.  We are flexible on the

10  time.  If 4:00 does not work, we're happy to do it earlier

11  or later.

12          MR. SKORDAS:  That is fine.  4:00 is fine.

13          THE COURT:  What else do we need to talk about

14  today?

15          MR. GADD:  The Court's trial order directs the

16  United States and the defense to provide paper copies of our

17  exhibits.  In this case that will be thousands of pages and

18  then we'll still have some exhibits that you can't turn into

19  paper like videos and audio recordings.  I wonder if the

20  Court would allow us to instead provide it electronically to

21  the Court?

22          THE CLERK:  That is fine with me.

23          THE COURT:  Yes.  If it is fine with them, it is

24  fine with me.

25          MR. SKORDAS:  That is fine with us, too.

1          MR. GADD:  I have a copy today and I'm happy to

2     give you now as you are considering the motions, for

3     example, and then on the morning of court we'll bring in

4     official copies and --

5          THE COURT:  Sure.  We'll take what we can get.

6     Give it to Ms. Toscano.

7          Anything else?

8          MR. GADD:  It is the disk that you got.

9          THE COURT:  Apparently you have it.

10         MR. SKORDAS:  We have it.

11         THE COURT:  Anything else anybody wants to talk

12    about?

13         MR. GADD:  Please.  On the same exhibit list I

14    have this yellow highlighting on the front --

15         THE COURT:  Yes.

16         MR. GADD:  -- and the yellow highlighted exhibits

17    are powder, and in almost every case they are powder

18    Fentanyl.  There is a huge risk with undiluted powder

19    Fentanyl.  It is a low-grade chemical weapon.  I have been

20    talking with our Ph.D. chemist at the lab about safety and

21    security.  They are very concerned about having powder come

22    into a courtroom as am I and as I believe the marshals'

23    service is.

24         When we were speaking in here before Your Honor

25    took the bench this morning, I think we came to a tentative

1   agreement that rather than bring powder into the courtroom,

2   or even bring powder off-site and let the jurors go on a

3   field trip and see the powder under a vented hood, that the

4   defense is going to allow our lab folks to take a picture of

5   these highlighted exhibits and we'll use a picture rather

6   than the actual powder.

7           THE COURT:  That sure makes sense, doesn't it?

8           MR. SKORDAS:  Yes, we agree with that.

9           THE COURT:  If you do decide to bring any powder

10  in, keep it as far away from the bench as you can.

11          MR. GADD:  We are going to have the encapsulated

12  pills, so when you think about a single pill, less than

13  one-hundredth of a part of it is Fentanyl.  The rest of it

14  is binders and fillers and colors and things like that and

15  it is encapsulated.

16          Not only is the pill encapsulated but it is in two

17  evidence bags, and then as I have been talking with these

18  same folks at the lab, they have asked me to put it in some

19  sort of clear case, so we have ordered -- they are almost

20  like clear Rubbermaid totes that have a sealable lid.

21          My request on the tablets is that we only have the

22  D.E.A. personnel handle them.  So, for example, if Mr.

23  Skordas is on cross-examination and he wants to ask a

24  witness about Exhibit 9.01, he could look at our D.E.A.

25  agent and say would you grab 901?  Then he will pull it out

1   of the bin and hold it up and show the jurors, but he will

2   wear protective gloves just to be careful, and that way we

3   can ensure everyone's safety.  The pills are not in the same

4   class as the powder.  It would be like most of the drugs

5   that come into this courtroom.

6           THE COURT:  Mr. Skordas.

7           MR. SKORDAS:  We have no interest in handling

8   Fentanyl.  We are fine with that.

9           THE COURT:  You're happy to have the gloved people

10  handle it?

11          MR. SKORDAS:  Yes, the professionals.

12          MR. GADD:  That will be our D.E.A. case agent or

13  if we have other D.E.A. agents here and, for example, if the

14  case agent were on the stand we -- we will also have the

15  chemist from the lab.  I doubt they will want to handle

16  things much -- we may hand them a copy of their test

17  results, and they may want to just quickly reference the bag

18  and say, yes, my numbers match up and these are the pills I

19  tested.

20          I am not sure that we need to discuss it now

21  necessarily, but since we are on the topic, I would prefer

22  not to send the pills back to the jury.

23          MR. SKORDAS:  Absolutely.

24          MR. GADD:  Okay.

25          THE COURT:  That seems to make sense.  So in this

```
 1    case they will get most of the exhibits but not all of them.

 2            Anything else?

 3            MR. SKORDAS:  You could give the jury a photograph

 4    or something if you want, but I --

 5            THE COURT:  Yes, you could.

 6            MR. SKORDAS:  I don't think that makes a

 7    difference.

 8            MR. GADD:  They will have 21 days with them and

 9    I'm happy to take a picture.

10            THE COURT:  Maybe you should.  Maybe you should

11    take a picture and send that back.

12            MR. GADD:  Perhaps when we have it in court the

13    first day lined up, we'll take a picture then and show the

14    defense, and if they are comfortable with it, that is what

15    we'll send back.

16            THE COURT:  Anything else, Mr. Skordas or Ms.

17    Beckett?

18            MR. SKORDAS:  No, Your Honor.  Thank you.

19            THE COURT:  Anything else from the government?

20            MR. GADD:  No, Your Honor.  Thank you very much.

21            THE COURT:  Thank you all for coming in.  I know

22    this is an enormous amount of work and I appreciate your

23    moving it along.

24            Thank you.

25            We'll be in recess.
```

1                    (Proceedings concluded.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25