1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4

UNITED STATES OF AMERICA,      )
5                              )
            Plaintiff,         )
6                              )
        vs.                    )
7                              )
AARON MICHAEL SHAMO,           )   Case No:   2:16CR00631
8                              )
            Defendant,         )
9      _____   )
                               )
10                             )

11

12

13

14

15

16
                 BEFORE THE HONORABLE DALE A. KIMBALL
17
                        August 22, 2019
18
                          JURY TRIAL
19
                        PAGES 1404-1554
20

21

22

23

24                       Reported by:
               KELLY BROWN HICKEN, RPR, RMR
25                       801-521-7238

```
 1                        APPEARANCES OF COUNSEL

 2

 3   FOR THE UNITED STATES:          OFFICE OF THE US ATTORNEY

 4                                   BY:  S. MICHAEL GADD

 5                                        VERNON STEJSKAL

 6                                        KENT A. BURGGRAFF

 7                                        Attorneys at Law

 8                                   111 SOUTH MAIN ST STE 1800

 9                                   SALT LAKE CITY, UTAH 84111

10

11   FOR THE DEFENDANT:             SKORDAS & CASTON

12                                   BY:  GREGORY G. SKORDAS

13                                        KAYTLIN V. BECKETT

14                                        Attorneys at Law

15                                   560 SOUTH 300 EAST STE 225

16                                   SALT LAKE CITY, UTAH

17

18

19

20

21

22

23

24

25
```

```
1                    I  N  D  E  X

2   WITNESS                 EXAMINATION BY           PAGE

3   STANLEY FRANK PLATEK    DIRECT BY MR. BURGGRAAF   1408

4

5   NICOLA RANIERI          DIRECT BY MR. BURGGRAAF   1436

6

7   ADAM LANZAROTTA         DIRECT BY MR. BURGGRAAF   1466

8

9   HEATHER ANNE McCAULEY   DIRECT BY MR. BURGGRAAF   1480

10

11  ARTHUR SIMONE           DIRECT BY MR. BURGGRAAF   1490

12

13  ADAM KOENEMAN           DIRECT BY GADD            1522

14                          CROSS BY BECKETT          1537

15                          REDIRECT BY GADD          1551

16

17

18

19

20

21

22

23

24

25
```

```
 1                SALT LAKE CITY, UTAH, THURSDAY, AUGUST 22, 2019
 2                          *   *   *   *   *
 3                THE COURT:  Are we ready to proceed?
 4                MR. SKORDAS:  Yes.
 5                THE COURT:  We'll get the jury and proceed.
 6                (Whereupon, the jury returned to the
 7           court proceedings.)
 8                THE COURT:  Good morning.  Welcome again.  Thank
 9      you for your work.
10                The government may call its next witness.
11                MR. BURGGRAAF:  United States would call
12      Frank Platek.
13                THE COURT:  Come forward and be sworn, please.
14                THE CLERK:  Please raise your right hand.
15                          STANLEY FRANK PLATEK,
16           called as a witness at the request of Plaintiff,
17              having been first duly sworn, was examined
18                      and testified as follows:
19                THE WITNESS:  I do.
20                THE CLERK:  Please come around to the witness box.
21                Please state your name and spell it for the record.
22                THE WITNESS:  Yes.  Stanley Frank Platek.
23      S-T-A-N-L-E-Y F-R-A-N-K, Platek is P-L-A-T-E-K.
24      //
25      //
```

```
 1                    DIRECT EXAMINATION

 2   BY MR. BURGGRAAF:

 3        Q.   Mr. Platek, thanks for being here this morning.  As

 4   you are aware I sometimes pronounce things incorrectly, and

 5   you feel free to correct me if I do.

 6             Can you tell me your current occupation is and

 7   where you're employed?

 8        A.   Yes.  I'm employed with the US Food and Drug

 9   Administration's Forensic Chemistry Center as a biologist in

10   the trace evidence section.

11        Q.   And how long have you been employed by the FDA?

12        A.   I've been employed by the FDA for over 28 years.

13        Q.   And in your current positions what are your job

14   responsibilities?

15        A.   Mostly to handle anything related to tampering,

16   particle analysis and to be a lead analyst when so designated

17   for any type of samples that come in related to my areas of

18   expertise.

19        Q.   And what's your educational background?

20        A.   I have a Bachelor of Science degree from Murray

21   State University in biology with a minor in chemistry.  I have

22   a Master of Science degree in Industrial Hygiene from the

23   University of Cincinnati College of Medicine.

24        Q.   What additional training do you have that relates

25   to your current position with the FDA?
```

1      A.    I have had numerous courses and training classes

2   throughout my career with the government of over 43 years.  I

3   have several courses in toolmark examination, a two-week

4   course with the Indiana State Police and a one-week course

5   with the safety institute of Ohio's Department of Justice

6   operation, in which they instructed the full analysis of

7   toolmarks.

8      Q.    And do you provide training to others?

9      A.    Yes.  I provide training in a number of other

10   areas.  I've been a faculty instructor at Northern Kentucky

11   University in northern Kentucky since 1982.  And I teach

12   scanning electron microscopy and energy-dispersive x-ray on

13   microanalysis.  I also teach at the Lehi University Microscopy

14   School, and I've been doing that since 2005.

15      Q.    And what professional organizations do you belong

16   to?

17      A.    I'm a member of the academy -- American Academy of

18   Forensic Scientists.  I am a member of the Midwestern

19   Association of Forensic Scientists.  I'm a member of the Ohio

20   Valley Microscopy Society, and I'm also a member of the

21   Microscopy Society of America, in which three years ago I was

22   honored as a fellow of that society.

23      Q.    And have you testified as an expert before?

24      A.    I have.

25      Q.    How many times?

1          A.    Three times.  State and federal.

2          Q.    And has the Court ever made a finding that your

3    testing methods or results were not accurate or correct?

4          A.    No, sir.  That is correct.

5          Q.    Have you had any experience analyzing pill press

6    punches and dies?

7          A.    I have.

8          Q.    What did you do to prepare for your testimony

9    today?

10         A.    Reviewed my notes, thought about the manner in

11   which I would present.  But normally it would just be review

12   what I've done and how I put my worksheets together.

13         Q.    And you've had a couple of less than full nights of

14   sleep, as well.

15         A.    That's true.

16         Q.    Okay.  Let's speak more generally -- first, how did

17   you become involved in this case?

18         A.    The case was assigned to me by our supervisor from

19   the trace evidence section.  We rotate how often different

20   people take positions as a lead analyst in a case, and for

21   this particular one since it would need an initial microscopy

22   front end and some of the additional physical examinations I

23   was assigned to take the sample.

24               The sample was picked up from our sample custodian

25   in the laboratory where I signed for it to maintain chain of

1      custody.  I take it to our laboratory.  And at that point the

2      sample is -- we have several forms that we put together that

3      are part of our procedure for bringing new samples into the

4      laboratory.  And we take those.  Those were prepared.  We

5      identify the seals, and then we go through a full photo

6      documentation of each of the items as received.  We don't open

7      anything.  Everything is photo documented.

8               And at that point we will be getting information

9      from both the information provided by the special agent as to

10     what their request was for analyses.  They will also -- in

11     conference we take a look at what the evidence may be, say, we

12     might suggest we could do this.  They say, we would like this.

13     We may not be able to perform some of those with what's

14     provided or we might need more information.  So we will be in

15     contact with the special agent or submitting agents in these

16     cases.

17              And at that point we decide -- it's sort of a

18     triage as to how a sample is going to be addressed.  If you're

19     going to do a destructive technique on something you can't do

20     that destructive technique first and then take it on and hope

21     to do something else.  So we decide who is going to receive

22     which portions of a sample and for what reasons.

23        Q.   I want to kind of backup just a little bit as far

24     as speaking more generally about the FDA lab, which I'm

25     referencing as the FDA lab the forensic chemistry center.

1          A.   Correct.

2          Q.   First of all, is the lab a certified or national

3     accredited lab?

4          A.   We are.  We are an accredited forensic laboratory.

5     We are accredited through a group that's all A-NAB and the

6     ANAB.  And the A in ANAB stands for the American National

7     International -- I'm sorry.  We converted about a year and a

8     half ago.  The American National Institute of Standards.  And

9     then the NAB part is National Accreditation Board.

10         Q.   I'm not going to ask you for every specific

11    requirement.  But what's typically required to become an

12    accredited lab?

13         A.   Obviously having a secure forensic security with

14    full chain of custody from time in to time out.  We have

15    procedures in place for all instrumentation.  We have analysts

16    that are determined through testing to be proficient in the

17    disciplines in which they are working.  We get annual tests in

18    specific disciplines based upon what we are doing in the

19    laboratory.  And it's a -- some of them are very rigorous, and

20    you must pass it to go on.  They are ways to handle it if

21    there are issues with that.  There have not been problems

22    along those areas.

23              We also have to have a facility set up in such a

24    manner that the analyses can be performed in a safe fashion

25    under safe working conditions.  The sample security is very

1     high priority with us.  And there are a number of other ones

2     as far as procedures, how you handle things, at the ANAB rules

3     and regulations, as it is with any forensic accreditation

4     board are very stringent.  And it takes truly years to be

5     prepared to be ready for one.

6         Q.   What types of equipment or instrumentation is

7     utilized at the lab?

8         A.   We have -- with all bragging rights among

9     scientists, we have an incredible array of instrumentation in

10    our laboratory.  For the microscopy side we have almost every

11    type that is available.  I say almost.  We have everything

12    from your basic light microscopes to scanning electron

13    microscopes.  We are equipped with all types of spectrometers.

14    We have infrared analysis instrumentation.  We have gas

15    chromatography, mass spectrometers, we have inductively

16    coupled plasma emissions spectrometer used for analyzing for

17    elements.  There are a lot of these different types of

18    instruments in the laboratory, and that doesn't begin to touch

19    them all.  A lot of these we have in duplicate and triplicate

20    because of the fruit put through the laboratory and what we

21    do.  You need to have a lot of instruments.

22         All instruments are certified.  We also have a

23    procedure in which if an analyst is going to use that

24    instrument that day they must perform a performance validation

25    of that instrument.  You can't assume that it's going to work

 1    properly.  And every day if you're going to use it you have to

 2    log in onto it, you have to perform the test with a certified

 3    standard, whether it's chemical or physical.  It's recorded in

 4    two places, one in the logbook right at the instrument, and

 5    one goes on to our quality assurance folder which is on the

 6    laboratory server.  And again, once it goes in it cannot go

 7    out.

 8        Q.   Is there standard policies and protocols for

 9    ensuring that the instrumentation and equipment is properly

10    sterilized?

11        A.   Sterilized, we do not do sterilization with the

12    exception of our biological safety laboratory 3.  We have a

13    full BSL 3 laboratory at the forensic chemistry center, and

14    that's handled for the microbiologist.

15             But as far as cleaning, preparation, making sure

16    that the samples are used, absolutely, that the surfaces are

17    wiped.  I will exchange backing papers between samples to

18    prevent cross-contaminations, just as an example.

19        Q.   Now, you mentioned quite a few protocols and

20    policies in how the lab operates.  As the lead analyst and to

21    your knowledge were those policies and protocols followed in

22    the analysis in this case?

23        A.   To the best of my knowledge, yes.

24        Q.   Are the processes and tests and methods for

25    analyzing items in the lab commonly accepted and considered

                                                              1414

1    reliable in the scientific community?

2         A.   They are, yes, sir.

3         Q.   While using the lab equipment to analyze and exam

4    items in the case did you have any indication that any

5    equipment was not operating properly?

6         A.   No, sir.

7         Q.   Are the labs results found by one analyst confirmed

8    by another?

9         A.   They are definitely confirmed.  Every analyst who

10   is assigned a portion of the sample to analyze will perform

11   their analyses.  They will prepare a worksheet section, and it

12   will be called an analytical section.  They will perform that

13   section, and that section is not only checked but fully

14   reviewed by another member of the forensic chemistry center

15   who is proficient in that technique.  You want to have

16   somebody who knows what you're doing review your work.  And

17   they'll make sure that everything both scientifically is

18   correct, that your calculations are correct, every single one

19   of them, and that, quite honestly, the right form is used.

20   All analytic information is in there.  We do have SOPs on

21   that, as well.

22        Q.   What does SOPs stand for?

23        A.   Standard operating procedure.

24        Q.   Okay.  Let's get a little more in-depth in this

25   specific case.  You mentioned retrieving items as well as a

1    request after being assigned as the lead analyst in this

2    matter.

3         A.    Correct.

4         Q.    What items specifically -- how are the items

5    labeled that were requested to be analyzed?

6         A.    I received 22 items, and they were each in

7    individual evidence bags, sealed evidence bags.  One side of

8    the evidence bag had a DEA label, evidence label on it, the

9    opposite side had an OCI, our office of criminal investigation

10   label.  Each bag also had a tape over the seal end with the

11   FDA OCI number information on it, as well.  And all bags were

12   sealed, received sealed.

13        Q.    Now you referenced a DEA label on the front of it.

14   I would like to approach and present you with Government's

15   Exhibit -- let me make sure I've got the right number here --

16   7.43.

17              Now, I'm not going to ask if you recognize that

18   specific exhibit.  But the label on the front of that, does

19   that look similar to the DEA labels that were on the 22 items

20   that were received?

21        A.    It does.  Including the one on the vial that's

22   inside here.

23        Q.    And the labels that were on the 22 items that you

24   received similar to this label, did it have a DEA exhibit

25   number listed?

```
 1        A.   Yes, it did.  On this -- just like this one right
 2   here.
 3        Q.   Okay.  Thank you.
 4             In preparation for your testimony did you take the
 5   time to list out essentially what the items were that were
 6   received and the general categories?
 7        A.   I did.
 8        Q.   Did you do so on that white pad?
 9        A.   I did.  In advance of this I prepared for easier
10   demonstration.
11             If I may get up, Your Honor?
12             THE COURT:  You may as long as you speak up.
13             MR. BURGGRAAF:  And, Your Honor, I believe he's
14   going to stay in his seat.  He is just going to flip the paper
15   over so the jury can see how he listed it out.
16             THE COURT:  Okay.
17        Q.   BY MR. BURGGRAAF:  Can you explain to the jury what
18   it is they're looking at there that you listed?
19        A.   Yes.  If you take a look at this, on the very top
20   line it says, Items 1 through 5, 7, and 11 were all tablets in
21   which the debossing on the tablets, the marks that are down
22   into the surface of the tablet, had the A and 215.  It also
23   had a half score on this.
24             The next lines down is Items 6, 8, 9, 10, 12 and
25   13, and those were debossed with a capital M that is enclosed
```

1    within a square, and the square has slightly rounded edges,

2    and the number 30 on the opposite side with a half score.

3              The next line down is Items 14 through 19.  And

4    these were oblong tablets that were marked GG249 on one side

5    with three, what we call, quarter scores.  There were three

6    separate marks on there.  And the backside of that tablet had

7    nothing on it.

8              The next one is Item 20.  There were two tablet

9    punches in there that were also marked with the GG249.  Now

10   these were embossed.  It's a negative image of what would have

11   been on the tablet.  And they were embossed with the GG249.

12   Included with that were other tablet punch tips, et cetera,

13   even five tablet dies.  And dies are another part of the

14   tableting process that were included with that sample.

15             The Item 21, there were 9 punches that had the

16   M, capital M with the square with the rounded corners.  And

17   tablet -- or Item 22 were 8, again more tablet punches, and

18   these were all with the embossing GG249.

19        Q.   So the last three items contained punch or punch

20   tips.

21        A.   Right.  The punches with the tip on the end of it,

22   correct.

23        Q.   Now you mentioned Item 20 that there were two punch

24   tips with the GG249.  You've got it separate there.  Why

25   haven't you listed out the additional punches?

1        A.    The reason we have not listed the other ones here

2    is we did not have corresponding tablets for comparison for

3    any of the other punch tips that were included with that

4    sample.

5        Q.    I want to start with Items 1 through 5, 7 and 11.

6    You've got it listed that they were each debossed with A215.

7    In each of the items both on that first line and the next two

8    that reference pills or tablets, how many of those pills or

9    tablets were in each item?

10       A.    Each item came with five tablets for all Items 1

11   through 19.

12       Q.    And do you know where those tablets came from

13   before being at the FDA lab?

14       A.    No, I was not.  I was told they would be coming

15   from DEA when we saw the evidence, but that was the extent of

16   it.

17       Q.    So the first line you've got the debossed tablets

18   with A215.  Do you know what the A215 means in the

19   pharmaceutical world?

20       A.    In the pharmaceutical world this one would refer to

21   an Oxycodone tablet.

22       Q.    And the next line down, the M or M box with the 30,

23   do you know what that --

24       A.    That's also an Oxycodone embossment.

25       Q.    And the GG249, do you know what that signifies?

1          A.    Yes.   Alprazolam.

2          Q.    So as the lead analyst in respect to the requested

3     analysis, what was your role?

4          A.    My role as lead analyst in this one was as I

5     mentioned before to evaluate the sample as I first receive it,

6     document how I first received it, and then I will upon

7     deciding once we've talked with other analysts and other

8     supervisors how they want us to approach the analyses on

9     these, I would open the sample, and we have a protocol, we

10    will put our initials and a date and we will open it directly

11    on the bag, and then the samples were removed.

12          In the case of Items 1 through 19, those tablets

13    were received in small glass vials with a white top.  And the

14    tablets were removed from those.  So this was done in a fume

15    hood now because we weren't sure what we were dealing with.

16    And we would have a 50 millimeter, which is about 2 1/2 inches

17    in diameter petri dishes that have forcible lids.  The hold

18    on.  We use these a lot in the laboratory.  They're new.

19    They're fresh.  They're brand-new out of the package, and

20    they're sterile when we do receive them.

21          We open one of those up after labeling it, and then

22    the five tablets we put in there and put the seal.  And then

23    all -- once that was done with all of the samples with their

24    own individual item petri dish were put into a plastic

25    snap lid container, and that was retained, and since we've

1    opened it in a hood.

2         Q.   And is that container then labeled to ensure that

3    items stay separate and clearly identified?

4         A.   Yes.  Each one is individually identified within

5    there, yes, sir.

6         Q.   So let me take you back just prior to this portion.

7    You mentioned and kind of confirmed that each of the items

8    came in a separate evidence bag; is that right?

9         A.   Yes.

10        Q.   And they had multiple labels on it?

11        A.   Yes.

12        Q.   I want to reference the DEA label that you

13   mentioned.  You mentioned that it had the DEA exhibit number

14   listed.

15        A.   (Witness indicates by nodding head up and down.)

16        Q.   On Item 1, did that label have DEA Exhibit

17   Number 14 noted on it?

18        A.   I would have to look in my records to confirm that

19   for Item 1.

20        Q.   Did you note that -- did you note down what DEA --

21        A.   The DEA numbers were not noted, but they are

22   captured for the photos for with each one of the items.  It

23   will be on the bag.

24        Q.   Okay.

25        A.   And I do have that in my record in my Section 1.

```
 1          Q.    Okay.  Section 1.

 2                MR. BURGGRAAF:  If I may approach?

 3                THE COURT:  You may.

 4                THE WITNESS:  Thank you.

 5          Q.    BY MR. BURGGRAAF:  Mr. Platek, I think if you can

 6    look at Item 1 and explain to the jury what DEA exhibit number

 7    is listed.

 8          A.    Exhibit Number 14.

 9          Q.    And Item Number 2, what DEA exhibit number is

10    listed?

11          A.    Item 34.

12          Q.    And Item Number 3, which DEA number is listed?

13          A.    I'm sorry.  You're printed on both sides here.

14                Item 1 was 14; Item 2 was 34; Item 3 was 64; Item 4

15    was 123.  Do you wish me to go on?

16          Q.    Yes.  Please go through Item 22.

17          A.    Sure.  Item 5 is 193; Item 6 is, it looks like 45.

18          Q.    Is it possible that that's an 85?

19          A.    The first character is slightly squiggled.  Let me

20    take a look and see if I can look on a different portion of

21    that.  Yes.  If I look up on the yellow label it's 85.

22          Q.    Okay.

23          A.    And Item 7 appears to be 95; and Item 8 is, it

24    looks like they have it as Exhibit 85.02.

25          Q.    Could that be 95.02?
```

1    A.    That is hard to read.  It could be a 95 on this

2    one.  The yellow tag above it does have 95 for the exhibit on

3    it.  I apologize.

4         Item 9 is 96; Item 10 is 136; Item 11 is 174;

5    Item 12 also has 174 on it; at least on their exhibits here;

6    Item 13, 188; Item 14, 54; Item 15 is Exhibit 15; Item 16 is

7    Exhibit 97; Item 17 is 126; Item 18, 173; Item 19, 185;

8    Item 20, 177; Item 21 is 178; and Item 22, 179.

9    Q.    Now, the jury previously heard testimony about each

10   of these exhibits and several of them that were tested by the

11   DEA lab.  The testimony for multiple items that you went over,

12   they heard testimony that was positive for the presence of

13   Fentanyl while others were positive for the presence of

14   Alprazolam.

15        When you documented those items in their evidence

16   bags did they have any sort of cautionary label?

17   A.    Yes, sir.  The first three appear on the Items 1

18   through 5 had a cautionary label on there that said Fentanyl.

19   Now, Items 1 through, I believe 1 through 13 had a caution

20   label on it.  But they all did not necessarily have anything

21   else handwritten on them.  The remainder of them, Items 14

22   through 19 did not have a caution on the bag.

23   Q.    And Items 20, 21, 22, did they have any sort of

24   cautionary label?

25   A.    Not to my recollection, no.

1      Q.    What precautions -- seeing those precaution labels,

2      did you take any additional precautions on how the items are

3      handled?

4      A.    We do.  Whenever there's a concern of Fentanyl the

5      samples are handled in a fume hood.  We'll keep them in that

6      area as much as possible while we're processing them.  As I

7      mentioned when they were opened they were done in a fume hood.

8      The samples in the case of the tablets are kept in petri

9      dishes until they have to be opened, say, under a microscope

10     or whatever.  And aside from that they're closed and retained

11     in the one area.

12     Q.    Now, you mentioned after the items were removed

13     from the evidence bag that they were then photographed.

14     A.    They were.

15     Q.    What type of instrument was used for photographing

16     the items?

17     A.    The initial one was done by stereoscopic light

18     microscopy.  And I positioned three tablets trying to show at

19     least two with the debossing and one with the backside of the

20     tablet for verification.

21     Q.    Can I abbreviate that by saying SLM?

22     A.    SLM, that is correct.

23     Q.    Because I'm probably going to get it wrong if I say

24     it otherwise.

25            What type of tool is this?

1          A.   It's a microscope, and you've seen them on TV on

2     forensic files.  It's a large binocular microscope that you

3     can look into.  Very high-end lenses inside of those, glass

4     lenses.  We can light below from underneath.  We can project

5     lights on the top, and we even have cable arms and wands that

6     we can put fiberoptics directly onto the tablets or whatever

7     we're examining.

8          Q.   And that's used to actually take the photographs?

9          A.   We do.  The system is also included with a very

10    high-end digital camera, which is located on the top of this

11    microscope.  It makes it actually a safer way for us to do

12    this because we don't have to put our face where our eyes are

13    here and samples are here close to your face, we can put it

14    down here.  We can be back from it and actually use a mouse

15    and a screen, and we can see exactly what we're going to

16    capture using a camera and capture those images.  It's the

17    same way if you were putting a cell phone up there and

18    collecting those images on a large monitor.

19         Q.   Let's look through a few of those photographs that

20    you took.  If we can look at Government's Exhibit 24.01.

21              Is this one of the photos you took?

22         A.   It is.

23         Q.   And what is it depicting?

24         A.   This is an image of three of the tablets of the

25    A215 type that you see on the top over here.  And the two on

1      the right show the debossed surfaces with the half score that

2      I mentioned.  The tab on the upper left is the same thing on

3      the other side.  But this one is showing the backside of the

4      tablet to show there is nothing on the backside of that

5      tablet.

6          Q.   Now you mentioned previously that in each item

7      there were five tablets.  Why are there only three depicted in

8      this photo?

9          A.   The lowest magnification that I can use on the

10     stereoscopic microscope and capture this type of image is

11     done, and that's the largest field I can get.  If I tried to

12     put any more tablets into this field they would then be shoved

13     out and you would have seen partials.  In fact, you're seeing

14     that the very bottom of one of the tablets, is slightly

15     covered.  You just can't quite squeeze it all in.  But it was

16     meant to be representative to show what the tablets looked on

17     both sides.

18         Q.   Let's look at 24.02.

19              Is this one of the photos that you took?

20         A.   Yes, sir, it is.

21         Q.   What is this depicting?

22         A.   This is depicting the type of tablets that you see

23     in the second line over here with the M in the large square

24     with rounded edges, and the backside has the 30 on it, the

25     debossed 30 with a half score.

1          Q.   And let's look at 24.03.

2          A.   Now these are oblong tablets, and these are from

3     the bottom one over here from Items 14 through 19

4     representative of those with the GG249 with the three-quarter

5     scores.  As you see, there are only two tablets in this one.

6     For the same reason, these are larger tablets and we could

7     only get those into the image as you see here.

8          Q.   And let's look at the next photo 24.04.  What are

9     we looking at here?

10         A.   Now this is a tablet punch tip.  And if you will

11    notice on it the upper right you can see the inverted GG that

12    we're talking about over here, and then the next block coming

13    down you'll see a 2 inverted.  The next one down you'll see a

14    4 inverted, and at the very bottom you'll see the 9 inverted.

15    This is the tablet punch tip with the embossed features.  The

16    embossed features are the ones that are sticking up that will

17    make the debossed features into a tablet once it's pressed.

18    And this is representative of those.

19         Q.   Let me look at Exhibit 24.05.  And what are we

20    looking at here?

21         A.   This is another one of the tablet punch tips

22    representative of the type over here that we had with the

23    20 -- Item 21.  And you'll see we had nine of those.  Those

24    have the M, capital M enclosed within the rounded-edge square.

25    And this type of appearance that you see here you're seeing

1     the actual M.  Again, it's the punch tip itself.

2          Q.   And it looks like there's some sort of white

3     substance that's on the punch tip.  Were you able to identify

4     what that was?

5          A.   We did not.  But there's so much -- there's

6     contamination on things.  We see loose particles of stuff, we

7     do not collect in this particular area.  But the images that

8     were captured initially were of the punch tips as received.

9     This is how we got them into the laboratory.  This is what

10    they looked like.  They were clean before processing.

11         Q.   So after you've identified and paragraphed the

12    items that were received for analysis then what did you do?

13         A.   Well, the work that I was going to do?  My next job

14    on this one was to process these and prepare these images or

15    these tablet punch tips for analysis by, it's called 3D image

16    analysis.  And what we would do with the 3D image analysis

17    will be explained by someone else.  But it was my job to

18    prepare these.

19              What we would do is we actually -- I would clean

20    the surface of these, and some of the material will wash off

21    with a little bit of water and little bit of squirt bottle.

22    This is all done in a hood where the liquid is collected and

23    sent to hazardous waste afterwards.  But I would clean the tip

24    of it off because we didn't get all of the particles out of

25    the or the deboss -- or the embossing that you see on the

                                                              1428

1    punch tip, we would take a small cotton swab.  It's on a

2    wooden dowel that we use in the laboratory all the time, a

3    clean one of those that's wetted with a little more water.

4    And then we would wipe the surface, get it cleaned off.  And

5    if we still couldn't get the stuff out as much as we could,

6    you can actually take these wooden dowels, and you can snap

7    them, and it forms a very nice little probe.  It's a soft

8    wood, and you can actually flair it a little bit so it becomes

9    kind of like a whisk.  And you can take that with water

10   squirted on there and use that to get as much as possible of

11   the residue on the surface of these tablets removed.  Then it

12   was wiped off with a chemlight, a little lab light that we

13   use, dried and then passed on for additional processing.

14        For additional processing, we want to be able to

15   compare the information, the embossed information on these

16   punch tips to the tablets.  Well, you could if you wanted to

17   try to take a punch tip and look at it directly inverted under

18   a microscope, capture an image and then process and try to

19   compare images of that to the tablets.  But you have to be

20   able to turn it over completely.  You have to do a mirror

21   image of it flipping your head.

22        So what we did we developed a method a while back

23   in which we wanted to be able to take a look at what the

24   tablet would look like if it was produced by that punch tip.

25   So in order to do that, we developed a method using Mikrosil.

                                                            1429

1    And Mikrosil, it's M-I-K-R-O-S-I-L.  Mikrosil is a product

2    that is commonly used in the forensic community for

3    transferring toolmarks, anything from screwdriver marks on a

4    door lock hasp or something in which an investigating agent or

5    detective wants to collect information from that crime scene

6    they will take the Mikrosil.  It comes in two parts, there's

7    the Mikrosil itself, and there's a hardener.  And you put down

8    equal lengths of the material.  You mix it up just like you

9    would an epoxy that you're going to do to make a repair on

10   something at home, you mix it up, and you have a little bit of

11   time.  It doesn't set up real, real fast.  But you smear it on

12   the surface of whatever.  You allow it to sit on that surface

13   for a while.  And then when you remove it it comes off as a

14   silicone mold.  It all comes off beautifully and completely,

15   and it has a good permanence to keep it around for a while.

16          What we did is we developed a method to develop

17   Mikrosil to make essentially -- we're taking tablet faces the

18   way the tablet punch tip would make that particular tablet if

19   it were there.  But instead of using tablet material we're

20   using the Mikrosil.

21          And I would take a punch tip and invert it so it

22   was pointed up in the air and the punch tip was up above me.

23   We would mix up the Mikrosil, and we dab.  We just don't smear

24   it on like we're smearing butter because you won't go down

25   into those little pockets, in little places and indentions.

1    You'd have to do a lot of sticking and stuff like that to make

2    sure you're getting everything well coated.  Then a little

3    bit, leave a little bit of a bleb of the Mikrosil above it.

4    And then the remainder of the material of the Mikrosil that

5    you mixed up is in a plastic petri dish just like we've

6    described before, take that and invert that and put that down

7    smoothly and flatly on the top of that surface, and then leave

8    it alone for 20 minutes to an hour.

9           When you come back and remove it, it pops out just

10   beautifully.  You'll have a perfect rendition of that surface

11   down to micro details.  Mikrosil does a beautiful job of

12   transferring even very, very small striations or marks or

13   blemishes or irregularities in the surface of any feature that

14   it's used on.

15          It comes in a number of colors.  There's a brick

16   red, a black, a white and a grey.  We determined a while back

17   that the grey was the best because it let's us see the

18   features well, but we don't get high reflectance in the

19   microscope back into the -- to distort images or cause

20   problems during analysis.

21          And then these were capped over with the top the

22   petri dish that's label with whatever punch tip was used to

23   make that.  It will have the sample number on it.  It will

24   have the item number on it.  It will have the date in which it

25   was prepared.  It will have my initials on it.  And then since

1    we did multiples we would do them as Roman Numeral I, Roman

2    Numeral II and Roman Numeral III.

3           Q.   For which punch tips did you actually create these

4    Mikrosil capsules?

5           A.   I did if for all of the ones we have identified

6    over here.  All of the GG249s, and all of the M encased in the

7    rounded-edge circle.

8           Q.   And how many casts for each punch tip did you do?

9           A.   Three.

10          Q.   Why do you do three?

11          A.   We do three for several reasons.  Number one, you

12   can't always tell right away when it goes to the 3-D images

13   equipment, it's profilometer, which will be discussed later.

14   But you can't tell just by glancing at it real quickly if

15   there are small bubbles or something in the surface of it.

16   We've gotten to where we're really quite good at it.  But if

17   you see some, it's rejected and we make another one.  That's

18   the beauty of it.  You can make all that you want to because

19   you're not hurting anything.

20               But in this case we try to get three that look the

21   best.  So you would be able to have repetitive -- you know, if

22   there is an irregularity uniqueness to this punch tip that we

23   would be making multiple copies of that that could also be

24   determined, yes, this is consistent between these punch tips.

25          Q.   So at the lab where you work more often than not

1    you're working in teams; that is right?

2         A.   Yes, sir.

3         Q.   And as a lead analyst you're responsible for kind

4    of coordinating amongst the other analysts?

5         A.   I don't coordinate it.  I'll be the pressure.

6    Where is your analytical section, because it's -- I'm the one

7    who has to prepare the final report.  But everyone is given

8    their sample whether they were given tablets or whether they

9    were given punch tips or anything.  I do not follow them in

10   their work or their analyses.  They go on.  They process

11   theirs the same way I did mine for their techniques.  And once

12   they have completed it they would have to have their work

13   checked and reviewed.  And then they get back what's called an

14   analytical report for their discipline, for their section.

15   And that goes into our record.  It's all logged in.

16           What I will do as the lead analyst is in the end I

17   will, of course, include all the information that I put in

18   here plus the identification information of the items that

19   were within the sample as received.  But I will also include

20   the lines from their verbiage from their analytical reports as

21   to what their findings were, synopsized into a small sentence

22   or a couple sentences or paragraphs.  That all goes into the

23   final report.

24           That report is then reviewed by my superior and by

25   another person who will go through and make sure that

1      everything is correct.  They will review all of the analytical

2      sections that were part of this particular work.  They'll

3      review what has been done there.  And they will also make sure

4      that, again, the correct forms were used, that it's clear,

5      that it's understandable.  And before anything even leaves

6      every analyst who submitted a portion of their work, their

7      section that was contributed to that analytical work has to

8      sign off on the final report, as well.  And there's a place on

9      there for their name, and their analyst number goes on there

10     so that you know that they were part of it and you could

11     follow which work they had done.  We can backtrack it that

12     way.

13          Q.   How many analysts were involved in performing tests

14     or examining these items?

15          A.   If I may look at this to count, I have to take a

16     look.

17               Counting myself there would be five people.

18          Q.   And prior to your testimony today did you list who

19     those individuals were that performed some form of analysis or

20     some step in the analysis to tell us what they did?

21          A.   I did.  I did.  I prepared this in advance.

22               If I may stand up and flip the chart.

23               MR. BURGGRAAF:  And with that, no further

24     questions, Your Honor.

25               THE COURT:  Thank you.

 1                  You may cross-examine.

 2                  MS. BECKETT:  I have no questions for this witness,

 3       Your Honor.

 4                  THE COURT:  Thank you, Ms. Beckett.

 5                  You may step down.

 6                  THE WITNESS:  Thank you.

 7                  THE COURT:  You may be excused.

 8                  And the government will call its next witness.

 9                  MR. BURGGRAAF:  Your Honor, the government will

10       call Nicola Ranieri.

11                  THE COURT:  Come forward and be sworn, please, at

12       the podium.

13                  THE CLERK:  Just right here.  Just raise your right

14       hand.

15                           NICOLA RANIERI,

16           called as a witness at the request of Plaintiff,

17              having been first duly sworn, was examined

18                    and testified as follows:

19                  THE WITNESS:  Yes, I do.

20                  THE CLERK:  If you'll just come around to the

21       witness box here.

22                  Please state your name and spell it for the record.

23                  THE WITNESS:  Nicola Ranieri.  N-I-C-O-L-A,

24       Ranieri, R-A-N-I-E-R-I.

25                  THE COURT:  You may proceed, Mr. Burggraaf.

1                         DIRECT EXAMINATION

2    BY MR. BURGGRAAF:

3         Q.   Mr. Ranieri, can you tell me what your current

4    occupation is and who you work for?

5         A.   Yes.  My current occupation is a forensic scientist

6    at the Food and Drug Administration Forensic Chemistry Center,

7    which is a specialized laboratory that was forensic for the

8    FDA.

9         Q.   And throughout your testimony I may refer to that

10   as the FDA lab.  How long have you been working at the FDA?

11        A.   Quite a long time.  I was essentially co-oped while

12   I was going through my undergraduate at UC since August of

13   1989, so it was 30 years.

14        Q.   And at the FDA lab what are your job

15   responsibilities?

16        A.   Well, I'm a scientific, microscopist.  I do various

17   forensic related analyses.  You know, tampering,

18   counterfeiting and various other consumer complaint samples

19   cases.

20        Q.   And what's your education background?

21        A.   I have an undergraduate degree from the University

22   of Cincinnati, Bachelor of Science degree.

23        Q.   And did it have a focus as far as your Bachelor of

24   Science?

25        A.   That's correct, yes.  Biology.

1436

1    Q.   And do you have any additional training that

2    relates to your current responsibilities?

3    A.   Actually, yeah.  I have quite a few, but over the

4    years, you can imagine.  So I've taken many courses.  For

5    specifically for this case I'm going to pick the ones that

6    relate to this moment here.  So I took a Confocal microscopy

7    and image analysis at George Washington Medical School.  I

8    took a computer-assisted image analysis at North State

9    University in North Carolina, State University, a

10   computer-assisted image analysis at Rochester Institute of

11   Technology.

12        I have had multiple others in the toolmark arena,

13   such as Dayton Crime Laboratory toolmark analysis training.  I

14   had regional crime laboratory from Dayton in toolmark

15   analysis.  I had an ATF toolmark analysis training at the

16   coroner's office in Cincinnati, Ohio.  And I also have taken a

17   tablet formulation and design in manufacturing tablets and

18   tablet punches at the training facility in St. Louis,

19   Missouri.  I could go on.

20   Q.   But you don't need to.  You sound like you've had

21   quite a bit of training.

22   A.   Yes.

23   Q.   Do you provide training or have you provided

24   training to others in your field of expertise?

25   A.   Yes.  You know, there's many inference related, so

1    I'll pick a few again.  One is the, it's a German name.  I

2    can't pronounce that one.  So it's a Food and Drug

3    Administration like agency.  But it's a chemistry and physics

4    in Vienna, Austria, analyst that came to our laboratory, and I

5    trained him.  There's the forensic science -- forensic

6    chemistry scientists at the city of police in Taipei, Taiwan.

7    Forensic science and physics laboratory from Singapore.  These

8    are agencies that do similar things that we do, and many other

9    within the Food and Drug Administration and other agency like

10   Food and Drug Administration nationally.

11        Q.   Have you published articles or literature in areas

12   of your expertise?

13        A.   Yes.  I published many.  But for this particular

14   one it would be, the most appropriate is the 2-D, 3-D

15   examination of tablet formulations and for suspect

16   counterfeiting and tablet sourcing.  So that one's done at the

17   microscopy microanalysis in 2010.

18        Q.   And you actually hold a patent for some of what you

19   do?

20        A.   Yeah.  I was lucky in my career because the

21   laboratory started when I started back in 1989.  So everything

22   was new.  So eventually I came up with a -- when you look at

23   tablets and someone hands you a bag of tablets you have

24   thousands of tablets.  To look at them all it's not easy

25   through a microscope.  So eventually I came up with something

1438

1    called alternate light source technology where essentially you

2    spread out all of these tablets.  You illuminate with a

3    specific light in a wavelength whether it's UV visible and

4    infrared, and then you can see the difference between a

5    suspect generally.

6            Then I created -- with that knowledge I created a

7    device that now today I have two full patents, one pending

8    international and three European patents pending still on the

9    device, and the FDA uses these device to detect or red flag a

10   suspect.

11           Q.   And have you testified as an expert before?

12           A.   Yes.

13           Q.   How many times?

14           A.   Three.  But specifically the one in this case last

15   year was about three.

16           Q.   And has the court ever made a finding that your

17   testing methods or results were not accurate or correct?

18           A.   I'm sorry.  Could you repeat that?

19           Q.   Has the Court ever made a finding that your testing

20   methods or results were inaccurate?

21           A.   No.  No.

22           Q.   Have you had training and experience in analyzing

23   pill press punches and dies?

24           A.   Yeah.  As I stated earlier I took an actual course

25   from a company called Natoli.  They actually manufacture

1    presses and tool punches.  And they actually have a facility

2    that train you and whoever wants to be a tool press operator.

3    So I took that course where that is, you know, the design that

4    punches a design, the tablet formulation, and they show how

5    to, train you how to run a press.

6          Q.   And what did you do to prepare for your testimony

7    today?

8          A.   I reviewed the work I did when I actually did the

9    work.

10         Q.   How did you become involved in this case?

11         A.   I received -- at our laboratory you have a lead

12   analyst, and then you have everyone else that follows.  A lead

13   analyst is usually the analyst that receives the case.  And in

14   this situation Mr. Platek was the lead analyst in this

15   particular case, so he did what we call a Section One.

16   Section One is an overall over everything that he's received.

17   Part of the supervisors and management of the laboratory is

18   instructed to have this technique done.  So I was one of those

19   techniques that was supposed to analyze these tablets.

20         Q.   So in your role in this case were you directed to

21   analyze and compare the tablet punches embossed with GG249

22   comparing them to each other and to tablets that were debossed

23   with GG249 in Items 14 through 19?

24         A.   Could I ask you to repeat that?  Sorry.

25         Q.   Were you directed in this manner to analyze the

1    tablet the punches --

2         A.    Yes.

3         Q.    -- embossed with GG249?

4         A.    Correct.  Yes, I was.

5         Q.    And compare them to each other?

6         A.    Correct.

7         Q.    And then compare them to the tablets or pills that

8    were in Items 14 through 19?

9         A.    Correct.

10        Q.    Were you also directed to analyze the tablet punch

11   tips embossed with an M and enclosed with a square comparing

12   them with the tablets that were debossed in a like manner?

13        A.    Correct.

14        Q.    What process and equipment did you use to perform

15   your analysis?

16        A.    The technique is called profilometry.  In our

17   laboratory we have an array of disciplines and

18   instrumentations.  When we have visitors usually these

19   visitors go through all these techniques.  And the microscopy

20   because it's visual as well as analytical is the most

21   attractive.  I wish I had a way to show you what a 3D image

22   looks like, 3 dimensional image looks like.  A system that is

23   called IFM, Infinite Focus Microscope.  What it does

24   essentially is it scans.  It measures the surface of a sample.

25   When it's finished collecting the whole surface it displays it

1    as an image, but it's really not an image because it has just

2    data points.

3         Q.   And did you use any other instrumentation or

4    equipment in performing your analysis of the punch tips and

5    the tablets such as 3DIA?

6         A.   Yes.  That instrument is called, we refer it to as

7    3DIA, which stands for 3-dimensional image analysis.  It's

8    considered a profilometer, so it was a technique called

9    profilometry.  The system, actually what it does is it

10   collects -- if you envision a picture, just a picture, that's

11   a flat image, so it's 2D.  It's considered a 2D image.  So you

12   have an X and a Y that dictates where the point for that

13   pixel.  So, for example, X direction and a Y direction, then

14   you find the two values and that's a point.  That's a pixel.

15        In this case, the system creates X, Y and Z, which

16   is the height.  So you have two dimensional, and three

17   dimensional makes the height.

18        Q.   So talk to me about this 3DIA instrument.  What is

19   it composed of?  What does it look like?  And how does it

20   operate?

21        A.   It's a big microscope.  It is a big microscope that

22   has a precision movement stage.  It moves in micrometer.

23   Actually nanometer steps, and it has a sensor that illuminates

24   the sample and collects, if you will, an image, but it's

25   really data of the value of that XYZ point.  The XYZ point in

1    particular for this case when it scans the whole surface, if

2    you can envision X5Y10 and Z15, that's one data point.  This

3    collects 6.3 million pixels.  To makes it easy, it's

4    6.3 million data points.  So picture 6.3 million of those, and

5    it takes those points and compares to a known would equal

6    number of points, and it as an algorithm, and it calculates

7    and XYZ location right here at this three-dimensional space.

8    Does this unknown have this point right here?  Yes or no?  If

9    it does, it's counts it as a yes, it has it.  After

10   6.3 million points it gives you a percentage of how many of

11   those points found the same at this from a known authentic to

12   an unknown suspect.

13        Q.   Let me see if I understand, if I can explain that

14   correctly.  Using this 3DIA equipment you can put a pill in

15   front of the equipment and it's going to gather from the

16   surface of that pill essentially 6.3 million data points?

17        A.   That's correct.

18        Q.   You can put another pill and get 6.3 data points

19   that you can then compare those data points?

20        A.   That is correct.  Yes.  So the beauty about this

21   technology, this technique, this instrument is that it's

22   extremely consistent.  And prior to any analysis, this

23   analysis or any analysis I've ever done with any technique

24   really in this case with this 3DIA system we also measure also

25   an authentic where we already know the data and results so we

1     can confirm that, yep, we got the same results as we got in

2     2010, 2015, last month.

3              So the tablet that it collects these points is then

4     saved the data.  It's called data set.  Then we have a library

5     of authentic.  We call that up, data set, and we tell the

6     system, okay, go ahead and compare these two data sets, and

7     return a percentage.

8              Or there's another technique that's called profile

9     measurements that actually gives you a cross section of that

10    particular surface, and it compares if these two profiles line

11    up exactly or not.  If it doesn't, you'll be able to visually

12    see it.

13        Q.   So you can compare one pill to another.  And when

14    you reference authentics are you referring to official

15    manufactured tablets from the official manufacturer?

16        A.   That is correct.  We -- because we do always a

17    comparison with an authentic we always have to have authentic

18    from a manufacturer.  So if we don't have it, then we

19    communicate -- well, myself, for example, I requested, through

20    the proper channels I request an authentic so I can use it in

21    my analyses.  And then there's a special group that actually

22    reaches out to the genuine makers, genuine makers of a

23    particular product, and it requests as an FDA agency to send

24    us some authentics.  So it usually sends us a bottle of

25    tablets or capsules.

 1              So in this case we had all three already, and we

 2    had those in the library already.  So that is the process, so

 3    comparing to what we call authentic.  Also we consider that a

 4    known because we have a known value.

 5          Q.   Now, we talk about comparing pills to pills.

 6          A.   That's correct.

 7          Q.   Can you also use this 3DIA analysis to compare

 8    pills to punch press tips?

 9          A.   Yes.  That's correct; because the system pretty

10    much can scan or measure anything you put underneath this.  So

11    in this case we can put the tablet punch under there, or we

12    can create what is called casting using Mikrosil.  And then we

13    have the actual.  Such a Mikrosil is a way to create the same

14    surface as the punch tip that made a tablet.  You take that

15    same punch tip.  You put Mikrosil on the top.  It's kind of

16    like making an identical tablet that this punch tip will make.

17    So then we compare the punch tip or the Mikrosil to a tablet.

18          Q.   In this case, before you began your analysis in

19    using via equipment did you verify that the equipment was

20    operating adequately?

21          A.   Per our SOPs and per, you know, the laboratory you

22    cannot proceed without what is called a verification to make

23    sure that the system is running as it was yesterday.

24          Q.   So you talk about these data sets and the potential

25    for at least in one aspect of it to collect 6.3 million data

1    points.

2         A.   Correct.

3         Q.   Am I correct in assuming that you're using the --

4    essentially the microscope is taking an image, but that's

5    taking those data, that net data, and you're then using a

6    computer to process that data?

7         A.   Yes.  It's a system.  So the microscope is coupled,

8    it's attached to a computer.  The computer runs the microscope

9    essentially.  So the computer will collect the data that the

10   sensor is picking up and transfers electronically obviously to

11   a computer.  The computer then converts that signal to a data

12   point or data points, and it saves it.  I'm prompted to save

13   it or not, then I save the image.  I hate to use the word

14   image because it really isn't an image because you see it.

15   It's really a wire frame of value points.  It's not really an

16   image, but to make it easy for humans they give you an image.

17             So it takes these points, then I call up the same

18   software, call up the data set of the one that I just scanned,

19   just measured, call up the data set file of the known or

20   authentic or genuine.  And the system has multiple ways of

21   comparing.  I pick what is called difference measurement

22   analyses as well as profile management analyses.

23        Q.   We'll maybe get to having you distinguish what each

24   of those mean.  Before we do did you document your findings

25   after performing this analysis?

                                                            1446

1      A.   Yes.  At the end of the process that the system is

2    comparing it to it prompts to save a PDF file for the report,

3    which is a report.  Then we take those reports and pile them

4    up, save them.  And then you take -- after you finished

5    collecting all of your items, tablets or punches or Mikrosil,

6    and when the whole work is complete then you put this package

7    together, which we call a section.

8      Q.   Let's look at some of essentially your findings.

9    If we can look at Government's Exhibit 24.09.

10          Am I accurate in stating this is a comparison photo

11   of a tablet punch tip, a Mikrosil cast of a tablet punch tip

12   from Item 22 to an actual tablet from Item 17?  Is that

13   correct?

14     A.   Yes, that's correct.

15     Q.   So tell me what we're looking at in this exhibit.

16     A.   As mentioned, the image on the left, which is

17   shiny, metallic looking, that is the tip what we call the

18   tablet punch tip.  That is the phase that actually comes in

19   contact with the powder that eventually is pressed to make a

20   tablet, so that's a punch tip.

21          The one in the middle essentially is a Mikrosil, a

22   casting of that punch tip.  Essentially is treated, the punch

23   tip is treated with Mikrosil as if you were making a tablet.

24   So instead of making a tablet you're making a casting which is

25   similar to making a tablet.  And the far right, the brownish

1    appearance, that's the tablet, Item 17, Tablet 1.

2        So looking at these three here put together, the

3    reason this was put together is because through the process of

4    tablet making just like any technique you have to essentially

5    take care of your instrumentation.  So the punch tip, it's a

6    tool that makes the tablets.  Therefore, if you don't take

7    very good care of that damage occurs through changing, through

8    replacement, through to a high pressure, anything that causes,

9    in this case, there's a green arrow, that causes a dent.  You

10   can see the little dent on the bottom of the edge of the

11   metallic looking punch tip.  There's a green arrow pointing,

12   as you can see it's over exposed only because, you know, it's

13   shiny.  But there is a tiny little bump as you see it coming

14   inward.  That's on the edge of the tablet punch tip cup.  The

15   cup is what essentially makes the shape.

16        On the center you have a Mikrosil with a green

17   arrow also points to the same.  As I explained it earlier the

18   punch tip once it presses onto a powder to make a tablet it

19   essentially transfers everything, every shape of it.  In this

20   case that little dent was transferred into the Mikrosil.  If

21   you see on the far right you see the same dent on the tablet

22   that was pressed by that punch.  Because of the location it's

23   quite evident that that punch tip appears to have made that

24   tablet.

25        And on the red arrows, I just wanted to bring that

1448

1    point out.  I can, can't I?

2         Q.   Yes.

3         A.   It's an important part because punch tips are made

4    typically by what's called the master hub.  Master hub is the

5    master punch tip, and that's where all the other punch tips

6    will be made.  So when a manufacturer manufactures the punch

7    tips and they make the master, consequently after that, they

8    make other punches using this master.  The master is made with

9    high strength steel that is treated to be harder than a metal

10   that they make for when you make a punch tip.  So you take

11   this master and it press it with extreme pressure and

12   transfers what's on the hub onto another punch tip, so you

13   created a punch tip.

14        The reason I'm explaining this is because the

15   master hub, the design, the original punch tip, that punch

16   tip, the punch tip makes all the other punches, it's called

17   the hub.  It's made with -- in this case you can see the

18   lines, I don't know if you can see those lines.  You know,

19   forgive me about the compression of PDF, but it was quite

20   clear on the actual image, those are called CNC process.

21   That's process called computer numeric calculations.  And that

22   is what made the master hub.

23        So those lines are made through the process of

24   making a hub, which then later the hub which is the master

25   will press onto another softer metal to make the punch tips.

1      So that punch tip there with those lines and that arrow, you

2      can see the casting Mikrosil in the center that shows the same

3      centrifugal CNC lines, and you can also see them on the

4      tablet.

5              Q.   So can you use essentially a comparison of the

6      defects or characteristics of a punch tip to determine whether

7      a pill or tablet was made by that punch tip?

8              A.   The process of making a tablet punch is revealing

9      that the process that took place of making that punch tip.

10     When there is a damage or a dent or nick or burr on a punch

11     tip it's kind of like creating its unique fingerprint.

12              So if I were to press my hand on here, take it off

13     and it left a mark, that mark there is essentially my hand.

14     If I cut myself and I press on it you're going to see the cut

15     there.  So when there's a damage on a punch tip it will

16     continue to replicate that on all the tablets that it makes.

17             Q.   Okay.  Let's go to Government's Exhibit 24.10.

18     What are we looking at here?

19             A.   This technique -- again, this is profilometry.  And

20     this particular technique is called profile measurement.

21     Please tell me if I need to move this closer.   Profile

22     measurement.  Yes.  The grey image on the upper left corner

23     with the red band across it, that one there is a casting of

24     the punch tip.  The red band is what the system will take and

25     calculate a cross section of that line.  On the right side of

1        the grey image is the profile, the cross section of that red

2        band on that casting material.  Beneath it below the grey

3        image you have a brown, which is a tablet with the same red

4        line going across it creating again its own profile.

5               You take the two profile diagrams on the right of

6        the tablets, and the system is then, compares the two

7        superimposed and overlays them together.  And anything that

8        overlays quite well tells you that it's a pretty good,

9        pre-consistent to it to each other.

10       Q.   The jury has heard prior testimony about these

11       Mikrosil casts being made of the punch tips that were

12       provided.  They also heard testimony that the punch tips for

13       this specific drug exhibit number was found on the floor of a

14       bedroom in the defendant's home.  That would be Item 20.  It

15       appears that Item 14 as you stated was one of the Alprazolam

16       pills that was analyzed; is that right?

17       A.   That's correct.

18       Q.   And the jury heard prior testimony that Item 14 had

19       a specific DEA exhibit number which correlated it to prior

20       testimony of a pill that was seized from codefendants Tonge

21       and Bustin in November of 2016.  With what we are seeing here

22       on the comparison of these two times what can we conclude as

23       far as the punch tip from the defendant's home and the pill

24       that came from a codefendants' home?

25       A.   What I can conclude is that the two are consistent

1451

 1    to each other.

 2         Q.   Let's go to Page 2 of this exhibit.

 3              Now I made a mistake of leaving out a page which

 4    deals with if I remember difference measurement analysis.

 5         A.   That's correct.

 6         Q.   Why don't you explain what difference measurement

 7    analysis is.

 8         A.   Just what I'm seeing here is a half page.  Is that

 9    what I'm supposed to see?

10              Yeah.  Thank you.  Okay.  So this is the second

11    page of essentially describing what the system did prior to

12    this.  The difference measurement module, which again, is a

13    different technique than the profile measurement module.  The

14    difference between the two is, one, as I mentioned, one

15    creates a cross section of my hand so you can compare the two,

16    the line and gives me a line so you can compare that line; the

17    other one, the difference measurement, in this particular case

18    this is a difference measurement, it takes the tablet and it

19    essentially measures every parts of that tablet.  Again,

20    repeating it again, but it is what it is, 6.3 million XYZ

21    locations points.  That is it.

22              These points are then calculated, the algorithm

23    calculates between what we just saw, the grey casting and the

24    tablet and gives how many -- what is the percentage of the

25    same exact location that the system saw?  6.3 million points

1    of XYZ locations, 97 percent and slightly higher than that

2    were in the same location, which that translates to they're

3    consistent, very consistent to each other.

4         Q.   Does that mean that it is pretty likely that the

5    punch tip analyzed created the pill analyzed?

6         A.   Yes, correct.

7         Q.   Let's look at Exhibit 24.11.  Can you explain what

8    we're looking at here?

9         A.   Yeah.  This is -- okay.  Obviously these are

10   punches, and this is a good example of what we talked about

11   just a bit ago about creating its own individual fingerprints.

12   In this particular case the images that are labeled A and the

13   center one B and the one to the right C, they're all showing

14   what in this discipline is called sticking, picking and

15   sticking.  Sticking and picking.  And it is exactly that.  It

16   is material sticking to the punch face to the punch tip.  And

17   that is a lot of times is due to poor maintenance of the tool.

18            For example, one of the things that one could do to

19   avoid material sticking as you can see on image B, underneath

20   it shows up close the 9, there is a type material that is

21   stuck to it.  That type of material is essentially for as long

22   as it's on there it will create its own additional fingerprint

23   to whatever it stamps, whatever tablets it makes.

24            So this really happens when -- for example, you

25   wouldn't drive a car 100,000 without changing your oil.  You

                                                          1453

 1      have to do some cleaning.  You have to maintain it.  So

 2      maintaining your tools is your livelihood.  So without doing

 3      cleaning, often cleaning this can happen.  There are other

 4      reasons that it can happen, but this is typical of potentially

 5      low maintenance.  And when you do low maintenance on these

 6      tools it stays, that material stays on there for as long as

 7      it's able to adhere to it.

 8              The one on the C shows a lot more material stuck to

 9      it.  And that is actually going to be transferred on tablets.

10      The A was rather clean.  There was nothing sticking to it.  So

11      that one there will create an exact image or a higher quality

12      image when you compare it to a casting with the Mikrosil

13      because it's nice and clean.  The one further to the right,

14      the C or the B, those have additional variations to

15      fingerprints such as material stuck to it.

16      Q.   So if there was a punch tip that has some sticking

17      and picking, it's going to carry over the defect to the pills

18      that it punches and are created.

19      A.   That's correct.  A lot of times that happens when

20      in the tableting production, manufacturing, you have

21      essentially what is called cohesiveness forces and adhesive

22      forces.  So when the packing, the pressure to make a tablet,

23      the cohesiveness of the formulation, if it's not as strong as

24      the adhesiveness of the cup essentially being more attractive

25      to it material will come off and will stay to it.  So a lot of

1     that happens when again maintaining the tools, adding

2     lubricant to the formulation, things like that.

3          Q.   We are going to look at some more comparisons that

4     you made between Mikrosil cast of the punch tips and pills

5     seized in this case.  The jury has previously heard that prior

6     to creating those Mikrosil casts that Mr. Platek actually

7     cleaned them off.  When we're looking at that percentage in

8     comparison, if the picking and sticking is removed is that

9     going to cause a difference in that percentage?

10         A.   Correct.  Yes.  Correct.  And I believe I do have

11    some data to show where the picking may have been.  So, yes,

12    correct.

13         Q.   Let's go on to Exhibit 24.12.  Why don't you tell

14    us what we're looking at here.  It looks like a similar

15    comparison, but this time from Item 14.  Again, an Alprazolam

16    pill that was seized from the Tonge/Bustin home to what the

17    jury has heard testimony about, an Alprazolam pill that was

18    seized from a net basket in the defendant's basement.  Tell me

19    in comparing those what are we looking at here?

20         A.   Okay.  What you're seeing is the profile

21    measurement.  In this profile measurement you have two tablets

22    that is actually a 3D image converted into a JPEG.  But each

23    of these tablets with the red band I described earlier creates

24    a diagram.  So tablet -- I'm sorry.  Item 14, tablet 3, here's

25    the diagram on the right side.  Item 18, tablet 1, the diagram

1    is on the right side.  The beauty about this particular one is

2    the debossing was nice and clean.  Therefore, they're

3    practically indistinguishable because there was no unique

4    individual fingerprint due to sticking and picking.

5         Q.   Let's look at Page 2 of the same exhibit, if you

6    can zoom out.

7              Explain this aspect of your analysis on comparing

8    these two pills.

9         A.   So.  Yes, thank you for zooming in.  So here this

10   is the difference measurement module.  Again this will take

11   one tablet and measure every component of that, every part of

12   that surface to every other part of the other surface and look

13   for the XYZ 6.3 million points and comes back with a result

14   that says how many at this point in this percentage map the

15   same location?  In this particular case as you can see it was

16   very little sticking in there, so the percentage is quite

17   high.

18        Q.   Is it fair to say that based on your analysis that

19   each of these pills that came from different locations were

20   actually made from the same punch tip?

21        A.   Yes.  Based on the analysis that we do authentics

22   to authentics, when you see numbers like this they do come

23   from the same place.

24        Q.   Let's look at Exhibit 14.  And you've given quite a

25   bit of explanation as to how to more or less compare or how

1    these are compared.  This appears to be a tablet from Item 14,

2    which the jury heard testimony came from the Tonge/Bustin

3    home, to Item 19, which was seized by postal inspectors

4    according to prior testimony.  Are these essentially

5    Alprazolam pills that were likely to have been made by the

6    same punch tip?

7         A.   Based on the comparison with the casting, yes,

8    they're very consistent.

9         Q.   Let's look at Page 2 of this exhibit, as well, if

10   you'll zoom out.

11             Again, like the prior exhibit, it looks like

12   there's a high percentage of those 6.3 million data set,

13   there's a high percentage of them being exactly aligned with

14   each other; is that right?

15        A.   Correct.

16        Q.   Let's go to Exhibit 24-14.  Again, looking at a

17   similar diagram but comparing a punch tip which the jury heard

18   testimony was found on the floor of the defendant's home to

19   what appears to be an authentic Alprazolam pill; is that

20   right?

21        A.   Correct.

22        Q.   And how did the punch tip compare to an authentic?

23        A.   As you can see the two diagrams related at the

24   bottom, they have very little resemblance to each other, not

25   consistent with each other.

1        Q.   And let's look at Page 2.  And what would we

2    conclude from the information here?

3        A.   That the lower percentage such as that one there

4    are quite a few XYZ locations that are not the same location

5    as the comparing sample.

6        Q.   Let's look at the next exhibit, 24.15.  This

7    appears to be a comparison of a Mikrosil cast of one of the

8    punch tips for an M box or Oxycodone punch tip.  The jury

9    heard testimony that items for this exhibit actually came from

10   a pill press from Mr. Shamo's home on Titian Way that actually

11   is compared to a tablet in Item 8, which is a tablet that came

12   from the Tonge/Bustin home.  What can we conclude from what

13   we're looking at here?

14       A.   Once again, the two diagrams are overlaid at the

15   bottom.  While they may not be over top of each other as the

16   previous there's a lot of sticking and picking going on in

17   that particular tablet.  They're very consistently consistent

18   to each other.

19       Q.   The sticking and picking that may have gone on in

20   the creation of that tablet, can the mere fact that the punch

21   tip being cleaned prior to creating the Mikrosil casts account

22   for some of the difference?

23       A.   I'm sorry.  Could you repeat that?

24       Q.   So as the jury heard in prior testimony that the

25   punch tips were, any debris was cleared off of them --

1          A.    Correct.

2          Q.    -- creating the Mikrosil cast.  Can the fact that

3     some of that debris being cleared off prior to creating the

4     cast account for some of the difference between the Mikrosil

5     and the actual tablet?

6          A.    Correct.  That is typical when you remove material

7     from such sticking and picking.  But the overall shape as you

8     can see is quite consistent.

9          Q.    Let's look at Page 2 of this exhibit.  What can we

10    conclude from in information?

11         A.    Once again, is not as high as the 99 percent, but

12    it is quite close.  The XYZ locations were quite consistent to

13    each other in the 6.3 million points there.  So this was very

14    consistent to each other.

15         Q.    The defendant has been charged in part for pills,

16    the possession of pills at locations other than his own home.

17    If the punch tip came from his own home and these pills came

18    from another home, what's the likelihood that the pills were

19    originally made by that punch tip in the defendant's home?

20         A.    Quite high.

21         Q.    Okay.  Let's go to 24.16.  Here it looks like it's

22    noted that we're making or you're making a comparison of a

23    Mikrosil cast of a punch tip of an M box or Oxycodone punch

24    tip.  The jury heard testimony related to the DEA drug exhibit

25    number that this came from Mr. Shamo's home on Titian Way, the

1    punch tip did.  And it looks like it's being made -- or

2    compared to a specific suspect pill that is in Item 12 that

3    was also seized from Mr. Shamo's home.  What can we conclude

4    from your analysis depicted here?

5         A.   That they are consistent with each other.

6         Q.   And let's look at Page 2.  Can a similar conclusion

7    be made based on the information we're seeing here?

8         A.   Yes, correct.

9         Q.   Let's look at Exhibit 24.17.  And I promise not to

10   belabor this any longer past this.  What are we looking at

11   here?

12        A.   This is actually really is my favorite type of

13   analysis because here the colorful little area there is to

14   describe what really, you know, sticking and picking is doing

15   to the fingerprint of this.  The arrow, you know, that's

16   pointing to the diagram will show why that -- yes, beautiful,

17   thank you.  The tips are gone.  You know, if you see, for

18   example, the bump, on the left side there's a bump and going

19   down and back another bump, the one on the right, there's

20   quite of material missing.  If we zoom out, a similar

21   situation is at the bottom showing what's missing there.  So

22   you have the little bump in the diagram.  So this was a way to

23   describe why you see some areas that don't, they do not have

24   right on top of each other.  So that is due to sticking and

25   picking.

1      Q.   So it looks like you have a red arrow on the second

2   diagram towards the top.  Is that what's depicting then, that

3   as well as the other depicting where there's --

4      A.   There's picking all over there, yeah.

5      Q.   And the jury previously heard testimony that linked

6   the DEA exhibit from Item 21 to a pill press in Mr. Shamo's

7   home that's stated previously with the suspect pill Item 13

8   coming from a DEA exhibit that was seized by postal

9   inspectors.

10          While we have some what you explained as picking

11   and sticking with the suspect pill, what conclusion can we

12   reach even with that picking and sticking?

13      A.   That this is consistent with each other.

14      Q.   I want to pull up side by side if we can.

15          THE COURT:  I assume you've got -- Mr. Burggraaf, I

16   assume you've still got some time about this witness.

17          MR. BURGGRAAF:  In fact, I'm on my last probably

18   three or four questions.

19          THE COURT:  Oh, all right.

20          MR. BURGGRAAF:  If I may.  If we can pull up

21   alongside what we're looking at here, the photo 24.05.

22      Q.   BY MR. BURGGRAAF:  You mentioned previously picking

23   and sticking.  Is photo 24.05 an example of picking and

24   sticking?

25      A.   An excellent example of picking and sticking.

1      Q.   The difference that's shown between the Mikrosil

2      cast in 24.17 as compared to the pill, is that possibly due

3      because the picking and sticking was cleaned off of this punch

4      tip before making the Mikrosil cast?

5      A.   Correct.

6      Q.   And based on your -- actually if we can go back to

7      24.17 by itself, and look at Page 2.

8           And based on the information here as well as the

9      analysis you did on the prior page is it fair to conclude that

10     the punch tip that was found in Mr. Shamo's home was very

11     likely to have created the pill that was seized by the postal

12     inspectors?

13     A.   Correct.

14          MR. BURGGRAAF:   No further questions.

15          THE COURT:   How much time do you think you need for

16     cross?

17          MR. SAM:   I don't have any questions, Your Honor.

18          THE COURT:   Thank you.   You may step down and be

19     excused.

20          We'll take our first break.

21          (Whereupon, the jury left the court proceedings.)

22          THE COURT:   Let me talk to your lawyers for a

23     minute.   Others of you can go or come or sit or do whatever

24     you want.

25          I read your government's paper this morning.   You

1462

1    did not, the defense did not designate a medical expert to

2    opine on defendant's, any diagnosis of any particular malady;

3    is that correct?  It is my understanding; correct?

4              MR. SKORDAS:  Yes.

5              THE COURT:  And I take it you're not intending to

6    designate one?

7              MR. SKORDAS:  That's also correct.

8              THE COURT:  Nonmedical expert -- nonmedical people

9    can't testify as to a diagnosis.

10              MR. SKORDAS:  Right.

11              THE COURT:  I mean, they can testify as to -- they

12    can't say somebody has X, Y or Z.  They can give their

13    observations about things that are common that we all make

14    observations about, intelligence, ability to organize, certain

15    behaviors and all that.

16              But so I don't think there's really an issue there,

17    is there, having clarified that?  You're not intending to try

18    to get an expert designation now?

19              MR. SKORDAS:  Nope.  And we don't intend to use

20    those witnesses as experts for the purposes of any medical

21    diagnosis.

22              THE COURT:  Mr. Gadd?

23              MR. GADD:  I just want to make sure we're all

24    clear.  So in the opening it seemed pretty clear to me as I

25    reread it that was the intention for those witnesses.  It's no

```
 1    longer the intention?  Or maybe it never was.

 2              MR. SKORDAS:  They can talk about his -- I mean,

 3    it's his mother, Your Honor.  She can talk about his growing

 4    up, his perhaps learning disabilities, other things that

 5    happened, not as an expert, but she would know as well as

 6    anyone else about those things.  And we can address those

 7    through factual questions and avoid anything that appears to

 8    be an opinion.

 9              THE COURT:  She can do that.

10              MR. GADD:  Learning disabilities is a diagnosis.

11    ADHD is a diagnosis.

12              THE COURT:  ADHD is clearly a diagnosis.  I guess

13    she can testify about things that she observed that perhaps

14    she thought were learning disabilities without learning a

15    diagnosis.

16              MR. SKORDAS:  That's all we intend to do.

17              THE COURT:  That's fairly common.

18              MR. GADD:  Sure.  I think he indicates that it

19    might be factual, not opinion.  I think it is opinion, though;

20    right?  Isn't she going to give her opinion that perhaps, and

21    I don't want to put words in her mouth, but perhaps in her

22    opinion her son didn't or wasn't smart, you know, things of

23    that nature?  I think it is opinions.

24              THE COURT:  Well, every mother has opinions about

25    whether their kids are smart or not.
```

```
 1                    MR. GADD:  Sure.

 2                    MR. SKORDAS:  They're appropriate lay opinion, Your

 3      Honor.

 4                    THE COURT:  Some things are appropriate opinions

 5      given by lay people, particularly lay people who know people

 6      well.

 7                    MR. GADD:  Yes, sir.  I think those type of

 8      opinions come in under 701.  But what I worry about is

 9      testimony such as, we took him to the doctor, and he got a

10      diagnosis and here it is.  Or --

11                    THE COURT:  No.  I'm not going to permit that.

12                    MR. SKORDAS:  Nor do we have any intention of doing

13      that.

14                    MR. GADD:  Okay.  Thank you, Your Honor.

15                    THE COURT:  Thank you.  We'll be in recess for

16      about 20 minutes.

17                    (Recess.)

18                    THE COURT:  Do you have your next witness?

19                    MR. STEJSKAL:  Yes.

20                    THE COURT:  Let's get the jury.

21                    (Whereupon, the jury returned to the court

22           proceedings.)

23                    THE COURT:  United States may call its next

24      witness.

25                    MR. BURGGRAAF:  United States calls Dr. Adam
```

1    Lanzarotta.

2              THE COURT:  Come forward and be sworn, please, at

3    the microphone.

4              THE CLERK:  Just right here.  Please raise your

5    right hand.

6                      ADAM LANZAROTTA,

7         called as a witness at the request of Plaintiff,

8            having been first duly sworn, was examined

9                   and testified as follows:

10             THE WITNESS:  I do.

11             THE CLERK:  Please come around to the witness box.

12             Please state your name and spell it for the record.

13             THE WITNESS:  Adam Lanzarotta.  A-D-A-M,

14   L-A-N-Z-A-R-O-T-T-A.

15             THE COURT:  You may proceed, Mr. Burggraaf.

16                   DIRECT EXAMINATION

17   BY MR. BURGGRAAF:

18        Q.   Dr. Lanzarotta, thanks for being here today.  Can

19   you tell us what your current occupation is and employer?

20        A.   I am a chemist for the Food and Drug

21   Administration's forensic chemistry center.

22        Q.   And for simplicity throughout your testimony I'm

23   going to refer to it as the FDA lab.

24        A.   Sure.

25        Q.   Can you tell me how long you've been with the FDA?

1        A.    11 years.

2        Q.    And what are your responsibilities in your

3   position?

4        A.    I am a chemist, so we examine compromised FDA

5   regulated products for tampering, adulterations,

6   counterfeiting, diversion, things of that nature.

7        Q.    You mentioned adulteration.  What do you mean by

8   that?

9        A.    Products that may have ingredients in them that

10   shouldn't have.

11        Q.    And what's your education background?

12        A.    I have a Bachelor of Science in Forensic Science

13   and Ph.D. in chemistry.

14        Q.    And what training -- other than your education what

15   other training do you have related to your position at the

16   FDA?

17        A.    I've taken a few courses specific to my particular

18   field of expertise at external -- with external outside FDA

19   and also internal FDA courses.  And I've also instructed many

20   courses, as well.

21        Q.    What type of courses have you instructed?

22        A.    Specific to my field.  So once we get into a little

23   bit later when we get into exactly what my field of expertise

24   is specifically, infrared spectroscopy.  I've done a lot of

25   courses in that area.

1        Q.    The infrared spectroscopy, is there an abbreviation

2    for that?

3        A.    Sure.  FTIR, and that is fourier-transform

4    infrared.

5        Q.    FTIR.  I'm going to use that, as well, because I

6    most definitely would mispronounce it.

7        A.    Sure.

8        Q.    Do you have any publications in your expertise?

9        A.    Sure.  I have several.

10       Q.    Do you want to provide an example of one are two of

11   those?

12       A.    Yeah.  I've looked at a couple cases, counterfeit

13   tablet cases, so I've done some investigating in that.  Also

14   in adulterated products, products like capsules and tablets

15   that have ingredients that shouldn't be in there, and using

16   novel techniques to examine those types of products.

17       Q.    And then you published based on what you found?

18       A.    That's correct.

19       Q.    And have you testified as an expert before?

20       A.    Yes.

21       Q.    How many times?

22       A.    I believe five or six.

23       Q.    And has the court ever made a finding that your

24   test methods or results were not accurate or correct?

25       A.    No.

1      Q.   Have you had training or experience in identifying

2    and analyzing Oxycodone pills, Alprazolam pills and Fentanyl?

3      A.   Yes.

4      Q.   For today what did you do to prepare for your

5    testimony?

6      A.   I looked back at over my notes, what we would call

7    bench notes or worksheets that we generated specific to this

8    case.

9      Q.   We heard prior testimony from your colleague

10   Mr. Platek who explained that you performed two different

11   forms of analysis on items received by the lab, specifically

12   alternative light source and FTIR, the infrared.  As far as

13   the alternative light source did you make any significant

14   findings related to your analysis there?

15     A.   No.

16     Q.   Moving on to the FTIR, can you explain what type of

17   analysis that is and the equipment that you use?

18     A.   Sure.  So it's a piece of equipment about this big,

19   2 feet, maybe, by about 2 feet deep, maybe, 8 inches tall, and

20   it has a small aperture on it where we take a portion of our

21   sample and put it on the aperture.  And then we lower a

22   pressure arm on top of that to make a compressed pellet.

23          And the way the instrument works is we pass

24   infrared light through that window which is made out of

25   diamond.  The light passes through that small amount of sample

 1    and then gets directed back towards the detector.  And based

 2    on which wavelengths of infrared light that the sample absorb

 3    we're able to determine a chemical fingerprint for that

 4    particular substance.

 5         Q.   If I understand you correctly, then, the FTIR

 6    process does analysis of pills received, and you didn't

 7    necessarily do anything related to the punch tips that were

 8    received.

 9         A.   Correct.

10         Q.   Your colleague, Mr. Platek, previously wrote down a

11    list of categories of the items received by the lab.  Does

12    that look accurate as far as the first three rows for what

13    analysis -- what items you did analysis on?

14         A.   That's correct.

15         Q.   I want to just confirm the type of tablets that you

16    were dealing with.  If we can go to Government's

17    Exhibit 24.01.  Do you recognize this photo?

18         A.   I didn't take this photograph personally, but I do

19    recognize it from the case.

20         Q.   Is this one of the types of tablets that you

21    performed an analysis on using FTIR?

22         A.   Correct.

23         Q.   And if we can go to 24.02.  Prior testimony also

24    provided to the jury that this was a photo taken in this case.

25    Did you perform analysis on this type of pill, as well?

1          A.    Correct.

2          Q.    And if we can go to 24.03.  Again, prior testimony

3     provided that this was one of the tablets that came in the

4     items received by the FDA lab.  Was this one of the types of

5     pills that you performed analysis on?

6          A.    Correct.

7          Q.    Before utilizing the FTIR equipment did you do

8     anything to verify that it was performing accurately and

9     correctly?

10         A.    Yes.  Every day before we run any type of samples

11    we have to do what is called a performance verification for

12    each piece of equipment.  And for this particular instrument

13    we did that -- or I did that in this case.

14         Q.    Previously the jury has heard testimony that

15    several of the items listed came from specific locations

16    significant in this case, specifically the defendant's home on

17    Titian way, the Tonge/Bustin home in South Jordan and blue

18    postal bin, which those items were seized by a postal

19    inspector.  They've also heard that some these drug exhibits

20    tested positive for either Fentanyl or Alprazolam.  Did you

21    take any specific precautions in dealing with these items?

22         A.    Sure.  We have a safety procedure in our

23    laboratory, general safety procedure.  So we used personal

24    protective equipment, gloves, glasses, laboratory coats.  We

25    conduct any type of analysis that we can inside of a

1    ventilation hood.  And in the event that we don't have that

2    capability we do have ventilation snorkels where we can

3    actually move those over the piece of equipment that I use,

4    and I can work my hands underneath that snorkel and take the

5    portion of the sample, put it on the aperture, and it provides

6    me with a barrier between the sample and myself.  And then if

7    there's anything that becomes airborne that ventilation hood

8    will pick that up.

9        Q.   And in regards to the 19 items, did you perform

10   this analysis using FTIR on all at least one pill from all

11   19 items?

12       A.   That's correct.

13       Q.   And why did you -- or did you perform that test a

14   single time?  Multiple times?

15       A.   I'm not entirely sure without looking directly at

16   my notes.  But I probably looked at it once.

17       Q.   Okay.  And can you describe what the portion of the

18   pill it is that you actually performed an analysis on?

19       A.   Yes.  Typically in this case I'll take a tablet and

20   I'll break it in half, and then I'll scrape a portion of the

21   core of the tablet, so the inside of the tablet, onto the

22   aperture of the instrument.

23       Q.   And in your analysis did you compare the results of

24   the FTIR of the suspect pills with authentic Oxycodone or

25   Alprazolam pills?

1          A.    That's correct.

2          Q.    And how do you document your findings after your

3     analysis?

4          A.    Well, once we've run the sample we end up with

5     what's called a spectrum, so it's just an XY plot, a graph,

6     and on that graph is a fingerprint of that particular sample.

7     So we compare the fingerprint of the suspect sample to the

8     fingerprint of an authentic sample.  And what we would do is

9     provide that data as a printout and then compare those

10    fingerprints to each other to make a determination on if the

11    suspect sample is consist with the authentic or not.

12         Q.    I'd like to look at some of that data that you

13    gathered for your analysis.  If we can look at Government's

14    Exhibit 24.08.  This is an FTIR result that -- or findings

15    that you created; is that right?

16         A.    That's correct.

17         Q.    It appears that there are four boxes on this

18    exhibit.  Can you walk me through each of those boxes and what

19    it is that we're looking at?

20         A.    Sure.  So if we start in the top left what we have

21    here is the signature of each of the labeled items that I was

22    talking about.  So we have an XY plot.  On the X axis or

23    horizontal axis that's what wavelength we're looking at.  And

24    along the Y axis we're looking at the intensity or absorbance

25    that we're seeing of each wavelength.

1              So if you look at the fingerprint, say, at the top

2    example, Item 14, we get a signature or fingerprint.  That

3    fingerprint is consistent with each of the other items in this

4    window here.

5         Q.   So if the jury having heard prior testimony that

6    each of the drug exhibits from which these items were taken

7    from came from different locations, can you draw any sort of

8    conclusion based on what we're looking at here?

9         A.   The conclusion I would draw is that the infrared

10   signature of each of these tablets from each of these items

11   are consistent with each other.

12        Q.   And if we can zoom out and go to the second box.

13   What are we looking at here?

14        A.   So the second box here is what is the result of a

15   library search of one of the representative signatures or

16   fingerprints that we were looking at on the previous page.  So

17   if you look at the very top it says, search results for the

18   number, Item 14.  So what we did was we took the spectrum.  We

19   searched it against probably 55- to 60,000 signature

20   fingerprints in our library, and these are the best matches

21   that the computer algorithm determined.

22        Q.   So based on what we're looking at here you've got

23   Row 3 and Row 4 that reference microcrystalline cellulose.

24   How likely was it that there was microcrystalline cellulose in

25   Items 14 through 19?

1         A.    I didn't document it on here what the ingredients

2    were because the question was just to compare it to authentic.

3    But I do want to point out that based on the data that I'm

4    looking at here, the suspect sample does appear to contained

5    some type of cellulose.

6         Q.    Okay.  If we can go to Box 3.  What is being

7    compared here?

8         A.    So in Box 3 we have one of our representative

9    spectra signatures from box Number 1, and we are comparing

10   that fingerprint, that signature, to that of an authentic

11   Alprazolam 2-milligram tablet core that was manufactured by

12   Sandoz.

13        Q.    And in your expert opinion, can you draw any

14   conclusions in making the comparison of those two pills, an

15   authentic versus a suspect pill?

16        A.    Sure.  I can tell if you look at the peak positions

17   along the X axis the signature of the suspect sample is not

18   consistent with that of the authentic.

19        Q.    And if we can go to the last box.  I believe you've

20   kind of summarized more or less your findings.  Is there

21   anything else noted here worth mentioning that you haven't

22   already that you concluded?

23        A.    I think this screen here summarizes everything.

24        Q.    Okay.  Thank you.  If we can now go to Government's

25   Exhibit 24.06.  Noting a pattern here as to how these are

1    structured we may skip Box 4 because I'm going to anticipating

2    you're going to explain to us what your conclusions are.  We

3    can look at Box 1.  It appears from this that you're

4    performing an analysis using FTIR for items that are scored as

5    A215s; is that correct?

6          A.   That's correct.

7          Q.   And tell me the results of your analysis comparing

8    those pills.

9          A.   The fingerprint of each of these tablet cores were

10   consistent with each other for each of the items listed in

11   this window here.

12         Q.   And if we can go to Box 3.  What are we looking at

13   here?

14         A.   We're looking at the top representative spectrum

15   from one of those that was shown in window Number 1 compared

16   to the fingerprint of an authentic Oxycodone hydrochloride

17   30 milligram tablet core manufactured by Actavis.  And what we

18   can see here as in a similar situation as previously the

19   signature of the suspect sample is not consistent with that of

20   the authentic.

21         Q.   And how -- do you have a reason for why or maybe

22   visually is there something that tells you here as to why

23   they're not consistent?

24         A.   Yeah.  If we look at the different regions down

25   here, we see along the X axis the number 2000.  So if we look

1    at everything to the right of that we see a different pattern

2    of these peaks or these absorptions.  And based on the

3    differences in each of these peaks we are able to determine

4    that the suspect and authentic are not consistent with each

5    other.

6              We can also see in the authentic Oxycodone we have

7    very sharp peaks around 17 -- between 1500 and 1800 that are

8    characteristics of Oxycodone itself, the active ingredient.

9    Those peaks are not present in the suspect signature.

10        Q.   So if we can zoom out.  What can you conclude,

11   then, when comparing the suspect pills marked A215 to the

12   authentic Oxycodone pill?

13        A.   That the suspect samples were not consistent with

14   the authentic.

15        Q.   Were the suspect pills consistent with each other?

16        A.   Yes.

17        Q.   Okay.  If we can move on to Exhibit 24.07.  If we

18   can zoom into Box 1.  It appears that this is capturing your

19   analysis results for the items provided the FDA lab that had a

20   embossment of an M with a box around it.  Is that what that

21   is?

22        A.   Correct.

23        Q.   And can you explain what we're looking at here?

24        A.   Each of the signatures are, fingerprints here were

25   from each of the items that you have described that had or

1    consisted of a sample with an M30 stamp on it.  And each of

2    the spectra signatures, fingerprints of each of those tablets

3    are all consistent with each other.

4         Q.   And if we can go to Box 3.  What are we looking at

5    here?

6         A.   We have one representative signature fingerprint

7    from the box Number 1, and it is compared to an authentic

8    Oxycodone 30 milligram core manufactured by Mallinckrodt, and

9    the suspect fingerprint is not consistent with that of the

10   authentic.

11        Q.   So if we can zoom out.  Is it fair to say that

12   essentially regardless of the location of where these

13   suspecting pills came from all of the suspect pills are

14   consistent with each other?

15        A.   Correct.  Using this technique, that's correct.

16        Q.   But they're inconsistent with authentic Oxycodone?

17        A.   That's correct.

18        Q.   If all the A215 and M30 suspect Oxycodone pills

19   analyzed were found to be consistent with each other but also

20   found not consistent with authentic Oxycodone pills, based on

21   your training and experience what would you conclude?

22        A.   Could you repeat the question?  I'm sorry.

23        Q.   It might have been a lengthy question.  Let me

24   rephrase it.

25             Is it probable based on your findings that all the

1    A215 pills would likely have come from the same source based

2    that they're consistent?

3         A.   I would say it's possible.  There are other

4    techniques that are more conclusive for that type of

5    conclusion.  And I think Mr. Ranieri's technique that he

6    described would probably be the most appropriate to make that

7    type of conclusion.

8         Q.   Okay.  Thank you.

9              No further questions.

10             THE COURT:  Cross-examine?

11             MR. SKORDAS:  No questions, Your Honor.  Thank you.

12             THE COURT:  Thank you.  You may step down.  And

13   you're excused if you want to be.

14             The government may call its next witness.

15             MR. BURGGRAAF:  The United States would call

16   Heather McCauley.

17             THE COURT:  Come forward and be sworn, please.  Now

18   you can come forward and be sworn.

19             THE CLERK:  Please raise your right hand.

20                      HEATHER ANNE McCAULEY,

21        called as a witness at the request of Plaintiff,

22           having been first duly sworn, was examined

23                   and testified as follows:

24             THE WITNESS:  I do.

25             THE CLERK:  Please come around to the witness box.

```
 1                    Please state your name and spell it for the record.
 2                    THE WITNESS:  Heather Anne McCauley, H-E-A-T-H-E-R
 3      A-N-N-E, M-C-C-A-U-L-E-Y.
 4                              DIRECT EXAMINATION
 5      BY MR. BURGGRAAF:
 6           Q.   Ms. McCauley, thanks for being here today.  Can you
 7      tell me what your current occupation is and where you're
 8      employed?
 9           A.   Sure.  I am currently the director of
10      investigations in Cincinnati, Ohio, in the office of Human
11      Animal Food.  And we do inspections for human and animal food
12      manufacturers in the state of Ohio and Kentucky.  But before
13      that I was a chemist in the forensic center for almost 26
14      years.
15           Q.   And for use of reference I'm going to refer to that
16      as the FDA lab.  You say you were employed in there for about
17      20 years?
18           A.   I was in the lab for about 26 years.  I've been in
19      my current position for about a year.
20           Q.   What's your education and background?
21           A.   I have a bachelor's of Chemistry -- I'm sorry.
22      Bachelor of Science in Chemistry and in Biology.
23           Q.   And when you're employed by the FDA lab what were
24      your job responsibilities?
25           A.   I would analyze evidence that was sent to the
```

1    laboratory for analysis, talk to Office of Criminal

2    Investigation agents, write reports, review reports, write

3    standard operating procedures and review them, maintain

4    instruments, do verification of those instruments and make

5    sure they were running properly.

6         Q.   And what training have you received in addition to

7    your education related to your FDA lab position?

8         A.   Earlier on in my career I attended a mass spectra

9    interpretation theory class.  Also when we get new

10   instrumentations in the laboratory usually we get some type of

11   training from the manufacturer on how to use that equipment,

12   and the FDA itself has various courses that you can take.

13        Q.   And do you have any publications related to your

14   job responsibilities that you had at the FDA lab?

15        A.   Sure.  I've given presentations and publications.

16   I've given presentation at the conference on small molecule

17   science on analyzing and identifying pharmaceuticals; a

18   presentation at the American Academy of Forensic Science on

19   the presence of pharmaceuticals and dietary supplement.  I

20   coauthored a paper with Dr. Lanzarotta, The Analysis of

21   Pharmaceuticals, on a piece of equipment that was a

22   combination of fourier-transform infrared and gas

23   chromatography with mass spectrometry.

24        Q.   That last one, we're going to talk about that some

25   more.

                                                            1481

1          A.    Yes.

2          Q.    Because you said it you saved me from saying it.

3     Can I abbreviate it from here on out as GCMS?

4          A.    Yes.

5          Q.    The jury has heard prior testimony about GCMS, and

6     I suspect that they may be somewhat of an expert at the end of

7     the trial themselves.  They might put some of you out of work.

8     That being said, can you describe what GCMS is?

9          A.    Sure.  So again GCMS stands for gas chromatography

10    mass spectrometry.  And so the instrument itself for visual

11    purposes, if you can imagine basically a 3-by-3 box that sits

12    on a benchtop.  It's pretty unimpressive looking at it from

13    the outside, but the magic happens on the inside.  And so the

14    gas chromatography part of that is if you can imagine like a

15    coffee stirrer that's 100-feet long and it's circled upon

16    itself like a coil about 12 inches in diameter.  And if you

17    can also imagine that that coffee stirrer had a coating of

18    material on the inside surface of it.  So it's open, and stuff

19    can pass through it, but there's a coating on the inside.

20              So what you do is you take your material, whatever

21    you're trying to analyze, and you mix it with some type of a

22    liquid.  And you take that liquid, and you pull it up into a

23    syringe and you inject it into the instrument through a port.

24    And that port is about 500 degrees Farenheit.  So it turns

25    everything into a gas.

1           And that gas then flows through that coffee

2    stirrer, which is called a column.  And that gas interacts or

3    interfaces with the material that's lined on the inside of the

4    coffee stirrer, if you will.  And as it interacts with that

5    phase, what's called a phase, it separates out that mixture

6    into its components.

7           So if you imagine like, say, a multivitamin.  As

8    those vitamins would be traveling through that column they

9    interact with it at different -- like in different ways that

10   gives it separation.  So say a Vitamin C might come out first,

11   Vitamin A might come out next, Vitamin B will come out last.

12   So you get separation in that way.  That's what the whole

13   purpose of gas chromatography is is to take a mixture, pass it

14   through a medium and separate it into its components.

15          So once that happens and you have your individual

16   components, they go into what's called the mass spectrometer.

17   And at that point those individual components are hit with a

18   voltage that explodes the molecule into a specific pattern,

19   which is like a fingerprint.  And that's how you can identify

20   what it is, because like that Vitamin C explodes the same way

21   every time.  It has a specific fingerprint that I can say

22   that's Vitamin C.  The same with Vitamin A, et cetera.

23          So then you get a piece of data in your computer

24   that shows a graph with each of those individual components

25   making like a peak, and then you get also what's called the

1    mass spectrum, which is the fingerprint of each one of those

2    peaks.

3         Q.   Excellent.  So there's essentially two processes

4    that go on within the GCMS instrument.

5         A.   Correct.

6         Q.   Now I want to backup just a little.  Have you

7    testified as an expert before?

8         A.   Yes.

9         Q.   How many times?

10        A.   8 to 10.

11        Q.   Has the court ever made a finding that your process

12   or testing methods were not accurate or correct?

13        A.   No.

14        Q.   Do you have experience analyzing Oxycodone pills,

15   Alprazolam pills and Fentanyl?

16        A.   Yes.

17        Q.   So tell me how you became involved in this crime

18   case.

19        A.   My supervisor asked me to analyze the evidence that

20   I had submitted to the laboratory.

21        Q.   And were you specifically directed to use the GCMS

22   method for analysis?

23        A.   Yes.

24        Q.   And is the GCMS equipment and tool as well as just

25   the process generally widely accepted in the scientific

1    community?

2         A.   Yes.  And the technical -- the procedure that we

3    use, I actually wrote that technical procedure and did the

4    validation for it for a laboratory.  And that's the general

5    method that we use for GCMS analysis that come into our

6    laboratory.  And we have used that procedure on thousands and

7    thousands of samples.

8         Q.   Before using this box, the GCMS equipment, do you

9    do anything to verify that it's operating correctly and will

10   give you accurate results?

11        A.   Yes.  There's different types of verification.  The

12   one that's the most important for this analysis specifically

13   is a daily verification where you run what's called a tune.

14   And you're just making sure that the instrument is operating

15   properly in the way that you expect it to on the day of use.

16   We also have different procedures that we do that might be

17   monthly or yearly to make sure that the instrument is in good

18   operation and functioning the way it's supposed to be and well

19   maintained.

20        And in addition to that when I run the samples

21   themselves, the first time that I run them when I don't

22   necessarily know what I have, I run what's called a screen

23   check standard.  And it has three known compounds in it that

24   I'm looking to make sure that they're coming out and being

25   separated the way that I mentioned.  And in the mass spectrum

1    of them is exactly how I would anticipate them to be.  So

2    that's run with that set of analysis to ensure -- another

3    safety to ensure that everything is going the way I would

4    expect it to do that day.

5          Q.   In your process when you're analyzing the substance

6    you're actually taking additional steps to ensure the accuracy

7    of the results such as doing multiple tests; is that right?

8          A.   Yes.  I run the standards in duplicate to make sure

9    that the second time that I analyze it it looks exactly the

10   same as the first that I analyzed it.  I also run certified

11   standards.

12         Q.   And what are those certified standards?

13         A.   Well, it depends on the analysis that you're doing.

14   So in this case the first time that I run the samples is what

15   I call the screen when I'm looking to see what I have.  And

16   then once I figure out what I think I have, which at that

17   point I'm calling it a tentative identification.  And then

18   I'll run a second time with certified standards.

19              So in this case once I identified that I had the

20   active ingredients of Fentanyl and Alprazolam then I ran

21   certified standards of those two compounds to show that what I

22   see in the sample looks exactly the same as a standard of

23   those materials.

24         Q.   And how do you ensure that there's no cross

25   contamination between one test and another or no adulterants

1    when running this analysis?

2        A.    Cross contamination between the samples?

3        Q.    Between maybe from one test to the next.  Does any

4    material remain within the GCMS device between tests?

5        A.    Generally no.  But we run blank, what's called a

6    blank.  So in this case these samples were dissolved into

7    methanol.  And then I have a sequence that I run that I set up

8    with each item in what order I'm going to run them in.  And I

9    run blanks in-between the samples to ensure that there's

10   nothing that's carrying over that would be showing up that

11   shouldn't be there.

12            Occasionally if something happens that I would

13   question that, I might -- the second time I run stuff I would

14   change the order of the way that I run them so that they're

15   not run in the same order each time.  So I do different things

16   to ensure that I don't have that situation that you're

17   describing.

18       Q.    In this case did you only perform an analysis on

19   the 19 items that contained different pills or tablets?

20       A.    That's correct.

21       Q.    And your colleague Mr. Platek on the paper to the

22   left of you there categorized the first 19 items received into

23   three different types of suspect pills or essentially pills

24   with the same scoring on them.  In looking at that, does that

25   accurately portray the categories and items that you did your

1    analysis on?

2         A.   Yes.

3         Q.   And was there a difference in results on any of the

4    items that were scored with A215?

5         A.   No.  All of the A215s looked the same.

6         Q.   And the next one down, Item 6, 8, 9, 10, 12, 13

7    scored with an M box and a 30, the results that you received

8    was there any inconsistency amongst the items?

9         A.   No.

10        Q.   So each of the items are tested separately;

11   correct?

12        A.   Yes.

13        Q.   So Items 14 through 19, did you find any

14   inconsistencies in your ultimate results?

15        A.   Within the Items 14 through 19 themselves, no,

16   there was no inconsistencies.

17        Q.   So let's talk about your results, then.  After

18   running the GCMS what did you find for Items 14 through 19?

19        A.   Items 14 through 19 were Alprazolam.

20        Q.   Okay.  And for the items at the top that were the

21   pills that were scored A215, what results did you find?

22        A.   Fentanyl.

23        Q.   And Items 6, 8, 9, 10, 12, 13 scored with an M box

24   and 30 what results did you find?

25        A.   Fentanyl.

1      Q.   And you mentioned earlier that you at least run the

2   analysis twice with the GCMS.  The second time you ran it did

3   it confirm the tentative results that you got the first time?

4      A.   Yes.

5           MR. BURGGRAAF:  If I can have one moment, Your

6   Honor?

7           THE COURT:  Yes.

8           (Time lapse.)

9      Q.   BY MR. BURGGRAAF:  I want to ask you, are you

10   familiar with the active ingredient in the authentic A215

11   tablets?

12      A.   No; because I don't -- the purpose of my analysis

13   wasn't to address authenticity.  The purpose of my analysis

14   was to simply look for any active pharmaceutical ingredients.

15      Q.   And in performing your analysis were you asked to

16   find the amount of the active ingredients?

17      A.   No.

18      Q.   Okay.  No further questions.

19           THE COURT:  Thank you.

20           Cross-examine?

21           MS. BECKETT:  I have no questions for this witness,

22   Your Honor.

23           THE COURT:  Thank you.

24           You may step down, and you're excused if you want

25   to be.

```
 1                    THE WITNESS:  Okay.

 2                    THE COURT:  You may call the next witness.

 3                    MR. BURGGRAAF:  The United States called Dr. Arthur

 4      Simone.

 5                    THE COURT:  Come forward and be sworn, please.

 6                    MR. BURGGRAAF:  If I can have a moment, Your Honor.

 7                    THE COURT:  Yes, you may.

 8                    THE CLERK:  Please raise your right hand.

 9                         ARTHUR SIMONE,

10         called as a witness at the request of Plaintiff,

11            having been first duly sworn, was examined

12                 and testified as follows:

13                    THE WITNESS:  I do.

14                    THE CLERK:  Please come around to the witness box.

15                    Please state your name and spell is it for the

16      record.

17                    THE WITNESS:  Arthur Simone, A-R-T-H-U-R,

18      S-I-M-O-N-E.

19                    THE COURT:  You may proceed, Mr. Burggraaf.

20                    MR. BURGGRAAF:  Thank you, Your Honor.

21                         DIRECT EXAMINATION

22      BY MR. BURGGRAAF:

23         Q.   Thank you, Dr. Simone, for being here this morning.

24              Can you tell me what your current occupation is and

25      where your employed?
```

1          A.    I'm employed after Food and Drug Administration

2    just outside of Washington DC.  And I'm senior medical advisor

3    in the office of unapproved drugs and labeling compliance.

4          Q.    How long have you been with the FDA?

5          A.    17 years.  Almost 17 1/2.

6          Q.    And in your current role what are your

7    responsibilities?

8          A.    I work in the office of compliance, and our jobs

9    are to make sure that the drugs that are available on the

10   marketplace are those that have been appropriately vetted by

11   FDA, to be sure they're safe and effective and highest quality

12   possible.  And those that aren't are removed, and that's what

13   my office does.

14         Q.    Let me take you back 17 1/2 years ago.  Where did

15   you work before the FDA?

16         A.    Prior to FDA I was in private practice.  I worked

17   in the Philadelphia area.  I was an assistant professor at the

18   University of Pennsylvania for several years and then went on

19   to several other colleges that were there.  Hahnemann

20   University, Medical College of Pennsylvania and Drexel

21   University as well as working in private practice.

22         Q.    And what type of practice do you have?

23         A.    Anesthesia.

24         Q.    And what's your education background?

25         A.    I started out wanting to be an engineer and got a

1    Bachelor of Science in Engineering Science, and then I went on

2    to Penn State University at that point to get a master and

3    Ph.D. in bioengineering.  And my specialty there was gas

4    mixing and aerodynamics and models of the upper airways and

5    the lungs.  And after that I went to medical school.

6         Q.   And you passed?

7         A.   Yes.

8         Q.   You may have said it, just so I want to make sure I

9    heard it, do you have a Ph.D.?

10        A.   Yes, I do.

11        Q.   What's the emphasis for that Ph.D?

12        A.   It's bioengineering.

13        Q.   Do you provide training instruction to others in

14   your field?

15        A.   At FDA?

16        Q.   At FDA or elsewhere.

17        A.   At FDA I do.

18        Q.   What types of training do you provide?

19        A.   For my first 14 years at FDA I worked in the office

20   of new drugs where we approved products, new drug products for

21   anesthesia, critical care and in my case also counter

22   terrorism.  So I trained people how to do the review work from

23   the clinical side, how to look at the clinical trials that

24   were conducted, how to look at toxicology studies that had

25   been performed, how to reviewed chemistry manufacturing

1    control data in an effort to decide whether the benefit of a

2    new drug outweighed its risk, and also look at the label and

3    to make sure the labeling adequately informed a physician how

4    to use a new drug.

5         Q.   You mentioned you're evolved with new drugs

6    applications and teaching others about that process.  We'll

7    come back to that.  But do you have any publications or have

8    you authored any literature related to your profession?

9         A.   I have.

10        Q.   What type -- can you give us a couple of examples

11   of your types of publications?

12        A.   Sure.  One of the big issues that has occurred in

13   recent years was whether anesthesia drugs affect the

14   development of the brains of infants over the last trimester

15   of pregnancy and during the first couple years after birth

16   while the brain is going through a rapid development phase.

17   And we have done in work in that, especially with animals.

18   And in the indication there is a lot of anesthesia drugs can

19   affect the brain adversely and those affects can last

20   throughout life.

21        Q.   And have you testified as an expert before?

22        A.   I have.

23        Q.   How many times?

24        A.   Eight times.

25        Q.   And has a court ever found that your testimony was

                                                              1493

1      inaccurate or not correct?

2           A.   No.

3           Q.   What training or experience do you have related to

4      Fentanyl and Oxycodone?

5           A.   For the first 14 years at FDA I was oftentimes the

6      only anesthesiologist in my division, so I covered all the

7      anesthesia products, and that included all the intravenous

8      formulations of Fentanyl.  It's the newer versions of Fentanyl

9      that came on the marketplace, I would be responsible for

10     reviewing those.  And for older versions that had been out

11     there for a while I would continue monitoring the safety of

12     those and any changes and indications that the companies would

13     seek.

14          Q.   For the jury why don't you explain what is

15     Fentanyl?

16          A.   Fentanyl is a potent opioid analgesic.  It's a very

17     strong painkiller.  It's commonly used in anesthesia and

18     sometimes in the ICU afterward.

19          Q.   What did you do to prepare for your testimony

20     today?

21          A.   I've had discussions with you about my knowledge

22     regarding Fentanyl and anesthesia in general, and I've just

23     reviewed some of the approvals of products that have been

24     involved in Fentanyl.

25          Q.   More generally, what does the FDA consider and

1    approve when an application is submitted as it relates to a

2    controlled substance?

3         A.   Can you rephrase that?

4         Q.   What's the FDA's role in respect to controlled

5    substances that want to be entered into the marketplace?

6         A.   It would actually be treated the same as any other

7    prescription drug product.  The company that wanted to market

8    these products would have to come to us and follow all the

9    steps that are normally required to show that whatever its

10   intended use is going to be and whatever the dose is going to

11   be administered that the product is effective.  It does what

12   they claim it will do, and that the risks have been well

13   established to the point where we can determine whether the

14   benefits of the drug outweigh the risk or the intended use.

15        Q.   So is what you just described part of the new drug

16   application?

17        A.   Yes.

18        Q.   Are there any other significant parts of that new

19   drug application?

20        A.   Yes.  So the drug application from very high level

21   includes three things -- or four things, I should say.  First

22   is chemistry manufacturing and controls.  So that's how the

23   company is going to make the product.  It has to be of the

24   highest quality possible to minimize risk.  So that includes

25   everything from where they are getting their supplies, their

1    active ingredients, which is the ingredient that does the work

2    of the drug, their inactive ingredients, how they're going to

3    analyze the ingredients when they get them, when you buy from

4    someone who sells them and then you have to also confirm what

5    it says it has, and that it's the purity it's supposed to

6    have.

7              It includes the recipe for how they actually go

8    about making the drugs and equipment they use.  It includes

9    all of the specifications for the drug when it's completed and

10   it's in its final format and how they go ahead and test that.

11   It includes having to reserve the products so if there's

12   ever an issue with it they can reanalyze it or give samples.

13   And it includes an inspection to make sure that the facility

14   really has the equipment they claim they have to do all this

15   work.  And that the facility is clean enough, if you will,

16   that it's suitable for making drugs, especially injectable

17   drugs.  That's one section of the NDA.

18        Q.    Thank you.  When you were involved with new drug

19   applications did you actually ever go and do the onsite

20   monitoring yourself?

21        A.    For inspection, no.

22        Q.    Those who did go and do the onsite and monitoring

23   and inspection would they bring back issues or concerns for

24   you to give an opinion?

25        A.    Yes.  They would if they found something.

1          Q.   I want to give you the opportunity to weigh in

2     similarly today.  I'd like us to look at Exhibit 13.09,

3     Photo 10.

4               We're looking at photos of the defendant's home on

5     Titian Way back in 2016.  And I'd like to walk you through a

6     room for which the jury heard prior testimony about, and

7     similar to what you've done in your profession ask you what

8     concerns or issues may arise were this the location being

9     considered for approval in a new drug application.  So do you

10    have anything you could speak to as far as what we're looking

11    at here?

12         A.   Just based on a quick glance at the image, one of

13    the concerns is the dust that's on the walls.  I'm not sure

14    what all the equipment is and whether it's all intact or not,

15    but there appears to be the one container right in the center

16    of the image where there's some white substance that's in

17    there that's being exposed to the rest of the environment.

18         Q.   And why is that -- why is the dust on the wall and

19    the exposed material, why is that of concern?

20         A.   There's two concerns.  It depends on what the

21    substances are in both places.  But you can have the stuff on

22    the wall get into the ingredients going into the drug product

23    and vice versa.  Stuff coming out of that container puts

24    people at risk for inhaling it.  And if that's what's on the

25    wall it's a substantial amount.  And on the other hand, dust

1    from the wall or anywhere else in the room for that matter

2    that gets into that hopper looking device into the medication

3    or the drug can cause harm to whoever takes it.

4         Q.    And if we can move to the next photo.

5              Is this indicative of a standard location that

6    would be approved for a pharmaceutical production operation?

7         A.    No.

8         Q.    And why not?

9         A.    It's a very makeshift looking facility.  It's not

10   something that appears to be permanent.  With the purposes of

11   the Bell jars that are lined up on the tables, I'm not sure --

12   the blockage of the windows with those pillow-like devices and

13   a roll of toilet paper is something that you wouldn't normally

14   see in a facility used by a company like Pfizer.  And again,

15   you've got the dust on the walls, the chair.  And I'm not sure

16   what those containers are on the shelves and what their

17   intended use is, but I can see they're covered with dust, as

18   well.

19        Q.    And just to complete the review of this room if we

20   can go to the next few photos maybe pausing for just a few

21   minutes.  I should say seconds.  Let's not pause for minutes

22   on each.

23              This is the second pill that the jury heard

24   testimony about, and heard further testimony about powder

25   taken from that hopper being tested positive for Fentanyl.

1         Do you have any additional concerns -- you can hold

2    it there -- did you have any additional concerns based on

3    those additional photos?

4         A.   Again, if there's Fentanyl in there because of its

5    potency I would be concerned for the possible exposure for the

6    people in the room either working on the drug or just even in

7    the peripheral of the room, and the fact that it's not

8    covered.  Beyond that, the fact that it's just not in a very

9    clean environment.  It's not something that at a minimum I'm

10   assuming these are for tablets that are being swallowed as

11   opposed to an injectable form.  Even for facilities that make

12   pills the requirements are higher than what would be required

13   for food.

14        So if an inspector were to go in and find roaches

15   in a facility that were making pills or rodent droppings,

16   which they do, they would be told to stop making the products

17   at that facility until the problem was cleared up.  And they

18   may be encouraged to recall a product if it had been made and

19   we can demonstrate anything was for risk for patients

20   downstream or something that had already been made.

21        Q.   Is that because a facility that produces this type

22   of product, if it's not clean it poses a health hazard for the

23   end user?

24        A.   Yes.

25        Q.   I want to ask you more generally about the new drug

1    application process.  Does the FDA maintain records or a

2    database for all approved new drug applications?

3            A.   Yes.  There are three databases that we have.  Two

4    of them are public, that's drugs at FDA, and what we call the

5    orange book, and they list all of the approved products.  And

6    then there's an internal database, which is our Document

7    Archival Reporting and Regulatory Tracking System or DARRTS.

8    The DARRTS system, which is internal, includes a lot of

9    proprietary information and information coming from drug

10   companies required to an approval of their product.

11           Q.   Speaking just to the approved applications, did you

12   review the FDA's databases in preparation for your testimony

13   today?

14           A.   I did.

15           Q.   And in reviewing the databases did you find an

16   approved application for manufacturing or bringing to market

17   any pharmaceuticals including Alprazolam or Fentanyl for any

18   of the following individuals:  Alex Tonge, Katie Buston, Mario

19   Noble, Drew Crandall or Jonathan Luke Paz?

20           A.   No.  I found nothing for them.

21           Q.   Similar question, did you find an FDA approved

22   application for the manufacturing or bringing to market any

23   pharmaceuticals including Alprazolam or Fentanyl for Aaron

24   Shamo or Pharma Master?

25           A.   I searched for both and found nothing for either.

1        Q.   Based on your search of those drug applications,

2    the approved ones, if it was discovered that Mr. Shamo either

3    individually or under a pseudonym of Pharma Master was

4    manufacturing pills scored with an A215 or M enclosed with a

5    box with 30 on the other side, what would you conclude by the

6    fact that he doesn't have an approved application?

7        A.   Those are products that have been approved, and

8    he's not listed as one of the manufacturers for them.  So

9    there's a Mallinckrodt Oxycodone product and then a Actavis

10   Oxycodone product that meet that description that you're

11   giving, at least what's imprinted on it.

12            There's another database that FDA, we like our

13   databases.  It's Electronic Drug Registration and Listing

14   System.  So that every company that's marketing a product in

15   the United States has to list their product with us, whether

16   it's an approved product or unapproved or illegally marketed

17   product they still have to list it.  And one of the reasons

18   for that is so that we know it's out there in the market.  And

19   if there's ever a problem with a product we can trace it back

20   to who made it and see what else they've made and take care of

21   issues that might arise related to that.

22            So if some company was cleaning one of their

23   machines and damaged it or left chemicals in it for the

24   cleaning part that were ending up those chemicals ending up in

25   the final pill form.  If someone calls and says, my aunt just

 1     died and she was taking these pills and here's the NDC code,

 2     we can look it up on the EDRLS or we can look up any other

 3     information that should be included in the prescription drug.

 4     Find out who made, where they made it.  We can send our

 5     inspectors there to search.  We can find out what other

 6     products are made there and might have been contaminated

 7     likewise, so it's a public health issue.  And none of the

 8     names that you mentioned, either the corporate entities or the

 9     individuals are registered in EDRLS.

10          Q.   Okay.

11          A.   And the two products that you just described, the

12     Mallinckrodt and the Actavis Oxycodone products EDRLS when I

13     look to see who's responsible for labeling and manufacturing

14     and packaging, distributing them, none of the entities you

15     just mentioned occur there.

16          Q.   FDA is essentially a regulatory agency of the

17     federal government; correct?

18          A.   Yes.

19          Q.   So if none of the individuals or entities named

20     were found in those databases do you reach a conclusion

21     essentially as part of that regulatory agency about the

22     individual manufacturing of those tablets?

23          A.   They would be making an unapproved new drug

24     product.

25          Q.   Okay.  Sticking to the new drug application

1    process, you yourself were I think you mentioned involved in

2    new drug applications for at least two Fentanyl products; is

3    that correct?

4         A.   I was involved with all of the opioid products that

5    were used in the operating room.  But involvement can occur in

6    a number of ways.  It can be with the initial review of all

7    the clinical studies and everything else which went along with

8    the approval of the first new drug application which allowed

9    the product to be marketed.  And then the rest of the life of

10   that product, life in quotes, we follow it for safety issues

11   and make sure that there's no updates to the label, that

12   there's no new problems that have been seen with the drug that

13   we didn't know about before.  And sometimes we have to adjust

14   the label accordingly or sometimes we find out there are

15   safety issues that make us take the product off the market

16   altogether.

17        Q.   Can you briefly explain your involvement in the

18   product Sublimaze Preservative 3?

19        A.   Sublimaze was one of the original Fentanyl products

20   that was approved for injection, and that was approved before

21   my time.  So I would have been more of a caretaker for that

22   new drug application and did not do the initial NDA reviewed.

23        Q.   So as a caretaker what was your role relating to

24   that product?

25        A.   When -- if I can just take one step back.  When

1    clinical trials are conducted to approve a drug these are big

2    studies to show that the drugs really does what it's supposed

3    to do with the dose that the company wants to market it for.

4    So they get all the safety information and efficacy

5    information.  But these trials are conducted anywhere from a

6    couple hundred to a few thousands people.

7           When it gets marketed it's usually used in hundreds

8    of thousands to millions of people depending on its use.

9    Something like Fentanyl, it's been hundreds of millions over

10   the years.  But there you're going to see very rare effects

11   that occur with the product.  Something might occur one in a

12   million times or real rare, and some of these can be serious

13   adverse reactions that would warrant relabeling the pill or

14   the products, rather, or sometimes consider taking it off the

15   market.  So I was following the safety reports for that.

16          Sometimes the other thing that can happen is a

17   company can come in, and it's not uncommon for them to ask to

18   have their product approved for adults, and they do all the

19   studies in adults.  And now it's a requirement that they go

20   back and do studies in children and submit those to us, and we

21   decide whether or not the risks outweigh the benefits or vice

22   versa and can approve the use for products in use for children

23   or a different indication.

24       Q.   Okay.  So separate NDA, separate product, can you

25   briefly explain your involvement to with Fentanyl Oralete and

1    what its intended purpose of use is?

2         A.   Fentanyl Oralete is, it's like a lozenge on a

3    stick.  People used to call it a lollipop, but I don't want to

4    use that phrase.  But it's something placed between the cheek

5    and the gums and it dissolves quickly, and the Fentanyl is

6    absorbed through the mucous and the gums.  It's used for

7    chronic pain and acute severe pain.  One of the more common

8    uses was veterans coming back with multiple amputations or

9    pain following exposure to explosive devices.

10        Q.   Is it fair to say that that product has more of a

11   time release aspect to it as far as the amount of Fentanyl

12   that is transferred into the bloodstream?

13        A.   I can't answer that question.  I don't know.

14        Q.   Okay.  What other forms of Fentanyl are you aware

15   of that FDA has approved for use?

16        A.   So there's the injectable type which would normally

17   be given intravenously for sometimes for patients in labor and

18   delivery will have an epidural or other patients that are

19   going into surgery with an epidural or spinal anesthetic, the

20   injectable can be used there.

21             There's a number of sprays that are used either

22   internasal or sublingual, under the tongue.  There's lozenges.

23   There's drug cake.  Those are buccal formulations, which again

24   are meant to be absorbed in the lining of the mouth.  There's

25   also topical products.  There's the Fentanyl patch where it's

 1    just absorbed gradually through the skin.  And there's

 2    iontophoretic products where it's also basically a patch.  But

 3    there's a battery supply that's there, and it uses electric

 4    current to also induce the Fentanyl to go through the skin

 5    quickly, more quickly than for a regular patch.

 6         Q.   And to your knowledge is there any tablet form of

 7    Fentanyl that is currently approved by the FDA?

 8         A.   There is no tablet form that's intended to be

 9    swallowed.

10         Q.   What about crushed or snorted or smoked?

11         A.   No, no and no.

12         Q.   Okay.  Of the current FDA approved forms of

13    Fentanyl are any of those forms allowed to be used without

14    supervision of a physician?

15         A.   No, none of them are.

16         Q.   What is your understanding of the definition of a

17    drug under federal law, specifically Title 21 USC 351?

18         A.   There's a special legal definition for drug, and

19    the two most common parts are any product that's intended to

20    prevent, treat, mitigate, cure or diagnose disease in man; and

21    the other part would be a nonfood product that's intended to

22    affect the structure or function of the body of man.

23         Q.   Does Fentanyl meet that definition?

24         A.   It does when it's used for its intended use for the

25    approved products, in other words, to treat pain or prevent

1    pain.  And it also meets that definition when it's used

2    recreationally to get high.

3         Q.    What about Oxycodone, does it fit that definition,

4    as well?

5         A.    Yes.

6         Q.    You mentioned you're an anesthesiologist, and

7    you've worked with previously and used Fentanyl; right?

8         A.    Yes.  On my patients.

9         Q.    Now, I'm sorry.  I missed that last part, but I'm

10   sure I need to hear it.

11        A.    On my patients.  I used Fentanyl on my patients.

12        Q.    Oh, thank you.  That is a important clarification.

13   Let's make sure that the court reporter got that.

14             Just to be clear, though, in your work you haven't

15   used or dealt with Fentanyl in overdose, when someone's come

16   into a hospital or medical setting due to Fentanyl overdose;

17   is that correct?

18        A.    Not to treat them.  That would usually be an

19   emergency room physician.

20        Q.    How about in your experience as an anesthesiologist

21   or otherwise, have you been called upon in the last 20 years

22   to treat somebody with alcohol intoxication or poisoning?

23        A.    Not to treat the intoxication itself.

24        Q.    Okay.

25        A.    Usually my interaction with those people would be

1    if they were in a car accident or something we're going to

2    head to the operating room, I'd be down there to get them

3    ready for that.

4         Q.   So tell me and the jury what was the purpose for

5    using Fentanyl in your practice.

6         A.   Merely as an analgesic, a pain medicine, and that

7    was both during the surgical procedure or some kind of

8    invasive procedure like a colonoscopy or for labor and

9    delivery, and also to provide pain relief for patients in

10   intensive care or hospital setting afterwards.

11        Q.   In your experience have you had the opportunity to

12   observe the effects of Fentanyl on the human body on multiple

13   occasions?

14        A.   Yes.  In the operating room setting.

15        Q.   Are you able to quantity the number of times you've

16   observed the effects of Fentanyl on the human body?

17        A.   It would be several thousand.

18        Q.   So explain what are the effects that Fentanyl has

19   on the human body?

20        A.   Broadly as we give it, in anesthesia we usually

21   titrate our medications to effect.  So it's not uncommon to

22   use Fentanyl in another drug product Midazolam prior to

23   surgery just to sedate the patient, make them comfortable.  If

24   somebody's coming in and got a broken arm and it's going to be

25   set in the operating room, the Fentanyl would provide the

1508

1      analgesia for something like that.

2              As you start to induce anesthesia, actually put the

3      patient to sleep for the surgical procedure, if you're using

4      Fentanyl to provide some pain relief during the procedure

5      you'll see that they start to breath more slowly, they're

6      breathing more shallow, their pupils will constrict.  And

7      eventually they'll stop breathing if you give enough Fentanyl.

8      Usually by that point, though, we've given them another

9      medication like Propofol and make them go off to sleep and

10     unconscious altogether, and we've taken over the airway.

11         Q.   What do you mean by taking over the airway?

12         A.   So if a patient receives enough opioid as I said

13     they'll start to breath more shallowing and less frequently,

14     and what happens is the carbon dioxide in the blood will build

15     up and the amount of oxygen decreases, and if you don't do

16     something, you don't intervene they'll die.  So we manage the

17     airway.  We assist with their breathing.  Sometimes initially

18     we'll put a mask with oxygen coming through it.  It's hooked

19     up to an anesthesia machine which has a ventilator on it.  It

20     also has a bag hanging from it so we can gradually squeeze the

21     bag and help move air in and out of the lungs.  Once general

22     anesthesia has been induced and the patient is, well, they're

23     unconscious and they're paralyzed, we put a breathing tube

24     into the windpipe, the trachea, and we hook them up to the

25     anesthesia machine later, and we breath for them.

1      Q.    Is the slowing of the breathing, kind of what you

2   describe, is it correct to use the term respiratory

3   depression?

4      A.    Yes.   That would be the technical term for it.

5      Q.    In your experience, when you're administering

6   Fentanyl to a patient do you request or monitor the blood

7   Fentanyl levels to determine the amounts of amounts of

8   Fentanyl in the blood?

9      A.    No.

10      Q.    Why not?

11      A.    We -- I guess two reasons.   One, we treat the

12   patient, not a number, from a blood level.   So whatever the

13   patient needs they get.   If I give a little bit and that's

14   adequate, I don't care what the blood level number is.   The

15   patient has enough analgesic, you leave them well enough

16   alone.   Some people who has a lot more painful condition, car

17   crash, multiple broken bones or cancer patient, then they

18   require a lot more Fentanyl for what a typical level might

19   show for an analgesic effect.   So you give them what they

20   need.   So you treat the patient, not a number.

21           And the other part to that is that if you are

22   giving a lot and the patient should be more sensitive to the

23   Fentanyl than you would expect you've got everything there to

24   deal with that situation.   I can support the airway primarily.

25      Q.    So as a physician, as an anesthesiologist, would

1510

1    you leave somebody alone that you've begun to give Fentanyl

2    to?

3         A.   No.

4         Q.   Do you know the blood Fentanyl -- this may be

5    inherent in your prior answer.  But do you know the blood

6    Fentanyl levels that are effective versus potentially toxic?

7         A.   No, I don't.

8         Q.   Does that go beyond the scope of your practice over

9    the years?

10        A.   It goes beyond the scope of the practice.  But even

11   in a new drug application it goes beyond the scope of what

12   would be required for that.

13        Q.   You mentioned that essentially you don't observe or

14   request the blood Fentanyl levels.  Do you -- in providing

15   Fentanyl to a patient do you monitor the dosage?

16        A.   We record the dose.  So normally what you would do,

17   first of all, the patient has monitors on them.  They've got a

18   blood pressure cuff, a pulse oximeter which measures the

19   oxygen levels in the blood.  That's what we worry about in

20   terms of what levels.  We measure their hear rate.  We have a

21   electrocardiograph monitor so we watch the rhythm of the

22   heart.  And there's some other monitors following general

23   induction of general anesthesia.  So that helps guide us in

24   terms of patient safety.  And then just watching the patient's

25   response.

1          If I give Propofol to put someone to sleep, I start

2     out with a low dose.  Same thing with Fentanyl, just to see

3     how the patient responds.  If I'm not getting an adequate

4     response, I give more.  And I keep giving more gradually until

5     I have the right amount.  If for some reason I've overshot,

6     then I'm prepared to treat that.  When I say I, I mean we as

7     anesthesiologists and nurse anesthetists.

8          Q.   What's a typical range of an appropriate dosage

9     that you're using in that setting?

10         A.   That varies based on a lot of issues.  So it

11    depends on the amount of pain you anticipate for a procedure.

12    Someone coming in for cataract surgery, which is an operation

13    on eye, they may need a very low dose of Fentanyl.  Typically

14    they're older people, as well, so they might be a bit more

15    sensitive to Fentanyl.  So you might give them 50 micrograms.

16    For most healthy young people a does of 100 micrograms.

17    They'll feel a bit wheezy and willing to go to sleep without

18    much effort.  For someone that's coming in for open heart

19    surgery, at least back in the day when we used Fentanyl for

20    that, they could get several milligrams of Fentanyl.  The does

21    varies widely depending on the intended use.

22              THE COURT:  I want to shift gears on you.  What

23    types of substances are usually found in pills that are

24    manufactured and approved by the FDA?  Just the general

25    categories of substances.

1         A.   I would say there's three things that you'll find

2    in pretty much every drug over the counter and prescription.

3    So you have the active ingredient, and that's the ingredient

4    that does the work of the drugs.  It lowers the blood

5    pressure, kills bacteria, open airways and asthmatic.  And

6    then you have the inactive ingredient, and those are the

7    things that make the active in a usable form.  So if it's a

8    powder you're going to inject you may dissolve it in

9    something.  You may want to add a preservative to prevent

10   bacteria from growing in it.  If it's a pill you've got this

11   powder, you need to make it something that you can compress

12   into the size and shape that someone can actually take.

13        The other thing that occurs in all of these is

14   nothing is 100-percent pure.  And the impurities are something

15   that poses substantial concern to us at FDA.  It can propose a

16   significant risk to the patient.

17        Q.   How does the FDA regulate the contents of

18   prescription pills?

19        A.   So this goes back to what we were talking before

20   about the manufacturing chemistry and MC controls part of the

21   new drug application.  So the ingredients that someone buys to

22   make a drug product, they buy it from some firm in China.  It

23   comes in.  And it's supposed to be salt, it supposed to be 99

24   percent pure.  So every ingredient that goes in a drug

25   product, whether it's over the counter or prescriptions drug

1      product, the company is required to test that ingredient when

2      they get it to make sure it really is what it says it's

3      supposed to be and it's as pure as it's supposed to be.

4            When the product is finally made, the finished drug

5      product, the company again has to again retest it and look to

6      make sure that it's within specification.  So not only do you

7      have these ingredients, a lot of times the medicines are made

8      by a series of chemical reaction.  They just mix the stuff in

9      batches.  And oftentimes those reactions don't go all the way.

10     So you still have a little bit of some of the initial

11     ingredients in there.  They're not going to help with the drug

12     product be effective.  They're not one of the inactive

13     ingredients, so those would be considered impurities, and some

14     of those can be very toxic.

15     Q.   If a manufacture, a pill tablet manufacturer, wants

16     to change one of the ingredients, can they just do that on

17     their own and without any grief from the FDA?

18     A.   They need to notify us in advance.  And sometimes

19     they need to do special testing.  So these impurities, things

20     like benzene, which is carcinogenic, stuff like that that you

21     find in a lot of compounds, they have to be within a certain

22     level.  If it's a small enough range you have to think it's

23     like 99.8 percent pure, it comes down to dose amounts, they

24     may not have to do anything about it.  And when they've tested

25     their product in humans initially, it's that finished product.

1    So you have a sense of the safety with that.  It's also tested

2    in animals before it goes to humans.

3            If they tweak the product putting in a new inactive

4    ingredient, they have to reconsider all of these things.

5    Again, does that new active ingredient interact any way with

6    the other ingredients that are there?  Does it make the pill

7    less effective?  Less safe?  Does it introduce some new risk?

8            And just so you know, usually we worry about

9    interactions with active and inactive ingredients.  We also

10   worry about reactions of the finished products with the

11   container it's in.  Sometimes we found that when pills are put

12   in plastic containers some of the components in that plastic

13   leach into the pills.  We even found that pills that are kept

14   in glass containers, which was a surprise to us, some of the

15   components, boron in particular, in glass leaches into the

16   pills.  So this almost interaction that goes on over the

17   course of the lifespan of the drug before it expires, and we

18   keep track of all of that.  So the small changes or what

19   appear to be small changes have to be vetted by the FDA.

20       Q.   Previously you mentioned two manufacturers that

21   create Oxycodone pills, Mallinckrodt and Actavis.  Do you know

22   what the active ingredients are in each of their products?

23       A.   Oxycodone is the active ingredient.

24       Q.   Do you know what quantity of Oxycodone is in each

25   of those pills?  Maybe I better specify.  The A215 from

```
 1    Actavis and the M30 from Mallinckrodt, do you know what the --
 2         A.    Those are 30 milligram formulations.
 3         Q.    In either one of those products should there be any
 4    Fentanyl found?
 5         A.    No.
 6         Q.    I want to show you -- you mentioned packaging, and
 7    I want to show you one of our exhibits.  If we can look at
 8    Government's Exhibit 7.83.
 9              THE COURT:  What is it?
10              MR. BURGGRAAF:  It's 7.83.  Photo 1 and 2.  We can
11    stop on Photo 1 for a moment.
12         Q.    BY MR. BURGGRAAF:  The jury's heard testimony that
13    what's being depicted here is a package that was seized from
14    the Tonge/Bustin porch on November 18, 2016.
15              And, Yvette, would you mind zooming in on the
16    invoice there?
17              This is the invoice that the jury heard testimony
18    about that was included within the package.
19              And, Yvette, if you'll zoom out now.
20              Dr. Simone, based on your experience of the FDA
21    what are the issues that we're looking at here with packaging
22    or other regulatory issues that the FDA deals with?
23         A.    I couldn't read all the information on that
24    invoice, just the name of the coffee company.  But if this is
25    something that was actually delivered to the end user those
```

1    plastic bags that's included, those would be considered the

2    immediate container.  Per FDA regulations they would have to

3    be determined whether or not there's any interaction with the

4    pills contained in those bags and the bags themselves.

5    There's no labeling on the bags to say what it is, who made

6    it, how to contact someone if there is a problem with it.

7    There's no listing of active and inactive ingredients in it.

8    In short, these would be misbranded drug products.

9         Q.   And if we could go to Photo 2.  Similarly the jury

10   has heard testimony -- they heard testimony that the pills

11   from that first photo contained Fentanyl.  The jury heard

12   testimony this was another package that was picked up from

13   that same night from the same location.  Similar issues

14   that -- similar issues is what you described previously?

15        A.   Again, this is intended for the end user.  There's

16   no labeling on the bags.  And again, the concern about

17   interactions between the bags and the product itself.

18        Q.   To clarify, so Oxycodone doses, are they most

19   routinely measured in milligrams?

20        A.   For the approval oral products, yes, they're

21   milligrams.

22        Q.   And how are Fentanyl doses measured?

23        A.   They're measured in micrograms.

24        Q.   So the metrically challenged, what is the

25   equivalent of micrograms to 1 milligram?

1      A.    There are 1,000 micrograms in 1 milligram.

2      Q.    And your testimony previously was that

3   100 micrograms, so a 10th of a milligram would be an

4   appropriate Fentanyl dosage to start out with for an adult in

5   your practice?

6      A.    Correct.  It would can a common dose that would be

7   administered.

8      Q.    How does the potency of Fentanyl and Oxycodone

9   compare?

10     A.    Fentanyl is multiple times more potent than

11  Oxycodone on a weight-by-weight basis.  If you wanted to get a

12  similar analgesic effect for the two products, you would have

13  to give anywhere from 10 to 100 times or maybe even 1,000

14  times more Oxycodone than Fentanyl.

15              MR. BURGGRAAF:  If I can have a moment, Your Honor?

16              THE COURT:  You may.

17              (Time lapse.)

18     Q.    BY MR. BURGGRAAF:  Sticking with what you just

19  mentioned as far as the potency, I want to give you some

20  hypotheticals dealing with potency that compare Oxycodone to

21  Fentanyl.

22              If you have an individual who takes 30 milligrams

23  of Oxycodone either orally or by crushing and snorting or

24  smoking it, how likely is it that they will suffer serious

25  adverse health consequences or death as a result?

1      30 milligrams of Oxycodone to clarify.

2           A.   That's going to depend on a number of factors.   If

3      you're giving it to an infant, if you're giving it to a

4      98-year-old that has a lot of medical problems you're going to

5      have a lot more risk associated with that than a healthy young

6      adult.   But for most healthy adults, they would probably

7      tolerate the 30 milligram dose with minimal side effects.

8           Q.   And yet to be clear, the FDA has approved an

9      Oxycodone pill in a 30 milligram quantity?

10          A.   They have, to treat pain.

11          Q.   If an individual takes by comparison 30 milligrams

12     of Fentanyl either orally or by crushing and snorting or

13     smoking it, how likely is it that they will suffer serious

14     adverse health consequences or death as a result?

15     30 milligrams of Fentanyl to qualify.

16          A.   It's extremely likely they'll die unless there is

17     some type of intervention beforehand.

18          Q.   So those two examples, do those help, then, to

19     accurately depict the difference in potency between

20     30 milligrams of Oxycodone versus 30 milligrams of Fentanyl?

21          A.   One way to show it.

22          Q.   How about a dosage of only 1 to 4 milligrams of

23     Fentanyl, how likely is it that an individual, an average

24     adult would suffer from adverse health consequences or death?

25          A.   Again, in all likelihood if there's no intervention

1    they would die.  And if I can just explain my thinking on that

2    a little bit?

3        Q.   Yes.

4        A.   Back many years ago when I was in practice patients

5    coming in for heart surgery, bypass grafting, valve repairs,

6    they had very fragile hearts.  They couldn't tolerate much

7    stress one way or the other.  And that includes the stress of

8    inducing anesthesia.  But Fentanyl is what we call a very

9    hemometrically dynamic stable drug.  It doesn't affect blood

10   pressure, heart rate much.  And often time we would give these

11   patients masses doses of Fentanyl.  And that would be

12   sufficient for them to undergo the heart procedure up to the

13   point where they were put on heart bypass.  And by that I mean

14   the surgeon was able to make an incision down the sternum

15   below the chest, and take a bone saw, cut that bone in half

16   and split the chest open and all without an increase in heart

17   rate or blood pressure.  And that would typically take

18   50 micrograms per kilogram in an adult.

19        So a 70 kilogram adult, which was 154 pounds, they

20   would get 3 1/2 milligrams of Fentanyl.  An 80 kilogram adult,

21   someone that's 176 pounds, they would get 4 milligrams of

22   Fentanyl.  And while we're pushing that drug, it's a massive

23   volume of Fentanyl.  They start -- you start to see all the

24   side effects.  In particularly, the respiratory depression,

25   they stop breathing.  And that's normal before we get to the

 1     end of the dose.  You'll see that after a couple hundred
 2     milligrams.  But we're ready to intervene that.
 3          Q.   To qualify, you start seeing those symptoms after a
 4     couple hundred milligrams --
 5          A.   Yes.
 6          Q.   -- or micrograms?
 7          A.   I'm sorry.  Micrograms.
 8          Q.   And in that scenario they would die unless there
 9     was intervention as far as the breathing aspect of it.
10          A.   Correct.
11          Q.   So jumping back to that example of maybe 1 to 4
12     milligrams of Fentanyl you stated that there was a likelihood
13     of suffering serious adverse health consequences or death if
14     there wasn't intervention.  If that individual was drinking a
15     fifth of vodka or alcohol would that generally change the risk
16     of death or adverse health consequences?
17          A.   No.  The alcohol is also a respiratory depressant,
18     so it might hasten death.  But it would be more the icing on
19     the cake than the cake.  The Fentanyl would be the chief part
20     for that.
21               MR. BURGGRAAF:  No further questions.
22               THE COURT:  Cross-examine?
23               MR. SAM:  I have no questions, Your Honor.
24               THE COURT:  Thank you.  You may step down.  And you
25     can be excused.

```
 1                    And we'll take a lunch break about 30 minutes.
 2                    (Whereupon, the jury left the court proceedings.)
 3                    THE COURT:  We'll be in recess for about 30
 4        minutes.
 5                    (Recess.)
 6                    THE COURT:  Are you ready to proceed?
 7                    MR. GADD:  Yes, sir.
 8                    THE COURT:  We'll get the jury and proceed.
 9                    (Whereupon, the jury returned to the court
10            proceedings.)
11                    THE COURT:  You may call your next witness.
12                    MR. GADD:  Thank you, sir.  The United States is
13        calls Special Agent Koeneman.
14                    THE COURT:  Come forward and be sworn, please.
15                              ADAM KOENEMAN,
16            called as a witness at the request of Plaintiff,
17              having been first duly sworn, was examined
18                      and testified as follows:
19                    THE WITNESS:  I do.
20                    THE CLERK:  Please come around to the witness
21        stand.
22                    Please state your name and spell it for the record.
23                    THE WITNESS:  It's Adam, A-D-A-M, Koeneman,
24        K-O-E-N-E-M-A-N.
25                    THE COURT:  Go ahead, Mr. Gadd.
```

 1          MR. GADD:  Thank you.

 2                    DIRECT EXAMINATION

 3     BY MR. GADD:

 4          Q.   I can hear you well, but do you want to just take

 5     that microphone and pull it over?  Thanks.

 6          A.   I don't want to be too loud.

 7          Q.   Special Agent Koeneman, are you prepared to testify

 8     about your part in the investigation of Pharma Master?

 9          A.   I am.

10          Q.   Before we do that let's go over your background and

11     your experience.  Can you tell us a little bit about yourself?

12          A.   Yes.  I was in the Army for about 13 years, in

13     US Army Special Operations.  Shortly after that I took a job

14     with ERO, Enforcement Removal Operations.  I worked primarily

15     gangs and helped out with narcotics in Dallas, Texas.  And

16     then I spent five years in Yuma, Arizona, primarily on

17     narcotics investigations with Homeland Security

18     Investigations.  And then I've been in the Salt Lake area for

19     about five years, as well.

20          Q.   Let's talk about your involvement in this case now.

21     We've heard plenty of testimony about a package that was

22     seized from Ms. Gleave and Mr. Mausia on November 15th, 2016.

23     You participated in that; correct?

24          A.   I did.

25          Q.   And after the package was seized it was bagged and

                                                              1523

1    booked into evidence?

2          A.    It was.

3          Q.    And then later transferred to the DEA for testing?

4          A.    That's correct.

5          Q.    At any point in that experience did any agent to

6    your knowledge promise Ms. Gleave she wouldn't be charged?

7          A.    No.   That never happens in our agency.

8          Q.    Let's talk about a few more people on the chart.

9    Can we look at 17.06 on our screen, as well?

10               Could you identify for the jury, Ms. Elise

11   Christensen?

12         A.    She is fifth from the right.

13         Q.    Bottom row?

14         A.    Yes.

15         Q.    That's her; correct?

16         A.    Correct.

17         Q.    I know she's been mentioned in testimony.  But let

18   me ask you, in your investigation did you determine what role,

19   if any, Miss Christensen played?

20         A.    I did.  Miss Christensen was a package receiver,

21   and she also bought postage and did errands and other kind of

22   administrative tasks for both Ms. Tonge and Miss Bustin as

23   part of the Shamo organization.

24         Q.    You interviewed Miss Christensen; correct?

25         A.    I did.

```
1            Q.    Did she confess?

2            A.    She did.

3            Q.    Let's take one more.  Could you identify Jordan

4     Vance?

5            A.    He is third from the left on the bottom row.

6            Q.    And that's him on the screen now?

7            A.    That's correct.

8            Q.    What was his role in the organization?

9            A.    He was I package receiver, as well.

10           Q.    If I could take you back to November 22nd, 2016,

11    were you working that day?

12           A.    Yes, I was.

13           Q.    Did you help on some of the search warrants that

14    were executed that day?

15           A.    I did.

16           Q.    Where were you assigned to help?

17           A.    I went to Ms. Tonge and Miss Bustin's residence.

18           Q.    At some point in that day did you and other agents

19    learn about Mr. Noble's alleged involvement?

20           A.    We did.

21           Q.    What steps were taken to find and interview

22    Mr. Noble?

23           A.    Agents went to Mr. Noble's work at eBay and

24    encountered him, and Mr. Noble went with them for an

25    interview.
```

1          Q.   At some point did you end up at the office to

2     review evidence with Mr. Noble?

3          A.   Yes.

4          Q.   And I should clarify.  That same night; correct?

5          A.   Yes, sir.

6          Q.   Did Mr. Noble give you access to Pharma Master

7     storefront on AlphaBay?

8          A.   He did.  He gave us his access to the Pharma Master

9     storefront, which was a surrogate access he had.

10          Q.   And you went on and looked at it that night; right?

11          A.   I did.

12          Q.   Did you work pretty late?

13          A.   Well into the wee hours of the morning.

14          Q.   Why so late?

15          A.   We were worried that someone in the organization

16     would delete the data off the Pharma Master page and that we

17     would never see it again.

18          Q.   When you were looking with Mr. Noble did you also

19     take screen shots?

20          A.   We did.  Many.

21          Q.   I want to look at a few.  Could we look at

22     Exhibit 15.04?  Do you recognize this?

23          A.   I do.

24          Q.   Is this one of those screen shots?

25          A.   It is.

1        Q.    There's a number of pages here, and I'm going to

2    skip through most.  What if we looked, for example, at Page 9.

3              And then, Ms. Laughter, if you could highlight the

4    left half of the screen for us and maybe just the top half of

5    that.  So that wasn't very clear.  How about the top left

6    quadrant?

7              Do you recognize this as some of the products that

8    were being sold on AlphaBay?

9        A.    Yes.

10       Q.    So you took these screen shots of AlphaBay

11   generally.  You also took screen shots on Pharma Master

12   storefront; correct?

13       A.    We did.

14       Q.    When you were looking through the Pharma Master

15   page were you able to see orders?

16       A.    We were.

17       Q.    Did you take screen shots of some of the bigger

18   orders that you found?

19       A.    Yes.  What we did was we started with the pill

20   orders that were around 50,000 or above, and then we worked

21   our way down to 40,000 and 30,000 and 20,000 down to about

22   5,000 pills at a time.

23       Q.    You've had a chance previously to look at

24   Exhibits 15.09 through 15.24.  Are those some of the screen

25   shots that you took that you just referenced?

 1        A.    Yes.

 2        Q.    I'm not going to drag you through all of them, but

 3    I do want to look at just one or two.  What if we looked at

 4    Exhibit 15.16.

 5              And then if we could have the left side maybe the

 6    top left quadrant of our screen blown up.

 7              Are you able to see from what you're looking at

 8    here the user name of the buyer on this order?

 9        A.    It is Jsquad24.  It's on the second line there

10    under Roxy Oxycodone.

11        Q.    When you look at this, moving over from where it

12    says Jsquad over to these items on the right of our screen

13    starting with item price, minus commission and net total, what

14    is your understanding of what those three things mean?

15        A.    So the item price is what the customer would buy,

16    would purchase the item for; then minus commission goes to

17    AlphaBay, just like eBay or website, they have to take their

18    part; and then the net total is generally what gets sent back

19    to the distributor.

20        Q.    If we could come out of this zoom and go a little

21    ways down there's feedback just up a little.  Could you read

22    the feedback left by the user who went by Jsquad 24?

23        A.    S-O means shout out, to mutha fucking boss of the

24    of darknet PM out here making shit happen and keeping his

25    word, you stay loyal to him and he'll stay loyal to you.  Go

                                                              1528

1    big or go home.  Stop the penny pinching.

2         Q.   And then under buyer notes, is that the address to

3    which the buyer wanted his 10,000 pills to be sent?

4         A.   Yes.

5         Q.   When you were there with Mr. Noble that night and

6    you were taking these screen shots, did you give Mr. Noble any

7    indication as to how you wanted him to go about, you know,

8    showing you things?

9         A.   We did.  We wanted Mr. Noble to show us exactly how

10   he would log in every day, not do anything differently, and

11   walk us through the process of how he would address customer

12   concerns, how he would communicate with people even so far as

13   to go into cutting, pasting exactly how he did.  We wanted

14   just a replication just as if he have was working.

15        Q.   So if we zoom out for a moment and look at the

16   entire screen shot, on the right half of our screen here, the

17   second kind of window down, if we zoom down on that I'm going

18   to ask you some questions.  Is this something that Mr. Noble

19   pulled up?

20        A.   It is.

21        Q.   We've heard some testimony about a pgp chain or a

22   key chain.  Is this a key chain?

23        A.   That's what this is, yes.

24        Q.   And looking inside where you see the boxes and some

25   indicators of names and e-mails associated.  Do you see those?

```
 1              A.    I do.

 2              Q.    Second from the bottom, do you see the name Pharma

 3    Master?

 4              A.    I do.

 5              Q.    And then an e-mail Pharma-Master@4life.com?

 6              A.    Yes.

 7              Q.    Is this a key pair?

 8              A.    Yes.  A pgp.

 9              Q.    A pgp pair.

10              A.    Pair, yes.

11              Q.    Would Mr. Noble use this key pair, the

12    Pharma-Master@4life.com to decrypt messages coming in as part

13    of his work as Pharma Master?

14              A.    Yes.  He took us through that process.

15              Q.    Let's look at just one last one.  It's

16    Exhibit 15.25.  And then we're going to look, yes, right where

17    you are.  Maybe we'll do half and then half.

18              Did Mr. Noble also show you some of the customer

19    service interactions that took place?

20              A.    He did.

21              Q.    And that's what we're looking at here; correct?

22              A.    That's right.

23              Q.    This is between Pharma Master and a customer named,

24    who went by the moniker stakbandz; is that right?

25              A.    That's correct.
```

1    Q.   Starting at the top could you read this interaction

2   between the customer and Pharma Master?

3    A.   Sure.  So at the top there stakbandz is using like

4   an insta messaging service within Pharm Master to say that the

5   package never sent.

6    Q.   And just to clarify that, that sort of

7   insta messaging service, that's something that AlphaBay

8   provides; correct?

9    A.   Yes.

10    Q.   And he's communicating with Pharma Master?

11    A.   Directly.

12    Q.   Okay.  I won't cut you off again.  Please go ahead.

13    A.   So stakbandz says:  The package never sent.  The

14   second one says:  The package never sent.  Can I get my money

15   in escrow?  This guy never sent them.

16    Pharma Master replies:  I am terribly sorry about

17   the delay.  The tracking number had to be reissued and we had

18   some stock issues.  And he gives like a website to track the

19   tracking.  There's a tracking number for the reship.  And

20   there's no need for any of your feedback.  Thanks for your

21   patience.  PM, meaning Pharma Master.

22    Stakbandz replies:  I've given you close to a month

23   to correct the error.  I've spent a few thousand with you.

24   I've been a good buyer.  Am I wrong for expecting good

25   service?

1531

1    Q.   And then if we look down.

2         What was Pharma Master's response to those

3    questions about, am I wrong to expect good service?

4    A.   So Pharma Master replies:  Order was sent.

5    Blacklisted.  Bye.

6         And stakbandz says:  I want my money in escrow.

7    People are getting sick.

8    Q.   When you were going through and taking screen shots

9    late into that evening, why did this stick out to you?

10   A.   The fact that -- that was one of the questions we

11   asked Mr. Noble is, had he ever had any feedback that somebody

12   might have got hurt or sick.  And he brought up this specific

13   instance.  He said he thought he remembered it.  And then as

14   we went through some of the feedback we found this one.  It

15   was pertinent to us because that indicates to us that some

16   customers may have been getting sick or hurt.

17   Q.   If we can change gears entirely now and talk about

18   not online Dark Web evidence but talk about electronic

19   devices.  Your agency took the assignment to search electronic

20   devices seized in this investigation; correct?

21   A.   That was our assignment, yes.

22   Q.   I want to talk about electronic devices associated

23   with two men, Mr. Paz and Mr. Crandall.  So let's start first

24   with Mr. Paz.  In approximately January of 2017 did police

25   officers execute three warrants of residences where Mr. Paz

1    was known to sometimes reside?

2         A.    Yes.

3         Q.    Was a taint team used?

4         A.    A taint team was used.

5         Q.    Will you explain what that means?

6         A.    So a taint team is used when we want to separate --

7    so at this time Mr. Paz had been represented by counsel, and

8    once he had been represented by counsel we use a taint team or

9    agents or officers who have nothing to do with our case to

10   search with a search warrant through any of the material that

11   we would like to look at.  And what the taint team does is

12   they consult with attorneys to see if there's any privileged

13   information between Mr. Paz and his lawyer.  And if there is,

14   they remove that before they give it to the case agents.  So

15   we had the taint team look for those things and remove that

16   before we would look at it.

17        Q.    And, in fact, in this case they did find some

18   privileged material; correct?

19        A.    They did.

20        Q.    You've talked about how they review it, and then

21   they'll hand it over to you and the other case agents.  Does

22   that happen overnight?

23        A.    It does not.  It took a number of months.

24        Q.    Now there was quite a bit of data at least on the

25   electronic devices; correct?

1        A.    Lots of data.

2        Q.    Once you did get the electronic devices from those

3   search warrants so case agents could now look at it, was a

4   computer forensic agent from your agency asked to examine

5   those devices?

6        A.    Yes.

7        Q.    He wrote a report about what he found?

8        A.    He did.

9        Q.    There was little found that was relevant to the

10  case?

11       A.    That's correct.

12       Q.    There was one item of note, though; correct?

13       A.    Yes.

14       Q.    Mr. Paz's iPhone --

15       A.    Yes.

16       Q.    -- was seized.

17             Mr. Paz at some point began cooperating with

18  agents.

19       A.    He did.

20       Q.    He gave some interviews?

21       A.    Yes.

22       Q.    As part of that process did he give you and the

23  other agents guesses as to what his pass code might be on this

24  phone?

25       A.    Yes.  He gave us multiple variations of a pass code

1534

1      that he thought would work on his phone.

2            Q.   Did any of them work?

3            A.   None of them worked.

4            Q.   As part of that process where he's interviewing

5      with agents did Mr. Paz voluntarily turn over his main

6      computer?

7            A.   He did.

8            Q.   It was another iMac; correct?

9            A.   It was.

10           Q.   And he gave you and the other agents permission to

11     search that computer.

12           A.   He did.

13           Q.   Did it appear -- when you and the other agents were

14     looking at his main computer, did it appear that at least some

15     of his iPhone data was backing up to his iMac?

16           A.   Yes.  His iPhone, it looked like it was

17     automatically backing up.  That was what our impression was.

18           Q.   Some of the exhibits pulled from Mr. Paz's computer

19     and they are on our exhibit list, those originally came from a

20     phone; correct?

21           A.   That's right.  Just like you go home and some

22     people back up their phones to the computer.  That's what

23     Mr. Paz did with this particular phone.

24           Q.   For all the devices we've talked about were all of

25     the images that agents created of those devices that were

```
 1      seized in those three warrants or for that matter in the

 2      entire investigation, were all of those images turned over to

 3      the defense?

 4           A.   Yes.  Every bit of every image that we had was

 5      turned over to the defense.

 6           Q.   Nothing was held back?

 7           A.   Not at all.

 8           Q.   Let's take just a minute and talk about

 9      Mr. Crandall's electronics.  Did you hear Mr. Crandall tell

10      the jury that he kept all of his Pharma Master data on a thumb

11      drive?

12           A.   Yes.

13           Q.   And that he destroyed it when Shamo got arrested?

14           A.   Yes.  I think in Loas.

15           Q.   And that he re-imaged his computer to remove any

16      evidence that might be left on that?

17           A.   That's right.

18           Q.   And then in approximately May of 2017 did

19      Mr. Crandall and his fiance fly into Hawaii?

20           A.   They did.

21           Q.   They were stopped at the airport; correct?

22           A.   They were.

23           Q.   Their electronics were seized?

24           A.   They were seized.

25           Q.   And the electronics were previewed at the scene?
```

```
 1          A.    They were.
 2          Q.    Did you and other agents obtain a search warrant
 3    from a federal judge in Hawaii to search those electronics
 4    more thoroughly?
 5          A.    We did.
 6          Q.    No evidence was found on his devices?
 7          A.    None.
 8          Q.    Like before, now with respect to Mr. Crandall's
 9    devices, were all of the images of those devices that were
10    created turned over to the defense?
11          A.    Absolutely.
12          Q.    Nothing was held back?
13          A.    Nothing was held back.
14          MR. GADD:  Can I have just a moment?
15          (Time lapse).
16          MR. GADD:  Nothing further.  Thank you.
17          THE COURT:  Thank you.  You may cross-examine,
18    Miss Beckett.
19                        CROSS-EXAMINATION
20    BY MS. BECKETT:
21          A.    Good afternoon.
22          Q.    Good afternoon, Agent Koeneman.  How are you?
23          A.    Good.
24          Q.    Agent Koeneman, when did you first hear the name
25    Aaron Shamo?
```

1        A.    I couldn't -- I wouldn't know a date.

2        Q.    November of 2016?

3        A.    It sounds about right.

4        Q.    Roughly a few weeks before he was arrested;

5   correct?

6        A.    I couldn't tell you a date, like a hard date.

7        Q.    But you were aware that he was arrested in

8   November, the end of November 2016; correct?

9        A.    Yes.

10       Q.    And it would be your testimony that you heard his

11  name sometime around November of 2016 for the first time;

12  correct?

13       A.    Yes, that's correct.

14       Q.    Were you present for the interview of TJ Edwards

15  that occurred on December 14, 2016?

16       A.    I was.

17       Q.    Do you remember TJ Edwards telling you that he was

18  approached by Mr. Crandall and asked if he was interested in

19  making some easy money around the end of 2015?

20       A.    What I recollect from that is he had a meeting with

21  Sasha Grant, Crandall and Mr. Shamo, and that's how he was

22  recruited.

23       Q.    You don't remember him saying that he was initially

24  approached directly by Mr. Crandall?

25       A.    That could be correct.  We interviewed a lot of

1    people.  So if you want I can review that and take a look at

2    it and see if that's correct.

3            Q.   That would be great.  Just a second.

4                 If I may approach, Your Honor?

5                 THE COURT:  You may.

6                 THE WITNESS:  Thank you.

7            Q.   BY MS. BECKETT:  The first half.

8            A.   First half?

9                 Yeah.  It says here that Edwards stated he was

10   introduced to Shamo through a mutual friend, through Crandall,

11   so that's why I understood it to be a meeting that took place.

12           Q.   Continue to the bottom of that page, if you will.

13   I believe the beginning of that next paragraph specifically

14   states something.

15           A.   Yes.  It says here that Edwards stated that he was

16   approached by Mr. Crandall initially.

17           Q.   Do you remember Mr. Edwards describing Mr. Shamo

18   and Mr. Crandall as copartners?

19           A.   Yeah.

20           Q.   And that Mr. Crandall referred to them both as

21   copartners?

22           A.   That's in the report, so yes.  It's highlighted

23   even.

24           Q.   I did try to make that easier to read.

25           A.   Thank you.

1          Q.   You're welcome.

2               Do you remember Mr. Edwards saying he was paid by

3     Mr. Crandall for the packages that he received?

4          A.   I do remember that.

5          Q.   Do you remember Mr. Edwards describing that meeting

6     you discussed a second ago with Mr. Crandall and Mr. Shamo and

7     Sasha Grant?

8          A.   Do I remember it?

9          Q.   Do you remember him describing that?

10          A.   I do.

11          Q.   Do you remember Mr. Edwards stating that Sasha

12    Grant did not seem surprised by the conversations concerning

13    the alleged drug trafficking?

14          A.   Can you repeat that, please?

15          Q.   Do you remember Mr. Edwards telling you that Sasha

16    Grant did not seem surprised about the conversations occurring

17    regarding alleged drug trafficking?

18          A.   I don't remember that specifically, but I'm

19    guessing it's highlighted in this report?

20          Q.   You're welcome to look at that if that will refresh

21    your recollection.

22          A.   Thank you.  Do you want to help me out and tell me

23    where it's highlighted?

24          Q.   Yeah.  On Page 3 of 4 in that top paragraph, the

25    third sentence there.  It starts there.

```
 1        A.    We wrote a lot of these, so....

 2        Q.    And then halfway down the page there's the sentence

 3   that says:  Sasha was present throughout.

 4        A.    Yeah.  It says that he -- nor did she seem

 5   surprised, that is correct.

 6        Q.    So it's safe to say that Miss Grant may have had

 7   some knowledge of what was actually occurring at that point in

 8   time; correct?

 9        A.    I wouldn't be able to speak to that.  That was what

10   was told to me, and I put it down in the report.

11        Q.    I believe you stated you were also present for the

12   interview of Elise Christensen that occurred on

13   September 21st, 2016; is that correct?

14        A.    Yes.

15        Q.    We've already heard significant testimony about who

16   Ms. Christensen is.

17              THE COURT:  Slow down a bit.

18              MS. BECKETT:  I can do that, Your Honor.  I

19   apologize.

20        Q.    BY MS. BECKETT:  Was Elise Christensen good friends

21   with Alex Tonge and Katie Bustin?

22        A.    That's how she described it.

23        Q.    Did Miss Christensen ever say that she had

24   personally met Aaron Shamo?

25        A.    I don't recall.  But it's in the report maybe?
```

1      Q.   Oddly it's not.

2      A.   Okay.  I don't recall that.

3      Q.   She never stated that specifically to you, that she

4   had met Mr. Shamo?

5      A.   She never -- I don't recall that.  I don't

6   recall -- so your first question was, did she ever state that

7   she had never met, which was confusing a little bit.  Sorry.

8   And she -- that's not -- she never not said she had met Aaron

9   Shamo.  I mean, that's -- sorry.

10      Q.   Would you like me to clarify that one?

11      A.   Yeah.  A little bit.

12      Q.   Did Miss Christensen say that she had personally

13   met Aaron Shamo?

14      A.   She did not.

15      Q.   Was Miss Christensen under the impression that she

16   was recruited because Ms. Tonge and Miss Bustin wanted to

17   limit their exposure by not receiving packages at their home?

18      A.   Did Miss Christensen state that?

19      Q.   Yes.

20      A.   Let me see.  This is a very long report.

21      Q.   Page 3 of 5.

22      A.   Thank you.

23      Q.   Yep.  Bottom paragraph.

24      A.   Yes, that's correct.  They wanted to keep them from

25   their address because they were illegal.

1    Q.   Wanted to insulate themselves?

2    A.   Yes.

3    Q.   Did Elise Christensen since state that it was

4    actually Alex Tonge and Katie Bustin that directed her to

5    download the Telegram app?

6    A.   It sounds correct, but I would like to see it in

7    the report to make sure I'm telling the truth here.  Do you

8    want to tell me what page that is on?

9    Q.   You can just turn to the next page, yes.

10   A.   Yep, she did.

11   Q.   Were the packages that Miss Christensen received

12   picked up by Katie Bustin and Alex Tonge?

13   A.   Generally yes.

14   Q.   Was Miss Christensen paid by Katie Bustin and

15   Alex Tonge?

16   A.   Yes.

17   Q.   Do you know whether Katie Bustin and Alex Tonge

18   financially benefited from recruiting Christensen to receive

19   those packages?

20   A.   Did they financially benefit?  I guess the greater

21   Shamo organization overall, so they're part of that.  So, yes,

22   they did.

23   Q.   Was Miss Christensen also friends with Sasha Grant?

24   A.   Let me see.

25   Q.   Page 5 of 5 of your report.

1543

1     A.   We're working well together here.

2          Friends with her on Facebook.

3     Q.   I believe it states that she was friends and

4     friends with her on Facebook; correct?

5     A.   Yes.

6     Q.   Were you also present for the interview of

7     Charmaine Drury on March 17, 2017?

8     A.   We're really reaching back here into the archives.

9          Yes.  Charmaine Drury, yes.

10    Q.   Who is Charmaine Drury?

11    A.   She is the mother of Alexandrya Tonge.

12    Q.   She received money from Alex Tonge?

13    A.   She did.

14    Q.   Do you know how much money she received on average

15    from Alex Tonge?

16    A.   I don't specifically recall.

17    Q.   Would it help you to refer to the bottom of your

18    report to refresh your recollection?

19    A.   The underlined portion?

20    Q.   That would be correct.

21    A.   $700 per month for rent via bank transfer.

22    Q.   For how long?

23    A.   From 12 to 18 months.  She wasn't very sure.

24    Q.   As part of your investigative tasks were you

25    reviewing and tracking the social media of Drew Crandall and

1    Sasha Grant while they were traveling abroad?

2         A.   We were.

3         Q.   You didn't personally involve yourself in that?

4         A.   I did.  I just didn't do it exclusively.

5         Q.   But that was part of your role?

6         A.   It was.

7         Q.   Do you remember reviewing a blog titled Drasha

8    Travels?

9         A.   We did review that blog.

10        Q.   Do you remember seeing a post from April 27th,

11   2017, that outlined the travels of Drew and Sasha over the

12   preceding 18 months?

13        A.   I'm familiar with it.  And it's right here in my

14   report.  So, yes.

15        Q.   Do you see the entirety of that posting in your

16   report there?

17        A.   No.  The posting had photos and all kinds of things

18   in it, so the entirety is not here.

19        Q.   Just the text?

20        A.   Yes.

21        Q.   If you could, I would like you to read through that

22   first section.  And it begins at the bottom of that Page 2.

23        A.   Of 4?

24        Q.   Of 4.

25        A.   Uh-huh (affirmative).

1      Q.   And goes on to the next page.

2      A.   So it says:  May to October, move to Auckland, New

3    Zealand.  These are just like bullet points.  Sasha started

4    working for Ernst & Young.  Housesit for six different

5    homeowners.

6           Continue or?

7      Q.   Yes, please.

8      A.   Drew becomes a stay-at-home dog dad with work on

9    the side.  We wait out the winter and enjoy hikes on warm days

10   with our various pups.  Realize we were puppy hungry.  Drew

11   turns 30 in July.  Drew's parents visit, and we have our

12   second family encounter and enjoy every second of it.  Save,

13   save, save for upcoming vacations.  Sasha is offered

14   sponsorship at work but turns it down for Southeast Asia

15   travel.

16     Q.   I'll skip the future portion.  I'll skip the

17   portion that says future.  And down at the bottom where it

18   says, fun facts?

19     A.   Fun facts.  We have been to eight countries in two

20   months, 10 countries overall.  Since leaving New Zealand we

21   have visited around 29 cities in various countries.  We

22   haven't stayed in the same place for more than a month since

23   March 2016.  In the last two months we have not stayed more

24   than four days in the same city.  We have taken 18 flights,

25   one train, 11 busses, 11 ferries and countless Tuk Tuks.  We

1  have taken 155 gigabytes of photos.  We would do it all over

2  in a heartbeat.

3       Q.   It's probably the reason that you were monitoring

4  that social media is because you wanted to know when

5  Drew Crandall was going to be back in the country?

6       A.   That's correct.

7       Q.   And it became clear that he was coming back into

8  the country to get married; correct?

9       A.   Yes.

10      Q.   And you were also present for the interview of

11 Sean Gygi on May 19th, 2017; correct?

12      A.   Was I present for that?  Oh, yes.  We did so many

13 interviews I'm having trouble recalling.  But that one I was

14 there for.

15      Q.   Understandable.

16           Do you remember Mr. Gygi saying he was, in fact,

17 paid to received packages by Mr. Crandall?

18      A.   Yes.

19      Q.   Do you remember Mr. Gygi describing Aaron as not

20 smart enough to learn the process of pill making?

21      A.   I don't recall him saying that, but I'm sure it's

22 highlighted here.  So, yes.  I wrote that in my report, that's

23 correct.

24      Q.   Do you remember Mr. Gygi describing Aaron as not

25 having the skills to set up the technical aspects of the

1    operation?

2         A.   Yes.

3         Q.   Do you remember Mr. Gygi describing Drew Crandall

4    as quite intelligent?

5         A.   Yes.

6         Q.   Do you remember Mr. Gygi describing Mr. Crandall

7    having computer skills to set up a Dark Web account and

8    storefront?

9         A.   Did we go backwards on the report now?

10        Q.   Do you remember him saying that?

11        A.   I don't remember that specifically, but I was

12   trying to refer to this report.

13        Q.   Just the highlighted sections.  That one might not

14   be highlighted.

15        A.   This is a seven-page report.  Excuse me.

16             Yes.

17        Q.   Do you remember Mr. Gygi describing that he

18   believed Mr. Crandall and Sasha Grant funded their

19   international travel from the proceeds coming from the sale of

20   illegal narcotics on the Dark Web?

21        A.   Yes.

22        Q.   Were you also present for the interview of

23   Jordan Vance on June 12th, 2017?

24        A.   I was.

25        Q.   Do you remember Mr. Vance explaining that he was

1548

1    introduced to Drew Crandall through Sasha Grant?

2         A.   Yes.

3         Q.   Do you remember Mr. Vance describing that he was

4    actually recruited to receive packages specifically by

5    Mr. Crandall?

6         A.   No.   I remember Crandall introducing Vance to Shamo

7    and that he was -- he was just approached to have a package

8    sent to him.   That's what I remember.

9         Q.   Were you present for the interview of Drew Crandall

10   on May 5th, 2017?

11        A.   I was.

12        Q.   Did he initially tell you that he was funding his

13   international travel through working through IT and tech

14   support?

15        A.   Yes.   He lied initially.

16        Q.   Were there other agents present for that interview?

17        A.   Yes, they were.

18        Q.   Was Guy Gino one of those agents?

19        A.   I don't recall.

20        Q.   Do you remember another agent asking Mr. Crandall

21   if he had accessed bitstamp or Bitcoin as late as April of

22   2017?

23        A.   I don't recall that, no.

24        Q.   Would it refresh your recollection to look at a

25   transcript of that report?

1          A.    It would be very helpful.

2                MS. BECKETT:  Your Honor if, I may approach?

3                THE COURT:  You may.

4                THE WITNESS:  It's about 15 pages here.

5          Q.    BY MS. BECKETT:  Correct.  That is not the entirety

6     of the transcript.  I'll represent to you it is a 160-page

7     transcript.  But if you will look at Page 156 I believe there

8     at the top.

9          A.    Okay.

10         Q.    Do you see a section in there where Agent Gino

11    inquires as to Mr. Crandall's accessing of Bitcoin?

12         A.    Yes, I see it.

13         Q.    Did Mr. Crandall deny accessing his Bitcoin?

14         A.    Mr. Agent Gino talks a lot.  I have to get through

15    this.

16         Q.    That is correct.

17         A.    Do you know exactly where this is?  Do you know

18    what page it's on?

19         Q.    What page what is on?

20         A.    The question you asked me specifically.

21         Q.    Do you see the portion where Agent Gino is asking

22    him about the Bitcoin?

23         A.    Yes.

24         Q.    Do you see a response from Mr. Crandall denying it

25    on any of those pages?

1       A.   I did not know these were front and back, so....

2       Q.   Let me get the response to that question.  Does

3  Mr. Crandall deny?

4       A.   I'll have to review this.

5            So I don't see -- I mean, this is a lot of -- I

6  don't see it here, and that was a very long interview.  And

7  often with suspects they initially deny.  And then we talk to

8  them longer and get to know them better, and they eventually

9  come around to the truth.  So that would not be outside the

10  realm of possibility.

11       Q.   I believe you indicated you were also present for

12  some interviews of Mr. Paz; is that correct?  There's not a

13  report there for an interview.

14       A.   I was going to say I don't think I was, no.

15            MS. BECKETT:  Just a second, Your Honor.

16            THE COURT:  Yes.

17            MS. BECKETT:  I have no further questions, Your

18  Honor.

19            THE COURT:  Thank you.

20            Redirect, Mr. Gadd?

21            MR. GADD:  Please.

22                      REDIRECT EXAMINATION

23  BY MR. GADD:

24       Q.   Can you tell me who did it, Mr. Crandall or

25  Mr. Shamo, to the following statements:  Hired Mr. Gygi as a

1    full-time runner for his organization.

2         A.    That was Aaron Shamo.

3         Q.    Paid Mr. Gygi $2,000 every two weeks to be a

4    full-time runner for his organization.

5         A.    That was Mr. Shamo again.

6         Q.    Made plans with Mr. Gygi to expand his operation

7    into Colorado.

8         A.    Again, Mr. Shamo.

9         Q.    On this same topic, let's look at one last exhibit.

10   Could we look at 15.26.  That was the video made with

11   Mr. Noble.  And if he with could go to 34:42 on the video.

12   And if you could zoom us in on the message there right in the

13   center.

14             Okay.  You see that there?

15        A.    I do.

16        Q.    At this point Mr. Shamo was under arrest; correct?

17        A.    Yes, he was.

18        Q.    And Mr. Noble was with you.

19        A.    He was.

20        Q.    But somebody had to tell Pharma Master -- excuse

21   me -- someone had to tell AlphaBay that this account owner got

22   busted today.

23        A.    That's correct.

24        Q.    Who sent that message?

25        A.    Throughout the investigation we uncovered that it

1    was Drew Crandall.

2         Q.   And he testified that he sent it, didn't he?

3         A.   Correct.

4         Q.   So if Mr. Crandall is the mastermind of

5    Pharma Master, if he runs the whole organization and his

6    minion Mr. Shamo has been busted, why is he shutting it all

7    down?

8         A.   It's not smart.

9         Q.   It wasn't his, was it?

10        A.   No.  Absolute not.

11        Q.   Who's was it?

12        A.   It was Mr. Shamo's organization.

13             MR. GADD:  No further questions.

14             THE COURT:  Thank you.

15             Recross?

16             MS. BECKETT:  I have no further questions, Your

17   Honor.

18             THE COURT:  Thank you.  You may step down and be

19   excused if you want to be.

20             THE WITNESS:  Thank you.

21             THE COURT:  Do we have any other witnesses today?

22             MR. GADD:  That's all of the witnesses for today.

23             THE COURT:  And we'll have somebody here at 8:30 in

24   the morning; correct?

25             MR. GADD:  Yes, sir.

                                                         1553

1            THE COURT:  All right.  Ladies and gentlemen of the

2    jury, same rules.  Have a nice afternoon, and we'll see you at

3    8:30 a.m.  And thanks for your work.

4            (Whereupon, the jury left the court proceedings.)

5            THE COURT:  We'll see you at 8:30 in the morning.

6    Thank you.

7            (Whereupon, the court proceedings were concluded.)

8                            *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   STATE OF UTAH          )

 2                          ) ss.

 3   COUNTY OF SALT LAKE  )

 4             I, KELLY BROWN HICKEN, do hereby certify that I am

 5   a certified court reporter for the State of Utah;

 6             That as such reporter, I attended the hearing of

 7   the foregoing matter on August 22, 2019, and thereat reported

 8   in Stenotype all of the testimony and proceedings had, and

 9   caused said notes to be transcribed into typewriting; and the

10   foregoing pages number from 1404 through 1554 constitute a

11   full, true and correct report of the same.

12             That I am not of kin to any of the parties and have

13   no interest in the outcome of the matter;

14             And hereby set my hand and seal, this ____ day of

15   _____ 2020.

16

17

18

19

20             _____
                      KELLY BROWN HICKEN, CSR, RPR, RMR
21

22

23

24

25
```