(b)(1)(A),MAG,APPEAL,CJA,FPD,XA_EXAM

Email All Attys
Email All Attys and Secondary Emails

# US District Court Electronic Case Filing System
## District of Utah (Central)
## CRIMINAL DOCKET FOR CASE #: <ins>2:16–cr–00631–DAK–JCB</ins>–1

Case title: USA v. Shamo et al
Magistrate judge case number: 2:16–mj–00597–DBP

Date Filed: 12/07/2016
Date Terminated: 10/15/2020

---

Assigned to: Judge Dale A. Kimball
Referred to: Magistrate Judge Jared C. Bennett

Appeals court case number: 20–4116
Tenth Circuit

**<ins>Defendant (1)</ins>**

| | | |
|---|---|---|
| **Aaron Michael Shamo**<br>*TERMINATED: 10/15/2020* | represented by | **Gregory G. Skordas**<br>SKORDAS & CASTON LLC<br>124 S 400 E STE 220<br>SALT LAKE CITY, UT 84111<br>801–531–7444<br>Fax: 801–665–0128<br>Email: gskordas@schhlaw.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: CJA Appointment* |
| | | **Adam G. Bridge**<br>UTAH FEDERAL DEFENDER OFFICE<br>46 W BROADWAY STE 110<br>SALT LAKE CITY, UT 84101<br>(801)524–4010<br>Email: adam_bridge@fd.org<br>*TERMINATED: 05/24/2017*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Public Defender or Community Defender Appointment* |
| | | **Daryl P. Sam**<br>DARYL P SAM PLLC<br>5955 S REDWOOD RD STE 102<br>SALT LAKE CITY, UT 84123<br>(801)506–6767<br>Email: daryl.sam@gmail.com |

1

*TERMINATED: 10/21/2019*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Kaytlin V. Beckett**
UTAH ATTORNEY GENERAL'S OFFICE
(5272)
5272 S COLLEGE DR STE 200
MURRAY, UT 84123
801–281–1200
Email: kbeckett@agutah.gov
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

| **Pending Counts** | **Disposition** |
|---|---|
| 21:848(b)(1) and (2)(A) CONTINUING CRIMINAL ENTERPRISE/Continuing Criminal Enterprise and Criminal Forfeiture Pursuant to 21:853 (1ss) | Dft found guilty by jury. SENTENCE: BOP: Life. No fine. SAF: $1200. Restitution: $132,466.97 |
| 21:952(a), 960, and 18:2 NARCOTICS – IMPORT/Aiding and Abetting the Importation of a Controlled Substance and Criminal Forfeiture Pursuant to 21:853 (2ss) | Dft found guilty by jury. SENTENCE: See Count 1ss |
| 21:952(a), 960, and 18:2 CONTROLLED SUBSTANCES – IMPORT/Aiding and Abetting the Importation of a Controlled Substance and Criminal Forfeiture Pursuant to 21:853 (3ss) | Dft found guilty by jury. SENTENCE: See Count 1ss |
| 21:952(a), 960, and 18:2 NARCOTICS – IMPORT/Aiding and Abetting the Importation of a Controlled Substance and Criminal Forfeiture Pursuant to 21:853 (4ss) | Dft found guilty by jury. SENTENCE: See Count 1ss |
| 21:841(a)(1) NARCOTICS – SELL, DISTRIBUTE, OR DISPENSE/Possession of Fentanyl with Intent to Distribute and Criminal Forfeiture Pursuant to 21:853 (5ss) | Dft found guilty by jury. SENTENCE: See Count 1ss |
| 21:841(a)(1) CONTROLLED SUBSTANCE – MANUFACTURE/Manufacture of | Dft found guilty by jury. SENTENCE: See Count 1ss |

2

Alprazolam and Criminal Forfeiture
Pursuant to 21:853
(7ss)

| | |
|---|---|
| 21:331(k) and 333(b)(7) AFFECTING THE LABEL TO CAUSE MISBRANDING/Knowing and Intentional Adulteration of Drugs While Held for Sale (8ss–9ss) | Dft found guilty by jury. SENTENCE: See Count 1ss |
| 21:843(b) and 18:2 USE COMMUNICATIONS FACILITY – CONTROLLED SUBSTANCE – DISTR./Aiding and Abetting the Use of the U.S. Mail in Furtherance of a Drug Trafficking Offense and Criminal Forfeiture Pursuant to 21:853 (10ss) | Dft found guilty by jury. SENTENCE: See Count 1ss |
| 18:1956(h) MONEY LAUNDERING – CONTROLLED SUBSTANCE – SELL/DISTR/DISP/Conspiracy to Commit Money Laundering (11ss) | Dft found guilty by jury. SENTENCE: See Count 1ss |
| 18:1956(a)(1)(A)(i) and (a)(1)(B)(i) MONEY LAUNDERING – CONTROLLED SUBSTANCE – SELL/DISTR/DISP/Money Laundering Promotion and Concealment (12ss) | Dft found guilty by jury. SENTENCE: See Count 1ss |
| 18:1957(a) ENGAGING IN MONETARY TRANSACTIONS/Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity (13ss) | Dft found guilty by jury. SENTENCE: See Count 1ss |

**<u>Highest Offense Level (Opening)</u>**

Felony

| **<u>Terminated Counts</u>** | **<u>Disposition</u>** |
|---|---|
| 21:841(a)(1) NARCOTICS – SELL, DISTRIBUTE, OR DISPENSE Possession of Fentanyl with Intent to Distribute; 21:853 Criminal Forfeiture (1) | Dismissed |
| | Dismissed |

3

| | |
|---|---|
| 21:848(b)(1) and (2)(A) CONTINUING CRIMINAL ENTERPRISE/Continuing Criminal Enterprise and Criminal Forfeiture Pursuant to 21:853 (1s) | |
| 21:952(a), 960 NARCOTICS – IMPORT/Aiding and Abetting the Importation of a Controlled Substance and 18:2 Aiding and Abetting and Criminal Forfeiture Pursuant to 21:853 (4s) | Dismissed |
| 21:952(a), 960 CONTROLLED SUBSTANCES – IMPORT/Aiding and Abetting the Importation of a Controlled Substance and 18:2 Aiding and Abetting and Criminal Forfeiture Pursuant to 21:853 (5s) | Dismissed |
| 21:952(a), 960 NARCOTICS – IMPORT/Aiding and Abetting the Importation of a Controlled Substance and 18:2 Aiding and Abetting and Criminal Forfeiture Pursuant to 21:853 (6s) | Dismissed |
| 21:841(a)(1) and 18:2 NARCOTICS – SELL, DISTRIBUTE, OR DISPENSE/Aiding and Abetting the Distribution of a Controlled Substance that Resulted in Death and Criminal Forfeiture Pursuant to 21:853 (6ss) | Hung Jury |
| 21:841(a)(1) NARCOTICS – SELL, DISTRIBUTE, OR DISPENSE/Possession of Fentanyl With Intent to Distribute and Criminal Forfeiture Pursuant to 21:853 (7s) | Dismissed |
| 21:841(a)(1) CONTROLLED SUBSTANCE – MANUFACTURE/Manufacture of Alprazolam and Criminal Forfeiture Pursuant to 21:853 (9s) | Dismissed |
| 21:331(k) and 333(b)(7) AFFECTING THE LABEL TO CAUSE MISBRANDING/Knowing and Intentional Adulteration of Drugs While Held for Sale | Dismissed |

(10s–11s)

| 21:843(b) and 18:843(b) USE COMMUNICATIONS FACILITY – CONTROLLED SUBSTANCE – DISTR./Use of the U.S. Mail in Furtherance of a Drug Trafficking Offense (12s) | Dismissed |
|---|---|

| 18:1956(h) MONEY LAUNDERING – CONTROLLED SUBSTANCE – SELL/DISTR/DISP/Conspiracy to Commit Money Laundering (13s) | Dismissed |

| 18:1956(a)(1)(B)(i) MONEY LAUNDERING – CONTROLLED SUBSTANCE – SELL/DISTR/DISP/Money Laundering Concealment (14s) | Dismissed |

| 18:1957(a) CONTROLLED SUBSTANCE – SELL, DISTRIBUTE, OR DISPENSE/Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity (15s) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

**Complaints**                                                    **Disposition**

21:841(a)(1) – Possession of Fentanyl
with Intent to Distribute

---

**Notice Party**

**Pretrial Noticing**                     represented by     **Pretrial Noticing**
                                                             Email: UTPml_PretrialNoticing@utp.uscourts.gov
                                                             PRO SE

---

**Notice Party**

**Charles D. Brock**
*TERMINATED: 08/21/2018*

---

**Notice Party**

**Mary Schuman**                          represented by  **Mary Schuman**
                                                         US PROBATION/PRETRIAL
                                                         PRO SE

---

**Notice Party**

**Jennifer L. Gaston**                    represented by  **Jennifer L. Gaston**
                                                         US PROBATION/PRETRIAL
                                                         Email: jennifer_gaston@utp.uscourts.gov
                                                         PRO SE

---

**Notice Party**

**Wyatt M. Stanworth**                    represented by  **Wyatt M. Stanworth**
                                                         US PROBATION/PRETRIAL
                                                         Email: wyatt_stanworth@utp.uscourts.gov
                                                         PRO SE

---

**Notice Party**

**Lorin Smith**
*TERMINATED: 03/22/2019*

---

**Notice Party**

**Jennifer D. Johnson**
*TERMINATED: 01/18/2021*

---

**Notice Party**

**Jennifer Wollitz**                      represented by  **Jennifer Wollitz**
                                                         US PROBATION/PRETRIAL
                                                         Email: jennifer_wollitz@utp.uscourts.gov
                                                         PRO SE

---

**Notice Party**

**Annie D. Carr**                         represented by  **Annie D. Carr**
                                                         US PROBATION/PRETRIAL
                                                         Email: annie_carr@utp.uscourts.gov
                                                         PRO SE

---

**Plaintiff**

| | | |
|---|---|---|
| **USA** | represented by | **S. Michael Gadd** |
| | | DEA/HIDTA |
| | | 348 E SOUTH TEMPLE |
| | | SALT LAKE CITY, UT 84111 |
| | | (801)524–3081 |
| | | Email: mgadd@agutah.gov |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | *Designation: Assistant US Attorney* |

**Vernon G. Stejskal**
US ATTORNEY'S OFFICE
111 S MAIN ST STE 1800
SALT LAKE CITY, UT 84111–2176
(801)325–1404
Email: vernon.stejskal@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Adam S. Elggren**
US ATTORNEY'S OFFICE
111 S MAIN ST STE 1800
SALT LAKE CITY, UT 84111–2176
(801)524–5682
Email: adam.elggren@usdoj.gov
*TERMINATED: 04/23/2019*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Cy H. Castle**
US ATTORNEY'S OFFICE
111 S MAIN ST STE 1800
SALT LAKE CITY, UT 84111–2176
(801)325–3214
Email: cy.castle@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Kent A. Burggraaf**
US ATTORNEY'S OFFICE
111 S MAIN ST STE 1800
SALT LAKE CITY, UT 84111–2176
385–602–2471
Email: kent.burggraaf@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 11/22/2016 | 1 | | COMPLAINT as to Aaron Michael Shamo (1). Assigned to Magistrate Judge Dustin B. Pead (tls) [2:16–mj–00597–DBP] (Entered: 11/22/2016) |

| 11/22/2016 | 3 | | AMENDED COMPLAINT as to Aaron Michael Shamo. Assigned to Magistrate Judge Dustin B. Pead. (tls) [2:16−mj−00597−DBP] (Entered: 11/22/2016) |
|---|---|---|---|
| 11/23/2016 | 5 | | Warrant on Amended Complaint Returned Executed on 11/22/2016, filed on 11/23/2016 in case as to Aaron Michael Shamo. (dla) [2:16−mj−00597−DBP] (Entered: 11/23/2016) |
| 11/23/2016 | 6 | | Minute Entry for proceedings held before Magistrate Judge Dustin B. Pead: Arraignment/Detention Hearing as to Aaron Michael Shamo (1) Complaint held on 11/23/2016. Defendant present with counsel and in custody. Defendant requests counsel. Financial Affidavit submitted. Court appoints FPD counsel, Adam Bridge. Defendant is advised of rights and charges. Government seeks detention. Defense submits to detention and requests a hearing at a later date. The Court sets the matter for detention hearing and orders defendant detained in USMS custody pending further order. (Detention Hearing set for 11/28/2016 at 08:45 AM in Rm 8.400 before Magistrate Judge Dustin B. Pead. Initial Appearance set for 12/7/2016 at 03:45 PM in Rm 8.400 before Magistrate Judge Evelyn J. Furse). Attorney for Plaintiff: Vernon Stejskal, Attorney for Defendant: Adam Bridge, FPD. Interpreter: Not Needed. Probation Officer: Lorin Smith. Court Reporter: Electronic/Laura Robinson. (Time Start: 10:36:18, Time End: 10:43:14, Room 8.400). (tls) [2:16−mj−00597−DBP] (Entered: 11/23/2016) |
| 11/23/2016 | 8 | | DOCKET TEXT ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Aaron Michael Shamo Adam G. Bridge for Aaron Michael Shamo appointed. No attached document.<br><br>Representation shall continue for any post−sentencing activities initiated by the US Probation Office Signed by Magistrate Judge Dustin B. Pead on 11/23/2016.(tls) [2:16−mj−00597−DBP] (Entered: 11/23/2016) |
| 11/23/2016 | 9 | | DOCKET TEXT ORDER OF TEMPORARY DETENTION as to Aaron Michael Shamo. No attached document. Detention Hearing set for 11/28/2016 at 08:45 AM in Rm 8.400 before Magistrate Judge Dustin B. Pead. Signed by Magistrate Judge Dustin B. Pead on 11/23/2017. (tls) [2:16−mj−00597−DBP] (Entered: 11/23/2016) |
| 11/28/2016 | 10 | | Minute Entry for proceedings held before Magistrate Judge Paul M. Warner: Detention Hearing as to Aaron Michael Shamo held on 11/28/2016. Defendant present with counsel and in custody. The Court hears argument on the issue of detention. The Court makes findings that the presumption applies in this matter and that defendant is a danger to the community based on the nature and circumstances of offense. Defendant is also found to be a risk of flight. Defendant is ordered to remain in USMS custody pending resolution of this matter. Note: Any future review of detention will remain with the magistrate judge who entered the first detention order, even if an order of referral to a different magistrate judge is entered on this defendant's case. Attorney for Plaintiff: Stewart Young, Attorney for Defendant: Adam Bridge, FPD. Interpreter: Not Needed. Probation Officer: Kelly Copley. Court Reporter: Electronic. (Time Start: 8:45:59, Time End: 9:13:58, Room 8.400). (tls) [2:16−mj−00597−DBP] (Entered: 11/28/2016) |
| 12/07/2016 | 11 | | INDICTMENT as to Aaron Michael Shamo (1) count(s) 1. Assigned to Judge Dale A. Kimball. (dla) (Additional attachment(s) added on 12/8/2016: # 1 Corrected Indictment) (jwt). Modified on 12/8/2016 − added corrected copy of indictment without foreperson's signature; sealed originally filed document (jwt). (Entered: 12/07/2016) |
| | | | *Main Document (Not Attached)* |
| | | | Attachment # 1 *Corrected Indictment* |
| 12/07/2016 | 13 | | Minute Entry for proceedings held before Magistrate Judge Evelyn J. Furse: Arraignment as to Aaron Michael Shamo (1) Count 1 held on 12/7/2016. Defendant present in custody and with FPD counsel. Defendant waives formal reading of the indictment and enters a NOT GUILTY |

| | | | |
|---|---|---|---|
| | | | plea. ( Discovery due by 12/14/2016., Proposed Jury Instructions along with proposed voir dire questions 2/10/2017., Motions due by 1/4/2017., Plea Agreement due by 1/23/2017., 5 Day Jury Trial set for 2/13/2017 at 08:30 AM in Rm 3.400 before Judge Dale A. Kimball.) Defendant remanded to the custody of the USMS.Attorney for Plaintiff: Stew Young – AUSA, Attorney for Defendant: Adam Bridge – FPD. Interpreter: Not Needed. Probation Officer: Lorin Smith/Kelly Copley. Court Reporter: Electronic.(Time Start: 3:34:02, Time End: 3:37:11, Room 8.400.) (lnp) (Entered: 12/07/2016) |
| 12/07/2016 | 14 | | Warrant on Indictment Returned Executed on 12/7/16, filed on 12/9/16 in case as to Aaron Michael Shamo. (dla) (Entered: 12/09/2016) |
| 12/09/2016 | 15 | | Defendant's MOTION to Revoke *Detention Order* filed by Aaron Michael Shamo. (Bridge, Adam) (Entered: 12/09/2016) |
| 12/12/2016 | 16 | | **NOTICE OF HEARING** as to Aaron Michael Shamo (Notice generated by Kim Jones) De Novo Review of Detention Hearing is set for Monday, 12/19/2016 at 03:00 PM in Rm 3.400 before Judge Dale A. Kimball.<br>Court Address: 351 South West Temple, Salt Lake City, Utah (kmj) (Entered: 12/12/2016) |
| 12/14/2016 | 17 | | First CERTIFICATE OF COMPLIANCE *and Request for Reciprocal Discovery* filed by USA as to Aaron Michael Shamo. (Stejskal, Vernon) (Entered: 12/14/2016) |
| 12/15/2016 | 18 | | NOTICE OF ATTORNEY APPEARANCE S. Michael Gadd appearing for USA. (Gadd, S.) (Entered: 12/15/2016) |
| 12/19/2016 | 19 | | Minute Entry for proceedings held before Judge Dale A. Kimball: Motion Hearing as to Aaron Michael Shamo held on 12/19/2016 re 15 Defendant's MOTION to Revoke *Detention Order* filed by Aaron Michael Shamo. Dft, in custody, was present with counsel. Court heard the arguments of counsel and took the motion under advisement. Attorney for Plaintiff: Vernon Stejskal, AUSA and Michael Gadd, AUSA. Attorney for Defendant: Adam Bridge, AFPD. Probation Officer: Loren Smith. Court Reporter: Ed Young. (kmj) (Entered: 12/19/2016) |
| 12/20/2016 | 20 | | ORDER AFFIRMING Judge Warner's 11/28/2016 Order that Defendant Aaron Michael Shamo shall remain detained pending trial. Signed by Judge Dale A. Kimball on 12/20/16. (dla) (Entered: 12/20/2016) |
| 01/04/2017 | 21 | | NOTICE OF ATTORNEY APPEARANCE Adam S. Elggren appearing for USA. *as co−counsel for forfeiture* (Elggren, Adam) (Entered: 01/04/2017) |
| 01/05/2017 | 22 | | Stipulated MOTION to Continue filed by Aaron Michael Shamo. (Attachments: # 1 Text of Proposed Order)(Bridge, Adam) (Entered: 01/05/2017) |
| 01/06/2017 | 23 | | ORDER TO CONTINUE – Ends of Justice as to Aaron Michael Shamo. Time excluded from 1/7/17 until 5/22/17. Motion terminated 22 Stipulated MOTION to Continue filed by Aaron Michael Shamo. Pretrial Motions due by 4/14/2017. Plea Agreement deadline is 4/28/2017. Jury Instructions and proposed voir dire are due on or before 5:00 PM on 5/17/2017. Jury Trial set for 5/22/2017 at 08:30 AM in Rm 3.400 before Judge Dale A. Kimball. Signed by Judge Dale A. Kimball on 1/6/17. (dla) (Entered: 01/06/2017) |
| 02/08/2017 | 24 | | Supplemental CERTIFICATE OF COMPLIANCE *and Request for Reciprocal Discovery* filed by USA as to Aaron Michael Shamo. (Stejskal, Vernon) (Entered: 02/08/2017) |
| 04/18/2017 | 25 | | Supplemental CERTIFICATE OF COMPLIANCE *and request for reciprocal discovery* filed by USA as to Aaron Michael Shamo. (Gadd, S.) (Entered: 04/18/2017) |
| 04/26/2017 | 26 | | |

| | | NOTICE OF FILING of Bill of Particulars for Forfeiture filed by USA as to Aaron Michael Shamo (Elggren, Adam) (Entered: 04/26/2017) |
|---|---|---|
| 05/11/2017 | 27 | NOTICE OF ATTORNEY APPEARANCE: Gregory G. Skordas appearing for Aaron Michael Shamo (Skordas, Gregory) (Entered: 05/11/2017) |
| 05/15/2017 | 28 | MOTION to Continue *Jury Trial* filed by Aaron Michael Shamo. (Attachments: # 1 Text of Proposed Order Order to Continue Jury Trial)(Skordas, Gregory) (Entered: 05/15/2017) |
| 05/17/2017 | 29 | ORDER TO CONTINUE – Ends of Justice as to Aaron Michael Shamo. Motion to Continue Jury Trial filed by Aaron Michael Shamo 28 is GRANTED. Jury Trial reset for 8/28/2017 at 08:30 AM in Rm 3.400 before Judge Dale A. Kimball. Time excluded from 5/23/17 until 8/28/17. Signed by Judge Dale A. Kimball on 5/17/17. (dla) (Entered: 05/17/2017) |
| 05/22/2017 | 30 | MOTION to Withdraw as Attorney by Adam G. Bridge. filed by Aaron Michael Shamo. (Attachments: # 1 Text of Proposed Order Granting Motion for Leave to Withdraw)(Bridge, Adam) (Entered: 05/22/2017) |
| 05/24/2017 | 31 | ORDER granting 30 Motion for Leave to Withdraw. Adam G. Bridge withdrawn from case for defendant as to Aaron Michael Shamo (1). Signed by Judge Dale A. Kimball on 5/23/17. (dla) (Entered: 05/24/2017) |
| 05/31/2017 | 32 | SUPERSEDING INDICTMENT as to Aaron Michael Shamo (1) count(s) 1s, 4s, 5s, 6s, 7s, 9s, 10s−11s, 12s, 13s, 14s, 15s; Drew Wilson Crandall (2) count(s) 2, 3, 13; Alexandrya Marie Tonge (3) count(s) 2, 3, 8, 12, 13; Katherine Lauren Anne Bustin (4) count(s) 2, 3, 8, 12, 13; Mario Anthony Noble (5) count(s) 2, 3; Sean Michael Gygi (6) count(s) 2, 3, 6, 12. Assigned to Judge Dale A. Kimball. (eat) (Entered: 05/31/2017) |
| 06/15/2017 | 51 | Stipulated MOTION for Protective Order *re: Discovery* by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi. (Attachments: # 1 Text of Proposed Order)(Gadd, S.) (Entered: 06/15/2017) |
| 06/15/2017 | 52 | ORDER GRANTING 51 Motion for Protective Order as to Aaron Michael Shamo (1), Drew Wilson Crandall (2), Alexandrya Marie Tonge (3), Katherine Lauren Anne Bustin (4), Mario Anthony Noble (5), Sean Michael Gygi (6). Signed by Magistrate Judge Evelyn J. Furse on 6/15/2017. (lnp) (Entered: 06/15/2017) |
| 06/21/2017 | 55 | **NOTICE OF HEARING** as to Aaron Michael Shamo (Notice generated by EJF Chambers) Arraignment on superseding indictment set for 6/29/2017 at 02:30 PM in Rm 8.400 before Magistrate Judge Evelyn J. Furse. (lnp) (Entered: 06/21/2017) |
| 06/28/2017 | | Notice of Appearance. U.S. Probation and Pretrial Services hereby advises the Court that Pretrial Noticing should be added to this case as to Aaron Michael Shamo (kk) (Entered: 06/28/2017) |
| 06/29/2017 | 62 | Supplemental CERTIFICATE OF COMPLIANCE *and Request for Reciprocal Discovery* filed by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi. (Stejskal, Vernon) (Entered: 06/29/2017) |
| 06/29/2017 | 64 | Minute Entry for proceedings held before Magistrate Judge Evelyn J. Furse: Arraignment as to Aaron Michael Shamo (1) Count 1,1s,4s,5s,6s,7s,9s,10s−11s,12s,13s,14s,15s held on 6/29/2017. Defendant present in custody with retained counsel. Rights and penalties explained. Defendants waived formal reading of the superseding indictment. Plea of NOT GUILTY entered by the defendant. Counsel makes an oral motion, stipulating to striking the trial dates. Defense counsel requested additional time to review discovery. Government counsel presents to the court a STA |

| | | | |
|---|---|---|---|
| | | | order. Defense counsel does not object to the order. Court to enter the STA order that sets a status conference and excludes time from 6/29/2017–8/31/2017. Court sets a status conference for 8/31/2017 at 10:00 AM in Rm 7.100 before Magistrate Judge Evelyn J. Furse. Defendant remanded to the custody of the USMS.Attorney for Plaintiff: Mike Gadd – AUSA, Attorney for Defendant: Rebecca Skordas/Greg Skordas – Retained. Interpreter: Not Needed. Probation Officer: Lorin Smith. Court Reporter: Electronic.(Time Start: 2:34:38, Time End: 2:42:03, Room 8.400.) (lnp) (Entered: 06/29/2017) |
| 06/29/2017 | <u>66</u> | | Warrant on Superseding Indictment Returned Executed on 06/29/17, filed on 6/30/17 in case as to Aaron Michael Shamo. (dla) (Entered: 06/30/2017) |
| 06/30/2017 | <u>65</u> | | *ORDER SETTING STATUS CONFERENCE AND EXCLUDING TIME FROM SPEEDY TRIAL ACT COMPUTATION – Ends of Justice as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi. Status Conference set for all defendants for 8/31/2017 at 10:00 AM in Rm 7.100 before Magistrate Judge Evelyn J. Furse. Time excluded until 8/31/17. Signed by Magistrate Judge Evelyn J. Furse on 6/29/17.* (dla) (Entered: 06/30/2017) |
| 08/31/2017 | 68 | | Minute Entry for proceedings held before Magistrate Judge Evelyn J. Furse: Status Conference held on 8/31/2017. Defendants Aaron Shamo and Drew Crandall present in custody with counsel. Defendants Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi present, appearing with retained counsel. Court hears from counsel regarding the status of setting trial dates. Counsel requested additional time due to the complexity of the case and to review discovery further. All time to be excluded between 8/31/2017–12/1/2017 pursuant to the Speedy Trial Act. Court instructs the Government to prepare a proposed speedy trial act order and submit to the Court. **Court sets a Status Conference for 12/1/2017 at 10:00 AM in Rm 8.400 before Magistrate Judge Evelyn J. Furse.** Attorney for Plaintiff: Michael Gadd – AUSA, Attorney for Defendant: Rebecca Skordas, Ed Brass, Earl Xaiz, Kyler Ovard, Eric Benson, Michael Holje, Retained. Interpreter: Not Needed. Court Reporter: Electronic.(Time Start: 10:07:01, Time End: 10:12:53, Room 7.100.) (lnp) (Entered: 08/31/2017) |
| 09/01/2017 | <u>69</u> | | *ORDER TO CONTINUE – Ends of Justice as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi. Time excluded from 8/31/2017 until 12/1/2017. Signed by Magistrate Judge Evelyn J. Furse on 9/1/2017.*(jwt) (Entered: 09/01/2017) |
| 09/13/2017 | <u>70</u> | | Supplemental CERTIFICATE OF COMPLIANCE *and request for reciprocal discovery* filed by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi. (Gadd, S.) (Entered: 09/13/2017) |
| 12/01/2017 | 81 | | Minute Entry for proceedings held before Magistrate Judge Evelyn J. Furse: Status Conference as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi held on 12/1/2017. Defendants present with retained counsel. Defense counsel, Eric Benson present, waiving defendant Sean Michael Gygi's appearance. Court hears from counsel regarding the status of setting trial dates. Counsel requested additional time due to the complexity of the case, voluminous discovery, time needed to review discovery further, and the number of defendants. Defense counsel, Eric Benson does not object to the continuance for purposes of preparation of defense, review of discovery based on the voluminous amount of discovery, and negotiations with the Government. All defense counsel joins in regarding Mr. Benson's statement. Court orders Government to turn over all documentation by 2/1/2018. **Court sets a Status Conference for 2/28/2018 at 03:00 PM in Rm 7.400 before Magistrate Judge Evelyn J. Furse.** All time to be excluded between 12/1/2017–2/28/2018 pursuant to the Speedy Trial Act. Court instructs the Government to |

| | | | |
|---|---|---|---|
| | | | prepare a proposed speedy trial act order and submit to the Court. Attorney for Plaintiff: Mike Gadd – AUSA, Attorney for Defendant: Rebecca Skordas, Mark R. Moffat, Edward K. Brass, Earl G. Xaiz, Kyler E. Ovard, Eric G. Benson, Retained. Interpreter: Not Needed. Court Reporter: Electronic.(Time Start: 10:03:28, Time End: 10:18:04, Room 8.400.) (lnp) (Entered: 12/01/2017) |
| 12/01/2017 | 82 | | ORDER (Ends of Justice) Setting Status Conference and Excluding Time from Speedy Trial Act Computation as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, and Sean Michael Gygi. The Court will hold a third status conference on 2/28/2018, at 3:00 PM before Magistrate Judge Evelyn J. Furse. The time between 12/1/2017, and 2/28/2018, is excluded from computation under the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(1)(D) and (7)(A) and (B)(ii). Signed by Magistrate Judge Evelyn J. Furse on 12/1/2017. (eat) (Entered: 12/01/2017) |
| 12/11/2017 | 85 | | ORDER REFERRING CASE to Magistrate Judge Paul M. Warner as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, and Sean Michael Gygi under 28:636 (b)(1)(A), Magistrate Judge to hear and determine all nondispositive pretrial matters. No attached document. Signed by Judge Dale A. Kimball on 12/11/2017. (eat) (Entered: 12/11/2017) |
| 12/12/2017 | 86 | | NOTICE OF FILING of Second Bill of Particulars for forfeiture filed by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi (Gadd, S.) (Entered: 12/12/2017) |
| 12/12/2017 | 87 | | Stipulated MOTION for Interlocutory Sale by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi. (Attachments: # 1 Text of Proposed Order) Motions referred to Paul M. Warner.(Gadd, S.) (Entered: 12/12/2017) |
| 12/12/2017 | 88 | | ORDER granting 87 Motion for Interlocutory Sale as to Aaron Michael Shamo (1), Drew Wilson Crandall (2), Alexandrya Marie Tonge (3), Katherine Lauren Anne Bustin (4), Mario Anthony Noble (5), and Sean Michael Gygi (6). Signed by Judge Dale A. Kimball on 12/12/2017. (eat) (Entered: 12/12/2017) |
| 12/14/2017 | 89 | | Supplemental CERTIFICATE OF COMPLIANCE *and request for reciprocal discovery* filed by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi. (Gadd, S.) (Entered: 12/14/2017) |
| 01/04/2018 | 91 | | NOTICE OF FILING of Third Bill of Particulars for Forfeiture filed by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi (Elggren, Adam) (Entered: 01/04/2018) |
| 01/04/2018 | 92 | | Joint MOTION to Amend Interlocutory Sale Order re 88 Order on Motion for Miscellaneous Relief, by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi. (Attachments: # 1 Text of Proposed Order) Motions referred to Paul M. Warner.(Elggren, Adam) (Entered: 01/04/2018) |
| 01/05/2018 | 93 | | ORDER granting 92 Motion to Amend Order Authorizing Interlocutory Sale as to Aaron Michael Shamo (1), Drew Wilson Crandall (2), Alexandrya Marie Tonge (3), Katherine Lauren Anne Bustin (4), Mario Anthony Noble (5), and Sean Michael Gygi (6). Signed by Judge Dale A. Kimball on 1/5/2018. (eat) (Entered: 01/05/2018) |
| 02/01/2018 | 95 | | Supplemental CERTIFICATE OF COMPLIANCE *and request for reciprocal discovery* filed by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine |

| | | | |
|---|---|---|---|
| | | | Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi. (Gadd, S.) (Entered: 02/01/2018) |
| 02/28/2018 | 96 | | Minute Entry for proceedings held before Magistrate Judge Paul M. Warner: Status Conference as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi held on 2/28/2018. Defendants Aaron Shamo and Drew Crandall present in custody with retained counsel. Defendants Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi present, appearing with retained counsel. Court hears from counsel regarding the status of setting trial dates. Counsel requested additional time due to the complexity of the case and to review discovery further. ( Discovery due as soon as possible., Motions due 3 weeks after discovery is provided., Proposed Jury Instructions along with proposed voir dire questions 8/17/2018., Plea Agreement due by 7/30/2018., 20 Day Jury Trial set for 8/20/2018 at 08:30 AM in Rm 3.400 before Judge Dale A. Kimball.) Defense counsel stipulates to the continuance for purposes of preparation of defense, review of discovery based on the voluminous amount of discovery, and negotiations with the Government. All time to be excluded between 2/28/2018–8/20/2018 pursuant to the Speedy Trial Act. Court instructs the Government to prepare a proposed speedy trial act order and submit to the Court. Attorney for Plaintiff: Michael Gadd – AUSA, Attorney for Defendant: Gregory G. Skordas, James C. Bradshaw, Edward K. Brass, Kyler E. Ovard, Eric G. Benson, Edward K. Brass forEarl G. Xaiz, All Retained Counsel. Interpreter: Not Needed. Court Reporter: Electronic.(Time Start: 3:17:09, Time End: 3:32:45, Room 8.400.) (lnp) Modified on 3/5/2018 by adding the motion cut off date. (lnp). (Entered: 02/28/2018) |
| 03/01/2018 | 97 | | ORDER SETTING JURY TRIAL & EXCLUDING TIME FROM SPEEDY TRIAL ACT COMPUTATION – Ends of Justice as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, and Sean Michael Gygi. A 20 day jury trial is scheduled to begin on 8/20/2018 at 8:30 a.m. in Courtroom 3.400 before Judge Dale A. Kimball. All time between 2/28/2018, and 8/20/2018, is excluded from computation of time under the Speedy Trial Act. Signed by Magistrate Judge Paul M. Warner on 2/28/2018. (eat) (Entered: 03/01/2018) |
| 05/02/2018 | 101 | | MOTION to Reassign Case , *specifically to reassign a related case to Judge Kimball* by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi. (Attachments: # 1 Text of Proposed Order)(Gadd, S.) (Entered: 05/02/2018) |
| 05/02/2018 | 102 | | ORDER granting 101 MOTION to Reassign Case, *specifically to reassign a related case to Judge Kimball*, filed by USA. Case 2:18−cr−00231 is hereby transferred to Judge Dale A. Kimball for all future proceedings. Signed by Judge Dale A. Kimball on 5/2/2018. (eat) (Entered: 05/02/2018) |
| 05/10/2018 | 106 | | Supplemental CERTIFICATE OF COMPLIANCE *and request for reciprocal discovery* filed by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi. (Gadd, S.) (Entered: 05/10/2018) |
| 05/23/2018 | 112 | | Supplemental CERTIFICATE OF COMPLIANCE *and request for reciprocal discovery* filed by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi. (Gadd, S.) (Entered: 05/23/2018) |
| 05/29/2018 | 113 | | Supplemental CERTIFICATE OF COMPLIANCE *and request for reciprocal discovery* filed by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi. (Gadd, S.) (Entered: |

| | | | |
|---|---|---|---|
| | | | 05/29/2018) |
| 07/20/2018 | 122 | | Supplemental CERTIFICATE OF COMPLIANCE *and request for reciprocal discovery* filed by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi. (Gadd, S.) (Entered: 07/20/2018) |
| 08/01/2018 | 125 | | MOTION to Continue *Jury Trial* filed by Aaron Michael Shamo. Motions referred to Paul M. Warner.(Skordas, Gregory) (Entered: 08/01/2018) |
| 08/03/2018 | 126 | | MOTION to Determine Admissibility of Exhibits *and Request for Hearing* by USA as to Aaron Michael Shamo. (Attachments: # 1 Text of Proposed Order) Motions referred to Paul M. Warner.(Gadd, S.) (Entered: 08/03/2018) |
| 08/03/2018 | 127 | | ORDER TO CONTINUE – Ends of Justice as to Aaron Michael Shamo and Drew Wilson Crandall. Time excluded from 8/3/2018, until 1/22/2019. Motion granted: 125 MOTION to Continue *Jury Trial* filed by Aaron Michael Shamo. Jury Trial is RESET for 1/22/2019, at 08:30 AM in Rm 3.400 before Judge Dale A. Kimball. Signed by Judge Dale A. Kimball on 8/3/2018. (eat) (Entered: 08/03/2018) |
| 08/10/2018 | 128 | | ORDER granting 126 MOTION to Determine Admissibility of Exhibits *and Request for Hearing* filed by USA as to Aaron Michael Shamo. 3–Day Evidentiary Hearing is set to begin on 1/9/2019, at 09:00 AM in Rm 3.400 before Judge Dale A. Kimball. Signed by Judge Dale A. Kimball on 8/10/2018. (eat) (Entered: 08/10/2018) |
| 09/08/2018 | 144 | | Order Appointing CJA Counsel as to Aaron Michael Shamo: Appointment of Attorney Daryl P. Sam Signed by Magistrate Judge Paul M. Warner on 11/8/18.(ksm) (Entered: 11/08/2018) |
| 10/11/2018 | 129 | | NOTICE of Proposed Pretrial Order by Aaron Michael Shamo (Skordas, Gregory) (Entered: 10/11/2018) |
| 10/12/2018 | 130 | | TRIAL ORDER with instructions for counsel as to Aaron Michael Shamo. 3–Week Jury Trial is set to begin on 1/22/2019, at 08:30 AM in Rm 3.400 before Judge Dale A. Kimball. Signed by Judge Dale A. Kimball on 10/12/2018. (Attachments: # 1 Stock Jury Instructions) (eat) (Entered: 10/12/2018) |
| 10/16/2018 | 132 | | NOTICE of Intent to use 404(b) evidence request by Aaron Michael Shamo (Skordas, Gregory) (Entered: 10/16/2018) |
| 10/18/2018 | 136 | | SECOND SUPERSEDING INDICTMENT as to Aaron Michael Shamo (1), Counts 1ss, 2ss, 3ss, 4ss, 5ss, 6ss, 7ss, 8ss–9ss, 10ss, 11ss, 12ss, 13ss. Assigned to Judge Dale A. Kimball. (eat) (Entered: 10/18/2018) |
| 10/22/2018 | 138 | | **NOTICE OF HEARING** as to Aaron Michael Shamo (Notice generated by DBP Chambers). Initial Appearance set for 10/29/2018 at 03:00 PM in Rm 8.400 before Magistrate Judge Brooke C. Wells. (tls) (Entered: 10/22/2018) |
| 10/29/2018 | 139 | | NOTICE OF ATTORNEY APPEARANCE Kent A. Burggraaf appearing for USA. (Burggraaf, Kent) (Entered: 10/29/2018) |
| 10/29/2018 | 140 | | NOTICE OF ATTORNEY APPEARANCE: Daryl P. Sam appearing for Aaron Michael Shamo *as Co–Counsel* (Sam, Daryl) (Entered: 10/29/2018) |
| 10/30/2018 | 141 | | Supplemental CERTIFICATE OF COMPLIANCE *and request for reciprocal discovery* filed by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi. (Gadd, S.) (Entered: 10/30/2018) |

| | | | |
|---|---|---|---|
| 10/30/2018 | 142 | | Minute Entry for proceedings held before Judge Magistrate Judge Dustin B. Pead: Initial Appearance/Arraignment as to Aaron Michael Shamo (1), Count 1ss,2ss,3ss,4ss,5ss,6ss,7ss,8ss−9ss,10ss,11ss,12ss,13ss held on 10/30/2018. Defendant present with counsel and in custody. Charges, rights and penalties explained. Defendant waives formal reading of indictment and enters NOT GUILTY pleas to all counts. The Court accepts the pleas and discusses status of the case. The parties agree that all current dates are reasonable, and all deadlines shall remain as scheduled. Defendant is to remain in USMS custody pending resolution of this matter. Attorney for Plaintiff: Michael Gadd, Attorney for Defendant: Greg Skordas, Daryl Sam and Kaitlynn Beck, CJA. Interpreter: Not Needed. Probation Officer: Charles Brock. Court Reporter: Electronic.(Time Start: 9:39:02, Time End: 9:42:24, Room 8.400.) (tls) (Entered: 10/30/2018) |
| 10/30/2018 | 143 | | Arrest on Second Superseding Indictment Warrant Returned Executed on 10/30/2018, filed on 11/1/2018, in case as to Aaron Michael Shamo. (eat) (Entered: 11/01/2018) |
| 11/26/2018 | 145 | | Certificate of Service by Aaron Michael Shamo *Notice of Expert Trent Leavitt* (Skordas, Gregory) (Entered: 11/26/2018) |
| 11/26/2018 | 146 | | Certificate of Service by Aaron Michael Shamo *Notice of Expert Kelly Shafto* (Skordas, Gregory) (Entered: 11/26/2018) |
| 11/26/2018 | 147 | | Certificate of Service by Aaron Michael Shamo *Notice of Expert Dr. Terri Haddix* (Skordas, Gregory) (Entered: 11/26/2018) |
| 11/26/2018 | 148 | | Certificate of Service by Aaron Michael Shamo *Proposed Witness List* (Skordas, Gregory) (Entered: 11/26/2018) |
| 11/26/2018 | 149 | | Certificate of Service by Aaron Michael Shamo *Proposed Exhibit List* (Skordas, Gregory) (Entered: 11/26/2018) |
| 11/26/2018 | 150 | | NOTICE of Expert, Bill Posey by USA as to Aaron Michael Shamo (Attachments: # 1 Exhibit CV of Bill Posey, # 2 Exhibit Toxicology Report) (Burggraaf, Kent) (Entered: 11/26/2018) |
| 11/26/2018 | 151 | | NOTICE of Expert, Guy Gino by USA as to Aaron Michael Shamo (Attachments: # 1 Exhibit Slides, # 2 Exhibit CV) (Gadd, S.) (Entered: 11/26/2018) |
| 11/26/2018 | 152 | | NOTICE of Expert, Danielle C. Farrell by USA as to Aaron Michael Shamo (Attachments: # 1 Exhibit, # 2 Exhibit) (Burggraaf, Kent) (Entered: 11/26/2018) |
| 11/26/2018 | 153 | | NOTICE of Expert, Thomas Wayne Rogers by USA as to Aaron Michael Shamo (Attachments: # 1 Exhibit Autopsy Report) (Gadd, S.) (Entered: 11/26/2018) |
| 11/26/2018 | 154 | | NOTICE of Expert, David A. Slagle by USA as to Aaron Michael Shamo (Attachments: # 1 Exhibit) (Burggraaf, Kent) (Entered: 11/26/2018) |
| 11/26/2018 | 155 | | NOTICE of Expert, Son Hoang by USA as to Aaron Michael Shamo (Attachments: # 1 Exhibit Report, # 2 Exhibit CV) (Gadd, S.) (Entered: 11/26/2018) |
| 11/26/2018 | 156 | | NOTICE of Expert, Arthur Simone by USA as to Aaron Michael Shamo (Attachments: # 1 Exhibit CV) (Gadd, S.) (Entered: 11/26/2018) |
| 11/26/2018 | 157 | | NOTICE of Expert, Emily A. Oblath by USA as to Aaron Michael Shamo (Attachments: # 1 Exhibit Reports, # 2 Exhibit CV) (Burggraaf, Kent) (Entered: 11/26/2018) |
| 11/26/2018 | 158 | | NOTICE of Expert, Jeffrey R. Bryan by USA as to Aaron Michael Shamo (Attachments: # 1 Exhibit CV) (Burggraaf, Kent) (Entered: 11/26/2018) |

| 11/26/2018 | 159 | | NOTICE of Expert, Heather McCauley by USA as to Aaron Michael Shamo (Attachments: # 1 Exhibit Reports, # 2 Exhibit CV) (Gadd, S.) (Entered: 11/26/2018) |
| 11/26/2018 | 160 | | NOTICE of Expert, Keith T. Chan by USA as to Aaron Michael Shamo (Attachments: # 1 Exhibit Report, # 2 Exhibit CV) (Burggraaf, Kent) (Entered: 11/26/2018) |
| 11/26/2018 | 161 | | NOTICE of Expert, Travis Falconer by USA as to Aaron Michael Shamo (Attachments: # 1 Exhibit Reports, # 2 Exhibit CV) (Gadd, S.) (Entered: 11/26/2018) |
| 11/26/2018 | 162 | | NOTICE of Expert, Stacey L. Hail by USA as to Aaron Michael Shamo (Burggraaf, Kent) (Entered: 11/26/2018) |
| 11/26/2018 | 163 | | NOTICE of Expert, Frank Platek by USA as to Aaron Michael Shamo (Attachments: # 1 Exhibit Reports, # 2 Exhibit CV) (Gadd, S.) (Entered: 11/26/2018) |
| 11/26/2018 | 164 | | NOTICE of Expert, Adam Lanzarotta by USA as to Aaron Michael Shamo (Attachments: # 1 Exhibit Reports, # 2 Exhibit CV) (Gadd, S.) (Entered: 11/26/2018) |
| 11/26/2018 | 165 | | NOTICE of Expert, Nicola Ranieri by USA as to Aaron Michael Shamo (Attachments: # 1 Exhibit Combined Reports, # 2 Exhibit CV) (Burggraaf, Kent) (Entered: 11/26/2018) |
| 11/26/2018 | 166 | | Certificate of Service by USA as to Aaron Michael Shamo *of the United States' Witness List* (Burggraaf, Kent) (Entered: 11/26/2018) |
| 11/26/2018 | 167 | | Certificate of Service by USA as to Aaron Michael Shamo *of the United States' Exhibit List* (Burggraaf, Kent) (Entered: 11/26/2018) |
| 12/06/2018 | 168 | | MOTION to Obtain Certified Plea Documents from the Clerk's Office by USA as to Aaron Michael Shamo. (Attachments: # 1 Text of Proposed Order) Motions referred to Paul M. Warner.(Gadd, S.) (Entered: 12/06/2018) |
| 12/07/2018 | 169 | | MOTION to Determine James Issues and Request for Hearing *and Memorandum in Support for James Hearing* filed by Aaron Michael Shamo. (Skordas, Gregory) (Entered: 12/07/2018) |
| 12/07/2018 | 170 | | ORDER granting 168 Motion for Release of Filed Statements in Advance of Plea and Sealed Plea Supplements as to Aaron Michael Shamo (1). Signed by Judge Dale A. Kimball on 12/7/2018. (eat) (Entered: 12/07/2018) |
| 12/07/2018 | 171 | | MOTION in Limine *for Order Excluding Evidence* filed by Aaron Michael Shamo. (Skordas, Gregory) (Entered: 12/07/2018) |
| 12/07/2018 | 172 | | MOTION in Limine *to allow Defendant to Wear Attire other Than Those provided as an Inmate During Trial and Pre admission Hearing and Memorandum in Support* filed by Aaron Michael Shamo. (Skordas, Gregory) (Entered: 12/07/2018) |
| 12/20/2018 | 173 | | Supplemental CERTIFICATE OF COMPLIANCE *and request for reciprocal discovery* filed by USA as to Aaron Michael Shamo. (Gadd, S.) (Entered: 12/20/2018) |
| 12/20/2018 | 174 | | RESPONSE to Motion by USA as to Aaron Michael Shamo re 172 MOTION in Limine *to allow Defendant to Wear Attire other Than Those provided as an Inmate During Trial and Pre admission Hearing and Memorandum in Support* (Burggraaf, Kent) (Entered: 12/20/2018) |
| 12/20/2018 | 175 | | Supplemental CERTIFICATE OF COMPLIANCE *and request for reciprocal discovery* filed by USA as to Aaron Michael Shamo. (Gadd, S.) (Entered: 12/20/2018) |
| 12/21/2018 | 176 | | MEMORANDUM in Opposition by USA as to Aaron Michael Shamo re 171 MOTION in Limine *for Order Excluding Evidence* (Gadd, S.) (Entered: 12/21/2018) |

| | | | |
|---|---|---|---|
| 12/27/2018 | 178 | | MOTION to Continue *Jury Trial* filed by Aaron Michael Shamo. (Attachments: # 1 Text of Proposed Order Order to Continue Jury Trial) Motions referred to Paul M. Warner.(Skordas, Gregory) (Entered: 12/27/2018) |
| 12/27/2018 | 179 | | ORDER TO CONTINUE – Ends of Justice as to Aaron Michael Shamo. Time excluded from 12/27/2018 until 6/17/2019. Motion granted: 178 MOTION to Continue *Jury Trial* filed by Aaron Michael Shamo. 3–Day Pre–Admission Evidentiary Hearing is RESET to begin on 5/29/2019 at 08:30 AM in Rm 3.400 before Judge Dale A. Kimball. 4–Week Jury Trial is RESET to begin on 6/17/2019 at 08:30 AM in Rm 3.400 before Judge Dale A. Kimball. Signed by Judge Dale A. Kimball on 12/27/2018. (eat) (Entered: 12/27/2018) |
| 12/27/2018 | 180 | | TRIAL ORDER with instructions for counsel as to Aaron Michael Shamo. 4–Week Jury Trial is set to begin on 6/17/2019, at 08:30 AM in Rm 3.400 before Judge Dale A. Kimball. Signed by Judge Dale A. Kimball on 12/27/2018. (eat) (Entered: 12/27/2018) |
| 12/27/2018 | | | **Set/Reset Hearings** as to Aaron Michael Shamo: 3–Day Pre–Admission Evidentiary Hearing is RESET to begin on 5/29/2019 at **09:00 AM** in Rm 3.400 before Judge Dale A. Kimball. PLEASE NOTE THAT THE TIME OF THE HEARING HAS BEEN CORRECTED TO 9:00 AM. (eat) (Entered: 12/27/2018) |
| 03/11/2019 | 184 | | NOTICE of Fourth Bill of Particulars (Regarding Forfeiture) by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi re 136 Indictment (Castle, Cy) (Entered: 03/11/2019) |
| 03/22/2019 | | | Notice of Withdrawal. U.S. Probation and Pretrial Services hereby advises the Court that Lorin Smith should be terminated from this case as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi (ljm) (Entered: 03/22/2019) |
| 04/01/2019 | 186 | | AMENDED TRIAL ORDER with instructions for counsel as to Aaron Michael Shamo. 4–Week Jury Trial is set to begin on 6/17/2019, at 08:30 AM in Rm 3.400 before Judge Dale A. Kimball. Please note new deadlines and requirements for objections to exhibits. Signed by Judge Dale A. Kimball on 4/1/2019. (Attachments: # 1 Stock Jury Instructions) (eat) (Entered: 04/01/2019) |
| 04/12/2019 | 187 | | CERTIFICATE OF COMPLIANCE *and request for reciprocal discovery* filed by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi. (Gadd, S.) (Entered: 04/12/2019) |
| 04/17/2019 | 188 | | Certificate of Service by Aaron Michael Shamo *Witness List* (Skordas, Gregory) (Entered: 04/17/2019) |
| 04/17/2019 | 189 | | Certificate of Service by Aaron Michael Shamo *Exhibit List* (Skordas, Gregory) (Entered: 04/17/2019) |
| 04/17/2019 | 190 | | CERTIFICATE OF COMPLIANCE *re: Exhibit and Witness lists* filed by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi. (Gadd, S.) (Entered: 04/17/2019) |
| 04/23/2019 | 191 | | SUBSTITUTION OF COUNSEL by USA. Cy H. Castle replacing Adam S. Elggren (Castle, Cy) (Entered: 04/23/2019) |
| 04/23/2019 | 192 | | MOTION for Extension of Time AUTHENTICATION ISSUES AND COMPUTER FORENSIC MATTERS filed by Aaron Michael Shamo. (Attachments: # 1 Text of Proposed Order ORDER APPROVING REQUEST FOR EXTENSION OF TIME TO FILE MOTIONS REGARDING AUTHENTICATION ISSUES AND COMPUTER FORENSIC MATTERS) Motions referred to Paul M. Warner.(Skordas, Gregory) (Entered: 04/23/2019) |

| 04/23/2019 | 193 | | MEMORANDUM in Opposition by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi re 192 MOTION for Extension of Time AUTHENTICATION ISSUES AND COMPUTER FORENSIC MATTERS (Attachments: # 1 Exhibit Correspondence between Counsel, # 2 Text of Proposed Order Proposed Order)(Gadd, S.) (Entered: 04/23/2019) |
|---|---|---|---|
| 04/24/2019 | 194 | | ORDER granting in part 192 Motion for Extension of Time to File Motions Regarding Authentication Issues and Computer Forensic Matters as to Aaron Michael Shamo (1). The court extends the time for Defendant to file any motions regarding authentication issues for records obtained from the "dark web" and motions regarding issues currently being examined by a computer forensic specialist, until 5/13/2019. The government shall respond to such motions by 5/21/2019, and Defendant shall file any reply memoranda by 5/23/2019. Signed by Judge Dale A. Kimball on 4/24/2019. (eat) (Entered: 04/24/2019) |
| 04/26/2019 | 195 | | NOTICE of Expert Eric Wheeler by Aaron Michael Shamo (Skordas, Gregory) (Entered: 04/26/2019) |
| 04/26/2019 | 196 | | MOTION in Limine *for in−trial notice of upcoming witnesses* by USA as to Aaron Michael Shamo. (Gadd, S.) (Entered: 04/26/2019) |
| 04/26/2019 | 197 | | MOTION in Limine *regarding potential punishment and drawing charging comparisons* by USA as to Aaron Michael Shamo. (Gadd, S.) (Entered: 04/26/2019) |
| 04/26/2019 | 198 | | MOTION in Limine *to Exclude Defense Exhibits* by USA as to Aaron Michael Shamo. (Gadd, S.) (Entered: 04/26/2019) |
| 04/26/2019 | 199 | | MOTION in Limine *to Strike Defendant's Expert Kelly Shafto* by USA as to Aaron Michael Shamo. (Attachments: # 1 Exhibit A−−K. Shafto Expert Notice)(Gadd, S.) (Entered: 04/26/2019) |
| 04/26/2019 | 200 | | MOTION in Limine *to Strike Defendant's Expert Terri Haddix* by USA as to Aaron Michael Shamo. (Attachments: # 1 Exhibit A−−T. Haddix Expert Notice)(Gadd, S.) (Entered: 04/26/2019) |
| 04/26/2019 | 201 | | MOTION in Limine *to Strike Defendant's Expert Eric Wheeler and Request for Daubert Hearing* by USA as to Aaron Michael Shamo. (Attachments: # 1 Exhibit E. Wheeler Expert Notice)(Gadd, S.) (Entered: 04/26/2019) |
| 04/26/2019 | 202 | | MOTION in Limine *to Exclude E−Currency Dollar Amount* filed by Aaron Michael Shamo. (Sam, Daryl) (Entered: 04/26/2019) |
| 04/26/2019 | 203 | | MOTION in Limine *for Order Excluding Evidence* filed by Aaron Michael Shamo. (Sam, Daryl) (Entered: 04/26/2019) |
| 05/02/2019 | 204 | | **NOTICE OF HEARING** as to Aaron Michael Shamo (Notice generated by DAK Chambers) : Hearing on Pretrial and Trial Issues is set for 5/17/2019, at 11:00 AM in Rm 3.400 before Judge Dale A. Kimball. This hearing is regarding procedural matters related to trial. The defendant is not required to present and briefing will not be necessary. (eat) (Entered: 05/02/2019) |
| 05/02/2019 | | | Notice of Appearance. U.S. Probation and Pretrial Services hereby advises the Court that Jennifer Johnson should be added to this case as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi (jdj) (Entered: 05/02/2019) |
| 05/10/2019 | 205 | | RESPONSE to Motion by Aaron Michael Shamo re 197 MOTION in Limine *regarding potential punishment and drawing charging comparisons* (Attachments: # 1 Exhibit Exhibit A. to Response to MIL. Sentencing)(Skordas, Gregory) (Entered: 05/10/2019) |
| 05/10/2019 | 206 | | |

| | | | |
|---|---|---|---|
| | | | NOTICE of Amended Notice of Expert Kelly Shafto by Aaron Michael Shamo (Skordas, Gregory) (Entered: 05/10/2019) |
| 05/10/2019 | 207 | | RESPONSE to Motion by Aaron Michael Shamo re 198 MOTION in Limine *to Exclude Defense Exhibits* (Sam, Daryl) (Entered: 05/10/2019) |
| 05/10/2019 | 208 | | RESPONSE to Motion by Aaron Michael Shamo re 199 MOTION in Limine *to Strike Defendant's Expert Kelly Shafto* (Skordas, Gregory) (Entered: 05/10/2019) |
| 05/10/2019 | 209 | | RESPONSE to Motion by Aaron Michael Shamo re 200 MOTION in Limine *to Strike Defendant's Expert Terri Haddix* (Skordas, Gregory) (Entered: 05/10/2019) |
| 05/10/2019 | 210 | | RESPONSE to Motion by Aaron Michael Shamo re 201 MOTION in Limine *to Strike Defendant's Expert Eric Wheeler and Request for Daubert Hearing* (Skordas, Gregory) (Entered: 05/10/2019) |
| 05/10/2019 | 211 | | MEMORANDUM in Opposition by USA as to Aaron Michael Shamo re 202 MOTION in Limine *to Exclude E−Currency Dollar Amount* (Gadd, S.) (Entered: 05/10/2019) |
| 05/10/2019 | 212 | | MEMORANDUM in Opposition by USA as to Aaron Michael Shamo re 203 MOTION in Limine *for Order Excluding Evidence* (Gadd, S.) (Entered: 05/10/2019) |
| 05/10/2019 | 213 | | Second MEMORANDUM in Opposition by USA as to Aaron Michael Shamo re 203 MOTION in Limine *for Order Excluding Evidence* (Gadd, S.) (Entered: 05/10/2019) |
| 05/15/2019 | 214 | | REQUEST to Submit for Decision (3 prior defense motions) re 172 MOTION in Limine *to allow Defendant to Wear Attire other Than Those provided as an Inmate During Trial and Pre admission Hearing and Memorandum in Support*, 169 MOTION to Determine James Issues and Request for Hearing *and Memorandum in Support for James Hearing*, 171 MOTION in Limine *for Order Excluding Evidence* by USA as to Aaron Michael Shamo. Motions referred to Paul M. Warner.(Burggraaf, Kent) Modified by correcting docket text on 5/15/2019 (eat). (Entered: 05/15/2019) |
| 05/17/2019 | 215 | | REPLY TO RESPONSE to Motion by USA as to Aaron Michael Shamo re 200 MOTION in Limine *to Strike Defendant's Expert Terri Haddix* (Gadd, S.) (Entered: 05/17/2019) |
| 05/17/2019 | 216 | | REPLY TO RESPONSE to Motion by USA as to Aaron Michael Shamo re 199 MOTION in Limine *to Strike Defendant's Expert Kelly Shafto* (Gadd, S.) (Entered: 05/17/2019) |
| 05/17/2019 | 217 | | REPLY TO RESPONSE to Motion by USA as to Aaron Michael Shamo re 201 MOTION in Limine *to Strike Defendant's Expert Eric Wheeler and Request for Daubert Hearing* (Gadd, S.) (Entered: 05/17/2019) |
| 05/17/2019 | 218 | | REPLY TO RESPONSE to Motion by USA as to Aaron Michael Shamo re 197 MOTION in Limine *regarding potential punishment and drawing charging comparisons* (Gadd, S.) (Entered: 05/17/2019) |
| 05/17/2019 | 219 | | Minute Entry for proceedings held before Judge Dale A. Kimball. Status Conference held on 5/17/2019 as to Aaron Michael Shamo (1). Counsel is present for the government and the defendant. The defendant is not required to be present and he is not present. The court addresses pretrial and trial issues. After hearing statements and arguments from counsel, the court makes the following rulings on the record: Defendant's 169 Motion for a James Hearing is DENIED. The court finds that the government's proffer is sufficient and a hearing will not be necessary. The government's 196 Motion for In−Trial Notice of Witnesses Being Called and Request for Additional Trial Weeks is GRANTED IN PART AND DENIED IN PART. the parties are allowed one additional week of trial. The trial will run for five weeks (23 days of trial and two |

| | | | |
|---|---|---|---|
| | | | days off for the Fourth of July holiday). The government anticipates that it will need 12 days and the defense anticipates that it will need 5–6 days. The first day of trial will consist of jury selection and opening statements. The final day of trial will be reserved for jury instructions and closing statements. The parties' statements shall not exceed one and a half hours per side. The parties shall give notice of the witnesses they intend to call in their respective cases–in–chief by 4:00 PM on the business day preceding the witness's direct examination. The time allowed for cross–examination of a witness shall not exceed the time taken for direct–examination of that witness. The government's 198 Motion in Limine to Exclude Defense Exhibits is GRANTED IN PART AND DENIED IN PART. The court finds that the defendant's current exhibit list is inadequate. Defendant shall file an Amended Exhibit List by 5/24/2019. Defendant's 172 Motion to Allow Defendant to Wear Suit During Pre–Admission Hearing/Trial is GRANTED IN PART AND DENIED IN PART. Defendant may wear a suit at trial; however, he may not wear a suit at the pre–admission hearing. Both parties invoke the Witness Exclusion Rule and all potential witnesses shall be excluded from the courtroom during trial, except for both parties' expert witnesses, Defendant's parents, and the government's case agents. 75 potential jurors will be present for voir dire from which 12 jurors and 2 alternates will be selected. The parties are ordered to submit a summary of the indictment to the court for voir dire. The court prefers a stipulated summary, but if the parties cannot stipulate, then each party shall submit a summary and the court will choose its preferred version. Each summary should not take longer than 5–7 minutes to read aloud. All of the government's exhibits are admitted as to foundation, except for exhibits 14.30, 14.40, 15.00–16.00, 17.04–17.05, 17.07–17.08, 18.00–18.02, 19.01–19.03, and 21.00–21.44, which shall be addressed at the pre–admission hearing. Defendant reserves his right to object to any of the exhibits on grounds of relevance. The parties stipulate to allowing pictures of the powdered fentanyl exhibits rather than the substance itself and that a DEA agent will be the only person allowed to physically handle exhibits that are fentanyl tablets. The parties also stipulate that the jury will not have access to any of the fentanyl tablet exhibits during its deliberation; however, photographs of the tablets will be permitted. Written Orders to follow Oral Orders: No. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf, AUSA. Attorneys for Defendant: Gregory G. Skordas and Kaytlin Beckett, CJA. Court Reporter: Ed Young. (eat) Modified by adding language about time for cross–examination on 5/20/2019 (eat). (Entered: 05/17/2019) |
| 05/17/2019 | 220 | | Defendant's MEMORANDUM in Support by Aaron Michael Shamo re 202 MOTION in Limine *to Exclude E–Currency Dollar Amount* (Skordas, Gregory) (Entered: 05/17/2019) |
| 05/17/2019 | 221 | | REPLY TO RESPONSE to Motion by Aaron Michael Shamo re 203 MOTION in Limine *for Order Excluding Evidence* (Skordas, Gregory) (Entered: 05/17/2019) |
| 05/17/2019 | 222 | | REPLY TO RESPONSE to Motion by Aaron Michael Shamo re 203 MOTION in Limine *for Order Excluding Evidence* (Skordas, Gregory) (Entered: 05/17/2019) |
| 05/20/2019 | 223 | | MODIFICATION OF DOCKET as to Aaron Michael Shamo re 219 Minute Entry of Status Conference held on 5/17/2019. The following language has been added. It was inadvertently omitted from the original entry: The time allowed for cross–examination of a witness shall not exceed the time taken for direct–examination of that witness. (eat) (Entered: 05/20/2019) |
| 05/24/2019 | 224 | | Defendant's MOTION to Continue *for Willful Failure to Provide Brady/Giglio Material* filed by Aaron Michael Shamo. Motions referred to Paul M. Warner.(Skordas, Gregory) (Entered: 05/24/2019) |
| 05/28/2019 | 225 | | MEMORANDUM in Opposition by USA as to Aaron Michael Shamo re 224 Defendant's MOTION to Continue *for Willful Failure to Provide Brady/Giglio Material* (Gadd, S.) (Entered: 05/28/2019) |

| 05/29/2019 | 226 | | Minute Entry for proceedings held before Judge Dale A. Kimball: Evidentiary Hearing as to Aaron Michael Shamo held on 5/29/2019. The defendant, in custody, is present with counsel. The government presents a copy of a plea offer to Defendant and requests that the court inquire whether Defendant previously received the offer, whether Defendant consulted with his counsel about the offer, and whether he had good reasons for rejecting the offer. The court so queries Defendant who responds to all questions affirmatively. The government indicates that the plea offer is still available, but will expire at midnight tonight. The court hears statements and arguments from counsel on pending motions and makes the following rulings on the record: the government's 197 Motion in Limine re Defendant's Potential Sentence is GRANTED. The government's chart in its Reply Brief is correct. The government's 199 Motion to Strike Expert Kelly Shafto is GRANTED IN PART AND DENIED IN PART. Defendant shall submit a report within one week and consult with the government. The government's 200 Motion to Strike Expert Dr. Terri Haddix is DENIED AS MOOT because Defendant indicated that he will no longer be calling her as a witness. Defendant's 171 Motion in Limine is preliminarily DENIED as to the testimony of Guy Gino, but the court will reserve its final ruling pending oral testimony on 5/31/2019. Defendant's 202 Motion to Exclude E–Currency Dollar Amount is DENIED except as to the value of the cryptocurrency at auction date. Defendant's 203 Motion to Exclude Evidence is DENIED. The government agrees that it won't tie deaths of unavailable witnesses to Defendant or say that the deaths resulted from overdoses. The court also denies the Motion as to the proximity photo, but it will reserve ruling on the facial photo. The court will hear oral argument on Defendant's 224 Motion to Continue on 5/31/2019. The court will also conduct a Daubert Hearing on the government's 201 Motion to Strike Expert Eric Wheeler on 5/31/2019. The government's witnesses are sworn, testimony is heard, and evidence is received (see attached Witness List). Court will resume tomorrow, 5/30/2019, at 9:00 AM. The defendant is remanded to the custody of the USMS. Written Order to follow Oral Order: No. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf, AUSA. Attorneys for Defendant: Gregory G. Skordas, Daryl P. Sam, and Kaytlin Beckett, CJA. Probation Officer: Jennifer Gaston. Court Reporter: Ed Young. (eat) Modified by adding text re plea offer on 5/29/2019 (eat). (Entered: 05/29/2019) |
| 05/30/2019 | 227 | | Minute Entry for proceedings held before Judge Dale A. Kimball: Evidentiary Hearing as to Aaron Michael Shamo held on 5/30/2019. The defendant, in custody, is present with counsel. The government's witnesses are sworn, testimony is heard, and evidence is received (see attached Witness List). The government withdraws the two facial pictures that were previously part of Exhibit 18.01. The parties discuss jury selection and the possibility of a juror questionnaire. The government requests that a total of 80 jurors be present for voir dire rather than 75. The court grants the request. Court will resume tomorrow, 5/31/2019, at 9:00 AM. The defendant is remanded to the custody of the USMS. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf, AUSA. Attorneys for Defendant: Gregory G. Skordas, Daryl P. Sam, and Kaytlin Beckett, CJA. Court Reporter: Kelly Hicken. (eat) (Entered: 05/30/2019) |
| 05/30/2019 | 228 | | REPLY TO RESPONSE to Motion by Aaron Michael Shamo re 224 Defendant's MOTION to Continue for Willful Failure to Provide Brady/Giglio Material (Attachments: # 1 Exhibit Exhibits A and B)(Sam, Daryl) (Entered: 05/30/2019) |
| 05/31/2019 | 229 | | Minute Entry for proceedings held before Judge Dale A. Kimball: Evidentiary Hearing as to Aaron Michael Shamo held on 5/31/2019. The defendant, in custody, is present with counsel. Defendant's witness is sworn and testimony is heard (see attached Witness List). After hearing statements and arguments from counsel, the court makes the following rulings on the record: Defendant shall submit a report on his Expert, Eric Wheeler. The court will hold a Daubert Hearing on the government's 201 Motion in Limine as it relates to the Dark Web at a later date. Defendant's 224 Motion to Continue is GRANTED in so far as the court believes it is necessary for Defendant to have additional time to review evidence and prepare his defense; however, the |

| | | | |
|---|---|---|---|
| | | | court finds that there have been no Brady or Giglio violations. The Jury Trial is CONTINUED to 8/12/2019 at 08:30 AM in Rm 3.400 before Judge Dale A. Kimball. All time between now and the new trial date is excluded from computation under the Speedy Trial Act. The government shall prepare and submit a proposed order excluding the time under the appropriate section of the Speedy Trial Act. A Status Conference will be held on 6/7/2019 at 11:00 AM in Rm 3.400. The government will consult with its witnesses and report to the court whether the new trial date is feasible. The court will issue a new Trial Order in due course, and the parties are still required to prepare a summary of the indictment. Court is adjourned. The defendant is remanded to the custody of the USMS. Written Order to follow oral order: No. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf, AUSA. Attorneys for Defendant: Gregory G. Skordas, Daryl P. Sam, and Kaytlin Beckett, CJA. Probation Officer: Glen Manross. Court Reporter: Laura Robinson. (eat) (Entered: 05/31/2019) |
| 06/04/2019 | 230 | | RESPONSE to Motion by USA as to Aaron Michael Shamo re 224 Defendant's MOTION to Continue *for Willful Failure to Provide Brady/Giglio Material* (Burggraaf, Kent) (Entered: 06/04/2019) |
| 06/04/2019 | 231 | | ORDER TO CONTINUE – Ends of Justice as to Aaron Michael Shamo. Time excluded from 5/24/2019 until 8/12/2019. 5–Week Jury Trial is RESET for 8/12/2019, at 08:30 AM in Rm 3.400 before Judge Dale A. Kimball. Signed by Judge Dale A. Kimball on 6/4/2019. (eat) (Entered: 06/04/2019) |
| 06/07/2019 | 233 | | Minute Entry for proceedings held before Judge Dale A. Kimball: Status Conference as to Aaron Michael Shamo held on 6/7/2019. The defendant, in custody, is present with counsel. The parties confirm that the Jury Trial set for 8/12/2019 at 08:30 AM is feasible. The court will conduct Jury Selection and Voir Dire on 8/9/2019 at 08:30 AM in Rm 3.400. The court's intention is that the trial will be completed by 9/6/2019. Defendant shall submit the report of his expert, Ms. Shafto, by 6/14/2019. Defendant shall submit the report of his expert, Mr. Wheeler, by 7/25/2019. Defendant is remanded to the custody of the USMS. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf, AUSA. Attorneys for Defendant: Gregory G. Skordas, Daryl P. Sam, and Kaytlin Beckett, CJA. Court Reporter: Ed Young. (eat) (Entered: 06/07/2019) |
| 06/13/2019 | 234 | | AMENDED TRIAL ORDER with instructions for counsel as to Aaron Michael Shamo. 4–Week Jury Trial is set for August 12, 2019, at 8:30 a.m. with jury selection beginning on August 9, 2019, at 9:30 a.m. in Rm 3.400 before Judge Dale A. Kimball. Signed by Judge Dale A. Kimball on 6/13/2019. (eat) (Entered: 06/13/2019) |
| 06/13/2019 | 235 | | **AMENDED NOTICE OF HEARING** as to Aaron Michael Shamo (Notice generated by DAK Chambers): Voir Dire is set for 8/9/2019, at 09:30 AM in Rm 3.400 before Judge Dale A. Kimball. PLEASE NOTE THE CHANGE IN TIME. (eat) (Entered: 06/13/2019) |
| 07/08/2019 | 236 | | **REQUEST FOR A JURY**<br>80 Jurors Needed for Voir Dire<br>Date Jurors Needed: 8/9/2019<br>Time Jurors Requested in the Courtroom: 9:30 AM<br>Length of Trial: 4 Weeks<br>Criminal Charge: Continuing Criminal Enterprise; Aiding and Abetting the Importation of a Controlled Substance; Possession of Fentanyl with Intent to Distribute; Aiding and Abetting the Distribution of a Controlled Substance that Resulted in Death; Manufacture of Alprazolam; Knowing and Intentional Adulteration of Drugs While Held for Sale; Aiding and Abetting the Use of the U.S. Mail in Furtherance of a Drug Trafficking Offense; Conspiracy to Commit Money Laundering; Money Laundering Promotion and Concealment; Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity |

| | | High Profile Case: YES<br>(eat) (Entered: 07/08/2019) |
|---|---|---|
| 07/11/2019 | 237 | MOTION to Reassign Case , *specifically to reassign a related case to Judge Kimball* by USA as to Aaron Michael Shamo. (Attachments: # 1 Text of Proposed Order)(Gadd, S.) (Entered: 07/11/2019) |
| 07/12/2019 | 238 | ORDER granting 237 MOTION to Reassign Related Case to Judge Kimball filed by USA. Signed by Judge Dale A. Kimball on 7/12/2019. (eat) (Entered: 07/12/2019) |
| 07/26/2019 | 239 | JURORS HAVE BEEN SENT A NOTICE TO APPEAR by the Jury Office.<br>Jurors to report on Friday, August 9, 2019 at 7:40 am. (ksp) (Entered: 07/26/2019) |
| 07/29/2019 | 240 | MEMORANDUM re: 234 Trial Order, *Summary of Second Superseding Indictment* filed by USA as to Aaron Michael Shamo (Burggraaf, Kent) (Entered: 07/29/2019) |
| 07/31/2019 | 241 | Proposed Jury Instructions by USA as to Aaron Michael Shamo (Gadd, S.) (Entered: 07/31/2019) |
| 08/01/2019 | 242 | Proposed Voir Dire by USA as to Aaron Michael Shamo (Gadd, S.) (Entered: 08/01/2019) |
| 08/05/2019 | | **Set Hearings** as to Aaron Michael Shamo: Jury Trial is set for 8/12/2019 – 9/6/2019 at 08:30 AM in Rm 3.400 before Judge Dale A. Kimball. This entry is for electronic calendaring purposes ONLY. It does not change any deadlines set forth in the court's 234 Amended Trial Order. Voir Dire is still scheduled for 8/9/2019 at 9:30 AM. (eat) (Entered: 08/05/2019) |
| 08/05/2019 | 243 | TRIAL BRIEF by USA as to Aaron Michael Shamo (Gadd, S.) (Entered: 08/05/2019) |
| 08/05/2019 | 244 | Proposed Jury Verdict by USA as to Aaron Michael Shamo (Gadd, S.) (Entered: 08/05/2019) |
| 08/06/2019 | 245 | NOTICE OF ATTORNEY APPEARANCE: Kaytlin V. Beckett appearing for Aaron Michael Shamo (Beckett, Kaytlin) (Entered: 08/06/2019) |
| 08/07/2019 | 246 | MOTION for Disclosure *of All GIGLIO Materials* filed by Aaron Michael Shamo. Motions referred to Paul M. Warner.(Skordas, Gregory) (Entered: 08/07/2019) |
| 08/08/2019 | 247 | RESPONSE to Motion by USA as to Aaron Michael Shamo re 246 MOTION for Disclosure *of All GIGLIO Materials* (Gadd, S.) (Entered: 08/08/2019) |
| 08/08/2019 | 248 | Defendant's Proposed Jury Instructions by Aaron Michael Shamo (Attachments: # 1 Exhibit A)(Sam, Daryl) (Entered: 08/08/2019) |
| 08/09/2019 | 249 | Minute Entry for proceedings held before Judge Dale A. Kimball: Voir Dire is held on 8/9/2019 as to Aaron Michael Shamo. 70 prospective jurors are assembled in the courtroom. The prospective jury panel is sworn and answers are given to questions posed by the court. A lunch break is taken at 11:30 with the jurors to return at 12:15. During the lunch break the court discusses preliminary matters with counsel and executes the Order Admitting the United States' Exhibits. The parties discuss Defendant's 246 Motion for Disclosure of All Giglio Materials. The court denies the Motion at this time finding that the government has complied. The prospective jury panel reassembles after the lunch break and a jury of 14 members is selected (12 regular jurors and 2 alternate jurors). The panel of 14 jurors is sworn. The court thanks the remaining prospective jurors and excuses them from the court. The panel of 14 jurors is preliminarily instructed by the court not to research or discuss the case. The jury is excused with instructions to return on Monday, 8/12/2019, at 8:30 a.m. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf, AUSA. Attorneys for Defendant: Gregory G. Skordas and Kaytlin Beckett, CJA. Court Reporter: Kelly Hicken. (eat) (Entered: 08/09/2019) |
| 08/09/2019 | 250 | |

| | | | |
|---|---|---|---|
| | | | ORDER Admitting the United States' Exhibits as to Aaron Michael Shamo. Signed by Judge Dale A. Kimball on 8/9/2019. (eat) (Entered: 08/09/2019) |
| 08/12/2019 | 251 | | Minute Entry for proceedings held before Judge Dale A. Kimball: Jury Trial as to Aaron Michael Shamo held on 8/12/2019. The court instructs the jury on preliminary matters. It then hears opening statements from counsel for Plaintiff and Defendant. Plaintiff's witnesses are sworn, testimony is heard, and evidence is entered. During the lunch break the parties discuss the government's concerns re Defendant's opening statement and the comparisons that were drawn between the co–defendants. The government will submit briefing on the issue and the court will discuss the matter tomorrow. The jury is excused for the day to return Tuesday, 8/13/2019, at 8:30 AM. The jury is instructed not to research or discuss the case. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf, AUSA. Attorneys for Defendant: Gregory G. Skordas, Daryl P. Sam, and Kaytlin Beckett, CJA. Court Reporter: Patti Walker. (eat) (Entered: 08/12/2019) |
| 08/12/2019 | 252 | | MOTION For a Curative Instruction by USA as to Aaron Michael Shamo. Motions referred to Paul M. Warner.(Gadd, S.) (Entered: 08/12/2019) |
| 08/13/2019 | 253 | | Minute Entry for proceedings held before Judge Dale A. Kimball: Jury Trial as to Aaron Michael Shamo held on 8/13/2019. The court instructs the jury on an additional preliminary matter. Plaintiff's witnesses are sworn, testimony is heard, and evidence is entered. The jury is excused for the day to return Wednesday, 8/14/2019, at 8:30 AM. The jury is instructed not to research or discuss the case. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf, AUSA. Attorneys for Defendant: Gregory G. Skordas, Daryl P. Sam, and Kaytlin V. Beckett, CJA. Court Reporter: Kelly Hicken. (eat) (Entered: 08/13/2019) |
| 08/14/2019 | 254 | | Minute Entry for proceedings held before Judge Dale A. Kimball: Jury Trial as to Aaron Michael Shamo held on 8/14/2019. Plaintiff's witnesses are sworn, testimony is heard, and evidence is entered. The jury is excused for the day to return Thursday, 8/15/2019, at 8:30 AM. The jury is instructed not to research or discuss the case. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf, AUSA. Attorneys for Defendant: Gregory G. Skordas, Daryl P. Sam, and Kaytlin Beckett, CJA. Court Reporter: Laura Robinson. (eat) (Entered: 08/14/2019) |
| 08/15/2019 | 255 | | Minute Entry for proceedings held before Judge Dale A. Kimball: Jury Trial as to Aaron Michael Shamo held on 8/15/2019. Plaintiff's witnesses are sworn, testimony is heard, and evidence is entered. The jury is excused for the day to return Friday, 8/16/2019, at 8:30 AM. The jury is instructed not to research or discuss the case. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf, AUSA. Attorneys for Defendant: Gregory G. Skordas, Daryl P. Sam, and Kaytlin Beckett, CJA. Court Reporter: Ed Young. (eat) (Entered: 08/15/2019) |
| 08/16/2019 | 256 | | Minute Entry for proceedings held before Judge Dale A. Kimball: Jury Trial as to Aaron Michael Shamo held on 8/16/2019. Plaintiff's witnesses are sworn, testimony is heard, and evidence is entered. The jury is excused for the day to return Monday, 8/19/2019, at 8:30 AM. The jury is instructed not to research or discuss the case. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf, AUSA. Attorneys for Defendant: Gregory G. Skordas, Daryl P. Sam, and Kaytlin Beckett, CJA. Court Reporter: Rebecca Janke. (eat) (Entered: 08/16/2019) |
| 08/19/2019 | 257 | | DOCKET TEXT ORDER as to Aaron Michael Shamo. The Clerk of Court is directed to issue any subpoena requested by counsel for Defendant as it relates to the jury trial in this matter. No attached document. Signed by Judge Dale A. Kimball on 8/19/2019. (eat) (Entered: 08/19/2019) |
| 08/19/2019 | 258 | | Minute Entry for proceedings held before Judge Dale A. Kimball: Jury Trial as to Aaron Michael Shamo held on 8/19/2019. Plaintiff's witnesses are sworn, testimony is heard, and evidence is entered. The jury is excused for the day to return Tuesday, 8/20/2019, at 8:30 AM. The jury is instructed not to research or discuss the case. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. |

| | | |
|---|---|---|
| | | Stejskal, and Kent A. Burggraaf, AUSA. Attorneys for Defendant: Gregory G. Skordas, Daryl P. Sam, and Kaytlin V. Beckett, CJA. Court Reporter: Ed Young. (eat) (Entered: 08/19/2019) |
| 08/20/2019 | 259 | Minute Entry for proceedings held before Judge Dale A. Kimball: Jury Trial as to Aaron Michael Shamo held on 8/20/2019. Plaintiff's witnesses are sworn, testimony is heard, and evidence is entered. The jury is excused for the day to return Wednesday, 8/21/2019, at 8:30 AM. The jury is instructed not to research or discuss the case. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf, AUSA. Attorneys for Defendant: Gregory G. Skordas, Daryl P. Sam, and Kaytlin V. Beckett, CJA. Court Reporter: Rebecca Janke. (eat) (Entered: 08/20/2019) |
| 08/21/2019 | 260 | Minute Entry for proceedings held before Judge Dale A. Kimball: Jury Trial as to Aaron Michael Shamo held on 8/21/2019. Plaintiff's witnesses are sworn, testimony is heard, and evidence is entered. The jury is excused for the day to return Thursday, 8/22/2019, at 8:30 AM. The jury is instructed not to research or discuss the case. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf, AUSA. Attorneys for Defendant: Gregory G. Skordas, Daryl P. Sam, and Kaytlin Beckett, CJA. Court Reporter: Patti Walker. (eat) (Entered: 08/21/2019) |
| 08/21/2019 | 261 | MOTION to Exclude *Evidence of the Defendant's Mental Condition* by USA as to Aaron Michael Shamo. (Attachments: # 1 Exhibit Transcript)(Gadd, S.) (Entered: 08/21/2019) |
| 08/22/2019 | 262 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial Opening Statements as to Aaron Michael Shamo held on August 12, 2019, before Judge Dale A. Kimball. Court Reporter/Transcriber: Patti Walker, CSR, RPR, CP, Telephone number (801)364–5440. <br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/12/2019. Redacted Transcript Deadline set for 9/23/2019. Release of Transcript Restriction set for 11/20/2019. (eat) Modified by removing restricted text on 11/20/2019 (rgj). (Entered: 08/22/2019) |
| 08/22/2019 | 264 | Minute Entry for proceedings held before Judge Dale A. Kimball: Jury Trial as to Aaron Michael Shamo held on 8/22/2019. Plaintiff's witnesses are sworn, testimony is heard, and evidence is entered. After the jury is excused for the first break, the court discusses the government's 261 Motion to Exclude Evidence of the Defendant's Mental Condition with counsel. The court hears statements and arguments from counsel and finds that the Motion is moot. Defendant does not intend to designate a new expert, and his witness is limited to testifying as to her opinion of facts that she has personal knowledge of. The jury is excused for the day to return Friday, 8/23/2019, at 8:30 AM. The jury is instructed not to research or discuss the case. Written Order to follow oral order: No. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf, AUSA. Attorneys for Defendant: Gregory G. Skordas, Daryl P. Sam, and Kaytlin Beckett, CJA. Court Reporter: Kelly Hicken. (eat) (Entered: 08/22/2019) |
| 08/22/2019 | 265 | MOTION Mistrial re 203 MOTION in Limine *for Order Excluding Evidence* filed by Aaron Michael Shamo. Motions referred to Paul M. Warner.(Skordas, Gregory) (Entered: 08/22/2019) |
| 08/23/2019 | 266 | |

| | | | |
|---|---|---|---|
| | | | Minute Entry for proceedings held before Judge Dale A. Kimball: Jury Trial as to Aaron Michael Shamo held on 8/23/2019. Plaintiff's witnesses are sworn, testimony is heard, and evidence is entered. The jury is excused for the day to return Monday, 8/26/2019, at 8:30 AM. The jury is instructed not to research or discuss the case with anyone. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf, AUSA. Attorneys for Defendant: Gregory G. Skordas, Daryl P. Sam, and Kaytlin Beckett, CJA. Court Reporter: Laura Robinson. (eat) (Entered: 08/23/2019) |
| 08/26/2019 | 267 | | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial: Testimony of Dr. Stacey Hail as to Aaron Michael Shamo held on August 21, 2019, before Judge Dale A. Kimball. Court Reporter/Transcriber: Patti Walker, CSR, RPR, CP, Telephone number (801)364–5440. **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact <u>personal data identifiers</u> from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/16/2019. Redacted Transcript Deadline set for 9/26/2019. Release of Transcript Restriction set for 11/25/2019. (eat) Modified by removing restricted text on 11/25/2019 (rgj). (Entered: 08/26/2019) |
| 08/26/2019 | 269 | | Minute Entry for proceedings held before Judge Dale A. Kimball: Jury Trial as to Aaron Michael Shamo held on 8/26/2019. The government rests after hearing testimony from its final witness. Defendant's witnesses are sworn and testimony is heard. The jury is excused for the day to return Tuesday, 8/27/2019, at 8:30 AM. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf, AUSA. Attorneys for Defendant: Gregory G. Skordas, Daryl P. Sam, and Kaytlin Beckett, CJA. Court Reporter: Ed Young. (eat) (Entered: 08/26/2019) |
| 08/27/2019 | 270 | | Minute Entry for proceedings held before Judge Dale A. Kimball: Jury Trial as to Aaron Michael Shamo held on 8/27/2019. Defendant is sworn and testimony is heard. The defense rests. The jury is excused for the day to return Thursday, 8/29/2019, at 8:30 AM. The attorneys shall reconvene for a Jury Instruction Conference tomorrow, 8/28/2019, at 10:00 AM in Rm 3.400 before Judge Dale A. Kimball. The defendant is not required to be present at the Jury Instruction Conference. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf, AUSA. Attorneys for Defendant: Gregory G. Skordas, Daryl P. Sam, and Kaytlin Beckett, CJA. Court Reporter: Rebecca Janke. (eat) (Entered: 08/27/2019) |
| 08/27/2019 | 271 | | First MOTION for Directed Verdict filed by Aaron Michael Shamo. (Skordas, Gregory) (Entered: 08/27/2019) |
| 08/27/2019 | 272 | | ~~MOTION Mistrial~~ SUPPLEMENT re 265 MOTION Mistrial re 203 MOTION in Limine *for Order Excluding Evidence* filed by Aaron Michael Shamo. Motions referred to Paul M. Warner.(Skordas, Gregory) Modified by correcting docket text on 8/28/2019 (eat). (Entered: 08/27/2019) |
| 08/28/2019 | 273 | | MEMORANDUM in Opposition by USA as to Aaron Michael Shamo re 272 MOTION Mistrial re 265 MOTION Mistrial re 203 MOTION in Limine *for Order Excluding Evidence* , 265 MOTION Mistrial re 203 MOTION in Limine *for Order Excluding Evidence* (Attachments: # 1 Exhibit 1 Partial Transcript of Hearing, May 29, 2019, # 2 Exhibit 2 Defendant's Exhibit List, # 3 |

| | | | |
|---|---|---|---|
| | | | Exhibit 3 Transcript of SA Keys Trial Testimony, # 4 Exhibit 4 USA's Proposed Limiting Instruction)(Burggraaf, Kent) (Entered: 08/28/2019) |
| 08/28/2019 | 274 | | Minute Entry for proceedings held before Judge Dale A. Kimball: Jury Instruction Conference as to Aaron Michael Shamo held on 8/28/2019. Counsel for Plaintiff and Defendant are present. Defendant is not required to be present and he is not present. The court discusses the parties' questions and concerns related to the proposed jury instructions. The parties shall submit any additional changes by 2:00 this afternoon. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf, AUSA. Attorneys for Defendant: Gregory G. Skordas and Kaytlin Beckett, CJA. Court Reporter: Patti Walker. (eat) (Entered: 08/28/2019) |
| 08/28/2019 | | | Terminate Deadlines and Hearings as to Aaron Michael Shamo: The jury trial dates scheduled for September 3rd – 6th have been removed from the court's calendar. They may be rescheduled on a day by day basis as necessary. (eat) (Entered: 08/28/2019) |
| 08/28/2019 | 275 | | MOTION to Dismiss filed by Aaron Michael Shamo. (Skordas, Gregory) (Entered: 08/28/2019) |
| 08/29/2019 | 276 | | MEMORANDUM DECISION AND ORDER denying Defendant's 265 Motion for Mistrial as to Aaron Michael Shamo (1). Signed by Judge Dale A. Kimball on 8/29/2019. (eat) (Entered: 08/29/2019) |
| 08/29/2019 | 277 | | Minute Entry for proceedings held before Judge Dale A. Kimball: Jury Trial as to Aaron Michael Shamo held on 8/29/2019. The court reads the Jury Instructions aloud to the jury. Closing arguments are heard, after which time the court security officer is sworn and the jury panel retires for deliberations. At about 3:00 PM the jury sends a note to the court asking to be excused for the day. The court excuses the jury for the day to return Friday, 8/30/2019, at 8:30 AM. The court instructs the jury not to research or discuss the case with anyone and not to begin deliberations again tomorrow until all jurors are present. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf, AUSA. Attorneys for Defendant: Gregory G. Skordas, Daryl P. Sam, and Kaytlin Beckett, CJA. Court Reporter: Rebecca Janke. (eat) (Entered: 08/29/2019) |
| 08/29/2019 | 278 | | Jury Instructions as to Aaron Michael Shamo. (eat) (Entered: 08/29/2019) |
| 08/30/2019 | 279 | | Minute Entry for proceedings held before Judge Dale A. Kimball: Jury Trial Concluded as to Aaron Michael Shamo on 8/30/2019. The jury resumes their deliberations at 8:35 AM. At 2:30 PM a note is received with questions for the court. Counsel for the government and Defendant assemble in chambers and a response to the note is discussed. The court sends a response to the note at 3:10 PM. At 3:35 a note is received stating that the jury has reached a verdict. The jury is brought into the courtroom at 3:41 PM and the verdict is read. The defendant is found guilty on Counts 1–5 and 7–13 of the Second Superseding Indictment. The jury does not reach a unanimous verdict on count 6. The jury is thanked for their service and excused. Sentencing is set for 12/3/2019, at 02:30 PM in Rm 3.400 before Judge Dale A. Kimball. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf, AUSA. Attorneys for Defendant: Gregory G. Skordas, Daryl P. Sam, and Kaytlin Beckett, CJA. Probation Officer: Heidi Groussman. Court Reporter: Rebecca Janke. (eat) (Entered: 08/30/2019) |
| 08/30/2019 | 280 | | JURY VERDICT as to Aaron Michael Shamo (1): Guilty on Counts 1ss–5ss, and 7ss–13ss. (eat) (Entered: 08/30/2019) |
| 08/30/2019 | 281 | | Exhibit List as to Aaron Michael Shamo. (eat) (Entered: 09/03/2019) |
| 08/30/2019 | 282 | | Witness List as to Aaron Michael Shamo. (eat) (Entered: 09/03/2019) |
| 08/30/2019 | 283 | | **SEALED DOCUMENT** Jury Notes as to Aaron Michael Shamo. (eat) (Entered: 09/03/2019) |

| 08/30/2019 | 284 | | **SEALED DOCUMENT** Jury Panel Record as to Aaron Michael Shamo. (eat) (Entered: 09/03/2019) |
|---|---|---|---|
| 09/04/2019 | 286 | | RESPONSE to Motion by USA as to Aaron Michael Shamo re 275 MOTION to Dismiss (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Burggraaf, Kent) (Entered: 09/04/2019) |
| 09/04/2019 | 287 | | MEMORANDUM in Opposition by USA as to Aaron Michael Shamo re 271 First MOTION for Directed Verdict (Gadd, S.) (Entered: 09/04/2019) |
| 09/10/2019 | 288 | | STATUS REPORT *Status of Forfeiture (Administratively Forfeited Currency)* by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi (Attachments: # 1 Exhibit A – Administrative Declaration $19,520, # 2 Exhibit B – Administrative Declaration $429,600, # 3 Exhibit C – Administrative Declaration $10,096.20)(Castle, Cy) (Entered: 09/10/2019) |
| 09/10/2019 | | | Notice of Appearance. U.S. Probation and Pretrial Services hereby advises the Court that Mary Schuman should be added to this case as to Aaron Michael Shamo (mrs) (Entered: 09/10/2019) |
| 09/17/2019 | 291 | | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial: Testimony of Virginia Keys as to Aaron Michael Shamo held on August 20, 2019, before Judge Dale A. Kimball. Court Reporter/Transcriber: Rebecca Janke, CSR, RPR, RMR, Telephone number (801)521–7238.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/8/2019. Redacted Transcript Deadline set for 10/18/2019. Release of Transcript Restriction set for 12/16/2019. (eat) Modified by removing restricted text on 12/16/2019 (rgj). (Entered: 09/17/2019) |
| 09/17/2019 | 292 | | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial: Testimony of Tori Grace as to Aaron Michael Shamo held on August 20, 2019, before Judge Dale A. Kimball. Court Reporter/Transcriber: Rebecca Janke, CSR, RPR, RMR, Telephone number (801)521–7238.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/8/2019. Redacted Transcript Deadline set for 10/18/2019. Release of Transcript Restriction set for 12/16/2019. (eat) Modified by removing restricted text on 12/16/2019 (rgj). (Entered: 09/17/2019) |

| | | | |
|---|---|---|---|
| 09/17/2019 | 293 | | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial: Testimony of Aaron Shamo held on August 27, 2019, before Judge Dale A. Kimball. Court Reporter/Transcriber: Rebecca Janke, CSR, RPR, RMR, Telephone number (801)521−7238.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/8/2019. Redacted Transcript Deadline set for 10/18/2019. Release of Transcript Restriction set for 12/16/2019. (eat) Modified by removing restricted text on 12/16/2019 (rgj). (Entered: 09/17/2019) |
| 09/17/2019 | | | Terminate Deadlines and Hearings as to Aaron Michael Shamo: all remaining calendar items related to the jury trial are hereby terminated. The jury trial concluded on 8/30/2019. (eat) (Entered: 09/17/2019) |
| 09/20/2019 | 295 | | MEMORANDUM DECISION AND ORDER denying 271 Motion for Judgment of Acquittal; and denying 275 Motion to Dismiss as to Aaron Michael Shamo (1). Signed by Judge Dale A. Kimball on 9/20/2019. (eat) (Entered: 09/20/2019) |
| 09/27/2019 | 296 | | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial as to Aaron Michael Shamo held on August 23, 2019, before Judge Dale A. Kimball. Court Reporter/Transcriber: Laura W. Robinson, RPR, FCRR, CSR, CP, Telephone number (801)328−4800.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/18/2019. Redacted Transcript Deadline set for 10/28/2019. Release of Transcript Restriction set for 12/26/2019. (eat) Modified by removing restricted text on 12/26/2019 (rgj). (Entered: 09/27/2019) |
| 10/21/2019 | 300 | | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial of Aaron Michael Shamo: Testimony of Stanley Frank Platek, Nicola Ranieri, Adam Lanzarotta, Heather Anne McCauley, and Arthur Simone held on August 22, 2019, before Judge Dale A. Kimball. Court Reporter/Transcriber: Kelly Brown Hicken, RPR, RMR, Telephone number (801)521−7238.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are** |

| | | | |
|---|---|---|---|
| | | | **located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/12/2019. Redacted Transcript Deadline set for 11/21/2019. Release of Transcript Restriction set for 1/21/2020. (eat) Modified by removing restricted text on 1/22/2020 (rgj). (Entered: 10/21/2019) |
| 10/21/2019 | 302 | | NOTICE OF WITHDRAWAL OF COUNSEL of Daryl P. Sam filed by Daryl P. Sam for Aaron Michael Shamo (Sam, Daryl) (Entered: 10/21/2019) |
| 10/21/2019 | | | Attorney update in case as to Aaron Michael Shamo. Attorney Daryl P. Sam terminated per the filing of 302 Notice of Withdrawal of Counsel. (eat) (Entered: 10/21/2019) |
| 11/04/2019 | 303 | | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial as to Aaron Michael Shamo: Testimony of Jessica Gleave and Alexandrya Marie Tonge held on August 13, 2019, before Judge Dale A. Kimball. Court Reporter/Transcriber: Kelly Brown Hicken, RPR, RMR, Telephone number (801)521–7238.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/25/2019. Redacted Transcript Deadline set for 12/5/2019. Release of Transcript Restriction set for 2/3/2020. (eat) Modified by removing restricted text on 2/6/2020 (rgj). (Entered: 11/04/2019) |
| 11/06/2019 | 305 | | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial as to Aaron Michael Shamo: Testimony of Sean Michael Gygi held on August 12, 2019, before Judge Dale A. Kimball. Court Reporter/Transcriber: Pattie Walker, CSR, RPR, CP, Telephone number (801)364–5440.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/27/2019. Redacted Transcript Deadline set for 12/9/2019. Release of Transcript Restriction set for 2/4/2020. (eat) Modified by removing restricted text on 2/6/2020 (rgj). (Entered: 11/06/2019) |

| 11/18/2019 | 307 | | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial of Aaron Michael Shamo: Testimony of Alexandrya Tonge and Katherine Bustin held on August 14, 2019, before Judge Dale A. Kimball. Court Reporter/Transcriber: Laura W. Robinson, RPR, FCRR, CSR, CP, Telephone number (801)328–4800.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact <u>personal data identifiers</u> from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/9/2019. Redacted Transcript Deadline set for 12/19/2019. Release of Transcript Restriction set for 2/18/2020. (eat) Modified by removing restricted text on 2/18/2020 (rks). (Entered: 11/18/2019) |
| 11/20/2019 | 310 | | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial of Aaron Michael Shamo: Testimony of Brennda Kurstin, Jeff Fletcher, and Jeff Bryan held on August 21, 2019, before Judge Dale A. Kimball. Court Reporter/Transcriber: Pattie Walker, CSR, RPR, CP, Telephone number (801)364–5440.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact <u>personal data identifiers</u> from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/11/2019. Redacted Transcript Deadline set for 12/23/2019. Release of Transcript Restriction set for 2/18/2020. (eat) Modified by removing restricted text on 2/18/2020 (rks). (Entered: 11/20/2019) |
| 11/21/2019 | 313 | | Stipulated MOTION to Continue *Sentencing* filed by Aaron Michael Shamo. Motions referred to Paul M. Warner.(Skordas, Gregory) (Entered: 11/21/2019) |
| 11/21/2019 | 314 | | ORDER granting 313 Stipulated MOTION to Continue *Sentencing* filed by Aaron Michael Shamo. Sentencing in this matter is continued until further notice. Signed by Judge Dale A. Kimball on 11/21/2019. (eat) (Entered: 11/21/2019) |
| 12/16/2019 | 321 | | ORDER FOR PSYCHOLOGICAL AND PSYCHIATRIC EXAMINATION AND REPORT as to Aaron Michael Shamo. Signed by Judge Dale A. Kimball on 12/16/2019. (eat) (Entered: 12/16/2019) |
| 12/30/2019 | 322 | | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Cross Examination of Mario Noble as to Aaron Michael Shamo held on 8/16/2019 before Judge Dale Kimball. Court Reporter/Transcriber Rebecca Janke, CSR, RPR, RMR, Telephone number (801)521–7238. |

| | | |
|---|---|---|
| | | **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/21/2020. Redacted Transcript Deadline set for 1/30/2020. Release of Transcript Restriction set for 3/30/2020. (jwt) Modified by removing restricted text on 3/30/2020 (rgj). (Entered: 12/30/2019) |
| 02/07/2020 | 325 | Correspondence from Samuel Browning, Licensed Psychologist for the Federal Medical Center, as to Aaron Michael Shamo. (eat) (Entered: 02/10/2020) |
| 02/07/2020 | 326 | Correspondence from the Honorable Dale A. Kimball to Samuel Browning, Licensed Psychologist for the Federal Medical Center, as to Aaron Michael Shamo. (eat) (Entered: 02/10/2020) |
| 03/26/2020 | 331 | MOTION for Order of Forfeiture by USA as to Aaron Michael Shamo. (Attachments: # 1 Text of Proposed Order) Motions referred to Paul M. Warner.(Castle, Cy) (Entered: 03/26/2020) |
| 03/27/2020 | 332 | ORDER DIRECTING FORFEITURE OF PROPERTY as to Aaron Michael Shamo. Motion granted: 331 MOTION for Order of Forfeiture filed by USA. Signed by Judge Dale A. Kimball on 3/27/2020. (eat) (Entered: 03/27/2020) |
| 03/31/2020 | 333 | **\*\*RESTRICTED DOCUMENT\*\*** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial as to Aaron Michael Shamo held on August 15, 2019, before Judge Dale A. Kimball. Court Reporter/Transcriber: Ed Young, Telephone number (801)328–3202. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/21/2020. Redacted Transcript Deadline set for 5/1/2020. Release of Transcript Restriction set for 6/29/2020. (eat) Modified by removing restricted text on 6/29/2020 (nl). (Entered: 03/31/2020) |
| 03/31/2020 | 334 | **\*\*RESTRICTED DOCUMENT\*\*** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial as to Aaron Michael Shamo held on August 19, 2019, before Judge Dale A. Kimball. Court Reporter/Transcriber: Ed Young, Telephone number (801)328–3202. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are** |

| | | |
|---|---|---|
| | | located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/21/2020. Redacted Transcript Deadline set for 5/1/2020. Release of Transcript Restriction set for 6/29/2020. (eat) Modified by removing restricted text on 6/29/2020 (nl). (Entered: 03/31/2020) |
| 03/31/2020 | 335 | **RESTRICTED DOCUMENT** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial as to Aaron Michael Shamo held on August 26, 2019, before Judge Dale A. Kimball. Court Reporter/Transcriber: Ed Young, Telephone number (801)328–3202.<br><br>NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/21/2020. Redacted Transcript Deadline set for 5/1/2020. Release of Transcript Restriction set for 6/29/2020. (eat) Modified by removing restricted text on 6/29/2020 (nl). (Entered: 03/31/2020) |
| 05/05/2020 | 348 | Motions No Longer Referred as to Aaron Michael Shamo: 312 SEALED MOTION. (eat) (Entered: 05/05/2020) |
| 05/05/2020 | 351 | NOTICE of Compliance of Publication by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi (Attachments: # 1 Affidavit, # 2 Advertisement Certification Report) (Castle, Cy) (Entered: 05/05/2020) |
| 06/04/2020 | 353 | REASSIGNMENT to Newly Appointed Magistrate Judge. Case Reassigned to Magistrate Judge Jared C. Bennett Magistrate Judge Paul M. Warner no longer assigned to the case. Case number will now read<br>2:16cr00631–DAK–JCB. Please make changes to document captions accordingly. (eat) (Entered: 06/04/2020) |
| 09/09/2020 | 354 | **NOTICE OF HEARING** as to Aaron Michael Shamo (Notice generated by DAK Chambers) Sentencing is set for 10/15/2020 at 10:00 AM in Rm 3.400 before Judge Dale A. Kimball. (eat) (Entered: 09/09/2020) |
| 09/29/2020 | 356 | SENTENCING MEMORANDUM by USA as to Aaron Michael Shamo (Attachments: # 1 Exhibit A– Galofaro and Whitehurst AP article)(Gadd, S.) (Entered: 09/29/2020) |
| 10/07/2020 | 357 | NOTICE FROM THE COURT re the Sentencing Hearing for Aaron Shamo on October 15, 2020 at 10:00 AM in courtroom 3.400 before Judge Dale A. Kimball.<br><br>The hearing is currently scheduled to be held in–person at the U.S. District Courthouse. Due to restrictions related to the COVID–19 pandemic, and in order to maintain proper social distancing |

guidelines, the number of people in the courtroom will be severely limited. There can be no more than 8 people at counsel's tables, including Defendant, and no more than 24 people in the gallery and jury box. Defendant's family members and victims identified by the U.S. Attorney's Office will be given seating priority. Any available seating after family and victims will be determined on a first−come, first−served basis.

The hearing will be simultaneously broadcast over Zoom in order to accommodate a larger audience. The Zoom participation information is listed below. Members of the public are encouraged to observe the hearing over Zoom rather than attending in−person at the courthouse. Those observing over Zoom should conduct themselves as if they were present in the courtroom. Audio and video feeds must be placed on mute and any disruption will result in ejection from Zoom. Questions can be directed to Judge Kimball's chambers at (801)524−6610.

Join ZoomGov Meeting:

https://www.zoomgov.com/j/16133447407?pwd=RWtlVFM2c2tmWXZKYUp5NVhTbkZ5UT09

Meeting ID: 161 3344 7407
Password: 584299
One tap mobile
+16692545252,,16133447407#,,,,0#,,584299# US (San Jose)
+16468287666,,16133447407#,,,,0#,,584299# US (New York)

Dial by your location
+1 669 254 5252 US (San Jose)
+1 646 828 7666 US (New York)
Meeting ID: 161 3344 7407
Password: 584299

Find your local number: https://www.zoomgov.com/u/abPYf89LJa (eat) (Entered: 10/07/2020)

| 10/09/2020 | 358 | | NOTICE FROM THE COURT that seating for the sentencing hearing on October 15, 2020 at 10:00 AM is full. All seating has been reserved to accommodate victims and Defendant's family members. Members of the public should not attend the hearing in−person at the courthouse. The hearing can be viewed over Zoom. Please see docket entry 357 for the Zoom participation information. (eat) (Entered: 10/09/2020) |
| --- | --- | --- | --- |
| 10/09/2020 | 359 | | Defendant's SENTENCING MEMORANDUM filed by Aaron Michael Shamo (Skordas, Gregory) (Entered: 10/09/2020) |
| 10/12/2020 | 360 | | Joint MOTION for Hearing *Post Sentencing to Determine Restitution Obligations*, Plaintiff's MOTION for Restitution Ordered as part of Judgment by USA as to Aaron Michael Shamo. Motions referred to Jared C. Bennett.(Gadd, S.) (Entered: 10/12/2020) |
| 10/12/2020 | 362 | | Motion No Longer Referred to Magistrate Judge Jared C. Bennett as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi: 360 Joint MOTION for Hearing *Post Sentencing to Determine Restitution Obligations*, Plaintiff's MOTION for Restitution Ordered as part of Judgment . This motion will be handled by District Judge Dale A. Kimball. (lrh) (Entered: 10/13/2020) |
| 10/13/2020 | 361 | | **NOTICE OF HEARING** as to Aaron Michael Shamo (Notice generated by DAK Chambers): Restitution Hearing is set for 11/19/2020 at 10:00 AM in Rm 3.400 before Judge Dale A. Kimball. (eat) (Entered: 10/13/2020) |

| 10/15/2020 | 363 | | Minute Entry for proceedings held before Judge Dale A. Kimball: Sentencing held on 10/15/2020 for Aaron Michael Shamo (1). Defendant, who is in custody, is present with his counsel. Counsel for the government is also present. The court addresses the parties before hearing statements from counsel for Defendant and for the government. A statement is given by a victim's mother, and Defendant makes a statement on the record. Count 1 of the original Indictment, and counts 1s, 4s−7s, and 9s−15s of the Superseding Indictment are dismissed since they were superseded by the Second Superseding Indictment. The jury was hung as to Count 6ss of the Second Superseding Indictment. Counts 1ss−5ss, and 7ss−13ss of the Second Superseding Indictment: Defendant was found guilty by a jury. SENTENCE: BOP: Life. The court recommends that Defendant be placed at FCI Phoenix Arizona in order to facilitate family visitation. No fine. Special Assessment Fee: $1200 ($100 for each count that Defendant was found guilty of). Restitution will be determined at a later date. A restitution hearing is set for 11/19/2020 at 10:00 a.m. Defendant orally waives his right to be present at that hearing. The Court incorporates by reference its earlier 332 Order of Forfeiture and adopts it as part of the Judgment of the court. All property listed in Exhibit A of that Order shall be forfeited to the United States. Defendant is remanded to the custody of the USMS. Attorneys for Plaintiff: Michael S. Gadd, Kent A. Burggraaf, and Vernon Stejskal, AUSA. Attorney for Defendant: Gregory G. Skordas. Interpreter: Not Needed. Probation Officer: Mary Schuman. Court Reporter: Patti Walker. (eat) Modified by adding language re restitution on 10/16/2020 (eat). (Entered: 10/15/2020) |
| 10/15/2020 | 364 | | <span style="color:red">JUDGMENT as to Aaron Michael Shamo (1). Count 1 of the original Indictment and Counts 1s, 4s−7s, and 9s−15s of the Superseding Indictment: Dismissed. Count 6ss of the Second Superseding Indictment: Hung Jury. Counts 1ss−5ss, and 7ss−13ss of the Second Superseding Indictment: Defendant was found guilty by a jury. SENTENCE: BOP: Life. No fine. SAF: $1200. Defendant Termed. Signed by Judge Dale A. Kimball on 10/15/2020. (eat)</span> (Entered: 10/15/2020) |
| 10/27/2020 | 366 | | NOTICE FROM THE COURT that the Restitution Hearing scheduled for 11/19/2020 at 10:00 AM will be conducted via Zoom. The parties should not appear in person at the courthouse. The Zoom participation information is as follows: <br><br>Join ZoomGov Meeting:<br><br>https://www.zoomgov.com/j/16133447407?pwd=RWtlVFM2c2tmWXZKYUp5NVhTbkZ5UT09<br><br>Meeting ID: 161 3344 7407<br>Password: 584299<br>One tap mobile<br>+16692545252,,16133447407#,,,,0#,,584299# US (San Jose)<br>+16468287666,,16133447407#,,,,0#,,584299# US (New York)<br><br>Dial by your location<br>+1 669 254 5252 US (San Jose)<br>+1 646 828 7666 US (New York)<br>Meeting ID: 161 3344 7407<br>Password: 584299<br><br>Find your local number: https://www.zoomgov.com/u/abPYf89LJa (eat) (Entered: 10/27/2020) |
| 10/28/2020 | 367 | | NOTICE OF APPEAL by Aaron Michael Shamo Appeals to the USCA Tenth Circuit. No Filing Fee. (Skordas, Gregory) (Entered: 10/28/2020) |
| 10/28/2020 | 368 | | Transmission of Preliminary Record to the USCA for the Tenth Circuit as to Aaron Michael Shamo re 367 Notice of Appeal − Final Judgment. (Attachments: # 1 Appendix) (eat) (Entered: |

| | | | |
|---|---|---|---|
| | | | 10/28/2020) |
| 10/28/2020 | 369 | | USCA Case Number as to Aaron Michael Shamo Case Appealed to Tenth Circuit Case Number 20–4116 for 367 Notice of Appeal – Final Judgment filed by Aaron Michael Shamo. (jrj) (Entered: 10/28/2020) |
| 11/02/2020 | 370 | | MEMORANDUM in Support by USA as to Aaron Michael Shamo re 360 Joint MOTION for Hearing *Post Sentencing to Determine Restitution Obligations*Plaintiff's MOTION for Restitution Ordered as part of Judgment (Gadd, S.) (Entered: 11/02/2020) |
| 11/11/2020 | 372 | | TRANSCRIPT REQUEST FORM by Aaron Michael Shamo for proceedings held on other proceeding and trial proceedings before Judge Dale Kimball, re 367 Notice of Appeal – Final Judgment, 369 USCA Case Number, 368 Transmission of Preliminary Record to USCA (Skordas, Gregory) (Entered: 11/11/2020) |
| 11/11/2020 | 373 | | DESIGNATION OF RECORD ON APPEAL by Aaron Michael Shamo re 367 Notice of Appeal – Final Judgment Designated documents 1,3,11,32,126,128,136,168,169,170,171,172,174,176,178,179,180,186,192,193,194,196, 197,198,199,200,201,202,203,205,207,208,209,210,211,212,213,214,215,216,217,218,220, 221,222,224,225,228,230,231,234,240,241,242,243,244,246,247,248,250,252,261,262,265, 267,271,272,273,275,276,278,280,281,282,283,284,286,287,291,292,293,295,296,300,303, 305,307,310,313,314,321,322,325,326,333,334,335,356,359,364,367. Designated transcripts for 05/17/2019,05/29/2019,05/30/2019,05/31/2019,08/12/2019,08/13/2019,08/14/2019,08/16/2019, 08/20/2019,08/21/2019,08/22/2019,08/27/2019,08/28/2019,08/29/2019,08/30/2019,10/15/2020. (Skordas, Gregory) (Entered: 11/11/2020) |
| 11/12/2020 | 374 | | Defendant's MEMORANDUM in Opposition by Aaron Michael Shamo re 360 Joint MOTION for Hearing *Post Sentencing to Determine Restitution Obligations*Plaintiff's MOTION for Restitution Ordered as part of Judgment (Skordas, Gregory) (Entered: 11/12/2020) |
| 11/19/2020 | 375 | | Minute Entry for proceedings held before Judge Dale A. Kimball: Restitution Hearing as to Aaron Michael Shamo held on 11/19/2020. All parties appear by Zoom. Defendant previously waived his right to be present and he is not present. After hearing statements and arguments from counsel, the court takes the matter under advisement and will issue a ruling in due course. Attorneys for Plaintiff: S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf. Attorneys for Defendant: Gregory G. Skordas and Gabriela Mena, CJA. Interpreter: Not Needed. Court Reporter: Teena Green. (eat) (Entered: 11/19/2020) |
| 11/24/2020 | 376 | | ORDER of the USCA for the Tenth Circuit as to Aaron Michael Shamo re 367 Notice of Appeal – Final Judgment. Order filed by Judge Tymkovich granting Gregory G. Skordas's motion to withdraw and appointing attorney William Dixon Lunn Jr. to represent appellant Aaron Michael Shamo. Notice of appearance due on 12/04/2020. Any supplemental transcript order form and/or designation of record due 12/15/2020. The district court shall wait until at least 12/16/2020 before transmitting the record on appeal. Please see attached order for additional information. (eat) (Entered: 11/24/2020) |
| 11/30/2020 | 377 | | MEMORANDUM DECISION AND ORDER granting the United States' 360 Motion for Restitution as to Aaron Michael Shamo (1). Shamo is ordered to pay restitution in the amount of $47,226.08 to United Insurance Group, $12,724.32 to J.L., $18,193.00 to R.R., $24,625.00 to T.K., and $29,698.57 to L.V. The court will enter a new Judgment reflecting these restitution obligations. Signed by Judge Dale A. Kimball on 11/30/2020. (eat) (Entered: 11/30/2020) |
| 12/01/2020 | 378 | | AMENDED JUDGMENT as to Aaron Michael Shamo. Restitution is ordered in the amount of $132,466.97. All other portions of the original Judgment remain the same. Signed by Judge Dale A. Kimball on 12/1/2020. (eat) (Entered: 12/01/2020) |

| 12/01/2020 | 380 | | **SEALED DOCUMENT** RESTITUTION LIST re 378 Amended Judgment as to Aaron Michael Shamo. (eat) (Entered: 12/01/2020) |
| 12/02/2020 | 381 | | MOTION to Reassign Case *specifically to reassign a related case to Judge Kimball* by USA as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi. (Attachments: # 1 Text of Proposed Order)(Burggraaf, Kent) (Entered: 12/02/2020) |
| 12/03/2020 | 382 | | ORDER granting 381 MOTION to Reassign Case *specifically to reassign a related case to Judge Kimball* filed by USA. Signed by Judge Dale A. Kimball on 12/3/2020. (eat) (Entered: 12/03/2020) |
| 12/18/2020 | 383 | | **RESTRICTED DOCUMENT** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing as to Aaron Michael Shamo held on May 31, 2019, before Judge Dale A. Kimball re 367 Notice of Appeal – Final Judgment. Court Reporter: Laura W. Robinson, RPR, FCRR, CSR, CP, Telephone number (801)328–4800. **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/8/2021. Redacted Transcript Deadline set for 1/19/2021. Release of Transcript Restriction set for 3/18/2021. (eat) (Entered: 12/18/2020) |
| 12/18/2020 | 384 | | **RESTRICTED DOCUMENT** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial as to Aaron Michael Shamo held on August 14, 2019, before Judge Dale A. Kimball re 367 Notice of Appeal – Final Judgment. Court Reporter: Laura W. Robinson, RPR, FCRR, CSR, CP, Telephone number (801)328–4800. **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/8/2021. Redacted Transcript Deadline set for 1/19/2021. Release of Transcript Restriction set for 3/18/2021. (eat) (Entered: 12/18/2020) |
| 12/18/2020 | 385 | | **RESTRICTED DOCUMENT** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial as to Aaron Michael Shamo held on August 23, 2019, before Judge Dale A. Kimball re 367 Notice of Appeal – Final Judgment. Court Reporter: Laura W. Robinson, RPR, FCRR, CSR, |

| | | | |
|---|---|---|---|
| | | | CP, Telephone number (801)328–4800.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/8/2021. Redacted Transcript Deadline set for 1/19/2021. Release of Transcript Restriction set for 3/18/2021. (eat) (Entered: 12/18/2020) |
| 12/18/2020 | 387 | | **\*\*RESTRICTED DOCUMENT\*\*** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial as to Aaron Michael Shamo held on August 12, 2019, before Judge Dale A. Kimball re 367 Notice of Appeal – Final Judgment. Court Reporter: Patti Walker, CSR, RPR, CP, Telephone number (801)364–5440.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/8/2021. Redacted Transcript Deadline set for 1/19/2021. Release of Transcript Restriction set for 3/18/2021. (eat) (Entered: 12/18/2020) |
| 12/18/2020 | 388 | | **\*\*RESTRICTED DOCUMENT\*\*** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial as to Aaron Michael Shamo held on August 13, 2019, before Judge Dale A. Kimball re 367 Notice of Appeal – Final Judgment. Court Reporter: Kelly Brown Hicken, RPR, RMR, Telephone number (801)521–7238.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/8/2021. Redacted Transcript Deadline set for 1/19/2021. Release of Transcript Restriction set for 3/18/2021. (eat) (Entered: |

| | | | 12/18/2020) |
|---|---|---|---|
| 12/18/2020 | <u>389</u> | | **RESTRICTED DOCUMENT** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial as to Aaron Michael Shamo held on August 21, 2019, before Judge Dale A. Kimball re <u>367</u> Notice of Appeal – Final Judgment. Court Reporter: Patti Walker, CSR, RPR, CP, Telephone number (801)364–5440.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact <u>personal data identifiers</u> from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/8/2021. Redacted Transcript Deadline set for 1/19/2021. Release of Transcript Restriction set for 3/18/2021. (eat) (Entered: 12/18/2020) |
| 12/18/2020 | <u>390</u> | | **RESTRICTED DOCUMENT** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial as to Aaron Michael Shamo held on August 22, 2019, before Judge Dale A. Kimball re <u>367</u> Notice of Appeal – Final Judgment. Court Reporter: Kelly Brown Hicken, RPR, RMR, Telephone number (801)521–7238.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact <u>personal data identifiers</u> from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/8/2021. Redacted Transcript Deadline set for 1/19/2021. Release of Transcript Restriction set for 3/18/2021. (eat) (Entered: 12/18/2020) |
| 12/18/2020 | <u>391</u> | | **RESTRICTED DOCUMENT** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Instruction Conference as to Aaron Michael Shamo held on August 28, 2019, before Judge Dale A. Kimball re <u>367</u> Notice of Appeal – Final Judgment. Court Reporter: Patti Walker, CSR, RPR, CP, Telephone number (801)364–5440.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact <u>personal data identifiers</u> from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** |

| | | | |
|---|---|---|---|
| | | | Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/8/2021. Redacted Transcript Deadline set for 1/19/2021. Release of Transcript Restriction set for 3/18/2021. (eat) (Entered: 12/18/2020) |
| 12/18/2020 | 392 | | **\*\*RESTRICTED DOCUMENT\*\*** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Sentencing Hearing as to Aaron Michael Shamo held on October 15, 2020, before Judge Dale A. Kimball re 367 Notice of Appeal – Final Judgment. Court Reporter: Patti Walker, CSR, RPR, CP, Telephone number (801)364–5440. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/8/2021. Redacted Transcript Deadline set for 1/19/2021. Release of Transcript Restriction set for 3/18/2021. (eat) (Entered: 12/18/2020) |
| 12/18/2020 | 394 | | **\*\*RESTRICTED DOCUMENT\*\*** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Pretrial Evidentiary Hearing as to Aaron Michael Shamo held on May 30, 2019, Volume II, before Judge Dale A. Kimball re 367 Notice of Appeal – Final Judgment. Court Reporter: Kelly Brown Hicken, RPR, RMR, Telephone number (801)521–7238. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/8/2021. Redacted Transcript Deadline set for 1/19/2021. Release of Transcript Restriction set for 3/18/2021. (eat) (Entered: 12/18/2020) |
| 12/29/2020 | 395 | | **\*\*RESTRICTED DOCUMENT\*\*** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial as to Aaron Michael Shamo held on August 16, 2019, before Judge Dale A. Kimball re 367 Notice of Appeal – Final Judgment. Court Reporter: Rebecca Janke, CSR, RPR, RMR, Telephone number (801)521–7238. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are** |

| | | | |
|---|---|---|---|
| | | | located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/19/2021. Redacted Transcript Deadline set for 1/29/2021. Release of Transcript Restriction set for 3/29/2021. (eat) (Entered: 12/29/2020) |
| 12/29/2020 | 396 | | **RESTRICTED DOCUMENT** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial as to Aaron Michael Shamo held on August 20, 2019, before Judge Dale A. Kimball re 367 Notice of Appeal – Final Judgment. Court Reporter: Rebecca Janke, CSR, RPR, RMR, Telephone number (801)521–7238.<br><br>NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/19/2021. Redacted Transcript Deadline set for 1/29/2021. Release of Transcript Restriction set for 3/29/2021. (eat) (Entered: 12/29/2020) |
| 12/29/2020 | 397 | | **RESTRICTED DOCUMENT** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial as to Aaron Michael Shamo held on August 27, 2019, before Judge Dale A. Kimball re 367 Notice of Appeal – Final Judgment. Court Reporter: Rebecca Janke, CSR, RPR, RMR, Telephone number (801)521–7238.<br><br>NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/19/2021. Redacted Transcript Deadline set for 1/29/2021. Release of Transcript Restriction set for 3/29/2021. (eat) (Entered: 12/29/2020) |
| 12/30/2020 | 398 | | **RESTRICTED DOCUMENT** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial – Closing Arguments as to Aaron Michael Shamo held on August 29, 2019, before Judge Dale A. Kimball re 367 Notice of Appeal – Final Judgment. Court Reporter: Rebecca Janke, CSR, RPR, RMR, Telephone number (801)521–7238. |

| | | | |
|---|---|---|---|
| | | | **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/20/2021. Redacted Transcript Deadline set for 2/1/2021. Release of Transcript Restriction set for 3/30/2021. (eat) (Entered: 12/30/2020) |
| 12/30/2020 | 399 | | **\*\*RESTRICTED DOCUMENT\*\*** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial – Verdict as to Aaron Michael Shamo held on August 30, 2019, before Judge Dale A. Kimball re 367 Notice of Appeal – Final Judgment. Court Reporter: Rebecca Janke, CSR, RPR, RMR, Telephone number (801)521–7238.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/20/2021. Redacted Transcript Deadline set for 2/1/2021. Release of Transcript Restriction set for 3/30/2021. (eat) (Entered: 12/30/2020) |
| 01/05/2021 | 400 | | **\*\*RESTRICTED DOCUMENT\*\*** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing Volume I as to Aaron Michael Shamo held on May 29, 2019, before Judge Dale A. Kimball re 367 Notice of Appeal – Final Judgment. Court Reporter: Ed Young, Telephone number (801)328–3202.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/26/2021. Redacted Transcript Deadline set for 2/5/2021. Release of Transcript Restriction set for 4/5/2021. (eat) (Entered: 01/05/2021) |
| 01/05/2021 | 401 | | |

| | | |
|---|---|---|
| | | **\*\*RESTRICTED DOCUMENT\*\*** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial as to Aaron Michael Shamo held on August 15, 2019, before Judge Dale A. Kimball re 367 Notice of Appeal – Final Judgment. Court Reporter: Ed Young, Telephone number (801)328–3202.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/26/2021. Redacted Transcript Deadline set for 2/5/2021. Release of Transcript Restriction set for 4/5/2021. (eat) (Entered: 01/05/2021) |
| 01/05/2021 | 402 | **\*\*RESTRICTED DOCUMENT\*\*** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial as to Aaron Michael Shamo held on August 19, 2019, before Judge Dale A. Kimball re 367 Notice of Appeal – Final Judgment. Court Reporter: Ed Young, Telephone number (801)328–3202.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/26/2021. Redacted Transcript Deadline set for 2/5/2021. Release of Transcript Restriction set for 4/5/2021. (eat) (Entered: 01/05/2021) |
| 01/05/2021 | 403 | **\*\*RESTRICTED DOCUMENT\*\*** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial as to Aaron Michael Shamo held on August 26, 2019, before Judge Dale A. Kimball re 367 Notice of Appeal – Final Judgment. Court Reporter: Ed Young, Telephone number (801)328–3202.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court |

| | | |
|---|---|---|
| | | Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/26/2021. Redacted Transcript Deadline set for 2/5/2021. Release of Transcript Restriction set for 4/5/2021. (eat) (Entered: 01/05/2021) |
| 01/05/2021 | 405 | **RESTRICTED DOCUMENT** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Status Conference on Pretrial and Trial Issues as to Aaron Michael Shamo held on May 17, 2019, before Judge Dale A. Kimball re 367 Notice of Appeal – Final Judgment. Court Reporter: Ed Young, Telephone number (801)328–3202. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/26/2021. Redacted Transcript Deadline set for 2/5/2021. Release of Transcript Restriction set for 4/5/2021. (eat) (Entered: 01/05/2021) |
| 01/06/2021 | 406 | **RESTRICTED DOCUMENT** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Jury Trial as to Aaron Michael Shamo held on August 22, 2019 (Pages 1404–1554), before Judge Dale A. Kimball re 367 Notice of Appeal – Final Judgment. Court Reporter: Kelly Brown Hicken, RPR, RMR, Telephone number (801)521–7238. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.** <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/27/2021. Redacted Transcript Deadline set for 2/8/2021. Release of Transcript Restriction set for 4/6/2021. (eat) (Entered: 01/06/2021) |
| 01/18/2021 | | Notice of Withdrawal. U.S. Probation and Pretrial Services hereby advises the Court that Jennifer Johnson should be terminated from this case as to Aaron Michael Shamo, Drew Wilson Crandall, Alexandrya Marie Tonge, Katherine Lauren Anne Bustin, Mario Anthony Noble, Sean Michael Gygi (mes) (Entered: 01/18/2021) |

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

NOV 2 2 2016

D. MARK JONES, CLERK
BY_____
DEPUTY CLERK

JOHN W. HUBER, United States Attorney (#7226)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801)-524-5682

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>AARON MICHAEL SHAMO,<br><br>Defendant. | Case No. 2:16mj 597 - DBP<br><br>COMPLAINT<br><br>Possession of Fentanyl with Intent to Distribute<br><br>Magistrate Judge Dustin B. Pead |

Before Dustin B. Pead, United States Magistrate Judge for the District of Utah,

appears the undersigned, who on oath deposes and says:

## COUNT 1

On or about November 22, 2016, in the Central Division of the District of Utah,

### AARON MICHAEL SHAMO,

the named defendant herein, did knowingly and intentionally possess with intent to

distribute Fentanyl, a Schedule II controlled substance, within the meaning of

21 U.S.C. § 812; all in violation of 21 U.S.C. §841(a)(1), and punishable pursuant to 21

U.S.C. §841(b)(1)(C).

1

Complainant states that this complaint is based on information obtained through an investigation consisting of the following:

1.  Complainant is a South Jordan Police Officer currently assigned to the Drug Enforcement Administration Metropolitan Narcotics Task Force (DEAMNTF) as a narcotics investigator. Complainant is familiar with the facts and circumstances alleged in this complaint.

2.  On November 22, 2016, agents and officers executed a search warrant at the home of Aaron Michael SHAMO, at 7939 Titian Street in Cottonwood Heights, Utah.

3.  Inside the home officers located what appears to be more than approximately 70,000 pills that have the appearance of oxycodone, and more than approximately 25,000 pills that have the appearance of Alprazolam, a/k/a Xanax. Both Oxycodone and Alprazolam are Schedule II controlled substances.

4.  Agents also located a pill press and bulk powdery substances that appeared to be ready to be pressed into pill form.

5.  Based on a prior investigation spanning several months, agents have reason to believe that the powdery substance was Fentanyl. Agents also have reason to believe that the pills having the appearance of oxycodone actually contain the Schedule II controlled substance Fentanyl. It is believed that the press was used to create the pills using the powdery substances. Due to the

2

extreme dangerousness of Fentanyl, agents have not yet been able to test the substances seized at the SHAMO home on November 22, 2016. A Hazardous Materials team is on the scene and is safely processing the home and the seized items.

6. SHAMO is known to have employed several individuals over the last year to accept shipments of packages from China at their residences. These individuals would deliver the packages to SHAMO without opening them or inspecting the contents.

7. Within the last few months, law enforcement agents were able to seize several of the packages that were shipped to these individuals from China. One package was tested by a crime lab, and was found to contain 120 grams of Fentanyl. Other packages intended for SHAMO were similarly labeled, and the contents had a similar appearance.

8. Based on the prior testing and the appearance of the seized items, agents believe that the pills having the appearance of oxycodone which were seized on November 22, 2016 contain the Schedule II controlled substance Fentanyl.

9. Agents also located and seized packaging materials from the SHAMO home on November 22. Based on the prior investigation, agents know that SHAMO packages the pills in numerous smaller packages and distributes them by shipping them to various addresses around the United States using

the United States Postal Service or other package delivery services.

DENNIS POWER
Task Force Officer
Drug Enforcement Administration

APPROVED:

JOHN W. HUBER
United States Attorney

VERNON G. STEJSKAL
Assistant United States Attorney

SUBSCRIBED AND SWORN TO BEFORE ME this 22nd day of November, 2016.

DUSTIN B. READ
United States Magistrate Judge

4

JOHN W. HUBER, United States Attorney (#7226)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801)-524-5682

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

NOV 22 2016

D. MARK JONES, CLERK
BY_____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16mj597- DBP |
| Plaintiff, | AMENDED COMPLAINT |
| vs. | Possession of Fentanyl with Intent to Distribute |
| AARON MICHAEL SHAMO, | |
| Defendant. | Magistrate Judge Dustin B. Pead |

Before Dustin B. Pead, United States Magistrate Judge for the District of Utah,

appears the undersigned, who on oath deposes and says:

COUNT 1

On or about November 22, 2016, in the Central Division of the District of Utah,

AARON MICHAEL SHAMO,

the named defendant herein, did knowingly and intentionally possess with intent to

distribute Fentanyl, a Schedule II controlled substance, within the meaning of

21 U.S.C. § 812; all in violation of 21 U.S.C. §841(a)(1), and punishable pursuant to 21

U.S.C. §841(b)(1)(C).

1

Complainant states that this complaint is based on information obtained through an investigation consisting of the following:

1. Complainant is a South Jordan Police Officer currently assigned to the Drug Enforcement Administration Metropolitan Narcotics Task Force (DEAMNTF) as a narcotics investigator. Complainant is familiar with the facts and circumstances alleged in this complaint.

2. On November 22, 2016, agents and officers executed a search warrant at the home of Aaron Michael SHAMO, at 7939 Titian Street in Cottonwood Heights, Utah, and at a stash location at 11469 Openview Lane in South Jordan, Utah.

3. Inside the Openview home, officers located what appears to be more than approximately 70,000 pills that have the appearance of oxycodone, and more than approximately 25,000 pills that have the appearance of Alprazolam, a/k/a Xanax. Both Oxycodone and Alprazolam are Schedule II controlled substances.

4. Inside the Titian home, officers located a pill press and bulk powdery substances that appeared to be ready to be pressed into pill form.

5. Based on a prior investigation spanning several months, agents have reason to believe that the powdery substance was Fentanyl. Agents also have reason to believe that the pills having the appearance of oxycodone actually contain the Schedule II controlled substance Fentanyl. It is believed that the

2

press was used to create the pills using the powdery substances. Due to the extreme dangerousness of Fentanyl, agents have not yet been able to test the substances seized at the SHAMO home on November 22, 2016. A Hazardous Materials team is on the scene and is safely processing the home and the seized items.

6. SHAMO is known to have employed several individuals over the last year to accept shipments of packages from China at their residences. These individuals would deliver the packages to SHAMO without opening them or inspecting the contents.

7. Within the last few months, law enforcement agents were able to seize several of the packages that were shipped to these individuals from China. One package was tested by a crime lab, and was found to contain 120 grams of Fentanyl. Other packages intended for SHAMO were similarly labeled, and the contents had a similar appearance.

8. Based on the prior testing and the appearance of the seized items, agents believe that the pills having the appearance of oxycodone which were seized on November 22, 2016 contain the Schedule II controlled substance Fentanyl.

9. Agents also located and seized packaging materials from the SHAMO home on November 22. Based on the prior investigation, agents know that SHAMO packages the pills in numerous smaller packages and distributes

3

them by shipping them to various addresses around the United States using

the United States Postal Service or other package delivery services.

_____
DENNIS POWER
Task Force Officer
Drug Enforcement Administration

APPROVED:

JOHN W. HUBER
United States Attorney

_____
VERNON G. STEJSKAL
Assistant United States Attorney


SUBSCRIBED AND SWORN TO BEFORE ME this 22nd day of November, 2016.

_____
DUSTIN B. PEAD
United States Magistrate Judge

4

52

JOHN W. HUBER, United States Attorney (#7226)
VERNON STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, #1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682

FILED
U.S. DISTRICT COURT

2016 DEC -7 P 2: 01

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | **INDICTMENT** |
| Plaintiff, | : | |
| | : | VIOL. 21 U.S.C. § 841(a)(1) |
| vs. | : | |
| | : | Possession of Fentanyl with Intent to Distribute |
| AARON MICHAEL SHAMO, | : | |
| Defendant. | : | Case: 2:16-cr-00631<br>Assigned To : Kimball, Dale A.<br>Assign. Date : 12/7/2016<br>Description: USA v. |

The Grand Jury Charges:

## COUNT 1

[21 U.S.C. § 841(a)(1)]

**[Possession of Fentanyl with Intent to Distribute]**

On or about November 22, 2016, in the Central Division of the District of Utah,

AARON MICHAEL SHAMO,

the named defendant herein, did knowingly and intentionally possess with intent to

distribute fentanyl, a Schedule II controlled substance, within the meaning of 21 U.S.C. §

812; all in violation of 21 U.S.C. §841(a)(1), and punishable pursuant to 21 U.S.C.

§841(b)(1)(C).

### NOTICE OF INTENTION TO SEEK CRIMINAL FORFEITURE

As a result of committing the felony offense in Count 1 of this indictment, which is

punishable by imprisonment for more than one year, the above named defendant shall forfeit to

the United States pursuant to 21 U.S.C. § 853 any and all property constituting or derived from

any proceeds the defendant obtained directly or indirectly as a result of the said felony offense

and any and all property, real and personal, used or intended to be used in any manner or part to

commit and to facilitate the commission of a violation of 21 U.S.C. § 841(a)(1), and any property

traceable thereto, including but not limited to the following:

**CURRENCY**

$1,227,773.00 in United States Currency

$19,520.00 in United States Currency

**AUTOMOBILES**

A 2011 Ford F-350 pickup, VIN#1FT8W3BT7BEC88017

A 2008 BMW 135i, VIN#WBAUC73508VF25535

A TRUE BILL:

/S/

FOREPERSON OF THE GRAND JURY

JOHN W. HUBER
United States Attorney

_____

VERNON STEJSKAL
Assistant United States Attorney

JOHN W. HUBER, United States Attorney (#7226)
VERNON STEJSKAL, Assistant United States Attorney (#8434)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: Michael.Gadd@usdoj.gov

FILED
U.S. DISTRICT COURT

2017 MAY 31 P 2: 49

DISTRICT OF UTAH

BY:
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    vs.<br><br>AARON MICHAEL SHAMO,<br>DREW WILSON CRANDALL,<br>ALEXANDRYA MARIE TONGE,<br>KATHERINE LAUREN ANNE BUSTIN,<br>MARIO ANTHONY NOBLE, and<br>SEAN MICHAEL GYGI,<br>    Defendants. | **SUPERSEDING INDICTMENT**<br><br>Case No. 2:16-cr-00631-DAK<br><br>VIOLATIONS:<br>21 U.S.C. §848, CONTINUING CRIMINAL ENTERPRISE;<br><br>21 U.S.C. §846, CONSPIRACY TO DISTRIBUTE A CONTROLLED SUBSTANCE;<br><br>21 U.S.C. §952, AIDING AND ABETTING THE IMPORTATION OF A CONTROLLED SUBSTANCE;<br><br>21 U.S.C. §841(a)(1), POSSESSION OF FENTANYL WITH INTENT TO DISTRIBUTE;<br><br>21 U.S.C. §841(a)(1), MANUFACTURE OF ALPRAZOLAM;<br><br>21 U.S.C. §§ 331(k) & 333(b)(7), KNOWING AND INTENTIONAL ADULTERATION OF DRUGS WHILE HELD FOR SALE;<br><br>21 U.S.C. §843(b), USE OF THE U.S. MAIL IN FURTHERANCE OF A DRUG TRAFFICKING OFFENSE;<br><br>18 U.S.C. §1956(h), CONSPIRACY TO |

| | COMMIT MONEY LAUNDERING; |
| | 18 U.S.C. § 1957(a), ENGAGING IN MONETARY TRANSACTIONS IN PROPERTY DERIVED FROM SPECIFIED UNLAWFUL ACTIVITY; |
| | 18 U.S.C. § 1956(a)(1)(A)(i), MONEY LAUNDERING CONCEALMENT; |
| | Judge Dale. A Kimball |

The Grand Jury Charges:

## **COUNT 1**
### (21 U.S.C. § 848, CONTINUING CRIMINAL ENTERPRISE)

Beginning on a date unknown to the Grand Jury, but at least by July 8, 2015, and

continuing to at least November 22, 2016, in the Central Division of the District of Utah

and elsewhere,

### AARON MICHAEL SHAMO,

defendant herein, did knowingly and intentionally engage in a continuing criminal

enterprise in that he knowingly and intentionally violated Title 21, United States Code,

Sections 841(a)(1), 846, and 952(a), which violations include, but are not limited to,

- The violation alleged in Count 2, Conspiracy to Distribute Fentanyl, which Count

  is re-alleged and incorporated herein by reference as though fully set forth in this

  Count;

- The violation alleged in Count 3, Conspiracy to Distribute Alprazolam, which

  Count is re-alleged and incorporated herein by reference as though fully set forth

  in this Count;

2

- The violation alleged in Count 4, Aiding and Abetting the Importation of a Controlled Substance, which Count is re-alleged and incorporated herein by reference as though fully set forth in this Count;

- The violation alleged in Count 5, Aiding and Abetting the Importation of a Controlled Substance, which Count is re-alleged and incorporated herein by reference as though fully set forth in this Count;

- The violation alleged in Count 6, Aiding and Abetting the Importation of a Controlled Substance, which Count is re-alleged and incorporated herein by reference as though fully set forth in this Count;

- The violation alleged in Count 7, Possession of Fentanyl with Intent to Distribute, which Count is re-alleged and incorporated herein by reference as though fully set forth in this Count;

- Aiding and abetting the violation alleged in Count 8, Possession of Fentanyl with Intent to Distribute, which Count is re-alleged and incorporated herein by reference as though fully set forth in this Count;

- The violation alleged in Count 9, Manufacture of Alprazolam, which Count is re-alleged and incorporated herein by reference as though fully set forth in this Count;

- The violation alleged in Count 12, Use of the U.S. Mail in Furtherance of a Drug Trafficking Offense, which Count is re-alleged and incorporated herein by reference as though fully set forth in this Count;

- Aiding and Abetting the Attempted Distribution of Fentanyl on or about November 20, 2016, to J.G., aka "trustworthymoney," through A.L., all in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 2;

- Aiding and Abetting the Possession of Fentanyl with Intent to Distribute on the following dates to the following addressees, each in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2:

| Date | Addressee | State | Number of Pills | Controlled Substance | Markings |
|---|---|---|---|---|---|
| 11/18/2016 | N.A. | CA | 12 | Fentanyl | A 215 |
| 11/18/2016 | M.J. | CA | 11 | Fentanyl | M/30 |
| 11/18/2016 | A.B. | CO | 20 | Fentanyl | M/30 |
| 11/18/2016 | B.B. | CO | 10 | Fentanyl | A 215 |
| 11/18/2016 | T.M. | CT | 60 | Fentanyl | M/30 |
| 11/18/2016 | J.R. | CT | 11 | Fentanyl | A 215 |
| 11/20/2016 | T.J. | FL | 200 | Fentanyl | A 215 |
| 11/18/2016 | P.F. | IL | 100 | Fentanyl | A 215 |
| 11/18/2016 | J.M. | IL | 22 | Fentanyl | M/30 |
| 11/18/2016 | A.G. | KY | 20 | Fentanyl | A 215 |
| 11/18/2016 | F.O. | LA | 100 | Fentanyl | M/30 |
| 11/20/2016 | C.D. | MA | 100 | Fentanyl | A 215 |
| 11/18/2016 | J.M. | MD | 27 | Fentanyl | A 215 |
| 11/20/2016 | N.M. | ME | 100 | Fentanyl | A 215 |

4

| 11/20/2016 | N.Y. | MI | 100 | Fentanyl | A 215 |
|---|---|---|---|---|---|
| 11/18/2016 | M.P. | MN | 16 | Fentanyl | A 215 |
| 11/18/2016 | A.B. | MO | 11 | Fentanyl | M/30 |
| 11/18/2016 | A.M. | MT | 40 | Fentanyl | M/30 |
| 11/18/2016 | D.G. | MT | 40 | Fentanyl | A 215 |
| 11/18/2016 | M.S. | NC | 100 | Fentanyl | A 215 |
| 11/18/2016 | M.L. | NC | 100 | Fentanyl | A 215 |
| 11/20/2016 | J.R. | NC | 100 | Fentanyl | A 215 |
| 11/18/2016 | L.P. | NY | 11 | Fentanyl | M/30 |
| 11/18/2016 | J.G. | NY | 11 | Fentanyl | M/30 |
| 11/18/2016 | B.S. | OH | 11 | Fentanyl | A 215 |
| 11/18/2016 | R.B. | OH | 150 | Fentanyl | A 215 |
| 11/18/2016 | K.M. TT S T R | OK | 11 | Fentanyl | M/30 |
| 11/18/2016 | C. | PA | 11 | Fentanyl | M/30 |
| 11/18/2016 | R.P. | PA | 11 | Fentanyl | A 215 |
| 11/18/2016 | J.S. | PA | 11 | Fentanyl | A 215 |
| 11/18/2016 | S.F. | PA | 11 | Fentanyl | A 215 |
| 11/20/2016 | A.H. | PA | 100 | Fentanyl | A 215 |
| 11/18/2016 | K.M. | SC | 11 | Fentanyl | M/30 |
| 11/18/2016 | T.E. | SC | 12 | Fentanyl | M/30 |
| 11/18/2016 | G.T. | TX | 11 | Fentanyl | M/30 |
| 11/20/2016 | A.W. | TX | 13 | Fentanyl | M/30 |
| 11/20/2016 | J.B. | TX | 100 | Fentanyl | M/30 |

5

| 11/18/2016 | A.T. | VA | 12 | Fentanyl | M/30 |
| 11/20/2016 | G.D. | VA | 150 | Fentanyl | A 215 |
| 11/20/2016 | A.H. | VA | 100 | Fentanyl | A 215 |

- Aiding and Abetting the Possession of Alprazolam with Intent to Distribute on the following dates to the following addressees, each in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2:

| Date | Addressee | State | Number of Pills | Controlled Substance | Markings |
| --- | --- | --- | --- | --- | --- |
| 11/20/2016 | A.L. | CA | 100 | Alprazolam | GG 249 |
| 11/18/2016 | A.F. | GA | 200 | Alprazolam | GG 249 |
| 11/20/2016 | S.S. | GA | 100 | Alprazolam | GG 249 |
| 11/20/2016 | P.O. | GA | 100 | Alprazolam | GG 249 |
| 11/18/2016 | D.C. | IL | 100 | Alprazolam | GG 249 |
| 11/20/2016 | D.C. | IL | 100 | Alprazolam | GG 249 |
| 11/20/2016 | J.H. | LA | 100 | Alprazolam | GG 249 |
| 11/20/2016 | J.S. | MI | 200 | Alprazolam | GG 249 |
| 11/20/2016 | C.G. | MS | 100 | Alprazolam | GG 249 |
| 11/18/2016 | S.W. | NC | 100 | Alprazolam | GG 249 |
| 11/18/2016 | R.K. | NC | 100 | Alprazolam | GG 249 |
| 11/18/2016 | F.W. | NC | 100 | Alprazolam | GG 249 |
| 11/20/2016 | Z.W. | NY | 100 | Alprazolam | GG 249 |
| 11/18/2016 | X.C. | OH | 100 | Alprazolam | GG 249 |
| 11/18/2016 | P.H. | PA | 100 | Alprazolam | GG 249 |

6

| 11/20/2016 | N.H. | SC | 100 | Alprazolam | GG 249 |
|---|---|---|---|---|---|
| 11/20/2016 | D.L. | SC | 100 | Alprazolam | GG 249 |
| 11/18/2016 | R.T. | TN | 100 | Alprazolam | GG 249 |
| 11/20/2016 | C.S. | TN | 100 | Alprazolam | GG 249 |
| 11/18/2016 | A.S. | TX | 100 | Alprazolam | GG 249 |

- Aiding and Abetting the Use of the U.S. Mail in Furtherance of a Drug Trafficking
  Offense on the following dates to the following addressees, each in violation of
  Title 21, United States Code, Section 843(b) and Title 18, United States Code,
  Section 2:

| Date | Addressee | State | Number of Pills | Controlled Substance | Markings |
|---|---|---|---|---|---|
| 11/22/2016 | T.G. | NC | 50 | Fentanyl | M/30 |
| 11/22/2016 | E.S. | NC | 100 | Fentanyl | A 215 |
| 11/22/2016 | E.J. | NC | 100 | Fentanyl | M/30 |
| 11/22/2016 | B.F. | ND | 500 | Fentanyl | M/30 |
| 11/22/2016 | D.P. | NY | 100 | Fentanyl | M/30 |
| 11/22/2016 | R.W. | SC | 50 | Fentanyl | M/30 |
| 11/22/2016 | M.E. | SD | 500 | Fentanyl | A 215 |
| 11/22/2016 | G.V. | VA | 100 | Fentanyl | M/30 |

- Aiding and Abetting the Distribution of Fentanyl on or about April 27, 2016, to
  D.M., all in violation of Title 21, United States Code, Section 841(a)(1) and Title

7

18, United States Code, Section 2;

- Aiding and Abetting the Distribution of Fentanyl on or about June 14, 2016, to D.M., all in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2; and

- Aiding and Abetting the Distribution of Fentanyl on or about June 12, 2016, to J.A., all in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2;

which violations were part of a continuing series of violations of the Controlled Substances Act, Title 21, United States Code, Section 801, *et seq*., undertaken by defendant, AARON MICHAEL SHAMO, in concert with at least five other persons with respect to whom AARON MICHAEL SHAMO occupied a position of organizer, supervisor, and any position of management, and from which such continuing series of violations the defendant obtained substantial income and resources.

Furthermore, the defendant, AARON MICHAEL SHAMO, was a principal administrator, organizer, supervisor and leader of the criminal enterprise, which involved possession with intent to distribute and distribution of more than 12,000 grams of a mixture and substance containing a detectable amount of Fentanyl (N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide), a schedule II controlled substance within the meaning of 21 U.S.C. § 812; all in violation of 21 U.S.C. § 848(b)(1) and (2)(A) and punishable under 21 U.S.C.§ 848(b).

8

## COUNT 2
(21 U.S.C. §§ 846 & 841(a)(1), CONSPIRACY TO DISTRIBUTE FENTANYL)

Beginning on a date unknown to the Grand Jury, but at least by February 3, 2016, and continuing to at least November 22, 2016, in the Central Division of the District of Utah and elsewhere,

DREW WILSON CRANDALL,
ALEXANDRYA MARIE TONGE,
KATHERINE LAUREN ANNE BUSTIN,
MARIO ANTHONY NOBLE, and
SEAN MICHAEL GYGI,

defendants herein, did combine, conspire, confederate and agree with AARON MICHAEL SHAMO, with each other, and with other persons, both known and unknown to the Grand Jury, to knowingly and intentionally distribute four hundred grams or more of a mixture or substance containing a detectable amount of Fentanyl (N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide), a Schedule II controlled substance within the meaning of 21 U.S.C. § 812, all in violation of 21 U.S.C.§§ 846 and 841(a)(1) and punishable under 21 U.S.C.§ 841(b)(1)(A).

## COUNT 3
(21 U.S.C. §§ 846 & 841(a)(1), CONSPIRACY TO DISTRIBUTE ALPRAZOLAM)

Beginning on a date unknown to the Grand Jury, but at least by December 22, 2015, and continuing to at least November 22, 2016, in the Central Division of the District of Utah and elsewhere,

DREW WILSON CRANDALL,
ALEXANDRYA MARIE TONGE,
KATHERINE LAUREN ANNE BUSTIN,
MARIO ANTHONY NOBLE, and

9

SEAN MICHAEL GYGI,

defendants herein, did combine, conspire, confederate and agree with AARON

MICHAEL SHAMO, with each other, and with other persons, both known and unknown

to the Grand Jury, to knowingly and intentionally distribute a mixture or substance

containing a detectable amount of Alprazolam, a Schedule IV controlled substance within

the meaning of 21 U.S.C. § 812, all in violation of 21 U.S.C.§§ 846 and 841(a)(1) and

punishable under 21 U.S.C.§ 841(b)(2).


## COUNT 4
### (21 U.S.C. §952, AIDING AND ABETTING THE IMPORTATION OF A CONTROLLED SUBSTANCE)

On or about June 23, 2016, in the Central Division of the District of Utah and

elsewhere,

AARON MICHAEL SHAMO,

defendant herein, did intentionally and knowingly import from the country of China into

the United States 40 grams or more of a mixture and substance containing a detectable

amount of Fentanyl (N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide), a

Schedule II controlled substance within the meaning of 21 U.S.C. § 812, and did aid and

abet therein, all in violation of 21 U.S.C.§§ 952(a), 960, and 18 U.S.C. § 2, and punishable

under 21 U.S.C.§ 960(b)(2).


10

## COUNT 5
### (21 U.S.C. §952, AIDING AND ABETTING THE IMPORTATION OF A CONTROLLED SUBSTANCE)

On or about November 8, 2016, in the Central Division of the District of Utah and

elsewhere,

### AARON MICHAEL SHAMO,

defendant herein, did intentionally and knowingly import from the country of China into

the United States a mixture and substance containing a detectable amount of Alprazolam,

a Schedule IV controlled substance within the meaning of 21 U.S.C. § 812, and did aid

and abet therein, all in violation of 21 U.S.C.§§ 952(a), 960, and 18 U.S.C. § 2, and

punishable under 21 U.S.C.§ 960(b)(2).


## COUNT 6
### (21 U.S.C. §952, AIDING AND ABETTING THE IMPORTATION OF A CONTROLLED SUBSTANCE)

On or about November 17, 2016, in the Central Division of the District of Utah and

elsewhere,

### AARON MICHAEL SHAMO, and
### SEAN MICHAEL GYGI,

defendants herein, did intentionally and knowingly import from the country of China into

the United States 40 grams or more of a mixture and substance containing a detectable

amount of Fentanyl (N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide), a

Schedule II controlled substance within the meaning of 21 U.S.C. § 812, and did aid and

abet therein, all in violation of 21 U.S.C.§§ 952(a), 960, and 18 U.S.C. § 2, and punishable

under 21 U.S.C.§ 960(b)(2).

## COUNT 7
### (21 U.S.C. § 841(a)(1), POSSESSION OF FENTANYL WITH INTENT TO DISTRIBUTE)
On or about November 22, 2016, in the Central Division of the District of Utah,

### AARON MICHAEL SHAMO,

the defendant herein, did knowingly and intentionally possess with intent to distribute

four hundred grams or more of a mixture or substance containing a detectable amount of

Fentanyl (N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide), a Schedule II

controlled substance within the meaning of 21 U.S.C. § 812; all in violation of 21 U.S.C.

§ 841(a)(1) and punishable pursuant to 21 U.S.C. § 841(b)(1)(A).

## COUNT 8
### (21 U.S.C. § 841(a)(1), POSSESSION OF FENTANYL WITH INTENT TO DISTRIBUTE)
On or about November 22, 2016, in the Central Division of the District of Utah,

### ALEXANDRYA MARIE TONGE, and
### KATHERINE LAUREN ANNE BUSTIN,

defendants herein, did knowingly and intentionally possess with intent to distribute four

hundred grams or more of a mixture or substance containing a detectable amount of

Fentanyl (N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide), a Schedule II

controlled substance within the meaning of 21 U.S.C. § 812; all in violation of 21 U.S.C.

§ 841(a)(1) and punishable pursuant to 21 U.S.C. § 841(b)(1)(A).

## COUNT 9
### (21 U.S.C. § 841(a)(1), MANUFACTURE OF ALPRAZOLAM)

On or about November 22, 2016, in the Central Division of the District of Utah,

AARON MICHAEL SHAMO,

the defendant herein, did knowingly and intentionally manufacture a mixture or substance containing a detectable amount of Alprazolam, a Schedule IV controlled substance within the meaning of 21 U.S.C. § 812; all in violation of 21 U.S.C. § 841(a)(1) and punishable pursuant to 21 U.S.C. § 841(b)(2).

## COUNT 10
### (21 U.S.C. §§ 331(k) & 333(b)(7), KNOWING AND INTENTIONAL ADULTERATION OF DRUGS WHILE HELD FOR SALE

Beginning on a date unknown to the Grand Jury, but at least by February 3, 2016, and continuing to at least November 22, 2016, in the Central Division of the District of Utah,

AARON MICHAEL SHAMO,

defendant herein, knowingly and intentionally manufactured a drug and caused the manufacture of a drug—specifically, round blue tablets debossed with "A 215" on the bisected side—and offered those tablets for sale on the internet as "Oxycodone 30 mg." Despite these representations, the defendant did not use Oxycodone at all in the manufacturing process, but instead, substituted Fentanyl, a much more potent synthetic opioid. These acts caused the drug to be adulterated as defined at 21 U.S.C. §§ 351(b) and 351(d), and the adulteration had a reasonable probability of causing serious adverse health consequences or death to humans. The manufacturing of these drugs was

13

performed after the component ingredients of the tablets had been shipped in interstate
commerce, from outside of Utah to Utah, and while the drugs were held for sale. All this
was in violation of 21 U.S.C. §§ 331(k) and 333(b)(7) and is punishable pursuant to 21
U.S.C. § 333(b)(7).

### COUNT 11
(21 U.S.C. §§ 331(k) & 333(b)(7), KNOWING AND INTENTIONAL
ADULTERATION OF DRUGS WHILE HELD FOR SALE)

Beginning on a date unknown to the Grand Jury, but at least by June 18, 2016, and
continuing to at least November 22, 2016, in the Central Division of the District of Utah,

AARON MICHAEL SHAMO,

defendant herein, knowingly and intentionally manufactured a drug and caused the
manufacture of a drug—specifically, round blue tablets with "M" on one side and a "30"
above a bisect on the other—and offered those tablets for sale on the internet as
"Oxycodone 30 mg." Despite these representations, the defendant did not use
Oxycodone at all in the manufacturing process, but instead, substituted Fentanyl, a much
more potent synthetic opioid. These acts caused the drug to be adulterated as defined at
21 U.S.C. §§ 351(b) and 351(d), and the adulteration had a reasonable probability of
causing serious adverse health consequences or death to humans. The manufacturing of
these drugs was performed after the component ingredients of the tablets had been
shipped in interstate commerce, from outside of Utah to Utah, and while the drugs were
held for sale. All this was in violation of 21 U.S.C. §§ 331(k) and 333(b)(7) and is
punishable pursuant to 21 U.S.C. § 333(b)(7).

14

## COUNT 12

(21 U.S.C. § 843(b), USE OF THE U.S. MAIL IN FURTHERANCE OF A DRUG
TRAFFICKING OFFENSE)

On or about September 12-23, 2016, in the Central Division of the District of Utah,

AARON MICHAEL SHAMO,
ALEXANDRYA MARIE TONGE,
KATHERINE LAUREN ANNE BUSTIN, and
SEAN MICHAEL GYGI,

the defendants herein, did knowingly and intentionally use a communication facility, the

U.S. Mail, in facilitating the commission of any act constituting a felony under Title 21,

United States Code, Section 841(a)(1), that is, distribution of a controlled substance; and

did aid and abet therein, all in violation of Title 21, United States Code, Section 843(b)

and Title 18, United States Code, Section 843(b). Specifically, a package containing

Alprazolam tablets and which listed a false return address was sent through the U.S. Mail,

but was returned by the postal service to the false return address in the date range listed

above. T.M., who resided at the address listed on the false return address, received the

package of Alprazolam tablets.

## COUNT 13

(18 U.S.C. § 1956(h), CONSPIRACY TO COMMIT MONEY LAUNDERING)

Beginning on a date unknown to the Grand Jury, but at least by December 22,

2015, and continuing to at least November 22, 2016, in the Central Division of the District

of Utah and elsewhere,

AARON MICHAEL SHAMO,
DREW WILSON CRANDALL,
ALEXANDRYA MARIE TONGE, and

15

KATHERINE LAUREN ANNE BUSTIN,

defendants herein, did knowingly combine, conspire, confederate and agree with each

other and with other persons, both known and unknown to the Grand Jury, to knowingly

conduct and attempt to conduct a financial transaction affecting interstate and foreign

commerce, to wit, wire transfers, bank deposits, electronic funds transfers, automated

clearing house payments, and the interstate movement of cash, which involved the

proceeds of a specified unlawful activity, that is, the distribution of a controlled substance

in violation of 21 U.S.C. § 841(a)(1), with the intent to promote, conceal, and disguise the

carrying on of specified unlawful activity, that is, distribution of a controlled substance,

and that while conducting and attempting to conduct such financial transactions knew that

the property involved in the financial transactions represented the proceeds of some form

of unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and (a)(1)(B)(i); all in

violation of 18 U.S.C. §1956(h).

## **COUNT 14**
(18 U.S.C. § 1956(a)(1)(B)(i), MONEY LAUNDERING CONCEALMENT)

On or about November 8, 2016, in the Central Division of the District of Utah,

AARON MICHAEL SHAMO,

defendant herein, did knowingly conduct and attempt to conduct a financial transaction

affecting interstate commerce, to wit a bank deposit, which involved the proceeds of a

specified unlawful activity, that is the distribution of a controlled substance, with the

intent to conceal the nature, source, location, ownership, and control of the proceeds of

the specified unlawful activity, to wit: distribution of a controlled substance in violation

16

of 21 U.S.C. § 841(a)(1); and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; all in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

## COUNT 15
### (18 U.S.C. § 1957(a), ENGAGING IN MONETARY TRANSACTIONS IN PROPERTY DERIVED FROM SPECIFIED UNLAWFUL ACTIVITY)

On or about May 5, 2016, in the Central Division of the District of Utah,

### AARON MICHAEL SHAMO,

defendant herein, did knowingly engage and attempt to engage in a monetary transaction by, through, or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, issue a personal check, such property having been derived from a specified unlawful activity, that is, distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1); all in violation of Title 18, United States Codes, Sections 1957(a).

## NOTICE OF INTENTION TO SEEK CRIMINAL FORFEITURE

Pursuant to 21 U.S.C. § 853, upon conviction of any offense in violation of 21 U.S.C. §§ 841, 846, 848, and/or 952, as set forth in this indictment, the defendant shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offenses and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the

17

commission of, the offenses. The property to be forfeited includes, but is not limited to, the following:

## CURRENCY

- $1,227,773.00 in United States Currency

- $19,520.00 in United States Currency

- $429,600.00 in United States Currency

## AUTOMOBILES

- A 2011 Ford F-350 pickup, VIN#1FT8W3BT7BEC88017

- A 2008 BMW 135i, VIN#WBAUC73508VF25535

## MISCELLANEOUS

- The pill press seized from the garage at Aaron SHAMO's residence on Titian Way.

  Here is a photo:



18

- The following dies/punches:

| Item | Punch Embossing | Comparison Tablet(s) Available | Comparison Tablet(s) Items |
|---|---|---|---|
| Item 20 A1 | GG 2 4 9 (w/ ¾ cores) | YES | 14, 15, 16, 17, 18, 19 |
| Item 20 A2 | GG 2 4 9 (w/ ¾ cores) | YES | 14, 15, 16, 17, 18, 19 |
| Item 20 A3 | (Slug – not a tablet punch) | NO | NOT APPLICABLE |
|  |  |  |  |
| Item 20 B1 | 2 (w/ ¾ cores) | NO | NOT AVAILABLE |
| Item 20 B2 | 2 (w/ ¾ cores) | NO | NOT AVAILABLE |
| Item 20 B3 | 2 (w/ ¾ cores) | NO | NOT AVAILABLE |
| Item 20 B4 | 2 (w/ ¾ cores) | NO | NOT AVAILABLE |
| Item 20 B5 | X A N A X (w/ ¾ cores) | NO | NOT AVAILABLE |
| Item 20 B6 | X A N A X (w/ ¾ cores) | NO | NOT AVAILABLE |
| Item 20 B7 | X A N A X (w/ ¾ cores) | NO | NOT AVAILABLE |
| Item 20 B8 | X A N A X (w/ ¾ cores) | NO | NOT AVAILABLE |
| Item 20 B9 | 10/325 | NO | NOT AVAILABLE |
| Item 20 B10 | X A N A X (w/ ¾ cores) | NO | NOT AVAILABLE |
| Item 20 B11 | 2 (w/ ¾ cores) | NO | NOT AVAILABLE |
| Item 20 B12 | M523 | NO | NOT AVAILABLE |
| Item 20 B13 | M523 | NO | NOT AVAILABLE |
| Item 20 B14 | M523 | NO | NOT AVAILABLE |
| Item 20 B15 | M523 | NO | NOT AVAILABLE |
| Item 20 | M523 | NO | NOT AVAILABLE |

19

| | | | |
|---|---|---|---|
| B16 | | | |
| Item 20 B17 | 10/325 | NO | NOT AVAILABLE |
| Item 20 B18 | 10/325 | NO | NOT AVAILABLE |
| Item 20 B19 | 10/325 | NO | NOT AVAILABLE |
| Item 20 B20 | 10/325 | NO | NOT AVAILABLE |
| Item 20 B21 | R 0 3 9 (w/ ¾ cores) | NO | NOT AVAILABLE |
| | | | |
| Item 20 | 10 metal die with oval shaped through holes | No Analyses Performed | No Analyses Performed |
| | | | |
| Item 21 A1 | M (enclosed in a square) | YES | 6, 8, 9, 10, 12, 13 |
| Item 21 A2 | M (enclosed in a square) | YES | 6, 8, 9, 10, 12, 13 |
| Item 21 A3 | M (enclosed in a square) | YES | 6, 8, 9, 10, 12, 13 |
| Item 21 A4 | M (enclosed in a square) | YES | 6, 8, 9, 10, 12, 13 |
| Item 21 A5 | M (enclosed in a square) | YES | 6, 8, 9, 10, 12, 13 |
| Item 21 A6 | M (enclosed in a square) | YES | 6, 8, 9, 10, 12, 13 |
| Item 21 A7 | M (enclosed in a square) | YES | 6, 8, 9, 10, 12, 13 |
| Item 21 A8 | M (enclosed in a square) | YES | 6, 8, 9, 10, 12, 13 |
| Item 21 A9 | M (enclosed in a square) | YES | 6, 8, 9, 10, 12, 13 |
| | | | |
| Item 22 A1 | GG 2 4 9 (w/ ¾ cores) | YES | 14, 15, 16, 17, 18, 19 |
| Item 22 A2 | GG 2 4 9 (w/ ¾ cores) | YES | 14, 15, 16, 17, 18, 19 |
| Item 22 A3 | GG 2 4 9 (w/ ¾ cores) | YES | 14, 15, 16, 17, 18, 19 |
| Item 22 | GG 2 4 9 (w/ ¾ | YES | 14, 15, 16, 17, 18, |

| | | | |
|---|---|---|---|
| A4 | cores) | | 19 |
| Item 22 A5 | GG 2 4 9 (w/ ¾ cores) | YES | 14, 15, 16, 17, 18, 19 |
| Item 22 A6 | GG 2 4 9 (w/ ¾ cores) | YES | 14, 15, 16, 17, 18, 19 |
| Item 22 A7 | GG 2 4 9 (w/ ¾ cores) | YES | 14, 15, 16, 17, 18, 19 |
| Item 22 A8 | GG 2 4 9 (w/ ¾ cores) | YES | 14, 15, 16, 17, 18, 19 |

## MONEY JUDGMENT

- A MONEY JUDGMENT equal to the value of any proceeds obtained, directly or indirectly, as the result of such offenses and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offenses.

Pursuant to 18 U.S.C. § 982(a)(1), upon conviction of any offense in violation of 18 U.S.C. §§ 1956 and/or 1957, the defendants shall forfeit to the United States of America any property, real or personal, involved in such violations, and any property traceable to such property. The property to be forfeited includes, but is not limited to the following:

- A MONEY JUDGMENT equal to the value of all property involved in the money laundering and any property traceable to such property.

If more than one defendant is convicted of an offense, the defendants so convicted shall be jointly and severally liable for the forfeiture related to such offense.

## SUBSTITUTE ASSETS

If any of the property described above, as a result of any act or omission of the defendants:

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the court;

    d.  has been substantially diminished in value; or

has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

A TRUE BILL:

/S/

FOREPERSON OF GRAND JURY

JOHN W. HUBER
United States Attorney

MICHAEL GADD,
Special Assistant United States Attorney
VERNON STEJSKAL,
Assistant United States Attorney

22

JOHN W. HUBER, United States Attorney (#7226)
VERNON STEJSKAL, Assistant United States Attorney (#8434)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: Michael.Gadd@usdoj.gov

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | GOVERNMENT'S RULE 12(b)(1) AND 104(a) MOTION TO DETERMINE ADMISSIBILITY OF EXHIBITS |
| vs. | |
| AARON MICHAEL SHAMO, | Judge Dale A. Kimball |
| Defendant. | |

The United States of America hereby requests a pre-trial evidentiary hearing under

Federal Rule of Criminal Procedure 12(b)(1) and Federal Rule of Evidence 104(a) to

determine the admissibility of all non-rebuttal exhibits or expert witness reports to be

offered by any party at trial. Rule 12 (b)(1) allows a party to "raise by pretrial motion any

. . . request that the court can determine without a trial on the merits."[1] Federal Rule of

Evidence 104(a) places upon the Court the obligation to decide preliminary questions,

---

[1] F.R.Crim.P. 12(b)(1).

including whether evidence is admissible.[2]  In deciding whether evidence is admissible, the Court is not bound by evidence rules, except those rules governing privilege.[3]

The Government seeks this hearing to insure that it has fully complied with its Rule 16 pre-trial discovery responsibilities, to promote a fair and efficient trial, to avoid unfair surprise, and to preclude either party from inadvertently offering inadmissible evidence in the jury's presence.

The Government requests a three-day evidentiary hearing be scheduled approximately two weeks before the trial for the Court to determine admissibility of the exhibits offered by both parties. The Government will seek stipulations as to the admissibility of many of its exhibits and will notify the Court if an agreement is reached prior to the hearing.

DATED  August 3, 2018.

JOHN W. HUBER
United States Attorney

 /s/  Michael Gadd                         _
MICHAEL GADD
Special Assistant United States Attorney

---

[2] FRE 104(a).

[3] Id.

2

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
|---|---|
| Plaintiff, | ORDER |
| vs. | |
| AARON MICHAEL SHAMO, | Judge Dale A. Kimball |
| Defendant. | |

The Court, having considered the United States' Rule 12(b)(1) and 104(a)

Motion to Determine Admissibility of Exhibits, and good cause appearing,

hereby orders:

1. A pre-admission hearing is to take place on _____ _____, 20___, at

   _____a.m/p.m.

2. At the pre-admission hearing, all non-rebuttal exhibits or reports prepared

   by expert witnesses that any party intends to offer at trial will be brought

   before the Court, with appropriate foundation, for the Court to make an

   admissibility decision.

3. Any party intending to offer exhibits at the pre-admission hearing will

   send an exhibit list and a copy of that party's exhibits, if not already

discovered, to the other party at least three days before the pre-admission hearing.

Signed this _____ day of _____, 2018.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>AARON MICHAEL SHAMO,<br><br>Defendant. | Case No. 2:16-cr-00631-DAK<br><br>ORDER<br><br>Judge Dale A. Kimball |

The Court, having considered the United States' Rule 12(b)(1) and 104(a) Motion to Determine Admissibility of Exhibits, and good cause appearing, hereby orders:

1. A pre-admission hearing is to take place on January 9, 10, and 11, 2018, beginning at 9:00 a.m. each day. The court will issue its standard Trial Order for Criminal cases four months prior to the trial date. Judge Kimball's standard Criminal Trial Order is available on Judge Kimball's practices and policies section of the court's website. This hearing will be used for all pending motions in limine and *Daubert* motions.

2. At the pre-admission hearing, all disputed non-rebuttal exhibits or reports prepared by expert witnesses that any party intends to offer at trial will

be brought before the Court, with appropriate foundation, for the Court to
make an admissibility decision.  This Order does not relieve the parties of
filing appropriate motions in limine and Daubert motions and complying
with the court's deadlines for such motions which will be set in the court's
Trial Order.

3. Any party intending to offer exhibits at the pre-admission hearing will
send an exhibit list and a copy of that party's exhibits, if not already
discovered, to the other party at least three days before the pre-admission
hearing.

Signed this 10th day of August, 2018.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

JOHN W. HUBER, United States Attorney (#7226)
VERNON STEJSKAL, Assistant United States Attorney (#8434)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: Michael.Gadd@usdoj.gov

FILED

2018 OCT 18  A 10 08

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>AARON MICHAEL SHAMO,<br><br>Defendant. | **SECOND SUPERSEDING INDICTMENT**<br><br>Case No. 2:16-cr-00631-DAK<br><br><br>VIOLATIONS:<br><br>COUNT 1: 21 U.S.C. § 848, CONTINUING CRIMINAL ENTERPRISE;<br><br>COUNTS 2-4: 21 U.S.C. § 952, AIDING AND ABETTING THE IMPORTATION OF A CONTROLLED SUBSTANCE;<br><br>COUNT 5: 21 U.S.C. § 841(a)(1), POSSESSION OF A CONTROLLED SUBSTANCE WITH INTENT TO DISTRIBUTE;<br><br>COUNT 6: 21 U.S.C. § 841(a)(1), AIDING AND ABETTING THE DISTRIBUTION OF A CONTROLLED SUBSTANCE RESULTING IN DEATH;<br><br>COUNT 7: 21 U.S.C. § 841(a)(1), MANUFACTURE OF A CONTROLLED SUBSTANCE; |

| | COUNTS 8-9: 21 U.S.C. §§ 331(k) & 333(b)(7), KNOWING AND INTENTIONAL ADULTERATION OF DRUGS WHILE HELD FOR SALE; |
| --- | --- |
| | COUNT 10: 21 U.S.C. § 843(b), AIDING AND ABETTING THE USE OF THE U.S. MAIL IN FURTHERANCE OF A DRUG TRAFFICKING OFFENSE;<br><br>COUNT 11: 18 U.S.C. § 1956(h), CONSPIRACY TO COMMIT MONEY LAUNDERING;<br><br>COUNT 12: 18 U.S.C. § 1956(a)(1)(A)(i), MONEY LAUNDERING PROMOTION AND CONCEALMENT;<br><br>COUNT 13: 18 U.S.C. § 1957(a), ENGAGING IN MONETARY TRANSACTIONS IN PROPERTY DERIVED FROM SPECIFIED UNLAWFUL ACTIVITY;<br><br><br>Judge Dale. A Kimball |

The Grand Jury Charges:

## COUNT 1
### (21 U.S.C. § 848, CONTINUING CRIMINAL ENTERPRISE)

Beginning on a date unknown to the Grand Jury, but at least by July 8, 2015, and

continuing to at least November 22, 2016, in the Central Division of the District of Utah

and elsewhere,

AARON MICHAEL SHAMO,

defendant herein, did knowingly and intentionally engage in a continuing criminal

2

enterprise in that he knowingly and intentionally violated Title 21, United States Code, Sections 841(a)(1), 846, and 952(a), which violations include, but are not limited to,

- Conspiracy to Distribute a Controlled Substance Resulting in Death:

  Beginning on a date unknown to the Grand Jury, but at least by February 3, 2016, and continuing to at least November 22, 2016, in the Central Division of the District of Utah and elsewhere, the defendant did combine, conspire, confederate and agree with other persons, both known and unknown to the Grand Jury, to knowingly and intentionally distribute four hundred grams or more of a mixture and substance containing a detectable amount of Fentanyl (N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide), a Schedule II controlled substance within the meaning of 21 U.S.C. § 812, the use of which resulted in the death of R.K. on June 13, 2016, all in violation of 21 U.S.C. §§ 846 and 841(a)(1) and punishable under 21 U.S.C. § 841(b)(1)(A);

- Conspiracy to Distribute a Controlled Substance:

  Beginning on a date unknown to the Grand Jury, but at least by December 22, 2015, and continuing to at least November 22, 2016, in the Central Division of the District of Utah and elsewhere, the defendant did combine, conspire, confederate and agree with other persons, both known and unknown to the Grand Jury, to knowingly and intentionally distribute a mixture and substance containing a detectable amount of Alprazolam, a Schedule IV controlled substance within the meaning of 21 U.S.C. § 812, all in violation of 21 U.S.C. §§ 846 and 841(a)(1) and punishable under 21 U.S.C. § 841(b)(2);

3

- The violation alleged in Count 2, Aiding and Abetting the Importation of a Controlled Substance, which Count is re-alleged and incorporated herein by reference as though fully set forth in this Count;

- The violation alleged in Count 3, Aiding and Abetting the Importation of a Controlled Substance, which Count is re-alleged and incorporated herein by reference as though fully set forth in this Count;

- The violation alleged in Count 4, Aiding and Abetting the Importation of a Controlled Substance, which Count is re-alleged and incorporated herein by reference as though fully set forth in this Count;

- The violation alleged in Count 5, Possession of a Controlled Substance with Intent to Distribute, which Count is re-alleged and incorporated herein by reference as though fully set forth in this Count;

- The violation alleged in Count 6, Aiding and Abetting the Distribution of a Controlled Substance Resulting in Death, which Count is re-alleged and incorporated herein by reference as though fully set forth in this Count;

- The violation alleged in Count 7, Manufacture of a Controlled Substance, which Count is re-alleged and incorporated herein by reference as though fully set forth in this Count;

- The violation alleged in Count 10, Aiding and Abetting the Use of the U.S. Mail in Furtherance of a Drug Trafficking Offense, which Count is re-alleged and incorporated herein by reference as though fully set forth in this Count;

4

- Aiding and Abetting the Attempted Distribution of a Controlled Substance,
  namely Fentanyl, on or about the following dates to the following addressees, each
  in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and Title
  18, United States Code, Section 2:

| Date | Addressee | State | Number of Pills | Controlled Substance | Markings |
|------|-----------|-------|-----------------|----------------------|----------|
| 11/18/2016 | R.L. | MA | 20,000 | Fentanyl | A 215 |
| 11/18/2016 | J.H. | OH | 2,000 | Fentanyl | A 215 |
| 11/18/2016 | B.W. | AL | 2,000 | Fentanyl | A 215 |
| 11/18/2016 | Y.C. | OH | 1,100 | Fentanyl | A 215 |
| 11/18/2016 | N.L. | NJ | 1,000 | Fentanyl | A 215 |
| 11/18/2016 | D.A. | NJ | 1,000 | Fentanyl | A 215 |
| 11/18/2016 | F.C. | AK | 1,000 | Fentanyl | A 215 |
| 11/18/2016 | P.T.A.C. | MD | 1,000 | Fentanyl | M/30 |
| 11/18/2016 | L.S. | MN | 1,000 | Fentanyl | M/30 |
| 11/18/2016 | V.R. | WA | 1,000 | Fentanyl | A 215 |
| 11/18/2016 | S.W. | NC | 1,000 | Fentanyl | A 215 |
| 11/18/2016 | G.M. | NV | 500 | Fentanyl | A 215 |
| 11/18/2016 | L.F. | PA | 500 | Fentanyl | M/30 |
| 11/18/2016 | S.R. | WA | 200 | Fentanyl | M/30 |
| 11/18/2016 | R.B. | OH | 150 | Fentanyl | A 215 |
| 11/18/2016 | D.P. | MA | 150 | Fentanyl | A 215 |

5

| 11/18/2016 | CBS.I., M.W. | KS | 100 | Fentanyl | A 215 |
| 11/18/2016 | M.J. | KY | 100 | Fentanyl | A 215 |
| 11/18/2016 | P.F. | IL | 100 | Fentanyl | A 215 |
| 11/18/2016 | J.P. | PA | 100 | Fentanyl | A 215 |
| 11/18/2016 | M.S. | NC | 100 | Fentanyl | A 215 |
| 11/18/2016 | F.O. | LA | 100 | Fentanyl | M/30 |
| 11/18/2016 | M.L. | NC | 100 | Fentanyl | A 215 |
| 11/18/2016 | T.M. | CT | 60 | Fentanyl | M/30 |
| 11/18/2016 | J.T. | OR | 50 | Fentanyl | M/30 |
| 11/18/2016 | A.M. | MT | 40 | Fentanyl | M/30 |
| 11/18/2016 | D.L.G. | MT | 40 | Fentanyl | A 215 |
| 11/18/2016 | M.M. | NY | 30 | Fentanyl | M/30 |
| 11/18/2016 | J.M.L. | MD | 27 | Fentanyl | A 215 |
| 11/18/2016 | J.M. | IL | 22 | Fentanyl | M/30 |
| 11/18/2016 | A.B. | CO | 20 | Fentanyl | M/30 |
| 11/18/2016 | A.G. | KY | 20 | Fentanyl | A 215 |
| 11/18/2016 | M.P. | MN | 16 | Fentanyl | A 215 |
| 11/18/2016 | J.T. | OR | 14 | Fentanyl | M/30 |
| 11/18/2016 | A.T. | VA | 12 | Fentanyl | M/30 |
| 11/18/2016 | T.E. | SC | 12 | Fentanyl | M/30 |
| 11/18/2016 | N.A. | CA | 12 | Fentanyl | A 215 |
| 11/18/2016 | C. | PA | 11 | Fentanyl | M/30 |
| 11/18/2016 | K.M.T.T.S.T.R. | OK | 11 | Fentanyl | M/30 |

| 11/18/2016 | K.M.H. | SC | 11 | Fentanyl | M/30 |
|---|---|---|---|---|---|
| 11/18/2016 | L.P. | NY | 11 | Fentanyl | M/30 |
| 11/18/2016 | B.S. | OH | 11 | Fentanyl | A 215 |
| 11/18/2016 | R.P. | PA | 11 | Fentanyl | A 215 |
| 11/18/2016 | A.B. | MO | 11 | Fentanyl | M/30 |
| 11/18/2016 | J.G. | NY | 11 | Fentanyl | M/30 |
| 11/18/2016 | M.J. | CA | 11 | Fentanyl | M/30 |
| 11/18/2016 | J.S. | PA | 11 | Fentanyl | A 215 |
| 11/18/2016 | S.F. | PA | 11 | Fentanyl | A 215 |
| 11/18/2016 | G.T. | TX | 11 | Fentanyl | M/30 |
| 11/18/2016 | J.R. | CT | 11 | Fentanyl | A 215 |
| 11/18/2016 | M.D. | NJ | 10 | Fentanyl | A 215 |
| 11/18/2016 | B.B. | CO | 10 | Fentanyl | A 215 |
| 11/20/2016 | A.W. | WA | 5,000 | Fentanyl | M/30 |
| 11/20/2016 | Y.C. | OH | 1,100 | Fentanyl | A 215 |
| 11/20/2016 | J.R. | MN | 1,000 | Fentanyl | M/30 |
| 11/20/2016 | A.P. | KY | 1,000 | Fentanyl | A 215 |
| 11/20/2016 | D.R. | DE | 500 | Fentanyl | M/30 |
| 11/20/2016 | L.R.T.A.S. | NJ | 500 | Fentanyl | A 215 |
| 11/20/2016 | A.M. | MN | 500 | Fentanyl | A 215 |
| 11/20/2016 | M.C. | SC | 200 | Fentanyl | A 215 |
| 11/20/2016 | T.J. | FL | 200 | Fentanyl | A 215 |
| 11/20/2016 | M.S. | NC | 200 | Fentanyl | M/30 |

7

| 11/20/2016 | G.D. | VA | 150 | Fentanyl | A 215 |
|------------|------|-----|-----|----------|-------|
| 11/20/2016 | A.H. | PA | 100 | Fentanyl | A 215 |
| 11/20/2016 | J.R. | NC | 100 | Fentanyl | A 215 |
| 11/20/2016 | C.D. | MA | 100 | Fentanyl | A 215 |
| 11/20/2016 | A.H. | VA | 100 | Fentanyl | A 215 |
| 11/20/2016 | N.M. | ME | 100 | Fentanyl | A 215 |
| 11/20/2016 | N.Y. | MI | 100 | Fentanyl | A 215 |
| 11/20/2016 | M.J. | KY | 100 | Fentanyl | A 215 |
| 11/20/2016 | D.L. | FL | 100 | Fentanyl | M/30 |
| 11/20/2016 | J.B. | TX | 100 | Fentanyl | M/30 |
| 11/20/2016 | A.W. | TX | 13 | Fentanyl | M/30 |

- Aiding and Abetting the Attempted Distribution of a Controlled Substance,
  namely Alprazolam, on or about the following dates to the following addressees,
  each in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and
  Title 18, United States Code, Section 2:

| Date | Addressee | State | Number of Pills | Controlled Substance | Markings |
|------|-----------|-------|-----------------|----------------------|----------|
| 11/18/2016 | W.R. | WA | 10,000 | Alprazolam | GG 249 |
| 11/18/2016 | H.W. | NJ | 10,000 | Alprazolam | GG 249 |
| 11/18/2016 | A.W. | NY | 5,000 | Alprazolam | GG 249 |
| 11/18/2016 | A.M. | CA | 5,000 | Alprazolam | GG 249 |
| 11/18/2016 | C.R. | WV | 2,000 | Alprazolam | GG 249 |

8

| 11/18/2016 | R.L. | FL | 2,000 | Alprazolam | GG 249 |
|---|---|---|---|---|---|
| 11/18/2016 | J.L. | CA | 2,000 | Alprazolam | GG 249 |
| 11/18/2016 | B.J. | LA | 2,000 | Alprazolam | GG 249 |
| 11/18/2016 | L. | NY | 2,000 | Alprazolam | GG 249 |
| 11/18/2016 | A.K. | WI | 2,000 | Alprazolam | GG 249 |
| 11/18/2016 | J.B. | TX | 1,000 | Alprazolam | GG 249 |
| 11/18/2016 | A.F. | GA | 200 | Alprazolam | GG 249 |
| 11/18/2016 | S.W. | NC | 100 | Alprazolam | GG 249 |
| 11/18/2016 | P.H. | PA | 100 | Alprazolam | GG 249 |
| 11/18/2016 | J.T. | OR | 100 | Alprazolam | GG 249 |
| 11/18/2016 | A.S. | TX | 100 | Alprazolam | GG 249 |
| 11/18/2016 | R.K. | NC | 100 | Alprazolam | GG 249 |
| 11/18/2016 | D.C. | IL | 100 | Alprazolam | GG 249 |
| 11/18/2016 | R.T. | TN | 100 | Alprazolam | GG 249 |
| 11/18/2016 | F.W. | NC | 100 | Alprazolam | GG 249 |
| 11/18/2016 | X.C. | OH | 100 | Alprazolam | GG 249 |
| 11/18/2016 | D.H. | FL | 50 | Alprazolam | GG 249 |
| 11/20/2016 | N.K. | MA | 2,000 | Alprazolam | GG 249 |
| 11/20/2016 | G.R. | TX | 2,000 | Alprazolam | GG 249 |
| 11/20/2016 | J.O. | SC | 2,000 | Alprazolam | GG 249 |
| 11/20/2016 | C.L. | OR | 2,000 | Alprazolam | GG 249 |
| 11/20/2016 | Mrs. L. | MI | 1,000 | Alprazolam | GG 249 |
| 11/20/2016 | A.S. | NC | 1,000 | Alprazolam | GG 249 |

9

| Date | | State | | Controlled Substance | Markings |
|------|------|------|------|------|------|
| 11/20/2016 | J.H. | TN | 1,000 | Alprazolam | GG 249 |
| 11/20/2016 | Y.C. | OH | 500 | Alprazolam | GG 249 |
| 11/20/2016 | J.S. | MI | 200 | Alprazolam | GG 249 |
| 11/20/2016 | N.H. | SC | 100 | Alprazolam | GG 249 |
| 11/20/2016 | C.S. | TN | 100 | Alprazolam | GG 249 |
| 11/20/2016 | J.H. | LA | 100 | Alprazolam | GG 249 |
| 11/20/2016 | D.C. | IL | 100 | Alprazolam | GG 249 |
| 11/20/2016 | S.S. | GA | 100 | Alprazolam | GG 249 |
| 11/20/2016 | A.L. | CA | 100 | Alprazolam | GG 249 |
| 11/20/2016 | D.L. | SC | 100 | Alprazolam | GG 249 |
| 11/20/2016 | P.O. | GA | 100 | Alprazolam | GG 249 |
| 11/20/2016 | Z.W. | NY | 100 | Alprazolam | GG 249 |
| 11/20/2016 | C.G. | MS | 100 | Alprazolam | GG 249 |

- Aiding and Abetting the Use of the U.S. Mail in Furtherance of a Drug Trafficking Offense on the following dates by delivering packages to the post office addressed to the following addressees, containing the following controlled substances, each in violation of Title 21, United States Code, Section 843(b) and Title 18, United States Code, Section 2:

| Date | Addressee | State | Number of Pills | Controlled Substance | Markings |
|------|-----------|-------|-----------------|----------------------|----------|
| 11/22/2016 | M.E. | SD | 5,000 | Fentanyl | M/30 |

10

| 11/22/2016 | E.J. | NC | 5,000 | Fentanyl | M/30 |
|---|---|---|---|---|---|
| 11/22/2016 | K.V. | NJ | 2,000 | Fentanyl | A 215 |
| 11/22/2016 | Mr. McG. | WA | 1,000 | Fentanyl | Mixed |
| 11/22/2016 | E.S. | NC | 500 | Fentanyl | M/30 |
| 11/22/2016 | R.W. | SC | 500 | Fentanyl | A 215 |
| 11/22/2016 | G.V. | VA | 100 | Fentanyl | M/30 |
| 11/22/2016 | E.B. | CT | 100 | Fentanyl | A 215 |
| 11/22/2016 | M.T. | IL | 100 | Fentanyl | M/30 |
| 11/22/2016 | B.F. | ND | 100 | Fentanyl | M/30 |
| 11/22/2016 | C.S. | CO | 50 | Fentanyl | M/30 |
| 11/22/2016 | S.H. | OH | 50 | Fentanyl | M/30 |
| 11/22/2016 | B.M. | AL | 50,000 | Alprazolam | GG 249 |
| 11/22/2016 | J.S. | CA | 50,000 | Alprazolam | GG 249 |
| 11/22/2016 | T.G. | NC | 20,000 | Alprazolam | GG 249 |
| 11/22/2016 | M.D. | CA | 2,000 | Alprazolam | GG 249 |
| 11/22/2016 | M.T. | VA | 2,000 | Alprazolam | GG 249 |
| 11/22/2016 | T.D. | IL | 100 | Alprazolam | GG 249 |

- Aiding and Abetting the Attempted Distribution of a Controlled Substance, namely Fentanyl, on or about November 20, 2016, to J.G., aka "trustworthymoney," through A.L., all in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 2;

11

- Aiding and Abetting the Distribution of Fentanyl on or about April 6, 2016, to E.B., all in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2;

- Aiding and Abetting the Distribution of Fentanyl on or about March 3, 2016, to C.V., all in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2; and

- Aiding and Abetting the Distribution of Fentanyl on or about August 3, 2016, to G.K., all in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2;

which violations were part of a continuing series of violations of the Controlled Substances Act, Title 21, United States Code, Section 801, *et seq.*, undertaken by the defendant, AARON MICHAEL SHAMO, in concert with at least five other persons with respect to whom AARON MICHAEL SHAMO occupied a position of organizer, supervisor, and any position of management, and from which such continuing series of violations the defendant obtained substantial income and resources.

Furthermore, the defendant, AARON MICHAEL SHAMO, was a principal administrator, organizer, supervisor and leader of the criminal enterprise, which involved possession with intent to distribute and distribution of more than 12,000 grams of a mixture and substance containing a detectable amount of Fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl]propanamide), a schedule II controlled substance within the meaning of 21 U.S.C. § 812; all in violation of 21 U.S.C. § 848(b)(1) and (2)(A) and punishable under 21 U.S.C. § 848(b).

12

## COUNT 2
### (21 U.S.C. § 952, AIDING AND ABETTING THE IMPORTATION OF A CONTROLLED SUBSTANCE)

On or about June 23, 2016, in the Central Division of the District of Utah and

elsewhere,

### AARON MICHAEL SHAMO,

defendant herein, did intentionally and knowingly import from the country of China into

the United States 40 grams or more of a mixture and substance containing a detectable

amount of Fentanyl (N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide), a

Schedule II controlled substance within the meaning of 21 U.S.C. § 812, and did aid and

abet therein, all in violation of 21 U.S.C. §§ 952(a), 960, and 18 U.S.C. § 2, and

punishable under 21 U.S.C. § 960(b)(2).


## COUNT 3
### (21 U.S.C. § 952, AIDING AND ABETTING THE IMPORTATION OF A CONTROLLED SUBSTANCE)

On or about November 8, 2016, in the Central Division of the District of Utah and

elsewhere,

### AARON MICHAEL SHAMO,

defendant herein, did intentionally and knowingly import from the country of China into

the United States a mixture and substance containing a detectable amount of Alprazolam,

a Schedule IV controlled substance within the meaning of 21 U.S.C. § 812; and did aid

and abet therein, all in violation of 21 U.S.C. §§ 952(a), 960, and 18 U.S.C. § 2, and

punishable under 21 U.S.C. § 960(b)(6).

13

## COUNT 4
### (21 U.S.C. § 952, AIDING AND ABETTING THE IMPORTATION OF A CONTROLLED SUBSTANCE)

On or about November 16, 2016, in the Central Division of the District of Utah and

elsewhere,

AARON MICHAEL SHAMO,

defendant herein, did intentionally and knowingly import from the country of China into

the United States 40 grams or more of a mixture and substance containing a detectable

amount of Fentanyl (N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide), a

Schedule II controlled substance within the meaning of 21 U.S.C. § 812, and did aid and

abet therein, all in violation of 21 U.S.C. §§ 952(a), 960, and 18 U.S.C. § 2, and

punishable under 21 U.S.C. § 960(b)(2).


## COUNT 5
### (21 U.S.C. § 841(a)(1), POSSESSION OF FENTANYL WITH INTENT TO DISTRIBUTE)

On or about November 22, 2016, in the Central Division of the District of Utah,

AARON MICHAEL SHAMO,

defendant herein, did knowingly and intentionally possess with intent to distribute four

hundred grams or more of a mixture and substance containing a detectable amount of

Fentanyl (N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide), a Schedule II

controlled substance within the meaning of 21 U.S.C. § 812; all in violation of 21 U.S.C.

§ 841(a)(1) and punishable pursuant to 21 U.S.C. § 841(b)(1)(A).


14

## **COUNT 6**
### (21 U.S.C. § 841(a)(1), AIDING AND ABETTING THE DISTRIBUTION OF A CONTROLLED SUBSTANCE THAT RESULTED IN DEATH)

On or about June 6 through June 13, 2016, in the Central Division of the District of

Utah and elsewhere,

### AARON MICHAEL SHAMO,

defendant herein, did intentionally and knowingly distribute a mixture and substance

containing a detectable amount of Fentanyl (N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-

piperidinyl ] propanamide), a Schedule II controlled substance within the meaning of 21

U.S.C. § 812, the use of which resulted in the death of R.K. on June 13, 2016, and did aid

and abet therein, all in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and

punishable under 21 U.S.C. § 841(b)(1)(C).


## **COUNT 7**
### (21 U.S.C. § 841(a)(1), MANUFACTURE OF ALPRAZOLAM)

On or about November 22, 2016, in the Central Division of the District of Utah,

### AARON MICHAEL SHAMO,

the defendant herein, did knowingly and intentionally manufacture a mixture and

substance containing a detectable amount of Alprazolam, a Schedule IV controlled

substance within the meaning of 21 U.S.C. § 812; all in violation of 21 U.S.C. §

841(a)(1) and punishable pursuant to 21 U.S.C. § 841(b)(2).

//

//

15

97

## COUNT 8
**(21 U.S.C. §§ 331(k) & 333(b)(7), KNOWING AND INTENTIONAL ADULTERATION OF DRUGS WHILE HELD FOR SALE)**

Beginning on a date unknown to the Grand Jury, but at least by February 3, 2016, and continuing to at least November 22, 2016, in the Central Division of the District of Utah,

AARON MICHAEL SHAMO,

defendant herein, knowingly and intentionally manufactured a drug and caused the manufacture of a drug—specifically, round blue tablets debossed with "A 215" on the bisected side—and offered those tablets for sale on the internet as "Oxycodone 30 mg." Despite these representations, the defendant did not use Oxycodone at all in the manufacturing process, but instead, substituted Fentanyl, a much more potent synthetic opioid. These acts caused the drug to be adulterated as defined at 21 U.S.C. §§ 351(b) and 351(d), and the adulteration had a reasonable probability of causing serious adverse health consequences or death to humans. The manufacturing of these drugs was performed after the component ingredients of the tablets had been shipped in interstate commerce, from outside of Utah to Utah, and while the drugs were held for sale. All this was done in violation of 21 U.S.C. §§ 331(k) and 333(b)(7) and is punishable pursuant to 21 U.S.C. § 333(b)(7).

## COUNT 9
**(21 U.S.C. §§ 331(k) & 333(b)(7), KNOWING AND INTENTIONAL ADULTERATION OF DRUGS WHILE HELD FOR SALE)**

Beginning on a date unknown to the Grand Jury, but at least by June 18, 2016, and continuing to at least November 22, 2016, in the Central Division of the District of Utah,

16

AARON MICHAEL SHAMO,

defendant herein, knowingly and intentionally manufactured a drug and caused the

manufacture of a drug—specifically, round blue tablets with "Ⓜ" on one side and a "30"

above a bisect on the other—and offered those tablets for sale on the internet as

"Oxycodone 30 mg." Despite these representations, the defendant did not use

Oxycodone at all in the manufacturing process, but instead, substituted Fentanyl, a much

more potent synthetic opioid. These acts caused the drug to be adulterated as defined at

21 U.S.C. §§ 351(b) and 351(d), and the adulteration had a reasonable probability of

causing serious adverse health consequences or death to humans. The manufacturing of

these drugs was performed after the component ingredients of the tablets had been

shipped in interstate commerce, from outside of Utah to Utah, and while the drugs were

held for sale. All this was done in violation of 21 U.S.C. §§ 331(k) and 333(b)(7) and is

punishable pursuant to 21 U.S.C. § 333(b)(7).

## COUNT 10
### (21 U.S.C. § 843(b), AIDING AND ABETTING THE USE OF THE U.S. MAIL IN FURTHERANCE OF A DRUG TRAFFICKING OFFENSE)

On or about September 12-23, 2016, in the Central Division of the District of

Utah,

AARON MICHAEL SHAMO,

defendant herein, did knowingly and intentionally use a communication facility, the U.S.

Mail, in facilitating the commission of any act constituting a felony under Title 21, United

States Code, Section 841(a)(1), that is, distribution of a controlled substance; and did aid

17

and abet therein, all in violation of Title 21, United States Code, Section 843(b) and Title

18, United States Code, Section 843(b). Specifically, a package containing Alprazolam

tablets and which listed a false return address was sent through the U.S. Mail, but was

returned by the postal service to the false return address in the date range listed above.

T.M., who resided at the address listed on the false return address, received the package of

Alprazolam tablets.

## COUNT 11
### (18 U.S.C. § 1956(h), CONSPIRACY TO COMMIT MONEY LAUNDERING)

Beginning on a date unknown to the Grand Jury, but at least by December 22,

2015, and continuing to at least November 22, 2016, in the Central Division of the District

of Utah and elsewhere,

### AARON MICHAEL SHAMO,

defendant herein, did knowingly combine, conspire, confederate and agree with other

persons, both known and unknown to the Grand Jury to commit offenses under Title 18,

United States Codes, Section 1956, in that they conducted and attempted to conduct

financial transactions affecting interstate commerce, which transactions involved the

proceeds of specified unlawful activity, that is, the distribution of a controlled substance,

in violation of 21 U.S.C. § 841(a)(1); 1) with the intent to promote the carrying on of such

specified unlawful activity, and 2) knowing that the transactions were designed in whole

or in part to conceal and disguise the nature, location, source, ownership, and control of

the proceeds of said specified unlawful activity, and while conducting and attempting to

conduct such financial transactions, knew that the property involved in the financial

18

transactions represented the proceeds of some form of unlawful activity, in violation of 18

U.S.C. §§ 1956(a)(1)(A)(i) and (a)(1)(B)(i); and to commit offenses under Title 18, United

States Code, Section 1957, in that they knowingly engaged and attempted to engage in

monetary transactions by, through or to a financial institution, affecting interstate and

foreign commerce, in criminally derived property of a value greater than $10,000, that is

the proceeds of the distribution of a controlled substance, in violation of 21 U.S.C. §

841(a)(1), such property having been derived from such specified unlawful activity, in

violation of 18 U.S.C. § 1957; all of which was done in violation of 18 U.S.C. §1956(h).

## COUNT 12
### (18 U.S.C. § 1956(a)(1)(B)(i), MONEY LAUNDERING PROMOTION AND CONCEALMENT)

On or about November 8, 2016, in the Central Division of the District of Utah,

### AARON MICHAEL SHAMO,

defendant herein, did knowingly conduct and attempt to conduct a financial transaction

affecting interstate commerce, to wit: the deposit of $2,700 into America First Credit

Union account #XX893-1, which involved the proceeds of a specified unlawful activity,

that is the distribution of a controlled substance, 1) with the intent to promote the carrying

on of such specified unlawful activity, and 2) knowing that the transactions were designed

in whole or in part to conceal and disguise the nature, location, source, ownership, and

control of the proceeds of said specified unlawful activity, and while conducting and

attempting to conduct such financial transactions, knew that the property involved in the

19

financial transactions represented the proceeds of some form of unlawful activity; all in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and (a)(1)(B)(i).

## COUNT 13

(18 U.S.C. § 1957(a), ENGAGING IN MONETARY TRANSACTIONS IN PROPERTY DERIVED FROM SPECIFIED UNLAWFUL ACTIVITY)

On or about May 5, 2016, in the Central Division of the District of Utah,

### AARON MICHAEL SHAMO,

defendant herein, did knowingly engage and attempt to engage in a monetary transaction by, through, or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, issue a personal check from the Defendant's Wells Fargo Bank account (#XX4284) in the amount of $14,000 payable to iDrive Utah, such property having been derived from a specified unlawful activity, that is, distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1); all in violation of Title 18, United States Codes, Sections 1957(a).

## NOTICE OF INTENTION TO SEEK CRIMINAL FORFEITURE

Pursuant to 21 U.S.C. § 853, upon conviction of any offense in violation of 21 U.S.C. §§ 841, 843, 846, 848, and/or 952, as set forth in this indictment, the defendant shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offenses and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offenses. The property to be forfeited includes, but is not limited to, the following:

20

- $5,357,950.38 in United States Currency, the proceeds of the sale of 513.15 Bitcoin

- $1,227,773.00 in United States Currency

- $19,520.00 in United States Currency

- $10,096.20 in United States Currency

- $671,030 in United States Currency

- $134,960 in United States Currency

- 512.93 Bitcoin Cash (BCH)

- 513.15 Bitcoin Gold (BTG)

- 32.811 Bitcoin

- $30,250 as a substitute res for a 2011 Ford F-350 pickup (VIN#1FT8W3BT7BEC88017) sold pursuant to an interlocutory sale order

- $6400 as a substitute res for a 2008 BMW 135i (VIN#WBAUC73508VF25535) sold pursuant to an interlocutory sale order

- Industrial large pill press and associated pill dyes



- Four 100-ounce silver bars

- A MONEY JUDGMENT equal to the value of any proceeds obtained, directly or indirectly, as the result of such offenses and any property used, or intended

21

to be used, in any manner or part, to commit, or to facilitate the commission of, the offenses and not available for forfeiture for one or more the reasons specified in 21 U.S.C. § 853(p) as a result of any act or omission of the defendant(s).

Pursuant to 18 U.S.C. § 982(a)(1), upon conviction of any offense in violation of 18 U.S.C. §§ 1956 and/or 1957, the defendant shall forfeit to the United States of America any property, real or personal, involved in such violations, and any property traceable to such property. The property to be forfeited includes, but is not limited to the following:

- A MONEY JUDGMENT equal to the value of all property involved in each money laundering offense and any property traceable to such property and not available for forfeiture for one or more the reasons specified in 21 U.S.C. § 853(p) as a result of any act or omission of the defendant(s).

## SUBSTITUTE ASSETS

If any of the property described above, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without

22

difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant

to 21 U.S.C. § 853(p) and 18 U.S.C. § 982(b).

A TRUE BILL:

_____
FOREPERSON OF GRAND JURY

JOHN W. HUBER
United States Attorney

_____
MICHAEL GADD
Special Assistant United States Attorney
VERNON STEJSKAL
Assistant United States Attorney

23

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

---

## IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | MOTION FOR THE RELEASE OF FILED STATEMENTS IN ADVANCE OF PLEA AND SEALED PLEA SUPPLEMENTS |
| vs. | |
| AARON MICHAEL SHAMO, DREW WILSON CRANDALL, ALEXANDRYA MARIE TONGE, KATHERINE LAUREN ANNE BUSTIN, MARIO ANTHONY NOBLE, and SEAN MICHAEL GYGI, | Judge Dale A. Kimball |
| Defendants. | |

The United States, by and through Michael Gadd, Special Assistant United States

Attorney, hereby moves the Court to order that copies of the plea agreements and plea

supplements filed in this case be produced by the clerk's office to the United States.

Those documents are numbered: 108, 109, 116, 117, 118, 119, 120, 121, 134, and 135.

The United States requests two certified copies of each document in order to comply with

the Court's Trial Order (Doc. 130).

//

No defendants have signaled an objection to this request.

Dated this 6th day of December, 2018.

JOHN W. HUBER
United States Attorney


 /S/ Michael Gadd
MICHAEL GADD
Special Assistant United States Attorney

# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | ORDER GRANTING THE RELEASE OF FILED STATEMENTS IN ADVANCE OF PLEA AND SEALED PLEA SUPPLEMENTS |
| vs. | |
| AARON MICHAEL SHAMO, DREW WILSON CRANDALL, ALEXANDRYA MARIE TONGE, KATHERINE LAUREN ANNE BUSTIN, MARIO ANTHONY NOBLE, and SEAN MICHAEL GYGI, | Judge Dale A. Kimball |
| Defendants. | |

The Court, good cause appearing, grants the United States' motion to have certified statements in advance of plea and sealed plea supplements released to it from the above-captioned case.

The clerk's office is ORDERED to produce two certified copies of each of the following plea documents from this case to the United States: 108, 109, 116, 117, 118, 119, 120, 121, 134, and 135.

DATED this ___ day of December, 2018.

_____
DALE A. KIMBALL
United States District Judge

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
**SKORDAS, CASTON & HYDE, LLC**
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> AARON MICHAEL SHAMO, et. al., <br><br> Defendant. | **MOTION FOR JAMES HEARING AND NOTIFICATION OF ORAL TESTIMONY** <br><br> Case No. 2:16-CR-00631 DAK <br><br> Judge Dale A. Kimball |

Aaron Michael Shamo, through his counsel, hereby moves the Court to preside over a James hearing to determine whether any statements made by Mr. Shamo's codefendants, or alleged unnamed conspirators, are admissible under the Confrontation Clause and the coconspirator exception to the hearsay rule, Federal Rule of Evidence 801(d)(2)(E).

Because the government must determine if it intends to introduce such statements, and would bear the burden of proof, Mr. Shamo cannot determine how many witnesses would be

1

called or the length of their testimony.

A memorandum of law is submitted herewith, and counsel for Mr. Shamo also seeks the

opportunity to brief the Court once the evidentiary hearing is completed.

DATED this 7th day of December, 2018.

SKORDAS, CASTON & HYDE, LLC

*/s/ Gregory G. Skordas*
Gregory G. Skordas
Attorney for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of December, 2018, I filed a true and correct copy of the foregoing MOTION FOR JAMES HEARING AND NOTIFICATION OF ORAL TESTIMONY, with the Clerk of the Court using CM/ECF system, which sent notification of such filing to the following:

S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Adam S. Elggren
Adam.elggren@usdoj.gov

*/s/ Sabrina Nielsen-Legal Secretary*
Skordas, Caston & Hyde, LLC

3

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
**SKORDAS, CASTON & HYDE, LLC**
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AARON MICHAEL SHAMO, et. al.,<br><br>Defendant. | **MEMORANDUM IN SUPPORT OF MOTION FOR JAMES HEARING**<br><br>Case No. 2:16-CR-00631 DAK<br><br>Judge Dale A. Kimball |

Aaron Michael Shamo, through his counsel, hereby submits this memorandum in support of his motion for the Court to preside over a James hearing to determine whether any statements made by Mr. Shamo's codefendants, or alleged unindicted coconspirators are admissible under the Confrontation Clause and the coconspirator exception to the hearsay rule, Federal Rule of Evidence 801(d)(2)(E).

**Facts**

1

In all counts of the indictment, the government may attempt to use statements by codefendants, and other alleged unknown or known but unnamed coconspirators, allegedly made during the course of and in furtherance of the alleged conspiracy against defendant.

## **Discussion of Law**

The Sixth Amendment to the United States Constitution guarantees all criminal defendants the right to confront their accusers.

Aside from Confrontation Clause analysis, Federal Rule of Evidence 802(d) states in relevant part:

> (d) a statement that meets the following conditions is not hearsay:
> . . .
> (2) An Opposing Party's Statement. The statement is offered against an opposing party and:  . . . (E) was made by the party's coconspirator during and in furtherance of the conspiracy. The statement must be considered but does not by itself establish . . . the existence of the conspiracy and the participation in it under (E).

Pursuant to *Bourjaily v. United States*, 483 U.S. 171, 175 (1987), this Court must find by a preponderance of the evidence that statements fall within the parameters of the rule in order to admit them. "Under Tenth Circuit law, a district court can only admit coconspirator statements if it holds a James hearing or conditions admission on forthcoming proof. … repeatedly mentioned, however, 'our strong preference for James proceedings.'" *United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007) (citations omitted). The Tenth Circuit requires proof of three prongs under 801(d)(2)(E). First, the government must prove the existence of a conspiracy. *United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995). Second, the government must prove that the defendant and the declarant were both members of the conspiracy. *Id*. Finally, the government must prove that the statements were made in furtherance of and in the course of the conspiracy. *Id*.

To establish the existence of a conspiracy, the government must present evidence

2

independent from the coconspirator statements. *United States v. Martinez*, 825 F.2d 1451, 1453 (10th Cir. 1987). To prove membership in a conspiracy, the government must show:

[1] that two or more persons agreed to violate the law, [2] that the defendant knew at least the essential objectives of the conspiracy, . . . [3] that the defendant knowingly and voluntarily became a part of it, and [4] that the alleged coconspirators were interdependent. *United States v. Evans*, 970 F.2d 663, 668 (10th Cir. 1992) (citation omitted).

A statement is made during the course of conspiracy if it is uttered before the objectives of the conspiracy eithers fails or succeed. *United States v. Owens*, 70 F.3d 1118, 1126 (10th Cir. 1995). A statement is viewed as having been made in furtherance of a conspiracy if it intended by the declarant to advance conspiratorial objectives. *United States v. Reyes*, 798 F.2d 380, 384 (10th Cir. 1986). This element of the test is applied narrowly to insure that the coconspirator exception to the hearsay rule is applied in limited circumstances. *United States v. Perez*, 989 F.2d 1574, 1578 (10th Cir. 1993, en banc).

WHEREFORE, the Defendant respectfully requests the Court set the matter for a James hearing to determine such admissibility in advance of trial currently scheduled to begin January 22, 2019.

DATED this 7th day of December, 2018.

SKORDAS, CASTON & HYDE, LLC

*/s/ Gregory G. Skordas*
Gregory G. Skordas
Attorney for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 7th day of December, 2018, I filed a true and correct copy of

the foregoing PRELIMINARY MEMORANDUM IN SUPPORT OF MOTION FOR JAMES

HEARING AND NOTIFICATION OF ORAL TESTIMONY, with the Clerk of the Court using

CM/ECF system, which sent notification of such filing to the following:

    S. Michael Gadd
    mgadd@agutah.gov

    Vernon G. Stejskal
    Vernon.stejskal@usdoj.gov

    Adam S. Elggren
    Adam.elggren@usdoj.gov


*/s/ Sabrina Nielsen-Legal Secretary*
Skordas, Caston & Hyde, LLC

4

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | ORDER GRANTING THE RELEASE OF FILED STATEMENTS IN ADVANCE OF PLEA AND SEALED PLEA SUPPLEMENTS |
| vs. | |
| AARON MICHAEL SHAMO, DREW WILSON CRANDALL, ALEXANDRYA MARIE TONGE, KATHERINE LAUREN ANNE BUSTIN, MARIO ANTHONY NOBLE, and SEAN MICHAEL GYGI, | Judge Dale A. Kimball |
| Defendants. | |

The Court, good cause appearing, grants the United States' motion to have certified statements in advance of plea and sealed plea supplements released to it from the above-captioned case.

The clerk's office is ORDERED to produce two certified copies of each of the following plea documents from this case to the United States: 108, 109, 116, 117, 118, 119, 120, 121, 134, and 135.

DATED this 7th day of December, 2018.

DALE A. KIMBALL
United States District Judge

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
**SKORDAS, CASTON & HYDE, LLC**
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone:  (801) 531-7444
Facsimile:  (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

Attorneys for Defendant

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> AARON MICHAEL SHAMO, et. al., <br><br> Defendant. | **MOTION IN LIMINE FOR ORDER EXCLUDING EVIDENCE** <br><br><br> Case No. 2:16-CR-00631 DAK <br><br> Judge Dale A. Kimball |

Aaron Michael Shamo, through his counsel, hereby moves the Court to enter an order

excluding evidence that the government intends to introduce at trial.

1. **Motion in Limine to exclude items from the Dark Web, PGP, Sigaint email, Dark Net Marketplace, AlphaBay, cryptocurrency and other evidence obtained from the internet**.

The Government intends to produce evidence from images obtained from the Dark Web

and other information obtained from the internet. Defendant requests that this court exclude all

1

electronic evidence that has not been properly authenticated under the Federal Rules of Evidence. Such evidence has the potential to mislead the jury and impose unfair prejudice on the defendant. It fails to meet the requirements of Federal Rules of Evidence (FRE) 401, 402 and 403.

Authentication of the evidence is necessary to establish that the evidence is what it purports to be and that there is a relationship between the evidence and the author or creator of the evidence. See FRE 901. It is critical that electronic data used against criminal defendants be properly authenticated because internet based evidence can be easily created, altered or manipulated.

In determining whether evidence is admissible, the court must conclude that it was reasonably probable that the evidence had not been altered since the occurrence of the crime. The information obtained from the Dark Web and other internet based evidence is subject to alteration or manipulation making authentication under FRE 901(b)(1) impossible.

Further, the Dark Web evidence and other internet evidence constitute hearsay under FRE 801 and cannot be admitted to prove the truth of the matters asserted therein. A similar issue arose in another 10th Circuit case where the Court found the lacking foundation was dispositive as to the admission of such evidence. *Powers v. Emcon Assocs.*, 2017 U.S. Dist. LEXIS 96968, 2 (D. Colo.). "'As a condition precedent to admissibility, Fed. R. Evid. 901 requires authentication or identification with evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *Id.* (citing *Strepka v. Jonsgaard*, No. 10-cv-00320-PAB-KMT, 2011 U.S. Dist. LEXIS 77516, 2011 WL, at *6 (D. Colo. July 18, 2011)). "While Fed. R. Evid. 902(5) provides that '[a] book, pamphlet, or other publication purporting to be issued by a public authority' is self-authenticating, private websites, or websites that do not

2

fall within the language of Rule 902(5), are not considered self-authenticating. Id. at 14-15 (See *Hansen v. PT Bank Negara Indonesia (Persero)*, 706 F.3d 1244, 1250 (10th Cir. 2013) (relying on Fed. R. Evid. 902(5) and finding that a foreign bank's website was not self-authenticating because it was not "a book, pamphlet, or other publication purporting to be issued by a public authority")). "To authenticate printouts from a website, the party proffering the evidence must produce some statement or affidavit from someone with knowledge [of the website] . . . for example [a] web master or someone else with personal knowledge would be sufficient." *Id*. at 16.

     The Government has provided no such authentication as required under the Federal Rules Evidence. The deadline to produce such authentication passed on November 19, 2018. The failure to properly disclose such authentication is proper cause to deny the admission of any such evidence at trial.

     **2. Motion in Limine to exclude expert Guy Gino and all reports and exhibits offered in relation to the Dark Web**

     In the Government's Notice Relating to Expert Testimony for Guy Gino, the government intends to introduce testimony "regarding the Dark Web, Dark Net Marketplaces generally and AlphaBay specifically, encrypted communications (including PGP encryption and Sigaint email accounts), and cryptocurrencies (including Bitcoin, how Blockchains work, and methods and means used to convert cryptocurrencies into fiat currencies, and the use of tumbler)." Further, the government attached a 111 page PowerPoint presentation and four videos related to the Dark Web/cryptocurrency.

     First, the Government has provided a list of 76 witnesses as potential witnesses for this case. It appears the information Mr. Gino would be providing is general information about the dark web which could be provided by other government witnesses. The testimony of Mr. Gino

would be irrelevant, duplicative, and will confuse the jury while providing no probative value.

Second, the proposed testimony about the Dark Web and related issues is irrelevant and has no probative value and would be extremely prejudicial to Mr. Shamo because it will confuse the jury on the issues of the case. In fact, such testimony would prove none of the elements of any of the charges against Mr. Shamo. Irrelevant evidence is not admissible. FRE 402.

Third, even if Mr. Gino's testimony is found to be relevant, the court may exclude it if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, waste of time, or needlessly presenting cumulative evidence. FRE 403. In this case, a detailed presentation on the Dark Web, cryptocurrency, Dark Net Marketplaces, AlphaBay, PGP encryption, Sigaint emails, Bitcoin and Blockchains will serve to confuse the jury and prejudice Mr. Shamo. The court should exclude expert Guy Gino and his reports.

### 3. Motion in Limine to exclude all witnesses and evidence related to the death of R.K. including experts Dr. Stacey L. Hail, Coroner Thomas Rogers, Toxicologist Bill Posey, fact witnesses and all reports and exhibits

Mr. Shamo requests the exclusion of evidence about alleged drug overdoses, including any fatalities. Such evidence is overly prejudicial and the evidence connecting Mr. Shamo to the deaths is based on evidence gathered from the Dark Web and the internet. Dark Web evidence cannot be authenticated and does not fall under an exception to the hearsay rules as argued above.

Mr. Shamo is charged in a 13 count second superseding indictment that alleges from July 2015 until November 2016, he conspired with others to knowingly and intentionally distribute fentanyl and alprazolam and money laundering. Further, Mr. Shamo is charged with engaging in a continuing criminal enterprise (CCE) and distributing fentanyl resulting in death. Mr. Shamo

was charged with 5 others in a superseding indictment and one other who was separately charged under a Felony Information. All six co-defendants and Mr. Shamo have common charges related to Conspiracy to Distribute Fentanyl. None of Mr. Shamo's co-defendants were charged with distribution of a controlled substance resulting in death nor were any charged with engaging in a CCE. The Government has acknowledged that it believes the conduct of Mr. Shamo is on par with the conduct of co-defendant Drew Crandall and Defendant in an associated matter, Jonathan Luke Paz. Nonetheless, the Government chose to charge only Mr. Shamo with the death resulting count.

Mr. Shamo is facing some of the most serious charges that can be made under federal law. However, Mr. Shamo is entitled to a fair trial. The admission of the discussed above evidence necessarily precludes that fairness. The Government has indicated it intends to admit several portions of evidence regarding the death of R.K., photographs, police reports, and autopsy and pathology reports. Mr. Shamo argues that evidence regarding overdosing, death, medical care given, medical examinations, grieving family and friends is inflammatory and prejudicial. It invites a jury to convict based on broad concepts of community safety, sympathy, fear, and passion. The inherent risk of prejudice increases with the current social climate surrounding what has been colloquially referred to as the "opioid epidemic." The prejudice from introducing this evidence to the jury far outweighs any probative value it may add. FRE 403. Therefore, the court should order that all evidence relating to death be excluded.

Alternatively, if the Court conclude the evidence is admissible, the Government has failed to meet the standards required for the admission of such evidence under Rule 104 of the Federal Rules of Evidence and a preliminary analysis of the evidence should be conducted outside the presence of the jury. Federal Rule of Evidence 104 requires the Court to "decide any

preliminary question about whether . . . evidence is admissible . . ." before such evidence is brought before a jury. Where "justice so requires" a hearing outside of the presence of the jury may be had to determine whether such evidence is sufficient to meet the preliminary question of whether a particular fact actually exists. FRE 104(c)(3). In the instant matter, the Government must prove under Rule 104, as a preliminary issue of fact that the drugs alleged to have been ingested by R.K. were in fact drugs obtained from Mr. Shamo and such drugs were in fact the direct cause of the death of R.K. before the death resulting count should be brought before the jury in its entirety. The evidence provided by the Government clearly indicates R.K. had a significant drug use history, but the Government has provided no analysis whereby a jury could conclude that the drugs ingested by R.K. were in fact drugs obtained from Mr. Shamo.

For the prejudicial reasons outlined above, the need to conduct this preliminary analysis outside the presence of the jury is paramount

WHEREFORE, Defendant, Aaron Michael Shamo, respectfully requests the Court enter order excluding the proffered evidence as outlined above.

DATED this 7th day of December, 2018.

SKORDAS, CASTON & HYDE, LLC

*/s/ Gregory G. Skordas*
Gregory G. Skordas
Attorney for Defendant

6

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 7th day of December, 2018, I filed a true and correct copy of

the foregoing **MOTION IN LIMINE FOR ORDER EXCLUDING EVIDENCE**, with the

Clerk of the Court using CM/ECF system, which sent notification of such filing to the following:

S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Adam S. Elggren
Adam.elggren@usdoj.gov

*/s/ Sabrina Nielsen-Legal Secretary*
Skordas, Caston & Hyde, LLC

7

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
**SKORDAS, CASTON & HYDE, LLC**
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone:  (801) 531-7444
Facsimile:  (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

Attorneys for Defendant

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> AARON MICHAEL SHAMO, et. al., <br><br> Defendant. | **MOTION TO ALLOW DEFENDANT TO WEAR ATTIRE OTHER THAN THOSE PROVIDED AS AN INMATE DURING TRIAL AND PRE-ADMISSION HEARING AND MEMORANDUM IN SUPPORT** <br><br><br> Case No. 2:16-CR-00631 DAK <br><br> Judge Dale A. Kimball |

Aaron Michael Shamo, through his counsel, hereby moves the Court to enter an order

allowing the Defendant to be clothed in attire other than those provided him as an inmate during

the pre-admission hearing scheduled for January 9-11, 2018 and trial scheduled to begin January

22, 2018. In support Defendant alleges as follows:

It is well-established that the U.S. Constitution prohibits the use of shackles during the guilt or innocence phase of a Defendant's case. *Ochoa v. Workman,* 669 F.3D 1130, 1145 (10TH Cir. 2012). That same prohibition stands for the requirement that a Defendant be required to stand trial while wearing readily identifiable prison attire. *Estelle v. Williams,* 425 U.S. 501, 512 (1976). The requirement that a Defendant wear prison attire during the guilt or innocence phase of his case serves no readily identifiable purpose or policy. *Id.* at 505.

In the instant matter, Mr. Shamo is charged with some of the most severe crimes an individual may be charged with in a federal matter. In the intervening two years since Mr. Shamo's arrest this case has made local and national news on multiple occasions. Mr. Shamo has serious concerns about the presumption of innocence given the exposure of this matter. Requiring a defendant to wear prison attire even in simple matters is a clear constitutional violation. In a matter as serious as Mr. Shamo's to not allow him the opportunity to appear before the jury with the presumption of innocence in tact to the greatest extent possible is paramount to the interests of justice.

WHEREFORE, Defendant, Aaron Michael Shamo, respectfully requests the Court allow him appear at the pre-admission hearing and jury trial in a suit provided to him by his family prior to the proceedings.

DATED this 7th day of December, 2018.

SKORDAS, CASTON & HYDE, LLC

*/s/ Gregory G. Skordas*
Gregory G. Skordas
Attorney for Defendant

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of December, 2018, I filed a true and correct copy of

the foregoing **MOTION TO ALLOW DEFENDANT TO WEAR ATTIRE OTHER THAN**

**THOSE PROVIDED AS AN INMATE DURING TRIAL AND PRE-ADMISSION**

**HEARING AND MEMORANDUM IN SUPPORT**, with the Clerk of the Court using

CM/ECF system, which sent notification of such filing to the following:

    S. Michael Gadd
    mgadd@agutah.gov

    Vernon G. Stejskal
    Vernon.stejskal@usdoj.gov

    Adam S. Elggren
    Adam.elggren@usdoj.gov

*/s/ Sabrina Nielsen-Legal Secretary*
Skordas, Caston & Hyde, LLC

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-3080
Email: kent.burggraaf@usdoj.gov

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AARON MICHAEL SHAMO,<br><br>Defendant. | Case No. 2:16-cr-00631 DAK<br><br>**UNITED STATE'S RESPONSE TO DEFENDANT'S MOTION TO ALLOW DEFENDANT TO WEAR ATTIRE OTHER THAN THOSE PROVIDED AS AN INMATE DURING TRIAL AND PRE-ADMISSION HEARING**<br><br>Judge Dale A. Kimball |

The United States of America, by and through Kent A. Burggraaf, Special Assistant United States Attorney, and hereby stipulates to the Defendant's request to allow him to appear at the pre-admission hearing and jury trial in a suit provided to him by his family prior to the proceedings.

RESPECTFULLY submitted on this 20th day of December, 2018.

JOHN W. HUBER
United States Attorney

*/s/ Kent A. Burggraaf*
KENT A. BURGGRAAF
Special Assistant United States Attorney

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

---

| UNITED STATES OF AMERICA, | Case No. 2:16-cr-631DAK |
|---|---|
| Plaintiff, | **MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE EVIDENCE** |
| vs. | |
| AARON MICHAEL SHAMO, | |
| Defendant. | Judge Dale A. Kimball |

---

The United States of America, by and through Michael Gadd, Special Assistant United

States Attorney, submits this memorandum in opposition to the defendant's request that the

Court exclude testimony and unspecified evidence that relates to the internet, cryptocurrency,

PGP encryption, or the overdose death of R.K. in Daly City, California, on June 13, 2016. The

United States urges the Court to deny the defendant's motion because 1. the United States can

and will lay appropriate foundation for its exhibits; 2. the expert testimony of Special Agent Guy

Gino about the Dark Net, Cryptocurrency, and PGP encryption will be particularly helpful to the

jury as it considers the fact testimony and exhibits in this case; and 3. just as evidence of a

homicide would not be unfairly prejudicial in a homicide case, evidence of distribution resulting

in death is not unfairly prejudicial to the defendant, who is charged in Count 6 with distributing

Fentanyl that resulted in R.K.'s death.

**Table of Contents**

1.  STATEMENT OF FACTS .................................................................................. 2
    1.1   Dark Net and Sigaint Exhibits ............................................................. 2
    1.2   Expert Testimony of Guy Gino ............................................................ 6
    1.3   Daly City Overdose Witnesses ............................................................ 7
2.  ARGUMENT .................................................................................................. 9
    2.1   The United States' witnesses can and will lay sufficient foundation for the Dark Net
          and Sigaint exhibits. ............................................................................... 9
    2.2   By definition, the proposed Dark Net and Sigaint exhibits are not hearsay. .............. 11
    2.3   The expert testimony of Special Agent Guy Gino and evidence of R.K.'s overdose
          death will not violate Rule 403 ............................................................ 14
          2.3.1   Special Agent Gino's testimony does not violate rule 403 ....................... 15
          2.3.2   Evidence about R.K.'s overdose death does not violate rule 403 ............. 16
3.  CONCLUSION ............................................................................................... 19

1.      **STATEMENT OF FACTS**

1.1     **Dark Net and Sigaint Exhibits**

        1.      This case involves an international Drug Trafficking Organization (DTO), run by

Aaron SHAMO, which manufactured controlled substances, namely fake oxycodone pills made

with Fentanyl and counterfeit Xanax tablets. The DTO distributed these controlled substances to

other individuals for purposes of further distribution throughout the United States and elsewhere

using their storefront, "PHARMA-MASTER," on the Dark Net[1] marketplace AlphaBay, and by

using the U.S. Mail. Mr. Shamo set up the storefront on AlphaBay and controlled the proceeds

earned by Pharma-Master on AlphaBay.

---

[1] Dark Net sites operate on the Dark Web, which cannot be accessed without special software,
and the Dark Net is a smaller part of the Deep Web.  The Deep Web is an area of the internet not
accessible using typical search engines like Google and accounts for approximately 96% of the
internet.  The Surface Web or Normal Web, on the other hand, accounts for just 4% of the
internet.  The majority of internet users are only familiar with the existence of the Surface Web.

2.     The United States has signaled it intends to seek admission of the following proposed exhibits that were captured from the Dark Net or from an email service that could be accessed through the Dark Net, Sigaint. Sigaint was a Dark Net email service that advertised it protected its users' locations and identities.

| Ex. No. | Description |
|---------|-------------|
| 15.00 | Pharma-Master store feedback screenshots (366 pages) |
| 15.01 | Pharma-Master store feedback screenshots (negative and neutral) |
| 15.02 | Pharmamaster.xls (a chart of the transactions with feedback) |
| 15.02 | Pharmamaster feedback summary table |
| 15.03 | Screenshots of feedback from Trustworthy Money |
| 15.04 | Screenshots of what they sell on AlphaBay |
| 15.05 | Sigaint email inbox contents for "Passthepeas" |
| 15.06 | Sigaint email sent box contents for "DRW99" |
| 15.07 | Sigaint email sent box contents for "Passthepeas" |
| 15.08 | Sigaint email trash folder contents for "DRW99" |
| 15.09 | Screenshots of Pharma-Master orders for 100 M30s or A 215s |
| 15.10 | Screenshots of Pharma-Master orders for 250 M30s or A215s |
| 15.11 | Screenshots of Pharma-Master orders for 500 M30s or A 215s |
| 15.12 | Screenshots of Pharma-Master orders for 1,000 M30s or A 215s |
| 15.13 | Screenshots of Pharma-Master orders for 1,100 M30s or A 215s |
| 15.14 | Screenshots of Pharma-Master orders for 2,000 M30s or A 215s |
| 15.15 | Screenshots of Pharma-Master orders for 5,000 M30s or A 215s |
| 15.16 | Screenshots of Pharma-Master orders for 10,000 M30s or A 215s |
| 15.17 | Screenshots of Pharma-Master orders for 20,000 M30s or A 215s |
| 15.18 | Screenshots of sales to Trustworthy Money for 10,000 fake oxy pills |
| 15.19 | Screenshots of sales to Trustworthy Money for 2,000 fake oxy pills |
| 15.20 | Screenshots of Pharma-Master orders for 1000 Alprazolam (Xanax) |
| 15.21 | Screenshots of Pharma-Master orders for 2,000 Alprazolam (Xanax) |

| 15.22 | Screenshots of Pharma-Master orders for 5,000 Alprazolam (Xanax) |
| 15.23 | Screenshots of Pharma-Master orders for 10,000 Alprazolam (Xanax) |
| 15.24 | Screenshots of Pharma-Master orders for 20,000 Alprazolam (Xanax) |
| 15.25 | Screenshot of Pharma-Master feedback from Stakbandz |
| 15.26 | Mario Noble interview - video file (12-7-2016 interview and Camtasia) |
| 15.27 | Sigaint email links from "Passthepeas" account (Get USPS links) |
| 15.28 | 9/26/2016-11/22/2016 Postal labels from links in Ex. 15.27 |
| 19.02 | Screenshot of Trustworthy Money profile on AlphaBay |

3.      For United States' proposed exhibits 15.00, 15.01, 15.02, 15.03, and 19.01, the United States will call HSI Investigative Analyst Robin Biundo to lay foundation for the exhibits to be admitted. Ms. Biundo will testify that as an analyst that helps investigate major Dark Net marketplace vendors, she accesses Dark Net marketplaces several times each week. During the period when the exhibits were created, Ms. Biundo accessed AlphaBay on a daily basis as part of her duties. Ms. Biundo had her own AlphaBay account that she used to access AlphaBay; she also accessed AlphaBay at times using accounts that had been surrendered to her and other agents by criminal suspects.

4.      Ms. Biundo and her team accessed AlphaBay and captured the screenshots in the proposed exhibits. She will testify that the screenshots are true and accurate representations of what she saw on AlphaBay with her own eyes.

5.      Ms. Biundo and her team took voluminous data from the screenshots in proposed exhibits 15.00 and 15.01 and compiled the data to create proposed exhibit 15.02, a chart and summary of Pharma-Master transactions for which she was able to capture feedback from Pharma-Master's store page on AlphaBay.

4

6.    For proposed exhibits 15.05 through 15.08, Ms. Biundo will testify that she and her team accessed, with consent, the Sigaint email accounts used by Ms. Tonge, Ms. Bustin, and Mr. Noble—three of Mr. Shamo's co-conspirators. Ms. Biundo will testify that those emails and screenshots in proposed exhibits 15.05 through 15.08 are true and accurate representations of the decrypted emails viewed in and captured from the Sigaint email accounts used by Ms. Tonge, Ms. Bustin, and Mr. Noble. Likewise, Ms. Tonge, Ms. Bustin, and Mr. Noble can testify that their emails contained in those exhibits are true and accurate.

7.    For United States' proposed exhibits 15.04, and 15.09 through 15.25, HSI Special Agent Adam Koeneman will lay foundation sufficient for the exhibits to be admitted. SA Koeneman will testify that he accessed AlphaBay as part of his duties. When he accessed AlphaBay to capture these exhibits, he also relied upon one of Mr. Shamo's co-defendants, Mario Noble, who gave SA Koeneman the ability to use Noble's AlphaBay account to access AlphaBay and some of the Pharma-Master store admin pages.  SA Koeneman will testify, like Ms. Biundo, that the screenshots he captured are true and accurate representations of what he saw on AlphaBay with his own eyes.

8.    For United States' proposed exhibit 15.26, SA Koeneman along with other agents sat down with Mr. Noble and audio and video recorded Mr. Noble as he took them onto Pharma-Master's page on AlphaBay. SA Koeneman will testify that the audio and video are true and accurate recordings of what he both saw and heard that day.

9.    For United States' proposed exhibit 15.27 and 15.28, HSI Special Agent Dan Ashment will testify that he, with permission, accessed the Sigaint account used by Ms. Tonge and Ms. Bustin. SA Ashment will explain that he took photographs of the computer screen as he viewed emails that contained links to print postage labels (15.27). SA Ashment will testify that

he clicked the links and printed the postage labels (15.28). SA Ashment will testify that the photographs he took and the postage labels he printed from the email links are true and accurate representations of what he saw with his own eyes.

10.      In addition to admitting these exhibits, the United States anticipates eliciting testimony from agents, analysts, and co-conspirators about communications over Sigaint accounts, AlphaBay, Pharma-Master, and encryption methods.

**1.2     Expert Testimony of Guy Gino**

11.      The United States has provided notice that it intends to call HSI Special Agent Guy Gino to provide expert testimony on the following subjects:

      a.  PGP Encryption;

      b.  Cryptocurrency, including Bitcoin;

      c.  The Dark Net; and

      d.  Dark Net Marketplaces, including AlphaBay;

12.      SA Gino's testimony will come relatively early in the United States' case-in-chief. His testimony is designed to educate the jury so that they will have the proper context in which to place the fact testimony they hear and exhibits they consider. To aid his testimony, SA Gino has prepared a PowerPoint presentation.

13.      SA Gino will testify that AlphaBay, like many Dark Net Marketplaces, worked to overcome the distrust inherent in online transactions, but which is amplified on Dark Net transactions where vendors and buyers enjoy some anonymity. For example, AlphaBay operated as an escrow service between buyers and vendors, employed moderators to settle disputes between buyers and vendors, and allowed buyers to post feedback on a vendor's store page. The feedback was accompanied by transaction data, including the item purchased by the buyer, the

price, quantity, and date, all of which was generated by AlphaBay. The feedback and transactional data displayed on a vendor's store page was not optional for the vendor. Sellers were required to post a bond with AlphaBay to begin selling goods and services on AlphaBay. Sellers were also given a trust rating by AlphaBay.

### 1.3 Daly City Overdose Witnesses

14. The United States intends to elicit the following testimony and admit the following exhibits regarding the death of R.K. in Daly City, California, on June 13, 2016.

15. United States' proposed exhibit 18.00 was gathered from proposed exhibit 14.54. Proposed exhibit 14.54 shows all the Pharma-Master customer order sheets located on Mr. Shamo's iMac computer. United States' proposed exhibit 18.00 shows two orders from R.K.'s address in Daly City to Pharma-Master for drugs Pharma-Master listed on AlphaBay as "Roxy-Oxycodone 30mg."

16. The orders were made on April 13, 2016, and June 6, 2016. Each order was for ten pills.

17. USPIS Inspector Megan Moore, who is a custodian of records for the Postal Service, will testify that the package containing the June order was shipped on June 9, 2016, from Midvale, Utah. The package arrived at R.K.'s residence at approximately 3pm on June 11, 2016.

18. Tori Grace, who was dating R.K.'s roommate and who was friends with R.K. will testify that she and her boyfriend arrived at R.K.'s residence at approximately 10:30pm on June 12, 2016. Ms. Grace saw R.K. had been drinking. Ms. Grace and her boyfriend hung out with R.K. in R.K.'s bedroom. Ms. Grace watched as R.K. crushed up two blue pills and snorted them. Ms. Grace knew that the pills had been ordered online and contained Fentanyl.

19.     Ms. Grace saw R.K. start to exhibit some of the symptoms of an opiate high. Ms. Grace heard R.K. ask Ms. Grace and her boyfriend to check on him. R.K. then laid down on his bed and went to sleep. Ms. Grace and her boyfriend checked on R.K. approximately every 15 minutes for two hours. Ms. Grace at one point noticed that R.K.'s breathing slowed. Ms. Grace saw her boyfriend roll R.K. into the recovery position as R.K. slept.

20.     The following morning, Ms. Grace learned from her boyfriend that R.K. had overdosed and died.

21.     Daly City Police Officer Sandra Sabins will testify that she and her partner received the call on the morning of the 13th to go to R.K.'s residence to check on an overdose report. Officer Sabins will testify that she entered the residence, spoke with Ms. Grace's boyfriend, viewed R.K., who was deceased, and took pictures of the crime scene. A few of those pictures comprise United States' proposed exhibit 18.01.

22.     R.K.'s body was taken to the coroner's office, where Dr. Thomas Rogers performed an autopsy. Dr. Rogers will testify that there was no other cause of death other than intoxication from the drugs found in R.K.'s blood toxicology report. Bill Posey, the toxicologist who analyzed R.K.'s blood, will testify about his results: he found alcohol, a cocaine metabolite, a cocaine cutting agent, and Fentanyl in R.K.'s blood.

23.     Dr. Stacey Hail, who studies overdose causes of death and who teaches and practices medicine, reviewed the case, including Dr. Rogers' and Bill Posey's reports. Dr. Hail will testify that despite having ethanol and a cocaine metabolite present in his bloodstream, Fentanyl intoxication was the but-for cause of death of R.K.

2.    **ARGUMENT**

2.1    **The United States' witnesses can and will lay sufficient foundation for the Dark Net and Sigaint exhibits.**

United States' proposed exhibits 15.00 through 15.28 and 19.02 should be admitted because the United States will offer testimony from witnesses who viewed the contents of the exhibits and will testify that the exhibits contain true and accurate representations of matters about which the witnesses have personal knowledge. In order to authenticate a piece of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Federal Rule of Evidence 901(a). Testimony of a witness with knowledge that an item is what it is claimed to be satisfies the requirement. Federal Rule of Evidence 901(b)(1).

Authentication is not a particularly high hurdle and proponent need not rule out contrary possibilities. *United States v. Brewer*, 630 F.2d 795, 801 (10th Cir. 1980); *United States v. Jardina*, 747 F.2d 945 (5th Cir. 1984); *United States v. Dhinsa*, 243 F.3d 635, 658-59 (2d Cir. 2001). Although not preferred, authentication "can be accomplished without the direct testimony of either a custodian or a percipient witness," such as when "appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances…provide sufficient indicia of reliability."  *United States v. Paulino*, 13 F.3d 20, 22-25 (1st Cir. 1994). The opponent's "'merely raising the possibility . . . of tampering is not sufficient to render evidence inadmissible.'" *United States v. Thomas*, 294 F.3d 899, 905 (7th Cir. 2002).

Once the authentication standard is met, lack of proof of connection, etc., goes to weight, not admissibility. *United States v. Hernandez-Herrera*, 952 F.2d 342, 44 (10th Cir. 1991);

9

*United States v. Santana*, 898 F.2d 821, 824 (1st Cir. 1990); *United States v. Long*, 857 F. 2d 436, 441-42 (8th Cir. 1988).

The defense's argument—that screenshots and video captures from Dark Net sites cannot be authenticated—has been previously advanced, unsuccessfully, in the criminal case against the founder of the first modern Dark Net Marketplace, Silk Road. In *United States v. Ulbricht,* Ulbricht argued that screenshots from various websites and Silk Road forum posts were electronic in nature and could not be verified as being what they purported to be. *United States v. Ulbricht*, 79 F. Supp. 3d 466, 487 (S.D.N.Y. 2015). Ulbricht relied upon *United States v. Vayner*, where the Second Circuit held the admission of a page of "the Russian equivalent of Facebook" to be error due to insufficient authentication. *Id. citing Vayner*, 769 F.3d 125 (2d Cir. 2014). But the court in *Ulbricht* declined to follow *Vayner*, reasoning that *Vayner* dealt with the issue of whether the government could prove Mr. Vayner authored the social media page, not whether the page existed. *Id.* The court in Ulbricht refused to exclude the government's screenshots, reasoning that "evidence may be authenticated in many ways" and "the 'type and quantum' of evidence necessary to authenticate a web page will always depend on context." *Id. citing Vayner.* The Ulbricht court also noted that its home circuit had expressed skepticism that authentication of evidence derived from the internet required "greater scrutiny" than authentication of any other record. *Id.*[2]

In this case, HSI Investigative Analyst Robin Biundo, HSI Special Agent Adam Koeneman, and HSI Special Agent Dan Ashment will lay the foundation to show that the proposed exhibits captured from the Dark Net or Sigaint are true and accurate representations of

---

[2] The defense has argued that the United States' Dark Web evidence cannot be admitted under FRE 902. The United States is not seeking to have the exhibits in paragraph 2 admitted under rule 902.

what they purport to be. These witnesses are each percipient witnesses; they personally, physically saw those Dark Net and Sigaint pages prior to capturing them as images. The witnesses are Dark Net savvy; Ms. Biundo, in particular, accessed AlphaBay every day during the main portion of the investigation. The defense has suggested no tangible, specific reason to believe any of the exhibits (or the Dark Net and Sigaint web pages) had been tampered with. The testimony of these percipient witnesses is all that is required under Rule 901 for the Court to admit United States' proposed exhibits 15.00 through 15.28 and 19.02 into evidence.

**2.2    By definition, the proposed Dark Net and Sigaint exhibits are not hearsay.**

The defense also argues that "Dark Web evidence and other internet evidence constitute hearsay," but the proposed exhibits listed in paragraph 2, above, are excluded from the definition of hearsay because they are variously statements by the defendant, adopted admissions of the defendant, or statements by co-conspirators made in furtherance of the conspiracy. Doc. 171, at 2. Hearsay is a statement, other than one made by the declarant while testifying at the trial or in a hearing, offered in evidence to prove the truth of the matter asserted. Federal Rules of Evidence 801(c).

Because a statement is offered to prove a proposition does not mean that the declarant has asserted that proposition. *United States v. Cesario-Ayala*, 576 F.3d 1120, 1129 (10th Cir. 2009)(statement that I've got your money not hearsay even though offered to show relationship between speaker and defendant); *United States v. Rodriguez-Lopez*, 565 F.3d 312 (6th Cir. 2009)(calls to defendant asking for heroin not hearsay when offered to circumstantially show participation in conspiracy, irrespective of truth); *United States v. Oguns*, 921 F.2d 442, 448-49 (2d Cir. 1990)(question whether apples had arrived not hearsay as circumstantial evidence of conspiracy - need not be admitted under coconspirator rule).

11

By definition, admissions by a party-opponent are not hearsay. FRE 801(d)(2)(A).

Likewise, adoptive admissions by a party opponent are not hearsay. FRE 801(d)(2)(B).

Declarants must be human; machines and computer code cannot be a declarant. *United States v. Lamons*, <u>532 F.3d 1251, 1262-63</u> (11th Cir. 2008) (computer generated billing records not a statement, therefore Confrontation Clause not implicated); *United States v. Washington*, <u>498 F.3d 225</u> (4th Cir. 2007) (data from chromatograph not hearsay and therefore not testimonial); *United States v. Hamilton*, <u>413 F.3d 1138, 1142-43</u> (10th Cir. 2005) (automatically generated computer headed information not hearsay).

The Sigaint email exhibits, 15.05 through 15.08, contain emails between Mr. Shamo and Ms. Tonge/Ms. Bustin, Mr. Crandall, and Mr. Noble, his co-defendants. The emails to or from Mr. Shamo are properly admitted as statements by a party opponent. The emails between Mr. Shamo's co-defendants were all done in furtherance of the conspiracy to distribute controlled substances, as is discussed in the United States' response to Mr. Shamo's request for a *James* hearing.

The AlphaBay screenshots and video capture exhibits likewise are not hearsay because they contain statements by a party opponent and his adopted admissions or contain statements the declarant did not offer for the truth of the matter asserted. Mr. Shamo set up his storefront on AlphaBay and authored its listings. Feedback was posted as Mr. Shamo sold his products. For example, here is a row of feedback and transaction data from proposed exhibit 15.00:



Here, the transactional data was supplied by AlphaBay—not a person, but computer code. The transactional data shows that a buyer with first letter "t" and last letter "y" bought drugs listed on Pharma-Master's storefront (by Mr. Shamo) as "Roxy – Oxycodone 30 mg X

12

2,000." In plain speak, the buyer, later identified as J.G. who used the moniker trustworthymoney, bought two thousand Fentanyl-laced fake oxycodone pills. The purchase price, converted by AlphaBay from Bitcoin to USD, is also listed: $10,003.50.

Finally, the buyer submitted his feedback to AlphaBay: "fe best vendor on dnm for oxys." Again, in plain speak, the buyer encourages other buyers to "fe," meaning finalize early their transactions with Pharma-Master rather than leaving payment pending in the escrow serivice provided by AlphaBay—an act that expresses trust and confidence in the fidelity of a vendor. The buyer shares his opinion that Pharma-Master is the best Dark Net Marketplace vendor for oxycodone pills.

Mr. Shamo received more than three hundred pages of positive feedback on Pharma-Master's page on AlphaBay. AlphaBay generally, and Mr. Shamo specifically, used buyer feedback as a way to enhance Pharma-Master's goodwill; it allowed other buyers, especially cautious new buyers, to feel more comfortable buying from Pharma-Master on AlphaBay. Mr. Shamo understood that feedback from buyers was part of the terms of doing business on AlphaBay. His year-long efforts to sell drugs on AlphaBay indicate his adoption of the feedback left by buyers.

The feedback is not posted to prove the truth of the matter asserted. It is posted to engender trust and goodwill for reliable vendors. Negative feedback, conversely, is posted to warn potential buyers and drive those buyers away towards reliable vendors. Markets thrive on the free exchange of information. AlphaBay was no exception.

The tranactional data, of course, cannot be hearsay because computer code cannot be a declarant.

13

The defense only dedicated one line in its motion claiming these exhibits contained hearsay. Because the defense has not signaled its objection to any particular exhibit, the United States will not include additional specific examples of how each exhibit is not hearsay. If the Court would prefer to have the United States explain each exhibit's admissibility, the United States would be happy to do so.

**2.3     The expert testimony of Special Agent Guy Gino and evidence of R.K.'s overdose death will not violate Rule 403.**

Special Agent Gino's expert testimony regarding the Dark Net, PGP Encryption, Cryptocurrency (including Bitcoin), the Dark Net, and Dark Net Marketplaces, including AlphaBay, is crucial for the jury as it labors to understand and consider the fact testimony and exhibits it will receive from many of the United States' witnesses. Likewise, evidence about the overdose death of R.K. will not unfairly prejudice Mr. Shamo.

Rule 403 is a rule of inclusion, not of exclusion. *United States v. Norton*, 867 F.2d 1354 (11th Cir. 1989); the rule carries a strong presumption for admissibility. *United States v. Grant*, 256 F.3d 1146, 1155 (11th Cir. 2001). "Within limits delineated in the Federal Rules of Evidence, the government is entitled to introduce all relevant, probative evidence at its disposal. The defense cannot be heard to complain that the government has produced too much evidence of guilt." *United States v. Burgess*, 576 F.3d 1078, 1098 (10th Cir. 2009). Relevant evidence should seldom be excluded. *United States v. Naranjo*, 710 F.2d 1465, 1469 (10th Cir. 1983). Evidence that damages the defendant's case is not evidence constituting unfair prejudice. *United States v. Chalan*, 812 F.2d 1302 (10th Cir. 1987); *United States v. Medina*, 755 F.2d 1269 (7th Cir. 1985). Only unfair prejudice, that is, prejudice that suggests a decision on an emotional rather than an evidentiary basis, is prohibited by the rule. *Naranjo*; *supra*.

14

Law enforcement agents, or even cooperating witnesses, may provide expert testimony on the practices of criminals. *United States v. Garza*, 566 F.3d 1194, 1199 (10th Cir. 2009)(use of firearms in drug trade); *United States v. McCollum*, 802 F.2d 344 (9th Cir. 1986) (mail fraud schemes); *United States v. Gil*, 58 F.3d 1414 (9th Cir. 1995) (modus operandi of drug traffickers); *United States v. Patterson*, 819 F.2d 1495 (9th Cir. 1987) (operation of narcotics distribution organizations); *United States v. Oreira*, 29 F.3d 185 (5th Cir. 1994) (workings of "giro" houses); *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1134-1138 (10th Cir. 2014) (alien smuggling operation and whether transportation away from border furthers alien's presence in U.S.). The "helpfulness" prong of admissibility—would a juror understand the evidence without specialized knowledge—is key. *Id.*; *United States v. McDonald*, 933 F.2d 1519, 1522 (10th Cir. 1991) (evidence of expert that of significance of drug facts and items associated with the drug trade proper subject for expert testimony dependent upon specialized knowledge).

### 2.3.1 Special Agent Gino's testimony does not violate rule 403.

Without Special Agent Gino's testimony, the jurors will be presented with, to use the example from the previous section, a row of feedback from Exhibit 15.00 and will have no way to understand and consider the importance of its contents. After listening to Special Agent Gino's testimony explaining how Dark Net marketplaces generally, and AlphaBay specifically, work and how transactions are conducted in Bitcoin, the jurors will have a basic understanding of how AlphaBay relies on feedback to generate goodwill for its vendors, how the feedback rows include a buyer's statement and transactional data, and what the components of the feedback mean.

15

Like with Dark Net Marketplaces and Cryptocurrency, if the jurors do not first learn the basics about PGP encryption, the jurors will not have a context into which they can consider exhibits and statements by co-defendants about using public and private PGP keys to encrypt communications with co-conspirators and with customers. For example, the final email in proposed exhibit 15.07 was sent to Ms. Tonge and Ms. Bustin to help teach them how to comply with Mr. Shamo's and Mr. Crandall's expectation that communications between co-conspirators, especially when the emails contained daily order lists or parcel tracking numbers, should be encrypted using PGP encryption. Without Special Agent Gino's testimony, the jurors will not have a context in which to consider the exhibit and the testimony about the exhibit from Ms. Tonge and Ms. Bustin.

Just as an expert in a more traditional narcotics case might testify about the manner, methods, and means employed by a Mexico-based drug trafficking organization, Special Agent Gino will testify about the manner, methods, and means employed by drug traffickers on the Dark Net. Contrary to the defendant's assertions, his testimony will be particularly helpful, even essential, to the jury.

Finally, to the defense's assertion that Special Agent Gino's testimony will be cumulative, the United States simply indicates that it intends to call Special Agent Gino relatively early in its case-in-chief.

### 2.3.2 Evidence about R.K.'s overdose death does not violate rule 403.

Just as evidence of a homicide would not be unfairly prejudicial in a homicide case, evidence of distribution resulting in death is not unfairly prejudicial to the defendant, who is charged in Count 6 with distributing Fentanyl that resulted in R.K.'s death. Rule 403 is a rule of inclusion. The defense's logic—overdose evidence is inflammatory and cannot be admitted in an

overdose trial—if true, would make it impossible to hold any distributor accountable for the overdose deaths he caused.

The statement of facts regarding R.K.'s death, proffered above, should allow the Court to determine under rule 104 that there is sufficient evidence to allow the facts surrounding R.K.'s death to be presented to the jury. To orders to R.K.'s address were found on the defendant's iMac computer (not the Dark Net). Pharma-Master's Fentanyl-laced fake oxycodone pills came to R.K.'s residence one day. R.K. consumed two pills the following night. He was found dead the next morning. An exceptionally qualified expert will testify that Fentanyl intoxication was the but-for cause of R.K.'s death. The United States submits that the evidence proves Mr. Shamo's guilt as to Count 6 beyond a reasonable doubt. It certainly meets the threshold standard in rule 104.

The defense has asserted that the United States indicated it considered Mr. Shamo to be "on par" with two of his co-conspirators, Mr. Paz and Mr. Crandall. Doc. 171, at 5. That does not accurately reflect the United States' views. The United States is unsure how the defense came to that mistaken understanding. The United States has previously submitted to the Court the following organizational chart for the charged co-conspirators, showing the most-culpable defendant, Mr. Shamo, on top.



Had the evidence available to the United States been able to support a conviction against Mr. Paz or Mr. Crandall for engaging in a continuing criminal enterprise, the United States would have pursued that charge, consistent with the Department of Justice's charging policy.

And because the defense has asserted a charging disparity between Mr. Shamo and his co-defendants regarding Count 6, Distribution Resulting in Death, the United States submits that it offered all of the charged defendants an opportunity to change their pleas prior to presenting Count 6 to the Grand Jury with the assurance that it would not seek distribution-resulting-in-death counts against any defendant who pleaded guilty to his or her charges prior to the facts underlying count 6 being presented to the Grand Jury. Mr. Shamo was treated fairly.

18

3.    **CONCLUSION**

For the foregoing reasons, the United States urges the Court to deny the defendant's

motion to exclude evidence.

DATED this 21st day of December, 2018.

JOHN W. HUBER
United States Attorney


 /s/Michael Gadd
MICHAEL GADD
Special Assistant United States Attorney

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
SKORDAS, CASTON & HYDE,
LLC
560 South 300 East, Suite
225 Salt Lake City, UT
84111 Telephone: (801)
531-7444
Facsimile: (801) 665-0128
Attorneys for Defendant
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, | **MOTION TO CONTINUE JURY TRIAL** |
| Plaintiff, | |
| v. | |
| AARON MICHAEL SHAMO, et. al., | Case No. 2:16-CR-00631 DAK |
| Defendant. | Judge Dale A. Kimball |

The Defendant, Aaron Michael Shamo, by and through his counsel of record, Gregory

G. Skordas and Kaytlin V. Beckett, hereby moves this Court for a continuance of the Jury

Trial currently set to begin January 22, 2018. This motion is made pursuant to the Speedy

Trial Act, <u>18 U.S.C. §§3161</u> (H)(7)(b)(ii) and (iv) which allow this Court to grant the motion to continue where it finds that the ends of justice served by the granting of the continuance outweigh the best interests of the public and the defendant in a speedy trial.  Defendant bases this motion on the following:

1.      Mr. Shamo first appeared in court on November 23, 2016 for a detention hearing and was assigned counsel, Adam Bridge.

2.      Mr. Shamo appeared in court for arraignment on December 7, 2016. At that time the jury trial was scheduled within the required time period and set for February 13, 2017.

3.      On January 5, 2017, then defense counsel, Adam Bridge, filed a motion to continue the jury trial, which was joined by the government.

4.      On January 6, 2017, an Order granting the continuance was entered and the jury trial was then reset for May 22, 2017.

5.      The time period from February 13, 2017 through May 22, 2017 was excluded from speedy trial act calculations under the Order entered January 5, 2017.

6.      The jury trial was then scheduled to commence on May 22, 2017.

7.      Mr. Shamo's current counsel entered an appearance on May 11, 2017.

8.      On May 15, 2017 Defense Counsel filed a motion to continue the jury after being retained by defendant Shamo.

9.      The time period from May 23, 2017 through August 28, 2017 was excluded from speedy trial act calculations under the Order entered May 17, 2017.

10.     On June 29, 2017 the Government provided additional discovery.

11.     On June 30, 2017, Counsel for the Defendants motioned the Court for additional time to review discovery and continuing the jury trial, which was joined by the Government.

12.     The time period from June 29, 2017 through August 31, 2017 was excluded from speedy trial act calculations under the Order entered June 30, 2017.

13.     The matter was set for a Status Conference on August 31, 2017.

14.     On August 31, 2017, the Government informed the Court there was still significant outstanding discovery and, joined by defense counsel, motion the Court to continue the trial.

15.     On The time period from August 31, 2017 through December 1, 2017 was excluded from speedy trial act calculations under the Order entered September 1, 2017.

16.     On September 13, 2017 the Government provided additional discovery.

17.     On December 1, 2017, Counsel for defendants motioned the Court for an extension of time to review discovery still outstanding.

18.     The time period from December 1, 2017 through February 28, 2018 was excluded from speedy trial act calculations under the Order entered December 1, 2017.

19.     The Court specifically ordered that all discovery be produced by February 1, 2018.

20.     The matter was set for a Status Conference on February 28, 2018.

21.     On December 14, 2017 the Government provided additional discovery.

22.     On February 1, 2018 the Government provided additional discovery.

23.     On February 28, 2018, Counsel for defendants stipulated to an extension of time to review discovery still outstanding.

24.     The time period from February 28, 2018 through August 20, 2018 was excluded from speedy trial act calculations under the Order entered March 1, 2018.

25.     The matter was set for trial on August 20, 2018.

26.     The Court ordered that all motions be filed three weeks after discovery is

provided.

27.     The Court ordered that all plea agreements are due by July 30, 2018.

28.     On May 10, 2018 the Government provided additional discovery.

29.     On May 23, 2018 the Government provided additional discovery.

30.     On May 29, 2018 the Government provided additional discovery.

31.     On July 20, 2018 the Government provided additional discovery.

32.      On August 1, 2018, Defense Counsel filed a Motion to Continue the Jury Trial,

which was joined by the Government.

33.     The time period from August 3, 2018 through January 22, 2019 was excluded

from speedy trial act calculations under the Order entered August 3, 2018.

34.     The matter was reset for trial to begin January 22, 2019 with a three-day pre-

admission hearing scheduled to begin January 9-11, 2019.

35.     On October 12, 2018, the Court entered a Trial Order outlining when discovery

must be completed, exchange of witness and exhibit lists, motion cutoff dates, and other

pretrial procedures.

36.     On October 18, 2018, the Government filed a Second Superseding Indictment.

37.     On October 29, 2018, Mr. Shamo made his initial appearance on the Second

Superseding Indictment.

38.     On October 30, 2018, the Government provided additional discovery.

39.     Defense Counsel was previously aware of 11 terabytes of discovery from

electronic devices in the Government's possession, but was not aware of the specific

discovery as relates to Jonathan Luke Paz.

40. Defense Counsel has retained a computer forensic examiner who indicated a review the 11 terabytes of data would require a month.

41. On or about November 20, 2018, Defense Counsel provided the Government two external hard drives in order to obtain the 11 terabytes of discovery.

42. On December 19-20, 2018, the Government provided the above mentioned discovery and additional discovery, totaling an estimated 16-20 terabytes of electronic data seized from the Defendant, co-defendants, and a defendant in a collateral matter, Jonathan Luke Paz.

43. The review of 16-20 terabytes of data by the Defense's Forensic Examiner will take longer than a month to complete.

44. The requested continuance and additional time sought is excludable under the Speedy Trial Act, pursuant to 18 U.S.C. § 3161 (H)(7)(b)(ii), based on the grounds that this case involves charges of possession of narcotics with attempt to distribute, conspiracy, death resulting from the sale of controlled substances, and money laundering against Mr. Shamo. The charges are unique in that they require detailed investigation and review of a significant amount of discovery, consultation with numerous experts, and further investigation of the new allegations and discovery.

45. The requested continuance and additional time sought is also excludable under the Speedy Trial Act, pursuant to 18 U.S.C. § 3161 (H)(7)(b)(iv), based on the grounds that additional time is necessary for effective preparation, taking into account the exercise of due diligence.

46.     Counsel requests the matter be reset for June 17, 2019 with the three-day preadmission hearing to be held on May 29-31, 2019, in accordance with the Court's Calendar, Defense Counsel's Schedule, and Counsel for the Government's Schedule.

47.     Counsel for the Government, Michael Gadd and Vernon Stejskal, have been contacted about this continuance and do not object.

48.     Mr. Shamo is currently in custody and agrees with counsel's reasons for the requested continuance as set forth above.

49.     The impact of this request will continue the trial date scheduled and allow counsel the necessary time to complete the tasks set forth above.

For the reasons set forth above, the Defendant, Aaron Michael Shamo respectfully requests a continuance of the Jury Trial currently set to begin January 22, 2019, and requests that the additional time be excluded from the speedy trial calculation pursuant to 18 U.S.C. §§3161 (H)(7)(b)(ii) and (iv).

DATED this 27th day of December, 2018.

SKORDAS, CASTON & HYDE, LLC


/s/ Gregory G. Skordas
Gregory G. Skordas

## CERTIFICATE OF SERVICE

I hereby certify that on the December 27, 2018, I electronically filed a true and correct copy of the foregoing **MOTION TO CONTINUE JURY TRIAL**, with the Clerk of the Court using CM/ECF system, which sent notification of such filing to the following:

S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Adam S. Elggren
Adam.elggren@usdoj.gov

*/s/ Sabrina Nielsen-Legal Secretary*
Skordas, Caston & Hyde, LLC

# IN THE UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>v.<br><br>AARON MICHAEL SHAMO, et. al.,<br><br>     Defendant. | **ORDER TO CONTINUE JURY TRIAL**<br><br><br>Case No. 2:16-CR-00631 DAK<br><br>Judge  Dale A. Kimball |

The Defendant, Aaron Michael Shamo, by and through his counsel of record, Gregory G. Skordas and Kaytlin V. Beckett, hereby moves this Court for a continuance of the Jury Trial currently set to begin January 22, 2018. This motion is made pursuant to the Speedy Trial Act, 18 U.S.C. §§3161 (H)(7)(b)(ii) and (iv) which allow this Court to grant the motion to continue where it finds that the ends of justice served by the granting of the continuance outweigh the best interests of the public and the defendant in a speedy trial.  Defendant bases this motion on the following:

1.     Mr. Shamo first appeared in court on November 23, 2016 for a detention hearing and was assigned counsel, Adam Bridge.

2.     Mr. Shamo appeared in court for arraignment on December 7, 2016. At that time the jury trial was scheduled within the required time period and set for February 13, 2017.

3.     On January 5, 2017, then defense counsel, Adam Bridge, filed a motion to continue the jury trial, which was joined by the government.

4.     On January 6, 2017, an Order granting the continuance was entered and the

jury trial was then reset for May 22, 2017.

5.      The time period from February 13, 2017 through May 22, 2017 was excluded from speedy trial act calculations under the Order entered January 5, 2017.

6.      The jury trial was then scheduled to commence on May 22, 2017.

7.      Mr. Shamo's current counsel entered an appearance on May 11, 2017.

8.      On May 15, 2017 Defense Counsel filed a motion to continue the jury after being retained by defendant Shamo.

9.      The time period from May 23, 2017 through August 28, 2017 was excluded from speedy trial act calculations under the Order entered May 17, 2017.

10.     On June 29, 2017 the Government provided additional discovery.

11.     On June 30, 2017, Counsel for the Defendants motioned the Court for additional time to review discovery and continuing the jury trial, which was joined by the Government.

12.     The time period from June 29, 2017 through August 31, 2017 was excluded from speedy trial act calculations under the Order entered June 30, 2017.

13.     The matter was set for a Status Conference on August 31, 2017.

14.     On August 31, 2017, the Government informed the Court there was still significant outstanding discovery and, joined by defense counsel, motion the Court to continue the trial.

15.     On The time period from August 31, 2017 through December 1, 2017 was excluded from speedy trial act calculations under the Order entered September 1, 2017.

16.     On September 13, 2017 the Government provided additional discovery.

17.     On December 1, 2017, Counsel for defendants motioned the Court for an extension of time to review discovery still outstanding.

18.     The time period from December 1, 2017 through February 28, 2018 was excluded

2

from speedy trial act calculations under the Order entered December 1, 2017.

19.     The Court specifically ordered that all discovery be produced by February 1, 2018.

20.     The matter was set for a Status Conference on February 28, 2018.

21.     On December 14, 2017 the Government provided additional discovery.

22.     On February 1, 2018 the Government provided additional discovery.

23.     On February 28, 2018, Counsel for defendants stipulated to an extension of time to review discovery still outstanding.

24.     The time period from February 28, 2018 through August 20, 2018 was excluded from speedy trial act calculations under the Order entered March 1, 2018.

25.     The matter was set for trial on August 20, 2018.

26.     The Court ordered that all motions be filed three weeks after discovery is provided.

27.     The Court ordered that all plea agreements are due by July 30, 2018.

28.     On May 10, 2018 the Government provided additional discovery.

29.     On May 23, 2018 the Government provided additional discovery.

30.     On May 29, 2018 the Government provided additional discovery.

31.     On July 20, 2018 the Government provided additional discovery.

32.     On August 1, 2018, Defense Counsel filed a Motion to Continue the Jury Trial, which was joined by the Government.

33.     The time period from August 3, 2018 through January 22, 2019 was excluded from speedy trial act calculations under the Order entered August 3, 2018.

34.     The matter was reset for trial to begin January 22, 2019 with a three-day pre-admission hearing scheduled to begin January 9-11, 2019.

35.     On October 12, 2018, the Court entered a Trial Order outlining when discovery

3

must be completed, exchange of witness and exhibit lists, motion cutoff dates, and other
pretrial procedures.

36.     On October 18, 2018, the Government filed a Second Superseding Indictment.

37.     On October 29, 2018, Mr. Shamo made his initial appearance on the Second
Superseding Indictment.

38.     On October 30, 2018, the Government provided additional discovery.

39.     Defense Counsel was previously aware of 11 terabytes of discovery from
electronic devices in the Government's possession, but was not aware of the specific
discovery as relates to Jonathan Luke Paz.

40.     Defense Counsel has retained a computer forensic examiner who indicated a
review the 11 terabytes of data would require a month.

41.     On or about November 20, 2018, Defense Counsel provided the Government
two external hard drives in order to obtain the 11 terabytes of discovery.

42.     On December 19-20, 2018, the Government provided the above mentioned
discovery and additional discovery, totaling an estimated 16-20 terabytes of electronic data
seized from the Defendant, co-defendants, and a defendant in a collateral matter, Jonathan
Luke Paz.

43.     The review of 16-20 terabytes of data by the Defense's Forensic Examiner will
take longer than a month to complete.

44.     The requested continuance and additional time sought is excludable under the
Speedy Trial Act, pursuant to 18 U.S.C. § 3161 (H)(7)(b)(ii), based on the grounds that this
case involves charges of possession of narcotics with attempt to distribute, conspiracy, death
resulting from the sale of controlled substances, and money laundering against Mr. Shamo.
The charges are unique in that they require detailed investigation and review of a significant

4

amount of discovery, consultation with numerous experts, and further investigation of the new allegations and discovery.

45.     The requested continuance and additional time sought is also excludable under the Speedy Trial Act, pursuant to 18 U.S.C. § 3161 (H)(7)(b)(iv), based on the grounds that additional time is necessary for effective preparation, taking into account the exercise of due diligence.

46.     Counsel requests the matter be reset for June 17, 2019 with the three-day preadmission hearing to be held on May 29-31, 2019, in accordance with the Court's Calendar, Defense Counsel's Schedule, and Counsel for the Government's Schedule.

47.     Counsel for the Government, Michael Gadd and Vernon Stejskal, have been contacted about this continuance and do not object.

48.     Mr. Shamo is currently in custody and agrees with counsel's reasons for the requested continuance as set forth above.

49.     The impact of this request will continue the trial date scheduled and allow counsel the necessary time to complete the tasks set forth above.

Based on the foregoing, and good cause appearing, it is hereby:

ORDERED

The Jury Trial currently scheduled to begin January 22, 2019, is hereby continued to the 17th day of June, 2019 at 8:30 a.m.  and the pre-admission hearing currently schedule to begin January 9, 2019 is rescheduled to May 29, 2019 at 8:30 a.m. pursuant to 18 U.S.C. §3161(H)(1)(A), the Court finds the ends of justice served by such continuance outweigh the best interests of the public and the Defendant in a Speedy Trial. Accordingly, the time between the date of this order and the new trial dates, as set forth above, is to be excluded from Speedy

*5*

Trial computation for good cause.

DATED this ____day of December, 2018.

BY THE COURT

_____

Dale A Kimball
United States District Court Judge

# IN THE UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF UTAH

| UNITED STATES OF AMERICA, | **ORDER TO CONTINUE JURY TRIAL** |
|---|---|
| Plaintiff, | |
| v. | |
| AARON MICHAEL SHAMO, et. al., | Case No. 2:16-CR-00631 DAK |
| Defendant. | Judge Dale A. Kimball |

The Defendant, Aaron Michael Shamo, by and through his counsel of record, Gregory

G. Skordas and Kaytlin V. Beckett, hereby moves this Court for a continuance of the Jury

Trial currently set to begin January 22, 2018. This motion is made pursuant to the Speedy

Trial Act, 18 U.S.C. §§3161 (H)(7)(b)(ii) and (iv) which allow this Court to grant the motion

to continue where it finds that the ends of justice served by the granting of the continuance

outweigh the best interests of the public and the defendant in a speedy trial. Defendant bases

this motion on the following:

1. Mr. Shamo first appeared in court on November 23, 2016 for a detention

hearing and was assigned counsel, Adam Bridge.

2. Mr. Shamo appeared in court for arraignment on December 7, 2016. At that

time the jury trial was scheduled within the required time period and set for February 13,

2017.

3. On January 5, 2017, then defense counsel, Adam Bridge, filed a motion to

continue the jury trial, which was joined by the government.

4. On January 6, 2017, an Order granting the continuance was entered and the

jury trial was then reset for May 22, 2017.

5.    The time period from February 13, 2017 through May 22, 2017 was excluded from speedy trial act calculations under the Order entered January 5, 2017.

6.    The jury trial was then scheduled to commence on May 22, 2017.

7.    Mr. Shamo's current counsel entered an appearance on May 11, 2017.

8.    On May 15, 2017 Defense Counsel filed a motion to continue the jury after being retained by defendant Shamo.

9.    The time period from May 23, 2017 through August 28, 2017 was excluded from speedy trial act calculations under the Order entered May 17, 2017.

10.    On June 29, 2017 the Government provided additional discovery.

11.    On June 30, 2017, Counsel for the Defendants motioned the Court for additional time to review discovery and continuing the jury trial, which was joined by the Government.

12.    The time period from June 29, 2017 through August 31, 2017 was excluded from speedy trial act calculations under the Order entered June 30, 2017.

13.    The matter was set for a Status Conference on August 31, 2017.

14.    On August 31, 2017, the Government informed the Court there was still significant outstanding discovery and, joined by defense counsel, motion the Court to continue the trial.

15.    On The time period from August 31, 2017 through December 1, 2017 was excluded from speedy trial act calculations under the Order entered September 1, 2017.

16.    On September 13, 2017 the Government provided additional discovery.

17.    On December 1, 2017, Counsel for defendants motioned the Court for an extension of time to review discovery still outstanding.

18.    The time period from December 1, 2017 through February 28, 2018 was excluded

2

from speedy trial act calculations under the Order entered December 1, 2017.

19.    The Court specifically ordered that all discovery be produced by February 1, 2018.

20.    The matter was set for a Status Conference on February 28, 2018.

21.    On December 14, 2017 the Government provided additional discovery.

22.    On February 1, 2018 the Government provided additional discovery.

23.    On February 28, 2018, Counsel for defendants stipulated to an extension of time to review discovery still outstanding.

24.    The time period from February 28, 2018 through August 20, 2018 was excluded from speedy trial act calculations under the Order entered March 1, 2018.

25.    The matter was set for trial on August 20, 2018.

26.    The Court ordered that all motions be filed three weeks after discovery is provided.

27.    The Court ordered that all plea agreements are due by July 30, 2018.

28.    On May 10, 2018 the Government provided additional discovery.

29.    On May 23, 2018 the Government provided additional discovery.

30.    On May 29, 2018 the Government provided additional discovery.

31.    On July 20, 2018 the Government provided additional discovery.

32.    On August 1, 2018, Defense Counsel filed a Motion to Continue the Jury Trial, which was joined by the Government.

33.    The time period from August 3, 2018 through January 22, 2019 was excluded from speedy trial act calculations under the Order entered August 3, 2018.

34.    The matter was reset for trial to begin January 22, 2019 with a three-day pre-admission hearing scheduled to begin January 9-11, 2019.

35.    On October 12, 2018, the Court entered a Trial Order outlining when discovery

must be completed, exchange of witness and exhibit lists, motion cutoff dates, and other pretrial procedures.

36.     On October 18, 2018, the Government filed a Second Superseding Indictment.

37.     On October 29, 2018, Mr. Shamo made his initial appearance on the Second Superseding Indictment.

38.     On October 30, 2018, the Government provided additional discovery.

39.     Defense Counsel was previously aware of 11 terabytes of discovery from electronic devices in the Government's possession, but was not aware of the specific discovery as relates to Jonathan Luke Paz.

40.     Defense Counsel has retained a computer forensic examiner who indicated a review the 11 terabytes of data would require a month.

41.     On or about November 20, 2018, Defense Counsel provided the Government two external hard drives in order to obtain the 11 terabytes of discovery.

42.     On December 19-20, 2018, the Government provided the above mentioned discovery and additional discovery, totaling an estimated 16-20 terabytes of electronic data seized from the Defendant, co-defendants, and a defendant in a collateral matter, Jonathan Luke Paz.

43.     The review of 16-20 terabytes of data by the Defense's Forensic Examiner will take longer than a month to complete.

44.     The requested continuance and additional time sought is excludable under the Speedy Trial Act, pursuant to 18 U.S.C. § 3161 (H)(7)(b)(ii), based on the grounds that this case involves charges of possession of narcotics with attempt to distribute, conspiracy, death resulting from the sale of controlled substances, and money laundering against Mr. Shamo. The charges are unique in that they require detailed investigation and review of a significant

amount of discovery, consultation with numerous experts, and further investigation of the new allegations and discovery.

45. The requested continuance and additional time sought is also excludable under the Speedy Trial Act, pursuant to 18 U.S.C. § 3161 (H)(7)(b)(iv), based on the grounds that additional time is necessary for effective preparation, taking into account the exercise of due diligence.

46. Counsel requests the matter be reset for June 17, 2019 with the three-day preadmission hearing to be held on May 29-31, 2019, in accordance with the Court's Calendar, Defense Counsel's Schedule, and Counsel for the Government's Schedule.

47. Counsel for the Government, Michael Gadd and Vernon Stejskal, have been contacted about this continuance and do not object.

48. Mr. Shamo is currently in custody and agrees with counsel's reasons for the requested continuance as set forth above.

49. The impact of this request will continue the trial date scheduled and allow counsel the necessary time to complete the tasks set forth above.

Based on the foregoing, and good cause appearing, it is hereby:

ORDERED

The Jury Trial currently scheduled to begin January 22, 2019, is hereby continued to the 17th day of June, 2019 at 8:30 a.m.  and the pre-admission hearing currently schedule to begin January 9, 2019 is rescheduled to May 29, 2019 at 8:30 a.m. pursuant to 18 U.S.C. §3161(H)(1)(A), the Court finds the ends of justice served by such continuance outweigh the best interests of the public and the Defendant in a Speedy Trial. Accordingly, the time between the date of this order and the new trial dates, as set forth above, is to be excluded from Speedy

Trial computation for good cause.

DATED this 27th day of December, 2018.

BY THE COURT

Dale A Kimball
United States District Court Judge

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-631DAK |
| Plaintiff, | TRIAL ORDER |
| vs. | |
| AARON MICHAEL SHAMO, | Judge Dale A. Kimball |
| Defendant. | |

This case is set for a four-week jury trial beginning on June 17, 2019, at 8:30 a.m. and a pre-admission and motion in limine hearing on May 29-31, 2019, at 9:00 a.m. In order to expedite the conduct of the trial in this case, counsel are instructed as follows:

**A. Court-Imposed Deadlines**

The deadlines in this Trial Order are Court-imposed deadlines. To modify any deadline, a party must file an appropriate motion with the Court and receive an order from the Court modifying such deadline. The dates herein specifically correspond with the current trial date of June 17, 2019.

**B. Pre-trial Motions**

All motions in limine and Speedy Trial Act motions must be filed with the Court by May 3, 2019. Memoranda in opposition to any motions must be filed no later than May 17, 2019. Reply memoranda, if necessary, must be filed by May 24, 2019. All pretrial motions must be fully briefed by May 24, 2019, so the Court may address them at the Pre-admission Hearing set for May 29-31, 2019.

## C. Proposed Voir Dire, Jury Instructions, and Special Verdict Form

### 1. Proposed Voir Dire

The parties must submit any proposed voir dire to the Court no later than June 3, 2019.

### 2. Special Verdict Form

The parties shall exchange proposed verdict forms by June 3, 2019. The parties should then confer in an attempt to agree on stipulated Verdict forms. The parties shall submit a single set of joint proposed verdict forms or their separate proposed verdict forms to the Court by June 7, 2019. In addition to filing the special verdict form electronically, the parties must email a copy of the special verdict form to utdecf_kimball@utd.uscourt.gov in Word or Word Perfect format. Any objection the parties have to the other party's proposed special verdict form shall be filed by June 11, 2019.

### 3. Jury Instructions

The procedure for submitting proposed jury instructions is as follows:

#### (a) stipulated set of instructions

1. The parties shall serve upon the opposing party their proposed jury instructions by June 3, 2019. The parties must then meet and confer to agree on a single set of instructions. The parties are required to jointly submit one set of stipulated final instructions. These instructions should be labeled as joint instructions, e.g. "Joint Instruction No. 1."

2. If the parties cannot agree upon a complete set of final instructions, they may submit separately those individual instructions upon which they cannot agree. These instructions should be labeled as an instruction proposed by the party, e.g. "Plaintiff's Proposed Instruction No. 1."

However, the parties are expected to agree upon the majority of the substantive instructions for the case.

3. The stipulated instructions and each party's supplemental instructions must be electronically filed with the Court by June 7, 2019. The electronically-filed instructions shall include citation to the authority that forms the basis for the instruction.

4. In addition to electronically filing the jury instructions, the parties shall also email a copy of the instructions, without citation to authority, to utdecf_kimball@utd.uscourts.gov in Word or Word Perfect format. The case name and number should be included in the email subject line.

5. No later than June 11, 2019, each party must file its objections to the supplemental instructions proposed by the other party. All such objections must recite the proposed disputed instruction in its entirety and specifically highlight the objectionable language in the proposed instruction. The objection must contain citations to authority and a concise argument explaining why the instruction is improper. If applicable, the objecting party should submit an alternative instruction addressing the subject or principle of law. Any alternative instruction proposed in a party's objection must be emailed to utdecf_kimball@utd.uscourts.gov in Word or Word Perfect format.

6. No later than June 14, 2019, each party may file a reply to the opposing party's objections.

*(b) stock instructions*

Attached to this Trial Order is the Court's stock jury instructions for criminal cases. The Court will give its stock instructions applicable to this case unless both parties agree to modify them and provide convincing arguments for such changes. When submitting their instructions,

the parties shall indicate in a list to the Court which of the Court's stock instructions should be given in this case and include those instructions with a label indicating that the instruction is one of Judge Kimball's stock instructions, e.g. "Joint Instruction No. 1 (Stock)" or "Plaintiff's Instruction No. 1 (Stock)."

*(c) additional instructions*

1. All jury instructions must be concise, understandable, and neutral statements of the law. Argumentative instructions are improper.

2. Modified versions of statutory or other form jury instructions may be acceptable. However, a modified jury instructions must identify the exact nature of the modification made to the form instruction and cite authority, if any, supporting such modification.

3. Any party who cannot comply with the requirement to email the instructions to chambers must contact the judge's chambers to make alternative arrangements.

4. If parties wish to be referred to in the instructions as something other than plaintiff and defendant, the parties must also make the appropriate changes to the Court's stock instructions so that every instruction consistently refers to each party.

*(d) final instructions*

After reviewing the parties' proposed instructions and any objections, the Court will provide the parties with a set of "The Court's Proposed Jury Instructions." Close to the end of trial, the Court will hold a jury instruction conference on the record to make any necessary changes to the jury instructions. The parties' previously filed objections are objections of record and need not be repeated at the jury instruction conference. After the jury instruction conference, the Court will provide the parties with a set of the final jury instructions.

## D. Trial Exhibits

The parties shall exchange exhibit lists by April 17, 2019.

Pursuant to Local Rule 83-5, each party is required to pre-mark all exhibits intended to be introduced during trial and prepare an exhibit list for the Court's use at trial. Exhibit labels (stickers) are available at the Intake Desk in the Clerk's Office. The standard exhibit list form is available on the Court's website (www.utd.uscourts.gov).

Parties must meet and confer to avoid marking the same exhibit twice. Plaintiffs should list their exhibits by consecutive numbers and defendants should list their exhibits by consecutive letters, unless authorized by the Court to use a different system.

Do NOT file the exhibit list or the exhibits. The exhibit list is to be provided to the Courtroom Deputy Clerk on the first morning of trial; the exhibits are to remain in the custody of counsel until admitted as evidence by the Court.

The Court prefers two courtesy copies of the exhibits in binders. Courtesy copies should be provided to the Courtroom Deputy Clerk on the first morning of trial.

Questions regarding the preparation of the exhibit list or courtesy copies may be directed to Courtroom Deputy Clerk Elizabeth Toscano at (801) 524–6610.

## E. Witness Lists

The parties shall exchange witness lists by April 17, 2019. In the event this requirement poses a danger to potential witnesses or for other good cause, a party may seek relief from this requirement from the Court.

The parties are required to prepare a separate witness list for the Court's use at trial.

Witness lists must be provided to the Court on the first morning of trial. Standard forms for witness lists are available on the Court's website, (www.utd.uscourts.gov). Questions regarding the preparation of these lists may be directed to Courtroom Deputy Clerk Elizabeth Toscano at (801) 524-6610.

**F. Expert Witness Notice**

The parties shall exchange all Notice of Experts by April 17, 2019.

**G. Discovery**

The government must finalize and produce all outstanding discovery by April 10, 2019. This duty to produce all outstanding discovery excludes production of any and all Brady/Giglio material, which shall be due April 24, 2019.

**H. Jury Pool Questionnaire**

The Court will send out a standard questionnaire to potential jurors.

**I. Plea Agreement/Continuance**

In the event that a plea agreement is reached between the parties, the Court should be notified as soon as possible. Also, in the event that a party needs a continuance of the current trial date, the Court should be notified as soon as possible.

**J. Courtroom Conduct**

Local Rule DUCrimR 53-1 provides that the standards set forth in DUCivR 43-1 apply equally to all criminal proceedings in this district. The Court expects counsel to follow the practices and protocol outline in DUCivR 43-1.

In addition to the conduct outlines in DUCivR 43-1, the Court expects the following conduct of counsel at trial:

1. Please be on time for each court session. The Court usually runs its trial day from

8:30 a.m. until approximately 2:00 p.m. with two short (fifteen minute) breaks.

2. Counsel is expected to stand: (1) as court is opened, recessed, or adjourned; (2) when the jury enters or retires from the courtroom; (3) when addressing or being addressed by the Court.

3. Counsel must instruct all persons at counsel table that gestures, facial expressions, audible comments, or any other manifestations of approval or disapproval during witness testimony are absolutely prohibited.

4. Counsel should instruct witnesses as to the need to make a clear record of the proceedings. Counsel and witnesses need to speak clearly into the microphones.

5. When possible, counsel should try to raise issues requiring argument to the Court during recesses rather than in sidebar conferences when the jury is present.

6. Members of the trial team should not confer or visit with anyone in the spectator section while court is in session.

7. Messages may be delivered to counsel table provided they are delivered discreetly and with as little disruption to the proceedings as possible.


DATED this 27th day of December, 2019.

BY THE COURT:


DALE A. KIMBALL
United States District Judge

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | **AMENDED TRIAL ORDER** |
| vs. | **Criminal Case No. 2:16CR631DAK** |
| AARON MICHAEL SHAMO, et al., | **Judge Dale A. Kimball** |
| Defendants. | |

This case is set for a four-week jury trial beginning on June 17, 2019, at 8:30 a.m. and a pre-admission and motion in limine hearing on May 29-31, 2019, at 9:00 a.m. In order to expedite the conduct of the trial in this case, counsel are instructed as follows:

**A. Court-Imposed Deadlines**

The deadlines in this Trial Order are court-imposed deadlines. To modify any deadline, a party must file an appropriate motion with the court and receive an order from the court modifying such deadline. The dates herein specifically correspond with the current trial date of June 17, 2019.

**B. Pre-trial Motions**

All motions in limine and Speedy Trial Act motions must be filed with the court by **April 26, 2019**. Memoranda in opposition to any motions must be filed no later than **May 10, 2019**.

Reply memoranda, if necessary, must be filed by **May 17, 2019.** All pretrial motions must be

fully briefed by May 17, 2019, so the court may address them at the Pre-admission Hearing set

for May 29-31, 2019. Any party challenging an exhibit as inadmissible at the Pre-Admission

hearing must make a specific written objection to the exhibit and submit the objection as part of a

motion in limine in accordance with the motion in limine deadlines.

**C. Proposed Voir Dire, Jury Instructions, and Special Verdict Form**

    *1. Proposed Voir Dire*

The parties must submit any proposed voir dire to the court no later than **June 3, 2019**.

    *2. Special Verdict Form*

The parties shall exchange proposed verdict forms by **June 3, 2019**. The parties should

then confer in an attempt to agree on stipulated Verdict forms. The parties shall submit a single

set of joint proposed verdict forms or their separate proposed verdict forms to the court by **June**

**7, 2019**. In addition to filing the special verdict form electronically, the parties must email a

copy of the special verdict form to utdecf_kimball@utd.uscourt.gov in Word or Word Perfect

format. Any objection the parties have to the other party's proposed special verdict form shall be

filed by **June 11, 2019.**

    *3. Jury Instructions*

The procedure for submitting proposed jury instructions is as follows:

*(a) stipulated set of instructions*

1.    The parties shall serve upon the opposing party their proposed jury instructions by

        **May 31, 2019**. The parties must then meet and confer to agree on a single set of

instructions. The parties are required to *jointly submit one set of stipulated final instructions.* These instructions should be labeled as joint instructions, e.g. "Joint Instruction No. 1"

2. If the parties cannot agree upon a complete set of final instructions, they may submit separately those individual instructions upon which they cannot agree. These instructions should be labeled as an instruction proposed by the party, e.g. "Plaintiff's Proposed Instruction No. 1." However, the parties are expected to agree upon the majority of the substantive instructions for the case.

3. The stipulated instructions and each party's supplemental instructions must be electronically filed with the court by **June 7, 2019**. The electronically-filed instructions shall include citation to the authority that forms the basis for the instruction.

4. In addition to electronically filing the jury instructions, the parties shall also email a copy of the instructions, *without* citation to authority, to utdecf_kimball@utd.uscourts.gov in Word or Word Perfect format. The case name and number should be included in the email subject line.

5. No later than **June 11, 2019**, each party must file its objections to the supplemental instructions proposed by the other party. All such objections must recite the proposed disputed instruction in its entirety and specifically highlight the objectionable language in the proposed instruction. The objection must contain citations to authority and a concise argument explaining why the

3

instruction is improper.  If applicable, the objecting party should submit an alternative instruction addressing the subject or principle of law.  Any alternative instruction proposed in a party's objection must be emailed to utdecf_kimball@utd.uscourts.gov in Word or Word Perfect format.

6.    No later than **June 14, 2019**, each party may file a reply to the opposing party's objections.

*(b) stock instructions*

Attached to this Trial Order is the court's <u>stock jury instructions</u> for criminal cases.  The court will give its stock instructions applicable to this case unless both parties agree to modify them and provide convincing arguments for such changes.  When submitting their instructions, the parties shall indicate in a list to the court which of the court's stock instructions should be given in this case and include those instructions with a label indicating that the instruction is one of Judge Kimball's stock instructions, e.g. "Joint Instruction No. 1 (Stock)" or "Plaintiff's Instruction No. 1 (Stock)."

*(c) additional instructions*

1.    All jury instructions must be concise, understandable, and neutral statements of the law.  Argumentative instructions are improper.

2.    Modified versions of statutory or other form jury instructions may be acceptable, However, a modified jury instructions must identify the exact nature of the modification made to the form instruction and cite authority, if any, supporting such modification.

3.      Any party who cannot comply with the requirement to email the instructions to chambers must contact the judge's chambers to make alternative arrangements.

4.      If parties wish to be referred to in the instructions as something other than plaintiff and defendant, the parties must also make the appropriate changes to the court's stock instructions so that every instruction consistently refers to each party.

*(d) final instructions*

After reviewing the parties' proposed instructions and any objections, the court will provide the parties with a set of "The Court's Proposed Jury Instructions."  Close to the end of trial, the court will hold a jury instruction conference on the record to make any necessary changes to the jury instructions.  The parties' previously filed objections are objections of record and need not be repeated at the jury instruction conference.  After the jury instruction conference, the court will provide the parties with a set of the final jury instructions.

## D.  Trial Exhibits

The parties shall exchange exhibit lists by **April 17, 2019**.  Any objections to the opposing party's exhibits must be filed submitted in writing in connection with the motion in limine deadlines provided above.

Pursuant to Local Rule 83-5, each party is required to pre-mark all exhibits intended to be introduced during trial and prepare an exhibit list for the court's use at trial.  Exhibit labels (stickers) are available at the Intake Desk in the Clerk's Office.   The standard exhibit list form is available on the Court's website (www.utd.uscourts.gov).

Parties must meet and confer to avoid marking the same exhibit twice.  Plaintiffs should

list their exhibits by consecutive numbers and defendants should list their exhibits by consecutive letters, unless authorized by the Court to use a different system.

Do **NOT** file the exhibit list or the exhibits. The exhibit list is to be provided to the Courtroom Deputy Clerk on the first morning of trial; the exhibits are to remain in the custody of counsel until admitted as evidence by the Court.

The court prefers two courtesy copies of the exhibits in binders. Courtesy copies should be provided to the Courtroom Deputy Clerk on the first morning of trial.

Questions regarding the preparation of the exhibit list or courtesy copies may be directed to Courtroom Deputy Clerk Elizabeth Toscano at (801) 524–6610.

**E. Witness Lists**

The parties shall exchange witness lists by **April 17, 2019**. In the event this requirement poses a danger to potential witnesses or for other good cause, a party may seek relief from this requirement from the Court.

The parties are required to prepare a separate witness list for the court's use at trial. Witness lists must be provided to the court on the first morning of trial. Standard forms for witness lists are available on the court's website, (www.utd.uscourts.gov). Questions regarding the preparation of these lists may be directed to Courtroom Deputy Clerk Elizabeth Toscano at (801) 524-6610.

**F. Expert Witness Notice**

The parties shall exchange all Notice of Experts by **April 17, 2019.**

## G. Discovery

The government must finalize and produce all outstanding discovery by **April 10, 2019.** This duty to produce all outstanding discovery excludes production of any and all *Brady/Giglio* material, which shall be due **April 24, 2019**.

## H. Plea Agreement/Continuance

In the event that a plea agreement is reached between the parties, the court should be notified as soon as possible. Also, in the event that a party needs a continuance of the current trial date, the court should be notified as soon as possible.

## I. Courtroom Conduct

Local Rule DUCrimR 53-1 provides that the standards set forth in DUCivR 43-1 apply equally to all criminal proceedings in this district. The court expects counsel to follow the practices and protocol outline in DUCivR 43-1.

In addition to the conduct outlines in DUCivR 43-1, the court expects the following conduct of counsel at trial:

1. Please be on time for each court session. The court usually runs its trial day from 8:30 a.m. until approximately 2:00 p.m. with two short (fifteen minute) breaks.

2. Counsel is expected to stand: (1) as court is opened, recessed, or adjourned; (2) when the jury enters or retires from the courtroom; (3) when addressing or being addressed by the court.

3. Counsel must instruct all persons at counsel table that gestures, facial expressions, audible comments, or any other manifestations of approval or disapproval during

7

witness testimony are absolutely prohibited.

4.      Counsel should instruct witnesses as to the need to make a clear record of the

proceedings.  Counsel and witnesses need to speak clearly into the microphones.

5.      When possible, counsel should try to raise issues requiring argument to the court

during recesses rather than in sidebar conferences when the jury is present.

6.      Members of the trial team should not confer or visit with anyone in the spectator

section while court is in session.

7.      Messages may be delivered to counsel table provided they are delivered discreetly

and with as little disruption to the proceedings as possible.

DATED this 1st day of April, 2019.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

# JUDGE KIMBALL'S

# STOCK JURY INSTRUCTIONS FOR

# CRIMINAL CASES

**Note: some instructions might not apply to your case**

# INSTRUCTION NO. 1

MEMBERS OF THE JURY:

Now that you have heard the evidence and are about to hear the arguments **[change if jury is instructed after arguments]**, it becomes my duty to instruct you on the law that applies to this case.

It is your duty as jurors to follow the law as stated in the instructions of the Court, and to apply the rules of law so given to the facts as you find them from the evidence in the case.

Counsel may refer **[change if jury is instructed after arguments]** to these instructions in their arguments. If, however, any difference appears to you between the law as stated by counsel and that stated by the Court in these instructions, you are of course to be governed by the Court's instructions.

You are not to single out any one instruction alone as stating the law, but must consider the instructions as a whole.

Neither are you to be concerned with the wisdom of any rule of law stated by the Court. Regardless of any opinion you may have as to what the law ought to be, it would be a violation of your sworn duty to base a verdict upon any other view of the law than that given in these instructions of the Court; just as it would be a violation of your sworn duty, as judges of the facts, to base a verdict upon anything but the evidence in the case.

Justice through trial by jury must always depend upon the willingness of each individual juror to seek the truth as to the facts from the same evidence presented to all the jurors; and to arrive at a verdict by applying the same rules of law, as given in the instructions of the Court.

## INSTRUCTION NO. 2

You have been chosen as jurors in this case to try the issues of fact presented by the allegations of the Indictment and denial made by the "Not Guilty" plea of the defendant. You are to perform this duty without bias or prejudice as to any party. The law does not permit jurors to be governed by sympathy, prejudice, or public opinion. The defendant and the public expect that you will carefully and impartially consider all the evidence in the case, follow the law as stated by the Court, and reach a just verdict.

## INSTRUCTION NO. 3

The Indictment or formal charge against the defendant is not evidence of guilt. Indeed, the defendant is presumed by the law to be innocent. The law does not require the defendant to prove his innocence or produce any evidence at all, nor does it compel him in a criminal case to take the witness stand to testify. The government has the burden of proving the defendant guilty beyond a reasonable doubt, and if it fails to do so you must acquit the defendant.

## INSTRUCTION NO. 4

While the government's burden of proof is a strict or heavy burden, it is not necessary that the defendant's guilt be proven beyond all possible doubt. It is only required that the government's proof exclude any "reasonable doubt" concerning the defendant's guilt. A "reasonable doubt" is a real doubt, based upon reason and common sense after careful and impartial consideration of all the evidence in the case.

Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs. If you are convinced that the defendant has been proved guilty beyond reasonable doubt, find him guilty. If you are not so convinced, find him not guilty.

## INSTRUCTION NO. 5

You are here to decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged. The defendant is not on trial for any act, conduct, or offense not alleged in the Indictment. Neither are you concerned with the guilt of any other person or persons not on trial as a defendant in this case.

## INSTRUCTION NO. 6

The evidence in this case consists of the sworn testimony of the witnesses, regardless of who may have called them; all exhibits received in evidence, regardless of who may have produced them; and all facts which may have been admitted or stipulated.

Statements and arguments of counsel are not evidence in this case. When, however, the attorneys on both sides stipulate or agree as to the existence of a fact, the jury must, unless otherwise instructed, accept the stipulation and regard that fact as conclusively proved.

Any evidence as to which an objection was sustained by the Court, and any evidence ordered stricken by the Court, must be entirely disregarded.

Anything you may have seen or heard outside the courtroom is not evidence, and must be entirely disregarded.

You are to consider only the evidence in this case. However, in your consideration of the evidence, you are not limited to the bald statements of the witnesses. On the contrary, you are permitted to draw from the facts which you find have been proved such reasonable inferences as seem justified in light of your experience. An inference is a deduction or conclusion which reason and common sense would lead you to draw from facts which are established by the evidence in the case. You should weigh all of the evidence in the case, affording each piece of evidence the weight or significance that you find it reasonably deserves.

## INSTRUCTION NO. 7

A "Stipulation" is an agreed statement of facts between the government and the defendant.

You should regard any stipulated facts as undisputed evidence.

## INSTRUCTION NO. 8

You may consider both direct and circumstantial evidence. "Direct evidence" is the testimony of one who asserts actual knowledge of a fact, such as an eyewitness. "Circumstantial evidence" is proof of a chain of facts and circumstances indicating either the guilt or innocence of the defendant. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It requires only that you weigh all of the evidence and be convinced of the defendant's guilt beyond a reasonable doubt before he can be convicted.

# INSTRUCTION NO. 9

Now, I have said that you must consider all of the evidence.   This does not mean, however, that you must accept all of the evidence as true or accurate.

You, as jurors, are the sole judges of the credibility or "believability" of each witness and the weight to be given to their testimony.   You should carefully scrutinize all the testimony given, the circumstances under which each witness has testified, and every matter in evidence that tends to show whether a witness is worthy of belief.

In weighing the testimony of the witnesses you should consider their relationship to the government or the defendant; their interest, if any, in the outcome of the case; their manner of testifying; their opportunity to observe or acquire knowledge concerning the facts about which they testified; their candor, fairness, intelligence; evidence regarding the general reputation of the witness for truth and veracity; and the extent to which they have been supported or contradicted by other credible evidence.   You may, in short, accept or reject the testimony of any witness in whole or in part.

A witness may be discredited or impeached by contradictory evidence; or by evidence that at some other time the witness has said or done something, or has failed to say or do something, which is inconsistent with the witness' present testimony.

If you believe any witness has been impeached and thus discredited, it is your exclusive province to give the testimony of that witness such credibility, if any, as you may think it deserves.

If a witness is shown knowingly to have testified falsely concerning any material matter, you have a right to distrust such witness' testimony in other particulars; and you may reject all the testimony of that witness or give it such credibility as you may think it deserves.

### INSTRUCTION NO. 10

If any reference by the Court or by the attorneys to matters of evidence does not coincide with your own recollection, it is your recollection which should control during your deliberations.

# INSTRUCTION NO. 11

Your decision should not be determined by the number of witnesses testifying for or against a party.   You should consider all the facts and circumstances in evidence to determine which of the witnesses you choose to believe or not believe.   You may find that the testimony of a smaller number of witnesses on one side is more credible than the testimony of a greater number of witnesses on the other side.

## INSTRUCTION NO. 12

The defendant in a criminal case has an absolute right under our Constitution not to testify.

The fact that the defendant did not testify must not be discussed or considered by the jury in any way when deliberating and in arriving at your verdict. No inference of any kind may be drawn from the fact that a defendant decided to exercise his privilege under the Constitution and did not testify.

As stated before, the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or of producing any evidence.

**[ALTERNATE INSTRUCTION IF DEFENDANT TESTIFIES:]**

A defendant in a criminal trial has a constitutional right to testify on his own behalf. This is the defendant's right, and his testimony should not be rejected or discredited by you simply because he is the defendant and on trial for a criminal charge. You should consider and weigh the testimony the same as the testimony of the other witnesses and determine the weight and credibility to be given thereto by the same rules that apply to witnesses generally.

**INSTRUCTION NO. ___**

The rules of evidence ordinarily do not permit the opinion of a witness to be received as evidence. An exception to this rule exists in the case of expert witnesses. A person who, by education, study, and experience, has become an expert in any art, science, or profession, and who is called as a witness, may give his or her opinion as to any such matter in which he or she is versed and which is material to the case.

You are not bound, however, by such an opinion. You should judge expert opinion testimony just as you judge any other testimony. Give it the weight to which you deem it entitled, whether that be great or slight, and you may reject it, if in your judgment the reasons given for it are unsound.

## INSTRUCTION NO. ___

You have heard the testimony of law enforcement officers.   The fact that a witness may be employed by tribal, state, or federal government as a law enforcement officer does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of an ordinary witness.   It is your decision, after reviewing all of the evidence, whether to accept the testimony of the law enforcement witness and to give to that testimony whatever weight, if any, you find it deserves.

**INSTRUCTION NO. ___**

The testimony of an immunized witness, someone who has been told that his testimony will not be used against him in return for that cooperation, must be examined and weighed by the jury with greater care than the testimony of someone who is appearing in Court without the need for such an agreement with the government.

## INSTRUCTION NO. ___

You have heard the testimony of _____ and _____.   They are each providing evidence for the government in exchange for a promise from the government to evaluate individually each one's cooperation and determine whether or not to recommend to the Court a reduced sentence.

The government may present the testimony of someone who has been promised favorable treatment in his or her own case in exchange for cooperation and/or testimony.   Some people in this position are truthful when testifying.   Still, you should consider the testimony of _____ and _____with more caution than the testimony of other witnesses.   Each may have had reason to be untruthful about their conduct or the conduct of others or to exaggerate what others did because he or she wanted to strike a good bargain with the government about his or her own case.   Whether or not such testimony may have been influenced by the plea agreement or the government's promises is for you to determine.

**INSTRUCTION NO. ___**

You have heard evidence that _____ and _____ have pleaded guilty to a crime which arose out of the same events for which the defendants are on trial here.   You must not consider those guilty pleas as any evidence of the guilt of the defendants in this case. You may consider those witnesses' guilty pleas only for the purpose of determining how much, if at all, to rely upon those witnesses' testimonies.

**INSTRUCTION NO. \_\_\_**

You have heard evidence that before the trial, witnesses made statements that may be inconsistent with the witnesses' testimony here in Court.   If you find that it is inconsistent, you may consider the earlier statement in deciding the truthfulness and accuracy of that witness' testimony in this trial.   You may not use it as evidence of the truth of the matters contained in that prior statement unless that statement was made under oath.   If the prior statement was made under oath, you may also consider it as evidence of the truth of the matter contained in that prior statement.

# INSTRUCTION NO. ___

There has been evidence that the defendant made certain statements in which the government claims he admitted certain facts charged in the Indictment. Evidence relating to any alleged statement, confession, admission or act alleged to have been made by a defendant outside of Court and after a crime has been committed should always be considered by the jury with caution and weighed with great care. In deciding what weight to give those statements, you should first examine whether each statement was, in fact, made and, if so, whether it was voluntarily and understandingly made. All such alleged statements, confessions, or admissions should be disregarded entirely unless the other evidence in the case convinces you beyond a reasonable doubt that the statement was made or done knowingly and voluntarily.

In determining whether any statement was knowingly or voluntarily made, you should consider the age, training, education, occupation, and physical and mental condition of the defendant, and his treatment while in custody or under interrogation as shown by the evidence in the case. Also consider all other circumstances in evidence surrounding the making of the statement.

If you determine that a statement was knowingly and voluntarily made, I instruct you that you are to give statements of a defendant such weight as you feel they deserve in light of all the evidence.

## INSTRUCTION NO. ___

At the beginning of the trial you were told that two defendants were accused of committing the crimes alleged in the Indictment.   The charges against defendant _____ have been disposed of, and he will no longer be part of the trial.   The fact that he is no longer part of the trial as a defendant should not enter your thinking when you are called upon to decide whether the government has proved, beyond a reasonable doubt, the guilt or innocence of   the remaining defendant.   You must base your verdict as to the remaining defendant solely on the basis of the evidence and the instructions given to you.

**INSTRUCTION NO. ___**

A separate crime is charged in each count of the Indictment. Each count and the evidence pertaining to it should be considered separately. The fact that you may find defendant guilty or not guilty as to one of the crimes charged should not control your verdict as to any other count.

**INSTRUCTION NO. ____**

The Indictment charges that each of the counts were committed "on or about" certain dates and within ranges of certain dates.   Although it is necessary for the government to prove beyond a reasonable doubt that the offenses were committed reasonably near the dates alleged, it is not necessary for the government to prove that the offenses were committed precisely on the dates charged.

**INSTRUCTION NO. ___**

As you know, there are three defendants on trial here: _____, _____ and

_____.   Each defendant is entitled to have his or her case decided solely on the evidence

which applies to him or her.   Count ___ of the Indictment charges a crime against _____,

_____, and _____.   You must give separate and individual consideration to each

charge against each defendant.   The fact that you find one defendant guilty or not guilty of the

crime charged in Count ___ should not control your verdict as to whether you find the other

defendant guilty or not guilty of the crime charged in Count ____, nor should it control your

verdict as to any other crime charged against that defendant.   You must consider the evidence

presented and determine whether the government has proved, beyond a reasonable doubt, its case

against each of defendants.

# INSTRUCTION NO. ___

The offenses charged in the Indictment, require the government to prove and for you to find that the defendant acted knowingly, willfully, and with a specific intent.

To establish that the defendant acted "knowingly," the government must prove that the defendant was conscious and aware of his actions, the defendant was acting voluntarily and intentionally, and the defendant did not act because of ignorance, mistake, or accident.

The word "willfully" means that the act was committed voluntarily and purposefully, with the specific intent to do something the law forbids.

Specific intent means more than the general intent to commit the act. To establish specific intent, the government must prove that the defendant knowingly did an act that the law forbids, or knowingly failed to do an act that the law requires, purposely intending to violate the law.

Although the knowledge or intent that a person possesses at any given time may not ordinarily be proved directly because there is no way of directly scrutinizing the workings of the human mind, you may consider evidence of the defendant's words, acts, or omissions, along with all of the other facts and circumstances in evidence, in deciding whether the defendant acted knowingly.

You may infer, but you are certainly not required to infer, that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. It is entirely up to you, however, to decide what facts to find from the evidence received during this trial.

## INSTRUCTION NO. ___

Good faith is a complete defense to the charges in the Indictment since good faith on the part of the defendant is inconsistent with intent to defraud or willfulness which is an essential part of the charges. The burden of proof is not on the defendant to prove that he acted in good faith, of course, since he has no burden to prove anything. The Government must establish beyond a reasonable doubt that the defendant acted with specific intent to defraud as charged in the Indictment.

While the term "good faith" has no precise definition, it means, among other things, a belief or opinion honestly held, an absence of malice or ill will, and an intention to avoid taking unfair advantage of another. One who expresses an opinion honestly held by him, or belief honestly entertained by him, is not chargeable with fraudulent intent even though his opinion is erroneous or his belief is mistaken. Similarly, evidence which establishes only that a person made a mistake in judgment or an error in management, or was careless, does not establish fraudulent intent.

On the other hand, an honest belief on the part of the defendant that a particular business venture was sound and would ultimately succeed would not, in and of itself, constitute "good faith" as used in these instructions if, in carrying out that venture, the defendant knowingly made false or fraudulent representations or material omissions to others with the specific intent to deceive them.

In determining whether the Defendant acted in good faith, you must consider all of the evidence in the case bearing on the Defendant's state of mind. However, you must keep in mind that, at all times, it is the government's burden to prove to you beyond a reasonable doubt that Defendant acted with the intent to defraud or intent to obtain money or property by means of false or fraudulent pretenses, representations, or promises.

# INSTRUCTION NO. ___

The government has offered evidence tending to show that on a different occasion the defendant engaged in conduct similar in nature to the charges in the indictment.

In that connection, let me remind you that the defendant is not on trial for committing the acts not alleged in the Indictment. Accordingly, you may not consider this evidence of the similar acts as a substitute for proof that the defendant committed the crime charged. Nor may you consider this evidence as proof that the defendant has a criminal personality or a bad character. The evidence of the other, similar acts was admitted for a much more limited purpose and you may consider it only for that limited purpose.

If you determine that the defendant committed the acts charged in the Indictment and the similar acts as well, then you may, but need not draw an inference that in doing the acts charged in the Indictment, the defendant acted knowingly and intentionally and not because of some mistake, accident or innocent reasons.

Evidence of similar acts may not be considered by you for any other purpose. Specifically, you may not use this evidence to conclude that because the defendant committed the other acts he must also have committed the acts charged in the Indictment.

**INSTRUCTION NO. ___**

You have heard testimony that a defendant fled.   If you believe that a defendant fled, then you may consider this conduct, along with all other evidence, in deciding whether the government has proved beyond a reasonable doubt that defendant committed the crime charged.   Flight, wherever it occurs, is the consummate act of evasion and while it is not necessarily indicative of wrongdoing, can be suggestive of such.   Fleeing from law enforcement officers may indicate a consciousness of guilt on the part of defendant.   On the other hand, sometimes an innocent person may flee to avoid being arrested, or for some other innocent reason.   You must determine what weight to give this evidence.

**INSTRUCTION NO. ___**

Charts and summaries have been prepared by the government and admitted into evidence. These charts and summaries have been shown to you during the trial for the purpose of explaining facts that are allegedly contained in books, records, documents, and other evidence in this case. You may consider the charts and summaries as you would any other evidence admitted during the trial and give them such weight or importance, if any, as you feel they deserve.    In making that decision, you should consider all of the testimony you heard about the way in which they were prepared.

**INSTRUCTION NO. ___**

At times throughout the trial the Court may have been called to rule whether or not certain offered evidence might be admitted.   Whether offered evidence is admissible is purely a question of law.   Neither the weight of the evidence nor the credibility of the witness is involved in such rulings.   You are not to consider evidence offered but not received nor any evidence stricken by the Court.

**INSTRUCTION NO. \_\_\_**

You are not to be concerned with the legality or illegality of any search by law enforcement officers of the residence occupied by the defendant. That is a matter exclusively within the province of the Court.

**INSTRUCTION NO. ___**

The punishment provided by law for the offense charged in the Indictment is a matter exclusively within the province of the Court, and should never be considered by the jury in any way in arriving at an impartial verdict as to the guilt or innocence of the accused.

**INSTRUCTION NO. ___**

If I have said or done anything in this case that makes it appear I have an opinion about the guilt or innocence of the defendant, disregard it. You are the sole judges of the facts and should in no way be influenced by what I have done here except to follow my instructions on the law. Nothing said in these instructions and nothing in any form of verdict prepared for your convenience is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find. What the verdict shall be is the sole and exclusive duty and responsibility of the jury.

**INSTRUCTION NO. ___**

Upon retiring to the jury room, you should first select one of your members to act as your foreperson who will preside over your deliberations and will be your spokesperson here in Court. A verdict form has been prepared for your convenience.

You will take the verdict form to the jury room and when you have reached a unanimous agreement as to your verdict, the foreperson will write the unanimous answer of the jury in the space provided for in each count of the Indictment, either not guilty or guilty. At the conclusion of your deliberations, the foreperson should date and sign the verdict.

# INSTRUCTION NO. ___

To reach a verdict, all of you must agree. Your verdict must be unanimous. Your deliberations will be secret. You will never have to explain your verdict to anyone.

It is your duty to consult with one another and to deliberate in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. During your deliberations, do not hesitate to reexamine your own opinions and change your mind if convinced that you were wrong. But do not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Remember at all times, you are judges, judges of facts. Your sole interest is to seek the truth from the evidence in the case, to decide whether the government has proved the defendant guilty beyond a reasonable doubt.

Bear in mind that you are never to reveal to any person, not even to the Court, how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict.

## INSTRUCTION NO. ___

If it becomes necessary during your deliberations to communicate with the Court, you may send a note by a Court security officer, signed by your foreperson or by one or more jurors. No member of the jury should attempt to communicate with the Court by any means other than a signed writing; and the Court will never communicate with any member of the jury on any subject touching the merits of the case, otherwise than in writing or orally here in open Court.

You will note from the oath the Court security officer will take that he, as well as any other person, is also forbidden to communicate in any way with any juror about any subject touching the merits of the case.

**INSTRUCTION NO. ___**

Preponderance of evidence is evidence sufficient to persuade you that a fact is more likely present than not present.

**INSTRUCTION NO. ___**

The defendant has offered evidence of his reputation for good character.   You should consider such evidence along with all the other evidence in the case.

Evidence of good character may be sufficient to raise a reasonable doubt whether the defendant is guilty, because you may think it improbable that a person of good character would commit such a crime.   Evidence of a defendant's character, inconsistent with those traits of a character ordinarily involved in the commission of the crime charged, may give rise to a reasonable doubt.

You should also consider any evidence offered to rebut the evidence offered by the defendant.

You should always bear in mind, however, that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

## INSTRUCTION NO. ___

The defendant has offered evidence in the form of reputation for honesty and integrity. You should consider such evidence along with all the other evidence in the case.

Evidence in the form of reputation for honesty and integrity may be sufficient to raise a reasonable doubt whether the defendant is guilty because you may think it improbable that a person of honesty and integrity would commit such a crime. Evidence in the form of reputation of a defendant's honesty and integrity may be inconsistent with those traits of character ordinarily involved in the commission of the crime charged, and may give rise to a reasonable doubt.

You should also consider any evidence offered to rebut the evidence offered by the defendant.

You will always bear in mind, however, that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

**INSTRUCTION NO. ___**

The testimony of a drug abuser must be examined and weighed by the jury with greater caution than the testimony of a witness who does not abuse drugs. _____ may be considered to be an abuser of drugs.   You must determine whether the testimony of that witness has been affected by the use of drugs or the need for drugs.

**INSTRUCTION NO. ___**

Your verdict must be unanimous.   Count _____ of the indictment accuses the defendant of committing the following acts: _____.

The government does not have to prove all of these different acts for you to return a guilty verdict on count _____.   But in order to return a guilty verdict, all of you must agree upon which of the listed acts, if any, the defendant committed *and* that he committed at least _[#]_ of the acts listed.

# INSTRUCTION NO. ___

As a defense to the crimes charged in the indictment, the defendant has asserted that he was entrapped.   The defendant was entrapped if

> (1) the idea for committing the crime(s) originated with government agents, and

> (2) the government agents then persuaded or talked the defendants into committing the crime(s), and

> (3) the defendant was not already willing to commit the crime(s).

When a person has no previous intent or purpose to violate the law, but is induced or persuaded by officers or agents to commit a crime, he is entrapped and the law forbids his conviction in such a case.   On the other hand, when a person already has the readiness and willingness to violate the law, and the officers or agents merely provide him with an opportunity to commit the crime and do so even by disguise or ruse, there is no entrapment.

In order to return a verdict of guilty as to the defendant for the crime(s) of _____, you must find beyond a reasonable doubt that the defendant was not entrapped.

[For the purposes of this case, _____, the informant, was an agent of the law enforcement officials.]

## INSTRUCTION NO. ___

The defendant has offered evidence that [he] / [she] was acting in [self defense] / [defense of another].

A person is entitled to defend himself or another person against the immediate use of unlawful force.   But the right to use force in such a defense is limited to using only as much force as reasonably appears to be necessary under the circumstances.   In particular, a person may use force which is intended or likely to cause death or great bodily harm only if he reasonably believes that force is necessary to prevent death or great bodily harm to himself or another.

To find the defendant guilty of the crime charged in the indictment, you must be convinced that the government has proved beyond a reasonable doubt: *either*, the defendant did not act in self-defense or defense of another, *or*, it was not reasonable for the defendant to think that the force he used was necessary to defend himself or another person against an immediate threat.

## INSTRUCTION NO. ___

The government must prove, beyond a reasonable doubt, that the offense(s) charged in this case was actually committed and that it was the defendant who committed it. Thus, the identification of the defendant as the person who committed the offense(s) charged is a necessary and important part of the government's case.

You should evaluate the credibility of any witness making an identification in the same manner as you would any other witness. You should also consider at least the following questions:

Did the witness have the ability and an adequate opportunity to observe the person who committed the offense(s) charged? You should consider, in this regard, such matters as the length of time the witness had to observe the person in question, the lighting conditions at that time, the prevailing visibility, the distance between the witness and the person observed, and whether the witness had known or observed the person before.

Is the testimony about an identification made after the commission of the crime(s) the product of the witness's own recollection? In this regard, you should consider very carefully the circumstances under which the later identification was made, including the manner in which the defendant was presented to the witness for identification and the length of time that elapsed between the crime(s) and the witness's subsequent identification.

If, after examining all of the testimony and evidence in this case, you have a reasonable doubt as to the identity of the defendant as the person who committed the offense(s) charged, you must find the defendant not guilty.

## INSTRUCTION NO. ___

The law recognizes two kinds of possession: actual possession and constructive possession.   A person who knowingly has direct physical control over an object or thing, at a given time, is then in actual possession of it.   A person who, although not in actual possession, knowingly has the power at a given time to exercise dominion or control over an object, either directly or through another person or persons, is then in constructive possession of it.

[More than one person can be in possession of an object if each knows of its presence and has the power to control it.]

[A defendant has joint possession of an object when two or more persons share actual or constructive possession of it.   However, merely being present with others who have possession of the object does not constitute possession.]

[In the situation where the object is found in a place (such as a room or car) occupied by more than one person, you may not infer control over the object based solely on joint occupancy. Mere control over the place in which the object is found is not sufficient to establish constructive possession.   Instead, in this situation, the government must prove some connection between the particular defendant and the object.]

[In addition, momentary or transitory control of an object is not possession.   You should not find that the defendant possessed the object if he possessed it only momentarily, or did not know that he possessed it.]

**INSTRUCTION NO. ___**

The defendant may be found guilty of attempting to commit a crime, even though he did not do all of the acts necessary in order to commit the crime.   However, the defendant may not be found guilty of attempting to commit any crime merely by thinking about it or even by making some plans or some preparation for the commission of a crime.   Instead, in order to prove an attempt, the government must prove beyond a reasonable doubt that (1) the defendant intended to commit the crime; and that (2) the defendant took a substantial step towards commission of that crime.

A "substantial step" is something beyond mere preparation.   A substantial step is an act which, in the ordinary and likely course of events, would lead to the commission of the particular crime.   That step must be a strong indication of the defendant's acts as criminal.   It should demonstrate commitment to the crime charged.

## INSTRUCTION NO. ___

If you unanimously find the defendant not guilty of the offense charged, or if, after all reasonable efforts, you are unable to agree on a verdict as to that offense, then you must determine whether the defendant is guilty or not guilty of _____.   The difference between these two offenses is that, to convict the defendant of _____, the government does not have to prove _____.   This is an element of the greater offense, but not of the lesser included offense.

For you to find the defendant guilty of _____, the government must prove each of the following elements beyond a reasonable doubt: __[insert elements of lesser offense]__.   If you are convinced that the government has proved all of these elements beyond a reasonable doubt, you may find the defendant guilty of the lesser included offense.   If you have a reasonable doubt about any of these elements, then you must find the defendant not guilty of the lesser included offense.

# INSTRUCTION NO. ___

If you conclude that the government has proved beyond a reasonable doubt that the defendant committed the crime charged, you must then consider whether the defendant should be found "not guilty by reason of insanity."   Under the law, a person is not criminally liable for his conduct while insane.   Insanity is therefore a defense to the crime charged.   The defendant has presented evidence of insanity at the time he committed the crime charged.

For you to return a verdict of not guilty by reason of insanity, the defendant must prove 1) that he suffered from a severe mental disease or defect when he committed the crime; *and* (2) that, as a result of this mental disease or defect, he was not able to understand what he was doing or to understand that it was wrong.   Insanity may be temporary or permanent.   You may consider evidence of the defendant's mental condition before, during, and after the crime, in deciding whether he was legally insane at the time of the crime.

Unlike other aspects of a criminal trial, the defendant has the burden of proving an insanity defense.   The defendant does not have to prove insanity beyond a reasonable doubt, however, but only by clear and convincing evidence.   Clear and convincing evidence is evidence that makes it highly probable that the defendant was insane.   You should render a verdict of "not guilty by reason of insanity" if you find, by clear and convincing evidence, that the defendant was insane when he committed the crime charged.

Although the defendant has raised the issue of insanity, the government still has the burden of proving all of the essential elements of the offense charged beyond a reasonable doubt. Remember that there are three possible verdicts in this case: guilty, not guilty, and not guilty only by reason of insanity.

**INSTRUCTION NO. ___**

Evidence has been introduced tending to establish an alibi – that the defendant was not present at the time when, or at the place where, the defendant is alleged to have committed the offense charged in the indictment.   The government has the burden of proving that the defendant was present at that time and place.   Unless the government proves this beyond a reasonable doubt, you must find the defendant not guilty.

## INSTRUCTION NO. ___

The defendant has offered evidence that he was coerced, or forced, to commit the crime. Under the law, the defendant is not guilty of a crime if, at the time it was committed, (1) there was an immediate threat of death or bodily injury to the defendant (or others); (2) the defendant had a well-grounded fear that the threat would be carried out; and (3) the defendant had no reasonable opportunity to escape the threatened harm.

On this issue, the government must prove beyond a reasonable doubt that defendant was not coerced.   In other words, for you to find defendant guilty, the government must prove that (1) there was no immediate threat; *or* (2) defendant's fear that the threat would be carried out was not well-grounded; *or* (3) defendant had a reasonable opportunity to escape the threatened harm.

**INSTRUCTION NO. ___**

Interstate commerce means commerce or travel between one state, territory or possession of the United States and another state, territory or possession of the United States, including the District of Columbia.   Commerce includes travel, trade, transportation and communication.

If you decide that there was any effect at all on interstate commerce, then that is enough to satisfy this element.   All that is necessary is that the natural and probable consequence of the acts the defendant took would be to affect interstate commerce.

Foreign commerce means commerce between any part of the United States (including its territorial waters), and any other country (including its territorial waters).

**INSTRUCTION NO. ___**

During this trial, you have heard sound recordings of certain conversations. These conversations were legally recorded; they are a proper form of evidence and may be considered by you as you would any other evidence. You were also given transcripts of those recorded conversations.

Keep in mind that the transcripts are not evidence. They were given to you only as a guide to help you follow what was being said. The recordings themselves are the evidence. If you noticed any differences between what you heard on the recordings and what you read in the transcripts, you must rely on what you heard, not what you read. If you could not hear or understand certain parts of the recordings, you must ignore the transcript as far as those parts are concerned.

## INSTRUCTION NO. ___

Members of the jury, I am going to ask that you return to the jury room and deliberate further.   I realize that you are having some difficulty reaching a unanimous agreement, but that is not unusual.   Sometimes, after further discussion, jurors are able to work out their differences and agree.

This is an important case.   If you should fail to agree upon a verdict, the case is left open and must be tried again.   Obviously, another trial would require the parties to make another large investment of time and effort, and there is no reason to believe that the case can be tried again by either side better or more exhaustively than it has been tried before you.

You are reminded that the defendant is presumed innocent, and that the government, not the defendant, has the burden of proof and it must prove the defendant guilty beyond a reasonable doubt.   Those of you who believe that the government has proved the defendant guilty beyond a reasonable doubt should stop and ask yourselves if the evidence is really convincing enough, given that other members of the jury are not convinced.   And those of you who believe that the government has not proved the defendant guilty beyond a reasonable doubt should stop and ask yourselves if the doubt you have is a reasonable one, given that other members of the jury do not share your doubt.   In short, every individual juror should reconsider his or her views.

It is your duty, as jurors, to consult with one another and deliberate with a view toward reaching an agreement, if you can do so without violence to individual judgment.   Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.   In the course of your deliberations do not hesitate to reexamine your own views and change your opinion if you are convinced it is erroneous.   But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your

fellow jurors, or for the mere purpose of returning a verdict.

What I have just said is not meant to rush or pressure you into agreeing on a verdict. Take as much time as you need to discuss things. There is no hurry. I will ask now that you retire once again and continue your deliberations with these additional comments in mind to be applied, of course, in conjunction with all of the instructions I have previously given you.

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
SKORDAS & CASTON, LLC
560 South 300 East, Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

Attorneys for Defendant Shamo

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>v.<br><br>AARON MICHAEL SHAMO,<br>DREW WILSON CRANDALL,<br>ALEXANDRYA TONGE,<br>KATHERINE BUSIN,<br>MARIO NOBLE, and<br>SEAN GYGI,<br><br>     Defendants. | **MOTION TO EXTEND TIME TO FILE MOTIONS REGARDING AUTHENTICATION ISSUES AND COMPUTER FORENSIC MATTERS**<br><br><br>Case No. 2:16-CR-00631-DAK<br><br>Judge Dale Kimball |

Defendant, Aaron Michael Shamo, by and through his attorney of record, Gregory G.

Skordas, hereby moves this Court for a four-week extension of time to file any motions

regarding authentication issues for records obtained from the "dark web" and motions regarding

issues currently being examined by a computer forensic specialist. Defendant bases this motion on the following grounds:

1. In December 2018, the Government provided Defendant Shamo's counsel with an estimated 20 TBs of computer and electronic data.

2. Defendant Shamo's Counsel is CJA-Appointed and is required to seek budget approval for matters in this case.

3. Defendant Shamo's Counsel had retained the services of a computer forensic company to examine previous issues related to electronic data.

4. After receipt of the new discovery, Counsel sought to have that same company, who was familiar with the case, review an estimated 4 TBs of that new data, which Counsel felt was necessary for the defense of Mr. Shamo.

5. Beginning in January 2019, Counsel attempted to obtain approval for the forensic review of that computer data, but such approval was not initially given.

6. In February 2019, Counsel was instructed to seek a new computer forensic company by the Tenth Circuit budgeting attorney, Cari Waters.

7. On March 27, 2019, after numerous phone calls and emails, Counsel was given budgeting approval for the services Trial Tech to review that newly provided computer data.

8. Trial Tech is still in the process of reviewing that provided data and will need time to provide reports and available information on those devices.

9. The receipt of those reports and information would likely serve as the basis for several motions.

Page **2** of 4

10. Counsel for the Government, Michael Gadd, has stipulated to this Motion to Extend via email.

WHEREFORE, Defendant respectfully requests a four- week extension of time to file an the above-outlined motions.

DATED this 23rd Day of April, 2019.


SKORDAS & CASTON, LLC


*/s/ Gregory G. Skordas*
Gregory G. Skordas

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of April, 2019, I filed a true and correct copy of the

foregoing **STIPULATED MOTION TO EXTEND TIME TO FILE MOTIONS**

**REGARDING AUTHENTICATION AND COMPUTER FORENSIC MATTERS** with the

Clerk of the Court using CM/ECF system, which sent notification of such filing to the following:

S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Adam S. Elggren
Adam.elggren@usdoj.gov

Kent Burggraaf
kburggraaf@agutah.gov


*/s/ Sabrina Nielsen-Legal Secretary*
SKORDAS & CASTON, LLC

Page **4** of **4**

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
SKORDAS & CASTON, LLC
560 South 300 East, Suite 225
Salt Lake City, UT 84111
Telephone:  (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

Attorneys for Defendant Shamo

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AARON MICHAEL SHAMO,<br>DREW WILSON CRANDALL,<br>ALEXANDRYA TONGE,<br>KATHERINE BUSIN,<br>MARIO NOBLE, and<br>SEAN GYGI,<br><br>Defendants. | **ORDER APPROVING REQUEST FOR EXTENSION OF TIME TO FILE MOTIONS REGARDING AUTHENTICATION ISSUES AND COMPUTER FORENSIC MATTERS**<br><br><br>Case No. 2:16-CR-00631-DAK<br><br>Judge Dale Kimball |

Based upon the motion of Defendant Aaron Michael Shamo, and for good cause

showing, the time for Defendant to file any motions regarding authentication issues for

records obtained from the "dark web" and motions regarding issues currently being

examined by a computer forensic specialist, is hereby extended by four-weeks.

DATED this 23rd day of April, 2019.

BY THE COURT:

_____

Dale Kimball
U.S. District Court Judge

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 23rd day of April, 2019, I filed a true and correct copy

of the foregoing **ORDER APPROVING REQUEST FOR EXTENSION OF TIME**

**TO FILE MOTIONS REGARDING AUTHENTICATION ISSUES AND**

**COMPUTER FORENSIC MATTERS**  with the Clerk of the Court using CM/ECF

system, which sent notification of such filing to the following:

S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Adam S. Elggren
Adam.elggren@usdoj.gov

Kent Burggraaf
kburggraaf@agutah.gov

*/s/ Sabrina Nielsen-Legal Secretary*
SKORDAS & CASTON, LLC

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | MEMORANDUM CLARIFYING THE UNITED STATES' POSITION REGARDING THE DEFENDANT'S MOTION TO EXTEND THE MOTIONS DEADLINE (DOC. 192) |
| vs. | |
| AARON MICHAEL SHAMO, DREW WILSON CRANDALL, ALEXANDRYA MARIE TONGE, KATHERINE LAUREN ANNE BUSTIN, MARIO ANTHONY NOBLE, and SEAN MICHAEL GYGI, | Judge Dale A. Kimball |
| Defendants. | |

The United States, by and through Michael Gadd, Special Assistant United States

Attorney, hereby seeks to provide clarification on two points raised in Doc. 192, Mr. Shamo's

motion to extend the deadline to file additional motions.

First, of the roughly 67 devices for which the United States has forensic data, Mr.

Shamo's counsel have had access to all but two of them since December 2017—more than

sixteen months ago (see Doc. 89, at 4). In December 2018, Mr. Shamo's counsel chose to

acquire their own copy of the data from the United States and to have an expert review it.

Second, the United States stipulated to extending the motion deadline four weeks from today—meaning the defense's motions (limited to dark web and computer forensic evidence) would be due on May 21, 2019. That deadline would allow the United States one week to respond or otherwise prepare prior to the pre-admission hearing scheduled for May 29-31, 2019. As written, the defense's proposed order would extend their deadline until May 31st, the final day of the pre-admission hearing.

The United States would like to accommodate the defense to the extent possible. It simply asks for a week to respond and prepare for the defense's motion(s) to exclude dark web and computer forensic evidence prior to the evidentiary hearing.

The United States has attached as Attachment A an email between counsel reflecting its understanding of the stipulation. An alternative proposed order has also been attached that reflects a due date of May 21, 2019.

Respectfully submitted this 23rd day of April, 2019.

JOHN W. HUBER
United States Attorney

_/s/ Michael Gadd_
MICHAEL GADD
Special Assistant United States Attorney

2

| From: | Michael Gadd |
|---|---|
| To: | Kaytlin Beckett |
| Cc: | Stejskal, Vernon (USAUT); Kent Burggraaf |
| Subject: | RE: US v. Shamo; final round of discovery ready for pick up |
| Date: | Tuesday, April 23, 2019 10:56:00 AM |

So are you thinking you'll be able to give us a copy of your exhibits from the computers by May 21 (four weeks from today)? And file your amended motion to exclude by May 21? If yes, we could try to respond by May 28th so the issues could be decided during the pre-admission hearing (May 29-31). If Judge Kimball is okay with it, we're okay with a compressed response time for that motion.

Could you send me your Expert Notice for Eric Wheeler by Friday (April 26th) so we can decide whether we want to challenge him under Rule 702 by the motion deadline (May 3rd)?
Thanks,
Mike

**From:** Kaytlin Beckett <kbeckett@schhlaw.com>
**Sent:** Tuesday, April 23, 2019 10:41 AM
**To:** Michael Gadd <mgadd@agutah.gov>
**Subject:** Re: US v. Shamo; final round of discovery ready for pick up

Mike,

I did not hear back from you on this, so we are going to file a motion with the Court. Asking for four weeks just on the computer forensic information. Hopefully, we get it done much sooner, but some of the images are encrypted and Eric is working with your tech folks to get that resolved.

Everything else will be filed this week.

Best,
Kaytlin Beckett

On Apr 16, 2019, at 9:18 PM, Kaytlin Beckett <kbeckett@schhlaw.com> wrote:

> Yes. We were using Eide Bailly, but some issues came up and we had to find someone else.
>
> Eric has only had the information for about two and half weeks now.
>
> On Apr 16, 2019, at 9:11 PM, Michael Gadd <mgadd@agutah.gov> wrote:
>
>> Is your new computer expert Eric Wheeler?
>>
>> I'll talk to the others tomorrow but I'm sure we can work something out.
>> Mike

**From:** Kaytlin Beckett <kbeckett@schhlaw.com>
**Sent:** Tuesday, April 16, 2019 11:38:21 AM
**To:** Michael Gadd
**Subject:** Re: US v. Shamo; final round of discovery ready for pick up

Mike,

I wanted to give you a heads up and I have a quick request. We were asked by the budgeting attorney to seek a new computer forensic expert back in February and only received the approval in the past few weeks. We are working diligently to get those reports and information necessary. I am going to list computer forensic reports on our exhibit list, but I will not have much more information than that until we receive them.

Along those same lines, one of the motions we previously filed dealt with authentication and online data issues from the dark web. We plan to refine a similar motion with more information from the current expert. Again, because of the delay in getting approval, we may not be able to get that motion filed by the court's requested deadline. Would you be willing to stipulate in an extension of time to file that particular motion in the even we are unable to get the reports and data from our expert in time?

Thanks again,
Kaytlin

On Apr 10, 2019, at 5:01 PM, Michael Gadd <mgadd@agutah.gov> wrote:

> All,
> Yvette has a disk for you at the USAO front desk that contains our last round of discovery in US v. Shamo. The disk contains records of some additional customers who have died from overdoses, lab notes from the chemists who performed tests on the drugs, some bank records, some controlled-substance-database records, a video of Bustin's post-arrest interview, a transcript of Ali Rose's interview, some business records certifications, some chain of custody documents, an updated spreadsheet showing Pharma-Master's feedback-linked sales, etc.
>
> I suspect this disk won't be as useful to you as the items we're pulling together for next Wednesday. By the 17th,

when the exhibit lists are due, I hope to be able to provide you a copy of our (non-physical) exhibits—that way you don't have to go searching by bates number for pictures or documents on our exhibit list. It'll all be on a disk for you.

Respectfully,
Mike


Michael Gadd
Assistant Attorney General
Special Assistant United States Attorney
348 E. South Temple
Salt Lake City, Utah 84111
C: 801.472.0911
D: 801.524.3081
Michael.Gadd@usdoj.gov
Mgadd@agutah.gov

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | ORDER EXTENDING THE MOTION DEADLINE FOR MOTIONS RELATED TO DARK WEB OR COMPUTER FORENSIC EVIDENCE |
| vs. | |
| AARON MICHAEL SHAMO, DREW WILSON CRANDALL, ALEXANDRYA MARIE TONGE, KATHERINE LAUREN ANNE BUSTIN, MARIO ANTHONY NOBLE, and SEAN MICHAEL GYGI, | Judge Dale A. Kimball |
| Defendants. | |

The Court, good cause appearing, grants Mr. Shamo's motion to extend the

deadline to file motions that relate to evidence obtained from the dark web or from

computer forensic analysis.

The defendant is ORDERED to file its motion(s) by May 21, 2019.

DATED this ___ day of April, 2019.

_____
DALE A. KIMBALL
United States District Judge

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
SKORDAS & CASTON, LLC
560 South 300 East, Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

Attorneys for Defendant Shamo

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> AARON MICHAEL SHAMO, <br> DREW WILSON CRANDALL, <br> ALEXANDRYA TONGE, <br> KATHERINE BUSIN, <br> MARIO NOBLE, and <br> SEAN GYGI, <br><br> Defendants. | **ORDER APPROVING IN PART REQUEST FOR EXTENSION OF TIME TO FILE MOTIONS REGARDING AUTHENTICATION ISSUES AND COMPUTER FORENSIC MATTERS** <br><br><br> Case No. 2:16-CR-00631-DAK <br><br> Judge Dale Kimball |

Based upon Defendant Aaron Michael Shamo's motion, and for good cause

shown, the court extends the time for Defendant to file any motions regarding

authentication issues for records obtained from the "dark web" and motions regarding

issues currently being examined by a computer forensic specialist, until **May 13, 2019**.

The government shall respond to such motions by **May 21, 2019**, and Defendant shall file

any reply memoranda by **May 23, 2019**.

      DATED this 24th day of April, 2019.

                    BY THE COURT:

                    Dale A. Kimball
                    U.S. District Court Judge

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

---

## IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>AARON MICHAEL SHAMO,<br><br>Defendant. | Case No. 2:16-cr-00631-DAK<br><br>MOTION FOR IN-TRIAL NOTICE OF WITNESSES BEING CALLED IN EACH PARTY'S CASE-IN-CHIEF AND REQUEST FOR ADDITIONAL TRIAL WEEKS<br><br>Judge Dale A. Kimball |

The United States, by and through Michael Gadd, Special Assistant United States Attorney, moves this Court to order that the parties provide notice to each other of the witnesses the parties intend to call in their respective cases-in-chief by 4pm on the business day preceding the witness's direct examination.

The United States was surprised to learn of the defendant's intention to call as many as sixty-four witnesses in his case-in-chief. In order to adequately prepare to cross-examine those witnesses, the United States has submitted this motion in limine.

The United States also requests that the Court block out an additional three weeks for the trial in order to give the defendant enough time to examine his witnesses.

Respectfully submitted this 26th day of April, 2019.

JOHN W. HUBER
United States Attorney

*/s/ Michael Gadd*
MICHAEL GADD
Special Assistant United States Attorney

2

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

---

### IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | MOTION IN LIMINE FOR AN ORDER PROHIBITING THE PARTIES FROM RAISING THE DEFENDANT'S POTENTIAL SENTENCE |
| vs. | |
| AARON MICHAEL SHAMO, | |
| Defendant. | Judge Dale A. Kimball |

The United States, by and through Michael Gadd, Special Assistant United States Attorney, moves this Court to prohibit all parties from encouraging jury nullification generally, from encouraging it specifically by (1) mentioning to the jury, on direct or cross-examination or in argument, the defendant's potential minimum and maximum sentence; and (2) drawing comparisons between the charges faced by the defendant with those charges faced by his co-conspirators. This motion is made pursuant to Rules 401, 402, and 403 of the Rules of Evidence and the case law cited below.

### STATEMENT OF FACTS

1.     The defendant is charged in Count One with Engaging in a Continuing Criminal Enterprise, a crime that carries a minimum mandatory sentence of life imprisonment.

2.     The defendant is charged in Count Six with Aiding and Abetting the Distribution of

Fentanyl Resulting in Death, a crime that carries a minimum mandatory sentence of twenty years' imprisonment and a maximum sentence of life imprisonment.

3.      None of the defendant's coconspirators were charged with the crimes alleged in Counts One or Six.

4.      Several of Mr. Shamo's coconspirators have pleaded guilty to crimes for which Mr. Shamo has also been charged. The Statements in Advance of Plea for those coconspirators have been marked as potential exhibits by the United States and the defendant. Those Statements in Advance of Plea recite the maximum (and where applicable, minimum) sentences faced by the coconspirators.

ARGUMENT

**1.  Jury Nullification is not a right and the Court and counsel should work together to avoid it.**

Jury nullification is antithetical to our system of justice and the rule of law. The Tenth Circuit has held there is no right to jury nullification. *Crease v. McKune*, 189 F.3d 1188, 1194 (10th Cir. 1999).

Jury nullification is defined as a jury's "knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness." Jury Nullification, *Black's Law Dictionary* (10th ed. 2014)(accessed electronically). The Tenth Circuit has favorably quoted a sister circuit that explained "[w]hile we recognize that a jury may render a verdict at odds with the evidence or the law, neither the court nor counsel should encourage jurors to violate their oath." *United States v.*

2

*Gonzalez*, 596 F.3d 1228, 1237 (10th Cir. 2010)(*quoting United States v. Trujillo*, 714 F.2d 102, 106 (11th Cir. 1983)).

Issues that lead to jury nullification are prohibited under case law and by the Rules of Evidence. Rule 401 defines relevant evidence as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Rule 402 makes irrelevant evidence inadmissible.

The defendant's potential punishment if convicted is not relevant or admissible under the rules. It does meet the test for relevance in Rule 401. Rule 402 requires its exclusion. Comparing and contrasting the charges faced by coconspirators is likewise irrelevant and inadmissible under Rules 401 and 402.

Even if, for the sake of argument, it could be assumed that there is some remote relevance to the defendant's potential punishment or how his charges compare with the charges faced by his coconspirators, that type of evidence (and argument) would be excluded under rule 403 as creating unfair prejudice and for its likelihood of confusing the jury as to its duty.

**1.1 The jury cannot consider the defendant's potential punishment because it could lead to jury nullification.**

The jury cannot consider the defendant's potential minimum mandatory sentence or maximum sentence; allowing the jury to consider punishment would open the door for jury nullification. The United States Supreme Court has held that "when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573, 579 (1994)(footnote omitted)(*quoting Rogers v. United States*, 422 U.S. 35, 40 (1975)). In *Shannon*, the Supreme Court explained that

its holding echoed the basic division of labor in our legal system—the jury finds facts and determines guilt while the court imposes sentences on defendants found guilty. *Id.*

The Tenth Circuit has fashioned a bright line rule that "[u]nless a statute specifically requires jury participation in determining punishment, the jury shall not be informed of the possible penalties." *United States v. Parrish*, <u>925 F.2d 1293, 1299</u> (10th Cir. 1991)(internal citations omitted). In a separate opinion, the Tenth Circuit stated: "[t]he authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial. Breach of this standard has often been grounds for reversal." *United States v. Greer*, <u>620 F.2d 1383, 1384</u> (10th Cir. 1980).

The Tenth Circuit pattern jury instructions reflect case law on this point. Pattern instruction 1.20 reads: "[i]f you find the defendant guilty, it will be my duty to decide what the punishment will be. You should not discuss or consider the possible punishment in any way while deciding your verdict." 10th Cir. Pattern Instruction 1.20 (2018).

The Court should prohibit all parties from informing the jury, through direct and cross-examination or through argument, of the potential punishment the defendant faces if convicted. The United States recognizes that the Statements in Advance of Plea (SAPs) for the cooperating defendant-witnesses in this case contain language that recites the maximum (and applicable minimum) penalties for some of Mr. Shamo's lesser counts—counts to which his coconspirators pleaded guilty. The United States also recognizes that those SAPs can be used to impeach the cooperating-defendant witnesses. However, the United States requests that the Court prohibit counsel from commenting upon potential sentences for even those counts covered in the SAPs other than to impeach the witnesses.

Since the penalties for Counts One and Six do not appear in any Statement in Advance of Plea, the United States requests an order that the potential penalties for those two counts never be mentioned in the jury's presence. To mention the possible penalties to Counts One or Six even once in the presence of the jury will lead to jury nullification.

**1.2  The jury cannot compare the charges faced by the defendant with those faced by co-conspirators because it could lead to jury nullification.**

Just as the jury should not engage in jury nullification based upon potential punishment, the jury cannot compare the charges faced by the defendant with the charges his co-conspirators' faced. "One touchstone of a fair trial is an impartial trier of fact—'a jury capable and willing to decide the case solely on the evidence before it.'" *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)(*quoting Smith v. Phillips*, 455 U.S. 209, 217 (1982)).

A juror meets the constitutional standard for impartiality where the juror "can lay aside his opinion and render a verdict based on the evidence presented in court." *Patton v. Yount*, 467 U.S. 1025, 1037 n.12 (1984). The Tenth Circuit has explained that a "defendant's right to an impartial jury does not include a right to a jury composed of persons who will disregard the district court's instructions." *United States v. Edwards*, 266 F. Supp. 3d 1290, 1305 (D.N.M. 2017) (*quoting United States v. James*, 203 F.3d 836, 2000 WL 136816, at *3 (10th Cir. Feb. 7, 2000)(unpublished)).

The Tenth Circuit pattern jury instructions reflect case law on this point. Pattern instruction 1.19 reads:

> You are here to decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of the crime charged. The defendant is not on trial for any act, conduct, or crime not charged in the indictment.

5

It is not up to you to decide whether anyone who is not on trial in this case should be prosecuted for the crime charged. The fact that another person also may be guilty is no defense to a criminal charge.

The question of the possible guilt of others should not enter your thinking as you decide whether this defendant has been proved guilty of the crime charged.

10th Cir. Pattern Instruction 1.19 (2018).

The Court should prohibit all parties from drawing the jury's attention, through direct and cross-examination or through argument, to which, if any, of the defendant's co-conspirators were charged in any of the counts the defendant faces. More specifically, the Court should prohibit the defense from drawing comparisons between the charges the defendant faces with the charges his two closest lieutenants—Drew Crandall and Luke Paz—faced. Drawing those comparisons, or inviting the jury to draw those comparisons by raising those issues in front of the jury, will lead to jury nullification.

Respectfully submitted this 26th day of April, 2019.

JOHN W. HUBER
United States Attorney

*/s/ Michael Gadd*
MICHAEL GADD
Special Assistant United States Attorney

6

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | MOTION TO EXCLUDE DEFENSE EXHIBITS |
| vs. | |
| AARON MICHAEL SHAMO, | Judge Dale A. Kimball |
| Defendant. | |

The United States, by and through Michael Gadd, Special Assistant United States

Attorney, moves this Court to prohibit the defendant from offering exhibits at the pre-admission

hearing or at trial because of the inadequate exhibit-list disclosure made by the defendant to the

United States.

## STATEMENT OF FACTS

1.      On April 1, 2019, the Court issued an Amended Trial Order that set pre-trial deadlines.

Doc. 186.

2.      The defendant has never provided reciprocal discovery in this case.

3.      The parties were ordered to exchange proposed exhibit lists by April 17, 2019. *Id.*, at 5.

4.      The Court ordered that objections to proposed exhibits be specific, made in writing, and

submitted as part of a motion in limine by April 26, 2019.  *Id*. at 1-2.

5. On April 16, 2019, the defense emailed the following proposed exhibit list:

**SHAMO PROPOSED EXHIBIT LIST**

1. Forensic Data and Documentation retrieved from the following:
   a. Computer of Aaron Shamo
   b. Computer of Drew Crandall
   c. Computer of Jonathan Luke Paz
   d. Computer of Mario Noble
   e. Cellular Phone of Aaron Shamo
   f. Cellular Phone of Drew Crandall
   g. Cellular Phone of Jonathan Luke Paz
2. Bitcoin records of the following:
   a. Aaron Shamo
   b. Drew Crandall
   c. Jonathan Luke Paz
3. Bank records of the following:
   a. Aaron Shamo
   b. Drew Crandall
   c. Jonathan Luke Paz
4. Images from Pharmamaster, AlphaBay as pertains to sales and customer feedback
5. Investigative Interviews of the following:
   a. Drew Crandall
   b. Jonathan Luke Paz
   c. Mario Noble
   d. Alexandrya Tonge
   e. [Paz's then-girlfriend]
   f. [Crandall's then-girlfriend]
6. Statement in Advance of Plea, of the following:
   a. Drew Crandall
   b. Mario Noble
   c. Sean Gygi
   d. Alexandrya Tonge
   e. Katherine Bustin
   f. Jonathan Luke Paz
7. Images of Search of Homes
8. Affidavits of Probable Cause for each search warrant
9. All documents and discovery related to the Oregon investigation
10. All documents relating to [G.L.]
    a. Death of [R.K.]
11. All documents relating to the death of [R.K.]
12. All documents related to messages on Alpha Bay from "Trustworthymoney"
    a. All messages from [A.L.]
13. All documents related to messages from large customers of the drug trafficking operation
    a. Documents and messages from and to [C.K.]
14. Any documents or information relating to [C.K.]
15. Any expert reports from computer forensics.

2

ARGUMENT

The defendant has not submitted an exhibit list—the defendant's list more closely resembles the breadth of a discovery request. It lists broad categories rather than specific exhibits. Because the defendant's exhibit list is inadequate, the Court should prohibit the defendant from offering exhibits at the pre-admission hearing or at trial.

In addition to the Court's Amended Trial Order, Federal Rule of Criminal Procedure 16 requires the defendant to provide books, papers, documents, data, or photographs that the defendant intends to use in his case-in-chief. Fed. R. Crim. P. 16 (b)(1)(A)(ii) and (B)(ii).

The Tenth Circuit has set out factors that a district court must consider in determining the appropriate sanction for a Rule 16 violation: "(1) the reason for the delay, including whether the non-compliant party acted in bad faith; (2) the extent of prejudice to the party that sought the disclosure; and (3) the 'feasibility of curing the prejudice with a continuance.'" *United States v. Banks*, 761 F.3d 1163, 1198-99 (10th Cir. 2014) (*citing United States v. Wicker*, 848 F.2d 1059, 1061 (10th Cir. 1988)).

The Tenth Circuit, in *Banks*, added that these three factors were not meant to bind the trial court's discretion; instead, *Banks* explained it might be appropriate to suppress evidence that did not conform with discovery orders in order to "maintain the schedule and integrity of the court" even when the moving party would not be prejudiced. *Id.*

Rule 16(d)(2)(C) specifically authorizes the Court to "prohibit [a] party from introducing the undisclosed evidence" if that party "fails to comply with this rule."

Category by category, the United States objects to the defendant's list as follows:

3

1. Forensic Data and Documentation retrieved from the following:
   a. Computer of Aaron Shamo
   b. Computer of Drew Crandall
   c. Computer of Jonathan Luke Paz
   d. Computer of Mario Noble
   e. Cellular Phone of Aaron Shamo
   f. Cellular Phone of Drew Crandall
   g. Cellular Phone of Jonathan Luke Paz

The United States objects to these proposed exhibits. The list is too broad—it encompasses terabytes of data. This description does not give the United States notice of the actual exhibits the defendant plans to offer—notice which would allow the United States to object to form or content. If the records are in the United States' custody, the defendant could have included bates numbers. If the records are in the defendant's custody, he has not provided them to the United States as required in Rule 16 and the Court's Amended Trial Order.

2. Bitcoin records of the following:
   a. Aaron Shamo
   b. Drew Crandall
   c. Jonathan Luke Paz

The United States objects to these proposed exhibits. The list is too broad. These records include thousands of transactions. It does not specify the records in a manner that allows the United States to find the exhibits. This description does not give the United States notice of the actual exhibits the defendant plans to offer—notice which would allow the United States to object to form or content. If the records are in the United States' custody, the defendant could have included bates numbers. If the records are in the defendant's custody, he has not provided them to the United States as required in Rule 16 and the Court's Amended Trial Order.

3. Bank records of the following:
   a. Aaron Shamo
   b. Drew Crandall
   c. Jonathan Luke Paz

The United States objects to these proposed exhibits. The list is too broad. These records could include thousands of transactions. The defendant has not specified which records or even which banks held the records. This description does not give the United States notice of the actual exhibits the defendant plans to offer—notice which would allow the United States to object to form or content. If the records are in the United States' custody, the defendant could have included bates numbers. If the records are in the defendant's custody, he has not provided them to the United States as required in Rule 16 and the Court's Amended Trial Order.

4. Images from Pharmamaster, AlphaBay as pertains to sales and customer feedback

This description is likewise too broad—in part. The United States has marked and proposed that screenshots from Pharma-Master's storefront on AlphaBay that contain customer feedback be admitted as United States' proposed exhibits 15.00 and 15.01. The United States, of course, does not object to the same exhibits it proposed.

But images from AlphaBay generally, which pertain to sales and customer feedback (i.e. not from Pharma-Master) is a category that is so large the United States cannot measure it. The United States would like to assume that the defendant did not intend to cast such a wide net. But if the records are in the United States' custody, the defendant could have included bates numbers. If the records are in the defendant's custody, he has not provided them to the United States as required in Rule 16 and the Court's Amended Trial Order.

5.   Investigative Interviews of the following:
   a.   Drew Crandall
   b.   Jonathan Luke Paz
   c.   Mario Noble
   d.   Alexandrya Tonge
   e.   [Paz's then-girlfriend]
   f.   [Crandall's then-girlfriend]

The United States objects to these proposed exhibits because they are hearsay. Hearsay is a statement, other than one made by the declarant while testifying at the trial or in a hearing, offered in evidence to prove the truth of the matter asserted. Federal Rule of Evidence 801(c). While enumerating hearsay exceptions, the rules specifically excluded investigative reports in a criminal case from the public-records exception found in Rule 803(8).

The declarant for each of the investigative reports listed by the defendant as proposed exhibits is a law enforcement officer or analyst. The reports were written outside of court. They would be offered for the truth of what the declarant asserted in the reports. There is no exception that allows their admission.

This description, like those before it, is also too broad. There are several reports each for most of those people listed.  The records were undoubtedly provided to the defendant by the United States. The defendant could have narrowed his list by including bates numbers. Proper notice would have allowed the United States to object based upon form or content.

6.   Statement in Advance of Plea, of the following:
   a.   Drew Crandall
   b.   Mario Noble

6

        c.   Sean Gygi
        d.   Alexandrya Tonge
        e.   Katherine Bustin
        f.   Jonathan Luke Paz

The United States does not object to these proposed exhibits. It has marked them as United States' proposed exhibits 23.00 through 23.07.

7. Images of Search of Homes

The United States objects to these proposed exhibits. The category of evidence listed as defendant's proposed exhibit seven is too broad. Even assuming it only refers to searches conducted as part of the investigation that led to the defendant's charges, it does not specify the records in a manner that allows the United States to find the exhibits. This description does not give the United States notice of the actual exhibits the defendant plans to offer—notice which would allow the United States to object to form or content. If the records are in the United States' custody, the defendant could have included bates numbers. If the records are in the defendant's custody, he has not provided them to the United States as required in Rule 16 and the Court's Amended Trial Order.

To be sure, the United States has marked and given notice of several proposed exhibits that contain images taken during the searchs of the defendant's residence and the Tonge/Bustin residence on November 22, 2016. To the extent that the defendant is seeking to also admit those images or videos, the United States does not object.

8.   Affidavits of Probable Cause for each search warrant

The United States objects to these proposed exhibits because they are hearsay. Hearsay is a statement, other than one made by the declarant while testifying at the trial or in a hearing, offered in evidence to prove the truth of the matter asserted. Federal Rule of Evidence 801(c). While enumerating hearsay exceptions, the rules specifically excluded "matters observed by law-enforcement personnel" in a criminal case from the public-records exception found in Rule 803(8).

The declarant for each of the investigative reports listed by the defendant as proposed exhibit is a law enforcement officer. The affidavits were written and signed outside of trial. They would be offered for the truth of what the declarant asserted in the reports. There is no exception that allows their admission.

This description, like those before it, is also too broad. There are multiple search warrant affidavits.  The affidavits were undoubtedly provided to the defendant by the United States. The defendant could have narrowed his list by including bates numbers—or even by including a description of the item or place to be searched. Proper notice would have allowed the United States to object based upon form or content.

9.   All documents and discovery related to the Oregon investigation

The United States objects to these proposed exhibits. The category is too broad. It does not specify the records in a manner that allows the United States to find the exhibits. This description does not give the United States notice of the actual exhibits the defendant plans to offer—notice which would allow the United States to object to form or content. If the records are in the United States' custody, the defendant could have included bates numbers. If the records

8

are in the defendant's custody, he has not provided them to the United States as required in Rule 16 and the Court's Amended Trial Order.

Likewise, the category of evidence the defendant seeks to admit as his proposed exhibit nine contains a great deal of hearsay, including reports written by officers and analysts.

    10. All documents relating to [G.L.]
        a. Death of [R.K.]
    11. All documents relating to the death of [R.K.]

The United States objects to these proposed exhibits. The categories, despite being overlapping, are too broad. The defendant does not specify the records in a manner that allows the United States to find the exhibits it seeks to admit. This description does not give the United States notice of the actual exhibits the defendant plans to offer—notice which would allow the United States to object to form or content. If the records are in the United States' custody, the defendant could have included bates numbers. If the records are in the defendant's custody, he has not provided them to the United States as required in Rule 16 and the Court's Amended Trial Order.

Likewise, the category of evidence the defendant seeks to admit as his proposed exhibits ten and eleven contains a great deal of hearsay, including reports written by officers and analysts as well as reports written by medical professionals.

The United States has given notice that it will seek admission for several exhibits that fall under the defendant's broad category, including, for example, United States proposed exhibits 18.00-18.02, and it does not object to the exhibits it intends to offer for admission.

    12. All documents related to messages on Alpha Bay from "Trustworthymoney"

9

a.   All messages from [A.L.]

The United States objects to these proposed exhibits. The categories, despite being

potentially overlapping, are too broad. The defendant does not specify the records in a manner

that allows the United States to find the exhibits it seeks to admit. This description does not give

the United States notice of the actual exhibits the defendant plans to offer—notice which would

allow the United States to object to form or content. If the records are in the United States'

custody, the defendant could have included bates numbers. If the records are in the defendant's

custody, he has not provided them to the United States as required in Rule 16 and the Court's

Amended Trial Order.

Likewise, the category of evidence the defendant seeks to admit as his proposed exhibit

twelve contains a great deal of hearsay, including reports written by officers and analysts.

The United States has given notice that it will seek admission for several exhibits that fall

under the defendant's broad category, including United States proposed exhibit 19.02, and it

does not object to the exhibits it intends to offer for admission.


13. All documents related to messages from large customers of the drug trafficking operation
      a.   Documents and messages from and to [C.K.]
14. Any documents or information relating to [C.K.]


The United States objects to these proposed exhibits. The categories, despite overlapping,

are too broad. The defendant does not specify the records in a manner that allows the United

States to find the exhibits it seeks to admit. This description does not give the United States

notice of the actual exhibits the defendant plans to offer—notice which would allow the United

States to object to form or content. If the records are in the United States' custody, the defendant

10

could have included bates numbers. If the records are in the defendant's custody, he has not provided them to the United States as required in Rule 16 and the Court's Amended Trial Order.

Likewise, the category of evidence the defendant seeks to admit as his proposed exhibits thirteen and fourteen contains a great deal of hearsay, including reports written by officers and analysts.

The United States has given notice that it will seek admission for several exhibits that fall under the defendant's broad categories and it does not object to the exhibits it intends to offer for admission.

15. Any expert reports from computer forensics.

The United States objects to these proposed exhibits because they are hearsay. Hearsay is a statement, other than one made by the declarant while testifying at the trial or in a hearing, offered in evidence to prove the truth of the matter asserted. Federal Rule of Evidence 801(c). While enumerating hearsay exceptions, the rules specifically excluded "matters observed by law-enforcement personnel" in a criminal case from the public-records exception found in Rule 803(8).

The declarants for forensic reports listed by the defendant as proposed exhibit are law enforcement officers. There is no exception that allows their admission.

The United States recognizes that the defendant has retained a computer forensic examiner to assist him in his defense. To the extent that examiner writes a report in the future that the defendant seeks to admit, the United States would request a brief period of time to consider the report before determining if an objection is appropriate—such a request is consistent, the United States believes, with the additional time the Court granted the defense to

11

work with their forensic expert to make objections to evidence obtained from the internet or the forensic analysis of electronic devices (Doc. 194).

The categorical description offered as defendant's exhibit 15, like those before it, is also too broad. There are multiple forensic reports. Those reports, with the exception of reports being generated by the defendant's expert, were undoubtedly provided to the defendant by the United States. The defendant could have narrowed his list by including bates numbers. Proper notice would have allowed the United States to object based upon form or content.[1]

CONCLUSION

The United States apologies to the Court for the repetitive nature of its objections. It wanted to provide specific objections as ordered, although it appears the Court's order was intended for circumstances where the defendant provided actual notice of the specific exhibits he sought to admit—and not just the general categories under which those exhibits might fall. The Court has power to suppress evidence that did not conform with the Court's orders in order to maintain the schedule and integrity of the Court. The United States requests that the Court prohibit the defendant from offering exhibits at the pre-admission hearing or at trial because of

---

[1] When the United States provided its proposed exhibit list to the defendant, it also gave the defendant a copy of its electronic exhibits—pictures, charts, spreadsheets, etc. For many of the proposed computer forensic exhibits the United States intends to offer for admission, the United States included a forensic report to aid the defendant's forensic expert as he verifies the United States' proposed forensic exhibits are what they purport to be.

the inadequate exhibit-list disclosure made by the defendant to the United States and for the

other reasons listed above.

Respectfully submitted this 26th day of April, 2019.

JOHN W. HUBER
United States Attorney


 /s/ Michael Gadd
MICHAEL GADD
Special Assistant United States Attorney

13

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | MOTION TO STRIKE DEFENDANT'S EXPERT KELLY SHAFTO |
| vs. | |
| AARON MICHAEL SHAMO, | Judge Dale A. Kimball |
| Defendant. | |

The United States, by and through Michael Gadd, Special Assistant United States

Attorney, moves this Court to prohibit proposed defense expert Kelly Shafto from testifying

because of the inadequate Rule 16 disclosure made by the defense to the United States.

The defendant's expert notice leaves the United States with very little information about Ms.

Shafto's opinions, the "bases and reasons for those opinions," and with no way of adequately

assessing this testimony to determine whether to file a *Daubert* challenge or adequately prepare

for cross-examination. Rule 16 forbids Ms. Shafto's testimony.

## STATEMENT OF FACTS

1. On November 26, 2018, the defendant sent a document entitled *Notice of Expert Kelly*

*Shafto* to the United States. [1]  In it, the defendant wrote three sentences to describe the nature of Ms. Shafto's proposed testimony:

> Kelly Shafto has reviewed the data and information provided by the Government and is investigating the general background of the case. Kelly Shafto is expected to provide testimony as to police procedure and general investigation techniques and practices. Ms. Shafto will testify as to the background of this investigation, as well as about the witnesses, defendants, and general background of the case.

2.      The defense did not attach a copy of Ms. Shafto's CV, but indicated Ms. Shafto's final written report would be provided to the United States when it became available.

3.      The Court required expert notice to be provided by April 17, 2019.

4.      The defendant has neither amended its expert notice nor provided the United States a report or CV from Ms. Shafto.


ARGUMENT

Because the defendant's Rule 16 notice was insufficient, the Court should prohibit Kelly Shafto from testifying. A defendant's expert summary is required to include the "witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(b)(1)(C). The 1993 Advisory Committee Note to Rule 16 explains that Rule 16(b)(1)(C) "is intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Rule 16, Advisory Committee Notes, 1993 Amendment.

The Note further explains the importance of an adequate summary in the Rule 16(b)(1)(C) disclosure, noting that the summary should explain "not only written and oral

---

[1] The defense's notice is attached as Exhibit A.

2

reports, tests, reports, and investigations, but any information that might be recognized as a legitimate basis for an opinion under Federal Rule of Evidence 703, including opinions of other experts." *Id.*

The Tenth Circuit has set out factors that a district court should consider in determining the appropriate sanction for a Rule 16 violation: "(1) the reason for the delay, including whether the non-compliant party acted in bad faith; (2) the extent of prejudice to the party that sought the disclosure; and (3) the 'feasibility of curing the prejudice with a continuance.'" *United States v. Banks*, 761 F.3d 1163, 1198-99 (10th Cir. 2014) (*citing United States v. Wicker*, 848 F.2d 1059, 1061 (10th Cir. 1988)).

The Tenth Circuit, in *Banks*, added that these three factors were not meant to bind the trial court's discretion; instead, *Banks* explained it might be appropriate to suppress evidence that did not conform with discovery orders in order to "maintain the schedule and integrity of the court" even when the moving party would not be prejudiced. *Id.*

Rule 16(d)(2)(C) specifically authorizes the Court to "prohibit [a] party from introducing the undisclosed evidence" if that party "fails to comply with this rule." Pursuant to this authority, there is "a deep and consistent body of case law" establishing that courts may exclude experts in criminal cases where there has been inadequate disclosure. *United States v. Ulbricht*, No. 14-cr-68, 2015 WL 413318, at *3-6 (S.D.N.Y. Feb. 1, 2015) (excluding defense experts because of, among other reasons, inadequate Rule 16 disclosures); *see also, e.g.*, *United States v. Concessi*, 38 Fed. Appx. 866, 868 (4th Cir. 2002) (affirming exclusion of defense experts where the Rule 16 disclosure "included only the general topics concerning which each proposed expert would testify" and "failed to describe the witnesses [*sic*] opinions or provide the bases and reasons for the witnesses' opinions"); *United States v. Mahaffy*, No. 05-cr-613(S-3), 2007 WL 1213738, at

3

*2 (E.D.N.Y. Apr. 24, 2007) (excluding defendants' experts because of late filed and inadequate expert reports); *United States v. Wilson*, 493 F. Supp. 2d 484, 487, 490-91 (E.D.N.Y. 2006) (holding that because defendant "has made no attempt at all to describe 'the bases and reasons for those opinions' as required by Fed. R. Crim. P. 16(b)(1)(C) …. testimony by [defendant's expert] cannot be admitted").

The three-sentence description from the defendant about Ms. Shafto's proposed testimony falls far below the standard set by Rule 16. It fails to identify Ms. Shafto's opinions and the bases and reasons for those opinions. It further failed to show that Ms. Shafto is qualified to offer any opinion.

The United States would prefer to think that the defendant has not withheld the required information out of bad faith—the first factor the Tenth Circuit gives for the Court to consider. But the United States has no information to suggest it was a simple oversight on behalf of the defense.

The second prong—the extent of prejudice to the United States—cuts in favor of prohibiting Ms. Shafto's testimony. Being able to test Ms. Shafto's opinions by effective, prepared cross examination and by eliciting dueling expert testimony requires time—time for the United States to research, consult experts, and plan. It cannot plan without knowing Ms. Shafto's opinions, bases for her opinions, and qualifications.

The final prong—whether a continuance would cure the prejudice—also cuts in favor of prohibiting Ms. Shafto's testimony. The defendant has already had one continuance—from January to June—since providing notice that Ms. Shafto would testify. That continuance did not spur the defendant to give proper notice. It is unclear another continuance would make any

change. And without proper notice, the United States cannot adequately prepare for Ms. Shafto's testimony, no matter how many continuances the Court might grant.

Because the defendant has not provided proper notice under Rule 16, the United States respectfully moves the Court to prohibit Kelly Shafto from testifying at trial.

Respectfully submitted this 26th day of April, 2019.

JOHN W. HUBER
United States Attorney

/s/ Michael Gadd
MICHAEL GADD
Special Assistant United States Attorney

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
**SKORDAS, CASTON & HYDE, LLC**
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
Attorneys for Defendant
gskordas@schhlaw.com
kbeckett@schhlaw.com

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AARON MICHAEL SHAMO, et. al.,<br><br>Defendant. | **NOTICE OF EXPERT<br>KELLY SHAFTO**<br><br>Case No. 2:16-CR-00631 DAK<br><br>Judge Dale A. Kimball |

The Defendant, Aaron Michael Shamo, through his counsel Gregory G. Skordas and Kaytlin V. Beckett, hereby gives notice of his intent to offer expert testimony through Kelly Shafto, Private Investigator from Panther Investigation.

The nature of that testimony is as follows: Kelly Shafto has reviewed the data and information provided by the Government and is investigating the general background of the case. Kelly Shafto is expected to provide testimony as to police procedure and general investigation techniques and practices. Ms. Shafto will testify as to the background of this investigation, as well as about the witnesses, defendants, and general background of the case.

Kelly Shafto has not, as of the date of this notice, provided a final written report. As soon as one is available it will be made available to the Government. Kelly Shafto is available through

1

Defense Counsel to cooperatively consult with the Government.


DATED this 26th day of November, 2018.

SKORDAS, CASTON & HYDE, LLC

_/s/ Gregory G. Skordas_
Gregory G. Skordas
Attorney for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 26th day of November, 2018, I filed a true and correct copy of

the foregoing NOTICE OF EXPERT KELLY SHAFTO, with the Clerk of the Court using

CM/ECF system, which sent notification of such filing to the following:

S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Adam S. Elggren
Adam.elggren@usdoj.gov


*/s/ Sabrina Nielsen-Legal Secretary*
Skordas, Caston & Hyde, LLC

3

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | MOTION TO STRIKE DEFENDANT'S EXPERT DR. TERRI HADDIX |
| vs. | |
| AARON MICHAEL SHAMO, | Judge Dale A. Kimball |
| Defendant. | |

The United States, by and through Michael Gadd, Special Assistant United States

Attorney, moves this Court to prohibit proposed defense expert Dr. Terri Haddix from testifying

because of the inadequate Rule 16 disclosure made by the defense to the United States.

The defendant's expert notice leaves the United States with very little information about Dr.

Haddix's opinions, the "bases and reasons for those opinions," and with no way of adequately

assessing this testimony to determine whether to file a *Daubert* challenge or adequately prepare

for cross-examination. Rule 16 forbids Dr. Haddix's testimony.

## STATEMENT OF FACTS

1.     On November 26, 2018, the defendant sent a document entitled *Notice of Expert Dr.*

*Terri Haddix* to the United States.[1] In it, the defendant wrote two sentences to describe the nature of Dr. Haddix's proposed testimony: "Dr. Haddix has reviewed the data and information provided with respect to Count 6…. Dr. Haddix is expected to provide testimony as to the causational elements of the Death Resulting Count as well as the specific information relating to the autopsy and forensic examination of R.K." The defense attached a copy of Dr. Haddix's CV and then indicated Dr. Haddix's final written report would be provided to the United States when it became available.

2.      The Court required expert notice to be provided by April 17, 2019.

3.      The defendant has neither amended its expert notice nor provided the United States a report from Dr. Haddix.

ARGUMENT

Because the defendant's Rule 16 notice was insufficient, the Court should prohibit Dr. Terri Haddix from testifying. A defendant's expert summary is required to include the "witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(b)(1)(C). The 1993 Advisory Committee Note to Rule 16 explains that Rule 16(b)(1)(C) "is intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Rule 16, Advisory Committee Notes, 1993 Amendment.

The Note further explains the importance of an adequate summary in the Rule 16(b)(1)(C) disclosure, noting that the summary should explain "not only written and oral

---

[1] The defense's notice is attached as Exhibit A.

reports, tests, reports, and investigations, but any information that might be recognized as a legitimate basis for an opinion under Federal Rule of Evidence 703, including opinions of other experts." *Id.*

The Tenth Circuit has set out factors that a district court should consider in determining the appropriate sanction for a Rule 16 violation: "(1) the reason for the delay, including whether the non-compliant party acted in bad faith; (2) the extent of prejudice to the party that sought the disclosure; and (3) the 'feasibility of curing the prejudice with a continuance.'" *United States v. Banks*, 761 F.3d 1163, 1198-99 (10th Cir. 2014) (*citing United States v. Wicker*, 848 F.2d 1059, 1061 (10th Cir. 1988)).

The Tenth Circuit, in *Banks*, added that these three factors were not meant to bind the trial court's discretion; instead, *Banks* explained it might be appropriate to suppress evidence that did not conform with discovery orders in order to "maintain the schedule and integrity of the court" even when the moving party would not be prejudiced. *Id.*

Rule 16(d)(2)(C) specifically authorizes the Court to "prohibit [a] party from introducing the undisclosed evidence" if that party "fails to comply with this rule." Pursuant to this authority, there is "a deep and consistent body of case law" establishing that courts may exclude experts in criminal cases where there has been inadequate disclosure. *United States v. Ulbricht*, No. 14-cr-68, 2015 WL 413318, at *3-6 (S.D.N.Y. Feb. 1, 2015) (excluding defense experts because of, among other reasons, inadequate Rule 16 disclosures); *see also, e.g.*, *United States v. Concessi*, 38 Fed. Appx. 866, 868 (4th Cir. 2002) (affirming exclusion of defense experts where the Rule 16 disclosure "included only the general topics concerning which each proposed expert would testify" and "failed to describe the witnesses [*sic*] opinions or provide the bases and reasons for the witnesses' opinions"); *United States v. Mahaffy*, No. 05-cr-613(S-3), 2007 WL 1213738, at

3

*2 (E.D.N.Y. Apr. 24, 2007) (excluding defendants' experts because of late filed and inadequate expert reports); *United States v. Wilson*, 493 F. Supp. 2d 484, 487, 490-91 (E.D.N.Y. 2006) (holding that because defendant "has made no attempt at all to describe 'the bases and reasons for those opinions' as required by Fed. R. Crim. P. 16(b)(1)(C) …. testimony by [defendant's expert] cannot be admitted").

The two-sentence description from the defendant about Dr. Haddix's proposed testimony falls far below the standard set by Rule 16. It fails to identify Dr. Haddix's opinions and the bases and reasons for those opinions. And, while the defendant attached Dr. Haddix's CV, without knowing her opinions, the Court cannot find (and the United States cannot concede) that Dr. Haddix is qualified to offer those opinions, despite her credentials.

The United States would prefer to think that the defendant has not withheld the required information out of bad faith—the first factor the Tenth Circuit gave to the Court to consider. But the United States has no information to suggest it was a simple oversight on behalf of the defense.

The second prong—the extent of prejudice to the United States—cuts in favor of prohibiting Dr. Haddix's testimony. Assuming that Dr. Haddix would offer an opinion that fentanyl was not the but-for cause of R.K.'s death, Dr. Haddix would likely create doubt for jurors when considering the second-most important count in the Indictment, Aiding and Abetting the Distribution of Fentanyl Resulting in Death (Count 6). Being able to test Dr. Haddix's opinions by effective, prepared cross examination and by eliciting dueling expert testimony requires time—time for the United States to research, consult experts, and plan.

The final prong—whether a continuance would cure the prejudice—also cuts in favor of prohibiting Dr. Haddix's testimony. The defendant has already had one continuance—from

4

January to June—since providing notice that Dr. Haddix would testify. That continuance did not spur the defendant to give proper notice. It is unclear another continuance would make any change. And without proper notice, the United States cannot adequately prepare for Dr. Haddix's testimony, no matter how many continuances the Court might grant.

Because the defendant has not provided proper notice under Rule 16, the United States respectfully moves the Court to prohibit Dr. Terri Haddix from testifying at trial.

Respectfully submitted this 26th Day of April, 2019.

JOHN W. HUBER
United States Attorney


*/s/ Michael Gadd*
MICHAEL GADD
Special Assistant United States Attorney

5

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
**SKORDAS, CASTON & HYDE, LLC**
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
Attorneys for Defendant
gskordas@schhlaw.com
kbeckett@schhlaw.com

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **NOTICE OF EXPERT DR. TERRI HADDIX** |
| Plaintiff, | |
| v. | Case No. 2:16-CR-00631 DAK |
| AARON MICHAEL SHAMO, et. al., | Judge Dale A. Kimball |
| Defendant. | |

The Defendant, Aaron Michael Shamo, through his counsel Gregory G. Skordas and

Kaytlin V. Beckett, hereby gives notice of their intent to offer expert testimony through Dr. Terri

Haddix.

The nature of that testimony is as follows:Dr. Haddix has reviewed the data and

information provided with respect to Count 6 of the Second Superseding Indictment "(Death

Resulting Count"). Dr. Haddix is expected to provide testimony as to the causational elements of

the Death Resulting Count as well as the specific information relating to the autopsy and forensic

examination of R.K.

Dr. Haddix has not, as of the date of this notice, provided a final written report. As soon

as one is available it will be made available to the Government. A copy of Dr. Haddix's CV is

1

attached. Dr. Haddix is available through Defense Counsel to cooperatively consult with the Government.

DATED this 26th day of November, 2018.

SKORDAS, CASTON & HYDE, LLC

*/s/ Gregory G. Skordas*
Gregory G. Skordas
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of November, 2018, I filed a true and correct copy of

the foregoing NOTICE OF EXPERT DR. TERRI HADDIX, with the Clerk of the Court using

CM/ECF system, which sent notification of such filing to the following:

S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Adam S. Elggren
Adam.elggren@usdoj.gov

/s/ Sabrina Nielsen-Legal Secretary
Skordas, Caston & Hyde, LLC

3



**Forensic Analytical™
Crime Lab**

**TERRI L. HADDIX**
**SENIOR FORENSIC PATHOLOGIST**
*Curriculum Vitae*

## PROFESSIONAL EXPERIENCE

Dr. Haddix has worked in the area of forensic pathology for over 20 years. She received forensic pathology training in Seattle, WA and neuropathology training at Stanford. She is board certified in anatomic, forensic and neuropathology. She has performed forensic autopsies in several counties throughout California and has testified as an expert in forensic pathology in both criminal and civil cases.

## LICENSURE
- Washington, No. 26810
- California, No. G82165

## BOARD CERTIFICATION
- Diplomate, American Board of Pathology
- Anatomic and Forensic Pathology, 9/1997
- Neuropathology, 9/2005

## FACULTY POSITIONS
- 8/2012 – 10/2012: Clinical Associate Professor, Department of Pathology, Stanford University Medical Center, Stanford, CA
- 2006 - 2012: Clinical Assistant Professor, Department of Pathology, Stanford University Medical Center, Stanford, CA
- 2005 - 06: Clinical Instructor, Department of Pathology, Stanford University Medical Center, Stanford, CA
- 1999 - 2012: Assistant Clinical Professor (volunteer faculty), Department of Pathology, University of California, San Francisco, CA
- 1996 - 1997: Assistant Clinical Professor, Department of Pathology, University of California, San Diego, CA
- 1989 - 1990: Teaching Associate, Division of Cardiothoracic Surgery, University of Washington, Seattle, WA

## EDUCATION
- 1979 - 1982: Major: Molecular, Cellular and Developmental Biology University of Colorado, Boulder, CO
- 1982 - 1983: BS, Biology, University of New Mexico, Albuquerque, NM

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

287

- 1983 - 1987: MD, graduation with honors, University of Colorado School of Medicine, Denver, CO

## POSTGRADUATE TRAINING

- 1987 - 1989: General Surgery Resident, University of Washington, Seattle, WA
- 1992 - 1994: Pathology Resident, University of Washington, Seattle, WA
- 1994 - 1995: Assistant Medical Examiner (Fellowship), King County Medical Examiner's Office, Seattle, WA
- 07/1995 - 12/1995: Washington State Forensic Pathology Specialist, University of Washington, Seattle, WA
- 2003 - 2005: Neuropathology Fellow, Stanford University, Stanford, CA

## OTHER PROFESSIONAL EXPERIENCE

- 12/2005 - : Forensic Pathologist, Forensic Analytical Crime Lab, Inc., Hayward, CA
- 10/1998 - 05/2003: Forensic Pathologist, San Mateo County, San Mateo, CA
- 11/1997 - 09/1998: Assistant Medical Examiner, San Francisco Medical Examiner's Office, San Francisco, CA
- 01/1996 - 10/1997: Deputy Medical Examiner, San Diego Medical Examiner's Office, San Diego, CA

## LOCUM TENENS

- 1999 - 2005: Monterey County Sheriff-Coroner's Office, Salinas, CA
- 2000 - 2010: San Luis Obispo County Sheriff-Coroner's Office, San Luis Obispo, CA
- 2000 - 2003: Santa Barbara County Sheriff-Coroner's Office, Santa Barbara, CA
- 2001 - 2002: San Joaquin County Sheriff-Coroner's Office, French Camp, CA
- 2002 - 2003: Western Laboratories Medical Group (contracted with Alameda County Sheriff-Coroner's Office), Oakland, CA
- 2003 - 2012: Santa Cruz County Sheriff-Coroner's Office, Santa Cruz, CA

## PROFESSIONAL ACTIVITIES

- **Memberships:**
  1995 - 2003: National Association of Medical Examiners
  1995 - : American Academy of Forensic Sciences
        Fellow status - 2017
  2001 - 2003: South Bay Pathology Society
  2014 - : Society of Forensic Engineers and Scientists

- **Committees:**
  1999 - 2003: San Mateo County Child Death Review Team

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

288

**RESEARCH EXPERIENCE**

- 1990 - 1992: Research Fellow, Division of Cardiothoracic Surgery, University of Washington, Seattle, WA

**PUBLICATIONS:**
Journal Articles

1. Jack E, Fennelly NK, Haddix T. Leptomeningeal Inflammation in Infant and Fetal Deaths Without Trauma. *Inflammation and Cell Signalling* DOI 10.14800/ics.225. Epub 2014 Sep 11.

2. Jack E, Fennelly NK, Haddix T. The inflammatory cellular constituents of foetal and infant leptomeninges: a survey of hospital-based autopsies without trauma. *Childs Nervous System* DOI 10.1007/s00381-013-2348-5. Epub 2014 Jan 9.

3. Monje M, Mitra SS, Freret ME, Raveh TB, Kim J, Masek M, Attema JL, Li G, Haddix T, Edwards MS, Fisher PG, Weissman IL, Rowitch DH, Vogel H, Wong AJ, Beachy PA. Hedge-hog responsive candidate cell of origin for diffuse intrinsic pontine glioma. *Proc Natl Acad Sci USA*; 108(11): 4453-8, 2011. doi: 10.1073/pnas.1101657108. Epub 2011 Mar 1.

4. Uryu K, Haddix T, Robinson J, et al. Burden of neurodegenerative diseases in a cohort of medical examiners subjects. *J Forensic Sci* 55(3): 642-5, 2010.

5. Haddix T, Chang S, Vogel H. A Thirty-five year old with a Dural-based Mass. *Brain Pathol* 17(3): 331-2, 2007.

6. Morgan T, Zhao S, Chang K, Haddix T, Domanay E, Cornbleet P, Arber D, Natkunam Y. Low CD27 expression in plasma cell dyscrasias correlates with high risk disease: An immunohistochemical analysis. *Am J Clin Path* 126(4): 545-51, 2006.

7. Lim M, Haddix T, Harsh G, Vogel H, Steinberg GK, Guccione S. Characterization of the Integrin αvβ3 in Arteriovenous Malformations and Cavernous Malformations. *Cerebrovasc Dis* 20: 23-27, 2005.

8. Lim M, Guccione S, Haddix T, Sims L, Cheshier S, Chu P, Vogel H, Harsh GH. Avb3 Integin in Central Nervous System Tumors. *Hum Pathol* 36(6): 665-9, 2005.

9. Reed W, Walker P, Haddix T, Perkins HL. Acute anemic events in sickle cell disease. *Transfusion* 40: 267-73, 2000.

10. Sato TT, Kovacich JC, Boyle EM Jr, Haddix TL, Weintraub A, Pohlman TH. CD14-dependent activation of human endothelial cells by Bacteroides fragilis outer membrane. *J Surg Res* 74(2): 103-11, 1998.

11. Logan BK, Fligner CL, Haddix TL. Cause and manner of death in fatalities involving methamphetamine. *J Forensic Sci* 43(1): 28-34, 1998.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

289

12.  Haddix TL, Harruff RC, Reay DT, Haglund WD. Asphyxial suicides utilizing plastic bags. *Am J Forensic Med Pathol* 17(4): 308-11, 1996.

13.  Haddix TL, Pohlman TH, Noel RF, Sato TT, Boyle EM Jr., Verrier ED. Hypothermia inhibits human E-selectin transcription. *J Surg Res* 64(2): 176-83, 1996.

14.  Johnson M, Haddix T, Pohlman T, Verrier E. Hypothermia reversibly inhibits endothelial cell expression of E-selectin and tissue factor. *J Card Surg* 10 (Suppl): 428-35, 1995.

15.  Deisher TA, Haddix TL, Montgomery KF, Pohlman TH, Kaushanski K, Harlan JM. Role of protein kinase C in the induction of VCAM-1 expression on human umbilical vein endothelial cells. *FEBS Lett* 331(3): 285-90, 1993.

16.  Peterson VM, Moore EE, Jones TN, Rundus C, Emmett M, Moore FA, McCroskey BL, Haddix T, Parson PE. Total enteral nutrition versus total parenteral nutrition after major torso injury: attenuation of hepatic protein reprioritization. *Surgery* 104(2): 199-207, 1988.

17.  Peterson VM, Murphy JR, Haddix TL, et al. Identification of novel prognostic indicators in burned patients. *J Trauma* 28(5): 632-7, 1988

## Book Chapters

1.  J-S Koh, U-K Chang and T. Haddix, "Extradural Benign Tumors," Chap. 1 in *Tumors of the Spine*, (Kim, Chang, Kim and Bilsky, Eds.), Saunders Elsevier, Philadelphia, 2008.

2.  J-S Koh, U-K Chang and T. Haddix, "Cysts and Other Benign Lesions," Chap. 2 in *Tumors of the Spine*, (Kim, Chang, Kim and Bilsky, Eds.), Saunders Elsevier, Philadelphia, 2008.

3.  J-S Koh, U-K Chang and T. Haddix, "Epidural Malignant Tumors," Chap. 3 in *Tumors of the Spine*, (Kim, Chang, Kim and Bilsky, Eds.), Saunders Elsevier, Philadelphia, 2008.

4.  J-S Koh, U-K Chang and T. Haddix, "Intradural Extramedullary Benign Tumors," Chap. 4 in *Tumors of the Spine*, (Kim, Chang, Kim and Bilsky, Eds.), Saunders Elsevier, Philadelphia, 2008.

5.  J-S Koh, U-K Chang and T. Haddix, "Intradural Extramedullary Cystic Lesions," Chap. 5 in *Tumors of the Spine*, (Kim, Chang, Kim and Bilsky, Eds.), Saunders Elsevier, Philadelphia, 2008.

6.  J-S Koh, U-K Chang and T. Haddix, "Intradural Extramedullary Malignant Tumors," Chap. 6 in *Tumors of the Spine*, (Kim, Chang, Kim and Bilsky, Eds.), Saunders Elsevier, Philadelphia, 2008.

7.  J-S Koh, U-K Chang and T. Haddix, "Intramedullary Tumors," Chap. 7 in *Tumors of the Spine*, (Kim, Chang, Kim and Bilsky, Eds.), Saunders Elsevier, Philadelphia, 2008.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

290

**ABSTRACTS:**

1. Jack E., Haas E., Haddix T. Evaluation of the Presence and Distribution of Leptomeningeal Inflammation in Cases of Sudden Death in Infancy. Presented at 2016 (February) American Academy of Forensic Sciences meeting, Las Vegas, NV.

2. Jack E., Fennelly NK, Haddix T. The Inflammatory Cellular Constituents of Fœtal and Infant Leptomeninges: a survey of hospital-based autopsies without trauma. Presented at British Neuropathological Society, February 2014.

3. Jack E, Fennelly NK, Haddix T. The Inflammatory Cellular Constituents of Fœtal and Infant Leptomeninges: a survey of hospital-based autopsies without trauma. Presented at the Irish Society of Surgical Pathology, Cork, Ireland, October 2013.

4. Monje, M, Freret M, Kim, J, Masek, M, Mitra, S, Haddix T, Edwards M, Fisher P, Rowitch D, Vogel H, Beachy P. A hedgehog-responsive precursor of the childhood hindbrain as a candidate cell of origin for diffuse intrinsic pontine glioma. Presented at 2011 (April) American Academy of Neurology meeting, Honolulu, HI.

5. Haddix T, Monje M, Masek M, Freret M, Fisher P, Vogel H. Supratentorial Extension of Diffuse Intrinsic Pontine Glioma (DIPG). Presented at 2011 (June) American Association of Neuropathologists meeting, Seattle, WA.

6. Amato M, Kim A, Peak S, Cullen S, Lando M, Haddix T. Fibrosing infraorbital nerve process masking intracranial malignant peripheral nerve sheath tumor (MPNST). Presented at 2008 (November) American Society of Ophthalmic Plastic and Reconstructive Surgery, Atlanta, GA.

7. Miller CR, Haddix T, Dunham CP, Perry A. Clinical significance of prospective molecular genetic analysis of glial neoplasms: the Washington University FISH laboratory experience. Presented at 2007 (April) American Association of Neuropathology meeting, Washington, DC.

8. Haddix T, Recht L, Myles T, Leung L, Vogel H. Overexpression of osteopontin (OPN) in glioblastoma multiforme (GBM). Presented at 2005 (June) American Association of Neuropathology meeting, Arlington, VA.

9. Pate L, Haddix T, Vogel H. Glioblastoma with remote subcutaneous metastases. Presented at 2005 (June) American Association of Neuropathology metting, Arlington, VA.

10. Lim M, Guccione S, Haddix T, Chu P, Vogel H, Steinberg G, Harsh G. Characterization of the integrin $\alpha v \beta 3$ expression in arteriovenous malformations and cavernous malformations. Presented at 2005 (February) American Association of Neurological Surgeons meeting (vascular section), New Orleans, LA.

11. Lim M, Guccione S, Haddix T, Chu P, Vogel H, Steinberg G, Harsh G. Characterization of the integrin $\alpha v \beta 3$ expression in arteriovenous malformations and cavernous malformations. Presented at 2005 Stroke meeting, New Orleans, LA.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

291

12. Lim M, Guccione S, Haddix T, Chu P, Vogel H, Steinberg G, Harsh G. Characterization of the integrin αvβ3 expression in arteriovenous malformations and cavernous malformations. Presented at 2005 (April) American Association of Neurological Surgeons meeting, New Orleans, LA.

13. Lim M, Guccione S, Haddix T, Chu P, Vogel H, Harsh G. Role of the αvβ3 Integrins in Angiogenesis of CNS Tumors. Presented at 2004 Congress of Neurological Surgeons meeting, San Francisco, CA.

14. Haddix T, Prichard J, Warnke R, Vogel H. Primary Hodgkin's Disease in the brain of a HIV-positive adult. Presented at 2004 American Association of Neuropathologists annual meeting, Cleveland, OH.

15. Lim M, Guccione S, Haddix T, Homer R, Atlas S, Harsh G. Expression of αvβ3 integrin in Human Glioblastoma Multiforme. Presented at 2004 American Association of Neurological Surgeons, Orlando, FL.

16. Haddix TL, Symes SA. Atypical decomposition and power saw dismemberment. Presented at 2003 National Association of Medical Examiners annual meeting, San Jose, CA.

17. Haddix TL. Death associated with a portable infusion device. Presented at 2001 National Association of Medical Examiners annual meeting, Richmond, VA.

18. Logan BK, Fligner CL, Haddix TL. Cause and manner of death in fatalities involving methamphetamine. Presented at 1998 American Academy of Forensic Sciences annual meeting, San Francisco.

19. Logan BK, Fligner CL, Haddix TL. Methamphetamine fatalities in Washington state, 1993-1995: Interpretation of methamphetamine concentrations. Presented at 1997 American Academy of Forensic Sciences annual meeting, New York.

20. Haddix TL, Harruff RC, Reay DT, Haglund WD. Asphyxial suicides utilizing plastic bags. Presented at 1995 National Association of Medical Examiners annual meeting, San Diego.

21. Harruff RC, Reay DT, Haddix TL, Miller SR, Webster JN, Haglund WD. Correlation of collision dynamics with injuries in traffic fatalities. Presented at 1995 National Association of Medical Examiners annual meeting, San Diego.

22. Sato TT, Martin S, Haddix TL, Neil D, Weintraub A, Pohlman TH. Activation of endothelial leukocyte adhesion by *B. fragilis* outer membrane. Presented at the Scientific Session of the 71st Annual Meeting of the American College of Surgeons Committee on Trauma, San Diego, 1993.

23. Haddix TL, Montgomery KF, Pohlman TH, Verrier ED. Reversible inhibition of Endothelial Leukocyte Adhesion Molecule 1 (ELAM-1) expression in hypothermic endothelial cells. Presented at Clinical Congress of the American College of Surgeons, Chicago, 1991.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

292

24. Peterson VM, Rundus C, Haddix T, Cherry D. Topical cerium nitrate enhances myelopoiesis in a mouse model of thermal injury. Presented at 1988 American Burn Association Meeting, Seattle.

25. Peterson VM, Emmett M, Murphy J, Gunther P, Ford P, Haddix T, Bartle E, Mancusi-Ungaro H. Serum group-specific component protein levels predict patient outcome following major thermal injuries. Presented at 1988 American Burn Association Meeting, Seattle.

26. Peterson VM, Moore EE, Jones TN, Rundus C, Moore F, McCroskey BL, Haddix TL, Emmett M, Parson PE. Total enteral nutrition versus total parenteral nutrition following major torso injury: Attenuation of hepatic protein reprioritization. Presented at 1988 Society of University Surgeons.

Forensic Analytical Crime Lab
3777 Depot Road, Suite 403 · Hayward, California 94545-2761 Telephone: 510/266-8100 www.facrimelab.com Fax: 510/887-4451

293

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | MOTION TO STRIKE DEFENDANT'S EXPERT ERIC WHEELER AND REQUEST FOR A *DAUBERT* HEARING |
| vs. | |
| AARON MICHAEL SHAMO, | Judge Dale A. Kimball |
| Defendant. | |

The United States, by and through Michael Gadd, Special Assistant United States

Attorney, moves this Court to prohibit proposed defense expert Eric Wheeler from testifying

because of the inadequate Rule 16 disclosure made by the defendant to the United States.

The defendant's expert notice leaves the United States with very little information about Mr.

Wheeler's opinions, the "bases and reasons for those opinions," and with no way of adequately

assessing this testimony to prepare for cross-examination. Rule 16 forbids Mr. Wheeler's

testimony. The United States recognizes the Mr. Wheeler has joined the defense team recently

and is willing to allow Mr. Wheeler additional time write a final report, if the Court is so

inclined. Once the United States has Mr. Wheeler's report, it will reassess whether to abandon its

motion to strike.

Assuming Mr. Wheeler provides a timely report that ameliorates the United States'

concerns about the inadequacy of his expert notice, the United States also requests that the Court

set a *Daubert* hearing on the final day the of pre-admission hearing, May 31, 2019, for the

defendant to show that Mr. Wheeler is qualified to offer opinions as they relate to (1) computer

forensics,  (2) the Dark Net, and (3) other specialized areas of knowledge that Mr. Wheeler may

claim in his forthcoming report.

STATEMENT OF FACTS

1.       On April 26, 2019, the defendant filed its *Notice of Expert Eric Wheeler* (Doc. 195). In it,

the defendant wrote that Mr. Wheeler had reviewed the data contained on electronic devices

seized as part of the underlying investigation. The defendant then wrote two sentences to

describe the nature of Mr. Wheeler's proposed testimony:

> Mr. Wheeler has also been retained to provide testimony as to the nature of online
> records, the content of those records, and the foundation of those records. Mr.
> Wheeler may provide testimony as to any alleged activity of the Defendant which
> occurred on the "Dark Web."

2.       The defendant attached a copy of Mr. Wheeler's CV, but indicated Mr. Wheeler's final

written report would be provided to the United States when it became available.

3.       The Court required expert notice to be provided by April 17, 2019, however, the

undersigned counsel for the United States learned Mr. Wheeler had been recently retained by the

defendant. The undersigned counsel told counsel for the defendant that if they were able to send

the United States Mr. Wheeler's expert notice by April 26, 2019, the United States would not

raise an objection about providing late notice and instead review Mr. Wheeler's notice on its

merits.

4.       At the time of this filing, the defendant has not yet provided the United States a report

from Mr. Wheeler.

2

ARGUMENT

**1.1    Mr. Wheeler's expert notice was inadequate.**

Because the defendant's Rule 16 notice was insufficient, the Court should prohibit Eric Wheeler from testifying. A defendant's expert summary is required to include the "witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." <u>Fed. R. Crim. P. 16(b)(1)(C)</u>. The 1993 Advisory Committee Note to Rule 16 explains that Rule 16(b)(1)(C) "is intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Rule 16, Advisory Committee Notes, 1993 Amendment.

The Note further explains the importance of an adequate summary in the Rule 16(b)(1)(C) disclosure, noting that the summary should explain "not only written and oral reports, tests, reports, and investigations, but any information that might be recognized as a legitimate basis for an opinion under Federal Rule of Evidence 703, including opinions of other experts." *Id.*

The Tenth Circuit has set out factors that a district court should consider in determining the appropriate sanction for a Rule 16 violation: "(1) the reason for the delay, including whether the non-compliant party acted in bad faith; (2) the extent of prejudice to the party that sought the disclosure; and (3) the 'feasibility of curing the prejudice with a continuance.'" *United States v. Banks*, <u>761 F.3d 1163, 1198-99</u> (10th Cir. 2014) (*citing United States v. Wicker*, <u>848 F.2d 1059, 1061</u> (10th Cir. 1988)).

The Tenth Circuit, in *Banks*, added that these three factors were not meant to bind the trial court's discretion; instead, *Banks* explained it might be appropriate to suppress evidence that

3

did not conform with discovery orders in order to "maintain the schedule and integrity of the court" even when the moving party would not be prejudiced. *Id.*

Rule 16(d)(2)(C) specifically authorizes the Court to "prohibit [a] party from introducing the undisclosed evidence" if that party "fails to comply with this rule." Pursuant to this authority, there is "a deep and consistent body of case law" establishing that courts may exclude experts in criminal cases where there has been inadequate disclosure. *United States v. Ulbricht*, No. 14-cr-68, 2015 WL 413318, at *3-6 (S.D.N.Y. Feb. 1, 2015) (excluding defense experts because of, among other reasons, inadequate Rule 16 disclosures); *see also, e.g.*, *United States v. Concessi*, 38 Fed. Appx. 866, 868 (4th Cir. 2002) (affirming exclusion of defense experts where the Rule 16 disclosure "included only the general topics concerning which each proposed expert would testify" and "failed to describe the witnesses [*sic*] opinions or provide the bases and reasons for the witnesses' opinions"); *United States v. Mahaffy*, No. 05-cr-613(S-3), 2007 WL 1213738, at *2 (E.D.N.Y. Apr. 24, 2007) (excluding defendants' experts because of late filed and inadequate expert reports); *United States v. Wilson*, 493 F. Supp. 2d 484, 487, 490-91 (E.D.N.Y. 2006) (holding that because defendant "has made no attempt at all to describe 'the bases and reasons for those opinions' as required by Fed. R. Crim. P. 16(b)(1)(C) …. testimony by [defendant's expert] cannot be admitted").

The two-sentence description from the defendant about Mr. Wheeler's proposed testimony falls far below the standard set by Rule 16. It fails to identify Mr. Wheeler's opinions and the bases and reasons for those opinions. The notice further failed to show that Mr. Wheeler is qualified to offer an opinion on the computer forensics performed by law enforcement in this investigation or on the Dark Net and related subjects.

4

As mentioned above, the United States is willing to give the defendant a little more time to correct its expert notice for Mr. Wheeler, if the Court is so inclined. It simply requests a brief period of time to consider the forthcoming corrected notice and report and make appropriate motions or objections.

**1.2    Mr. Wheeler does not appear to have sufficient bases and reasons to draw opinions in this case.**

It does not appear that Mr. Wheeler is qualified to offer opinions on topics referenced in his expert notice; assuming the defendant provides a final report for Mr. Wheeler, the United States requests a *Daubert* hearing. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that district courts are gatekeepers who initially assess the admissibility of "scientific" expert testimony under Fed.R.Evid. 702 for both relevance and reliability. 509 U.S. 579 (1993).

The Tenth Circuit has further explained that while district courts have discretion in how they conduct the gatekeeper function, district courts have no discretion to avoid performing gatekeeper functions. *See Bitter v. A.O. Smith Corp*., 400 F.3d 1227, 1232 (10th Cir. 2005). In *Bitter v. A.O. Smith Corp*, the Tenth Circuit discussed the role of the district courts when considering a *Daubert* challenge to whether an expert is qualified to testify. *Id*. at 1232-33. The expert's proffered testimony must have "a reliable basis in the knowledge and experience in his discipline." *Id*. The proponent of the expert testimony must establish that the expert used reliable methods to reach his/her conclusion and that the expert's opinion is based on a reliable factual basis. *Id*. at 1233.

The Tenth Circuit offered four guiding factors district courts may apply when making a reliability determination:

(1) Whether a theory has been or can be tested or falsified; (2) whether the theory or technique has been subject to peer review and publication; (3) whether there are known or potential rates of error with regard to specific techniques; and (4) whether the theory or approach has "general acceptance."

*Id*. at 1233 (citing *Daubert*, 509 U.S. at 593-94).

The United States, based upon the notice provided by the defendant, seeks a *Daubert* hearing to determine, specifically, whether Mr. Wheeler's proposed testimony is reliable and based upon theories generally accepted within the relevant scientific community. Because Mr. Wheeler's CV does not indicate he has any familiarity with (1) the computer forensic tools used by investigators in this case; or (2) the Dark Net; the United States respectfully requests that a *Daubert* hearing be scheduled on the final day of the pre-admission hearing, May 31, 2019, for the defendant to show Mr. Wheeler meets the threshold requirements of an expert under Rule 702.

Respectfully submitted this 26th day of April, 2019.

JOHN W. HUBER
United States Attorney


*/s/ Michael Gadd*

MICHAEL GADD
Special Assistant United States Attorney

6

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
SKORDAS & CASTON, LLC
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
Attorneys for Defendant
gskordas@schhlaw.com
kbeckett@schhlaw.com

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. AARON MICHAEL SHAMO, et. al., Defendant. | **NOTICE OF EXPERT ERIC WHEELER** Case No. 2:16-CR-00631 DAK Judge Dale A. Kimball |

The Defendant, Aaron Michael Shamo, through his counsel Gregory G. Skordas, hereby gives notice of his intent to offer expert testimony through Eric Wheeler.

The nature of that testimony is as follows: Mr. Wheeler has reviewed all data and information provided by the Government concerning electronic data, electronically stored information, computer records, and the defendant's alleged use of the "dark web" for drugs sales related to several of the counts in the Second Superseding Indictment. Specifically, Mr. Wheeler has reviewed the cell phones, computers, and electronic devices of co-defendants and co-conspirators.

Mr. Wheeler has also been retained to provide testimony as to the nature of online records, the content of those records, and the foundation of those records. Mr. Wheeler may

provide testimony as to any alleged activity of the Defendant which occurred on the "Dark Web."

     Mr. Wheeler has not, as of the date of those notice, provided a final written report. As soon as one is available it will be made available to the Government. A copy of Mr. Wheeler's CV is attached. Mr. Wheeler is available through Defense Counsel to cooperatively consult with the Government.

     DATED this 26th day of April 2019.

                    SKORDAS & CASTON, LLC


                    */s/ Gregory G. Skordas*
                    Gregory G. Skordas
                    Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of April 2019, I filed a true and correct copy of the

foregoing **NOTICE OF EXPERT ERIC WHEELER**, with the Clerk of the Court using

CM/ECF system, which sent notification of such filing to the following:

S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Adam S. Elggren
Adam.elggren@usdoj.gov

*/s/ Sabrina Nielsen-Legal Secretary*
SKORDAS & CASTON, LLC

Curriculum Vitae of Eric Wheeler
5664 S. Green Street Suite 303
Salt Lake City, Utah
(801)303-7858

My Technological background includes demonstrative graphic creation, legal document management software support, trial presentations and forensic computer analysis. I am fluent in multiple CPU operating systems and have provided IT support for both Apple OS and Windows systems. I taught various advanced graphic classes at USU including; "Photoshop for Photographers", "Typography". While working in the advertising industry I held seniority project management roles while working on global clientele including but not limited to; BMW, Chevrolet, FOX, Kellogg's, Crate and Barrel, Intel and Microsoft. After having transitioned into the legal services I have presented evidence in over 50 trials and have national client base. I am certified in computer forensics through AccessData. I have advanced knowledge of and certifications for both Verdict Systems and inData. I now manage the legal technology company, Trial Tech LLC.

In my legal experience I have worked extensively for both defense and plaintiff counsel in both civil and criminal matters.

EDUCATION:

     UTAH STATE UNIVERSITY, Logan Utah 1998-2001
     BFA GRAPHIC DESIGN/COMMERCIAL ART with emphasis in PHOTOGRAPHY

     WEBER STATE UNIVERSITY, Ogden Utah 1995; 1997-1998
     Art/Art History Major

PROFESSIONAL EXPERIENCE:

     TRIAL TECH LLC, Salt Lake City Utah – 2006-2018
     Senior Trial Consultant

     Trial Tech provides IT services for the legal community including; Graphics (3D and 2D), Videography and Video Editing, Trial Consulting, Evidence Presentations and Computer Forensics.

     SYSTEMS WEST LITIGATION SERVICES, Sandy Utah – 2002-2006
     IT Manager

     Systems West Litigation Resources provides Document Management, Demonstrative Graphics, Trial Evidence Presentations and Trial Consulting

     VIEWPOINT DIGITAL, Salt Lake City Utah – 2001-2002
     Senior Designer

     ViewPoint Digital provided "Rich Media" or 3D content for the entertainment industry and online retailers.

     SUN DESIGN GROUP, Logan Utah – 1998-2001

     SDG is a local advertising firm in the Cache Valley region the specialized in Print Media, Corporate ID and Web Design

**TRIAL EXPERIENCE:**
**I have presented evidence in over 100 trials including but not limited to:**

Safeway v Consonus

Proctor and Gamble v Amway

SCO v Novell

Lutron v Control 4

US v US Magnesium

Bueno Conato V Bajio

Frazier v ASC

Gleason v Tran

US v Geddes

US v Koerber

Gonzales v Novosel

Adel v Westgate

US v Johnson

Mason v BYU

Arnold v Curtis

US v Flood

Benjamin v Datamark

Lefavi v Utah Water Company

Hillcrest v UDOT

Bracken v Wasatch Electric

Macey v Dole

Thompson v Becker

Walker v Orem

US v Merrill

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
**SKORDAS & CASTON, LLC**
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

Attorneys for Defendant

---

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| UNITED STATES OF AMERICA, | **MOTION IN LIMINE TO EXCLUDE E-CURRENCY DOLLAR AMOUNT** |
|---|---|
| Plaintiff, | |
| v. | |
| AARON MICHAEL SHAMO, et. al., | Case No. 2:16-CR-00631 DAK |
| Defendant. | Judge Dale A. Kimball |

Aaron Michael Shamo, through his counsel, hereby moves the Court to enter an order excluding evidence that the government intends to introduce at trial. The proffered evidence is not in accordance with Federal Rules of Evidence 104 and 403. Specifically, Mr. Shamo request the Government be restricted from referencing the exact dollar amount of Bitcoin, Bitcash, or other electronic currency alleged to be in the possession and control of Mr. Shamo.

FRE 104, requires the Court to make a preliminary finding regarding preliminary questions of fact. That determination is made outside of the jury's presence. This limitation specifically applies to issues where the relevance of certain evidence is conditioned upon the existence of a fact. When such occurs, the Court must make a preliminary determination that sufficient evidence exists to find that a fact exists. FRE 104(b). The Government must, in order to overcome the restrictions of 104(b), establish a causational link that "adequately connects" Mr. Shamo to the evidence being proffered to a degree sufficient to find he was involved in the alleged conduct. *United States v. Cardall*, 885 F.2d 656, 672 (10th Cir. 1989).

In this instant matter, Defendant, Aaron Michael Shamo, requests the Court deny admission of the following:

**1. Reference to the exact dollar amount of Bitcoin, Bitcash, or other e-currency.**

The government should be excluded from making references to the dollar amount of e-currency alleged to be in the possession or control of Mr. Shamo at the time of his arrest. The currency amount that the government intends to introduce is not relevant and is prejudicial in a manner inconsistent with the Federal Rules of Evidence, and the government cannot meet the requirements of Rule 104 as a prerequisite to the admission of any reference to the dollar amount of the bitcoin.

The government cannot meet the preliminary requirements of Rule 104 establishing Mr. Shamo's dollar amount in e-currency. There is not sufficient evidence to find that the dollar amount of that Bitcoin will be correct. Bitcoin is a digital currency and the currency is not consistent. The exchange rate for Bitcoin, Bitcash, and other similar e-currency is neither consistent, nor sufficiently recordable. Bitcoin is exchanged by people and may be exchanged for different currencies. The government has not proffered any evidence to support a finding that

there was an exact dollar amount to the Bitcoin found in Mr. Shamo's e-wallet. Such evidence is not sufficient to overcome Rule 104. The Government, likewise, cannot distinguish between amounts of e-currency in that e-wallet obtained through legitimate activities versus amounts allegedly obtained through the activities for which Mr. Shamo has been indicted. The Government should be precluded from labeling that e-currency with a specific U.S. Dollar amount at any point throughout the trial.

Should the Court find the evidence is sufficient under Rule 104, the evidence does not comport with the requirements of FRE 403. The auctioned amount and the exchange rate amount of the E-Currency seized in this matter is a subject of great debate. In fact, the Government specifically sought an agreement from Mr. Shamo and co-defendants to obtain and auction the e-currency wallets when exchange rates for that currency were high. Thus, any number provided is, at very best, a slight estimation.

Second, the mention of specific dollar amount would have a significantly prejudicial effect given that the Government was able to auction off that asset at a price-point significantly higher than any profit ever obtained by Mr. Shamo or his co-defendants. Nor has the Government sought to differentiate between amounts Mr. Shamo had prior to the dates of the allegations, amounts compounding after Mr. Shamo was incarcerated, and amounts garnered by co-defendants and co-conspirators. Allowing the Government to reference Mr. Shamo being in possession of several million dollars would undoubtedly prejudice the jury against him. The prejudice from introducing this evidence to the jury far outweighs any probative value it may add. FRE 403.

Therefore, Mr. Shamo, respectfully requests the court order that any mention of the e-currency's dollar amount be excluded.

DATED this 26th day of April, 2019.

SKORDAS & CASTON, LLC

*/s/ Gregory G. Skordas*
Gregory G. Skordas

*/s/ Kaytlin V. Beckett*
Kaytlin V. Beckett

*/s/ Daryl P. Sam*
Daryl P. Sam

## CERTIFICATE OF SERVICE

I hereby certify that on the April 26, 2019, I electronically filed a true and correct copy of the foregoing **MOTION IN LIMINE TO EXCLUDE E-CURRENCY DOLLAR AMOUNT**, with the Clerk of the Court using CM/ECF system, which sent notification of such filing to the following:

S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Adam S. Elggren
Adam.elggren@usdoj.gov

*/s/ Daryl P. Sam*
Daryl P. Sam

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
**SKORDAS & CASTON, LLC**
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

Attorneys for Defendant Aaron Shamo

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AARON MICHAEL SHAMO, et. al.,<br><br>Defendant. | **MOTION IN LIMINE FOR ORDER EXCLUDING EVIDENCE**<br><br>Case No. 2:16-CR-00631 DAK<br><br>Judge Dale A. Kimball |

Aaron Michael Shamo, through his counsel of record, hereby moves the Court to enter an order excluding evidence that the government intends to introduce at trial. The proffered evidence is not in accordance with Federal Rules of Evidence 104, 401, and 403.

FRE 104, requires the Court to make a preliminary finding regarding preliminary questions of fact. That determination is made outside of the jury's presence. This limitation

specifically applies to issues where the relevance of certain evidence is conditioned upon the existence of a fact. When such occurs, the Court must make a preliminary determination that sufficient evidence exists to find that a fact exists. FRE 104(B). The Government must, in order to overcome the restrictions of 104(b), establish a causational link that "adequately connects" Mr. Shamo to the evidence being proffered to a degree sufficient to find he was involved in the alleged conduct. *United States v. Cardall*, 885 F.2d 656, 672 (10th Cir. 1989).

FRE 401, limits the admissibility of irrelevant evidence. FRE 401 specifically states, "[e]vidence is relevant if:**(a)** it has any tendency to make a fact more or less probable than it would be without the evidence; and**(b)** the fact is of consequence in determining the action." FRE 402, excludes evidence that is not relevant as outlined in FRE 401. FRE 403 excludes evidence deemed relevant under FRE 401, where "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

In the instant matter, Defendant, Aaron Michael Shamo, requests the Court deny admission of the following:

1. **References to overdose deaths**.

The Government should be excluded from making references to overdose deaths other than the allegation made in the "death resulting" count for which the Defendant is on trial. The government intends to introduce information about overdose deaths throughout the country that are allegedly related to this case. Other than the overdose death of R.K., Aaron Shamo is not charged in connection with the deaths of any other individual. Nonetheless, the government has produced numerous records indicating an alleged link between the drugs distributed by this alleged drug trafficking scheme and individuals who died as a result of overdose. These

overdoses are not relevant to the instant matter, any reference to these overdose deaths is prejudicial in a manner inconsistent with the Federal rules of Evidence, and the government cannot meet the requirements of Rule 104 as a prerequisite to the admission of any references to these deaths.

The Government cannot meet the preliminary requirements of Rule 104 in establishing Mr. Shamo's connection to these overdose deaths. There is not sufficient evidence to find a causational link between Mr. Shamo's conduct and any resulting death. In *Burrage v. United States*, the court "consider[ed] whether the mandatory-minimum provision applies when use of a covered drug supplied by the defendant contributes to, but is not a but-for causation of, the victim's death or injury." 571 U.S. 204, 206 (2014). The alleged victim, Banka, died on April 15, 2010 after an extended drug binge. Banka had begun his drug binge April 14. *Id*. Banka started with smoking marijuana and then injected oxycodone. *Id*. Banka's wife supplied him the money to obtain the drugs, knowing he was planning to go on a binge, prior to being incarcerated. Banka then met with Mr. Burrage who sold Banka one gram of heroin. *Id*. "Banka immediately cooked and injected some of the heroin and, after returning home, injected more heroin between midnight and 1 a.m. on April 15." *Id*. Banka's wife went to sleep around 5 a. m., shortly after witnessing Banka prepare another batch of heroin to inject. *Id*. When Banka's wife woke up a few hours later, she found Banka dead. *Id*. Banka's house and car were searched and the police found 0.59 grams of heroin, alprazolam and clonazepam tablets, oxycodone pills, a bottle of hydrocodone, and other drugs. *Id*. Mr. Burrage was charged with two counts of distributing heroin. *Id*. One of those counts alleged that his distribution resulted in a death. *Id*. and 207. The Supreme Court of the United States held that " . . . at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or

serious bodily injury, a defendant cannot be liable . . . . " *Id*. at 218. In this case, Mr. Shamo is even further removed from the alleged overdose deaths than Mr. Burrage. The Government has not proffered any evidence to support a finding that Mr. Shamo knew anything about the individuals alleged to overdose. Nor, in the evidence reviewed by the Defense, has the Government established the drugs in fact ingested and alleged to have caused these numerous overdose was of the same chemical mixture and purchased directly from Mr. Shamo. In fact, the Government has indicated on numerous occasions that their formula for making such determinations was a comparison of the address of the party overdosing with shipping records obtained from the "dark web" and dates of overdoses compared to dates of alleged shipments of drugs. In some instances, the deceased party was not in fact the party receiving or purchasing the drugs. Such evidence is not sufficient to overcome Rule 104.

Should the Court find the evidence is sufficient under Rule 104, the evidence does not comport with the requirements of relevance under 401 and 403, because the existence of the overdose deaths does not make any fact of consequence more or less probable. The alleged overdose deaths are not of consequence in determining any of the remaining charges against Mr. Shamo. The Government cannot establish the relevance of these overdoses, with the exception of the "death resulting" count currently pending. Though Mr. Shamo ardently disagrees with the accuracy of that charge, references to the overdose death of R.K. are the only references of consequence in the currently pending matter.

Should the Court determine the references comport with 104 and are relevant, they are still properly excluded due to their prejudicial impact and minimal probative value. The Government has provided the names of numerous individuals tenuously connected to this matter who have overdosed. The Government subsequently only sought to indict Mr. Shamo with a

single "death resulting count," regarding R.K. If the Government now intends to reference the numerous other alleged overdoses the impact of such would result in significant prejudice against Mr. Shamo where almost no probative value is obtained from those references.

### 2. Motion in Limine to exclude pictures relating to the death of R.K.

The Government should be precluded from introducing any autopsy photos of R.K. and photos of the scene of R.K.'s overdose which depict any portion of R.K.'s body. The government intends to introduce pictures of an alleged victim's overdose. These pictures are extremely prejudicial to Mr. Shamo and offer no probative value.

Though the photos may be of minimal relevance as they depict the overdose death of R.K., the alleged victim in the "death resulting" count, that minimal relevancy is vastly outweighed by the contents of those photos. The prejudicial impact of those photos would likely lead a jury to make improper inferences about Mr. Shamo without giving proper weight to the actual evidence connecting Mr. Shamo to the death of R.K. There is a very real possibility of undue jury hostility toward Mr. Shamo where the claims being made involve the death of an individual. This is especially true under the circumstances of this case where there is no evidence that Mr. Shamo or the co-defendants had the intent to harm anyone. Such evidence is properly excluded under FRE 403, as outlined above.

Mr. Shamo is charged in a 13-Count second superseding indictment that alleges, from July 2015 until November 2016, he conspired with others to knowingly and intentionally distribute fentanyl and alprazolam and money laundering. Further, Mr. Shamo is charged with engaging in a continuing criminal enterprise (CCE) and distributing fentanyl resulting in death. Ms. Shamo was charged, along with five others in a superseding indictment and one other who

was separately charged under a Felony Information. All six co-defendants and Mr. Shamo have common charges related to Conspiracy to Distribute Fentanyl. None of Mr. Shamo's co-defendants are charged with distribution of a controlled substance resulting in death.

Mr. Shamo is facing some of the most serious charges under federal law. However, Mr. Shamo is entitled to a fair trial. Mr. Shamo argues that evidence regarding overdose deaths and pictures of a dead body from when it was discovered to the autopsy is extremely prejudicial. It invites a jury to convict based on broad concepts of community safety, sympathy, fear and passion. The prejudice from introducing this evidence to the jury far outweighs any probative value it may add. FRE 403. Therefore, the court should order that any reference to an overdose death, other than that of R.K, and any photos depicting R.K.'s body during after death or during autopsy, as described above, be excluded.

DATED this 26th day of April, 2019.

SKORDAS & CASTON, LLC


/s/ Gregory G. Skordas
Gregory G. Skordas


/s/ Kaytlin V. Beckett
Kaytlin V. Beckett


/s/ Daryl P. Sam
Daryl P. Sam

## CERTIFICATE OF SERVICE

I hereby certify that on the April 26, 2019, I electronically filed a true and correct copy

of the foregoing **MOTION IN LIMINE FOR ORDER EXCLUDING EVIDENCE**, with

the Clerk of the Court using CM/ECF system, which sent notification of such filing to the

following:

S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Adam S. Elggren
Adam.elggren@usdoj.gov

*/s/ Daryl P. Sam*
Daryl P. Sam

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
SKORDAS & CASTON, LLC
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com
Attorneys for Defendant Aaron Michael Shamo

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AARON MICHAEL SHAMO, et. al.,<br><br>Defendant. | **RESPONSE TO MOTION IN LIMINE FOR ORDER PROHIBITING THE PARTIES FROM RAISING THE DEFENDANT'S POTENTIAL SENTENCE**<br><br>Case No. 2:16-CR-00631 DAK<br><br>Judge Dale A. Kimball |

Aaron Michael Shamo, through his counsel, hereby moves the Court to enter an order denying Plaintiff's Motion in Limine Prohibiting the Parties from Raising Defendant's Potential Sentence. In support Mr. Shamo alleges as follows:

## STATEMENT OF RELEVANT FACTS

1.     On or about November 22, 2016, Aaron Shamo was arrested for his alleged involvement with an online Drug Trafficking Organization (DTO). Mr. Shamo has remained in custody since this arrest.

2. On December 6, 2016, Mr. Shamo was indicted on a single count of Possession of fentanyl with intent to distribute in violation of 21 U.S.C. §841(A)(1).

3. After the initial arrest, law enforcement identified multiple alleged co-conspirators, including, but not limited to, Drew Crandall, Katie Bustin, Alex Tonge, Sean Gygi, Mario Noble, and Luke Paz.

4. On May 31, 2017, The Government filed a superseding indictment against the above-named parties, with the exception Luke Paz.

5. That Superseding Indictment charged the parties as follows:

   a. Mr. Shamo with one count of a continuing criminal enterprise, in violation of 21 U.S.C. §848; three counts of aiding and abetting importation of a controlled substance, in violation of 21 U.S.C. § 952; one count of Possession of fentanyl with intent to distribute, in violation of 21 U.S.C. §841(A)(1); one count of manufacture of alprazolam, in violation of 21 U.S.C. §841(A)(1); two counts of knowing and intentional adulteration of drugs while held for sale, in violation of 21 U.S.C. § 331(k) & 333(b)(7); one count of use of the U.S. Mail in furtherance of a drug trafficking offense, in violation of 21 U.S.C. § 843(b); one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); one count of money laundering concealment, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and one count of engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957(a).

   b. Crandall, Bustin, Tonge, Noble, Gygi with one count of conspiracy to distribute fentanyl in violation of 21 U.S.C. § 846 & 841(A)(1); and one count of conspiracy to distribute alprazolam in violation of 21 U.S.C. § 846 & 841(A)(1).

   c. Mr. Gygi was also charged with one count of aiding and abetting importation of a controlled substance, in violation of 21 U.S.C. § 952; and one count of use of the U.S. Mail in furtherance of a drug trafficking offense, in violation of 21 U.S.C. § 843(b).

   d. Ms. Bustin and Ms. Tonge were also charged with one count of possession of fentanyl with intent to distribute, in violation of 21 U.S.C. §841(A)(1); one count of use of the U.S. Mail in furtherance of a drug trafficking offense, in violation of 21 U.S.C. § 843(b); and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).

e. Mr. Crandall was also charged with one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).

6. Mr. Shamo has never been offered any sort of plea in this matter.

7. Mr. Shamo agreed to an early forfeiture of assets in order to allow the Government to auction off numerous bitcoin/bitcash e-wallets while such e-currency was at a high point. The Government received several million dollars in forfeiture as a result of Mr. Shamo's concession.

8. On April 25, 2018, the Government separately charged Luke Paz by way of Felony Information with his alleged involvement in the DTO.

9. The felony information charged Mr. Paz with the following:

a. One count of conspiracy to manufacture fentanyl, in violation of2 1 U.S.C. § 846 & 841(A)(1); two counts of knowing and intentional adulteration of drugs while held for sale, in violation of 21 U.S.C. § 331(k) & 333(b)(7); and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).

10. When Mr. Paz was ultimately indicted, 18 months after the arrest of Mr. Shamo, he was found to be in possession of several hundred thousand dollars from his alleged involvement in the DTO.

11. On May 14, 2018, Mr. Noble plead guilty to Conspiracy to Distribute Fentanyl and Conspiracy to Distribute Alprazolam.

12. On June 7, 2018, Katie Bustin and Alex Tonge plead guilty to Conspiracy to Distribute Fentanyl, Conspiracy to Distribute Alprazolam, Possession of Fentanyl with Intent to Distribute, Use of the Mail in Furtherance of Drug Trafficking Offense, and Conspiracy to Commit Money Laundering.

13.     On June 7, 2018, Sean Gygi plead guilty to Conspiracy to Distribute Fentanyl, Conspiracy to Distribute Alprazolam, Aiding and Abetting the Importation of a Controlled Substance, and Use of the U.S. Mail in furtherance of a Drug Trafficking Offense.

14.     In early 2018, Government's Counsel, Michael Gadd, indicated that the Government would likely be seeking a superseding indictment against Mr. Shamo, Mr. Crandall, and Mr. Paz to include a count of aiding and abetting importation of a controlled substance resulting in death, in violation of 21 U.S.C. § 841(a)(1). Mr. Gadd indicated that the reason the Government had not yet sought the indictment was due to ongoing negotiations with Mr. Crandall and Mr. Paz who did not want to be indicted on that charge.

15.     Mr. Shamo's counsel engaged in multiple negotiations with the Government believing those negotiations were in good faith, hoping those negotiations would result in a sentence commensurate with what it appeared Mr. Crandall and Mr. Paz would receive.

16.     On October 17, 2018, Mr. Crandall plead guilty to Conspiracy to Distribute Fentanyl, Conspiracy to Distribute Alprazolam, and Conspiracy to Commit Money Laundering.

17.     October 18, 2018, the Government sought a superseding indictment against Mr. Shamo charging him with an additional count of aiding and abetting importation of a controlled substance resulting in death, in violation of 21 U.S.C. § 841(a)(1).

18.     On December 10, 2018, Luke Paz plead guilty to Conspiracy to Manufacture a Controlled Substance and two counts of Knowing and Intentional Adulteration of Drugs While Held for Sale.

19.     The Government has also indicated it believes it could have obtained the same indictment for Continuing Criminal Enterprise and Aiding and Abetting Importation of a Controlled Substance Resulting in Death against Mr. Paz and Mr. Crandall.

20. None of the co-conspirators have been sentenced as the Government intends to call them as witnesses in the case against Mr. Shamo and their sentencings have been postponed until such time.

21. The Government, however, has indicated it believes Mr. Paz will ultimately be sentenced to a term of incarceration of about 20-25 years and Mr. Crandall will receive a little less time than that of Mr. Paz. The Government is desirous of obtaining a Life Sentence for Mr. Shamo in order to increase the sentences of the other co-conspirators.

22. Attached as Exhibit A, is a non-exhaustive list of the statements of co-conspirators which specifically demonstrate that Mr. Shamo was not the mastermind behind the alleged DTO, Mr. Shamo was not the party capable of organizing and executing all of the moving parts of the alleged DTO, and Mr. Shamo did not have the ability or desire to manufacture fentanyl which is the basis of the Continuing Criminal Enterprise Charge with the mandatory life sentence attached.

23. The Government is now seeking an order prohibiting Mr. Shamo from examining before a jury clear sentencing disparities and inconsistencies in the Government's case and the culpability of the co-conspirators in this matter.

## **ARGUMENT**

The Court should deny the Government's motion. The Government seeks to limit Mr. Shamo's ability to adequately and accurately cross-examine and confront the witnesses against him. The Government's argument rests solely on a concern that should the jury hear the disparities as outlined above it "will lead to jury nullification." Motion in Limine at p. 5 & 6. Mr. Shamo should be allowed inquiry into the charges and potential sentences of the alleged co-conspirators for multiple reasons. First, the conduct of alleged co-conspirators is relevant and

intrinsic to the elements of the Continuing Criminal Enterprise and conspiracy charges. Second, the natural bias of the co-conspirators who stand to benefit substantially from testifying against Mr. Shamo is relevant and probative, especially so in light of their statements regarding Mr. Shamo's actual role in the alleged conspiracy as outlined in Exhibit A. Lastly, Mr. Shamo is not intentionally seeking jury nullification despite the Government's concerns.

The Government makes a cursory reference to Rules 401, 402, and 403 of the Rules of Evidence, but fails to apply those rules to the issues with the exception of cursory, conclusory statements. The Government's concern about jury nullification is a direct result of their improper and disparate handling and treatment of the defendants in this case, not the fault of Mr. Shamo exercising his right to confront and cross-examine the witnesses against him. Importantly, the Government has not cited a single case or rule that precludes Mr. Shamo the opportunity to cross-examine the witnesses, including their conduct, the roles in the alleged conspiracy, and their favorable plea agreements.

Rule 401 defines what is relevant evidence noting, evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence, (b) the fact is of consequence in determining the action." Rule 402 allows for the admission of relevant evidence absent some other showing. Rule 403 holds that a Court may exclude relevant evidence if its probative value is substantially outweighed by unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. None of these rules work to prohibit Mr. Shamo's cross-examination of witnesses on the exact issues they will be testifying to or to inquire into issues pertinent to the theory of his defense; rights afforded him by the United States Constitution.

The inquiry into the conduct and charges of the co-conspirators is relevant and intrinsic to the charged offenses. The Continuing Criminal Enterprise charge requires a showing of, among other things, Mr. Shamo's role in the organization relative to other co-conspirators, the amount of money coming into the conspiracy, and the amount of drugs being distributed by the conspiracy. 21 U.S.C. § 848 (b). If the Government cannot establish that Mr. Shamo was a principal and the amount of drugs distributed attributable to Mr. Shamo meets a certain threshold or the amount of money coming into and attributable to the conspiracy, then Mr. Shamo cannot be sentenced to a term of life imprisonment. Whether or not Mr. Shamo controlled and organized the actions of the co-conspirators is an issue intrinsic to the Continuing Criminal Enterprise, which requires a showing that his conduct was in concert with five or more persons. *Id.* at (c). In short, the roles, conduct, and independent acts of the co-conspirators is relevant as contemplated by Rule 401. It is admissible as outlined in Rule 402.

The potential sentences and charges against the co-conspirators are also relevant and admissible. Namely, the Government has acknowledged the possibility of, and Exhibit A outlines, that Mr. Shamo did not in fact act in a manner as culpable as Mr. Crandall or Mr. Paz in certain areas pertaining to the CCE count. The Government has acknowledged, and Exhibit A outlines, that Mr. Crandall and Mr. Paz could have been, and indeed almost were, both indicted on the death resulting count. The choice not to indict Crandall and Paz on that particular charge was the impetus behind both individuals entering guilty pleas to all pending charges against them, agreeing to testify against Mr. Shamo, and receiving heavily reduced sentences despite the greater or equal culpability of both Crandall and Paz. By acknowledging on multiple occasions that the Government was delaying seeking a new indictment including the death resulting count because Crandall and Paz did not want to be charged with that particular offense the Government

has made the disparate charging and sentencing relevant and admissible as to the sentencing and plea agreements of those two parties and what impact it may have on the veracity of their testimony.

The Government's contention regarding Rule 403 relies solely on a belief that mentioning the disparate charges "will lead to jury nullification." The Government is correct that Jury Nullification is not a right; Mr. Shamo is not seeking a jury instruction that allows for jury nullification as contemplated in the Government's case law. Mr. Shamo's purpose in examining this disparate treatment is multi-fold: (1) the conduct and actions of the co-conspirators is being attributed to Mr. Shamo as a result of CCE charge and by machination of a conspiracy charge, probing the degree of that conduct is integral to the defense; (2) the Government has alleged that Mr. Shamo was a principal in the DTO, but testimony of the co-conspirators will in fact establish that Mr. Shamo's was subordinate to Mr. Crandall and Mr. Paz in most aspects of the DTO; (3) the fact that these parties have pled guilty and received favorable plea agreements, pretrial release, and beneficial sentencing recommendations despite their level of culpability demonstrates significant motivation for bias and fabrication of their testimony; and (4) should the jury hear such evidence and determine that Mr. Shamo's role was in fact subordinate to those others they are allowed to make the inference that those parties not being charged with or pleading guilty to the same level of offense supports a finding that Mr. Shamo is likewise not guilty of the charged offense. This is further supported by the statements of co-conspirators outlined in Attachment A.

The Government's case law in no manner works to disqualify this line of inquiry where the Defendant is faced with the statements of co-conspirators, the Government has acknowledged similar degrees of culpability, the resulting sentence of those co-conspirators is

significantly reduced in exchange for their testimony against the defendant, and the acts and conduct of those individuals are being attributed to the defendant by virtue of the nature of the charges he is facing. Mr. Shamo is not seeking an instruction that allows the jurors to defy their oath to make a determination of guilt or innocence based on the evidence before them. Instead, Mr. Shamo is seeking to make certain the information before those jurors is complete and accurate as to each party called to testify. Limiting that information strips Mr. Shamo of the sacrosanct right to confront the witnesses brought against him, including motivations for bias and fabrication.

Wherefore, Mr. Shamo respectfully requests the Court deny the Government's motion and allow reasonable and necessary inquiry into the testimony of the co-conspirators as outlined above.

DATED this 10th day of May, 2019.

SKORDAS & CASTON, LLC


/s/ Gregory G. Skordas
Gregory G. Skordas

## CERTIFICATE OF SERVICE

I hereby certify that on the May 10th, 2019, I electronically filed a true and correct copy of the foregoing **RESPONSE TO MOTION IN LIMINE FOR ORDER PROHIBITING THE PARTIES FROM RAISING THE DEFENDANT'S POTENTIAL SENTENCE**, with the Clerk of the Court using CM/ECF system, which sent notification of such filing to the following:

S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Adam S. Elggren
Adam.elggren@usdoj.gov

*/s/ Sabrina Nielsen-Legal Secretary*
SKORDAS & CASTON, LLC

## STATEMENTS IN EVIDENCE REGARDING A. SHAMO

**Luke Paz**
**Proffer Interview on July 2, 2018 part 2**
Bates ID- 004-001-024-00007

Page 7: "Ashment: To the point where you now are talking about – so how did that progressed? Paz: Um, I guess, uh, that Drew kid was leaving out of the country. He was going to New Zealand. So, he asked – or I guess [UI] asked me if I wanted to get more involved, press for him. Um – and – I mean – I was like, uh – I mean, I'll come see what you guys do, I mean, I don't really – I can't say either way. So, I went over there. And Drew showed me how to use this machine that – that they had."

Page 12: [after explaining how Drew was showing him to use the machine] "cause Shamo, I guess, didn't know much about it. I mean, he still knew a lot 'cause eventually he would help me. Ashment: so, is it fair to say Drew lead the conversations on the technical aspects of pill pressing. Paz [exhales]. Yeah.

Page 13: Paz: Yea. But Drew was in a rush to leave. So, he showed me mainly, like, most of what I needed to do. And then he left. And then he did – I guess, he had like, and – he made notes on how to do everything. So, that Shamo could refer back to it and tell me – 'cause he was leaving. Had to go catch his flight or something. And then – they – him and Shamo remained in contact. And he would still answer questions and tell him how to do everything. And – what – with the machine- in regards to the machine.

Page 37: Ashment: "Makes sense. Okay. So, let's start about the fent – Fentanyl now at this point. So, how did that start? Paz: That, um, I know that him and Drew had talked about it. that – that they wanted to do it. Um, so, I don't know if they did get into to.

Page 52: Paz: Drew also made a little calculator program where you would enter in the amount of test pills, like the – the number of test pills, the weight of those test pills, and – and then you would enter the dosage of the active ingredient of what you wanted each pill to contain.  . . . Both for Xanax and the [UI]

Page 53: ". . .  I mean, Shamo and Drew were in communication when he was in New Zealand" Ashment: uh-huh Paz: and I'm sure that they were talking. I know they were. Drew – he was helping with a lot of the formulations and stuff.

Page 54: Yengich: I understand that. But answer that question. Did you Luke Paz come up with the formula for the Oxy . . .  Did you, yes or no? Paz: I – I mean, I figured it out

Page 55:  Yengich: . . .  Drew had made calculations relative to the pressing of pills he left, right? Paz: Yes. Yenchich: Okay. And actually came up with the formulaic manner in which to make certain kind of pills. Am I Right about that? Paz: Yes. Yengich: Okay, what kind of pills did he give a formula for? Paz: Yh, [exhales]. I – I think it was for all of them. Yengich: Well, okay, But all of them means nothing to me. Paz: well, I guess, the ones that they were selling. But I mean…"

**Drew Crandall**
**June 6, 2017 interview**

Page 35: [after explaining how Shamo started making pills] "like, Drew has a stake in this. So, he came to me. Um, and he said, 'Hey, if you will package these things, put the stamps on, write the addresses out, um, I would give you a one third stake, instead of one sixth.." So, the agreement at that time was any money after business expenses are paid, reups are done, and all of that, he gets two thirds of the money and I get one third."

Page 38: "our stuff kind of started to improve"

Page 80: [after explaining how the police interviewed their roommate for 10 grams of cocaine Aaron had sent to their house] "I told him, 'this is why I didn't want to traffic cocaine. I''m – you know, I take full responsibility for all these other drugs, you know. But this. is why I did not wanna traffic this."

Page 109: . . . Kaite and Alex expressed interest in making more money Um, they had only received seven or eight packages, not many Um, they wanted to make some more money. And – and I told Aaron, like, hey, you know… I'm leaving in September, why don't you make them the shippers?

Page 121: Crandall: you know. So I taught them how to package everything. And I was there four, five nights in a row for the first week. You know, kind of walking through the process. Teaching them what goes in what package. you know, this is stuff that I – Aaron and I had picked up over, you know, a year of trafficking ourselves.

Page 143: . . . "I felt like I was the workhorse the one doing all the work. I was cashing out the money. I was pressing the pills. Katie and Alex were sending things out. All he was doing was the customer service side. Taking care of that. you know and – I knew that he wouldn't be able to run the press himself and figure it out. He would struggle for months. And so, you know, I - I had that deadline

Page 145: ". . .I felt very trapped. Um, 'cause I had an angry girlfriend and a – a business partner that wasn't helping me at all. And, you know, I didn't think he could do it himself."

Page 195: "Just to be safe. Um, because Aaron was never great at math. And when I realized that he was pressing his own, I worried a little bit about his dosages that he was adding in. I worried about the level and the consistency that he could do. 'Cause Aaron – he wasn't great at math. Or it – you know when I was trying to teach him how to press he would get confused all the time. Um… one thing I did before I left in October, he, um – you know, he was having me set up the machine.

talks about the program he wrote "it took me twenty-five minutes to write the program. But it was something that I knew that, you, he wasn't gonna be able to do the math himself."

Page 212: I was freaking the hell out, you know, 'Cause I knew I was still responsible. Still part of it. Still involved in this.

Page 244: US: Why didn't you go to the police? Crandall: Because of my involvement. I knew that I was responsible for this as well. I played just as big a role as he did in the start of this.

**Follow up interview 6/13/17**
Bates ID-004-001-022-00001

Page 6: [when asked about who recruited Jordan Vance] Um, I kind of suggested it to him. Jordan had bought, um, a few products from us in the Fall of 2014. U,, He'd buy Adderall, a little Valium umm.. US: where did he buy those from? Crandall: Huh? US: where did he buy those form? Crandall: um.. US: he bought them from you? Crandall: From , me. Yeah.

Page 10: Crandall: Um, I told him I was gonna send him a package. I bought it. Um, used my debit card and shipped it to his house.

Page 14: Um, I approached a few other people, um during late 2014, early 2015. Umm. … Some turned me down. (speaking about recruiting)

Page 19: . . . "Aaron was asking me when I came back to do customer service in 2016, um, you know, do you know anyone else that can be a drop?" (he then gave him two names)

Page 47: Crandall: Um, so, in the fall of 2015 I was helping Aaron pressing. Um, I was trying to get him to learn it himself. 'Casuse I knew he'd have to do it. So, I would sometimes set up the machine. . . . (Talks about Shamo recruiting luke) Um. So, Luke cam over. Um, I gave him a rundown on how to use the machine. What the ejection height meant. What the fill depth is. How to – the pressure. How to lower the pressure. When it gets jammed, how to unjam it. Um, I showed him how to use the machine basically.

Page 48: . . . "I actually took picture of the machine. I made a little diagram. Put a number next to each little gear and wrote a little synopsis. Like, this is your fill height. You know, turn it to the left to go up. down. I just kind of annotated the image and sent it back to Aaron. And this was, like, a day or two after I left to New Zealand."

Page 64- 67: (Crandall had access to Shamo's PharmaMaster account and could do anything. He got it shut down the day Shamo got arrested)

Page 75-76: US: was Aaron very Smart? CRANDALL: No, but he can research.

**Katherine Bustin**
**Interview on May 31, 2017**

Page 14: Q. Did you get an impression as to who was the mastermind or brains behind the operation at the beginning between the two?
A. That's hard. I would say for like mixing things and knowing the ins and outs of how to safely shipment something, that was all Drew. He knew everything there was to know about it, all the ingredients that were in everything, how to press it, how to all of that. But Aaron was the mastermind at the bitcoins online and he knew how to go through the dark web and all of that. So it was kind of a mix, but when it comes to the hefty bulk lifting of actually making these pills, that was Drew in the beginning and Aaron had to figure that out after he left.

**Interview on November 22, 2016**

Page 3-4: Crandall showed them how to package and prepare all of the orders for shipment.

Page 6: Bustin Stated she and Tonge originally received $500.00 biweekly, an amount decided upon by Shamo and Crandall

**Gillian Webb**
**Interview on January 10, 2017**

"He's a sweetheart but he's not that smart"

"Webb knew the business would not succeed as Shamo was lazy. Webb stated Shamo and 'some guy named John' would remote into people's computers to fix issues. Webb did not know John's last name but said, 'I know he was a computer nerd too.' Webb stated John did most of the work as Shamo was 'so lazy.'"

"Webb explained that compared to Penrose and Samuelian Shamo seemed like the 'little brother that was lost and didn't know what he was doing."

**Alexandrya Tonge**
**Interview on May 31, 2017**

TONGE stated SHAMO specifically mentioned that Jonathan Luke PAZ helped him manufacture the fentanyl counterfeit Oxycodone and Roxicodone pills. She said Shamo spoke to her about Paz's involvement before they began selling those pills on AlphaBay. She said Shamo was frustrated because Paz knew how to precisely manufacture the pills so they wouldn't appear counterfeit, but he wouldn't tell Shamo the formula because he wanted to stay in the DTO. According to Shamo, Paz was worried if he (Shamo) knew the formula he would manufacture the pills himself and push him out. Shamo and Paz worked for a few months to perfect the formula because someone in the local club scene wanted to buy the pills from them.

**Sean Gygi**
**Interview May 19, 2017**

Page 60: "I never thought Shamo was smart enough to make his own pills."

Page 98: When Gygi was asked "If you had to pick between Drew and Aaron, who would be smart enough to – smart to start something like this?" Gygi: "Drew. He's definitely got the computer skills to do that. Um. And then, I'm – I'm guessing Shamo would just have kind of carried on with what he was taught."

**Mario Noble**
**DHS Interview December 7, 2016**

Page 6: Noble explained that when Grant met Crandall he was already involved in the shipping of narcotics. He heard that they had a connect in India for MDMA or Acid.

**Sasha Grant**
**Interview June 16 & 17, 2017**

Page 3: "Grant stated she believes that Crandall did not mention Shamo's involvement until later after Grant questioned if he was doing it on his own. Crandall told Grant he and Shamo were doing it together and described their arrangement as 'partners'"

Page 6: Grant knew it would take Crandall time to remove himself from the drug trafficking organization, and did not know what they would mean for Crandall's involvement and what he would be doing during that time. Grant recalled Crandall explaining that slowly he would push things off onto other people and Shamo would hire other people to assist Shamo or take over what Crandall was no longer doing.

Page 9: My understanding from Drew was that Aaron was the one that was handling online orders and that sort of thing, and Drew was doing the packaging and shipping and that sort of thing. Grant went on to explain Bustin and Tonge 'coming into the mix' was to take Crandall's packaging job from him. Grant could recall seeing packaging materials at the Murphy's Lane residence and described it as being downstairs in the living room, in Crandall's room, and in Crandall's backpack."

Page 9: Crandall told Grant that Shamo was 'buying me out' and therefore would cash out the money Crandall invested."

Page 10: Grant's understanding was the business was a partnership as Crandall and Shamo went 'in on it together.'

Page 10: Grant explained, 'up until this point, I know that, or had been told that him [Shamo] and Drew were partners in this."

Page 10: Grant explained there were people accepting packages, and the only one she was aware of was Sean Gygi. Grant explained Gygi was a "closer friend of Drew."

Page 10: "When asked how she learned people were accepting packages Grant responded, "Drew told me." Grant explained she vaguely remembered Crandall picking up a package at someone's house."

Page 11: "Grant stated she was not 100% sure who had the idea to begin the organization and who put that idea in motion. Grant explained that when Crandall first told her about the business Crandall told her they had read about it online but did not know whose idea it actually was."

Page 11: Grant recalled asking Crandall how to get a pill press. Crandall told Grant, 'you just order it online.' Grant was not certain who ordered the pill press but thought it was Shamo.

Page 13: When Grant was asked if she was at a 'recruitment meeting' with Trevor Edwards she explained she and Crandall got wings at a restaurant with Edwards one time. Grant felt like the meeting was about rent money as Edwards had lost his job. Grant believes she asked Crandall how he know Edwards and things Edwards was a drop for Crandall and Shamo. Grant was 'pretty sure' Shamo was present for the meeting but was not certain

Page 16: "The third area Grant wanted to clarify was who started the organization. Grant explained when Crandall and Shamo started the business she did not know either of them, and therefore did not know if it was a mutual 'coming about' or if one asked the other to go in on it with them. Grant stated Crandall told her Shamo had invested more money than Crandall, as Shamo had more money to invest.

Page 18: "Grant recalled Crandall telling her he showed Shamo how to use the pill press

Page 19: "Grant stated 'he [Shamo] kinda has like a lazy attitude, I think. If he can delegate it to someone else and not do it himself then he will definitely do that and he'll pay for the convenience of not having to work."

Page 23: Grant explained from her understanding of Crandall and Shamo, Crandall may not have had joint access to the Bitcoin account because he didn't want to be the front runner and understood the consequences of breaking the law more than Shamo.

**Stephanie Shamo Arbelaez**
**Interview September 24, 2018**

Page 3: "Arbelaez felt that Shamo was not a criminal mastermind. He was computer savvy but couldn't run a business because he was unable to follow through"

Page 4: "She [Arbelaez] felt that Drew Crandall was the smart one in Shamo's friend group. She said SHAMO often made comments about his intelligence. She felt that Crandall was the "mastermind" and possibly PAZ

Page 4: She mentioned that Shamo liked to please people, even if the things he did were bad or wrong. she didn't think Shamo would have known how to start a business. She said Shamo told her he was learning a lot form other people. She felt he was gullible. She thought Paz was working with law enforcement. She though Paz and Crandall were leaders in the organization. she though that possibly the whole friend group might have been involved with the drug trafficking organization. She felt that Shamo was 'taking the fall' for the organization because he was loyal. She said Shamo didn't even know about drug interactions, and she had to tell him the possible negative side effects.

Page 5: Arbelaez felt that Crandall was smart enough to get out of the country and have others run the organization.

332

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
SKORDAS & CASTON, LLC
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com
Attorneys for Defendant Aaron Michael Shamo

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AARON MICHAEL SHAMO, et. al.,<br><br>Defendant. | **RESPONSE TO MOTION TO EXCLUDE DEFENSE EXHIBITS**<br><br>Case No. 2:16-CR-00631 DAK<br><br>Judge Dale A. Kimball |

Aaron Michael Shamo, through his counsel, hereby moves the Court to enter an order denying Plaintiff's Motion to exclude defense exhibits. In support Mr. Shamo alleges as follows:

### STATEMENT OF RELEVANT FACTS

1. On April 1, 2019, the Court issued an Amended Trial Order that set pre trial deadlines.

2. Mr. Shamo has not provided reciprocal discovery in this case because he does not have reciprocal discovery to provide to the Government.

333

3. Mr. Shamo provided the government with an exhibit list by email on April 16, 2019 which was accurately restated by the government in its Motion to Exclude Defense Exhibits.

4. All items on Mr. Shamo's exhibit list are items Mr. Shamo has received from the government.

## ARGUMENT

The Court should deny the Government's motion. The Government seeks to eliminate Mr. Shamo's ability to present a defense by prohibiting Mr. Shamo from presenting any exhibits at the pre-admission hearing or at trial because Mr. Shamo's proposed exhibit list is not specific enough[1]. However, Rule 16 of the Federal Rules of Criminal Procedure does not provide any requirements as to how specific a proposed exhibit list must be rather, as with other discovery matters, it is left to the Court's discretion. In the alternative, even if the Court finds that Mr. Shamo's proposed exhibit list is not specific enough, exclusion of the exhibits at trial would be an extreme improper remedy.

The Government argues that Mr. Shamo's proposed exhibit list is not specific enough. However, the Federal Rules of Criminal Procedure Rule 16 do not give any requirements for how specific a proposed exhibit list needs to be. Rather, the Court has discretion in dealing with discovery matters. *See United State v. Wicker*, 848 F.2d 1059, 1060 (10th Cir. 1988). Rule 16 requires the defendant to provide books, papers, documents, data, or photographs that the defendant intends to use in his case-in-chief. Fed. R. Crim. P. 16 (b)(1)(A)(ii) & (b)(ii). There is

---

[1] In its motion, the Government objects to the exhibits category by category for not being specific enough. It also objects to a number of the exhibits for being hearsay. However, the purpose of the pre-admission hearing is to address the admissibility of the evidence at trial. As such, Mr. Shamo will wait to address the admissibility of these exhibits, as to them being hearsay, at that hearing.

no requirement in the rule to identify each item the defense will use at trial specifically. The defense should not be required to disclose all the minutiae of its evidence, nor should they be required to delineate their case with total specificity. *See United State v. Elam*, 678 F.2d 1234, 1253 (5th Cir. 1982). It is difficult for the defense in a criminal trial to know exactly what specific pieces of evidence it will need to produce at trial because the defense does not know what exactly the government will produce at trial, particularly in complex cases.

In this case, it would be well within the court's discretion to accept Mr. Shamo's proposed exhibit list as is. Given the complexity of this case and the expected length of the trial, it is nearly impossible to know with exactness what exhibits Mr. Shamo will need to use in his defense at trial, and thus this court should not require Mr. Shamo to try to speculate to achieve the requested level of specificity.

In the alternative, even if the Court finds that Mr. Shamo's proposed exhibit list is not specific enough, prohibiting Mr. Shamo from presenting any exhibits at the pre-admission hearing or trial would be an improper remedy. The Court has "broad discretion in imposing sanctions" in discovery matters. *Wicker*, 848 F.2d at 1060. However, "[d]espite this broad grant of power, the district court's exercise of discretion should be guided by several factors, and if a sanction is imposed, it should be the 'least severe sanction that will accomplish … prompt and full compliance with the court's discovery orders.'" Id. While this does not mean a court can never suppress evidence, "absent bad faith or a trial in progress, a continuance is typically the appropriate remedy." *United States v. Yepa*, 608 Fed. Appx. 672, 679 (10th Cir. 2015) To guide its decision for the proper sanction, the court should consider three principle factors factors: "(1) the reason for the delay, including whether the non-compliant party acted in bad faith; (2) the

extent of prejudice to the other party; and (3) the feasibility of curing the prejudice with a continuance." *Id.* (*citing Wicker*, <u>848 F.2d at 1061</u>).

The government mentioned these factors in its motion but did not attempt to analyze them. When considering these factors, it is evident the excluding the evidence would be an extreme sanction. First, there is no bad faith by Mr. Shamo. The government has not attempted to identify any bad faith, and there is no evidence of any bad faith. Second, the extent of prejudice to the government is minimal. "Typically, prejudice requires that the delay impact the [other parties] ability to prepare or present his case. *Yepa*, <u>608 Fed. Appx. at 679</u> (*citing United States v. Golyansky*, <u>291 F.3d 1245, 1250</u> (10th Cir. 2002). Here there is minimal prejudice to the Government's ability to prepare its case-in-chief because the Government carries the burden of proof at trial. The government states that the proposed exhibit list is not specific enough to allow it to object to form or content of the exhibits. However, if there are any exhibits that Mr. Shamo needs to use in his defense after seeing the Government's case-in-chief, there is still an opportunity for the Government to object to the form and content before they are introduced at trial.

Lastly, this issue would easily be cured through the court granting leave to Mr. Shamo to amend his proposed exhibit list to achieve the desired specificity. A continuance in this case, if any, would be minimal not affecting the scheduled trial date. If the Court did require Mr. Shamo to be more specific with the exhibits he possibly will use at trial, Mr. Shamo would request five days in order to amend his proposed exhibit list.

Considering these factors, the Court should deny the Government's motion to exclude defense exhibits. Granting such a motion would be an extreme sanction preventing Mr. Shamo

from exercising his constitutional right to present a defense. This would not be the least severe sanction that would accomplish prompt and full compliance with the court's discovery order.

Wherefore, Mr. Shamo respectfully requests the Court to deny the Government's motion and use the proposed exhibit list as is, or in the alternative to grant Mr. Shamo leave to amend the proposed exhibit list.

DATED this 10th day of May, 2019.

SKORDAS, CASTON & HYDE, LLC

*/s/ Gregory G. Skordas*
Gregory G. Skordas
Attorney for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on May 10, 2019, I electronically filed a true and correct copy of the

foregoing **RESPONSE TO MOTION IN LIMINE TO EXCLUDE DEFENSE EXHIBITS**,

with the Clerk of the Court using CM/ECF system, which sent notification of such filing to the

following:

        S. Michael Gadd
        mgadd@agutah.gov

        Vernon G. Stejskal
        Vernon.stejskal@usdoj.gov

        Adam S. Elggren
        Adam.elggren@usdoj.gov

                        */s/ Daryl P. Sam* _____

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
SKORDAS & CASTON, LLC
560 South 300 East, Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

---

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>v.<br><br>AARON MICHAEL SHAMO,<br>DREW WILSON CRANDALL,<br>ALEXANDRYA TONGE,<br>KATHERINE BUSIN,<br>MARIO NOBLE, and<br>SEAN GYGI,<br><br>         Defendants. | **RESPONSE TO MOTION TO STRIKE DEFENDANT'S EXPERT KELLY SHAFTO**<br><br>Case No. 2:16-CR-00631-DAK<br><br>Judge Kimball |

Defendant, by and through counsel, opposes the Government's motion to prohibit proposed expert Kelly Shafto from testifying. Defense made adequate Rule 16 disclosure to the United States. The United States was provided with a summary of Ms. Shafto and the work she

was conducting in this matter. Ms. Shafto has no written opinion; therefore, a written opinion cannot be provided.

## STATEMENT OF FACTS

1. On November 26, 2018 Defendant provided the government with a Notice of expert Kelly Shafto.

2. The notice identified that Ms. Shafto is a private investigator from Panther Investigation.

3. Ms. Shafto is a retired Unified Police Department officer, who has testified for the Government on many drug related cases.

4. The notice described the nature of her testimony. Specifically, the notice stated that Ms. Shafto would be reviewing information provided by the Government and is investigating the general background of the case.

5. Also, the notice identified the expected testimony Ms. Shafto would provide.

6. Ms. Shafto has not provided Defense with a written report, therefore there is no report to provide the Government.

7. Defense will acknowledge that a CV of Ms. Shafto was not provided with the notice as an oversight but was served of Counsel as of this filing.

## ARGUMENT

The Court should allow Kelly Shafto to testify because Defendant's Rule 16 notice was sufficient. Rule 16 (b)(1)(C) states that "[t]he the defendant must, at the government's request, give to the government a written summary of any testimony that the defendant intends to use. . . ". Defendant's notice fits the sufficiency requirement for Rule 16 because Defendant provided

the Government with the nature of Ms. Shafto's testimony and what subject area she would be testifying to.

In *United States v. Galloway* the court held that the Government's six untimely expert notices were sufficient under Rule 16 because a written summary of any testimony that the expert witness would give was provided. *United States v. Galloway*, 2018 U.S. Dist. LEXIS 85766, 5. In *Galloway* the court states, "[r]ule 16 is designed to give opposing counsel notice that expert testimony will be presented, permitting 'more complete pretrial preparation' by the opposing side. . . ." *Id*. at 6. All six of the notices were either sufficient or acknowledged by the court that some notices were to be supplemented. *Id*. at 2. Under Rule 16 the Government and Defense have the same requirement as to what qualifies as sufficient notice of an expert's testimony. For a Rape Trauma Expert, the Government provided a notice indicating the subject areas the expert would be testifying to and that was held as sufficient. *Id*. at 11. The Government provided notice of a few doctors and the notice states the individuals " ' . . . are expected to testify as to the cause and manner of the death of the deceased individuals, and to the relevant findings during the autopsies.' " *Id*. at 12. The Court classified this as sufficient notice. Id. When the Government provided a notice of a Sexual Assault Nurse, the notice stated that they ". . . expec[t] this witness to give her opinion 'based on her relevant findings.' " *Id*. at 12-13. The Court indicated that this notice ". . . does not provide Defendants with any direction or indication of exactly what [the nurse's] opinion might be. However, it may be difficult for the Government to be more specific about [the nurse's] opinion without having received the report." *Id*. at 13. The court ordered that the report be provided to the Defense once it is received. *Id*.

The Notice of Expert Kelly Shafto was sufficient because it provided subject areas that she would be testifying to and the nature of her testimony. Notice of Ms. Shafto was provided on

November 26, 2018 and the Defense acknowledges that a CV was not sent at that time, which was an oversight that has been cured. The nature of her testimony and the subjects were clearly provided. Not only was the Government provided with sufficient information of what Ms. Shafto was going to testify to, the Government is very familiar Ms. Shafto and her credentials as she has testified for them in many drug related cases. Though the Government's knowledge is not the same as providing a CV, it serves significantly to cure any concern about prejudice to the Government.

Defense will not deny that they failed to provide a CV by the deadline on the Court's Scheduling Order, but the tardiness does not warrant the drastic remedy of exclusion of Ms. Shafto. The CV of Ms. Shafto has since been provided. As stated in the Government's motion, there are three factors that a district court should consider in determining what an appropriate sanction for a Rule 16 violation. The factors are as follows: "(1) the reason for the delay, including whether the non-compliant party acted in bad faith; (2) the extent of prejudice to the party that sought the disclosure; and (3) the 'feasibility of curing the prejudice with a continuance.'" *United States v. Banks*, 761 F.3d 1163, 1198-99 (10th Cir. 2014) (*citing United States v. Wicker*, 848 F.2d 1059, 1061 (10th Cir. 1988)). In Galloway, the Court acknowledged there was a delay of providing Defense with the six notices but agreed that exclusion of those witnesses was not warranted. *United States v. Galloway*, 2018 U.S. Dist. LEXIS 85766, 15.

Defense not providing Ms. Shafto's CV on time does not fall in the *Wicker* factor. First, the reason for the delay of the CV was not in bad faith, but instead an oversight. The Government was provided with a Notice of Ms. Shafto's expected testimony in November of 2018, giving the Government ample time to reach out to her themselves or prepare to meet the proposed testimony. Second, Defense acknowledges that they overlooked providing the CV, but

the Government cannot prove that they will be prejudiced by her testimony when they know the nature and subjects her testimony. The Government has used Ms. Shafto as their witness for many federal trials, especially drug related cases as recently as last year. Third, as the Government states there was a continuance after 21 terabytes[1] of discovery was provided three weeks before the original trial date, but if the court determines that the Government was prejudiced, a continuance would cure the prejudice to give the Government ample time to review Ms. Shafto's CV.

Because Defendant has provided proper notice under Rule 16, Defendant opposes the United States' Motion to Strike Kelly Shafto from testifying at trial.

DATED this 10th Day of May, 2019.

SKORDAS & CASTON, LLC

_/s/ Gregory G. Skordas_
Gregory G. Skordas

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2019, I filed a true and correct copy of the foregoing

**RESPONSE TO MOTION TO STRIKE DEFENDANT'S EXPERT KELLY SHAFTO**

with the Clerk of the Court using CM/ECF system, which sent notification of such filing to the

following:

S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Adam S. Elggren
Adam.elggren@usdoj.gov

Kent Burggraaf
kburggraaf@agutah.gov

*/s/ Sabrina Nielsen-Legal Secretary*
SKORDAS & CASTON, LLC

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
SKORDAS & CASTON, LLC
560 South 300 East, Suite 225
Salt Lake City, UT 84111
Telephone:  (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>AARON MICHAEL SHAMO,<br>DREW WILSON CRANDALL,<br>ALEXANDRYA TONGE,<br>KATHERINE BUSIN,<br>MARIO NOBLE, and<br>SEAN GYGI,<br><br>        Defendants. | **RESPONSE TO MOTION TO STRIKE DEFENDANT'S EXPERT DR. TERRI HADDIX**<br><br><br>Case No. 2:16-CR-00631-DAK<br><br>Judge Kimball |

Defendant, by and through counsel, opposes the Government's motion to prohibit

proposed expert Dr. Terri Haddix from testifying. Defense made adequate Rule 16 disclosure to

the United States. The United States was provided with a summary of Dr. Haddix's expected

testimony and her CV. Dr. Haddix has not provided Defense with a final written report;

therefore, a written report cannot be provided.

## STATEMENT OF FACTS

1. On November 26, 2018 Defendant provided the government with a Notice of expert Dr. Haddix.

2. The notice identified the nature of Dr. Haddix expected testimony and her credentials.

3. Specifically, the notice stated that Dr. Haddix reviewed the data and information provided with respect to Count 6 of the Second Superseding Indictment ("Death Resulting Count").

4. Also, the notice identified the subject of expected testimony Dr. Haddix was going to provide.

5. Dr. Haddix has not provided Defense with a written report, therefore there is no report to provide the Government.

## ARGUMENT

The Court should allow Dr. Haddix to testify because Defendant's Rule 16 notice was

sufficient. Rule 16 (b)(1)(C) states that "[t]he the defendant must, at the government's request,

give to the government a written summary of any testimony that the defendant intends to use. . .

." Defendant's notice fits the sufficiency requirement for Rule 16 because Defendant provided

the Government with the nature of Dr. Haddix's testimony and what subject area she would be

testifying to.

In *United States v. Galloway* the court held that the Government's six untimely expert notices were sufficient under Rule 16 because a written summary of any testimony that the expert witness would give was provided. *United States v. Galloway*, 2018 U.S. Dist. LEXIS 85766, 5. In *Galloway* the court states, "Rule 16 is designed to give opposing counsel notice that expert testimony will be presented, permitting 'more complete pretrial preparation' by the opposing side. . . ." *Id*. at 6. All six of the notices were either sufficient or acknowledged by the court that some notices were to be supplemented. *Id*. at 2. Under Rule 16 the Government and Defense have the same requirement as to what qualifies as sufficient notice of an expert's testimony. For a Rape Trauma Expert, the Government provided a notice indicating the subject areas the expert would be testifying to and that was held as sufficient. *Id*. at 11. The Government provided notice of a few doctors and the notice states the individuals "' . . . are expected to testify as to the cause and manner of the death of the deceased individuals, and to the relevant findings during the autopsies.'" *Id*. at 12. The Court classified this as sufficient notice. *Id*. When the Government provided a notice of a Sexual Assault Nurse, the notice stated that they ". . . expec[t] this witness to give her opinion 'based on her relevant findings.'" *Id*. at 12-13. The Court indicated that this notice ". . . does not provide Defendants with any direction or indication of exactly what [the nurse's] opinion might be. However, it may be difficult for the Government to be more specific about [the nurse's] opinion without having received the report." *Id*. at 13. The Court ordered that the report be provided to the Defense once it is received. *Id*.

The Notice of Dr. Haddix was sufficient because it provided subject areas that she would be testifying to and the nature of her testimony. Notice of Dr. Haddix was provided on November 26, 2018 and the nature of her testimony and the subjects were clearly provided.

Defense has not been provided with a report and therefore does not warrant the drastic remedy of exclusion of Dr. Haddix. As stated in the Government's motion, there are three factors that a district court should consider in determining what an appropriate sanction for a Rule 16 violation. The factors are as follows: "(1) the reason for the delay, including whether the non-compliant party acted in bad faith; (2) the extent of prejudice to the party that sought the disclosure; and (3) the 'feasibility of curing the prejudice with a continuance.'" *United States v. Banks*, 761 F.3d 1163, 1198-99 (10th Cir. 2014) (*citing United States v. Wicker*, 848 F.2d 1059, 1061 (10th Cir. 1988)). In Galloway, the Court acknowledged there was a delay of providing Defense with the six notices but agreed that exclusion of those witnesses was not warranted. *United States v. Galloway*, 2018 U.S. Dist. LEXIS 85766, 15.

Defense not providing Dr. Haddix's report does not fall in the *Wicker* factors. First, Defense not having a report to give the Government does not constitute bad faith on Defense's part. Second, the Government cannot prove that they will be prejudiced by her testimony when they know the nature and subjects of Dr. Haddix's testimony. The Government has been provided with the exact count that we anticipate using Dr. Haddix for and exactly what element in that count. The Government has had notice of Dr. Haddix and had not objected to striking her testimony before the original trial date. Third, as the Government states, there was a continuance after 21 terabytes of discovery was provided three weeks before the original trial date to Defense, but if the court determines that the Government was prejudiced, a continuance would cure the prejudice to give the Government ample time to review a report that has not been provided.

Because Defendant has provided proper notice under Rule 16, Defendant opposes the

United States' Motion to Strike Dr. Haddix from testifying at trial.

    DATED this 10th Day of May, 2019.


                    SKORDAS & CASTON, LLC


                    _/s/ Gregory G. Skordas_____
                    Gregory G. Skordas

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 10, 2019, I filed a true and correct copy of the foregoing

**RESPONSE TO MOTION TO STRIKE DEFENDANT'S EXPERT DR. TERRI HADDIX**

with the Clerk of the Court using CM/ECF system, which sent notification of such filing to the

following:

S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Adam S. Elggren
Adam.elggren@usdoj.gov

Kent Burggraaf
kburggraaf@agutah.gov


*/s/ Sabrina Nielsen-Legal Secretary*
SKORDAS & CASTON, LLC

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
SKORDAS & CASTON, LLC
560 South 300 East, Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com
Attorneys for Defendant Aaron Michael Shamo

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>AARON MICHAEL SHAMO,<br>DREW WILSON CRANDALL,<br>ALEXANDRYA TONGE,<br>KATHERINE BUSIN,<br>MARIO NOBLE, and<br>SEAN GYGI,<br><br>    Defendants. | **RESPONSE TO MOTION TO STRIKE DEFENDANT'S EXPERT ERIC WHEELER**<br><br>Case No. 2:16-CR-00631-DAK<br><br>Judge Kimball |

Defendant, by and through counsel, opposes the Government's motion to prohibit

proposed expert Eric Wheeler from testifying. Defense made adequate Rule 16 disclosure to the

United States. The United States was provided with the nature of Mr. Wheeler's expected

testimony, specific subjects, and his CV. Mr. Wheeler has not provided Defense with a final written report; therefore, a written report cannot be provided.

## STATEMENT OF FACTS

1.  On April 26, 2019 Defense provided the government with a Notice of expert Mr. Wheeler.

2.  The notice identified the nature of Mr. Wheeler's expected testimony and his credentials.

3.  Specifically, the notice stated that the nature of Mr. Wheeler's testimony was going to consist of all the data and information provided by the Government concerning electronic data, electronically stored information, computer, records, and Defendant's alleged use of the "dark web" for drug sales related to several of the counts in the Second Superseding Indictment. The notice provided what electronic devices Mr. Wheeler has reviewed.

4.  Importantly, the Government's contention regarding the nature of the discovery Mr. Wheeler is reviewing is incorrect.

5.  Defense Counsel was aware of the existence of 11 TBs of Discovery prior to November 2018. The Government subsequently informed Defense Counsel of the existence of nearly 20+ TBs of data in early December 2018.

6.  In late 2018 the Government was provided with one of the Co-Conspirator's, Luke Paz's, computer and other electronic data.

7.  Defense Counsel's intention in having computer data reviewed was to specifically have the computers and electronics of Drew Crandall and Luke Paz reviewed.

8.  The existence of Mr. Paz's computer and electronic information was not revealed to Defense Counsel in the timeframe alleged by the Government.

9.   In addition, the Government took nearly three weeks to actually provide the computer forensic data to Defense Counsel once it was requested.

10. Even after receipt of the information, Defense Counsel had to get approval from the CJA Budgeting Attorney before retaining an expert on electronic data. That budget approval could not be obtained until the amount of data to be reviewed was calculated.

11. Defense asked for a continuance due to the unexpected amount of discovery before the trial.

12. Defense was granted the continuance.

13. Defense Counsel had previously retained the Eide Bailly Firm to review the forensic data in this matter.

14. Eide Bailly provided a written estimate to process the new data in February. The CJA budgeting attorney also did not approve the Defense's request, but did not notify Defense Counsel of that concern until March.

15. CJA Budgeting Attorney provided the names of two other experts but Defense Counsel did not receive any response from those proposed experts.

16. The CJA Budgeting Attorney requested Defense Counsel coordinate with a Discovery Attorney to find another expert. The name provided from the Discovery Attorney also did not return contact.

17. In mid-March 2019 after multiple emails and attempts to find an expert that would be approved, Defense Counsel suggested the use of Eric Wheeler as a possible option knowing Trial Tech's familiarity with and reliability in the federal court system.

18. Mr. Wheeler was not approved by the CJA Budgeting Attorney until March 27, 2019. It was several days before the budget came through for Mr. Wheeler to begin working through the massive discovery.

19. Mr. Wheeler has not provided a report to Defense due to the obstacles Defense has experienced in retaining an expert and the unexpected amount of electronic data the Government provided.

## ARGUMENT

### 1. Mr. Wheeler's Expert Notice Complied with Rule 16

The Court should allow Mr. Wheeler to testify because Defendant's Rule 16 notice was sufficient. Rule 16 (b)(1)(C) states that "[t]he the defendant must, at the government's request, give to the government a written summary of any testimony that the defendant intends to use . . . ." Defendant's notice fits the sufficiency requirement for Rule 16 because Defendant provided the Government with the nature of Mr. Wheeler's testimony and what subject area he would be testifying to.

In *United States v. Galloway* the court held that the Government's six untimely expert notices were sufficient under Rule 16 because a written summary of any testimony that the expert witness would give was provided. *United States v. Galloway*, 2018 U.S. Dist. LEXIS 85766, 5. In *Galloway* the court states, "Rule 16 is designed to give opposing counsel notice that expert testimony will be presented, permitting 'more complete pretrial preparation' by the opposing side. . . ." *Id*. at 6. All six of the notices were either sufficient or acknowledged by the court that some notices were to be supplemented. *Id*. at 2. Under Rule 16 the Government and Defense have the same requirement as to what qualifies as sufficient notice of an expert's

testimony. For a Rape Trauma Expert, the Government provided a notice indicating the subject areas the expert would be testifying to and that was held as sufficient. *Id*. at 11. The Government provided notice of a few doctors and the notice states the individuals "' . . . are expected to testify as to the cause and manner of the death of the deceased individuals, and to the relevant findings during the autopsies.'" *Id*. at 12. The Court classified this as sufficient notice. *Id*. When the Government provided a notice of a Sexual Assault Nurse, the notice stated that they ". . . expec[t] this witness to give her opinion 'based on her relevant findings.'" *Id*. at 12-13. The Court indicated that this notice ". . . does not provide Defendants with any direction or indication of exactly what [the nurse's] opinion might be. However, it may be difficult for the Government to be more specific about [the nurse's] opinion without having received the report." *Id*. at 13. The Court ordered that the report be provided to the Defense once it is received. *Id*.

The Notice of Mr. Wheeler was sufficient because it provided subject areas that he would be testifying to and the nature of his testimony. Notice of Mr. Wheeler was provided on April 26, 2019 and the nature of his testimony and the subjects were clearly provided.

Defense has not been provided with a report and therefore does not warrant the drastic remedy of exclusion of Mr. Wheeler. As stated in the Government's motion, there are three factors that a district court should consider in determining what an appropriate sanction for a Rule 16 violation. The factors are as follows: "(1) the reason for the delay, including whether the non-compliant party acted in bad faith; (2) the extent of prejudice to the party that sought the disclosure; and (3) the 'feasibility of curing the prejudice with a continuance.'" *United States v. Banks*, 761 F.3d 1163, 1198-99 (10th Cir. 2014) (*citing United States v. Wicker*, 848 F.2d 1059, 1061 (10th Cir. 1988)). In *Galloway*, the Court acknowledged there was a delay of providing

Defense with the six notices but agreed that exclusion of those witnesses was not warranted. *United States v. Galloway*, 2018 U.S. Dist. LEXIS 85766, 15.

Defense not providing Mr. Wheeler's report does not fall in the *Wicker* factor. First, Defense not having a report to give the Government does not constitute bad faith on Defense's part. As mentioned above, there have been many unforeseen events prolonging the production of Mr. Wheeler's report. Second, the Government cannot prove that they will be prejudiced by his testimony when they know the nature and subjects of Mr. Wheeler's testimony. Third, as the Government states, there was a continuance after twenty-one terabytes of discovery was provided three weeks before the original trial date to Defense. As outlined about, nearly half of that data was not previously disclosed to Defense Counsel despite the Government's assertion. If the court determines that the Government was prejudiced, a continuance would cure the prejudice by giving the Government more time to receive a report regarding Mr. wheeler's review of the data.

### 2. Eric Wheeler is Qualified Under *Daubert* Because his Work meets the Required Standard.

Mr. Wheeler is qualified to offer opinions on topics referenced in his expert notice. As stated by the Government, *Daubert* has created a checklist of specific factors for the Court to use in assessing the reliability of scientific expert testimony. The four factors that are suggested for the court to consider are the following: " . . . (1) whether a theory has been or can be tested or falsified; (2) whether the theory or technique has been subject to peer review and publication; (3) whether there are known or potential rates of error with regard to specific techniques; and (4) whether the theory or approach has general acceptance." *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004). It has been made clear " . . . that this list is neither definitive nor

exhaustive and that a trial judge has wide discretion both in deciding how to assess an expert's reliability and in making a determination of that reliability." *Id*. at 1233.

Mr. Wheeler's sufficient experience with electronic data makes his opinion's reliable. Mr. Wheeler has presented evidence in over a hundred trials. Going through the Daubert factors, any theory of electronically stored data that he has been presented by Mr. Wheeler can be tested or verified through reliable methods. His theories in trials have been generally accepted. Mr. Wheeler's theories and expertise have been reliable.

Because Defendant has provided proper notice under Rule 16 and his work qualifies as being reliable, Defendant opposes the United States' Motion to Strike Mr. Wheeler from testifying at trial.

DATED this 10th Day of May, 2019.


SKORDAS & CASTON, LLC


*/s/ Gregory G. Skordas*
Gregory G. Skordas

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2019, I filed a true and correct copy of the foregoing

**RESPONSE TO MOTION TO STRIKE DEFENDANT'S EXPERT ERIC WHEELER**

with the Clerk of the Court using CM/ECF system, which sent notification of such filing to the

following:

S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Adam S. Elggren
Adam.elggren@usdoj.gov

Kent Burggraaf
kburggraaf@agutah.gov


*/s/ Sabrina Nielsen-Legal Secretary*
SKORDAS & CASTON, LLC

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE THE DOLLAR VALUE OF CRYPTOCURRENCIES |
| vs. | |
| AARON MICHAEL SHAMO, | |
| Defendant. | Judge Dale A. Kimball |

The United States, by and through Michael Gadd, Special Assistant United States
Attorney, urges the Court to deny the defendant's motion to exclude evidence of the dollar value
of various cryptocurrencies.[1] Cryptocurrencies are exchanged every day for fiat currencies;
current and historical exchange rates are widely available. There is no risk of unfair prejudice in
telling the jury the dollar value of cryptocurrencies seized from the defendant's cryptocurrency
wallets.

---

[1] The Defendant's motion is Doc. 202.

**Table of Contents**

1. STATEMENT OF FACTS ...................................................................................... 2

    1.1    Cryptocurrency ............................................................................................ 2

    1.2    Engaged in Peer-to-Peer Exchanges ........................................................... 3

    1.3    Present and Historical Values ...................................................................... 6

    1.4    Defendant's Devices .................................................................................... 9

    1.5    Auction...................................................................................................... 10

    1.6    Earnings from Drug Trafficking ................................................................ 11

2      ARGUMENT.................................................................................................... 12

    2.1    The historical dollar value of Bitcoin is widely known and readily accessible.... 12

    2.2    The cryptocurrency seized from the defendant's wallets came solely from illicit activity.................................................................................................................. 14

    2.3    Revealing the auction price to the jury will not create unfair prejudice against the defendant because exchange rates can be easily explained. ............................... 15

    2.4    Unlike a commercial bank, cryptocurrency wallet software applications do not offer compounding interest to their customers. ............................................... 16

    2.5    Even if some of the cryptocurrency in the defendant's wallets was earned by his co-conspirators, the defendant has co-conspirator liability for all of the cryptocurrency found in his wallets. ....................................................................................... 17

## 1.      STATEMENT OF FACTS

      1.      The defendant and his co-conspirators manufactured Fentanyl-laced fake

Oxycodone and other illicit drugs.

      2.      The defendant, with help from his co-conspirators, sold those drugs on the Dark

Net, including on AlphaBay.

      3.      Customers paid the defendant with Bitcoin.

**1.1    Cryptocurrency**

      4.      Bitcoin is a cryptocurrency.

360

5.      Cryptocurrencies are decentralized digital currencies; cryptocurrencies have no centralized administering authority such as a national bank or the Federal Reserve.

6.      Cryptocurrencies are open source and math based; they use a global network of participants to validate transactions, which are recorded on a publicly accessible ledger called the blockchain. The exchange rate of a cryptocurrency follows basic economic principles, such as supply and demand.

7.      Bitcoin has been acknowledged by the US Treasury. It can be used to conduct legitimate transactions at businesses in Utah and throughout the world, including, for example, at Overstock.com.

8.      Cryptocurrencies are held in digital "wallets." Wallets are software programs.

9.      Cryptocurrencies can be exchanged for fiat currencies, like US Dollars.

10.     Cryptocurrency-to-dollar exchanges happen with the aid of an exchanger.

11.     Exchangers can be (1) commercial online exchangers; (2) cryptocurrency ATMs or kiosks; or (3) peer-to-peer exchangers.

12.     The defendant and his co-conspirators mostly used peer-to-peer exchangers to convert their Bitcoin into US Dollars.

**1.2     Engaged in Peer-to-Peer Exchanges**

13.     The defendant set up Bitcoin-for-US Dollar exchanges frequently. United States proposed Exhibits 14.00, 14.02, 14.03, 14.20, and 14.21 show numerous examples of the defendant setting up peer-to-peer exchanges. Here is an example from proposed exhibit 14.02. The blue texts came from the defendant. The grey responses are from his buyer:



**Local User** — Sent 3/30/2016 10:07:48 PM
Hey it's airshamu4 from localbitcoins, I'm finally feeling above water, can you meet around 530?

**+14356120402** — Received 3/30/2016 10:08:59 PM
Yeah I can do that. Give me an address.

**Local User** — Sent 3/30/2016 10:11:14 PM
Cool, you ok at a public place? Starbucks - 3158 e. 6200 s. Cottonwood heights

**+14356120402** — Received 3/30/2016 10:13:50 PM
That sounds fine. i'll be there.

**+14356120402** — Received 3/30/2016 11:07:59 PM
Probably going to be a few minutes late. Dealing with some gnarly traffic right now. Sorry

GOVERNMENT EXHIBIT
**14.02**
2:16CR 631 DAK

**+14356120402** — Received 3/30/2016 11:28:19 PM
Just arrived

**Local User** — Sent 3/30/2016 11:28:31 PM
2 min away

**Local User** — Sent 3/30/2016 11:28:37 PM
Sorry traffic got me too

**+14356120402** — Received 3/30/2016 11:28:54 PM
All good. I'm on the couch.

4



13.1    The defendant starts by identifying himself by the username he used on "Localbitcoins"—a website that connects bitcoin buyers and sellers. Once they meet up to make the trade, the buyer texts his cryptocurrency wallet address to the defendant; the wallet address is the long string of characters that begins with 1HBE2Q. The defendant needed the buyer's wallet address in order to transfer Bitcoin to the buyer.

13.2    Nine days after their first transaction, the buyer asked the defendant if he could buy "$5k" of bitcoin from the defendant. The defendant indicated he could sell "15k" worth of Bitcoin to the buyer.

5

### 1.3 Present and Historical Values

14. The Bitcoin Blockchain is publicly accessible. For example, it can be accessed online at Blockchain.info (which now redirects to Blockchain.com; (last checked May 8, 2019)).

15. Blockchain.info also shows current and historical dollar values for bitcoin. Here, for example, is a screenshot (captured May 10, 2019) that shows the historical dollar value of bitcoin for the last two years:



6

16.     Here is a screenshot from Blockchain.info of the historical dollar value of Bitcoin from its inception until the present (captured May 10, 2019):



17.     The defendant visited Blockchain.info during the time period covering his criminal conduct, as demonstrated in proposed Exhibit 14.32, which contains a list of URLs the defendant visited.

18.     On November 22, 2016, one Bitcoin was worth $748.75USD (historical value shown on Blockchain.info).

19. A simple google search will reveal the dollar value of various world currencies, including bitcoin (screenshot taken on April 30, 2019):



20. Major cryptocurrency exchanges publish current and historical exchange rates. Here is a screenshot from the frontpage of one of those exchanges, Coinbase.com, taken on May 1, 2019. At the time of the screen shot, one Bitcoin was worth $5,298.51 USD:



8

21.     Like Coinbase, Bitstamp.net is a major exchange. Here is a screenshot showing current and historical dollar values for Bitcoin taken May 1, 2019. At the time of the screenshot, one Bitcoin was worth $5,298.20 USD:



### 1.4     Defendant's Devices

22.     On November 22, 2016, the defendant was arrested at his residence. His residence was searched.

23.     Agents seized computers, phones, and other electronic devices from the defendant and his residence.

24.     Agents searched those electronic devices for evidence of the defendant's crimes, including evidence of cryptocurrency transactions.

9

25.     Agents collectively spent well over one thousand man-hours searching for the defendant's cryptocurrency wallets and passwords to his wallets. The defendant did not assist agents as they worked to identify, access, and seize his cryptocurrency.

26.     Agents eventually gained accessed to most, but not all, of the defendant's cryptocurrency wallets and seized his cryptocurrency from the wallets to which the agents had access.

27.     In total, agents seized approximately 513.15 Bitcoins from the defendant's wallets.

28.     Agents also seized similar quantities of two other cryptocurrencies (Bitcoin Cash and Bitcoin Gold) that were created by "forks" in the blockchain.

29.     A "fork" is a change to the software of the digital currency network that creates two separate versions of the blockchain with a shared history. In practical terms, after the fork, the next time the software for the defendant's wallets was updated, the wallets held a new cryptocurrency in a quantity equal to the number of Bitcoins in the wallet.

**1.5     Auction**

30.     The United States moved the Court for an order to conduct an interlocutory sale of the defendant's Bitcoin and some other seized assets. The defendant and his co-defendants stipulated to the interlocutory sale.

31.     In February 2018, the defendant's 513.15 Bitcoins were auction off by the United States Marshal's Service for $5,357,950.38 USD. The auction yielded a net exchange value of $10,441.29 USD per Bitcoin.

10

### 1.6    Earnings from Drug Trafficking

32.     The United States will call an expert witness at trial, Special Agent Guy Gino, to educate the jury on, among other things, cryptocurrency, cryptocurrency wallets, the blockchain, and cryptocurrency exchanges.

33.     Special Agent Gino will testify that he reviewed the cryptocurrency found in the defendant's wallets and determined that none of the currency found in the defendant's wallets was created through "Bitcoin Mining"—a legitimate way to "earn" Bitcoin by working to validate transactions as part of the blockchain.

34.     United States' proposed Exhibit 16.10 shows wage-data reported to the State of Utah.  According to that data, the defendant did not earn legitimate wages after the first quarter of 2015.

35.     United States' proposed Exhibit 15.02 is a demonstrative summary of the defendant's AlphaBay transactions for which agents were able to capture data. It shows that the defendant and his co-conspirators earned $2,817,520.93 USD worth of Bitcoin from their drug sales on AlphaBay. That dollar amount was calculated by taking the US Dollar-to-Bitcoin exchange rate on the date of each of the 5,589 AlphaBay transactions for which agents captured data.

36.     Through the investigation, it was determined that none of the 513.15 Bitcoins seized from the defendant's wallets existed in those wallets prior to August 2016.

11

## 2   ARGUMENT

The United States urges the Court to deny the defendant's request to exclude references to the dollar value of cryptocurrencies because (1) the present and historical dollar value of Bitcoin is widely known and readily accessible from commercial exchanges; (2) the cryptocurrency seized from the defendant's wallets came solely from illicit activity; (3) revealing the auction price to the jury will not create unfair prejudice against the defendant because exchange rates can be easily explained; (4) unlike in a commercial bank saving or checking account, cryptocurrency wallet software applications do not offer compounding interest to their customers; and (5) even if some of the cryptocurrency in the defendant's wallets was "garnered" by his co-conspirators, the defendant has co-conspirator liability for all of the cryptocurrency found in his wallets.

The defendant cites to evidence rules 104 and 403 as justification for his request. Rule 104 requires the Court to decide preliminary questions, such as whether a witness is qualified, a privilege exists, or evidence is admissible; in so deciding, the Court is not bound by evidence rules, except rules covering legal privileges. Fed. R. Evid. 104(a).

Rule 403 is a rule of inclusion, not of exclusion; the law favors admission of all relevant evidence. *United States v. Watson*, 766 F.3d 1219, 1241 (10th Cir. 2014)(internal citations omitted). The rule carries a strong presumption for admissibility. *United States v. Grant*, 256 F.3d 1146, 1155 (11th Cir. 2001). "Within limits delineated in the Federal Rules of Evidence, the government is entitled to introduce all relevant, probative evidence at its disposal." *United States v. Burgess,* 576 F.3d 1078, 1099 (10th Cir. 2009). Relevant evidence should seldom be excluded; the application of Rule 403 should be "cautious and sparing." *United States v. Naranjo*, 710 F.2d 1465, 1469 (10th Cir. 1983).

Evidence that damages the defendant's case is not evidence constituting unfair prejudice. *United States v. Chalan*, 812 F.2d 1302, 1308 (10th Cir. 1987). Only unfair prejudice, that is, prejudice that suggests a decision on an emotional rather than an evidentiary basis, is prohibited by the rule. *Naranjo*; *supra; United States v. Nevels*, 490 F.3d 800, 805 (10th Cir. 2007) (internal citations omitted). "In performing the [Rule] 403 balancing, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *Nevels*, 490 F.3d at 805.

### 2.1 The historical dollar value of Bitcoin is widely known and readily accessible.

The defendant argues that the Court does not have enough evidence to find the historical dollar value of Bitcoin presented at trial will be correct. Doc. 202, at 2. This response is the United States' first opportunity to proffer evidence in that regard. The historical dollar value of Bitcoin is widely known and readily accessible on commercial exchanges. Cryptocurrencies seeking economic acceptance within regulated markets must be able to justify and track their value on market platforms. *Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213, 229 (E.D.N.Y. 2018).

Whether by google search or by referencing one of the major commercial exchanges, the present and historical dollar values of Bitcoin can be obtained quite easily, as demonstrated in the statement of facts above. The defendant knows well how to ascertain exchange rates—he repeatedly engaged in transactions where he either obtained Bitcoin for drugs or sold Bitcoin for US Dollars. He visited URLs that contained present and historical exchange rates. The proffered evidence regarding exchange rates should satisfy the Court as it makes its preliminary decisions under Rule 104(a) and Rule 403.

## 2.2    The cryptocurrency seized from the defendant's wallets came solely from illicit activity.

Contrary to the defendant's assertion, the United States can and has determined that none of the cryptocurrency seized from the defendant came from a legitimate source, such as Bitcoin mining. The defendant had no legitimate wages after the first quarter of 2015. The defendant earned at least $2.8 million USD worth of Bitcoin from selling controlled substances on AlphaBay. None of the Bitcoin seized from the defendant's wallets were awarded to him for Bitcoin mining—all the Bitcoin came as payment from other wallets.

None of the cryptocurrency seized from the defendant's wallets was received by those wallets prior to the dates alleged in the Indictment. The blockchain—the publicly accessible ledger that contains all the Bitcoin transactions from its creation until the present time—shows when the defendant's Bitcoin was transferred into his wallets. The defendant alleges the United States has not "sought to differentiate between amounts Mr. Shamo had prior to the dates of the allegations…" Doc. 202, at 3.

The defendant did not allege his seized Bitcoin pre-dated the crimes for which he was indicted —just that the United States had not analyzed his accounts to see if his cryptocurrency holdings pre-dated his charged criminal conduct. The defendant cited to no specific authority where a court held exclusion was the appropriate remedy when some of a defendant's drug trafficking proceeds were acquired by that defendant prior to the dates alleged in an Indictment.

But the Court does not have to determine whether exclusion is the correct remedy because the seized Bitcoin was, in fact, acquired by the defendant during the time period when he engaged in his continuing criminal enterprise (Count 1), from June 2015 through November 22, 2016.

14

Bitcoin, like other currencies, is fungible. Determining the date of deposit for a particular Bitcoin found in a wallet requires the application of one of several accounting methods, such as the first-in-first-out approach, the last-in-last-out approach, or the lowest intermediate balance approach. *See United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1159 (2d Cir.1986). The Tenth Circuit has limited the use of the lowest intermediate balance approach because the approach is an "equitable fiction." *In re Foster*, 275 F.3d 924, 927 (10th Cir.2001).

Under either a last-in-last-out approach or a first-in-first-out approach, the Bitcoin seized from the defendant was transferred into his wallets during the time period when he engaged in his continuing criminal enterprise. None of the 513.15 Bitcoins seized from the defendant's wallets existed in those wallets prior to August 2016, more than one year after the time period alleged in Count 1 began and only a few months before the defendant's arrest.

### 2.3 Revealing the auction price to the jury will not create unfair prejudice against the defendant because exchange rates can be easily explained.[2]

The defendant asserts no authority for his claim that informing the jury about the price for which the Marshal's Service auctioned off the defendant's 513.15 Bitcoins would have a "significantly prejudicial effect." *Id*. at 3. The United States has found none.

The correct test under rule 403 is not whether the evidence will have a prejudicial effect, but whether the evidence will create unfair prejudice. *United States v. Chalan*, 812 F.2d 1302,

---

[2] The defendant also argued that the "exchange rate amount of the E-currency seized in this matter is the subject of great debate." Doc. 202, at 3. The United States submits such is not the case. The exchange rate obtained by the Marshal's Service at the auction was $10,441.29 USD per Bitcoin. The Marshal's Service auctioned off 513.15 Bitcoins that agents had seized from the defendant's wallets. Those facts are not "slight estimation[s]" or, to the United States' knowledge, the subject of "great debate." *Id*.

15

1308 (10th Cir. 1987). Rule 403 is a rule of inclusion, not of exclusion; the law favors admission of all relevant evidence. *Watson*, 766 F.3d at 1241. The rule carries a strong presumption for admissibility. *United States v. Grant*, 256 F.3d 1146, 1155 (11th Cir. 2001).

There is no unfair prejudice in explaining to the jury that because of increases in the value of Bitcoin between the defendant's arrest and the auction, the auction price was $5,357,950.38 USD and the auction yielded a net exchange rate of $10,441.29 USD per Bitcoin. The United States also intends on informing the jury that the dollar-to-Bitcoin exchange rate on the date of the defendant's arrest was $748.75 USD. It will further inform the jury that the 513.15 Bitcoins seized from the defendant were worth approximately $384,221.06 USD on the date of his arrest. These are facts; these facts do not elicit emotions that override reason. They are not unfairly prejudicial.

### 2.4 Unlike a commercial bank, cryptocurrency wallet software applications do not offer compounding interest to their customers.

The defendant argued that the United States failed to consider compounding amounts of cryptocurrency in the defendant's wallets and that is another reason why the Court should exclude evidence of the value of the defendant's seized cryptocurrency. Doc. 202, at 3. The defendant cited to no specific authority suggesting exclusion was the appropriate remedy.

Here again, the Court does not have to determine whether exclusion is the correct remedy because the defendant's wallets—software applications—did not offer compounding interest to those who kept their cryptocurrency in the wallets.

Commercial banks and credit unions offer compounding interest on fiat currency kept in bank accounts because the banks and credit unions do not really keep a customer's money in an

16

account—that money is invested by the bank in loans or other investments. Unlike the U.S. dollar or any other fiat currency, Bitcoin is not backed by a government or other legal institution, it is decentralized and transferred peer-to-peer. Reuben Grinberg, *Bitcoin: An Innovative Alternative Digital Currency*, 4 Hastings Sci. & Tech. L.J. 159, 162 (2012).

Cryptocurrency wallets hold the actual currency. The software engineers who created the wallets cannot access the wallets without the owner's password. The cryptocurrency stays in the wallet until the owner transfers it. There is no compounding interest for cryptocurrency wallets. The software engineers generally earn their money by charging a small transaction fee for every transfer of cryptocurrency to or from the wallet.

### 2.5   Even if some of the cryptocurrency in the defendant's wallets was earned by his co-conspirators, the defendant has co-conspirator liability for all of the cryptocurrency found in his wallets.

The defendant is liable for the foreseeable acts of his co-conspirators. The defendant argued that the Court should exclude evidence of the dollar value of his seized cryptocurrency because the United States has not attempted to distinguish amounts of cryptocurrency garnered by co-conspirators. Doc. 202, at 3. The defendant cited to no specific authority suggesting exclusion was the appropriate remedy. Nor did the defendant explain how much of the seized cryptocurrency was, in his view, earned by co-conspirators.

But the Court does not have to determine whether exclusion is the correct remedy because the defendant is liable for the foreseeable acts of his co-conspirators. Under the doctrine of *Pinkerton v. United States*, the criminal act of one coconspirator, if it was committed within the scope of and in furtherance of the conspiracy, can be attributed to another coconspirator for the purpose of holding the latter responsible for the substantive offense, provided that the

17

criminal act was reasonably foreseeable as a necessary or natural consequence of the conspiracy. 328 U.S. 640, 647-48 (1946); *United States v. Lopez*, 271 F.3d 472, 480 (3d Cir. 2001); *see also United States v. Clark*, 717 F.3d 790, 808-09 (10th Cir. 2013) (holding that defendant guilty of conspiracy to commit securities and wire fraud was properly convicted of money laundering under Pinkerton theory of liability; it was reasonably foreseeable to him that money laundering, and the specific transaction at issue, would be undertaken to further the conspiracy).

Even if the Bitcoins seized from the defendant's wallets were earned by one of his co-conspirators, the defendant is still liable for the crime during which the Bitcoin was earned. All the seized Bitcoin was transferred into the defendant's wallets in the last four months of his very profitable criminal enterprise. Because he is liable for the crime, evidence of proceeds of the crime should not be excluded.

The United States asks the Court to deny the defendant's motion to exclude references to the dollar value of cryptocurrencies for the reasons stated above.

Respectfully submitted this 10th day of May, 2019.

JOHN W. HUBER
United States Attorney

*/s/ Michael Gadd*
MICHAEL GADD
Special Assistant United States Attorney

18

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE REFERENCES TO SOME OVERDOSE DEATHS |
| vs. | |
| AARON MICHAEL SHAMO, | |
| Defendant. | Judge Dale A. Kimball |

The United States, by and through Michael Gadd, Special Assistant United States

Attorney, urges the Court to deny in part the defendant's motion to exclude references to some

overdose deaths found in Doc. 203.[1] While the United States agrees that references to most of the

overdose deaths suffered by customers of Mr. Shamo would be unfairly prejudicial, there are a

few deceased customers whose deaths can be mentioned under Rule 403.

---

[1] In his motion filed as Doc. 203, the defendant also moved the Court to exclude photographs of R.K., who died from a fentanyl overdose and who is the listed victim in Count 6, Aiding and Abetting the Distribution of a Controlled Substance Resulting in Death. For clarity, the United States has responded to that request in a separate memorandum filed contemporaneously to this memorandum.

## STATEMENT OF FACTS

1. The defendant and his co-conspirators manufactured Fentanyl-laced fake Oxycodone and other illicit drugs.

2. The defendant, with help from his co-conspirators, sold those drugs on the Dark Net, including on AlphaBay.

3. Once a sale was made, the defendant and his co-conspirators would package and ship drugs to their customers.

4. The defendant and his co-conspirators compiled daily (or near-daily) order sheets that listed the shipping information provided by their customers along with the product and quantity the customers ordered.

5. Many of those daily order lists were recovered by investigators.

6. The combined daily order lists have been marked as United States' proposed Exhibit 14.30; Exhibit 14.30 is 1,984 pages in length.

7. Here is a redacted snippet from proposed Exhibit 14.30, for reference:

M Box 30 - Oxycodone 30 mg X250
Sale # 3449517 - Item # 171130 - Jul 12, 2016 - 09:06 - to trustworthymoney

Postage: Priority mail - 5 days - USD 3.75
Quantity: 2

hey pharma, this is for 500 of the m boxes. i didnt see a listing for 500 theres only 250 or 1000....so i just ordered quantity 2... u usually hook it up with extras anyway so its no problem. can i get tracking on my order. thanks


a████ l█████
█████ sw 76th ave #██
portland, oregon 97225

8. This order was for five hundred Fentanyl-laced fake Oxycodone pills, which the listing describes as "M Box 30 – Oxycodone 30 mg." The pills were ordered on July 12, 2016, by "trustworthymoney"—a drug dealer from Portland that agents subsequently identified

as J.G. The snippet includes a note from "trustworthymoney" explaining his order and asking for the ability to track the order once shipped. At the bottom of the snippet, the defendant or a co-conspirator included the name and shipping address provided to them by "trustworthymoney": A.L. on 76th Avenue in Portland.

9. Investigators have combed through more than one thousand of the 1,984 pages in Exhibit 14.30 looking for customers who have died from drug overdoses.

10. Investigators have identified more than eighty customers who died from drug overdoses.

11. The defendant is charged with Engaging in a Continuing Criminal Enterprise (Count 1), Aiding and Abetting the Distribution of a Controlled Substance Resulting in Death (Count 6), and eleven other counts.

12. Count 1, Engaging in a Continuing Criminal Enterprise, lists a series of predicate offenses, including:

- Aiding and Abetting the Distribution of Fentanyl on or about April 6, 2016, to E.B., all in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2;

- Aiding and Abetting the Distribution of Fentanyl on or about March 3, 2016, to C.V., all in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2; and

- Aiding and Abetting the Distribution of Fentanyl on or about August 3, 2016, to G.K., all in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2;

13. The three customers listed in those three predicate offenses, E.B., C.V., and G.K., all died of drug overdoses.

3

14. E.B. ordered forty-four Fentanyl-laced pills from Pharma-Master on April 5-6, 2016. The pills were delivered on April 13, 2016. E.B. died April 24, 2016, inside his dorm room after a night of partying. His toxicology screening showed he had Ethanol, Cocaine, Diazepam, and Fentanyl in his system at the time of his death.

15. C.V. ordered fourteen Fentanyl-laced pills from Pharma-Master. The last order was placed on March 3, 2016. C.V. overdosed and died on March 25, 2016, after using drugs with a friend in his apartment the prior evening. The friend found C.V. dead on the 25th. C.V. died with Cocaine, Fentanyl, and Alprazolam in his system.

16. G.K. ordered sixty Fentanyl-laced pills from Pharma-Master. The last order, for twenty pills, was placed on August 3, 2016. On the evening of August 12, 2016, G.K. went to party with friends, but became separated from his group. A passerby found him the following morning dead in the grass outside an apartment complex. Police officers found pills marked as if they were Oxycodone pills on G.K.'s person. G.K. died with Fentanyl, Alprazolam, and Ethanol in his system.

17. The deceased victim listed in Count 6 is R.K. Facts related to R.K.'s overdose death have been filed in a contemporaneous memorandum regarding photos from the scene of R.K.'s death and are incorporated herein by reference. R.K.'s friend and roommate, G.L., died of an overdose while this case has been pending trial.

18. The envelope of pills that killed R.K. was addressed to G.L. G.L. and his girlfriend watched R.K. crush and snort two of the pills. G.L. rolled R.K. into the recovery position and checked on R.K. several times during the night before R.K. died. G.L. found R.K. dead the following morning.

ARGUMENT

The United States agrees that it would be unfairly prejudicial to make reference to most of the overdose deaths of the defendant's customers in order to prove the crimes charged in the Indictment. The defendant conceded in his motion that it would be proper for the United States to present evidence about R.K.'s death—the victim from Count 6. The only deceased customers in dispute are three of the customers listed in predicate offenses to Count 1—E.B., C.V., and G.K.—and G.L., who was R.K.'s roommate and friend. The United States urges the Court to deny the defendant's motion with respect to those four decedents because referring to their deaths is necessary to explain (1) why each of the three deceased customers was not interviewed by agents, and (2) why none of those four decedents are available to testify. Such testimony will not unfairly prejudice the defendant.

Rule 403 is a rule of inclusion, not of exclusion; the law favors admission of all relevant evidence. *United States v. Watson*, 766 F.3d 1219, 1241 (10th Cir. 2014)(internal citations omitted). The rule carries a strong presumption for admissibility. *United States v. Grant*, 256 F.3d 1146, 1155 (11th Cir. 2001). "Within limits delineated in the Federal Rules of Evidence, the government is entitled to introduce all relevant, probative evidence at its disposal." *United States v. Burgess,* 576 F.3d 1078, 1099 (10th Cir. 2009). Relevant evidence should seldom be excluded; the application of Rule 403 should be "cautious and sparing." *United States v. Naranjo*, 710 F.2d 1465, 1469 (10th Cir. 1983).

Evidence that damages the defendant's case is not evidence constituting unfair prejudice. *United States v. Chalan*, 812 F.2d 1302, 1308 (10th Cir. 1987). Only unfair prejudice, that is, prejudice that suggests a decision on an emotional rather than an evidentiary basis, is prohibited by the rule. *Naranjo*; *supra; United States v. Nevels*, 490 F.3d 800, 805 (10th Cir. 2007) (internal

citations omitted). "In performing the [Rule] 403 balancing, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *Nevels*, 490 F.3d at 805.

Evidence of the death of a person involved in a drug trafficking offense is not *per se* unfairly prejudicial; references to the death can have strong probative value. In *United States v. Paredes*, the trial court allowed evidence of a courier's overdose death to be presented to the jury despite some risk the jury might improperly attribute the death to Paredes, the courier's boss. 176 F. Supp. 2d 179, 182 (S.D.N.Y. 2001). Paredes was indicted for drug trafficking conspiracy offenses; the government sought to admit evidence at trial that while bringing a load of heroin into New York from Canada, the defendant's courier overdosed on heroin and died. *Id*. at 180-182. Paredes allegedly told another co-conspirator that the courier's body should be brought back to Canada in order to prevent law enforcement detection of Paredes' drug trafficking. *Id*. at 180-81. The court reasoned that while there was some risk that the jury might react unfavorably to the proposed testimony and conjecture that Paredes was responsible for his courier's death, there was strong probative value to the evidence. *Id*. at 182. The evidence of the courier's overdose death would help prove the elements of the conspiracy counts and help corroborate the co-conspirator's statements about Paredes efforts to avoid detection. *Id*. The court determined that the probative value outweighed the risk of unfair prejudice and allowed the evidence to be presented to the jury. *Id*.

The risk of unfair prejudice was higher in *Paredes* than in this case, but the court in *Paredes* allowed the evidence of the courier's heroin-overdose death to be presented to the jury. The United States asks the Court to deny the defendant's motion as it relates to E.B., C.V., G.K., and G.L. Distribution of fentanyl to E.B., C.V., and G.K. has been charged as a predicate

6

offense to Count 1. The United States will not present evidence that the defendant's pills were the cause of death for E.B., C.V., and G.K. Nor will the United States present evidence that E.B., C.V., and G.K. died from drug overdoses.

But the United States intends to briefly ask its investigator whether she interviewed E.B., C.V., and G.K. when she investigated the defendant's distribution of Fentanyl to them. To that question, the investigator will simply respond that her investigation revealed each died on his respective date of death, and, accordingly, she did not interview E.B., C.V., or G.K. because all three died prior to the beginning of her investigation.

There is little prejudicial effect in having an investigator explain why she was prevented from conducting a full investigation. Conversely, it is highly important for the investigator to explain why she did not interview the three customers—otherwise the jury will be left to wonder why the investigation was apparently incomplete with regards to the charges that the defendant aided and abetted the distribution of Fentanyl to E.B., C.V., and G.K.

Similarly, the United States intends to elicit from G.L.'s former girlfriend that G.L. is unavailable to testify because he is dead. Because G.L. died after the conclusion of the defendant's drug trafficking, there is very little risk the jury will improperly seek to hold the defendant accountable for G.L.'s death. But without explaining why G.L. cannot testify, the jury will be left to wonder why the United States has not presented its best evidence.

The United States would not oppose a limiting instruction that informed the jury that no evidence was presented that connected the defendant with the death of E.B., C.V., G.K., or G.L. It could also explain that the only reason the jury heard testimony about each of their deaths was to explain why they were not interviewed or why they cannot testify in front of the jury.

Rule 403, which is a rule of inclusion, does not prevent the United States from eliciting testimony about why the decedents were not interviewed or cannot testify. With the United States' assurances that it will not elicit testimony or offer evidence that the three deceased customers overdosed or that the defendant's fentanyl was the cause of death, the Court should deny the defendant's motion, in part, by allowing the United States to elicit from its witnesses that (1) E.B., C.V., and G.K. were not interviewed, and that (2) E.B., C.V., G.K., and G.L. cannot testify, because they are dead.

Respectfully submitted this 10th day of May, 2019.

JOHN W. HUBER
United States Attorney


*/s/ Michael Gadd*
MICHAEL GADD
Special Assistant United States Attorney

8

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE PHOTOGRAPHS OF R.K. |
| vs. | |
| AARON MICHAEL SHAMO, | Judge Dale A. Kimball |
| Defendant. | |

The United States, by and through Michael Gadd, Special Assistant United States
Attorney, urges the Court to deny the defendant's motion to exclude photographs of its deceased
victim, R.K.[1] The photographs of R.K. that the United States intends to admit into evidence have
important, probative value, and the risk of unfair prejudice is fairly low.

## STATEMENT OF FACTS

1. The defendant and his co-conspirators manufactured Fentanyl-laced fake Oxycodone and
   other illicit drugs.

---

[1] In his motion filed as Doc. 203, the defendant also moved the Court to exclude references to
more than eighty of the defendant's customers who have died from drug overdoses. For clarity,
the United States has responded to that request in a separate memorandum filed
contemporaneously to this memorandum.

2. The defendant, with help from his co-conspirators, sold those drugs on the Dark Net, including on AlphaBay.

3. R.K. and his roommate, G.L., ordered Fentanyl-laced fake Oxycodone pills from PHARMA-MASTER, the defendant's AlphaBay storefront, in April 2016, and again on June 6, 2016.

4. The June 6th order was for ten pills that PHARMA-MASTER advertised as Roxy-Oxycodone. The June 6th order was processed and shipped out of Utah on June 9th.

5. It arrived at R.K. and G.L.'s residence on June 11th.

6. On June 12th, in the late evening, R.K. crushed and snorted two of the Fentanyl-laced fake Oxycodone pills in his room.

7. R.K. began exhibiting the effects almost immediately. R.K. asked G.L. and G.L.'s girlfriend to check on him while R.K. laid down in bed. R.K. fell asleep shortly thereafter.

8. G.L. rolled R.K. into the recovery position in an effort to prevent R.K. from asphyxiating should R.K. vomit during the night. G.L. and his girlfriend went to sleep.

9. The following morning, G.L. found R.K. in bed, still in the recovery position. R.K. was cold to the touch and G.L. called for help. Medical personnel arrived shortly thereafter and pronounced R.K. dead.

10. The local police department took photographs while at the scene as part of their investigation. The United States has marked photographs of R.K. and the scene of his death as proposed exhibit 18.01. The three pages showing some portion R.K.'s deceased body from proposed Exhibit 18.01 are as follows:

3





4



11. R.K.'s body was taken to the coroner's office, where Dr. Thomas Rogers performed an autopsy. Dr. Rogers determined that there was no other cause of death other than intoxication from the drugs found in R.K.'s blood toxicology report. Bill Posey, the toxicologist who analyzed R.K.'s blood, found alcohol, a cocaine metabolite, a cocaine cutting agent, and Fentanyl in R.K.'s blood.

5

12. Dr. Stacey Hail, who studies overdose causes of death and who teaches and practices

medicine, reviewed the case, including Dr. Rogers' report and Bill Posey's report. Dr.

Hail concluded that despite having ethanol and a cocaine metabolite present in his

bloodstream, Fentanyl intoxication was the but-for cause of death of R.K.

13. Dr. Hail wrote a report that contained her findings. Dr. Hail included several pictures

from the scene of R.K.'s death, including the close-up photo above that shows blood and

mucus on R.K.'s face.

14. The death-scene pictures helped Dr. Hail form her expert opinion. She wrote:

The opioid toxidrome presents with pinpoint pupils, central nervous system (CNS)
depression and respiratory depression or apnea (cessation of breathing.) Death occurs by
falling asleep and ultimately apnea. In other words, opioid toxic patients go to sleep,
eventually stop breathing, and die. They are most often found dead in bed. . . . **RK had
blood, mucus, fluids and gastric contents about his face, nose and mouth consistent with
opioid intoxication.** RK's lung parenchyma was prominently congested and edematous--also
consistent with opioid intoxication. (emphasis added).

15. Dr. Hail concluded her report:

RK was found dead on 6/13/2016 after snorting 2 pills of fentanyl. RK did not die while
demonstrating any signs of the toxidrome associated with cocaine use. RK's autopsy did not
reveal the typical findings that are associated with sudden death in acute or chronic cocaine
use. RK did not have a tongue laceration or abrasion from a cocaine-induced seizure. RK did
have pulmonary edema which is associated with an opioid death. Evidence revealed that he
snorted 2 fentanyl pills, fell asleep and died consistent with the opioid toxidrome. RK would
not have died but for the fentanyl.

16. R.K.'s death is listed in the Indictment in several places.

17. The defendant is charged with Engaging in a Continuing Criminal Enterprise (Count 1),

Aiding and Abetting the Distribution of a Controlled Substance Resulting in Death

(Count 6), and eleven other counts. Count 6 specifically lists the death of R.K. on June

13, 2016.

6

18. Count 1, Engaging in a Continuing Criminal Enterprise, lists a series of predicate

offenses, including:

- Conspiracy to Distribute a Controlled Substance Resulting in Death, which specifically

  cites to R.K.'s death on June 13, 2016; and

- The violation alleged in Count 6, Aiding and Abetting the Distribution of a Controlled

  Substance Resulting in Death.

ARGUMENT

The United States urges the Court to deny the defendant's request to exclude pictures of

R.K. The United States has narrowed down its pictures to three photographs that depict some

portion of R.K.'s deceased body. The photographs have important evidentiary value to the

United States generally, and specifically to the testimony of its expert, Dr. Stacey Hail. The three

photographs do not incite the passion of those who view them to a degree that a jury might make

an emotion decision rather than a decision based upon the evidence.

Rule 403 is a rule of inclusion, not of exclusion; the law favors admission of all relevant

evidence. *United States v. Watson*, 766 F.3d 1219, 1241 (10th Cir. 2014)(internal citations

omitted). The rule carries a strong presumption for admissibility. *United States v. Grant*, 256

F.3d 1146, 1155 (11th Cir. 2001). "Within limits delineated in the Federal Rules of Evidence, the

government is entitled to introduce all relevant, probative evidence at its disposal." *United States

v. Burgess*, 576 F.3d 1078, 1099 (10th Cir. 2009). Relevant evidence should seldom be excluded;

the application of Rule 403 should be "cautious and sparing." *United States v. Naranjo*, 710 F.2d

1465, 1469 (10th Cir. 1983).

Evidence that damages the defendant's case is not evidence constituting unfair prejudice.

*United States v. Chalan*, 812 F.2d 1302, 1308 (10th Cir. 1987). Only unfair prejudice, that is,

7

prejudice that suggests a decision on an emotional rather than an evidentiary basis, is prohibited by the rule. *Naranjo*; *supra; United States v. Nevels*, 490 F.3d 800, 805 (10th Cir. 2007) (internal citations omitted). "In performing the [Rule] 403 balancing, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *Nevels*, 490 F.3d at 805.

A trial court properly admitted photographs that depicted severe injuries in conjunction with the testimony of a pathologist because the photographs were a substantial aid in illustrating the testimony of the pathologist. *United States v. Soundingsides*, 820 F.2d 1232, 1243 (10th Cir. 1987). In *Soundingsides*, the primary cause of death was a blunt force injury to the head of the victim. *See id.* at 1234. The prosecution sought to admit photos that displayed the victim's severe injuries in graphic detail. *See id.* Defense counsel objected on the grounds that "the photographs and slides were "not necessarily relevant," and were "so outrageous that they are much more likely to inflame the jury than to produce any appropriate evidence." *Id.* at 1243. The court ruled that although the photos were "undeniably gruesome," they had considerable probative value in proving the nature of [the victim's] injuries and the cause of her death. *See id.* The Tenth Circuit held that "[i]n light of this probative worth, their admission was not unduly prejudicial." *Id.*

Photographs that showed the victim's head and body face down in a pool of blood were not more prejudicial than probative because, although gruesome, they allowed the medical examiner to show the extent of the various injuries to the victim. *Wilson v. Sirmons*, 536 F.3d 1064, 1115 (10th Cir. 2008), *opinion reinstated sub nom., Wilson v. Workman*, 577 F.3d 1284 (10th Cir. 2009). In *Wilson v. Sirmons*, Wilson was convicted of first-degree murder and robbery with a dangerous weapon for his role in a murder of a convenience store clerk. *See id.* at 1072. Wilson challenged the admission of photographs admitted at trial that showed the victim's body

at the crime scene as more prejudicial than probative. *See id.* at 1114. On habeas review, the 10th circuit ruled that the photographs were gruesome, but still relevant to the case because they allowed the medical examiner to show where the murder weapon caused the injuries and the extent of the injuries. *See id.* at 1115.

Other courts have held similarly. *See also Williams v. Trammell,* 782 F.3d 1184, 1203 (10th Cir. 2015) (concluding that "photographs of a victim's body, while gruesome, can be relevant when they depict the extent of injuries"); *United States v. Naranjo,* 710 F.2d 1465, 1468 (10th Cir. 1983) ("gruesomeness alone does not make photographs inadmissible"); *United States v. Fields*, 483 F.3d 313, 355 (5th Cir. 2007)(gruesome photographs were probative because they helped the jury understand the medical examiner's testimony and supported his theory of the case); *United States v. Collins,* 368 F. App'x 517, 521 (5th Cir. 2010) (probative value of photographs outweighed prejudicial impact where the photos corroborated medical examiner's testimony about the cause of death); *United States v. Davidson*, 122 F.3d 531, 538 (8th Cir. 1997) (gruesome autopsy photographs were properly admitted when they helped explain the testimony of the doctor that performed the autopsy).

The United States asks the Court to deny the defendant's motion to exclude the highly-probative photographs of R.K.'s deceased body that the United States seeks to introduce. The close-up picture of R.K.'s face shows signs—blood and mucus—that Dr. Hail recognized as symptomatic of opioid intoxication. Dr. Hail relied upon that picture when determining that Fentanyl was R.K.'s but-for cause of death. The United States will ask the jury to consider that same evidence, the blood and mucus on R.K.'s face, when they decide whether Fentanyl was the but-for cause of death. The jury needs to see the photograph in order to make an informed decision.

9

The picture of R.K. on the carpet shows his position in the room. He was next to the bed where he died. The two black dots show where EMS personnel tried to save him and also help explain why his body was moved from his bed. It also gives spatial context for the third picture.

The third picture, which depicts R.K.'s legs, gives additional context to where R.K. died with respect to the USPS envelope that contained the defendant's drugs and the battery and toot-straw R.K. used to crush up and snort the defendant's pills. The USPS envelope is on top of the trash can near R.K.'s feet. The battery and toot-straw were found on R.K.'s desk, pictured in the background.

None of the pictures evokes an overpowering emotional response. There are no open, gaping wounds. There is little blood. These three pictures are not equal to the gruesomeness of the photographs in *Soundingsides* or *Wilson*. They should be admitted.

The United States has worked to cull down its available pictures to three that show R.K.'s deceased body; because there are only three pictures, there is little chance of overwhelming the jury with blood or gore. The pictures being proffered by the United States are probative in nature and necessary for the testimony of the expert witness supporting the charge of Count 6.

Rule 403 is a rule of inclusion. These pictures represent some of the United States' best evidence for Count 6 and two of the predicate offenses listed in Count 1. The pictures should not be excluded.

Respectfully submitted this 10th day of May, 2019.

JOHN W. HUBER
United States Attorney

*/s/ Michael Gadd*
MICHAEL GADD
Special Assistant United States Attorney

10

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 349-7187
Email: kburggraaf@agutah.gov / kent.burggraaf@usdoj.gov

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631 DAK |
| Plaintiff, | **UNITED STATES' REQUEST TO SUBMIT FOR DECISION** |
| v. | |
| AARON MICHAEL SHAMO, | Judge Dale A. Kimball |
| Defendant. | |

The United States of America, by and through Kent A. Burggraaf, Special Assistant United States Attorney, hereby requests that the following motions be submitted for decision.

1. Defendant's Motion for James Hearing and Notification of Oral Testimony (Doc. 169), filed and electronically served on December 7, 2018. A response was filed and electronically served on defense counsel by the United States on December 21, 2018. This response was filed under seal, due to its contents containing grand jury material. No reply was filed and the time has passed for filing a reply. This motion is now ready for a decision.

2. Defendant's Motion in Limine for Order Excluding Evidence (Doc. 171), filed and electronically served on December 7, 2018. A response was filed and electronically served by the

United States on December 21, 2018 (Doc. 176).  No reply was filed and the time has passed for filing a reply.  A hearing was not requested by either party.  This motion is now ready for a decision.

       3.     Defendant's Motion to Allow Defendant to Wear Attire Other than Those Provided as an Inmate During Trial and Pre-Admission Hearing and Memorandum in Support (Doc. 172), filed and electronically served on December 7, 2018.  A response was filed and electronically served by the United States on December 20, 2018, stipulating to the Defendant's request to allow him to appear at the pre-admission hearing and jury trial in a suit provided to him by his family prior to the proceedings (Doc. 174).  No reply was filed and the time has passed for filing a reply. A hearing was not requested by either party.  The motion is now ready for a decision.

      RESPECTFULLY submitted on this 15th day of May, 2019.

JOHN W. HUBER
United States Attorney

*/s/ Kent A. Burggraaf*
KENT A. BURGGRAAF
Special Assistant United States Attorney

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

---

## IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | REPLY TO THE DEFANDANT'S RESPONSE TO MOTION TO STRIKE DEFENDANT'S EXPERT DR. TERRI HADDIX |
| vs. | |
| AARON MICHAEL SHAMO, | |
| Defendant. | Judge Dale A. Kimball |

The United States, by and through Michael Gadd, Special Assistant United States Attorney, provides the following reply to the defendant's response to the United States' Motion to Strike Defendant's Expert Dr. Terri Haddix. The defendant's expert notice leaves the United States with very little information about Dr. Haddix's opinions, the "bases and reasons for those opinions," and no way of adequately assessing the proffered testimony to prepare for cross-examination.

The Rule 16 notice for Dr. Haddix is insufficient. The Court should not allow Dr. Haddix to testify. A defendant's expert summary is required to include the "witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P, 16(b)(1)(C).

While the defendant has provided the curriculum vitae of Dr. Terri Haddix, he has failed to provide the opinions of Dr. Haddix and the basis of her opinions. The defendant argues in his response that Dr. Haddix's opinions were adequately summarized in her initial notice.[1] The defendant's notice of expert included two sentences simply stating Dr. Haddix had reviewed the data and information provided by the United States with respect to Count 6 and would testify to causational elements of R.K.'s death and to "specific" [but unnamed] information relating to the autopsy of R.K. Doc. 200-1 at 1. These declarations do not convey any opinions Dr. Haddix plans to express when she testifies, nor the bases on which those opinions rely.

In his response, the defendant failed to address the binding case law cited in the United States' initial motion and instead relied on a non-binding, unpublished order from the district of New Mexico.[2] Binding precedent is clear. Notice must include "the witness's opinions, the bases and reasons for those opinions, and the witness's qualification."[3]

The defendant asserts that his brief notice is permissible based upon the rational of a non-binding and unpublished order in *United States v. Galloway*, No. 1:17-CR-01235-WJ, 2018 WL 2303106, (D.N.M. May 21, 2018) (unpublished).[4] The *Galloway* case has not yet been tried to a jury; the court in *Galloway* could revisit its ruling. The defendant erroneously contends that expert notices in *Galloway* are analogous to the current case.

The defendant's argument relies on the notices given for Ann Burgess, a rape trauma expert, and Sherrie Cordova, a sexual assault nurse, both experts for the Government whose

---

[1] Response to Motion to Strike Defendant's Expert Terri Haddix, Doc. 209; Notice of Expert Dr. Terri Haddix, Doc. 200-1.

[2] Motion to Strike Defendant's Expert Terri Haddix, Doc. 200.

[3] Fed R. Crim. P. 16(b)(1)(C).

[4] Cited in the Defendant's Response as *United States v. Galloway,* 2018 U.S. Dist. LEXIS 85766.

notices were opposed by Galloway and her co-defendants. Those notices do not support the defendant's argument because (1) Ms. Cordova's notice led the court to require more information to be provided to Galloway and her co-defendants once it was available to the United States; and (2) the notice of Ms. Burgess was only specific enough to suffice as adequate notice because it detailed explicit examples of issues regarding human trafficking which she was going to address in her testimony. Also, (3) the defendant failed to address that the notice of Mr. Jay Stuart, a ballistics expert for the Government in *Galloway*, which was found to be insufficient despite having been supplemented by two highly technical ballistic reports. *Id.* The unpublished order in *Galloway* does not support the defendant's insufficient notice for Dr. Terri Haddix.

### 1. The Government's Notice Regarding Ms. Cordova was Insufficient and Required Supplementation

The court in *Galloway* remarked that the notice of Ms. Sherrie Cordova, which stated that she was, "to give her opinion 'based on her relevant findings'," was "sketchy" because it did not provide Galloway or her co-defendants with "any direction or indication of exactly what Ms. Cordova's opinion might be." *Id. at 5.* The Government was waiting to receive the official Sexual Assault Nurse Examination report from Ms. Cordova—the report on which her testimony would be founded. *Id.* at 5. The court required that the notice be supplemented with "more specific information as to the nature of Ms. Cordova's opinions on receipt of the report". *Id.* This example is in no way equivalent to the notice provided by the defendant regarding Dr. Haddix. The defendant claimed in November 2018 that Dr. Haddix was drafting a report that will presumably state her opinions. Doc. 200-1 at 1. No report has been given to the United States.

3

## 2. The List of *Explicit* Examples That Would be Addressed by Ms. Burgess in Her Testimony was Found to not Be Overly General and Constituted Valid Notice

The defendant asserts that merely giving notice of the general areas of which the expert would be testifying is sufficient notice under Rule 16.[5] The defendant based this argument on the example of the Ms. Burgess in *Galloway*. In *Galloway*, Ms. Burgess' notice was deemed to have satisfied Rule 16 because it was "specific enough to provide sufficient notice" to allow for adequate trial preparation. *Id.* at 4. The notice stated that Ms. Burgess would, "testify regarding her expertise in the areas of children who are exploited through sex rings, female juvenile prostitution, coping behavior of the rape victim, post-traumatic stress and rape trauma, and delayed reporting." *Id.* These examples provided within the notice are concise and state how the expert testimony will be helpful to the jury. They explicitly state what Ms. Burgess' testimony would include and are in no way as general as the defendant asserts. And the *Galloway* court's order does not indicate whether Ms. Burgess had authored reports that had been given previously to Galloway and her co-defendants in discovery.

This example proffered by the defendant is distinguishable from his current notice for Dr. Haddix. In *Galloway*. Burgess' notice included specific features of human trafficking that would be addressed within her testimony. Conversely, the notice provided by the defendant merely asserts that Dr. Haddix will testify generally to the causational elements of R.K.'s death and to "specific" [but unnamed] information relating to the autopsy of R.K. Doc. 200-1 at 1. If the defendant provides the United States a detailed report from Dr. Haddix and adds specificity to its notice, the Court might be placed in a better position to find Dr. Haddix's notice sufficient.

---

[5] Response to Motion to Strike Defendant's Expert Terri Haddix, Doc. 209.

### 3. The Defendant Failed to Address the Notice of Mr. Stuart, Which was Deemed Inadequate Due to Lack of Detail Despite Having Two Technical Reports Attached

In *Galloway*, the government wrote the following in its notice of ballistic expert Mr. Jay Stuart. "Mr. Stuart will testify as to the results of ballistic analysis on ammunition and firearms recovered during two homicide investigations." *Id.* at 3. The reports mentioned were provided as exhibits. *Id.* However, despite the notice having been supplemented with highly detailed reports, the court in *Galloway* ruled that there was no way "to infer from the Notice exactly what Mr. Stuart's opinion will be." *Id*. The court reasoned that although the reports were provided with the notice, Galloway and her co-defendants had no way to infer "exactly what Mr. Stuart's opinion will be." *Id.* The government was ordered to provide Mr. Stuart's exact opinion. *Id*.

The example of Mr. Stuart directly conflicts with the rational utilized by the defendant regarding the notice of Dr. Haddix. The government's brief notice for Mr. Stuart is just like the notice provided by the defendant for Dr. Haddix—neither included the expert's opinions. As was found with Mr. Stuart, such general statements are insufficient to satisfy Rule 16. Furthermore, Mr. Stuart's notice was deemed insufficient despite the inclusion of two highly technical ballistic reports that clarified his future testimony. The defendant has provided no such reports or any additional documentation from Dr. Haddix that might help the United States infer what her opinions will be.

The *Galloway* court recognized that for complex scientific testimony or testimony on other technical areas, disclosure obligations increased. *Id*. at 4 (*citing United States v. Goxcon-Chagal*, 886 F. Supp. 2d 1222, 1254 (D. N.M. 2012); *United States v. Jackson*, 51 F. 3d 646, 651

5

(7th Cir. 1995)). Dr. Terri Haddix's proposed testimony about forensic pathology is complex scientific testimony that requires more disclosure from the defendant.

The defendant elected to forego addressing the binding law cited by the United States in its motion to exclude Dr. Haddix's testimony. Instead, the defendant cited to a non-binding, unpublished pre-trial order. Because the notice for Dr. Terri Haddix was insufficient, the United States continues to respectfully urge the Court to prohibit Dr. Haddix from testifying at trial.

Respectfully submitted this 17th day of May, 2019.

JOHN W. HUBER
United States Attorney

*/s/ Michael Gadd*
MICHAEL GADD
JOHN W. HUBER
United States Attorney

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
|---|---|
| Plaintiff, | REPLY TO THE DEFANDANT'S RESPONSE TO MOTION TO STRIKE DEFENDANT'S EXPERT KELLY SHAFTO |
| vs. | |
| AARON MICHAEL SHAMO, | |
| Defendant. | Judge Dale A. Kimball |

The United States, by and through Michael Gadd, Special Assistant United States

Attorney, provides the following reply to the defendant's response to the United States' Motion

to Strike Defendant's Expert Kelly Shafto.  The defendant's expert notice, even as amended,

continues to leave the United States with very little information about Ms. Shafto's opinions, the

"bases and reasons for those opinions," and with no way of adequately assessing the proffered

testimony to determine whether to file a *Daubert* challenge or adequately prepare for cross

examination.

The Court should not allow Kelly Shafto to testify because defendant's Rule 16 notice

was insufficient.   A defendant's expert summary is required to include the "witness's opinions,

the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P,

16(b)(1)(C).

While the defendant has recently provided the curriculum vitae of Kelly Shafto, he has failed to provide the opinions of Ms. Shafto and the basis of her opinions. The defendant argues in his response that Ms. Shafto's opinions were adequately summarized in his initial notice.[1] The defendant's notice of expert, which was not substantially different when compared to his amended notice, included three sentences simply stating Ms. Shafto had reviewed the provided information and would be testifying to the general background of the case and the techniques and practices employed within the investigation. These assertions do not convey the opinions Ms. Shafto plans to express when she testifies, nor the bases on which those opinions rely.

In his response, the defendant failed to address the binding case law cited in the United States' initial motion and instead relied on a non-binding, unpublished order from *United States v. Galloway, et al*, from the district of New Mexico.[2] Binding precedent is clear. Notice must include "the witness's opinions, the bases and reasons for those opinions, and the witness's qualification."[3]

The defendant asserts that his brief notice is permissible based upon the rational of a non-binding and unpublished order in *United States v. Galloway*, No. 1:17-CR-01235-WJ, 2018 WL 2303106, (D.N.M. May 21, 2018) (unpublished).[4] The defendant erroneously contends that expert notices in *Galloway* are analogous to the current case.

---

[1] Response to Motion to Strike Defendant's Expert Kelly Shafto, Doc. 208; Notice of Expert, Doc. 199-1; *see also* Amended Notice of Expert, Doc. 206. The defendant argued that the United States was "very familiar" with Ms. Shafto and that she testified in a federal drug case (presumably in the District of Utah) within the last year. Doc. 208 at 5-6. The three assigned prosecutors for the United States have never heard of Ms. Shafto. To the best of their memories, Ms. Shafto did not testify in a federal drug trial in Utah in the last year.

[2] Motion to Strike Defendant's Expert Kelly Shafto, Doc. 199.
[3] Fed R. Crim. P. 16(b)(1)(C)
[4] Cited in the Defendant's Response as *United States v. Galloway,* 2018 U.S. Dist. LEXIS 85766.

The defendant's argument relies on the notices given for Ann Burgess, a rape trauma expert, and Sherrie Cordova, a sexual assault nurse, both experts for the Government whose notices were opposed by Galloway and her co-defendants. Those notices do not support the defendant's argument because (1)Ms. Cordova's notice led the court to require more information to be provided to Galloway and her co-defendants once it was available to the United States; and (2) the notice of Ms. Burgess was only specific enough to suffice as adequate notice because it detailed explicit examples of issues regarding human trafficking which she was going to address in her testimony. Also, (3) the defendant failed to address that the notice of Mr. Jay Stuart, a ballistics expert for the Government in *Galloway*, which was found to be insufficient despite having been supplemented by two highly technical ballistic reports. *Id.* The unpublished order in *Galloway* does not support the defendant's insufficient notice for Kelly Shafto.

1.  **The Government's Notice Regarding Ms. Cordova was Deemed Sufficient Only After Being Supplemented with a Necessary Report**

The court in *Galloway* remarked that the notice of the Ms. Sherrie Cordova, which stated that she was, "to give her opinion 'based on her relevant findings'," was "sketchy" because it did not provide Galloway or her co-defendants with "any direction or indication of exactly what Ms. Cordova's opinion might be." *Id. at 5.* The Government was waiting to receive the official Sexual Assault Nurse Examination report from Ms. Cordova—the report on which her testimony would be founded. *Id.* at 5. The court required that the notice be supplemented with "more specific information as to the nature of Ms. Cordova's opinions on receipt of the report". *Id.* This example is in no way equivalent to the notice provided by the defendant regarding Ms. Shafto. The defendant has not claimed Ms. Shafto is waiting upon the receipt of pertinent information necessary for the preparation of her opinions.

3

The defendant has made contradictory statements about Ms. Shafto's report. The defendant has been promising it would disclose Ms. Shafto's report since November 2018.[5]  No report has been provided to the United States. In his amended notice the defendant stated "[a]s soon as [a final written report] is available, it will be made available to the Government." Doc. 206 at 1. But on the same day, the defendant wrote in his motion response that "Ms. Shafto has no written opinion; therefore, a written opinion cannot be provided." Doc. 208, at 2.

### 2.  The List of *Explicit* Examples That Would be Addressed by Ms. Burgess in Her Testimony was Found to not Be Overly General and Constituted Valid Notice

The defendant asserts that merely giving notice of the general areas of which the expert would be testifying is sufficient notice under Rule 16.[6]  The defendant based this argument on the example of the Ms. Burgess in *Galloway*.  In *Galloway*, Ms. Burgess' notice was deemed to have satisfied Rule 16 because it was "specific enough to provide sufficient notice" to allow for adequate trial preparation. *Id.* at 4 (emphasis added). The notice stated that Ms. Burgess would, "testify regarding her expertise in the areas of children who are exploited through sex rings, female juvenile prostitution, coping behavior of the rape victim, post-traumatic stress and rape trauma, and delayed reporting." *Id.* These examples provided within the notice are extremely concise. They explicitly state what Ms. Burgess' testimony would include, and are in no way as general as the defendant asserts. And the *Galloway* court's order does not indicate whether Ms. Burgess had authored reports that had been given previously to Galloway and her co-defendants in discovery.

---

[5] See Doc. 199-1.
[6] Response to Motion to Strike Defendant's Expert Kelly Shafto, Doc. 208.

This example proffered by the defendant is distinguishable from his current notice for Ms. Shafto. In *Galloway*. Burgess' notice included specific features of human trafficking that would be addressed within her testimony. Conversely, the notice provided by the defendant merely asserts that Ms. Shafto will testify generally to the "police procedure, general investigation techniques and practices" regarding the investigation of the defendant. If the defendant had provided the United States a detailed report from Ms. Shafto and been more specific in its notice, the Court might have been placed in a better position to find Ms. Shafto's notice sufficient.

**3. The Defendant Failed to Address the Notice of Mr. Stuart, Which was Deemed Inadequate Due to Lack of Detail Despite Having Two Technical Reports Attached**

In *Galloway*, the government provided the following notice of ballistic expert Mr. Jay Stuart. "Mr. Stuart will testify as to the results of ballistic analysis on ammunition and firearms recovered during two homicide investigations." *Id*. at 3. The reports mentioned were provided as exhibits. *Id*. However, despite the notice having been supplemented with highly detailed reports, the court in *Galloway* ruled that there was no way "to infer from the Notice exactly what Mr. Stuart's opinion will be." *Id*. The court reasoned that although the reports were provided with the notice, Galloway and her co-defendants had no way to infer "exactly what Mr. Stuart's opinion will be." *Id*. The government was ordered to provide Mr. Stuart's exact opinion. *Id*.

The example of Mr. Stuart directly conflicts with the rational utilized by the defendant regarding the notice of Ms. Shafto. The government's brief notice for Mr. Stuart is just like the

notice provided by the defendant for Ms. Shafto—neither included the expert's opinions.[7]  As was found with Mr. Stuart, such general statements are insufficient to satisfy Rule 16. Furthermore, Mr. Stuart's notice was deemed insufficient despite the inclusion of two highly technical ballistic reports that clarified his future testimony.[8]  The defendant has provided no such reports or any additional documentation from Ms. Shafto that might help the United States infer what her opinions will be.

The defendant elected to forego addressing the binding law cited by the United States in its motion to exclude Ms. Shafto's testimony. Instead, the defendant cited to a non-binding, unpublished pre-trial order. Because the notice for Kelly Shafto was insufficient, the United States continues to respectfully urge the Court to prohibit Ms. Shafto from testifying at trial.

Respectfully submitted this 17th day of May, 2019.

JOHN W. HUBER
United States Attorney

/s/ Michael Gadd
MICHAEL GADD
Special Assistant United States Attorney

---

[7] Notice of Expert, Doc. 199-1; *see also* Amended Notice of Expert, Doc. 206.

[8] The *Galloway* court recognized that for complex scientific testimony or testimony on other technical areas, disclosure obligations increased. *Id.* at 4 (*citing United States v. Goxcon-Chagal*, 886 F. Supp. 2d 1222, 1254 (D. N.M. 2012); *United States v. Jackson*, 51 F. 3d 646, 651 (7th Cir. 1995)). It is unclear from the notice provided for Ms. Shafto whether her testimony will also cover technical areas that raise the defendant's disclosure obligations.

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | REPLY TO THE DEFANDANT'S RESPONSE TO MOTION TO STRIKE DEFENDANT'S EXPERT ERIC WHEELER |
| vs. | |
| AARON MICHAEL SHAMO, | |
| Defendant. | Judge Dale A. Kimball |

The United States, by and through Michael Gadd, Special Assistant United States

Attorney, provides the following reply to the defendant's response to the United States' Motion

to Strike Defendant's Expert Eric Wheeler. The defendant's expert notice leaves the United

States with very little information about Mr. Wheeler's opinions, the "bases and reasons for

those opinions," and no way of adequately assessing the proffered testimony to prepare for cross-

examination. Should the Court determine that notice, or a future supplemental notice, for Mr.

Wheeler complies with Rule 16, the United States maintains its request that the Court set a

*Daubert* hearing the final day of the pre-admission hearing, May 31, 2019, for the defendant to

show that Mr. Wheeler is in fact qualified to offer his opinions as they relate to (1) computer

forensics, (2) the Dark Net, and (3) other specialized areas of knowledge .

The current Rule 16 notice for Mr. Wheeler is insufficient. The Court should not allow Eric Wheeler to testify.   A defendant's expert summary is required to include the "witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P, 16(b)(1)(C).

While the defendant has provided the curriculum vitae of Eric Wheeler, he has failed to provide the opinions of Mr. Wheeler, the basis of his opinions, and qualifications he has that allow him to speak on those potential opinions.  The defendant argues in his response that Mr. Wheeler's opinions were adequately summarized in his initial notice.[1]  The defendant's notice of expert included two sentences about his proposed testimony; the notice stated Mr. Wheeler had reviewed all of the data and information provided by the United States and would be testifying as to the "nature of online records, content of those records, and the foundation of those records" and to matters that occurred on the Dark Net.  These declarations do not convey any opinions Mr. Wheeler plans to express when he testifies. The defendant's notice further failed to show how Mr. Wheeler is qualified to offer an opinion on the Dark Net, the computer forensics performed by law enforcement in the investigation, and related subjects.

In his response, the defendant failed to address the binding case law cited in the United States' initial motion and instead relied on a non-binding, unpublished order from the district of New Mexico.[2]  Binding precedent is clear.  Notice must include "the witness's opinions, the bases and reasons for those opinions, and the witness's qualification."[3]

---

[1] Response to Motion to Strike Defendant's Expert Eric Wheeler, Doc. 210; Notice of Expert Eric Wheeler, Doc. 195.
[2] Motion to Strike Defendant's Expert Eric Wheeler, Doc. 201.
[3] Fed R. Crim. P. 16(b)(1)(C).

The defendant asserts that his brief notice is permissible based upon the rational of a non-binding and unpublished order in *United States v. Galloway*, No. 1:17-CR-01235-WJ, 2018 WL 2303106, (D.N.M. May 21, 2018) (unpublished).[4] The *Galloway* case has not yet been tried to a jury; the court in *Galloway* could revisit its ruling. The defendant erroneously contends that expert notices in *Galloway* are analogous to the current case.

The defendant's argument relies on the notices given for Ann Burgess, a rape trauma expert, and Sherrie Cordova, a sexual assault nurse, both experts for the Government whose notices were opposed by Galloway and her co-defendants. Those notices do not support the defendant's argument because (1) Ms. Cordova's notice led the court to require more information to be provided to Galloway and her co-defendants once it was available to the United States; and (2) the notice of Ms. Burgess was only specific enough to suffice as adequate notice because it detailed explicit examples of issues regarding human trafficking which she was going to address in her testimony. Also, (3) the defendant failed to address that the notice of Mr. Jay Stuart, a ballistics expert for the Government in *Galloway*, which was found to be insufficient despite having been supplemented by two highly technical ballistic reports. *Id.* The unpublished order in *Galloway* does not support the defendant's insufficient notice for Eric Wheeler.

1.  **The Government's Notice Regarding Ms. Cordova was Insufficient and Required Supplementation**

The court in *Galloway* remarked that the notice of Ms. Sherrie Cordova, which stated that she was, "to give her opinion 'based on her relevant findings'," was "sketchy" because it did not

---

[4] Cited in the Defendant's Response as *United States v. Galloway,* 2018 U.S. Dist. LEXIS 85766.

provide Galloway or her co-defendants with "any direction or indication of exactly what Ms. Cordova's opinion might be." *Id. at 5.* The Government was waiting to receive the official Sexual Assault Nurse Examination report from Ms. Cordova—the report on which her testimony would be founded. *Id.* at 5. The court required that the notice be supplemented with "more specific information as to the nature of Ms. Cordova's opinions on receipt of the report". *Id.* This example is in no way equivalent to the notice provided by the defendant regarding Mr. Wheeler. The defendant inferred that Mr. Wheeler is drafting a report that will state his opinions. Doc. 195 at 2.

2. **The List of *Explicit* Examples That Would be Addressed by Ms. Burgess in Her Testimony was Found to not Be Overly General and Constituted Valid Notice**

The defendant asserts that merely giving notice of the general areas of which the expert would be testifying is sufficient notice under Rule 16.[5] The defendant based this argument on the example of the Ms. Burgess in *Galloway*. In *Galloway*, Ms. Burgess' notice was deemed to have satisfied Rule 16 because it was "specific enough to provide sufficient notice" to allow for adequate trial preparation. *Id.* at 4. The notice stated that Ms. Burgess would, "testify regarding her expertise in the areas of children who are exploited through sex rings, female juvenile prostitution, coping behavior of the rape victim, post-traumatic stress and rape trauma, and delayed reporting." *Id.* These examples provided within the notice are concise. They explicitly state what Ms. Burgess' testimony would include and are in no way as general as the defendant asserts. And the *Galloway* court's order does not indicate whether Ms. Burgess had authored reports that had been given previously to Galloway and her co-defendants in discovery.

---

[5] Response to Motion to Strike Defendant's Expert Eric Wheeler, Doc. 210.

This example proffered by the defendant is distinguishable from his current notice for Mr. Wheeler. In *Galloway.* Burgess' notice included specific features of human trafficking that would be addressed within her testimony. Conversely, the notice provided by the defendant merely asserts that Mr. Wheeler will testify generally to the nature, content, and foundation of online records as well as "alleged activity of the Defendant which occurred on the "Dark Web." Doc. 195 at 1-2. If the defendant provides the United States a detailed report from Mr. Wheeler and adds specificity to its notice, the Court might be placed in a better position to find Mr. Wheeler's notice sufficient.

### 3. The Defendant Failed to Address the Notice of Mr. Stuart, Which was Deemed Inadequate Due to Lack of Detail Despite Having Two Technical Reports Attached

In *Galloway*, the government wrote the following in its notice of ballistic expert Mr. Jay Stuart. "Mr. Stuart will testify as to the results of ballistic analysis on ammunition and firearms recovered during two homicide investigations." *Id*. at 3. The reports mentioned were provided as exhibits. *Id.* However, despite the notice having been supplemented with highly detailed reports, the court in *Galloway* ruled that there was no way "to infer from the Notice exactly what Mr. Stuart's opinion will be." *Id*. The court reasoned that although the reports were provided with the notice, Galloway and her co-defendants had no way to infer "exactly what Mr. Stuart's opinion will be." *Id.* The government was ordered to provide Mr. Stuart's exact opinion. *Id*.

The example of Mr. Stuart directly conflicts with the rational utilized by the defendant regarding the notice of Mr. Wheeler. The government's brief notice for Mr. Stuart is just like the notice provided by the defendant for Mr. Wheeler—neither included the expert's opinions. As was found with Mr. Stuart, such general statements are insufficient to satisfy Rule 16.

Furthermore, Mr. Stuart's notice was deemed insufficient despite the inclusion of two highly technical ballistic reports that clarified his future testimony. The defendant has provided no such reports or any additional documentation from Mr. Wheeler that might help the United States infer what his opinions will be.

The *Galloway* court recognized that for complex scientific testimony or testimony on other technical areas, disclosure obligations increased. *Id*. at 4 (*citing United States v. Goxcon-Chagal*, 886 F. Supp. 2d 1222, 1254 (D. N.M. 2012); *United States v. Jackson*, 51 F. 3d 646, 651 (7th Cir. 1995)). Mr. Wheeler's proposed testimony about computer forensic analysis and the Dark Net is complex scientific testimony that requires more disclosure from the defendant.

The defendant elected to forego addressing the binding law cited by the United States in its motion to exclude Mr. Wheeler's testimony. Instead, the defendant cited to a non-binding, unpublished pre-trial order. Because the notice for Eric Wheeler was insufficient, the United States continues to respectfully urge the Court to prohibit Mr. Wheeler from testifying at trial.

Respectfully submitted this 17th day of May, 2019.

JOHN W. HUBER
United States Attorney

*/s/ Michael Gadd*
MICHAEL GADD
JOHN W. HUBER
United States Attorney

6

414

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | REPLY TO DEFENDANT'S RESPONSE IN OPPOSITION TO MOTION FOR ORDER PROHIBITING THE PARTIES FROM RAISING THE DEFENDANT'S POTENTIAL SENTENCE |
| vs. | |
| AARON MICHAEL SHAMO, | |
| Defendant. | Judge Dale A. Kimball |

---

The United States, by and through Michael Gadd, Special Assistant United States

Attorney, in reply to the defendant's memorandum in opposition (Doc. 205), urges the Court to

prohibit all parties from encouraging jury nullification generally, and from encouraging it

specifically by (1) mentioning to the jury, on direct or cross-examination or in argument, the

defendant's potential minimum and maximum sentence; and (2) drawing comparisons between

the charges faced by the defendant with those charges faced by his co-conspirators.

### 1. False or Misleading Statements

The defendant, in his memorandum in opposition, made several statements that were

materially incorrect. The United States requests that the Court disregard those statements. The

false or misleading statements include the following:

- "Mr. Shamo has never been offered any sort of plea in this matter." Doc. 205, at 3.

While Rule 410 generally prohibits the United States from revealing plea negotiations during trial, the rules of evidence do not apply to pre-trial motion practice regarding the inadmissibility of evidence. F. R. Evid. 1101(d). And Rule 410(b)(1) creates an exception for instances, such as this, where, in fairness, the statement ought to be considered.

Contrary to his assertion, the defendant has received a plea offer from the United States. After meeting with counsel for the defendant in a Rule 410 conference, the United States Attorney for the District of Utah personally called the defendant's lead attorney and extended a plea offer to the defendant. That call occurred on approximately November 30, 2018. The offer remains open and will not expire until May 29, 2019.

- "Mr. Shamo agreed to an early forfeiture of his assets in order to allow the Government to auction off numerous bitcoin/bitcash e-wallets while such e-currency was at a high point." Doc. 205, at 3.

The defendant did not forfeit his assets during the interlocutory sale.[1] The stipulated motion for an interlocutory sale explained that the sale was not a forfeiture by the defendant: "[t]he proceeds from any sale will be a 'substitute res' that will be subject to forfeiture in the place of the properties that are sold. The proceeds must be held in an interest-bearing account maintained by the United States pending the conclusion of the forfeiture action." Doc. 87,[2] at 5.

---

[1] The defendant challenged the administrative forfeiture of assets seized from his residence, including his BMW sedan, his pick-up truck, and more than $1.2 million in USD. But the defendant did not challenge the administrative forfeiture of his cryptocurrency and it was forfeited administratively at some point after the interlocutory sale. When the undersigned prosecutor learned the defendant had not challenged the administrative forfeiture of his cryptocurrency and the time window for making a claim was drawing to a close, he alerted counsel for the defendant in case the challenge had been overlooked.

[2] The United States sought to amend the Court's order for an interlocutory sale in Doc. 92. Doc. 92 does not indicate the interlocutory sale represented a forfeiture by the defendant.

- When Mr. Paz was ultimately indicted, 18 months after the arrest of Mr. Shamo, he was found to be in possession of several hundred thousand dollars from his alleged involvement in the DTO." Doc. 205, at 3.
  Mr. Paz was charged by Felony Information on April 25, 2018. Later that summer, Mr.

Paz through his attorney voluntarily surrendered the proceeds of his illegal conduct to agents

during a series of interviews covered by a standard proffer agreement.

- "The Government has also indicated it believes it could have obtained the same indictment for Continuing Criminal Enterprise …against Mr. Paz and Mr. Crandall." Doc. 205, at 4.

The undersigned counsel for the United States has never indicated a belief that the grand

jury would have returned an indictment against Paz or Crandall for engaging in a continuing

criminal enterprise (CCE). To his knowledge, no other representatives of the United States have

offered that opinion. This mistaken argument by the defendant has been corrected previously by

the United States. See Doc. 176, at 17-18.

- "The Government, however, has indicated it believes Mr. Paz will ultimately be sentenced to a term of incarceration of about 20-25 years and Mr. Crandall will receive a little less time than that of Mr. Paz. The Government is desirous of obtaining a Life Sentence for Mr. Shamo in order to increase the sentences of the other co-conspirators." Doct. 205, at 5.

During the Rule 410 conference mentioned above, the undersigned counsel for the United

States was asked by counsel for the defendant whether he thought the defendant's estimated

sentence for Mr. Paz—twenty to twenty-five years—was an accurate projection. The question

was asked during a pitch by defense counsel for a plea agreement that recommended a stipulated

sentence of twenty-five years. To counsel's question, the undersigned attorney for the United

States briefly agreed in an effort to extend professional courtesy to the defendant's counsel by

not derailing his plea negotiation pitch by engaging in a protracted debate about the likely

sentence a co-conspirator like Mr. Paz might receive, given any number of currently unknown

3

variables, such as the extent of cooperation Mr. Paz might be able to provide. The United States

does not presume to know what sentence the Court might impose. That figure, twenty to twenty-

five years, came from the defense's pitch for a favorable plea resolution.

 The United States has not and would never seek a life sentence against a defendant in

order to potentially pressure the Court to increase the length of sentences imposed upon co-

conspirators. Any suggestion to the contrary is false.

 Congress determined that for some crimes—the worst crimes—defendants should face a

life sentence. But even now the United States has held open its plea offer for the defendant. The

defendant's suggestion that the United States is pursuing his case for inappropriate reasons is

without merit.[3]

- "Namely, the Government has acknowledged the possibility…that Mr. Shamo did not in fact act in a manner as culpable as Mr. Crandall or Mr. Paz in certain areas pertaining to the CCE count." Doc. 205, at 7.

 The United States has never indicated the defendant was less culpable than either Mr. Paz

or Mr. Crandall. Everyone in the criminal enterprise had a role to play, but Mr. Shamo is most

culpable. Throughout the case, the United States has maintained that culpability follows the

following chart of charged co-conspirators, with the most culpable co-conspirator at the top.

---

[3] The United States has likewise previously explained that Mr. Shamo was afforded the same opportunity as Mr. Paz and Mr. Crandall to plead guilty and avoid the potential of the grand jury returning a death-resulting count. See Doc. 176 at 18.



The PHARMA-MASTER DTO included approximately 14 additional co-conspirators who held lesser roles in the organization

- "The choice not to indict Crandall and Paz on that particular charge was the impetus behind both individuals entering guilty pleas to all pending charges against them, agreeing to testify against Mr. Shamo, and receiving heavily reduced sentences, despite the greater or equal culpability of both Crandall and Paz."

Mr. Crandall and Mr. Paz have not been sentenced; it seems premature to argue they received heavily reduced sentences. And, as stated above, neither Mr. Paz nor Mr. Crandall are equally culpable with the defendant.

These statements by the defendant are not all the objectionable statements in his response or in his attachment, which contains quotations taken out of the context in which they were spoken. But the United States will not address the remaining statements. In many instances, the defendant presumed to know the motivations and thoughts of the United States or his co-

conspirators; the United States simply asserts that in those instances, the defendant was frequently incorrect.

## 2. The defendant used permitted areas of inquiry to justify its opposition to the United States request that all parties be prohibited from impermissible areas of inquiry and argument.

In his response, the defendant used several areas of permissible inquiry and argument to oppose the United States' request that both parties be prohibited from engaging in trial strategies that could lead to jury nullification. The United States' request seeks to prevent the jury reaching a conclusion based upon improper grounds, namely (1) consideration of the defendant's potential minimum and maximum sentence, and (2) comparing the charges faced by the defendant with those charges faced by his co-conspirators.

Here are the areas of inquiry or argument the defendant raised or alluded to in his memorandum, sorted by whether each is permitted or not. The page number referenced at the end of each area of inquiry or argument corresponds to the defendant's response.

6

| Permitted | Not Permitted |
|---|---|
| Culpability of co-conspirators (p. 5) | The clear sentencing disparities between co-conspirators (p. 5) |
| Charges and potential sentences for testifying co-conspirators for purposes of impeachment (p.5) | Charges (or lack thereof) and potential sentences of non-testifying co-conspirators (p.5) |
| Conduct of co-conspirators (p.6) | Charges and potential sentences for testifying co-conspirators for purposes other than impeachment (p.5) |
| Roles of co-conspirators (p.6, 7) | Improper and disparate handling and treatment of defendants in this case (p. 6) |
| Independent acts of co-conspirators (p. 7) | Disparate charging and sentencing with respect to Mr. Paz and Mr. Crandall and Count 1 CCE (p. 7-8) |
| Favorable plea agreements [for impeachment] (p. 7) | If jury determines that the defendant is less culpable than Mr. Paz or Mr. Crandall, then the defendant is not guilty of CCE because neither Paz nor Crandall were charged with CCE (p. 8) |
| Whether the defendant controlled and organized the actions of his co-conspirators (p.7-8) | |
| Conduct of co-conspirators attributed to the defendant under CCE or conspiracy offenses (p. 8) | |
| Role of the defendant with respect to Mr. Paz or Mr. Crandall (p.8) | |
| Plea and cooperation agreements [for impeachment] (p. 8) | |
| Whether Mr. Paz or Mr. Crandall pleaded guilty in part to avoid being charged by the grand jury with Distribution of a Controlled Substance Resulting in Death. (p. 7-8) | |

**a. The defendant's potential sentence cannot be considered by the jury.**

The defendant's response does not contain a single citation to case law. Not one. And the

defendant did not address head on the Supreme Court case law, Tenth Circuit case law, other

7

persuasive case law, and Tenth Circuit pattern jury instructions relied upon by the United States in making its request.

The law is clear. Jury nullification is antithetical to our system of justice and to the rule of law. The jury should not learn the potential sentence faced by the defendant. *Shannon v. United States*, 512 U.S. 573, 579 (1994). In the Not-Permitted column, the defendant has several areas of inquiry or argument that run afoul of case law that forbids the jury from hearing the potential sentence faced by a defendant.

| Not Permitted |
| --- |
| The clear sentencing disparities between co-conspirators (p. 5) |
| Charges (or lack thereof) and potential sentences of non-testifying co-conspirators (p.5) |
| Charges and potential sentences for testifying co-conspirators for purposes other than impeachment (p.5) |
| Improper and disparate handling and treatment of defendants in this case (p. 6) |
| Disparate charging and sentencing with respect to Mr. Paz and Mr. Crandall and Count 1 CCE (p. 7-8) |

The Court should preclude the defendant from arguing or eliciting testimony about any of these topics because it will lead to jury nullification.

**b. The jury cannot draw comparisons between co-conspirators' charges.**

It is inappropriate to argue or elicit testimony that compares the charges faced by one co-conspirator against charges faced by another. On this issue the defendant did not cite to any case law. But the law is clear. The jury cannot consider whether anyone not on trial should have been charged for the crime charged. 10th Cir. Pattern Instruction 1.19 (2018).

In the Not-Permitted column, the defendant has several areas of inquiry or argument that run afoul of the law, which forbids the jury from considering whether anyone not on trial should

8

have been charged for Engaging in a Continuing Criminal Enterprise (Count 1) or Distribution of

a Controlled Substance Resulting in Death (Count 6).

| Not Permitted |
| --- |
| Charges (or lack thereof) and potential sentences of non-testifying co-conspirators (p.5) |
| Charges and potential sentences for testifying co-conspirators for purposes other than impeachment (p.5) |
| Improper and disparate handling and treatment of defendants in this case (p. 6) |
| Disparate charging and sentencing with respect to Mr. Paz and Mr. Crandall and Count 1 CCE (p. 7-8) |
| If jury determines that the defendant is less culpable than Mr. Paz or Mr. Crandall, then the defendant is not guilty of CCE because neither Paz nor Crandall were charged with CCE (p. 8) |

The Court should preclude the defendant from arguing or eliciting testimony about any of

these topics because it will lead to jury nullification.


### 3. Conclusion

In conclusion, the United States requests that the Court enter an order forbidding all

parties from:

1. encouraging jury nullification generally;

2. mentioning to the jury, on direct or cross-examination or in argument, the defendant's

   potential minimum and maximum sentence for Counts one and six;

3. drawing comparisons between the charges faced by the defendant with those charges

   faced by his co-conspirators;

4. commenting upon potential sentences for those counts covered by the statements-in-

   advance-of-plea for co-conspirators for purposes other than impeachment; and

5. eliciting testimony or making arguments on the following impermissible topics:

| Not Permitted |
|---|
| The clear sentencing disparities between co-conspirators (p. 5) |
| Charges (or lack thereof) and potential sentences of non-testifying co-conspirators (p.5) |
| Charges and potential sentences for testifying co-conspirators for purposes other than impeachment (p.5) |
| Evidence of improper and disparate handling and treatment of defendants in this case (p. 6) |
| Disparate charging and sentencing with respect to Mr. Paz and Mr. Crandall and Count 1 CCE (p. 7-8) |
| If jury determines that the defendant is less culpable than Mr. Paz or Mr. Crandall, then the defendant is not guilty of CCE because neither Paz nor Crandall were charged with CCE (p. 8) |

Respectfully submitted this 17th day of May, 2019.

JOHN W. HUBER
United States Attorney

*/s/ Michael Gadd*
MICHAEL GADD
Special Assistant United States Attorney

10

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
**SKORDAS & CASTON, LLC**
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

Attorneys for Defendant Aaron Shamo

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **REPLY MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE E-CURRENCY DOLLAR AMOUNT** |
| Plaintiff, | |
| v. | |
| AARON MICHAEL SHAMO, et. al., | Case No. 2:16-CR-00631 DAK |
| Defendant. | Judge Dale A. Kimball |

Aaron Michael Shamo, through his counsel of record, hereby moves the Court to enter an order excluding evidence that the government intends to introduce at trial. The proffered evidence is not in accordance with Federal Rules of Evidence 104 and 403.

The Government asks the court to allow references to the dollar value of cryptocurrencies for five reasons: (1) the present and historical dollar value of Bitcoin is widely known and

readily accessible from commercial exchanges: (2) the cryptocurrency seized from the defendant's wallets came solely from illicit activity: (3) revealing the auction price to the jury will not create unfair prejudice against the defendant because exchange rates can be easily explained; (4) unlike in a commercial bank saving or checking account, cryptocurrency wallet software applications do not offer compounding interest to their customers; and (5) even if some of the cryptocurrency in the defendant's wallets was "garnered" by his co-conspirators, the defendant has co-conspirator liability for all of the cryptocurrency found in his wallets.

      The Government should be limited when referring to cryptocurrencies because of the severity of the prejudicial effect it will have on Mr. Shamo. Specifically, if the Government is insistent in referring to the cryptocurrency in a U.S. Dollar amount, those amounts should only be specified in two ways. First, if the Government is referring to the U.S. Dollar amount of a specific transaction, it should only be allowed to refer to that transaction by the "exchange rate" at the specific point in time when that transaction occurred. If the historical information is not available or not readily provable, the Government should only be allowed to refer to the amount of cryptocurrency alleged to have been exchanged. Second, if the Government is going to refer to amount of cryptocurrency in the e-wallets at the point in time  when Mr. Shamo was arrested and those e-wallets were seized in a U.S. Dollar amount, then the Government should be limited to referring to the "exchange rate" at the specific point in time when those e-wallets were seized and no longer in the possession of Mr. Shamo or any co-conspirator. The Government should specifically be limited from mentioning the amount of money received from the auctioning of the cryptocurrency during a historical highpoint for that exchange rate. The Government should further be limited from describing the present-day exchange rate of that cryptocurrency. Anything outside of this scope is either irrelevant or prejudicial to Mr. Shamo.

The government excludes the most important part of Rule 403 and that is that even relevant evidence with probative value may be excluded. *United States v. Watson*, 766 F.3d 1219, 1241 (10th Cir. 2014). As stated in *Watson*, ". . . 'court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'" *Id*. (citing to Fed. R. Evid. 403). The information of cryptocurrency that the government wants to present outside the limiting instruction is unfairly prejudicial ". . . 'because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly or apart from its judgement as to his guilt or innocence of the crime charged.'" *United States v. Nevels*, 490 F.3d 800, 805 (10th Cir. 2007) (citing *United States v. Leonard*, 439 F.3d 648, 652 (10th Cir. 2006).   Evidence of wealth or profits derived from an illegitimate source with regard to a claim of conspiracy only become relevant upon a showing that the proceeds were actually garnered during the period of the alleged conspiracy. *United States v. Miller,* 549 F. Supp 2d 1312, 1327 (Dist. Kan 2008) (citing *United States v. Penny,* 60 F.3d 1257, 1263 (7th Cir. Ct. App. 1995).

1. **The Government should be limited when referring to cryptocurrencies because of the prejudicial effect.**

The Government should be limited in any references to the dollar amount of e-currency alleged to be in the possession or control of Mr. Shamo at the time of his arrest or any amount attributed to the conspiracy. The currency amount that the Government intends to introduce is not relevant, prejudicial in a manner inconsistent with the Federal Rules of Evidence, and inaccurate. Even if the government can determine that none of the cryptocurrency seized from

those e-wallets came from a legitimate source, the evidence, as outlined by the Government, does not comport with the requirements of FRE 403 or established case law on the issue.

Specifically, stating the amount of cryptocurrency in terms of the current day exchange rate or even in regard to the amount garnered by the Government at auction would be significantly prejudicial because it will provoke a response from the jury affecting the jury's attitude toward the Mr. Shamo. The inference that this alleged conspiracy generated profits in the amount ultimately collected by the Government at auction would lead to a significantly prejudicial inference against Mr. Shamo and paint a picture of proceeds and profits that is wholly inaccurate.

Even if the court finds that Mr. Shamo is liable for all of the cryptocurrency found in these wallets as a result of the doctrine of under the *Pinkerton* Doctrine, sharing that amount in the manner discussed above would be significantly prejudicial. Furthermore, as outlined in case law, the amount alleged to have been garnered by the Government at auction was a proceed or profit realized during the time period outside of the alleged conspiracy and thus should be inadmissible. The prejudice from introducing this evidence to the jury far outweighs any probative value it may add. FRE 403. Limiting the scope of cryptocurrency is the only way to prevent significant unfair prejudice.

WHEREFORE, Mr. Shamo, respectfully requests the court order that any mention of the e-currency's dollar amount be limited, in the manner outlined above

DATED this 17th day of May 2019.

SKORDAS & CASTON, LLC

*/s/ Gregory G. Skordas*

Gregory G. Skordas

*/s/ Kaytlin V. Beckett*
Kaytlin V. Beckett

*/s/ Daryl P. Sam*
Daryl P. Sam


# CERTIFICATE OF SERVICE

I hereby certify that on the May 17, 2019, I electronically filed a true and correct copy

of the foregoing **REPLY MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO**

**EXCLUDE E-CURRENCY DOLLAR AMOUNT**, with the Clerk of the Court using

CM/ECF system, which sent notification of such filing to the following:

S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Adam S. Elggren
Adam.elggren@usdoj.gov

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
**SKORDAS & CASTON, LLC**
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

Attorneys for Defendant Aaron Shamo

## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **REPLY MEMORANDUM IN SUPPORT OF MOTION IN LIMINE FOR ORDER EXCLUDING EVIDENCE- REFERENCE TO OVERDOSE DEATHS** |
| Plaintiff, | |
| v. | |
| AARON MICHAEL SHAMO, et. al., | |
| Defendant. | Case No. 2:16-CR-00631 DAK |
| | Judge Dale A. Kimball |

Aaron Michael Shamo, through his counsel of record, hereby moves the Court to enter an order excluding evidence that the government intends to introduce at trial. The proffered evidence is not in accordance with Federal Rules of Evidence 104, 401, and 403.

The Government has indicated it intends to proffer before the jury that E.B., C.V., G.K., and G.L. all died as a result of a drug overdoses. The Government further proffers testimony as

to the nature of those overdose deaths. The Government intends to offer evidence to establish that the drug trafficking organization at the heart of this matter supplied drugs to these individuals. The Government further acknowledges that Mr. Shamo is not on trial for those deaths and the Government has not proffered evidence which could conclusively tie Mr. Shamo to those overdose deaths. The Government further acknowledges that it does plan to argue Mr. Shamo is responsible for at least one overdose death, R.K. The Government proffers that the information is probative because it allows the investigator to explain why those individuals were not interviewed or called to testify.

Rule 403 allows for the exclusion of evidence where its probative value is substantially outweighed by the danger of unfair prejudice. Rule 403 exclusionary impact is proper where the proffered evidence has a tendency to suggest a decision on improper basis. *United States v. Watson,* 766 F.3d 1219, 1242 (10th Cir. 2004). The prejudicial impact must be evaluated in conjunction with the probative value. There is limited probative value in explaining to a jury why certain witnesses are not available to testify at trial. There is no probative value in explaining to the jury that a witness was unavailable for trial as a result of dying from a drug overdose. There is even less probative value in proclaiming to the jury that four witnesses are unavailable for trial as a result of multiple independent drug overdoses. This prejudicial impact, in the context of a case involving a "death resulting" count, substantially outweighs the non-existence probative value of mentioning the overdoses of certain non-parties, non-victims.

The Government's offer to allow a limiting instruction regarding the overdose is disingenuous. It can be very easily inferred from the statement of facts proffered by the Government in their memorandum, that they plan to outline the facts behind each one of these overdose deaths in a fashion not much different than the manner in which they intend to outline

the death of R.K. In short, though the Government is open to the idea of a limiting instruction the intention is to nonetheless allow the jury to make conclusions about not only the cause of these overdose deaths but to paint Mr. Shamo as the person responsible for feeding their addictions which ultimately resulted in these overdose deaths.

This type of prejudicial inference is the exact type of prejudicial impact Rule 403 is intended to combat. The Government has not posited a single probative fact allowing for the admission of evidence regarding the death of these four individuals resulting from drug overdoses. The Government, instead, argues that they must be able to expound upon a witness' unavailability. The Government can, and should, be required to simply acknowledge that the individual was not available to testify or for interviews. Expounding further than that is unnecessary, irrelevant, and unfairly prejudicial without any probative value with which to establish admissibility under Rule 403.

WHEREFORE, Aaron Shamo, respectfully request the Court enter an order prohibiting the Government from mentioning the alleged overdose deaths of any individual not specifically outlined in the "death resulting" count.

DATED this 17th day of May, 2019.

SKORDAS & CASTON, LLC

/s/ Gregory G. Skordas
Gregory G. Skordas

/s/ Kaytlin V. Beckett
Kaytlin V. Beckett

/s/ Daryl P. Sam
Daryl P. Sam

**CERTIFICATE OF SERVICE**

I hereby certify that on the May 17, 2019, I electronically filed a true and correct copy of

the foregoing **REPLY MEMORANDUM IN SUPPORT OF MOTION IN LIMINE FOR**

**ORDER EXCLUDING EVIDENCE-REFERENCE TO OVERDOSE DEATHS**, with the

Clerk of the Court using CM/ECF system, which sent notification of such filing to the following:


    S. Michael Gadd
    mgadd@agutah.gov

    Vernon G. Stejskal
    Vernon.stejskal@usdoj.gov

    Adam S. Elggren
    Adam.elggren@usdoj.gov


                    */s/ Sabrina Nielsen-Legal Secretary*
                    SKORDAS & CASTON, LLC

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
**SKORDAS & CASTON, LLC**
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

Attorneys for Defendant Aaron Shamo

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> AARON MICHAEL SHAMO, et. al., <br><br> Defendant. | **REPLY MEMORANDUM IN SUPPORT OF MOTION IN LIMINE FOR ORDER EXCLUDING EVIDENCE-PHOTOGRAPHS OF R.K.** <br><br> Case No. 2:16-CR-00631 DAK <br><br> Judge Dale A. Kimball |

Aaron Michael Shamo, through his counsel of record, hereby moves the Court to enter an order excluding evidence that the government intends to introduce at trial. The proffered evidence is not in accordance with Federal Rules of Evidence 104, 401, and 403.

The Government has specifically proffered three photos they believe are necessary to their case against Mr. Shamo in relation to the "death resulting" count: (1) photograph depicting

the face and upper-torso of a deceased R.K.; (2) a close-up of the first photograph, which graphically depicts blood, mucus, and discoloration of R.K.'s face; (3) a photograph depicting what appears to be the lower body of R.K. after he was discovered deceased by his roommate. The contents of these photos are not relevant, and their prejudicial impact substantially outweighs any probative value the Government can fabricate.

The Government argues that the documents are necessary to establish elements that differentiate between an opioid death and a death related to cocaine or multiple drug toxicity. These pictures, as supplied by the Government, are neither necessary nor sufficient to establish such. Nothing prohibits the Government's expert from expounding upon the information she reviewed in making her ultimate conclusion as to the "but for" cause of R.K.'s death. If the Government's expert believes the presence of blood and mucus around R.K.'s face at the time of his death is the result of an opioid death, she can make such a conclusion absent showing such inflammatory photographs to the jury.

Rule 403 allows for the exclusion of evidence where its probative value is substantially outweighed by the danger of unfair prejudice. Rule 403 exclusionary impact is proper where the proffered evidence has a tendency to suggest a decision on improper basis. *United States v. Watson,* 766 F.3d 1219, 1242 (10th Cir. 2004). The Government relies heavily on the holding in *United States v. Soundingsides,* for the supposition that gruesome autopsy photos are admissible if they aid in the testimony of a pathologist.820 F.2D 1232 (10TH Cir. 1987). *Soundingsides* also specifically outlined the probative value of those gruesome photos was to demonstrate a required element of the charged offense, malice aforethought. *Id.* at 1243. The trial judge further noted that the probative nature of the photos was in that they demonstrated "something that couldn't be otherwise seen."

The disposition in *Soundingsides,* in fact, cut against admissibility. The prejudicial impact must be evaluated in conjunction with the probative value. The Government in this instance has suggested minimal probative value to the three photos proffered; namely, the presence of mucus and blood in those photos suggesting the death was a result of opioid overdose and not cocaine or multiple drug toxicity. There is significant room for other more probative and less prejudicial evidence- the testimony of those on scene and those who examined the body of R.K. In short, the photographs demonstrate something that can otherwise be demonstrated without the risk of unfair prejudice to Mr. Shamo.

The Government is in no manner prohibited from discussing the findings of a medical examiner who conducted the autopsy of R.K. The Government is in no manner prohibited from asking individuals present during R.K.'s overdose what their actions were. The Government can elicit necessary testimony of the nature not available in *Soundingsides.*

WHEREFORE, Aaron Shamo respectfully request the Court enter an order prohibiting the admission of unnecessarily prejudicial photographs depicting the death of R.K.

DATED this 17th day of May, 2019.

SKORDAS & CASTON, LLC

*/s/ Gregory G. Skordas*
Gregory G. Skordas

*/s/ Kaytlin V. Beckett*
Kaytlin V. Beckett

*/s/ Daryl P. Sam*
Daryl P. Sam

# CERTIFICATE OF SERVICE

I hereby certify that on the May 17, 2019, I electronically filed a true and correct copy of

the foregoing **REPLY MEMORANDUM IN SUPPORT OF MOTION IN LIMINE FOR**

**ORDER EXCLUDING EVIDENCE-PHOTOGRAPHS OF R.K.**, with the Clerk of the Court

using CM/ECF system, which sent notification of such filing to the following:

    S. Michael Gadd
    mgadd@agutah.gov

    Vernon G. Stejskal
    Vernon.stejskal@usdoj.gov

    Adam S. Elggren
    Adam.elggren@usdoj.gov

                        */s/ Sabrina Nielsen-Legal Secretary*

                        SKORDAS & CASTON, LLC

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
**SKORDAS & CASTON, LLC**
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

Attorneys for Defendant Aaron Shamo

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. AARON MICHAEL SHAMO, et. al., Defendant. | **MOTION TO CONTINUE FOR WILLFUL FAILURE TO PROVIDE BRADY/GIGLIO MATERIAL** Case No. 2:16-CR-00631 DAK Judge Dale A. Kimball |

Aaron Michael Shamo, through his counsel of record, hereby moves the Court to enter an

order to continue the trial currently scheduled to begin June 17, 2019, based on the

Government's willful failure to provide *Brady/Giglio* material in advance of trial, pursuant to the

Due Process Clause of the U.S. Constitution, and Def. R. Crim P. 16. In support, the Defendant

alleges as follows:

## STATEMENT OF RELEVANT FACTS

1.   In the Government's prior Notifications of Compliance with Discovery Requests, the Government noted, "The United States continues to make available forensic data from seized electronic devices. Parties who seek to obtain their own copy of the forensic data have been asked to provide and 8TB hard drive and a 3TB hard drive to the United States Attorney's Office."

2.   In that regard, Defense Counsel was aware of the existence of 11 TBs of Discovery prior to November 2018.

3.   In November of 2018, Defense Counsel learned the Government had in its possession, the seized electronic devices of alleged co-conspirator, Jonathan Luke Paz.

4.   On November 26, 2018, Defense Counsel provided the US Attorney's Office with the hard drives as requested above. (See Attachment A, Messenger Receipt for hand delivery of hard drives).

5.   A week later, Defense Counsel contacted the US Attorney's Office to receive a timeline of the data transfer. Defense Counsel was informed the US Attorney's Office had misplaced the provided hard drives.

6.   The US Attorney's Office insisted they had never received the hard drives and Defense Counsel must have sent them to the wrong address.

7.   On December 7, 2018, after being provided a delivery receipt for those hard drives, the US Attorney's Office acknowledged they had misplaced and subsequently found the hard drives. (See Attachment B, Email from Michael Gadd).

8.   The US Attorney's Office acknowledged that the transfer of that Data would take a significant amount of time.

9. On or about December 21, 2018, the US Attorney's Office returned the hard drives provided by Defense Counsel and two other hard drives.

10. The US Attorney's Office explained that they in fact had obtained and now provided an estimated 20+TBs of electronic data.

11. Defense Counsel's intention in having computer data reviewed was to specifically have the computers and electronics of Drew Crandall and Luke Paz reviewed.

12. In numerous correspondence and conversations with the Government, Defense Counsel intimated a concern that Mr. Paz was in fact the party responsible for mixing and pressing all of the fentanyl alleged to have been produced in this scheme.

13. Specifically, Defense Counsel relayed a belief that Mr. Paz would have in his possession a "ledger" type of document that outlined the number of pills he had pressed and an accounting of all of the money he in fact received and/or believed he was owed for being the sole party responsible for pressing pills.[1]

14. Defense Counsel copied the data from the Government's two extra hard drives onto their devices. Defense Counsel's legal assistant compared the data transferred from the Government's hard drives before those hard drives were returned to the US Attorney's Office; specifically noting the data from Mr. Paz's computer. The data transferred matched what was provided on the Government's hard drives and those were subsequently retrieved by the US Attorney's Office from Defense Counsel's office in early 2019.

---

[1] Importantly, Mr. Shamo is the only defendant/co-conspirator remaining in this matter. Every other party has plead and is awaiting sentencing until after testifying in the trial against Mr. Shamo. The Government has also acknowledged that the requisite conduct of co-conspirators, Drew Crandall and Jonathan Luke Paz, was on par with the conduct for which Mr. Shamo is currently charged.

15. Even after receipt of the information, Defense Counsel had to get approval from the CJA Budgeting Attorney before retaining an expert on electronic data. That budget approval could not be obtained until the amount of data to be reviewed was calculated.

16. Defense asked for a continuance due to the unexpected amount of discovery before the trial. That request was supported by the Government believing the parties needed more time and there was still potential for plea negotiations.

17. The Court granted the continuance.

18. Defense Counsel had previously retained the Eide Bailly Firm to review the forensic data in this matter.

19. On more than one occasion, the Government informed Defense Counsel that there was nothing of value pulled from the devices that Defense Counsel was desirous of having reviewed, but that they understood Defense Counsel still wanted to conduct due diligence.

20. Eide Bailly provided a written estimate to process the new data in February. The CJA budgeting attorney also did not approve the Defense's request and did not notify Defense Counsel of that concern until March 2019.

21. The CJA Budgeting Attorney provided the names of two other experts but Defense Counsel did not receive any response from those proposed experts after contacting them.

22. The CJA Budgeting Attorney requested Defense Counsel coordinate with a Discovery Attorney to find another expert. The name provided from the Discovery Attorney also did not return contact.

23. In mid-March 2019 after multiple emails and attempts to find an expert that would be approved, Defense Counsel suggested the use of Eric Wheeler as a possible option knowing Trial Tech's familiarity with and reliability in the federal court system.

24. Mr. Wheeler was not approved by the CJA Budgeting Attorney until March 27, 2019. It was several days before the budget came through for Mr. Wheeler to begin working through the massive discovery.

25. In April 2019, Eric Wheeler contacted the US Attorney's Office and requested native file versions of the electronic data. He believed he had received that from the US Attorney's Office.

26. Upon reviewing the data initially, Eric Wheeler noticed that the forensic image of one of the co-conspirator's computers was encrypted and contacted the US Attorney's Office to obtain an unencrypted version.

27. The US Attorney's Office informed Mr. Wheeler that they did not encrypt the forensic image, but it must have been encrypted by the owner of the computer.

28. Upon information and belief, the purpose of creating a forensic image of a computer hard drive is to conduct a forensic review of that device. In short, there would be no conceivable reason for the owner of the computer to create the image let alone encrypting it. As of the date of this filing, that forensic image is still encrypted and inaccessible to Defense Counsel.

29. Upon review of the Government's Proposed Exhibits, Defense Counsel noted the existence of two documents not previously disclosed or noted by the Government- a "ledger" accounting for pills made and money owing and a text message exchange allegedly between Aaron Shamo and Jonathan Luke Paz negotiating Paz's per pill payment. (See Attachment C, New Exhibits).

30. Defense Counsel inquired of the Government where these particular exhibits were in the discovery provided as they were not bates stamped like all other previous exhibits. Defense Counsel was informed they had been retrieved from Mr. Paz's Computer.

31. Defense Counsel asked Mr. Wheeler to focus his review more thoroughly on the file

labeled "Luke Paz's iMac." Mr. Wheeler informed Defense Counsel that folder was in fact nearly empty and did not contain a forensic image of the actual computer, but only contained photos, downloads, and internet bookmarks.

32. Defense Counsel and Mr. Wheeler contacted the US Attorney's Office to inquire again as to the location of those new exhibits. The Government insisted Defense Counsel must have improperly copied the electronic data when it was provided by the US Attorney's Office in December 2018/January 2019.

33. Defense Counsel and Mr. Wheeler inquired as to why those documents were not provided in the native file version as requested by Mr. Wheeler when other such data had been provided in native format.

34. The Government continued to insist the failure to have the correct data was the result of Defense Counsel's improper copying of the hard drives provided by the US Attorney's Office. The Government further insisted that the forensic images can only be copied using specific software and a verification process and not a traditional "drag/drop" or "copy/paste" method would not allow the proper copying.

35. The Government did not address the fact that every other external hard drive, forensic image, and thumb drive had copied intact using the above methods.

36. Defense Counsel compared the hard drives in their office with the data provided to Mr. Wheeler and it matched exactly.

37. The Government insisted that Defense Counsel still had the US Attorney's hard drives in their possession and should look to those for the proper files. Defense Counsel informed the Government that those hard drives had been retrieved by Michael Gadd several months earlier.

38. The Government subsequently acknowledged that they had found that hard drive in their

possession, but nevertheless insisted that Mr. Wheeler provide a new hard drive for copying of the forensic image of Mr. Paz's iMac. This insistence seemed improper as the Government had insisted that these hard drives (which were previously provided to Defense Counsel) had the proper forensic images and copying such a large file size would require several days.

39. On May 21, 2019, Mr. Wheeler provided another external hard drive to the US Attorney's Office.

40. On May 23, 2019, the US Attorney's Office contacted Defense Counsel and informed them that the forensic image of Mr. Paz's computer was in fact separated onto three different hard drives and the 8TB Hard drive provided by Mr. Wheeler "might" be large enough to hold the entire image, but the copying of that forensic imaging will not be completed until some time next week. (See Attachment D, Email Correspondence From Yvette Laughter).

## ARGUMENT

Suppression of material evidence is violative of a Defendant's constitutional rights and due process. *Brady v. Maryland,* 373 U.S. 83 (1963); and *Giglio v. United States*, 405 U.S. 150 (1972). When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule. *Giglio v. United States*, 405 U.S. 150, 154 (1972). *Id.* It does not matter whether the non-disclosure of the evidence is a result of negligence or intentional conduct. *Id.* Suppression by the prosecution of evidence favorable to an accused upon request violates due process when that evidence is material to guilt or punishment. *United States v. Young,* 45 F.3d 1405, 1407 (10th Cir. 1995). It is well-established that evidence of a witness's credibility or bias falls into this category of *Brady-Giglio* material which the government is required to disclose. *United States v. Robinson*, 583 F.3d 1265 (10th Cir. 2009); and *United States v. Buchanan*, 891 F.2d 1436 (10th Cir. 1989). This

evidence is particularly material because the confrontation clause allows a witness' credibility be subjected to particular attack for biases or ulterior motives during cross-examination and no such meaningful cross-examination can occur where the defendant is unaware of the biases known to the government and not disclosed to the defendant. *Heinemann v. Murphy*, 326 F. App'x 455, 466 (10th Cir. 2009). Importantly, a co-defendant who testifies with only a reasonable expectation or understanding of leniency, but not a formal agreement, has an even more powerful incentive to testify falsely in order to facilitate a conviction and curry favor with a prosecutor. *Id. At 704* (for purposes of assessing credibility, absence of a formal agreement only increases significance of witness' expectation of favorable treatment) (quoting *Campbell v. Reed,* 594 F.2d 4, 7 (4th Cir. 1979)).

There is not proper precedent to allow the exclusion of delays due to willful *Brady/ Giglio* violations from the Defendant's Speedy Trial Act calculations with the exception of the time period required to complete briefing on this motion. 18 U.S.C.S §1361

## **ANALYSIS**

The Government has failed to provide evidence material to defense of Mr. Shamo, which necessitates a continuance that should not be excluded from the Speedy Trial calculation. Mr. Shamo's defense has rested largely on the fact that his conduct is of a lesser degree than those of certain co-conspirators; Drew Crandall and Luke Paz. This defense has been supported in previous motions by the inclusion of six pages worth of statements outlining that Mr. Shamo was not capable or competent enough to have orchestrated the alleged conspiracy. Specifically, Mr. Shamo has outlined that his role was significantly limited at the outset of the conspiracy to that of customer service and knowledge of bitcoin. The Government is fully aware that Mr. Shamo has contested he never had the chemical formula for the fentanyl-based pills and never himself

pressed a single pill containing fentanyl. That role was filled solely by Mr. Paz. Mr. Shamo did

not start the conspiracy or drug trafficking of his own accord and could not have initiated such a

task without the skills, business savvy, and knowledge of Drew Crandall. Mr. Crandall

acknowledged this in his interviews with investigators. The Government further acknowledged

that it had the ability to obtain indictments as to Mr. Paz and Mr. Crandall for the both the "death

resulting" offense and the continuing criminal enterprise offense; the latter which the

Government contends requires a mandatory life sentence and no judicial discretion to deviate

from that minimum sentence.

Mr. Paz and Mr. Crandall were not indicted on those two particular charges as a result of

very favorable plea agreements. The Government outlined for Defense Counsel their belief that

Mr. Crandall will receive a sentence in the range of 20 years; and Mr. Paz will receive a sentence

in the range of 25 years. Such sentences are significantly lower than the hardline mandatory life

sentence faced by Mr. Shamo despite overwhelming evidence to the contrary. Neither Crandall

or Paz have been sentenced and it is expected that they will not be sentenced until after Mr.

Shamo is sentenced. As of the date of this filing, Paz remains out of custody pending sentencing,

while Mr. Shamo has been in the custody of the US Marshalls since his arrest in November

2016- nearly three full years. Fully cognizant of this fact and the significant disparity, the

Government has sought an order from the court limiting Defense Counsel's ability to even

question Crandall and Paz regarding their favorable plea agreements and potential sentences.

Now, three weeks before trial, well after discovery and exhibit deadlines have lapsed, the

Government has still failed to provide Mr. Shamo with the information that is clearly available

on Paz's computer. Based on an evaluation of the non-bates stamped exhibits, it is clear that

evidence which supports a conclusion that Paz was in fact the party responsible for the pressing

and processing of all fentanyl-based pills is contained on Paz's computer. That computer, in violation of established case law, has never been provided to Defense Counsel despite repeated requests. In addition to those repeated requests, the Government has routinely implied no relevant documentation exists on that particular computer. That is clearly inaccurate as the documents recently produced are not only relevant but directly address the heart of Mr. Shamo's defense- that his conduct is not remotely close to that alleged in the indictment. That exact conduct is what subjects Mr. Shamo to a potential mandatory life sentence. There is no disagreement between the parties that the mandatory life sentence in this matter would only arise if the amount of fentanyl-based pills attributed to Mr. Shamo in fact meets the statutory threshold for such a sentence. In that regard, the evidence is material to Mr. Shamo and goes directly to the heart of Paz's credibility as a witness in this matter. That type of materiality is of the exact type contemplated by *Brady/Giglio*. This materiality is further supported by *United States v. Young*, as Mr. Shamo's role and connection to the fentanyl-based pills is the only element which potentially exposes him to a mandatory life sentence, whereas Paz and Crandall face no such harsh punishment despite the culpability of their conduct.

The Government's willful failure to deny access to that hard drive has significantly hindered Mr. Shamo's ability to prepare an adequate defense. Should the Government provide that hard drive by the estimated date (on or about May 28-29, 2019), Defense Counsel is still faced with an enormous task: (1) obtaining new budget approval for review of the 8TBs or more of data; (2) actually processing 8TBs or more of data in the intervening three weeks; and (3) making significant scheduling accommodations to allow time to review that data in its entirety. Undoubtedly, this willful delay and continue failure to provide the requested information has prejudiced Mr. Shamo's defense by no fault of his or Defense Counsel.

WHEREFORE, Aaron Shamo, respectfully request the Court continue the matter to allow Mr. Shamo an appropriate amount of time to obtain, process, and review the improperly withheld *Brady/Giglio* material in their entirety. Due to the Government's willful conduct in failing to provide the requested information, the continued time should not be excluded from Mr. Shamo's Speedy Trial Act calculations with the exception of the time allotted for completion of briefing on this motion and entry of the Court's ruling.

DATED this 24th day of May, 2019.

SKORDAS & CASTON, LLC

*/s/ Gregory G. Skordas*
Gregory G. Skordas

*/s/ Kaytlin V. Beckett*
Kaytlin V. Beckett

*/s/ Daryl P. Sam*
Daryl P. Sam

## CERTIFICATE OF SERVICE

I hereby certify that on the May 24, 2019, I electronically filed a true and correct copy of

the foregoing **MOTION TO CONTINUE FOR WILLFUL FAILURE TO PROVIDE**

**BRADY/GIGLIO MATERIAL**, with the Clerk of the Court using CM/ECF system, which sent

notification of such filing to the following:

    S. Michael Gadd
    mgadd@agutah.gov

    Vernon G. Stejskal
    Vernon.stejskal@usdoj.gov

    Kent Burggraaf
    kburggraaf@agutah.gov

                     */s/ Sabrina Nielsen-Legal Secretary*
                     SKORDAS & CASTON, LLC

Attachment A, Messenger Receipt for Hand Delivery of Hard Drives

# LEGAL MESSENGER INC

P.O. box 11101 SLC, UT 84147

Office: (801) 521-3999   Email: lmi@xmission.com

**Billing Detail for:**

Skordas Caston & Hyde
560 S 300 E #225
Salt Lake City, UT 84102

Printed 11/30/2018

For Period 11/01/2018 to 11/30/2018

Page: 1

| Dated Order | Attorney/contact  Client Reference | Comment | Court Runs Regulars   Specials | All Others Misc. Reg/Spcl. | Totals |
|---|---|---|---|---|---|
| 11/06/2018 | GREG/SABRINA  MODES/REG TO THOMAS BRUNKER | 160  E 300 S @ 1006 | | $8.00 | $8.00 |
| 11/26/2018 | GREG/SABRINA  SHAMO/REG TO US ATTY | 111 S MAIN @ 1115 | | $8.00 | $8.00 |
| | | Grand Totals: | | $16.00 | $16.00 |

This print-out is in attorney/contact order.  Print-outs are also available in dated order.  Your comments are welcome.  Thanks for using LMI.

## Final Details for Order #112-2257195-1296251
Print this page for your records.

**Order Placed:** November 21, 2018
**Amazon.com order number:** 112-2257195-1296251
**Order Total:** $233.99

### Shipped on November 22, 2018

| Items Ordered | Price |
|---|---|
| 1 of: *Toshiba HDTB330XK3CB Canvio Basics 3TB Portable External Hard Drive USB 3.0, Black*<br>Sold by: Amazon.com Services, Inc<br><br>Condition: New | $79.99 |
| 1 of: *Seagate Expansion 8TB Desktop External Hard Drive USB 3.0 (STEB8000100)*<br>Sold by: Amazon.com Services, Inc<br><br>Condition: New | $139.00 |

**Shipping Address:**

[redacted]

**Shipping Speed:**
Two-Day Shipping

| | |
|---|---|
| Item(s) Subtotal: | $218.99 |
| Shipping & Handling: | $0.00 |
| | ----- |
| Total before tax: | $218.99 |
| Sales Tax: | $15.00 |
| | ----- |
| **Total for This Shipment:** | **$233.99** |
| | ----- |

### Payment information

**Payment Method:**
Visa | Last digits: [redacted]

**Billing address**
Nora Oki
560 South 300 East
Suite 225
Salt Lake City, Utah 84111
United States

| | |
|---|---|
| Item(s) Subtotal: | $218.99 |
| Shipping & Handling: | $0.00 |
| | ----- |
| Total before tax: | $218.99 |
| Estimated tax to be collected: | $15.00 |
| | ----- |
| **Grand Total:** | **$233.99** |

**Credit Card transactions**

Visa ending in [redacted] November 22, 2018: $233.99

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2018, Amazon.com, Inc. or its affiliates

Attachment B, Email from Michael Gadd



**Kaytlin Beckett <kbeckett@schhlaw.com>**

---

# Shamo

**Daryl Sam** <daryl.sam@gmail.com>                                       Sat, Dec 8, 2018 at 10:43 PM
To: Kaytlin Beckett <kbeckett@schhlaw.com>, lawoffice@schhlaw.com, gmena@schhlaw.com

I think I forgot to forward this email from Mike Gadd about the hard drives.

---------- Forwarded message ----------
From: **Michael Gadd** <mgadd@agutah.gov>
Date: Fri, Dec 7, 2018 at 9:37 AM
Subject: Re: Shamo
To: Laughter, Yvette (USAUT) <yvette.laughter@usdoj.gov>, Daryl Sam <daryl.sam@gmail.com>

The hard drives have been found! We'll start the data transfer.  My memory is that it takes a minute to move 11TB, but Yvette will remember better than me.

**From:** Daryl Sam <daryl.sam@gmail.com>
**Sent:** Thursday, December 6, 2018 4:17:55 PM
**To:** Laughter, Yvette (USAUT); Michael Gadd
**Subject:** Fwd: Shamo

Mike and Yvette,

Attached below is a receipt from LMI showing the hard drives were delivered to your office on 11/26 at 11:15 am. Also, attached is a receipt for the purchase of the hard drives. Apparently Yvette was out that day so the hard drives were likely given to someone else. Let me know if you are able to find them.

Thanks,
Daryl

---------- Forwarded message ----------
From: **Receptionist Skordas, Caston & Hyde** <lawoffice@schhlaw.com>
Date: Thu, Dec 6, 2018 at 4:11 PM
Subject: Re: Shamo
To: <daryl.sam@gmail.com>

Daryl,

Attached is the confirmation from LMI as well as the receipt for the hard drives. Is there anything that we can do on our end to help, or will you be handling this issue?
[Quoted text hidden]

Attachment C, New Exhibits


**Back**

3k April 20th

3.5k April 21st

Total: 13.8k = $17,250

Paid $2500 June 4.    $14,750 owed

Paid $2500 June 10

Amzn $1000 June 10  $11,250 owed

Paid $3500 June 13.   $7,750

Amzn $200 June 13

Paid $7500 June 21  $1,450 owed

Paid $1000 June 22 $450 owed


4.6k May 5th

11k May 7th

Total 15.6k = $19,500

May 10th 30k girls

May 10th 15k Chris


June 07 15k Chris

June 09 22k total 5k went to girls 27k

June 10 60k total 5k went to girls 65k

GOVERNMENT
EXHIBIT

**22.04**

2:16CR 631 DAK




Also, I'm selling a lot more bulk online, so stuffs moving fast but it's a huge price drop, I wanna discuss this when you get back, it's getting down with all the extras that are being passed out that I'm not making nearly as much as predicted, I'm sure you know this. So probly starting next week I'm giving my shippers an up in pay but I wanna cut your pay from a full dollar to .75 cents per pill, not a huge difference until I get a bigger shipping team I have to sell bulk and not lower quantities, I wanna be fair so let me know your thoughts. Cause.. I'm doing the math and with btc dropping extras being passed out and cost of running everything my cut is getting lower and lower, I wanna run some numbers wth you.

I feel shifty saying this but when we sell 4000 roxy at 5 a pop, they send an extra 1k it actually lowers price to 3.50.. If you get a dollar per pill and btc drops 35% I nearly get what you get but.. I'm paying employees drops

6:16 PM

Idk man, let's sit down and talk and run number, I can put prices up, move slower or we can lower prices and move quickly

6:17 PM

GOVERNMENT
EXHIBIT
22.07
2:16CR 631 DAK

Attachment D, Email Correspondence From Yvette Laughter



**Gmail**
by Google

Kaytlin Beckett <kbeckett@schhlaw.com>

---

# Hard Drive

**Laughter, Yvette (USAUT)** <Yvette.Laughter@usdoj.gov>          Thu, May 23, 2019 at 2:48 PM
To: Kent Burggraaf <kburggraaf@agutah.gov>, Eric Wheeler <eric@trial-tech.com>, Kaytlin Beckett
<kbeckett@schhlaw.com>
Cc: Daryl Sam <daryl.sam@gmail.com>, Michael Gadd <mgadd@agutah.gov>, "gskordas@schhlaw.com"
<gskordas@schhlaw.com>, Dan Ashment <Daniel.E.Ashment@ice.dhs.gov>

Good afternoon everyone –

Just wanted to give you all a quick update about the status of the hard drive transfer.   We have found what we believe to be Mr.
Paz's computer images.  They are very large and are contained on three hard drives.  They should all fit on Mr. Wheeler's hard
drive but since I can only copy one at a time (one hard drive receiving the info), these will not finish before the week-end.  I hope to
get these to you by the end of the day Tuesday or perhaps mid-day Wednesday.

Best,

*Yvette Laughter*

Supervisory Legal Admin. Spec.

Violent Crime Section

United States Attorney's Office

111 South Main, Suite 1800

Salt Lake City, Utah 84111-2176

(801) 325-3264

Yvette.Laughter@usdoj.gov

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

---

## IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO CONTINUE FOR FAILURE TO PROVIDE BRADY/GIGLIO MATERIAL |
| vs. | |
| AARON MICHAEL SHAMO, | |
| Defendant. | Judge Dale A. Kimball |

---

The United States, through counsel, provides the following response in opposition to the Defendant's Motion to Continue for Willful Failure to Provide *Brady/Giglio* Material (Doc. 224). The United States opposes the Defendant's motion on two grounds: (1) the United States has met its discovery obligations in this case, including its *Brady/Giglio* obligation; and (2) the grounds set forth in the Defendant's motion are not proper grounds for continuing the jury trial.

The United States affirms that in December 2018 it provided the Defendant with all the digital content it possessed and over which it had control. This content was provided to the Defendant on hard drives provided by defense counsel and on hard drives loaned to defense counsel. It is believed that either (a) defense counsel has in its possession all of the digital content it is now requesting, or (b) there was a copying error on the part of defense counsel from the loaned

hard drives to defense counsel's storage media. The hard drives previously loaned to defense counsel still contain the same digital content, and those same hard drives are the source from which the United States re-copied the digital content requested last week.

In short, counsel for the Defendant made an error—and the error has set back their expert's review by approximately one week. That is not a valid reason to continue the trial. The United States respectfully requests the Court deny the Defendant's motion.

## TABLE OF CONTENTS

1. STATEMENT OF RELEVANT FACTS .............................................................................. 3

2. ARGUMENT ................................................................................................................... 15

2.1 The United States bears no responsibility for the Defendant's errors ........................... 15

2.2 Additional delay is unwarranted and harmful ............................................................... 16

2.3 The defense's error is not a *Brady/Giglio* violation; false accusations of *Brady/Giglio* violations have no place in pre-trial litigation ...................................................................... 19

    2.3.1 An image of Luke Paz's iMac ............................................................................... 22

    2.3.2 Encrypted files from co-conspirators' devices ....................................................... 23

    2.3.3 Exhibits from Luke Paz's iMac .............................................................................. 24

3. CONCLUSION ................................................................................................................. 25

461

## 1.    STATEMENT OF RELEVANT FACTS

1.      On November 23, 2016, the Defendant appeared for a detention hearing, after being charged by complaint, and was appointed counsel.  *See* Doc. 6 and 8.

2.      On December 7, 2016, the Defendant was indicted and arraigned.  Doc. 11 and 13.

3.      On December 14, 2016, the United States submitted its first Notification of Compliance and Request for Reciprocal Discovery (Doc. 17) and provided the discovery materials noted therein to the Defendant.  In that notice, the United States affirmed that:

> Additional discovery materials would be provided when they became available, within a reasonable time.  The United States would comply with its obligation under Rule 16 and 26.2 of the Federal Rules of Criminal Procedure and the Jencks Act without requiring the Defendant to make a specific request for such material.[1] Upon request of the Defendant, the United States would permit and facilitate the Defendant's own inspection, copying or photographing of those items described/defined in Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure. This includes items "within the government's possession, custody, or control".

4.      On January 5, 2017, the Defendant filed his first motion to continue the jury trial scheduled for February 13, 2017.  Doc. 22.  The United States did not object to this motion.  At the time of that motion, twenty-nine days had elapsed under the Speedy Trial Act.

5.      On January 6, 2017, the Court ordered the trial be continued to May 22, 2017, excluding time between the filing of the Defendant's motion to the new trial date from speedy trial computations.  Doc. 23.

6.      Between February 8, 2017 and April 12, 2019, on approximately fourteen (14) subsequent occasions, the United States provided additional discovery, or notice that discovery

---

[1] The United States also requested reciprocal discovery and continuing compliance with the request.  To date, the United States has received no reciprocal discovery; the Defendant has not provided copies of the exhibits it proposes to use at trial.  On May 24, 2019, the Defendant provided an updated exhibit list without Bates numbering or copies thereof.  Under the requirements of reciprocal discovery, the Defendant must provide copies of his exhibits.  *See e.g., United States v. Swenson*, 298 F.R.D. 474, 478 (D. Idaho 2014).

3

462

had previously been provided, and/or notice of availability to inspect discoverable materials to the Defendant, within a reasonable time of the materials coming into possession/control of the United States. Corresponding notices of compliance were filed.[2]  In those notices, most affirmed the same intent as was included in the first notice of compliance.

7.     On May 15, 2017, the Defendant filed his second motion to continue the jury trial scheduled for May 22, 2017.  Doc. 28.  The United States did not object to this motion.

8.     On May 17, 2017, the Court ordered the trial be continued to August 28, 2017, excluding time between the date of the order and the new trial date from speedy trial computation. Doc. 29.

9.     On May 31, 2017, the Defendant and five co-defendants were indicted under a superseding indictment.  Doc. 32.

10.    On June 30, 2017, upon motion by defense counsel for the defendants in this matter (effectively Defendant Shamo's third motion to continue), Magistrate Judge Evelyn Furse ordered the jury trial continued, setting a status conference on August 31, 2017, and excluding time between June 30, 2017, and the status conference from speedy trial computation.  Doc. 65.  The United States did not object to this request for a continuance.  This was the third continuance of the trial.

11.    On September 1, 2017, following a status conference on August 31, 2017, Magistrate Judge Evelyn Furse ordered a second status conference on December 1, 2017, and excluded time between August 31, 2017 and December 1, 2017, from speedy trial computation. Doc. 69.

_____

[2] *See* Court docket, documents 24, 25, 62, 70, 89, 95, 106, 112, 113, 122, 141, 173, 175, and 187.

12. On December 1, 2017, upon motion by defense counsel for the defendants (effectively Defendant Shamo's fourth motion to continue), Magistrate Judge Evelyn Furse ordered a third status conference on February 28, 2018, and excluded time between December 1, 2017, and the third status conference from speedy trial computation. Doc. 82.

13. Approximately eighteen months ago, on December 14, 2017, the United States provided the following notice to the Defendant in the United States' Supplemental Notification of Compliance and Request for Reciprocal Discovery (Doc. 89):

> "The United States has previously made available, and continues to make available forensic data from seized electronic devices, as follows. Parties who seek to obtain their own copy of the forensic data have been asked to provide an 8TB hard drive and a 3TB hard drive to the United States Attorney's Office." [A detailed list of 65 electronic devices/data was included.]

14. On February 1, 2018, the United States provided the following notice to the Defendant, in the United States' Supplemental Notification of Compliance and Request for Reciprocal Discovery (Doc. 95):

> "The United States continues to make available forensic data from seized electronic devices. The latest devices are listed as follows. Parties who seek to obtain their own copy of the forensic data have been asked to provide an 8TB hard drive and a 3TB hard drive to the United States Attorney's Office." [A list of two additional devices/data was included ("Shamo iPhone 6s" and "Shamo iPhone 7 – Axiom, Cellebright").]

15. On February 28, 2018, Magistrate Judge Paul M. Warner scheduled a jury trial in this matter for August 20, 2018, ordering time be excluded between February 28, 2018, and the jury trial date from speedy trial computation (order entered March 1, 2018). Doc. 97.

16.     Between May 10, 2018, and December 20, 2018, the United States provided six

discovery notices to the Defendant that stated (Doc. 106, 112, 113, 122, 141, and 173):[3]

> "The United States continues to make available forensic data from seized electronic
> devices. Parties who seek to obtain their own copy of the forensic data have been
> asked to provide an 8TB hard drive and a 3TB hard drive to the United States
> Attorney's Office." [No additional/new devices were listed in the notice.]

17.     On August 1, 2018, the Defendant filed his third written motion to continue (his

fifth overall motion to continue) the jury trial. Doc. 125. The United States did not object to this

motion.

18.     On August 3, 2018, the Court Ordered the trial continued from August 20, 2018 to

January 22, 2019, excluding time between the date of the order and the new trial date from speedy

trial computation. Doc. 127.

19.     On October 18, 2018, the Defendant was indicted under the second superseding

indictment. Doc. 136.

20.     Based on representations of and documentation tendered by defense counsel, on or

about November 26, 2018, the Defendant provided two hard drives to the U.S. Attorney's Office.

These were delivered on a day when the assigned front-desk staff from the U.S. Attorney's Office

was out of the office. The hard drives were not addressed to the assigned prosecutors or paralegal.

The hard drives did not reference this case by complete case name or case number. None of the

prosecutors or paralegals working on this case knew about the hard drives until a member of the

defense inquired about them. This resulted in several days of delay in locating the hard drives.

---

[3] A similar notice was also repeated a seventh time (disclosing the available forensic data from
seized electronic devices) in the United States' Supplemental Notification of Compliance and
Request for Reciprocal Discovery, filed April 4, 2019 (Doc. 187).

6

Due to the size of the digital content, in excess of 11 terabytes, duplicating the files required just under two weeks (started December 7, and concluded on or around December 20, 2018).

21.     On December 7, 2018, counsel for the United States emailed to defense counsel information and twenty-seven (27) documents deemed to be subject to disclosure pursuant to *Brady*, *Giglio*, and the Jencks Act.

22.     On December 20, 2018, the United States notified defense counsel that the hard drives with the requested digital content were ready for pickup and filed two Supplemental Notification of Compliance and Request for Reciprocal Discovery (Doc. 173 and 175).  Doc. 175 included the following:

> "The United States of America, by and through the undersigned, hereby files a supplemental notification in regards to its discovery obligations. The United States made forensic data from seized electronic devices available to all defense counsel prior to December 2017. Doc 89, at 4. Counsel for Mr. Shamo have recently provided external hard drives to the United States and the United States has made copies of the forensic data from the case for the defense. Three hard drives containing forensic data were provided to the defense on December 19, 2018; two more hard drives containing forensic data are available today for pick-up. Included on the hard drives is forensic data from two more recently seized devices. The United States has continuously made all its forensic data available. Because the hard drives from Mr. Shamo's defense counsel were not large enough to contain all the forensic data, the United States has loaned three hard drives containing data to the defense. The two newer devices are a cell phone from M.P. and an iMac computer from L.P."

23.     On December 20, 2018, within the digital content of the discoverable materials, the United States provided to the Defendant the two exhibits mentioned in and included as attachments to the Defendant's current motion to continue.  *See* Doc. 224. The exhibits come from Luke Paz's iMac computer, for which the forensic image file(s) were provided.  They were not individually

466

bates stamped when provided, because they were part of a larger digital file (i.e., the large forensic

image files of Luke Paz's iMac computer).[4]

24.  On December 27, 2018, the Defendant filed his fourth written motion to continue

(his sixth motion to continue when including the two oral motions).[5] Doc. 178.  On the same day,

_____

[4] The United States does not bates stamp every individual document, folder, subfolder, etc. included within a larger digital forensic image file.  To do so, especially in a case with as many electronic device image files as this case has, would not be tenable.  The larger file itself, or the storage media in which the file is included, are routinely bates stamped instead.
As illustrative of this point, many of the 14-series exhibits proposed by the United States and now mostly admitted, were not bates stamped, because they came from a larger volume of digital content—the Defendant's computer and cell phones.  *See* Docket Entry 219.

[5] Defense counsel communicated with counsel for the United States about this continuance.  While the United States did not object to the motion, it communicated to defense counsel its disagreement with part of the reasoning outlined in Defendant's motion and included in the proposed order. Specifically, counsel for the United States reminded defense counsel that the majority of the digital evidence had been made available to defense counsel since December 14, 2017, a year earlier.  The only digital evidence noticed as available after that date were forensic content of the Defendant's two cell phones on February 1, 2018 (with notice provided prior to the discovery deadline), and the forensic image of an iMac computer belonging to Luke Paz and cell phone content of M.P., not received by the United States until late in 2018.  Therefore, the Defendant had the opportunity to obtain copies of the majority of the forensic content well in advance of its December 2018 motion to continue; the United States expressed to defense counsel that this point was not clear in the motion to continue nor the proposed order.

The Defendant's December 2018 motion to continue give the appearance that the United States delayed in providing discovery, when in actuality, the defense waited until November 2018 to request a copy of the digital content and was then dissatisfied when multiple terabytes of data, including the forensic image of Luke Paz's iMac, took a lengthy period of time to copy.  [Large amounts of digital content, i.e., multiple terabytes, can take multiple days or weeks to copy, depending on the hardware and software being used to duplicate the content.  It's unclear whether defense counsel either then or now is aware of this logistical issue in duplicating digital content, while ensuring the file(s) are not changed.  It is one of the reasons for which the United States provided early notice of the large quantity of digital content available for viewing or copying.]

In his December 2018 motion to continue, the Defendant states that the United States misrepresented the amount of digital content, because it initially only requested that defense counsel provide an 8 terabyte hard drive and a 3 terabyte hard drive, when ultimately the digital content was more than 11 terabytes total (defense counsel's assertion being that it was 20 terabytes of data).  However, the 8TB and 3TB hard drive were required in reference to the digital content noticed in the United States' Supplemental Notification of Compliance and Request for Reciprocal

8

the Court ordered the jury trial scheduled for January 22, 2019, continued to June 17, 2019, also ordering the exclusion of time between December 27, 2018, and the new trial date from Speedy Trial Act computation.  Doc. 179.

25.     On April 17, 2019, the United States provided to defense counsel its list of proposed exhibits.  See Doc. 190.  The United States also notified defense counsel that by the end of the following day (April 18) a DVD with a copy of all the proposed electronic exhibits for the United States would be available for pickup at the U.S. Attorney's Office.  The DVD contained the two exhibits cited to and included in the Defendant's current motion to continue, along with other items from Luke Paz's computer (listed in the United States' 22-series of exhibits).[6]  This was the second time content from Luke Paz's computer was provided to defense counsel.

26.     On April 24, 2019, as a supplement to prior disclosures, counsel for the United States emailed to defense counsel information and twenty-eight (28) documents deemed to be subject to disclosure pursuant to *Brady*, *Giglio*, and the Jencks Act.

27.     On April 26, 2019, the Defendant filed his Notice of Expert Eric Wheeler (Doc. 195).  In it, the Defendant included:

> "Mr. Wheeler has reviewed all data and information provided by the Government concerning electronic data, electronically stored information, computer records, and the defendant's alleged use of the "dark web" for drug sales related to several of the counts in the Second Superseding Indictment.  Specifically, Mr. Wheeler has reviewed the cell phones, computers, and electronic devices of co-defendants and co-conspirators."

---

Discovery, filed December 14, 2017 (Doc. 89).  The United States hoped to fit the additional content on an 8TB and 3TB hard drive provided by defense counsel; however, when it was determined the additional files would not fit on the hard drives provided, to avoid delay, the United States placed the additional content on its own hard drive(s) and allowed defense counsel to borrow those drive(s).

[6] The United States proposed exhibits that came from Luke Paz's computer were not objected to by the Defendant and were admitted by the Court (as to foundation).  *See* Docket Entry 219.

9

28.     On April 26, 2019, the United States filed its Motion to Strike Defendant's Expert Eric Wheeler and Request for a *Daubert* Hearing, based on inadequate Rule 16 disclosure by the Defendant.  Doc. 201.  Resolution of this motion is still pending.

29.     On May 21, 2019, almost a month after the Defendant's notice of expert had asserted Mr. Wheeler had already reviewed all the electronic data, counsel for the United States received a phone call from the Defendant's counsel, Daryl Sam.  Mr. Sam expressed that the Defendant's computer expert, Eric Wheeler, could not locate the full forensic image/files for Luke Paz's iMac computer in the discovery previously provided.

30.     The phone call on May 21, 2019, was followed up with a conference call on the same day between counsel for the Defendant, Daryl Sam, Defendant's computer expert, Eric Wheeler, and counsel for the United States.  Counsel for the United States affirmed that it had previously provided a full forensic copy of the forensic image for Luke Paz's iMac computer in December 2018[7] and that there may have been a copying error when counsel for the Defendant copied the forensic image files in which larger files were not copied.[8] However, counsel for the

---

[7] In providing the forensic image of Luke Paz's iMac computer in December 2018, the United States explained that in conjunction with the other digital content being provided, the forensic image files were too large to fit on the remaining space of any one hard drive and therefore forensic image files were included on three separate hard drives.

[8] The United States utilizes specific software in the copying process to ensure digital content, including file metadata, is not changed and to ensure all files, including large files such as forensic image files, are completely copied over.  This is necessary to ensure that metadata such as accessed/modified/created dates are not changed, and because traditional copy/paste or drag/drop methods of copying will not always duplicate all files accurately, particularly larger files.  Counsel for the United States explained this during its phone call with defense counsel and defense expert during its phone call on or about May 21, 2019.  Counsel for the United States also expressed its suspicion that perhaps defense counsel did not provide a full copy of the forensic image to Mr. Wheeler, if defense counsel utilized a copy/paste or drag/drop method for copying the files.

10

United States offered to provide Mr. Wheeler with another copy. It was agreed[9] that Mr. Wheeler would drop off a hard drive at the U.S. Attorney's Office the following day, so that the United States could recopy the requested files. Additional phone numbers were exchanged between the parties to facilitate continued communication regarding the proposed actions.

31.     During the conference call on May 21, 2019, Mr. Wheeler raised the question about the encrypted files within the digital content provided to the defense in December 2018. Counsel for the United States partially explained during that phone call, and then explained further the following day, that the files of some of the electronic devices were in an encrypted state when seized. Agents for the United States were unable to decrypt the encrypted files, because decrypting them would require a password/key, which agents of the United States did not have (i.e., the files were encrypted by someone in possession of them prior to them being seized). It was further explained that these encrypted files were provided in the interest of full disclosure and transparency through the discovery process. While the encrypted files were seized pursuant to legal authority, the United States does not know what is contained within the encrypted files.[10]

---

[9] The Defendant asserted in his motion that the United States "insisted that Mr. Wheeler provide a new hard drive for copying of the forensic image of Mr. Paz's iMac." The Defendant then asserted, "This insistence seemed improper as the Government had insisted that these hard drives (which were previously provided to Defense Counsel) had proper forensic images and copying such a large file size would require several days." It is correct that counsel for the United States explained that re-copying these files would take several days, however the Defendant's motion mischaracterizes the interaction, in that the parties discussed how to get Mr. Wheeler what he needed as quickly as possible. Not knowing whether defense counsel had properly copied the files which had previously been provided to them, it was determined and agreed upon to just provide Mr. Wheeler with another copy and that he would deliver a hard drive to the U.S. Attorney's Office for that purpose. [It is possible that the drafter of the Defendant's motion was not Mr. Sam, in that the conversations between him, Mr. Wheeler and counsel for the United States were cordial and professional.]

[10] Based on the assertions of the Defendant, in paragraphs 26-28, it appears that there may be a lack of understanding about the processes used by computer forensic examiners in performing cell phone extractions and in creating a forensic image of a computer hard drive. In processing digital evidence, computer forensic examiners for the United States attempt to decrypt cell phones and

11

32.     On May 22, 2019, counsel for the United States received a call from the Defendant's computer expert, Eric Wheeler.  During that call, he requested that in providing the duplicate copy of the digital content discussed the prior day, he would like any digital files related to phones or computers for Drew Crandall and Luke Paz, not just the forensic file(s) for Luke Paz's iMac computer.  [The request for the additional content appeared abnormal, based on the Defendant's Notice of Expert filed a month earlier, and based on the trial proximity.]

33.     During the phone call on May 22, 2019, Mr. Wheeler acknowledged that the additional requested electronic data would be a larger quantity of digital content than previously requested, but that he thought his 8 terabyte hard drive would be sufficient.[11]  Mr. Wheeler acknowledged that he had received some of the forensic image files of Luke Paz's iMac computer from defense counsel, but believed he had not received all the forensic image file(s).

---

computer files by using known or identified passwords, by brute force, or other methods (i.e., they attempt to decrypt, they do not encrypt files).  Sometimes, as in this case, computer forensic examiners are unable to decrypt encrypted files.  The evidence is of little value in an encrypted state.

The assertions made in the Defendant's motion seem to indicate that the United States encrypted the files either before or after imaging a computer.  However, there is not a reason to encrypt these forensic images as has been suggested by the Defendant's motion.  Furthermore, the Defendant's motion did not specify any evidence or exhibits the United States has turned over that demonstrated that the United States has in fact accessed the encrypted files (i.e., accessed/is in possession of files from the devices from which the encrypted files came).  The United States affirms it is not aware of the location of any nor does not have a copy of these encrypted files in a decrypted state.  Based on the Defendant's description, the United States further affirms that it is not the party responsible for encrypting the files.

The United States wanted to avoid the claim that governmental agents seized electronic devices and either did not search them, or searched them and did not turn over what was found.  In reality (and for transparency), agents for the United States found some encrypted file(s) for which they were unable to decrypt.

[11] Counsel for United States directly communicated Mr. Wheeler's wishes to the legal staff at the U.S. Attorney's Office.

34.     On May 22, 2019, pursuant to Mr. Wheeler's request, staff at the U.S. Attorney's Office began copying approximately 1.98 terabytes of digital content pertaining to Drew Crandall and Luke Paz.  However, this 1.98 terabytes did not include the forensic image files of Luke Paz's iMac computer.

35.     On May 22, 2019, staff at the U.S. Attorney's Office attempted to locate the hard drives previously loaned to defense counsel with the forensic image of Luke Paz's iMac computer. This was done in an effort to save re-copying time, anticipating the same hard drives could be provided to Mr. Wheeler.[12]

36.     On May 23, 2019, staff for the United States discovered and recalled that in providing the forensic image files for Luke Paz's iMac computer in December 2018, the files had been split between multiple hard drives, due to their size and the other content being provided.[13] Rather than risk defense counsel or Mr. Wheeler not being capable of identifying/recognizing all the forensic image files stored on the hard drives previously loaned to defense counsel (i.e., they were not previously able to identify/recognize them), the United States began copying the files from the different hard drives onto the hard drive provided by Mr. Wheeler.

37.     On May 23, 2019, staff at the U.S. Attorney's Office emailed defense counsel and counsel for the United States, informing them that the re-copying process for the forensic image files of Luke Paz's iMac computer was underway.  This email notice explained that due to the files

---

[12] Part of that process of locating the loaned hard drives included an email inquiry to defense counsel to determine if the hard drives had been returned to the U.S. Attorney's Office; it was confirmed that the hard drives loaned to defense counsel had been returned. The hard drives were located by staff at the U.S. Attorney's Office.

[13] This may also explain why defense counsel may have failed to provide its own expert a full copy of the forensic image files of Luke Paz's iMac computer, not realizing it was located in multiple locations and not recognizing/identifying all the files needed by Mr. Wheeler, thereby only providing a portion of the forensic image files.

13

being located on multiple hard drives (i.e., the hard drives previously loaned to defense counsel in December 2018), and due to the large file size, the re-copying process to Mr. Wheeler's hard drive would not be completed before the weekend.

38.     The United States affirms that in December 2018 it provided the Defendant with all the digital content it possessed and over which it had control.  This content was provided on the hard drives provided by defense counsel, and on hard drives loaned to defense counsel.  It is believed that either defense counsel has in its possession all of the digital content of which it requested a copy last week, or there was a copying error on the part of defense counsel (from the loaned hard drives to defense counsel's storage media).  The hard drives previously loaned to defense counsel still contain the same digital content, and those hard drives are the source from which the United States re-copied the digital content requested.

39.     On May 24, 2019, the Defendant filed its Motion to Continue for Willful Failure to Provide *Brady/Giglio* Material.  Doc. 224.  Other than the emails and the cooperative phone calls between the parties, counsel for the United States received no communication from defense counsel regarding the discovery provided, nor the United States efforts to provide defense counsel and their expert another copy of the digital content requested.

40.     Today, May 28, 2019, staff at the United States Attorney's Office provided notice to the Defendant's expert and counsel that Mr. Wheeler's hard drive was ready for pickup.[14]

---

[14] This delay and additional effort might have been avoided, were the Defendant's inquiry and request received in a timelier fashion (e.g., more than four weeks prior to trial or closer in proximity to the time in which notice of the digital content was given).

14

## 2.    ARGUMENT

The United States urges the Court to deny the Defendant's motion to continue because (1) the United States bears no responsibility for the errors made by defense counsel in copying or transferring the image of Luke Paz's iMac; and (2) additional delay is unwarranted and harmful. The United States also notes that the Defendant's accusations of willful *Brady/Giglio* violations are wholly without merit.

### 2.1    The United States bears no responsibility for the Defendant's errors

The one-week delay to Mr. Wheeler's review came as a result of an error by the defense—the United States has fully complied with its discovery obligations. Rule 16 requires the United States to provide discovery to the Defendant and the United States' discovery obligations remain ongoing. The United States takes a broader view of its discovery obligations than required by Rule 16.

With few exceptions, the material in dispute in the Defendant's motion to continue are files that collectively make up a bit-for-bit copy of Luke Paz's iMac computer. Those files, referred to as an image of his computer, were provided to counsel for the Defendant in December 2018. As explained above, the United States loaned three hard drives to the defense in December 2018. Those loaned hard drives contained the image of Luke Paz's iMac. Counsel for the Defendant attempted to make a copy of the loaned hard drives and then returned the loaned hard drives to the United States.

On April 26, 2019, counsel for the Defendant filed a document indicating its expert, Mr. Wheeler, had reviewed the image of Luke Paz's iMac, among other electronic data. But on May 21, 2019, Mr. Wheeler and counsel for the Defendant indicated they could not locate the full image of Luke Paz's iMac.

15

474

The image of Luke Paz's iMac is still on the loaned hard drives. The United States used those same loaned hard drives to transfer the image files directly to Mr. Wheeler's hard drive, thereby eliminating any chance counsel for the defense could make additional errors in copying or transferring the data for Mr. Wheeler.

As explained above, it appears that counsel for the defense either (1) erred in copying the loaned hard drives in December 2018 and January 2019; or (2) erred in transferring the image files to Mr. Wheeler.

The error resulted in an approximately one-week delay for Mr. Wheeler to review the image files of Luke Paz's iMac. The United States had no control over the error. The United States worked diligently to provide another copy of those same files so that Mr. Wheeler could conduct his review.

## 2.2    Additional delay is unwarranted and harmful

The Court should deny the Defendant's motion to continue as there is no valid basis on which to grant the motion and because additional delay would not be consistent with aims of the Speedy Trial Act. The Sixth Amendment of U.S. Constitution guarantees the Defendant's right to a speedy trial. Congress has codified that right: "In any case involving a defendant charged with an offense, the appropriate judicial officer, at the earliest practicable time, shall, after consultation with counsel for the defendant and the attorney for the Government, set the case for trial a day certain… so as to assure a speedy trial." 18 U.S.C. §3161(a).

The opposite guarantee—a right to unlimited continuances—is neither a constitutional nor statutory right.  However, in order to ensure that a defendant is not rushed to trial without an adequate opportunity to prepare, Congress amended the Speedy Trial Act in 1979 to provide a

minimum time period during which trial may not commence. Speedy Trial Act Amendments of 1979, Pub. L. No. 96-43, Section 3, 93 Stat. 327. The amendment provided that trial may not begin less than 30 days from the date the defendant first appears in court, unless otherwise agreed to in writing. 18 U.S.C. §3161(c)(2).

The 30-day defense preparation period provided for in §3161(c)(2) is calculated without reference to the §3161(h) exclusions. Therefore, while only twenty-nine days have elapsed under the Speedy Trial Act, more than thirty-days have elapsed in reference to §3161(c)(2). Indeed, the Defendant has been in custody for two and one-half years.

The Defendant's motion fails to cite to any authority that holds a continuance of a trial is a proper remedy for the United States' alleged conduct. The Defendant alleged a *Brady/Giglio* violation as a justification for the continuance, without excluding time under the Speedy Trial Act. Doc. 224.

The United States has found no case law or statutory basis to continue the trial because an error by a defense attorney led to a one-week delay in a defense expert's review of forensic data. There is not a good reason to continue the trial. At most, the Court should continue Mr. Wheeler's Daubert hearing by one week so that he can have the extra week to conduct his review.

As noted above, this case has been continued approximately six times previously upon request of the Defendant. At the time that each of these prior continuances were requested, the United States either did not object or stipulated to accommodate the Defendant, notwithstanding the United States preparations for trial. Each of the continuances has required witnesses to change their schedules and required some to cancel hotel and flight accommodations.

17

One of the United States' key witnesses died while this case has been pending trial. Several of its witnesses have retired, changed employment, or changed assignments within their agencies. The memories of the United States' witnesses are not improving with time. Another continuance should not be granted as it is not in the interest of justice to delay this matter further. If the trial were again continued, it would again cause great inconvenience to the United States' witnesses, many of whom reside outside the State of Utah.

In considering the Defendant's motion, the Court should take note of the inconsistency or misrepresentation regarding the Defendant's proposed expert, Eric Wheeler. In their Notice of Expert, they assert that Mr. Wheeler had already reviewed all the data and content from all cell phones, computers, and electronic devices of co-defendants and co-conspirators, at least as of April 26, 2019. *See* Doc. 195. Almost a month later, on May 21, 2019, defense counsel and Mr. Wheeler contacted the United States to make inquiries and requests related to the electronic data provided to them on or about December 20, 2018. The order in which things have transpired should lead the Court to a finding that it was not the United States' willful conduct that has hindered the Defendant's preparation for trial.

The Defendant's expert, Mr. Wheeler, has been engaged since approximately April on tasks for the Defendant such as organizing discovery. The Defendant has waited until after the motion deadline and the Exhibit-List deadline to have Mr. Wheeler review Mr. Paz's iMac contents and other electronic devices from the Defendant's co-conspirators. The review of those devices has not been the highest priority for the Defendant. The error by defense counsel has only set Mr. Wheeler's review back by approximately one week. The Defendant did not cite to a reason for excluding time (or not excluding time) under the Speedy Trial Act that applies to this

18

circumstance.  The United States submits that there is no valid reason to continue the jury trial scheduled to begin June 17, 2019.

**2.3     The defense's error is not a *Brady/Giglio* violation; false accusations of *Brady/Giglio* violations have no place in pre-trial litigation**

Counsel for the Defendant made an error that set back their expert's review by one week but that error cannot be converted into a *Brady/Giglio* violation; the Court should look disapprovingly on false accusations of *Brady/Giglio* violations. The Defendant's motion points out three items as evidence of the United States' willful *Brady/Giglio* violation: (1) the forensic image files from Luke Paz's computer; (2) encrypted files from a co-conspirators' devices; and (3) non-bates stamped exhibits from Luke Paz's computer.   None of these items are being suppressed by the United States and therefore does not arise to a *Brady/Giglio* violation.  These items were provided to the Defendant in December 2018 and have now been re-copied from the same drives previously loaned to defense counsel as a courtesy to defense counsel and Mr. Wheeler.  This additional copy of discoverable material will once again include the forensic image files from Luke Paz's iMac computer, which includes the exhibits cited to in the Defendant's motion.

*Brady v. Maryland* established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution.  373 U.S. 83, 87 (1963).  Within the *Brady* rule falls impeachment evidence as well as exculpatory evidence. *Giglio v. United States*, 405 U.S. 150, 154 (1972).

Here, there is no *Brady* or *Giglio* issue.  On approximately fifteen occasions the United States has provided and supplemented evidence to the Defendant, including notices of digital

content available to be inspected or copied. On two additional occasions the United States provided material which the United States believed to be disclosable under its *Brady/Giglio* obligation or pursuant to the Jencks Act.

The Defendant's motion cites to *United States v. Young*, <u>45 F. 3d 1405</u>. In *United States v. Young*, the Tenth Circuit Court of Appeals held, among other things, (1) the government's delayed disclosure of impeachment evidence did not deprive Young of a fair trial, and (2) delayed disclosure did not violate the Young's rights under the Sixth Amendment or Jencks Act.

Young was part of an eleven-person conspiracy to distribute cocaine. Young and one other co-defendant proceeded to trial, resulting in the defendant being convicted of two counts of money laundering. During trial the government introduced a tape recording between two co-conspirators which had not previously been provided to Young. Over Young's objection claiming a *Brady* violation (i.e., violation of her due process rights), the court admitted the tape recording with impeaching evidence against a co-conspirator.

Unlike *Young*, where the material evidence was provided during trial and ruled as adequate disclosure, here the claimed material evidence has been provided previously and a courtesy copy has again been provided—prior to trial. The United States' disclosure in December 2018, and the additional copy of electronic data provided today, is not so late as to prejudice the Defendant; i.e., disclosure of the three items mentioned in the Defendant's motion did not come so late as to inhibit the Defendant's effective use. *See United States v. Rogers*, <u>960 F.2d 1501, 1511</u> (10th Cir. 1992); *Cf. United States v. Beale*, <u>921 F.2d 1412</u> (11th Cir. 1991).

"[T]he relevant standard of materiality does not focus on the trial preparation, but instead on whether earlier disclosure would have created reasonable doubt of guilt that did not otherwise exist." *United States v. George*, <u>778 F.2d 556, 562</u> (10th Cir. 1985)(citing *United States v. Agurs*,

20

427 U.S. 97, 112 n. 20 (1976)).  Here, the United States provided disclosure of the evidence at issue almost six months prior to the current trial setting (which the Defendant claimed his expert, Mr. Wheeler had already reviewed in their notice of expert, filed April 26, 2019).[15]  Whether the evidence at issue was provided in December 2018 or this week does not create a reasonable doubt that did not otherwise exist.[16]

Like the court in *Young*, the Court should find that the disclosure of the three items mentioned in the Defendant's motion do not constitute a *Brady/Giglio* violation, nor does their disclosure inhibit the Defendant from having a fair trial as currently scheduled.

The Defendant claims as the basis for the continuance that the United States has failed to provided evidence material to his defense.  As is outlined above, the United States has provided discoverable materials to the Defendant on approximately fifteen occasions.  The United States has provided the Defendant discoverable materials in close proximity to when it received them.

When electronic data was of substantial size, the United States provided notice of the items and an opportunity to inspect or copy the materials.  This notice was then duplicated as a reminder in subsequent discovery notices.  The first notice of an opportunity to inspect was provided in the first Notification of Compliance and Request for Reciprocal Discovery, dated December 14, 2016.

---

[15] Previously the Defendant represented that they had "retained a computer forensic examiner who indicated a review of 11 terabytes would require a month." Doc. 178.  Under the same approximate time frame for review, the current trial setting should allow for sufficient time (i.e. three weeks) for the Defendant's computer expert, Eric Wheeler, to review less than eight terabytes of data.

[16] If the co-defendants Paz and Crandall also committed the offense indicted in Count I and Count VI as alleged in the Defendant's motion (though unindicted), that would not change the fact that the Defendant committed the offenses (i.e., it would not create a reasonable doubt that he committed the offenses, but merely illustrates the ongoing conspiracy and criminal enterprise in which he was engaged).  Contrary to the Defendant's assertions, the United States has never asserted that Mr. Shamo played a less culpable role as compared to co-defendants Paz and Crandall.

*See* Doc. 17.  The notices and invitations to inspect or copy discoverable materials became even more specific, beginning with the United States Supplemental Notification of Compliance and Request for Reciprocal Discovery, dated December 14, 2017, and continuing in notices thereafter as a reminder, in which the United States provided specifics for getting copies of the electronic data in the possession of the United States.  *See* Doc. 89.  It was not until almost a year later, in November 2018, in which the Defendant requested a copy of the electronic data, and then expressed dismay when it could not be copied and provided more quickly.

### 2.3.1   An image of Luke Paz's iMac

The Defendant's motion to continue focuses on digital content and exhibits found on Luke Paz's iMac computer, insinuating that this content and exhibits were intentionally withheld. However, as was explained to defense counsel on multiple occasions, the forensic image of Luke Paz's computer, and the computer itself, were not received by the United States until late in 2018. The forensic image of Luke Paz's iMac computer was promptly given to the Defendant even before investigators for the United States had a sufficient opportunity to go through it.  The United States began transferring a bit-for-bit copy for the Defendant of Luke Paz's iMac computer the same day it received from the Rocky Mountain Computer Forensic Laboratory a hard drive containing the iMac computer's forensic image files.  The United States acted with great expediency because it recognized the potential for the digital content to contain relevant material.

While initially preparing the electronic data to be provided to the Defendant in December 2018, the forensic files from Luke Paz's computer had not been anticipated because the forensic image files were not previously in the possession of the United States.  Due to the size of the files, the forensic image files had to be divided across multiple hard drives to be provided to the Defendant.  Were these forensic image files to be included on a single hard drive, it would have

22

required a significant amount of time to re-arrange and re-copy other electronic data already copied to the hard drives to be loaned to defense counsel.

In hindsight, taking extra time to put all of the forensic image files from Luke Paz's iMac on one hard drive would have been more ideal, since the Defendant (i.e., defense counsel and/or their retained expert) ultimately could not identify or recognize the corresponding files, or possibly failed to use a proper process to create a duplicate copy.[17]  However, at the time these files were being provided, on or about December 20, 2018, the United States and the Defendant were still preparing for the jury trial in this matter, which was scheduled to go forward in less than a month (January 2019).  The United States desired to provide the electronic data requested as quickly as possible to allow the Defendant as much time as possible to prepare for the upcoming January trial.  [The Defendant did not file his motion to continue the January 2019 trial date until December 27, 2018, after his counsel received the digital files from the United States.  *See* Doc. 179.]

### 2.3.2    Encrypted files from co-conspirators' devices

The Defendant's motion insinuates that the United States has further hindered his preparation for trial by providing encrypted files of a co-conspirator's computer and failing to provide a decrypted version.  *See* Doc. 224, p. 5.  Again, the United States affirms it has complied with its discovery obligation.  The handful of encrypted files are in the same format in which the United States received them.  The United States does not have password/key needed to decrypt the files.  Thus, the United States does not know the contents of the encrypted files but provided a

---

[17] This past week, when the staff at the U.S. Attorney's Office located the hard drives it had previously loaned to defense counsel, they were quickly able to identify and recognize the forensic image files from Luke Paz's computer.  Because a computer forensic expert for the United States was not needed to locate and identify these files, it is unclear why the defense could not locate them previously.  This is what led counsel for the United States to believe that perhaps there had been a duplication error by the defense.

copy of the encrypted file(s) due to the source (i.e., a co-conspirator) and in the interest of full transparency and disclosure.

As for the encrypted files, it is debatable whether the files are material under *Brady*. *See e.g., United States v. Bagley*, 473 U.S. 667, 682 (1985)(Evidence is material within the meaning of *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"). The United States has no way of knowing whether the files are subject to disclosure under Rule 16, *Brady, Giglio*, or the Jencks Act, because it has been unable to decrypt the files. The contents are unknown to the United States. In their encrypted state, the files will likely not have a reasonable probability of changing the trial's outcome. Nevertheless, the encrypted files have been provided in the spirit of full disclosure. And the existence of encrypted files, for example on devices that were seized from Drew Crandall, might be an avenue the Defendant could pursue in his examination of Drew Crandall.

### 2.3.3  Exhibits from Luke Paz's iMac

The United States did not anticipate using the content from Luke Paz's iMac computer at the Defendant's January 2019 trial; the United States was not aware of the relevant content that originated on Mr. Paz's iMac at that time. With the continuation of the trial (*see* Doc. 179) and the extension of the discovery deadline to April 10, 2019 (*see* Doc. 180), the United States reviewed the contents of Luke Paz's computer by searching the forensic image files provided to the Defendant on or about December 20, 2018. It was within these files that the exhibits cited to and included in the Defendant's motion to continue were found.

24

### 2.3.4 False accusations of *Brady/Giglio* violations have no place in pre-trial litigation

Willfully withholding exculpatory evidence, or other *Brady/Giglio* violations, are among the most serious accusations that can be leveled against a prosecutor. If true, those allegations would lead to termination of employment, bar discipline, and the likely dismissal of the case.

False accusations of prosecutorial misconduct are equally as serious.

The Defendant's accusations are wholly without merit, as shown above. The United States has been fully compliant with its discovery obligations and its disclosure obligations under *Brady, Giglio*, and the Jencks Act. The Defendant used those false accusations to seek a trial continuance. Such false accusations are sanctionable. See 18 U.S.C. § 3162(b). The United States will leave it to the Court to determine if sanctions are appropriate.

## 3. CONCLUSION

The United States respectfully requests that the Court deny the Defendant's motion to continue because: (1) the United States has met its discovery obligations in this case and its *Brady/Giglio* obligations; and (2) the grounds set forth in the Defendant's motion are not proper grounds for continuing the jury trial.

Respectfully submitted this 28th day of May, 2019.

JOHN W. HUBER
United States Attorney

*/s/ Michael Gadd*
MICHAEL GADD
Special Assistant United States Attorney

*/s/ Kent A. Burggraaf*
KENT A. BURGGRAAF
Special Assistant United States Attorney

*/s/ Vernon G. Stejskal*
VERNON G. STEJSKAL
Assistant United States Attorney

25

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
**SKORDAS & CASTON, LLC**
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

Attorneys for Defendant Aaron Shamo

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **REPLY IN SUPPORT OF MOTION TO CONTINUE FOR WILLFUL FAILURE TO PROVIDE BRADY/GIGLIO MATERIAL** |
| Plaintiff, | |
| v. | |
| AARON MICHAEL SHAMO, et. al., | Case No. 2:16-CR-00631 DAK |
| Defendant. | Judge Dale A. Kimball |

Aaron Michael Shamo, through his counsel of record, hereby moves the Court to enter an order to continue the trial currently scheduled to begin June 17, 2019, based on the Defense not having the reasonable time necessary for effective preparation and the Government's negligent failure to provide *Brady/Giglio* material in advance of trial, pursuant to the Due Process Clause of the U.S. Constitution, and Def. R. Crim P. 16. In support, the Defendant alleges as follows:

## STATEMENT OF RELEVANT FACTS

1.  Defendant, by reference, hereby incorporates that outlined statement of facts in the originating motion.

2.  As of the date of this filing, Defense's expert Eric Wheeler, was provided an external hard drive containing 6.2TBS of data just regarding Mr. Crandall and Mr. Paz. (Attachment A, Compilation from Eric Wheeler).

3.  According to Mr. Wheeler, 2.83 TBs of that data is the forensic image of alleged Co-conspirator, Jonathan Luke Paz's computer. This is the computer at issue. (*Id.*)

4.  In the original hard drives provided to Defense Counsel, the forensic image of Mr. Paz's computer was labeled as a subfolder titled "Luke Paz iMac." That label was not added by Defense Counsel, it was the name of the file at the time it was provided.

5.  In the Discovery most recently provided to Mr. Wheeler there is a stand-alone file labeled "image," which appears to represent the forensic image of Mr. Paz's computer.

6.  Nonetheless, the Government now contends that the hard drives provided to Mr. Wheeler were copied from the exact same hard drives previously provided to Defense Counsel.

7.  This particular computer, and the Government's possession of it, was not known to the Defense until the end of 2018, when Defense Counsel requested the available electronic forensic data from the US Attorney's Office.

8.  Defense Counsel's intention in seeking that electronic data was to have a forensic review of that iMac.

9.  Defense Counsel delivered the hard drives, via LMI Messenger Services, to the US Attorney's Office, with white sticker labels identifying the case number associated with this case.

10. Defense Counsel filed their Notice of Expert regarding Mr. Wheeler believing Mr. Wheeler had indeed reviewed the available image of Mr. Paz's computer; because, in fact, Mr. Wheeler had reviewed what was provided to him.

11. On May 22, 2019, an email from Plaintiff's Counsel, Kent Burggraaf, indicates that the combined file size of the Government's "Paz" and "Drew Crandall" files is 1.98 TB in total. That is clearly inaccurate. (Attachment B, Email Correspondence).

12. This email correspondence from Mr. Burrgraaf also indicated that a verification process and/or specific software would be the only way to ensure the proper transfer of those files. No such instruction had ever been given to Defense Counsel upon receipt of those hard drives.

13. As previously outlined, no other computer files were missing in their entirety from defense's files, just the Luke Paz iMac, which Defense Counsel was intentionally seeking to review.

14. In short, the *Brady/Giglio* material cited by the Defense in their original motion was specifically the failure to provide the Forensic Image of the Paz iMac.

15. The only disclosure from the Paz iMac, of any meaningful content, occurred with the production of the Government's Exhibits. That disclosure spurred Defense Counsel and Mr. Wheeler to re-examine what had been provided and make immediate contact with the US Attorney's Office to rectify the non-disclosure.

## ARGUMENT

Defense Counsel committed no error in copying files or relaying such copies to Mr. Wheeler for review. As thoroughly outlined above, Defense Counsel timely sought the Forensic Image of the Paz iMac. The Government provided no specific instruction on how they had copied the files

or how such files needed to be copied. Defense Counsel copied such files with almost no errors, including the complete copying of nearly every other computer, thumb drive, and external hard drive without incident. Nonetheless, the Government now contends that a verification process or software was required for such transfer. Similarly, the Government has insisted that the combined file size of the Paz and Crandall files amounted to 1.98 TB. Mr. Wheeler has provided a vastly different analysis; outlining that the iMac alone consists of 2.83 TBs of data. The Government's motion even concedes that the forensic image was spread over three hard drives. The files copied by Defense Counsel regarding the Paz iMac, were not spread over three hard drives. Defense Counsel specifically remembers the file label of Luke Paz iMac and such file was not spread over three separate hard drives when received by Defense Counsel's office.

In addition, the Government argues that the files provided to Defense Counsel in December are still intact on the hard drives previously provided. Yet, the Government's newly provided discovery includes files labeled in a manner wholly different than that provided to Defense Counsel previously. The Government also contends that it did not provide those exact hard drives to Mr. Wheeler out of fear that they would be copied incorrectly by defense counsel, despite the fact that they would simply have been provided to a computer forensic expert for review without Defense Counsel having to copy them.

Furthermore, Mr. Wheeler specifically request Native Files from the Government to expedite the processing time. The Government provided the Native Files, but even those native files did not contain the information from the Paz iMac.

Defendant is entitled to a continuance as the Government's failure to provide the proper forensic image of Mr. Paz's iMac is a *Brady* violation. The continuance is necessary to process the newly received information and allow Defense Counsel a proper amount of time to review

whatever information is now retrievable from that device. Such processing and review cannot be completed in one week despite the repeated contention by the Government. The processing of 2.83 TBs of information into a format for review by Defense Counsel is only the first step to fully reviewing the information. Defense Counsel will still need adequate time to review that information to determine its legal relevancy.

Suppression of material evidence is violative of a Defendant's constitutional rights and due process. *Brady v. Maryland,* 373 U.S. 83 (1963); and *Giglio v. United States*, 405 U.S. 150 (1972). When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule. *Giglio v. United States*, 405 U.S. 150, 154 (1972). *Id.* It does not matter whether the non-disclosure of the evidence is a result of negligence or intentional conduct. *Id.* Suppression by the prosecution of evidence favorable to an accused upon request violates due process when that evidence is material to guilt or punishment. *United States v. Young,* 45 F.3d 1405, 1407 (10th Cir. 1995).

It is clear from the Government's proposed exhibits that Mr. Paz's role is significantly different than he has repeatedly contended. It is also clear from those exhibits that there is significant possibility that similar ledgers and request for money are likely present on Mr. Paz's computer. The Government is acutely aware of the role of Mr. Paz and the very favorable nature of his plea agreement despite the culpability of his conduct. The Government is also aware that the Continuing Criminal Enterprise Count, which carries the mandatory life sentence sought by the Government, requires the Government establish Mr. Shamo was a principal or leader in the organization.

The failure to provide Mr. Paz's iMac for thorough review in advance of trial is a violation of the requirements outlined in *Brady/Giglio.* Mr. Shamo is entitled to the evidence on the iMac in

question as Mr. Paz is an alleged co-conspirator whose statements will be used against Mr.

Shamo. Mr. Shamo is entitled to the information on Mr. Paz's iMac as it serves to establish that

Mr. Shamo was not in fact the principal or leader in the capacity alleged by the Government. Mr.

Shamo is entitled to the information on Mr. Paz's iMac as impeachment, bias, and credibility

evidence. There is no proper cause for the Government not to provide the requested information

until the week of the pre-admission hearing and only three weeks before trial.

There is not proper precedent to allow the exclusion of delays due to *Brady/ Giglio* violations

from the Defendant's Speedy Trial Act calculations with the exception of the time period

required to complete briefing on this motion. 18 U.S.C.S §3161. The Government in fact carries

a large part of the burden to make certain sure the case against a defendant is brought to trial in a

timely manner in accordance with the Speedy Trial Act requirements. *United States v. Koerber,*

813 F.3d 1262, 1280 (10th Cir. 2016). In *Koerber,* the Court of Appeals even acknowledged that

a proper examine of a Speedy Trial Act calculation requires an inquiry into the culpability of

conduct in failing to meet a timely trial schedule. *Id.* at 1283. Where the Government's culpable

conduct was in large part to blame for any such delay, the Government should not be entitled to

the benefit of a Speedy Trial Act calculation which excludes intentional delay for tactical

purposes. *Id.*

In this matter, the Defendant diligently sought the information in repeated requests through

Counsel and Expert Eric Wheeler. Through no fault of Defense Counsel or Expert Eric Wheeler,

the information was not made available until Tuesday May 28, 2019- three weeks before trial.

Despite every contention of the Government, the information has never been in the hands of the

defendant in any meaningful manner. Defendant has been prejudiced by the Government's delay

in providing the information. Mr. Shamo is entitled to a continuance to seek a proper review of the information recently provided.

A continuance in this case is justified under the Speedy Trial Act because failure to grant the extension "would deny counsel for the defendant…the reasonable time necessary for effective preparation, taking into account the exercise of due diligence" (*see* 18 U.S.C §3161(h)(7)(B)(iv)). Thus, the continuance would serve "the ends of justice" and "outweigh the best interest of the public and the defendant in a speedy trial."18 U.S.C §3161(h)(7)(B)(iv)

WHEREFORE, Aaron Shamo, respectfully request the Court continue the matter to allow Mr. Shamo an appropriate amount of time to process and review the improperly withheld *Brady/Giglio* material in its entirety. Due to the Government's negligent conduct in failing to provide the requested information, the continued time should not be excluded from Mr. Shamo's Speedy Trial Act calculations

DATED this 30th day of May, 2019.

SKORDAS & CASTON, LLC

/s/ *Gregory G. Skordas*
Gregory G. Skordas

/s/ *Kaytlin V. Beckett*
Kaytlin V. Beckett

/s/ *Daryl P. Sam*
Daryl P. Sam

**CERTIFICATE OF SERVICE**

I hereby certify that on the May 30, 2019, I electronically filed a true and correct copy of

the foregoing **REPLY IN SUPPORT OFMOTION TO CONTINUE FOR WILLFUL**

**FAILURE TO PROVIDE BRADY/GIGLIO MATERIAL**, with the Clerk of the Court using

CM/ECF system, which sent notification of such filing to the following:


S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Kent Burggraaf
kburggraaf@agutah.gov


*/s/ Sabrina Nielsen-Legal Secretary*
SKORDAS & CASTON, LLC

# ATTACHMENT A

| Discovery Received 4/1/19 | | Discovery Received 5/28/19 | |
|---|---|---|---|
| Folder Name | Size | Folder Name | Size |
| Shamo\SHAMO CASE\Drew CRANDALL\CRANDALL INSTAGRAM | 331MB | CRANDALL INSTAGRAM | 331MB |
| For Review/Crandall/ CRANDALL MAC MEMORY | 3.99GB | CRANDALL MAC MEMORY | 3.99GB |
| For Review/Crandall/ CRANDALL MACBOOK NEW | 163GB | CRANDALL MACBOOK NEW | 163GB |
| For Review\Crandall\CRANDALL Phone | 79.4GB | CRANDALL PHONE | 79.4GB |
| | | Image | 2.83TB |
| For Review\Paz\L1_001_MAC LAPTOP, SN-C1MJFPASDTY3 | 465GB | 17MC00065/L1_001_MAC LAPTOP, SN-C1MJFPASDTY3 | 465GB |
| Shamo\SHAMO CASE\PAZ\17MC00065\L1_002a_WD EXT DRIVE, SN-WXA1C20F9091 | 244GB | 17MC00065/L1_002a_WD EXT DRIVE, SN-WXA1C20F9091 | 244GB |
| | | 17MC00065/L1_003a_SEAGATE EXT DRIVE, SN-N4KBZRP | 1.61TB |
| Shamo\SHAMO CASE\PAZ\17MC00065\L1_007a_TRANSCEND SDHC 32 GB | 21.3GB | 17MC00065/L1_007a_TRANSCEND SDHC 32 GB | 21.3GB |
| Shamo\SHAMO CASE\PAZ\17MC00065\L1_008a_SANDISK EXTREME 256 GB | 16.9GB | 17MC00065/L1_008a_SANDISK EXTREME 256 GB | 16.9GB |
| Shamo\SHAMO CASE\PAZ\17MC00065\L1_008b_SANDISK EXTREME 256 GB | 12.9GB | 17MC00065/L1_008b_SANDISK EXTREME 256 GB | 12.9GB |
| Shamo\SHAMO CASE\PAZ\17MC00065\L1_009a_USB NECKLACE DRIVE | 283GB | 17MC00065/L1_009a_USB NECKLACE DRIVE | 283MB |
| Shamo\SHAMO CASE\PAZ\17MC00065\L1_010a_USB MEDIGAIN DRIVE | 39.6MB | 17MC00065/L1_010a_USB MEDIGAIN DRIVE | 39.6MB |
| Shamo\SHAMO CASE\PAZ\17MC00065\L1_013a_SANDISK SDHC CARD | 773MB | 17MC00065/L1_013a_SANDISK SDHC CARD | 773MB |
| Shamo\SHAMO CASE\PAZ\17MC00065\L1_016a_SANDISK SD CARD 2GB | 1.52GB | 17MC00065/L1_016a_SANDISK SD CARD 2GB | 1.52GB |
| For Review\Paz\L1_017a_WD EXT DRIVE, SN-WXE808DC1147 | 92.3GB | 17MC00065/L1_017a_WD EXT DRIVE, SN-WXE808DC1147 | 92.3GB |
| Shamo\SHAMO CASE\PAZ\17MC00065\L1_018a_COMPACT DISC | 630MB | 17MC00065/L1_018a_COMPACT DISC | 630MB |
| Shamo\SHAMO CASE\PAZ\17MC00065\L1_018b_COMPACT DISC 2 | 112MB | 17MC00065/L1_018b_COMPACT DISC 2 | 112MB |

| | | | |
|---|---|---|---|
| \For Review\Paz\L2_001a_ASUS LAPTOP, SN-G8N0CY007852314 | 2.58GB | 17MC00066/L2_001a_ASUS LAPTOP, SN-G8N0CY007852314 | 2.58GB |
| \For Review\Paz\L2_002a_MACBOOK PRO, SN-C02L220BFFT3 (ENCRYPTED) | 181GB | 17MC00066/L2_002a_MACBOOK PRO, SN-C02L220BFFT3 | 181GB |
| Shamo\SHAMO CASE\PAZ\17MC00066\L2_008a_SANDISK ULTRA 64 GB Micro SD Card | 74.6GB | 17MC00066/L2_008a_SANDISK ULTRA 64 GB Micro SD Card | 74.6GB |
| Shamo\SHAMO CASE\PAZ\17MC00067\HTC Nexus One | 44.1GB | 17MC00067/HTC Nexus One | 44.1GB |
| Shamo\SHAMO CASE\PAZ\17MC00067\iPAD Mini | 15GB | 17MC00067/iPAD Mini | 15GB |
| For Review\Paz\L3_001a_MAC BOOK PRO, SN-W800759Y66E | 134GB | 17MC00067/L3_001a_MAC BOOK PRO, SN-W800759Y66E | 134GB |
| Shamo\SHAMO CASE\PAZ\17MC00067\L3_004a_SEAGATE, SN-51DZGE06 | 27.2GB | 17MC00067/L3_004a_SEAGATE, SN-51DZGE06 | 27.2GB |
| Shamo\SHAMO CASE\PAZ\17MC00067\L3_010_COMPACT DISCS (5) | 7.48GB | 17MC00067/L3_010_COMPACT DISCS (5) | 7.48GB |
| Shamo\SHAMO CASE\PAZ\17MC00067\L3_011a_USB FLASH DRIVE RED | 156MB | 17MC00067/L3_011a_USB FLASH DRIVE RED | 156MB |
| Shamo\SHAMO CASE\PAZ\17MC00067\L3_012a_PNY 32 MB CF CARD | 29.5MB | 17MC00067/L3_012a_PNY 32 MB CF CARD | 29.5MB |
| Shamo\SHAMO CASE\PAZ\17MC00067\L3_013a_PLAYSTATION 3 HARD DRIVE | 51.3GB | 17MC00067/L3_013a_PLAYSTATION 3 HARD DRIVE | 51.3GB |
| Shamo\SHAMO CASE\PAZ\17MC00067\NOKIA 2760 | - | 17MC00067/NOKIA 2760 | - |
| For Review\Paz\SAMSUNG GT-N5110 | 11.8GB | 17MC00067/SAMSUNG GT-N5110 | 11.8GB |
| For Review\Paz\SAMSUNG SCH-i515 | 52GB | 17MC00067/SAMSUNG SCH-i515 | 52GB |
| For Review\Paz\SAMSUNG SM-N900V | 91.3GB | 17MC00067/SAMSUNG SM-N900V | 91.3GB |
| For Review\Paz\Luke Paz iMAC | 9.8GB | | |
| | | | |
| **TOTAL FOR (PAZ AND CRANDALL)** | **1.77TB** | **TOTAL FOR (PAZZ AND CRANDALL)** | **6.2TB** |
| | | | |
| **OTHER DISCOVERY RECEIVED** | **4.44TB** | | |

# ATTACHMENT B



**Kaytlin Beckett <kbeckett@schhlaw.com>**

## Hard Drive

**Kent Burggraaf** <kburggraaf@agutah.gov>             Wed, May 22, 2019 at 2:13 PM
To: Eric Wheeler <eric@trial-tech.com>, Kaytlin Beckett <kbeckett@schhlaw.com>
Cc: Daryl Sam <daryl.sam@gmail.com>, "Yvette Laughter, USAUT" <Yvette.Laughter@usdoj.gov>, Michael Gadd
<mgadd@agutah.gov>, "gskordas@schhlaw.com" <gskordas@schhlaw.com>, Dan Ashment
<Daniel.E.Ashment@ice.dhs.gov>

Yvette has located the drive provided to the defense this past December; it was returned as Kaitlyn mentioned. Yvette is
copying the folders titled "Drew CRANDALL" and "Paz", with all the original contents provided on the borrowed hard drive
in December. The size of the two folders combined is around **1.98 terabytes**. She'll notify Eric as soon as the copying is
complete.


[Kaitlyn, you might consider comparing that file size (1.98 TB) to the combined file size of those two same folders you
copied in December, and let us know if there is a major difference in file size (i.e., if we are wasting time giving you the
same files you already have and should be looking elsewhere for the E01 file(s) requested by Eric, if any). When copies
are made, typical copy/paste or drag/drop methods of copying will likely not copy over larger file(s), such as E01 files. We
suspect that was the method used when the files were copied from the borrowed hard drive in December to another
storage media by defense in December, which resulted in you not having the files that Eric has requested. When this
additional copy is provided, please use some form of verification or software to ensure you're not missing or changing a
file(s) when copying from one hard drive to another. This will hopefully help us avoid any additional issues.]


Agent Ashment has clarified that there was not one large E01 file for Paz's computer, but several smaller files (though still
large in size). The encrypted files provided were not encrypted by us (not by our agents or forensic examiners). While
we could not access them, we provided them in the interest of full transparency of what was found. In other words, they
were encrypted by the owner of the files prior to the devices being seized or turned over. We did not encrypt the files and
therefore cannot decrypt them without the password/key.


Regards,


Kent A. Burggraaf

*Assistant Utah Attorney General*

*Special Assistant U.S. Attorney*

Utah Attorney General's Office

348 E. South Temple

Salt Lake City, Utah 84111

(801) 349-7187

kburggraaf@agutah.gov


This email transmission from the Office of the Utah State Attorney General, contains information which may be
confidential and/or legally privileged. The information is intended only for the use of the individual or entity named on this
transmission. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the
taking of any action in reliance on the contents of this email is strictly prohibited and that the email should be deleted

immediately. If you have received this email in error, please notify us at kburggraaf@agutah.gov. The unauthorized disclosure, use or publication of confidential or privileged information inadvertently transmitted to you may result in criminal and/or civil liability.

[Quoted text hidden]

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>v.<br><br>AARON MICHAEL SHAMO<br><br>      Defendant. | **ORDER TO CONTINUE JURY TRIAL**<br><br>Case No. 2:16-cr-00631-DAK<br><br>Judge Dale A. Kimball |

Based on the Motion to Continue Jury Trial (Doc. 224) filed by defendant, AARON MICHAEL SHAMO, in the above-entitled case, and for good cause appearing, the court finds:

1.     Defendant first appeared on December 7, 2016 for the initial appearance on the Indictment returned in this matter. The jury trial was scheduled for February 13, 2017, which was within the 70-day time period of the Speedy Trial Act.

2.     This is the seventh request to continue trial in this matter. Each of the prior motions to continue by the defendant have been granted. The trial was scheduled to commence June 17, 2019.

3.     A total of 29 days have run on the Speedy Trial Act clock.

4.     Defendant has moved to continue trial due to the nature of the prosecution, making it unreasonable to expect adequate preparation for the trial in time for the current trial setting and would deny counsel for the defendant the reasonable time necessary for effective preparation.

5.     The length of delay requested is 60-90 days.

6.     Specifically, defendant has alleged that the continuance is necessary and the court

has made a finding that the ends of justice will be served by granting the continuance, due to the nature of the prosecution, making it unreasonable to expect adequate preparation for the trial in time for the current trial setting and would deny counsel for the defendant the reasonable time necessary for effective preparation, and such action will outweigh the best interest of the public and the defendant in a speedy trial.

7.    The facts that support this allegation include the following:

    a.  This case is complex, involves multiple co-conspirators and over 14 terabytes of discovery.

    b.  On fifteen or more occasions, the United States has provided discovery to the defendant, including providing many terabytes of data in December 2018.

    c.  The parties have exercised due diligence in preparing for trial, having exchanged proposed witness and exhibit lists, and a 3-day pre-admission hearing having been completed, in preparation for trial.

    d.  The defendant's designated computer expert has reviewed the digital content of all of the electronic devices he was provided by defense counsel; however, the defendant's designated computer expert needs additional time to process approximately 2.83 terabytes of data that originated from a co-conspirator's computer, and then provide it to the defense team for review.

    e.  The defendant's designated computer expert received a full copy of the 2.83 terabytes on or about May 28, 2019, and such content cannot be processed and then reviewed by the defense team before the currently scheduled trial date.

    f.  The defendant has affirmed that the review of this 2.83 terabytes of data is

necessary in order to effectively prepare for trial.

8.      Defendant is in custody and agree(s) with the need for a continuance of the trial and agree(s) that the defense will not be hindered or prejudiced by the delay.

9.      The delay resulting from the requested continuance is excludable under the Speedy Trial Act, 18 U.S.C. §§ 3161(h)(7)(a), 3161(h)(7)(b)(ii), and 3161(h)(7)(b)(iv).

10.     Counsel for the United States has opposed this motion to continue. *See* Doc. 225.

11.     The court finds no *Brady* or *Giglio* violations as alleged.  *See* Doc. 229.

Based on the foregoing findings, the court concludes that the ends of justice will be served by granting the continuance, due to the nature of the prosecution, making it unreasonable to expect adequate preparation for the trial in time for the current trial setting and would deny counsel for the defendant the reasonable time necessary for effective preparation.  Therefore, the ends of justice served by such a continuance outweigh the best interests of the public and the defendant in a speedy trial.

THEREFORE, pursuant to the Speedy Trial Act, 18 U.S.C. §§ 3161(h)(7)(a), 3161(h)(7)(b)(ii), and 3161(h)(7)(b)(iv), the 5-week Jury Trial previously scheduled to begin on June 17, 2019 is hereby continued to the 12th day of August, 2019, at 8:30 a.m.  Accordingly, the time between the filing of the Motion, May 24, 2019, and the new trial date set forth above, August 12, 2019 is excluded from Defendant's speedy trial computation for good cause.

DATED this _____ day of June, 2019.

BY THE COURT:


_____
DALE A. KIMBALL
United States District Court Judge

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>AARON MICHAEL SHAMO<br><br>        Defendant. | **ORDER TO CONTINUE JURY TRIAL**<br><br>Case No. 2:16-cr-00631-DAK<br><br>Judge Dale A. Kimball |

Based on the Motion to Continue Jury Trial (Doc. 224) filed by defendant, AARON MICHAEL SHAMO, in the above-entitled case, and for good cause appearing, the court finds:

1.    Defendant first appeared on December 7, 2016 for the initial appearance on the Indictment returned in this matter. The jury trial was scheduled for February 13, 2017, which was within the 70-day time period of the Speedy Trial Act.

2.    This is the seventh request to continue trial in this matter. Each of the prior motions to continue by the defendant have been granted. The trial was scheduled to commence June 17, 2019.

3.    A total of 29 days have run on the Speedy Trial Act clock.

4.    Defendant has moved to continue trial due to the nature of the prosecution, making it unreasonable to expect adequate preparation for the trial in time for the current trial setting and would deny counsel for the defendant the reasonable time necessary for effective preparation.

5.    The length of delay requested is 60-90 days.

6.    Specifically, defendant has alleged that the continuance is necessary and the court

has made a finding that the ends of justice will be served by granting the continuance, due to the nature of the prosecution, making it unreasonable to expect adequate preparation for the trial in time for the current trial setting and would deny counsel for the defendant the reasonable time necessary for effective preparation, and such action will outweigh the best interest of the public and the defendant in a speedy trial.

7. The facts that support this allegation include the following:

   a. This case is complex, involves multiple co-conspirators and over 14 terabytes of discovery.

   b. On fifteen or more occasions, the United States has provided discovery to the defendant, including providing many terabytes of data in December 2018.

   c. The parties have exercised due diligence in preparing for trial, having exchanged proposed witness and exhibit lists, and a 3-day pre-admission hearing having been completed, in preparation for trial.

   d. The defendant's designated computer expert has reviewed the digital content of all of the electronic devices he was provided by defense counsel; however, the defendant's designated computer expert needs additional time to process approximately 2.83 terabytes of data that originated from a co-conspirator's computer, and then provide it to the defense team for review.

   e. The defendant's designated computer expert received a full copy of the 2.83 terabytes on or about May 28, 2019, and such content cannot be processed and then reviewed by the defense team before the currently scheduled trial date.

   f. The defendant has affirmed that the review of this 2.83 terabytes of data is

necessary in order to effectively prepare for trial.

8.     Defendant is in custody and agree(s) with the need for a continuance of the trial and agree(s) that the defense will not be hindered or prejudiced by the delay.

9.     The delay resulting from the requested continuance is excludable under the Speedy Trial Act, 18 U.S.C. §§ 3161(h)(7)(a), 3161(h)(7)(b)(ii), and 3161(h)(7)(b)(iv).

10.     Counsel for the United States has opposed this motion to continue. *See* Doc. 225.

11.     The court finds no *Brady* or *Giglio* violations as alleged. *See* Doc. 229.

Based on the foregoing findings, the court concludes that the ends of justice will be served by granting the continuance, due to the nature of the prosecution, making it unreasonable to expect adequate preparation for the trial in time for the current trial setting and would deny counsel for the defendant the reasonable time necessary for effective preparation. Therefore, the ends of justice served by such a continuance outweigh the best interests of the public and the defendant in a speedy trial.

THEREFORE, pursuant to the Speedy Trial Act, 18 U.S.C. §§ 3161(h)(7)(a), 3161(h)(7)(b)(ii), and 3161(h)(7)(b)(iv), the 5-week Jury Trial previously scheduled to begin on June 17, 2019 is hereby continued to the 12th day of August, 2019, at 8:30 a.m. Accordingly, the time between the filing of the Motion, May 24, 2019, and the new trial date set forth above, August 12, 2019 is excluded from Defendant's speedy trial computation for good cause.

DATED this 4th day of June, 2019.

BY THE COURT:

DALE A. KIMBALL
United States District Court Judge

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | **AMENDED TRIAL ORDER** |
| vs. | **Criminal Case No. 2:16CR631DAK** |
| AARON MICHAEL SHAMO, et al., | **Judge Dale A. Kimball** |
| Defendants. | |

This case is set for a four-week jury trial with jury selection beginning on August 9, 2019, at 9:30 a.m. The remaining trial days, beginning August 12, 2019, will begin at 8:30 a.m. In order to expedite the conduct of the trial in this case, counsel are instructed as follows:

## A. Court-Imposed Deadlines

The deadlines in this Trial Order are court-imposed deadlines. To modify any deadline, a party must file an appropriate motion with the court and receive an order from the court modifying such deadline. The dates herein specifically correspond with the current trial date of August 9, 2019.

## B. Pre-trial Motions

The parties have previously filed all pre-trial motions and had a chance to argue all of them. The court has ruled on all of them except the possible need for a *Daubert* hearing with

respect to Eric Wheeler's qualifications to provide opinions regarding the Dark Net/Deep Web. Wheeler's expert report is due July 25, 2019. The United States may also renew its motion as to Ms. Shafto after receiving and reviewing her report, if necessary.

**C. Summary of the Indictment**

The parties shall meet and confer to agree upon a summary of the Superseding Indictment that the Court can read during jury selection. If the parties cannot agree on a stipulated summary, they may each file their own proposed summary, and the court will create a summary from the proposals. The parties shall submit the stipulated summary or their separate proposed summaries by **July 29, 2019**.

**D. Proposed Voir Dire, Jury Instructions, and Special Verdict Form**

*1. Proposed Voir Dire*

The parties must submit any proposed voir dire to the court no later than **August 1, 2019**.

*2. Special Verdict Form*

The parties shall exchange proposed verdict forms by **July 29, 2019**. The parties should then confer in an attempt to agree on a stipulated Verdict form. The parties shall submit a stipulated proposed verdict form or their separate proposed verdict forms to the court by **August 5, 2019**. In addition to filing the special verdict form electronically, the parties must email a copy of the special verdict form to utdecf_kimball@utd.uscourt.gov in Word or Word Perfect format. Any objection the parties have to the other party's proposed special verdict form shall be filed by **August 9, 2019.**

2

### 3. *Jury Instructions*

The procedure for submitting proposed jury instructions is as follows:

*(a) stipulated set of instructions*

1. The parties shall serve upon the opposing party their proposed jury instructions by **July 23, 2019**. The parties must then meet and confer to agree on a single set of instructions. The parties are required to *jointly submit one set of stipulated final instructions.* These instructions should be labeled as joint instructions, e.g. "Joint Instruction No. 1"

2. If the parties cannot agree upon a complete set of final instructions, they may submit separately those individual instructions upon which they cannot agree. These instructions should be labeled as an instruction proposed by the party, e.g. "Plaintiff's Proposed Instruction No. 1." However, the parties are expected to agree upon the majority of the substantive instructions for the case.

3. The stipulated instructions and each party's supplemental instructions must be electronically filed with the court by **July 31, 2019**. The electronically-filed instructions shall include citation to the authority that forms the basis for the instruction.

4. In addition to electronically filing the jury instructions, the parties shall also email a copy of the instructions, *without* citation to authority, to utdecf_kimball@utd.uscourts.gov in Word or Word Perfect format. The case name and number should be included in the email subject line.

3

5.     No later than **August 7, 2019**, each party must file its objections to the supplemental instructions proposed by the other party. All such objections must recite the proposed disputed instruction in its entirety and specifically highlight the objectionable language in the proposed instruction. The objection must contain citations to authority and a concise argument explaining why the instruction is improper. If applicable, the objecting party should submit an alternative instruction addressing the subject or principle of law. Any alternative instruction proposed in a party's objection must be emailed to utdecf_kimball@utd.uscourts.gov in Word or Word Perfect format.

6.     No later than **August 14, 2019**, each party may file a reply to the opposing party's objections.

*(b) stock instructions*

Attached to this Trial Order is the court's stock jury instructions for criminal cases. The court will give its stock instructions applicable to this case unless both parties agree to modify them and provide convincing arguments for such changes. When submitting their instructions, the parties shall indicate in a list to the court which of the court's stock instructions should be given in this case and include those instructions with a label indicating that the instruction is one of Judge Kimball's stock instructions, e.g. "Joint Instruction No. 1 (Stock)" or "Plaintiff's Instruction No. 1 (Stock)."

*(c) additional instructions*

1.     All jury instructions must be concise, understandable, and neutral statements of

the law.  Argumentative instructions are improper.

2.    Modified versions of statutory or other form jury instructions may be acceptable, However, a modified jury instructions must identify the exact nature of the modification made to the form instruction and cite authority, if any, supporting such modification.

3.    Any party who cannot comply with the requirement to email the instructions to chambers must contact the judge's chambers to make alternative arrangements.

4.    If parties wish to be referred to in the instructions as something other than plaintiff and defendant, the parties must also make the appropriate changes to the court's stock instructions so that every instruction consistently refers to each party.

*(d) final instructions*

After reviewing the parties' proposed instructions and any objections, the court will provide the parties with a set of "The Court's Proposed Jury Instructions."  Close to the end of trial, the court will hold a jury instruction conference on the record to make any necessary changes to the jury instructions.  The parties' previously filed objections are objections of record and need not be repeated at the jury instruction conference.  After the jury instruction conference, the court will provide the parties with a set of the final jury instructions.

**E.  Trial Exhibits**

The parties have already exchanged exhibit lists.  If a party intends to add exhibits to their current lists, they should notify the opposing party by **July 29, 2019.**

Pursuant to Local Rule 83-5, each party is required to pre-mark all exhibits intended to be

5

introduced during trial and prepare an exhibit list for the court's use at trial. Exhibit labels (stickers) are available at the Intake Desk in the Clerk's Office. The standard exhibit list form is available on the Court's website (www.utd.uscourts.gov).

Parties must meet and confer to avoid marking the same exhibit twice. Plaintiffs should list their exhibits by consecutive numbers and defendants should list their exhibits by consecutive letters, unless authorized by the Court to use a different system.

Do **NOT** file the exhibit list or the exhibits. The exhibit list is to be provided to the Courtroom Deputy Clerk; the original exhibits are to remain in the custody of counsel until admitted as evidence by the Court.

The court prefers (1) one courtesy copy of the exhibits in a binder presented to the Courtroom Deputy on **August 12, 2019**; and (2) two electronic courtesy copies of the exhibits and exhibit lists on discs presented to the Courtroom Deputy at jury selection on **August 9, 2019**.

Questions regarding the preparation of the exhibit list or courtesy copies may be directed to Courtroom Deputy Clerk Elizabeth Toscano at (801) 524–6610.

## F.  Witness Lists

The parties have already exchanged witness lists. The parties may amend their lists, if necessary, by **July 12, 2019.**

The parties are required to prepare a separate witness list for the court's use at trial. Witness lists must be provided to the court on the first morning of trial. Standard forms for witness lists are available on the court's website, (www.utd.uscourts.gov). The Court prefers the witness list to be submitted electronically at utdecf_kimball@utd.uscourts.gov. Questions

510

regarding the preparation of these lists may be directed to Courtroom Deputy Clerk Elizabeth Toscano at (801) 524-6610.

**G. Plea Agreement**

In the event that a plea agreement is reached between the parties, the court should be notified as soon as possible.

**H. Courtroom Conduct**

Local Rule DUCrimR 53-1 provides that the standards set forth in DUCivR 43-1 apply equally to all criminal proceedings in this district. The court expects counsel to follow the practices and protocol outline in DUCivR 43-1.

In addition to the conduct outlines in DUCivR 43-1, the court expects the following conduct of counsel at trial:

1.  Please be on time for each court session. The court usually runs its trial day from 8:30 a.m. until approximately 2:00 p.m. with two short (fifteen minute) breaks.

2.  Counsel is expected to stand: (1) as court is opened, recessed, or adjourned; (2) when the jury enters or retires from the courtroom; (3) when addressing or being addressed by the court.

3.  Counsel must instruct all persons at counsel table that gestures, facial expressions, audible comments, or any other manifestations of approval or disapproval during witness testimony are absolutely prohibited.

4.  Counsel should instruct witnesses as to the need to make a clear record of the proceedings. Counsel and witnesses need to speak clearly into the microphones.

5.      When possible, counsel should try to raise issues requiring argument to the court during recesses rather than in sidebar conferences when the jury is present.

6.      Members of the trial team should not confer or visit with anyone in the spectator section while court is in session.

7.      Messages may be delivered to counsel table provided they are delivered discreetly and with as little disruption to the proceedings as possible.

DATED this 13th day of June, 2019.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | STIPULATED SUMMARY OF SECOND SUPERSEDING INDICTMENT |
| vs. | |
| AARON MICHAEL SHAMO, | Judge Dale A. Kimball |
| Defendant. | |

COMES NOW the United States of America, by and through counsel, Kent A. Burggraaf, Special Assistant United States Attorney, and submits the following summary of the Second Superseding Indictment. As previously ordered by the Court, the counsel for the United States and for the Defendant, Aaron Shamo, have conferred regarding the contents of this summary and stipulate to the Court using this summary at the beginning of trial in this matter, in lieu of a full reading of the Second Superseding Indictment.

### Summary of Second Superseding Indictment

1. A federal grand jury in the District of Utah charged the Defendant, Aaron Shamo, with the following offenses against the United States:

2.  Count 1 alleges that beginning on a date unknown, but at least between July 8, 2015 and November 22, 2016, in Utah and elsewhere, the Defendant, Aaron Shamo, engaged in a continuing criminal enterprise in violation of federal law.

3.  Specifically, Count 1 alleges that the Defendant, Aaron Shamo, acting in concert with at least 5 other persons with respect to whom he occupied a position of organizer, supervisor, or manager, committed a continuing series of violations of the Controlled Substances Act, including the aiding, abetting, attempting, or conspiring to import, manufacture, distribute, and possess with intent to distribute, fentanyl and alprazolam, using the U.S. Mail in furtherance of these offenses. From such continuing series of violations, the Defendant obtained substantial income and resources.

4.  Count 1 also alleges that the Defendant, Aaron Shamo, was a principal administrator, organizer, supervisor, or leader of the criminal enterprise which involved the possession with intent to distribute and the distribution of more than 12,000 grams (12 kilograms) of a mixture or substance containing a detectable amount of Fentanyl.

5.  Count 2 alleges that on or about June 23, 2016, in Utah and elsewhere, the Defendant, Aaron Shamo, imported 40 grams or more of a mixture or substance containing the controlled substance Fentanyl into the United States from China.

6.  Count 3 alleges that on or about November 8, 2016, in Utah and elsewhere, the Defendant, Aaron Shamo, imported the controlled substance Alprazolam into the United States from China.

7.  Count 4 alleges that on or about November 16, 2016, in Utah and elsewhere, the Defendant, Aaron Shamo, imported 40 grams or more of a mixture or substance containing the controlled substance fentanyl into the United States from China.

8.  Count 5 alleges that on November 22, 2016, in Utah, the Defendant, Aaron Shamo, possessed 400 grams or more of a mixture or substance containing the controlled substance Fentanyl with the intent to distribute that substance to others.

9.  Count 6 alleges that between June 6 and June 13, 2016, in Utah and elsewhere, the Defendant, Aaron Shamo, distributed or aided and abetted in the distribution of the controlled substance Fentanyl, and that as a result a man with the initials R.K. died on June 13, 2016.

10. Count 7 alleges that on November 22, 2016, in Utah, the Defendant, Aaron Shamo, manufactured the controlled substance Alprazolam, by pressing it with other fillers into consumable pills.

11. Count 8 alleges that beginning on a date unknown, but at least between February 3 and November 22, 2016, in Utah, the Defendant, Aaron Shamo, held adulterated drugs for sale in that he manufactured pills to have the appearance of Oxycodone (bearing the markings "A 215"), but which contained the controlled substance Fentanyl and not Oxycodone, and the adulteration had a reasonable probability of causing serious adverse health consequences or death to humans.

12. Count 9 alleges that beginning on a date unknown, but at least between June 18 and November 22, 2016, in Utah, the Defendant, Aaron Shamo, held adulterated drugs for sale in that he manufactured pills to have the appearance of Oxycodone (bearing the markings "M" and "30"), but which contained the controlled substance Fentanyl and not Oxycodone, and the adulteration had a reasonable probability of causing serious adverse health consequences or death to humans.

13. Count 10 alleges that between September 12 and September 23, 2016, in Utah, the Defendant, Aaron Shamo, used, or aided and abetted in the use of the United States Mail in furtherance of a drug trafficking offense to facilitate the distribution of the controlled substance Alprazolam.

14. Count 11 alleges that beginning on a date unknown, but at least between December 22, 2015 and November 22, 2016, in Utah and elsewhere, the Defendant, Aaron Shamo, conspired with others to commit money laundering offenses.

15. Count 12 alleges that on or about November 8, 2016, in Utah, the Defendant, Aaron Shamo, engaged in money laundering by promotion and concealment by depositing $2,700.00 into a credit union account which involved the known proceeds of the distribution of a controlled substance with the intent to carry on that distribution activity or knowing the transaction was to conceal the nature of the proceeds.

16. Count 13 alleges that on or about May 5, 2016, in Utah, the Defendant, Aaron Shamo, engaged or attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000.00 by issuing a personal check from a Wells Fargo bank account to iDrive Utah.

Respectfully submitted this 29th day of July, 2019.

JOHN W. HUBER
United States Attorney

*/s/ Kent A. Burggraaf*
KENT A. BURGGRAAF
Special Assistant United States Attorney

4

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

---

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-631 DAK |
| Plaintiff, | UNITED STATES' PROPOSED JURY INSTRUCTIONS |
| v. | |
| AARON MICHAEL SHAMO, | Judge Dale A. Kimball |
| Defendant. | |

---

The United States of America, by and through Michael Gadd, Special Assistant United States Attorney, hereby requests the Court instruct the jury with the following proposed jury instructions.

The United States met with counsel for the defendant to confer on proposed jury instructions, as ordered by the Court. Counsel for the defendant indicated it could not stipulate to any of the United States' proposed instructions because stipulating would limit their arguments on appeal, if the defendant is convicted.

The United States notes that it provided its proposed instructions to the defense on

July 11, 2019. To date, the defense has not provided its proposed jury instructions to the
United States. Because the defense has not proposed any instructions, the United States is
not able to stipulate to instructions proposed by the defense.

Respectfully Submitted this 31st day of July, 2019,

                                      JOHN W. HUBER
                                      United States Attorney

                                       /s/ *Michael Gadd*
                                       MICHAEL GADD
                                       Special Assistant United States Attorney

UNITED STATES' PROPOSED INSTRUCTION NO. [1]

MEMBERS OF THE JURY:

Now that you have heard the evidence, it becomes my duty to instruct you on the law that applies to this case.

It is your duty as jurors to follow the law as stated in the instructions of the Court, and to apply the rules of law so given to the facts as you find them from the evidence in the case.

Counsel may refer to these instructions in their arguments. If, however, any difference appears to you between the law as stated by counsel and that stated by the Court in these instructions, you are of course to be governed by the Court's instructions. You are not to single out any one instruction alone as stating the law, but must consider the instructions as a whole.

Neither are you to be concerned with the wisdom of any rule of law stated by the Court. Regardless of any opinion you may have as to what the law ought to be, it would be a violation of your sworn duty to base a verdict upon any other view of the law than that given in these instructions of the Court; just as it would be a violation of your sworn duty, as judges of the facts, to base a verdict upon anything but the evidence in the case.

Justice through trial by jury must always depend upon the willingness of each individual juror to seek the truth as to the facts from the same evidence presented to all the jurors; and to arrive at a verdict by applying the same rules of law, as given in the instructions of the Court.

---

[1] Stock.

3

UNITED STATES' PROPOSED INSTRUCTION NO.[2]

     You have been chosen as jurors in this case to try the issues of fact presented by the allegations of the indictment and the denial made by the "Not Guilty" plea of the defendant. You are to perform this duty without bias or prejudice as to any party. The law does not permit jurors to be governed by sympathy, prejudice, or public opinion. The defendant and the public expect that you will carefully and impartially consider all the evidence in the case, follow the law as stated by the Court, and reach a just verdict.

     **The indictment in this case is entitled Second Superseding Indictment. But for convenience, I will simply refer to it in these instructions as the indictment.**

---

[2] Stock. Addition appears in bold font.

UNITED STATES' PROPOSED INSTRUCTION NO.[3]

The Indictment or formal charge against the defendant is not evidence of guilt.

Indeed, the defendant is presumed by the law to be innocent. The law does not require the

defendant to prove his innocence or produce any evidence at all, nor does it compel him

in a criminal case to take the witness stand to testify.

---

[3] Stock. The last sentence of this stock instruction was removed because it would be redundant
with the following instruction.

Here and throughout, the United States has elected to be referred to as the United States rather
than as the government.

UNITED STATES' PROPOSED INSTRUCTION NO.[4]

The government has the burden of proving the defendant guilty beyond a reasonable doubt. The law does not require a defendant to prove his innocence or produce any evidence at all. The government has the burden of proving the defendant guilty beyond a reasonable doubt, and if it fails to do so, you must find the defendant not guilty.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. It is only required that the government's proof exclude any "reasonable doubt" concerning the defendant's guilt. A reasonable doubt is a doubt based on reason and common sense after careful and impartial consideration of all the evidence in the case. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

---

[4] 10th Circuit Pattern Instruction 1.05.

6

UNITED STATES' PROPOSED INSTRUCTION NO.[5]

You are here to decide whether the United States has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged. The defendant is not on trial for any act, conduct, or offense not alleged in the Indictment. Neither are you concerned with the guilt of any other person or persons not on trial as a defendant in this case.

---

[5] Stock.

UNITED STATES' PROPOSED INSTRUCTION NO.[6]

If you find the defendant guilty, it will be my duty to decide what the punishment will be. You should not discuss or consider the possible punishment in any way while deciding your verdict.

---

[6] 10th Circuit Pattern Instruction 1.20.

8

UNITED STATES' PROPOSED INSTRUCTION NO.[7]

You are here to decide whether the United States has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged. The defendant is not on trial for any act, conduct, or crime not charged in the indictment.

It is not up to you to decide whether anyone who is not on trial in this case should be prosecuted for the crime charged. The fact that another person also may be guilty is no defense to a criminal charge.

The question of the possible guilt of others should not enter your thinking as you decide whether this defendant has been proved guilty of the crimes charged.

---

[7] 10th Circuit Pattern Instruction 1.19.

9

UNITED STATES' PROPOSED INSTRUCTION NO.[8]

You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, the exhibits that I allowed into evidence, the stipulations that the lawyers agreed to, and the facts that I have judicially noticed.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. Their questions and objections are not evidence. My legal rulings are not evidence. And my comments and questions are not evidence.

**You are to consider only the evidence in this case. However, in your consideration of the evidence, you are not limited to the bald statements of the witnesses. On the contrary, you are permitted to draw from the facts which you find have been proved such reasonable inferences as seem justified in light of your experience. An inference is a deduction or conclusion which reason and common sense would lead you to draw from facts which are established by the evidence in the case.**

During the trial, I did not let you hear the answers to some of the questions that the lawyers asked. I also ruled that you could not see some of the exhibits that the lawyers wanted you to see. And sometimes I ordered you to disregard things that you saw or

---

[8] 10th Circuit Pattern Instruction 1.6 (2018); Bold paragraph comes from Stock.

10

heard, or I struck things from the record. You must completely ignore all of these things. Do not even think about them. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.

11

UNITED STATES' PROPOSED INSTRUCTION NO.[9]

There are, generally speaking, two types of evidence from which a jury may properly determine the facts of a case. One is direct evidence, such as the testimony of an eyewitness. The other is indirect or circumstantial evidence, that is, the proof of a chain of facts which point to the existence or non-existence of certain other facts.

As a general rule, the law makes no distinction between direct and circumstantial evidence. The law simply requires that you find the facts in accord with all the evidence in the case, both direct and circumstantial.

While you must consider only the evidence in this case, you are permitted to draw reasonable inferences from the testimony and exhibits, inferences you feel are justified in the light of common experience. An inference is a conclusion that reason and common sense may lead you to draw from facts which have been proved.

By permitting such reasonable inferences, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts which have been established by the testimony and evidence in this case.

---

[9] 10th Circuit Pattern Instruction 1.07.

12

UNITED STATES' PROPOSED INSTRUCTION NO.[10]

I remind you that it is your job to decide whether the United States has proved the guilt of the defendant beyond a reasonable doubt. In doing so, you must consider all of the evidence. This does not mean, however, that you must accept all of the evidence as true or accurate.

You are the sole judges of the credibility or "believability" of each witness and the weight to be given to the witness's testimony. An important part of your job will be making judgments about the testimony of the witnesses [including the defendant] who testified in this case. You should think about the testimony of each witness you have heard and decide whether you believe all or any part of what each witness had to say, and how important that testimony was. In making that decision, I suggest that you ask yourself a few questions: Did the witness impress you as honest? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome in this case? Did the witness have any relationship with either the United States or the defense? Did the witness seem to have a good memory? Did the witness clearly see or hear the things about which he/she testified? Did the witness have the opportunity and ability to understand the questions clearly and answer them directly? Did the witness's testimony differ from the testimony of other witnesses? When weighing the conflicting testimony, you should consider whether the discrepancy has to do with a material fact or

_____

[10] 10th Circuit Pattern Instruction 1.08.

13

with an unimportant detail. And you should keep in mind that innocent misrecollection—like failure of recollection—is not uncommon.

[The testimony of the defendant should be weighed and his credibility evaluated in the same way as that of any other witness.]

[The defendant did not testify and I remind you that you cannot consider his decision not to testify as evidence of guilt. I want you to clearly understand, please, that the Constitution of the United States grants to a defendant the right to remain silent. That means the right not to testify or call any witnesses. That is a constitutional right in this country, it is very carefully guarded, and you should understand that no presumption of guilt may be raised and no inference of any kind may be drawn from the fact that a defendant does not take the witness stand and testify or call any witnesses.]

In reaching a conclusion on a particular point, or ultimately in reaching a verdict in this case, do not make any decisions simply because there were more witnesses on one side than on the other.

14

UNITED STATES' PROPOSED INSTRUCTION NO.[11]

An informant is someone who provides evidence against someone else for a personal reason or advantage. The testimony of an informant alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilt, even though not corroborated or supported by other evidence. You must examine and weigh an informant's testimony with greater care than the testimony of an ordinary witness. You must determine whether the informant's testimony has been affected by self- interest, by an agreement he has with the United States, by his own interest in the outcome of the case, or by prejudice against the defendant.

You should not convict a defendant based on the unsupported testimony of an informant, unless you believe the unsupported testimony beyond a reasonable doubt.

A person may testify under a grant of immunity (an agreement with the United States). His testimony alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilt even though it is not corroborated or supported by other evidence. You should consider testimony given under a grant of immunity with greater care and caution than the testimony of an ordinary witness. You should consider whether testimony under a grant of immunity has been affected by the witness's own interest, the United States' agreement, the witness's interest in the outcome of the case, or by prejudice against the defendant.

---

[11] 10th Circuit Pattern Instruction 1.14 (2018).

15

On the other hand, you should also consider that an immunized witness can be prosecuted for perjury for making a false statement. After considering these things, you may give testimony given under a grant of immunity such weight as you feel it deserves.

You should not convict a defendant based on the unsupported testimony of an immunized witness, unless you believe the unsupported testimony beyond a reasonable doubt.

**In this case, the nature of the immunity agreement(s) is as follows: the United States has promised Ryan Jensen and Jessica Gleave that it will not use their testimony against them in a criminal case, other than for a prosecution for perjury if they testify untruthfully.**

**Mr. Jensen and Ms. Gleave agreed to testify truthfully and completely, answering all questions posed to them.**

UNITED STATES' PROPOSED INSTRUCTION NO.[12]

The United States called as some of its witnesses alleged accomplices, who were named as co-defendants in the indictment. The United States has entered into a plea agreement with the co-defendants, **wherein the co-defendants pleaded guilty as charged and agreed to testify truthfully if called upon to testify. In exchange, the United States has agreed to ask the Court to consider imposing sentences that would otherwise be lower than the recommendation the United States would have made if the co-defendants had not agreed to testify truthfully. The United States has also agreed to signal to the Court that by testifying truthfully, the co-defendants should not be subject to any minimum-mandatory sentence otherwise applicable to their crimes**. **The agreement makes clear, however, that final sentencing decisions rest solely with the Court.** Plea bargaining is lawful and proper, and the rules of this Court expressly provide for it.

An alleged accomplice, including one who has entered into a plea agreement with the United States, is not prohibited from testifying. On the contrary, the testimony of an alleged accomplice may, by itself, support a guilty verdict. You should receive this type of testimony with caution and weigh it with great care. You should never convict a defendant upon the unsupported testimony of an alleged accomplice, unless you believe that testimony beyond a reasonable doubt. The fact that an accomplice has entered a guilty plea to the offense charged is not evidence of the guilt of any other person.

---

[12] 10th Circuit Pattern Instruction 1.15 (2018).

17

UNITED STATES' PROPOSED INSTRUCTION NO.[13]

The defendant did not testify and I remind you that you cannot consider his

decision not to testify as evidence of guilt. You must understand that the Constitution of

the United States grants to a defendant the right to remain silent. That means the right not

to testify. That is a constitutional right in this country, it is very carefully guarded, and

you must not presume or infer guilt from the fact that a defendant does not take the

witness stand and testify or call any witnesses.

_____

[13] 10th Circuit Pattern Instruction 1.08.1. Could be cut depending on the yellow highlights on proposed instruction 10, above.

UNITED STATES' PROPOSED INSTRUCTION NO.[14]

Evidence has been presented about a statement attributed to the defendant alleged to have been made after the commission of the crimes charged in this case but not made in court. Such evidence should always be considered by you with caution and weighed with care. You should give any such statement the weight you think it deserves, after considering all the circumstances under which the statement was made.

In determining whether any such statement is reliable and credible, consider factors bearing on the voluntariness of the statement. For example, consider the age, gender, training, education, occupation, physical and mental condition of the defendant, and all the other circumstances in evidence surrounding the making of the statement.

After considering all this evidence, you may give such weight to the statement as you feel it deserves under all the circumstances. If you determine that the statement is unreliable or not credible, you may disregard the statement entirely.

---

[14] 10th Circuit Pattern Instruction 1.25. The following phrase was removed from the penultimate paragraph because the United States does not intend to admit statements of the defendant made under custodial interrogation: "and any evidence concerning his treatment while under interrogation if the statement was made in response to questioning by government officials."

19

UNITED STATES' PROPOSED INSTRUCTION NO.[15]

If I have said or done anything in this case that makes it appear I have an opinion about the guilt or innocence of the defendant, disregard it. You are the sole judges of the facts and should in no way be influenced by what I have done here except to follow my instructions on the law. Nothing said in these instructions and nothing in any form of verdict prepared for your convenience is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find. What the verdict shall be is the sole and exclusive duty and responsibility of the jury.

---

[15] Stock.

20

UNITED STATES' PROPOSED INSTRUCTION NO.[16]

If any reference by the Court or by the attorneys to matters of evidence does not coincide with your own recollection, it is your recollection which should control during your deliberations.

---

[16] Stock.

UNITED STATES' PROPOSED INSTRUCTION NO.[17]

      During this trial, you have heard sound recordings of certain conversations. These conversations were legally recorded; they are a proper form of evidence and may be considered by you as you would any other evidence. You were also given transcripts of those recorded conversations.

      Keep in mind that the transcripts are not evidence. They were given to you only as a guide to help you follow what was being said. The recordings themselves are the evidence. If you noticed any differences between what you heard on the recordings and what you read in the transcripts, you must rely on what you heard, not what you read. If you could not hear or understand certain parts of the recordings, you must ignore the transcript as far as those parts are concerned.

---

[17] 10th Circuit Pattern Instruction 1.40.

22

UNITED STATES' PROPOSED INSTRUCTION NO.[18]

A separate crime is charged in each count of the indictment. Each charge, and the evidence pertaining to it, should be considered separately by you. The fact that you may find the defendant guilty or not guilty as to one of the counts should not control your verdict as to any other count.

---

[18] Stock.

23

UNITED STATES' PROPOSED INSTRUCTION NO.[19]

During the trial, you heard the testimony of expert witnesses who expressed opinions concerning

- **the identity and weight of substances including mixtures containing controlled substances;**

- **the illegitimacy of pills and tablets based upon composition, imprints, and other aspects;**

- **the nature of the Dark Net and how Dark Net Marketplaces operate;**

- **how AlphaBay operated from the perspective of vendors and customers;**

- **the nature and use of PGP encryption;**

- **the nature of cryptocurrencies and how cryptocurrencies such as Bitcoin are used in transactions over the Dark Net;**

- **the nature of and methods used in computer forensic examinations;**

- **the nature and operation of drug-trafficking organizations;**

  - **including the methods and means by which drug traffickers launder drug proceeds through promotion, concealment, and spending;**

- **what constitutes a drug or drug component under the FDCA;**

- **the make-up, regulation, standards, quality, purity, markings (including which Pharmaceutical company is allowed to use which markings), uses,**

---

[19] 10th Circuit Pattern Instruction 1.17.

24

**physiological effect on humans, listing in the Official US Pharmacopeia Compendium, and federal regulation of both Oxycodone and Fentanyl;**

- **the relative potency of Oxycodone, Fentanyl, and other opiates; and**

- **the risk of serious adverse health consequences or death from marking Fentanyl to appear like Oxycodone tablets.**

In some cases, such as this one, scientific, technical, or other specialized knowledge may assist the jury in understanding the evidence or in determining a fact in issue. A witness who has knowledge, skill, experience, training or education, may testify and state an opinion concerning such matters.

You are not required to accept such an opinion. You should consider opinion testimony just as you consider other testimony in this trial. Give opinion testimony as much weight as you think it deserves, considering the education and experience of the witness, the soundness of the reasons given for the opinion, and other evidence in the trial.

541

UNITED STATES' PROPOSED INSTRUCTION NO.[20]

You are not to be concerned with the legality or illegality of any search by law enforcement officers of the residence occupied by the defendant. That is a matter exclusively within the province of the Court.

---

[20] Stock.

UNITED STATES' PROPOSED INSTRUCTION NO.[21]

      You have heard testimony as to the manner in which the government conducted its investigation in this case including certain investigative methods or techniques that were used and certain investigative methods or techniques that were not used. In attempting to prove its case, the government is under no obligation to use all of the investigative methods that are available to it or use any particular method. The question is whether the evidence presented is sufficient to convince you beyond a reasonable doubt of the defendant's guilt.

---

[21] *U.S. v. Johnson*, 479 Fed. Appx. 811, 816-818 (10th Cir. 2012).

UNITED STATES' PROPOSED INSTRUCTION NO.[22]

You will note that the indictment charges that the crimes were committed "on or about" a certain date or between approximate dates. Although it is necessary for the United States to prove beyond a reasonable doubt that the offenses were committed on a date reasonably near the date alleged in the indictment, it is not necessary for the United States to prove that the offenses were committed precisely on the dates charged.

---

[22] Adapted from 10th Circuit Pattern Instruction 1.18.

28

UNITED STATES' PROPOSED INSTRUCTION NO.[23]

Fentanyl (also referred to as N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide) is a controlled substance within the meaning of the law.

Likewise, Alprazolam is a controlled substance within the meaning of the law.

---

[23] These sentences appear in pattern instructions for distribution, possession with intent to distribute, importation of a controlled substances, and others. By putting these statements here, it avoids redundancy below.

UNITED STATES' PROPOSED INSTRUCTION NO.[24]

**Several counts of the indictment and most of the underlying offenses listed in Count 1 of the indictment** also charge a violation of 18 U.S.C. section 2, which provides that: "Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

This law makes it a crime to intentionally help someone else commit a crime. To find the defendant guilty of this crime, you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: someone else committed the charged crime, and

Second: the defendant intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about. This means that the United States must prove that the defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help him.

The defendant need not perform the underlying criminal act, be present when it is performed, or be aware of the details of its commission to be guilty of aiding and abetting. But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough. Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.

---

[24] 10th Circuit Pattern Instruction 2.06 (2018).

30

UNITED STATES' PROPOSED INSTRUCTION NO.[25]

The defendant is charged in Count 1 with a violation of 21 U.S.C. section 848. This law makes it a crime to engage in what is called a "continuing criminal enterprise" involving controlled substances.

To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the defendant violated the Controlled Substances Act **by conspiring to distribute Fentanyl, as charged in the list of underlying violations to Count 1, which list of violations can be found on the special verdict form**;

Second: such violatio**n was** part of a continuing series of violations of the Controlled Substances Act **that began on a date unknown to the Grand Jury, but at least by July 8, 2015, and continued to at least November 22, 2016.** These violations must be connected together as a series of related or ongoing activities, as distinguished from isolated and disconnected acts. You must unanimously agree on which of at least three of these underlying violations has been proved. **The underlying violations listed in Count 1 may be found on the special verdict form attached to the end of these instructions;**

Third: the defendant committed these violations in concert (or by common design or plan) with five or more other persons. The five other persons need not have acted at

---

[25] Adapted from 10th Circuit Pattern Jury Instruction 2.88. The United States has included a Sixth element, the quantity of Fentanyl and the defendant's principal role, in an attempt to reflect the two-part analysis by the jury—first guilt, then, if guilty, quantity and principal role.

31

the same time or in concert with each other. You need not unanimously agree on the identity of any other persons acting in concert with the defendant, so long as each of you finds that there were five or more such persons;

Fourth: the defendant was an organizer, supervisor, or manager of those five persons; and

Fifth: the defendant obtained substantial income or resources from the series of violations.

**If you find the defendant guilty, you will be asked to find whether**

**Sixth:**

**1) the conspiracy to distribute Fentanyl involved twelve kilograms or more of a mixture or substance containing a detectable amount of Fentanyl; and**

**2) the defendant was a principal administrator, organizer, or leader of the enterprise.**

The term "substantial income or resources" means income in money or property which is significant in size or amount as distinguished from some relatively insignificant, insubstantial, or trivial amount.

The term "organizer, supervisor, or manager" means that the defendant was more than a fellow worker, and that the defendant either organized or directed the activities of five or more other persons, exercising some form of managerial authority over them. The defendant need not be the only principal organizer or supervisor.

**Likewise, the law does not require the United States to prove the defendant was the only principal administrator, organizer, or leader; the United States need**

32

only prove beyond a reasonable doubt that the defendant was one of possibly several principal administrators, organizers, or leaders.

33

UNITED STATES' PROPOSED INSTRUCTION NO.[26]

The defendant is charged **in the list of underlying violations to Count 1** with violating sections 841(a)(1) and 846 of Title 21 of the United States Code. This law makes it a crime for anyone to conspire with someone else to violate federal laws pertaining to controlled substances. In this case, the defendant **is charged with conspiracy to distribute Fentanyl resulting in death.**

To find the defendant committed this crime, you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: **beginning on a date unknown to the Grand Jury, but at least by February 3, 2016, and continuing to at least November 22, 2016,** two or more persons agreed to violate the federal drug laws;

Second: the defendant knew the essential objective of the conspiracy;

Third: the defendant knowingly and voluntarily involved himself in the conspiracy;

Fourth: there was interdependence among the members of the conspiracy; and

**Fifth: the death of R.K. resulted from use of Fentanyl distributed in furtherance of the conspiracy.**

A conspiracy is an agreement between two or more persons to accomplish an unlawful purpose. It is a kind of "partnership in criminal purposes" in which each member becomes the agent or partner of every other member. The evidence may show

---

[26] 10th Circuit Pattern Jury Instruction 2.87 (modified to reflect this is a predicate offense to the CCE charge).

34

that some of the persons involved in the alleged conspiracy are not on trial. This does not matter. There is no requirement that all members of a conspiracy be charged or tried together in one proceeding.

The evidence need not show that the members entered into an express or formal agreement. Nor does the law require proof that the members agreed on all the details. But the evidence must show that the members of the alleged conspiracy came to a mutual understanding to try to accomplish a common and unlawful plan.

If you are convinced that the charged conspiracy existed, then you must next determine whether the defendant was a member of that conspiracy, that is, whether the defendant knew at least the essential goals of the conspiracy and voluntarily chose to be part of it. The law does not require proof that the defendant knew all the other members of the conspiracy or knew all the details about how activities were to be carried out. A person may belong to a conspiracy for a brief period of time or play a minor role. On the other hand, proof is not sufficient if it merely shows that the defendant knew about the existence of the conspiracy or was associated with members of the conspiracy. Rather, the evidence must show the defendant knowingly joined the conspiracy with the intent to advance its purposes.

You are also required to find that interdependence existed among the members of the conspiracy. This means that the members intended to act for their shared mutual benefit. To satisfy this element, you must conclude that the defendant participated in a shared criminal purpose and that his actions constituted an essential and integral step toward the realization of that purpose.

35

To secure a conviction for conspiring to distribute a drug that "results" in death, the United States must prove the victim's use of the drug is a but-for cause of the death.[27]

---

[27] *United States v. Burrage*, 571 U.S. 204, 218-219 (2014); *United States v. MacKay*, 610 F. App'x 797, 798 (10th Cir. 2015) (internal citations omitted).

UNITED STATES' PROPOSED INSTRUCTION NO.[28]

The defendant is charged **in the list of underlying violations to Count 1** with violating sections 841(a)(1) and 846 of Title 21 of the United States Code. This law makes it a crime for anyone to conspire with someone else to violate federal laws pertaining to controlled substances. In this case, the defendant **is charged with conspiracy to distribute Alprazolam.**

To find the defendant committed this crime, you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: **beginning on a date unknown to the Grand Jury, but at least by December 22, 2015, and continuing to at least November 22, 2016,** two or more persons agreed to violate the federal drug laws;

Second: the defendant knew the essential objective of the conspiracy;

Third: the defendant knowingly and voluntarily involved himself in the conspiracy; and

Fourth: there was interdependence among the members of the conspiracy.

---

[28] 10th Circuit Pattern Jury Instruction 2.87 (modified to reflect this is a predicate offense to the CCE charge and duplicate language removed).

37

UNITED STATES' PROPOSED INSTRUCTION NO. [29]

The defendant is charged in **the list of underlying violations to Count 1** with **aiding and abetting** attempted violations of 21 U.S.C. section 841(a)(1). This law makes it a crime to distribute a controlled substance. To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

**First**: the defendant**'s co-conspirator(s)** knowingly or intentionally attempted to distribute a controlled substance as charged;

**Second**: the substance was in fact

- Fentanyl, for those crimes alleging Fentanyl on or about the dates alleged; or

- Alprazolam, for those crimes alleging Alprazolam on or about the dates alleged.

**Third: the defendant aided or abetted his co-conspirator(s) in the attempted commission of the offense.**

The term "distribute" means to deliver or to transfer possession or control of something from one person to another. The term "distribute" includes the sale of something by one person to another. It is not necessary, however, for the United States to

---

[29] *See* 10th Circuit Pattern Instruction 2.85.1; *United States v. Johnson*, 130 F.3d 1420, 1428 (10th Cir. 1997) (modified to reflect the two-part analysis by the jury—first guilt, then, if guilty, quantity, and to reflect aiding and abetting attempts to violate the law).

38

prove that any transfer of money or other thing of value occurred at the same time as, or because of, the distribution.

The United States is not required to prove that the defendant knew the precise nature of the controlled substance.

UNITED STATES' PROPOSED INSTRUCTION NO.[30]

The defendant may be found guilty of attempting to commit a crime, even though he did not do all of the acts necessary in order to commit the crime. However, the defendant may not be found guilty of attempting to commit any crime merely by thinking about it, or even by making some plans or some preparation for the commission of a crime.

Instead, in order to prove an attempt, the United States must prove beyond a reasonable doubt that:

(1) the defendant intended to commit the crime; and

(2) the defendant took a substantial step towards commission of that crime.

A "substantial step" is something beyond mere preparation. A substantial step is an act which, in the ordinary and likely course of events, would lead to the commission of the particular crime. The step must be a strong indication of the defendant's criminal intent, and must unequivocally mark the defendant's acts as criminal. It should demonstrate commitment to the crime charged.

---

[30] *See* 10th Circuit Pattern Instruction 1.32 (2018).

UNITED STATES' PROPOSED INSTRUCTION NO. [31]

The defendant is charged in Counts 2, 3, and 4**, and also in the list of underlying violations to Count 1**, with **aiding and abetting** violations of 21 U.S.C. section 952(a) and section 960(a)(1). This law makes it a crime to knowingly or intentionally import a controlled substance.

To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the defendant **or his co-conspirator(s) imported into the United States from a place outside the United States the controlled substances listed below**;

- **Fentanyl, on or about June 23, 2016 (Count 2)**
- **Alprazolam, on or about November 8, 2016 (Count 3)**
- **Fentanyl, on or about November 17, 2016 (Count 4)**

Second: the defendant knew the substance he **or his co-conspirator(s) imported** into the United States was a controlled substance;

Third: the defendant knew that the substance would enter the United States; and

Fourth: **the defendant aided or abetted his co-conspirator(s) in the commission of the offense.**

**If you find the defendant guilty, you will be asked to find whether**

**Fifth:**

---

[31] 10th Circuit Pattern Instruction 2.90 (2018), modified to reflect the two-part analysis by the jury—first guilt, then, if guilty, quantity. Use of the word "imported" reflects the language of the statute—21 U.S.C. §952(a).

41

- **the quantity of the substance at issue in both Count 2 and Count 4 was at least 40 grams of a mixture or substance containing a detectable amount of Fentanyl.**

42

UNITED STATES' PROPOSED INSTRUCTION NO. [32]

The defendant is charged in Count 5**, and also in the list of underlying violations to Count 1, with violations** of 21 U.S.C. section 841(a)(1). This law makes it a crime to possess a controlled substance with the intent to distribute it.

To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the defendant knowingly or intentionally possessed a controlled substance **on or about November 22, 2016**, as charged;

Second: the substance was in fact Fentanyl; and

Third: the defendant possessed the substance with the intent to distribute it;

**If you find the defendant guilty, you will be asked to find whether**

Fourth: the amount of the controlled substance possessed by the defendant was at least 400 grams of a mixture or substance containing a detectable amount of Fentanyl.


To "possess with intent to distribute" means to possess with intent to deliver or transfer possession of a controlled substance to another person, with or without any financial interest in the transaction.

---

[32] 10th Circuit Pattern Instruction 2.85 (2018), modified to reflect the two-part analysis by the jury—first guilt, then, if guilty, quantity.

43

UNITED STATES' PROPOSED INSTRUCTION NO. [33]

The law recognizes two kinds of possession: actual possession and constructive possession. A person who knowingly has direct physical control over an object or thing, at a given time, is then in actual possession of it.

A person who, although not in actual possession, knowingly has the power and intent at a given time to exercise dominion or control over an object, either directly or through another person or persons, is then in constructive possession of it.

More than one person can be in possession of an object if each knows of its presence and has the power and intent to control it.

In the situation where the object is found in a place (such as a room or car) occupied by more than one person, you may not infer power and intent to exercise control over the object based solely on joint occupancy. Mere control over the place in which the object is found is not sufficient to establish constructive possession. Instead, in this situation, the United States must prove some connection between the particular defendant and the object demonstrating the power and intent to exercise control over the object.

---

[33] *See* 10th Circuit Pattern Instruction 1.31 (2011) for the first paragraph and 1.31 (2018) for the remainder.

UNITED STATES' PROPOSED INSTRUCTION NO. [34]

The defendant is charged in Count 6, **and also in the list of underlying violations to Count 1,** with a violation of 21 U.S.C. section 841(a)(1). This law makes it a crime to distribute a controlled substance. To find the defendant guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First: the defendant**'s co-conspirator(s)** knowingly or intentionally distributed a controlled substance **on or about June 6 through June 13, 2016,** as charged;

Second: the substance was in fact Fentanyl;

Third: **the** death **of R.K.** resulted from use of **the Fentanyl distributed by the defendant's co-conspirators; and**

**Fourth: the defendant aided or abetted his co-conspirator(s) in the commission of the offense.**

The term "distribute" means to deliver or to transfer possession or control of something from one person to another. The term "distribute" includes the sale of something by one person to another. It is not necessary, however, for the government to prove that any transfer of money or other thing of value occurred at the same time as, or because of, the distribution.

**To secure a conviction for distributing a drug that "results" in death, the United States must prove the victim's use of the drug is a but-for cause of the**

---

[34] 10th Circuit Pattern Instruction 2.85.1 (2018).

45

death.[35]

---

[35] *United States v. Burrage*, 571 U.S. 204, 218-219 (2014); *United States v. MacKay*, 610 F. App'x 797, 798 (10th Cir. 2015) (internal citations omitted).

UNITED STATES' PROPOSED INSTRUCTION NO. [36]

The defendant is charged in Count 7**, and also in the list of underlying violations to Count 1,** with a violation of 21 U.S.C. section 841(a)(1). This law makes it a crime to **manufacture** a controlled substance. To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the defendant knowingly or intentionally **manufactured** a controlled substance **on or about November 22, 2016**, as charged; and

Second: the substance was in fact Alprazolam.

**The term "manufacture" means the production, preparation, propagation, compounding, or processing of a drug or other substance.**

---

[36] 10th Circuit Pattern Instruction 2.85.1 (2018), modified to reflect manufacture rather than distribution. See also 21 USC § 802(15) for the definition of manufacture.

47

UNITED STATES' PROPOSED INSTRUCTION NO. [37]

The defendant is charged in Counts 8 and 9 with violations of the Food, Drug, and

Cosmetic Act, specifically 21 U.S.C. sections 331(k) & 333(b)(7). These sections make it

a crime to intentionally adulterate drugs while held for sale after their shipment in

interstate commerce. To find the defendant guilty of this crime you must be convinced

that the United States has proved each of the following beyond a reasonable doubt:

> First: the relevant product, Fentanyl, was a drug as you will be instructed that
>
> word means;
>
> Second: the defendant held the drug for sale after its shipment in interstate
>
> commerce;
>
> Third: the defendant performed, or caused to be performed, one or more acts
>
> which resulted in the article being adulterated;
>
> Fourth: the defendant knowingly and intentionally adulterated or caused the

adulteration of the drug:

---

[37] *See United States v. Blue Ribbon Smoked Fish, Inc.*, 179 F. Supp. 2d. 30, 42 (E.D.N.Y. 2001). *See* 21 U.S.C. §351 for the definition of adulterated. *See* 21 U.S.C. §321 for the definitions of drug, interstate commerce, and official compendium. The definition of serious adverse health consequences was taken from 21 CFR 821.3(e).

Authority for the held-for-sale instruction language is as follows: *United States. v. Sullivan*, 332 U.S. 689, 696 (1948); *Hipolite Egg Co. v. United States*, 220 U.S. 45, 54 (1911); *Baker v. United States*, 932 F.2d 813, 814-15 (9th Cir. 1991); *United States v. Article of Device Labeled in Part '110 V Vapozone'*, 194 F.Supp. 332 (N.D. Calif. 1961); *United States v. Diapulse Corp. of America*, 514 F.2d 1097, 1098 (2d Cir. 1975); *United States v. Dianovin Pharmaceuticals, Inc.*, 475 F.2d 100, 103 (1st Cir. 1973); *United States v. Detroit Vital Foods, Inc.*, 330 F.2d 78, 81-82 (6th Cir. 1964); *DeFreese v. United States*, 270 F.2d 737, 739 (5th Cir. 1959), cert. denied, 362 U.S. 944 (1960).

48

- **For Count 8, beginning on a date unknown to the grand jury, but at least by February 3, 2016, and continuing to at least November 22, 2016;**
- **For Count 9, beginning on a date unknown to the grand jury, but at least by June 18, 2016, and continuing to at least November 22, 2016;**

and

Fifth: such adulteration of the drug had a reasonable probability of causing serious adverse health consequences or death to humans.

A drug is adulterated if:

a) it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium; or

b) it is a drug and any substance has been substituted wholly or in part therefor.

An article is "held for sale" if it is being held for any purpose other than for personal use by the defendants.

For the requirement of a prior shipment in interstate commerce to be satisfied, it is enough to show that the article traveled in interstate commerce prior to the article being held for sale.

An article is held for sale after shipment in interstate commerce without regard to how long after the shipment the misbranding occurred, how many intrastate sales had intervened, or who had received the article at the end of the interstate commerce. After an article has been shipped in interstate commerce, it is immaterial when or how defendant obtained the article.

49

For Counts 8 and 9 only, the terms listed below are defined as follows:

The term "interstate commerce" means commerce between any State or Territory and any place outside thereof.

The term "drug" means:

    1) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them.

    2) articles intended for use in the diagnosis, cure, treatment, or prevention of disease in man, or intended to affect any function of the human body, or

    3) articles intended for use as a component of any other drug.

The term "official compendium" means the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, official National Formulary, or any supplement to any of them.

The term "serious adverse health consequences" means any potential significant adverse experience related to a drug, which could be life-threatening or which could result in permanent or long-term injuries or illnesses.

50

UNITED STATES' PROPOSED INSTRUCTION NO. [38]

The defendant is charged in Count 10**, and also in the list of underlying violations to Count 1,** with **aiding and abetting** a violation of 21 U.S.C. section 843(b). This law makes it a crime to use a communication facility to commit a felony drug offense. To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the defendant**'s co-conspirator(s)** knowingly used the U.S. Mail **on or about September 12-23, 2016**;

Second: the defendant**'s co-conspirator(s)** acted with the intent to commit a drug felony, namely Distribution of Alprazolam; and

**Third: the defendant aided and abetted his co-conspirator(s) in the commission of the offense.**

You are instructed that Distribution of Alprazolam is a felony.

---

[38] 10th Circuit Pattern Instruction 2.86 (2018) (modified to reflect aiding and abetting).

51

UNITED STATES' PROPOSED INSTRUCTION NO. [39]

The following definitions and instructions apply to Counts 11 and 12.

The term "conducts" includes initiating, concluding, or participating in initiating or concluding, a transaction.

The term "financial transaction" means a transaction involving the use of a financial institution that is engaged in, or the activities of which affect, interstate commerce in any way or degree.

The term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through specified unlawful activity, including the gross receipts of such activity.

The term "interstate commerce" means commerce or travel between the states, territories or possessions of the United States, including the District of Columbia. It is not necessary that the defendant have intended or anticipated an effect on interstate commerce. All that is necessary is that the natural and probable consequence of the acts the defendant took would be to affect interstate commerce.

---

[39] 10th Circuit Pattern Instruction 2.73.1 (2018).

52

UNITED STATES' PROPOSED INSTRUCTION NO. [40]

The defendant is charged in Count 11 with a violation of 18 U.S.C. section 1956(h). This law makes it a crime for anyone to conspire with someone else to commit a money laundering offense.

To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: that the defendant and at least one other person, in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan to

A. violate 18 U.S.C. section 1956, which was to conduct a financial transaction involving proceeds of some form of unlawful activity beginning on a date unknown to the Grand Jury, but at least by December 22, 2015, and continuing to at least November 22, 2016:

    i. with the intent to promote the carrying on of a specified unlawful activity; or

    ii. knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activity;

or

---

[40]*See* 18 U.S.C. 1956(h). *See also* Pattern Crim. Jury Instr. 11th Cir. O74.5 (amended 2015); First Circuit Pattern Instruction 4.18. *See* 18 U.S.C. §1956(c)(7)(B)(i) for the specified unlawful activities.

B. violate 18 U.S.C. section 1957, which was to conduct a monetary transaction by, through, or to a financial institution involving criminally derived property beginning on a date unknown to the Grand Jury, but at least by December 22, 2015, and continuing to at least November 22, 2016:

    i.   which transaction affected interstate or foreign commerce;

    ii.   which transaction involved property of a value greater than $10,000 USD; and

Second: that the defendant, knowing the unlawful purpose of the plan, willfully joined in it.

Distribution of a controlled substance is a "specified unlawful activity" under the law. Manufacture of a controlled substance is also a "specified unlawful activity" under the law.

UNITED STATES' PROPOSED INSTRUCTION NO. [41]

The defendant is charged in Count 12 with a violation of 18 U.S.C. section 1956(a)(1)(B)(i). This law makes it a crime knowingly to conceal or disguise the nature, location, source, ownership, or control of proceeds of specified unlawful activity.

To find the defendant guilty of this crime, you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the defendant conducted a financial transaction on or about November 8, 2016;

Second: the financial transaction involved the proceeds of **an unlawful activity, specifically**, distribution of a controlled substance;

Third: the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and

Fourth: the defendant conducted the financial transaction:

    i.    with the intent to promote the carrying on of a specified unlawful activity; or

    ii.    knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activity.

---

[41] 10th Circuit Pattern Instruction 2.73.1 (2018).

55

UNITED STATES' PROPOSED INSTRUCTION NO. [42]

The defendant is charged in Count 13 with money laundering in violation of 18 U.S.C. section 1957(a). In order for the defendant to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt:

First: the defendant knowingly engaged or attempted to engage in a monetary transaction on or about May 5, 2016;

Second: the defendant knew the transaction involved criminally derived property;

Third: the property had a value greater than $10,000;

Fourth: the property was, in fact, derived from the distribution of a controlled substance; and

Fifth: the transaction occurred in the United States.

The term "monetary transaction" means the deposit, in or affecting interstate commerce, of funds or a monetary instrument by, through, or to a financial institution.

The term "financial institution" means **any credit union or FDIC-insured bank**.

The term "criminally derived property" means any property constituting, or derived from, the proceeds of a criminal offense. The United States must prove that the defendant knew that the property involved in the monetary transaction constituted, or was derived from, proceeds obtained by some criminal offense. The United States does not have to prove that the defendant knew the precise nature of that criminal offense, or knew

---

[42] *See* Model Crim. Jury Instr. 9th Cir. 8.150 (2010); *See also* Pattern Crim. Jury Instr. 11th Cir. O74.6 (2016).

the property involved in the transaction represented the proceeds of distribution of a controlled substance.

Although the United States must prove that, of the property at issue more than $10,000 was criminally derived, the United States does not have to prove that all of the property at issue was criminally derived.

57

## UNITED STATES' PROPOSED INSTRUCTION NO.[43]

I have explained to you the elements which the United States must prove beyond a reasonable doubt before you may convict the defendant of Counts 1 through 13, along with the crimes alleged in the list of underlying offenses to Count 1. I have also explained to you that punishment is in the exclusive province of the Court, and that you should not concern yourselves with questions of punishment. However, because the punishment under the law for the crimes the defendant is charged with committing varies with the quantity of drugs involved, the law requires that you make special findings in your verdict with regard to those amounts. Those findings, too, must be made beyond a reasonable doubt.

You will be provided with a verdict form on which you will record your verdict. This form contains two determinations for Counts 1, 2, 4, and 5 that you may have to make. The first determination is whether you find the defendant guilty or not guilty of the offense charged in Counts 1, 2, 4, and 5 of the Indictment. If you find the defendant not guilty as to a Count, you need proceed no further.

If, on the other hand, you find the defendant guilty of a Count, you should proceed to the second determination for that Count, that is, the quantity of Fentanyl involved in each offense.

---

[43] Adapted from *U.S. v. Alejandro ARCINIEGA-ZETINA*, 2:14cr154-DN (D.Utah), Doc. 500, Instruction 39; *Apprendi v. New Jersey*, 120 S.Ct. 2348 (2000).

58

UNITED STATES' PROPOSED INSTRUCTION NO.[44]

To reach a verdict, all of you must agree. Your verdict must be unanimous. Your deliberations will be secret. You will never have to explain your verdict to anyone.

It is your duty to consult with one another and to deliberate in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. During your deliberations, do not hesitate to reexamine your own opinions and change your mind if convinced that you were wrong. But do not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Remember at all times, you are judges, judges of facts. Your sole interest is to seek the truth from the evidence in the case, to decide whether the government has proved the defendant guilty beyond a reasonable doubt.

Bear in mind that you are never to reveal to any person, not even to the Court, how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict.

---

[44] Stock.

59

UNITED STATES' PROPOSED INSTRUCTION NO. [45]

Upon retiring to the jury room, you should first select one of your members to act as your foreperson who will preside over your deliberations and will be your spokesperson here in Court. A verdict form has been prepared for your convenience.

You will take the verdict form to the jury room and when you have reached a unanimous agreement as to your verdict, the foreperson will write the unanimous answer of the jury in the space provided for in each count of the Indictment, either not guilty or guilty. At the conclusion of your deliberations, the foreperson should date and sign the verdict.

---

[45] Stock.

UNITED STATES' PROPOSED INSTRUCTION NO.[46]

If it becomes necessary during your deliberations to communicate with the Court, you may send a note by a Court security officer, signed by your foreperson or by one or more jurors. No member of the jury should attempt to communicate with the Court by any means other than a signed writing; and the Court will never communicate with any member of the jury on any subject touching the merits of the case, otherwise than in writing or orally here in open Court.

You will note from the oath the Court security officer will take that he, as well as any other person, is also forbidden to communicate in any way with any juror about any subject touching the merits of the case.

---

[46] Stock.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br><br>AARON MICHAEL SHAMO,<br><br>Defendant. | STIPULATED PROPOSED VOIR DIRE QUESTIONS<br><br>Case No. 2:16-CR-631 DAK<br><br>District Judge Dale A. Kimball |

The United States, by and through Michael Gadd, Special Assistant United States Attorney, hereby submits the following stipulated Proposed Voir Dire Questions. It is anticipated that the Court will ask the prospective jurors about fairly-standard question topics, such as name, age, marital status, education, employment, and family composition. The proposed questions below are meant to supplement the questions the Court will ask.

Respectfully Submitted this 1st day of August, 2019.

/s/ Michael Gadd
MICHAEL GADD
Special Assistant United States Attorney

**PROPOSED VOIR DIRE QUESTIONS:**

**These questions are Yes and No questions and will be asked aloud in the Courtroom by the Judge. If your answer to any of these questions will be YES, please be prepared to discuss your experiences, circumstances, or conflicts.**
*(If answering one or more of these questions in the presence of other potential jurors would touch on private issues you may indicate a desire to answer the question privately.)*

1. Do you read a newspaper? If yes, which?

2. Do you read any magazines or periodicals? If yes, which?

3. Do you have any hearing problems?

4. Are you taking any medication that might make it difficult for you to serve as a juror?

5. Do you have any problems or areas of concern at home or at work that might interfere with your duties as a juror during trial?

6. The defendant in this matter is Aaron Michael Shamo. There was a significant amount of news and media coverage regarding this case. Have you read any articles, seen or heard news/media reports, or overheard any information regarding this case?

7. Do you, any of your family members, or a close personal friend have specialized training, education, or experience in law?

8. Have you, any of your family members, or a close personal friend been employed by a law enforcement agency?

9. Have you, any of your family members, or a close personal friend ever been involved, in any court, in a criminal matter that concerned yourself, any member of your family, or a close friend including as a defendant, a witness, or a victim.

10. Are you or any of your family members employed by the United States Government?

11. Have you or any of your family members had a negative experience with any law enforcement entity, including the Drug Enforcement Administration, Homeland Security Investigations, Food and Drug Administration, United States Postal Inspection Service, or the Internal Revenue Service–Criminal Investigations?

12. Have you had any experience involving yourself, any member of your family, or any close friend relating to the use or possession of illegal drugs or narcotics that would prevent you from viewing the evidence impartially or affect the way you view law enforcement personnel or affect the way you view the court system (including the judge, the prosecution, or the defense attorney)?

13. Evidence will be presented at trial about a drug overdose death. Have you had any

experience with drug overdoses involving yourself, any member of your family, or any close friend? If yes, could you be fair and impartial when considering the evidence in this case and applying it to the law as you will be instructed.

14. Are you a member of a group, or do you have an affiliation with a group, that advocates a position on drug issues or policies?

15. Do you have strong feelings about U.S. drug laws that would prevent you from viewing the evidence impartially?

16. Do you believe the government should be required to prove its case by a standard greater than "beyond a reasonable doubt," such as "beyond any possible doubt" or "to an absolute certainty"?

17. The Judge will instruct you on the law that is applicable to the case. Are you willing to accept what the law is, regardless of what you personally believe the law is or ought to be?

18. If you watch television shows or movies involving crime scene investigation, such as "CSI" or "NCIS", do you believe these shows or movies accurately represent real-life criminal investigation techniques and capabilities?

19. Do you hold any opinions, religious beliefs, or philosophies which would make you unable to come to a verdict in this case, such as a belief that no person should ever be judged or convicted?

20. You will be instructed that a person charged with a crime is presumed innocent. Will you be unable to follow this instruction?

21. The defendant is charged with drug crimes and money laundering offenses. Do you know of any reason why you may be partial towards or against the United States, towards or against any witness, or towards or against the defendant, because of the nature of the charges or otherwise?

22. If selected to serve as a juror, is there any reason you believe you will not follow the instructions given to you and apply the law to the facts in this case?

23. Do you have strong feelings, whether from a moral, philosophical, religious, or other perspective, that would make it difficult for you to stand in judgment of another person?

[Have Prosecution introduce themselves and list all witnesses]

24. Are you familiar with any of these individuals?

[Have Defense introduce themselves and list all witnesses]

25. Are you familiar with any of these individuals?

26. Do you understand that the defendant is entitled to a fair trial? Do you understand that the

United States is also entitled to a fair trial?

27. If you were the defendant, is there any reason you would not want someone in your state of mind on the jury?

28. If you were the prosecutor, is there any reason you would not want someone in your state of mind on the jury?

29. Is there any reason, not previously addressed, that you believe would affect your ability to be a juror in this case?

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | UNITED STATES' TRIAL BRIEF |
| vs. | |
| | Judge Dale A. Kimball |
| AARON MICHAEL SHAMO, | |
| Defendant. | |

The United States of America, by and through its counsel, Michael Gadd, Special Assistant United States Attorney, Kent Burggraaf, Special Assistant United States Attorney, and Vernon Stejskal, Assistant United States Attorney, hereby files its Trial Brief.

## I

## STATEMENT OF THE CASE

### A.    Indictment

On October 18, 2018, a grand jury returned a second superseding indictment against Aaron Michael Shamo (Defendant), charging him as follows:[1]

---

[1] See Doc. 136.

1

Count 1 alleges that beginning on a date unknown, but at least between July 8, 2015, and November 22, 2016, in Utah and elsewhere, the Defendant, Aaron Shamo, engaged in a continuing criminal enterprise (CCE) in violation of federal law.

Specifically, Count 1 alleges that the Defendant, Aaron Shamo, acting in concert with at least five other persons with respect to whom he occupied a position of organizer, supervisor, or manager, committed a continuing series of violations of the Controlled Substances Act, including the aiding, abetting, attempting, or conspiring to import, manufacture, distribute, and possess with intent to distribute, fentanyl and alprazolam, using the U.S. Mail in furtherance of these offenses. From such continuing series of violations, the Defendant obtained substantial income and resources.

Count 1 also alleges that the Defendant, Aaron Shamo, was a principal administrator, organizer, supervisor, or leader of the criminal enterprise which involved the possession with intent to distribute and the distribution of more than 12,000 grams (12 kilograms) of a mixture or substance containing a detectable amount of Fentanyl.

Count 2 alleges that on or about June 23, 2016, in Utah and elsewhere, the Defendant, Aaron Shamo, imported 40 grams or more of a mixture or substance containing the controlled substance Fentanyl into the United States from China.

Count 3 alleges that on or about November 8, 2016, in Utah and elsewhere, the Defendant, Aaron Shamo, imported the controlled substance Alprazolam into the United States from China.

Count 4 alleges that on or about November 16, 2016, in Utah and elsewhere, the Defendant, Aaron Shamo, imported 40 grams or more of a mixture or substance containing the controlled substance fentanyl into the United States from China.

Count 5 alleges that on November 22, 2016, in Utah, the Defendant, Aaron Shamo, possessed 400 grams or more of a mixture or substance containing the controlled substance Fentanyl with the intent to distribute that substance to others.

Count 6 alleges that between June 6 and June 13, 2016, in Utah and elsewhere, the Defendant, Aaron Shamo, distributed or aided and abetted in the distribution of the controlled substance Fentanyl, and that as a result a man with the initials R.K. died on June 13, 2016.

Count 7 alleges that on November 22, 2016, in Utah, the Defendant, Aaron Shamo, manufactured the controlled substance Alprazolam, by pressing it with other fillers into consumable pills.

Count 8 alleges that beginning on a date unknown, but at least between February 3 and November 22, 2016, in Utah, the Defendant, Aaron Shamo, held adulterated drugs for sale in that he manufactured pills to have the appearance of Oxycodone (bearing the markings "A 215"), but which contained the controlled substance Fentanyl and not Oxycodone, and the adulteration had a reasonable probability of causing serious adverse health consequences or death to humans.

Count 9 alleges that beginning on a date unknown, but at least between June 18 and November 22, 2016, in Utah, the Defendant, Aaron Shamo, held adulterated drugs for sale in that he manufactured pills to have the appearance of Oxycodone (bearing the markings "M" and "30"), but which contained the controlled substance Fentanyl and not Oxycodone, and the adulteration had a reasonable probability of causing serious adverse health consequences or death to humans.

Count 10 alleges that between September 12 and September 23, 2016, in Utah, the Defendant, Aaron Shamo, used, or aided and abetted in the use of the United States Mail in furtherance of a drug trafficking offense to facilitate the distribution of the controlled substance Alprazolam.

Count 11 alleges that beginning on a date unknown, but at least between December 22, 2015 and November 22, 2016, in Utah and elsewhere, the Defendant, Aaron Shamo, conspired with others to commit money laundering offenses.

Count 12 alleges that on or about November 8, 2016, in Utah, the Defendant, Aaron Shamo, engaged in money laundering by promotion and concealment by depositing $2,700.00 into a credit union account which involved the known proceeds of the distribution of a controlled substance with the intent to carry on that distribution activity or knowing the transaction was to conceal the nature of the proceeds.

Count 13 alleges that on or about May 5, 2016, in Utah, the Defendant, Aaron Shamo, engaged or attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000.00 by issuing a personal check from a Wells Fargo bank account to iDrive Utah.

Defendant was arraigned on the Second Superseding Indictment on October 30, 2018, and entered not-guilty pleas.[2]

### B.    Trial Status

A jury trial is scheduled to begin August 9, 2019, before the Honorable Dale A. Kimball, United States District Court Judge. The United States expects its case-in-chief to last approximately twelve days.

### C.    Defense Counsel

Greg Skordas, Daryl Sam, and Kaitlynn Beckett represent Defendant in this case.

### D.    Custody Status

Defendant is in custody pending trial.

---

[2] Doc. 142.

E. **Interpreter**

The United States does not require the assistance of an interpreter for its case in chief.

F. **Jury Waiver**

Defendant has not filed a jury waiver.

G. **Pretrial Motions**

The Court has ruled on the pre-trial motions made by both parties. The Court left open the possibility of renewing objections by the United States to defense experts Kelly Shafto and Eric Wheeler. The United States has received Ms. Shafto's report and does not intend to renew its objection so long as Ms. Shafto's testimony concerns the opinions she gave in her report.

The defense has recently indicated it will not call Eric Wheeler as a witness.

H. **Stipulations not Contained on the Docket**

The parties have not reached any stipulations not covered on the docket, particularly the minute entry entered on May 17, 2019.[3]

I. **Discovery**

The United States has complied with its discovery obligations. To date, Defendant has not provided reciprocal discovery.

## II

## SUMMARY OF ANTICIPATED EVIDENCE

This case involves an international Drug Trafficking Organization (DTO), run by Aaron Shamo, which manufactured controlled substances, namely fake oxycodone pills made with Fentanyl and counterfeit Xanax tablets. The DTO distributed these controlled substances to other individuals for purposes of further distribution throughout the United States and elsewhere using

---

[3] Doc. 219.

5

their storefront, "Pharma-Master," on the Dark Net[4] marketplace AlphaBay and by using the U.S. Mail.

**<u>Overview</u>**

By way of an overview, the organization began with collaboration between Shamo and Drew Crandall but quickly grew to include dozens of co-conspirators. Shamo and Crandall purchased pill tableting machines, sometimes called pill presses, dies and punches to mark pills so the markings would match those of legitimate pharmaceutical drugs, and inert pill ingredients, such as binding agents and colors. Some items, such as the binding agents and colors were purchased legally, and other inputs, such as Fentanyl and Alprazolam, were purchased and imported into the United States illicitly. To avoid detection, Shamo and Crandall had many of their inputs shipped to nominees or straw purchasers. Shamo and Crandall paid their nominees and straw purchasers for their assistance.

The inputs would then be pressed into pills that had the appearance of legitimate pharmaceuticals. The fake oxycodone-type pills and the counterfeit Alprazolam tablets were sold on the Dark Web at a significant profit. Once sold, Shamo and Crandall used co-conspirators to package the pills and ship the pills to Pharma-Master's customers. From June 2015 through November 2016, Alexandrya Tonge and Katherine Bustin packaged pill orders, affixed shipping labels and postage to their packages, and (as the operation grew) passed off the packages to a runner—Sean Gygi—who would drop the packages off at post offices and blue boxes throughout

---

[4] Dark Net sites operate on the Dark Web, which cannot be accessed without special software, and the Dark Net is a smaller part of the Deep Web. The Deep Web is an area of the internet not accessible using typical search engines like Google and accounts for approximately 96% of the internet. The Surface Web or Normal Web, on the other hand, accounts for just 4% of the internet. The majority of internet users are only familiar with the existence of the Surface Web.

the valley. Crandall trained Tonge and Bustin to use fictitious business names and addresses for return addresses on the packages of pills they filled.

Shamo also employed a co-conspirator, Mario Noble, to provide online customer support. In addition to corresponding with customers online, Noble would, at times, assist Shamo by building a daily order list that included customers' shipping addresses and the type and quantity of drugs purchased by each customer. Noble would send the daily order list to Tonge and Bustin using a secure email service that encrypted the messages. Noble stepped away from his role during September 2016, but returned shortly thereafter on a part-time basis.

Crandall, who had been travelling abroad since November 2015 after telling co-conspirators that Shamo was buying him out of their partnership, began again to actively work with the DTO in June of 2016; Crandall, like Noble, provided online customer support and processed orders.

The organization used encrypted communication apps to communicate with each other and relied on PGP encryption methods to communicate with customers. Members of the DTO frequently communicated on the mobile application known as Telegram. On July 8, 2015, Crandall created a dark web email account for Tonge and Bustin and then emailed instructions regarding PGP encryption to Tonge and Bustin. Crandall instructed Tonge and Bustin to delete the email, but a copy of the email was preserved and viewed by law enforcement.[5]

When Crandall left the United States in November 2015, Luke Paz began pressing pills with Shamo. Paz had previously served as a nominee/straw purchaser for the organization. Paz and Shamo developed the recipe for the Fentanyl-laced fake oxycodone pills sold by Pharma-

---

[5]July 8, 2015, is the date by which the CCE crime alleged in Count 1 had begun.

Master on Alphabay. Paz continued to press pills for the organization until Shamo's arrest on November 22, 2016.

     Sales on the Dark Web marketplace were conducted in Bitcoin, a decentralized virtual currency. Shamo, Crandall, and Paz expended a fair amount of effort converting their Bitcoins into fiat currency, which could be used to support their lifestyles and pay their co-conspirators, among other things.



- "Ringleader"
- Recruited others
- Pressed at his residences
- Controlled AlphaBay proceeds
- Controlled AlphaBay content
- Laundered Bitcoin
- Ordered raw materials

- Pressed pills
- Developed Fentanyl formula
- Laundered Bitcoin
- Received pill manufacturing equipment

 

- "Mastermind" re: Pill Pressing
- Recruited others
- Trained Tonge/Bustin
- Pressed pills
- Packaged and shipped pills
- Laundered Bitcoin
- Customer service
- Processed orders



- Nominee
- Processed orders
- Customer support
- Recruited

 

- Nominees
- Packaged pills for shipment
- Recruited



- Nominee
- Delivered pill packages to post offices
- Recruited

The PHARMA-MASTER DTO included approximately 14 additional co-conspirators who held lesser roles in the organization

8

**Pharma-Master**

1. **Totals**

    While investigators have recovered forensic evidence that shows Shamo and Crandall were selling drugs on Dark Net marketplaces prior to their sales on AlphaBay, the charges in the Superseding Indictment largely use dates and amounts connected with Pharma-Master's sales on Alphabay.



    On November 11, 2015, Pharma-Master's storefront was registered on AlphaBay. Pharma-Master's storefront on Alphabay allowed customers to post feedback online. The feedback listed the price (in Bitcoin), type, quantity of pills purchased, as well as the date of the purchase. Investigators were able to determine the total revenue and total sales from the sales for which feedback was captured; the totals for the feedback-linked sales are as follows:

9

## Pharma-Master Feedback Totals

| | | | |
|---|---|---|---|
| **Revenue:** | $2,817,520.93 | | |
| **Total Items:** | 872,659 | | |
| **Total Transactions:** | 5589 | | |

| | **Total Orders** | **Total Quantity** | **Total Value** |
|---|---|---|---|
| **Fentanyl-laced Fake Oxycodone** | 3,491 | 458,946 | $2,472,040.73 |
| *sold as: M Box* | 871 | 210,752 | $1,005,760.73 |
| *sold as: Roxy* | 2,244 | 242,985 | $1,417,272.82 |
| *sold as: Fentanyl* | 376 | 5,209 | $49,007.18 |
| **Counterfeit Xanax** | 1,652 | 405,701 | $283,039.42 |
| **Adderall** | 87 | 884 | $8,971.26 |
| **Etizolam** | 105 | 3,930 | $3,830.85 |
| **Valium** | 75 | 2,010 | $2,172.50 |
| **LSD** | 82 | 694 | $3,734.53 |
| **Mephedrone** | 23 | 30 | $1,082.40 |
| **Cialis** | 25 | 250 | $368.85 |
| **MDMA** | 27 | 189 | $1,276.77 |
| **Ritalin** | 7 | 25 | $185.42 |
| **Custom Order** | 7 | 0 | $14,593.50 |
| **Express Mail** | 7 | 0 | $224.70 |
| **One Time Payment** | 1 | 0 | $26,000.00 |
| **Cancelled** | 23 | | |

**\* Total Transactions Does Not Include Cancelled Orders\***

\*Fentanyl-laced Fake Oxycodone total is from M Box, Roxy, and Fentanyl combined into one result. These three categories were the three ways in which Pharma-Master advertised Fentanyl-laced pills for sale on Alphabay.

The figures above were calculated from positive feedback posted between Dec 15, 2015, and November 2016, when the storefront was shut down after Shamo's arrest. The cash value of the Bitcoin paid for the fake and counterfeit pills was determined based on the date of sale. The Bitcoin-to-US Dollar exchange rate has fluctuated significantly since 2015-2016. These figures

10

represent the United States' best efforts to conservatively calculate total sales and revenue. For example, they do not include any offline pill sales.

The Pharma-Master DTO engaged in a practice of shipping more pills than a customer ordered—as a way of engendering positive online customer feedback and to prevent customer complaints, which were labor-intensive to resolve. The true number of pills shipped is likely higher than these sales figures indicate.

The data from the feedback showed that Pharma-Master on AlphaBay sold Alprazolam as early as December 22, 2015, and Fentanyl-laced fake oxycodone as early as February 3, 2016.

## 2. Customers

Pharma-Master sold drugs to both addicts and redistributors. For redistributors who bought large quantities, the price-per-pill would be lower than consumers who purchased one, ten, or even one hundred pills at a time.

One of Pharma-Master's largest customers, who went by the online handle "Trustworthy Money," was charged in the District of Oregon. Here is a picture of Jared Gillespie, aka "Trustworthy Money":



11

Trustworthy Money encouraged other Dark Web customers to buy from Pharma-Master. In one online feedback post, Trustworthy Money wrote, "basic economics will tell u to put all your money back in to re-upping. don't spend hella money[.] put all that shit back into pharmas pills cuz these will make u a millionare under a year[,] guarantee[.]"

### 3. Drug Quantities
#### a. Fentanyl

Some of the titles for Pharma-Master's listings would alert potential buyers that the oxycodone pills for sale contained Fentanyl. Some of the titles of items listed for sale purported to be Oxycodone 30mg pills. None of the oxycodone-type pills seized during the investigation contained oxycodone; they have all contained Fentanyl. Seized oxycodone-type pills containing Fentanyl have born markings identical to genuine oxycodone pills, "A 215", or "M" (with a box surrounding the letter) and "30" on the reverse side. Here is a picture that shows the top stamp for each of those two types of pills (Counts 8 and 9):



The fake oxycodone pills containing Fentanyl seized in this investigation weigh about what real 30mg Oxycodone pills weigh. The "Roxys"—those pills that were stamped A 215—weigh over 100mg per pill. The "M boxes"—those pills that were stamped with an "M" with a box around it on one side and a "30" on the other side—weigh slightly more than the Roxys. For ease of math and to give the benefit of small variation in weight from pill to pill to the defendant, each fake-oxycodone pill containing Fentanyl will be given a weight of 100mg for purposes of aggregation calculations. From February 2016 to November 2016, the Pharma-

593

Master DTO sold on AlphaBay 457,845 fake oxycodone pills containing Fentanyl. Those pills equal 45.785kg of Fentanyl.[6] During the search warrants on November 22, 2016, agents also seized bulk Fentanyl in powder form and thousands of pills held in inventory.

      b.   Alprazolam

From December 2015 through November 2016, the Pharma-Master DTO sold 405,801 counterfeit Xanax tablets containing Alprazolam. During the search warrants on November 22, 2016, agents also seized bulk Alprazolam in powder form and thousands of pills held in inventory.

**Use of U.S. Mail**

The out-going pill packages seized in the investigation all indicated, through postage or otherwise, that the DTO intended to send the packages through the U.S. Mail.

In September 2016, Tina Young called USPS to report that she received a package that was returned to her address but that she had not shipped. The package purported to be Jamaican coffee beans (a false business name consistent with one used extensively by Tonge and Bustin in connection with the shipment of controlled substances). Ms. Young did not drink coffee, so she gave the package to a co-worker. The co-worker opened the package the following day to start grinding the beans, but found counterfeit Xanax. Ms. Young requested a USPIS Inspector call her right away at her work—although Ms. Young said she did not know how long she would be at work because she feared someone would come to her residence looking for the drugs. (Count 10)

For reference, here are pictures of two of the USPS packages containing Fentanyl pills and Alprazolam pills seized during the investigation:

---

[6] Fentanyl is measured as a mixture or substance under USSG 2D1.1.

13



From customer addresses recovered during the investigation, agents determined that

Pharma-Master distributed drugs through the US Mail to every dot on this map:



Each dot is a destination zip code for the packages Pharma-Master sent to customers.

With some frequency, a zip code had several packages sent it to from Pharma-Master.

14

**Search Warrants**

The active investigation of this case began when Customs and Border Patrol seized a package of Fentanyl addressed to one of Shamo's nominees, Ryan Jensen, in June of 2016 (Count 2). Agents later obtained a search warrant to search Jensen's residence. Jensen agreed to cooperate with the investigation. Jensen led agents to Sean Gygi.

Postal Inspectors seized on November 8, 2016, an inbound packages of alprazolam addressed to Sean Gygi (Count 3).

On November 17, 2016, a search warrant was executed at Gygi's residence; Gygi began cooperating with investigators. Gygi explained that he was in possession of an unopened package that belonged to the defendant. Gygi gave consent for the agents to seize the package, which contained Fentanyl (Count 4). Gygi explained he worked for Shamo by picking up packages from Shamo's shipping team and dropping the outbound packages off at Postal Service drop boxes throughout the valley.

On November 18, 2016, and again on November 20, 2016, Gygi accepted packages from Tonge and Bustin at the direction of the investigators. During those two days, the investigators seized more than 120 packages containing pills pressed with Alprazolam or Fentanyl. Gygi also recorded a conversation with Shamo at the agents' direction. The investigators applied for search warrants based upon probable cause that drugs and paraphernalia would be located in Shamo's residence and in Tonge and Bustin's residence.

On November 22, 2016, investigators executed the warrants at Shamo's residence and at Tonge and Bustin's residence. In Shamo's residence, investigators discovered a pill press running in a basement room, pills containing Fentanyl (Count 5), tablets containing Alprazolam, and three additional pill presses—one of which was still in a crate in the garage. The running pill

press was producing counterfeit Xanax tablets (Count 7). Investigators also seized $1,227,773 in US currency from the home. Shamo, who had his gloves and mask in his pocket, was arrested.

Tonge and Bustin's residence yielded additional Fentanyl-laced fake oxycodone pills (also Count 5), counterfeit Xanax pills containing Alprazolam, packaging and shipping materials, and additional currency.

**Crandall Overseas**

According to some co-conspirators, Crandall and his then-girlfriend fled the country in November 2015 because Crandall's girlfriend was spooked by some aspect of the conspiracy. From November 2015 until May 5, 2017, Crandall and his girlfriend lived abroad, touring through Asia and staying for months in New Zealand and Australia. Crandall and his girlfriend paid for their travel, at least in part, by using proceeds from the Pharma-Master DTO.

The day after Shamo's arrest, Crandall's girlfriend reached out to Noble—a friend and former co-worker—to enquire how he was doing. Noble did not respond. Crandall then took steps to erase his social media presence. Crandall alerted Alphabay that Pharma-Master had been compromised; the Pharma-Master storefront was shut down.

**Death Resulting from Distribution**

**1. Daly City (Count 6)**

R.K. and his roommate, G.L., ordered Roxycodone pills from Pharma-Master in April 2016, and again on June 6, 2016. The June 6th order was for ten pills that Pharma-Master advertised as Roxy-Oxycodone. The June 6th order was processed and shipped out of Utah on June 9th. It arrived at R.K. and G.L.'s residence on June 11th.

On June 12, 2016, in the late evening, R.K. crushed and snorted two of the "Roxy" pills. R.K. and G.L. thought the pills contained Fentanyl.

16

R.K. began feeling the effects almost immediately. R.K. asked G.L. and G.L.'s girlfriend to check on him while R.K. laid down in bed. R.K. fell asleep shortly thereafter. G.L. rolled R.K. into the recovery position in an effort to prevent R.K. from asphyxiating should R.K. vomit during the night. G.L. went to sleep.

The following morning, R.K. was found dead in his bedroom.

The Coroner's report indicated R.K. died from multiple drug intoxication. R.K. had alcohol, cocaine metabolite, a cocaine cutting agent, and Fentanyl in his blood when he died.

A Forensic Toxicology Expert, Dr. Stacey Hail, reviewed the case and determined that R.K.'s but-for cause of death was the Fentanyl he ingested.

**Cryptocurrency Seizures**

Agents have seized from various cryptocurrency wallets associated with the investigation approximately 513.15 Bitcoin, along with cryptocurrency that was created based on forks within the Bitcoin block chain including 512.93 Bitcoin Cash (BCH) and 513.15 Bitcoin Gold (BTG). With the stipulation of the defendants, the seized Bitcoin was sold at auction by the USMS in 2018 for $5,357,950.38 in United States Currency.

**Currency turned over by Paz**

During debriefs with agents in 2018, PAZ gave agents 30.811 in Bitcoin, $671,030 USD, and $134,960 USD. The cash and Bitcoin were proceeds from drug distribution through Pharma-Master.

**Currency turned over by Shamo's parents**

Shamo gave more than $429,000 USD to his family to hold on his behalf. Shamo's parents turned the cash over to investigators. Here is the cash seized from Shamo's parents:

17



**<u>Money Laundering Efforts</u>**

As mentioned above, Crandall, Shamo, Paz and their associates spent a great deal of effort turning their Bitcoin into fiat currency. During the execution of a search warrant on his house on November 22, 2016, Shamo admitted to recently "unloading" Bitcoin. Agents seized over $1.2 million in cash from Shamo's house during the execution of the search warrant. Here is a picture of the cash seized from Shamo's residence:

18



     Trial Exhibits 14.00, 14.02, 14.03, and 14.20, all show efforts Shamo undertook to launder his drug proceeds from Bitcoin into dollars.

Shamo paid his co-conspirators in cash, gift cards, and Bitcoin for their work for Pharma-Master.

     The image below, dated November 8, 2016, shows Shamo making a $2,700 cash deposit into Crandall's bank account at an AFCU branch located in Cottonwood Heights, not far from Shamo's house. (Count 10) Shamo was depositing Crandall's past-due wages.

19



Digital Video Snapshot
Site: Cottonwood/Ctnwood
Camera Name: Teller 6
11/8/2016 11:49:29 AM (Mountain Standard Time)

In addition to the cash deposits into Crandall's AFCU account, there were at least three wire transfers from Bitstamp, a Bitcoin exchange company. The first wire transfer from Bitstamp into Crandall's AFCU bank account was in the amount of $3,013 on April 19, 2016. The second wire transfer from Bitstamp into Crandall's AFCU bank account was in the amount of $5,343 on August 4, 2016. The third wire transfer from Bitstamp into Crandall's AFCU bank account was in the amount of $2,508 on September 22, 2016.

On another occasion, Shamo sent Sean Gygi $7,500 worth of his Bitcoin—the Bitcoin was processed through a cryptocurrency exchange—and the funds from the conversion of Bitcoin into dollars were deposited into Gygi's bank account at USAA.  Shamo then had Gygi write a check to Shamo's friend, M.P., who was an early investor in Shamo's drug distribution efforts.  Gygi was paid a fee for his assistance.

Alexandrya Tonge and Katherine Bustin both stated that they used Shamo and Crandall's Bitcoin—transferred to a Bitcoin wallet under Tonge and Bustin's control—to pay for postage to ship the drugs through the US Postal Service.

Both Shamo and Crandall used their bank accounts to pay postage.

Both Shamo and Crandall used their bank accounts to pay for various products purchased from the Tablet Press Club in Canada that were used to manufacture pills.

Shamo paid Sean Gygi $4,000 cash per month to pick up and mail the pills that were ordered on Pharma-Master's storefront.

Shamo and Crandall paid Alexandrya Tonge and Katherine Bustin each $3,500 per month to process and package the pill orders.

Shamo paid Mario Noble $3,000 per month for doing customer service on the Pharma-Master website, when he worked full time.

Shamo paid for all materials needed for the production and distribution of the illegal drugs which his organization was selling.  The funds used to continue these activities were acquired through the illegal sale and distribution of drugs.

Shamo paid Paz a percentage of the proceeds for every pill sold.

**Money Laundering Spending:  18 U.S.C. 1957(a)**

On or about May 5, 2016, Shamo wrote a check out of his Wells Fargo Bank account

21

#4284 in the amount of $14,000 to iDrive Utah in partial payment for a truck. (Count 11) iDrive

Utah was part-owned by Shamo's friend and early investor, M.P.  Shamo purchased the truck

using drug proceeds.

## III

## WITNESSES

The United States expects to call the following witnesses in its case-in-chief, but reserves

the right to call fewer or more witnesses, as necessary.

1. Special Agent Ely Hebert, DEA
2. Officer Jaime Pimentel, CBP
3. Special Agent Christopher Amidan, DEA
4. Ryan Jensen
5. Jessica Gleave
6. Sean Gygi
7. Detective Josh Fife, WVC PD (formerly DEA TFO)
8. TFO Mike Hamideh, DEA (ret.)
9. SA Eric Breyer
10. Sgt. Cameron Thor, Park City PD (formerly DEA TFO)
11. TFO Jake Nattress, DEA
12. Special Agent Guy Gino, HSI
13. Katie Bustin
14. Alexandrya Tonge
15. Mario Noble
16. Drew Crandall
17. Jonathan Luke Paz
18. Tina Young
19. Special Agent Dave Slagle, HSI
20. Special Agent Adam Koeneman, HSI
21. Special Agent Dan Ashment, HSI
22. Intelligence Analyst Robin Biundo, HSI
23. Keith Chan, DEA Western Regional Laboratory
24. Danielle Farrell, DEA Western Regional Laboratory
25. Emily A. Oblath, DEA Western Regional Laboratory
26. Son Hoang, DEA Western Regional Laboratory
27. Frank Platek, FDA Forensic Chemistry Center
28. Nico Ranieri, FDA Forensic Chemistry Center
29. Adam Lanzarotta, Ph.D., FDA Forensic Chemistry Center
30. Heather McCauley, FDA Forensic Chemistry Center
31. Arthur F. Simone, M.D., Ph.D., FDA
32. Special Agent Jeff Bryan, DEA (ret.)

22

33. Special Agent Jeff Fletcher, IRS CI
34. Brennda Kurstin
35. Inspector J. Agster, USPIS
36. Inspector Andrea Brandon, USPIS
37. Inspector Lance Howell, USPIS
38. Special Agent Virginia Keys, FDA OCI
39. Inspector Megan Moore, USPIS
40. Tori Grace
41. Officer Sandra Sabins, Daly City PD
42. Thomas Wayne Rogers, M.D.
43. B.L. Posey, Toxicologist
44. Stacey L. Hail, MD, FACMT

# IV

# EXHIBITS

The United States has provided the defendant and the Court with a copy of its electronic exhibits. The United States' physical exhibits, including the drugs, will be available for inspection by counsel for the defendant during the week of August 5, 2019.

# V

# APPLICABLE LAW AND ELEMENTS OF THE OFFENSES CHARGED

On July 31, 2019, the United States filed its proposed jury instructions which contained the elements of each of the Counts facing the defendant. (Doc. 241)

23

604

# VI

## CONCLUSION

Should further issues arise, the United States will alert the Court at its earliest convenience.

Dated: August 5, 2019.

Respectfully submitted,

JOHN W. HUBER
United States Attorney

/s/ *Michael Gadd*
MICHAEL GADD
Special Assistant United States Attorney
KENT BURGGRAAF
Special Assistant United States Attorney
VERNON STEJSKAL
Assistant United States Attorney

24

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  (801) 524-5682
Email: michael.gadd@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| UNITED STATES OF AMERICA, | Case No. 2:16-cr-631 DAK |
|---|---|
| Plaintiff, | UNITED STATES' PROPOSED SPECIAL VERDICT FORM |
| v. | |
| AARON MICHAEL SHAMO, | Judge Dale A. Kimball |
| Defendant. | |

The United States of America, by and through Michael Gadd, Special Assistant United

States Attorney, hereby requests the Court present the jury with the following proposed

Special Verdict Form. To date, the defense has not signaled its objection to this form.

Respectfully Submitted,

JOHN W. HUBER
United States Attorney


 /s/ Michael Gadd
MICHAEL GADD
Special Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | SPECIAL VERDICT FORM |
| Plaintiff, | |
| v. | Case No. 2:16-cr-631 DAK |
| AARON MICHAEL SHAMO, | District Judge Dale A. Kimball |
| Defendant. | |

We, the jury duly impaneled in the above-entitled case, find the defendant AARON MICHAEL SHAMO:

## **Count 1—Engaging in a Continuing Criminal Enterprise**

1. We, the jury duly impaneled in the above-entitled case, find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY  ☐ GUILTY as to Count 1 of the Indictment.

If you found the defendant not guilty of Count 1, do not answer questions 1a, 1b, and 1c. If you found the defendant guilty of Count 1, please answer questions 1a, 1b, and 1c.

1a.  Having found the defendant guilty of Count 1, do you also unanimously find that the United States proved beyond a reasonable doubt that the amount of controlled substance attributable to the defendant was at least 12,000 grams of a mixture or substance containing a detectable amount of Fentanyl?

Proven ☐       Not Proven ☐

1b.  Having found the defendant guilty of Count 1, do you also unanimously find that the United States proved beyond a reasonable doubt that the defendant was a principal administrator, organizer, or leader of the enterprise?

Proven ☐       Not Proven ☐

1c. Please indicate by checking the box for each alleged underlying violation below whether you unanimously find the United States proved the defendant committed the violation beyond a reasonable doubt.

**The List of Underlying Violations**

Conspiracy to Distribute Fentanyl Resulting in Death of R.K., all in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 2;

Proven ☐          Not Proven ☐

Conspiracy to Distribute Alprazolam, all in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 2;

Proven ☐          Not Proven ☐

The violation alleged in Count 2, Aiding and Abetting the Importation of a Controlled Substance;

Proven ☐          Not Proven ☐

The violation alleged in Count 3, Aiding and Abetting the Importation of a Controlled Substance;

Proven ☐          Not Proven ☐

The violation alleged in Count 4, Aiding and Abetting the Importation of a Controlled Substance;

Proven ☐          Not Proven ☐

The violation alleged in Count 5, Possession of Fentanyl with Intent to Distribute;

Proven ☐          Not Proven ☐

The violation alleged in Count 6, Aiding and Abetting the Distribution of Fentanyl Resulting in Death;

Proven ☐          Not Proven ☐

The violation alleged in Count 7, Manufacture of Alprazolam;

Proven ☐          Not Proven ☐

The violation alleged in Count 10, Use of the U.S. Mail in Furtherance of a Drug Trafficking Offense;

Proven ☐            Not Proven ☐

Aiding and Abetting the Attempted Distribution of a Controlled Substance, namely Fentanyl, on or about the following dates to the following addressees, each in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 2:

| Proven | Not | Date | Addressee Initials | State | Number of Pills | Controlled Substance | Markings |
|--------|-----|------|--------------------|-------|-----------------|----------------------|----------|
| ☐ | ☐ | 11/18/2016 | R.L. | MA | 20,000 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | J.H. | OH | 2,000 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | B.W. | AL | 2,000 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | Y.C. | OH | 1,100 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | N.L. | NJ | 1,000 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | D.A. | NJ | 1,000 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | F.C. | AK | 1,000 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | P.T.A.C. | MD | 1,000 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | L.S. | MN | 1,000 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | V.R. | WA | 1,000 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | S.W. | NC | 1,000 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | G.M. | NV | 500 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | L.F. | PA | 500 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | S.R. | WA | 200 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | R.B. | OH | 150 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | D.P. | MA | 150 | Fentanyl | A 215 |

| Proven | Not | Date | Addressee Initials | State | Number of Pills | Controlled Substance | Markings |
|---|---|---|---|---|---|---|---|
| ☐ | ☐ | 11/18/2016 | CBS.I., M.W. | KS | 100 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | M.J. | KY | 100 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | P.F. | IL | 100 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | J.P. | PA | 100 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | M.S. | NC | 100 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | F.O. | LA | 100 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | M.L. | NC | 100 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | T.M. | CT | 60 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | J.T. | OR | 50 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | A.M. | MT | 40 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | D.L.G. | MT | 40 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | M.M. | NY | 30 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | J.M.L. | MD | 27 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | J.M. | IL | 22 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | A.B. | CO | 20 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | A.G. | KY | 20 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | M.P. | MN | 16 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | J.T. | OR | 14 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | A.T. | VA | 12 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | T.E. | SC | 12 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | N.A. | CA | 12 | Fentanyl | A 215 |

| Proven | Not | Date | Addressee Initials | State | Number of Pills | Controlled Substance | Markings |
|:---:|:---:|---|---|:---:|:---:|---|---|
| ☐ | ☐ | 11/18/2016 | C. | PA | 11 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | K.M.T.T.S.T.R. | OK | 11 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | K.M.H. | SC | 11 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | L.P. | NY | 11 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | B.S. | OH | 11 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | R.P. | PA | 11 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | A.B. | MO | 11 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | J.G. | NY | 11 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | M.J. | CA | 11 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | J.S. | PA | 11 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | S.F. | PA | 11 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | G.T. | TX | 11 | Fentanyl | M/30 |
| ☐ | ☐ | 11/18/2016 | J.R. | CT | 11 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | M.D. | NJ | 10 | Fentanyl | A 215 |
| ☐ | ☐ | 11/18/2016 | B.B. | CO | 10 | Fentanyl | A 215 |
| ☐ | ☐ | 11/20/2016 | A.W. | WA | 5,000 | Fentanyl | M/30 |
| ☐ | ☐ | 11/20/2016 | Y.C. | OH | 1,100 | Fentanyl | A 215 |
| ☐ | ☐ | 11/20/2016 | J.R. | MN | 1,000 | Fentanyl | M/30 |
| ☐ | ☐ | 11/20/2016 | A.P. | KY | 1,000 | Fentanyl | A 215 |
| ☐ | ☐ | 11/20/2016 | D.R. | DE | 500 | Fentanyl | M/30 |
| ☐ | ☐ | 11/20/2016 | L.R.T.A.S. | NJ | 500 | Fentanyl | A 215 |

| Proven | Not | Date | Addressee Initials | State | Number of Pills | Controlled Substance | Markings |
|:---:|:---:|---|---|:---:|:---:|---|---|
| ☐ | ☐ | 11/20/2016 | A.M. | MN | 500 | Fentanyl | A 215 |
| ☐ | ☐ | 11/20/2016 | M.C. | SC | 200 | Fentanyl | A 215 |
| ☐ | ☐ | 11/20/2016 | T.J. | FL | 200 | Fentanyl | A 215 |
| ☐ | ☐ | 11/20/2016 | M.S. | NC | 200 | Fentanyl | M/30 |
| ☐ | ☐ | 11/20/2016 | G.D. | VA | 150 | Fentanyl | A 215 |
| ☐ | ☐ | 11/20/2016 | A.H. | PA | 100 | Fentanyl | A 215 |
| ☐ | ☐ | 11/20/2016 | J.R. | NC | 100 | Fentanyl | A 215 |
| ☐ | ☐ | 11/20/2016 | C.D. | MA | 100 | Fentanyl | A 215 |
| ☐ | ☐ | 11/20/2016 | A.H. | VA | 100 | Fentanyl | A 215 |
| ☐ | ☐ | 11/20/2016 | N.M. | ME | 100 | Fentanyl | A 215 |
| ☐ | ☐ | 11/20/2016 | N.Y. | MI | 100 | Fentanyl | A 215 |
| ☐ | ☐ | 11/20/2016 | M.J. | KY | 100 | Fentanyl | A 215 |
| ☐ | ☐ | 11/20/2016 | D.L. | FL | 100 | Fentanyl | M/30 |
| ☐ | ☐ | 11/20/2016 | J.B. | TX | 100 | Fentanyl | M/30 |
| ☐ | ☐ | 11/20/2016 | A.W. | TX | 13 | Fentanyl | M/30 |

**The List of Underlying Violations, cont.**

Aiding and Abetting the Attempted Distribution of a Controlled Substance, namely Alprazolam, on or about the following dates to the following addressees, each in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 2:

| Proven | Not | Date | Addressee Initials | State | Number of Pills | Controlled Substance | Markings |
|--------|-----|------|--------------------|-------|-----------------|----------------------|----------|
| ☐ | ☐ | 11/18/2016 | W.R. | WA | 10,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | H.W. | NJ | 10,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | A.W. | NY | 5,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | A.M. | CA | 5,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | C.R. | WV | 2,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | R.L. | FL | 2,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | J.L. | CA | 2,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | B.J. | LA | 2,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | L. | NY | 2,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | A.K. | WI | 2,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | J.B. | TX | 1,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | A.F. | GA | 200 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | S.W. | NC | 100 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | P.H. | PA | 100 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | J.T. | OR | 100 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | A.S. | TX | 100 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | R.K. | NC | 100 | Alprazolam | GG 249 |

| Proven | Not | Date | Addressee Initials | State | Number of Pills | Controlled Substance | Markings |
|:------:|:---:|:-----|:------------------:|:-----:|:---------------:|:--------------------:|:--------:|
| ☐ | ☐ | 11/18/2016 | D.C. | IL | 100 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | R.T. | TN | 100 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | F.W. | NC | 100 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | D.C. | IL | 100 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | R.T. | TN | 100 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | F.W. | NC | 100 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | X.C. | OH | 100 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/18/2016 | D.H. | FL | 50 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/20/2016 | N.K. | MA | 2,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/20/2016 | G.R. | TX | 2,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/20/2016 | J.O. | SC | 2,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/20/2016 | C.L. | OR | 2,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/20/2016 | Mrs. L. | MI | 1,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/20/2016 | A.S. | NC | 1,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/20/2016 | J.H. | TN | 1,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/20/2016 | Y.C. | OH | 500 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/20/2016 | J.S. | MI | 200 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/20/2016 | N.H. | SC | 100 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/20/2016 | C.S. | TN | 100 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/20/2016 | J.H. | LA | 100 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/20/2016 | D.C. | IL | 100 | Alprazolam | GG 249 |

| Proven | Not | Date | Addressee Initials | State | Number of Pills | Controlled Substance | Markings |
|--------|-----|------|-------------------|-------|-----------------|---------------------|----------|
| ☐ | ☐ | 11/20/2016 | S.S. | GA | 100 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/20/2016 | A.L. | CA | 100 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/20/2016 | D.L. | SC | 100 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/20/2016 | P.O. | GA | 100 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/20/2016 | Z.W. | NY | 100 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/20/2016 | C.G. | MS | 100 | Alprazolam | GG 249 |

**The List of Underlying Violations, cont.**

Aiding and Abetting the Use of the U.S. Mail in Furtherance of a Drug Trafficking Offense on the following dates by delivering packages to the post office addressed to the following addressees, containing the following controlled substances, each in violation of Title 21, United States Code, Section 843(b) and Title 18, United States Code, Section 2:

| Proven | Not | Date | Addressee Initials | State | Number of Pills | Controlled Substance | Markings |
|--------|-----|------|-------------------|-------|-----------------|---------------------|----------|
| ☐ | ☐ | 11/22/2016 | M.E. | SD | 5,000 | Fentanyl | M/30 |
| ☐ | ☐ | 11/22/2016 | E.J. | NC | 5,000 | Fentanyl | M/30 |
| ☐ | ☐ | 11/22/2016 | K.V. | NJ | 2,000 | Fentanyl | A 215 |
| ☐ | ☐ | 11/22/2016 | Mr. McG. | WA | 1,000 | Fentanyl | Mixed |
| ☐ | ☐ | 11/22/2016 | E.S. | NC | 500 | Fentanyl | M/30 |
| ☐ | ☐ | 11/22/2016 | R.W. | SC | 500 | Fentanyl | A 215 |
| ☐ | ☐ | 11/22/2016 | G.V. | VA | 100 | Fentanyl | M/30 |
| ☐ | ☐ | 11/22/2016 | E.B. | CT | 100 | Fentanyl | A 215 |
| ☐ | ☐ | 11/22/2016 | M.T. | IL | 100 | Fentanyl | M/30 |
| ☐ | ☐ | 11/22/2016 | B.F. | ND | 100 | Fentanyl | M/30 |
| ☐ | ☐ | 11/22/2016 | C.S. | CO | 50 | Fentanyl | M/30 |
| ☐ | ☐ | 11/22/2016 | S.H. | OH | 50 | Fentanyl | M/30 |
| ☐ | ☐ | 11/22/2016 | B.M. | AL | 50,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/22/2016 | J.S. | CA | 50,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/22/2016 | T.G. | NC | 20,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/22/2016 | M.D. | CA | 2,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/22/2016 | M.T. | VA | 2,000 | Alprazolam | GG 249 |
| ☐ | ☐ | 11/22/2016 | T.D. | IL | 100 | Alprazolam | GG 249 |

**The List of Underlying Violations, cont.**

☐ Aiding and Abetting the Attempted Distribution of a Controlled Substance, namely Fentanyl, on or about November 20, 2016, to J.G., aka "trustworthymoney," through A.L., all in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 2;

☐ Aiding and Abetting the Distribution of Fentanyl on or about April 6, 2016, to E.B., all in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2;

☐ Aiding and Abetting the Distribution of Fentanyl on or about March 3, 2016, to C.V., all in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2; and

☐ Aiding and Abetting the Distribution of Fentanyl on or about August 3, 2016, to G.K., all in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

617

## Count 2—Aiding and Abetting the Importation of Fentanyl

2. We, the jury duly impaneled in the above-entitled case, find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY   ☐ GUILTY as to Count 2 of the Indictment.

If you found the defendant not guilty of Count 2, do not answer question 2a. If you found the defendant guilty of Count 2, please answer question 2a:

2a. Having found the defendant guilty of Count 2, do you also unanimously find that the United States proved beyond a reasonable doubt that the amount of controlled substance attributable to the defendant was at least 40 grams of a mixture or substance containing a detectable amount of Fentanyl?

Proven ☐        Not Proven ☐

## Count 3—Aiding and Abetting the Importation of Alprazolam

3. We, the jury duly impaneled in the above-entitled case, find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY   ☐ GUILTY as to Count 3 of the Indictment.

## Count 4—Aiding and Abetting the Importation of Fentanyl

4. We, the jury duly impaneled in the above-entitled case, find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY   ☐ GUILTY as to Count 4 of the Indictment.

If you found the defendant not guilty of Count 4, do not answer question 4a. If you found the defendant guilty of Count 4, please answer question 4a:

4a. Having found the defendant guilty of Count 4, do you also unanimously find that the United States proved beyond a reasonable doubt that the amount of controlled substance attributable to the defendant was at least 40 grams of a mixture or substance containing a detectable amount of Fentanyl?

Proven ☐        Not Proven ☐

**Count 5—Possession of Fentanyl with Intent to Distribute**

5. We, the jury duly impaneled in the above-entitled case, find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY    ☐ GUILTY as to Count 5 of the Indictment.

If you found the defendant not guilty of Count 5, do not answer question 5a. If you found the defendant guilty of Count 5, please answer question 5a:

5a. Having found the defendant guilty of Count 5, do you also unanimously find that the United States proved beyond a reasonable doubt that the amount of controlled substance attributable to the defendant was at least 400 grams of a mixture or substance containing a detectable amount of Fentanyl?

Proven ☐        Not Proven ☐

**Count 6—Distribution of Fentanyl that Resulted in Death**

6. We, the jury duly impaneled in the above-entitled case, find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY    ☐ GUILTY as to Count 6 of the Indictment.

**Count 7—Manufacture of Alprazolam**

7. We, the jury duly impaneled in the above-entitled case, find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY    ☐ GUILTY as to Count 7 of the Indictment.

**Count 8—Adulteration of Drugs**

8. We, the jury duly impaneled in the above-entitled case, find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY    ☐ GUILTY as to Count 8 of the Indictment.

**Count 9—Adulteration of Drugs**

9. We, the jury duly impaneled in the above-entitled case, find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY     ☐ GUILTY as to Count 9 of the Indictment.

**Count 10—Use of the U.S. Mail in furtherance of a Drug Trafficking Offense**

10. We, the jury duly impaneled in the above-entitled case, find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY     ☐ GUILTY as to Count 10 of the Indictment.

**Count 11—Conspiracy to Commit Money Laundering**

11. We, the jury duly impaneled in the above-entitled case, find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY     ☐ GUILTY as to Count 11 of the Indictment.

**Count 12—Money Laundering Promotion or Concealment**

12. We, the jury duly impaneled in the above-entitled case, find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY     ☐ GUILTY as to Count 12 of the Indictment.

**Count 13—Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity**

13. We, the jury duly impaneled in the above-entitled case, find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY     ☐ GUILTY as to Count 13 of the Indictment.

DATED this _____ day of September, 2019.

_____
FOREPERSON

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | |
| | UNITED STATES' RESPONSE REGARDING ITS BRADY/GIGLIO OBLIGATIONS |
| vs. | |
| AARON MICHAEL SHAMO, | |
| | Judge Dale A. Kimball |
| Defendant. | |

The United States, by and through Michael Gadd, Special Assistant United States Attorney, certifies that it has satisfied its *Brady/Giglio* disclosure obligations. The undersigned prosecutor met and conferred with counsel for the defendant today and answered their questions, specifically questions regarding whether any additional co-conspirators had been charged for their involvement with Mr. Shamo's drug trafficking enterprise.

While conferring today, the defendant's representatives indicated they were aware of Mr. Shamo's co-conspirators who had been charged but inquired about additional suspects whose names appear on the defendant's witness list. The United States assured

them that it had not charged any of the defendant's proposed witnesses other than those previously identified. The United States recognizes that its disclosure obligations remain ongoing.

Respectfully submitted this 8th day of August, 2019,

JOHN W. HUBER
United States Attorney

*/s/ Michael Gadd*
MICHAEL GADD
Special Assistant United States Attorney

2

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
**SKORDAS, CASTON & HYDE, LLC**
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone:  (801) 531-7444
Facsimile:  (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

Attorneys for Defendant

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AARON MICHAEL SHAMO, et. al.,<br><br>Defendant. | **DEFENDANT'S PROPOSED JURY INSTRUCTIONS**<br><br>Case No. 2:16-CR-00631 DAK<br><br>Judge Dale A. Kimball |
|---|---|

Aaron Michael Shamo, through his counsel, hereby requests the Court instruct the jury

with the following proposed jury instructions.

Defendant's Objections and proposed changes to the Government's Proposed Jury

Selection is Attached hereto as Exhibit "A".

Respectfully Submitted,

DATED this 8th day of August, 2019.

DARYL P. SAM, PLLC

*/s/ Daryl P. Sam*
Attorney for Defendant

2

DEFENDANT'S PROPOSED INSTRUCTION NO. 1

MEMBERS OF THE JURY:

Now that you have heard the evidence, it becomes my duty to instruct you on the law that applies to this case.

It is your duty as jurors to follow the law as stated in the instructions of the Court, and to apply the rules of law so given to the facts as you find them from the evidence in the case.

Counsel may refer to these instructions in their arguments. If, however, any difference appears to you between the law as stated by counsel and that stated by the Court in these instructions, you are of course to be governed by the Court's instructions.

You are not to single out any one instruction alone as stating the law, but must consider the instructions as a whole.

Neither are you to be concerned with the wisdom of any rule of law stated by the Court. Regardless of any opinion you may have as to what the law ought to be, it would be a violation of your sworn duty to base a verdict upon any other view of the law than that given in these instructions of the Court; just as it would be a violation of your sworn duty, as judges of the facts, to base a verdict upon anything but the evidence in the case.

Justice through trial by jury must always depend upon the willingness of each individual juror to seek the truth as to the facts from the same evidence presented to all the jurors; and to arrive at a verdict by applying the same rules of law, as given in the instructions of the Court.

DEFENDANT'S PROPOSED INSTRUCTION NO. 2

You have been chosen as jurors in this case to try the issues of fact presented by the allegations of the indictment and the denial made by the "Not Guilty" plea of the defendant. You are to perform this duty without bias or prejudice as to any party. The law does not permit jurors to be governed by sympathy, prejudice, or public opinion. The defendant and the public expect that you will carefully and impartially consider all the evidence in the case, follow the law as stated by the Court, and reach a just verdict.

The indictment in this case is entitled Second Superseding Indictment. But for convenience, I will simply refer to it in these instructions as the indictment.

DEFENDANT'S PROPOSED INSTRUCTION NO. 3

The Indictment or formal charge against the defendant is not evidence of guilt. Indeed, the defendant is presumed by the law to be innocent. The law does not require the defendant to prove his innocence or produce any evidence at all, nor does it compel him in a criminal case to take the witness stand to testify. The government has the burden of proving the defendant guilty beyond a reasonable doubt, and if it fails to do so you must acquit the defendant.

Even though the defendant has called witnesses in this case, the presumption of innocence remains with him, and the government still has the burden of proof beyond a reasonable doubt.

DEFENDANT'S PROPOSED INSTRUCTION NO. 4

While the government's burden of proof is a strict or heavy burden, it is not necessary that the defendant's guilt be proven beyond all possible doubt. It is only required that the government's proof exclude any reasonable doubt concerning the defendant's guilt. A reasonable doubt is a real doubt, based upon reason and common sense after careful and impartial consideration of all the evidence in the case.

Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs. If you are convinced that the defendant has been proved guilty beyond reasonable doubt, find him guilty. If you are not so convinced, find him not guilt

DEFENDANT'S PROPOSED INSTRUCTION NO. 5

You are here to decide whether the United States has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged. The defendant is not on trial for any act, conduct, or offense not alleged in the Indictment. Neither are you concerned with the guilt of any other person or persons not on trial as a defendant in this case.

DEFENDANT'S PROPOSED INSTRUCTION NO. 6

You are here to decide whether the United States has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged. The defendant is not on trial for any act, conduct, or crime not charged in the indictment.

It is not up to you to decide whether anyone who is not on trial in this case should be prosecuted for the crime charged. The fact that another person also may be guilty is no defense to a criminal charge.

The question of the possible guilt of others should not enter your thinking as you decide whether this defendant has been proved guilty of the crimes charged.

DEFENDANT'S PROPOSED INSTRUCTION NO. 5

The evidence in this case consists of the sworn testimony of the witnesses, regardless of who may have called them; all exhibits received in evidence, regardless of who may have produced them; and all facts which may have been admitted or stipulated.

Statements and arguments of counsel are not evidence in this case. When, however, the attorneys on both sides stipulate or agree as to the existence of a fact, the jury must, unless otherwise instructed, accept the stipulation and regard that fact as conclusively proved.

Any evidence as to which an objection was sustained by the Court, and any evidence ordered stricken by the Court, must be entirely disregarded.

Anything you may have seen or heard outside the courtroom is not evidence, and must be entirely disregarded.

You are to consider only the evidence in this case. However, in your consideration of the evidence, you are not limited to the bald statements of the witnesses. On the contrary, you are permitted to draw from the facts which you find have been proved such reasonable inferences as seem justified in light of your experience. An inference is a deduction or conclusion which reason and common sense would lead you to draw from facts which are established by the evidence in the case. You should weigh all of the evidence in the case, affording each piece of evidence the weight or significance that you find it reasonably deserves.

DEFENDANT'S PROPOSED INSTRUCTION NO. 6

There are, generally speaking, two types of evidence from which a jury may properly determine the facts of a case. One is direct evidence, such as the testimony of an eyewitness. The other is indirect or circumstantial evidence, that is, the proof of a chain of facts which point to the existence or non-existence of certain other facts.

As a general rule, the law makes no distinction between direct and circumstantial evidence. The law simply requires that you find the facts in accord with all the evidence in the case, both direct and circumstantial.

While you must consider only the evidence in this case, you are permitted to draw reasonable inferences from the testimony and exhibits, inferences you feel are justified in the light of common experience. An inference is a conclusion that reason and common sense may lead you to draw from facts which have been proved.

By permitting such reasonable inferences, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts which have been established by the testimony and evidence in this case.

10

DEFENDANT'S PROPOSED INSTRUCTION NO. 7

I remind you that it is your job to decide whether the United States has proved the guilt of the defendant beyond a reasonable doubt. In doing so, you must consider all of the evidence. This does not mean, however, that you must accept all of the evidence as true or accurate.

You are the sole judges of the credibility or "believability" of each witness and the weight to be given to the witness's testimony. An important part of your job will be making judgments about the testimony of the witnesses [including the defendant] who testified in this case. You should think about the testimony of each witness you have heard and decide whether you believe all or any part of what each witness had to say, and how important that testimony was. In making that decision, I suggest that you ask yourself a few questions: Did the witness impress you as honest? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome in this case? Did the witness have any relationship with either the United States or the defense? Did the witness seem to have a good memory? Did the witness clearly see or hear the things about which he/she testified? Did the witness have the opportunity and ability to understand the questions clearly and answer them directly? Did the witness's testimony differ from the testimony of other witnesses? When weighing the conflicting testimony, you should consider whether the discrepancy has to do with a material fact or with an unimportant detail. And you should keep in mind that innocent misrecollection—like failure of recollection—is not uncommon.

[The testimony of the defendant should be weighed and his credibility evaluated in the same way as that of any other witness.]

[The defendant did not testify and I remind you that you cannot consider his decision not to testify as evidence of guilt. I want you to clearly understand, please, that the Constitution of

11

the United States grants to a defendant the right to remain silent. That means the right not to testify or call any witnesses. That is a constitutional right in this country, it is very carefully guarded, and you should understand that no presumption of guilt may be raised and no inference of any kind may be drawn from the fact that a defendant does not take the witness stand and testify or call any witnesses.]

In reaching a conclusion on a particular point, or ultimately in reaching a verdict in this case, do not make any decisions simply because there were more witnesses on one side than on the other.

12

DEFENDANT'S PROPOSED INSTRUCTION NO. 8

An informant is someone who provides evidence against someone else for a personal reason or advantage. The testimony of an informant alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilt, even though not corroborated or supported by other evidence. You must examine and weigh an informant's testimony with greater care than the testimony of an ordinary witness. You must determine whether the informant's testimony has been affected by self- interest, by an agreement he has with the United States, by his own interest in the outcome of the case, or by prejudice against the defendant.

You should not convict a defendant based on the unsupported testimony of an informant, unless you believe the unsupported testimony beyond a reasonable doubt.

A person may testify under a grant of immunity (an agreement with the United States). His testimony alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilt even though it is not corroborated or supported by other evidence. You should consider testimony given under a grant of immunity with greater care and caution than the testimony of an ordinary witness. You should consider whether testimony under a grant of immunity has been affected by the witness's own interest, the DEFENDANT'S agreement, the witness's interest in the outcome of the case, or by prejudice against the defendant.

On the other hand, you should also consider that an immunized witness can be prosecuted for perjury for making a false statement. After considering these things, you may give testimony given under a grant of immunity such weight as you feel it deserves.

You should not convict a defendant based on the unsupported testimony of an immunized witness, unless you believe the unsupported testimony beyond a reasonable doubt.

In this case, the nature of the immunity agreement(s) is as follows: the United States has promised Ryan Jensen and Jessica Gleave that it will not use their testimony against them in a criminal case, other than for a prosecution for perjury if they testify untruthfully.

Mr. Jensen and Ms. Gleave agreed to testify truthfully and completely, answering all questions posed to them.

DEFENDANT'S PROPOSED INSTRUCTION NO. 9

The United States called as some of its witnesses alleged accomplices, who were named as co-defendants in the indictment. The United States has entered into a plea agreement with the co-defendants, wherein the co-defendants pleaded guilty as charged and agreed to testify truthfully if called upon to testify. In exchange, the United States has agreed to ask the Court to consider imposing sentences that would otherwise be lower than the recommendation the United States would have made if the co-defendants had not agreed to testify truthfully. The United States has also agreed to signal to the Court that by testifying truthfully, the co-defendants should not be subject to any minimum-mandatory sentence otherwise applicable to their crimes. The agreement makes clear, however, that final sentencing decisions rest solely with the Court. Plea bargaining is lawful and proper, and the rules of this Court expressly provide for it.

An alleged accomplice, including one who has entered into a plea agreement with the United States, is not prohibited from testifying. On the contrary, the testimony of an alleged accomplice may, by itself, support a guilty verdict. You should receive this type of testimony with caution and weigh it with great care. You should never convict a defendant upon the unsupported testimony of an alleged accomplice, unless you believe that testimony beyond a reasonable doubt. The fact that an accomplice has entered a guilty plea to the offense charged is not evidence of the guilt of any other person.

DEFENDANT'S PROPOSED INSTRUCTION NO. 10

The defendant did not testify and I remind you that you cannot consider his decision not to testify as evidence of guilt. You must understand that the Constitution of the United States grants to a defendant the right to remain silent. That means the right not to testify. That is a constitutional right in this country, it is very carefully guarded, and you must not presume or infer guilt from the fact that a defendant does not take the witness stand and testify or call any witnesses.

16

DEFENDANT'S PROPOSED INSTRUCTION NO. 11

Evidence has been presented about a statement attributed to the defendant alleged to have been made after the commission of the crimes charged in this case but not made in court. Such evidence should always be considered by you with caution and weighed with care. You should give any such statement the weight you think it deserves, after considering all the circumstances under which the statement was made.

In determining whether any such statement is reliable and credible, consider factors bearing on the voluntariness of the statement. For example, consider the age, gender, training, education, occupation, physical and mental condition of the defendant, and all the other circumstances in evidence surrounding the making of the statement.

After considering all this evidence, you may give such weight to the statement as you feel it deserves under all the circumstances. If you determine that the statement is unreliable or not credible, you may disregard the statement entirely.

17

DEFENDANT'S PROPOSED INSTRUCTION NO. 12

If I have said or done anything in this case that makes it appear I have an opinion about the guilt or innocence of the defendant, disregard it. You are the sole judges of the facts and should in no way be influenced by what I have done here except to follow my instructions on the law. Nothing said in these instructions and nothing in any form of verdict prepared for your convenience is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find. What the verdict shall be is the sole and exclusive duty and responsibility of the jury.

18

DEFENDANT'S PROPOSED INSTRUCTION NO. 13

If any reference by the Court or by the attorneys to matters of evidence does not coincide

with your own recollection, it is your recollection which should control during your

deliberations.

641

DEFENDANT'S PROPOSED INSTRUCTION NO. 14

During this trial, you have heard sound recordings of certain conversations. These conversations were legally recorded; they are a proper form of evidence and may be considered by you as you would any other evidence. You were also given transcripts of those recorded conversations.

Keep in mind that the transcripts are not evidence. They were given to you only as a guide to help you follow what was being said. The recordings themselves are the evidence. If you noticed any differences between what you heard on the recordings and what you read in the transcripts, you must rely on what you heard, not what you read. If you could not hear or understand certain parts of the recordings, you must ignore the transcript as far as those parts are concerned.

DEFENDANT'S PROPOSED INSTRUCTION NO. 15

A separate crime is charged in each count of the indictment. Each charge, and the evidence pertaining to it, should be considered separately by you. The fact that you may find the defendant guilty or not guilty as to one of the counts should not control your verdict as to any other count.

21

DEFENDANT'S PROPOSED INSTRUCTION NO. 16

During the trial, you heard the testimony of expert witnesses who expressed opinions concerning

- the identity and weight of substances including mixtures containing controlled substances;

- the illegitimacy of pills and tablets based upon composition, imprints, and other aspects;

- the nature of the Dark Net and how Dark Net Marketplaces operate;

- how AlphaBay operated from the perspective of vendors and customers;

- the nature and use of PGP encryption;

- the nature of cryptocurrencies and how cryptocurrencies such as Bitcoin are used in transactions over the Dark Net;

- the nature of and methods used in computer forensic examinations;

- the nature and operation of drug-trafficking organizations;

  o including the methods and means by which drug traffickers launder drug proceeds through promotion, concealment, and spending;

- what constitutes a drug or drug component under the FDCA;

- the make-up, regulation, standards, quality, purity, markings (including which Pharmaceutical company is allowed to use which markings), uses, physiological effect on humans, listing in the Official US Pharmacopeia Compendium, and federal regulation of both Oxycodone and Fentanyl;

- the relative potency of Oxycodone, Fentanyl, and other opiates; and

22

- the risk of serious adverse health consequences or death from marking Fentanyl to appear like Oxycodone tablets.

In some cases, such as this one, scientific, technical, or other specialized knowledge may assist the jury in understanding the evidence or in determining a fact in issue. A witness who has knowledge, skill, experience, training or education, may testify and state an opinion concerning such matters.

You are not required to accept such an opinion. You should consider opinion testimony just as you consider other testimony in this trial. Give opinion testimony as much weight as you think it deserves, considering the education and experience of the witness, the soundness of the reasons given for the opinion, and other evidence in the trial.

23

DEFENDANT'S PROPOSED INSTRUCTION NO. 17

You are not to be concerned with the legality or illegality of any search by law enforcement officers of the residence occupied by the defendant. That is a matter exclusively within the province of the Court.

DEFENDANT'S PROPOSED INSTRUCTION NO. 18

You have heard testimony as to the manner in which the government conducted its investigation in this case including certain investigative methods or techniques that were used and certain investigative methods or techniques that were not used. In attempting to prove its case, the government is under no obligation to use all of the investigative methods that are available to it or use any particular method. The question is whether the evidence presented is sufficient to convince you beyond a reasonable doubt of the defendant's guilt.

DEFENDANT'S PROPOSED INSTRUCTION NO. 19

You will note that the indictment charges that the crimes were committed "on or about" a certain date or between approximate dates. The United States must prove beyond a reasonable doubt that the offenses were committed on a date reasonably near the date alleged in the indictment

26

DEFENDANT'S PROPOSED INSTRUCTION NO. 20

Fentanyl (also referred to as N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ]

propenamide) is a controlled substance within the meaning of the law.

Likewise, Alprazolam is a controlled substance within the meaning of the law.

DEFENDANT'S PROPOSED INSTRUCTION NO. 21

Several counts of the indictment and most of the underlying offenses listed in Count 1 of the indictment also charge a violation of 18 U.S.C. section 2, which provides that: "Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

This law makes it a crime to intentionally help someone else commit a crime. To find the defendant guilty of this crime, you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: someone else committed the charged crime, and

Second: the defendant intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about. This means that the United States must prove that the defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help him.

The defendant need not perform the underlying criminal act, be present when it is performed, or be aware of the details of its commission to be guilty of aiding and abetting. But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough. Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.

DEFENDANT'S PROPOSED INSTRUCTION NO. 22

The defendant is charged in Count 1 with a violation of 21 U.S.C. section 848.

This law makes it a crime to engage in what is called a "continuing criminal enterprise" involving controlled substances.

To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the defendant violated the Controlled Substances Act by conspiring to distribute Fentanyl, as charged in the list of underlying violations to Count 1, which list of violations can be found on the special verdict form;

Second: such violation was part of a continuing series of violations of the Controlled Substances Act that began on a date unknown to the Grand Jury, but at least by July 8, 2015, and continued to at least November 22, 2016. These violations must be connected together as a series of related or ongoing activities, as distinguished from isolated and disconnected acts. You must unanimously agree on which of at least three of these underlying violations has been proved. The underlying violations listed in Count 1 may be found on the special verdict form attached to the end of these instructions;

Third: the defendant committed these violations in concert (or by common design or plan) with five or more other persons. The five other persons need not have acted at the same time or in concert with each other. You need not unanimously agree on the identity of any other persons acting in concert with the defendant, so long as each of you finds that there were five or more such persons;

Fourth: the defendant was an organizer, supervisor, or manager of those five persons; and

29

Fifth: the defendant obtained substantial income or resources from the series of violations.

If you find the defendant guilty, you will be asked if you find, unanimously and beyond a reasonable doubt, the following:

Sixth:

1)      the conspiracy to distribute Fentanyl involved at least twelve kilograms or more of a mixture or substance containing a detectable amount of Fentanyl; and

2)      the defendant was a principal administrator, organizer, or leader of the enterprise.

The term "substantial income or resources" means income in money or property which is significant in size or amount as distinguished from some relatively insignificant, insubstantial, or trivial amount.

The term "organizer, supervisor, or manager" means that the defendant was more than a fellow worker, and that the defendant either organized or directed the activities of five or more other persons, exercising some form of managerial authority over them. The defendant need not be the only principal organizer or supervisor.

30

DEFENDANT'S PROPOSED INSTRUCTION NO. 23

To find the defendant guilty of Count 1 with a violation of 21 U.S.C. section 848, you must be convinced the United States has proved each of the following:

First: find unanimously and beyond a reasonable doubt the defendant violated the Controlled Substances Act by conspiring to distribute Fentanyl, as charged in the list of underlying violations to Count 1, which list of violations can be found on the special verdict form;

Second: find unanimously and beyond a reasonable doubt such violation was part of a continuing series of violations of the Controlled Substances Act that began on a date unknown to the Grand Jury, but at least by July 8, 2015, and continued to at least November 22, 2016. These violations must be connected together as a series of related or ongoing activities, as distinguished from isolated and disconnected acts. You must unanimously agree on which of at least three of these underlying violations has been proved. The underlying violations listed in Count 1 may be found on the special verdict form attached to the end of these instructions;

Third: find unanimously and beyond a reasonable doubt the defendant committed these violations in concert (or by common design or plan) with five or more other persons. The five other persons need not have acted at the same time or in concert with each other. You need not unanimously agree on the identity of any other persons acting in concert with the defendant, so long as each of you finds that there were five or more such persons;

Fourth: find unanimously and beyond a reasonable doubt the defendant was an organizer, supervisor, or manager of those five persons; and

Fifth: find unanimously and beyond a reasonable doubt the defendant obtained substantial income or resources from the series of violations.

31

653

If you find the defendant guilty of the first five elements, you will then be asked if the United States has proved each of the following

Sixth:

1) find unanimously and beyond a reasonable doubt the conspiracy to distribute Fentanyl involved at least twelve kilograms or more of a mixture or substance containing a detectable amount of Fentanyl; and

2) find unanimously and beyond a reasonable doubt the defendant was a principal administrator, organizer, or leader of the enterprise.

DEFENDANT'S PROPOSED INSTRUCTION NO. 24

The defendant is charged in the list of underlying violations to Count 1 with violating sections 841(a)(1) and 846 of Title 21 of the United States Code. This law makes it a crime for anyone to conspire with someone else to violate federal laws pertaining to controlled substances. In this case, the defendant is charged with conspiracy to distribute Fentanyl resulting in death.

To find the defendant committed this crime, you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: beginning on a date unknown to the Grand Jury, but at least by February 3, 2016, and continuing to at least November 22, 2016, two or more persons agreed to violate the federal drug laws;

Second: the defendant knew the essential objective of the conspiracy;

Third: the defendant knowingly and voluntarily involved himself in the conspiracy;

Fourth: there was interdependence among the members of the conspiracy; and

Fifth: the death of R.K. resulted from use of Fentanyl distributed in furtherance of the conspiracy.

A conspiracy is an agreement between two or more persons to accomplish an unlawful purpose. It is a kind of "partnership in criminal purposes" in which each member becomes the agent or partner of every other member. The evidence may show that some of the persons involved in the alleged conspiracy are not on trial. This does not matter. There is no requirement that all members of a conspiracy be charged or tried together in one proceeding.

The evidence need not show that the members entered into an express or formal agreement. Nor does the law require proof that the members agreed on all the details. But the

33

evidence must show that the members of the alleged conspiracy came to a mutual understanding to try to accomplish a common and unlawful plan.

If you are convinced that the charged conspiracy existed, then you must next determine whether the defendant was a member of that conspiracy, that is, whether the defendant knew at least the essential goals of the conspiracy and voluntarily chose to be part of it. The law does not require proof that the defendant knew all the other members of the conspiracy or knew all the details about how activities were to be carried out. A person may belong to a conspiracy for a brief period of time or play a minor role. On the other hand, proof is not sufficient if it merely shows that the defendant knew about the existence of the conspiracy or was associated with members of the conspiracy. Rather, the evidence must show the defendant knowingly joined the conspiracy with the intent to advance its purposes.

You are also required to find that interdependence existed among the members of the conspiracy. This means that the members intended to act for their shared mutual benefit. To satisfy this element, you must conclude that the defendant participated in a shared criminal purpose and that his actions constituted an essential and integral step toward the realization of that purpose.

To secure a conviction for conspiring to distribute a drug that "results" in death, the United States must prove beyond a reasonable doubt the victim's use of the drug is a but-for cause of the death.

DEFENDANT'S PROPOSED INSTRUCTION NO. 25

The defendant is charged in the list of underlying violations to Count 1 with violating sections 841(a)(1) and 846 of Title 21 of the United States Code. This law makes it a crime for anyone to conspire with someone else to violate federal laws pertaining to controlled substances. In this case, the defendant is charged with conspiracy to distribute Alprazolam.

To find the defendant committed this crime, you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: beginning on a date unknown to the Grand Jury, but at least by December 22, 2015, and continuing to at least November 22, 2016, two or more persons agreed to violate the federal drug laws;

Second: the defendant knew the essential objective of the conspiracy;

Third: the defendant knowingly and voluntarily involved himself in the conspiracy; and

Fourth: there was interdependence among the members of the conspiracy.

35

DEFENDANT'S PROPOSED INSTRUCTION NO. 26

The defendant is charged in the list of underlying violations to Count 1 with aiding and abetting attempted violations of 21 U.S.C. section 841(a)(1). This law makes it a crime to distribute a controlled substance. To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the defendant's co-conspirator(s) knowingly and intentionally attempted to distribute a controlled substance as charged;

Second: the substance was in fact

- Fentanyl, for those crimes alleging Fentanyl on or about the dates alleged; or

- Alprazolam, for those crimes alleging Alprazolam on or about the dates alleged.

Third: the defendant aided and abetted his co-conspirator(s) in the attempted commission of the offense.

The term "distribute" means to deliver or to transfer possession or control of something from one person to another. The term "distribute" includes the sale of something by one person to another. It is not necessary, however, for the United States to prove that any transfer of money or other thing of value occurred at the same time as, or because of, the distribution.

36

DEFENDANT'S PROPOSED INSTRUCTION NO. 27

The defendant may be found guilty of attempting to commit a crime, even though he did not do all of the acts necessary in order to commit the crime. However, the defendant may not be found guilty of attempting to commit any crime merely by thinking about it, or even by making some plans or some preparation for the commission of a crime.

Instead, in order to prove an attempt, the United States must prove beyond a reasonable doubt that:

(1)     the defendant intended to commit the crime; and

(2)     the defendant took a substantial step towards commission of that crime.

A "substantial step" is something beyond mere preparation. A substantial step is an act which, in the ordinary and likely course of events, would lead to the commission of the particular crime. The step must be a strong indication of the defendant's criminal intent, and must unequivocally mark the defendant's acts as criminal. It should demonstrate commitment to the crime charged.

DEFENDANT'S PROPOSED INSTRUCTION NO. 28

The defendant is charged in Counts 2, 3, and 4, and also in the list of underlying violations to Count 1, with aiding and abetting violations of 21 U.S.C. section 952(a) and section 960(a)(1). This law makes it a crime to knowingly or intentionally import a controlled substance.

To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the defendant or his co-conspirator(s) imported into the United States from a place outside the United States the controlled substances listed below;

- Fentanyl, on or about June 23, 2016 (Count 2)

- Alprazolam, on or about November 8, 2016 (Count 3)

- Fentanyl, on or about November 17, 2016 (Count 4)

Second: the defendant knew the substance he or his co-conspirator(s) imported into the United States was a controlled substance;

Third: the defendant knew that the substance would enter the United States; and

Fourth: the defendant aided and abetted his co-conspirator(s) in the commission of the offense.

If you find the defendant guilty, you will be asked to find whether

Fifth:

- the quantity of the substance at issue in both Count 2 and Count 4 was at least 40 grams of a mixture or substance containing a detectable amount of Fentanyl.

38

DEFENDANT'S PROPOSED INSTRUCTION NO. 29

The defendant is charged in Count 5, and also in the list of underlying violations to Count 1, with violations of 21 U.S.C. section 841(a)(1). This law makes it a crime to possess a controlled substance with the intent to distribute it.

To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the defendant knowingly or intentionally possessed a controlled substance on or about November 22, 2016, as charged;

Second: the substance was in fact Fentanyl; and

Third: the defendant possessed the substance with the intent to distribute it;

If you find the defendant guilty, you will be asked to find whether

Fourth: the amount of the controlled substance possessed by the defendant was at least 400 grams of a mixture or substance containing a detectable amount of Fentanyl.

To "possess with intent to distribute" means to possess with intent to deliver or transfer possession of a controlled substance to another person, with or without any financial interest in the transaction.

39

DEFENDANT'S PROPOSED INSTRUCTION NO. 30

The law recognizes two kinds of possession: actual possession and constructive possession. A person who knowingly has direct physical control over an object or thing, at a given time, is then in actual possession of it.

A person who, although not in actual possession, knowingly has the power and intent at a given time to exercise dominion or control over an object, either directly or through another person or persons, is then in constructive possession of it.

More than one person can be in possession of an object if each knows of its presence and has the power and intent to control it.

In the situation where the object is found in a place (such as a room or car) occupied by more than one person, you may not infer power and intent to exercise control over the object based solely on joint occupancy. Mere control over the place in which the object is found is not sufficient to establish constructive possession. Instead, in this situation, the United States must prove some connection between the particular defendant and the object demonstrating the power and intent to exercise control over the object.

DEFENDANT'S PROPOSED INSTRUCTION NO. 31

The defendant is charged in Count 6, and also in the list of underlying violations to Count 1, with a violation of 21 U.S.C. section 841(a)(1). This law makes it a crime to distribute a controlled substance. To find the defendant guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First: the defendant's co-conspirator(s) knowingly or intentionally distributed a controlled substance on or about June 6 through June 13, 2016, as charged;

Second: the substance was in fact Fentanyl;

Third: the death of R.K. resulted from use of the Fentanyl distributed by the defendant's co-conspirators; and

Fourth: the defendant aided and abetted his co-conspirator(s) in the commission of the offense.

The term "distribute" means to deliver or to transfer possession or control of something from one person to another. The term "distribute" includes the sale of something by one person to another. It is not necessary, however, for the government to prove that any transfer of money or other thing of value occurred at the same time as, or because of, the distribution.

To secure a conviction for distributing a drug that "results" in death, the United States must prove beyond a reasonable doubt the victim's use of the drug is a but-for cause of the death.

41

DEFENDANT'S PROPOSED INSTRUCTION NO. 32

The defendant is charged in Count 7, and also in the list of underlying violations to Count 1, with a violation of 21 U.S.C. section 841(a)(1). This law makes it a crime to manufacture a controlled substance. To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the defendant knowingly or intentionally manufactured a controlled substance on or about November 22, 2016, as charged; and

Second: the substance was in fact Alprazolam.

The term "manufacture" means the production, preparation, propagation, compounding, or processing of a drug or other substance.

DEFENDANT'S PROPOSED INSTRUCTION NO. 33

The defendant is charged in Counts 8 and 9 with violations of the Food, Drug, and Cosmetic Act, specifically 21 U.S.C. sections 331(k) & 333(b)(7). These sections make it a crime to intentionally adulterate drugs while held for sale after their shipment in interstate commerce. To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the relevant product, Fentanyl, was a drug as you will be instructed that word means;

Second: the defendant held the drug for sale after its shipment in interstate commerce;

Third: the defendant performed, or caused to be performed, one or more acts which resulted in the article being adulterated;

Fourth: the defendant knowingly and intentionally adulterated or caused the adulteration of the drug:

- For Count 8, beginning on a date unknown to the grand jury, but at least by February 3, 2016, and continuing to at least November 22, 2016;

- For Count 9, beginning on a date unknown to the grand jury, but at least by June 18, 2016, and continuing to at least November 22, 2016;

and

Fifth: such adulteration of the drug had a reasonable probability of causing serious adverse health consequences

43

A drug is adulterated if:

  a)  it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium; or

  b)  it is a drug and any substance has been substituted wholly or in part therefor.

An article is "held for sale" if it is being held for any purpose other than for personal use by the defendants.

For the requirement of a prior shipment in interstate commerce to be satisfied, it is enough to show that the article traveled in interstate commerce prior to the article being held for sale.

An article is held for sale after shipment in interstate commerce without regard to how long after the shipment the misbranding occurred, how many intrastate sales had intervened, or who had received the article at the end of the interstate commerce.  After an article has been shipped in interstate commerce, it is immaterial when or how defendant obtained the article.

For Counts 8 and 9 only, the terms listed below are defined as follows:

The term "interstate commerce" means commerce between any State or Territory and any place outside thereof.

The term "drug" means:

  1)  articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them.

2)      articles intended for use in the diagnosis, cure, treatment, or prevention of disease in man, or intended to affect any function of the human body, or

3)      articles intended for use as a component of any other drug.

The term "official compendium" means the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, official National Formulary, or any supplement to any of them.

The term "serious adverse health consequences" means any potential significant adverse experience related to a drug, which could be life-threatening or which could result in permanent or long-term injuries or illnesses.

DEFENDANT'S PROPOSED INSTRUCTION NO. 34

The defendant is charged in Count 10, and also in the list of underlying violations to Count 1, with aiding and abetting a violation of 21 U.S.C. section 843(b). This law makes it a crime to use a communication facility to commit a felony drug offense. To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the defendant's co-conspirator(s) knowingly used the U.S. Mail on or about September 12-23, 2016;

Second: the defendant's co-conspirator(s) acted with the intent to commit a drug felony, namely Distribution of Alprazolam; and

Third: the defendant aided and abetted his co-conspirator(s) in the commission of the offense.

You are instructed that Distribution of Alprazolam is a felony.

46

DEFENDANT'S PROPOSED INSTRUCTION NO. 35

The following definitions and instructions apply to Counts 11 and 12.

The term "conducts" includes initiating, concluding, or participating in initiating or concluding, a transaction.

The term "financial transaction" means a transaction involving the use of a financial institution that is engaged in, or the activities of which affect, interstate commerce in any way or degree.

The term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through specified unlawful activity, including the gross receipts of such activity.

The term "interstate commerce" means commerce or travel between the states, territories or possessions of the United States, including the District of Columbia. It is not necessary that the defendant have intended or anticipated an effect on interstate commerce. All that is necessary is that the natural and probable consequence of the acts the defendant took would be to affect interstate commerce.

47

DEFENDANT'S PROPOSED INSTRUCTION NO. 36

The defendant is charged in Count 11 with a violation of 18 U.S.C. section 1956(h). This law makes it a crime for anyone to conspire with someone else to commit a money laundering offense.

To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: that the defendant and at least one other person, in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan to

A.     violate 18 U.S.C. section 1956, which was to conduct a financial transaction involving proceeds of some form of unlawful activity beginning on a date unknown to the Grand Jury, but at least by December 22, 2015, and continuing to at least November 22, 2016:

i.     with the intent to promote the carrying on of a specified unlawful activity; or

ii.     knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activity;

or

B.     violate 18 U.S.C. section 1957, which was to conduct a monetary transaction by, through, or to a financial institution involving criminally derived property beginning on a date unknown to the Grand Jury, but at least by December 22, 2015, and continuing to at least November 22, 2016:

i.     which transaction affected interstate or foreign commerce;

   ii.  which transaction involved property of a value greater than

$10,000 USD; and

  Second: that the defendant, knowing the unlawful purpose of the plan, willfully

joined in it.

  Distribution of a controlled substance is a "specified unlawful activity" under the

law. Manufacture of a controlled substance is also a "specified unlawful activity" under

the law.

DEFENDANT'S PROPOSED INSTRUCTION NO. 37

The defendant is charged in Count 12 with a violation of 18 U.S.C. section 1956(a)(1)(B)(i). This law makes it a crime knowingly to conceal or disguise the nature, location, source, ownership, or control of proceeds of specified unlawful activity.

To find the defendant guilty of this crime, you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the defendant conducted a financial transaction on or about November 8, 2016;

Second: the financial transaction involved the proceeds of an unlawful activity, specifically, distribution of a controlled substance;

Third: the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and

Fourth: the defendant conducted the financial transaction:

      i.      with the intent to promote the carrying on of a specified unlawful activity; or

      ii.      knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activity.

DEFENDANT'S PROPOSED INSTRUCTION NO. 38

The defendant is charged in Count 13 with money laundering in violation of 18 U.S.C. section 1957(a). In order for the defendant to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt:

First: the defendant knowingly engaged or attempted to engage in a monetary transaction on or about May 5, 2016;

Second: the defendant knew the transaction involved criminally derived property;

Third: the property had a value greater than $10,000;

Fourth: the property was, in fact, derived from the distribution of a controlled substance; and

Fifth: the transaction occurred in the United States.

The term "monetary transaction" means the deposit, in or affecting interstate commerce, of funds or a monetary instrument by, through, or to a financial institution.

The term "financial institution" means any credit union or FDIC-insured bank.

The term "criminally derived property" means any property constituting, or derived from, the proceeds of a criminal offense. The United States must prove that the defendant knew that the property involved in the monetary transaction constituted, or was derived from, proceeds obtained by some criminal offense. The United States does not have to prove that the defendant knew the precise nature of that criminal offense, or knew the property involved in the transaction represented the proceeds of distribution of a controlled substance.

Although the United States must prove that, of the property at issue more than $10,000 was criminally derived, the United States does not have to prove that all of the property at issue was criminally derived.

51

DEFENDANT'S PROPOSED INSTRUCTION NO. 39

I have explained to you the elements which the United States must prove beyond a reasonable doubt before you may convict the defendant of Counts 1 through 13, along with the crimes alleged in the list of underlying offenses to Count 1. I have also explained to you that punishment is in the exclusive province of the Court, and that you should not concern yourselves with questions of punishment. However, because the punishment under the law for the crimes the defendant is charged with committing varies with the quantity of drugs involved, the law requires that you make special findings in your verdict with regard to those amounts. Those findings, too, must be made beyond a reasonable doubt.

You will be provided with a verdict form on which you will record your verdict. This form contains two determinations for Counts 1, 2, 4, and 5 that you may have to make. The first determination is whether you find the defendant guilty or not guilty of the offense charged in Counts 1, 2, 4, and 5 of the Indictment. If you find the defendant not guilty as to a Count, you need proceed no further.

If, on the other hand, you find the defendant guilty of a Count, you should proceed to the second determination for that Count, that is, the quantity of Fentanyl involved in each offense.

DEFENDANT'S PROPOSED INSTRUCTION NO. 40

To reach a verdict, all of you must agree. Your verdict must be unanimous. Your deliberations will be secret. You will never have to explain your verdict to anyone.

It is your duty to consult with one another and to deliberate in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. During your deliberations, do not hesitate to reexamine your own opinions and change your mind if convinced that you were wrong. But do not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Remember at all times, you are judges, judges of facts. Your sole interest is to seek the truth from the evidence in the case, to decide whether the government has proved the defendant guilty beyond a reasonable doubt.

Bear in mind that you are never to reveal to any person, not even to the Court, how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict.

DEFENDANT'S PROPOSED INSTRUCTION NO. 41

Upon retiring to the jury room, you should first select one of your members to act as your foreperson who will preside over your deliberations and will be your spokesperson here in Court. A verdict form has been prepared for your convenience.

You will take the verdict form to the jury room and when you have reached a unanimous agreement as to your verdict, the foreperson will write the unanimous answer of the jury in the space provided for in each count of the Indictment, either not guilty or guilty. At the conclusion of your deliberations, the foreperson should date and sign the verdict.

DEFENDANT'S PROPOSED INSTRUCTION NO. 42

If it becomes necessary during your deliberations to communicate with the Court, you may send a note by a Court security officer, signed by your foreperson or by one or more jurors. No member of the jury should attempt to communicate with the Court by any means other than a signed writing; and the Court will never communicate with any member of the jury on any subject touching the merits of the case, otherwise than in writing or orally here in open Court.

You will note from the oath the Court security officer will take that he, as well as any other person, is also forbidden to communicate in any way with any juror about any subject touching the merits of the case.

# EXHIBIT A

678

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>    AARON MICHAEL SHAMO,<br><br>        Defendant. | Case No. 2:16-cr-631 DAK<br><br>UNITED STATES' PROPOSED JURY INSTRUCTIONS<br><br>Judge Dale A. Kimball |

The United States of America, by and through Michael Gadd, Special Assistant United States Attorney, hereby requests the Court instruct the jury with the following proposed jury instructions.

Respectfully Submitted,

JOHN W. HUBER
United States Attorney

 /s/ Michael Gadd
MICHAEL GADD
Special Assistant United States Attorney

UNITED STATES' PROPOSED INSTRUCTION NO. 1

MEMBERS OF THE JURY:

Now that you have heard the evidence, it becomes my duty to instruct you on the law that applies to this case.

It is your duty as jurors to follow the law as stated in the instructions of the Court, and to apply the rules of law so given to the facts as you find them from the evidence in the case.

Counsel may refer to these instructions in their arguments. If, however, any difference appears to you between the law as stated by counsel and that stated by the Court in these instructions, you are of course to be governed by the Court's instructions.

You are not to single out any one instruction alone as stating the law, but must consider the instructions as a whole.

Neither are you to be concerned with the wisdom of any rule of law stated by the Court. Regardless of any opinion you may have as to what the law ought to be, it would be a violation of your sworn duty to base a verdict upon any other view of the law than that given in these instructions of the Court; just as it would be a violation of your sworn duty, as judges of the facts, to base a verdict upon anything but the evidence in the case.

Justice through trial by jury must always depend upon the willingness of each individual juror to seek the truth as to the facts from the same evidence presented to all the jurors; and to arrive at a verdict by applying the same rules of law, as given in the instructions of the Court.

2

UNITED STATES' PROPOSED INSTRUCTION NO. 2

You have been chosen as jurors in this case to try the issues of fact presented by the allegations of the indictment and the denial made by the "Not Guilty" plea of the defendant. You are to perform this duty without bias or prejudice as to any party. The law does not permit jurors to be governed by sympathy, prejudice, or public opinion. The defendant and the public expect that you will carefully and impartially consider all the evidence in the case, follow the law as stated by the Court, and reach a just verdict.

The indictment in this case is entitled Second Superseding Indictment. But for convenience, I will simply refer to it in these instructions as the indictment.

3

681

UNITED STATES' PROPOSED INSTRUCTION NO. 3

The Indictment or formal charge against the defendant is not evidence of guilt. Indeed, the defendant is presumed by the law to be innocent. The law does not require the defendant to prove his innocence or produce any evidence at all, nor does it compel him in a criminal case to take the witness stand to testify. The government has the burden of proving the defendant guilty beyond a reasonable doubt, and if it fails to do so you must acquit the defendant.

Even though the defendant has called witnesses in this case, the presumption of innocence remains with him, and the government still has the burden of proof beyond a reasonable doubt.

**Commented [DS1]:** Added back in from Judge Kimball's stock instruction

4

UNITED STATES' PROPOSED INSTRUCTION NO. 4

~~The government has the burden of proving the defendant guilty beyond a reasonable doubt. The law does not require a defendant to prove his innocence or produce any evidence at all. The government has the burden of proving the defendant guilty beyond a reasonable doubt, and if it fails to do so, you must find the defendant not guilty.~~

~~Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. It is only required that the government's proof exclude any "reasonable doubt" concerning the defendant's guilt. A reasonable doubt is a doubt based on reason and common sense after careful and impartial consideration of all the evidence in the case. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.~~

While the government's burden of proof is a strict or heavy burden, it is not necessary that the defendant's guilt be proven beyond all possible doubt. It is only required that the government's proof exclude any reasonable doubt concerning the defendant's guilt. A reasonable doubt is a real doubt, based upon reason and common sense after careful and impartial consideration of all the evidence in the case.

Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs. If you are convinced that the defendant has been proved guilty beyond reasonable doubt, find him guilty. If you are not so convinced, find him not guilt

**Commented [DS2]:** Replace Government's instruction with Judge Kimball's stock instruction

5

6

UNITED STATES' PROPOSED INSTRUCTION NO. 5

You are here to decide whether the United States has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged. The defendant is not on trial for any act, conduct, or offense not alleged in the Indictment. Neither are you concerned with the guilt of any other person or persons not on trial as a defendant in this case.

7

UNITED STATES' PROPOSED INSTRUCTION NO. 6

~~If you find the defendant guilty, it will be my duty to decide what the punishment will be.~~

~~You should not discuss or consider the possible punishment in any way while deciding your~~

~~verdict.~~

> **Commented [DS3]:** Defendant objects to this instruction. This is covered in Government's proposed instruction 43.

8

UNITED STATES' PROPOSED INSTRUCTION NO. 7

You are here to decide whether the United States has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged. The defendant is not on trial for any act, conduct, or crime not charged in the indictment.

It is not up to you to decide whether anyone who is not on trial in this case should be prosecuted for the crime charged. The fact that another person also may be guilty is no defense to a criminal charge.

The question of the possible guilt of others should not enter your thinking as you decide whether this defendant has been proved guilty of the crimes charged.

9

UNITED STATES' PROPOSED INSTRUCTION NO. 8

~~You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.~~

~~The evidence in this case includes only what the witnesses said while they were testifying under oath, the exhibits that I allowed into evidence, the stipulations that the lawyers agreed to, and the facts that I have judicially noticed.~~

~~Nothing else is evidence. The lawyers' statements and arguments are not evidence. Their questions and objections are not evidence. My legal rulings are not evidence. And my comments and questions are not evidence.~~

~~You are to consider only the evidence in this case. However, in your consideration of the evidence, you are not limited to the bald statements of the witnesses. On the contrary, you are permitted to draw from the facts which you find have been proved such reasonable inferences as seem justified in light of your experience. An inference is a deduction or conclusion which reason and common sense would lead you to draw from facts which are established by the evidence in the case.~~

~~During the trial, I did not let you hear the answers to some of the questions that the lawyers asked. I also ruled that you could not see some of the exhibits that the lawyers wanted you to see. And sometimes I ordered you to disregard things that you saw or heard, or I struck things from the record. You must completely ignore all of these things. Do not even think about them. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.~~

The evidence in this case consists of the sworn testimony of the witnesses, regardless of who may have called them; all exhibits received in evidence, regardless of who may have produced them; and all facts which may have been admitted or stipulated.

**Formatted:** Line spacing: Double

10

Statements and arguments of counsel are not evidence in this case. When, however, the attorneys on both sides stipulate or agree as to the existence of a fact, the jury must, unless otherwise instructed, accept the stipulation and regard that fact as conclusively proved.

Any evidence as to which an objection was sustained by the Court, and any evidence ordered stricken by the Court, must be entirely disregarded.

Anything you may have seen or heard outside the courtroom is not evidence, and must be entirely disregarded.

You are to consider only the evidence in this case. However, in your consideration of the evidence, you are not limited to the bald statements of the witnesses. On the contrary, you are permitted to draw from the facts which you find have been proved such reasonable inferences as seem justified in light of your experience. An inference is a deduction or conclusion which reason and common sense would lead you to draw from facts which are established by the evidence in the case. You should weigh all of the evidence in the case, affording each piece of evidence the weight or significance that you find it reasonably deserves.

**Formatted:** Indent: First line: 0", Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers

**Commented [DS4]:** Replace Government's suggested jury instruction with Judge Kimball's stock instruction.

11

UNITED STATES' PROPOSED INSTRUCTION NO. 9

There are, generally speaking, two types of evidence from which a jury may properly determine the facts of a case. One is direct evidence, such as the testimony of an eyewitness. The other is indirect or circumstantial evidence, that is, the proof of a chain of facts which point to the existence or non-existence of certain other facts.

As a general rule, the law makes no distinction between direct and circumstantial evidence. The law simply requires that you find the facts in accord with all the evidence in the case, both direct and circumstantial.

While you must consider only the evidence in this case, you are permitted to draw reasonable inferences from the testimony and exhibits, inferences you feel are justified in the light of common experience. An inference is a conclusion that reason and common sense may lead you to draw from facts which have been proved.

By permitting such reasonable inferences, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts which have been established by the testimony and evidence in this case.

12

UNITED STATES' PROPOSED INSTRUCTION NO. 10

I remind you that it is your job to decide whether the United States has proved the guilt of the defendant beyond a reasonable doubt. In doing so, you must consider all of the evidence. This does not mean, however, that you must accept all of the evidence as true or accurate.

You are the sole judges of the credibility or "believability" of each witness and the weight to be given to the witness's testimony. An important part of your job will be making judgments about the testimony of the witnesses [including the defendant] who testified in this case. You should think about the testimony of each witness you have heard and decide whether you believe all or any part of what each witness had to say, and how important that testimony was. In making that decision, I suggest that you ask yourself a few questions: Did the witness impress you as honest? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome in this case? Did the witness have any relationship with either the United States or the defense? Did the witness seem to have a good memory? Did the witness clearly see or hear the things about which he/she testified? Did the witness have the opportunity and ability to understand the questions clearly and answer them directly? Did the witness's testimony differ from the testimony of other witnesses? When weighing the conflicting testimony, you should consider whether the discrepancy has to do with a material fact or with an unimportant detail. And you should keep in mind that innocent misrecollection—like failure of recollection—is not uncommon.

[The testimony of the defendant should be weighed and his credibility evaluated in the same way as that of any other witness.]

[The defendant did not testify and I remind you that you cannot consider his decision not to testify as evidence of guilt. I want you to clearly understand, please, that the Constitution of

13

the United States grants to a defendant the right to remain silent. That means the right not to testify or call any witnesses. That is a constitutional right in this country, it is very carefully guarded, and you should understand that no presumption of guilt may be raised and no inference of any kind may be drawn from the fact that a defendant does not take the witness stand and testify or call any witnesses.]

In reaching a conclusion on a particular point, or ultimately in reaching a verdict in this case, do not make any decisions simply because there were more witnesses on one side than on the other.

14

UNITED STATES' PROPOSED INSTRUCTION NO. 11

An informant is someone who provides evidence against someone else for a personal reason or advantage. The testimony of an informant alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilt, even though not corroborated or supported by other evidence. You must examine and weigh an informant's testimony with greater care than the testimony of an ordinary witness. You must determine whether the informant's testimony has been affected by self- interest, by an agreement he has with the United States, by his own interest in the outcome of the case, or by prejudice against the defendant.

You should not convict a defendant based on the unsupported testimony of an informant, unless you believe the unsupported testimony beyond a reasonable doubt.

A person may testify under a grant of immunity (an agreement with the United States). His testimony alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilt even though it is not corroborated or supported by other evidence. You should consider testimony given under a grant of immunity with greater care and caution than the testimony of an ordinary witness. You should consider whether testimony under a grant of immunity has been affected by the witness's own interest, the United States' agreement, the witness's interest in the outcome of the case, or by prejudice against the defendant.

On the other hand, you should also consider that an immunized witness can be prosecuted for perjury for making a false statement. After considering these things, you may give testimony given under a grant of immunity such weight as you feel it deserves.

You should not convict a defendant based on the unsupported testimony of an immunized witness, unless you believe the unsupported testimony beyond a reasonable doubt.

15

In this case, the nature of the immunity agreement(s) is as follows: the United States has promised Ryan Jensen and Jessica Gleave that it will not use their testimony against them in a criminal case, other than for a prosecution for perjury if they testify untruthfully.

Mr. Jensen and Ms. Gleave agreed to testify truthfully and completely, answering all questions posed to them.

16

UNITED STATES' PROPOSED INSTRUCTION NO. 12

The United States called as some of its witnesses alleged accomplices, who were named as co-defendants in the indictment. The United States has entered into a plea agreement with the co-defendants, wherein the co-defendants pleaded guilty as charged and agreed to testify truthfully if called upon to testify. In exchange, the United States has agreed to ask the Court to consider imposing sentences that would otherwise be lower than the recommendation the United States would have made if the co-defendants had not agreed to testify truthfully. The United States has also agreed to signal to the Court that by testifying truthfully, the co-defendants should not be subject to any minimum-mandatory sentence otherwise applicable to their crimes. The agreement makes clear, however, that final sentencing decisions rest solely with the Court. Plea bargaining is lawful and proper, and the rules of this Court expressly provide for it.

An alleged accomplice, including one who has entered into a plea agreement with the United States, is not prohibited from testifying. On the contrary, the testimony of an alleged accomplice may, by itself, support a guilty verdict. You should receive this type of testimony with caution and weigh it with great care. You should never convict a defendant upon the unsupported testimony of an alleged accomplice, unless you believe that testimony beyond a reasonable doubt. The fact that an accomplice has entered a guilty plea to the offense charged is not evidence of the guilt of any other person.

17

UNITED STATES' PROPOSED INSTRUCTION NO. 13

The defendant did not testify and I remind you that you cannot consider his decision not to testify as evidence of guilt. You must understand that the Constitution of the United States grants to a defendant the right to remain silent. That means the right not to testify. That is a constitutional right in this country, it is very carefully guarded, and you must not presume or infer guilt from the fact that a defendant does not take the witness stand and testify or call any witnesses.

18

UNITED STATES' PROPOSED INSTRUCTION NO. 14

Evidence has been presented about a statement attributed to the defendant alleged to have been made after the commission of the crimes charged in this case but not made in court. Such evidence should always be considered by you with caution and weighed with care. You should give any such statement the weight you think it deserves, after considering all the circumstances under which the statement was made.

In determining whether any such statement is reliable and credible, consider factors bearing on the voluntariness of the statement. For example, consider the age, gender, training, education, occupation, physical and mental condition of the defendant, and all the other circumstances in evidence surrounding the making of the statement.

After considering all this evidence, you may give such weight to the statement as you feel it deserves under all the circumstances. If you determine that the statement is unreliable or not credible, you may disregard the statement entirely.

19

UNITED STATES' PROPOSED INSTRUCTION NO. 15

If I have said or done anything in this case that makes it appear I have an opinion about the guilt or innocence of the defendant, disregard it. You are the sole judges of the facts and should in no way be influenced by what I have done here except to follow my instructions on the law. Nothing said in these instructions and nothing in any form of verdict prepared for your convenience is meant to suggest or convey in any way or manner any intimation as to what verdict I think you should find. What the verdict shall be is the sole and exclusive duty and responsibility of the jury.

20

UNITED STATES' PROPOSED INSTRUCTION NO. 16

If any reference by the Court or by the attorneys to matters of evidence does not coincide with your own recollection, it is your recollection which should control during your deliberations.

21

UNITED STATES' PROPOSED INSTRUCTION NO. 17

During this trial, you have heard sound recordings of certain conversations. These conversations were legally recorded; they are a proper form of evidence and may be considered by you as you would any other evidence. You were also given transcripts of those recorded conversations.

Keep in mind that the transcripts are not evidence. They were given to you only as a guide to help you follow what was being said. The recordings themselves are the evidence. If you noticed any differences between what you heard on the recordings and what you read in the transcripts, you must rely on what you heard, not what you read. If you could not hear or understand certain parts of the recordings, you must ignore the transcript as far as those parts are concerned.

22

UNITED STATES' PROPOSED INSTRUCTION NO. 18

A separate crime is charged in each count of the indictment. Each charge, and the evidence pertaining to it, should be considered separately by you. The fact that you may find the defendant guilty or not guilty as to one of the counts should not control your verdict as to any other count.

23

UNITED STATES' PROPOSED INSTRUCTION NO. 19

During the trial, you heard the testimony of expert witnesses who expressed opinions concerning

- the identity and weight of substances including mixtures containing controlled substances;

- the illegitimacy of pills and tablets based upon composition, imprints, and other aspects;

- the nature of the Dark Net and how Dark Net Marketplaces operate;

- how AlphaBay operated from the perspective of vendors and customers;

- the nature and use of PGP encryption;

- the nature of cryptocurrencies and how cryptocurrencies such as Bitcoin are used in transactions over the Dark Net;

- the nature of and methods used in computer forensic examinations;

- the nature and operation of drug-trafficking organizations;
  - including the methods and means by which drug traffickers launder drug proceeds through promotion, concealment, and spending;

- what constitutes a drug or drug component under the FDCA;

- the make-up, regulation, standards, quality, purity, markings (including which Pharmaceutical company is allowed to use which markings), uses, physiological effect on humans, listing in the Official US Pharmacopeia Compendium, and federal regulation of both Oxycodone and Fentanyl;

- the relative potency of Oxycodone, Fentanyl, and other opiates; and

24

- the risk of serious adverse health consequences or death from marking Fentanyl to appear like Oxycodone tablets.

In some cases, such as this one, scientific, technical, or other specialized knowledge may assist the jury in understanding the evidence or in determining a fact in issue. A witness who has knowledge, skill, experience, training or education, may testify and state an opinion concerning such matters.

You are not required to accept such an opinion. You should consider opinion testimony just as you consider other testimony in this trial. Give opinion testimony as much weight as you think it deserves, considering the education and experience of the witness, the soundness of the reasons given for the opinion, and other evidence in the trial.

25

UNITED STATES' PROPOSED INSTRUCTION NO. 20

You are not to be concerned with the legality or illegality of any search by law enforcement officers of the residence occupied by the defendant. That is a matter exclusively within the province of the Court.

26

UNITED STATES' PROPOSED INSTRUCTION NO. 21

You have heard testimony as to the manner in which the government conducted its investigation in this case including certain investigative methods or techniques that were used and certain investigative methods or techniques that were not used. In attempting to prove its case, the government is under no obligation to use all of the investigative methods that are available to it or use any particular method. The question is whether the evidence presented is sufficient to convince you beyond a reasonable doubt of the defendant's guilt.

27

UNITED STATES' PROPOSED INSTRUCTION NO. 22

You will note that the indictment charges that the crimes were committed "on or about" a certain date or between approximate dates. ~~Although it is necessary for t~~The United States ~~must~~~~to~~ prove beyond a reasonable doubt that the offenses were committed on a date reasonably near the date alleged in the indictment~~, it is not necessary for the United States to prove that the offenses were committed precisely on the dates charged.~~

28

UNITED STATES' PROPOSED INSTRUCTION NO. 23

Fentanyl (also referred to as N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propenamide) is a controlled substance within the meaning of the law.

Likewise, Alprazolam is a controlled substance within the meaning of the law.

29

UNITED STATES' PROPOSED INSTRUCTION NO. 24

Several counts of the indictment and most of the underlying offenses listed in Count 1 of the indictment also charge a violation of 18 U.S.C. section 2, which provides that: "Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

This law makes it a crime to intentionally help someone else commit a crime. To find the defendant guilty of this crime, you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: someone else committed the charged crime, and

Second: the defendant intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about. This means that the United States must prove that the defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help him.

The defendant need not perform the underlying criminal act, be present when it is performed, or be aware of the details of its commission to be guilty of aiding and abetting. But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough. Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.

30

UNITED STATES' PROPOSED INSTRUCTION NO. 25

The defendant is charged in Count 1 with a violation of 21 U.S.C. section 848.

This law makes it a crime to engage in what is called a "continuing criminal enterprise" involving controlled substances.

To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the defendant violated the Controlled Substances Act by conspiring to distribute Fentanyl, as charged in the list of underlying violations to Count 1, which list of violations can be found on the special verdict form;

Second: such violation was part of a continuing series of violations of the Controlled Substances Act that began on a date unknown to the Grand Jury, but at least by July 8, 2015, and continued to at least November 22, 2016. These violations must be connected together as a series of related or ongoing activities, as distinguished from isolated and disconnected acts. You must unanimously agree on which of at least three of these underlying violations has been proved. The underlying violations listed in Count 1 may be found on the special verdict form attached to the end of these instructions;

Third: the defendant committed these violations in concert (or by common design or plan) with five or more other persons. The five other persons need not have acted at the same time or in concert with each other. You need not unanimously agree on the identity of any other persons acting in concert with the defendant, so long as each of you finds that there were five or more such persons;

Fourth: the defendant was an organizer, supervisor, or manager of those five persons; and

31

Fifth: the defendant obtained substantial income or resources from the series of

violations.

If you find the defendant guilty, you will be asked if you to find, whether unanimously

and beyond a reasonable doubt, the following:

> **Commented [DS5]:** Apprendi v. New Jersey, 120 S. Ct. 2348 (2000).

Sixth:

1) the conspiracy to distribute Fentanyl involved at least twelve kilograms or more

   of a mixture or substance containing a detectable amount of Fentanyl; and

2) the defendant was a principal administrator, organizer, or leader of the enterprise.

The term "substantial income or resources" means income in money or property which is

significant in size or amount as distinguished from some relatively insignificant, insubstantial, or

trivial amount.

The term "organizer, supervisor, or manager" means that the defendant was more than a

fellow worker, and that the defendant either organized or directed the activities of five or more

other persons, exercising some form of managerial authority over them. The defendant need not

be the only principal organizer or supervisor.

Likewise, the law does not require the United States to prove the defendant was the only

principal administrator, organizer, or leader; the United States need only prove beyond a

reasonable doubt that the defendant was one of possibly several principal administrators,

organizers, or leaders.

> **Commented [DS6]:** Objection, the government did not provide authority for adding this language to the instruction

> **Formatted:** Indent: First line: 0", Space After: 10 pt, Line spacing: Multiple 1.15 li

32

DEFENDANT'S PROPOSED INSTRUCTION NO. ___

To find the defendant guilty of Count 1 with a violation of 21 U.S.C. section 848, you must be convinced the United States has proved each of the following:

First: find unanimously and beyond a reasonable doubt the defendant violated the Controlled Substances Act by conspiring to distribute Fentanyl, as charged in the list of underlying violations to Count 1, which list of violations can be found on the special verdict form;

Second: find unanimously and beyond a reasonable doubt such violation was part of a continuing series of violations of the Controlled Substances Act that began on a date unknown to the Grand Jury, but at least by July 8, 2015, and continued to at least November 22, 2016. These violations must be connected together as a series of related or ongoing activities, as distinguished from isolated and disconnected acts. You must unanimously agree on which of at least three of these underlying violations has been proved. The underlying violations listed in Count 1 may be found on the special verdict form attached to the end of these instructions;

Third: find unanimously and beyond a reasonable doubt the defendant committed these violations in concert (or by common design or plan) with five or more other persons. The five other persons need not have acted at the same time or in concert with each other. You need not unanimously agree on the identity of any other persons acting in concert with the defendant, so long as each of you finds that there were five or more such persons;

Fourth: find unanimously and beyond a reasonable doubt the defendant was an organizer, supervisor, or manager of those five persons; and

Fifth: find unanimously and beyond a reasonable doubt the defendant obtained substantial income or resources from the series of violations.

33

If you find the defendant guilty of the first five elements, you will then be asked if the United States has proved each of the following

Sixth:

1) find unanimously and beyond a reasonable doubt the conspiracy to distribute Fentanyl involved at least twelve kilograms or more of a mixture or substance containing a detectable amount of Fentanyl; and

2) find unanimously and beyond a reasonable doubt the defendant was a principal administrator, organizer, or leader of the enterprise.

34

UNITED STATES' PROPOSED INSTRUCTION NO.26

The defendant is charged in the list of underlying violations to Count 1 with violating sections 841(a)(1) and 846 of Title 21 of the United States Code. This law makes it a crime for anyone to conspire with someone else to violate federal laws pertaining to controlled substances. In this case, the defendant is charged with conspiracy to distribute Fentanyl resulting in death.

To find the defendant committed this crime, you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: beginning on a date unknown to the Grand Jury, but at least by February 3, 2016, and continuing to at least November 22, 2016, two or more persons agreed to violate the federal drug laws;

Second: the defendant knew the essential objective of the conspiracy;

Third: the defendant knowingly and voluntarily involved himself in the conspiracy;

Fourth: there was interdependence among the members of the conspiracy; and

Fifth: the death of R.K. resulted from use of Fentanyl distributed in furtherance of the conspiracy.

A conspiracy is an agreement between two or more persons to accomplish an unlawful purpose. It is a kind of "partnership in criminal purposes" in which each member becomes the agent or partner of every other member. The evidence may show that some of the persons involved in the alleged conspiracy are not on trial. This does not matter. There is no requirement that all members of a conspiracy be charged or tried together in one proceeding.

The evidence need not show that the members entered into an express or formal agreement. Nor does the law require proof that the members agreed on all the details. But the

35

evidence must show that the members of the alleged conspiracy came to a mutual understanding to try to accomplish a common and unlawful plan.

If you are convinced that the charged conspiracy existed, then you must next determine whether the defendant was a member of that conspiracy, that is, whether the defendant knew at least the essential goals of the conspiracy and voluntarily chose to be part of it. The law does not require proof that the defendant knew all the other members of the conspiracy or knew all the details about how activities were to be carried out. A person may belong to a conspiracy for a brief period of time or play a minor role. On the other hand, proof is not sufficient if it merely shows that the defendant knew about the existence of the conspiracy or was associated with members of the conspiracy. Rather, the evidence must show the defendant knowingly joined the conspiracy with the intent to advance its purposes.

You are also required to find that interdependence existed among the members of the conspiracy. This means that the members intended to act for their shared mutual benefit. To satisfy this element, you must conclude that the defendant participated in a shared criminal purpose and that his actions constituted an essential and integral step toward the realization of that purpose.

To secure a conviction for conspiring to distribute a drug that "results" in death, the United States must prove beyond a reasonable doubt the victim's use of the drug is a but-for cause of the death.

**Commented [DS7]:** Added language to reflect ruling in *United States v. Burrage*, 134 S. Ct. 881, 892 (2014). The but-for cause of death burden is the proof beyond a reasonable doubt standard.

36

UNITED STATES' PROPOSED INSTRUCTION NO.28

The defendant is charged in the list of underlying violations to Count 1 with violating sections 841(a)(1) and 846 of Title 21 of the United States Code. This law makes it a crime for anyone to conspire with someone else to violate federal laws pertaining to controlled substances. In this case, the defendant is charged with conspiracy to distribute Alprazolam.

To find the defendant committed this crime, you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: beginning on a date unknown to the Grand Jury, but at least by December 22, 2015, and continuing to at least November 22, 2016, two or more persons agreed to violate the federal drug laws;

Second: the defendant knew the essential objective of the conspiracy;

Third: the defendant knowingly and voluntarily involved himself in the conspiracy; and

Fourth: there was interdependence among the members of the conspiracy.

37

UNITED STATES' PROPOSED INSTRUCTION NO. 29

The defendant is charged in the list of underlying violations to Count 1 with aiding and abetting attempted violations of 21 U.S.C. section 841(a)(1). This law makes it a crime to distribute a controlled substance. To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the defendant's co-conspirator(s) knowingly and~~or~~ intentionally attempted to distribute a controlled substance as charged;

Second: the substance was in fact

- Fentanyl, for those crimes alleging Fentanyl on or about the dates alleged; or

- Alprazolam, for those crimes alleging Alprazolam on or about the dates alleged.

Third: the defendant aided and~~or~~ abetted his co-conspirator(s) in the attempted commission of the offense.

The term "distribute" means to deliver or to transfer possession or control of something from one person to another. The term "distribute" includes the sale of something by one person to another. It is not necessary, however, for the United States to prove that any transfer of money or other thing of value occurred at the same time as, or because of, the distribution.

~~The United States is not required to prove that the defendant knew the precise nature of the controlled substance.~~

38

UNITED STATES' PROPOSED INSTRUCTION NO. 30

The defendant may be found guilty of attempting to commit a crime, even though he did not do all of the acts necessary in order to commit the crime. However, the defendant may not be found guilty of attempting to commit any crime merely by thinking about it, or even by making some plans or some preparation for the commission of a crime.

Instead, in order to prove an attempt, the United States must prove beyond a reasonable doubt that:

(1)     the defendant intended to commit the crime; and

(2)     the defendant took a substantial step towards commission of that crime.

A "substantial step" is something beyond mere preparation. A substantial step is an act which, in the ordinary and likely course of events, would lead to the commission of the particular crime. The step must be a strong indication of the defendant's criminal intent, and must unequivocally mark the defendant's acts as criminal. It should demonstrate commitment to the crime charged.

39

UNITED STATES' PROPOSED INSTRUCTION NO. 31

The defendant is charged in Counts 2, 3, and 4, and also in the list of underlying violations to Count 1, with aiding and abetting violations of 21 U.S.C. section 952(a) and section 960(a)(1). This law makes it a crime to knowingly or intentionally import a controlled substance.

To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the defendant or his co-conspirator(s) imported into the United States from a place outside the United States the controlled substances listed below:

- Fentanyl, on or about June 23, 2016 (Count 2)

- Alprazolam, on or about November 8, 2016 (Count 3)

- Fentanyl, on or about November 17, 2016 (Count 4)

Second: the defendant knew the substance he or his co-conspirator(s) imported into the United States was a controlled substance;

Third: the defendant knew that the substance would enter the United States; and

Fourth: the defendant aided and~~or~~ abetted his co-conspirator(s) in the commission of the offense.

If you find the defendant guilty, you will be asked to find whether

Fifth:

- the quantity of the substance at issue in both Count 2 and Count 4 was at least 40 grams of a mixture or substance containing a detectable amount of Fentanyl.

40

UNITED STATES' PROPOSED INSTRUCTION NO. 32

The defendant is charged in Count 5, and also in the list of underlying violations to Count 1, with violations of 21 U.S.C. section 841(a)(1). This law makes it a crime to possess a controlled substance with the intent to distribute it.

To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the defendant knowingly or intentionally possessed a controlled substance on or about November 22, 2016, as charged;

Second: the substance was in fact Fentanyl; and

Third: the defendant possessed the substance with the intent to distribute it;

If you find the defendant guilty, you will be asked to find whether

Fourth: the amount of the controlled substance possessed by the defendant was at least 400 grams of a mixture or substance containing a detectable amount of Fentanyl.

To "possess with intent to distribute" means to possess with intent to deliver or transfer possession of a controlled substance to another person, with or without any financial interest in the transaction.

41

UNITED STATES' PROPOSED INSTRUCTION NO. 33

The law recognizes two kinds of possession: actual possession and constructive possession. A person who knowingly has direct physical control over an object or thing, at a given time, is then in actual possession of it.

A person who, although not in actual possession, knowingly has the power and intent at a given time to exercise dominion or control over an object, either directly or through another person or persons, is then in constructive possession of it.

More than one person can be in possession of an object if each knows of its presence and has the power and intent to control it.

In the situation where the object is found in a place (such as a room or car) occupied by more than one person, you may not infer power and intent to exercise control over the object based solely on joint occupancy. Mere control over the place in which the object is found is not sufficient to establish constructive possession. Instead, in this situation, the United States must prove some connection between the particular defendant and the object demonstrating the power and intent to exercise control over the object.

42

UNITED STATES' PROPOSED INSTRUCTION NO. 34

The defendant is charged in Count 6, and also in the list of underlying violations to Count 1, with a violation of 21 U.S.C. section 841(a)(1). This law makes it a crime to distribute a controlled substance. To find the defendant guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First: the defendant's co-conspirator(s) knowingly or intentionally distributed a controlled substance on or about June 6 through June 13, 2016, as charged;

Second: the substance was in fact Fentanyl;

Third: the death of R.K. resulted from use of the Fentanyl distributed by the defendant's co-conspirators; and

Fourth: the defendant aided and~~or~~ abetted his co-conspirator(s) in the commission of the offense.

The term "distribute" means to deliver or to transfer possession or control of something from one person to another. The term "distribute" includes the sale of something by one person to another. It is not necessary, however, for the government to prove that any transfer of money or other thing of value occurred at the same time as, or because of, the distribution.

To secure a conviction for distributing a drug that "results" in death, the United States must prove ~~beyond a reasonable doubt~~ the victim's use of the drug is a but-for cause of the death.

**Commented [DS8]:** Added language to reflect ruling in *United States v. Burrage*, 134 S. Ct. 881, 892 (2014). The but-for cause of death burden is the proof beyond a reasonable doubt standard.

43

UNITED STATES' PROPOSED INSTRUCTION NO. 35

The defendant is charged in Count 7, and also in the list of underlying violations to Count 1, with a violation of 21 U.S.C. section 841(a)(1). This law makes it a crime to manufacture a controlled substance. To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the defendant knowingly or intentionally manufactured a controlled substance on or about November 22, 2016, as charged; and

Second: the substance was in fact Alprazolam.

The term "manufacture" means the production, preparation, propagation, compounding, or processing of a drug or other substance.

44

UNITED STATES' PROPOSED INSTRUCTION NO. 36

The defendant is charged in Counts 8 and 9 with violations of the Food, Drug, and Cosmetic Act, specifically 21 U.S.C. sections 331(k) & 333(b)(7). These sections make it a crime to intentionally adulterate drugs while held for sale after their shipment in interstate commerce. To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the relevant product, Fentanyl, was a drug as you will be instructed that word means;

Second: the defendant held the drug for sale after its shipment in interstate commerce;

Third: the defendant performed, or caused to be performed, one or more acts which resulted in the article being adulterated;

Fourth: the defendant knowingly and intentionally adulterated or caused the adulteration of the drug:

- For Count 8, beginning on a date unknown to the grand jury, but at least by February 3, 2016, and continuing to at least November 22, 2016;

- For Count 9, beginning on a date unknown to the grand jury, but at least by June 18, 2016, and continuing to at least November 22, 2016;

and

Fifth: such adulteration of the drug had a reasonable probability of causing serious adverse health consequences or death to humans.

45

A drug is adulterated if:

     a)      it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium; or

     b)      it is a drug and any substance has been substituted wholly or in part therefor.

An article is "held for sale" if it is being held for any purpose other than for personal use by the defendants.

For the requirement of a prior shipment in interstate commerce to be satisfied, it is enough to show that the article traveled in interstate commerce prior to the article being held for sale.

An article is held for sale after shipment in interstate commerce without regard to how long after the shipment the misbranding occurred, how many intrastate sales had intervened, or who had received the article at the end of the interstate commerce.  After an article has been shipped in interstate commerce, it is immaterial when or how defendant obtained the article.

For Counts 8 and 9 only, the terms listed below are defined as follows:

The term "interstate commerce" means commerce between any State or Territory and any place outside thereof.

The term "drug" means:

     1)      articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them.

46

2)    articles intended for use in the diagnosis, cure, treatment, or prevention of disease in man, or intended to affect any function of the human body, or

3)    articles intended for use as a component of any other drug.

The term "official compendium" means the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, official National Formulary, or any supplement to any of them.

The term "serious adverse health consequences" means any potential significant adverse experience related to a drug, which could be life-threatening or which could result in permanent or long-term injuries or illnesses.

47

UNITED STATES' PROPOSED INSTRUCTION NO. 37

The defendant is charged in Count 10, and also in the list of underlying violations to Count 1, with aiding and abetting a violation of 21 U.S.C. section 843(b). This law makes it a crime to use a communication facility to commit a felony drug offense. To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the defendant's co-conspirator(s) knowingly used the U.S. Mail on or about September 12-23, 2016;

Second: the defendant's co-conspirator(s) acted with the intent to commit a drug felony, namely Distribution of Alprazolam; and

Third: the defendant aided and abetted his co-conspirator(s) in the commission of the offense.

You are instructed that Distribution of Alprazolam is a felony.

48

UNITED STATES' PROPOSED INSTRUCTION NO. 38

The following definitions and instructions apply to Counts 11 and 12.

The term "conducts" includes initiating, concluding, or participating in initiating or concluding, a transaction.

The term "financial transaction" means a transaction involving the use of a financial institution that is engaged in, or the activities of which affect, interstate commerce in any way or degree.

The term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through specified unlawful activity, including the gross receipts of such activity.

The term "interstate commerce" means commerce or travel between the states, territories or possessions of the United States, including the District of Columbia. It is not necessary that the defendant have intended or anticipated an effect on interstate commerce. All that is necessary is that the natural and probable consequence of the acts the defendant took would be to affect interstate commerce.

49

UNITED STATES' PROPOSED INSTRUCTION NO. 39

The defendant is charged in Count 11 with a violation of 18 U.S.C. section 1956(h). This law makes it a crime for anyone to conspire with someone else to commit a money laundering offense.

To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: that the defendant and at least one other person, in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan to

A.      violate 18 U.S.C. section 1956, which was to conduct a financial transaction involving proceeds of some form of unlawful activity beginning on a date unknown to the Grand Jury, but at least by December 22, 2015, and continuing to at least November 22, 2016:

      i.      with the intent to promote the carrying on of a specified unlawful activity; or

      ii.      knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activity;

or

B.      violate 18 U.S.C. section 1957, which was to conduct a monetary transaction by, through, or to a financial institution involving criminally derived property beginning on a date unknown to the Grand Jury, but at least by December 22, 2015, and continuing to at least November 22, 2016:

      i.      which transaction affected interstate or foreign commerce;

50

ii.    which transaction involved property of a value greater than $10,000 USD; and

Second: that the defendant, knowing the unlawful purpose of the plan, willfully joined in it.

Distribution of a controlled substance is a "specified unlawful activity" under the law. Manufacture of a controlled substance is also a "specified unlawful activity" under the law.

51

UNITED STATES' PROPOSED INSTRUCTION NO. 40

The defendant is charged in Count 12 with a violation of 18 U.S.C. section 1956(a)(1)(B)(i). This law makes it a crime knowingly to conceal or disguise the nature, location, source, ownership, or control of proceeds of specified unlawful activity.

To find the defendant guilty of this crime, you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

First: the defendant conducted a financial transaction on or about November 8, 2016;

Second: the financial transaction involved the proceeds of an unlawful activity, specifically, distribution of a controlled substance;

Third: the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and

Fourth: the defendant conducted the financial transaction:

      i.      with the intent to promote the carrying on of a specified unlawful activity; or

      ii.      knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activity.

52

UNITED STATES' PROPOSED INSTRUCTION NO. 41

The defendant is charged in Count 13 with money laundering in violation of 18 U.S.C. section 1957(a). In order for the defendant to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt:

First: the defendant knowingly engaged or attempted to engage in a monetary transaction on or about May 5, 2016;

Second: the defendant knew the transaction involved criminally derived property;

Third: the property had a value greater than $10,000;

Fourth: the property was, in fact, derived from the distribution of a controlled substance; and

Fifth: the transaction occurred in the United States.

The term "monetary transaction" means the deposit, in or affecting interstate commerce, of funds or a monetary instrument by, through, or to a financial institution.

The term "financial institution" means any credit union or FDIC-insured bank.

The term "criminally derived property" means any property constituting, or derived from, the proceeds of a criminal offense. The United States must prove that the defendant knew that the property involved in the monetary transaction constituted, or was derived from, proceeds obtained by some criminal offense. The United States does not have to prove that the defendant knew the precise nature of that criminal offense, or knew the property involved in the transaction represented the proceeds of distribution of a controlled substance.

Although the United States must prove that, of the property at issue more than $10,000 was criminally derived, the United States does not have to prove that all of the property at issue was criminally derived.

53

UNITED STATES' PROPOSED INSTRUCTION NO. 42

I have explained to you the elements which the United States must prove beyond a reasonable doubt before you may convict the defendant of Counts 1 through 13, along with the crimes alleged in the list of underlying offenses to Count 1. I have also explained to you that punishment is in the exclusive province of the Court, and that you should not concern yourselves with questions of punishment. However, because the punishment under the law for the crimes the defendant is charged with committing varies with the quantity of drugs involved, the law requires that you make special findings in your verdict with regard to those amounts. Those findings, too, must be made beyond a reasonable doubt.

You will be provided with a verdict form on which you will record your verdict. This form contains two determinations for Counts 1, 2, 4, and 5 that you may have to make. The first determination is whether you find the defendant guilty or not guilty of the offense charged in Counts 1, 2, 4, and 5 of the Indictment. If you find the defendant not guilty as to a Count, you need proceed no further.

If, on the other hand, you find the defendant guilty of a Count, you should proceed to the second determination for that Count, that is, the quantity of Fentanyl involved in each offense.

54

UNITED STATES' PROPOSED INSTRUCTION NO. 43

To reach a verdict, all of you must agree. Your verdict must be unanimous. Your deliberations will be secret. You will never have to explain your verdict to anyone.

It is your duty to consult with one another and to deliberate in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. During your deliberations, do not hesitate to reexamine your own opinions and change your mind if convinced that you were wrong. But do not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Remember at all times, you are judges, judges of facts. Your sole interest is to seek the truth from the evidence in the case, to decide whether the government has proved the defendant guilty beyond a reasonable doubt.

Bear in mind that you are never to reveal to any person, not even to the Court, how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict.

55

UNITED STATES' PROPOSED INSTRUCTION NO. 44

Upon retiring to the jury room, you should first select one of your members to act as your foreperson who will preside over your deliberations and will be your spokesperson here in Court. A verdict form has been prepared for your convenience.

You will take the verdict form to the jury room and when you have reached a unanimous agreement as to your verdict, the foreperson will write the unanimous answer of the jury in the space provided for in each count of the Indictment, either not guilty or guilty. At the conclusion of your deliberations, the foreperson should date and sign the verdict.

56

UNITED STATES' PROPOSED INSTRUCTION NO. 45

If it becomes necessary during your deliberations to communicate with the Court, you may send a note by a Court security officer, signed by your foreperson or by one or more jurors. No member of the jury should attempt to communicate with the Court by any means other than a signed writing; and the Court will never communicate with any member of the jury on any subject touching the merits of the case, otherwise than in writing or orally here in open Court.

You will note from the oath the Court security officer will take that he, as well as any other person, is also forbidden to communicate in any way with any juror about any subject touching the merits of the case.

57

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

AUG 0 9 2019

D. MARK JONES, CLERK
BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | ORDER ADMITTING THE UNITED STATES' EXHIBITS |
| vs. | |
| AARON MICHAEL SHAMO, | Judge Dale A. Kimball |
| Defendant. | |

The Court, having heard testimony and considered objections such as hearsay, relevance, and rule 403 objections, admits into evidence the contested exhibits presented by the United States at the evidentiary hearing held May 29-31, 2019. The contested exhibits were listed in the minute entry in Document Number 219.[1]

On May 17, 2019, the Court admitted all the uncontested exhibits proposed by the United States. (Doc. 219) Those uncontested exhibits were admitted with the understanding that they cannot be challenged at trial for insufficient foundation. However, the defense may still object at trial to those previously uncontested exhibits based upon other objections such as hearsay, rule 404b, or rule 403 objections.

DATED this 9th day of August, 2019.

DALE A. KIMBALL
United States District Judge

---

[1] The United States withdrew two pictures from Exhibit 18.01 that depicted the deceased victim's face.

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | MOTION FOR A CURATIVE INSTRUCTION REGARDING CHARGING COMPARISONS |
| vs. | |
| AARON MICHAEL SHAMO, | Judge Dale A. Kimball |
| Defendant. | |

The United States, by and through Michael Gadd, Special Assistant United States Attorney, provides the following memorandum in regards to the defendant drawing charging comparisons in his opening statement. The United States asks the Court to issue a curative instruction that informs the jury of its duty to not consider the charging comparisons drawn by the defendant.

The Court ruled from the bench on May 29, 2019, indicating that it agreed with the chart contained in Document 218; the chart outlined permissible and non-permissible areas of argument and inquiry. (see Minute Entry, Doc. 226). That chart outlined several impermissible areas of inquiry and argument, including (1) "charges (or lack thereof) and potential sentences of non-testifying co-conspirators," (2) "charges and potential sentences for testifying co-

conspirators for purposes other than impeachment," and (3) "disparate charging and sentencing with respect to Mr. Paz and Mr. Crandall and Count 1, CCE."

In his opening, the defendant drew comparisons between his charges—specifically Counts 1 and 6—and those charges faced by testifying co-conspirators, including Mr. Paz and Mr. Crandall—none of whom were charged in Counts 1 or 6. Specifically, he pointed out that no other co-defendant was charged with Count 1, Engaging in a Continuing Criminal Enterprise. Drawing that comparison was a violation of the Court's order because it falls under the third impermissible area of inquiry and argument listed above. The defendant highlighted the disparate charges between himself and Mr. Paz and Mr. Crandall (among others).

As a curative instruction, the United States requests the Court instruct the jury tomorrow morning with the following instruction, which removes one inapplicable sentence from, but otherwise follows, Tenth Circuit Pattern Instruction 1.19:

> You are here to decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of the crime[s] charged. . . . It is not up to you to decide whether anyone who is not on trial in this case should be prosecuted for the crime[s] charged. The fact that another person *also* may be guilty is no defense to a criminal charge.
>
> The question of the possible guilt of others should not enter your thinking as you decide whether this defendant has been proved guilty of the crime[s] charged.

Respectfully submitted this 12th day of August, 2019.

JOHN W. HUBER
United States Attorney

*/s/ Michael Gadd*
MICHAEL GADD
Special Assistant United States Attorney

2

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. AARON MICHAEL SHAMO, Defendant. | Case No. 2:16-cr-00631-DAK MOTION TO EXCLUDE EVIDENCE OF THE DEFENDANT'S MENTAL CONDITION Judge Dale A. Kimball |

The United States, by and through Michael Gadd, Special Assistant United States

Attorney, provides the following motion to exclude evidence of the defendant's mental

condition. The defendant has not provided notice of his intent to call an expert witness to offer

opinions as to any mental condition suffered by the defendant—a requirement under Rule

16(b)(1)(C) of the Federal Rules of Criminal Procedure. The defendant has also failed to comply

with the additional notice requirements in Rule 12.2 of the Federal Rules of Criminal Procedure,

which govern notice of expert evidence of a mental condition. For those reasons, the United

States moves the Court to exclude all testimony and evidence offered to prove the defendant's

alleged mental condition.

## STATEMENT OF FACTS

1. The Court ordered that the parties exchange notice of their respective expert witnesses by April 17, 2019. Doc. 186, at 6. Both parties gave notice of experts they intended to call pursuant to Rule 16(b)(1)(C).

2. In his opening statement to the jury, counsel for the defendant said "[a]lthough in a criminal case in America the defendant doesn't need to testify, you'll hear from Aaron. You'll hear from his family members. And you'll hear from his – by family members, I mean his mother and sister. And here's what you'll learn about Aaron. That he is learning disabled. He had severe ADHD, and a processing disorder."[1]

3. Counsel for the defendant went on to explain that the jury would hear that "Aaron just wasn't capable of organizing or running an organization like this without substantial assistance."[2]

4. The defendant has never provided notice of an expert witness who would offer the expert's opinion that (1) the defendant suffers from a learning disability generally, (2) the defendant specifically suffers from the mental disorder classified as Attention Deficit Hyperactivity Disorder (ADHD); or (3) that the defendant suffers from a "processing disorder."

5. The defendant has not provided any discovery in this case.

## ARGUMENT

The Court should exclude evidence of the defendant's alleged mental conditions because (1) the defendant has failed to give notice pursuant to Rule 12.2(b) of the Federal Rules of

---

[1] Transcript of the Opening Statement by Defense, at 49 (attached as Exhibit 1).
[2] *Id.* at 50.

Criminal Procedure of his intent to introduce evidence relating to a mental condition that bears upon the issue of guilt; (2) only an expert witness can offer an opinion that the defendant suffers from a learning disability, ADHD, or a processing disorder; and (3) the defendant has failed to give notice, pursuant to Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure and the Court's trial order, of an expert witness who would offer the expert's opinion that the defendant suffers from a learning or processing disorder.

## A. The defendant violated Rule 12.2(b) by not giving proper notice

By not giving notice of his intent to elicit opinions from the defendant's family that the defendant suffered from various mental conditions, the defendant violated Rule 12.2(b) of the Federal Rules of Criminal Procedure. Rule 12.2(b) states that:

> If a defendant intends to introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant bearing on either (1) the issue of guilt or (2) the issue of punishment in a capital case, the defendant must—within the time provided for filing a pretrial motion or at any later time the court sets—notify an attorney for the government in writing of this intention and file a copy of the notice with the clerk. The court may, for good cause, allow the defendant to file the notice late, grant the parties additional trial-preparation time, or make other appropriate orders. Fed. R. Crim. P. 12.2 (b).

In a related case dealing with Rule 12.2(a), the Tenth Circuit upheld a District Court's denial of a request to employ an expert (who presumably would testify at trial) because the request was made five days prior to trial and twenty-seven days after the deadline for filing notice of a "mental-defect defense." *United States v. Landers*, 564 F.3d 1217, 1223-4 (10th Cir. 2009).

Because the defendant has never filed notice of his intent to introduce expert evidence regarding his alleged mental conditions, the Court should exclude all such evidence.

**B. An opinion that the defendant suffers from a learning disability, ADHD, or a processing disorder requires an expert witness**

The defendant's mother and sister are not qualified to offer an opinion that the defendant suffers from a mental conditions, including a learning disability, ADHD, or a processing disorder. Federal Rule of Evidence 702 requires that for a witness to take the stand and offer an opinion based upon scientific, technical, or other specialized knowledge, the witness must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702.

There is no indication that the defendant's mother or sister—or anyone else on the defendant's witness list—is qualified to offer an opinion that the defendant suffers from a learning disability, ADHD, or a processing disorder. That type of an opinion requires an expert.

**C. The defendant did not give notice of an expert witness who would offer an opinion as to his alleged mental conditions**

The Court ordered the parties to provide expert notice by April 17, 2019—the defendant gave some notice for other expert witnesses he intended to call. The defendant did not give notice of an expert who would offer an opinion that the defendant suffered from a learning disability, ADHD, or a processing disorder.

In *United States v. Paup*, the Tenth Circuit recently upheld a lower court's decision to exclude the testimony of Paup's expert witness regarding Paup's mental condition because Paup's tardy expert notice was filed ten days after the court-imposed deadline and seventeen days prior to trial. *United States v. Paup*, No. 18-1114, 2019 WL 3756446, at 3 (10th Cir. Aug. 9, 2019). The Tenth Circuit applied the *Wicker* factors—which were enumerated in instances

4

where the government had made a discovery violation—against Paup for failing to give timely

notice of her expert witness. *Id.* at 4. The Wicker factors are:

> 1) the reasons the government delayed producing the requested materials,
> including whether or not the government acted in bad faith when it failed to
> comply with the discovery order; (2) the extent of prejudice to the defendant as a
> result of the government's delay; and (3) the feasibility of curing the prejudice
> with a continuance.

*Id.* (citing *United States v. Wicker*, 848 F.2d 1059, 1061 (10th Cir. 1988)).

The Tenth Circuit explained in *Paup* that the *Wicker* factors did not cabin a court's

discretion but were instead meant to guide a court as it considered sanctions for discovery

violations; the Tenth Circuit explained that suppressing evidence such as the testimony of Paup's

expert might be necessary "to maintain the integrity and schedule of the court even though the

[opposing party] may not be prejudiced." *Id.* at 6.

A continuance, the Tenth Circuit explained, "is almost always 'doable'" but courts have

no obligation to grant continuances, especially in cases with unusual circumstances such Paup's

case, where prior continuances were given for Paup to find and give notice of her expert. *Id.*

In the present case, there does not appear to be any evidence of the defendant acting in

bad faith. However, even if the defendant had an expert witness who was qualified to testify

regarding his alleged mental conditions, there is no feasible way the United States could

adequately (1) prepare to examine that witness, or (2) arrange for a dueling expert to possibly

refute the testimony. To date, the defendant has still not given notice of a qualified expert

witness. Lastly, while continuances are almost always "doable," granting a lengthy continuance

mid-trial for the defendant to find and give notice of a competent expert would provide serious,

undue, unfair prejudice to the United States and would put unreasonable strain on the jury.

Excluding evidence of the defendant's alleged mental condition is the appropriate sanction.

## CONCLUSION

Because the defendant has not met his notice requirements and because the defendant does not have a qualified witness from whom he could elicit expert opinions regarding his alleged mental conditions, the United States urges the Court to preclude the defendant's witnesses from offering an opinion—or by otherwise mentioning—that the defendant suffered from a learning disability, ADHD, a processing disorder, or any other mental condition bearing on the issue of guilt.

The United States further requests that the Court order counsel for the defendant not argue that the defendant had a learning disability, ADHD, a processing disorder, or any other mental condition. The United States also requests that the Court instruct the defendant's witnesses, prior to their testimony and outside the presence of the jury, that they cannot testify to the defendant's alleged mental conditions and that a violation of the Court's order may result in contempt proceedings.

Respectfully submitted this 21st day of August, 2019.

JOHN W. HUBER
United States Attorney

/s/ Michael Gadd
MICHAEL GADD
Special Assistant United States Attorney

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                        DISTRICT OF UTAH

 3                        CENTRAL DIVISION

 4

 5   UNITED STATES OF AMERICA,    )

 6             Plaintiff,         )

 7      vs.                       )   Case No.  2:16-CR-631-DAK

 8   AARON MICHAEL SHAMO,         )

 9             Defendant.         )

10   _____)

11

12           BEFORE THE HONORABLE DALE A. KIMBALL

13           -------------------------------------

14                       August 12, 2019

15                         Jury Trial

16                     Opening Statements

17

18

19

20

21

22

23

24   REPORTED BY: Patti Walker, CSR, RPR, CP    801-364-5440

25   351 South West Temple, #8.431, Salt Lake City, Utah  84101
```

```
 1                    A P P E A R A N C E S

 2

 3

 4   For Plaintiff:              Michael Gadd
                                 Vernon G. Stejskal
 5                               Kent A. Burggraaf
                                 U.S. ATTORNEY'S OFFICE
 6                               111 South Main Street, #1100
                                 Salt Lake City, Utah  84111
 7

 8
     For Defendant:              Gregory G. Skordas
 9                               Kaytlin V. Beckett
                                 SKORDAS & CASTON LLC
10                               560 South 300 East, #225
                                 Salt Lake City, Utah  84111
11

12                               Daryl P. Sam
                                 DARYL P SAM PLLC
13                               5955 S. Redwood Road, #102
                                 Salt Lake City, Utah  84123
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          SALT LAKE CITY, UTAH; MONDAY, AUGUST 12, 2019; 8:30 A.M.

 2                    (Proceedings not transcribed)

 3          THE COURT:  The government may proceed with its

 4   opening statement.

 5          MR. GADD:  Thank you, Your Honor.

 6          Death, drugs, and money, that's why we're here.

 7   That man right there, Mr. Aaron Michael Shamo, founded and

 8   led an organization dedicated to the distribution of drugs.

 9   Mr. Shamo and his employees, they made their own drugs.

10   They pressed together drugs, specifically drugs that were

11   almost identical to Oxycodone.  Oxycodone is a painkiller.

12   But Mr. Shamo's fake Oxycodone contained Fentanyl.  Fentanyl

13   is a powerful synthetic opioid.  Mr. Shamo sold his Fentanyl

14   pills online.  In 2016, he sold hundreds of thousands of

15   Fentanyl pills.  He made millions of dollars.  And

16   Mr. Shamo's Fentanyl killed a man.  That's why we're here.

17          In the short time I have with you this morning, I

18   want to first review the time line of this case.  And then

19   once we've done that, I want to talk to you about the

20   evidence that you're going to hear over the next four weeks

21   as it relates to these other topics you see on the screen.

22   If at any point you don't see something on the screen, if

23   you'll just raise your hand.  That's true now or for any

24   time at trial.

25          In the beginning, Mr. Shamo started selling drugs
```

```
 1   with a roommate, a friend of his, Drew Crandall.  That's who
 2   you see pictured there.  Mr. Crandall was a junior partner,
 3   a one-third partner, meaning Mr. Crandall got one-third of
 4   the profits, Mr. Shamo got two.  And they divided up their
 5   roles.  Mr. Shamo was in charge of listing the drugs for
 6   sale online.  He was in charge of customer service.  He was
 7   in charge of order processing.  He made the decision on what
 8   drugs they were going to sell and acquiring those drugs so
 9   that they could sell them.  And, lastly, Mr. Shamo accepted
10   payment for the drugs.
11           The payment for drugs bought online comes in the
12   form of cryptocurrency, and you're going to hear about one
13   particularly in this case.  That's Bitcoin.
14           His partner, his friend, Drew Crandall, was in
15   charge of packaging the drugs and then shipping those drugs,
16   once they had a customer who made a purchase.  And then
17   towards the end of his hands-on involvement, Mr. Crandall
18   worked with Mr. Shamo to develop a process and a recipe for
19   pressing pills.  Specifically they made counterfeit Xanax
20   that looked almost identical to the ones you see pictured
21   there.
22           But in 2015, Mr. Crandall got spooked.  Two things
23   happened.  The first is his girlfriend lost her job because
24   of her association with Mr. Shamo and Mr. Crandall.  And
25   then, second, Mr. Shamo ordered some drugs delivered to
```

1    their address in the name of a roommate.  Those drugs got

2    caught in the mail.  The roommate was questioned by law

3    enforcement.  And that was enough for Mr. Crandall and he

4    said I'm out.  So he made plans with his girlfriend to leave

5    the United States.

6           Mr. Shamo agreed to buy him out.  They negotiated

7    a price.  Settled on 30,000.  And then over the next months,

8    Mr. Shamo worked to find replacements for his one-time

9    partner.  Together, they hired and trained these two women,

10   Alex Tonge and Katie Bustin, to take over packaging the

11   drugs and then shipping the drugs.

12          Later, in November of 2015, shortly before

13   Mr. Crandall was going to fly overseas, Mr. Shamo hired his

14   very close friend, Luke Paz, to take over pressing the

15   pills.

16          In that same month, November 2015, Mr. Shamo went

17   to a new website where you can buy drugs online.  The

18   website is called AlphaBay.  Mr. Shamo created an account on

19   AlphaBay so that he could be a seller.  He named his

20   account, his storefront Pharma-Master.  Much of the evidence

21   you're going to hear over the next four weeks will come from

22   Mr. Shamo's drug sales as Pharma-Master.

23          Working together, Mr. Shamo, and his new employee,

24   Mr. Paz, developed a process and a recipe to create those

25   fake Oxycodone pills I mentioned, the ones that contained

```
 1    Fentanyl.  They're fakes.  Looked almost identical to the
 2    real thing, like you see pictured here.  Mr. Shamo sold
 3    those Fentanyl pills on AlphaBay.
 4            AlphaBay kept records.  So agents and analysts
 5    went back, captured as much of the records as they could,
 6    and then they put it in a table here for you.  What you're
 7    looking at, if you look on the left column, that's the date.
 8    So this first page you're looking at here, this is his sales
 9    in January 2016.  The next column over, you can see a first
10    and last initial for the user name of the purchaser.  Then
11    you can see what price they paid.  Each row, of course, is
12    its own sale.  Then there's a column for dose.  That was as
13    it was supplied online by Mr. Shamo.  The quantity of pills
14    that they purchased.  Lastly, under the column that says
15    sold as, this was the name Mr. Shamo gave the drugs that he
16    was selling.  So as you look down that far right column, you
17    can see in January of 2016, most of Mr. Shamo's drug sales
18    were his counterfeit Xanax.
19            By the end, in November of 2016, if you look in
20    that same right column, most of his drug sales were his
21    Fentanyl pills, and he had three different names under which
22    he would sell his Fentanyl pills.  So if you're in the far
23    right column and you look down at the bottom, second one up,
24    you can see there it says Fentanyl, Roxy-Oxycodone.  So
25    sometimes right in the listing he would tell his would-be
```

```
 1   customers that his product contained Fentanyl.  And then
 2   that next word, Roxy, that's a street name for a particular
 3   type of Oxycodone.
 4          Other times he would list his drugs, but he
 5   wouldn't include Fentanyl in the title.  So if you look one
 6   row up, you can see it says Roxy-Oxycodone.
 7          Then the third way he would list his Fentanyl
 8   pills, if you go up six, seven rows, you see M Box 30.
 9   That's another street name for a type of Oxycodone pill, and
10   it gets its name for how the pill is stamped when it's
11   pressed together by the pharmaceutical company.  He sold
12   this Fentanyl in those three ways.
13          As he and Mr. Paz worked on their process and
14   their recipe and perfected their fakes, his sales
15   skyrocketed.  By the end, you can notice in the quantity
16   column, he's no longer selling one, ten, 100 pills
17   exclusively.  He has large orders.  You can see in the
18   middle of the page there, there's a single order for 10,000
19   pills.  The row right above that, that's the same purchaser.
20   That purchaser on one day purchased 12,000 of the M Box 30s,
21   Mr. Shamo's Fentanyl pills.
22          Mr. Shamo, of course, couldn't do this alone.  He
23   had the help that I've mentioned before.  He had these folks
24   working for him.  But in the spring of 2016, he hired
25   additional help.  He hired this man, a close friend, someone
```

```
 1   he could trust, Mario Noble, a former coworker of his, and
 2   he hired Mr. Noble to do online customer support, and then
 3   to also help with order processing when Mr. Shamo was away.
 4            Mr. Shamo solicited his old friend, Drew Crandall,
 5   who was living overseas, and brought him on board in the
 6   summer of 2016 to also help with customer support as their
 7   sales continued to take off.
 8            In the summer, two women, Ms. Tonge and
 9   Ms. Bustin, they started to get burned out.  They would have
10   to not only package the pills but put the postage label on,
11   address the packages, and then they were taking it to blue
12   collection boxes, the post office boxes that they put around
13   the community.  So Mr. Shamo hired this man, another trusted
14   associate of his, Sean Gygi, to take over that last part of
15   Ms. Tonge's and Ms. Bustin's role.
16            So most nights of the week, Mr. Gygi would show up
17   at a doorstep in Daybreak, and he would pick up packages and
18   envelopes, and then take those himself to the blue
19   collection boxes and drop them off.
20            You're going to hear from the people that you see
21   pictured there, starting with Mr. Paz, and then the bottom
22   row.  Mr. Shamo's organization was bigger even than this.
23            We've talked about most of the people in the
24   middle row here.  Let's take just a minute and talk about
25   the two people on the left.  So you see Gabby Noriega on the
```

```
 1    far left.  Mr. Shamo hired her to be the functional
 2    equivalent of his executive assistant.  She would run
 3    errands, pick up groceries, grab Cafe Rio.  But she was also
 4    asked to do things like buy postage, $6,000 worth of postage
 5    at a time, so that you could make sure that Ms. Tonge and
 6    Ms. Bustin always had enough postage to keep the process
 7    running.
 8             Next to her, Mr. Kenny, Chris Kenny.  Mr. Shamo,
 9    most of his customers were online, but he did have a local
10    customer, Mr. Kenny, and it was through Mr. Kenny that he
11    got feedback early on about his fake pills.  So Mr. Kenny
12    would, for example, tell him how the pills worked in
13    relation to a legitimate Oxycodone pill.
14             Then on the bottom row, far left, Miles Penrose.
15    Early on, Mr. Shamo and Mr. Crandall, they were cash poor,
16    and their friend Miles Penrose, who at the time owned part
17    of a used truck dealership, he invested $10,000 in their
18    drug distribution activities.  Over a period of months, they
19    paid him back $30,000.  Mr. Penrose will also come up in
20    this trial because he helped them launder some of their drug
21    money, including selling Mr. Shamo his truck.
22             Then bottom row, far right, with the dyed red hair
23    is Alex Tebbs.  She had a role very similar to Ms. Noriega,
24    but for a shorter period of time.  She would buy stamps for
25    Mr. Shamo at his request, and then get reimbursed.  Then she
```

```
 1    also helped him in a failed attempt to try to buy a T-shirt
 2    business.  He was looking for a legitimate business through
 3    which he could launder his drug money.
 4           The rest of the people you see on the bottom row,
 5    they were all package receivers.  I mentioned he had the one
 6    package that came to his roommate that got caught.  There
 7    was risk for Mr. Shamo any time he tried to import drugs
 8    from overseas, and specifically Fentanyl from China.  So
 9    Mr. Shamo hired everyone else on the bottom row to receive
10    packages on his behalf.  And for two or $300 per package,
11    with no questions asked, they would turn it over to
12    Mr. Shamo so that he could import the ingredients he needed
13    to press his pills.
14           By the fall of 2016, Mr. Shamo, who was helped at
15    times by Mr. Paz, spent a fair amount of his effort
16    converting his drug money, his Bitcoin, into cash, into
17    dollars.  Most of those transactions were relatively small,
18    but they found some Bitcoin buyers out of California who
19    were willing to do larger transactions.  The largest single
20    transaction they engaged in, one transaction was for
21    $400,000.
22           By November of 2016, Mr. Shamo's days would have
23    been largely consumed with pressing pills with Luke Paz,
24    converting Bitcoin to cash with Paz and others, order
25    processing, and customer service.  Even though he had hired
```

1  Mr. Noble and Mr. Crandall, he still had a hand in it.

2  Whenever they would run into a problem, they would flag the

3  issue for him and he made final decisions.  He had to make

4  sure that Ms. Tonge and Ms. Bustin stayed fully supplied

5  both on postage and on drugs so that they could keep the

6  process running.

7       I mentioned there was some risk in importing

8  Fentanyl from China, and that's eventually how Mr. Shamo was

9  caught.  It was this package right here that led to his

10  arrest.  Looking in now, you can see that that package is

11  addressed to Ryan Jensen in Midvale.  Ryan Jensen is one of

12  those package receivers.  You can see there it comes from

13  China.  This package came through the international mail

14  facility in Long Beach.  So that's where it hit sovereign

15  soil here.

16       The Customs and Border Protection watches packages

17  as they come in, and some of the officers from Customs and

18  Border Protection checked this package.  They opened it up.

19  They found a Mylar bag.  Inside that Mylar bag, a plastic

20  bag, and inside of that, white powder.  That powder was

21  tested by a scientist at the DEA laboratory and they

22  confirmed that it was Fentanyl.

23       The agents built up a case and an investigation

24  against Jensen, the man whose name was on the package.  And

25  by November 1st of 2016, they had enough in their

1  investigation that they were able to apply for and then

2  receive a search warrant.  They executed the search warrant

3  at his house.  They interviewed Mr. Jensen, and he

4  confessed.  He told them that he was accepting packages on

5  Mr. Shamo's behalf.  Mr. Shamo was a friend of his.

6  Mr. Shamo would pay him two, $300 for every package he

7  received.  And Mr. Jensen told the investigators about other

8  people that he suspected were doing the same thing.

9        One of those people was Sean Gygi.  About a week

10  later, at this point, agents, postal inspectors, all working

11  together, they were watching the mail closely for any

12  packages from China coming to Mr. Shamo's associates, and

13  they caught this one that you see there, addressed to

14  Mr. Gygi.  With a search warrant, they opened it up.  They

15  looked inside.  They saw this inner packaging, kind of the

16  cartoon character packaging, and then inside of that powder.

17  That was tested.  It's Alprazolam.  That's the

18  pharmaceutical ingredient in the counterfeit Xanax pills.

19        At the same time period, they caught one

20  additional package going to Mr. Gygi.  Inside of it, the

21  same packaging, the cartoon character.  This one had a

22  slightly different powder in it.  Tested, and it was

23  Fentanyl.

24        With that, agents had enough to apply for and

25  receive a search warrant for Mr. Gygi's residence.  They

1    executed the warrant, and then they interviewed him.  He was

2    hesitant at first.  There was a moment in the interview

3    where the agents told him that he had been accepting

4    packages that contained Fentanyl, and the agents watched as

5    his countenance changed.

6          When the interview was over, they let him go.  He

7    went home that night and thought long and hard.  And the

8    next morning he called up the agents and said we need to

9    talk.  He told them that not only was he accepting packages

10   from Mr. Shamo but, earlier that year, he had been hired to

11   do more.  He had been hired as a runner.  He told the agents

12   about this porch in Daybreak where he would go most nights

13   of the week and pick up boxes, and then take those boxes and

14   put them into the mail.

15         He agreed to do two things.  First, he agreed to

16   have a conversation with Mr. Shamo and record the

17   conversation and talk about -- Mr. Shamo paid him during the

18   conversation, he got paid every two weeks $2,000 -- and then

19   to talk about their future plans.  You're going to hear that

20   recording during the trial.  And then, second, he agreed to

21   take the agents with him that night to pick up packages off

22   that doorstep in Daybreak, the doorstep of Ms. Tonge and

23   Ms. Bustin.

24         So they went out that night.  He had missed the

25   night before.  And so when he got the packages and then

 1   turned them over to the agents, there were 79 packages and

 2   envelopes, total.  Here they are spread out, which you can

 3   see there is the largest boxes in the back, and the medium

 4   size boxes in the middle, and then priority mail envelopes

 5   in the front.

 6        Here's looking inside one of the boxes.  When the

 7   agents opened the boxes, they found Mylar bags and then an

 8   invoice.  You can see that at the bottom of your screen.

 9   It's for Jamaica green coffee.  It's meant to be coffee

10   beans.  Inside of the Mylar bags, plastic bags.  And then

11   the plastic bags contained pills that were confirmed

12   Fentanyl.  This one box is just shy of 20,000 pills.  You

13   can see that in the second red box there.

14        Here's looking at a couple more seized that night.

15   More pills.  You can see the addresses that these are being

16   shipped to.  This going to New York, New York.

17        Mr. Gygi took the agents out two nights later for

18   another pickup, this time just over 40 packages and parcels.

19   Here's one of the large boxes they got that night.  This was

20   tested.  It has Fentanyl.  You can see that in the red box.

21   This other drug you see in the red box with the parentheses

22   ANPP at the end, this is a Fentanyl precursor.  So this

23   Fentanyl is created in a chemistry lab in China and then

24   shipped over here.  The precursor wasn't fully synthesized,

25   and the DEA tests are sensitive enough that they were able

```
 1   to pick it up in addition to the Fentanyl that Mr. Shamo was
 2   putting inside of his pills.
 3           Here's more from that second night with Mr. Gygi's
 4   help.  Not all the packages were large.  Here's a priority
 5   mail envelope.
 6           By November 22nd, the agents had enough that they
 7   applied for and received a search warrant to search
 8   Ms. Tonge's and Ms. Bustin's residence in Daybreak.  When
 9   they got inside, this is what they found.  Pills all over
10   the floor.  Packaging material.  You can see the name there,
11   Uline.  Uline is a company that sells packaging material,
12   including Mylar bags.  Postage, padded envelopes, priority
13   mailboxes you can see in the pile there.  A digital scale.
14   A large stock of drugs.  There's a plastic tote there full
15   of drugs.  On top of that, more bags of the Fentanyl pills.
16   Pills on the bed.  Here's their vacuum.  The pills would
17   spill on the floor.  They'd just vacuum them up.
18           The drugs were taken from the residence, taken to
19   the DEA where they were photographed, tagged, bagged, and
20   then sent to the lab.  Those drugs, what you're seeing in
21   the picture, that's what's here in front of us.  These
22   totes, specifically the sealed totes -- you can see, for
23   example, this one is taped around it.  The sealed ones
24   contain his Fentanyl pills, the unsealed ones, everything
25   else.
```

1          This is the largest single exhibit, the largest
2     one place where pills were gathered during this
3     investigation.  It's this one right here.  That one exhibit,
4     that one has more than 74,000 pills in it.

5          At the same time the agents were executing that
6     warrant, another group of agents executed a warrant on
7     Mr. Shamo's residence.  He lived on Titian Way in Cottonwood
8     Heights.  Because of the strong suspicion that he was
9     pressing Fentanyl, powdered Fentanyl inside of his home, the
10    warrant had to be executed by agents wearing HAZMAT gear.
11    Many agencies and local police departments were involved.
12    For example, you get the DEA and their HAZMAT team.  They
13    were also supported by Homeland Security Investigations,
14    Postal Inspection Service, Food and Drug Administration, the
15    IRS as a criminal investigative team.  They were helping
16    with the financial side of the investigation.  The fire
17    department was on hand to help decontaminate, and then for
18    rescues, if needed.  The National Guard has a HAZMAT team
19    that came out to help, and it took all the help.  Here they
20    are getting ready.

21         When they got inside, they found an old, single
22    punch pill press, in a wood cabinet, not being used.  They
23    found a brand new industrial size pill press in a crate in
24    the garage, which hadn't been used.  They found boxes, and
25    inside the boxes that same cartoon character packaging, and

1    then bags of powders.  They found boxes and boxes of this

2    formula 5,000.  This is the ingredients going into the

3    pills.  You can see there most of it, that top line, is

4    microcrystalline cellulose.  But it also has some other

5    ingredients.  There were kilograms of it in these boxes in a

6    closet.

7          Let me orient you on this picture.  So you're

8    looking down at HAZMAT boots, and then this is a crate using

9    the stainless steel pry bar behind the lid of the crate.

10   They popped open the lid.  The crate looks like it has

11   bricks inside, but that box is on its end.  They pulled one

12   out, took the lid off and set it down so you could see what

13   was inside the box.  The cylinders in that box, those are

14   punches that go into the press.  So the punches come

15   together.  And then there's a metal plate called a die in

16   the middle that's holding the powder.  The punches come

17   together with force and it presses together the pill.

18         The tip of the punch is embossed so that when it

19   presses together, it leaves an imprint on the pill.  Those

20   are here, and you'll get to see them.

21         Here's more, the punches on this shelf.  These

22   punches would wear out over time, which is why he was buying

23   more and more of them.

24         In the basement they found a room that was

25   lockable and it had a pill press running.  If you look at

1    the wall, you can see the powder on the wall.  Then closer

2    up, you can see powder spilling out onto the shelf of the

3    pill press.

4          Now looking around the room, you can see mason

5    jars and lids on that back table.  Mr. Shamo and whomever

6    was helping him press, either Mr. Crandall before and then

7    Mr. Paz who he hired after, they would shake up the

8    ingredients in those mason jars.  That's how they'd mix

9    their ingredients before putting them into the press.

10         You can see dies, colors, bags of pills on the

11   shelves.  Zooming in here, you can see the white bottle with

12   the red that says relaX.  It's a lubricant for machine

13   parts.  The presses' moving parts had to be lubricated.

14   Every time they replaced one of the punches, they would have

15   to lubricate that before it went back in.  More ingredients.

16         They took some precautions.  When Mr. Shamo was --

17   when the agents made entry into his home as part of the

18   search warrant, he was downstairs.  They called him up, and

19   then passed him out so he could be decontaminated and then

20   taken into custody.  He had gloves and his mask on him when

21   he came up.

22         Here's the other side of the room.  That's the

23   Fentanyl press.  Looking closer, the powder, the

24   ingredients, the binding agents, the colors, the Fentanyl,

25   once it's all mixed up, it would go into this hopper on top,

```
 1   and then go down through the funnel into kind of like the
 2   bowl in the middle.  Then powder is moved around that bowl
 3   and the punches work.  It's a rotary press, so there's lots
 4   of punches and it's running around like this.  Every time a
 5   pill is punched and pressed together, it goes down the chute
 6   you can see coming down the bottom of the photo, and then
 7   into a net at the very bottom of the photo.
 8          Much of what was in this room was contaminated.
 9   It was destroyed.  It's hazardous.  But the agents took
10   samples.  And then they also pulled out the punches so that
11   the punch and the punched tip could be tested by the lab.
12   The punches that came out of this press, the lab, they did a
13   residue test on and it was confirmed Fentanyl.
14          The agents didn't stop their search there.  They
15   continued to look in places they normally look during
16   searches, including in his dresser.  In his top drawer, they
17   didn't find clothes.  In his bottom drawer, he had cash.
18   Here's one of those stacks, for example.  Cash in drawers
19   like this one.  He had a safe full of cash.  $1.2 million in
20   cash pulled out of his home.
21          They also seized electronic devices, and much of
22   the evidence you're going to hear over the next four weeks
23   comes from Mr. Shamo's electronics, specifically an iMac
24   computer, that one, and then two of his cell phones.  He had
25   an iPhone 6S and then an iPhone 7.
```

1    The agents worked late into the night processing

2    Mr. Shamo's house.  I mentioned that they took samples of

3    the powders before things were destroyed.  That's what you

4    see going on here.  Anytime there was evidence that could be

5    removed from the home, it would have to be picked up by

6    someone in their full gear, including their self-contained

7    breathing apparatus, brought outside for decontamination.

8    And then everything coming out of the house came to this

9    table that you see here where agents and supervisors checked

10   it in and then put them in the larger evidence bags.

11   Here's money, for example, coming out the house.

12   Agents worked late at this search warrant, but

13   they also worked late based on investigation they learned

14   from Ms. Tonge and Ms. Bustin.  So at Ms. Tonge's and

15   Ms. Bustin's search warrant, as a part of that they

16   interviewed both Ms. Tonge and Ms. Bustin, and they too

17   confessed.  They told the agents that they were packaging

18   and shipping these pills for Mr. Shamo; that Mr. Shamo was

19   their boss; that he had been paying them to do it.  And they

20   told the agents that they suspected an old coworker of

21   theirs might also be involved, Mario Noble.

22   So a couple agents went to where Mr. Noble worked,

23   and they asked at the front desk for Mr. Noble so they could

24   ask him some questions.  The front desk told Mr. Noble that

25   there were some special agents there to see him.  So as he

walked up, he erased Telegram, a communication app that he
had used with Mr. Shamo.  He erased it off his phone.

Once he sat down with the agents, he also
confessed.  And later that night, he took two of the
agents -- sat down with them, and took them online,
specifically onto AlphaBay.  And because Mr. Noble had been
doing customer service, he had shared access to some of the
Pharma-Master pages, and he was able to take them on, show
them what he had been working on, and allow them to take
screen shots that night so they wouldn't lose some of the
evidence.

Ms. Tonge and Ms. Bustin, in their interviews,
also told the agents one thing that gave them alarm.  They
said that the prior night, because Mr. Gygi was gone, they
took packages to blue collection boxes.  So a postal
inspector raced out.  Ms. Tonge and Ms. Bustin, they had
described the packages.  They would never put their return
address on it.  They would always pick one randomly off a
map, and then they would make up a name for the return
address line.  This time the name were all the same.  So
they told the agents what name to look for.  They told them
there would be 20 packages, and the postal inspector was
able to gather up all 20 before they got dispersed through
the mail stream.

Here's a couple of those last 20.  A box here,

1    Fentanyl pills.  These like all the others, Fentanyl.

2            Shortly after Mr. Shamo's arrest, his friend, Drew

3    Crandall, living overseas, notified AlphaBay, said

4    Pharma-Master has been compromised, it needs to be shut

5    down.

6            In January of 2017, the agents, working with now

7    the cooperating co-conspirators and building their own

8    investigation, had enough information to apply for and

9    receive three search warrants to search places where Mr. Paz

10   was known to sometimes reside.  That process of searching

11   his residences began discussions between Mr. Paz and his

12   attorney and these agents.  During that process, Mr. Paz

13   turned over his drug money, in total, just under $800,000.

14   He was getting paid a percentage for every pill that he

15   pressed.

16           In March of 2017, Mr. Shamo's parents turned over

17   money he had left with his family, in total, just shy of an

18   additional $430,000.

19           Let's take a minute now and let's talk about

20   Darknet markets.  You're going to hear specifically from a

21   special agent who, because of his training and experience,

22   is able to offer opinions that you can consider, and he's

23   going to talk about Darknet markets in some detail.  I want

24   to give you just the briefest overview of the evidence

25   you're going to hear.

1    Darknet markets, that name, those were the

2 websites where Mr. Shamo was selling his drugs.  The

3 Darknet, it's a corner of the Internet.  You need a special

4 browser, an Internet browser to get on there.  And then you

5 also need a user name and password to enter the markets.

6 This one that you see pictured here, this is the first sort

7 of commonly known Darknet markets, Silk Road.  And Darknet

8 markets have some characteristics in common.

9    So, for example, you can see the categories on the

10 left of the items that are for sale.  In the middle, that's

11 going to be the featured product descriptions, so you can

12 click on one of those and then make a purchase.  And then

13 lastly, user information on top.

14    When drugs were purchased on the Darknet, they

15 were purchased with cryptocurrency.  The cryptocurrency

16 you're going to hear about in this case is Bitcoin.

17    This is AlphaBay, the market where Mr. Shamo was

18 selling drugs in 2016.  You can see there the URL, the

19 address.  It says AlphaBay.  Then there's some nonsense

20 letters followed by dot onion.  When you think about the

21 websites that you're going to on the Surface Web, you go to

22 places that are dot com, or dot org, or maybe dot gov.  If

23 you want to go to a Darknet market, you're flicking for dot

24 onion websites and you need a specific browser to get there.

25    Then on the left, these are the items for sale.

1   This screen shot is showing counterfeit items.  The next one
2   here, these are drug items for sale.
3          AlphaBay made money on every transaction on its
4   site.  It took a cut.  AlphaBay had the incentive to try to
5   increase the amount of transactions.  But on the Darknet,
6   anonymity is key, and buyers feel hesitancy to buy online,
7   to send their Bitcoins to a vendor who's anonymous for fear
8   they won't get their product back.  So AlphaBay took some
9   steps to try to alleviate some of the concern a potential
10  buyer might have, and most of it had to do with feedback.
11  In addition to feedback, AlphaBay worked as an escrow
12  service.  But for now, let's talk just about the feedback.
13         So a potential buyer could go on to AlphaBay and
14  look at a seller.  They could see that -- for example, this
15  seller, on the number one there, had 94 percent positive
16  feedback over the last 12 months.
17         Then if you're looking at the second arrow, number
18  two, not only could you see the percent positive over the
19  last 12 months, but they would break it down by one month,
20  six months, 12 months so you could look for trends.
21         Customers would rate sellers based on their -- now
22  if you're looking at number three -- their stealth, and what
23  they mean by stealth is how expertly a seller packages and
24  ships drugs to avoid law enforcement detection.  Customers
25  would also rate sellers based on the quality and the value.

1          And then lastly, number four, customers were

2     allowed to leave comments, feedback.  So you can see the top

3     row of feedback here at the bottom, that customer wrote

4     perfect.  But it's not 2016.  It's 2013.

5          Then if you look underneath that, that tells you

6     what product they're referring to.  It's Microsoft Office.

7     You can see the price there in dollars.  So they pay in

8     Bitcoin, but AlphaBay would display it in dollars.  Six and

9     a half dollars for Microsoft Office, and the date and time

10    of the purchase.

11         Even if a customer didn't want to type in

12    comments, AlphaBay would still generate a row for every

13    transaction.  So if you look at the bottom two rows, those

14    customers left no comment, but AlphaBay generates a row.  So

15    A potential buyer can see a seller's individual sales, how

16    much they're selling, what people are paying, the date on

17    which they're making sales.  That same date, it was there

18    for Pharma-Master, and that's how the agents created this

19    chart that shows his sales for 2016 that you saw earlier.

20         This specifically is one of the 366 pages of

21    feedback that the agents were able to capture for

22    Mr. Shamo's drug sales.  So let's look at just a few of the

23    comments his customers left.

24         I heart you.  I really do.  Absolute perfection

25    again.  Very discreet shipping.  No worry there.  Product

1   looks great.  Some think they feel stronger than a regular
2   30.  That's good, though.  Just be careful if you don't have
3   a tolerance.  Thanks.  Be back soon.  Take care.  Enjoy
4   life.  That customer, you can see below, they bought 100 of
5   his Fentanyl pills, specifically the ones that he labeled
6   M Box 30s.
7           Here's another.  There is no one better to do
8   business with.  I have done thousands, and this fact is
9   indisputable.  Thank you, Pharma-Master.  This person bought
10  another hundred of his Fentanyl pills.  Fantastic service.
11  I'll be back.  This person bought ten pills.
12          Agents and analysts took this feedback and the
13  sales data, they added it all up, and from the feedback we
14  were able to capture, Mr. Shamo sold $2.8 million worth of
15  drugs in 2016, more than 800,000 pills and more than 5500
16  transactions.
17          Let's focus now just for a moment on his Fentanyl
18  pills.  Just the Fentanyl sales.  Almost 3500 transactions,
19  more than 450,000 Fentanyl pills, and he made $2.4 million.
20          I mentioned he had the three ways of listing his
21  Fentanyl pills.  So this breaks down by how he would
22  describe them.  When he labeled it an M Box or an M Box 30,
23  he had 871 orders, but those were larger orders.  So you
24  look at the total quantity, 210,000 pills, and just from his
25  M Boxes, he made a million dollars.

1      When he labeled it as a Roxy -- and you can see

2  what a Roxy looks like.  It's that A215.  That's the other

3  name you'll hear it described as.  When he labeled it as

4  just a Roxy, more orders, 2200, but smaller orders.  So the

5  total quantity, 242,000 pills, and he made 1.4 million just

6  off of Roxys.

7      Lastly, when he would put in his listing right in

8  the title that his pills contained Fentanyl, 376 orders,

9  just over 5,000 pills, just under $50,000.

10      Let's talk about the evidence you're going to hear

11  with respect to Mr. Shamo's oversight.  Mr. Shamo maintained

12  oversight even as he hired employees, including on ordering

13  ingredients and parts.  So here he's corresponding with his

14  executive assistant, Ms. Gabby Noriega.  He said, hey, did

15  you order the stearic acid from the link I sent you?  I

16  needed it specifically from Pyro Chem Labs because they

17  don't triple press stearic acid.  He gives her the link.

18  This is the link I sent.  Did you order it from this, Pyro

19  Chem Labs?  Then she clarifies, on to the next page, yeah,

20  I'll get you the address in a sec, but this is urgent for

21  the stearic acid.  I'm on a very large time crunch.  Gabby.

22  And then she indicates that she's made the purchase.

23      A little later in time he tells her, we need

24  cornstarch, lactose -- he needs another bucket of lactose,

25  and more stearic acid ASAP.  Get ordering.  Also half bag

1   Ziploc bags.  The snack size ones.  Then she's catching up.

2   Okay.  Some stearic acid should be coming like any day now.

3   I ordered some not that long ago, I thought.  How much more

4   cornstarch do you want?  Then he clarifies.  Focus on

5   lactose first.  Order like 30 to 50 pounds.  Then more

6   stearic acid.  We should be okay on cornstarch for a little

7   bit.

8           He asks her a little later did you order the

9   filler from tabletpress.com?  It's a Canadian company where

10  he's buying that microcrystalline cellulose.  And then he

11  says, to TJ Edwards.  TJ Edwards is one of his package

12  receivers, this man right here.  Then he says, also when's

13  your payday?  And then to those two questions, Ms. Noriega

14  responds not yet just because you said you would check to

15  make sure that was right and I didn't hear back from you.

16  And then when's payday?  It was Sunday.  Okay.  You've got

17  to remind me of these things, LOL.  This month's been crazy.

18          Mr. Shamo was also in charge in ordering parts,

19  specifically the dies and the punches.  So he got an e-mail

20  from a Chinese manufacturer.  They indicated they got his

21  e-mail at the Aliexpress store, and asked if he was

22  interested in good A215 or good Xanax replica dies.  And

23  when they say dies, they mean not just the dies but the

24  punches.  He responds, sounds good.  I would like both made.

25  And then asks do you accept Bitcoin as payment?  I'd like

1    you to get started immediately.  And then he clarifies the

2    type of press that he's using.  They tell him that they

3    cannot accept Bitcoin.  They only accept Western Union and

4    wire transfers.  Then they confirm, do you want to order the

5    A215 and the Xanax replica dies?  Then they talk about the

6    specifications for his press.  They work it out.  He

7    indicates that the MoneyGram will be coming in his name, but

8    the dies, the punches, they need to be sent to Julian

9    Mausia, this man right here, another one of his package

10   receivers.

11          There was evidence found in Mr. Shamo's devices

12   about payments he made to China.  This is $2100.  That's for

13   Fentanyl.  This is a money gram, $1400, going to China.

14   Then $1100 also going to China.  Mr. Shamo maintained

15   oversight on quality control, how much Fentanyl.  And how

16   did Mr. Shamo figure out how much Fentanyl to put inside his

17   pills?  Research.  This was found on his computer.

18   Something he found online.  You can see there it's a

19   comparison.  It compares, among other things, Oxycodone and

20   Fentanyl.

21          I mentioned that he was getting feedback from this

22   local dealer.  Mr. Shamo had a note in one of his phones.

23   The date on it is February of 2016, so right when he's in

24   the process of creating and perfecting fake Fentanyl pills,

25   and at the bottom of that note, this is what he wrote -- or

```
 1    copied.  Okay.  So these are the best so far.  They smoke

 2    perfect and they snort and slide.  Slide means how it is

 3    traced along aluminum foil as they smoke it, heat it up from

 4    the bottom.  The color being speckled won't fly so that

 5    needs to be fixed, but you already knew that.  My boy smoked

 6    two in a row and barely got high.  So a bit stronger is

 7    going to be a must, bro.  But all in all these are f'g close

 8    to being money in the bank, man.  You did it, bro.

 9           Mr. Shamo's oversight over quality control

10    continued.  This is February of 2016.  Even by the end,

11    November of 2016, they are still having issues with quality

12    control.  Here's customer service, Mario Noble.  He says to

13    Mr. Shamo, his boss, you hearing complaints on the recent

14    batch?  Mr. Shamo:  No.  Batch of what?  I haven't read

15    messages all week.  Noble:  Got a couple of complaints about

16    the M Box 30s it looks like.  So Mr. Shamo says sticky them.

17    That means flag it for me so it won't go down in the chute.

18    I'll look at it tomorrow -- or I'll look at them tomorrow.

19           Then a little later in November, the other

20    customer service agent at this point, Drew Crandall, tells

21    Mr. Shamo, getting complaints about the last batch of

22    M Boxes from before vacation.  Are making people sick.  Only

23    halfway through messages and I already have four people

24    saying stuff about it.  Then he asked his boss, should I

25    just tell them to suck it up or should we reship 50 percent?
```

1    Mr. Shamo in response, partway through that first line,
2    yeah, let's do a 50 percent reship for those guys.  Just
3    give a pill count for reships that go out so I can keep
4    track.
5          Then he changes subjects.  He says, also Sean is
6    my runner for mail.  So he's just revealed a member of his
7    organization to another member.  I haven't heard a response
8    from him since yesterday.  And the Sean he's referring to is
9    Mr. Gygi.  If you still talk to him -- because Mr. Gygi and
10   Mr. Crandall knew each other from before -- can you reach
11   out and see if he's okay.  You look at the date on that
12   message, November 18th.  The day prior was the date Mr. Gygi
13   met the agents.  But the night of the 17th is when Mr. Gygi
14   was thinking long and hard about what he should do.  The
15   morning of the 18th is when he agreed to cooperate.  And the
16   night of the 18th was the first night he took the agents
17   along to collect the pills.
18         Mr. Shamo kept oversight over customer service and
19   order processing, even though he had people helping him.  He
20   had to train them.  So, for example, Mario Noble asked, yo.
21   Roxy just means replica Oxycodone, right?  Mr. Shamo:  Mine
22   does, yeah.  I only sell replica.  Yeah.  But Roxys are an
23   official drug, right?  The R just means it's a replica?  No.
24   Roxy is a real drug made from real Oxycodone.  Mine are made
25   with a substitute.  His substitute was Fentanyl.  Mr. Noble:

1  Oh, okay.

2       I mentioned that agents seized his electronic

3  devices, including the iMac.  From the iMac, agents were

4  able to find 1984 pages of orders.  So whomever was doing

5  order processing, usually Mr. Shamo, sometimes Mr. Noble,

6  they would take the orders that came in online and then they

7  would create this document.  It's a text file.  You see the

8  dotted dashed lines there?  Each block there is an

9  individual sale.  So they would copy in the top four rows

10  from AlphaBay.  And then a buyer, when they made a purchase,

11  they would have to submit that name and address to which

12  they wanted their pills sent.

13       The order processor, Mr. Shamo usually, but

14  Mr. Noble when he was helping, would copy that information

15  from the buyer, put it in the text file, and this document,

16  the daily order sheet, was encrypted and sent to Ms. Tonge

17  and Ms. Bustin, and they would work right off this document

18  to package the pills.  So they knew what a buyer wanted, how

19  much they wanted, what address they wanted it sent to, and

20  then those pills would go out in the mail.  From these 1984

21  pages that were taken from Mr. Shamo's computer, the agents

22  were able to plot by ZIP code everywhere he sent drugs in

23  2016.  Every dot on that map is a ZIP code to which

24  Mr. Shamo and his employees sent drugs.

25       Let's talk about money.  I mentioned that

1   Mr. Shamo spent a fair amount of effort converting his
2   Bitcoin, his drug money, into cash that he could spend and
3   use.  Here's one of many examples you're going to see
4   through the trial.  So at the top, that's Mr. Shamo in the
5   blue.  He says, hey, it's airshamo4 from localbitcoins.
6   Airshamo4 is his user name.  Localbitcoins is a website that
7   brings together people who want to buy and people who want
8   to sell Bitcoin.  Mr. Shamo says, I'm finally feeling above
9   water.  Can you meet around 5:30?  His potential buyer says,
10  yeah, I can do that.  Give me an address.  Mr. Shamo,
11  Starbucks, Cottonwood Heights.  Buyer says that sounds fine.
12  I'll be there.  They both get caught in traffic.

13          Now moving to the next page, the buyer arrives and
14  then Mr. Shamo arrives.  He says, sorry, traffic got me too.
15  Buyer says, all good.  I'm on to the couch.  Mr. Shamo:
16  Thanks.  I'm getting off the freeway now.  See you in a
17  second.  That next message, the one that starts 1HBE2Q,
18  that's the buyer sending Mr. Shamo the wallet address he
19  wants Mr. Shamo to send Bitcoins to.

20          And all apparently goes well because eight days
21  later, the buyer reaches out to him again and says, hey, do
22  you have any more coins to sell.  He's looking to buy around
23  5,000.  Mr. Shamo says, I'm getting my car fixed.  If not
24  tonight, tomorrow.  Then the buyer says, okay.  Just let me
25  know when you find out.  How much do you have available you

1  could sell?  Mr. Shamo writes, 15k.  I'll have more next
2  week.

3         All of Mr. Shamo's efforts to cash out Bitcoin
4  resulted in $1.2 million in his house.  It's all drug money.
5  There's Mr. Shamo's 1.2 million as it's going into the bank
6  at Loomis.  The $430,000 turned over by his parents, all
7  drug money.  Mr. Paz's cash, $800,000, all money.

8         Mr. Shamo purchased this truck from his friend, an
9  early investor, Miles Penrose.  Paid for it with drug money.
10 He bought silver bars.  You can see right there.  He used
11 Bitcoin to pay for it.  He didn't even have to exchange it
12 into cash in order to buy his silver bars.

13        Mr. Shamo was still holding cryptocurrency,
14 specifically Bitcoin, at the time of his arrest.  To date --
15 and it's not finished, but to date the agents have
16 identified and seized from Mr. Shamo's accounts 535 Bitcoin.
17 On the date of his arrest, a Bitcoin was worth almost $750.

18        Mr. Shamo had to pay wages to his employees.
19 Sometimes for Mr. Crandall, he would pay him in Bitcoins
20 since Mr. Crandall was overseas.  But he got late on one of
21 his payments and so Shamo went himself to deposit money into
22 Mr. Crandall's account.  That's what you see on the picture
23 there.  He put $2700 in Mr. Crandall's account as payment
24 for his work doing customer service.

25        Then Mr. Shamo used this drug money to support his

1     lifestyle.  He, with friends, bought a boat and a truck to

2     pull it.  Here he is in his boat on the lake with Paz.  He

3     bought an 88-inch TV, a $2,000 bedroom set.  Took trips.

4     This is a beach in California.  He also went to spring break

5     in Mexico.  Multiple trips to Las Vegas.  On a cruise with

6     Luke Paz and their girlfriends.  Fine wine.  Port calls.

7     All of it was paid for with drug money.

8             You're going to hear from several of the people on

9     the screen.  It's anticipated that you're going to hear from

10    Mario Noble.  He's going to tell you that Mr. Shamo hired

11    him, that Mr. Shamo trained him, that Mr. Shamo paid him,

12    that Mr. Shamo was his boss.

13            You're going to hear from Luke Paz.  He's going to

14    tell you Mr. Shamo hired him.  Mr. Shamo and Mr. Crandall

15    trained him, that the two of them worked together, that they

16    had an agreement that he would get a percentage of the price

17    for each pill that he pressed, and that Mr. Shamo paid him,

18    and Mr. Shamo was his boss.

19            You're going to hear from Drew Crandall.  He's

20    going to tell you in the beginning he was a junior partner

21    with Mr. Shamo, but Mr. Shamo bought him out.  And when he

22    came back, he was an employee doing customer service online

23    overseas.  Mr. Shamo paid him.  Mr. Shamo was the final

24    decision maker.

25            You're going to hear Ms. Tonge and Ms. Bustin.

1    They're going to tell you that they were initially recruited

2    by Mr. Shamo and Mr. Crandall.  And once Mr. Crandall left,

3    Mr. Shamo was the boss.  Mr. Shamo paid them.  Mr. Shamo

4    either brought them postage or sent them Bitcoins so they

5    could purchase postage.  Mr. Shamo kept them supplied with

6    drugs.  And Mr. Shamo and his employees would give them the

7    daily order sheets so they would know to whom to send the

8    drugs.

9           You're going to hear from Mr. Gygi.  He was a

10   package receiver before.  After his friend, Mr. Crandall, is

11   gone, Mr. Shamo approaches him about taking a larger role.

12   He recruits him to be the runner, the courier.  Mr. Shamo

13   paid him.  Mr. Shamo had plans with Mr. Gygi to expand his

14   role in the organization.

15          It's also anticipated you'll hear from Mr. Jensen.

16   Mr. Jensen's package was the first package caught, the

17   package that led to Mr. Shamo's arrest.  He's going to tell

18   you that Mr. Shamo paid him.  He considered Mr. Shamo a

19   friend.  And he received those packages on Mr. Shamo's

20   behalf.

21          You'll also hear from this woman, Jessica Gleave.

22   She's going to talk about the packages that she and her

23   boyfriend, next to her, Julian Mausia, received at

24   Mr. Shamo's request, on his behalf, and that he paid them

25   two, $300 per package for every package they received.

1            You saw our witness list Friday.  The only thing I
2    wanted to mention about it is we have some witnesses who,
3    because of their education, their training, or experience,
4    they have the ability to offer an opinion that you can
5    consider.  For example, this special agent will be the one
6    that talks about the Darknet, and cryptocurrency, and the
7    types of encryption they used.  These other witnesses
8    underlined in yellow, they're similar.

9            You're going to hear from computer forensic
10   witnesses, scientists and chemists from two different
11   laboratories.  They're going to talk about what was in the
12   pills and how good the fakes were.

13           You're going to hear from a doctor, a Ph.D, with
14   the Food and Drug Administration who was part of the team
15   that reviewed Fentanyl for use in hospital settings, and
16   he'll talk about some of the dangers of Fentanyl.

17           Then lastly, the three on the right.  Dr. Thomas
18   Rogers performed an autopsy.  Bill Posey, below him, helped
19   Dr. Rogers with toxicology analysis.  Then lastly,
20   Dr. Stacey Hail, who is a forensic pathologist, and I'll
21   talk about her in just a moment.

22           Let's finish now talking about Mr. Shamo's
23   customers.  Mr. Shamo sold his drugs to other drug dealers.
24   This is a sale for 5,000 of his Fentanyl pills.  That
25   purchaser is a drug dealer.  Another 5,000, 10,000, 20,000

1    of the counterfeits.

2              Let's talk about one drug dealer in particular

3    that you're going to hear more about in this case.  His user

4    name was Trustworthy Money.  Here's 10,000 pills to

5    Trustworthy Money.  Another 10,000 sold by Mr. Shamo to

6    Trustworthy Money.  Another 10,000.  Here's Trustworthy

7    Money and the daily order sheets that we've talked about

8    that, when Mr. Noble was helping, Mr. Noble would create.

9    Trustworthy Money sends a message, it says, fifth row down,

10   I messaged you about getting 2k extra pills if I buy this.

11   So 12,000 total.  You said to let you know so you could let

12   the shipping team know.  Please let them know.  Thank you.

13   I really appreciate it.  As soon as it's marked ship, I'll

14   partially release 35k.  By that he means the money is in

15   escrow at AlphaBay and he'll release it to Mr. Shamo as soon

16   as Mr. Shamo marks that it shipped.

17             Mr. Trustworthy Money gives Pharma-Master the name

18   and address he wants his pills shipped to.  He also uses a

19   package receiver.  So that's not him.  That's a real person,

20   Alivia Luckcuck, and then her address.  Trustworthy Money is

21   this guy.  His real him is Jared Gillespie.  He's fanned out

22   $100 bills in front of him.  He has a money counter.  You'll

23   notice on the table over here, Mr. Shamo has two money

24   counters.

25             Mr. Shamo sold to drug dealers.  He also sold to

1    drug users, and there's one I want to talk about now.

2           These two orders go to the same user.  So when

3    you're looking at this, you can see the sales information

4    from AlphaBay.  Second row, all the way to the right, it

5    says to and then T-W-A-D.  That's the user, Twad.  You can

6    see the name and address that that user wanted the pills

7    sent to.  And then for that top order, that's ten pills.

8    The listing is for one pill.  The quantity is ten.  So

9    that's ten pills.  It's going to 3 Midvale Drive in Daly

10   City, California.  Daly City is a suburb of San Francisco.

11          The second order, on the bottom now, is in June,

12   specifically June 6th, 2016.  Same user, same shipping

13   address, also for ten pills.  The package that contained

14   those ten pills was tracked.  So postal inspectors were able

15   to tell that it shipped out of Utah on June 9th, 2016, and

16   arrived at 3 Midvale Drive in Daly City on June 11th.

17          That address, 3 Midvale Drive, had these three

18   people at it.  The guy in the middle, that's Gregory Lee,

19   whose name was on the shipping request.  To his left, with

20   the funny sunglasses, that's Ruslan Kluyev, but his friends

21   called him Russ.  And then the woman here, Ms. Tori Grace,

22   is Greg Lee's girlfriend.  Mr. Lee, Russ, they're roommates.

23   Ms. Grace sometimes would spend the night there with them.

24          I mentioned that the package arrived June 11th,

25   2016.  The very next night, June 12th, Greg and Tori arrived

1  home after eating dinner with Greg's family, and they found

2  Russ -- he was there to meet them.  It was clear he had been

3  drinking.  They went into his bedroom to hang out with him

4  for a little while.  They watched Russ, their friend, crush

5  up two blue pills that they knew were Fentanyl.  He crushed

6  them up with that battery.  They watched Russ, their friend,

7  snort those pills using the rolled up sticky note you see

8  there.  They watched as their friend Russ started exhibiting

9  the effects almost immediately.  Russ laid down on his bed

10  and asked Tori and Greg to check on him that night.

11          Fentanyl is an opioid.  Opioids are central

12  nervous system depressants.  Taken too much and you shut

13  down.

14          Greg and Tori were nervous.  They checked on him

15  several times that night before they went to bed.  The last

16  time going in to check on him, Tori watched as her

17  boyfriend, Greg, rolled their friend into the recovery

18  position.  It's a way to arrange a body so that if someone

19  unconscious were to vomit, they won't asphyxiate.

20          Tori thought that Russ's breathing was slowing,

21  but Greg dismissed it.  The following morning, Tori got up

22  and went to work.  It was while she was at work that she

23  found out that Russ was dead.

24          Police were called.  An investigation began.

25  Here's his bed.  You can see his glasses.  There's Russ.

1    You can see the desk behind him where the battery and the

2    sticky note were.  Then just inside of that door, there's a

3    garbage can.  On the top of that garbage can, there's a

4    priority mail envelope, and that envelope came from Utah.

5              An autopsy was ordered.  A toxicology analysis was

6    part of that autopsy.  They looked at what was in his blood

7    at the time of Russ's death.  They found that he had alcohol

8    on board.  He was negative for cocaine, but he did have

9    cocaine metabolite and a cocaine cutting agent.  But then at

10   the bottom there, you see that he had Fentanyl in his

11   system.

12             Dr. Stacey Hail, she's a medical doctor.  She

13   still works in an ER.  She teaches, and then she studies how

14   drugs and classes of drugs affect the human body in an

15   overdose.  She reviewed Russ's case.  She's going to take

16   the stand in this trial and she's going to tell you that

17   having reviewed it, and based on her training and

18   experience, and her education, it's her opinion that

19   Fentanyl was the but for cause of Russ's death.  Meaning but

20   for the fact that he ingested the Fentanyl that night, he

21   wouldn't have died.

22             Death, drugs, and money, that's why we're here.

23             At the conclusion of this case, after you've heard

24   all of this evidence and much more, one of my partners on

25   the case, Mr. Vernon Stejskal here, is going to stand up in

```
 1    front of you and ask you to return a verdict of guilty to
 2    every count.  That will be the only verdict that's
 3    consistent with the evidence.
 4              Thank you.
 5              THE COURT:  Thank you, Mr. Gadd.
 6              Want to take a break before your opening?
 7              MR. SKORDAS:  It's up to you, Your Honor.  I'm
 8    ready to go.  I won't be quite as long, but a break might be
 9    in order.
10              THE COURT:  We'll be in recess until five or ten
11    after ten.
12              (Jury excused)
13              (Recess)
14              THE COURT:  Ready to proceed?
15              MR. SKORDAS:  Yes, Your Honor.
16              THE COURT:  Get the jury.
17              (Jury present)
18              THE COURT:  Mr. Skordas, you may proceed with your
19    opening statement.
20              MR. SKORDAS:  Thank you, Your Honor.
21              Counsel, members of the jury, before I start, I
22    want to introduce someone that you missed on Friday, and
23    that's our colleague Daryl Sam, who did get his daughter
24    successfully married off, and he'll be here for the balance
25    of the trial.
```

 1          I'm going to start by saying something that I
 2   don't recall saying in opening statements before and it
 3   might come as a surprise to some of you, but one of the
 4   parting remarks that counsel made in his opening is that in
 5   a couple of weeks, one of his associates is going to get up
 6   and ask you to find Aaron Shamo guilty on these counts.
 7   We're going to agree with some of that.  We think that the
 8   evidence will support that he's guilty of some of these
 9   counts.  That might come as a surprise.
10          We think the evidence will support the notion that
11   he's guilty of many of these counts, that he was involved in
12   this drug ring, that he participated in the drug ring, and
13   that he should be held responsible for that.  And he has
14   maintained that from the beginning and will maintain that in
15   the next three weeks before you.
16          There are a couple of things -- Elizabeth, if you
17   could help me.  You're ahead of me -- that we don't agree
18   with in terms of the government, and when you listen to the
19   evidence, listen closely to some of these concepts because
20   Aaron Shamo did not cause the death or create the death of
21   another individual.  Aaron Shamo is not, as the evidence
22   will show, the kingpin of a large drug organization.  And
23   the government will no doubt prance this diagram in front of
24   you repeatedly during this trial, and we invite that.  In
25   fact, we would ask that you look at it in a little bit

1  different way.

2         Count 1 of the information that you'll hear is the

3  one that is sort of a kingpin count, if you will.  It

4  requires that the government show that he was a leader, that

5  he was a mastermind, that he was the kingpin, if you will,

6  of this organization.  And that's what they intend to prove

7  is, based on their understanding of what's going on, that

8  he's at the top and all these other folks down here at the

9  bottom, they work for Aaron Shamo.

10         Counsel has indicated that he's going to call some

11  witnesses, most importantly, and maybe in the beginning

12  here, Drew Crandall.  When you hear from Drew Crandall, here

13  are some things you're going to learn, that he worked for

14  eBay customer service in IT; that he has a background in

15  computers and IT support; that he studied mechanical

16  engineering in college; that at the time after that he was

17  in debt to the tune of $45,000; and that while he was in

18  college, he began selling his own prescription medication to

19  individuals, his own Adderall; that he got involved in the

20  manufacturing and shipping of pills to make money to pay for

21  his significant college debt.

22         He helped establish the online marketplace and

23  shipping procedures for this group.  He's knowledgeable in

24  Bitcoin.  He took the proceeds from drug sales and traveled

25  around the world with his fiancee.  He trained Luke Paz to

act as his replacement, and that he was still receiving,

accessing, and using proceeds from this as late as

April 2017.  He was arrested in May 2017 when he returned to

get married in Hawaii.  What's the significance of that?

          The significance of that, members of the jury, as

you'll hear, is that in April of 2017, Aaron Shamo had been

in jail for five months.  He's there today.  He'll sleep

there tonight.  And he's been there every day since

November 22nd of 2016, every day.

          When Drew Crandall is receiving access and using

proceeds in April 2017, the evidence will show he certainly

wasn't doing it with the direction, or help, or assistance

of Aaron Shamo because he was in the Weber County Jail.

When Drew Crandall was arrested in May of 2017 to get

married in Hawaii, Aaron Shamo was in the Weber County Jail,

not directing anything or anyone.

          Drew Crandall, you will learn, members of the

jury, through his own testimony and those of the agents,

lied when he was interviewed by the agents about his

involvement, lied about his assets to the investigators when

he was questioned about what he had done here.

          You'll learn a concept that you've probably all

understood since high school, which is plea bargaining.

You'll learn that Mr. Crandall plea bargained this case.  He

pled guilty to three counts.  Aaron Shamo, as you know,

1    members of the jury, is charged with 13.  He pled to

2    conspiracy to distribute Fentanyl, Alprazolam, and

3    conspiracy to commit money laundering.  He was never charged

4    with the continuing criminal enterprise count, the kingpin

5    count, if you will.  And he agreed to plead guilty in order

6    to avoid any risk of being convicted of a death resulting

7    count.

8            Counsel told you that you'll be hearing from Luke

9    Paz, and that's true, and here's what you'll learn from Luke

10   Paz.  He became friends with Aaron Shamo through a group

11   called Mario Kart 64, and you'll learn what that means, and

12   basically replaced Drew Crandall while he was traipsing

13   around the world with his girlfriend.  He ordered and

14   received a pill press.  He developed the formula for making

15   the Fentanyl based drugs and kept it in his possession.  He

16   kept a ledger of his manufacturing of Fentanyl based drugs,

17   and paid himself with Bitcoin and currency exchanges -- the

18   organized Bitcoin currency exchanges.  He was arrested in

19   April of 2018, after Aaron Shamo had been in custody for

20   over 18 months.  Luke Paz will come in probably through that

21   back door.  He hasn't spent a day in jail.  And when he was

22   arrested, he had $800,000 in cash and 32 and change in

23   Bitcoin.

24           You'll learn that Luke Paz, when he was questioned

25   by investigators for the government, lied about his

1    involvement, lied about his assets.  And he was allowed to

2    plead guilty to two counts of knowing and intentional

3    adulteration of drugs while held for sale, Fentanyl, and

4    conspiracy to commit laundering.  He was never charged with

5    a serious death resulting count.  He was never charged with

6    a serious kingpin count, the continuing criminal enterprise.

7           Counsel told you that you'll hear from Sean Gygi.

8    That's true.  But here's what you'll hear about and from

9    Sean Gygi, that he worked at eBay with Drew Crandall and

10   Aaron.  He delivered pills to Ms. Bustin and Ms. Tonge --

11   who we'll talk about in just a minute -- for packaging.  He

12   received pills from those same two women and delivered them

13   to different addresses.  He received at least $4,000 a

14   month, had packages and drug manufacturing materials

15   delivered to his home on multiple occasions, and made $300

16   for every package delivered to his home.

17          What did he do?  He lied to the investigators when

18   he was questioned.  He lied about his assets.  He lied about

19   his involvement in this enterprise.  And he was allowed to

20   plead guilty.  He was allowed to plea bargain to conspiracy

21   to distribute Fentanyl, Alprazolam, aiding and abetting in

22   the importation of a controlled substance, and the use of

23   mail in furtherance of a drug offense.  He too, like

24   everyone else, except Aaron Shamo, was never charged with a

25   continuing criminal enterprise count, and he agreed to plead

1    guilty to avoid the death resulting count.

2          Counsel told you about Mario Noble, who you will

3    also hear from.  Mario Noble has got a little more

4    involvement in some things.  He's trying to run his own

5    business.  He became involved in this organization through

6    Drew Crandall's friend, Sasha.  He opened his own

7    marketplace on the Internet to sell candy laced with drugs.

8    He tried online marketplace of his own, was making at least

9    $3,000 a month in salary, had access to the entire

10   Pharma-Master page on AlphaBay, and dealt with every aspect

11   of customer service.  He had the ability to manage money

12   coming and going from the Pharma-Master account and dictated

13   his own hours and schedule.

14         What did he get?  Conspiracy to distribute

15   Fentanyl and Alprazolam.  Never charged as a leader,

16   organizer.  Agreed to plead guilty to avoid the death

17   resulting count.

18         Ms. Bustin and Ms. Tonge, you've heard quite a bit

19   about them.  You'll see them all on this chart here.  I

20   won't go through every one.  They also worked at eBay with

21   Drew and Aaron.  They packaged and prepared drugs for

22   shipping.  They made their own schedule.  They requested

23   more jobs and money on multiple occasions.  They made at

24   least $2,000 a month and upwards of $3500 a month for

25   packaging.  And when they were arrested, members of the

1     jury, they had 75,000 Fentanyl pills in their home.

2          They were questioned by investigators in this

3     case.  They lied about their involvement.  They lied about

4     their assets.  They pled guilty to conspiracy to distribute

5     Fentanyl, Alprazolam, possession of Fentanyl with the intent

6     to distribute, the use of the U.S. Mail in furtherance of a

7     drug trafficking offense, and conspiracy to commit money

8     laundering.  Again, they were never charged with a

9     continuing criminal enterprise, leadership role, and they

10    agreed to plead guilty to avoid the death resulting count.

11         Jessica Gleave, offered full immunity from any

12    future prosecution.  Nothing.  Pled guilty to nothing.

13         Ryan Jensen, who you'll hear from today, offered

14    full immunity from any future prosecution.

15         Although in a criminal case in America the

16    defendant doesn't need to testify, you'll hear from Aaron.

17    You'll hear from his family members.  And you'll hear from

18    his -- by family members, I mean his mother and sister.  And

19    here's what you'll learn about Aaron, that he's learning

20    disabled, he had severe ADHD, and a processing disorder;

21    that he was roommates after college with Drew Crandall; and

22    that in college, like Drew Crandall, he began selling his

23    own prescription medication along with Drew.

24         He was arrested November 22nd, 2016, awaiting

25    trial, and has been sitting in jail since that day.  Longer

1    than all the other people in this chart combined.

2         When he gets arrested, there are no Fentanyl pills

3    found in his home.  Never in possession of the formula for

4    possessing Fentanyl.  Importantly, members of the jury, he

5    was never interviewed by the investigators in this case.

6    And as you'll see, some of the co-defendants and some of the

7    people that will be testifying -- as you'll hear I should

8    say, will tell you that Aaron just wasn't capable of

9    organizing or running an organization like this without

10   substantial assistance.

11        The government, early on in this case, November of

12   2016, created this chart.  It's about a three-year-old

13   chart.  And their argument this morning is that Aaron

14   founded and led this organization.  Their argument this

15   morning and their statements are that he was the leader of

16   this.  And counsel said Aaron did this, and Aaron directed

17   that, and Aaron did this, and Aaron was in charge of that.

18   But when you listen to the evidence, you'll find that that's

19   not the case.  When you hear the witnesses testify, you will

20   see that that was not the case.

21        It's an unfortunate role that we play as defense

22   attorneys in a criminal case because we have to wait until

23   the government puts his case on.  That's just the way it

24   works in America.  It's worked for hundreds of years.  But I

25   would ask you, members of the jury, to withhold judgment on

1  this case until you've heard the entirety of the evidence.

2  I would ask you to not form an opinion today or tomorrow,

3  certainly not based on the statements of counsel this

4  morning, but to wait until you hear all the evidence.

5       Wait until you see the big picture -- which has

6  now disappeared -- because what you'll see is that Luke Paz

7  pressed 480,000 Fentanyl pills.  He has not spent any time

8  in jail.  He cut a plea deal.

9       Drew Crandall, still benefiting from drug sales,

10  as I indicated, as late as April 2017, he cut a plea deal.

11       Mario Noble started his own drug marketplace,

12  which failed.  He's not in jail.  He cut a deal.

13       Ms. Tonge, found with nearly 75,000 Fentanyl

14  pills, she's not in jail.  She cut a deal, as did her

15  associate, Ms. Bustin -- by the way, I have their names

16  backwards here -- who also cut a deal.  Never went to jail.

17       Mr. Gygi derives substantial income from

18  importation and shipment of illegal narcotics.  Not in jail.

19  Middleman between multiple parties.  Not in jail.  Cut a

20  plea deal.

21       The only person on trial, members of the jury, is

22  Aaron Shamo.  The only person who is left standing, if you

23  will, is Aaron Shamo.  The reason for that, as you'll see,

24  is that the government decided early on that he was somehow

25  the kingpin of this organization and his head needed to

1    roll.

2          We've told you earlier -- I've told you earlier

3    that he will admit to his conduct here, and we will agree

4    with Mr. Stejskal in our closing that he should be convicted

5    of some of these counts, but not all of them.  He didn't

6    have a plea deal, and he was never interviewed by

7    investigators.

8          This is a trial that is scheduled to go about

9    three or four weeks.  I believe it could be a little bit

10   less than that.  I don't think this trial is going to take

11   that long.  I say that because Aaron's owning what he did.

12   And we can flash all the styrofoam or plastic containers in

13   front of you all and bounce them around, but we know what

14   they are.  We'll agree to what they are, and we'll agree to

15   how they came into possession of certain individuals.  We'll

16   agree how the government got these.  But the evidence will

17   not establish, members of the jury, that Aaron Shamo caused

18   the death of another or that he was the organizer, leader,

19   mastermind of this organization.  Just the opposite.

20         So please keep an open mind.  Keep from forming a

21   final opinion until you hear all the evidence, and that

22   might be a couple of weeks from now.  Remember the

23   instructions that the Judge has given, instructions about

24   the presumption of innocence, because in America, in 2019,

25   an accused is presumed innocent until the government

1   establishes proof beyond a reasonable doubt to each and
2   every element of the offense.
3           Keep in mind, as the Judge instructed you this
4   morning and will instruct you again, that the government
5   carries the burden of proof.  The defense doesn't have to
6   put on any evidence at all, even though we will.  Keep in
7   mind, members of the jury, as the Judge has instructed you
8   and will continue to instruct you, that unless and until you
9   find beyond a reasonable doubt each and every element of
10  those offenses, you have a legal and moral obligation to
11  find Aaron Shamo not guilty.  And at the end of the day, at
12  the end of the month, at the end of the trial, that's what
13  the evidence will show.
14          Thank you.
15          (Whereupon, proceedings not transcribed.)
16          THE COURT:  Did you say you had something you
17  needed to take up?
18          MR. GADD:  Two things.
19          THE COURT:  Do we need to wait for the clerk to
20  get back in?
21          MR. GADD:  Probably.
22          THE COURT:  All right.
23          There she is.
24          Go ahead.
25          MR. GADD:  I think the Court probably caught this

1    as opening statements were going on.  The Court ruled on a

2    motion in limine back in May where we had asked the Court to

3    preclude the defense from charging comparisons between

4    co-defendants.  Much of the defense's opening statement was

5    drawing those comparisons that the Court ruled --

6            THE COURT:  I'm looking at your chart, the chart

7    in your exhibit.  Do you know what I'm talking about?

8            MR. GADD:  Of the people?

9            THE COURT:  No.  No.  I'm looking at the chart

10   about permitted and not permitted.

11           MR. GADD:  Yes, sir.  Yes, sir.  The filed one.

12           THE COURT:  Charges permitted.  Charges and

13   potential sentences for testifying co-conspirators?

14           MR. GADD:  Yes, sir.

15           THE COURT:  That's permitted.  What are you saying

16   he shouldn't have done?

17           MR. GADD:  The comparison is pointing out that

18   they're not charged with other crimes, specifically CCE or

19   the death resulting offense, Count 1 and Count 6.

20           THE COURT:  Mr. Skordas.

21           MR. SKORDAS:  We're happy to ask each one of them

22   that individually if that's what it's going to take.

23           THE COURT:  I'm not sure I understand what you're

24   complaining about.

25           MR. GADD:  Yes, sir.  I'll try to be more clear.

```
 1            The Court ruled that they could not draw
 2   comparisons between Mr. Shamo, who's charged in Count 1 and
 3   Count 6, and the other defendants who are not.  But since
 4   those comparisons have been drawn, I'm asking for a curative
 5   instruction.  I think we can model it similar to the
 6   instruction that we've proposed in the final jury
 7   instructions or we tell the jurors now so that they're not
 8   laboring under a false impression for the next four weeks,
 9   that it's not their role to decide or judge the charges and
10   that they should not draw those comparisons.
11            THE COURT:  Mr. Skordas.
12            MR. SKORDAS:  Your Honor, our understanding was
13   that it was really sentencing comparisons that we were
14   staying away from, but the government can argue whatever it
15   wants.  We were just going through what we believe the facts
16   will be when these individuals each testify.  We're entitled
17   to do that.  I'd be happy to bring all their attorneys in,
18   if that's what you want, but there was a very clear intent
19   by everybody to avoid those two counts.
20            MR. GADD:  The problem there is none of them faced
21   the CCE count.  That's why drawing the comparison is
22   impermissible.
23            THE COURT:  Well, but you can point that out,
24   can't you, on the testimony?
25            MR. GADD:  Yes, certainly.  My request is that we
```

1    have a short instruction now so that the jury doesn't think

2    for the next four weeks, or when we get to the individual

3    cooperators' testimony, that part of what they are supposed

4    to consider is the grand jury's decision on whom to charge

5    with what or to draw comparisons between co-defendants and

6    what charges the grand jury indicted them on.

7            THE COURT:  In your own chart -- do you know what

8    I'm talking about?  In your own brief --

9            MR. GADD:  Yes, sir.

10           THE COURT:  -- you say permitted, and I agreed

11   with this, charges and potential sentences for testifying

12   co-conspirators for purposes of impeachment.

13           MR. GADD:  Yes, sir.

14           THE COURT:  Isn't that what he did?  Isn't that

15   permitted?

16           MR. GADD:  Yes, that is permitted.  It's the

17   inverse that's not permitted.

18           THE COURT:  Which is what?

19           MR. GADD:  Pointing out what they were not charged

20   with and then drawing comparisons.

21           THE COURT:  I don't know that I ruled on that.

22           MR. GADD:  I would be happy to take a minute this

23   afternoon when court is adjourned and try to put what I'm

24   trying to say in writing and hopefully make it more clear.

25           THE COURT:  All right.  So far I don't think he

1    has violated this chart.  If I'm wrong, then I'm sure you'll

2    point it out.

3         MR. GADD:  The second issue I'd like to address is

4    his contention that the defendant was never interviewed.  So

5    I've instructed our agents not to bring up that when they

6    tried to interview the defendant, he invoked his right to

7    remain silent.  But by making it a point of contention that

8    was never interviewed, unlike the other co-defendants, we

9    think the jurors need to hear the full story, that he was

10   given the opportunity and refused.

11        THE COURT:  They do, don't they, if they tried to

12   interview him and he invoked his right?

13        You said he was never interviewed?

14        MR. SKORDAS:  Correct.

15        THE COURT:  They say they tried to interview him

16   and couldn't.

17        MR. SKORDAS:  Early on.  And we tried for three

18   years to interview with them and they wouldn't.  So if they

19   want to open that up, let's open the whole thing up.  We

20   have been begging them for an interview for three years,

21   Your Honor.  I'll testify to that.

22        THE COURT:  Mr. Gadd.

23        MR. GADD:  We'll have a hard time with an attorney

24   as a witness.

25        THE COURT:  Yes.  Yeah.  We're not going to do

```
 1   that.
 2            MR. GADD:  I see it as an open door, but because
 3   it's a sensitive issue dealing with Fifth Amendment rights,
 4   I wanted to bring it up first with the Court to make sure
 5   that we were okay to briefly ask our agents if they asked to
 6   interview him and if he refused.  And we'll try to phrase it
 7   such that we don't implicate his constitutional rights.
 8   We'll just indicate that he chose not to.
 9            THE COURT:  If you do that, Mr. Skordas is going
10   to want to bring up through -- I guess Mr. Shamo, if he
11   testifies, and it sounds like he's going to --
12            MR. GADD:  If Mr. Shamo has personal knowledge,
13   I'm sure he could testify to that.
14            THE COURT:  -- that at some point he wanted an
15   interview.
16            You can do what you said you wanted to do and then
17   you can do what I suggested you could do.
18            MR. GADD:  Those were the two things.  Thank you,
19   Your Honor.
20            THE COURT:  You haven't convinced me on the first
21   thing.  You do understand that, right?
22            MR. GADD:  Yes, sir.  I'll look at it again.
23            THE COURT:  All right.
24            Now we're probably looking at five to 12.
25            We'll be in recess.
```

```
 1              (Recess)
 2              THE COURT:  Where are we on the fight we ended
 3     with?
 4              MR. GADD:  No further resolution.
 5              THE COURT:  Were you complaining about what he
 6     said during his opening statement or something he's asked a
 7     witness?
 8              MR. GADD:  Just the opening statement.
 9              THE COURT:  But you didn't object at the time
10     either.
11              MR. GADD:  No, sir, chose not to object out of a
12     professional courtesy.
13              THE COURT:  But you're not objecting to anything
14     he's asked a witness yet?
15              MR. GADD:  I have not made an objection, no.
16              THE COURT:  Precisely, again, what do you think he
17     should not have said in his opening statement?
18              MR. GADD:  Drawing a comparison between the
19     charges Mr. Shamo faces and those faced by his
20     co-defendants.  Charging decisions at their core are made by
21     the grand jury.  Mr. Shamo was charged with Count 1, CCE.
22     His other co-defendants weren't.  It's not for this jury to
23     try to rejudge what the grand jury did or didn't do.
24              So I fully agree that they can talk about what
25     someone pleaded guilty to and then minimum and maximum
```

```
 1   sentences as impeachment.  It was that next step, drawing
 2   the comparison between who got charged in Count 1 and who
 3   didn't that I saw as impermissible.
 4            THE COURT:  Mr. Skordas.
 5            MR. SKORDAS:  Your Honor, the grand jury, as this
 6   Court knows, issues indictments based on evidence presented
 7   to it by the United States Attorney's Office.  Had they
 8   sought an indictment for the CCE count, they would have
 9   received that.  But they didn't.
10            THE COURT:  But isn't it true that we usually
11   don't get into the charging decisions in a trial?
12            MR. SKORDAS:  Yes.
13            THE COURT:  What would your curative be?
14            MR. GADD:  We have a couple Pattern Instructions,
15   the Tenth Circuit Pattern Instructions that I think hit
16   right on this point.  And I apologize for not pulling those
17   numbers.  They're two of the instructions that we proposed
18   as final instructions.  So my thought is maybe this
19   afternoon I could try to draft up something that's neutral
20   but explains to the jury their role and specifically
21   indicates that making those comparisons is not within their
22   role, and then just explaining it to them perhaps tomorrow
23   morning.
24            THE COURT:  Well, take a shot at it.  And run it
25   by -- I mean send it to him, send it to me.  We'll talk
```

1    about it tomorrow.

2              MR. GADD:  Will do.  Thank you, sir.

3              THE COURT:  Let's get the jury and proceed.

4              (Whereupon, proceedings not transcribed.)

C E R T I F I C A T E


        I hereby certify that the foregoing matter is
transcribed from the stenographic notes taken by me and is a
true and accurate transcription of the same.


PATTI WALKER, CSR-RPR-CP      DATED: 8-19-19
Official Court Reporter
351 South West Temple, #8.431
Salt Lake City, Utah  84101
801-364-5440

1                IN THE UNITED STATES DISTRICT COURT

2                        DISTRICT OF UTAH

3                        CENTRAL DIVISION

4

5    UNITED STATES OF AMERICA,    )

6              Plaintiff,         )

7       vs.                       )  Case No.  2:16-CR-631-DAK

8    AARON MICHAEL SHAMO,         )

9              Defendant.         )

10   _____)

11

12         BEFORE THE HONORABLE DALE A. KIMBALL

13         -------------------------------------

14                   August 12, 2019

15                     Jury Trial

16                  Opening Statements

17

18

19

20

21

22

23

24   REPORTED BY: Patti Walker, CSR, RPR, CP    801-364-5440

25   351 South West Temple, #8.431, Salt Lake City, Utah  84101

```
 1                      A P P E A R A N C E S

 2

 3

 4    For Plaintiff:              Michael Gadd
                                  Vernon G. Stejskal
 5                                Kent A. Burggraaf
                                  U.S. ATTORNEY'S OFFICE
 6                                111 South Main Street, #1100
                                  Salt Lake City, Utah  84111
 7

 8
      For Defendant:              Gregory G. Skordas
 9                                Kaytlin V. Beckett
                                  SKORDAS & CASTON LLC
10                                560 South 300 East, #225
                                  Salt Lake City, Utah  84111
11

12                                Daryl P. Sam
                                  DARYL P SAM PLLC
13                                5955 S. Redwood Road, #102
                                  Salt Lake City, Utah  84123
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        SALT LAKE CITY, UTAH; MONDAY, AUGUST 12, 2019; 8:30 A.M.

 2                    (Proceedings not transcribed)

 3             THE COURT:  The government may proceed with its

 4   opening statement.

 5             MR. GADD:  Thank you, Your Honor.

 6             Death, drugs, and money, that's why we're here.

 7   That man right there, Mr. Aaron Michael Shamo, founded and

 8   led an organization dedicated to the distribution of drugs.

 9   Mr. Shamo and his employees, they made their own drugs.

10   They pressed together drugs, specifically drugs that were

11   almost identical to Oxycodone.  Oxycodone is a painkiller.

12   But Mr. Shamo's fake Oxycodone contained Fentanyl.  Fentanyl

13   is a powerful synthetic opioid.  Mr. Shamo sold his Fentanyl

14   pills online.  In 2016, he sold hundreds of thousands of

15   Fentanyl pills.  He made millions of dollars.  And

16   Mr. Shamo's Fentanyl killed a man.  That's why we're here.

17             In the short time I have with you this morning, I

18   want to first review the time line of this case.  And then

19   once we've done that, I want to talk to you about the

20   evidence that you're going to hear over the next four weeks

21   as it relates to these other topics you see on the screen.

22   If at any point you don't see something on the screen, if

23   you'll just raise your hand.  That's true now or for any

24   time at trial.

25             In the beginning, Mr. Shamo started selling drugs
```

```
 1   with a roommate, a friend of his, Drew Crandall.  That's who
 2   you see pictured there.  Mr. Crandall was a junior partner,
 3   a one-third partner, meaning Mr. Crandall got one-third of
 4   the profits, Mr. Shamo got two.  And they divided up their
 5   roles.  Mr. Shamo was in charge of listing the drugs for
 6   sale online.  He was in charge of customer service.  He was
 7   in charge of order processing.  He made the decision on what
 8   drugs they were going to sell and acquiring those drugs so
 9   that they could sell them.  And, lastly, Mr. Shamo accepted
10   payment for the drugs.
11        The payment for drugs bought online comes in the
12   form of cryptocurrency, and you're going to hear about one
13   particularly in this case.  That's Bitcoin.
14        His partner, his friend, Drew Crandall, was in
15   charge of packaging the drugs and then shipping those drugs,
16   once they had a customer who made a purchase.  And then
17   towards the end of his hands-on involvement, Mr. Crandall
18   worked with Mr. Shamo to develop a process and a recipe for
19   pressing pills.  Specifically they made counterfeit Xanax
20   that looked almost identical to the ones you see pictured
21   there.
22        But in 2015, Mr. Crandall got spooked.  Two things
23   happened.  The first is his girlfriend lost her job because
24   of her association with Mr. Shamo and Mr. Crandall.  And
25   then, second, Mr. Shamo ordered some drugs delivered to
```

1    their address in the name of a roommate.  Those drugs got

2    caught in the mail.  The roommate was questioned by law

3    enforcement.  And that was enough for Mr. Crandall and he

4    said I'm out.  So he made plans with his girlfriend to leave

5    the United States.

6         Mr. Shamo agreed to buy him out.  They negotiated

7    a price.  Settled on 30,000.  And then over the next months,

8    Mr. Shamo worked to find replacements for his one-time

9    partner.  Together, they hired and trained these two women,

10   Alex Tonge and Katie Bustin, to take over packaging the

11   drugs and then shipping the drugs.

12        Later, in November of 2015, shortly before

13   Mr. Crandall was going to fly overseas, Mr. Shamo hired his

14   very close friend, Luke Paz, to take over pressing the

15   pills.

16        In that same month, November 2015, Mr. Shamo went

17   to a new website where you can buy drugs online.  The

18   website is called AlphaBay.  Mr. Shamo created an account on

19   AlphaBay so that he could be a seller.  He named his

20   account, his storefront Pharma-Master.  Much of the evidence

21   you're going to hear over the next four weeks will come from

22   Mr. Shamo's drug sales as Pharma-Master.

23        Working together, Mr. Shamo, and his new employee,

24   Mr. Paz, developed a process and a recipe to create those

25   fake Oxycodone pills I mentioned, the ones that contained

1   Fentanyl. They're fakes. Looked almost identical to the
2   real thing, like you see pictured here. Mr. Shamo sold
3   those Fentanyl pills on AlphaBay.

4           AlphaBay kept records. So agents and analysts
5   went back, captured as much of the records as they could,
6   and then they put it in a table here for you. What you're
7   looking at, if you look on the left column, that's the date.
8   So this first page you're looking at here, this is his sales
9   in January 2016. The next column over, you can see a first
10  and last initial for the user name of the purchaser. Then
11  you can see what price they paid. Each row, of course, is
12  its own sale. Then there's a column for dose. That was as
13  it was supplied online by Mr. Shamo. The quantity of pills
14  that they purchased. Lastly, under the column that says
15  sold as, this was the name Mr. Shamo gave the drugs that he
16  was selling. So as you look down that far right column, you
17  can see in January of 2016, most of Mr. Shamo's drug sales
18  were his counterfeit Xanax.

19          By the end, in November of 2016, if you look in
20  that same right column, most of his drug sales were his
21  Fentanyl pills, and he had three different names under which
22  he would sell his Fentanyl pills. So if you're in the far
23  right column and you look down at the bottom, second one up,
24  you can see there it says Fentanyl, Roxy-Oxycodone. So
25  sometimes right in the listing he would tell his would-be

1 customers that his product contained Fentanyl. And then

2 that next word, Roxy, that's a street name for a particular

3 type of Oxycodone.

4      Other times he would list his drugs, but he

5 wouldn't include Fentanyl in the title. So if you look one

6 row up, you can see it says Roxy-Oxycodone.

7      Then the third way he would list his Fentanyl

8 pills, if you go up six, seven rows, you see M Box 30.

9 That's another street name for a type of Oxycodone pill, and

10 it gets its name for how the pill is stamped when it's

11 pressed together by the pharmaceutical company. He sold

12 this Fentanyl in those three ways.

13      As he and Mr. Paz worked on their process and

14 their recipe and perfected their fakes, his sales

15 skyrocketed. By the end, you can notice in the quantity

16 column, he's no longer selling one, ten, 100 pills

17 exclusively. He has large orders. You can see in the

18 middle of the page there, there's a single order for 10,000

19 pills. The row right above that, that's the same purchaser.

20 That purchaser on one day purchased 12,000 of the M Box 30s,

21 Mr. Shamo's Fentanyl pills.

22      Mr. Shamo, of course, couldn't do this alone. He

23 had the help that I've mentioned before. He had these folks

24 working for him. But in the spring of 2016, he hired

25 additional help. He hired this man, a close friend, someone

1    he could trust, Mario Noble, a former coworker of his, and

2    he hired Mr. Noble to do online customer support, and then

3    to also help with order processing when Mr. Shamo was away.

4           Mr. Shamo solicited his old friend, Drew Crandall,

5    who was living overseas, and brought him on board in the

6    summer of 2016 to also help with customer support as their

7    sales continued to take off.

8           In the summer, two women, Ms. Tonge and

9    Ms. Bustin, they started to get burned out.  They would have

10    to not only package the pills but put the postage label on,

11    address the packages, and then they were taking it to blue

12    collection boxes, the post office boxes that they put around

13    the community.  So Mr. Shamo hired this man, another trusted

14    associate of his, Sean Gygi, to take over that last part of

15    Ms. Tonge's and Ms. Bustin's role.

16           So most nights of the week, Mr. Gygi would show up

17    at a doorstep in Daybreak, and he would pick up packages and

18    envelopes, and then take those himself to the blue

19    collection boxes and drop them off.

20           You're going to hear from the people that you see

21    pictured there, starting with Mr. Paz, and then the bottom

22    row.  Mr. Shamo's organization was bigger even than this.

23           We've talked about most of the people in the

24    middle row here.  Let's take just a minute and talk about

25    the two people on the left.  So you see Gabby Noriega on the

1     far left.  Mr. Shamo hired her to be the functional
2     equivalent of his executive assistant.  She would run
3     errands, pick up groceries, grab Cafe Rio.  But she was also
4     asked to do things like buy postage, $6,000 worth of postage
5     at a time, so that you could make sure that Ms. Tonge and
6     Ms. Bustin always had enough postage to keep the process
7     running.
8          Next to her, Mr. Kenny, Chris Kenny.  Mr. Shamo,
9     most of his customers were online, but he did have a local
10    customer, Mr. Kenny, and it was through Mr. Kenny that he
11    got feedback early on about his fake pills.  So Mr. Kenny
12    would, for example, tell him how the pills worked in
13    relation to a legitimate Oxycodone pill.
14         Then on the bottom row, far left, Miles Penrose.
15    Early on, Mr. Shamo and Mr. Crandall, they were cash poor,
16    and their friend Miles Penrose, who at the time owned part
17    of a used truck dealership, he invested $10,000 in their
18    drug distribution activities.  Over a period of months, they
19    paid him back $30,000.  Mr. Penrose will also come up in
20    this trial because he helped them launder some of their drug
21    money, including selling Mr. Shamo his truck.
22         Then bottom row, far right, with the dyed red hair
23    is Alex Tebbs.  She had a role very similar to Ms. Noriega,
24    but for a shorter period of time.  She would buy stamps for
25    Mr. Shamo at his request, and then get reimbursed.  Then she

```
1   also helped him in a failed attempt to try to buy a T-shirt
2   business.  He was looking for a legitimate business through
3   which he could launder his drug money.
4          The rest of the people you see on the bottom row,
5   they were all package receivers.  I mentioned he had the one
6   package that came to his roommate that got caught.  There
7   was risk for Mr. Shamo any time he tried to import drugs
8   from overseas, and specifically Fentanyl from China.  So
9   Mr. Shamo hired everyone else on the bottom row to receive
10  packages on his behalf.  And for two or $300 per package,
11  with no questions asked, they would turn it over to
12  Mr. Shamo so that he could import the ingredients he needed
13  to press his pills.
14         By the fall of 2016, Mr. Shamo, who was helped at
15  times by Mr. Paz, spent a fair amount of his effort
16  converting his drug money, his Bitcoin, into cash, into
17  dollars.  Most of those transactions were relatively small,
18  but they found some Bitcoin buyers out of California who
19  were willing to do larger transactions.  The largest single
20  transaction they engaged in, one transaction was for
21  $400,000.
22         By November of 2016, Mr. Shamo's days would have
23  been largely consumed with pressing pills with Luke Paz,
24  converting Bitcoin to cash with Paz and others, order
25  processing, and customer service.  Even though he had hired
```

1   Mr. Noble and Mr. Crandall, he still had a hand in it.

2   Whenever they would run into a problem, they would flag the

3   issue for him and he made final decisions.  He had to make

4   sure that Ms. Tonge and Ms. Bustin stayed fully supplied

5   both on postage and on drugs so that they could keep the

6   process running.

7           I mentioned there was some risk in importing

8   Fentanyl from China, and that's eventually how Mr. Shamo was

9   caught.  It was this package right here that led to his

10  arrest.  Looking in now, you can see that that package is

11  addressed to Ryan Jensen in Midvale.  Ryan Jensen is one of

12  those package receivers.  You can see there it comes from

13  China.  This package came through the international mail

14  facility in Long Beach.  So that's where it hit sovereign

15  soil here.

16          The Customs and Border Protection watches packages

17  as they come in, and some of the officers from Customs and

18  Border Protection checked this package.  They opened it up.

19  They found a Mylar bag.  Inside that Mylar bag, a plastic

20  bag, and inside of that, white powder.  That powder was

21  tested by a scientist at the DEA laboratory and they

22  confirmed that it was Fentanyl.

23          The agents built up a case and an investigation

24  against Jensen, the man whose name was on the package.  And

25  by November 1st of 2016, they had enough in their

1    investigation that they were able to apply for and then

2    receive a search warrant. They executed the search warrant

3    at his house. They interviewed Mr. Jensen, and he

4    confessed. He told them that he was accepting packages on

5    Mr. Shamo's behalf. Mr. Shamo was a friend of his.

6    Mr. Shamo would pay him two, $300 for every package he

7    received. And Mr. Jensen told the investigators about other

8    people that he suspected were doing the same thing.

9         One of those people was Sean Gygi. About a week

10   later, at this point, agents, postal inspectors, all working

11   together, they were watching the mail closely for any

12   packages from China coming to Mr. Shamo's associates, and

13   they caught this one that you see there, addressed to

14   Mr. Gygi. With a search warrant, they opened it up. They

15   looked inside. They saw this inner packaging, kind of the

16   cartoon character packaging, and then inside of that powder.

17   That was tested. It's Alprazolam. That's the

18   pharmaceutical ingredient in the counterfeit Xanax pills.

19        At the same time period, they caught one

20   additional package going to Mr. Gygi. Inside of it, the

21   same packaging, the cartoon character. This one had a

22   slightly different powder in it. Tested, and it was

23   Fentanyl.

24        With that, agents had enough to apply for and

25   receive a search warrant for Mr. Gygi's residence. They

1    executed the warrant, and then they interviewed him.  He was

2    hesitant at first.  There was a moment in the interview

3    where the agents told him that he had been accepting

4    packages that contained Fentanyl, and the agents watched as

5    his countenance changed.

6            When the interview was over, they let him go.  He

7    went home that night and thought long and hard.  And the

8    next morning he called up the agents and said we need to

9    talk.  He told them that not only was he accepting packages

10   from Mr. Shamo but, earlier that year, he had been hired to

11   do more.  He had been hired as a runner.  He told the agents

12   about this porch in Daybreak where he would go most nights

13   of the week and pick up boxes, and then take those boxes and

14   put them into the mail.

15           He agreed to do two things.  First, he agreed to

16   have a conversation with Mr. Shamo and record the

17   conversation and talk about -- Mr. Shamo paid him during the

18   conversation, he got paid every two weeks $2,000 -- and then

19   to talk about their future plans.  You're going to hear that

20   recording during the trial.  And then, second, he agreed to

21   take the agents with him that night to pick up packages off

22   that doorstep in Daybreak, the doorstep of Ms. Tonge and

23   Ms. Bustin.

24           So they went out that night.  He had missed the

25   night before.  And so when he got the packages and then

```
 1   turned them over to the agents, there were 79 packages and
 2   envelopes, total.  Here they are spread out, which you can
 3   see there is the largest boxes in the back, and the medium
 4   size boxes in the middle, and then priority mail envelopes
 5   in the front.
 6           Here's looking inside one of the boxes.  When the
 7   agents opened the boxes, they found Mylar bags and then an
 8   invoice.  You can see that at the bottom of your screen.
 9   It's for Jamaica green coffee.  It's meant to be coffee
10   beans.  Inside of the Mylar bags, plastic bags.  And then
11   the plastic bags contained pills that were confirmed
12   Fentanyl.  This one box is just shy of 20,000 pills.  You
13   can see that in the second red box there.
14           Here's looking at a couple more seized that night.
15   More pills.  You can see the addresses that these are being
16   shipped to.  This going to New York, New York.
17           Mr. Gygi took the agents out two nights later for
18   another pickup, this time just over 40 packages and parcels.
19   Here's one of the large boxes they got that night.  This was
20   tested.  It has Fentanyl.  You can see that in the red box.
21   This other drug you see in the red box with the parentheses
22   ANPP at the end, this is a Fentanyl precursor.  So this
23   Fentanyl is created in a chemistry lab in China and then
24   shipped over here.  The precursor wasn't fully synthesized,
25   and the DEA tests are sensitive enough that they were able
```

```
 1    to pick it up in addition to the Fentanyl that Mr. Shamo was
 2    putting inside of his pills.
 3             Here's more from that second night with Mr. Gygi's
 4    help.  Not all the packages were large.  Here's a priority
 5    mail envelope.
 6             By November 22nd, the agents had enough that they
 7    applied for and received a search warrant to search
 8    Ms. Tonge's and Ms. Bustin's residence in Daybreak.  When
 9    they got inside, this is what they found.  Pills all over
10    the floor.  Packaging material.  You can see the name there,
11    Uline.  Uline is a company that sells packaging material,
12    including Mylar bags.  Postage, padded envelopes, priority
13    mailboxes you can see in the pile there.  A digital scale.
14    A large stock of drugs.  There's a plastic tote there full
15    of drugs.  On top of that, more bags of the Fentanyl pills.
16    Pills on the bed.  Here's their vacuum.  The pills would
17    spill on the floor.  They'd just vacuum them up.
18             The drugs were taken from the residence, taken to
19    the DEA where they were photographed, tagged, bagged, and
20    then sent to the lab.  Those drugs, what you're seeing in
21    the picture, that's what's here in front of us.  These
22    totes, specifically the sealed totes -- you can see, for
23    example, this one is taped around it.  The sealed ones
24    contain his Fentanyl pills, the unsealed ones, everything
25    else.
```

1          This is the largest single exhibit, the largest

2    one place where pills were gathered during this

3    investigation.  It's this one right here.  That one exhibit,

4    that one has more than 74,000 pills in it.

5          At the same time the agents were executing that

6    warrant, another group of agents executed a warrant on

7    Mr. Shamo's residence.  He lived on Titian Way in Cottonwood

8    Heights.  Because of the strong suspicion that he was

9    pressing Fentanyl, powdered Fentanyl inside of his home, the

10   warrant had to be executed by agents wearing HAZMAT gear.

11   Many agencies and local police departments were involved.

12   For example, you get the DEA and their HAZMAT team.  They

13   were also supported by Homeland Security Investigations,

14   Postal Inspection Service, Food and Drug Administration, the

15   IRS as a criminal investigative team.  They were helping

16   with the financial side of the investigation.  The fire

17   department was on hand to help decontaminate, and then for

18   rescues, if needed.  The National Guard has a HAZMAT team

19   that came out to help, and it took all the help.  Here they

20   are getting ready.

21         When they got inside, they found an old, single

22   punch pill press, in a wood cabinet, not being used.  They

23   found a brand new industrial size pill press in a crate in

24   the garage, which hadn't been used.  They found boxes, and

25   inside the boxes that same cartoon character packaging, and

```
 1    then bags of powders.  They found boxes and boxes of this
 2    formula 5,000.  This is the ingredients going into the
 3    pills.  You can see there most of it, that top line, is
 4    microcrystalline cellulose.  But it also has some other
 5    ingredients.  There were kilograms of it in these boxes in a
 6    closet.
 7             Let me orient you on this picture.  So you're
 8    looking down at HAZMAT boots, and then this is a crate using
 9    the stainless steel pry bar behind the lid of the crate.
10    They popped open the lid.  The crate looks like it has
11    bricks inside, but that box is on its end.  They pulled one
12    out, took the lid off and set it down so you could see what
13    was inside the box.  The cylinders in that box, those are
14    punches that go into the press.  So the punches come
15    together.  And then there's a metal plate called a die in
16    the middle that's holding the powder.  The punches come
17    together with force and it presses together the pill.
18             The tip of the punch is embossed so that when it
19    presses together, it leaves an imprint on the pill.  Those
20    are here, and you'll get to see them.
21             Here's more, the punches on this shelf.  These
22    punches would wear out over time, which is why he was buying
23    more and more of them.
24             In the basement they found a room that was
25    lockable and it had a pill press running.  If you look at
```

1    the wall, you can see the powder on the wall.  Then closer
2    up, you can see powder spilling out onto the shelf of the
3    pill press.
4            Now looking around the room, you can see mason
5    jars and lids on that back table.  Mr. Shamo and whomever
6    was helping him press, either Mr. Crandall before and then
7    Mr. Paz who he hired after, they would shake up the
8    ingredients in those mason jars.  That's how they'd mix
9    their ingredients before putting them into the press.
10           You can see dies, colors, bags of pills on the
11   shelves.  Zooming in here, you can see the white bottle with
12   the red that says relaX.  It's a lubricant for machine
13   parts.  The presses' moving parts had to be lubricated.
14   Every time they replaced one of the punches, they would have
15   to lubricate that before it went back in.  More ingredients.
16           They took some precautions.  When Mr. Shamo was --
17   when the agents made entry into his home as part of the
18   search warrant, he was downstairs.  They called him up, and
19   then passed him out so he could be decontaminated and then
20   taken into custody.  He had gloves and his mask on him when
21   he came up.
22           Here's the other side of the room.  That's the
23   Fentanyl press.  Looking closer, the powder, the
24   ingredients, the binding agents, the colors, the Fentanyl,
25   once it's all mixed up, it would go into this hopper on top,

1   and then go down through the funnel into kind of like the

2   bowl in the middle.  Then powder is moved around that bowl

3   and the punches work.  It's a rotary press, so there's lots

4   of punches and it's running around like this.  Every time a

5   pill is punched and pressed together, it goes down the chute

6   you can see coming down the bottom of the photo, and then

7   into a net at the very bottom of the photo.

8        Much of what was in this room was contaminated.

9   It was destroyed.  It's hazardous.  But the agents took

10   samples.  And then they also pulled out the punches so that

11   the punch and the punched tip could be tested by the lab.

12   The punches that came out of this press, the lab, they did a

13   residue test on and it was confirmed Fentanyl.

14        The agents didn't stop their search there.  They

15   continued to look in places they normally look during

16   searches, including in his dresser.  In his top drawer, they

17   didn't find clothes.  In his bottom drawer, he had cash.

18   Here's one of those stacks, for example.  Cash in drawers

19   like this one.  He had a safe full of cash.  $1.2 million in

20   cash pulled out of his home.

21        They also seized electronic devices, and much of

22   the evidence you're going to hear over the next four weeks

23   comes from Mr. Shamo's electronics, specifically an iMac

24   computer, that one, and then two of his cell phones.  He had

25   an iPhone 6S and then an iPhone 7.

```
 1           The agents worked late into the night processing
 2    Mr. Shamo's house.  I mentioned that they took samples of
 3    the powders before things were destroyed.  That's what you
 4    see going on here.  Anytime there was evidence that could be
 5    removed from the home, it would have to be picked up by
 6    someone in their full gear, including their self-contained
 7    breathing apparatus, brought outside for decontamination.
 8    And then everything coming out of the house came to this
 9    table that you see here where agents and supervisors checked
10    it in and then put them in the larger evidence bags.
11           Here's money, for example, coming out the house.
12           Agents worked late at this search warrant, but
13    they also worked late based on investigation they learned
14    from Ms. Tonge and Ms. Bustin.  So at Ms. Tonge's and
15    Ms. Bustin's search warrant, as a part of that they
16    interviewed both Ms. Tonge and Ms. Bustin, and they too
17    confessed.  They told the agents that they were packaging
18    and shipping these pills for Mr. Shamo; that Mr. Shamo was
19    their boss; that he had been paying them to do it.  And they
20    told the agents that they suspected an old coworker of
21    theirs might also be involved, Mario Noble.
22           So a couple agents went to where Mr. Noble worked,
23    and they asked at the front desk for Mr. Noble so they could
24    ask him some questions.  The front desk told Mr. Noble that
25    there were some special agents there to see him.  So as he
```

 1  walked up, he erased Telegram, a communication app that he

 2  had used with Mr. Shamo.  He erased it off his phone.

 3          Once he sat down with the agents, he also

 4  confessed.  And later that night, he took two of the

 5  agents -- sat down with them, and took them online,

 6  specifically onto AlphaBay.  And because Mr. Noble had been

 7  doing customer service, he had shared access to some of the

 8  Pharma-Master pages, and he was able to take them on, show

 9  them what he had been working on, and allow them to take

10  screen shots that night so they wouldn't lose some of the

11  evidence.

12          Ms. Tonge and Ms. Bustin, in their interviews,

13  also told the agents one thing that gave them alarm.  They

14  said that the prior night, because Mr. Gygi was gone, they

15  took packages to blue collection boxes.  So a postal

16  inspector raced out.  Ms. Tonge and Ms. Bustin, they had

17  described the packages.  They would never put their return

18  address on it.  They would always pick one randomly off a

19  map, and then they would make up a name for the return

20  address line.  This time the name were all the same.  So

21  they told the agents what name to look for.  They told them

22  there would be 20 packages, and the postal inspector was

23  able to gather up all 20 before they got dispersed through

24  the mail stream.

25          Here's a couple of those last 20.  A box here,

1    Fentanyl pills.  These like all the others, Fentanyl.

2            Shortly after Mr. Shamo's arrest, his friend, Drew

3    Crandall, living overseas, notified AlphaBay, said

4    Pharma-Master has been compromised, it needs to be shut

5    down.

6            In January of 2017, the agents, working with now

7    the cooperating co-conspirators and building their own

8    investigation, had enough information to apply for and

9    receive three search warrants to search places where Mr. Paz

10   was known to sometimes reside.  That process of searching

11   his residences began discussions between Mr. Paz and his

12   attorney and these agents.  During that process, Mr. Paz

13   turned over his drug money, in total, just under $800,000.

14   He was getting paid a percentage for every pill that he

15   pressed.

16           In March of 2017, Mr. Shamo's parents turned over

17   money he had left with his family, in total, just shy of an

18   additional $430,000.

19           Let's take a minute now and let's talk about

20   Darknet markets.  You're going to hear specifically from a

21   special agent who, because of his training and experience,

22   is able to offer opinions that you can consider, and he's

23   going to talk about Darknet markets in some detail.  I want

24   to give you just the briefest overview of the evidence

25   you're going to hear.

1    Darknet markets, that name, those were the

2    websites where Mr. Shamo was selling his drugs.  The

3    Darknet, it's a corner of the Internet.  You need a special

4    browser, an Internet browser to get on there.  And then you

5    also need a user name and password to enter the markets.

6    This one that you see pictured here, this is the first sort

7    of commonly known Darknet markets, Silk Road.  And Darknet

8    markets have some characteristics in common.

9         So, for example, you can see the categories on the

10   left of the items that are for sale.  In the middle, that's

11   going to be the featured product descriptions, so you can

12   click on one of those and then make a purchase.  And then

13   lastly, user information on top.

14        When drugs were purchased on the Darknet, they

15   were purchased with cryptocurrency.  The cryptocurrency

16   you're going to hear about in this case is Bitcoin.

17        This is AlphaBay, the market where Mr. Shamo was

18   selling drugs in 2016.  You can see there the URL, the

19   address.  It says AlphaBay.  Then there's some nonsense

20   letters followed by dot onion.  When you think about the

21   websites that you're going to on the Surface Web, you go to

22   places that are dot com, or dot org, or maybe dot gov.  If

23   you want to go to a Darknet market, you're flicking for dot

24   onion websites and you need a specific browser to get there.

25        Then on the left, these are the items for sale.

```
 1    This screen shot is showing counterfeit items.  The next one
 2    here, these are drug items for sale.
 3              AlphaBay made money on every transaction on its
 4    site.  It took a cut.  AlphaBay had the incentive to try to
 5    increase the amount of transactions.  But on the Darknet,
 6    anonymity is key, and buyers feel hesitancy to buy online,
 7    to send their Bitcoins to a vendor who's anonymous for fear
 8    they won't get their product back.  So AlphaBay took some
 9    steps to try to alleviate some of the concern a potential
10    buyer might have, and most of it had to do with feedback.
11    In addition to feedback, AlphaBay worked as an escrow
12    service.  But for now, let's talk just about the feedback.
13              So a potential buyer could go on to AlphaBay and
14    look at a seller.  They could see that -- for example, this
15    seller, on the number one there, had 94 percent positive
16    feedback over the last 12 months.
17              Then if you're looking at the second arrow, number
18    two, not only could you see the percent positive over the
19    last 12 months, but they would break it down by one month,
20    six months, 12 months so you could look for trends.
21              Customers would rate sellers based on their -- now
22    if you're looking at number three -- their stealth, and what
23    they mean by stealth is how expertly a seller packages and
24    ships drugs to avoid law enforcement detection.  Customers
25    would also rate sellers based on the quality and the value.
```

```
 1              And then lastly, number four, customers were
 2    allowed to leave comments, feedback.  So you can see the top
 3    row of feedback here at the bottom, that customer wrote
 4    perfect.  But it's not 2016.  It's 2013.
 5              Then if you look underneath that, that tells you
 6    what product they're referring to.  It's Microsoft Office.
 7    You can see the price there in dollars.  So they pay in
 8    Bitcoin, but AlphaBay would display it in dollars.  Six and
 9    a half dollars for Microsoft Office, and the date and time
10    of the purchase.
11              Even if a customer didn't want to type in
12    comments, AlphaBay would still generate a row for every
13    transaction.  So if you look at the bottom two rows, those
14    customers left no comment, but AlphaBay generates a row.  So
15    A potential buyer can see a seller's individual sales, how
16    much they're selling, what people are paying, the date on
17    which they're making sales.  That same date, it was there
18    for Pharma-Master, and that's how the agents created this
19    chart that shows his sales for 2016 that you saw earlier.
20              This specifically is one of the 366 pages of
21    feedback that the agents were able to capture for
22    Mr. Shamo's drug sales.  So let's look at just a few of the
23    comments his customers left.
24              I heart you.  I really do.  Absolute perfection
25    again.  Very discreet shipping.  No worry there.  Product
```

```
 1   looks great.  Some think they feel stronger than a regular
 2   30.  That's good, though.  Just be careful if you don't have
 3   a tolerance.  Thanks.  Be back soon.  Take care.  Enjoy
 4   life.  That customer, you can see below, they bought 100 of
 5   his Fentanyl pills, specifically the ones that he labeled
 6   M Box 30s.
 7         Here's another.  There is no one better to do
 8   business with.  I have done thousands, and this fact is
 9   indisputable.  Thank you, Pharma-Master.  This person bought
10   another hundred of his Fentanyl pills.  Fantastic service.
11   I'll be back.  This person bought ten pills.
12         Agents and analysts took this feedback and the
13   sales data, they added it all up, and from the feedback we
14   were able to capture, Mr. Shamo sold $2.8 million worth of
15   drugs in 2016, more than 800,000 pills and more than 5500
16   transactions.
17         Let's focus now just for a moment on his Fentanyl
18   pills.  Just the Fentanyl sales.  Almost 3500 transactions,
19   more than 450,000 Fentanyl pills, and he made $2.4 million.
20         I mentioned he had the three ways of listing his
21   Fentanyl pills.  So this breaks down by how he would
22   describe them.  When he labeled it an M Box or an M Box 30,
23   he had 871 orders, but those were larger orders.  So you
24   look at the total quantity, 210,000 pills, and just from his
25   M Boxes, he made a million dollars.
```

```
 1              When he labeled it as a Roxy -- and you can see
 2    what a Roxy looks like.  It's that A215.  That's the other
 3    name you'll hear it described as.  When he labeled it as
 4    just a Roxy, more orders, 2200, but smaller orders.  So the
 5    total quantity, 242,000 pills, and he made 1.4 million just
 6    off of Roxys.
 7              Lastly, when he would put in his listing right in
 8    the title that his pills contained Fentanyl, 376 orders,
 9    just over 5,000 pills, just under $50,000.
10              Let's talk about the evidence you're going to hear
11    with respect to Mr. Shamo's oversight.  Mr. Shamo maintained
12    oversight even as he hired employees, including on ordering
13    ingredients and parts.  So here he's corresponding with his
14    executive assistant, Ms. Gabby Noriega.  He said, hey, did
15    you order the stearic acid from the link I sent you?  I
16    needed it specifically from Pyro Chem Labs because they
17    don't triple press stearic acid.  He gives her the link.
18    This is the link I sent.  Did you order it from this, Pyro
19    Chem Labs?  Then she clarifies, on to the next page, yeah,
20    I'll get you the address in a sec, but this is urgent for
21    the stearic acid.  I'm on a very large time crunch.  Gabby.
22    And then she indicates that she's made the purchase.
23              A little later in time he tells her, we need
24    cornstarch, lactose -- he needs another bucket of lactose,
25    and more stearic acid ASAP.  Get ordering.  Also half bag
```

```
 1   Ziploc bags.  The snack size ones.  Then she's catching up.
 2   Okay.  Some stearic acid should be coming like any day now.
 3   I ordered some not that long ago, I thought.  How much more
 4   cornstarch do you want?  Then he clarifies.  Focus on
 5   lactose first.  Order like 30 to 50 pounds.  Then more
 6   stearic acid.  We should be okay on cornstarch for a little
 7   bit.
 8           He asks her a little later did you order the
 9   filler from tabletpress.com?  It's a Canadian company where
10   he's buying that microcrystalline cellulose.  And then he
11   says, to TJ Edwards.  TJ Edwards is one of his package
12   receivers, this man right here.  Then he says, also when's
13   your payday?  And then to those two questions, Ms. Noriega
14   responds not yet just because you said you would check to
15   make sure that was right and I didn't hear back from you.
16   And then when's payday?  It was Sunday.  Okay.  You've got
17   to remind me of these things, LOL.  This month's been crazy.
18           Mr. Shamo was also in charge in ordering parts,
19   specifically the dies and the punches.  So he got an e-mail
20   from a Chinese manufacturer.  They indicated they got his
21   e-mail at the Aliexpress store, and asked if he was
22   interested in good A215 or good Xanax replica dies.  And
23   when they say dies, they mean not just the dies but the
24   punches.  He responds, sounds good.  I would like both made.
25   And then asks do you accept Bitcoin as payment?  I'd like
```

```
 1   you to get started immediately.  And then he clarifies the
 2   type of press that he's using.  They tell him that they
 3   cannot accept Bitcoin.  They only accept Western Union and
 4   wire transfers.  Then they confirm, do you want to order the
 5   A215 and the Xanax replica dies?  Then they talk about the
 6   specifications for his press.  They work it out.  He
 7   indicates that the MoneyGram will be coming in his name, but
 8   the dies, the punches, they need to be sent to Julian
 9   Mausia, this man right here, another one of his package
10   receivers.
11        There was evidence found in Mr. Shamo's devices
12   about payments he made to China.  This is $2100.  That's for
13   Fentanyl.  This is a money gram, $1400, going to China.
14   Then $1100 also going to China.  Mr. Shamo maintained
15   oversight on quality control, how much Fentanyl.  And how
16   did Mr. Shamo figure out how much Fentanyl to put inside his
17   pills?  Research.  This was found on his computer.
18   Something he found online.  You can see there it's a
19   comparison.  It compares, among other things, Oxycodone and
20   Fentanyl.
21        I mentioned that he was getting feedback from this
22   local dealer.  Mr. Shamo had a note in one of his phones.
23   The date on it is February of 2016, so right when he's in
24   the process of creating and perfecting fake Fentanyl pills,
25   and at the bottom of that note, this is what he wrote -- or
```

```
 1    copied.  Okay.  So these are the best so far.  They smoke

 2    perfect and they snort and slide.  Slide means how it is

 3    traced along aluminum foil as they smoke it, heat it up from

 4    the bottom.  The color being speckled won't fly so that

 5    needs to be fixed, but you already knew that.  My boy smoked

 6    two in a row and barely got high.  So a bit stronger is

 7    going to be a must, bro.  But all in all these are f'g close

 8    to being money in the bank, man.  You did it, bro.

 9            Mr. Shamo's oversight over quality control

10    continued.  This is February of 2016.  Even by the end,

11    November of 2016, they are still having issues with quality

12    control.  Here's customer service, Mario Noble.  He says to

13    Mr. Shamo, his boss, you hearing complaints on the recent

14    batch?  Mr. Shamo:  No.  Batch of what?  I haven't read

15    messages all week.  Noble:  Got a couple of complaints about

16    the M Box 30s it looks like.  So Mr. Shamo says sticky them.

17    That means flag it for me so it won't go down in the chute.

18    I'll look at it tomorrow -- or I'll look at them tomorrow.

19            Then a little later in November, the other

20    customer service agent at this point, Drew Crandall, tells

21    Mr. Shamo, getting complaints about the last batch of

22    M Boxes from before vacation.  Are making people sick.  Only

23    halfway through messages and I already have four people

24    saying stuff about it.  Then he asked his boss, should I

25    just tell them to suck it up or should we reship 50 percent?
```

```
 1   Mr. Shamo in response, partway through that first line,
 2   yeah, let's do a 50 percent reship for those guys.  Just
 3   give a pill count for reships that go out so I can keep
 4   track.
 5          Then he changes subjects.  He says, also Sean is
 6   my runner for mail.  So he's just revealed a member of his
 7   organization to another member.  I haven't heard a response
 8   from him since yesterday.  And the Sean he's referring to is
 9   Mr. Gygi.  If you still talk to him -- because Mr. Gygi and
10   Mr. Crandall knew each other from before -- can you reach
11   out and see if he's okay.  You look at the date on that
12   message, November 18th.  The day prior was the date Mr. Gygi
13   met the agents.  But the night of the 17th is when Mr. Gygi
14   was thinking long and hard about what he should do.  The
15   morning of the 18th is when he agreed to cooperate.  And the
16   night of the 18th was the first night he took the agents
17   along to collect the pills.
18          Mr. Shamo kept oversight over customer service and
19   order processing, even though he had people helping him.  He
20   had to train them.  So, for example, Mario Noble asked, yo.
21   Roxy just means replica Oxycodone, right?  Mr. Shamo:  Mine
22   does, yeah.  I only sell replica.  Yeah.  But Roxys are an
23   official drug, right?  The R just means it's a replica?  No.
24   Roxy is a real drug made from real Oxycodone.  Mine are made
25   with a substitute.  His substitute was Fentanyl.  Mr. Noble:
```

 1  Oh, okay.

 2          I mentioned that agents seized his electronic

 3  devices, including the iMac.  From the iMac, agents were

 4  able to find 1984 pages of orders.  So whomever was doing

 5  order processing, usually Mr. Shamo, sometimes Mr. Noble,

 6  they would take the orders that came in online and then they

 7  would create this document.  It's a text file.  You see the

 8  dotted dashed lines there?  Each block there is an

 9  individual sale.  So they would copy in the top four rows

10  from AlphaBay.  And then a buyer, when they made a purchase,

11  they would have to submit that name and address to which

12  they wanted their pills sent.

13          The order processor, Mr. Shamo usually, but

14  Mr. Noble when he was helping, would copy that information

15  from the buyer, put it in the text file, and this document,

16  the daily order sheet, was encrypted and sent to Ms. Tonge

17  and Ms. Bustin, and they would work right off this document

18  to package the pills.  So they knew what a buyer wanted, how

19  much they wanted, what address they wanted it sent to, and

20  then those pills would go out in the mail.  From these 1984

21  pages that were taken from Mr. Shamo's computer, the agents

22  were able to plot by ZIP code everywhere he sent drugs in

23  2016.  Every dot on that map is a ZIP code to which

24  Mr. Shamo and his employees sent drugs.

25          Let's talk about money.  I mentioned that

```
 1   Mr. Shamo spent a fair amount of effort converting his
 2   Bitcoin, his drug money, into cash that he could spend and
 3   use.  Here's one of many examples you're going to see
 4   through the trial.  So at the top, that's Mr. Shamo in the
 5   blue.  He says, hey, it's airshamo4 from localbitcoins.
 6   Airshamo4 is his user name.  Localbitcoins is a website that
 7   brings together people who want to buy and people who want
 8   to sell Bitcoin.  Mr. Shamo says, I'm finally feeling above
 9   water.  Can you meet around 5:30?  His potential buyer says,
10   yeah, I can do that.  Give me an address.  Mr. Shamo,
11   Starbucks, Cottonwood Heights.  Buyer says that sounds fine.
12   I'll be there.  They both get caught in traffic.
13         Now moving to the next page, the buyer arrives and
14   then Mr. Shamo arrives.  He says, sorry, traffic got me too.
15   Buyer says, all good.  I'm on to the couch.  Mr. Shamo:
16   Thanks.  I'm getting off the freeway now.  See you in a
17   second.  That next message, the one that starts 1HBE2Q,
18   that's the buyer sending Mr. Shamo the wallet address he
19   wants Mr. Shamo to send Bitcoins to.
20         And all apparently goes well because eight days
21   later, the buyer reaches out to him again and says, hey, do
22   you have any more coins to sell.  He's looking to buy around
23   5,000.  Mr. Shamo says, I'm getting my car fixed.  If not
24   tonight, tomorrow.  Then the buyer says, okay.  Just let me
25   know when you find out.  How much do you have available you
```

1  could sell?  Mr. Shamo writes, 15k.  I'll have more next

2  week.

3  　　　　All of Mr. Shamo's efforts to cash out Bitcoin

4  resulted in $1.2 million in his house.  It's all drug money.

5  There's Mr. Shamo's 1.2 million as it's going into the bank

6  at Loomis.  The $430,000 turned over by his parents, all

7  drug money.  Mr. Paz's cash, $800,000, all money.

8  　　　　Mr. Shamo purchased this truck from his friend, an

9  early investor, Miles Penrose.  Paid for it with drug money.

10  He bought silver bars.  You can see right there.  He used

11  Bitcoin to pay for it.  He didn't even have to exchange it

12  into cash in order to buy his silver bars.

13  　　　　Mr. Shamo was still holding cryptocurrency,

14  specifically Bitcoin, at the time of his arrest.  To date --

15  and it's not finished, but to date the agents have

16  identified and seized from Mr. Shamo's accounts 535 Bitcoin.

17  On the date of his arrest, a Bitcoin was worth almost $750.

18  　　　　Mr. Shamo had to pay wages to his employees.

19  Sometimes for Mr. Crandall, he would pay him in Bitcoins

20  since Mr. Crandall was overseas.  But he got late on one of

21  his payments and so Shamo went himself to deposit money into

22  Mr. Crandall's account.  That's what you see on the picture

23  there.  He put $2700 in Mr. Crandall's account as payment

24  for his work doing customer service.

25  　　　　Then Mr. Shamo used this drug money to support his

```
 1    lifestyle.  He, with friends, bought a boat and a truck to
 2    pull it.  Here he is in his boat on the lake with Paz.  He
 3    bought an 88-inch TV, a $2,000 bedroom set.  Took trips.
 4    This is a beach in California.  He also went to spring break
 5    in Mexico.  Multiple trips to Las Vegas.  On a cruise with
 6    Luke Paz and their girlfriends.  Fine wine.  Port calls.
 7    All of it was paid for with drug money.
 8              You're going to hear from several of the people on
 9    the screen.  It's anticipated that you're going to hear from
10    Mario Noble.  He's going to tell you that Mr. Shamo hired
11    him, that Mr. Shamo trained him, that Mr. Shamo paid him,
12    that Mr. Shamo was his boss.
13              You're going to hear from Luke Paz.  He's going to
14    tell you Mr. Shamo hired him.  Mr. Shamo and Mr. Crandall
15    trained him, that the two of them worked together, that they
16    had an agreement that he would get a percentage of the price
17    for each pill that he pressed, and that Mr. Shamo paid him,
18    and Mr. Shamo was his boss.
19              You're going to hear from Drew Crandall.  He's
20    going to tell you in the beginning he was a junior partner
21    with Mr. Shamo, but Mr. Shamo bought him out.  And when he
22    came back, he was an employee doing customer service online
23    overseas.  Mr. Shamo paid him.  Mr. Shamo was the final
24    decision maker.
25              You're going to hear Ms. Tonge and Ms. Bustin.
```

```
 1   They're going to tell you that they were initially recruited
 2   by Mr. Shamo and Mr. Crandall.  And once Mr. Crandall left,
 3   Mr. Shamo was the boss.  Mr. Shamo paid them.  Mr. Shamo
 4   either brought them postage or sent them Bitcoins so they
 5   could purchase postage.  Mr. Shamo kept them supplied with
 6   drugs.  And Mr. Shamo and his employees would give them the
 7   daily order sheets so they would know to whom to send the
 8   drugs.
 9           You're going to hear from Mr. Gygi.  He was a
10   package receiver before.  After his friend, Mr. Crandall, is
11   gone, Mr. Shamo approaches him about taking a larger role.
12   He recruits him to be the runner, the courier.  Mr. Shamo
13   paid him.  Mr. Shamo had plans with Mr. Gygi to expand his
14   role in the organization.
15           It's also anticipated you'll hear from Mr. Jensen.
16   Mr. Jensen's package was the first package caught, the
17   package that led to Mr. Shamo's arrest.  He's going to tell
18   you that Mr. Shamo paid him.  He considered Mr. Shamo a
19   friend.  And he received those packages on Mr. Shamo's
20   behalf.
21           You'll also hear from this woman, Jessica Gleave.
22   She's going to talk about the packages that she and her
23   boyfriend, next to her, Julian Mausia, received at
24   Mr. Shamo's request, on his behalf, and that he paid them
25   two, $300 per package for every package they received.
```

```
 1              You saw our witness list Friday.  The only thing I
 2    wanted to mention about it is we have some witnesses who,
 3    because of their education, their training, or experience,
 4    they have the ability to offer an opinion that you can
 5    consider.  For example, this special agent will be the one
 6    that talks about the Darknet, and cryptocurrency, and the
 7    types of encryption they used.  These other witnesses
 8    underlined in yellow, they're similar.
 9              You're going to hear from computer forensic
10    witnesses, scientists and chemists from two different
11    laboratories.  They're going to talk about what was in the
12    pills and how good the fakes were.
13              You're going to hear from a doctor, a Ph.D, with
14    the Food and Drug Administration who was part of the team
15    that reviewed Fentanyl for use in hospital settings, and
16    he'll talk about some of the dangers of Fentanyl.
17              Then lastly, the three on the right.  Dr. Thomas
18    Rogers performed an autopsy.  Bill Posey, below him, helped
19    Dr. Rogers with toxicology analysis.  Then lastly,
20    Dr. Stacey Hail, who is a forensic pathologist, and I'll
21    talk about her in just a moment.
22              Let's finish now talking about Mr. Shamo's
23    customers.  Mr. Shamo sold his drugs to other drug dealers.
24    This is a sale for 5,000 of his Fentanyl pills.  That
25    purchaser is a drug dealer.  Another 5,000, 10,000, 20,000
```

```
 1   of the counterfeits.
 2         Let's talk about one drug dealer in particular
 3   that you're going to hear more about in this case.  His user
 4   name was Trustworthy Money.  Here's 10,000 pills to
 5   Trustworthy Money.  Another 10,000 sold by Mr. Shamo to
 6   Trustworthy Money.  Another 10,000.  Here's Trustworthy
 7   Money and the daily order sheets that we've talked about
 8   that, when Mr. Noble was helping, Mr. Noble would create.
 9   Trustworthy Money sends a message, it says, fifth row down,
10   I messaged you about getting 2k extra pills if I buy this.
11   So 12,000 total.  You said to let you know so you could let
12   the shipping team know.  Please let them know.  Thank you.
13   I really appreciate it.  As soon as it's marked ship, I'll
14   partially release 35k.  By that he means the money is in
15   escrow at AlphaBay and he'll release it to Mr. Shamo as soon
16   as Mr. Shamo marks that it shipped.
17         Mr. Trustworthy Money gives Pharma-Master the name
18   and address he wants his pills shipped to.  He also uses a
19   package receiver.  So that's not him.  That's a real person,
20   Alivia Luckcuck, and then her address.  Trustworthy Money is
21   this guy.  His real him is Jared Gillespie.  He's fanned out
22   $100 bills in front of him.  He has a money counter.  You'll
23   notice on the table over here, Mr. Shamo has two money
24   counters.
25         Mr. Shamo sold to drug dealers.  He also sold to
```

1    drug users, and there's one I want to talk about now.

2          These two orders go to the same user.  So when

3    you're looking at this, you can see the sales information

4    from AlphaBay.  Second row, all the way to the right, it

5    says to and then T-W-A-D.  That's the user, Twad.  You can

6    see the name and address that that user wanted the pills

7    sent to.  And then for that top order, that's ten pills.

8    The listing is for one pill.  The quantity is ten.  So

9    that's ten pills.  It's going to 3 Midvale Drive in Daly

10   City, California.  Daly City is a suburb of San Francisco.

11         The second order, on the bottom now, is in June,

12   specifically June 6th, 2016.  Same user, same shipping

13   address, also for ten pills.  The package that contained

14   those ten pills was tracked.  So postal inspectors were able

15   to tell that it shipped out of Utah on June 9th, 2016, and

16   arrived at 3 Midvale Drive in Daly City on June 11th.

17         That address, 3 Midvale Drive, had these three

18   people at it.  The guy in the middle, that's Gregory Lee,

19   whose name was on the shipping request.  To his left, with

20   the funny sunglasses, that's Ruslan Kluyev, but his friends

21   called him Russ.  And then the woman here, Ms. Tori Grace,

22   is Greg Lee's girlfriend.  Mr. Lee, Russ, they're roommates.

23   Ms. Grace sometimes would spend the night there with them.

24         I mentioned that the package arrived June 11th,

25   2016.  The very next night, June 12th, Greg and Tori arrived

```
1    home after eating dinner with Greg's family, and they found
2    Russ -- he was there to meet them.  It was clear he had been
3    drinking.  They went into his bedroom to hang out with him
4    for a little while.  They watched Russ, their friend, crush
5    up two blue pills that they knew were Fentanyl.  He crushed
6    them up with that battery.  They watched Russ, their friend,
7    snort those pills using the rolled up sticky note you see
8    there.  They watched as their friend Russ started exhibiting
9    the effects almost immediately.  Russ laid down on his bed
10   and asked Tori and Greg to check on him that night.
11          Fentanyl is an opioid.  Opioids are central
12   nervous system depressants.  Taken too much and you shut
13   down.
14          Greg and Tori were nervous.  They checked on him
15   several times that night before they went to bed.  The last
16   time going in to check on him, Tori watched as her
17   boyfriend, Greg, rolled their friend into the recovery
18   position.  It's a way to arrange a body so that if someone
19   unconscious were to vomit, they won't asphyxiate.
20          Tori thought that Russ's breathing was slowing,
21   but Greg dismissed it.  The following morning, Tori got up
22   and went to work.  It was while she was at work that she
23   found out that Russ was dead.
24          Police were called.  An investigation began.
25   Here's his bed.  You can see his glasses.  There's Russ.
```

```
 1    You can see the desk behind him where the battery and the
 2    sticky note were.  Then just inside of that door, there's a
 3    garbage can.  On the top of that garbage can, there's a
 4    priority mail envelope, and that envelope came from Utah.
 5             An autopsy was ordered.  A toxicology analysis was
 6    part of that autopsy.  They looked at what was in his blood
 7    at the time of Russ's death.  They found that he had alcohol
 8    on board.  He was negative for cocaine, but he did have
 9    cocaine metabolite and a cocaine cutting agent.  But then at
10    the bottom there, you see that he had Fentanyl in his
11    system.
12             Dr. Stacey Hail, she's a medical doctor.  She
13    still works in an ER.  She teaches, and then she studies how
14    drugs and classes of drugs affect the human body in an
15    overdose.  She reviewed Russ's case.  She's going to take
16    the stand in this trial and she's going to tell you that
17    having reviewed it, and based on her training and
18    experience, and her education, it's her opinion that
19    Fentanyl was the but for cause of Russ's death.  Meaning but
20    for the fact that he ingested the Fentanyl that night, he
21    wouldn't have died.
22             Death, drugs, and money, that's why we're here.
23             At the conclusion of this case, after you've heard
24    all of this evidence and much more, one of my partners on
25    the case, Mr. Vernon Stejskal here, is going to stand up in
```

```
 1   front of you and ask you to return a verdict of guilty to
 2   every count.  That will be the only verdict that's
 3   consistent with the evidence.
 4             Thank you.
 5             THE COURT:  Thank you, Mr. Gadd.
 6             Want to take a break before your opening?
 7             MR. SKORDAS:  It's up to you, Your Honor.  I'm
 8   ready to go.  I won't be quite as long, but a break might be
 9   in order.
10             THE COURT:  We'll be in recess until five or ten
11   after ten.
12             (Jury excused)
13             (Recess)
14             THE COURT:  Ready to proceed?
15             MR. SKORDAS:  Yes, Your Honor.
16             THE COURT:  Get the jury.
17             (Jury present)
18             THE COURT:  Mr. Skordas, you may proceed with your
19   opening statement.
20             MR. SKORDAS:  Thank you, Your Honor.
21             Counsel, members of the jury, before I start, I
22   want to introduce someone that you missed on Friday, and
23   that's our colleague Daryl Sam, who did get his daughter
24   successfully married off, and he'll be here for the balance
25   of the trial.
```

```
 1              I'm going to start by saying something that I
 2     don't recall saying in opening statements before and it
 3     might come as a surprise to some of you, but one of the
 4     parting remarks that counsel made in his opening is that in
 5     a couple of weeks, one of his associates is going to get up
 6     and ask you to find Aaron Shamo guilty on these counts.
 7     We're going to agree with some of that.  We think that the
 8     evidence will support that he's guilty of some of these
 9     counts.  That might come as a surprise.
10              We think the evidence will support the notion that
11     he's guilty of many of these counts, that he was involved in
12     this drug ring, that he participated in the drug ring, and
13     that he should be held responsible for that.  And he has
14     maintained that from the beginning and will maintain that in
15     the next three weeks before you.
16              There are a couple of things -- Elizabeth, if you
17     could help me.  You're ahead of me -- that we don't agree
18     with in terms of the government, and when you listen to the
19     evidence, listen closely to some of these concepts because
20     Aaron Shamo did not cause the death or create the death of
21     another individual.  Aaron Shamo is not, as the evidence
22     will show, the kingpin of a large drug organization.  And
23     the government will no doubt prance this diagram in front of
24     you repeatedly during this trial, and we invite that.  In
25     fact, we would ask that you look at it in a little bit
```

1    different way.

2            Count 1 of the information that you'll hear is the

3    one that is sort of a kingpin count, if you will.  It

4    requires that the government show that he was a leader, that

5    he was a mastermind, that he was the kingpin, if you will,

6    of this organization.  And that's what they intend to prove

7    is, based on their understanding of what's going on, that

8    he's at the top and all these other folks down here at the

9    bottom, they work for Aaron Shamo.

10           Counsel has indicated that he's going to call some

11   witnesses, most importantly, and maybe in the beginning

12   here, Drew Crandall.  When you hear from Drew Crandall, here

13   are some things you're going to learn, that he worked for

14   eBay customer service in IT; that he has a background in

15   computers and IT support; that he studied mechanical

16   engineering in college; that at the time after that he was

17   in debt to the tune of $45,000; and that while he was in

18   college, he began selling his own prescription medication to

19   individuals, his own Adderall; that he got involved in the

20   manufacturing and shipping of pills to make money to pay for

21   his significant college debt.

22           He helped establish the online marketplace and

23   shipping procedures for this group.  He's knowledgeable in

24   Bitcoin.  He took the proceeds from drug sales and traveled

25   around the world with his fiancee.  He trained Luke Paz to

```
 1    act as his replacement, and that he was still receiving,
 2    accessing, and using proceeds from this as late as
 3    April 2017.  He was arrested in May 2017 when he returned to
 4    get married in Hawaii.  What's the significance of that?
 5            The significance of that, members of the jury, as
 6    you'll hear, is that in April of 2017, Aaron Shamo had been
 7    in jail for five months.  He's there today.  He'll sleep
 8    there tonight.  And he's been there every day since
 9    November 22nd of 2016, every day.
10            When Drew Crandall is receiving access and using
11    proceeds in April 2017, the evidence will show he certainly
12    wasn't doing it with the direction, or help, or assistance
13    of Aaron Shamo because he was in the Weber County Jail.
14    When Drew Crandall was arrested in May of 2017 to get
15    married in Hawaii, Aaron Shamo was in the Weber County Jail,
16    not directing anything or anyone.
17            Drew Crandall, you will learn, members of the
18    jury, through his own testimony and those of the agents,
19    lied when he was interviewed by the agents about his
20    involvement, lied about his assets to the investigators when
21    he was questioned about what he had done here.
22            You'll learn a concept that you've probably all
23    understood since high school, which is plea bargaining.
24    You'll learn that Mr. Crandall plea bargained this case.  He
25    pled guilty to three counts.  Aaron Shamo, as you know,
```

```
 1   members of the jury, is charged with 13.  He pled to
 2   conspiracy to distribute Fentanyl, Alprazolam, and
 3   conspiracy to commit money laundering.  He was never charged
 4   with the continuing criminal enterprise count, the kingpin
 5   count, if you will.  And he agreed to plead guilty in order
 6   to avoid any risk of being convicted of a death resulting
 7   count.
 8           Counsel told you that you'll be hearing from Luke
 9   Paz, and that's true, and here's what you'll learn from Luke
10   Paz.  He became friends with Aaron Shamo through a group
11   called Mario Kart 64, and you'll learn what that means, and
12   basically replaced Drew Crandall while he was traipsing
13   around the world with his girlfriend.  He ordered and
14   received a pill press.  He developed the formula for making
15   the Fentanyl based drugs and kept it in his possession.  He
16   kept a ledger of his manufacturing of Fentanyl based drugs,
17   and paid himself with Bitcoin and currency exchanges -- the
18   organized Bitcoin currency exchanges.  He was arrested in
19   April of 2018, after Aaron Shamo had been in custody for
20   over 18 months.  Luke Paz will come in probably through that
21   back door.  He hasn't spent a day in jail.  And when he was
22   arrested, he had $800,000 in cash and 32 and change in
23   Bitcoin.
24           You'll learn that Luke Paz, when he was questioned
25   by investigators for the government, lied about his
```

 1    involvement, lied about his assets.  And he was allowed to

 2    plead guilty to two counts of knowing and intentional

 3    adulteration of drugs while held for sale, Fentanyl, and

 4    conspiracy to commit laundering.  He was never charged with

 5    a serious death resulting count.  He was never charged with

 6    a serious kingpin count, the continuing criminal enterprise.

 7            Counsel told you that you'll hear from Sean Gygi.

 8    That's true.  But here's what you'll hear about and from

 9    Sean Gygi, that he worked at eBay with Drew Crandall and

10    Aaron.  He delivered pills to Ms. Bustin and Ms. Tonge --

11    who we'll talk about in just a minute -- for packaging.  He

12    received pills from those same two women and delivered them

13    to different addresses.  He received at least $4,000 a

14    month, had packages and drug manufacturing materials

15    delivered to his home on multiple occasions, and made $300

16    for every package delivered to his home.

17            What did he do?  He lied to the investigators when

18    he was questioned.  He lied about his assets.  He lied about

19    his involvement in this enterprise.  And he was allowed to

20    plead guilty.  He was allowed to plea bargain to conspiracy

21    to distribute Fentanyl, Alprazolam, aiding and abetting in

22    the importation of a controlled substance, and the use of

23    mail in furtherance of a drug offense.  He too, like

24    everyone else, except Aaron Shamo, was never charged with a

25    continuing criminal enterprise count, and he agreed to plead

1    guilty to avoid the death resulting count.

2           Counsel told you about Mario Noble, who you will

3    also hear from.  Mario Noble has got a little more

4    involvement in some things.  He's trying to run his own

5    business.  He became involved in this organization through

6    Drew Crandall's friend, Sasha.  He opened his own

7    marketplace on the Internet to sell candy laced with drugs.

8    He tried online marketplace of his own, was making at least

9    $3,000 a month in salary, had access to the entire

10   Pharma-Master page on AlphaBay, and dealt with every aspect

11   of customer service.  He had the ability to manage money

12   coming and going from the Pharma-Master account and dictated

13   his own hours and schedule.

14          What did he get?  Conspiracy to distribute

15   Fentanyl and Alprazolam.  Never charged as a leader,

16   organizer.  Agreed to plead guilty to avoid the death

17   resulting count.

18          Ms. Bustin and Ms. Tonge, you've heard quite a bit

19   about them.  You'll see them all on this chart here.  I

20   won't go through every one.  They also worked at eBay with

21   Drew and Aaron.  They packaged and prepared drugs for

22   shipping.  They made their own schedule.  They requested

23   more jobs and money on multiple occasions.  They made at

24   least $2,000 a month and upwards of $3500 a month for

25   packaging.  And when they were arrested, members of the

1   jury, they had 75,000 Fentanyl pills in their home.

2           They were questioned by investigators in this

3   case.  They lied about their involvement.  They lied about

4   their assets.  They pled guilty to conspiracy to distribute

5   Fentanyl, Alprazolam, possession of Fentanyl with the intent

6   to distribute, the use of the U.S. Mail in furtherance of a

7   drug trafficking offense, and conspiracy to commit money

8   laundering.  Again, they were never charged with a

9   continuing criminal enterprise, leadership role, and they

10  agreed to plead guilty to avoid the death resulting count.

11          Jessica Gleave, offered full immunity from any

12  future prosecution.  Nothing.  Pled guilty to nothing.

13          Ryan Jensen, who you'll hear from today, offered

14  full immunity from any future prosecution.

15          Although in a criminal case in America the

16  defendant doesn't need to testify, you'll hear from Aaron.

17  You'll hear from his family members.  And you'll hear from

18  his -- by family members, I mean his mother and sister.  And

19  here's what you'll learn about Aaron, that he's learning

20  disabled, he had severe ADHD, and a processing disorder;

21  that he was roommates after college with Drew Crandall; and

22  that in college, like Drew Crandall, he began selling his

23  own prescription medication along with Drew.

24          He was arrested November 22nd, 2016, awaiting

25  trial, and has been sitting in jail since that day.  Longer

1  than all the other people in this chart combined.

2      When he gets arrested, there are no Fentanyl pills

3  found in his home.  Never in possession of the formula for

4  possessing Fentanyl.  Importantly, members of the jury, he

5  was never interviewed by the investigators in this case.

6  And as you'll see, some of the co-defendants and some of the

7  people that will be testifying -- as you'll hear I should

8  say, will tell you that Aaron just wasn't capable of

9  organizing or running an organization like this without

10  substantial assistance.

11      The government, early on in this case, November of

12  2016, created this chart.  It's about a three-year-old

13  chart.  And their argument this morning is that Aaron

14  founded and led this organization.  Their argument this

15  morning and their statements are that he was the leader of

16  this.  And counsel said Aaron did this, and Aaron directed

17  that, and Aaron did this, and Aaron was in charge of that.

18  But when you listen to the evidence, you'll find that that's

19  not the case.  When you hear the witnesses testify, you will

20  see that that was not the case.

21      It's an unfortunate role that we play as defense

22  attorneys in a criminal case because we have to wait until

23  the government puts his case on.  That's just the way it

24  works in America.  It's worked for hundreds of years.  But I

25  would ask you, members of the jury, to withhold judgment on

```
 1   this case until you've heard the entirety of the evidence.
 2   I would ask you to not form an opinion today or tomorrow,
 3   certainly not based on the statements of counsel this
 4   morning, but to wait until you hear all the evidence.
 5             Wait until you see the big picture -- which has
 6   now disappeared -- because what you'll see is that Luke Paz
 7   pressed 480,000 Fentanyl pills.  He has not spent any time
 8   in jail.  He cut a plea deal.
 9             Drew Crandall, still benefiting from drug sales,
10   as I indicated, as late as April 2017, he cut a plea deal.
11             Mario Noble started his own drug marketplace,
12   which failed.  He's not in jail.  He cut a deal.
13             Ms. Tonge, found with nearly 75,000 Fentanyl
14   pills, she's not in jail.  She cut a deal, as did her
15   associate, Ms. Bustin -- by the way, I have their names
16   backwards here -- who also cut a deal.  Never went to jail.
17             Mr. Gygi derives substantial income from
18   importation and shipment of illegal narcotics.  Not in jail.
19   Middleman between multiple parties.  Not in jail.  Cut a
20   plea deal.
21             The only person on trial, members of the jury, is
22   Aaron Shamo.  The only person who is left standing, if you
23   will, is Aaron Shamo.  The reason for that, as you'll see,
24   is that the government decided early on that he was somehow
25   the kingpin of this organization and his head needed to
```

```
 1   roll.

 2           We've told you earlier -- I've told you earlier

 3   that he will admit to his conduct here, and we will agree

 4   with Mr. Stejskal in our closing that he should be convicted

 5   of some of these counts, but not all of them.  He didn't

 6   have a plea deal, and he was never interviewed by

 7   investigators.

 8           This is a trial that is scheduled to go about

 9   three or four weeks.  I believe it could be a little bit

10   less than that.  I don't think this trial is going to take

11   that long.  I say that because Aaron's owning what he did.

12   And we can flash all the styrofoam or plastic containers in

13   front of you all and bounce them around, but we know what

14   they are.  We'll agree to what they are, and we'll agree to

15   how they came into possession of certain individuals.  We'll

16   agree how the government got these.  But the evidence will

17   not establish, members of the jury, that Aaron Shamo caused

18   the death of another or that he was the organizer, leader,

19   mastermind of this organization.  Just the opposite.

20           So please keep an open mind.  Keep from forming a

21   final opinion until you hear all the evidence, and that

22   might be a couple of weeks from now.  Remember the

23   instructions that the Judge has given, instructions about

24   the presumption of innocence, because in America, in 2019,

25   an accused is presumed innocent until the government
```

1    establishes proof beyond a reasonable doubt to each and

2    every element of the offense.

3          Keep in mind, as the Judge instructed you this

4    morning and will instruct you again, that the government

5    carries the burden of proof.  The defense doesn't have to

6    put on any evidence at all, even though we will.  Keep in

7    mind, members of the jury, as the Judge has instructed you

8    and will continue to instruct you, that unless and until you

9    find beyond a reasonable doubt each and every element of

10   those offenses, you have a legal and moral obligation to

11   find Aaron Shamo not guilty.  And at the end of the day, at

12   the end of the month, at the end of the trial, that's what

13   the evidence will show.

14         Thank you.

15         (Whereupon, proceedings not transcribed.)

16         THE COURT:  Did you say you had something you

17   needed to take up?

18         MR. GADD:  Two things.

19         THE COURT:  Do we need to wait for the clerk to

20   get back in?

21         MR. GADD:  Probably.

22         THE COURT:  All right.

23         There she is.

24         Go ahead.

25         MR. GADD:  I think the Court probably caught this

```
 1    as opening statements were going on.  The Court ruled on a
 2    motion in limine back in May where we had asked the Court to
 3    preclude the defense from charging comparisons between
 4    co-defendants.  Much of the defense's opening statement was
 5    drawing those comparisons that the Court ruled --
 6              THE COURT:  I'm looking at your chart, the chart
 7    in your exhibit.  Do you know what I'm talking about?
 8              MR. GADD:  Of the people?
 9              THE COURT:  No.  No.  I'm looking at the chart
10    about permitted and not permitted.
11              MR. GADD:  Yes, sir.  Yes, sir.  The filed one.
12              THE COURT:  Charges permitted.  Charges and
13    potential sentences for testifying co-conspirators?
14              MR. GADD:  Yes, sir.
15              THE COURT:  That's permitted.  What are you saying
16    he shouldn't have done?
17              MR. GADD:  The comparison is pointing out that
18    they're not charged with other crimes, specifically CCE or
19    the death resulting offense, Count 1 and Count 6.
20              THE COURT:  Mr. Skordas.
21              MR. SKORDAS:  We're happy to ask each one of them
22    that individually if that's what it's going to take.
23              THE COURT:  I'm not sure I understand what you're
24    complaining about.
25              MR. GADD:  Yes, sir.  I'll try to be more clear.
```

```
 1          The Court ruled that they could not draw
 2   comparisons between Mr. Shamo, who's charged in Count 1 and
 3   Count 6, and the other defendants who are not.  But since
 4   those comparisons have been drawn, I'm asking for a curative
 5   instruction.  I think we can model it similar to the
 6   instruction that we've proposed in the final jury
 7   instructions or we tell the jurors now so that they're not
 8   laboring under a false impression for the next four weeks,
 9   that it's not their role to decide or judge the charges and
10   that they should not draw those comparisons.
11          THE COURT:  Mr. Skordas.
12          MR. SKORDAS:  Your Honor, our understanding was
13   that it was really sentencing comparisons that we were
14   staying away from, but the government can argue whatever it
15   wants.  We were just going through what we believe the facts
16   will be when these individuals each testify.  We're entitled
17   to do that.  I'd be happy to bring all their attorneys in,
18   if that's what you want, but there was a very clear intent
19   by everybody to avoid those two counts.
20          MR. GADD:  The problem there is none of them faced
21   the CCE count.  That's why drawing the comparison is
22   impermissible.
23          THE COURT:  Well, but you can point that out,
24   can't you, on the testimony?
25          MR. GADD:  Yes, certainly.  My request is that we
```

```
1    have a short instruction now so that the jury doesn't think
2    for the next four weeks, or when we get to the individual
3    cooperators' testimony, that part of what they are supposed
4    to consider is the grand jury's decision on whom to charge
5    with what or to draw comparisons between co-defendants and
6    what charges the grand jury indicted them on.
7              THE COURT:  In your own chart -- do you know what
8    I'm talking about?  In your own brief --
9              MR. GADD:  Yes, sir.
10             THE COURT:  -- you say permitted, and I agreed
11   with this, charges and potential sentences for testifying
12   co-conspirators for purposes of impeachment.
13             MR. GADD:  Yes, sir.
14             THE COURT:  Isn't that what he did?  Isn't that
15   permitted?
16             MR. GADD:  Yes, that is permitted.  It's the
17   inverse that's not permitted.
18             THE COURT:  Which is what?
19             MR. GADD:  Pointing out what they were not charged
20   with and then drawing comparisons.
21             THE COURT:  I don't know that I ruled on that.
22             MR. GADD:  I would be happy to take a minute this
23   afternoon when court is adjourned and try to put what I'm
24   trying to say in writing and hopefully make it more clear.
25             THE COURT:  All right.  So far I don't think he
```

```
 1   has violated this chart.  If I'm wrong, then I'm sure you'll
 2   point it out.
 3           MR. GADD:  The second issue I'd like to address is
 4   his contention that the defendant was never interviewed.  So
 5   I've instructed our agents not to bring up that when they
 6   tried to interview the defendant, he invoked his right to
 7   remain silent.  But by making it a point of contention that
 8   was never interviewed, unlike the other co-defendants, we
 9   think the jurors need to hear the full story, that he was
10   given the opportunity and refused.
11           THE COURT:  They do, don't they, if they tried to
12   interview him and he invoked his right?
13           You said he was never interviewed?
14           MR. SKORDAS:  Correct.
15           THE COURT:  They say they tried to interview him
16   and couldn't.
17           MR. SKORDAS:  Early on.  And we tried for three
18   years to interview with them and they wouldn't.  So if they
19   want to open that up, let's open the whole thing up.  We
20   have been begging them for an interview for three years,
21   Your Honor.  I'll testify to that.
22           THE COURT:  Mr. Gadd.
23           MR. GADD:  We'll have a hard time with an attorney
24   as a witness.
25           THE COURT:  Yes.  Yeah.  We're not going to do
```

1   that.

2           MR. GADD:  I see it as an open door, but because

3   it's a sensitive issue dealing with Fifth Amendment rights,

4   I wanted to bring it up first with the Court to make sure

5   that we were okay to briefly ask our agents if they asked to

6   interview him and if he refused.  And we'll try to phrase it

7   such that we don't implicate his constitutional rights.

8   We'll just indicate that he chose not to.

9           THE COURT:  If you do that, Mr. Skordas is going

10  to want to bring up through -- I guess Mr. Shamo, if he

11  testifies, and it sounds like he's going to --

12          MR. GADD:  If Mr. Shamo has personal knowledge,

13  I'm sure he could testify to that.

14          THE COURT:  -- that at some point he wanted an

15  interview.

16          You can do what you said you wanted to do and then

17  you can do what I suggested you could do.

18          MR. GADD:  Those were the two things.  Thank you,

19  Your Honor.

20          THE COURT:  You haven't convinced me on the first

21  thing.  You do understand that, right?

22          MR. GADD:  Yes, sir.  I'll look at it again.

23          THE COURT:  All right.

24          Now we're probably looking at five to 12.

25          We'll be in recess.

```
 1              (Recess)
 2              THE COURT:  Where are we on the fight we ended
 3    with?
 4              MR. GADD:  No further resolution.
 5              THE COURT:  Were you complaining about what he
 6    said during his opening statement or something he's asked a
 7    witness?
 8              MR. GADD:  Just the opening statement.
 9              THE COURT:  But you didn't object at the time
10    either.
11              MR. GADD:  No, sir, chose not to object out of a
12    professional courtesy.
13              THE COURT:  But you're not objecting to anything
14    he's asked a witness yet?
15              MR. GADD:  I have not made an objection, no.
16              THE COURT:  Precisely, again, what do you think he
17    should not have said in his opening statement?
18              MR. GADD:  Drawing a comparison between the
19    charges Mr. Shamo faces and those faced by his
20    co-defendants.  Charging decisions at their core are made by
21    the grand jury.  Mr. Shamo was charged with Count 1, CCE.
22    His other co-defendants weren't.  It's not for this jury to
23    try to rejudge what the grand jury did or didn't do.
24              So I fully agree that they can talk about what
25    someone pleaded guilty to and then minimum and maximum
```

1     sentences as impeachment.  It was that next step, drawing
2     the comparison between who got charged in Count 1 and who
3     didn't that I saw as impermissible.
4               THE COURT:  Mr. Skordas.
5               MR. SKORDAS:  Your Honor, the grand jury, as this
6     Court knows, issues indictments based on evidence presented
7     to it by the United States Attorney's Office.  Had they
8     sought an indictment for the CCE count, they would have
9     received that.  But they didn't.
10              THE COURT:  But isn't it true that we usually
11    don't get into the charging decisions in a trial?
12              MR. SKORDAS:  Yes.
13              THE COURT:  What would your curative be?
14              MR. GADD:  We have a couple Pattern Instructions,
15    the Tenth Circuit Pattern Instructions that I think hit
16    right on this point.  And I apologize for not pulling those
17    numbers.  They're two of the instructions that we proposed
18    as final instructions.  So my thought is maybe this
19    afternoon I could try to draft up something that's neutral
20    but explains to the jury their role and specifically
21    indicates that making those comparisons is not within their
22    role, and then just explaining it to them perhaps tomorrow
23    morning.
24              THE COURT:  Well, take a shot at it.  And run it
25    by -- I mean send it to him, send it to me.  We'll talk

```
 1    about it tomorrow.
 2                MR. GADD:  Will do.  Thank you, sir.
 3                THE COURT:  Let's get the jury and proceed.
 4                (Whereupon, proceedings not transcribed.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    C E R T I F I C A T E

 2

 3

 4          I hereby certify that the foregoing matter is

 5   transcribed from the stenographic notes taken by me and is a

 6   true and accurate transcription of the same.

 7

 8

 9

10

11

12

13

14

15

16   PATTI WALKER, CSR-RPR-CP      DATED: 8-19-19
     Official Court Reporter
17   351 South West Temple, #8.431
     Salt Lake City, Utah  84101
18   801-364-5440

19

20

21

22

23

24

25
```

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
**SKORDAS & CASTON, LLC**
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **MOTION FOR MISTRIAL** |
| Plaintiff, | Case No. 2:16-CR-00631 DAK |
| v. | Judge Dale A. Kimball |
| AARON MICHAEL SHAMO, et. al., | |
| Defendant. | |

Aaron Michael Shamo, by and through counsel, hereby motions this Court for a mistrial and discharge of the jury prior to the rendering of any verdict. In support of this motion, the Defendant alleges as follows:

## STATEMENT OF RELEVANT FACTS

1. On April 26, 2019, Defendant filed a Motion in Limine requesting this Court limit the Government's ability to discuss or mention overdose deaths alleged to be related to the events charged in the indictment, with the exception of the death of R.K. for which Mr. Shamo was actually charged.

2. On May 10, 2019, the Government responded to that Motion and argued that the subject of overdose victims was necessary to certain charges in the indictment even beyond the "death resulting" count tied to R.K.

3. The Government argued that the overdose deaths of E.B., C.V., and G.K. were necessary to paint a clear picture of the predicate offenses to Count 1 - Continuing Criminal Enterprise.

4. The Government also argued that investigators needed to be able to explain why E.B., C.V., and G.K were not interviewed by investigators. The Government made the same argument as to G.L., the roommate of R.K.

5. On May 17, 2019, the Defendant replied to that response outlining the concerns of prejudice under Rule 403, the lack of necessity, and the clear indication that the Government intends to outline the deaths of G.L., E.B., C.V., and G.K in the same manner it intends to outline the death of R.K.

6. On May 29, 2019, the matter came before the Court for a motion hearing. There was some discussion on the record concerning the Government's needs to indicate the reason for the investigator's inability to interview E.B., C.V., and G.K and why G.L. was not being called to testify at trial.

7. The Court's minute entry from that hearing indicates: "The Government agrees that it won't tie overdose deaths of unavailable witnesses to Defendant or say that the death resulted

from overdoses."

8. During the jury trial on August 20, 2019, the Government called Agent Virginia Keys with the Food and Drug Administration as a witness during its case-in-chief. Attachment A contains the specific portions of this examination that are of issue in this motion.

9. During direct examination of Agent Keys, SAUSA Gadd referred to the family of G.K. while the family could be heard audibly crying and gasping in the pews adjacent to the jury.

10. Agent Keys then got emotional on the stand while testifying about these individuals who had died.

11. Defense Counsel objected to the inquiry and counsel approached the bench for a conference at sidebar; wherein, the Court indicated they believed SAUSA Gadd had gone beyond the scope of the necessary inquiry regarding those deaths and tying them to the Defendant.

12. Following the Bench Conference, SAUSA Gadd continued his direct examination of Agent Keys and inquired as to the remaining two parties, C.V. and E.B., then continued a similar inquiry regarding G.L. before continuing in the same inquiry relating to the only alleged victim, R.K. Attachment A contains the relevant portions of this inquiry as well.

13. Even after leaving the witness stand, Agent Keys continued to tear up in the presence of the jury.

## ARGUMENT

"[C]ourts of justice may discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *United States v. Taylor,* F.2d 1177, 1178 (10th Cir. 1979). A motion for mistrial should be granted in circumstances where the error

tends to deprive the Defendant of a fair trial. *United States v. Burch,* 48 F.3d 1233, 1247 (10th Cir. 1995). Where a cautionary instruction is insufficient to cure the error and "the character of the testimony is such that it will create so strong an impression on the minds of the jurors that they will be unable to disregard it in their consideration of the case" a mistrial is appropriate. *United States v. Morgan,* 748 F.3d 1024, 1039 (10th Cir. 2014) (citing *Maestas v. United States,* 341 F.3d 493, 496 (10th Cir. 1965)).

In *Taylor* the Defendant's motion for a mistrial was denied where an officer testified that he had previously "worked a case" on the defendant, the trial court later ruled the evidence of such inadmissible, and the trial court took specific steps to limit the impact of the ambiguous statement. *United States v. Taylor,* F.2d 1177. In *Burch* the trial court's denial of a motion for mistrial was upheld where the basis of that motion rested solely on the judicial officer's derogatory comments to counsel regarding counsel's lack of competency and not in relation to the evidence before the jury. *United States v. Burch,* 48 F.3d 1233. In *Morgan,* the trial court's denial of a motion for mistrial was upheld where the offending statements, though innocuous, were excluded, stricken from the record, and a cautionary jury instruction was sufficient to undo the prejudicial impact. *United States v. Morgan,* 748 F.3d 1024.

In *Maestas,* the trial court's denial of multiple motions for a mistrial were overturned where those motions were based on multiple statements of witnesses regarding prior incarceration and prior criminal conduct. *Maestas v. United States,* 341 F.3d 493. The *Maestas* court reasoned that part of the need for a mistrial as the appropriate remedy came from the fact that there were multiple improper statements made despite proper instruction on the limitations of such statements. *Id.*

In the instant matter, a mistrial and discharge of the jury is the proper remedy as the

Defendant has been deprived of his constitutional right to a fair trial. The Government's inquiry regarding overdose deaths exceeds even the limitations outlined in *Maestas*. The Court was specific in its ruling during the pre-admission hearing- the Government was prohibited from mentioning other overdose deaths and/or tying the Defendant to other overdose deaths with the exception of the single count involving R.K. The exchange between Agent Keys and Government's Counsel took place in the presence of the jury and clearly implied the overdose death of three of the customers of PharmaMaster. Government Counsel's inquiry about whether or not the family of G.K. had been interviewed and whether or not they were present in the Courtroom was strategically designed to garner an emotional response from Agent Keys and G.K.'s family and it did in fact elicit an emotional response from both parties.

The concerns regarding substantial and unfair prejudice were clearly outlined prior to the pre-admission hearing and the Court concurred at that time that there was a significant enough concern and the need to inquire further into other overdose death had limited probative value. Additionally, these inquiries were conducted in the same manner as the inquiry regarding the only alleged victim, R.K. The implication clearly being that these overdose deaths were connected to the purchases alleged to have occurred on PharmaMaster.

In this particular instance, under the totality of the circumstances a cautionary jury instruction would be ineffective to cure the intentional error committed by the Government in addressing these overdose deaths in the manner and capacity in which they were addressed. It was not one overdose death that was mentioned, it was three; it was not a simple passing reference to three overdose deaths, it was a reference to those individuals being "real people" who died and at least one of their families being present; it was also coupled with a witness who became emotional on the stand and a family audibly crying in the Courtroom at the mention of

their deceased relative. Counsel for the Government made certain to note for the jury the presence of the family in the Courtroom, which elicited the emotional response from both the Agent being examined and the family. As outlined in *Morgan,* undoubtedly "the character of the testimony [was] such that it [created] so strong an impression on the minds of the jurors that they will be unable to disregard it in their consideration of the case." 748 F.3d 1024, 1039. No such cautionary jury instruction can protect the rights of the accused under such egregious circumstances.

The testimony proffered and the circumstances under which it was proffered left such a clear impression that even the Court noted the implication was Mr. Shamo was responsible for each one of the deaths being discussed. Counsel for the Government's follow-up inquiry after direction from the Court was similarly insufficient to undo the significant harm caused by the prejudicial inquiry and implications. As previously outlined, Rule 403's exclusionary impact is proper where the proffered evidence has a tendency to suggest a decision on improper basis. *United States v. Watson,* 766 F.3d 1219, 1242 (10th Cir. 2004). The prejudicial impact must be evaluated in conjunction with the probative value. There was limited probative value in explaining to a jury why certain witnesses were not available to testify at trial. There was no probative value in explaining to the jury that a witness was unavailable for trial as a result of dying from a drug overdose. There was no cause for doing so in the same course of discussing the one death for which the Defendant was in fact charged, with the exception of attempting to tie the Defendant to those deaths in the same manner. This is further supported by the unnecessary inquiry into the presence of the family in the Courtroom. The effect of this improper inquiry is to deprive the Defendant of the right to a fair trial by suggesting to the jury Mr. Shamo is guilty of such egregious uncharged offenses and allowing such hostility to suggest an ultimate

verdict on an improper basis. There is no effective and sufficient way to cure that error.

WHEREFORE, the defendant moves the Court for a mistrial and discharge of the jury prior to the rendering of any verdict in order to preserve the Defendant's right to a fair trial.

Respectfully Submitted this 22nd day of August, 2019.

/s/ Gregory G. Skordas
Gregory G. Skordas

/s/ Kaytlin V. Beckett
Kaytlin v. Beckett

/s/ Daryl P. Sam
Daryl P. Sam

### CERTIFICATE OF SERVICE

I hereby certify that on the August 22, 2019, I electronically filed a true and correct copy of the foregoing **MOTION FOR MISTRIAL**, with the Clerk of the Court using CM/ECF system, which sent notification of such filing to the following:

S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Kent Burggraaf
kburggraaf@agutah.gov

/s/ Sabrina Snow-Legal Secretary

SKORDAS & CASTON, LLC

# ATTACHMENT A

1    Q.   For the large purchasers, so for this

2    purchaser for example, Trustworthy Money, who is

3    purchasing 10,000 of the Fentanyl pills, what did you

4    and other agents do to further investigation into

5    these types of large purchases?

6    A.   When we reviewed all of the pages -- there's

7    1,984 pages of customer orders.  And, as we reviewed

8    them, we pulled out the orders of -- the larger orders

9    that were clearly not personal use orders, and we sent

10    leads all over the United States to different law

11    enforcement jurisdictions so that they could follow up

12    on those cases because that was clearly supplies for a

13    dealer in that area.

14    Q.   And that took care of the large orders, but

15    I'm hoping you and I can talk about some of the small

16    order customers.

17    A.   Uh-huh.

18    Q.   Have you personally investigated more than 90

19    of the small order customers?

20    A.   I did personally investigate over 90 of the

21    small orders of clients -- or customers.

22    Q.   I want to focus just on five who are

23    mentioned in the Indictment.

24    A.   Okay.

25    Q.   So if we could start first with Gavin

1   Keblish.  If we could look at page 748.  Do you see

2   his name at the top there?

3       A.   I do.

4       Q.   Can you explain what was ordered in that

5   transaction?

6       A.   I can.  Gavin Keblish, his address is 54

7   Seatuck Avenue in East Port, New York.  He went under

8   the moniker AJM6753.  He ordered Roxy Oxy, 30

9   milligrams.  He ordered 40 of them on May 5, 2016, and

10  had priority mail for that package.

11      Q.   And then let's look at one more order.  If we

12  could go to page 1,214.  There's an extra zero in

13  there.  Thanks.

14           What did he order on that date?

15      A.   He ordered M-box 30 Oxycodone, 30 milligrams.

16  He ordered 20 of those using the moniker AJM6753 and

17  had them sent to him at the 54 Seatuck Avenue, East

18  Port, New York address.

19      Q.   Did you look into Mr. Gavin Keblish?

20      A.   I did.

21      Q.   Did you speak with detectives in this area?

22      A.   I did.

23      Q.   Did you speak to his family?

24      A.   I did.

25      Q.   They are here in the courtroom with us?

1    A.    They are.

2    Q.    Was Gavin a real person?

3    A.    He was.

4    Q.    Did you speak to Gavin to confirm that he

5    ordered the Fentanyl-laced fake oxycodone from

6    Pharma-Master?

7    A.    I did not.

8    Q.    Why not?

9    A.    He's dead.

10    Q.    Let's talk about Conner Valenter.  Could we

11    look at page 450.  Do you see his name on there near

12    the bottom?

13    A.    I do.

14    Q.    What was ordered on that date, February 23?

15    A.    Conner ordered Fentanyl Roxy Oxycodone, 30

16    milligrams, one pill on February 23 of 2016, using the

17    moniker Spitta.

18    Q.    Could we look at page 489.  What did he order

19    on February 25?

20    A.    He ordered Fentanyl Roxy Oxycodone, 30

21    milligrams, eight pills, under the moniker Spitta, and

22    he had them sent to his address in Seattle,

23    Washington.

24    Q.    And, finally, could we look at page 563.

25    What did he order on March 3?

1       A.   He ordered Fentanyl Roxy Oxycodone, 30

2   milligram, five tablets using the same moniker of

3   Spitta, and he had them sent to his address in Seattle

4   Washington.

5       Q.   Did you look into Mr. Conner Valenter?

6       A.   I did.

7            MR. SKORDAS:  Your Honor, could we approach?

8            THE COURT:  Yes.

9   (Conference among the Court and the attorneys at the

10       bench outside of the hearing of the jury.)

11           THE COURT:  These aren't the people who you

12   are claiming the homicide count on, are they?

13           MR. SKORDAS:  No.

14           MR. GADD:  So the homicide count, his name is

15   Ruslan Kluyev.

16           THE COURT:  RK?

17           MR. GADD:  Yes, RK.  These people are charged

18   in the Indictment; specifically, Mr. Shamo distributed

19   drugs to them.  So this was our -- our written motions

20   that were done I think in April and May, where the

21   ruling was we couldn't mention the other customers who

22   are now dead from an overdose, those folks whose names

23   are in the Indictment and Mr. Shamo is charged with

24   distributing drugs that did go to them.  I can ask my

25   agent if she interviewed them because that's a major

1   investigative step that any investigator would take.

2   She was ordered by Your Honor to not mention that

3   their death was an overdose.  In fact, you will notice

4   we are not going into the death at all.

5        MR. SKORDAS:  You've got to be kidding me.

6        MS. BECKETT:  The ruling was very contrary on

7   the overdose deaths, and it was specific to:  They are

8   allowed to discuss Gregory Lee, who was an overdose,

9   who was investigated because they weren't able to

10  interview him.  He is not here testifying.  That was

11  what was allowed.  They are very, very, very far over

12  the line when they have a family out here crying in

13  the courtroom, and it's clear that the indication is

14  that he was an overdose death.  Your Honor's ruling

15  was very clear in that regard.

16       THE COURT:  I don't have the order with me, I

17  don't think, but I thought -- I thought you were going

18  to -- I guess I thought there would be a stipulation:

19  The reason we didn't call -- these people weren't

20  investigated.  They weren't called because they were

21  dead.  That's not really -- I mean, you're leaving

22  more of an impression they died of an overdose and

23  you're trying to connect it to Shamo.

24       MR. SKORDAS:  Of course he is.

25       MR. GADD:  I'm happy to ask her right now,

1    these four men we are talking about were not --

2    Mr. Shamo was not charged with causing their deaths.

3    We will make it very clear.

4          THE COURT:  Yeah, you should do it.  But then

5    what else do you need to do?

6          MS. BECKETT:  That doesn't fix it.

7          MR. GADD:  I still need to prove the counts

8    in the Indictment, the people distributing drugs to

9    these people.  The Grand Jury charged it.  I've got to

10   ask these questions.  I will clarify to make it very

11   clear he is not charged with causing their deaths.

12         MR. SKORDAS:  But you can ask if he

13   distributed drugs to them, and you can show that.

14         But when he then asked:  Why didn't you

15   interview them -- he didn't ask that about a single

16   other person who allegedly received drugs -- so that

17   she can say, "Because they are dead."  That clearly

18   violates the order of this Court.

19         THE COURT:  It seems to me it does.

20         MR. GADD:  We have asked other people.  Jared

21   Gillespie, the other person named in the Indictment,

22   he was interviewed.  That was the question we asked.

23   These are just the people named in the Indictment.

24   The Grand Jury charged it.  It's part of what I have

25   to prove.

1        MS. BECKETT:  You're two steps beyond that

2   when you have family in the courtroom and when you ask

3   him whether or not the family is present.  You asked

4   whether or not they were present in the courtroom.

5        MR. GADD:  Yes, I did.

6        MS. BECKETT:  You have gone way over what the

7   Court's ruling was on the overdose.

8        MR. SKORDAS:  I think we need to make a

9   motion outside the presence of the jury at the next

10  break.

11       MR. GADD:  Let's take a minute and look up

12  the order or the minutes.  This is clearly what was

13  talked about at the hearing.

14       THE COURT:  I didn't envision it going this

15  way.  I envisioned it, you can say, "These people were

16  charged in the Indictment."

17       MR. GADD:  Yes.

18       THE COURT:  "We couldn't interview them

19  because they are not here.  They are dead."

20       MR. GADD:  I did ask that.

21       THE COURT:  Why do you need to ask anything

22  else, I guess is my question.

23       MR. GADD:  Oh, because we have set this up --

24  because in order for them to be guilty, he has to send

25  it to a real person.  How do you prove that they are a

1    real person?  You have to investigate it.  Right?  You

2    talk to detectives who talk to family if you can't

3    find the person.

4        THE COURT:  Okay.  So you're entitled to give

5    evidence that he sent it to him, but the problem is,

6    you are tying that to the deaths.  You've got to say

7    something about you're not charging him with the death

8    of this person.

9        MR. GADD:  I will do that right now.

10        MR. SKORDAS:  In fact, he did, and if this

11    was a real person.  She answered yes.  At that time

12    the inquiry is over.  Instead, he continues and asks:

13        Did you interview him?

14        No.

15        Why not?

16        Because he's dead.

17        And his whole family is here?

18        You've got to be kidding me, Judge.  This is

19    outrageous.  I'm sorry.

20        THE COURT:  You're going to ask for a

21    mistrial, and I'm going to deny it.

22        MR. SKORDAS:  I understand.  I need to,

23    though.

24        THE COURT:  You don't need to get anymore

25    than that he sent them to him.  Why do we need to know

```
 1    anything else?

 2           MR. GADD:  I understand what the Court has

 3    said, and I'll limit myself to it.

 4           THE COURT:  All right.

 5           MR. GADD:  Okay.

 6           (Proceedings continued in open court.)

 7           THE COURT:  Go ahead, Mr. Gadd.

 8       Q.    BY MR. GADD:  Special Agent Keys, let's

 9    clarify so that we're abundantly clear.  The people

10    that we're going to talk about, starting with

11    Mr. Keblish, now Mr. Valenter, they are named in the

12    Indictment, but Mr. Shamo has not been charged with

13    causing their death?

14       A.    That is correct.  They were his customers.

15       Q.    Let's take -- if you'll excuse me, I forgot

16    which question I left off on.

17       A.    Right.  I don't remember.

18       Q.    Let me circle back, and I'll make sure we get

19    the important ones.

20       A.    Okay.

21       Q.    You looked into Mr. Conner Valenter?

22       A.    I did.

23       Q.    Was he a real person?

24       A.    He was.

25       Q.    Let's talk about Edward Blatz.  There is a
```

1    number of orders here.  We don't need to necessarily

2    look at them all, but let's look at the first.  We

3    have page 417.  Do you see the order there for Ed

4    Blatz?

5         A.    I do.

6         Q.    What was ordered?

7         A.    He ordered Roxy Oxycodone, 30 milligrams, two

8    tablets on February 21 using the moniker Veldgear, and

9    he had it shipped to him in Washington, D.C.

10        Q.    Now let's jump to the last, if we could look

11   at page 624, and then it goes on to the next page.

12   You can see that there?

13        A.    Yes.

14        Q.    What did he order this time?

15        A.    He ordered Roxy Oxycodone, 30 milligrams, 40

16   tablets, on April 5, 2016, under the moniker Veldgear.

17   And he had it shipped to the same address in

18   Washington, D.C.

19        Q.    Did you look into Mr. Edward Blatz?

20        A.    I did.

21        Q.    Was he a real person or just a name on a

22   page?

23        A.    He was a real person.

24        Q.    If we could look at Exhibit 18.01.  And if we

25   could look at page 2.  Who is that?

1    A.    This is Gregory Lee.

2    Q.    Did you also find orders sent to his address?

3    A.    I did.

4    Q.    If we could look at -- jumping back to

5    Exhibit 14.30, if we could look at 664.  And then it

6    goes on to the next page, so if you could highlight

7    the bottom.  Perfect.  If you could call that out for

8    us.

9          What was ordered on April 12?

10   A.    So April 12 shows that he ordered Roxy

11   Oxycodone, 30 milligrams, one tablet, but it was

12   combined with a second order the next day of Roxy

13   Oxycodone, 30 milligrams, ten tablets, using the

14   moniker T-Wad.  And it was sent to Gregory Lee at 3

15   Midvale Drive, Daly City, California.

16   Q.    Let's look at one additional order.  This is

17   on page 862.  And then it goes on -- like the previous

18   one, it goes on to the next page.  So there's the top

19   half.  Do you see what was ordered there?

20   A.    I do.  He ordered Roxy Oxycodone, 30

21   milligrams, 10 tablets, on June 6, 2016, using the

22   moniker T-Wad, and it was sent to Gregory Lee at his

23   Midvale Drive address in Daly City.

24   Q.    That Midvale Drive is what you see here?

25   A.    Yes.

```
 1        Q.   Was Mr. Lee a real person?

 2        A.   He was.

 3             MR. GADD:  If I can have just one moment?

 4             THE COURT:  Sure.

 5             MR. GADD:  Nothing further.  Thank you.

 6             THE COURT:  You thank you, Mr. Gadd.

 7             You may cross examine, Mr. Skordas.

 8             MR. SKORDAS:  Thank you, Your Honor.

 9                      CROSS EXAMINATION

10   BY MR. SKORDAS:

11        Q.   Agent Keys, were you involved in this

12   investigation even after November, when Mr. Shamo was

13   taken into custody?

14        A.   I was.

15        Q.   And did you help other agents serve a search

16   warrant on a house in Cottonwood Heights in February

17   of 2017?

18        A.   I did.

19        Q.   And that was some, I guess, two and a half or

20   three months after Aaron was taken into custody,

21   correct?

22        A.   Yes.

23        Q.   And you served the search warrant on the home

24   that Aaron had previously lived, correct?

25        A.   I served it on the garage of the home that he
```

1                    IN THE UNITED STATES DISTRICT COURT

2                           DISTRICT OF UTAH

3                           CENTRAL DIVISION

4

5    UNITED STATES OF AMERICA,      )

6               Plaintiff,          )

7        vs.                        )   Case No.  2:16-CR-631-DAK

8    AARON MICHAEL SHAMO,           )

9               Defendant.          )

10   _____)

11

12           BEFORE THE HONORABLE DALE A. KIMBALL

13        -------------------------------------

14                      August 21, 2019

15                        Jury Trial

16             Testimony of Dr. Stacey Hail

17

18

19

20

21

22

23

24   REPORTED BY: Patti Walker, CSR, RPR, CP    801-364-5440

25   351 South West Temple, #8.431, Salt Lake City, Utah  84101

```
 1                    A P P E A R A N C E S

 2

 3

 4   For Plaintiff:              Michael Gadd
                                 Vernon G. Stejskal
 5                               Kent A. Burggraaf
                                 U.S. ATTORNEY'S OFFICE
 6                               111 South Main Street, #1100
                                 Salt Lake City, Utah  84111
 7

 8
     For Defendant:              Gregory G. Skordas
 9                               Kaytlin V. Beckett
                                 SKORDAS & CASTON LLC
10                               560 South 300 East, #225
                                 Salt Lake City, Utah  84111
11

12                               Daryl P. Sam
                                 DARYL P SAM PLLC
13                               5955 S. Redwood Road, #102
                                 Salt Lake City, Utah  84123
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2   Witness             Examination By          PAGE

 3   Stacey Hail         Mr. Gadd  (Direct)          4

 4                       Ms. Beckett  (Cross)       42

 5                       Mr. Gadd  (Redirect)       59

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1    SALT LAKE CITY, UTAH; WEDNESDAY, AUGUST 21, 2019; 8:30 A.M.

 2                          PROCEEDINGS

 3             THE COURT:  Good morning, ladies and gentlemen of

 4    the jury.  Welcome back.  It occurs to me that yesterday

 5    must have felt like you were back in school and had the joy

 6    of unexpectedly being let out early.

 7             We'll proceed.

 8             MR. GADD:  Your Honor, the United States calls

 9    Dr. Stacey Hail.

10             THE COURT:  Come forward and be sworn, please.

11                          STACEY HAIL,

12             Having been duly sworn, was examined

13                    and testified as follows:

14             THE CLERK:  Please state your name and spell it

15    for the record.

16             THE WITNESS:  Good morning.  My name is

17    Dr. Stacey, it's S-t-a-c-e-y, Hail, H-a-i-l, like a

18    hailstorm.

19             THE COURT:  You may proceed, Mr. Gadd.

20             MR. GADD:  Thank you, sir.

21                      DIRECT EXAMINATION

22    BY MR. GADD:

23    Q    Good morning.

24    A    Good morning.

25    Q    If we could, I'm hoping this morning we could go first

```
 1    over your background.  Can you tell us where you work?
 2    A    Yes.  I am an emergency physician and a medical
 3    toxicologist.  I work at Parkland Hospital in Dallas, Texas,
 4    where they took JFK when he was shot.
 5    Q    Parkland is a particularly busy hospital, correct?
 6    A    Parkland is the single busiest emergency department in
 7    the entire country.
 8    Q    When you're wearing your emergency room medicine hat,
 9    can you describe for the jury what a typical day is like for
10    you.
11    A    Well, in the Parkland emergency room, I'm serving as
12    attending physician.  I see patients on my own, but I also
13    supervise emergency medicine residents and students.  And,
14    of course, in the emergency department, we see all comers.
15    So I manage heart attacks, strokes, overdoses, traumas, you
16    name it.  Anything that presents to the emergency department
17    is in my scope of practice.
18    Q    This morning you've come to us from Texas, correct?
19    A    Correct.
20    Q    But you visited Utah recently?
21    A    Yes.  It's actually kind of strange to be here working
22    because most of the time when I fly into Salt Lake City,
23    it's for a vacation.  And we were just here two weeks ago.
24    And we come in the winter and the summer.  Utah is our
25    favorite place to come.
```

```
 1   Q    You mentioned teaching just a little bit.  Do you, in
 2   fact, hold a teaching position at the University of Texas
 3   Southwestern.
 4   A    Yes.  I am an associate professor at the University of
 5   Texas Southwestern.  I am a UT Southwestern employee and we
 6   staff the Parkland emergency room.  So kind of like Harvard
 7   faculty, they staff Massachusetts General.  So it's the same
 8   kind of process.  I'm a faculty at University of Texas
 9   Southwestern, but I work out of Parkland.
10   Q    And when you're teaching medical students, how much of
11   that takes place in the classroom as opposed to the
12   emergency room?
13   A    Some of it takes place in the classroom, and we have
14   weekly emergency medicine conferences.  But most of the time
15   in the medical setting, our teaching is at the bedside of
16   the patient.
17   Q    You also work one additional place, correct?
18   A    Yes.  I work at the North Texas Poison Center.
19   Q    When you're working for the poison center, what's a
20   typical day like?
21   A    Well, the way that it works, when I take call for the
22   poison center is it is 24/7 call for an entire week.  And
23   the way that that works is we have toxicology fellows in
24   training, and we take calls from all over North Texas.  And
25   it's not just a mom or a dad calling the poison center
```

```
 1   because their child drank bleach, or something like that.

 2   We take phone calls from doctors and nurses around the

 3   region that are requesting consultation for how to manage a

 4   poisoned patient.

 5        And every day in the poison center we have toxicology

 6   rounds where we have a roundtable discussion talking about

 7   patients that have been poisoned and how to manage them, and

 8   we do lectures.  And then we see bedside consultations at

 9   Parkland, at our children's hospital, and university because

10   obviously we can't do bedside rounds at every hospital all

11   over North Texas.

12   Q    We've talked a little bit about your background and

13   kind of what a typical day might be like for each of the

14   different hats that you wear.  There's much more to your

15   resume, correct?

16   A    Correct.

17   Q    You're board certified.  You're on various groups.  You

18   teach.  You train.  All of those things, correct?

19   A    Correct.

20   Q    If it's okay, I want to skip ahead away from the board

21   certifications and things like that and I want to talk for a

22   minute about your work as an expert, both consulting and as

23   a witness.  Have you consulted and offered opinions in cases

24   prior to this one?

25   A    Yes.
```

```
 1   Q    Was that both as an emergency room physician and also a
 2   medical toxicologist?
 3   A    Yes.  I've provided opinions in emergency medicine
 4   malpractice cases before, both on the plaintiff's side and
 5   the defense side.  But then also, as you can imagine, there
 6   are many legal cases that involve drugs, chemicals, poisons,
 7   any murder case that involves someone poisoning somebody.
 8   So there are far more cases that involve toxicology poisons,
 9   and I offer expertise in those as well.
10   Q    In a typical case where someone has asked you to come
11   and give them an opinion, do those cases always go to trial
12   like this one?
13   A    No.
14   Q    But you've testified in courtrooms before, correct?
15   A    Correct.
16   Q    In fact, this has been kind of a busy year for you?
17   A    Yes.
18   Q    How many times have you testified in a courtroom this
19   spring and summer?
20   A    This is my eighth trial since April 29th.  It's a busy
21   opioid epidemic.
22   Q    We've talked about a term medical toxicologist, and
23   could you just take a minute and explain to the jurors the
24   difference between a medical toxicologist and a toxicologist
25   Ph.D.
```

```
1   A    Yes, I'm glad you asked that.

2            JUROR:  Could we move this a little?  Not all the

3   jury can see the witness.

4            THE COURT:  Yes.  Thank you.

5   BY MR. GADD:

6   Q    Same question as before, could you explain the

7   difference between a medical toxicologist and a toxicologist

8   Ph.D.?

9   A    That's an important question to understand because a

10  lot of people are confused that, oh, you're an emergency

11  physician, but you're also a toxicologist.  We don't

12  understand how that works.  But just like in internal

13  medicine, you can do a residency in internal medicine and

14  then do a fellowship in cardiology, or a fellowship in

15  pulmonology.  There are actually fellowships after emergency

16  medicine, and one of those fellowships is medical

17  toxicology.  And it's because, if you think about it, where

18  do most poisonings show up?  If somebody overdoses, they

19  come to the emergency department.  If someone gets bitten by

20  a venomous snake, they show up in the emergency department.

21  If somebody drinks a poison, they show up in the emergency

22  department.

23       So medical toxicology is part of emergency medicine,

24  and we do not work in the laboratory.  I was a chemistry

25  major, but I no longer play with gas chromatographs and all
```

1   of the things in the laboratory anymore.  I am managing
2   patients.  I am a medical doctor.  I treat poisoned
3   patients.  My interaction is with a patient who is
4   intoxicated or poisoned, not a test tube of blood or urine.
5       A forensic toxicologist that has a Ph.D is a laboratory
6   person and their interaction with a patient is a test tube
7   of blood or urine, whereas me, the medical toxicologist,
8   interacts with the patient.
9   Q    And this is along those same lines, but could you
10  explain for us just the difference between someone like
11  yourself, a medical toxicologist, and perhaps a forensic
12  pathologist?
13  A    A forensic pathologist -- and the word forensic --
14  there's nothing magical about the word forensic.  Forensic
15  just means that you are doing something for legal purposes.
16  So I am a toxicologist.  I guess in the sense that I'm
17  sitting right here in a court means that I'm acting as a
18  forensic toxicologist in a way.
19      A pathologist is a physician that when they graduate
20  from medical school, their years of training are
21  specifically with patients that are dead.  They never once
22  interact with a living patient.  They interact with a body.
23  They look at tissues under the microscope.  They can look at
24  blood.  They can look at urine, but they never are treating
25  a patient that is alive.

```
 1          My job as an emergency physician and a medical
 2   toxicologist is to make sure that my patient doesn't get to
 3   meet that pathologist.
 4   Q    And aside from seeing a living patient, are there other
 5   things that make your specialty different from those other
 6   two that I mentioned?
 7   A    Well, basically the same thing.  My patients are
 8   living.  And I use a methodology when I look at dead
 9   patients to figure out why someone has died.  But most
10   importantly, pathologists do not have any medical toxicology
11   training.  They don't take any of the rotations or the
12   coursework to learn about medical toxicology and hone in the
13   skills that is necessary to figure out which drug does what
14   kind of intoxication.
15   Q    I'd like to talk about the methodology that you
16   mentioned.  And I wonder if it would be helpful if you were
17   to explain for the jury, and for the rest of us, some of the
18   terms you use in your work as a medical toxicologist.
19   A    Sure.
20   Q    Would you be willing -- and this is kind of why we were
21   blocking your view -- would you be willing to come to our
22   whiteboard here and just walk us through some of the
23   bread-and-butter terms that you use as a medical
24   toxicologist?
25   A    Sure.  May I step down?
```

1  Q    Please.

2       Please go ahead.

3  A    There is a bread-and-butter term that we use in medical

4  toxicology, and this is exactly how I teach my doctors in

5  training at the poison center, and the word is toxidrome.

6  Toxidrome is toxic plus syndrome mashed together in one

7  word.

8       And if there's anything I say today, this may be the

9  one thing to remember.  A toxidrome is the most important

10 term in medical toxicology.  When you listen to the news,

11 you hear about celebrities that overdose, and you get the

12 sense that an overdose is an overdose is an overdose.  But

13 that is not true.  From a medical toxicology standpoint, I

14 spent two years learning how one kind of overdose looks

15 different from another.  So the definition of a toxidrome is

16 the constellation of signs or symptoms that are unique to a

17 group of substances.

18 Q    And there are several types of toxidromes, correct?

19 A    There are a number of toxidromes that we learn about

20 and focus on, and the first one is sympathomimetic.

21 Q    I'm glad you said it.

22 A    Sympathomimetic is the toxidrome that mimics your

23 sympathetic nervous system.  Your sympathetic nervous system

24 is your fight-or-flight nervous system.  So drugs like

25 cocaine or meth mimic your sympathetic nervous system.  They

1    rev up your fight-or-flight nervous system.

2    Q    So for a patient you see in the ER who's experiencing

3    the sympathomimetic toxidrome, what does it look like?  What

4    do you see?

5    A    And this is very important because this is the crux of

6    medical toxicology, what does the intoxicated patient look

7    like.  So the features of the sympathomimetic toxidrome are,

8    first and foremost, agitation.  They are acting crazy.

9    Secondly, they have big pupils.  They are very sweaty.  They

10   have an elevated heart rate.  They have an elevated blood

11   pressure.  And then they ultimately can develop seizures and

12   cardiac arrhythmias, which is what causes death.  So this is

13   a very distinct toxidrome.

14        So when I work in the emergency department and I see

15   somebody high on cocaine, or high on meth, or high on bath

16   salts -- you may have heard of those -- they are very, very

17   difficult to control, they are very agitated, and it

18   requires a number of resources, nurses and police officers

19   to hold them down because it can be very unsafe for us as

20   physicians to get close to them.

21   Q    Can we talk about that, the next toxidrome that you see

22   somewhat frequently in your work in the emergency

23   department.

24   A    So we're going to talk now about the opioid toxidrome,

25   and the opioid toxidrome looks much, much different from the

1    sympathomimetic toxidrome.  So the opioid toxidrome involves

2    opiates and opioids.

3    Q    Can you maybe, just for our benefit, can you explain

4    the difference between those two words, opiates and opioids?

5    A    Right.  An opiate comes directly from the poppy plant.

6    Do you remember the scene from Wizard of Oz, they're running

7    through the field of poppies, and what happens?  They start

8    getting very, very sleepy.  That's because a poppy is

9    papaverine somniferum, like somnolent, getting sleepy.  So

10   any of the substances that come straight from the poppy are

11   opiates.

12        Now if you take one of those substances, like opium, or

13   morphine, or codeine, and you take it into a laboratory, and

14   you tinker with those molecules, those are called

15   semisynthetic opioids.  Once it no longer comes from the

16   poppy itself, it is an opioid.

17        And then if you derive from scratch in a laboratory a

18   new chemical that doesn't come from the poppy at all, then

19   that is a synthetic opioid.  So Fentanyl is completely

20   synthetic.  It is derived completely out of the laboratory.

21   Q    Thank you for explaining that.

22        When you're working in the emergency department and

23   someone comes in and they're experiencing the opioid

24   toxidrome, what sort of things do you observe?

25   A    So the way that an opioid toxic patient looks is they

1    have pinpoint pupils.  This is a very dramatic finding.  So

2    when someone comes -- we're all used to seeing our pupils as

3    a normal size and depending on how much light is let in.

4    But an opioid toxic patient, their pupils are so tiny, you

5    almost can't see their pupils at all.  It's actually pretty

6    strange.

7         The other finding is central nervous system -- I'm

8    abbreviating that, CNS -- depression.  So this is your

9    brain, and that involves looking sleepy to being completely

10   unconscious.

11        The third finding in the opioid toxidrome is

12   respiratory depression.  This basically means that you

13   breathe slower and slower until you develop what we call

14   apnea, which is when you stop breathing, and that is how you

15   die.  So opioid toxic patients go to sleep and die.

16        Sympathomimetic patients are agitated, acting crazy,

17   and have a sudden cardiac arrest.  This happens over a

18   little bit more time.

19   Q    You talked a bit about respiratory depression, and I

20   wanted to ask you a question about a phrase in your report

21   agonal breathing.  Could you kind of explain where that fits

22   in?

23   A    So the thing that happens in any patient who is

24   unconscious, for whatever reason, whether it's head trauma

25   or unconsciousness from an opioid, is you no longer protect

```
 1    your airway.  When we are awake every day, we hold our
 2    airway open.  We don't think about it, but we do.  Then
 3    there's some people at night, when they get sleepy and
 4    they're sleeping deep, they start snoring.  That's because
 5    they're kind of unconscious, they're not protecting their
 6    airway, and you develop an obstructive breathing pattern.
 7    So the tissue collapses on itself, and as you're breathing
 8    past it, it makes a noise.
 9         And so my husband is one of these people that does
10    this.  And what happens when he starts snoring at night, you
11    give him a kick, he wakes up a little bit, he opens up that
12    obstruction, and he stops snoring.
13         Now let me make this clear.  This is not actually
14    snoring.  It sounds like snoring, but it's much worse.  The
15    airway collapses on itself and it creates obstruction.  And
16    so the opioid toxic patient has to breathe past that
17    obstruction, and so it makes a sound that we call agonal
18    breathing.  Agonal does not mean in agony necessarily.  It's
19    just a style of breathing from the brain.  Laypeople,
20    inevitably, whenever they're around an opioid toxic patient,
21    will describe it as snoring.
22    Q    Snoring, heavy snoring, things like that?
23    A    Can you get a little closer to the mike?
24    Q    Sorry.
25    A    Thanks.
```

904

1 Q Do they describe it as snoring, heavy snoring, loud

2 snoring?  Do you hear things like that?

3 A Yeah, anything to describe -- because I've never seen a

4 layperson say, oh, yes, they were agonally breathing.  What

5 it sounds like is snoring to the layperson.

6 Q After a person stops breathing, how soon after does

7 death occur?

8 A Say that again.

9 Q After a person stops breathing, how soon after does

10 death occur?

11 A Well, what happens as an opioid toxic patient's

12 breathing gets slower and slower and there is obstruction

13 that occurs, this is a death that happens over minutes to

14 hours.  Now there are some opioids that are so potent that

15 it can be more rapid.  It depends on the potency and the

16 dose that was taken.

17  But as we were talking about the obstruction that

18 happens, what's important about this obstruction is it

19 requires a lot of pressure to breathe past it.  So if you

20 try this, if you plug your nose and close your mouth and try

21 to take a breath, you're going to feel a sensation inside of

22 your chest trying to overcome that 100 percent obstruction,

23 and that's negative pressure in your lungs.  What that does

24 is it draws fluid into the lungs, and this is pulmonary

25 edema.

1  So, inevitably, in almost any opioid death I see, there

2  is pulmonary edema.  This is fluid.  It's drawn out of the

3  capillaries in the lungs.  And it's bloody.  And it could be

4  pink tinged.  Sometimes it's very foamy looking, but it is

5  fluid in the lungs, and this is because death has taken some

6  time to develop as they are breathing past that obstruction

7  and slower and slower over time.

8  So pulmonary edema is not part of the toxidrome per se,

9  but it is a consequence of the toxidrome, and that is what I

10  see invariably in all pulmonary -- in all opioid toxic

11  deaths.

12 Q    With the rise of Fentanyl use, what are you seeing as

13 an emergency room physician?

14 A    Fentanyl is a very potent opioid.  And just to express

15 how potent, we assign morphine that you take by mouth, which

16 in medicine by mouth is abbreviated PO.  So PO morphine gets

17 a label one.  Heroin, depending on how you use it, maybe

18 like 1.5 to three oxycodone, maybe 1.5 to five, just

19 depending on how you use the drug, if you crush it versus

20 inject it.  So those are some examples of the potency.

21 Fentanyl, we assign the number 100.  So Fentanyl is 100

22 times more potent than PO morphine.  So in these

23 circumstances, we see this central nervous system depression

24 happen pretty quickly with Fentanyl.  They slump over

25 wherever they are.  With all of the heroin deaths I've seen,

1    they have time to get comfortable in their recliner or get

2    comfortable in bed and go to sleep.  But a lot of times in

3    these Fentanyl overdoses, they may be slumped over in the

4    bathroom stall at McDonald's.  That's how fast sometimes the

5    central nervous system depression can occur.  But this

6    respiratory depression takes longer and that's why we still

7    see the pulmonary edema.  We see it in living patients that

8    live to come to the emergency.  And we are also requiring

9    higher doses of Narcan to get these people back.

10   Q    Do you just want to take a minute and explain what

11   Narcan is?

12   A    Narcan is the antidote for opioid toxicity.  Narcan is

13   the trade name.  Naloxone is the generic name.  And you can

14   give Narcan up the nose.  You can put it down an

15   intratracheal tube if the patient is intubated.  Most of the

16   time we inject it.  And what happens is within seconds, it

17   specifically reverses the central nervous depression and

18   respiratory depression from an opioid.

19         Narcan does not reverse cocaine.  Narcan does not

20   reverse Xanax.  Narcan does not reverse anything other than

21   an opioid.  And what's important is once the patient is

22   already dead, Narcan does not have the Lazarus effect.  It

23   does not raise the patient from the dead.

24   Q    For a patient who's built up some tolerance to opioids,

25   how does that tolerance affect the timing of the central

907

1    nervous system depression, the respiratory depression, and
2    ultimate death?
3    A    When tolerances happen in an addict of some kind, it
4    takes larger doses to get the effect they used to have, and
5    it can take longer for these symptoms to display themselves.
6    Q    There are other toxidromes you use in your work,
7    correct?
8    A    Correct.
9    Q    I wonder if there's just maybe one more we could talk
10   about this morning.  Could you talk about the sedative
11   hypnotic toxidrome?
12   A    The sedative hypnotic toxidrome is what we see with
13   people that overdose on sedatives.
14        Now in the 1960s, there were very toxicologically
15   interesting sedatives.  Marilyn Monroe died from Nembutal,
16   which is a barbiturate.  Elvis Presley died from Placidyl,
17   or eth clyro vinyl, which is a sedative.  These kinds of
18   sedatives have respiratory depression associated with them.
19   But somewhere along the way, we have gotten better with
20   designing our antianxiety agents and our other types of
21   antidepressants.
22        So nowadays, when we're talking about benzodiazepines,
23   things like Xanax, or Valium, even in massive overdose,
24   which I see all the time, people coming in after taking an
25   entire bottle of Xanax, they have CNS depression.  But the

1    important thing is they do not have respiratory depression.

2        Now because these are sedatives and they cause you to

3    relax, when you are relaxed, you do breathe a little slower,

4    okay.  But that's not what I'm talking about.  Respiratory

5    depression is a very significant finding in opioid overdoses

6    because it works at certain receptors in the brain to cause

7    you to slow your breathing and stop breathing.  Just by

8    virtue of relaxing and breathing slower is not respiratory

9    depression.  So there is not significant respiratory

10   depression with sedative hypnotics like benzodiazepine.

11       I'm also going to put alcohol into this category

12   Because alcohol also works at the same receptors that we're

13   talking about in this toxidrome.  So even though somebody

14   can drink a ton of alcohol and get drunk as a skunk, they

15   may be passed out, they do not have the respiratory

16   depression associated with it like you see with opioids.

17       And think about it.  The only time that we really hear

18   about people that die from alcohol poisoning are college

19   kids playing drinking games.  And it's so rare and

20   significant it makes the news, and that's because they have

21   gone into this stratosphere with their alcohol level.  But

22   most drinking, including heavy drinking, does not cause

23   respiratory depression.

24   Q   This may be a good point if you want to resume the

25   stand.  I want to ask you some additional questions about

```
 1   how you treat patients in the emergency room.  And thank you

 2   for explaining that.

 3           What you've just taught us isn't just academic,

 4   right?

 5   A    No.

 6   Q    Do you live and breathe this?

 7   A    Yes.  This is everyday emergency medicine and medical

 8   toxicology in every emergency department across the entire

 9   country.

10   Q    So if you're in the emergency department and you have a

11   heroin overdose come in and they're barely breathing, do you

12   base your treatment on numbers?

13   A    No, and that would be ridiculous.  Imagine a patient

14   coming in who has pinpoint pupils, who is unconscious and

15   barely breathing, and my colleagues and I sit around and go,

16   oh, we must get that heroin level back to decide what we're

17   going to do with this patient.

18        First of all, it would take a while to get that level

19   back.  Secondly, the patient would be dead by the time we

20   got that level back, and even when we get that level back, I

21   wouldn't know what it means because it's different in

22   everybody.  There are wide ranges that cause toxicity,

23   depending on sex, and genetics, and tolerance, and other

24   issues.  So never do we say let's get this level and see

25   what to do in a patient like that.  We would give Narcan.
```

1    We treat the patient, not a number.

2    Q    And when we talk about levels, blood levels, drug

3    levels, what is it specifically that you refer to that

4    you're not using in that setting?

5    A    We are not using what would be called a lethal level.

6    And normally -- and I apologize because a lot of times when

7    I tell lawyers this, it's like I'm telling them there's no

8    such thing as Santa Claus.  As toxicologists, we don't care

9    about the number in these circumstances and there is no

10   defined lethal level, not to be mixed up with the lethal

11   dose.  There is definitely a dose that somebody can take

12   that can be lethal.  But we're talking about concentrations

13   in the body.  When we're talking about opioids, when we're

14   talking about cocaine metabolite, most drugs that we talk

15   about, we are not looking at the number.  It does not mean

16   very much in living patients and it means even less in dead

17   patients.

18   Q    For that same scenario where you're working in the

19   emergency department and a heroin overdose comes in and

20   they're barely breathing, do you try to gather information

21   not just what you see but also about kind of their history?

22   A    Right.  Certainly if we see a patient that has pinpoint

23   pupils, unconscious and barely breathing, we are managing

24   that patient, giving them Narcan, supporting their airway.

25   But we're also gathering data from the EMS personnel that

1    come in, by family that may come in, and that is part of

2    getting the history as we do in all kinds of emergency

3    patients.

4    Q    Let's turn our attention to the reason we've asked you

5    to come here, the death of Ruslan Kluyev.  Were you asked to

6    review his death?

7    A    Yes.

8    Q    Are you familiar with the but for cause standard?

9    A    Yes, I am.

10   Q    Did you reach a conclusion as to the but for cause of

11   Ruslan's death?

12   A    Yes.  Ruslan would not have died but for the Fentanyl.

13   Q    Can you walk us through your methodology for reaching

14   that conclusion?

15   A    Yeah.  As I stated previously, I'm aware of a but for

16   cause of death standard and cause of death opinions in

17   federal court.  And what that means is that you have to come

18   up with an opinion that this person would not have died but

19   for a certain reason.

20        And I am a medical toxicologist, but I am not stuck in

21   a toxicology tunnel vision.  Because I'm an emergency

22   physician and I see patients that suffer from trauma, I

23   first look for any reason to believe that somebody died from

24   trauma, and I need to rule out trauma.  And in this case, I

25   ruled out trauma.

1       The next thing is to rule out natural causes of death,

2   things that cause sudden death.  So cancer is not a sudden

3   death.  That's a long death.  Looking for things that would

4   cause sudden death, like a heart attack, or a stroke, or a

5   pulmonary embolism, something along those lines, and rule

6   out natural causes of death.

7       Then I turn my attention to the toxicology.  So when I

8   am coming up with a but for cause of death, I'm not having

9   tunnel vision.  I am looking for all the different reasons

10  that somebody could experience sudden death.

11  Q    And as part of your research for this case, did you

12  review the police reports?

13  A    Yes.

14  Q    Did you review the autopsy report?

15  A    Yes.

16  Q    And the findings of the medical examiner's office?

17  A    Yes.

18  Q    The toxicology results that were included in them?

19  A    Yes.

20  Q    Did you review witness statements?

21  A    Yes.

22  Q    Photos from the scene of the death?

23  A    Yes.

24  Q    Let's talk through some of those things.  First if we

25  could talk about the autopsy.  Did you specifically review

```
 1   the report written by the autopsy surgeon, Dr. Thomas
 2   Rogers?
 3   A    Yes.
 4   Q    What did the autopsy reveal?
 5   A    The autopsy revealed that there were no signs of
 6   trauma, there were no signs of sudden death from natural
 7   causes, and ultimately the cause of death was mixed drug
 8   intoxication.
 9   Q    Let's talk for a minute about the toxicology results.
10        MR. GADD:  Ms. Louder, if we could look at 18.02.
11   BY MR. GADD:
12   Q    While that's popping up on your screen, did you review
13   the toxicology results from Mr. Kluyev's blood that was
14   taken during the autopsy?
15   A    Yes.
16   Q    If we could zoom in on that same section we were
17   looking at yesterday, could we go line by line through these
18   results?
19   A    Yes.
20   Q    What's blood ethyl alcohol?
21   A    Ethyl alcohol is ethanol or just alcohol, and this
22   would be from the vodka that he was reportedly drinking the
23   night of his death.
24   Q    As long as we're on this topic, in your report there's
25   a missing number one, correct?
```

914

```
 1   A     Correct.
 2   Q     So with that correction, the additional number one, can
 3   you tell us how many standard alcoholic beverages that this
 4   blood alcohol concentration would equate to?
 5   A     Yes.  So with the caveat that alcohol concentrations
 6   are very handwavy, I have consulted on a number of DWI cases
 7   and a number of what are called dram shop cases, that any
 8   kind of alcohol calculations are not as exact as I wish they
 9   would be.  And so when I say this, with the caveat that this
10   is a handwavy calculation.
11         So .19 is approximately 12.5 standard alcoholic
12   beverages in this case, mainly because I'm taking about a
13   three-hour time frame where I don't think he was drinking,
14   which is once he used the Fentanyl and he was placed in the
15   fetal position for three hours, and so you metabolize off
16   three drinks.  So I add that back in.  So it is at least
17   12.5 alcoholic beverages.  In my report I accidentally left
18   the one off and put 2.5.  It is 12.5.
19   Q     You've talked to us about how you treat living
20   patients.  Do you have people come into the ER who are at
21   .19?
22   A     Oh, absolutely.  Whereas this seems like an impressive
23   number, and it is, I'm not advocating for heavy drinking,
24   but I think a lot of people have a sense -- you said in Utah
25   it's .05 to drive, correct?
```

1    Q    Yeah.

2    A    So in Utah.  In other places, it's .08.  It's not like

3    you are not intoxicated at all at .049 and then you

4    magically become intoxicated at .05.  I think studies show

5    there's an impairment even lower than .05.  But the point is

6    how somebody deals with this intoxication, how they show it.

7    It looks different based on somebody's tolerance.  And I'm

8    not saying that that means that they can drive above .05 or

9    above .08.  The point is is how they demonstrate signs of

10   intoxication.  And so somebody coming into the emergency

11   department with .19 could look very normal to an emergency

12   physician.

13       We play a game in the ER, guess the drug guy's alcohol

14   level, and we don't do very well with that.  And that's

15   because my record is .534.  So not .0534, .534.  And not

16   only was this guy not acting intoxicated, he was actually

17   withdrawing.

18       We see every day in the emergency department numbers in

19   the 300s, the 200s.  So this is definitely a high level, but

20   this is not a level that would at all be something to be

21   concerned about causing death.

22   Q    .534?

23   A    Yes.

24   Q    That's two and a half times what we see here, right?

25   A    Right.

```
 1   Q     And your patient was alive?

 2   A     Yes.

 3   Q     Let's look at the next one down, cocaine.  I suppose

 4   that one doesn't have to be defined, but could you maybe

 5   take the next one down that I don't dare try to pronounce.

 6   A     So that's benzoylecgonine, or BE is how we

 7   traditionally abbreviate it.

 8         Cocaine is a pretty fast acting drug, and it oftentimes

 9   gets metabolized to these other things that we see here.  So

10   the BE.  The ecgonine methyl ester is EME.  And cocaethylene

11   is when cocaine combines with ethanol.  So these are all

12   metabolites of cocaine.

13         Cocaine is what is active.  These other metabolites are

14   not as active.  So the fact that cocaine has already come

15   and gone says a lot about where he was in the midst of his

16   intoxication.  But frequently cocaine is metabolized very

17   quickly.

18   Q     So if we're talking now about cocaine and the

19   sympathomimetic toxidrome, would you expect to see -- for

20   someone experiencing those signs and symptoms, you know, the

21   agitation, the sweatiness, the big pupils, the elevated

22   heart rate, maybe it was a case where it was, you know, a

23   sudden death when they were arrested by the police,

24   something like that, would you expect to get results back

25   and see cocaine was negative?
```

```
 1   A     No.   In someone who is acutely intoxicated like that,
 2   we would expect to see the cocaine to be -- the cocaine
 3   cocaine to be present.
 4   Q     Every body is a little different, but let me see if I
 5   can ask it this way.  How fast does an average living body
 6   metabolize cocaine?
 7   A     Well, of course, that's an impossible question to
 8   answer because it always depends on the dose.  The saying in
 9   toxicology, the dose makes the poison.  And drug dealers
10   don't have very good quality control, so we never really
11   know what dose is actually being taken.  So I don't think
12   anybody could really answer that question.  But overall,
13   cocaine gets metabolized very quickly.
14   Q     Is it faster or slower -- other things being equal in
15   terms of, you know, purity and things like that, is it
16   faster or slower than the metabolization rate for heroin?
17   A     So heroin, believe it or not, is the trade name for
18   diacetylmorphine.  Diacetylmorphine was discovered or
19   invented in the late 1800s by Bayer Pharmaceuticals, the
20   same people that make aspirin, so Bayer aspirin.  They were
21   the ones that named heroin heroin.  So heroin is the trade
22   name for diacetylmorphine.  Diacetylmorphine has a very
23   fleeting half life.  I have never once, ever, ever, ever,
24   seen diacetylmorphine in a dead body.  Because it's so fast,
25   it gets metabolized very quickly.
```

```
 1        There is a metabolite called 6-monoacetylmorphine, or
 2   6-MAM is how it's abbreviated.  That's not around too long
 3   either, but you generally can find it in urine or -- not
 4   necessarily the blood.  And then most of the time in heroin
 5   deaths, we see just morphine because that's what it gets
 6   metabolized to.  So cocaine gets metabolized pretty quickly,
 7   but I still see cocaine postmortem.  I have never seen
 8   diacetylmorphine as a molecule postmortem.
 9   Q    I think you mentioned this, but I wanted to kind of
10   drill down on it.  So how does the physiological effect of a
11   cocaine metabolite, such as BE or EME, how does that differ
12   from the physiological effect of cocaine?
13   A    These metabolites are not as active as cocaine.
14   Cocaine is what causes this sympathomimetic toxidrome.
15   Q    We've talked about cocaethylene.  Could we take the
16   next one down that starts with an L.
17   A    Levamisole is a drug that is for worms, and this is not
18   FDA approved in the United States.  It is used in like
19   Mexico and South America to treat different kinds of
20   parasitic infections, and for some reason it's been used to
21   cut cocaine.
22   Q    You see this with some frequency, correct?
23   A    I've seen it a number of times.  I don't know why they
24   use it to cut cocaine because I don't think it adds anything
25   to the high.  It's probably just readily available, but it
```

1   doesn't really have any effects that cause toxicity except

2   for chronic toxicity.  Like someone who is taking it for a

3   long-term parasitic infection will develop a decline in

4   their white blood cell count, so they are unavailable to

5   fight infections as well.  But that's a chronic issue with

6   people that are taking it as prescribed.

7   Q    So we've talked now about cocaine metabolite and this

8   cocaine cutting agent.  Do you have an opinion as to whether

9   the cocaine metabolite or the cocaine cutting agent killed

10  Ruslan Kluyev?

11  A    The cocaine nor any of the metabolites caused or

12  contributed to his death.  They did not cause or contribute

13  to his death.

14  Q    Let's take the bottom row, then, Fentanyl.  We talked

15  about it briefly.  Can you maybe just explain to the jury

16  what exactly Fentanyl is?

17  A    Fentanyl is 100 times more potent than PO morphine.  It

18  is a synthetic opioid, and it has traditionally been used in

19  medicine for cancer pain, like Fentanyl patches.  And as an

20  emergency physician, whenever I do procedures, I give

21  Fentanyl all the time for reducing fractures, or putting a

22  shoulder back in place.  We use Fentanyl for pain.  We give

23  it intravenously.  Little kids will be given Fentanyl

24  lollipops in the ER for pain control.  So Fentanyl has been

25  traditionally used in medicine for treating pain.

920

```
 1        Unfortunately, over the last several years, Fentanyl
 2   has found its way into the illegal drug market, and because
 3   it's much more potent than heroin ever was, we are seeing
 4   deaths across the entire country.
 5   Q    If Fentanyl is that dangerous, in your experience, why
 6   do people risk using it?
 7   A    In many circumstances, they don't even know that
 8   Fentanyl is present.  It may be Fentanyl tainted heroin, or
 9   it may just be that heroin is completely replaced by
10   Fentanyl, or it may be in these counterfeit pills and they
11   don't know.  However, for individuals that do know that it's
12   Fentanyl, they are doing what's called chasing the dragon.
13   Q    Can you explain that term?
14   A    When somebody uses an opioid for the first time, they
15   develop euphoria.  Euphoria is what brings them back for
16   more every time.  However, as time goes on, the brain
17   chemistry changes and they will never find that euphoria
18   again, but they don't give up trying.  They want to find it
19   and they'll use bigger doses of the same drug, or they will
20   seek out other drugs that are more potent to try to find
21   that euphoria.  So that is called chasing the dragon.  They
22   are always looking for that high that they had the first
23   time.
24   Q    When we look at the toxicology results, next to
25   Fentanyl on the right side of the screen, there's a drug
```

1    level reported.  Is there any significance in that level to

2    you as a medical toxicologist?

3    A    No.  The significance is that it is not a false

4    positive.  Whenever I see a quantitative result, meaning

5    that there is a number or a concentration, that means that

6    it is no chance for a false positive.  When you see results

7    like present or positive, that is a qualitative result.

8    There is always a chance that it could be a false positive.

9    But when you see a concentration, it is definitely that this

10   Fentanyl is present.  It is not cross-reacting with

11   something.  But the number in and of itself is there's no

12   defined lethal level.

13            MR. GADD:  Could we zoom out for a minute.

14            So just above the two signatures, this kind of

15   standard report from Central Valley Toxicology, could you

16   zoom in.  Do you see where it says blood Fentanyl, and

17   ranges, and effective, and potentially toxic?  So down that

18   next grouping.

19   BY MR. GADD:

20   Q    When you say to the jury there's no set defined level,

21   that's a reference to something like this that might show up

22   in a report, correct?

23   A    Correct.

24   Q    There's no intellectual honesty or dishonesty from a

25   toxicologist who has this just in the standard kind of form

```
 1   report, right?
 2   A    There are a couple of things that involve why these
 3   ranges need to be looked at with a grain of salt.  Number
 4   one, a lot of times on these toxicology reports, they are
 5   reporting ranges in living patients.  So these are
 6   antemortem levels.  You can't compare an antemortem drug
 7   level to a postmortem drug level.  It's apples and oranges.
 8   So it's not appropriate to say our postmortem level is
 9   .0009, or whatever, and we're comparing it to this range
10   that's listed here because that range could be for living
11   patients, and there is no defined lethal level as I said
12   before.
13   Q    Could we take a minute and talk about reports and
14   witness statements that you reviewed in researching your
15   conclusion?
16   A    Yes.
17   Q    Did you specifically read the police reports created in
18   Daly City that dealt with the death scene, and the
19   interviews, and things of that nature?
20   A    Yes.
21   Q    Did you learn in those reports that two witnesses
22   watched Ruslan crush and snort two Fentanyl pills prior to
23   laying down in his bed on the night of his death?
24   A    Yes.  Their testimony was that he had crushed these
25   pills with a yellow battery and snorted it through a rolled
```

1    up blue Post-it note.

2    Q    Do you know whether the physiological effect would

3    change if someone were to crush up a fake pill containing

4    Fentanyl and snort it versus if they were to ingest the fake

5    pill containing Fentanyl?

6    A    So anytime you crush up any pill, it's a pretty

7    dangerous practice, whether it's pharmaceutical or fake.

8    Basically what you're doing is getting a bolus, or an all at

9    once dose through your nose, which you absorb things through

10   your nose very quickly, which is why people do that.  If you

11   take a pill by mouth, it's going to take some time to

12   digest.

13        The other thing is there are a lot of pills, depending

14   on the engineering of the matrix that the pill is made, some

15   of them are designed to slowly release drug over time, and

16   if you crush that up, you've completely destroyed that

17   matrix and you're getting the whole dose all at one time.

18   So whether it's designed to be trickling into your blood

19   system over time or meant to just take as a pill, whenever

20   you crush up any pill and snort it, it's dangerous.

21   Q    You've referred to pills that are designed for kind of

22   an extended release effect, correct?

23   A    Correct.

24   Q    Those are made by pharmaceutical companies?

25   A    Yes.

```
 1   Q    Do you know if it takes a fair amount of sophistication
 2   to make a pill that has an extended release?
 3   A    I would think so.
 4   Q    Let's talk for a moment about pictures at the scene of
 5   Ruslan's death.
 6            MR. GADD:  Could we look at 1801, page six.
 7   BY MR. GADD:
 8   Q    Can you see that on your screen?
 9   A    Yes.
10   Q    Is this one of the pictures that you considered?
11   A    Yes.
12   Q    What stands out to you when you look at this?
13   A    There are fluids on the bedcovers there.  And
14   oftentimes in opioid overdoses, we will see something called
15   a foam cone.  Now you remember we talked about pulmonary
16   edema earlier as a consequence of an opioid overdose or an
17   opioid toxicity.  That pulmonary edema will come out the
18   airway, so that means it will come out the mouth and nose,
19   and because it is mixing with air, it looks very foamy.
20   Like I guess the milk on a cappuccino, they put air through
21   it.  So whenever you put air through a fluid, it's going to
22   get foamy.
23        Because he was placed in a fetal position instead of on
24   his back, you wouldn't have seen the foam cone because that
25   fluid would have just poured out.  So what you see on this
```

 1  bed is blood tinged pulmonary edema.

 2          MR. GADD:  Could we look at page seven.

 3  BY MR. GADD:

 4  Q    Is this also a picture that you considered when you

 5  were coming to your conclusion?

 6  A    Yes.  This was after he was moved off of the bed onto

 7  the floor, and because of rigor mortis, he was still in the

 8  fetal position that he had been placed in.

 9  Q    There's an additional picture I'd like to show you that

10  we're not publishing out of respect to the victim, and once

11  I show you, I'd like to ask you some questions about it.

12          Do you recognize that picture?

13  A    Yes.

14  Q    Is that a picture that you relied on when you were

15  forming your conclusion?

16  A    Yes.

17  Q    What, when you look at that picture -- maybe we should

18  take it in two steps.  Could you describe for the jurors

19  what you see in that picture?

20  A    This picture is of his face, and it has a great deal of

21  secretions, blood tinged fluid, mucus, material all over his

22  face.  And this is a combination of any material that could

23  have been in his stomach that could have come out, but it is

24  also the pulmonary edema as it emanates out of the body as

25  he's dying and once he's dead.

1  Q    Would you ever expect to see a pulmonary edema with a
2  cocaine overdose?
3  A    Not so much because with cocaine you have someone who
4  is very agitated and they have a sudden cardiac arrest.
5  That is something very quick so there is not time for
6  pulmonary edema to develop.  Whereas in an opioid death, as
7  they breathe slower and slower and slower over time and then
8  they stop breathing, the heart is still beating for, you
9  know, some length of time after you stop breathing.  So this
10 is a death that takes place over time, and that's why we see
11 pulmonary edema and other secretions in these opioid cases
12 as opposed to somebody who drops dead in police custody or
13 drops dead due to cocaine.
14 Q    When you were telling the jury your conclusion, you
15 used the phrase but for.  Can you just circle back with me
16 and describe what but for causation means in a case like
17 this?
18 A    Yes.  In the circumstance, the medical examiner called
19 the cause of death mixed drug intoxication, and I find that
20 to be a very intellectually honest cause of death.  I
21 believe that medical examiners should say that and list out
22 all the drugs that are found postmortem because, number one,
23 they may not necessarily know all of the evidence and all of
24 the perimortem circumstances.  That word perimortem
25 circumstances is very important because that's what paints

1    the picture of the toxidromes.

2        They may not have that information when they are coming

3    up with a cause of death, so they call it mixed drug

4    intoxication, which I am absolutely fine with because they

5    have not been trained in medical toxicology.

6        My job as a medical toxicologist is to review all of

7    the information and determine what were the perimortem

8    circumstances.  What did somebody look like as they were

9    dying.  And from that information and the evidence provided,

10   everything that I reviewed, I come up with the but for cause

11   of death, if I can, and that is, specifically in this case,

12   that Ruslan would not have died but for the Fentanyl.

13   Q    You give opinions in a fair number of cases.  People

14   reach out to you seeking your opinion, correct?

15   A    Correct.

16   Q    For instances like this where the question is whether

17   or not a drug was a but for cause of death, approximately

18   what percentage of the time are you able to find a but for

19   cause?

20   A    Approximately 50/50.  I obviously review a lot of cases

21   for the Department of Justice, and part of that is because

22   there are actually fewer than 300 board certified medical

23   toxicologists in the country.  So we are actually a pretty

24   rare commodity compared to the number of drug cases.  There

25   are very few of us that are medical toxicologists and even

1   fewer that even like talking to you lawyers.  So I get a lot
2   of calls from the Department of Justice.
3       When the Department of Justice asks me to look for a
4   but for cause of death, probably 50 percent of the time I
5   tell them that this case does not have all the evidence to
6   meet that but for standard.
7   Q    I believe you recently testified at a sentencing in one
8   of those very cases, right, where you could not make that
9   conclusion?
10  A    Correct.  When I am reviewing a case and there may be a
11  hole in the evidence, or some missing pieces of information,
12  or what I would call a fly in the ointment to make a but for
13  cause of death, the benefit of the doubt goes to the
14  defendant, and I will not meet that but for cause of death
15  standard.
16      A couple weeks ago I went to West Virginia, which is
17  the ground zero of the opioid epidemic for a number of
18  reasons, and didn't testify in a trial but testified in a
19  sentencing hearing about the fact that it was not but for,
20  but more likely than not.
21              MR. GADD:  If I could have just one moment?
22              THE COURT:  Yes.
23              MR. GADD:  Nothing further.  Thank you.
24              THE COURT:  Ms. Beckett, you may cross-examine.
25  //

```
 1                        CROSS-EXAMINATION
 2    BY MS. BECKETT:
 3    Q    Dr. Hail, you're being paid for your testimony today,
 4    correct?
 5    A    Correct.
 6    Q    What's your hourly rate?
 7    A    I believe in this case it's 550 an hour.
 8    Q    And who's paying that?
 9    A    The Department of Justice.
10    Q    Do you have any federal government contracts?
11    A    Yes.
12    Q    How many federal government contracts do you have?
13    A    I'm not sure.  A lot.
14    Q    More than ten?
15    A    Uh-huh, yes.
16    Q    More than 20?
17    A    Probably.
18    Q    Over the course of your career, more than 50?
19    A    Probably.
20    Q    How often in a criminal case have you testified on
21    behalf of a defendant?
22    A    In a federal court case of this nature none.
23    Q    Never?
24    A    Correct.  I do consult with defense attorneys around
25    the country, but none of those cases have ever gone to
```

```
 1   trial.
 2   Q    I believe Mr. Gadd just asked you how many times -- or
 3   he discussed briefly that there have been times where you
 4   have not found a but for cause.  Would that be a correct
 5   recitation of what just occurred?
 6   A    Right.  Approximately 50 percent of the time.
 7   Q    And you can't put a number on how many times you
 8   haven't found a but for cause?
 9   A    Well, I have been reviewing cases related to opioid
10   epidemic issues with the federal government since 2008, and
11   sometimes these contracts are a quick one hour of my time to
12   say no, this does not meet but for, and sometimes they are
13   larger engagements with more complicated cases.  And
14   sometimes one doctor case may have 25 deaths out of their
15   practice.
16        So I have reviewed hundreds and hundreds of opioid
17   deaths over the last decade, and I obviously have not kept
18   tabs on exactly how many, but it is about half the time I
19   say it meets but for and half the time that it does not.
20   Q    So the answer is no, you don't know how many times
21   you've testified that --
22   A    I can't give you an exact number.
23   Q    How many times have you found a but for cause?
24   A    I don't know the exact number.  But like I said, I've
25   reviewed hundreds of cases and about half the time it meets
```

```
 1   the but for standard.  And even amongst those cases, they
 2   don't always go to trial.
 3   Q    I believe you testified that what makes you unique and
 4   qualified to testify is that you have a lot of hands-on
 5   experience with patients, correct?
 6   A    Correct.
 7   Q    Hands-on experience with the opioid epidemic --
 8   A    Yes.
 9   Q    -- in an emergency medical setting, correct?
10   A    Correct.
11   Q    Did you touch a victim in this case?
12   A    No.
13   Q    Examine a body?
14   A    No.
15   Q    Examine blood?
16   A    No.
17   Q    Examine any organs?
18   A    No.
19   Q    Touch anything other than a report?
20   A    No.
21   Q    I believe your report and the report of the medical
22   examiner, or pathologist in this case, mentions pulmonary
23   edema; is that correct?
24   A    Correct.
25   Q    I believe you went over this a little bit, but if you
```

1    could, just explain briefly what pulmonary edema is.

2    A    Pulmonary edema is fluid that leaks out of the

3    capillaries and can be present in the lungs. We've already

4    talked about that.

5    Q    I believe you testified that part of pulmonary edema

6    comes from that negative pressure in the lungs; is that

7    correct?

8    A    Correct. As an opioid toxic patient is breathing

9    slower and against an obstruction, they have to work hard to

10   work against that obstruction, and it creates negative

11   pressure in the lungs that draws fluid into the lungs.

12   Q    But it can be any kind of obstruction that can create

13   pulmonary edema, correct?

14   A    Not necessarily. I mean if somebody is choking, they

15   could potentially have obstruction that causes pulmonary

16   edema. I haven't ever seen that before. But typically we

17   see this kind of pulmonary edema related to negative

18   pressure from the way that the patient is breathing as they

19   die.

20   Q    If somebody aspirates vomit into their lungs, could

21   that create an obstruction that then leads to pulmonary

22   edema?

23   A    That's not the same kind of obstruction. Aspiration is

24   something that goes into the airways and it can cause an

25   inflammatory response. But unless there is some massive

```
 1   food particle that is obstructing an airway, it is not the
 2   same kind of obstruction.
 3   Q    If someone has apnea and aspirates vomit into their
 4   airway, could that cause pulmonary edema?
 5   A    No.  Aspiration in the lungs is not pulmonary edema.
 6   Q    That was not my question.
 7        If somebody has apnea and aspirates vomit into their
 8   airway, can that then lead to pulmonary edema?
 9   A    I answered that a couple questions ago.  Most of the
10   time no.  If there is some huge chunk of steak, perhaps,
11   that obstructs up high and the person is breathing against
12   that, then perhaps.  But the obstruction has already
13   occurred by the time aspiration is occurring.
14   Q    Explain that.  The obstruction has occurred by the time
15   somebody is aspirating, explain that.
16   A    Well, your question was they've stopped breathing
17   completely, and what I'm describing is a specific
18   physiological issue that as someone is still breathing as
19   they die, they're creating that negative pressure that
20   causes pulmonary edema.  Your question was apnea, which is
21   not breathing, thus hence they are not creating a negative
22   pressure.
23   Q    So if somebody is struggling to breathe, say snoring or
24   that agonal breathing that you were discussing previously,
25   could that lead to that obstruction and pulmonary edema?
```

```
 1  A    Right.  That's what we've been talking about today.
 2  Q    So yes?
 3  A    Yes.
 4  Q    I believe you testified a little bit about multiple
 5  drug toxicity; is that correct?
 6  A    Correct.
 7  Q    Can alcohol exacerbate symptoms of multiple drug
 8  toxicity?
 9  A    I'm sorry.  Can you repeat that?
10  Q    Can alcohol exacerbate symptoms of multiple drug
11  toxicity?
12  A    Well, it depends on what drugs you're talking about.
13  Q    Cocaine.
14  A    Cocaine can, combined with alcohol, cause cocaethylene,
15  which was one of the substances.  So that is cocaine plus
16  ethanol causes cocaethylene.  So in that sense it can
17  enhance the effects of the cardiotoxicity of cocaine.
18       The alcohol does not necessarily cause someone to be
19  more sympathomimetic.  In fact, to some degree, alcohol may
20  cause someone to come down from cocaine toxicity.
21  Q    How about alcohol and Fentanyl?
22  A    Alcohol could potentially enhance the respiratory
23  depressant effects, but the opioid has to be present.  So,
24  for example, I'm going to use -- well, we'll use alcohol
25  since you asked it.  Alcohol can certainly enhance
```

935

1    respiratory depression from an opioid, but you have to have

2    that opioid present to have that respiratory depression

3    enhanced.  Because remember I said that alcohol does not

4    have significant respiratory depression in and of itself.

5    It may enhance it.  It may enhance oxycodone.  It may

6    enhance heroin.  But in those situations, those are lower

7    potency opioids.

8         In a setting with Fentanyl, Fentanyl is so potent and a

9    stand-alone cause of death -- and all of these opioids are

10   stand-alone causes of death -- and you might enhance the

11   respiratory depression from the Fentanyl but, remember,

12   Fentanyl is 100 times more potent than morphine.  And so to

13   say that alcohol enhances the respiratory depression of

14   Fentanyl is to say you have a shotgun wound to your heart,

15   which is the Fentanyl, and a pinprick hole to your heart,

16   which is the alcohol, and focusing in on that pinprick.

17   Q    So the answer is yes, alcohol can increase those

18   effects, correct?

19   A    And just like I explained --

20   Q    It's a yes or no question, Dr. Hail.

21   A    Subtly enhance.

22   Q    Thank you.

23        What was the original use of Fentanyl?

24   A    Well, as I described before, Fentanyl has been used

25   traditionally in medicine for pain.

```
 1   Q    What's a common dose for that?
 2   A    About 25 micrograms is what we would start with
 3   intravenously.
 4   Q    Micrograms per what, liter?
 5   A    It's a dose, not a concentration.
 6   Q    Okay.  So how would that show up in the blood work, the
 7   original dose?
 8   A    If you give a 25 microgram dose of Fentanyl?
 9   Q    Uh-huh.
10   A    I don't know.
11   Q    You don't know what that number would look like?
12   A    As I was saying, we don't send drug levels in the
13   medical setting because they don't mean anything.  There are
14   certain references that you can look at that will show what
15   a 25 microgram dose might look like.  The way it works is
16   you give the dose intravenously.  It spikes high and then it
17   goes down low again.  And those numbers can be quite a wide
18   range in living patients.
19   Q    Is chronic opioid use a greater risk factor for
20   overdose?
21   A    It can be.  I mean, remember, you can use heroin one
22   time and die.  You can use heroin for 25 years and die.
23   Q    Is someone who has recently relapsed after coming clean
24   at greater risk for overdose?
25   A    Perhaps.  It depends on how long that they've been
```

```
 1   clean.
 2        It's interesting, your brain can start healing, for
 3   lack of a better term, and lose its tolerance to some of
 4   these drugs.  And then yes, somebody who has been clean for
 5   some length of time may use the dose they used to use and
 6   have a tendency to overdose.
 7   Q    You work in an emergency medical setting at a hospital
 8   most of the time, correct?
 9   A    Emergency department and the poison center.
10   Q    And earlier you testified that you have a lot of
11   hands-on experience with patients, correct?
12   A    Correct.
13   Q    When you make a diagnosis, I believe it was your
14   testimony that you prefer to do those hands-on examinations,
15   correct?
16   A    Correct.
17   Q    For an individual who is drinking heavily, they
18   sometimes have an inability to protect their airway?
19   A    If they are comatose from their drinking.
20   Q    They lay down?
21   A    If they reach levels like we talked about before, like
22   in a drinking game where they become comatose, then yes,
23   they cannot protect their airway.
24   Q    That's why you place somebody in the recovery position
25   is because you don't want them to aspirate and they would be
```

1   able to better protect their airway, correct?

2   A    Just in general or from alcohol?

3   Q    In general.

4   A    In general, if somebody is comatose and they're not

5   protecting their airway in the emergency department setting,

6   we would intubate them.  We don't put them in the recovery

7   position.

8   Q    If you were at your house drinking with a friend and

9   you were concerned that they may have overdone it but you

10  didn't want to take them to a hospital, would it be common

11  practice maybe for somebody to put them in a recovery

12  position?

13  A    I don't know what the common practice is for that.

14  Q    What is the recovery position, Dr. Hail?

15  A    A recovery position is to put somebody on their side so

16  should they vomit or should they have any kind of secretions

17  from their airway, the fluids can roll out of their airway.

18  Q    Can people who are long-term drug users have issues

19  with sleep apnea?

20  A    Sleep apnea is a completely different process than

21  opioid toxicity.

22  Q    Dr. Hail, that was not my question.  I would ask that

23  you please respond to the question I'm asking you.

24  A    Okay.  Repeat your question.

25  Q    Can chronic drug use create issues of sleep apnea?

1   A    Not necessarily.  That question doesn't make a lot of
2   sense.
3   Q    Part of your testimony earlier is that pulmonary edema
4   is not specifically part of the toxidrome you've discussed;
5   is that correct?
6   A    It is a consequence of the toxidrome, not a feature of
7   the toxidrome.
8   Q    Because pulmonary edema can come from other things,
9   correct, than just opioid use?
10  A    Right.  There are a number of different physiological
11  mechanisms for pulmonary edema to occur.
12  Q    Did you create a report in this case that was provided
13  to the government?
14  A    Yes.
15  Q    Are you familiar with the language in that report?
16  A    Yes.
17  Q    Do you remember in that report specifically stating
18  that drug concentrations must not be interpreted in a
19  vacuum?
20  A    Correct.
21  Q    Do you still believe that?
22  A    Yes.
23  Q    Do you also remember in that report where you quoted
24  that there's no defined lethal level for drugs?
25  A    Correct.

1  Q    Do you still believe that?

2  A    Yes.

3  Q    In your report you also stated that mixed drug

4  intoxication, as in this case, these opinions are

5  intellectually honest because most medical examiners do not

6  always have all the case specific details to elucidate which

7  drug was most responsible for causing the death.  Do you

8  remember stating that?

9           THE COURT:  You probably need to slow down.

10          MS. BECKETT:  I apologize, Your Honor.  I will.  I

11 can restate that.

12 BY MS. BECKETT:

13 Q    These opinions are intellectually honest because most

14 medical examiners do not always have all the case specific

15 details to elucidate which drug was most responsible for

16 causing the death.  Do you remember stating that?

17 A    Yes.

18 Q    Do you still believe that?

19 A    Yes.

20 Q    You believe that you are more qualified to offer an

21 opinion than the doctor who actually medically examined the

22 body in this case?

23 A    Sorry.  You are really talking fast.

24 Q    You believe that you are more qualified to give an

25 opinion on this issue than the doctor who examined the

1     alleged victim's body?

2     A     Yes.

3     Q     Do you remember stating in your report impairment,

4     intoxication, and cause of death are not determined by drug

5     concentrations alone?

6     A     Yes.

7     Q     Do you still believe that?

8     A     Yes.

9     Q     What is hypoventilation?

10    A     Hypoventilation is a word.  Hypo means low.

11    Ventilation means to breathe in and out.  And so

12    hypoventilation is not just necessarily breathing slower,

13    but it is also ineffective respiration, that you are not

14    effectively breathing in and you are not effectively

15    breathing out.

16    Q     Is that common with alcohol intoxication?

17    A     It can be.

18    Q     If you had a patient in your hospital who came in and

19    they were exhibiting signs of alcohol intoxication and

20    opioid use, or potential opioid overdose, would you only

21    treat the opioid symptoms?

22    A     Yes.

23    Q     You wouldn't treat anything for the alcohol

24    intoxication?

25    A     There is no antidote for alcohol intoxication.

```
 1   Q    You wouldn't do anything to treat anything related to
 2   the alcohol intoxication?
 3   A    Well, and please be fair.  You understand that alcohol
 4   intoxication is a very wide range of symptoms.  Nine times
 5   out of ten, the drunk, homeless guy that gets brought to me
 6   in the emergency department just gets a bed to go sleep it
 7   off, and we do absolutely nothing.  So, you know, it depends
 8   on what you mean.  And if someone is coming in with alcohol
 9   and an opioid, we're most concerned about the opioid because
10   that's what can potentially cause death, not the alcohol.
11   Q    So if the hypoventilation is related to the alcoholism
12   and the opioids, you would only treat the opioids?
13   A    Right, because in that situation that you're
14   describing, the opioid is what's causing the
15   hypoventilation.  Hypoventilation and respiratory depression
16   are probably terms that could be used interchangeably.
17   Q    I believe you stated that you were able to rule out all
18   other causes with the exception of Fentanyl in this case; is
19   that correct?
20   A    Correct.
21   Q    You did so without touching a victim?
22   A    Correct.
23   Q    Looking at a body?
24   A    Correct.
25   Q    I believe it was also your testimony that the cocaine
```

943

1   use of the victim was not a problem in this case?

2   A    I didn't say it was not a problem.  I said it was not

3   the but for cause of death.

4   Q    So it had no impact in what he may or may not have been

5   experiencing?

6   A    What I said was that he was not displaying signs and

7   symptoms of sympathomimetic toxicity.

8   Q    I believe we also discussed a cutting agent that is not

9   FDA approved in the United States.  I'm not going to say

10  that drug name because I will say it incorrectly, but I

11  believe it starts with an L.

12  A    Well, truth be told, I may potentially be saying it

13  incorrectly as well.  There is a bit of discussion amongst

14  ourselves in toxicology whether it's levamisole or

15  levamisole.  So I won't hold you to it if you don't hold me

16  to it.

17  Q    So it was also your testimony that the presence of that

18  particular non-FDA approved drug was not problematic or

19  causational of any of the effects or symptoms that the

20  alleged victim in this case was experiencing?

21  A    Correct.

22  Q    And the alcohol intoxication was also not problematic?

23  A    Correct.

24  Q    The prosecutor had you look at a photo of some

25  bedsheets in this case, and I won't bring that photo back

1    up.  Did you examine those bedsheets yourself?

2    A    No.

3    Q    So you don't actually know what was on them, correct?

4    A    I did not examine the bedsheets.

5          MS. BECKETT:  If we could look at Government's

6    Exhibit 18.02.  If I could have you just look at the blood

7    Fentanyl.  If I could have you highlight that.

8    BY MS. BECKETT:

9    Q    Do you see where it says potentially toxic, greater

10    than .010 micrograms per liter?

11    A    Milligrams per liter, and yes, I see that.

12    Q    Are you aware of what the actual levels were in this

13    case?

14    A    .009.

15    Q    Less than that?

16    A    Yes.

17    Q    What does effective level mean on here?

18    A    I suppose by saying effective, that whoever created

19    this document is indicating some type of therapeutic level.

20    And as you can see from this range, this is what I was

21    saying before when I was asked about what the level would be

22    and I said I don't know.  That .0003 to .010 is a wide range

23    over a huge exponential number of numbers.  So I suspect

24    that in this particular case it is referring to what would

25    be considered therapeutic, and this is what we would say is

1    a wide therapeutic index.  This is a huge range.

2    Q    You don't have any other drug level on Mr. Kluyev, do

3    you, other than the .0009?

4    A    I'm sorry.  Can you repeat the question?  I'm not sure

5    I understand what you're talking about.

6    Q    There was not another drug level given for this

7    Fentanyl, correct?  The only number we have is the .009.

8    A    Right.  This was sent on femoral blood.

9    Q    I believe your testimony earlier, you used the phrase

10   not so much when asked whether or not edema occurs with a

11   cocaine death.  Do you remember saying that?

12   A    Yes.

13   Q    But it has happened?

14   A    I was referring to the activity of the metabolites.

15   The cocaine is what is active.  The metabolites are not.

16   Q    I don't believe that answered my question.  I believe

17   what I asked you was has edema ever occurred with a cocaine

18   death?

19   A    Not that you see very frequently.  I can't say never

20   because there are situations where somebody who has

21   developed sympathomimetic toxicity and they may develop

22   acute heart failure because of the effects of the cocaine

23   could potentially develop pulmonary edema.  It's a different

24   kind of pulmonary edema from a different kind of mechanism.

25        MS. BECKETT:  Just a second, Your Honor.

```
 1              THE COURT:  Sure.
 2   BY MS. BECKETT:
 3   Q    Did you review a document titled Verdict of the Coroner
 4   in this case?
 5   A    Entitled what?
 6   Q    Verdict of the Coroner.
 7   A    I don't specifically recall a verdict of the coroner.
 8              MS. BECKETT:  Your Honor, if I may approach?
 9              THE COURT:  You may.
10              THE WITNESS:  Oh, okay.  Yes.
11   BY MS. BECKETT:
12   Q    You're familiar with that?
13   A    Yes.
14   Q    What was the determination of the coroner in this case?
15   A    It says that this death was due to multiple drug
16   intoxication.
17   Q    Thank you.
18              MS. BECKETT:  I have no further questions,
19   Your Honor.
20              THE COURT:  Thank you, Ms. Beckett.
21              Mr. Gadd, redirect?
22              MR. GADD:  Please.
23                        REDIRECT EXAMINATION
24   BY MR. GADD:
25   Q    There was a moment just a minute ago when you were
```

1    answering a question and you were cut off, and I did my best

2    to write it down.  I think the question was something like

3    can chronic drug use create sleep apnea.  It was the

4    question that didn't make a lot of sense.  Do you remember

5    that question?

6    A    Yes.

7    Q    Can you explain the rest of what you were going to say,

8    why it didn't make sense?

9    A    Well, sleep apnea is a disease entity just in and of

10   itself.  And there are individuals who may have morbid

11   obesity.  There may be individuals that have problems with

12   their brain centrally that can cause sleep apnea.  And so

13   these individuals who have absolutely nothing to do with

14   drug toxicity or anything, just a completely different

15   thing, require those masks at night called the CPAP masks

16   that you might see like on TV, and that pushes the air in.

17   And so these people do have a type of obstruction that

18   causes them to snore, and it is snoring, and this positive

19   pressure opens up the airway so that they don't have that

20   obstruction when they're breathing.

21       But there is nothing specific to suggest that a chronic

22   drug user, in general, is going to develop sleep apnea over

23   time.  That's not an appropriate causation discussion, which

24   is why I said that the question didn't make sense.

25   Q    There was some discussion about how in a rare

1  circumstance like if someone had a big piece of steak, I
2  think was your term, that got caught in their throat, that
3  could create an obstruction that might mimic some of these
4  other effects, correct?
5  A    Correct.
6  Q    That's something that's looked for in an autopsy,
7  right?
8  A    Right.
9  Q    You talk about your methodology, and autopsy surgeons
10 have a methodology.  They look for specific things like
11 that, correct?
12 A    Correct.  And there was no piece of steak or something
13 that was mentioned in the airways, which you would see in a
14 choking death.  Of course, in a choking death, you are going
15 to typically have history from the people surrounding the
16 patient that said we were at a restaurant and then suddenly
17 they grabbed their neck, and no matter what we did, we
18 couldn't relieve the obstruction and they stopped breathing
19 and they died.
20     The important thing as a physician is we take a
21 history, and we obtain data.  You don't just take one piece
22 of data in a vacuum.  You have to make a reasonable
23 conclusion what the diagnosis is.  And I make diagnoses
24 every single day, and cause of death is a diagnosis.  But I
25 don't have to cut people open from stem to stern to make a

```
 1   diagnosis.  We take a history.  We have imaging studies.
 2   And, of course, the history is the most important part of
 3   coming up with a diagnosis.
 4   Q    We've been looking at the toxicology results signed by
 5   one of our prior witnesses, Mr. Bill Posey, who has a
 6   bachelor's degree and a science major, although I can't
 7   remember which.  In referring to those types of results,
 8   you've said a phrase I want to ask you about, levels don't
 9   mean much in a living patient, and I think you've said they
10   mean even less in a deceased patient.
11   A    Yes.
12   Q    Can you kind of explain why that's the case.
13   A    Yes.  This is an important thing to understand because
14   as we are all sitting here living, our heart is pumping, and
15   so our blood is mixing all around our body.  So it is
16   homogenous.  It should be the same.  So if I draw a drug
17   level from a scalp vein, or from your subclavian vessel
18   right here, or straight into your heart, or in your femoral
19   vessel, or in your toe vein, in a living person, those
20   numbers should all be close to the same within laboratory
21   error.
22        But in a dead person, the heart has stopped, and that
23   blood is no longer mixing.  And so the blood just pools in
24   the gravity locations.  That's lividity.  That's why
25   whenever you see pictures of dead bodies, they're purple on
```

1  the underside of their body, if they're laying on their back

2  of course.

3      So part of dying is the putrefaction process.  When you

4  die, your cells die and those cells burst open.  That's

5  called autolysis.  Whatever is inside those cells comes out

6  wherever it is.  So drugs don't just hang out in the blood.

7  They cross the blood-brain barrier into the brain.  They go

8  into tissue.  They go into fat.

9      So essentially wherever you draw blood in a dead

10  patient, using my prior example, like the scalp, or the toe,

11  or the heart, you're going to get different answers for that

12  number, which is part of the reason why you don't hang your

13  hat on the number.  Because if in this case Ruslan's femoral

14  level was .009, but if it had been drawn from somewhere

15  else, you might have had a completely different number.  You

16  could potentially have a wide range of numbers.  So that's

17  why it is not appropriate to rely on that one number, but

18  for sure that Fentanyl is there.

19          MR. GADD:  Nothing further.  Thank you.

20          THE COURT:  Thank you.

21          Recross, Ms. Beckett?

22          MS. BECKETT:  No further questions, Your Honor.

23          THE COURT:  Thank you.

24          Thank you.  You may step down.

25          We'll take our first break.  We'll be in recess

1    for about 20 minutes.

2              (Whereupon, proceedings not transcribed.)

```
 1                    C E R T I F I C A T E

 2

 3

 4            I hereby certify that the foregoing matter is

 5    transcribed from the stenographic notes taken by me and is a

 6    true and accurate transcription of the same.

 7

 8

 9

10

11

12

13

14

15

16    PATTI WALKER, CSR-RPR-CP      DATED: 8-26-19
      Official Court Reporter
17    351 South West Temple, #8.431
      Salt Lake City, Utah  84101
18    801-364-5440

19

20

21

22

23

24

25
```

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
SKORDAS & CASTON, LLC
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> AARON MICHAEL SHAMO, et. al., <br><br> Defendant. | **MOTION FOR A JUDGMENT OF ACQUITTAL** <br><br><br> Case No. 2:16-CR-00631 DAK <br><br> Judge Dale A. Kimball |

Aaron Michael Shamo, through his counsel, hereby moves the Court for judgment of acquittal.

## ARGUMENT

The evidence presented by the government is insufficient to sustain a conviction. The Court should enter a judgment of acquittal on the ground that the Government has failed to

present sufficient proof from which a rational juror could conclude beyond a reasonable doubt that Mr. Shamo is guilty on each and every count under the Second Superseding Indictment.

The Court should enter a judgment of acquittal to Count 1 (21 U.S.C. § 848, Continuing Criminal Enterprise). The Government has failed to present sufficient proof from which any rational juror could conclude beyond a reasonable doubt that Mr. Shamo knowingly and intentionally violated 21 U.S.C. § 848. The Government has failed to present sufficient evidence to prove the elements for a continuing criminal enterprise. The Government has failed to show Mr. Shamo was part of a continuing series of violations of the Controlled Substance Act including Conspiracy to Distribute a Controlled Substance Resulting in Death.

The Court should enter a judgment of acquittal to Count 6 (21 U.S.C. § 841 (a)(1), Aiding and Abetting the Distribution of a controlled Substance Resulting in Death). Specifically, there is insufficient evidence that the controlled substance in this case resulted in death. Under *United States v. Burrage*, 134 S. Ct. 881 (2014), the Government has the burden to prove beyond a reasonable doubt that the use by an alleged victim of a controlled substance that the Defendant was responsible for is the "but for" cause of the death.

In *Burrage*, a long-time drug user, Banka, purchased heroin from Burrage. *Burrage v. United States*, 571 U.S. 204, 206. Banka died after an extended binge that included using the heroin that Banka purchased from Burrage. *Id*. Burrage was indicted with unlawfully distributing heroin and that death resulted from the use of the substance. *Id*. Medical experts testified at trial that Banka might have died even if he had not taken the heroin. *Id* at 207. "Dr. Eugene Schwilke, a forensic toxicologist, determined that multiple drugs were present in Banka's system at the time of his death, including heroin metabolites, codeine, alprazolam, clonazepam metabolites, and oxycodone. . . ." *Id*. ". . . Burrage moved for a judgment of acquittal, arguing that Banka's

death could only 'result from' heroin use if there was evidence that heroin was a but-for cause of death. The court denied the motion and, as relevant here, instructed the jury that the Government only had to prove that heroin was a contributing cause of death." *Id* at 204. Burrage was convicted and the Eighth Circuit upheld the District Court's jury instruction. *Id.*

The Supreme Court granted certiorari and the two questions that the court looked at was ". . . [w]hether the defendant may be convicted under the 'death results' provision (1) when the use of the controlled substance was a 'contributing cause' of the death, and (2) without separately instructing the jury that it must decide whether the victim's death by drug overdose was a foreseeable result of the defendant's drug-trafficking offense." *Id.* at 208. The court held that ". . . where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision 21 U.S.C. §841(b)(1)(C) unless such use is but-for cause of the death or injury." *Id.* at 219.

Here, just like *Burrage*, it cannot be determined that fentanyl was an independently sufficient cause of Mr. Kluyev's death. On August 21st, 2019, Dr. Stacey Hail testified as to pulmonary edema and fentanyl use. Dr. Hail discussed the toxicology results of Mr. Kluyev's blood that was taken during his autopsy. Dr. Hail testified to each amount of drug that was on Mr. Kluyev's toxicology report and concluded from her analysis of the case that fentanyl was the cause of Mr. Kluyev's death. Hail Trans. P. 21. Dr. Hail testified as to the effect of each toxin found within the report. Hail Trans. P. 22-31. Dr. Hail only reviewed documents provided by the government to make her conclusion. Hail Trans. P. 22. Dr. Hail acknowledged that the coroner determined the death of Mr. Kluyev's to be a result of multiple drug intoxication. Hail Trans. P. 56.

If the court finds that Dr. Hail's conclusion is correct as to fentanyl causing the death Mr. Kluyev's, there is still insufficient evidence that the fentanyl that Mr. Kluyev's snorted came from Mr. Shamo. If the pills that were snorted cannot be determined to have come from Mr. Shamo, then there is no conduct from the defendant within the causation analysis. Tori Grace testified about Mr. Kluyev's drug use and what she witnessed the night before Mr. Kluyev's death. Ms. Grace herself stated that Mr. Kluyev was a heavy drug user. Grace Trans. P. 15. The night before Mr. Kluyev overdosed, Ms. Grace witnessed him drinking vodka and snot pills that contained fentanyl. Grace Trans. P. 8. Ms. Grace did not see what the pills looked like before being crushed. Grace Trans. P. 9. There was an envelope from Utah in Mr. Kluyev's room, but again no indication as to whether the drugs that were snorted prior to overdosing were actually the pills contained in that package from Utah. Mr. Kluyev was a heavy drug user that would try to get his hands on anything and the exact pills that were snorted cannot be determined.

In this particular case, Mr. Shamo cannot be held liable for causing a death because the government has not met their burden in showing that Mr. Kluyev would have lived but for his fentanyl use. There were multiple drugs in Mr. Kluyev's system, and the coroner concluded that the death was caused by multiple drug intoxication. Also, the specific pills that were snorted are impossible to identify. All that can be proven is that there was fentanyl in Mr. Kluyev's system and that there was a package in his room from Utah that may have contained illegal drugs at one time. The drugs snorted by Mr. Kluyev before overdosing cannot be identified as pills that came from Mr. Shamo.

WHEREFORE, the defendant moves the Court for judgment of acquittal.

Respectfully Submitted this 27th day of August, 2019.

*/s/ Gregory G. Skordas*_____
Gregory G. Skordas

*/s/ Kaytlin V. Beckett*_____
Kaytlin v. Beckett

*/s/ Daryl P. Sam*_____
Daryl P. Sam

## CERTIFICATE OF SERVICE

I hereby certify that on the August 27, 2019, I electronically filed a true and correct copy

of the foregoing **MOTION FOR A JUDGMENT OF ACQUITTAL**, with the Clerk of the

Court using CM/ECF system, which sent notification of such filing to the following:

S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Kent Burggraaf
kburggraaf@agutah.gov

*/s/ Gabriela Mena*_____

SKORDAS & CASTON, LLC

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
**SKORDAS & CASTON, LLC**
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| UNITED STATES OF AMERICA, | **SUPPLEMENT TO MOTION FOR MISTRIAL** |
|---|---|
| Plaintiff, | |
| v. | Case No. 2:16-CR-00631 DAK |
| AARON MICHAEL SHAMO, et. al., | Judge Dale A. Kimball |
| Defendant. | |

Aaron Michael Shamo, by and through counsel, hereby Supplements his motion for a mistrial and discharge of the jury prior to the rendering of any verdict filed August 22, 2019. In support of this motion, the Defendant alleges as follows:

## STATEMENT OF FURTHER RELEVANT FACTS:

1.  On Friday August 23, 2019, a member of the Defendant's family approached Defense counsel.

2.  This family member informed Defense Counsel that they had overheard Agent Virginia Keys speaking with members G.K.'s family.

3.  G.K.'s family was the family referred to in Defendant's prior motion that SAUSA Gadd and Agent referenced during direct examination.

4.  The member of Defendant's family overheard G.K.'s family telling Agent Keys they felt bad for how much food they had been eating at their hotel and Agent Keys was heard responding "take advantage of it."

5.  The indication from the conversation led this member of the Defendant's family to believe the Government was in fact paying for G.K.'s family to remain present in the Courtroom throughout the entirety of this trial.

6.  Defense Counsel inquired of the Government as to whether or not the Government was in fact paying for the family to be present for this trial, including the day in question when the family was audibly sobbing in the presence of the jury and specifically reference by SAUSA Gadd and agent Keys during direct examination.

7.  SAUSA Gadd responded in the affirmative, that the Government was in fact assisting the family financially in order for them to be present for the entirety of the trial.

8.  Such was further acknowledged on the record during a sidebar conference on August 27, 2019.

9.  Government's Exhibit 23.06, the Statement in Advance of Guilty Plea of co-conspirator was shown to the jury and contains the following statement:

"I agree to pay restitution to the family (or next-of-kin or estate) of every person who ordered a controlled substance from Pharma Master on AlphaBay who is now deceased pursuant to [ ]. To date, the United States has identified approximately [    ] Pharma Master customers who are now deceased. Whether it was Pharma Master's pills that killed the decedents or Pharma Master's pills fed the decedents addictions until death took them. . ."

10. This exhibit was labeled redacted, leading one to believe the section relating to overdose deaths was in fact redacted. Instead, only the large blank space containing the number of alleged deaths was redacted.

## ARGUMENT

"[C]ourts of justice may discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *United States v. Taylor*, F.2d 1177, 1178 (10th Cir. 1979). A motion for mistrial should be granted in circumstances where the error tends to deprive the Defendant of a fair trial. *United States v. Burch*, 48 F.3d 1233, 1247 (10th Cir. 1995). Where a cautionary instruction is insufficient to cure the error and "the character of the testimony is such that it will create so strong an impression on the minds of the jurors that they will be unable to disregard it in their consideration of the case" a mistrial is appropriate. *United States v. Morgan*, 748 F.3d 1024, 1039 (10th Cir. 2014) (citing *Maestas v. United States*, 341 F.3d 493, 496 (10th Cir. 1965)). Similarly, instances of prosecutorial misconduct in the midst of a trial warrant good cause for a mistrial in advance of the jury rendering a verdict. *E.g. United States v. Rio*, 637 F.2d 728 (10th Cir. 1980).When particular conduct of the prosecution deprives the Defendant of the right to a fair and impartial trial, the Defendant's due process rights have been violated and a mistrial is warranted. *United States v. Gabaldon*, 91 F.3d 91, 93 (10th Cir. 1996).

Defendant has thoroughly outlined the unduly prejudicial impact of the direct

examination of Agent Keys and the inquiries made by SAUSA Gadd during that examination in his originating Motion for Mistrial. The facts outlined above are designed to paint a clearer of picture of the clear intent of the prosecution with regard to that line of questioning. Undoubtedly, it is the design of the Government to pay G.K.'s family to be present in the courtroom throughout the entirety of this trial. Undoubtedly, it was the specific design of SAUSA Gadd and Agent Keys to coordinate a line of questioning that would draw attention to the presence of G.K.'s family in the courtroom. This particular conduct was done in violation of the Court's order and Government's agreement that would not mention the overdose deaths of any individuals or tie the defendant to the overdose deaths of any individuals with the exception of R.K.

Furthermore, the continued reference to large number of overdose deaths in Luke Paz's SIAP is also a violation of the Court's order on this issue. The document, unlike its title would lead one to believe, was not in fact redacted in a manner consistent with this Court's order and the Government's agreement to not attempt to tie any other overdose deaths to the Defendant.

WHEREFORE, the defendant moves the Court for a mistrial and discharge of the jury prior to the rendering of any verdict in order to preserve the Defendant's right to a fair trial.

Respectfully Submitted this 27th day of August, 2019.

/s/ Gregory G. Skordas_____
Gregory G. Skordas

/s/ Kaytlin V. Beckett_____
Kaytlin v. Beckett

/s/ Daryl P. Sam_____
Daryl P. Sam

## CERTIFICATE OF SERVICE

I hereby certify that on the August 27, 2019, I electronically filed a true and correct copy of the foregoing **SUPPLEMENT TO MOTION FOR MISTRIAL**, with the Clerk of the Court using CM/ECF system, which sent notification of such filing to the following:

S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Kent Burggraaf
kburggraaf@agutah.gov


/s/ Gabriela Mena_____

SKORDAS & CASTON, LLC

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: kburggraaf@agutah.gov / kent.burggraaf@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR A MISTRIAL |
| vs. | |
| AARON MICHAEL SHAMO, | Judge Dale A. Kimball |
| Defendant. | |

The United States, by and through Kent A. Burggraaf, Special Assistant United States

Attorney, provides the following memorandum in opposition to the Defendant's Motion for a

Mistrial (Doc. 265) and Supplement (Doc. 272), in accordance with Rule 26.3, of the Federal Rules

of Criminal Procedure. The Defendant has not demonstrated that a mistrial is a manifest necessity.

Rule 26.3 is specifically intended to allow for suggested alternatives to declaring a mistrial. In

addition to putting forth its arguments against declaring a mistrial, the United States proposes some

suggested alternatives for the Court to consider.

//

//

## STATEMENT OF FACTS

1.    Earlier this year, the Defendant moved to prohibit the United States' from making reference at trial to all but one of the overdose deaths of his customers.  Doc. 203.

2.    The United States agreed to the possibility it would be unfairly prejudicial to make reference to all or most of the overdose deaths of the Defendant's customers, but asked the Court to deny the Defendant's motion with respect to four of the Defendant's customers who were named as customers in the Second Superseding Indictment.  Doc. 212, at 5.

3.    Those four customers were E.B., C.V., and G.K.—and G.L., who was R.K.'s roommate and friend.  *Id*.

4.    The United States explained that the Defendant was charged in the Second Superseding Indictment with Aiding and Abetting the Distribution of Fentanyl to E.B., C.V., and G.K. *Id*. at 3.

5.    G.L., the United States explained, was the roommate of R.K. and the person to whom the package of Fentanyl-laced fake oxycodone was addressed.  *Id*. at 4.

6.    The United States explained that it would not present evidence that the Defendant's pills were the cause of death for E.B., C.V., and G.K; the United States agreed that it would not present evidence that E.B., C.V., and G.K. died from drug overdoses.  *Id*. at 7.

7.    The United States wrote that it intended to briefly ask its investigator whether she interviewed E.B., C.V., and G.K. when she investigated the Defendant's distribution of Fentanyl to them.  To that question, the investigator, the United States explained, would simply respond that her investigation revealed each of the individuals was deceased and their respective dates of death, and, accordingly, she did not interview E.B., C.V., or G.K. because all three individuals were deceased prior to the beginning of her investigation.  *Id*.

8.    In like manner, the United States explained that while there was little risk that G.L.'s death would be wrongly attributed to the Defendant, it intended to elicit testimony that he, too, was deceased. *Id.*

9.    The United States argued that there was little prejudicial effect in having an investigator explain why she could not interview customers; conversely, the United States argued, it was highly important for the investigator to explain why she did not interview those four men—otherwise the jury would be left to wonder why the investigation was apparently incomplete with regards to the charges that the Defendant aided and abetted the distribution of Fentanyl to E.B., C.V., and G.K., and ultimately to G.L.'s roommate, R.K. *Id.*

10.   On May 29, 2019, the Court addressed the Defendant's motion to prevent reference to customers who died from overdoses:

> THE COURT:    We'll give a limiting instruction on that, so that it is clear that he is not being charged with those deaths.
>
> MS. BECKETT:  Your Honor, on that I believe we also agreed we would not refer to those as overdose deaths, just simply deceased or unavailable to testify or be interviewed.   I believe that was the discussion that occurred.
>
> THE COURT:    I think it was.   Mr. Gadd?
>
> MR. GADD:     That is my memory as well.

Exhibit 1, Partial Transcript of Motion Hearing, May 29, 2019, at 12-13.

11.   On May 29, 2019, the Court's minute entry reflected the following, in relation to the Defendant's motion to exclude evidence related to the overdose deaths:  "Defendant's [203] Motion to Exclude Evidence is DENIED.  The government agrees that it won't tie deaths of unavailable witnesses to Defendant or say that the deaths resulted from overdoses." Doc. 226.

3

12.     Prior to the May 2019 pre-admission hearing, the United States and the Defendant each proposed that the plea documents for Luke Paz be marked and admitted as an exhibit at trial; the Defendant marked Mr. Paz's Statement in Advance of Plea as Defendant's exhibit 6f. *See* attached Exhibit 2, Defense Exhibit List, at 1.

13.     In the restitution section of Mr. Paz's plea agreement, the United States redacted out the number of deceased customers to the families of whom Mr. Paz requested his forfeited drug proceeds be given. *See* Government's Trial Exhibit 23.06, which the United States labeled as "Paz SIAP redacted."

14.     The Defendant did not redact Mr. Paz's plea agreement in their proposed exhibit.

15.     On August 20, 2019, the United States called Special Agent Keys to testify at the Defendant's trial. Special Agent Keys testified about several unrelated subjects prior to testifying about the Defendant's customers. Exhibit 3, Transcript of SA Key's Trial Testimony, at 1-20.

16.     Special Agent Keys explained that she spearheaded efforts to investigate the Defendant's customers. *Id*. at 20.

17.     Special Agent Keys explained that investigative leads were sent to law enforcement agents and agencies throughout the United States for the Defendant's large-order customers. *Id*. at 22.

18.     Special Agent Keys testified that she personally investigated many of the Defendant's smaller-order customers. *Id*.

19.     Special Agent Keys explained that investigations into the customers began by looking at the list of customers' preferred shipping names and addresses but, as an investigator, she was presented with a problem: in many similar instances, customers do not use their real name. *Id*. at 20-21.

4

20.     She explained that, at first, the name associated with the customer's shipping address did not mean anything to her—more investigation was required because sometimes customers used fake identities, aliases, straw purchasers, or package receivers.  *Id*.

21.     From there, the United States entered into the questions that prompted the Defendant's motion for a mistrial:

> Q. So if we could start first with [G.K.].  If we could look at page 748.  Do you see his name at the top there?
>
> A. I do.
>
> Q. Can you explain what was ordered in that transaction?
>
> A. I can.  [G.K.], his address is 54 Seatuck Avenue in East Port, New York.  He went under the moniker AJM6753.  He ordered Roxy Oxy, 30 milligrams.  He ordered 40 of them on May 5, 2016, and had priority mail for that package.
>
> Q. And then let's look at one more order.  If we could go to page 1,214.  There's an extra zero in there.  Thanks.  What did he order on that date?
>
> A. He ordered M-box 30 Oxycodone, 30 milligrams.  He ordered 20 of those using the moniker AJM6753 and had them sent to him at the 54 Seatuck Avenue, East Port, New York address.
>
> Q. Did you look into Mr. [G.K.]?
>
> A. I did.
>
> Q. Did you speak with detectives in this area?
>
> A. I did.
>
> Q. Did you speak to his family?
>
> A. I did.
>
> Q. They are here in the courtroom with us?
>
> A. They are.
>
> Q. Was [G.K.] a real person?
>
> A. He was.

5

Q. Did you speak to [G.K.] to confirm that he ordered the Fentanyl-laced fake oxycodone from Pharma-Master?

A. I did not.

Q. Why not?

A. He's dead.

Q. Let's talk about [C.V.].  Could we look at page 450.  Do you see his name on there near the bottom?

A. I do.

Q. What was ordered on that date, February 23?

A. [C.V.] ordered Fentanyl Roxy Oxycodone, 30 milligrams, one pill on February 23 of 2016, using the moniker Spitta.

Q. Could we look at page 489.  What did he order on February 25?

A. He ordered Fentanyl Roxy Oxycodone, 30 milligrams, eight pills, under the moniker Spitta, and he had them sent to his address in Seattle, Washington.

Q. And, finally, could we look at page 563.

What did he order on March 3?

A. He ordered Fentanyl Roxy Oxycodone, 30 milligram, five tablets using the same moniker of Spitta, and he had them sent to his address in Seattle, Washington.

Q. Did you look into Mr. [C.V.]?

A. I did.

MR. SKORDAS: Your Honor, could we approach?

THE COURT: Yes.

Exhibit 3, at 22-25.

22.     During the side bar the Court expressed concern that the jury might be left with the

impression that G.K. and the other customers died from overdoses and that the Defendant was

connected to their deaths.  The Court ordered the United States to clarify for the jury that the

Defendant was not charged with causing the deaths of the four men.  Counsel for the defense

argued that the United States' inquiry regarding these customers should be limited to whether the

6

customers were, in fact, real people. Counsel for the Defendant indicated he would move for a mistrial. The Court indicated the motion for a mistrial would be denied.[1] *See Id*. at 25-30.

23.     The United States clarified with its next question that the Defendant was not charged with causing the deaths of those customers (other than R.K.) who were named in the Indictment:

> Q: Special Agent Keys, let's clarify so that we're abundantly clear. The people that we're going to talk about, starting with Mr. [G.K.], now Mr. [C.V.], they are named in the Indictment, but Mr. Shamo has not been charged with causing their death?
>
> A. That is correct. They were his customers.
>
> *Id*. at 30.

24.     For the remaining customers, the United States limited its inquiry to only whether each customer was a real person, as counsel for the Defendant suggested. *See Id*. at 30-33.

25.     Neither counsel for the United States nor Special Agent Keys mentioned R.K., the overdose victim in Count 6, during the direct examination.

26.     At no point during the direct examination did the undersigned counsel for the United States observe Special Agent Keys cry.

27.     At no point during the direct examination did the undersigned counsel for the United States hear gasps or audible crying from the gallery.

28.     Families of several of the Defendant's deceased customers have attended the trial, including the family of G.K. It has been reported to the undersigned counsel that some of those people observing the trial have, at various times throughout the trial, cried quietly in the gallery.

---

[1] Specifically the Court stated: "You're going to ask for a mistrial, and I'm going to deny it." Exhibit 3, at 29.

29.     Within in the first day or two of trial, the prosecution team met and discussed the substance of the material that might have an impact on the Defendant's customers' families that may be attending the trial, including the family of G.K.

30.     The prosecution team assigned one of its staff to consult with known family members of the Defendant's customers in attendance and advise them of the nature of testimony that would be heard and the need to maintain proper decorum in the courtroom.

31.     The United States, through its victim coordinator, made arrangements to help some of the victims cover the costs of attending the trial.  It is anticipated that one or more of these family members of G.K., as well as some of the family members of the Defendant's other known customers (both living and deceased) will make or submit statements at the Defendant's sentencing, if the Defendant is convicted.

32.     In earlier testimony, HSI Intelligence Analyst Robin Biundo was asked whether another name on the "daily order sheets"—A.L.—was a real person, based upon the investigation her task force conducted in Oregon.  Ms. Biundo was also asked to identify J.G., the drug dealer who hired A.L. to be his package receiver, from a photo taken during her investigation.

ARGUMENT

        The Court was correct when it denied the Defendant's motion for a mistrial, in that:  (1) The United States' questions to its witness, Special Agent Keys, and her answers did not violate the Court's order or the United States' prior agreement. (2) During Special Agent Keys' testimony, there was no mention that any of the deceased customers of Pharma-Master died from overdoses. (3) There was no claim that the Defendant was responsible for the deaths of his deceased customers.  (4) Crime victims have a right to be in the courtroom.  (5) Mr. Paz's Statement in

8

Advance of Plea does not violate the Court's order or the United States' agreement.

## I. SPECIAL AGENT KEYS TESTIMONY DID NOT VIOLATE THE COURT'S PRIOR ORDER, NOR WAS THE PROBATIVE VALUE SUBSTANTIALLY OUTWEIGHED BY UNFAIR PREJUDICE

During its examination of Special Agent Keys, the United States was presenting evidence based upon its agreement and the parties' and Court's concurrence resulting in the denial of the Defendant's motion to exclude at the hearing on May 29, 2019. Like with A.L. and J.G., the United States was eliciting testimony that G.K., to whom the Defendant has been charged with aiding and abetting the distribution of Fentanyl, was a real person and that G.K. was really his name and not an aliases or false identity. In compliance with the minute entry and agreement of the United States, when asking Special Agent Keys about G.K., the United States did not elicit testimony that G.K.'s death was an overdose death, nor did it ask questions tying G.K.'s death to the Defendant. *See* Exhibit 3, at 22-25.

Relevant evidence and testimony presented at trial as part of the United States' case-in-chief is inherently prejudicial to the Defendant (though not implying that such evidence is *unfairly* prejudicial to the point of *substantially outweighing* its probative value). The mere fact that testimony is presented that the Defendant was investigated, and individual witnesses were sought out, for alleged criminal conduct is prejudicial against the Defendant. Rule 403 of the Federal Rules of Evidence stands for the principal that relevant evidence, or evidence and testimony with probative value, is admissible, except where its "probative value is substantially outweighed" by, among other things, its unfair prejudicial effect, misleading the jury, or confusing the issues.

9

Here, the evidence of the death of a potential key witness, G.K., a customer of the Defendant and identified in Count I of the Second Superseding Indictment, is probative. That evidence is an important part of the United States' case-in-chief because the United States does not have possession of the drugs that the Defendant sent to G.K. Further, the United States cannot call G.K. to confirm that he ordered and received the Fentanyl-laced pills from Pharma-Master. There is probative value to explaining to the jury why they are not hearing from a key witness to the alleged criminal conduct. The United States' evidence regarding the predicate offense involving distribution to G.K. (as well as the offenses regarding C.V. and E.B.) is supported by less evidence, compared to other offenses. For nearly all the other predicate offenses, the United States has physical evidence (such as the drugs) it has presented to the jury.

When concerns were expressed during the testimony of Special Agent Keys, the United States sought to ensure the jury was not misled or confused by: (1) clarifying with Special Agent Keys before the jury that the Defendant was not charged with causing the deaths of customers (other than R.K.) named in the indictment; and (2) limiting its inquiry into the remaining customers to asking whether they were real people, as counsel for the Defendant suggested during the side bar.

The jury heard evidence that G.K. is dead. The jury has not heard any evidence that C.V. or E.B. are dead.[2] The jury heard testimony about G.L.'s death, when Counsel for the Defendant questioned G.L.'s girlfriend about G.L.'s death. The questions about G.L.'s death propounded by

---

[2] The sidebar and the Defendant's motion for a mistrial sidetracked the previously concurred upon evidence to be presented at trial, as discussed in the hearing on May 29, 2019, namely that the deaths of C.V. and E.B. would also be mentioned in testimony, while not linking them to the Defendant nor mentioning them as overdoses.

10

defense counsel contradict the argument about the Defendant being unfairly prejudiced by mention of G.K.'s death and inability to be interviewed—asking witnesses questions regarding deceased or unavailable witnesses was not unfairly prejudicial to the Defendant.

In its May 29, 2019, ruling denying the Defendant's motion to exclude evidence, the Court considered the potential for misleading the jury by this probative information coming out at trial, indicating a limiting instruction would be sufficient to address the possibility of unfair prejudice by testimony that G.K., C.V., E.B., and G.L. were dead (without mentioning the cause of death or tying them to the Defendant). This contemplated limiting instruction has not yet been given, though the United States followed up the sidebar discussion with asking Special Agent Keys whether the Defendant was charged with the death of G.K., confirming he was not and was only being referenced as a customer of the Defendant.

Contrary to the Defendant's representations of the Court's ruling and findings at the May 29, 2019, hearing, it was contemplated and discussed previously that the jury would hear that G.K., C.V., E.B., and G.L. were dead.[3] *See* Exhibit 1, at 12-13. The Court concurred that testimony

---

[3] During the sidebar, Counsel for the Defendant misrepresented the Court's order, stating: "The ruling was very contrary on the overdose deaths, and it was specific to: They are allowed to discuss [G.K.], who was an overdose, who was investigated because they weren't able to interview him. He is not here testifying. That was allowed. They are very, very, very far over the line when they have a family out here crying in the courtroom, and it's clear that the indication is that he was an overdose death. Your Honor's ruling was very clear in that regard." Exhibit 3, at 26. Defense counsel appears to misconstrue the fact that the Defendant's motion to exclude was previously denied by the Court. *See* Doc. 226. The United States agreed at the May 29, 2019 hearing (i.e., effectively a stipulation) what it would not do, as noted in the Court's minute entry. *See id.* The United States has complied with that stipulation.

Counsel for the Defendant further argued during the sidebar: "…But when he then asked: Why didn't you interview them - - he didn't ask that about a single other person who allegedly received drugs - - so that she can say, 'Because they are dead.' That clearly violates the order of this Court." Exhibit 3, at 27. Defense counsel's assertion of a clear violation of the Court's order is actually

regarding the deaths had probative value for explaining the lack of interview or testimony from those individuals, which is what prompted the discussion of a limiting instruction to balance any potential for unfair prejudice. Counsel for the defense seemed to concur with the Court, specifically stating that the witnesses would not speak of the deaths as overdose deaths, referencing the deceased's unavailability to testify or be interviewed (Counsel for the Defendant indicated referencing them as the "deceased"). Exhibit 1, at 12. The Defendant's argument for a mistrial seems to rely on the simplicity of the Court's minute entry, overlooking the denial of the Defendant's motion, without the context that supported the United States' stipulation. *See* Exhibit 1, at 12-13; *compare* Doc. 226. The parties and the Court ultimately concurred with the fact that the death and unavailability of those mentioned in the Second Superseding Indictment would be part of testimony at trial, without referencing them as overdoses or linking their deaths to the Defendant. *See* Exhibit 1, at 12-13; Doc. 226.

This is not a circumstance where the probative value of the testimony is substantially outweighed by unfair prejudice. *See* Rule 403, Federal Rules of Evidence. However, to fully resolve any potential prejudice that might exist because the jury learned that G.K. is dead, the United States proposes the Court follow the same course the Court outlined at the May 29, 2019, hearing—instruct the jury that no evidence was presented that connected the Defendant with G.K.'s death; and the reason the jury learned of G.K.'s death was so that it would understand why

---

contrary to the Court's order denying the Defendant's prior motion and the United States agreement. *See* Exhibit 1, at 12-13; *and see* Doc. 226.

Further implication by defense counsel that having a victim's family in the courtroom during Special Agent Keys testimony was a violation of the Court's order denying their motion is not well-founded. *See* Exhibit 3, at 28; *compare* Exhibit 1, at 12-13 and Doc. 226. Such a finding would be contrary to the Crime Victims' Act, 18 U.S.C. § 3771.

G.K. was not interviewed or called to testify at trial. The Court could instruct the jury further that it should draw no inferences from the testimony that G.K. is dead. This would satisfy the Court's direction at the May 29th hearing (i.e., that a limiting instruction would be given). *See* Exhibit 1, at 12. The United States has included herewith a proposed limiting instruction for this purpose, as Exhibit 4.

## II. THE EMOTIONAL STATE OF A TESTIFYING WITNESS AND THE PRESENCE OF FAMILY MEMBERS OF ONE OF THE DEFENDANT'S DECEASED CUSTOMERS ARE NOT A PROPER BASIS FOR A MISTRIAL

In relation to the Defendant's assertion of an emotional state which the defense perceived as coming from a family member(s) of one of the Defendant's customers, Rule 615 of the Federal Rules of Evidence specifically does not authorize the exclusion of "a person authorized by statute to be present". The "court shall not order any victim of an offense excluded from the trial of a Defendant accused of that offense because such victim may, during the sentencing hearing, make a statement or present any information in relation to the sentence. 18 U.S.C. § 3510(a). The Crime Victims' Rights Act, 18 U.S.C. § 3771(a), includes a victim's "right not to be excluded from any such court proceeding".[4] Furthermore, eliciting an emotional response from a witness–is not grounds for a mistrial.[5]

---

[4] A crime victim is defined as "a person directly and proximately harmed as a result of the commission of a Federal offense". 18 U.S.C. § 3771(e). In the case of a deceased crime victim (e.g., G.K.), family members of the decedent "may assume the crime victim's rights". *Id.*
[5] After orally moving for a mistrial, or alluding to the same, during the sidebar on August 20, 2019, the Defendant filed its Motion for Mistrial. Doc. 265. The Defendant supplemented its motion on August 27, 2019. Doc. 272.

The Defendant has raised the issue of the United States helping to pay for accommodations and travel expenses for the family members of a deceased customer of the Defendant. It is anticipated some of these family members will provide statement(s) at the Defendant's sentencing, if convicted. The United States, through its victim coordinator, routinely helps provide for travel and accommodations in situations similar to this one.

III.     REFERENCE TO PAGE SEVEN OF MR. PAZ'S STATEMENT IN ADVANCE OF PLEA, IN ITS REDACTED STATE, WAS NOT MADE NOR WAS IT PUBLISHED TO THE JURY

The Defendant's supplement to its prior motion for a mistrial appears to overlook the fact that his motion to exclude evidence about overdose deaths was denied. *See* Doc. 203 and 226. The Defendant asserts that Mr. Paz's Statement in Advance of Plea (Government's Exhibit 23.06) was insufficiently redacted and therefore caused an undue prejudicial impact requiring a mistrial. The Defendant failed to acknowledge that he, himself, proposed that an unredacted copy be given as an exhibit at trial. However, the United States did redact the number of overdose victims from Mr. Paz's Statement in Advance of Plea, without specific direction from the Court. This was done to avoid the specific question of its probative value being substantially outweighed by unfair prejudice, and in the spirit of the United States' agreement/stipulation regarding testimony about overdoses. Government's Exhibit 23.06—the redacted plea agreement—was admitted into evidence without objection from the Defendant. Doc. 250, Order Admitting the United States' Exhibits.[6]

---

[6] The Court's Order states, in part: "On May 17, 2019, the Court admitted all the uncontested exhibits proposed by the United States. (Doc. 219) Those uncontested exhibits were admitted with

During the examination of Mr. Paz, the United States did not question Mr. Paz about nor publish to the jury page seven (7), which contained the following language and redaction: "g. Restitution. …To date, the United States has identified approximately [REDACTED] Pharma-Master customers who are now deceased.  Whether it was Pharma-Master pills that killed the decedents or Pharma-Master's pills fed the decedents' addictions until death took them, I agree that restitution should be made to their family or next-of-kin."  Government's Exhibit 23.06, at 7. The United States avoided this page, but did not outright remove or redact it, because it had already been admitted as an exhibit.[7]

If the Court deems it prudent, the United States would stipulate to the removal or further redaction of page seven (7) of Mr. Paz's Statement in Advance of Plea (Government's Exhibit 23.06) prior to the full set of digital exhibits being provided to the jury (e.g., the text of the whole page could be redacted, if desired).

//

//

---

the understanding that they cannot be challenged at trial for insufficient foundation. However, the defense may still object at trial to those previously uncontested exhibits based upon other objections such as hearsay, rule 404b, or rule 403 objections." Doc. 250.

[7] During the direct examination of Mr. Paz, counsel for the United States reviewed a digital copy of Mr. Paz's Statement in Advance of Plea with Mr. Paz, specifically directing that particular pages be put up on the screen.  The following pages were displayed and published to the jury, while questions related thereto were asked of Mr. Paz: 1, 2, 4, 5; and page 13-14 (Plea Supplement).  No other pages were published or displayed to the jury.  During the cross examination of Mr. Paz, Counsel for the Defendant also used and published Government's Exhibit 23.06; however, they also did not reference or display page seven (7) of the exhibit.

Neither the Defendant's motion, nor his supplement, allude to the fact that the United States actually referenced or published to the jury the contents of page seven (7) of Mr. Paz's Statement in Advance of Plea.  The Defendant's assertion appears to rely merely on the method of redaction and inclusion of page seven (7) in Government's Exhibit 23.06.  See Doc. 265 and 272.

15

## CONCLUSION

WHEREFORE, because the Defendant has not demonstrated that a mistrial is a manifest necessity, the United States respectfully requests that the Court uphold its prior ruling of May 29, 2019, and its denial of the Defendant's motion for a mistrial and consider giving the jury the limiting instruction proposed as a feasible alternative to mistrial.

Furthermore, the United States respectfully requests the Court's decision in regard to the inclusion, removal, or further redaction of page seven (7) of Government's Exhibit 23.06 prior to the digital copy being provided to the jury (again, as a feasible alternative to a mistrial).

Respectfully submitted this 28th day of August, 2019.

JOHN W. HUBER
United States Attorney


*/s/ Kent A. Burggraaf*
Kent A. Burggraaf
Special Assistant United States Attorney

16

EXHIBIT 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                       DISTRICT OF UTAH

 3                       CENTRAL DIVISION

 4

 5   UNITED STATES OF AMERICA,       )

 6           Plaintiff,              )

 7   vs.                            )      Case No. 2:16-CR-631DAK

 8   AARON MICHAEL SHAMO,           )

 9           Defendant.             )

10   _____)

11

12

13           BEFORE THE HONORABLE DALE A. KIMBALL

14      ------------------------------------

15                    May 29, 2019

16

17                   Motion Hearing

18

19                  Partial Transcript

20

21

22

23

24

25
```

EXHIBIT 1

```
 1                      A P P E A R A N C E S

 2

 3    For Plaintiff:              S. MICHAEL GADD
                                  348 East South Temple
 4                                Salt Lake City, Utah

 5                                VERNON G. STEJSKAL
                                  111 South Main Street
 6                                Suite 1800
                                  Salt Lake City, Utah
 7
                                  KENT A. BURGGRAAF
 8                                348 East South Temple
                                  Salt Lake City, Utah
 9

10    For Defendant:             GREGORY G. SKORDAS
                                 KATYLIN V. BECKETT
11                               560 South 300 East
                                 Suite 225
12                               Salt Lake City, Utah

13                               DARYL P. SAM
                                 5955 South Redwood Road
14                               Suite 102
                                 Salt Lake City, Utah

15

16

17

18

19

20

21
      Court Reporter:            Ed Young
22                               351 South West Temple
                                 Room 3.302
23                               Salt Lake City, Utah 84101-2180
                                 801-328-3202
24                               ed_young@utd.uscourts.gov

25
```

EXHIBIT 1

```
 1    May 29, 2019                                9:00 a.m.

 2                   P R O C E E D I N G S

 3

 4         THE COURT:  We're here this morning in the matter

 5    of United States of America vs. Aaron Shamo, 2:16-CR-631.

 6    The United States is represented by Mr. Michael Gadd,

 7    Mr. Vernon Stejskal and Mr. Kent Burggraaf.

 8         Correct?

 9         MR. GADD:  Correct, Your Honor.

10         THE COURT:  The defendant is present and

11    represented by his counsel, Mr. Greg Skordas, Mr. Daryl Sam

12    and Ms. Kaytlin Beckett.

13         MR. SKORDAS:  That is correct, Your Honor.

14         THE COURT:  All right.  I have a briefed motion on

15    the request for a continuance by the defendant.  Does one of

16    you want to talk about that?

17         MS. BECKETT:  Your Honor, at this point in time we

18    would still like to file a reply brief on that.  I believe

19    the government just filed their responsive brief yesterday,

20    and we had talked with Mr. Gadd about having Eric Wheeler

21    here when that motion is argued so that he can give some

22    context to that.

23         THE COURT:  About what?

24         MR. SKORDAS:  Mr. Wheeler -- Eric Wheeler, he

25    would like to be here for that hearing.  He can give some
```

```
 1    context to the issue of the forensic review and how long it

 2    is actually going to take to process that data, because the

 3    information that has currently been provided is not

 4    accurate, and we would request we be able to argue that on

 5    Friday.  I believe we still have hearing time that should be

 6    available on Friday if that is possible, Your Honor.

 7              THE COURT:  Will he be here Friday?

 8              MS. BECKETT:  Yes, he can be here Friday.

 9              THE COURT:  All right.  So you want that heard

10    Friday?

11              MS. BECKETT:  That would be preferable, yes, Your

12    Honor.

13              THE COURT:  That is okay with me.

14              Is that okay with you?

15              MR. GADD:  Yes, Your Honor.

16              THE COURT:  So Friday we'll argue that and hear

17    testimony from Mr. Wheeler.

18              MS. BECKETT:  Correct, Your Honor.

19              THE COURT:  All right.  What do you want to take

20    up next?

21              MR. GADD:  We're ready to lay foundation for the

22    contested exhibits if the Court is willing to hear that.

23              THE COURT:  What about the motions in limine that

24    are outstanding?

25              MR. GADD:  I'm ready to argue on all of them.
```

```
 1                THE COURT:  Do you care about the order?

 2                MR. SKORDAS:  No, Your Honor.

 3                THE COURT:  We talked at the last hearing about

 4      the government's motion regarding sentence, the sentences or

 5      possible sentences.

 6                Do you want to say anything else about that?

 7                MR. GADD:  No, sir.

 8                MS. BECKETT:  No, Your Honor.

 9                THE COURT:  Ms. Beckett?

10                MS. BECKETT:  No.

11                THE COURT:  All right.  I will tell you how I feel

12      about that.  I think the government's chart on page 7 of its

13      reply brief is correct.  That is what I will permit and/or

14      prohibit.

15                Do you see the chart?

16                MS. BECKETT:  I don't know if I have that in front

17      of me, Your Honor.  I apologize.

18                THE COURT:  I can't hear you.

19                MS. BECKETT:  I don't know that I have that in

20      front of me, Your Honor.  I apologize.

21                THE COURT:  Now, with respect to the government's

22      motion to strike the expert, Kelly Shafto, the current

23      situation is not satisfactory, but is he going to -- he or

24      she?

25                MR. SKORDAS:  She.
```

1          THE COURT:  Is she going to provide a report?

2          MS. BECKETT:  Your Honor, I believe it is her

3   intention to do so.  I have not received that report from

4   her, but essentially what she has been charged with and what

5   she has been doing in this case involves interviewing the

6   witnesses and, more specifically, involving the death

7   resulting count and some of the information that has come to

8   our attention, and I believe she does intend to provide a

9   report on that.

10          THE COURT:  Well, can you get the government a

11   report at least by, say, a week from now?

12          MS. BECKETT:  Yes, Your Honor.  That is not a

13   problem.

14          THE COURT:  And then do we need to have a further

15   hearing or you can consult with them if you have some issues

16   with the report?

17          MR. GADD:  If we could plan on that -- we'll

18   consult with them, and we will look at the report and

19   consult with them, and I think worst case scenario, we may

20   ask the Court for a Daubert hearing on one of the afternoons

21   of trial.

22          THE COURT:  All right.

23          MR. GADD:  Thank you.

24          THE COURT:  Motion to strike Dr. Terry Haddix.

25   Again, we need a report.

EXHIBIT 1

1          MS. BECKETT:  Your Honor, at this time I don't

2     think we're going to be calling Dr. Haddix as a witness.  It

3     is my understanding that we will not be calling her.

4          THE COURT:  I guess that takes care of that motion

5     then.

6          MS. BECKETT:  Yes, Your Honor.

7          THE COURT:  Motion to strike Eric Wheeler.  He is

8     going to be testifying in a couple of days; is that right?

9          MS. BECKETT:  I apologize, Your Honor.  What was

10    that?

11         THE COURT:  Eric Wheeler is going to be here

12    testifying Friday?

13         MS. BECKETT:  Correct.

14         THE COURT:  Do we need a Daubert hearing with him?

15    There is no indication in what has been disclosed so far

16    about his experience with the dark web for instance.

17         MR. GADD:  I would like a hearing.  What I worry

18    about is the one-week delay in his processing Luke Paz's

19    computer may make it so he is not fully able to testify at

20    Friday's hearing.

21         On the other hand, nothing between now and then

22    will change his relationship and his expertise on things on

23    the dark net, and so if we could perhaps use his Friday

24    testimony as a Daubert hearing and then come back to it if,

25    for example, he comes up with some novel or untested theory

EXHIBIT 1

```
 1    as it relates to computer forensics and Mr. Paz's computer,

 2    that would be our request.

 3              MR. SKORDAS:  That is fine.

 4              THE COURT:  That makes sense, doesn't it?  You're

 5    okay with that?

 6              MR. SKORDAS:  Yes.

 7              THE COURT:  All right.  Do we start with that on

 8    Friday, first thing, at 9:00?

 9              MR. SKORDAS:  I think that we should be done with

10    the other parts of your presentation by Friday so we

11    probably can start right away.

12              MR. GADD:  Worst case scenario, we have one

13    witness who is serving a search warrant in Las Vegas who was

14    planning to be back for Friday morning, but I have a feeling

15    that his exhibits may be admitted today and we won't need

16    him Friday.

17              THE COURT:  Okay.  Let's see.  Defendant's motions

18    regarding the dark web, P.G.P., sigaint e-mail, dark net

19    marketplace, AlphaBay, et cetera, what do you want to say

20    about that?

21              MR. SAM:  Your Honor, with the information that we

22    have been getting in and the hard drive that came in

23    yesterday, we would like by the end of next week to respond

24    to that.

25              THE COURT:  To renew or respond to that motion?
```

EXHIBIT 1

1    All right.  But it is your motion.  Do you mean bolster it?

2             MR. SAM:  Yes, to supplement what we have filed.

3             THE COURT:  Mr. Gadd?

4             MR. GADD:  I just wanted to make sure we are all

5    on the same page.  The Court's referring to the motion filed

6    as document 171 on December --

7             THE COURT:  I am.

8             MR. GADD:  -- 1st, so six and a half months ago

9    roughly?

10             MR. SAM:  I'm sorry.  I'm getting mixed up.  The

11    exhibit -- the motion for the extension on exhibits, we did

12    provide the government the exhibits last Friday.  Maybe I

13    am --

14             THE COURT:  You two better talk for a minute.

15             MR. SAM:  Your Honor, if we could reserve that

16    until Friday --

17             THE COURT:  Friday?

18             MR. SAM:  Yes, if there is any oral argument to be

19    made on that.

20             THE COURT:  I think preliminarily it looks to me

21    as though, assuming the government can authenticate the

22    documents through their agents, which it appears they would

23    do, then that motion would be denied.

24             MR. SAM:  That would be my understanding too, Your

25    Honor, if there is something that can't be authenticated --

EXHIBIT 1

```
 1              THE COURT:  All right.  Let's see.  You're
 2   objecting to Guy Gino's testimony?
 3              MR. GADD:  That was part of the same motion, that
 4   document 171.  It is partway --
 5              THE COURT:  That is the second part.
 6              MR. GADD:  Yes, sir.
 7              THE COURT:  I guess right now I don't see why he
 8   can't do what the government proposes that he do and testify
 9   to, so I'm denying that motion preliminarily.  I will listen
10   to more argument if you want to.
11              MR. SAM:  Your Honor, that would be acceptable to
12   us at this point.  If there is anything with authentication
13   that we object to, we'll raise it.
14              THE COURT:  Thank you.
15              Motion to exclude ecurrency dollar amounts.  I
16   don't see any reason to do that except that I don't know
17   what the auction value would have to do with anything.  That
18   is not relevant, is it?
19              MR. GADD:  The defense has suggested in their
20   reply that perhaps we should be limited to the value on the
21   date of the seizure, the value on the date of acquisition
22   or -- I think it was just those two.  Or the value on the
23   date of his arrest.  I think those were the three that they
24   were interested in.  As we looked at it, we thought that is
25   fair and we're happy to limit ourselves to that.
```

```
1          THE COURT:  All right.  That makes sense to me.
2     You get a partial grant and a partial denial on that.
3          MR. GADD:  I will say, so they are not caught off
4     guard, that the value on the date of the seizure is also
5     substantially high.  Bitcoin, as you can see from our
6     response, Bitcoin was trending up when we seized it and was
7     on its way back down when we sold it and is still going to
8     be quite high.  I think we can ameliorate all of these
9     concerns by just explaining to the jury that exchange rates
10    fluctuate and they shouldn't hold it against Mr. Shamo that
11    he happened to make a very good illicit investment.
12         THE COURT:  Now, did you just say something
13    different than what you had previously agreed to in your
14    prior statement?
15         MR. GADD:  No.  The agreement stays.  I don't want
16    to catch them off guard when they hear the number or the
17    value on the date that it was seized because it will also be
18    high.  I didn't look it up last night, but it will be high.
19         THE COURT:  You have agreed on the three dates.
20         Ms. Beckett?
21         MS. BECKETT:  Yes, Your Honor.
22         I would just like to clarify.  I think our request
23    in our motion also included that we would like substantial
24    information on how they are establishing the amounts that
25    they are referencing, whether that be the historical data or
```

EXHIBIT 1

1    somebody who can actually talk about the historical data

2    itself in terms of the exchange rates for Bitcoin.  So if

3    they are going to talk about the actual amount at the time

4    it was seized, we would like to have somebody on the stand

5    who can actually talk about the historical amount and what

6    the exchange rate was at that point in time.  That would be

7    our request.  Or if they want to do it at the point in time

8    of the transaction, we would need that information still.

9              MR. GADD:  We'll lay that foundation testimony

10   through our expert, Guy Gino.

11             THE COURT:  Now, when you were here before I think

12   we talked about the people who are now not available to

13   testify because they are not alive and that you are not

14   claiming that the defendant has any responsibility for,

15   correct?

16             MR. GADD:  Yes.

17             THE COURT:  We'll give a limiting instruction on

18   that, so that it is clear that he is not being charged with

19   those deaths.

20             MS. BECKETT:  Your Honor, on that I believe we

21   also agreed we would not refer to those as overdose deaths,

22   just simply deceased or unavailable to testify or be

23   interviewed.  I believe that was the discussion that

24   occurred.

25             THE COURT:  I think it was.

EXHIBIT 1

1          Mr. Gadd?

2          MR. GADD:  That is my memory as well.

3          THE COURT:  Let's talk about the pictures for a

4     minute.

5          MS. BECKETT:  I think we laid a significant amount

6     of testimony on this before, but our concern with the photos

7     that have been proposed, even the narrowed number, is they

8     are not necessary and they are fairly gruesome and I believe

9     those were provided to the Court.

10          THE COURT:  Yes.

11          MS. BECKETT:  Our concern is that showing those

12     photos when there is not a necessity for the information

13     that they contain is unnecessary and, as we outlined, very

14     much unduly prejudicial.

15          THE COURT:  Thank you.

16          MR. GADD:  As I think about the attorneys on the

17     case, I am going to guess most of us have had cases with

18     photos far worse.  That has certainly been my experience.  I

19     suspect that is Mr. Skordas's experience.  These just are

20     not that bad.

21          We have narrowed it down to three.  They have

22     significant, important, probative value to our case, and

23     specifically to a very difficult aspect of our case and that

24     is proving but for causation of death.  These photos were

25     relied on specifically by our expert, Dr. Hail.  Not only

EXHIBIT 1

```
 1    did she rely on them, she even included the close-up picture

 2    in her report.  This is some of our very best evidence that

 3    Fentanyl was the but for cause of death.

 4            Her role is educational.  She is going to try to

 5    teach the jurors in the limited time she has on the stand

 6    that you can tell, through a combination of physiological

 7    effects and an autopsy and through years and years of

 8    training and experience and education and studying it, what

 9    drugs killed someone.  The physiological effects are

10    apparent in the photos.  I don't see a way for us to prove

11    it without the photos.  We have tried to limit it to just

12    these three.

13            THE COURT:  Well, she could describe it, couldn't

14    she?

15            MR. GADD:  It is just not the same.  You know, I

16    think colloquially --

17            THE COURT:  Colloquially.

18            MR. GADD:  -- we say a picture is worth one

19    thousand words and certainly that is the case here.  We have

20    cited a number of examples where courts allowed pictures far

21    worse than these in order to help a forensic expert explain

22    the nature and the cause of death.

23            THE COURT:  Ms. Beckett?

24            MS. BECKETT:  Your Honor, I think there are two

25    issues that we're looking at.  First, we have already
```

1    conceded that we are not bringing in another expert who is

2    going to argue the issue of whether or not it was a Fentanyl

3    overdose.  That I think negates part of the government's

4    argument.

5            The other side of that is that Ms. Hail, the

6    expert who is referring to these photos, she didn't conduct

7    any examination of the victim in the case.  She reviewed

8    reports.  She can discuss those reports.  She can discuss

9    those reports the same way she can discuss those photos

10   without giving those to the jury.

11           The flip side of that, Your Honor, is that there

12   are causational elements you have to look at for a death

13   resulting count and the government is ignoring the other

14   side of that.  Without going too far down the road of what

15   evidence we will be bringing forward in that regard,

16   essentially what they are guaranteeing by showing these

17   types of photos to the jury is nullifying the other side of

18   that argument by seeing a young man who is deceased, an up

19   close photo of a deceased individual's face in two separate

20   shots, and then his body on the floor next to a bed after it

21   has been moved.  I don't see how those have any other impact

22   than unduly prejudicial.  I don't think they are necessary

23   and I think Your Honor is correct in pointing out that Ms.

24   Hail can simply say what she saw and what she reviewed

25   without showing that to the jury.

EXHIBIT 1

```
1              THE COURT:  One of the photos I would call a
2    proximity photo and I don't have any problem with that.
3    Preliminarily, I'm inclined only to let that one in, but I
4    will keep thinking about that.
5              What do you want to do next?
6              The proximity photo sort of sets the room up.  I
7    don't think it is unduly prejudicial.
8              MR. GADD:  Is that the photo that just shows the
9    lower half of his body?
10             The defendants provided the United States with its
11   exhibit list and we appreciate them doing that.  To the
12   extent that the United States has some specific objections
13   to the exhibits related to foundation, how would the Court
14   like us to proceed?  Should we file those?  Should we
15   address it at this hearing?  What is the best path forward?
16             THE COURT:  Well, we can address it now if you
17   want.  It might make more sense to file your objections,
18   though.
19             MR. GADD:  I will do that.  I think it would help
20   to see the foundation.  I hate to object saying, well, there
21   is no foundation when they have not had a chance to put any
22   on, but I think there are significant foundation objections,
23   and so I would like to go through those.  I'm happy to put
24   it in writing and maybe that is the best path forward.
25             THE COURT:  It may be, but if you want to proceed,
```

EXHIBIT 1

```
 1    I will let you.

 2           MR. GADD:  I will do it in writing.  That makes

 3    more sense.

 4           THE COURT:  All right.

 5           MR. GADD:  On this green sheet of paper I have

 6    what has been the standing plea offer from the United

 7    States.  I don't want to get into it much, but after a pair

 8    of Supreme Court cases a couple years ago, Lefler and Frye,

 9    it became incumbent on the government shortly before trial

10    to just quickly put on the record a few things.

11           Mr. Shamo now has a chance to look at that and it

12    will show his case number, today's date, and then the very

13    short prior offer and it is just three lines.  I wonder if

14    the Court would be willing to just inquire briefly and

15    ensure that he has received the offer, that he had a chance

16    to consider it and ask any questions that he wanted to his

17    attorney, and that he has a reason, in his mind a good

18    reason to reject the offer, and then with those three things

19    covered, the only thing I would add is that the offer will

20    expire at the end of the day today.

21           THE COURT:  Do you have any objection?

22           MS. BECKETT:  I would like to briefly make a

23    record in that regard, Your Honor.

24           THE COURT:  All right.

25           MS. BECKETT:  There has been conversation back and
```

EXHIBIT 1

```
 1    forth between our office and the U.S. Attorney's Office
 2    regarding this particular offer, and we actually
 3    counteroffered them at a certain point with a range that was
 4    different than this.  The range I believe that we suggested
 5    was between 28 -- down to 28 or 25 years and they are still
 6    allowed to argue up to life in prison which, in our opinion,
 7    is commensurate with some of the other coconspirators who
 8    are on the same level of culpability or that the government
 9    has alleged are on the same level of culpability as
10    Mr. Shamo.
11          MR. GADD:  I don't mean to interrupt other than to
12    say my preference would be that we not go into the details
13    and the specifics of the offer consistent with Rule 410, but
14    just for Mr. Shamo to say that he has received the offer, he
15    has had a chance to consider it and ask any questions that
16    he would like to to his attorneys and that in his mind he
17    has a good reason to reject the offer.  That is all.
18          MS. BECKETT:  I see no reason to not make a record
19    of that, Your Honor.  There is specific information that
20    has been brought before this Court right now.  We are making
21    a record in that regard, but we are not objecting to an
22    inquiry as to whether or not Mr. Shamo has had an
23    opportunity to question his counsel and inquire about this.
24          MR. SKORDAS:  Mr. Shamo, you received the offer?
25          MR. SHAMO:  Yes.  I just received the offer.
```

EXHIBIT 1

```
 1                THE COURT:  And do you understand it?

 2                MR. SHAMO:  Yes, I understand it.

 3                THE COURT:  All right.  Have you had a chance to

 4    question your lawyers about it?

 5                MR. SHAMO:  I'm sorry?

 6                THE COURT:  Have you had an opportunity to

 7    question your lawyers about it, to talk to them about it?

 8                MR. SHAMO:  Yes, I have.

 9                THE COURT:  In your mind, and you don't need to

10    tell me any reasons, but in your mind at least to this point

11    you feel like you have sound reasons for not accepting it?

12                MR. SHAMO:  Yes.

13                THE COURT:  Thank you.

14                MR. GADD:  Thank you, Your Honor.

15                I notice the defendant said that he had just

16    received the offer.  I thought we might want to clarify just

17    for the record that he received this green sheet of paper

18    that we'll put into our case file and hopefully never have

19    to use again, but the offer was made approximately six

20    months ago and I believe that is when he first received the

21    offer.  I just wanted to clarify.

22                THE COURT:  Is that essentially correct, you

23    received it before today?

24                MR. SHAMO:  Yeah.  It is one that was discussed.

25                THE COURT:  Okay.  Thank you.
```

1          MR. GADD:  Other than calling witnesses and laying

2    foundation for exhibits, I don't have anything else to

3    address.

4          Thank you.

5          THE COURT:  What about you, Mr. Skordas?

6          MR. SKORDAS:  No, Your Honor.

7          THE COURT:  Well, let's call them then.

8          (Proceedings continue.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**SHAMO PROPOSED EXHIBIT LIST**

1. Forensic Data and Documentation retrieved from the following:
   a. Computer of Aaron Shamo
   b. Computer of Drew Crandall
   c. Computer of Jonathan Luke Paz
   d. Computer of Mario Noble
   e. Cellular Phone of Aaron Shamo
   f. Cellular Phone of Drew Crandall
   g. Cellular Phone of Jonathan Luke Paz
2. Bitcoin records of the following:
   a. Aaron Shamo
   b. Drew Crandall
   c. Jonathan Luke Paz
3. Bank records of the following:
   a. Aaron Shamo
   b. Drew Crandall
   c. Jonathan Luke Paz
4. Images from Pharmamaster, AlphaBay as pertains to sales and customer feedback
5. Investigative Interviews of the following:
   a. Drew Crandall
   b. Jonathan Luke Paz
   c. Mario Noble
   d. Alexandrya Tonge
   e. Sadie Gurley
   f. Sasha Grant
6. Statement in Advance of Plea, of the following:
   a. Drew Crandall
   b. Mario Noble
   c. Sean Gygi
   d. Alexandrya Tonge
   e. Katherine Bustin
   f. Jonathan Luke Paz
7. Images of Search of Homes
8. Affidavits of Probable Cause for each search warrant
9. All documents and discovery related to the Oregon investigation
10. All documents relating to Gregory Lee
    a. Death of Russlan Klyuev
11. All documents relating to the death of Russlan Klyuev
12. All documents related to messages on Alpha Bay from "Trustworthymoney"
    a. All messages from Alivia Luckcuck
13. All documents related to messages from large customers of the drug trafficking operation
    a. Documents and messages from and to Christopher Kenney
14. Any documents or information relating to Christopher Kenney
15. Any expert reports from computer forensics.

1           IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4    _____

                                    )
5    UNITED STATES OF AMERICA,      )
                                    )
6              Plaintiff,           )
                                    )
7        -vs-                       )    2:16-CR-631 DK
                                    )
8    AARON MICHAEL SHAMO, et al.,   )
                                    )
9              Defendants.          )
     _____)

10

11

12

13

14          BEFORE THE HONORABLE DALE KIMBALL

15            DATE:  AUGUST 20, 2019

16        REPORTER'S TRANSCRIPT OF PROCEEDINGS

17          TESTIMONY OF VIRGINIA KEYS

18

19

20

21

22

23

24

25          Reporter:  REBECCA JANKE, CSR, RPR, RMR
                       (801) 521-7238

```
 1

 2                    A P P E A R A N C E S

 3

 4   FOR THE PLAINTIF       UNITED STATE'S ATTORNEY'S OFFICE

 5                          BY:  MICHAEL GADD, ESQ.

 6                               VERNON G. STEJSKAL, ESQ.

 7                               KENT A. BURGGRAAF, ESQ.

 8                          111 SOUTH MAIN STREET, 1800

 9                          SALT LAKE CITY, UTAH  84111

10

11

12

13   FOR THE DEFENDANT:     SKORDAS & CSTON, LLC

14                          BY:  GREGORY G. SKORDAS, ESQ.

15                               KAYTLIN V. BECKETT, ESQ.

16                          560 SOUTH 300 EAST, 225

17                          SALT LAKE CITY, UTAH 84111

18

19                          DARYL P. SAM, PLLC

20                          BY:  DARYL P. SAM, ESQ.

21                          5955 SOUTH REDWOOD ROAD, 102

22                          SALT LAKE CITY, UTAH 84123

23

24

25
```

```
 1    AUGUST 20, 2019                    SALT LAKE CITY, UTAH

 2                       P R O C E E D I N G S

 3                           *  *  *

 4              (Testimony of Agent Virginia Keys)

 5         THE COURT:  You may step down, thank you, and

 6    you may be excused.  The government may call it's next

 7    witness.

 8         MR. GADD:  Your Honor, the United States

 9    calls Special Agent Virginia Keys.

10                      VIRGINIA KEYS,

11    the witness hereinbefore named, being first duly

12    cautioned and sworn or affirmed to tell the truth, the

13    whole truth, and nothing but the truth, was examined

14    and testified as follows:

15         THE CLERK:  Please state your name and spell

16    it for the record.

17         THE WITNESS:  My name is Virginia Keys.

18    V-i-r-g-i-n-i-a.  K-e-y-s.

19         THE COURT:  You may proceed, Mr. Gadd

20         MR. GADD:  Thank you, sir.

21                   DIRECT EXAMINATION

22    BY MR. GADD:

23      Q.  Special Agent Keys, are you prepared to

24    testify about your part in the investigation of the

25    drug distribution activities of this defendant and his
```

1     co-conspirators?

2          A.    I am.

3          Q.    Before we do that, I just want to give the

4     jury a very brief summary about your background and

5     your experience.  Could you tell us a little about

6     yourself.

7          A.    Sure.  I'm a single mom, and I've lived in

8     Utah for a little over five years, and I enjoy

9     gardening and I like to play volleyball.

10         Q.    Thanks.  Could you tell us about maybe your

11    education and your background?

12         A.    Sure.  After I got divorced in 2004, I went

13    back to school, and I finished my bachelor's degree in

14    inter-disciplinary studies.  My disciplines are

15    accounting and business and communications with an

16    emphasis in international law enforcement surveillance

17    and cryptography.

18              I continued on my with my master's degree,

19    and I -- my master's is in criminal justice with an

20    emphasis in cyber crime.  And during my master's

21    program, I was recruited by the government to become a

22    special agent for IRS Criminal Investigations.  After

23    I graduated, IRS CI sent me to training with my

24    children in Georgia, and I put them in school while I

25    was doing my training.  We were there for six months.

1       During the -- that was at the Federal Law

2   Enforcement Training Center, or the FLETC is what it's

3   called for short.  During the time I was there, I

4   learned about the law.  I learned about arrest

5   warrants, search warrants, report writing,

6   interviewing, defensive tactics, all the things that

7   we were going to need to do our job as special agents.

8       And then, after I finished that training, I

9   came back to Washington State, and I worked for IRS

10  Criminal Investigation as a special agent for a little

11  over seven years before they transferred me to Utah.

12  I was here a little over two years with them before I

13  transferred over to FDA Office of Criminal

14  Investigations.  For short, I'll just say OCI because

15  it's easier.  And I have been with them for a little

16  over three years.

17      During the training that I had with IRS,

18  before I transferred over, my investigations included

19  gun smuggling, prostitution, Ponzi schemes, money

20  laundering schemes, drug smuggling, those types of

21  crimes.  And then, with FDA, my investigations include

22  investigating misbranding, adulteration, tampering,

23  counterfeit drugs that contaminate the drug supply.

24  And then, part of my responsibilities as well, is to

25  investigate overdoses and overdose deaths associated

 1   with those cases.

 2       Q.   You said FLETC and it just reminded me, the

 3   law enforcement -- the federal law enforcement loves

 4   its acronyms.  Is that fair to say?

 5       A.   It does.

 6       Q.   If I fall into that habit of using acronyms,

 7   will you correct me?

 8       A.   Sure.

 9       Q.   Okay.  So when people find out you're a law

10   enforcement agent in the Food and Drug Administration,

11   do you get quizzical looks?

12       A.   I do.  I actually get razzed pretty good.  A

13   lot of people ask me if I'm just there to keep their

14   food safe.  But there's a little bit more to it than

15   that.

16       Q.   For sure.  For sure.  Let's talk for a minute

17   about this exhibit right here.  This is true

18   Oxycodone, isn't it?

19       A.   It is.

20       Q.   Did you obtain -- oh, and maybe for the

21   record, this is Exhibit 24.00.  Did you obtain true

22   Oxycodone pills from Actavis?

23       A.   I did.

24       Q.   Did you also obtain true Oxycodone pills from

25   Mallinckrodt?

EXHIBIT 3

7

1    A.   I did.  The Mallinckrodt pills are stamped or

2  embossed with an M box and then the Actavis are

3  stamped with an A-215.

4    Q.   I'm holding Exhibit 24.  These are those

5  pills you obtained, right?

6    A.   That is correct.

7         MR. GADD:  Your Honor, at this time I would

8  like to take a moment and pass these around the jury.

9         THE COURT:  All right.

10         (Jurors looking at Exhibit 24.)

11         THE WITNESS:  You can touch them if you want,

12  if it's easier to see the embossment.  I'll just make

13  sure and count them when I get that back.

14         THE COURT:  Don't take any out.

15    Q.   By MR. GADD:  I said two names there, Actavis

16  and Mallinckrodt.  Those are the pharmaceutical

17  companies that sell these pills?

18    A.   They are.  They are registered with the FDA

19  and approved to manufacture the actual Oxycodone pills

20  for distribution in the United States.

21    Q.   And for these real Oxycodone pills, the

22  active pharmaceutical ingredient is Oxycodone,

23  correct?

24    A.   Oxycodone, yes.

25    Q.   Let's take a minute and just do a little bit

1     of housekeeping.  So the FDA, the Food and Drug

2     Administration, it has a chemistry lab, correct?

3          A.   It does.  It's called the Forensic Chemistry

4     Center.

5          Q.   Did you arrange for some of the pills from

6     Mr. Shamo and some of the punches and dies from

7     Mr. Shamo, did you arrange for those to be sent from

8     the DEA lab to your -- the FDA lab?

9          A.   I did.

10         Q.   I just want to read those through so that

11    they are clear in the record, and what I'll do is I'll

12    read not our court exhibit number, but I'll read the

13    DEA drug exhibit number, and then at the end, I want

14    to ask you if I got them right.

15              So in this category of items that you

16    arranged for the FDA lab to test, I show that we have

17    DEA Exhibit Number 14, 34, 64, 123, 193, 85, 95.01,

18    95.02, 96, 136, 174.01, 174.02, 188, 54, 15, 97, 126,

19    173, 185, 177, 178 and 179.  Does that sound correct?

20         A.   It does.

21         Q.   And we heard some about this yesterday,

22    right?

23         A.   We did.

24         Q.   The chemists were talking about how some of

25    the items that they had tested or sampled had bits

1      removed so that they could go into special programs,

2      correct?

3          A.   Correct.

4          Q.   All right.  Let's jump back into it.  Could

5      we look at 1706.  Can you see that on your screen?

6          A.   I do.

7          Q.   Could you point out for the jury Alex Tebbs?

8          A.   Sure.  So if you look at the bottom row, the

9      third row, the farthest to the right, Ms. Tebbs has

10     the red hair, and she's the very last one in that row.

11         Q.   What role did Ms. Tebbs play in Mr. Shamo's

12     organization?

13         A.   She was the pseudo-executive assistant for

14     him.  She would also run errands.  She would clean his

15     house, different tasks that he would ask her to do.

16     And that also includes helping him try to get into

17     other businesses.

18         Q.   Have you reviewed the text messages that were

19     captured between Ms. Tebbs and Mr. Shamo?

20         A.   I have.

21         Q.   Could we look at 14.04.  Could you read that

22     to the jury.

23         A.   Sure.  The "local user" is Mr. Shamo, and the

24     gray box is Ms. Tebbs or Alex.

25              Mr. Shamo:  Hey, Alex, any news on the

EXHIBIT 3

1    T-shirt bis?

2              Alex:  He hasn't said anything yet.  Do you

3    want me to offer him a price?

4              Mr. Shamo:  Yeah.  Offer 5K and see what he

5    says.  I want to get the ball rolling on it.  BTC is

6    doing really well, so the sooner I get a bis up, the

7    better.

8              As you've heard, BTC is short for BitCoin.

9              Alex:  Okay.  Perfect.  I'll text him now.

10             Alex:  Also, if it's cool with you, I can get

11   your watches fixed today and drop off the dry clean

12   and come down tomorrow.  I asked him what he thinks,

13   so we'll see what he says.

14             Mr. Shamo:  Yeah.  No pressure on when you

15   come down.

16             Alex:  Okay.  Perfect.  I just figured I

17   would have more stuff done by tomorrow.  It would be a

18   little more productive, lol.  When I go on lunch in

19   about half an hour, I'll call the food bank and get

20   some time set up.

21             MR. SHAMO:  Oh, yeah.  Need that done for

22   sure, lol.  I have some paperwork I might need filled

23   out for this class I need.  I might send you in to do

24   it.  Also, I need to get a dentist appointment.  Can

25   you maybe find one close by to me and get one set up?

1    Q.   Let's talk for just a minute about the offer

2    for the T-shirt business.  Are you aware of other

3    instances where Mr. Shamo tried to buy a legitimate

4    business through which he could launder drug money?

5    A.   Yes.

6    Q.   Let's look at 14.06.  Can you read this one

7    as well?

8    A.   Yes.  Again, Mr. Shamo is in blue, and Alex

9    is in the gray.

10        Mr. Shamo:  Both.  I had someone drive me to

11   the airport and asked them to leave the truck keys on

12   the counter.  That obviously didn't happen.  If you

13   can do the dishes in the sink and get a shoe rack that

14   I pointed out, that would be great.  I forgot to

15   transfer BTC -- or BitCoin -- over to my online

16   wallet, so I can't set up the trade today.  I can't

17   remember what else, but I'll have to get you more cash

18   to get Legal Zoom going.  What time was the detail

19   appointment at?  Hey, I need you to run some paperwork

20   into Prime For Life for me.  They are open 'til 9 p.m.

21   most nights, so anytime in the next few days would be

22   great if you can.  Also, I'm moving forward with the

23   gym this week and meeting with the owner in the next

24   few days for lunch, so I'll really need some legal

25   paperwork set up soon for that.  Most likely we'll use

1    Legal Zoom since it's easy.  Also, can you get the

2    shoe rack that I picked out and reschedule the

3    appointment for the detailing?  I was pissed.  Allie

4    took the keys to the truck, so sorry about that, but

5    let me know your thoughts and coordination for this.

6         Allie:  No big deal at all, lol.  I already

7    left after I tried to call.  It was my cousin's

8    birthday party, so I went to that, ha, ha.  But, yes,

9    I'll get on that.  What shoe rack was it you wanted?

10   Would you like me to get hold of Legal Zoom?  I

11   rescheduled for this Saturday, so no biggy, and I'll

12   get started on the paperwork.  You just want a

13   contract between you two saying you will be part

14   owner.  Any other details I need to know?

15        Mr. Shamo:  Yeah.  It will be a startup for

16   the gym since it's not legal yet, but I'll get more

17   details, how he wants us to set it up in the next few

18   days.  Also figure out a name for the one shirt bis.

19   I want to get that started soon.  Ugh.  It's going to

20   be a super busy week for me.  Let me know what day you

21   can come down to do the paperwork for Prime For Life.

22   Carpet cleaners this week.  Please try and set up for

23   Thursday or Friday.

24        Q.   The date on these messages that you've just

25   read, it's June of 2016, correct?

1      A.   Correct.

2      Q.   Let's look at just one or two more.  Could we

3   look at 14.05.  Ms. Tebbs' role wasn't just running

4   errands or trying to set up businesses that he could

5   purchase or launder his money through?

6           MR. SKORDAS:  Objection to counsel's

7   characterization of laundering money.

8           THE COURT:  Objection -- what's the question

9   -- sustained.

10     Q.   BY MR. GADD:  I probably should throw a

11  question in there.  I will.  In what we are about to

12  read here in 14.05, did you see additional steps that

13  the defendant asked Ms. Tebbs to take in her work for

14  him?

15     A.   I did.  He wanted her to also make BitCoin

16  trades for him.

17     Q.   Let's read that, would you?

18     A.   Mr. Shamo is in the blue.  Alex is in the

19  gray again.

20           Mr. Shamo:  Hey, my biggest BTC trader is in

21  town tomorrow.  Think you can make the trade for me?

22           Alex:  Yes.  I can definitely do that.  I'm

23  free tomorrow, so any time morning sometime would be

24  best.

25           Mr. Shamo:  Awesome.  I'll set it up.

1    Alex:  Sorry.  I'm at work.  I can call you

2    around 5 or 6 if that's okay.  Are you going to do

3    Vegas?

4    Mr. Shamo:  Okay.  I'm going.  Can I send you

5    my card info and you buy the 9:50 flight?

6    Alex:  Yes.  For tonight?

7    Mr. Shamo.  Yes.

8    Alex:  Okay.  Southwest, right?

9    Q.   And then let's look at one other.  Let's look

10   at 14.07.  This will be our last one for Ms. Tebbs.

11   In addition to engaging her to trade BitCoin, did she

12   also buy stamps at his request?

13   A.   She did.

14   Q.   Let's look at this now, and could you read

15   this for us?

16   A.   Yes.  Again, Mr. Shamo is in blue.  Alex is

17   in gray.

18   Mr. Shamo:  I need those stamps ASAP.  Can I

19   get your bank account info so I can drop cash in?

20   Alex:  Yes.  Give me a sec.  My account

21   number is 2910962 and I am at Golden West.  It's Alex

22   Tebbs on the account.

23   Mr. Shamo:  I've been down south most of my

24   day and haven't had a chance to get it.  I might just

25   give you cash when you come down next.  Meh.  Also,

EXHIBIT 3

1  don't hate me, but I have another watch to do, lol.

2  I'll talk to you.

3          Alex:  I can get order it -- I'm sorry -- I

4  can just order it, and you can just pay me back.  What

5  exactly is it?  I'm fine.  I'm used to it now.

6          Mr. Shamo:  Lol.  Priority stamped the 6.451,

7  I think.  I need 1,000 of them, so it will be around 7

8  K, if you can front that.

9      Q.   When you see in there the 6.451, what does

10  that mean, if anything, to you?

11     A.   That's a priority stamp that actually

12  includes the tracking amount and stuff in the price.

13     Q.   And is that the price, $6.45?

14     A.   It is.

15     Q.   Let's turn away from Ms. Tebbs now, and let's

16  talk about eBay items.  So, did you help analyze

17  Mr. Shamo's computers and data that was received

18  either from subpoenas or search warrants?

19     A.   I did.

20     Q.   All right.  Could we look at Exhibit 17.09.

21  Do you recognize this?

22     A.   I do.

23     Q.   Did you compile a list of some relevant items

24  that were, to use their phrase, won or purchased on

25  eBay?

1    A.   I did.

2    Q.   Let's look at these items that you flagged.

3  Can you walk us through what each of the columns

4  means?

5    A.   Sure.  When you look on the left, that's the

6  purchase date and time of the auction.  One of the

7  things about eBay is when you -- you have two choices.

8  You can either actually be involved in an auction and

9  make bids and compete against other people to try to

10 win the bid, or you can just have a buy now feature,

11 and even if you do the buy now feature, eBay still

12 lists it as you winning the auction.

13       So the second column is the auction title,

14 basically the product that was being either won or

15 purchased immediately, then the buyer's shipping

16 address, the shipping city of the buyer and the buyer

17 shipping name.

18   Q.   Can you tell us these -- each row is

19 something that he purchased, correct?

20   A.   Correct.

21   Q.   Can you walk us through the rows and what

22 they are?

23   A.   Sure.  So let's start at the bottom just for

24 chronological purposes.  So on June 6 of 2015, at

25 16:49, he won or purchased the USPS new 1999 USS

1    Arizona Memorial priority mail express stamp sheet of

2    ten.  It was shipped to 1383 East Murphy's Lane in

3    Salt Lake City, and the buyer's shipping name is Aaron

4    Shamo.

5          The next line up, July 8 of 2015, at 16:52,

6    he purchased USPS new 1999 USS Arizona memorial

7    priority mail express stamp, sheet of ten.

8          THE COURT:  A little bit slower so she can

9    take it down.

10          THE WITNESS:  Sorry.  He had it shipped to

11    1383 East Murphy's Lane in Salt Lake City, and the

12    buyer shipping name is Aaron Shamo.

13    Q.   BY MR. GADD: So let me jump in for just a

14    moment.  As we work our way up, there's going to be

15    several types of dies and stamps, but could you talk

16    specifically about the first and third row and then if

17    you want to do it chronologically, maybe we do the

18    third row first?

19    A.   Sure.  So, if you go up, it's the third row

20    from the top.  In December -- on December 26, 2015, at

21    16:06, he won or purchased the molds of A-215 for

22    tablet press pill press die pill maker TDP 0/1.5/5/6.

23    He had it shipped to 7939 South Titian Street in

24    Cottonwood Heights.  Buyer shipping name is Aaron

25    Shamo.  And the top line.  On March 12 of 2016, at

1  21:45, he won the shipping from USA, A-215 die for

2  tablet press pill press TDP 0/1.5/5/6.  He had it

3  shipped to 7939 South Titian Street, Cottonwood

4  Heights.  Buyer shipping name is Aaron Shamo.

5      Q.   In addition to this chart you've created, I

6  want to look at a couple other exhibits.  Can we now

7  turn to Mr. Shamo's emails.  This would be exhibit

8  21.34.  And then if we could go to page 4.  Do you

9  recognize this?

10     A.   I do.

11     Q.   What are we looking at here?

12     A.   This is the PayPal receipt for Mr. Shamo's

13 purchase of one of the A-215 pill dies.  He spent, all

14 total, $124 for it.

15     Q.   Then, if we could advance ahead to page 76.

16     A.   This is -- whoops.

17     Q.   Sorry.  Were you going to say something on

18 the previous one or this one?

19     A.   This one.

20     Q.   Okay.  Please, tell us what it is.

21     A.    This is another receipt for that second pill

22 die for the A-215 pill die for his pill press.  He

23 spent a total of $124 for this one as well, through

24 PayPal.

25     Q.   Let's look at one last set of emails.  Could

1    we look at Exhibit 21.08.  And if we could go down to

2    page 20.  Do you recognize this?

3         A.   I do.

4         Q.   What is this we're looking at?

5         A.   This is eBay, another basic receipt from eBay

6    showing the pill die that he ordered, the A-215.  The

7    estimated delivery date was going to be Thursday,

8    March 24th, to Thursday, April 7, and it shows his

9    $124 payment through PayPal for it.

10        Q.   As long as we've got the picture up, let me

11   and you a question about the face of the punch in the

12   picture.  Why is it backwards?

13        A.   Because when it actually smashes in the pill

14   press together, then it's readable for the person who

15   is looking at it, so it has to backwards on the punch

16   die.

17        Q.   And the punches and on the face of the

18   punches that we have seized in this exhibit, I believe

19   it's 13.13, the boxes of dies, you had a chance to

20   actually look at those, correct?

21        A.   I did.

22        Q.   Did you see that similar backwards, as we

23   read it, looking down at it?

24        A.   I did.

25        Q.   Let's look at one last page in this exhibit.

 1    Could we go to page 30.

 2            What's this we're looking at?

 3        A.    This is another eBay receipt showing that he

 4    purchased it as a guest, that Aaron Shamo purchased it

 5    as a guest.  He paid $124 through PayPal for it, and

 6    it's the other mold for the A-215 pill punch that goes

 7    in the pill press.

 8        Q.    Thanks.  I want to change gears one last time

 9    entirely.  Such is the life of a case agent.  Let's

10    talk for a minute now about customers of Mr. Shamo's.

11    Did you spearhead agents' efforts to investigate

12    Pharma-Master's customers?

13        A.    I did.

14        Q.    Could we look at Exhibit 14.30.  And if we

15    could look at page 1,854.  We have had this exhibit up

16    quite a bit for the jury.  This is the combined daily

17    order sheets, correct?

18        A.    It is.

19        Q.    And I just wanted to pull out this page to

20    talk about kind of what you saw as an investigator.

21    So we're highlighting now this sale going to Alivia

22    Luckcuck, who there has been some testimony about.

23    When you first started looking at these 1900 pages of

24    orders, did the name on the shipping address, did it

25    mean anything to you?

1    A.   No, not necessarily, because as an

2  investigator, in a lot of cases with drug trafficking

3  organizations, sometimes when -- when there are

4  customers orders such as this, they don't use their

5  real name, so we didn't know who all was real and who

6  wasn't.

7    Q.   So when you say they don't use their real

8  name, sometimes it's maybe a fake identity they use?

9    A.   True, yes.

10    Q.   Or an alias?

11    A.   Correct.

12    Q.   Did some people use straw purchasers?

13    A.   Yes.

14    Q.   And maybe we could just define that.  What's

15  a straw purchaser?

16    A.   So a straw purchaser is somebody who the

17  leader of the organization has purchase an item and

18  have it sent to them or sent to somebody else so it

19  sends another layer of anonymity away from the leader

20  of the organization.

21    Q.   And then there's been testimony that at least

22  some people used package receivers, correct?

23    A.   Correct.

24    Q.   And Ms. Luckcuck is a package receiver?

25    A.   She is.

1    Q.   For the large purchasers, so for this

2   purchaser for example, Trustworthy Money, who is

3   purchasing 10,000 of the Fentanyl pills, what did you

4   and other agents do to further investigation into

5   these types of large purchases?

6    A.   When we reviewed all of the pages -- there's

7   1,984 pages of customer orders.  And, as we reviewed

8   them, we pulled out the orders of -- the larger orders

9   that were clearly not personal use orders, and we sent

10  leads all over the United States to different law

11  enforcement jurisdictions so that they could follow up

12  on those cases because that was clearly supplies for a

13  dealer in that area.

14   Q.   And that took care of the large orders, but

15  I'm hoping you and I can talk about some of the small

16  order customers.

17   A.   Uh-huh.

18   Q.   Have you personally investigated more than 90

19  of the small order customers?

20   A.   I did personally investigate over 90 of the

21  small orders of clients -- or customers.

22   Q.   I want to focus just on five who are

23  mentioned in the Indictment.

24   A.   Okay.

25   Q.   So if we could start first with Gavin

1    Keblish.  If we could look at page 748.  Do you see

2    his name at the top there?

3         A.   I do.

4         Q.   Can you explain what was ordered in that

5    transaction?

6         A.   I can.  Gavin Keblish, his address is 54

7    Seatuck Avenue in East Port, New York.  He went under

8    the moniker AJM6753.  He ordered Roxy Oxy, 30

9    milligrams.  He ordered 40 of them on May 5, 2016, and

10   had priority mail for that package.

11        Q.   And then let's look at one more order.  If we

12   could go to page 1,214.  There's an extra zero in

13   there.  Thanks.

14             What did he order on that date?

15        A.   He ordered M-box 30 Oxycodone, 30 milligrams.

16   He ordered 20 of those using the moniker AJM6753 and

17   had them sent to him at the 54 Seatuck Avenue, East

18   Port, New York address.

19        Q.   Did you look into Mr. Gavin Keblish?

20        A.   I did.

21        Q.   Did you speak with detectives in this area?

22        A.   I did.

23        Q.   Did you speak to his family?

24        A.   I did.

25        Q.   They are here in the courtroom with us?

1    A.   They are.

2    Q.   Was Gavin a real person?

3    A.   He was.

4    Q.   Did you speak to Gavin to confirm that he

5    ordered the Fentanyl-laced fake oxycodone from

6    Pharma-Master?

7    A.   I did not.

8    Q.   Why not?

9    A.   He's dead.

10    Q.   Let's talk about Conner Valenter.  Could we

11    look at page 450.  Do you see his name on there near

12    the bottom?

13    A.   I do.

14    Q.   What was ordered on that date, February 23?

15    A.   Conner ordered Fentanyl Roxy Oxycodone, 30

16    milligrams, one pill on February 23 of 2016, using the

17    moniker Spitta.

18    Q.   Could we look at page 489.  What did he order

19    on February 25?

20    A.   He ordered Fentanyl Roxy Oxycodone, 30

21    milligrams, eight pills, under the moniker Spitta, and

22    he had them sent to his address in Seattle,

23    Washington.

24    Q.   And, finally, could we look at page 563.

25    What did he order on March 3?

1    A.    He ordered Fentanyl Roxy Oxycodone, 30

2    milligram, five tablets using the same moniker of

3    Spitta, and he had them sent to his address in Seattle

4    Washington.

5    Q.    Did you look into Mr. Conner Valenter?

6    A.    I did.

7    MR. SKORDAS:  Your Honor, could we approach?

8    THE COURT:  Yes.

9    (Conference among the Court and the attorneys at the

10    bench outside of the hearing of the jury.)

11    THE COURT:  These aren't the people who you

12    are claiming the homicide count on, are they?

13    MR. SKORDAS:  No.

14    MR. GADD:  So the homicide count, his name is

15    Ruslan Kluyev.

16    THE COURT:  RK?

17    MR. GADD:  Yes, RK.  These people are charged

18    in the Indictment; specifically, Mr. Shamo distributed

19    drugs to them.  So this was our -- our written motions

20    that were done I think in April and May, where the

21    ruling was we couldn't mention the other customers who

22    are now dead from an overdose, those folks whose names

23    are in the Indictment and Mr. Shamo is charged with

24    distributing drugs that did go to them.  I can ask my

25    agent if she interviewed them because that's a major

1    investigative step that any investigator would take.

2    She was ordered by Your Honor to not mention that

3    their death was an overdose.  In fact, you will notice

4    we are not going into the death at all.

5         MR. SKORDAS:  You've got to be kidding me.

6         MS. BECKETT:  The ruling was very contrary on

7    the overdose deaths, and it was specific to:  They are

8    allowed to discuss Gregory Lee, who was an overdose,

9    who was investigated because they weren't able to

10   interview him.  He is not here testifying.  That was

11   what was allowed.  They are very, very, very far over

12   the line when they have a family out here crying in

13   the courtroom, and it's clear that the indication is

14   that he was an overdose death.  Your Honor's ruling

15   was very clear in that regard.

16        THE COURT:  I don't have the order with me, I

17   don't think, but I thought -- I thought you were going

18   to -- I guess I thought there would be a stipulation:

19   The reason we didn't call -- these people weren't

20   investigated.  They weren't called because they were

21   dead.  That's not really -- I mean, you're leaving

22   more of an impression they died of an overdose and

23   you're trying to connect it to Shamo.

24        MR. SKORDAS:  Of course he is.

25        MR. GADD:  I'm happy to ask her right now,

1    these four men we are talking about were not --

2    Mr. Shamo was not charged with causing their deaths.

3    We will make it very clear.

4            THE COURT:  Yeah, you should do it.  But then

5    what else do you need to do?

6            MS. BECKETT:  That doesn't fix it.

7            MR. GADD:  I still need to prove the counts

8    in the Indictment, the people distributing drugs to

9    these people.  The Grand Jury charged it.  I've got to

10   ask these questions.  I will clarify to make it very

11   clear he is not charged with causing their deaths.

12           MR. SKORDAS:  But you can ask if he

13   distributed drugs to them, and you can show that.

14           But when he then asked:  Why didn't you

15   interview them -- he didn't ask that about a single

16   other person who allegedly received drugs -- so that

17   she can say, "Because they are dead."  That clearly

18   violates the order of this Court.

19           THE COURT:  It seems to me it does.

20           MR. GADD:  We have asked other people.  Jared

21   Gillespie, the other person named in the Indictment,

22   he was interviewed.  That was the question we asked.

23   These are just the people named in the Indictment.

24   The Grand Jury charged it.  It's part of what I have

25   to prove.

1        MS. BECKETT:  You're two steps beyond that

2    when you have family in the courtroom and when you ask

3    him whether or not the family is present.  You asked

4    whether or not they were present in the courtroom.

5        MR. GADD:  Yes, I did.

6        MS. BECKETT:  You have gone way over what the

7    Court's ruling was on the overdose.

8        MR. SKORDAS:  I think we need to make a

9    motion outside the presence of the jury at the next

10   break.

11       MR. GADD:  Let's take a minute and look up

12   the order or the minutes.  This is clearly what was

13   talked about at the hearing.

14       THE COURT:  I didn't envision it going this

15   way.  I envisioned it, you can say, "These people were

16   charged in the Indictment."

17       MR. GADD:  Yes.

18       THE COURT:  "We couldn't interview them

19   because they are not here.  They are dead."

20       MR. GADD:  I did ask that.

21       THE COURT:  Why do you need to ask anything

22   else, I guess is my question.

23       MR. GADD:  Oh, because we have set this up --

24   because in order for them to be guilty, he has to send

25   it to a real person.  How do you prove that they are a

1 real person?  You have to investigate it.  Right?  You

2 talk to detectives who talk to family if you can't

3 find the person.

4     THE COURT:  Okay.  So you're entitled to give

5 evidence that he sent it to him, but the problem is,

6 you are tying that to the deaths.  You've got to say

7 something about you're not charging him with the death

8 of this person.

9     MR. GADD:  I will do that right now.

10     MR. SKORDAS:  In fact, he did, and if this

11 was a real person.  She answered yes.  At that time

12 the inquiry is over.  Instead, he continues and asks:

13     Did you interview him?

14     No.

15     Why not?

16     Because he's dead.

17     And his whole family is here?

18     You've got to be kidding me, Judge.  This is

19 outrageous.  I'm sorry.

20     THE COURT:  You're going to ask for a

21 mistrial, and I'm going to deny it.

22     MR. SKORDAS:  I understand.  I need to,

23 though.

24     THE COURT:  You don't need to get anymore

25 than that he sent them to him.  Why do we need to know

```
 1    anything else?

 2           MR. GADD:  I understand what the Court has

 3    said, and I'll limit myself to it.

 4           THE COURT:  All right.

 5           MR. GADD:  Okay.

 6           (Proceedings continued in open court.)

 7           THE COURT:  Go ahead, Mr. Gadd.

 8       Q.  BY MR. GADD: Special Agent Keys, let's

 9    clarify so that we're abundantly clear.  The people

10    that we're going to talk about, starting with

11    Mr. Keblish, now Mr. Valenter, they are named in the

12    Indictment, but Mr. Shamo has not been charged with

13    causing their death?

14       A.   That is correct.  They were his customers.

15       Q.   Let's take -- if you'll excuse me, I forgot

16    which question I left off on.

17       A.   Right.  I don't remember.

18       Q.   Let me circle back, and I'll make sure we get

19    the important ones.

20       A.   Okay.

21       Q.   You looked into Mr. Conner Valenter?

22       A.   I did.

23       Q.   Was he a real person?

24       A.   He was.

25       Q.   Let's talk about Edward Blatz.  There is a
```

1    number of orders here.  We don't need to necessarily

2    look at them all, but let's look at the first.  We

3    have page 417.  Do you see the order there for Ed

4    Blatz?

5         A.   I do.

6         Q.   What was ordered?

7         A.   He ordered Roxy Oxycodone, 30 milligrams, two

8    tablets on February 21 using the moniker Veldgear, and

9    he had it shipped to him in Washington, D.C.

10        Q.   Now let's jump to the last, if we could look

11   at page 624, and then it goes on to the next page.

12   You can see that there?

13        A.   Yes.

14        Q.   What did he order this time?

15        A.   He ordered Roxy Oxycodone, 30 milligrams, 40

16   tablets, on April 5, 2016, under the moniker Veldgear.

17   And he had it shipped to the same address in

18   Washington, D.C.

19        Q.   Did you look into Mr. Edward Blatz?

20        A.   I did.

21        Q.   Was he a real person or just a name on a

22   page?

23        A.   He was a real person.

24        Q.   If we could look at Exhibit 18.01.  And if we

25   could look at page 2.  Who is that?

1    A.   This is Gregory Lee.

2    Q.   Did you also find orders sent to his address?

3    A.   I did.

4    Q.   If we could look at -- jumping back to

5    Exhibit 14.30, if we could look at 664.  And then it

6    goes on to the next page, so if you could highlight

7    the bottom.  Perfect.  If you could call that out for

8    us.

9         What was ordered on April 12?

10   A.   So April 12 shows that he ordered Roxy

11   Oxycodone, 30 milligrams, one tablet, but it was

12   combined with a second order the next day of Roxy

13   Oxycodone, 30 milligrams, ten tablets, using the

14   moniker T-Wad.  And it was sent to Gregory Lee at 3

15   Midvale Drive, Daly City, California.

16   Q.   Let's look at one additional order.  This is

17   on page 862.  And then it goes on -- like the previous

18   one, it goes on to the next page.  So there's the top

19   half.  Do you see what was ordered there?

20   A.   I do.  He ordered Roxy Oxycodone, 30

21   milligrams, 10 tablets, on June 6, 2016, using the

22   moniker T-Wad, and it was sent to Gregory Lee at his

23   Midvale Drive address in Daly City.

24   Q.   That Midvale Drive is what you see here?

25   A.   Yes.

1      Q.  Was Mr. Lee a real person?

2      A.  He was.

3          MR. GADD:  If I can have just one moment?

4          THE COURT:  Sure.

5          MR. GADD:  Nothing further.  Thank you.

6          THE COURT:  You thank you, Mr. Gadd.

7          You may cross examine, Mr. Skordas.

8          MR. SKORDAS:  Thank you, Your Honor.

9                 CROSS EXAMINATION

10  BY MR. SKORDAS:

11     Q.  Agent Keys, were you involved in this

12  investigation even after November, when Mr. Shamo was

13  taken into custody?

14     A.  I was.

15     Q.  And did you help other agents serve a search

16  warrant on a house in Cottonwood Heights in February

17  of 2017?

18     A.  I did.

19     Q.  And that was some, I guess, two and a half or

20  three months after Aaron was taken into custody,

21  correct?

22     A.  Yes.

23     Q.  And you served the search warrant on the home

24  that Aaron had previously lived, correct?

25     A.  I served it on the garage of the home that he

```
 1    had lived in.
 2         Q.   Okay.  And you -- you found some items in the
 3    home, correct?
 4         A.   In the garage.
 5         Q.   All right.  In the garage.  I'm sorry.
 6         A.   Sorry.  I have to be specific.
 7         Q.   That's all right.  And among those items was
 8    a crate that had a press in it.  Correct?
 9         A.   Correct.  The DEA, during the search warrant,
10    had taken the press out of the crate, but the crate
11    was still in the garage.
12         Q.   Of the home?
13         A.   Correct.
14         Q.   And you seized the crate?
15         A.   Yes.  Parts of it, yes.
16         Q.   Especially this part?
17         A.   Yes.
18         Q.   What is this part?
19         A.   This is one of the sides of the wooden crate
20    that the press came in.
21         Q.   And for the record, I'm showing you
22    Government's Exhibit 13.14, I think?
23         A.   That's correct.
24         Q.   And there's an addressee on that crate,
25    correct?
```

1      A.    Yes.

2      Q.    Who's the addressee?

3      A.    Luke Paz.

4      Q.    At what address?

5      A.    Hold on.  I got to look through the tape.

6   The address is 1500 Woodland Avenue, in Salt Lake

7   City, Utah.

8      Q.    And that crate was found in February in

9   Cottonwood Heights, correct?

10     A.    In the garage at the Titian Way home, yes.

11          MR. SKORDAS:  I believe that's all I have,

12  Your Honor.

13          THE COURT:  Thank you.

14          Any redirect?

15          MR. GADD:  No, sir.  Thank you.

16          THE COURT:  Thank you.

17          You may step down, Ms. Keys.  Thank you.  You

18  may call your next witness.

19

20

21

22

23

24

25   (Whereupon the testimony of Agent Keys was concluded.)

```
 1
 2                    REPORTER'S CERTIFICATE
 3    STATE OF UTAH            )
 4                             ) ss.
 5    COUNTY OF SALT LAKE      )
 6
 7             I, REBECCA JANKE, do hereby certify that I
 8    am a Certified Court Reporter for the State of Utah;
 9             That as such Reporter I attended the hearing
10    of the foregoing matter on August 20, 2019, and
11    thereat reported in Stenotype all of the testimony and
12    proceedings had, and caused said notes to be
13    transcribed into typewriting, and the foregoing pages
14    numbered 1 through 35 constitute a full, true and
15    correct record of the proceedings transcribed.
16             That I am not of kin to any of the parties
17    and have no interest in the outcome of the matter;
18             And hereby set my hand and seal this 21st
19    day of August, 2019.
20
21
22
23             _____
24             REBECCA JANKE, CSR, RPR, RMR
25
```

EXHIBIT 4

UNITED STATES' PROPOSED LIMITING INSTRUCTION

You are instructed that no evidence was presented that connected the defendant with

G.K.'s death. The only reason you heard evidence about G.K.'s death was to show why G.K.

was not interviewed by law enforcement or called as a witness to testify at trial. You should draw

no inferences from the testimony that G.K. is dead.

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
**SKORDAS & CASTON, LLC**
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com

Daryl P. Sam (#8276)
Daryl P. Sam, PLLC
5955 South Redwood Road, Suite 102
Salt Lake City, Utah, 84123
Telephone: (801) 506-6767
Fax: (801) 386-5476
daryl.sam@gmail.com

Attorneys for Defendant Aaron Shamo

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **MOTION TO DISMISS** |
| Plaintiff, | |
| v. | Case No. 2:16-CR-00631 DAK |
| AARON MICHAEL SHAMO, et. al., | Judge Dale A. Kimball |
| Defendant. | |

Aaron Michael Shamo, through his counsel of record, herby moves the Court to dismiss this case based on the prosecutorial misconduct pursuant to the Due Process Clause of the U.S. Constitution. In support, the Defendant alleges as follows:

1. On November 26, 2018, defense provided the Government with their witness list when trial was anticipated to start January 2019.

2. On April 16, 2019, defense provided the Government with their witness list again.

3. Both witness lists had Sasha Grant, Miles Penrose, and Gabriel Noriega

4. On June 19, 2019, there was an email exchange between defense and Mr. Gadd and defense stating the government was willing help prevent witnesses for the defense of invoking their Fifth Amendment Right by offering defense's witnesses plea deals.

5. On June 10, 2019, Ana Gabriela Noriega was served with felony information.

6. On July 11, 2019, Ms. Noriega entered into a plea agreement.

7. On August 15, 2019, the government realized that Sasha Grant was in the courtroom and brought it to defense's attention because she was listed as a witness for defense. The Government brought it to defense's attention and defense asked Ms. Grant to leave the courtroom due to defense's intention in calling her as a witness.

8. On August 19, 2019, defense sent out subpoenas to a constable to serve witnesses

9. On August 23, 2019, Scott Williams proffered the record that his client, Mr. Penrose, was invoking his Fifth Amendment Right.

10. On August 26, 2019, Ms. Grant met with defense to go over what was anticipated for the following day when she would be testifying for the defense.

11. Marlin Grant, counsel for Ms. Grant, was conferenced into the meeting.

12. Later that same day Mr. Grant was in communication with the government and the government indicated to Mr. Grant that Ms. Grant did not have immunity to testify and that she only had immunity when interviewing with the government.

13. Mr. Grant was under the impression that his client, Ms. Grant, was granted immunity for all proceedings related to that testimony.

14. On August 27, 2019, Mr. Grant proffered to the court that Ms. Grant would be invoking her Fifth Amendment Right and not testifying for Mr. Shamo.

15. On August 27, 2019, Mr. Crane, attorney for Gabriel Noriega, also proffered for the record that his client would also be invoking her Fifth Amendment Right and would not testify on behalf of Mr. Shamo.

16. Ms. Noriega's plea agreement was very limited and did not preclude the possibility of Ms. Noriega being charged in another jurisdiction or future indictments of any other offense other than drug charges.

## **ARGUMENT**

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor . . . ." U.S. Const. Amend. VI. Prosecutorial misconduct that prevents a Defendant from presenting a defense violates a Defendant's Sixth Amendment. *Id*.

"The right of a defendant to establish a defense by presenting his own witnesses is a fundamental element of Due Process". *United States v. Crawford*, 707 F.2d 447,449 (10th Cir. 1983) (*citing Webb v. Texas*, 409 U.S. 95 (1972)). In *Crawford*, the court held that the actions of the Assistant United States Attorney did not deprive the defendant of a fair trial when he indicated that many witnesses for the defense were under investigation in other jurisdictions. *Id*. The Government made the statement outside the presence of the jury, after the government had rested but before defense presented their case. *Id*. All of defenses witnesses testified and no witnesses invoked their Fifth Amendment Right during cross-examination. The District court indicated that the Assistant United States Attorney handled the disclosure proper and a professional manner.

In this case, the Government has interfered substantially with defense's witnesses by discouraging them to testify. "'Interference is substantial when the government actor actively discourages a witness from testifying through threats of prosecution, intimidation, or coercive badgering'". *United States v. Portillos*, 714 Fed. Appx. 899, 893-894 (10th Cir. 2017) (*quoting United States v. Serrano*, 406

F.3d 1208, 1214 (10th Cir. 2005)). On August 27, 2019, Mr. Gadd indicated in court that he tried preventing the problem of witnesses for the defense to invoke their Fifth Amendment Right by letting defense know that he would try to work out plea deals for defense's witnesses. Mr. Gadd's actions were the opposite of making sure witnesses did not invoke their Fifth Amendment Right.

The only witness for the defense that the government did provide a deal to was Ana Gabriela Noriega. Ms. Noriega still ended invoking her Fifth Amendment Right because she did not know whether she could potentially face charges in other jurisdictions. The plea agreement that Ms. Noriega entered into was extremely vague and only protected her from minimal indictments. Ms. Noriega faces the possibility of being indicted for any offense other than drug offenses. Also, her plea deal specifically states that Ms. Noriega's plea agreement is solely between her and the United States Attorney for the District of Utah and does not bind any other federal, state, or local prosecuting, administrative, or regulatory authorities. The Government was able to indicate Ms. Noriega's involvement and make her out to be Mr. Shamo's personal executive assistant. That role is particularly important as she could be deemed one of the five individuals Mr. Shamo is alleged to have exercised managerial authority over. On more than one occasion, the Government quoted messages between Mr. Shamo and Ms. Noriega. Yet Mr. Shamo was not able to call her as a witness and undercut the Government's assertion that she played some major role in the drug trafficking organization as his executive assistant.

Mr. Penrose was on defense's witness list and was never provided a plea deal or immunity for his testimony. However, Mr. Penrose has been the ongoing target of grand jury investigation since 2018 and the Government had been in contact with his attorney, Mr. Williams, about potential charges. Mr. Penrose was another person that the government indicated throughout their case-in-chief. Specifically, it was indicated many times that Mr. Penrose was involved with money laundering and funding the drug trafficking organization from the outset alongside Mr. Shamo. Yet again Mr. Shamo was not able to call Mr. Penrose to prove otherwise or undercut the Government's theory that the Mr. Penrose worked at the behest of Mr. Shamo as opposed to under his own discretion and benefit.

Egregious interference continued when Ms. Grant invoked her Fifth Amendment Right. Similar to Mr. Penrose and Ms. Noriega, Sasha Grant was on every witness list provided to the Government from the defense. On August 15, 2019, Ms. Grant appeared in court to hear Mr. Crandall testify. The Government indicated she was in the courtroom and informed defense counsel because they knew she was a witness for defense and the exclusionary rule was invoked. Defense asked Ms. Grant to leave and defense informed the Government once again that the defense still anticipated calling her as a witness. August 26, 2019, Ms. Grant met with defense to go over her prior statements made to the Government during her June/July 2017 interviews. That same night the Government informed her attorney, Marlin Grant, that she did not have immunity from testifying all though she was granted immunity when interviewing with agents in both interviews in in 2017. Mr. Grant had all along been under the impression that Ms. Grant's immunity extended to all proceedings so long as her testimony was consistent with the statements made during her interview when the grant of immunity was given. The Government has no valid reason as to why immunity could not have been granted for her to testify for defense because there was plenty of notice as to her being a witness and defenses intention to calling her as a witness. The Government subsequently indicated there was simply not enough time to get a grant of immunity in place prior to her testimony.

Instead of helping the government made sure to inform Ms. Grant that her immunity was only valid for the time she interviewed with agents the night before testifying for the defense. Ms. Grant was also indicated throughout the government's case-in-chief indicating how she was the reason why Mr. Crandall was not part of the drug organization after Ms. Grant and Mr. Crandall started traveling the world. Ms. Grant's prior statements to agents indicated the opposite. In fact, Ms. Grant's statements to agents would have directly contradicted the Government's star witness- Drew Crandall in many respects. Namely, Ms. Grant's testimony was necessary to prove that Mr. Crandall's involvement perhaps never fully ended as he remained in contact with Mr. Shamo; Mr. Crandall had a continual drug habit while traveling abroad; Mr. Crandall would have been smart enough to keep his name off of the bitcoin wallets

because he understood the legal ramifications; Mr. Crandall once again became heavily involved in the organization in a more hands-on capacity as early as May 2016. That date is of particular importance as Mr. Crandall was not charged with the death resulting count due to his statements that he was not re-involved until July 1, 2016. Nonetheless, Mr. Shamo was unable to call Ms. Grant as a witness despite the Government's full foreknowledge that she may have criminal exposure if such immunity was not granted in accordance with her attorney's prior understanding.

The Government has, at every step, violated Mr. Shamo's fundamental right to establish a defense by presenting his own witnesses and fully confronting the witnesses brought against him. The Government did not simply indicate witnesses being under investigation in other jurisdictions, but rather intimidated witnesses to not testify for Mr. Shamo. The direct result of those intimidation tactics prevented Mr. Shamo from in fact mounting an effective defense to the charges leveled against him.

WHEREFORE, the defendant, Aaron Michael Shamo, moves the Court to dismiss this matter in its entirely based on constitutional violations as analyzed above.

Respectfully Submitted this 28th day of August, 2019.

*/s/ Gregory G. Skordas*_____
Gregory G. Skordas

*/s/ Kaytlin V. Beckett*_____
Kaytlin v. Beckett

*/s/ Daryl P. Sam*_____
Daryl P. Sam

## CERTIFICATE OF SERVICE

I hereby certify that on the August 28, 2019, I electronically filed a true and correct copy

of the foregoing **MOTION TO DISMISS**, with the Clerk of the Court using CM/ECF system,

which sent notification of such filing to the following:

S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Kent Burggraaf
kburggraaf@agutah.gov

*/s/ Gabriela Mena* _____

SKORDAS & CASTON, LLC

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    **Plaintiff,**<br><br>vs.<br><br>AARON MICHAEL SHAMO,<br><br>    **Defendant.** | **MEMORANDUM DECISION<br>AND ORDER**<br><br>**Case No. 2:16CR631DAK**<br><br>**Judge Dale A. Kimball** |

This matter is before the court on Defendant Aaron Michael Shamo's Motion for a Mistrial and Supplement [Docket No. 272]. Under Rule 26.3 of the Federal Rules of Criminal Procedure, "[b]efore ordering a mistrial, the court must give each defendant and the government an opportunity to comment on the propriety of the order, to state whether that party consents or objects, and to suggest alternatives." Fed. R. Crim. P. 26.3. The government has filed a memorandum in opposition to Defendant's Motion for a Mistrial. Therefore, the court considers the matter fully briefed.

"The Supreme Court has held that 'courts of juristic may discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act or the ends of public justice would otherwise be defeated.'" *United States v. Taylor*, 605 F.2d 1177, 1178 (10th Cir. 1979) (citation omitted). "The Supreme Court has refused to adopt a mechanistic formula for the presence of manifest necessity, and has repeatedly reiterated that trial judges must be accorded broad discretion to declare a mistrial."

*Walk v. Edmondson*, 472 F.3d 1227, 1236 (10th Cir. 2007). Although the Federal Rules of Criminal Procedure offer little guidance on when a judge should grant a mistrial, "the district court has discretion to grant a mistrial only when a defendant's right to a fair and impartial trial has been impaired." *United States v. Meridyth*, 364 F.3d 1181, 1183 (10th Cir. 2004).

In this case, in relation to a pretrial motion in limine, the court and counsel discussed the parameters for evidence regarding Pharma-Master customers, other than R.K., who were unavailable to be interviewed by case agents because they were dead. The court and counsel recognized that the government needed to prove that certain customers alleged in the Indictment were actual people who received product. However, the government agreed that it would not tie the deaths of these Pharma-Master customers to Defendant and not mention that their deaths were from drug overdoses. Defendant asks the court to declare a mistrial and discharge the jury based on Agent Virginia Keys' testimony regarding customer deaths, Agent Keys' alleged crying on the stand, customer G.K.'s family's presence in the courtroom, counsel's reference to the family presence, the family's alleged crying during testimony, the government's assistance to the customers' families who wanted to attend trial, and Luke Paz's Statement in Advance of Plea referencing Pharma-Master customer deaths.

Agent Keys' testimony did not violate the court's order or the parties' agreement. The court and counsel agreed that agents could testify that the customers were unavailable because they were dead–the agents just could not tie the death to Defendant and could not say the death was a drug overdose. Agent Keys never testified that G.K.'s death was an drug overdose. In addition, counsel for the United States clarified with Agent Keys that Defendant was not charged with G.K.'s death, he was only being referenced as one of Defendant's customers. With respect to the

2

other customers, Agent Keys only testified that the customer identified was a real person.

Moreover, the jury will be generally instructed that they are not to be concerned with anything that

is not charged. The testimony did not unduly prejudice Defendant. The United States had the right

to explain why the agent did not speak directly to the customer alleged in the Indictment. There is

probative value in the investigative techniques used by the agents. The United States needs to

prove that the charges have been thoroughly and competently investigated.

      Out of an abundance of caution, the United States offered to give a curative instruction but

Defendant declined the inclusion of such an instruction, claiming that it would only draw more

attention to the problem. "Where evidence is later ruled inadmissible, a cautionary instruction is

ordinarily sufficient to cure any alleged prejudice to the defendant and declaring a mistrial is only

appropriate where a cautionary instruction is unlikely to cure the prejudicial effect of an error."

*United States v. Peveto*, 881 F.2d 844, 859 (10th Cir. 1989). In this instance, the court does not

believe the curative instruction is necessary. Agent Keys' testimony was not contrary to the court's

prior rulings, was not more prejudicial than probative, and is not grounds for a mistrial.[1]

      As to the presence of G.K.'s family in the courtroom, customers' families had a right to

attend the trial like any member of the public. Trials are public proceedings. They also had a right

to be present under the Crime Victim's Rights Act, 18 U.S.C. § 3771. Whether the victim

coordinator at the U.S. Attorney's office assisted some of the families in being able to attend is

irrelevant. The victim coordinator is only trying to comply with the Crime Victims' Rights Act.

Counsel's reference to G.K.'s family's presence in the courtroom was not unfairly prejudicial. It

---

[1] The jury also heard testimony about R.K.'s roommate G.L.'s death, but the questions about his death were asked by defense counsel. Although he was also a Pharma-Master customer, the evidence regarding his death is not the subject of Defendant's concerns.

3

merely confirmed that they were the family members the agent spoke with in her investigation. Counsel was not acting in bad faith and acknowledging the family was inconsequential given that Agent Keys clarified that Defendant was not charged with the death of G.K., he was mentioned only because he was one of Defendant's customers. Furthermore, the alleged crying by G.K.'s family in the gallery and Agent Keys while she was testifying were not so significant that they were a breach of the court's decorum standards. In fact, the United States' counsel and members of the court's staff did not notice the alleged crying. However, witnesses and spectators are only human and occasionally they show emotion. All of Defendant's witnesses cried on the stand more visibly and noticeably than Agent Keys or the families in the gallery. Defendant can receive a fair trial without perfectly whitewashing the facts and circumstances surrounding the investigation and the consequences of the drug distribution. None of these courtroom decorum issues rise to the level of justifying a mistrial.

With respect to Luke Paz's Statement in Advance of Plea referencing customer deaths, the United States agreed to redact that portion of the exhibit before it is given to the jury. The number of deaths was previously redacted. However, the entire paragraph will now be redacted before the exhibit is given to the jury. The United states did not question Paz about or publish this portion of his plea agreement to the jury during trial. Accordingly, this exhibit does not form the basis for a mistrial.

"[M]otions for mistrial . . . call for an examination of the prejudicial impact of an error or errors when viewed in the context of the entire case." *United States v. Gabaldon*, 91 F.3d 91, 94 (10th Cir. 1996). The court does not believe that any of Defendant's alleged grounds for mistrial constitute errors. However, even if they did, the court does not believe that in the context of the

entire trial any of them individually or all of them cumulatively create a prejudicial impact against

Defendant.  Therefore, the court concludes that Defendant has failed to demonstrate any grounds

for a mistrial.  Accordingly, Defendant's Motion for a Mistrial [Docket No. 265] is DENIED.

DATED this 29th day of August, 2019.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

5

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, | JURY INSTRUCTIONS |
| Plaintiff, | |
| | CASE NO. 2:16CR631DAK |
| v. | |
| | Judge Dale A. Kimball |
| AARON MICHAEL SHAMO, | |
| Defendant. | |

JURY INSTRUCTION NO. 1

MEMBERS OF THE JURY:

Now that you have heard the evidence, it becomes my duty to instruct you on the law that applies to this case.

It is your duty as jurors to follow the law as stated in the instructions of the Court, and to apply the rules of law so given to the facts as you find them from the evidence in the case.

Counsel may refer to these instructions in their arguments. If, however, any difference appears to you between the law as stated by counsel and that stated by the Court in these instructions, you are of course to be governed by the Court's instructions.

You are not to single out any one instruction alone as stating the law, but must consider the instructions as a whole.

Neither are you to be concerned with the wisdom of any rule of law stated by the Court. Regardless of any opinion you may have as to what the law ought to be, it would be a violation of your sworn duty to base a verdict upon any other view of the law than that given in these instructions of the Court; just as it would be a violation of your sworn duty, as judges of the facts, to base a verdict upon anything but the evidence in the case.

Justice through trial by jury must always depend upon the willingness of each individual juror to seek the truth as to the facts from the same evidence presented to all the jurors; and to arrive at a verdict by applying the same rules of law, as given in the instructions of the Court.

JURY INSTRUCTION NO. 2

You have been chosen as jurors in this case to try the issues of fact presented by the allegations of the Indictment and the denial of those allegations made by the "Not Guilty" plea of the defendant. You are to perform this duty without bias or prejudice as to any party. The law does not permit jurors to be governed by sympathy, prejudice, or public opinion. The defendant and the public expect that you will carefully and impartially consider all the evidence in the case, follow the law as stated by the Court, and reach a just verdict.

The indictment in this case is entitled Second Superseding Indictment. But for convenience, I will simply refer to it in these instructions as the Indictment.

JURY INSTRUCTION NO. 3

The Indictment or formal charge against the defendant is not evidence of guilt. Indeed,

the defendant is presumed by the law to be innocent. The law does not require the defendant to

prove his innocence or produce any evidence at all, nor does it compel him in a criminal case to

take the witness stand to testify.  Even though the defendant has called witnesses in this case, the

presumption of innocence remains with him and the government always has the burden of

proving the defendant's guilt beyond a reasonable doubt.

JURY INSTRUCTION NO. 4

The government has the burden of proving the defendant guilty beyond a reasonable doubt.  The law does not require a defendant to prove his innocence or produce any evidence at all.  The government has the burden of proving the defendant guilty beyond a reasonable doubt, and if it fails to do so, you must find the defendant not guilty.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt.  There are few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt.  It is only required that the government's proof exclude any "reasonable doubt" concerning the defendant's guilt.  A reasonable doubt is a doubt based on reason and common sense after careful and impartial consideration of all the evidence in the case. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty.  If, on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

5

JURY INSTRUCTION NO. 5

You are here to decide whether the United States has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged.  The defendant is not on trial for any act, conduct, or offense not alleged in the Indictment.  Neither are you to be concerned with the guilt of any other person or persons not on trial as a defendant in this case.

JURY INSTRUCTION NO. 6

If you find the defendant guilty, it will be my duty to decide what the punishment will be.

You should not discuss or consider the possible punishment in any way while deciding your

verdict.

1056

JURY INSTRUCTION NO. 7

You are here to decide whether the United States has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged. The defendant is not on trial for any act, conduct, or crime not charged in the indictment.

It is not up to you to decide whether anyone who is not on trial in this case should be prosecuted for the crime charged. The fact that another person also may be guilty is no defense to a criminal charge.

The question of the possible guilt of others should not enter your thinking as you decide whether this defendant has been proved guilty of the crimes charged.

1057

JURY INSTRUCTION NO. 8

The evidence in this case consists of the sworn testimony of the witnesses, regardless of who may have called them; all exhibits received in evidence, regardless of who may have produced them; and all facts which may have been admitted or stipulated.  You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The lawyers' statements and arguments are not evidence. Their questions and objections are not evidence. My legal rulings and comments are not evidence.  You must disregard any evidence as to which an objection was sustained by the Court, and any evidence ordered stricken by the court.

You are to consider only the evidence in this case. However, in your consideration of the evidence, you are not limited to the bald statements of the witnesses. On the contrary, you are permitted to draw from the facts which you find have been proved such reasonable inferences as seem justified in light of your experience. An inference is a deduction or conclusion which reason and common sense would lead you to draw from facts which are established by the evidence in the case.  You should weigh all of the evidence in the case, affording each piece of evidence the weight or significance that you find it reasonably deserves.

9

JURY INSTRUCTION NO. 9

There are, generally speaking, two types of evidence from which a jury may properly determine the facts of a case. One is "direct evidence," which is the testimony of one who asserts actual knowledge of a fact, such as an eyewitness. The other is "circumstantial evidence," which is proof of a chain of facts and circumstances pointing to the existence or non-existence of certain other facts.

As a general rule, the law makes no distinction between direct and circumstantial evidence. The law simply requires that you find the facts in accord with all the evidence in the case, both direct and circumstantial.

While you must consider only the evidence in this case, you are permitted to draw reasonable inferences from the testimony and exhibits, inferences you feel are justified in the light of common experience. An inference is a conclusion that reason and common sense may lead you to draw from facts which have been proved.

By permitting such reasonable inferences, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts which have been established by the testimony and evidence in this case.

1059

JURY INSTRUCTION NO. 10

I remind you that it is your job to decide whether the United States has proved the guilt of the defendant beyond a reasonable doubt.  In doing so, you must consider all the evidence. This does not mean, however, that you must accept all of the evidence as true or accurate.

You are the sole judges of the credibility or "believability" of each witness and the weight to be given to the witness's testimony. An important part of your job will be making judgments about the testimony of the witnesses, including the defendant, who testified in this case. You should think about the testimony of each witness you have heard and decide whether you believe all or any part of what each witness had to say, and how important that testimony was.  In making that decision, I suggest that you ask yourself a few questions: Did the witness impress you as honest? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome in this case? Did the witness have any relationship with either the United States or the defense? Did the witness seem to have a good memory? Did the witness clearly see or hear the things about which he/she testified? Did the witness have the opportunity and ability to understand the questions clearly and answer them directly?  Was the witness's testimony supported or contradicted by other credible evidence? Did the witness's testimony differ from the testimony of other witnesses? When weighing the conflicting testimony, you should consider whether the discrepancy has to do with a material fact or with an unimportant detail. And you should keep in mind that innocent misrecollection—like failure of recollection—is not uncommon.

The testimony of the defendant should be weighed and his credibility evaluated in the same way as that of any other witness.

11

1060

JURY INSTRUCTION NO. 11

Your decision on the facts of this case should not be determined by the number of witnesses testifying for or against a party. You should consider all the facts and circumstances in evidence to determine which of the witnesses you choose to believe or not believe. In reaching a conclusion on a particular point, or ultimately in reaching a verdict in this case, do not make any decisions simply because there were more witnesses on one side than on the other.

1061

JURY INSTRUCTION NO. 12

An informant is someone who provides evidence against someone else for a personal reason or advantage. The testimony of an informant alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilt, even though not corroborated or supported by other evidence. You must examine and weigh an informant's testimony with greater care than the testimony of an ordinary witness. You must determine whether the informant's testimony has been affected by self- interest, by an agreement he has with the United States, by his own interest in the outcome of the case, or by prejudice against the defendant.

You should not convict a defendant based on the unsupported testimony of an informant, unless you believe the unsupported testimony beyond a reasonable doubt.

In this case, Ryan Jensen, Jessica Gleave, Sean Gygi, Katherine Bustin, and Alexandrya Tonge are considered informants.

13

JURY INSTRUCTION NO. 13

A person may testify under a grant of immunity (an agreement with the United States). His testimony alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilt even though it is not corroborated or supported by other evidence. You should consider testimony given under a grant of immunity with greater care and caution than the testimony of an ordinary witness. You should consider whether testimony under a grant of immunity has been affected by the witness's own interest, the United States' agreement, the witness's interest in the outcome of the case, or by prejudice against the defendant.

On the other hand, you should also consider that an immunized witness can be prosecuted for perjury for making a false statement. After considering these things, you may give testimony given under a grant of immunity such weight as you feel it deserves.

You should not convict a defendant based on the unsupported testimony of an immunized witness, unless you believe the unsupported testimony beyond a reasonable doubt.

In this case, the nature of the immunity agreement(s) is as follows: the United States has promised Ryan Jensen and Jessica Gleave that it will not use their testimony against them in a criminal case, other than for a prosecution for perjury if they testify untruthfully.  Mr. Jensen and Ms. Gleave agreed to testify truthfully and completely, answering all questions posed to them.

14

JURY INSTRUCTION NO. 14

The United States called as some of its witnesses alleged accomplices, who were named as co-defendants in the Indictment. The United States has entered into a plea agreement with the co-defendants, wherein the co-defendants pleaded guilty as charged and agreed to testify truthfully if called upon to testify. In exchange, the United States has agreed to ask the Court to consider imposing sentences that would otherwise be lower than the recommendation the United States would have made if the co-defendants had not agreed to testify truthfully. The United States has also agreed to signal to the Court that by testifying truthfully, the co-defendants should not be subject to any minimum-mandatory sentence otherwise applicable to their crimes. The agreement makes clear, however, that final sentencing decisions rest solely with the Court. Plea bargaining is lawful and proper, and the rules of this Court expressly provide for it.

An alleged accomplice, including one who has entered into a plea agreement with the United States, is not prohibited from testifying. On the contrary, the testimony of an alleged accomplice may, by itself, support a guilty verdict. You should receive this type of testimony with caution and weigh it with great care. You should not convict the defendant upon the unsupported testimony of an alleged accomplice, unless you believe that testimony beyond a reasonable doubt. The fact that an accomplice has entered a guilty plea to the offense charged is not evidence of the guilt of any other person.

In this case, Sean Gygi, Mario Noble, Katherine Bustin, Alexandrya Tonge, Drew Crandall, and Luke Paz are considered accomplices.

1064

JURY INSTRUCTION NO. 15

During the trial, you heard the testimony of expert witnesses who expressed opinions concerning

- the identity and weight of substances including mixtures containing controlled substances;

- the illegitimacy of pills and tablets based upon composition, imprints, and other aspects;

- the nature of the Dark Net and how Dark Net Marketplaces operate;

- how AlphaBay operated from the perspective of vendors and customers;

- the nature and use of PGP encryption;

- the nature of cryptocurrencies and how cryptocurrencies such as Bitcoin are used in transactions over the Dark Net;

- the nature of and methods used in computer forensic examinations;

- the nature and operation of drug-trafficking organizations;

  o including the methods and means by which drug traffickers launder drug proceeds through promotion, concealment, and spending;

- what constitutes a drug or drug component under the FDCA;

- the make-up, regulation, standards, quality, purity, markings (including which Pharmaceutical company is allowed to use which markings), uses, physiological effect on humans, listing in the Official US Pharmacopeia Compendium, and federal regulation of both Oxycodone and Fentanyl;

- the relative potency of Oxycodone, Fentanyl, and other opiates; and

16

1065

- the risk of serious adverse health consequences or death from marking Fentanyl to appear like Oxycodone tablets.

In some cases, such as this one, scientific, technical, or other specialized knowledge may assist the jury in understanding the evidence or in determining a fact in issue. A witness who has knowledge, skill, experience, training or education, may testify and state an opinion concerning such matters.

You are not required to accept such an opinion. You should consider opinion testimony just as you consider other testimony in this trial. Give opinion testimony as much weight as you think it deserves, considering the education and experience of the witness, the soundness of the reasons given for the opinion, and other evidence in the trial.

17

JURY INSTRUCTION NO. 16

You have heard the testimony of law enforcement officers.  The fact that a witness may
be employed by the federal government or by another law enforcement agency as a law
enforcement officer does not mean that his or her testimony is necessarily deserving of more or
less consideration or greater or lesser weight than that of an ordinary witness.

It is your decision, after reviewing all the evidence, whether to accept the testimony of
the law enforcement witness and to give that testimony whatever weight, if any, you find it
deserves.

1067

JURY INSTRUCTION NO. 17

A defendant in a criminal trial has a constitutional right to testify in his own behalf.  This is the defendant's right, and his testimony should not be rejected or discredited by you simply because he is the defendant and on trial for a criminal charge.  You should consider and weigh the testimony the same as the testimony of the other witnesses and determine the weight and credibility to be given thereto by the same rules that apply to witnesses generally.

19

JURY INSTRUCTION NO. 18

Evidence has been presented about a statement attributed to the defendant alleged to have been made after the commission of the crimes charged in this case but not made in court. Such evidence should always be considered by you with caution and weighed with care. You should give any such statement the weight you think it deserves, after considering all the circumstances under which the statement was made.

In determining whether any such statement is reliable and credible, consider factors bearing on the voluntariness of the statement. For example, consider the age, gender, training, education, occupation, physical and mental condition of the defendant, and all the other circumstances in evidence surrounding the making of the statement.

After considering all this evidence, you may give such weight to the statement as you feel it deserves under all the circumstances. If you determine that the statement is unreliable or not credible, you may disregard the statement entirely.

JURY INSTRUCTION NO. 19

During this trial, you have heard sound recordings of certain conversations. These conversations were legally recorded; they are a proper form of evidence and may be considered by you as you would any other evidence. You were also given transcripts of those recorded conversations.

Keep in mind that the transcripts are not evidence. They were given to you only as a guide to help you follow what was being said. The recordings themselves are the evidence. If you noticed any differences between what you heard on the recordings and what you read in the transcripts, you must rely on what you heard, not what you read. If you could not hear or understand certain parts of the recordings, you must ignore the transcript as far as those parts are concerned.

JURY INTRUCTION NO. 20

Certain charts and summaries have been shown to you to help explain the evidence in this case.  Their only purpose is to help explain the evidence.  Any chart or summary that has not been entered into evidence as an exhibit is not evidence or proof of any facts.

1071

JURY INSTRUCTION NO. 21

You are not to be concerned with the legality or illegality of any search by law enforcement officers of the residence occupied by the defendant. That is a matter exclusively within the province of the Court.

JURY INSTRUCTION NO. 22

You have heard testimony as to the manner in which the government conducted its investigation in this case including certain investigative methods or techniques that were used and certain investigative methods or techniques that were not used. In attempting to prove its case, the government is under no obligation to use all of the investigative methods that are available to it or use any particular method. The question is whether the evidence presented is sufficient to convince you beyond a reasonable doubt of the defendant's guilt.

1073

JURY INSTRUCTION NO. 23

If I have said or done anything in this case that makes it appear that I have an opinion about the guilt or innocence of the defendant, disregard it. You are the sole judges of the facts and should in no way be influenced by what I have done here except to follow my instructions on the law.  At times throughout the trial, I have been called upon to rule whether certain questions can be asked, whether certain answer can be admitted, and whether other evidence may be admitted into evidence.  These matters are purely questions of law.  Neither the weight nor the credibility of the witness is involved in such rulings.  In addition, nothing said in these instructions and nothing in any form of verdict prepared for your convenience is meant to suggest or convey in any way what verdict I think you should find.  What the verdict shall be is the sole and exclusive duty and responsibility of the jury.

1074

JURY INSTRUCTION NO. 24

If any reference by the Court or by the attorneys to matters of evidence does not coincide with your own recollection, it is your recollection which should control during your deliberations.

JURY INSTRUCTION NO. 25

A separate crime is charged in each count of the Indictment. Each charge, and the evidence pertaining to it, should be considered separately by you. The fact that you may find the defendant guilty or not guilty as to one of the counts should not control your verdict as to any other count.

The Indictment charges defendant with the following counts:

Count 1:  Continuing Criminal Enterprise;

Counts 2-4:  Aiding and Abetting the Importation of a Controlled Substance;

Count 5:  Possession of a Controlled Substance with Intent to Distribute;

Count 6: Aiding and Abetting the Distribution of a Controlled Substance Resulting in Death;

Count 7: Manufacture of a Controlled Substance;

Counts 8-9: Knowing and Intentional Adulteration of Drugs While Held for Sale;

Count 10:  Aiding and Abetting the Use of the U.S. Mail in Furtherance of a Drug Trafficking Offense;

Count 11:  Conspiracy to Commit Money Laundering;

Count 12:  Money Laundering Promotion and Concealment; and

Count 13: Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity.

I will instruct you as to the law applicable to each of the counts alleged against the defendant.

27

JURY INSTRUCTION NO. 26

You will note that the Indictment charges that the crimes were committed "on or about" a certain date or between approximate dates. Although it is necessary for the United States to prove beyond a reasonable doubt that the offenses were committed on a date reasonably near the date alleged in the indictment, it is not necessary for the United States to prove that the offenses were committed precisely on the dates charged.

28

JURY INSTRUCTION NO. 27

Several of the following instructions will refer to controlled substances.

Fentanyl (also referred to as N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propenamide) is a controlled substance within the meaning of the law.

Likewise, Alprazolam is a controlled substance within the meaning of the law.

JURY INSTRUCTION NO. 28

Several counts of the Indictment and most of the underlying offenses listed in Count 1 of the Indictment also charge a violation of 18 U.S.C. section 2, which provides that: "Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

This law makes it a crime to intentionally help someone else commit a crime. To find the defendant guilty of this crime, you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

*First*: someone else committed the charged crime, and

*Second*: the defendant intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about. This means that the United States must prove that the defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help him or her.

The defendant need not perform the underlying criminal act, be present when it is performed, or be aware of the details of its commission to be guilty of aiding and abetting. But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough. Mere presence at the scene of a crime and knowledge that a crime is being committed are also not sufficient to establish aiding and abetting.

1079

JURY INSTRUCTION NO. 29

The defendant is charged in Count 1 with a violation of 21 U.S.C. section 848. This law makes it a crime to engage in what is called a "continuing criminal enterprise" involving controlled substances.

To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following five elements beyond a reasonable doubt:

*First*: the defendant violated the Controlled Substances Act as charged in the list of underlying violations to Count 1, which list of violations can be found on the Special Verdict Form provided to you with these instructions;

*Second*: the defendant engaged in a continuing series of at least three violations of the Controlled Substances Act that began on a date unknown to the Grand Jury, but at least by July 8, 2015, and continued to at least November 22, 2016. These violations must be connected together as a series of related or ongoing activities, as distinguished from isolated and disconnected acts. You must unanimously agree on which of at least three of these underlying violations the United States has proved. The underlying violations listed in Count 1 may be found on the Special Verdict Form provided to you with these instructions;

*Third*: the defendant committed these violations in concert (or by common design or plan) with five or more other persons. The five other persons need not have acted at the same time or in concert with each other. You need not unanimously agree on the identity of any other persons acting in concert with the defendant, so long as each of you finds that there were five or more such persons;

*Fourth*: the defendant was an organizer, supervisor, or manager of those five persons. The terms "organizer, supervisor, or manager" means that the defendant was more than a fellow

31

1080

worker, and that the defendant either organized or directed the activities of five or more other persons, exercising some form of managerial authority over them. An organizer can be defined as a person who puts together a number of people engaged in separate activities and arranges them in their activities in one essentially orderly operation or enterprise. The word "organizer" does not carry with it the implication that the organizer is necessarily able to control those whom he organizes. A relationship of supervision is created when one person gives orders or directions to another person who carries them out. An enterprise can have more than one organizer, supervisor, or manager. A co-defendant can be a co-manager and be included as one of the five others with respect to whom the defendant holds a supervisory position.

and

*Fifth*: the defendant obtained substantial income or resources from the series of violations. The term "substantial income or resources" means income in money or property which is significant in size or amount as distinguished from some relatively insignificant, insubstantial, or trivial amount.

32

JURY INSTRUCTION NO. 30

If you find beyond a reasonable doubt that the defendant is guilty of engaging in a

continuing criminal enterprise as explained in the previous instruction, you will also be asked to

find whether the United States proved beyond a reasonable doubt each of the following:

1)    the conspiracy to distribute Fentanyl involved twelve kilograms or more of a

        mixture or substance containing a detectable amount of Fentanyl; and

2)    the defendant is the principal administrator, organizer, or leader of the enterprise

        or is one of several such principal administrators, organizers, or leaders.

The law does not require the United States to prove the defendant was the only principal

administrator, organizer, or leader; the United States need only prove beyond a reasonable doubt

that the defendant was one of possibly several principal administrators, organizers, or leaders.

1082

JURY INSTRUCTION NO. 31

The defendant is charged in the list of underlying violations to Count 1 with violating sections 841(a)(1) and 846 of Title 21 of the United States Code. This law makes it a crime for anyone to conspire with someone else to violate federal laws pertaining to controlled substances. In this case, the defendant is charged with conspiracy to distribute Fentanyl resulting in death.

To find the defendant committed this crime, you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

*First*: beginning on a date unknown to the Grand Jury, but at least by February 3, 2016, and continuing to at least November 22, 2016, two or more persons agreed to violate the federal drug laws;

*Second*: the defendant knew the essential objective of the conspiracy;

*Third*: the defendant knowingly and voluntarily involved himself in the conspiracy;

*Fourth*: there was interdependence among the members of the conspiracy; and

*Fifth*: the death of R.K. resulted from use of Fentanyl distributed in furtherance of the conspiracy. I will further explain this fifth element in the next instruction.

A conspiracy is an agreement between two or more persons to accomplish an unlawful purpose. It is a kind of "partnership in criminal purposes" in which each member becomes the agent or partner of every other member. The evidence may show that some of the persons involved in the alleged conspiracy are not on trial. This does not matter. There is no requirement that all members of a conspiracy be charged or tried together in one proceeding.

The evidence need not show that the members entered into an express or formal agreement. Nor does the law require proof that the members agreed on all the details. But the

1083

evidence must show that the members of the alleged conspiracy came to a mutual understanding to try to accomplish a common and unlawful plan.

If you conclude from the evidence beyond a reasonable doubt that the charged conspiracy existed, then you must next determine whether the defendant was a member of that conspiracy—that is, whether the defendant knew at least the essential goals of the conspiracy and voluntarily chose to be part of it. The law does not require proof that the defendant knew all the other members of the conspiracy or knew all the details about how activities were to be carried out. A person may belong to a conspiracy for a brief period of time or play a minor role. On the other hand, proof is not sufficient if it merely shows that the defendant knew about the existence of the conspiracy or was associated with members of the conspiracy. Rather, the evidence must show the defendant knowingly joined the conspiracy with the intent to advance its purposes.

The United States must prove that interdependence existed among the members of the conspiracy. This means that the members intended to act for their shared mutual benefit. To satisfy this element, the United States must demonstrate that the defendant participated in a shared criminal purpose and that his actions constituted an essential and integral step toward the realization of that purpose.

JURY INSTRUCTION NO. 32

To secure a conviction for conspiring to distribute a drug that "results" in death as that term is used in the Fifth element of the charge explained in the previous instruction, you must find beyond a reasonable doubt that the United States has proven that R.K.'s use of the drug is a "but-for" cause of the death. This requires proof that R.K.'s death would not have occurred in the absence of the defendant's conduct. If the defendant's conduct combines with other factors to produce the death, it is the "but-for" cause of death only if the other factors alone would not have caused the death. If R.K.'s use of the drug allegedly distributed by the defendant merely played a nonessential contributing role in producing R.K.'s death, then it was not the but-for cause of R.K.'s death.

36

JURY INSTRUCTION NO. 33

The defendant is charged in the list of underlying violations to Count 1 with violating sections 841(a)(1) and 846 of Title 21 of the United States Code. This law makes it a crime for anyone to conspire with someone else to violate federal laws pertaining to controlled substances. In this case, the defendant is charged with conspiracy to distribute Alprazolam.

To find the defendant committed this crime, you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

*First*: beginning on a date unknown to the Grand Jury, but at least by December 22, 2015, and continuing to at least November 22, 2016, two or more persons agreed to violate the federal drug laws;

*Second*: the defendant knew the essential objective of the conspiracy;

*Third*: the defendant knowingly and voluntarily involved himself in the conspiracy; and

*Fourth*: there was interdependence among the members of the conspiracy.

1086

JURY INSTRUCTION NO. 34

The defendant is charged in the list of underlying violations to Count 1 with aiding and abetting attempted violations of 21 U.S.C. section 841(a)(1). This law makes it a crime to distribute a controlled substance. To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

*First*: the defendant's co-conspirator(s) knowingly or intentionally attempted to distribute a controlled substance as charged;

*Second*: the substance was in fact

- Fentanyl, for those crimes alleging Fentanyl on or about the dates alleged; or

- Alprazolam, for those crimes alleging Alprazolam on or about the dates alleged.

*Third*: the defendant aided and abetted his co-conspirator(s) in the attempted distribution of a controlled substance.

The term "distribute" means to deliver or to transfer possession or control of something from one person to another. The term "distribute" includes the sale of something by one person to another. It is not necessary, however, for the United States to prove that any transfer of money or other thing of value occurred at the same time as, or because of, the distribution.

The United States is not required to prove that the defendant knew the precise nature of the controlled substance.

JURY INSTRUCTION NO. 35

The defendant may be found guilty of attempting to commit a crime, even though he did not do all of the acts necessary in order to commit the crime. However, the defendant may not be found guilty of attempting to commit any crime merely by thinking about it, or even by making some plans or some preparation for the commission of a crime.

Instead, in order to prove an attempt, the United States must prove beyond a reasonable doubt that:

(1)     the defendant intended to commit the crime; and

(2)     the defendant took a substantial step towards commission of that crime.

A "substantial step" is something beyond mere preparation. A substantial step is an act which, in the ordinary and likely course of events, would lead to the commission of the particular crime. The step must be a strong indication of the defendant's criminal intent, and must unequivocally mark the defendant's acts as criminal. It should demonstrate commitment to the crime charged.

39

JURY INSTRUCTION NO. 36

The defendant is charged in Counts 2, 3, and 4, and also in the list of underlying violations to Count 1, with aiding and abetting violations of 21 U.S.C. section 952(a) and section 960(a)(1). This law makes it a crime to knowingly or intentionally import a controlled substance.

To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

*First*: the defendant or his co-conspirator(s) imported into the United States from a place outside the United States the controlled substances listed below;

- Fentanyl, on or about June 23, 2016 (Count 2)

- Alprazolam, on or about November 8, 2016 (Count 3)

- Fentanyl, on or about November 17, 2016 (Count 4)

*Second*: the defendant knew the substance he or his co-conspirator(s) imported into the United States was a controlled substance;

*Third*: the defendant knew that the substance would enter the United States; and

*Fourth*: the defendant aided and abetted his co-conspirator(s) in the commission of the offense.

40

JURY INSTRUCTION NO. 37

If you find beyond a reasonable doubt that the defendant is guilty of Counts 2 and 4, and

also in the list of underlying violations to Count 1, with aiding and abetting violations of 21

U.S.C. section 952(a) and section 960(a)(1), as explained in the previous instruction, you will be

asked to find whether the United States proved beyond a reasonable doubt whether:

- the quantity of the substance at issue in both Count 2 and Count 4 was at least 40

  grams of a mixture or substance containing a detectable amount of Fentanyl.

1090

JURY INSTRUCTION NO. 38

The defendant is charged in Count 5, and also in the list of underlying violations to Count 1, with violations of 21 U.S.C. section 841(a)(1). This law makes it a crime to possess a controlled substance with the intent to distribute it.

To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

*First*: the defendant knowingly or intentionally possessed a controlled substance on or about November 22, 2016, as charged;

*Second*: the substance was in fact Fentanyl; and

*Third*: the defendant possessed the substance with the intent to distribute it;

To "possess with intent to distribute" means to possess with intent to deliver or transfer possession of a controlled substance to another person, with or without any financial interest in the transaction.

42

JURY INSTRUCTION NO. 39

If you find beyond a reasonable doubt that the defendant is guilty of Count 5, and also in the list of underlying violations to Count 1, with violations of 21 U.S.C. section 841(a)(1), as explained in the previous instruction, you will be asked to find whether the United States proved beyond a reasonable doubt whether:

- the amount of the controlled substance possessed by the defendant was at least 400 grams of a mixture or substance containing a detectable amount of Fentanyl.

1092

JURY INSTRUCTION NO. 40

The law recognizes two kinds of possession: actual possession and constructive possession. A person who knowingly has direct physical control over an object or thing, at a given time, is then in actual possession of it.

A person who, although not in actual possession, knowingly has the power and intent at a given time to exercise dominion or control over an object, either directly or through another person or persons, is then in constructive possession of it.

More than one person can be in possession of an object if each knows of its presence and has the power and intent to control it.

In the situation where the object is found in a place (such as a room or car) occupied by more than one person, you may not infer power and intent to exercise control over the object based solely on joint occupancy. Mere control over the place in which the object is found is not sufficient to establish constructive possession. Instead, in this situation, the United States must prove some connection between the particular defendant and the object demonstrating the power and intent to exercise control over the object.

44

JURY INSTRUCTION NO. 41

The defendant is charged in Count 6, and also in the list of underlying violations to Count 1, with a violation of 21 U.S.C. section 841(a)(1). This law makes it a crime to distribute a controlled substance. To find the defendant guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt:

*First*: the defendant's co-conspirator(s) knowingly or intentionally distributed a controlled substance on or about June 6 through June 13, 2016, as charged;

*Second*: the substance was in fact Fentanyl;

*Third*: the death of R.K. resulted from use of the Fentanyl distributed by the defendant's co-conspirators; and

*Fourth*: the defendant aided and abetted his co-conspirator(s) in the commission of the offense.

The term "distribute" means to deliver or to transfer possession or control of something from one person to another. The term "distribute" includes the sale of something by one person to another. It is not necessary, however, for the government to prove that any transfer of money or other thing of value occurred at the same time as, or because of, the distribution.

To secure a conviction for distributing a drug that "results" in death, the United States must prove beyond a reasonable doubt that the victim's use of the drug is a but-for cause of the death as I explained in Jury Instruction No. 32.

45

JURY INSTRUCTION NO. 42

The defendant is charged in Count 7, and also in the list of underlying violations to Count 1, with a violation of 21 U.S.C. section 841(a)(1). This law makes it a crime to manufacture a controlled substance. To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

*First*: the defendant knowingly or intentionally manufactured a controlled substance on or about November 22, 2016, as charged; and

*Second*: the substance was in fact Alprazolam.

The term "manufacture" means the production, preparation, propagation, compounding, or processing of a drug or other substance.

JURY INSTRUCTION NO. 43

The defendant is charged in Counts 8 and 9 with violations of the Food, Drug, and Cosmetic Act, specifically 21 U.S.C. sections 331(k) & 333(b)(7). These sections make it a crime to intentionally adulterate drugs while held for sale after their shipment in interstate commerce. To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

*First*: the relevant product, Fentanyl, was a "drug" as I will define that word later in this instruction;

*Second*: the defendant held the drug for sale after its shipment in interstate commerce;

*Third*: the defendant performed, or caused to be performed, one or more acts which resulted in the drug being adulterated;

*Fourth*: the defendant knowingly and intentionally adulterated or caused the adulteration of the drug:

- For Count 8, beginning on a date unknown to the grand jury, but at least by February 3, 2016, and continuing to at least November 22, 2016;

- For Count 9, beginning on a date unknown to the grand jury, but at least by June 18, 2016, and continuing to at least November 22, 2016;

and

*Fifth*: such adulteration of the drug had a reasonable probability of causing serious adverse health consequences or death to humans.

47

A drug is adulterated if:

    a)    it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium; or

    b)    it is a drug and any substance has been substituted wholly or in part.

An drug is "held for sale" if it is being held for any purpose other than for personal use by the defendants.

For the requirement of a prior shipment in interstate commerce to be satisfied, it is enough to show that the drug traveled in interstate commerce prior to the drug being held for sale.

A drug is held for sale after shipment in interstate commerce without regard to how long after the shipment the misbranding occurred, how many intrastate sales had intervened, or who had received the drug at the end of the interstate commerce. After a drug has been shipped in interstate commerce, it is immaterial when or how defendant obtained the drug.

For Counts 8 and 9 only, the terms listed below are defined as follows:

The term "interstate commerce" means commerce between any State or Territory and any place outside thereof.

The term "drug" means:

    1)    articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them.

    2)    articles intended for use in the diagnosis, cure, treatment, or prevention of disease in man, or intended to affect any function of the human body, or

3)      articles intended for use as a component of any other drug.

The term "official compendium" means the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, official National Formulary, or any supplement to any of them.

The term "serious adverse health consequences" means any potential significant adverse experience related to a drug, which could be life-threatening or which could result in permanent or long-term injuries or illnesses.

1098

JURY INSTRUCTION NO. 44

The defendant is charged in Count 10, and also in the list of underlying violations to Count 1, with aiding and abetting a violation of 21 U.S.C. section 843(b). This law makes it a crime to use a communication facility to commit a felony drug offense. To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

*First*: the defendant's co-conspirator(s) knowingly used the U.S. Mail on or about September 12-23, 2016;

*Second*: the defendant's co-conspirator(s) acted with the intent to commit a drug felony, namely Distribution of Alprazolam; and

*Third*: the defendant aided and abetted his co-conspirator(s) in the commission of the offense.

You are instructed that Distribution of Alprazolam is a felony.

JURY INSTRUCTION NO. 45

The defendant is charged in Count 11 with a violation of 18 U.S.C. section 1956(h). This law makes it a crime for anyone to conspire with someone else to commit a money laundering offense.

To find the defendant guilty of this crime you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

*First*: that the defendant and at least one other person, in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan to

    A.    violate 18 U.S.C. section 1956, which was to conduct a financial transaction involving proceeds of some form of unlawful activity beginning on a date unknown to the Grand Jury, but at least by December 22, 2015, and continuing to at least November 22, 2016:

        i.    with the intent to promote the carrying on of a specified unlawful activity; or

        ii.    knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activity;

or

    B.    violate 18 U.S.C. section 1957, which was to conduct a monetary transaction by, through, or to a financial institution involving criminally derived property beginning on a date unknown to the Grand Jury, but at least by December 22, 2015, and continuing to at least November 22, 2016:

        i.    which transaction affected interstate or foreign commerce;

1100

ii.     which transaction involved property of a value greater than $10,000 USD; and

*Second*: that the defendant, knowing the unlawful purpose of the plan, willfully joined in it.

The word "willfully" means that the act was committed voluntarily and purposefully, with the specific intent to do something the law forbids.

Distribution of a controlled substance is a "specified unlawful activity" under the law. Manufacture of a controlled substance is also a "specified unlawful activity" under the law.

JURY INSTRUCTION NO. 46

The defendant is charged in Count 12 with a violation of 18 U.S.C. section 1956(a)(1)(B)(i). This law makes it a crime knowingly to conceal or disguise the nature, location, source, ownership, or control of proceeds of specified unlawful activity.

To find the defendant guilty of this crime, you must be convinced that the United States has proved each of the following beyond a reasonable doubt:

*First*: the defendant conducted a financial transaction on or about November 8, 2016;

*Second*: the financial transaction involved the proceeds of an unlawful activity, specifically, distribution of a controlled substance;

*Third*: the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, namely the manufacture and/or distribution of a controlled substance which constitute felonies under federal law; and

*Fourth*: the defendant conducted the financial transaction:

      i.     with the intent to promote the carrying on of a specified unlawful activity; or

      ii.    knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activity.

JURY INSTRUCTION NO. 47

The following definitions and instructions apply to Counts 11 and 12.

The term "conducts" includes initiating, concluding, or participating in initiating or concluding, a transaction.

The term "financial transaction" means a transaction involving the use of a financial institution that is engaged in, or the activities of which affect, interstate commerce in any way or degree.

The term "proceeds" means any property derived from or obtained or retained, directly or indirectly, through specified unlawful activity, including the gross receipts of such activity.

The term "interstate commerce" means commerce or travel between the states, territories or possessions of the United States, including the District of Columbia. It is not necessary that the defendant have intended or anticipated an effect on interstate commerce. All that is necessary is that the natural and probable consequence of the acts the defendant took would be to affect interstate commerce.

1103

JURY INSTRUCTION NO. 48

The defendant is charged in Count 13 with money laundering in violation of 18 U.S.C. section 1957(a). In order for the defendant to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt:

*First*: the defendant knowingly engaged or attempted to engage in a monetary transaction on or about May 5, 2016;

*Second*: the defendant knew the transaction involved criminally derived property;

*Third*: the property had a value greater than $10,000;

*Fourth*: the property was, in fact, derived from the distribution of a controlled substance; and

*Fifth*: the transaction occurred in the United States.

The term "monetary transaction" means the deposit, in or affecting interstate commerce, of funds or a monetary instrument by, through, or to a financial institution.

The term "financial institution" means any credit union or FDIC-insured bank.

The term "criminally derived property" means any property constituting, or derived from, the proceeds of a criminal offense. The United States must prove that the defendant knew that the property involved in the monetary transaction constituted, or was derived from, proceeds obtained by some criminal offense. The United States does not have to prove that the defendant knew the precise nature of that criminal offense, or knew the property involved in the transaction represented the proceeds of distribution of a controlled substance.

Although the United States must prove that, of the property at issue more than $10,000 was criminally derived, the United States does not have to prove that all of the property at issue was criminally derived.

## JURY INSTRUCTION NO. 49

Counts 12 and 13 require the government to prove and for you to find that the defendant acted knowingly. To establish that the defendant acted "knowingly," the government must prove that the defendant was conscious and aware of his actions, was acting voluntarily and intentionally, and was not acting because of ignorance, mistake, or accident.

Although the knowledge or intent that a person possesses at any given time may not ordinarily be proved directly because there is no way of directly scrutinizing the workings of the human mind, you may consider evidence of the defendant's words, acts, or omissions, along with all of the other facts and circumstances in evidence, in deciding whether the defendant acted knowingly.

JURY INSTRUCTION NO. 50

I have explained to you the elements which the United States must prove beyond a reasonable doubt before you may convict the defendant of Counts 1 through 13, along with the crimes alleged in the list of underlying offenses to Count 1. I have also explained to you that punishment is in the exclusive province of the Court, and that you should not concern yourselves with questions of punishment. However, because the punishment under the law for the crimes the defendant is charged with committing varies with the quantity of drugs involved, the law requires that you make special findings in your verdict with regard to those amounts. Those findings, too, must be made beyond a reasonable doubt and unanimously.

The Court will provide you with a Special Verdict Form on which you will record your verdict. This form contains three determinations for Counts 1 and two determinations for Counts 2, 4, and 5 that you may have to make. The first determination is whether you find the defendant guilty or not guilty of the offense charged in Counts 1, 2, 4, and 5 of the Indictment. If you find the defendant not guilty as to a Count, you do not need to proceed to the subsequent question(s) regarding that Count. If, on the other hand, you find the defendant guilty of a Count, you should proceed to the subsequent determination(s) for that Count, that is, the quantity of Fentanyl involved in each offense.

JURY INSTRUCTION NO. 51

To reach a verdict, all of you must agree. Your verdict must be unanimous. Your deliberations will be secret. You will never have to explain your verdict to anyone.

It is your duty to consult with one another and to deliberate in an effort to reach agreement if you can do so.  Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. During your deliberations, do not hesitate to re-examine your own opinions and change your mind if convinced that you were wrong.  But do not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Remember at all times, you are judges, judges of facts. Your sole interest is to seek the truth from the evidence in the case, to decide whether the government has proved the defendant guilty beyond a reasonable doubt.

Bear in mind that you are never to reveal to any person, not even to the Court, how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict.

JURY INSTRUCTION NO. 52

After the closing arguments by counsel, a Court Security Officer will escort you to the jury room to deliberate. Any exhibits admitted into evidence, with the exception of fentanyl, will also be placed in the jury room for your review.

Upon retiring to the jury room, you should first select one of your members to act as your foreperson, who will preside over your deliberations and will be your spokesperson here in Court. The second thing you should do is review the instructions. Your deliberations will be more productive if you understand the legal principles upon which your verdict must be based, and you are bound by your oath to follow the law stated in the instructions.

A Special Verdict Form has been prepared for your convenience. You will take the Special Verdict Form to the jury room and when you have reached a unanimous agreement as to your verdict, the foreperson will write the unanimous answer of the jury in the space provided for each count of the Indictment, either not guilty or guilty. At the conclusion of your deliberations, the foreperson should date and sign the Special Verdict Form. The foreperson should then give a note to the Court Security Officer, who will be stationed outside the jury room, stating that the jury has reached a verdict. The foreperson should not reveal what the verdict is at that time and should maintain possession of the Special Verdict Form until the jury returns to the courtroom and the Court requests it to be given to the Courtroom Deputy.

JURY INSTRUCTION NO. 53

If it becomes necessary during your deliberations to communicate with the Court, you

may send a note by a Court Security Officer, signed by your foreperson or by one or more jurors.

No member of the jury should attempt to communicate with the Court by any means other than a

signed writing; and the Court will never communicate with any member of the jury on any

subject touching the merits of the case, otherwise than in writing or orally here in open court.

You will note from the oath the Court Security Officer will take that he, as well as any

other person, is also forbidden to communicate in any way with any juror about any subject

touching the merits of the case.

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

AUG 3 0 2019

D. MARK JONES, CLERK
BY_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br><br>AARON MICHAEL SHAMO,<br><br>Defendant. | SPECIAL VERDICT FORM<br><br>Case No. 2:16-cr-631 DAK<br><br>District Judge Dale A. Kimball |

We, the jury duly impaneled in the above-entitled case, having reviewed and applied the Jury Instructions provided by the Court, find the following unanimously and beyond a reasonable doubt as to the defendant AARON MICHAEL SHAMO:

## Count 1—Engaging in a Continuing Criminal Enterprise

1. As to Count 1, we find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY ☒ GUILTY

If you found the defendant not guilty of Count 1, do not answer questions 1a, 1b, and 1c. If you found the defendant guilty of Count 1, please answer questions 1a, 1b, and 1c.

1a. Having found the defendant guilty of Count 1, do you also unanimously find that the United States proved beyond a reasonable doubt that the amount of controlled substance attributable to the defendant was at least 12,000 grams of a mixture or substance containing a detectable amount of Fentanyl?

Proven ☒ Not Proven ☐

1b. Having found the defendant guilty of Count 1, do you also unanimously find that the United States proved beyond a reasonable doubt that the defendant was a principal administrator, organizer, or leader of the enterprise?

Proven ☒ Not Proven ☐

1

1c. Please indicate by checking the box for each alleged underlying violation below whether you unanimously find the United States proved the defendant committed the violation beyond a reasonable doubt.

**The List of Underlying Violations**

Conspiracy to Distribute Fentanyl Resulting in Death of R.K., all in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 2;

Proven ☐     Not Proven ☐

Conspiracy to Distribute Alprazolam, all in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 2;

Proven ☒     Not Proven ☐

The violation alleged in Count 2, Aiding and Abetting the Importation of a Controlled Substance;

Proven ☒     Not Proven ☐

The violation alleged in Count 3, Aiding and Abetting the Importation of a Controlled Substance;

Proven ☒     Not Proven ☐

The violation alleged in Count 4, Aiding and Abetting the Importation of a Controlled Substance;

Proven ☒     Not Proven ☐

The violation alleged in Count 5, Possession of Fentanyl with Intent to Distribute;

Proven ☒     Not Proven ☐

The violation alleged in Count 6, Aiding and Abetting the Distribution of Fentanyl Resulting in Death;

Proven ☐     Not Proven ☐

The violation alleged in Count 7, Manufacture of Alprazolam;

Proven ☒     Not Proven ☐

2

The violation alleged in Count 10, Use of the U.S. Mail in Furtherance of a Drug Trafficking Offense;

Proven ☒          Not Proven ☐

Aiding and Abetting the Attempted Distribution of a Controlled Substance, namely Fentanyl, on or about the following dates to the following addressees, each in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 2:

| Proven | Not | Date | Addressee Initials | State | Number of Pills | Controlled Substance | Markings |
|--------|-----|------|--------------------|-------|-----------------|----------------------|----------|
| ☒ | ☐ | 11/18/2016 | R.L. | MA | 20,000 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | J.H. | OH | 2,000 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | B.W. | AL | 2,000 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | Y.C. | OH | 1,100 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | N.L. | NJ | 1,000 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | D.A. | NJ | 1,000 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | F.C. | AK | 1,000 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | P.T.A.C. | MD | 1,000 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | L.S. | MN | 1,000 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | V.R. | WA | 1,000 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | S.W. | NC | 1,000 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | G.M. | NV | 500 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | L.F. | PA | 500 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | S.R. | WA | 200 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | R.B. | OH | 150 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | D.P. | MA | 150 | Fentanyl | A 215 |

3

| Proven | Not | Date | Addressee Initials | State | Number of Pills | Controlled Substance | Markings |
|--------|-----|------|--------------------|-------|-----------------|----------------------|----------|
| ☒ | ☐ | 11/18/2016 | CBS.I., M.W. | KS | 100 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | M.J. | KY | 100 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | P.F. | IL | 100 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | J.P. | PA | 100 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | M.S. | NC | 100 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | F.O. | LA | 100 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | M.L. | NC | 100 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | T.M. | CT | 60 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | J.T. | OR | 50 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | A.M. | MT | 40 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | D.L.G. | MT | 40 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | M.M. | NY | 30 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | J.M.L. | MD | 27 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | J.M. | IL | 22 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | A.B. | CO | 20 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | A.G. | KY | 20 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | M.P. | MN | 16 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | J.T. | OR | 14 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | A.T. | VA | 12 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | T.E. | SC | 12 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | N.A. | CA | 12 | Fentanyl | A 215 |

4

| Proven | Not | Date | Addressee Initials | State | Number of Pills | Controlled Substance | Markings |
|--------|-----|------|--------------------|-------|-----------------|----------------------|----------|
| ☒ | ☐ | 11/18/2016 | C. | PA | 11 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | K.M.T.T.S.T.R. | OK | 11 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | K.M.H. | SC | 11 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | L.P. | NY | 11 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | B.S. | OH | 11 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | R.P. | PA | 11 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | A.B. | MO | 11 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | J.G. | NY | 11 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | M.J. | CA | 11 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | J.S. | PA | 11 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | S.F. | PA | 11 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | G.T. | TX | 11 | Fentanyl | M/30 |
| ☒ | ☐ | 11/18/2016 | J.R. | CT | 11 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | M.D. | NJ | 10 | Fentanyl | A 215 |
| ☒ | ☐ | 11/18/2016 | B.B. | CO | 10 | Fentanyl | A 215 |
| ☒ | ☐ | 11/20/2016 | A.W. | WA | 5,000 | Fentanyl | M/30 |
| ☒ | ☐ | 11/20/2016 | Y.C. | OH | 1,100 | Fentanyl | A 215 |
| ☒ | ☐ | 11/20/2016 | J.R. | MN | 1,000 | Fentanyl | M/30 |
| ☒ | ☐ | 11/20/2016 | A.P. | KY | 1,000 | Fentanyl | A 215 |
| ☒ | ☐ | 11/20/2016 | D.R. | DE | 500 | Fentanyl | M/30 |
| ☒ | ☐ | 11/20/2016 | L.R.T.A.S. | NJ | 500 | Fentanyl | A 215 |

5

| Proven | Not | Date | Addressee Initials | State | Number of Pills | Controlled Substance | Markings |
|--------|-----|------|--------------------|-------|-----------------|----------------------|----------|
| ☒ | ☐ | 11/20/2016 | A.M. | MN | 500 | Fentanyl | A 215 |
| ☒ | ☐ | 11/20/2016 | M.C. | SC | 200 | Fentanyl | A 215 |
| ☒ | ☐ | 11/20/2016 | T.J. | FL | 200 | Fentanyl | A 215 |
| ☒ | ☐ | 11/20/2016 | M.S. | NC | 200 | Fentanyl | M/30 |
| ☒ | ☐ | 11/20/2016 | G.D. | VA | 150 | Fentanyl | A 215 |
| ☒ | ☐ | 11/20/2016 | A.H. | PA | 100 | Fentanyl | A 215 |
| ☒ | ☐ | 11/20/2016 | J.R. | NC | 100 | Fentanyl | A 215 |
| ☒ | ☐ | 11/20/2016 | C.D. | MA | 100 | Fentanyl | A 215 |
| ☒ | ☐ | 11/20/2016 | A.H. | VA | 100 | Fentanyl | A 215 |
| ☒ | ☐ | 11/20/2016 | N.M. | ME | 100 | Fentanyl | A 215 |
| ☒ | ☐ | 11/20/2016 | N.Y. | MI | 100 | Fentanyl | A 215 |
| ☒ | ☐ | 11/20/2016 | M.J. | KY | 100 | Fentanyl | A 215 |
| ☒ | ☐ | 11/20/2016 | D.L. | FL | 100 | Fentanyl | M/30 |
| ☒ | ☐ | 11/20/2016 | J.B. | TX | 100 | Fentanyl | M/30 |
| ☒ | ☐ | 11/20/2016 | A.W. | TX | 13 | Fentanyl | M/30 |

6

## 1c. The List of Underlying Violations, cont.

Aiding and Abetting the Attempted Distribution of a Controlled Substance, namely Alprazolam, on or about the following dates to the following addressees, each in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 2:

| Proven | Not | Date | Addressee Initials | State | Number of Pills | Controlled Substance | Markings |
|---|---|---|---|---|---|---|---|
| ☒ | ☐ | 11/18/2016 | W.R. | WA | 10,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/18/2016 | H.W. | NJ | 10,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/18/2016 | A.W. | NY | 5,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/18/2016 | A.M. | CA | 5,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/18/2016 | C.R. | WV | 2,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/18/2016 | R.L. | FL | 2,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/18/2016 | J.L. | CA | 2,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/18/2016 | B.J. | LA | 2,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/18/2016 | L. | NY | 2,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/18/2016 | A.K. | WI | 2,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/18/2016 | J.B. | TX | 1,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/18/2016 | A.F. | GA | 200 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/18/2016 | S.W. | NC | 100 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/18/2016 | P.H. | PA | 100 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/18/2016 | J.T. | OR | 100 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/18/2016 | A.S. | TX | 100 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/18/2016 | R.K. | NC | 100 | Alprazolam | GG 249 |

| Proven | Not | Date | Addressee Initials | State | Number of Pills | Controlled Substance | Markings |
|---|---|---|---|---|---|---|---|
| ☒ | ☐ | 11/18/2016 | D.C. | IL | 100 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/18/2016 | R.T. | TN | 100 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/18/2016 | F.W. | NC | 100 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/18/2016 | X.C. | OH | 100 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/18/2016 | D.H. | FL | 50 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/20/2016 | N.K. | MA | 2,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/20/2016 | G.R. | TX | 2,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/20/2016 | J.O. | SC | 2,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/20/2016 | C.L. | OR | 2,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/20/2016 | Mrs. L. | MI | 1,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/20/2016 | A.S. | NC | 1,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/20/2016 | J.H. | TN | 1,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/20/2016 | Y.C. | OH | 500 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/20/2016 | J.S. | MI | 200 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/20/2016 | N.H. | SC | 100 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/20/2016 | C.S. | TN | 100 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/20/2016 | J.H. | LA | 100 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/20/2016 | D.C. | IL | 100 | Alprazolam | GG 249 |

8

| Proven | Not | Date | Addressee Initials | State | Number of Pills | Controlled Substance | Markings |
|--------|-----|------|--------------------|-------|-----------------|----------------------|----------|
| ☒ | ☐ | 11/20/2016 | S.S. | GA | 100 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/20/2016 | A.L. | CA | 100 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/20/2016 | D.L. | SC | 100 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/20/2016 | P.O. | GA | 100 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/20/2016 | Z.W. | NY | 100 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/20/2016 | C.G. | MS | 100 | Alprazolam | GG 249 |

## 1c. The List of Underlying Violations, cont.

Aiding and Abetting the Use of the U.S. Mail in Furtherance of a Drug Trafficking Offense on the following dates by delivering packages to the post office addressed to the following addressees, containing the following controlled substances, each in violation of Title 21, United States Code, Section 843(b) and Title 18, United States Code, Section 2:

| Proven | Not | Date | Addressee Initials | State | Number of Pills | Controlled Substance | Markings |
|--------|-----|------|--------------------|-------|-----------------|----------------------|----------|
| ☒ | ☐ | 11/22/2016 | M.E. | SD | 5,000 | Fentanyl | M/30 |
| ☒ | ☐ | 11/22/2016 | E.J. | NC | 5,000 | Fentanyl | M/30 |
| ☒ | ☐ | 11/22/2016 | K.V. | NJ | 2,000 | Fentanyl | A 215 |
| ☒ | ☐ | 11/22/2016 | Mr. McG. | WA | 1,000 | Fentanyl | Mixed |
| ☒ | ☐ | 11/22/2016 | E.S. | NC | 500 | Fentanyl | M/30 |
| ☒ | ☐ | 11/22/2016 | R.W. | SC | 500 | Fentanyl | A 215 |
| ☒ | ☐ | 11/22/2016 | G.V. | VA | 100 | Fentanyl | M/30 |
| ☒ | ☐ | 11/22/2016 | E.B. | CT | 100 | Fentanyl | A 215 |
| ☒ | ☐ | 11/22/2016 | M.T. | IL | 100 | Fentanyl | M/30 |
| ☒ | ☐ | 11/22/2016 | B.F. | ND | 100 | Fentanyl | M/30 |
| ☒ | ☐ | 11/22/2016 | C.S. | CO | 50 | Fentanyl | M/30 |
| ☒ | ☐ | 11/22/2016 | S.H. | OH | 50 | Fentanyl | M/30 |
| ☒ | ☐ | 11/22/2016 | B.M. | AL | 50,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/22/2016 | J.S. | CA | 50,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/22/2016 | T.G. | NC | 20,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/22/2016 | M.D. | CA | 2,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/22/2016 | M.T. | VA | 2,000 | Alprazolam | GG 249 |
| ☒ | ☐ | 11/22/2016 | T.D. | IL | 100 | Alprazolam | GG 249 |

10

**1c. The List of Underlying Violations, cont.**

Aiding and Abetting the Attempted Distribution of a Controlled Substance, namely Fentanyl, on or about November 20, 2016, to J.G., aka "trustworthymoney," through A.L., all in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 2;

Proven ☒        Not Proven ☐

Aiding and Abetting the Distribution of Fentanyl on or about April 6, 2016, to E.B., all in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2;

Proven ☒        Not Proven ☐

Aiding and Abetting the Distribution of Fentanyl on or about March 3, 2016, to C.V., all in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2;

Proven ☒        Not Proven ☐

Aiding and Abetting the Distribution of Fentanyl on or about August 3, 2016, to G.K., all in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

Proven ☒        Not Proven ☐

1120

**Count 2—Aiding and Abetting the Importation of Fentanyl**

2. As to Count 2, we find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY     ☒ GUILTY

If you found the defendant not guilty of Count 2, do not answer question 2a. If you found the defendant guilty of Count 2, please answer question 2a:

2a. Having found the defendant guilty of Count 2, do you also unanimously find that the United States proved beyond a reasonable doubt that the amount of controlled substance attributable to the defendant was at least 40 grams of a mixture or substance containing a detectable amount of Fentanyl?

Proven ☒     Not Proven ☐

**Count 3—Aiding and Abetting the Importation of Alprazolam**

3. As to Count 3, we find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY     ☒ GUILTY

**Count 4—Aiding and Abetting the Importation of Fentanyl**

4. As to Count 4, we find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY     ☒ GUILTY

If you found the defendant not guilty of Count 4, do not answer question 4a. If you found the defendant guilty of Count 4, please answer question 4a:

4a. Having found the defendant guilty of Count 4, do you also unanimously find that the United States proved beyond a reasonable doubt that the amount of controlled substance attributable to the defendant was at least 40 grams of a mixture or substance containing a detectable amount of Fentanyl?

Proven ☒     Not Proven ☐

12

**Count 5—Possession of Fentanyl with Intent to Distribute**

5. As to Count 5, we find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY     ☒ GUILTY

If you found the defendant not guilty of Count 5, do not answer question 5a. If you found the defendant guilty of Count 5, please answer question 5a:

5a. Having found the defendant guilty of Count 5, do you also unanimously find that the United States proved beyond a reasonable doubt that the amount of controlled substance attributable to the defendant was at least 400 grams of a mixture or substance containing a detectable amount of Fentanyl?

Proven ☒          Not Proven ☐

**Count 6—Distribution of Fentanyl that Resulted in Death**

6. As to Count 6, we find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY     ☐ GUILTY

**Count 7—Manufacture of Alprazolam**

7. As to Count 7, we find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY     ☒ GUILTY

**Count 8—Adulteration of Drugs**

8. As to Count 8, we find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY     ☒ GUILTY

**Count 9—Adulteration of Drugs**

9. As to Count 9, we find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY     ☒ GUILTY

13

**Count 10—Use of the U.S. Mail in furtherance of a Drug Trafficking Offense**

10. As to Count 10, we find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY    ☒ GUILTY

**Count 11—Conspiracy to Commit Money Laundering**

11. As to Count 11, we find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY    ☒ GUILTY

**Count 12—Money Laundering Promotion or Concealment**

12. As to Count 12, we find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY    ☒ GUILTY

**Count 13—Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity**

13. As to Count 13, we find the defendant AARON MICHAEL SHAMO:

☐ NOT GUILTY    ☒ GUILTY

DATED this ____ day of August, 2019.

JURY FOREPERSON

14

# UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| UNITED STATES OF AMERICA | **UNITED STATES' EXHIBIT LIST** |
|---|---|
| V. | |
| AARON MICHAEL SHAMO | Case Number: 2:16-cr-631 DAK |

| PRESIDING JUDGE | PLAINTIFF'S ATTORNEY | DEFENDANT'S ATTORNEY |
|---|---|---|
| Hon. Dale A. Kimball | Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf | Gregory G. Skordas, Daryl P. Sam, and Kaytlin V. Beckett |
| **TRIAL DATE (S)** | **COURT REPORTER** | **COURTROOM DEPUTY** |
| August 9 – August 30, 2019 | | Elizabeth Toscano |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| | | | | | **Imported drug packages** |
| 1.00 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 1, package caught by CBP addressed to Jensen |
| 1.01 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 1 test and retest result |
| 1.02 | | 5/17/19 | X | 8/9/19 | N-1 package |
| 1.03 | | 5/17/19 | X | 8/9/19 | pictures of N-1 |
| | | | | | |
| 2.00 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 2, package addressed to Gygi |
| 2.01 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 2 test result |
| 2.02 | | 5/17/19 | X | 8/9/19 | N-2 package |
| 2.03 | | 5/17/19 | X | 8/9/19 | pictures of N-2 |
| | | | | | |
| 3.00 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 3, package addressed to Mausia |
| 3.01 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 3 test result |
| 3.02 | | 5/17/19 | X | 8/9/19 | N-3 package |
| | | | | | |
| 4.00 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 166, package addressed to Mausia |
| 4.01 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 166 test result |
| 4.02 | | 5/17/19 | X | 8/9/19 | N-50 package |
| 4.03 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 183, package addressed to Gleave |
| 4.04 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 183 test result |
| 4.05 | | 5/17/19 | X | 8/9/19 | N-67 package |
| | | | | | |
| 5.00 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 12, package addressed to Gygi |
| 5.01 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 12 test result |
| 5.02 | | 5/17/19 | X | 8/9/19 | N-7 package |
| 5.03 | | 5/17/19 | X | 8/9/19 | Pictures of N-7 |

Page 1 of 13

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| 6.00 | | 5/17/19 | X | 8/9/19 | Chart of outbound drug packages from 11/18, 11/20, and 11/22/2016 |
| | | | | | |
| | | | | | **Packages seized on 11/18/2016** |
| 7.00 | | 5/17/19 | X | 8/9/19 | N-8 packages |
| 7.01 | | 5/17/19 | X | 8/9/19 | Picture 11/18/16 packages with Gygi |
| 7.02 | | 5/17/19 | X | 8/9/19 | picture of first seized outbound packages with Gygi |
| 7.03 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 14 |
| 7.04 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 14 test result |
| 7.05 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 15 |
| 7.06 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 15 test and retest result |
| 7.07 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 16 |
| 7.08 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 17 |
| 7.09 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 18 |
| 7.10 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 19 |
| 7.11 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 20 |
| 7.12 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 21 |
| 7.13 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 22 |
| 7.14 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 23 |
| 7.15 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 24 |
| 7.16 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 25 |
| 7.17 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 26 |
| 7.18 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 27 |
| 7.19 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 28 |
| 7.20 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 29 |
| 7.21 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 30 |
| 7.22 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 31 |
| 7.23 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 32 |
| 7.24 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 33 |
| 7.25 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 34 |
| 7.26 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 34 test result |
| 7.27 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 35 |
| 7.28 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 36 |
| 7.29 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 37 |
| 7.30 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 38 |
| 7.31 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 40 |
| 7.32 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 41 |
| 7.33 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 43 |
| 7.34 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 44 |
| 7.35 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 45 |
| 7.36 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 47 |
| 7.37 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 48 |
| 7.38 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 49 |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| 7.39 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 50 |
| 7.40 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 51 |
| 7.41 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 52 |
| 7.42 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 53 |
| 7.43 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 54 |
| 7.44 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 54 test and retest result |
| 7.45 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 55 |
| 7.46 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 56 |
| 7.47 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 57 |
| 7.48 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 58 |
| 7.49 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 59 |
| 7.50 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 60 |
| 7.51 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 61 |
| 7.52 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 62 |
| 7.53 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 63 |
| 7.54 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 64 |
| 7.55 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 64 test result |
| 7.56 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 65 |
| 7.57 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 66 |
| 7.58 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 67 |
| 7.59 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 68 |
| 7.60 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 69 |
| 7.61 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 71 |
| 7.62 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 72 |
| 7.63 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 73 |
| 7.64 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 74 |
| 7.65 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 75 |
| 7.66 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 76 |
| 7.67 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 77 |
| 7.68 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 78 |
| 7.69 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 79 |
| 7.70 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 80 |
| 7.71 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 81 |
| 7.72 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 82 |
| 7.73 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 83 |
| 7.74 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 84 |
| 7.75 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 85 |
| 7.76 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 86 |
| 7.77 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 87 |
| 7.78 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 88 |
| 7.79 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 90 |
| 7.80 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 92 |

Page 3 of 13

1126

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| 7.81 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 93 |
| 7.82 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 94 |
| 7.83 | | 5/17/19 | X | 8/9/19 | pictures of DEA drug exhibits 14-94 |
| 7.84 | | 5/17/19 | X | 8/9/19 | N-11  invoices |
| | | | | | |
| | | | | | **Outbound drug packages seized on 11/20/2016** |
| 8.00 | | 5/17/19 | X | 8/9/19 | N-9  packages |
| 8.01 | | 5/17/19 | X | 8/9/19 | N-10  invoices |
| 8.02 | | 5/17/19 | X | 8/9/19 | pictures of DEA drug exhibits 95-138 |
| 8.03 | | 5/17/19 | X | 8/9/19 | picture of seized outbound drug packages on 11/20/2016 |
| 8.04 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 95 |
| 8.05 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 95 test result |
| 8.06 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 96 |
| 8.07 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 97 test and retest result |
| 8.08 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 97 |
| 8.09 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 98 |
| 8.10 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 99 |
| 8.11 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 100 |
| 8.12 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 101 |
| 8.13 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 102 |
| 8.14 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 103 |
| 8.15 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 104 |
| 8.16 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 105 |
| 8.17 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 106 |
| 8.18 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 107 |
| 8.19 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 108 |
| 8.20 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 109 |
| 8.21 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 110 |
| 8.22 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 111 |
| 8.23 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 113 |
| 8.24 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 114 |
| 8.25 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 115 |
| 8.26 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 116 |
| 8.27 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 117 |
| 8.28 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 118 |
| 8.29 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 121 |
| 8.30 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 122 |
| 8.31 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 123 |
| 8.32 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 123 test result |
| 8.33 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 124 |
| 8.34 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 125 |
| 8.35 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 126 |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| 8.36 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 127 |
| 8.37 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 128 |
| 8.38 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 129 |
| 8.39 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 130 |
| 8.40 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 131 |
| 8.41 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 132 |
| 8.42 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 133 |
| 8.43 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 134 |
| 8.44 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 135 |
| 8.45 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 136 |
| 8.46 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 137 |
| 8.47 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 138 |
| | | | | | |
| | | | | | **Out-bound drug packages intercepted at the post office on 11/22/16** |
| 9.00 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 184 |
| 9.01 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 185 |
| 9.02 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 185 test and retest result |
| 9.03 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 186 |
| 9.04 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 187 |
| 9.05 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 188 |
| 9.06 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 189 |
| 9.07 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 190 |
| 9.08 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 191 |
| 9.09 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 192 |
| 9.10 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 193 |
| 9.11 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 193 test result |
| 9.12 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 194 |
| 9.13 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 195 |
| 9.14 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 198 |
| 9.15 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 199 |
| 9.16 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 200 |
| 9.17 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 201 |
| 9.18 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 202 |
| 9.19 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 203 |
| 9.20 | | 5/17/19 | X | 8/9/19 | pictures of DEA drug exhibits 184-203 |
| 9.21 | | 5/17/19 | X | 8/9/19 | N-68 invoices from packages |
| 9.22 | | 5/17/19 | X | 8/9/19 | N-69 packages |
| 9.23 | | 5/17/19 | X | 8/9/19 | 20 shipping labels from seized packages from the post office on 11/22/16 |
| | | | | | |
| | | | | | **Drugs from the Tonge/Bustin residence on 11/22/2016** |
| 10.00 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 139 |
| 10.01 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 139 test result |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| 10.02 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 140 |
| 10.03 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 141 |
| 10.04 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 142 |
| 10.05 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 143 |
| 10.06 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 144 |
| 10.07 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 145 |
| 10.08 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 146 |
| 10.09 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 147 |
| 10.10 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 148 |
| 10.11 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 149 |
| 10.12 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 150 |
| 10.13 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 151 |
| 10.14 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 152 |
| 10.15 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 153 |
| 10.16 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 154 |
| 10.17 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 155 |
| 10.18 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 156 |
| 10.19 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 157 |
| 10.20 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 158 |
| 10.21 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 159 |
| 10.22 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 160 |
| 10.23 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 161 |
| 10.24 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 162 |
| | | | | | |
| | | | | | **Non-drug evidence seized at Tonge/Bustin residence on 11/22/2016** |
| 11.00 | | 5/17/19 | X | 8/9/19 | Pictures from N-45 |
| 11.01 | | 5/17/19 | X | 8/9/19 | N-36 |
| 11.02 | | 5/17/19 | X | 8/9/19 | N-37 |
| 11.03 | | 5/17/19 | X | 8/9/19 | N-42 |
| 11.04 | | 5/17/19 | X | 8/9/19 | N-43 |
| 11.05 | | 5/17/19 | X | 8/9/19 | N-44 |
| | | | | | |
| | | | | | **Drugs from Shamo's residence on Titian Way on 11/22/2016** |
| 12.00 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 168 |
| 12.01 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 169 |
| 12.02 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 170 |
| 12.03 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 171 |
| 12.04 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 172 |
| 12.05 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 173 |
| 12.06 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 173 test and retest result |
| 12.07 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 174 |
| 12.08 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 175 |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| 12.09 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 175 test result |
| 12.10 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 176 |
| 12.11 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 177 |
| 12.12 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 178 |
| 12.13 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 178 test result |
| 12.14 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 179 |
| 12.15 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 179 test result |
| 12.16 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 180 |
| 12.17 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 180 test result |
| 12.18 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 181 |
| 12.19 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 181 test result |
| | | | | | |
| | | | | | **Non-drug evidence seized at Shamo's residence on Titian Way on 11/22/2016** |
| 13.00 | | 5/17/19 | X | 8/9/19 | Video from Titian Way SW |
| 13.01 | | 5/17/19 | X | 8/9/19 | misc. pictures from Titian way SW |
| 13.02 | | 5/17/19 | X | 8/9/19 | N-53 |
| 13.03 | | 5/17/19 | X | 8/9/19 | N-57 |
| 13.04 | | 5/17/19 | X | 8/9/19 | N-60 |
| 13.05 | | 5/17/19 | X | 8/9/19 | N-61 |
| 13.06 | | 5/17/19 | X | 8/9/19 | N-66 |
| 13.07 | | 5/17/19 | X | 8/9/19 | N-71 |
| 13.08 | | 5/17/19 | X | 8/9/19 | N-73 Pill Press |
| 13.09 | | 5/17/19 | X | 8/9/19 | Pictures from Titian Way |
| 13.10 | | 5/17/19 | X | 8/9/19 | Picture from Titian way of money bag |
| 13.11 | | 5/17/19 | X | 8/9/19 | picture of money on conference room table |
| 13.12 | | 5/17/19 | X | 8/9/19 | N-81    pill press |
| 13.13 | | 5/17/19 | X | 8/9/19 | N-82    box of dies |
| 13.14 | | 5/17/19 | X | 8/9/19 | N-83    side of crate |
| | | | | | |
| | | | | | **Items found on Shamo's Computer and Phones** |
| 14.00 | | 5/17/19 | X | 8/9/19 | iphone 6S Facebook Messenger unknown recipeint. btc wallets and transactions. |
| 14.01 | | 5/17/19 | X | 8/9/19 | iPhone 6S FB Messenger with Noriega. btc trades training. |
| 14.02 | | 5/17/19 | X | 8/9/19 | iphone 6S MMS unknown recipeint. multiple trades with one person, 435 number. |
| 14.03 | | 5/17/19 | X | 8/9/19 | iphone 6S MMS unknown recipeint. multiple trades with one person. 951 number. |
| 14.04 | | 5/17/19 | X | 8/9/19 | iPhone 6S MMS with Allyx. btc launder through t shirt biz. |
| 14.05 | | 5/17/19 | X | 8/9/19 | iPhone 6S MMS with Allyx. btc trade with biggest trader. |
| 14.06 | | 5/17/19 | X | 8/9/19 | iPhone 6S MMS with Allyx. btc trades and other businesses. |
| 14.07 | | 5/17/19 | X | 8/9/19 | iPhone 6S MMS with Allyx. buying stamps for $7k. |
| 14.08 | | 5/17/19 | X | 8/9/19 | iPhone 6S MMS with Noriega. buying stamps again. |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| 14.09 | | 5/17/19 | X | 8/9/19 | iPhone 6S MMS with Noriega. buying stamps. |
| 14.10 | | 5/17/19 | X | 8/9/19 | iPhone 6S MMS with Luke. no TOR on iPhone. just Telegram. |
| 14.11 | | 5/17/19 | X | 8/9/19 | iPhone 6S MMS with Luke. work when girls leave. |
| 14.12 | | 5/17/19 | X | 8/9/19 | iPhone 6s Telegram messages with Drew Nov 2016. |
| 14.13 | | 5/17/19 | X | 8/9/19 | iPhone 6s Telegram messages with Noriega. re ordering press ingredients and supplies. payment with whole food cards. |
| 14.14 | | 5/17/19 | X | 8/9/19 | iPhone 6s Telegram messages with Julian M re multiple packages. |
| 14.15 | | 5/17/19 | X | 8/9/19 | iPhone 6s Telegram messages with Mario Noble. |
| 14.16 | | 5/17/19 | X | 8/9/19 | iPhone 6S Telegram with Dan Allen. recruit as a drop |
| 14.17 | | 5/17/19 | X | 8/9/19 | iPhone 6S Telegram with Dan Allen. recruit as a drop. part 2. |
| 14.18 | | 5/17/19 | X | 8/9/19 | iPhone 6S. note. To do list. Chris owes 95K. t shirts. fire Noriega. |
| 14.19 | | 5/17/19 | X | 8/9/19 | iPhone 6S. notes. make 250K easy. press with Luke. Quality control. |
| 14.20 | | 5/17/19 | X | 8/9/19 | iphone 7  MMS with unknown . Nov 2016 btc transactions. |
| 14.21 | | 5/17/19 | X | 8/9/19 | iphone 7 Facebook Messenger with unknown regarding btc transfers and deals. Facebook Messenger Messages |
| 14.22 | | 5/17/19 | X | 8/9/19 | iPhone 7. Money Counter Video clip |
| 14.23 | | 5/17/19 | X | 8/9/19 | iPhone 7 MMS with MMS with Roy re boat. part 1 |
| 14.24 | | 5/17/19 | X | 8/9/19 | iPhone 7 MMS with MMS with Roy re boat. part 2 |
| 14.25 | | 5/17/19 | X | 8/9/19 | iPhone 7 MMS with MMS with Roy re buying boat with btc. |
| 14.26 | | 5/17/19 | X | 8/9/19 | iPhone 7 MMS with MMS with Roy re buying truck from Penrose. btc. iOS iMessage_SMS_MMS |
| 14.27 | | 5/17/19 | X | 8/9/19 | iPhone 7 MMS with MMS with Roy. Last btc trade before arrest. |
| 14.28 | | 5/17/19 | X | 8/9/19 | "iPhone 6s. 1/5 inventory ""30A749""" |
| 14.29 | | 5/17/19 | X | 8/9/19 | iMac. Note: I created an empire…Chris owes 95k |
| 14.30 | | 5/29/19 | X | 8/9/19 | iMac. Pharma-Master Orders (pg 1-1984) |
| 14.31 | | 5/17/19 | X | 8/9/19 | iMac. Reddit chart, darknet markets subreddit, articles re: drug busts |
| 14.32 | | 5/17/19 | X | 8/9/19 | iMac. Chart showing sites visited that aid charged offenses |
| 14.33 | | 5/17/19 | X | 8/9/19 | iMac. Chrome passwords list |
| 14.34 | | 5/17/19 | X | 8/9/19 | iMac. ""New Text Document"" |
| 14.35 | | 5/17/19 | X | 8/9/19 | iMac. Supply.txt |
| 14.36 | | 5/17/19 | X | 8/9/19 | iMac.results.txt |
| 14.37 | | 5/17/19 | X | 8/9/19 | iMac. New key.txt |
| 14.38 | | 5/17/19 | X | 8/9/19 | iMac. Opiod potency comparison. Docx |
| 14.39 | | 5/17/19 | X | 8/9/19 | iMac. How to ship drugs. Pdf (june 2015) |
| 14.40 | | 5/29/19 | X | 8/9/19 | iMac. 8-4.txt |
| 14.41 | | 5/17/19 | X | 8/9/19 | iMac. Stuff I Need |
| 14.42 | | 5/17/19 | X | 8/9/19 | iMac. 100% Original Money Laundering |
| 14.43 | | 5/17/19 | X | 8/9/19 | iMac. Pass.txt |
| 14.44 | | 5/17/19 | X | 8/9/19 | iMac. Google search terms chart |
| 14.45 | | 5/17/19 | X | 8/9/19 | iMac. Video for Western Union payment to Jackchemfactory |
| 14.46 | | 5/17/19 | X | 8/9/19 | iMac. Pharma-Master Pharma-Master@4life.com(67D9E2E5F6A08C4F)_pub_sec.asc |
| 14.47 | | 5/17/19 | X | 8/9/19 | iMac. pharma-master pharma-master@home.com(FA8503FE656BC61A)_pub_sec.asc |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | **Items Captured from Dark Net and Sigaint** |
| 15.00 | | 5/30/19 | X | 8/9/19 | Feedback PDF 1-366 |
| 15.01 | | 5/30/19 | X | 8/9/19 | Feedback negative and neutral |
| 15.02 | | 5/30/19 | X | 8/9/19 | Pharmamaster.xls |
| 15.02 | | 5/30/19 | X | 8/9/19 | Pharmamaster feedback summary |
| 15.03 | | 5/29/19 | X | 8/9/19 | 9/26/2016-11/22/2016 Postal labels from Sigaint |
| 15.04 | | 5/29/19 | X | 8/9/19 | Screenshots of what they sell on Alphabay |
| 15.05 | | 5/29/19 | X | 8/9/19 | Sigaint Inbox screenshot of Passthepeas |
| 15.06 | | 5/29/19 | X | 8/9/19 | DRW99 sent box |
| 15.07 | | 5/29/19 | X | 8/9/19 | Passthepeas sent box |
| 15.08 | | 5/29/19 | X | 8/9/19 | drw99 trash folder |
| 15.09 | | 5/29/19 | X | 8/9/19 | Orders of 100 M30s |
| 15.10 | | 5/29/19 | X | 8/9/19 | Orders of 250 M30s |
| 15.11 | | 5/29/19 | X | 8/9/19 | Orders of 500 M30s |
| 15.12 | | 5/29/19 | X | 8/9/19 | Orders of 1,000 M30s |
| 15.13 | | 5/29/19 | X | 8/9/19 | Orders of 1,100 M30s |
| 15.14 | | 5/29/19 | X | 8/9/19 | Orders of 2,000 M30s |
| 15.15 | | 5/29/19 | X | 8/9/19 | Orders of 5,000 M30s |
| 15.16 | | 5/29/19 | X | 8/9/19 | Orders of 10,000 M30s |
| 15.17 | | 5/29/19 | X | 8/9/19 | Orders of 20,000 M30s |
| 15.18 | | 5/29/19 | X | 8/9/19 | Sales to Trustworthy Money for 10,000 oxy pills |
| 15.19 | | 5/29/19 | X | 8/9/19 | Sales to Trustworthy Money for 2,000 oxy pills |
| 15.20 | | 5/29/19 | X | 8/9/19 | Orders of 1000 Alprazolam (Xanax) |
| 15.21 | | 5/29/19 | X | 8/9/19 | Orders of 2,000 Alprazolam (Xanax) |
| 15.22 | | 5/29/19 | X | 8/9/19 | Orders of 5,000 Alprazolam (Xanax) |
| 15.23 | | 5/29/19 | X | 8/9/19 | Orders of 10,000 Alprazolam (Xanax) |
| 15.24 | | 5/29/19 | X | 8/9/19 | Orders of 20,000 Alprazolam (Xanax) |
| 15.25 | | 5/29/19 | X | 8/9/19 | Stakbandz - "People are getting sick" |
| 15.26 | | 5/29/19 | X | 8/9/19 | Mario Noble interview with screen recording |
| 15.27 | | 5/29/19 | X | 8/9/19 | Pharma-Master Dark Web (Get USPS links) |
| | | | | | |
| | | | | | **Financial Exhibits** |
| 16.00 | | 5/29/19 | X | 8/9/19 | cryptocurrency wallet screen shots |
| 16.01 | | 5/17/19 | X | 8/9/19 | Venmo Subpoena Return re: Aaron Shamo |
| 16.02 | | 5/17/19 | X | 8/9/19 | Venmo Summary Spreadsheet |
| 16.03 | | 5/17/19 | X | 8/9/19 | Western Union Subpoena Return re: Aaron Shamo |
| 16.04 | | 5/17/19 | X | 8/9/19 | Pictures of money Shamo's parents turned over |
| 16.05 | | 5/17/19 | X | 8/9/19 | AFCU - Bit Wire on 4-19-16 - Crandall |
| 16.06 | | 5/17/19 | X | 8/9/19 | AFCU - Bit Wire on 8-4-16 - Crandall |
| 16.07 | | 5/17/19 | X | 8/9/19 | AFCU - Bit Wire on 9-22-16 - Crandall |
| 16.08 | | 5/17/19 | X | 8/9/19 | AFCU picture of Wilkes depositing into Crandall's account |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| 16.09 | | 5/17/19 | X | 8/9/19 | AFCU picture of Shamo depositing into Crandall's account |
| 16.10 | | 5/17/19 | X | 8/9/19 | DWS Wage data for Aaron Shamo |
| 16.11 | | 5/17/19 | X | 8/9/19 | iDrive retail purchase agreement (physical Exhibit in IRS custody) |
| 16.12 | | 5/17/19 | X | 8/9/19 | iDrive copy of checks (physical Exhibit in IRS custody) |
| 16.13 | | 5/17/19 | X | 8/9/19 | Idrive copy of cash (physical Exhibit in IRS custody) |
| 16.14 | | 5/17/19 | X | 8/9/19 | USAA Check from Gygi to Penrose |
| 16.15 | | 5/17/19 | X | 8/9/19 | USAA records for Gygi's account |
| 16.16 | | 5/17/19 | X | 8/9/19 | Three pictures of Paz's cash |
| 16.17 | | 5/17/19 | X | 8/9/19 | Picture of Shamo's cash at Loomis |
| 16.18 | | 5/17/19 | X | 8/9/19 | Wells Fargo records for Shamo's account xx4284 |
| 16.19 | | 5/17/19 | X | 8/9/19 | Wells Fargo: $14K Check # 1001 from Shamo to iDrive |
| 16.20 | | 5/17/19 | X | 8/9/19 | Wells Fargo: xx4284 Summary Spreadsheet |
| 16.21 | | 5/17/19 | X | 8/9/19 | Wells Fargo: xx4284 Cash/Non-cash Summary Spreadsheet |
| 16.22 | | 8/15/19 | X | 8/15/19 | AFCU Statement 1-1-16 thr 12-31-16 |
| | | | | | |
| | | | | | **Misc.** |
| 17.00 | | 5/17/19 | X | 8/9/19 | Crandall Post Office Purchases |
| 17.01 | | 5/17/19 | X | 8/9/19 | N-48 Gygi recording and transcript |
| 17.02 | | 5/17/19 | X | 8/9/19 | invoice from Press Club Nutrition for Microcrystalline Cellulose to Gygi |
| 17.03 | | 5/17/19 | X | 8/9/19 | invoice from Press Club Nutrition for Microcrystalline Cellulose to Jensen |
| 17.04 | | 5/29/19 | X | 8/9/19 | pictures of texts between Gygi and Bustin |
| 17.05 | | 5/29/19 | X | 8/9/19 | the distribution map; several images |
| 17.06 | | 5/17/19 | X | 8/9/19 | Photos of co-conspirators |
| 17.07 | | 5/30/19 | X | 8/9/19 | PPT slides from Special Agent Guy Gino (demonstrative) |
| 17.08 | | 5/29/19 | X | 8/9/19 | Noble's pre-written responses |
| 17.09 | | 5/17/19 | X | 8/9/19 | Ebay Items Won by Shamo |
| | | | | | |
| | | | | | **Daly City** |
| 18.00 | | 5/29/19 | X | 8/9/19 | Daly City Info |
| 18.01 | | 5/30/19 | X | 8/9/19 | R.K. pictures |
| 18.02 | | 5/30/19 | X | 8/9/19 | R.K. toxicology report by Bill Posey |
| | | | | | |
| | | | | | **Trustworthy Money** |
| 19.00 | | 5/30/19 | X | 8/9/19 | pictures of trustworthy Money's phone memo with seed recovery |
| 19.01 | | 5/30/19 | X | 8/9/19 | Trustworthy Money profile on AlphaBay |
| 19.02 | | 5/30/19 | X | 8/9/19 | Summary exhibit of Trustworthy Money feedback for all sellers. |
| 19.03 | | 5/30/19 | X | 8/9/19 | Picture of J. Gillespie and his money |
| | | | | | |
| | | | | | **843(b)** |
| 20.00 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 210 |
| 20.01 | | 5/17/19 | X | 8/9/19 | DEA drug ex. 210, test and retest result |
| | | | | | |

1133

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| | | | | | **Hotmail** |
| 21.00 | | 5/29/19 | X | 8/9/19 | Airshamu4@hotmail.com |
| 21.01 | | 5/29/19 | X | 8/9/19 | Amazon.com |
| 21.02 | | 5/29/19 | X | 8/9/19 | Billing@paypal.com |
| 21.03 | | 5/29/19 | X | 8/9/19 | Cloudbet.com |
| 21.04 | | 5/29/19 | X | 8/9/19 | Coinsfer.com |
| 21.05 | | 5/29/19 | X | 8/9/19 | Customerservice@rtp-labs.com |
| 21.06 | | 5/29/19 | X | 8/9/19 | Diesel Online Store |
| 21.07 | | 5/29/19 | X | 8/9/19 | Drewcrandall1@gmail.com |
| 21.08 | | 5/29/19 | X | 8/9/19 | Ebay@ebay.com |
| 21.09 | | 5/29/19 | X | 8/9/19 | Email@allegiantdeals.com |
| 21.10 | | 5/29/19 | X | 8/9/19 | E-trade Alerts |
| 21.11 | | 5/29/19 | X | 8/9/19 | Eztest.com |
| 21.12 | | 5/29/19 | X | 8/9/19 | gc-orders@gc.email.amazon.com |
| 21.13 | | 5/29/19 | X | 8/9/19 | Gyft.com |
| 21.14 | | 5/29/19 | X | 8/9/19 | Hotels.com |
| 21.15 | | 5/29/19 | X | 8/9/19 | Info@allbtc.com |
| 21.16 | | 5/29/19 | X | 8/9/19 | info@miamiclubnews.com |
| 21.17 | | 5/29/19 | X | 8/9/19 | Investorshub.com |
| 21.18 | | 5/29/19 | X | 8/9/19 | Jermylapin@hotmail.com |
| 21.19 | | 5/29/19 | X | 8/9/19 | JMBullion.com |
| 21.20 | | 5/29/19 | X | 8/9/19 | Joanie.bates@Mollymaid.com |
| 21.21 | | 5/29/19 | X | 8/9/19 | Kos_amy@hotmail.com |
| 21.22 | | 5/29/19 | X | 8/9/19 | Mamun_mailbox@yahoo.com |
| 21.23 | | 5/29/19 | X | 8/9/19 | Marketplace-messages@amazon.com |
| 21.24 | | 5/29/19 | X | 8/9/19 | Memberservices@ticketfly.com |
| 21.25 | | 5/29/19 | X | 8/9/19 | Microsoft account team |
| 21.26 | | 5/29/19 | X | 8/9/19 | Milespenrose@gmail.com |
| 21.27 | | 5/29/19 | X | 8/9/19 | Moneygram.com |
| 21.28 | | 5/29/19 | X | 8/9/19 | Northstamp@aol.com |
| 21.29 | | 5/29/19 | X | 8/9/19 | Orders@24tix.com |
| 21.30 | | 5/29/19 | X | 8/9/19 | Overstock.com |
| 21.31 | | 5/29/19 | X | 8/9/19 | pn44cmmjm5wrf1n@marketplace.amazon.com |
| 21.32 | | 5/29/19 | X | 8/9/19 | RCWilley.com |
| 21.33 | | 5/29/19 | X | 8/9/19 | Receipts@uber.com |
| 21.34 | | 5/29/19 | X | 8/9/19 | Service@Paypal.com |
| 21.35 | | 5/29/19 | X | 8/9/19 | Southwest Airlines |
| 21.36 | | 5/29/19 | X | 8/9/19 | Stamps.com |
| 21.37 | | 5/29/19 | X | 8/9/19 | Tabletpressclub.com |
| 21.38 | | 5/29/19 | X | 8/9/19 | Ticketsnow.com |
| 21.39 | | 5/29/19 | X | 8/9/19 | Uline.com |
| 21.40 | | 5/29/19 | X | 8/9/19 | USPS.com |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| 21.41 | | 5/29/19 | X | 8/9/19 | Veldtgold.com |
| 21.42 | | 5/29/19 | X | 8/9/19 | Western Union |
| 21.43 | | 5/29/19 | X | 8/9/19 | Wintrillions.com |
| 21.44 | | 5/29/19 | X | 8/9/19 | ZP-9A Mini Rotary Press Machine |
| | | | | | |
| 22.00 | | 5/17/19 | X | 8/9/19 | **Items from Paz's computer** |
| 22.01 | | 5/17/19 | X | 8/9/19 | Bitcoins |
| 22.02 | | 5/17/19 | X | 8/9/19 | Boat |
| 22.03 | | 5/17/19 | X | 8/9/19 | Conspicuous Consumption. Lifestyle |
| 22.04 | | 5/17/19 | X | 8/9/19 | DHL |
| 22.05 | | 5/17/19 | X | 8/9/19 | Notes |
| 22.06 | | 5/17/19 | X | 8/9/19 | Phone Apps Screenshot |
| 22.07 | | 5/17/19 | X | 8/9/19 | Reddit |
| 22.08 | | 5/17/19 | X | 8/9/19 | Telegram 1 |
| | | | | | Telegram 2 |
| | | | | | |
| | | | | | **Plea and Immunity Agreements** |
| 23.00 | | 5/17/19 | X | 8/9/19 | Bustin SIAP |
| 23.01 | | 5/17/19 | X | 8/9/19 | Crandall SIAP |
| 23.02 | | 5/17/19 | X | 8/9/19 | Gygi SIAP |
| 23.03 | | 5/17/19 | X | 8/9/19 | Jensen Pocket Immunity |
| 23.04 | | 5/17/19 | X | 8/9/19 | Gleave Pocket Immunity |
| 23.05 | | 5/17/19 | X | 8/9/19 | Noble SIAP |
| 23.06 | | 5/17/19 | X | 8/9/19 | Paz SIAP |
| 23.07 | | 5/17/19 | X | 8/9/19 | Tonge SIAP |
| | | | | | |
| | | | | | **FDA Exhibits** |
| 24.00 | | 5/17/19 | X | 8/9/19 | Authenticate Oxycodone pills provided to FDA from manufacturers for comparison |
| 24.01 | | 5/17/19 | X | 8/9/19 | Photo of Item 1 - A215 Oxycodone Pills provided to FDA (seized from Openview Lane) |
| 24.02 | | 5/17/19 | X | 8/9/19 | Photo of Item 8 - M30 Oxycodone Pills provided to FDA (seized from Openview Lane) |
| 24.03 | | 5/17/19 | X | 8/9/19 | Photo of Item 14 - GG249 Alprazolam Pills provided to FDA (seized from Openview Lane) |
| 24.04 | | 5/17/19 | X | 8/9/19 | Photo of Item20-A2 - Alprazolam GG249 Tablet Punch Tips provided to FDA (seized from Titian Way) |
| 24.05 | | 5/17/19 | X | 8/9/19 | Photo of Item 21-A1 - Oxycodone M30 Tablet Punch Tips provided to FDA (seized from Titian Way) |
| 24.06 | | 5/17/19 | X | 8/9/19 | Tables: FT-IR Spectroscopy Results and Conclusions for Items 1-5, 7, and 11 |
| 24.07 | | 5/17/19 | X | 8/9/19 | Tables: FT-IR Spectroscopy Results and Conclusions for Items 6, 8, 9, 10, 12, and 13 |
| 24.08 | | 5/17/19 | X | 8/9/19 | Tables: FT-IR Spectroscopy Results and Conclusions for Items 14-19 |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| 24.09 | | 5/17/19 | X | 8/9/19 | Comparison Photos of Tablet Punch Tip (Item 22A2) to Alprazolam GG249 Mikrosil Impression (Item 22, Sub A2-3) to GG249 Alprazolam Tablet (Item 17-T1) |
| 24.10 | | 5/17/19 | X | 8/9/19 | Table A1 Profile Form Analysis 11:  Mikrosil Tablet Punch Tip (Item 20, Sub A2-3) vs. Item 14-T3 (2 pages) |
| 24.11 | | 5/17/19 | X | 8/9/19 | Table A2 Profile Form Analysis 18:  Alprazolam GG249 Tablet Punch Tip Visual Defects Translates to Pressed Tablets |
| 24.12 | | 5/17/19 | X | 8/9/19 | Table A2 Profile Form Analysis 20: Item 14-T3 vs. Item 18-T1 (Alprazolam GG249 seized at Openview Ln vs. Titian Way) (2 pages) |
| 24.13 | | 5/17/19 | X | 8/9/19 | Table A2 Profile Form Analysis 21:  Item 14-T3 vs. Item 19-T1 (Alprazolam GG249 seized at Openview Ln vs. USPS Blue Bin) (2 pages) |
| 24.14 | | 5/17/19 | X | 8/9/19 | Table A2 Profile Form Analysis 22: Alprazolam GG249 Mikrosil Tablet Punch Tip (Item 20, Sub A2-3) vs. Authentic Alprazolam GG249 Pill (482775_S1_T1) (2 pages) |
| 24.15 | | 5/17/19 | X | 8/9/19 | Table B1 Profile Form Analysis 11:  Oxycodone M30 Mikrosil Tablet Punch Tip (Item 21, Sub A1-3) vs. Item 8-T1 (2 pages) |
| 24.16 | | 5/17/19 | X | 8/9/19 | Table B1 Profile Form Analysis 14:  Oxycodone M30 Mikrosil Tablet Punch Tip (Item 21, Sub A1-3) vs. Item 12-T1 (2 pages) |
| 24.17 | | 5/17/19 | X | 8/9/19 | Table B1 Profile Form Analysis 15:  Oxycodone M30 Mikrosil Tablet Punch Tip (Item 21, Sub A1-3) vs. Item 13-T1 (2 pages) |
| 24.18 | | 5/17/19 | X | 8/9/19 | Mallinckrodt Oxycodone Hydrochloride Tablets USP - Manufacturer Product Information (proprietary information redacted) |
| 24.19 | | 5/17/19 | X | 8/9/19 | Activis Oxycodone Hydrochloride Tablets - Manufacturer Product Information (proprietary information redacted) |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

AO 187 (Rev. 7/87) Exhibit and Witness List

# UNITED STATES DISTRICT COURT

## FOR THE  DISTRICT OF       UTAH

UNITED STATES OF AMERICA
V.
AARON MICHAEL SHAMO

## WITNESS LIST

Case Number:  2:16-CR-00631-001-DAK

| PRESIDING JUDGE | PLAINTIFF'S ATTORNEY | DEFENDANT'S ATTORNEY |
|---|---|---|
| Dale A. Kimball | S. Michael Gadd, Vernon G. Stejskal, and Kent A. Burggraaf | Gregory G. Skordas, Daryl P. Sam, and Kaytlin V. Beckett |

| TRIAL DATE (S) | COURT REPORTER | COURTROOM DEPUTY |
|---|---|---|
| August 12, 2019 – August 30, 2019 | | Elizabeth Toscano |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| * | | 8/12/2019 | | | WITNESS: Jaime Pimentel, Officer, CBP |
| * | | 8/12/2019 | | | WITNESS: Christopher Amidan, Special Agent, DEA |
| * | | 8/12/2019 | | | WITNESS: Ryan Jensen |
| * | | 8/12/2019 | | | WITNESS: Sean Michael Gygi |
| * | | 8/12/2019 | | | WITNESS: Ely Hebert, Special Agent, DEA |
| * | | 8/13/2019 | | | WITNESS: Jessica Gleave |
| * | | 8/13/2019 | | | WITNESS: Joshua Fife, Detective, West Valley City Police Department |
| * | | 8/13/2019 | | | WITNESS: Michael Hamideh,, Retired Task Force Officer, DEA |
| * | | 8/13/2019 | | | WITNESS: Alexandrya Tonge |
| * | | 8/14/2019 | | | WITNESS: Katherine Lauren Anne Bustin |
| * | | 8/14/2019 | | | WITNESS: Eric Breyer, Special Agent |
| * | | 8/14/2019 | | | WITNESS: Cameron Thor, Sargeant, Park City Police Department |
| * | | 8/14/2019 | | | WITNESS: Jacob Nattress, Task Force Officer, DEA |
| * | | 8/15/2019 | | | WITNESS: Drew Wilson Crandall |
| * | | 8/15/2019 | | | WITNESS: Mario Noble |
| * | | 8/16/2019 | | | WITNESS: Guy Gino, Special Agent, HSI |
| * | | 8/16/2019 | | | WITNESS: Robin Biundo, Intelligence Analyst, HSI |
| * | | 8/16/2019 | | | WITNESS: Tina Young |
| * | | 8/16/2019 | | | WITNESS:  Lance Howell, Inspector, USPIS |
| * | | 8/16/2019 | | | WITNESS: Megan Moore, Inspector, USPIS |
| * | | 8/19/2019 | | | WITNESS: Andrea Brandon, Inspector, USPIS |

* Include a notation as to the location of any exhibit not held with the case file or not available because of size.

AO 187A (Rev. 7/87)     **EXHIBIT AND WITNESS LIST – CONTINUATION**

| United States of America | vs. | Aaron Michael Shamo | CASE NO. 2:16-cr-00631-001-DAK |
|---|---|---|---|

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| * | | 8/19/2019 | | | WITNESS: Emily Oblath, DEA Western Regional Laboratory |
| * | | 8/19/2019 | | | WITNESS: Danielle Farrell, DEA Western Regional Laboratory |
| * | | 8/19/2019 | | | WITNESS: Keith Chan, DEA Western Regional Laboratory |
| * | | 8/19/2019 | | | WITNESS: Son Hoang, DEA Western Regional Laboratory |
| * | | 8/19/2019 | | | WITNESS: David Anthony Slagle, Special Agent, HSI |
| * | | 8/20/2019 | | | WITNESS: Virginia Keys, Special Agent, FDA OCI |
| * | | 8/20/2019 | | | WITNESS: Tori Grace |
| * | | 8/20/2019 | | | WITNESS: Sandra Sabins, Officer, Daly City Police Department |
| * | | 8/20/2019 | | | WITNESS: Bill Posey, Toxicologist |
| * | | 8/20/2019 | | | WITNESS: Thomas Rogers, M.D. |
| * | | 8/21/2019 | | | WITNESS: Stacey Hail, MD, FACMT |
| * | | 8/21/2019 | | | WITNESS: Brennda Kurstin |
| * | | 8/21/2019 | | | WITNESS: Jeff Fletcher, Special Agent, IRS CI |
| * | | 8/21/2019 | | | WITNESS: Jeff Bryan, Retired Special Agent, DEA |
| * | | 8/22/2019 | | | WITNESS: Stanley Frank Platek, FDA Forensic Chemistry Center |
| * | | 8/22/2019 | | | WITNESS: Nicola Ranieri, FDA Forensic Chemistry Center |
| * | | 8/22/2019 | | | WITNESS: Adam Lanzarotta, Ph.D., FDA Forensic Chemistry Center |
| * | | 8/22/2019 | | | WITNESS: Heather Anne McCauley, FDA Forensic Chemistry Center |
| * | | 8/22/2019 | | | WITNESS: Arthur Simone, M.D., Ph.D., FDA |
| * | | 8/22/2019 | | | WITNESS: Adam Koeneman, Special Agent, HSI |
| * | | 8/23/2019 | | | WITNESS: Jonathan Luke Paz |
| * | | 8/23/2019 | | | WITNESS: Daniel Ashment, Special Agent, HSI |
| | * | 8/26/2019 | | | WITNESS: Rebecca Shamo |
| | * | 8/26/2019 | | | WITNESS: Stephanie Shamo Arbelaez |
| | * | 8/27/2019 | | | WITNESS: Aaron Shamo |
| | | | | | |
| | | | | | |

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: kburggraaf@agutah.gov / kent.burggraaf@usdoj.gov

---

### IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH, CENTRAL DIVISION

---

| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
|---|---|
| Plaintiff, | MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS |
| vs. | |
| AARON MICHAEL SHAMO, | Judge Dale A. Kimball |
| Defendant. | |

---

The United States, by and through Kent A. Burggraaf, Special Assistant United States

Attorney, provides the following memorandum in opposition to the Defendant's Motion to Dismiss

(Doc. 275).   The United States opposes the Defendant's motion in that (1) it does not outline

prosecutorial misconduct as alleged, (2) it does not show the United States used undue influence

to dissuade witnesses from testifying, and (3) the Defendant did not make a plausible showing that

Ms. Noriega's, Mr. Penrose's, or Ms. Grant's testimony would have been material and favorable

to his defense, and not merely cumulative to other witnesses' testimony.

//

//

STATEMENT OF RELEVANT FACTS

1.     On May 5, 2017, co-defendant Drew Crandall and his fiancé, Sasha Grant, were interviewed by law enforcement in Hawaii.   HSI Special Agents Ashment and Koeneman interviewed Mr. Crandall, while Ms. Grant was interviewed by other agents.

2.     On or about June 8, 2017, counsel for the United States and Ms. Grant's attorney spoke by phone about Ms. Grant cooperating with law enforcement, by way of one or more debrief interviews.  The United States sent a proposed proffer agreement to Ms. Grant's attorney to review. At the time, counsel for the United States expressed that he did not intend to seek an indictment against Ms. Grant.[1]

3.     On June 16, 2017, Sasha Grant entered into a proffer agreement with the United States (sometimes referred to as a "Queen-for-a-day" agreement) and submitted to a pair of interviews by law enforcement.  Ms. Grant and her attorney were provided this agreement in advance of the meeting with law enforcement to consider.   The cooperation agreement included the following standard terms:

> 1.     During the proffer, Ms. Grant agrees to provide accurate, truthful, and complete information, and not to withhold any information concerning the matters about which the United States inquires…
>
> 2.     Except as set forth in paragraphs 3 and 4 below, no statements Ms. Grant makes during her proffer will be admissible against her in the Government's case-in-chief in any future federal criminal proceeding, other than in a prosecution for perjury, false statement, or obstruction of justice.  This is the only limitation on the use of these statements.
>
> 3.     Notwithstanding the foregoing paragraph, there will be no limitation on the right of the United States to make derivative use of the information provided by Ms. Grant during her proffer…
>
> 4.     The United States will be free to use the statements and information provided by Ms. Grant, including any information which may be directly or indirectly derived

---

[1] Ms. Grant was not listed as a witness for the United States.

2

therefrom, for impeachment, cross-examination, or rebuttal should Ms. Grant testify in a future civil or criminal proceeding or grand jury session. Thus, in the event Ms. Grant is at any time a witness at a trial or before a grand jury, and she offers testimony different from any statements made or other information provided during the proffer, the United States may impeach or otherwise examine Ms. Grant concerning any prior statement made or other information provided by her.

5.      Notwithstanding paragraph 2, above, if Ms. Grant knowingly and intentionally provides information which is materially false, misleading, or designed to obstruct justice, the United States may, without any limitation, use all statements and information provided by her in any civil or criminal proceedings against her.

6.      This Agreement is limited to the statements made by Ms. Grant at the time of the proffer and does not apply to any statements made by Ms. Grant at any other time, whether oral, written, or recorded.

7.      Ms. Grant's proffer is made in accordance with the understandings set forth herein. No promises, agreements, or understandings exist between the parties other than those set forth herein. No promises, agreements, or understandings exist between the parties other than those set forth in this Agreement and no modification shall have effect unless executed in writing by the parties with the same formalities as in this Agreement.

4.      On November 26, 2018, the Defendant provided his "Proposed Witness List," which contained approximately sixty (60) names.

5.      On April 16, 2019, the Defendant again provided his "Proposed Witness List," this time with approximately sixty-four (64) names. Approximately ten (10) of the individuals included on the Defendant's list were also included on the witness list for the United States, leaving fifty-four (54) different witness for the United States to consider in preparation for trial.

6.      On June 19, 2019, counsel for the United States emailed to counsel for the Defendant (copying all three defense attorneys) the following:

> We just spoke with Greg [Skordas] and I wanted to loop you in. There are several witnesses on your list (but not on our list) that face some criminal exposure. We're worried that if they're called to testify, they'll invoke. At least one of their attorneys, Nathan Crane (who represents Gabby Noriega), told me that she won't testify for anyone unless we figure out a plea agreement first. But the risk we face in entering plea agreements with some of these witnesses is that we'll look like we're trying to dirty up your witnesses. So after talking it over with Greg, we've agreed to try to enter plea agreements, if possible, with people like

3

Gabby (i.e., who are now represented). And we agree not to impeach people like Gabby (witnesses who plead between now and trial) with their plea agreements.
Greg said the defense would send us a short list of witnesses who you strongly want to call but who may face criminal exposure. We'll try to figure out plea deals, if possible, that makes it so those witnesses can testify without the risk of having them invoke.

7.     The United States moved forward with the only defense witnesses identified as potentially on the Defendant's "short list," Ana Gabriela Noriega (a.k.a., Gabby Noriega). After negotiations with Mr. Crane, Ms. Noriega was charged by Felony Information on June 10, 2019.

8.     On July 11, 2019, Ms. Noriega entered a plea, pursuant to a negotiated Statement in Advance of Plea, which was signed and accepted by the Court. [As anticipated and intended, Ms. Noriega's case was quickly resolved, for the purpose of allowing her to testify in this matter unencumbered by her criminal involvement with the Defendant.]

9.     On July 9, 2019, counsel for the Defendant emailed counsel for the United States the following in response to the email on June 19, 2019, regarding the "short list":

"I apologize for just getting back to you on this. We were in the process of getting you a short list and then I failed to follow up on it. I will let you know as soon as we have it."

10.    Up to the date of jury selection on August 9, 2019, the Defendant did not provide the United States with the anticipated "short list", leaving a large list of potential witness with possible criminal exposure. It was not feasible for the United States to attempt to resolve all other potential criminal liability of the remaining individuals on the Defendant's Proposed Witness List, especially when considering the Defendant's speedy trial rights and a trial date of June 17, 2019, subsequently continued upon Defendant's motion to August 12, 2019. *See* Doc. 224 & 231.

11.    On August 7, 2019, a representative of counsel for the Defendant, Gabriela Mena, emailed counsel for the United States the following, copying the defense attorneys involved on the email (continued on the next page):

4

As stated in the email sent June 19, 2019 titled US v. Shamo; your witness list, Gabby Noriega was a witness listed on defense's witness list who was ultimately indicted. Defense would like to know whether any other person on defense's witnesses list has been charged criminally. Due to time sensitivity of the trial starting on Monday it would be greatly appreciated if we receive a response by the end of the business day Thursday August 8, 2019.

12. That same day, August 7, 2019, counsel for the United States emailed the following response to Ms. Mena's inquiry:

"Shamo, Crandall, Paz, Tonge, Bustin, Noble, Gygi, Noriega (who you mentioned), and Gillespie were all charged for conduct related to this case. And I think that is what you're asking about, right? Or were you asking if I've checked to see if your witnesses have prior convictions?"

No further response was received from Ms. Mena or defense counsel on this subject.

13. On August 9, 2019, counsel for the Defendant presented their list of potential witnesses to the court and jury pool (i.e., effectively the "short list" in that it included about thirteen witnesses instead of sixty-four). Sasha Grant, Ana Gabriela Noriega, and Miles Penrose were part of the Defendant's list of potential witnesses.

14. On August 14, 2019, a day upon which it was anticipated Drew Crandall would testify (though he did not testify until August 15, 2019), Sasha Grant was observed in the courtroom. Counsel for the United States approached counsel for the Defendant about her presence, since she was on the Defendant's witness list. Defense counsel initially stated that it was okay if she remained, because the defense was not anticipating calling her to testify in the Defendant's case-in-chief. Subsequently defense counsel did ask her to step out of the courtroom, indicating she may be called to testify.

15.     On August 19, 2019, counsel for Defendant brought to the attention of the Court that they still needed the Clerk of the Court to issue subpoenas for their witnesses which had not yet been served, upon which the Court directed the Clerk of the Court to do so.  *See* Doc. 257.

16.     On August 23, 2019, counsel for Miles Penrose appeared and proffered that his client would be invoking his Fifth Amendment right.  The Court asked for input from the parties about the proffer; neither party objected, and Mr. Penrose was not called to testify in the Defendant's case-in-chief.

17.     On Friday evening, August 23, 2019, counsel for the Defendant emailed to counsel for the United States that they would be calling the following individuals to testify, once the United States had concluded its case-in-chief:

> a.  Monday (August 26, 2019):  Dustin Samualian (or Samuelian)[2]; Rebecca Shamo; and Ana Gabriela Noriega.
>
> b.  Tuesday (August 27, 2019):  Sasha Grant; Christopher Kenny[3]; Stephanie Shamo Arbelaez; and the Defendant.

18.     On the morning of Monday, August 26, 2019, during the final witness for the United States, counsel for the Defendant conferred with counsel for the United States during a break in the testimony of HSI Special Agent Ashment.  Counsel for the United States indicated he would give defense counsel wide latitude in questioning Special Agent Ashment during cross-examination. Defense counsel expressed that the allowance for broad questions would allow him to avoid calling

---

[2] Mr. Samuelian was ultimately not called to testify during the Defendant's case-in-chief.
[3] Counsel for the Defendant emailed subsequently informing counsel for the United States of their inability to serve Christopher Kenny and he was not called to testify in the Defendant's case-in-chief.

6

as many witnesses as he might otherwise call once the United States rested. Defense counsel then

questioned Special Agent Ashment about the initial interview with Sasha Grant by other agents,

having him read contents of a report into the record, which content he did not author.

19.     During the cross-examination of Agent Ashment on August 26, 2019, he was questioned

about individuals interviewed by other investigators and asked to read from investigative reports

written by other agents. As part of his testimony, on cross-examination, Agent Ashment testified

about or read into the record reports about Sasha Grant.

20.     On the afternoon of Monday, August 26, 2019, after some communication in and after

court between defense counsel and counsel for the United States, counsel for the United States

emailed to defense counsel to confirm their only anticipated witness for the following day was the

Defendant. Defense counsel emailed back: "We will also be calling Sasha Grant."

21.     On the evening of Monday, August 26, 2019, counsel for the United States received the

following email from counsel for Sasha Grant:

> "The defense for Aaron is asking Sasha by subpoena to testify Tuesday morning [August
> 27, 2019] at 830am. I wanted to make sure she is still immune from issues so long as she
> does not vary from the investigation. She was ok testifying and will not change any of her
> testimony, she just worries that Kaitlyn or Darrel Sam [counsel for the Defendant] will
> twist it and make her look bad. I did not know what to tell her since she gave that testimony
> under protection and is merely repeating it again without varying the answer, so it too
> should still be protected as far as she is concerned, especially since the testimony is against
> Aaron and Drew and really does not help them but helps your case. I just need assurance
> she is still protected and no charges will come against her. Please let me know. I am coming
> down in the morning.  Thanks."

22.     Counsel for the United States replied to Ms. Grant's attorney the same evening, as follows:

> "The proffer agreement covered Ms. Grant's statements during the two interviews held at
> the [United States Attorney's Office]. It does not cover statements made at trial. Immunity

7

at trial requires an immunity agreement signed by our US Attorney, John Huber.  I'm not sure if John's in Utah…"[4]

23.    A few hours later, Ms. Grant's attorney sent an email reply to counsel for the United States:

"Thanks, if there is no immunity I suppose she will need to take the fifth, but her testimony actually helps your side. Not sure why defense wants it except to spread the guilt and focus from Shamo."

24.    On the morning of August 27, 2019, counsel for the United States spoke with Ms. Grant's attorney, in the presence of the Defendant's attorney, Mr. Sam.  It was explained that the proffer agreement covered Ms. Grant as to disclosures made during her proffer interviews with law enforcement, but not for disclosures outside those interviews.  At this point, for the first time, a request for immunity for Ms. Grant's testimony was requested.  Counsel for the United States placed a phone call to the U.S. Attorney's Office to inquire about getting immunity for Ms. Grant to testify that day.  The response was that it would not be able to happen within that short of notice, due to the approvals needed in processing the request.  *See* Reporter's Transcript of Proceedings, August 27, 2019, attached as <u>Exhibit 1</u>, at 12-13.

25.     Before the Court on the morning of August 27, 2019, counsel for Sasha Grant appeared and proffered an invocation of Ms. Grant's Fifth Amendment right to not testify, providing the following information to the Court.  *See Id.*, at 8-9.

   a.   Counsel for Ms. Grant was not aware that the prior cooperation agreement only covered Ms. Grant for statements she made during her prior interviews with law enforcement.  *Id.* at 8; *but see* ¶¶ 2-3, and 22.

---

[4] *See* ¶ 3 ("This Agreement is limited to the statements made by Ms. Grant at the time of the proffer and does not apply to any statements made by Ms. Grant at any other time, whether oral, written, or recorded.").

8

b.  Counsel for Ms. Grant was not made aware Ms. Grant was going to be called to testify until late Sunday night, August 25, 2019, when he was notified by counsel for co-defendant Drew Crandall.  Exhibit 1, at 8.

c.  Ms. Grant and her attorney met with counsel for Defendant the afternoon of August 26, 2019.  During the meeting, about 2:00 p.m., counsel for Defendant stated they would not be calling Ms. Grant to testify.  At about 3:00 p.m., counsel for Defendant said they would still like to talk to Ms. Grant.  *Id.*

d.  After that, counsel for Ms. Grant contacted counsel for the United States to clarify the issue of immunity.  *Id.*, at 8-9.  *See also* ¶¶ 21-23 (outlining the specific emails exchanged).

26.    Before the Court on the morning of August 27, 2019, counsel for Ana Gabriela Noriega appeared and proffered an invocation of Ms. Noriega's Fifth Amendment right to not testify, providing the following information to the Court.  *See* Exhibit 1, at 9-10.

a.  Counsel for Ms. Noriega was recently contacted by counsel for the Defendant regarding acceptance of a subpoena for Ms. Noriega to testify.  However, counsel for Ms. Noriega never received a subpoena.  *Id.*, at 9.

b.  Federal agents contacted Ms. Noriega on May 8, 2019, informing her that criminal charges were going to be filed.  Ms. Noriega hired legal counsel two days later. Counsel for Ms. Noriega then contacted counsel for the United States and a resolution to Ms. Noriega's case was worked out, wherein Ms. Noriega entered a guilty plea to Conspiracy to Commit Money Laundering.  *Id.*  *See also* ¶¶ 6-8.

9

    c.   Counsel for Ms. Noriega acknowledged the limited authority of the counsel for the United States ("the government's hands are tied as to the District of Utah") and could not give immunity against state charges or charges outside the District of Utah. He further acknowledged that the activities with which Ms. Noriega may have been involved are far reaching, and therefore charges could be filed in any state. <u>Exhibit 1</u>, at 14-15.

27.    In response to Ms. Noriega's and Ms. Grant's invocation of their Fifth Amendment right, and assertions made by defense counsel, counsel for the United States explained the following:

    a.   The United States had anticipated the issue of the defense witnesses invoking their right not to testify, which prompted the prosecutions efforts to reach out to the defense team in advance of trial to discuss the potential criminal exposure of some of the proposed defense witnesses. <u>Exhibit 1</u>, at 11; *see also* ¶¶ 4-12.

    b.   A shorter witness list was anticipated from defense counsel, which would enable the United States to attempt to work something out with those witnesses that would allow them to testify, either through testimonial immunity or a plea deal. Exhibit 1, at 11.

    c.   That is what happened in the case of Ms. Noriega; the intent was to enable her to testify which is why her plea agreement states that the United States would not seek further indictment for any other drug offense for which the United States Attorney's Office was aware of at that time. *Id.*, at 11-12.

    d.   The prosecution team has been extremely careful not to act in a way that would influence a witness for the defense; counsel for the United States has tried to be as

hands off as possible, including by not even contacting attorneys representing defense witnesses; that was left to defense counsel. *Id.*, at 12.

    e.   The process for granting a defense witness immunity for their testimony involved a process, which could not happen quickly. *Id.*, at 13.

    *See also* ¶¶ 5-13, and 20-24.

28.    Counsel for Ms. Noriega further explained to the Court that notwithstanding the plea agreement in place, Ms. Noriega may face criminal exposure for her testimony outside the District of Utah, and there was no agreement with the State of Utah, which is why she invoked her Fifth Amendment right. Exhibit 1, at 14-15.

ARGUMENT

The Court should deny the Defendant's Motion to Dismiss (Doc. 275) because the Defendant has not demonstrated prosecutorial misconduct. The Defendant has failed to show the United States used undue influence to dissuade defense witnesses from testifying. *See United States v. Portillos*, 714 Fed. Appx. 889 (10th Cir. 2017). The Defendant has also failed to make a plausible showing that Ms. Noriega's, Mr. Penrose's, or Ms. Grant's testimony would have been "material and favorable" to his defense, "and not merely cumulative to other witnesses' testimony". *See id.*

//

//

//

11

I. THE UNITED STATES DID NOT SUBSTANTIALLY INTERFERE WITH THE DECISION OF DEFENSE WITNESSES TO TESTIFY, NOR DID IT USE UNDUE INFLUENCE TO DISSUADE THEM FROM TESTIFYING

The Defendant has a constitutional right to present a defense; that is essential to a fair trial. U.S. Const. Amend. VI. *See United States v. Portillos*, 714 Fed.Appx. 889, 893 (10th 2017); *see also United States v. Serrano*, 406 F.3d 1208, 1214 (10th Cir. 2005). "That right, 'however, is not absolute'; courts have held that 'a defendant's right to present a defense does not include the right to compel a witness to waive his Fifth Amendment privilege.'" *Portillos*, at 893 (*citing Serrano*, at 1215). "That said, the government cannot substantially interfere with a defense witness's decision to testify." *Id.* The United States has not used undue influence to dissuade Sasha Grant, Ana Gabriela Noriega, or Miles Penrose from testifying, nor did it exert substantial interference with the defense witnesses' decisions whether to testify.

"Interference is substantial when the government actor actively discourages a witness from testifying through threats of prosecution, intimidation, or coercive badgering." *Serrano*, at 1216 (*citing United States v. Crawford*, 707 F.2d 447, 449 (10th Cir. 1983)). "The potential for unconstitutional coercion by a government actor significantly diminishes, however, if a defendant's witness elects not to testify after consulting an independent attorney." *Id.*

In *U.S. v. Portillos*, the Tenth Circuit Court affirmed the district court's ruling that the government did not use undue influence to dissuade witnesses from testifying. *Portillos*, at 894. In *Portillos*, the defendant was alleged to be part of a tax fraud scheme. *Id.* at 890. The defendant claimed that there was selective and vindictive prosecution based on the fact that four other women involved in the overall scheme were not indicted. *Id.* at 890-891. The defendant called these other

12

four witnesses to testify at trial. *Id.* at 891. Prior to trial, government agents interviewed the four defense witnesses, and in the interview said that Ms. Portillos was suggesting that they might be involved in the tax fraud scheme. *Id.* The agent informed each of the four defense witnesses of their right to testify, their right to counsel, and the penalties of perjury. *Id.* The defendant stated that this interview interfered with her witnesses. At trial one witness sought counsel and invoked the Fifth Amendment; the other three women did not, and only one was called to testify. *Id.*

In their holding that the government had not substantially interfered with defense witnesses, the Tenth Circuit Court of Appeals affirmed the lower court's ruling that meeting with defense witnesses and informing them of their potentially criminal liability and the penalties of perjury did not constitute substantial interference. *Id.* at 894. The lower court's reasoning relied on the fact that "there was never any suggestion that a witness should not testify." *Id.* The court "ruled that informing the witnesses of their right to counsel, of their right not to incriminate themselves, and of the penalties for perjury did not have the effect of chilling the witnesses." *Id.*; *cf. Serrano*, at 1212 n. 1 (rejecting the notion that a prosecutor raised witness self-incrimination solely to gain tactical advantage at trial, noting that prosecutors have an ethical obligation to advise unrepresented witnesses of their possible need for counsel and of their right against self-incrimination). In *Portillos*, only one of the defense witnesses invoked her Fifth Amendment privilege, which decision was made after consulting her own attorney, "which weighs against a finding of coercion." *Portillos*, at 894; *see also Serrano*, at 1216. The United States did not seek to dissuade Ms. Grant, Ms. Noriega, or Mr. Penrose not to testify. In Ms. Noriega's case, the United States actually attempted to facilitate her ability to testify.

13

Here, the Defendant has asserted that the United States has substantially interfered with three of their witnesses: Sasha Grant; Miles Penrose; and Ana Gabriela Noriega. However, the Defendant's assertion is made without supportive facts. Like *Portillo*, each of the three defense witnesses named in their motion were represented by counsel when making the decision whether to testify, which weighs against a finding of coercion on the part of the United States. *See Portillos*, at 894. Mr. Penrose and Ms. Grant have been represented for quite some time. Ms. Noriega was advised to get an attorney when approached by law enforcement in May 2019.

The Defendant raises, as an act of substantial interference, the fact that the United States offered to work out plea deals with proposed defense witnesses. The United States was under no obligation to offer plea deals or immunity to any of the defense witnesses. However, the prosecution team was willing to help, where feasible, to ensure the Defendant's ability to call his desired witnesses if it could be determined which of the sixty-four (64) witnesses listed were actually going to testify.[5]

In relation to the issue of whether to testify or not in this case, government agents and the prosecution team did not communicate with Ms. Grant, Ms. Noriega, or Mr. Penrose directly once represented by counsel. No conversation was had with Mr. Penrose or his attorney about him being named as a defense witness or whether to testify. The only discussions regarding Ms. Grant

---

[5] Realistically, the United States could not attempt to resolve all known criminal liabilities amongst the fifty-three witnesses (the witnesses not in common with the United States witness list, and excluding the Defendant). For many of the witnesses listed by the Defendant, there was known issues of criminal liability; however, the investigations into each had not been completed. Ultimately, the Defendant only called a fraction of its sixty-four (64) initially listed witnesses, and only appeared to be inclined to call half of the witnesses (i.e., six) it listed during the selection of the jury.

14

being named as a defense witness and whether to testify were had through her attorney, which communication was prompted by her attorney's initiation; the substance of those communications is outlined in the Statement of Relevant Facts. *See* ¶¶ 21-24.

In relation to Ms. Noriega, counsel for the United States was transparent with Ms. Noriega's attorney about the reason for negotiating a resolution to her case before a Felony Information was filed (i.e., to permit her to testify in the Defendant's case-in-chief without further criminal liability for the known offenses related to the Defendant's case). Ms. Noriega was also the cited example in the communication between counsel for the Defendant and counsel for the United States when discussing Defendant's Proposed Witness List, beginning in June of this year. After government agents advised Ms. Noriega to seek legal counsel in May 2019, no contact was made with her directly, nor discussion had with her in relation to the decision to testify or not. *See* ¶¶ 6-8, 11-12, and 26-28.

At no point did the United States attempt to induce a witness not to testify, nor badger or intimidate them. The mere fact that the United States provided immunity during Ms. Grant's proffer interviews does not require that the United States further provide testimonial or transactional immunity. Nonetheless, when immunity was requested for Ms. Grant by counsel for the Defendant, the United States inquired as to its feasibility on short notice. The United States also attempted to help, but failed in the case of Ms. Noriega, by working with her attorney. However, had the United States not charged or offered a plea deal to Ms. Noriega, she would have still been in the same situation as to whether to testify or invoke her right not to testify (albeit with additional criminal liability to consider). This is the exact circumstances in which Mr. Penrose was situated—no plea deal; no immunity; and possible criminal liability. The United States did

15

not engage any of the three named individuals in a discussion as to whether to testify or not; such discussions were limited to communication with their respective attorneys and therefore presumptively not coercive.

## II. THE DEFENDANT DID NOT MAKE A PLAUSIBLE SHOWING THAT MS. NORIEGA'S, MR. PENROSE'S OR MS. GRANT'S TESTIMONY WOULD HAVE BEEN MATERIAL AND FAVORABLE TO HIS DEFENSE

The Tenth Circuit Court explained in *Portillos* that "a defendant must make a plausible showing that a witness's testimony would have been material and favorable to his or her defense, and not merely cumulative to other witnesses' testimony, before he or she can demonstrate a denial of due process. *Portillos* at 894 (*citing United States v. Caballero*, 277 F.3d 1235, 1241 (10th Cir. 2002)). "It is not enough to show 'the mere potential for favorable testimony' or to 'merely point to any conceivable benefit' from a witness's testimony." *Id.* (quoting *United States v. Iribe-Perez*, 129 F.3d 1167, 1173 (10th Cir. 1997)). Here, the Defendant has failed to make a plausible showing that Ms. Noriega's, Mr. Penrose's, or Ms. Grant's testimony would have been material and favorable to his defense, and not just merely cumulative to other witnesses' testimony.

In the Defendant's motion, the Defendant asserts: "Mr. Shamo was not able to call [Ms. Noriega] as a witness and undercut the Government's assertion that she played some major role in the drug trafficking organization as [the Defendant's] executive assistant." Doc. 275 at 4. This is an example of the Defendant citing to a "mere potential for favorable testimony." The Defendant does not provide aspects of Ms. Noriega's anticipated testimony that would have actually undercut the case against the Defendant. While Ms. Noriega was part of the Defendant's drug trafficking organization, she was not merely one of five individuals over which the Defendant was considerer

16

a manager, leader, administrator, and organizer. There were multiple witnesses which pointed to the Defendant as the leader and organizer of an organization involving approximately twenty-three (23) individuals. *See* Gov.t's Trial Exhibit 17.06, Chart of Defendant's Drug Trafficking Organization, attached as Exhibit 2. Thus, the United States case against the Defendant related to his role as leader and organizer did not rest on Ms. Noriega being a subordinate in the Defendant's drug trafficking organization. Had Ms. Noriega testified for the purpose outlined in the Defendant's motion, it would not have materially supported the Defendant's defense, but would have been merely cumulative to the substance of the Defendant's testimony, and the testimony of the witnesses in the United States' case-in-chief, detailing Ms. Noriega's involvement as the Defendant's executive assistant in the drug trafficking organization.[6]

Like Ms. Noriega, in the case of Mr. Penrose, the Defendant asserted he "was not able to call Mr. Penrose to prove otherwise [i.e., that Mr. Penrose was involved in money laundering and funding the drug trafficking organization from the outset] or undercut the Government's theory that [] Mr. Penrose worked at the behest of Mr. Shamo as opposed to under his own discretion and benefit." Doc. 275 at 4-7. This is the extent of the Defendant's outline of the potential testimony of Mr. Penrose; such a limited assertion does not go beyond "the mere potential for favorable

---

[6] *See* Exhibit 1, at 88-89. The Defendant testified of Ms. Noriega's activities, acting as the Defendant's executive assistant, including looking into properties in Puerto Rico and the Caribbean in which the Defendant could invest his drug proceeds. This did not negate Ms. Noriega's role as represented in the United States' case-in-chief, but actually supported it. *See also* Exhibit 1, at 91-92 (the Defendant confirms his ongoing payment obligation to Ms. Noriega, as his employee).

testimony' or to 'merely point to any conceivable benefit' from a witness's testimony". *See Portillos* at 894.[7]

In the case of Ms. Grant, the Defendant mischaracterizes the evidence and testimony presented to the jury. Mr. Crandall's testimony was that he left the drug trafficking organization in the Fall of 2015 to travel with Ms. Grant. He further testified that in the Spring of 2016 he sought further payment from the Defendant as part of the Defendant's and his "buyout" agreement (i.e., the Defendant agreed to buyout Mr. Crandall from the drug trafficking organization). Mr. Crandall testified that in the Summer of 2016 he returned to the organization, this time as an employee and not a junior partner as before.

The Defendant's motion asserts that Mr. Crandall: (1) "perhaps" never fully ended his involvement in the Defendant's organization; (2) he had a continual drug habit while traveling abroad; (3) he was smart enough to keep his name off the bitcoin wallets[8]; and (4) he was involved as early as May 2016. *See* Doc. 275 at 5-6. While it is unknown whether Ms. Grant would have

---

[7] Testimony of a co-defendant, Drew Crandall, established that Mr. Penrose was an early investor in the Defendant's drug trafficking organization, Mr. Penrose having invested $10,000 which was used by the Defendant to purchase narcotics for resale. Mr. Crandall testified that Mr. Crandall received $30,000 several months later as a return on his investment. Testimony of IRS agent Jeff Fletcher and the testimony of Brennda Kurstin, a former employee of Mr. Penrose, outlined the financial dealings of Mr. Penrose and the Defendant, in an effort to conceal drug proceeds in the purchase of a vehicle from Mr. Penrose's business, iDrive. The Defendant's motion does not assert how Mr. Penrose's testimony would specifically negate the other witnesses' testimony. The United States' case-in-chief did not portray the Defendant in a managerial role over Mr. Penrose, but merely showed Mr. Penrose's involvement in certain aspects of the drug trafficking organization.

[8] *But see* Exhibit 1 at 92 (the Defendant testifies and confirms that he paid Mr. Crandall bi-weekly and that he didn't pay him more, because Mr. Crandall didn't need it—i.e., the Defendant was in control of the drug proceeds and paying Mr. Crandall at that point as an employee).

18

testified to these points (i.e., there is nothing other than the Defendant's assertions in his motion), presuming she would have, the Defendant's defense would not have benefited from this testimony.

During Mr. Crandall's testimony, it was shown that he played a key role as a junior partner to the Defendant; his own testimony demonstrated he had used drugs; Mr. Crandall's testimony demonstrated he was smart and computer savvy. Further, if Mr. Crandall was more heavily re-involved in the organization in May of 2016, or if he never fully left the drug trafficking organization, that would not change the culpability of the Defendant, because such facts do not demonstrate that the Defendant did not commit the criminal conduct alleged in the Indictment. It would merely show that Mr. Crandall was also more culpable within the organization, while not negating the Defendant's role and culpability.[9] Special Agent Ashment, during cross examination, read at length from interview reports regarding Ms. Grant, which put into evidence many of the points the Defendant claims Ms. Grant would have covered in her testimony. Because Ms. Grant would have testified about those things which Mr. Crandall and others had testified, her testimony would have been cumulative to the testimony presented in the United States' case-in-chief, and not any more favorable to the Defendant's defense than testimony already presented.

As in *Portillos*, the Defendant has made assertions that Ms. Noriega's, Mr. Penrose's, and Ms. Grant's testimony would have helped his defense, by merely characterizing their potential

---

[9] The Defendant's motion asserts: "That date [May 2016] is of particular importance as Mr. Crandall was not charged with the death resulting count due to his statements that he was not re-involved until July 1, 2016." Doc. 275 at 6. The Defendant seemed to rely on the defense that if other co-defendants were not charged fairly or on par with his charges, then he must not be guilty of the charges either. This would not be a proper inference upon which the jury would make a decision as to the Defendant's guilt (e.g., "it's unfair that Mr. Crandall wasn't also charged, so don't hold the Defendant guilty"); it also negates the fact that the Grand Jury decided the charges upon which the Defendant should be indicted.

19

testimony as "critical" and could have aided in the to undercut the Government's case. However, "[t]his is not enough to plausibly show materiality," especially when the Defendant still had many others on his Potential Witness List within his ability to call and testify in his defense. *See Portillos* at 894. The Defendant has failed to show prejudice from interference and the Defendant has not been denied his due process rights to a fair trial.


CONCLUSION

The United States respectfully requests the Court deny the Defendant's Motion to Dismiss, in that the Defendant has failed to show prosecutorial misconduct by the United States. Specifically, the Defendant has not shown: (1) that the United States used undue influence to dissuade Ms. Noriega, Mr. Penrose, or Ms. Grant from testifying; and (2) the Defendant failed to make a plausible showing that the testimony of Ms. Noriega, Mr. Penrose, or Ms. Grant would have been material and favorable to his defense, and not merely cumulative to other witnesses' testimony. Therefore, the Defendant has not been prejudiced nor his due process rights infringed.

Respectfully submitted this 4th day of September, 2019.

JOHN W. HUBER
United States Attorney


*/s/ Kent A. Burggraaf*
Kent A. Burggraaf
Special Assistant United States Attorney

20

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION


_____
                                )
UNITED STATES OF AMERICA,        )
                                )
          Plaintiff,             )
                                )
     -vs-                        )     2:16-CR-631 DK
                                )
AARON MICHAEL SHAMO, et al.,     )
                                )
          Defendants.            )
_____)




BEFORE THE HONORABLE DALE KIMBALL

DATE:  AUGUST 27, 2019

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL










Reporter:  REBECCA JANKE, CSR, RPR, RMR
(801) 521-7238

```
 1
 2                    A P P E A R A N C E S
 3
 4    FOR THE PLAINTIF      UNITED STATE'S ATTORNEY'S OFFICE
 5                          BY:  MICHAEL GADD, ESQ.
 6                               VERNON G. STEJSKAL, ESQ.
 7                               KENT A. BURGGRAAF, ESQ.
 8                          111 SOUTH MAIN STREET, 1800
 9                          SALT LAKE CITY, UTAH  84111
10
11
12
13    FOR THE DEFENDANT:    SKORDAS & CSTON, LLC
14                          BY:  GREGORY G. SKORDAS, ESQ.
15                               KAYTLIN V. BECKETT, ESQ.
16                          560 SOUTH 300 EAST, 225
17                          SALT LAKE CITY, UTAH 84111
18
19                          DARYL P. SAM, PLLC
20                          BY:  DARYL P. SAM, ESQ.
21                          5955 SOUTH REDWOOD ROAD, 102
22                          SALT LAKE CITY, UTAH 84123
23
24
25
```

```
 1    AUGUST 27, 2019                    SALT LAKE CITY, UTAH

 2                      P R O C E E D I N G S

 3                           *   *   *

 4            THE COURT:  Good morning, everyone.

 5            MR. STEJSKAL:  Good morning.

 6            THE COURT:  Where are we?

 7            MR. SKORDAS:  Your Honor, we have a couple

 8    of -- a couple of matters we just wanted to bring to

 9    the Court's attention before you bring the jury in.

10    We have, I think, one or two witnesses today.  I think

11    we should be done with the defense case by noon today.

12            THE COURT:  Does that include the defendant?

13            MR. SKORDAS:  Yes.

14            MS. BECKETT:  Sorry, Your Honor, just to

15    clarify.  We have -- technically, there are two

16    attorneys that will be proffering before the Court and

17    then I believe just one witness that will be

18    testifying.

19            MR. SKORDAS:  Right.  And that witness is

20    Aaron Shamo.

21            THE COURT:  All right.  Let me suggest

22    something, then.  We do these proffers and the

23    defendant today.  Tomorrow we have a settlement of the

24    instruction conference and you people can get ready

25    for your closing arguments and bring the jury back on
```

Exhibit 1

```
 1   Thursday.

 2              MR. SKORDAS:  Is that okay?

 3              MR. STEJSKAL:  Sure.

 4              MR. SKORDAS:  That's fine, Your Honor.  That

 5   makes a lot of sense.

 6              THE COURT:  What about it?

 7              MR. STEJSKAL:  That's fine, Your Honor.

 8              THE COURT:  That will give you time to

 9   streamline your closing arguments from four hours each

10   to two and a half or something.  And do you have --

11   you handed them our --

12              THE CLERK:  Yes.

13              THE COURT:  So you have now the Court's

14   notions about instructions and verdict form.

15              MR. SKORDAS:  Correct.

16              THE COURT:  But you'll need time to review

17   that and think about it, and we can hold a hearing in

18   the morning and get that squared away.

19              MR. SKORDAS:  Very well.  That makes a lot of

20   sense.

21              THE COURT:  Does that work for everyone?

22              MR. STEJSKAL:  Yes.  That works, Your Honor,

23   thank you.

24              THE COURT:  Do you want the jury to see the

25   proffers?
```

```
 1              MR. SKORDAS:  No.  I don't think so.

 2              THE COURT:  Probably not, right?

 3              MR. SKORDAS:  And we need just a few minutes,

 4    but otherwise we're ready to go.

 5              THE COURT:  All right.

 6              MS. BECKETT:  Your Honor, can we approach

 7    briefly?

 8              THE COURT:  Approach?  Yes.

 9       (Conference among the Court and counsel out of the

10                  hearing of anyone else.)

11              MS. BECKETT:  I want to make a record really

12    quickly for the Court because we have that motion for

13    a mistrial that we had filed.

14              THE COURT:  Yes.

15              MS. BECKETT:  And some information came to us

16    through Mr. Shamo's family, that they believed the

17    government was actually paying for the family of

18    whatever alleged victim it was that cried during that

19    cross examination of Agent Keys, and I clarified with

20    counsel, and the government is essentially paying for

21    that family to be present here during this trial.

22    They are assisting.

23              THE COURT:  So you're adding that on your

24    motion for mistrial?

25              MS. BECKETT:  Correct.  But we wanted to make
```

 1    a record of that for the Court because we think that's

 2    an essential issue that needed to be brought up and

 3    put on the record.

 4            THE COURT:  You were going to respond --

 5    there you are.  You were going to respond to the -- I

 6    need a program -- to the motion for mistrial?

 7            MR. GADD:  Right.  We have written a rough

 8    draft.  We're just waiting for the transcript from

 9    May, from Ed who got into town yesterday.  I talked to

10    Ed.  He said he was working on it, and he said he

11    would have it today.

12            THE COURT:  Now can you comment on this

13    additional --

14            MR. GADD:  I would be happy to do it in

15    writing or now.  I would say the United States helps

16    various victims in various cases and I recognize that

17    the family involved, while their child is mentioned in

18    the Indictment, it's not the family of RK, who most of

19    our focus has been on.

20            THE COURT:  All right.

21            MR. GADD:  But it's probably worth

22    mentioning, there are several families who have

23    observed each day of Court who have children who were

24    customers of Mr. Shamo's and who are now deceased.

25    Some of them we didn't even know about.  I mean,

```
 1   that's -- it's frankly a little embarrassing.  We're
 2   still finding out people who were affected by this.
 3           THE COURT:  Anything else?
 4           MS. BECKETT:  I just wanted to make that
 5   clear for the record.  I think that's going to be very
 6   problematic.
 7           THE COURT:  All right.  Are we going to --
 8   where is the -- I don't know you.
 9           MS. MADDEN:  Gabriel Madden, one of the
10   associates who has been helping on defense.
11           THE COURT:  Well, welcome.
12           So, are we are ready with these proffers?
13           MS. BECKETT:  Yes.  Thank you, Your Honor.
14           THE COURT:  Then we'll get the jury.
15           (Proceedings continued in open court.)
16           MS. BECKETT:  We have two attorneys here.
17   The first attorney is Marlin Grant, who is counsel for
18   Sasha Grant, who we intended to call as a witness
19   today.  But he is here essentially to make a proffer
20   and sort of give a timeline as to when he was informed
21   that Ms. Grant would no longer have immunity if she
22   were to testify before the Court.  So if we could hear
23   from him first.
24           THE COURT:  All right.
25           You can just stand at the podium.
```

```
 1              MR. GRANT:  Oh, right here?

 2              THE COURT:  Yeah.

 3              MR. GRANT:  Okay.  Good morning.  My name is

 4    Marlin Grant.  I'm the attorney for Sasha Grant.  I

 5    became involved when she landed in Hawaii about two

 6    years ago.  I was involved also with the July -- or I

 7    guess it was the June 16th and 15th investigation into

 8    the -- and the 17th by the prosecution's office.

 9    Sasha made a proffer of evidence at that time.  That

10    immunity was granted only for that hearing apparently.

11    We were under the impression that it would be for any

12    further testimony in the case.  I did not receive

13    information that she was even going to be called as a

14    witness until late Sunday night from Jim Bradshaw,

15    attorney for Drew Crandall.

16              On Monday, I talked to the defense counsel

17    and arranged to have them at least talk to Sasha.  In

18    the middle of that, they said, well, we're not going

19    to use her testimony.  I got that notice about 2:00

20    o'clock on Monday.  And then at about 3:00 o'clock,

21    they said:  No, we would still like to talk to her.

22              So they talked to her at 4:00 o'clock.

23              THE COURT:  This is yesterday?

24              MR. GRANT:  This is yesterday.  After that I

25    called or sent an email to Mike Gadd to say:  Look,
```

1    does she have immunity for tomorrow?  They want to

2    have her testify at 8:30 in the morning.

3            And he says:  It's doubtful.  Let me talk to

4    you in the morning.

5            And apparently they called Mr. Huber this

6    morning to see if immunity could be granted, and that

7    could not.  So that's the timeline, and I'm invoking

8    the Fifth Amendment privilege for my client not to

9    testify today.

10           THE COURT:  Thank you.

11           MS. BECKETT:  I would just like to clarify on

12   that, Your Honor.  It was our impression that actually

13   Mr. Bradshaw was going to accept service of the

14   subpoena for Ms. Grant, which is why it did not make

15   it to Mr. Grant initially.

16           And the next attorney is Nathan Crane on

17   behalf of Anna Gabriel Noriega.

18           THE COURT:  Mr. Crane?

19           MR. CRANE:  Good morning, Your Honor.

20           THE COURT:  Good morning.

21           MR. CRANE:  I was contacted recently by the

22   defense indicating they wanted to serve a subpoena on

23   my client, asking if I would accept service.  I

24   indicated I would.  I have not -- although a subpoena

25   did not come, as I talked to my client about

```
 1    testifying today and discussing her rights, she
 2    indicated she wanted to invoke her Fifth Amendment
 3    rights today at this hearing -- or at this trial, and
 4    she is not under subpoena, but we would accept
 5    service, and I was told her presence would not be
 6    needed today and I could come today.
 7            I have also been asked to give a brief
 8    timeline of when I became involved.  My understanding
 9    is that Ms. Gabriel Noriega was contacted by federal
10    agents on May 8, 2019, approximately, and told that
11    criminal charges were going to be filed against her
12    very soon.  She hired me two days later.  I then
13    contacted the prosecution's team, and we were able to
14    work out a resolution of her case wherein, on July 11,
15    2019, she plead guilty to conspiracy to commit money
16    laundering.  And that's where we stand right now.
17            THE COURT:  Thank you, Mr. Crane.
18            MR. CRANE:  Thank you.
19            THE COURT:  Any comments from the government
20    or the defense?
21            MS. BECKETT:  Just briefly one thing, Your
22    Honor.  We had initially listed Gabriel Noriega as a
23    witness at the end of last year and when the trial was
24    initially scheduled to begin in January of this year.
25    And there was some correspondence between our office
```

1    and the prosecutor's office about whether or not they

2    needed to get plea agreements in place and in order to

3    get these individuals to be able to testify.  And I

4    think that's become a problem, so I just wanted to get

5    a record of that.

6              THE COURT:  All right.  Thank you.

7              Mr. Gadd, do you want to say something about

8    this?

9              MR. GADD:  I do.

10             THE COURT:  You better hang on, Mr. Crane.

11   You might want to say something else.

12             MR. GADD:  We anticipated this problem would

13   happen months and months ago, so, as a prosecution

14   team, we reached out to the defense and said:  Several

15   of the people on your witness list face criminal

16   exposure, and if you give us a short list of people

17   that you want to call as witnesses, we'll see if we

18   can work out something that allows them to testify

19   whether that's, you know, some sort of testimonial

20   immunity or a plea deal.

21             In the case of Ms. Noriega, that's a main

22   part of the reason why we've tried to work out a plea

23   deal.  She has pleaded guilty.  In her guilty plea

24   document, the United States has agreed not to seek

25   Indictment against her for any other drug offense for

```
1    which the United States Attorney's Office for the

2    District of Utah is aware at the time that it was

3    signed back in, I believe, July.  Our intention in

4    going through all that was to actually make it so that

5    she could be a witness.

6            We want to be extremely careful that our

7    actions aren't viewed as trying to influence witnesses

8    the defense wants to call.  We have tried to be as

9    hands off as we absolutely could, including by not

10   even contacting their attorneys when we had a sense

11   that they might be subpoenaed.  We left that to the

12   defense to handle.  My goal this morning was to

13   explain where we stood with Ms. Noriega.

14           I think what I would like to do is have

15   Mr. Stejskal talk through kind of some of the events

16   that led up to where we are at with the testimony of

17   Ms. Grant since, if she were to testify, she would be

18   his witness.

19           THE COURT:  All right.

20           MR. STEJSKAL:  Very briefly on that, Your

21   Honor.  So, as Mr. Gadd stated, the United States

22   reached out to defense counsel, the defense team a

23   couple months ago, before the previous trial

24   scheduling and said:  If you have any witnesses that

25   you plan on calling, let us know and we'll work
```

1   through the process.  And Ms. Grant was never listed

2   as a potential witness.  No contact from the defense

3   team about working with her.  We first got that

4   indication late last night.  I talked to the U.S.

5   Attorney's Office this morning and was informed that

6   it's a process to get somebody immunity for their

7   testimony.  It takes approval through DC.  It takes

8   the U.S. Attorney, John Huber's approval, and that's

9   not something that can happen with the snap of a

10  finger and so the timing on that just doesn't work

11  out.

12          We're disappointed that defense counsel

13  didn't reach out earlier.  We have done what we can to

14  assist with the process, but it appears at this point

15  that if she needs to invoke her Fifth Amendment

16  privilege, we can not grant immunity at this time.

17          THE COURT:  Thank you.

18          Ms. Beckett, anything else?

19          MS. BECKETT:  Yeah.  Your Honor, I would like

20  to make a few things very clear.  These individuals

21  were interviewed in 2017.  The government was more

22  than aware of their potential criminally liability.

23  Sasha Grant and Anna Gabriel Noriega were listed as

24  witnesses as early as November of last year when we

25  provided our first witness list.  There was no qualms

Exhibit 1

1    about that.  They were very aware of that.

2         And, on top of that, in terms of Sasha Grant,

3    when Drew Crandall testified, we clarified with the

4    prosecutors over here that we were going to ask her

5    ourselves to leave the courtroom because we intended

6    to call her as a witness, and that was over a week

7    ago.  At that point in time, they were more than aware

8    that we intended to call her as a witness and did

9    nothing in that regard and made no comment about

10   concerns regarding her immunity or anything at that

11   point.  And, as her attorney specifically stated, it

12   wasn't until last night that he became aware that

13   apparently the immunity she had did not apply to this

14   particular proceeding.  We would just like to make

15   that as part of the record.

16        THE COURT:  Thank you.

17        Mr. Crane, do you want to say anything else?

18   Apparently you do.

19        MR. CRANE:  Your Honor, the only thing I

20   would add, while I agree with the prosecution that the

21   government's hands are tied as to the District of

22   Utah, it does not cover charges -- we have no

23   agreement with the State of Utah.  We have no

24   agreement with any other district.  This is a

25   far-reaching -- mails are involved.  It really could

Exhibit 1

1    be filed in any state, arguably, and so that's

2    ultimately why we have decided to invoke the Fifth

3    today.

4              THE COURT:  Thank you.

5              MR. CRANE:  Thank you, Your Honor.

6              THE COURT:  Anything else from the United

7    States?

8              MR. GADD:  No, sir.  Thank you.

9              THE COURT:  Thank you.

10              All right.  We'll get the jury and proceed.

11              MR. CRANE:  May I be excused, sir?

12              THE COURT:  You may.

13              MR. CRANE:  Thank you.

14              THE COURT:  And this is your last witness,

15    right?

16              MR. SKORDAS:  Correct.

17              THE CLERK:  All rise, please.

18              (Whereupon the jury enters the courtroom.)

19              Court will resume session.  You may be

20    seated.

21              THE COURT:  Good morning again, ladies and

22    gentlemen of the jury.  Thank you for your work.  This

23    is how we are going to proceed.  The government is

24    going to call -- or excuse me.  The defense is going

25    to call the defendant, and he will be the last

Exhibit 1

```
 1   witness.  We should finish him by or before noon, do

 2   you think?

 3           MR. SKORDAS:  Yes.

 4           THE COURT:  And we're going to take -- you're

 5   going to take tomorrow off.  We aren't.  We're going

 6   to settle the instructions and the verdict form, and

 7   the lawyers will get a little more time to streamline

 8   their closing arguments, we hope, down to manageable

 9   proportions.  So, after you're excused today, you will

10   be back here on Thursday at 8:30 for instructions and

11   closing arguments.

12           You may proceed.

13           MR. SKORDAS:  Thank you, Your Honor.  The

14   defense calls Aaron Shamo.

15           THE COURT:  Come forward and be sworn,

16   please.

17                     AARON SHAMO,

18   the witness hereinbefore named, being first duly

19   cautioned and sworn or affirmed to tell the truth, the

20   whole truth, and nothing but the truth, was examined

21   and testified as follows:

22           THE CLERK:  Please come around to the witness

23   box.  Please state your name and spell it for the

24   record.

25           THE WITNESS:  Yes.  Aaron Shamo.  A-a-r-o-n.
```

```
 1    S-h-a-m-o.

 2            THE COURT:  You may proceed, Mr. Skordas.

 3                    DIRECT EXAMINATION

 4    BY MR. SKORDAS:

 5       Q.   Aaron, I'm going to help you avoid what you

 6    just did, and I'm going to have you just pull that up.

 7       A.   Okay.

 8       Q.   Aaron, would you tell the jury where you

 9    currently reside.

10       A.   Salt Lake County -- or jail.

11       Q.   How long have you been there?

12       A.   Oh, man.  I've been there since November,

13    right before Thanksgiving.  And then --

14       Q.   Go ahead.

15       A.   Oh.  And then I was at Weber County for about

16    two -- I mean, two and something years.

17       Q.   Weber County Jail?

18       A.   Yeah.

19       Q.   You've been incarcerated continually since

20    your arrest in November of 2016, correct?

21       A.   Yes.  That's correct.

22       Q.   And when you were arrested in November of

23    2016, how old were you?

24       A.   26.

25       Q.   How old are you now?
```

```
 1        A.   I'm 29.

 2        Q.   What's your level of education?

 3        A.   High school, freshman of college.  I mean, we

 4   call that completing, so a tiny bit of college.

 5        Q.   Where did you go to high school?

 6        A.   I went -- part of it was high school in

 7   Mountain Point in Arizona and then the rest --

 8        Q.   Did you --

 9        A.   -- was --

10        Q.   Did you ultimately graduate?  I'm sorry.  Did

11   you ultimately graduate from high school?

12        A.   I did, yes.

13        Q.   I'm sorry.  Go ahead.

14        A.   Thanks to going to a boarding school or,

15   yeah, a school for I guess troubled kids, and I

16   graduated high school there.

17        Q.   Where was that?

18        A.   That was in south Utah, La Verkin, Utah.

19        Q.   After that, did you attend college?

20        A.   Yes, I did.

21        Q.   Where?

22        A.   Utah Valley University.

23        Q.   Just briefly, would you tell the jury about

24   your life before you went to high school.

25        A.   Yeah.  So I love video games, kind of grew up
```

Exhibit 1

```
 1    on video games, grew up with friends, I guess,

 2    troubled friends I guess you could say.  Kind of was

 3    getting into trouble.  I was smoking weed, and my

 4    parents were really not having it.  They are really

 5    good parents in case you couldn't see.  I grew up

 6    really strong L.D.S, square parents.  And so, with me

 7    going out and smoking weed is definitely a violation

 8    of the religion and so they weren't too approval of

 9    it.

10            And so, I mean, there's a lot of things going

11    on in my life, like, as far as emotion-wise, I guess I

12    was just bouncing around trying to find myself and

13    really just kind of stuck to a habit that really

14    wasn't good for me and so my parents saw that,

15    intervened and took me to a boarding school, south of

16    Utah.

17        Q.   Did you struggle in school before then?

18        A.   Oh, yeah.  Yeah.  Like I -- my mind was

19    always scattered.  It was everywhere.  So I didn't

20    really stay focused in school.  I was too busy on

21    other things such as video games.  That was more, I

22    don't know, multi-tasking, I guess you could say, like

23    I had a hard time sitting down.  I was later diagnosed

24    with something, I mean, but as -- it made sense

25    because as a kid, like, I just didn't -- like, I knew
```

Exhibit 1

```
 1   where I wasn't doing well in school, but it was just

 2   like I just accepted it.  Like, okay, school is just

 3   not for me.  I don't know.  Does that answer it?

 4        Q.   Yes.  That was great.  When did you start

 5   school at Utah Valley?

 6        A.   '08.  It was right after boarding school.  I

 7   had a few classes to finish up for high school.  And

 8   then I made the move to Utah just -- just bare, not

 9   knowing anyone, just moving up here.  Only my sister

10   was going to college.  She was going to B.Y.U. at the

11   time.  It seemed like a good environment, as well as I

12   could get into snow boarding, so I set up my classes

13   to snow board every other day, like a class, like,

14   Monday, Wednesday and Friday and then snow board on

15   Tuesdays and Thursdays, so it was kind of a win-win

16   situation.

17        Q.   Did you find work at eBay at some point?

18        A.   Yeah.  Yeah.  That came much later.  It was

19   actually thanks to my co-defendant, Drew, who got me

20   the job.  He actually helped me with one of my first

21   good jobs, which was before that, at Teleperformance.

22   We can't really say we worked for Apple, but it was an

23   umbrella company that worked at Apple or doing Apple

24   products.  And so he got me that job, and then later

25   on Drew actually initially got me the eBay job as
```

Exhibit 1

```
 1   well.
 2       Q.   What was the name of the first company?
 3       A.   Teleperformance U.S.A.
 4       Q.   Where were they located?
 5       A.   Lindon, Utah, so down south.  It was just
 6   north of Orem about ten minutes.
 7       Q.   What did you do there?
 8       A.   There we troubleshoot Mac computers, so if
 9   you see the back of an iMac and it says, "call Apple,"
10   you pick up the phone and you dial, and you'd get one
11   of us.  And so we were instructed on how to just
12   basically troubleshoot, which I mean Macs at the time
13   were amazing computers, and so most of the time it was
14   grandma calling how to close a window.  The computer
15   wasn't turning on so, you know, is it plugged in?  Oh,
16   that's the problem.  Okay.  You know, so it was -- it
17   was a lot of just troubleshooting, and, you know, they
18   gave us some Apple discounts, and I was, you know,
19   obsessed with Apple, so it kind of went hand-in-hand.
20       Q.   Had you quit Utah Valley by then, or was it
21   overlapping?
22       A.   Yeah.  I was -- I was going in and out of
23   school.  So, I mean, my first semester -- I have a bad
24   trend of going to school, doing, you know, pretty good
25   as far as when we start out, knowing my teachers, and
```

 1   then getting really sidetracked, distracted or in a

 2   relationship that just tanks my -- the end of the

 3   semester and so, because of that, my grades really

 4   suffered.

 5          And, you know, so then I come to my parents

 6   and I say:  Okay, let's -- what about next year?

 7          And they are like:  Well, you should probably

 8   retake, you know, these classes if this is what you

 9   want to do in life.

10          I go:  Okay.

11          So a lot of it was retakes.  And so I think I

12   was just working at the time.

13      Q.   How did Drew help you get that job, this

14   first job that you've --

15      A.   The first job?

16      Q.   Yeah.  At Teleperformance.

17      A.    Yeah.  He was already working for the company

18   and so, basically, most of these companies that are

19   actually pretty good, and they want people just like

20   that individual, and so references, it goes a long

21   way.  And so he -- he put in the recommendation.

22   There's actually one time in my training class where I

23   had failed a test.  You have to get, I think, 70

24   percent or 80 percent on all the tests, and I had

25   failed one.  So he talked to the trainer, and I was

Exhibit 1

1    able to retake it and, you know, complete the training

2    and then get the rest of the -- or get on to the job.

3        Q.   Tell the jury about your transition from

4    Teleperformance to eBay.

5        A.   Yeah.  Let's see.  Teleperformance because I

6    was there for I think a year or two.  I think I moved

7    back to Arizona for just a summer to hang out with my

8    parents, and it was kind of hard on me because I

9    didn't -- it was one of those moments where I realized

10   I missed being home for quite a bit, and so, I mean,

11   this is just a side story, but, so, leaving -- so I

12   went home for just a few months as a lot of kids do,

13   and then when I wanted to go back to Salt Lake, my mom

14   actually, you know, on the side out of the airport,

15   she cried.  She was like:  Are you sure you don't want

16   to stay?

17            And I was like:  Yeah, I'm pretty sure.  I

18   think I've got to go back to Utah.

19            Arizona was just a bad environment for me.

20   And so I needed to just be out of the state, really.

21   And so when I came back, I was looking for work, and

22   Drew eventually, he got hired on to eBay and at some

23   point he, same thing, put in a recommendation and got

24   me the job.

25       Q.   What did you do at eBay?

Exhibit 1

1    A.   At eBay, it's -- it's kind of like what the

2    Judge is doing up here now, is just a lot of

3    mediating.  And so eBay, when you have a complaint

4    with an item you open up a resolution, and so from

5    there -- so say you have a bad item, you know, you

6    tell the seller you have a bad item.  The seller

7    disagrees and says the item is pretty good and you

8    got, you know, a good item.  And the buyer still says

9    he has a bad item.  So what, you know, they do is open

10   up a resolution.  We tell the buyer to -- or eBay

11   tells the buyer to go and return the item and then a

12   lot of where we come in is the sellers calling in and

13   complaining that they had a return and that the money

14   is over in the buyer's hands.  And so, it's just kind

15   of a lot of walking through buyers and sellers on how

16   to mediate on terms.

17   Q.   How long were you there?

18   A.   I was there for two years, I believe.

19        MR. SKORDAS:  May I, Your Honor?

20        THE COURT:  You may.

21        MR. SKORDAS:  It's gone.  Where is your

22   poster?

23        MR. BURGGRAAF:  We can call it up.

24        MR. SKORDAS:  Okay.

25   Q.   BY MR. SKORDAS:  Aaron, can you see that

```
 1   poster in front of you?

 2       A.   Yeah.  Yes, I can.

 3       Q.   Can you tell us --

 4            THE COURT:  Why don't we identify the

 5   exhibit.

 6            MR. SKORDAS:  Sorry.  This is Exhibit 17.06.

 7            THE COURT:  Thank you.

 8       Q.   BY MR. SKORDAS:  It's a diagram or a group of

 9   photos that the government created.  I want you to go

10   and start on the second row and tell the jury, from

11   your experience at eBay, who you met there on that

12   second row.

13       A.   Yeah.  I met --

14       Q.   We talked about Drew Crandall.

15       A.   Yeah.  Drew Crandall, I mean, obviously.

16   Noble, Tonge, Bustin and Gygi.

17       Q.   All worked at eBay?

18       A.   All worked at eBay, yeah.

19       Q.   Mario Noble, Drew Crandall, Ms. Tonge, Bustin

20   and Gygi?

21       A.   Uh-huh.

22       Q.   Yes?

23       A.   Yes.

24       Q.   And on the bottom row, are there any eBay

25   employees that you met?
```

```
 1        A.    I don't believe so.  I know -- I think

 2   Edwards was working there, but I -- that was Drew's

 3   friend, that wasn't mine.  And no, I don't know any of

 4   them if they were working at eBay.

 5        Q.    All right.  Thank you.  Why did you leave

 6   eBay?

 7        A.    Kind of a trend I had.  I mean, Drew was, I

 8   mean, by best friend at the time.  I mean, we car

 9   pooled together.  We -- you know, after the gas

10   station we would go get, you know, gummies together.

11   And so all of a sudden, when he got fired, he would --

12   he had a pretty gnarly temper.  He would put the

13   customers on hold and start swearing up a storm and

14   then take them off and then continue the process as if

15   nothing happened.  So, over time, I think one or two

16   of the times slipped where he might have swore at

17   customers.  I might have watered down the story,

18   but -- and so he was eventually let go.

19             And I, at the time, I mean, we lived at Orem.

20   We lived at -- it's east Salt Lake.  We lived at

21   Millcreek together.  And so now I didn't have my

22   carpool buddy, and it was kind of unfair.  I was like,

23   well, why am I going to work and you're not?  So, at

24   the time, it didn't make sense to me, and so I left

25   shortly after Drew.
```

Exhibit 1

```
 1        Q.   How did your learn what you now know about
 2   computers?
 3        A.   Well, I mean, Drew's a genius.  He's taught
 4   me quite a bit.  I mean, I've also self-taught myself,
 5   you know, a bit about computers.  You kind of have to,
 6   with, I mean, how much stuff trends because, I mean,
 7   one day, you know, something is cool.  The next
 8   there's a new program, so it's kind of hard to keep
 9   up.  But it was actually cool.  I know they talked
10   about how my computer had a solid state hard drive
11   into the Mac.  Drew was actually the one that helped
12   pop off my Mac.  We disassembled it together and, with
13   his help, I was able to get a solid state hard drive
14   on top of the normal hard drive, and so it seemed
15   pretty easy getting it undone, but with a lot of help,
16   he -- you know, he -- he was actually the one that put
17   it back together.  So, a lot of things, he was way
18   more on top of than I was.
19        Q.   You grew up in a household with just sisters,
20   correct?
21        A.   Yes.
22        Q.   And you were the baby?
23        A.   Yeah.
24        Q.   The youngest?
25        A.   Yeah.
```

1    Q.    I guess you're always the baby.  Did you --

2    did you feel any sort of brotherly attachment to Drew

3    and some of these other folks that you were hanging

4    out with?

5    A.    Yeah.  I mean, I didn't have any other older

6    brothers.  I didn't really have role models.  I mean,

7    during -- I mean, most of the time I grew up, I didn't

8    even really have parents.  Most of it, I was just

9    figuring it out.  You know, from boarding school

10   straight to college.  You know, from doing my laundry,

11   I, you know, turned to my roommate.  I'm, like:  Well,

12   what do I do?

13        So he showed me how to do cold, cold, so I

14   washed all my clothes cold, cold because I, you know,

15   didn't want to mess up colors.  And so Drew was

16   definitely -- he was older than me.  We met long

17   boarding -- well, it was called free boarding, long

18   boarding, skate boarding.  We met that way, and he had

19   a lot of the same interests with me as far as video

20   games went, and so there's definitely some attachment.

21   And, you know -- and I still consider him my brother

22   today, I guess.

23   Q.    Let's -- I guess let's cut to the chase.  How

24   did you and whoever get started in the drug

25   distribution business?

```
 1        A.    Uh-huh.  So Drew kind of touched on it a

 2   little bit.  So, I was living paycheck-to-paycheck.  I

 3   was working at eBay.  I was saving a little bit and,

 4   you know, just kind of coasting in life.  And Drew was

 5   really struggling as far as money goes and so he was

 6   looking to find, you know, more income.  He was using

 7   a lot of the -- you see the commercials like check for

 8   cash and quick payday loans because he needed stuff

 9   immediately and then he would have to pay it back and

10   so he was just working further down into the hole.

11        And so he -- I mean, I, you know, was mining

12   BitCoins at the time.  I had a huge -- it's called a

13   K&C miner that, you know, was just a plug and play.

14   You just plug it in, it gets my BitCoins.

15        Q.    What is it' called?

16        A.    K&C miner.  It's like a giant metal box.  It

17   was -- during the raid, it was actually in the

18   hallway, and I was like:  Oh, there it is.

19        And so I'd run a couple miners at the time.

20   A few Antminers, that miner.  And so I was, you know,

21   dabbling in BitCoins.  I thought it was a really cool

22   thing.  I kind of saw a future in it.  And so --

23        Q.    About -- sorry, Aaron.

24        A.    Oh.

25        Q.    About what period of time are we now talking?
```

Exhibit 1

1   What year would you say or what years?

2       A.   Oh, man.  I know it's, I mean, 2014, 2015.  I

3   couldn't tell you.

4       Q.   All right.  Go ahead, then.

5       A.   Yeah.  And so, since I was kind of using

6   BitCoins and kind of thinking it was kind of like a

7   new technology wave.  And Drew -- like we both had an

8   adderall prescription and so --

9       Q.   You both had an adderall prescription?

10      A.   Yeah, yeah.

11      Q.   All right.

12      A.   Because, I mean, afterwards I got diagnosed

13  with ADHD, but it was kind of too late because I, you

14  know, wasn't really going back to college, so I kind

15  of realized, like, oh, yeah, this helps.  And so,

16  there is a markup on it as far as, you know, if we

17  could get it off online.  And so we piled in our

18  Adderall.  I piled in, you know, the BitCoins that I

19  was kind of saving up, and then he piled in some

20  money, and we went ahead and opened up a store front.

21      Q.   Selling what?

22      A.   Selling Adderall.

23      Q.   And how did you obtain the Adderall that you

24  sold?

25      A.   It was through a doctor.

1    Q.   A doctor?

2    A.   Yeah, a doctor.  I drove down to a sports

3  medicine doctor down in Provo, and he was just the guy

4  to just prescribe it.  I had to go to a psychiatrist,

5  or I might be wrong in the name, but he had to

6  diagnose me properly and then -- so, you know, once a

7  month I could go down and get it checked out, so then

8  I had a steady supply.  And I know --

9    Q.   A steady -- excuse me.  A steady supply of

10  Adderall that was being prescribed to you personally?

11    A.   Yes.

12    Q.   Not given to you by a doctor --

13    A.   Yeah.

14    Q.   -- to sell?

15    A.   Yeah.  Prescribed.

16    Q.   All right.  Go ahead.

17    A.   Yeah.  And so it was kind of a win-win

18  situation.  It helped Drew.  I, you know, thought it

19  was cool.  And so we went ahead and moved on and sold

20  Adderall, and it made kind of a comfortable, like,

21  extra 900, 1200 bucks a month, so that's how it

22  started.

23    Q.   And then what was the next step, if you will?

24    A.   Next step is -- I mean, I think with money

25  comes greed, and so, all of a sudden, you know, Drew

Exhibit 1

```
 1   realizes he's digging out of the hole.  At the time,
 2   we are still at eBay and so I'm -- you know, to me
 3   it's just -- it's just, whatever.  I'm like:  Cool, I
 4   can buy some Vans.  You know, I didn't really think
 5   much of it and -- and so it kind of got pushed, like:
 6   Well, I'm getting this far out of the hole.  Let's
 7   continue.
 8            Because he was really working on his student
 9   loans.  My -- I was really blessed.  My parents helped
10   me out, and they were paying for my college, so I
11   didn't have the burden of student loans.  And so I
12   thought this was a really great idea to help my
13   friend, you know, and do something that I thought was
14   completely harmless.
15       Q.   And so what did you do?  What was the next
16   step that you did?
17       A.   Oh, sorry, yeah.  So the next step, so we
18   kind of talked about what -- what's available.  And it
19   really connects you to certain things that you
20   wouldn't normally ever see.  And so the next step is,
21   I believe we ordered like a hundred grams of Molly,
22   MDMA, and we started out that way because it's -- I
23   guess from where it's made, it's dirt cheap, and so
24   then we were able to obtain it here, and it's a party
25   drug and so you're able to make, you know, a bit more
```

Exhibit 1

```
 1    money on it.  And from there --
 2        Q.   Aaron, how did you obtain the Molly?  How did
 3    you get started acquiring the product?
 4        A.   So --
 5        Q.   And I don't want you to get any individual in
 6    trouble, but just generally how did you get it?
 7        A.   Yeah.  So, I mean, it's used right through
 8    the dark net market, and, you know, since BitCoins was
 9    the thing, you could pay BitCoins and then they would
10    just ship it out to you and, at the time, I think it
11    was just either in my name or Drew's name.  It was --
12    we didn't really think anything of it.  It was just in
13    our names.
14        Q.   What did you have to do with it to sell it?
15        A.   So, at first we just sold it in gram bags,
16    and then Drew kind of did the math and, you know, we
17    realized, you know, it's not going to be in pill form,
18    but you could put it in caps, so if you crushed it up
19    and then sit there and just tap it and put it in caps,
20    then you could actually, you know, sell it, and it's
21    more better for the next guy.  It's -- and it's better
22    for markup as well.  And so, you know, moving from
23    that, you know, because it comes in a crystal form so
24    you just crush it up, you know, put it in the capsules
25    and sell it that way.
```

Exhibit 1

 1    Q.   How did you find the customers?

 2    A.   And so -- right.  Everything was done on the

 3  marketplace, so all we had to do was just put up a

 4  listing and say this is what we have.  And so, any

 5  time, you know, orders would come through, I would

 6  pass it off, and Drew would ship it.  And then he

 7  would come up with new and different ways on how to,

 8  you know, make it undetectable through the mail, mail

 9  system.

10    Q.   Like what?

11    A.   So, I mean, there was a little bit of talk

12  about stuff online, like, you know, and we had to

13  think, like, okay, you know, the mail system is pretty

14  busy.  What's something that can just move on through

15  that wouldn't be looked at twice?  And so, you know,

16  something like candy bars that we could end up, you

17  know, pulling out Airheads, stuff like that, and use

18  a -- like a sampling food company to then ship it.

19  That way, you know, they open it up, the candy bar is

20  there, it's just pretty much taped or glued, and then

21  they have their product at that point.

22    Q.   Were you or Drew or others using some of the

23  product also?

24    A.   Yeah.  Yeah.  I -- I was using the MDMA.  We

25  had Ambien at one point, which is a sleeper.  I had a

Exhibit 1

1   really tough time.  I would -- so, with the eBay

2   shift, it was later in the afternoon, so I would get

3   off from work, go work out, take pre-workout, get all

4   hyped up, go to the gym, and then, once you're done

5   with the pump, the caffeine is still streaming through

6   my blood stream and so then, all of a sudden, you

7   know, I'm back at home and I'm wide awake and so I

8   would use -- you know, I would kind of -- I would try

9   Ambien.  It wasn't really for me.  I didn't like it.

10          You know, we had gotten GHB so I used that

11  for a little bit.  I ended up didn't liking it, but

12  yeah, we had, like, MDMA, which, I mean, because back

13  then, a lot of pills were being pressed in Ecstasy,

14  and you really don't know what's in it, and so it's

15  kind of a guess like, well, I hope it's going to be

16  okay.  Or, what we later found out is, if you have a

17  mandolin marquis test is you could do a color code and

18  see how it -- what colors pop up as to what's being

19  cut.

20          And so since we knew exactly, you know, this

21  is MDMA, all of a sudden we know, it's -- what exactly

22  we're taking.  And so, I mean, in my strange mind, I

23  thought, you know, we're not dealing with the cut.

24  They are not putting methamphetamine in it.  And so I

25  thought it was a bit safer.  And so we were able to

```
1   also sell it to our friends at really low prices just

2   because, you know, it was just a friend, like, I don't

3   want to make money off of you, you know, let's just

4   have fun.  And so I was able to sell -- we didn't sell

5   GHB to anyone.  It was sold online, though.  And,

6   yeah, we sold just a little bit of MDMA, just to our

7   close friends and MDMA online.

8       Q.   Did you sell Ambien?

9       A.   Yes.  I mean, at one point we had, like,

10  Modafinil, which is kind of like a -- like an

11  Adderall.  We had obtained -- one of our friends had a

12  prescription for Ritalin, and he needed money and so

13  he was: Hey, let me sell you my Ritalin.

14          Okay.  That's fine.

15          So we would buy his Ritalin.  And my friend,

16  Mike Hanson, same thing.  He, you know, he was

17  struggling with money, and, you know, he was, like:

18  Man, let me sell you my Adderall.  You're making money

19  off of Adderall, right?

20          He didn't understand or know how.  He just

21  knew I had mentioned it before.  Yeah.  Sure.  Let me

22  help you out.  I'll buy it.  You know, that's no

23  problem.

24          So I was able to buy his Adderall and, again,

25  sell it online.
```

1    Q.   Then obviously you evolved into other drugs,

2    correct?

3    A.   Yeah.  Over -- over time, it -- it definitely

4    involved -- or evolved.  Things kind of got a little

5    hairy.  We -- I mean, not everything was all rosy.

6    What we ended up doing is, so, they kind of mentioned

7    on another testimony is that there were marketplaces

8    that would just shut down, pull out or just leave and

9    so we kind of got screwed on not just one but multiple

10   occasions.  And so there could have been anywhere

11   between 10, $20,000 that was sitting in escrow and so

12   we would just completely get wiped out.  And so all we

13   would have is just, like:  Okay.  Well, this is all we

14   got.  I guess we'll just start again.

15        And so I can't remember the question.

16   Q.   That's okay.  You were paying some money to

17   get some product from some illegal distributors, I

18   guess, and they got closed down so you lost the money

19   that was in escrow.  Is that what you're saying?

20   A.   Yeah.  That's correct.

21   Q.   But you did ultimately evolve into this huge

22   operation, Aaron, correct?

23   A.   Correct.

24   Q.   So, tell the jury, and take your time to walk

25   us through selling Molly and a couple Adderalls to

1   selling fake Oxy.

2      A.   Yeah.  So with money comes greed, and so at

3   that point, I remember -- so I'm going to jump into

4   the time frame of obtaining the single pill press that

5   would just punch down and pop out one pill at a time.

6   And so, you know, because I didn't know anything of

7   it.  And, you know, I was -- we were -- at the time

8   we're getting Zanax from another country.  I believe

9   it was India.  And so Drew came up with the idea of,

10  well, we could just press it.  And so I'm, like, okay.

11  And so in his brainyac brain of his, you know, he's,

12  like, it's just a simple -- you know, it's just

13  simple.  It's an algorithm.  And so he did the math.

14         And he's like, we could easily find out

15  what -- you know, if we, you know, rule out the active

16  ingredient, we could find what else we need to put

17  into it.  And so at first we started with just the

18  microcrystalline cellulose in the product and realized

19  that wasn't going to work.  And then --

20     Q.   Why?

21     A.   You need more active -- or not active.  You

22  need more chemicals in it.  There's, like, an

23  anti-caking agent, a lubricant.  There's a lot of

24  stuff that kind of goes into it.  And so I -- I

25  remember, like, being stuck.  He's being frustrated.

```
 1    He -- and so I remember finding a company that sold a
 2    one bag -- you know it -- you know, one bag fits all,
 3    like, it's like this is what you need, assuming that
 4    that's exactly -- you know, it comes canned, as like
 5    the solution, and so, you know, I was, like, okay,
 6    let's try this.
 7              I gave it to Drew, and Drew, you know, was
 8    able to make it work.  And a lot of swearing and
 9    frustration and, you know, he was able to pop out to
10    what we initially were aiming for, which was Zanax at
11    the time.  And then he was able to do the same thing
12    with MDMA.  And so Drew was dating a girl, Sasha, and
13    so she eventually, like my girlfriend, found out what
14    we were doing.  I mean, she's like:  You quit your
15    job.  What are you doing?
16              I'm, like:  Trading BitCoins.
17              And I was trading BitCoins on the side, but
18    it wasn't very heavily, and so, eventually, you know,
19    things kind of get out.  And Drew's girl wasn't really
20    okay with it.  And so, over time, it did evolve from
21    Zanax, but it didn't move over to any other products
22    until, I mean, Luke pretty much got involved.
23    Q.    Okay.  And you talked about this first pill
24    press that you bought.  How did you find it?
25    A.    I mean, good question.  I think it was just
```

1  some back page to some -- excuse me -- some Chinese

2  website that was offering the press.  Again, we didn't

3  know anything what we were doing or what it was about,

4  and eventually, we're, like, okay, well let's -- you

5  know, it's pretty expensive.  Let's dive into it.  I

6  mean, we weren't really being paid all that much from

7  the proceeds.  It was kind of like working on a

8  minimum wage for a long time.  And so we're, like,

9  let's see if this works.

10        And once we were able to obtain that, then,

11  you know, the process kind of evolved from there, I

12  should say.

13     Q.   If you could bring up 17.06 again.

14        Before we get to Mr. Paz, you did start

15  working with some of these people, correct, on the

16  Zanax, or maybe I'm wrong.  Tell me how that evolved.

17     A.   Yeah.  Yeah.  So, at the time, the girls

18  Tonge and Bustin, they were involved, and so they were

19  involved with the Zanax as well.  I don't believe

20  Noble was.  I mean, I think Gygi was just drop.  I

21  mean, we only had, like, Gygi and maybe one or two

22  drops at the time, like, they were just accepting, you

23  know, packages and delivering.  So it was, I mean,

24  fairly small, nothing that's up there like it is right

25  now.

```
 1          And it's funny because each drop, I wouldn't
 2    even mention to anyone, they would approach me and
 3    say:  What do I have to do for money?
 4          And I would say:  Well, if you want, you
 5    could just accept this and deliver it.
 6          Yeah.  Yeah.  Let's keep doing that.
 7          So it just continued to evolve as, you know,
 8    more and more people wanted to, you know, what are you
 9    doing?  Let me in, whatever you're doing.
10          I'm, like, okay.
11          And so from there -- so Tonge and Bustin,
12    Drew showed them how to ship, showed them how to
13    disguise, showed them pretty much everything, he
14    showed them the BitCoin wallets, the email.  He showed
15    them -- it was basically like, you know, because
16    they -- I guess I could take a step back.  So Tonge
17    and Bustin approached me at one point, and they were
18    like, hey, we have our mom's prescription.  We want to
19    sell it to you.
20          And I said, well, it's not really my thing,
21    but, you know, if it will really help, you know, you
22    guys out, I'll order it -- I'll buy it off you and
23    then we'll just do it on line.
24          So, slowly, you know, at one point, I bought
25    my friend's B.M.W.  He was trying to buy a house and
```

```
 1   so, you know, it was just a 2008 and so it wasn't
 2   anything crazy or special, so they saw me with the car
 3   and they were like, well, what do we have to do to
 4   like, you know, to get into this?
 5         And so I was like, look, you know, you could
 6   talk to Drew, and, I mean, if this is something you
 7   want to do, then, you know, you could go ahead and I
 8   guess get started because I didn't know what they
 9   should be doing past a drop.  I was like, well, I
10   mean, website is taken care of.  Drew is doing all the
11   shipping, postage, running around, errands.  And then,
12   as far as cashouts, Drew was doing a bunch of them,
13   and I think I was doing some of the side, and so at
14   the time, Drew kind of saw this as an opportunity to
15   kind of -- kind of pivot, I guess.  And so, from the
16   Zanax over is this is when Drew was about to leave the
17   country.
18         And so I remember him saying -- so, we had
19   had a lot of talks, a lot of talks about what was
20   happening.  There's a lot of frustration going on, a
21   lot of, I guess we won't say butting heads.  He was
22   dating his girl, which turned in to be his fiance.
23   And I thought she was really cool.  She was an
24   alcoholic, he was a pot head, so their two problems
25   kind of collided and I guess made sense and so he was
```

1    saying:  She wants to travel the country.

2            And I was like:  Okay, cool.

3            And he was like:  Well, I want to go.

4            I was like:  All right.  That's cool.  Well,

5    what do we need to do?

6            He goes:  Sasha doesn't like what I'm doing.

7            And so I was like:  Okay.  What do I need to

8    do?  What do I --

9            And he's like:  You know, I want you to tell

10   everyone I'm bought out.

11           And, you know, at the time I think he had

12   20,000.  I had pulled out, I think -- I can't remember

13   what I paid for the boat, but I think it was around

14   20,000 as well because I had bought a boat with my

15   friend Miles.  And so once we kind of got the

16   transition, he showed Luke how to run the machine.  He

17   showed -- I mean, I didn't.  He's like:  Here, Aaron,

18   you know, why don't you try to understand this.

19           So I'm sitting there, and he's turning knobs

20   and showing him how to run this.  And Luke's looking

21   at me, and I'm looking at Luke like, well, I hope you,

22   you know, understand this.

23           And so eventually, you know, that was the

24   transition.  Drew left the country.  Luke kind of took

25   over, took the, you know, the pill press spot.  The

Exhibit 1

44

```
 1    girls were now shipping.  I was, again, just, you
 2    know, running the website, which, you know, processing
 3    orders over, moving them down and getting them over to
 4    the shipping company or to the girls.  And, you know,
 5    and we had a lot of bumps on the road.  There was a
 6    lot of issues that would come with his transition out
 7    of the country.
 8          And so really, when it came down to, I mean,
 9    the reason for, you know, this whole thing is, for the
10    Fentanyl Roxy's was, at the time, I was being trained
11    by the gentleman that's second from the left, Kenny.
12    He -- you know, I don't know if he owned the gym or if
13    he was a personal trainer.
14    Q.    When you say you were being trained by him,
15    you mean he was your trainer, your physical trainer?
16    A.    Yeah.  Yeah.  Yes.
17    Q.    Okay.  You transitioned into Kenny there.
18    You finally got me there.  So, go ahead.
19    A.    Yeah.  Sorry.  And so he was -- you know,
20    Miles had mentioned to him like, hey, this guy, you
21    know, Aaron could get anything.  You know, I have a
22    friend that could get anything you want.  And really
23    it was just I had found the Dark Web and, you know, I
24    would, you know, do small things for friends like if
25    my friend needed a certain antibiotics.  He's like:
```

```
 1    Dude, I don't have time to go to the doctor.

 2            I'm just:  Go to the doctor.

 3            He's like:  Dude, can you help me out?

 4            And so I'd get him antibiotics, something

 5    really simple.  And so anyway, Chris kind of heard

 6    that, and he's like:  Hey, I was working with this

 7    other guy over here and, you know, they kind of talked

 8    about Fentanyl, a Roxy at a time.  And there was a

 9    falling out.

10            And so he was really leaning into me like:

11    You should really do this.  And he's like:  Well, what

12    can you get?

13            And I'm like:  Well, I -- you know, Zanax.

14            And so at the time he was, you know, buying

15    Zanax and selling it and so that kind of happened

16    several times.  And so eventually, you know, after so

17    many conversations, so many goings, he -- you know, I

18    started bringing up to other people.  You know, I

19    said:  Okay.  Is this -- it this a possibility?  Is

20    this -- I don't really know anything about it.  I have

21    never done a pain pill.  I have never taken opiates.

22    I've, you know, stayed away from that my whole life.

23    And so this is kind of new to me.  I don't know how I

24    feel.

25            And it -- at the time Luke was on board.  He
```

```
 1    just came back from Vivant, and usually the Vivant

 2    sell is, go sell for the summer.  You come back and

 3    then, you know, you've got a lot of money.  You flash

 4    a lot of cash.  So he had just got back, had a BMW.

 5    So I was like:  Oh, man, are you doing good?

 6          He was like:  No.  I paid off all my debts

 7    from the time I wasn't doing good.  So his real push

 8    was, well, I really want to make some money.

 9          And so I -- you know, Zanax was something

10    that I would take on occasion.  I would, you know,

11    bite a little corner and then take it for sleep, and,

12    you know, it's kind of a cool feeling to feel through

13    your bloodstream, you know, so it's like:  Zanax, not

14    so bad, you know.

15          And so he -- the thing that we organized out

16    because of how many payment kind of worked, is he

17    wanted to get paid not so much for like a percentage.

18    I was like:  Well, how do you want to get paid?

19          He said --

20          You know, do you want a percentage of what's

21    being sold?  Do you want a percentage?

22          He goes:  I want a fixed amount of work being

23    done, so anything that I make, I get paid.  I get, you

24    know, money.

25    Q.    You're talking about Mr. Paz now?
```

1    A.   Yeah.  Mr. Paz at this point.  And so, you

2  know, with Zanax, he's, you know, the markup is so low

3  that, I mean, these things are being sold for 50 cents

4  to a dollar, and it's -- you know, there's not much of

5  a markup, so his sweat and tears of all day work turns

6  into -- I mean, it's still a substantial amount of

7  money, but, you know, when we're kind of talking about

8  this possibility, he's saying this would be great.

9  Let's, you know -- and so I -- again, I kind of tossed

10  it in my head.  I'm like -- it took a long time for me

11  to come around and actually do it.

12         I mean, as you can see, it took months

13  from -- you know, the whole time I was talking to

14  Chris, the whole time, between --

15    Q.   This is Kenny?

16    A.   Oh, yeah, Kenny.

17    Q.   Okay.

18    A.   And so, it kind of took a long transition.

19  And so I had actually -- you know, Drew was having

20  fun.  He was out there.  He was really enjoying life.

21  And I had actually reached out to him and I had gotten

22  his opinion.  I said:  What do you think about this?

23         And I think he said something along the lines

24  like:  Well, you know, you've got to follow the money.

25         And so I was like:  Okay, you know.  And so

1    at that point, we went ahead and decided to move

2    forward.  And so I had ordered the A-215 die.

3        Q.   Aaron, when you say we decided to go forward,

4    who is the "we" at that point?

5        A.   I mean, it was -- it's hard because you

6    can't -- you can't really say one moves with -- you

7    know, it's everyone kind of -- it's kind of like at

8    this point, we're all friends.  We're all moving

9    together.  And so it wasn't just this person's

10   deciding.  It's, you know, okay, let's go ahead and do

11   this because it's -- in the end, everyone is

12   succeeding.  Everyone is, you know, doing better.  I'm

13   seeing the switch in people's lives where they are

14   stressed and now they are more comfortable and so, you

15   know, I kind of brought it up.

16            And so I believe it came down to, I mean,

17   Luke, Drew and I.  I mean, I brought it up to the

18   girls, but they -- I mean, they don't really care.

19   They are just, you know, putting things in and

20   shipping it out and so it didn't really bother them.

21   And so they were just worried about -- because at

22   first we -- we didn't have any really money to pay

23   them on a weekly basis.  So I'm like:  I promise you

24   I'll get you this.

25            And they are like:  Okay.  You know, just

Exhibit 1

```
 1    give me the paycheck.
 2            Because I was like:  Do you want a percentage
 3    because I'd rather do that so then you can ride the
 4    lows and highs.
 5            And they're like:  No, no, no.  Just put me
 6    on the weekly.
 7            So I'm, like, okay.  So, at that point, it
 8    became, you know, let's go ahead and do that.  And so,
 9    not knowing anything about it, we used the -- again,
10    the canned substance.  We were just taking it and
11    throwing it in and, you know, we -- the only blue dye
12    that I knew was a dark blue and so Luke actually
13    figured out if you could just take literally just your
14    hands, and it's just a small flick, and you would
15    literally just put a few particles in.  And when you
16    shake that up with everything in it, that will give it
17    just the light blue.  So at first they were, you know,
18    too blue, too light.  But eventually he was able to
19    kind of find, you know, a good balance on that.
20       Q.   What was Chris Kenny's involvement in terms
21    of the Fentanyl and the opioids?
22       A.   As far as the Fentanyl and opioids, he was --
23    he was the connection into, I guess, Utah, and, you
24    know, through word of mouth, I've heard -- you know,
25    it kind of went from there.  But he was just the one
```

1  guy that -- I mean, it was his idea the whole time

2  that he was kind of leaning on me, saying, you know,

3  this is what you need to be doing.  This is -- you

4  know, there's money to be made, and, you know, so, at

5  that point, he was really kind of leaning on me to

6  move towards that.

7          And to be honest, I, you know, actually liked

8  the Zanax.  That's why I kept it on.  And so that was

9  like my thing, you know.  We used a GG 249.  I think

10 it was an out-of-the-country look.  And, you know,

11 it's something -- because I've seen the American bars,

12 and I don't really, you know, like them too much, so I

13 liked the GG 247.  And so with him, he was, I guess,

14 kind of like the outlet.  I mean, it was kind of the

15 start, the idea, and, you know, from there he was also

16 buying in decent quantities.

17     Q.   Drew had told his girlfriend and others that

18 he sort of was bought out of the business, but in fact

19 he remained, correct?

20     A.   Yeah.  That's correct, so --

21     Q.   Go ahead.

22     A.   So, I mean, like I said, he was my brother,

23 and I wanted to do anything that I could for him, and

24 I mean, like with my girlfriend, I -- you know, when

25 she found out, I was like:  Well, sucks, but this is

Exhibit 1

```
 1    what I'm doing.
 2           And we kind of argued on that and eventually
 3    broke it off.  And so with him, he wanted to go a
 4    different direction.  He said:  I really want to marry
 5    this girl.
 6           And I was like:  Cool.  I -- you know,
 7    proceed.
 8           And so we sat down and we talked, and he's
 9    like:  Okay.  You know, let's -- I need everyone to
10    know, you know, that I'm, you know, moving out of the
11    country.
12           It was kind of like a public stunt in a
13    sense, and so, you know, he got to travel.  And then
14    the idea was is that he was really pushing because I
15    was like:  Yeah, man, just whatever I can do to help,
16    let me know.
17           And he was like:  Well, how about I come back
18    in like a few months, and, you know, I'll press for a
19    month, and you guys will be good and then you can just
20    surf on that for awhile.
21           And so I'm like:  Sure, I mean, yeah, that
22    sounds, you know, logical.  And so his idea was to
23    come back and then, you know, save up some money so
24    that way I could pitch it to him and then he could go
25    ahead and jump back and continue his surfing around
```

```
 1    the world.  And --
 2         Q.   How did you -- how did you exchange money
 3    with Drew while he was on the other side of the world?
 4         A.   I mean, it just depended.  If he needed bills
 5    paid, I could, you know, write through, slip it on to
 6    his bank account.  I could -- I mean, for the most
 7    part, I just sent him BitCoins.  I mean, you could
 8    receive it anywhere in the world.  It wouldn't matter
 9    if it came from my account or the actual marketplace
10    itself.  Marketplace was actually a little bit safer
11    because they had a tumbling service embedded into it,
12    and so that way he could go ahead and use that, in a
13    sense.
14         Q.   What do you mean the marketplace?
15         A.   Well, the dark net market website.
16         Q.   So he was able to access the BitCoins from
17    this operation, if you will, through that?
18         A.   Yeah.  In a sense.  I mean, if he would send
19    me a message and say:  This is what I need.
20              You know, it only would take just an hour to
21    send it through.  And so he wasn't too interested on
22    being hands on, on the actual marketplace itself
23    because, you know, he was -- you know, he had dealt
24    with the marketplace.  He would buy weed and stuff off
25    of it like, you know, when we sold weed at the time,
```

1     that was his doing.  He was like:  Well, we can buy a

2     pound and, you know, then if I smoke weed, it's only

3     $3 a gram.  And, you know, he would kind of do the

4     math in that sense.

5           And so, I mean, at the time, he didn't have,

6     I guess, direct access.  He had, like, kind of a side

7     access, but, like, the first account that we had, one

8     time -- you know, sometime in the months, he's like:

9     I need -- I want to look at something.

10          So, you know, I shot him the password.  It

11    wasn't an issue.  Yeah.  Here you go.  Go ahead and

12    jump, you know, on, and, you know, whatever you need

13    to check out.

14          So it wasn't that he was blocked from it.  It

15    was just, he -- I don't think he had any interest.

16    Q.   What was Luke Paz doing while Drew was

17    traveling the world?

18    A.    Well, Luke, he -- so at first he came back.

19    He had a couple months that he was, you know, kind of

20    work free.  So, at that sense he was getting trained

21    by Drew and then pressing.  And then once he found the

22    formula, the, you know, Fentanyl Roxy's, then, you

23    know, that's basically what he did is he would come

24    over, press, bounce, and then he also did some

25    traveling, too, with -- they did pre-season, so you go

```
 1    out for the pre-season, go sell, and then you would

 2    come back.  And so that way, for his mind, he wanted

 3    to be out of the public eye, and he wanted to, you

 4    know, at least keep a facade of selling, even if he

 5    was or wasn't.

 6         Q.   You mean selling legitimately through the

 7    company that he was working for?

 8         A.   Yes.  That's correct.

 9         Q.   And you said the name of that company but

10    I've forgotten it already.

11         A.   I think it's Vivant Security.

12         Q.   All right.  Take us up to 2016 then.  What

13    was happening in the -- maybe the five or six months

14    before your arrest.

15         A.   Five or six months, things kind of really

16    picked up.  I mean, things were never really great

17    from the start, but they finally kind of moved

18    forward.  So, at that point, you know, Luke wanted

19    to -- because, I mean, he got -- he got a fixed rate

20    of everything that was being made, so we kind of moved

21    up to a pill press such as the one that you see in

22    front.  So it was easier.  It was faster.  It was more

23    accurate.  And -- oh, crap.  I forgot what I was going

24    to say.

25         Q.   That's okay.  That's okay.  It was a dumb
```

Exhibit 1

1  question anyway, but I'm trying to get you up to

2  November of 2016, but let's start with a couple months

3  prior to that.

4      A.   Okay.

5      Q.   Your business picked up, and you were

6  starting to buy bigger -- or at least a bigger or two

7  pill press, correct?

8      A.   Yes.

9      Q.   And your market was getting bigger?

10     A.   Yeah.  I mean, it's how -- I mean, you could

11  you kind of control the market in a sense.  I mean, in

12  a sense, we're kind of getting flooded with more

13  orders.  I mean, on the screen, the girls were getting

14  pretty frustrated.  They were on, you know, on an

15  income, and they said:  Look, we're so busy.  Why

16  don't you, you know, just do the logical thing and

17  instead of selling singles and tens and 20's, just

18  move up to hundreds and thousands.  That makes sense.

19  That would be easier.

20          So, I mean, in my mind, I'm like:  Well, is

21  that what you guys want?

22          They are like:  Yeah.  It would be less

23  packages.  And they said, you know, and besides, it's

24  more money.  We would all benefit.

25          And so it was kind of a transition saying,

Exhibit 1

```
 1    okay, you know, and this is what I kind of do.  I go

 2    to Luke and I say:  So is -- you know, is this what

 3    you want to do, though?

 4           Yeah, of course, I mean, you know, because

 5    the more we get out, it's better for us, you know,

 6    we'll have an indated mind (as spoken).  Let's do

 7    this.

 8           You know, so I, you know, kind of go to

 9    the -- he was kind of grandfathered on this whole

10    thing.  I say:  You know, is this what we should be

11    doing.

12           He says:  You know, you got to follow the

13    money.

14           So it was kind of like, let's -- I guess

15    that's what we're going to do.  I mean, it's really --

16    really stupid kind of thinking about it now.  I mean,

17    really shameful, too, but, you know, at that time,

18    about halfway through, that's when things kind of

19    started picking up.

20           And several months into that, it went from

21    kind of a hobby into something that I was kind of --

22    my eyes were a little too big, and I was like:  This

23    isn't what, you know, I expected at all.  Like it went

24    from, you know, something so small, you know, back

25    then, into, you know, something like this now.  And,
```

Exhibit 1

1    like, so, when we had the two machines, I would press

2    the Zanax.  If you noticed, there was two chairs.  I

3    would press the Zanax.  It's real easy.  It's just

4    the -- I mean, Drew already set up the mathematics.

5    So it was just bag the Zanax.  And Luke would actually

6    help set up the -- I don't want to say coordinates,

7    but the knobs.

8            And so, at that point -- and you could see,

9    there's a bunch of powder around it, which is really

10   embarrassing because there's, like, something that

11   comes down as a flap, that keeps the powder from

12   spilling in, and in my rush, I just screwed it down

13   and went, when Luke is the one that kind of sits there

14   and eyeballs it and really sets it on, so that way

15   it's really perfect and there is no powder that's

16   spilling.  And then, at that time, Luke is right next

17   to me, and he's pressing the Roxy's.

18   Q.   And were the presses basically the same, or

19   how were they different?

20   A.   I mean, they're -- they are the same in

21   similar ways, but, I mean, it was kind of like getting

22   into something new and, at that point, kind of

23   interesting, I mean, so his was just basic, like the

24   speed valve was just this little tiny knob, and the

25   one that I was using, there was an LCD screen that

```
 1   could even give a pill count, what you're doing, and

 2   then you could adjust the speed, though it kind of

 3   sucked, like the more basic one was, I guess, in a

 4   sense better, but that's as far as I know.

 5       Q.   At this time, were you and Drew and Luke

 6   getting most of your income from BitCoin, then?

 7       A.   Yes.  That's correct.

 8       Q.   But the girls, as you've described them, and

 9   perhaps some of the others were getting paid in cash;

10   is that right?

11       A.   Yeah.

12       Q.   So tell the jury how you were converting --

13   and I know we've heard it a hundred times -- the

14   BitCoin to cash.

15       A.   I mean -- so there's various ways -- I mean,

16   back then, especially when we first started, I mean,

17   you would have to almost beg someone to take BitCoins,

18   like -- and we were overpaying people to just take

19   them, like:  Look, we'll give you a $50 break.  Just

20   take them.

21            And so, over time, it kind of evolved.  I

22   mean, nowadays, companies like New Egg and, I don't

23   know, they take BitCoin, so it's, you know, a little

24   bit more fluid currency.  So, back then, we had --

25   there is a kiosk that was a BitCoin kiosk that we
```

Exhibit 1

```
 1   could use as well as it was pretty much all
 2   peer-to-peer.  And then there was BitStamp.  So, I
 3   mean, it just kind of varied as far as, like, when we
 4   would cash out.
 5       Q.   And you would cash out periodically to pay
 6   some of these other people that didn't want to deal
 7   with BitCoins, they wanted cash?
 8       A.   Yeah.  They didn't understand it.  I mean,
 9   Drew explained it to the girls, but they were like:
10   And then what?
11            You know, and so they were like:  Just -- I
12   just want money.
13            And we're like:  Okay.  That's fine.  Just
14   here.  Take it.  Take money.  That's easier.
15       Q.   How did -- let's talk about some of the other
16   people -- Mario Noble get involved?
17       A.   Mario Noble, I think was referred by, I mean,
18   Sasha, Drew's girl.  They had an idea of, you know,
19   packages coming in because, I mean, that's, you know,
20   again, you know, I took Molly at times.  I thought it
21   was cool and so, you know, then we would give it to
22   our friends, and so they had an idea that drugs
23   were coming in and put two and two together.  That
24   makes sense.  And so Sasha went ahead and referred
25   Noble and said:  Hey, you know --
```

Exhibit 1

```
 1              Because he was complaining about money.  And

 2      he's like:  Ah, you know, I'm paycheck-to-paycheck,

 3      like, I'm in debt, you know, credit cards.

 4              And so, through him, he kind of approached

 5      us.  I don't know if I talked to him first or Drew,

 6      but he basically got the rundown of, okay, go ahead

 7      and accept packages and you could receive money.

 8         Q.   What about Mr. Gygi?

 9         A.   Same thing.  He was Drew's friend.  I thought

10      he was a little odd.  He was very closed with him and

11      his girlfriend, and that was -- he was on the vetter

12      side with eBay, so I guess he sat close to Drew, and

13      so Drew hooked him on being a drop.  And then, you

14      know, he didn't get more involved until the girls were

15      saying:  Look, we don't want to go to post offices.

16      We don't want to pick up stamps.  We don't want to do

17      this.

18              And that's when I approached Gygi and said:

19      Hey?  Is this something you want to do?  I mean, you

20      could just go pick up some postage.  You could just

21      drop it off in some blue boxes.

22              You know, I think -- you know, and at the

23      time I think he got fired from eBay as well and so he

24      was really kind of starving.  He was kind of not

25      really doing well as an individual and so I said --
```

Exhibit 1

1    you know, I mean, things just kind of weirdly meshed

2    together.  It was just like, well, this is what they

3    want.  Is that -- you know, do you want to try it out?

4            Yeah.  Yeah.  Why not?

5            So, okay, that's cool.

6            And I believe -- I mean, Drew was, you know,

7    out of the country so it was just, like, yeah.  Let's

8    do that.  We had excess income, so we were up to kind

9    of get him, you know, accepting drops and moving

10   postage every day.

11       Q.   What were you doing with your income that you

12   were making?

13       A.   Good question.  I mean --

14       Q.   Storing it in your sock drawer?

15       A.   Yeah.  Yeah.  I mean, as you can see, my cars

16   weren't new.  The B.M.W. was bought from one of my

17   friends, Ben, and, I mean, and then right towards the

18   end, another instance, my friend Roy, he was selling

19   his car.  I remember, you know, kind of checking out

20   the car.  He was selling it to Miles, and I was

21   looking at it, and I was like:  Well, is it awesome?

22            And he was like:  Yeah.  It's pretty awesome.

23            And I was like:  Yeah, you know, let's do it.

24   I'll buy the truck.  But, I mean, I didn't like to be

25   super flashy.  I, you know, started out buying some

```
1    designer things and then all of a sudden people kind

2    of change.  They treat you different.  They just

3    expect things more out of you, like, say, if we were

4    at a concert and, you know, they are like:  Oh, he's

5    going to get shots, and they kind of look at me.

6            And I'm just like, I need to stop wearing

7    these clothes.

8            And so I kind of just spent it on casual

9    vacations.  I didn't really splurge on anything

10   except, you know, there was a TV and, you know, and

11   then I tried to be more mature and I bought some

12   furniture.  And that's basically it.

13   Q.   Just sort of a diversion for just a minute.

14   Your mother testified to a duffel bag of cash that was

15   delivered to her and another packet of cash that was

16   apparently delivered to one of your sisters.  Can you

17   tell the jury about those?

18   A.   Yeah.  And so they were really encouraging me

19   to save my money at the time, and I was not against

20   it.  I mean, I was a kid.  I mean, I kind of still

21   view myself as a kid.  And so I thought that was a

22   great idea.  I was dating someone at the time, so we

23   drove down to Pine Valley in the truck that I bought.

24   You know, I was like: Hey, let's try out the truck.

25           You know, and so, you know, I was able to,
```

Exhibit 1

```
 1    you know, deliver a duffel bag of money to them.

 2            And they were kind of surprised, and I was

 3    like, you know, here it is, you know, just hang on to

 4    it.  If I ever come up with an investment or need it

 5    for anything, you know, it's a way that I just won't

 6    spend it.  So they accepted it at that time.

 7            Another time is when my sister was driving

 8    through Utah.  She stopped by the house.  You know, I

 9    hadn't spent too much time with her little kids which

10    were really cute.  It was -- they look just like my

11    sister and her husband at the time.  And so, you know,

12    I took advantage of the opportunity.  I said:  You're

13    going to parents' house, right?

14            Yeah.

15            Hang on.

16            You know, so I, you know, filled up a -- just

17    one of those gym bags that, you know, have the

18    shoestring and it was just tied up, and I was like:

19    Well, you could bring this down, right?

20            She kind of looks at me like:  Yeah, we could

21    take it down.

22            I'm like:  Okay.  Cool.

23            So I was able to, I guess, in a sense,

24    through, you know, what my parents would suggest is

25    saving money.
```

```
 1        Q.   So you -- you didn't intend for these to be

 2   gifts to your sister or your parents.  It was just you

 3   sort of rat-holing it for a rainy day or something

 4   like that; is that fair?

 5        A.   Yes.  That's correct.

 6             MR. SKORDAS:  May I have just a minute, Your

 7   Honor?

 8             THE COURT:  Yes.

 9             MR. SKORDAS:  I apologize, Your Honor.

10             THE COURT:  I didn't hear what he said.

11             MR. SKORDAS:  I apologize.

12             THE COURT:  Oh.  Apology accepted.

13             MR. SKORDAS:  Could we go to Exhibit 783,

14   please.

15             THE COURT:  783?

16        Q.   BY MR. SKORDAS:  Can you blow the four

17   packages up a little bit for me, Yvette.

18             Aaron, do you see that?

19        A.   Yes, I do.

20        Q.   How did you get to that?  How did you get to

21   that?  And I'll indicate that this is a picture that

22   shows packages with, it looks likes thousands of pills

23   in each one.  There even is a handwritten note that

24   says, I think, 2,000 or something on each one.

25        A.   Yeah.  I mean, things kind of exploded and, I
```

```
 1   mean, it's really a good question because, I mean,

 2   it's one of those things where everyone is benefiting

 3   from more.  And so it wasn't just, like, the girls

 4   wanted less shipments.  You know, Luke wanted more

 5   money.  I, you know, was cool with whatever.  I mean,

 6   I'm not going to lie.  Money is cool, so I was like:

 7   Why not?

 8             And, at the time, Drew was traveling the

 9   world.  And so, if it was up to me, I would have

10   pushed down and kept it mom and pop.  You're able to

11   work with people a lot more closely on it, but it's --

12   it just kind of, I guess, progressed in that

13   direction.  It's one thing led to another.

14        Q.   Thank you.  Earlier you said something that I

15   hadn't heard before.  You said we were -- maybe I

16   mischaracterized it.  You said something like:  We

17   were looking for the end, or you were thinking there

18   was an end.

19        A.   Yeah.

20        Q.   What did that look like to you?

21        A.    It was December.  We were coming up as, you

22   know, when can we unplug?  Like, what's -- you know,

23   this isn't a lifestyle.  I -- I honestly felt, like,

24   hollow.  I wasn't a human being, like, I wasn't happy.

25   You know, I could wear cool clothes, but I was just
```

```
 1    like:  Man, I'm a piece of shit.

 2            So, it kind of came to a point where I was

 3    talking with Luke.  And Luke was like:  Look, we need

 4    to be done with this.

 5            And I was like:  Yeah, I wanted that last

 6    year.  And this is where I'm at, you know.

 7            And it's just -- you know, one thing led to

 8    another of, you know, when we wanted to stop, it's

 9    like, well, this person -- you know, Drew -- Drew

10    needs this much money, you know.  So it's like, okay,

11    well, we got to keep going.  It's like, well, okay,

12    you know, now I just need to be a little bit more

13    comfortable.  So we kept going.  And so at the end

14    point, which was kind of funny, is -- not funny.  It

15    was -- it was just right there, and so I was looking

16    at it.  And I kind of talked to even Gygi about

17    moving -- marijuana was legal over in Colorado and so

18    I had an idea about moving up.

19            And then, you know, we had talked about

20    ending, but at the same time it was always the back

21    door of:  Well, let's take a break for a long time and

22    maybe get back to it.  But the end was, you know,

23    ideally in December.

24      Q.   Talk to us about the day of November 22,

25    2016.  What happened that day?
```

```
 1       A.   SWAT, multiple agencies kicked down my door,
 2   and I was arrested.
 3       Q.   Were you home?
 4       A.   Yes, I was.
 5       Q.   Who else was there?
 6       A.   No one else.
 7       Q.   Where were you when they kicked down the
 8   door?
 9       A.   I was coming out from the basement.
10       Q.   What had you been doing?
11       A.   So, at the time, I was waiting for Luke to
12   get there.  He is pretty lazy, so I mass-texted his
13   phone, and then I was actually down there pressing
14   Zanax at the time.
15       Q.   Were you taken into custody?
16       A.   Yeah.  Yeah.  I was taken into custody.
17       Q.   And you have been in custody ever since then,
18   correct?
19       A.   Yeah.  Yeah.  I have been in custody ever
20   since.
21       Q.   Why didn't Luke show up that day?
22       A.   I'm assuming just dodged a bullet because
23   they came at 10:00 o'clock.  He's always late.
24       Q.   10 a.m.?
25       A.   Yeah, 10 a.m.  And so I honestly don't know,
```

Exhibit 1

1    so, I mean, it was just me, so that's where they

2    rested their hat.

3            MR. SKORDAS:  Would this be a good time for a

4    short break, Your Honor?

5            THE COURT:  Yes.  We'll be in recess for

6    about 15 minutes.

7            THE CLERK:  All rise, please.

8            (Whereupon the jury leaves the courtroom.)

9            THE COURT:  This is the day, remember, I have

10   problems starting at noon.

11           MR. SKORDAS:  Very well, yes.

12           THE COURT:  I need to be gone about ten to

13   noon.  This has been a long-standing problem, but if

14   we're not done with this witness today, we'll bring

15   him -- I mean, he'll finish Thursday morning before we

16   do the instructions and closing.

17           MR. SKORDAS:  That's fine.

18           THE COURT:  Given there is no sense bringing

19   the jury in for -- it wouldn't be very long.

20           MR. SKORDAS:  Right.

21           THE COURT:  -- testimony on Wednesday.  All

22   right.

23           MR. SKORDAS:  Yes, sir.  Thank you, Judge.

24                  (Short recess.)

25           THE COURT:  Should we get the jury and

```
 1    proceed?

 2              MR. SKORDAS:  Yes.  We're ready.

 3              THE CLERK:  All rise for the jury.

 4              (Whereupon the jury enters the courtroom.)

 5              Please be seated.

 6              THE COURT:  You may proceed, Mr. Skordas.

 7              MR. SKORDAS:  Thank you, Judge.

 8        Q.    BY MR. SKORDAS:  Aaron, I probably should

 9    have just asked you these before the break because I'm

10    almost done.  You testified earlier, right at the

11    outset, that you have been in jail continuously since

12    November of 2016, correct?

13        A.    Yes.  That's correct.

14        Q.    Have you had occasion to have cellmates or

15    roommates who had drug problems?

16        A.    Yeah.  It's an eye-opening experience.

17    It's -- they come in and they are miserable.  They

18    look miserable.  And they are coming off.  Some of

19    them are throwing up.  I've seen an old man take a

20    crap where it hits the wall, like it's really not a

21    pretty scene.  To see it firsthand -- I mean, I was

22    never around addiction really, and so I never got to

23    see anything like that, and so seeing someone go

24    through the struggles was really intense.

25              I mean, a lot of them are abusing meth.  A
```

```
 1   lot of them are abusing heroin.  And it's just -- they

 2   are sucked up.  They are a hundred -- I mean, these

 3   guys should be 180 pounds, and they are 120, 130, and

 4   they are coming in.  And when they are coming to jail,

 5   they are finally getting the nutrition that they need.

 6   As far as heroin, they are either sick, their body has

 7   gotten so used to it in taking it so long and

 8   increasing the doses, that they just -- you know, when

 9   they drop off -- I mean, I don't want to publicly, you

10   know, shame the jails I was at, but, you know, they

11   kind of give them a Gatorade and say:  Well, all

12   right, you know.

13          It's kind of like, so, they are just left

14   there, like just miserable.  And, you know, and then

15   watching this, like, Dude, it's horrible.  And I ask

16   them, you know, simple questions, because I, you know

17   I'm like:  Why?  Why do you do this?

18          You know, and they can't really give me a

19   straight answer, and I kind of see that it just takes

20   over their life.

21          And you just don't see that when someone

22   orders something.  They praise it.  A guy here, you

23   know, it's excellent.  You're the best.  Like, you

24   know, my doctor pulled me off of this.  I didn't know

25   what I was going to do.
```

```
 1              And so you don't see the ripple that it has

 2   on these people and families that come in and they are

 3   just so frustrated with these individuals.  And I'm

 4   trying to talk to them because it's so simple, like

 5   obviously this isn't working, you know, like, it's

 6   just so basic.  Why don't you just do something

 7   different?  And you're so miserable in jail that, you

 8   know, it's just like:  God, this sucks.  It's like

 9   you're just sitting there, like you're eating crappy

10   food, you're not with your family.

11              And then they're just talking about, like,

12   when I get out, like, man, it's going to be so nice to

13   just, you know, have a relief because it's just like a

14   horrible process.

15              And you just watch people just jump right

16   back into it, or they have a speech of like:  I'm

17   never coming back.  I'm never going to go do it again.

18              And you see them weeks later.  They are like:

19   I just wanted to get high one time.

20              And I got to see the struggle, and it's just

21   brutal to see what they are doing and to see such --

22   you know, when I got into it, you know, people would

23   message me back and forth, and, you know, it was -- it

24   went from what I thought was a blessing of, you know,

25   I can't get prescribed this because, you know, I'm a
```

1    lawyer and they could take it as a judgment call, you

2    know.

3           Or I can't get prescribed this because, you

4    know, whatever this says, you know, and if people

5    don't have insurance, it's a high cost.  Or like, you

6    know, going through the doctor, the psychiatrist.  My

7    parents, you know, I was blessed that they are able to

8    help walk me through the process, and, you know, I was

9    on their insurance until 26.

10          And so, at the beginning, it was, you know,

11   we could have Ambien.  We could have Adderall, and so

12   if they needed just, you know, maybe this is something

13   for them that they could try.  And, you know, it's

14   outside of, you know, the controlled process that it

15   seemed like -- it seemed like a good idea.  It was a

16   win-win situation.  It was something that they could

17   benefit from.  And, you know, I felt like I was doing

18   something positive, you know, even -- yeah.

19          So, to answer your question, seeing firsthand

20   completely changed -- completely changed my mind.  You

21   know, afterwards the opioid epidemic hit and the

22   broadcasting, the gruesome effects of what happens,

23   because before, it was just, you know -- it was just,

24   you know, this is a prescribed pain killer.  This is

25   what companies are making.  It's okay.  It's -- sorry

Exhibit 1

```
 1    to lose it, but, you know, it's one of the worst life

 2    lessons.  And it's not okay, you know.  I'm seeing

 3    it's enabling something that, as I would tell people

 4    so often, it's not working.

 5           Anyhow, so I got to see, you know, them

 6    coming off the streets or, you know, people that came

 7    from, you know, they're in a company or a huge

 8    baseball player, it doesn't matter who, and they hit

 9    rock bottom, you know.  And I have seen that

10    firsthand.

11           MR. SKORDAS:  That's all I have, Your Honor.

12           THE COURT:  Thank you, Mr. Skordas.

13           You may cross examine.

14           MR. GADD:  If I could have just two minutes.

15    Thank you.  My hope is taking that couple minutes will

16    mean I'm up here for less time.

17                      CROSS EXAMINATION

18    BY MR. GADD:

19        Q.   Good morning.

20           THE COURT:  Speak up.

21        Q.   BY MR. GADD:  Good morning.

22        A.   Good morning.

23        Q.   Let's start with an easy one.  You have a

24    password you like to use, Molly Dog, right?

25        A.   Yeah.
```

Exhibit 1

```
 1        Q.   And it's not that you were referring to the
 2   drug Molly, right?
 3        A.   Yeah.
 4        Q.   You were referring to an actual dog?
 5        A.   Yeah.  My pet growing up was actually a
 6   golden retriever who was named Molly.
 7        Q.   It's just a coincidence that you were later
 8   using Molly, correct, or MDMA?
 9        A.   Yeah.  The name came later down the line, you
10   know.  Rappers kind of do that, so, yeah.
11        Q.   Sure.  Let's try another one that I hope will
12   be an easy one for you.  Could we look at Exhibit
13   14.38.  Do you remember seeing this?
14        A.   Yeah.  I remember seeing it here in court.
15        Q.   So, Ms. Laughter, if you can just give us the
16   chart, if you can call that up.
17             So this is the potency chart that was found
18   on your computer, along with all the other passwords
19   that were some variation of Molly Dog.  This chart was
20   useful, right?
21        A.   Yeah.  There was a lot of prescriptions
22   there.
23        Q.   And I mean useful because you were trying to
24   stick Fentanyl in a pill that you were marketing to
25   look like you Oxycodone.  You needed something like
```

```
 1   this, right?

 2        A.   I mean, yeah, really the chart wasn't really

 3   helpful, but, I mean, I see where you're going with

 4   it, yeah.

 5        Q.   Not as helpful as the it could have been

 6   because you had some other issues at play, right?

 7   It's not like exact science, right?

 8        A.   Yeah.

 9        Q.   You remember Special Agent Jeff Bryan, the

10   retired DEA agent.  He talked about your process, and

11   he made a comparison to like making chocolate chip

12   cookies.  Do you remember that?

13        A.   Uh, yeah.

14        Q.   You remember too many chocolate chips go into

15   a cookie and somebody ends up dead.  Do you remember

16   that?

17        A.   If he said that, okay.

18        Q.   This was for you to try to figure out how

19   many chocolate chips to put in your cookies, right?

20        A.   I mean, really the chart wasn't really

21   useful.  It was -- I guess what you're kind of leaning

22   on is, we started on, you know, a super low dose, and

23   we, you know, gave it to Chris.  And he had, you know,

24   said:  Okay, let me test it.

25             And then he's -- from there he's like:  A
```

Exhibit 1

1    little bit stronger.  A little bit stronger.

2           So it wasn't really --

3      Q.   You kind of walked it up, right?

4      A.   Yeah, so it kind of walked up from that

5    point.

6      Q.   By the end, do you remember how much Fentanyl

7    you were putting in each pill?

8      A.   I don't.  I know the ball park range.

9      Q.   Go ahead and tell us.

10     A.   It's about a milligram.

11     Q.   The other problem you had with making these

12   cookies is how pure the chocolate was, right?  I mean,

13   you're not getting your Fentanyl from a pharmaceutical

14   company, right?

15     A.   Well, it --

16     Q.   Right?

17     A.   Yeah.

18     Q.   Let's look -- here.  I'll show you.  Let's

19   look at Exhibit 301.

20           And then if you could highlight the top for

21   us there.  So this is one of those packages that we

22   seized, the test results from, right?

23     A.   Yeah.

24     Q.   This is the Mausia package from the middle of

25   November?

Exhibit 1

```
 1        A.    Uh-huh.

 2        Q.    Do you see the substance purity line there?

 3        A.    I do see that, yes.

 4        Q.    80 percent?

 5        A.    Yeah.

 6        Q.    That's how pure the chocolate is in your

 7   chocolate chip cookies, right?

 8        A.    Uh-huh.

 9        Q.    What happens when you get one that's 50

10   percent?

11        A.    Obviously the effects aren't going to be as

12   great.

13        Q.    Customers complain?

14        A.    Yeah, sure.

15        Q.    You've got to change your recipe?

16        A.    I mean, you have to hear more than one ear,

17   but, I mean --

18        Q.    Yeah.  One complaint is not enough, but if

19   you get a bunch of complaints, they are saying this

20   whole batch of chocolate chips aren't any good, you're

21   going to have to change your recipe, right?

22        A.    Yeah, but through the whole thing, it was

23   pretty consistent.  There was never anything -- it was

24   always -- I mean, we would get advice to put it up,

25   and I would say:  Just keep it where it's at or tailor
```

Exhibit 1

```
 1    it down.  It's not one of those things we really

 2    wanted to push the envelope on.

 3        Q.   You say it was consistent, but you didn't

 4    have the ability to test for purity levels, did you?

 5        A.   No, we did not.

 6        Q.   At one point, you reached out to a company to

 7    see if they would do GCMS testing for you, but nobody

 8    was willing to test your Fentanyl pills, right?

 9        A.   No.  We never asked.

10        Q.   You needed constant feedback to try to get a

11    sense for not only how many chocolate chips were going

12    in your cookies, but how strong the chocolate was,

13    right?

14        A.   Yeah.

15        Q.   Constant feedback?

16        A.   It wasn't that we needed it, it was just

17    always at hand.

18        Q.   You tested your MDMA pills before you used

19    them?

20        A.   Yes.

21        Q.   And you talked about how you had a color

22    test.  I think you called it a Marquis test, right?

23        A.   Yeah.

24        Q.   And if you put a little bit in, shake it up,

25    see what color it is, that will tell you roughly what
```

1    the active pharmaceutical ingredient is, right?

2        A.    Yeah.   Eyedroppers.   So you would put it on a

3    clean plate and it would color on -- yeah.

4        Q.    Were you doing that for your Fentanyl as

5    well?

6        A.    Yeah.   We would make sure that, coming in,

7    Fentanyl was the actual ingredient.

8        Q.    And your customers down the line, were they

9    testing it?

10        A.    I honestly am not sure.

11        Q.    Let's look at Exhibit 14.44.   We can stay

12    here on the first page.   Do you recall this?

13        A.    Just my computer's Google search.

14        Q.    Right, Google searches from your computer,

15    but not all of them?

16        A.    Yeah.

17        Q.    You know better than anyone how many times

18    you searched things?

19        A.    Uh-huh.

20        Q.    Were you surprised when you heard testimony

21    that it was thousands of searches?

22        A.    No.   I mean, I'm a closet nerd.   I mean, if

23    you have any question, you know, Google is there.

24        Q.    And that's how you learned a lot of this,

25    right?   I mean, you learned by research?

Exhibit 1

```
 1        A.    Trial and error, yeah.

 2        Q.    Sure.  You see the right column, third one

 3   down?

 4        A.    Which one?

 5        Q.    Do you see it now?

 6        A.    The third one down?

 7        Q.    Uh-huh.

 8        A.    Naloxone?

 9        Q.    Yeah.

10        A.    Okay.

11        Q.    Did you buy it?

12        A.    No.

13        Q.    You thought about buying it?

14        A.    Sorry?

15        Q.    You thought about buying it?

16        A.    I mean, again, it could have just popped up

17   as one of the Google searches.  A lot of things auto

18   populate and so a lot of, you know, what I was doing

19   is, I mean, you can see just on the top one there is

20   Clonazepam, you know, and so there's a lot of

21   research.

22        Q.    Clonazepam is a benzo?

23        A.    Yeah.  And so that's a benzo --

24        Q.    Naloxone.

25              THE COURT:  Let him finish his answer before
```

1    you question.

2        Q.   BY MR. GADD:  You go ahead.

3        A.   I can't even tell you what Naloxone is, to be

4    honest.

5        Q.   But you visited the website.  You went to

6    stopoverdose.org.

7        A.   Yeah.  You definitely hand-picked selected a

8    few websites that I visited.

9        Q.   There was many, wasn't there?

10       A.   Yeah.  I mean, there was a lot of video games

11   I searched.  I would watch Twitch TV, and my computer

12   was openly available, so if any search needed to be

13   done, you know, it could be done.

14       Q.   You watched the DEA video that talked about

15   the dangers of Fentanyl and the need to have Naloxone

16   present?

17       A.   Uh-huh.

18       Q.   And you heard from Dr. Hale.  She talked

19   about Naloxone, sold as Narcan, N-a-r-c-a-n.  You

20   watched a 50-minute-long video made by VICE, where you

21   learned about the dangers of Fentanyl, where you

22   watched addicts shoot up.  And that's why you searched

23   it, isn't it?

24       A.   It was being advertised.  I think it just

25   came out, and it was kind of around the time -- I

1    mean, I'm pretty sure it was around October.  It was

2    kind of -- like, it was a new thing.  I mean, Fentanyl

3    was, I mean, before, just a research chemical.  So,

4    the only thing I knew was it was just, you know, just

5    like a pain killer.  And so, yeah, Naloxone came out

6    around that time.  I was looking at, you know, what

7    the mark was.

8        Q.   And you were worried.  You know, you had

9    powdered Fentanyl in your home.  You were using it in

10   a pill press.  There's a risk, right?

11       A.   I mean, this sounds kind of dumb, but, I

12   mean, we didn't really think of the risk.

13       Q.   You had a mask.  You wore gloves.  There's

14   gloves on your shelves.  You were worried about the

15   risk, right?

16       A.   Yeah.  We were also wearing gloves.  The mask

17   kind of made your face sweaty, so it was one of those

18   things we sometimes wore, but I guess, to be honest,

19   it's just like the agent said, you know, what we came

20   to understand is when it's airborne and so if it's in

21   the air.  So everything -- you know, even when Luke

22   would pour it, I remember him saying that he would

23   hold his breath and go ahead and do the process.

24       Q.   So you knew it was a danger when it was

25   airborne?

```
 1        A.   I mean, just like anything.  I mean, you

 2   know, if there's a ton of Zanax in the air, it's like,

 3   you know, that's -- you know, it can't be good.

 4        Q.   It's going to make you feel relaxed if

 5   there's a ton of Zanax in the air?

 6        A.   Yeah, sure.

 7        Q.   And if there's a ton of Fentanyl in the air?

 8        A.   Yeah.  Then that's something to be

 9   considered.

10        Q.   You're going to go sleep, aren't you?

11        A.   Yeah.

12        Q.   And you may not wake up, will you?

13        A.   Yeah.  Too much of the chemical, yeah.

14        Q.   Let's talk for a minute about your

15   motivation.

16        A.   Uh-huh.

17        Q.   You indicated greed was a motivation?

18        A.   Yeah.

19        Q.   A love of money was a motivation?

20        A.   Uh-huh.

21        Q.   There's probably more to it than just that,

22   though, isn't there?

23        A.   Yeah.  I mean with money comes a lifestyle.

24   You get accustomed to things.  It's hard to break off

25   of.  There is a saying in jail where it's like if you
```

Exhibit 1

84

```
 1    drive a BMW, you can't go back to a Toyota.  It's

 2    just, you know, and so you kind of get accustomed to

 3    things and, you know, how things are going, and, you

 4    know, at the time I thought money was really important

 5    in life.  It, you know, defines someone.

 6        Q.   You say "accustomed," but that's not the word

 7    you used when you told your mom.  You said "addicted"

 8    to her.  Do you remember that?  You told her that's

 9    what you were addicted to.

10        A.   Yeah, sure.

11        Q.   A lifestyle?

12        A.    If there's an alcohol anonymous or if there's

13    a money anonymous, I'd definitely sit down and, you

14    know, be present at the meeting.

15        Q.   Let's look at 14.19.  And if we could go to

16    the second page and then call up the last box.

17             These are notes that you typed in.  This is

18    from January 1, 2016.  You see starting in the body,

19    you wrote this to yourself?

20        A.   Yeah.

21        Q.   "Love you Shamo.  You're such a great guy and

22    everyone loves you, LOL.  Today is the first day of

23    2016.  Let's do it right.  I will over achieve.  I

24    will overcome, and I will be F'ing rich.  Every girl

25    will love me.  They will want me.  They will need me.
```

Exhibit 1

 1   Focus.  Every small detail matters.  I want that girl

 2   from Snow Globe to like me.  She will love me.  She

 3   doesn't know it yet, but she will be obsessed with

 4   me."

 5          "Life is great.  Life is amazing.  I honestly

 6   can't wait to live it.  Gonna make 250 K in the next

 7   few months easy."

 8          That's what you wrote?

 9   A.   Yeah.  I was pretty big on The Secret.  So, I

10   mean, you know, at the time I wasn't feeling like such

11   a great guy, so I was saying it.  You know, it's

12   almost like hoping that it's going to be.

13   Q.   Is that why you pay people in jail to say

14   these things to you?

15   A.   I mean, jail is a pretty awful place.

16   Q.   That's not how you described it in your phone

17   calls.  Do you remember your first video chat with

18   your girlfriend Ellie?  Do you remember what you told

19   her about jail?

20   A.   Yeah.  I'm pretty sure it's probably

21   something.  I think I remember being energetic,

22   bouncing off the walls.

23   Q.   It's like living in a college dorm.  Do you

24   remember saying that?

25   A.   Yeah, sure.

```
 1        Q.   It's like having a bunch of roommates.  We
 2   stay up 'til, like, 4 a.m. playing cards, sleep in,
 3   bunch of cool guys.
 4        Do you remember that?
 5        A.   Yeah.  She was going through a rough time as
 6   well as I was, so it's like, if I'm not strong, how
 7   can she be strong?  And, to be honest, I was really
 8   hoping to hang on to her, and just over the years it
 9   just completely deteriorated.
10        Q.   Circling back on this idea of motivation.
11   Greed was certainly a motivator, but you had something
12   to prove, didn't you?
13        A.   Yeah, in a sense, like, I mean, prove to my
14   friends that, you know, I was as good a friend as they
15   wanted me to be, sure.
16        Q.   Oh, no.  You had something to prove about
17   your potential, right?
18        A.   I mean, when you're saying all these really
19   great, positive things, yeah, that does sound good.
20        Q.   You had something to prove to your family,
21   right?
22        A.   Sure.
23        Q.   When you talked about Luke Paz pressing Zanax
24   in the early days of his involvement, you described it
25   as he had -- he was putting forward sweat and tears,
```

```
 1   and you went on to say that he wasn't making a lot,

 2   but then you kind of took a pause and said:  I mean,

 3   it was still a substantial amount of money.

 4          But I don't think we ever heard you say how

 5   much was he making in those early just Zanax days?

 6   What was that substantial amount of money?

 7      A.   I mean, we're talking just a few thousand

 8   dollars, like it's -- I guess substantial is just

 9   outside of what you're normally making at a normal

10   job, I guess.

11      Q.   I think we can agree on that definition.

12   Let's talk about your lifestyle.  There's been some

13   testimony about your trips to Las Vegas?

14      A.   Yeah, sure.

15      Q.   You liked to go to Las Vegas?

16      A.   Yeah.  It became something of a routine with

17   the friends I was with, yeah.

18      Q.   And it was routine?

19      A.   On occasion, yeah.

20      Q.   Routine means frequently, right?

21      A.   Yeah.  I mean, we -- I guess we would always

22   find the excuse or someone would find the excuse to

23   go, so, yeah we went.

24      Q.   Your employees got annoyed that you were gone

25   so often, didn't they?
```

Exhibit 1

1    A.   I mean, there was always groaning in a lot of

2    places, yeah.

3    Q.   Do you remember at one point telling your mom

4    that you did some damage to your wallet in Las Vegas?

5    A.   Yeah, sure.  I mean, you take $5,000 and you

6    leave empty-handed.  You know, it's kind of -- it's

7    not a good feeling.

8    Q.   Did you say 5,000?

9    A.   Yeah.

10   Q.   And sometimes it was more?

11   A.   I mean, sometimes it -- it went a little

12   upwards, but I mean it just depended.

13   Q.   Sure.  And on March 22 of 2016, you told your

14   mom it was 7,000 on that last trip.  That was

15   possible, right?

16   A.   Sure.

17   Q.   You wouldn't have had a reason to lie to your

18   mom, would you?

19   A.   No.

20   Q.   You had Ms. Gabby Noriega look into real

21   estate you while you were on a trip to Puerto Rico?

22   A.   Yeah.

23   Q.   You liked Puerto Rico?

24   A.   It was beautiful, yeah.

25   Q.   You thought you might want to buy a home

Exhibit 1    Case 2:16-cr-00631-DAK-JCB  Document 400-1  Document 286 Filed 02/05/21  Filed 05/04/19  Page 590 of 1050  Page 247 of 2320

89

```
 1    there?

 2         A.   Sure.  Yeah.

 3         Q.   A beach house.  One there and one in Mexico,

 4    right?  That was the plan?

 5         A.   I wouldn't say Mexico.  I only went there

 6    once.  It wasn't really something I was looking at.

 7         Q.   But you did say Mexico to Gabby?

 8         A.   I mean, if I threw out the suggestion, sure I

 9    could own up to it.

10         Q.   And you also asked her to look at some of the

11    islands in the Caribbean, correct?

12         A.   At the time, we were just on a cruise and so

13    we went out to several of the islands and then we

14    stopped right at Puerto Rico, and it was just kind of

15    the one trip, and I was really amazed how, I mean,

16    different it was, you know, inland of America to, you

17    know, something so, I guess, different.

18         Q.   And you had a million dollars in your

19    dresser, and you had to spend it on something, right?

20         A.   Sure.

21         Q.   We talked a little bit about Luke Paz's money

22    from Zanax.  Let's take a minute and talk about Drew

23    Crandall's money in 2016.  So he leaves end of 2015,

24    right, November, 2015?

25         A.   Uh-huh.
```

 1    Q.   And then, in 2016, that's the year you were

 2   arrested.  Let's talk about that year.

 3    A.   Yeah.

 4    Q.   You indicated that it was sometimes safer to

 5   send money just directly from your AlphaBay wallet to

 6   Drew, right?

 7    A.   Yeah.

 8    Q.   Because AlphaBay used a tumbler?

 9    A.   Yeah.

10    Q.   You've heard testimony from these agents that

11   they could see the transaction go from your AlphaBay

12   wallet to your wallet?

13    A.   Okay.  I mean, that would make sense.  They

14   used a tumbler from AlphaBay.  I don't know how it

15   works, but I mean --

16    Q.   And everyone thinks that they had a tumbler,

17   right?  I mean, you didn't just make that up, right?

18    A.   No.

19    Q.   It's on Readit, or was at the time?

20    A.   Yeah.

21    Q.   AlphaBay was taken down.  You knew that,

22   right?

23    A.   Yeah, sometime they were.  When I was in jail

24   I learned that.

25    Q.   Would it surprise to you learn that they

```
 1   actually didn't use a tumbler?

 2       A.   Yeah.  It kind of would.

 3       Q.   These agents testified they could see it go

 4   from your AlphaBay wallet to your wallet, on HMO.  How

 5   could they see that with a tumbler?

 6       A.   I'm not too tech savvy, so I don't know.

 7       Q.   This is your part of the organization,

 8   though.  You're the you BitCoin guy.  You're the Dark

 9   Web guy.  You searched Tumblers, MultiBit,

10   Mimblewimble.  You searched them all.  You had Readit

11   posts where you were looking at whether or not --

12           MR. SKORDAS:  I object.  This isn't a

13   question.  This is counsel testifying.

14           THE COURT:  What's the question?

15       Q.   BY MR. GADD:  Again, would you be surprised

16   to learn that AlphaBay did not use a tumbler?

17       A.   Yeah.  Absolutely.

18       Q.   So now, let's talk about Drew Crandall's

19   money.

20       A.   Uh-huh.

21       Q.   How much did you send to him in 2016?

22       A.   I honestly couldn't tell you.  Things were

23   obviously moving pretty fast.  I mean, you saw from

24   even Gabby's timeline, when, you know, you threw up a

25   text, and it's like:  Oh, you know, you should have
```

Exhibit 1

```
 1    got me money last week.

 2         Why didn't you tell me?  You know, so I

 3    couldn't put a number on it.

 4       Q.   Yeah.  I remember that part.  It was October,

 5    right, 2016?

 6       A.   Uh-huh.

 7       Q.   Do you remember November 8, 2016, you put

 8    $2700 in Drew's account?

 9       A.   Sure.  That sounds about right.

10       Q.   That would have been his bi-weekly wage,

11    right?

12       A.   It's what he asked me to do, yeah.

13       Q.   Did you ever send a hundred-thousand dollars

14    to him?

15       A.   Well, he didn't need a hundred-thousand

16    dollars.

17       Q.   Let's talk for a minute about blame.  Did you

18    testify that it was Ms. Tonge and Ms. Bustin's fault

19    that you transitioned from the one and the ten and the

20    hundred-pill orders to the hundred-thousand,

21    ten-thousand-pill orders?

22       A.   I won't say fault.  But I know that's how you

23    look at things.  It was definitely a group decision.

24    I mean, it's something that, you know, I'm trying to

25    own up to what I do, so I contributed to that as well.
```

Exhibit 1

93

 1   I mean, I didn't have any objections at the time.  No

 2   one was, you know, screaming, "stop."  You know,

 3   everyone was benefiting.

 4       Q.   And was it Chris Kenny's fault that you

 5   decided to sell fake oxycodone?

 6       A.   If there is one entity that would be removed,

 7   then, yeah, we would have never ever gone in that

 8   direction.

 9       Q.   And was it Chris Kenny's fault that you

10   stuffed those fake Oxycodone pills with Fentanyl?

11       A.   Off of his suggestion, I guess that's true.

12       Q.   And was it Luke Paz's fault that he was lazy

13   and running late on November 22, and that's why some

14   hat got rested on you?  Is it Luke's fault?

15       A.   Well, that's what I have been telling myself

16   for the last couple of years in jail, sure.

17       Q.   Was it also Luke's fault that your volume of

18   sales went up?

19       A.   No.  I mean that's, you know, the website's

20   doing.

21       Q.   Was it Luke's fault that you got faster

22   machines?

23       A.   I mean, it was a contributing decision, sure.

24       Q.   Was it Drew Crandall's fault that you started

25   pressing Zanax in the first place?

Exhibit 1

1    A.   That I would probably say was true, yeah.

2    Q.   And your package receivers or you called them

3  drops, was it their fault for receiving packages?

4    A.   It was a choice.

5    Q.   They were never asking for it?

6    A.   Well, yeah, they approached me.

7    Q.   Everyone approached you?

8    A.   Pretty much towards the middle or end, every

9  single person approached me.

10   Q.   You never reached out to anyone to ask them

11  to be a drop?

12   A.   Well, of course, at the beginning that's what

13  we did is we reached out to a few, yeah.

14   Q.   And towards the middle and towards the end?

15   A.   I mean, at that point, it wasn't so much that

16  we needed it.  It was just people were willing to do

17  it.

18   Q.   Everybody wanted more money.  It was their

19  fault that this thing took off?

20   A.   Sure.  Myself included.

21   Q.   And where did that money end up?

22   A.   Well, in your hands.

23   Q.   $1.2 million was found in your sock drawer,

24  right?

25   A.   Yeah.

Exhibit 1

```
 1        Q.   Almost a half million dollars was in your
 2   parents' closet, right?
 3        A.   That's correct.
 4        Q.   More than 500 BitCoin has been identified,
 5   accessed and seized from wallets in your sole
 6   possession and control, right?
 7        A.   Yes.  That's correct.
 8        Q.   There would have been more money had your
 9   lifestyle been different, right?
10        A.   I mean, it depends at the point when you're
11   talking about.  There's times when, sure, I would
12   definitely spend.
13        Q.   We talked about Vegas.  We talked about
14   Puerto Rico, a trip to Tahoe, right?  You took a trip?
15        A.   Yeah, we drove to Tahoe.
16        Q.   California --
17        A.   Yeah we've --
18        Q.   -- on the beach?
19        A.   -- been there a handful of -- you know.
20        Q.   Spring break in Mexico?
21        A.   Yeah.  Again, we drove down.
22        Q.   You liked to go to clubs?
23        A.   Well, it's kind of moved to -- a lot of the
24   music is going into the clubs.  There's not so much
25   concerts, so, yeah, concerts.
```

Exhibit 1

1     Q.    Concerts?   Clubs?

2     A.    Yeah.

3     Q.    You wouldn't just go to clubs, though, you

4  wanted to buy a table at the club, right?

5     A.    So, depends who's playing, of course, and

6  depends if, you know, there's going to be a group of

7  us, as friends.  As a friend group, we had a pretty

8  tight-knitted friend group.  If we were all going to

9  be there, it seemed only logical to do that.

10    Q.    Tables are a status symbol, right?

11    A.    It's a little bit away from the crowd.  You

12  get some space.  So, sure.

13    Q.    It's a status symbol, right?

14    A.    I mean, yeah, you could look at that.

15    Q.    All those trips, the concerts, tables, bottle

16  service, that was all paid for with drug proceeds,

17  wasn't it?

18    A.    Just about, yeah.

19    Q.    Could we look at 17.06.  Let's take a minute

20  on the second row here.  You talked about your

21  tight-knit group of friends, your friends that would

22  go to the club with you, friends that would chip in on

23  the table or sit at your table when you bought it?

24    A.    Uh-huh.

25    Q.    Mr. Noble is not one of the cool kids, is he?

Exhibit 1

97

```
 1        A.   He was there.

 2        Q.   You would invite him?

 3        A.   Yeah.  Of course I would.

 4        Q.   Make him feel good?

 5        A.   Yeah.  He was a friend.

 6        Q.   He wanted to spend time with you.  He's not

 7   one of the cool kids, is he?

 8        A.    To be honest, the two on the bottom, Roy

 9   Stephans and Perry, they really didn't really care for

10   him too much.  He would take a bit of Molly and get

11   really sweaty, and then he would try to have a bro

12   moment, but, you know, I always -- I always let him

13   there.  I mean, he was a friend.  I wouldn't let the

14   other friends just kick him off for no reason.

15        Q.   You kept him under your wing?

16        A.   Yeah.  We were friends.

17        Q.   Drew Crandall, kind of the same way, isn't

18   he?

19        A.   I have known Drew for a long time, yeah.

20        Q.   The cool kids didn't like Drew, did they?

21        A.    There was definitely conflictions.  Luke

22   didn't like Drew.  Actually, I mean, a lot of them,

23   like Mike.  Mike and Drew never got along, so, yeah,

24   there's always conflictions.

25        Q.   Sean Gygi, not one of the cool kids, right?
```

Exhibit 1

1      A.   Well, he was Drew's friend.  I only would see

2   him at the clubs and stuff, and, you know, since he

3   was Drew's friend, we would invite him in, say:  Hey,

4   come have a drink with us, you know, and we could fist

5   bump together.

6      Q.   Take him under your wing?

7      A.   Yeah.  We were spending time together.

8      Q.   Were Ms. Tonge and Ms. Bustin ever cool

9   enough to hang out at your table?

10      A.   Absolutely.  I invited them every time.

11      Q.   And the cool kids, did they like Ms. Tonge

12   and Ms. Bustin?

13      A.   It wasn't so much of a say.  I mean, they

14   were more of a stay-at-home, watch a TV show, because

15   trust me, I would try to get them out.

16      Q.   But they liked you, right?  They wanted to be

17   your friend?

18      A.   Sure, we're all friends.

19      Q.   Let's talk about amounts.  You've seen our

20   chart, right, feed-back linked sales.  You know how

21   many pills were at least recorded in the feedback,

22   right?

23      A.   I'm assuming so.

24      Q.   But there were more pills, Fentanyl pills

25   than just those, correct?

Exhibit 1

```
 1          A.    I have no idea.

 2          Q.    You had the auto-feedback pills that don't

 3    show up in our rows of feedback that you sold to those

 4    people as well, right?

 5          A.    I couldn't tell you.

 6          Q.    You sold off line.  And by that, I mean to

 7    Mr. Kenny, right?

 8          A.    Yeah.  That was the initial.

 9          Q.    If you had a bad batch, you would have to

10    reship pills, right?

11          A.    I mean, reships often on multiple occasions,

12    but not a bad batch.

13          Q.    Or for some other reason?

14          A.    Yeah.  For whatever reason.

15          Q.    You would have to reship those pills?

16          A.    Sure.

17          Q.    So let's you and I talk about totals.  How

18    many pills did you sell to Chris Kenny?

19          A.    I couldn't tell you.  It depends the week.

20    One month I'm dropping off, you know, 5,000 Xanax

21    bars, and then he's asking for 500 Roxy's, or it could

22    be later in 2016, he's asking for a thousand.  I mean,

23    it just -- I couldn't tell you.

24          Q.    Did you ever take him 10,000?

25          A.    I have no idea.
```

Exhibit 1

1    Q.   You would be the one to deliver, right?

2    A.   Yeah, sure.

3    Q.   You didn't count the pills before you

4    delivered them?

5    A.   No.  I never counted the pills.

6    Q.   Weigh them out?

7    A.   Yeah.  Luke would actually weigh them out.  I

8    would throw them in a gym bag, and the way the

9    exchange happened was basically gym bag for cash, but

10   he was always behind.

11   Q.   You would have to keep track of how many

12   pills you gave him, right?

13   A.   As a rough idea, sure.

14   Q.   That's how you know how much money he owes

15   you, right?

16   A.   Well, it's also on a -- once you get to that

17   point, it's really a trusting situation, so, yeah.

18   Q.   Which is all the more reason to keep records,

19   right?

20   A.   I mean, it would have been a smart idea to

21   have a record, yeah.

22   Q.   You kept records, right?

23   A.   Unfortunately, no.  I didn't keep records on

24   that.

25   Q.   You have notes where you write things like:

Exhibit 1

         1    Chris owes 95 K.

         2          You have seen that, right?

         3      A.   Yeah.  I was venting in a journal and needed

         4    to keep it on top of my head.

         5      Q.   Or you might forget?

         6      A.   Yeah.  Sure.

         7      Q.   So how many pills do you think you sold Chris

         8    Kenny?

         9      A.   I honestly have no idea.

        10      Q.   How much money do you think he gave you?

        11      A.   I mean, to be honest, everything happened so

        12    fast, it gets to a point when everything is pretty

        13    much a blur.  It's -- you don't even know -- I mean, I

        14    couldn't even tell you, like, even the agents that

        15    stopped at my house, they would ask, you know:  So is

        16    there any money in the house?

        17          Yeah.  There's money.

        18          Well, how much money?

        19          And an honest guess would have been, I think

        20    around 700,000.  And for you to tell me 1.2 million is

        21    like, I guess, I had, you know, 1.2 million in the

        22    house.  I guess that's what it was.

        23      Q.   You were making so much money you couldn't

        24    keep track of it?

        25      A.   I mean, things -- it wasn't so much, it was

Exhibit 1

1    just there was no track.

2        Q.   You had two money counters, and you couldn't

3    keep track of it?

4        A.   Well, one was pretty crappy, so, I mean, just

5    like anything, you want to get something a little bit

6    nicer that doesn't stick.

7        Q.   Do you feel any remorse other than for

8    getting caught?

9        A.   Of course I feel remorse.  Around the time --

10   I mean, let's say, if we had the media spree of opioid

11   epidemic, I would have ceased immediately.  It's --

12   you know, it's an eye-opening experience.  It's -- I

13   wasn't aware.  To me, addiction was -- you know, I

14   used cocaine sometimes, and, you know, it's something

15   I could pick up and put down.  It was my understanding

16   that cocaine is addicting so, you know, this chemical

17   is something of addiction, and I didn't know of what

18   degree.

19       Q.   Do you feel any remorse that your actions

20   furthered other people's additions?

21       A.   Yeah.  From seeing it firsthand, it -- I

22   mean, I testified earlier about it.  It's really a sad

23   situation.

24       Q.   And you fell like you were just trying to

25   help.  I think that's what you said, isn't it?

Exhibit 1

```
 1        A.    Yeah.
 2        Q.    People couldn't get these prescriptions
 3   anymore from their doctor, and you were there to help
 4   them?
 5        A.    Yeah.  And in the messaging system, that
 6   happened on multiple occasions, where they said they
 7   are in a panicky state and they didn't know what to
 8   do.
 9        Q.    You were just trying to be a friend?
10        A.    Yeah.
11        Q.    Can we look at 783.
12              That guy just needed a friend?
13        A.    Well, when things --
14              THE COURT:  What's the question?  That wasn't
15   a question.
16        Q.    BY MR. GADD:  Did that guy just need a
17   friend?
18        A.    He might have a lot of friends, assuming from
19   the pill count.  I don't know.
20              MR. GADD:  Nothing further.
21              THE COURT:  Thank you, Mr. Gadd.
22              Redirect, Mr. Skordas?
23              MR. SKORDAS:  I'm sorry, Judge.  Nothing
24   further.
25              THE COURT:  Thank you.  You may step down,
```

Exhibit 1

```
 1   Mr. Shamo.

 2           And you rest?

 3           MR. SKORDAS:  Yes, Your Honor.  Defense

 4   rests.

 5           THE COURT:  Ladies and gentlemen of the jury,

 6   you're free 'til 8:30 on Thursday morning, where you

 7   will receive the instructions from the Court and

 8   listen to the closing arguments of the lawyers and

 9   then begin to deliberate.

10           Don't talk to anyone about the case, read,

11   listen, watch anything about it.  Don't let anyone

12   talk to you about it.  And we'll see you at -- have a

13   nice day tomorrow, and we'll see you at 8:30 on

14   Thursday morning.  Thank you very much.

15           THE CLERK:  All rise, please.

16           (Whereupon the jury leaves the courtroom.)

17           THE COURT:  We'll see the lawyers or at least

18   some of them from each side at 10 a.m. tomorrow

19   morning.  Nobody else needs to be here.

20           MR. GADD:  Thank you, Your Honor.

21           THE COURT:  Unless they want to sleep through

22   an instruction conference.  At 10 in this courtroom.

23   Thank you.  We'll be in recess until 10 in the

24   morning.

25           (Whereupon the proceedings were concluded.)
```

```
 1

 2                    REPORTER'S CERTIFICATE

 3   STATE OF UTAH              )

 4                              ) ss.

 5   COUNTY OF SALT LAKE        )

 6

 7          I, REBECCA JANKE, do hereby certify that I

 8   am a Certified Court Reporter for the State of Utah;

 9          That as such Reporter I attended the hearing

10   of the foregoing matter on August 27, 2019, and

11   thereat reported in Stenotype all of the testimony and

12   proceedings had, and caused said notes to be

13   transcribed into typewriting, and the foregoing pages

14   numbered 1 through 104 constitute a full, true and

15   correct record of the proceedings transcribed.

16          That I am not of kin to any of the parties

17   and have no interest in the outcome of the matter;

18          And hereby set my hand and seal this 28th

19   day of August, 2019.

20

21

22

23

24          _____

25          REBECCA JANKE, CSR, RPR, RMR
```

Exhibit 2



**SHAMO**



**NORIEGA**



**KENNY**



**NOBLE**



**PAZ**



**CRANDALL**



**TONGE**



**BUSTIN**



**GYGI**



PENROSE



JENSEN



VANCE



MAUSIA



GLEAVE



STEPHENS



PERRY



EDWARDS



CHRISTENSEN



BERNAL



BRUNER



FRANCOM



TEBBS

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00631-DAK |
| Plaintiff, | MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR A JUDGEMENT OF ACQUITTAL |
| vs. | |
| AARON MICHAEL SHAMO, | Judge Dale A. Kimball |
| Defendant. | |

The United States, by and through Michael Gadd, Special Assistant United States

Attorney, provides the following memorandum in opposition to the defendant's motion for a

judgment of acquittal. The Court should deny the defendant's motion because the evidence

presented by the United States (1) satisfied all the elements for Count 1, Engaging in a

Continuing Criminal Enterprise; (2) proved fentanyl was the but-for cause of death of R.K.; and

(3) proved that the fentanyl that killed R.K. came from the defendant and his co-conspirators.[1]

---

[1] Other than an unsupported, fleeting statement, the defendant has not alleged that the proof was insufficient as to Counts 2-5, 7-13. This response will be limited to the proof for Counts 1 and 6. If the Court would like the United States to outline the facts that proved the violations charged in Counts 2-5, 7-13, it would be happy to do so.

1

## ARGUMENT

Motions for judgements of acquittal are governed by <u>Federal Rule of Criminal Procedure</u> <u>29</u>, which reads:

> a) Before Submission to the Jury. After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.
>
> (b) Reserving Decision. The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

When reviewing the denial of a motion for judgment of acquittal based on insufficient evidence, courts of appeals view the evidence in the light most favorable to the government and determine whether there was sufficient evidence from which a jury could find the defendant guilty beyond a reasonable doubt. *United States v. Johnson*, <u>120</u> <u>F.3d 1107, 1108</u> (10th Cir. 1997); *United States v. Edgmon*, <u>952 F.2d 1206, 1209</u> (10th Cir. 1991); *United States v. Berry*, <u>931 F.2d 671, 673</u> (10th Cir. 1991). "The [sufficiency] test is the same, whether applied by the appellate court or by the trial court in ruling on a motion for judgment of acquittal." *United States v. Hooks*, <u>780 F.2d 1526, 1531</u> n.1 (10th Cir. 1986).

And although trial courts have heard the evidence, they cannot weigh the evidence or assess credibility of witnesses when determining if the evidence presented was sufficient. *Burks v. United States*, <u>437 U.S. 1, 16</u>, (1978).

2

**Count 1—Engaging in a Continuing Criminal Enterprise**

To submit the case to the jury, the United States was first required to present evidence

that met the following elements of the offense for Count 1:

> *First*: the defendant violated the Controlled Substances Act as charged in the list
> of underlying violations to Count 1;
> *Second*: the defendant engaged in a continuing series of at least three violations of
> the Controlled Substances Act that began on a date unknown to the Grand Jury,
> but at least by July 8, 2015, and continued to at least November 22, 2016;
> *Third*: the defendant committed these violations in concert (or by common design
> or plan) with five or more other persons;
> *Fourth*: the defendant was an organizer, supervisor, or manager of those five
> persons; and
> *Fifth*: the defendant obtained substantial income or resources from the series of
> violations.

Additionally, for this case, the United States was also required to present evidence that

proved the following elements:

> 1) the conspiracy to distribute Fentanyl involved twelve kilograms or more of a
> mixture or substance containing a detectable amount of Fentanyl; and
> 2) the defendant is the principal administrator, organizer, or leader of the
> enterprise or is one of several such principal administrators, organizers, or leaders.

To satisfy its burden of proof, the United States offered more than two weeks of

testimony and evidence. Here is a non-exhaustive summary of the evidence that touched

upon Count 1.

Testimony revealed that the defendant's continuing criminal enterprise began with

collaboration between the defendant and Drew Crandall but quickly grew to include dozens of

co-conspirators. The defendant purchased pill tableting machines, sometimes called pill presses,

dies and punches to mark pills so the markings would match those of legitimate pharmaceutical

drugs, and inert pill ingredients, such as binding agents and colors. Some items, such as the

binding agents and colors were purchased legally, and other inputs, such as Fentanyl and

3

Alprazolam, were purchased and imported into the United States illicitly. To avoid detection, the defendant and Crandall had many of their inputs shipped to nominees or straw purchasers. The defendant and Crandall paid their nominees and straw purchasers for their assistance.

The inputs would then be pressed into pills that had the appearance of legitimate pharmaceuticals. The fake oxycodone-type pills and the counterfeit Alprazolam tablets were sold on the Dark Web at a significant profit. Once sold, the defendant and Crandall used co-conspirators to package the pills and ship the pills to Pharma-Master's customers. From July 2015 through November 2016, Alexandrya Tonge and Katherine Bustin packaged pill orders, affixed shipping labels and postage to their packages, and (as the operation grew) passed off the packages to a runner—Sean Gygi—who would drop the packages off at post offices and blue boxes throughout the valley. Crandall trained Tonge and Bustin to use fictitious names and addresses for return addresses on the packages of pills they filled.

The defendant also employed a co-conspirator, Mario Noble, to provide online customer support.  In addition to corresponding with customers online, Noble would, at times, assist the defendant by building a daily order list that included customers' shipping addresses and the type and quantity of drugs purchased by each customer. Noble or the defendant would send the daily order list to Tonge and Bustin using a secure email service, Sigaint; they would also encrypt their messages to each other. Noble stepped away from his role during September 2016 but returned shortly thereafter on a part-time basis.

Crandall, who had been travelling abroad since November 2015 after telling co-conspirators that the defendant was buying him out of their partnership, began again to actively work for the defendant in the defendant's continuing criminal enterprise in the summer of 2016;

4

Crandall, like Noble, provided online customer support and processed orders. Crandall was paid a wage for his customer service work.

The organization used encrypted communication apps to communicate with each other and relied on PGP encryption methods to communicate with customers. Members of the criminal enterprise frequently communicated on the mobile application known as Telegram. On July 8, 2015, Crandall shared a dark web email account with Tonge and Bustin for them to use, and then emailed instructions regarding PGP encryption to Tonge and Bustin. Crandall instructed Tonge and Bustin to delete the email, but a copy of the email was preserved and viewed by law enforcement.[2]

When Crandall left the United States in November 2015, Luke Paz began pressing pills with the defendant. Paz had previously served as a nominee/straw purchaser for the organization. Paz and the defendant developed the recipe for the Fentanyl-laced fake oxycodone pills sold by Pharma-Master on Alphabay. Paz would mix the inert ingredients; the defendant maintained control over the Fentanyl and how much Fentanyl should be added to each batch of pills. Paz continued to press pills for the organization until the defendant's arrest on November 22, 2016.

Sales on the Dark Web marketplace were conducted in Bitcoin, a decentralized virtual currency. The defendant, Crandall, and Paz expended a fair amount of effort converting their Bitcoins into fiat currency, which could be used to support their lifestyles and pay their co-conspirators, among other things.

Testimony covered how these sites in the exhibit pictured below, all of which were visited by the defendant, aided his efforts to Engage in a Continuing Criminal Enterprise. For example, Sigaint (top row) was an email service accessed through the dark net (or, at times

---

[2] July 8, 2015, is the date by which the CCE crime alleged in Count 1 had begun.

through the clear net) that the defendant and his subordinates used to email encrypted

communications to each other. Specifically, the defendant and his subordinates used Sigaint's

email service to send daily order sheets, reshipment lists, and package tracking information.

| URLs from N60 | |
|---|---|
| **Item** | **Date and time** |
| http://sigaintevyh2rzvw.onion/mail/ | 10/21/2015 11:41:58PM |
| https://blockchain.info/wallet/#/home | 11/21/2016 7:14:30 PM |
| http://www.uline.com/Product/ViewCart/Checkout | 8/28/2016 6:14:52 PM |
| http://www.aliexpress.com/item/mold-die-for-tablet-press-machine-XANAX-stamp-Customized-punch/575414328.html | 8/25/2015 5:57:48 PM |
| http://www.aliexpress.com/item/Single-Punch-Tablet-Press-Pill-Making-Machine-Maker-TDP-5/323140046301.html | 9/8/2015 8:55:26 PM |
| http://m.aliexpress.com/item/32411614623.html | 9/23/2015 5:01:59 PM |
| https://drugs-forum.com/forum/forumdisplay.php?f=3 | 10/5/2016 12:44:32 AM |
| http://stopoverdose.org/faq.htm | 9/24/2016 6:16:14 PM |
| https://www.aliexpress.com/store/product/ZP-9E-Rotary-Tablet-Press-Machine-PLC-type-Tablet-press-machine-Tablet-pressing-pharmaceutical-machinery-equipment/803578_32523581224.html | 10/25/2016 5:16:01 PM |
| https://www.youtube.com/watch?v=9Xi4A8S23Xo | 10/17/2016 11:53:40 PM |
| http://www.aliexpress.com/item-img/ZP8-Intelligent-Rotary-Tablet-Press-pills-making-pill-press-tablet-making-press-machine/501357268.html?spm=2114.12010108.1000017.2.jAVfD3 | 8/23/2016 4:53:05 PM |
| https://www.youtube.com/watch?v=28rJqj-7pEY | 10/17/2016 11:56:00 PM |
| https://www.westernunion.com/us/en/login.html | 7/11/2016 6:29:38 PM |
| http://abraxasdegupusel.onion/login | 10/21/2016 11:42:00 PM |
| http://alphabaywyjrktqn.onion/index.php | 1/21/2016 7:35:58 PM |

1

GOVERNMENT
EXHIBIT
**14.32**
2:16CR 631 DAK

The defendant bought pill presses and pill press components off of AliExpress. He sold

his pills on AlphaBay. Blockchain.info hosted a bitcoin wallet used by the defendant. The jury

heard testimony about each of these sites and how visiting those sites aided the defendant as he

organized, managed, and led his criminal enterprise.

6

| GOOGLE SEARCH TERMS FROM N60SSD | |
|---|---|
| MBB Mylar bags | Clonazepam namebrand |
| 1.5 tdp die | ritalin |
| clonazepam | buy naloxone online |
| silk road onion | amazon redeem |
| bitcoin wallet | bip32 public key |
| TheCryptoStore | aliexpress whois |
| m 30 pill | 1771 laurelhurst |
| diezepam | buy anything with bitcoin |
| adderall 30mg | diazepam 10mg |
| diazepam | clonazepam |
| hidemyass proxy | 2.83495231 kilograms |
| fentanyl | private jet service salt lake city |
| roxy pill | die presse |
| fentanyl | bitcoin wallet |
| m s2 blue pill | Ritalinic acid |
| cross pill white | m 4 pill |
| uline | pill die |
| clonazepam | m 15 pill |
| Acetylfentanyl | roxy fently |
| 1MZsmXgMZvq15eaYgcHQvqpqHLdV18s | ritalin die |
| FRL | multibit classic |
| pre-mixed excipient | bitcoin wallet |
| m 15 ritalin | multibit classic download |
| lorazepam | darkmarketnews |
| bitcoin qt | adderall cas number |
| bitcoin wallet | ritalin mold |
| 25 mg adderall | pill press die |
| m 15 pill | amazon redeem |
| ritalin | fentanyl |
| yellow op 40 | 1771 Laurelhurst Drive, Salt Lake City, UT |
| roxy fently | Lorazepam |
| Clonazepam name brand | multibit classic to multibit hd |
| ritalin die | darkmarketnews |
| fentanyl marquis test | ritalin mold |
| Ritalinic acid | bitcoin assistance |
| btce hacked | Meclonazepam vs clonazepam |
| yellow op 40 | btce hacked |
| amazon redeem | roxy 30mg |
| ritalin m 30 | btce hacked |
| pgp key C250E47EDEB3D752 | ritalin m 20 |

1

GOVERNMENT
EXHIBIT
**14.44**
2:16CR 631 DAK

Testimony explained how these google searches, conducted by the defendant, helped him organize, lead, and conduct his criminal enterprise. The jury heard evidence that each of the sophisticated techniques used by the defendant could be learned simply by "googling it." The defendant learned his drug trafficking tradecraft through doggedly researching topics, such as those listed in exhibit 14.44, online.

Testimony explained how the defendant used this manual, and other sources of

information, to guide how his criminal enterprise shipped drugs through the mail in an effort to

avoid law enforcement detection.

## How to ship drugs

**Point For Safe Shipping**

**An interesting thread that was posted on reddit today:
http://www.reddit.com/r/SilkRoad/comments/1rhq7z/safe_shippingwh at_is_it/**

**Following a great AMA thread with a postal worker:
http://www.reddit.com/r/reloaded/comments/1rdgb0?sort=hot**

**I would take these adivices with a grain of Salt but its a great sum up of the information thats been floating around this topic on the forums:**

**=====**

**This is based off extensive research of FBI, DEA and Customs manuals.**

**Safe shipping**

**What it is**

**Safe shipping means packaging and mailing products in ways that minimize risk for all involved. Safe shipping is more than packaging a product to reduce risk of interception, it is also using techniques to avoid liability for the shipper and recipient for any seized products.**

**List of things customs looks for**

**The following is a list of things customs uses to screen for suspicious parcels. A suspicious attribute of a parcel is called a flag. A single flag is often not much of a problem, but the more flags a package has the higher the chances it will be intercepted.**

1. **No return address**
2. **Restrictive markings (such as writing "Personal!" on the envelope)**
3. **Misspelled words**
4. **Poorly typed or written text**
5. **Excessive postage**

> GOVERNMENT
> EXHIBIT
> **14.39**
> 2:16CR 631 DAK

8



This chart, and an abundance of testimony about those pictured on it, showed the defendant's role as principal leader, organizer, and administrator of his criminal enterprise. The testimony also showed how the defendant maintained control over the drug proceeds; paid for expenses, such as ingredients, equipment, and wages; decided what to sell and how much to charge for his products; recruited and trained subordinates; and directed the actions of his subordinates pictured on the chart. The defendant had a leadership role over more than twenty co-conspirators. Those co-conspirators who testified all identified the defendant as the leader of the criminal enterprise. And their testimony coupled with the exhibits showed the defendant was the principal leader, organizer, and administrator. He had no boss. He was everyone else's boss. The defendant's uninterrupted involvement in the criminal enterprise was unmatched by any of his subordinates.

9



Pictures including these, and testimony about them, showed that the defendant made substantial income. Agents seized $1,657,373 USD that belonged to the defendant. Agents also seized 513.15 Bitcoin from the defendant's bitcoin wallets. Testimony established that the defendant earned more than 3,000 Bitcoins between November 2015 and November 2016. The defendant had no legitimate source of income after the first quarter of 2015.

The jury heard testimony and saw exhibits, such as 6.00, below, and the 7-, 8-, and 9-series exhibits, that showed how the defendant aided and abetted the distribution of controlled substances. Evidence showed that the defendant, or an employee like Mario Noble, would gather orders from the dark net and send those orders to the defendant's shipping team, Ms. Tonge and Ms. Bustin. The defendant kept the shipping team well stocked with drugs. The shipping team packaged the drugs for shipment. From the summer of 2016 onward, Mr. Gygi placed the packages into the U.S. mail stream.

10

## SEIZED OUTBOUND PACKAGES

| Date Obtained | Addressee | State | Number of Pills | Controlled Substance | Markings |
|---|---|---|---|---|---|
| 11/18/2016 | R.L. | MA | 20000 | Fentanyl | A 215 |
| 11/18/2016 | B.W. | AL | 2000 | Fentanyl | A 215 |
| 11/18/2016 | J.H. | OH | 2000 | Fentanyl | A 215 |
| 11/18/2016 | Y.C. | OH | 1100 | Fentanyl | A 215 |
| 11/18/2016 | F.C. | AK | 1000 | Fentanyl | A 215 |
| 11/18/2016 | P.T.A.C. | MD | 1000 | Fentanyl | M/30 |
| 11/18/2016 | L.S. | MN | 1000 | Fentanyl | M/30 |
| 11/18/2016 | S.W. | NC | 1000 | Fentanyl | A 215 |
| 11/18/2016 | D.A. | NJ | 1000 | Fentanyl | A 215 |
| 11/18/2016 | N.L. | NJ | 1000 | Fentanyl | A 215 |
| 11/18/2016 | V.R. | WA | 1000 | Fentanyl | A 215 |
| 11/18/2016 | G.M. | NV | 500 | Fentanyl | A 215 |
| 11/18/2016 | L.F. | PA | 500 | Fentanyl | M/30 |
| 11/18/2016 | S.R. | WA | 200 | Fentanyl | M/30 |
| 11/18/2016 | D.P. | MA | 150 | Fentanyl | A 215 |
| 11/18/2016 | R.B. | OH | 150 | Fentanyl | A 215 |
| 11/18/2016 | P.F. | IL | 100 | Fentanyl | A 215 |
| 11/18/2016 | CBS.I., M.W. | KS | 100 | Fentanyl | A 215 |
| 11/18/2016 | M.J. | KY | 100 | Fentanyl | A 215 |
| 11/18/2016 | F.O. | LA | 100 | Fentanyl | M/30 |
| 11/18/2016 | M.L. | NC | 100 | Fentanyl | A 215 |
| 11/18/2016 | M.S. | NC | 100 | Fentanyl | A 215 |
| 11/18/2016 | J.P. | PA | 100 | Fentanyl | A 215 |
| 11/18/2016 | T.M. | CT | 60 | Fentanyl | M/30 |
| 11/18/2016 | J.T. | OR | 50 | Fentanyl | M/30 |
| 11/18/2016 | A.M. | MT | 40 | Fentanyl | M/30 |
| 11/18/2016 | D.L.G. | MT | 40 | Fentanyl | A 215 |
| 11/18/2016 | M.M. | NY | 30 | Fentanyl | M/30 |
| 11/18/2016 | J.M. | MD | 27 | Fentanyl | A 215 |
| 11/18/2016 | J.M. | IL | 22 | Fentanyl | M/30 |
| 11/18/2016 | A.B. | CO | 20 | Fentanyl | M/30 |
| 11/18/2016 | A.G. | KY | 20 | Fentanyl | A 215 |
| 11/18/2016 | M.P. | MN | 16 | Fentanyl | A 215 |
| 11/18/2016 | J.T. | OR | 14 | Fentanyl | M/30 |
| 11/18/2016 | N.A. | CA | 12 | Fentanyl | A 215 |
| 11/18/2016 | T.E. | SC | 12 | Fentanyl | M/30 |
| 11/18/2016 | A.T. | VA | 12 | Fentanyl | M/30 |
| 11/18/2016 | M.J. | CA | 11 | Fentanyl | M/30 |
| 11/18/2016 | J.R. | CT | 11 | Fentanyl | A 215 |
| 11/18/2016 | A.B. | MO | 11 | Fentanyl | M/30 |
| 11/18/2016 | L.P. | NY | 11 | Fentanyl | M/30 |
| 11/18/2016 | J.G. | NY | 11 | Fentanyl | M/30 |
| 11/18/2016 | B.S. | OH | 11 | Fentanyl | A 215 |
| 11/18/2016 | K.M.T.T.S.T.R. | OK | 11 | Fentanyl | M/30 |

GOVERNMENT
EXHIBIT
**6.00**
2:16CR 631 DAK

Page 1



001-005-002-00021



001-005-002-00182

12

Testimony and exhibits were presented that showed that DEA chemists weighed and tested more than 12,000 grams of fentanyl seized in the investigation. The testimony also showed that the defendant was in actual or constructive possession of all the Fentanyl seized (or had ordered the Fentanyl from China).

Additionally, the evidence showed that all the fake oxycodone pills sold by the defendant contained Fentanyl. The jury heard testimony that the defendant notified potential dark net customers that his pills contained Fentanyl—although the defendant had three names for his Fentanyl pills sold on AlphaBay and only one name used the word Fentanyl.

13

# Pharma-Master Feedback Totals

**Revenue:**          $2,817,520.93
**Total Items:**      872,659
**Total Transactions:** 5589

|                              | Total Orders | Total Quantity | Total Value    |
|------------------------------|--------------|----------------|----------------|
| **Fentanyl-laced Fake Oxycodone** | **3,491**    | **458,946**    | **$2,472,040.73** |
| *sold as: M Box*             | 871          | 210,752        | $1,005,760.73  |
| *sold as: Roxy*              | 2,244        | 242,985        | $1,417,272.82  |
| *sold as: Fentanyl*          | 376          | 5,209          | $49,007.18     |
| **Counterfeit Xanax**        | **1,652**    | **405,701**    | **$283,039.42** |

DEA Chemists testified that the defendant's Fentanyl pills weighed just over 100mg each. Feedback-linked sales showed the defendant sold more than 458,000 fentanyl-laced fake oxycodone, as shown in Exhibit 15.02a, above. That equates to 45,894 grams of a mixture or substance containing a detectable amount of Fentanyl.[3]

The defendant's criminal enterprise engaged in a practice of shipping more pills than a customer ordered—as a way of engendering positive online customer feedback and to prevent customer complaints, which were labor-intensive to resolve. The true number of pills shipped is higher than these sales figures indicate for that reason. These sales figures above also do not account for sales in which the transaction was "auto-finalized." Testimony established that the

---

[3] The fake oxycodone pills containing Fentanyl seized in this investigation weighed just over 100mg each. The "Roxys"—those pills that were stamped A 215—weighed slightly over 100mg per pill. The "M boxes"—those pills that were stamped with an "M" with a box around it on one side and a "30" on the other side—weighed slightly more than the Roxys.
For ease of math and to give the benefit of small variation in weight from pill to pill to the defendant, the jury was encouraged to give each fake-oxycodone pill containing Fentanyl a weight of 100mg for purposes of calculating aggregate amounts.

14

defendant had more than one thousand additional orders on AlphaBay that were not captured in the feedback because the sales were auto-finalized.

The data from the feedback showed that Pharma-Master on AlphaBay sold Alprazolam as early as December 22, 2015, and Fentanyl-laced fake oxycodone as early as February 3, 2016.

The defendant manufactured counterfeit pills and supervised and assisted in the manufacturing of the Fentanyl pills. The defendant's Alprazolam pill press, pictured below, was running when agents executed a search warrant on his residence on November 22, 2016:



001-006-004-00051

15

Testimony and exhibits, such as the one below, showed that the defendant maintained constructive possession over his Fentanyl pills even when stored at the residence of his shipping team, Ms. Tonge and Ms. Bustin. Here is the largest single exhibit of Fentanyl pills seized during this investigation; it contained approximately 74,000 Fentanyl pills, and it was discovered at the Tonge/Bustin residence on November 22, 2016.



001-006-003-00205

16

The defendant, under his Pharma-Master vendor account, sold drugs to both addicts and redistributors. For redistributors who bought large quantities, the price-per-pill would be lower than consumers who purchased one, ten, or even one hundred pills at a time.

One of Pharma-Master's largest customers, who went by the online handle "Trustworthy Money," was arrested in the District of Oregon. The jury was shown this picture of Jared Gillespie, aka "Trustworthy Money":

 (Exhibit 19.03)

The jury heard that Trustworthy Money encouraged other Dark Web customers to buy from Pharma-Master. In one online feedback post, Trustworthy Money wrote, "basic economics will tell u to put all your money back in to re-upping. don't spend hella money[.] put all that shit back into pharmas pills cuz these will make u a millionare under a year[,] guarantee[.]" (Exhibit 15.00)

Agents found many of the criminal enterprise's daily orders sheets on the defendant's iMac computer. Those daily order sheets were compiled into Exhibit 14.30. That exhibit showed orders submitted by customers, both dealers and addicts.

17

From customer addresses recovered during the investigation, agents determined that the defendant and his subordinates distributed drugs through the US Mail to every dot on this map:



Each dot is a destination zip code for the packages the defendant and his subordinates sent to customers. With some frequency, a zip code had several packages sent it to from the defendant and his subordinates in his continuing criminal enterprise.

18

The jury heard that the active investigation of this case began when Customs and Border Patrol seized a package of Fentanyl addressed to one of the defendant's nominees, Ryan Jensen, in June of 2016 (Count 2). Agents later obtained a search warrant to search Jensen's residence. Jensen agreed to cooperate with the investigation. Jensen led agents to Sean Gygi.

On November 8, 2016, Postal Inspectors seized an inbound packages of alprazolam addressed to Sean Gygi (Count 3).

On November 17, 2016, a search warrant was executed at Gygi's residence; Gygi began cooperating with investigators. Gygi explained that he was in possession of an unopened package that belonged to the defendant. Gygi gave consent for the agents to seize the package, which contained Fentanyl (Count 4). Gygi explained he worked for the defendant by picking up packages from the defendant's shipping team and dropping the outbound packages off at Postal Service drop boxes throughout the valley.

On November 18, 2016, and again on November 20, 2016, Gygi accepted packages from Tonge and Bustin at the direction of the investigators. During those two days, the investigators seized more than 120 packages containing pills pressed with Alprazolam or Fentanyl. Gygi also recorded a conversation with the defendant at the agents' direction. The investigators applied for search warrants based upon probable cause that drugs and paraphernalia would be located in the defendant's residence and in Tonge's and Bustin's residence.

On November 22, 2016, investigators executed the warrants at the defendant's residence and at Tonge's and Bustin's residence. In the defendant's residence, investigators discovered a pill press that was running in a basement room, pills containing Fentanyl (Count 5), tablets containing Alprazolam, and three additional pill presses—one of which was still in a crate in the garage. The running pill press was producing counterfeit Alprazolam tablets (Count 7).

Investigators also seized $1,227,773 in US currency from the home. The defendant, who had his gloves and mask in his pocket, was arrested.

Tonge's and Bustin's residence yielded additional Fentanyl-laced fake oxycodone pills (also Count 5), counterfeit Alprazolam pills, packaging and shipping materials, and additional currency.

According to some co-conspirators, Crandall and his then-girlfriend fled the country in November 2015 because Crandall's girlfriend was spooked by some aspect of the conspiracy. From November 2015 until May 5, 2017, Crandall and his girlfriend lived abroad, touring through Asia and staying for months in New Zealand and Australia. Crandall and his girlfriend paid for their travel, at least in part, by using proceeds from the Pharma-Master DTO.

The day after the defendant's arrest, Crandall's girlfriend reached out to Noble—a friend and former co-worker—to enquire how he was doing. Noble did not respond. Crandall then took steps to erase his social media presence. Crandall alerted Alphabay that Pharma-Master had been compromised—specifically that the owner of the account had been arrested; the Pharma-Master vendor account was banned.

In summary, the United States presented evidence sufficient to meet all the elements for Count 1, Engaging in a Continuing Criminal Enterprise.

20

**Count 6—Aiding and Abetting the Distribution of Fentanyl that Resulted in Death**

To submit the case to the jury, the United States was first required to present evidence

that met the following elements of the offense for Count 6:

*First*: the defendant's co-conspirator(s) knowingly or intentionally distributed a
controlled substance on or about June 6 through June 13, 2016, as charged;
*Second*: the substance was in fact Fentanyl;
*Third*: the death of R.K. resulted from use of the Fentanyl distributed by the
defendant's co-conspirators; (i.e. Fentanyl was the but-for cause of death); and
*Fourth*: the defendant aided and abetted his co-conspirator(s) in the commission
of the offense.

To satisfy its burden of proof, the United States offered testimony and exhibits from no

fewer than seven witnesses. Here is a non-exhaustive summary of the evidence that touched

upon Count 6:

Testimony established that R.K. and G.L. lived at 3 Midvale Drive in Daly City,

California, in June of 2016. Those two roommates ordered Fentanyl-laced fake oxycodone pills

from Pharma-Master on AlphaBay. From Exhibit 14:30:

Roxy - Oxycodone 30 mg X10
Sale # 2742764 - Item # 91505 - Jun 6, 2016 - 10:50 - to twad

Postage: Priority Mail - 4 days - USD 7.75
Quantity: 1

GREGORY LEE

3 MIDVALE DR
DALY CITY CA 94015-2105

The order was placed on June 6. Postal records, verified by the tracking logs of Ms. Tonga and Ms. Bustin, show that the package left Utah on June 9, 2016, and was delivered to R.K.'s residence on June 11, 2016, at 3pm.

The jury heard testimony that the following evening, June 12, 2016, R.K. crushed up and snorted two of the Fentanyl pills. He began to exhibit the physical effects and laid down in his bed. R.K. asked G.L. and G.L.'s girlfriend to check on him.

The last time they checked on R.K. that night, they rolled R.K. into the recovery position. R.K. sounded as if he was snoring in his sleep.

The following morning R.K. was found dead and an investigation began. Here is R.K.'s bed where he died.





R.K.'s body was close to a garbage can inside his room. On top of the can, officers found and
photographed a priority mail envelope with a Utah return address (Ex 17.01, p8):



23

The jury heard evidence that the defendant purchased stamps identical to the stamp on the envelope in the month of June 2016. The defendant also directed several of his subordinates to purchase stamps during the same time period.

In exhibit 14.15, the defendant explained to one of his customer service employees that they never changed the shipping name and address provided by customers—they just copied and pasted the addresses into the daily order sheets.

An autopsy was performed; the autopsy ruled out causes of death other than the drugs in R.K.'s blood at the time of his death. His toxicology results showed R.K. had Fentanyl, alcohol, cocaine metabolites, and a cocaine-cutting agent in his blood, as follows:

Blood Ethyl Alcohol = 0.19 grams%

| | |
|---|---|
| Cocaine | = Negative |
| Benzoylecgonine | = 0.23   mg/L |
| Ecgonine Methyl Ester | = Present |
| Cocaethylene | = Present |
| Levamisole | = Present |
| Fentanyl | = 0.009 mg/L |

Dr. Stacey Hail, a medical toxicologist, reviewed R.K.'s case and testified as to her expert opinion of the cause of death. She testified that R.K. would not have died but for the Fentanyl he ingested.

Dr. Hail testified that with an opioid death, as opposed to a Cocaine metabolite-caused death, patients go to sleep and die. Dr. Hail explained that alcohol would have no significant effect on the respiratory depression that precedes an opioid-caused death, nor would alcohol in the amounts consumed by R.K. cause death.

24

Dr. Hail testified that the level of Fentanyl found in the defendant's blood was not especially helpful in drawing a conclusion as to the cause of death; she explained that there is no defined lethal level:

> We are not using what would be called a lethal level. And normally -- and I apologize because a lot of times when I tell lawyers this, it's like I'm telling them there's no such thing as Santa Claus. As toxicologists, we don't care about the number in these circumstances and there is no defined lethal level, not to be mixed up with the lethal dose. There is definitely a dose that somebody can take that can be lethal. But we're talking about concentrations in the body. When we're talking about opioids, when we're talking about cocaine metabolite, most drugs that we talk about, we are not looking at the number. It does not mean very much in living patients and it means even less in dead patients. (Transcript of Dr. Hail's Testimony, at 23).

There was no evidence presented that R.K. had another source of Fentanyl.

In summary, the evidence that the defendant's Fentanyl pills were the but-for cause of R.K.'s death was sufficient for Count 6 to be presented to the jury.

CONCLUSION

The evidence presented at trial, through testimony and through the exhibits, satisfied the elements of Counts 1 and Count 6, the only two counts challenged by the defendant's motion for a judgement of acquittal. The Court should deny the defendant's motion.

Respectfully submitted this 4th day of August, 2019.

JOHN W. HUBER
United States Attorney

 */s/ Michael Gadd*
MICHAEL GADD
Special Assistant United States Attorney

25

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2         FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

 3

 4    _____
                                      )
 5    UNITED STATES OF AMERICA,       )
                                      )
 6                 Plaintiff,         )
                                      )
 7        -vs-                        )    2:16-CR-631 DK
                                      )
 8    AARON MICHAEL SHAMO, et al.,    )
                                      )
 9                 Defendants.        )
      _____)
10

11

12

13

14          BEFORE THE HONORABLE DALE KIMBALL

15              DATE:  AUGUST 20, 2019

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17            TESTIMONY OF VIRGINIA KEYS

18

19

20

21

22

23

24

25          Reporter:  REBECCA JANKE, CSR, RPR, RMR
                       (801) 521-7238
```

```
 1
 2                    A P P E A R A N C E S
 3
 4     FOR THE PLAINTIF       UNITED STATE'S ATTORNEY'S OFFICE
 5                            BY:  MICHAEL GADD, ESQ.
 6                                 VERNON G. STEJSKAL, ESQ.
 7                                 KENT A. BURGGRAAF, ESQ.
 8                            111 SOUTH MAIN STREET, 1800
 9                            SALT LAKE CITY, UTAH  84111
10
11
12
13     FOR THE DEFENDANT:     SKORDAS & CSTON, LLC
14                            BY:  GREGORY G. SKORDAS, ESQ.
15                                 KAYTLIN V. BECKETT, ESQ.
16                            560 SOUTH 300 EAST, 225
17                            SALT LAKE CITY, UTAH 84111
18
19                            DARYL P. SAM, PLLC
20                            BY:  DARYL P. SAM, ESQ.
21                            5955 SOUTH REDWOOD ROAD, 102
22                            SALT LAKE CITY, UTAH 84123
23
24
25
```

```
 1   AUGUST 20, 2019                    SALT LAKE CITY, UTAH

 2                      P R O C E E D I N G S

 3                             * * *

 4              (Testimony of Agent Virginia Keys)

 5              THE COURT:  You may step down, thank you, and

 6   you may be excused.  The government may call it's next

 7   witness.

 8              MR. GADD:  Your Honor, the United States

 9   calls Special Agent Virginia Keys.

10                      VIRGINIA KEYS,

11   the witness hereinbefore named, being first duly

12   cautioned and sworn or affirmed to tell the truth, the

13   whole truth, and nothing but the truth, was examined

14   and testified as follows:

15              THE CLERK:  Please state your name and spell

16   it for the record.

17              THE WITNESS:  My name is Virginia Keys.

18   V-i-r-g-i-n-i-a.  K-e-y-s.

19              THE COURT:  You may proceed, Mr. Gadd

20              MR. GADD:  Thank you, sir.

21                      DIRECT EXAMINATION

22   BY MR. GADD:

23      Q.   Special Agent Keys, are you prepared to

24   testify about your part in the investigation of the

25   drug distribution activities of this defendant and his
```

1   co-conspirators?

2      A.   I am.

3      Q.   Before we do that, I just want to give the

4   jury a very brief summary about your background and

5   your experience.  Could you tell us a little about

6   yourself.

7      A.   Sure.  I'm a single mom, and I've lived in

8   Utah for a little over five years, and I enjoy

9   gardening and I like to play volleyball.

10      Q.   Thanks.  Could you tell us about maybe your

11   education and your background?

12      A.   Sure.  After I got divorced in 2004, I went

13   back to school, and I finished my bachelor's degree in

14   inter-disciplinary studies.  My disciplines are

15   accounting and business and communications with an

16   emphasis in international law enforcement surveillance

17   and cryptography.

18         I continued on my with my master's degree,

19   and I -- my master's is in criminal justice with an

20   emphasis in cyber crime.  And during my master's

21   program, I was recruited by the government to become a

22   special agent for IRS Criminal Investigations.  After

23   I graduated, IRS CI sent me to training with my

24   children in Georgia, and I put them in school while I

25   was doing my training.  We were there for six months.

1    During the -- that was at the Federal Law

2    Enforcement Training Center, or the FLETC is what it's

3    called for short.  During the time I was there, I

4    learned about the law.  I learned about arrest

5    warrants, search warrants, report writing,

6    interviewing, defensive tactics, all the things that

7    we were going to need to do our job as special agents.

8    And then, after I finished that training, I

9    came back to Washington State, and I worked for IRS

10   Criminal Investigation as a special agent for a little

11   over seven years before they transferred me to Utah.

12   I was here a little over two years with them before I

13   transferred over to FDA Office of Criminal

14   Investigations.  For short, I'll just say OCI because

15   it's easier.  And I have been with them for a little

16   over three years.

17   During the training that I had with IRS,

18   before I transferred over, my investigations included

19   gun smuggling, prostitution, Ponzi schemes, money

20   laundering schemes, drug smuggling, those types of

21   crimes.  And then, with FDA, my investigations include

22   investigating misbranding, adulteration, tampering,

23   counterfeit drugs that contaminate the drug supply.

24   And then, part of my responsibilities as well, is to

25   investigate overdoses and overdose deaths associated

```
 1   with those cases.
 2       Q.   You said FLETC and it just reminded me, the
 3   law enforcement -- the federal law enforcement loves
 4   its acronyms.  Is that fair to say?
 5       A.   It does.
 6       Q.   If I fall into that habit of using acronyms,
 7   will you correct me?
 8       A.   Sure.
 9       Q.   Okay.  So when people find out you're a law
10   enforcement agent in the Food and Drug Administration,
11   do you get quizzical looks?
12       A.   I do.  I actually get razzed pretty good.  A
13   lot of people ask me if I'm just there to keep their
14   food safe.  But there's a little bit more to it than
15   that.
16       Q.   For sure.  For sure.  Let's talk for a minute
17   about this exhibit right here.  This is true
18   Oxycodone, isn't it?
19       A.   It is.
20       Q.   Did you obtain -- oh, and maybe for the
21   record, this is Exhibit 24.00.  Did you obtain true
22   Oxycodone pills from Actavis?
23       A.   I did.
24       Q.   Did you also obtain true Oxycodone pills from
25   Mallinckrodt?
```

1      A.   I did.  The Mallinckrodt pills are stamped or

2   embossed with an M box and then the Actavis are

3   stamped with an A-215.

4      Q.   I'm holding Exhibit 24.  These are those

5   pills you obtained, right?

6      A.   That is correct.

7           MR. GADD:  Your Honor, at this time I would

8   like to take a moment and pass these around the jury.

9           THE COURT:  All right.

10          (Jurors looking at Exhibit 24.)

11          THE WITNESS:  You can touch them if you want,

12   if it's easier to see the embossment.  I'll just make

13   sure and count them when I get that back.

14          THE COURT:  Don't take any out.

15      Q.   By MR. GADD:  I said two names there, Actavis

16   and Mallinckrodt.  Those are the pharmaceutical

17   companies that sell these pills?

18      A.   They are.  They are registered with the FDA

19   and approved to manufacture the actual Oxycodone pills

20   for distribution in the United States.

21      Q.   And for these real Oxycodone pills, the

22   active pharmaceutical ingredient is Oxycodone,

23   correct?

24      A.   Oxycodone, yes.

25      Q.   Let's take a minute and just do a little bit

1    of housekeeping.  So the FDA, the Food and Drug

2    Administration, it has a chemistry lab, correct?

3        A.   It does.  It's called the Forensic Chemistry

4    Center.

5        Q.   Did you arrange for some of the pills from

6    Mr. Shamo and some of the punches and dies from

7    Mr. Shamo, did you arrange for those to be sent from

8    the DEA lab to your -- the FDA lab?

9        A.   I did.

10        Q.   I just want to read those through so that

11    they are clear in the record, and what I'll do is I'll

12    read not our court exhibit number, but I'll read the

13    DEA drug exhibit number, and then at the end, I want

14    to ask you if I got them right.

15            So in this category of items that you

16    arranged for the FDA lab to test, I show that we have

17    DEA Exhibit Number 14, 34, 64, 123, 193, 85, 95.01,

18    95.02, 96, 136, 174.01, 174.02, 188, 54, 15, 97, 126,

19    173, 185, 177, 178 and 179.  Does that sound correct?

20        A.   It does.

21        Q.   And we heard some about this yesterday,

22    right?

23        A.   We did.

24        Q.   The chemists were talking about how some of

25    the items that they had tested or sampled had bits

```
 1   removed so that they could go into special programs,
 2   correct?
 3       A.   Correct.
 4       Q.   All right.  Let's jump back into it.  Could
 5   we look at 1706.  Can you see that on your screen?
 6       A.   I do.
 7       Q.   Could you point out for the jury Alex Tebbs?
 8       A.   Sure.  So if you look at the bottom row, the
 9   third row, the farthest to the right, Ms. Tebbs has
10   the red hair, and she's the very last one in that row.
11       Q.   What role did Ms. Tebbs play in Mr. Shamo's
12   organization?
13       A.   She was the pseudo-executive assistant for
14   him.  She would also run errands.  She would clean his
15   house, different tasks that he would ask her to do.
16   And that also includes helping him try to get into
17   other businesses.
18       Q.   Have you reviewed the text messages that were
19   captured between Ms. Tebbs and Mr. Shamo?
20       A.   I have.
21       Q.   Could we look at 14.04.  Could you read that
22   to the jury.
23       A.   Sure.  The "local user" is Mr. Shamo, and the
24   gray box is Ms. Tebbs or Alex.
25            Mr. Shamo:  Hey, Alex, any news on the
```

```
 1   T-shirt bis?

 2           Alex:  He hasn't said anything yet.  Do you

 3   want me to offer him a price?

 4           Mr. Shamo:  Yeah.  Offer 5K and see what he

 5   says.  I want to get the ball rolling on it.  BTC is

 6   doing really well, so the sooner I get a bis up, the

 7   better.

 8           As you've heard, BTC is short for BitCoin.

 9           Alex:  Okay.  Perfect.  I'll text him now.

10           Alex:  Also, if it's cool with you, I can get

11   your watches fixed today and drop off the dry clean

12   and come down tomorrow.  I asked him what he thinks,

13   so we'll see what he says.

14           Mr. Shamo:  Yeah.  No pressure on when you

15   come down.

16           Alex:  Okay.  Perfect.  I just figured I

17   would have more stuff done by tomorrow.  It would be a

18   little more productive, lol.  When I go on lunch in

19   about half an hour, I'll call the food bank and get

20   some time set up.

21           MR. SHAMO:  Oh, yeah.  Need that done for

22   sure, lol.  I have some paperwork I might need filled

23   out for this class I need.  I might send you in to do

24   it.  Also, I need to get a dentist appointment.  Can

25   you maybe find one close by to me and get one set up?
```

1      Q.   Let's talk for just a minute about the offer

2   for the T-shirt business.  Are you aware of other

3   instances where Mr. Shamo tried to buy a legitimate

4   business through which he could launder drug money?

5      A.   Yes.

6      Q.   Let's look at 14.06.  Can you read this one

7   as well?

8      A.   Yes.  Again, Mr. Shamo is in blue, and Alex

9   is in the gray.

10          Mr. Shamo:  Both.  I had someone drive me to

11   the airport and asked them to leave the truck keys on

12   the counter.  That obviously didn't happen.  If you

13   can do the dishes in the sink and get a shoe rack that

14   I pointed out, that would be great.  I forgot to

15   transfer BTC -- or BitCoin -- over to my online

16   wallet, so I can't set up the trade today.  I can't

17   remember what else, but I'll have to get you more cash

18   to get Legal Zoom going.  What time was the detail

19   appointment at?  Hey, I need you to run some paperwork

20   into Prime For Life for me.  They are open 'til 9 p.m.

21   most nights, so anytime in the next few days would be

22   great if you can.  Also, I'm moving forward with the

23   gym this week and meeting with the owner in the next

24   few days for lunch, so I'll really need some legal

25   paperwork set up soon for that.  Most likely we'll use

```
1   Legal Zoom since it's easy.  Also, can you get the

2   shoe rack that I picked out and reschedule the

3   appointment for the detailing?  I was pissed.  Allie

4   took the keys to the truck, so sorry about that, but

5   let me know your thoughts and coordination for this.

6           Allie:  No big deal at all, lol.  I already

7   left after I tried to call.  It was my cousin's

8   birthday party, so I went to that, ha, ha.  But, yes,

9   I'll get on that.  What shoe rack was it you wanted?

10  Would you like me to get hold of Legal Zoom?  I

11  rescheduled for this Saturday, so no biggy, and I'll

12  get started on the paperwork.  You just want a

13  contract between you two saying you will be part

14  owner.  Any other details I need to know?

15          Mr. Shamo:  Yeah.  It will be a startup for

16  the gym since it's not legal yet, but I'll get more

17  details, how he wants us to set it up in the next few

18  days.  Also figure out a name for the one shirt bis.

19  I want to get that started soon.  Ugh.  It's going to

20  be a super busy week for me.  Let me know what day you

21  can come down to do the paperwork for Prime For Life.

22  Carpet cleaners this week.  Please try and set up for

23  Thursday or Friday.

24     Q.   The date on these messages that you've just

25  read, it's June of 2016, correct?
```

1    A.   Correct.

2    Q.   Let's look at just one or two more.  Could we

3  look at 14.05.  Ms. Tebbs' role wasn't just running

4  errands or trying to set up businesses that he could

5  purchase or launder his money through?

6         MR. SKORDAS:  Objection to counsel's

7  characterization of laundering money.

8         THE COURT:  Objection -- what's the question

9  -- sustained.

10    Q.   BY MR. GADD:  I probably should throw a

11  question in there.  I will.  In what we are about to

12  read here in 14.05, did you see additional steps that

13  the defendant asked Ms. Tebbs to take in her work for

14  him?

15    A.   I did.  He wanted her to also make BitCoin

16  trades for him.

17    Q.   Let's read that, would you?

18    A.   Mr. Shamo is in the blue.  Alex is in the

19  gray again.

20         Mr. Shamo:  Hey, my biggest BTC trader is in

21  town tomorrow.  Think you can make the trade for me?

22         Alex:  Yes.  I can definitely do that.  I'm

23  free tomorrow, so any time morning sometime would be

24  best.

25         Mr. Shamo:  Awesome.  I'll set it up.

14

```
 1              Alex:  Sorry.  I'm at work.  I can call you
 2    around 5 or 6 if that's okay.  Are you going to do
 3    Vegas?
 4              Mr. Shamo:  Okay.  I'm going.  Can I send you
 5    my card info and you buy the 9:50 flight?
 6              Alex:  Yes.  For tonight?
 7              Mr. Shamo.  Yes.
 8              Alex:  Okay.  Southwest, right?
 9       Q.   And then let's look at one other.  Let's look
10    at 14.07.  This will be our last one for Ms. Tebbs.
11    In addition to engaging her to trade BitCoin, did she
12    also buy stamps at his request?
13       A.   She did.
14       Q.   Let's look at this now, and could you read
15    this for us?
16       A.   Yes.  Again, Mr. Shamo is in blue.  Alex is
17    in gray.
18              Mr. Shamo:  I need those stamps ASAP.  Can I
19    get your bank account info so I can drop cash in?
20              Alex:  Yes.  Give me a sec.  My account
21    number is 2910962 and I am at Golden West.  It's Alex
22    Tebbs on the account.
23              Mr. Shamo:  I've been down south most of my
24    day and haven't had a chance to get it.  I might just
25    give you cash when you come down next.  Meh.  Also,
```

1  don't hate me, but I have another watch to do, lol.

2  I'll talk to you.

3       Alex:  I can get order it -- I'm sorry -- I

4  can just order it, and you can just pay me back.  What

5  exactly is it?  I'm fine.  I'm used to it now.

6       Mr. Shamo:  Lol.  Priority stamped the 6.451,

7  I think.  I need 1,000 of them, so it will be around 7

8  K, if you can front that.

9       Q.   When you see in there the 6.451, what does

10  that mean, if anything, to you?

11      A.   That's a priority stamp that actually

12  includes the tracking amount and stuff in the price.

13      Q.   And is that the price, $6.45?

14      A.   It is.

15      Q.   Let's turn away from Ms. Tebbs now, and let's

16  talk about eBay items.  So, did you help analyze

17  Mr. Shamo's computers and data that was received

18  either from subpoenas or search warrants?

19      A.   I did.

20      Q.   All right.  Could we look at Exhibit 17.09.

21  Do you recognize this?

22      A.   I do.

23      Q.   Did you compile a list of some relevant items

24  that were, to use their phrase, won or purchased on

25  eBay?

1       A.   I did.

2       Q.   Let's look at these items that you flagged.

3   Can you walk us through what each of the columns

4   means?

5       A.   Sure.  When you look on the left, that's the

6   purchase date and time of the auction.  One of the

7   things about eBay is when you -- you have two choices.

8   You can either actually be involved in an auction and

9   make bids and compete against other people to try to

10  win the bid, or you can just have a buy now feature,

11  and even if you do the buy now feature, eBay still

12  lists it as you winning the auction.

13       So the second column is the auction title,

14  basically the product that was being either won or

15  purchased immediately, then the buyer's shipping

16  address, the shipping city of the buyer and the buyer

17  shipping name.

18       Q.   Can you tell us these -- each row is

19  something that he purchased, correct?

20       A.   Correct.

21       Q.   Can you walk us through the rows and what

22  they are?

23       A.   Sure.  So let's start at the bottom just for

24  chronological purposes.  So on June 6 of 2015, at

25  16:49, he won or purchased the USPS new 1999 USS

1  Arizona Memorial priority mail express stamp sheet of

2  ten. It was shipped to 1383 East Murphy's Lane in

3  Salt Lake City, and the buyer's shipping name is Aaron

4  Shamo.

5       The next line up, July 8 of 2015, at 16:52,

6  he purchased USPS new 1999 USS Arizona memorial

7  priority mail express stamp, sheet of ten.

8       THE COURT: A little bit slower so she can

9  take it down.

10      THE WITNESS: Sorry. He had it shipped to

11  1383 East Murphy's Lane in Salt Lake City, and the

12  buyer shipping name is Aaron Shamo.

13   Q.  BY MR. GADD: So let me jump in for just a

14  moment. As we work our way up, there's going to be

15  several types of dies and stamps, but could you talk

16  specifically about the first and third row and then if

17  you want to do it chronologically, maybe we do the

18  third row first?

19   A.  Sure. So, if you go up, it's the third row

20  from the top. In December -- on December 26, 2015, at

21  16:06, he won or purchased the molds of A-215 for

22  tablet press pill press die pill maker TDP 0/1.5/5/6.

23  He had it shipped to 7939 South Titian Street in

24  Cottonwood Heights. Buyer shipping name is Aaron

25  Shamo. And the top line. On March 12 of 2016, at

1  21:45, he won the shipping from USA, A-215 die for

2  tablet press pill press TDP 0/1.5/5/6.  He had it

3  shipped to 7939 South Titian Street, Cottonwood

4  Heights.  Buyer shipping name is Aaron Shamo.

5      Q.   In addition to this chart you've created, I

6  want to look at a couple other exhibits.  Can we now

7  turn to Mr. Shamo's emails.  This would be exhibit

8  21.34.  And then if we could go to page 4.  Do you

9  recognize this?

10     A.   I do.

11     Q.   What are we looking at here?

12     A.   This is the PayPal receipt for Mr. Shamo's

13  purchase of one of the A-215 pill dies.  He spent, all

14  total, $124 for it.

15     Q.   Then, if we could advance ahead to page 76.

16     A.   This is -- whoops.

17     Q.   Sorry.  Were you going to say something on

18  the previous one or this one?

19     A.   This one.

20     Q.   Okay.  Please, tell us what it is.

21     A.   This is another receipt for that second pill

22  die for the A-215 pill die for his pill press.  He

23  spent a total of $124 for this one as well, through

24  PayPal.

25     Q.   Let's look at one last set of emails.  Could

```
 1    we look at Exhibit 21.08.  And if we could go down to

 2    page 20.  Do you recognize this?

 3         A.   I do.

 4         Q.   What is this we're looking at?

 5         A.   This is eBay, another basic receipt from eBay

 6    showing the pill die that he ordered, the A-215.  The

 7    estimated delivery date was going to be Thursday,

 8    March 24th, to Thursday, April 7, and it shows his

 9    $124 payment through PayPal for it.

10         Q.   As long as we've got the picture up, let me

11    and you a question about the face of the punch in the

12    picture.  Why is it backwards?

13         A.   Because when it actually smashes in the pill

14    press together, then it's readable for the person who

15    is looking at it, so it has to backwards on the punch

16    die.

17         Q.   And the punches and on the face of the

18    punches that we have seized in this exhibit, I believe

19    it's 13.13, the boxes of dies, you had a chance to

20    actually look at those, correct?

21         A.   I did.

22         Q.   Did you see that similar backwards, as we

23    read it, looking down at it?

24         A.   I did.

25         Q.   Let's look at one last page in this exhibit.
```

1    Could we go to page 30.

2        What's this we're looking at?

3    A.    This is another eBay receipt showing that he

4    purchased it as a guest, that Aaron Shamo purchased it

5    as a guest.  He paid $124 through PayPal for it, and

6    it's the other mold for the A-215 pill punch that goes

7    in the pill press.

8    Q.    Thanks.  I want to change gears one last time

9    entirely.  Such is the life of a case agent.  Let's

10   talk for a minute now about customers of Mr. Shamo's.

11   Did you spearhead agents' efforts to investigate

12   Pharma-Master's customers?

13   A.    I did.

14   Q.    Could we look at Exhibit 14.30.  And if we

15   could look at page 1,854.  We have had this exhibit up

16   quite a bit for the jury.  This is the combined daily

17   order sheets, correct?

18   A.    It is.

19   Q.    And I just wanted to pull out this page to

20   talk about kind of what you saw as an investigator.

21   So we're highlighting now this sale going to Alivia

22   Luckcuck, who there has been some testimony about.

23   When you first started looking at these 1900 pages of

24   orders, did the name on the shipping address, did it

25   mean anything to you?

```
 1        A.    No, not necessarily, because as an
 2   investigator, in a lot of cases with drug trafficking
 3   organizations, sometimes when -- when there are
 4   customers orders such as this, they don't use their
 5   real name, so we didn't know who all was real and who
 6   wasn't.
 7        Q.    So when you say they don't use their real
 8   name, sometimes it's maybe a fake identity they use?
 9        A.    True, yes.
10        Q.    Or an alias?
11        A.    Correct.
12        Q.    Did some people use straw purchasers?
13        A.    Yes.
14        Q.    And maybe we could just define that.  What's
15   a straw purchaser?
16        A.    So a straw purchaser is somebody who the
17   leader of the organization has purchase an item and
18   have it sent to them or sent to somebody else so it
19   sends another layer of anonymity away from the leader
20   of the organization.
21        Q.    And then there's been testimony that at least
22   some people used package receivers, correct?
23        A.    Correct.
24        Q.    And Ms. Luckcuck is a package receiver?
25        A.    She is.
```

1    Q.   For the large purchasers, so for this

2    purchaser for example, Trustworthy Money, who is

3    purchasing 10,000 of the Fentanyl pills, what did you

4    and other agents do to further investigation into

5    these types of large purchases?

6    A.   When we reviewed all of the pages -- there's

7    1,984 pages of customer orders.  And, as we reviewed

8    them, we pulled out the orders of -- the larger orders

9    that were clearly not personal use orders, and we sent

10   leads all over the United States to different law

11   enforcement jurisdictions so that they could follow up

12   on those cases because that was clearly supplies for a

13   dealer in that area.

14   Q.   And that took care of the large orders, but

15   I'm hoping you and I can talk about some of the small

16   order customers.

17   A.   Uh-huh.

18   Q.   Have you personally investigated more than 90

19   of the small order customers?

20   A.   I did personally investigate over 90 of the

21   small orders of clients -- or customers.

22   Q.   I want to focus just on five who are

23   mentioned in the Indictment.

24   A.   Okay.

25   Q.   So if we could start first with Gavin

1   Keblish.  If we could look at page 748.  Do you see

2   his name at the top there?

3       A.   I do.

4       Q.   Can you explain what was ordered in that

5   transaction?

6       A.   I can.  Gavin Keblish, his address is 54

7   Seatuck Avenue in East Port, New York.  He went under

8   the moniker AJM6753.  He ordered Roxy Oxy, 30

9   milligrams.  He ordered 40 of them on May 5, 2016, and

10  had priority mail for that package.

11      Q.   And then let's look at one more order.  If we

12  could go to page 1,214.  There's an extra zero in

13  there.  Thanks.

14           What did he order on that date?

15      A.   He ordered M-box 30 Oxycodone, 30 milligrams.

16  He ordered 20 of those using the moniker AJM6753 and

17  had them sent to him at the 54 Seatuck Avenue, East

18  Port, New York address.

19      Q.   Did you look into Mr. Gavin Keblish?

20      A.   I did.

21      Q.   Did you speak with detectives in this area?

22      A.   I did.

23      Q.   Did you speak to his family?

24      A.   I did.

25      Q.   They are here in the courtroom with us?

1     A.   They are.

2     Q.   Was Gavin a real person?

3     A.   He was.

4     Q.   Did you speak to Gavin to confirm that he

5 ordered the Fentanyl-laced fake oxycodone from

6 Pharma-Master?

7     A.   I did not.

8     Q.   Why not?

9     A.   He's dead.

10    Q.   Let's talk about Conner Valenter.  Could we

11 look at page 450.  Do you see his name on there near

12 the bottom?

13    A.   I do.

14    Q.   What was ordered on that date, February 23?

15    A.   Conner ordered Fentanyl Roxy Oxycodone, 30

16 milligrams, one pill on February 23 of 2016, using the

17 moniker Spitta.

18    Q.   Could we look at page 489.  What did he order

19 on February 25?

20    A.   He ordered Fentanyl Roxy Oxycodone, 30

21 milligrams, eight pills, under the moniker Spitta, and

22 he had them sent to his address in Seattle,

23 Washington.

24    Q.   And, finally, could we look at page 563.

25 What did he order on March 3?

```
 1        A.   He ordered Fentanyl Roxy Oxycodone, 30
 2   milligram, five tablets using the same moniker of
 3   Spitta, and he had them sent to his address in Seattle
 4   Washington.
 5        Q.   Did you look into Mr. Conner Valenter?
 6        A.   I did.
 7             MR. SKORDAS:  Your Honor, could we approach?
 8             THE COURT:  Yes.
 9    (Conference among the Court and the attorneys at the
10        bench outside of the hearing of the jury.)
11             THE COURT:  These aren't the people who you
12   are claiming the homicide count on, are they?
13             MR. SKORDAS:  No.
14             MR. GADD:  So the homicide count, his name is
15   Ruslan Kluyev.
16             THE COURT:  RK?
17             MR. GADD:  Yes, RK.  These people are charged
18   in the Indictment; specifically, Mr. Shamo distributed
19   drugs to them.  So this was our -- our written motions
20   that were done I think in April and May, where the
21   ruling was we couldn't mention the other customers who
22   are now dead from an overdose, those folks whose names
23   are in the Indictment and Mr. Shamo is charged with
24   distributing drugs that did go to them.  I can ask my
25   agent if she interviewed them because that's a major
```

1    investigative step that any investigator would take.

2    She was ordered by Your Honor to not mention that

3    their death was an overdose.  In fact, you will notice

4    we are not going into the death at all.

5         MR. SKORDAS:  You've got to be kidding me.

6         MS. BECKETT:  The ruling was very contrary on

7    the overdose deaths, and it was specific to:  They are

8    allowed to discuss Gregory Lee, who was an overdose,

9    who was investigated because they weren't able to

10   interview him.  He is not here testifying.  That was

11   what was allowed.  They are very, very, very far over

12   the line when they have a family out here crying in

13   the courtroom, and it's clear that the indication is

14   that he was an overdose death.  Your Honor's ruling

15   was very clear in that regard.

16        THE COURT:  I don't have the order with me, I

17   don't think, but I thought -- I thought you were going

18   to -- I guess I thought there would be a stipulation:

19   The reason we didn't call -- these people weren't

20   investigated.  They weren't called because they were

21   dead.  That's not really -- I mean, you're leaving

22   more of an impression they died of an overdose and

23   you're trying to connect it to Shamo.

24        MR. SKORDAS:  Of course he is.

25        MR. GADD:  I'm happy to ask her right now,

1    these four men we are talking about were not --

2    Mr. Shamo was not charged with causing their deaths.

3    We will make it very clear.

4         THE COURT:  Yeah, you should do it.  But then

5    what else do you need to do?

6         MS. BECKETT:  That doesn't fix it.

7         MR. GADD:  I still need to prove the counts

8    in the Indictment, the people distributing drugs to

9    these people.  The Grand Jury charged it.  I've got to

10   ask these questions.  I will clarify to make it very

11   clear he is not charged with causing their deaths.

12        MR. SKORDAS:  But you can ask if he

13   distributed drugs to them, and you can show that.

14        But when he then asked:  Why didn't you

15   interview them -- he didn't ask that about a single

16   other person who allegedly received drugs -- so that

17   she can say, "Because they are dead."  That clearly

18   violates the order of this Court.

19        THE COURT:  It seems to me it does.

20        MR. GADD:  We have asked other people.  Jared

21   Gillespie, the other person named in the Indictment,

22   he was interviewed.  That was the question we asked.

23   These are just the people named in the Indictment.

24   The Grand Jury charged it.  It's part of what I have

25   to prove.

1          MS. BECKETT:  You're two steps beyond that

2  when you have family in the courtroom and when you ask

3  him whether or not the family is present.  You asked

4  whether or not they were present in the courtroom.

5          MR. GADD:  Yes, I did.

6          MS. BECKETT:  You have gone way over what the

7  Court's ruling was on the overdose.

8          MR. SKORDAS:  I think we need to make a

9  motion outside the presence of the jury at the next

10 break.

11         MR. GADD:  Let's take a minute and look up

12 the order or the minutes.  This is clearly what was

13 talked about at the hearing.

14         THE COURT:  I didn't envision it going this

15 way.  I envisioned it, you can say, "These people were

16 charged in the Indictment."

17         MR. GADD:  Yes.

18         THE COURT:  "We couldn't interview them

19 because they are not here.  They are dead."

20         MR. GADD:  I did ask that.

21         THE COURT:  Why do you need to ask anything

22 else, I guess is my question.

23         MR. GADD:  Oh, because we have set this up --

24 because in order for them to be guilty, he has to send

25 it to a real person.  How do you prove that they are a

1    real person?  You have to investigate it.  Right?  You

2    talk to detectives who talk to family if you can't

3    find the person.

4            THE COURT:  Okay.  So you're entitled to give

5    evidence that he sent it to him, but the problem is,

6    you are tying that to the deaths.  You've got to say

7    something about you're not charging him with the death

8    of this person.

9            MR. GADD:  I will do that right now.

10           MR. SKORDAS:  In fact, he did, and if this

11   was a real person.  She answered yes.  At that time

12   the inquiry is over.  Instead, he continues and asks:

13           Did you interview him?

14           No.

15           Why not?

16           Because he's dead.

17           And his whole family is here?

18           You've got to be kidding me, Judge.  This is

19   outrageous.  I'm sorry.

20           THE COURT:  You're going to ask for a

21   mistrial, and I'm going to deny it.

22           MR. SKORDAS:  I understand.  I need to,

23   though.

24           THE COURT:  You don't need to get anymore

25   than that he sent them to him.  Why do we need to know

```
 1   anything else?
 2          MR. GADD:  I understand what the Court has
 3   said, and I'll limit myself to it.
 4          THE COURT:  All right.
 5          MR. GADD:  Okay.
 6          (Proceedings continued in open court.)
 7          THE COURT:  Go ahead, Mr. Gadd.
 8     Q.   BY MR. GADD: Special Agent Keys, let's
 9   clarify so that we're abundantly clear.  The people
10   that we're going to talk about, starting with
11   Mr. Keblish, now Mr. Valenter, they are named in the
12   Indictment, but Mr. Shamo has not been charged with
13   causing their death?
14     A.   That is correct.  They were his customers.
15     Q.   Let's take -- if you'll excuse me, I forgot
16   which question I left off on.
17     A.   Right.  I don't remember.
18     Q.   Let me circle back, and I'll make sure we get
19   the important ones.
20     A.   Okay.
21     Q.   You looked into Mr. Conner Valenter?
22     A.   I did.
23     Q.   Was he a real person?
24     A.   He was.
25     Q.   Let's talk about Edward Blatz.  There is a
```

1    number of orders here.  We don't need to necessarily

2    look at them all, but let's look at the first.  We

3    have page 417.  Do you see the order there for Ed

4    Blatz?

5        A.    I do.

6        Q.    What was ordered?

7        A.    He ordered Roxy Oxycodone, 30 milligrams, two

8    tablets on February 21 using the moniker Veldgear, and

9    he had it shipped to him in Washington, D.C.

10       Q.    Now let's jump to the last, if we could look

11   at page 624, and then it goes on to the next page.

12   You can see that there?

13       A.    Yes.

14       Q.    What did he order this time?

15       A.    He ordered Roxy Oxycodone, 30 milligrams, 40

16   tablets, on April 5, 2016, under the moniker Veldgear.

17   And he had it shipped to the same address in

18   Washington, D.C.

19       Q.    Did you look into Mr. Edward Blatz?

20       A.    I did.

21       Q.    Was he a real person or just a name on a

22   page?

23       A.    He was a real person.

24       Q.    If we could look at Exhibit 18.01.  And if we

25   could look at page 2.  Who is that?

1    A.    This is Gregory Lee.

2    Q.    Did you also find orders sent to his address?

3    A.    I did.

4    Q.    If we could look at -- jumping back to

5    Exhibit 14.30, if we could look at 664.  And then it

6    goes on to the next page, so if you could highlight

7    the bottom.  Perfect.  If you could call that out for

8    us.

9         What was ordered on April 12?

10   A.    So April 12 shows that he ordered Roxy

11   Oxycodone, 30 milligrams, one tablet, but it was

12   combined with a second order the next day of Roxy

13   Oxycodone, 30 milligrams, ten tablets, using the

14   moniker T-Wad.  And it was sent to Gregory Lee at 3

15   Midvale Drive, Daly City, California.

16   Q.    Let's look at one additional order.  This is

17   on page 862.  And then it goes on -- like the previous

18   one, it goes on to the next page.  So there's the top

19   half.  Do you see what was ordered there?

20   A.    I do.  He ordered Roxy Oxycodone, 30

21   milligrams, 10 tablets, on June 6, 2016, using the

22   moniker T-Wad, and it was sent to Gregory Lee at his

23   Midvale Drive address in Daly City.

24   Q.    That Midvale Drive is what you see here?

25   A.    Yes.

1    Q.    Was Mr. Lee a real person?

2    A.    He was.

3          MR. GADD:  If I can have just one moment?

4          THE COURT:  Sure.

5          MR. GADD:  Nothing further.  Thank you.

6          THE COURT:  You thank you, Mr. Gadd.

7          You may cross examine, Mr. Skordas.

8          MR. SKORDAS:  Thank you, Your Honor.

9                    CROSS EXAMINATION

10   BY MR. SKORDAS:

11   Q.   Agent Keys, were you involved in this

12   investigation even after November, when Mr. Shamo was

13   taken into custody?

14   A.   I was.

15   Q.   And did you help other agents serve a search

16   warrant on a house in Cottonwood Heights in February

17   of 2017?

18   A.   I did.

19   Q.   And that was some, I guess, two and a half or

20   three months after Aaron was taken into custody,

21   correct?

22   A.   Yes.

23   Q.   And you served the search warrant on the home

24   that Aaron had previously lived, correct?

25   A.   I served it on the garage of the home that he

```
 1   had lived in.
 2        Q.   Okay.  And you -- you found some items in the
 3   home, correct?
 4        A.   In the garage.
 5        Q.   All right.  In the garage.  I'm sorry.
 6        A.   Sorry.  I have to be specific.
 7        Q.   That's all right.  And among those items was
 8   a crate that had a press in it.  Correct?
 9        A.   Correct.  The DEA, during the search warrant,
10   had taken the press out of the crate, but the crate
11   was still in the garage.
12        Q.   Of the home?
13        A.   Correct.
14        Q.   And you seized the crate?
15        A.   Yes.  Parts of it, yes.
16        Q.   Especially this part?
17        A.   Yes.
18        Q.   What is this part?
19        A.   This is one of the sides of the wooden crate
20   that the press came in.
21        Q.   And for the record, I'm showing you
22   Government's Exhibit 13.14, I think?
23        A.   That's correct.
24        Q.   And there's an addressee on that crate,
25   correct?
```

```
 1        A.    Yes.

 2        Q.    Who's the addressee?

 3        A.    Luke Paz.

 4        Q.    At what address?

 5        A.    Hold on.  I got to look through the tape.

 6   The address is 1500 Woodland Avenue, in Salt Lake

 7   City, Utah.

 8        Q.    And that crate was found in February in

 9   Cottonwood Heights, correct?

10        A.    In the garage at the Titian Way home, yes.

11             MR. SKORDAS:  I believe that's all I have,

12   Your Honor.

13             THE COURT:  Thank you.

14             Any redirect?

15             MR. GADD:  No, sir.  Thank you.

16             THE COURT:  Thank you.

17             You may step down, Ms. Keys.  Thank you.  You

18   may call your next witness.

19

20

21

22

23

24

25   (Whereupon the testimony of Agent Keys was concluded.)
```

```
 1
 2                    REPORTER'S CERTIFICATE
 3   STATE OF UTAH              )
 4                             ) ss.
 5   COUNTY OF SALT LAKE        )
 6
 7          I, REBECCA JANKE, do hereby certify that I
 8   am a Certified Court Reporter for the State of Utah;
 9          That as such Reporter I attended the hearing
10   of the foregoing matter on August 20, 2019, and
11   thereat reported in Stenotype all of the testimony and
12   proceedings had, and caused said notes to be
13   transcribed into typewriting, and the foregoing pages
14   numbered 1 through 35 constitute a full, true and
15   correct record of the proceedings transcribed.
16          That I am not of kin to any of the parties
17   and have no interest in the outcome of the matter;
18          And hereby set my hand and seal this 21st
19   day of August, 2019.
20
21
22
23          _____
24          REBECCA JANKE, CSR, RPR, RMR
25
```

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

 3

 4    _____
                                     )
 5    UNITED STATES OF AMERICA,      )
                                     )
 6              Plaintiff,           )
                                     )
 7       -vs-                        )    2:16-CR-631 DK
                                     )
 8    AARON MICHAEL SHAMO, et al.,   )
                                     )
 9              Defendants.          )
      _____)
10

11

12

13

14         BEFORE THE HONORABLE DALE KIMBALL

15              DATE:  AUGUST 20, 2019

16         REPORTER'S TRANSCRIPT OF PROCEEDINGS

17              TESTIMONY OF TORI GRACE

18

19

20

21

22

23

24

25         Reporter:  REBECCA JANKE, CSR, RPR, RMR
                      (801) 521-7238
```

```
 1

 2                      A P P E A R A N C E S

 3

 4   FOR THE PLAINTIF        UNITED STATE'S ATTORNEY'S OFFICE

 5                           BY:  MICHAEL GADD, ESQ.

 6                                VERNON G. STEJSKAL, ESQ.

 7                                KENT A. BURGGRAAF, ESQ.

 8                           111 SOUTH MAIN STREET, 1800

 9                           SALT LAKE CITY, UTAH  84111

10

11

12

13   FOR THE DEFENDANT:      SKORDAS & CSTON, LLC

14                           BY:  GREGORY G. SKORDAS, ESQ.

15                                KAYTLIN V. BECKETT, ESQ.

16                           560 SOUTH 300 EAST, 225

17                           SALT LAKE CITY, UTAH 84111

18

19                           DARYL P. SAM, PLLC

20                           BY:  DARYL P. SAM, ESQ.

21                           5955 SOUTH REDWOOD ROAD, 102

22                           SALT LAKE CITY, UTAH 84123

23

24

25
```

```
 1   AUGUST 20, 2019                    SALT LAKE CITY, UTAH
 2                   P R O C E E D I N G S
 3                        *  *  *
 4               (Testimony of Tori Grace.)
 5          MR. GADD:  Your Honor, the United States
 6   calls Tori Grace.
 7          THE COURT:  Come forward and be sworn,
 8   please, right up here at the podium.
 9                      TORI GRACE,
10   the witness hereinbefore named, being first duly
11   cautioned and sworn or affirmed to tell the truth, the
12   whole truth, and nothing but the truth, was examined
13   and testified as follows:
14          THE CLERK:  If you'll just come to the
15   witness box.  Please state your name and spell it for
16   the record.
17          THE WITNESS:  Tori Grace.  T-o-r-i.
18   G-r-a-c-e.
19          THE COURT:  Go ahead.
20                   DIRECT EXAMINATION
21   BY MR. GADD:
22      Q.   Ms. Grace, are you prepared to testify about
23   the death of your friend Russ?
24      A.   Yes.
25      Q.   Before we do that, I'd like to give the jury
```

1    just a very brief idea of kind of your background.

2    Can you tell us a little bit about yourself?

3        A.   I live in the San Francisco Bay area.  Right

4    now I work full time, and I'm getting ready to go back

5    to school to study anthropology.

6        Q.   Back in 2016, you were in school, correct?

7        A.   Uh-huh.

8        Q.   Were you at San Francisco State?

9        A.   Yes.

10       Q.   After Russ' death, did you move home?

11       A.   I did.

12       Q.   And school starts next week?

13       A.   Yes.

14       Q.   Can we look at 18.01 again.

15            Who is that?

16       A.   Russ.

17       Q.   That's the name that he preferred to go by,

18   right?

19       A.   Yes.

20       Q.   Was his full name Ruslan Kluyev?

21       A.   Yes.

22       Q.   Did you know his family?

23       A.   I meet his parents after he passed.

24       Q.   Could we look at page 2.

25            Who is that?

1     A.   It was Gregg.

2     Q.   Was his full name Gregory Lee?

3     A.   (Witness nods.)

4     Q.   How did you and Gregg meet?

5     A.   We met through two mutual friends while I was

6  still in high school.

7         THE COURT:  Can you hear her?

8         You need to speak up right into the

9  microphone, if you would, please.

10    Q.   BY MR. GADD: You can adjust it if you want.

11  I'll repeat that last question, so we make sure

12  everyone heard.  How did you and Gregg meet?

13    A.   We met through two mutual friends while I was

14  in high school.

15    Q.   And at some point you started dating,

16  correct?

17    A.   Yes.

18    Q.   Do you remember the first time you met Russ?

19    A.   Vaguely, yes.

20    Q.   How did you meet him?

21    A.   Gregg and I met him in San Francisco.

22    Q.   He and Gregg knew each other, correct?

23    A.   Yes.  They met online.

24    Q.   And at some point, did Russ move in with

25  Gregg?

```
 1        A.   Yes, he did.
 2        Q.   Was that at their address, 3 Midvale Drive in
 3   Daly City?
 4        A.   Yes.
 5        Q.   If it's okay, I want to talk just a minute
 6   about drug use.  Did Russ and Gregg use drugs?
 7        A.   Yes, they did.
 8        Q.   Did you sometimes use with them?
 9        A.   I did.
10        Q.   How many days have you been clean?
11        A.   Since Gregg passed.  About two years, two and
12   a half years.
13        Q.   Russ, specifically, what sort of drugs did he
14   use?
15        A.   He used anything he could get his hands on.
16        Q.   Did you ever see them go online to buy their
17   drugs?
18        A.   Only a few times.
19        Q.   Do you remember what website they went to?
20        A.   AlphaBay.
21        Q.   When they would order drugs online, how would
22   the drugs arrive?
23        A.   Through the mail.
24        Q.   Did you actually see packages arrive?
25        A.   I've only seen two packages.
```

1    Q.   What did the packages look like?

2    A.   Like U.S.P.S. envelopes.

3    Q.   Did you get to see what was inside the

4    packages?

5    A.   Only a couple times, the only two times that

6    they came.

7    Q.   What did you -- what did you see inside the

8    packages?

9    A.   They were usually packaged in, like,

10   miscellaneous items in, like, these little metallic

11   pouches.

12   Q.   And inside the pouch, what did the -- what

13   did the drugs look like?

14   A.   The drugs that I saw both times were MDMA.

15   Q.   And you recognized it because you had seen it

16   before?

17   A.   Yes.

18   Q.   Could we talk for a minute about June 12,

19   2016, so the night before Russ' death.  Were you and

20   Gregg out that night?

21   A.   Uh-huh.

22   Q.   Had you been eating dinner somewhere?

23   A.   Yeah.  At his parents' house.

24   Q.   And then did you go back to Gregg and Russ'

25   residence?

1       A.   Yes.

2       Q.   About what time of day or night was it when

3    you got back to that residence?

4       A.   So, around 10:30, 11.

5       Q.   In the evening?

6       A.   In the evening.

7       Q.   Were you met there by Russ?

8       A.   Yeah.  He let us in.

9       Q.   Did it appear to you he had been drinking?

10      A.   Yeah.

11      Q.   It was fairly obvious?

12      A.   Yeah.  He was still pouring himself more

13   drinks when we got there.

14      Q.   Do you happen to remember what he had been

15   drinking?

16      A.   Vodka.

17      Q.   That night, did you and Gregg hang out with

18   Russ for a little while?

19      A.   Yeah.  Only for about 15 minutes.

20      Q.   Was it inside of his room?

21      A.   Uh-huh.

22      Q.   If we could look at page 3.  Do you recognize

23   this?

24      A.   Yes.

25      Q.   What is it?

```
 1        A.   Russ's desk.

 2        Q.   Was it inside his room?

 3        A.   Yes.

 4        Q.   While you were hanging out with him, did you

 5   see him grind up two pills?

 6        A.   Yes.

 7        Q.   Do you know what type of pills they were?

 8        A.   Some kind of opiate.  I knew that.

 9        Q.   Did you get to see the pills?

10        A.   I only saw them, like, after he had crushed

11   them.

12        Q.   Do you know where he got the pills?

13        A.   I assumed he got them online.

14        Q.   Could we look at page 4.

15             Do you know what that is?

16        A.   That's what he used to crush them up, yeah.

17        Q.   It's a battery, right?

18        A.   Yeah.

19        Q.   And they would crush them on the desk?

20        A.   Yeah.

21        Q.   Could we look at page 5.

22             What's that?

23        A.   It's what he used to snort the drugs.

24        Q.   And, specifically, is it kind of the blue

25   rolled up note?
```

```
 1        A.   Yeah.  It's a Post-it note.

 2        Q.   I want to ask you some questions about Russ

 3   specifically, so if we could look at page 1.  And

 4   maybe -- you are the best witness to clarify this.

 5   What's he wearing?

 6        A.   He was really into all tech stuff, so I

 7   actually don't know what it is.

 8        Q.   Just sunglasses and then something else?

 9        A.   Yeah.

10        Q.   But he didn't always wear that, right?

11        A.   No.

12        Q.   Okay.  So that night, June 12, were you

13   concerned about Russ snorting two pills?

14        A.   Yes, I was.

15        Q.   Why?

16        A.   Because he was already drinking.

17        Q.   Did he show any signs of use after he snorted

18   them?

19        A.   Yeah.

20        Q.   What did you observe?

21        A.   He immediately started to, like, nod, so,

22   like, fall asleep and wake up, and he couldn't stand

23   up anymore.

24        Q.   Did he lay down?

25        A.   He did, yeah.
```

1    Q.    Were you and Gregg asked to check on him?

2    A.    Yeah.  He did ask us that.

3    Q.    And did you check on him?

4    A.    Yeah.

5    Q.    When you would check on him, what sort of

6    things were you looking or listening for?

7    A.    That he was still breathing.

8    Q.    How many times do you think you checked on

9    him that night?

10    A.    I checked on him about four or five times,

11    but Gregg went in there, like, two more times more

12    than I did.

13    Q.    But when you were watching him, did you

14    notice anything about his breathing?

15    A.    He seemed to be breathing like he always did

16    when he slept.  He was a loud snorer, so every time we

17    went in, he was still snoring pretty loudly.

18    Q.    The last time you went in, did you and Gregg

19    roll him into the recovery position?

20    A.    We did, yeah.

21    Q.    Can you just briefly explain to the jurors

22    what the recovery position is?

23    A.    It's where you lay the person on their side

24    and have their leg go over their body and then their

25    head rest on their elbow facing down.

12

```
 1       Q.   Why did you do that?

 2       A.   In case he threw up, and we didn't want him

 3   to choke on his own throw up.

 4       Q.   Let's talk about the following morning, so

 5   June 13, 2016.  What did you do that morning?

 6       A.   I got up and went to work.

 7       Q.   And when did you find out that Russ had

 8   passed?

 9       A.   About two after -- two hours after I started

10   my shift.

11       Q.   You have a good support system, correct?

12       A.   Uh-huh.

13       Q.   Your mom is here today supporting you?

14       A.   (Witness nods.)

15       Q.   If I could just ask you about two more

16   pictures.

17            If we could look at page 7.

18            Do you recognize the room.

19       A.   Yes.

20       Q.   Is that Russ' room?

21       A.   (Witness nods.)

22       Q.   And maybe just so I can help the court

23   reporter, you nodded your head in the affirmative,

24   correct?

25       A.   Yes.
```

1        Q.   Do you see what looks like a garbage can in

2    the foreground on the left side of the photo?

3        A.   Yes, I do.

4        Q.   And do you see the envelope on top?

5        A.   Yes.

6        Q.   I want to show you a closer look at the

7    envelope.

8             Could we look at page 8.

9             Do you recognize this envelope?

10       A.   I don't.  No.

11       Q.   Did you have any friends in Sandy, Utah?

12       A.   No.

13       Q.   Do you know if Gregg had any friends in

14   Sandy, Utah?

15       A.   No, he didn't.

16       Q.   Russ?

17       A.   No.

18            MR. GADD:  No further questions.  Thank you.

19            THE COURT:  Thank you.

20            You may cross examine.  Mr. Sam.

21                     CROSS EXAMINATION

22   BY MR. SAM

23       Q.   Ms. Grace, thanks for being here today.  And

24   I just want to ask you a few questions about Russ and

25   Gregg.  On that day, on June 13, that was your first

```
 1   day of work; is that right?

 2        A.   It was, yeah.

 3        Q.   Where were you working at?

 4        A.   Philz Coffee in San Francisco.

 5        Q.   Okay.  And you received a call from Gregg

 6   that day?

 7        A.   Uh-huh.

 8        Q.   Telling you what happened to Russ?

 9        A.   Yeah.

10        Q.   Okay.  And then, later on that day, you got

11   one or two calls from Daly City police; is that right?

12        A.   Yes.

13        Q.   Okay.  And they asked you to come in to talk;

14   is that right?

15        A.   Uh-huh.

16        Q.   So, I think you received one call from

17   Officer Sabins.  Do you remember that?

18        A.   Yes.

19        Q.   And then another one from Officer Garrett, I

20   think.  And then he actually picked you up and took

21   you to the Daly City Police Department that day; is

22   that correct?

23        A.   Yes.

24        Q.   I think on the way there, too, your mother

25   called you or you called your mother?
```

15

```
 1        A.    Uh-huh.
 2        Q.    Because she was concerned about the
 3   situation; is that right?
 4        A.    Yes.
 5        Q.    Okay.  And you -- and so you gave two
 6   interviews to -- there's one that day with the Daly
 7   City Police Department and then, approximately two
 8   years later, some agents from Utah came and
 9   interviewed you at your home; is that correct?
10        A.    Yes.
11        Q.    Okay.  And I just wanted to review with you
12   what -- your friendship with Russ and kind of some of
13   the things that were going on.  He was a heavy drug
14   user; is that right?
15        A.    He was.
16        Q.    And I think you told the Daly City Police
17   that he used -- he was a recovering heroin addict; is
18   that right?
19        A.    Yeah, he was.
20        Q.    But he was using all kinds of drugs and
21   alcohol.  And in that -- and he put a lot of pressure
22   on his peers, including you and others, to participate
23   in drug use; is that right?
24        A.    Uh-huh.
25        Q.    Okay.  And you had a knowledge about
```

```
 1    Fentanyl, correct, before this day, before you came

 2    home with -- or went to Gregg and Russ's apartment,

 3    you had knowledge of Fentanyl before that; is that

 4    right?

 5        A.    Yes.

 6        Q.    And had you seen Gregg or Russ use Fentanyl

 7    before that time?

 8        A.    Not before that time, no.

 9        Q.    Okay.  But you had heard about it and you

10    understood the effects of it?

11        A.    Yes.

12        Q.    Okay.  And your testimony was that you --

13    when you came home and you found Russ, he had drank a

14    whole bottle of vodka.  Is that your testimony?

15        A.    Yes.

16        Q.    And that you were concerned, at that point,

17    when you went into his room with him and he was

18    crushing up pills, what he said was Fentanyl.  And why

19    were you concerned after observing him drinking

20    alcohol with him crushing up Fentanyl pills?

21        A.    Because I know that mixing those two kinds of

22    things can be very deadly.

23        Q.    Yeah.  Okay.  So it's very dangerous.  You

24    understood that?

25        A.    Uh-huh.
```

17

```
 1        Q.   You and Gregg both knew that, so you were --
 2   did you try to stop him or anything?
 3        A.   We did, yeah.
 4        Q.   Okay.  And then -- then you saw the effects
 5   of it, and you eventually put him in a recovery
 6   position; is that right?
 7        A.   Yeah.
 8        Q.   Have you had a situation like that before,
 9   where you have put either Russ or a friend in that
10   position?
11        A.   That was the first time.
12        Q.   Okay.  But that's something that you knew was
13   something that would be preventative if there were a
14   problem?
15        A.   Yeah.
16        Q.   And so you were trying to help him out with
17   that.  I just want to ask you about Gregg.  And I know
18   these are sensitive topics, but Gregg passed away less
19   than a year after Russ; is that right?
20        A.   Yes.
21        Q.   And you were not present when Gregg passed
22   away; is that right?
23        A.   No, I wasn't.
24        Q.   Okay.  One of your good friends -- I
25   apologize.  One of your good friends was there, Nicole
```

```
 1   and Sean, and it was maybe kind of a similar
 2   situation.  And I wanted to ask you about your
 3   statement when the -- when agents came and met with
 4   you in 2018.  You stated that, after Russ died, that
 5   you and Gregg kind of started to drift apart.  Is that
 6   right?
 7        A.    Uh-huh.
 8        Q.    And why was that?
 9        A.    Because Gregg continued to use, and I thought
10   it was dumb after, like, what his friend had just gone
11   through.
12        Q.    Okay.  And you knew it was dangerous, risky
13   behavior.  In fact, I think you told agents, too, when
14   you met with them in 2018, that you and Gregg said
15   that you were both concerned for Russ because there
16   was alcohol involved, and you said that the risk was
17   too high?
18        A.    Uh-huh.
19        Q.    To be involved with taking other drugs in
20   that situation?
21        A.    Yeah.
22        Q.    And I'm sure your mother is a good influence
23   for you.
24        A.    Uh-huh.
25        Q.    I know that from her contacting you when you
```

```
 1    were -- on that day when Russ passed away, and I'm

 2    sure she was concerned because she didn't want

 3    something like that to happen to you.  So I'd just

 4    encourage you to keep up the good work and keep up and

 5    encourage, you know, your college and things, and

 6    there's a lot of potential for you, and I encourage

 7    you to keep on that path, so...

 8         A.    Thank you.

 9              MR. SAM:  I don't have any other questions.

10              THE COURT:  Thank you, Mr. Sam.

11              Any redirect?

12              MR. GADD:  No, Your Honor.

13              Thank you very much.

14              THE COURT:   You may step down, and you're

15    excused.

16              Let's take our first break, and we'll be in

17    recess until about quarter after 10.

18              THE CLERK:  All rise, please.

19

20

21

22

23

24

25              (Whereupon the jury leaves the courtroom.)
```

```
 1

 2                    REPORTER'S CERTIFICATE

 3    STATE OF UTAH                )

 4                                 ) ss.

 5    COUNTY OF SALT LAKE          )

 6

 7            I, REBECCA JANKE, do hereby certify that I

 8    am a Certified Court Reporter for the State of Utah;

 9            That as such Reporter I attended the hearing

10    of the foregoing matter on August 20, 2019, and

11    thereat reported in Stenotype all of the testimony and

12    proceedings had, and caused said notes to be

13    transcribed into typewriting, and the foregoing pages

14    numbered 1 through 19 constitute a full, true and

15    correct record of the proceedings transcribed.

16            That I am not of kin to any of the parties

17    and have no interest in the outcome of the matter;

18            And hereby set my hand and seal this 23rd

19    day of August, 2019.

20

21

22

23

24            _____

25            REBECCA JANKE, CSR, RPR, RMR
```

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION


_____
                               )
UNITED STATES OF AMERICA,       )
                               )
            Plaintiff,          )
                               )
    -vs-                        )    2:16-CR-631 DK
                               )
AARON MICHAEL SHAMO, et al.,    )
                               )
            Defendants.         )
_____)


BEFORE THE HONORABLE DALE KIMBALL

DATE:  AUGUST 27, 2019

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL


Reporter:  REBECCA JANKE, CSR, RPR, RMR
              (801) 521-7238

1

2                    A P P E A R A N C E S

3

4    FOR THE PLAINTIF       UNITED STATE'S ATTORNEY'S OFFICE

5                           BY:  MICHAEL GADD, ESQ.

6                                VERNON G. STEJSKAL, ESQ.

7                                KENT A. BURGGRAAF, ESQ.

8                           111 SOUTH MAIN STREET, 1800

9                           SALT LAKE CITY, UTAH  84111

10

11

12

13   FOR THE DEFENDANT:      SKORDAS & CSTON, LLC

14                           BY:  GREGORY G. SKORDAS, ESQ.

15                                KAYTLIN V. BECKETT, ESQ.

16                           560 SOUTH 300 EAST, 225

17                           SALT LAKE CITY, UTAH 84111

18

19                           DARYL P. SAM, PLLC

20                           BY:  DARYL P. SAM, ESQ.

21                           5955 SOUTH REDWOOD ROAD, 102

22                           SALT LAKE CITY, UTAH 84123

23

24

25

```
 1   AUGUST 27, 2019                    SALT LAKE CITY, UTAH
 2                   P R O C E E D I N G S
 3                          * * *
 4        THE COURT:  Good morning, everyone.
 5        MR. STEJSKAL:  Good morning.
 6        THE COURT:  Where are we?
 7        MR. SKORDAS:  Your Honor, we have a couple
 8   of -- a couple of matters we just wanted to bring to
 9   the Court's attention before you bring the jury in.
10   We have, I think, one or two witnesses today.  I think
11   we should be done with the defense case by noon today.
12        THE COURT:  Does that include the defendant?
13        MR. SKORDAS:  Yes.
14        MS. BECKETT:  Sorry, Your Honor, just to
15   clarify.  We have -- technically, there are two
16   attorneys that will be proffering before the Court and
17   then I believe just one witness that will be
18   testifying.
19        MR. SKORDAS:  Right.  And that witness is
20   Aaron Shamo.
21        THE COURT:  All right.  Let me suggest
22   something, then.  We do these proffers and the
23   defendant today.  Tomorrow we have a settlement of the
24   instruction conference and you people can get ready
25   for your closing arguments and bring the jury back on
```

```
 1    Thursday.
 2              MR. SKORDAS:  Is that okay?
 3              MR. STEJSKAL:  Sure.
 4              MR. SKORDAS:  That's fine, Your Honor.  That
 5    makes a lot of sense.
 6              THE COURT:  What about it?
 7              MR. STEJSKAL:  That's fine, Your Honor.
 8              THE COURT:  That will give you time to
 9    streamline your closing arguments from four hours each
10    to two and a half or something.  And do you have --
11    you handed them our --
12              THE CLERK:  Yes.
13              THE COURT:  So you have now the Court's
14    notions about instructions and verdict form.
15              MR. SKORDAS:  Correct.
16              THE COURT:  But you'll need time to review
17    that and think about it, and we can hold a hearing in
18    the morning and get that squared away.
19              MR. SKORDAS:  Very well.  That makes a lot of
20    sense.
21              THE COURT:  Does that work for everyone?
22              MR. STEJSKAL:  Yes.  That works, Your Honor,
23    thank you.
24              THE COURT:  Do you want the jury to see the
25    proffers?
```

```
 1            MR. SKORDAS:  No.  I don't think so.

 2            THE COURT:  Probably not, right?

 3            MR. SKORDAS:  And we need just a few minutes,

 4   but otherwise we're ready to go.

 5            THE COURT:  All right.

 6            MS. BECKETT:  Your Honor, can we approach

 7   briefly?

 8            THE COURT:  Approach?  Yes.

 9      (Conference among the Court and counsel out of the

10               hearing of anyone else.)

11            MS. BECKETT:  I want to make a record really

12   quickly for the Court because we have that motion for

13   a mistrial that we had filed.

14            THE COURT:  Yes.

15            MS. BECKETT:  And some information came to us

16   through Mr. Shamo's family, that they believed the

17   government was actually paying for the family of

18   whatever alleged victim it was that cried during that

19   cross examination of Agent Keys, and I clarified with

20   counsel, and the government is essentially paying for

21   that family to be present here during this trial.

22   They are assisting.

23            THE COURT:  So you're adding that on your

24   motion for mistrial?

25            MS. BECKETT:  Correct.  But we wanted to make
```

1    a record of that for the Court because we think that's

2    an essential issue that needed to be brought up and

3    put on the record.

4         THE COURT:  You were going to respond --

5    there you are.  You were going to respond to the -- I

6    need a program -- to the motion for mistrial?

7         MR. GADD:  Right.  We have written a rough

8    draft.  We're just waiting for the transcript from

9    May, from Ed who got into town yesterday.  I talked to

10   Ed.  He said he was working on it, and he said he

11   would have it today.

12        THE COURT:  Now can you comment on this

13   additional --

14        MR. GADD:  I would be happy to do it in

15   writing or now.  I would say the United States helps

16   various victims in various cases and I recognize that

17   the family involved, while their child is mentioned in

18   the Indictment, it's not the family of RK, who most of

19   our focus has been on.

20        THE COURT:  All right.

21        MR. GADD:  But it's probably worth

22   mentioning, there are several families who have

23   observed each day of Court who have children who were

24   customers of Mr. Shamo's and who are now deceased.

25   Some of them we didn't even know about.  I mean,

```
1    that's -- it's frankly a little embarrassing.  We're
2    still finding out people who were affected by this.
3              THE COURT:  Anything else?
4              MS. BECKETT:  I just wanted to make that
5    clear for the record.  I think that's going to be very
6    problematic.
7              THE COURT:  All right.  Are we going to --
8    where is the -- I don't know you.
9              MS. MADDEN:  Gabriel Madden, one of the
10   associates who has been helping on defense.
11             THE COURT:  Well, welcome.
12             So, are we are ready with these proffers?
13             MS. BECKETT:  Yes.  Thank you, Your Honor.
14             THE COURT:  Then we'll get the jury.
15             (Proceedings continued in open court.)
16             MS. BECKETT:  We have two attorneys here.
17   The first attorney is Marlin Grant, who is counsel for
18   Sasha Grant, who we intended to call as a witness
19   today.  But he is here essentially to make a proffer
20   and sort of give a timeline as to when he was informed
21   that Ms. Grant would no longer have immunity if she
22   were to testify before the Court.  So if we could hear
23   from him first.
24             THE COURT:  All right.
25             You can just stand at the podium.
```

1          MR. GRANT:  Oh, right here?

2          THE COURT:  Yeah.

3          MR. GRANT:  Okay.  Good morning.  My name is

4     Marlin Grant.  I'm the attorney for Sasha Grant.  I

5     became involved when she landed in Hawaii about two

6     years ago.  I was involved also with the July -- or I

7     guess it was the June 16th and 15th investigation into

8     the -- and the 17th by the prosecution's office.

9     Sasha made a proffer of evidence at that time.  That

10    immunity was granted only for that hearing apparently.

11    We were under the impression that it would be for any

12    further testimony in the case.  I did not receive

13    information that she was even going to be called as a

14    witness until late Sunday night from Jim Bradshaw,

15    attorney for Drew Crandall.

16          On Monday, I talked to the defense counsel

17    and arranged to have them at least talk to Sasha.  In

18    the middle of that, they said, well, we're not going

19    to use her testimony.  I got that notice about 2:00

20    o'clock on Monday.  And then at about 3:00 o'clock,

21    they said:  No, we would still like to talk to her.

22          So they talked to her at 4:00 o'clock.

23          THE COURT:  This is yesterday?

24          MR. GRANT:  This is yesterday.  After that I

25    called or sent an email to Mike Gadd to say:  Look,

9

```
 1    does she have immunity for tomorrow?  They want to

 2    have her testify at 8:30 in the morning.

 3            And he says:  It's doubtful.  Let me talk to

 4    you in the morning.

 5            And apparently they called Mr. Huber this

 6    morning to see if immunity could be granted, and that

 7    could not.  So that's the timeline, and I'm invoking

 8    the Fifth Amendment privilege for my client not to

 9    testify today.

10            THE COURT:  Thank you.

11            MS. BECKETT:  I would just like to clarify on

12    that, Your Honor.  It was our impression that actually

13    Mr. Bradshaw was going to accept service of the

14    subpoena for Ms. Grant, which is why it did not make

15    it to Mr. Grant initially.

16            And the next attorney is Nathan Crane on

17    behalf of Anna Gabriel Noriega.

18            THE COURT:  Mr. Crane?

19            MR. CRANE:  Good morning, Your Honor.

20            THE COURT:  Good morning.

21            MR. CRANE:  I was contacted recently by the

22    defense indicating they wanted to serve a subpoena on

23    my client, asking if I would accept service.  I

24    indicated I would.  I have not -- although a subpoena

25    did not come, as I talked to my client about
```

1    testifying today and discussing her rights, she

2    indicated she wanted to invoke her Fifth Amendment

3    rights today at this hearing -- or at this trial, and

4    she is not under subpoena, but we would accept

5    service, and I was told her presence would not be

6    needed today and I could come today.

7             I have also been asked to give a brief

8    timeline of when I became involved.  My understanding

9    is that Ms. Gabriel Noriega was contacted by federal

10   agents on May 8, 2019, approximately, and told that

11   criminal charges were going to be filed against her

12   very soon.  She hired me two days later.  I then

13   contacted the prosecution's team, and we were able to

14   work out a resolution of her case wherein, on July 11,

15   2019, she plead guilty to conspiracy to commit money

16   laundering.  And that's where we stand right now.

17             THE COURT:  Thank you, Mr. Crane.

18             MR. CRANE:  Thank you.

19             THE COURT:  Any comments from the government

20   or the defense?

21             MS. BECKETT:  Just briefly one thing, Your

22   Honor.  We had initially listed Gabriel Noriega as a

23   witness at the end of last year and when the trial was

24   initially scheduled to begin in January of this year.

25   And there was some correspondence between our office

 1    and the prosecutor's office about whether or not they

 2    needed to get plea agreements in place and in order to

 3    get these individuals to be able to testify.  And I

 4    think that's become a problem, so I just wanted to get

 5    a record of that.

 6              THE COURT:  All right.  Thank you.

 7              Mr. Gadd, do you want to say something about

 8    this?

 9              MR. GADD:  I do.

10              THE COURT:  You better hang on, Mr. Crane.

11    You might want to say something else.

12              MR. GADD:  We anticipated this problem would

13    happen months and months ago, so, as a prosecution

14    team, we reached out to the defense and said:  Several

15    of the people on your witness list face criminal

16    exposure, and if you give us a short list of people

17    that you want to call as witnesses, we'll see if we

18    can work out something that allows them to testify

19    whether that's, you know, some sort of testimonial

20    immunity or a plea deal.

21              In the case of Ms. Noriega, that's a main

22    part of the reason why we've tried to work out a plea

23    deal.  She has pleaded guilty.  In her guilty plea

24    document, the United States has agreed not to seek

25    Indictment against her for any other drug offense for

1    which the United States Attorney's Office for the

2    District of Utah is aware at the time that it was

3    signed back in, I believe, July.  Our intention in

4    going through all that was to actually make it so that

5    she could be a witness.

6         We want to be extremely careful that our

7    actions aren't viewed as trying to influence witnesses

8    the defense wants to call.  We have tried to be as

9    hands off as we absolutely could, including by not

10   even contacting their attorneys when we had a sense

11   that they might be subpoenaed.  We left that to the

12   defense to handle.  My goal this morning was to

13   explain where we stood with Ms. Noriega.

14         I think what I would like to do is have

15   Mr. Stejskal talk through kind of some of the events

16   that led up to where we are at with the testimony of

17   Ms. Grant since, if she were to testify, she would be

18   his witness.

19         THE COURT:  All right.

20         MR. STEJSKAL:  Very briefly on that, Your

21   Honor.  So, as Mr. Gadd stated, the United States

22   reached out to defense counsel, the defense team a

23   couple months ago, before the previous trial

24   scheduling and said:  If you have any witnesses that

25   you plan on calling, let us know and we'll work

1   through the process.  And Ms. Grant was never listed

2   as a potential witness.  No contact from the defense

3   team about working with her.  We first got that

4   indication late last night.  I talked to the U.S.

5   Attorney's Office this morning and was informed that

6   it's a process to get somebody immunity for their

7   testimony.  It takes approval through DC.  It takes

8   the U.S. Attorney, John Huber's approval, and that's

9   not something that can happen with the snap of a

10  finger and so the timing on that just doesn't work

11  out.

12          We're disappointed that defense counsel

13  didn't reach out earlier.  We have done what we can to

14  assist with the process, but it appears at this point

15  that if she needs to invoke her Fifth Amendment

16  privilege, we can not grant immunity at this time.

17          THE COURT:  Thank you.

18          Ms. Beckett, anything else?

19          MS. BECKETT:  Yeah.  Your Honor, I would like

20  to make a few things very clear.  These individuals

21  were interviewed in 2017.  The government was more

22  than aware of their potential criminally liability.

23  Sasha Grant and Anna Gabriel Noriega were listed as

24  witnesses as early as November of last year when we

25  provided our first witness list.  There was no qualms

1   about that.  They were very aware of that.

2          And, on top of that, in terms of Sasha Grant,

3   when Drew Crandall testified, we clarified with the

4   prosecutors over here that we were going to ask her

5   ourselves to leave the courtroom because we intended

6   to call her as a witness, and that was over a week

7   ago.  At that point in time, they were more than aware

8   that we intended to call her as a witness and did

9   nothing in that regard and made no comment about

10  concerns regarding her immunity or anything at that

11  point.  And, as her attorney specifically stated, it

12  wasn't until last night that he became aware that

13  apparently the immunity she had did not apply to this

14  particular proceeding.  We would just like to make

15  that as part of the record.

16          THE COURT:  Thank you.

17          Mr. Crane, do you want to say anything else?

18  Apparently you do.

19          MR. CRANE:  Your Honor, the only thing I

20  would add, while I agree with the prosecution that the

21  government's hands are tied as to the District of

22  Utah, it does not cover charges -- we have no

23  agreement with the State of Utah.  We have no

24  agreement with any other district.  This is a

25  far-reaching -- mails are involved.  It really could

1    be filed in any state, arguably, and so that's

2    ultimately why we have decided to invoke the Fifth

3    today.

4              THE COURT:  Thank you.

5              MR. CRANE:  Thank you, Your Honor.

6              THE COURT:  Anything else from the United

7    States?

8              MR. GADD:  No, sir.  Thank you.

9              THE COURT:  Thank you.

10             All right.  We'll get the jury and proceed.

11             MR. CRANE:  May I be excused, sir?

12             THE COURT:  You may.

13             MR. CRANE:  Thank you.

14             THE COURT:  And this is your last witness,

15   right?

16             MR. SKORDAS:  Correct.

17             THE CLERK:  All rise, please.

18             (Whereupon the jury enters the courtroom.)

19             Court will resume session.  You may be

20   seated.

21             THE COURT:  Good morning again, ladies and

22   gentlemen of the jury.  Thank you for your work.  This

23   is how we are going to proceed.  The government is

24   going to call -- or excuse me.  The defense is going

25   to call the defendant, and he will be the last

1    witness.  We should finish him by or before noon, do

2    you think?

3            MR. SKORDAS:  Yes.

4            THE COURT:  And we're going to take -- you're

5    going to take tomorrow off.  We aren't.  We're going

6    to settle the instructions and the verdict form, and

7    the lawyers will get a little more time to streamline

8    their closing arguments, we hope, down to manageable

9    proportions.  So, after you're excused today, you will

10   be back here on Thursday at 8:30 for instructions and

11   closing arguments.

12           You may proceed.

13           MR. SKORDAS:  Thank you, Your Honor.  The

14   defense calls Aaron Shamo.

15           THE COURT:  Come forward and be sworn,

16   please.

17                      AARON SHAMO,

18   the witness hereinbefore named, being first duly

19   cautioned and sworn or affirmed to tell the truth, the

20   whole truth, and nothing but the truth, was examined

21   and testified as follows:

22           THE CLERK:  Please come around to the witness

23   box.  Please state your name and spell it for the

24   record.

25           THE WITNESS:  Yes.  Aaron Shamo.  A-a-r-o-n.

 1    S-h-a-m-o.

 2            THE COURT:  You may proceed, Mr. Skordas.

 3                    DIRECT EXAMINATION

 4    BY MR. SKORDAS:

 5       Q.   Aaron, I'm going to help you avoid what you

 6    just did, and I'm going to have you just pull that up.

 7       A.   Okay.

 8       Q.   Aaron, would you tell the jury where you

 9    currently reside.

10       A.   Salt Lake County -- or jail.

11       Q.   How long have you been there?

12       A.   Oh, man.  I've been there since November,

13    right before Thanksgiving.  And then --

14       Q.   Go ahead.

15       A.   Oh.  And then I was at Weber County for about

16    two -- I mean, two and something years.

17       Q.   Weber County Jail?

18       A.   Yeah.

19       Q.   You've been incarcerated continually since

20    your arrest in November of 2016, correct?

21       A.   Yes.  That's correct.

22       Q.   And when you were arrested in November of

23    2016, how old were you?

24       A.   26.

25       Q.   How old are you now?

1   A.   I'm 29.

2   Q.   What's your level of education?

3   A.   High school, freshman of college.  I mean, we

4   call that completing, so a tiny bit of college.

5   Q.   Where did you go to high school?

6   A.   I went -- part of it was high school in

7   Mountain Point in Arizona and then the rest --

8   Q.   Did you --

9   A.   -- was --

10   Q.   Did you ultimately graduate?  I'm sorry.  Did

11   you ultimately graduate from high school?

12   A.   I did, yes.

13   Q.   I'm sorry.  Go ahead.

14   A.   Thanks to going to a boarding school or,

15   yeah, a school for I guess troubled kids, and I

16   graduated high school there.

17   Q.   Where was that?

18   A.   That was in south Utah, La Verkin, Utah.

19   Q.   After that, did you attend college?

20   A.   Yes, I did.

21   Q.   Where?

22   A.   Utah Valley University.

23   Q.   Just briefly, would you tell the jury about

24   your life before you went to high school.

25   A.   Yeah.  So I love video games, kind of grew up

1     on video games, grew up with friends, I guess,

2     troubled friends I guess you could say.  Kind of was

3     getting into trouble.  I was smoking weed, and my

4     parents were really not having it.  They are really

5     good parents in case you couldn't see.  I grew up

6     really strong L.D.S, square parents.  And so, with me

7     going out and smoking weed is definitely a violation

8     of the religion and so they weren't too approval of

9     it.

10          And so, I mean, there's a lot of things going

11    on in my life, like, as far as emotion-wise, I guess I

12    was just bouncing around trying to find myself and

13    really just kind of stuck to a habit that really

14    wasn't good for me and so my parents saw that,

15    intervened and took me to a boarding school, south of

16    Utah.

17          Q.   Did you struggle in school before then?

18          A.   Oh, yeah.  Yeah.  Like I -- my mind was

19    always scattered.  It was everywhere.  So I didn't

20    really stay focused in school.  I was too busy on

21    other things such as video games.  That was more, I

22    don't know, multi-tasking, I guess you could say, like

23    I had a hard time sitting down.  I was later diagnosed

24    with something, I mean, but as -- it made sense

25    because as a kid, like, I just didn't -- like, I knew

1    where I wasn't doing well in school, but it was just

2    like I just accepted it.  Like, okay, school is just

3    not for me.  I don't know.  Does that answer it?

4        Q.  Yes.  That was great.  When did you start

5    school at Utah Valley?

6        A.  '08.  It was right after boarding school.  I

7    had a few classes to finish up for high school.  And

8    then I made the move to Utah just -- just bare, not

9    knowing anyone, just moving up here.  Only my sister

10   was going to college.  She was going to B.Y.U. at the

11   time.  It seemed like a good environment, as well as I

12   could get into snow boarding, so I set up my classes

13   to snow board every other day, like a class, like,

14   Monday, Wednesday and Friday and then snow board on

15   Tuesdays and Thursdays, so it was kind of a win-win

16   situation.

17       Q.  Did you find work at eBay at some point?

18       A.  Yeah.  Yeah.  That came much later.  It was

19   actually thanks to my co-defendant, Drew, who got me

20   the job.  He actually helped me with one of my first

21   good jobs, which was before that, at Teleperformance.

22   We can't really say we worked for Apple, but it was an

23   umbrella company that worked at Apple or doing Apple

24   products.  And so he got me that job, and then later

25   on Drew actually initially got me the eBay job as

```
 1   well.
 2        Q.    What was the name of the first company?
 3        A.    Teleperformance U.S.A.
 4        Q.    Where were they located?
 5        A.    Lindon, Utah, so down south.  It was just
 6   north of Orem about ten minutes.
 7        Q.    What did you do there?
 8        A.    There we troubleshoot Mac computers, so if
 9   you see the back of an iMac and it says, "call Apple,"
10   you pick up the phone and you dial, and you'd get one
11   of us.  And so we were instructed on how to just
12   basically troubleshoot, which I mean Macs at the time
13   were amazing computers, and so most of the time it was
14   grandma calling how to close a window.  The computer
15   wasn't turning on so, you know, is it plugged in?  Oh,
16   that's the problem.  Okay.  You know, so it was -- it
17   was a lot of just troubleshooting, and, you know, they
18   gave us some Apple discounts, and I was, you know,
19   obsessed with Apple, so it kind of went hand-in-hand.
20        Q.    Had you quit Utah Valley by then, or was it
21   overlapping?
22        A.    Yeah.  I was -- I was going in and out of
23   school.  So, I mean, my first semester -- I have a bad
24   trend of going to school, doing, you know, pretty good
25   as far as when we start out, knowing my teachers, and
```

1   then getting really sidetracked, distracted or in a

2   relationship that just tanks my -- the end of the

3   semester and so, because of that, my grades really

4   suffered.

5          And, you know, so then I come to my parents

6   and I say:  Okay, let's -- what about next year?

7          And they are like:  Well, you should probably

8   retake, you know, these classes if this is what you

9   want to do in life.

10         I go:  Okay.

11         So a lot of it was retakes.  And so I think I

12  was just working at the time.

13     Q.   How did Drew help you get that job, this

14  first job that you've --

15     A.   The first job?

16     Q.   Yeah.  At Teleperformance.

17     A.   Yeah.  He was already working for the company

18  and so, basically, most of these companies that are

19  actually pretty good, and they want people just like

20  that individual, and so references, it goes a long

21  way.  And so he -- he put in the recommendation.

22  There's actually one time in my training class where I

23  had failed a test.  You have to get, I think, 70

24  percent or 80 percent on all the tests, and I had

25  failed one.  So he talked to the trainer, and I was

1    able to retake it and, you know, complete the training

2    and then get the rest of the -- or get on to the job.

3        Q.   Tell the jury about your transition from

4    Teleperformance to eBay.

5        A.   Yeah.  Let's see.  Teleperformance because I

6    was there for I think a year or two.  I think I moved

7    back to Arizona for just a summer to hang out with my

8    parents, and it was kind of hard on me because I

9    didn't -- it was one of those moments where I realized

10    I missed being home for quite a bit, and so, I mean,

11    this is just a side story, but, so, leaving -- so I

12    went home for just a few months as a lot of kids do,

13    and then when I wanted to go back to Salt Lake, my mom

14    actually, you know, on the side out of the airport,

15    she cried.  She was like:  Are you sure you don't want

16    to stay?

17         And I was like:  Yeah, I'm pretty sure.  I

18    think I've got to go back to Utah.

19         Arizona was just a bad environment for me.

20    And so I needed to just be out of the state, really.

21    And so when I came back, I was looking for work, and

22    Drew eventually, he got hired on to eBay and at some

23    point he, same thing, put in a recommendation and got

24    me the job.

25        Q.   What did you do at eBay?

1      A.   At eBay, it's -- it's kind of like what the

2   Judge is doing up here now, is just a lot of

3   mediating.  And so eBay, when you have a complaint

4   with an item you open up a resolution, and so from

5   there -- so say you have a bad item, you know, you

6   tell the seller you have a bad item.  The seller

7   disagrees and says the item is pretty good and you

8   got, you know, a good item.  And the buyer still says

9   he has a bad item.  So what, you know, they do is open

10  up a resolution.  We tell the buyer to -- or eBay

11  tells the buyer to go and return the item and then a

12  lot of where we come in is the sellers calling in and

13  complaining that they had a return and that the money

14  is over in the buyer's hands.  And so, it's just kind

15  of a lot of walking through buyers and sellers on how

16  to mediate on terms.

17      Q.   How long were you there?

18      A.   I was there for two years, I believe.

19           MR. SKORDAS:  May I, Your Honor?

20           THE COURT:  You may.

21           MR. SKORDAS:  It's gone.  Where is your

22  poster?

23           MR. BURGGRAAF:  We can call it up.

24           MR. SKORDAS:  Okay.

25      Q.   BY MR. SKORDAS:  Aaron, can you see that

1    poster in front of you?

2        A.    Yeah.  Yes, I can.

3        Q.    Can you tell us --

4              THE COURT:  Why don't we identify the

5    exhibit.

6              MR. SKORDAS:  Sorry.  This is Exhibit 17.06.

7              THE COURT:  Thank you.

8        Q.    BY MR. SKORDAS:  It's a diagram or a group of

9    photos that the government created.  I want you to go

10   and start on the second row and tell the jury, from

11   your experience at eBay, who you met there on that

12   second row.

13       A.    Yeah.  I met --

14       Q.    We talked about Drew Crandall.

15       A.    Yeah.  Drew Crandall, I mean, obviously.

16   Noble, Tonge, Bustin and Gygi.

17       Q.    All worked at eBay?

18       A.    All worked at eBay, yeah.

19       Q.    Mario Noble, Drew Crandall, Ms. Tonge, Bustin

20   and Gygi?

21       A.    Uh-huh.

22       Q.    Yes?

23       A.    Yes.

24       Q.    And on the bottom row, are there any eBay

25   employees that you met?

1      A.   I don't believe so.  I know -- I think

2   Edwards was working there, but I -- that was Drew's

3   friend, that wasn't mine.  And no, I don't know any of

4   them if they were working at eBay.

5      Q.   All right.  Thank you.  Why did you leave

6   eBay?

7      A.   Kind of a trend I had.  I mean, Drew was, I

8   mean, by best friend at the time.  I mean, we car

9   pooled together.  We -- you know, after the gas

10  station we would go get, you know, gummies together.

11  And so all of a sudden, when he got fired, he would --

12  he had a pretty gnarly temper.  He would put the

13  customers on hold and start swearing up a storm and

14  then take them off and then continue the process as if

15  nothing happened.  So, over time, I think one or two

16  of the times slipped where he might have swore at

17  customers.  I might have watered down the story,

18  but -- and so he was eventually let go.

19          And I, at the time, I mean, we lived at Orem.

20  We lived at -- it's east Salt Lake.  We lived at

21  Millcreek together.  And so now I didn't have my

22  carpool buddy, and it was kind of unfair.  I was like,

23  well, why am I going to work and you're not?  So, at

24  the time, it didn't make sense to me, and so I left

25  shortly after Drew.

1    Q.   How did your learn what you now know about

2    computers?

3    A.   Well, I mean, Drew's a genius.  He's taught

4    me quite a bit.  I mean, I've also self-taught myself,

5    you know, a bit about computers.  You kind of have to,

6    with, I mean, how much stuff trends because, I mean,

7    one day, you know, something is cool.  The next

8    there's a new program, so it's kind of hard to keep

9    up.  But it was actually cool.  I know they talked

10   about how my computer had a solid state hard drive

11   into the Mac.  Drew was actually the one that helped

12   pop off my Mac.  We disassembled it together and, with

13   his help, I was able to get a solid state hard drive

14   on top of the normal hard drive, and so it seemed

15   pretty easy getting it undone, but with a lot of help,

16   he -- you know, he -- he was actually the one that put

17   it back together.  So, a lot of things, he was way

18   more on top of than I was.

19   Q.   You grew up in a household with just sisters,

20   correct?

21   A.   Yes.

22   Q.   And you were the baby?

23   A.   Yeah.

24   Q.   The youngest?

25   A.   Yeah.

1      Q.   I guess you're always the baby.  Did you --

2  did you feel any sort of brotherly attachment to Drew

3  and some of these other folks that you were hanging

4  out with?

5      A.   Yeah.  I mean, I didn't have any other older

6  brothers.  I didn't really have role models.  I mean,

7  during -- I mean, most of the time I grew up, I didn't

8  even really have parents.  Most of it, I was just

9  figuring it out.  You know, from boarding school

10  straight to college.  You know, from doing my laundry,

11  I, you know, turned to my roommate.  I'm, like:  Well,

12  what do I do?

13          So he showed me how to do cold, cold, so I

14  washed all my clothes cold, cold because I, you know,

15  didn't want to mess up colors.  And so Drew was

16  definitely -- he was older than me.  We met long

17  boarding -- well, it was called free boarding, long

18  boarding, skate boarding.  We met that way, and he had

19  a lot of the same interests with me as far as video

20  games went, and so there's definitely some attachment.

21  And, you know -- and I still consider him my brother

22  today, I guess.

23      Q.   Let's -- I guess let's cut to the chase.  How

24  did you and whoever get started in the drug

25  distribution business?

1      A.    Uh-huh.  So Drew kind of touched on it a

2   little bit.  So, I was living paycheck-to-paycheck.  I

3   was working at eBay.  I was saving a little bit and,

4   you know, just kind of coasting in life.  And Drew was

5   really struggling as far as money goes and so he was

6   looking to find, you know, more income.  He was using

7   a lot of the -- you see the commercials like check for

8   cash and quick payday loans because he needed stuff

9   immediately and then he would have to pay it back and

10  so he was just working further down into the hole.

11          And so he -- I mean, I, you know, was mining

12  BitCoins at the time.  I had a huge -- it's called a

13  K&C miner that, you know, was just a plug and play.

14  You just plug it in, it gets my BitCoins.

15      Q.    What is it' called?

16      A.    K&C miner.  It's like a giant metal box.  It

17  was -- during the raid, it was actually in the

18  hallway, and I was like:  Oh, there it is.

19          And so I'd run a couple miners at the time.

20  A few Antminers, that miner.  And so I was, you know,

21  dabbling in BitCoins.  I thought it was a really cool

22  thing.  I kind of saw a future in it.  And so --

23      Q.    About -- sorry, Aaron.

24      A.    Oh.

25      Q.    About what period of time are we now talking?

```
 1    What year would you say or what years?
 2         A.   Oh, man.  I know it's, I mean, 2014, 2015.  I
 3    couldn't tell you.
 4         Q.   All right.  Go ahead, then.
 5         A.   Yeah.  And so, since I was kind of using
 6    BitCoins and kind of thinking it was kind of like a
 7    new technology wave.  And Drew -- like we both had an
 8    adderall prescription and so --
 9         Q.   You both had an adderall prescription?
10         A.   Yeah, yeah.
11         Q.   All right.
12         A.   Because, I mean, afterwards I got diagnosed
13    with ADHD, but it was kind of too late because I, you
14    know, wasn't really going back to college, so I kind
15    of realized, like, oh, yeah, this helps.  And so,
16    there is a markup on it as far as, you know, if we
17    could get it off online.  And so we piled in our
18    Adderall.  I piled in, you know, the BitCoins that I
19    was kind of saving up, and then he piled in some
20    money, and we went ahead and opened up a store front.
21         Q.   Selling what?
22         A.   Selling Adderall.
23         Q.   And how did you obtain the Adderall that you
24    sold?
25         A.   It was through a doctor.
```

1       Q.   A doctor?

2       A.   Yeah, a doctor.  I drove down to a sports

3    medicine doctor down in Provo, and he was just the guy

4    to just prescribe it.  I had to go to a psychiatrist,

5    or I might be wrong in the name, but he had to

6    diagnose me properly and then -- so, you know, once a

7    month I could go down and get it checked out, so then

8    I had a steady supply.  And I know --

9       Q.   A steady -- excuse me.  A steady supply of

10   Adderall that was being prescribed to you personally?

11      A.   Yes.

12      Q.   Not given to you by a doctor --

13      A.   Yeah.

14      Q.   -- to sell?

15      A.   Yeah.  Prescribed.

16      Q.   All right.  Go ahead.

17      A.   Yeah.  And so it was kind of a win-win

18   situation.  It helped Drew.  I, you know, thought it

19   was cool.  And so we went ahead and moved on and sold

20   Adderall, and it made kind of a comfortable, like,

21   extra 900, 1200 bucks a month, so that's how it

22   started.

23      Q.   And then what was the next step, if you will?

24      A.   Next step is -- I mean, I think with money

25   comes greed, and so, all of a sudden, you know, Drew

1    realizes he's digging out of the hole.  At the time,

2    we are still at eBay and so I'm -- you know, to me

3    it's just -- it's just, whatever.  I'm like:  Cool, I

4    can buy some Vans.  You know, I didn't really think

5    much of it and -- and so it kind of got pushed, like:

6    Well, I'm getting this far out of the hole.  Let's

7    continue.

8           Because he was really working on his student

9    loans.  My -- I was really blessed.  My parents helped

10   me out, and they were paying for my college, so I

11   didn't have the burden of student loans.  And so I

12   thought this was a really great idea to help my

13   friend, you know, and do something that I thought was

14   completely harmless.

15      Q.  And so what did you do?  What was the next

16   step that you did?

17      A.  Oh, sorry, yeah.  So the next step, so we

18   kind of talked about what -- what's available.  And it

19   really connects you to certain things that you

20   wouldn't normally ever see.  And so the next step is,

21   I believe we ordered like a hundred grams of Molly,

22   MDMA, and we started out that way because it's -- I

23   guess from where it's made, it's dirt cheap, and so

24   then we were able to obtain it here, and it's a party

25   drug and so you're able to make, you know, a bit more

```
 1   money on it.  And from there --
 2        Q.   Aaron, how did you obtain the Molly?  How did
 3   you get started acquiring the product?
 4        A.   So --
 5        Q.   And I don't want you to get any individual in
 6   trouble, but just generally how did you get it?
 7        A.   Yeah.  So, I mean, it's used right through
 8   the dark net market, and, you know, since BitCoins was
 9   the thing, you could pay BitCoins and then they would
10   just ship it out to you and, at the time, I think it
11   was just either in my name or Drew's name.  It was --
12   we didn't really think anything of it.  It was just in
13   our names.
14        Q.   What did you have to do with it to sell it?
15        A.   So, at first we just sold it in gram bags,
16   and then Drew kind of did the math and, you know, we
17   realized, you know, it's not going to be in pill form,
18   but you could put it in caps, so if you crushed it up
19   and then sit there and just tap it and put it in caps,
20   then you could actually, you know, sell it, and it's
21   more better for the next guy.  It's -- and it's better
22   for markup as well.  And so, you know, moving from
23   that, you know, because it comes in a crystal form so
24   you just crush it up, you know, put it in the capsules
25   and sell it that way.
```

1      Q.   How did you find the customers?

2      A.   And so -- right.  Everything was done on the

3   marketplace, so all we had to do was just put up a

4   listing and say this is what we have.  And so, any

5   time, you know, orders would come through, I would

6   pass it off, and Drew would ship it.  And then he

7   would come up with new and different ways on how to,

8   you know, make it undetectable through the mail, mail

9   system.

10     Q.   Like what?

11     A.   So, I mean, there was a little bit of talk

12  about stuff online, like, you know, and we had to

13  think, like, okay, you know, the mail system is pretty

14  busy.  What's something that can just move on through

15  that wouldn't be looked at twice?  And so, you know,

16  something like candy bars that we could end up, you

17  know, pulling out Airheads, stuff like that, and use

18  a -- like a sampling food company to then ship it.

19  That way, you know, they open it up, the candy bar is

20  there, it's just pretty much taped or glued, and then

21  they have their product at that point.

22     Q.   Were you or Drew or others using some of the

23  product also?

24     A.   Yeah.  Yeah.  I -- I was using the MDMA.  We

25  had Ambien at one point, which is a sleeper.  I had a

1       really tough time.  I would -- so, with the eBay

2       shift, it was later in the afternoon, so I would get

3       off from work, go work out, take pre-workout, get all

4       hyped up, go to the gym, and then, once you're done

5       with the pump, the caffeine is still streaming through

6       my blood stream and so then, all of a sudden, you

7       know, I'm back at home and I'm wide awake and so I

8       would use -- you know, I would kind of -- I would try

9       Ambien.  It wasn't really for me.  I didn't like it.

10              You know, we had gotten GHB so I used that

11      for a little bit.  I ended up didn't liking it, but

12      yeah, we had, like, MDMA, which, I mean, because back

13      then, a lot of pills were being pressed in Ecstasy,

14      and you really don't know what's in it, and so it's

15      kind of a guess like, well, I hope it's going to be

16      okay.  Or, what we later found out is, if you have a

17      mandolin marquis test is you could do a color code and

18      see how it -- what colors pop up as to what's being

19      cut.

20              And so since we knew exactly, you know, this

21      is MDMA, all of a sudden we know, it's -- what exactly

22      we're taking.  And so, I mean, in my strange mind, I

23      thought, you know, we're not dealing with the cut.

24      They are not putting methamphetamine in it.  And so I

25      thought it was a bit safer.  And so we were able to

1    also sell it to our friends at really low prices just

2    because, you know, it was just a friend, like, I don't

3    want to make money off of you, you know, let's just

4    have fun.  And so I was able to sell -- we didn't sell

5    GHB to anyone.  It was sold online, though.  And,

6    yeah, we sold just a little bit of MDMA, just to our

7    close friends and MDMA online.

8         Q.   Did you sell Ambien?

9         A.   Yes.  I mean, at one point we had, like,

10   Modafinil, which is kind of like a -- like an

11   Adderall.  We had obtained -- one of our friends had a

12   prescription for Ritalin, and he needed money and so

13   he was:  Hey, let me sell you my Ritalin.

14            Okay.  That's fine.

15            So we would buy his Ritalin.  And my friend,

16   Mike Hanson, same thing.  He, you know, he was

17   struggling with money, and, you know, he was, like:

18   Man, let me sell you my Adderall.  You're making money

19   off of Adderall, right?

20            He didn't understand or know how.  He just

21   knew I had mentioned it before.  Yeah.  Sure.  Let me

22   help you out.  I'll buy it.  You know, that's no

23   problem.

24            So I was able to buy his Adderall and, again,

25   sell it online.

1      Q.   Then obviously you evolved into other drugs,

2    correct?

3      A.   Yeah.  Over -- over time, it -- it definitely

4    involved -- or evolved.  Things kind of got a little

5    hairy.  We -- I mean, not everything was all rosy.

6    What we ended up doing is, so, they kind of mentioned

7    on another testimony is that there were marketplaces

8    that would just shut down, pull out or just leave and

9    so we kind of got screwed on not just one but multiple

10   occasions.  And so there could have been anywhere

11   between 10, $20,000 that was sitting in escrow and so

12   we would just completely get wiped out.  And so all we

13   would have is just, like:  Okay.  Well, this is all we

14   got.  I guess we'll just start again.

15         And so I can't remember the question.

16     Q.   That's okay.  You were paying some money to

17   get some product from some illegal distributors, I

18   guess, and they got closed down so you lost the money

19   that was in escrow.  Is that what you're saying?

20     A.   Yeah.  That's correct.

21     Q.   But you did ultimately evolve into this huge

22   operation, Aaron, correct?

23     A.   Correct.

24     Q.   So, tell the jury, and take your time to walk

25   us through selling Molly and a couple Adderalls to

1     selling fake Oxy.

2       A.   Yeah.  So with money comes greed, and so at

3     that point, I remember -- so I'm going to jump into

4     the time frame of obtaining the single pill press that

5     would just punch down and pop out one pill at a time.

6     And so, you know, because I didn't know anything of

7     it.  And, you know, I was -- we were -- at the time

8     we're getting Zanax from another country.  I believe

9     it was India.  And so Drew came up with the idea of,

10    well, we could just press it.  And so I'm, like, okay.

11    And so in his brainyac brain of his, you know, he's,

12    like, it's just a simple -- you know, it's just

13    simple.  It's an algorithm.  And so he did the math.

14          And he's like, we could easily find out

15    what -- you know, if we, you know, rule out the active

16    ingredient, we could find what else we need to put

17    into it.  And so at first we started with just the

18    microcrystalline cellulose in the product and realized

19    that wasn't going to work.  And then --

20      Q.   Why?

21      A.   You need more active -- or not active.  You

22    need more chemicals in it.  There's, like, an

23    anti-caking agent, a lubricant.  There's a lot of

24    stuff that kind of goes into it.  And so I -- I

25    remember, like, being stuck.  He's being frustrated.

1    He -- and so I remember finding a company that sold a

2    one bag -- you know it -- you know, one bag fits all,

3    like, it's like this is what you need, assuming that

4    that's exactly -- you know, it comes canned, as like

5    the solution, and so, you know, I was, like, okay,

6    let's try this.

7            I gave it to Drew, and Drew, you know, was

8    able to make it work.  And a lot of swearing and

9    frustration and, you know, he was able to pop out to

10   what we initially were aiming for, which was Zanax at

11   the time.  And then he was able to do the same thing

12   with MDMA.  And so Drew was dating a girl, Sasha, and

13   so she eventually, like my girlfriend, found out what

14   we were doing.  I mean, she's like:  You quit your

15   job.  What are you doing?

16           I'm, like:  Trading BitCoins.

17           And I was trading BitCoins on the side, but

18   it wasn't very heavily, and so, eventually, you know,

19   things kind of get out.  And Drew's girl wasn't really

20   okay with it.  And so, over time, it did evolve from

21   Zanax, but it didn't move over to any other products

22   until, I mean, Luke pretty much got involved.

23       Q.   Okay.  And you talked about this first pill

24   press that you bought.  How did you find it?

25       A.   I mean, good question.  I think it was just

1    some back page to some -- excuse me -- some Chinese

2    website that was offering the press.  Again, we didn't

3    know anything what we were doing or what it was about,

4    and eventually, we're, like, okay, well let's -- you

5    know, it's pretty expensive.  Let's dive into it.  I

6    mean, we weren't really being paid all that much from

7    the proceeds.  It was kind of like working on a

8    minimum wage for a long time.  And so we're, like,

9    let's see if this works.

10            And once we were able to obtain that, then,

11   you know, the process kind of evolved from there, I

12   should say.

13       Q.   If you could bring up 17.06 again.

14            Before we get to Mr. Paz, you did start

15   working with some of these people, correct, on the

16   Zanax, or maybe I'm wrong.  Tell me how that evolved.

17       A.   Yeah.  Yeah.  So, at the time, the girls

18   Tonge and Bustin, they were involved, and so they were

19   involved with the Zanax as well.  I don't believe

20   Noble was.  I mean, I think Gygi was just drop.  I

21   mean, we only had, like, Gygi and maybe one or two

22   drops at the time, like, they were just accepting, you

23   know, packages and delivering.  So it was, I mean,

24   fairly small, nothing that's up there like it is right

25   now.

```
 1          And it's funny because each drop, I wouldn't
 2   even mention to anyone, they would approach me and
 3   say:  What do I have to do for money?
 4          And I would say:  Well, if you want, you
 5   could just accept this and deliver it.
 6          Yeah.  Yeah.  Let's keep doing that.
 7          So it just continued to evolve as, you know,
 8   more and more people wanted to, you know, what are you
 9   doing?  Let me in, whatever you're doing.
10          I'm, like, okay.
11          And so from there -- so Tonge and Bustin,
12   Drew showed them how to ship, showed them how to
13   disguise, showed them pretty much everything, he
14   showed them the BitCoin wallets, the email.  He showed
15   them -- it was basically like, you know, because
16   they -- I guess I could take a step back.  So Tonge
17   and Bustin approached me at one point, and they were
18   like, hey, we have our mom's prescription.  We want to
19   sell it to you.
20          And I said, well, it's not really my thing,
21   but, you know, if it will really help, you know, you
22   guys out, I'll order it -- I'll buy it off you and
23   then we'll just do it on line.
24          So, slowly, you know, at one point, I bought
25   my friend's B.M.W.  He was trying to buy a house and
```

```
 1    so, you know, it was just a 2008 and so it wasn't

 2    anything crazy or special, so they saw me with the car

 3    and they were like, well, what do we have to do to

 4    like, you know, to get into this?

 5           And so I was like, look, you know, you could

 6    talk to Drew, and, I mean, if this is something you

 7    want to do, then, you know, you could go ahead and I

 8    guess get started because I didn't know what they

 9    should be doing past a drop.  I was like, well, I

10    mean, website is taken care of.  Drew is doing all the

11    shipping, postage, running around, errands.  And then,

12    as far as cashouts, Drew was doing a bunch of them,

13    and I think I was doing some of the side, and so at

14    the time, Drew kind of saw this as an opportunity to

15    kind of -- kind of pivot, I guess.  And so, from the

16    Zanax over is this is when Drew was about to leave the

17    country.

18           And so I remember him saying -- so, we had

19    had a lot of talks, a lot of talks about what was

20    happening.  There's a lot of frustration going on, a

21    lot of, I guess we won't say butting heads.  He was

22    dating his girl, which turned in to be his fiance.

23    And I thought she was really cool.  She was an

24    alcoholic, he was a pot head, so their two problems

25    kind of collided and I guess made sense and so he was
```

```
 1   saying:  She wants to travel the country.

 2           And I was like:  Okay, cool.

 3           And he was like:  Well, I want to go.

 4           I was like:  All right.  That's cool.  Well,

 5   what do we need to do?

 6           He goes:  Sasha doesn't like what I'm doing.

 7           And so I was like:  Okay.  What do I need to

 8   do?  What do I --

 9           And he's like:  You know, I want you to tell

10   everyone I'm bought out.

11           And, you know, at the time I think he had

12   20,000.  I had pulled out, I think -- I can't remember

13   what I paid for the boat, but I think it was around

14   20,000 as well because I had bought a boat with my

15   friend Miles.  And so once we kind of got the

16   transition, he showed Luke how to run the machine.  He

17   showed -- I mean, I didn't.  He's like:  Here, Aaron,

18   you know, why don't you try to understand this.

19           So I'm sitting there, and he's turning knobs

20   and showing him how to run this.  And Luke's looking

21   at me, and I'm looking at Luke like, well, I hope you,

22   you know, understand this.

23           And so eventually, you know, that was the

24   transition.  Drew left the country.  Luke kind of took

25   over, took the, you know, the pill press spot.  The
```

 1    girls were now shipping.  I was, again, just, you

 2    know, running the website, which, you know, processing

 3    orders over, moving them down and getting them over to

 4    the shipping company or to the girls.  And, you know,

 5    and we had a lot of bumps on the road.  There was a

 6    lot of issues that would come with his transition out

 7    of the country.

 8          And so really, when it came down to, I mean,

 9    the reason for, you know, this whole thing is, for the

10    Fentanyl Roxy's was, at the time, I was being trained

11    by the gentleman that's second from the left, Kenny.

12    He -- you know, I don't know if he owned the gym or if

13    he was a personal trainer.

14    Q.   When you say you were being trained by him,

15    you mean he was your trainer, your physical trainer?

16    A.   Yeah.  Yeah.  Yes.

17    Q.   Okay.  You transitioned into Kenny there.

18    You finally got me there.  So, go ahead.

19    A.   Yeah.  Sorry.  And so he was -- you know,

20    Miles had mentioned to him like, hey, this guy, you

21    know, Aaron could get anything.  You know, I have a

22    friend that could get anything you want.  And really

23    it was just I had found the Dark Web and, you know, I

24    would, you know, do small things for friends like if

25    my friend needed a certain antibiotics.  He's like:

```
1    Dude, I don't have time to go to the doctor.

2            I'm just:  Go to the doctor.

3            He's like:  Dude, can you help me out?

4            And so I'd get him antibiotics, something

5    really simple.  And so anyway, Chris kind of heard

6    that, and he's like:  Hey, I was working with this

7    other guy over here and, you know, they kind of talked

8    about Fentanyl, a Roxy at a time.  And there was a

9    falling out.

10           And so he was really leaning into me like:

11   You should really do this.  And he's like:  Well, what

12   can you get?

13           And I'm like:  Well, I -- you know, Zanax.

14           And so at the time he was, you know, buying

15   Zanax and selling it and so that kind of happened

16   several times.  And so eventually, you know, after so

17   many conversations, so many goings, he -- you know, I

18   started bringing up to other people.  You know, I

19   said:  Okay.  Is this -- it this a possibility?  Is

20   this -- I don't really know anything about it.  I have

21   never done a pain pill.  I have never taken opiates.

22   I've, you know, stayed away from that my whole life.

23   And so this is kind of new to me.  I don't know how I

24   feel.

25           And it -- at the time Luke was on board.  He
```

1     just came back from Vivant, and usually the Vivant

2     sell is, go sell for the summer.  You come back and

3     then, you know, you've got a lot of money.  You flash

4     a lot of cash.  So he had just got back, had a BMW.

5     So I was like:  Oh, man, are you doing good?

6           He was like:  No.  I paid off all my debts

7     from the time I wasn't doing good.  So his real push

8     was, well, I really want to make some money.

9           And so I -- you know, Zanax was something

10    that I would take on occasion.  I would, you know,

11    bite a little corner and then take it for sleep, and,

12    you know, it's kind of a cool feeling to feel through

13    your bloodstream, you know, so it's like:  Zanax, not

14    so bad, you know.

15          And so he -- the thing that we organized out

16    because of how many payment kind of worked, is he

17    wanted to get paid not so much for like a percentage.

18    I was like:  Well, how do you want to get paid?

19          He said --

20          You know, do you want a percentage of what's

21    being sold?  Do you want a percentage?

22          He goes:  I want a fixed amount of work being

23    done, so anything that I make, I get paid.  I get, you

24    know, money.

25        Q.   You're talking about Mr. Paz now?

1     A.   Yeah.  Mr. Paz at this point.  And so, you

2   know, with Zanax, he's, you know, the markup is so low

3   that, I mean, these things are being sold for 50 cents

4   to a dollar, and it's -- you know, there's not much of

5   a markup, so his sweat and tears of all day work turns

6   into -- I mean, it's still a substantial amount of

7   money, but, you know, when we're kind of talking about

8   this possibility, he's saying this would be great.

9   Let's, you know -- and so I -- again, I kind of tossed

10  it in my head.  I'm like -- it took a long time for me

11  to come around and actually do it.

12         I mean, as you can see, it took months

13  from -- you know, the whole time I was talking to

14  Chris, the whole time, between --

15    Q.   This is Kenny?

16    A.   Oh, yeah, Kenny.

17    Q.   Okay.

18    A.   And so, it kind of took a long transition.

19  And so I had actually -- you know, Drew was having

20  fun.  He was out there.  He was really enjoying life.

21  And I had actually reached out to him and I had gotten

22  his opinion.  I said:  What do you think about this?

23         And I think he said something along the lines

24  like:  Well, you know, you've got to follow the money.

25         And so I was like:  Okay, you know.  And so

1    at that point, we went ahead and decided to move

2    forward.  And so I had ordered the A-215 die.

3        Q.    Aaron, when you say we decided to go forward,

4    who is the "we" at that point?

5        A.    I mean, it was -- it's hard because you

6    can't -- you can't really say one moves with -- you

7    know, it's everyone kind of -- it's kind of like at

8    this point, we're all friends.  We're all moving

9    together.  And so it wasn't just this person's

10   deciding.  It's, you know, okay, let's go ahead and do

11   this because it's -- in the end, everyone is

12   succeeding.  Everyone is, you know, doing better.  I'm

13   seeing the switch in people's lives where they are

14   stressed and now they are more comfortable and so, you

15   know, I kind of brought it up.

16           And so I believe it came down to, I mean,

17   Luke, Drew and I.  I mean, I brought it up to the

18   girls, but they -- I mean, they don't really care.

19   They are just, you know, putting things in and

20   shipping it out and so it didn't really bother them.

21   And so they were just worried about -- because at

22   first we -- we didn't have any really money to pay

23   them on a weekly basis.  So I'm like:  I promise you

24   I'll get you this.

25           And they are like:  Okay.  You know, just

1    give me the paycheck.

2         Because I was like:  Do you want a percentage

3    because I'd rather do that so then you can ride the

4    lows and highs.

5         And they're like:  No, no, no.  Just put me

6    on the weekly.

7         So I'm, like, okay.  So, at that point, it

8    became, you know, let's go ahead and do that.  And so,

9    not knowing anything about it, we used the -- again,

10   the canned substance.  We were just taking it and

11   throwing it in and, you know, we -- the only blue dye

12   that I knew was a dark blue and so Luke actually

13   figured out if you could just take literally just your

14   hands, and it's just a small flick, and you would

15   literally just put a few particles in.  And when you

16   shake that up with everything in it, that will give it

17   just the light blue.  So at first they were, you know,

18   too blue, too light.  But eventually he was able to

19   kind of find, you know, a good balance on that.

20        Q.   What was Chris Kenny's involvement in terms

21   of the Fentanyl and the opioids?

22        A.   As far as the Fentanyl and opioids, he was --

23   he was the connection into, I guess, Utah, and, you

24   know, through word of mouth, I've heard -- you know,

25   it kind of went from there.  But he was just the one

1  guy that -- I mean, it was his idea the whole time

2  that he was kind of leaning on me, saying, you know,

3  this is what you need to be doing.  This is -- you

4  know, there's money to be made, and, you know, so, at

5  that point, he was really kind of leaning on me to

6  move towards that.

7      And to be honest, I, you know, actually liked

8  the Zanax.  That's why I kept it on.  And so that was

9  like my thing, you know.  We used a GG 249.  I think

10  it was an out-of-the-country look.  And, you know,

11  it's something -- because I've seen the American bars,

12  and I don't really, you know, like them too much, so I

13  liked the GG 247.  And so with him, he was, I guess,

14  kind of like the outlet.  I mean, it was kind of the

15  start, the idea, and, you know, from there he was also

16  buying in decent quantities.

17      Q.  Drew had told his girlfriend and others that

18  he sort of was bought out of the business, but in fact

19  he remained, correct?

20      A.  Yeah.  That's correct, so --

21      Q.  Go ahead.

22      A.  So, I mean, like I said, he was my brother,

23  and I wanted to do anything that I could for him, and

24  I mean, like with my girlfriend, I -- you know, when

25  she found out, I was like:  Well, sucks, but this is

 1    what I'm doing.

 2          And we kind of argued on that and eventually

 3    broke it off.  And so with him, he wanted to go a

 4    different direction.  He said:  I really want to marry

 5    this girl.

 6          And I was like:  Cool.  I -- you know,

 7    proceed.

 8          And so we sat down and we talked, and he's

 9    like:  Okay.  You know, let's -- I need everyone to

10    know, you know, that I'm, you know, moving out of the

11    country.

12          It was kind of like a public stunt in a

13    sense, and so, you know, he got to travel.  And then

14    the idea was is that he was really pushing because I

15    was like:  Yeah, man, just whatever I can do to help,

16    let me know.

17          And he was like:  Well, how about I come back

18    in like a few months, and, you know, I'll press for a

19    month, and you guys will be good and then you can just

20    surf on that for awhile.

21          And so I'm like:  Sure, I mean, yeah, that

22    sounds, you know, logical.  And so his idea was to

23    come back and then, you know, save up some money so

24    that way I could pitch it to him and then he could go

25    ahead and jump back and continue his surfing around

1    the world.  And --

2        Q.   How did you -- how did you exchange money

3    with Drew while he was on the other side of the world?

4        A.   I mean, it just depended.  If he needed bills

5    paid, I could, you know, write through, slip it on to

6    his bank account.  I could -- I mean, for the most

7    part, I just sent him BitCoins.  I mean, you could

8    receive it anywhere in the world.  It wouldn't matter

9    if it came from my account or the actual marketplace

10   itself.  Marketplace was actually a little bit safer

11   because they had a tumbling service embedded into it,

12   and so that way he could go ahead and use that, in a

13   sense.

14       Q.   What do you mean the marketplace?

15       A.   Well, the dark net market website.

16       Q.   So he was able to access the BitCoins from

17   this operation, if you will, through that?

18       A.   Yeah.  In a sense.  I mean, if he would send

19   me a message and say:  This is what I need.

20            You know, it only would take just an hour to

21   send it through.  And so he wasn't too interested on

22   being hands on, on the actual marketplace itself

23   because, you know, he was -- you know, he had dealt

24   with the marketplace.  He would buy weed and stuff off

25   of it like, you know, when we sold weed at the time,

```
 1    that was his doing.  He was like:  Well, we can buy a
 2    pound and, you know, then if I smoke weed, it's only
 3    $3 a gram.  And, you know, he would kind of do the
 4    math in that sense.
 5            And so, I mean, at the time, he didn't have,
 6    I guess, direct access.  He had, like, kind of a side
 7    access, but, like, the first account that we had, one
 8    time -- you know, sometime in the months, he's like:
 9    I need -- I want to look at something.
10            So, you know, I shot him the password.  It
11    wasn't an issue.  Yeah.  Here you go.  Go ahead and
12    jump, you know, on, and, you know, whatever you need
13    to check out.
14            So it wasn't that he was blocked from it.  It
15    was just, he -- I don't think he had any interest.
16       Q.   What was Luke Paz doing while Drew was
17    traveling the world?
18       A.   Well, Luke, he -- so at first he came back.
19    He had a couple months that he was, you know, kind of
20    work free.  So, at that sense he was getting trained
21    by Drew and then pressing.  And then once he found the
22    formula, the, you know, Fentanyl Roxy's, then, you
23    know, that's basically what he did is he would come
24    over, press, bounce, and then he also did some
25    traveling, too, with -- they did pre-season, so you go
```

1    out for the pre-season, go sell, and then you would

2    come back.  And so that way, for his mind, he wanted

3    to be out of the public eye, and he wanted to, you

4    know, at least keep a facade of selling, even if he

5    was or wasn't.

6         Q.   You mean selling legitimately through the

7    company that he was working for?

8         A.   Yes.  That's correct.

9         Q.   And you said the name of that company but

10   I've forgotten it already.

11        A.   I think it's Vivant Security.

12        Q.   All right.  Take us up to 2016 then.  What

13   was happening in the -- maybe the five or six months

14   before your arrest.

15        A.   Five or six months, things kind of really

16   picked up.  I mean, things were never really great

17   from the start, but they finally kind of moved

18   forward.  So, at that point, you know, Luke wanted

19   to -- because, I mean, he got -- he got a fixed rate

20   of everything that was being made, so we kind of moved

21   up to a pill press such as the one that you see in

22   front.  So it was easier.  It was faster.  It was more

23   accurate.  And -- oh, crap.  I forgot what I was going

24   to say.

25        Q.   That's okay.  That's okay.  It was a dumb

1     question anyway, but I'm trying to get you up to

2     November of 2016, but let's start with a couple months

3     prior to that.

4          A.    Okay.

5          Q.    Your business picked up, and you were

6     starting to buy bigger -- or at least a bigger or two

7     pill press, correct?

8          A.    Yes.

9          Q.    And your market was getting bigger?

10         A.    Yeah.  I mean, it's how -- I mean, you could

11    you kind of control the market in a sense.  I mean, in

12    a sense, we're kind of getting flooded with more

13    orders.  I mean, on the screen, the girls were getting

14    pretty frustrated.  They were on, you know, on an

15    income, and they said:  Look, we're so busy.  Why

16    don't you, you know, just do the logical thing and

17    instead of selling singles and tens and 20's, just

18    move up to hundreds and thousands.  That makes sense.

19    That would be easier.

20              So, I mean, in my mind, I'm like:  Well, is

21    that what you guys want?

22              They are like:  Yeah.  It would be less

23    packages.  And they said, you know, and besides, it's

24    more money.  We would all benefit.

25              And so it was kind of a transition saying,

1    okay, you know, and this is what I kind of do.  I go

2    to Luke and I say:  So is -- you know, is this what

3    you want to do, though?

4          Yeah, of course, I mean, you know, because

5    the more we get out, it's better for us, you know,

6    we'll have an indated mind (as spoken).  Let's do

7    this.

8          You know, so I, you know, kind of go to

9    the -- he was kind of grandfathered on this whole

10   thing.  I say:  You know, is this what we should be

11   doing.

12         He says:  You know, you got to follow the

13   money.

14         So it was kind of like, let's -- I guess

15   that's what we're going to do.  I mean, it's really --

16   really stupid kind of thinking about it now.  I mean,

17   really shameful, too, but, you know, at that time,

18   about halfway through, that's when things kind of

19   started picking up.

20         And several months into that, it went from

21   kind of a hobby into something that I was kind of --

22   my eyes were a little too big, and I was like:  This

23   isn't what, you know, I expected at all.  Like it went

24   from, you know, something so small, you know, back

25   then, into, you know, something like this now.  And,

1   like, so, when we had the two machines, I would press

2   the Zanax.  If you noticed, there was two chairs.  I

3   would press the Zanax.  It's real easy.  It's just

4   the -- I mean, Drew already set up the mathematics.

5   So it was just bag the Zanax.  And Luke would actually

6   help set up the -- I don't want to say coordinates,

7   but the knobs.

8         And so, at that point -- and you could see,

9   there's a bunch of powder around it, which is really

10   embarrassing because there's, like, something that

11   comes down as a flap, that keeps the powder from

12   spilling in, and in my rush, I just screwed it down

13   and went, when Luke is the one that kind of sits there

14   and eyeballs it and really sets it on, so that way

15   it's really perfect and there is no powder that's

16   spilling.  And then, at that time, Luke is right next

17   to me, and he's pressing the Roxy's.

18      Q.   And were the presses basically the same, or

19   how were they different?

20      A.   I mean, they're -- they are the same in

21   similar ways, but, I mean, it was kind of like getting

22   into something new and, at that point, kind of

23   interesting, I mean, so his was just basic, like the

24   speed valve was just this little tiny knob, and the

25   one that I was using, there was an LCD screen that

```
 1    could even give a pill count, what you're doing, and
 2    then you could adjust the speed, though it kind of
 3    sucked, like the more basic one was, I guess, in a
 4    sense better, but that's as far as I know.
 5        Q.   At this time, were you and Drew and Luke
 6    getting most of your income from BitCoin, then?
 7        A.   Yes.  That's correct.
 8        Q.   But the girls, as you've described them, and
 9    perhaps some of the others were getting paid in cash;
10    is that right?
11        A.   Yeah.
12        Q.   So tell the jury how you were converting --
13    and I know we've heard it a hundred times -- the
14    BitCoin to cash.
15        A.   I mean -- so there's various ways -- I mean,
16    back then, especially when we first started, I mean,
17    you would have to almost beg someone to take BitCoins,
18    like -- and we were overpaying people to just take
19    them, like:  Look, we'll give you a $50 break.  Just
20    take them.
21            And so, over time, it kind of evolved.  I
22    mean, nowadays, companies like New Egg and, I don't
23    know, they take BitCoin, so it's, you know, a little
24    bit more fluid currency.  So, back then, we had --
25    there is a kiosk that was a BitCoin kiosk that we
```

```
 1   could use as well as it was pretty much all

 2   peer-to-peer.  And then there was BitStamp.  So, I

 3   mean, it just kind of varied as far as, like, when we

 4   would cash out.

 5       Q.  And you would cash out periodically to pay

 6   some of these other people that didn't want to deal

 7   with BitCoins, they wanted cash?

 8       A.  Yeah.  They didn't understand it.  I mean,

 9   Drew explained it to the girls, but they were like:

10   And then what?

11           You know, and so they were like:  Just -- I

12   just want money.

13           And we're like:  Okay.  That's fine.  Just

14   here.  Take it.  Take money.  That's easier.

15       Q.  How did -- let's talk about some of the other

16   people -- Mario Noble get involved?

17       A.  Mario Noble, I think was referred by, I mean,

18   Sasha, Drew's girl.  They had an idea of, you know,

19   packages coming in because, I mean, that's, you know,

20   again, you know, I took Molly at times.  I thought it

21   was cool and so, you know, then we would give it to

22   our friends, and so they had an idea that drugs

23   were coming in and put two and two together.  That

24   makes sense.  And so Sasha went ahead and referred

25   Noble and said:  Hey, you know --
```

1       Because he was complaining about money.  And

2  he's like:  Ah, you know, I'm paycheck-to-paycheck,

3  like, I'm in debt, you know, credit cards.

4       And so, through him, he kind of approached

5  us.  I don't know if I talked to him first or Drew,

6  but he basically got the rundown of, okay, go ahead

7  and accept packages and you could receive money.

8       Q.   What about Mr. Gygi?

9       A.   Same thing.  He was Drew's friend.  I thought

10 he was a little odd.  He was very closed with him and

11 his girlfriend, and that was -- he was on the vetter

12 side with eBay, so I guess he sat close to Drew, and

13 so Drew hooked him on being a drop.  And then, you

14 know, he didn't get more involved until the girls were

15 saying:  Look, we don't want to go to post offices.

16 We don't want to pick up stamps.  We don't want to do

17 this.

18      And that's when I approached Gygi and said:

19 Hey?  Is this something you want to do?  I mean, you

20 could just go pick up some postage.  You could just

21 drop it off in some blue boxes.

22      You know, I think -- you know, and at the

23 time I think he got fired from eBay as well and so he

24 was really kind of starving.  He was kind of not

25 really doing well as an individual and so I said --

1    you know, I mean, things just kind of weirdly meshed

2    together.  It was just like, well, this is what they

3    want.  Is that -- you know, do you want to try it out?

4              Yeah.  Yeah.  Why not?

5              So, okay, that's cool.

6              And I believe -- I mean, Drew was, you know,

7    out of the country so it was just, like, yeah.  Let's

8    do that.  We had excess income, so we were up to kind

9    of get him, you know, accepting drops and moving

10   postage every day.

11        Q.   What were you doing with your income that you

12   were making?

13        A.   Good question.  I mean --

14        Q.   Storing it in your sock drawer?

15        A.   Yeah.  Yeah.  I mean, as you can see, my cars

16   weren't new.  The B.M.W. was bought from one of my

17   friends, Ben, and, I mean, and then right towards the

18   end, another instance, my friend Roy, he was selling

19   his car.  I remember, you know, kind of checking out

20   the car.  He was selling it to Miles, and I was

21   looking at it, and I was like:  Well, is it awesome?

22             And he was like:  Yeah.  It's pretty awesome.

23             And I was like:  Yeah, you know, let's do it.

24   I'll buy the truck.  But, I mean, I didn't like to be

25   super flashy.  I, you know, started out buying some

1    designer things and then all of a sudden people kind

2    of change.  They treat you different.  They just

3    expect things more out of you, like, say, if we were

4    at a concert and, you know, they are like:  Oh, he's

5    going to get shots, and they kind of look at me.

6         And I'm just like, I need to stop wearing

7    these clothes.

8         And so I kind of just spent it on casual

9    vacations.  I didn't really splurge on anything

10   except, you know, there was a TV and, you know, and

11   then I tried to be more mature and I bought some

12   furniture.  And that's basically it.

13   Q.   Just sort of a diversion for just a minute.

14   Your mother testified to a duffel bag of cash that was

15   delivered to her and another packet of cash that was

16   apparently delivered to one of your sisters.  Can you

17   tell the jury about those?

18   A.   Yeah.  And so they were really encouraging me

19   to save my money at the time, and I was not against

20   it.  I mean, I was a kid.  I mean, I kind of still

21   view myself as a kid.  And so I thought that was a

22   great idea.  I was dating someone at the time, so we

23   drove down to Pine Valley in the truck that I bought.

24   You know, I was like: Hey, let's try out the truck.

25        You know, and so, you know, I was able to,

1    you know, deliver a duffel bag of money to them.

2          And they were kind of surprised, and I was

3    like, you know, here it is, you know, just hang on to

4    it.  If I ever come up with an investment or need it

5    for anything, you know, it's a way that I just won't

6    spend it.  So they accepted it at that time.

7          Another time is when my sister was driving

8    through Utah.  She stopped by the house.  You know, I

9    hadn't spent too much time with her little kids which

10   were really cute.  It was -- they look just like my

11   sister and her husband at the time.  And so, you know,

12   I took advantage of the opportunity.  I said:  You're

13   going to parents' house, right?

14         Yeah.

15         Hang on.

16         You know, so I, you know, filled up a -- just

17   one of those gym bags that, you know, have the

18   shoestring and it was just tied up, and I was like:

19   Well, you could bring this down, right?

20         She kind of looks at me like:  Yeah, we could

21   take it down.

22         I'm like:  Okay.  Cool.

23         So I was able to, I guess, in a sense,

24   through, you know, what my parents would suggest is

25   saving money.

1     Q.  So you -- you didn't intend for these to be

2  gifts to your sister or your parents.  It was just you

3  sort of rat-holing it for a rainy day or something

4  like that; is that fair?

5     A.  Yes.  That's correct.

6         MR. SKORDAS:  May I have just a minute, Your

7  Honor?

8         THE COURT:  Yes.

9         MR. SKORDAS:  I apologize, Your Honor.

10        THE COURT:  I didn't hear what he said.

11        MR. SKORDAS:  I apologize.

12        THE COURT:  Oh.  Apology accepted.

13        MR. SKORDAS:  Could we go to Exhibit 783,

14  please.

15        THE COURT:  783?

16     Q.  BY MR. SKORDAS:  Can you blow the four

17  packages up a little bit for me, Yvette.

18        Aaron, do you see that?

19     A.  Yes, I do.

20     Q.  How did you get to that?  How did you get to

21  that?  And I'll indicate that this is a picture that

22  shows packages with, it looks likes thousands of pills

23  in each one.  There even is a handwritten note that

24  says, I think, 2,000 or something on each one.

25     A.  Yeah.  I mean, things kind of exploded and, I

1   mean, it's really a good question because, I mean,

2   it's one of those things where everyone is benefiting

3   from more.  And so it wasn't just, like, the girls

4   wanted less shipments.  You know, Luke wanted more

5   money.  I, you know, was cool with whatever.  I mean,

6   I'm not going to lie.  Money is cool, so I was like:

7   Why not?

8            And, at the time, Drew was traveling the

9   world.  And so, if it was up to me, I would have

10  pushed down and kept it mom and pop.  You're able to

11  work with people a lot more closely on it, but it's --

12  it just kind of, I guess, progressed in that

13  direction.  It's one thing led to another.

14       Q.   Thank you.  Earlier you said something that I

15  hadn't heard before.  You said we were -- maybe I

16  mischaracterized it.  You said something like:  We

17  were looking for the end, or you were thinking there

18  was an end.

19       A.   Yeah.

20       Q.   What did that look like to you?

21       A.   It was December.  We were coming up as, you

22  know, when can we unplug?  Like, what's -- you know,

23  this isn't a lifestyle.  I -- I honestly felt, like,

24  hollow.  I wasn't a human being, like, I wasn't happy.

25  You know, I could wear cool clothes, but I was just

1    like:  Man, I'm a piece of shit.

2         So, it kind of came to a point where I was

3    talking with Luke.  And Luke was like:  Look, we need

4    to be done with this.

5         And I was like:  Yeah, I wanted that last

6    year.  And this is where I'm at, you know.

7         And it's just -- you know, one thing led to

8    another of, you know, when we wanted to stop, it's

9    like, well, this person -- you know, Drew -- Drew

10   needs this much money, you know.  So it's like, okay,

11   well, we got to keep going.  It's like, well, okay,

12   you know, now I just need to be a little bit more

13   comfortable.  So we kept going.  And so at the end

14   point, which was kind of funny, is -- not funny.  It

15   was -- it was just right there, and so I was looking

16   at it.  And I kind of talked to even Gygi about

17   moving -- marijuana was legal over in Colorado and so

18   I had an idea about moving up.

19        And then, you know, we had talked about

20   ending, but at the same time it was always the back

21   door of:  Well, let's take a break for a long time and

22   maybe get back to it.  But the end was, you know,

23   ideally in December.

24      Q.   Talk to us about the day of November 22,

25   2016.  What happened that day?

```
 1        A.    SWAT, multiple agencies kicked down my door,
 2   and I was arrested.
 3        Q.    Were you home?
 4        A.    Yes, I was.
 5        Q.    Who else was there?
 6        A.    No one else.
 7        Q.    Where were you when they kicked down the
 8   door?
 9        A.    I was coming out from the basement.
10        Q.    What had you been doing?
11        A.    So, at the time, I was waiting for Luke to
12   get there.  He is pretty lazy, so I mass-texted his
13   phone, and then I was actually down there pressing
14   Zanax at the time.
15        Q.    Were you taken into custody?
16        A.    Yeah.  Yeah.  I was taken into custody.
17        Q.    And you have been in custody ever since then,
18   correct?
19        A.    Yeah.  Yeah.  I have been in custody ever
20   since.
21        Q.    Why didn't Luke show up that day?
22        A.    I'm assuming just dodged a bullet because
23   they came at 10:00 o'clock.  He's always late.
24        Q.    10 a.m.?
25        A.    Yeah, 10 a.m.  And so I honestly don't know,
```

```
 1    so, I mean, it was just me, so that's where they
 2    rested their hat.
 3            MR. SKORDAS:  Would this be a good time for a
 4    short break, Your Honor?
 5            THE COURT:  Yes.  We'll be in recess for
 6    about 15 minutes.
 7            THE CLERK:  All rise, please.
 8            (Whereupon the jury leaves the courtroom.)
 9            THE COURT:  This is the day, remember, I have
10    problems starting at noon.
11            MR. SKORDAS:  Very well, yes.
12            THE COURT:  I need to be gone about ten to
13    noon.  This has been a long-standing problem, but if
14    we're not done with this witness today, we'll bring
15    him -- I mean, he'll finish Thursday morning before we
16    do the instructions and closing.
17            MR. SKORDAS:  That's fine.
18            THE COURT:  Given there is no sense bringing
19    the jury in for -- it wouldn't be very long.
20            MR. SKORDAS:  Right.
21            THE COURT:  -- testimony on Wednesday.  All
22    right.
23            MR. SKORDAS:  Yes, sir.  Thank you, Judge.
24                    (Short recess.)
25            THE COURT:  Should we get the jury and
```

```
 1    proceed?

 2              MR. SKORDAS:  Yes.  We're ready.

 3              THE CLERK:  All rise for the jury.

 4              (Whereupon the jury enters the courtroom.)

 5              Please be seated.

 6              THE COURT:  You may proceed, Mr. Skordas.

 7              MR. SKORDAS:  Thank you, Judge.

 8        Q.   BY MR. SKORDAS:  Aaron, I probably should

 9    have just asked you these before the break because I'm

10    almost done.  You testified earlier, right at the

11    outset, that you have been in jail continuously since

12    November of 2016, correct?

13        A.   Yes.  That's correct.

14        Q.   Have you had occasion to have cellmates or

15    roommates who had drug problems?

16        A.   Yeah.  It's an eye-opening experience.

17    It's -- they come in and they are miserable.  They

18    look miserable.  And they are coming off.  Some of

19    them are throwing up.  I've seen an old man take a

20    crap where it hits the wall, like it's really not a

21    pretty scene.  To see it firsthand -- I mean, I was

22    never around addiction really, and so I never got to

23    see anything like that, and so seeing someone go

24    through the struggles was really intense.

25              I mean, a lot of them are abusing meth.  A
```

1    lot of them are abusing heroin.  And it's just -- they

2    are sucked up.  They are a hundred -- I mean, these

3    guys should be 180 pounds, and they are 120, 130, and

4    they are coming in.  And when they are coming to jail,

5    they are finally getting the nutrition that they need.

6    As far as heroin, they are either sick, their body has

7    gotten so used to it in taking it so long and

8    increasing the doses, that they just -- you know, when

9    they drop off -- I mean, I don't want to publicly, you

10   know, shame the jails I was at, but, you know, they

11   kind of give them a Gatorade and say:  Well, all

12   right, you know.

13         It's kind of like, so, they are just left

14   there, like just miserable.  And, you know, and then

15   watching this, like, Dude, it's horrible.  And I ask

16   them, you know, simple questions, because I, you know

17   I'm like:  Why?  Why do you do this?

18         You know, and they can't really give me a

19   straight answer, and I kind of see that it just takes

20   over their life.

21         And you just don't see that when someone

22   orders something.  They praise it.  A guy here, you

23   know, it's excellent.  You're the best.  Like, you

24   know, my doctor pulled me off of this.  I didn't know

25   what I was going to do.

1    And so you don't see the ripple that it has

2 on these people and families that come in and they are

3 just so frustrated with these individuals. And I'm

4 trying to talk to them because it's so simple, like

5 obviously this isn't working, you know, like, it's

6 just so basic. Why don't you just do something

7 different? And you're so miserable in jail that, you

8 know, it's just like: God, this sucks. It's like

9 you're just sitting there, like you're eating crappy

10 food, you're not with your family.

11    And then they're just talking about, like,

12 when I get out, like, man, it's going to be so nice to

13 just, you know, have a relief because it's just like a

14 horrible process.

15    And you just watch people just jump right

16 back into it, or they have a speech of like: I'm

17 never coming back. I'm never going to go do it again.

18    And you see them weeks later. They are like:

19 I just wanted to get high one time.

20    And I got to see the struggle, and it's just

21 brutal to see what they are doing and to see such --

22 you know, when I got into it, you know, people would

23 message me back and forth, and, you know, it was -- it

24 went from what I thought was a blessing of, you know,

25 I can't get prescribed this because, you know, I'm a

1    lawyer and they could take it as a judgment call, you

2    know.

3        Or I can't get prescribed this because, you

4    know, whatever this says, you know, and if people

5    don't have insurance, it's a high cost.  Or like, you

6    know, going through the doctor, the psychiatrist.  My

7    parents, you know, I was blessed that they are able to

8    help walk me through the process, and, you know, I was

9    on their insurance until 26.

10       And so, at the beginning, it was, you know,

11   we could have Ambien.  We could have Adderall, and so

12   if they needed just, you know, maybe this is something

13   for them that they could try.  And, you know, it's

14   outside of, you know, the controlled process that it

15   seemed like -- it seemed like a good idea.  It was a

16   win-win situation.  It was something that they could

17   benefit from.  And, you know, I felt like I was doing

18   something positive, you know, even -- yeah.

19       So, to answer your question, seeing firsthand

20   completely changed -- completely changed my mind.  You

21   know, afterwards the opioid epidemic hit and the

22   broadcasting, the gruesome effects of what happens,

23   because before, it was just, you know -- it was just,

24   you know, this is a prescribed pain killer.  This is

25   what companies are making.  It's okay.  It's -- sorry

1    to lose it, but, you know, it's one of the worst life

2    lessons.  And it's not okay, you know.  I'm seeing

3    it's enabling something that, as I would tell people

4    so often, it's not working.

5            Anyhow, so I got to see, you know, them

6    coming off the streets or, you know, people that came

7    from, you know, they're in a company or a huge

8    baseball player, it doesn't matter who, and they hit

9    rock bottom, you know.  And I have seen that

10    firsthand.

11            MR. SKORDAS:  That's all I have, Your Honor.

12            THE COURT:  Thank you, Mr. Skordas.

13            You may cross examine.

14            MR. GADD:  If I could have just two minutes.

15    Thank you.  My hope is taking that couple minutes will

16    mean I'm up here for less time.

17                    CROSS EXAMINATION

18    BY MR. GADD:

19        Q.   Good morning.

20             THE COURT:  Speak up.

21        Q.   BY MR. GADD:  Good morning.

22        A.   Good morning.

23        Q.   Let's start with an easy one.  You have a

24    password you like to use, Molly Dog, right?

25        A.   Yeah.

1     Q.  And it's not that you were referring to the

2  drug Molly, right?

3     A.  Yeah.

4     Q.  You were referring to an actual dog?

5     A.  Yeah.  My pet growing up was actually a

6  golden retriever who was named Molly.

7     Q.  It's just a coincidence that you were later

8  using Molly, correct, or MDMA?

9     A.  Yeah.  The name came later down the line, you

10  know.  Rappers kind of do that, so, yeah.

11     Q.  Sure.  Let's try another one that I hope will

12  be an easy one for you.  Could we look at Exhibit

13  14.38.  Do you remember seeing this?

14     A.  Yeah.  I remember seeing it here in court.

15     Q.  So, Ms. Laughter, if you can just give us the

16  chart, if you can call that up.

17     So this is the potency chart that was found

18  on your computer, along with all the other passwords

19  that were some variation of Molly Dog.  This chart was

20  useful, right?

21     A.  Yeah.  There was a lot of prescriptions

22  there.

23     Q.  And I mean useful because you were trying to

24  stick Fentanyl in a pill that you were marketing to

25  look like you Oxycodone.  You needed something like

```
 1    this, right?
 2         A.   I mean, yeah, really the chart wasn't really
 3    helpful, but, I mean, I see where you're going with
 4    it, yeah.
 5         Q.   Not as helpful as the it could have been
 6    because you had some other issues at play, right?
 7    It's not like exact science, right?
 8         A.   Yeah.
 9         Q.   You remember Special Agent Jeff Bryan, the
10    retired DEA agent.  He talked about your process, and
11    he made a comparison to like making chocolate chip
12    cookies.  Do you remember that?
13         A.   Uh, yeah.
14         Q.   You remember too many chocolate chips go into
15    a cookie and somebody ends up dead.  Do you remember
16    that?
17         A.   If he said that, okay.
18         Q.   This was for you to try to figure out how
19    many chocolate chips to put in your cookies, right?
20         A.   I mean, really the chart wasn't really
21    useful.  It was -- I guess what you're kind of leaning
22    on is, we started on, you know, a super low dose, and
23    we, you know, gave it to Chris.  And he had, you know,
24    said:  Okay, let me test it.
25              And then he's -- from there he's like:  A
```

```
 1    little bit stronger.  A little bit stronger.
 2            So it wasn't really --
 3       Q.   You kind of walked it up, right?
 4       A.   Yeah, so it kind of walked up from that
 5    point.
 6       Q.   By the end, do you remember how much Fentanyl
 7    you were putting in each pill?
 8       A.   I don't.  I know the ball park range.
 9       Q.   Go ahead and tell us.
10       A.   It's about a milligram.
11       Q.   The other problem you had with making these
12    cookies is how pure the chocolate was, right?  I mean,
13    you're not getting your Fentanyl from a pharmaceutical
14    company, right?
15       A.   Well, it --
16       Q.   Right?
17       A.   Yeah.
18       Q.   Let's look -- here.  I'll show you.  Let's
19    look at Exhibit 301.
20            And then if you could highlight the top for
21    us there.  So this is one of those packages that we
22    seized, the test results from, right?
23       A.   Yeah.
24       Q.   This is the Mausia package from the middle of
25    November?
```

```
 1        A.    Uh-huh.
 2        Q.    Do you see the substance purity line there?
 3        A.    I do see that, yes.
 4        Q.    80 percent?
 5        A.    Yeah.
 6        Q.    That's how pure the chocolate is in your
 7   chocolate chip cookies, right?
 8        A.    Uh-huh.
 9        Q.    What happens when you get one that's 50
10   percent?
11        A.    Obviously the effects aren't going to be as
12   great.
13        Q.    Customers complain?
14        A.    Yeah, sure.
15        Q.    You've got to change your recipe?
16        A.    I mean, you have to hear more than one ear,
17   but, I mean --
18        Q.    Yeah.  One complaint is not enough, but if
19   you get a bunch of complaints, they are saying this
20   whole batch of chocolate chips aren't any good, you're
21   going to have to change your recipe, right?
22        A.    Yeah, but through the whole thing, it was
23   pretty consistent.  There was never anything -- it was
24   always -- I mean, we would get advice to put it up,
25   and I would say:  Just keep it where it's at or tailor
```

1    it down.  It's not one of those things we really

2    wanted to push the envelope on.

3        Q.   You say it was consistent, but you didn't

4    have the ability to test for purity levels, did you?

5        A.   No, we did not.

6        Q.   At one point, you reached out to a company to

7    see if they would do GCMS testing for you, but nobody

8    was willing to test your Fentanyl pills, right?

9        A.   No.  We never asked.

10       Q.   You needed constant feedback to try to get a

11   sense for not only how many chocolate chips were going

12   in your cookies, but how strong the chocolate was,

13   right?

14       A.   Yeah.

15       Q.   Constant feedback?

16       A.   It wasn't that we needed it, it was just

17   always at hand.

18       Q.   You tested your MDMA pills before you used

19   them?

20       A.   Yes.

21       Q.   And you talked about how you had a color

22   test.  I think you called it a Marquis test, right?

23       A.   Yeah.

24       Q.   And if you put a little bit in, shake it up,

25   see what color it is, that will tell you roughly what

1    the active pharmaceutical ingredient is, right?

2         A.   Yeah.  Eyedroppers.  So you would put it on a

3    clean plate and it would color on -- yeah.

4         Q.   Were you doing that for your Fentanyl as

5    well?

6         A.   Yeah.  We would make sure that, coming in,

7    Fentanyl was the actual ingredient.

8         Q.   And your customers down the line, were they

9    testing it?

10        A.   I honestly am not sure.

11        Q.   Let's look at Exhibit 14.44.  We can stay

12   here on the first page.  Do you recall this?

13        A.   Just my computer's Google search.

14        Q.   Right, Google searches from your computer,

15   but not all of them?

16        A.   Yeah.

17        Q.   You know better than anyone how many times

18   you searched things?

19        A.   Uh-huh.

20        Q.   Were you surprised when you heard testimony

21   that it was thousands of searches?

22        A.   No.  I mean, I'm a closet nerd.  I mean, if

23   you have any question, you know, Google is there.

24        Q.   And that's how you learned a lot of this,

25   right?  I mean, you learned by research?

```
 1        A.    Trial and error, yeah.

 2        Q.    Sure.  You see the right column, third one

 3   down?

 4        A.    Which one?

 5        Q.    Do you see it now?

 6        A.    The third one down?

 7        Q.    Uh-huh.

 8        A.    Naloxone?

 9        Q.    Yeah.

10        A.    Okay.

11        Q.    Did you buy it?

12        A.    No.

13        Q.    You thought about buying it?

14        A.    Sorry?

15        Q.    You thought about buying it?

16        A.    I mean, again, it could have just popped up

17   as one of the Google searches.  A lot of things auto

18   populate and so a lot of, you know, what I was doing

19   is, I mean, you can see just on the top one there is

20   Clonazepam, you know, and so there's a lot of

21   research.

22        Q.    Clonazepam is a benzo?

23        A.    Yeah.  And so that's a benzo --

24        Q.    Naloxone.

25              THE COURT:  Let him finish his answer before
```

1   you question.

2         Q.   BY MR. GADD:  You go ahead.

3         A.   I can't even tell you what Naloxone is, to be

4   honest.

5         Q.   But you visited the website.  You went to

6   stopoverdose.org.

7         A.   Yeah.  You definitely hand-picked selected a

8   few websites that I visited.

9         Q.   There was many, wasn't there?

10        A.   Yeah.  I mean, there was a lot of video games

11  I searched.  I would watch Twitch TV, and my computer

12  was openly available, so if any search needed to be

13  done, you know, it could be done.

14        Q.   You watched the DEA video that talked about

15  the dangers of Fentanyl and the need to have Naloxone

16  present?

17        A.   Uh-huh.

18        Q.   And you heard from Dr. Hale.  She talked

19  about Naloxone, sold as Narcan, N-a-r-c-a-n.  You

20  watched a 50-minute-long video made by VICE, where you

21  learned about the dangers of Fentanyl, where you

22  watched addicts shoot up.  And that's why you searched

23  it, isn't it?

24        A.   It was being advertised.  I think it just

25  came out, and it was kind of around the time -- I

1    mean, I'm pretty sure it was around October.  It was

2    kind of -- like, it was a new thing.  I mean, Fentanyl

3    was, I mean, before, just a research chemical.  So,

4    the only thing I knew was it was just, you know, just

5    like a pain killer.  And so, yeah, Naloxone came out

6    around that time.  I was looking at, you know, what

7    the mark was.

8        Q.   And you were worried.  You know, you had

9    powdered Fentanyl in your home.  You were using it in

10   a pill press.  There's a risk, right?

11       A.   I mean, this sounds kind of dumb, but, I

12   mean, we didn't really think of the risk.

13       Q.   You had a mask.  You wore gloves.  There's

14   gloves on your shelves.  You were worried about the

15   risk, right?

16       A.   Yeah.  We were also wearing gloves.  The mask

17   kind of made your face sweaty, so it was one of those

18   things we sometimes wore, but I guess, to be honest,

19   it's just like the agent said, you know, what we came

20   to understand is when it's airborne and so if it's in

21   the air.  So everything -- you know, even when Luke

22   would pour it, I remember him saying that he would

23   hold his breath and go ahead and do the process.

24       Q.   So you knew it was a danger when it was

25   airborne?

```
 1        A.   I mean, just like anything.  I mean, you
 2   know, if there's a ton of Zanax in the air, it's like,
 3   you know, that's -- you know, it can't be good.
 4        Q.   It's going to make you feel relaxed if
 5   there's a ton of Zanax in the air?
 6        A.   Yeah, sure.
 7        Q.   And if there's a ton of Fentanyl in the air?
 8        A.   Yeah.  Then that's something to be
 9   considered.
10        Q.   You're going to go sleep, aren't you?
11        A.   Yeah.
12        Q.   And you may not wake up, will you?
13        A.   Yeah.  Too much of the chemical, yeah.
14        Q.   Let's talk for a minute about your
15   motivation.
16        A.   Uh-huh.
17        Q.   You indicated greed was a motivation?
18        A.   Yeah.
19        Q.   A love of money was a motivation?
20        A.   Uh-huh.
21        Q.   There's probably more to it than just that,
22   though, isn't there?
23        A.   Yeah.  I mean with money comes a lifestyle.
24   You get accustomed to things.  It's hard to break off
25   of.  There is a saying in jail where it's like if you
```

```
 1    drive a BMW, you can't go back to a Toyota.  It's
 2    just, you know, and so you kind of get accustomed to
 3    things and, you know, how things are going, and, you
 4    know, at the time I thought money was really important
 5    in life.  It, you know, defines someone.
 6        Q.   You say "accustomed," but that's not the word
 7    you used when you told your mom.  You said "addicted"
 8    to her.  Do you remember that?  You told her that's
 9    what you were addicted to.
10        A.   Yeah, sure.
11        Q.   A lifestyle?
12        A.   If there's an alcohol anonymous or if there's
13    a money anonymous, I'd definitely sit down and, you
14    know, be present at the meeting.
15        Q.   Let's look at 14.19.  And if we could go to
16    the second page and then call up the last box.
17             These are notes that you typed in.  This is
18    from January 1, 2016.  You see starting in the body,
19    you wrote this to yourself?
20        A.   Yeah.
21        Q.   "Love you Shamo.  You're such a great guy and
22    everyone loves you, LOL.  Today is the first day of
23    2016.  Let's do it right.  I will over achieve.  I
24    will overcome, and I will be F'ing rich.  Every girl
25    will love me.  They will want me.  They will need me.
```

1   Focus.  Every small detail matters.  I want that girl

2   from Snow Globe to like me.  She will love me.  She

3   doesn't know it yet, but she will be obsessed with

4   me."

5           "Life is great.  Life is amazing.  I honestly

6   can't wait to live it.  Gonna make 250 K in the next

7   few months easy."

8           That's what you wrote?

9       A.   Yeah.  I was pretty big on The Secret.  So, I

10  mean, you know, at the time I wasn't feeling like such

11  a great guy, so I was saying it.  You know, it's

12  almost like hoping that it's going to be.

13      Q.   Is that why you pay people in jail to say

14  these things to you?

15      A.   I mean, jail is a pretty awful place.

16      Q.   That's not how you described it in your phone

17  calls.  Do you remember your first video chat with

18  your girlfriend Ellie?  Do you remember what you told

19  her about jail?

20      A.   Yeah.  I'm pretty sure it's probably

21  something.  I think I remember being energetic,

22  bouncing off the walls.

23      Q.   It's like living in a college dorm.  Do you

24  remember saying that?

25      A.   Yeah, sure.

1       Q.   It's like having a bunch of roommates.  We

2    stay up 'til, like, 4 a.m. playing cards, sleep in,

3    bunch of cool guys.

4          Do you remember that?

5       A.   Yeah.  She was going through a rough time as

6    well as I was, so it's like, if I'm not strong, how

7    can she be strong?  And, to be honest, I was really

8    hoping to hang on to her, and just over the years it

9    just completely deteriorated.

10      Q.   Circling back on this idea of motivation.

11   Greed was certainly a motivator, but you had something

12   to prove, didn't you?

13      A.   Yeah, in a sense, like, I mean, prove to my

14   friends that, you know, I was as good a friend as they

15   wanted me to be, sure.

16      Q.   Oh, no.  You had something to prove about

17   your potential, right?

18      A.   I mean, when you're saying all these really

19   great, positive things, yeah, that does sound good.

20      Q.   You had something to prove to your family,

21   right?

22      A.   Sure.

23      Q.   When you talked about Luke Paz pressing Zanax

24   in the early days of his involvement, you described it

25   as he had -- he was putting forward sweat and tears,

1    and you went on to say that he wasn't making a lot,

2    but then you kind of took a pause and said:   I mean,

3    it was still a substantial amount of money.

4         But I don't think we ever heard you say how

5    much was he making in those early just Zanax days?

6    What was that substantial amount of money?

7         A.   I mean, we're talking just a few thousand

8    dollars, like it's -- I guess substantial is just

9    outside of what you're normally making at a normal

10   job, I guess.

11        Q.   I think we can agree on that definition.

12   Let's talk about your lifestyle.  There's been some

13   testimony about your trips to Las Vegas?

14        A.   Yeah, sure.

15        Q.   You liked to go to Las Vegas?

16        A.   Yeah.  It became something of a routine with

17   the friends I was with, yeah.

18        Q.   And it was routine?

19        A.   On occasion, yeah.

20        Q.   Routine means frequently, right?

21        A.   Yeah.  I mean, we -- I guess we would always

22   find the excuse or someone would find the excuse to

23   go, so, yeah we went.

24        Q.   Your employees got annoyed that you were gone

25   so often, didn't they?

```
 1        A.    I mean, there was always groaning in a lot of
 2   places, yeah.
 3        Q.    Do you remember at one point telling your mom
 4   that you did some damage to your wallet in Las Vegas?
 5        A.    Yeah, sure.  I mean, you take $5,000 and you
 6   leave empty-handed.  You know, it's kind of -- it's
 7   not a good feeling.
 8        Q.    Did you say 5,000?
 9        A.    Yeah.
10        Q.    And sometimes it was more?
11        A.    I mean, sometimes it -- it went a little
12   upwards, but I mean it just depended.
13        Q.    Sure.  And on March 22 of 2016, you told your
14   mom it was 7,000 on that last trip.  That was
15   possible, right?
16        A.    Sure.
17        Q.    You wouldn't have had a reason to lie to your
18   mom, would you?
19        A.    No.
20        Q.    You had Ms. Gabby Noriega look into real
21   estate you while you were on a trip to Puerto Rico?
22        A.    Yeah.
23        Q.    You liked Puerto Rico?
24        A.    It was beautiful, yeah.
25        Q.    You thought you might want to buy a home
```

1    there?

2        A.   Sure.   Yeah.

3        Q.   A beach house.   One there and one in Mexico,

4    right?   That was the plan?

5        A.   I wouldn't say Mexico.   I only went there

6    once.   It wasn't really something I was looking at.

7        Q.   But you did say Mexico to Gabby?

8        A.   I mean, if I threw out the suggestion, sure I

9    could own up to it.

10       Q.   And you also asked her to look at some of the

11   islands in the Caribbean, correct?

12       A.   At the time, we were just on a cruise and so

13   we went out to several of the islands and then we

14   stopped right at Puerto Rico, and it was just kind of

15   the one trip, and I was really amazed how, I mean,

16   different it was, you know, inland of America to, you

17   know, something so, I guess, different.

18       Q.   And you had a million dollars in your

19   dresser, and you had to spend it on something, right?

20       A.   Sure.

21       Q.   We talked a little bit about Luke Paz's money

22   from Zanax.   Let's take a minute and talk about Drew

23   Crandall's money in 2016.   So he leaves end of 2015,

24   right, November, 2015?

25       A.   Uh-huh.

1      Q.   And then, in 2016, that's the year you were

2   arrested.  Let's talk about that year.

3      A.   Yeah.

4      Q.   You indicated that it was sometimes safer to

5   send money just directly from your AlphaBay wallet to

6   Drew, right?

7      A.   Yeah.

8      Q.   Because AlphaBay used a tumbler?

9      A.   Yeah.

10      Q.   You've heard testimony from these agents that

11   they could see the transaction go from your AlphaBay

12   wallet to your wallet?

13      A.   Okay.  I mean, that would make sense.  They

14   used a tumbler from AlphaBay.  I don't know how it

15   works, but I mean --

16      Q.   And everyone thinks that they had a tumbler,

17   right?  I mean, you didn't just make that up, right?

18      A.   No.

19      Q.   It's on Readit, or was at the time?

20      A.   Yeah.

21      Q.   AlphaBay was taken down.  You knew that,

22   right?

23      A.   Yeah, sometime they were.  When I was in jail

24   I learned that.

25      Q.   Would it surprise to you learn that they

1  actually didn't use a tumbler?

2      A.   Yeah.  It kind of would.

3      Q.   These agents testified they could see it go

4  from your AlphaBay wallet to your wallet, on HMO.  How

5  could they see that with a tumbler?

6      A.   I'm not too tech savvy, so I don't know.

7      Q.   This is your part of the organization,

8  though.  You're the you BitCoin guy.  You're the Dark

9  Web guy.  You searched Tumblers, MultiBit,

10  Mimblewimble.  You searched them all.  You had Readit

11  posts where you were looking at whether or not --

12          MR. SKORDAS:  I object.  This isn't a

13  question.  This is counsel testifying.

14          THE COURT:  What's the question?

15      Q.   BY MR. GADD:  Again, would you be surprised

16  to learn that AlphaBay did not use a tumbler?

17      A.   Yeah.  Absolutely.

18      Q.   So now, let's talk about Drew Crandall's

19  money.

20      A.   Uh-huh.

21      Q.   How much did you send to him in 2016?

22      A.   I honestly couldn't tell you.  Things were

23  obviously moving pretty fast.  I mean, you saw from

24  even Gabby's timeline, when, you know, you threw up a

25  text, and it's like:  Oh, you know, you should have

    1    got me money last week.
    2         Why didn't you tell me?  You know, so I
    3    couldn't put a number on it.
    4         Q.   Yeah.  I remember that part.  It was October,
    5    right, 2016?
    6         A.   Uh-huh.
    7         Q.   Do you remember November 8, 2016, you put
    8    $2700 in Drew's account?
    9         A.   Sure.  That sounds about right.
   10         Q.   That would have been his bi-weekly wage,
   11    right?
   12         A.   It's what he asked me to do, yeah.
   13         Q.   Did you ever send a hundred-thousand dollars
   14    to him?
   15         A.   Well, he didn't need a hundred-thousand
   16    dollars.
   17         Q.   Let's talk for a minute about blame.  Did you
   18    testify that it was Ms. Tonge and Ms. Bustin's fault
   19    that you transitioned from the one and the ten and the
   20    hundred-pill orders to the hundred-thousand,
   21    ten-thousand-pill orders?
   22         A.   I won't say fault.  But I know that's how you
   23    look at things.  It was definitely a group decision.
   24    I mean, it's something that, you know, I'm trying to
   25    own up to what I do, so I contributed to that as well.

1    I mean, I didn't have any objections at the time.  No

2    one was, you know, screaming, "stop."  You know,

3    everyone was benefiting.

4        Q.   And was it Chris Kenny's fault that you

5    decided to sell fake oxycodone?

6        A.   If there is one entity that would be removed,

7    then, yeah, we would have never ever gone in that

8    direction.

9        Q.   And was it Chris Kenny's fault that you

10   stuffed those fake Oxycodone pills with Fentanyl?

11       A.   Off of his suggestion, I guess that's true.

12       Q.   And was it Luke Paz's fault that he was lazy

13   and running late on November 22, and that's why some

14   hat got rested on you?  Is it Luke's fault?

15       A.   Well, that's what I have been telling myself

16   for the last couple of years in jail, sure.

17       Q.   Was it also Luke's fault that your volume of

18   sales went up?

19       A.   No.  I mean that's, you know, the website's

20   doing.

21       Q.   Was it Luke's fault that you got faster

22   machines?

23       A.   I mean, it was a contributing decision, sure.

24       Q.   Was it Drew Crandall's fault that you started

25   pressing Zanax in the first place?

1      A.   That I would probably say was true, yeah.

2      Q.   And your package receivers or you called them

3 drops, was it their fault for receiving packages?

4      A.   It was a choice.

5      Q.   They were never asking for it?

6      A.   Well, yeah, they approached me.

7      Q.   Everyone approached you?

8      A.   Pretty much towards the middle or end, every

9 single person approached me.

10      Q.   You never reached out to anyone to ask them

11 to be a drop?

12      A.   Well, of course, at the beginning that's what

13 we did is we reached out to a few, yeah.

14      Q.   And towards the middle and towards the end?

15      A.   I mean, at that point, it wasn't so much that

16 we needed it.  It was just people were willing to do

17 it.

18      Q.   Everybody wanted more money.  It was their

19 fault that this thing took off?

20      A.   Sure.  Myself included.

21      Q.   And where did that money end up?

22      A.   Well, in your hands.

23      Q.   $1.2 million was found in your sock drawer,

24 right?

25      A.   Yeah.

1     Q.   Almost a half million dollars was in your

2  parents' closet, right?

3     A.   That's correct.

4     Q.   More than 500 BitCoin has been identified,

5  accessed and seized from wallets in your sole

6  possession and control, right?

7     A.   Yes.  That's correct.

8     Q.   There would have been more money had your

9  lifestyle been different, right?

10     A.   I mean, it depends at the point when you're

11  talking about.  There's times when, sure, I would

12  definitely spend.

13     Q.   We talked about Vegas.  We talked about

14  Puerto Rico, a trip to Tahoe, right?  You took a trip?

15     A.   Yeah, we drove to Tahoe.

16     Q.   California --

17     A.   Yeah we've --

18     Q.   -- on the beach?

19     A.   -- been there a handful of -- you know.

20     Q.   Spring break in Mexico?

21     A.   Yeah.  Again, we drove down.

22     Q.   You liked to go to clubs?

23     A.   Well, it's kind of moved to -- a lot of the

24  music is going into the clubs.  There's not so much

25  concerts, so, yeah, concerts.

1    Q.    Concerts?    Clubs?

2    A.    Yeah.

3    Q.    You wouldn't just go to clubs, though, you

4    wanted to buy a table at the club, right?

5    A.    So, depends who's playing, of course, and

6    depends if, you know, there's going to be a group of

7    us, as friends.  As a friend group, we had a pretty

8    tight-knitted friend group.  If we were all going to

9    be there, it seemed only logical to do that.

10   Q.    Tables are a status symbol, right?

11   A.    It's a little bit away from the crowd.  You

12   get some space.  So, sure.

13   Q.    It's a status symbol, right?

14   A.    I mean, yeah, you could look at that.

15   Q.    All those trips, the concerts, tables, bottle

16   service, that was all paid for with drug proceeds,

17   wasn't it?

18   A.    Just about, yeah.

19   Q.    Could we look at 17.06.  Let's take a minute

20   on the second row here.  You talked about your

21   tight-knit group of friends, your friends that would

22   go to the club with you, friends that would chip in on

23   the table or sit at your table when you bought it?

24   A.    Uh-huh.

25   Q.    Mr. Noble is not one of the cool kids, is he?

1     A.   He was there.

2     Q.   You would invite him?

3     A.   Yeah.  Of course I would.

4     Q.   Make him feel good?

5     A.   Yeah.  He was a friend.

6     Q.   He wanted to spend time with you.  He's not

7  one of the cool kids, is he?

8     A.   To be honest, the two on the bottom, Roy

9  Stephans and Perry, they really didn't really care for

10  him too much.  He would take a bit of Molly and get

11  really sweaty, and then he would try to have a bro

12  moment, but, you know, I always -- I always let him

13  there.  I mean, he was a friend.  I wouldn't let the

14  other friends just kick him off for no reason.

15     Q.   You kept him under your wing?

16     A.   Yeah.  We were friends.

17     Q.   Drew Crandall, kind of the same way, isn't

18  he?

19     A.   I have known Drew for a long time, yeah.

20     Q.   The cool kids didn't like Drew, did they?

21     A.   There was definitely conflictions.  Luke

22  didn't like Drew.  Actually, I mean, a lot of them,

23  like Mike.  Mike and Drew never got along, so, yeah,

24  there's always conflictions.

25     Q.   Sean Gygi, not one of the cool kids, right?

1    A.   Well, he was Drew's friend.  I only would see

2   him at the clubs and stuff, and, you know, since he

3   was Drew's friend, we would invite him in, say:  Hey,

4   come have a drink with us, you know, and we could fist

5   bump together.

6    Q.   Take him under your wing?

7    A.   Yeah.  We were spending time together.

8    Q.   Were Ms. Tonge and Ms. Bustin ever cool

9   enough to hang out at your table?

10    A.   Absolutely.  I invited them every time.

11    Q.   And the cool kids, did they like Ms. Tonge

12   and Ms. Bustin?

13    A.   It wasn't so much of a say.  I mean, they

14   were more of a stay-at-home, watch a TV show, because

15   trust me, I would try to get them out.

16    Q.   But they liked you, right?  They wanted to be

17   your friend?

18    A.   Sure, we're all friends.

19    Q.   Let's talk about amounts.  You've seen our

20   chart, right, feed-back linked sales.  You know how

21   many pills were at least recorded in the feedback,

22   right?

23    A.   I'm assuming so.

24    Q.   But there were more pills, Fentanyl pills

25   than just those, correct?

1       A.   I have no idea.

2       Q.   You had the auto-feedback pills that don't

3  show up in our rows of feedback that you sold to those

4  people as well, right?

5       A.   I couldn't tell you.

6       Q.   You sold off line.  And by that, I mean to

7  Mr. Kenny, right?

8       A.   Yeah.  That was the initial.

9       Q.   If you had a bad batch, you would have to

10 reship pills, right?

11      A.   I mean, reships often on multiple occasions,

12 but not a bad batch.

13      Q.   Or for some other reason?

14      A.   Yeah.  For whatever reason.

15      Q.   You would have to reship those pills?

16      A.   Sure.

17      Q.   So let's you and I talk about totals.  How

18 many pills did you sell to Chris Kenny?

19      A.   I couldn't tell you.  It depends the week.

20 One month I'm dropping off, you know, 5,000 Xanax

21 bars, and then he's asking for 500 Roxy's, or it could

22 be later in 2016, he's asking for a thousand.  I mean,

23 it just -- I couldn't tell you.

24      Q.   Did you ever take him 10,000?

25      A.   I have no idea.

1    Q.   You would be the one to deliver, right?

2    A.   Yeah, sure.

3    Q.   You didn't count the pills before you

4 delivered them?

5    A.   No.  I never counted the pills.

6    Q.   Weigh them out?

7    A.   Yeah.  Luke would actually weigh them out.  I

8 would throw them in a gym bag, and the way the

9 exchange happened was basically gym bag for cash, but

10 he was always behind.

11    Q.   You would have to keep track of how many

12 pills you gave him, right?

13    A.   As a rough idea, sure.

14    Q.   That's how you know how much money he owes

15 you, right?

16    A.   Well, it's also on a -- once you get to that

17 point, it's really a trusting situation, so, yeah.

18    Q.   Which is all the more reason to keep records,

19 right?

20    A.   I mean, it would have been a smart idea to

21 have a record, yeah.

22    Q.   You kept records, right?

23    A.   Unfortunately, no.  I didn't keep records on

24 that.

25    Q.   You have notes where you write things like:

```
 1    Chris owes 95 K.
 2             You have seen that, right?
 3        A.   Yeah.  I was venting in a journal and needed
 4    to keep it on top of my head.
 5        Q.   Or you might forget?
 6        A.   Yeah.  Sure.
 7        Q.   So how many pills do you think you sold Chris
 8    Kenny?
 9        A.   I honestly have no idea.
10        Q.   How much money do you think he gave you?
11        A.   I mean, to be honest, everything happened so
12    fast, it gets to a point when everything is pretty
13    much a blur.  It's -- you don't even know -- I mean, I
14    couldn't even tell you, like, even the agents that
15    stopped at my house, they would ask, you know:  So is
16    there any money in the house?
17             Yeah.  There's money.
18             Well, how much money?
19             And an honest guess would have been, I think
20    around 700,000.  And for you to tell me 1.2 million is
21    like, I guess, I had, you know, 1.2 million in the
22    house.  I guess that's what it was.
23        Q.   You were making so much money you couldn't
24    keep track of it?
25        A.   I mean, things -- it wasn't so much, it was
```

1    just there was no track.

2         Q.   You had two money counters, and you couldn't

3    keep track of it?

4         A.   Well, one was pretty crappy, so, I mean, just

5    like anything, you want to get something a little bit

6    nicer that doesn't stick.

7         Q.   Do you feel any remorse other than for

8    getting caught?

9         A.   Of course I feel remorse.  Around the time --

10   I mean, let's say, if we had the media spree of opioid

11   epidemic, I would have ceased immediately.  It's --

12   you know, it's an eye-opening experience.  It's -- I

13   wasn't aware.  To me, addiction was -- you know, I

14   used cocaine sometimes, and, you know, it's something

15   I could pick up and put down.  It was my understanding

16   that cocaine is addicting so, you know, this chemical

17   is something of addiction, and I didn't know of what

18   degree.

19        Q.   Do you feel any remorse that your actions

20   furthered other people's additions?

21        A.   Yeah.  From seeing it firsthand, it -- I

22   mean, I testified earlier about it.  It's really a sad

23   situation.

24        Q.   And you fell like you were just trying to

25   help.  I think that's what you said, isn't it?

```
 1        A.   Yeah.

 2        Q.   People couldn't get these prescriptions

 3   anymore from their doctor, and you were there to help

 4   them?

 5        A.   Yeah.  And in the messaging system, that

 6   happened on multiple occasions, where they said they

 7   are in a panicky state and they didn't know what to

 8   do.

 9        Q.   You were just trying to be a friend?

10        A.   Yeah.

11        Q.   Can we look at 783.

12             That guy just needed a friend?

13        A.   Well, when things --

14             THE COURT:  What's the question?  That wasn't

15   a question.

16        Q.   BY MR. GADD:  Did that guy just need a

17   friend?

18        A.   He might have a lot of friends, assuming from

19   the pill count.  I don't know.

20             MR. GADD:  Nothing further.

21             THE COURT:  Thank you, Mr. Gadd.

22             Redirect, Mr. Skordas?

23             MR. SKORDAS:  I'm sorry, Judge.  Nothing

24   further.

25             THE COURT:  Thank you.  You may step down,
```

```
 1   Mr. Shamo.

 2           And you rest?

 3           MR. SKORDAS:  Yes, Your Honor.  Defense

 4   rests.

 5           THE COURT:  Ladies and gentlemen of the jury,

 6   you're free 'til 8:30 on Thursday morning, where you

 7   will receive the instructions from the Court and

 8   listen to the closing arguments of the lawyers and

 9   then begin to deliberate.

10           Don't talk to anyone about the case, read,

11   listen, watch anything about it.  Don't let anyone

12   talk to you about it.  And we'll see you at -- have a

13   nice day tomorrow, and we'll see you at 8:30 on

14   Thursday morning.  Thank you very much.

15           THE CLERK:  All rise, please.

16           (Whereupon the jury leaves the courtroom.)

17           THE COURT:  We'll see the lawyers or at least

18   some of them from each side at 10 a.m. tomorrow

19   morning.  Nobody else needs to be here.

20           MR. GADD:  Thank you, Your Honor.

21           THE COURT:  Unless they want to sleep through

22   an instruction conference.  At 10 in this courtroom.

23   Thank you.  We'll be in recess until 10 in the

24   morning.

25           (Whereupon the proceedings were concluded.)
```

```
 1

 2                    REPORTER'S CERTIFICATE

 3   STATE OF UTAH              )

 4                              ) ss.

 5   COUNTY OF SALT LAKE        )

 6

 7          I, REBECCA JANKE, do hereby certify that I

 8   am a Certified Court Reporter for the State of Utah;

 9          That as such Reporter I attended the hearing

10   of the foregoing matter on August 27, 2019, and

11   thereat reported in Stenotype all of the testimony and

12   proceedings had, and caused said notes to be

13   transcribed into typewriting, and the foregoing pages

14   numbered 1 through 104 constitute a full, true and

15   correct record of the proceedings transcribed.

16          That I am not of kin to any of the parties

17   and have no interest in the outcome of the matter;

18          And hereby set my hand and seal this 28th

19   day of August, 2019.

20

21

22

23

24          _____

25          REBECCA JANKE, CSR, RPR, RMR
```

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    **Plaintiff,**<br><br>vs.<br><br>AARON MICHAEL SHAMO,<br><br>                    **Defendant.** | **MEMORANDUM DECISION<br>AND ORDER**<br><br>**Case No.  2:16CR631DAK**<br><br>**Judge Dale A. Kimball** |

This matter is before the court on Defendant Aaron Michael Shamo's Motion for Judgment of Acquittal [Docket No. 271] and Motion to Dismiss [Docket No. 275].  The United States has filed a memorandum in opposition to the motions.  Because the time for filing replies has passed, the court considers the motions fully briefed.

<u>Motion for Judgment of Acquittal</u>

Defendant argues that the evidence presented by the United States was insufficient to sustain a conviction on Counts 1 and 6 of the Second Superseding Indictment.  When reviewing a motion for judgment of acquittal based on insufficient evidence, courts view the evidence in the light most favorable to the government and determine whether there was sufficient evidence from which a jury could find the defendant guilty beyond a reasonable doubt.  *United States v. Johnson*, 120 F.3d 1107, 1108 (10th Cir. 1997); *United States v. Hooks*, 780 F.2d 1526, 1531 n.1 (10th Cir. 1986).  Because the court reserved decision on the motion, "it must decide the motion on the basis of the evidence at the time the ruling was reserved."  Fed. R. Crim. P. 29(b).  Moreover, the court

cannot weigh the evidence or assess credibility of witnesses when determining if the evidence the United States presented was sufficient. *Burks v. United States*, 437 U.S. 1, 16 (1978).

Under Count 1, Engaging in a Continuing Criminal Enterprise, the United States presented extensive evidence of the drug organization and the roles of individual participants. The agents' initial seizures of packages, led them to straw man package drops and couriers who provided access to the organization's distribution and communication methods. When agents searched Defendant's house, he was engaged in pressing counterfeit Xanax, had a mask and gloves on him, and over a million dollars in cash. Investigators also seized his electronic devices, which included extensive information regarding Defendant's involvement in the drug distribution operation. Defendant conducted extensive internet searches related to the drug distribution organization, he emailed and texted co-conspirators with directions and oversight, and he controlled the full Pharma-Master account on AlphaBay and the Bitcoin wallets associated with it. Moreover, investigators obtained texts and emails from co-conspirators that corroborated co-conspirators' testimony regarding the individuals' roles in the organization. This evidence demonstrated that Defendant organized, supervised or managed far more than five subordinates. The seized packages and computer information related to Pharma-Master's operations on the AlphaBay marketplace also provided evidence of the scope of the operation. Furthermore, the United States presented evidence that Defendant had no other source of income. All of this evidence demonstrated that there were numerous controlled substances violations, involving Defendant and more than five of his subordinates, which generated substantial income for Defendant. Because the evidence satisfied the elements of a continuing criminal enterprise, the court properly sent Count 1 to the jury for consideration.

With respect to the sentencing factors associated with the continuing criminal enterprise count, the United States presented evidence from which a jury could conclude that Defendant was the, or one of several, principal leaders, organizers, and administrators, and the distribution of Fentanyl exceeded 12 kilograms. Viewing the evidence in the light most favorable to the United States, as the court is required to do, the United States presented evidence that Defendant started the organization with Crandall, who was only a 1/3 interest partner. Defendant bought Crandall out when Crandall left the country. Defendant then negotiated a payment structure with Paz for his role in pressing pills and converting crypto-currency to cash. Everyone testified that they negotiated with Defendant regarding their pay and level of involvement in the organization. Defendant controlled the money and made the ultimate executive decisions. Defendant did not have a boss. In addition, the packages agents seized contained more than 12 kilograms of a substance containing Fentanyl, and the orders on AlphaBay indicate that Defendant sold more than 45 kilograms of Fentanyl-laced pills. The United States also presented evidence that Defendant maintained constructive possession over his Fentanyl-laced pills even when they were stored at the shipping team's home. Therefore, the United States presented sufficient evidence to support the enhanced sentencing findings related to the continuing criminal enterprise charge, and the court appropriately sent the issue to the jury.

Under Count 6, Aiding and Abetting the Distribution of Fentanyl that resulted in Death, the United States presented evidence that R.K. obtained Fentanyl from Defendant's organization. R.K.'s roomate placed the order, the order was tracked to their address, R.K.'s friend witnessed him crush two blue pills and snort them, she heard R.K. making noises she thought was snoring, R.K. died that night or next morning, the package from Defendant's organization was in R.K.'s

3

room where he died, and Fentanyl was found in his blood during the autopsy. Dr. Stacey Hail, a

medical toxicologist, testified that R.K. would not have died but for the Fentanyl he ingested. The

other drugs and alcohol in R.K.'s system would not have caused his death. The snoring sounds

R.K.'s friend heard indicates he had the respiratory depression that precedes an opioid-caused

death. The blood and mucus on R.K.'s face also indicated respiratory depression. A jury could

have relied on this evidence to conclude that R.K.'s taking of the Fentanyl, that Defendant aided

and abetted in the distribution of, was the but-for cause of R.K.'s death. Accordingly, it was

appropriate for the court to present Count 6 to the jury for consideration. Therefore, the court

denies Defendant's Motion for a Judgment of Acquittal.

## Motion to Dismiss

Defendant moves the court to dismiss the case based on alleged prosecutorial misconduct

in violation of Defendant's due process rights under the Sixth Amendment. Defendant asserts that

the United States discouraged defense witnesses–Ana Gabriela Noriega, Miles Penrose, and Sasha

Grant–from testifying. All three potential defense witnesses appeared during trial and invoked

their Fifth Amendment rights out of concern for potential criminal exposure.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall

enjoy the right . . . to be confronted with the witnesses against him; [and] to have compulsory

process for obtaining witnesses in his favor." U.S. Const. Amend. VI. "The right of a defendant

to establish a defense by presenting his own witnesses is a fundamental element of Due Process."

*United States v. Crawford*, 707 F.2d 447, 449 (10th Cir. 1983). The defendant's right "'however,

is not absolute'; courts have held that 'a defendant's right to present a defendant does not include

the right to compel a witness to waive his [or her] Fifth Amendment privilege.'" *United States v.*

4

*Portillos*, <u>714 Fed. Appx. 889, 893</u> (10th Cir. 2017).

"That said, the government cannot substantially interfere with a defense witness's decision to testify." *Id.* "Interference is substantial when the government actor actively discourages a witness from testifying through threats of prosecution, intimidation, or coercive badgering." *United States v. Serrano*, <u>406 F.3d 1208, 1214</u> (10th Cir. 2005). "The potential for unconstitutional coercion by a government actor significantly diminishes, however, if a defendant's witness elects not to testify after consulting an independent attorney." *Id.*

In this case, all three potential defense witnesses were represented by counsel when making their decisions not to testify. The United States did not communicate with the three witnesses directly once they were represented by counsel. And, the United States did not directly engage any of the three potential witnesses in a discussion as to whether to testify or not.

Defendant claims that the United States failed to work out plea deals or immunity agreements with proposed defense witnesses. The United States was under no obligation to offer plea deals or immunity to any witness. Defendant identified 64 potential witnesses, 54 of whom were not on the United States' witness list. Although the United States offered to help work out plea deals with proposed witnesses if Defendant narrowed down the list, Defendant never identified specific witnesses for the United States and did not reduce his witness list to twelve until jury selection. By that date, the United States was not in a position to reach a plea deal or immunization agreement with the witnesses prior to their proposed testimony.

The United States worked out a plea deal with Noriega to enable her to testify, but her counsel was concerned about her criminal exposure outside of this district and for non-drug-related offenses. The United States' attempt to help cannot be considered coercive or intimidating.

5

She merely had a very cautious attorney representing her interests and she chose to follow his counsel. The United States was not obligated to work out a global plea deal that covered every potential basis for Noriega's criminal exposure. In addition, the United States' grant of immunity to Grant during her proffer interviews clearly stated that her immunity was only for those interviews. The United States was not hiding the scope of the immunity or playing games–the scope of the immunity was in writing.

Furthermore, Defendant has not shown that these witnesses would have been material and favorable to his defense. Defendant claims that Noriega's testimony would have undercut the United States' assertion that she played a major role in the drug trafficking organization as Defendant's executive assistant. But there were text messages that she could not have denied. She could not have denied that Defendant was responsible for paying her. She could not have denied the text requests Defendant sent to her. Her role in the organization appears to be quite clear in the text messages. Defendant does not claim that these texts were taken out of context. Defendant himself testified as to Noriega's role, portraying himself as a sometimes absent-minded boss, but boss nonetheless.

Defendant also claims that Penrose was unable to testify and prove that he was not engaged in money laundering and did not work at Defendant's behest. But the United States did not assert that Penrose worked or operated under Defendant's direction or supervision. He was not necessary for the jury's finding of five subordinates under the continuing criminal enterprise charge. In addition, Defendant has never made any suggestion that Penrose was the one and only principal or leader of the organization. Rather, the testimony at trial was that Penrose was an initial financial investor in the organization when Defendant and Crandall started out and that he

sold Defendant a truck at a later date. Crandall testified that Penrose was an initial investor, and Brenda Kurstin testified as to the truck purchase. Defendant did not dispute this testimony in his own testimony or on cross examination of those witness. Moreover, Defendant does not explain how or why Penrose would have been able to refute Crandall's testimony as to the initial investment or Kurstin's testimony regarding the truck purchase.

As to Grant, Defendant claims that she would have testified that Crandall never fully ended his involvement in the organization, had a continual drug habit while traveling abroad, was smart enough to keep his name off the Bitcoin wallets, and was re-involved with the organization as early as May 2016. There was substantial evidence at trial that Crandall was smarter than Defendant, that he maintained connections with Defendant while abroad when he was trying to get his full alleged buy-out, and that he used marijuana and possibly other drugs. Defendant does not explain how any of this would have changed Defendant's culpability on any of the charges. There is substantial documentary evidence demonstrating that Crandall was not a full partner, especially after he left the country. Crandall returned to do customer service work remotely and was paid less than Noble, while Defendant and Paz were making millions of dollars. Defendant never testified that Crandall was a full partner or his smarter superior, or that he never left the organization. If Grant testified to such, her testimony would not have corroborated or even be consistent with Defendant's testimony. Even those claims would not have lessened Defendant's own culpability under the CCE as one of several principal administrators, leaders, or organizers of the organization. Crandall's alleged earlier re-involvement date of May 2016 is also irrelevant to Defendant's culpability on the death-resulting charge. The fact that Defendant thinks Crandall could have also been charged with the count has nothing to do with his own charges. Moreover,

7

Special Agent Ashment read lengthy portions from Grant's interview reports. There is no suggestion that Grant would have testified differently at trial than she did during her proffer interviews. Her attorney confirmed that she would testify the same as she did in her interviews; he was only concerned that she did not have an immunity agreement for that testimony at trial. Given Defendant's access to large portions of her interview through Special Agent Ashment's testimony, Defendant has not shown that her testimony would have been material and not merely cumulative. "It is not enough to show 'the mere potential for favorable testimony' or to 'merely point to any conceivable benefit' from a witness's testimony." *Portillos*, 714 Fed. Appx. at 894.

Conclusion

Based on the above reasoning, Defendant's Motion for Judgment of Acquittal [Docket No. 271] is DENIED and Motion to Dismiss [Docket No. 275] is DENIED.

DATED this 20th day of September, 2019.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

```
In re:                   )
                         )
UNITED STATES OF         )
AMERICA,                 )
                         )
        Plaintiff,       )
                         )
vs.                      )    Case No.
                         )    2:16-CR-00631DAK
AARON MICHAEL SHAMO,     )
                         )
        Defendant.       )
                         )
_____   )
```

<u>BEFORE THE HONORABLE DALE A. KIMBALL</u>

August 23, 2019

JURY TRIAL

1

**Appearances of Counsel:**

For the Plaintiff:     Kent A. Burggraaf
S. Michael Gadd
Attorney at Law
Utah Attorney General's Office
348 E. South Temple
Salt Lake City, Utah 84111

Vernon G. Stejskal
Attorney at Law
US Attorney's Office
111 S. Main Street
Suite 1800
Salt Lake City, Utah 84111

For the Defendant:     Gregory G. Skordas
Kaytlin V. Beckett
Attorney at Law
Skordas & Caston
560 South 300 East
Suite 225
Salt Lake City, Utah 84111

Daryl P. Sam
Attorney at Law
Daryl P. Sam PLLC
5955 South Redwood Road
Suite 102
Salt Lake City, Utah 84123

Court Reporter:

Laura W. Robinson, RPR, FCRR, CSR, CP
351 South West Temple
8.430 U.S. Courthouse
Salt Lake City, Utah 84101
(801)328-4800

```
                        I N D E X
```

Examinations                                              Page

  **JONATHAN LUKE PAZ**                                        7
  DIRECT EXAMINATION                                            7
  BY MR. BURGGRAAF
  CROSS-EXAMINATION                                           121
  BY MS. BECKETT
  REDIRECT EXAMINATION                                        145
  BY MR. BURGGRAAF
  RECROSS-EXAMINATION                                         150
  BY MS. BECKETT
  **DANIEL ASHMENT**                                          151
  DIRECT EXAMINATION                                          151
  BY MR. GADD

```
                          Salt Lake City, Utah August 23, 2019
  1

  2                              (8:31 a.m.)

  3                 THE COURT:  Good morning.  Are we ready to

  4        proceed?  The jury is all present.

00:29:29  5        MR. GADD:  Mr. Burggraaf is just using the

  6        restroom so if we could wait for just one minute for

  7        him.

  8                 THE COURT:  We'll wait.

  9                 MR. GADD:  While we have that minute, could I

00:29:37 10        address the court briefly?

 11                 THE CLERK:  Court is in session.  You may be

 12        seated.

 13                 THE COURT:  Let's get everybody seated first.

 14                 MR. GADD:  I saw that the defense had filed

00:29:51 15        their written motion, um, and my plan is to respond

 16        also in writing.  I have requested a transcript of

 17        part of the hearing on May 29th.  The court reporter

 18        that day is on a trip with Judge Benson this week so

 19        I anticipate when he gets back we'll get a copy of

00:30:09 20        that transcript.

 21                 THE COURT:  All right.

 22                 MR. GADD:  As soon as I can I will respond in

 23        writing.

 24                 THE COURT:  All right.  Well, Judge Benson, I

00:30:16 25        think, is helping out up in Idaho, isn't he?
```

4

```
 1          MR. GADD:  Yeah.
 2          THE COURT:  Some of his staff are with him.
 3    Some of the jurors needs to leave today by about 10
 4    to 2, so that's when we'll be closing down today at
 5    10 to 2.
 6          MR. GADD:  That will be great.  Just as far
 7    as scheduling goes, we have just two witnesses left.
 8    I anticipate our first witness, Mr. Paz, will take
 9    much of the day, perhaps all of the day, and then
10    we'll likely rest on Monday.
11          THE COURT:  I suppose it's possible that
12    Mr. Paz would take all of today and part of Monday,
13    is that possible?
14          MR. GADD:  Possible.
15          MR. SKORDAS:  It's possible.  So are you
16    saying you have two witnesses and then you're done?
17          MR. GADD:  Yes.
18          MR. SKORDAS:  So -- and we know who they are,
19    they have been very good about articulating that.  So
20    I assume there is no chance you think that we'll do
21    both today?
22          MR. GADD:  Hope springs eternal.  I would
23    like to be done today.  I would like Mr. Paz before
24    lunch and our last witness, Special Agent Ashment,
25    after lunch.  But we'll see how many questions he
```

00:30:33
00:30:46
00:31:00
00:31:09
00:31:20

5

```
 1   gets.
 2          MR. SKORDAS:  But they're both long
 3   witnesses, very long.
 4          THE COURT:  Okay.  However long they take,
 5   you wouldn't want to start today, I assume, right?
 6          MR. SKORDAS:  With the defense case?
 7          THE COURT:  Yes.
 8          MR. SKORDAS:  We could, but I don't know that
 9   we're going to get through.
10          THE COURT:  Probably not.
11          MR. SKORDAS:  Especially if the jurors want
12   to leave.
13          THE COURT:  Yeah 10 to 2.  All right.
14          MR. GADD:  Thank you.
15          THE COURT:  Go get them.
16          THE CLERK:  All rise for the jury.
17          (Jury returns to the courtroom.)
18          THE COURT:  The government may call its next
19   witness.
20          MR. BURGGRAAF:  The United States calls
21   Jonathan Luke Paz.
22          THE COURT:  Come forward and be sworn please
23   right up here at the mic.
24          THE CLERK:  Please raise your right hand.
25                    JONATHAN LUKE PAZ,
```

00:31:34 (line 5)
00:31:44 (line 10)
00:31:51 (line 15)
00:34:23 (line 20)
00:34:50 (line 25)

6

```
 1   called as a witness at the request of the Government,

 2        having been first duly sworn, was examined

 3              and testified as follows:

 4        THE WITNESS:  I do.

 5        THE CLERK:  Please come around to the witness

 6   box here.  Please state and spell your name for the

 7   record.

 8        THE WITNESS:  My name is Jonathan Luke Paz,

 9   J-O-N-A-T-H-A-N L-U-K-E P-A-Z.

10        THE COURT:  You may proceed, Mr. Burggraaf.

11        MR. BURGGRAAF:  Thank you, Your Honor.

12                 DIRECT EXAMINATION

13   BY MR. BURGGRAAF:

14   Q.   Good morning Mr. Paz.  Thank you for being here.

15   Let's start with some preliminary information.  Where

16   do you currently live?

17   A.   In New York.

18   Q.   And how long have you lived there?

19   A.   About four months.

20   Q.   Are you currently employed?

21   A.   Yes.

22   Q.   And what -- where are you employed?

23   A.   Um, as -- I sell solar panels.

24   Q.   Okay.  And did you live in Utah prior to moving

25   to New York?
```

Timestamps (left margin):
- 00:35:02 (line 5)
- 00:35:32 (line 10)
- 00:35:38 (line 15)
- 00:35:49 (line 20)
- 00:36:02 (line 25)

7

1   A.   I did, yeah.

2   Q.   How long did you live in Utah?

3   A.   Um, I have been here pretty much my whole life.

4   Q.   Okay.  Why are you here to testify today?

00:36:14   5   A.   Um, just to come clean and tell the truth on the

6   things that I know to be true the things that I did.

7   Q.   You know the defendant Aaron Shamo; is that

8   correct?

9   A.   I do.

00:36:29   10   Q.   Is Aaron Shamo your friend?

11   A.   Yeah.

12   Q.   How and when did you first meet Mr. Shamo?

13   A.   Um, we met roughly eight years ago in Provo at an

14   apartment complex Belmont.

00:36:46   15   Q.   How did you meet?

16   A.   Um, through mutual friend, Mike Hansen.  We were

17   all just over there hanging out playing video games.

18   Q.   And in addition to video games, did you get

19   together for any other social-type activities?

00:37:02   20   A.   Um, yeah, like afterwards.  I mean once we met we

21   would get together and go out on the weekends, go to

22   movies, snowboarding, things like that.

23   Q.   At some point did the frequency of the contact

24   with Mr. Shamo increase?

00:37:22   25   A.   Um, over the years, yeah.  Um, I would -- yeah it

```
 1   did.
 2   Q.   What precipitated or what was the cause of you
 3   getting together more often?
 4   A.   I mean we just like back -- so I guess I would
 5   say, um, we just started hanging out more.  He was
 6   living in Salt Lake, my girlfriend lived up in Salt
 7   Lake, I was up there more often.  And so just because
 8   he was in the same town, we were closer, um, it was
 9   easier to hang out.  Before then, I was living in
10   Provo, he was up in Salt Lake, it was a little bit
11   harder to get together because of that.
12   Q.   And in the first few years of getting to know
13   Mr. Shamo, did you -- did you form an impression of
14   what type of person he was?
15   A.   Yeah, for sure.
16   Q.   And what was your impression?
17   A.   Um, nice guy, funny guy, um, thought he was a
18   good person for sure, um, and we had a lot of the
19   same interests so we got along.
20   Q.   Was he someone that others liked to be around?
21   A.   Yeah, definitely.
22   Q.   Would you have considered him to be smart?
23   A.   Yeah, I think he is a smart guy, yeah.
24   Q.   Was he innovative or able to problem solve and
25   think outside the box?
```

00:37:44
00:38:04
00:38:22
00:38:40
00:38:54

9

```
 1   A.   I would say so, yeah.

 2   Q.   Do you have an example of that that you remember?

 3   A.   Um, I mean he was always -- I mean I don't know.

 4   He is -- as far as examples go like right now, um, he

 5   just seemed to always have a lot to talk about, a lot

 6   of interesting things that he was into and liked and

 7   that's what I found interesting, you know, about my

 8   conversations.

 9   Q.   Did he ever talk to you about Bitcoin mining?

10   A.   Eventually, yeah.

11   Q.   What did you discuss about Bitcoin mining?

12   A.   Um, basically just what it was, how it worked.

13   Um, it was new to me, I didn't know anything about it

14   and he basically just told me, you know, how the

15   whole process of Bitcoin mining worked.

16   Q.   Did he share with you whether he was actually

17   doing any of the Bitcoin mining himself?

18   A.   Yeah, he wanted to get started into it and said

19   that he bought some miners and was mining bitcoins.

20   Q.   So the jury has heard prior testimony about

21   others being invited to invest or being asked to

22   invest in the Bitcoin mining machines or computers.

23   Were you invited to invest?

24   A.   Yeah, at one point that was something that --

25   that was asked and -- or I guess he offered just
```

00:39:22
00:39:37
00:39:59
00:40:17
00:40:35

10

1       wanting to invest in Bitcoin mining and thought it

2       was a good opportunity to profit during the time.

3       Q.   So did you invest in the Bitcoin mining?

4       A.   I did not, no.  I didn't end up doing it.

00:40:55   5    Q.   Why not?

6       A.   Just I mean the miners were pretty expensive and

7       I didn't have, you know, the money to invest into it.

8       Q.   At some point did you learn that he was no longer

9       mining Bitcoin?

00:41:12   10   A.   Um, yeah, he mentioned that he stopped mining

11      Bitcoins and I think it was just because of the cost

12      with the electricity would go up and I'm not sure the

13      real reason why but he did mention that he stopped

14      mining them.

00:41:35   15   Q.   And do you remember about when that was?

16      A.   Um, sometime in the year of 2015, I believe,

17      might have been earlier.

18      Q.   Throughout the time that you have known

19      Mr. Shamo, have you ever lived with him?

00:41:56   20   A.   Yeah, we were roommates in Provo.

21      Q.   And how about when he moved up to the Salt Lake

22      area when he had a home on Titian Way.  Did you live

23      with him way?

24      A.   Where at?

00:42:10   25   Q.   On Titian and there are different pronunciations

11

```
 1   you might call it Titian Way?
 2   A.   Right.  We -- I didn't actually live at that
 3   house.
 4   Q.   Were you a signer on the lease --
 5   A.   Yeah.
 6   Q.   -- for that house?
 7   A.   Yeah, I did sign the lease.  Um, the landlord
 8   came into town and lived out-of-state so he had
 9   mentioned that I was thinking about moving in and the
10   landlord said well to save me a trip if you do decide
11   to move in in the future at some point, I won't have
12   to come back.  So why don't you just sign right now
13   while you're here to avoid that trip so I signed.
14   Q.   But did you ever actually --
15   A.   No, I never moved in and I never lived there.
16   Q.   Were you invited by Mr. Shamo to move in?
17   A.   Yeah, he wanted me to move in.
18   Q.   And why did you decline?
19   A.   Um, I -- I just didn't want to move in because of
20   things that were -- that I knew were there and
21   happening.  And, um, and I just liked -- I mean I
22   kind of wanted to move back to Utah County I was in
23   Salt Lake so...
24   Q.   You mentioned one of the reasons is that you knew
25   about the things that were there and happening.  What
```

00:42:22
00:42:34
00:42:52
00:43:10
00:43:26

12

1  were those things that were there and happening that

2  you knew about?

3  A.   Um, just some of the, you know, the whole

4  operation of what was -- what was going on.

00:43:41  5  Q.   What was the operation?

6  A.   Just the making of pills and selling on the Dark

7  Web.

8  Q.   And how did you learn about that?

9  A.   About the --

00:43:59  10  Q.   About the making of pills and selling them on the

11  Dark Web?

12  A.   Um, he had -- I mean the majority of the things

13  that I was -- that I learned, you know, was by -- was

14  through him.

00:44:16  15  Q.   So he told you he was making pills and selling

16  them on the Dark Web?

17  A.   Eventually, yeah.

18  Q.   Did he ever invite you to participate in that?

19  A.   He did.

00:44:28  20  Q.   Before we kind of go down that road, did he speak

21  about anyone else who was involved with making and

22  selling pills at that point?

23  A.   I'm sorry what was that?

24  Q.   At that point, when you learned from Mr. Shamo

00:44:42  25  that he was making and selling pills, did you learn

13

|   | |
|---|---|
| 00:44:52 | |
| 00:45:04 | |
| 00:45:20 | |
| 00:45:39 | |
| 00:45:59 | |

1  about anyone else who was involved?

2  A.   I did, yeah.

3  Q.   And who did you learn was also involved?

4  A.   Drew Crandall.

5  Q.   Let's talk about Drew Crandall a little bit.

6  Before that time had you had the opportunity to meet

7  and get to know Drew Crandall?

8  A.   Yes.

9  Q.   So where did you first meet Drew Crandall?

10  A.   In Provo as well at a mutual friend's house and

11  we were also playing video games.

12  Q.   It seems like you met quite a few people playing

13  video games.

14  A.   At that point, yeah.

15  Q.   Can I ask what video game was it?

16  A.   Mainly Mario Kart.

17  Q.   Okay.  So you meet Mr. Crandall playing Mario

18  Kart.  Did you interact with him on more than one

19  occasion over video games or other social activities?

20  A.   Not a whole lot.  There was -- there was -- I

21  mean an event, there were dances that back in the

22  days of college we would go to and he was there so I

23  do remember that one time.  But other than that, no.

24  Q.   I asked you earlier when you first met Mr. Shamo

25  if you had formed an impression about the type of

```
 1   person he was.  Similar question, did you form an
 2   impression after meeting Drew Crandall and having an
 3   opportunity to interact with him what type of person
 4   he was?
 5   A.   I did, yeah.
 6   Q.   What was your impression of him?
 7   A.   Um, I mean as far as personalities go we were
 8   different and had different interests, I mean other
 9   than video games that's like the one thing that we
10   had in common.  And then I just -- I mean there were
11   -- I just didn't like, you know, the way that he --
12   the things that he talked about mostly.  Things that
13   he said.
14   Q.   Did you like Mr. Crandall?
15   A.   Um, I didn't dislike him, just wasn't somebody
16   that I would associate with on a normal basis.
17   Q.   After meeting him initially, did you ever
18   initiate contact with him on your own?
19   A.   Um, no.  The only time would have been if we were
20   online on a video game.
21   Q.   At some point you did have at least a lengthier
22   meeting with Mr. Crandall where he trained you how to
23   use a pill press, correct?
24   A.   Correct.
25   Q.   Can you tell me how that was arranged?
```

00:46:11  (line 5)
00:46:32  (line 10)
00:46:51  (line 15)
00:47:11  (line 20)
00:47:26  (line 25)

15

1    A.    He was getting ready to leave to New Zealand and

2    they wanted a replacement to basically take over the

3    -- being the one who was pressing the pills, I guess.

4    And so Aaron asked me to come over and, you know,

5    over, you know, a few weeks or months I eventually

6    went over and I think it was the day that he was

7    leaving to go to New Zealand, or at least moving out

8    of the house that they were at.

9    Q.    So Mr. Shamo is the one who initiated that

10   meeting?

11   A.    Yeah.

12   Q.    And when you showed up to Mr. Shamo's home to be

13   trained how to use the pill press, who was there?

14   Who was present during that?

15   A.    Just myself, Drew, and Aaron.

16   Q.    After -- well during this meeting, was there

17   discussion amongst all three of you and if so what

18   was it?

19   A.    Yeah, there was.  It was mainly about how the

20   machine was operated, how it worked, how to use it,

21   and kind of I guess just prepping me if, you know, if

22   that was something that I was going to be doing.

23   Q.    And who was giving you the instruction?

24   A.    Um, mainly Drew.  He seemed to be the one that

25   knew the majority of how the machine worked.

16

Q.    And did Mr. Shamo give any sort of direction or

instruction?

A.    Um, I think honestly it was mainly Drew.  Um,

Shamo was there listening and --

00:49:38     Q.    Okay.  Did you get the impression whether

Mr. Shamo at that time knew how the pill press

operated?

A.    Yeah, he -- he knew how the machine operated,

yeah.

00:49:47     Q.    Okay.  After Mr. Crandall left the country, did

you ever communicate with him directly or indirectly?

A.    After he left I did not.

Q.    What was the relationship at that time when you

were being trained on the pill press, what was the

00:50:08     relationship between Mr. Shamo and Crandall in

relation to selling drugs?

A.    They -- they had been doing it for some time

before, before I was ever -- before I even knew about

it, before I ever found out about it they had already

00:50:25     been selling on the Dark Web and using this machine.

Q.    Do you know what kind of agreement they had as

far as who would do what work and how the money --

how people would get paid?

A.    Do I know?  Do I have an idea?

00:50:43     Q.    Yes.

1  A.   Yes.  So I think mainly Drew was the one

2  pressing, eventually was the one packaging shipments

3  out and getting them ready to ship out.  And I

4  believe Shamo was the main one on the -- on the, I

00:51:06   5  guess, dark net website part of the things, creating

6  the listings and being in charge of that side of it.

7  Q.   And do you know how they divided up the drug

8  proceeds when items were sold?

9  A.   Um, not 100 percent, but, you know, I heard from

00:51:29  10  him, Mr. Shamo, that it was, I believe, 30 percent,

11  25 to 30 percent was what Drew was getting paid.

12  Q.   Okay.  Now, you mentioned you were invited to

13  kind of take over pressing pills.  At that time, that

14  was around -- that was in 2015; is that right?

00:51:54  15  A.   Yes, the end of 2015.

16  Q.   And did you have a job at that point?

17  A.   I had just come back from a summer of summer

18  sales so I wasn't currently employed during that

19  time.

00:52:14  20  Q.   And at some point when you began pressing pills

21  for Mr. Shamo, did you still -- did you have a job at

22  that point?

23  A.   Um, it was kind of the same thing.  It was -- I

24  was working for a company, Vivint, and going out

00:52:31  25  during the summers.  And during the off season, we

```
 1   would do like pre-season trips so we would go out for

 2   a week to a different state.  So that is the only

 3   type of work that I would have been doing during that

 4   time.

 5   Q.   Okay.  At some point were you ever invited to

 6   receive packages on behalf of Mr. Shamo?

 7   A.   I was, yeah.

 8   Q.   When did that occur?

 9   A.   Um, at the same time.  And eventually I did end

10   up -- I did receive a few packages.

11   Q.   Did he tell you what was being shipped in those

12   packages that you were receiving?

13   A.   Didn't say specifically what was, you know, what

14   each -- or what each package had inside of it, but I,

15   you know, I knew it was probably going to be drugs

16   most likely.

17   Q.   How many of those packages do you -- did you

18   receive?

19   A.   Um, I am not sure.  Probably around five or six.

20   It was at least less than ten.

21   Q.   What would you do with the packages when they

22   came to you?

23   A.   Um, I would take them to Shamo's house and give

24   them to him.

25   Q.   And were you paid for receiving packages?
```

Timestamps (left margin):
00:52:49 — line 5
00:53:06 — line 10
00:53:22 — line 15
00:53:39 — line 20
00:53:51 — line 25

19

1   A.   Yes, I was.

2   Q.   Do you remember how much you were being paid?

3   A.   Um, roughly 2- to 300.

4   Q.   Who would pay you?

00:54:02   5   A.   He would.

6   Q.   At any point did anyone else pay you for

7   receiving those packages?

8   A.   No.

9   Q.   You mentioned that Mr. Shamo invited you,

00:54:15   10   recruited you, to take over pressing pills when

11   Mr. Crandall was leaving the country.  Um, can you

12   explain how that discussion went or ongoing

13   discussion went as far as having you press pills?

14   A.   Just yeah, that it was an opportunity to, you

00:54:35   15   know, he said that Drew was leaving the country and

16   he needed someone to replace him.  Um, I wasn't

17   working at the time and -- and at that point they had

18   -- I believe for the majority they had, you know,

19   they had stopped pressing altogether and, you know,

00:54:58   20   they had some inventory that they were -- I don't

21   know if they were selling it at that point or not,

22   but it was something that, you know, was kind of a

23   future, kind of a plan for in the future.

24   Q.   Was this a one time conversation or something

00:55:13   25   that took place over time?

20

```
 1    A.    It was over time.  It was over, you know, there

 2    was multiple conversations about it.

 3    Q.    Did you readily accept his invitation to start

 4    taking on that role when he -- when he was first

 5    inviting you?

 6    A.    It took, you know, several weeks to actually for

 7    me to end up actually doing it.

 8    Q.    And did you decline at first or did you accept?

 9    A.    I just was unsure.  I didn't know if that like if

10    I wanted to do it.

11    Q.    Was there anything that precipitated you actually

12    making the decision to start helping Mr. Shamo

13    manufacture pills?

14    A.    I mean there was obviously -- there were a few

15    different thoughts and reasons.  In early -- late

16    2015 or early 2016, is when, um, you know he was

17    going to start back up and they had to -- or he had

18    to create a new store front in order to do so.  So

19    during that time I was still unsure about it.  I was

20    over spending time at his house, we were playing lots

21    of Mario Kart, talking about, obviously, you know,

22    pressing, you know, how much money could be made.

23    And I was still undecided between doing that or going

24    out and selling again for the summer.  Um, and you

25    know, eventually, yeah, that the -- so yeah, I mean
```

21

```
 1   while I was over there, you know, we talked about it,
 2   you know, probably pressed a little bit but I mean I
 3   wanted to -- I just didn't really feel good about it
 4   I didn't know if I wanted to continue doing it and I
 5   was deciding on the other opportunity with Vivint.
 6           And then at the same time I found out that my
 7   sister had brain cancer.  She had a tumor in her
 8   brain that she needed to get removed and that was --
 9   and I mean I was single at the time, she was married,
10   she has kids, and they told her that she would only
11   have five to seven years left.  So that effected me
12   and I just wanted to help her in any way that I could
13   and I think that is the decision that kind of pushed
14   me over the edge to stay home for the summer and work
15   with Shamo and not go out for the summer.
16   Q.   Did you discuss this concern, your family's
17   health concern, with Mr. Shamo?
18   A.   I did, yeah.
19   Q.   And did you discuss your consideration of going
20   and working with Vivint over the summer?
21   A.   Yeah, both.
22   Q.   And what was Mr. Shamo's response?
23   A.   So at that time I needed money I wasn't getting
24   -- I wasn't making anything and I went to the
25   managers at Vivint to, you know, let them know that,
```

00:57:40 (line 5)
00:58:19 (line 10)
00:58:45 (line 15)
00:59:03 (line 20)
00:59:22 (line 25)

22

```
 1   you know, like I needed money and to see if they
 2   could help me out.  So they offered and we made a
 3   deal that I would, you know, get an advance of 10,000
 4   to go out for the summer.  And there is terms for
 5   that so that money could at the end of the summer
 6   based on sales I would either have to pay that back
 7   or if I had 100 accounts then I could keep it and
 8   they wouldn't -- they wouldn't dock that off of my
 9   back end check.  So, um, I told him that, and he --
10   he really wanted me to stay.  Um, we had been going
11   to concerts and things and he wanted to have a fun
12   summer and we both wanted to have a fun summer, I
13   just needed to make money and wasn't making money at
14   the time and he did -- he offered to basically pay me
15   that $10,000.00 and went and grabbed $10,000.00 in
16   cash and gave it to me, and, you know, that was a lot
17   of money to me at the time, um, and so I stayed.
18   Q.   What did you do with that $10,000.00?
19   A.   Well, I used -- I mean I lived off of that as
20   long as I could.  Um, what I would have done with the
21   10,000 that I was going to get from Vivint and so
22   that is what I did.
23   Q.   Do you know where Mr. Shamo got that $10,000.00?
24   A.   Um, I had an idea.  I mean I thought -- I assumed
25   it was from the previous sales that him and Drew
```

23

```
 1    had -- had done in the past.  I also knew that he,

 2    you know, was meeting up with people and trading

 3    bitcoins and it could have been from that as well.

 4    Q.   Okay.  So you start pressing pills and describe

 5    what the pill press was like?

 6    A.   Um, it had a big wheel on it that you could turn

 7    with your hand.  I think it was only there in case of

 8    the machine getting jammed but had a single press or

 9    single die so it wasn't a rotary one, it was like a

10    single one that would press one pill each time and

11    that's pretty much it.

12    Q.   How well did it work?

13    A.   It had a lot of complications got jammed quite

14    frequently and didn't make them very fast.

15    Q.   Where was this pill press located?

16    A.   At his house in the bedroom next to the master

17    bedroom.

18    Q.   So when you start pressing the pills, where did

19    the ingredients come from?

20    A.   They were -- pretty much already there, and he

21    had other people that he would, you know, that he

22    would send packages to, so the ingredients that was

23    needed, and he would pay them to receive the packages

24    and then they would -- they would meet up somewhere

25    and he would pick up the packages from those people
```

01:01:32 — 5
01:01:52 — 10
01:02:14 — 15
01:02:28 — 20
01:02:48 — 25

24

```
 1  so they would come from multiple sources, I guess,
 2  but packages from people that he sent them too.
 3  Q.   Did you yourselves ever purchase or order the
 4  ingredients that were needed?
 5  A.   No.
 6  Q.   What were the -- what type of pill was it that or
 7  pills did you press initially?
 8  A.   Initially it was Xanax.
 9  Q.   And were you the only one that would press pills?
10  A.   Um, initially.
11  Q.   Initially?
12  A.   Initially.  I mean I want to say yeah, the
13  majority of it.  Um, there were times where he would
14  maybe run the machine if I wasn't there, if he
15  needed, if he needed more pills.
16  Q.   How often would you go to Mr. Shamo's home to
17  press pills in the beginning?
18  A.   Um, I mean in the beginning I would go over there
19  a lot just we would hang out and play video games, go
20  to the gym.  So even if we weren't pressing at the
21  time, you know, I would spend a lot of time over
22  there.  But I mean just specifically for pills, in
23  the very beginning when things were getting started
24  up, I mean we weren't pressing a whole lot, so I
25  would say maybe once or twice a week or less.
```

01:03:05 — line 5
01:03:23 — line 10
01:03:50 — line 15
01:04:07 — line 20
01:04:24 — line 25

25

1    Q.   And that once or twice a week how many pills

2    would you press?

3    A.   Um, that I am not too sure about.  It wasn't very

4    many, 1,000 to 2,000 maybe.

01:04:45    5    Q.   And after the pills were pressed, um, what would

6    happen with them?

7    A.   Um, we would put them in a bag and then they

8    would get -- he would deliver them to the people that

9    he had packaging them up for him and shipping them.

01:05:09    10    Q.   Do you know who those people were that were

11    packaging and shipping?

12    A.   I didn't know who they were.

13    Q.   Did you learn later who they were?

14    A.   Um, I mean he told me, yeah.  I knew like they

01:05:25    15    were just -- that they were -- I knew them as the

16    shipping girls.  I didn't ever like officially meet

17    them, just met up or saw them I think like only once,

18    once or twice each.  They both came over to his house

19    a couple of times but I never really talked -- spoke

01:05:52    20    to them.

21    Q.   Would Mr. Shamo tell you when and how many pills

22    were needed?

23    A.   Yeah.  I mean the -- I mean the idea would be,

24    you know, we would press what they needed, you know,

01:06:11    25    and at that in the beginning stages, um, there

26

| | |
|---|---|
| | 1 weren't a whole lot of orders and so there weren't a |
| | 2 whole lot of pills that needed to be pressed and then |
| | 3 it was getting bigger and so eventually more and more |
| | 4 started. |
| 01:06:31 | 5 Q.   Did you ever or Mr. Shamo ever kind of stockpile |
| | 6 extra pills for future orders? |
| | 7 A.   We tried to with the first machine.  I think |
| | 8 that's where we ran into issues, we weren't able to |
| | 9 keep up with them.  But eventually we tried to and it |
| 01:06:52 | 10 was still hard.  But there were times where, um, you |
| | 11 know, there was some stocked up. |
| | 12 Q.   Where would that stock be kept? |
| | 13 A.   He would -- I mean at his house.  But then |
| | 14 whether it was that day or the following day they |
| 01:07:16 | 15 would eventually get delivered to the girls who were |
| | 16 packaging them up. |
| | 17 Q.   So he wasn't keeping the pressed pills at his |
| | 18 house for more than a day or two after they were |
| | 19 manufactured? |
| 01:07:30 | 20 A.   Yeah, most of the time. |
| | 21 Q.   And why?  Do you know why that was? |
| | 22 A.   Um, just because they were the ones that were |
| | 23 receiving the orders and needed to have the product |
| | 24 on hand to be able to ship them and package them |
| 01:07:50 | 25 package them and ship them. |

27

1485

01:08:06

01:08:30

01:08:55

01:09:18

01:09:35

1  Q.   Walk me through the process that you went through

2  to actually manufacture these Xanax or Alprazolam

3  pills?

4  A.   The process of manufacturing them?

5  Q.   Yes.

6  A.   Um, there was -- with those pills they had a --

7  he had already had multiple bags, boxes of like a

8  pre-mixed filler that they bought off a website that

9  already had all of the ingredients mixed.  And it was

10 just a white powder and we would, you know, we would

11 measure out whatever -- whatever amount of you know

12 by weight, whatever amount of powder for like the --

13 that you could fill into a mason jar.  And then put

14 in the active ingredient, the Alprazolam, and then

15 shake it up, mix it, and then put it into the machine

16 into a funnel that would start pressing the pills out

17 of that powder.

18 Q.   So that I can gain some clarity on this, you were

19 essentially putting the inactive ingredients and the

20 active ingredient Alprazolam into a mason jar and

21 then just shaking it?

22 A.   In the beginning, yes.  And then there were

23 mixers later on that we would put those ingredients

24 in and turn it on and it would just spin for hours at

25 a time.

28

Q.   You mentioned earlier that Mr. Shamo was the one

operating the website on the dark net or Dark Web.

Were you aware of any pills, Xanax pills, were being

sold in Utah?

01:09:50   A.   That happened as well, yes.

Q.   Tell me about that?

A.   There was a local guy that he had been dealing

with and, you know, before with Drew and they were

selling those Xanax pills to that individual and so

01:10:20   he would meet up with the same person and sell the

Xanax as well.

Q.   If we can pull up Exhibit 17.06.  Do you have

that on the screen before you.  Do you recognize that

individual that you are referencing?

01:10:38   A.   I do, yeah.

Q.   And where is he on this chart?

A.   The second row on the left side says "Kenny"

underneath his picture.

Q.   And at the time, by what name did you know him?

01:10:55   A.   Chris.

Q.   And how did you know that these Xanax pills were

being distributed in Utah through him?

A.   How did I know that they were being distributed

in Utah?

01:11:12   Q.   Through Chris?

```
     1    A.    Yeah, um, that's just what I was told.

     2    Q.    By whom?

     3    A.    Shamo.

     4    Q.    Did you ever interact with Chris yourself?

01:11:24  5    A.    I did not.

     6    Q.    Were you ever there when pills were being

     7    provided to Chris?

     8    A.    There was a few times, yeah.

     9    Q.    Tell me about those times?

01:11:40  10   A.    So I drove Aaron to either his house or his gym.

    11    I would wait in the car while he would go inside

    12    either the house or the gym and they would -- he

    13    would drop the pills off and then come back outside

    14    and then we would talk about whatever and then he

01:12:08  15   would come outside.

    16    Q.    How many times did you drive Mr. Shamo to meet

    17    with Chris for that purpose?

    18    A.    Probably -- I mean it was a handful.  Between 7

    19    to 10 times, different times probably.

01:12:26  20   Q.    Why was it that you were driving Mr. Shamo?

    21    A.    At that time he had a DUI and didn't want to

    22    drive his car.  So I would drive for that purpose.

    23    Q.    When you were driving him to meet with Chris, do

    24    you know how many pills Chris was being provided?

01:12:48  25   A.    Um, roughly, you know, on different occasions
```

1    between 1,000 to 2,000.  Um, it was mainly like

2    2,000.  I mean the highest was mainly 2,000.

3    Eventually it was more.  But in the beginning, it was

4    1,000 or 2,000.

01:13:10    5    Q.   When you said that eventually there was more,

6    were more provided to him during any of those times

7    that you were driving Mr. Shamo?

8    A.   Most likely.  I can't remember exactly.  I would

9    say yeah.

01:13:31    10    Q.   You mentioned that Mr. Shamo would go into

11    Chris's home or gym.  Was there any occasion when you

12    were driving him for this purpose that you observed

13    the actual exchange of pills or money?

14    A.   There was one time when he came out of his gym

01:13:50    15    and we were sitting in the car and I think the reason

16    was because he had people in the gym, didn't want

17    them to see something or he was leaving or just

18    rushed, so he came outside himself while we were both

19    still sitting in the car and they made that

01:14:06    20    transaction through the window of the car.  That was

21    like when I had seen him.

22    Q.   We're going to speak more about Chris in a

23    moment, but if we can first pull up Government's

24    Exhibit 14.19.  And if we can go to the second page.

01:14:44    25    Here we're looking at an exhibit that has been

31

1  admitted that has your name on it.  Do you know why

2  your name and Julian Mausia's name would have been

3  included or being shared amongst or with by Mr. Shamo

4  or to Mr. Shamo?

01:15:08   5  A.   Um, it just looks like notes from his computer,

6  has a few -- it looks like three addresses on here.

7  An address for Shawn, myself, and for Julian.  I

8  think it is just notes.  So these are just the

9  addresses of probably where they would -- where he

01:15:35  10  would send the packages to.

11  Q.   And I'm sorry because this may be -- that might

12  have not been a great question.  Can you -- can you

13  read the portion, the paragraph portion down at the

14  bottom of this.

01:15:48  15  A.   Okay.  "So these are the best so far.  They smoke

16  perfect and they snort and slide.  The color being

17  speckled won't fly so that needs to be fixed but you

18  already knew that.  My boy smoked two in a row and

19  barely got high, so a bit stronger is going to be a

01:16:08  20  must, bro.  But in all, these are f-ing close to

21  being money in the bank man.  You did it, bro."

22  Q.   Do you recognize the context of that message and

23  who may have sent it?

24  A.   Yeah.  It is -- it came from Chris.

01:16:25  25  Q.   And who was it sent to?

32

```
         1    A.    To Aaron.

         2    Q.    And what is he referencing?

         3    A.    The pills that were -- so that they were the

         4    fentanyl pressed pills and he is referencing those,

01:16:43 5    yeah.

         6    Q.    So at some point you transitioned to pressing

         7    fentanyl pills in addition to Xanax pills; is that

         8    right?

         9    A.    Yeah.

01:16:56 10   Q.    How long after you started helping to press pills

        11    did you and Mr. Shamo start pressing pills containing

        12    fentanyl?

        13    A.    How long afterwards?

        14    Q.    Yes.

01:17:08 15   A.    Um, I mean a couple of months but two to three,

        16    four months.

        17    Q.    So by that message, it looks like Chris may have

        18    had some interest in you and Mr. Shamo pressing

        19    pills; is that right?

01:17:26 20   A.    That's right, yeah.

        21    Q.    Were you made aware before starting to press

        22    fentanyl pills, were you made aware of any

        23    communications with Mr. Shamo and Chris about

        24    pressing pills other than Xanax?

01:17:43 25   A.    Yeah.  It was basically I believe Chris's idea.
```

33

```
 1   He was already or he had been buying those same

 2   pills, the fentanyl pressed pills, from another

 3   source and I believe wanted to get them at a better

 4   price.  And so he told Aaron that they would, if he

 5   could figure it out or if he could start doing that,

 6   that there would be a lot of money to be made.

 7   Q.   Did you understand what needed to be figured out?

 8   A.   I did not.

 9   Q.   So how did -- how did it come about that you and

10   Mr. Shamo started manufacturing fentanyl pills?

11   A.   It was just, you know, he told me about it, he

12   told me that, you know, that Chris was the one that

13   mentioned it, that I guess had the idea of Aaron

14   getting started and pressing them so that they could

15   make money together.

16        Um, seemed like he had the most knowledge on

17   it because he had already been buying them from

18   another source.  Neither of us knew how to make them,

19   had never been something, you know, it was new.

20   So...

21   Q.   Let me back up just a little bit.  It sounds like

22   Mr. Shamo had an ongoing relationship of some sort

23   with Chris.  Do you know how they were -- how they

24   were introduced or met each other?

25   A.   I'm not exactly sure, I think it was through a
```

01:18:14
01:18:33
01:18:58
01:19:19
01:19:35

34

1    mutual friend.

2    Q.   Do you know who that mutual friend was?

3    A.   Um, Miles.

4    Q.   And what leads you to believe that Miles may have

01:19:47    5    introduced them to each other?

6    A.   Just from one of the conversations that Shamo and

7    I had I remember that.

8    Q.   When Mr. Shamo is speaking to you about what

9    Chris is asking for, namely a different kind of pill,

01:20:06    10    was fentanyl the first thing that was mentioned as

11    far as the different kind of pill or was he just

12    hoping for an Oxycodone pill?

13    A.   Um, I mean, yeah, he would say you guys should

14    make Roxy's or let's make Roxy's.  And I am like what

01:20:27    15    is that?  And he explained to me it is like an oxy

16    pill.  I'm like how do you make that?  Like how are

17    you going to get oxy?  And, you know, at that point

18    he said that they -- that he would use fentanyl.

19    Q.   And who -- who is he?

01:20:44    20    A.   Well, I mean I think that that came from Chris

21    like --

22    Q.   It is coming through Mr. Shamo?

23    A.   Yeah.

24    Q.   Was there any issue with being able to acquire

01:20:56    25    Oxycodone to make the pills that Chris was

35

1493

1  requesting?

2  A.    From what I understood is it was next to

3  impossible to acquire Oxycodone.

4  Q.    And what's the basis for that opinion?

01:21:11   5  A.    Um, that I am not sure.  I mean, um, I mean -- I

6  honestly don't know.  Just probably was regulated

7  harder or super hard to just make.

8  Q.    Did you try to acquire Oxycodone?

9  A.    No.  Well, I mean I didn't.  So I don't know

01:21:30   10  if --

11  Q.    Are you aware if Mr. Shamo tried to acquire or

12  research Oxycodone?

13  A.    I don't know that he tried acquiring it.  I mean

14  just -- I just -- from what he told me that it was

01:21:43   15  just hard to either make or get.

16  Q.    So you and Mr. Shamo have this discussion about

17  creating pills that looked like Oxycodone pills but

18  with fentanyl.  Walk me through, after you have had

19  these conversations, walk me through what actions led

01:22:06   20  to actually manufacturing those pills?

21  A.    Um, a lot of it was I think Chris just kept on

22  talking about the issue, bringing it up saying hey

23  man, you know, we could make a lot more if you do

24  this, if you make these.  And so at that time I mean

01:22:32   25  I don't think that Shamo knew how to do it either so

36

```
 1    I think I mean we had initially started with making

 2    it in the same way that the Xanax was made where we

 3    had like the pre-mixed filler and then we would add

 4    the active ingredient, fentanyl, mix it up, and

 5    basically do it the same way.  Add some blue powder,

 6    kind of like a die that would, you know, color the

 7    pill blue.  And then we would, you know, we made a

 8    few batches, gave them to Chris, and we would get

 9    feedback from him based off of people who were using

10    them that Chris was giving them to.

11          And then from -- based off of that feedback,

12    we would tweak the way that they were being made so

13    from that slide that was shown, talked about them

14    sliding and smoking and being able to snort them and

15    that was the whole idea of the first -- the first

16    batches that we made they didn't do that from the

17    pre-mixed filler.  I guess when they were smoked,

18    snorted, or however they use them in that way, they

19    weren't sliding, they were just burning.  And so we

20    had to figure out how to make them slide.  And that's

21    -- so yeah, that's -- do you want me to keep going on

22    like the whole --

23    Q.   Well, we will pick up there in just a moment.

24    Let me ask you --

25    A.   Okay.
```

01:22:55
01:23:18
01:23:45
01:24:02
01:24:16

37

```
 1   Q.   -- a few questions to kind of unpack what you

 2   just described.  You mentioned pre-mix.  What was the

 3   pre-mix?

 4   A.   I mean I don't know exactly, but it just came

 5   pre-made so it was add -- the ingredients already in,

 6   you know, the ingredients just to make a pill.

 7   Q.   Where did that pre-mix come from?

 8   A.   Um, from online, I'm not sure exactly.  I think

 9   it was -- it was an online site like Tablet Press

10   Club, something like that.  But from what I

11   understand, is Drew is the one that bought those

12   before he left to New Zealand so he had a -- he had a

13   lot of that.  Before Drew left he bought like a few

14   boxes and we were able to use that.

15   Q.   And we have been talking about trying to make

16   these pills with fentanyl.  When you are having these

17   discussions with Mr. Shamo, did you know what

18   fentanyl was before then?

19   A.   No.

20   Q.   Did Mr. Shamo explain to you what fentanyl was?

21   A.   Yeah, um, he explained, you know, what it was and

22   what it did and how it was similar to oxy and said

23   that it was a research chemical and basically that it

24   just would make the same effects of oxy of the, I

25   guess, that drug Oxycodone.
```

01:24:28
01:24:47
01:25:04
01:25:16
01:25:42

38

1    Q.   Did you, at that time, do anything to verify what

2    he told you or to research fentanyl yourself?

3    A.   No, he didn't tell me to research it but he said

4    that it wasn't a controlled substance yet at the time

01:26:02    5    so I did research that to see if it was a controlled

6    substance or not.  And I couldn't -- and I didn't

7    research it that in depth.  I mean I didn't find

8    anything about it being a controlled substance.

9    Q.   So did you do a web search of some sort?

01:26:20    10   A.   Yeah.

11   Q.   And the results that came up didn't identify it

12   for you as a controlled substance?

13   A.   Right.

14   Q.   Did it confirm that it was a research substance

01:26:31    15   when you did that search?

16   A.   I didn't -- that wasn't confirmed either.

17   Q.   Okay.  You mentioned that when you were initially

18   making these pills with the pre-mix and adding in the

19   fentanyl, that the pills wouldn't slide.  What does

01:26:48    20   that mean?

21   A.   I didn't know what that meant either and I found

22   out that that is just how the users would use those

23   pills and they would take a, I guess, a piece of tin

24   foil or a spoon but I'm sure I think it was tin foil,

01:27:03    25   put the pill on it and then light it from underneath

39

1    until it started smoking, and then they would smoke

2    that smoke.  But the pill would end up sliding down

3    the tin foil and not just staying there and burning.

4    Q.   So previously you talked about you kind of

01:27:22    5    referenced "we", we would mix the pre-mix or you

6    would take the pre-mix, add fentanyl and make pills

7    but you said "we".  Um, did both you and Mr. Shamo

8    make these initial fentanyl pills?

9    A.   The initial -- I mean I think it was a combined

01:27:45    10   effort to make the -- to try to get these pills to

11   work and to, you know, so the first batches I'm not

12   sure whether or not, you know, whether we were both

13   doing it at that time.  A majority of it was myself.

14   There could have been times where I wasn't there and

01:28:14    15   he may have done it.

16        During the times that the machine was getting

17   jammed, you know, he would help un-jam it and things

18   like that.  So initially, you know, when we were

19   trying to figure out how to get the, you know, the

01:28:31    20   right mixture of powder, then yeah.

21   Q.   So something you said there, when it would jam he

22   would un-jam it.  He had the skill set to be able to

23   get the pill press operating when there was a jam?

24   A.   Yeah.

01:28:48    25   Q.   Getting the powder right, what issues were you

1    having with the powder when you're trying to make

2    these pills?

3    A.   Just -- well first of all, they weren't sliding

4    and they needed to slide and smoke and so that was

01:29:04    5    the main issue.  And then -- and then obviously

6    getting the mixture right.  Of the inactive

7    ingredients the mixture needed to be created or mixed

8    together so that the pill could hold its form and

9    also slide and that is pretty much it.

01:29:33    10    Q.   Now, you mentioned previously the pre-mix was

11    essentially all of the inactive ingredients.  Did you

12    find a problem with the pre-mix when you were trying

13    to create these fentanyl pills?

14    A.   Just that they wouldn't slide.

01:29:45    15    Q.   So did you switch to a different method or --

16    A.   Yeah.

17    Q.   -- what?  What did you do instead of using the

18    pre-mix?

19    A.   So he ended up ordering -- he looked up the main

01:29:58    20    ingredients in the real oxy and just ordered like the

21    main four ingredients and we used those ingredients.

22    Q.   And you said "he" are you referring to Mr. Shamo?

23    A.   Yeah.

24    Q.   At some point you figure out how to get these

01:30:19    25    pills right; is that right?

41

```
 1   A.    Yeah.

 2   Q.    What part of the process did you figure out?

 3   A.    The mixture of the four inactive ingredients.  So

 4   just like a good combination of all four of them that

 5   would work, when you're talking about the structure

 6   of the pill itself without any active ingredient

 7   included.

 8   Q.   So would it be accurate to say essentially the

 9   ratio of the different inactive ingredients you

10   figured out a way that the pill would not be too

11   hard, that it would slide, but it would still hold

12   its form?

13   A.    Yeah.

14   Q.    And that was without the active ingredient?

15   A.    Yeah, that was without the active ingredient.

16   Q.    So when you figured that out, did you share the

17   ratio, the amounts of inactive ingredients with

18   Mr. Shamo?

19   A.    I didn't ever give that to him, he never really

20   asked for it, um, that I can recall.  And I didn't

21   ever just say here it is.  I was the one that was

22   mainly mixing that mixture together and so I mean if

23   he had the powder that was already mixed that was

24   good enough.  I mean he didn't need it.

25   Q.    So after you figured out the right amounts of
```

42

1    inactive ingredients, were you able to determine how

2    much fentanyl should go in each pill or the mix?

3    A.    So he had a program on his computer that Drew

4    made that you would get the -- so you would just use

01:32:15   5    the inactive ingredients, you would make some test

6    pills and he would weigh out 20 of them.  So on the

7    program you would know they would -- he would enter

8    in the number of pills, number of test pills, the

9    weight of those test pills, and then that would tell

01:32:37  10    him the amounts -- the amount of the active

11    ingredient to include in the inactive mixture.

12    Q.    Did you watch him use this program?

13    A.    Yeah.  Like most of the time he showed me it.

14    Q.    Did he ever let you use that program yourself?

01:32:56  15    A.    Um, it wasn't ever -- no.  I mean it wasn't ever

16    anything that I asked to do.

17    Q.    So any time you were making these fentanyl pills,

18    you could mix the inactive ingredients but you had to

19    go to him to get the right amount -- to determine the

01:33:12  20    right amount of fentanyl to add?

21    A.    Yes.

22    Q.    When you watched him the once or twice use this

23    program, did he have to put in how much fentanyl he

24    wanted in each pill as part of the calculation?

01:33:26  25    A.    I believe so.  That I'm unsure about but I

43

```
 1  believe that would be the case.  It was the same
 2  program that he used for the Xanax.  So we would have
 3  to know the dosage that you wanted in those Xanax
 4  pills.
 5  Q.   Did you ever tell him what dosage should go in
 6  those pills?
 7  A.   No.  I had no idea.
 8  Q.   So you get some feedback from Chris and we read
 9  some of it.  Did you get any other feedback from
10  Chris or was it just the one time?
11  A.   There was feedback from Chris throughout the
12  whole -- like the whole time there was.
13  Q.   So once you figured out the -- so when you're
14  going through this process, is Chris buying these
15  sample pills?  Are you giving him pills?  How was he
16  able to give you this feedback?
17  A.   Yeah.  So we would give him -- he would, you
18  know, want a few hundred, or a thousand.  He would
19  give them to, I don't know, some of his -- he put one
20  of them who would use them I guess that had been
21  using them for a while, and they would take them and
22  then report back to Chris and, you know, just let him
23  know if they were -- if they were sliding or not if
24  they smoked, if they were too blue or not blue
25  enough, they were too hard, they would crumble,
```

01:33:45 — line 5
01:33:59 — line 10
01:34:16 — line 15
01:34:36 — line 20
01:34:54 — line 25

44

```
       1    things like that.
       2    Q.   Was Mr. Shamo getting feedback from any other
       3    source as you guys are trying to figure out these
       4    pills?
01:35:08  5    A.   Eventually.  Once -- once he posted them online
       6    then there were people online that were reporting
       7    back, kind of the same way giving feedback on the
       8    size, color, hardness, maybe even taste.  And also
       9    providing insight on how to make the pill better,
01:35:37 10    what things could be done to make it better.  I guess
      11    mimic a real oxy.
      12    Q.   Did Mr. Shamo ever press pills without you?
      13    A.   Yeah, there were times that he did.
      14    Q.   And if he didn't know the right amount of
01:35:57 15    inactive ingredients, how would he do that?
      16    A.   He would ask me to mix up the inactive
      17    ingredients before I left.  Like if I was on a work
      18    trip or out of town and wasn't going to be able to
      19    press and he was going to press, then I would -- I
01:36:15 20    would just basically create or go over and mix the
      21    powder, the inactive powders together, and get that
      22    ready for him to use to be able to press.
      23    Q.   If you were preparing these powders for him, did
      24    you add the active ingredient fentanyl as well?
01:36:33 25    A.   Um, I can't remember if I added that or not.  I
```

45

think there were times that I did, times where I
didn't.  It was just all about if I had enough time
to or not.  But I know that I for sure did like
the -- the inactive mixture of powders with the blue
die included.  So once that was all ready, then the
last step was to add the fentanyl.

Q.   Did you ever press these fentanyl pills without
him giving you the amount that needed to be added?
The amount of active ingredient that needed to be
added?

A.   No, I didn't know that part of it.  So once the
mixture is made, then -- then I would -- sometimes
the machine would be -- needed to be adjusted.  That
could affect the size of the pill.  Or maybe they
were a little bit harder so that would effect the
weight of the pill because there is more powder being
pressed into the pill.  So that was the idea.  Like
every time you -- a new powder was created and/or you
know you would always have to continually monitor
like the sizing and the adjustments of the machine in
order to get the weight.  So obviously yeah, so I
would test the pills, get the weight of the pills,
and then tell him those numbers, text those to him,
and then he would send back the amounts that needed
to be added.

01:36:57
01:37:20
01:37:38
01:37:56
01:38:12

46

1    Q.    So after you figured out how to make these pills,

2    were they -- did they continue to be sold or were

3    they sold in Utah?

4    A.    After -- sorry, what was that?

01:38:30    5    Q.    After you figured out and you were pressing these

6    pills containing the fentanyl, were they sold in

7    Utah?

8    A.    Yeah.  I believe -- yeah, only to Chris, as far

9    as I know.  So Chris was the one that was buying them

01:38:47    10    from him, from Shamo, and then he was giving them to

11    whoever or selling them to whoever most likely here

12    in Utah.

13    Q.    Did you and Mr. Shamo ever have a discussion

14    about why Chris was the only one in Utah that the

01:39:04    15    pills were being provided to?

16    A.    Um, he didn't want -- I mean when they originally

17    started, him and Drew, they were just selling them

18    online and that was to basically hide that so that

19    they wouldn't have to go out and sell to people

01:39:23    20    locally.  And so I think it was for that reason that

21    they didn't want to sell to anybody locally.

22    Q.    So they would only utilize Chris to do that?

23    A.    Yeah, Chris, uh-huh.

24    Q.    When you start manufacturing these fentanyl

01:39:42    25    pills, what quantities did you initially start with

47

1    as far as how often and how many would you make?

2    A.   In the beginning?

3    Q.   Yes, the beginning with the fentanyl?

4    A.   It wasn't many.  Um, 1,000 to 2,000.

5    Q.   And how often were you -- how often and how many

6    of those pills were being provided to Chris?

7    A.   It could have been once a month, maybe once every

8    two weeks in the beginning.

9    Q.   And were pills being sold to anyone other than

10   Chris at that point?

11   A.   Locally not that I'm aware of.

12   Q.   And how about not locally?

13   A.   Online.

14   Q.   And did you ever help to manage or put listings

15   up online to sell the pills?

16   A.   No.

17   Q.   How did you know that was taking place online?

18   A.   Um, I mean he would tell me about -- he would

19   tell me about it and he showed me those sites like

20   once or twice, um, you know I just kind of wanted to

21   see it.  And then there were -- there were a couple

22   of times where I got on the dark net myself on my

23   phone to look at the -- basically see his listings,

24   see the, you know, what he was listing them as and by

25   reading that I was able to know.

48

Q.   When you did that, did you have a log-in for the
Pharma-Master storefront?

A.   No.  That was just me going on, an honest me as
any other person would be able to do.

Q.   And why did you want to go on and see the listing
for the pills?

A.   Just to verify that they were being sold as what
they were and that's what his listing said that they
were.  Fentanyl pressed oxy's or Roxy's.  It said in
the listing that it had -- that they were pressed
fentanyl that they didn't have oxy.  And I wanted to
verify that and that's what it did say.

Q.   So in the beginning were you still pressing these
new pills, the fentanyl containing pills, once or
twice a week?

A.   Um, yeah.

Q.   And how many were you pressing that once or twice
a week?

A.   I'm not sure, I mean a few thousand.  A lot of
the times it was when the amounts that they -- that
he needed to fulfill orders online as well as the
amounts that Chris would request.  So in the
beginning there wasn't much of a stockpile.

Q.   Did that amount that he needed to press did that
change at some point?

49

1   A.   Yeah, once it started getting bigger and they

2   were selling more online and people -- so people

3   could go on -- anybody that bought those, anything on

4   the Dark Web from any vendor could go on and give

01:43:27   5   that vendor feedback on the site itself as well as on

6   Reddit.  People who get on Reddit and they could talk

7   about each vendor, experiences.  And so, um, yeah

8   those -- did that answer the question?

9   Q.   I'm sure you did.

01:43:50   10   A.   Okay.

11   Q.   Would Mr. Shamo direct you when and how many

12   pills were needed?

13   A.   Yeah, just saying, you know, whether it was Chris

14   needs this many or we need this many online, or this

01:44:03   15   person just put in an order for 5,000 or 10,000.  He

16   would let me know those instances.

17   Q.   And did Mr. Shamo press fentanyl pills on

18   occasion?

19   A.   Yeah, on occasion.

01:44:16   20   Q.   Were both of you still pressing the Xanax pills

21   at that point?

22   A.   No, at that point it was only him that was

23   pressing the Xanax.

24   Q.   Why was that?

01:44:26   25   A.   Um, because it became an issue to switch the dies

```
 1    out of the one machine, just took -- it was a long

 2    process, took a while, and I mean it might even take

 3    all day long to get the machine set up again when you

 4    switch them back and forth from like a Xanax or from

 5    fentanyl or any die if it was different.

 6            And so he ended up getting another machine

 7    specifically for Xanax just to have one for Xanax and

 8    one for the fentanyl pills.  And then -- and so he

 9    kind of wanted to be the one doing the Xanax.

10    Q.  Okay.  You talked about how the number of pills

11    are being sold increased.  When do you recall was the

12    time where you maybe pressed the most pills in a

13    single week?

14    A.  Um, probably in the summer, June, July, August,

15    somewhere around there.

16    Q.  And do you remember the amount that you pressed

17    in a single week?

18    A.  In a single week, no.  Um, it could have been 20,

19    30, 40,000.

20    Q.  And as you went into the fall of 2016, did the

21    volume continue to increase?

22    A.  I believe so, yeah.

23    Q.  So in a single month would you have pressed more

24    than 40,000 fentanyl containing pills?

25    A.  That's possible, yeah.
```

01:44:53 (line 5)
01:45:22 (line 10)
01:45:49 (line 15)
01:46:03 (line 20)
01:46:22 (line 25)

51

```
 1   Q.   We have before you -- I want to point out a

 2   couple of Government Exhibits.  Specifically there is

 3   totes up here that are marked a series of Government

 4   Exhibit Numbers 7, 8, 9, and 12.

 5        I'm going to point these out to you and then

 6   ask you a question related to that.  So these three

 7   right here (indicating), and I'm going to lift this

 8   one up so you can kind of see its contents.  Can you

 9   see the contents of these ones?

10   A.   Not really.

11   Q.   So just these top two, can you now see the

12   contents of these two okay?

13   A.   Yeah.

14   Q.   Okay.  And can you see the contents of these ones

15   okay?

16   A.   Yeah.

17   Q.   Towards the end of pressing pills with Mr. Shamo,

18   about how much time in the fall of 2016 would it have

19   taken you to press the pills that you see in all of

20   these top totes?

21   A.   Um, it could have taken an entire month or more.

22   Q.   And you mentioned earlier that you would

23   sometimes stockpile the Xanax or Alprazolam pills.

24   Would you sometimes stockpile the pills containing

25   fentanyl?
```

01:46:48
01:47:05
01:47:25
01:47:48
01:48:13

52

01:48:29

01:48:44

01:49:47

01:50:07

01:50:23

1    A.    Eventually we got -- we were caught up and we

2    were able to, yeah.  At one point or maybe a couple

3    of different times we were able to do that, yeah.

4    Q.    Would you keep that stockpile or large quantities

5    of those fentanyl containing pills at Mr. Shamo's

6    house for very long?

7    A.    I mean there were times where they were there.  I

8    mean, after I was there and they were pressed.  But

9    then eventually in a day or two they were usually

10   sent to the girls or Chris.

11   Q.    Okay.  Did you ever have a week or so where you

12   pressed 70,000 fentanyl containing pills?

13   A.    Um, it could have happened in a week.  Yeah.

14   Q.    Did you ever deliver pills yourself to the

15   packaging or shippers?

16   A.    There was -- no.  I mean there was one time that

17   I took them a bag of something.

18   Q.    Did you know what was in the bag?

19   A.    I mean, yeah, I knew it was Xanax.

20   Q.    And why was it that you took them on that

21   occasion?

22   A.    He had an order that needed to be fulfilled that

23   night and shipped out in the morning.  Someone had

24   put in an order online.

25   Q.    If you only did that on one occasion, then who

53

```
 1   was taking them every other time?

 2   A.   Um, he was.

 3   Q.   I want to show you a few photos that were taken

 4   during the execution of Mr. Shamo's home and ask you

 5   a few questions about them.  If we can pull up

 6   Government's Exhibit 13.09 photo 10.  Do you

 7   recognize this photo?

 8   A.   Um, yeah.

 9   Q.   What is it?

10   A.   It is the -- down in the room that the pill press

11   was in, there is that big mixer.  So that's just the

12   room where the pills were being made.

13   Q.   This isn't the original press that you were

14   trained on; is that right?

15   A.   No.

16   Q.   At what point did Mr. Shamo get this press?

17   A.   Um, that one came later on, months after, but I

18   think that is the second press.

19   Q.   And when you say the second press, you mean the

20   press after the first one that you were trained on

21   with the big wheel on top?

22   A.   The third press in that case then.

23   Q.   This would be the third press?

24   A.   Yeah.

25   Q.   Okay.  And before getting this press, did he talk
```

01:50:44 (line 5)
01:51:05 (line 10)
01:51:21 (line 15)
01:51:45 (line 20)
01:51:53 (line 25)

54

1  to you about getting it?

2  A.  Yeah.

3  Q.  Did you have a discussion why he was getting it?

4  A.  Yeah.  He just wanted to have one press for the

01:52:11  5  fentanyl pills and one press for the Xanax pills.

6  Because I mean like I said, in order to take the dies

7  out and go from pressing one pill to another it was a

8  lengthy process.  You had to set up the machine

9  right, they had to be adjusted, size the pressure,

01:52:38  10  taking each die out and putting a new one in took a

11  long time.

12  Q.  Did you contribute to the cost of purchasing this

13  press?

14  A.  No.

01:52:48  15  Q.  Did you order the press yourself?

16  A.  No.

17  Q.  Is there a reason that it may have come to you

18  and Mr. Shamo in your name?

19  A.  Yeah.  I mean he -- it was just the same -- for

01:53:06  20  the same reason that he would send other packages to

21  different people.  And obviously a package of that

22  size and weight couldn't really send that to anybody

23  else so he sent it to me.

24  Q.  Do you know where it came from?

01:53:25  25  A.  China, I believe.

55

1  Q.   And when it arrived, was it delivered to your

2  home or some other location?

3  A.   Um, a different location.

4  Q.   What location was that?

01:53:40  5  A.   Um, it was where I was living with my girlfriend,

6  the house that she was living at, Emily Mitchell's

7  home.

8  Q.   And once it arrived there, how did it get to

9  Mr. Shamo's house?

01:53:53  10  A.   We picked it up using his truck.

11  Q.   Was anyone else involved in moving it?

12  A.   No.

13  Q.   You mentioned that it was -- it was sent to you

14  in a similar fashion as other packages were sent to

01:54:16  15  other people.  Does that mean you were paid for

16  having it sent in your name?

17  A.   Yeah, I was paid.

18  Q.   Do you recall how much you were paid?

19  A.   I mean depending on the size of it, two to three

01:54:27  20  to 4,000.

21  Q.   Okay.  Let's look at Government's Exhibit 13.09,

22  photo 13.  Do you recognize the piece of machinery in

23  this photo?

24  A.   Yeah.

01:54:42  25  Q.   What is it?

56

```
 1   A.   It is the other pill press.

 2   Q.   And when did Mr. Shamo get this press?

 3   A.   That was the first one that was purchased after

 4   we got rid of the first single die press.  So, um,

 5   March or April.

 6   Q.   Did he talk to you before getting this press

 7   about getting it?

 8   A.   Yeah.

 9   Q.   And how did the discussion go?

10   A.   Just that he was thinking about getting a more

11   efficient faster press.  The one that we had was

12   having the issues of getting jammed and so that was

13   the reasoning.

14   Q.   Who was this press shipped to?

15   A.   To me.

16   Q.   Did you purchase it?

17   A.   No.

18   Q.   Why was it shipped to you?

19   A.   That same reason.  And so that he and I could

20   pick it up in his truck.  The same reason of I mean

21   nothing that he was ordering was being sent to his

22   house.

23   Q.   In the circumstances of this press, was it you

24   and him who again transported it to his house?

25   A.   Yes.
```

01:55:08    5

01:55:18    10

01:55:33    15

01:55:47    20

01:56:03    25

57

```
 1   Q.   And once you got a press into the house, then

 2   what, what did you guys do with it?

 3   A.   Um, we had to figure out how to set it up, it

 4   didn't come with any instructions.  So they would

 5   first send the base of the machine and then the

 6   moving parts or the top part of it were like the

 7   rotary part of it would come later.

 8   Q.   The base part, did they always look somewhat

 9   similar to the base of this pill press here in the

10   courtroom.

11   A.   Yeah, pretty much.  I don't think it came with

12   the two rods, only the center one and then later on

13   we attached those two rods.

14   Q.   So after you received those parts, other than the

15   base, who was it that would work on getting the press

16   functioning and working right?

17   A.   Mainly myself.

18   Q.   Did Mr. Shamo help with that as well?

19   A.   Yeah.  Like in the beginning when we got the

20   first one it was a combined effort.

21   Q.   Let's look at Government's Exhibit 13.09, photo

22   11.  Do you recognize kind of the setting that's

23   depicted in this photo?

24   A.   I do.

25   Q.   Is this still in that same press room in
```

01:56:27 (line 5)
01:56:43 (line 10)
01:57:03 (line 15)
01:57:18 (line 20)
01:57:36 (line 25)

58

|        | 1  | Mr. Shamo's house? |
|--------|----|--------------------|
|        | 2  | A.   Yes. |
|        | 3  | Q.   Can you tell me about some of the items that are |
|        | 4  | showing in this photo?  Specifically the items on the |
| 01:57:48 | 5  | table as well as on the shelf? |
|        | 6  | A.   Yeah.  Those are the mason jars, that's the |
|        | 7  | scale, some rubber gloves, some bags of pills, and |
|        | 8  | that's pretty much it. |
|        | 9  | Q.   It looks like -- |
| 01:58:05 | 10 | A.   Powder in the back. |
|        | 11 | Q.   Yeah, that is what I was going to ask about.  The |
|        | 12 | powder in the back, do you know what kind of powder |
|        | 13 | that was? |
|        | 14 | A.   Um, most likely the microcrystalline cellulose. |
| 01:58:18 | 15 | Q.   And why do you say that? |
|        | 16 | A.   I just remember it being in a bigger bag.  The |
|        | 17 | other powders came -- I mean yeah, the other powders |
|        | 18 | came in smaller bags. |
|        | 19 | Q.   So Ms. Laughter, if you can zoom out and zoom |
| 01:58:33 | 20 | back in on the lower shelf there by the table leg. |
|        | 21 | Can you see the item that's there on that shelf? |
|        | 22 | A.   Yes. |
|        | 23 | Q.   Do you know what type of -- what that item is? |
|        | 24 | A.   In the middle? |
| 01:58:49 | 25 | Q.   Yes. |

59

|       |    |                                                        |
|-------|----|--------------------------------------------------------|
|       | 1  | A.    I would guess the lactose or the corn starch.    |
|       | 2  | Q.    Is that one of the ingredients in the inactive   |
|       | 3  | ingredients?                                           |
|       | 4  | A.    Yeah.                                             |
| 01:59:03 | 5  | Q.    Okay.  If we can go to Government's            |
|       | 6  | Exhibit 13.09, photo 12.  And Ms. Laughter if you can  |
|       | 7  | zoom in on that top shelf.  Do you recognize what is   |
|       | 8  | up there on that top shelf?                            |
|       | 9  | A.    Yeah.                                             |
| 01:59:30 | 10 | Q.    And it looks like there is additional bags of |
|       | 11 | powder.  Do you know what substance was in those bags  |
|       | 12 | of powder?                                             |
|       | 13 | A.    I think it was the Alprazolam.                   |
|       | 14 | Q.    Okay.  If we can zoom back out and go to        |
| 01:59:54 | 15 | Exhibit 13.09, photo 19.  Do you recognize this piece |
|       | 16 | of equipment?                                          |
|       | 17 | A.    Yes, one of the mixers.                           |
|       | 18 | Q.    And when did -- when did you or Mr. Shamo get   |
|       | 19 | this?                                                   |
| 02:00:13 | 20 | A.    I think it came after or around the same time as |
|       | 21 | the third press for the Xanax.  That was mainly used   |
|       | 22 | for -- that was only used for the Xanax.               |
|       | 23 | Q.    Maybe I should also clarify.  Did you order this? |
|       | 24 | A.    No.                                               |
| 02:00:35 | 25 | Q.    Did Mr. Shamo order it?                          |

60

```
 1    A.    Yeah.

 2    Q.    Who was it shipped to?

 3    A.    It was shipped to me.

 4    Q.    Did you get paid for receiving this?

 5    A.    Yes.

 6    Q.    Do you recall how much?

 7    A.    Probably around 2- or 3,000.

 8    Q.    Let's go to -- well, as opposed to moving on, you

 9    also had a smaller version of this mixer; is that

10    right?

11    A.    Yeah.

12    Q.    And did you get -- did Mr. Shamo get that smaller

13    mixer before or after this one?

14    A.    Before.

15    Q.    And do you know who that was shipped to?

16    A.    To me.

17    Q.    And did you -- how much did you receive in

18    payment for receiving that?

19    A.    That one I can't remember.  A smaller amount, a

20    thousand or less.

21    Q.    I want to go to Government's Exhibit 13.09 and

22    look at three photos, 27, 28 and 29.

23          And Ms. Laughter, if you can leave it on the

24    first one for about five or six seconds, scroll to

25    the second one, and then scroll to the third one.
```

02:00:45 (line 5)
02:01:03 (line 10)
02:01:11 (line 15)
02:01:23 (line 20)
02:01:42 (line 25)

61

1    Do you recognize the items that are depicted

2  in that photo or those three photos?

3  A.   Can you show them to me again.  This one, yeah.

4  Q.   Ms. Laughter, if you can go back to 27.

02:02:08    5  A.   Um, yeah.

6  Q.   There is some packaging to the side of this box

7  with some pink on it.  Was it common to see this type

8  of packaging in Mr. Shamo's house?

9  A.   That was the packaging that they used for like

02:02:28    10  the active ingredient of either fentanyl or

11  Alprazolam.  So yeah, I saw it a few times.

12  Q.   Ms. Laughter, would you go to the next photo.

13  There is similar packaging but different coloring.

14  Same question.  Did you see this type of packaging

02:02:48    15  that had foreign writing on it with powder inside in

16  a separate bag?

17  A.   Um, yeah, it's possible.  Most likely.

18  Q.   Okay.  If we can go to Government's

19  Exhibit 13.09, photo 33.  Do you recognize this item?

02:03:18    20  A.   Um, I mean it looks -- yeah, it looks like a pill

21  press.

22  Q.   So the jury has heard testimony that this was a

23  press that was found in a crate in Mr. Shamo's

24  garage.  Do you know why he had another press sitting

02:03:33    25  in his garage?

62

```
 1   A.   Yeah.   The one -- the one press that was used to

 2   press the Xanax, like that center rod seemed to be

 3   slightly bent so when it was going around it was

 4   making a lot of noise and also getting stuck so it

 5   needed a replacement.   Or I guess that might be --

 6   that looks like it is the machine.   But that was the

 7   reason for getting a new one.

 8   Q.   Did you contribute or purchase this press?

 9   A.   No.

10   Q.   Do you know who it was shipped to?

11   A.   Shipped to me.

12   Q.   Did you receive payment for having it shipped to

13   you?

14   A.   Yeah.

15   Q.   How much were you paid?

16   A.   The same amount, around 2- to 3,000.

17   Q.   You mentioned the Xanax press that it may have

18   had an issue with the center rod.   Would that cause

19   -- did you observe was this a cause for why powder

20   would spill out around that press or was that --

21   A.   I am sure that contributed to it.

22   Q.   Was there any other reason why there would be

23   powder all over that press?

24   A.   For the speed that it was going at I am sure that

25   it just got thrown off.
```

02:03:53 (line 5)
02:04:08 (line 10)
02:04:14 (line 15)
02:04:28 (line 20)
02:04:44 (line 25)

63

```
 1   Q.   When you would press the Xanax pills, did you

 2   ever use that press?

 3   A.   I don't think so, no.

 4   Q.   Okay.

 5   A.   I mean I probably -- I mean I did help to try to

 6   figure out why it was having the issue that it was

 7   having.

 8   Q.   Okay.  In respect to pressing pills, Xanax and

 9   fentanyl pills, were you aware if Mr. Shamo ever

10   tried to get Mr. Crandall to come back and start

11   pressing pills after he had left the country?

12   A.   That I don't know.

13   Q.   Do you know if Mr. Shamo was trying to replace

14   you with someone else or get additional help for

15   pressing pills?

16   A.   Um, yeah.  There was talk about, you know, I -- I

17   didn't want -- I mean I can't remember what he and I

18   spoke about but I was telling him like I'm going to

19   be done on this date.  I don't want to do this any

20   more.  So he was probably -- he did try to recruit

21   Mario, I believe offered Mario to -- offered that

22   position to Mario.

23   Q.   What date did you give him that you wanted to be

24   done?

25   A.   I believe we were going to be done by December of
```

02:04:58 (line 5)
02:05:18 (line 10)
02:05:32 (line 15)
02:05:57 (line 20)
02:06:13 (line 25)

64

```
     1  that year, end of December or somewhere -- sometime
     2  in December.  I can't remember exactly.
     3  Q.   Which year are we talking about?
     4  A.   2016.
02:06:26   5  Q.   Why did you feel it necessary to give him notice
     6  of being done or wanting to be done?
     7  A.   Just letting him know that if he was going to
     8  continue that I wasn't going to be there.
     9  Q.   Were you aware of Mr. Shamo's plans to expand to
02:06:51  10  another packaging and shipping location in Colorado?
    11  A.   Not a whole lot.  I remember some small talk
    12  about it, but he also did mention that he wanted to
    13  be done as well.  So...
    14  Q.   Did he give you a date as to when he would be
02:07:16  15  done?
    16  A.   No.  I mean I can't say exactly, but I do think
    17  that we kind of both agreed in December we were going
    18  to be done.
    19       THE COURT:  Pick a good stopping point and
02:07:26  20  we'll take our first break.
    21       MR. BURGGRAAF:  I'll do one more question and
    22  then we'll stop.
    23       THE COURT:  All right.
    24  Q.   (By Mr. Burggraaf)  Were you ever aware of anyone
02:07:34  25  ever dying or getting sick after using the fentanyl
```

65

```
 1   pills or Xanax pills?
 2   A.   There -- in the very beginning we did have a
 3   scare from Chris that he believed at that point that
 4   it was because of the use of the fentanyl pills and
 5   later on, like a week or so later, he reached back
 6   out to Shamo and said that that wasn't the cause of
 7   her death, it was something else.  So that was the
 8   only thing -- that was the only time that I had ever
 9   heard about.  It was obviously a scary moment for the
10   both of us, for everybody and I told him that I was
11   done at that point.
12        And then later on when he told me that Chris
13   had reached back out to him and told him that that
14   wasn't the cause of death and that Chris has big
15   plans and that we -- that I should come back and
16   consider it again because that wasn't what happened.
17   And, you know, that I was going to get paid more.
18   And so I ended up going back because I was told that
19   that wasn't the cause of this individual's death.
20        MR. BURGGRAAF:  Okay.
21        THE COURT:  Thank you.  We'll be in recess
22   for about 20 minutes.
23        (Jury leaves the courtroom.)
24        THE COURT:  Thank you.  We'll be in recess.
25        (Recess.)
```

02:07:56

02:08:16

02:08:39

02:08:58

02:30:27

66

```
 1              THE COURT:  Go get the jury and we'll
 2   proceed.
 3              MR. BURGGRAAF:  Your Honor, for
 4   clarification, when I said I had one more question I
 5   hope you didn't interpret that as meaning I was done.
 6              THE COURT:  I did not.
 7              MR. SKORDAS:  I thought he was.
 8              MS. BECKETT:  I knew better.
 9              THE COURT:  As did I.
10              THE CLERK:  All rise please.
11              (Jury returns to the courtroom.)
12              THE COURT:  You may proceed, Mr. Burggraaf.
13              MR. BURGGRAAF:  Thank you, Your Honor.
14   Q.  (By Mr. Burggraaf)  Mr. Paz, we have talked
15   through how you came about to pressing pills with and
16   for Mr. Shamo.  I want to take you back to the
17   beginning.  You said that you received $10,000.00 in
18   cash from Mr. Shamo.  Was that some form of payment
19   for pills that you were going to press or merely to
20   keep you in Utah to help him press pills?
21   A.   It was just to keep me in Utah.
22   Q.   So did you and Mr. Shamo come to some other
23   agreement in relation to how much you would be paid
24   for pressing pills?
25   A.   Yeah.  Originally we agreed on -- that I would
```

02:30:42
02:31:09
02:31:49
02:32:09
02:32:27

67

```
 1   get paid 25 percent of the pills that I pressed.

 2   Later on that was renegotiated.

 3   Q.   What was it renegotiated to?

 4   A.   Maybe not renegotiated but he did want to change

 5   that and to a lesser amount.

 6   Q.   And was it your understanding when you came to

 7   that agreement that you were an employee or a full

 8   partner of Mr. Shamo's?

 9   A.   An employee.

10   Q.   Did you put anything in writing as far as that

11   agreement?

12   A.   No.

13   Q.   I would like to have us take a look at

14   Government's Exhibit 22.04.  It is on the screen

15   there for you.  Do you recognize this screenshot?

16   A.   I do.

17   Q.   What is it?

18   A.   Pills that I had pressed, amounts that he -- that

19   would be owed for the amount of pills pressed based

20   on the 25 percent.  And then payment that was -- that

21   I received and where the pills were going as far as

22   to the girls or to Chris.

23   Q.   So it looks like at the top of the screen this

24   must be from a phone.  And is it from the Notes App

25   in an iPhone?
```

02:32:49

02:33:09

02:33:24

02:33:44

02:34:11

68

1    A.    Yeah.

2    Q.    Is it from your phone?

3    A.    Yeah.

4    Q.    Why did you feel the need to track the pills that

02:34:21    5    you made and the money owed like this?

6    A.    He just wanted me to keep track of the pills that

7    I was pressing specifically to pay me for those

8    amounts.  And because I would press pills and then

9    leave them at his house and then maybe that night or

02:34:44    10    in the morning or sometime when I wasn't there he

11    could take them to Chris or the girls.  I would just,

12    you know, for my record just keep track of where they

13    were going.

14    Q.    It looks like the first date we have up there

02:34:58    15    April 20th and April 21st.  At this point, are you

16    tracking Xanax pills or fentanyl pills?

17    A.    No, this is just the fentanyl.

18    Q.    The 3K in front of April 20th, is that

19    representing the number of pills that you pressed?

02:35:15    20    A.    I believe so.

21    Q.    And actually, Ms. Laughter, if you'll zoom out

22    momentarily here.  It looks like there was -- there

23    is maybe the hint of some other text above that

24    April 20th date.  Were you tracking the pills pressed

02:35:31    25    and the amounts owed prior to April 20th of 2016?

A.   Um, that I'm not sure.  I started -- I started tracking these amounts when the fentanyl pills were being pressed so it would have been around that time.

Q.   You have got a number there total 13.8K.  Is that representing 13,800?

A.   I think so, yeah.

Q.   And what did you understand the price of the fentanyl pills or the price that Mr. Shamo was selling them for?

A.   I understood it to be $5 a pill and so 25 percent of that would be $1.25.

Q.   Is that where you got the figure of $17,250?

A.   Yeah.

Q.   If there is only the 3K and the 3.5K showing above, is it fair to say that that 13.8 thousand also included pills that were pressed prior to April 20th?

A.   Yeah, I think that's for the whole month of April.  13.8 was April's amount.

Q.   As we go down the page, you have got wording that says "paid $2,500 June 4th.  Paid $2,500 June 10th." And then you have got written here, "Amazon 1,000, June 10th."  What does that mean?

A.   That I was paid with like an Amazon gift card.

Q.   Were you often paid in other methods other than cash?

```
 1   A.   No, not often.  Just mainly cash.
 2   Q.   And did you know where the cash was coming from
 3   that you were paid with?
 4   A.   It was first Bitcoins and then converted to cash
 5   through trading it with another person.  So the cash
 6   was coming from there.
 7   Q.   And do you know how -- or were you involved at
 8   this stage in June of 2016 in exchanging Bitcoin for
 9   cash?
10   A.   Um, I had been to a couple of transfers with him
11   personally.  Um, he sent me a small amount, probably
12   less than 5,000, I can't remember.  100 percent of
13   where I could do whatever with it, buy a gift card
14   online with it, meet up with somebody with it, and so
15   that would have been my only Bitcoin related
16   transactions.
17   Q.   So on the left there there is several other paid
18   and Amazon amounts through June and then you have got
19   monetary amounts on the right side 11,250 owed,
20   7,750, 1,450, 450 owed.  Is that just tracking the
21   running total of what you believed you were owed for
22   the pills you had pressed?
23   A.   Yeah.
24   Q.   Down below you have another total based on pills,
25   a pill count.  Is it accurate to say that in May you
```

71

1    at least pressed either the equivalent of or

2    somewhere close to 15,600 fentanyl type pills?

3    A.   Yup, uh-huh (affirmative).

4    Q.   And you felt based on the calculation then that

02:39:19    5    he owed you 19,500 for that amount?

6    A.   Right.

7    Q.   You have got a couple of other May 10th lines.

8    One that says, "30K girls, one that says 15K Chris."

9    What do those lines mean?

02:39:34    10   A.   Um, I believe that 30K went to the girls and 15K

11   went to Chris.  I think that's what it means.

12   Q.   And is the Chris that's referenced here the same

13   Chris that we were speaking about previously?

14   A.   Yeah.

02:40:00    15   Q.   And do these numbers reflect purely fentanyl

16   based pills?

17   A.   I believe so.

18   Q.   Going further down you have got, "June 7th, 15K,

19   Chris; June 9th, 22K total 5K went to girls, 27K; and

02:40:24    20   then June 10th, 60K total 5K went to girls, 65K."  Is

21   that -- is it fair to say that the end number for

22   each of those lines, the last two lines, are the

23   amount of pills that you would have pressed either on

24   that date or leading up to that date and then also

02:40:48    25   noting the source of -- or the location of where

72

1530

1  those pills were taken thereafter?

2  A.   I believe so.

3  Q.   You mentioned that Mr. Shamo would pay you in

4  cash and also in Amazon gift cards.  Why would he use

02:41:08  5  Amazon gift cards to pay you?

6  A.   Um, because you could buy them with Bitcoins.

7  Q.   Okay.

8  A.   And that was the hard part was getting cash from

9  the Bitcoins.

02:41:22  10  Q.   How often would Mr. Shamo pay you?

11  A.   A few times -- it would depend on the rate that

12  he, you know, that you could meet up with somebody

13  and transfer Bitcoins and receive cash.  So that part

14  wasn't frequent.  But it could be once or twice a

02:41:45  15  week or it could be once every two weeks, once a

16  month.

17  Q.   And how were you using the money that he was

18  paying you?

19  A.   How was I using it?

02:41:56  20  Q.   Yes.

21  A.   Just to live with, buy gas, groceries, that type

22  of stuff.  I mean vacations, um, Vegas, gambling.

23  Q.   Did Mr. Shamo ever pay you in Bitcoin?

24  A.   Yeah.

02:42:19  25  Q.   You mentioned the 5,000 amount, was that

73

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 02:42:34 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 02:42:56 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 02:43:08 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 02:43:25 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 02:43:46 | 25 |

1    $5,000.00 in value of Bitcoin?

2    A.   Yeah.

3    Q.   Not actually 5,000 Bitcoin, right?

4    A.   Right.

5    Q.   When did he give you that $5,000?

6    A.   I don't remember that.  It was sometime around

7    that time, June, probably June, July.  The $5,000

8    amount, I believe, was around that time.

9    Q.   At that, whether it was June or July, whenever

10   you received that $5,000 worth of Bitcoin, did you

11   already have a Bitcoin wallet?

12   A.   No.

13   Q.   Was that the first time you opened up your own

14   Bitcoin wallet?

15   A.   Yeah.

16   Q.   Did you at any point have more than one Bitcoin

17   wallet?

18   A.   Yeah.

19   Q.   When else did you have a Bitcoin wallet other

20   than the one that this 5,000 worth of Bitcoin was put

21   into?

22   A.   There was another time where he sent me like

23   50,000 value, so I don't know how many coins that was

24   to another wallet, and I used that one a little bit.

25   Q.   Why did you have a separate wallet when he gave

1    you that amount?

2    A.   I think one was on a computer and one was on my

3    phone.

4    Q.   What did you use that $50,000.00 worth of Bitcoin

02:44:01    5    for?

6    A.   I didn't use all of it.  And of the amount that I

7    did use was like trade somebody at one point for like

8    $8,000 and then gambled with it on an online Bitcoin

9    gambling site.

02:44:27    10   Q.   So tell me about the time when you traded $8,000

11   worth of Bitcoin.  How was that set up?  Who was

12   involved?

13   A.   There was a site localbitcoins.com that you can

14   meet up with anybody in any state.  And so I just

02:44:48    15   messaged one of those individuals in Georgia and met

16   up with them there.  I don't know anything about the

17   person, just made the transaction and sent him

18   Bitcoins, got the cash and then that was that.

19   Q.   Was that the first time you were ever involved in

02:45:08    20   a Bitcoin for cash exchange?

21   A.   I believe so, yeah.

22   Q.   And why was it in Georgia?

23   A.   I was out there working.

24   Q.   What were you doing for work?

02:45:20    25   A.   Selling smart home systems.

75

```
 1   Q.   So were you still maintaining a regular job while

 2   pressing pills for Aaron Shamo?

 3   A.   I was trying my hardest to.  Yeah.

 4   Q.   Why?

 5   A.   I wanted to continue working and wanted my family

 6   to know that I was still working.  If I just all of a

 7   sudden stopped working but I had all this money,

 8   questions would be asked and so I wanted to continue

 9   working.

10   Q.   You mentioned two amounts of Bitcoin that

11   Mr. Shamo transferred to you, one for $50,000.00

12   worth and one for $5,000.00 worth each going to

13   different wallets.  Were there any other times where

14   Mr. Shamo paid you in Bitcoin?

15   A.   Not that I recall.

16   Q.   Did you ever open up or establish any other

17   Bitcoin wallet?

18   A.   No.

19   Q.   And to clarify, what was your understanding as

20   far as where Mr. Shamo was getting the Bitcoins that

21   he provided to you?

22   A.   Through the proceeds of the online sales from the

23   pills.

24   Q.   Did you have access to those Bitcoin proceeds

25   from the online sales?
```

02:45:35 — line 5
02:45:57 — line 10
02:46:16 — line 15
02:46:37 — line 20
02:46:54 — line 25

76

```
 1    A.    No.
 2    Q.    Did you know of anyone else who had access to
 3    those proceeds other than Mr. Shamo?
 4    A.    No.
 5    Q.    Do you know how many cryptocurrency wallets,
 6    Bitcoin or otherwise, that Mr. Shamo had?
 7    A.    No.
 8    Q.    You mentioned that you set up an exchange
 9    Bitcoins for cash in Georgia.  Did you -- did you set
10    up an exchange like that on any other occasion for
11    yourself?
12    A.    There -- I think yeah, there was one other time
13    that I met with somebody in Utah.  Those are the only
14    two times that I had ever done a transaction.
15    Q.    And how much was that exchange for, the one that
16    you set up in Utah?
17    A.    I think it was less than 1,000.  Might have been
18    1,000.
19    Q.    After Mr. Shamo had been arrested, you ended up
20    turning over some Bitcoin to law enforcement; is that
21    correct?
22    A.    Correct.
23    Q.    Though it was quite some time after Mr. Shamo's
24    arrest; is that right?
25    A.    Yeah.
```

02:47:06 (line 5)
02:47:30 (line 10)
02:47:49 (line 15)
02:48:09 (line 20)
02:48:17 (line 25)

77

```
          1    Q.   Did you spend or use the Bitcoin that was left

          2    between when Mr. Shamo was arrested and when you

          3    finally turned it over?

          4    A.   That was the 8,000 of it.

02:48:33  5    Q.   Did you lose any additional Bitcoin due to

          6    gambling?

          7    A.   Yes.

          8    Q.   Do you know how much?

          9    A.   No.  I can't remember how -- yeah, I don't

02:48:48  10   remember that.

          11   Q.   Also after Mr. Shamo had been arrested, sometime

          12   after he had been arrested, more than a year, you

          13   turned over additional cash to law enforcement; is

          14   that right?

02:49:01  15   A.   Yes.

          16   Q.   Where did that cash come from?

          17   A.   From trading Bitcoins.

          18   Q.   Your own Bitcoins?

          19   A.   No.  So it was a couple of different transactions

02:49:22  20   from one Bitcoin trader in California and he found us

          21   on the local Bitcoin website.  And I was the one that

          22   was talking to him and met up with him here in Utah

          23   and sort of large amounts 2, 300, 400,000 but I

          24   didn't have the Bitcoins.  Once I got there, I text

02:49:58  25   Shamo, let him know the money is here, he would send
```

78

1  the Bitcoins from his computer to their cell phone.

2  Once they received them we would part ways, I would

3  take the money and they would leave.  So the majority

4  of that money came from those transactions.

02:50:15  5  Q.   When did -- when did those transactions take

6  place?

7  A.   Not until the very end, like end of October or

8  early November or about a period of two weeks.

9  Q.   Did you have a substantial sum of cash prior to

02:50:33  10  that time on you?

11  A.   Not a whole lot.

12  Q.   How much do you think you had on hand prior to

13  those Bitcoin transactions?

14  A.   I mean at that point I did have some from

02:50:49  15  Bitcoins and I would say 30, 40,000.

16  Q.   You mentioned that you would text Mr. Shamo when

17  you were meeting up to make those exchanges.  Were

18  these Mr. Shamo's Bitcoins that were being traded?

19  A.   Yes.

02:51:14  20  Q.   Why was it that you were the one showing up in

21  person and communicating with this individual from

22  California?

23  A.   I was the one that had my -- my number on the

24  website localbitcoins.com.  They called my number,

02:51:33  25  texted me, I was the one talking to them.  And

because it was such a large amount, you know, we

didn't know if it was law enforcement or what. So it

was really risky but I ended up being the one that

went out to do that transaction initially.

02:51:56    Q.   At the time did you think that trading Bitcoin

for cash was illegal?

A.   No.

Q.   And why were you concerned if it was law

enforcement?

02:52:05    A.   Because it was a large amount and could have been

that the people who had those amounts, those large

amounts of Bitcoins, could most likely, you know,

could have been doing something illegal to get them.

Q.   So you mentioned 2, 3, 400,000. Do you remember

02:52:30    how many times you met with this individual from

California to make these exchanges?

A.    Not for certain, 5 or 6, around that, I think.

Maybe close to 5.

Q.   And were they all that large as far as the value

02:52:45    of exchanges?

A.    They were all significantly large, yeah.

Q.   When you turned the cash over to law enforcement

at the end of the day it was just over $800,000 in

cash.  If these were Mr. Shamo's Bitcoins, why did

02:53:03    you have that much cash?

1  A.   That was from amounts that he -- so the whole

2  time that I was pressing I would press all these

3  pills and we couldn't convert the Bitcoins to cash

4  and so that was the biggest, I guess, issue.  Just

5  couldn't find anybody with that amount of money and

6  that often to trade to receive as cash.

7         So when this guy was trading this amount of

8  money, that large sum of money, then he was able to

9  pay me what was owed.

10  Q.   So it was actually back wages?

11  A.   Yeah.

12  Q.   Ms. Laughter, will you pull up the exhibit we

13  were on Government's Exhibit 22.04.  This is that

14  note where you're tracking pills and amounts owed.

15  The last dollar figure you have here, which I assume

16  -- am I correct in assuming that that 19,500 is

17  anything that was owed prior to May 10th?

18  A.   Yeah, that's about right.

19  Q.   So you don't have any additional dollar values

20  further down that page.  Did you continue to track

21  the number of pills after June 10th that you had

22  pressed?

23  A.   I did, yeah.

24  Q.   And did the number of pills you're pressing

25  increase significantly as you went on throughout the

02:53:24
02:53:46
02:54:05
02:54:29
02:54:43

81

```
 1  summer and into the fall?
 2  A.   It did.
 3  Q.   Is that why you had a back amount -- a back
 4  amount owed of around $800,000 or more?
 5  A.   Yes.
 6  Q.   Now, there is a bit of time between when
 7  Mr. Shamo is arrested and when this exchange happens
 8  in the end of October 2016 and November 2016 and the
 9  time that you actually turned the money over to law
10  enforcement.  How much of the cash that you received
11  from Mr. Shamo, either through these exchanges or
12  otherwise, did you spend during that timeframe?
13  A.   I did not keep track of that.  I don't know.  Um,
14  a few hundred thousand.
15  Q.   You spent a few hundred thousand?
16  A.   I would say so.
17  Q.   What did you spend it on?
18  A.   Gambling, just entertainment, trips to Vegas,
19  living expenses.
20  Q.   What expenses?
21  A.   Living expenses.  Just pretty much it.
22  Q.   Did you spend any of the money you were earning
23  on family, your girlfriend or fiancée at the time, or
24  anyone else?
25  A.   Um, a little bit, yeah.
```

02:54:59 (line 5)
02:55:21 (line 10)
02:55:43 (line 15)
02:56:03 (line 20)
02:56:24 (line 25)

```
 1   Q.    What types of things would you use that money for

 2   when you were spending it for your girlfriend,

 3   fiancée, or other members of your family?

 4   A.    Birthday presents, gifts.  That's really it.

 5   Q.    I know it is a difficult subject.  You mentioned

 6   that your sister had health concerns.

 7   A.    Yeah.

 8   Q.    How much money did you help her out with?

 9   A.    I didn't ever give her any of the money.  I

10   wanted -- I mean like I knew I couldn't give her any

11   of the cash that was being, you know, from that,

12   questions would come.  And so my initial thought was

13   I wanted to be able to help her out with it obviously

14   in the future and just didn't know how exactly.

15         Um, it would have involved money laundering

16   but I didn't end up giving her any of that money.  I

17   did donate to her from the money that I received from

18   Vivint and worked enough that I could but it wasn't

19   anything from any of this.

20   Q.    How much did you donate to her from your Vivint

21   job?

22   A.    Like 4- or $500.00.

23   Q.    Okay.  Is it fair to say that you took some great

24   trips, vacations with Mr. Shamo during the timeframe

25   that you were pressing pills with him?
```

02:56:48 (line 5)
02:57:08 (line 10)
02:57:30 (line 15)
02:57:50 (line 20)
02:58:08 (line 25)

83

```
1    A.   We went on some, yeah.

2    Q.   What types of trips and vacations did you go on

3    with him?

4    A.   We went to Vegas a lot.  Within one year it was

5    probably 10 or 15 times.  We went on a cruise and

6    California.  Um, I think that's it.

7    Q.   How about any boating trips?

8    A.   Went boating as well.

9    Q.   Whose boat was it that I went out on?

10   A.   Um, it was a boat that he purchased with some

11   friends.  So it was their boat.

12   Q.   Of all of these trips, um, were you funding them?

13   Was he funding them?  How were they being paid for?

14   A.   Um, I mean in the beginning it was, you know, he

15   helped.  We had other friends that helped.  So the

16   majority of it was from him or others.  But later on,

17   when I had more money, I didn't need that any more.

18   So I could --

19   Q.   You mentioned that Mr. Shamo with friends bought

20   a boat.  Who were the friends that he bought a boat

21   with?

22   A.   Um, Roy and Clint.

23   Q.   Are they depicted?  If we can pull up 7.10 photo

24   6.  Do you recognize are Roy and Clint depicted on

25   this chart?
```

02:58:22 — line 5
02:58:42 — line 10
02:59:09 — line 15
02:59:27 — line 20
02:59:42 — line 25

84

|     |                                                                      |
|-----|----------------------------------------------------------------------|
| 1   | A.   Yeah, they're the bottom row in the middle                      |
| 2   | Stephens and Perry.                                                   |
| 3   | Q.   How were they involved in this drug trafficking                  |
| 4   | operation?                                                            |
| 5   | A.   Just I don't think they were much.  From what I                 |
| 6   | know, they just received some packages.                              |
| 7   | Q.   Either in social settings or other settings, did                |
| 8   | you use any of the drugs you were producing?                         |
| 9   | A.   No.                                                              |
| 10  | Q.   Did Mr. Shamo try the pills that you were                       |
| 11  | pressing?                                                             |
| 12  | A.   I would say no.                                                  |
| 13  | Q.   Did you use any other drugs?                                    |
| 14  | A.   I have used other drugs, yeah.                                  |
| 15  | Q.   Tell me what drugs you have used?                              |
| 16  | A.   Um, I tried MDMA three or four times; cocaine,                  |
| 17  | five or six times; and GHB one time and marijuana.                   |
| 18  | Q.   And where did you get these drugs?                             |
| 19  | A.   Um, they were always offered to me at clubs or                  |
| 20  | parties.  MDMA came from Shamo, cocaine usually came                 |
| 21  | from Shamo, and the GHB came from Shamo.                             |
| 22  | Q.   Did you ever use steroids?                                     |
| 23  | A.   No.                                                              |
| 24  | Q.   Did you ever roofie anyone?                                    |
| 25  | A.   Um, I ended up technically roofie-ing --                        |

02:59:53 (line 5)
03:00:14 (line 10)
03:00:28 (line 15)
03:01:04 (line 20)
03:01:25 (line 25)

85

1    roofie-ing myself, my girlfriend and my friend Mark.

2    Q.   Let's explain that term.   What does roofie mean

3    to you?

4    A.   To me it means like putting GHB in somebody's

03:01:45   5    drink and for whatever purpose of them

6    unintentionally knowing maybe.

7    Q.   Is that what you did to?

8    A.   That is not what I did.   I was given GHB to try.

9    He recommended a certain amount.   I took that amount.

03:02:04   10   And then we got back to the club and I asked say my

11   girlfriend and Mark if they wanted to try it.   They

12   agreed.   And I gave them the same amount that I took.

13   Q.   You mentioned "he".   Who is "he", who is the one

14   that told you the amount to take?

03:02:24   15   A.   Shamo, Aaron.

16   Q.   Is he the one that provided it to you?

17   A.   Yeah.

18   Q.   There has been some discussion about the dark net

19   marketplaces including AlphaBay.   You said you had

03:02:38   20   actually gone on to the Pharma-Master's storefront.

21   How -- and I believe you mentioned that you accessed

22   that through your cell phone; is that right?

23   A.   Yeah.

24   Q.   You are somewhat savvy with things related to

03:02:51   25   your cell phone; is that correct?

86

1   A.   Yeah.

2   Q.   Um, so where did you acquire your knowledge?  How

3   do you become savvy and knowledgeable about how to

4   use your cell phone in a more sophisticated way?

03:03:03   5   A.   I just ever since the iPhone came out and I

6   learned that you can jail brake it and change the

7   appearance of it, change the color of the apps,

8   change the theme of the phone, change anything you

9   wanted to, um, just kind of like a hobby an interest

03:03:25   10   that I liked doing.  I worked at Verizon, learned

11   more about cell phones there, and it's just something

12   that I liked doing.  So...

13   Q.   So, um, when I phrased it as, you know, in asking

14   the question, how did you become more sophisticated,

03:03:45   15   by sophisticated that means you would jail brake the

16   phone for the purpose of more or less changing the

17   cosmetics of how the phone appeared and reacted?

18   A.   Yeah, exactly.

19   Q.   Um, did you use special encryption on your phone

03:04:00   20   or other electronic devices?

21   A.   Never like in general used an app that was --

22   that was encrypted to communicate with Shamo and that

23   was the only encryption that I ever had on any phone.

24   Q.   You mentioned that you accessed the

03:04:22   25   Pharma-Master's storefront on your phone.  How many

```
 1   times did you get on the dark net?
 2   A.   Like two or three.
 3   Q.   Did you ever get on it from another device?
 4   A.   No.
 5   Q.   If we can pull up Government's Exhibit 22.06,
 6   this is two pages.  Let's look at this first page
 7   here.  Do you recognize it?
 8   A.   I do.
 9   Q.   What is it?
10   A.   Um, it is a thread on Reddit somebody explaining
11   how to basically access the Dark Web on your -- on an
12   IOS device and they just recommend a lot of different
13   tools to do so.
14   Q.   You mentioned you accessed the Pharma-Master
15   storefront.  What was your reason for doing that?
16   A.   Just to verify that the products being sold were
17   being sold as what they were which was pressed
18   fentanyl.
19   Q.   And why did you want to verify that?
20   A.   I mean just to make sure that the people who were
21   buying those pills specifically knew what they were
22   buying and weren't having surprises, weren't
23   intending to buy a real one that they were hoping had
24   Oxy in it.  And so I wanted to be able to clearly see
25   as if I was going to go buy myself that if I was a
```

03:04:40 (line 5)
03:04:53 (line 10)
03:05:24 (line 15)
03:05:40 (line 20)
03:06:06 (line 25)

88

```
 1   user I could make that decision seeing that these
 2   were pressed with fentanyl.  That that was something
 3   that I was okay with doing and willing to buy.
 4   Q.   Was that because you understood there was a
 5   difference between Oxycodone and fentanyl?
 6   A.   Yeah.  And also because if I was going to buy
 7   anything from any market or anything, I would want to
 8   make sure it was 100 percent real and what it was
 9   that I was buying and I would want the same for
10   everybody else.
11   Q.   Did you ever buy anything from AlphaBay or
12   another dark net marketplace?
13   A.   No.
14   Q.   There were two desktop computers in Mr. Shamo's
15   home office; is that right?
16   A.   Yeah.
17   Q.   If we can pull up Government's Exhibit 13.09,
18   photo 31.  Had you had the opportunity to observe
19   Mr. Shamo in this office space at his home?
20   A.   Yeah.
21   Q.   What computer was he normally using when --
22   A.   The one on the right.
23   Q.   And what was the one on the left for?
24   A.   It was just a new computer that he purchased that
25   he ended up -- mainly his girlfriend used that
```

03:06:22 (line 5)
03:06:46 (line 10)
03:07:03 (line 15)
03:07:22 (line 20)
03:07:38 (line 25)

89

```
 1   computer.  I would use it.  We would play Star Craft
 2   on it together.
 3   Q.   And did -- which computer -- do you know which
 4   computer Mr. Shamo used to operate the Pharma-Master
 5   storefront and process pill orders?
 6   A.   Yeah, I mean mainly the one on the right.
 7   Q.   You say "mainly".  Did he use the one on the
 8   left?
 9   A.   I don't know if he used the one on the left side.
10   The only one I ever saw him using for those purposes
11   would be the one on the right.
12   Q.   So did you have occasion to observe him actually
13   on the dark net and either processing the orders or
14   doing or putting up listings for the pills that you
15   were creating?
16   A.   Yeah.
17   Q.   And did you ever see the daily order sheet or the
18   orders that came in on a daily basis?
19   A.   There was only like once or twice that I can
20   remember or sorry just seeing orders coming in?  Like
21   on -- I mean he would tell me about orders like every
22   day.  But actually seeing them I don't know if I
23   actually saw those.  What I was referring to about
24   the once or twice was just like the addresses of
25   those individuals who had purchased from the
```

03:07:58
03:08:09
03:08:22
03:08:37
03:08:56

90

```
 1  storefront.
 2  Q.   Where did you see those addresses?
 3  A.   He showed me an e-mail of what they looked like.
 4  Like oh look how pretty this is, all these addresses.
 5  Q.   And was it in an e-mail format or some other
 6  format that he showed you in?
 7  A.   It came through like an e-mail but then you
 8  clicked on a file or e-mail and it was just a text
 9  file.
10  Q.   Okay.  Did you ever use the computer that
11  Mr. Shamo used for accessing the dark net?
12  A.   No.
13  Q.   Did you ever see Drew Crandall access that
14  computer?
15  A.   No.
16  Q.   Did you actually ever take a role of processing
17  daily order -- daily orders or send daily orders to
18  Tonge and Bustin?
19  A.   No.
20  Q.   Did you ever ship pills or other drugs to anyone?
21  A.   No.
22  Q.   You mentioned you used one encrypted app.  Do you
23  remember what it was called?
24  A.   Telegram.
25  Q.   And who did you communicate with using Telegram?
```

Timestamps:
03:09:12 (line 5)
03:09:24 (line 10)
03:09:40 (line 15)
03:10:02 (line 20)
03:10:14 (line 25)

91

1    A.    Just Aaron Shamo.

2    Q.    Anyone else?

3    A.    That was it.

4    Q.    When did you first start using the Telegram App?

03:10:25    5    A.    Um, when he told me about it and told me to get

6    it.  So in the beginning, probably around January or

7    somewhere around there of 2016, maybe 2015, the end

8    of 2015.

9    Q.    When you would communicate with Mr. Shamo using

03:10:48    10    the Telegram App, what was the general subject matter

11    of the messages that you and him would be exchanging?

12    A.    It would only be in relation to this.  Like we

13    would communicate on a normal text messaging

14    otherwise but it would just be about what time are

03:11:08    15    you coming over, we need to do this, we need to do

16    this, we need to do that.  That type of stuff.

17    Q.    Let's look at Government's Exhibit 22.08.  Do you

18    recognize this screenshot?

19    A.    Um, I have seen it.

03:11:28    20    Q.    Do you remember receiving these messages from

21    Mr. Shamo?

22    A.    Yeah.

23    Q.    And I want to stick more to the relevant portions

24    which probably come at the top here.  What was

03:11:40    25    Mr. Shamo trying to communicate to you through this

92

```
 1    messaging?

 2    A.   He just wanted to know what time I was going to

 3    come over to start working again, that's what he

 4    means by we can work.  He says like it looks like it

 5    says something coming at something.  And then so

 6    come, we can work, and he'll drop off, I think that

 7    is supposed to be a comma, we can work and he'll drop

 8    off and then the internet will back up soon and there

 9    is money to be made.

10    Q.   So when he said we can work, what did you take

11    that to mean?

12    A.   Like either to start pressing or just do

13    something to -- whether it was mix powders or press

14    pills.

15    Q.   Okay.  Let's look at Government's Exhibit 22.07.

16    Have you seen this before?

17    A.   Yeah.

18    Q.   What is it?

19    A.    It's just a message from him about things that he

20    is dealing with in regards to sales and costs of

21    things and wanting to renegotiate the amount that he

22    was paying me.

23    Q.   Was this a message from Mr. Shamo to you?

24    A.    Yeah.

25    Q.   How do you know that?
```

03:11:55 (line 5)
03:12:13 (line 10)
03:12:27 (line 15)
03:12:49 (line 20)
03:13:04 (line 25)

93

A.   It looks like it is a picture from my cell phone
that was from the Telegram App.

Q.   Do you remember at some point receiving these
specific messages from Mr. Shamo?

A.   Yeah, I remember that.

Q.   If you wouldn't mind, if you would please read
the messages.

A.   "So also I'm selling a lot more bulk online.
Stuff is moving fast, but it's a huge price drop.  I
want to discuss this with you when you get back.
It's getting down with all of the extras that are
being passed out that I'm not making nearly as much
as predicted.  I'm sure you know this.  So probably
starting next week I'm giving my shippers an up in
pay but I want to cut your pay from a full dollar to
75 cents per pill.  Not a huge difference.  Until I
get a bigger shipping team I have to sell bulk and
not lower quantities.  I want be fair so let me know
your thoughts because I'm doing the math and with
Bitcoin dropping, extras being passed out and cost of
running everything, my cut is getting lower and
lower.  I want to run some numbers with you.  I feel
shifty saying this but when we sell 4,000 Roxy at
five a pop, they send an extra 1K it actually lowers
price to 3.50.  If you get a dollar per pill and

94

```
 1    Bitcoin drops 35 percent, I nearly get what you get
 2    but I'm playing employees, drops, I don't know, man,
 3    let's sit down and talk and run numbers.  I can put
 4    prices up, move slower or we can lower prices and
 5    move quickly."
 6    Q.   He mentions at one point get a bigger shipping
 7    team.  Did you understand what he meant by that?
 8    A.   No.
 9    Q.   Had he talked to you about getting a bigger
10    shipping team?
11    A.   Um, no, just -- not that I recall.
12    Q.   In multiple places he talks about "extras".  What
13    did the extras refer to?
14    A.   Pretty much every shipment that was sent out
15    would be sent out with extra pills.  Um, so like if
16    they ordered 100, they would get 115.  They order
17    1,000, they would get 1,100.
18    Q.   Why was that happening?  Why were extras being
19    included?
20    A.   That I'm not really sure.  It was just something
21    -- I mean instead of having to count out each pill
22    they were measured by weight and they just wanted to
23    throw in extras to make the buyer's happy.
24    Q.   Let's look at Government's Exhibit 14.10.  If you
25    will take a look at this, do you recognize a phone
```

03:14:42 (line 5)
03:14:54 (line 10)
03:15:13 (line 15)
03:15:30 (line 20)
03:15:51 (line 25)

Case 2:16-cr-00631-DAK-JCB Document 408-96 Filed 02/27/19 PageID.9087 Page 55 of 47
2727

```
  1   number in this screenshot?

  2   A.   Yeah, my phone number is in the gray.

  3   Q.   And do you know who the local user is based on

  4   the context of the messages?

  5   A.   I think it is Shamo.

  6   Q.   And do you remember having this exchange of

  7   messages with Mr. Shamo?

  8   A.   Very vaguely, yeah.

  9   Q.   Correct me if I'm wrong, but is it fair to

 10   summarize this discussion by saying that he is

 11   informing you he has got a new iPhone and you're

 12   asking him how he is going to use TOR on the iPhone.

 13   And he is informing you that he doesn't use TOR to

 14   access essentially the Dark Net on his iPhone he only

 15   uses the Telegram App on his iPhone.  Is that a fair

 16   summary of the exchange?

 17   A.   I believe so.

 18   Q.   Let's look at Government's Exhibit 14.10.  Oh,

 19   sorry, that's where we are.  Um, I may have the

 20   number wrong.  Is this a one page exhibit,

 21   Ms. Laughter?

 22        Let's move on to Government's Exhibit 14.29.

 23   And if we can zoom in where it says "body to do" on

 24   down to the end of that.  This is some data that was

 25   retrieved, we have heard testimony about retrieval of
```

03:16:06
03:16:46
03:17:08
03:17:29
03:17:53

96

|     |                                                                   |
| --- | ----------------------------------------------------------------- |
| 1   | data from Mr. Shamo's iPhone, and this is some of                 |
| 2   | that as the testimony has been provided.  I want to               |
| 3   | ask you, um, if you know, if you happen to know what              |
| 4   | some of these terms mean.  Down below it says, three              |
| 5   | lines up from the bottom, "make blues".  Do you know              |
| 6   | what that was referring to?                                       |
| 7   | A.   Um, the blue pills.                                          |
| 8   | Q.   And if we can go to page two.  And Ms. Laughter              |
| 9   | if you will zoom in on kind of the "to do" portion of             |
| 10  | this.  Part way down, just the second line it says,               |
| 11  | "daily orders".  Do you know what that was                        |
| 12  | referencing?                                                      |
| 13  | A.   Um, the getting the daily order info to the                  |
| 14  | girls.                                                            |
| 15  | Q.   And if we can go to Page 3, and if you will just             |
| 16  | zoom on the message as a whole, the text portion,                 |
| 17  | there's a part here where it speaks to -- it's about              |
| 18  | two-thirds of the way down it says, "another case                 |
| 19  | where I don't trust Ally's friends and for sure gonna             |
| 20  | fire Gabby."  Did you know who he was referencing                 |
| 21  | when -- by the name Gabby?                                        |
| 22  | A.   Um, Ally's friend Gabby.                                     |
| 23  | Q.   What role did she play as it relates to                      |
| 24  | Mr. Shamo?                                                        |
| 25  | A.   Um, from what I know he had her as an assistant              |

03:18:15 (line 5)
03:18:39 (line 10)
03:19:00 (line 15)
03:19:29 (line 20)
03:19:44 (line 25)

97

1  to do his grocery shopping, daily tasks, wash his

2  car.  Kind of a personal assistant.

3  Q.   Okay.  And down below the last line says, "Chris

4  owes 95K 10/27."  Do you know what that's

03:20:12  5  referencing?

6  A.   That's the amount of money that Chris owes for

7  pills that were given to him.

8  Q.   Is this the same Chris that you have testified

9  about previously?

03:20:25  10  A.   Yeah.

11  Q.   If we can speak now about your electronic

12  devices, we talked about your phone.  At some point

13  did you turn over your phone to law enforcement?

14  A.   Yeah.  Well yeah.

03:20:47  15  Q.   When did that happen?

16  A.   During the raid that they -- when they raided my

17  house.

18  Q.   Okay.  Did you own an iMac?

19  A.   Yeah.

03:20:59  20  Q.   What happened to your iMac?

21  A.   Um, I took it to my lawyer.

22  Q.   When did you do that?

23  A.   Before the bust, before the raid happened on my

24  house.

03:21:11  25  Q.   If I said to you that the raid occurred in

98

```
 1  January of 2017, does that sound about right?

 2  A.   Yeah.

 3  Q.   So you took your iMac to your attorney.  Do you

 4  know what happened with it after that?

 5  A.   He turned it over to the government.

 6  Q.   Do you know when that occurred?

 7  A.   Um, not exactly.  A few months after that.

 8  Q.   Okay.  If we can pull up the chart from

 9  Government's Exhibit 17.06.  On this chart, who do

10  you recognize?

11  A.   The whole middle row where I'm in.  Um, Penrose,

12  Jensen, Mausia, Gleave, Stephens, Perry, and Tebbs.

13  Q.   Let's talk about some of these individuals.  How

14  do you recognize Ms. Noriega?

15  A.   That's Ally's friend.

16  Q.   And did she have a role that you were aware of in

17  Mr. Shamo's organization?

18  A.   That I'm aware of, no.

19  Q.   And I think we have already spoken about the one

20  next to her.  Is that the one that you referenced as

21  Chris?

22  A.   Yes.

23  Q.   Next to Chris, who is that individual?

24  A.   Mario.

25  Q.   And do know what Mario's role was in Mr. Shamo's
```

Timestamps (left margin):
03:21:26 — line 5
03:21:55 — line 10
03:22:28 — line 15
03:22:44 — line 20
03:23:01 — line 25

```
 1   drug trafficking organization?

 2   A.   I think he was answering questions on the

 3   website.

 4   Q.   And how do you know that?

 5   A.   That is what I was told.

 6   Q.   Who told you?

 7   A.   Shamo told me that.

 8   Q.   Okay.  We have got you then next and we've spoken

 9   about Mr. Crandall, um, next to that we have got

10   Ms. Tonge.  What do you know about her as it relates

11   to this pill operation?

12   A.   Tonge and Bustin?

13   Q.   Yes.

14   A.   Just that they were the ones packaging and

15   getting the packages ready to be shipped.

16   Q.   And next to them Mr. Gygi.  How did you know him

17   and what role did he have?

18   A.   I didn't know him.  Just knew that he was the one

19   that would pick the packages up when they were ready,

20   and would drop them off at the blue mailboxes.

21   Q.   And how did you know that?

22   A.   That's what Shamo told me.

23   Q.   Of that row that we have just spoken about, did

24   you recruit any of them?

25   A.   No.
```

Timestamps:
03:23:12 (line 5)
03:23:26 (line 10)
03:23:40 (line 15)
03:23:57 (line 20)
03:24:13 (line 25)

100

```
 1   Q.   Did you pay any of them?

 2   A.   No.

 3   Q.   Are you aware -- did you actually observe any

 4   times when Mr. Crandall paid any of them?

 5   A.   No.

 6   Q.   I want to look at that bottom row.  You mentioned

 7   Mr. Penrose.  What role did he play in the pill

 8   organization?

 9   A.   Um, the only thing that I was told is that in the

10   beginning gave him some money to get started.

11   Q.   And who told you that?

12   A.   Aaron Shamo.

13   Q.   Mr. Jensen, do you know what role he played?

14   A.   Not 100 percent, but I was also told that he was

15   receiving packages, saw him bring packages over, and

16   get paid for them.

17   Q.   Mr. Mausia and Ms. Gleave, do you know what role

18   they played?

19   A.   They also were just receiving packages.

20   Q.   And Mr. Stephens and Mr. Perry, do you know what

21   role they played?

22   A.   Packages as well.

23   Q.   And Ms. Tebbs?

24   A.   Um, I think she was another personal assistant.

25   Q.   Of all of the people that you mentioned that you
```

03:24:22
03:24:42
03:25:05
03:25:19
03:25:34

101

```
 1   were familiar with on that bottom row, did you

 2   recruit any of them to do anything related to the

 3   pill manufacturing or pill distribution?

 4   A.   No.   No.

 5   Q.   Did you pay any of them?

 6   A.   No.

 7   Q.   Did you ever observe yourself -- did you ever

 8   observe Mr. Crandall paying any of them?

 9   A.   No.

10   Q.   We can take that down.  At any point did you ever

11   contribute your own money to purchase product,

12   ingredients, or supplies?

13   A.   No.

14   Q.   Did you ever purchase ingredients for pills?

15   Sorry, let me scratch that.  Who did buy the supplies

16   and ingredients for pills?

17   A.   Um, Drew, I think Ryan Jensen did.

18   Q.   They actually purchased items?

19   A.   Ingredients?

20   Q.   Yes.

21   A.   Yeah, like powders and filler powders?

22   Q.   How do you know that they made those purchases?

23   A.   That is just what Shamo told me.

24   Q.   So you never visually saw them actually making

25   those purchases?
```

03:25:47 (line 5)
03:26:10 (line 10)
03:26:27 (line 15)
03:26:46 (line 20)
03:27:00 (line 25)

102

1    A.    No.

2    Q.    If somebody were to see the pill presses and the

3    mixers purchased and your name on it, do you believe

4    that they might come to a conclusion that you

03:27:11    5    purchased those items?

6    A.    Yeah.

7    Q.    Did you ever observe Mr. Shamo paying anyone for

8    the work that they did.

9    A.    Yeah.

03:27:27    10    Q.    Who did you observe him paying?

11    A.    Brian Jensen, Jessica Gleave and Julian.

12    Q.    Who was in charge for listing the products on the

13    Pharma-Master store front on AlphaBay?

14    A.    That was something that Shamo did.

03:27:45    15    Q.    Who was the leader, or who would you consider

16    your boss when pressing the pills?

17    A.    Shamo.

18    Q.    Did you ever give directions to anyone else in

19    the pill pressing operation?

03:28:01    20    A.    No.

21    Q.    Did Mr. Shamo give you directions, what to do,

22    how many pills to press and when?

23    A.    Yes.

24    Q.    Did Mr. Crandall ever give you directions, what

03:28:16    25    to do, what pills to press, and when?

103

```
 1    A.   No.  He just showed me how to use the first
 2    machine initially.
 3    Q.   After Mr. Crandall left the country, are you
 4    aware if Mr. Shamo paid him anything?
 5    A.   Just by what he had told me was Bitcoins.  I
 6    don't know the amounts.
 7    Q.   Did Mr. Shamo ever mention anything about a
 8    payout or a buyout as it relates to Mr. Crandall?
 9    A.   I recall something about that.  Around 30 or
10    40,000 is what I remember.
11    Q.   When you said that Mr. Shamo had paid Crandall
12    Bitcoins while he was out the country, do you know
13    what that was for?
14    A.   For his role in what he was doing on the website
15    answering questions.
16    Q.   Do you know if his role went beyond answering
17    questions at that point?
18    A.   I think that's, to my knowledge, that's all it
19    was.
20    Q.   Do you know the amounts that Mr. Shamo would pay
21    Drew Crandall for performing that service?
22    A.   I don't.
23    Q.   From your perspective, after Mr. Crandall left
24    the country, was he still, Mr. Shamo's partner in any
25    significant way?
```

03:28:33 (line 5)
03:28:55 (line 10)
03:29:13 (line 15)
03:29:29 (line 20)
03:29:52 (line 25)

104

A.   Um, just through the website.  Like he wanted to

continue in that way so I think because he was out of

the country that he was using -- able to still access

the website and help out on that side.

MR. BURGGRAAF:  Okay.  If I may have a

moment, Your Honor.

THE COURT:  You may.

Q.   (By Mr. Burggraaf)  In the question I asked you

about how the relationship between Crandall and

Mr. Shamo after Mr. Crandall had left the country.

Um, the helping out, was that just customer service

that you're aware of?

A.   Yeah.

Q.   I want to jump to about almost a little over a

year after Mr. Shamo was arrested.  At that point you

interviewed with law enforcement multiple times; is

that right?

A.   Yeah.

Q.   You met with agents from Homeland Security

Investigations, HSI, at least three times to explain

your role in the distribution of fentanyl, right?

A.   Yeah.

Q.   In meeting with HSI agents, you had a little bit

of difficulty always giving the full truth, is that

fair to say?

105

```
 1    A.   Yeah.

 2    Q.   And not only that, it took you more than a year

 3    after Mr. Shamo had been arrested for you to even

 4    start cooperating; is that right?  Or did you start

 5    cooperating sometime before that?

 6    A.   I mean I think at that year point is when I was

 7    given the option.  I mean from the beginning I felt

 8    like I was cooperating.

 9    Q.   Okay.

10    A.   Whenever -- whenever I was asked to come in and

11    meet I went in and met.

12    Q.   So --

13    A.   So like -- I don't know.  I feel like I was

14    cooperating from the git-go but obviously it wasn't

15    until after the raid happened and then eventually it

16    was okay now it's time to come in.

17    Q.   So when you were given the opportunity to meet,

18    you didn't delay, you just scheduled a time or and

19    went ahead and met with law enforcement; is that

20    correct?

21    A.   I believe so.

22    Q.   Okay.  At the time when you first met with law

23    enforcement you had several Bitcoins that you turned

24    over, right?

25    A.   Yes.
```

03:32:07 (line 5)
03:32:26 (line 10)
03:32:46 (line 15)
03:33:02 (line 20)
03:33:19 (line 25)

106

```
1   Q.   Do you know how many?

2   A.   I think it was like around 33 and something.

3   Q.   Were those Bitcoins the remainder you had left of

4   what Mr. Shamo had given you previously?

5   A.   Yes.

6   Q.   Did you know what the approximate value was of

7   those Bitcoins at the time when you turned them over?

8   A.   At the time I think it was about somewhere around

9   200,000.

10  Q.   At what point did you turn over cash to law

11  enforcement?

12  A.   I can't remember if it was before or after that,

13  but I want to say it was after the Bitcoin, after I

14  turned over the Bitcoins.

15  Q.   When you were meeting with law enforcement they

16  asked you about cash that you received; is that

17  right?

18  A.   Yes.

19  Q.   And the first time they asked you about it, what

20  did you tell them that you did with the cash?

21  A.   I was dishonest and I told them that I had thrown

22  it away in multiple garbage cans, gas stations, green

23  garbage cans.  I mean it was a lot of money and it

24  was I guess something that I really hadn't thought

25  through.  And then it took some time for me to want
```

03:33:36    5
03:33:51    10
03:34:20    15
03:34:32    20
03:35:05    25

107

```
 1   to come clean completely.
 2   Q.   When you say it took some time, you met with law
 3   enforcement again, right?
 4   A.   Yeah.
 5   Q.   Did you delay in meeting with them again or did
 6   you schedule an appointment when they wanted to meet
 7   with you?
 8   A.   So I didn't schedule appointments, it was, you
 9   know, through my lawyer.  And I would just cooperate
10   with whatever, whenever I was supposed to be there.
11   Q.   So the next time that you met with law
12   enforcement, you brought something with you, right?
13   A.   Yeah.
14   Q.   If we can look at Government's Exhibit 16.16,
15   let's just look at photo 1.  Is this what you brought
16   with you?
17   A.   Yeah.
18   Q.   Now, we mentioned approximately $800,000 was the
19   amount that you turned over previously.  Is what's in
20   this duffel bag approximately $800,000 or something
21   less than that?
22   A.   It's less.
23   Q.   Did you represent to law enforcement at that
24   point that this was all of the cash that you had?
25   A.   Yeah, I did.
```

03:35:19
03:35:31
03:35:48
03:36:01
03:36:14

108

```
 1    Q.   So you were being dishonest about the amount of

 2    cash again or --

 3    A.   That was the first time that I had been.

 4    Q.   Okay.

 5    A.   This was -- so just to clarify, this was the

 6    first time that I gave them that amount of money in

 7    cash.  So that was the -- that was the first time

 8    that I was dishonest about that.

 9    Q.   But in providing them this cash, this wasn't all

10    of the cash that you had from working for Mr. Shamo;

11    is that right?

12    A.   Right.

13    Q.   Later you met with the Homeland Security

14    Investigation agents again and the subject of cash

15    came up again and what did you tell them?

16    A.   I brought more cash with me on that day and we

17    had another discussion about if I had any other cash

18    anywhere.  And I made a decision to be honest about

19    it because I did have other cash somewhere and we,

20    after that meeting, we went right down to where the

21    cash was at and I handed it -- handed all of it over.

22    Q.   And it was approximately 130,000 or a little

23    more; is that right?

24    A.   Yeah.

25    Q.   If we can look at Government's Exhibit 16.16
```

03:36:25 — 5
03:36:43 — 10
03:36:56 — 15
03:37:21 — 20
03:37:36 — 25

109

```
 1   photo 3, is this all of the cash that you ended up

 2   turning over to law enforcement?

 3   A.   Um --

 4   Q.   The last -- the last time, I should say.  Is this

 5   the cash that was turned over?

 6   A.   Yeah, the last time, yeah.

 7   Q.   Are you hiding any more cash or Bitcoin from law

 8   enforcement?

 9   A.   No.

10   Q.   Did you have any Bitcoin cash at some point?

11   A.   Yeah.

12   Q.   And did you turn that over?

13   A.   That is inaccessible to me, so no.

14   Q.   What do you mean it is inaccessible to you?

15   A.   At the time -- so Bitcoin cash from what I

16   understand is it was created from Bitcoins like a

17   branch off Bitcoins.  And so anybody that had an

18   amount of Bitcoins would automatically be given

19   Bitcoin cash.

20        So when it became possible to transfer the

21   Bitcoin cash amount that you were given, I

22   transferred that amount to a Bitcoin cash wallet and

23   it was just an app on my phone and then from there I

24   never used any of it, never spent any of it or

25   anything, but they updated -- and I didn't need a
```

03:37:58
03:38:07
03:38:23
03:38:44
03:39:09

110

```
 1  password or user name or log-in to access it.  The
 2  app was updated after and it required a password and
 3  a log-in, like a user I.D. and log-in, and I never
 4  made one so I couldn't -- had no way of accessing it.
 5  So they're still there somewhere.
 6  Q.   Do you recall the name of the app that you moved
 7  these Bitcoin cash --
 8  A.   I think it was called BTC.com.
 9  Q.   Since being charged, have you spent a single day
10  in jail?
11  A.   I have not.
12  Q.   You're aware that Mr. Shamo and Mr. Crandall have
13  both been in jail since they were initially arrested,
14  right?
15  A.   Right.
16  Q.   So why are you -- why are you not in jail?
17  A.   I had a hearing and that was discussed and the
18  court decided that I wasn't a flight risk or a threat
19  to the community.
20  Q.   And after that hearing you still had -- directly
21  after it you still had all of that money you hadn't
22  turned it over yet, correct?
23  A.   Correct.
24  Q.   Why didn't you flee the country or go somewhere
25  where you couldn't be found with all of that money?
```

03:39:28  (line 5)
03:39:45  (line 10)
03:39:54  (line 15)
03:40:17  (line 20)
03:40:35  (line 25)

111

```
 1   A.   Because it's -- I mean sure I had the thought but
 2   it wasn't like a thought that I dwelt on.  And once I
 3   realized what that would mean, I would never get to
 4   come back to the United States, so I would leave my
 5   family, I would leave everything here, if I ever did
 6   come back go to jail for the rest of my life and live
 7   the rest of my life running from that, so I wanted
 8   to -- I just wanted to take full responsibility for
 9   the things that I did.
10   Q.   Mr. Shamo you stated he was -- he is your friend.
11   Since he was arrested, have you communicated with
12   him?
13   A.   Yeah, I have.
14   Q.   When and under what circumstances did you
15   communicate with him?
16   A.   Just through some phone calls that he made.
17   Q.   And since his arrest have you provided him with
18   money?
19   A.   I sent him some money, yeah.
20   Q.   When and how much?
21   A.   There were I think two times and I can't quite
22   remember but around 200 every time maybe.  Maybe it
23   was 300, maybe it was only 200.
24   Q.   Since Mr. Shamo's arrest, has he tried to get you
25   to do anything related to his Bitcoin or Bitcoin
```

03:40:56 — line 5
03:41:43 — line 10
03:41:58 — line 15
03:42:15 — line 20
03:42:36 — line 25

112

1    wallets?

2    A.    No.

3    Q.    Did you ever see a letter that had been sent to

4    his girlfriend at the time, Ally Rose, that

03:42:57   5    referenced you and requested you to do anything?

6    A.    I did see the letter.

7    Q.    And what did that letter state?

8    A.    Um, she mainly read it to me but -- and I can't

9    fully remember, something about there being something

03:43:17   10   on the blockchain just wanted the password changed or

11   something.

12   Q.    And who did you understand that letter to be

13   from?

14   A.    From Shamo.

03:43:28   15   Q.    Why are you here testifying today?

16   A.    To just testify to the truth of everything that I

17   did and things that I know to be true.

18   Q.    Are you hoping to get anything out of it, the

19   mere fact that you're here testifying?

03:43:56   20   A.    I'm just wanting to be fully clean and hope to

21   get some credit.

22   Q.    Credit towards what?

23   A.    Anything.  I don't know what's expected.  I know

24   what I'm looking at.  I know the severity of all of

03:44:21   25   this and just hoping for some credit towards that.

113

```
 1    Q.   You have already pled guilty in your case; is
 2    that right?
 3    A.   Yeah.
 4    Q.   But as part of your plea agreement you agreed to
 5    wait to be sentenced until others in this case have
 6    been sentenced, right?
 7    A.   Yeah.
 8    Q.   If we can look at Government's Exhibit 23.06.  Do
 9    you recognize this document?
10    A.   It looks familiar, yeah.
11    Q.   This is the Statement in Advance of Plea or a
12    Plea Agreement that you entered into on or about
13    December 10th, 2018, isn't it?
14    A.   Yeah.
15    Q.   Let's look at Page 1 and 2.  In this Plea
16    Agreement you agreed and then actually did plead
17    guilty to Count 1 conspiracy to manufacture a
18    controlled substance; right?
19    A.   Yes.
20    Q.   And also the same for Counts 2 and 3 to plead
21    guilty knowing and intentional adulteration of drugs
22    while held for sale, right?
23    A.   Yes.
24    Q.   You also pled guilty to Count 4 conspiracy to
25    commit money laundering, right?
```

03:44:38 — line 5
03:44:53 — line 10
03:45:13 — line 15
03:45:27 — line 20
03:45:40 — line 25

114

1  A.  Yes.

2  Q.  Do you recall if any counts were dismissed as

3  part of this plea agreement?

4  A.  Um, I'm not sure.

03:45:57  5  Q.  There is another count mentioned later which

6  we'll address momentarily, but it is not -- but it is

7  not one that is charged.  In pleading guilty to the

8  offenses that we have outlined, you admitted to

9  operating the pill press in Mr. Shamo's home helping

03:46:15  10  to develop the recipe and manufacturing pills made to

11  look like Oxycodone pills but that contained

12  fentanyl, right?

13  A.  Right.

14  Q.  You also admitted to pressing pills containing

03:46:27  15  Alprazolam creating counterfeit Xanax, right?

16  A.  Right.

17  Q.  You admitted to manufacturing approximately 480

18  fake Oxycodone pills each of which weighed just over

19  100 milligrams; is that correct?

03:46:38  20  A.  Yes.

21  Q.  You admitted to manufacturing and distribution of

22  approximately 48 kilograms of a mixture or substance

23  containing fentanyl that Shamo paid for; is that

24  right?

03:46:52  25  A.  Yeah.

115

1   Q.    I may have misstated earlier, you admitted to

2   manufacturing approximately 480,000 fake Oxycodone

3   pills each of which weighed just over 100 milligrams;

4   is that correct?

03:47:16    5   A.    Yeah.

6   Q.    You admitted that you deposited cash into your

7   bank even though you knew it represented illegal drug

8   distribution proceeds; is that accurate?

9   A.    Um, yeah.

03:47:40    10   Q.    Through the Plea Agreement you admitted to

11   turning over drug distribution proceeds of, the first

12   time, $671,000 or $671,030.00 and the second time

13   $134,960.00 in cash, a total of $805,990.00 in cash

14   as well as just under 33 Bitcoins.  Is that correct

03:48:15    15   that you admitted to forfeiting those?

16   A.    Yeah.

17   Q.    When you entered into this Plea Agreement that's

18   being depicted here, you read through the whole

19   thing; is that right?

03:48:26    20   A.    I did.

21   Q.    Did you read the part, and if we can turn to

22   Page 5, did you read the part on Page 5 in regards to

23   relevant conduct?

24   A.    Yeah.

03:48:41    25   Q.    What do you understand that to mean?

116

1  A.   That even with things that I haven't been charged

2  with as of yet, that there still is the possibility

3  that that is going to be taken into consideration.

4  Q.   So you weren't charged with distributing pills

03:49:15  5  containing fentanyl that resulted in a death, were

6  you?

7  A.   No.

8  Q.   But you recognize that that's relevant conduct

9  that the judge may take into account when you're

03:49:26  10  sentenced.  You have to answer out loud.

11  A.   Yup.

12  Q.   How do you feel about the fact that you helped

13  manufacture pills which may have resulted in

14  someone's death?

03:49:47  15  A.   Something I am going to have to live with for the

16  rest of my life and I wish I had more knowledge on it

17  when these things were going on.  Um, but I feel

18  terrible for it.  I mean there is -- it happens every

19  day that people overdose and I just didn't know about

03:50:28  20  -- I mean I just haven't been around that environment

21  and don't really understand what a -- what an

22  addiction does to a person.

23  Q.   If we can look at Page 13.  As part of the

24  agreement with the United States you agreed to

03:50:53  25  testify truthfully and completely, correct?

117

A.   Correct.

Q.   And if you don't testify truthfully and completely, then you may not get the benefit of testifying truthfully and completely that's outlined in this Plea Agreement?

A.   Correct.

Q.   If we can look at the next page.  This first paragraph, only paragraph on the page states, "if defendant testifies truthfully and completely, the United States will present the defendant's cooperation for the court's consideration at sentencing pursuant to U.S. Sentencing Guidelines 5K1.1.  The United States also agrees to not charge the defendant with death resulting violations of Title 21 United States Code Section 841(a)(1) that may arise out of the continuing investigation into overdose deaths tied to Pharma-Master drug sales." Did you read that before signing it?

A.   I did.

Q.   Can you summarize why you got involved in manufacturing and distributing such a dangerous drug as fentanyl?

A.   In the beginning it was in my down time just a way to make money.  That wasn't happening and that is why I was still trying to work, still trying to do

118

```
 1   some summer sales and leave for summer sales and then
 2   it took weeks and months to come to the decision.
 3   And mainly the reason -- there was multiple reasons.
 4   I think the main one was just wanting to help my
 5   sister with her illness and that was a way that I
 6   justified it.
 7              MR. BURGGRAAF:  That's all my questions, Your
 8   Honor.
 9              THE COURT:  Thank you.  We'll take a recess
10   for 30 minutes and be back about 12:25 or so.  Thank
11   you.
12              THE CLERK:  All rise, please.
13              (Jury leaves the courtroom.)
14              THE COURT:  Court is in recess.
15              (Recess.)
16              THE COURT:  We'll get the jury and proceed
17   with the cross-examination.
18              MR. SKORDAS:  Yes, we're ready.
19              THE COURT:  If you're not done by 10 to 2,
20   then we'll continue it on Monday morning.
21              MR. SKORDAS:  Right.  Wait, wait, wait.  Um,
22   could everyone sit down?  Can I have the benefit of
23   the record for a minute?
24              THE COURT:  Sure.
25              MR. SKORDAS:  We had subpoenaed a young man,
```

03:53:02
03:53:14
04:25:54
04:28:13
04:28:25

119

1    one of the people on the chart, who is represented

2    by --

3              THE COURT:  You can sit down if you want

4    until the jury comes in.

04:28:37    5              MR. SKORDAS:  He is represented by Scott

6    Williams.  Who would that be?  Miles Penrose.  And we

7    just need to make a record.  He is going to come in

8    today, as we finish, and make a record, out of the

9    presence of the jury, that he is going to refuse to

04:28:54    10   testify based on his Fifth Amendment privilege.  And

11   I just need the record to be clear on that because I

12   don't want to do it in front of the jury obviously.

13             So we may need the benefit of the record for

14   just a few minutes at the end of the hearing.

04:29:07    15             THE COURT:  That's fine.  It's the jurors

16   that have the problem, not me.

17             MR. SKORDAS:  Right, right.  Okay.  So he

18   thinks he will be here by quarter to two.

19             THE COURT:  That's fine.  Actually it's not I

04:29:24    20   but nobody pays any attention to the difference

21   between me and I.

22             THE CLERK:  All rise for the jury.

23             (Jury returns to the courtroom.)

24             THE COURT:  You may proceed with your

04:31:06    25   cross-examination, Ms. Beckett.

120

|  | 1 | **CROSS-EXAMINATION** |
|---|---|---|
|  | 2 | BY MS. BECKETT: |
|  | 3 | Q.   Thank you, Your Honor.  Luke, you and Aaron have |
|  | 4 | been friends for some time, correct? |
| 04:31:28 | 5 | A.   Yeah. |
|  | 6 | Q.   How long have you been friends with Aaron? |
|  | 7 | A.   Eight years. |
|  | 8 | Q.   You guys were really close, right? |
|  | 9 | A.   Yeah. |
| 04:31:44 | 10 | Q.   Yes? |
|  | 11 | A.   Yeah. |
|  | 12 | Q.   Have spent a significant amount of time together? |
|  | 13 | A.   Yeah. |
|  | 14 | Q.   You guys hung out at the gym together? |
| 04:31:56 | 15 | A.   Yeah. |
|  | 16 | Q.   Played video games together? |
|  | 17 | A.   Yeah. |
|  | 18 | Q.   Lived together for a while? |
|  | 19 | A.   Yeah. |
| 04:32:09 | 20 | Q.   You guys kind of became close like brothers? |
|  | 21 | A.   I would say so. |
|  | 22 | Q.   I imagine that makes it a little bit difficult |
|  | 23 | for you to come in here today? |
|  | 24 | A.   Yeah. |
| 04:32:22 | 25 | Q.   Do you still consider Aaron a friend? |

121

```
     1   A.    You bet.
     2   Q.    Earlier you testified that you would describe
     3   Aaron as somebody who was friendly and fun.  Does
     4   that sound accurate?
04:32:40  5   A.    For sure.
     6   Q.    Would you describe Aaron as a people pleaser?
     7   A.    Yeah.
     8   Q.    Likes to make people happy?
     9   A.    For sure.
04:32:52 10   Q.    Likes to do things for the people he cared about?
    11   A.    Definitely.
    12   Q.    I believe you also testified a little bit about
    13   Drew Crandall and what kind of person you thought he
    14   was.  Do you remember that?
04:33:08 15   A.    Yeah.
    16   Q.    Would you describe Drew the same way you would
    17   describe Aaron?
    18   A.    I just don't know Drew on that same level.
    19   Q.    But I believe your testimony in part was that you
04:33:23 20   didn't really like Drew.  Would you say that is
    21   correct?
    22   A.    Yeah.
    23   Q.    And why were you not a fan of Drew?
    24   A.    Um, just the few interactions that we had from
04:33:39 25   what I gathered I mean it just wasn't -- the things
```

122

```
         1    basically that he talked about and --

         2    Q.   What kind of things did Drew talk about?

         3    A.   I mean just conversations.  But I can't recall,

         4    those were years ago.  The conversations I had with

04:33:55 5    him have been very few.

         6    Q.   When were you first roommates with Aaron?

         7    A.   Um, probably right around five, six years ago.

         8    Q.   Is that in Provo?

         9    A.   Yeah, Provo.

04:34:23 10   Q.   Did you guys have another roommate at that time?

         11   A.   Yeah, a few.

         12   Q.   Do you remember a roommate named I think it was

         13   Mike?

         14   A.   Yeah.

04:34:33 15   Q.   When you and Aaron were roommates in Provo, did

         16   either one of you do drugs?

         17   A.   Aaron and I?

         18   Q.   Uh-huh (affirmative).

         19   A.   Not that I recall.  I didn't.  I don't think he

04:34:52 20   did either.

         21   Q.   You had a roommate Mike who would drink though,

         22   correct?

         23   A.   Yeah.

         24   Q.   And he would do drugs, correct?

04:35:01 25   A.   Um, yeah.
```

123

|  | 1 | Q. And you guys would make jokes about that, right? |
|  | 2 | A. We did. |
|  | 3 | Q. Because he was trying to hide it you thought it |
|  | 4 | was funny? |
| 04:35:11 | 5 | A. Um, yeah. |
|  | 6 | Q. You have been interviewed multiple times in |
|  | 7 | regards to your testimony today, correct? |
|  | 8 | A. Yeah. |
|  | 9 | Q. July 2nd, 2018, you were interviewed? |
| 04:35:30 | 10 | A. Uh-huh (affirmative). |
|  | 11 | Q. July 3rd, 2018, you were interviewed? |
|  | 12 | A. Yeah. |
|  | 13 | Q. August 7th, 2018, you were interviewed? |
|  | 14 | A. Yeah. |
| 04:35:40 | 15 | Q. November 5th, 2018, you were interviewed? |
|  | 16 | A. Yeah. |
|  | 17 | Q. Were you interviewed any other time? |
|  | 18 | A. Um, I don't believe so. |
|  | 19 | Q. Did you meet with the prosecution at all to |
| 04:35:55 | 20 | prepare for your testimony today? |
|  | 21 | A. Um, yeah. |
|  | 22 | Q. Was that last night? |
|  | 23 | A. We did meet last night. |
|  | 24 | Q. Did you meet with them any other time? |
| 04:36:07 | 25 | A. Um, once about a month ago. |

124

1   Q.   Specifically regarding what you were going to be

2   testifying to, correct?

3   A.   Um, kind of just an outline of the whole thing,

4   yeah.

04:36:22    5   Q.   How long were those meetings?

6   A.   First one four or five hours.  Last night's was a

7   little bit longer.

8   Q.   So a draining experience for you?

9   A.   It wasn't too bad.

04:36:46   10   Q.   You weren't charged in this case, were you?  You

11   were charged separately?

12   A.   I'm not sure.

13   Q.   Do you have any co-defendants in your case?

14   A.   Um, I don't believe so.

04:37:15   15   Q.   Do you remember when you were officially charged?

16   A.   When I was officially in charge?

17   Q.   When you were officially charged with the crimes

18   that you pled to?

19   A.   Oh, um, 2017 or sorry --

04:37:34   20   Q.   If I represented to you that it was around April

21   of 2018 would that sound correct?

22   A.   Yeah, that sounds correct.

23   Q.   About a year and a half or almost quite a while

24   after Aaron was arrested, correct?

04:37:53   25   A.   Correct.

125

```
 1   Q.   But it was your testimony that agents knew about

 2   your potential involvement very early on, correct?

 3   A.   Yeah.

 4   Q.   I believe you described that you -- your home or

 5   where you were living had been raided in January

 6   2017; is that correct?

 7   A.   Yeah.

 8   Q.   And you were ultimately charged with conspiracy

 9   to manufacture fentanyl, two counts of knowing and

10   intentional adulteration of drugs while held for

11   sale, and conspiracy to commit money laundering?

12   A.   Yeah.

13   Q.   Do you remember your interview from July 2nd,

14   2018?

15   A.   Um, I'm sure I'm familiar with it.

16   Q.   If I asked you some questions about that do you

17   think you would be able to answer those?

18   A.   I believe so, yeah.

19   Q.   Do you remember that you told agents that around

20   the end of 2015 you were recruited to be more

21   involved in this organization?

22   A.   That I was recruited to be more involved?

23   Q.   Uh-huh (affirmative).

24   A.   Yeah.

25   Q.   Do you remember telling those agents that were
```

04:38:12 (line 5)
04:38:30 (line 10)
04:38:52 (line 15)
04:39:12 (line 20)
04:39:24 (line 25)

126

|   | 1 | interviewing you that Drew Crandall was the |
|---|---|---|
|   | 2 | individual in fact who trained you to operate that |
|   | 3 | pill press? |
|   | 4 | A.   Yeah. |
| 04:39:34 | 5 | Q.   Do you remember telling the agents that Drew |
|   | 6 | Crandall was in fact the individual who instructed |
|   | 7 | you on how to fix the pill press if it became jammed? |
|   | 8 | A.   He mentioned it, yeah. |
|   | 9 | Q.   Do you remember telling agents that Aaron was |
| 04:39:54 | 10 | present when Drew Crandall was training you? |
|   | 11 | A.   Yeah. |
|   | 12 | Q.   More specifically, do you remember telling the |
|   | 13 | agents that Drew trained you and Aaron stood by |
|   | 14 | because Aaron I guess didn't know that much about |
| 04:40:09 | 15 | pressing pills? |
|   | 16 | A.   Yeah. |
|   | 17 | Q.   Do you remember telling agents during that |
|   | 18 | interview that to your knowledge Aaron was not |
|   | 19 | involved in manufacturing any pills containing |
| 04:40:25 | 20 | fentanyl before that time period? |
|   | 21 | A.   Yeah. |
|   | 22 | Q.   Do you remember telling agents that Drew Crandall |
|   | 23 | even made notes for you and Aaron on how to operate |
|   | 24 | the press before he left the country? |
| 04:40:39 | 25 | A.   Yeah. |

127

1   Q.    That he created a diagram of sorts?

2   A.    I don't know if I ever saw a diagram but --

3   Q.    Specific instructions?

4   A.    I believe so.

04:40:52   5   Q.    Do you remember telling agents that Drew Crandall

6   stayed in contact with Aaron in order to troubleshoot

7   any issues that arose pressing those pills while he

8   was abroad?

9   A.    Yeah.

04:41:12   10   Q.    I believe you also testified that at a certain

11   point in time you were using the Telegram App to

12   communicate with Aaron; is that correct?

13   A.    Yeah, I did.

14   Q.    Did you delete that Telegram App from the your

04:41:28   15   phone before you were interviewed by the agents?

16   A.    Yeah.

17   Q.    So they have never seen the contents of your

18   Telegram App; correct?

19   A.    They wouldn't have been able to.  Correct.

04:41:42   20   Q.    You have been asked a significant number of

21   questions by the prosecution about an individual by

22   the name of Chris Kenny.  Do you remember telling the

23   agents during your July 2nd interview that Chris

24   Kenny was in fact the individual who came up with the

04:42:00   25   idea to press fentanyl pills?

128

1    A.    Yeah.

2    Q.    That the idea to use fentanyl in general

3    originated with Chris Kenny?

4    A.    Yeah.

04:42:13    5    Q.    That he wanted you to specifically press fentanyl

6    for local customers?

7    A.    Yeah.

8    Q.    Do you remember telling agents that Chris Kenny

9    in fact had local connections that would deal to club

04:42:29    10    owners?

11    A.    Yeah.

12    Q.    Do you remember telling those agents that Chris

13    Kenny, in fact, provided significant feedback

14    regarding the first batch or first round of fentanyl

04:42:44    15    pills that were pressed?

16    A.    Yeah.

17    Q.    Requested changes?

18    A.    Yeah.

19    Q.    And you attempted to make those changes to

04:42:53    20    improve those pills for lack of a better word?

21    A.    Yeah.

22    Q.    Do you remember telling agents that you went so

23    far as to sort of test the different ingredients to

24    make sure that they would slide or crush or had the

04:43:12    25    correct color?

129

```
 1    A.    Yeah.   That was referring to the inactive

 2    ingredients, yeah.

 3    Q.    Was that to make the pills more marketable?

 4    A.    No, that was just me following what I was told to

 5    do.

 6              THE COURT:   Speak up just a little bit.

 7              THE WITNESS:   Yeah, that was just me

 8    following what I was told to do.

 9              THE COURT:   Thank you.

10    Q.    (By Ms. Beckett)   What would be the purpose of

11    making the pills slide?

12    A.    I didn't know at the time.

13    Q.    Do you remember telling agents that Drew Crandall

14    actually created a calculator like program or app in

15    order to determine the amount of active ingredient

16    versus filler ingredients for those pills?

17    A.    Yeah.

18    Q.    That was an app or program that was used

19    regularly for both pressing the Xanax and fentanyl

20    pills?

21    A.    Yes.

22    Q.    And that was an integral part of being able to

23    figure out the active ingredient versus the filler

24    ingredient, correct?

25    A.    Correct.
```

04:43:29 — line 5
04:43:37 — line 10
04:43:54 — line 15
04:44:06 — line 20
04:44:14 — line 25

130

1  Q.   Could you have pressed those fentanyl pills

2  without that knowledge?

3  A.   No.

4  Q.   Do you remember telling the agents that you used

04:44:30   5  that particular program to perfect the formula that

6  was ultimately used for those fentanyl pills?

7  A.   I said that the program was used for that.  I'm

8  not sure that I specified who used it.

9  Q.   I believe there was some testimony earlier that

04:44:55   10  you were the individual who was responsible for the

11  amount and formulation of the inactive ingredients in

12  those pills; is that correct?

13  A.   Of the inactive ingredient, yeah.

14  Q.   Can you make a pill with just an active

04:45:17   15  ingredient and no inactive ingredients?

16  A.   No.

17  Q.   So, in fact, those pills could not have been

18  pressed without the knowledge that you provided,

19  correct?

04:45:28   20  A.   They could have been pressed they just wouldn't

21  meet the requirements that Chris wanted.

22  Q.   You testified as well that Drew Crandall not only

23  pressed but also packaged and shipped; is that

24  correct?

04:45:56   25  A.   Correct.

131

1589

```
 1   Q.   If we could look at Government's Exhibit 13.09,

 2   photo 10, I believe it is, are you familiar with this

 3   photo?

 4   A.   Yeah.

 5   Q.   I believe it was your testimony that this is a

 6   pill press that was shipped to you?

 7   A.   Yeah.

 8   Q.   If we could look at, I believe it is photo 13 but

 9   I might be wrong on that number, are you familiar

10   with that photo?

11   A.   Yes.

12   Q.   Is that a pill press that was also shipped to

13   you?

14   A.   Yeah.

15   Q.   If we could see photo 19.  Are you familiar with

16   that piece of equipment?

17   A.   Yeah.

18   Q.   Is that a V-mixer?

19   A.   Yeah.

20   Q.   Was that also shipped to you?

21   A.   It was.

22   Q.   If we could see photo 33.  Are you familiar with

23   that photo?

24   A.   Yeah.

25   Q.   Is that another press that was also shipped to
```

04:46:22 — line 5
04:46:42 — line 10
04:46:50 — line 15
04:47:02 — line 20
04:47:16 — line 25

132

|   | |
|---|---|
| | 1   you? |
| | 2   A.   Yes. |
| | 3   Q.   And once you received all of these items you |
| | 4   helped transport them to the Titian Way address? |
| 04:47:26 | 5   A.   Yes. |
| | 6   Q.   And placed them in that home to be used for |
| | 7   pressing pills? |
| | 8   A.   Yes. |
| | 9   Q.   Your testimony is that you yourself had a Bitcoin |
| 04:47:44 | 10   wallet, correct? |
| | 11   A.   Yeah. |
| | 12   Q.   You had two separate Bitcoin wallets? |
| | 13   A.   I believe so, yeah. |
| | 14   Q.   One that was no longer accessible. |
| 04:47:55 | 15   A.   That was a separate one so I guess that could be |
| | 16   considered a third. |
| | 17   Q.   So you were knowledgeable in how to use Bitcoin? |
| | 18   A.   Yeah. |
| | 19   Q.   I believe you also testified that you engaged in |
| 04:48:11 | 20   some, what we'll call, peer-to-peer Bitcoin |
| | 21   transactions? |
| | 22   A.   Yeah. |
| | 23   Q.   Where you met an individual in person and |
| | 24   exchanged Bitcoin for cash, correct? |
| 04:48:25 | 25   A.   Correct. |

133

1    Q.    Did that on multiple occasions?

2    A.    Um, there were multiple occasions where that

3    occurred, yeah.

4    Q.    I believe part of your testimony included that

04:48:45  5    your sister was diagnosed with an illness and that

6    was part of your motivation for getting involved with

7    this organization; is that correct?

8    A.    That was part of the motivation, yeah.

9    Q.    And that you wanted a $10,000.00 advance from the

04:49:01  10   company that you worked for at the time?

11   A.    Yeah.

12   Q.    But instead you asked Mr. Shamo for a $10,000.00

13   advance?

14   A.    I didn't ask, he just wanted me to stay and help

04:49:13  15   him so he offered it to me.

16   Q.    None of that money went to your sister though,

17   correct?

18   A.    Correct.

19   Q.    You, in fact, kept that $10,000.00 for yourself,

04:49:25  20   correct?

21   A.    Yeah, correct.

22   Q.    If we could look at Government's Exhibit 22.04.

23   Are you familiar with this?

24   A.    Yes.

04:49:49  25   Q.    Is it your common practice to keep a ledger of

134

```
 1    all of the pills that you pressed?

 2    A.   I did keep it.

 3    Q.   Would you regularly show that to Aaron to let him

 4    know how many pills you had pressed?

 5    A.   No, I didn't show that to him.  I sent it to him

 6    one time when he asked for it.

 7    Q.   Is that why this is a screenshot and wasn't taken

 8    off of your phone, it was taken off your computer?

 9    A.   Yeah.

10    Q.   You, in fact, were paid for every pill you

11    pressed?

12    A.   Um, you could say that.

13    Q.   So the more pills you pressed the more money you

14    would make?

15    A.   Correct.

16    Q.   These amounts that are listed on here, the dollar

17    amounts, how much you thought you were owed?

18    A.   Yeah, that's what we had discussed.

19    Q.   A dollar-twenty-five a pill?

20    A.   Yeah.

21    Q.   Can you walk me through the process of making a

22    pill, of pressing a pill?

23    A.   Yeah.  I mean like from -- from which one, for

24    what one?

25    Q.   A fentanyl pill.
```

Timestamps: 04:50:02 (line 5), 04:50:21 (line 10), 04:50:30 (line 15), 04:50:42 (line 20), 04:51:06 (line 25)

135

1  A.   The powder was mixed of inactive ingredients, it

2  was shooken (sic) up in jars, put it into mixers,

3  mixers were turned on, mixed it for a few hours.  At

4  that point the fentanyl was added to it and then it

04:51:25   5  was re-mixed for another few hours.  And then it was

6  put into the machine to be pressed and to make pills.

7  Q.   Would you make those calculations using that

8  calculator app before you put those ingredients

9  together?

04:51:39  10  A.   No.

11  Q.   When would you use that app?

12  A.   I never used the app but the app was used.  After

13  the inactive ingredients were mixed, and after they

14  were -- you actually would make test pills, use those

04:52:02  15  test pills, weigh them, and then use the weight of

16  those pills and the number of pills that were tested,

17  those were the numbers you needed to enter into the

18  app.

19  Q.   Do you know how much fentanyl was added to those

04:52:22  20  pills?

21  A.   I don't.

22  Q.   Part of your testimony was that at a certain

23  point in time you may have been the individual who,

24  in fact, added fentanyl to those pills.  Do you

04:52:35  25  remember testifying to that?

04:52:41

04:52:54

04:53:15

04:53:43

04:53:52

```
 1    A.    Yeah.

 2    Q.    That could have happened on more than one

 3    occasion?

 4    A.    Yeah.

 5    Q.    Did you also press Xanax?

 6    A.    Um, initially, yeah.

 7    Q.    Did you add the active ingredient to those Xanax

 8    pills?

 9    A.    On a few occasions, yeah.

10    Q.    Part of your testimony, I believe, included that

11    you would access the Dark Web yourself and check the

12    Pharma-Master page; is that correct?

13    A.    I did that, yeah.

14    Q.    And the times you looked at the Pharma-Master

15    page you saw that it mentioned fentanyl as the active

16    ingredient in those pills?

17    A.    Yeah.

18    Q.    If we could look at Government's Exhibit 23.06.

19    You're familiar with this document, correct?

20    A.    Yeah.

21    Q.    This is a document that you executed pleading

22    guilty to the charges against you, correct?

23    A.    Yes.

24    Q.    As a result of a plea agreement between you and

25    the prosecution?
```

137

```
 1    A.   Yeah.
 2    Q.   If we could look at Page 5 of that document.  If
 3    you could just highlight that first paragraph.  This
 4    states, "I pressed approximately 480,000 fake
 5    Oxycodone pills each of which weighed just over
 6    100 milligrams.  I therefore manufactured and
 7    distributed approximately 48 kilograms of a mixture
 8    or substance containing fentanyl."  Is that correct?
 9    A.   Yeah.
10    Q.   Is your testimony that you made a
11    dollar-twenty-five per pill?
12    A.   Yeah.
13    Q.   That's roughly $600,000, correct?
14    A.   Correct.  Well, yeah.
15    Q.   If my math is correct.
16    A.   Uh-huh (affirmative).
17    Q.   Which it might not be so you can double check me
18    on that.  But when you were interviewed by the agents
19    in this case, you ultimately turned over over
20    $800,000 in cash, correct?
21    A.   Correct.
22    Q.   And you agreed that the money you turned over at
23    that point in time were the proceeds from this
24    organization, correct?
25    A.   Correct.
```

138

1  Q.   And that was turned over in July and August

2  of 2018, does that sound right?

3  A.   Yeah.

4  Q.   Coming up on two years after this organization

04:55:41  5  had been shut down?

6  A.   Yeah.

7  Q.   Did you spend any of that money in the two years

8  between now and then?

9  A.   Very little, but yeah.

04:56:01  10  Q.   I believe part of your testimony is also that

11  during the course of your involvement with this

12  organization you had spent quote several hundred

13  thousands of dollars, does that sound correct?

14  A.   Yeah.

04:56:13  15  Q.   Safe to say that you made or had at some point in

16  time in your possession over a million dollars?

17  A.   I don't know if that was ever in my possession,

18  but the bulk of that didn't come until the last few

19  weeks.

04:56:28  20  Q.   You had $800,000.00 last year and your testimony

21  is that you had spent over several hundred thousands

22  of dollars?

23  A.   From the time of when I had started, so during

24  like the whole year, yeah.

04:56:46  25  Q.   How old are you?

139

```
 1   A.   31.
 2   Q.   How old were you when you became involved with
 3   this organization?
 4   A.   27, 28, around there.
 5   Q.   Would you say that's a good amount of money to
 6   make for a 27, 28 year old?
 7   A.   Yeah.
 8   Q.   If we could go back to that 23.06 Exhibit.  Is
 9   your understanding that by entering into this
10   agreement you may ultimately curry some sort of favor
11   at sentencing?
12   A.   I don't know what the guidelines are, just that
13   there are guidelines.
14   Q.   Is it your intention to receive cooperation
15   credit towards your sentencing by testifying?
16   A.   I think I mentioned earlier that by doing
17   cooperating not -- yeah cooperating but mainly
18   testifying of the truth that some credit would be
19   given, yeah.
20   Q.   And that you also wouldn't be charged with what
21   we will refer to as the death resulting count?
22   A.   That's in there too.
23   Q.   Who determines whether or not you testified
24   truthfully today?
25   A.   Um, I believe the jury.  I'm not positive on
```

140

1    that.

2    Q.   Who is ultimately going to give you credit at

3    sentencing for your testimony today?

4    A.   That I'm not sure.  The judge I'm sure.

04:58:25    5    Q.   But it is your testimony that you also haven't

6    spent any time in jail on these charges?

7    A.   Right.

8    Q.   You had a detention hearing in June of 2018,

9    correct?

04:58:36    10    A.   Correct.

11    Q.   And you were released?

12    A.   Correct.

13    Q.   Is that because the government stipulated to your

14    release at that point in time?

04:58:48    15    A.   It was just a decision by the court.

16    Q.   The government didn't agree that it was okay for

17    you to be released?

18    A.   I am not sure on that.

19    Q.   What have you been doing for the last two and a

04:59:11    20    half years?

21    A.   Got married and I have been working.

22    Q.   Just living your life?

23    A.   Trying to.

24    Q.   Your time involved in this particular drug

04:59:48    25    trafficking organization didn't in fact really

141

1  overlap with Mr. Crandall's presence here in this

2  country, did it?

3  A.   Um, no, I don't think so.

4  Q.   He trained you and then left, correct?

05:00:04   5  A.   Right.

6  Q.   So you wouldn't be fully aware of what his

7  involvement might have been while he was out of the

8  country, correct?

9  A.   Yeah, correct.

05:00:13   10  Q.   And you also wouldn't have knowledge of who

11  Mr. Crandall had recruited before you were involved,

12  correct?

13  A.   Correct.

14  Q.   You also wouldn't know who perhaps Mario Noble

05:00:25   15  had recruited, correct?

16  A.   Correct.

17  Q.   Or Alex Tonge?

18  A.   Correct.

19  Q.   You also wouldn't know if Mr. Crandall had

05:00:37   20  personally paid people, correct?

21  A.   I wouldn't know that.

22  Q.   Same for Ms. Tonge?

23  A.   Correct.

24  Q.   Same for Mr. Noble?

05:00:48   25  A.   Correct.

142

```
 1   Q.   You interviewed with agents on multiple occasions

 2   and there has been a lot of questions about whether

 3   or not you were truthful when you were first

 4   interviewed.  Why were you initially not truthful

 5   with the agents?

 6   A.   Um, I was scared.  I was -- I wasn't even

 7   initially truthful with my lawyer.  I didn't tell him

 8   that I had the money and he found out later and it

 9   was a dumb decision but I was able to realize that it

10   wasn't something that I wanted to hang on to and

11   wanted to turn it over.

12   Q.   I believe you testified that you welcomed the

13   opportunity to interview with agents and finally come

14   clean; is that correct?

15   A.   That I welcomed the opportunity?

16   Q.   Uh-huh (affirmative).

17   A.   It was something that I wanted to do.

18   Q.   But you did want to have counsel present with

19   you, correct?

20   A.   I had already had counsel before the bust, before

21   they raided my home, earlier on.

22   Q.   After Mr. Shamo was arrested?

23   A.   Yeah.

24   Q.   If we could look at Government's Exhibit 22.07.

25   Are you familiar with this?
```

05:01:16 (line 5)
05:01:42 (line 10)
05:01:55 (line 15)
05:02:05 (line 20)
05:02:33 (line 25)

143

```
 1    A.    Yeah.
 2    Q.    It appears here that there is some negotiation
 3    going on about the amount to be paid per pill.  Would
 4    that be a correct representation?
 5    A.    Correct.
 6    Q.    Your testimony today is that you were receiving a
 7    dollar twenty five per pill, correct?
 8    A.    Correct.
 9    Q.    Which is why you had the amount of money in your
10    possession that you had in your possession, correct?
11    A.    Yeah.
12          MS. BECKETT:  If I could just have a minute,
13    Your Honor.
14          THE COURT:  You may.
15          MS. BECKETT:  Just a few more questions, Your
16    Honor.
17          THE COURT:  Sure.
18    Q.    (By Ms Beckett)  When you pled guilty to the
19    charges against you, did you forfeit some of your
20    personal assets?
21    A.    Items that were seized at my residence, yeah.
22    Q.    And the cash?
23    A.    I did forfeit the cash.
24    Q.    Uh-huh (affirmative).  Did you -- did you do that
25    in hopes it would also curry you some sort of favor
```

Timestamps:
05:02:48 (line 5)
05:03:00 (line 10)
05:03:43 (line 15)
05:04:12 (line 20)
05:04:32 (line 25)

144

1    at sentencing?

2    A.   I wanted to come clean fully.  It took a couple

3    of times to do so, but ultimately I wanted to come

4    clean fully for it.

05:04:51    5         MS. BECKETT:  I have no further questions,

6    Your Honor.

7         THE COURT:  Thank you, Ms. Beckett.

8    Redirect, Mr. Burggraaf?

9                   **REDIRECT EXAMINATION**

05:04:57    10   BY MR. BURGGRAAF:

11   Q.   Can we pull back up Exhibit 22.07.  Your

12   testimony was that your original agreement was to get

13   paid 25 percent?

14   A.   Right.

05:05:20    15   Q.   Which you calculated out to be about a dollar

16   twenty five per pill?

17   A.   Right.  Based on the $5 price that he was selling

18   it at.

19   Q.   So this message seems to state that at some point

05:05:34    20   you had been reduced to a dollar.  Was that because

21   the price per pill had gone down, or was it because

22   he reduced the percentage?

23   A.   It was one of the two but I'm not sure.

24   Q.   And it looks like he was proposing here to reduce

05:05:55    25   it even more; is that right?

145

1   A.   Right.  Right.

2   Q.   While noting that he was going to raise the pay

3   of his other employees; is that right?

4   A.   Right.

05:06:04   5   Q.   How did you feel about that?

6   A.   I mean at the time I didn't know what to think

7   about it and I'm not sure what we actually spoke

8   about after, but I understood where he was coming

9   from, price of Bitcoin was dropping.

05:06:26   10   Q.   Can we pull up Government's Exhibit 23.06.  We're

11   back here to this document again.  If we can go to

12   Page 5 and highlight that top paragraph again.  Did

13   you draft that language?

14   A.   No, I don't believe so.

05:07:00   15   Q.   But you agreed with it for the purpose of

16   admitting guilt; is that right?

17   A.   Right.

18   Q.   Defense counsel asked you the question about

19   calculation.  If you take that 480,000 and times it

05:07:21   20   by a dollar-twenty-five, that would come out to

21   something just over 600,000.  You were paid for local

22   pill sales also, weren't you?

23   A.   Right.

24   Q.   Were you paid for extras though that were

05:07:40   25   included or merely the amount of money that came in

146

```
 1   for the sales?
 2   A.   Well, that wasn't really discussed.  But the
 3   other exhibit that you showed where it had the
 4   listing of pills pressed and amounts owed, that was
 5   just taken into consideration only the pressed pills.
 6   It wasn't subtracting extras, it wasn't subtracting
 7   pills that went missing, wasn't subtracting lost
 8   shipments.
 9   Q.   So there were a lot of variables about what
10   happened to the pills?
11   A.   Right.  Right.
12   Q.   Okay.  I was asking you questions previously
13   about your cooperation.  You started cooperating
14   early 2017; is that right?
15   A.   Yeah, that's what I remember.
16   Q.   Why did it take so long or do you know why it
17   took so long to finally have your first interview?
18   A.   No, I'm not sure.  I mean I got a lawyer early on
19   and then it was like all done through my lawyer.
20   Q.   You were asked about the equipment deliveries
21   that came in your name?
22   A.   Uh-huh (affirmative).
23   Q.   If you're the one who ordered them, why was Shamo
24   paying you for them?  Like the pill press.  If you
25   were the one who ordered them, why was Shamo paying
```

05:07:59 (line 5)
05:08:13 (line 10)
05:08:32 (line 15)
05:08:54 (line 20)
05:09:10 (line 25)

147

```
 1  you for it?
 2  A.   I thought that she had said that those were just
 3  addressed to me.  But that's what I understood.  I
 4  mean that they were sent to me, he did order them.
 5  Q.   So you were paid merely as a drop or a package
 6  receiver; is that right?
 7  A.   Right.
 8  Q.   Did this follow the pattern of Mr. Shamo as far
 9  as other package receivers in that he would use their
10  name and address, once they received the package he
11  would pay them for it?
12  A.   Yes.
13  Q.   You haven't served a day in jail, correct?
14  A.   Correct.
15  Q.   So when it comes to sentencing, you can't get
16  credit for any time served unlike Mr. Shamo or
17  Mr. Crandall; is that right?
18  A.   Correct.
19  Q.   When you were asked about what you knew as far as
20  Crandall's involvement when he was out of the
21  country, you had testified that you believed he was
22  handling customer service, correct?
23  A.   Correct.
24  Q.   But you only knew that because that's what the
25  defendant Mr. Shamo told you; is that correct?
```

05:09:27  (line 5)
05:09:40  (line 10)
05:10:00  (line 15)
05:10:18  (line 20)
05:10:34  (line 25)

148

1    A.   Right.

2    Q.   You didn't know what the involvement of

3    Ms. Tonge, Ms. Bustin or Mario Noble, what their

4    involvement was prior to you starting to press pills;

05:10:49    5    is that right?

6    A.   Right.

7    Q.   But you only knew they were involved because that

8    is what the defendant told you; is that right?

9    A.   Correct.

05:11:04    10    Q.   If we can pull up Government's Exhibit 8.02 and

11    go to Page 2.  Do you have any idea how many pills

12    are here displayed?

13    A.   Um, many.

14    Q.   How many are -- what was that?  How many

05:11:35    15    approximate pills do you think might be there?

16    A.   Eight to 10,000.

17    Q.   Do you know any individual or have you heard of

18    any individual who could ingest this many pills?

19    A.   No.

05:11:45    20    Q.   So if this is a dealer's order, how would that

21    dealer's customers who never saw the Pharma-Master

22    page know the pills contained fentanyl?

23    A.   That I don't know.

24    Q.   They wouldn't know unless they saw the page?

05:12:02    25    A.   Or unless the dealer told them but yeah.

149

```
 1              MR. BURGGRAAF:  Okay.  No further questions.
 2              THE COURT:  Re-cross?
 3              MS. BECKETT:  Just briefly, Your Honor.
 4                    RECROSS-EXAMINATION
 5   BY MS. BECKETT:
 6   Q.   If we could pull up that Exhibit 23.06, Page 5,
 7   and highlight that top paragraph again, please.
 8   Thank you.  This says 480,000 fake Oxycodone pills
 9   that you pressed, correct?
10   A.   Uh-huh (affirmative).
11   Q.   And you agreed to this language when you pled
12   guilty, correct?
13   A.   Uh-huh (affirmative).
14   Q.   But you also pressed Xanax, correct?
15   A.   In the very beginning, yeah.
16   Q.   So this just specifically only accounts for the
17   fentanyl pills, correct?
18   A.   Yeah.
19              MS. BECKETT:  I have no further questions,
20   Your Honor.
21              THE COURT:  Thank you.  Are we done with this
22   witness?
23              MR. BURGGRAAF:  Yes, Your Honor.
24              THE COURT:  You may step down.  Thank you.
25   Should we start the next person?
```

```
 1              MR. GADD:  Happy to start.  Your Honor, the
 2    United States calls Special Agent Daniel Ashment.
 3              THE COURT:  Come forward and be sworn please
 4    right here in front of the clerk.
 5              THE CLERK:  Please raise your right hand.
 6                        DANIEL ASHMENT,
 7    called as a witness at the request of the Government,
 8          having been first duly sworn, was examined
 9                  and testified as follows:
10              THE WITNESS:  Yes.
11              THE CLERK:  Please come around to the witness
12    box.  Please state your name and spell it for the
13    record.
14              THE WITNESS:  Daniel Ashment, A-S-H-M-E-N-T.
15              THE COURT:  You may proceed, Mr. Gadd.
16                      DIRECT EXAMINATION
17    BY MR. GADD:
18    Q.   Thank you.  Just for the court and for the jury,
19    I'll just let everyone know Special Agent Ashment is
20    who we anticipate will be our last witness in our
21    case-in-chief.  I don't anticipate we'll get all the
22    way through his questions today, but probably Monday
23    morning.
24         Are you prepared to testify about your part in
25    the investigation of Mr. Shamo's drug distribution
```

Timestamps (left margin):
05:13:40 — 5
05:13:47 — 10
05:14:10 — 15
05:14:21 — 20
05:14:42 — 25

151

1    activities?

2    A.    Yes, I am.

3    Q.    Can you tell us a little bit about yourself?

4    A.    Yeah.  My name is Dan Ashment.  I was born and

05:14:52   5    raised here in Utah.  I attended Utah State

6    University, got a bachelor's degree in sociology and

7    psychology then I traveled to Indiana and went to

8    Ball State University where I received a master's

9    degree in public administration with a criminal

05:15:09   10    justice concentration.

11          Then I was able to be recruited and receive a

12    job with Homeland Security Investigations or HSI.

13    HSI is an organization that has been mentioned a

14    little bit but it is an organization we have a broad

05:15:24   15    range of authority.  We actually enforce over 400

16    federal laws and statutes including human smuggling,

17    human trafficking, counter proliferation

18    investigation, terrorism, and narcotics.

19          One of my specialties or things that I have

05:15:38   20    been working on lately is Dark Web investigations and

21    also packages coming from overseas containing drugs.

22    Q.    Let's do just a little bit of housekeeping first.

23    Do you know Ms. Tina Young?

24    A.    Yes.

05:15:56   25    Q.    You met with her previously?

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | A.   Yes, I have.                                          |
|       | 2  | Q.   She testified here?                                   |
|       | 3  | A.   Yes.                                                  |
|       | 4  | Q.   Tina Young is her preferred name, correct?            |
| 05:16:02 | 5 | A.   That's correct.                                      |
|       | 6  | Q.   In Count 10 of the indictment, which deals with       |
|       | 7  | her package, it lists her by initials at TM, correct?      |
|       | 8  | A.   Correct.                                              |
|       | 9  | Q.   That's the same person, TM is Tina Young?             |
| 05:16:16 | 10 | A.   That is the same person, yes.                      |
|       | 11 | Q.   It's just her preferred name now?                     |
|       | 12 | A.   Yes.                                                  |
|       | 13 | Q.   Okay.  Let's take a look at Exhibit 17.06.  Can       |
|       | 14 | you see that?                                              |
| 05:16:29 | 15 | A.   Yes, I can.                                        |
|       | 16 | Q.   Is this chart accurate?                               |
|       | 17 | A.   Yes, it is.                                           |
|       | 18 | Q.   Let's you and I talk through some of these people     |
|       | 19 | that we haven't touched on much yet.  Starting with        |
| 05:16:41 | 20 | Ms. Noriega, after Mr. Shamo's arrest did Ms. Noriega   |
|       | 21 | reach out to law enforcement?                              |
|       | 22 | A.   Yes.  She voluntarily came to law enforcement and     |
|       | 23 | reached out to us, yes.                                    |
|       | 24 | Q.   Was that before anyone on the investigative team      |
| 05:17:00 | 25 | knew about her involvement?                             |

153

1    A.    It was, yeah.  We didn't know who she was.

2    Q.    Did you find communications between Ms. Noriega

3    and Mr. Shamo on Mr. Shamo's devices?

4    A.    Yes, we did.

05:17:13    5    Q.    Were you able to determine what Ms. Noriega's

6    role was within the organization?

7    A.    Yes.  It was someone we would classify as an

8    executive assistant, someone who helped with personal

9    things, personal details, um, as well as things

05:17:27    10    related to the drug trafficking organization.

11    Q.    There was a point earlier in the trial where --

12    where there was some discussion about legal zoom

13    log-in information that belonged to Ms. Noriega.  Do

14    you recall that?

05:17:40    15    A.    Yes, I do.

16    Q.    As part of your investigation did you see an

17    instance where Mr. Shamo requested Ms. Noriega's

18    legal zoom user name and password?

19    A.    Yes, I did.  It was on text messages between the

05:17:53    20    two.

21    Q.    I want to look at some of those text messages.  I

22    think I will move away from that one but let's look

23    at Exhibit 14.09.  Are you familiar with this?

24    A.    I am, yes.

05:18:07    25    Q.    What is happening here?

154

```
 1   A.   This is text messages between Ms. Noriega and
 2   Mr. Shamo.
 3   Q.   Who is in the blue?
 4   A.   That would be Mr. Shamo.
 5   Q.   And the gray?
 6   A.   And the gray would be Ms. Noriega.
 7   Q.   Could you read those for us?
 8   A.   Yes.  It says, "645 stamp times 1,000 and then
 9   Ms. Noriega replies to Mr. Shamo okay.  What's your
10   address?  I'll just have it shipped there.  And then
11   there is a gif there.  Mr. Shamo says also pick up
12   plan B at Costco please.  I might need that, um, any
13   time today.  Sooner the better.  Ms. Noriega replies,
14   ha-ha, okay.  I just put money in the bank so I'll
15   order them ASAP.  Mr. Shamo responds with an emoji.
16   Ms. Noriega says, I have 900 stamps.  I'll stop by
17   this other post office by my house and see if they
18   can get me another 100."
19   Q.   Let's look at one more and then I want to ask you
20   questions about stamps.  Can we look at 14.08.  Is
21   this just two days later?
22   A.   Yes, it is.
23   Q.   Okay.  Would you read those to the jury.
24   A.   Yes.  Ms. Noriega says, "Sup, Shamo.  Mr. Shamo
25   replies, wanna get another 1K stamps for meh?  The
```

05:18:15  (line 5)
05:18:29  (line 10)
05:18:54  (line 15)
05:19:16  (line 20)
05:19:32  (line 25)

155

```
 1  answer is yes.  Ms. Noriega responds with yes and an

 2  emoji ha-ha."

 3  Q.   There is that word in the second box there M-E-H,

 4  meh.  Did you see that a lot when you were looking

 5  through Mr. Shamo's devices?

 6  A.   Yes, numerous -- we saw that M-E-H numerous times

 7  looking through text messages on his devices.

 8  Q.   Did he even name one of his log-ins for a

 9  computer that?

10  A.   Yes, it was, as Agent Slagel testified to.

11  Q.   Did you get a -- did you get a sense from your

12  review of Mr. Shamo's electronics that when people

13  like Ms. Noriega bought stamps for him that he would

14  reimburse them?

15  A.   Yes, there were numerous instances of that, yeah.

16  Q.   Let's look at Exhibit 14.01.  What did Mr. Shamo

17  want Ms. Noriega to do in this exhibit?

18  A.   In this exhibit Mr. Shamo was asking her to

19  facilitate -- to help him with Bitcoin trades with

20  local Bitcoin trades.

21  Q.   And what's the date on this?

22  A.   The date was June 10th, 2016.

23  Q.   Do you want to read the top half?

24  A.   Sure.  Ms. Noriega says, "On my way back.  So

25  much traffic.  Mr. Shamo replies sweet.  I have a
```

Timestamps:
05:19:53 (line 5)
05:20:05 (line 10)
05:20:20 (line 15)
05:20:44 (line 20)
05:21:03 (line 25)

```
 1   Bitcoin trade at 6.  If you want to see what it's
 2   like you're welcome to join.  I eventually want you
 3   to do them."  Ms. Noriega replies, "Yeah, I'll come.
 4   I'm going to leave my house in a sec, do you want
 5   coffee on my way?  I switched the detail to 11 and
 6   the other one to next week."
 7   Q.   Let me ask you a few questions about this.  Um,
 8   is there some risk in meeting up person-to-person to
 9   trade cash for Bitcoin?
10   A.   There is.  Any time there is large amounts of
11   cash there is always a risk associated with that
12   meeting especially in this -- in these types of
13   circumstances.
14   Q.   And let's be more specific.  Is one of the risks
15   that you're going to be robbed?
16   A.   Of course, yeah, most definitely.
17   Q.   Assaulted?
18   A.   Yes.
19   Q.   Would it be safer for Mr. Shamo if he didn't have
20   to go in person?
21   A.   It would.  And it would help facilitate you to be
22   anonymous also.
23   Q.   Because the buyer would never see your face?
24   A.   That's correct.
25   Q.   If we look at Exhibit 14.13.  These are Telegram
```

Time stamps:
05:21:20 (line 5)
05:21:37 (line 10)
05:21:48 (line 15)
05:21:58 (line 20)
05:22:11 (line 25)

157

1      messages now, correct?

2      A.   Yes, they are.  The encrypted app telegram.

3      Q.   Is this also between Mr. Shamo and Ms. Noriega?

4      A.   This is.

05:22:28    5      Q.   This is a particularly long exhibit and I won't

6      go through all of it with you, but could you read the

7      first four and a half messages here on Page 1?

8      A.   Sure.  Yeah Ms. Noriega says, or Mr. Shamo says,

9      "Hey, did you order the steric acid from the link O

05:22:47   10      sent you?  I needed it specifically from Pyro-Chem

11      Labs because they don't triple press the steric

12      acid."  And then he gives the link.  "This is the

13      link I sent.  Did you order from this Pyro-Chem

14      Labs."

05:23:03   15      Q.   And then Ms. Noriega clarifies at the bottom.

16      A.   Ms. Noriega clarifies and says, "The Tablet Press

17      Club link you sent me a couple of days ago I haven't

18      ordered because I thought you said you needed" --

19      Q.   And then it continues?

05:23:16   20      A.   It continues on from there, yes.

21      Q.   Much of their messages back and forth are like

22      this, right?

23      A.   Yes.

24      Q.   Let's look -- we'll just pick a sample.  What if

05:23:25   25      we go to Page 8 and then if you could read the top

158

```
 1   three for us.
 2   A.   Yeah.  Mr. Shamo says, "We need corn starch,
 3   lactose, another bucket and more steric acid ASAP.
 4   Get ordering.  Also, half bag Ziploc bags, the
 5   snack-sized ones."
 6   Q.   Could we look at, and I hope I'm not going too
 7   fast, if I go too fast please slow me down.  Could we
 8   look at Page 9.
 9          Do you see starting in the middle there,
10   there are some Uline items?
11   A.   Yes.
12   Q.   So if we could highlight those three in the
13   middle.  That's great, yeah.  Can you read this off
14   as well?
15   A.   Sure.  "Need some supplies from Uline.  "And then
16   it gives some product order numbers, "S117739, also
17   need S1294.  You can also order bubble wrap from
18   them, S5995P.  And then some more product order
19   numbers would be the sizes we need, then you can
20   select the color of Mylar.  Choose gold and black."
21   Q.   So these S numbers, is that something specific to
22   Uline?
23   A.   Yes.  These are product order numbers that you
24   find on Uline for specific products related to
25   packaging and shipping and things of that nature.
```

05:23:45
05:23:59
05:24:09
05:24:30
05:24:45

159

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 05:24:55 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 05:25:16 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 05:25:34 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 05:25:44 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 05:25:57 | 25 |

Q.   And all of these instances we've read thus far

that is Mr. Shamo giving direction to Ms. Noriega,

correct?

A.   Yes, they are.

Q.   Let's look at just a couple more.  What if we

looked at Page 11.  And if we could pick it up with

the middle to the bottom starting with awesome.  So

if we go up just a little higher.  One more.  That's

great.

A.   Yeah Mr. Shamo says, "Awesome.  And did you order

the filler from TabletPressClub.com to TJ Edwards.

Also," and this is the second one, "when is your

payday."

Q.   And to those two questions did she give two

answers?

A.   She did give two answers to those two questions.

Q.   Go ahead.

A.   Ms. Noriega replies, "Not yet just because you

said you would check to make sure that was right and

I didn't hear back from you."  And that's regarding

the filler from Tablet Press Club.  And then the next

answer to the question of when was her payday was,

"it was Sunday."

Q.   And then he gives two responses, correct?

A.   Yes.

160

1    Q.    Will you read those?

2    A.    Response to the first, "Okay, you gotta remind me

3    of these things, LOL.  This month has been crazy."

4    And then the second one, "But yeah, it was correct."

05:26:09   5    Q.    Meaning the order from Tablet Press?

6    A.    For the order, yes.

7    Q.    Was that in October, end of October 2016?

8    A.    Yes, it was.

9    Q.    Could we look -- finally, could we look at

05:26:22   10   Page 14 of this exhibit.  And then here at the bottom

11   two messages he is giving her some additional

12   requests, correct?

13   A.    Correct.

14   Q.    I know you have done a lot of reading, would you

05:26:40   15   prefer just to summarize what he is asking for here?

16   A.    Yeah.  This is again Mr. Shamo ordering

17   Ms. Noriega to do several things including order

18   filler, lactose, detail his car.  And then one

19   specific one was a T-shirt business.  So the EIN

05:27:01   20   paper for the LLC we started, specifically the

21   T-shirt business.  And this was a business designed

22   specifically to launder money earlier.  And then

23   there is additional information regarding personal

24   details that Mr. Shamo is asking Ms. Noriega to do

05:27:18   25   for him.

```
 1    Q.   Groceries, have wine sent to his parents'
 2    address, it looks like, things like that?
 3    A.   Yes.
 4    Q.   It wasn't all roses between Mr. Shamo and
 5    Ms. Noriega though right?
 6    A.   No, it wasn't.
 7    Q.   Could we look at Exhibit 14.18.  And then if we
 8    could go to Page 2 and focus on the bottom eight or
 9    so rows.  That's great, yeah.  Just to give a little
10    bit of context, and I probably should ask this before
11    we zoomed in, are these -- is this a note that was
12    found on Mr. Shamo's devices?
13    A.   Yes, it was.
14    Q.   On one of his phones, correct?
15    A.   Correct.
16    Q.   Did you see instances where Mr. Shamo would write
17    himself long running notes?
18    A.   Yes.  There were several instances on his phones
19    where he would write himself notes.
20    Q.   In this instance that we have got highlighted up
21    on the screen now, did you notice anything that
22    relates to Ms. Noriega?
23    A.   Yeah.  There was one line, third line down in
24    particular, that stuck out to me.
25    Q.   Would you read that out for us?
```

05:27:31
05:27:54
05:28:05
05:28:17
05:28:29

162

1    A.   Yes.  It says, it just says, starting in the

2    middle there, "Another case where I don't trust

3    Ally's friends and for sure gonna fire Gabby."  And

4    Gabby was Ms. Noriega.

05:28:44  5    Q.   To your knowledge was she fired?

6    A.   Not to my knowledge, no.

7    Q.   And I think this has been covered but just in

8    case, who is Ally?

9    A.   Ally was Mr. Shamo's girlfriend at the time.

05:28:54  10   Q.   And friends with Ms. Noriega?

11   A.   Yes.

12   Q.   Do you see right at the bottom it says, "Chris

13   owes 95K"?

14   A.   Yes.

05:29:06  15   Q.   Did you identify a Chris that worked with

16   Mr. Shamo?

17   A.   Yes, we did.  Chris Kenny.

18   Q.   He was talked about earlier today?

19   A.   Yes.  He has been spoken of several times during

05:29:16  20   trial.

21   Q.   Let's not belabor that then.  What if we looked

22   at Exhibit 14.19.  And then if we could look at the

23   first note on Page 2.  If you could highlight that

24   top one for us.  This was read previously, right?

05:29:38  25   A.   That's correct.

163

05:29:50

05:30:01

05:30:20

05:30:35

05:30:42

1    Q.    Did you recognize this bottom paragraph as

2    feedback?

3    A.    Yes, I did.

4    Q.    Specifically for what was later -- what was --

5    what was being made with fentanyl?

6    A.    Yes, specifically those pill related to fentanyl,

7    yes.

8    Q.    To your knowledge, based on all of your

9    investigation including and maybe specifically

10   looking through Mr. Shamo's phones and his computer,

11   do you know if Mr. Shamo ever used a single one of

12   the fentanyl pills he was making?

13   A.    Not to my knowledge.  I'm not aware of any in the

14   organization that used those pills specifically the

15   fentanyl pills.

16   Q.    We have looked at a lot of exhibits that start

17   with 14, we call it the 14 series exhibits.  Did

18   those 14 series exhibits, all of the 14 series, did

19   they come from his devices?

20   A.    Yes, they did.

21   Q.    And I can be more specific, Mr. Shamo's devices?

22   A.    Yes.

23   Q.    Two phones and the computer right here next to

24   me?

25   A.    That's correct, yes.

164

```
 1   Q.   I want to ask you a similar question but it's now

 2   about the Exhibit 21 series.  Did all of the exhibits

 3   that come under Exhibit 21, that series, did they

 4   come from Mr. Shamo's e-mail account?

 5   A.   Yes, they did.

 6   Q.   If we could look for another minute at

 7   Exhibit 17.06.  I want to ask you about Mr. Paz.  It

 8   is true that Mr. Paz lied to you, correct?

 9   A.   That is correct, he did.  Initially when we met,

10   yes.

11   Q.   And specifically about his drug proceeds?

12   A.   Yes.

13   Q.   Is that common in your experience?

14   A.   It is very common in my experience.  Oftentimes I

15   talk to defendants, cooperating defendants, targets

16   of investigation, and usually it takes about an hour

17   minimum to get to the truth and I'll tell them hey,

18   um, the truth is a journey.  Oftentimes it's -- it's

19   difficult for people to admit to things that they

20   have done that are wrong and that are against the

21   law, um, especially to a stranger like myself.  It is

22   very common for defendants to lie initially

23   especially when we meet.

24   Q.   And you're faced with sometimes the difficult

25   task of figuring out what's truthful and what's not,
```

05:30:56    5
05:31:22    10
05:31:33    15
05:31:51    20
05:32:06    25

165

```
 1   correct?

 2   A.   Correct.

 3   Q.   Do you ever try to independently corroborate

 4   something a cooperator is telling you?

 5   A.   We always try to independently corroborate.

 6   Trust but verify.

 7   Q.   Trust but verify.  Will you explain what that

 8   means?

 9   A.   You -- you want to believe and if the things that

10   they're telling you are corroborated by other pieces

11   of evidence, separate from what they have told you,

12   it helps you to know that you're on the right track

13   with them.  And then if you have questions or things

14   like that, again you dig for additional evidence to

15   try and corroborate well are they lying or are they

16   telling the truth.

17   Q.   So let me just shoot a couple of examples towards

18   you.  So Mr. Paz, for example, he tells you he has a

19   Bitcoin wallet.  Did you corroborate that he had a

20   Bitcoin wallet?

21   A.   We did corroborate that he had a Bitcoin wallet,

22   yes.

23   Q.   You had him show it to you, right?

24   A.   We did, yes.

25   Q.   And you looked up that wallet on the blockchain?
```

05:32:18
05:32:30
05:32:46
05:33:00
05:33:07

05:33:18

05:33:28

05:33:43

05:34:04

05:34:12

```
 1   A.   We did look it up on the blockchain.  In fact we
 2   were aware of that particular wallet before we met
 3   with Mr. Paz.
 4   Q.   That would be an example of corroborating what he
 5   said?
 6   A.   Yes.
 7   Q.   And Mr. Paz's money on the blockchain came from
 8   whose wallets?
 9   A.   From Mr. Shamo's wallets, yes.  So can I explain
10   that just a little bit.  So, um, we were aware of
11   Mr. Shamo's cryptocurrency wallet, specifically his
12   Bitcoin wallets.  We had been tracking where they
13   were going to different places, we were aware of
14   several of them, and we saw one in particular that we
15   felt might be Mr. Paz's wallet.  We also verified in
16   the end that that wallet was related to Mr. Paz
17   specifically.
18   Q.   You saw the -- we don't necessarily need to look
19   at it, but you saw the three pictures of the cash
20   that Mr. Paz turned over?
21   A.   Yes.
22   Q.   He surrendered that to you specifically, correct?
23   A.   He did, yes.
24   Q.   Those pictures are accurate representations?
25   A.   Yes, they are accurate.
```

167

```
     1   Q.   While we're still on this screen let's talk about

     2   one or two more people.  Could we talk for just a

     3   minute about Julian Mausia?

     4   A.   Sure.

05:34:24  5   Q.   Would you identify him for the jury?

     6   A.   Yeah.  Julian Mausia is the fourth from the left

     7   on the bottom row there.

     8   Q.   Let's look for a minute there at Exhibit 14.14.

     9   Are these Telegram messages between Mr. Mausia and

05:34:47 10   the defendant?

    11   A.   Yes, they are.

    12   Q.   This is another long exhibit and I won't drag you

    13   through all of it, but let's look at just one or two

    14   examples.  If you could read the rows of

05:35:00 15   communications that are shown here on the first page.

    16   A.   Sure.  Mr. Mausia says, "What's up, bro.  I got a

    17   package here for ya.  Mr. Shamo replies, yay, should

    18   be another landing soon.  The one you got, can I get

    19   the last four of tracking?"  Mr. Mausia replies,

05:35:19 20   "It's at my house, but I'm meeting my family for

    21   lunch."

    22   Q.   This is a good -- let me ask instead of say.  Is

    23   this a good representation of what these messages

    24   back and forth look like?

05:35:33 25   A.   Yeah, there were numerous messages similar to
```

168

1    this one in the beginning here.

2    Q.   Let's look at just one more.  Could we go to

3    Page 5 and we'll pick it up in the second full box

4    starting with, "Hey, pack landed."  And then if we

05:35:50    5    could go all the way down.

6    A.   Sure.  So this says Mr. Shamo speaking to

7    Mr. Mausia.  He says, "Hey pack landed on 8/27.  Can

8    I grab from you soon?"  Mr. Mausia replies, "Hey,

9    bro, yeah, I got it, it's at my house.  I'm at work

05:36:07    10    now, you need it soon?"  Mr. Shamo replies, "Um, can

11    I grab it tomorrow sometime?"  Mr. Mausia, "Yeah,

12    bro.  I don't work so I'm free all day pretty much."

13    Mr. Shamo says, "Nice, I'll see you tomorrow.  Hey,

14    will you be free in two hours or so?"  Mr. Mausia,

05:36:24    15    "Yeah, man, sorry I just saw this.  But yeah, I got

16    two things here for you now."

17    Q.   Then if we can go to the next page, page six.

18    And then maybe we do top half, bottom half.

19    A.   Mr. Mausia says, "A really heavy one just came

05:36:47    20    in."  Mr. Shamo replies, "Nice.  Hey, I want to see

21    if Jess can get that packed tonight.  I might head

22    down tomorrow instead.  That cool?"  Mr. Mausia

23    replies, "Yeah man, that's chill.  Just let me know,

24    dude.  I just got another package in for you."

05:37:09    25    Mr. Shamo replies, "Yay.  Um, I'll try and come down

169

```
 1   tomorrow.  I'm dragging my feet hoping Jessica can

 2   grab hers."  Mr. Mausia says, "Yeah, for sure.

 3   Hopefully we'll get them tonight.  And Mr. Shamo

 4   applauds."

 5   Q.   The Jessica referred to in here, is that

 6   Ms. Gleave?

 7   A.   Yes, it is.

 8   Q.   Were she and Mr. Mausia dating at the time?

 9   A.   Yes, they were at the time.

10   Q.   And on this broader subject of corroboration, did

11   you and other agents seize packages from either

12   Ms. Gleave or Mr. Mausia?

13   A.   Yes, we did, early on in the investigation and

14   also a little bit later in the investigation.

15   Q.   If we could look at 17.06 one last time.  Could

16   you identify for the jury Clint Perry.

17   A.   Yeah.  Clint Perry is on the bottom row in the

18   center kind of in between Drew and Luke Paz.

19   Q.   In your investigation, did you determine what

20   role Mr. Perry played?

21   A.   Yeah.  Mr. Perry was a package receiver who was

22   recruited by Mr. Shamo to receive packages for the

23   drug trafficking organization.

24   Q.   Was he interviewed?

25   A.   Yes, he was.
```

05:37:24 — line 5
05:37:31 — line 10
05:37:48 — line 15
05:38:12 — line 20
05:38:23 — line 25

170

```
 1    Q.    Did we seize packages?

 2    A.    We did seize packages from him.

 3    Q.    His name on it, heading to Mr. Shamo?

 4    A.    Yes.  And he indicated that he was paid by

 5    Mr. Shamo for receiving those packages.

 6          MR. GADD:  Your Honor, I'm at a pretty good

 7    breaking point.

 8          THE COURT:  All right.

 9          MR. GADD:  We're going to transition from

10    people to subject matter.  If this works for the

11    court, this may be the best spot to make a break.

12          THE COURT:  It works for everybody.  Ladies

13    and gentlemen of the jury, thank you again for your

14    work.  Have a nice weekend and we'll see you at 8:30

15    Monday morning.

16          THE CLERK:  All rise, please.

17          (Jury leaves the courtroom.)

18          THE COURT:  We'll see you Monday morning as

19    well, Mr. Ashment.  People can sit and come and go as

20    they please.  Mr. Williams, maybe I better wait for

21    Elizabeth to get back in here.

22          (Brief pause in proceedings.)

23          MR. SKORDAS:  Thank you, judge.  I think if

24    it please the court that I would just have

25    Mr. Williams make a proffer.
```

05:38:33 (line 5)
05:38:45 (line 10)
05:38:59 (line 15)
05:39:42 (line 20)
05:41:05 (line 25)

171

1          THE COURT:  That's all right.

2          MR. SKORDAS:  As soon as he is through.

3          THE COURT:  It always pleases the court when

4  Mr. Williams makes a proffer.

05:41:21      5          MR. WILLIAMS:  I'm the court reporters dream.

6  I just keep blabbing and blabbing and blabbing.

7  Judge --

8          THE COURT:  This is Mr. Scott Williams.

9          MR. WILLIAMS:  I'm new to this.  On the 19th

05:41:40     10  of August, just of 2019, just a couple of days ago, I

11  received -- I accepted service on behalf of Miles

12  Penrose, my client, of a subpoena for personal

13  appearance next Monday on August 26th.  I received

14  that subpoena from the defense, Mr. Skordas, and his

05:42:07     15  team.

16          Mr. Penrose was not in the city at the time.

17  I was able to inform him of it, but I immediately

18  informed Mr. Skordas that I had been representing

19  Mr. Penrose in some relation to this case for I think

05:42:27     20  well over a year.  I just looked at some e-mails with

21  Mr. Gadd that I think go back to February of '18.

22          Not only did I have some frustration with the

23  subpoena and the timing, but I let Mr. Skordas know

24  that he would be exercising his Fifth Amendment right

05:42:50     25  and not answering any questions at this trial if they

172

1    were posed to him and that is the position that he

2    takes today.  I would inform Your Honor that I mean I

3    didn't catch the number of the exhibit which is the

4    -- all of the pictures of individuals.

05:43:04    5         THE COURT:  17.06.

6         MR. WILLIAMS:  Thank you.  17.06 for the

7    record, which I have not seen before, has Mr. Penrose

8    on it.  And that's just for the record.  And when I

9    spoke with Mr. Gadd and have spoken to him a number

05:43:19   10    of times in the pendency of the case against

11    Mr. Shamo, there has been discussions that included

12    the possibility that Mr. Penrose might have some

13    criminal liability.

14         I don't think there is any good faith

05:43:32   15    argument that he wouldn't have a Fifth Amendment

16    privilege in relation to questions that would be

17    posed to him by the government or the defense.

18         So I'm making that proffer and hoping that

19    that is a sufficient record to satisfy Mr. Skordas

05:43:46   20    who did subpoena him, satisfy the government and/or

21    most importantly satisfy Your Honor without having to

22    have Mr. Penrose take the stand and utter the usual

23    mantra.  He would state with regard to any question

24    that he was on advice of counsel I exercise my Fifth

05:44:07   25    Amendment right to not answer the question posed.

173

```
 1          THE COURT:  Thank you, Mr. Williams.
 2   Mr. Skordas, do you want to say anything?
 3          MR. SKORDAS:  No.  I think that's the record
 4   I wanted.  I think that Scott would also stipulate
 5   that Mr. Penrose is in the courtroom.
 6          MR. WILLIAMS:  That's correct.  Mr. Penrose
 7   is in the courtroom.  You know, I wanted -- to help
 8   everybody we came over on this short notice to do
 9   this.  Mr. Penrose is in the courtroom.  He has been
10   with me this afternoon.  I have informed him
11   completely of the nature and the circumstances and
12   what his rights are.  That's how he knows that he
13   would exercise those rights.
14          THE COURT:  Thank you.  Mr. Gadd, do you want
15   to say anything?
16          MR. GADD:  No, sir.
17          THE COURT:  Yeah, I'm satisfied that you have
18   your record and he doesn't need to appear on Monday.
19          MR. WILLIAMS:  Thank you, Your Honor.
20          THE COURT:  Thank you.  Let's have the
21   lawyers come up here.  Other people can leave, I need
22   to just raise one issue.
23          (Sidebar conference.)
24          THE COURT:  I try to anticipate the turmoil
25   and I don't know if I'm anticipating it correctly or
```

05:44:19 — line 5
05:44:32 — line 10
05:44:44 — line 15
05:44:53 — line 20
05:45:25 — line 25

174

```
 1   not.  But apparently Mr. Shamo is going to testify,
 2   right?
 3           MR. SKORDAS:  It looks like it, yes.
 4           THE COURT:  And there is not a lot of law out
 5   there.  Normally they don't, usually they don't
 6   testify.  Usually defendants don't testify, but when
 7   they do there is occasionally an issue arises about
 8   what's the extent of cross based on what's the extent
 9   of direct.  So I don't know if that's going to arise
10   or not, but I'm going to give you two citations to
11   Tenth Circuit cases, one in which I was affirmed, by
12   the way.  The first one is United States of America
13   versus Crockett.  Is somebody taking these down for
14   both sides?  It is 435 F.3d 1305, and the other one
15   is United States of America versus David Banks, et
16   al.  These are both Tenth Circuit cases, 761 F.3d
17   1163.
18           THE CLERK:  I have the citations in my e-mail
19   and I can send it to all counsel if they want.
20           THE COURT:  Any comments on that?
21           MR. SKORDAS:  No.  But thank you for bringing
22   that to our attention.
23           MR. GADD:  My very brief reading on this
24   issue thus far is that it is kind of a hybrid of what
25   is covered on direct and what I think can sometimes
```

175

```
 1    be raised in opening statements.
 2            THE COURT:  Yeah, I wish it were absolutely
 3    clear.  It's one of those where it's kind of around
 4    the edges.  You also have an issue of well if the
 5    defendant testifies then anything that may be
 6    relevant to his or her credibility might be an issue
 7    too on cross.  But anyway, be thinking about that.
 8    It may come up.
 9            MR. GADD:  Thank you.
10            MR. SKORDAS:  Very well.
11            THE COURT:  Have a nice weekend if that's
12    possible.  I suspect it's more possible for me than
13    any of you.
14            MR. GADD:  We see some light almost at the
15    end of the tunnel.  Half a witness away.
16            THE COURT:  Mr. Skordas, do you have any
17    idea?  Can you estimate at all how long your case may
18    take?  It sounds like this witness is going to take a
19    lot on Monday.
20            MR. GADD:  We're moving pretty good.
21            THE COURT:  This guy.
22            MR. GADD:  I might have an hour and
23    20 minutes.
24            THE COURT:  Oh, okay.  And you'll have a
25    bunch of cross.
```

05:47:24
05:47:35
05:47:46
05:48:03
05:48:11

176

```
 1          MR. SKORDAS:  Yeah, so maybe two hours total
 2   on Monday for the state or the government.
 3          MR. GADD:  Okay.
 4          MR. SKORDAS:  And then we could possibly be
 5   done by Tuesday evening or maybe Wednesday early.  I
 6   don't think we have a lot of witnesses.
 7          THE COURT:  Okay.  We've got to settle the
 8   instructions but we could -- we're about there on
 9   those.
10          MR. SKORDAS:  Right.
11          MR. GADD:  Yeah.  Can I - can I raise one
12   last issue?
13          THE COURT:  Sure.
14          MR. GADD:  A member of our office when they
15   were coming to the courthouse this morning, thought
16   they potentially, but they don't want to make any
17   accusations, they thought potentially that one of the
18   jurors walked in with the defendant's parents.  But
19   the person who told me they weren't 100 percent sure
20   they thought they saw them talking to each other as
21   they came in.  So I wonder if on Monday in a very low
22   key manner, if the court would be willing to inquire
23   if any jurors have had any contact with either party
24   or, you know, family members.  Try to make it very
25   neutral.  And then if there was something we could
```

05:48:24

05:48:37

05:48:43

05:49:00

05:49:17

177

```
 1    hear about it and address it.  If it was a mistaken
 2    identity case no one is the wiser.
 3              MR. SKORDAS:  I don't see any benefit in that
 4    but I'll leave it up to you.  We have all been
 5    bumping into the jurors.  Unfortunately they park in
 6    the same place at the same time.
 7              MR. BURGGRAAF:  I don't know that that
 8    statement is accurate that we all have been bumping
 9    in to them.
10              THE COURT:  Kim sleeps in the basement we can
11    all acknowledge that.
12              MR. SKORDAS:  Defense team and jurors all
13    have to go through security and pay for our parking.
14    The prosecutors avoid all of that.
15              THE COURT:  Not sure what to do about that.
16              MR. GADD:  I wonder --
17              THE COURT:  If it were more clear that they
18    had actually been talking and we knew which juror it
19    was, then we could get them aside and say were you
20    talking to the parents.
21              THE CLERK:  They have been instructed that if
22    anyone talks to them -- they have been instructed
23    that if anyone speaks to them they are supposed to
24    tell us.
25              THE COURT:  I know they have.
```

05:49:33
05:49:46
05:50:02
05:50:14
05:50:23

178

1    MR. GADD:  Maybe the solution is just a

2  reminder with that same instruction on Monday if

3  someone has spoken.

4    THE COURT:  Why don't I just repeat that.

05:50:31  5    MR. SKORDAS:  That probably makes sense.

6    MR. GADD:  Yeah.  I'm not overly worried if

7  there was something.

8    THE COURT:  It could be just good morning if

9  it is a juror.

05:50:40  10    MR. SKORDAS:  Most likely.

11    THE COURT:  All right.  Thank you.

12    MR. GADD:  Thank you all.

13    (Whereupon, court adjourned at 2:53 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

179

1       **REPORTER'S CERTIFICATE**

2

3           I, Laura W. Robinson, Certified Shorthand

4    Reporter, Registered Professional Reporter and Notary

5    Public within and for the County of Salt Lake, State

6    of Utah, do hereby certify:

7           That the foregoing proceedings were taken

8    before me at the time and place set forth herein and

9    were taken down by me in shorthand and thereafter

10   transcribed into typewriting under my direction and

11   supervision;

12          That the foregoing pages contain a true and

13   correct transcription of my said shorthand notes so

14   taken.

15          In witness whereof I have subscribed my name

16   this 27th day of September, 2019.

17

18                  _____

19                  Laura W. Robinson

20                  RPR, FCRR, CSR, CP

21

22

23

24

25

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4

   UNITED STATES OF AMERICA,        )
5                                    )
              Plaintiff,             )
6                                    )
         vs.                         )
7                                    )
   AARON MICHAEL SHAMO,              )   Case No:  2:16CR00631
8                                    )
              Defendant,             )
9    _____   )
                                     )
10                                   )

11

12

13

14

15

16

              BEFORE THE HONORABLE DALE A. KIMBALL

17

              August 22, 2019

18

                   JURY TRIAL
19        TESTIMONY OF STANLEY FRANK PLATEK
            TESTIMONY OF NICOLA RANIERI
20         TESTIMONY OF ADAM LANZAROTTA
         TESTIMONY OF HEATHER ANNE McCAULEY
21         TESTIMONY OF ARTHUR SIMONE

22

23

24                 Reported by:
         KELLY BROWN HICKEN, RPR, RMR
25                 801-521-7238

1

```
 1                  APPEARANCES OF COUNSEL

 2

 3   FOR THE UNITED STATES:        OFFICE OF THE US ATTORNEY

 4                                 BY:  S. MICHAEL GADD

 5                                      VERNON STEJSKAL

 6                                      KENT A. BURGGRAFF

 7                                      Attorneys at Law

 8                                 111 SOUTH MAIN ST STE 1800

 9                                 SALT LAKE CITY, UTAH 84111

10

11   FOR THE DEFENDANT:            SKORDAS & CASTON

12                                 BY:  GREGORY G. SKORDAS

13                                      KAYTLIN V. BECKETT

14                                      Attorneys at Law

15                                 560 SOUTH 300 EAST STE 225

16                                 SALT LAKE CITY, UTAH

17

18

19

20

21

22

23

24

25
```

2

```
 1                        I  N  D  E  X

 2   WITNESS                  EXAMINATION BY          PAGE

 3   STANLEY FRANK PLATEK       DIRECT BY MR. BURGGRAAF   5

 4   NICOLA RANIERI            DIRECT BY MR. BURGGRAAF   33

 5   ADAM LANZAROTTA           DIRECT BY MR. BURGGRAAF   63

 6   HEATHER ANNE McCAULEY     DIRECT BY MR. BURGGRAAF   77

 7   ARTHUR SIMONE             DIRECT BY MR. BURGGRAAF   87

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
                        SALT LAKE CITY, UTAH, THURSDAY, AUGUST 22, 2019
```

 1

 2                                   *   *   *   *   *

 3              THE COURT:  Are we ready to proceed?

 4              MR. SKORDAS:  Yes.

08:30:50  5     THE COURT:  We'll get the jury and proceed.

 6              (Whereupon, the jury returned to the

 7        court proceedings.)

 8              THE COURT:  Good morning.  Welcome again.  Thank

 9     you for your work.

08:32:26 10     The government may call its next witness.

11              MR. BURGGRAAF:  United States would call

12     Frank Platek.

13              THE COURT:  Come forward and be sworn, please.

14              THE CLERK:  Please raise your right hand.

08:32:42 15                      STANLEY FRANK PLATEK,

16        called as a witness at the request of Plaintiff,

17            having been first duly sworn, was examined

18                      and testified as follows:

19              THE WITNESS:  I do.

08:32:52 20     THE CLERK:  Please come around to the witness box.

21              Please state your name and spell it for the record.

22              THE WITNESS:  Yes.  Stanley Frank Platek.

23     S-T-A-N-L-E-Y F-R-A-N-K, Platek is P-L-A-T-E-K.

24     //

08:33:32 25     //

4

```
                        DIRECT EXAMINATION

           BY MR. BURGGRAAF:

               Q.   Mr. Platek, thanks for being here this morning.  As

           you are aware I sometimes pronounce things incorrectly, and

08:33:40   you feel free to correct me if I do.

                    Can you tell me your current occupation is and

           where you're employed?

               A.   Yes.  I'm employed with the US Food and Drug

           Administration's Forensic Chemistry Center as a biologist in

08:33:53   the trace evidence section.

               Q.   And how long have you been employed by the FDA?

               A.   I've been employed by the FDA for over 28 years.

               Q.   And in your current positions what are your job

           responsibilities?

08:34:07       A.   Mostly to handle anything related to tampering,

           particle analysis and to be a lead analyst when so designated

           for any type of samples that come in related to my areas of

           expertise.

               Q.   And what's your educational background?

08:34:23       A.   I have a Bachelor of Science degree from Murray

           State University in biology with a minor in chemistry.  I have

           a Master of Science degree in Industrial Hygiene from the

           University of Cincinnati College of Medicine.

               Q.   What additional training do you have that relates

08:34:41   to your current position with the FDA?
```

5

```
 1          A.   I have had numerous courses and training classes

 2   throughout my career with the government of over 43 years.  I

 3   have several courses in toolmark examination, a two-week

 4   course with the Indiana State Police and a one-week course

08:35:03  5   with the safety institute of Ohio's Department of Justice

 6   operation, in which they instructed the full analysis of

 7   toolmarks.

 8          Q.   And do you provide training to others?

 9          A.   Yes.  I provide training in a number of other

08:35:21  10   areas.  I've been a faculty instructor at Northern Kentucky

11   University in northern Kentucky since 1982.  And I teach

12   scanning electron microscopy and energy-dispersive x-ray on

13   microanalysis.  I also teach at the Lehi University Microscopy

14   School, and I've been doing that since 2005.

08:35:45  15          Q.   And what professional organizations do you belong

16   to?

17          A.   I'm a member of the academy -- American Academy of

18   Forensic Scientists.  I am a member of the Midwestern

19   Association of Forensic Scientists.  I'm a member of the Ohio

08:36:01  20   Valley Microscopy Society, and I'm also a member of the

21   Microscopy Society of America, in which three years ago I was

22   honored as a fellow of that society.

23          Q.   And have you testified as an expert before?

24          A.   I have.

08:36:17  25          Q.   How many times?
```

6

1    A.   Three times.  State and federal.

2    Q.   And has the Court ever made a finding that your

3    testing methods or results were not accurate or correct?

4    A.   No, sir.  That is correct.

08:36:31  5    Q.   Have you had any experience analyzing pill press

6    punches and dies?

7    A.   I have.

8    Q.   What did you do to prepare for your testimony

9    today?

08:36:43  10    A.   Reviewed my notes, thought about the manner in

11    which I would present.  But normally it would just be review

12    what I've done and how I put my worksheets together.

13    Q.   And you've had a couple of less than full nights of

14    sleep, as well.

08:36:56  15    A.   That's true.

16    Q.   Okay.  Let's speak more generally -- first, how did

17    you become involved in this case?

18    A.   The case was assigned to me by our supervisor from

19    the trace evidence section.  We rotate how often different

08:37:15  20    people take positions as a lead analyst in a case, and for

21    this particular one since it would need an initial microscopy

22    front end and some of the additional physical examinations I

23    was assigned to take the sample.

24       The sample was picked up from our sample custodian

08:37:37  25    in the laboratory where I signed for it to maintain chain of

7

custody.  I take it to our laboratory.  And at that point the

sample is -- we have several forms that we put together that

are part of our procedure for bringing new samples into the

laboratory.  And we take those.  Those were prepared.  We

08:37:55   identify the seals, and then we go through a full photo

documentation of each of the items as received.  We don't open

anything.  Everything is photo documented.

And at that point we will be getting information

from both the information provided by the special agent as to

08:38:14   what their request was for analyses.  They will also -- in

conference we take a look at what the evidence may be, say, we

might suggest we could do this.  They say, we would like this.

We may not be able to perform some of those with what's

provided or we might need more information.  So we will be in

08:38:34   contact with the special agent or submitting agents in these

cases.

And at that point we decide -- it's sort of a

triage as to how a sample is going to be addressed.  If you're

going to do a destructive technique on something you can't do

08:38:48   that destructive technique first and then take it on and hope

to do something else.  So we decide who is going to receive

which portions of a sample and for what reasons.

Q.   I want to kind of backup just a little bit as far

as speaking more generally about the FDA lab, which I'm

08:39:12   referencing as the FDA lab the forensic chemistry center.

8

         1          A.   Correct.

         2          Q.   First of all, is the lab a certified or national

         3     accredited lab?

         4          A.   We are.  We are an accredited forensic laboratory.

08:39:26 5     We are accredited through a group that's all A-NAB and the

         6     ANAB.  And the A in ANAB stands for the American National

         7     International -- I'm sorry.  We converted about a year and a

         8     half ago.  The American National Institute of Standards.  And

         9     then the NAB part is National Accreditation Board.

08:39:47 10         Q.   I'm not going to ask you for every specific

        11     requirement.  But what's typically required to become an

        12     accredited lab?

        13         A.   Obviously having a secure forensic security with

        14     full chain of custody from time in to time out.  We have

08:40:02 15    procedures in place for all instrumentation.  We have analysts

        16     that are determined through testing to be proficient in the

        17     disciplines in which they are working.  We get annual tests in

        18     specific disciplines based upon what we are doing in the

        19     laboratory.  And it's a -- some of them are very rigorous, and

08:40:25 20    you must pass it to go on.  They are ways to handle it if

        21     there are issues with that.  There have not been problems

        22     along those areas.

        23               We also have to have a facility set up in such a

        24     manner that the analyses can be performed in a safe fashion

08:40:42 25    under safe working conditions.  The sample security is very

                                                                        9

1      high priority with us.  And there are a number of other ones

2      as far as procedures, how you handle things, at the ANAB rules

3      and regulations, as it is with any forensic accreditation

4      board are very stringent.  And it takes truly years to be

08:41:06  5      prepared to be ready for one.

6          Q.   What types of equipment or instrumentation is

7      utilized at the lab?

8          A.   We have -- with all bragging rights among

9      scientists, we have an incredible array of instrumentation in

08:41:22  10      our laboratory.  For the microscopy side we have almost every

11      type that is available.  I say almost.  We have everything

12      from your basic light microscopes to scanning electron

13      microscopes.  We are equipped with all types of spectrometers.

14      We have infrared analysis instrumentation.  We have gas

08:41:45  15      chromatography, mass spectrometers, we have inductively

16      coupled plasma emissions spectrometer used for analyzing for

17      elements.  There are a lot of these different types of

18      instruments in the laboratory, and that doesn't begin to touch

19      them all.  A lot of these we have in duplicate and triplicate

08:42:02  20      because of the fruit put through the laboratory and what we

21      do.  You need to have a lot of instruments.

22              All instruments are certified.  We also have a

23      procedure in which if an analyst is going to use that

24      instrument that day they must perform a performance validation

08:42:21  25      of that instrument.  You can't assume that it's going to work

10

1   properly.  And every day if you're going to use it you have to

2   log in onto it, you have to perform the test with a certified

3   standard, whether it's chemical or physical.  It's recorded in

4   two places, one in the logbook right at the instrument, and

08:42:41  5   one goes on to our quality assurance folder which is on the

6   laboratory server.  And again, once it goes in it cannot go

7   out.

8       Q.   Is there standard policies and protocols for

9   ensuring that the instrumentation and equipment is properly

08:42:59  10   sterilized?

11      A.   Sterilized, we do not do sterilization with the

12   exception of our biological safety laboratory 3.  We have a

13   full BSL 3 laboratory at the forensic chemistry center, and

14   that's handled for the microbiologist.

08:43:20  15          But as far as cleaning, preparation, making sure

16   that the samples are used, absolutely, that the surfaces are

17   wiped.  I will exchange backing papers between samples to

18   prevent cross-contaminations, just as an example.

19      Q.   Now, you mentioned quite a few protocols and

08:43:36  20   policies in how the lab operates.  As the lead analyst and to

21   your knowledge were those policies and protocols followed in

22   the analysis in this case?

23      A.   To the best of my knowledge, yes.

24      Q.   Are the processes and tests and methods for

08:43:54  25   analyzing items in the lab commonly accepted and considered

11

1    reliable in the scientific community?

2         A.    They are, yes, sir.

3         Q.    While using the lab equipment to analyze and exam

4    items in the case did you have any indication that any

08:44:13  5    equipment was not operating properly?

6         A.    No, sir.

7         Q.    Are the labs results found by one analyst confirmed

8    by another?

9         A.    They are definitely confirmed.  Every analyst who

08:44:22 10    is assigned a portion of the sample to analyze will perform

11    their analyses.  They will prepare a worksheet section, and it

12    will be called an analytical section.  They will perform that

13    section, and that section is not only checked but fully

14    reviewed by another member of the forensic chemistry center

08:44:40 15    who is proficient in that technique.  You want to have

16    somebody who knows what you're doing review your work.  And

17    they'll make sure that everything both scientifically is

18    correct, that your calculations are correct, every single one

19    of them, and that, quite honestly, the right form is used.

08:44:56 20    All analytic information is in there.  We do have SOPs on

21    that, as well.

22         Q.    What does SOPs stand for?

23         A.    Standard operating procedure.

24         Q.    Okay.  Let's get a little more in-depth in this

08:45:08 25    specific case.  You mentioned retrieving items as well as a

12

1      request after being assigned as the lead analyst in this

2      matter.

3              A.    Correct.

4              Q.    What items specifically -- how are the items

08:45:19  5    labeled that were requested to be analyzed?

6              A.    I received 22 items, and they were each in

7      individual evidence bags, sealed evidence bags.  One side of

8      the evidence bag had a DEA label, evidence label on it, the

9      opposite side had an OCI, our office of criminal investigation

08:45:41  10   label.  Each bag also had a tape over the seal end with the

11     FDA OCI number information on it, as well.  And all bags were

12     sealed, received sealed.

13             Q.    Now you referenced a DEA label on the front of it.

14     I would like to approach and present you with Government's

08:46:01  15   Exhibit -- let me make sure I've got the right number here --

16     7.43.

17                 Now, I'm not going to ask if you recognize that

18     specific exhibit.  But the label on the front of that, does

19     that look similar to the DEA labels that were on the 22 items

08:46:29  20   that were received?

21             A.    It does.  Including the one on the vial that's

22     inside here.

23             Q.    And the labels that were on the 22 items that you

24     received similar to this label, did it have a DEA exhibit

08:46:44  25   number listed?

13

1          A.   Yes, it did.  On this -- just like this one right

2     here.

3          Q.   Okay.  Thank you.

4               In preparation for your testimony did you take the

08:47:05  5     time to list out essentially what the items were that were

6     received and the general categories?

7          A.   I did.

8          Q.   Did you do so on that white pad?

9          A.   I did.  In advance of this I prepared for easier

08:47:20 10     demonstration.

11               If I may get up, Your Honor?

12               THE COURT:  You may as long as you speak up.

13               MR. BURGGRAAF:  And, Your Honor, I believe he's

14     going to stay in his seat.  He is just going to flip the paper

08:47:33 15     over so the jury can see how he listed it out.

16               THE COURT:  Okay.

17          Q.   BY MR. BURGGRAAF:  Can you explain to the jury what

18     it is they're looking at there that you listed?

19          A.   Yes.  If you take a look at this, on the very top

08:47:44 20     line it says, Items 1 through 5, 7, and 11 were all tablets in

21     which the debossing on the tablets, the marks that are down

22     into the surface of the tablet, had the A and 215.  It also

23     had a half score on this.

24               The next lines down is Items 6, 8, 9, 10, 12 and

08:48:09 25     13, and those were debossed with a capital M that is enclosed

                                                                      14

08:48:32

08:48:51

08:49:13

08:49:44

08:49:56

1  within a square, and the square has slightly rounded edges,

2  and the number 30 on the opposite side with a half score.

3          The next line down is Items 14 through 19.  And

4  these were oblong tablets that were marked GG249 on one side

5  with three, what we call, quarter scores.  There were three

6  separate marks on there.  And the backside of that tablet had

7  nothing on it.

8          The next one is Item 20.  There were two tablet

9  punches in there that were also marked with the GG249.  Now

10 these were embossed.  It's a negative image of what would have

11 been on the tablet.  And they were embossed with the GG249.

12 Included with that were other tablet punch tips, et cetera,

13 even five tablet dies.  And dies are another part of the

14 tableting process that were included with that sample.

15         The Item 21, there were 9 punches that had the

16 M, capital M with the square with the rounded corners.  And

17 tablet -- or Item 22 were 8, again more tablet punches, and

18 these were all with the embossing GG249.

19         Q.   So the last three items contained punch or punch

20 tips.

21         A.   Right.  The punches with the tip on the end of it,

22 correct.

23         Q.   Now you mentioned Item 20 that there were two punch

24 tips with the GG249.  You've got it separate there.  Why

25 haven't you listed out the additional punches?

15

```
 1        A.   The reason we have not listed the other ones here

 2   is we did not have corresponding tablets for comparison for

 3   any of the other punch tips that were included with that

 4   sample.

 5        Q.   I want to start with Items 1 through 5, 7 and 11.

 6   You've got it listed that they were each debossed with A215.

 7   In each of the items both on that first line and the next two

 8   that reference pills or tablets, how many of those pills or

 9   tablets were in each item?

10        A.   Each item came with five tablets for all Items 1

11   through 19.

12        Q.   And do you know where those tablets came from

13   before being at the FDA lab?

14        A.   No, I was not.  I was told they would be coming

15   from DEA when we saw the evidence, but that was the extent of

16   it.

17        Q.   So the first line you've got the debossed tablets

18   with A215.  Do you know what the A215 means in the

19   pharmaceutical world?

20        A.   In the pharmaceutical world this one would refer to

21   an Oxycodone tablet.

22        Q.   And the next line down, the M or M box with the 30,

23   do you know what that --

24        A.   That's also an Oxycodone embossment.

25        Q.   And the GG249, do you know what that signifies?
```

08:50:10 (line 5)
08:50:31 (line 10)
08:50:46 (line 15)
08:50:59 (line 20)
08:51:16 (line 25)

16

1          A.    Yes.   Alprazolam.

2          Q.    So as the lead analyst in respect to the requested

3     analysis, what was your role?

4          A.    My role as lead analyst in this one was as I

08:51:40  5     mentioned before to evaluate the sample as I first receive it,

6     document how I first received it, and then I will upon

7     deciding once we've talked with other analysts and other

8     supervisors how they want us to approach the analyses on

9     these, I would open the sample, and we have a protocol, we

08:52:00  10    will put our initials and a date and we will open it directly

11    on the bag, and then the samples were removed.

12          In the case of Items 1 through 19, those tablets

13    were received in small glass vials with a white top.  And the

14    tablets were removed from those.  So this was done in a fume

08:52:19  15    hood now because we weren't sure what we were dealing with.

16    And we would have a 50 millimeter, which is about 2 1/2 inches

17    in diameter petri dishes that have forcible lids.  The hold

18    on.  We use these a lot in the laboratory.  They're new.

19    They're fresh.  They're brand-new out of the package, and

08:52:35  20    they're sterile when we do receive them.

21          We open one of those up after labeling it, and then

22    the five tablets we put in there and put the seal.  And then

23    all -- once that was done with all of the samples with their

24    own individual item petri dish were put into a plastic

08:52:52  25    snap lid container, and that was retained, and since we've

```
            1   opened it in a hood.

            2        Q.   And is that container then labeled to ensure that

            3   items stay separate and clearly identified?

            4        A.   Yes.  Each one is individually identified within

08:53:09    5   there, yes, sir.

            6        Q.   So let me take you back just prior to this portion.

            7   You mentioned and kind of confirmed that each of the items

            8   came in a separate evidence bag; is that right?

            9        A.   Yes.

08:53:20   10        Q.   And they had multiple labels on it?

           11        A.   Yes.

           12        Q.   I want to reference the DEA label that you

           13   mentioned.  You mentioned that it had the DEA exhibit number

           14   listed.

08:53:36   15        A.   (Witness indicates by nodding head up and down.)

           16        Q.   On Item 1, did that label have DEA Exhibit

           17   Number 14 noted on it?

           18        A.   I would have to look in my records to confirm that

           19   for Item 1.

08:53:51   20        Q.   Did you note that -- did you note down what DEA --

           21        A.   The DEA numbers were not noted, but they are

           22   captured for the photos for with each one of the items.  It

           23   will be on the bag.

           24        Q.   Okay.

08:54:02   25        A.   And I do have that in my record in my Section 1.
```

1          Q.    Okay.  Section 1.

2                MR. BURGGRAAF:  If I may approach?

3                THE COURT:  You may.

4                THE WITNESS:  Thank you.

08:54:54  5     Q.    BY MR. BURGGRAAF:  Mr. Platek, I think if you can

6     look at Item 1 and explain to the jury what DEA exhibit number

7     is listed.

8          A.    Exhibit Number 14.

9          Q.    And Item Number 2, what DEA exhibit number is

08:55:07  10    listed?

11         A.    Item 34.

12         Q.    And Item Number 3, which DEA number is listed?

13         A.    I'm sorry.  You're printed on both sides here.

14               Item 1 was 14; Item 2 was 34; Item 3 was 64; Item 4

08:55:38  15    was 123.  Do you wish me to go on?

16         Q.    Yes.  Please go through Item 22.

17         A.    Sure.  Item 5 is 193; Item 6 is, it looks like 45.

18         Q.    Is it possible that that's an 85?

19         A.    The first character is slightly squiggled.  Let me

08:56:05  20    take a look and see if I can look on a different portion of

21    that.  Yes.  If I look up on the yellow label it's 85.

22         Q.    Okay.

23         A.    And Item 7 appears to be 95; and Item 8 is, it

24    looks like they have it as Exhibit 85.02.

08:56:38  25         Q.    Could that be 95.02?

19

1    A.    That is hard to read.  It could be a 95 on this

2    one.  The yellow tag above it does have 95 for the exhibit on

3    it.  I apologize.

4         Item 9 is 96; Item 10 is 136; Item 11 is 174;

08:57:15 5    Item 12 also has 174 on it; at least on their exhibits here;

6    Item 13, 188; Item 14, 54; Item 15 is Exhibit 15; Item 16 is

7    Exhibit 97; Item 17 is 126; Item 18, 173; Item 19, 185;

8    Item 20, 177; Item 21 is 178; and Item 22, 179.

9    Q.    Now, the jury previously heard testimony about each

08:59:13 10   of these exhibits and several of them that were tested by the

11   DEA lab.  The testimony for multiple items that you went over,

12   they heard testimony that was positive for the presence of

13   Fentanyl while others were positive for the presence of

14   Alprazolam.

08:59:36 15        When you documented those items in their evidence

16   bags did they have any sort of cautionary label?

17   A.    Yes, sir.  The first three appear on the Items 1

18   through 5 had a cautionary label on there that said Fentanyl.

19   Now, Items 1 through, I believe 1 through 13 had a caution

09:00:04 20   label on it.  But they all did not necessarily have anything

21   else handwritten on them.  The remainder of them, Items 14

22   through 19 did not have a caution on the bag.

23   Q.    And Items 20, 21, 22, did they have any sort of

24   cautionary label?

09:00:25 25   A.    Not to my recollection, no.

20

1    Q.   What precautions -- seeing those precaution labels,

2  did you take any additional precautions on how the items are

3  handled?

4    A.   We do.  Whenever there's a concern of Fentanyl the

09:00:40  5  samples are handled in a fume hood.  We'll keep them in that

6  area as much as possible while we're processing them.  As I

7  mentioned when they were opened they were done in a fume hood.

8  The samples in the case of the tablets are kept in petri

9  dishes until they have to be opened, say, under a microscope

09:01:00 10  or whatever.  And aside from that they're closed and retained

11  in the one area.

12    Q.   Now, you mentioned after the items were removed

13  from the evidence bag that they were then photographed.

14    A.   They were.

09:01:11 15    Q.   What type of instrument was used for photographing

16  the items?

17    A.   The initial one was done by stereoscopic light

18  microscopy.  And I positioned three tablets trying to show at

19  least two with the debossing and one with the backside of the

09:01:28 20  tablet for verification.

21    Q.   Can I abbreviate that by saying SLM?

22    A.   SLM, that is correct.

23    Q.   Because I'm probably going to get it wrong if I say

24  it otherwise.

09:01:40 25         What type of tool is this?

21

1          A.   It's a microscope, and you've seen them on TV on

2     forensic files.  It's a large binocular microscope that you

3     can look into.  Very high-end lenses inside of those, glass

4     lenses.  We can light below from underneath.  We can project

09:01:59  5     lights on the top, and we even have cable arms and wands that

6     we can put fiberoptics directly onto the tablets or whatever

7     we're examining.

8          Q.   And that's used to actually take the photographs?

9          A.   We do.  The system is also included with a very

09:02:12  10    high-end digital camera, which is located on the top of this

11    microscope.  It makes it actually a safer way for us to do

12    this because we don't have to put our face where our eyes are

13    here and samples are here close to your face, we can put it

14    down here.  We can be back from it and actually use a mouse

09:02:30  15    and a screen, and we can see exactly what we're going to

16    capture using a camera and capture those images.  It's the

17    same way if you were putting a cell phone up there and

18    collecting those images on a large monitor.

19         Q.   Let's look through a few of those photographs that

09:02:45  20   you took.  If we can look at Government's Exhibit 24.01.

21              Is this one of the photos you took?

22         A.   It is.

23         Q.   And what is it depicting?

24         A.   This is an image of three of the tablets of the

09:03:02  25   A215 type that you see on the top over here.  And the two on

22

1660

1    the right show the debossed surfaces with the half score that

2    I mentioned.  The tab on the upper left is the same thing on

3    the other side.  But this one is showing the backside of the

4    tablet to show there is nothing on the backside of that

09:03:21  5   tablet.

6        Q.   Now you mentioned previously that in each item

7    there were five tablets.  Why are there only three depicted in

8    this photo?

9        A.   The lowest magnification that I can use on the

09:03:35  10  stereoscopic microscope and capture this type of image is

11   done, and that's the largest field I can get.  If I tried to

12   put any more tablets into this field they would then be shoved

13   out and you would have seen partials.  In fact, you're seeing

14   that the very bottom of one of the tablets, is slightly

09:03:52  15  covered.  You just can't quite squeeze it all in.  But it was

16   meant to be representative to show what the tablets looked on

17   both sides.

18       Q.   Let's look at 24.02.

19            Is this one of the photos that you took?

09:04:09  20      A.   Yes, sir, it is.

21       Q.   What is this depicting?

22       A.   This is depicting the type of tablets that you see

23   in the second line over here with the M in the large square

24   with rounded edges, and the backside has the 30 on it, the

09:04:22  25  debossed 30 with a half score.

23

```
            1         Q.   And let's look at 24.03.

            2         A.   Now these are oblong tablets, and these are from

            3    the bottom one over here from Items 14 through 19

            4    representative of those with the GG249 with the three-quarter

09:04:42    5    scores.  As you see, there are only two tablets in this one.

            6    For the same reason, these are larger tablets and we could

            7    only get those into the image as you see here.

            8         Q.   And let's look at the next photo 24.04.  What are

            9    we looking at here?

09:05:00   10         A.   Now this is a tablet punch tip.  And if you will

           11    notice on it the upper right you can see the inverted GG that

           12    we're talking about over here, and then the next block coming

           13    down you'll see a 2 inverted.  The next one down you'll see a

           14    4 inverted, and at the very bottom you'll see the 9 inverted.

09:05:23   15    This is the tablet punch tip with the embossed features.  The

           16    embossed features are the ones that are sticking up that will

           17    make the debossed features into a tablet once it's pressed.

           18    And this is representative of those.

           19         Q.   Let me look at Exhibit 24.05.  And what are we

09:05:43   20    looking at here?

           21         A.   This is another one of the tablet punch tips

           22    representative of the type over here that we had with the

           23    20 -- Item 21.  And you'll see we had nine of those.  Those

           24    have the M, capital M enclosed within the rounded-edge square.

09:06:05   25    And this type of appearance that you see here you're seeing
```

24

1       the actual M.  Again, it's the punch tip itself.

2            Q.   And it looks like there's some sort of white

3       substance that's on the punch tip.  Were you able to identify

4       what that was?

09:06:22  5       A.   We did not.  But there's so much -- there's

6       contamination on things.  We see loose particles of stuff, we

7       do not collect in this particular area.  But the images that

8       were captured initially were of the punch tips as received.

9       This is how we got them into the laboratory.  This is what

09:06:41  10      they looked like.  They were clean before processing.

11            Q.   So after you've identified and paragraphed the

12      items that were received for analysis then what did you do?

13            A.   Well, the work that I was going to do?  My next job

14      on this one was to process these and prepare these images or

09:06:59  15      these tablet punch tips for analysis by, it's called 3D image

16      analysis.  And what we would do with the 3D image analysis

17      will be explained by someone else.  But it was my job to

18      prepare these.

19                 What we would do is we actually -- I would clean

09:07:17  20      the surface of these, and some of the material will wash off

21      with a little bit of water and little bit of squirt bottle.

22      This is all done in a hood where the liquid is collected and

23      sent to hazardous waste afterwards.  But I would clean the tip

24      of it off because we didn't get all of the particles out of

09:07:36  25      the or the deboss -- or the embossing that you see on the

25

1    punch tip, we would take a small cotton swab.  It's on a

2    wooden dowel that we use in the laboratory all the time, a

3    clean one of those that's wetted with a little more water.

4    And then we would wipe the surface, get it cleaned off.  And

09:07:51  5    if we still couldn't get the stuff out as much as we could,

6    you can actually take these wooden dowels, and you can snap

7    them, and it forms a very nice little probe.  It's a soft

8    wood, and you can actually flair it a little bit so it becomes

9    kind of like a whisk.  And you can take that with water

09:08:11  10    squirted on there and use that to get as much as possible of

11    the residue on the surface of these tablets removed.  Then it

12    was wiped off with a chemlight, a little lab light that we

13    use, dried and then passed on for additional processing.

14         For additional processing, we want to be able to

09:08:32  15    compare the information, the embossed information on these

16    punch tips to the tablets.  Well, you could if you wanted to

17    try to take a punch tip and look at it directly inverted under

18    a microscope, capture an image and then process and try to

19    compare images of that to the tablets.  But you have to be

09:08:51  20    able to turn it over completely.  You have to do a mirror

21    image of it flipping your head.

22         So what we did we developed a method a while back

23    in which we wanted to be able to take a look at what the

24    tablet would look like if it was produced by that punch tip.

09:09:07  25    So in order to do that, we developed a method using Mikrosil.

26

```
 1    And Mikrosil, it's M-I-K-R-O-S-I-L.  Mikrosil is a product

 2    that is commonly used in the forensic community for

 3    transferring toolmarks, anything from screwdriver marks on a

 4    door lock hasp or something in which an investigating agent or

 5    detective wants to collect information from that crime scene

 6    they will take the Mikrosil.  It comes in two parts, there's

 7    the Mikrosil itself, and there's a hardener.  And you put down

 8    equal lengths of the material.  You mix it up just like you

 9    would an epoxy that you're going to do to make a repair on

10    something at home, you mix it up, and you have a little bit of

11    time.  It doesn't set up real, real fast.  But you smear it on

12    the surface of whatever.  You allow it to sit on that surface

13    for a while.  And then when you remove it it comes off as a

14    silicone mold.  It all comes off beautifully and completely,

15    and it has a good permanence to keep it around for a while.

16        What we did is we developed a method to develop

17    Mikrosil to make essentially -- we're taking tablet faces the

18    way the tablet punch tip would make that particular tablet if

19    it were there.  But instead of using tablet material we're

20    using the Mikrosil.

21        And I would take a punch tip and invert it so it

22    was pointed up in the air and the punch tip was up above me.

23    We would mix up the Mikrosil, and we dab.  We just don't smear

24    it on like we're smearing butter because you won't go down

25    into those little pockets, in little places and indentions.
```

09:09:32  5
09:09:52 10
09:10:07 15
09:10:27 20
09:10:43 25

27

```
 1         You'd have to do a lot of sticking and stuff like that to make

 2         sure you're getting everything well coated.  Then a little

 3         bit, leave a little bit of a bleb of the Mikrosil above it.

 4         And then the remainder of the material of the Mikrosil that

09:10:59  5  you mixed up is in a plastic petri dish just like we've

 6         described before, take that and invert that and put that down

 7         smoothly and flatly on the top of that surface, and then leave

 8         it alone for 20 minutes to an hour.

 9              When you come back and remove it, it pops out just

09:11:15 10  beautifully.  You'll have a perfect rendition of that surface

11         down to micro details.  Mikrosil does a beautiful job of

12         transferring even very, very small striations or marks or

13         blemishes or irregularities in the surface of any feature that

14         it's used on.

09:11:33 15      It comes in a number of colors.  There's a brick

16         red, a black, a white and a grey.  We determined a while back

17         that the grey was the best because it let's us see the

18         features well, but we don't get high reflectance in the

19         microscope back into the -- to distort images or cause

09:11:51 20  problems during analysis.

21              And then these were capped over with the top the

22         petri dish that's label with whatever punch tip was used to

23         make that.  It will have the sample number on it.  It will

24         have the item number on it.  It will have the date in which it

09:12:04 25  was prepared.  It will have my initials on it.  And then since
```

28

1  we did multiples we would do them as Roman Numeral I, Roman

2  Numeral II and Roman Numeral III.

3      Q.   For which punch tips did you actually create these

4  Mikrosil capsules?

09:12:22  5      A.   I did if for all of the ones we have identified

6  over here.  All of the GG249s, and all of the M encased in the

7  rounded-edge circle.

8      Q.   And how many casts for each punch tip did you do?

9      A.   Three.

09:12:44  10      Q.   Why do you do three?

11      A.   We do three for several reasons.  Number one, you

12  can't always tell right away when it goes to the 3-D images

13  equipment, it's profilometer, which will be discussed later.

14  But you can't tell just by glancing at it real quickly if

09:13:00  15  there are small bubbles or something in the surface of it.

16  We've gotten to where we're really quite good at it.  But if

17  you see some, it's rejected and we make another one.  That's

18  the beauty of it.  You can make all that you want to because

19  you're not hurting anything.

09:13:13  20          But in this case we try to get three that look the

21  best.  So you would be able to have repetitive -- you know, if

22  there is an irregularity uniqueness to this punch tip that we

23  would be making multiple copies of that that could also be

24  determined, yes, this is consistent between these punch tips.

09:13:30  25      Q.   So at the lab where you work more often than not

29

         1    you're working in teams; that is right?

         2         A.   Yes, sir.

         3         Q.   And as a lead analyst you're responsible for kind

         4    of coordinating amongst the other analysts?

09:13:45 5         A.   I don't coordinate it.  I'll be the pressure.

         6    Where is your analytical section, because it's -- I'm the one

         7    who has to prepare the final report.  But everyone is given

         8    their sample whether they were given tablets or whether they

         9    were given punch tips or anything.  I do not follow them in

09:14:03 10   their work or their analyses.  They go on.  They process

         11   theirs the same way I did mine for their techniques.  And once

         12   they have completed it they would have to have their work

         13   checked and reviewed.  And then they get back what's called an

         14   analytical report for their discipline, for their section.

09:14:23 15   And that goes into our record.  It's all logged in.

         16        What I will do as the lead analyst is in the end I

         17   will, of course, include all the information that I put in

         18   here plus the identification information of the items that

         19   were within the sample as received.  But I will also include

09:14:39 20   the lines from their verbiage from their analytical reports as

         21   to what their findings were, synopsized into a small sentence

         22   or a couple sentences or paragraphs.  That all goes into the

         23   final report.

         24        That report is then reviewed by my superior and by

09:14:59 25   another person who will go through and make sure that

                                                                          30

1    everything is correct.  They will review all of the analytical

2    sections that were part of this particular work.  They'll

3    review what has been done there.  And they will also make sure

4    that, again, the correct forms were used, that it's clear,

09:15:17  5    that it's understandable.  And before anything even leaves

6    every analyst who submitted a portion of their work, their

7    section that was contributed to that analytical work has to

8    sign off on the final report, as well.  And there's a place on

9    there for their name, and their analyst number goes on there

09:15:38  10    so that you know that they were part of it and you could

11    follow which work they had done.  We can backtrack it that

12    way.

13         Q.    How many analysts were involved in performing tests

14    or examining these items?

09:15:48  15         A.    If I may look at this to count, I have to take a

16    look.

17              Counting myself there would be five people.

18         Q.    And prior to your testimony today did you list who

19    those individuals were that performed some form of analysis or

09:16:11  20    some step in the analysis to tell us what they did?

21         A.    I did.  I did.  I prepared this in advance.

22              If I may stand up and flip the chart.

23              MR. BURGGRAAF:  And with that, no further

24    questions, Your Honor.

09:16:32  25              THE COURT:  Thank you.

31

```
 1                   You may cross-examine.

 2                   MS. BECKETT:  I have no questions for this witness,

 3         Your Honor.

 4                   THE COURT:  Thank you, Ms. Beckett.

09:16:47  5         You may step down.

 6                   THE WITNESS:  Thank you.

 7                   THE COURT:  You may be excused.

 8                   And the government will call its next witness.

 9                   MR. BURGGRAAF:  Your Honor, the government will

09:16:57 10         call Nicola Ranieri.

11                   THE COURT:  Come forward and be sworn, please, at

12         the podium.

13                   THE CLERK:  Just right here.  Just raise your right

14         hand.

09:17:27 15                         NICOLA RANIERI,

16            called as a witness at the request of Plaintiff,

17               having been first duly sworn, was examined

18                     and testified as follows:

19                   THE WITNESS:  Yes, I do.

09:17:34 20                   THE CLERK:  If you'll just come around to the

21         witness box here.

22                   Please state your name and spell it for the record.

23                   THE WITNESS:  Nicola Ranieri.  N-I-C-O-L-A,

24         Ranieri, R-A-N-I-E-R-I.

09:18:06 25                   THE COURT:  You may proceed, Mr. Burggraaf.
```

32

```
 1                        DIRECT EXAMINATION

 2    BY MR. BURGGRAAF:

 3         Q.   Mr. Ranieri, can you tell me what your current

 4    occupation is and who you work for?

 5         A.   Yes.  My current occupation is a forensic scientist

 6    at the Food and Drug Administration Forensic Chemistry Center,

 7    which is a specialized laboratory that was forensic for the

 8    FDA.

 9         Q.   And throughout your testimony I may refer to that

10    as the FDA lab.  How long have you been working at the FDA?

11         A.   Quite a long time.  I was essentially co-oped while

12    I was going through my undergraduate at UC since August of

13    1989, so it was 30 years.

14         Q.   And at the FDA lab what are your job

15    responsibilities?

16         A.   Well, I'm a scientific, microscopist.  I do various

17    forensic related analyses.  You know, tampering,

18    counterfeiting and various other consumer complaint samples

19    cases.

20         Q.   And what's your education background?

21         A.   I have an undergraduate degree from the University

22    of Cincinnati, Bachelor of Science degree.

23         Q.   And did it have a focus as far as your Bachelor of

24    Science?

25         A.   That's correct, yes.  Biology.
```

09:18:13 (line 5)
09:18:35 (line 10)
09:18:59 (line 15)
09:19:20 (line 20)
09:19:33 (line 25)

33

```
 1          Q.   And do you have any additional training that

 2    relates to your current responsibilities?

 3          A.   Actually, yeah.  I have quite a few, but over the

 4    years, you can imagine.  So I've taken many courses.  For

 5    specifically for this case I'm going to pick the ones that

 6    relate to this moment here.  So I took a Confocal microscopy

 7    and image analysis at George Washington Medical School.  I

 8    took a computer-assisted image analysis at North State

 9    University in North Carolina, State University, a

10    computer-assisted image analysis at Rochester Institute of

11    Technology.

12               I have had multiple others in the toolmark arena,

13    such as Dayton Crime Laboratory toolmark analysis training.  I

14    had regional crime laboratory from Dayton in toolmark

15    analysis.  I had an ATF toolmark analysis training at the

16    coroner's office in Cincinnati, Ohio.  And I also have taken a

17    tablet formulation and design in manufacturing tablets and

18    tablet punches at the training facility in St. Louis,

19    Missouri.  I could go on.

20          Q.   But you don't need to.  You sound like you've had

21    quite a bit of training.

22          A.   Yes.

23          Q.   Do you provide training or have you provided

24    training to others in your field of expertise?

25          A.   Yes.  You know, there's many inference related, so
```

09:19:53 (line 5)
09:20:24 (line 10)
09:20:54 (line 15)
09:21:21 (line 20)
09:21:33 (line 25)

34

```
  1    I'll pick a few again.  One is the, it's a German name.  I

  2    can't pronounce that one.  So it's a Food and Drug

  3    Administration like agency.  But it's a chemistry and physics

  4    in Vienna, Austria, analyst that came to our laboratory, and I

09:22:00 5    trained him.  There's the forensic science -- forensic

  6    chemistry scientists at the city of police in Taipei, Taiwan.

  7    Forensic science and physics laboratory from Singapore.  These

  8    are agencies that do similar things that we do, and many other

  9    within the Food and Drug Administration and other agency like

09:22:34 10   Food and Drug Administration nationally.

  11        Q.   Have you published articles or literature in areas

  12   of your expertise?

  13        A.   Yes.  I published many.  But for this particular

  14   one it would be, the most appropriate is the 2-D, 3-D

09:22:51 15   examination of tablet formulations and for suspect

  16   counterfeiting and tablet sourcing.  So that one's done at the

  17   microscopy microanalysis in 2010.

  18        Q.   And you actually hold a patent for some of what you

  19   do?

09:23:08 20        A.   Yeah.  I was lucky in my career because the

  21   laboratory started when I started back in 1989.  So everything

  22   was new.  So eventually I came up with a -- when you look at

  23   tablets and someone hands you a bag of tablets you have

  24   thousands of tablets.  To look at them all it's not easy

09:23:34 25   through a microscope.  So eventually I came up with something
```

35

1    called alternate light source technology where essentially you

2    spread out all of these tablets.  You illuminate with a

3    specific light in a wavelength whether it's UV visible and

4    infrared, and then you can see the difference between a

09:23:54   5    suspect generally.

6            Then I created -- with that knowledge I created a

7    device that now today I have two full patents, one pending

8    international and three European patents pending still on the

9    device, and the FDA uses these device to detect or red flag a

09:24:17  10    suspect.

11         Q.   And have you testified as an expert before?

12         A.   Yes.

13         Q.   How many times?

14         A.   Three.  But specifically the one in this case last

09:24:28  15    year was about three.

16         Q.   And has the court ever made a finding that your

17    testing methods or results were not accurate or correct?

18         A.   I'm sorry.  Could you repeat that?

19         Q.   Has the Court ever made a finding that your testing

09:24:44  20    methods or results were inaccurate?

21         A.   No.  No.

22         Q.   Have you had training and experience in analyzing

23    pill press punches and dies?

24         A.   Yeah.  As I stated earlier I took an actual course

09:24:57  25    from a company called Natoli.  They actually manufacture

36

1   presses and tool punches.  And they actually have a facility

2   that train you and whoever wants to be a tool press operator.

3   So I took that course where that is, you know, the design that

4   punches a design, the tablet formulation, and they show how

09:25:20  5   to, train you how to run a press.

6       Q.   And what did you do to prepare for your testimony

7   today?

8       A.   I reviewed the work I did when I actually did the

9   work.

09:25:35 10       Q.   How did you become involved in this case?

11       A.   I received -- at our laboratory you have a lead

12   analyst, and then you have everyone else that follows.  A lead

13   analyst is usually the analyst that receives the case.  And in

14   this situation Mr. Platek was the lead analyst in this

09:25:59 15   particular case, so he did what we call a Section One.

16   Section One is an overall over everything that he's received.

17   Part of the supervisors and management of the laboratory is

18   instructed to have this technique done.  So I was one of those

19   techniques that was supposed to analyze these tablets.

09:26:22 20       Q.   So in your role in this case were you directed to

21   analyze and compare the tablet punches embossed with GG249

22   comparing them to each other and to tablets that were debossed

23   with GG249 in Items 14 through 19?

24       A.   Could I ask you to repeat that?  Sorry.

09:26:47 25       Q.   Were you directed in this manner to analyze the

37

1    tablet the punches --

2         A.    Yes.

3         Q.    -- embossed with GG249?

4         A.    Correct.  Yes, I was.

09:26:55  5    Q.    And compare them to each other?

6         A.    Correct.

7         Q.    And then compare them to the tablets or pills that

8    were in Items 14 through 19?

9         A.    Correct.

09:27:08 10    Q.    Were you also directed to analyze the tablet punch

11   tips embossed with an M and enclosed with a square comparing

12   them with the tablets that were debossed in a like manner?

13        A.    Correct.

14        Q.    What process and equipment did you use to perform

09:27:21 15   your analysis?

16        A.    The technique is called profilometry.  In our

17   laboratory we have an array of disciplines and

18   instrumentations.  When we have visitors usually these

19   visitors go through all these techniques.  And the microscopy

09:27:45 20   because it's visual as well as analytical is the most

21   attractive.  I wish I had a way to show you what a 3D image

22   looks like, 3 dimensional image looks like.  A system that is

23   called IFM, Infinite Focus Microscope.  What it does

24   essentially is it scans.  It measures the surface of a sample.

09:28:08 25   When it's finished collecting the whole surface it displays it

38

    1    as an image, but it's really not an image because it has just

    2    data points.

    3         Q.   And did you use any other instrumentation or

    4    equipment in performing your analysis of the punch tips and

09:28:26  5    the tablets such as 3DIA?

    6         A.   Yes.  That instrument is called, we refer it to as

    7    3DIA, which stands for 3-dimensional image analysis.  It's

    8    considered a profilometer, so it was a technique called

    9    profilometry.  The system, actually what it does is it

09:28:53 10    collects -- if you envision a picture, just a picture, that's

   11    a flat image, so it's 2D.  It's considered a 2D image.  So you

   12    have an X and a Y that dictates where the point for that

   13    pixel.  So, for example, X direction and a Y direction, then

   14    you find the two values and that's a point.  That's a pixel.

09:29:17 15         In this case, the system creates X, Y and Z, which

   16    is the height.  So you have two dimensional, and three

   17    dimensional makes the height.

   18         Q.   So talk to me about this 3DIA instrument.  What is

   19    it composed of?  What does it look like?  And how does it

09:29:42 20    operate?

   21         A.   It's a big microscope.  It is a big microscope that

   22    has a precision movement stage.  It moves in micrometer.

   23    Actually nanometer steps, and it has a sensor that illuminates

   24    the sample and collects, if you will, an image, but it's

09:30:05 25    really data of the value of that XYZ point.  The XYZ point in

                                                                    39

```
 1    particular for this case when it scans the whole surface, if

 2    you can envision X5Y10 and Z15, that's one data point.  This

 3    collects 6.3 million pixels.  To makes it easy, it's

 4    6.3 million data points.  So picture 6.3 million of those, and

 5    it takes those points and compares to a known would equal

 6    number of points, and it as an algorithm, and it calculates

 7    and XYZ location right here at this three-dimensional space.

 8    Does this unknown have this point right here?  Yes or no?  If

 9    it does, it's counts it as a yes, it has it.  After

10    6.3 million points it gives you a percentage of how many of

11    those points found the same at this from a known authentic to

12    an unknown suspect.

13         Q.   Let me see if I understand, if I can explain that

14    correctly.  Using this 3DIA equipment you can put a pill in

15    front of the equipment and it's going to gather from the

16    surface of that pill essentially 6.3 million data points?

17         A.   That's correct.

18         Q.   You can put another pill and get 6.3 data points

19    that you can then compare those data points?

20         A.   That is correct.  Yes.  So the beauty about this

21    technology, this technique, this instrument is that it's

22    extremely consistent.  And prior to any analysis, this

23    analysis or any analysis I've ever done with any technique

24    really in this case with this 3DIA system we also measure also

25    an authentic where we already know the data and results so we
```

09:30:44 — line 5
09:31:12 — line 10
09:31:36 — line 15
09:31:52 — line 20
09:32:20 — line 25

40

1    can confirm that, yep, we got the same results as we got in

2    2010, 2015, last month.

3           So the tablet that it collects these points is then

4    saved the data.  It's called data set.  Then we have a library

09:32:43  5    of authentic.  We call that up, data set, and we tell the

6    system, okay, go ahead and compare these two data sets, and

7    return a percentage.

8           Or there's another technique that's called profile

9    measurements that actually gives you a cross section of that

09:33:02 10    particular surface, and it compares if these two profiles line

11    up exactly or not.  If it doesn't, you'll be able to visually

12    see it.

13        Q.    So you can compare one pill to another.  And when

14    you reference authentics are you referring to official

09:33:22 15    manufactured tablets from the official manufacturer?

16        A.    That is correct.  We -- because we do always a

17    comparison with an authentic we always have to have authentic

18    from a manufacturer.  So if we don't have it, then we

19    communicate -- well, myself, for example, I requested, through

09:33:45 20    the proper channels I request an authentic so I can use it in

21    my analyses.  And then there's a special group that actually

22    reaches out to the genuine makers, genuine makers of a

23    particular product, and it requests as an FDA agency to send

24    us some authentics.  So it usually sends us a bottle of

09:34:13 25    tablets or capsules.

41

1        So in this case we had all three already, and we

2   had those in the library already.  So that is the process, so

3   comparing to what we call authentic.  Also we consider that a

4   known because we have a known value.

09:34:30  5        Q.   Now, we talk about comparing pills to pills.

6        A.   That's correct.

7        Q.   Can you also use this 3DIA analysis to compare

8   pills to punch press tips?

9        A.   Yes.  That's correct; because the system pretty

09:34:46 10   much can scan or measure anything you put underneath this.  So

11   in this case we can put the tablet punch under there, or we

12   can create what is called casting using Mikrosil.  And then we

13   have the actual.  Such a Mikrosil is a way to create the same

14   surface as the punch tip that made a tablet.  You take that

09:35:12 15   same punch tip.  You put Mikrosil on the top.  It's kind of

16   like making an identical tablet that this punch tip will make.

17   So then we compare the punch tip or the Mikrosil to a tablet.

18        Q.   In this case, before you began your analysis in

19   using via equipment did you verify that the equipment was

09:35:34 20   operating adequately?

21        A.   Per our SOPs and per, you know, the laboratory you

22   cannot proceed without what is called a verification to make

23   sure that the system is running as it was yesterday.

24        Q.   So you talk about these data sets and the potential

09:35:56 25   for at least in one aspect of it to collect 6.3 million data

42

1     points.

2          A.   Correct.

3          Q.   Am I correct in assuming that you're using the --

4     essentially the microscope is taking an image, but that's

09:36:11   5     taking those data, that net data, and you're then using a

6     computer to process that data?

7          A.   Yes.  It's a system.  So the microscope is coupled,

8     it's attached to a computer.  The computer runs the microscope

9     essentially.  So the computer will collect the data that the

09:36:36  10     sensor is picking up and transfers electronically obviously to

11     a computer.  The computer then converts that signal to a data

12     point or data points, and it saves it.  I'm prompted to save

13     it or not, then I save the image.  I hate to use the word

14     image because it really isn't an image because you see it.

09:37:00  15     It's really a wire frame of value points.  It's not really an

16     image, but to make it easy for humans they give you an image.

17          So it takes these points, then I call up the same

18     software, call up the data set of the one that I just scanned,

19     just measured, call up the data set file of the known or

09:37:22  20     authentic or genuine.  And the system has multiple ways of

21     comparing.  I pick what is called difference measurement

22     analyses as well as profile management analyses.

23          Q.   We'll maybe get to having you distinguish what each

24     of those mean.  Before we do did you document your findings

09:37:47  25     after performing this analysis?

43

```
 1              A.    Yes.  At the end of the process that the system is

 2      comparing it to it prompts to save a PDF file for the report,

 3      which is a report.  Then we take those reports and pile them

 4      up, save them.  And then you take -- after you finished

 5      collecting all of your items, tablets or punches or Mikrosil,

 6      and when the whole work is complete then you put this package

 7      together, which we call a section.

 8              Q.    Let's look at some of essentially your findings.

 9      If we can look at Government's Exhibit 24.09.

10              Am I accurate in stating this is a comparison photo

11      of a tablet punch tip, a Mikrosil cast of a tablet punch tip

12      from Item 22 to an actual tablet from Item 17?  Is that

13      correct?

14              A.    Yes, that's correct.

15              Q.    So tell me what we're looking at in this exhibit.

16              A.    As mentioned, the image on the left, which is

17      shiny, metallic looking, that is the tip what we call the

18      tablet punch tip.  That is the phase that actually comes in

19      contact with the powder that eventually is pressed to make a

20      tablet, so that's a punch tip.

21              The one in the middle essentially is a Mikrosil, a

22      casting of that punch tip.  Essentially is treated, the punch

23      tip is treated with Mikrosil as if you were making a tablet.

24      So instead of making a tablet you're making a casting which is

25      similar to making a tablet.  And the far right, the brownish
```

09:38:08 (line 5)
09:38:35 (line 10)
09:39:02 (line 15)
09:39:29 (line 20)
09:39:52 (line 25)

44

1    appearance, that's the tablet, Item 17, Tablet 1.

2         So looking at these three here put together, the

3    reason this was put together is because through the process of

4    tablet making just like any technique you have to essentially

09:40:17  5    take care of your instrumentation.  So the punch tip, it's a

6    tool that makes the tablets.  Therefore, if you don't take

7    very good care of that damage occurs through changing, through

8    replacement, through to a high pressure, anything that causes,

9    in this case, there's a green arrow, that causes a dent.  You

09:40:45 10    can see the little dent on the bottom of the edge of the

11    metallic looking punch tip.  There's a green arrow pointing,

12    as you can see it's over exposed only because, you know, it's

13    shiny.  But there is a tiny little bump as you see it coming

14    inward.  That's on the edge of the tablet punch tip cup.  The

09:41:10 15    cup is what essentially makes the shape.

16         On the center you have a Mikrosil with a green

17    arrow also points to the same.  As I explained it earlier the

18    punch tip once it presses onto a powder to make a tablet it

19    essentially transfers everything, every shape of it.  In this

09:41:34 20    case that little dent was transferred into the Mikrosil.  If

21    you see on the far right you see the same dent on the tablet

22    that was pressed by that punch.  Because of the location it's

23    quite evident that that punch tip appears to have made that

24    tablet.

09:41:58 25         And on the red arrows, I just wanted to bring that

45

1       point out.  I can, can't I?

2           Q.   Yes.

3           A.   It's an important part because punch tips are made

4       typically by what's called the master hub.  Master hub is the

09:42:15  5       master punch tip, and that's where all the other punch tips

6       will be made.  So when a manufacturer manufactures the punch

7       tips and they make the master, consequently after that, they

8       make other punches using this master.  The master is made with

9       high strength steel that is treated to be harder than a metal

09:42:45 10       that they make for when you make a punch tip.  So you take

11       this master and it press it with extreme pressure and

12       transfers what's on the hub onto another punch tip, so you

13       created a punch tip.

14           The reason I'm explaining this is because the

09:43:03 15       master hub, the design, the original punch tip, that punch

16       tip, the punch tip makes all the other punches, it's called

17       the hub.  It's made with -- in this case you can see the

18       lines, I don't know if you can see those lines.  You know,

19       forgive me about the compression of PDF, but it was quite

09:43:28 20       clear on the actual image, those are called CNC process.

21       That's process called computer numeric calculations.  And that

22       is what made the master hub.

23           So those lines are made through the process of

24       making a hub, which then later the hub which is the master

09:43:46 25       will press onto another softer metal to make the punch tips.

46

1    So that punch tip there with those lines and that arrow, you

2    can see the casting Mikrosil in the center that shows the same

3    centrifugal CNC lines, and you can also see them on the

4    tablet.

09:44:06    5    Q.    So can you use essentially a comparison of the

6    defects or characteristics of a punch tip to determine whether

7    a pill or tablet was made by that punch tip?

8    A.    The process of making a tablet punch is revealing

9    that the process that took place of making that punch tip.

09:44:35    10    When there is a damage or a dent or nick or burr on a punch

11    tip it's kind of like creating its unique fingerprint.

12    So if I were to press my hand on here, take it off

13    and it left a mark, that mark there is essentially my hand.

14    If I cut myself and I press on it you're going to see the cut

09:45:01    15    there.  So when there's a damage on a punch tip it will

16    continue to replicate that on all the tablets that it makes.

17    Q.    Okay.  Let's go to Government's Exhibit 24.10.

18    What are we looking at here?

19    A.    This technique -- again, this is profilometry.  And

09:45:29    20    this particular technique is called profile measurement.

21    Please tell me if I need to move this closer.  Profile

22    measurement.  Yes.  The grey image on the upper left corner

23    with the red band across it, that one there is a casting of

24    the punch tip.  The red band is what the system will take and

09:45:55    25    calculate a cross section of that line.  On the right side of

47

1    the grey image is the profile, the cross section of that red

2    band on that casting material.  Beneath it below the grey

3    image you have a brown, which is a tablet with the same red

4    line going across it creating again its own profile.

09:46:29  5        You take the two profile diagrams on the right of

6    the tablets, and the system is then, compares the two

7    superimposed and overlays them together.  And anything that

8    overlays quite well tells you that it's a pretty good,

9    pre-consistent to it to each other.

09:46:51  10        Q.   The jury has heard prior testimony about these

11    Mikrosil casts being made of the punch tips that were

12    provided.  They also heard testimony that the punch tips for

13    this specific drug exhibit number was found on the floor of a

14    bedroom in the defendant's home.  That would be Item 20.  It

09:47:18  15    appears that Item 14 as you stated was one of the Alprazolam

16    pills that was analyzed; is that right?

17        A.   That's correct.

18        Q.   And the jury heard prior testimony that Item 14 had

19    a specific DEA exhibit number which correlated it to prior

09:47:36  20    testimony of a pill that was seized from codefendants Tonge

21    and Bustin in November of 2016.  With what we are seeing here

22    on the comparison of these two times what can we conclude as

23    far as the punch tip from the defendant's home and the pill

24    that came from a codefendants' home?

09:48:02  25        A.   What I can conclude is that the two are consistent

48

1686

1    to each other.

2    Q.   Let's go to Page 2 of this exhibit.

3         Now I made a mistake of leaving out a page which

4    deals with if I remember difference measurement analysis.

09:48:19  5    A.   That's correct.

6    Q.   Why don't you explain what difference measurement

7    analysis is.

8    A.   Just what I'm seeing here is a half page.  Is that

9    what I'm supposed to see?

09:48:33  10        Yeah.  Thank you.  Okay.  So this is the second

11   page of essentially describing what the system did prior to

12   this.  The difference measurement module, which again, is a

13   different technique than the profile measurement module.  The

14   difference between the two is, one, as I mentioned, one

09:48:58  15   creates a cross section of my hand so you can compare the two,

16   the line and gives me a line so you can compare that line; the

17   other one, the difference measurement, in this particular case

18   this is a difference measurement, it takes the tablet and it

19   essentially measures every parts of that tablet.  Again,

09:49:19  20   repeating it again, but it is what it is, 6.3 million XYZ

21   locations points.  That is it.

22        These points are then calculated, the algorithm

23   calculates between what we just saw, the grey casting and the

24   tablet and gives how many -- what is the percentage of the

09:49:46  25   same exact location that the system saw?  6.3 million points

49

1     of XYZ locations, 97 percent and slightly higher than that

2     were in the same location, which that translates to they're

3     consistent, very consistent to each other.

4          Q.   Does that mean that it is pretty likely that the

09:50:10  5   punch tip analyzed created the pill analyzed?

6          A.   Yes, correct.

7          Q.   Let's look at Exhibit 24.11.  Can you explain what

8     we're looking at here?

9          A.   Yeah.  This is -- okay.  Obviously these are

09:50:32  10  punches, and this is a good example of what we talked about

11    just a bit ago about creating its own individual fingerprints.

12    In this particular case the images that are labeled A and the

13    center one B and the one to the right C, they're all showing

14    what in this discipline is called sticking, picking and

09:51:02  15  sticking.  Sticking and picking.  And it is exactly that.  It

16    is material sticking to the punch face to the punch tip.  And

17    that is a lot of times is due to poor maintenance of the tool.

18          For example, one of the things that one could do to

19    avoid material sticking as you can see on image B, underneath

09:51:33  20  it shows up close the 9, there is a type material that is

21    stuck to it.  That type of material is essentially for as long

22    as it's on there it will create its own additional fingerprint

23    to whatever it stamps, whatever tablets it makes.

24          So this really happens when -- for example, you

09:52:00  25  wouldn't drive a car 100,000 without changing your oil.  You

50

1    have to do some cleaning.  You have to maintain it.  So

2    maintaining your tools is your livelihood.  So without doing

3    cleaning, often cleaning this can happen.  There are other

4    reasons that it can happen, but this is typical of potentially

09:52:30  5    low maintenance.  And when you do low maintenance on these

6    tools it stays, that material stays on there for as long as

7    it's able to adhere to it.

8            The one on the C shows a lot more material stuck to

9    it.  And that is actually going to be transferred on tablets.

09:52:57 10   The A was rather clean.  There was nothing sticking to it.  So

11   that one there will create an exact image or a higher quality

12   image when you compare it to a casting with the Mikrosil

13   because it's nice and clean.  The one further to the right,

14   the C or the B, those have additional variations to

09:53:23 15   fingerprints such as material stuck to it.

16       Q.   So if there was a punch tip that has some sticking

17   and picking, it's going to carry over the defect to the pills

18   that it punches and are created.

19       A.   That's correct.  A lot of times that happens when

09:53:43 20   in the tableting production, manufacturing, you have

21   essentially what is called cohesiveness forces and adhesive

22   forces.  So when the packing, the pressure to make a tablet,

23   the cohesiveness of the formulation, if it's not as strong as

24   the adhesiveness of the cup essentially being more attractive

09:54:14 25   to it material will come off and will stay to it.  So a lot of

51

1     that happens when again maintaining the tools, adding

2     lubricant to the formulation, things like that.

3          Q.   We are going to look at some more comparisons that

4     you made between Mikrosil cast of the punch tips and pills

09:54:36  5     seized in this case.  The jury has previously heard that prior

6     to creating those Mikrosil casts that Mr. Platek actually

7     cleaned them off.  When we're looking at that percentage in

8     comparison, if the picking and sticking is removed is that

9     going to cause a difference in that percentage?

09:55:00 10          A.   Correct.  Yes.  Correct.  And I believe I do have

11     some data to show where the picking may have been.  So, yes,

12     correct.

13          Q.   Let's go on to Exhibit 24.12.  Why don't you tell

14     us what we're looking at here.  It looks like a similar

09:55:22 15     comparison, but this time from Item 14.  Again, an Alprazolam

16     pill that was seized from the Tonge/Bustin home to what the

17     jury has heard testimony about, an Alprazolam pill that was

18     seized from a net basket in the defendant's basement.  Tell me

19     in comparing those what are we looking at here?

09:55:45 20          A.   Okay.  What you're seeing is the profile

21     measurement.  In this profile measurement you have two tablets

22     that is actually a 3D image converted into a JPEG.  But each

23     of these tablets with the red band I described earlier creates

24     a diagram.  So tablet -- I'm sorry.  Item 14, tablet 3, here's

09:56:15 25     the diagram on the right side.  Item 18, tablet 1, the diagram

52

1  is on the right side.  The beauty about this particular one is

2  the debossing was nice and clean.  Therefore, they're

3  practically indistinguishable because there was no unique

4  individual fingerprint due to sticking and picking.

09:56:42  5      Q.  Let's look at Page 2 of the same exhibit, if you

6  can zoom out.

7          Explain this aspect of your analysis on comparing

8  these two pills.

9      A.  So.  Yes, thank you for zooming in.  So here this

09:56:58  10  is the difference measurement module.  Again this will take

11  one tablet and measure every component of that, every part of

12  that surface to every other part of the other surface and look

13  for the XYZ 6.3 million points and comes back with a result

14  that says how many at this point in this percentage map the

09:57:29  15  same location?  In this particular case as you can see it was

16  very little sticking in there, so the percentage is quite

17  high.

18      Q.  Is it fair to say that based on your analysis that

19  each of these pills that came from different locations were

09:57:44  20  actually made from the same punch tip?

21      A.  Yes.  Based on the analysis that we do authentics

22  to authentics, when you see numbers like this they do come

23  from the same place.

24      Q.  Let's look at Exhibit 14.  And you've given quite a

09:58:05  25  bit of explanation as to how to more or less compare or how

53

1  these are compared.  This appears to be a tablet from Item 14,

2  which the jury heard testimony came from the Tonge/Bustin

3  home, to Item 19, which was seized by postal inspectors

4  according to prior testimony.  Are these essentially

09:58:31  5  Alprazolam pills that were likely to have been made by the

6  same punch tip?

7       A.   Based on the comparison with the casting, yes,

8  they're very consistent.

9       Q.   Let's look at Page 2 of this exhibit, as well, if

09:58:47  10  you'll zoom out.

11            Again, like the prior exhibit, it looks like

12  there's a high percentage of those 6.3 million data set,

13  there's a high percentage of them being exactly aligned with

14  each other; is that right?

09:59:02  15       A.   Correct.

16       Q.   Let's go to Exhibit 24-14.  Again, looking at a

17  similar diagram but comparing a punch tip which the jury heard

18  testimony was found on the floor of the defendant's home to

19  what appears to be an authentic Alprazolam pill; is that

09:59:28  20  right?

21       A.   Correct.

22       Q.   And how did the punch tip compare to an authentic?

23       A.   As you can see the two diagrams related at the

24  bottom, they have very little resemblance to each other, not

09:59:44  25  consistent with each other.

Q.   And let's look at Page 2.  And what would we
conclude from the information here?

A.   That the lower percentage such as that one there
are quite a few XYZ locations that are not the same location
as the comparing sample.

Q.   Let's look at the next exhibit, 24.15.  This
appears to be a comparison of a Mikrosil cast of one of the
punch tips for an M box or Oxycodone punch tip.  The jury
heard testimony that items for this exhibit actually came from
a pill press from Mr. Shamo's home on Titian Way that actually
is compared to a tablet in Item 8, which is a tablet that came
from the Tonge/Bustin home.  What can we conclude from what
we're looking at here?

A.   Once again, the two diagrams are overlaid at the
bottom.  While they may not be over top of each other as the
previous there's a lot of sticking and picking going on in
that particular tablet.  They're very consistently consistent
to each other.

Q.   The sticking and picking that may have gone on in
the creation of that tablet, can the mere fact that the punch
tip being cleaned prior to creating the Mikrosil casts account
for some of the difference?

A.   I'm sorry.  Could you repeat that?

Q.   So as the jury heard in prior testimony that the
punch tips were, any debris was cleared off of them --

55

1    A.   Correct.

2    Q.   -- creating the Mikrosil cast.  Can the fact that

3    some of that debris being cleared off prior to creating the

4    cast account for some of the difference between the Mikrosil

10:01:47   5    and the actual tablet?

6    A.   Correct.  That is typical when you remove material

7    from such sticking and picking.  But the overall shape as you

8    can see is quite consistent.

9    Q.   Let's look at Page 2 of this exhibit.  What can we

10:02:10  10    conclude from in information?

11    A.   Once again, is not as high as the 99 percent, but

12    it is quite close.  The XYZ locations were quite consistent to

13    each other in the 6.3 million points there.  So this was very

14    consistent to each other.

10:02:32  15    Q.   The defendant has been charged in part for pills,

16    the possession of pills at locations other than his own home.

17    If the punch tip came from his own home and these pills came

18    from another home, what's the likelihood that the pills were

19    originally made by that punch tip in the defendant's home?

10:02:55  20    A.   Quite high.

21    Q.   Okay.  Let's go to 24.16.  Here it looks like it's

22    noted that we're making or you're making a comparison of a

23    Mikrosil cast of a punch tip of an M box or Oxycodone punch

24    tip.  The jury heard testimony related to the DEA drug exhibit

10:03:23  25    number that this came from Mr. Shamo's home on Titian Way, the

56

1694

1    punch tip did.  And it looks like it's being made -- or

2    compared to a specific suspect pill that is in Item 12 that

3    was also seized from Mr. Shamo's home.  What can we conclude

4    from your analysis depicted here?

10:03:45   5        A.   That they are consistent with each other.

6        Q.   And let's look at Page 2.  Can a similar conclusion

7    be made based on the information we're seeing here?

8        A.   Yes, correct.

9        Q.   Let's look at Exhibit 24.17.  And I promise not to

10:04:10  10   belabor this any longer past this.  What are we looking at

11   here?

12       A.   This is actually really is my favorite type of

13   analysis because here the colorful little area there is to

14   describe what really, you know, sticking and picking is doing

10:04:32  15   to the fingerprint of this.  The arrow, you know, that's

16   pointing to the diagram will show why that -- yes, beautiful,

17   thank you.  The tips are gone.  You know, if you see, for

18   example, the bump, on the left side there's a bump and going

19   down and back another bump, the one on the right, there's

10:05:00  20   quite of material missing.  If we zoom out, a similar

21   situation is at the bottom showing what's missing there.  So

22   you have the little bump in the diagram.  So this was a way to

23   describe why you see some areas that don't, they do not have

24   right on top of each other.  So that is due to sticking and

10:05:25  25   picking.

1    Q.   So it looks like you have a red arrow on the second

2    diagram towards the top.  Is that what's depicting then, that

3    as well as the other depicting where there's --

4    A.   There's picking all over there, yeah.

10:05:41    5    Q.   And the jury previously heard testimony that linked

6    the DEA exhibit from Item 21 to a pill press in Mr. Shamo's

7    home that's stated previously with the suspect pill Item 13

8    coming from a DEA exhibit that was seized by postal

9    inspectors.

10:06:04    10       While we have some what you explained as picking

11    and sticking with the suspect pill, what conclusion can we

12    reach even with that picking and sticking?

13    A.   That this is consistent with each other.

14    Q.   I want to pull up side by side if we can.

10:06:24    15       THE COURT:  I assume you've got -- Mr. Burggraaf, I

16    assume you've still got some time about this witness.

17       MR. BURGGRAAF:  In fact, I'm on my last probably

18    three or four questions.

19       THE COURT:  Oh, all right.

10:06:37    20       MR. BURGGRAAF:  If I may.  If we can pull up

21    alongside what we're looking at here, the photo 24.05.

22    Q.   BY MR. BURGGRAAF:  You mentioned previously picking

23    and sticking.  Is photo 24.05 an example of picking and

24    sticking?

10:07:02    25    A.   An excellent example of picking and sticking.

58

1  Q. The difference that's shown between the Mikrosil

2 cast in 24.17 as compared to the pill, is that possibly due

3 because the picking and sticking was cleaned off of this punch

4 tip before making the Mikrosil cast?

10:07:21 5  A. Correct.

6  Q. And based on your -- actually if we can go back to

7 24.17 by itself, and look at Page 2.

8  And based on the information here as well as the

9 analysis you did on the prior page is it fair to conclude that

10:07:55 10 the punch tip that was found in Mr. Shamo's home was very

11 likely to have created the pill that was seized by the postal

12 inspectors?

13  A. Correct.

14  MR. BURGGRAAF: No further questions.

10:08:07 15  THE COURT: How much time do you think you need for

16 cross?

17  MR. SAM: I don't have any questions, Your Honor.

18  THE COURT: Thank you. You may step down and be

19 excused.

10:08:19 20  We'll take our first break.

21  (Whereupon, the jury left the court proceedings.)

22  THE COURT: Let me talk to your lawyers for a

23 minute. Others of you can go or come or sit or do whatever

24 you want.

10:09:03 25  I read your government's paper this morning. You

59

```
 1    did not, the defense did not designate a medical expert to

 2    opine on defendant's, any diagnosis of any particular malady;

 3    is that correct?  It is my understanding; correct?

 4              MR. SKORDAS:  Yes.

 5              THE COURT:  And I take it you're not intending to

 6    designate one?

 7              MR. SKORDAS:  That's also correct.

 8              THE COURT:  Nonmedical expert -- nonmedical people

 9    can't testify as to a diagnosis.

10              MR. SKORDAS:  Right.

11              THE COURT:  I mean, they can testify as to -- they

12    can't say somebody has X, Y or Z.  They can give their

13    observations about things that are common that we all make

14    observations about, intelligence, ability to organize, certain

15    behaviors and all that.

16              But so I don't think there's really an issue there,

17    is there, having clarified that?  You're not intending to try

18    to get an expert designation now?

19              MR. SKORDAS:  Nope.  And we don't intend to use

20    those witnesses as experts for the purposes of any medical

21    diagnosis.

22              THE COURT:  Mr. Gadd?

23              MR. GADD:  I just want to make sure we're all

24    clear.  So in the opening it seemed pretty clear to me as I

25    reread it that was the intention for those witnesses.  It's no
```

10:09:23  5
10:09:36  10
10:09:53  15
10:10:06  20
10:10:21  25

60

```
      1    longer the intention?  Or maybe it never was.

      2            MR. SKORDAS:  They can talk about his -- I mean,

      3    it's his mother, Your Honor.  She can talk about his growing

      4    up, his perhaps learning disabilities, other things that

10:10:39  5    happened, not as an expert, but she would know as well as

      6    anyone else about those things.  And we can address those

      7    through factual questions and avoid anything that appears to

      8    be an opinion.

      9            THE COURT:  She can do that.

10:10:53 10            MR. GADD:  Learning disabilities is a diagnosis.

     11    ADHD is a diagnosis.

     12            THE COURT:  ADHD is clearly a diagnosis.  I guess

     13    she can testify about things that she observed that perhaps

     14    she thought were learning disabilities without learning a

10:11:09 15    diagnosis.

     16            MR. SKORDAS:  That's all we intend to do.

     17            THE COURT:  That's fairly common.

     18            MR. GADD:  Sure.  I think he indicates that it

     19    might be factual, not opinion.  I think it is opinion, though;

10:11:19 20    right?  Isn't she going to give her opinion that perhaps, and

     21    I don't want to put words in her mouth, but perhaps in her

     22    opinion her son didn't or wasn't smart, you know, things of

     23    that nature?  I think it is opinions.

     24            THE COURT:  Well, every mother has opinions about

10:11:35 25    whether their kids are smart or not.
```

61

```
           1                 MR. GADD:  Sure.

           2                 MR. SKORDAS:  They're appropriate lay opinion, Your

           3      Honor.

           4                 THE COURT:  Some things are appropriate opinions

10:11:43   5      given by lay people, particularly lay people who know people

           6      well.

           7                 MR. GADD:  Yes, sir.  I think those type of

           8      opinions come in under 701.  But what I worry about is

           9      testimony such as, we took him to the doctor, and he got a

10:11:56  10      diagnosis and here it is.  Or --

          11                 THE COURT:  No.  I'm not going to permit that.

          12                 MR. SKORDAS:  Nor do we have any intention of doing

          13      that.

          14                 MR. GADD:  Okay.  Thank you, Your Honor.

10:12:05  15                 THE COURT:  Thank you.  We'll be in recess for

          16      about 20 minutes.

          17                 (Recess.)

          18                 THE COURT:  Do you have your next witness?

          19                 MR. STEJSKAL:  Yes.

10:34:36  20                 THE COURT:  Let's get the jury.

          21                 (Whereupon, the jury returned to the court

          22           proceedings.)

          23                 THE COURT:  United States may call its next

          24      witness.

10:35:24  25                 MR. BURGGRAAF:  United States calls Dr. Adam
```

```
  1    Lanzarotta.

  2              THE COURT:  Come forward and be sworn, please, at

  3    the microphone.

  4              THE CLERK:  Just right here.  Please raise your

  5    right hand.

  6                     ADAM LANZAROTTA,

  7       called as a witness at the request of Plaintiff,

  8           having been first duly sworn, was examined

  9                  and testified as follows:

 10              THE WITNESS:  I do.

 11              THE CLERK:  Please come around to the witness box.

 12              Please state your name and spell it for the record.

 13              THE WITNESS:  Adam Lanzarotta.  A-D-A-M,

 14    L-A-N-Z-A-R-O-T-T-A.

 15              THE COURT:  You may proceed, Mr. Burggraaf.

 16                     DIRECT EXAMINATION

 17    BY MR. BURGGRAAF:

 18       Q.   Dr. Lanzarotta, thanks for being here today.  Can

 19    you tell us what your current occupation is and employer?

 20       A.   I am a chemist for the Food and Drug

 21    Administration's forensic chemistry center.

 22       Q.   And for simplicity throughout your testimony I'm

 23    going to refer to it as the FDA lab.

 24       A.   Sure.

 25       Q.   Can you tell me how long you've been with the FDA?
```

10:35:36 (line 5)
10:35:38 (line 10)
10:36:09 (line 15)
10:36:17 (line 20)
10:36:29 (line 25)

63

                    A.    11 years.

                    Q.    And what are your responsibilities in your
position?

                    A.    I am a chemist, so we examine compromised FDA
10:36:40  regulated products for tampering, adulterations,
counterfeiting, diversion, things of that nature.

                    Q.    You mentioned adulteration.  What do you mean by
that?

                    A.    Products that may have ingredients in them that
10:36:57  shouldn't have.

                    Q.    And what's your education background?

                    A.    I have a Bachelor of Science in Forensic Science
and Ph.D. in chemistry.

                    Q.    And what training -- other than your education what
10:37:08  other training do you have related to your position at the
FDA?

                    A.    I've taken a few courses specific to my particular
field of expertise at external -- with external outside FDA
and also internal FDA courses.  And I've also instructed many
10:37:32  courses, as well.

                    Q.    What type of courses have you instructed?

                    A.    Specific to my field.  So once we get into a little
bit later when we get into exactly what my field of expertise
is specifically, infrared spectroscopy.  I've done a lot of
10:37:50  courses in that area.

1    Q.    The infrared spectroscopy, is there an abbreviation

2  for that?

3    A.    Sure.  FTIR, and that is fourier-transform

4  infrared.

10:38:04  5    Q.    FTIR.  I'm going to use that, as well, because I

6  most definitely would mispronounce it.

7    A.    Sure.

8    Q.    Do you have any publications in your expertise?

9    A.    Sure.  I have several.

10:38:16  10    Q.    Do you want to provide an example of one are two of

11  those?

12    A.    Yeah.  I've looked at a couple cases, counterfeit

13  tablet cases, so I've done some investigating in that.  Also

14  in adulterated products, products like capsules and tablets

10:38:34  15  that have ingredients that shouldn't be in there, and using

16  novel techniques to examine those types of products.

17    Q.    And then you published based on what you found?

18    A.    That's correct.

19    Q.    And have you testified as an expert before?

10:38:48  20    A.    Yes.

21    Q.    How many times?

22    A.    I believe five or six.

23    Q.    And has the court ever made a finding that your

24  test methods or results were not accurate or correct?

10:38:56  25    A.    No.

65

1    Q. Have you had training or experience in identifying

2    and analyzing Oxycodone pills, Alprazolam pills and Fentanyl?

3    A. Yes.

4    Q. For today what did you do to prepare for your

10:39:11    5    testimony?

6    A. I looked back at over my notes, what we would call

7    bench notes or worksheets that we generated specific to this

8    case.

9    Q. We heard prior testimony from your colleague

10:39:26    10    Mr. Platek who explained that you performed two different

11    forms of analysis on items received by the lab, specifically

12    alternative light source and FTIR, the infrared. As far as

13    the alternative light source did you make any significant

14    findings related to your analysis there?

10:39:48    15    A. No.

16    Q. Moving on to the FTIR, can you explain what type of

17    analysis that is and the equipment that you use?

18    A. Sure. So it's a piece of equipment about this big,

19    2 feet, maybe, by about 2 feet deep, maybe, 8 inches tall, and

10:40:08    20    it has a small aperture on it where we take a portion of our

21    sample and put it on the aperture. And then we lower a

22    pressure arm on top of that to make a compressed pellet.

23    And the way the instrument works is we pass

24    infrared light through that window which is made out of

10:40:32    25    diamond. The light passes through that small amount of sample

66

1  and then gets directed back towards the detector.  And based

2  on which wavelengths of infrared light that the sample absorb

3  we're able to determine a chemical fingerprint for that

4  particular substance.

10:40:48  5      Q.   If I understand you correctly, then, the FTIR

6  process does analysis of pills received, and you didn't

7  necessarily do anything related to the punch tips that were

8  received.

9      A.   Correct.

10:41:00  10      Q.   Your colleague, Mr. Platek, previously wrote down a

11  list of categories of the items received by the lab.  Does

12  that look accurate as far as the first three rows for what

13  analysis -- what items you did analysis on?

14      A.   That's correct.

10:41:17  15      Q.   I want to just confirm the type of tablets that you

16  were dealing with.  If we can go to Government's

17  Exhibit 24.01.  Do you recognize this photo?

18      A.   I didn't take this photograph personally, but I do

19  recognize it from the case.

10:41:40  20      Q.   Is this one of the types of tablets that you

21  performed an analysis on using FTIR?

22      A.   Correct.

23      Q.   And if we can go to 24.02.  Prior testimony also

24  provided to the jury that this was a photo taken in this case.

10:42:00  25  Did you perform analysis on this type of pill, as well?

67

     1          A.    Correct.

     2          Q.    And if we can go to 24.03.  Again, prior testimony

     3     provided that this was one of the tablets that came in the

     4     items received by the FDA lab.  Was this one of the types of

10:42:19 5     pills that you performed analysis on?

     6          A.    Correct.

     7          Q.    Before utilizing the FTIR equipment did you do

     8     anything to verify that it was performing accurately and

     9     correctly?

10:42:30 10          A.    Yes.  Every day before we run any type of samples

    11     we have to do what is called a performance verification for

    12     each piece of equipment.  And for this particular instrument

    13     we did that -- or I did that in this case.

    14          Q.    Previously the jury has heard testimony that

10:42:48 15     several of the items listed came from specific locations

    16     significant in this case, specifically the defendant's home on

    17     Titian way, the Tonge/Bustin home in South Jordan and blue

    18     postal bin, which those items were seized by a postal

    19     inspector.  They've also heard that some these drug exhibits

10:43:13 20     tested positive for either Fentanyl or Alprazolam.  Did you

    21     take any specific precautions in dealing with these items?

    22          A.    Sure.  We have a safety procedure in our

    23     laboratory, general safety procedure.  So we used personal

    24     protective equipment, gloves, glasses, laboratory coats.  We

10:43:32 25     conduct any type of analysis that we can inside of a

1    ventilation hood.  And in the event that we don't have that

2    capability we do have ventilation snorkels where we can

3    actually move those over the piece of equipment that I use,

4    and I can work my hands underneath that snorkel and take the

10:43:55  5    portion of the sample, put it on the aperture, and it provides

6    me with a barrier between the sample and myself.  And then if

7    there's anything that becomes airborne that ventilation hood

8    will pick that up.

9        Q.   And in regards to the 19 items, did you perform

10:44:14  10   this analysis using FTIR on all at least one pill from all

11   19 items?

12       A.   That's correct.

13       Q.   And why did you -- or did you perform that test a

14   single time?  Multiple times?

10:44:32  15       A.   I'm not entirely sure without looking directly at

16   my notes.  But I probably looked at it once.

17       Q.   Okay.  And can you describe what the portion of the

18   pill it is that you actually performed an analysis on?

19       A.   Yes.  Typically in this case I'll take a tablet and

10:44:54  20   I'll break it in half, and then I'll scrape a portion of the

21   core of the tablet, so the inside of the tablet, onto the

22   aperture of the instrument.

23       Q.   And in your analysis did you compare the results of

24   the FTIR of the suspect pills with authentic Oxycodone or

10:45:20  25   Alprazolam pills?

```
           1         A.    That's correct.

           2         Q.    And how do you document your findings after your

           3    analysis?

           4         A.    Well, once we've run the sample we end up with

10:45:32   5    what's called a spectrum, so it's just an XY plot, a graph,

           6    and on that graph is a fingerprint of that particular sample.

           7    So we compare the fingerprint of the suspect sample to the

           8    fingerprint of an authentic sample.  And what we would do is

           9    provide that data as a printout and then compare those

10:45:54  10    fingerprints to each other to make a determination on if the

          11    suspect sample is consist with the authentic or not.

          12         Q.    I'd like to look at some of that data that you

          13    gathered for your analysis.  If we can look at Government's

          14    Exhibit 24.08.  This is an FTIR result that -- or findings

10:46:19  15    that you created; is that right?

          16         A.    That's correct.

          17         Q.    It appears that there are four boxes on this

          18    exhibit.  Can you walk me through each of those boxes and what

          19    it is that we're looking at?

10:46:33  20         A.    Sure.  So if we start in the top left what we have

          21    here is the signature of each of the labeled items that I was

          22    talking about.  So we have an XY plot.  On the X axis or

          23    horizontal axis that's what wavelength we're looking at.  And

          24    along the Y axis we're looking at the intensity or absorbance

10:46:57  25    that we're seeing of each wavelength.
```

70

1    So if you look at the fingerprint, say, at the top

2  example, Item 14, we get a signature or fingerprint.  That

3  fingerprint is consistent with each of the other items in this

4  window here.

10:47:16  5    Q.   So if the jury having heard prior testimony that

6  each of the drug exhibits from which these items were taken

7  from came from different locations, can you draw any sort of

8  conclusion based on what we're looking at here?

9    A.   The conclusion I would draw is that the infrared

10:47:34  10  signature of each of these tablets from each of these items

11  are consistent with each other.

12    Q.   And if we can zoom out and go to the second box.

13  What are we looking at here?

14    A.   So the second box here is what is the result of a

10:47:52  15  library search of one of the representative signatures or

16  fingerprints that we were looking at on the previous page.  So

17  if you look at the very top it says, search results for the

18  number, Item 14.  So what we did was we took the spectrum.  We

19  searched it against probably 55- to 60,000 signature

10:48:20  20  fingerprints in our library, and these are the best matches

21  that the computer algorithm determined.

22    Q.   So based on what we're looking at here you've got

23  Row 3 and Row 4 that reference microcrystalline cellulose.

24  How likely was it that there was microcrystalline cellulose in

10:48:44  25  Items 14 through 19?

71

1          A.    I didn't document it on here what the ingredients

2     were because the question was just to compare it to authentic.

3     But I do want to point out that based on the data that I'm

4     looking at here, the suspect sample does appear to contained

5     some type of cellulose.

6          Q.    Okay.  If we can go to Box 3.  What is being

7     compared here?

8          A.    So in Box 3 we have one of our representative

9     spectra signatures from box Number 1, and we are comparing

10    that fingerprint, that signature, to that of an authentic

11    Alprazolam 2-milligram tablet core that was manufactured by

12    Sandoz.

13         Q.    And in your expert opinion, can you draw any

14    conclusions in making the comparison of those two pills, an

15    authentic versus a suspect pill?

16         A.    Sure.  I can tell if you look at the peak positions

17    along the X axis the signature of the suspect sample is not

18    consistent with that of the authentic.

19         Q.    And if we can go to the last box.  I believe you've

20    kind of summarized more or less your findings.  Is there

21    anything else noted here worth mentioning that you haven't

22    already that you concluded?

23         A.    I think this screen here summarizes everything.

24         Q.    Okay.  Thank you.  If we can now go to Government's

25    Exhibit 24.06.  Noting a pattern here as to how these are

72

1    structured we may skip Box 4 because I'm going to anticipating

2    you're going to explain to us what your conclusions are.  We

3    can look at Box 1.  It appears from this that you're

4    performing an analysis using FTIR for items that are scored as

10:50:47    5    A215s; is that correct?

6        A.    That's correct.

7        Q.    And tell me the results of your analysis comparing

8    those pills.

9        A.    The fingerprint of each of these tablet cores were

10:51:02   10    consistent with each other for each of the items listed in

11    this window here.

12        Q.    And if we can go to Box 3.  What are we looking at

13    here?

14        A.    We're looking at the top representative spectrum

10:51:19   15    from one of those that was shown in window Number 1 compared

16    to the fingerprint of an authentic Oxycodone hydrochloride

17    30 milligram tablet core manufactured by Actavis.  And what we

18    can see here as in a similar situation as previously the

19    signature of the suspect sample is not consistent with that of

10:51:46   20    the authentic.

21        Q.    And how -- do you have a reason for why or maybe

22    visually is there something that tells you here as to why

23    they're not consistent?

24        A.    Yeah.  If we look at the different regions down

10:52:01   25    here, we see along the X axis the number 2000.  So if we look

73

1    at everything to the right of that we see a different pattern

2    of these peaks or these absorptions.  And based on the

3    differences in each of these peaks we are able to determine

4    that the suspect and authentic are not consistent with each

5    other.

6           We can also see in the authentic Oxycodone we have

7    very sharp peaks around 17 -- between 1500 and 1800 that are

8    characteristics of Oxycodone itself, the active ingredient.

9    Those peaks are not present in the suspect signature.

10           Q.   So if we can zoom out.  What can you conclude,

11   then, when comparing the suspect pills marked A215 to the

12   authentic Oxycodone pill?

13           A.   That the suspect samples were not consistent with

14   the authentic.

15           Q.   Were the suspect pills consistent with each other?

16           A.   Yes.

17           Q.   Okay.  If we can move on to Exhibit 24.07.  If we

18   can zoom into Box 1.  It appears that this is capturing your

19   analysis results for the items provided the FDA lab that had a

20   embossment of an M with a box around it.  Is that what that

21   is?

22           A.   Correct.

23           Q.   And can you explain what we're looking at here?

24           A.   Each of the signatures are, fingerprints here were

25   from each of the items that you have described that had or

74

1    consisted of a sample with an M30 stamp on it.  And each of

2    the spectra signatures, fingerprints of each of those tablets

3    are all consistent with each other.

4        Q.   And if we can go to Box 3.  What are we looking at

10:54:14  5    here?

6        A.   We have one representative signature fingerprint

7    from the box Number 1, and it is compared to an authentic

8    Oxycodone 30 milligram core manufactured by Mallinckrodt, and

9    the suspect fingerprint is not consistent with that of the

10:54:36 10   authentic.

11       Q.   So if we can zoom out.  Is it fair to say that

12   essentially regardless of the location of where these

13   suspecting pills came from all of the suspect pills are

14   consistent with each other?

10:54:51 15       A.   Correct.  Using this technique, that's correct.

16       Q.   But they're inconsistent with authentic Oxycodone?

17       A.   That's correct.

18       Q.   If all the A215 and M30 suspect Oxycodone pills

19   analyzed were found to be consistent with each other but also

10:55:08 20   found not consistent with authentic Oxycodone pills, based on

21   your training and experience what would you conclude?

22       A.   Could you repeat the question?  I'm sorry.

23       Q.   It might have been a lengthy question.  Let me

24   rephrase it.

10:55:23 25            Is it probable based on your findings that all the

75

1    A215 pills would likely have come from the same source based

2    that they're consistent?

3            A.   I would say it's possible.  There are other

4    techniques that are more conclusive for that type of

10:55:40  5    conclusion.  And I think Mr. Ranieri's technique that he

6    described would probably be the most appropriate to make that

7    type of conclusion.

8            Q.   Okay.  Thank you.

9                 No further questions.

10:55:52 10            THE COURT:  Cross-examine?

11            MR. SKORDAS:  No questions, Your Honor.  Thank you.

12            THE COURT:  Thank you.  You may step down.  And

13    you're excused if you want to be.

14            The government may call its next witness.

10:56:02 15            MR. BURGGRAAF:  The United States would call

16    Heather McCauley.

17            THE COURT:  Come forward and be sworn, please.  Now

18    you can come forward and be sworn.

19            THE CLERK:  Please raise your right hand.

10:57:06 20                    HEATHER ANNE McCAULEY,

21        called as a witness at the request of Plaintiff,

22          having been first duly sworn, was examined

23                   and testified as follows:

24            THE WITNESS:  I do.

10:57:11 25            THE CLERK:  Please come around to the witness box.

1          Please state your name and spell it for the record.

2          THE WITNESS:  Heather Anne McCauley, H-E-A-T-H-E-R

3     A-N-N-E, M-C-C-A-U-L-E-Y.

4                    DIRECT EXAMINATION

10:57:43  5   BY MR. BURGGRAAF:

6          Q.   Ms. McCauley, thanks for being here today.  Can you

7     tell me what your current occupation is and where you're

8     employed?

9          A.   Sure.  I am currently the director of

10:57:57 10   investigations in Cincinnati, Ohio, in the office of Human

11    Animal Food.  And we do inspections for human and animal food

12    manufacturers in the state of Ohio and Kentucky.  But before

13    that I was a chemist in the forensic center for almost 26

14    years.

10:58:20 15        Q.   And for use of reference I'm going to refer to that

16    as the FDA lab.  You say you were employed in there for about

17    20 years?

18        A.   I was in the lab for about 26 years.  I've been in

19    my current position for about a year.

10:58:33 20        Q.   What's your education and background?

21        A.   I have a bachelor's of Chemistry -- I'm sorry.

22    Bachelor of Science in Chemistry and in Biology.

23        Q.   And when you're employed by the FDA lab what were

24    your job responsibilities?

10:58:47 25        A.   I would analyze evidence that was sent to the

77

1    laboratory for analysis, talk to Office of Criminal

2    Investigation agents, write reports, review reports, write

3    standard operating procedures and review them, maintain

4    instruments, do verification of those instruments and make

10:59:11  5    sure they were running properly.

6        Q.   And what training have you received in addition to

7    your education related to your FDA lab position?

8        A.   Earlier on in my career I attended a mass spectra

9    interpretation theory class.  Also when we get new

10:59:35  10   instrumentations in the laboratory usually we get some type of

11   training from the manufacturer on how to use that equipment,

12   and the FDA itself has various courses that you can take.

13       Q.   And do you have any publications related to your

14   job responsibilities that you had at the FDA lab?

10:59:52  15       A.   Sure.  I've given presentations and publications.

16   I've given presentation at the conference on small molecule

17   science on analyzing and identifying pharmaceuticals; a

18   presentation at the American Academy of Forensic Science on

19   the presence of pharmaceuticals and dietary supplement.  I

11:00:19  20   coauthored a paper with Dr. Lanzarotta, The Analysis of

21   Pharmaceuticals, on a piece of equipment that was a

22   combination of fourier-transform infrared and gas

23   chromatography with mass spectrometry.

24       Q.   That last one, we're going to talk about that some

11:00:41  25   more.

78

1     A.   Yes.

2     Q.   Because you said it you saved me from saying it.

3  Can I abbreviate it from here on out as GCMS?

4     A.   Yes.

11:00:49  5     Q.   The jury has heard prior testimony about GCMS, and

6  I suspect that they may be somewhat of an expert at the end of

7  the trial themselves.  They might put some of you out of work.

8  That being said, can you describe what GCMS is?

9     A.   Sure.  So again GCMS stands for gas chromatography

11:01:12  10  mass spectrometry.  And so the instrument itself for visual

11  purposes, if you can imagine basically a 3-by-3 box that sits

12  on a benchtop.  It's pretty unimpressive looking at it from

13  the outside, but the magic happens on the inside.  And so the

14  gas chromatography part of that is if you can imagine like a

11:01:42  15  coffee stirrer that's 100-feet long and it's circled upon

16  itself like a coil about 12 inches in diameter.  And if you

17  can also imagine that that coffee stirrer had a coating of

18  material on the inside surface of it.  So it's open, and stuff

19  can pass through it, but there's a coating on the inside.

11:02:07  20     So what you do is you take your material, whatever

21  you're trying to analyze, and you mix it with some type of a

22  liquid.  And you take that liquid, and you pull it up into a

23  syringe and you inject it into the instrument through a port.

24  And that port is about 500 degrees Farenheit.  So it turns

11:02:29  25  everything into a gas.

```
1        And that gas then flows through that coffee

2   stirrer, which is called a column.  And that gas interacts or

3   interfaces with the material that's lined on the inside of the

4   coffee stirrer, if you will.  And as it interacts with that

11:02:53  5   phase, what's called a phase, it separates out that mixture

6   into its components.

7        So if you imagine like, say, a multivitamin.  As

8   those vitamins would be traveling through that column they

9   interact with it at different -- like in different ways that

11:03:17 10   gives it separation.  So say a Vitamin C might come out first,

11   Vitamin A might come out next, Vitamin B will come out last.

12   So you get separation in that way.  That's what the whole

13   purpose of gas chromatography is is to take a mixture, pass it

14   through a medium and separate it into its components.

11:03:40 15        So once that happens and you have your individual

16   components, they go into what's called the mass spectrometer.

17   And at that point those individual components are hit with a

18   voltage that explodes the molecule into a specific pattern,

19   which is like a fingerprint.  And that's how you can identify

11:04:04 20   what it is, because like that Vitamin C explodes the same way

21   every time.  It has a specific fingerprint that I can say

22   that's Vitamin C.  The same with Vitamin A, et cetera.

23        So then you get a piece of data in your computer

24   that shows a graph with each of those individual components

11:04:29 25   making like a peak, and then you get also what's called the
```

80

1    mass spectrum, which is the fingerprint of each one of those

2    peaks.

3         Q.   Excellent.  So there's essentially two processes

4    that go on within the GCMS instrument.

11:04:45    5         A.   Correct.

6         Q.   Now I want to backup just a little.  Have you

7    testified as an expert before?

8         A.   Yes.

9         Q.   How many times?

11:04:52   10         A.   8 to 10.

11         Q.   Has the court ever made a finding that your process

12   or testing methods were not accurate or correct?

13         A.   No.

14         Q.   Do you have experience analyzing Oxycodone pills,

11:05:08   15   Alprazolam pills and Fentanyl?

16         A.   Yes.

17         Q.   So tell me how you became involved in this crime

18   case.

19         A.   My supervisor asked me to analyze the evidence that

11:05:19   20   I had submitted to the laboratory.

21         Q.   And were you specifically directed to use the GCMS

22   method for analysis?

23         A.   Yes.

24         Q.   And is the GCMS equipment and tool as well as just

11:05:36   25   the process generally widely accepted in the scientific

81

1    community?

2         A.   Yes.  And the technical -- the procedure that we

3    use, I actually wrote that technical procedure and did the

4    validation for it for a laboratory.  And that's the general

11:05:52  5    method that we use for GCMS analysis that come into our

6    laboratory.  And we have used that procedure on thousands and

7    thousands of samples.

8         Q.   Before using this box, the GCMS equipment, do you

9    do anything to verify that it's operating correctly and will

11:06:14 10    give you accurate results?

11         A.    Yes.  There's different types of verification.  The

12    one that's the most important for this analysis specifically

13    is a daily verification where you run what's called a tune.

14    And you're just making sure that the instrument is operating

11:06:32 15    properly in the way that you expect it to on the day of use.

16    We also have different procedures that we do that might be

17    monthly or yearly to make sure that the instrument is in good

18    operation and functioning the way it's supposed to be and well

19    maintained.

11:06:51 20         And in addition to that when I run the samples

21    themselves, the first time that I run them when I don't

22    necessarily know what I have, I run what's called a screen

23    check standard.  And it has three known compounds in it that

24    I'm looking to make sure that they're coming out and being

11:07:13 25    separated the way that I mentioned.  And in the mass spectrum

82

1       of them is exactly how I would anticipate them to be.  So

2       that's run with that set of analysis to ensure -- another

3       safety to ensure that everything is going the way I would

4       expect it to do that day.

11:07:30  5           Q.   In your process when you're analyzing the substance

6       you're actually taking additional steps to ensure the accuracy

7       of the results such as doing multiple tests; is that right?

8           A.   Yes.  I run the standards in duplicate to make sure

9       that the second time that I analyze it it looks exactly the

11:07:53 10      same as the first that I analyzed it.  I also run certified

11      standards.

12           Q.   And what are those certified standards?

13           A.   Well, it depends on the analysis that you're doing.

14      So in this case the first time that I run the samples is what

11:08:09 15      I call the screen when I'm looking to see what I have.  And

16      then once I figure out what I think I have, which at that

17      point I'm calling it a tentative identification.  And then

18      I'll run a second time with certified standards.

19               So in this case once I identified that I had the

11:08:33 20      active ingredients of Fentanyl and Alprazolam then I ran

21      certified standards of those two compounds to show that what I

22      see in the sample looks exactly the same as a standard of

23      those materials.

24           Q.   And how do you ensure that there's no cross

11:08:51 25      contamination between one test and another or no adulterants

83

1    when running this analysis?

2        A.    Cross contamination between the samples?

3        Q.    Between maybe from one test to the next.  Does any

4    material remain within the GCMS device between tests?

11:09:11  5        A.    Generally no.  But we run blank, what's called a

6    blank.  So in this case these samples were dissolved into

7    methanol.  And then I have a sequence that I run that I set up

8    with each item in what order I'm going to run them in.  And I

9    run blanks in-between the samples to ensure that there's

11:09:35 10  nothing that's carrying over that would be showing up that

11   shouldn't be there.

12        Occasionally if something happens that I would

13   question that, I might -- the second time I run stuff I would

14   change the order of the way that I run them so that they're

11:09:51 15  not run in the same order each time.  So I do different things

16   to ensure that I don't have that situation that you're

17   describing.

18        Q.    In this case did you only perform an analysis on

19   the 19 items that contained different pills or tablets?

11:10:08 20        A.    That's correct.

21        Q.    And your colleague Mr. Platek on the paper to the

22   left of you there categorized the first 19 items received into

23   three different types of suspect pills or essentially pills

24   with the same scoring on them.  In looking at that, does that

11:10:29 25  accurately portray the categories and items that you did your

84

1    analysis on?

2         A.   Yes.

3         Q.   And was there a difference in results on any of the

4    items that were scored with A215?

11:10:49  5         A.   No.  All of the A215s looked the same.

6         Q.   And the next one down, Item 6, 8, 9, 10, 12, 13

7    scored with an M box and a 30, the results that you received

8    was there any inconsistency amongst the items?

9         A.   No.

11:11:10 10         Q.   So each of the items are tested separately;

11    correct?

12         A.   Yes.

13         Q.   So Items 14 through 19, did you find any

14    inconsistencies in your ultimate results?

11:11:22 15         A.   Within the Items 14 through 19 themselves, no,

16    there was no inconsistencies.

17         Q.   So let's talk about your results, then.  After

18    running the GCMS what did you find for Items 14 through 19?

19         A.    Items 14 through 19 were Alprazolam.

11:11:41 20         Q.   Okay.  And for the items at the top that were the

21    pills that were scored A215, what results did you find?

22         A.   Fentanyl.

23         Q.   And Items 6, 8, 9, 10, 12, 13 scored with an M box

24    and 30 what results did you find?

11:12:01 25         A.   Fentanyl.

85

```
         1          Q.   And you mentioned earlier that you at least run the
         2    analysis twice with the GCMS.  The second time you ran it did
         3    it confirm the tentative results that you got the first time?
         4          A.   Yes.
11:12:18 5          MR. BURGGRAAF:  If I can have one moment, Your
         6    Honor?
         7          THE COURT:  Yes.
         8          (Time lapse.)
         9          Q.   BY MR. BURGGRAAF:  I want to ask you, are you
11:12:31 10   familiar with the active ingredient in the authentic A215
        11    tablets?
        12          A.   No; because I don't -- the purpose of my analysis
        13    wasn't to address authenticity.  The purpose of my analysis
        14    was to simply look for any active pharmaceutical ingredients.
11:13:00 15         Q.   And in performing your analysis were you asked to
        16    find the amount of the active ingredients?
        17          A.   No.
        18          Q.   Okay.  No further questions.
        19          THE COURT:  Thank you.
11:13:11 20         Cross-examine?
        21          MS. BECKETT:  I have no questions for this witness,
        22    Your Honor.
        23          THE COURT:  Thank you.
        24          You may step down, and you're excused if you want
11:13:20 25   to be.
```

86

```
                        THE WITNESS:  Okay.

  1

  2                     THE COURT:  You may call the next witness.

  3                     MR. BURGGRAAF:  The United States called Dr. Arthur

  4     Simone.

11:13:56  5             THE COURT:  Come forward and be sworn, please.

  6                     MR. BURGGRAAF:  If I can have a moment, Your Honor.

  7                     THE COURT:  Yes, you may.

  8                     THE CLERK:  Please raise your right hand.

  9                             ARTHUR SIMONE,

11:14:26 10          called as a witness at the request of Plaintiff,

 11              having been first duly sworn, was examined

 12                     and testified as follows:

 13                     THE WITNESS:  I do.

 14                     THE CLERK:  Please come around to the witness box.

11:14:43 15             Please state your name and spell is it for the

 16     record.

 17                     THE WITNESS:  Arthur Simone, A-R-T-H-U-R,

 18     S-I-M-O-N-E.

 19                     THE COURT:  You may proceed, Mr. Burggraaf.

11:15:01 20             MR. BURGGRAAF:  Thank you, Your Honor.

 21                         DIRECT EXAMINATION

 22     BY MR. BURGGRAAF:

 23          Q.   Thank you, Dr. Simone, for being here this morning.

 24               Can you tell me what your current occupation is and

11:15:10 25     where your employed?
```

87

1          A.    I'm employed after Food and Drug Administration

2     just outside of Washington DC.  And I'm senior medical advisor

3     in the office of unapproved drugs and labeling compliance.

4          Q.    How long have you been with the FDA?

11:15:23  5          A.    17 years.  Almost 17 1/2.

6          Q.    And in your current role what are your

7     responsibilities?

8          A.    I work in the office of compliance, and our jobs

9     are to make sure that the drugs that are available on the

11:15:39 10    marketplace are those that have been appropriately vetted by

11    FDA, to be sure they're safe and effective and highest quality

12    possible.  And those that aren't are removed, and that's what

13    my office does.

14         Q.    Let me take you back 17 1/2 years ago.  Where did

11:15:55 15    you work before the FDA?

16         A.    Prior to FDA I was in private practice.  I worked

17    in the Philadelphia area.  I was an assistant professor at the

18    University of Pennsylvania for several years and then went on

19    to several other colleges that were there.  Hahnemann

11:16:13 20    University, Medical College of Pennsylvania and Drexel

21    University as well as working in private practice.

22         Q.    And what type of practice do you have?

23         A.    Anesthesia.

24         Q.    And what's your education background?

11:16:26 25         A.    I started out wanting to be an engineer and got a

88

| | |
|---|---|
| 1 | Bachelor of Science in Engineering Science, and then I went on |
| 2 | to Penn State University at that point to get a master and |
| 3 | Ph.D. in bioengineering. And my specialty there was gas |
| 4 | mixing and aerodynamics and models of the upper airways and |
| 11:16:47 5 | the lungs. And after that I went to medical school. |
| 6 | Q. And you passed? |
| 7 | A. Yes. |
| 8 | Q. You may have said it, just so I want to make sure I |
| 9 | heard it, do you have a Ph.D.? |
| 11:17:00 10 | A. Yes, I do. |
| 11 | Q. What's the emphasis for that Ph.D? |
| 12 | A. It's bioengineering. |
| 13 | Q. Do you provide training instruction to others in |
| 14 | your field? |
| 11:17:10 15 | A. At FDA? |
| 16 | Q. At FDA or elsewhere. |
| 17 | A. At FDA I do. |
| 18 | Q. What types of training do you provide? |
| 19 | A. For my first 14 years at FDA I worked in the office |
| 11:17:26 20 | of new drugs where we approved products, new drug products for |
| 21 | anesthesia, critical care and in my case also counter |
| 22 | terrorism. So I trained people how to do the review work from |
| 23 | the clinical side, how to look at the clinical trials that |
| 24 | were conducted, how to look at toxicology studies that had |
| 11:17:46 25 | been performed, how to reviewed chemistry manufacturing |

89

1  control data in an effort to decide whether the benefit of a

2  new drug outweighed its risk, and also look at the label and

3  to make sure the labeling adequately informed a physician how

4  to use a new drug.

11:18:02  5      Q.   You mentioned you're evolved with new drugs

6  applications and teaching others about that process.  We'll

7  come back to that.  But do you have any publications or have

8  you authored any literature related to your profession?

9      A.   I have.

11:18:16  10     Q.   What type -- can you give us a couple of examples

11  of your types of publications?

12     A.   Sure.  One of the big issues that has occurred in

13  recent years was whether anesthesia drugs affect the

14  development of the brains of infants over the last trimester

11:18:36  15  of pregnancy and during the first couple years after birth

16  while the brain is going through a rapid development phase.

17  And we have done in work in that, especially with animals.

18  And in the indication there is a lot of anesthesia drugs can

19  affect the brain adversely and those affects can last

11:18:54  20  throughout life.

21     Q.   And have you testified as an expert before?

22     A.   I have.

23     Q.   How many times?

24     A.   Eight times.

11:19:00  25     Q.   And has a court ever found that your testimony was

1    inaccurate or not correct?

2         A.   No.

3         Q.   What training or experience do you have related to

4    Fentanyl and Oxycodone?

11:19:15  5    A.   For the first 14 years at FDA I was oftentimes the

6    only anesthesiologist in my division, so I covered all the

7    anesthesia products, and that included all the intravenous

8    formulations of Fentanyl.  It's the newer versions of Fentanyl

9    that came on the marketplace, I would be responsible for

11:19:38 10   reviewing those.  And for older versions that had been out

11   there for a while I would continue monitoring the safety of

12   those and any changes and indications that the companies would

13   seek.

14        Q.   For the jury why don't you explain what is

11:19:51 15   Fentanyl?

16        A.   Fentanyl is a potent opioid analgesic.  It's a very

17   strong painkiller.  It's commonly used in anesthesia and

18   sometimes in the ICU afterward.

19        Q.   What did you do to prepare for your testimony

11:20:05 20   today?

21        A.   I've had discussions with you about my knowledge

22   regarding Fentanyl and anesthesia in general, and I've just

23   reviewed some of the approvals of products that have been

24   involved in Fentanyl.

11:20:22 25   Q.   More generally, what does the FDA consider and

91

1     approve when an application is submitted as it relates to a

2     controlled substance?

3          A.   Can you rephrase that?

4          Q.   What's the FDA's role in respect to controlled

11:20:38  5     substances that want to be entered into the marketplace?

6          A.   It would actually be treated the same as any other

7     prescription drug product.  The company that wanted to market

8     these products would have to come to us and follow all the

9     steps that are normally required to show that whatever its

11:20:58 10     intended use is going to be and whatever the dose is going to

11     be administered that the product is effective.  It does what

12     they claim it will do, and that the risks have been well

13     established to the point where we can determine whether the

14     benefits of the drug outweigh the risk or the intended use.

11:21:15 15          Q.   So is what you just described part of the new drug

16     application?

17          A.   Yes.

18          Q.   Are there any other significant parts of that new

19     drug application?

11:21:25 20          A.   Yes.  So the drug application from very high level

21     includes three things -- or four things, I should say.  First

22     is chemistry manufacturing and controls.  So that's how the

23     company is going to make the product.  It has to be of the

24     highest quality possible to minimize risk.  So that includes

11:21:45 25     everything from where they are getting their supplies, their

92

1    active ingredients, which is the ingredient that does the work

2    of the drug, their inactive ingredients, how they're going to

3    analyze the ingredients when they get them, when you buy from

4    someone who sells them and then you have to also confirm what

11:22:04   5    it says it has, and that it's the purity it's supposed to

6    have.

7         It includes the recipe for how they actually go

8    about making the drugs and equipment they use.  It includes

9    all of the specifications for the drug when it's completed and

11:22:14  10    it's in its final format and how they go ahead and test that.

11    It includes having to reserve the products so if there's

12    ever an issue with it they can reanalyze it or give samples.

13    And it includes an inspection to make sure that the facility

14    really has the equipment they claim they have to do all this

11:22:32  15    work.  And that the facility is clean enough, if you will,

16    that it's suitable for making drugs, especially injectable

17    drugs.  That's one section of the NDA.

18         Q.    Thank you.  When you were involved with new drug

19    applications did you actually ever go and do the onsite

11:22:52  20    monitoring yourself?

21         A.    For inspection, no.

22         Q.    Those who did go and do the onsite and monitoring

23    and inspection would they bring back issues or concerns for

24    you to give an opinion?

11:23:03  25         A.    Yes.  They would if they found something.

93

1          Q.   I want to give you the opportunity to weigh in

2    similarly today.  I'd like us to look at Exhibit 13.09,

3    Photo 10.

4          We're looking at photos of the defendant's home on

11:23:25  5    Titian Way back in 2016.  And I'd like to walk you through a

6    room for which the jury heard prior testimony about, and

7    similar to what you've done in your profession ask you what

8    concerns or issues may arise were this the location being

9    considered for approval in a new drug application.  So do you

11:23:54 10    have anything you could speak to as far as what we're looking

11    at here?

12         A.   Just based on a quick glance at the image, one of

13    the concerns is the dust that's on the walls.  I'm not sure

14    what all the equipment is and whether it's all intact or not,

11:24:12 15    but there appears to be the one container right in the center

16    of the image where there's some white substance that's in

17    there that's being exposed to the rest of the environment.

18         Q.   And why is that -- why is the dust on the wall and

19    the exposed material, why is that of concern?

11:24:31 20         A.   There's two concerns.  It depends on what the

21    substances are in both places.  But you can have the stuff on

22    the wall get into the ingredients going into the drug product

23    and vice versa.  Stuff coming out of that container puts

24    people at risk for inhaling it.  And if that's what's on the

11:24:49 25    wall it's a substantial amount.  And on the other hand, dust

1    from the wall or anywhere else in the room for that matter

2    that gets into that hopper looking device into the medication

3    or the drug can cause harm to whoever takes it.

4         Q.   And if we can move to the next photo.

11:25:11  5         Is this indicative of a standard location that

6    would be approved for a pharmaceutical production operation?

7         A.   No.

8         Q.   And why not?

9         A.   It's a very makeshift looking facility.  It's not

11:25:34 10   something that appears to be permanent.  With the purposes of

11   the Bell jars that are lined up on the tables, I'm not sure --

12   the blockage of the windows with those pillow-like devices and

13   a roll of toilet paper is something that you wouldn't normally

14   see in a facility used by a company like Pfizer.  And again,

11:25:57 15   you've got the dust on the walls, the chair.  And I'm not sure

16   what those containers are on the shelves and what their

17   intended use is, but I can see they're covered with dust, as

18   well.

19        Q.   And just to complete the review of this room if we

11:26:11 20   can go to the next few photos maybe pausing for just a few

21   minutes.  I should say seconds.  Let's not pause for minutes

22   on each.

23        This is the second pill that the jury heard

24   testimony about, and heard further testimony about powder

11:26:31 25   taken from that hopper being tested positive for Fentanyl.

                                                              95

1          Do you have any additional concerns -- you can hold

2     it there -- did you have any additional concerns based on

3     those additional photos?

4          A.   Again, if there's Fentanyl in there because of its

11:26:50  5     potency I would be concerned for the possible exposure for the

6     people in the room either working on the drug or just even in

7     the peripheral of the room, and the fact that it's not

8     covered.  Beyond that, the fact that it's just not in a very

9     clean environment.  It's not something that at a minimum I'm

11:27:10 10    assuming these are for tablets that are being swallowed as

11     opposed to an injectable form.  Even for facilities that make

12     pills the requirements are higher than what would be required

13     for food.

14          So if an inspector were to go in and find roaches

11:27:31 15    in a facility that were making pills or rodent droppings,

16     which they do, they would be told to stop making the products

17     at that facility until the problem was cleared up.  And they

18     may be encouraged to recall a product if it had been made and

19     we can demonstrate anything was for risk for patients

11:27:49 20    downstream or something that had already been made.

21          Q.   Is that because a facility that produces this type

22     of product, if it's not clean it poses a health hazard for the

23     end user?

24          A.   Yes.

25          Q.   I want to ask you more generally about the new drug

11:28:02

96

1    application process.  Does the FDA maintain records or a

2    database for all approved new drug applications?

3         A.    Yes.    There are three databases that we have.   Two

4    of them are public, that's drugs at FDA, and what we call the

11:28:25  5    orange book, and they list all of the approved products.   And

6    then there's an internal database, which is our Document

7    Archival Reporting and Regulatory Tracking System or DARRTS.

8    The DARRTS system, which is internal, includes a lot of

9    proprietary information and information coming from drug

11:28:46 10    companies required to an approval of their product.

11         Q.    Speaking just to the approved applications, did you

12    review the FDA's databases in preparation for your testimony

13    today?

14         A.    I did.

11:29:00 15         Q.    And in reviewing the databases did you find an

16    approved application for manufacturing or bringing to market

17    any pharmaceuticals including Alprazolam or Fentanyl for any

18    of the following individuals:  Alex Tonge, Katie Buston, Mario

19    Noble, Drew Crandall or Jonathan Luke Paz?

11:29:25 20         A.    No.   I found nothing for them.

21         Q.    Similar question, did you find an FDA approved

22    application for the manufacturing or bringing to market any

23    pharmaceuticals including Alprazolam or Fentanyl for Aaron

24    Shamo or Pharma Master?

11:29:43 25         A.    I searched for both and found nothing for either.

97

2727

Q.   Based on your search of those drug applications,
the approved ones, if it was discovered that Mr. Shamo either
individually or under a pseudonym of Pharma Master was
manufacturing pills scored with an A215 or M enclosed with a
box with 30 on the other side, what would you conclude by the
fact that he doesn't have an approved application?

A.   Those are products that have been approved, and
he's not listed as one of the manufacturers for them.  So
there's a Mallinckrodt Oxycodone product and then a Actavis
Oxycodone product that meet that description that you're
giving, at least what's imprinted on it.

There's another database that FDA, we like our
databases.  It's Electronic Drug Registration and Listing
System.  So that every company that's marketing a product in
the United States has to list their product with us, whether
it's an approved product or unapproved or illegally marketed
product they still have to list it.  And one of the reasons
for that is so that we know it's out there in the market.  And
if there's ever a problem with a product we can trace it back
to who made it and see what else they've made and take care of
issues that might arise related to that.

So if some company was cleaning one of their
machines and damaged it or left chemicals in it for the
cleaning part that were ending up those chemicals ending up in
the final pill form.  If someone calls and says, my aunt just

98

1   died and she was taking these pills and here's the NDC code,

2   we can look it up on the EDRLS or we can look up any other

3   information that should be included in the prescription drug.

4   Find out who made, where they made it. We can send our

11:31:38   5   inspectors there to search. We can find out what other

6   products are made there and might have been contaminated

7   likewise, so it's a public health issue. And none of the

8   names that you mentioned, either the corporate entities or the

9   individuals are registered in EDRLS.

11:31:58   10      Q.   Okay.

11      A.   And the two products that you just described, the

12   Mallinckrodt and the Actavis Oxycodone products EDRLS when I

13   look to see who's responsible for labeling and manufacturing

14   and packaging, distributing them, none of the entities you

11:32:14   15   just mentioned occur there.

16      Q.   FDA is essentially a regulatory agency of the

17   federal government; correct?

18      A.   Yes.

19      Q.   So if none of the individuals or entities named

11:32:26   20   were found in those databases do you reach a conclusion

21   essentially as part of that regulatory agency about the

22   individual manufacturing of those tablets?

23      A.   They would be making an unapproved new drug

24   product.

11:32:43   25      Q.   Okay. Sticking to the new drug application

99

1   process, you yourself were I think you mentioned involved in

2   new drug applications for at least two Fentanyl products; is

3   that correct?

4       A.   I was involved with all of the opioid products that

11:33:01   5   were used in the operating room.  But involvement can occur in

6   a number of ways.  It can be with the initial review of all

7   the clinical studies and everything else which went along with

8   the approval of the first new drug application which allowed

9   the product to be marketed.  And then the rest of the life of

11:33:18  10   that product, life in quotes, we follow it for safety issues

11   and make sure that there's no updates to the label, that

12   there's no new problems that have been seen with the drug that

13   we didn't know about before.  And sometimes we have to adjust

14   the label accordingly or sometimes we find out there are

11:33:38  15   safety issues that make us take the product off the market

16   altogether.

17       Q.   Can you briefly explain your involvement in the

18   product Sublimaze Preservative 3?

19       A.   Sublimaze was one of the original Fentanyl products

11:33:51  20   that was approved for injection, and that was approved before

21   my time.  So I would have been more of a caretaker for that

22   new drug application and did not do the initial NDA reviewed.

23       Q.   So as a caretaker what was your role relating to

24   that product?

11:34:08  25       A.   When -- if I can just take one step back.  When

100

1    clinical trials are conducted to approve a drug these are big

2    studies to show that the drugs really does what it's supposed

3    to do with the dose that the company wants to market it for.

4    So they get all the safety information and efficacy

5    information.  But these trials are conducted anywhere from a

6    couple hundred to a few thousands people.

7           When it gets marketed it's usually used in hundreds

8    of thousands to millions of people depending on its use.

9    Something like Fentanyl, it's been hundreds of millions over

10   the years.  But there you're going to see very rare effects

11   that occur with the product.  Something might occur one in a

12   million times or real rare, and some of these can be serious

13   adverse reactions that would warrant relabeling the pill or

14   the products, rather, or sometimes consider taking it off the

15   market.  So I was following the safety reports for that.

16          Sometimes the other thing that can happen is a

17   company can come in, and it's not uncommon for them to ask to

18   have their product approved for adults, and they do all the

19   studies in adults.  And now it's a requirement that they go

20   back and do studies in children and submit those to us, and we

21   decide whether or not the risks outweigh the benefits or vice

22   versa and can approve the use for products in use for children

23   or a different indication.

24        Q.   Okay.  So separate NDA, separate product, can you

25   briefly explain your involvement to with Fentanyl Oralete and

101

1    what its intended purpose of use is?

2         A.   Fentanyl Oralete is, it's like a lozenge on a

3    stick.  People used to call it a lollipop, but I don't want to

4    use that phrase.  But it's something placed between the cheek

11:36:00  5    and the gums and it dissolves quickly, and the Fentanyl is

6    absorbed through the mucous and the gums.  It's used for

7    chronic pain and acute severe pain.  One of the more common

8    uses was veterans coming back with multiple amputations or

9    pain following exposure to explosive devices.

11:36:20  10        Q.   Is it fair to say that that product has more of a

11   time release aspect to it as far as the amount of Fentanyl

12   that is transferred into the bloodstream?

13        A.   I can't answer that question.  I don't know.

14        Q.   Okay.  What other forms of Fentanyl are you aware

11:36:45  15   of that FDA has approved for use?

16        A.   So there's the injectable type which would normally

17   be given intravenously for sometimes for patients in labor and

18   delivery will have an epidural or other patients that are

19   going into surgery with an epidural or spinal anesthetic, the

11:37:02  20   injectable can be used there.

21             There's a number of sprays that are used either

22   internasal or sublingual, under the tongue.  There's lozenges.

23   There's drug cake.  Those are buccal formulations, which again

24   are meant to be absorbed in the lining of the mouth.  There's

11:37:21  25   also topical products.  There's the Fentanyl patch where it's

102

1    just absorbed gradually through the skin.  And there's

2    iontophoretic products where it's also basically a patch.  But

3    there's a battery supply that's there, and it uses electric

4    current to also induce the Fentanyl to go through the skin

11:37:41  5    quickly, more quickly than for a regular patch.

6         Q.   And to your knowledge is there any tablet form of

7    Fentanyl that is currently approved by the FDA?

8         A.   There is no tablet form that's intended to be

9    swallowed.

11:38:00  10         Q.   What about crushed or snorted or smoked?

11         A.   No, no and no.

12         Q.   Okay.  Of the current FDA approved forms of

13    Fentanyl are any of those forms allowed to be used without

14    supervision of a physician?

11:38:17  15         A.   No, none of them are.

16         Q.   What is your understanding of the definition of a

17    drug under federal law, specifically Title 21 USC 351?

18         A.   There's a special legal definition for drug, and

19    the two most common parts are any product that's intended to

11:38:37  20    prevent, treat, mitigate, cure or diagnose disease in man; and

21    the other part would be a nonfood product that's intended to

22    affect the structure or function of the body of man.

23         Q.   Does Fentanyl meet that definition?

24         A.   It does when it's used for its intended use for the

11:38:57  25    approved products, in other words, to treat pain or prevent

103

1    pain.  And it also meets that definition when it's used

2    recreationally to get high.

3         Q.   What about Oxycodone, does it fit that definition,

4    as well?

11:39:10  5         A.   Yes.

6         Q.   You mentioned you're an anesthesiologist, and

7    you've worked with previously and used Fentanyl; right?

8         A.   Yes.  On my patients.

9         Q.   Now, I'm sorry.  I missed that last part, but I'm

11:39:25 10    sure I need to hear it.

11         A.   On my patients.  I used Fentanyl on my patients.

12         Q.   Oh, thank you.  That is a important clarification.

13    Let's make sure that the court reporter got that.

14              Just to be clear, though, in your work you haven't

11:39:41 15    used or dealt with Fentanyl in overdose, when someone's come

16    into a hospital or medical setting due to Fentanyl overdose;

17    is that correct?

18         A.   Not to treat them.  That would usually be an

19    emergency room physician.

11:39:57 20         Q.   How about in your experience as an anesthesiologist

21    or otherwise, have you been called upon in the last 20 years

22    to treat somebody with alcohol intoxication or poisoning?

23         A.   Not to treat the intoxication itself.

24         Q.   Okay.

11:40:20 25         A.   Usually my interaction with those people would be

104

1    if they were in a car accident or something we're going to

2    head to the operating room, I'd be down there to get them

3    ready for that.

4         Q.   So tell me and the jury what was the purpose for

11:40:33  5    using Fentanyl in your practice.

6         A.   Merely as an analgesic, a pain medicine, and that

7    was both during the surgical procedure or some kind of

8    invasive procedure like a colonoscopy or for labor and

9    delivery, and also to provide pain relief for patients in

11:40:53  10   intensive care or hospital setting afterwards.

11        Q.   In your experience have you had the opportunity to

12   observe the effects of Fentanyl on the human body on multiple

13   occasions?

14        A.   Yes.  In the operating room setting.

11:41:08  15        Q.   Are you able to quantity the number of times you've

16   observed the effects of Fentanyl on the human body?

17        A.   It would be several thousand.

18        Q.   So explain what are the effects that Fentanyl has

19   on the human body?

11:41:25  20        A.   Broadly as we give it, in anesthesia we usually

21   titrate our medications to effect.  So it's not uncommon to

22   use Fentanyl in another drug product Midazolam prior to

23   surgery just to sedate the patient, make them comfortable.  If

24   somebody's coming in and got a broken arm and it's going to be

11:41:47  25   set in the operating room, the Fentanyl would provide the

105

2727

1    analgesia for something like that.

2         As you start to induce anesthesia, actually put the

3    patient to sleep for the surgical procedure, if you're using

4    Fentanyl to provide some pain relief during the procedure

11:42:07  5    you'll see that they start to breath more slowly, they're

6    breathing more shallow, their pupils will constrict.  And

7    eventually they'll stop breathing if you give enough Fentanyl.

8    Usually by that point, though, we've given them another

9    medication like Propofol and make them go off to sleep and

11:42:23 10    unconscious altogether, and we've taken over the airway.

11         Q.   What do you mean by taking over the airway?

12         A.   So if a patient receives enough opioid as I said

13    they'll start to breath more shallowing and less frequently,

14    and what happens is the carbon dioxide in the blood will build

11:42:39 15    up and the amount of oxygen decreases, and if you don't do

16    something, you don't intervene they'll die.  So we manage the

17    airway.  We assist with their breathing.  Sometimes initially

18    we'll put a mask with oxygen coming through it.  It's hooked

19    up to an anesthesia machine which has a ventilator on it.  It

11:42:58 20    also has a bag hanging from it so we can gradually squeeze the

21    bag and help move air in and out of the lungs.  Once general

22    anesthesia has been induced and the patient is, well, they're

23    unconscious and they're paralyzed, we put a breathing tube

24    into the windpipe, the trachea, and we hook them up to the

11:43:16 25    anesthesia machine later, and we breath for them.

106

1    Q.   Is the slowing of the breathing, kind of what you

2 describe, is it correct to use the term respiratory

3 depression?

4    A.   Yes.   That would be the technical term for it.

11:43:35  5    Q.   In your experience, when you're administering

6 Fentanyl to a patient do you request or monitor the blood

7 Fentanyl levels to determine the amounts of amounts of

8 Fentanyl in the blood?

9    A.   No.

11:43:44 10    Q.   Why not?

11    A.   We -- I guess two reasons.   One, we treat the

12 patient, not a number, from a blood level.   So whatever the

13 patient needs they get.   If I give a little bit and that's

14 adequate, I don't care what the blood level number is.   The

11:44:01 15 patient has enough analgesic, you leave them well enough

16 alone.   Some people who has a lot more painful condition, car

17 crash, multiple broken bones or cancer patient, then they

18 require a lot more Fentanyl for what a typical level might

19 show for an analgesic effect.   So you give them what they

11:44:18 20 need.   So you treat the patient, not a number.

21        And the other part to that is that if you are

22 giving a lot and the patient should be more sensitive to the

23 Fentanyl than you would expect you've got everything there to

24 deal with that situation.   I can support the airway primarily.

11:44:35 25    Q.   So as a physician, as an anesthesiologist, would

107

```
 1      you leave somebody alone that you've begun to give Fentanyl

 2      to?

 3          A.    No.

 4          Q.    Do you know the blood Fentanyl -- this may be

 5      inherent in your prior answer.  But do you know the blood

 6      Fentanyl levels that are effective versus potentially toxic?

 7          A.    No, I don't.

 8          Q.    Does that go beyond the scope of your practice over

 9      the years?

10          A.    It goes beyond the scope of the practice.  But even

11      in a new drug application it goes beyond the scope of what

12      would be required for that.

13          Q.    You mentioned that essentially you don't observe or

14      request the blood Fentanyl levels.  Do you -- in providing

15      Fentanyl to a patient do you monitor the dosage?

16          A.    We record the dose.  So normally what you would do,

17      first of all, the patient has monitors on them.  They've got a

18      blood pressure cuff, a pulse oximeter which measures the

19      oxygen levels in the blood.  That's what we worry about in

20      terms of what levels.  We measure their hear rate.  We have a

21      electrocardiograph monitor so we watch the rhythm of the

22      heart.  And there's some other monitors following general

23      induction of general anesthesia.  So that helps guide us in

24      terms of patient safety.  And then just watching the patient's

25      response.
```

11:44:51
11:45:03
11:45:23
11:45:41
11:46:00

108

1          If I give Propofol to put someone to sleep, I start

2    out with a low dose.  Same thing with Fentanyl, just to see

3    how the patient responds.  If I'm not getting an adequate

4    response, I give more.  And I keep giving more gradually until

11:46:11  5    I have the right amount.  If for some reason I've overshot,

6    then I'm prepared to treat that.  When I say I, I mean we as

7    anesthesiologists and nurse anesthetists.

8          Q.   What's a typical range of an appropriate dosage

9    that you're using in that setting?

11:46:30  10         A.   That varies based on a lot of issues.  So it

11   depends on the amount of pain you anticipate for a procedure.

12   Someone coming in for cataract surgery, which is an operation

13   on eye, they may need a very low dose of Fentanyl.  Typically

14   they're older people, as well, so they might be a bit more

11:46:52  15   sensitive to Fentanyl.  So you might give them 50 micrograms.

16   For most healthy young people a does of 100 micrograms.

17   They'll feel a bit wheezy and willing to go to sleep without

18   much effort.  For someone that's coming in for open heart

19   surgery, at least back in the day when we used Fentanyl for

11:47:13  20   that, they could get several milligrams of Fentanyl.  The does

21   varies widely depending on the intended use.

22         THE COURT:  I want to shift gears on you.  What

23   types of substances are usually found in pills that are

24   manufactured and approved by the FDA?  Just the general

11:47:33  25   categories of substances.

109

|  | 1 | A. I would say there's three things that you'll find |
| | 2 | in pretty much every drug over the counter and prescription. |
| | 3 | So you have the active ingredient, and that's the ingredient |
| | 4 | that does the work of the drugs. It lowers the blood |
| 11:47:50 | 5 | pressure, kills bacteria, open airways and asthmatic. And |

        A.   I would say there's three things that you'll find
in pretty much every drug over the counter and prescription.
So you have the active ingredient, and that's the ingredient
that does the work of the drugs.  It lowers the blood
pressure, kills bacteria, open airways and asthmatic.  And
then you have the inactive ingredient, and those are the
things that make the active in a usable form.  So if it's a
powder you're going to inject you may dissolve it in
something.  You may want to add a preservative to prevent
bacteria from growing in it.  If it's a pill you've got this
powder, you need to make it something that you can compress
into the size and shape that someone can actually take.

        The other thing that occurs in all of these is
nothing is 100-percent pure.  And the impurities are something
that poses substantial concern to us at FDA.  It can propose a
significant risk to the patient.

    Q.   How does the FDA regulate the contents of
prescription pills?

    A.   So this goes back to what we were talking before
about the manufacturing chemistry and MC controls part of the
new drug application.  So the ingredients that someone buys to
make a drug product, they buy it from some firm in China.  It
comes in.  And it's supposed to be salt, it supposed to be 99
percent pure.  So every ingredient that goes in a drug
product, whether it's over the counter or prescriptions drug

110

1    product, the company is required to test that ingredient when

2    they get it to make sure it really is what it says it's

3    supposed to be and it's as pure as it's supposed to be.

4            When the product is finally made, the finished drug

11:49:16  5    product, the company again has to again retest it and look to

6    make sure that it's within specification.  So not only do you

7    have these ingredients, a lot of times the medicines are made

8    by a series of chemical reaction.  They just mix the stuff in

9    batches.  And oftentimes those reactions don't go all the way.

11:49:34  10   So you still have a little bit of some of the initial

11   ingredients in there.  They're not going to help with the drug

12   product be effective.  They're not one of the inactive

13   ingredients, so those would be considered impurities, and some

14   of those can be very toxic.

11:49:49  15       Q.   If a manufacture, a pill tablet manufacturer, wants

16   to change one of the ingredients, can they just do that on

17   their own and without any grief from the FDA?

18       A.   They need to notify us in advance.  And sometimes

19   they need to do special testing.  So these impurities, things

11:50:08  20   like benzene, which is carcinogenic, stuff like that that you

21   find in a lot of compounds, they have to be within a certain

22   level.  If it's a small enough range you have to think it's

23   like 99.8 percent pure, it comes down to dose amounts, they

24   may not have to do anything about it.  And when they've tested

11:50:27  25   their product in humans initially, it's that finished product.

111

1    So you have a sense of the safety with that.  It's also tested

2    in animals before it goes to humans.

3         If they tweak the product putting in a new inactive

4    ingredient, they have to reconsider all of these things.

11:50:44  5    Again, does that new active ingredient interact any way with

6    the other ingredients that are there?  Does it make the pill

7    less effective?  Less safe?  Does it introduce some new risk?

8         And just so you know, usually we worry about

9    interactions with active and inactive ingredients.  We also

11:51:03  10   worry about reactions of the finished products with the

11   container it's in.  Sometimes we found that when pills are put

12   in plastic containers some of the components in that plastic

13   leach into the pills.  We even found that pills that are kept

14   in glass containers, which was a surprise to us, some of the

11:51:20  15   components, boron in particular, in glass leaches into the

16   pills.  So this almost interaction that goes on over the

17   course of the lifespan of the drug before it expires, and we

18   keep track of all of that.  So the small changes or what

19   appear to be small changes have to be vetted by the FDA.

11:51:35  20        Q.   Previously you mentioned two manufacturers that

21   create Oxycodone pills, Mallinckrodt and Actavis.  Do you know

22   what the active ingredients are in each of their products?

23        A.   Oxycodone is the active ingredient.

24        Q.   Do you know what quantity of Oxycodone is in each

11:51:57  25   of those pills?  Maybe I better specify.  The A215 from

112

| | |
|---|---|
| 1 | Actavis and the M30 from Mallinckrodt, do you know what the -- |
| 2 | A.   Those are 30 milligram formulations. |
| 3 | Q.   In either one of those products should there be any |
| 4 | Fentanyl found? |
| 11:52:23  5 | A.   No. |
| 6 | Q.   I want to show you -- you mentioned packaging, and |
| 7 | I want to show you one of our exhibits.  If we can look at |
| 8 | Government's Exhibit 7.83. |
| 9 | THE COURT:  What is it? |
| 11:52:38  10 | MR. BURGGRAAF:  It's 7.83.  Photo 1 and 2.  We can |
| 11 | stop on Photo 1 for a moment. |
| 12 | Q.   BY MR. BURGGRAAF:  The jury's heard testimony that |
| 13 | what's being depicted here is a package that was seized from |
| 14 | the Tonge/Bustin porch on November 18, 2016. |
| 11:53:06  15 | And, Yvette, would you mind zooming in on the |
| 16 | invoice there? |
| 17 | This is the invoice that the jury heard testimony |
| 18 | about that was included within the package. |
| 19 | And, Yvette, if you'll zoom out now. |
| 11:53:25  20 | Dr. Simone, based on your experience of the FDA |
| 21 | what are the issues that we're looking at here with packaging |
| 22 | or other regulatory issues that the FDA deals with? |
| 23 | A.   I couldn't read all the information on that |
| 24 | invoice, just the name of the coffee company.  But if this is |
| 11:53:48  25 | something that was actually delivered to the end user those |

113

1    plastic bags that's included, those would be considered the

2    immediate container.  Per FDA regulations they would have to

3    be determined whether or not there's any interaction with the

4    pills contained in those bags and the bags themselves.

11:54:09  5    There's no labeling on the bags to say what it is, who made

6    it, how to contact someone if there is a problem with it.

7    There's no listing of active and inactive ingredients in it.

8    In short, these would be misbranded drug products.

9         Q.   And if we could go to Photo 2.  Similarly the jury

11:54:30  10   has heard testimony -- they heard testimony that the pills

11   from that first photo contained Fentanyl.  The jury heard

12   testimony this was another package that was picked up from

13   that same night from the same location.  Similar issues

14   that -- similar issues is what you described previously?

11:54:49  15        A.   Again, this is intended for the end user.  There's

16   no labeling on the bags.  And again, the concern about

17   interactions between the bags and the product itself.

18        Q.   To clarify, so Oxycodone doses, are they most

19   routinely measured in milligrams?

11:55:17  20        A.   For the approval oral products, yes, they're

21   milligrams.

22        Q.   And how are Fentanyl doses measured?

23        A.   They're measured in micrograms.

24        Q.   So the metrically challenged, what is the

11:55:30  25   equivalent of micrograms to 1 milligram?

114

1        A.   There are 1,000 micrograms in 1 milligram.

2        Q.   And your testimony previously was that

3   100 micrograms, so a 10th of a milligram would be an

4   appropriate Fentanyl dosage to start out with for an adult in

5   your practice?

6        A.   Correct.  It would can a common dose that would be

7   administered.

8        Q.   How does the potency of Fentanyl and Oxycodone

9   compare?

10        A.   Fentanyl is multiple times more potent than

11   Oxycodone on a weight-by-weight basis.  If you wanted to get a

12   similar analgesic effect for the two products, you would have

13   to give anywhere from 10 to 100 times or maybe even 1,000

14   times more Oxycodone than Fentanyl.

15             MR. BURGGRAAF:  If I can have a moment, Your Honor?

16             THE COURT:  You may.

17             (Time lapse.)

18        Q.   BY MR. BURGGRAAF:  Sticking with what you just

19   mentioned as far as the potency, I want to give you some

20   hypotheticals dealing with potency that compare Oxycodone to

21   Fentanyl.

22             If you have an individual who takes 30 milligrams

23   of Oxycodone either orally or by crushing and snorting or

24   smoking it, how likely is it that they will suffer serious

25   adverse health consequences or death as a result?

115

1    30 milligrams of Oxycodone to clarify.

2         A.   That's going to depend on a number of factors.  If

3    you're giving it to an infant, if you're giving it to a

4    98-year-old that has a lot of medical problems you're going to

11:57:27  5  have a lot more risk associated with that than a healthy young

6    adult.  But for most healthy adults, they would probably

7    tolerate the 30 milligram dose with minimal side effects.

8         Q.   And yet to be clear, the FDA has approved an

9    Oxycodone pill in a 30 milligram quantity?

11:57:50 10       A.   They have, to treat pain.

11        Q.   If an individual takes by comparison 30 milligrams

12   of Fentanyl either orally or by crushing and snorting or

13   smoking it, how likely is it that they will suffer serious

14   adverse health consequences or death as a result?

11:58:06 15  30 milligrams of Fentanyl to qualify.

16        A.   It's extremely likely they'll die unless there is

17   some type of intervention beforehand.

18        Q.   So those two examples, do those help, then, to

19   accurately depict the difference in potency between

11:58:23 20  30 milligrams of Oxycodone versus 30 milligrams of Fentanyl?

21        A.   One way to show it.

22        Q.   How about a dosage of only 1 to 4 milligrams of

23   Fentanyl, how likely is it that an individual, an average

24   adult would suffer from adverse health consequences or death?

11:58:42 25       A.   Again, in all likelihood if there's no intervention

116

11:58:58  
11:59:20  
11:59:42  
12:00:00  
12:00:27  

1    they would die.  And if I can just explain my thinking on that

2    a little bit?

3        Q.   Yes.

4        A.   Back many years ago when I was in practice patients

5    coming in for heart surgery, bypass grafting, valve repairs,

6    they had very fragile hearts.  They couldn't tolerate much

7    stress one way or the other.  And that includes the stress of

8    inducing anesthesia.  But Fentanyl is what we call a very

9    hemometrically dynamic stable drug.  It doesn't affect blood

10   pressure, heart rate much.  And often time we would give these

11   patients masses doses of Fentanyl.  And that would be

12   sufficient for them to undergo the heart procedure up to the

13   point where they were put on heart bypass.  And by that I mean

14   the surgeon was able to make an incision down the sternum

15   below the chest, and take a bone saw, cut that bone in half

16   and split the chest open and all without an increase in heart

17   rate or blood pressure.  And that would typically take

18   50 micrograms per kilogram in an adult.

19        So a 70 kilogram adult, which was 154 pounds, they

20   would get 3 1/2 milligrams of Fentanyl.  An 80 kilogram adult,

21   someone that's 176 pounds, they would get 4 milligrams of

22   Fentanyl.  And while we're pushing that drug, it's a massive

23   volume of Fentanyl.  They start -- you start to see all the

24   side effects.  In particularly, the respiratory depression,

25   they stop breathing.  And that's normal before we get to the

117

1   end of the dose.  You'll see that after a couple hundred

2   milligrams.  But we're ready to intervene that.

3       Q.   To qualify, you start seeing those symptoms after a

4   couple hundred milligrams --

12:00:41  5       A.   Yes.

6       Q.   -- or micrograms?

7       A.   I'm sorry.  Micrograms.

8       Q.   And in that scenario they would die unless there

9   was intervention as far as the breathing aspect of it.

12:00:53 10       A.   Correct.

11       Q.   So jumping back to that example of maybe 1 to 4

12   milligrams of Fentanyl you stated that there was a likelihood

13   of suffering serious adverse health consequences or death if

14   there wasn't intervention.  If that individual was drinking a

12:01:12 15   fifth of vodka or alcohol would that generally change the risk

16   of death or adverse health consequences?

17       A.   No.  The alcohol is also a respiratory depressant,

18   so it might hasten death.  But it would be more the icing on

19   the cake than the cake.  The Fentanyl would be the chief part

12:01:34 20   for that.

21            MR. BURGGRAAF:  No further questions.

22            THE COURT:  Cross-examine?

23            MR. SAM:  I have no questions, Your Honor.

24            THE COURT:  Thank you.  You may step down.  And you

12:01:46 25   can be excused.

118

1                    And we'll take a lunch break about 30 minutes.

2                    (Whereupon, the jury left the court proceedings.)

3                    THE COURT:  We'll be in recess for about 30

4         minutes.

12:02:26  5          (Whereupon, requested testimony concluded.)

6                         *   *   *   *   *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

119

```
 1    STATE OF UTAH          )

 2                           ) ss.

 3    COUNTY OF SALT LAKE    )

 4              I, KELLY BROWN HICKEN, do hereby certify that I am

 5    a certified court reporter for the State of Utah;

 6              That as such reporter, I attended the hearing of

 7    the foregoing matter on August 22, 2019, and thereat reported

 8    in Stenotype all of the testimony and proceedings had, and

 9    caused said notes to be transcribed into typewriting; and the

10    foregoing pages number from 4 through 119 constitute a full,

11    true and correct report of the same.

12              That I am not of kin to any of the parties and have

13    no interest in the outcome of the matter;

14              And hereby set my hand and seal, this ____ day of

15    _____ 2019.

16

17

18

19

20              _____
                      KELLY BROWN HICKEN, CSR, RPR, RMR
21

22

23

24

25
```

120

```
1                    IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4

     UNITED STATES OF AMERICA,      )
5                                    )
              Plaintiff,             )
6                                    )
          vs.                        )
7                                    )
     AARON MICHAEL SHAMO,            )   Case No:  2:16CR00631
8                                    )
              Defendant,             )
9    _____  )
                                     )
10                                   )

11

12

13

14

15

16          BEFORE THE HONORABLE DALE A. KIMBALL

17
                    August 13, 2019
18
                       JURY TRIAL
19             TESTIMONY OF JESSICA GLEAVE
          TESTIMONY OF ALEXANDRYA MARIE TONGE
20

21

22

23

24                  Reported by:
          KELLY BROWN HICKEN, RPR, RMR
25                  801-521-7238
```

1

```
 1                    APPEARANCES OF COUNSEL

 2

 3   FOR THE UNITED STATES:        OFFICE OF THE US ATTORNEY

 4                                 BY:  S. MICHAEL GADD

 5                                      VERNON STEJSKAL

 6                                      KENT A. BURGGRAFF

 7                                      Attorneys at Law

 8                                 111 SOUTH MAIN ST STE 1800

 9                                 SALT LAKE CITY, UTAH 84111

10

11   FOR THE DEFENDANT:            SKORDAS & CASTON

12                                 BY:  GREGORY G. SKORDAS

13                                      KAYTLIN V. BECKETT

14                                      Attorneys at Law

15                                 560 SOUTH 300 EAST STE 225

16                                 SALT LAKE CITY, UTAH

17

18

19

20

21

22

23

24

25
```

2

```
 1                        I   N   D   E   X

 2     WITNESS                 EXAMINATION BY          PAGE

 3     JESSICA GLEAVE          DIRECT BY GADD          5

 4                             CROSS BY BECKETT        19

 5     ALEXANDRYA MARI TONGE   DIRECT BY STEJSKAL      28

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
          1                SALT LAKE CITY, UTAH, TUESDAY, AUGUST, 13, 2019

          2                          *   *   *   *   *

          3        (TESTIMONY GIVEN AND NOT ORDERED AND NOT TRANSCRIBED.)

          4                MR. GADD:  Your Honor, the United States calls
09:24:49  5     Jessica Gleave.

          6                THE COURT:  Somebody is getting her, I assume?

          7                MR. GADD:  It's always an act of faith when you

          8     announce something like that.

          9                THE COURT:  Come forward and be sworn, please,
09:25:14 10     right here in front of the clerk of court.  Right here.

         11                THE CLERK:  Please raise your right hand.

         12                          JESSICA GLEAVE,

         13           called as a witness at the request of Plaintiff,

         14             having been first duly sworn, was examined
09:25:29 15                     and testified as follows:

         16                THE WITNESS:  I do.

         17                THE CLERK:  Come around to the witness box right

         18     here.

         19                Please state your name and spell it for the record.
09:25:44 20                THE WITNESS:  Jessica Gleave.  J-E-S-S-I-C-A,

         21     G-L-E-A-V-E.

         22                THE COURT:  Go ahead, Mr. Gadd.

         23                MR. GADD:  Thank you, sir.

         24     //
09:25:53 25     //
```

4

DIRECT EXAMINATION

BY MR. GADD:

Q.   Good morning.

A.   Good morning.

09:25:55   Q.   Thank you for coming this morning.  Are you
prepared to testify about your part in the investigation of
drug packages that are linked to Mr. Aaron Shamo?

A.   Yes.

Q.   Before we do that could you tell us just a little

09:26:09   bit about yourself?

A.   My name is Jessica Gleave.  I grew up in Arizona.
I was going to school, moved here when I was 19 to go to
school for dental hygiene and then decided to pursue a career
in eyelash extensions.  And I decided I loved it here, so I

09:26:30   stayed here and have been here ever since.

Q.   Let's talk for a minute about relationships.  Do
you know Mr. Shamo?

A.   Yes.

Q.   There's a chart right next to you, you can see

09:26:43   there.  That's Exhibit 17.06.  Who else do you know on this
chart?

A.   I know Luke Paz and Drew Crandall.

Q.   And how about on the bottom row?  Who do you know
on the bottom row?

09:27:00   A.   Julian* Mausia, and I recognize a couple other

5

1    people, but I don't necessarily know them.

2         Q.    And for these jurors will you point out your

3    picture on the chart?

4         A.    I'm just right here.

09:27:14  5    Q.    You mentioned the gentleman next to you on the

6    chart, Mr. Mausia.  And I think you say Mausia?

7         A.    Mausia, yeah.

8         Q.    Mausia.  I'll do better.  What was your

9    relationship with Mr. Mausia in 2016?

09:27:30  10   A.    We were boyfriend/girl friend.

11        Q.    Are you still now?

12        A.    No.

13        Q.    What type of relationship did you have with

14   Mr. Shamo?  Was it a social relationship?

09:27:44  15   A.    Yeah.  We were good friends.

16        Q.    You'd hang out together?

17        A.    Yeah.

18        Q.    Go to clubs together?

19        A.    Yes.

09:27:51  20   Q.    Party together?

21        A.    Yes.

22        Q.    Travel together?

23        A.    Occasionally, yes.

24        Q.    At some point in your relationship with Mr. Shamo

09:28:04  25   it transitioned from being strictly a social relationship to a

6

|   |   |
|---|---|
| 1 | business relationship of sorts; correct? |
| 2 | A.   Yes. |
| 3 | Q.   Did you accept packages on Mr. Shamo's behalf? |
| 4 | A.   Yes. |
| 09:28:16 5 | Q.   Can you tell us how you first got involved with |
| 6 | that? |
| 7 | A.   It came to my attention that my -- Julian was |
| 8 | accepting packages for him and he had told me about it, and so |
| 9 | eventually I decided that I wanted to, as well, and that's how |
| 09:28:36 10 | I found out about it. |
| 11 | Q.   When Mr. Mausia first told you that he was |
| 12 | accepting packages from Mr. Shamo how did you feel about it? |
| 13 | A.   I was mad. |
| 14 | Q.   Why were you mad? |
| 09:28:48 15 | A.   Because he had lied about it to me, and he was my |
| 16 | serious boyfriend that I was in love with so I was hurt, and |
| 17 | one of my good friends, so I felt mad about it.  But.... |
| 18 | Q.   You knew there was something to these packages |
| 19 | then? |
| 09:29:05 20 | A.   What do you mean? |
| 21 | Q.   They weren't maybe legal? |
| 22 | A.   Possibly, yeah.  I didn't know.  But, yeah, I |
| 23 | thought maybe. |
| 24 | Q.   Did you try to talk Julian out of it? |
| 09:29:21 25 | A.   I honestly don't remember.  I was mad, but |

7

```
 1    obviously I ended up doing it, as well, so I wasn't that upset
 2    about it, but....
 3          Q.   And when you finally made that decision to receive
 4    packages yourself what was your arrangement with Mr. Shamo?
 5          A.   So I would get a package just randomly, they would
 6    just come.  And whenever I received one I would let him know,
 7    and then he would either come pick it up or I would bring it
 8    to him in exchange for money.
 9          Q.   How much money would he pay you for a package?
10          A.   2- to $300.
11          Q.   Did he pay you in cash?
12          A.   Yes.
13          Q.   And when you would exchange the packages where
14    would you exchange them?
15          A.   He would either come pick them up from me or I
16    would bring them to him.  It was different every time.
17          Q.   Did Mr. Shamo ever tell you what was inside of the
18    packages that you were receiving?
19          A.   No.
20          Q.   Was anyone ever with Mr. Shamo when you'd exchange
21    packages for money?
22          A.   No.  Occasionally there would be -- well, like I
23    said, we were friends so occasionally sometimes we would
24    exchange them before we would go out or whatever we do, so
25    there would be friends there.  But not anyone there specific,
```

09:29:41 5
09:30:02 10
09:30:14 15
09:30:27 20
09:30:54 25

8

no.

Q.   Looking back how many packages total do you think you received from Mr. Shamo?

A.   Probably around 10 to 15 packages.

Q.   And I know you won't know the exact number, but how many packages do you know of that Julian received?

A.   I honestly don't know because he didn't tell me about it, so I legitimately don't know.

Q.   Don't know an exact number.  Do you have an estimate?

A.   It had to have been more, around 10 to 15 is what I received, and he received more than that because he had been doing it longer.  So I would say more than 10 to 15.

Q.   Was there a schedule to it, or did they come randomly?  What was your experience?

A.   It was just randomly.  There wasn't really a set schedule.  It would just be legitimately totally random.

Q.   You mentioned that you knew Luke Paz and Drew Crandall.  Did you interact with them socially, as well?

A.   Yeah.

Q.   Did they ever pay you money for packages?

A.   No.

Q.   Let's talk about a package that was taken at Texas Roadhouse.  I want to show you an, Exhibit 3.02.

Now, the jurors won't be able to see that well, so

9

```
 1    I need you to be essentially their eyes for a moment.  Who's

 2    name is on the package?

 3         A.   Julian Mausia.

 4         Q.   When you look at that package does that look like

 5    the type of packages that came in your name?

 6         A.   Yes.

 7         Q.   Does that package look like it came from China?

 8         A.   It says China on here.  I'm not really sure where

 9    it came from.  But other than the label itself saying China,

10    so yes.

11         Q.   Do you remember any of your labels saying China?

12         A.   A lot of them were in other languages, so it could

13    have been in Chinese, but I'm not really sure.  But....

14         Q.   Do you remember in the November of 2016 being asked

15    to come to Texas Roadhouse and then this package was taken?

16    Do you remember that experience?

17         A.   Being asked by Julian?

18         Q.   Were you asked by Julian to come bring the car?

19         A.   Yeah.

20         Q.   Can you tell the jurors just briefly kind of what

21    happened there?

22         A.   So I had dropped off, me and my boyfriend at the

23    time both were servers at Texas Roadhouse, and I dropped him

24    off to work.  We were sharing his car at the time because my

25    car, I was in the process of getting a new one.  And then so I
```

09:32:51 (line 5)
09:33:08 (line 10)
09:33:27 (line 15)
09:33:42 (line 20)
09:33:58 (line 25)

10

|  | 1 | dropped him off running some errands.  And then like an hour |
|---|---|---|
|  | 2 | or two into the shift he said, I'm done.  Come pick me up. |
|  | 3 | And I said, okay.  And I went and picked him up. |
|  | 4 | And then I was cut off by -- I looked -- I parked |
| 09:34:18 | 5 | the car and looked up, and there's all these black trucks in |
|  | 6 | front of me and agents knocking on my window and asking me |
|  | 7 | where the package was, which I wasn't even aware it was in the |
|  | 8 | car at the time.  So.... |
|  | 9 | Q.   Had Julian not told you that that package was in |
| 09:34:37 | 10 | the car? |
|  | 11 | A.   No. |
|  | 12 | Q.   You had a chance to spend some time with those |
|  | 13 | agents that night; right? |
|  | 14 | A.   Yes. |
| 09:34:43 | 15 | Q.   Maybe longer than you would have liked? |
|  | 16 | A.   Yeah. |
|  | 17 | Q.   But at some point you started to cooperate with |
|  | 18 | them to answer their questions; correct? |
|  | 19 | A.   Yeah. |
| 09:34:55 | 20 | Q.   Did you make the change when you were told about |
|  | 21 | the potential seriousness of what was inside of these |
|  | 22 | packages? |
|  | 23 | A.   Yes. |
|  | 24 | Q.   The follow day, you met with some additional |
| 09:35:06 | 25 | agents; right? |

11

```
  1              A.    Yes.

  2              Q.    And as part of a conversation there, did you agree

  3      to notify them if more packages arrived for you?

  4              A.    Yes.

09:35:15 5       Q.    And that, in fact, happened; right?

  6              A.    Yeah.

  7              Q.    For you and Julian.  Let me show you first

  8      Exhibit 4.02, and then I think I'll also bring 4.05 at the

  9      same time.

09:35:46 10            So the jury heard about this just a minute ago so I

 11      won't belabor it too much with you, but let's just briefly

 12      explain what happened here.  So another package came 4.02;

 13      correct?

 14              A.    Yes.

09:35:59 15      Q.    And you and Julian decided to call and turn that

 16      one over.

 17              A.    Yes.

 18              Q.    And you met agents and turned it over to them?

 19              A.    So it looks like 4.02 is the one that Julian

09:36:12 20      received, so I'd actually never seen this one because I was

 21      out of town for Thanksgiving.  But this one was the one that I

 22      turned over.

 23              Q.    Let's talk about that one, 4.05.

 24              A.    Yeah.

09:36:24 25      Q.    That arrived.  And did you make the phone call or
```

12

1  did Julian to the agents?

2      A.   No.  I did.

3      Q.   And did you agree upon a place where you would meet

4  to turn the package over?

09:36:35  5      A.   Yes.

6      Q.   Where did you meet?

7      A.   We just met at a McDonald's like right above,

8  30 minutes from here just around the Point of the Mountain in

9  Draper.  I gave it to them there.

09:36:51  10      Q.   I want to talk to you now about another package,

11  this one found at Mr. Shamo's residence.  Had you previously

12  before his arrest been to Mr. Shamo's residence?

13      A.   Yes.

14      Q.   And when I say his residence, I mean the one on

09:37:05  15  Titian Way in Cottonwood Heights.  Is that the one you're

16  thinking of?

17      A.   Yes.

18      Q.   Could we look at Exhibit 13.09?  And then two of

19  the pages in there, Page 28, and then we'll look at Page 29.

09:37:43  20  Here we go.

21          Do you recognize the package in that picture;

22  right?  You can see that there?  It's on your screen?

23      A.   Yes.

24      Q.   And now if we can look at 29 so we can see a label.

09:37:55  25  Can we go one more?  There we go.

13

1          Do you see your name on that?

2     A.   Yes.

3     Q.   Is that an address that you at one point lived at?

4     A.   Yes, it is.

09:38:13  5     Q.   Is that an address that Mr. Shamo sent packages to

6  in your name?

7     A.   Yes.

8     Q.   How did a package with your name end up inside his

9  house?

09:38:23 10     A.   I delivered this package personally to him.

11     Q.   I want to ask you now about an exhibit from

12  Mr. Shamo's computer.  This one.

13          Can we look at Pages 30 and 31?  Sorry about that.

14  That one right there.  You got it.

09:39:12 15         Okay.  Did you ever go inside this room, his home

16  office?

17     A.   So I've seen a few rooms in his house.  I've never

18  seen it -- I'm not sure if it was set up this way when I was

19  in there, so honestly I don't know.

09:39:35 20     Q.   The rooms you did go in, did you see his TV?  Maybe

21  downstairs, did you ever see that?

22     A.   Yes.

23     Q.   The big TV?

24     A.   Yes.

09:39:45 25     Q.   You'd been upstairs through the front door in the

14

1 living room area?

2  A. Yes.

3  Q. I'm not sure on this room.  How about a room that

4 was locked sometimes with kind of reddish burgundy walls and

09:40:01  5 two pill presses inside of it, did you ever see that room?

6  A. No.

7  Q. Did you ever hear noises when you were hanging out

8 there, kind of pounding noises?

9  A. No.

09:40:12  10  Q. Okay.  Now back to this.  There's a document found

11 on the computer, and I want to ask you some questions about

12 it.  So, Ms. Laughter, if we could look at 14.35.

13   Take just a moment and take a look at that.  That's

14 the first page.  As you look at that, do you recognize this

09:40:42  15 document from something prior to November 22nd, 2016?

16  A. I honestly don't.

17  Q. If you look at the very bottom of this first page

18 and as we go onto the second page, it has your name on it;

19 right?

09:40:59  20  A. Yeah.

21  Q. And that's the beginnings of your address; right?

22  A. Yeah.

23  Q. Can we look the second page briefly?  And then how

24 about the name right below this one?  Do you recognize

09:41:23  25 Mr. Mausia's name?

15

```
         1          A.    Yes.

         2          Q.    And is that an address that you knew him to reside

         3    at at one point?

         4          A.    Honestly I don't know what his address was, but if

09:41:34 5    that's what it was, then, yes.

         6          Q.    You didn't write this document, though, did you?

         7          A.    No.

         8          Q.    Can we zoom out one last time?

         9          How about any of the other names or addresses on

09:41:48 10   there, are these people you know?

         11         A.    I recognize two of the names just from knowing some

         12   of his friends.  But I don't know them personally, and I

         13   wouldn't consider myself friends with them.

         14         Q.    Which are the two names that you recognized?

09:42:07 15         A.    I recognize Clint Perry* and Roy Stevens, and

         16   that's just because we have a big giant group of friends that

         17   we used to go out with a lot.  That's where I recognize the

         18   names from.

         19         Q.    When you would communicate with Mr. Shamo, so

09:42:22 20   changing gears now again, when you would communicate with him

         21   about, you know, about a package arriving or meeting up, how

         22   would you communicate with him?

         23         A.    We would either text or talk over an app called

         24   Telegram.

09:42:38 25         Q.    Why Telegram?
```

16

                    A.   Because it's just what he told me to contact him

on, and we had been talking over it for years as friends.  And

it's just what he told me he preferred communications on.

                    Q.   Was it that same for Julian?

09:43:00        A.   Yes.

                    Q.   Could we look at 14.14?  And then specifically if

we could go down to Page 6.

                    This is Telegram communications between Shamo and

Julian, but you're mentioned here and I want to ask you about

09:43:23   it.  So picking up at the top where the contacts saved as

Julian, Jessica's friend writes:  A really heavy one just came

in.  And then the owner of the phone, AS writes:  Nice.  Hey,

I want to see if Jess can get that packed tonight.  I might

head down tomorrow instead.  Is that cool?

09:43:40        Did you ever have an instance that you can recall

where Mr. Shamo would wait to pick up packages until he could

pick up one from both of you?

                    A.   Yes.

                    Q.   Let's take a minute now and talk about immunity.

09:43:57   So could we look at 23.04?

                    This is an immunity agreement; correct?

                    A.   Yes.

                    Q.   First written in June, but you signed it yesterday;

correct?

09:44:18        A.   Yes.

17

1775

1          Q.   You needed an attorney, before you can think

2    through this and make a decision you needed advice from an

3    attorney before you were going to sign it; right?

4          A.   I was definitely going to sign it before the

09:44:33  5    attorney, but yeah.

6          Q.   One of us wanted you to have an attorney; right?

7          A.   Yeah.

8          Q.   And the court appointed an attorney for you?

9          A.   Yes.

09:44:44  10         Q.   Are you comfortable with the terms in this

11   agreement?

12         A.   Yes.

13         Q.   Essentially you've agreed to testify, and the

14   United States has agreed not to use what you say against you

09:44:56  15   so long as you tell the truth.

16         A.   Yes.

17         Q.   I've also told your attorney that the United States

18   doesn't have plans to seek a charge against you for those

19   packages that you're looking at right there; correct?

09:45:08  20         A.   Yes.

21         Q.   Since that meeting with the agents, so November of

22   2016 until now, have you stayed in contact with the agents?

23         A.   Yes.

24         Q.   Have you been truthful with them?

09:45:28  25         A.   Yes.

18

```
          1          Q.   Let's talk now about maybe some of the harder

          2     questions.  You know the packages probably contained drugs;

          3     right?

          4          A.   Not necessarily drugs, but something illegal, yes.

09:45:47  5          Q.   So why did you help Aaron Shamo?

          6          A.   For money purposes only.

          7          Q.   Would you have helped him if you knew the packages

          8     contained Fentanyl?

          9          A.   No.

09:46:08 10               MR. GADD:  No further questions.  Thank you.

         11               THE COURT:  Thank you, Mr. Gadd.

         12               You may cross-examine Ms. Beckett.

         13               MS. BECKETT:  Yes, Your Honor.

         14                    CROSS-EXAMINATION

09:46:17 15     BY MS. BECKETT:

         16          Q.   Ms. Gleave, thank you for being here today.  Would

         17     it be a correct assessment to say that you're uncomfortable

         18     being here today?

         19          A.   It's not my favorite place to be, but I'm here

09:46:38 20     willingly.

         21          Q.   You were pretty good friends with Aaron, weren't

         22     you?

         23          A.   Yes.

         24          Q.   You guys knew each other for several years;

09:46:46 25     correct?
```

19

1     A.   Yes.

2     Q.   In fact, he dated your cousin for several years;

3 correct?

4     A.   Yes.

09:46:51 5     Q.   What's her name?

6     A.   Jillian Waltham.

7     Q.   Is that how you became friends through Jillian?

8     A.   Yes.

9     Q.   And you guys partied together?

09:47:02 10     A.   Yes.

11     Q.   Went out clubbing together?

12     A.   Yes.

13     Q.   Socialized a lot?

14     A.   Yes.

09:47:08 15     Q.   Before you ever became involved --

16     A.   Yeah.

17     Q.   -- in the events you're talking about here today;

18 correct?

19     A.   Yes.

09:47:17 20     Q.   And, in fact, it was you that approached Aaron

21 wanting to be involved; correct?

22     A.   Honestly I don't know.  I don't remember.

23     Q.   You remember discovering that your boyfriend at

24 that time Julian Mausia was receiving packages; correct?

09:47:39 25     A.   Yes.

20

1    Q.   And it was your testimony that you were upset that

2    he was receiving packages?

3    A.   Yes.  When I originally found out, yes.

4    Q.   Why were you upset that he was receiving packages?

09:47:49  5    A.   Because he lied to me about it and to my really

6    good friends doing something behind my back, so I wasn't

7    necessarily thrilled about it.

8    Q.   So he lied about receiving packages or the contents

9    of those packages?

09:48:08  10    A.   No.  He lied to me about receiving packages.

11    Neither me or Julian ever knew what was inside of them.  It

12    was a don't ask, don't tell policy.

13    Q.   But you were mad that he received mail?

14    A.   Yes.

09:48:22  15    Q.   We talked a little bit a second ago about you and

16    Aaron having a group of friends that would party together.  Is

17    that a correct assessment of your testimony?

18    A.   Yes.

19    Q.   What kind of partying did you do?

09:48:41  20    A.   What do you mean?

21    Q.   Go to clubs?

22    A.   Yes.

23    Q.   Are you a drug user?

24    A.   Occasionally.  Not avid drug user.

09:48:53  25    Q.   Ever tried cocaine?

21

|  | A. | Yes. |
|--|----|------|

1          A.    Yes.

2          Q.    Roxy?

3          A.    Yes.

4          Q.    Weed?

09:49:02  5          A.    Yes.

6          Q.    Xanax?

7          A.    Yes.

8          Q.    During this time period that you were receiving

9    packages and prior to that, you did those drugs?

09:49:10 10          A.    More prior to that, but yes.

11          Q.    And at that point in time you were working as a

12    server for Texas Roadhouse; correct?

13          A.    Yes.

14          Q.    Did you make a lot of money as a server?

09:49:23 15          A.    I wouldn't say a lot of money, but I do okay.

16          Q.    So when the opportunity arose for you to make more

17    money you jumped at it; correct?

18          A.    Yeah.

19          Q.    And after learning that your boyfriend at the time

09:49:39 20    was making money receiving packages you thought that was a

21    good option for you; correct?

22          A.    Not a good option, but an option, yes.

23          Q.    As opposed to getting another job?

24          A.    Yes.

09:49:52 25          Q.    Easy money for you?

22

```
         1        A.   Yeah.

         2        Q.   Even though you had some inkling about what was in

         3   those packages it didn't really matter because it was easy

         4   money; correct?

09:50:08 5        A.   Yes.

         6        Q.   That's why you never questioned it?

         7        A.   Yes.

         8        Q.   I believe it was your testimony that you had used

         9   the Telegram app to communicate with Mr. Shamo even before you

09:50:23 10  were involved in the events that you are discussing today; is

         11  that correct?

         12       A.   Yes.

         13       Q.   So it was an app that you guys uses even as

         14  friends; correct?

09:50:34 15       A.   Yes.

         16       Q.   Just a preferred method of communication, I believe

         17  you called it?

         18       A.   Yes.

         19       Q.   This exhibit that you're looking at right here next

09:50:47 20  to you, these photos, I apologize, I do not know the number on

         21  that one.

         22            MR. GADD:  17.06.

         23            MS. BECKETT:  17.06, thank you.

         24       Q.   BY MS. BECKETT:  I believe you stated that you know

09:50:58 25  Mr. Paz and Mr. Crandall; is that correct?
```

23

```
 1              A.   On these photos?

 2              Q.   Correct.

 3              A.   Yes.

 4              Q.   How are you familiar with Luke Paz?

09:51:07  5     A.   We all became friends at the exact same time like

 6     nine years ago.  We all met in Provo.

 7              Q.   How are you familiar with Mr. Crandall?

 8              A.   He was a weird friend of Aaron's that we met.

 9              Q.   Are you aware of Mr. Paz' role in this

09:51:28 10    organization?

11              A.   I wasn't, no.  And I'm honestly still not.

12              Q.   What about Mr. Crandall's?

13              A.   No.

14              Q.   I believe you discussed briefly a scenario where

09:51:45 15    you were stopped outside of Texas Roadhouse.  Do you remember

16     that part of your testimony?

17              A.   Yes.

18              Q.   You were detained by agents; correct?

19              A.   Yes.

09:51:53 20     Q.   Were you uncomfortable at that point in time?

21              A.   I mean, yeah.

22              Q.   It's okay.  It's expected.  Did you initially tell

23     the agents what your involvement was?

24              A.   No.

09:52:11 25     Q.   You withheld that information?
```

24

```
           1        A.   Yes.

           2        Q.   But later you decided to inform them what you

           3   believed your role was?

           4        A.   Yes.

09:52:26   5        Q.   During initial conversations with agents did they

           6   ever tell you that if you cooperated that you would not be

           7   charged?

           8        A.   Yes.

           9        Q.   Did that occur at that first meeting after Texas

09:52:42  10   Roadhouse?

          11        A.   Yes.

          12        Q.   They told you at that point in time that if you

          13   cooperated you would not be charged?

          14        A.   Honestly it was a real long time ago.  If it

09:52:56  15   wasn't, I don't know.

          16        Q.   It was around that time period?

          17        A.   I don't know.  Yeah.

          18        Q.   Okay.

          19        A.   I don't know if it was the exact night, but it was

09:53:05  20   around that time period, yes.

          21        Q.   So you knew almost immediately if you told them

          22   about other people that you would be safe; correct?

          23        A.   Yes.  But that means that I don't really know

          24   anything about anyone else, so....

09:53:24  25        Q.   So you gave them the only name you knew.
```

25

1        A.   I didn't give them any name.  It was told to me.

And so I started cooperating.

2   [con't]

3        Q.   You gave them Aaron Shamo's name, though; correct?

4        A.   I didn't give them anyone's name.  It was told to

09:53:42  5   me.

6        Q.   Aaron Shamo's name was told to you?

7        A.   Yes.

8        Q.   If we can go to Exhibit 23.04.  I believe that's

9   the immunity agreement.

09:54:00 10        You signed this yesterday; correct?

11        A.   Yes.

12        Q.   And this essentially solidifies what you were told

13   from the outset; correct?

14        A.   Yes.

09:54:13 15        Q.   Have you ever spent a day in jail?

16        A.   Yes, I have.

17        Q.   On this charge?

18        A.   No.

19        Q.   On this case?

09:54:21 20        A.   No.

21        Q.   So when agents initially detained you outside of

22   Texas Roadhouse you were allowed to go home and think about

23   it.

24        A.   Yes.

09:54:31 25        Q.   Then come back with any information you had later;

26

```
         1    correct?

         2         A.    Yes.

         3               MS. BECKETT:  Just one second, Your Honor.

         4               THE COURT:  Sure.

09:54:49 5               (Time lapse.)

         6               MS. BECKETT:  I have no further questions.

         7               THE COURT:  Thank you, Ms. Beckett.

         8               Mr. Gadd, any redirect?

         9               MR. GADD:  Nothing further.  Thank you.

09:55:08 10              THE COURT:  Thank you.  You may step down, and

         11   you're excused.

         12              THE WITNESS:  Thank you.

         13              THE COURT:  You can come and go as you please.

         14       (TESTIMONY GIVEN AND NOT ORDERED AND NOT TRANSCRIBED.)

12:50:41 15              THE COURT:  Government may call its next witness.

         16              MR. STEJSKAL:  We call Alex Tonge.

         17              THE COURT:  Come forward and be sworn, please,

         18   right up here in front of the clerk of court.

         19              THE CLERK:  Please raise your right-hand.

12:51:14 20                   ALEXANDRYA MARIE TONGE,

         21       called as a witness at the request of Plaintiff,

         22         having been first duly sworn, was examined

         23                 and testified as follows:

         24              THE WITNESS:  I do.

12:51:23 25              THE CLERK:  Come around to the witness box here.
```

27

```
            1                  Please state your name and spell it for the record.

            2                  THE WITNESS:  It's Alexandrya Marie Tonge.

            3       A-L-E-X-A-N-D-R-Y-A, M-A-R-I-E, T-O-N-G-E.

            4                  THE COURT:  You may proceed, Mr. Stejskal.

12:51:51    5                  MR. STEJSKAL:  Thank you, Your Honor.

            6                          DIRECT EXAMINATION

            7       BY MR. STEJSKAL:

            8            Q.   Your current occupation?

            9            A.   I'm an install manager at Main Street Office

12:51:59   10       Furniture.

           11                  THE COURT:  You need to speak up and right into the

           12       microphone so everybody can hear you.

           13            Q.   BY MR. STEJSKAL:  How about your previous

           14       employment before that?

12:52:07   15            A.   I worked at ebay in business development.

           16            Q.   And how long did you work at ebay?

           17            A.   For five years.

           18            Q.   Over what time period?

           19            A.   August 2012 through August 2017 -- or May 2017.

12:52:22   20            Q.   And you also have some military experience?

           21            A.   I do.

           22            Q.   What's that?

           23            A.   I served six years in the Utah National Guard.

           24            Q.   Over what time period?

12:52:31   25            A.   2013 through 2019.
```

28

```
      1          Q.    Do you know Katie Bustin?

      2          A.    I do.

      3          Q.    How do you know her?

      4          A.    She's my wife.

12:52:48  5      Q.    And did the two of you work together at ebay back

      6   in those years that you mentioned?

      7          A.    Yes, we did.

      8          Q.    And how did you -- did you form a relationship

      9   while you were there?

12:52:57 10      A.    Yes.  We were friends at first, and it formed

     11   beyond that later.

     12          Q.    Through your employment at ebay, did you come to

     13   know a man by the name of Aaron Shamo?

     14          A.    I did, yes.

12:53:13 15      Q.    How did you come to know him?

     16          A.    Through Katie.  He worked on a team with her there.

     17   So he was in the same department that I was working in at that

     18   time.

     19          Q.    And what did you know of him or about him at that

12:53:27 20   time?

     21          A.    Just that he was, you know, regular guy working at

     22   ebay.

     23          Q.    How about a gentleman named Drew Crandall?

     24          A.    Yes.  Worked in the same department.

12:53:40 25      Q.    As you or as --
```

1    A.   So at that time we all worked in the same

department.

3    Q.   Okay.  And what do you know about him?

4    A.   Same kind of thing.  Just someone that worked

12:53:51  5  there.

6    Q.   At some point did you and Miss Bustin become more

7  involved with Aaron Shamo in business relations?

8    A.   Yeah.  So when Aaron had left ebay he continued

9  living what seemed like a pretty normal lifestyle, didn't seem

12:54:21  10  to struggle with money, so we were kind of interested in what

11  business venture he was doing outside of ebay in order to do

12  that.

13    Q.   And how did you guys try to figure that out?

14    A.   Katie had asked Aaron, what are you up to?  What

12:54:36  15  are you doing?  How are you making money?  How are you living?

16  Type of thing.

17    Q.   And what response?

18    A.   He had mentioned that he was trading Bitcoin and

19  making money that way.  So....

12:54:49  20    Q.   Okay.  Anything beyond that that you became

21  involved in?

22    A.   Yes.  So we, you know, had kind of expressed

23  interest in getting involved, so he mentioned that he could

24  ship packages directly to us.  And if we brought them to him

12:55:04  25  he would give us a couple hundred bucks a package.

30

1    Q.    Do you recall where you had that conversation with

2  Mr. Shamo?

3    A.    In his BMW somewhere in Midvale, initially.

4    Q.    Any more talk about what was in those packages or

12:55:22  5  why he wanted you to do that?

6    A.    Not at that time.  I chose to kind of not push

7  beyond that initially to find out what was in that.

8    Q.    Okay.  What were your instructions then as far as

9  doing that for him?

12:55:36 10    A.    Don't open the packages, just bring them to him at

11  his house, let him now, hey, we got one, and meet up

12  somewhere.

13    Q.    Did that seem at all fishy to you when you started

14  doing that?

12:55:48 15    A.    Yeah.  Yeah.  It seemed, you know, kind of strange

16  that he would want something shipped somewhere else instead of

17  to him.

18    Q.    But you agreed to do it, anyway?

19    A.    Yeah.

12:55:58 20    Q.    How come?

21    A.    I was kind of in a tight position financially.

22    Q.    Take your time.

23          So because of that you decided you would go ahead

24  and no questions asked?

12:56:46 25    A.    Yeah.

31

1    Q.   Who told you what you would be paid and how you

2   would be paid?

3    A.   Aaron was who we communicated with.

4    Q.   And before I forget, can you identify Aaron Shamo

12:57:03  5   in the courtroom here today?

6    A.   Yeah.  He's sitting in the black suit over there,

7   black tie.

8    Q.   At the end of counsel table?

9    MR. STEJSKAL:  May the record reflect that this

12:57:12 10   witness has identified the defendant Aaron Shamo?

11    THE COURT:  Yes.

12    MR. STEJSKAL:  Thank you, Your Honor.

13    Q.   BY MR. STEJSKAL:  How many packages do you believe

14   you received in that manner?

12:57:24 15    A.   Four to five packages.

16    Q.   And how would they come?

17    A.   So initially they would just, a little random.  I

18   mean, shipped in a brown box with what seemed like a normal

19   shipping label.  Chinese writing on some of them.  Envelopes.

12:57:47 20    Q.   And you would receive them.  And then what would

21   you do with them once they came in your possession?

22    A.   Katie would reach out to Aaron and say, hey, we've

23   got a package.  When do you want to meet up so we can give it

24   to you?

12:58:01 25    Q.   When would you meet Mr. Shamo to deliver those

32

```
        1    packages?

        2         A.   We met him in his car or at his out in SugarHouse.

        3         Q.   How would you get paid?

        4         A.   In cash.

12:58:13 5         Q.   By whom?

        6         A.   By Aaron.

        7         Q.   And who were those packages addressed to?

        8         A.   I believe they were addressed to Katie.

        9         Q.   And did you move sometime in 2015?

12:58:33 10        A.   We did, yes.  We lived in Riverton, and we moved to

       11    South Jordan in Day Break.

       12         Q.   And can you tell us the address?

       13         A.   Yeah.  116 -- 11469 South Open View Drive.  Sorry.

       14         Q.   And just for perspective that's the place that the

12:58:53 15   police ultimately came to?

       16         A.   Yes.  Yeah.

       17         Q.   While you were living at that residence, were you

       18    still having some financial difficulties?

       19         A.   Yes.  They had minimized.  Initially my mom was

12:59:09 20   sick.  She was in the hospital for six months.  She's a single

       21    parent, so it was just me and her, and so I felt, you know,

       22    the need to try to take care of her.  So we had initially been

       23    living together in Riverton, and she got her own place in

       24    South Jordan.

12:59:36 25        Q.   Your mom did, and you guys got your own place.
```

33

1  A. Yeah.

2  Q. Did there come an opportunity to make more money

3 with Mr. Shamo?

4  A. Yes.

12:59:45 5  Q. How did that come about?

6  A. In a conversation that myself, Katie, Aaron and

7 Drew had to do more for kind of what they were trying to build

8 and give us a background on what they were doing.

9  Q. Do you recall approximately when that conversation

13:00:03 10 took place?

11  A. I believe in May of 2015 or June shortly after we

12 had moved to South Jordan.

13  Q. Okay. And do you recall where that conversation

14 took place?

13:00:18 15  A. Yes. In the basement of the SugarHouse where Aaron

16 and Drew lived.

17  Q. And what was the proposition? What was the

18 business arrangement?

19  A. That we would package product for them and ship it

13:00:34 20 out to, you know, buyers that are purchasing from them online.

21  Q. And how were you going to get paid?

22  A. In cash.

23  Q. Do you recall how much initially was promised?

24  A. I believe we started at a thousand a month or a

13:00:51 25 thousand every two weeks, so a thousand per person per month.

34

```
 1              Q.    Okay.  And who would pay you?

 2              A.    Aaron would pay us.

 3              Q.    So how did you get started or trained in performing

 4        that operation?

 5              A.    After that conversation at the residence they said

 6        that they would set up a time to bring, you know, product over

 7        to our house so that they could teach us how to do it.  And so

 8        that was scheduled.  And Drew's actually the one that brought

 9        all of that product over.

10              Q.    Okay.  So initially Drew came over to your house in

11        Daybreak?

12              A.    Yes.

13              Q.    Drew Crandall?

14              A.    Yes.

15              Q.    And what did he bring and what did he show you?

16              A.    Brought a tote full of drugs to ship out, brought

17        envelopes, mylar bags, heat press, postage.

18              Q.    And at that period of time how was communication to

19        take place between you and Mr. Shamo?

20              A.    Via Telegram.

21              Q.    Tell us what Telegram is.

22              A.    It's a texting app that can be used in an

23        encryption mode.  It's not detectable or easily readable.

24              Q.    So in lay terms how does that work?  So if you send

25        a text what happens?
```

13:01:15 (line 5)
13:01:32 (line 10)
13:01:39 (line 15)
13:02:06 (line 20)
13:02:25 (line 25)

35

1    A.    So it's just -- from my understanding, so it's just

2    sent almost like a normal text but you open a different app.

3    But it's kind of a locked -- it's a locked down app.  You've

4    got to be able to erase everything or send secret messages so

13:02:49  5  instead of your phone.  You know, anyone in the government can

6    have access to that or see messages or whatever.  It allows

7    for that not to happen.

8    Q.    So the idea is it's more secure or secret than

9    regular text messages.

13:03:03  10  A.    Correct.

11    Q.    Whose idea was it to communicate through that

12    program?

13    A.    Aaron's.

14    Q.    Did he specifically tell you guys?

13:03:14  15  A.    Yeah.  He showed us the app to download and kind of

16    how to use it.

17    Q.    And gave you instructions that that's what you were

18    to communicate with?

19    A.    Yes.

13:03:22  20  Q.    Is there also something called Sigaint?

21    THE COURT:  Called what?

22    MR. STEJSKAL:  Sigaint, S-I-G-A-I-N-T.

23    Q.    BY MR. STEJSKAL:  Does that sound right?

24    A.    Yes.

13:03:35  25  Q.    What's that?

36

```
 1            A.   It's an e-mail on the Dark Web.  So like a Gmail,
 2       but in an area that's nondetectable.
 3            Q.   So in lay terms sort of like the Telegram app for
 4       text messages it's sort of that for e-mail?
13:03:56 5       A.   Correct.
 6            Q.   Let's look at Exhibit 15.07.  Just looking at that
 7       page there can you tell us what that is?
 8            A.   Yeah.  That's what the e-mail interface looked
 9       like.
13:04:19 10      Q.   That's --
11            A.   I believe that was ours.  It's the, pass the peas.
12            Q.   Tell us what you mean by that.  It says
13       passthepeas@sigaint.org.  What is that?
14            A.   That was the e-mail address that was given to us to
13:04:36 15      use.
16            Q.   Given to you by whom?
17            A.   By Aaron.
18            Q.   And that's how you were to receive e-mail messages?
19            A.   Correct.
13:04:44 20      Q.   Let's go all the way to the last page.  It might be
21       a blank page, so it might be the second-to-the-last page.  And
22       starting at subject there, if you can focus that in.
23            A.   So that was how to get everything set up so we
24       could have access to it from our computer at our house.
13:05:13 25      Q.   So reading that down there, the text, it's
```

37

```
 1   basically, here's what you've got to do?

 2        A.   Yeah.

 3        Q.   So did you guys receive this message?

 4        A.   We did receive it.  Drew sent it to himself and set

 5   it up on our computer.

 6        Q.   At your house?

 7        A.   Correct.

 8        Q.   And then kind of showed you how to use it?

 9        A.   Right.

10        Q.   What does it mean by, open the GPG Keychain

11   program?

12        A.   So that's the program to use to read encrypted

13   message that are sent as documents.

14        Q.   So you have to be some kind of a key to be able to

15   un-encrypt and read these messages?

16        A.   Yes.  It's kind of like a USB key that you click

17   and put in.

18        Q.   And you were given that by then?

19        A.   Correct.

20        Q.   You said your address was, pass the peas; correct?

21        A.   Yes.

22        Q.   Do you recall what Mr. Shamo's was?

23        A.   American Steam, I believe?

24        Q.   Okay.  And again, what kind of things would you

25   communicate with Mr. Shamo over this e-mail system?
```

13:05:25   5
13:05:34  10
13:05:54  15
13:06:09  20
13:06:28  25

38

1    A.   Orders were sent via this e-mail.  Or if there were

2    things that needed to be addressed like if there was a

3    customer service issue, it would be sent through here.

4    Q.   Okay.  All right.  So let's shut that down.

13:06:52  5    So when this operation, I guess when you initially

6    got involved here it looks like in June or July of 2015, tell

7    us what kind of packaging materials you were using at that

8    time.

9    A.   Priority envelopes, non-padded, and mylar bags to

13:07:14  10    put the product in.

11    Q.   So some of those yellow padded envelopes?

12    A.   It ended up being, yeah.

13    Q.   Okay.  So you said mylar bags.  Any other things

14    that you can think of?

13:07:30  15    A.   Like a makeshift invoice to put in with the

16    package.

17    Q.   Okay.  Let's look at Exhibit 11.00, 031.

18    Do you recognize that?

19    A.   I do, yes.

13:07:53  20    Q.   What is that?

21    A.   An invoice that we created to include with the

22    shipment that was sent out.

23    Q.   Okay.  Were you given instructions on using

24    invoices?

13:08:04  25    A.   Yes.  When Drew came over initially he had brought

39

1    some that they had already created to send out with their

2    packages.  I assumed they were already using it, so he kind of

3    brought over a format to use.

4         Q.    Did you change that over time?

13:08:21  5         A.    I did, yeah.

6         Q.    Why?

7         A.    Just kind of break things up, change how things are

8    going out.  There were concerns of packages being, you know,

9    intercepted, then change would happen.

13:08:37 10         Q.    Were you given instruction on that?

11         A.    Yeah.  Drew, you know, had mentioned, maybe we need

12    to change it up, not keep things the same.

13         Q.    And after Drew left the organization, did you

14    receive instructions from someone else?

13:08:52 15         A.    Yes.  Aaron kind of recommended, let's try coffee

16    beans in packages or Legos in packages to kind of change

17    what's being sent.

18         Q.    Let's also look at 7.02, I guess the first page.

19    Nope.  Let's try the second page.  There's a series of photos.

13:09:28 20    Is this 7.03?  Never mind.  Let's skip that for now.  Let's

21    look at 11.00, Page 26.

22         In the bottom left corner there we see some

23    Cheez-its and some cookies and things.  Do you see that?

24         A.    Yes.

13:10:07 25         Q.    What's that about?

40

1      A.   So we also used that because they are made of mylar

2   to put product actually in with those food items and then

3   reseal it and send those out.

4      Q.   So you talked about so there's cookies here,

13:10:24  5   there's chips.  It was the mylar bags that you wanted to put

6   the pills in?

7      A.   Yes.

8      Q.   And this is again towards the beginning of this in

9   the summer of 2015?

13:10:38  10      A.   Yes.

11      Q.   Did that change over time that you kind of quit

12   using these?

13      A.   Yeah.  Aaron had mentioned several complaints of,

14   you know, people getting cookies that were all spilled

13:10:52  15   everywhere, whatever, so we decided to change that.

16      Q.   Okay.  And you mentioned coffee beans a second ago.

17   Tell me about that.

18      A.   So inside the just the normal mylar bags we added

19   coffee beans.  So he ordered coffee beans somewhere online and

13:11:09  20   brought them over for us to use.

21      Q.   When you say "he" who was that?

22      A.   Aaron.

23      Q.   And it was like a giant bag of coffee beans?

24      A.   Yeah.  It was a burlap sack with coffee beans.

13:11:20  25      Q.   And you put a few in each package?

41

1     A.   Yes.

2     Q.   And that was per his instructions?

3     A.   Correct.

4     Q.   Talk about postage.  How did that work at the

13:11:33 5  beginning?

6     A.   So initially we would get the envelopes from the

7  post office and then have priority stamps.  And so we would

8  just stamp the envelope with that postage.

9     Q.   And were there times that you used regular stamps,

13:11:50 10  too?

11     A.   Yeah.  If we needed to increase the amount of

12  postage on that package.

13     Q.   Okay.  Let's look at 11.00, 029.

14          Do you recognize those being found at your house?

13:12:12 15     A.   Yes.  They were kind of I believe a counterfeit

16  postage that was purchased online rather than instead of

17  trying to get postage from the post office.

18     Q.   So who were those given to you by?

19     A.   By Aaron.

13:12:29 20     Q.   Okay.  And apparently they didn't work because they

21  were counterfeit?

22     A.   Yeah.  So we had several that were never used.

23     Q.   So just kind of put them in the closet?

24     A.   Yeah.

13:12:39 25     Q.   Okay.  Let's next look at Photo 33.  If we could

42

```
         1    zoom in a little bit.

         2           Can you tell what that is?

         3    A.    Yes.  That's a receipt from the post office for

         4    purchasing priority mail stamps.

13:13:01 5    Q.    And those look like a fairly sizeable dollar

         6    amounts there.  It looks like $580.50 on the top line.  Tell

         7    us about the amounts of postage you were going through.

         8    A.    We purchased that probably twice a week.  So

         9    sometimes Aaron would purchase it and give it to us.

13:13:24 10   Sometimes Drew would purchase it.  Sometimes we would purchase

         11   it and get reimbursed on Venmo.

         12   Q.    Okay.  But that was an important part of what you

         13   were doing having postage available.

         14   A.    Correct.

13:13:37 15   Q.    Couldn't really do your job without it.

         16   A.    Right.

         17   Q.    Did the postage get even more sophisticated later

         18   on in your participation?

         19   A.    Yes.  There was a website on the Dark Web that you

13:13:57 20   could purchase actual shipping labels and print them out, and

         21   it had to have the address going and coming.  And it would

         22   include the postage.  And you would purchase it via Bitcoin.

         23   Q.    And how did you get turned onto that?

         24   A.    So Drew suggested that we use that.  Aaron set us

13:14:23 25   up with the website, set us up with a Bitcoin wallet and would
```

43

2727

1    transfer Bitcoin to us in order to purchase the postage.

2           Q.    Do you recall what the website was called?

3           A.    Getusps.com.

4           Q.    Did you also try to track packages?

13:14:46  5        A.    Yes.

6           Q.    And let's look at Photo 47.

7                 Do you recognize that?

8           A.    Yeah.  Tracking is free to use if you use a

9    priority envelope.

13:15:03  10        Q.    Okay.  And those were found at your house on the

11   search warrant.  Do you recognize why those are there?

12          A.    Yes.  When we were doing postage that you buy at

13   the post office we would include a tracking label on each

14   package and then keep the bottom portion and write the

13:15:20  15   customer name with it so that if issues arose that could be

16   referenced.

17          Q.    If I understood you correctly you would save the

18   tracking number so if something came up you could figure out

19   from the tracking number what package it was that had

13:15:41  20   concerns.

21          A.    Correct.  See if it been delivered or not.

22          Q.    Okay.  Let's look at Photo 32 and Photo 37 and

23   Photo 38.  Can you tell us what those are?

24          A.    Those are label printers to use when using like

13:16:16  25   USPS because it would print on a sticker basically so you can

```
          1    stick that to the envelope or box.

          2         Q.   So it would print out the address and you would

          3    just paste it on there.

          4         A.   Correct.

13:16:32  5         Q.   Did you guys do that?

          6         A.   We could never get it to work properly.

          7         Q.   So how did you use it instead?

          8         A.   Just used a printer, just a normal standard printer

          9    and printed it out that way.

13:16:45 10         Q.   So you ended up with some extra labels that you

         11    couldn't use?

         12         A.   Yeah.  Label makers, yeah.

         13         Q.   In the closet with everything else?

         14         A.   Yeah.

13:16:55 15         Q.   How did you figure out return addresses?

         16         A.   So when Drew came over initially he said just pick

         17    a random address on Google Maps near the post office you want

         18    to use at that time and use that as a return address.  So

         19    every time was different.  Every day was different.

13:17:13 20         Q.   And did you kind of do that then?

         21         A.   Yeah.  Uh-huh (affirmative).  Once he kind of

         22    showed us how to do that he didn't come over every day, and I

         23    took that over.

         24         Q.   And were those individuals or companies or how did

13:17:29 25    you do that?
```

45

1    A.   So we kind of matched it with the invoice that we

2    were using, and we would use a company name.  But initially we

3    would just think of a random first and last name.

4    Q.   So like many things this seems to progress over

13:17:45  5    time, so at the beginning you used individual names and later

6    on you decided it would be company names?

7    A.   Correct.  Yeah.

8    Q.   Were you given some instruction on that?

9    A.   Yeah.  Just to make it more professional, you know,

13:17:57  10    conversations with Aaron on, what could we do to ensure

11    packages were arriving and not a red flag in a post office.

12    Q.   So would it be fair that he kind of gave you

13    directions on that?

14    A.   Yes.

13:18:14  15    Q.   And then how did that relate to where the packages

16    would be dropped off for delivery?

17    A.   So we would find post offices in that area.  So if

18    it's in South Jordan we would try to find blue boxes and post

19    offices in that area and drop it off like that.

13:18:34  20    Q.   And at the beginning here that we're talking about

21    the summer of 2015 and going forward from there, was that one

22    of you and Miss Bustin's tasks, as well, was to actually drop

23    them off?

24    A.   Yes.

13:18:48  25    Q.   This sounds kind of time consuming.

46

1          A.    Very.

2          Q.    Tell us about that.  How time consuming?

3          A.    At the beginning, you know, maybe an hour or two a

4     night, plus drop-off time.  And it progressed to three, four,

13:19:03  5     five hours depending on how many orders were happening that

6     day.

7          Q.    So you seem to say that there were fewer orders at

8     the beginning and the order numbers increased as time went on?

9          A.    Yes.

13:19:18  10          Q.    How about package sizes, did that seem to increase,

11     too, as time went on?

12          A.    Exponentially, yeah.

13          Q.    What do you mean by that?

14          A.    Initially maybe somebody was buying five or 10 of

13:19:30  15     something, and then we were shipping out hundreds and

16     thousands to one person.

17          Q.    By the end?

18          A.    Yeah.

19          Q.    You guys were still working at ebay, then, 2015

13:19:49  20     into 2016?

21          A.    Up until our indictment, yes.

22          Q.    And so how did that affect your quality of life, I

23     guess, working at ebay and doing this?

24          A.    Not much free time.  So working, going to school

13:20:05  25     full-time and doing this, as well.  Didn't leave for much of

47

1    social life outside of that.

2         Q.   Let's look at Exhibit 11.  Let's do Page 2.

3              Do you see that "ship to" address on there?

4         A.   Yes.  Aaron's address in Cottonwood.

13:20:40  5    Q.   And this was found with the search warrant at your

6    house.  So how did you come in possession of this thing?

7         A.   It was something that he ordered that we needed

8    paper, labels or something of that nature, and then brought it

9    over to our house.

13:20:54 10    Q.   Okay.  Let's look at Page 3.  Page 4.  There we go.

11             What's that?

12        A.   Mylar bags.

13        Q.   Page 5.  That's not Page 5.  That's Page 6, I

14   think.  That's Page 6.  Page 7.

13:21:32 15             What are we looking at there?

16        A.   The desk that we sat at to do orders.

17        Q.   And on the right side, those white things?

18        A.   The priority envelopes that we used.

19        Q.   So you used a bunch of those?

13:21:47 20    A.   Yeah.

21        Q.   42.  See that address again?

22        A.   Yep.

23        Q.   So was it fairly common for Mr. Shamo to order that

24   and bring that stuff over to you?

13:22:02 25    A.   Yes.  Yeah.

48

         1          Q.   That's really how you got most or all of that

         2   stuff?

         3          A.   Yeah.  Very seldom did we purchase something

         4   ourselves.

13:22:13 5          Q.   Was that 42?  43, same thing.  And 44.  Remember

         6   those stickers?

         7          A.   Yeah.  Aaron toyed around with the idea of putting

         8   those on packages so that things weren't crushed or again just

         9   change the look of the package that was going through.

13:22:39 10         Q.   And that was kind of early on you quit using those,

        11   too?

        12         A.   Yeah.

        13         Q.   How come?

        14         A.   Just seemed like more time for us.

13:22:50 15         Q.   Now, you said Mr. Crandall, Drew, had initially

        16   brought stuff over to you guys and showed you how to run

        17   things.

        18         A.   Yeah.

        19         Q.   And I believe you said that was in like late summer

13:23:04 20   of 2015?

        21         A.   Yes.

        22         Q.   Was there some point that Mr. Crandall planned to

        23   leave or was leaving the country?

        24         A.   Yeah.  Later that year in November he was getting

13:23:16 25   ready to go to New Zealand and do a working visa there.

                                                                          49

1    Q.   What did you know about that?  Where did you learn

2    about that from?

3    A.   I learned that from Aaron.  And he mentioned that

4    he bought Drew out for 30,000 to take over fully himself.

13:23:33  5    Q.   Okay.  And did Drew end up leaving then?

6    A.   He did, yes.

7    Q.   Where did that conversation take place about buying

8    Drew out and those things?

9    A.   At our house in our office.

13:23:47  10    Q.   And did that have any effect or change on what you

11    guys were going to be required to do, you and Ms. Bustin?

12    A.   Just assumed, you know, kind of more work less one

13    person running around to get things.  So Aaron would have to

14    be more involved in getting product to us or making decisions

13:24:11  15    and things like that.

16    Q.   Did your pay change over time?

17    A.   It did, yes.

18    Q.   Explain that.

19    A.   I think we had, you know, mentioned we were doing a

13:24:23  20    lot.  We're spending this much time.  I feel like getting more

21    money is worth it for him, for Aaron to pay us.  And I think

22    also if he felt discontent from us, that was kind of a

23    Band-Aid for him.  Give me some more money or let me pay you

24    more, try to fix things there with us that.

13:24:47  25    Q.   Did you complain at all to Aaron that it was taking

50

1808

```
 1    too much time or it was too hard?

 2         A.   Yeah, absolutely.

 3         Q.   Tell us about that.

 4         A.   Just conversations about, you know, if he didn't

 5    get any mail to us til 8:00 or 9:00 and we had three hours of

 6    work to do, you know, it was areas of frustration with him.

 7    And it got to the point where we just kind of said, you know,

 8    we don't really want to do this anymore.  It's too much.  It's

 9    too much pressure to do this.  And his response was, kind of

10    upset, you know, you can't do that to me.  You can't just

11    leave.  And at least let me get somebody in your position.

12    You can help train them.  I'll give you money for a

13    downpayment on a house, whatever I can do, type of response.

14         Q.   And this is later on in the --

15         A.   Yeah.  It was October, November, right before

16    everything came to a head.

17         Q.   Okay.  We'll get more into that later.  We'll try

18    to stay on progression here a little bit.

19         A.   Yeah.

20         Q.   So tell us about what you were shipping.  So at the

21    beginning do you recall what kind of items you were shipping?

22         A.   Yeah.  Yeah.  We shipped weed or Ecstacy, LSD.

23         Q.   By weed you mean marijuana?

24         A.   Yes.

25         Q.   What's Ecstacy?
```

51

```
         1        A.    Party drug.

         2        Q.    And what kinds of amounts were you shipping those

         3   things?

         4        A.    Small amounts.  You know, even one or two things at

13:26:25 5   a time or maybe 10 for a larger order, stuff like that.  So

         6   nothing extensive.

         7        Q.    Okay.  Let's look at Photo 41 on 11.00.

         8        Do you recognize that?

         9        A.    Yes.  Those were used to capsule MDMA.

13:26:52 10       Q.    And did you guys do that or did somebody else?

        11        A.    Initially Aaron or Drew did it.  They came

        12   pre-done, but that was something else that we had to do.

        13        Q.    And again, that was towards the beginning of your

        14   involvement in this organization?

13:27:07 15       A.    Correct.

        16        Q.    And then you guys quit doing that.

        17        A.    Yeah.

        18        Q.    So like these like many things ended up in the

        19   closet?

13:27:15 20       A.    Yeah.

        21        Q.    Okay.  So marijuana, LSD, MDMA.  Eventually did you

        22   move on to other things that you were shipping?

        23        A.    Yeah.  Xanax was the next kind of big thing.

        24        Q.    Tell us what that was.  What does that look like?

13:27:35 25       A.    Little white bar made of powder.
```

52

|  |  |
|---|---|
| | 1 |
Q.   And tell us about order sizes towards the beginning of Xanax.

A.   They were, you know, still kind of small, but they increased pretty easily, it seemed like.

13:27:55   Q.   And did you seem to do a lot of that?

A.   Yeah.

Q.   Did that become one of the primary products?

A.   Yes.

Q.   In fact, was that the primary product before Drew

13:28:06   left?

A.   Yes.

Q.   After Drew left, did the products change again?

A.   They did.

Q.   What happened?

13:28:12   A.   They turned into little blue capsules, circular capsules that were M Box, is what they were termed.

Q.   And did you know what M Box or Oxycodone was?

A.   He just said it was like Oxycodone.

Q.   Did you know outside of that from an injury or

13:28:36   something else what Oxycodone pills were?

A.   Yes.

Q.   How did you know?

A.   Previous relationship, been used.  Injury or when my mom was in the hospital that's what she used.

13:28:50   Q.   So you had seen those before?

1       A.   Yeah.

2       Q.   And they were Oxycodone?

3       A.   Yeah.

4       Q.   When this started, did you have any reason to

13:29:00  5    suspect that these were something other than Oxycodone?

6       A.   No.

7       Q.   And did you feel comfortable shipping those?

8       A.   Yeah.  I mean, to some extent.

9       Q.   Did Mr. Shamo give you an explanation for why he

13:29:16  10   was sending these to people?

11      A.   Yeah.  He kind of initially played off his, you

12   know, I'm a white collar drug dealer.  I'm trying to help

13   people that can't get medicine in a formal way that still need

14   it.

13:29:32  15   Q.   And did you believe that or did you think about

16   that some more?

17      A.   I did, you know, initially believe that seemed

18   right to me.  I mean, I also was trying to make myself feeling

19   better about what I was involved in.  So he kind of has a very

13:29:55  20   charismatic way of explaining things or, you know, trying to

21   calm you down and make you feel like, no, that's what we're

22   doing.  It's okay.

23      Q.   "He" meaning Aaron?

24      A.   Yes.

13:30:06  25   Q.   That's what he told you, and that sounded

54

```
         1    believable?

         2         A.   Yeah.

         3         Q.   Did you come to change that view based on what you

         4    were doing and quantities?

13:30:13 5         A.   Yeah.  Absolutely.  That's kind of what brought on

         6    discontent.

         7         Q.   Tell us about that.  How did you kind of conclude

         8    differently?

         9         A.   Doing that, you know, number of pills seemed

13:30:25 10   strange to me that someone would want to buy, you know, 1,000,

         11   2,000, 5,000 pills for an injury or, you know, something of

         12   that nature.

         13        Q.   Let's talk about pill press.  Do you know what that

         14   is?

13:30:52 15        A.   Aaron and Drew showed us the pill press that was

         16   used for Xanax initially when we were shipping that out.

         17        Q.   Where was that located when you saw it?

         18        A.   In the SugarHouse.

         19        Q.   On Murphy's Lane?

13:31:05 20        A.   Yeah.

         21        Q.   Where in the house, do you recall?

         22        A.   In the basement in a storage room off a door in

         23   Aaron's room and downstairs.

         24        Q.   And you said they were -- so that was before Drew

13:31:19 25   left, so they were only pressing Xanax at that time to your
```

55

```
  1    knowledge?

  2         A.   Correct.

  3         Q.   How was the sales done to your knowledge?  How was

  4    contact made with customers?

  5         A.   Through an online platform similar to ebay but on

  6    the Dark Web.

  7         Q.   Who ran that?

  8         A.   Aaron ran that.

  9         Q.   And how would that work, then?  Walk us through the

 10    process of how somebody orders and get drugs.

 11         A.   I assume -- I never saw the site online, but

 12    ordering through finding a listing basically saying, I want to

 13    buy that, providing information, Aaron receives the address,

 14    the order info and then passes that along.

 15         Q.   To whom?

 16         A.   To myself and Katie.

 17         Q.   And then what would you guys do?

 18         A.   Package the order that was referenced with the

 19    address.

 20         Q.   And then what?

 21         A.   Ship it out.

 22         Q.   And initially that was you guys, and then later

 23    somebody else took over that role?

 24         A.   Yeah.

 25         Q.   How was the money controlled?  Did you guys get
```

56

```
 1    money directly from these sales?

 2         A.   No.  We just got paid every other week in cash from

 3    Aaron.

 4         Q.   How did that cash get to you?  Like physically did

13:32:46  5   he pay you in cash with his hand?

 6         A.   Yeah.  There were times if he was, you know, around

 7    when we were home he would come in and give it to us then, or

 8    he would put it in my truck.

 9         Q.   So who was in charge of this operation?  Who gave

13:33:02 10   you instructions on how to do things?

11         A.   Aaron.

12         Q.   Now let's be clear.  Before Drew left Drew had some

13    involvement in that; correct?

14         A.   Yeah.  He had a role.

13:33:14 15        Q.   Okay.  And then after Drew left was it exclusively

16    Aaron?

17         A.   Yeah.  We didn't communicate with anyone else.

18         Q.   Did you know anyone in the organization?

19         A.   Knew of them, yeah.  Kind of put two and two

13:33:28 20   together to know who was involved.

21         Q.   Give us an example.

22         A.   Sean Gygi was the person that picked packages up

23    from us to drop them off.

24         Q.   Did you have much communication with Gygi?

13:33:40 25        A.   Just to let him know orders were ready.
```

57

1      Q.   How did you communicate with him?

2      A.   Katie would text him via Telegram and let him know.

3      Q.   Anybody else you knew in the organization?

4      A.   Yeah.  Mario Noble.

13:33:56 5      Q.   And how did you come to know that Mr. Noble was

6 part of the organization?

7      A.   Just kind of by chance.  Process of elimination in

8 a conversation that he had with Katie at work.  He saw the

9 Telegram app on her phone and kind of questioned, oh, why do

13:34:13 10 you use that?  What do you use that for?  And we knew that

11 Aaron and Mario were pretty good buddies.  Aaron kind of tried

12 to take him out and take him under his wing to help him with

13 girls and stuff like that.  So we kind of figured that is who

14 else would be involved.

13:34:31 15      Q.   Did you have any other contact with Mr. Noble?

16      A.   He would e-mail -- any customer service issues and

17 questions he would e-mail.

18      Q.   And we'll get to that specifically a little bit

19 later.

13:34:41 20        Did Mr. Shamo move from that SugarHouse location to

21 somewhere else?

22      A.   Yeah.  He moved to Cottonwood Heights.

23      Q.   And was that shortly after Drew left the country,

24 Mr. Crandall?

13:34:54 25      A.   Yes.

1    Q.    Have you been to the Cottonwood Heights home?

2    A.    I have.

3    Q.    What was that like?

4    A.    Pretty nice house.  But I'd only been in the living

13:35:06  5    room mostly and then into an office once.

6    Q.    Okay.  And did you know what was occurring over

7    there?

8    A.    I'm assuming -- I assumed the manufacturing of the

9    products that he was bringing to us.

13:35:24  10    Q.    Did Mr. Shamo upgrade your equipment at times when

11    something would break or you needed something else?

12    A.    Yeah.  Uh-huh (affirmative).

13    Q.    Let's look at Page 27 of 11.00.

14          What's that?

13:35:46  15    A.    It's a heat press to reseal or seal mylar bags.

16    Q.    What was the purpose of doing that?

17    A.    So nothing came out of that package so it was

18    sealed tight, air tight.

19    Q.    Okay.  Let's look at 34.

13:36:06  20          It's kind of a dark picture, but can you see that?

21    A.    Yeah.  That was the initial heat press that was

22    used.

23    Q.    Okay.

24    A.    Didn't work very well.

13:36:16  25    Q.    Had lots of frustrations with that one?

59

1          A.    Yeah.

2          Q.    So how did you get the other one?  How did you get

3    upgraded?

4          A.    Just by telling Aaron, hey, this really isn't

13:36:26 5    working for us.  Can you find another machine that we can use?

6          Q.    And he would take care of you when you had issues

7    like that?

8          A.    Yeah.  Yeah.

9          Q.    Let's look at Page 21.

13:36:43 10         Do you recognize that silver thing?

11         A.    Yeah.  It's a scale that we used to kind of weigh

12   out pills instead of having to count out 100, 200.

13         Q.    Let's look at 9.

14              What's that there on the right?

13:37:03 15        A.    Another version of a scale.  Better.

16         Q.    That's a better one?

17         A.    Yeah.

18         Q.    Okay.  So is that another upgrade that was provided

19   to you?

13:37:13 20        A.    Yes.

21         Q.    Why did you need a better scale?

22         A.    To be more precise so we weren't sending too much

23   or too little.

24         Q.    And as quantities increased did that become more

13:37:26 25   important?

60

```
 1          A.   Absolutely, yeah.

 2          Q.   So that silver one in Photo 21 just like everything

 3   ended up in the closet?

 4          A.   Yeah.

13:37:35  5   Q.   What was Mr. Shamo's demeanor like?  How did he act

 6   around you?

 7          A.   Very charismatic.  You know, fun to be around,

 8   friendly, happy.

 9          Q.   Did he try to solve your problems when you'd come

13:37:55 10  up with issues?

11          A.   Yeah.  Yeah.  You know, he was definitely a yes man

12   and wanted to take care of anything we brought up.

13          Q.   Did he sometimes give you extra money?

14          A.   Yeah.  Yeah.  You know, if we were -- did a lot of

13:38:11 15  orders or kind of complaining about the time being spent he

16   would give a couple extra hundred dollars.  I know you guys

17   are working hard, and here's a little bit extra to say thank

18   you.

19          Q.   Tell us about the progression in pay.  So I think

13:38:27 20  you said you guys were getting 500 or 1,000 at the beginning.

21   How did that progress?

22          A.   Normally in, you know, every couple months, a

23   couple hundred dollars more, I don't remember the exact

24   increments, but I know we ended up at $3500 biweekly.

13:38:50 25  Q.   Between the two of you?
```

61

```
 1            A.    Correct.

 2            Q.    So roughly 7,000 a month between the two of you?

 3            A.    Yes.

 4            Q.    And that was towards the end you said?

13:39:01 5    A.    Yeah.  It was only the last couple months, maybe.

 6            Q.    And things had more or less steadily progressed

 7       from the beginning to that point?

 8            A.    Yeah.

 9            Q.    Was that mostly in response to Mr. Shamo's

13:39:15 10   generosity, to you guys complaining, to the workload shifting?

11       What was the reason for those?

12            A.    A little bit of everything.  Obviously he saw the

13       amount of orders coming in, and we talked about it and would

14       ask, hey, you know, can we get a little extra money every

13:39:31 15   month?  We're doing a lot.  He said, yeah, yeah, we'll work on

16       it.  I'll think about it and I'll let you know.  And then

17       raises would come.

18            Q.    Okay.  At some point during 2016 did you tell

19       Mr. Shamo you were done delivering to the post offices?

13:39:49 20   A.    Yes.

21            Q.    Tell us about that conversation.

22            A.    It was a conversation that Katie and I had, and she

23       just wanted to minimize our involvement continuously and

24       expressed frustration to have to do what seemed like

13:40:05 25   everything.  So we reached out and said, you know, we would
```

62

1    really like someone to be a runner and take packages so we

2    don't have to do that, as well, minimize our involvement or,

3    you know, risk.

4          Q.   When you say you reached out you reached out to

13:40:21  5    whom?

6          A.   To Aaron.

7          Q.   And had a conversation with him about it?

8          A.   Correct, yeah.

9          Q.   And what was his response?

13:40:26  10          A.   He said, yeah, I'll find a runner for you.  I'll

11    see, you know, there's probably someone who wants to be more

12    involved that could be a perfect fit that can do that.

13          Q.   Did that end up happening?

14          A.   Yes.

13:40:38  15          Q.   Who did he get?

16          A.   Sean Gygi.

17          Q.   What was the timeframe of Mr. Gygi taking over that

18    role roughly?

19          A.   Handful of months before November, so not too long

13:40:51  20    but several months.

21          Q.   Handful of months, probably the summer of 2016?

22          A.   Yeah.

23          Q.   And again, how would that work?  How would you

24    communicate with Mr. Gygi?

13:41:03  25          A.   Once we finished packing orders for that day Katie

63

1    would send a message via Telegram to Sean to let him know they

2    were ready.

3          Q.    So by that time were orders getting bigger?

4          A.    Yeah.  A lot bigger.  A lot more orders, you know,

13:41:22  5    50, 60, 70 orders a day and large quantities.

6          Q.    Did you guys still have to package and prepare all

7    of those for shipping?

8          A.    Correct.  Yeah.

9          Q.    How would you get the packages to Mr. Gygi?

13:41:37  10          A.    We would put them in boxes on the front porch, and

11    then he would pick them up from the porch.

12          Q.    How would you communicate to them?

13          A.    Telegram.

14          Q.    Again can you explain briefly what that is?

13:41:47  15          A.    Encrypting messaging through a specific app.

16          Q.    Tell us about how the drugs that you were shipping

17    would get to your house.

18          A.    So either Aaron would bring them over in a duffle

19    bag or a box or he put them in my truck either at --

13:42:11  20    that was parked at ebay or parked in front of our house.

21          Q.    And how would he have access to your truck?

22          A.    Via pin pad on the door.

23          Q.    So you didn't have to be there?

24          A.    No.

13:42:23  25          Q.    You could just --

64

```
 1        A.   Drop it off, yeah.

 2        Q.   And I'm sorry.  You said a duffle bag?

 3        A.   Yeah.

 4        Q.   Often times that's how drugs would get to you?

13:42:33  5   A.   Correct.  Yeah.

 6        Q.   So would you have frequent contact with Mr. Shamo

 7   when the drugs were delivered, or was it more often that he

 8   would do it that way and just kind of give them to you in your

 9   truck?

13:42:47 10   A.   It was more often that he would give it to us in

11   the truck because with orders being as large as they were and

12   frequent as they were it needed to happen more often, and he

13   said he would be running behind on getting it pressed and

14   would try to get it out to us.

13:43:03 15   Q.   And you guys were working full-time at ebay at that

16   time?

17        A.   We were, yes.

18        Q.   Was he working at that time?

19        A.   He was not.

13:43:09 20   Q.   So this was his thing?

21        A.   Full-time, yeah.

22        Q.   Tell me about customer service.  So how -- would

23   you put the addresses in the computer to make the shipping

24   labels?

13:43:27 25   A.   Correct.  Yeah.  Based on an e-mail that was sent
```

65

to us with the order information.

Q.   Okay.  You would type it into that USPS?

A.   Yes.

Q.   And what kind of response would you get from that

program?

A.   It would either say it was a valid address or this

is actually the correct zip code or address unknown.

Q.   And by address unknown it's like an invalid address

that you shouldn't ship to.  Is that your interpretation?

A.   Yeah.

Q.   What would you do with those?

A.   Just keep a record of them and then send it back

via e-mail and say, this address isn't valid.

Q.   Who would you send those to?

A.   Back to Aaron.

Q.   By what means?

A.   By the Sigaint or whatever.

Q.   Sigaint.  I'm not sure exactly either, but the

e-mail?

A.   Yeah.

Q.   And then would Mr. Shamo get back to you on how to

deal with those address issues?

A.   Yeah.  He would reach out to the customer or have

someone reach out to the customer to get a correct address,

and then say, these are the updated addresses.  Now you can

66

1    ship that order.

2    Q.   And were there other customer service issues you

3    deal with, as well?

4    A.   None that we really dealt with, but they were

13:44:50 5    messages that we would see in an e-mail that he would include,

6    you know, happy customers or, hey, can you throw in a sample

7    of this, or, can you send extras?

8    Q.   And how were the roles between you and Ms. Bustin

9    separated?  What did you guys kind of do?

13:45:13 10    A.   So I would do all the addressing, labeling, put the

11    invoice in, pull the orders and un-encrypt them.  And then she

12    would have a paper in front of her of what the order was, and

13    she would count it out and put it in a mylar and press it and

14    give it to me.

13:45:35 15    Q.   And seal it back in the envelope and ready to be

16    shipped in a box?

17    A.   Yeah.

18    Q.   Let's look at Photo 8 from 11.00.  And if you could

19    focus in on that paper on top of the --

13:45:52 20    Can you tell us what that is?

21    A.   That's what the printout of the orders would look

22    like once it was unencrypted.

23    Q.   So how would it get unencrypted again?

24    A.   Through an encryption key on the computer that we

13:46:07 25    had.

67

```
 1              Q.   So you were given the key to un-encrypt encrypted
 2    e-mail; correct?
 3              A.   Yes.
 4              Q.   And you would put the key in and un-encrypt it?
 5              A.   Correct.
 6              Q.   And then this is what would printout?
 7              A.   Yeah.
 8              Q.   Looking specifically, I know this is kind of hard
 9    to see, but can you explain the lines on this?  So let's
10    look -- let's start on the bottom one where it says, M Box.
11    Do you see that down there?
12              A.   Yeah.
13              Q.   Explain what that means down there.
14              A.   So that was -- we knew that as the blue pill that
15    had a square on it with an M imprinted.  That I'm assuming
16    what the terminology would be on the website that he used
17    times 5,000 and the quantities that was being shipped, order
18    number, date it was ordered and customer, user name, and then
19    how it was to be shipped.
20              Q.   Meaning priority mail?
21              A.   Yeah.
22              Q.   Most of these seem to say.
23              A.   Yeah.  There were very few that requested
24    expedited.
25              Q.   And if they did what would you do with that?
```

13:46:18
13:46:29
13:46:39
13:47:03
13:47:12

68

```
         1              A.    Put it in a blue envelope, and it would ship

         2    faster.

         3              Q.    And they would tell you the shipping price, and you

         4    would have to put that amount of postage on it?

13:47:25 5              A.    Yes.

         6              Q.    So looking at this particular order form do you see

         7    the date on these orders?

         8              A.    Yeah.  November 19th, 2016.

         9              Q.    Okay.  And it looks like there's four of them on

13:47:39 10   this page.  Can you see the quantities?

        11              A.    Yeah.  They're all 5,000.

        12              Q.    And is that what you were doing at this time?  This

        13    is a few days before the police came.

        14              A.    Correct.  Yeah.  That was a current order that had

13:47:55 15   been shipped out.

        16              Q.    I'm going to hand you these two exhibits.  Let's

        17    look first at what's marked as 11.03.  Can you tell us what

        18    that is?

        19              A.    So that was an order sheet that had been completed.

13:48:35 20             Q.    And that was found at your residence there?

        21              A.    (Witness indicates by nodding head up and down.)

        22              Q.    How can you tell it's been completed?

        23              A.    So the kind of squiggly mark over the order was

        24    Katie's way of saying that item was done.  And there's tally

13:48:53 25   marks for what's been counted so she could keep track.
```

69

                    Q.   And let's look at the other one I handed you, which

I think is 11.02.  Is that what the yellow sticker says?

                    A.   Yes.

                    Q.   Flip that over and look at the back.

                         What is that?

13:49:08            A.   So same thing.  Completed orders from September

with the same mark just shown that they had been done,

counted.

                    Q.   Let's look at Page 36 of the photos.

13:49:28                 Do you see that on the screen?

                    A.   Yeah.  Same page.

                    Q.   Same page as 11.02, the front page that you're

looking at there?

                    A.   Yes.

13:49:42            Q.   I'm sorry.  Tell us again what those pink pen marks

mean.

                    A.   That's Katie's way of just notating that that order

had been counted and done.

                    Q.   And it looks like these are from September of 2016?

13:49:57            A.   Yes.

                    Q.   And what are the quantities on these?

                    A.   2,000 and 1,000, 1100.

                    Q.   Is that normal quantities at that time?

                    A.   Yeah.

13:50:10            Q.   Were problems fairly frequent, meaning would you

70

1    have to communicate with Mr. Shamo almost daily on this stuff?

2         A.   Yeah.  We definitely communicated daily.  Address

3    issues, needing Bitcoin transfer to purchase postage, needing

4    more product or more bags to put things in.

5         Q.   And how would those communications take place?

6         A.   All via Telegram.

7         Q.   And was Mr. Shamo pretty good at responding to your

8    concerns?

9         A.   Yeah.  He was good.  If he didn't respond, then we

10   would send an emoji in a normal text message to try to get him

11   to look at Telegram.

12        Q.   I think you testified previously that you and

13   Ms. Bustin were uncomfortable at times with what you were

14   doing?

15        A.   Yeah.  We definitely tried to compartmentalize what

16   we were doing, you know, whatever took place in the office

17   where we packaged.  And that's where, we didn't talk about it

18   outside of that or tried not to to try to live as normal as

19   possible.  I mean, obviously it was our choice to be involved,

20   but we kind of felt stuck, felt like it was something that we

21   had to do or, you know, really needed to do.  So we tried to

22   keep it as separate from our life as possible, told no one

23   that we were involved.

24        Q.   Did you make efforts to quit or leave the

25   organization?

71

1      A.   We did, yeah.  Especially in a couple weeks before

2    everything happened, we, you know had said, we really don't

3    want to be involved anymore.  We just can't do it.  I need you

4    to come get everything.  And had said, you can't do that to

13:52:13    5    me.  At least let me try to find a replacement.  You can train

6    them and get them set up.  Like if you do that I'll help you

7    with a downpayment on your house, and tried to kind of ease

8    that frustration.

9      Q.   Did he know that house was important to you?

13:52:29   10      A.   Yeah.

11      Q.   How so?

12      A.   He knew it was something that we wanted to do for

13    ourselves and put our life on, you know, a better track.

14      Q.   So leading up to when the police came in November

13:52:46   15    of 2016, did Mr. Shamo drop off some drugs on November 18th,

16    which would have been a day Mr. Gygi was involved?

17      A.   Yeah.  He put them in our truck right outside our

18    house in a duffle bag.

19      Q.   Was that normal?

13:53:10   20      A.   Yeah.

21      Q.   How would you know that there were drugs in your

22    truck?

23      A.   He would send a message via Telegram letting us

24    know he made the drop and it was in place.

13:53:23   25      Q.   Since the truck was locked you would just get them

72

```
 1   when you were there?
 2          A.    Yeah.
 3          Q.    How did the drugs come to you?
 4          A.    Normally in small Ziploc bags inside larger Ziploc
 5   bags and then that inside a duffle bag.
 6          Q.    On November 18th, so this is four days before the
 7   police came, five days, did you put out packages for Mr. Gygi
 8   as normal?
 9          A.    We did.
10          Q.    And notify him via Telegram?
11          A.    Correct.
12          Q.    Did he come and get those?
13          A.    He did, yeah.
14          Q.    How did you know?  Did he communicate with you by
15   Telegram that he got them, or did you just see that that he
16   were gone?
17          A.    I think we just saw that they were gone.  The boxes
18   were empty, so we would take them back in the house.  But with
19   them being at our front door we could hear when someone was
20   there.
21          Q.    That's what I was getting at.  Yeah.  7.03?  The
22   first page has got them all on a table.  That one.
23                So looking at that, does that appear to be how many
24   packages you would have put out on the 18th?
25          A.    Yeah.  It seems like a normal --
```

73

```
        1          Q.   And it looks like it's a mix.  So tell us about the
                    different sizes there.
        2
        3          A.   Smaller orders in the envelopes, orders that would
        4     fit in a small box and then larger orders in the larger boxes
13:55:42 5    just based on how much would fit.
        6          Q.   The quantities --
        7          A.   Correct.
        8          Q.   -- that would fit?
        9          A.   Yeah.
13:55:49 10        Q.   Okay.  And then let's look at 8.02.  8.01.  Not a
       11     picture.
       12          You also put out a bunch the packages on the 20th.
       13     So two days before the police came; correct?
       14          A.   Correct.
13:56:18 15        Q.   And that was a large number of packages similar to
       16     what we just looked at.
       17          A.   Yes.
       18          Q.   And again, all different sizes based on quantity.
       19          A.   Correct.
13:56:27 20        Q.   Did that take some time to process and put those
       21     together?
       22          A.   Yeah.  Several hours.
       23          Q.   8.03.  Thank you.
       24          Does that look like then the packages that you
13:56:42 25   would have put out on the 20th?
```

74

```
 1          A.    Yeah.
 2          Q.    Let's look at Exhibit 15.05, Exhibit -- I'm sorry,
 3    Page 7.
 4                So do you recognize generally this what we're
13:57:10 5    looking at here?
 6          A.    Yeah.  That would be an e-mail from Aaron, which is
 7    American Steam, and has the encrypted message at the bottom,
 8    which is the orders, and a little message from him.
 9          Q.    Can you read that message for us up there?
13:57:27 10          A.    Yeah.  Happy weekend.  I'll try to come over and
11    drop stuff, with a smiley face.
12          Q.    What's the smiley face?
13          A.    Aaron's way of sending a smiley face.
14          Q.    Kind of his thing?  He often did that in these
13:57:43 15    messages?
16          A.    Yes.
17          Q.    And what does that mean, I'll try to come over
18    tomorrow and drop stuff.  You're reading that.  What does that
19    mean to you?
13:57:51 20          A.    Bring product, bring pills and drop it off.
21          Q.    And the gibberish at the bottom, what did you say
22    that is?
23          A.    It's an encrypted message with the orders.
24          Q.    Let's look at 15.05.  Can you tell us what that is?
13:58:14 25          A.    Yeah.  That's the download available for the
```

75

```
 1              orders, the shipping labels from Get USPS.

 2                   Q.   Again, so that's again on this encrypted e-mail

 3              system, and it's Get USPS talking about shipping labels.

 4                   A.   Yeah.

13:58:34  5          Q.   And you're receiving or sending message on this.

 6              Pass the peas is you?

 7                   A.   Yes.

 8                   Q.   So you're receiving this message?

 9                   A.   Correct.

13:58:44 10          Q.   Let's scroll to Page 2.

11                   So you see the date on that is November 22nd?

12                   A.   Yeah.

13                   Q.   And obviously you remember that day.  What is this

14              message mean here?  It says, hey, first half.

13:59:08 15          A.   So we pulled orders, but only some of them and sent

16              it over, because he wanted to get them done and didn't want to

17              wait till whatever time to get them.

18                   Q.   And when you say "he," who are you talking about?

19                   A.   Aaron.

13:59:21 20          Q.   And is that who American Steam is up there?

21                   A.   Yes.

22                   Q.   That was his e-mail address?

23                   A.   Yeah.

24                   Q.   So sometimes he would send you part orders so you

13:59:32 25     could get working on them and send them later?
```

76

```
 1              A.   Send the rest, yeah.

 2              Q.   Let's look at Page 5.  There's a different "from"

 3         up there.  Do you see that?

 4              A.   Yeah.

13:59:55  5     Q.   It says shortbread 66?

 6              A.   Yes.

 7              Q.   Do you know who that is?

 8              A.   Drew.

 9              Q.   Drew Crandall?

14:00:02 10     A.   Correct.

11              Q.   And how long had he had that address?

12              A.   I don't know when he set that up, but that was what

13         he was using when he was abroad to try to help with customer

14         service issues.

14:00:16 15     Q.   So was there a period where Drew was kind of out

16         and you never saw anything from Drew?

17              A.   Yeah.  He was completely gone.

18              Q.   And then did he come back in to do customer

19         service?

14:00:27 20     A.   Yeah.  Aaron mentioned that they kind of needed

21         more money abroad and offered, you know, him to help with

22         something simple like this instead of -- nothing physical, but

23         could pull orders or help handle customer service.

24              Q.   And you were told or became aware that

14:00:43 25     Shortbread 66 was Drew Crandall?
```

77

1          A.    Correct.

2          Q.    And when he came back in you started getting

3     e-mails from him.

4          A.    Yes.

14:00:51  5          Q.    What does this mean?  It says subject says,

6     reshipped 11/20.  What does that mean to you?

7          A.    So unhappy customers.  We need to reship the same

8     order again.

9          Q.    Either the product was bad or it didn't show up or

14:01:04 10     there was just some problem?

11          A.    Correct.  Yeah.

12          Q.    Would Drew tell you what the problem was or just

13     tell you how to fix it?

14          A.    Just tell us how to fix it.

14:01:12 15          Q.    And it says attachments in there, and there are two

16     text files there.  Do you know what that means?

17          A.    Yeah.  One encrypted message to pass the peas,

18     which is us, and then one to Pharma, which was Aaron.

19          Q.    What do you mean by encrypted message?

14:01:31 20          A.    With the order information so we knew which orders

21     were shipping out again.

22          Q.    I see.  So whatever was being shipped those are the

23     instructions in the encrypted gibberish there at the bottom?

24          A.    Correct.

14:01:46 25          Q.    Which you had the key to un-encrypt?

78

```
        1          A.    Yes.

        2          Q.    And to your knowledge Mr. Shamo had that, too?

        3          A.    Yes.

        4          Q.    November 21st, so the day before the police came,

14:02:02 5    was there an occasion that Mr. Gygi wasn't coming so you had

        6    to do some work yourself?

        7          A.    Yeah.  We had to package the orders and drop them

        8    off ourselves.

        9          Q.    So you guys did that and dropped them at the postal

14:02:19 10   boxes?

       11          A.    I did, yeah.

       12          Q.    You did.  Okay.  Roughly how many packages, if you

       13    recall?

       14          A.    40, maybe.  Somewhere around there.

14:02:32 15        Q.    And at that time were you using the same return

       16    address?

       17          A.    Yeah.

       18          Q.    Do you recall what that was?

       19          A.    I think it was in West Jordan at that time.  But I

14:02:47 20   don't remember.

       21          Q.    Because that's where you recall dropping the

       22    packages off?

       23          A.    Yeah.  Correct.

       24          Q.    Let's look at Exhibit 9.20.  And if you could,

14:02:59 25   yeah, focus in on that address label.
```

79

1               Do you recognize that address label?

2       A.   Yeah.  So build it up was what the return name was

3 at the time because we were going to add Legos to the packages

4 to ship out with it.

5       Q.   So that sounded like a company name that would make

6 sense with Legos?

7       A.   Yeah.

8       Q.   And at that time did you put that same return

9 address on all the packages?

10      A.   I did, yes.

11      Q.   So you ended up talking to the police then when

12 they came on November 22nd.

13      A.   Yes.

14      Q.   Did you specifically tell them about that return

15 address?

16      A.   Yeah.  And I told them where they were dropped off

17 so that they could take them before they were picked up to be

18 shipped out.

19      Q.   Let's talk then specifically about November 22nd.

20 Day started normal.

21      A.   Yeah, fairly normal.

22      Q.   Day didn't end normal.

23      A.   Right.

24      Q.   I guess let's start with you were pulled over in

25 your truck that morning?

80

1       A.   I was.  I was on my way to school and was pulled

2   over coming out of Daybreak on the hill.

3       Q.   And where were you going to school at that time?

4       A.   Utah Helicopter in West Jordan.

14:04:25  5   Q.   Studying what?

6       A.   Flight rotorcraft.

7       Q.   You were going to be a helicopter pilot?

8       A.   I was, yeah.

9       Q.   So you were pulled over by an officer.  And were

14:04:37  10  you cooperative from the beginning?

11      A.   Yeah, absolutely.  As soon as he asked, you know,

12  why do you think I'm pulling you over?  I'm not in a uniform.

13  I'm not in a marked vehicle.  And I said, I know.  I know why.

14      Q.   And so did you talk to him a little bit?

14:04:54  15  A.   Yeah.  You know, he asked me where Katie was.  And

16  that morning she was getting milk from my mom's house, which

17  is about six doors down.  So I told him that.  And I said,

18  please don't, you know, kick down my door.  I'll let you in.

19  Whatever you need me to do, I can do.

14:05:20  20  Q.   And so you did go back and, in fact, let the police

21  into your home with the keys.

22      A.   Yes.

23      Q.   And Ms. Bustin was in there?

24      A.   She was, yeah.

14:05:29  25  Q.   And they kind of took her aside, as well?

81

```
             1              A.    Correct.

             2              Q.    And then they searched your home pretty thoroughly;

             3    correct?

             4              A.    Yes.

14:05:41     5              Q.    And meanwhile you guys were being interviewed by

             6    other officers there.

             7              A.    We were, yeah.

             8              Q.    I want to walk through a few of these photos from

             9    your house, so --

14:05:54    10              THE COURT:  I've got a calendar that starts at

            11    2:30.  How much more time do you have?

            12              MR. STEJSKAL:  I don't believe I certainly couldn't

            13    finish direct and cross by 2:30.

            14              THE COURT:  How much more time on direct?

14:06:14    15              MR. STEJSKAL:  Probably at least 20 minutes.

            16              THE COURT:  Better start in the morning with it.

            17    Jurors have been in for over an hour and a half now.  All

            18    right.

            19              So thank you, ladies and gentlemen of the jury.  I

14:06:35    20    appreciate your work.  You know the rules about talking to

            21    people or anyone.  And be safe.  We'll see you at 8:30 in the

            22    morning.

            23              (Whereupon, the jury left the court proceedings.)

            24              THE COURT:  We'll be in recess on this matter until

14:07:17    25    8:30 tomorrow.  Thank you.
                  (Whereupon, the testimony was continued to August 13, 2019.)
```

82

```
 1    STATE OF UTAH          )

 2                           ) ss.

 3    COUNTY OF SALT LAKE  )

 4            I, KELLY BROWN HICKEN, do hereby certify that I am

 5    a certified court reporter for the State of Utah;

 6            That as such reporter, I attended the hearing of

 7    the foregoing matter on August 13, 2019, and thereat reported

 8    in Stenotype all of the testimony and proceedings had, and

 9    caused said notes to be transcribed into typewriting; and the

10    foregoing pages number from 4 through 82 constitute a full,

11    true and correct report of the same.

12            That I am not of kin to any of the parties and have

13    no interest in the outcome of the matter;

14            And hereby set my hand and seal, this ____ day of

15    _____ 2019.

16

17

18

19

20            _____

21                         KELLY BROWN HICKEN, CSR, RPR, RMR

22

23

24

25
```

83

1              IN THE UNITED STATES DISTRICT COURT

2                       DISTRICT OF UTAH

3                       CENTRAL DIVISION

4

5   UNITED STATES OF AMERICA,    )

6              Plaintiff,        )

7     vs.                        )  Case No.  2:16-CR-631-DAK

8   AARON MICHAEL SHAMO,         )

9              Defendant.        )

10   _____)

11

12           BEFORE THE HONORABLE DALE A. KIMBALL

13         -------------------------------------

14                    August 12, 2019

15                      Jury Trial

16            Testimony of Sean Michael Gygi

17

18

19

20

21

22

23

24   REPORTED BY: Patti Walker, CSR, RPR, CP     801-364-5440

25   351 South West Temple, #8.431, Salt Lake City, Utah  84101

```
 1                    A P P E A R A N C E S

 2

 3

 4    For Plaintiff:              Michael Gadd
                                  Vernon G. Stejskal
 5                                Kent A. Burggraaf
                                  U.S. ATTORNEY'S OFFICE
 6                                111 South Main Street, #1100
                                  Salt Lake City, Utah  84111
 7

 8
      For Defendant:              Gregory G. Skordas
 9                                Kaytlin V. Beckett
                                  SKORDAS & CASTON LLC
10                                560 South 300 East, #225
                                  Salt Lake City, Utah  84111
11

12                                Daryl P. Sam
                                  DARYL P SAM PLLC
13                                5955 S. Redwood Road, #102
                                  Salt Lake City, Utah  84123
14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        I N D E X

2   Witness              Examination By              PAGE

3   Sean Michael Gygi    Mr. Gadd  (Direct)              4

4                        Mr. Sam  (Cross)               36

5                        Mr. Gadd  (Redirect)           45

6                        Mr. Sam  (Recross)             49

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        SALT LAKE CITY, UTAH; MONDAY, AUGUST 12, 2019; 8:00 A.M.
 2               (Proceedings not transcribed)
 3               MR. GADD:  Your Honor, the United States calls
 4    Sean Gygi.
 5               THE COURT:  Come forward and be sworn, please,
 6    right up here in front of the clerk of the court.
 7                           SEAN GYGI,
 8            Having been duly sworn, was examined
 9                   and testified as follows:
10               THE CLERK:  Come around to the witness box here.
11               Please state your name and spell it for the
12    record.
13               THE WITNESS:  Sean Michael Gygi.  S-e-a-n,
14    M-i-c-h-a-e-l, G-y-g-i.
15               THE COURT:  You may proceed, Mr. Gadd.
16               MR. GADD:  Thank you, sir.
17               I pulled that water away not because I don't want
18    you to have water, but because it was the prior witness's.
19    If you need it, it's just on your right.
20                      DIRECT EXAMINATION
21    BY MR. GADD:
22    Q    Mr. Gygi, are you prepared to testify about your part
23    in the investigation of drug packages that are linked to
24    this defendant, Mr. Shamo?
25    A    Yes, I am.
```

1   Q    Before we do that, could you tell us a little bit about

2   yourself?

3   A    I can.  My name is Sean Gygi, as I stated.  I've lived

4   in Utah about 15 years.  Love the place.  Currently work as

5   a workforce management analyst for a call center in Sandy.

6   And no kids, but love dogs.

7   Q    Thanks.

8        Do you know Mr. Shamo?

9   A    I do.

10  Q    What was your relationship like with Mr. Shamo in 2016?

11  A    In 2016, that was the time where we were both involved

12  in the criminal enterprise that's been described.

13  Q    Did you have a social relationship at all or was it all

14  work?

15  A    We definitely had a social relationship as well.  It

16  was to the effect of going out to concerts and clubs

17  together, occasionally hanging out together, although not as

18  much in 2016 as 2015.

19  Q    I'm going to show you a chart.  I'm going to put it up

20  next to you.

21        MR. GADD:  And then could we look at the

22  organization chart on the screen as well.

23  BY MR. GADD:

24  Q    When you look at this chart, 17.06, will you tell us

25  who else you knew at the time, 2015, 2016?

1    A    Yes.  I definitely new Mario Noble.  I recognize Luke

2    Paz, although I didn't interact with him on very many

3    occasions.  Drew Crandall, Tonge and Bustin, and Jessica

4    Frankham.

5    Q    And we won't talk about Ms. Frankham much, but let's

6    just briefly cover it.  How did you know her?

7    A    She is my girlfriend.  I've known her about five years

8    now.

9    Q    Did she also receive packages from Mr. Shamo?

10   A    She did.

11   Q    And did he pay her or pay you for those packages?

12   A    He paid her.

13   Q    Let's talk for a minute about how you were recruited.

14   Do you recall when you first started accepting packages on

15   Mr. Shamo's behalf?

16   A    I believe it would have been in 2015.

17   Q    And how did you get involved?

18   A    At first it was -- it seemed to be fairly innocent,

19   nothing to the effect of what it ended up being.

20   Specifically was asked if I was okay receiving packages that

21   would be addressed to myself every once in a while.  It

22   wasn't described what would be in them, but I understood

23   that it wasn't exactly legal.

24   Q    Thinking back, how many packages do you think you

25   received from Mr. Shamo?

1    A    It's hard to say for sure.  I had estimated that it was

2    probably in the range of 30 to 50 packages overall.

3    Q    Let's talk about one of those packages.

4         MR. GADD:  Can we look at 2.03.

5    BY MR. GADD:

6    Q    Can you see that there?

7    A    I can.

8    Q    I'm also going to show you 2.02.

9         Now the jurors can't see the box there, 2.02, very

10   well.  Can you explain what it is that's inside that bag?

11   A    Yes.  It's what I would consider to be a normal postal

12   package.  It's very obviously addressed from China to

13   myself.

14   Q    The box and the bag, is that what we're looking at on

15   the screen in front of you?

16   A    Yes.

17   Q    It has your name on it?

18   A    That's correct.

19   Q    And your address, at least at the time?

20   A    Yes, that's correct.

21   Q    The other packages you received, somewhere between 30

22   and 50, did they look like this?

23   A    They weren't all in cardboard boxes.  Some of them were

24   in bubble wrapped envelopes, but they were all fairly

25   similar in size.

1   Q    You had some indication of what at least a few of those

2   packages had in them, right?

3   A    Not the ones from China.  The ones that were sent

4   domestically before that, I definitely had seen the contents

5   of some of them.

6   Q    So maybe unpack that a little bit for the jury.  Can

7   you talk about the difference between domestic and the ones

8   from China?

9   A    I can.  Prior to late 2015, when Drew Crandall left the

10  country to go on an extended trip, the packages that we had

11  received were -- they were cardboard boxes generally, but

12  they were all addressed from within the United States.  And

13  on -- I can think of at least two to three separate

14  occasions, they were opened in front of me and contained

15  things like marijuana or LSD.

16  Q    Then the change took place, right?  Is that when

17  Mr. Crandall left?

18  A    That's correct.

19  Q    And the packages after he left, what were they like?

20  A    They were like the ones sitting in front of me.

21  Q    There was a second package in November of 2016 that was

22  shown to you during questioning, correct?

23  A    That is correct.

24  Q    Let's fill in the story up until that point.  In

25  November of 2016, agents executed a search warrant at your

1   residence, right?

2   A    That is correct.

3   Q    And were you asked to sit down and speak with them?

4   A    Yes.  I was -- I was taken separately to a location

5   downtown, which I believe it was the DEA headquarters here,

6   although I'm not entirely sure.

7   Q    Did it have kind of the curves above the windows?

8   A    That sounds right, yes.

9   Q    You went into the basement?

10  A    I don't think we went into the basement.  It was the

11  first floor.

12  Q    The main floor?

13  A    Yeah.

14  Q    Sure.  And you sat down and you spoke with the agents,

15  right?

16  A    Correct.

17  Q    At some point during that interview, did they ask you

18  if they could look inside a package that they had caught?

19  A    Yes, they did.

20  Q    Let's look at 5.03 now.  Then I also want to show you

21  5.02.

22       You've got 5.02 in the bag.  The jurors can't see that

23  one as well, but we've got 503 here up on the screen.  Is

24  this the same package?

25  A    Yes.  They do appear to be the same.

1    Q    And on that package, it's shipped to your name,

2    correct?

3    A    That is correct.

4    Q    And your address at the time?

5    A    That is correct.

6    Q    When a package like this made it to you, it wasn't

7    caught.  When it made it to you, what would you do with it?

8    A    At that point I would inform Shamo that I had received

9    the package and needed to meet up to exchange that for

10    payment.

11    Q    Let's talk for just a minute about payment.  You kind

12    of drew a line when Mr. Crandall left in terms of how the

13    packages changed.  Did payment change?

14    A    Yes, fairly significantly.

15    Q    Tell us how so.

16    A    When Mr. Crandall was involved, I was being paid 50 to

17    $100 per package.  After he left, it wasn't an immediate

18    change, but within, I would say, two months, the payment

19    increased to two to $300 per package.

20    Q    How were you paid?

21    A    In cash or through Venmo.

22    Q    When you needed to exchange a package for money, where

23    would you do it?

24    A    Generally at Mr. Shamo's home.

25    Q    And on those 2016 packages, the China packages, did

 1   Mr. Shamo ever tell you what was inside?

 2   A    No.

 3   Q    Was anyone ever with Mr. Shamo when you would exchange

 4   packages for money?

 5   A    I don't recall specifically, but I don't believe so.

 6   Q    Let's talk about the transition that you took from

 7   being just a package receiver to more full-time

 8   responsibility.  At some point you changed, right?

 9   A    That's accurate.

10   Q    What was it that you became?

11   A    I would be -- I guess you could call it a courier or a

12   runner.  I was picking up packages and dropping them off at

13   various post office collection bins.

14   Q    When did you make the change?

15   A    I believe that would have been June or July 2016,

16   sometime around there.

17   Q    Why did you take that additional role?

18   A    I had lost my job earlier that year and I needed money.

19   Q    Did Mr. Shamo pay pretty well?

20   A    Yes, very well.

21   Q    How much was he paying you to be a runner?

22   A    $2,000 every other week.

23   Q    Was he on time with his payments?

24   A    I can't really recall a time where he wasn't -- where

25   he was late.

1   Q    So let's talk for a minute about your role as a runner

2   or a courier.  How frequently would you go and pick up

3   packages?

4   A    Five to six nights per week.

5   Q    From whom would you pick up the packages?

6   A    It wasn't -- I didn't know who it was at the time.  It

7   was merely just an address where I would pick up packages

8   from the porch, though I came to know who they were later

9   on.

10  Q    That address, was that in Daybreak?

11  A    Yes, that's correct.

12  Q    And where would you take the packages once you picked

13  them up?

14  A    It's changed each night.  I would determine where they

15  needed to go based on the return addresses on the packages.

16  For example, if the return address was Cottonwood Heights, I

17  would find collection bins or post offices nearby that ZIP

18  code or address.

19  Q    How did you know to do that?

20  A    It was something that had been explained briefly when I

21  began doing this, not specifically how to find the

22  locations, but rather just to -- how to know, roughly, where

23  to go.

24  Q    What was the problem with taking a package that had a

25  Midvale return address and shipping it from Provo?

1    A    I believe the concern there was to obfuscate where the
2    packages were originating.
3    Q    So if it had a Midvale return address, where would you
4    look for the blue collection box?
5    A    Nearby Midvale.
6    Q    I mentioned the blue collection boxes.  You dropped off
7    there, correct?
8    A    That's correct.
9    Q    How about a post office, did you ever go inside?
10   A    Yes.  There came a time where there were packages that
11   were too large to fit in the blue collection bins, and at
12   that point I began using post office lobbies.
13   Q    Did it make you nervous to go inside the post office?
14   A    Absolutely.
15   Q    Why?
16   A    Because I understood -- I understood maybe not what was
17   included, but that it wasn't aboveboard.
18   Q    Let's talk now about cooperating with agents.  There
19   was a turning point where you started cooperating with these
20   agents.  What caused it?
21   A    When I was questioned and had a search warrant served,
22   I answered some questions that day, but was certainly
23   reluctant to tell the whole story.  I went home the night
24   that I had been questioned and really took a long time to
25   think about what the right thing to do was.  And after

 1   learning that there was Fentanyl included in these packages,

 2   I really understood that I couldn't do anything but put a

 3   stop to what had been going on.  People were obviously going

 4   to be getting hurt and that wasn't something I was okay

 5   with.

 6   Q    Did you recognize the name Fentanyl when they said it?

 7   A    I did.  I had heard of it before.

 8   Q    Up until that point, and I'm talking now about not

 9   inbound packages but the ones that you were shipping out,

10   what did you think those packages had in them?

11   A    I was under the impression that they were the same type

12   of things that I had known were included in packages before,

13   marijuana, LSD, Ecstasy, Xanax, that kind of stuff.

14   Q    The following morning, November 18th, did you reach out

15   to the agents that you had interviewed with?

16   A    I did.  It was one of the first things I did waking up

17   that morning.

18   Q    And they met up with you again, right?

19   A    They did, fairly quickly.

20   Q    When you spoke with them that following day,

21   November 18th, did you agree to record a conversation with

22   Mr. Shamo?

23   A    I did, yes.

24   Q    Where did that conversation take place?

25   A    I was in my apartment complex in Mr. Shamo's vehicle, I

```
 1   believe his BMW.
 2              MR. GADD:  Could we look at Exhibit 17.01.
 3              Let's go ahead and play it once through.
 4              Just a moment.  I think our sound might be off.
 5              Your Honor, what if we took a quick, five-minute
 6   break?  We'll diagnose the sound issue, and there's one
 7   other thing I'd like to address with Your Honor.
 8              THE COURT:  It's impossible to only take a
 9   five-minute break with a jury.  Do you want to address
10   something at side-bar?
11              MR. GADD:  Both.  To fix the sound and also --
12   because the exhibit is the audio recording.  The transcript
13   just helps it.
14              THE COURT:  Let's see if we can get the sound
15   going here.
16              Rule number one with gizmos is if something can go
17   wrong, it will.
18              We could take our second break, which is usually a
19   longer break, bring some food up for the jury.  But it won't
20   be up until 11:30.
21              MR. SKORDAS:  That might make sense.
22              THE COURT:  If we break now, we're probably
23   looking at ten to 12:00.
24              MR. GADD:  If we could do that, that would be
25   great.
```

```
 1                THE COURT:  Okay.  Let's do that.

 2                MR. GADD:  Great.

 3                (Jury excused)

 4                (Proceedings not transcribed)

 5                (Recess)

 6                (Jury present)

 7                THE COURT:  You may proceed, Mr. Gadd.

 8                MR. GADD:  Thank you, sir.

 9    BY MR. GADD:

10    Q    Mr. Gygi, with any luck, the court IT professionals

11    have solved our sound issue.  So let's maybe just talk about

12    where we were when we left off and then we'll jump back into

13    this.

14         So on November 18, you contacted the agents to indicate

15    that there was more to the story you wanted to tell them,

16    right?

17    A    That is correct.

18    Q    And you spoke with them?

19    A    Yes.

20    Q    From that point onward, have you been truthful with

21    them?

22    A    Yes, absolutely.

23    Q    On that morning, November 18th, did they ask you to

24    record a conversation with Mr. Shamo?

25    A    Yes, they did.
```

1    Q    And the conversation, did that take place -- I believe

2    you said in his BMW?

3    A    Yes, parked at my apartment complex.

4          MR. GADD:  Let's now, if we can, read and listen

5    to Exhibit 17.01.

6                    (Audio recording played)

7    BY MR. GADD:

8    Q    Do you remember making that recording?

9    A    Yes, I do.

10   Q    Were you nervous at all to record it?

11   A    Yes, quite nervous.

12   Q    There were a few things you talked about in there that

13   I want to bring up and have you, if you can, explain for the

14   jury.

15   A    All right.

16   Q    Near the beginning, Mr. Shamo indicated that he went

17   live.  What did you understand that to mean?

18   A    My understanding at the time was that packages were

19   being prepared.  I wasn't sure if that had meant that

20   product had run out at the time or if it was merely just a

21   temporary break.

22   Q    You indicated to him at one point that you had missed

23   the prior night because of an emergency.  There was no

24   emergency, though, right?

25   A    That's correct.

1    Q    Instead, what were you doing that prior night?

2    A    I was wrestling with my decision what to do the next

3    day after being interviewed by the agents throughout the

4    day.

5    Q    This was just an audio recording, so we couldn't see

6    what was happening, but were you paid by Mr. Shamo during

7    that conversation?

8    A    Yes, I was.

9    Q    Did he pay you in cash?

10   A    Yes.

11   Q    You referenced plans that had to do with Colorado.

12   What were your plans?

13   A    Well, the plans were, a fair amount of time before

14   this, at minimum, several months, Mr. Shamo and I had

15   discussed setting up a location to ship packages outside of

16   Utah.

17   Q    Who's idea was it?

18   A    It was Mr. Shamo's idea to expand beyond the state,

19   though Colorado was my suggestion.

20   Q    Why was Colorado important for you?

21   A    My girlfriend has family out there, so it would have

22   been an easy place to get settled, and her and I had both

23   talked about, outside of this venture, wanting to move out

24   there.

25   Q    Was it important to Mr. Shamo that the new shipper be

1  in a different state?

2  A    Yes, though the specific state wasn't quite as

3  important as it being outside of Utah.

4  Q    We heard you negotiating about a biweekly amount.  Was

5  that the amount he was going to pay you?

6  A    Yes, that's correct.

7  Q    And it was $3,000, correct?

8  A    Yes, that is correct.

9  Q    Was that more than you were receiving to be the runner?

10  A    It was, yes.

11  Q    He talked to you about a separate room.  What did you

12  understand from that?

13  A    My understanding was that the people preparing

14  shipments would want to have a room that was solely

15  dedicated to that purpose so that it wouldn't be anything

16  that anyone else used for any other purpose.

17  Q    He talked about that's how his shipping team did it.

18  Had you ever been inside of Ms. Tonge's and Ms. Bustin's

19  residence?

20  A    No.

21  Q    You hadn't seen the room that they used, then?

22  A    No, I hadn't.

23  Q    Towards the end there, he wants you to check on that

24  one thing and you clarified about a package.  What was going

25  on there?

1  A    There was a package that -- I can't recall if it had

2  specifically said it was delivered or undeliverable, but

3  either way, it was a package that I was supposed to have

4  received by that point and I had not yet gotten it.

5  Q    By that point was law enforcement seizing some of the

6  packages coming to you?

7  A    Yes.

8  Q    Let's talk now about the night of November 18th, 2016,

9  so the day after you first met those agents.  Did you take

10  agents along with you as you picked up packages that night?

11  A    I did, yes.

12  Q    What did you drive to pick up the packages?

13  A    It was a car that my girlfriend and I shared.

14  Q    And did the agents, did they ride with you or follow

15  behind you?  Where were they?

16  A    They followed behind in a separate vehicle.

17  Q    Did you lead them to Ms. Tonge's and Ms. Bustin's

18  residence?

19  A    I did, yes.

20  Q    Once you gathered up the packages, what did you do?

21  A    I believe after securing the packages in the car, we

22  drove back to the South Jordan Police Department.  I led the

23  way and the agents followed.

24  Q    And then once at the police department, did they take

25  possession of those packages?

2727

1   A    Yes.

2   Q    I want to show you Exhibit 7.00.  Will you take a look

3   inside that box.

4        What do you see?

5   A    I see envelopes that I recognize as the same address --

6   return address, names, and type that I was used to dropping

7   off and shipping out.

8   Q    Maybe just for the jury, because they're having a

9   harder time seeing that than you are, can you show them what

10  else is inside the box?

11       What do you have there?

12  A    This is a larger box that I was used to shipping out

13  occasionally.

14  Q    That size box, would that fit in a blue collection bin?

15  A    I do not believe so.

16  Q    If you could, maybe just tip it down and give the jury

17  a sense for how many packages or boxes came in that.

18  A    (Indicating)

19           MR. GADD:  Could we look at 7.01.

20  BY MR. GADD:

21  Q    Once you arrived at the police station, the packages,

22  the parcels, the envelopes, those were turned over to the

23  agents, correct?

24  A    Yes, they were.

25  Q    And this picture that you're seeing here, does that

1    also look like the packages that you had picked up that

2    night?

3    A    Yes, it does.

4    Q    There's approximately 79 packages, correct?

5    A    That appears to be correct.

6    Q    Was that more than a normal amount?

7    A    It was more than a normal amount for a single night,

8    though considering I had not shipped out the night prior,

9    this does add up as the amount for two nights.

10   Q    There are different sizes.  You showed some in the box

11   and then we can see some in the picture.  Do you see on the

12   right side the envelopes, the priority mail envelopes?

13   A    I do, yes.

14   Q    Is that something you would typically pick up from the

15   residence in Daybreak?

16   A    Yes.

17   Q    You showed us the larger package that you can see kind

18   of in the foreground there.  In the background, in the

19   middle, there's boxes with smaller, but they're definitely

20   boxes.  Was that a common size as well?

21   A    Yes, it was.

22   Q    That was the first night you took the agents along to

23   pick up packages.  You did one more time, right?

24   A    That is correct.

25   Q    Was it two nights later --

1    MR. GADD:  Oh, thank you, Yvette.

2  BY MR. GADD:

3  Q    You can see those smaller boxes a little closer there.

4  Do you remember shipping that size specifically?

5  A    Correct.

6  Q    And you recall just now a return address from the ones

7  you looked at, and that made me think of this.  You talked

8  briefly to the jury about reading the return address and

9  then going to a blue collection box near there.  Who told

10  you to do that?

11  A    Mr. Shamo gave me a basic rundown of the process.  His

12  explanation, I believe, I don't recall the exact specifics,

13  but it was something to the effect that the return address

14  would change with each batch that was going out and I would

15  need to find collection bins that I can't use nearby that

16  address.  I wasn't given specifics on how to find the

17  collection bins, but that was my understanding.

18  Q    You're resourceful.  You figured out how to find

19  collections bins, right?

20  A    I did.

21  Q    How did you find them?

22  A    I would use the USPS mobile application and look up

23  collection boxes that were nearby the address that was

24  provided.

25  Q    The second night you went along to pick up -- or you

 1   brought the agents along to pick up packages, that was

 2   November 20th, 2016, right?

 3   A    That sounds correct.

 4   Q    Did you text with one of the shippers to set a time

 5   when you would come pick them up?

 6   A    Yes.  That was the normal process.

 7   Q    Let's look, if we could, at 17.04.

 8        Do you recognize what we're looking at there?

 9   A    I do, yes.

10   Q    Is this a screen shot -- or maybe even better, a

11   picture of a screen?

12   A    Yes.  It's a photograph of a conversation on my phone.

13   Q    Your phone.  And then up at the top it says Katy.

14   Who's Katy?

15   A    That would have been Katy Bustin, I believe.

16   Q    Did you know her last name by that point?

17   A    I did.  I had interacted with her in our time both

18   being employed at eBay.

19   Q    And I think you indicated at some point you started to

20   figure out who the shippers were.  How did you figure out

21   that Ms. Bustin was one of the shippers?

22   A    I recalled that Ms. Bustin had interacted with both

23   Mr. Crandall and Mr. Shamo at and outside of eBay, and just

24   kind of put two and two together about who that was.

25   Q    Could you read the series of text messages for us?

1    A    Yes.  From myself:  Do you know when stuff is going to
2    be ready today?  I've got a family thing tonight, so I'd
3    prefer to get it done early, if possible.  From Katy:  Yeah.
4    Let me see when Shamo is planning on having orders for us.
5    I replied with a thumbs up.  Katy replied:  What time do you
6    need it by?  I stated:  The family thing is at seven, so if
7    I'm done by then, that would be great.  Katy replied:  Okay.
8    I might just have you pick up yesterday's.  Haven't heard
9    from Shamo.  And I replied:  That's great.  I'll do that if
10   it gets to be around six and you haven't heard from him.
11   Q    If you could keep going there.
12   A    Katy replied:  Sounds good.  They're going to Lehi,
13   though.  Need more time.  Just message me when you want to
14   come.  I replied:  No, that's fine.  I'm going south for my
15   family anyways.  And she replied:  Sounds good, with an
16   emoji.  Should be ready at five.  You want them now or in an
17   hour?  I replied:  Sweet.  I'll come by at six and grab
18   everything.  She replied:  Perfect.  And then about an hour
19   later she replied -- or, excuse me, about 45 minutes later,
20   she replied:  They're out for you whenever.  Going to Lehi
21   and Riverton.  Riverton drop is only eight packages thin.
22   Q    Let's take a minute and look at that last message from
23   Katy.  Going to Lehi and Riverton.  What did you understand
24   that to mean?
25   A    I understood that there were two separate batches of

1    packages with two separate return addresses with -- return

2    addresses in those specific cities.

3    Q    And then she indicates Riverton drop is only eight

4    packages thin.  Will you kind of translate that for the

5    jury.

6    A    Yes.  My understanding of that was the batch of

7    packages that was addressed to Riverton was smaller than a

8    normal batch, being only eight packages.  I can't remember

9    specifically how much an average batch was.  Maybe 20 to 30

10   packages, if I were to guess.

11   Q    So on that night, had you not been working with the

12   agents, it would have required you to go to two different

13   cities to find blue collection bins, correct?

14   A    That's correct.

15   Q    But rather than go to Lehi and Riverton, did you go and

16   pick up these packages?

17   A    Yes.  I went and picked them up the same as the

18   previous trip with the agents.

19   Q    Same as before, your car, right?

20   A    Correct.

21   Q    And they followed behind?

22   A    That's correct.

23   Q    And did you take the packages to the police station

24   again?

25   A    Yes.

```
 1   Q    And that's where the agents took possession of them?
 2   A    That is correct.
 3   Q    Let me show you Exhibit 8.
 4             THE COURT:  Exhibit which?
 5             MR. GADD:  This is Exhibit 8.00.
 6             And if we can also look at 8.03 on the screen.
 7   BY MR. GADD:
 8   Q    Go ahead and take just a moment and look through those.
 9        Do you recognize those?
10   A    Yes, I do.
11   Q    What are they?
12   A    They appear to be the same type of packages that I was
13   accustomed to shipping.
14   Q    You can see on the screen these packages laid out.  Do
15   these appear to be the same packages as what's been folded
16   down flat inside that box?
17   A    It's hard to say without confirming the addresses on
18   them, but yes, they do match the size, shape, and amount
19   that I would expect.
20   Q    So here there's just over 43 packages and parcels.  Was
21   that a more normal size amount for a pickup night?
22   A    For a single night, yes, it was slightly more than
23   normal.
24   Q    You get the three sizes here in this picture as well,
25   the large box and backs, and then the medium and the small.
```

```
 1    Were those normal sizes?

 2    A    Yes.

 3    Q    They're all priority mail.  Do you remember a time when

 4    you weren't shipping priority mail?

 5    A    I don't recall anything specific about the shipping

 6    methods.

 7    Q    Were you ever asked to take it to anywhere other than

 8    like a post office or a blue collection bin?

 9    A    No.  Those were the only locations that were used.

10    Q    Never FedEx?

11    A    No.

12    Q    Never UPS?

13    A    No.

14    Q    Let's talk a minute about Mr. Shamo's residence.  Have

15    you ever been to Mr. Shamo's residence on Titian Way in

16    Cottonwood Heights?

17    A    Yes, many times.

18    Q    How often would you say you've been there?

19    A    At the time that we were working together, once every

20    two to three weeks would be a guess for me.

21    Q    Were you going there for business or social?  Why would

22    you go to his house?

23    A    It was almost entirely business, though I do recall a

24    handful of times that it was not business related.

25              MR. GADD:  Could we look at 17.02.
```

1    BY MR. GADD:

2    Q    Can you see that on your screen?

3    A    I can.

4    Q    I'm going to zoom in there on the top.

5         Do you see your name on it?

6    A    I do.

7    Q    What is this?  Do you know?

8    A    This appears to be a --

9    Q    Do you want to zoom out?  Would that help?

10   A    No.  It just appears to be, I would guess, an invoice

11   for a package that was shipped to me from Canada.

12   Q    Did you leave this in Mr. Shamo's residence when you

13   were there for business?

14   A    If it matches the type of packages that I received from

15   Canada for Mr. Shamo, then yes.

16   Q    Oh, I see, meaning if it were inside a package you gave

17   to him, it might have gotten in there that way?

18   A    Correct.

19   Q    But you never actually put your fingers on this

20   document, right?

21   A    Not that I can recall at any time.

22   Q    Can you think of any other reason why a document with

23   your name on it might end up in Mr. Shamo's residence?

24   A    No.

25   Q    Let's look -- if we could look at the bottom half for

 1   just a minute.

 2        Do you see there in description it says inert

 3   excipient, microcrystalline cellulose.  Do you know what

 4   microcrystalline cellulose is?

 5   A    No, I don't.

 6   Q    I want to turn now and talk a little bit about evidence

 7   taken from Mr. Shamo's devices.

 8             MR. GADD:  Could we look at 13.09, pages 30 or

 9   31 -- well, we'll look at them both.

10   BY MR. GADD:

11   Q    Did you ever go inside Mr. Shamo's home office?

12   A    Yes.  I recall going in there a handful of times.

13   Q    Did it look about like this?

14   A    That seems to be correct.

15   Q    Did you ever use either computer that was there?

16   A    No.

17   Q    There's a document that was found on his iMac, this one

18   right here.  I want to ask you some questions about it.

19             MR. GADD:  Can we look at 14.35.

20   BY MR. GADD:

21   Q    Do you recognize this first page of the document?

22   A    I recognize it from when we had briefed about this

23   earlier, but I do not specifically know what it was.

24   Q    You didn't write this document, did you?

25   A    No.

1          MR. GADD:  Can we look at the next page.

2    BY MR. GADD:

3    Q    Do you see your name on that one?

4    A    I do, yes.

5    Q    And was that your address at the time?

6    A    Yes, it was.

7    Q    Is that an address at which you received packages from

8    Mr. Shamo?

9    A    Yes, it was.

10   Q    And you have no idea how it got on his computer?

11   A    I would assume that it had been on his computer if it

12   was used to procure these packages.

13   Q    Let's take just a minute now and talk about the -- I'll

14   call it the deal.

15          MR. GADD:  Could we look at 23.02.

16   BY MR. GADD:

17   Q    Do you recognize this document?

18   A    Yes, I do.

19   Q    This is your statement in advance of plea of guilty and

20   plea agreement between you and the United States, correct?

21   A    That is correct.

22   Q    At the end of this -- and we'll scroll through it in a

23   minute -- you signed this document?

24   A    I did.

25   Q    In court?

1    A    Yes.

2    Q    For pleading guilty?

3    A    Correct.

4    Q    Here on the first page, this letter --

5         MR. GADD:  If you could pull up paragraph number

6    one.

7    BY MR. GADD:

8    Q    Did you, in fact, plead guilty to Counts 2, 3, 6 and 12

9    of the superseding indictment?

10   A    I did, yes.

11   Q    Were any of the charges that you faced dismissed?

12   A    No, they were not.

13   Q    You pled as charged?

14   A    Correct.

15   Q    By pleading as charged, were you trying to take full

16   responsibility?

17   A    I was.

18        MR. GADD:  If we can zoom back out now.

19   BY MR. GADD:

20   Q    There's this statement in advance of plea, but then at

21   the end of it is an addendum.

22        MR. GADD:  If we can scroll through to the

23   addendum.

24        Okay.  Starting here.

25

1    BY MR. GADD:

2    Q    This is -- for lack of a better term, this is the

3    agreement between you and the United States, correct?

4    A    Yes, that's correct.

5    Q    Picking up in the second paragraph, does it say the

6    defendant, that's you, agrees to testify truthfully and

7    completely for the United States in any subsequent court

8    hearing or trial relating to this case if called upon?

9    A    It does.

10   Q    Did you agree to wait to be sentenced until all the

11   remaining defendants in your case had been sentenced?

12   A    Yes, I did.

13        MR. GADD:  Then if we could go to the next page,

14   that top paragraph.

15   BY MR. GADD:

16   Q    If you testify truthfully and completely, was it the

17   agreement that the United States would present your

18   cooperation to the court -- that's Judge Kimball, correct?

19   A    Yes.

20   Q    -- for his consideration at your sentencing under that

21   Sentencing Guideline 5K1.1, and did you understand that to

22   mean that if you had a minimum mandatory sentence for one of

23   the counts you pleaded guilty, there would no longer be a

24   minimum mandatory sentence?

25   A    That is my understanding, yes.

1   Q    And then it says the United States also agrees not to
2   charge or seek a charge against you for death resulting
3   violations of -- and then Title 21 United States Code
4   841(a)(1) -- that may arise out of the continuing
5   investigation into overdose deaths tied to the Pharma-Master
6   drug sales.  That was your understanding as well, correct?
7   A    Yes, that's correct.
8   Q    Was there any other agreement?
9   A    Not to my knowledge, no.
10  Q    You understand that one day soon you're going to be
11  standing here and Judge Kimball will be sentencing you?
12  A    I do.
13  Q    Is it your understanding that I, United States, we are
14  going to tell Judge Kimball everything you did wrong?
15  A    Yes.
16  Q    And then everything you did to help make it right?
17  A    Yes.
18  Q    You understand that the sentence is 100 percent up to
19  Judge Kimball?
20  A    I do.
21  Q    Let's talk now about the hard questions.
22       In 2016, when you were picking up packages off the
23  doorstep in Daybreak, you knew those packages probably
24  contained drugs, didn't you?
25  A    I did.

```
 1   Q    So why did you help Aaron Shamo?

 2   A    I helped because at the time when this began, my

 3   understanding of the operation was something that I was -- I

 4   was told and made to believe wasn't going to be harming

 5   anyone, and it was easy money to make.  It was something

 6   that I believed would be not necessarily in the right, but

 7   also not in the wrong.  And when it obviously transformed

 8   into what it became, I became extremely distraught and

 9   uncomfortable with what had happened.

10   Q    You say you became distraught and uncomfortable, but

11   when?  When was the first time you realized what was going

12   on?

13   A    I would say it was when I was questioned by agents that

14   had a search warrant, when they made it clear that this was

15   Fentanyl that was being prepared and shipped.

16   Q    Last question.  Who was your boss?

17   A    Can you clarify what you are asking?

18   Q    That was a bad question so it wasn't the last.

19        When it came to picking up the packages, putting them

20   in the mail stream, who was your boss?

21   A    Aaron Shamo, without a doubt.

22   Q    Did you have any other bosses?

23   A    I would say Drew Crandall would have qualified as that

24   at the time when I had known he was involved.

25   Q    Back in 2015?
```

```
 1   A     Correct, before he left the country.

 2   Q     But in 2016, any bosses?

 3   A     Other than Aaron Shamo, no.

 4         MR. GADD:  No further questions.  Thank you.

 5         THE COURT:  Thank you.

 6         Defense may cross-examine.

 7                     CROSS-EXAMINATION

 8   BY MR. SAM:

 9   Q     Hello, Mr. Gygi.  I'm going to introduce myself to you

10   for the first time -- I wasn't here on Friday -- Daryl Sam,

11   and I represent the defendant, Mr. Shamo.  I appreciate you

12   being here today and I know that it's a big day.

13         So I'd like to ask you a few questions and ask you

14   about your life a little bit.  You started off by saying you

15   have a dog; is that right?

16   A     Two, yes.

17   Q     You've got two dogs.  Okay.  And you value that pretty

18   highly, I guess, in your personal life.

19         You also snowboard too; is that correct?

20   A     It's been a while, but yes.

21   Q     You were snowboarding back in 2016, I guess, when you

22   had that conversation with Mr. Shamo.  You were discussing

23   that, right?

24   A     That's correct.

25   Q     In fact, before that eventful day on November 17th when
```

1     law enforcement came, you had already started planning to go

2     to Colorado; is that right?

3     A     Yes.

4     Q     That plan was in the works?

5     A     It was, correct.

6     Q     And part of that was you talked about -- when you

7     talked to Mr. Shamo, you talked about an Epic Pass as well;

8     is that right?

9     A     That's correct.

10    Q     So Colorado was a great destination for you; is that

11    right?

12    A     Correct.  I didn't have that pass at the time, but that

13    was what I was planning.

14    Q     And then you also stated earlier that you were there

15    when packages were opened; is that correct?

16    A     Correct.  I don't believe that was in 2016, but rather

17    2015.

18    Q     So early on you were getting packages and you would

19    open them in the presence of Mr. Shamo; is that right?

20    A     I wasn't the one who opened them, but I was present

21    when they were opened, yes.

22    Q     And was Mr. Crandall there as well?

23    A     Absolutely.

24    Q     And was that because you were using what was in the

25    package; is that correct?

```
 1   A     While I was using those drugs, I was not using the ones
 2   that specifically came from those packages.
 3   Q     But those are substances that you were using?
 4   A     Yes.
 5   Q     LSD, marijuana --
 6   A     That's correct.
 7   Q     -- cocaine; is that correct?
 8   A     Not cocaine.
 9   Q     Not cocaine.  Okay.
10         So in May of 2017, you interviewed with agents; is that
11   right?
12   A     In May, yes, that is correct.
13   Q     About six months after.
14         And just to clarify too, there was a search on
15   November 17th of your home, is that correct, of 2016?
16   A     Yes, that's correct.
17   Q     And you were not detained at that point; is that right?
18   A     I was -- I voluntarily went for questioning.  I was not
19   detained.
20   Q     So you got to sleep in your own bed that night?
21   A     After it had been tossed around, yeah.
22   Q     And have you ever spent a night in jail?
23   A     I have not.
24   Q     You never have?
25   A     No.
```

```
 1   Q    Okay.  And then six months later, approximately in May
 2   of 2017, you sat down with agents --
 3   A    Yes.
 4   Q    -- and spoke with them; is that right?
 5   A    Yes, that is correct.
 6   Q    Okay.  And you opened up with the agents at that point
 7   and talked about a lot of things.
 8        You stated that you left eBay in January of 2015; is
 9   that correct?
10   A    I believe -- yes, January 2015, that's correct.
11   Q    And did you pick up other work after that in 2015 --
12   other regular full-time employment?
13   A    No.  My employment consisted entirely of the operation
14   that had been run by Mr. Shamo and the others.
15   Q    So you were depending totally, financially, on the
16   operation; is that correct?
17   A    That is correct.
18   Q    And at that point, in January 2015, you were a receiver
19   of packages; is that right?
20   A    That is correct.
21   Q    And you testified you were making about 50 to $100 at
22   that point, per package; is that right?
23   A    That's correct as well.
24   Q    So you were making about 100 to $200 a month at that
25   point; is that correct?
```

1   A    That seems like an appropriate number, yes.

2   Q    Not a lot to live on at that point?

3   A    No.  I had other money saved that I was using for

4   living expenses.

5   Q    Okay.  And as things progressed, you pushed Mr. Shamo

6   for more work; is that right?

7   A    I did exactly that.  I brought up the request for more

8   work later on in 2015 when my savings began to run low.

9   Q    So you had some savings, and when things started to get

10  tight, you approached Mr. Shamo about more work?

11  A    Yes, that's correct.

12  Q    That was about what time, mid 2015?

13  A    I would say it was probably about May or June that I

14  approached him, and then June or July that I began acting as

15  a courier, a runner.

16  Q    Okay.  So was it June 2015 you started acting as a

17  courier.  How much did you get paid at that point?

18  A    That was $2,000 every other week.

19  Q    So beginning in June 2015, you're making about 4,000 a

20  month?

21  A    Yes.

22  Q    Okay.  And you stated that you didn't come to know

23  about the Fentanyl until the day of the search when you were

24  told; is that correct?  Is that your testimony?

25  A    That is correct.

1    Q    And you started making more money doing this.  And what

2    was the volume like in June of 2015?

3    A    Can you clarify what volume you're asking about?

4    Q    Well, the volume of how many -- the amount of packages

5    that you were moving.

6    A    Receiving or shipping?

7    Q    Shipping.

8    A    I would estimate that there was, by my recollection,

9    about 20 to 30 packages per night, five to six nights per

10   week.

11   Q    Okay.  And at the end here, there were about -- what

12   was the volume when you helped investigators on

13   November 18th?

14   A    If I recall correctly, it was roughly the same.  Maybe

15   slightly more than that.  Maybe it had bumped up to about 30

16   to 40 packages per night, but I believe it was still right

17   around 30 being the average.

18   Q    Okay.

19        MR. SAM:  If we could pull up Exhibit 23 -- I

20   believe it's 23.02.  If we can pull that up.

21        This is a copy of your plea agreement.

22        If we could go to page two.  Actually, let's go

23   back to page one.

24   BY MR. SAM:

25   Q    Count 2, conspiracy to distribute Fentanyl, you pled

 1   guilty to that; is that correct?

 2   A    I did, yes.

 3   Q    And why did you plead guilty to that if you had not had

 4   knowledge of it?

 5   A    I believe I pled guilty to that because that was the

 6   agreement that the United States government had reached with

 7   myself and my attorney.  If I recall correctly, they had not

 8   wanted to budge on any of those charges.

 9   Q    It could have been maybe they didn't believe you, but

10   that was a moment of truth that came to you on

11   November 17th?

12   A    That could be the case, yeah.

13   Q    Because you were making substantial money from this and

14   it was a livelihood for you; is that correct?

15   A    It was, absolutely.

16   Q    And you had aspirations of going to Colorado and

17   getting an Epic Pass, and kind of continuing on this path;

18   is that right?

19   A    Yes.

20   Q    Okay.  And then on page two, if we could go down to the

21   potential penalties of what you can get.  It's your

22   understanding that just for pleading to conspiracy to

23   distribute Fentanyl, you could get ten years --

24   A    Yes, I understand.

25   Q    -- as a minimum mandatory?

1    A    That was made clear at my change of plea.

2    Q    And a life maximum -- a life top, right?

3    A    Correct.

4    Q    And so it's your hope in coming here today and

5    testifying, and then also entering this plea, is that you

6    hope to avoid any substantial sentence; is that right?

7    A    Well, I understand that actions have consequences.  So

8    I only hope that my sentence is fair considering my

9    cooperation and my actions.

10   Q    I mean, you're fortunate to be alerted right off the

11   bat as this was all coming down and had that opportunity.

12   Do you feel fortunate that you were in that position?

13   A    Yes.  I feel fortunate that I was given a chance to do

14   the right thing.

15   Q    Would you take Mr. Shamo as somebody that would be able

16   to be smart enough to run a drug organization?

17   A    I would take him as someone who's smart enough to

18   maintain the operation on his own.

19   Q    So between Drew Crandall and Aaron Shamo, as far as the

20   technicality of pressing pills and putting formulas

21   together, who would you say would be better at that?

22   A    I don't know.  I don't know either of their expertise

23   when it comes to chemistry, so things like putting together

24   formulas.  But as far as the other half of your question, I

25   would say Mr. Crandall was more in tune with what that would

1   require.

2   Q    In fact, when you interviewed with agents in May of

3   2017, you said that, correct, that you felt that

4   Mr. Crandall would have the knowledge to do things where

5   Mr. Shamo would not, as far as pressing pills?

6   A    I don't recall specifically stating anything about

7   pressing pills, but I do recall in my testimony agreeing --

8   or, excuse me, not my testimony, my interview with agents,

9   agreeing that Mr. Crandall was smarter for that kind of

10  stuff.

11  Q    And it's your opinion that Mr. Shamo would not be able

12  to run this operation without some major help?

13  A    That's my opinion, that he wouldn't be able to set up

14  the operation without additional help.  Running it is

15  another question entirely.

16  Q    So your testimony is running -- or that setting it up,

17  he would not have the expertise in doing that?

18  A    That is correct.

19  Q    You felt like Crandall was there in the beginning and

20  kind of got things off the ground, then?

21  A    Yes, I definitely do.

22  Q    And without Crandall, this would have never turned into

23  this?

24  A    I think that's a fair assessment, yes.

25          MR. SAM:  Just a moment.

```
 1              THE COURT:  Sure.

 2              MR. SAM:  I have no further questions, Your Honor.

 3              THE COURT:  Thank you.

 4              Redirect?

 5                      REDIRECT EXAMINATION

 6  BY MR. GADD:

 7  Q    The first thing I wanted to bring up was just to

 8  clarify.  There were a few questions you got asked and a few

 9  responses that referred to you acting as a courier in 2015.

10  So I was hoping we could clarify the date.  Was it 2015 or

11  2016 that you started?

12  A    Can you clarify when it was that the search warrant was

13  served?

14  Q    So if the search warrant was November of 2016, how many

15  months before that would you have started?

16  A    It would have been June or July 2016, not 2015.

17  Q    So for the questions that you were asked, it was

18  talking about 2015.

19       Your time as a courier was just a few months, right?

20  A    That is accurate, yes.

21  Q    And that was 2016?

22  A    Correct.

23              MR. GADD:  Could we look at 23.02 again, and could

24  we go to paragraph 11.

25  //
```

1   BY MR. GADD:

2   Q    You got asked a question about not knowing it was

3   Fentanyl and still pleading guilty.  Let's look at paragraph

4   11 together.

5        So as part of your statement in advance of plea,

6   there's facts in there, and you stipulate and agree that the

7   following facts accurately describe your conduct.  That's

8   part of it, correct?

9   A    Yes, that is correct.

10  Q    I want to ask you again, after I read through this, if

11  it's still true.  In 2015, I agreed with Aaron Shamo and

12  other co-conspirators to accept packages of drugs addressed

13  to me at my address.  I would then transfer the drug

14  packages to Shamo.  Shamo paid me for each package I

15  accepted on his behalf.  I continued to accept packages on

16  Shamo's behalf in 2016.

17       On November 17th, 2016, one of those packages -- sent

18  from China and addressed to me at my address -- was seized

19  by law enforcement after it entered the United States Mail

20  system.  The package contained more than 40 grams of

21  Fentanyl.  I knew the packages I had been receiving

22  contained controlled substances.  I also knew that the

23  packages would enter the United States -- they were being

24  shipped to me from China.

25       In 2016, I became a runner for Shamo's organization.

1    Approximately five nights a week, I would drive to the

2    residence of Tonge and Bustin and pick up packages and

3    envelopes, all within the District of Utah, that were ready

4    to be mailed in the U.S. Postal system.  The packages and

5    envelopes contained drugs.  I would then drop off the

6    packages and envelopes at post offices scattered throughout

7    the Salt Lake Valley.  I staggered the post offices from

8    which I sent the packages in an attempt to avoid detection

9    by law -- if we can jump to the next page -- enforcement.

10   The packages I mailed contained both Fentanyl-laced pills

11   and alprazolam tablets.  I continued to ship packages and

12   envelopes of drugs for the Shamo organization until

13   November 2016.

14       My co-conspirators and I each had a role to play and we

15   relied upon each other to meet our common objective:  To

16   earn money by selling drugs.  I knowingly and voluntarily

17   involved myself with Shamo and my other co-conspirators.  It

18   was my free choice to do so.

19       Is any of that untrue?

20   A    No.  That is completely true.

21   Q    You got asked questions about Mr. Shamo's ability, his

22   aptitude.  Specifically I think you said that you weren't

23   sure he would have the ability to set up an organization

24   that led to these types of results, correct?

25   A    Correct.

1    Q    But you talked about running and maintaining it.  Why

2    do you say that he might be capable of running or

3    maintaining it?

4    A    Well, because setting it up would require a lot of

5    specialized technical knowledge about how to access the dark

6    web where the drugs were sold, how to set up accounts, all

7    that kind of stuff.

8         As far as maintaining, I believe it would be fair to

9    say that just about anyone could be taught how to maintain

10   something that has already been built.

11   Q    So in a sense you have given the jurors an opinion

12   about Mr. Shamo's ability, his aptitude?

13   A    That's correct.

14   Q    If you found out that Mr. Shamo was the one who did all

15   the setting up on the dark web, would it change your

16   opinion?

17   A    Yes.  It would definitely change my opinion.

18   Q    If you saw the thousands of Internet searches he did on

19   these and related topics, would it change your opinion?

20   A    It very well could, yes.

21   Q    And to be fair, no one has shown you those Internet

22   searches, right?

23   A    That's correct.

24   Q    Did you see, either on the news or elsewhere, the money

25   that came out of his house?

1   A    Yes.  I recall seeing that on the news.

2   Q    What did you think when you saw that?

3   A    I was astounded at the sheer volume of cash that was on

4   hand, both in total amount and number of bills, how large

5   the amount was.

6        MR. GADD:  Nothing further.  Thank you.

7        THE COURT:  Thank you, Mr. Gadd.

8        Recross, Mr. Sam?

9                    RECROSS-EXAMINATION

10  BY MR. SAM:

11  Q    So you were asked about maintaining or keeping up this

12  operation, correct?

13  A    Correct.

14  Q    As far as this operation goes, the reason why you're

15  here to take responsibility is it would have been impossible

16  for something like this to be run without some structure,

17  without somebody like you picking up the drugs and going out

18  throughout the valley and dropping them off in different

19  locations; is that correct?

20  A    Correct.  There was quite a bit of structure in how the

21  operation was handled and built.

22  Q    There's a lot of detailed instructions as far as your

23  responsibility.  You were being paid $4,000 a month to go

24  drop off packages, correct?

25  A    Correct.

1   Q    So you had a -- and I wanted a clarification too, in

2   that when you were wired with Mr. Shamo and had that

3   conversation that we went through, you made the statement

4   that you were going to get paid 3,000 biweekly.  Is that

5   what you said in there?  Do you remember that?

6   A    I believe I asked for clarification about how much,

7   asking if it was either four or 5,000, and Mr. Shamo

8   clarified that normally it would be 2,500, and he would make

9   it 3,000 for me.

10  Q    Okay.  And what was the time period?  So you're saying

11  four or 5,000 a month?

12  A    No, biweekly.

13  Q    Oh, biweekly.  And when you say biweekly, what did that

14  mean, twice a week or twice a month?

15  A    Twice a month, every other week.

16  Q    Okay.  I just wanted a clarification on that, how much

17  money we're talking about.  But we're talking about between

18  five or $6,000 a month is what you were anticipating going

19  to Colorado to do this?

20  A    I would say I was anticipating, at the start of that

21  conversation and prior to this, that it would be between six

22  and $10,000 all together per month.  Mr. Shamo clarified

23  that it would be 6,000 all together per month.

24  Q    So that was something that you were comfortable with,

25  and that's why you're taking responsibility here, because

1    that was a substantial position in the company -- or the

2    operation, and you would be compensated for it, and you

3    recognize that that was something that was a major part of

4    the operation?

5    A    Yes.  I definitely understood the seriousness of my --

6    what my responsibility would be in the operation with that.

7    Q    And you were just one -- you were just one part of the

8    organization; is that your understanding?  There was a lot

9    of other things going on?

10   A    Yes, correct.

11   Q    And that's why you say as far as Mr. Shamo setting this

12   up, he wouldn't have had the ability to set this all up on

13   his own?

14   A    That's how I've testified, yes, correct.

15   Q    And there were other things -- you were going to take

16   over a position of shipper, what Ms. Tonge and Ms. Bustin

17   were doing, in Colorado; is that right?  You would fill that

18   role in Colorado?

19   A    That was my understanding as well, yes.

20   Q    And had you been trained in that?  Did you know what

21   that fully was going to entail?

22   A    No, I did not.

23   Q    Okay.  But you understood that it was somewhat intense,

24   from your observation?

25   A    Can you clarify what you mean by intense?

```
 1   Q    Well, I mean it was substantial.  You were involved

 2   with picking up packages.  So you'd pick up 20 to 30

 3   packages a night; is that correct?

 4   A    That is correct.

 5   Q    And so there was some work that had to be done to

 6   produce that?

 7   A    Correct.  My understanding was it would be preparing

 8   those packages.

 9   Q    As far as the detail of how that all happened, you

10   didn't know at this point; is that correct?

11   A    I didn't get any specifics about that.

12   Q    But you expected to get some training if you were going

13   to Colorado, that you would be prepped on that, what the

14   details of that would be?

15   A    Correct.

16   Q    Okay.  All right.

17        I don't have any further questions for you.

18             THE COURT:  Thank you.

19             Are we done with this witness?

20             MR. GADD:  Please.

21             THE COURT:  You may be excused.  Thank you.

22             (Proceedings not transcribed)

23

24

25
```

```
 1                    C E R T I F I C A T E

 2

 3

 4          I hereby certify that the foregoing matter is

 5    transcribed from the stenographic notes taken by me and is a

 6    true and accurate transcription of the same.

 7

 8

 9

10

11

12

13

14

15

16    PATTI WALKER, CSR-RPR-CP        DATED: 10-31-19
      Official Court Reporter
17    351 South West Temple, #8.431
      Salt Lake City, Utah  84101
18    801-364-5440

19

20

21

22

23

24

25
```

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION


In re:                    )
                          )
UNITED STATES OF          )
AMERICA,                  )
                          )
        Plaintiff,        )
                          )
vs.                       )   Case No.
                          )   2:16-CR-00631DAK
AARON MICHAEL SHAMO,      )
                          )
        Defendant.        )
                          )
_____    )




BEFORE THE HONORABLE DALE A. KIMBALL

August 14, 2019


JURY TRIAL


Trial Testimony of:

Alexandrya Tonge

Katherine Bustin

**Appearances of Counsel:**

For the Plaintiff:      Kent A. Burggraaf
                              S. Michael Gadd
                              Attorney at Law
                              Utah Attorney General's Office
                              348 E. South Temple
                              Salt Lake City, Utah 84111

                              Vernon G. Stejskal
                              Attorney at Law
                              US Attorney's Office
                              111 S. Main Street
                              Suite 1800
                              Salt Lake City, Utah 84111

For the Defendant:      Gregory G. Skordas
                              Kaytlin V. Beckett
                              Attorney at Law
                              Skordas & Caston
                              560 South 300 East
                              Suite 225
                              Salt Lake City, Utah 84111

                              Daryl P. Sam
                              Attorney at Law
                              Daryl P. Sam PLLC
                              5955 South Redwood Road
                              Suite 102
                              Salt Lake City, Utah 84123

Court Reporter:

        Laura W. Robinson, RPR, FCRR, CSR, CP
               351 South West Temple
               8.430 U.S. Courthouse
            Salt Lake City, Utah 84101
                (801)328-4800

2

```
                         I N D E X
```

Examinations                                              Page

**ALEXANDRYA TONGE**
CONTINUED DIRECT EXAMINATION                                 4
BY MR. STEJSKAL
CROSS-EXAMINATION                                           18
BY MS. BECKETT
REDIRECT EXAMINATION                                        33
BY MR. STEJSKAL
RECROSS-EXAMINATION                                         36
BY MS. BECKETT
**KATHERINE BUSTIN**                                       37
DIRECT EXAMINATION                                         38
BY MR. STEJSKAL
CROSS-EXAMINATION                                          53
BY MR. SKORDAS

```
 1   Salt Lake City, Utah                    August 14, 2019
 2                          (8:38 a.m.)
 3              THE COURT:  The jury is here.  Are we ready
 4   to proceed?
 5              MR. GADD:  Yes, Your Honor.
 6              THE COURT:  All right.  We'll get them.  The
 7   witness may resume the stand assuming she is here.
 8              MR. STEJSKAL:  She is here, she is just in
 9   the other room.
10              (Jury returned.)
11              THE COURT:  Good morning ladies and gentlemen
12   of the jury.  Thank you for being here.  Thank you
13   for being prompt.  We appreciate your work.
14              You may proceed, Mr. Stejskal.
15              MR. STEJSKAL:  Thank you, Your Honor.
16              (Whereupon, Ms. Alexandrya Tonge resumed
17               the witness stand having been previously
18               sworn.)
19                  CONTINUED DIRECT EXAMINATION
20   BY MR. STEJSKAL:
21   Q.   Ms. Tonge, we were talking yesterday a little bit
22   about the financial arrangements and I believe you
23   said your pay from Mr. Shamo increased over time; is
24   that correct?
25   A.   It is.
```

00:41:07
00:42:23
00:42:59
00:43:00
00:43:18

4

```
 1    Q.   And you said you were paid in cash but there were

 2    also other methods with which you were paid?

 3    A.   Yes.

 4    Q.   And let's specifically refer to Venmo.  Were you

 5    ever paid by Venmo?

 6    A.   Yeah, on a couple of occasions.

 7    Q.   Tell me what Venmo is?

 8    A.   It is an electronic form of receiving money.  So

 9    you can send it from your bank account to someone

10    else's user name and they can transfer it to their

11    personal bank account.

12    Q.   So instead of handing cash, it is some kind of

13    electronic transfer?

14    A.   Correct.

15    Q.   Okay.  Let's pop up Exhibit 16.02.  Can you see

16    that there in front of you?

17    A.   Yes.

18    Q.   And in the left hand column there do you see your

19    name in several places highlighted in blue?

20    A.   Yes.

21    Q.   And then there are payments in another column

22    that says debit.  Do you see those?

23    A.   Yes.

24    Q.   And then in the column next to that there are

25    some comments do you see those, too, like halfway
```

00:43:28 — line 5
00:43:38 — line 10
00:43:47 — line 15
00:44:05 — line 20
00:44:22 — line 25

5

```
 1   down the page "obey my dog"?

 2   A.   Yeah.

 3   Q.   Can you tell us what that is about?

 4   A.   Just funny comments that he would add to the

 5   message that he was sending with the money.

 6   Q.   So they're not really what it's about, it is just

 7   kind of funny comments then?

 8   A.   Correct, yeah.

 9   Q.   What are those payments for?

10   A.   Um, for either payment for just normal or

11   reimbursement for purchasing things at the post

12   office.

13   Q.   And by payment "for normal", what do you mean by

14   that?

15   A.   Um, what he would pay us to do, what we were

16   doing shipping out drugs.

17   Q.   Okay.  So basically wages for your work?

18   A.   Yeah.

19   Q.   And those $500 amounts there in the middle in

20   September of 2015, is that kind of a normal payment

21   you would have received at that time for your work?

22   A.   Yes.

23   Q.   Let's go to the second page.  There is a few more

24   down there, there is a 625, another 500, do you see

25   those?
```

00:44:37 (line 5)
00:44:46 (line 10)
00:44:59 (line 15)
00:45:11 (line 20)
00:45:32 (line 25)

6

```
        1    A.    Yeah.
        2    Q.    Again, are those consistent with payment for your
        3    work?
        4    A.    Yes.
00:45:39 5    Q.    Then there is some totals at the bottom.  Do you
        6    see next to your name there it says, total for you
        7    5,950.  Were you making that kind of money over the
        8    course of this?
        9    A.    Yeah, it seems about right.
00:46:00 10   Q.    You said some of this might have been
        11   reimbursement for other things?
        12   A.    Yeah, purchasing postage, priority stamps at the
        13   post office if we needed to do that.
        14   Q.    So sometimes you would do that with your own
00:46:12 15   money and get reimbursed?
        16   A.    Correct.
        17   Q.    By whom?
        18   A.    By Aaron.
        19   Q.    And how would you communicate with him to get
00:46:19 20   reimbursed?
        21   A.    Through telegram to let him know this is what we
        22   spent so if you could send that.
        23   Q.    And would he always pay you back?
        24   A.    Yeah.
00:46:29 25   Q.    Now, you're aware that there was cash seized from
```

7

```
        1    your home on November 22nd of 2016?

        2    A.   Yes.

        3    Q.   Approximately $19,000 or 19,500?

        4    A.   Yes.

00:46:45 5    Q.   What was that cash from?

        6    A.   Payments from Aaron for doing what we were doing.

        7    Q.   So that money came in cash and sometimes you guys

        8    just stored it away there at the house?

        9    A.   Yeah.

00:46:57 10   Q.   If we can look at 11.00, photo 6.  So that is in

       11    your home?

       12    A.   Yes.

       13    Q.   In the bedroom?

       14    A.   Yeah.

00:47:15 15   Q.   Is that Ms. Bustin's drawer or yours?

       16    A.   Ms. Bustin's.

       17    Q.   Okay.  And then let me see, there were the --

       18    let's look at 23, picture 23.  Do you see the money

       19    in the nightstand drawer there?

00:47:39 20   A.   Yes.

       21    Q.   Okay.  That was also in your home.  And then

       22    picture 24.  And that is your side, your nightstand?

       23    A.   Yes.

       24    Q.   Okay.  So that was just money you had around?

00:47:54 25   A.   It wasn't deposited.  We were just kind of
```

8

```
 1    keeping it.

 2    Q.   You had spent some of the money that Mr. Shamo

 3    paid you over the course of these events too,

 4    correct?

 5    A.   Yes.

 6    Q.   So you made money off of this, your role in this

 7    operation, correct?

 8    A.   Yes.

 9    Q.   Did you see pictures of or hear about the money

10    taken from Mr. Shamo's home?

11    A.   Yes.

12    Q.   And do you recall roughly how much that was?

13    A.   Over a million in cash.

14    Q.   Did you and Ms. Bustin have anywhere near that

15    amount?

16    A.   No.

17    Q.   How come you guys didn't have that much?

18    A.   I wasn't even remotely aware of the amount this

19    was bringing in.

20    Q.   Were you in charge of the money?

21    A.   No.

22    Q.   Did money come directly to you from customers?

23    A.   No.

24    Q.   Did Bitcoin come directly to you from customers?

25    A.   No.
```

00:48:05 — 5
00:48:18 — 10
00:48:27 — 15
00:48:45 — 20
00:48:55 — 25

1  Q.   Let's look at Exhibit 23.07.  This is your

2  Statement in Advance of Plea of Guilty or essentially

3  your guilty plea.  Do you recall that?

4  A.   Yes.

00:49:22   5  Q.   And did you, in fact, plead guilty to every

6  charge against you in this case?

7  A.   I did.

8  Q.   Did you go over that with your attorney?

9  A.   I did.

00:49:34  10  Q.   And did you enter that guilty plea with a full

11  understanding of what you were doing?

12  A.   Yes.

13  Q.   Was there any specific sentencing agreement that

14  you would get probation or you would get no jail or

00:49:46  15  you would get ten years or anything like that?

16  A.   No.

17  Q.   Did you agree to testify truthfully in any

18  hearing or case that came up in this matter?

19  A.   Yes.

00:50:02  20  Q.   Why did you decide to do that?

21  A.   I knew what we were involved in was wrong and we

22  had made poor choices and I just wanted the

23  opportunity to own up to that.

24  Q.   Okay.  Do you also have hope that the judge will

00:50:22  25  consider this in determining what your punishment

10

1 will be from this?

2 A. Yeah.

3 Q. Have you testified truthfully?

4 A. Yes.

00:50:38 5 Q. It was also part of the agreement that you

6 wouldn't be charged with any death that resulted in

7 this case; is that correct?

8 A. Correct.

9 Q. Now, you knew nothing about that during your

00:50:49 10 participation, correct?

11 A. Correct.

12 Q. It's also true that you have no stake in the

13 outcome, correct?

14 A. Correct.

00:51:00 15 Q. Doesn't matter what happens as long as you tell

16 the truth?

17 A. Yes.

18 Q. You expect to get sentenced after this is over,

19 correct?

00:51:08 20 A. Yes.

21 Q. After this trial is over?

22 A. Yes.

23 Q. Did you have other consequences other than this

24 criminal charge because of your involvement in this

00:51:19 25 case?

11

1   A.   Yeah, um, I lost my job.

2   Q.   That was at eBay?

3   A.   Yes.

4   Q.   You were essentially fired?

00:51:27   5   A.   Yup.

6   Q.   Why did they say they did that?

7   A.   Just our involvement in this case.

8   Q.   Okay.

9   A.   Um, I received a general under other than

00:51:39   10   honorable discharge from the military.

11   Q.   And the military was important to you, correct?

12   A.   (Witness crying) extremely.

13   Q.   Very important to you.  You served six years

14   honorably?

00:52:08   15   A.   Yes.

16   Q.   And you were also going to school to become a

17   helicopter pilot; is that correct?

18   A.   Correct.

19   Q.   That is gone as well?

00:52:18   20   A.   Yes.

21   Q.   So there have been consequences already from your

22   actions in this?

23   A.   Yes.

24   Q.   And you expect additional consequences from your

00:52:26   25   sentencing?

12

```
 1   A.   Yes.
 2   Q.   After reflecting on this and kind of
 3   understanding the scope of all that was involved in
 4   this organization, you have empathy for others who
 5   may have been affected by this?
 6   A.   Yeah, absolutely.
 7   Q.   Tell us about that?
 8   A.   I wasn't, you know, fully aware of the alteration
 9   of the drugs and what was being sent and sold as
10   something else.  And when we found that out November
11   22nd when we were interviewed, and talking to
12   Homeland Security and the post office inspector, they
13   told us the severity of what was being used and I
14   felt badly.
15   Q.   Let's talk about a couple more things.  Let's
16   look at Exhibit 14.30.  Here is the first page.  Can
17   you tell us what that is?
18   A.   Yeah.  An order sheet.  It looks like for Xanax
19   bars.
20   Q.   Is this -- this is just one page but is this a
21   typical order sheet as they came to you?
22   A.   Yes.
23   Q.   From Mr. Shamo?
24   A.   Yes.
25   Q.   Let's look at Page 862.  If you can look at that
```

00:52:39  5
00:52:54  10
00:53:26  15
00:53:50  20
00:53:58  25

13

```
 1   bottom entry there what does that say?

 2   A.   It says "sale of Roxy or Oxycodone".

 3   Q.   And how many?

 4   A.   Ten.

 5   Q.   And in what strength?

 6   A.   30 milligram.

 7   Q.   Were these always 30 milligrams?

 8   A.   Yeah, I think so.

 9   Q.   Okay.  And what does that postage part mean?

10   A.   They paid for priority mail.

11   Q.   And what is the name at the bottom there?

12   A.   Gregory Lee.

13   Q.   If we can go to the very next page.  There at the

14   top, that is a continuation of that address?

15   A.   Yes.

16   Q.   So did you and Ms. Bustin send a package to that

17   if you were fulfilling these orders?

18   A.   Yes.

19   Q.   And again, that date looked like June 6th of

20   2016?

21   A.   Yeah.

22   Q.   I'm going to hand you next what has been marked

23   or admitted as Government's Exhibit 11.05.  Can you

24   tell us what that is?

25   A.   Sheets of tracking information from packages that
```

14

1    were sent out and then a customer name notated next

2    to it to know what tracking was assigned to which

3    customer.

4    Q.   While we're looking at that, can you pull up

5    11.00, Page 9, please.  If you could highlight by the

6    glove there?  On the screen is essentially the same

7    thing maybe not the same page, but the same thing

8    you're talking about there?

9    A.   Yes.

10   Q.   Again, what are those?

11   A.   Tracking numbers from the postage that was used

12   for a package that was sent out and a customer name

13   notated in the exhibit.

14   Q.   Explain that to us.  It looks like stickers, the

15   black part?

16   A.   Yeah.  So it was a tracking number that could be

17   used with priority mail and you can pull one part of

18   the sticker off and put it on the package and then

19   one part is for your reference to reference the

20   tracking on that shipment.

21   Q.   And then on the end of that it looks like

22   handwritten names?

23   A.   Yeah.  My handwriting, um, writing names of the

24   customers that that tracking number referenced.

25   Q.   What was the purpose of keeping this information?

00:55:42
00:56:01
00:56:16
00:56:28
00:56:40

15

1  A.  To know if there was an issue with a package that

2  was sent if it didn't arrive or it arrived.

3  Q.  So if there was a problem somebody gave you a

4  name you could reference these sheets and figure out

00:56:55    5  the tracking number for that order?

6  A.  Yes.  Yup.

7  Q.  Looking at 11.5 in front of you, there is a

8  column that is going up and down as it is facing you.

9  Can you see that?

00:57:03   10  A.  Yes.

11  Q.  What's the first name in that first column on

12  your left?

13  A.  Gregory Lee.

14  Q.  And is there a tracking label next to that?

00:57:12   15  A.  There is.

16  Q.  And what does that indicate to you?

17  A.  That that package was shipped out.

18  Q.  Thank you.  And let's next look at Exhibit 18.01,

19  photo 8.  Do you recognize that?

00:57:34   20  A.  Yes.

21  Q.  What is that?

22  A.  That was the first stages of sending out packages

23  with a return address and a name that was random and

24  then a "to address" referencing the order that was

00:57:50   25  given to us to ship out.

16

1    Q.   So in the upper left, that Erin Sandoval, that's

2    the return address?

3    A.   Yes.

4    Q.   That is just a name that you made up?

00:57:59    5    A.   Yes.

6    Q.   Or came up with in some way?

7    A.   Yes.

8    Q.   But the "to", that's the actual customer?

9    A.   Yes.

00:58:05    10    Q.   That the drugs were sent to?

11    A.   Yes.

12    Q.   Okay.  Thank you.  Let's try to understand your

13    role.  Did you organize this operation?

14    A.   No.

00:58:20    15    Q.   Who did?

16    A.   Um, Aaron and Drew.

17    Q.   And after Drew left, who was kind of charge of

18    the organization?

19    A.   Aaron.

00:58:28    20    Q.   Did you recruit anyone to participate?

21    A.   No.

22    Q.   Did you manage anyone to supervise their

23    day-to-day activities?

24    A.   No.

00:58:42    25    Q.   Do you believe you knew everybody else that was

17

```
 1    involved in this organization?

 2    A.    No.

 3    Q.    Why do you say that?

 4    A.    When I saw the -- all of the names listed or

 5    read, you know, there was 20 people involved.  I had

 6    no idea.

 7    Q.    So your role was limited to exactly what you

 8    explained, packaging and shipping the drugs?

 9    A.    Yes.

10    Q.    And putting them in the boxes for a while and

11    then that got taken from you?

12    A.    Correct.

13    Q.    Based on all that you know, who was in charge of

14    this operation?

15    A.    Aaron Shamo.

16          MR. STEJSKAL:  Thank you.  That's all of the

17    questions I have.

18          THE COURT:  Thank you Mr. Stejskal.  You may

19    cross-examine, Ms. Beckett.

20                    CROSS-EXAMINATION

21    BY MS. BECKETT:

22    Q.    Ms. Tonge, I believe it was your testimony that

23    you began your involvement with this organization in

24    2015; is that correct?

25    A.    Correct.
```

00:58:53 (line 5)
00:59:15 (line 15)
00:59:22 (line 20)
00:59:50 (line 25)

18

1    Q.    When in 2015?

2    A.    Approximately April or March.

3    Q.    And I believe it was also your testimony that you

4    approached Aaron Shamo and asked how you could be

01:00:06   5    involved, correct?

6    A.    How I could make money from him whatever he was

7    doing, involved in.

8    Q.    So your intention was to find a way to make some

9    easy money?

01:00:17   10   A.    To make extra money, yeah.

11   Q.    You were still working at the time, correct?

12   A.    Correct.

13   Q.    I believe at that point in time your testimony

14   was that you were living in Riverton?

01:00:24   15   A.    Yes.

16   Q.    With your girlfriend at the time Katie Bustin?

17   A.    Bustin, yeah.

18   Q.    And your mother?

19   A.    Yes.

01:00:32   20   Q.    Were you renting a home out there?

21   A.    I was, yup.

22   Q.    The three of you?

23   A.    Yes.

24   Q.    Any other adults in that home?

01:00:40   25   A.    No.

19

```
         1    Q.   And at some point in I believe 2016 you moved

         2    from Riverton to Daybreak; is that correct?

         3    A.   It was in 2015.

         4    Q.   End of 2015, middle of 2015?

01:00:54 5    A.   June.

         6    Q.   June of 2015?

         7    A.   Yes.

         8    Q.   So not long after you started in this

         9    organization you were able to move from Riverton to

01:01:01 10   Daybreak?

        11    A.   Correct.

        12    Q.   And you moved into a separate home from your

        13    mother?

        14    A.   Rented a town home, yeah.

01:01:08 15   Q.   And your mother had a town home or house she was

        16    renting or purchased?

        17    A.   A townhouse that she purchased.

        18    Q.   I believe your testimony was that towards the end

        19    of this organization you were making roughly 3,500

01:01:28 20   every two weeks between the two of you; correct?

        21    A.   Correct.

        22    Q.   With that money you also paid off your truck;

        23    correct?

        24    A.   I did not.

01:01:41 25   Q.   Your truck is not paid off?
```

20

```
 1   A.   It was not.

 2   Q.   Your truck is currently not paid off?

 3   A.   Um, the truck that I had at the time was a loan.

 4   I sold that truck and I was given a truck from work

 5   that I currently drive that is paid off but it was

 6   not paid off by me.

 7   Q.   You had a car as well, correct?

 8   A.   Correct.

 9   Q.   You were paying on that during this time period

10   as well, correct?

11   A.   Yes.

12   Q.   So you and your girlfriend made enough money to

13   move into a town home at Daybreak and pay on two

14   vehicles during this time period, correct?

15   A.   Yes.

16   Q.   I believe it is also your testimony that your

17   initial contact after you approached Aaron Shamo was

18   Drew Crandall; is that correct?

19   A.   We talked to him as well, yes, but never directly

20   to just Drew.

21   Q.   Drew never came over to your home?

22   A.   He did.

23   Q.   So you did speak directly with Drew Crandall?

24   A.   Correct, but he wasn't just someone that we were

25   only working with, we were working with both parties.
```

01:01:54 (line 5)
01:02:05 (line 10)
01:02:18 (line 15)
01:02:33 (line 20)
01:02:45 (line 25)

21

01:02:56

01:03:10

01:03:24

01:03:47

01:03:58

1   Q.   Drew is the person who showed you how to package

2   these items for shipping, correct?

3   A.   He did.

4   Q.   He showed you how to operate the heat sealer?

5   A.   He did.

6   Q.   Came over to your home on a regular basis?

7   A.   For about two weeks.

8   Q.   Showed you how to find return addresses?

9   A.   Drop a pin on a map, yup.

10  Q.   Showed you how to find blue boxes or post office

11  boxes or post office places to drop these packages

12  off?

13  A.   Just said find blue boxes in these areas.

14  Q.   He instructed you on how to do that, correct?

15  A.   Sure.

16  Q.   I believe it was also your testimony that Drew is

17  the one who set up the "Pass the Peas" e-mail account

18  for you; is that correct?

19  A.   Correct.

20  Q.   Did you forfeit any assets?

21  A.   The money in the home.

22  Q.   So just the 1,900 --

23  A.   19,000.

24  Q.   19,500?

25  A.   Yes.

|       |    |                                                                |
|-------|----|----------------------------------------------------------------|
|       | 1  | Q.   That's not all of the money you made during this          |
|       | 2  | organization though, was it?                                   |
|       | 3  | A.   No, it was not.                                           |
|       | 4  | Q.   You made a significant amount of money, correct?          |
| 01:04:06 | 5 | A.   In comparison I would say no.                            |
|       | 6  | Q.   I did not ask in comparison.  You made a                 |
|       | 7  | significant amount of money, correct?                          |
|       | 8  | A.   I made money, yes.                                        |
|       | 9  | Q.   You were still working during this time period,          |
| 01:04:19 | 10 | correct?                                                     |
|       | 11 | A.   Correct.                                                  |
|       | 12 | Q.   You had a salary from your job plus all of this          |
|       | 13 | roughly 3,500 every two weeks between you and                 |
|       | 14 | Ms. Bustin, correct?                                          |
| 01:04:26 | 15 | A.   3,500 at the end, not throughout.                       |
|       | 16 | Q.   You essentially managed your own schedule during        |
|       | 17 | all of this though, correct?                                  |
|       | 18 | A.   Yes.                                                      |
|       | 19 | Q.   And there were multiple times where you contacted       |
| 01:04:41 | 20 | either Aaron or Drew Crandall and complained about            |
|       | 21 | the amount of work you had to do, correct?                    |
|       | 22 | A.   Correct.                                                 |
|       | 23 | Q.   And when you needed any sort of assistance you          |
|       | 24 | received the assistance you needed, correct?                  |
| 01:04:55 | 25 | A.   Correct.                                                 |

23

01:05:06

01:05:14

01:05:25

01:05:33

01:05:50

```
 1   Q.   At some point in time you decided you did not
 2   want to be the party who was dropping off these
 3   packages, correct?
 4   A.   Correct.
 5   Q.   And you essentially asked for somebody else to
 6   come fulfill that role, correct?
 7   A.   Yes.
 8   Q.   That individual was Sean Gygi, correct?
 9   A.   Yes.
10   Q.   And he became your point of contact and you would
11   let him know when to pick up packages, correct?
12   A.   When we had finished processing we would just say
13   hey they're ready for you.
14   Q.   And you would tell him to come get them?
15   A.   We would just let him know that they were ready
16   so that he could come get them.
17   Q.   And you would let him know where they needed to
18   be dropped off?
19   A.   He would see the address from the label and he
20   would know which area it needed to be taken to.
21   Q.   There was never a point in time when you told him
22   these may need to go to Lehi or these may need to go
23   to Sandy or some other area?
24   A.   I may have referenced the city.
25   Q.   I believe it was also your testimony that you
```

24

|  | 1 | began in the military in 2013; is that correct? |
|--|---|--|
|  | 2 | A.    Yes. |
|  | 3 | Q.    And you were discharged in 2019, correct? |
|  | 4 | A.    Correct. |
| 01:06:01 | 5 | Q.    Your testimony was that you were -- were you |
|  | 6 | active duty during that time period? |
|  | 7 | A.    National Guard. |
|  | 8 | Q.    Just reserves? |
|  | 9 | A.    Yes. |
| 01:06:08 | 10 | Q.    So for almost the entirety of your military |
|  | 11 | career you were involved in this organization? |
|  | 12 | A.    For two years of the six. |
|  | 13 | Q.    When did you plead guilty in this case? |
|  | 14 | A.    In June of 2018. |
| 01:06:28 | 15 | Q.    You were going to school during this time period |
|  | 16 | too, correct? |
|  | 17 | A.    Correct. |
|  | 18 | Q.    You wanted to become a helicopter pilot? |
|  | 19 | A.    Yes. |
| 01:06:39 | 20 | Q.    I'm going to ask that question again.  You wanted |
|  | 21 | to become a helicopter pilot, correct? |
|  | 22 | A.    Yes. |
|  | 23 | Q.    So in November of 2016 when you were stopped by |
|  | 24 | police officers or agents in this case, you had a lot |
| 01:06:50 | 25 | to lose, correct? |

25

01:06:57

01:07:03

01:07:28

01:07:41

01:07:56

1    A.    Yes.

2    Q.    You had a girlfriend?

3    A.    Yes.

4    Q.    A career?

5    A.    Yes.

6    Q.    A family?

7    A.    Yes, yup.

8    Q.    A mother you wanted to take care of?

9    A.    Yup.

10   Q.    You were also trying to purchase a home?

11   A.    Correct.

12   Q.    When agents approached you, you told them

13   anything they needed to hear, correct?

14   A.    I told them the truth.

15   Q.    At the end of 2016 when you were approached by

16   agents, at that point in time was Drew Crandall

17   involved in the organization?

18   A.    He was, yes.

19   Q.    You had contact with him through e-mail and

20   telegram?

21   A.    On occasion, yes.

22   Q.    Are you familiar with Luke Paz?

23   A.    I know the name, yes.

24   Q.    Are you familiar with his role in this

25   organization?

26

1   A.   Mostly.

2   Q.   What is your understanding of Luke Paz's role in

3   this organization?

4   A.   He pressed pills with Aaron.

01:08:05   5   Q.   What kind of pills did Luke Paz press?

6   A.   The oxycodone fentanyl pills.

7   Q.   At some point in time did Aaron Shamo express

8   frustration to you about not having access to the

9   formula for the fentanyl pills?

01:08:19   10   A.   He did.

11   Q.   Who did he say had that formula?

12   A.   Luke.

13   Q.   Did he say that that formula -- without having

14   that formula he was unable to actually press the

01:08:28   15   pills himself?

16   A.   Correct.

17   Q.   And that he was frustrated that Luke held onto

18   that formula and kept it from him?

19   A.   Yes, because he wanted to do that himself.

01:08:44   20   Q.   I believe we looked at a couple of invoices on

21   some of these exhibits, do you remember those?

22   A.   Yes.

23   Q.   You created some of those invoices, correct?

24   A.   I did.

01:08:54   25   Q.   You had kind of free range on what those looked

27

```
 1  like, correct?
 2  A.   Correct.
 3  Q.   I believe part of your testimony was that you and
 4  Katie wanted to leave this organization and that
 5  Aaron had offered you a down payment on a home to
 6  keep you around.  Is that your testimony?
 7  A.   Correct.
 8  Q.   Do you remember a time in 2000 -- it may have
 9  been 2015 but possibly early 2016 when there was an
10  incident involving your dog?
11  A.   Yes.
12  Q.   Can you tell me what that was?
13  A.   Um, yes.  He had gotten into the room where we
14  kept all of the products and ingested an MDMA pill.
15  Q.   Do you remember approaching Aaron and telling him
16  that you needed a home with a backyard so you could
17  continue to manufacture pills and not put your
18  animals at risk?
19  A.   I don't remember that, no.
20  Q.   Would it surprise you if a conversation like that
21  occurred?
22  A.   I know we talked to him about the dog getting
23  hurt, but no, it wouldn't.
24  Q.   Do you remember complaining to Aaron about the
25  number of orders you had to fulfill or Drew about the
```

01:09:09
01:09:24
01:09:37
01:09:48
01:10:01

28

```
 1   number of orders you had to fulfill?
 2   A.   Yes.
 3   Q.   Do you remember suggesting to either Drew or
 4   Aaron that potentially shipping in bulk was a better
 5   idea for you, Katie, and the organization?
 6   A.   No.
 7   Q.   You also testified that you received money
 8   through Venmo, not just cash, correct?
 9   A.   Correct.
10   Q.   And that you also had your own Bitcoin wallet; is
11   that correct?
12   A.   To purchase postage only, yes.
13   Q.   But you knew how to use that Bitcoin wallet,
14   correct?
15   A.   Yes, correct.
16   Q.   There has been some testimony about Aaron leaving
17   or some individual leaving drugs or items in your
18   truck and that's where you would retrieve them from.
19   Does that sound correct to you?
20   A.   Correct.
21   Q.   Did Aaron ever have a key fob for your truck?
22   A.   He had the pin code for the door.
23   Q.   But not the key fob, correct?
24   A.   Correct.
25   Q.   Did that pin code make the lights in your truck
```

01:10:14
01:10:28
01:10:39
01:10:59
01:11:09

29

```
 1   flash on and off when you enter the code?

 2   A.    I don't know if the lights flash.

 3   Q.    Like with a key fob, do you know what?

 4   A.    Yeah, I -- I don't recall but sure.

 5   Q.    Is it also consistent with your testimony that

 6   you and Katie did actually use those gel caps to

 7   manufacture MDMA pills for shipping, correct?

 8   A.    Correct.

 9   Q.    So you weren't just involved in shipping, you

10   actually manufactured those pills?

11   A.    That's not manufacturing it's just putting the

12   powder that is already there in to a capsule.  It is

13   not making them.  It is -- I think it is different.

14   There is not a formula involved or any other

15   additions.

16   Q.    Taking it from one form to another in order to

17   sell it en masse?

18   A.    Sure.

19   Q.    Is that correct?

20   A.    I think it's a different terminology.  There's

21   not a formula.  It is taking one powder and putting

22   it into a capsule instead of adding different

23   ingredients.

24   Q.    Ms. Tonge, I didn't ask you if there was a

25   formula involved, I asked if you took the product
```

01:11:25  (line 5)
01:11:39  (line 10)
01:11:52  (line 15)
01:12:00  (line 20)
01:12:17  (line 25)

30

```
 1   from one form, put it into another, and then shipped
 2   it out for sale?
 3   A.   Yes.
 4   Q.   Since you were stopped on November 22nd, 2016,
 5   did you spend time in jail?
 6   A.   I did not.
 7   Q.   As a matter of fact, you got married since that
 8   date, correct?
 9   A.   I did.
10   Q.   After you pled guilty in this case, did you have
11   any other interviews with the government?
12   A.   I have.
13   Q.   How many interviews have you had?
14   A.   One.
15   Q.   I believe we looked at your Statement in Advance
16   of Plea?
17   A.   Yes.
18   Q.   Were you offered any incentive for cooperating
19   with the government?
20   A.   Not at the beginning, no, I was not.
21   Q.   When you entered that plea?
22   A.   I was.
23   Q.   You were offered both leniency for cooperating as
24   well as told that you would not be charged with a
25   death resulting count, correct?
```

01:12:32 (line 5)
01:12:47 (line 10)
01:13:01 (line 15)
01:13:12 (line 20)
01:13:26 (line 25)

31

```
 1    A.   Correct.
 2    Q.   If we can look at Exhibit 14.30.  Do you have the
 3    page number on that very large exhibit.  Do you have
 4    a page number down at the bottom of this exhibit?
 5    That is an order you fulfilled, correct?
 6    A.   Correct.
 7    Q.   So an order you shipped, correct?
 8    A.   Correct.
 9    Q.   Are you aware that the government is alleging
10    that this shipment to Gregory Lee is the basis for
11    the death resulting count in this case?
12    A.   I am.
13    Q.   But you're not charged with that?
14    A.   Correct.
15    Q.   In fact, you agreed to plead guilty so that you
16    would not be charged with that, correct?
17    A.   I pled guilty because I knew what I did was
18    wrong.
19    Q.   And part of that agreement entailed you not being
20    charged with a death resulting count, correct?
21    A.   Correct.
22         MS. BECKETT:  Just one second, Your Honor.
23    Those are all of the questions I have.  Thank you.
24         THE COURT:  Thank you.  Redirect,
25    Mr. Stejskal?
```

Timestamps:
01:13:53 — line 5
01:14:01 — line 10
01:14:14 — line 15
01:14:23 — line 20
01:14:46 — line 25

32

|     | **REDIRECT EXAMINATION** |
| --- | --- |
| 1   | |

BY MR. STEJSKAL:

Q.   Let me just clear up a couple of things just so
we're all understanding here.  You were asked how

01:15:12  many other interviews you had with the government and
I believe you answered one, correct?

A.   Since the guilty plea, yeah.

Q.   Since the guilty plea, that was the question,
okay.

01:15:21  A.   Yes.

Q.   And that was in preparation for trial?

A.   Correct.

Q.   When you pled guilty, it was explained to you
that the judge would consider all of your conduct in

01:15:37  this whole matter, correct?

A.   Correct.

Q.   And that -- to your understanding did that
include the fact that somebody died?

A.   Yeah.

01:15:46  Q.   You weren't specifically charged with that but
that would be considered, correct?

A.   Correct.

Q.   When did your cooperation start with the United
States law enforcement?

01:15:58  A.   November 22nd when I was pulled over.

33

```
 1   Q.   Basically from the moment you were pulled over?
 2   A.   Yes.
 3   Q.   Describe that again your interaction with the
 4   officer that pulled you over?
 5   A.   I just -- he knew -- he asked me if I knew why I
 6   was being pulled over.  He was in an unmarked vehicle
 7   and he wasn't wearing a uniform and I told him what I
 8   did.  I requested that he not breakdown our door,
 9   that I would let him in and show him anything that he
10   needed to see.
11   Q.   And then you interviewed with some other agents
12   that same day?
13   A.   I did.
14   Q.   Did anybody promise you anything at that time?
15   A.   No.
16   Q.   You cooperated fully just based on what you said
17   that you wanted to cooperate?
18   A.   Correct.
19   Q.   One other clarification.  I had asked you if you
20   recruited anyone.  Are you familiar with a person by
21   the name of Elise Christensen?
22   A.   I am.
23   Q.   Who is that?
24   A.   A friend from eBay.
25   Q.   Maybe the term "recruited" wasn't the right
```

01:16:09 (line 5)
01:16:28 (line 10)
01:16:36 (line 15)
01:16:48 (line 20)
01:16:59 (line 25)

34

```
 1  terminology, but did you speak with Ms. Christensen
 2  about this or refer her to someone?
 3  A.   I did, yeah.  To receive packages to get that
 4  money to be a drop basically for Aaron.
 5  Q.   How did you assist in that relationship?
 6  A.   Um, just gave her the information and passed that
 7  along to Aaron because he had needed another person
 8  to kind of fulfill that spot.
 9  Q.   And did you have any negotiation with
10  Ms. Christensen about what she would be paid?
11  A.   I did not.
12  Q.   Or how to do it?
13  A.   No.
14  Q.   Who did that?
15  A.   Aaron told me this is how much she could get from
16  doing that.  So as soon as she gets a package she can
17  let me know or you can bring it to me for her.
18  Q.   When you say "let me know", let you know or let
19  Mr. Shamo know?
20  A.   Let Mr. Shamo know or let myself know.
21       MR. STEJSKAL:  Thank you.  That's all of the
22  questions.
23       THE COURT:  Thank you.  Any re-cross?
24       MS. BECKETT:  Yes.  Just briefly, Your Honor.
25  Your Honor, if I may approach.
```

01:17:16
01:17:32
01:17:37
01:17:53
01:18:09

35

```
              1              THE COURT:  You may.
              2                  RECROSS-EXAMINATION
              3   BY MS. BECKETT:
              4   Q.   I have placed an exhibit next to you, I believe
01:18:32      5   it is 17.06.  If I could have you look at that,
              6   Ms. Tonge.  On that chart, who are you familiar with?
              7   A.   Um, Noble, Shamo, Paz, Crandall, myself, Bustin,
              8   Gygi, and Christensen.
              9   Q.   I believe it was your testimony just now that you
01:18:59     10   essentially referred Elise Christensen to Mr. Shamo;
             11   is that correct?
             12   A.   Yes.
             13   Q.   And that if she received a package on Mr. Shamo's
             14   behalf, she could let you know about that package?
01:19:11     15   A.   Correct.
             16   Q.   And you would retrieve that package from her and
             17   provide it to either Mr. Shamo or Mr. Crandall?
             18   A.   Provide it to Aaron, yeah.
             19   Q.   If we could go back to that 14.30 exhibit.
01:19:39     20   You're familiar with this exhibit, correct?
             21   A.   Correct.
             22   Q.   Those are essentially daily order sheets?
             23   A.   Correct.
             24   Q.   Was your testimony that you were not aware that
01:19:53     25   fentanyl was being used in these pills; is that
```

36

```
 1   correct?

 2   A.   Fentanyl was being used in pills that were

 3   marketed as something other than that, correct.

 4   Q.   But you were aware that there was fentanyl,

 5   correct?

 6   A.   I saw on the pages.  I was unaware of what it

 7   was.

 8   Q.   You were unaware of what fentanyl was?

 9   A.   Correct.

10   Q.   Until somebody in this case told you?

11   A.   The severity of that, yes.

12        MS. BECKETT:  That's all I have.  Thank you.

13        THE COURT:  Thank you.  Anything else?

14        MR. STEJSKAL:  No.

15        THE COURT:  You may step down.  Thank you and

16   you may be excused.  The government may call its next

17   witness.

18        MR. STEJSKAL:  The government will call Katie

19   Bustin.

20        THE COURT:  Come forward and be sworn,

21   please.

22        THE CLERK:  Please raise your right hand.

23             KATHERINE LAUREN ANNE BUSTIN,

24    called as a witness at the request of the Defendant,

25        having been first duly sworn, was examined
```

01:20:03
01:20:15
01:20:26
01:20:54
01:21:02

37

```
 1                    and testified as follows:
 2              THE WITNESS:  I do.
 3              THE CLERK:  Come around to the witness box
 4   here (indicating).  Please state your name and spell
 5   it for the record.
 6              THE WITNESS:  It is Katherine Lauren Anne
 7   Bustin, K-A-T-H-E-R-I-N-E L-A-U-R-E-N A-N-N-E
 8   B-U-S-T-I-N.
 9              THE COURT:  You may proceed, Mr. Stejskal.
10              MR. STEJSKAL:  Thank you, Your Honor.
11                       DIRECT EXAMINATION
12   BY MR. STEJSKAL:
13   Q.   Where do you work?
14   A.   I work at Main Street Office Furniture.
15   Q.   With Ms. Tonge?
16   A.   Yes.
17   Q.   What do you do there?
18   A.   I am the designer and space planner.
19   Q.   What kinds of customers do you guys have?
20   A.   Mostly commercial businesses, offices trying to
21   get cubicals and their offices set up.
22   Q.   How long have you worked there?
23   A.   Um, a little over two years.
24   Q.   Where did you previously work?
25   A.   I worked at eBay.
```

01:21:28  (line 5)
01:21:47  (line 10)
01:21:54  (line 15)
01:22:03  (line 20)
01:22:16  (line 25)

38

```
          1    Q.    How long did you work there?

          2    A.    For a little over six years.

          3    Q.    So you started when?

          4    A.    Um, August 2011.

01:22:28  5    Q.    And when did you quit working there?

          6    A.    Um, June 2017.

          7    Q.    And you were let go as a result of your

          8    involvement in this case, correct?

          9    A.    Yes.

01:22:48  10   Q.    Tell us about some of the people that you met at

          11   eBay that were involved in this?

          12   A.    Um, I first met Aaron.  I think we were on the

          13   same team together and we had kind of become work

          14   friends and his friend Drew would come over and

01:23:07  15   visit.  So in proximity I would talk to him as well.

          16   Q.    Just at work or did you socialize outside of

          17   work?

          18   A.    Just at work.

          19   Q.    At some point you became Facebook friends I

01:23:19  20   guess?

          21   A.    Yeah.

          22   Q.    But as far as going to pubs with those guys and

          23   stuff?

          24   A.    No, it wasn't my scene really so --

01:23:26  25   Q.    And so you struck up a casual work relationship
```

39

1   with Mr. Shamo and Mr. Crandall?

2   A.   Yes.

3   Q.   And was there something about that that turned

4   into this?

01:23:39   5   A.   Yeah.  Um, I had driving Drew home one night and

6   he had kind of told me a few things, not necessarily

7   any specifics, but I kind of had an idea of what they

8   were kind of doing.  I also knew that Aaron was

9   planning on leaving eBay and I didn't know how he

01:24:00   10   could do that with not having a job and paying all of

11   the bills still.

12   Q.   So did you end up meeting with Mr. Shamo and

13   Mr. Crandall about becoming involved?

14   A.   Yes.  I don't recall who approached who, but,

01:24:18   15   yes, we talked about it and Aaron had asked if we

16   wanted to be a drop is what he called it to receive

17   packages at our home address.

18   Q.   And did you agree to do that?

19   A.   Yes.

01:24:30   20   Q.   And did you and Ms. Tonge receive several

21   packages that way?

22   A.   Yes.  We received, I think, four or five of them.

23   Q.   And what did you do with those?

24   A.   We weren't allowed to open them, we just brought

01:24:43   25   them straight to Aaron .

40

1    Q.   And what were you paid for those?

2    A.   Um, from what I recall we were paid about $100 a

3    package.  So sometimes we would get a few at a time.

4    Q.   Paid in cash?

01:24:57    5    A.   Yes.

6    Q.   Did you eventually become involved in the

7    organization in a different way?

8    A.   Yes.  Over probably another five months or so,

9    um, again I don't recall who approached who, but

01:25:15    10    there was an opportunity to make a little bit more

11    money and do a few more things so they kind of

12    explained that to us, Aaron and Drew, and we kind of

13    got started from there.

14    Q.   Okay.  Before I forget, you talk about an Aaron

01:25:30    15    Shamo that you knew and were involved with in these

16    activities.  Can you identify him for the jurors?

17    A.   Yes.  He is over here, far right.

18    Q.   Describe him a little bit.

19    A.   Um, I don't really have my glasses on so I can't

01:25:45    20    see him clearly, but he is wearing a black suit,

21    possibly a black tie.

22          THE COURT:  I didn't hear what you said.

23          MR. SKORDAS:  I was just going to say we'll

24    stipulate that she knows Aaron.

01:25:54    25          THE COURT:  Thank you.

41

```
 1              MR. STEJSKAL:  Thank you.
 2   Q.   (By Mr. Stejskal) I'm sorry, what was the further
 3   work then that you had agreed to do?
 4   A.   Originally it was to start shipping out some
 5   product.  Um, we still didn't know a whole lot at the
 6   beginning, but we made an agreement that Drew would
 7   come over and kind of show us the ropes of how to
 8   ship things and how to get them sent out.
 9   Q.   And he did that and you guys watched?
10   A.   Yes.  He would come over -- I think he came over
11   maybe three or four times and helped us learn how to
12   package and make it safe to go through the mail.
13   Q.   In addition to packaging, what else did he show
14   you about how to get the orders and that kind of
15   stuff?
16   A.   Um, he worked with Alex on setting up an account
17   on the computer through the Dark Web.  I didn't do
18   anything on the computer much so I didn't know a
19   whole lot about how they set that up, um, but that's
20   how he kind of explained how to do it.
21   Q.   Okay.  Let's talk about you then.  So how did you
22   divide up the duties between you and Ms. Tonge at the
23   beginning there?
24   A.   Um, the first time that Drew came over he just
25   kind of told us one person will package, the other
```

01:26:10
01:26:26
01:26:45
01:27:00
01:27:13

42

1 person will do orders, it is probably just easier

2 that way.  So it just happened to be that I was doing

3 the sorting and Alex was doing the labels and

4 packaging.

01:27:27    5 Q.   What do you mean by sorting?

6 A.   I would look at the order sheets that Alex would

7 print out and I would sort and count the pills, put

8 them in packages, and I would hand them back to Alex

9 and she would seal them in the package and put

01:27:40   10 postage on it.

11 Q.   And then at the beginning you guys were also

12 responsible for getting them in the postal system?

13 A.   Yes.  In the beginning we would drive them around

14 to random blue boxes and as well as dropping them off

01:27:52   15 in the bins at the post office.

16 Q.   When you started, what size of packages were you

17 doing and kind of how many?

18 A.   In the beginning it was pretty small.  We were

19 doing maybe sets of 10 or 20 in a little package but

01:28:11   20 it got bigger from there.  But originally it was only

21 a few at a time.

22 Q.   And as far as how many packages at night would

23 you guys do?

24 A.   In the beginning probably maybe 10 to 20 orders a

01:28:23   25 night.

43

1   Q.   And did that progress as time went by?

2   A.   Yes, yeah, very much.

3   Q.   At some point did Mr. Crandall leave the country?

4   A.   He did.  I am not quite sure of the time frame

01:28:38  5   that he left, but I remember he wanted to travel

6   around with his girlfriend Sasha at the time and he

7   was going to get paid out from Aaron so he could go

8   travel.

9   Q.   And did he in fact leave?

01:28:53  10   A.   Yes.

11   Q.   After Mr. Crandall left, who was your main

12   contact with as far as running your part of this

13   operation?

14   A.   It was always Aaron that we communicated with

01:29:10  15   after Drew was gone.

16   Q.   Before him would you communicate with both of

17   them when Drew was around?

18   A.   Yes.

19   Q.   And did the types of drugs you were shipping out

01:29:26  20   change after Drew left?

21   A.   They did.  Um, after he left, Aaron had started

22   or had a contact of some kind that wanted him to

23   start shipping out oxy or what I thought were oxy --

24   Oxycodone.  And from that point, we mostly shipped

01:29:46  25   that and kind of left behind some of the other pills

44

|   |   |
|---|---|
| | 1 that were originally being shipped. |
| | 2 Q. So those weren't as profitable or weren't -- |
| | 3 A. Just weren't as popular, yeah. |
| | 4 Q. Did you have any contact with customers? |
| 01:30:00 | 5 A. No. There were some messages on orders we got, |
| | 6 but we never reached out to any customer. |
| | 7 Q. Did you get any payment from customers? |
| | 8 A. No, it was always through Aaron. |
| | 9 Q. Did you have anything to do with the Dark Web? |
| 01:30:13 | 10 A. No. Myself I did not. |
| | 11 Q. So if I understand what you're saying, orders |
| | 12 would come to you and you guys would fill them? |
| | 13 A. Yes. |
| | 14 Q. You described counting pills at the beginning |
| 01:30:30 | 15 when there were 10 or 20 or whatever. Um, would you |
| | 16 physically hand count those one, two, three four and |
| | 17 put them in a package? |
| | 18 A. Yes. |
| | 19 Q. Did that eventually change? |
| 01:30:40 | 20 A. Yes. Once the orders got bigger, um, Aaron would |
| | 21 provide us with scales and we could you know count |
| | 22 out ten and weigh how much that was and then just do |
| | 23 the math from there if it was a large order. |
| | 24 Q. And who told you how to do that? |
| 01:30:56 | 25 A. Um, from what I recall, it was Aaron. |

45

```
        1    Q.   And so describe that.  There were some orders I
        2    think I saw of 2,000 and 5,000.  How would you
        3    prepare those for packaging and delivery?
        4    A.   Um, at first I would try and do the math right,
01:31:16  5    um, and just weigh them out.  But it was just so much
        6    and it was taking up so much of our evenings that we
        7    -- I would just kind of assume or guess how much
        8    would be in a package and if it looked right just
        9    send it.
01:31:35 10    Q.   And you got some feedback sometimes or saw some
       11    feedback that you were putting too many in?
       12    A.   Yes.  Um, Aaron would reach out and let us know
       13    that extras are fine for customers and it's nice to
       14    do that, but sometimes people were saying they had
01:31:52 15    like 100 or more extras and that is just because I
       16    wasn't counting them.
       17    Q.   And was Aaron upset about that?
       18    A.   Um, I don't know if I would say he was upset.  He
       19    seemed maybe annoyed just because that's his profit
01:32:10 20    and his pills that he has made.  So I don't think he
       21    was really ever upset about it, but I don't think he
       22    was happy about it.
       23    Q.   He kind of told you to be more careful?
       24    A.   Yes.
01:32:24 25    Q.   There seemed to be an abundance of pills.  Did
```

46

1    you guys ever run short?

2    A.    Um, from what I can recall, I don't think we did.

3    Um, Aaron would supply us with pills pretty regularly

4    so most of the time we didn't run out.  If we did,

01:32:44    5    then he would reach out to the customers and let them

6    know it will be a day or two late.

7    Q.    And we saw photos of the search warrant and there

8    were kind of pills on the floor and stuff and pills

9    in the vacuum cleaner.  Do you recall that?

01:33:00    10    A.    Yes.

11    Q.    Were those accurate pictures?  Was that kind of

12    how the house was at the time?

13    A.    Yes.  It was something that we didn't have

14    passion about, we didn't really care about it.  So if

01:33:10    15    we dropped a pill or there was something on the

16    ground, we would just vacuum it up.  We weren't

17    counting individual pills.

18    Q.    So you weren't accountable to Mr. Shamo for each

19    and every pill?

01:33:20    20    A.    Correct.

21    Q.    There were so many that it didn't --

22    A.    It was hard to keep track of anything that's why

23    he would reach out sometimes when we had large orders

24    but, um, or large extras on orders.  But other than

01:33:34    25    that, he didn't count every pill so we didn't either.

47

```
         1   Q.    And was there -- were there sometimes re-ships?
         2   A.    Yes.  Some people would say that maybe they got
         3   the product and it was smashed so they couldn't take
         4   them or that they just didn't get the package at all
01:33:51 5   so we would have to re-ship out to that address.
         6   Q.    Did you at times have concerns or reservations
         7   about doing this and ask to get out of it?
         8   A.    Yes.  Um, (witness crying) a few months before,
         9   sorry, a few months before we were caught, I had just
01:34:47 10  a horrible feeling and I wanted to be done
         11  completely, um, but was persuaded otherwise to just
         12  keep going with it.
         13  Q.    Did you have conversations with Mr. Shamo about
         14  that and what not?
01:35:07 15  A.    Yes.  Um, we had told him -- Alex and I had told
         16  him that we were very uncomfortable, that we didn't
         17  want to do it any more.  I was paranoid from the
         18  beginning.  Um, I kept asking for less
         19  responsibilities or less public places to go and --
01:35:29 20  but instead he -- Aaron would offer, you know, time
         21  off, paid time off, or he offered to give us money to
         22  buy a house.  And that was something that we were
         23  looking to do, so that was a huge incentive.  We
         24  wanted to, you know, build a life.  So...
01:35:48 25  Q.    And somewhere towards the end you had surgery on
```

48

```
 1   your wrists?

 2   A.   I did, yes.  I had a cyst on both of my wrists.

 3   So the day that we were arrested I had just had a

 4   surgery just a few days before that.

 5   Q.   During that time Ms. Tonge had to kind of do

 6   things on her own?

 7   A.   Yes.  She would do the orders and I couldn't

 8   really do much.  I couldn't move my wrists very much

 9   so I wouldn't -- I didn't do them for the last

10   probably three weeks, I would say, up to the time we

11   were caught.  So...

12   Q.   And all that time you were feeling like you

13   wanted to quit?

14   A.   Yes.

15   Q.   November 22nd of 2016, you remember that day well

16   I assume?

17   A.   Yes.

18   Q.   What happened that day?

19   A.   Um, that was the day that our house was raided.

20   Um, I was in bed and Alex luckily was able to let

21   them into the house rather than breaking in and they

22   came in and flipped our house and searched everything

23   and brought us in for questioning.

24   Q.   And were you cooperative at that time?

25   A.   Yes.
```

01:36:07
01:36:25
01:36:37
01:36:50
01:37:10

49

```
      1   Q.   How so?

      2   A.   Um, I just told the truth.  As soon as they

      3   brought us in I gave up everything I knew.

      4   Q.   Were you emotional at that time?

01:37:22  5   A.   Yeah, very much.

      6   Q.   Did you have any agreement at that time about

      7   what was going to happen to you?

      8   A.   No.

      9   Q.   But you told them any way?

01:37:33 10   A.   Yes.

     11   Q.   How come?

     12   A.   I didn't want to be in this from the beginning so

     13   I knew it was something that I just needed to clear

     14   up and tell the truth and just get out of it

01:37:48 15   completely.

     16   Q.   Let's look at Exhibit 23.00.  Do you recognize

     17   that?

     18   A.   Yes.

     19   Q.   That is the front page of your guilty plea?

01:38:07 20   A.   Yes.

     21   Q.   Did you in fact plead guilty in this matter?

     22   A.   I did.

     23   Q.   Did you plead to every charge that was charged

     24   against you?

01:38:15 25   A.   Yes.
```

50

```
          1   Q.   Did you have any specific sentencing agreement

          2   about what is going to happen to you?

          3   A.   No.

          4   Q.   Did you also enter into a cooperation agreement?

01:38:27  5   A.   Yes.

          6   Q.   And in that you agreed to tell the truth in any

          7   further court proceeding against anyone else,

          8   correct?

          9   A.   Yes.

01:38:36 10   Q.   Have you done that?

         11   A.   Yes.

         12   Q.   Part of the agreement was that you would not be

         13   charged with the death that resulted from this

         14   organization; is that correct?

01:38:49 15   A.   Correct.

         16   Q.   But you understood that the judge will consider

         17   all of your conduct and everything that happened as a

         18   result of this organization in determining what

         19   happens to you, correct?

01:39:01 20   A.   Yes.

         21   Q.   Do you have any stake in the outcome of this

         22   proceeding?

         23   A.   No.

         24   Q.   All you were told is to tell the truth, correct?

01:39:13 25   A.   Yes.
```

51

```
          1   Q.   Did you have any -- other than this criminal

          2   charge any other consequences from your involvement

          3   in this?

          4   A.   Um, aside from losing my job, no.

01:39:25  5   Q.   Okay.  You were fired from your job?

          6   A.   Yes.

          7   Q.   And probably some friends and family kind of had

          8   some --

          9   A.   Luckily no family.  My family has been very

01:39:35 10   supportive but I lost a lot of friends.

         11   Q.   Did you organize this operation?

         12   A.   No.

         13   Q.   Did you manage anyone, supervise their day-to-day

         14   activities?

01:39:57 15   A.   No.

         16   Q.   Did you know that others were involved?

         17   A.   Um, yes, just a few people, but yes.

         18   Q.   When you say just a few people, did you -- do you

         19   think you knew everybody that was involved in this

01:40:12 20   organization?

         21   A.   No.

         22   Q.   Why do you say that?

         23   A.   Um, I just saw the sign.  I didn't realize there

         24   were that many people at all.

01:40:21 25   Q.   Based on what you did and what you know, who was
```

52

```
 1   in charge of this operation?

 2   A.   Aaron was.

 3   Q.   Why do you say that?

 4   A.   He was the one who did all of the communicating,

 5   he made the financial decisions, he is the one who

 6   started the account on the Dark Web, he created this

 7   whole thing and taught others.

 8             MR. STEJSKAL:  Thank you.  That's all of the

 9   questions I have.

10             THE COURT:  Thank you.  Thank you

11   Mr. Stejskal.  Mr. Skordas, you may cross-examine.

12             MR. SKORDAS:  Thank you, Your Honor.

13                     CROSS-EXAMINATION

14   BY MR. SKORDAS:

15   Q.   Hi.

16   A.   Hi.

17   Q.   My name is Greg Skordas and I'm Aaron's attorney.

18   We haven't met before, have we?

19   A.   I don't think so.

20   Q.   Or spoken?

21   A.   No.

22   Q.   Um, you know Drew Crandall, correct?

23   A.   Yes.

24   Q.   Do you see his picture on there?

25   A.   Yes.
```

53

```
 1   Q.   Kind of a give away but his name is underneath
 2   it.  Is that the fellow you know as Drew Crandall?
 3   A.   Yes.
 4   Q.   And I think your testimony was that you knew
 5   Aaron and Drew through your employment there at eBay;
 6   correct?
 7   A.   Correct.
 8   Q.   And that the introduction into this mess you got
 9   yourself into was first from a drive home you had
10   with you and Drew, correct?
11   A.   Partially.  He didn't tell me a whole lot from
12   there.  Um, he just had a lot of envelopes in his
13   backpack and I was curious and he was very vague in
14   what he said.  But it later came to light from Aaron
15   of what more specifically what they were doing.
16   Q.   And you were, of course, reluctant to get
17   involved in this, correct?
18   A.   I was, yes.
19   Q.   And although Alex is a dear friend of yours, she
20   sort of took the laboringor on a lot of this; is that
21   fair?
22   A.   Um, partially.  Um, I would say that she is a
23   little bit more money driven, money stresses her out
24   a little bit more than it does me, but we both made
25   the decision.  So...
```

01:41:19
01:41:33
01:41:48
01:42:03
01:42:19

54

```
 1   Q.   But, for example, the packages that were

 2   delivered to your house were always in her name and

 3   not yours; correct?

 4   A.   In the beginning, yes, the packages that Aaron

 5   would have shipped to us were addressed to Alex.

 6   Q.   And that was your choice, right?  You wanted to

 7   keep your involvement as little as possible?

 8   A.   Correct.  Alex and I talked about it, yes.

 9   Q.   And you were taken into custody or at least taken

10   to the South Jordan Police Department on November

11   22nd, correct?

12   A.   Yes.

13   Q.   And that's the first time that anyone in law

14   enforcement had addressed you about this whole thing;

15   correct?

16   A.   Correct.

17   Q.   You were interviewed separate from Alex?

18   A.   Yes.

19   Q.   And you were interviewed by a police officer or

20   two or three?

21   A.   Correct, yes.

22   Q.   And you described your involvement in this to the

23   best you could, correct?

24   A.   Yes.

25   Q.   You told them that you were receiving parcels
```

01:42:31
01:42:50
01:43:02
01:43:11
01:43:19

55

01:43:33

01:43:43

01:43:57

01:44:08

01:44:22

```
 1   from all over the country, correct?
 2   A.   Yes.
 3   Q.   From Florida, from Taiwan, domestic and
 4   international, I think is what you told the
 5   investigators; is that fair?
 6   A.   Yes.
 7   Q.   And that was correct?
 8   A.   Uh-huh (affirmative).
 9   Q.   And that you would -- either you or Alex would
10   drive these parcels after you got them to the house,
11   correct?
12   A.   To Aaron and Drew's house.  Every once in a while
13   Aaron would come and pick them up from us if we were
14   busy.
15   Q.   So when the government was talking to you, you
16   kept referring to it as Aaron's house.  But you knew
17   it was Aaron and Drew's house, correct?
18   A.   They lived together in the beginning, yes.
19   Q.   And when you were delivering packages to them,
20   they were living together, correct?
21   A.   Yes.
22   Q.   And that you were paid 100 or 200 or something
23   per package when you would make those deliveries,
24   correct?
25   A.   Correct, yes.
```

56

01:44:33

01:44:43

01:44:51

01:45:00

01:45:16

1    Q.    But at some point you or -- you and Alex or maybe

2    Alex seized an opportunity to make more money; is

3    that fair?

4    A.    Yes.

5    Q.    Right or wrong that's what you decided to do,

6    correct?

7    A.    Correct.

8    Q.    And you decided to get involved in sort of the

9    shipping and packaging part of this?

10   A.    Right.

11   Q.    Correct?

12   A.    Right.

13   Q.    And Drew came to your house over the course of

14   several days and walked you through that process;

15   correct?

16   A.    He did in the beginning, yes.

17   Q.    He taught you how to do that?

18   A.    Yes.

19   Q.    He taught you how to get the labels and get the

20   packages and put things together, correct?

21   A.    Originally we didn't have labels we were just

22   doing postage, actual stamps from the post office.

23   Later, the shipping labels was an idea of Aaron's

24   after Drew had left.

25   Q.    I think what you told the police was that Drew

57

1  showed you and Alex how to package the pills properly

2  so product was not damaged during shipment; is that

3  fair?

4  A.   Correct, yes.

01:45:27  5  Q.   And that Drew directed you and Alex to put the

6  pills in mylar bags because they could not be x-rayed

7  and to include an invoice in each package; is that

8  correct?

9  A.   Yes.

01:45:38  10  Q.   When you told the officers that on November 22nd

11  you were trying to tell the truth, correct?

12  A.   Yes.

13  Q.   You were scared out of your wits, weren't you?

14  A.   Yeah.

01:45:45  15  Q.   You were -- you were anxious to curry a little

16  favor from law enforcement, isn't that a fair

17  statement?

18  A.   I'm not sure if I would say a favor, but I was

19  just trying to come clean.

01:45:57  20  Q.   You didn't go to jail that night, did you?

21  A.   No.

22  Q.   And you knew that the keys to that jail were

23  somewhat in your pocket by your cooperation?

24  A.   I actually didn't know.  I thought I was going to

01:46:11  25  jail.  They didn't tell me if I was or was not.

58

01:46:26

01:46:45

01:47:01

01:47:17

01:47:30

1   Q.   But you know today that had you told them that

2   night you didn't want to speak with them you would

3   have gone to jail?

4   A.   I assumed so.

5   Q.   Crandall also directed you how to sort of change

6   up the invoices once in a while, correct, so that

7   they would show different products?

8   A.   Yeah.  He mentioned in the beginning to switch up

9   the invoices so that way, you know, if it were ever

10  looked at it would be different than other product.

11  Q.   And what you told officers, and I'm not trying to

12  put words in your mouth, I'm reading the report here,

13  so if I'm wrong correct me, was that Crandall worked

14  with you four or five times and then he continued to

15  teach you?

16  A.   In the beginning he would teach us kind of things

17  about the post office.  If I recall correctly, um,

18  his girlfriend worked for the post office and she

19  knew kind of what could be x-rayed or not x-rayed.

20  So he would originally teach us.  After that, when he

21  left, we had to switch up a whole lot of stuff.  But

22  in the beginning he did teach us.

23  Q.   You keep talking about "in the beginning".  Was

24  there a time when Drew got out of the picture?

25  A.   Yes.  He decided to travel with his girlfriend

59

Sasha.  I don't know exactly the timeframe, but when

he left, Aaron basically took over everything that he

would have been doing with us and taught us

everything else from that point on.

01:47:48   Q.   I want to show you an exhibit that has been

previously entered, it is 15.05, and have you go to

Page 5 of that.  And can you make the top part pretty

-- do you see those names at the top?

A.   Yes.

01:48:23   Q.   And so if you look at the third line it says the

date?

A.   Yes.

Q.   What is the date that this was sent?

A.   November 20th, 2016.

01:48:33   Q.   And that is two days before you were arrested?

A.   Yes.

Q.   Or at least questioned, correct?

A.   Yes.

Q.   And who is "Shortbread 66"?

01:48:42   A.   I don't know actually.

Q.   You don't know who that is?

A.   I don't.  I didn't do any of the e-mailing or

anything online.

Q.   Do you know who "Pass the Peas" is?

01:49:01   A.   Um, that is the account that Aaron set up for us

60

```
 1   to receive e-mails.

 2   Q.   That is you guys?

 3   A.   Yes.

 4   Q.   No matter who set it up, that is your account,

 5   right?

 6   A.   Right.

 7   Q.   Who is "American Steam"?

 8   A.   I don't know.

 9   Q.   If I were to tell you that "Shortbread 66" is

10   Drew Crandall, and "American Steam" is Aaron Shamo,

11   would that surprise you or does that seem consistent

12   with your recollection today?

13   A.   It seems consistent because when Drew was out of

14   the country, he, I assume, possibly ran out of money

15   and he wanted to get back in.  So for a while it

16   looks like he was sending the pages to us.

17   Q.   It looks like, and correct me if I'm wrong, but

18   he is sending you pages two days before the police

19   come to your house?

20   A.   On this day, yes.

21   Q.   Isn't this the type of message that you guys were

22   receiving fairly regularly during that time?

23   A.   Um, I honestly don't recognize it because I never

24   did the e-mails.

25   Q.   Was that Alex's duties?
```

01:49:11 (line 5)
01:49:18 (line 10)
01:49:35 (line 15)
01:49:53 (line 20)
01:50:08 (line 25)

61

```
 1    A.    Correct, yes.

 2    Q.    And you had a separate function in this?

 3    A.    Yes.

 4    Q.    Thank you.  I think you told officers at the time

 5    that Crandall, Drew Crandall, showed Alex how to

 6    access the e-mail account, decrypt the order

 7    fulfillment list, and print the information; is that

 8    accurate?

 9    A.    Yes, correct, when he was training us in the

10    beginning.

11    Q.    You told them that you don't -- you didn't have

12    knowledge of the Dark Web and that Drew taught you

13    that part of it, correct?

14    A.    Um, from what I remember, I think that's

15    accurate.  He didn't teach me any of it, so the only

16    thing that relates to that I don't know if Alex was

17    more taught by Drew or Aaron.  I'm not quite sure.

18    Q.    Did Aaron come to your house and show you how to

19    package things?

20    A.    After -- I mean we saw both of them quite often.

21    Q.    Both Aaron and Drew?

22    A.    Yes.

23    Q.    What period of time are you talking about?

24    A.    This was before Drew left to travel.  We would

25    see them both at their home together or if they ever
```

01:50:27 (line 5)
01:50:43 (line 10)
01:50:59 (line 15)
01:51:19 (line 20)
01:51:35 (line 25)

62

1   came to give us money.  They were friends so they

2   were together quite a lot.

3   Q.   And sorry I didn't mean to cut you off, actually

4   I did.  I just wanted to ask you another question.

01:51:53   5   When was it that you recall that Drew left?

6   A.   I really don't know if I remember.  I can't

7   remember what time it was specifically.

8   Q.   Do you remember telling officers on November 22nd

9   that Drew taught Alex to randomly pick a spot on the

01:52:19   10   map, list the address, and make up a name for the

11   return address?

12   A.   Yes.

13   Q.   And that Drew told her to keep it as random as

14   possible just so it is somewhere throughout the Salt

01:52:29   15   Lake valley?

16   A.   Correct.

17   Q.   Is that accurate?

18   A.   Yes.

19   Q.   You told the truth when you told them that?

01:52:33   20   A.   Yes.

21   Q.   How did you and Alex decide amongst yourselves

22   how the money was going to be divided up?

23   A.   Um, when we ever got payment it was just an equal

24   split.  Normally from the beginning talking to Drew

01:53:01   25   and Aaron, they both said, you know, we'll pay you

63

```
 1   each this much.  Any time there was an increase it
 2   was always an equal increase so we always got paid
 3   the same amount.
 4   Q.   When you started working with Drew and Aaron,
 5   where did you live?
 6   A.   Um, we were considered --
 7   Q.   I don't need to know the exact address but what
 8   city?
 9   A.   When we were drops we were in Riverton.
10   Q.   Did you ultimately move?
11   A.   Yes, we moved to Daybreak.
12   Q.   Was that a nicer place?
13   A.   Yes.
14   Q.   Was that, in part, based on the fact that you had
15   an increased income?
16   A.   Um, I don't know.  I don't remember if it was
17   something that we could afford before that.  We were
18   still drops at the time so we weren't making a whole
19   lot to make a difference.
20   Q.   But when you became more than drops you could
21   afford a lot more, couldn't you?
22   A.   Yes.  Mostly bills and school, but yes.
23   Q.   You were making about $7,000 a month?
24   A.   Um, that seems like a lot but I know it was
25   probably close to that.
```

01:53:16
01:53:26
01:53:34
01:53:51
01:54:08

64

```
 1   Q.   $3,500 every other week, does that make more
 2   sense?
 3   A.   I think so.
 4   Q.   Was that always in cash?
 5   A.   Yes.
 6   Q.   Just sort of showed up in -- whose truck was it
 7   with the key fob, yours or Alex's?
 8   A.   It was Alex's truck.
 9   Q.   And the money would show up in the truck?
10   A.   Yes.  Or we would meet up or Aaron would come
11   over to our house and give it to us.
12   Q.   Could we look at 23.00, please.  Ms. Bustin, I am
13   going to show you something that you have already
14   looked at and this is your Plea Agreement.  Do you
15   see that?
16   A.   Yes.
17   Q.   It is dated or at least it is stamped by this
18   court on June 7th of 2018, correct?
19   A.   Correct.
20   Q.   Is that the day you pled guilty?
21   A.   Um, I would assume so.
22   Q.   So 14 months ago?
23   A.   I honestly can't remember.  I'm not great with
24   dates, but it sounds that it could be right.
25   Q.   And in 14 months you haven't been sentenced?
```

01:54:19    5
01:54:29    10
01:54:47    15
01:54:56    20
01:55:12    25

65

```
 1   A.   Correct.
 2   Q.   You haven't been back to this court to decide
 3   what your punishment will be, correct?
 4   A.   Correct.
 5   Q.   And that's because that decision is in large part
 6   based on your participation today, correct?
 7   A.   Um, I don't know that it's based off of that or
 8   just we're just here.  If I had no promises or
 9   anything I would still be here.  So I don't know if
10   -- I don't think anything would be different.
11   Q.   Well, you haven't been sentenced yet?
12   A.   Correct.
13   Q.   You don't know what your punishment is going to
14   be, correct?
15   A.   Correct.
16   Q.   You're hoping that the punishment will be as less
17   as possible, correct?
18   A.   I would hope so.
19   Q.   And part of that expectation is based on your
20   testimony today, correct?
21   A.   I guess yeah I would say yes.
22   Q.   There is no reason, is there, ma'am, to put the
23   sentencing over for over 14 months, is there, except
24   for you to come in here and testify against Aaron
25   Shamo?
```

01:55:21
01:55:46
01:55:54
01:56:05
01:56:19

66

1   A.   That makes sense, yes.

2   Q.   Well, according to this plea agreement, if you

3   look at the top there, it says you're pleading

4   guilty, and I'm looking at Paragraph 1, make it

01:56:39   5   bigger, please, that you're pleading guilty to Counts

6   2, 3, 8, 12, and 13 of the Superseding Indictment,

7   correct?

8   A.   Yes.

9   Q.   So you pled guilty to five counts?

01:56:51   10   A.   Yes.

11   Q.   Out of the 13.  And you weren't charged with all

12   of the 13 but you pled to these five, correct?

13   A.   Correct.

14   Q.   And so Count 1, for example, we can see sort of

01:57:04   15   at the bottom there is conspiracy to distribute

16   fentanyl, do you see that?

17   A.   Yes.

18   Q.   And, in fact, you did conspire to distribute

19   fentanyl, correct?

01:57:12   20   A.   Yes.

21   Q.   You were packaging fentanyl and sending it out,

22   correct?

23   A.   Of what we thought was Oxycodone, but yes.

24   Q.   But some of the shipping labels actually

01:57:23   25   identified this as fentanyl, didn't they, or did you

67

1    not see those?

2    A.   I think there were some on the order pages, um, I

3    don't know much about medication of any kind so I

4    assumed they were just the same thing.

01:57:35    5    Q.   So you at least had some written information sent

6    to you that you were distributing fentanyl, correct?

7    A.   Yes.

8    Q.   Can we go to the later counts, please.  I

9    appreciate it, Yvette.  So it looks like the next

01:57:56    10   count you pled to is conspiracy to distribute

11   Alprazolam.  Did you know you were distributing

12   Alprazolam?

13   A.   Yes.

14   Q.   And then possession of fentanyl with intent to

01:58:09    15   distribute.  Do you see that?

16   A.   Yes.

17   Q.   And then let's look at the next -- use of the

18   U.S. Mail in furtherance of a drug trafficking

19   offense.  Do you see that?

01:58:21    20   A.   Yes.

21   Q.   And finally conspiracy to commit money

22   laundering?

23   A.   Correct, yes.

24   Q.   Those are the counts you pled to?

01:58:28    25   A.   Yes.

68

```
 1    Q.   Can we look at the -- is there an addendum on

 2    this.  Can we look at the addendum please, that is

 3    the last page or two.  There we go.  Do you see this?

 4    A.   Yes.

 5    Q.   This is -- let's go back one page, I'm sorry, two

 6    pages.  Do you see the signature there?

 7    A.   Yes.

 8    Q.   That's your signature, correct?

 9    A.   Correct.

10    Q.   And that signature, because you weren't sure of

11    the date earlier is June 7th of 2018.  Does that

12    refresh your recollection?

13    A.   Yes.

14    Q.   So that is when you signed this?

15    A.   Yes.

16    Q.   It looks like you had an attorney there that day?

17    A.   Correct.

18    Q.   You probably signed it in this very building,

19    didn't you?

20    A.   Yes.

21    Q.   Maybe not this particular court but in front of a

22    judge?

23    A.   Yes.

24    Q.   And said guilty and you read this over and what

25    not?
```

```
  1    A.    Uh-huh.

  2    Q.    Yes?

  3    A.    Yes.

  4    Q.    Can't do uh-huh, it makes her crazy.  The

  5    addendum, the next couple of pages, indicates that

  6    you're to testify completely and truthfully and if

  7    you do you're not going to be charged with other

  8    offenses.  Do you understand that?

  9    A.    Yes.

 10    Q.    And that is significant to you, isn't it?

 11    A.    Yes.

 12    Q.    It is significant because those other offenses

 13    could carry additional penalties?

 14    A.    Correct.

 15    Q.    Significant additional penalties, correct?

 16    A.    Yes.

 17    Q.    You talked to your attorney about that?

 18    A.    Yes.

 19    Q.    And I won't ask you what he told you, but you

 20    understand that some of the other charges were much

 21    more serious?

 22    A.    Yes.

 23    Q.    And it's only smart on your part and your

 24    attorney's to avoid those, correct?

 25    A.    Yes.
```

01:59:26
01:59:39
01:59:47
01:59:54
02:00:05

70

```
 1   Q.   I mean you're hoping you don't do any prison at

 2   all I assume?

 3   A.   I hope so, yes.

 4   Q.   And I think you answered this but let me ask you

 5   again.  Since November 22nd of 2016, how much time

 6   have you done in custody?

 7   A.   Zero.

 8        MR. SKORDAS:  That's all I have, Your Honor.

 9        THE COURT:  Redirect, Mr. Stejskal?

10        MR. STEJSKAL:  No, Your Honor.

11        THE COURT:  Thank you.  Since there is no

12   redirect, there will be no re-cross.  You may step

13   down and you may be excused and we'll take our first

14   break.  Try to get back in in about 15 minutes.

15        THE CLERK:  All rise, please.

16        (Jury left the courtroom.)

17        THE COURT:  We'll be in recess.  Thank you.

18        (Recess.)

19        (Whereupon, the trial continued but

20         was not transcribed.)

21

22

23

24

25
```

02:00:18 (line 5)
02:00:33 (line 10)
02:00:46 (line 15)

71

1    **REPORTER'S CERTIFICATE**

2

3         I, Laura W. Robinson, Certified Shorthand

4    Reporter, Registered Professional Reporter and Notary

5    Public within and for the County of Salt Lake, State

6    of Utah, do hereby certify:

7         That the foregoing proceedings were taken

8    before me at the time and place set forth herein and

9    were taken down by me in shorthand and thereafter

10   transcribed into typewriting under my direction and

11   supervision;

12        That the foregoing pages contain a true and

13   correct transcription of my said shorthand notes so

14   taken.

15        In witness whereof I have subscribed my name

16   this 18th day of November, 2019.

17

18                _____

19                Laura W. Robinson

20                RPR, FCRR, CSR, CP

21

22

23

24

25

72

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                       DISTRICT OF UTAH

 3                       CENTRAL DIVISION

 4

 5   UNITED STATES OF AMERICA,     )

 6            Plaintiff,           )

 7      vs.                        )   Case No.  2:16-CR-631-DAK

 8   AARON MICHAEL SHAMO,          )

 9            Defendant.           )

10   _____)

11

12           BEFORE THE HONORABLE DALE A. KIMBALL

13         --------------------------------------

14                    August 21, 2019

15                       Jury Trial

16    Testimony of Brennda Kurstin, Jeff Fletcher, Jeff Bryan

17

18

19

20

21

22

23

24   REPORTED BY: Patti Walker, CSR, RPR, CP    801-364-5440

25   351 South West Temple, #8.431, Salt Lake City, Utah  84101
```

```
 1                    A P P E A R A N C E S

 2

 3

 4   For Plaintiff:              Michael Gadd
                                 Vernon G. Stejskal
 5                               Kent A. Burggraaf
                                 U.S. ATTORNEY'S OFFICE
 6                               111 South Main Street, #1100
                                 Salt Lake City, Utah  84111
 7

 8
     For Defendant:              Gregory G. Skordas
 9                               Kaytlin V. Beckett
                                 SKORDAS & CASTON LLC
10                               560 South 300 East, #225
                                 Salt Lake City, Utah  84111
11

12                               Daryl P. Sam
                                 DARYL P SAM PLLC
13                               5955 S. Redwood Road, #102
                                 Salt Lake City, Utah  84123
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2  Witness              Examination By          PAGE

 3  Brennda Kurstin      Mr. Stejskal  (Direct)       4

 4                       Mr. Sam  (Cross)            11

 5  Jeff Fletcher        Mr. Stejskal  (Direct)      13

 6                       Ms. Beckett  (Cross)        53

 7                       Mr. Stejskal  (Redirect)    59

 8  Jeff Bryan           Mr. Stejskal  (Direct)      62

 9                       Mr. Skordas  (Cross)       106

10                       Mr. Stejskal  (Redirect)   115

11                       Mr. Skordas  (Recross)     118

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1   SALT LAKE CITY, UTAH; WEDNESDAY, AUGUST 21, 2019; 8:30 A.M.

 2           (Proceedings previously transcribed and under

 3   separate cover.)

 4           THE COURT:  You may call your next witness,

 5   Mr. Stejskal.

 6           MR. STEJSKAL:  The United States next calls

 7   Brennda Kurstin.

 8           THE COURT:  Come forward and be sworn, please.

 9   Stejskal.

10                   BRENNDA KURSTIN,

11           Having been duly sworn, was examined

12                and testified as follows:

13           THE CLERK:  Please state your name and spell it

14   for the record.

15           THE WITNESS:  It's Brennda Kurstin.

16   B-r-e-n-n-d-a, K-u-r-s-t-i-n.

17           THE COURT:  Go ahead.

18           MR. STEJSKAL:  Thank you, Your Honor.

19                   DIRECT EXAMINATION

20   BY MR. STEJSKAL:

21   Q    Good morning, and thanks for coming.

22        Tell us a little bit about yourself.

23   A    My name is Brennda.  I don't know what I'm supposed to

24   say, just I work in the used car industry as an office

25   manager.

1  Q    And that's why you're here this morning, correct?

2  A    Correct.

3  Q    Did you formerly work at a car dealership named IDrive?

4  A    I did.

5  Q    You no longer work there at this point?

6  A    I do not.

7  Q    What was the time frame in which you worked at IDrive?

8  A    It was December of '15 until October of '18.

9  Q    What were your duties at IDrive?

10 A    I was office manager.  I did accounting, bookkeeping,

11 and title work.

12 Q    And, again, what type of business is IDrive?

13 A    It is used car sales.

14 Q    So other than you as the office manager, and

15 bookkeeper, and accounting, who else worked there?

16 A    There's two owners, Nate Reynolds and Miles Penrose.

17 And then they had a few salesmen, some lot techs, mechanics,

18 just kind of your full auto body.

19 Q    In your duties as the office manager and bookkeeper,

20 did you help process and keep track of the paperwork that

21 went with used car sales?

22 A    Right, yep.

23        MR. STEJSKAL:  Let's pull up 16.11.

24 BY MR. STEJSKAL:

25 Q    Did you have a role in a sale of a vehicle from IDrive

1    to an individual by the name of Aaron Shamo?

2    A    I would have processed the title work for any vehicle

3    sales and collected any documents from the salesmen.

4    Q    Do you recall what kind of vehicle was sold in that

5    particular transaction?

6    A    We sold trucks, so an '11 F350.

7    Q    Do you recall that?

8    A    Well, I don't know the vehicle particularly.

9    Q    Bur you recall processing the paperwork?

10    A    Correct.  Yeah, I do.

11    Q    And do you keep a file, then, with the paperwork in it?

12    A    Yes.

13    Q    And this document was part of that file?

14    A    It was.

15          MR. STEJSKAL:  Let's zoom back out, please.

16    BY MR. STEJSKAL:

17    Q    Generally, the numbers on right side of that document,

18    what do those numbers indicate?

19    A    That equals the sales price of the vehicle and any fees

20    associated with the vehicle purchase that we would collect

21    from the customer.

22    Q    You then were given documents to support the payments

23    of vehicles, correct?

24    A    Correct.

25          MR. STEJSKAL:  Let's next look at 16.12.

```
 1  BY MR. STEJSKAL:
 2  Q    Do you recognize these documents?
 3  A    I do.
 4  Q    What are they?  First talk about the top one that says
 5  Wells Fargo Bank.
 6  A    So that's the check from the customer to be part of the
 7  payment to the purchase of the vehicle.
 8  Q    And do you see the date on that?
 9  A    Yeah.  5-5-16.
10  Q    Is that the date that the vehicle transaction took
11  place?
12  A    It was.
13  Q    Give us the details of when the vehicle was coming in
14  and then going out.  Where did it come from and where did it
15  go?
16  A    So this truck we took in on trade.  So it came from a
17  customer, Roy Stevens, where we get a trade-in.  We get the
18  vehicle, we negotiate, you know, the trade-in price, and
19  then do the payoff.  This one was kind of an already
20  predetermined sale where the customer already had a buyer
21  for the vehicle.  So it was a pretty quick turnaround for
22  the trade-in.
23  Q    So what do you mean by the customer had a buyer for the
24  vehicle?
25  A    So he had a friend who was going to purchase the truck,
```

1    but we were just going to facilitate the sale so he could

2    get -- the initial person buying our truck would get sales

3    tax credit for their trade-in.

4    Q    And you mentioned the name Miles Penrose.  Who's

5    Mr. Penrose.

6    A    He was an owner of IDrive.

7    Q    And did he know either of the individuals that were

8    involved in this truck transaction?

9    A    He did.

10   Q    Who did he know?

11   A    As far as I know, he knew both parties in the

12   transaction.

13   Q    You said the seller was a -- I just lost the name.

14   A    It's Roy Stephens.

15   Q    And the buyer was whom?

16   A    Aaron Shamo.

17   Q    So that Wells Fargo check at the top there, who's that

18   from?

19   A    That's from Aaron.

20   Q    And the amount?

21   A    14,000.

22   Q    Now that wasn't the full payment for the vehicle,

23   correct?

24   A    Correct.

25   Q    Do you recall the total purchase price of the vehicle?

```
 1   A    I want to say it was almost 40,000.  I don't know the
 2   exact price.  I'd have to go back to the contract.
 3              MR. STEJSKAL:  Let's go back to the previous page
 4   and look at 16.11.  Maybe blow up the figures on the side
 5   there.
 6              THE WITNESS:  Yeah.  So the total cost would be
 7   about 42,615.
 8   BY MR. STEJSKAL:
 9   Q    So 14,000 was partial payment for the vehicle?
10   A    Correct.
11   Q    And we saw a second check there.  What was that?
12   A    That's a check that was given to me by Miles Penrose
13   for an additional payment for the vehicle.
14   Q    So that also went towards the purchase price of the
15   vehicle?
16   A    Yes.
17   Q    And what did you learn about the circumstances of that
18   check?
19   A    Miles was giving me a payment because they had split
20   the purchase of a boat, and so those were the funds that he
21   owed Aaron for the money they received from the boat sale.
22   Q    So when you say they, it was Mr. Penrose and Mr. Shamo
23   had purchased a boat together?
24   A    Correct.
25   Q    And this was money from that?
```

1    A    Yes.

2    Q    Were there additional funds, then, applied to the

3    purchase of the vehicle?

4    A    Yes.  There was also a cash payment.

5         MR. STEJSKAL:  And let's look at 16.13.

6    BY MR. STEJSKAL:

7    Q    What is that?

8    A    So when I received cash for vehicle sales, I would make

9    a quick copy of it and sign it with the dates so that I

10   would know with the bank deposit, that that's where the cash

11   needs to be allocated, what vehicle was to be -- the

12   bookkeeping side would go to.

13   Q    So this is an amount of cash given to you by whom?

14   A    I was given it by Miles Penrose.

15   Q    And he got it from?

16   A    Aaron Shamo.

17        MR. STEJSKAL:  Let's go back to 16.11 again, and

18   highlight the numbers again, if you would.

19   BY MR. STEJSKAL:

20   Q    In line number 19 there, there's a line that says total

21   payments 18,200.  Do you see that?

22   A    I do.

23   Q    Now that's different from the check from Mr. Penrose,

24   which is 19,200; isn't that correct?

25   A    Correct.

1    Q    Tell us about the circumstances of that.

2    A    They wanted the cash payment to be less than 10,000.

3    Q    So that was just recorded in that manner?

4    A    Right.  They didn't update the contract.  It was

5    just -- Miles just had let me know that he was going to

6    write the check for a higher dollar amount.

7    Q    After receiving the funds, both the two checks and the

8    cash payment, what did you do to process the transaction?

9    A    The checks and cash were deposited into the Chase Bank

10   account that's under IDrive's name.

11   Q    And then you watched to make sure the checks cleared?

12   A    Correct.  And then I just process the title paperwork

13   for the vehicle.

14   Q    So who drove the vehicle off the lot?

15   A    I wasn't there.  I assume the customer would drive it

16   off.

17   Q    Thank you.

18        MR. STEJSKAL:  That's all the questions for this

19   witness.

20        THE COURT:  Thank you.

21        You may cross-examine.

22        Mr. Sam.

23                    CROSS-EXAMINATION

24   BY MR. SAM:

25   Q    I just have a couple of questions.

```
 1        So any decisions you made as far as having to account
 2   for this, was that given to you by the owners, or where did
 3   that come from?
 4   A    Right.  That was by Miles Penrose.
 5   Q    And the customer wouldn't have given you any
 6   instruction on how to account for that?
 7   A    Correct.  I was given that instruction by Miles.
 8   Q    Okay.
 9             MR. SAM:  I have no further questions.
10             THE COURT:  Thank you.
11             Any redirect?
12             MR. STEJSKAL:  No, Your Honor.
13             THE COURT:  Thank you.  You may step down, and you
14   may be excused.
15             You may call your next witness.
16             MR. STEJSKAL:  The United States would next call
17   Special Agent Jeff Fletcher.
18             THE COURT:  Come forward and be sworn, please.
19                       JEFF FLETCHER,
20           Having been duly sworn, was examined
21                 and testified as follows:
22             THE CLERK:  Please state your name and spell it
23   for the record.
24             THE WITNESS:  My name is Jeff Fletcher.  J-e-f-f.
25   Fletcher, F-l-e-t-c-h-e-r.
```

Case 2:16-cr-00631-DAK-JCB Document 408-10 Filed 02/03/19 Page 113 of 219 PageID 9500
Case 2:16-cr-00631-DAK Document 403-10 Filed 02/03/19 Page 197 of 205 PageID 9500
2727

```
 1                       DIRECT EXAMINATION
 2  BY MR. STEJSKAL:
 3  Q     Your occupation, please?
 4  A     I'm a special agent with IRS Criminal Investigations.
 5  I guess I don't need to tell you what IRS stands for.
 6  Q     Describe for us your educational background.
 7  A     I have a bachelor's degree in international finance
 8  from Brigham Young University.
 9  Q     And what training did you receive to become an
10  investigator with the IRS?
11  A     As a special agent with IRS, we attend the Federal Law
12  Enforcement Training Center.  We do two and a half months of
13  basic law enforcement training, which includes firearms,
14  defensive tactics, doing general investigations.  A lot of
15  other agencies attend that first part.
16        The second part of our training includes financial
17  investigations.  We investigate crimes like money
18  laundering, tax evasion structuring.  If a crime involves
19  money, we would investigate it.
20        Training at the Federal Law Enforcement Training
21  Center, we are taught about the statutes pertaining to the
22  financial crimes we investigate.  We learn to follow the
23  money, how to track and trace proceeds of the illegal
24  activity, how to reconstruct income using various methods,
25  using bank account records, using net worth and assets, and
```

1  also via cash expenditures.

2  Q    Do you have any specific certifications with regard to

3  your training and investigative duties?

4  A    Yes, I do.

5  Q    What would that be?

6  A    I'm a certified anti-money laundering specialist, a

7  member of CAMs.

8  Q    Tell us about your experience as a financial

9  investigator with the IRS.

10  A    Yeah.  I've been a special agent with IRS Criminal

11  Investigations for 24 years.  Part of that, actually, I was

12  a tax auditor.  So I audited businesses.  But as a special

13  agent with IRS Criminal Investigations, for the last 20

14  years I have been investigating organized crime, drug task

15  force cases, working mostly with the DEA, Homeland Security,

16  FBI.  And now I've even expanded my horizons.  I'm working

17  with U.S. Postal and FDA on this case.

18  Q    And generally speaking here first, tell us about your

19  duties with IRS.  What types of things do you do to conduct

20  these investigations?

21  A    We look at the money.  We look at financial records.

22  We look at assets.  We look at cars, houses purchased.  You

23  know, we follow the money two different directions.  We can

24  follow -- in a drug situation, we can follow the drugs

25  sometimes to the cash obtained from the drugs.  But

 1   oftentimes we can't do that, so we look at assets and we

 2   follow the assets, which might lead to the drugs too.

 3   Q    In your capacity as a special agent with the IRS, did

 4   you become involved in this investigation of Aaron Shamo and

 5   others?

 6   A    Yes, I did.

 7   Q    What was your specific role in this investigation?

 8   A    The financial investigation aspects of the case,

 9   looking at bank accounts, financial transactions.  In this

10   case it was obviously cryptocurrency.  Looking at assets,

11   cars, any assets that were purchased and any cash that was

12   seized.

13   Q    Through your extensive training and many years of

14   experience, did you become familiar with the terms used in

15   investigating money laundering and financial offenses?

16   A    Yes, I have.

17   Q    Let's define a few of those terms so everybody

18   understands what we're talking about when we get into this.

19   First the term money laundering, can you tell us what money

20   laundering is?

21   A    Yeah.  Basically it's taking money that is dirty money

22   from illegal activity and a process of conducting financial

23   transactions to make that money appear to be clean.  A lot

24   of times you'll have a large amount of cash.  You go in and

25   plop that cash down to buy a house, the bank is going to ask

 1    you questions.  So you want to make that money look like

 2    it's come from a legitimate source.

 3    Q    Are you familiar with the term promotion --

 4    A    Yes, I am.

 5    Q    -- in the aspect of money laundering and financial

 6    investigations?

 7    A    Yes.

 8    Q    Explain for the jury the term promotion.

 9    A    A promotion is basically taking proceeds from an

10    illegal activity, drug distribution, and using that money to

11    keep the business going.  It could be purchasing more drugs.

12    It could be paying an employee to make shipments for you.

13    It could be -- let's see -- paying rent on a house that

14    you're using to store drugs, paying a phone bill on a phone

15    that you use to make communications with other people in the

16    organization.  So anything that keeps that drug organization

17    moving.

18    Q    Are you familiar with the term concealment?

19    A    Yes, I am.

20    Q    Can you explain that term for us?

21    A    Concealment is where -- there's three terms we use.

22    It's placement, layering, and integration.  In concealment,

23    what the individual who has money from illegal activities

24    wants to do is try to distance themselves from those illegal

25    funds.  They don't want people to know that the funds came

1    from illegal activity.  So they try to conduct multiple

2    transactions to distance themselves.  They may use

3    transactions with nominee names, with other individuals.

4    They may set up bank accounts with other people's names.

5    They may conduct several transactions in several different

6    bank accounts.  So the further they can get from that money,

7    the better for them, so that law enforcement doesn't detect

8    that this money is from illegal proceeds.

9    Q    Are you familiar with the term specified unlawful

10   activity, or SUA?

11   A    Yes, I am.

12   Q    Explain that term for the jury.

13   A    That's a list of codified crimes that are considered

14   crimes for the purposes of money laundering.  There's -- not

15   every crime is a crime for money laundering.  There's wire

16   fraud.  There's drug distribution.  Tax evasion isn't one of

17   those crimes that is a specified unlawful activity.  So

18   there's a specific list of those crimes.

19   Q    And many of those involve controlled substance

20   offenses, correct?

21   A    Yes, they do.

22   Q    Are you familiar with the term financial transaction?

23   A    Yes, I am.

24   Q    Tell us what that means.

25   A    A financial transaction is just a movement of funds.

1    Movement of funds could be depositing cash into a bank
2    account.  It could be paying an individual for a car, paying
3    an individual for work.  That's pretty much a financial
4    transaction.
5    Q    How about the term financial institution?
6    A    Yeah.  Financial institution is actually codified.  In
7    Title 31 5312(a), there's a list of businesses that are
8    considered financial institutions.
9         First of all, we all think of a bank.  A bank is a
10   financial institution.  But that also talks about car
11   dealerships, businesses that sell vehicles, jewelry shops,
12   real estate agencies.  Those are all considered financial
13   institutions for purpose of money laundering.
14   Q    Just by law that's how the --
15   A    By law, yes.
16   Q    How about the term interstate commerce or affecting
17   interstate commerce?
18   A    Yeah.  Interstate commerce is business from one state
19   to the other, so it affects multiple states.  For example,
20   banks are FDIC insured, and transactions in one -- and
21   they're chartered in multiple states.  Like Wells Fargo is
22   chartered in various states.  So to place or deposit funds
23   into Wells Fargo, for example, does affect interstate
24   commerce because you can wire funds through the bank --
25   through Wells Fargo from one bank in, say, Utah to a bank in

1    California.

2    Q    So those are our terms.

3         How did you become involved, then, in the investigation

4    of Aaron Shamo and his associates?

5    A    I was called by one of the agents of the DEA, and he

6    told me that they were looking at this organization and that

7    there potentially could be some money involved.

8    Q    And did you learn what type of operation they were

9    running as far as selling drugs on the street versus selling

10   drugs in a different way?

11   A    Yeah.  We learned that Mr. Shamo owned a storefront on

12   AlphaBay, known as Pharma-Master, and that this was an

13   online storefront that sold pills.

14   Q    And were you able to determine in what type or what

15   form payment was received in that market?

16   A    Yeah.  AlphaBay received funds in a cryptocurrency

17   known as Bitcoin.

18   Q    Tell us about Bitcoin.  What is that?

19   A    Bitcoin -- I've learned quite a bit over the last

20   couple years about Bitcoin.  But Bitcoin is a cryptcurrency.

21   It's a decentralized currency.  When you think of the U.S.

22   dollar, that's backed by the U.S. government.  Cryptcurrency

23   isn't.  It's a decentralized cryptcurrency and it involves

24   two different keys, a private key and a public key.  The

25   public key is like a wallet.  You have your money.  The

```
 1   private key -- I think it was explained by
 2   Special Agent Gino -- is kind of like the PIN number to your
 3   debit card and so not everybody can see that.  It's private.
 4   Q    We'll get into that more in a little bit.
 5        In the initial part of your investigation, did you
 6   locate a wallet connected with the AlphaBay account that was
 7   attributed to Aaron Shamo?
 8   A    Yes, I did.
 9   Q    How did you find that wallet?
10   A    Yeah.  On January 14th, 2017, myself and
11   Special Agent Keys went and talked to Mr. Aaron Shamo's
12   landlord.  Shamo was living at -- had been living at 7939
13   Titian Way in Cottonwood Heights.  So we interviewed his
14   landlord.
15   Q    And were you given a document of an exchange between
16   Mr. Shamo and the landlord, Mr. Lapin?
17   A    Yeah, we were.  We were given an e-mail that was sent
18   to Mr. Lapin by Mr. Shamo that talked about his source of
19   income to be able to pay the rent, and that e-mail also
20   included his Bitcoin wallet.
21   Q    Let's look at Exhibit 21.18, the second page of that.
22   Can you identify that for us, please?
23   A    Yes.  That is the e-mail.
24   Q    Who is the e-mail from?
25   A    It's from airshamu4@hotmail.com.
```

1    Q    Who is it to?

2    A    Jeremylapin@hotmail.com.

3    Q    You just talked about identifying a Bitcoin wallet.

4    How did you do that from this document?

5    A    Well, we identified it because it's in the e-mail.

6    Mr. Shamo is saying, hey, here's our incoming Bitcoin

7    wallet.  Any profits made come here first, then

8    distrusted -- I think he meant distributed -- to investors,

9    my two employees, and myself.  And then it's got the wallet

10   address beginning in 1Hmo and ending in kdq.  It also said

11   it should come up as U.S. dollars, but if it's not, then it

12   will say.

13   Q    Well, that looks like a link, that yellow line down.

14   So what does that link to?

15   A    The blue -- yeah.  That's the link to his Bitcoin

16   address.

17   Q    So by clicking on that, the landlord could see some

18   information that relates to a Bitcoin wallet?

19   A    Yes.

20   Q    What's the date on that e-mail?

21   A    It's November 13th, 2015.

22   Q    Based on your investigation, was that around or just

23   before the time that Mr. Shamo moved into that Titian Way

24   house?

25   A    Yes, it is.

1   Q    Looking at that Bitcoin wallet number that you've

2   identified, starting at 1Hmo, did that have further

3   significance in your financial investigation?

4   A    Yes.  That was the Bitcoin wallet that was used to

5   receive funds from the AlphaBay's Darknet market store,

6   Pharma-Master.

7   Q    Let's talk specifically, then, about that Pharma-Master

8   store and that wallet.  Were you present when there was a

9   spreadsheet of sales and income from Pharma-Master kind of

10  showing the money that was coming in?

11  A    Yes, based on the feedback.

12  Q    Let's look at Exhibit 15.02.A.  Do you recognize that?

13  A    Yes, I do.

14  Q    How does that relate to your financial investigation?

15  A    It shows that there were -- this is based on

16  feedback -- 5,589 transactions.  The revenue was over

17  $2.8 million.

18  Q    And was part of your financial investigation to track

19  or trace money to either find it still in existence or

20  figure out where it went or where it came from?

21  A    That's what we try to do, yes.

22  Q    You testified that the Pharma-Master account was set up

23  to receive money in Bitcoin, correct?

24  A    Yes.

25  Q    Is Bitcoin easy to spend?

 1   A    Not really.  I mean, most places don't take Bitcoin for

 2   transactions.  I know you can buy a Tesla with a Bitcoin.

 3   But generally speaking, no.  It's a little more difficult to

 4   spend.

 5   Q    To be clear, there are some businesses that do accept

 6   Bitcoin?

 7   A    There are a few, yes.

 8   Q    Does converting Bitcoin to cash make it easier to

 9   spend?

10   A    Yes, it would.

11   Q    Explain that.

12   A    I mean, most people take cash.  Cash is U.S. dollars

13   currency.  Unless you spend a large amount, no one is going

14   to question small dollar amounts of cash.  It's widely

15   accepted everywhere pretty much.

16   Q    Does converting Bitcoin to cash also assist in

17   concealing the source of the funds?

18   A    Yes, it does.

19   Q    Explain that, please.

20   A    Well, converting Bitcoin to cash -- it depends on how

21   the Bitcoin is converted obviously.  But once you take

22   Bitcoin -- there's a blockchain so it can be followed to a

23   degree.  But once you convert that Bitcoin into cash, it's

24   hard to follow the cash.  Cash is what we call fungible.

25   It's indistinguishable.  It's -- I mean, you can't really

```
 1   tell one dollar from another.  You can't follow it.  So it's
 2   difficult to follow cash.
 3   Q    You talked about converting Bitcoin to cash.  What are
 4   the ways in which one can convert Bitcoin into cash?
 5   A    Yeah, there's three ways.  The first is the commercial
 6   online Bitcoin exchanges.  A couple of those are Bitstamp
 7   and Coinbase.  Those are regulated.  There's paperwork.
 8   There's a paper trail.  It's pretty easy to convert Bitcoin
 9   through those exchanges.
10   Q    And the fees for those?
11   A    The fees are about one to two percent.  Not too high.
12   Q    You said there are three ways.  That was one.  What
13   else?
14   A    The other way is the peer to peer Bitcoin exchange.  I
15   think it's been talked about, LocalBitcoins.com.  Peer to
16   peer is where a person that has Bitcoin wants some cash, or
17   vice versa, and so they meet up.  There's been testimony
18   where individuals -- Mr. Crandall would have cash and would
19   meet with individuals that had Bitcoin that wanted to
20   purchase the Bitcoin.  So they would just make that
21   exchange.  In those situations, there is no paper trail.
22   Q    Explain that a little better.  What do you mean by
23   there is no paper trail?
24   A    There's no -- like Bitstamp, the money goes through an
25   exchange.  We can follow that money.  But when an individual
```

1    meets another person on the street and they exchange Bitcoin

2    for cash, there's no way we know who provided the Bitcoin,

3    who provided the cash.

4    Q    So it's anonymous?

5    A    It's anonymous, yes.

6    Q    And you said there were three methods.  What was the

7    other one?

8    A    The other one is the Bitcoin ATMs.  It's an ATM.  There

9    is a paper trail with the Bitcoin ATMs.  Probably less than

10   the online commercial Bitcoin exchanges who are regulated,

11   but there's still a paper trail.

12   Q    Did Mr. Shamo use any of these particular conversion

13   methods to exchange his Bitcoin for cash?

14   A    He used the peer to peer.  He used LocalBitcoins.com.

15   He met individuals on the street.  Mr. Crandall also met

16   people on the street and converted the Bitcoin to cash so

17   they could spend it.

18   Q    And based on your investigation, were large amounts

19   converted?

20   A    Yes.

21   Q    What kind of amounts?

22   A    Millions.  I mean over a million.

23   Q    Did agents ultimately end up seizing large amounts of

24   cash?

25   A    Yes, they did.

1  Q    Let's look at Exhibit 13.09, photo number five.  What
2  is that?
3  A    That's the picture of cash in Mr. Shamo's dresser
4  drawer that was seized during the search warrant on
5  November 22nd, 2016.
6  Q    And do you recall approximately how much money was
7  seized on that date from Mr. Shamo's residence?
8  A    It was over $1.2 million.  The cash was located in two
9  dresser drawers, two safes, and a nightstand.
10  Q    Do you recall some testimony about Mr. Shamo informing
11  agents about trading in his Bitcoin for cash right around
12  that time?
13  A    Yes.  When Mr. Shamo was arrested, he told agents that
14  he had just recently exchanged about 700 -- in excess of
15  $700,000 of Bitcoin for the cash.
16  Q    Is the conversion of Bitcoin to cash considered a money
17  laundering transaction?
18  A    It is.
19  Q    Explain that for us.  Why is that?
20  A    It's a financial transaction.  It's with U.S. currency.
21  So it's basically -- and it depends on how they're doing it,
22  but if it's a peer to peer, it's Bitcoin for cash.  It's a
23  transaction with proceeds from illegal activity with the
24  intent to either conceal or disguise the proceeds.
25  Q    Was there also a sum of cash seized or turned over in

1    Arizona in March of 2017?

2    A    Yes, there was.

3    Q    Let's look at Exhibit 16.04, photo number four.  Can

4    you identify that for us?

5    A    Yeah.  That is approximately $429,000 cash that was

6    turned over voluntarily by Mike and Rebecca Shamo to U.S.

7    Postal Inspector Andrea Brandon.

8    Q    And is that evidence of a money laundering transaction?

9    A    It is evidence of money laundering, yes.  And the

10   statement attached to the consent form said that this money

11   was hand delivered by Aaron Shamo to them.

12   Q    And how is that significant in your investigation of

13   Mr. Shamo as far as money laundering?

14   A    It shows that Mr. Shamo obtained the cash.  We know

15   that his source from the online store was cryptocurrency.

16   So it obviously had to be converted into cash.

17   Q    Was there also a sum of money obtained from a Luke Paz?

18   A    There was.

19   Q    Let's look at photo 16.16.  What is that?

20   A    It's a bag of cash.

21   Q    And was that the cash that was obtained from Mr. Paz?

22   A    Yeah.  Mr. Paz turned over cash on two occasions in

23   August of 2018.  One amount was approximately $671,000, and

24   the other amount was approximately $134,000.

25   Q    Did you do any research on Aaron Shamo to determine if

1  he had other sources of income other than the Pharma-Master,

2  AlphaBay website?

3  A    Yes.  I looked at his employment to see if he had a

4  legitimate job.

5  Q    How did you do that research?

6  A    I pulled up the Utah Department of Workforce Services

7  database.

8  Q    What is the Department of Workforce Services?

9  A    It's a database.  If someone is employed and working

10 and receiving wages in the State of Utah, this database has

11 your quarterly wages and amounts of those wages.

12 Q    Am I on there?

13 A    Are you?  Yeah.  You get paid by the government.  It's

14 in Utah.

15 Q    It keeps track of everybody?

16 A    Yes.  If you're working, getting a wage in Utah, you

17 should be on that database, yes.

18        THE COURT:  What's the relevance of your being on

19 there?

20        MR. STEJSKAL:  I was just curious.  I didn't know

21 anybody was keeping track of me.

22        THE WITNESS:  I can pull you up.  But I can't pull

23 your tax returns.

24 BY MR. STEJSKAL:

25 Q    Let's look at Exhibit 16.10.  Can you identify -- I

 1   guess page two.  Can you identify that for us, please?

 2   A     Yeah.  That is a certified copy of the Workforce

 3   Services for Mr. Aaron Shamo.

 4   Q     And the time period on that appears to be what?

 5   A     The date that I did the pull or --

 6   Q     The time period covered from the Workforce Services

 7   report.

 8   A     It looks like the second quarter of 2009 through the

 9   first quarter of 2015.

10   Q     And when did you run this report?

11   A     You'd have to let me see the bottom of the page so I

12   can remember that.  Let's see.

13   Q     Let me just ask it this way.  Did you run it after

14   Mr. Shamo was arrested?

15   A     Yeah.  It was November or December of 2017 -- or 2016.

16   Excuse me.

17   Q     There's a date on the screen now.

18   A     Oh, that's the certified copy, yeah.  The certified

19   copy is 12-24, 2018.  I actually ran it prior to that.

20   Q     You ran it in the course of your investigation in 2017?

21   A     Yes.

22   Q     So does that account for all income through the time of

23   his arrest in late 2016, November of 2016?

24   A     That accounts for all of the wages that he received in

25   the State of Utah, from employers in the State of Utah.

1   Q    And what does this report indicate as far as income for

2   Mr. Shamo?

3   A    The relevancy is that it shows that he was receiving

4   wages from eBay starting the third quarter of 2013, and that

5   his last wage was from eBay in the first quarter of 2015 in

6   the dollar amount of $1,573 for that quarter.

7   Q    No legitimate income reported after that?

8   A    No.

9   Q    Let's talk about a few specific transactions, then,

10  that Mr. Shamo was involved in.  Let's first talk about a

11  transaction with IDrive on May 5th of 2016.  Are you

12  familiar with that transaction?

13  A    Yes, I am.

14  Q    Let's look at Exhibit 16.11.  Can you identify that for

15  us?

16  A    Yeah.  That's the retail sales agreement Ms. Kurstin

17  just spoke about.  It's the purchase of a 2011 Ford F350

18  from IDrive, Utah.

19  Q    And the purchaser name there at the top?

20  A    Aaron Shamo.

21  Q    Let's look at 16.12.  What do you see on that page?

22  A    Two checks.  One from Wells Fargo Bank -- that's the

23  bank account ending in 4284, which is Aaron Shamo's bank

24  account -- in the amount of $14,000 to IDrive.  The other

25  check is a check from Mr. Shamo's friend, Miles Penrose, in

1   the amount of 19,200.

2   Q    And then 16.13 that you saw with Ms. Kurstin also

3   showed some cash that was involved in this transaction?

4   A    Yes.  $9,420 in cash.

5   Q    Let's go back to 16.12, specifically referring to the

6   check from Mr. Shamo there.  What bank did that come from?

7   A    Wells Fargo Bank.

8   Q    Did you do any investigation into accounts by

9   Mr. Shamo?

10  A    Yes.  I found that he did have a Wells Fargo bank

11  account ending in number 4284.

12  Q    And that was what this check was written from?

13  A    Yes, it was.

14  Q    Let's look at Exhibit 16.21 and talk about your review

15  of Mr. Shamo's account.  What is this?

16  A    That's a summary of the deposit items into Mr. Shamo's

17  bank account at Wells Fargo.

18  Q    Looking at or around the date of May 5th when this

19  truck was purchased, are there any items that stand out to

20  you around that time?

21  A    Yeah.  Can you go to that page?  Actually that's the

22  wrong year.

23  Q    Sorry.  20 --

24  A    16.

25  Q    -- 16.

1    A    May of 2016.

2    Q    Page four.  I'm sorry.

3    A    Yes.  So on 5-4, 2016, there was a cash deposit in the

4    amount of $7,500.  And on May 5th, 2016, there's another

5    cash deposit in the amount of $5,000 just prior to the check

6    being written for $14,000.

7    Q    So cash is being deposited into that bank account in an

8    amount enough to cover that check that was written to

9    IDrive, correct?

10   A    Correct.

11   Q    What is the monetary transaction, then, as it relates

12   to IDrive and the purchase of that F350 truck?

13   A    It's the check for the $14,000 from Mr. Shamo's bank

14   account to IDrive.

15   Q    And what's the financial institution involved in that

16   transaction?

17   A    Wells Fargo is the financial institution that the bank

18   was -- that the check was written from.

19   Q    And the effect on interstate commerce?

20   A    Again, Wells Fargo is FDIC insured.  They're chartered

21   in various states, so you can send wires from state to

22   state.  So that affects interstate commerce.

23   Q    And the check was for 14,000.  Is there anything

24   significant about that amount?

25   A    It's over $10,000.

```
 1   Q    And why is that significant?
 2   A    Because the statute 18 U.S.C. 1957 requires a monetary
 3   transaction with a financial institution in an amount over
 4   $10,000.
 5   Q    Did you do some further examination of Mr. Shamo's bank
 6   account?
 7   A    Yes, I did.
 8   Q    Let's look at Exhibit 16.21.  Can you identify that for
 9   us, please?
10   A    Yeah.  It's another summary of his bank account.  It
11   shows money coming in and also funds being expended out of
12   that account.
13   Q    Give us a summary of that.  What did you determine from
14   this examination of Mr. Shamo's bank account?
15   A    First of all, on the deposit side, I analyzed the
16   deposits from the date of February of 2016 through November
17   of 2016, and I found that there were approximately 55 cash
18   deposits into the account totaling just over $88,000.
19   Eleven of those cash deposits were deposited in out of state
20   banks.
21   Q    What kind of states, if you recall?
22   A    There was California, Florida, Maryland, North
23   Carolina.
24   Q    And could you tell from the bank statement and your
25   research what funds from this account, what kind of things
```

 1   they were used to pay for?

 2   A    Yeah.  A lot of the funds went to pay Venmo.  There

 3   were wires to MoneyGram, wires to Western Union, and also

 4   wires to debit card purchases to the U.S. Postal Service.

 5   Q    And also to IDrive?

 6   A    And then the check to IDrive, yes.

 7        There was also a check in the amount of $23,000 to the

 8   IRS.

 9   Q    He didn't have any reported income on the Workforce

10   Services?

11   A    Correct -- well, he had -- in 2015, he had $1500.

12   Q    Did you search for other accounts of Mr. Shamo?

13   A    I did search for other accounts, yes.

14   Q    And what results?

15   A    I didn't find any.  There was a savings account

16   attached to this with minimal activity, but no other bank

17   accounts for Mr. Shamo that I found.

18   Q    So this appeared to be, from your research, the primary

19   account activity?

20   A    Yeah.  There was an E-Trade account, Ameritrade

21   account -- stock account also that I found.

22   Q    Let's shift gears for a minute and talk about Drew

23   Crandall.  Are you familiar with Drew Crandall from the

24   investigation?

25   A    Yes, I am.

1   Q    Are you aware that he was part of Mr. Shamo's drug
2   tracking organization?
3   A    Yes, I am aware of that.
4   Q    Did you investigate his finances?
5   A    I did.
6   Q    Tell us about that investigation.
7   A    I found that Mr. Crandall had a bank account at America
8   First Credit.  As I was going through his account, I found
9   some deposits from Bitstamp, which is one of those
10  commercial online Bitcoin exchanges.  I found some cash
11  deposits also.  It seemed like in 2015 there was probably
12  about 11 to $12,000 worth of cash deposits in his bank
13  account.
14  Q    Did you also search for other accounts with regard to
15  Mr. Crandall?
16  A    I did.
17  Q    Any other accounts found?
18  A    No.
19  Q    So did you review the account, then, that you just
20  referred to?
21  A    I did.
22  Q    Did you obtain a bank statement for that account?
23  A    Yes.  I obtained bank statements for that account for
24  three years.
25  Q    Let's look at 16.22.  Can you identify that for us,

1    please?

2    A    It looks like a bank to bank transfer in the amount of

3    $3,013.

4    Q    I'm not talking about the yellow line, just generally

5    what the document is.

6    A    Okay.  You threw me off there.

7         Yeah, that's his America First Credit Union bank

8    statements.

9    Q    From your analysis, describe the money flow as you kind

10   of reviewed the bank account and what was going in and what

11   was going out.

12   A    For Mr. Crandall's bank account, really I saw

13   occasional, sporadic cash deposits.  I was really looking at

14   the dates of November 2016 -- excuse me, November, December

15   of 2015 through November of 2016.  One thing I did see was

16   the wires in from Bitstamp and some cash deposits.

17   Q    Let's talk more generally now.  Were you present when

18   Mr. Crandall testified as to his financial activity?

19   A    Yes, I was.

20   Q    And as you reviewed this bank statement, is it

21   consistent with Mr. Crandall's testimony?

22   A    It is.

23   Q    You said you identified some transactions associated

24   with Bitcoin.  Are you familiar with Bitstamp?

25   A    Yes.

1  Q     What's Bitstamp?

2  A     Bitstamp is one of those commercial online Bitcoin

3  exchanges where there is an actual paper trail.

4  Q     Are there Bitstamp transactions associated with

5  Mr. Crandall's account?

6  A     There are.  There's three -- actually four.  Three

7  during this time frame of December to November --

8  December 15th through November 2016.

9  Q     Let's look first at Exhibit 16.05.  Can you identify

10 that for us?

11 A     Yes.  That is a wire transfer from Bitstamp on

12 April 19th, 2016 in the amount of $3,013.

13 Q     Do you recall the circumstances of that, according to

14 Mr. Crandall?

15 A     Yes.  Backing up a little bit, Mr. Crandall stated that

16 when he decided to leave to travel abroad with his

17 girlfriend, he wanted to be bought out of the drug business

18 with Mr. Shamo.  They negotiated an amount of $40,000.

19      Mr. Crandall stated that prior to leaving, he was

20 provided Bitcoin from Mr. Shamo in the dollar equivalent of

21 about $20,000.  He said that he would get amounts -- Bitcoin

22 amounts of about $10,000.  He would meet with people on the

23 street.  He would convert that Bitcoin into the cash.  He

24 would keep $5,000 and he would give $5,000 to Mr. Shamo.  He

25 basically -- he did say I was helping him launder money.

1    He did that four different times from September through

2  November when he left the States.  So he was able to get

3  approximately $20,000 of the $40,000 that was owed to him

4  before he left the country.

5  Q    So he was still owed money when he left the country?

6  A    He was still owed $20,000.

7  Q    So tell us about this specific transaction from April

8  of 2016.

9  A    So Mr. Crandall in his testimony stated that this 3,013

10 was part of Mr. Crandall cashing in the Bitcoin that he had

11 received from Mr. Shamo in April of 2016.

12 Q    Are you familiar with the term tumbler?

13 A    Yes.

14 Q    What's a tumbler?

15 A    A tumbler is a way to anonymize or basically cut the

16 trail of the blockchain, which makes it difficult to follow

17 the movement of the Bitcoin.

18 Q    And did Mr. Crandall indicate that the money was sent

19 through a tumbler?

20 A    Yeah.  Mr. Crandall stated that when he received the

21 Bitcoin from Mr. Shamo, Mr. Shamo ran it through a tumbler

22 and then into his Bitcoin account.

23 Q    So that was the first.  You said there were three, I

24 believe, in this time period.

25    Let's next look at Exhibit 16.06.  Can you identify

```
 1   that for us, please?
 2   A    Yeah.  That is a deposit on August 4th, 2016 in the
 3   amount of $5,343 from Bitstamp into Mr. Crandall's America
 4   First Credit Union account.
 5   Q    Do you recall from Mr. Crandall the circumstances of
 6   that money?
 7   A    Yeah.  He said that that dollar amount actually
 8   consisted of two things.  It consisted of part of the
 9   Bitcoins that he received as a payout prior, and then also
10   it consisted of approximately $22,400, which represented his
11   wages for working for Mr. Shamo doing customer service
12   support for Pharma-Master in the month of July, which is
13   when Mr. Crandall stated that he started working again for
14   Pharma-Master.
15   Q    So does this payment from Mr. Shamo to Mr. Crandall
16   constitute a money laundering transaction?
17   A    Yes, it does.  It constitutes promotion money
18   laundering.
19   Q    Explain that.  Why is that?
20   A    Because Mr. Crandall was working for Mr. Shamo.  He was
21   doing customer service on his storefront, on AlphaBay, known
22   as Pharma-Master.  So this is payment for him to do the
23   customer service, to actually answer questions and help
24   people with issues that they had on their pill purchases.
25   Q    You mentioned a third Bitstamp transfer.  Let's look at
```

1    16.07.  Would you identify that for us, please?

2    A    Yeah.  That is a deposit on September 22nd, 2016 in the

3    amount of $2,508 into Drew Crandall's America First Credit

4    Union bank account.

5    Q    And what did you learn about that amount of money being

6    transferred from Mr. Shamo to Mr. Crandall?

7    A    Mr. Crandall stated that that was, again, payment for

8    his wages for working as customer service on Pharma-Master

9    for the prior month, which would have been the month of

10   August.

11   Q    Does this transaction also constitute money laundering,

12   in your professional opinion?

13   A    Yes, it does.

14   Q    Explain.

15   A    It is a payment and promotion of the illegal activity

16   with funds that were derived from Bitcoin through

17   Pharma-Master.

18   Q    Did you go back, then, and look at Mr. Crandall's

19   account statement to show that these funds actually came

20   through that America First account?

21   A    I did.

22   Q    Did you verify all three of those transactions?

23   A    Yes.

24   Q    Did you also look into cash deposits of Mr. Crandall's

25   account?

1    A    Yeah, I did look at the cash deposits.

2         One thing that I was curious about was Mr. Crandall was

3    busy traveling the world with his girlfriend, but there were

4    cash deposits into his bank account while he was gone.  So I

5    wanted to know who was making those cash deposits.

6    Q    What did you do to investigate those deposits?

7    A    I contacted America First and asked if I could get

8    photo images of all the deposits that were being made into

9    the account so I could find out who was doing that.

10   Luckily, they keep those images for 90 days, so I barely

11   made that cutoff.

12   Q    What did you then receive from America First?

13   A    I received two photo images of transactions that show

14   individuals making deposits into Drew Crandall's America

15   First Credit Union account.

16   Q    Let's look first, then, at Exhibit 16.09.  Identify

17   that for us, please.

18   A    Yeah.  That's a picture of Mr. Shamo making a deposit

19   into Drew Crandall's bank account at America First Credit

20   Union.  It says the Cottonwood branch, which is not far from

21   Mr. Shamo's house.

22   Q    In addition to the photo, did you obtain anything else

23   from America First that showed that this monetary

24   transaction actually occurred?

25   A    I got the financial statements that show the dollar

```
 1  amount.

 2  Q    Did you get the deposit slip?

 3  A    Yes.

 4  Q    And did that show that amount being deposited into

 5  Mr. Crandall's account?

 6  A    It did.

 7  Q    And you said you also got the bank statement?

 8  A    Yes.

 9  Q    Can we look at Exhibit 16.22.

10  A    It's not the yellow.

11  Q    Our date here is November 8th of 2016.

12       Let me scroll down a couple of pages.

13       What do you see on this page?

14  A    It shows a deposit at the Cottonwood Heights branch for

15  $2,700.

16  Q    Does that match the information on the photograph that

17  we just observed?

18  A    Yes, it does.

19  Q    Based on your investigation of Mr. Shamo's drug

20  trafficking organization, how did Mr. Shamo obtain that cash

21  that he deposits into Mr. Crandall's account?

22  A    Based on my investigation and testimony, he obtained

23  that cash by converting the cryptocurrency Bitcoin, meeting

24  individuals with cash, and exchanging his cryptocurrency for

25  cash.
```

1  Q    Did you learn from Mr. Crandall what that $2700 payment
2  was for?
3  A    Yeah.  Mr. Crandall stated in his testimony that that
4  $2700 cash deposit made by Mr. Shamo into his bank account
5  was for doing customer service on Pharma-Master, his wages
6  basically.
7  Q    Does that constitute money laundering?
8  A    Yes, it does.
9  Q    In what way?
10 A    It's promotion, again.  He's paying an individual to
11 help keep his business running by doing customer support.
12 Q    Does this particular manner of transaction also have
13 indications of concealment?
14 A    Yes, it does.
15 Q    Describe that for us.
16 A    It's very hard to track and trace the proceeds of the
17 illegal activity when he takes the Bitcoin, meets people on
18 the street, gets the cash, and then surreptitiously goes
19 into the bank and makes a deposit of the cash into his bank
20 account.
21 Q    Let's talk about another specific transaction from
22 November 22nd of 2016.  Did you obtain a second photo from
23 America First Credit Union?
24 A    Yes, I did.
25 Q    Let's look at Exhibit 16.08.  Can you identify that for

1   us, please.

2   A     Yeah.  That's a picture of an individual who's tied to

3   Salt Lake City Bitcoins.  Through my investigation, I

4   identified him as Scott Wilkes.  He is making a $900 deposit

5   into Drew Crandall's America First bank account.

6   Q     Did you cross-reference his photo with

7   Mr. Crandall's bank statement to see that this transaction

8   took place?

9   A     Yes, I did.

10  Q     Let's go to 16.22 again and look at that.  The date is

11  November 22nd of 2016.

12  A     That shows the $900 deposit into the Salt Lake Metro

13  Branch of America First Credit Union, which is pretty close

14  to where Scott Wilkes resides.

15  Q     Again, explain for us who Scott Wilkes is and what his

16  business is.

17  A     Scott Wilkes is an individual who posts on

18  LocalBitcoin.com that he's looking for Bitcoin and that he

19  has cash.  He has individuals who he meets with that need

20  Bitcoin or cash, and he is the intermediary for those.  He

21  owns Salt Lake City Bitcoins.

22  Q     So in these transactions, the Bitstamp transactions and

23  these two cash deposits, it appears that -- well, it's not

24  the last one.  The three Bitstamp transactions and the one

25  with the photograph of Aaron Shamo depositing money, those

 1    appear to have involved both Mr. Shamo and Mr. Crandall; is

 2    that correct?

 3    A     Yes, that is correct.

 4    Q     So are they both responsible for money laundering based

 5    on those transactions?

 6    A     Yes, they are.

 7    Q     They both took part in those transactions.

 8    A     They both conducted financial transactions.

 9    Q     In addition to all the items of money laundering,

10    instances of money laundering that you just testified to,

11    were there other transactions specifically involving

12    promotion?

13    A     Yes, there were.

14    Q     Let's first talk about Ms. Tonge and Ms. Bustin as they

15    relate to Mr. Shamo.  Were there promotion transactions that

16    you identified with those individuals?

17    A     Yes.  Ms. Tonge and Ms. Bustin were purchasing stamps

18    and shipping labels.  The testimony was that Mr. Shamo would

19    move Bitcoin to a wallet controlled by the two women and

20    they would use that wallet to purchase shipping labels

21    through GetUSPS.com.

22    Q     And some of that -- or much of that involved Bitcoin?

23    A     Yes, it did.  Ms. Tonge and Ms. Bustin stated in their

24    testimony that they were purchasing approximately $500 worth

25    of stamps twice a week.

1   Q    Were there also transactions involving the payment of

2   wages to Ms. Tonge and Ms. Bustin?

3   A    Yeah.  Ms. Tonge and Ms. Bustin stated that initially

4   they were being paid $1,000 each per month.  That was

5   negotiated originally with Mr. Crandall and Mr. Shamo.  But

6   later on, they were being paid, toward the last few months,

7   $3,500 each per month for doing the processing of the

8   Pharma-Master website, processing the pills and packaging

9   those.  And initially they were also sending those boxes out

10  to different post office mail containers.

11  Q    Did you do some investigation involving Venmo

12  transactions as well?

13  A    Yes, I did.

14  Q    And what did you find on that?

15  A    I found that Mr. Shamo was using his bank account at

16  Wells Fargo to fund his Venmo account, and that he was using

17  his Venmo account to pay Tonge and Bustin.

18  Q    Does that constitute money laundering, in your opinion?

19  A    Yes, it does.

20  Q    How so?

21  A    Mr. Shamo -- it's a lot of work, but he's taking

22  Bitcoin, meeting people on the street, converting that to

23  cash, depositing that cash into his bank account, and then

24  moving that cash from his bank account -- now it's in his

25  account, to his Venmo account, and then using that to pay

```
 1   Tonge and Bustin.
 2   Q    You talked about postage.  Did you find any specific
 3   instances where Mr. Shamo used his bank accounts to buy the
 4   postage himself?
 5   A    Yes, I did.
 6   Q    Let's look at Exhibit 16.20.  What are we looking at in
 7   16.20?
 8   A    It's a spreadsheet that was created from his Wells
 9   Fargo bank account.  It shows deposits and expenses.
10   Q    And does it indicate what those expenses were for?
11   A    Yes.  Oftentimes it does.
12   Q    And what was the date on the postal transaction that
13   you identified?
14   A    I want to say it was May of 2016.
15   Q    May or June of 2016?
16   A    Yeah.
17   Q    Let me refer you to June 24th of 2016 on the statement
18   here and see if you can identify it.
19        In the blue there in about the middle of the page.
20   A    Yeah.  It shows a debit card purchase on June 24th,
21   2016 for $1,032 to the U.S. Postal Service.
22   Q    Again, that came directly from Mr. Shamo's account to
23   the Postal Service?
24   A    Yes, it did.
25   Q    Is that a money laundering transaction?
```

1   A     Yes, it is.

2   Q     In what way?

3   A     It's proceeds from illegal activity laundered through

4   his bank account and then used to purchase stamps, which are

5   promoting his business.  The stamps are used to send the

6   pills that were ordered from the customers of Pharma-Master.

7   Q     We're on the subject of promotion.  We could refer to

8   that chart next to you, 17.06.  There were some others

9   identified involved in the drug trafficking organization.

10  Are you familiar with those people?

11  A     Yes.  Yes, I am.

12  Q     Let's talk about a few of those.  Let's talk about

13  Mr. Gygi who's there on the far right in the first full row

14  under Mr. Shamo.  What was your investigation with regard to

15  money transferred from Mr. Shamo to Mr. Gygi?

16  A     Mr. Gygi worked as a courier.  He was the individual

17  who would pick up packages from Tonge and Bustin and ship

18  those out using different mail collection boxes throughout

19  Salt Lake County.  He was paid $4,000 a month by Mr. Shamo,

20  in cash, for doing that.

21  Q     And does that constitute promotion?

22  A     Yes, it does.

23  Q     Let's talk about Mr. Noble.  Did you do some

24  investigation as to financial transactions involving

25  Mr. Shamo to Mr. Noble?

1   A   Yeah.  Mr. Noble, as he stated, worked customer service

2   for Pharma-Master also, and he was paid $1600 a month by

3   Mr. Shamo, in cash.  He did say he took, I think, September

4   off.

5   Q   And does that involve promotion, then?

6   A   Yes, it does.

7   Q   Let's talk generally about the others on that document

8   that we heard testimony were receiving -- the word drops,

9   were receiving money for getting packages at their homes.

10  How does that relate to the promotion of money laundering?

11  A   Yeah.  Mr. Shamo's providing them cash to receive

12  packages and those packages are used to either -- to

13  manufacture the pills.  He was receiving fentanyl and

14  ingredients from Press Club to help make the pills.

15  Q   The indictment contains an allegation of conspiracy to

16  commit money laundering.  Are you familiar with that?

17  A   Yes, I am.

18  Q   Are you familiar with the term conspiracy?

19  A   Yes.

20  Q   Tell us about that.  What does it mean by conspiracy?

21  A   Conspiracy is usually an agreement by one or more

22  individuals.  In this conspiracy to money launder is

23  agreements between Mr. Shamo, Mr. Crandall, specifically

24  Tonge and Bustin to launder money to help further the

25  enterprise.  There was an agreement with several

1    individuals.  Mr. Noble agreed to perform work in exchange
2    for being paid.  Mr. Crandall, same thing, testified that he
3    was being paid $2,400 a month to do customer service.  Tonge
4    and Bustin agreed to be paid by Mr. Shamo.  Mr. Shamo would
5    drop off cash in their truck or provide them the cash.  So
6    they had an agreement to work for the organization and also
7    an agreement to receive cash.
8    Q    And based on your investigation, these weren't written
9    agreements, these were just agreements among individuals to
10   do these certain things?
11   A    Yes.
12   Q    In exchange for payment, correct?
13   A    Correct.
14   Q    You heard from Mr. Crandall, Ms. Tonge, Ms. Bustin that
15   they pled guilty to conspiracy to launder money, correct?
16   A    Yes.
17   Q    What were their roles, then, in this money laundering
18   with Mr. Shamo?
19   A    Tonge and Bustin helped purchase stamps, shipping
20   labels.  I think I mentioned before, they were individuals
21   who processed the orders from Pharma-Master, got them ready.
22   Initially they also shipped those out.
23       Mr. Noble provided customer support for Pharma-Master.
24   He answered phone calls.  Then Mr. Gygi was a courier.  He
25   would take the packages that Tonge and Bustin would leave on

 1   their doorstep and he would go deposit those into the
 2   different mailboxes.
 3        Am I missing anybody?
 4   Q    Probably, but we covered those.
 5        Based on law enforcement's investigation, specifically
 6   your financial investigation into this drug trafficking
 7   organization, who primarily controlled the money generated
 8   by AlphaBay and Pharma-Master?
 9   A    Mr. Shamo controlled the money.  All the money went
10   through Mr. Shamo.  He owned the Bitcoin wallet that
11   received the funds from Pharma-Master.
12   Q    And we saw a sum of money with Mr. Paz.  Setting that
13   aside for a minute, where was the majority of the money
14   found when law enforcement took down the organization?
15   A    It was found in Mr. Shamo's house at Titian Way in
16   Cottonwood Heights.
17   Q    And the Bitcoin as well, where was that found?
18   A    It was found on Mr. Shamo's computer.
19   Q    And in his wallets?
20   A    And in his wallets on his computer and his phones.
21            MR. STEJSKAL:  May I have a moment, Your Honor?
22            THE COURT:  Yes.
23            THE WITNESS:  That's a lot of sticky notes.
24            MR. STEJSKAL:  No.  There's only two.
25   //

```
 1    BY MR. STEJSKAL:
 2    Q    One's a clarification.  It was heard that you testified
 3    that Noble answered phone calls.  Is that your
 4    recollection -- is that your recollection of what happened?
 5    A    No.  He didn't answer phone calls.  He answered
 6    e-mails.  He had access to the Pharma-Master, in part, and
 7    he was able to respond to e-mails.  He even mentioned that
 8    he had some premade up e-mails to different responses.  So,
 9    sorry, no.  He didn't answer phone calls.
10    Q    So that was just a misstatement?
11    A    Yes.
12    Q    We heard some testimony about a Miles Penrose and the
13    fact that he owned IDrive.  Is Mr. Penrose depicted on
14    17.06, the government's exhibit?
15    A    Yes, he is.
16    Q    Where is he?
17    A    He's on the bottom left row.
18    Q    And is that who you spoke with when you investigated
19    the IDrive transaction?
20    A    Yes.
21    Q    So this is the same person?
22    A    Yes, it is.
23    Q    And is he also the individual we talked about earlier
24    that invested in the drug trafficking business?
25    A    Yes, he is.
```

```
 1              MR. STEJSKAL:  No further questions.

 2              THE COURT:  Thank you, Mr. Stejskal.

 3              Defense may cross-examine.  Ms. Beckett.

 4              MS. BECKETT:  I only have one sticky note and it's

 5    from Mr. Skordas.

 6              THE WITNESS:  Oh, good.  It's going to be short.

 7              MS. BECKETT:  No.  These are just Mr. Skordas

 8    reminding me to talk slower for the court reporter.

 9                        CROSS-EXAMINATION

10    BY MS. BECKETT:

11    Q    So I believe it was your testimony that you were

12    present for the interview of Jeremy Lapin?

13    A    Yes.

14    Q    He's the landlord for the Titian Way residence,

15    correct?

16    A    That is correct, yes.

17    Q    He owned that home?

18    A    Yes, he did.

19    Q    When you interviewed him, did he tell you anybody else

20    was on the lease for that home at Titian Way?

21    A    Yes.  He said Luke Paz was also on the lease.

22    Q    And that he had signed that lease in 2016, correct?

23    A    That is correct.  He said that he'd only seen Luke Paz

24    there one time during the whole time that he'd been on the

25    lease.
```

```
 1   Q    But Mr. Lapin wasn't around all that often, was he?
 2   A    I assume not.  Like a landlord, probably doing work on
 3   the house occasionally.
 4   Q    Could we look at Government's Exhibit 21.18, page two.
 5   It's an e-mail you indicated came from Mr. Shamo to Jeremy
 6   Lapin.  That particular e-mail says, hey, here is our
 7   incoming Bitcoin wallet, correct?
 8   A    It does.
 9   Q    It does not say here is my Bitcoin wallet, correct?
10   A    It says our.
11   Q    Refers to investors, employees, and himself?
12   A    Yes.
13   Q    I believe part of your testimony is that Mr. Paz had
14   some involvement in these cash transactions, correct?
15   A    I didn't testify to that.  I did say that we received
16   cash that was voluntarily surrendered by Mr. Paz.
17   Q    Are you aware of Mr. Paz's involvement in converting
18   large amounts of Bitcoin to cash?
19   A    Yes.
20   Q    You're aware that he was an individual who would meet
21   people for peer to peer transactions and receive a
22   significant amount of cash?
23   A    Yes.  I'm aware that he was helping Mr. Shamo launder
24   his money.
25   Q    And your testimony was that Mr. Paz turned over a
```

1    little over $800,000 in cash, correct?

2    A    That is correct, yes.

3    Q    And that wasn't until August of 2018, correct?

4    A    Yes.

5    Q    A significant amount of time after November of 2016

6    when Mr. Shamo was arrested, correct?

7    A    That's over a year, yeah.

8    Q    Almost two years?

9    A    Almost two.

10   Q    But he still had $800,000 in cash?

11   A    Mr. Paz did, yes.

12   Q    You testified that Mr. Crandall conducted some -- had

13   some cash deposits made into his bank account; is that

14   correct?

15   A    That is correct, yes.

16   Q    And Mr. Crandall was able to track the user down online

17   from a foreign country to deposit cash into his account,

18   correct?

19   A    I'm not sure about that.  Can you repeat that question?

20   Q    Do you know where Mr. Crandall was when he had Scott

21   Wilkes deposit money into his bank account?

22   A    He was in Asia, I'm pretty sure.

23   Q    So nowhere near Salt Lake?

24   A    That's correct, yes.

25   Q    But he was able to track somebody down here in the Salt

1    Lake valley to deposit money into his account?

2    A    Yeah.  I think he stated that he had found someone on

3    LocalBitcoin.com, and that was Scott Wilkes with Salt Lake

4    City Bitcoins.

5    Q    And he was able to track that person down pretty

6    quickly, correct?

7    A    Yeah, on the Internet.

8    Q    The same day that Mr. Shamo was arrested, correct?

9    A    That is correct, yes.

10   Q    Is that, as you referred to previously, a sign of

11   concealment?

12   A    Yes.  It is concealment, money laundering by

13   Mr. Crandall.

14   Q    And that particular transaction was not really

15   associated with Mr. Shamo, correct?

16   A    The funds had come from Mr. Shamo, yes, they did.  So

17   it is associated with Mr. Shamo.

18   Q    According to Mr. Crandall, that money came from

19   Mr. Shamo?

20   A    According to Mr. Crandall, yes.

21   Q    If Mr. Crandall were using these peer to peer Bitcoin

22   transactions, I believe it was your testimony there wouldn't

23   be a paper trail, correct?

24   A    On the three Bitstamp transfers into his bank account,

25   that is correct.  On the cash deposits into his account, no,

```
 1   there was no paper trail.
 2   Q    Part of your testimony is that Mr. Crandall said he
 3   would make these $10,000 Bitcoin transactions, and 5,000 of
 4   that would go to Mr. Shamo and that he would keep 5,000 for
 5   himself?
 6   A    Yes.  He said he was helping Mr. Shamo launder money.
 7   Q    Is there any proof that he gave that money back to
 8   Mr. Shamo and didn't keep it for himself?
 9   A    Just the testimony.
10   Q    The same goes for his testimony that the money he was
11   receiving was simply wages, correct?
12   A    Well, he said that the money he was receiving was
13   partly wages, but he was also receiving money that was
14   payout for the business prior.  So it was wages and payout,
15   depending on when he received it.
16   Q    But that was based just on his statements to you,
17   correct -- or his statements in general?
18   A    Yeah.  Those statements were corroborated by the
19   financial transactions also.
20   Q    The fact that they were wages was corroborated by the
21   financial transactions?
22   A    No, the fact of the amounts.  He said that he was paid
23   approximately $2400 a month.  There were several
24   transactions pretty close to that same amount.
25   Q    Are you aware that Mario Noble testified to actually
```

1    being an individual who recruited people to essentially work

2    in this organization?

3    A    He stated that he helped get people to receive packages

4    as drops.  He did say that.

5    Q    Specifically, I believe that was individuals with the

6    last name of Vance and Bruner.  Does that sound correct?

7    A    That sounds correct.  I'm not 100 percent sure, but

8    that's correct.

9    Q    I apologize.  I almost cut you off.

10        Do you remember Mr. Noble stating that he, in fact,

11   received money and benefited from that?

12   A    Yes, he did.  I think it was like $100.

13   Q    Is that money laundering?

14   A    It actually is, yes, promotion.

15   Q    Not just a conspiracy to commit, but actual money

16   laundering itself, correct?

17   A    Money laundering and a conspiracy because Mr. Shamo is

18   also involved in giving Mario Noble the cash, which moved on

19   to those drops.  So it's part of the conspiracy with

20   Mr. Shamo.

21   Q    Based on the testimony just of Mario Noble, though,

22   correct?

23   A    There were other drops.  In the drops that Mario Noble

24   recruited, it is just based on his testimony, yes.

25   Q    The same for Ms. Tonge?  I believe there was testimony

```
 1    that she recruited an individual by the name of Elise

 2    Christensen?

 3    A    I don't remember that testimony.  Sorry.

 4    Q    That's not a problem.

 5              MS. BECKETT:  Just one second, Your Honor.

 6              THE COURT:  Yes.

 7              MS. BECKETT:  I have no further questions,

 8    Your Honor.

 9              THE COURT:  Thank you, Ms. Beckett.

10              Mr. Stejskal, redirect.

11                      REDIRECT EXAMINATION

12    BY MR. STEJSKAL:

13    Q    Let's go back to 21.18, page two, that e-mail.  The

14    line about the Bitcoin wallet, what does it refer to the

15    employees belonging to?

16    A    Can you repeat that question?  I didn't quite

17    understand it.

18    Q    It says our Bitcoin wallet.  Why don't you just read

19    the line again.

20    A    Okay.  Here's our incoming Bitcoin wallet.  Any profits

21    made come here first and distrusted to investors, my two

22    employees, and myself.

23    Q    So that statement is from Mr. Shamo based on the --

24    A    Yeah, to Mr. Lapin.

25    Q    So he's saying Mr. Shamo's two employees, correct?
```

1    A     Yes.

2    Q     Now you said the purpose of this e-mail was to rent

3    property from Mr. Lapin based on your investigation,

4    correct?

5    A     Yeah.  He's needing to show Mr. Lapin that he has a

6    source of income to pay his rent.  Mr. Lapin is not going to

7    allow him to rent a house without a source of income.

8    Q     So based on your investigation, did Mr. Shamo lie about

9    having legitimate income in Bitcoin?

10   A     Yes, he did.  He often told people that he was either

11   trading Bitcoin or mining Bitcoin and that was the source of

12   his income.

13   Q     Are you familiar with Luke Paz?

14   A     Yes, I am.

15   Q     Did Luke Paz have another residence where he lived

16   during the period of this trafficking organization?

17   A     Yes, he did.

18   Q     Did you receive any indication during your

19   investigation that Mr. Paz lived at this Titian Way address?

20   A     No, I did not.  Just the rental contract with his name

21   on it.  But again, interviewing the landlord, the landlord

22   said he almost never saw him there.  I think one time.

23   Q     Did Mr. Paz have legitimate employment throughout this

24   period, and specifically when this e-mail was sent?

25   A     Yeah.  He worked for a couple of different home

```
 1    security system companies.  He was selling home security
 2    systems.  A lot of times he was in Texas and Louisiana
 3    selling those security systems.
 4    Q    So based on that, he, unlike Mr. Shamo, could provide
 5    employment records to the landlord to rent an apartment --
 6    or a house, correct?
 7    A    Yes, that is correct.
 8    Q    Thank you.
 9              MR. STEJSKAL:  That's all the questions I have.
10              THE COURT:  Any recross?
11              MS. BECKETT:  No, Your Honor.  Thank you.
12              THE COURT:  Thank you.  You may step down.
13              Do you want to start another witness or take a
14    second break?
15              MR. STEJSKAL:  Probably second break, Your Honor.
16    It's been about an hour and a half.
17              THE COURT:  Okay.  We'll be in recess for about 30
18    minutes.
19              (Jury excused)
20              (Recess)
21              (Jury present)
22              THE COURT:  You may call your next witness,
23    Mr. Stejskal.
24              MR. STEJSKAL:  Thank you, Your Honor.
25              The United States next calls Jeff Bryan.
```

```
 1              THE COURT:  Come forward and be sworn, please.
 2                          JEFF BRYAN,
 3            Having been duly sworn, was examined
 4                  and testified as follows:
 5              THE CLERK:  Please state your name and spell it
 6    for the record.
 7              THE WITNESS:  Jeff Brian.  J-e-f-f-, B-r-y-a-n.
 8              THE COURT:  You may proceed.
 9              MR. STEJSKAL:  Thank you, Your Honor.
10                      DIRECT EXAMINATION
11    BY MR. STEJSKAL:
12    Q    Your occupation?
13    A    I'm a financial investigator for the Drug Enforcement
14    Administration.  I'm a contract employee.
15    Q    And how long have you been doing that?
16    A    About a year and a half -- a little over a year and a
17    half.
18    Q    What were you doing before that?
19    A    Prior to that, I was a DEA agent, a special agent,
20    since 1991.
21    Q    And I'm not used not to calling you special agent
22    because you've been a special agent for a long time.  Can I
23    still call you that?
24    A    Nope.
25    Q    Retirement must be good.
```

1    A    It is.

2    Q    Tell us about your educational background.

3    A    I graduated with a bachelor's degree from the

4    University of Utah in sociology, with a certificate of

5    criminology.

6    Q    And following that education, did you go directly into

7    DEA?

8    A    Yes, I did.

9    Q    Tell us about your training, then, upon becoming a DEA

10   agent and then continuing that training.  And let's split

11   that a little bit between your training with regard to drug

12   trafficking and kind of separate training with regard to

13   financial investigations and money laundering because I

14   believe those are two different aspects of what you've done

15   over your career.

16   A    New special agents are trained at the Quantico DEA

17   Academy.  We're co-located with the FBI there.  We have our

18   own training academy because we're trained differently, and

19   our training is approximately four months.  It varies from

20   year to year, depending on who's in charge and what they're

21   being trained on, but it's about four months long.

22        In that training, we are trained with all kinds of

23   investigative techniques, interviewing, surveillance, report

24   writing.  We're trained on defensive tactics and firearms,

25   everything that we need to know to do our job when we get

1    assigned to our location.

2    Q    And then after receiving that initial training that all

3    agents receive, have you received other trainings in either

4    your specialty or just periodic updates?

5    A    Yes.  Throughout an agent's career, you have the

6    opportunity to go to in-service training, and a lot of it is

7    personal preference on what kind of investigations you want

8    to try to do or what you have an aptitude for.  And so I was

9    trained initially -- not too long after the academy, I was

10   trained in clandestine laboratories.  So I became certified

11   to enter laboratories with all the suits on, and the SCBAs,

12   and dismantle methamphetamine laboratories.

13        And then I became a site safety instructor.  So that's

14   another certification where when we would dismantle a

15   laboratory, because of the toxic nature of the chemicals and

16   the by-products of methamphetamine labs, we would have to

17   designate an area for that cleanup, and safe zones, and

18   clean zones, and dirty zones, and they were progressive.  So

19   we were trained on how to do that to keep the environment

20   safe and people safe while we processed the evidence of a

21   lab.  And that's just one example.

22        There are other trainings on conspiracy, for example,

23   what is a conspiracy and how do you investigate a conspiracy

24   investigation.  There were trainings of different interview

25   techniques that are more specialized than we reached in the

1    academy.  And those are throughout an agent's career.

2        I attended a training not too long before I retired

3    because I didn't know I was going to retire.  So throughout

4    an agent's career, we receive this in-service training that

5    is put on either by the Department of Justice or other

6    government entities, or by companies, such as a company -- I

7    attended a training from Coinbase.  An individual from the

8    company called Coinbase, which is a virtual exchange

9    company, a virtual currency exchange company, came out and

10   trained us on what virtual currency is and how it's used.

11   So those kinds of trainings are typically what an agent goes

12   through and that I participated in as well throughout my 28

13   years.

14       And along with those, we also are trained in financial

15   investigations.

16   Q    Let me stop you for a second before you go into the

17   financial side.  There's one more from the drug side I'd

18   like to highlight, and that's pharmaceutical drug training?

19   A    Yes.  So at different periods of an agent's career,

20   drugs and their -- the drug of choice for a community or a

21   society kind of evolves and changes.  When I first hired on,

22   cocaine was very popular.  And shortly after that, LSD was

23   very popular.  And then after that, methamphetamine

24   absolutely took over and we were all focused on

25   methamphetamine.

```
 1        And then what was your question?
 2   Q    Your training with regard to pharmaceutical drugs and
 3   how it became that.
 4   A    Sorry.  So in 2009, it became very apparent that a lot
 5   of pharmaceuticals were being diverted and abused.  And so
 6   DEA started to focus heavily on the pharmaceutical industry
 7   and how it's being diverted on the street.  So at that time
 8   I attended a pharmaceutical drug training.  Because as
 9   agents, we have a -- DEA is kind of divided in two parts.
10   We have the special agents, which is the criminal
11   investigation side, and we have diversion, which is the
12   regulatory side of DEA.  So they work with the doctors and
13   their licenses, and the pharmacies and the legal production
14   and dissemination of legal pharmaceutical drugs, and that is
15   controlled by DEA as well.  So we have a criminal side and
16   we have an administrative side.
17        And so at that time, as an agent I hadn't worked with
18   pharmaceutical drugs very much, and it became -- people
19   started trafficking pharmaceuticals, so we had to treat
20   pharmaceuticals just like any other street drug.  And so on
21   the criminal side of the house, we started to investigate
22   pharmaceutical diversion.  So I attended a training on
23   pharmaceuticals.
24   Q    And then let's talk about the financial side as well.
25   It looks like you received training in money laundering
```

1    investigations, asset forfeiture, a specific financial

2    investigation seminar.  Tell us a little bit about your

3    training in that part.

4    A    Yes.  So throughout the course of an investigation,

5    oftentimes people who traffic in narcotics or drugs, they

6    make a lot of money, and sometimes it's hard to hide that

7    money.  And we try to seize assets that are derived from the

8    elicit proceeds of that trafficking activity.  So we receive

9    training on how that happens, how do people conceal their

10   money, how do they accumulate assets, and how do they try to

11   hide them so it doesn't look like it belongs to them, and

12   how did they move their money back and forth.  So we receive

13   training on that.

14   Q    In addition to your training, you have vast experience

15   since -- I believe you said 1991, correct?

16   A    Yes.

17   Q    Explain for the jury kind of the progression of your

18   career, how you moved into different areas as you became a

19   more experienced agent.

20   A    Okay.  As I said, when I first hired on, cocaine was

21   very prevalent here in Utah.  I hired on here.  My first

22   area was here in Utah.  And as an agent, we go undercover

23   and we purchase drugs so that we can testify to the fact

24   that we purchased drugs from an individual or from an

25   organization.  And that's called a controlled purchase,

 1   which means we're purchasing illegal substances, but it's
 2   controlled.  We're using official, authorized government
 3   funds for that.  And we never do it by ourselves.  We have a
 4   whole group of people that are there observing, and
 5   watching, and protecting as we are undercover.  It's not
 6   like TV where people go to parties and things like that.  We
 7   never use or simulate the use of drugs when we're
 8   undercover.  It's strictly a business proposition or
 9   business deal.
10       So we do a lot of that in DEA.  We purchase drugs from
11   trafficking organizations.  And I did that a lot as a
12   younger agent.  And then in 1998, I was selected to go to
13   Sao Paulo, Brazil for a four-year period where I worked
14   primarily cocaine trafficking from cartels in Colombia,
15   Bolivia, and Peru, who were using Brazil as a transit
16   country to send cocaine to the United States and other parts
17   of world.  So I did that for four years.
18       Then I was able to come back to Salt Lake, which was
19   kind of unusual to get the same spot twice, but I was
20   fortunate, and came back to Salt Lake and worked traditional
21   drugs again, methamphetamine and cocaine.  And also at that
22   time Ecstasy became very popular.  This was in the early
23   2000s.  Ecstasy is MDMA.  So I worked a lot of Ecstasy
24   cases.
25       Then I was selected to be on what was called a FIT

```
 1    team, which is a financial investigations team, and it was a
 2    task force within the DEA.  And there were several agencies
 3    that were involved, including IRS, and some local
 4    departments.  And we concentrated and focused on drug
 5    trafficking organizations that were highly successful, that
 6    had a lot of assets and were moving a lot of money.  So we
 7    focused on kind of the bigger organizations so that we could
 8    go after them financially and follow the money, sometimes
 9    back to the drugs.  So I did that for a period of about
10    three and a half to four years.
11         And then near the end of 2009 or beginning of 2010,
12    that's when pharmaceutical diversion became very prevalent
13    and prominent, and it became a real problem that DEA
14    recognized.  So we formed a group within the DEA called the
15    TDS, or the tactical diversion squad, and I became a member
16    of the tactical diversion squad in 2010.  And that's when we
17    started focusing primarily -- my group, anyway, started
18    focusing primarily on the diversion of pharmaceutical drugs.
19         Most commonly and most prevalent, it was oxycodone,
20    because that is kind of the pharmaceutical that is most
21    sought after on the street is oxycodone.  And so I did that
22    until the beginning of 2018 when I retired.
23    Q    And you couldn't stay away, so you came back to DEA as
24    a contract financial investigator?
25    A    That's right.
```

1  Q    Twenty however many years wasn't enough.  Okay.

2       So you have experience both domestic and international,

3  correct?

4  A    Yes.

5  Q    And you've done investigations from small individuals

6  or organizations up to -- I think you said cartel activity

7  when you were in Brazil?

8  A    Yes.

9  Q    And during those investigations and throughout your

10 career, have you developed expertise in a lot of things that

11 are involved with drug trafficking?

12 A    Yeah.  And a lot of that is just on-the-job training.

13 We go to training, in-service training, but really to

14 understand and to become a good investigator, a lot of it is

15 just trial and error, and experience.  And so that's what

16 you develop.  And any investigator who has -- any police

17 officer who does that for an amount of time develops those

18 abilities to be able to investigate and recognize and put a

19 case together.

20 Q    Part of that experience was in types of drugs and

21 dealing with different drugs over the years?

22 A    Yes.

23 Q    And lately that has evolved into pharmaceuticals?

24 A    Yes.

25 Q    What types of drugs are we talking about when we're

1  talking about the pharmaceutical area and the tax diversion
2  squad?
3  A    I think I mentioned the most common -- or the most
4  sought after is oxycodone.
5      Now oxycodone is the generic term for the drug
6  oxycodone.  Much like Ibuprofen is a generic term.  The
7  brand name for Ibuprofen would be Advil or Motrin, for
8  example.  So oxycodone would be the Ibuprofen.  It's an
9  analgesic.  It's a painkiller.  It's very effective and a
10  very good, effective drug, but it has a high potential for
11  abuse and addiction.
12      So some of the names for oxycodone would be -- you may
13  have heard of Oxycontin.  When the pharmaceutical thing
14  first took off, Oxycontin was the most sought after pill.
15  They were called Oxy 80s because they contained
16  80 milligrams of oxycodone, and they were a time-release
17  pill.  So if you took the pill like you were supposed to as,
18  for example, a cancer patient would take Oxycontin 80s, it
19  was a timed release.  So it had 80 milligrams.  That's a lot
20  of oxycodone, but it was released over a period of time so
21  they didn't have to keep taking pills throughout the day to
22  kill their pain.
23      Well, drug abusers soon realized that there was a lot
24  of drug in those, and so they would crush them and snort
25  them, or smoke them, and it was a huge problem because they

1   were very addictive.

2       So that is -- a brand name would be Oxycontin.  Or

3   Percocet has oxycodone in it.  Or Roxicodone has oxycodone

4   in it.  So those are brand names.  But the pill that

5   we're -- or the drug or the active ingredient we're talking

6   about is oxycodone.  Those are very sought after.

7       There are other pharmaceutical pills that are also

8   abused, such as Xanax, or on the street they're called

9   Xannie bars because they look like a bar, like a Tylenol

10  bar.  And there are other pharmaceuticals that are also

11  abused.  But most of the illicit desire or the illicit use

12  of pharmaceuticals is for narcotics or painkillers, or more

13  specifically oxycodone.

14  Q   And opioids?

15  A   And it is an opioid, the oxycodone is.

16  Q   You described that early in your career you were

17  primarily involved with what I would call traditional

18  investigative techniques, undercover work, use of

19  confidential informants, conducting surveillance, those

20  types of things; is that right?

21  A   Yes.

22  Q   Did you and, I guess, law enforcement generally evolve

23  into more sophisticated techniques like tracking of

24  vehicles, phones, computers, financial investigations?

25  A   Yes.  We try to keep up with technology.  Usually the

1    traffickers are ahead of us with apps and things like that

2    to conceal their communications and things like that.  But

3    we try to keep up and we use things like vehicle trackers,

4    and we have to have a warrant to put that on a vehicle.

5         We still employ the use of traditional investigation

6    techniques such as going in and buying the drugs.  There's

7    no better evidence than actually seizing or buying drugs

8    from the individual who is trafficking it.  And then we

9    conduct interviews and we try to find out who's in charge,

10   whose drugs were they, and then we try to corroborate that

11   evidence through other means, through bank records, through

12   rental car records, and things like that.  So the

13   information that we gather investigatively, we always try to

14   corroborate by other means.

15   Q    So throughout combining your training and your lengthy

16   career, have you developed expertise into the common methods

17   and means that drug traffickers employ to carry on drug

18   trafficking?

19   A    Yes.

20   Q    Have you testified as an expert before with regard to

21   drug trafficking?

22   A    Yes, I have.

23   Q    And so that's why we have you here today is to testify

24   to some general concepts and trends in drug trafficking; is

25   that correct?

 1   A     Yes.

 2   Q     You were in the tactical diversion squad when you were

 3   at DEA, but you didn't have a whole lot of direct

 4   involvement with the investigation of Aaron Shamo in this

 5   case, correct?

 6   A     I did not.  I had some other cases.  I assisted

 7   sometimes with evidence processing and things like that, but

 8   I was not the case agent.

 9   Q     So using your expertise, let's talk about a few things

10   to try to help the jury understand drug trafficking and

11   other things.  What are some things that all drug

12   trafficking organizations must have?  Let's talk first about

13   source of supply.

14   A     Okay.  Well, in order to traffic drugs, you have to

15   have the drugs, and whether these are illicit drugs like

16   cocaine, and methamphetamine, and heroin, and now the big

17   focus is on pharmaceutical drugs, in order to be a drug

18   trafficking organization, you have to obtain the drugs in

19   order to sell them.  That would be the first requirement I

20   would think.

21   Q     And are there a couple ways to do that?  You can

22   probably either buy them or make them?

23   A     Yes.  You know, historically, methamphetamine was made

24   here in the U.S.  And here in Utah specifically,

25   methamphetamine was manufactured, and we had a huge

1   methamphetamine lab problem here in Utah, so much so that

2   when we started to get methamphetamine that would come from

3   Mexico, they knew -- and we knew this from our

4   investigations and interviews, and listening to phones, we

5   knew that the individuals who were bringing the

6   methamphetamine to Utah, they had to bring pure

7   methamphetamine because the Utah drug users demanded that it

8   be high quality methamphetamine.  So that was kind of an

9   anomaly.

10      But yes, they either have to purchase the drugs already

11  made or they have to manufacture those drugs.

12  Q    And in what ways can drugs be manufactured?

13  A    Well, you have to have the ingredients.  It's kind of

14  like baking cookies.  You have a recipe and you need the

15  ingredients that are on that recipe, and then you need

16  certain equipment.  For drugs, for pills, for example, you

17  have to have the active ingredient, in this case oxycodone,

18  or something that is similar to oxycodone and other opiates,

19  such as fentanyl, and you need other materials, such as

20  binders that hold the tablets together, and there are other

21  materials.

22      But then you also need equipment, such as presses and

23  dies that actually imprint an imprint on the pills

24  themselves to make them appear to be legitimate manufactured

25  pills by pharmaceutical companies.

1    So yes, they have to be manufactured in a way that is

2 similar to the real pills in order to be sold on the street.

3 Q So all drug trafficking organizations need a source of

4 supply, correct?

5 A They need a source of supply?  Yes.

6 Q How about a way to market or sell it to others?

7 A Yes.  So a drug trafficking organization is really just

8 like any other business.  They're just selling an illicit

9 product.  They need their product to sell and they need

10 people to sell them, or they need people to transport the

11 product to where they're going to sell them, and then they

12 need people who are going to buy them.  And drug trafficking

13 organizations work the very same way as a legitimate

14 business.  So there is someone in charge of making that

15 happen and there are people that have delegated

16 responsibilities to do their part.

17 Q Is it fair to say that over the course of your career

18 you've investigated many drug traffickers and drug

19 trafficking organizations?

20 A Yes.

21 Q Do they come in different structures and sizes?

22 A Yes.

23 Q Explain that for us.

24 A Well, I'll use the analogy again of a legitimate

25 business.  You have Amazon.com that is huge all over the

```
 1   world and there's one guy in charge.  But you also have

 2   businesses, like a landscaping business that started up by a

 3   father and his son, and they hire some neighborhood kids,

 4   and they might employ 15 people, but that's considerably

 5   smaller than Amazon.com.  And there's an unlimited range of

 6   different kinds of businesses and sizes of businesses, and

 7   it's just like that with drug trafficking.

 8        Some businesses -- some drug traffickers start out on

 9   their own.  They have enough capital to get it going to

10   purchase their initial drugs and sell it.  And some need

11   some investors to be able to buy the product or buy the

12   equipment needed to manufacture, and things like that.  So

13   if you compare it to a regular legitimate business, it's

14   very similar.  They're just selling an illicit product that

15   is illegal.

16   Q    So regardless of the organization, then, and the size

17   of the organization, there are certain roles that need to be

18   carried out in order to make the operation successful?

19   A    Yes.

20   Q    And if I understood you, sometimes one person can

21   handle everything?

22   A    Yes.  A smaller organization would be one person goes

23   and buys the drugs from whoever his source of supply is, and

24   then sells it to his customers all by himself and keeps all

25   the profits.
```

1    Other organizations may employ others to help them with

2    that, and it could be as simple as, hey, will you go rent

3    this car for me.  And then they use that car to go to

4    California and pick up drugs and come back.  And their name

5    isn't on that rental car agreement, but someone else's is,

6    and they would pay that person a nominal fee to do that for

7    them.

8        That's just an example of the creativity and the amount

9    of diversion and different ways that a drug trafficking

10   organization can work.  It's really as far as their

11   imagination can go and how much they want to succeed and how

12   successful they want to be.

13   Q    So tell us about the evolution of a developing drug

14   trafficking organization, that maybe it starts off small

15   with a single individual, and then as it expands, the

16   different roles that need to be filled.

17   A    Okay.  Typically it's not hard to imagine how someone

18   gets into drug trafficking.  Many get into drug trafficking

19   because they are using the drug themselves -- not all, some

20   don't, and they do it primarily for the monetary reasons of

21   drug trafficking.

22       But a lot of drug trafficking organizations start

23   because they have to go buy the pills, or the drug, whatever

24   kind of drug of choice that they have, but it's expensive.

25   It's not hard at all to have a hundred dollar a day drug

1    habit.  And so in order to supplement their income enough to

2    be able to buy their drug, they buy a little bit extra and

3    sell it.  And so that's sometimes how it starts.  They're

4    doing it just to support their own habit.  And then

5    oftentimes it becomes -- they become familiar with the

6    individuals who are supplying the drug and they start buying

7    more and more and more, and pretty soon they're buying

8    enough that they have so many customers that they can't

9    handle them all, so they go into business with someone, and

10   that person then handles some of the customers and the

11   original person handles some of the customers.

12       Or a drug trafficking organization is a couple of

13   buddies that say, hey, let's do this.  I've got this much

14   money and you've got this much money, let's put it together

15   and go buy a kilo of cocaine, or whatever the drug of choice

16   is, and that's how they start.

17       So it generally starts small, because you have to build

18   reputation with the source of supply and you have to build

19   up a customer base just like any other business.  And as it

20   grows, more people become employed and tasks become

21   delegated to them, and there's someone who is in charge of

22   making those decisions.  And that's kind of how it evolves.

23   Q    Let's talk about that last concept, then, of somebody

24   being in charge.  What types of things does the person in

25   charge be responsible for or remain responsible for?  Let's

1   talk first about defining the scope of the operation.

2   A    Well, again, it's relative to the size of the

3   organization.  But whoever is in charge is making the

4   decisions on who does what, who is delegated for what, where

5   does the money come from and where does the money go, who

6   keeps the money, who uses that money in furtherance of the

7   business.  They promote the business with their illicit

8   proceeds.  And so that person who was in charge makes those

9   kinds of decisions, personnel, things that are purchased for

10  the business, such as manufacturing equipment, or vehicles,

11  or plane tickets, or rental cars.  Those are all decisions

12  that are made by the person in charge or who he delegates

13  that to, or she.

14  Q    So if I understood you correctly, they will define

15  what's being sold?

16  A    Uh-huh.  (Affirmative)

17  Q    They'll procure a source of supply?

18  A    They'll set the price of those drugs.  They're

19  ultimately in charge just like someone who runs a business.

20  Q    And when these other roles are filled, who hires those

21  people to fill those other roles?

22  A    The person in charge, the leader, organizer of that

23  organization.

24  Q    How about the money and the profits, who controls the

25  money and the profits?

```
 1   A     That individual would also be in charge ultimately of
 2   the money, and typically they would receive the bulk of the
 3   proceeds, but they have to share it with people who are
 4   doing some of the work or they wouldn't do it either.  So
 5   that person is in charge of the funds, of the proceeds of
 6   the incoming and outgoing, and they typically will delegate
 7   jobs to others, and they may give people more authority than
 8   others.  They're in charge so they decide that.
 9   Q     Is it often structured like a business where the
10   leader, organizer is like the CEO and they make the most
11   money and then money kind of trickles down?
12   A     Typically it is, yes.  And the leader, organizer
13   sometimes is very hands off.  They don't want to be around
14   the drugs at all.  Once they get to a certain point, they
15   delegate everything.  Other leaders, organizers are very
16   involved, and they want to be involved, and they want to be
17   hands-on, just like -- we've all had bosses who let us do
18   our job and we have bosses who are right involved with us
19   and kind of managing us.  So the same thing with drug
20   trafficking organizations.
21   Q     Let's talk a little bit about traditional drug
22   trafficking organizations, the seller on the street corner
23   versus -- are you familiar with online drug trafficking?
24   A     Yes.
25   Q     Can you kind of compare and contrast?
```

1    A     Yes.  So traditional drug trafficking operations, they

2    generally sell their product locally because they deliver it

3    hand to hand and they receive the money hand to hand.  So

4    they communicate however they're going to communicate, on an

5    app, or on a telephone, or in person, and they will make

6    arrangements to meet an individual to purchase a certain

7    amount of drug for a certain amount of money.  That price is

8    negotiated, and they will meet them and do the exchange in

9    person.

10        An online drug trafficking business isn't like that.

11   There still is product and there still has to be an

12   exchange, but it's generally not done in person.  Funds are

13   transferred either by Venmo, or by Bitcoin, or depositing

14   into bank accounts.  There's a lot of ways to move money to

15   another location.  And then that individual who purchased

16   that drug receives that drug either in the mail or another

17   type of courier service.  So it's not a face-to-face

18   meeting, but it's an online transaction, just like you would

19   order something from Amazon.

20   Q     Let's talk real quickly and briefly about that delivery

21   service.  So online, are you familiar with them using the

22   Postal Service?

23   A     Yes.

24   Q     It's been sadly joked that the Postal Service is the

25   largest drug distributor in the United States.

1 A    Unfortunately, it might be true.

2 Q    Tell us about your experience with the Postal Service

3 being used by drug trafficking organizations to deliver

4 narcotics.

5 A    Well, it's also joked that sometimes it's not very

6 reliable, but in actuality, the Postal Service is very

7 reliable.  And drug traffickers will use the Postal Service

8 for a couple of reasons.  They prefer the Postal Service.

9 That doesn't mean that they don't use UPS and FedEx, and

10 other couriers, but generally they prefer the Postal

11 Service.  One reason is the sheer volume.  Millions and

12 millions and millions of letters and packages per day are

13 sent through the U.S. Mail.  And so the sheer volume alone

14 helps a small package with a few pills in it get through

15 without any detection at all.  That's one reason.  It's just

16 a -- it's a needle in a haystack.

17     The other reason is once that package is mailed, for

18 law enforcement to open that package, it requires a search

19 warrant, and it's sometimes difficult to get a search

20 warrant for a package when you suspect what's in there but

21 you don't have any probable cause to give to a judge stating

22 why you believe that there's pills in there, unless you've

23 done an investigation and you know this individual is

24 sending packages via mail and you can articulate that in an

25 affidavit and then get a search warrant.  But that's not a

```
 1    ten-minute thing.  It requires a lot of effort and work.

 2    And so that's another reason that the Postal Service is

 3    used.

 4        Another reason that the Postal Service is used is

 5    traffickers -- it's possible to purchase postage with

 6    Bitcoin.  They can purchase the postage fees with Bitcoin.

 7        So those are three reasons that I know of why

 8    traffickers prefer U.S. mail.

 9  Q    Let's talk a little bit also about the price of drugs.

10    Are there various factors that affect the price of drugs in

11    any given area at any given time?

12  A    Yes.  There are a lot of factors that determine how

13    much a drug costs in a particular area.  The first, of

14    course, will be supply and demand.  Just like any other

15    business, supply and demand drives the price of goods.  But

16    there are other factors in the drug world that also affect

17    the price of drugs.  The first would be the purity of the

18    drug, how pure is that drug.

19        Now if you have a mid level cocaine trafficker who is

20    buying three or four ounces of cocaine at a time to

21    redistribute, and typically they'll sell it like a gram at a

22    time.  So 28 grams in an ounce, and they have three or four,

23    that's a hundred or so grams of cocaine.  So they buy it in

24    ounces and they divide it up into grams to sell.  The purity

25    of that drug will help determine the price of the drug.
```

1      If they're selling grams that are very high purity,

2   somewhere around 85 or 90 percent pure cocaine, that's worth

3   a lot more than grams that have been cut with another inert

4   substance, such as inositol, or some other substance.  And

5   they sometimes will do that because this person that buys

6   three or four ounces will then get their three or four

7   ounces and they will add three or four ounces of this inert

8   material.  Now instead of three or four ounces, they have

9   six or eight ounces that they can divide up and sell.  So

10   they've essentially doubled their product -- doubled the

11   amount of their product, but it's not as pure.  So on the

12   street, it's hard to know exactly how pure the drug is going

13   to be.

14      So that brings up the next factor in the price of

15   drugs, and that's how well you know your dealer, what your

16   relationship with your dealer is.  If it's someone that

17   you've been dealing with for a long time and you know that

18   they don't cut their cocaine, you're willing to pay a higher

19   price for that.  Also in knowing your dealer, it might be a

20   personal friend, or a family member, or a high school buddy,

21   and typically they get a little price break.  Your

22   relationship with your source of supply is very important in

23   determining the price.

24      Another factor that determines the price of street

25   drugs is the proximity to where it's being sold to where the

 1    drug is manufactured or purchased.  So historically, if you

 2    wanted a good price on methamphetamine, you drove to San

 3    Diego and picked it up yourself and brought it back.  If you

 4    wanted a pound of methamphetamine delivered to you, it was

 5    going to be more expensive because there was the cost and

 6    the risk of someone else driving it back to you and

 7    delivering it to you.  So the proximity to the source of

 8    supply is also a factor.

 9         Another factor in determining the price of drugs will

10    be the consistency or frequency that you purchase that drug

11    from your source of supply.  There are traffickers who have

12    just a few customers and they know every Thursday this guy

13    is going to want two ounces, and this is guy is going to

14    want three ounces, and they have set amounts, and they know

15    they're good for it every time and they always bring their

16    money.

17         So the frequency and the consistency also determines

18    the price because he knows -- that drug dealer knows that

19    they're going to get their money on that day.  And so the

20    purchaser will say, hey, I'm a good customer.  I've been

21    with you for a year and a half and you know I'm on time

22    every time and I bring my money every time, so I want a

23    price break because there's less risk.  So they'll typically

24    get a price break.

25         Another factor is the quantity.  Just like going to

 1    Costco, things are sometimes cheaper there because you have

 2    to buy two great big ketchups instead of one little one, and

 3    by volume it's a lot cheaper.  Even though you're spending

 4    more up front, by volume you're getting more ketchup per

 5    dollar than if you were to go buy a small one at Smith's,

 6    for example.  So quantity is a very important factor in

 7    determining the price of drugs on the street.

 8         There are retail prices and there are wholesale prices,

 9    and those are all relative to the size of the drug

10    trafficking organization.  A huge drug trafficking

11    organization would consider a hundred pounds to be a

12    wholesale price.  A small drug trafficker organization would

13    maybe consider a pound of methamphetamine to be a wholesale

14    price.

15         So it's all relative to the location, to the purity of

16    the drug, to the relationship with the dealer, and the

17    supply and demand in that area.

18         Right now the price of methamphetamine is as low as

19    I've ever seen it in my entire career.  In 2008, I

20    personally purchased one pound of methamphetamine.  It was

21    very pure, it came right from Mexico because we had a

22    tracker on the car that went and picked it up.  One pound of

23    methamphetamine was $25,000.  Just a couple of weeks ago,

24    our office purchased a pound of methamphetamine for less

25    than 3,000.

1     So you see there are so many factors, and right now the

2     supply and demand dictates the price of that.  So those are

3     some of the factors that determine the price of drug on the

4     street.  And pharmaceuticals follow those same, exact

5     rules -- or factors.

6  Q    Let me drill down just a little bit on a couple of

7     those, one being the location and transportation costs.  So

8     how has online sales made that different where the cost of

9     transportation maybe are different using the Postal Service,

10    or whatever other means?

11 A    Well, there's cost of shipping the pills, but it also

12    sometimes is balanced out by the quantity.  So a person is

13    going to have to pay postage, so they're willing to pay a

14    little bit more for their pill.  Now if these are real

15    oxycodone pills, or authentic pills, those are typically a

16    little bit more than a counterfeit pill would be because

17    they are harder to get.  They're the real deal.  They have

18    real oxycodone in them, so they're going to be a little bit

19    more.  And you add the price of shipping on that, it could

20    be a little bit more.

21    However, if you're willing to buy several hundred or

22    even a thousand pills at a time, you're going to get a

23    wholesale price.  And as long as that money hits the account

24    and you ship it, then that's a good -- that's a wholesale

25    price and you're going to get a much, much better deal as

```
 1    long as you develop that rapport and reputation with your
 2    source of supply and he knows the money will be there.
 3         Does that answer your question?
 4    Q    It does.  And let me drill down on one other one, and
 5    that's the buyer-seller relationship and the trust factor or
 6    risk factors involved there.  Typically in a traditional
 7    drug trafficking organization, you meet the guy on the
 8    corner so you see him.  Online, that's a little bit
 9    different.  So how does the trust relationship factor work
10    online?
11    A    Okay.  So it works very similar to street trafficking.
12    For example, if an agent goes undercover and is introduced
13    to a source of supply by -- usually an informant, generally
14    the first time you make a buy from an individual, you're
15    going to pay a little bit more than you will the third or
16    fourth time because now he sees, okay, this guy is good for
17    the money, shows up, he always has the money with him.  It
18    goes without a hitch, everything is safe, no cops.  So then
19    after a while they lower the price.
20         Well, online, you don't get that face-to-face rapport,
21    but what you do have online is kind of like Yelp.  On these
22    dark web -- these dark web vendor sites, customers leave
23    reviews for the people that they purchase the drugs from,
24    and so they have user names online.  And a customer would
25    say -- the black oxy king maybe is his name.  Black oxy
```

1　king -- I'm just making that up -- is a really good vendor.

2　Every time I get my pills on time.  Every time they're

3　authentic.  Or he's the cheapest and I always get my pills.

4　They leave reviews just like you would at a restaurant.

5　　　　So a first time buyer will go on those dark websites

6　and they'll look at reviews of someone and they'll say,

7　okay, I'm going to try this one.  Because there's a real

8　risk there of sending your money to someone -- you don't

9　even know where they are in the world, and you're sending

10　them money with the expectation of getting drugs back.  So

11　those reviews become very important.

12　Q    And for the vendor, then, who's selling the drugs, that

13　becomes very important to them to maintain positive reviews?

14　A    Yes.  Yeah, just like eBay or any other website.

15　Q    Let's talk a little bit about the pharmaceutical drugs

16　themselves and what we're selling -- some trafficking

17　organizations sell.  So what are controlled substances?

18　A    Controlled substances are substances that are

19　controlled by the government, and there are different

20　schedules of controlled substances, from Schedule 1 down to

21　Schedule 5, I believe.

22　　　　So oxycodone, for example, is a Schedule 2 drug.

23　Fentanyl is also a Schedule 2 drug, and it's controlled

24　because of its ability or proponents to be addictive or

25　abused.  And it also takes into account whether there's a

1    legitimate medical purpose for that drug.  So a Schedule 2

2    drug typically is a drug that's produced pharmaceutically,

3    that has a very specific medical need and use, but it's a

4    Schedule 2 because there is a high potential for it to be

5    abused or that it has a highly addictive property.

6         So those are some of the factors that go into

7    determining how a controlled substance is scheduled.  But a

8    controlled substance is, simply put, a substance that is

9    controlled by the government for those reasons.

10   Q    And oxycodone and fentanyl are both controlled

11   substances, correct?

12   A    Yes.

13   Q    In addition to price, let's talk about value.  Have you

14   specifically been involved in investigations and learn the

15   pricing of pharmaceuticals, such as oxycodone, in the black

16   market?

17   A    Yes.

18   Q    Tell us about that.  What's the pricing like for

19   oxycodone?

20   A    Okay.  So now we're talking about real oxycodone, not

21   counterfeit oxycodone.  Oxycodone is obtained from a

22   pharmacy.  It's very common to get prescribed oxycodone

23   after a surgery because it is a very good and effective

24   painkiller.  And there are people who get oxycodone

25   prescriptions monthly.  So I'm going to use this just as an

1   example.  This isn't the person who goes to the dentist and
2   gets four oxycodone pills to get him through the next day.
3   This is someone who purchases oxycodone tablets every month
4   because they're prescribed by a doctor every single month.
5   So it's not uncommon at all for someone like that to get 120
6   oxycodone tablets per month.  So that's four per day.  All
7   right.

8        When they go to the pharmacy with a prescription signed
9   by a doctor, so it's legitimate, and they go to the
10  pharmacy, without insurance, oxycodone tablets are somewhere
11  between $1.50 and $3 per tablet here in Utah at the local
12  pharmacies.  There's $1.50 to a $3 price, without
13  insurance, if they were paying cash price, which a lot of
14  people do.  They pay cash for their pills.

15       So now they walk away with 120 oxycodone pills.  If
16  they're selling those retail on the street, not wholesale,
17  if they sold the entire 120, they would get less.  But if
18  they're selling them just two, or three, or four at a time
19  to someone, they can get $30 a pill for those.  So that's a
20  significant profit per pill.

21       So a prescription that they walked out of the pharmacy
22  paying $200 for is now worth about $3600.  And it's not
23  uncommon at all for someone to get that prescription and, in
24  this world we live in, they realize how much that's worth,
25  and that's a pretty good supplement to your income if you

1    sell your pills to someone every month.  Unfortunately,

2    there are a lot of people that do it because there are a lot

3    of people that want those pills and they're willing to pay

4    for them.  So that's the legitimate market.

5        Now if you're buying them wholesale, you might get them

6    for as low as 15 or 12, depending on all of those factors

7    that we talked about, your relationship, your proximity to

8    the source, the supply and demand, and all those other

9    factors they will determine.  So here in Salt Lake, right

10   now, you can pay easily $30 per pill if you're are buying

11   them retail on the street.

12   Q    Legitimate oxycodone pills are controlled, you said, by

13   the federal government?

14   A    Yes.

15   Q    And they can only be obtained by a prescription?

16   A    Yes.

17   Q    So people can't obtain say a thousand of those unless

18   prescribed by a doctor, and that's typically more than what

19   a doctor would prescribe?

20   A    Yes.

21   Q    So have drug traffickers in the black market used other

22   things as a substitute for oxycodone in order to take

23   advantage of the demand?

24   A    Yes.  So in order to get there, let me just kind of

25   explain how that evolved.

1      So a drug trafficking organization may find or recruit

2   people to go get prescriptions.  They go in and say my back

3   hurts chronically.  I can't get through the day without some

4   pain pills, and they find a doctor who will prescribe them

5   pills.  And a drug trafficking organization may recruit 15

6   or 20 of these people who are getting 120 pills per month,

7   and each month they give them money to go in and get their

8   pills and go to the pharmacy and pay for them, and that is a

9   drug trafficking organization.

10      And sometimes they even fraudulently produce the

11   prescription.  It's not a real prescription, but they're

12   forged, and they're very good, and they go to the pharmacy

13   and pass it as a real scrip and they can get their pills

14   that way.

15      Now other trafficking organizations have figured out

16   that they can manufacture the pills that are very popular.

17   The oxycodone pills, for example, the two most common and

18   most popular here in Utah, and pretty much across the

19   country, are what we call the Ms or the As.  And they're

20   both blue.  They're called blues on the street.  They're

21   both blue.  They're both round.  The Ms are made by a

22   company named Mallinckrodt, and they have a square imprinted

23   on it with an M, a block M inside the square, and on the

24   flip side of that pill, there's a 30 with an underscore.

25   The As have an A on the round pill at the top with an

1    underscore and then a 215. So they're called A 215. Or
2    they're called As, or they're Ms.
3        And drug seekers or users have a preference of which
4    they like. If they smoke them, some of them like the Ms
5    better than the As because of the flavor. Some of them
6    snort them and they like the As over the Ms because it
7    doesn't burn as much, or whatever their preference is. So,
8    again, that would factor into the price of those drugs
9    because one might be sought after by an individual more than
10   another.
11       So the manufacturer of the counterfeit pills, they try
12   to simulate those exact pills. So when they manufacture
13   them, they put blue dye in the pill, and they make them
14   round. They have a press that presses these pills, and the
15   press has dies, on the bottom and on the top, that imprint
16   either the M or the A, and the underscore, and the 215 and
17   the 30. They imprint that on the pill, and then spit it
18   out. And it's a press that goes pretty quick.
19       So that's how they've been able to manufacture these
20   fentanyl pills that don't contain any oxycodone at all. But
21   fentanyl is a synthetic opiate, so the effect is very
22   similar to the oxycodone pill. So a person who is addicted
23   to opiates can take that fentanyl pill and may think that
24   it's oxycodone because it gives them kind of the same
25   effect.

1   Q    Is there a high demand for these opioids, specifically
2   these pills, on the street?
3   A    Oh, yes.  That's why we have this epidemic right now.
4   Q    Based on your training and experience in investigating
5   cases, tell us about the profit margin with fentanyl as
6   opposed to oxycodone.
7   A    Okay.  With fentanyl, they are not purchasing the
8   oxycodone.  They're purchasing the fentanyl, which is much
9   more -- I guess the word would be powerful.  It's a hundred
10  times more powerful than morphine.  So fentanyl is actually
11  measured in micrograms, not milligrams.  Oxycodone is
12  measured in milligrams, and Oxy 30 has 30 milligrams of the
13  active ingredient of oxycodone.  Fentanyl is measured in
14  micrograms.  So milligrams is a thousandth of a gram.  A
15  microgram is a millionth of a gram.  So that's a big
16  difference.  That's how much more potent fentanyl is.
17       So a person that wants to manufacture fentanyl-laced,
18  counterfeit Oxy pills will purchase fentanyl on the dark
19  web.  The dark web is essentially a black market Amazon.com,
20  that you can get guns, and explosives, and drugs, and
21  whatever you want on the dark web.
22       So it's not very hard to purchase fentanyl, and it
23  generally comes from China.  They get it shipped to someone,
24  or themselves, and then they take that fentanyl and they mix
25  it together, just like cookies, if they have the recipe, and

1    they make these pills for a lot cheaper than they can buy

2    them on the street if they were real oxycodone.  So the

3    profit margin is huge in fentanyl pills because you're

4    kicking them out by the thousands and you're not paying,

5    even the pharmaceutical -- the pharmacy price for them, the

6    cash price, you're spitting them out for pennies on the

7    dollar as compared to buying real oxycodone pills.

8    Q    Because of that potency of fentanyl and the measurement

9    in micrograms, how important is quality control in the

10   manufacture of pills?

11   A    Well, real oxycodone manufacturers are -- they have to

12   be able to certify that there is exactly 30 milligrams of

13   active ingredient.  And I keep saying 30 milligrams because

14   it's the Oxy 30s.  That's kind of what we're talking about,

15   the 30 milligram tablets.  They know that there is precisely

16   30 milligrams of active ingredient in each pill, because

17   those manufacturing companies have very low tolerances of

18   margin of error, and they're mixed in equipment that makes

19   sure that the drug is mixed evenly, and when those pills are

20   produced, each pill has the exact amount in it.

21        With clandestinely manufactured pills, that's not being

22   done in a controlled environment, in a laboratory.  It's

23   being done in a basement or a bedroom of a home in blenders,

24   and then it's put in a hopper where it goes into the pill

25   press.  So one pill may have high concentration of fentanyl

1    and another pill hardly has any at all.  So there's a
2    tremendous risk there of quality control.  There is no
3    quality control.  Some pills have a lot and some pills might
4    not have any.
5    Q    And given the powerful nature of this, risk can be
6    lethal?
7    A    Yes.
8    Q    Are you familiar with drug trafficking organizations
9    testing for quality on third parties?
10   A    I am.
11   Q    Tell us about how that works.
12   A    I'm trying to remember what year, but it was maybe four
13   years ago, we just first started seeing counterfeit produced
14   oxycodone tablets, at least here in Utah, and it was one of
15   the very first manufacturing labs -- pill manufacturing labs
16   that we took off.  We did a search warrant on a hotel on
17   State Street down in Sandy.  And they had a pill press in
18   there, and there was blue powder everywhere.  And we knew
19   what we had, so we did a warrant.  We all got in our suits
20   and we went and processed all the evidence and, sure enough,
21   they were producing Oxy -- counterfeit Oxy 30 tablets.  They
22   were using fentanyl and there was fentanyl in there, which
23   is very dangerous because it's so potent that if you're
24   exposed to it even through your skin, you can OD on it.  You
25   can overdose on it.  So we have to take very serious

 1   precautions in processing the evidence in a situation like
 2   that.
 3       During the interviews of the suspects in that case, we
 4   learned that the individual who was manufacturing those
 5   pills, he had no idea how powerful those pills were because
 6   it's not an exact science.  He's not doing it in a
 7   laboratory.  He was doing it in a hotel room.
 8       So he would make a batch of pills, and he was curious
 9   as to how powerful those pills were, so he had addicts who
10   were friends who he was giving those pills to to test.  And
11   he would give them to them for free.  That was the caveat,
12   that you can have them for free but you have to tell me how
13   you feel, which is very dangerous, and some of them OD'd.
14   So he was actually testing the strength of his pills on his
15   own friends who were addicts.  So they were more than
16   willing to try the drug and give him that feedback so that
17   they could get their fix.  It was a very, very sad
18   situation.
19   Q    And with regard to online marketplaces, you're saying
20   that some of the feedback has to do with quality control,
21   correct?
22   A    Yes.  So if they're real oxycodone, those online
23   vendors who are selling legitimate Oxy pills, they're
24   selling them illegally, but they're real pills.  They tout
25   that on their site.  Mine are not fake.  I sell real

 1   oxycodone.  And people that get them know that they're real

 2   because they can usually tell by looking at the pills.  But

 3   definitely when they take the pill, they can tell that it's

 4   real oxycodone, and they'll give feedback.

 5       And some vendors will make sure that everybody gets the

 6   real stuff and not the fake stuff.  Other vendors are very

 7   up front about the fact that they are counterfeit pills.

 8   And other vendors try to put off counterfeit pills as real,

 9   legitimate oxycodone.  So there's the whole spectrum there.

10           MR. STEJSKAL:  May I have just a moment,

11   Your Honor?

12           THE COURT:  Sure.

13   BY MR. STEJSKAL:

14   Q   Let's talk specifically about the term continuing

15   criminal enterprise, or CCE.  Are you familiar with that

16   term?

17   A   Yes.  It's a statute, a federal statute.

18   Q   Have you investigated or been involved in the

19   investigation of cases that were termed continuing criminal

20   enterprises, or CCEs?

21   A   Yes, I have.  I have been a case agent on a couple of

22   those.

23   Q   Tell us generally what that statute is.

24   A   The CCE statute, or continuing criminal enterprise, is

25   a statute that specifies a certain level of trafficking,

```
 1   leader of a trafficking organization.  So there are a couple
 2   of factors that have to be present in order to charge
 3   continuing criminal enterprise.  One of those is there has
 4   to be a leader, organizer, someone who is in charge of the
 5   organization, and they're typically the person that is
 6   charged with that statute.  Even though the overall
 7   conspiracy may involve 20 other people, generally the CCE is
 8   charged for the leader, organizer of that group.  Now that's
 9   one factor.  There has to be a leader, organizer.
10        The other is they have to have at least five
11   individuals --
12             MR. SKORDAS:  Your Honor, I'm going to object.
13   This is a legal conclusion and something for the jury.
14             THE COURT:  He can testify as to his
15   understanding, I think, generally, but he can't give a legal
16   opinion.  Are you asking him for a legal opinion?
17             MR. STEJSKAL:  I'm not asking him for a legal
18   opinion, no.  Let me ask another question and we'll go that
19   way.
20             THE COURT:  All right.
21   BY MR. STEJSKAL:
22   Q    Based on your training and experience, what specific
23   facts or areas would apply to a principal administrator,
24   organizer, or leader?  What kinds of things would that
25   person do?
```

```
 1           MR. SKORDAS:  Same objection.

 2           THE COURT:  Overruled.  He can testify as to his

 3   understanding and experience.

 4           THE WITNESS:  My understanding is the leader,

 5   organizer would be the person in charge of the decisions,

 6   who gets hired, what the prices are, who rents the vehicles.

 7   They delegate -- the very things that we've been talking

 8   about would be a leader, organizer.

 9   BY MR. STEJSKAL:

10   Q    And to involve five other persons, five or more other

11   persons, what type of roles would five other persons or

12   would more people fill?

13   A    So my understanding of the statute means that --

14           MR. SKORDAS:  Same objection, Your Honor.

15           THE COURT:  You can have a continuing objection.

16           MR. SKORDAS:  Thank you.

17           THE WITNESS:  My understanding would be that there

18   have to be five individuals that worked under the employ of

19   that leader, organizer.  So they would be people that may

20   purchase equipment in their names.  They may be people that

21   ship the drugs, or drive somewhere to deliver the drugs, or

22   pick the drugs up.  They may be people who are in charge of

23   collecting money.  As I've said, there are so many different

24   types of organizations and facets of a drug trafficking

25   organization, just like any other business, that leader,
```

 1   organizer would delegate those types of activities to the
 2   people under them.
 3   BY MR. STEJSKAL:
 4   Q    And another requirement is that the leader, organizer
 5   obtains substantial income or resources from the operation?
 6   A    Yes.
 7   Q    Explain that for us.  How do they obtain resources from
 8   the operation?
 9   A    Well, the operation, of course, in the case of drug
10   trafficking, is the actual trafficking of illegal drugs, and
11   the proceeds that are gained from that are illicit proceeds.
12   And as I understand it, this statute requires that those
13   proceeds be substantial, and I think that's all it says.
14   It's a relative term, substantial.  But the proceeds have to
15   be substantial in order to charge the CCE.
16   Q    So based on your experience, is a million dollars
17   substantial?
18   A    Yes.
19   Q    Let's talk lastly about the term conspiracy.  You said
20   you obtained specific training on conspiracy, correct?
21   A    Yes.
22   Q    And you've investigated a number of conspiracy cases
23   throughout your career?
24   A    I have.
25   Q    Conspiracy requires an agreement between people.  Is

1  that your understanding?

2  A    Yes.  It was defined to me as a conspiracy is an

3  agreement between two or more individuals, and then in order

4  to be a criminal conspiracy, that agreement would be to

5  break the law.  And so a conspiracy is where two or more, or

6  a group of people conspire together to accomplish something

7  like drug trafficking, and each individual in that

8  conspiracy is not required to know what the other

9  individuals' roles are.

10      They know, for example, you are in the conspiracy if

11  you know that your job is only to rent cars every single

12  week to drive to San Diego to pick up drugs, and you rent

13  the cars.  That's all you do.  You don't even drive them.

14  Your job is to rent that car.  That's your part of the

15  conspiracy.  You are now a co-conspirator.

16      So each individual in a conspiracy has a part in that

17  crime that's being perpetrated, and each individual doesn't

18  have to know what the other individual is doing, but they

19  can still be part of the conspiracy.

20  Q    And often it's up to the leader, organizer to kind of

21  define those roles?

22  A    Of course.

23  Q    Is there often, in your experience, a written contract

24  of this agreement?

25  A    I've never seen one.

 1   Q    So how does the agreement take place?

 2   A    It's usually verbally.  Sometimes they don't even

 3   specify it.  It just starts happening.  You know, hey --

 4   they just start doing it and they're good at it, or it

 5   worked and so they do it again.  Sometimes it just becomes

 6   their role.  Oftentimes -- they don't sit down and have a

 7   board meeting and say, okay, here's what we're going to do.

 8   We're taking a different approach to this.  It's very fluid

 9   and it just evolves into an organization and everybody has

10   their role that's defined by someone.

11               MR. STEJSKAL:  One moment, Your Honor?

12               THE COURT:  Yes.

13   BY MR. STEJSKAL:

14   Q    In a conspiracy investigation, based on your

15   experience, is there always a single leader or a role

16   sometimes divided?

17   A    Roles are divided.

18   Q    Explain that.

19   A    Well, oftentimes there are partners, and sometimes

20   partners stay together for a long time and other times

21   partners start disagreeing on how things are done.

22        I did a case a few years ago where it started out with

23   two partners, and the one just finally said I'm out, and the

24   other just kept going with all of the previous customers,

25   and everything was kept going.  The one just left and he got

 1   bought out, but the organization continued.  But he was

 2   still part of the conspiracy and he was an equal partner

 3   until that certain date when he voluntarily left the

 4   conspiracy and completely got out of the drug trafficking

 5   business.  So he was a co-conspirator until that time and he

 6   was an equal partner until that time.

 7   Q    And you've seen different organizations that operate

 8   differently?

 9   A    Yes.

10   Q    Again, you said they come in different structures and

11   sizes?

12   A    Just like businesses, yep.

13   Q    Thank you.

14            MR. STEJSKAL:  That's all the questions at this

15   time, Your Honor.

16            THE COURT:  Thank you.

17            You may cross-examine, Mr. Skordas.

18                     CROSS-EXAMINATION

19   BY MR. SKORDAS:

20   Q    Mr. Bryan, did you say you started at the DEA in 1991?

21   A    Yes.

22   Q    And you started here in Salt Lake?

23   A    Yes, sir.

24   Q    When you started at the DEA, you started as a field

25   agent, or something with that title?

1    A    Special agent, yes.

2    Q    Special agent.  And did you start sort of on the

3    street, so to speak, trying to do hand-to-hand buys and

4    trying to find individuals that were selling drugs?

5    A    Yes.

6    Q    And you would go to clubs, or places like that to do

7    that?

8    A    Typically we don't do that too much.  That's kind of a

9    dangerous thing to do, and it's not very fruitful in terms

10   of -- we go out in clubs and how do you know who you're

11   buying from, and it's dangerous.  When we make undercover

12   purchases, it's very controlled, generally.  So we usually

13   get introduced by someone.

14   Q    And you'd be introduced by someone to an individual who

15   was going to distribute drugs to you, correct?

16   A    Yes.

17   Q    And you'd have some government money that controlled

18   part of the controlled buy and exchange that for the drugs?

19   A    Yes.

20   Q    And then you would arrest the person that gave you the

21   drugs eventually, at some point, right?

22   A    Uh-huh, (Affirmative).  Sometimes.  Sometimes we'd see

23   where they're getting the drugs and we try to go up the

24   chain from there.

25   Q    Because that's the goal of all of this, isn't it?

```
 1   A     Yes.

 2   Q     Is to find out where the drugs are coming from?

 3   A     Yes.

 4   Q     Tell the jury why -- well, did you say you worked in

 5   the cocaine area for a while?

 6   A     Yes.

 7   Q     And did that take you to Brazil?

 8   A     Yes.

 9   Q     And tell the jury why you went to Brazil.

10   A     Well, I went to Brazil because I had lived there

11   before.  I already spoke the language, and there was an

12   opportunity to work there.  So I took my family down there

13   and worked.  It wasn't because I wanted to work cocaine.  It

14   was I wanted to broaden my scope of investigations.  But

15   that's what we were working down there, was cocaine.

16   Q     But the DEA sent you there because the cocaine was

17   coming from Brazil -- or from Colombia I think you said?

18   A     Yes.  It was used as a transit country.

19   Q     And from Venezuela, correct?

20   A     Yeah, other South American countries.  There are 26

21   major seaports along the east coast of Brazil, and they try

22   to get the cocaine to those seaports to go all over the

23   world, and we tried to intercept those loads in concert with

24   the Brazilian Federal Police.  We didn't work unilaterally

25   down there.  And we tried to intercept those loads before
```

1    they got on those boats.

2    Q    Because your end game is to get the source of supply,

3    correct?

4    A    That's correct.

5    Q    That's the ultimate bad guy, correct?

6    A    Yes.

7    Q    And in the cocaine industry, that bad guy was in

8    Colombia, correct?

9    A    Well, we would go up the chain as far as we could, but

10   ultimately most of the cartels were in Colombia.

11   Q    And you testified about meth and that most of the

12   cartels for meth were in Mexico?

13   A    They're now in Mexico.  The meth started here in the

14   U.S.  That's a U.S. homegrown product.

15   Q    It is now?

16   A    It was, back in the biker days.

17   Q    Because people can make meth?

18   A    Make it.  So the source of supply is here.  So they

19   were manufacturing it.

20   Q    I'm sorry.  I'll quit cutting you off.

21   A    That's okay.

22   Q    Because you can buy, arguably, legal products, set up a

23   little meth lab in your basement and make something that's

24   illegal, correct?

25   A    Yes, back then you could.  Now some of those products

```
 1   that you need to manufacture methamphetamine are controlled
 2   as well.
 3   Q    The precursors?
 4   A    Yes.
 5   Q    But cocaine isn't something you make in your basement,
 6   is it?
 7   A    No.
 8   Q    And neither is fentanyl, is it?
 9   A    No.
10   Q    So to get the source of supply, the DEA sends you,
11   sometime in the '90s, I guess, or early 2000s, to Brazil to
12   try to chase that down, correct?
13   A    Yes.  My job was to try to get the cocaine before it
14   was shipped to other parts of the world, primarily the U.S.
15   Q    And prescription drugs, the source of supply is China
16   often, correct?
17   A    No.  Prescription drugs, it's pharmaceutical companies
18   that produce it.  They are legally producing the
19   pharmaceutical drugs, and they're all over the world.
20   Q    What about fentanyl?
21   A    Fentanyl is -- if you're buying it illicitly?
22   Q    Right.
23   A    Yes.  Typically fentanyl is purchased on the dark
24   web -- if someone is buying it illicitly, they purchase it
25   on the dark web, and generally it comes from China.
```

1   Q    So those are the bad guys, right, that are making the

2   illegal drug?

3   A    Uh-huh.  (Affirmative)  Well, it's made legally.

4   They're probably diverting it.

5   Q    Well, I suppose in Colombia in 2000 you could make

6   cocaine legally.  You just can't send it to America,

7   correct?

8   A    Well, I'm sure fentanyl is probably produced here in

9   America as well in a controlled environment and it's used

10  for pharmaceuticals.  Diversion is -- the term diversion is

11  used to specify a product that has -- that there's a

12  controlled chain.  So a pharmaceutical company may produce

13  fentanyl or oxycodone, and then they sell it to -- the

14  manufacturer sells it to a company.

15  Q    I'm going to cut you off.  I'm not talking about a

16  pharmaceutical company that's manufacturing cocaine, or

17  methamphetamine, or fentanyl.  I'm talking about an illegal

18  distributor.

19  A    Of fentanyl?

20  Q    Of any of those things.

21  A    Okay.

22  Q    That's who you want, isn't it?

23  A    Yes.

24  Q    Okay.  So fentanyl --

25  A    An illegal distributor of those things.

1   Q    Absolutely.  It's coming from China?

2   A    Well, the pills aren't coming from China.  The fentanyl

3   is.

4   Q    That's what I said, fentanyl.

5   A    Okay.

6   Q    In whatever form.

7   A    Okay.

8   Q    And by the same token, I guess marijuana at some point

9   was coming from other locales, right?

10  A    Yes.

11  Q    Where was that coming from during your time at the DEA?

12  A    Some from Mexico.  The high quality marijuana was grown

13  in the northwest of our country, northwest United States.  A

14  lot of marijuana comes from South America, but it doesn't

15  come up here because it's not worth shipping up here all the

16  way.  But countries in South America produce it as well for

17  local distribution.  So marijuana can grow just about

18  anywhere.

19  Q    What about LSD?

20  A    LSD is typically produced in San Francisco

21  clandestinely.  Historically, in the United States, the

22  epicenter is San Francisco for some reason.

23  Q    And it's made by some lab that makes LSD?

24  A    Yes, a clandestine lab.

25  Q    And Ecstasy, where does that come from?

1   A     Ecstasy generally comes --

2   Q     I'm not trying to quiz you.

3   A     It generally comes from Europe, the Netherlands.

4   Q     I'm asking you these questions because I don't know the

5   answers.

6   A     That's okay.

7   Q     When you would work at the DEA and you arrested

8   individuals who were selling you drugs, it was not uncommon

9   that they didn't know the name of the person they were

10  getting the drugs from, correct?

11  A     Is it not uncommon?

12  Q     Right.

13  A     No.  They usually know who they're getting the drugs

14  from.

15  Q     And did they know who that person was getting the drugs

16  from?

17  A     Maybe not.

18  Q     And did they know who was manufacturing the drugs?

19  A     Maybe, maybe not.

20  Q     Did they know the folks in Colombia that were bringing

21  the drugs?

22  A     Well, I gave you an example of a pound of

23  methamphetamine that I purchased.  That individual knew

24  exactly who was producing that meth.  But I've purchased a

25  lot of drugs where they had no idea who was producing the

1  drug.  So, again, it's just like a business.  They're so

2  different.  Some do and some don't.

3  Q    But the folks that are running the cartel are only

4  successful if nobody knows who they are.  It's no fun going

5  to jail because --

6  A    The people that are running the cartels?

7  Q    Right.

8  A    Well, that level, most people do know who's running the

9  cartels.  It's no secret who runs the cartels.

10  Q    There's no secret to you who's running the cartel, but

11  to the guy on the street that's just handing you the drugs,

12  they don't know.

13  A    They don't care.

14  Q    Right.

15  A    Yeah.

16  Q    And they don't get a letter from whoever are latest

17  drug lord in Colombia is saying, Dude, we'd sure love you to

18  help us out here, do they?

19  A    No.  They don't need to.

20  Q    You talked about the use of Bitcoin a little bit --

21  A    Uh-huh. (Affirmative)

22  Q    -- and you said that the U.S. Postal Service is often

23  used because it accepts Bitcoin?

24  A    So you don't buy stamps with Bitcoin.  But if you have

25  a -- there are drug trafficking organizations that ship

1    drugs via the U.S. Postal Service, and they can print their

2    own postage, and they have to purchase -- you purchase it in

3    advance, and then you can print the postage.  And it is

4    possible to purchase that postage with Bitcoin.  It's

5    possible.  Not all drug traffickers do that.  In fact, I

6    don't know very many that do, but it's possible.

7    Q    But people who are selling oranges or shoes can buy

8    their stamps using Bitcoin too, correct?

9    A    Sure.

10   Q    It's not just limited to illegal organizations?

11   A    No.  No.  Bitcoin is not illegal.

12   Q    Right.  That was the question I should have asked you

13   first.

14          MR. SKORDAS:  I believe that's all I have,

15   Your Honor.

16          THE COURT:  Thank you, Mr. Skordas.

17          Any redirect?

18          MR. STEJSKAL:  Briefly, Your Honor.

19                      REDIRECT EXAMINATION

20   BY MR. STEJSKAL:

21   Q    So as a long-term member of DEA, you are aware of DEA,

22   the United States Drug Enforcement Administration, and what

23   targets they identify generally, correct?

24   A    Yes.

25   Q    Are you familiar with the term CPOT, C-P-O-T?

1    A    Yes.

2    Q    What is that?

3    A    That is a priority target, meaning the DEA has

4    identified certain priority targets that are like major.

5    Now I talked about the different sizes of organizations.  A

6    CPOT would be a CEO of Costco or a CEO of Target.  Those are

7    huge organizations and those CPOTs are who DEA has

8    identified as the leaders of those organizations.

9    Q    Has DEA identified Chinese fentanyl suppliers as CPOTs?

10   A    Yes.

11   Q    And does DEA have investigations into Chinese fentanyl

12   suppliers?

13   A    Yes.

14   Q    Because those investigations exist, does that mean DEA

15   should not investigate pill suppliers in the United States

16   that use that fentanyl?

17   A    No.

18   Q    Why not?

19   A    Because it's being sold here.  The pills are being

20   manufactured here and sold here.  We don't get a lot of

21   cooperation from China when it comes to those

22   investigations, believe it or not.  So the fentanyl that is

23   purchased from them here clandestinely and then used to

24   produce pills, that's what's being sold on the streets of

25   the United States and here in Utah, and everywhere else.

1    So yes, when those pills are produced with that

2   fentanyl, we have to find the people that are producing

3   those pills with that fentanyl and stop it.  That's what we

4   try to do.

5   Q    So what's the ultimate goal of DEA?  Are you familiar

6   with the terms disrupt and dismantle?

7   A    Yes.

8   Q    What does that mean?

9   A    Well, we disrupt and dismantle as high up the chain as

10  we can.  That's what we try to do.  So if a drug trafficking

11  organization is kind of a smaller organization, maybe five

12  people, and we dismantle that organization and all five of

13  them go to jail, that trafficking organization was disrupted

14  and dismantled.

15      Now if there's a big, very large organization that we

16  would -- you know, compared to a large department store, for

17  example, if we're comparing to legitimate businesses, if we

18  took off the managers of several stores, we're disrupting

19  it, but we haven't completely dismantled it.  But we're

20  disrupting it.  We would try to get to the very, very top

21  guy that we can to dismantle it, but sometimes we can only

22  disrupt.  Does that answer your question?

23  Q    Just because you don't get the top guy, that doesn't

24  mean you shouldn't target the second guy?

25  A    No.

```
 1   Q    And DEA has made Chinese fentanyl suppliers a priority

 2   target?

 3   A    Yes.

 4   Q    Thank you.

 5           THE COURT:  Thank you.

 6           Any recross, Mr. Skordas?

 7                    RECROSS-EXAMINATION

 8   BY MR. SKORDAS:

 9   Q    And those suppliers still exist today, don't they?

10   A    Yes.

11           MR. SKORDAS:  Nothing further, Your Honor.

12           THE COURT:  Thank you.  You may step down.

13           THE WITNESS:  Thank you, Your Honor.

14           THE COURT:  We'll start tomorrow at 8:30.

15           Thank you again, ladies and gentlemen of the jury.

16   We so appreciate you, and we'll see you tomorrow.

17           (Jury excused)

18           THE COURT:  Have a nice evening.

19           (Whereupon, the trial was continued to Thursday,

20   August 22, 2019 at 8:30 a.m.)

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E

 2

 3

 4          I hereby certify that the foregoing matter is

 5   transcribed from the stenographic notes taken by me and is a

 6   true and accurate transcription of the same.

 7

 8

 9

10

11

12

13

14

15

16   PATTI WALKER, CSR-RPR-CP      DATED: 11-19-19
     Official Court Reporter
17   351 South West Temple, #8.431
     Salt Lake City, Utah  84101
18   801-364-5440

19

20

21

22

23

24

25
```

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
Gabriela Mena (#17087)
**SKORDAS & CASTON, LLC**
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com
gmena@schhlaw.com
Attorneys for Defendant

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | **STIPULATED MOTION TO CONTINUE SENTENCING** |
| Plaintiff, | |
| v. | Case No. 2:16-CR-00631 DAK |
| AARON MICHAEL SHAMO, et. al., | Judge Dale A. Kimball |
| Defendant. | |

---

Defendant, Aaron Michael Shamo, by and through his counsel of record, Gregory G.

Skordas, hereby moves this Court for an Order Continuing the Sentencing currently set for

December 3, 2019, at 2:30 p.m.

This motion is based on the following:

1. Defense Counsel is researching legal issues associated with the numerous "victim impact

statements" received in conjunction with this matter.

2. Defense Counsel has a scheduling conflict with and will be in a jury trial in Logan, UT,

*State of Utah v. Baugh, Brevan:* 181100862.

3. On November 20, 2019, Defense Counsel filed a motion with this Court, (Doc. No. 312), the issues addressed therein will take a significant period of time to resolve and must be resolved prior to moving forward with sentencing.

4. The United States of America, through Counsel Michael Gadd, has stipulated to the continuance via email.

WHEREFORE, the Defendant respectfully requests this Court Continue the Sentencing until such time as the issues addressed in the Motion (Doc. No 312) are fully adjudicated by this court.

Respectfully submitted this 21st day, of November 2019.

SKORDAS & CASTON, LLC


*/s/ Gregory G. Skordas*
Gregory G. Skordas

# CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2019, I electronically filed a true and correct copy of the foregoing, **STIPULATED MOTION TO CONTINUE,** with the Clerk of the Court using ECF system, which sent notification of such filing to the following:

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Michael Gadd
mgadd@agutah.gov

Kent Burggraaf
kburggraaf@agutah.gov

*/s/ Sabrina Snow- Legal Secretary*
SKORDAS & CASTON, LLC

Gregory G. Skordas (#3865)
Kaytlin V. Beckett (#16257)
Gabriela Mena (#17087)
**SKORDAS & CASTON, LLC**
560 South 300 East Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
kbeckett@schhlaw.com
gmena@schhlaw.com
Attorneys for Defendant

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | **ORDER TO CONTINUE** |
| Plaintiff, | Case No. 2:16-CR-00631 DAK |
| v. | Judge Dale A. Kimball |
| AARON MICHAEL SHAMO, et. al., | |
| Defendant. | |

---

Based upon the STIPULATED MOTION TO CONTINUE and for good cause appearing,

the Motion to Continue in the above-entitled matter is hereby granted and the matter is

Continued until further notice.

SO ORDERED this 21st day of November, 2019

Dale A. Kimball
U.S. District Judge

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2 :16-cr-00631 DAK |
| Plaintiff, | |
| | ORDER FOR PSYCHOLOGICAL AND PSYCHIATRIC EXAMINATION AND REPORT |
| vs. | |
| AARON MICHAEL SHAMO, | |
| | Judge Dale A. Kimball |
| Defendant. | |

Based upon the Court's own motion, and good cause appearing:

IT IS HEREBY ORDERED that an in-custody, psychological and psychiatric examination be conducted to determine whether the defendant may presently be suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility.

Specifically, the Court orders that, pursuant to 18 U.S.C. § 4247(b), the defendant shall remain in the custody of the Attorney General (including the United States Marshal's Service and the Bureau of Prisons) during the time period required for this evaluation and that the examination, unless impracticable, be conducted in the suitable facility closest to the District of Utah.

It is hereby ordered that the examiner(s) conducting the psychological and psychiatric examination of the defendant prepare a report that includes those factors set out in 18 U.S.C. § 4247(c)(1),(2),(3), and (4)(E).

The Court ORDERS that, pursuant to 18 U.S.C. § 4247, a psychological and psychiatric report be filed with the Court. Copies of this report are to be provided to:

Michael Gadd
Kent A. Burggraaf
Vernon G. Stejskal
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Email: michael.gadd@usdoj.gov

Greg Skordas
Kaytlin Beckett
Attorneys for Mr. Shamo
560 South 300 East, suite 225
Salt Lake City, Utah 84111
Email:gskordas@schlaw.com

This evaluation is to be completed by the Bureau of Prisons while Mr. Shamo remains in the custody of the Attorney General (including the United States Marshal's Service and the Bureau of Prisons). At the conclusion of the evaluation the Court orders that the defendant be returned to the District of Utah as soon as possible.

DATED this 16th day of December, 2019.

BY THE COURT:

Hon. Dale A. Kimball
United States District Judge

08:07:24

08:07:24

08:07:24

08:07:24

08:07:24

08:07:24

1            IN THE UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4   _____

5  UNITED STATES OF AMERICA,    )
                            )

6           Plaintiff,     )
                            )

7     -vs-             )   2:16-CR-631 DK
                            )

8  AARON MICHAEL SHAMO, et al.,  )
                            )

9          Defendants.    )
  _____)

10

11

12

13

14      BEFORE THE HONORABLE DALE KIMBALL

15         DATE:  AUGUST 16, 2019

16     REPORTER'S TRANSCRIPT OF PROCEEDINGS

17     CROSS EXAMINATION OF MARIO NOBLE

18

19

20

21

22

23

24

25      Reporter:  REBECCA JANKE, CSR, RPR, RMR
               (801) 521-7238

```
 1

 2                   A P P E A R A N C E S

 3

 4   FOR THE PLAINTIF       UNITED STATE'S ATTORNEY'S OFFICE

08:07:24   5                    BY:  MICHAEL GADD, ESQ.

 6                             VERNON G. STEJSKAL, ESQ.

 7                             KENT A. BURGGRAAF, ESQ.

 8                        111 SOUTH MAIN STREET, 1800

 9                        SALT LAKE CITY, UTAH  84111

08:07:24  10

11

12

13   FOR THE DEFENDANT:    SKORDAS & CSTON, LLC

14                    BY:  GREGORY G. SKORDAS, ESQ.

08:07:24  15                         KAYTLIN V. BECKETT, ESQ.

16                        560 SOUTH 300 EAST, 225

17                        SALT LAKE CITY, UTAH 84111

18

19                        DARYL P. SAM, PLLC

08:07:24  20                    BY:  DARYL P. SAM, ESQ.

21                        5955 SOUTH REDWOOD ROAD, 102

22                        SALT LAKE CITY, UTAH 84123

23

24

08:07:24  25
```

```
        1   AUGUST 16, 2019                    SALT LAKE CITY, UTAH

        2                   P R O C E E D I N G S

        3                           *  *  *

        4              THE COURT:  Is there some question we need to
08:32:26 5   talk about?

        6              MR. STEJSKAL:  Your Honor, following the

        7   testimony yesterday, I was approached by Mr. Crandall's

        8   father, and Mr. Crandall's father informed me that he

        9   recognized one of the jurors from having worked together
08:32:46 10  at the LDS Church in some capacity many years ago.  I

       11   think he said five, seven, nine years ago.  He said they

       12   were not friends outside of work.  They weren't even close

       13   at work.  The juror had never met Drew Crandall, but he

       14   just wanted to let us know, and I wanted to let the Court
08:33:05 15  know that there was -- he did inform me of that.

       16              THE COURT:  Okay.  Anybody think that's an issue,

       17   a problem?

       18              MR. SKORDAS:  I don't think it's an issue, Your

       19   Honor.
08:33:14 20            THE COURT:  Obviously the juror -- the father is

       21   not a witness and so the juror didn't know him, and

       22   Crandall is not that unusual a name.

       23              MR. SKORDAS:  Right.

       24              THE COURT:  I don't think it's a problem.  And
08:33:30 25  neither of you do?
```

08:33:40

1    MR. SKORDAS:  Correct.

2    MR. STEJSKAL:  Correct, Your Honor.

3    THE COURT:  Thank you, though, for bringing it to

4    the Court's attention.  The jury is here and we're ready

5    to proceed, correct?

6    MR. GADD:  Yes.

7    MR. SKORDAS:  Yes, Your Honor.

8    THE CLERK:  All rise.

9    (Whereupon the jury enters the courtroom.)

08:35:32    10    THE COURT:  Good morning again, ladies and

11    gentlemen of the jury.  Well, we've almost got through

12    another week.

13    Mr. Sam, you may proceed with your cross

14    examination.

08:35:44    15    MR. SAM:  All right.  Thank you.

16                    CROSS EXAMINATION

17    BY MR. SAM:

18    Q.   Mr. Noble, good morning.  Appreciate your coming

19    back this morning to finish up here.

08:35:51    20    If we could start off where are we left off with

21    the government's direct and go to Exhibit 23.05.  If you

22    could pull that up.

23    And you remember this document from yesterday,

24    I'm sure?

08:36:20    25    A.   Yes.

08:36:37

```
 1    Q.   Okay.  And you're aware of it.  And if we could
 2  go -- highlight the two counts.  And I think it's just on
 3  the first page there -- that you plead to.  So, as you
 4  remember, you plead to conspiracy to distribute Fentanyl
 5  and conspiracy to distribute Alprazolam?
 6    A.   Yes.
 7    Q.   Is that correct?  And you understood what the
 8  penalties, potential penalties for those were?
 9    A.   When I plead guilty, yes.
10    Q.   To what you plead guilty to?
11    A.   Yes.
12    Q.   Okay.  And then if we could go to the last page,
13  second to the last page of the 23.05 and then the sealed
14  addendum.  Yeah.
15         So, at the bottom of that, it was your
16  understanding that, by pleading to those charges, that you
17  would not be charged with the death-resulting count; is
18  that correct?
19    A.   That is correct.
20    Q.   Okay.
21         And then, if we could go to paragraph 11 in the
22  23.05.  And I think that's page 3 or 4.  Page 3.  Okay,
23  yeah.
24         In paragraph 11, there is -- what you agreed to
25  your involvement in this operation; is that correct?  Is
```

08:36:49   (line 10)

08:37:05   (line 15)

08:37:16   (line 20)

08:37:44   (line 25)

1    that your understanding?

2        A.   Yes.

3        Q.   Okay.  And if I could have you read that, and

4    maybe we'll pause as you go through that, but starting in

08:37:58    5    February, 2016, will you read that.

6        A.   In February, 2016, I was contacted by Aaron Shamo

7    in Utah who expressed to me his desire for me to become

8    the backbone of a store in Alpha Bay, a Dark Net

9    marketplace.  Shamo recruited me to be in charge of

08:38:19    10   customer service and processing orders of various

11   controlled substances, including alprazolam tablets and

12   pills marked with oxycodone but which contained fentanyl.

13   Aaron Shamo created a profile for me, Dr. Wario, and gave

14   me partial access to Pharma-Master, Aaron Shamo's store on

08:38:36    15   Alpha Bay.

16        My access allowed me to process orders and

17   correspond with customers as Pharma-Master, but I had no

18   access to the BitCoins or other account rights.  I

19   continued to provide these services during 2016.

08:38:49    20   Eventually I was unable to keep up with the demands of my

21   assignment, so Aaron Shamo hired another person whose name

22   I learned was Drew to help with my responsibilities.

23        Q.   And if I could pause right there.  You stated

24   that you were -- had the assignment of customer service

08:39:06    25   and that there was some point that somebody else came on,

```
 1    is that right?

 2         A.    That's correct.

 3         Q.    Whose name you learned was Drew; is that right?

 4         A.    That is correct.

 5         Q.    And how did you learn that?

 6         A.    Through a conversation with Shamo.

 7         Q.    Okay.  At what point was that?  Do you

 8    remember -- in I think in your testimony yesterday you

 9    stated that you -- you weren't told by Shamo that Drew was

10    involved?

11         A.    I was told that Drew Crandall was not involved.

12         Q.    Okay.  Okay.  So there's a distinguishment there.

13    You were told that somebody by the name of Drew was

14    involved?

15         A.    Correct.  I asked him -- two Drew's that I knew

16    that he knew.  I asked him if it was those two gentlemen,

17    and he told me no.

18         Q.    Okay.  And that was your testimony.  He told you

19    no, that it was --

20         A.    It wasn't Drew Crandall, and it wasn't the other

21    Drew that we both knew.

22         Q.    So it was your understanding that there was a

23    Drew that you were not familiar with?

24         A.    Correct.

25         Q.    Is that correct?  So the identity of that other
```

08:39:13  5
08:39:27  10
08:39:38  15
08:39:49  20
08:39:58  25

|  | 1 | person you did not know, you just had the name Drew, who |
|  | 2 | was not Drew Crandall or the other individual that you |
|  | 3 | both knew? |
|  | 4 | A.    That's correct. |
| 08:40:10 | 5 | Q.    Okay.  And then, if you'll keep reading. |
|  | 6 | A.    I stopped working for Pharma-Master for a short |
|  | 7 | time, but when my expenses mounted in October, 2016, I |
|  | 8 | contacted Aaron Shamo and again asked for work.  Aaron |
|  | 9 | Shamo said that the other customer support person had been |
| 08:40:27 | 10 | falling behind and agreed to hire me part-time.  For my |
|  | 11 | part-time work, Aaron Shamo paid me $800 every two weeks. |
|  | 12 | I worked part-time for Pharma-Master until the store was |
|  | 13 | shut down in November 2016.  When I worked for |
|  | 14 | Pharma-Master, part of my daily duties included pulling |
| 08:40:51 | 15 | together a list of customers, their mailing addresses, and |
|  | 16 | the types and quantities of drugs they ordered.  Once I |
|  | 17 | created the list, I would send it to a -- send it in an |
|  | 18 | encrypted form through an email account Aaron Shamo |
|  | 19 | created for me to co-conspirators who were responsible for |
| 08:41:09 | 20 | packaging the orders, affixing mailing labels and postage. |
|  | 21 | During the time period I worked for |
|  | 22 | Pharma-Master, I processed thousands of customer service |
|  | 23 | responses for both tablets containing Alprazolam and pills |
|  | 24 | containing fentanyl.  I processed customer service |
| 08:41:28 | 25 | responses for much more than 400 grams of fentanyl. |

| | | |
|---|---|---|
| | 1 | Q.   Okay.  And I'll stop you there.  So there's a -- |
| | 2 | there's a line through orders in that paragraph, correct? |
| | 3 | A.   Correct. |
| | 4 | Q.   And you changed that to customer service |
| 08:41:40 | 5 | responses? |
| | 6 | A.   That was my main responsibility, yes. |
| | 7 | Q.   Okay.  So that was your main responsibility, but |
| | 8 | you were a part of the orders, too; is that correct? |
| | 9 | A.   I did ask -- or I did process some of the orders, |
| 08:41:51 | 10 | yeah. |
| | 11 | Q.   Okay.  So you were -- in your testimony |
| | 12 | yesterday, there was testimony that you gave that you sent |
| | 13 | the orders to the shippers, correct, and encrypted email? |
| | 14 | A.   Correct. |
| 08:42:03 | 15 | Q.   Okay.  So -- so, the customer service responses |
| | 16 | was just changed because that was your main -- your main |
| | 17 | duty with the organization; is that right? |
| | 18 | A.   To correspond with the amounts listed in that |
| | 19 | statement, the customer service responses was more |
| 08:42:19 | 20 | applicable. |
| | 21 | Q.   Okay.  When it says thousands? |
| | 22 | A.   Correct. |
| | 23 | Q.   Right.  Okay.  So how many orders did you |
| | 24 | process?  Not thousands, I guess?  Is that why it changed? |
| 08:42:29 | 25 | A.   Yeah.  I couldn't tell you an exact number now, |

```
    1    but it wasn't that many, no.
    2        Q.   Okay.   All right.   Thank you.   And then if
    3    you'll finish the last paragraph?
    4        A.   My co-conspirators and I each had a role to play,
08:42:41  5  and we relied upon on each other to meet our common
    6    objective, to earn money by selling drugs.  I knowingly
    7    and voluntarily involved myself with Pharma-Master and my
    8    co-conspirators.  It was my free choice to do so.
    9        Q.   Okay.   And that's why you're here today, because
08:42:53 10  you -- you plead to -- you have taken responsibility,
    11   correct?
    12       A.   Correct.
    13       Q.   And you understand the gravity of the situation.
    14   The penalty for conspiracy to distribute fentanyl is a
08:43:09 15  ten-year minimum mandatory, maximum life.  You understand
    16   that?
    17       A.   I do.
    18       Q.   Okay.
    19       A.   Like I said yesterday, it was one of the worst
08:43:16 20  decisions I made in my life, but I did make the decision,
    21   yes.
    22       Q.   Right.   Now, if we could -- if we could go to
    23   Exhibit 15.06, and I believe this was your email sent box;
    24   is that correct, as you look at that?
08:43:35 25       A.   Yes.
```

08:43:47

      Q.    Okay.  And so these emails were what you used to
send to the shippers when you did process an order; is
that correct?

      A.    That's correct.

      Q.    Okay.  And if we could -- if we could go to page
50 and 51 -- or the bottom of 50, first, very bottom
there.  There was -- this was dated June 7 when you sent
an email to the shippers, right?  Passthepeas were if the
shippers, correct?

08:44:09

      A.    Correct.

      Q.    Okay.  And then if we could go to page 51 at the
top, down to the attachment.  Yes.

            So -- so this is a continuation of that page, and
it -- the attachment, what does that read?

08:44:25

      A.    Are you asking where it says attachments at the
bottom?

      Q.    Right.

      A.    So 6-6.txt.

      Q.    And what did that mean 6-6?

08:44:36

      A.    That would have been the date.

      Q.    Okay.  So 6/6.  And what year was this?

      A.    2016.

      Q.    Okay.  And were you aware of what orders were
encrypted in this email?

08:44:46

      A.    I mean, I was the one that compiled them and

```
 1    encrypted it, so yeah.

 2         Q.   Okay.  So you had it printed out and encrypted it

 3    and sent it?

 4         A.   Yeah.  I had a soft copy, yeah.

 5         Q.   Okay.  Are you aware that there is an order in

 6    there that the government is claiming a death resulted as

 7    a result of a shipment made from this organization?

 8         A.   I did not know that.

 9         Q.   You didn't know that.  Okay.  But you knew you

10    could be charged with that?

11         A.   When?

12         Q.   When you negotiated your deal with the

13    government, you knew that you could be charged with a

14    death-resulting count?

15         A.   I was under the understanding that, with the

16    plea, that I would not be charged with that.

17         Q.   Correct.  Correct.  That's why you entered the

18    plea; is that right?

19         A.   Correct.  Part of the reason, but yeah.

20         Q.   Right.  And if there was -- the government is

21    claiming a death-resulting count against Mr. Shamo on this

22    order.  And you participated in this order; is that

23    right?

24         A.   That's correct.

25         Q.   Correct.  Right?  And so -- and by pleading
```

08:44:58   (line 5)
08:45:08   (line 10)
08:45:18   (line 15)
08:45:30   (line 20)
08:45:41   (line 25)

        1    today, you avoided that charge?

        2        A.    Correct.

        3        Q.    Okay.  Thank you.  If we could.  I did want to

        4    ask you a couple of questions about this candy laced drug

08:46:03  5    business and about how that came about.  And I think you

        6    testified that it was in January of 2016 or so that that

        7    was being talked about or discussed.  Can you tell me a

        8    little bit more about that, how that came about?

        9        A.    Yeah.  So when Shamo originally approached me, he

08:46:23 10    stated that he wanted to get a second store started on

       11    Alpha Bay but that he wanted somebody else to be the

       12    primary runner, manager of it.  So essentially my job

       13    duties would have been to manage the sales and do customer

       14    service and to process the orders.  And then he would be

08:46:40 15    the one supplying the product.

       16        Q.    Okay.  And was that something that was mutual

       17    between the both of you, that you were both kind of

       18    excited about that?

       19        A.    At the time, when he approached me and, you know,

08:46:53 20    we talked about the amount of money and stuff that could

       21    be made from it, it was something that I wanted to move

       22    forward with.

       23        Q.    Okay.  And you were quite excited about that,

       24    right, in the discussions and the -- with Mr. Shamo?

08:47:07 25        A.    I don't know if I would use the word "excited,"

14

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | but I was willing to move forward.                           |
|       | 2  | Q.   Right.  Right.  And that's how it started as far        |
|       | 3  | as getting on the Tor browser and getting involved with      |
|       | 4  | the Dark Net --                                              |
| 08:47:20 | 5  | A.   Correct.                                             |
|       | 6  | Q.   -- with this business, correct?                         |
|       | 7  | A.   That's right.                                           |
|       | 8  | Q.   And then it didn't -- it didn't turn into               |
|       | 9  | anything, correct?                                           |
| 08:47:28 | 10 | A.   Nothing at all.                                      |
|       | 11 | Q.   Okay.  If we could go to Exhibit 17.08, pull that       |
|       | 12 | up.                                                          |
|       | 13 | And do you recognize this document?                          |
|       | 14 | A.   I do?                                                   |
| 08:47:45 | 15 | Q.   Okay.  And what is?                                  |
|       | 16 | A.   Most of it is the canned responses that I had for       |
|       | 17 | customer service requests.                                   |
|       | 18 | Q.   Okay.  And who created this list?                       |
|       | 19 | A.   Who did?  I did.                                        |
| 08:47:56 | 20 | Q.   You did.  Okay.  And that was part of your           |
|       | 21 | responsibilities of customer service for the organization;   |
|       | 22 | is that correct?                                            |
|       | 23 | A.   Correct.  My responsibility was to respond to          |
|       | 24 | customer requests, and I felt the most efficient way to do   |
| 08:48:07 | 25 | that was to create canned responses since we were getting |

1   a lot of the same questions.

2        Q.   Okay.  And that kind of made your job easier,

3   correct?  You would get a complaint, and you would have a

4   list of responses, and you could just plug those in?

08:48:21   5        A.   Correct.

6        Q.   Is that correct?  Okay.  And there -- I believe

7   there's about five pages here, four or five pages of

8   responses.  Does that sound right?

9        A.   Yeah.  There was a good number of them.

08:48:33  10        Q.   There was quite a bit.  Okay.

11             And if we could go to page 2 and go to the

12   response of:  How much Fent?

13             If we could do that one down to:  Thanks, PM.

14             Yeah.  So if you'll read this one.

08:48:49  15        A.   We understand, being sure to know what you are

16   purchasing -- yeah.  We understand being sure to know what

17   you're purchasing, unfortunately we do not discuss our

18   formula or processes for many reasons.  We would say that

19   the effects of one of our Fent Roxies is equal to the

08:49:07  20   effects of a 30 milligram Roxy.  Hope this helps.  Thanks.

21   PM.

22        Q.   Okay.  Now, again, so this helps you respond to

23   complaints or questions that you received from customers,

24   correct?

08:49:20  25        A.   Correct.

```
 1      Q.   Okay.  And how did this canned response -- how

 2   was that created?

 3      A.   I mean, I was getting questions about how much

 4   Fent was in each pill and what the effects were and things

 5   like that, so I reached out to Shamo because I had no idea

 6   the process of the making the pills or anything like that,

 7   so I asked him, and this was essentially his response, was

 8   that we don't talk about the formula or the process.  And

 9   I took what he said and put a customer service spin on it

10   and created this canned response.

11      Q.   Okay.  So you asked Mr. Shamo, "How do we respond

12   to this, what's the fromula?"

13           Because people were asking you, right?

14      A.   Correct.

15      Q.   What's the formula?  And Mr. Shamo's response

16   was, "We don't want to give specifics," basically; is that

17   correct?

18      A.   Yeah.  He didn't want someone to take his formula

19   and start using it as their own.

20      Q.   Okay.  And so even though you never got a formula

21   from Mr. Shamo --

22      A.   No.

23      Q.   -- is that right?  Okay.  And is it possible that

24   Mr. Shamo, himself didn't have the formula?

25      A.   I don't think so.
```

08:49:32 — line 5
08:49:50 — line 10
08:49:59 — line 15
08:50:11 — line 20
08:50:23 — line 25

```
            1       Q.   Okay.  You believe he did have the formula?

            2       A.   Yeah.  I mean, I saw the pill presses in his

            3   house.  He was telling me that he was pressing the pills

            4   from those.  You know, the context of that, I would assume
08:50:37    5   that he was the one doing it.

            6       Q.   As far as you know, you never saw a formula?

            7       A.   I didn't.

            8       Q.   And you don't know if Mr. Shamo was actually

            9   putting that formula together or who may have put that
08:50:50   10   formula together; is that correct?

           11       A.   That's correct.

           12       Q.   You have no idea.  Your involvement with the

           13   formula was basically getting questions from the

           14   customers?
08:50:58   15       A.   And giving them this response.

           16       Q.   And then going to Mr. Shamo and Mr. Shamo telling

           17   you, "Just tell them it's equal to the effect of a 30

           18   milligram Roxy."

           19       A.   Correct.
08:51:14   20       Q.   Correct?  If we could go to Exhibit 14.15 and

           21   just the first page of that.

           22            What is this page here?  Do you recognize this

           23   from yesterday?

           24       A.   I believe this would have been the first time
08:51:33   25   that Shamo and I had communicated on Telegram.
```

```
           1      Q.   Okay.  And, in general, right?  This was
           2  Telegram.  These were your Telegram messages, correct?
           3      A.   Correct.
           4      Q.   I think it was your testimony yesterday that when
08:51:47   5  you were arrested at eBay or taken in for questioning at
           6  eBay on November 22, that you were alerted by your
           7  co-workers that Homeland Security was at the front desk
           8  looking for you; is that right?
           9      A.   That is correct.
08:52:03  10      Q.   And on your way down or in the process of coming
          11  to meet them, you deleted this; is that right?
          12      A.   That is correct.
          13      Q.   Okay.  So I'm curious here, just wondering, how
          14  did the government get this information when you deleted
08:52:20  15  it?
          16      A.   From what I understand, this is Shamo's side.
          17      Q.   Okay.  So this is Shamo's.  Yours was not
          18  recovered, correct?
          19      A.   Correct.
08:52:27  20      Q.   Okay.  So this was -- yours was deleted, correct?
          21      A.   That's right.
          22      Q.   If we would go to page 43 of this document.
          23           And there's -- this is all communication between
          24  you and Mr. Shamo, right, texting back and forth.
08:52:43  25           And if we could go to the bottom of:  I just put
```

```
           1    in 12 hours today.

           2            So, this response here from Mr. Shamo, "I put in

           3    a 12-hour today pressing and filling orders and getting

           4    stuff locally," was that common for Mr. Shamo to be

08:53:07   5    saying, "I'm working hard here.  I'm really busy and I'm

           6    trying to get product out."  Or --

           7       A.   At the beginning, yeah.

           8       Q.   Okay.

           9       A.   Once he kind of diversified, like it seemed like

08:53:21  10    he had more people involved, it seemed like he had a lot

          11    more free time.

          12       Q.   Okay.  So maybe at the first, when you first got

          13    involved, it was pretty common for him to be --

          14       A.   Doing a lot.

08:53:32  15       Q.   -- putting in long days and working hard.  Okay.

          16    And as far as others involved, you said at first that he

          17    didn't -- he mentioned the name Drew, but he didn't -- he

          18    didn't tell you Drew Crandall, correct?

          19       A.    I didn't know anybody else that was involved, but

08:53:49  20    we had had conversations about him expanding his

          21    business.

          22       Q.   Okay.  And maybe bringing others on?

          23       A.   Correct.  But I just never knew their -- who they

          24    were.

08:53:59  25       Q.   Right.  And at the conversations of bringing
```

```
      1    others on, too, you were involved in actively

      2    participating with having drops made to other individuals,

      3    friends of yours, correct?

      4        A.   Correct.

08:54:11   5    Q.   And not individuals that knew Mr. Shamo?

      6        A.   Correct.

      7        Q.   Right.  They were yours.  In fact you -- you were

      8    kind of a middleman between Mr. Bruner and Kayla.  What

      9    was Kayla's last name?

08:54:27  10    A.   Kayla was Bruner.  It was Jordan Burnell.

     11        Q.   Jordan Burnell, yeah.  And they were your

     12    friends, correct?

     13        A.   That is correct.

     14        Q.   And you kind of insulated them from Mr. Shamo; is

08:54:42  15    that fair to say?

     16        A.   He asked for drops.  He asked me to be a drop,

     17    and I told him I didn't want stuff going to my mom's

     18    house, but I could talk to people and see if I could

     19    recruit people to work under me, kind of like an MLM, if

08:54:56  20    you will.

     21        Q.   Okay.  Not necessarily insulating them, but you

     22    were kind of a middleman?

     23        A.   Right.

     24        Q.   Okay.  But you did want to protect them, correct?

08:55:05  25    A.   Of course.
```

```
           1      Q.   And you didn't want them too involved.  In fact,
           2   you have conversations on this text, on the Telegram with
           3   Mr. Shamo about nothing illegal is being dropped at my
           4   friends house, correct?
08:55:19   5      A.   Yeah.
           6      Q.   It was just filler, right?
           7      A.   That's what he was telling me, yeah.
           8      Q.   You were kind of wanting to make -- you wanted to
           9   make that clear, that you didn't want illegal material
08:55:31  10   going to your friends' houses?
          11      A.   Right.
          12      Q.   Okay.  As far as Telegram, too, that's something
          13   that you used before, right?  It wasn't -- Mr. Shamo
          14   didn't introduce you to Telegram; is that right?
08:55:49  15      A.   Right.
          16      Q.   Who introduced you to Telegram?
          17      A.   Sasha Grant.
          18      Q.   Okay.  Sasha.  And you knew Sasha from how long?
          19      A.   Six years ago.
08:55:58  20      Q.   Okay.  So --
          21      A.   We were together a long time ago.
          22      Q.   So you knew Sasha before you knew Drew Crandall
          23   or before you knew Aaron Shamo; is that right?
          24      A.   That is correct.
08:56:06  25      Q.   Okay.  And it was several years before that she
```

```
 1    introduced you to Telegram; is that right?

 2         A.   That's right.

 3         Q.   Okay.  In fact, I think in your Grand Jury

 4    testimony you said that you used that with Drew Crandall

08:56:17   5    as well, right?

 6         A.   I had communicated with him, yeah.

 7         Q.   And as far as your use of marijuana, that's

 8    something you communicated through -- with Drew

 9    Crandall?

08:56:26  10         A.   That's correct.  That's how I originally had

11    downloaded Telegram was to communicate with him to pick up

12    marijuana, yeah.

13         Q.   Right.  Okay.  And then, as far as Luke Paz, did

14    that name ever -- you socialized with Luke Paz, correct?

08:56:46  15         A.   When I was around Shamo, Luke was around a lot,

16    yeah.

17         Q.   Okay.  And so did Mr. Shamo ever mention the name

18    of Luke Paz as being part of this organization?

19         A.   He did not.

08:56:56  20         Q.   Okay.  It was kind of like Drew Crandall, right?

21    He never -- that name never came up as far as being

22    involved in this operation?

23         A.   Yeah.  It sounds like my name was the only one

24    that he told people.

08:57:10  25         Q.   You felt like he was throwing your name around?
```

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 08:57:24 | 5 |

         1     A.   Correct.

         2     Q.   I mean, that was true with the shippers as well;

         3   is that correct?

         4     A.   That's what it sounds like.

08:57:24  5     Q.   Okay.  So, on the day that he got arrested, you

         6   got a message from either Drew Crandall or Sasha Grant; is

         7   that right?

         8     A.   You said the day that he got arrested?

         9     Q.   I'm sorry.  The day he got arrested, the day that

08:57:38 10   you got questioned?

        11     A.   Correct.  And, yes, I did get a message.

        12     Q.   Okay.  And who was that from?

        13     A.   Sasha Grant.

        14     Q.   Sasha Grant.  And in what format -- she didn't

08:57:48 15   send you a Telegram, I guess?

        16     A.   No.  It was over Snapchat.

        17     Q.   Okay.  So it was over a common social media site.

        18   Okay.  And did you respond to that?

        19     A.   I did not.

08:57:59 20     Q.   Okay.  And why didn't you respond?

        21     A.   I was with lawyers at the time, and they told me

        22   not to.

        23     Q.   Okay.  So did you suspect, at that time, that

        24   Sasha knew something?

08:58:13 25     A.   Yeah.

24

```
           1      Q.   But before that, you had no idea; is that
           2   correct?
           3      A.   No idea of what?
           4      Q.   That Sasha would have any connection with this?
08:58:24   5      A.   Well, like she had told me previously, back in --
           6   toward the end of 2015, kind of before I got involved with
           7   Shamo, that there was stuff going on with Drew and
           8   Shamo.
           9      Q.   Okay.  So there was -- there may have been some
08:58:40  10   indication that Drew Crandall was still involved?
          11      A.   Not still involved, no.
          12      Q.   Okay.  So -- so, Sasha contacting you, did that
          13   give you an indication that maybe Drew was involved, then,
          14   again?
08:58:59  15      A.   No.
          16      Q.   Okay.  So it wasn't uncommon for you to get a
          17   message from Sasha, then?
          18      A.   It seemed like a pretty tight friend group, so
          19   for her to be messaging me the day that Shamo got picked
08:59:17  20   up was not a surprise to me because I'm sure there were
          21   people that she knew that had heard that Shamo had gotten
          22   picked up and had spread the word.
          23      Q.   Okay.  So, as far as you know, in your
          24   involvement in this, Mr. Shamo was the base of this
08:59:42  25   organization; is that correct?
```

1     A.   That's correct.

2     Q.   And if there were others that were instructing

3 Mr. Shamo, you would not know?

4     A.   I would not.

08:59:51  5     Q.   All right.  So, as far as Burnell and Bruner, you

6 as a middleman, you gained financially from that; is that

7 correct?

8     A.   I did.

9     Q.   And how much did you make?

09:00:35 10     A.   It was 150 per package.

11     Q.   And approximately how many drops did you do?

12     A.   I can recall three to four.

13     Q.   I think in your Grand Jury testimony you said

14 that you did about nine with one and three with another.

09:00:57 15 Does that sound right?

16     A.   That's not what I remember.

17     Q.   Okay.  So maybe you misunderstood when you were

18 in front of the Grand Jury?

19     A.   It's possible.  I also remember -- I don't

09:01:08 20 remember, rather, how the packages were paid for, if that

21 makes sense, because I remember there were multiple boxes

22 that came in one shipment, and I'm not sure how much Shamo

23 actually paid me for that.

24     Q.   There may have been a discount if three or four

09:01:26 25 packages came at once or something?

1   A. Possible.

2   Q. You just don't remember; is that right?

3   A. That's right.

4   Q. Okay.  So there may have been a total of --

09:01:34 5   A. Of nine packages.

6   Q. -- 9 to 12 packages themselves, but only four or

7 five actual transfers?

8   A. Right.  Transfers is a good word.  Yeah.

9   Q. Okay.  Okay.  Can you tell us who else you

09:01:55 10 communicated with, with Telegram to Mr. Shamo?

11 Mr. Crandall, you've mentioned?

12   A. The other person that I remember is Kelly

13 McGraff.

14   Q. Kelly McGraff?

09:02:06 15   A. Correct.

16   Q. Okay.  And is that the only other person?

17   A. That's the only person I can recall.

18   Q. Okay.  And what was the purpose of communicating

19 with Kelly McGraff through Telegram?

09:02:16 20   A. I was organizing picking up MDMA.

21   Q. Okay.  So transfer of drugs?

22   A. Correct.

23   Q. Okay.  And as far as drug use goes, you were

24 using drugs during this while you were performing the

09:02:40 25 duties of Mr. Shamo and during this period of time; is

```
             1    that correct?

             2         A.   Yeah.

             3         Q.   In fact, you had asked Mr. Shamo for some drugs

             4    or some --

  09:02:48   5         A.   That's how it all started, yeah.

             6         Q.   And so that's something you participated in.  You

             7    did get questioned on November 22, correct?

             8         A.   Uh-huh.  Yes.

             9         Q.   Okay.  And -- and then you were later indicted in

  09:03:05  10    May of 2016; is that right?

            11         A.   It would have been May of 2017.

            12         Q.   Or 2017.  Correct.

            13         A.   But yes.

            14         Q.   Right.  And at that point, you went before a

  09:03:17  15    Judge, and you asked to be released, right, and there was

            16    a chance that you might be detained at that point?

            17         A.   Correct.

            18         Q.   Okay.  But you weren't -- you didn't spend a

            19    night in jail on November 22.  You didn't go to jail when

  09:03:31  20    you came back on the Indictment in May of 2017; is that

            21    right?

            22         A.   That's right.

            23         Q.   Okay.  And so you haven't spent a night in jail

            24    on this case; is that correct?

  09:03:42  25         A.   That's correct.
```

```
          1        Q.    Okay.  And as far as drug use goes, when you came

          2   on your Indictment, you were released.  You were on what

          3   was called pretrial release; is that right?

          4        A.    That is correct.

09:03:56  5        Q.    Okay.  And under that pretrial release, you had

          6   certain conditions to meet; is that right, and maintain,

          7   correct?

          8        A.    That is correct.

          9        Q.    Okay.  And have you been able to maintain those

09:04:08  10  conditions?

          11       A.    Not all of them.

          12       Q.    Okay.  What conditions have you not met?

          13       A.    I was requested to not use drugs.

          14       Q.    Okay.  And you have failed on those conditions,

09:04:22  15  then?

          16       A.    That's correct.

          17       Q.    Okay.  How many times?

          18       A.    A handful.

          19       Q.    Okay.  Like more than ten?

09:04:36  20       A.    Yeah.

          21       Q.    Okay.  More than 15, or --

          22       A.    I did have possession of a THC pen, so I did use

          23   that, but, yes, more than 15 times, yes.

          24       Q.    So you have been working with the probation

09:04:54  25  office on that; is that right?
```

```
        1       A.   That is correct.

        2       Q.   Okay.  And you haven't been back in court to

        3   question your detention because of that?

        4       A.   I have not.

09:05:02   5    Q.   All right.  You have been able to work that out

        6   with your probation officer?

        7       A.   Correct.

        8       Q.   Okay.  And as you sit here today, are you

        9   impaired?

09:05:12  10    A.   I am not.

        11      Q.   Okay.  So you're of sound mind, and yesterday as

        12  well; is that correct?

        13      A.   That is correct.

        14      Q.   Okay.

09:05:23  15         I have no further questions.

        16         THE COURT:  Thank you, Mr. Sam.

        17         Mr. Gadd, you may redirect.

        18         MR. GADD:  Nothing further.  Thank you, Your

        19  Honor.

09:05:36  20         THE COURT:  Thank you.  You can step down,

        21  Mr. Noble, and you can be excused.

        22

        23

        24

        25         (Whereupon the testimony was completed.)
```

1

2                      REPORTER'S CERTIFICATE

3   STATE OF UTAH              )

4                              ) ss.

5   COUNTY OF SALT LAKE        )

6

7           I, REBECCA JANKE, do hereby certify that I am a

8   Certified Court Reporter for the State of Utah;

9           That as such Reporter I attended the hearing of

10  the foregoing matter on August 18, 2019, and thereat

11  reported in Stenotype all of the testimony and proceedings

12  had, and caused said notes to be transcribed into

13  typewriting, and the foregoing pages numbered 1 through 29

14  constitute a full, true and correct record of the

15  proceedings transcribed.

16          That I am not of kin to any of the parties and

17  have no interest in the outcome of the matter;

18          And hereby set my hand and seal this 18th day of

19  December, 2019.

20

21

22

23

24          _____

25          REBECCA JANKE, CSR, RPR, RMR

**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Medical Center*

---

*3150 Horton Road*
*Fort Worth, TX 76119*

January 31, 2020

Honorable Dale A. Kimball
United States District Judge
District of Utah
351 S.W. Temple
Salt Lake City, Utah 84101

Re: SHAMO, Aaron Michael
Reg. No. 24911-081
Case No. 2:16-cr-00631 DAK

Dear Judge Kimball:

In accordance with your Court Order, dated December 16, 2019, and pursuant to the provision of Title 18, United States Code, Section 4244, Mr. Shamo arrived at the Federal Medical Center (FMC), Fort Worth on January 24, 2020. Federal statute typically provides for an examination period of up to 30 days. Based on the Federal Bureau of Prisons' interpretation of the statute, we respectfully request this examination period begin on the date of Mr. Shamo's arrival to our facility, in order to allow a full, comprehensive examination.

If this request is granted, this evaluation will end no later than February 24, 2020, and the corresponding report would be submitted to the Court within 14 days of the conclusion of the evaluation. Should the evaluation be completed prior to the aforementioned time period, the Court will be notified.

If we can provide further assistance, please feel free to contact me at (817) 413-3269.

Sincerely,

Samuel Browning, Ph.D.
Licensed Psychologist

# UNITED STATES DISTRICT COURT

United States Courthouse
351 S. West Temple Street, Room 10.400
Salt Lake City, UT 84101
(801) 524-6610

**Dale A. Kimball**
United States District Judge

February 7, 20120

Samuel Browning, Ph.D.
Licensed Psychologist
Federal Bureau of Prisons, Federal Medical Center
3150 Horton Road
Fort Worth, TX   76119

      RE:    *United States v. Aaron Michael Shamo*
             Reg. No. #24911-081
             Case No. 2:16CR631DAK

Dear Dr. Browning:

      This letter is in response to your January 31, 2020 letter regarding the examination of Aaron Michael Shamo at your facility.  I agree with your request to do a thirty day examination between January 24, 2020 and February 24, 2020, with a corresponding report submitted to the court 14 days later.  Thank you for your request for clarification.

                 Sincerely,

                 Dale A. Kimball,
                 United States District Judge



```
 1                IN THE UNITED STATES DISTRICT COURT

 2                        DISTRICT OF UTAH

 3                        CENTRAL DIVISION

 4

 5    UNITED STATES OF AMERICA,        )

 6            Plaintiff,               )

 7    vs.                              )      Case No. 2:16-CR-631DAK

 8    AARON MICHAEL SHAMO,             )

 9            Defendant.               )

10    _____)

11

12

13            BEFORE THE HONORABLE DALE A. KIMBALL

14            ------------------------------------

15                       August 15, 2019

16

17                        Jury Trial

18

19

20

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3   For Plaintiff:          S. MICHAEL GADD
                             348 East South Temple
 4                           Salt Lake City, Utah

 5                           VERNON G. STEJSKAL
                             111 South Main Street
 6                           Suite 1800
                             Salt Lake City, Utah
 7
                             KENT A. BURGGRAAF
 8                           348 East South Temple
                             Salt Lake City, Utah
 9

10   For Defendant:          GREGORY G. SKORDAS
                             KATYLIN V. BECKETT
11                           560 South 300 East
                             Suite 225
12                           Salt Lake City, Utah

13                           DARYL P. SAM
                             5955 South Redwood Road
14                           Suite 102
                             Salt Lake City, Utah

15

16

17

18

19

20

21   Court Reporter:         Ed Young
22                           351 South West Temple
                             Room 3.302
23                           Salt Lake City, Utah 84101-2180
                             801-328-3202
24                           ed_young@utd.uscourts.gov

25
```

```
 1                    I N D E X

 2
     Witness              Examination              Page
 3   -------              -----------              ----

 4   Drew Wilson Crandall    Mr. Stejskal (Direct)        4

 5   Drew Wilson Crandall    Mr. Skordas (Cross)        121

 6
     Mario Noble             Mr. Gadd (Direct)          149
 7

 8

 9

10

11

12

13

14

15   Exhibit                                      Received
     -------                                      --------
16

17

18

19

20

21

22

23

24

25
```

```
1    August 15, 2019                              8:30 a.m.

2                     P R O C E E D I N G S

3

4         THE COURT:  The jury is here.  We'll get them and

5    proceed.

6         (WHEREUPON, the jury enters the proceedings.)

7         THE COURT:  Thank you, ladies and gentlemen of the

8    jury, for being prompt.  We appreciate your work.

9         You may call your next witness, Mr. Stejskal.

10        MR. STEJSKAL:  Thank you, Your Honor.

11        The United States next calls Drew Crandall.

12                    DREW WILSON CRANDALL

13              Having been duly sworn, was examined

14                    and testified as follows:

15        THE WITNESS:  Drew Wilson Crandall, D-r-e-w,

16   W-i-l-s-o-n, C-r-a-n-d-a-l-l.

17        THE COURT:  You  may proceed.

18        MR. STEJSKAL:  Thank you, Your Honor.

19                    DIRECT EXAMINATION

20   BY MR. STEJSKAL

21   Q.   Lean into that microphone the best you can so everyone

22   can hear you.  Pull it down or whatever is the most

23   comfortable.

24        How old are you?

25   A.   I am 33 years old.
```

```
1    Q.   And where do you currently live?

2    A.   I guess I would say Draper, Utah, but I am currently

3    incarcerated in the Tooele County Detention Center.

4    Q.   The jail there?

5    A.   Yes.

6    Q.   How long have you been in jail?

7    A.   A little over 27 months.

8    Q.   When were you arrested?

9    A.   May 5th, 2017.

10   Q.   Where were you arrested?

11   A.   I was arrested at the Hawaii Honolulu International

12   Airport.

13   Q.   What were you arrested for?

14   A.   Conspiracy to traffic drugs, specifically Fentanyl and

15   Xanax and then also conspiracy to commit money laundering.

16   Q.   Your involvement in this particular case is what you

17   were arrested for?

18   A.   Yes.

19   Q.   Now, you had a pretrial detention hearing in Hawaii,

20   correct?

21   A.   Correct.

22   Q.   And asked to be released?

23   A.   Yes.

24   Q.   With what result?

25   A.   I was detained indefinitely.
```

```
1    Q.   A judge there found you to be detained?

2    A.   Yes.

3    Q.   How did you get to Utah?

4    A.   20 something days later I was extradited to Utah.  I

5    spent a night in Nevada, Pahrump, and then was flown up to

6    Salt Lake City.

7    Q.   So we're clear, you didn't fight extradition, it just

8    took you that long to get here?

9    A.   Yep.

10   Q.   When you got back here, you had another pretrial

11   detention hearing before Judge Kimball, correct?

12   A.   Correct.

13   Q.   And with what result?

14   A.   I was still detained awaiting trial.

15   Q.   You were deemed a flight risk or risk of danger to the

16   community?

17   A.   Yes.

18   Q.   It was the judge that decided that, not me or your

19   attorney or anybody else, correct?

20   A.   Yes.

21   Q.   Is it your understanding that you will get credit for

22   the time that you have served on any ultimate sentence that

23   you receive as a result of this offense?

24   A.   Yes.

25   Q.   Let's start at the beginning, I guess.  Do you know
```

1    Aaron Shamo?

2    A.   Yes.

3    Q.   How long have you known him?

4    A.   Probably about 10 to 11 years.

5    Q.   Where did you guys first meet?

6    A.   We met in Provo.  We had mutual friends that we would

7    go skateboarding and long boarding with.

8    Q.   Were you guys both going to school?

9    A.   Yes.  I believe at the time -- I was going to school,

10   but I don't know if Aaron was specifically, but I think he

11   was at Utah Valley University.

12   Q.   And did you become roommates at some point?

13   A.   Yeah, we did.  About three to four years after we met

14   we became roommates in a townhouse in Orem.

15   Q.   What were you guys doing at that time?

16   A.   We were both working at a company called

17   Teleperformance.  I was going to school and Aaron was just

18   working.

19   Q.   After Teleperformance, where did you go next?

20   A.   I moved to Salt Lake to continue my education at the

21   University of Utah.

22   Q.   Did you keep track of Mr. Shamo at that time?

23   A.   Very rarely.  I know that he stayed in the Orem area

24   for another couple months and then moved back to his

25   parents' house in Arizona.

1   Q.   And then ultimately did you guys get back together at

2   some future date?

3   A.   Yes.  About two or three years later he moved back to

4   Salt Lake and was living at a house on Laurelhurst Drive on

5   the east side.  I was living in a house on 9th East.  My

6   lease had finally expired and so I decided to move in with

7   him.

8   Q.   On Laurelhurst?

9   A.   Yes.

10  Q.   Approximately when was that, 2012, '13?

11  A.   Early 2014.

12  Q.   Okay.  Let's talk about your employment at eBay.

13  A.   Yep.

14  Q.   When did you start there?

15  A.   I started there in March of 2014 -- or April.

16  Q.   Did Mr. Shamo work there as well?

17  A.   He did.  He started a little bit later than me.  I

18  referred him to the position and he started in about June of

19  2014.

20  Q.   How long did you guys work there?

21  A.   I worked there 21 months.  Mr. Shamo worked there about

22  18 months.

23  Q.   You guys quit right around the same time?

24  A.   Yes.

25  Q.   So you are roommates at the Laurelhurst residence for a

1   while.  Were there seeds of starting a business at that time

2   together?

3   A.   Yes.  When Aaron was in Arizona he told me about

4   Bitcoin mining and introduced me to it and explained what

5   Bitcoins were.  I tried it out for a day or two and didn't

6   get very far with my computer.  When I moved into the

7   Laurelhurst address, he was looking into purchasing a

8   Bitcoin miner, and he wanted me to be partners with him in

9   mining Bitcoins.

10  Q.   Really basically can you tell us what that is?

11  A.   Bitcoin mining is essentially being the backbone of the

12  system.  When someone makes a transaction in Bitcoins, you

13  need a computer to verify it.  There is a lot of heavy math

14  involved with the encryption of it, and being a miner is the

15  backbone of that.  And then you get rewarded for mining by

16  receiving bitcoins.

17  Q.   You guys don't actually do the math.  The computer does

18  that?

19  A.   No.  It is all done on the computer and it is all

20  programmed right into the machine.

21  Q.   So how did you guys get started in that?  Did you buy

22  some kind of equipment?

23  A.   Yeah.  Aaron was researching online what he wanted to

24  get.  He approached me with a miner.  I believe the

25  manufacturer was K. & C.  It was $6,000 and he asked me to

1    put in half.  I explained to him that I didn't have that

2    much money.  I was only able to put in 1,000.  He got our

3    other roommate, David, to invest additional funds and then

4    Aaron made up the rest.

5    Q.   What did you say that cost approximately?

6    A.   Approximately $6,000.

7    Q.   So the three of you invested in the bitcoin miner?

8    A.   Yes.

9    Q.   By miner we're just talking about that computer

10   equipment that does what you said?

11   A.   Yes.  It is just a big piece of computer equipment that

12   you plug into the wall and you plug into an ethernet and

13   plug into the internet and you set it up once and it just

14   runs.

15   Q.   How do you guys get paid for that?

16   A.   As you mine bitcoins on the network, you are part of

17   that backbone of the network and they keep track of how much

18   of work you put in and how much of a percentage you add to

19   the total network capacity and they reward you Bitcoins for

20   that.

21   Q.   Talk about a Bitcoin wallet.  How does that money come

22   in and so you can actually access it?

23   A.   Anytime that you receive Bitcoins you have to have an

24   address that you are receiving it at.  So the wallets are

25   created and periodically Bitcoins are deposited into that

```
 1   wallet.
 2   Q.    Who set up these Bitcoin wallets for your Bitcoin
 3   mining operation?
 4   A.    Aaron did.  He set up the whole miner and he set up the
 5   wallets and everything.
 6   Q.    Who controlled the money, then, that came into the --
 7   A.    Aaron did.
 8   Q.    Did you ultimately get some money paid out of that?
 9   A.    I did.
10   Q.    How much?
11   A.    Roughly five or $600.
12   Q.    That happened at Laurelhurst and then did you guys move
13   sometime later in 2014?
14   A.    Yes.  Later in -- it was actually early 2015.
15   Q.    Where did you guys move?
16   A.    We moved to a house on 1700 East in Salt Lake just
17   south of 2100 South.
18   Q.    Near Highland High School?
19   A.    Yes.
20   Q.    While at that address did you or Mr. Shamo do research
21   on Google about the dark web?
22   A.    I didn't specifically and I didn't know for sure if
23   Aaron was doing research but, you know, he had used the dark
24   web and he was familiar with it.
25   Q.    Were you?
```

1     A.   Just in a general sense.  I knew what it was, but I had

2     never actually logged on to the websites or anything or

3     downloaded the T.O.R. browser.

4     Q.   Did there come some discussion between you and Mr.

5     Shamo about that?

6     A.   Yes.

7     Q.   Tell us about that.

8     A.   In the early part of 2015 Aaron and I were both

9     receiving Adderall prescriptions.  I was very strapped for

10    money and having issues paying my bills.  So he approached

11    me and mentioned that he would like to start selling our

12    Adderall prescriptions online through the dark web and using

13    that money to pay bills and just have a little extra money

14    each month.

15    Q.   When you say he there, who are you talking about?

16    A.   Aaron.

17    Q.   You guys were roommates at that time?

18    A.   Yes.

19    Q.   Did you or Mr. Shamo buy some things off the dark net?

20    A.   Yes.  At the time when we lived at Laurelhurst Drive,

21    Aaron was buying G.H.B.

22    Q.   What is that?

23    A.   It is a depressant.  It is generally referred to as a

24    date rape drug.  It makes you feel drunk and is work we

25    nervous system depressant.

1    Q.    Were you buying that or using that at that time?

2    A.    No.

3    Q.    So tell me more about selling Adderall prescriptions on

4    the dark web.  How did that work?  Who set that up and how

5    did that work?

6    A.    So I would just give Aaron part of my prescription each

7    month, just the portion that I felt like I could part with,

8    because I was taking it for work and for school and stuff.

9    So he set up the accounts and set up the vendor account and

10   everything.  We needed to make an original deposit to set up

11   that account, and so we used some of the bitcoins from our

12   miner that we purchased to then make that initial deposit to

13   set up that account, but it was all Aaron that set up the

14   account.  I never even had access to it, never knew the user

15   name or the password.

16   Q.    But you knew what he was doing?

17   A.    Yes.

18   Q.    So presumably then there were customers that would

19   order this Adderall?

20   A.    Yes.

21   Q.    How did it get to them?

22   A.    The Adderall would be packaged and then dropped off at

23   the post office.  And part of our agreement with setting

24   this up and doing this is I would give up some of my

25   Adderall prescription and I would take care of the shipping.

1     Aaron would come to me each night with a list of people that

2     had made orders and he would come to me with a lockbox that

3     he kept all of the prescription drugs in, and I would

4     package them up in padded envelopes, write the addresses on

5     them, put stamps on them, and then in the morning when we

6     would drive to work, we would drop that off at the post

7     office.

8     Q.   You knew that that was illegal at that time, correct?

9     A.   Correct.

10    Q.   Why did you decide to do it?

11    A.   I was having trouble paying my bills, keeping up with

12    those each month, and I was just struggling financially.  I

13    had a lot of debt in student loans and I was just trying to

14    keep me head above water.

15    Q.   Tell us about the student loans.

16    A.   I had about $40,000 worth of student loans.  I had been

17    attending the University of Utah and dropped out.  I had

18    failed some classes and didn't achieve graduation and

19    eventually those loans started coming due.  So when those

20    loans started coming due, I didn't have enough money each

21    month to pay my bills and I started looking into other

22    opportunities and ways to get a part-time job or make a

23    little extra money and that is when Aaron approached me

24    about selling our drugs online.

25    Q.   You were both working at eBay at this time, correct?

```
1    A.    Yes.

2    Q.    In addition to yours and Mr. Shamo's Adderall

3    prescriptions, was there somebody else's that you sold?

4    A.    Yes.  Aaron was purchasing other Adderall

5    prescriptions, specifically from a mutual friend or ours,

6    Mike Hanson.

7    Q.    What was your involvement in that?

8    A.    None.  I never had any involvement.  Aaron would go

9    meet him and purchase it from him.

10   Q.    Now, you said you had to make a deposit to set up an

11   account or you guys had to -- Mr. Shamo did.  There is a

12   term Agora.  Are you familiar with that term?

13   A.    Yes.

14   Q.    What is that?

15   A.    That is the name of the marketplace that Aaron had set

16   up the account to sell drugs on, similar to eBay or Amazon.

17   Agora is just the name of the website.

18   Q.    Do you know what the account was called at that time?

19   A.    The account was jean001.

20   Q.    Is that just kind of a made-up name?

21   A.    Yeah.  Aaron came up with that name.  I don't know

22   where that came from.

23   Q.    And here we're talking like the summer of 2014?

24   A.    Summer of 2015.  This was about May and June of 2015.

25         No.  2014.  I am sorry.  You are right.  This is May or
```

1    June of 2014.

2    Q.   And you guys are living by Highland High School there

3    at 1700 South?

4    A.   Yes.

5    Q.   Was there an agreement between you and Mr. Shamo as to

6    this account that you now set up to sell Adderall?

7    A.   Yes.

8    Q.   What was the agreement?

9    A.   Originally when we purchased the Bitcoin miner, the

10   agreement was I would receive one-sixth and Aaron and David

11   would split the other five-sixths.  When Aaron and I decided

12   to start selling Adderall, the agreement was that I would

13   receive one-third of all of the profits and Aaron would

14   receive two-thirds.

15   Q.   What was your initial investment, then, in setting up

16   that account to do that?

17   A.   Just whatever Bitcoins were left over from the miner.

18   The original deposit was around $1,000, but I never had

19   access to those wallets, so I didn't know exactly what was

20   in there and how much -- how many Bitcoins that Aaron had

21   used for my portion of it to start this account.

22   Q.   Was there a written agreement between you guys?

23   A.   No.

24   Q.   Just a conversation and kind of a handshake?

25   A.   Yep.  Aaron and I at the time were roommates and

```
1    friends so we just kind of relied on that as a verbal
2    contract, just, you know, I'll take one-third and you take
3    two-thirds and that was the extent of it.
4    Q.   You began selling Adderall.  Did you and Mr. Shamo
5    ultimately add more to your items for sale?
6    A.   Yes.
7    Q.   What did you add?
8    A.   Initially we started adding G.H.B.
9    Q.   You described what that was.
10   A.   Yes.
11   Q.   Anything else?
12   A.   After that Aaron purchased Modafinil from someone else,
13   and then we started buying M.D.M.A. and adding that and
14   eventually L.S.D. and various other drugs, marijuana,
15   cocaine at one point and a lot of other things.
16   Q.   How were these drugs obtained?
17   A.   Aaron would purchase them through a separate account
18   and they would be shipped either to our friends' houses or a
19   few times at the beginning it was shipped to our house that
20   we lived at.
21   Q.   What was your involvement in purchasing those items?
22   A.   I had no involvement in purchasing those.  Aaron had
23   control of all of the accounts.  He had the selling account
24   that he would sell from and he had a separate account to buy
25   from, and he would do all of the purchasing through that.
```

1   The only thing he ever asked me for was to think of any

2   friends that we could send drugs to, sent to their house

3   instead of sending it to ours.

4   Q.   What about the shipping and packaging at that time?

5   A.   I was still doing all of the shipping and packaging for

6   all of the orders per day.

7   Q.   Where would you do that?

8   A.   In my room.

9   Q.   Where did Mr. Shamo do the computer part?

10  A.   In his room.  We lived in the basement and his room was

11  just down the hall and over to the side.

12  Q.   Did you have much interaction in his room with the

13  computer stuff?

14  A.   Not really.

15  Q.   What did you ship those in at that time?

16  A.   Padded envelopes and flat rate priority envelopes,

17  those from the post office.  The padded envelopes we would

18  buy from Walmart and various sources locally.

19  Q.   Tell us more about the G.H.B.  What did it look like

20  and what was it shipped in?

21  A.   Aaron ordered it through the guys as being wheel

22  cleaner from China or somewhere, so it would come in a

23  one-liter bottle.  Then we would have to find out some way

24  to get sodium hydroxide.  We would mix the precursors.

25  Aaron would always -- we had a glass beaker and Aaron would

1    go into the bathroom where we had an air vent and he would

2    mix the quantities together and then bring that to me and I

3    would put that in individual vials to send out.

4    Q.   Did you ever try G.H.B.?

5    A.   I did.

6    Q.   Approximately when?

7    A.   September of 2014.

8    Q.   Where were you?

9    A.   I was at my friend's house.

10   Q.   Did you guys also go to Park City Live?

11   A.   Yes.

12   Q.   When did you meet Sasha?  Who is Sasha Grant?

13   A.   Sasha Grant is my girlfriend.  She was my girlfriend at

14   the time and she is now my fiancee.

15   Q.   Where and when did you meet her?

16   A.   I met her at Park City Live about the end of September

17   in 2014.

18   Q.   And you guys have been close friends and now your

19   fiancee?

20   A.   Yes.

21   Q.   You had G.H.B. and you added a few other things.  Did

22   you add even more items in about October of that same year,

23   2014?

24   A.   Yes.

25   Q.   What was that?

1   A.   Around that time we added Xanax, we added magic

2   mushrooms, psilocybin, and then around the end of October,

3   early November there was cocaine that was purchased.

4   Q.   Let me back up.  Let's first talk about M.D.M.A.  You

5   already mentioned that.

6   A.   Yes.

7   Q.   What did that look like?

8   A.   It was a brownish crystal -- almost like candy looking,

9   like a light brown, crystal looking thing.

10  Q.   Was there a process to getting that ready to send?

11  A.   Yeah.  We had to use a mortar and pestle and crush it

12  up into powder and then put it into individual capsules.

13  Q.   Work intensive?

14  A.   Yes.

15  Q.   Ultimately that was discontinued in you guys'

16  inventory?

17  A.   Yes.

18  Q.   You said you were getting I believe Xanax at that time?

19  A.   Yes.

20  Q.   How did you guys get that?

21  A.   It was just shipped internationally.  I believe Aaron

22  was using some vendor in India to send that over.

23  Q.   What was your involvement in obtaining that?

24  A.   I had no involvement in obtaining that.  Aaron would

25  sometimes purchase new things without telling and it would

1   just show up, and then all of a sudden I would see an order

2   with a new drug that we had not sold previously.  He would

3   come in with a package and say here, this is what we're

4   selling now.

5   Q.   And you would package that stuff and send it?

6   A.   Yes.

7   Q.   Tell us about the money at this time.  This is from

8   June when you guys kind of are started selling Adderall and

9   now we are in October and you said you had been packaging

10  things.  How is the money flow at this time?

11  A.   At this time I don't really know.  I would just get

12  information from Shamo.  Everything at this point was pretty

13  much reinvested to buying more drugs and to diversify the

14  drugs that we were selling.  The original plan was to be

15  done by September or October, make a quick 30, 40,000 and

16  then, you know, end our operation.  That didn't come as

17  quickly as we had hoped and we had to keep pushing that end

18  date out.  So at this point until October, neither Aaron nor

19  I had received any sort of payout or any profits.

20  Q.   You also talked about some cocaine.

21  A.   Yes.

22  Q.   Where did you guys get that?

23  A.   We had a mutual friend who was always talking to us

24  about our business and buying personal items for himself.

25  He approached us and wanted to make an investment.  This

```
1    investment would help us get up on our feet quicker, get

2    more inventory to sell quicker, and so he approached us

3    about investing $10,000.  Aaron wanted to originally process

4    cocaine leaves, coca leaves and process the cocaine

5    ourselves.  Eventually we decided to purchase cocaine and

6    M.D.M.A. with that money.

7    Q.    And that is approximately when?

8    A.    The end of October or early November of 2014.

9    Q.    Was there another incident with a smaller amount of

10   cocaine that got you in trouble?

11   A.    Yes.  Aaron had purchased about ten grams or so.  He

12   sent that to our roommate at our address under our

13   roommate's name and that package was seized.  Later on in

14   2015, in about February our roommate was called in to

15   Homeland Security and interviewed.

16   Q.    Do you know how that went?

17   A.    Ultimately the Homeland Security agents didn't pursue

18   that at all, but it definitely gave Aaron and I a big scare

19   and a shake-up.  We removed all the drugs from our house and

20   cleaned everything up and shut down for a few days.

21   Q.    That ten grams of cocaine was sent to that roommate

22   under his name?

23   A.    Yes.  It was sent to Clancy Cooper at our address under

24   his name and it was sent from Peru, I think.

25   Q.    And I believe you previously stated that you and Mr.
```

```
 1   Shamo were trying to find other people who would receive
 2   items in their name?
 3   A.    Yes.
 4   Q.    Did you guys have a term for that?
 5   A.    We called that a drop.
 6   Q.    Explain what a drop is.
 7   A.    So it is dangerous to send drugs to yourself in your
 8   own name.  So through the research that Aaron did online he
 9   figured that what we would do is tell our friends, hey,
10   we'll give you $50, we'll give you $100 if we can send a
11   package to your house in your name.  Don't open it.  When
12   you get it, let us know and we'll come and pick it up and
13   hand you cash.
14   Q.    Did you and Mr. Shamo have some conversation about who
15   to recruit to do that?
16   A.    Yes, we did.
17   Q.    Who did you guys come up with?
18   A.    We chose mutual friends.  One of them was Sean Gygi.
19   He was my team member at eBay.  I knew him.  And then we
20   also recruited other friends that we knew either through
21   eBay or through various sources.  Katie Bustin was one.
22   Alex Tonge.  We asked a few other people.  Some of them
23   turned us down, though.
24   Q.    If you would look to your left.  Sorry.  I'm challenged
25   here.
```

1       Do you recognize some of the folks on that chart?

2  A.   Yes.

3  Q.   Who do you recognize?

4  A.   Obviously Aaron at the top.  Me and Luke Paz, Alex

5  Tonge, Katie Bustin, Sean Gygi, Mario Noble, Penrose in the

6  lower left, Vance, Jordan Vance, Jessica Gleave, Roy

7  Stevens, Clint Perry, Jessica Francom and that is it.

8  Q.   Of those, who were drops?

9  A.   Let's see.  So initially Mario Noble was not a drop,

10  but he became one later on.  Alex Tonge, Katie Bustin, Sean

11  Gygi and Jordan Vance was a drop.  Those are all the ones

12  that I know about.

13  Q.   Tell me a little bit more about the recruitment

14  process.  Let's talk about Mr. Gygi.  How did that go?  You

15  knew him at eBay.  Did Mr. Shamo know him a little bit, too?

16  A.   Yes.  We had gone to various concerts and parties

17  together.  Shamo and I were both very familiar with him, so

18  we approached Sean and said, hey, we're looking for someone

19  to help us out.  You can make a couple extra hundred dollars

20  a month.  Are you interested?  He expressed some interest

21  and so we kind of gave him a rundown of what this would all

22  entail.  We tried to keep the focus on how much money he

23  would make and not exactly what we were going to do.  We

24  were a little deceptive in that respect.

25       Eventually with questions and whatnot, we had to

1    disclose what was actually going to happen.  We would say,

2    you know, we'll send you four or five packages a month and

3    we'll pay you $50 to $100 per package.  Don't ever open

4    them.  If anyone ever comes asking about it or you get

5    interviewed by the police, just say you never ordered it,

6    and because we ordered it and not you, there is no evidence

7    that you ever purchased that.  We would tell them that, you

8    know, they can't really get a conviction out of that because

9    there is no evidence that you made the order and you can't

10   control who sends you packages.

11   Q.   You and Mr. Shamo had talked this out and kind of had a

12   sales pitch, for lack of a better term?

13   A.   Yes.

14   Q.   Would you and Mr. Shamo always meet with these people

15   together?

16   A.   Not always.

17   Q.   Tell me about that.

18   A.   Sometimes Aaron would approach people that he knew and

19   sometimes I would approach people that I knew.  A lot of

20   times if they were mutual friends we would both approach

21   them together, but it really just depended on who it was.

22   Q.   Ultimately did it take Mr. Shamo's approval for

23   somebody to become a drop?

24   A.   Yes.

25   Q.   You spoke about an investment here.  Did somebody

```
 1    invest in the business?

 2    A.   Yes, Miles Penrose.

 3    Q.   He is on the chart there?

 4    A.   Yes, the lower left.

 5    Q.   Tell me how that came about.

 6    A.   We were at Park City Live and Miles just started small

 7    talk with Aaron saying how is your business going, because

 8    at that time Miles was purchasing personal drugs, personal

 9    amounts.  He approached Aaron and said how are things going.

10    I guess, you know, I heard about this later, but the gist of

11    the conversation was that things are going good.

12              MR. SKORDAS:  I object if he heard about it later.

13    It is hearsay.

14              THE COURT:  Sustained.

15    BY MR. STEJSKAL

16    Q.   Let's not say any statements that you heard secondhand.

17         What do you know personally about that recruitment?

18    A.   Okay.  What I know personally is after talking with Mr.

19    Shamo, Miles approached both of us and said I would like to

20    make an investment.  I will give you some cash and you can

21    purchase more drugs and then you can sell more and make more

22    profit quicker.  He was essentially investing his capital

23    that he had in his business into ours.

24    Q.   What was his business if you remember?

25    A.   He is a car dealer.
```

```
 1   Q.   How much did he invest?

 2   A.   $10,000.

 3   Q.   How did that come to you guys?

 4   A.   It came in cash.

 5   Q.   Who did he give it to?

 6   A.   He gave it to Aaron.

 7   Q.   Do you know how Mr. Shamo invested it?

 8   A.   Yes.  Some of that we kept so that we could pay for

 9   shipping supplies and stamps and various items that we

10   needed, and then Aaron and I both made a wire transfer to a

11   Bitcoin exchange.  I purchased $3,000 worth of Bitcoins and

12   Aaron purchased $3,000 worth.

13   Q.   Why Bitcoin?

14   A.   Because we needed Bitcoins to buy more drugs on the

15   dark net markets.

16   Q.   What was then purchased with that money?

17   A.   Cocaine, one kilogram, and M.D.M.A.

18   Q.   How did the cocaine sell?

19   A.   Sorry.  What was that?

20   Q.   How did the cocaine sell, meaning fast or slow or did

21   it take a while?

22   A.   It took about two or three months to go through that

23   kilogram, but it sold fairly quickly.  There were five to

24   six orders a day for anywhere between a gram to three grams.

25   Q.   And the profit comes from selling it in smaller
```

```
 1   amounts?

 2   A.   Yes.  You break it down from a kilogram brick into one

 3   gram and half gram amounts and sell those at a higher

 4   markup.

 5   Q.   Are you aware if there was any written agreement

 6   between Mr. Shamo, yourself and Mr. Penrose?

 7   A.   There was not.

 8   Q.   The time frame here we're talking about is the end of

 9   2014 now?

10   A.   About November of 2014.

11   Q.   Tell me what is going on at eBay at that time.

12   A.   At that time I was struggling with my stats and just

13   struggling altogether.  The job was very stressful and very

14   demanding and I was put on probationary status around that

15   time.  Our lease was up at our current place and so in

16   November of 2014 we moved to a house on Murphys Lane, 1383

17   East in Salt Lake.

18   Q.   Which is roughly 38th South or so?

19   A.   Yes.

20   Q.   Who all moved in that residence?

21   A.   Aaron, me and Clancy Cooper.

22   Q.   That is in November.  Then what happened at eBay in

23   December?

24   A.   At the very end of December I had gotten to the point

25   where I was going to be fired and eBay allowed me to quit
```

1    gracefully instead of, you know, having an official

2    termination.  So at the very end of December I was let go

3    from eBay.

4    Q.    How about Mr. Shamo?

5    A.    He quit two or three days later.

6    Q.    Let's talk about what was going on with you and Sasha

7    Grant at this time.

8    A.    At that time we were getting closer and in the middle

9    of December she was feeling distant from me a little bit and

10   she said you're spending a lot of time doing other things.

11   I didn't clue her in to the drug dealing immediately.  I

12   kept that a secret from her and occasionally I would have to

13   go leave for an hour or two to go package drugs for the

14   night and not tell her.  So she was not sure that I was

15   being faithful or that I had my heart in that relationship.

16        So at our company Christmas party she confronted me and

17   said what is going on?  You know, I'm about to break this

18   off.  So I came clean to her and I told her that Aaron and I

19   were dealing drugs and that I am doing this only as a

20   short-term measure to pay off student loans and debt and to

21   help myself out financially.  I told her that initially it

22   was only supposed to be four or five months but things are

23   going slower than we expected.  I let her know that this is

24   not something I want to do long-term or permanently, that

25   there was always an end date in mind for me, and I don't see

1     this as a viable career choice at all.

2     Q.   How did she take all of this?

3     A.   It was very rough on her.  She didn't take it too very

4     well at all initially.  She was very on the fence about

5     continuing our relationship most of that December.  At the

6     end of December, over New Year's we went on a vacation to

7     Mexico with my parents.

8     Q.   When you say we, you and Ms. Grant?

9     A.   Me and Ms. Grant and my parents.

10    Q.   Tell us about that trip.

11    A.   It was a humanitarian trip.  We went down to an

12    orphanage to help them rebuild some of their buildings and

13    retile.  My parents had a neighbor that had a nonprofit that

14    was helping this orphanage, so we went down and helped them

15    for a couple days and then spent New Year's in Mexico.

16    Q.   Did that help you and Ms. Grant's relationship?

17    A.   It did.  We talked about a lot of things then and I

18    told her exactly why I was doing this.  I let her know at

19    that time that I didn't really feel comfortable with this,

20    but I was trying to get out from underneath my debt and help

21    myself out financially.  We kind of talked it over and

22    smoothed things over a little bit.

23    Q.   Did you guys eventually start using PayPal cards?

24    A.   Yes.  Around that time, in December of 2014 we were --

25    occasionally we needed money for shipping supplies and

```
 1   various things that we needed cash for and so we started

 2   trading Bitcoins for a PayPal cash card.  Then from that

 3   PayPal cash card, we would deposit it into our PayPal

 4   accounts.  PayPal has a debit card that you can buy or sign

 5   up for.  PayPal sent me a debit card and I would sometimes

 6   use that debit card to purchase postage and shipping

 7   supplies.

 8   Q.   Did you end up with some problems with PayPal?

 9   A.   Yes.  At the end of January of 2015 and the early part

10   of February my PayPal account was suspended due to high risk

11   and fraudulent behavior.  PayPal does not like it when you

12   purchase a cash card and then put that into your account and

13   then immediately withdraw that into cash or make purchases

14   right away.  It sets off some of their fraud alerts and

15   fraud filters.

16   Q.   Was there an issue with some stolen PayPal cards as

17   well?

18   A.   Yes.  We were purchasing PayPal cards through a site

19   called localbitcoins.com.  The people that I was purchasing

20   these PayPal cards from had used stolen credit cards to buy

21   them.  So when those stolen credit cards were reported

22   stolen later on by the people they were stolen from, PayPal

23   got wind of that and thought Aaron and I were committing

24   credit card fraud and so they suspended my account.

25   Q.   Did Ms. Grant kind of get in trouble for this too?
```

1   A.   Yes, she did.  My account had gotten suspended.  Aaron

2   was putting pressure on me to use other people's accounts as

3   well to launder money, and so I used Sasha Grant's account

4   to launder $1,000 through.  Later on that ended up resulting

5   in her termination from eBay.

6   Q.   What do you mean by Mr. Shamo was putting pressure on

7   you?

8   A.   So Aaron was asking me if there were any other people I

9   know that have PayPal accounts, because PayPal has a limit

10  of how much money you can deposit via a cash card per month

11  and I had hit that limit in paying for postage and shipping

12  supplies and paying for my own bills.

13       At this point in January, I was subsisting only on the

14  proceeds from the drug business.  I had no job and so I had

15  to pay my rent and car and cell phone payment and such.  I

16  reached out to Sasha to use her account.  Aaron reached out

17  to his friends, his girlfriend and their friends,

18  specifically Natalie Madson, Julian Webb, his girlfriend at

19  the time, Luke Paz, various other people that we knew that

20  we could use their PayPal account.

21  Q.   You said you were then pulling some money out of the

22  business.  Was Mr. Shamo pulling some money out too to live

23  on?

24  A.   Yes.

25  Q.   He was not working either, correct?

```
 1   A.   Yes.

 2   Q.   Other than in this organization?

 3   A.   Yes.

 4   Q.   Let's go back a little bit and start talking about the

 5   drug business again.  Was there a point around this time

 6   frame, maybe late 2014, that you got a bad batch of Xanax?

 7   A.   No.  There was one in 2015, but in 2014 I don't believe

 8   there was one.

 9   Q.   Maybe I have that wrong.  Let's talk about the account

10   that you were running at the end of 2014 and 2015.

11   A.   Okay.  That would be jean001 on Agora.

12   Q.   Okay.  Was there a problem there?

13   A.   Not that I was made aware of.  I never handled any of

14   the customer service side of things or any ordering, so I

15   was not really made aware of anything.

16   Q.   Maybe I have my timing off here in the switch from

17   jean001 to the other account.

18        When was that?

19   A.   That was around the summer of 2015 into the fall of

20   2015.

21   Q.   I have my timing off.  I apologize.

22        Mr. Penrose, back to him, he made this $10,000

23   investment.  How was he to be paid back?

24   A.   Paid back in cash at a later date.  We didn't have a

25   specific time frame, but we let him know it would be four or
```

```
 1   five months and we were going to double his investment to

 2   $20,000.

 3   Q.   Were you guys able to pay him back immediately?

 4   A.   Not immediately.  We kept reinvesting all of that money

 5   into more quantities and various other drugs.

 6   Q.   Then in about April of 2015 was there a car purchase?

 7   A.   Yes.  Our friend Benjamin Kennard was selling his car

 8   and Aaron wanted to buy it.  So per our agreement any money

 9   pulls out, I am going to get 50 percent of what he pulls

10   out, so I get one-third and he gets two-thirds.  Aaron

11   pulled out $15,000 to pay for that car and I received 7,500

12   at that time.

13   Q.   What kind of car was that?

14   A.   It was a 2008 B.M.W.

15   Q.   Did Mr. Shamo continue driving that for quite some

16   time?

17   A.   Yes.

18   Q.   Tell us about the business at that time.  Is it

19   growing?  Is it doing okay?

20   A.   Yes.  At that time there were about 45 to 60 orders per

21   day.  It was staying pretty consistent from about January of

22   that year all the way throughout -- that is about when we

23   hit the peak of orders per day.  We were selling various

24   drugs at that point.  In April we had finally sold out of

25   cocaine, but we were selling M.D.M.A., L.S.D., marijuana,
```

1    lots of Xanax, various other pills, Valium, Cialis, Viagra,

2    Ambien, just anything.

3        Aaron's goal with the site was to be a one-stop shop

4    and offer everything to everyone and then, you know, people

5    that are purchasing one drug consistently would say, oh,

6    maybe I want to try something else.  You know, I already

7    have a rapport with the seller and I will buy it from him.

8    Q.    Were these drugs you were selling, are any of these

9    manufactured by you guys or are these still getting bought?

10   A.    Only the G.H.B. at that time was manufactured by us.

11   Everything was just bought in bulk and break it down into

12   smaller quantities and resell.

13   Q.    And approximately how many orders would you guys be

14   going through in a given day or week or however you can

15   break it down?

16   A.    We would ship things out about five days a week and we

17   had about 40 to 60 orders a day, anywhere between 250 to 300

18   orders a week.

19   Q.    How many pills -- what kind of quantities?

20   A.    Usually in between a gram to three grams of various

21   substances.  Xanax would sometimes be upward of 100 or 200

22   at a time, but generally it was less than 50 at that point.

23   Q.    That probably involved a lot of postage and a lot of

24   packaging?

25   A.    Yes.

1    Q.   Where did you get the postage?

2    A.   We would purchase it from post offices.  Aaron also

3    would purchase it form Amazon and eBay.  You can purchase

4    prepaid postage through there.  A lot of our postage came

5    from that.  But then I also would stop off -- on my daily

6    drop-offs I would go into the post office and purchase

7    stamps with cash or with a debit card.

8    Q.   Let's look at Exhibit 17.00.  Look on your screen

9    there.

10        Do you recognize that?

11   A.   Yes.

12   Q.   What is that?

13   A.   That is purchasing postage from the post office.  We

14   would send out the prepaid envelopes which required about $6

15   worth of postage, so we would buy these big stamps that are

16   $5.75 apiece and then add one other 50 cent stamp to cover

17   the postage.  Those are the amounts, so $184 and $115, that

18   is, you know, roughly 20 or 30 each day.

19   Q.   Do you see the dates there in the left column?

20   A.   Yes.

21   Q.   This is the time frame around February and March of

22   2015?

23   A.   Yep.

24   Q.   Does that look consistent with kind of the amounts of

25   postage -- you said you were buying it in various manners.

1  This was one of the manners?

2  A.   Yes.

3  Q.   Does this look consistent with what you were saying?

4  A.   Yes.  A lot of times we would purchase with cash to try

5  and avoid any sort of financial record, so these purchases

6  with a debit card definitely do not reflect the total amount

7  of postage we were buying.

8           MR. STEJSKAL:  Blow that back up again and let's

9  look at the second page.

10  BY MR. STEJSKAL

11  Q.   Same thing?

12  A.   Yes.  Those look like purchases made with my PayPal

13  debit card.  It was banned or restricted at the end of

14  January.  Most of these purchases would have been made with

15  that card.

16  Q.   I think you said it kind of peaked -- did you say in

17  March --

18  A.   Yes.

19  Q.   -- as far as sales?

20  A.   Um, no.  I mean, it was pretty consistent from

21  January of 2015 on.  Once we bought a pill press later on in

22  the year, then things started getting into large, large

23  quantities, but I think that from January to June of that

24  year our sales were pretty consistent.

25  Q.   Let's talk about Ms. Grant and her termination from

1    eBay.  When was that?

2    A.    That was in May of 2015.

3    Q.    And presumably you had a conversation with her when

4    that happened?

5    A.    Yes.

6    Q.    Tell us about that conversation.

7    A.    So one of our other friends at eBay was committing

8    fraud by removing feedback for bribes and money, and so they

9    started investigating all of her known friends and people

10    that she worked with.  Sasha was one of those.  So they

11    initiated an investigation with her, and then they found out

12    that she was linked to Aaron's and my PayPal accounts.  My

13    PayPal account was suspended in January and Aaron's was

14    suspended in March, along with a lot of our other friends'

15    accounts that we were using.

16    So through eBay they were investigating and found out

17    that she was linked to all these other people that were

18    suspended for fraud, so they pulled her into a room at eBay

19    and interrogated her for a couple hours.  They were asking

20    her about stolen credit cards and removed feedback and, you

21    know, what are Aaron and Drew doing with all of these stolen

22    cards?  Because at the time eBay thought Aaron and I were

23    committing credit card fraud.  In reality we were just

24    trading Bitcoins for cards.  Where those cards had been

25    purchased from was not from us but it was from stolen credit

1   cards.

2   Q.   She she got terminated and then you and she had a

3   heart-to-heart about your future, correct?

4   A.   Yes.  We were -- we basically had the biggest fight we

5   have ever had and she was basically ready to end it at that

6   point because indirectly, from what Aaron and I were doing

7   led to her getting fired and she had a really good job there

8   and was very, very frustrated with me.  We kind of took a

9   week apart to think about everything.

10       Eventually -- ultimately her and I decided that at that

11  point I needed to have an end date in mind, because I had

12  just been pushing everything back.  She kind of gave me an

13  ultimatum and said you have to be done by a certain date or

14  I'm not going to continue this relationship anymore.  The

15  date that Sasha and I agreed on was September 1st.

16  Q.   Of 2015?

17  A.   2015, yes.

18  Q.   Okay.  Did you then have a conversation with Mr. Shamo?

19  A.   Yes.

20  Q.   Tell us about that.

21  A.   So after talking this over with Sasha and deciding to

22  leave, I told Aaron don't worry about the one-thirds,

23  two-thirds split anymore.  All I want you to do is cover my

24  bills so I can pay my monthly bills, and then in

25  September -- on September 1st I would like a payout of

1    $40,000 so that I can pay off my student loans, and then I
2    am completely done and I'm no longer going to do this with
3    you.
4    Q.    That 40,000, is that roughly what your student loans
5    were at that time?
6    A.    Roughly, yes.
7    Q.    You discussed that Xanax was a product that you guys
8    were selling?
9    A.    Yes.
10   Q.    What was the profit margin on that, buying it off of
11   whenever you bought it and then reselling it?
12   A.    I would say about two and a half to three times the
13   money that you spent on the purchase was what you would get
14   out of it once you broke it down.
15   Q.    In other words, if you spent $1,000, you would make
16   2,500 to 3,000?
17   A.    Yes.
18   Q.    Did you have a discussion with Mr. Shamo about how
19   maybe you could increase that profit margin?
20   A.    Yes.  Aaron was looking into other ways to increase
21   that, and so we started researching pill presses and
22   pressing the pills ourselves.
23   Q.    What did he tell you about that?
24   A.    He told me that the profit margins for that were a lot
25   higher and we can make a lot more money quicker and that way

```
1    I could get a payout by September 1st and I could receive
2    the full amount.
3    Q.   Was there a particular way that you guys communicated
4    using electronic devices?
5    A.   Yes.  We used an app called Telegram.
6    Q.   How did you come about that?
7    A.   Through research that Aaron did initially in the summer
8    of 2014.  We were always trying to communicate and we knew
9    that text messages were not encrypted and they were not
10   safe.  They are likely to be snooped upon and read.  You can
11   receive them from record subpoenas and stuff, so he
12   approached me and told me about this app called Telegram.
13        What the app will do is it encrypts your messages
14   between you and this other party.  You can set up a secret
15   chat, set up self-destruct timers and various things.  It is
16   essentially a way to communicate with privacy.
17   Q.   You're saying Mr. Shamo came to you with that?
18   A.   Yes.
19   Q.   He told you to use it?
20   A.   Yep.
21   Q.   Did you guys start using it basically from that point
22   on?
23   A.   Yes.
24   Q.   Did you guys use that with other people to communicate
25   with as well?
```

1    A.    Yes.  We specifically told our drops, you know,

2    download this.  It is a free app.  Set it up and only chat

3    with us through the secret chat option.  If you chat with us

4    regularly, those can be read by other parties.

5    Q.    Back to the pressing idea.  So Mr. Shamo had discussed

6    that with you that possibly you could make more money that

7    way.  How did that progress from that first conversation?

8    A.    So later that summer Aaron went ahead and purchased a

9    pill press.

10    Q.    When you say Aaron did, what do you know about that?

11    A.    Aaron purchased it from China.  I don't even know where

12    he purchased it from or where he went to get that.  Again,

13    Aaron had control of all of the money and all the

14    purchasing, and so he just did some research online and

15    found a company that would sell him a pill press and ship it

16    to our house.

17    Q.    To be clear, you were okay with that idea?

18    A.    I was hesitant, but at that point I did have an end day

19    in mind and I thought, you know, if that gets me to that

20    eventual goal of $40,000 quicker, then that is okay.  I'm

21    okay with that.

22    Q.    When did you guys receive the pill press?

23    A.    In July of 2015.

24    Q.    Right around this same time was there a discussion

25    about help with packaging?

1  A.  Yes.  Because I was going to discontinue work in

2  September, we started chatting like, you know, who can take

3  over my responsibilities in packaging and shipping every

4  day.  We decided to approach Katie and Alex and have them

5  take over the shipping part of the operation every day.

6  Then that would slowly phase me out of the business.

7  Q.  By Katie and Alex you mean Katie Bustin and Alex Tonge?

8  A.  Yes.

9  Q.  They were acquaintances from eBay?

10  A.  Yes.

11  Q.  How did you guys approach them?

12  A.  We met them at a bar downtown, went up on the patio and

13  had a little privacy and we basically said I'm leaving.  I

14  am not going to be doing this after September.  I need

15  someone to take over my responsibilities each day.  Are you

16  guys interested in making more money than you are now as our

17  drops?

18  Q.  When you say we, that is you and Mr. Shamo?

19  A.  Yes, me and Aaron.

20  Q.  What was their reaction?

21  A.  They were okay with it.  They took a day or two to

22  think about it I think, but then came back and said they

23  wanted to continue with that, that they could use the extra

24  money to pay off their debts and their loans.

25  Q.  How did you and Mr. Shamo get them involved?

1    A.    I went over to their house about three or four days in

2    a row and taught them how to do my portion of the work.    I

3    brought over a bunch of shipping supplies and quantities of

4    drugs.    I sat with them a few nights and helped them set up

5    their e-mail -- not e-mail, their encryption program so that

6    they could speak with Aaron via e-mail.    I showed them how

7    to package all of the drugs, vacuum seal them, put them in

8    envelopes, and how to print shipping labels or address

9    labels.

10   Q.    So you spent a few days with them showing them how to

11   do all those things?

12   A.    Yes.

13   Q.    At their home?

14   A.    Yes.

15   Q.    You said that you showed them or installed the

16   communication app.    What were you talking about there?    What

17   in particular --

18   A.    I was using the Apple operating system and so were

19   they, and Aaron was using Windows, and so Aaron set up their

20   e-mail account and e-mailed the encryption key.    Not

21   e-mailed.

22        He gave me the encryption key and then I set up the

23   program that they were eventually going to use on my

24   computer to just see how it worked.    I drove over to their

25   house with a flash drive with his encryption key on it.

1    Then I sat with them on the computer and showed them the

2    program to install and helped them add his public encryption

3    key to their computer so they could read the messages that

4    he sent to them and they could encrypt messages to send back

5    to him.

6        At that time I also logged in to the e-mail account

7    that Aaron had created and I sent them an e-mail with some

8    instructions just as a backup.

9    Q.    To help us understand, you're saying Aaron created

10   these things and you are installing these things?

11   A.    Yes.  Aaron created the e-mail account.  I logged in

12   once to send an e-mail through that account and to get them

13   the encryption keys they needed so that they could speak

14   back and forth with Aaron.

15   Q.    Do you remember what the e-mail account was called or

16   what their address would have been?

17   A.    Yes.  Aaron's e-mail account was americansteam, and

18   Katie and Alex, their e-mail account was passthepeas.

19   Q.    What do you mean by the decryption or key?

20   A.    So they were using a method to communicate called

21   P.G.P.  There is a public key and a private key.  By key

22   what I mean is a long stream of characters and numbers that

23   is just randomly generated.  What you do is you encrypt your

24   message with the public key, and then the only way to read

25   that message that has been encrypted is to use the private

1    key to decrypt it.  Again, it is pretty complicated

2    mathematics and I have no idea how it works.  I had just

3    used it before.

4    Q.   Mr. Shamo was using this as well?

5    A.   Yes.  He would use that on a daily basis.  Anyone who

6    would create an order would use his public P.G.P. key to

7    send him a message with their address.  Every day every

8    single order that he received he would have to decrypt each

9    message to obtain people's shipping address that they wanted

10   the drug sent to.  Once they were decrypted, he would pass

11   that over to me and I would package everything up.

12   Q.   You said that he created this for them and you set it

13   up.  What about his encryption side of things, did you have

14   to set that up for him or did he set that up himself?

15   A.   No.  He set up his own encryption keys and he set up

16   their encryption keys as well.

17   Q.   How about actually on his system, though, you set up

18   their account on their computer.  Did you have to set his up

19   on his computer?

20   A.   No.  He did that himself.  He already had it set up

21   from all of his daily orders for the last year, so it was

22   just already there for him.  I never once logged on to his

23   computer and used it.

24   Q.   So that was the e-mail system to communicate orders and

25   such?

1   A.   Yes.

2   Q.   What about like the texting system?

3   A.   Through Telegram he would communicate with them, with

4   Katie and Alex directly through Telegram.  I was not a part

5   of those messages.  We never set up any group chats or

6   anything.  It was just direct, you know, person-to-person

7   communication.

8   Q.   How did Ms. Tonge and Ms. Bustin get Telegrams?

9   A.   They downloaded it when they first became drops for us.

10  We just had them download it and that is how we would

11  communicate.

12  Q.   When you say we, did you install it for them or did Mr.

13  Shamo direct them to use it?  How did that go if you recall?

14  A.   They installed it on their own.  I believe it was Aaron

15  that told them both about the app.  He just said, hey,

16  download this app.  It is free.  Once you have the app

17  downloaded, send me a message.

18  Q.   Were there kind of strict instructions telling them to

19  use encrypted communication?

20  A.   Yes.

21  Q.   So they are on board now.  Let's get back to the pill

22  press.  You said July of 2015?

23  A.   Yes.

24  Q.   How does that arrive or where does it arrive?

25  A.   It gets delivered to our house on Murphys Lane.  It

```
1    comes in a big wooden crate.  So Aaron and I took that
2    downstairs.  We disassembled the crate.  There was a storage
3    closet that we would package everything from.  It was
4    connected to Aaron's room and only accessible through
5    Aaron's room.  We placed it inside there on a wooden bench
6    and we set it up there.
7    Q.   Then there was a Lake Powell trip in there somewhere?
8    A.   Yes.  I went to Lake Powell with my family in early
9    August so I was out.  By that time, though, Katie and Alex
10   had taken over all of the packaging of daily orders and it
11   was Aaron taking care of the customer service and all of
12   that and sending them daily e-mails of what drugs to package
13   and who to package and send it to.
14   Q.   To your understanding the business kept running while
15   you were on that trip?
16   A.   Yes.
17   Q.   Did you and Ms. Grant solidify your travel plans around
18   that time?
19   A.   Yes.  So after our argument in May, we decided in June
20   and July that we were going to leave the country and do a
21   lit bit of traveling.  She did some research and found these
22   visas that New Zealand offered where you can live there for
23   a year if you are under 30 and single and various other
24   stipulations.  So around the middle of August, Sasha Grant
25   and I purchased one-way plane tickets to New Zealand.
```

1   Q.   When did the press start running?

2   A.   Towards the end of July in 2015.

3   Q.   So before you went on that Lake Powell trip?

4   A.   Yes.

5   Q.   Did it run while you were gone?

6   A.   Yes, it did.

7   Q.   Who ran it?

8   A.   Aaron did.

9   Q.   Tell us about the initial setup then.  How did you come

10  up with setting it up and figuring out what to put in there?

11  A.   Aaron did a little bit of research on the press name on

12  YouTube and someone else had created a how-to video on how

13  to set up the pressure and the injection height and various

14  parts of it.  So Aaron and I both watched that, and then we

15  would go into the separate room and we would run filler or

16  the inert substance in each pill, and it does not have any

17  active ingredient, and we would figure out how to set it up

18  correctly so the pills wouldn't chip, so it would eject and

19  be the correct weight that we were trying to obtain.

20  Q.   You say we, so you are both in there doing that?

21  A.   Yes.

22  Q.   Is one of you more hands-on than the other?

23  A.   I kind of have a mathematical and engineering

24  background.  So at the direction of Aaron, I was kind of the

25  one, you know, switching all the gears and making the

```
1    adjustments.  Then I would take the pressed pill to Aaron

2    and say how does this look?  Is this the right weight.  Does

3    this feel right?  Does this crush right?  It was a joint

4    effort, but I did a lot of the hands-on work.

5    Q.   How about when you were going to add the active

6    ingredients, how did that work?

7    A.   Aaron came up with the amount of active ingredient that

8    he was looking for.  In this case we were pressing Xanax.

9    He wanted three milligrams in each bar.  He purchased a mold

10   for a two milligram bar that you can get from the pharmacy.

11   So we would set up the machine and run the inert substance

12   and just filler and no active ingredient and figure out the

13   weight of the pill.  And then based on the weight of the

14   pill, we would just do a little ratio algebra problem to

15   figure out how much active ingredient and how much filler

16   you needed to combine to get the desired dose.

17   Q.   How would that get mixed and kind of put in to make it

18   work?

19   A.   We would mix them in glass Mason jars.  So we would add

20   the active ingredient and then add the filler, and then we

21   would just take the Mason jar and shake it for ten to 15

22   minutes and roll it around.

23   Q.   I don't want to pass this over.  I guess I heard you

24   say there was a two milligram Xanax that sold as a

25   legitimate pharmaceutical?
```

1    A.    Uh-huh.

2    Q.    And you guys used that mold but put three milligrams

3    in?

4    A.    Yes.

5    Q.    Why?

6    A.    Aaron wanted the pills to be strong.  He wanted people

7    to get good reviews.  You are selling a new product and you

8    have no feedback on it, you know, people will have a hard

9    time trusting it.  So he wanted to built up good feedback

10   and people saying this is good stuff and this is exactly

11   what I ordered.

12   Q.    You said there was an algebraic formula for how much

13   filler goes in with how much active ingredient.

14   A.    Yes.

15   Q.    Was that written down anywhere?

16   A.    Initially it was not.

17   Q.    How about later?

18   A.    Yes.  Later on I created a little computer program, I

19   guess.  It is hardly a program, but essentially you run, you

20   know, say, 100 pills with the inert substance and you figure

21   out the average weight of each pill.  Say the pill is 100

22   milligrams and you're looking for a ten milligram active

23   ingredient.  So you put in the weight of your pills and then

24   you put in your desired active ingredient amount and what

25   you want that to weigh, and then the program would say, you

1    know, if you have got a 100 milligram pill and you want 10

2    milligrams of active ingredient in it and the rest to be

3    filler, you need to add a one to nine ratio.

4    Q.   When you left the country you left that for Mr. Shamo?

5    A.   Yes.

6    Q.   So at this time when you first set up this press, what

7    were you guys pressing?

8    A.   Xanax.

9    Q.   Anything else?

10   A.   We tried to press M.D.M.A. into pills and then there

11   were steroids, Turnable, and then there was another pill,

12   Etizolam.  I am not really sure what that is.

13   Q.   Where those other drugs fairly short lived?

14   A.   Yes.  They only lasted one or two runs, one or two

15   weeks.  There was not much to press.

16   Q.   How about Xanax?

17   A.   That was kind of the main moneymaker.  Aaron kept

18   purchasing the active ingredient in larger and larger

19   quantities.  That was the main seller.

20   Q.   You came back from Lake Powell and then how were the

21   duties divided up at that time?

22   A.   At that point I was trying to phase myself out, because

23   I just started a new job as well, and so when I came back

24   from Lake Powell, I was trying not to do any work at all.

25   The press was something that Aaron was able to run on his

1    own.  Katie and Alex were doing the shipping.  Aaron was

2    still taking care of the customer service and the daily

3    orders.

4        Occasionally Aaron would come to me and need an errand

5    run, I needed to run postage out to Katie and Alex or I

6    needed to make a drop of more product to their house.  So I

7    had my full-time job and then I would squeeze that in in the

8    evenings occasionally running some errands.

9    Q.   Where was that job?

10    A.   It was a company called Data2 Logistics in Murray.

11    Q.   You said you had bought a one-way ticket to New

12    Zealand.  Why did you get a job at that point?

13    A.   I needed to save money for our trip and, you know, I

14    told Sasha I was going to be done by September 1st and that

15    was my plan, and so I didn't want to just sit around from

16    September to the end of November when I was going to leave,

17    so I decided to get a real job.

18    Q.   Tell us about any payouts from the drug business that

19    you may have received prior to leaving the country in

20    November.

21    A.   So originally I am supposed to receive that 40,000.

22    September 1st came and went and I received nothing.  Aaron

23    said that one of the batches of active ingredient that he

24    purchased was not actually Xanax.  We had no way to test it,

25    and so he received that information via feedback once we had

1    already sold it.  So he started getting a plethora of

2    negative feedback and disputes online.  Eventually they shut

3    the account down, what you were referring to earlier.  But,

4    anyway, I started receiving payments in $5,000 increments

5    towards the end of September, partially through October, and

6    then the last payment I received was about the first week in

7    November.

8    Q.    How much, total, were those payments?

9    A.    I received $20,000.

10   Q.    In various increments?

11   A.    Yes.

12   Q.    Before I forget, let's go back to the bad reviews and

13   the bad Xanax.  Tell us about that.

14   A.    So Aaron told me that the active ingredient was some

15   sort of a cannabinoid, so it was kind of giving the same

16   feeling as Xanax but it was not actually Xanax.  This was

17   the feedback he was receiving from customers.  So eventually

18   with enough bad reviews and disputes open on Agora, they

19   shut the account down and terminated the account.

20   Q.    That was your jean001 account on Agora?

21   A.    No.  Actually at that point that was our account on

22   Evolution.  Agora had shut down halfway through the summer

23   and just turned everything off.  They just decided to quit

24   being a dark net marketplace and they just shut their

25   company down.  So the jean001 account was lost at that point

```
1    and Aaron set up other accounts online on different

2    marketplaces, and the other marketplace is the one that we

3    got banned from.

4    Q.   That is Evolution that you talked about?

5    A.   Evolution, yes.

6    Q.   And that was because of bad reviews?

7    A.   Yes.

8    Q.   What did Mr. Shamo do next, then, to keep the business

9    running?

10   A.   He made sure that he found a new supplier for his

11   active ingredient and he created a different account and

12   started selling on that.

13   Q.   Do you know what that new account was?

14   A.   Yes.  The new account was Pharma-Master on AlphaBay.

15   Q.   What is AlphaBay?

16   A.   AlphaBay is another dark net marketplace.

17   Q.   When you say Pharma-Master, can you spell that?

18   A.   P-h-a-r-m-a M-a-s-t-e-r.

19   Q.   So Pharma like pharmacy?

20   A.   Yes.

21   Q.   Do you now how he came up with that name?

22   A.   I don't.  I think it was because he was selling Xanax

23   at the time mostly, and that is what he wanted to focus on

24   and Xanax is a pharmaceutical and the mold that we were

25   using looked like pharmaceuticals, and Aaron was using the
```

1    press primarily to manufacture these drugs, and so he wanted

2    to sell pharmaceuticals.  So I think that is why he chose

3    that name.

4    Q.    What is the time frame on that when you migrated to

5    AlphaBay and Pharma-Master?

6    A.    Around October of 2015.

7    Q.    When did you leave the country?

8    A.    November of 2015.

9    Q.    So you were there when it happened but not that long?

10   A.    Yes.

11   Q.    You said that you received approximately $20,000 in

12   increments from Mr. Shamo?

13   A.    Yes.

14   Q.    What, if anything, did you have to do to earn that

15   during that time?

16   A.    So Aaron had control of all the money and the accounts

17   and any time I needed money, I had to go to him.  He needed

18   money to buy more product and more supplies, and so he would

19   say, you know, if you go trade out these Bitcoins, I need

20   5,000 for the business and I will allow you to cash out

21   5,000 as well.

22        So I was running errands for him.  I was laundering

23   money for him.  I was purchasing postage and taking it to

24   Katie and Alex.  I guess sometimes I would take gallon bags

25   of Xanax, 10,000 or so at a time, out to Katie's and Alex's

```
 1   house so they could package them up.

 2   Q.   As you were preparing to leave, what was the plan on

 3   how the press was going to keep running?

 4   A.   Aaron was able to run it himself, but he wanted to have

 5   someone else do that for him, so he recruited his friend

 6   Luke Paz to come over and be the new run the press guy and

 7   do that all for him.

 8        So he invited Paz over about a week or two before I

 9   left and me and Aaron and Paz -- we all kind of sat there

10   and showed Paz how to use the machine, how to set it up and

11   all of that.

12   Q.   Did you and Mr. Shamo all participate in that?

13   A.   Yes.

14   Q.   Were there things like calculations and changing things

15   out that were necessary to make the machine run properly?

16   A.   Yes.

17   Q.   Who showed those?

18   A.   I showed Luke how to do that.  Aaron would say, hey,

19   make sure he knows how to unjam the machine.  Make sure he

20   knows how to set it up when we need to change out the mold,

21   so I would show Luke which screws to undo and which gears to

22   adjust.

23   Q.   Was Mr. Shamo also being shown that?

24   A.   He knew already how to do that and how to set up the

25   machine and how to adjust it.
```

```
 1    Q.    Did you in fact then use those tickets to New Zealand?

 2    A.    Yes.

 3    Q.    On what date?

 4    A.    November 27th of 2015.

 5    Q.    How much money did you have with you at that time?

 6    A.    I had $17,000.

 7    Q.    Where did that come from?

 8    A.    That came from the proceeds of selling drugs.

 9    Q.    You said you had gotten 20,000.  What did you do with

10    the other --

11    A.    I paid off my car and got rid of that and then I paid

12    off my cell phone so that I could get it unlocked and it

13    would work overseas.

14    Q.    And once you left for New Zealand on November 27, 2015,

15    what contact, if any, did you maintain with Mr. Shamo and

16    the organization?

17    A.    None.  I basically just quit contact with him at all.

18    During the fall our friendship really deteriorated quickly.

19    I was frustrated because I hadn't been paid the full amount

20    that we agreed on in May, and Aaron kept holding that over

21    my head and, you know, using that to keep me doing errands

22    for him and in the business and so our friendship

23    deteriorated and I don't think we spoke for a full three or

24    four months after that.

25    Q.    When you left did you feel as if Mr. Shamo still owed
```

1   you money?

2   A.   Yes.

3   Q.   Who much did he owe you?

4   A.   $20,000.

5   Q.   And you didn't pester him for it constantly?

6   A.   No.  Initially I had enough to go travel with and had

7   enough of a savings account that I was okay, and I just

8   didn't bother him, pester him each week for that.  I figured

9   I would just cool off for a couple of months and then return

10  back to that and ask him for money later.

11  Q.   Tell us about your travels.

12  A.   We traveled to New Zealand.  We initially lived in a

13  house on the south island with eight other people.  Sasha

14  and I got also jobs right away working for minimum wage at a

15  restaurant and housekeeping at a little hotel nearby.  So we

16  started, you know, to see the country and do a little bit of

17  traveling and fun activities, but then we also worked during

18  the week to try to offset the cost of that.

19       We purchased a car and sometimes we would go camping

20  for the weekend and live out of the car.  We just wanted to

21  see the country.  I wanted to make that clean break from the

22  organization.  Everybody always, you know, would lump Shamo

23  and I together, and I knew that everyone would continue to

24  do that if I stayed in the country, and so we left the

25  contrary to get away from that and to make that clean break

1    completely.

2    Q.   Did Ms. Grant have some influence on that?

3    A.   Absolutely.

4    Q.   Now, you talked about working and you talked about some

5    other travel.  You guys took a lot of lavish travel pictures

6    during that time, correct?

7    A.   We did a lot of activities, because we were only in the

8    country once and we wanted to see all the country had to

9    offer so we prioritized that, but some of what you don't

10   see -- you see the highlights of the trip, but sometimes we

11   didn't have a place to live and we would go camping for the

12   weekend and live out of our car.  We were house-sitting in

13   New Zealand so we didn't have to pay rent.  We did all that

14   we could.  We would stay in hostels and dorm rooms to keep

15   costs down.  We just tried to live as cheaply as possible so

16   that we could see all the country had to offer.

17   Q.   Ms. Grant had kind of a travel blog and she was sending

18   pictures to relatives and family?

19   A.   Yeah.  Instead of being asked by all of our relatives

20   the same exact questions, we decided to set up a blog so

21   that we could share that with our family so that we didn't

22   get asked the same question over and over.  What did you do

23   this week?

24   Q.   Were you showing pictures of house-sitting and the

25   labor you were doing?

```
1    A.    Yeah.  We took a few pictures of the pets that we were

2    taking care of and the houses that we were staying in and,

3    you know, not so many pictures of us doing fruit picking and

4    working in a restaurant or anything like that.

5    Q.    Most of the pictures were beach pictures and you guys

6    doing really fun travel things?

7    A.    Yes.

8    Q.    Were you running through the money that you had?

9    A.    Yes.  We started in New Zealand with 17,000.  We left

10   New Zealand with only about 7,000 left of that.  We had been

11   putting activities on credit cards and paying for it and we

12   did some currency exchanges and paid rent and groceries with

13   that money.  We were spending that money that we had saved.

14   Q.    Did you ultimately reinitiate contact with Mr. Shamo?

15   A.    Yes.

16   Q.    How did that come about?

17   A.    I reached out to him in late March of 2016 and I said,

18   hey, do you have the money that you owe me still?  Have you

19   been able to get that?  First he mentioned, you know, no, I

20   don't have it now.  I should have it pretty soon.  I kind of

21   left it at that.  We didn't speak for another couple weeks.

22   I reached out to him again in early April and said, hey, I

23   really need that money.  He sent me $2,400 at that point.

24   He said I can get you another 7,600 or so to pay off a

25   10,000 chunk in a couple weeks.  He said that he had gotten
```

```
 1    things rolling again or something and he finally had some
 2    money.
 3    Q.   Did you ultimately get that money then?
 4    A.   Yes, I did.
 5    Q.   You got about 10,000 in April and May of --
 6    A.   2016, yes.
 7    Q.   In what form did you get that money?
 8    A.   I provided Aaron with a Bitcoin wallet address.  I then
 9    transferred that money to a Bitcoin exchange called
10    Bitstamp, which is a lot like a stock exchange.  You can
11    trade Bitcoins like they were commodities or stocks.  So I
12    took those Bitcoins and I sold portions of that on the
13    exchange, and then from the exchange I made a wire transfer
14    to my U.S. bank account.
15    Q.   At that point did Mr. Shamo still owe you money?
16    A.   Yes.  He still owed me $10,000.
17    Q.   Of the 40,000 that you had agreed on --
18    A.   Yes.
19    Q.   -- he had paid you $30,000?
20    A.   Yes.
21    Q.   You talked a little bit about these student loan
22    payments and that that was your goal of working in this
23    business to pay that off?
24    A.   Yes.
25    Q.   Yet you seem to have spent a lot of money on travel and
```

1   such.  Tell us about the inconsistency of not paying off the

2   student loans.

3   A.   I was not sure where my money was going to come from

4   and how much of it I would get in total, and so I put off

5   paying those loans, because as soon as you pull them out of

6   deferment, you owe money each month, and I don't want to run

7   out of money and not have the ability to pay them again,

8   because once you put them on deferment once, you are not

9   able to again.

10       Then it also was the fact that I finally had money for

11   the first time in three or four or five years and I wanted

12   to not be drowning in debt and living paycheck to paycheck.

13   I was reluctant to pay off my loans initially because I

14   finally had some money to spend and I was not worried about

15   it too much.

16   Q.   Looking back, probably not the best use of your money?

17   A.   No, not at all.  It was probably the worst thing I

18   could have done.

19   Q.   That was April and May of 2016.  Mr. Shamo had paid you

20   $10,000?

21   A.   Yes.

22   Q.   Are you still tight for money?

23   A.   Sorry?

24   Q.   Are you still a little tight for money?

25   A.   Yes.  At that point we were very tight for money.  When

```
 1    I received that 10,000, I did finally start paying on my
 2    student loans.  I was paying $500 a month, but I was
 3    calculating out what we were spending each month and what I
 4    was spending to pay off these loans and I realized our money
 5    wouldn't last forever.  We were trying to find jobs on the
 6    north island.  We had recently moved up to that area of the
 7    country.  That is when we started house-sitting and looking
 8    for work in Auckland.  But, yes, money was always a concern
 9    and it was always very tight.
10    Q.   Around that time, May and June of 2016, was there more
11    communication with Mr. Shamo about the business?
12    A.   Yes.  Aaron approached me and asked me to fly home and
13    run the press for him for a week.  He offered me $50,000 to
14    do so.  I turned him down right away.  I didn't want to
15    leave the country.  I knew that Sasha would have some major
16    problems with it if I left.  I knew that that would get me
17    back into my old life and I didn't want any part of that.  I
18    initially said no to that.
19    Q.   That is a ton of money.  How did you resist that?
20    A.   I just didn't want to get back into it and be
21    physically back living with Aaron and be back in the United
22    States and be around it.  I wanted to separate myself from
23    all of that.
24    Q.   Mr. Shamo made that offer and you told him no, you
25    didn't want to do that?
```

```
 1    A.    Yes.

 2    Q.    Any other discussions about the business?

 3    A.    We just made small talk.  How are things going?  I let

 4    him know that I was having trouble finding a job on a

 5    part-time basi in New Zealand and that money was getting

 6    tight and we were worried about that.  I asked him for the

 7    final $10,000.  He said I don't have that, but you can come

 8    and work for me again and I will pay you that money.

 9    Q.    What was the proposal?  What kind of work did he want

10    you to do?

11    A.    He wanted me to log on and perform customer service.

12    So I would log on and answer messages for him.  The messages

13    that I would answer would be in relation to his daily drug

14    sales.  You know, someone needs a tracking number.  Someone

15    didn't get an order.  That type of thing.  He would pay me

16    $1,200 a week to perform those customer service duties.

17    Q.    Were you familiar with customer service work?

18    A.    No.  I had never done it before.  I had never logged on

19    to any dark net web account.  It was all new to me.

20    Q.    Did you do any of that at eBay?

21    A.    I did customer service at eBay, but, you know -- I was

22    part of eBay's seller vetting group and fraud prevention, so

23    I would review people that had been flagged and vet them as

24    a seller and set appropriate selling limits, and any

25    fraudulent activity that I noticed I would send over to the
```

1    back office teams to take care of.

2    Q.    So not the same kind of customer service?

3    A.    Not really.  A little bit of the same, you know, just

4    general customer service and you have got to talk to

5    customers, you have got to, you know, be able to do that

6    with ease.  So I had that customer service background from

7    my various jobs, but I had never done it before on the dark

8    web.

9    Q.    After having these discussions with Mr. Shamo about

10   rejoining the drug trafficking operation, did you have a

11   discussion with Ms. Grant?

12   A.    Yes, I did.

13   Q.    Tell us about that.

14   A.    I told her -- you know, I was having trouble finding

15   work.  If we were going to house-sit, we had a better chance

16   of getting these house-sits if I could work from home.  I

17   said, you know, Aaron still owes me 10,000 and he has

18   offered me to perform customer service for him for a certain

19   amount per week.  You know, is this okay?  Are you

20   comfortable with this?  She was not.

21        She told me not to do it.  She said that she didn't

22   feel right about it and that she was worried and scared.

23   She told me she didn't feel safe when I kind of approached

24   her with that.  But she said ultimately it is your decision

25   and you can make that.  So I was pretty apprehensive about

```
1    doing it initially.  I felt like Aaron owed me that 10,000
2    without doing any work, but at the same time I talked myself
3    into it.  I told myself just doing customer service I will
4    be safe and, you know, I won't have any physical contact
5    with anything, and only Aaron will know what I am doing and
6    I justified it for myself that way.  I made a terrible
7    mistake.
8    Q.   What was the agreement as to what you were going to get
9    paid?
10   A.   $1,200 every two weeks.
11   Q.   Was there also hope that you would get that additional
12   10,000 that was owed?
13   A.   That 10,000 was kind of part of that weekly wage.
14   Basically what it was was I don't have the 10,000 right away
15   right now, but come work for me and you'll get that 10,000
16   with just a little bit of work.
17   Q.   So did you, in fact, agree to do that customer service
18   work?
19   A.   I did.
20   Q.   How did you get that set up when you were in a foreign
21   country?
22   A.   Aaron gave me directions on which web site to go to to
23   set up an e-mail account.  I set up my own e-mail account,
24   shortbread66.  He sent me his P.G.P. information so I could
25   decrypt the messages that he was sending to me and decrypt
```

1   the messages that his customers were sending to him in case

2   I had to look up an order or something.  So he provided me

3   with a text file with log-in information and canned

4   responses for customer service in P.G.P. keys.

5   Q.   So you would log on your computer there wherever you

6   were.  Where were you at that time?

7   A.   I was living in a house in Auckland, New Zealand, the

8   capital city.

9   Q.   This is customer service you can run from anywhere

10  then?

11  A.   Anywhere you have internet access.

12  Q.   Did you have access to the entire dark web account that

13  Mr. Shamo was running or limited access?

14  A.   No.  He gave me access to a secondary account that he

15  had.  In the AlphaBay system you can grant shared access to

16  other accounts, and with that shared access you can allow

17  other accounts to see your messages and your sales orders,

18  but I never had access to wallets or making listings or

19  anything -- any sort of administration of the account.  I

20  only had access to see the messages and to see the sales

21  orders.

22  Q.   What date did you start again working for this

23  organization for Mr. Shamo?

24  A.   Roughly July 1st of 2016.

25  Q.   So you log on to this customer service account,

1   correct?

2   A.   Yes.

3   Q.   What do you see?

4   A.   Not much of anything.  When I logged on, I saw that

5   Aaron had used that account for purchasing a few things, but

6   there were no messages, no orders.  I'm on the sidebar and

7   the navigation of the account and you can click on shared

8   access, and in there it shows what accounts you have been

9   granted access to.

10      There are two buttons in there, one for messages and

11  one for sales orders.  I was able to click on both of those

12  and that gave me access to his messages and sales orders on

13  the main selling account, the Pharma-Master account.

14  Q.   Did you then go through those messages?

15  A.   Yes.

16  Q.   Was there quite a stack at that time?

17  A.   There was.  There were 20 pages of backlog messages

18  from a month back.  I started going through them and went

19  back maybe only two weeks or so and just ignored the rest

20  and started answering what messages I could.  Aaron had sent

21  me through Telegram a bunch of shipping numbers, so then I

22  could correlate the tracking numbed with the sales date and

23  then the name that ordered it.  So if someone needed their

24  tracking number or wanted to know where their product was or

25  if it got delivered I could sometimes look that up or

1  provide it for them.

2  Q.  Was the site active at that time?

3  A.  Yes.

4  Q.  Is there something called vacation mode?

5  A.  Yes.  You can put the site -- not the site, but you can

6  put the account into vacation mode.  In vacation mode you're

7  not able to sell anything, but you could still receive

8  messages and still talk to people that have purchased from

9  you previously, but it prevents all new sales from going

10 through.

11 Q.  Was the site in vacation mode a little bit while you

12 got caught up?

13 A.  I am not sure.  There is no way for me to tell.  I

14 think Aaron was in vacation mode right before I started

15 working for him, but I think once I started answering

16 messages, he pulled it out of vacation mode so he could

17 continue and make more sales.

18 Q.  What e-mail did you use to receive communications or

19 send communications to Mr. Shamo?

20 A.  I used shortbread66.

21 Q.  Was that new at that time or did that continue over

22 from something that you were previously using?

23 A.  That was new.  I set that up at that time.

24 Q.  That is on that encrypted e-mail system that you talked

25 about?

```
 1   A.   Yes.  The website was calmed Sigaint, S-i-g-a-i-n-t.

 2   Q.   You were shortbread66?

 3   A.   Yes.

 4   Q.   Do you know what Mr. Shamo was?

 5   A.   Americansteam.

 6   Q.   Did you also have communication with Ms. Bustin and Ms.

 7   Tonge on that encrypted website?

 8   A.   Yes.  Later on, after, you know, people needed orders

 9   reshipped -- initially I sent those reshipments to Aaron to

10   pass on to them, but sometimes he wouldn't respond to those

11   very quickly, so I started e-mailing Katie and Alex directly

12   with reshipments.  Generally there would be one or two every

13   couple of days that needed to be reshipped.

14   Q.   Were there customer service issues that you were

15   allowed to deal with yourself and others that you had to run

16   through Mr. Shamo?

17   A.   Yes.  Aaron informed me that any issue less than $500 I

18   should just handle myself to my discretion and do what I

19   need to do.  Anything over that, what I would do is I would

20   sticky the message, meaning that it stays at the top of your

21   list of unread messages.  Then I would send him a Telegram

22   message with a quick little note.  Here is the user name.

23   This is what this guy needs.  This is what he is having a

24   problem with.  Anything over a certain dollar amount Aaron

25   would handle personally.
```

1  Q.   How many messages would you handle then in this new

2  customer service role of yours?

3  A.   About 30 to 45 a day.

4  Q.   What kinds of things?

5  A.   You know, hey, I have not received my order yet.  You

6  know, can I get a tracking number?  You know, if I order

7  this on this date when should I expect it?  You know, I

8  didn't get the full amount that I ordered.  I ordered 20

9  pills and I only got 19.

10      Some people would ask for custom orders.  I am $5 short

11  from ordering a package of 1,000.  Can you cut me a special

12  deal?  Some people would complain about the quality.  You

13  know, these pills are breaking apart.  I didn't feel

14  anything from this.  This didn't do anything for me.

15      Later on in the fall of 2016 people started complaining

16  that they were getting sick.  I took that to mean that they

17  were like sick to their stomach and nauseous, that type of

18  thing.

19  Q.   How much communication would you have with Mr. Shamo

20  while you were working this customer service job?

21  A.   Two or three messages a day.  I would just log on and

22  take care of the messages and then send him a Telegram

23  message after and say, you know, you're all caught up on

24  messages.  Here are your stickies.  I would send one of

25  those every day or so.

```
 1              THE COURT:  Pick a good stopping point for a
 2    break.
 3              MR. STEJSKAL:  This is as good as any.
 4              THE COURT:  We'll take our first break.  We'll try
 5    to get going at about 10:30.
 6              (WHEREUPON, the jury leaves the proceedings.)
 7              THE COURT:  We'll be in recess until about 10:30.
 8    Thank you.
 9              (Recess)
10              THE COURT:  Are you ready to go?
11              MR. STEJSKAL:  Yes.
12              THE COURT:  Let's go get the jury and proceed.
13    You can stand or sit as you please until they start coming
14    in.
15              (WHEREUPON, the jury enters the proceedings.)
16              THE COURT:  You may proceed, Mr. Stejskal.
17              MR. STEJSKAL:  Thank you, Your Honor.
18    BY MR. STEJSKAL
19    Q.   So, Mr. Crandall, when we left off you had rejoined Mr.
20    Shamo in this operation doing customer service in July of
21    2016; is that correct?
22    A.   Yes.
23    Q.   And when you started back up, your first task was to
24    catch up on all the old messages?
25    A.   Yes.
```

1    Q.   Were you seeing then as part of your customer service

2    the customer orders?

3    A.   Yes, some of them.

4    Q.   Was there anything about the products in those customer

5    orders that was different from when you were involved in the

6    operation before you left the United States in the end of

7    2015?

8    A.   Yes.

9    Q.   What was different?

10   A.   Aaron had gotten rid of almost all of the products he

11   was selling and he was selling exclusively Xanax and

12   Oxycodone pills with Fentanyl instead of Oxycodone as the

13   active ingredient.

14   Q.   You were able to figure that out from the customer

15   service orders?

16   A.   Yes.  A lot of the sales orders had the title of the

17   listing, and one of those had the word Fentanyl in it, and

18   the other two listings he had just had Oxycodone and then he

19   had the Xanax listing.

20   Q.   Before you had left the United States in 2015 you were

21   involved in the pressing and selling of counterfeit Xanax,

22   correct?

23   A.   Yes.

24   Q.   How about Fentanyl and Oxycodone?

25   A.   No, not at all.  He was not even selling any Oxycodone

1    or Fentanyl.  In the last week of November of 2015 I know he

2    was purchasing Oxycodone locally and giving it to the girls,

3    but I never saw it and I was never a part of that.  There

4    was no Fentanyl ever involved before I had left the country.

5    Q.   And no pressing of any Oxycodone or --

6    A.   No, no pressing.  He was just buying from a source

7    locally and reselling it.

8    Q.   Did you know that Mr. Shamo was involved in that prior

9    to agreeing to do his customer service for him?

10   A.   No, I had no idea.

11   Q.   When you saw that on the customer service orders, what

12   was your reaction?

13   A.   I was a little apprehensive and scared.  You know, back

14   when Aaron and I were selling drugs when I was in Salt Lake,

15   I always expressed some apprehension about selling opiates.

16   I was scared.  I was nervous of the consequences.  It was a

17   drug that I never felt comfortable with.  So when I came

18   back and started doing customer service, it scared me

19   initially, but I thought at the time that I was just doing

20   the customer service and I was very far removed from it, and

21   I made that justification for myself that it was okay that I

22   was back doing customer service for him, even though he was

23   selling opiates and Fentanyl.

24   Q.   So, again, some justification to yourself?

25   A.   Yes.

```
 1   Q.   Tell us about the progression.  Now we have gone
 2   from -- I believe you said you started with Adderall,
 3   correct?
 4   A.   Yes.
 5   Q.   And then moved into other things such as M.D.M.A. and
 6   L.S.D.?
 7   A.   Yes.
 8   Q.   Xanax?
 9   A.   Yes.
10   Q.   Tell us how this progressed, how you moved from
11   Adderall and now all the way to oxy.
12   A.   It started out with Adderall.  Hey, we'll make 300
13   bucks a month, 400 bucks a month on the side.  I mentioned
14   to him that I would like to get my student loans paid off
15   completely and be done.  He started looking into other drugs
16   and that is when G.H.B. was added.  He said M.D.M.A. had a
17   good profit margin so we started selling M.D.M.A.
18        Then about four or five months into this, based on the
19   information that Aaron received from customer service and
20   the orders, he realized that people wanted kind of a
21   one-stop shop to get all of the drugs they want.  That is
22   when we started adding in L.S.D., magic mushrooms,
23   marijuana, and he thought that the profit margins would be
24   really high with cocaine.  I pushed back on that initially.
25   I didn't want to sell cocaine and I never felt comfortable
```

1    with it ever.  It just scared me.

2    Q.    What do you mean by you pushed back?

3    A.    I told him why don't we just keep the M.D.M.A.  If you

4    want more profit, then sell more of it.  Why can't we just

5    stick with what we have and keep it where we are at?

6    Q.    Were there other times that you pushed back?

7    A.    Many times, yes.  The cocaine was one of them.  Buying

8    the press was a time I pushed back.  When Sasha was fired

9    from her job I had to make the decision to push back very

10   hard.  Once I had tried to get out in September of 2015 I

11   pushed back hard on doing anything for him, but he had his

12   hands on the money and I had no other way to get it and I

13   kind of was torn between trying to get what we agreed on and

14   performing the errands and stuff for him.

15   Q.    What do you mean by push back hard?  Are you in fights

16   with him?

17   A.    Yes.  I mean, when that cocaine package was seized and

18   our roommate, Clancy, got called in by Homeland Security,

19   Aaron and I had a big fight.  We were yelling at each other.

20   I told him, you know, this is what happens when you order

21   cocaine.  If Homeland Security had seized Ambien, I doubt

22   they would have made such a fuss about this and, you know,

23   you're putting our safety at risk.  We're going to get

24   arrested.

25        I was very scared, especially when, you know, Homeland

```
 1   Security comes knocking -- it is not the Salt Lake City
 2   police.  It scared me a lot and I pushed back hard on that
 3   and I told him this is why I never wanted to sell cocaine in
 4   the first place.
 5   Q.   When you had these disagreements, what kind of things
 6   would Mr. Shamo do to keep you in the organization?
 7   A.   He would just say if you quit now and you get out, you
 8   are not going to get the money you want.  You know, you're
 9   basically forfeiting your profits in the business.  He would
10   say, look, it is okay.  People want that one-stop shop.
11   They are going to get it somewhere else.  They are going to
12   get it from someone else.  It might as well be us.  We might
13   as well make money off of it.  You're just sending a package
14   to them.  What does it matter what is in it?
15   Q.   So each time you went along with it?
16   A.   Yes.
17   Q.   And then here we are in July of 2016 and you're seeing
18   oxy and Fentanyl.  Any push back at that time?
19   A.   I didn't push back to him.  I pushed back a little bit
20   on myself and talked it over with Sasha.  She didn't feel
21   comfortable with it at all, but I made the decision to go
22   through with it.  It is something that I regret all the time
23   now.  It was the worse decision I have ever made.  I don't
24   know exactly why I could justify that in my mind, why it was
25   okay when I pushed back so hard on it a year ago or seven
```

1    months ago.  I just felt like I was in a financial pinch

2    again and just needed the money and wanted to get that

3    10,000 that we agreed on.  I made some terrible

4    justifications for myself.

5    Q.    And money seemed to be the primary motivating factor?

6    A.    Yes.

7    Q.    How were you paid, then, once you started this customer

8    service work in July of 2016?

9    A.    Solely through Bitcoins.  Aaron would send me Bitcoins

10   and then I would figure out a way for me to get it back to

11   my U.S. bank account.

12   Q.    Where did you bank in the U.S.?

13   A.    America First Credit Union.

14   Q.    Tell us generally how that process would work, how you

15   would get money from Bitcoin to your U.S. bank account?

16   A.    I would send the Bitcoins to the Bitcoin exchange, kind

17   of like the stock market.  I would sell the Bitcoins that I

18   needed on there.  Then I would make a wire transfer from

19   that Bitcoin exchange to my U.S. bank account.  I believe

20   that Bitstamp is the name of the company and I believe they

21   are based out of London.

22   Q.    Let's look at Exhibit 16.05.

23         Do you recognize that?

24   A.    Yes.

25   Q.    What is that?

1   A.   That is a wire transfer from Bitstamp to my bank

2   account.

3   Q.   I'm looking for a date.

4        MR. SKORDAS:  The fourth line.  The fourth box.

5   BY MR. STEJSKAL

6   Q.   Do you see a date on there?

7   A.   Yes.

8   Q.   I should ask you.  What is the date on that?

9   A.   It is April 19th, 2016.

10  Q.   So that is earlier than you coming back into customer

11  service, so what is this payment?

12  A.   This is the first payment he has made me since I left

13  the country.  He paid me through Bitcoin and this is part of

14  that 10,000 I got before I returned to doing customer

15  service.

16  Q.   Again, how does this work?  How does the money get from

17  Mr. Shamo to your America First bank account?

18  A.   I provide him with a Bitcoin wallet address.  He sends

19  the Bitcons from his wallets through a tumbling service,

20  which is meant to obfuscate where they come from and

21  originate.  So he sends them through the tumbling service

22  and then they land in my wallet 20 or 30 minutes later.

23       Once they are in my wallet, I transfer them to a

24  Bitstamp wallet, and then from that Bitstamp wallet I sell

25  them from there and convert them into U.S. dollars.  Then I

```
 1   make a U.S. dollar bank transfer from Bitstamp to my bank
 2   account.
 3   Q.   Let's next look at 16.06.
 4        Can you identify that for us, please?
 5   A.   Yes.  This was on August 4th, 2016.  This was partially
 6   some of the 10,000 that I received in April of 2016, and
 7   then the other portion of this is the wages I earned in July
 8   of 2016 by doing customer service.  I didn't sell all the
 9   Bitcoins I received from Aaron initially, because sometimes
10   the price of those Bitcoins will go up, and I didn't need
11   the money right away and so I wanted a couple extra hundred
12   dollars so I didn't sell all my Bitcoins immediately.
13   Q.   What were you paid in wages?
14   A.   In Bitcoins.
15   Q.   How much money were you paid?
16   A.   About $2,400 a month.
17   Q.   So you had some money previously paid by Mr. Shamo
18   sitting in --
19   A.   My Bitstamp account, yes.
20   Q.   It is secure and it can just kind of sit there?
21   A.   Yes.
22   Q.   You were hoping it would appreciate?
23   A.   Yes.
24   Q.   So you just cashed some of that in with your wages and
25   that is what we're looking at here?
```

```
 1    A.    Yes.

 2    Q.    What is our total amount here?

 3    A.    $5,343.

 4    Q.    On the bottom here it says you are living at Murphys

 5    Lane.  Were you living at Murphys Lane at that time?

 6    A.    No.  I was in New Zealand at the time.  I had not

 7    changed the address for my bank after I left the country, so

 8    my bank was still under the impression that I lived at

 9    Murphys Lane.

10    Q.    This is your America First account?

11    A.    Yes.

12    Q.    How would you access money from that account?

13    A.    They have an online portal.  So I would log in to my

14    account through America First -- I mostly paid my student

15    loans through that.  We would pay Sasha's credit card bill

16    through my America First account.

17    Q.    Let's next look at 16.07.

18          Can you identify that for us, please?

19    A.    Yes.  That is September 22nd, 2016, and it was for

20    $2,508.

21    Q.    What was that for?

22    A.    That was for my wages in August.

23    Q.    Which you agreed on what?

24    A.    1,200 every two weeks.  So in August there are a few

25    more extra days, so there is 25, 50 roughly or --
```

```
 1    Q.   Same process here that Mr. Shamo would send it to you
 2    in Bitcoin and then you would get it into your account in
 3    this manner?
 4    A.   Yes.
 5    Q.   Let's next look at 16.09.
 6         Do you see the date up there in the upper left-hand
 7    corner?
 8    A.   Yes.  That is November 8th, 2016.
 9    Q.   Are you familiar with what happened on that date with
10    regard to this photo?
11    A.   Yes.
12    Q.   Explain that for us.
13    A.   So I had moved close to $20,000 through my Bitstamp
14    account that year and I was afraid of tax penalties and that
15    type of thing, and law enforcement, so I asked Aaron to make
16    a cash deposit into my account with the wages I earned in
17    October.  So in the first part of November he came and
18    deposited roughly $2,700 in my account.
19    Q.   Directly into your America First account?
20    A.   Yes.
21    Q.   He is in Utah here still?
22    A.   Yes.
23    Q.   You're where?
24    A.   I am in -- at that point I am in Australia.
25    Q.   How did you became aware that you had that money in
```

1    your account?

2    A.    I was able to log on to my America First account and

3    see the deposit.  He sent me a Telegram message saying the

4    deposit was made.

5    Q.    During this period then from July 1st of 2016 through

6    November here of 2016, are you running this organization at

7    all or are you more of an employee?

8    A.    Absolutely not.  I am definitely just an employee.  The

9    only thing I do is customer service and I have no hand in

10   anything else.

11   Q.    Are you paid a regular wage?

12   A.    Yes.

13   Q.    Did you have any say in how the company was run?

14   A.    No, not at all.

15   Q.    Let's go to 16.08.

16        Do you see the date up there in the upper left-hand

17   corner?

18   A.    November 22nd.

19   Q.    You're ultimately familiar with that date, correct?

20   A.    That is the date that Aaron was arrested.

21   Q.    Do you know the circumstances surrounding this

22   photograph?

23   A.    Yes.  I had a few Bitcoins left at that point.  I had

24   been notified by people here in Utah that Aaron had been

25   arrested, so I started selling the rest of the Bitcoins that

```
 1   I had and purging myself from all of that.  I got onto
 2   localbitcoin.com and found some guy locally in Utah who was
 3   willing to do a cash deposit in exchange for the few
 4   Bitcoins I had left.  He deposited roughly $1,000 into my
 5   America First account and I transferred in the last of my
 6   Bitcoins.
 7   Q.   The transfer shows 900.  Does that sound accurate?
 8   A.   Yes.
 9   Q.   Let's look at Exhibit 16.22.
10        THE CLERK:  That one has not been offered as far
11   as I know.
12        MR. STEJSKAL:  I talked to Mr. Skordas this
13   morning and --
14        THE CLERK:  Okay.
15        MR. SKORDAS:  Yes, that is fine.
16        THE COURT:  Okay.
17        MR. STEJSKAL:  I will have him identify it and
18   then we will offer it here.  Thank you.
19        MR. SKORDAS:  We stipulate to its early admission.
20        THE COURT:  16.22 is admitted into evidence.
21        MR. STEJSKAL:  Thank you, Your Honor.
22        (Plaintiff's Exhibit 16.22 was
23         received into evidence.)
24   BY MR. STEJSKAL
25   Q.   Now it is up on the screen, Mr. Crandall.  Can you
```

1    identify that?

2        Let's leave the big document up here right now.

3    A.    Let's see.  That looks like a deposit into my --

4    Q.    I am not talking about the yellow line now.  I am

5    sorry.  Can you just identify the whole document?

6    A.    That is my America First Credit Union account and the

7    balance.

8    Q.    It has kind of got a running total of the balance and

9    the dates on the left?

10   A.    Yes.

11   Q.    Now let's focus on that yellow line.

12   A.    That is a bank transfer from Bitstamp to my America

13   First account.

14   Q.    You see the date there, 4-19-16, on the left?

15   A.    Yes.

16   Q.    That was one that we previously removed to there as one

17   of those Bitstamp transfers?

18   A.    Yes.

19   Q.    Let's go to the next yellow line.

20        Do you recognize this one?

21   A.    Yes.

22   Q.    What is that?

23   A.    That is a bank transfer from Bitstamp to my America

24   First account.

25   Q.    That is, again, the one that we referred to that was

1    your July wages?

2    A.    Yes.

3    Q.    Plus some extra money that you --

4    A.    Received in April.

5    Q.    Okay.  Let's go to the next yellow line.  9-22 of 2016.

6          Can you identify that one?

7    A.    That is a deposit I made from Bitstamp to my America

8    First account for August wages, $2,500 -- $2,508.

9    Q.    I think there is one more yellow line.

10         Do you see a date on that one?

11   A.    Yes.  That was the 8th of November.  That is the

12   deposit that Aaron deposited into my account in the amount

13   of $2,700.

14   Q.    That was the photograph of Mr. Shamo earlier we saw

15   making that deposit?

16   A.    Yes.

17   Q.    And that corresponds to this deposit?

18   A.    Yes.

19   Q.    There is one more.

20         Can you identify that one by date?

21   A.    Yes.  That was on November 22nd in 2016.  That was the

22   deposit of $900 from the person I found on localbitcoin to

23   make that cash deposit into my account.

24   Q.    Thank you.

25         How did you communicate with that person on

1  localbitcoin?

2  A.    There is a way to send messages through the website.

3  He had an ad up that he was buying Bitcoins.  I responded to

4  it and said are you okay with doing a cash transfer -- cash

5  deposit into my bank.  We'll hold the Bitcoins in escrow,

6  and then I will release the Bitcoins once you confirm the

7  deposit in there.

8  Q.    Did you specifically look for someone that was in Salt

9  Lake or had access to America First?

10 A.    Yes.  America First is a local bank and so I had to

11 make sure someone was in the Salt Lake area in order to do

12 that.

13 Q.    Did you have any communications with Mr. Shamo about

14 your concerns with the Fentanyl and the oxy pills?

15 A.    Yes.  In October of 2016 Aaron went on vacation, so I

16 was still answering a few messages but nothing new was being

17 shipped out.  Someone sent a message and said that they had

18 gotten sick.  Well, first they sent a message and said they

19 didn't receive their order and it was for 40,000 pills, so

20 it was quite a large order.  I referred Aaron to it and he

21 said just reship it.

22     It was reshipped at a later date.  Then they came back

23 and said that they had gotten sick and -- no.  I am sorry.

24 They came back initially and said they didn't receive the

25 product.  I looked up the tracking number and saw that it

1    had been delivered and even the first one had been

2    delivered, too.  I told them that.  I said, look, the

3    tracking shows delivery.  They came back and said someone is

4    getting sick and my friend overdosed.

5         So I immediately messaged Aaron and said, hey, this is

6    a really serious problem.  Someone is saying they overdosed.

7    Like, what do we do?  You need to handle this.  I started

8    freaking out and I was very, very scared at that point.

9    That was the first time I had ever heard of any overdose or

10   anything and it just freaked me out.  I refused to log in

11   for quite a few days after that and just kind of left it to

12   Aaron.  I figured that was a big issue that he has to deal

13   with rather than a small thing that I can take care of.

14   Q.   How did he handle that?

15   A.   Initially he was going to look at obituary records in

16   the area.  I don't know if that was ever looked into or not.

17        A few days later or about a week later or so, the

18   person who purchased the pills created a dispute online,

19   disputing that transaction.  At that point an administrator

20   has to get involved and you are kind of forced into taking

21   care of that.  So I told Aaron to look into it.  I gave him

22   some more details and told him, you know, the first shipment

23   the tracking shows delivered, the second one shows

24   delivered.

25        Aaron responded to me the next day and said I bet this

1    guy is just faking it.  It looks like he is just trying to

2    scam us.  I can't confirm that someone died, but, you know,

3    he refused to reship it because we have a confirmed tracking

4    number.  He didn't really say much about the overdose at all

5    or didn't seem to care about it.

6    Q.    When you were involved with the pill press at the end

7    of 2015 before you left the country, you talked previously

8    about mixing the stuff in Mason jars?

9    A.    Uh-huh.

10   Q.    Do you have concerns that now that Mr. Shamo is dealing

11   with Fentanyl and oxy, that that was not a good method?

12   A.    Yes.

13   Q.    Did you have communication with Mr. Shamo about that?

14   A.    Yes.  People would always ask, you know, what is the

15   ratio of active ingredient to filler.  Aaron gave me just a

16   canned response to give to people when they asked for that

17   that says we don't discuss our formula with anybody, but

18   they are pressed to mimic a 30-milligram Oxycodone.  So

19   those were the answers I would give back to the customers.

20        Some people would complain that they were getting sick

21   occasionally.  I asked Aaron about it and I said, you know,

22   what would be causing this do you think?  What is going on?

23   I was assuming this meant that people were getting nauseous

24   and upset stomachs.  I asked him, you know, are you mixing

25   it long enough?  Is everything getting mixed up properly?

1    He told me he had professional mixing equipment at that

2    point.  So that kind of alleviated my concerns and I didn't

3    really worry about it too much after that.

4    Q.   Was there any professional mixing equipment before you

5    left the country?

6    A.   No.  It was all done by hand.

7    Q.   I am going to show you Exhibit 13.09.  Yes.  Photo 19.

8         Do you recognize that?

9    A.   I do not.  I have never seen that before.

10   Q.   So the conversation that you just relayed about

11   somebody overdosing and dealing with that on customer

12   service, that was in the fall of 2016?

13   A.   Yes.

14   Q.   You said there were other messages or customer service

15   issues dealing with those kind of issues?

16   A.   No one ever mentioned an overdose.  They would just say

17   that people were getting sick.  Occasionally someone would

18   say that the pills were very strong.  I relayed that to

19   Aaron, and Aaron told me that Fentanyl tolerance and opioid

20   tolerance is a little different.  If someone is really

21   tolerant to opioids and then they take a Fentanyl pill,

22   sometimes it can affect them a little bit harder than it

23   would with the same amount of opiates.  People would say

24   that occasionally, you know, that this one was really strong

25   or that type of thing, but there wasn't really much I could

```
 1    do in terms of customer service.  I would always message
 2    Aaron and say, hey, someone is complaining about being sick
 3    or not feeling well.  Make sure that you keep mixing
 4    everything.
 5    Q.   Did you communicate with Mr. Shamo over Telegram?
 6    A.   Yes.
 7    Q.   That was one of your ways of communication?
 8    A.   Yes.
 9    Q.   And the other one was over that --
10    A.   Encrypted e-mail.
11    Q.   If you just had things to chat about --
12    A.   Telegram.
13    Q.   -- which form would you use?
14    A.   The only thing we used the e-mail for was to send -- so
15    when I would send a reshipment e-mail to Katie and Alex, I
16    would c.c. Aaron on that e-mail.  That is really the only
17    way I would use the e-mail to communicate with him.
18    Everything else was through Telegram.
19    Q.   Telegram messages were encrypted, correct?
20    A.   Correct.
21    Q.   They could also be erased off of phones or whatever
22    other devices that were being accessed?
23    A.   Yes.
24    Q.   But they were not always erased, correct?
25    A.   Not always.  It depends on your settings and how you
```

```
 1    set up the chat.
 2    Q.   Let's look at Exhibit 14.12.
 3         Do you recognize this first page here?
 4    A.   Yes.  This is a Telegram message between me and Aaron.
 5    Q.   Do you see the date on that?  I guess the dates are not
 6    on here.  Down in the messages.  Sorry.
 7    A.   Yes.  The first message was sent on the 10th of
 8    November in 2016.
 9    Q.   Let's scroll down a little bit.  Do you see under the
10    picture where it says Drew new phone?
11         MR. STEJSKAL:  Let's not go there yet, Ms. Lauder.
12    BY MR. STEJSKAL:
13    Q.   Do you see that in small print where it says Drew, new
14    phone?
15    A.   Yes.
16    Q.   Did you get a new phone around this time?
17    A.   I got a new phone number, because when I left the
18    country, I had to get a New Zealand phone number.  So I
19    think that that was what Aaron had for his contact name in
20    his phone for me is Drew, new phone.
21    Q.   He named that as a new phone?
22    A.   That is what he just named the contact.
23    Q.   Up there, and we're looking at the top photograph, is
24    that you?
25    A.   Yes, that is.
```

1    Q.   We have heard some other people say that you're smart

2    and Mr. Shamo is not so much.  This does not look too smart.

3    What are you doing here?

4    A.   I am sitting with a tiger.  I am in Thailand.

5    Q.   I don't see a fence around that tiger.

6    A.   No.  It was very scary.  There was a tourist attraction

7    in Thailand where you could go in the cage with the tigers.

8    You have a couple of trainers around you, but you're able to

9    go in and pet them and take pictures while you do.

10   Q.   That still does not seem too smart.  You were

11   comfortable with it?

12   A.   It was very nerve racking.  But, I mean, yeah, I had

13   seen so many people do it the rest of the day and before me,

14   so I figured if all these other tourists are doing it, it is

15   okay.

16   Q.   You don't want to be that one.

17        Let's scroll down to the messages.  Is this how you

18   would communicate with Mr. Shamo then?

19   A.   Yes.

20   Q.   Since this is Drew, new phone, Crandall, is this off of

21   his phone?

22   A.   Yes.  These are messages on his phone.

23   Q.   What is the white box here?  Who is sending this

24   message to whom?

25   A.   These are messages that I sent to Aaron.  In the white

 1  box is me and the green box later on is going to be Aaron's

 2  response.

 3  Q.   Here looking at this screen, walk me through this brief

 4  conversation.

 5  A.   So on the 16th of November I was trying to do some

 6  customer service work from Thailand.  All I needed was my

 7  computer and internet access.  At 7:00 a.m. Utah time, and I

 8  am not exactly sure how the time change worked, but I was

 9  trying to answer messages so I sent Aaron a message and said

10  is the website down, meaning AlphaBay?  I said it won't load

11  for me.  Then I tried a different U.R.L. and that worked.

12  There is about five or six different U.R.L.s you can use to

13  get to the same site, and so I just tried a different one

14  right after and it worked.

15  Q.   So you got in apparently?

16  A.   Yes.

17  Q.   Let's go to the next one.  Follow us through on this

18  conservation here at the top.

19  A.   So on the 16th of November, after I was finished

20  performing customer service I sent a message and said, hey,

21  I'm all caught up on messages.  Apparently he was in

22  vacation mode at that time, because the next day I asked him

23  are you live again?  He said, yeah, we went live last night.

24  That was on the 17th of November.

25  Q.   Okay.  Tell us again what vacation mode is.

1    A.    It is where you can't generate any new sales but you

2    can still process old, previous sales and answer messages.

3    Sometimes Aaron would take a weekend off or a day off and he

4    wouldn't have any new orders come in, but still people would

5    send messages and so I still had to do customer service to

6    keep up on that.

7    Q.    Did you have any control over putting that in vacation

8    mode?

9    A.    No, not at all.

10   Q.    Who did?

11   A.    Aaron did.

12   Q.    Let's go to the white box.

13         The green box is there.  Who is that saying we went

14   live again last night?

15   A.    That is Aaron.

16   Q.    Let's go to the boxes under that.  Make that larger,

17   please.

18         Read that top one for us.

19   A.    So on the 18th of November I said I am getting

20   complaints about the last batch of in boxes, which was the

21   name of one of his listings, and from before vacation mode

22   that are making people sick.  I'm only halfway through the

23   messages and I already have four people saying stuff about

24   it.  Should I just tell them to suck it up?  Should we

25   reship 50 percent?  Reship 50 percent means if they ordered

1   100 we will reship 50 of them.

2   Q.   Now, should I tell them to suck it up sounds a little

3   callus.  What are you thinking there?

4   A.   I am absolutely ashamed that I ever said that.  I read

5   that now and I can't believe I would say that to somebody.

6   It is horrible.  It is terrible to say to somebody.  I can't

7   believe I would have done something like that but, you know,

8   it is there and I said it.

9   Q.   Now, that last line, should I just tell them or should

10  we reship 50 percent, you're asking that question to Mr.

11  Shamo?

12  A.   Yes.

13  Q.   Why are you asking him as opposed to taking care of it

14  yourself?

15  A.   Because there is a lot of orders there and a lot of

16  those orders were large quantities, and so I just wanted to

17  get confirmation from him, you know, is this something that

18  we're not going to do anything about?  Is this something

19  that I can send a message to Katie and Alex and have them

20  reship some of this?  I am getting his permission to deal

21  with these whichever way he wants to.

22  Q.   You are not allowed to deal with this without his

23  permission?

24  A.   Again, these orders must have been over $500

25  collectively, and so I had to kind of forward that over to

```
 1    Aaron.  Anything less than 500 I was just taking care of,

 2    but anything over that I had to talk to Aaron and okay it

 3    with him.

 4    Q.   That was the standing agreement throughout your

 5    customer service work --

 6    A.   Yes.

 7    Q.   -- that anything over 500, Mr. Shamo was in charge?

 8    A.   Yes.

 9    Q.   Do you know pill-wise what these were selling for?

10    A.   It depends on the quantity, but in single quantities I

11    believe each pill was about $10.  Then in larger quantities,

12    10,000 or more, I think it was one dollar or two a pill.

13    Q.   It wouldn't take a whole lot to get over that $500

14    threshold, right?

15    A.   No.

16    Q.   At this time what size of orders were you guys sending

17    based on your customer service feedback?

18    A.   There was a lot.  Sometimes one or two pills.

19    Sometimes ten.  A lot of people would order hundreds.  Very

20    rarely you would get orders for 10,000 or so at a time,

21    5,000, sometimes people would make orders upwards of 20,000

22    pills.

23    Q.   That next box does not really say much, I guess.

24         The second message down there is all caught up.  What

25    is that?
```

1   A.   So on the 18th I had caught up on all of the messages

2   that were in the account.  And then right below that I send

3   him a message saying there are three sticky messages.  These

4   are messages that people want to talk to Aaron specifically

5   about a special order or something like that.  None of them

6   were really disputes and so I just said you have three

7   stickies that need your attention.  Nothing major.

8   Q.   Those are things that Mr. Shamo has to take care of

9   himself as the guy running this as opposed to something that

10   you can take care of?

11   A.   Yes.  These are people asking for like a custom order.

12   Hey, I have enough to buy 33,000 pills and not 40,000.  Can

13   you set up a custom order for me or cut me a custom deal,

14   something like that?  These are just things that I don't

15   have any control over.  I can't set up new listings or

16   anything like that, and so I just pass them on to Aaron to

17   deal with.

18   Q.   Let's go down to the next page.  Make the green boxes

19   big, if you would.

20       What do we see in that first one?

21   A.   So he responded back to my message where I said I'm all

22   caught up, and he responded back to the question I had

23   where, you know, should I just tell them to suck it up or

24   should we reship half of those pills to those people?  Then

25   he said just give a pill count so we can keep track of how

1    many extra pills he is sending out. And then --

2    Q.   Let's stop there. What do you mean by a recount?

3    A.   Say if someone ordered 1,000 pills and we are going to

4    reship half of them, we are going to ship them out 500, so I

5    just keep a tally of how many are getting reshipped and let

6    him know.

7    Q.   So he knows how many pills are going out?

8    A.   Yes.

9    Q.   Go ahead with that next line.

10    A.   He was asked if I had heard from Sean recently. I had

11    not been conversing with Sean at all. He said Sean is my

12    runner for mail. I have not heard a response from him since

13    yesterday. You know, if you still talk to him, can you

14    reach out and see if he is okay?

15    Q.   Who is this Sean we are talking about here?

16    A.   Sean Gygi.

17    Q.   You knew him but you just hadn't talked to him for a

18    while.

19    A.   Yes.

20    Q.   Looking at the date there that these messages are being

21    exchanged between you and Mr. Shamo, 11-18 of 2016, does

22    that mean anything to you based on what you now know?

23    A.   Yes. Based on not I now know Sean had been approached

24    by Homeland Security agents and he was becoming a criminal

25    informant at that point. He was handing the packages over

1    to Homeland Security instead of sending them out and he was

2    meeting with Aaron and wearing a wire.

3    Q.    That lines up with this message here time-wise?

4    A.    Yes.

5    Q.    How about that last line on that big message there?

6    A.    So he basically is saying that in the listings he is

7    switching over to bulk purchases only.

8    Q.    Read that for us first.

9    A.    We are also slowly moving to bulk, so I'm pulling

10   listings with a ten quantity and listings with a 100

11   quantity for Xanax to slowly move up.

12   Q.    Now, tell us what that means.

13   A.    Instead of selling the Xanax 10 at a time or 100 at a

14   time, he wanted to move up to 500 or 1,000 at a time or

15   more.

16   Q.    This seems to be a statement rather than a question.

17   Is he asking you if you want to do this or is he telling you

18   that that is what you're going to do?

19   A.    It is more just of an F.Y.I.  You won't see listings

20   for ten or 100 anymore.

21   Q.    Who makes these major business decisions?

22   A.    Aaron does.

23   Q.    Let's next look at Exhibit 15.05 and page 5 of that.

24         Do you recognize this?

25   A.    Yes.  This is an e-mail that I sent to Katie and Alex

```
 1    as well as Aaron, and this has some reshipment information
 2    that is encrypted and it is attached as a text file.
 3    Q.    Shortbread66 --
 4    A.    That is me.
 5    Q.    -- and passthepeas --
 6    A.    That is Katie and Alex.
 7    Q.    -- and americansteam?
 8    A.    That is Aaron.
 9    Q.    The subject is reship.  So you're doing what now?
10    A.    After I have done the messages that were, you know, a
11    few orders that needed to be reshipped, so I put the plain
12    text information of what needs to be reshipped and what
13    address it is going to, and I ran it through the encryption
14    program and then pasted two versions of it into text files.
15    The first attachment is to Katie and Alex and it is
16    encrypted with their P.G.P. key.  That is the 11-20 P2P
17    T.X.T.  The second one is sent to Aaron and that's the 11-20
18    Pharma.  That just has the same information that I sent to
19    Katie and Alex, but it is encrypted so only he can read it.
20    Q.    This series of letters and numbers at the bottom, that
21    is just the encryption itself?
22    A.    Yes.  That is the message once it has been encrypted.
23    It is just a random string of characters.
24    Q.    So you're sending just the reship information.  This is
25    not the daily orders, this is just your customer service
```

1   reship?

2   A.   Yes.   This is just reshipments, not the daily orders.

3   Q.   That was November 20th of 2016 and November 18th and

4   leading up to that.   Now let's talk about November 22nd of

5   2016.

6        What happened that day?

7   A.   Sasha and I had arrived in the capital of Laos that

8   day, riding a bus overnight and it was about 7:00 or 8:00

9   p.m. that night.   We had a mutual friend, Crystelle Madson,

10  reach out to us on Facebook.   She sent us the K.S.L. news

11  article about Aaron being arrested.   I had previously,

12  earlier that night, been trying to log on to answer messages

13  and take care of things and I couldn't get in.   The internet

14  where we were at was very unreliable and I couldn't get a

15  solid connection.

16       No one was responding to messages and when that came up

17  and Crystelle sent us that message, we both started crying

18  and freaking out.   Immediately I was very, very scared.   I

19  went out and purchased some more data for my phone so I

20  could set up a mobile hot stop so I could actually log on to

21  the account.

22       I immediately logged in to the account and started

23  deleting messages, deleting anything that I could.   Again, I

24  only had access to the messages and that was it.   I opened

25  up one dispute with someone and that also had an

1    administrator added into the dispute process, and I sent a

2    private message to the administrator and said this account

3    has been compromised by law enforcement, please shut down

4    the account.  I was trying to cover my tracks and delete any

5    evidence that I was in there and any messages I had sent.

6    After that was all done --

7    Q.    That was the administrator of AlphaBay, whoever runs

8    the --

9    A.    Just any administrator.  Anytime you open up a dispute

10   on AlphaBay as a customer it creates a three-party

11   discussion where the seller and the buyer and some

12   administrator from AlphaBay can come in and mediate that

13   dispute.  I went into a recent one and found an

14   administrator and just sent them a personal message based on

15   their user name.

16   Q.    You told them to shut Mr. Shamo's particular sale site

17   down?

18   A.    Yes.

19   Q.    The Pharma-Master site?

20   A.    Yes.

21   Q.    Then what?

22   A.    After I had deleted all of the messages and told them

23   to shut the site down, I logged out.  I stored everything

24   related to the customer service and the business on a little

25   flash drive.  I took that flash drive and destroyed it,

1    threw it down the storm drain in Laos and just completely

2    destroyed it.  Then after that I reformatted my computer and

3    deleted everything and reinstalled my operating system.

4    Q.   I believe that was the same day you cashed in most of

5    the remainder of your Bitcoin?

6    A.   Yep.

7    Q.   Just to clear that out as well?

8    A.   Yes.  Just to get rid of everything.  I knew it was

9    over and there was nothing more to it, and so I just wanted

10   to get rid of all evidence and get rid of everything that

11   connected me to this and just completely stop it.

12   Q.   Then after that did you talk to family or friends or

13   people in the United States?

14   A.   Yes.  So I first initially reached out to Sean Gygi and

15   asked him if he was okay.  At that point I didn't know what

16   his role was in this or what he was doing.  I had that

17   message from Aaron that said he was a mail runner.  I didn't

18   know exactly what that meant or if he was still a drop at

19   all, so I just asked him if he was okay.

20        Sean Gygi said, yeah, I am fine.  No big deal.  To me

21   it kind of sounded like things were okay.  I reached out

22   also to Dan Allen, a mutual friend, and I just said, holy

23   crap.  Have you seen the news?  This is crazy.  I was kind

24   of hoping Dan would give me some more information, but he

25   just kind of said, yeah, this is nuts and left it at that.

1    And then Sasha reached out to Mario Noble to ask him if

2    he was okay or he had been arrested and he was very vague as

3    well and didn't say anything.

4    Q.    Did you give any instructions to your family about what

5    to do?

6    A.    No.  My family had no idea that I was doing this.  I

7    kept them completely in the dark the whole time.  I was

8    partially trying to protect them.  I was ashamed of what I

9    was doing.  I was doing something illegal for money and I am

10   not proud of it.  I didn't want my family to know at all.

11    A couple weeks after Aaron was arrested, though, I did

12   reach out to my parents and I sent them the news article

13   from K.S.L. and said I don't know if you have seen this, but

14   Aaron has been arrested and these are pretty serious

15   charges.  I was his roommate and his friend for a long time

16   so if the police want to talk to me, you know, let them know

17   that I'm out of the country.  Give them my e-mail address.

18   Give them my phone number and I will talk to them.  We even

19   had a video chat about that and they kind of reassured me

20   that everything is going to be okay.  We'll forward law

21   enforcement over to you if it comes to that, but no one has

22   reached out to you.  I kind of left it at that.  I didn't

23   want to let my parents know anything further, but I kind of

24   let them know that I am available to talk to if someone

25   comes knocking on their door looking for me.

1   Q.   To your knowledge did anyone do that from law

2   enforcement?

3   A.   No, no one ever did.

4   Q.   You're still in Laos?

5   A.   Yes.

6   Q.   Then what do you do?

7   A.   Well, a lot of our travel arrangements and plans were

8   already set up and paid for in advance so we continued along

9   our travels.  In January we were in Indonesia.  We decided

10  back in September of 2016 that we really enjoyed traveling

11  and we wanted to keep that going, and so Australia offers

12  the same type of visa that New Zealand does.  We signed up

13  for a one-year work visa in Australia.

14       Our plan after our Southeast Asia backpacking trip was

15  to go to Australia after that and live there for a year.  So

16  in the first part of January when we finally left Indonesia,

17  we landed in Brisbane, Australia and we started working

18  there and living there.

19  Q.   Were you guys worried about this investigation still?

20  A.   Yes.  Sasha and I had gotten engaged when we were in

21  Thailand, and so we were trying to set a date for our

22  wedding and figure that all out.  We talked about it and

23  said, you know, if someone is going to come asking about

24  this or want to talk to me, it is going to happen within the

25  first couple of months.  So we kind of set a date as

1    January 10th.  If no one talks to us from -- maybe it was
2    the 20th.  Maybe it was two months after Aaron had been
3    arrested.  We said if no one talks to us by January 20th,
4    let's go ahead and set an official date for our wedding and
5    have people start planning on attending and booking their
6    tickets and stuff.  So we were on the lookout and kind of
7    looking at news stories and keeping tabs on that during that
8    time, but no one ever reached out to us, so January 20th
9    came and went and we planned our wedding after that.
10   Q.   Where did you plan to get married?
11   A.   We planned to meet our families in Hawaii and get
12   married on May 12, 2017.  So we started booking plane
13   tickets and buying a dress and buying a ring and all of that
14   and started setting that all up.
15   Q.   You sent out invitations and your family made
16   arrangements and all of that?
17   A.   Yes.  All my family were attending and a lot of her
18   family were too.  We had 45 people that were flying out to
19   Hawaii to meet us for our wedding.  We were going to fly
20   from Australia and meet our families there.
21   Q.   Did you guys end up flying from Australia to Hawaii?
22   A.   We did.  We flew out of Australia on May 5th and then
23   when I landed in Hawaii, I was arrested that morning coming
24   through customs.
25   Q.   Right off the airplane?

1    A.    Yes.

2    Q.    And they confiscated any electronic equipment that you

3    had with you?

4    A.    Yes.  They confiscated my phone, my computer, all the

5    cameras I had.  They confiscated my passport.  They

6    confiscated Sasha's passport and her phone and her computer

7    and they confiscated every electronic device that we had.

8    Q.    And pulled you in a room and started questioning you?

9    A.    Yes.  They separated us and they ran a search through

10   all of my bags and the same with hers.  They pulled me into

11   a room at Homeland Security and started questioning me.

12   They pulled Sasha into a separate room and started

13   questioning her.  The interrogation lasted an hour or two.

14   Q.    And you initially lied to investigators, correct?

15   A.    Yes.  Initially they were just making small talk asking

16   what I was doing, where I was traveling, but when they

17   started asking about financial information and about

18   Bitcoins I started freaking out and I lied to investigators.

19   I was really scared and I didn't like where their

20   questioning was going and I didn't want to incriminate

21   myself.  I didn't have a lawyer present or anything and so,

22   you know, part of my Miranda rights is I have the right to

23   remain silent so I lied to them first and then they kept

24   pressing the matter, and so I finally asked for a lawyer and

25   decided to just be quiet.

1   Q.   And you have been in custody ever since?

2   A.   Yes.

3   Q.   You were returned to Utah by the United States

4   marshals, correct?

5   A.   Yes.

6   Q.   You then hired and talked with an attorney here?

7   A.   Yes.

8   Q.   And after that you submitted to more interviews with

9   law enforcement, correct?

10  A.   Yes, I did.

11  Q.   Let's look at Exhibit 23.01.

12       Do you recognize that?

13  A.   Yes.

14  Q.   What is that?

15  A.   That is my plea agreement that I signed on October 17th

16  of last year.

17  Q.   And in that did you agree to plead guilty to every

18  count you were charged with?

19  A.   Yes.

20  Q.   That was with the advice of your attorney?

21  A.   Yes.

22  Q.   Was there any specific sentencing agreement that the

23  United States promised to you?

24  A.   No.

25  Q.   Did you also sign a cooperation agreement?

```
 1   A.   Yes, I did.

 2   Q.   Let's scroll to that, the last few pages.

 3        Looking at the bottom of that, it says you agree to

 4   testify truthfully and completely for the United States in

 5   any subsequent court hearing or trial.

 6        Did you agree to that?

 7   A.   Yes.

 8   Q.   And you agreed to wait to be sentenced until after the

 9   trial, correct?

10   A.   Yes.

11   Q.   Have you testified truthfully and completely?

12   A.   Yes.

13   Q.   Was it your hope as a result of testifying and

14   cooperating that the judge may be more lenient on you?

15   A.   Yes.

16   Q.   Any specific promise as to what is going to happen?

17   A.   No.

18   Q.   Let's go back to the top and look at the second

19   paragraph with the charges.

20        It says you agree to plead guilty to counts two, three

21   and 13; is that correct?

22   A.   Yes.

23   Q.   And count two is conspiracy to distribute Fentanyl,

24   correct?

25   A.   Yes.
```

```
 1    Q.   Did you do that?

 2    A.   Yes, I did.

 3    Q.   What was your role in that?

 4    A.   My role in that was customer service.  I provided

 5    customer service for all of the sales on the dark web and I

 6    was paid for it biweekly.

 7    Q.   Let's scroll down and look at the next count.

 8         You also pled guilty to count three, conspiracy to

 9    distribute Alprazolam?

10    A.   Yes.

11    Q.   By that they mean --

12    A.   Xanax.

13    Q.   -- counterfeit Xanax?

14    A.   Yes.

15    Q.   Did you do that?

16    A.   Yes, I did.

17    Q.   Count 13, conspiracy to commit money laundering.

18         Did you plead guilty to that?

19    A.   Yes, I did.

20    Q.   Did you do that?

21    A.   Yes.

22    Q.   That is because the money you were dealing with was

23    from --

24    A.   Illegal proceeds, and I converted it into real currency

25    and used it for everything.
```

1    Q.   Some of the proceeds -- some of it was your wages?

2    A.   Yes.

3    Q.   You were not charged with distribution resulting in

4    death, correct?

5    A.   Correct.

6    Q.   You're aware that Mr. Shamo is charged with that and

7    that that occurred in June of 2016?

8    A.   Yes.

9    Q.   Were you involved in this drug trafficking organization

10   in June of 2016?

11   A.   I was not.

12   Q.   You got back in when?

13   A.   July 1st, 2016.

14   Q.   Were you aware at that time that someone had died as a

15   result of this operation?

16   A.   I had no idea.

17   Q.   Were you told that your job is to tell the truth?

18   A.   Yes.

19   Q.   Were you told that you could harm yourself if you're

20   telling lies and untruths?

21   A.   Yes.

22   Q.   Did you tell the truth here with us today?

23   A.   Yes, I did.

24   Q.   Do you have any stake in the outcome of these

25   proceedings?  Does it matter what you get on what happens

1    here?

2    A.    I'm sorry.  One more time?

3    Q.    That was a poorly worded question.  Let me try that

4    again.

5          Does your cooperation depend on whether Mr. Shamo is

6    found guilty or not guilty?

7    A.    No.

8    Q.    All you were told is to tell the truth?

9    A.    Yes.

10   Q.    Will you get sentenced after this trial is over?

11   A.    Yes.

12   Q.    And you expect that there is a sentence coming?

13   A.    Yes.

14   Q.    You have been in jail now for how long?

15   A.    27 months and nine days.

16   Q.    And you still have plans to marry Ms. Crandall?

17   A.    Yes.

18   Q.    She is standing by you?

19   A.    Yes.

20   Q.    That is going to happen after accepting whatever

21   sentence Judge Kimball hands down?

22   A.    Yes.

23   Q.    I joked earlier about you and the tiger in that picture

24   and others have said that you're smart and Mr. Shamo is not

25   that smart, and, therefore, you must be the brains behind

1    this operation.  You have known Mr. Shamo for how long?

2    A.    2008 or so.

3    Q.    How do you respond to that, that others say that he is

4    not too smart?

5    A.    It is pretty easy to Google things and do a little bit

6    of research.  You know, it is not that hard and there are

7    websites out there with a plethora of information that you

8    can just do 30 minutes of research and figure out how to do

9    this.

10   Q.    So he did some of these things to set up the

11   organization?

12   A.    Yes.

13   Q.    Let's pare that down a little bit.  Let's talk about

14   what you did as part of the organization.  At the beginning

15   did you and Mr. Shamo discuss getting involved in this type

16   of activity?

17   A.    We did.

18   Q.    And did you both agree to start selling Adderall and

19   get involved?

20   A.    Yes.

21   Q.    Did you guys become partners?

22   A.    Yes.  I had a one-third partnership and he, you know,

23   had a two-thirds stake in it, but at the same time he had

24   almost all of the decision making capabilities.  I didn't

25   choose what to order or anything like that or how to set

1    this up.  He had control of the money the whole time.  I

2    never once had access to the wallets.  I trusted him enough

3    that he would just pay me fairly based on our one-third,

4    two-thirds agreement.

5    Q.   You packaged and shipped drugs?

6    A.   Yes.

7    Q.   Knowing that they were illegal drugs?

8    A.   Yes.

9    Q.   You helped recruit some others as drops?

10   A.   Yes.

11   Q.   You helped put together the recipe, for lack of a

12   better term, to make these counterfeit Xanax with

13   Alprazolam?

14   A.   No.  Aaron came to me with the recipe.  I sat at the

15   machine and did the algebraic ratio math to make sure it was

16   going to come out correct, but he came to me with the

17   recipe.

18   Q.   I see.  So he had the active ingredients and the --

19   A.   He came to me with what he wanted.  He said I want a

20   three milligram pill and here is the mold and here is the

21   active ingredients and the filler.

22   Q.   When you left the company you got paid out some?

23   A.   Yes.

24   Q.   And expected more or hoped for more?

25   A.   Yes.

1    Q.   And then in July of 2016 you got back into customer

2    service?

3    A.   Yes.

4    Q.   Who was in charge of the organization?

5    A.   Aaron Shamo.

6    Q.   From the beginning?

7    A.   Yes.

8    Q.   In the beginning with your partnership, did you have

9    some decision making capacity?

10   A.   When it came to shipping products and that type of

11   thing, yes, but I would also receive feedback from him.

12   Aaron would say, hey, this got damaged in shipping.  Can we

13   add some kind of bubble wrap to it?  You know, can you put

14   it in a Mylar bag to conceal it better?  Can you -- the term

15   that they use on the dark net is stealth.  Can you add more

16   stealth to the package, meaning, you know, put it in a candy

17   bar wrapper or put it in a stuffed toy?  So I kind of had

18   some leeway in how to do that, but Aaron would come to me

19   with suggestions and just let me implement that on my own.

20   Q.   Once you left the country, how much direction did you

21   have over the organization?

22   A.   None.

23   Q.   Did that ever change?

24   A.   No.

25   Q.   So what kinds of things did Mr. Shamo do that you

1    didn't do?

2    A.   He was in charge of ordering new products, ordering all

3    products.  He was in charge of decrypting every daily order

4    and sending that to either me or to Katie and Alex later on.

5    He was handling all of the money.  Initially all the money

6    was kept in a lockbox that I never had a key too.  It was

7    always in his room with the drugs.  Aaron had control over

8    all of that.

9    Q.   Who listed what was sold?

10   A.   Aaron did.

11   Q.   Who determined how much to charge customers?

12   A.   Aaron did.

13   Q.   Who paid the other employees in this organization?

14   A.   For the most part that was Aaron, but occasionally I

15   would send money to other drops.  When I would pick up a

16   package I would give them $50 or I would pay them via Venmo,

17   and then later on the business would reimburse me in

18   whatever payout I got.

19   Q.   After you left the country in late 2015, did you have

20   any further involvement in paying other members of the

21   organization?

22   A.   No.

23   Q.   Who directed others on what to do?

24   A.   Aaron did.

25   Q.   Did you have a little bit of control in that before you

1   left the country?

2   A.    Not really.  I mean, I trained Luke how to use the

3   press, you know, and Aaron was there but I kind of did the

4   hands-on training of it.  I talked to Katie and Alex when

5   they were shipping things out to see if they were low on

6   stamps or shipping supplies and if I needed to bring more.

7   Aaron would ask me to bring them wages occasionally.  He

8   would just give me a stack of cash and I would drive over to

9   their house.

10  Q.    But he was directing you what to do?

11  A.    Yes.

12  Q.    Who made the final decision on how to address customer

13  service complaints over $500?

14  A.    Aaron did.

15  Q.    Who made the decision to start pressing and selling

16  pills laced with Fentanyl?

17  A.    Aaron did.

18  Q.    Did you have any involvement in that whatsoever?

19  A.    No.

20  Q.    Were you in the United States when those pills were

21  being pressed?

22  A.    No.

23  Q.    Did you ever run that Fentanyl pill press, pressing

24  Fentanyl pills?

25  A.    No.  I have never seen that press before.

1    Q.    Looking back, how do you feel about what you did?

2    A.    I feel terrible.  I am absolutely ashamed about what I

3    did.  It enabled people with an addiction to further that.

4    I did some terrible things and I did it all for money.  I do

5    not feel good about it at all.

6    Q.    Have you heard about the opioid epidemic?

7    A.    Yes.

8    Q.    How do you think you and Mr. Shamo affected that?

9    A.    I think we made it very, very easy to get more and more

10   pills for less money, and I think it exacerbates the problem

11   when someone can get it for very cheap and in huge

12   quantities.

13   Q.    Looking back and thinking about it since your arrest

14   and spending all of this time in custody, do you have any

15   empathy for those affected by your and Mr. Shamo's actions?

16   A.    Absolutely.  I live with people that are struggling

17   with their addictions every day, you know, and it is not

18   pretty at all.  Oftentimes they try so hard but they can't

19   help themselves and they come in and out of jail.  Watching

20   someone come down from withdrawal is terrible.  I have seen

21   it many times now and it is bad.  It is just ruining people

22   and their families too.  People come into jail and they have

23   no money and no means of support and their families have to

24   pick that all up.  They are always stealing from their

25   families to get more drugs for themselves, and their

```
 1   families and their friends and their loved ones are paying

 2   the price as well.

 3   Q.   So you regret your involvement in this?

 4   A.   Absolutely.

 5   Q.   But you're owning up to it?

 6   A.   Yes.

 7   Q.   Thank you.

 8         MR. STEJSKAL:  No further questions at this time,

 9   Your Honor.

10         THE COURT:  Thank you, Mr. Stejskal.

11         Mr. Skordas, you may cross-examine.

12         MR. SKORDAS:  Thank you, Your Honor.

13         Could we look at Government's Exhibit 23.01,

14   please.

15                    CROSS-EXAMINATION

16   BY MR. SKORDAS:

17   Q.   Good morning, Mr. Crandall.

18   A.   Good morning.

19   Q.   Do you remember signing this agreement?

20   A.   Yes, I do.

21   Q.   Go to page 9 of that.  That is in fact your signature,

22   isn't it?

23   A.   Yes, it is.

24   Q.   And it is a signature dated October 17th of last year,

25   correct?
```

1   A.   Yes.

2   Q.   Why don't you read for the jury paragraph 9 there.

3   A.   I understand and agree to all of the above.  I know

4   that I am free to change or delete anything contained in

5   this statement, and I do not wish to make changes to this

6   agreement because I agree with the terms and all of the

7   statements are correct.

8   Q.   That is what you stated to a court in this very

9   building on October 17, 2018, correct?

10  A.   Yes.

11  Q.   Go to page 1 of that agreement.  It says under

12  paragraph one that you're going to be pleading guilty to

13  counts two, three and 13 of the indictment, correct?

14  A.   Correct.

15  Q.   Count two is specified down there on the very bottom --

16       MR. SKORDAS:  If you could highlight that, please,

17  Yvette.  Thank you.

18  BY MR. SKORDAS

19  Q.   Conspiracy to distribute Fentanyl, correct?

20  A.   Yes.

21  Q.   Read the last line, the fifth element of that.

22  A.   The overall scope of the conspiracy involved at least

23  400 grams of Fentanyl.

24  Q.   And read the second line of that.

25  A.   The defendant knew the essential objection of the

1    conspiracy.

2    Q.   And the third line --

3    A.   The defendant knowingly and voluntarily involved

4    himself in the conspiracy.

5    Q.   You knew what the conspiracy was and you knowingly and

6    voluntarily involved yourself in the conspiracy, and the

7    conspiracy was to distribute at least 400 grams of Fentanyl,

8    correct?

9    A.   Correct.

10   Q.   You knew that is what you were doing?

11   A.   Yes.

12   Q.   And you voluntarily did it?

13   A.   Yes.

14   Q.   And you knew that is what was going on here, correct?

15   A.   Yes.

16   Q.   There was no doubt in your mind as to what was being

17   distributed, was there?

18   A.   No.

19   Q.   You knew it wasn't Oxycontin that was being

20   distributed, didn't you?

21   A.   I learned that very quickly once I started doing

22   customer service again, yes.

23   Q.   That was not my question.  You knew that you were

24   distributing Fentanyl, correct?

25   A.   Correct.

1   Q.   You pled guilty to that because it was true, correct?

2   A.   Yes.

3   Q.   And if you look at count two of this -- excuse me.

4        The second count that you pled guilty to which was

5   count three, on the second page the same -- thank you.

6        The exact same is true for the Alprazolam, correct?

7   A.   Correct.

8   Q.   The Xanax, if you will.  You knew that you were

9   distributing that as well, correct?

10  A.   Yes.

11  Q.   And you pled guilty to that?

12  A.   Yeah.

13  Q.   And you pled guilty to conspiracy to commit money

14  laundering, correct?

15  A.   Yes.

16  Q.   Because you knew that you were laundering money?

17  A.   Yes.

18  Q.   There is a little box at the bottom of page 2.  You

19  also understand, don't you, that there are significant

20  penalties that arise from each of those counts, correct?

21  A.   Yes.

22  Q.   And you could serve a significant period of time for

23  that, right?

24  A.   Yes.

25  Q.   But importantly you avoided much more significant time

1   by not pleading guilty to the death related count, correct?

2   A.   Yes.

3   Q.   Your attorney told you that, correct?

4   A.   Yes.

5   Q.   You don't want to have to plead guilty to that one or

6   be charged with that one, correct?

7   A.   I was not around and part of the organization when that

8   death occurred.

9   Q.   So it is not your fault?

10  A.   I am not saying it is not my fault.

11  Q.   I think that is exactly what you just said.  You're not

12  responsible for that.  Let them suck it up.

13       Isn't that what you're saying?

14       Let's go to page 11 of this agreement.  This is an

15  addendum to this plea, correct?

16  A.   Yes.

17  Q.   And there is a paragraph there on the bottom where it

18  says you agree to testify truthfully and completely for the

19  United States in any subsequent court hearing or trial

20  related to this case if called upon, correct?

21  A.   Correct.

22  Q.   The only subsequent court hearing or trial related to

23  this case is today, this very minute, correct?

24  A.   Yes.

25  Q.   You have not testified in any other capacity, have you?

```
 1   A.   No.

 2   Q.   It also says that you agree to await sentencing until

 3   everybody else in this case has been sentenced, correct?

 4   A.   Yes.

 5   Q.   So notwithstanding that this plea was entered in

 6   October of last year, you still have not been sentenced?

 7   A.   No, I have not.

 8   Q.   And part of the reason you have not been sentenced is

 9   because what is going to happen at your sentencing is

10   largely contingent on what you do today, correct?

11   A.   I hope that it is.

12   Q.   And you hope that you'll be found to have testified

13   truthfully and completely, correct?

14   A.   Yes.

15   Q.   But Aaron and I don't decide if you testified

16   truthfully, do we?

17   A.   No.

18   Q.   This jury of 14 people don't get to tell the Judge

19   whether you testified truthfully, do they?

20   A.   No.

21   Q.   Your lawyer and your parents and your family don't get

22   to tell the Judge that you testified truthfully, do they?

23   A.   No.

24   Q.   These three men here get to tell the Judge that,

25   correct?
```

```
 1    A.    I guess so.
 2    Q.    They are the deciders of if you tell the truth today,
 3    direct?
 4    A.    Correct.
 5    Q.    They told you that they will tell the Judge whether or
 6    not they feel like you have told the truth?
 7    A.    Yes.
 8    Q.    Correct?
 9    A.    Correct.
10    Q.    In response to how well you do today in testifying
11    against Aaron Shamo, correct?
12    A.    That and in response to the evidence that they have
13    gathered.
14    Q.    You don't have to tell the truth about anything else,
15    right?  You have not been questioned about any other
16    individuals that you have had to testify in court about,
17    have you?
18    A.    I have not testified in court against anyone else.
19    Q.    And you are never going to, are you?
20    A.    They have all pled guilty so, no, I don't have to.
21    Q.    And none of them are in jail, are they?
22    A.    No.
23    Q.    You're the only person in jail besides Aaron, correct?
24    A.    Correct.
25    Q.    And you were arrested about four months after he was,
```

```
 1    correct?

 2    A.   About seven or six.

 3    Q.   I am sorry.  My math is bad.

 4         You have been in jail continually since then?

 5    A.   Yes.

 6    Q.   As far as you know, looking at that chart, you and

 7    Aaron are the only people that have spent a minute in jail,

 8    correct?

 9    A.   Correct.

10    Q.   You have given an interview to law enforcement in

11    connection with this case, correct?

12    A.   Yes.

13    Q.   Have you had a chance to review that prior to

14    testifying today?

15    A.   No.

16    Q.   Would it help you if you saw it in your testimony

17    today?

18    A.   No.

19    Q.   You think you can remember everything that you said?

20    A.   Yes.

21    Q.   You were asked whether or not Aaron was very smart,

22    correct?

23    A.   Yes.

24    Q.   And you told law enforcement no, correct?

25    A.   Correct.
```

```
 1   Q.   You said, well, but he can Google things?

 2   A.   Yes.

 3   Q.   Did you tell law enforcement the truth when you gave

 4   that statement?

 5   A.   Yes.

 6   Q.   Mostly?

 7   A.   Mostly.

 8   Q.   Did you tell law enforcement the truth when they asked

 9   was Aaron very smart and you said no?

10   A.   Yes.

11   Q.   Did you tell law enforcement the truth about your

12   involvement in this case?

13   A.   Yes.

14   Q.   Did you hold back a little bit?

15   A.   No.

16   Q.   Do you remember talking to law enforcement and

17   describing Aaron -- or having law enforcement describe Aaron

18   as a moron?

19   A.   I don't recall that.

20   Q.   Would it help you if you saw that?

21   A.   Yes.

22            MR. SKORDAS:  May I, Your Honor?

23            THE COURT:  You may.

24   BY MR. SKORDAS

25   Q.   Just take a look at that for me, Drew.
```

1      What is that?

2  A.    A transcript of my interview with law enforcement on

3  the 13th of June in 2017.

4  Q.    Who was present, do you recall?

5  A.    Law enforcement agents, an I.R.S. agent, a postal

6  inspector, my lawyer and some of the prosecutors.

7  Q.    You had a couple lawyers there, didn't you?

8  A.    Yes.

9  Q.    Turn to page 127 of that.  It is on the top right-hand

10  --

11  A.    127?

12  Q.    1-2-7, yes, sir.

13      At some point during the interview law enforcement

14  didn't think you were being very honest, did they?

15  A.    Yes.

16  Q.    Why don't you read that question that begins on page 9.

17  Excuse me.  Line 9.

18  A.    And -- because last time I told you I appreciate your

19  honesty, but, you know -- and when you're telling me that --

20  I mean, we have a tendency to do this when we are in

21  trouble.  Okay.  All I wanted to do was this -- was my plan.

22  Your actions say something very different.  Very different.

23  You know what I mean?  You're telling me you set the -- you

24  set the entire press, and Shamo is such a moron that he

25  can't do the mixes right or learn how to operate the

```
 1   machine.  You're doing all of it and you are getting

 2   basically nothing for it, you know, in comparison.  That

 3   sounds really strange.

 4   Q.   That is the question that law enforcement asked you,

 5   correct?

 6   A.   Correct.

 7   Q.   You're saying that Aaron is such a moron that he can't

 8   even do anything?

 9   A.   Correct.

10   Q.   That was paraphrasing your comments to them, correct?

11   A.   Yes.

12   Q.   Go to page 128.  That is the next page, correct?

13   A.   Yes.

14   Q.   The officers asked you a question that begins on line

15   11.  Why don't you read the jury that question.

16   A.   You're not the only person that we have talked to that

17   has parroted this exact same thing.  You're -- but it is

18   so -- it is -- I mean, you're looking at a bunch of people

19   here who had --

20        MR. STEJSKAL:  Your Honor, I am going to object at

21   this point.  He is asking him to read the questions and not

22   the answers.  These are not previous statements of this

23   witness.

24        THE COURT:  This is --

25        MR. SKORDAS:  I can have him read his answers.
```

1    That is fine.

2            THE COURT:  You need to have him read the answers.

3    BY MR. SKORDAS

4    Q.   All right.  Let's back up one page.  We earlier had you

5    read a question that began on line 9.  Read your answer on

6    line 21.

7    A.   I don't know why I protected him so much and why I feel

8    like I'm so loyal to him.  I -- I don't know.  I mean, when

9    I look at it in retrospect, I feel like I have been abused

10   and I keep going back to him.  You know, I don't know.  I

11   guess I'm just looking for acceptance from someone, a

12   friend.  I really don't know.  I mean there is no other

13   money that I received and I don't know why I have such

14   loyalty to the guy.  I don't know.  I really don't know why

15   I protected him so much.

16   Q.   Now read the next question and your answer.

17   A.   You're not the only person that we have talked to who

18   has parroted this exact same thing.  But it is so -- it

19   is -- I mean, you're looking at a bunch of people here who

20   if we had been in the situation -- like it sounds like you

21   were doing everything.  You're setting up the machines,

22   pressing, you're making sure he got -- you were so worried

23   about him doing the mixes right that you created a computer

24   program, you know.  You knew he was running oxys, you know,

25   eventually, and you knew oxys were going through the system

```
 1    and stuff like that.  You know, you talk to a guy like
 2    Vance, you know, and this guy -- all these people who are
 3    receiving packages, and they are making just a little bit of
 4    money and then Aaron is sitting on almost a half a million
 5    dollars in cash.  How is that -- I don't understand.  How is
 6    he a master manipulator?  What is the deal?
 7    Q.    Your answer?
 8    A.    He is really good at manipulating for sure.
 9    Q.    Is that the way you remember this conversation going?
10    A.    Yes.
11    Q.    Well, since we are there, why don't we continue.  Just
12    finish that page.
13    A.    Why do you say that?  I mean, tell me some examples of
14    that other than this enormous one here.  I mean, whenever we
15    would go out to someplace, some bar, some dinner place he
16    would always get his way.  He is always kind of, you know,
17    gaining an ally, use that ally to, you know, get everyone
18    else to agree to it.  He was always the ringleader in the
19    friends group.  Everyone looked up to him.  He was the one
20    that everyone called first to hang out.  He was kind of the
21    leader in the group, you know, and he is always -- it is
22    kind of his personality.  He has always been the leader on
23    the top.  You know, he will cheat his way to get to the top.
24    Q.    That is how you described Aaron that day, correct?
25    A.    Yes.
```

1    Q.    That was in response to it looks like about an hour of

2    interview and interrogation by law enforcement, correct?

3    A.    Yes.

4    Q.    You were arrested in Hawaii; is that right?

5    A.    Yes.

6    Q.    What was the date of that?

7    A.    May 5th, 2017.

8    Q.    You were there for a wedding with Sasha?

9    A.    Yes.

10    Q.    And you never did get married, did you?

11    A.    No.

12    Q.    And all the people that flew out there didn't get to

13    participate in that, correct?

14    A.    Correct.

15    Q.    You were taken into custody?

16    A.    Yes.

17    Q.    And you have remained in custody ever since?

18    A.    Yes.

19    Q.    And you argued both in Hawaii and in Utah to be

20    released, correct?

21    A.    Yes.

22    Q.    I think the prosecutor asked you if the judge was the

23    one that made the decision to hold you; is that right?

24    A.    Yes.

25    Q.    And the judge did make that decision, correct?

1    A.   Yes.

2    Q.   What did the government argue?

3    A.   That I was a flight risk and a danger to the community.

4    Q.   And that you should be held?

5    A.   And that I should be held.

6    Q.   And the judge agreed with that, correct?

7    A.   Yes.

8    Q.   Over your objection and your attorney's pleading,

9  correct?

10    A.   Yes.

11    Q.   Both here and in Hawaii?

12    A.   Yes.

13    Q.   The government asked that you be held?

14    A.   Yes.

15    Q.   And the judge followed that recommendation?

16    A.   Yes.

17    Q.   And you have been held ever since?

18    A.   Yes, I have.

19    Q.   At any time did you have your own Bitcoin account?

20    A.   Yes.

21    Q.   Did you at all times have your own Bitcoin account?

22    A.   I always had the ability to create a new wallet in the

23  various services that I used.

24    Q.   How do you create a wallet in Bitcoin?

25    A.   You just press a button and it will generate a new

```
 1    wallet address for you.  I don't know exactly how the system

 2    generates a new one, but I know that you can generate as

 3    many as you need.

 4    Q.   And you lived off of Bitcoins and wages and things like

 5    that while you were traveling around the world, correct?

 6    A.   Yes.

 7    Q.   As I understood it and listening, you traveled to New

 8    Zealand?

 9    A.   Yes.

10    Q.   Thailand?

11    A.   Yes.

12    Q.   Laos?

13    A.   Yep.

14    Q.   Indonesia?

15    A.   Yes.

16    Q.   Australia?

17    A.   Yes.

18    Q.   Hawaii?

19    A.   Yes.

20    Q.   What did I miss?

21    A.   Cambodia, Malaysia and Singapore.

22    Q.   In which of those jurisdictions did you work?

23    A.   In Australia and New Zealand.

24    Q.   What did you do in Australia?

25    A.   I was customer support and tech support for an
```

1    e-commerce company.  They helped you as a small business

2    create a website to sell from, like a Shopify type version

3    for Australia.

4    Q.   How long did you have that job?

5    A.   Five months.

6    Q.   What did you do in New Zealand?  I think you already

7    described that.

8    A.   I worked at a fish and chips restaurant doing prep work

9    for them.  I worked on a farm picking weeds a few times.  I

10   picked fruit.  We were house-sitting to avoid that.  And

11   then I worked for Aaron's organization doing customer

12   service.

13   Q.   I think you described your work in New Zealand as

14   minimum wage?

15   A.   Yes.

16   Q.   Is that correct?

17        But minimum wage does not allow you to travel to

18   Thailand, Laos, Indonesia, Singapore and Hawaii and

19   Australia, does it?

20   A.   No.

21   Q.   Getting money from your folks or your friends in Utah

22   allows you to live that lifestyle, correct?

23   A.   Getting money from the drug trafficking I did before I

24   left allowed me to do that.

25   Q.   And getting money from drug trafficking while you're

1   not even involved in the enterprise anymore, correct,

2   according to you?

3   A.   Yes.

4   Q.   You're getting money for something and everyone else is

5   doing all of the work?  Isn't that fair?  Isn't that a fair

6   recitation of what you said?

7   A.   It is money that Aaron and I agreed on originally.

8   Q.   But you're not doing anything you claim and you're

9   still getting money?

10  A.   I'm getting back pay, yes.

11  Q.   Everybody on that chart is here in Utah taking all the

12  risk and you're on the other side of the world getting paid,

13  correct?

14  A.   I took the risk for over a year when I was in the

15  country.  But, yes, once I left I am not taking any of the

16  risk, but I am still receiving payments from Aaron.

17  Q.   Because at that point you had earned something from

18  this organization, correct?

19  A.   Aaron and I made an agreement.

20  Q.   You had earned the right to travel the world and

21  continue to get paid for doing nothing, correct?

22  A.   No.  I chose that.  I didn't earn that.  I chose to

23  leave the country to get away from -- to get away from

24  everything.  I wanted to separate myself from it.  I didn't

25  feel right about it from the beginning.  I had some moral

1   reservations about it and I wanted to leave the country to

2   get away from that and make that clean break.

3   Q.   Can we go to Exhibit 15.05, page 5?

4        If you look at the top of this, and we have already

5   talked about this a little bit, it is an e-mail from you to

6   the two girls, Alex and Katie, correct?

7   A.   Correct.

8   Q.   November 20th of 2016, correct?

9   A.   Yes.

10  Q.   After you had made a clean break from the organization,

11  correct?

12  A.   Correct.

13  Q.   And two days before Aaron was arrested, correct?

14  A.   Yes.

15  Q.   And things were starting to happen at this time,

16  weren't they?

17  A.   What things?

18  Q.   Well, you have learned since that Ryan Jensen had been

19  arrested, correct?

20  A.   Not at this point, no.

21  Q.   And that Sean Gygi was already working with the

22  government, correct?

23  A.   No.  After the fact, but not at this date.

24  Q.   I understand.  Okay.  You now know that?

25  A.   I now know that, yes.

1    Q.   You now know why everything was going haywire during

2    this time, correct?

3    A.   Yes.

4    Q.   And you learned two days later that Aaron had been

5    arrested, correct?

6    A.   Yes.

7    Q.   And you took some fairly significant steps to shield

8    yourself from Aaron and this entire organization, correct?

9    A.   Yes.

10   Q.   You went to a bank and sold your Bitcoin wallet,

11   correct?  You went somewhere and sold it.

12   A.   I went to -- I went online and sold my Bitcoins that

13   were in my wallet and transferred them to my bank.

14   Q.   Let's turn to Exhibit 16.08.  This is a picture of some

15   fellow cashing you out of your Bitcoins, correct?

16   A.   Correct.

17   Q.   On November 22nd?

18   A.   Yes.

19   Q.   The day you learned, right --

20   A.   Yes.

21   Q.   You also reached out to several people involved in this

22   organization, correct?

23   A.   People that I know had been involved before I left, but

24   I was not sure if they were still involved, but, yes.

25   Q.   You wanted to know what was going on, right?

```
 1   A.   Yes.

 2   Q.   You reached out to Sean Gygi?

 3   A.   Yes.

 4   Q.   I think you said you reached out to -- Sean Gygi lied

 5   to you and told you everything is fine, correct?

 6   A.   Correct.

 7   Q.   You reached out to Dan Allen?

 8   A.   Yes.

 9   Q.   And he told you everything was nuts, correct?

10   A.   Yes.

11   Q.   You reached out to Mario Noble?

12   A.   Sasha did.

13   Q.   I'm sorry.  Sahsa did.

14        He sort of lied to you guys, too, at that point,

15   correct?

16   A.   Yes.

17   Q.   He was kind of vague about what was going on I think is

18   the way you described him, correct?

19   A.   Yes.

20   Q.   You then went -- and maybe I don't have my things in

21   order -- and started getting rid of your fingerprint on the

22   internet, correct?

23   A.   Yes.

24   Q.   You started shutting down accounts, correct?

25   A.   Yes.
```

```
 1    Q.   You went immediately and did that, right?
 2    A.   Yes.
 3    Q.   Right?
 4         You told law enforcement you did that to cover
 5    yourself, correct?
 6    A.   Yes.
 7    Q.   In fact, you and your fiancee sort of laid low for what
 8    you thought was a safe period of time, two months, right?
 9    A.   Yes.
10    Q.   You were done with this at that point, right?  You had
11    washed your hands of Aaron and everybody else?
12    A.   Yes.
13    Q.   And you had done everything that you could to get as
14    far away from that as possible?
15    A.   Yes.
16    Q.   And after two months of not hearing anything you
17    decided it was probably safe to come back to the United
18    States?
19    A.   No.  I decided to go through with my wedding.  I guess,
20    yes, the wedding was going to be in Hawaii.  Yes, I didn't
21    think I was going to be arrested when I landed in Hawaii.
22    Q.   Otherwise you probably wouldn't have landed in Hawaii,
23    correct?
24    A.   I would have tried to contact someone here if I knew I
25    was going to be arrested, and I probably would have
```

1    contacted law enforcement and contacted a lawyer to make

2    sure that they were there when I landed.

3    Q.   Prior to the day you were arrested in Hawaii, you had

4    not done any of that?

5    A.   Correct.

6    Q.   You had not reached out to law enforcement?

7    A.   Correct.

8    Q.   You had not done anything at all to help absolve

9    yourself or take any responsibility or own anything in

10    relation to this, correct?

11    A.   Correct.

12    Q.   You had done just the opposite.  You had erased

13    everything that you could find that had your fingerprints on

14    it, correct?

15    A.   Yes.

16    Q.   You talked about something called a pill press.

17    A.   Yes.

18    Q.   Tell the jury what a pill press is.

19    A.   A pill press is a machine that takes powders and

20    presses it into a pill based on the mold you have.

21    Q.   And part of the reason that you use a pill press is so

22    that you can make the powder look like a pill, right?

23    A.   Yes.

24    Q.   Because people don't want powder and they don't want it

25    in a gelcap.  They want the real deal, right?

1    A.    Correct.

2    Q.    And so you got a press to make the powder look like it

3    is the real deal, right?

4    A.    I didn't get the press, but, yes, Aaron and I got --

5    Q.    I know it is everybody else's fault.  I'm just asking.

6    A.    Yes.

7    Q.    And you put some inert substance in there, some filler,

8    right?

9    A.    Yes.

10   Q.    What did you use for that?

11   A.    It is microcrystalline cellulose.

12   Q.    What is that?  Do you know?

13   A.    I don't.  It is just I think what every pill has as a

14   filler to get the shape and the weight that you want.

15   Q.    And how did you get the shape that you wanted?

16   A.    Molds were purchased online.

17   Q.    The mold of a pill?

18   A.    Yes.

19   Q.    And how did you get the weight that you wanted?

20   A.    By getting a real version of the pill and weighing it

21   or just comparing the size.

22   Q.    And how did you get the ratio of the quantity that made

23   the pill the appropriate strength?

24   A.    Aaron gave that to me.

25   Q.    But you figured it out, right?  You're the one that did

```
 1   the math calculation on it, correct?
 2   A.   Yes, because Aaron would always ask me to do it for
 3   him.  He would say, hey, I am having troubling figuring out
 4   this math, this ratio.  Will you do this for me?
 5   Q.   And you did?
 6   A.   Yes.
 7   Q.   You figured out that if you put two drops of this in
 8   and ten drops of this in you'll have a 20-percent solution?
 9   A.   Yes.
10   Q.   Because Aaron couldn't figure that out?
11   A.   No, he didn't want to do it.  He could figure it out
12   himself.
13   Q.   But he never did, did he?
14   A.   He did sometimes.  I was not always there when he was
15   pressing.
16   Q.   That is because you had already set up the formula,
17   correct?
18   A.   It is because I solved the algebra problem, but
19   sometime before we even had that he would text me through
20   Telegram and ask --
21   Q.   How did you get the consistency --
22           THE COURT:  Let him finish his answer.
23           MR. SKORDAS:  I am sorry.
24           THE WITNESS:  Sometimes he would text me through
25   Telegram and tell me what the pills were weighing and then I
```

1    would quickly do the math problem for him and respond.

2    BY MR. SKORDAS

3    Q.   How did you get the consistency?  How did you get the

4    powder to hold together?

5    A.   The pill press does that for you with the pressure.  I

6    think there is binders that are included in the inert

7    substance that help bind the pill together.

8    Q.   In the microcrystalline or whatever it is called?

9    A.   Yeah.

10   Q.   How did you get the color of the pill to match?

11   A.   Trial and error and looking at it.  The Xanax we

12   pressed we added no color.  When we tried to press M.D.M.A.,

13   we just decided on blue and kept adding a blue filler until

14   it looked right.

15   Q.   The Xanax was already white?

16   A.   Yes.

17   Q.   And you used Alprazolam to make that --

18   A.   Yes.

19   Q.   -- that you were buying from China?

20   A.   Yes.

21   Q.   You remember this interview with your lawyers and law

22   enforcement that you have already described and that you

23   have in front of you there, correct?

24   A.   Yes.

25   Q.   They were pretty upset with Aaron Shamo at the time,

```
 1    weren't they?
 2    A.   I assume so.  I don't know their state of mind.
 3    Q.   You were, too, by the end of that, weren't you?
 4    A.   Yeah.
 5    Q.   They had done a pretty good job of getting you upset
 6    about this whole deal, hadn't they?
 7    A.   I think I was upset before that, but, yes, they helped
 8    play into that, I guess.
 9    Q.   Not so upset that you didn't want to get out of this
10    easy money, correct?
11    A.   Sorry?  One more time.
12    Q.   You were not so upset with what was going on that you
13    got out of it?
14    A.   I did make a break at one point, but I did return to
15    it, so yes.
16    Q.   Because it was easy money?
17    A.   Yes.
18    Q.   It was a lot easier than cleaning houses in New
19    Zealand?
20    A.   Yes.
21    Q.   Or waiting tables?
22    A.   Yes.
23            MR. SKORDAS:  That's all that I have, Your Honor.
24            THE COURT:  Thank you.
25            Let's take our longer break and then you can
```

```
 1    redirect, unless it is just a second or two.

 2              MR. STEJSKAL:  I am not sure yet, so --

 3              THE COURT:  All right.  We'll be in recess until

 4    about 20 to.

 5              (WHEREUPON, the jury leaves the proceedings.)

 6              THE COURT:  We'll see you in about 30 minutes.

 7              (Recess)

 8              THE COURT:  I understand that the government is

 9    not going to do redirect on Mr. Crandall?

10              MR. GADD:  Yes, sir.  That is correct.

11              THE COURT:  No redirect and no recross and we have

12    excused him.

13              MR. GADD:  Yes, sir.

14              THE COURT:  All right.

15              Do you have another witness ready to go?

16              MR. GADD:  We do.

17              THE COURT:  Mr. Skordas, is he here?

18              MR. GADD:  He is here.

19              THE COURT:  There he is.

20              Everybody is ready.  Let's get the jury.

21              MR. GADD:  Your Honor, would you mind just telling

22    them once they come in that we had no further questions for

23    Mr. Crandall just so that it makes sense in their minds what

24    is happening?

25              THE COURT:  Yes.
```

```
1              MR. GADD:  Thank you.

2              (WHEREUPON, the jury enters the proceedings.)

3              THE COURT:  The government is not doing a redirect

4    on Mr. Crandall, so no redirect and no recross and so he has

5    been excused so we're on to the next witness.

6              The government may call its next witness.

7              MR. GADD:  Your Honor, the United States calls

8    Mario Noble.

9              THE COURT:  Come forward and be sworn, please,

10   right up here in front of the clerk of court as soon as she

11   gets here.

12                         MARIO NOBLE

13              Having been duly sworn, was examined

14                  and testified as follows:

15              THE WITNESS:  My name is Mario Noble, M-a-r-i-o,

16   N-o-b-l-e.

17              THE COURT:  You may proceed, Mr. Gadd.

18              MR. GADD:  Thank you, sir.

19                      DIRECT EXAMINATION

20   BY MR. GADD

21   Q.   Mr. Noble, are you prepared to testify about your part

22   in the Pharma-Master organization?

23   A.   Yes.

24   Q.   Before we do that, could you tell us just a little bit

25   about yourself?
```

1   A.   Yeah.  I was born and raised in southern California.  I

2   spent 23 years there.  I moved up here to Utah about eight

3   years ago.  I am currently working as a personal trainer,

4   hoping to get into a web development field.  I like to stay

5   active in the gym and spend time with my dogs.

6   Q.   Let's talk for a minute about relationships.

7        MR. GADD:  If we could pull up Exhibit 1706?

8   BY MR. GADD

9   Q.   You'll see it on your screen, but there is also a chart

10  next to you.  I want to ask you some questions once that

11  pops up on the screen.

12       THE COURT:  Can you hear Mr. Gadd all right?

13  Okay.

14       MR. GADD:  I will get even closer.

15  BY MR. GADD

16  Q.   Can you see that on your screen okay?

17  A.   Yes, I can.

18  Q.   All right.  Do you know Mr. Shamo?

19  A.   I do.

20  Q.   Who else do you know?

21  A.   Paz, Crandall, Tonge, Bustin, Gygi, Bruner and Bernal.

22  That is it.

23  Q.   How did you first meet Mr. Shamo?

24  A.   I met him through Drew Crandall's girlfriend.

25  Q.   We have heard her name a bit today.  Go ahead and tell

```
1    us.  What was her name?

2    A.   Sasha Grant.

3    Q.   Did you two become friends?

4    A.   Almost.

5    Q.   That word means something to you, doesn't it, friend?

6    A.   Yes.

7    Q.   Why don't you tell the jury, what is a friend to you?

8    A.   A friend to me would be somebody that you kind of spend

9    time with without any other obligation, somebody that you

10   choose to spend time with.

11   Q.   When you say you were almost friends with Mr. Shamo,

12   what do you mean?

13   A.   We chose to spend time together, but most of the time

14   we spent together was business related.

15   Q.   In 2016 did you spend some time together socially?

16   A.   Yes.

17   Q.   And then certainly time together in business pursuits?

18   A.   Yes.

19   Q.   Do you have an opinion as to whether or not Mr. Shamo

20   was a, to borrow a phrase, high roller?

21   A.   From where I was and my perspective and the stories

22   that he told me made it seem like he was, yeah.

23   Q.   How so?

24   A.   All of his vacations he was staying in like really nice

25   hotels and really nice rooms.  Every time I went out with
```

1   him he had his own table that multiple people were on and he

2   was the only person paying for them and different things

3   like that.

4   Q.   When you say table, is that like at a club?

5   A.   Yes.  Like a V.I.P. table at a club that you had to

6   specifically pay for and only the people that you allowed

7   could come on the table.

8   Q.   You have some knowledge of his vacations, right?

9   A.   He told me stories when like he would come back and

10  stuff, yeah.

11  Q.   And part of the reason he talked to you about vacations

12  was because you were kind of covering for him while he was

13  gone, right?

14  A.   That is true.  Yes.

15  Q.   What sort of vacations do you recall him going on?

16  A.   I remember him going to Mexico and I remember him going

17  down to Vegas a couple of times.

18  Q.   Trips to Tahoe?

19  A.   Yeah.  There were stories there too.

20  Q.   We have heard some people talk about Park City Live.

21  Did you ever go there?

22  A.   Not with Shamo.

23  Q.   You have been there, though?

24  A.   After, yes.

25  Q.   What is that?

```
 1   A.   It is like a music venue.

 2   Q.   How frequently did he make trips to Vegas?

 3   A.   I can remember two trips to Vegas.

 4   Q.   You mentioned that you had a business type of

 5   relationship with him.  Let's talk about how you were

 6   recruited.  How were you first kind of introduced to it?

 7   How did you get involved?

 8   A.   Well, I was actually going -- meeting with him to buy

 9   drugs for my personal recreation, and he informed me that he

10   had a potential job opportunity for me if I was interested.

11   Q.   Do you know approximately when that took place?

12   A.   I believe it was toward the end of January of 2016,

13   beginning of February of 2016.

14   Q.   What was it that he wanted you to do?

15   A.   Initially he wanted me to open my own store on the dark

16   web and sell my own product that he would supply me with.

17   Q.   What happened to your store?

18   A.   It never got off the ground.  There was never -- like

19   the supply could never come through.

20   Q.   That was his responsibility, though, right?

21   A.   Correct.

22   Q.   And then at some point you took on a slightly different

23   role, correct?

24   A.   I did, yes.

25   Q.   Can you walk us through that?
```

1    A.    He asked me while he was going on vacation to respond

2    to customer service requests.

3    Q.    And that turned into a more permanent position?

4    A.    It did.

5    Q.    For doing customer service, how much did Mr. Shamo

6    agree to pay you?

7    A.    I don't remember the initial amount, but it was kind of

8    like on an hourly rate.

9    Q.    And you negotiated that with him over time, right?

10   A.    I did.

11   Q.    Was he prompt at paying your wages?

12   A.    Not always.

13   Q.    How many hours on average would you work for him in a

14   given week?

15   A.    Usually it was about six to seven.

16   Q.    Let's talk first about customer service.  Who taught

17   you how to perform your customer service duties?

18   A.    I have been in the customer service industry for about

19   seven or eight years so I have picked up a lot of my own --

20   how to respond to customers and what they like and things

21   like that.  I was also working at eBay at the time, which my

22   job was to tell people how to respond to their customers, so

23   I had a pretty good idea how to do it myself.

24   Q.    Had you had any experience with the dark net?

25   A.    No.  Zero.

1    Q.    Had you ever performed customer service for a dark net
2    vendor?
3    A.    No.
4    Q.    Was there a little bit of a learning curve for you?
5    A.    A little bit.
6    Q.    Who taught you that aspect of it then?
7    A.    Some of it I picked up like going through the process
8    and then I would like bounce things off of Shamo.
9    Q.    Do you know or do you recall the name of Mr. Shamo's
10   seller account?
11   A.    Pharma-Master.
12   Q.    In order to do customer service for Mr. Shamo as
13   Pharma-Master, did you have to log in to AlphaBay?
14   A.    I did, yes.
15   Q.    Did you use your old log-in?
16   A.    I used my own account, yeah.
17   Q.    That was the account that you set up in order to have
18   your own store, right?
19   A.    Correct.
20   Q.    What was the name on your account?
21   A.    My store name was Dr. Wario.
22   Q.    So if you logged in as Dr. Wario, how did you get
23   access to Mr. Shamo's seller account, Pharma-Master?
24   A.    AlphaBay had the ability to provide -- for your account
25   to provide another account, kind of like backdoor access

1   without them actually having access to your direct account.

2   Q.   Did they call it like shared access?

3   A.   Uh-huh.  Yes.

4   Q.   Is that how you got into his account then, shared

5   access?

6   A.   Yes.

7   Q.   Did you have full access to his account?

8   A.   No, I did not.

9   Q.   What sort of things could you see and access?

10  A.   I could see the feedback, I could see the listings, I

11  could see the orders and I could see the messages.

12  Q.   How about the money, the drug proceeds, the payment,

13  could you access that?

14  A.   I could not.

15  Q.   Could you make new listings, things for sale?

16  A.   I don't remember.

17  Q.   Let's look for just a minute at Exhibit 15.26.  This is

18  a video that you made with some agents.  You will see it pop

19  up on your screen and then I am hoping we can look at a

20  point in that video.  It is time stamped as 20:51.

21      Then if we could jump ahead to 20:51 there.

22      While we're going through it, let me just ask you a

23  little bit of background about the video.  You sat down with

24  some agents I believe in December of 2016, right?

25  A.   That is correct.

```
1    Q.   They had the ability to take a video capture of the

2    screen that you were working on with them, right?

3    A.   Yes.

4    Q.   You walked through AlphaBay, Pharma-Master, the e-mail

5    account?  That is what this video is, right?

6    A.   Correct.

7    Q.   All right.  We're up here now at time stamp 20:51.  You

8    had mentioned that you had kind of backdoor access.  Let's

9    walk through this together and I want to ask you some

10   questions.  At the top right it says logged in as and it is

11   going to zoom up there for you.

12        Can you still read that?

13   A.   Yes.

14   Q.   Who are you logged in as?

15   A.   Dr. Wario.

16   Q.   That is your account, right?

17   A.   Correct.

18        MR. GADD:  If we can zoom back out, Ms. Lauder.

19   BY MR. GADD

20   Q.   Here you're looking at shared access.  Can you kind of

21   walk us through -- give control, take control, and what is

22   going on there?

23   A.   Yeah.  Like I said, you had the ability to give another

24   account control.  So if I wanted to give somebody access to

25   my account, I could go into give control and follow the
```

```
1    prompts there to provide another account access.  Then under

2    the take control tab is where somebody had provided me

3    access to their account.

4    Q.   It looks like as you work across to the right it says

5    take control again and there are two words under that, sales

6    and messages.  Would you click on one of those in order to

7    take control of Pharma-Master?

8    A.   Yeah.  So when you clicked on one of those, it would

9    just take you to those pages as Pharma-Master.

10   Q.   Once you were in there if you were to provide customer

11   service feedback, would it look like it came from Dr. Wario?

12   A.   No, it would not.

13   Q.   Would it look like it came from Pharma-Master?

14   A.   Yes.

15   Q.   Those were the two items that you had shared access

16   for, right?

17   A.   Yes.

18   Q.   Sales and messages?

19   A.   Correct.

20        MR. GADD:  Could we jump ahead to the time stamp

21   34:42?

22   BY MR. GADD

23   Q.   Okay.  Take a minute to look at that there and then I

24   want to ask you some questions about it.

25        We're here on a conversations tab, right?
```

```
 1    A.   Correct.

 2    Q.   And you have identified a conversation for these agents

 3    that are making the video capture, correct?

 4    A.   Yes.

 5    Q.   This is a message, correct?

 6    A.   Yes.

 7    Q.   Can you tell who it was sent by?

 8    A.   I cannot.

 9    Q.   If you were to look -- do you see where it says banned

10    kind of right in the center?

11    A.   Yes.

12    Q.   Just to the left of that --

13    A.   The account it was sent by was Pharma-Master, yes.

14    Q.   That was probably a bad question the first time.

15         Sent by Pharma-Master?

16    A.   Correct.

17    Q.   And then can you read the message underneath?

18    A.   It says this account owner got busted today.  Please

19    delete the account and disable it.  Thanks, P.M.

20    Q.   Over here to the left you can see it says Pharma-Master

21    and banned, right?

22    A.   Yes.

23    Q.   Can you tell from this when that message was sent?

24    A.   It says at the top November 23rd, 2016 at 17:17.

25    Q.   The time stamp is dependent on wherever AlphaBay set up
```

1    their time zone, right?

2    A.   Correct.

3    Q.   You don't happen to know where they set it up, do you?

4    A.   I do not.

5    Q.   Did you send that message?

6    A.   I did not.

7    Q.   Do you know who sent it?

8    A.   I do not.

9    Q.   Were you ever able to deduce who sent it?

10   A.   I can make assumptions.

11   Q.   Walk us through them.  What are your assumptions here?

12   A.   Shamo was busted.  I was at work and there was one

13   other person who had access to the account.

14   Q.   At the time did you know that other person who had some

15   sort of access to it?

16   A.   I knew there was somebody, but I didn't know who it

17   was.

18   Q.   They were also doing customer service like you, right?

19   A.   At that time, yeah.

20   Q.   Let's look at one more.  Same Exhibit, 15.26.  This

21   will be two screen shots and the time stamp starts at 23:43.

22   We're in the about tab here, right?

23   A.   Yes.

24   Q.   This is about team Pharma-Master?

25   A.   Correct.

1    Q.    I know it is a little hazy because it is a screen shot

2    of a video, but are you able to read about us and shipping?

3    You can see those?

4    A.    Yes.

5    Q.    Can you read that about us section to the jury?

6    A.    Sure.  We are a U.S. based team that prides ourselves

7    in delivering the highest quality products.  We pride

8    ourselves in fast delivery, top-notch stealth and customer

9    satisfaction.  The product is always on point.

10   Q.    Then shipping.

11   A.    We guarantee we have the best stealth for the product

12   that you purchase.  Each order is sent within 24 to 48

13   hours.  We don't ship Saturday or Sunday so keep that in

14   mind when placing your order.

15   Q.    Can you read the next line down that starts with the

16   two asterisks?

17   A.    The please do not discuss?

18   Q.    Yes.

19   A.    Please do not discuss stealth specifics as I rotate

20   stealth methods often.

21   Q.    We're looking in the more about me or the about tab.

22         Did you write any of this?

23   A.    None of it.

24   Q.    Do you know who wrote it?

25   A.    I would assume Shamo, but we never talked about it.

1   Q.   Was this here in some form or another once you started

2   working for Mr. Shamo?

3   A.   Yes.

4   Q.   You can see just below where you finished reading there

5   is an address section.

6   A.   Uh-huh.

7   Q.   Can up read that for the jury?

8   A.   Please provide an address with my P.G.P. key.  I'm

9   getting a lot of weird addresses so please use this format.

10       Do you want me to read the format?

11  Q.   No.  That is okay.

12       MR. GADD:  Can we look at 23:52?

13  BY MR. GADD

14  Q.   You can see where that address format is kind of at the

15  top of the screen, right?

16  A.   Yes.

17       MR. GADD:  Then if we could pick it up at the end

18  of the address format where it says any order --

19  BY MR. GADD

20  Q.   Could you read that?

21  A.   Any order that does not have as address or is unable to

22  be decrypted I cancel automatically.  Just reorder if this

23  happens and make sure to provide your address correctly.

24  Any order without a first and last name I do not cover any

25  shipping issues, no reship, no refund.

1    Q.   Let's read the refund section.  Could you read that

2    one?

3    A.   I always stand by my shipping and stealth.  I will

4    re-ship any product.  That does not make it free of charge.

5    Please wait to bring up non-delivered issues ten days after

6    being marked shipped.  Please reach out to me before leaving

7    any type of feedback.

8    Q.   Let's change gears now and let's talk about customer

9    service and what a typical response might be.  Could you

10   explain to the jury kind of the process that you would go

11   through to get a customer service inquiry and then give a

12   typical response?

13   A.   So I would go through the shared access, go into the

14   messages, and typically I would scroll to the message that

15   was received first because they were listed in order so I

16   would go backwards.  So the ones that were sent later got

17   responded to first.

18        I would read their message and see what it was that

19   they needed.  A lot of the messages that they sent would

20   follow along like a similar pattern, so I had a few canned

21   responses ready.

22   Q.   Did you encounter when you were doing customer service

23   people who wanted to dispute with you?

24   A.   Yes.

25   Q.   Did you ever have instances where you needed to re-ship

```
 1    or you needed to have product re-shipped to a customer?

 2    A.   I did, yes.

 3              MR. GADD:  Could we look quickly at 15.06 and

 4    let's go down to page 30.  Then if we could look at the top

 5    half or so.  All right.

 6    BY MR. GADD

 7    Q.   Let's lay a little foundation here.

 8         We're looking at an e-mail that is from DRW-99.

 9         Who is that?

10    A.   That is my e-mail account.

11    Q.   It is at sigaint.org.  What is that?

12    A.   Like a dark web e-mail domain.

13    Q.   Whose idea was it for you to set up an e-mail account

14    on that?

15    A.   Shamo's.

16    Q.   Pass the peas.  Who is that?

17    A.   Those were the people that were responsible for

18    shipping the product.

19    Q.   American Steam?

20    A.   That was Shamo.

21    Q.   When you were sending e-mails you had a habit of

22    replying to previous e-mails, right?

23    A.   Correct.

24    Q.   Is that why we see kind of this mess up here in the

25    subject line?
```

1    A.   Yeah.

2    Q.   Reply, forward, reply?

3    A.   Yes.

4    Q.   And then in the body of this e-mail from you, you have

5    got three asterisks and then you say disputers.  That is it,

6    right?

7    A.   Yeah.

8    Q.   You have attached something to this though, right?

9    A.   Yeah.

10   Q.   And that is what you're sending, right?

11   A.   Yes.

12   Q.   What is it that you would have attached?  Do you want

13   us to zoom out?  Will that help?

14   A.   I mean, if it was a dispute and I had something

15   attached, it would be reshipments.

16   Q.   When you attach a document, what type of file is it

17   typically?

18   A.   I would attach them as text documents.

19   Q.   Would you encrypt them?

20   A.   I would.

21   Q.   Using P.G.P. encryption?

22   A.   Yes.

23   Q.   Let's talk about P.G.P. encryption and decrypting for

24   just a moment.  Did Mr. Shamo give you his private P.G.P.

25   key?

```
 1    A.    He did.

 2    Q.    Did he send it to you by e-mail?

 3    A.    I don't remember.

 4    Q.    Let's look at 15.06, same exhibit, first page.  Maybe

 5    this is helpful for the jury.  There is this black box on

 6    top.  Is that how it looked when you logged in?

 7    A.    Yes.

 8          MR. GADD:  And then if we can go back out, Ms.

 9    Lauder.

10    BY MR. GADD

11    Q.    The rest of the stuff on the page, the white stuff,

12    that is just the contents of the e-mails that would have

13    been clicked on in that box, right?

14    A.    Yeah.

15    Q.    Okay.  So you are looking at this first e-mail and this

16    is another reply because that is your habit, right?

17    A.    Yes.

18    Q.    In the e-mail you say track, track, track, track, but

19    I'm interested in the e-mail that you replied to.  Do you

20    see that there starting with the arrows?

21    A.    Yeah.

22    Q.    That is from Mr. Shamo, right?

23    A.    Yes.

24    Q.    In it he writes my P.G.P. key, yeah.  So the question

25    from before is did Mr. Shamo give you his private P.G.P.
```

1   key?

2   A.   Yes.

3   Q.   He also has some other information in that e-mail to

4   you starting with market.  Do you recognize what is below

5   that?

6   A.   That looks like the U.R.L. for the AlphaBay

7   marketplace.

8   Q.   And then there is pass with a colon.  What is below

9   that?  Do you recognize that?

10  A.   I do know that that is a password into something and

11  then the words below that are like the code words.  If you

12  forgot your password, you had to have those code words to

13  get a new password.

14  Q.   Like a recovery phrase?

15  A.   Right.

16  Q.   You mentioned just a minute ago canned responses.  I

17  want to show the jury just a couple of them.

18            MR. GADD:  If we could look at 17.08.

19  BY MR. GADD

20  Q.   Do you recognize this?

21  A.   I do.

22  Q.   Did you create this list of canned responses?

23  A.   I did.

24  Q.   Would you kind of create it in order as you ran into

25  something?

```
 1   A.   Yeah.  As I got more and more messages around the same
 2   thread, I would create a canned response around it.
 3   Q.   You seem to sign your e-mails thanks, P.M.
 4        Do you see that on there?
 5   A.   P dash M.  Yeah.
 6   Q.   Thank you for clarifying that.  P-M.
 7        Was that always kind of how you signed off?
 8   A.   Always.
 9   Q.   If you would, read starting with tracking update and
10   four or five rows down.  Can you read us that canned
11   response?
12   A.   Yeah.  Thank you for reaching out to us.  We have
13   investigated your order.  You can find a link to the
14   tracking for your order below.  Tracking, and then that is
15   where I put the tracking number, hope this helps.  Let us
16   know if you need any further assistance from us.  Thanks,
17   P-M.
18   Q.   Having canned responses, did it make your job easier?
19   A.   It did.
20   Q.   Faster?
21   A.   Yes.
22   Q.   At some point were you being paid a flat rate?
23   A.   I was.
24   Q.   So efficiency was important to you?
25   A.   Yes.
```

1    Q.    Let's look at just one more.  Go down four pages.  The
2    top one is custom under 5-K plus.
3          What is that?
4    A.    It would be a custom order, a customer requesting a
5    custom order under 5,000 pills.
6    Q.    All right.  What was your canned response?
7    A.    Thank you for reaching out to us.  We appreciate your
8    interest in our product.  We want to move our product as
9    efficiently as possible.  We are currently moving toward
10   bulk heavier shipments.  Because of this change we will only
11   be creating custom listings for orders of 5-K plus going
12   forward.  Please let us know if you are interested in a bulk
13   order.
14   Q.    Who made the decision to not take custom orders for
15   less than 5,000 pills?
16   A.    Shamo.
17   Q.    And he expressed that decision to you?
18   A.    Correct.
19   Q.    That is how you knew what to say?
20   A.    Yeah.
21   Q.    Is that true for most of these?
22   A.    Yes.
23   Q.    Let's talk about communicating with Mr. Shamo.  Would
24   you use Telegram?
25   A.    Yes.

1   Q.   Why Telegram?

2   A.   I was told that it was an encrypted form of instant

3   messaging.

4   Q.   Who told you that?

5   A.   Drew Crandall's girlfriend, Sasha Grant.

6   Q.   Mr. Shamo also used Telegram?

7   A.   Yes.

8   Q.   Were you comfortable asking Mr. Shamo for direction and

9   advice?

10  A.   Uh-huh.  Yes.

11  Q.   I want to look through some of your communications with

12  him.

13  A.   Okay.

14  Q.   This will be Exhibit 14.15.  My thought in this is that

15  maybe you and I can go through it by topic rather than

16  chronologically.

17  A.   Okay.

18  Q.   We'll see if it falls flat.  First let's talk about Tor

19  and P.G.P., the first topic.  Look at page 3, I think, right

20  at the bottom.

21       You have had a chance to look at this before, right?

22  A.   Yes.

23  Q.   On these boxes where it says at the bottom A.S., that

24  is from Mr. Shamo, right?

25  A.   Yes.

1    Q.   The other colored boxes, those are from you?

2    A.   Yes.

3    Q.   This bottom message from him, could you read that out

4    loud?

5    A.   K, I'm gonna for sure get your account up tonight.

6    Make sure to download the Tor browser.

7    Q.   Did you know what Tor was prior to making this

8    arrangement with Mr. Shamo?

9    A.   I did not.

10   Q.   Did he teach you about it?

11   A.   He did.

12   Q.   If we could go to page 4 and we're going to look at

13   P.G.P. for U.S.B.  Up there at the top, do you see that

14   first handful of messages?

15   A.   Yes.

16   Q.   What is it you're asking in that first question?  Go

17   ahead and read it.

18   A.   Yep.  And G.P.G. and what was the name of the e-mail

19   thing?

20   Q.   And then his response?

21   A.   G.P.G. for U.S.B.

22   Q.   What is that?

23   A.   I don't remember.

24   Q.   Could it have a program you used to decrypt?

25   A.   It could have.

1    Q.   Let's go to the bottom now of page 4.  He is going to

2    ask you a question above that.  I am sorry.  I should have

3    warned you.

4              MR. GADD:  Can we just zoom out here?

5    BY MR. GADD

6    Q.   There is a correction there in his question, but do you

7    understand what he is communicating?

8    A.   Yes.  He wanted to know what I decided on my name.

9    Q.   That is when you made a decision?

10   A.   Correct.

11   Q.   And you told him?

12   A.   Yes.

13   Q.   Do you recall your first sale?

14   A.   Yeah.

15   Q.   Were you able to decrypt the message coming in on your

16   first sale?

17   A.   The first sale for my account?

18   Q.   For your account, Dr. Wario.

19   A.   Yes.

20   Q.   At some point you needed Mr. Shamo's private key in

21   order to decrypt, right?

22   A.   Not from the ones that were coming on my account.

23   Q.   Maybe that is the distinction.  Let's look at page 36.

24   Right there in the middle starting with yo, can you read

25   your question to him?

```
 1   A.   Yo, I think because the sales were on your account with
 2   your public key I can't decrypt people's public keys to
 3   process orders.  Do you know of a way to bypass that?
 4   Q.   Then you can skip the next line.  Read the bottom one
 5   there.
 6   A.   I will have to give you my private key and pass.
 7   Q.   At some point you got his private key anyway to do his
 8   customer service, right?
 9   A.   Correct.
10   Q.   Let's talk about his keys for a moment.
11        MR. GADD:  Can we look at page 45?
12   BY MR. GADD
13   Q.   So you go through several pages where you're trying to
14   troubleshoot and you're trying to figure out decrypting,
15   right?  It looks like maybe you don't have the right key,
16   correct?
17   A.   Correct.
18   Q.   You are going to ask a couple of questions to him here.
19   The bottom three, if we could look at those, and can you
20   read your top kind of response to him?
21   A.   Yeah.  I think I want a key at master4life.com.
22   Q.   And then next?
23   A.   Haveoneathome.com.
24   Q.   When you say you want or you have, you are referring
25   not to your keys but Mr. Shamo's keys, correct?
```

```
 1   A.   Correct.
 2   Q.   You're just trying to find the right one so that you
 3   can do your job?
 4   A.   Yes.
 5   Q.   How did you know that you needed or wanted one at
 6   master4life.com?
 7   A.   I believe there was something with the key that I was
 8   trying to decrypt that had that in there.
 9   Q.   You were kind of trying to figure it out, the missing
10   links sort of?
11   A.   Sort of speak, yes.
12   Q.   And then you said you had one that is athome.com.  Is
13   that kind of the same process, that you were able to use
14   your program to figure out what you had?
15   A.   Yes.
16   Q.   And then you must have figured it out because of the
17   bottom line, right?
18   A.   That is what it looks like, yes.
19   Q.   New topic.  Let's now talk about sigaint, but I want to
20   talk about it in terms of your Telegram messages with Mr.
21   Shamo.  Look at the bottom of page 8.
22        We're going to be in 14 and 15 for a while.  Not too
23   long, I promise.
24   A.   Thank you.
25   Q.   Sure.  Page 8, if we could.
```

```
 1        Bottom three -- that DRW-99, that is your sigaint,
 2   right?
 3   A.   Correct.
 4   Q.   You're telling him, right --
 5   A.   Yeah.
 6   Q.   -- and then you ask him a question in the middle box
 7   there, right?
 8   A.   Yes.
 9   Q.   What did you mean by are you able to access your S.I.
10   e-mail?
11   A.   The sigaint domain to e-mail.
12   Q.   And what was his response?
13   A.   Yeah.  I'm on American Steam all day.
14   Q.   A little ways further in -- you had a problem at one
15   point while he was on vacation, right?
16   A.   Yeah.
17   Q.   You needed to communicate with the shippers?
18   A.   Uh-huh.
19   Q.   But your e-mails were not working?
20   A.   Correct.
21   Q.   Were you trying to get Mr. Shamo to troubleshoot it?
22   A.   Yeah.
23   Q.   From wherever he was on vacation?
24   A.   Correct.
25   Q.   Eventually you figure it out, right?
```

1      Page 62.  Let's look at the top six or so.  This first

2    part there he is saying pass the pea, singular.  He is just

3    trying to troubleshoot for you, right?

4    A.   Correct.

5    Q.   He says try both, L.O.L.

6    A.   Yes.

7    Q.   Read the fourth box down there and feel free to

8    abbreviate some of the words you think you should.

9    A.   Dude, I think we are all freaking dyslexic.  The site

10   is called sigaint.  I thought it was giant.  We have all

11   been spelling it wrong.  Hopefully that worked.

12   Q.   That was the problem, right?

13   A.   Correct.

14   Q.   Was this a common issue?  Did you know other people

15   that were having that problem where they were inverting the

16   A and the I?

17   A.   I know I had a problem with it and that is why I only

18   referred to it as the S.I., because I couldn't remember

19   which way the rest of it was supposed to be.

20   Q.   Thank you.  That was probably a bad question but a good

21   answer.  Thank you.

22       You were having trouble talking to the shippers.  Did

23   you later find out who the shippers were?

24   A.   I know who they are now.

25   Q.   You actually know the shippers, right?

```
 1    A.   I do.

 2    Q.   And knew them at the time?

 3    A.   I did.

 4    Q.   When you were at work how closely did you sit next to

 5    Ms. Bustin?

 6    A.   She sat directly to my left.

 7    Q.   Like right next to you?

 8    A.   Right next to me.

 9    Q.   Did you have any idea at that point that your night

10    activities and her night activities were connected?

11    A.   I did not.  I saw that she had Telegram on her phone at

12    one point.

13    Q.   What did you say to her about that?

14    A.   Hey, why do you have Telegram?

15    Q.   What did she say?

16    A.   Don't worry about it.

17    Q.   Did you tell her you had Telegram?

18    A.   I did not.

19    Q.   New topic.  Ready?  Let's talk about Reddit Reviewer.

20         MR. GADD:  Can we look at page 13?

21    BY MR. GADD

22    Q.   Right at the top -- it will be much of it though.  I

23    guess we'll make it go in two parts.

24         What is it you're telling Mr. Shamo here in the first

25    box?
```

```
 1   A.   Basically somebody wanted to get a free shipment so
 2   that they could try it out and then review it so that other
 3   people knew what they were getting themselves into.
 4   Q.   Did that happen with some frequency?
 5   A.   A couple of times.
 6   Q.   Did you have authority to make that decision?
 7   A.   I didn't feel like I did, no.
 8   Q.   So what did Mr. Shamo tell you there?
 9   A.   In this case he wanted to move forward with it.
10   Q.   He gives you some direction in that third box, right?
11   A.   Correct.
12        MR. GADD:  If we could zoom out and look at the
13   second half of it.
14   BY MR. GADD
15   Q.   You looked into him, right?
16   A.   I did.
17   Q.   He seemed pretty legit to you?
18   A.   He did.
19   Q.   Let's talk for a minute now about Fentanyl.
20        MR. GADD:  If we could look at the bottom of page
21   14.
22   BY MR. GADD
23   Q.   This is still in the time period where you're thinking
24   you're going to set up your own store, right?
25   A.   Yes.
```

1   Q.   Let's look at the bottom communication he had with you,

2   that bottom box.  Do you remember him saying that to you or

3   writing it to you?

4   A.   Yeah.

5   Q.   What did you think when he said I say we can make 10-K

6   within two weeks?

7   A.   That is a lot of money.

8           MR. GADD:  Can we look at the top of 15?

9   BY MR. GADD

10  Q.   That is good.  Then we will keep going.

11          He gives you some instruction here, right?

12  A.   Yes.

13  Q.   Did he phrase that in the form of a question?

14  A.   No.

15  Q.   He told you?

16  A.   Yeah.

17          MR. GADD:  Then if we could zoom out, now we're

18  going to read a few more of the messages here.  We can go

19  most of the way down, I think.

20          If there is anyone on the jury when we're doing this

21  and you can't read it, just raise your hand and we'll do a

22  better zoom.

23  BY MR. GADD

24  Q.   The top row there, that is your response to his earlier

25  assertion, correct?

```
 1   A.   Correct.

 2   Q.   And then in the next row you're asking him a question?

 3   A.   Uh-huh.

 4   Q.   What is it you asked him?

 5   A.   What is fent candy?  I will have to do my research.

 6   Q.   Then did you explain why you were asking the question

 7   in the next row?

 8   A.   So that I could describe it in the listing, yeah.

 9   Q.   And then he answered your question, right?

10   A.   Yes.

11   Q.   What did he say?

12   A.   He said it is Fentanyl.

13   Q.   Did he say how much he had?

14   A.   He said he has a ton of it.

15   Q.   Did he encourage you to trust him?

16   A.   Yeah.

17   Q.   You needed to ask him some additional questions, right?

18   Look now at page 16.  He is starting with take a pic of more

19   candy, so the second one down, and if we could look at the

20   box of Mr. Shamo's replies.  Go down five or so.

21        Here is more direction from him, right?

22   A.   Yes.

23   Q.   And he says take a pic of more candy.  What did you

24   understand that to mean?

25   A.   At the time I just had regular candy that I bought and
```

```
 1   was taking pictures of.

 2   Q.   And he wanted more candy?

 3   A.   Uh-huh.  Yes.

 4   Q.   And then the next row, 500 micrograms.  Was that a

 5   response to your question, an earlier question?

 6   A.   Yes, describing it so that I knew what to put in the

 7   listing.

 8   Q.   Then he is going to tell you what price to charge,

 9   right?

10   A.   Yeah.

11   Q.   What does he mean I.D.K. ten per candy?

12   A.   I don't know, ten per candy, so he is just ballparking.

13   Q.   This is brand new, right?

14   A.   Yes.

15   Q.   Can we look at page 20?  Mr. Shamo there, the third one

16   down, what does he tell you there in the middle?

17   A.   He says the Fentanyl candy will fly off the shelf,

18   saying it will sell fast.

19   Q.   And then the bottom one?

20   A.   So we want to focus on that and the Xanax first.

21   Q.   Did you know what Fentanyl was?

22   A.   He had -- before I got involved in this, no, I had

23   never even heard of it.

24   Q.   Did he tell you what it was?

25   A.   He said it had similar effects to heroin.
```

1  Q.   Let's change topics now.  Let's talk about the phrase
2  finalize early.  If we could look at page 23.  The third
3  from the bottom you're going to ask him a question, and
4  could you read that question?
5  A.   Do we F.E.?
6  Q.   What does F.E. mean?
7  A.   Finalize early.
8  Q.   What is his response?
9  A.   No, we allow escrow.
10 Q.   From that response and from your work in customer
11 service, did you get a sense for whether or not
12 Pharma-Master would allow customers to finalize early?
13 A.   Yes.
14 Q.   But they could also use AlphaBay's escrow service,
15 right?
16 A.   Yes.
17 Q.   Let's talk about kind of in a general sense Fentanyl,
18 but also the names Oxycodone and Roxy and things like that.
19       MR. GADD:  Can we look at the bottom of page 24?
20 BY MR. GADD
21 Q.   You're still trying to set up your own site at this
22 point, right?
23 A.   Correct.
24 Q.   Is that you responding to him here at the top box?
25 A.   Yes, it is.

1    Q.   And then what is his response down here at the bottom?

2    A.   Do you want me to read it?

3    Q.   Please.

4    A.   I don't have M.D.M.A. crystal yet.  I will have to

5    order some soon and Valium soon so hold off on that too for

6    another week, maybe less.  I am working on getting

7    Oxycontin, a ten milligram mold, and once I do, you can sell

8    those on top of the other Roxies that I have.  They go fast.

9    Q.   At some point you're going to have to clarify with him

10   the difference between a Fent Roxy and a Roxy, right?

11   A.   Correct.

12   Q.   Before we do that, did you know what M.D.M.A. was?

13   A.   I did.

14   Q.   What is another name for it?

15   A.   Ectasy.

16   Q.   Now let's go and let's look at page 55, the third line

17   from the bottom, if we could do that, and then look at the

18   bottom three.

19        You have got a question here for him, right?  Read that

20   question out loud.

21   A.   Hey, are Fent Roxies and Roxies -- I see -- different?

22   Do they need to be separated different on the sheet I send

23   the shippers?

24   Q.   Now we have to lay a little foundation, right?  This is

25   not customer service?

```
 1    A.    No.

 2    Q.    It is order processing?

 3    A.    Correct.

 4    Q.    You would do that sometimes, right?

 5    A.    Yes.

 6    Q.    So in your question you say, hey, are Fent Roxies and

 7    Roxies, and then there is that dash, I see.  Do you think

 8    that could have been like a fat finger, a mistype --

 9    A.    It could have been a typo.

10    Q.    -- for maybe Oxy?

11    A.    It is possible.

12    Q.    Either way you asked him are they different.  What is

13    his response?

14    A.    No, both are the same.

15    Q.    And then below that?

16    A.    Same price, just different.

17    Q.    Let's look at page 79.  It is the second full box, a

18    question for you, and we'll go down maybe five to --

19    perfect.  That is great.

20          Could you read that top box?

21    A.    Someone wants to know if they could shoot a full Roxy

22    and how much Fent is in each one.  Any insight?

23    Q.    You didn't know the answers to those questions, right?

24    A.    I did not.

25    Q.    That is one that you clearly asked for assistance on?
```

```
 1   A.   Correct.

 2   Q.   What did he say?  Can you read those?

 3   A.   Just say the effects equal a 30 milligram Roxy.  Yeah,

 4   they can shoot a full one.  They are a safe dose so no

 5   O.D.s.  I said perfect.

 6   Q.   Did you ever talk to him about the quality of the drugs

 7   that he was selling?  Did he ever express an opinion as to

 8   his quality?

 9   A.   Yeah.  He said they were top-notch.  Maybe not those

10   words, but he made it seem like they were high quality.

11   Q.   Something to that effect, equal perhaps to a

12   prescription drug?

13   A.   Correct.

14   Q.   Let's look at pages 114 and 115.  We better do that one

15   at a time, now that I think about it.

16        You got a complaint here, right, the second from the

17   bottom?

18   A.   Yes.

19   Q.   We'll look at those two and then we'll go down.

20        Can you read your question to Mr. Shamo?

21   A.   Do you want the whole thing?

22   Q.   Please.  Yes.

23   A.   Also, someone has complained about getting Roxies that

24   were pressed when he ordered non-pressed, non-Fent Roxies.

25   Is that a thing?  Should we re-ship?
```

```
 1   Q.   What is his response?

 2   A.   L.O.L.  I only have pressed Fent.

 3   Q.   Now if we can go to the next page and then just the

 4   first one there.

 5   A.   It is clearly in the description.

 6   Q.   So there must have been somewhere other than like in

 7   the title of the listing where that information was

 8   contained?

 9   A.   Correct.

10   Q.   Do you remember actually seeing it in a description

11   somewhere?

12   A.   In the description, yeah.

13   Q.   How did your customer get confused?  Do you know?

14   A.   I don't.

15   Q.   Any idea?

16   A.   I mean, there was another listing that didn't have Fent

17   in the title.

18   Q.   So some listings had Fentanyl in the title and others

19   don't?

20   A.   Correct.

21   Q.   Let's look at page 122.  From time to time would you

22   get complaints about the pills that your shipping team was

23   sending out?

24   A.   Yes.

25   Q.   Would you flag those for Mr. Shamo?
```

1   A.   Yes.

2   Q.   If it was like an isolated, single complaint, would you

3   flag it for him?

4   A.   It got to a point where I sometimes would make a

5   decision, like he told me just if it seems legit, to just

6   re-ship it or refund, so sometimes I would make the

7   decision.

8   Q.   If you got several complaints in a row, is that

9   something that you would raise to his attention?

10  A.   Yeah.

11  Q.   Let's look at the bottom four.  Thank you.

12       Can you read your response to him and the question you

13  asked in that top box?

14  A.   Yo, lots of complaints about thin Roxies.  Is that

15  going to change?

16  Q.   What did he say?

17  A.   Yeah.  Thin Roxies was very brief.  The new ones are

18  perfect.

19  Q.   And then?

20  A.   We're sending the perfect ones out now.

21  Q.   With that information what do you do for your customers

22  who are complaining?

23  A.   I would offer them a reshipment.

24  Q.   In your experience did most customers take you up on

25  that?

1   A.   Most of them.

2   Q.   If it was not a reshipment would it be a refund?

3   A.   It would.

4   Q.   Did you have the ability to refund?

5   A.   I did not.

6        MR. GADD:  Could we look at page 134?

7        THE WITNESS:  Can I go back to that last question?

8   BY MR. GADD

9   Q.   Sure.

10  A.   So initially when I had access I wasn't able to

11  initiate a refund, but it got to the point where he wanted

12  me to be more autonomous.  I never pronounce that word

13  right.  He did give me access to the sales so I was able to

14  process refunds towards the end.

15  Q.   Thank you for clarifying.

16       We're here on page 134 now.  I want to direct you to

17  the very bottom box there.

18  A.   Okay.

19  Q.   Do you see that one?  Do you remember asking him this

20  question?

21  A.   I do.

22  Q.   Could you read that for the jury and, I should say, for

23  the record?

24  A.   Yes.  Someone wants to pick up 1-K Roxies local.

25  Interested?

1    Q.   And then if we could look at his response, which I

2    think goes on to the next page.  It is just that top box,

3    right?  Can you see that there?

4    A.   Yeah.

5    Q.   What was his response?

6    A.   He told me to sticky the message.

7    Q.   At some point did Mr. Shamo tell you about a local

8    dealer?

9    A.   He did.

10   Q.   Someone he was giving Fentanyl pills to?

11   A.   Correct.

12         MR. GADD:  Could we look at page 146 at the

13   bottom?

14   BY MR. GADD

15   Q.   You have raised something to his attention here, right?

16   A.   Correct.

17   Q.   Could you read the top box?

18   A.   Someone is saying Alpha is thinking about removing Fent

19   being sold, says there is a threat about it.  I will sticky

20   it if you want to take a look.

21   Q.   When you say in there someone is saying Alpha is

22   thinking about -- what is Alpha?

23   A.   AlphaBay, the marketplace.

24   Q.   Put this maybe in your own words, but explain to the

25   jury what this means.  What does it mean?

```
1    A.    Essentially it meant that his most like top selling

2    product might be pulled, so it would impact profits.

3              MR. GADD:  Could we look at 147 now?

4    BY MR. GADD

5    Q.    His response is at the top, right?

6    A.    Correct.

7              MR. GADD:  Let's go maybe to the first six or so.

8    That is great.

9    BY MR. GADD

10   Q.    This is his response, right?  That is weird.

11   A.    Correct.

12   Q.    L.O.L.

13         And then he asks is it a Reddit article or just a

14   rumor?

15   A.    Uh-huh.

16   Q.    What was your response?

17   A.    It is a Reddit article.

18   Q.    Did he indicate whether or not that was going to be

19   good for him?

20   A.    He did.

21   Q.    At the bottom there?

22   A.    Correct.

23   Q.    Did he say it is not good for me?

24   A.    He did.

25   Q.    He didn't say it is not good for us, did he?
```

```
 1    A.   He did not.

 2    Q.   He didn't say it is not good for his boss, did he?

 3    A.   He did not.

 4         MR. GADD:  Could we look at page 150, the bottom

 5    two messages, if we could.

 6    BY MR. GADD

 7    Q.   Is this another instance where you're getting some sort

 8    of customer service inquiry that you need to raise to Mr.

 9    Shamo's attention?

10    A.   Yeah, it is.

11    Q.   Could you read that top box for us?

12    A.   Someone wants 10-K but wants to know what analogue is

13    used.  Also wants to know how much Fent and active

14    ingredients.

15    Q.   10-K, that is 10,000 pills, right?

16    A.   Correct.

17    Q.   And then you asked the second question in the box

18    there.  What was your question to Mr. Shamo?

19    A.   I asked him if he wanted me to hit them with the we

20    don't talk about formula or if he wanted to respond to it.

21         MR. GADD:  Then if we could zoom out, and then if

22    we could just scroll down one page.

23    BY MR. GADD

24    Q.   It is the very top one, his response, correct?

25    A.   Yes.
```

1   Q.   When he says sticky it, that means flag it for him,

2   right?

3   A.   Flag it so it will stick to the top so he does not have

4   to search for the message.

5   Q.   And then he indicates that he will take over from here?

6   A.   Correct.

7          MR. GADD:  Could we go to 154?  If we could, let's

8   look at the top seven or so.  Maybe one more.  That is

9   great.

10  BY MR. GADD

11  Q.   Can you tell us the date for these?  We have not done

12  much of that but let's do it here.  What is the date on

13  this?

14  A.   The date is May 26, 2016.

15  Q.   And you're going to ask him a question in these top two

16  boxes, right?

17  A.   Yes.

18  Q.   Would you read that question?

19  A.   Roxie just means replica Oxycodone, right?

20  Q.   So you started in the spring, February and March,

21  right?

22  A.   Correct.

23  Q.   It is now the end of May, and is this the first time

24  you have had this question that you can remember?

25  A.   It was the first time that I had to respond to it, so

```
1    yes.

2    Q.   You're asking this not for your own benefit.  You need

3    to respond to someone, right?

4    A.   Correct.

5    Q.   When you say Roxie just means replica Oxycodone, right,

6    what is his response?

7    A.   Mine does, yeah.

8    Q.   And then?

9    A.   I only sell replica.

10   Q.   But he did not quite answer the question you were

11   asking, right?

12   A.   Correct.

13   Q.   So you're going to pose it a different way down here,

14   right?

15   A.   Yes.

16   Q.   Read that one.

17   A.   Yeah, but Roxies are an official drug, right?  The R

18   just means it is a replica?

19   Q.   And then what is his response?

20   A.   No.  Roxie is a real drug made from real Oxycodone.

21   Q.   And then his next line there?

22   A.   Mine are made with a substitute.

23   Q.   At the point you knew what the substitute was, right?

24   A.   Correct.

25   Q.   He had told you it was Fentanyl?
```

```
 1   A.   Yes.

 2   Q.   Let's change gears.  We have been talking about

 3   Fentanyl and Roxy and Roxies.  I now want to talk about a

 4   phrase called drops.  Are you familiar with that phrase?

 5   A.   Yes, I am.

 6   Q.   I guess it is more of a term than a phrase.

 7        MR. GADD:  If we could look at page 38 and third

 8   from the bottom there.

 9   BY MR. GADD

10   Q.   He is giving you an excuse here and he indicates that

11   he just got back picking stuff up from drops down south.

12   Long day.

13        At that point did you know what he meant when he said

14   drop or drops?

15   A.   I don't remember.

16   Q.   You know it now, though, right?

17   A.   I do.

18   Q.   What is a drop?

19   A.   Essentially an address that he would use to send stuff

20   so that it didn't come directly to him.

21        MR. GADD:  Could we jump ahead now to 146?

22   BY MR. GADD

23   Q.   Drops or maybe another term is package receivers?

24   A.   Yes.

25   Q.   They earned money for accepting packages, right?
```

```
 1    A.   They did.

 2    Q.   And you knew that?

 3    A.   I did.

 4    Q.   At one point did you talk to some friends of yours

 5    about becoming drops?

 6    A.   I did.

 7    Q.   Second there from the bottom, what is it you indicated

 8    here in the white box to him?

 9    A.   I had spoken to him about someone being a drop for him

10    and I was telling him that I had the address if he wanted

11    it.

12    Q.   What did you stand to gain from giving him a drop?

13    A.   I was going to split the proceeds with the drop.

14    Q.   So if you got $300 for a package, how would you split

15    it?

16    A.   50-50.

17    Q.   Your drops, the people you recruited, they knew that,

18    right?

19    A.   Correct.

20    Q.   Mr. Shamo knew as well?

21    A.   I don't remember.

22    Q.   Okay.

23         MR. GADD:  Scroll down.  I think we're going to go

24    to page 148, the top box there, and then we'll do maybe the

25    first five or so.
```

```
 1    BY MR. GADD

 2    Q.   Do you recognize the name in that top box?

 3    A.   I do.

 4    Q.   And the address?

 5    A.   Yes.

 6    Q.   Who is Jordan Bernal?

 7    A.   It is a friend of mine.

 8    Q.   Was he the drop that you had referenced?

 9    A.   He was.

10    Q.   And you in fact explain that in the next communication,

11    right?

12    A.   Correct.

13    Q.   That is what you mean when you say the drop?

14    A.   Yes.

15    Q.   And then what is it you ask him to do right after the

16    drop?

17    A.   I asked him to let me know when something was coming so

18    I could tell the drop, Jordan.

19    Q.   Was Mr. Shamo pleased?

20    A.   Yes.

21    Q.   That is what that next row means?

22    A.   Yes.

23    Q.   Then does he say I will have a couple sent A.S.A.P.?

24    A.   Yes, he does.

25    Q.   Then he expresses some love for you in the last one
```

1    there, right?

2    A.    That is what he says.

3    Q.    We might as well point it out.  Jump to 17.06 so

4    everyone can see.  You'll see it on your screen but it is

5    also on the chart.  Once it is up on the screen, I am

6    wondering if you can identify for the jury Mr. Bernal.

7    A.    He is on the bottom row fourth from the right.

8    Q.    That is him?

9    A.    Correct.

10   Q.    Part of your communications with Mr. Shamo now are not

11   just about customer service, right?  Part of it is managing

12   your drops, correct?

13   A.    Right.

14          MR. GADD:  Jump back in and can we look at page

15   172, right in the middle and all the way to the bottom?

16   BY MR. GADD

17   Q.    You have got a question here now at the top of the

18   screen.  Can you read that?

19   A.    Hey, do you know when that shipment is going to land at

20   the drop I gave you?

21   Q.    You have a second question there about tracking,

22   correct?

23   A.    Correct.

24   Q.    Because you have a couple hats you're wearing at this

25   point, right?

1    A.    Yes.

2    Q.    And then he sends three responses in a row and the

3    second response, so in the middle of his response he writes

4    I'm sending a bunch to him.

5          Is that a reference to Mr. Bernal?

6    A.    Yes.

7    Q.    He should have five or six coming to him.  Did you

8    understand that to mean packages?

9    A.    Yes.

10          MR. GADD:  If we could look now at the next page,

11   173.

12   BY MR. GADD

13   Q.    You have got a response there at the top?

14   A.    Yes.

15          MR. GADD:  Could we go to the first four boxes

16   there on the call out?

17   BY MR. GADD

18   Q.    That is your response at the top, right?

19   A.    Correct.

20   Q.    What did you write to him?

21   A.    Oh, don't overdo it.

22   Q.    And then you want to clarify it in the next one, right?

23   What did you ask him?

24   A.    Is it 300 per package or --

25   Q.    And his response is?

```
1    A.   Yeah.

2    Q.   Then to your statement about don't overdo it, did he

3    respond here starting with they are?

4    A.   Yes.

5    Q.   Did he say they are coming from different sources, but

6    I will slow it down.  I will wait for the first two to land.

7    They should be in the next week or two and continue after

8    that?

9    A.   Yes.

10   Q.   Was that acceptable to you?

11   A.   Yeah.

12   Q.   What were you worried about with overdoing it?

13   A.   I didn't want Jordan to get caught.

14   Q.   The money is okay, it is just the risk?

15   A.   Correct.

16   Q.   Okay.

17        MR. GADD:  Could we look at 193?  Start right

18   there in the middle starting with C.O.O.  That is great.

19   Those three are great.

20   BY MR. GADD

21   Q.   You had one drop that was working and then can you read

22   the message you sent to him there at the top?

23   A.   I said I'm going to try to get another drop next week,

24   too.

25   Q.   And he is pleased with that, right?
```

```
 1    A.   He was.

 2    Q.   Again, he said that he loves you, dude, and then he

 3    told you three should be landing soon from your first drop,

 4    correct?

 5    A.   Yes.

 6    Q.   I think I will skip ahead on a lot of the drop stuff.

 7    Let's jump to where you indicate the name of your second

 8    drop and let's talk about page 242.

 9         Do you see the bottom half of the screen where there is

10    a name and an address?

11    A.   Yes.

12    Q.   Who is Kayla Bruner?

13    A.   That is another friend of mine.

14    Q.   Is this the second drop?

15    A.   Yes.

16    Q.   You're sending this to Mr. Shamo, correct?

17    A.   Yes.

18    Q.   At the bottom he is asking for a phone number, right?

19    A.   Correct.

20    Q.   You want to know -- you need a phone number?  Did he

21    explain to you that he needed a phone number sometimes for

22    the shippers?

23    A.   Correct.

24    Q.   Meaning like the commercial carriers who send stuff,

25    whether it is U.P.S., D.H.L. or some other shipper?
```

```
 1   A.   That is correct.

 2   Q.   Let's change gears.  Let's talk about pressing.

 3        Could we look at page 43?  Starting there, the second

 4   from the bottom, Mr. Shamo wrote to you that I put in a

 5   12-hour -- today pressing and filling orders and getting

 6   stuff locally.  This is March 15th, correct?

 7   A.   Yes.

 8   Q.   Did you know what he meant when he said pressing?

 9   A.   I knew that that meant like creating the pills, yeah.

10   Q.   Did you ever see his pill press?

11   A.   I did see one of them, yeah.

12   Q.   Do you recall what it looked like?

13   A.   Vaguely.

14   Q.   Do you remember, was it in his Cottonwood Heights

15   address?

16   A.   It was.

17   Q.   Do you remember whether it was upstairs or down?

18   A.   Downstairs.  Sorry, upstairs.

19   Q.   Upstairs?

20   A.   Upstairs.

21   Q.   Was it not in the room with kind of the burgundy color

22   on the wall?

23   A.   I don't remember the color of the wall.

24        MR. GADD:  Let's look at page 221, fourth from the

25   bottom there.  All the way to the bottom is fine.
```

```
 1   BY MR. GADD
 2   Q.   Mr. Shamo wants to change your role up slightly,
 3   correct?
 4   A.   He did.
 5   Q.   Could you read what he wrote to you?
 6   A.   I might have a promotion for you for a month if you're
 7   interested.  My pressing buddy might be leaving for a month
 8   or so.  I can train you and pay you a lot if you are
 9   interested.
10   Q.   Then he indicates how much a lot is?
11   A.   Probably 5-K a week.
12   Q.   Do you remember when he asked you this?
13   A.   I do.
14   Q.   What did you think?
15   A.   5-K a week is a lot, but I don't want to get so
16   hands-on.
17   Q.   When you say hands-on, to this point you're working at
18   a keyboard, right?
19   A.   Correct.
20   Q.   You have not touched any of the Fentanyl?
21   A.   Never.
22   Q.   Or none of the Xanax that is being shipped out?
23   A.   Never.
24   Q.   So your response to him -- did you write, oh, boy?
25        Maybe I am using the wrong inflection there.  Why don't
```

```
 1   you read it.
 2   A.   Oh, boy.  We'll have to talk about it.  Can we meet
 3   Monday?
 4   Q.   And then he wants you to think about it and indicates
 5   that you'll have to get trained and things like that, right?
 6   A.   Correct.
 7   Q.   Your final decision on whether or not to press?
 8   A.   I declined it.
 9   Q.   How did he take it when you said no?
10   A.   He asked again and made sure I was sure that I didn't
11   want to and then said all right.
12   Q.   Let's talk now about roles, meaning like positions.
13            MR. GADD:  Could we look first at page 49, the top
14   three boxes?
15   BY MR. GADD
16   Q.   This is March 15th, 2016, correct?
17   A.   Correct.
18   Q.   At this point you're not full-time customer service,
19   right?
20   A.   Not yet.
21   Q.   So he writes you're the man, Mario.  I owe for this.
22   Make me proud and you'll have a permanent spot.
23            Did you want a permanent spot?
24   A.   At the time I did, yeah.
25   Q.   What was it that you were going to do that would
```

```
1    potentially make him proud?

2    A.    Just continue giving good customer service and getting

3    good feedback for the shop.

4           MR. GADD:  Let's look at page 68, the very top two

5    or three boxes.  Maybe the top two is fine.

6    BY MR. GADD

7    Q.    You reached out to him to ask him a question, right?

8    A.    Correct.

9    Q.    Read your question to him.

10   A.    Hey, man, I looked at your store last night and it said

11   there was nothing listed.  Maybe something was up with my

12   browser, but everything is still going strong, right?

13   Q.    This was not necessarily part of your customer service

14   duties, right?

15   A.    I believe I was logging in to do my job and I

16   couldn't --

17   Q.    Did you have any ability to fix it when the store was

18   not looking right?

19   A.    I did not.

20   Q.    Who had that ability?

21   A.    Shamo.

22   Q.    Why were you looking out for his well-being?

23   A.    At the time I kind of looked at it like we were a team.

24          MR. GADD:  Let's look, if we could, at page 69

25   over on the same topic of roles and positions.
```

1    BY MR. GADD

2    Q.   Right in the middle starting with I only have access,

3    you're explaining to him why you can't do something that he

4    needs, right?

5    A.   Correct.

6    Q.   What is it you wrote to him there?

7    A.   I said I only have access to see your messages and

8    sales.  I can't view anything else as you.

9    Q.   That is because you were going through your account in

10   that shared access mode, right?

11   A.   Correct.

12   Q.   Your relationship with Mr. Shamo as an employer, was it

13   rocky at times?

14   A.   Sometimes.

15   Q.   But sometimes good?

16   A.   Yeah.

17   Q.   Did you have times when you fell behind in your duties?

18   A.   I did.

19   Q.   Let's look at one of those.  Let's look at page 72.

20   The top box from Mr. Shamo, so the second full one down, and

21   then we can look at the next one if you want to to give it

22   context.  That is good for now.

23        This is Mr. Shamo reaching out to you, right?

24   A.   Correct.

25   Q.   What does he say?  There is a ton of messages that have

1  gone unanswered.  I'll be helping you, but we need to get

2  these taken care of.

3  A.  Correct.

4  Q.  Then you're trying to jump back in, right?  You're

5  trying to keep your job?

6  A.  Pretty much.

7  Q.  Let's look at page 77 for a minute.  Right there in the

8  middle, the largest of the messages, this is March of 2016,

9  right?

10 A.  Correct.

11 Q.  And you're still trying to figure out how much you're

12 going to get paid and when and things like that, right?

13 A.  Correct.

14 Q.  Did you propose a pay scale to Mr. Shamo?

15 A.  I did.

16 Q.  Could you read that for us?

17 A.  Hey, man, I was running the numbers and thinking about

18 it last week on my way home.  I was wondering if you would

19 consider this pay scale?  75 for messages.  It takes up the

20 most time and takes the most effort looking up tracking and

21 tailored responses, 25 for an hour and a half to under three

22 hours, 75 for three hours plus.  Let me know what you think.

23 Q.  By the end -- that is an unfair question.

24     By the summer of 2016 how much were you getting paid?

25 A.  I mean, it was hourly depending on how much time I was

1    spending.  I don't remember exactly what the dollar amounts

2    were.

3    Q.   At some point you went to the flat rate, though, right?

4    A.   Correct.

5    Q.   Was that at the end?

6    A.   Towards the end.

7    Q.   How much was your flat rate?

8    A.   I don't recall.

9    Q.   You also had reduced hours at the end, right?

10   A.   I did.

11   Q.   Because he had hired someone else to help?

12   A.   Correct.

13   Q.   Let's look at page 152.  In the fourth one down you're

14   going to ask a question starting with do you want.  You're

15   trying to clarify about sending e-mails to the shippers,

16   right?

17   A.   Correct.

18   Q.   That is why you said do you want me sending the e-mail

19   every night?

20   A.   Yes.

21   Q.   This is when you are doing order processing?

22   A.   Correct.

23   Q.   What is Mr. Shamo's response?

24   A.   He said the shipper is backed up so sending the e-mail

25   tonight won't help, but if you want you can send it or I

```
 1    will send it later.

 2    Q.   Did he say shipper singular or plural?

 3    A.   In this case he said singular.

 4    Q.   And then the next response or the continuation of Mr.

 5    Shamo's response, what did he say there?

 6    A.   That day with 200 orders really got him.  L.O.L.

 7    Q.   Did he say him or her?

 8    A.   He said him.

 9    Q.   Or did he say them?

10    A.   He said him.

11    Q.   Him.

12         Do you know whether or not he protected your identity

13    from the other people in the organization?

14    A.   I don't think he did.

15    Q.   He never told you who the shippers were, right?

16    A.   Huh-uh.

17              MR. GADD:  Can we look at pages 207 and 208?

18    Let's try that again.  How about 207 to start?

19    BY MR. GADD

20    Q.   Sometimes you were paid in Amazon codes, correct?

21    A.   That is correct.

22    Q.   That is what we see starting here at the bottom of the

23    page, right?

24    A.   Yes, it is.

25              MR. GADD:  If we could go to the next page, Ms.
```

1    Lauder.

2    BY MR. GADD

3    Q.    That picture that is kind of split between the two

4    pages, are those Amazon codes?

5    A.    Yes, they are.

6    Q.    And then the amount that he is giving to you?

7    A.    Yes.

8    Q.    He indicates that those are all codes for Amazon to

9    you, right?

10   A.    Correct.

11   Q.    When he was not paying you in Amazon codes, how did he

12   pay you?

13   A.    Cash.

14   Q.    Was it roughly every two weeks?

15   A.    It was.

16          MR. GADD:  Could we look at page 262?

17   BY MR. GADD

18   Q.    It is the last question on the idea of the various

19   roles within the organization.  Right at the bottom Mr.

20   Shamo is going to give you a response, the last one there.

21   What does he say to you?

22   A.    He is saying that they are on vacation because the

23   shippers were debating about leaving.

24   Q.    You also thought about leaving, correct?

25   A.    I did.

1   Q.   Let's talk about that now.  At one point you wanted to

2   get out, right?

3   A.   Correct.

4   Q.   Why?

5   A.   At the time we were getting a lot of messages about law

6   enforcement heat and, I don't know, there was something

7   weighing on my conscience every night that I logged in.

8   That is part of the reason why some of the messages got

9   backed up.

10  Q.   At some point you as a customer service representative,

11  you started getting reports from customers about law

12  enforcement letters, right?

13  A.   That is correct.

14  Q.   What does that mean?

15  A.   It meant instead of getting the package they got a

16  letter from the post office.

17  Q.   And then they would complain to you?

18  A.   Correct.

19  Q.   Did that make you nervous --

20  A.   Yes.

21  Q.   -- that letters were going out?

22  A.   Yes.

23       MR. GADD:  Could we look at page 183?

24  BY MR. GADD

25  Q.   This is where you tell Mr. Shamo that you're ready to

```
 1   get out, right?

 2   A.   Yes.

 3   Q.   If we could look at the biggest message there and kind

 4   of go all of the way through to the bottom.

 5        Could you read what you wrote to him?

 6   A.   Yo, man, I think I want out.  I wanted to say something

 7   sooner but I needed to think about it.  It is all just so

 8   overwhelming right now.  I think it would be a good idea to

 9   just cool it down for a month or two.  I wanted to finish

10   the week and hopefully have one last payday.  I can even

11   send you the templates I have set up for most of the

12   responses.  I hope that is cool.

13   Q.   Did he respond, hey, Mario, I will always respect your

14   decision?  If it is getting to be too much work I can always

15   hire another customer support member to help or I can raise

16   your pay or I can even give you paid time off.  If there is

17   anything I can do to aid you to stay and not take a break,

18   let me know?

19   A.   He did.

20   Q.   That is what he wrote.

21        Then you indicated thanks at the bottom, right?

22   A.   Yes.

23   Q.   You said you would think about it and then asked if he

24   could meet on Sunday.  Was that to talk in person?

25   A.   Correct.
```

1    Q.   You did stay, right, this time?

2    A.   That is when we switched over to a flat rate.

3    Q.   He mentioned in there maybe hiring another customer

4    support member to help, right?

5    A.   Correct.

6    Q.   That happened at some point?

7    A.   It did.

8    Q.   Let's take just a minute and let's talk about that.

9         MR. GADD:  If we could go to page 193, the last

10   two at the bottom, if we could.

11   BY MR. GADD

12   Q.   The date on here is?

13   A.   June 30th.

14   Q.   And Mr. Shamo is asking you a question, right?

15   A.   Yes.

16   Q.   He is checking up on you?

17   A.   Correct.

18   Q.   Does he say, hey, how are messages going?  Looks like

19   we are really backed up.

20   A.   Yes, he did.

21   Q.   And then did he say I will text my other customer rep

22   guy to see if he had any other questions?

23   A.   Correct.

24   Q.   Was that about the time that he brought someone on to

25   help?

1    A.    Yes.

2    Q.    In the next page or two you're going to get some

3    questions about shared access and how it looks for you,

4    correct?

5    A.    Correct.

6    Q.    Mr. Shamo needed to teach that to his other customer

7    service rep, right?

8    A.    He did, yeah.

9    Q.    Did he ever tell you who it was?

10   A.    He never did.

11   Q.    Did you figure out who it was?

12   A.    I have now.  I asked him and he lied to me, so --

13   Q.    You asked him?

14   A.    I asked Shamo who the other person was and the person

15   that I think it is, he told me it was not that person.

16   Q.    We can just say it now because --

17   A.    Drew Crandall.

18   Q.    That is who you thought --

19   A.    No, I didn't think it was because Shamo told me it

20   wasn't him and I believed Shamo.

21   Q.    Who did he tell you it was?

22   A.    He never did.

23   Q.    Let's look at page 196.  At some point he asked you for

24   templates, right?

25   A.    Correct.

```
 1    Q.    What is what we had looked at, right, your kind of
 2    canned responses?
 3    A.    Correct.
 4    Q.    You needed to pass those over to the new guy, right?
 5    A.    Yes.
 6    Q.    So the bottom two there, does he say, also, for the
 7    e-mail templates did you use passthepeas P.G.P. or mine?
 8    Then he says can I get that again?
 9          When you sent your canned responses over to him, did
10    you encrypt it like you normally would encrypt it?
11    A.    I did just for safety, yeah.
12    Q.    Because he needs the key to unlock that, he is
13    wondering which of the two P.G.P. keys you locked it with,
14    right?
15    A.    Correct.
16    Q.    Can you tell us when you did actually take a break from
17    the organization?
18    A.    It was around September of 2016.
19    Q.    Why did you stop?
20    A.    Like I said, it was weighing on my conscience and I
21    also had revealed it to my mom who I was living with at the
22    time and she was not happy about it.
23    Q.    That was her response?
24    A.    Correct.
25    Q.    Is that maybe putting it mildly?
```

```
1   A.   Yes.

2   Q.   So you stopped?

3   A.   I did.

4   Q.   Did you go back?

5   A.   I did.

6        MR. GADD:  Let's look at page 249.  If we could

7   look at the second one down and then we'll go all the way to

8   the end.

9   BY MR. GADD

10  Q.   What is the date on this?

11  A.   September 17th, 2016.

12  Q.   You reach out at the top and say hope the V.K. is going

13  well, right?

14  A.   Correct.

15  Q.   Were you just keeping in contact at that point?

16  A.   I am not sure.  Was the previous message --

17  Q.   We could zoom out if you want.

18  A.   I am not sure.  I assume it had to do with the previous

19  message.

20  Q.   That is okay.  I can even withdraw that question if you

21  want.

22  A.   Sure.

23  Q.   Mr. Shamo, in the third box down, does he say it is

24  good, man?  And then does he say want to come back, L.O.L.?

25  A.   He does.
```

```
 1   Q.   What did you take want to come back to mean?

 2   A.   That he wanted me to work for him again.

 3   Q.   Then a couple of days later, the next box down, does he

 4   say, hey, you coming back at the end of the month or what is

 5   your play?  Just trying to get an idea.

 6   A.   He does.

 7   Q.   What did you respond?

 8   A.   I'm hoping to move next week in which case, yeah.

 9   Q.   When you say I'm hoping to move, what did that mean?

10   A.   I was moving out from my mother's house.

11   Q.   You were going to get your own place?

12   A.   Correct.

13   Q.   Maybe I jumped the gun there.  Read the next box for

14   us.

15   A.   Sure.  So I just put money down on a place so I am like

16   98 percent in at this point.  Welcome back.

17   Q.   His response is?

18   A.   Yeah.

19   Q.   Then he wants to use your drop again, right?  That is

20   the bottom one there?

21   A.   Correct.

22   Q.   Once you came back you had kind of a part-time role,

23   right?

24   A.   Correct.

25   Q.   And a reduced amount of money was being paid to you?
```

```
 1   A.   Correct.

 2   Q.   Let's look now at order processing.  Most of your work

 3   for him was customer service, right?

 4   A.   Correct.

 5   Q.   But you would process orders?

 6   A.   Every once in a while, yeah.

 7            MR. GADD:  Could we look at page 164?

 8   BY MR. GADD

 9   Q.   Looking right in the middle, so he has got those three

10   responses right in the middle, and I want to ask you about

11   the second one.  This is June of 2016, right?

12   A.   Correct.

13   Q.   Does he tell you the only thing is do not mark shipped

14   to any Utah orders?

15   A.   Yes, he does.

16   Q.   Why?  Do you know?

17   A.   Not the details.  I know he was working with somebody

18   in Utah, but I didn't know --

19   Q.   Was this kind of like a standing order or was it just

20   like a one-time thing?

21   A.   The way we handled Utah orders was constantly changing.

22   Q.   Let's look at page 212.  You mentioned it was

23   constantly changing.  Is that why you asked the question

24   here in the middle?

25   A.   Yes, it is.
```

```
 1                 MR. GADD:  Go ahead and pull that out and let's
 2      read that in.
 3      BY MR. GADD
 4      Q.   This is July of 2016, right?
 5      A.   Correct.
 6      Q.   What is it that you're asking Mr. Shamo here?
 7      A.   I asked him if we were still canceling any Utah orders.
 8      Q.   Utah or Salt Lake County?
 9      A.   Salt Lake County orders, yeah.
10      Q.   There was mention in your communications with him of
11      another state, not just Utah, right?  Let's look for a
12      minute at messages about Colorado.
13                 MR. GADD:  Could we look at page 203?
14      BY MR. GADD
15      Q.   Right at the very bottom, do you see that one?
16      A.   I do.
17                 MR. GADD:  Zoom in on the bottom one.
18      BY MR. GADD
19      Q.   Can you read what Mr. Shamo told you?
20      A.   He said also, I'm opening up a shipping department in
21      Colorado so that will be good.
22      Q.   Did it matter to you as customer service whether it
23      shipped here or there?
24      A.   Not at all.
25                 MR. GADD:  Could we look at page 239, the third
```

```
 1    one down?  If we could go maybe to the three boxes and let's
 2    start there.  Yeah.
 3    BY MR. GADD
 4    Q.    This is now the end of August of 2016, right?
 5    A.    Correct.
 6    Q.    When we zoom out we'll look at some above it for
 7    context, but can you read Mr. Shamo's first response there
 8    on the screen?
 9    A.    True.  Once I get another shipping department in
10    another state I will feel a lot better.
11    Q.    And then did he say when that was going to happen?
12    A.    He expected it in the next month or two.
13          MR. GADD:  Can we zoom out?
14    BY MR. GADD
15    Q.    His first comment there, the part about once I get
16    another shipping department in another state I will feel a
17    lot better, that was in response to the box just above it
18    that you had written, correct?
19    A.    Yes.
20    Q.    Now what was it that you wrote that led him to say
21    that?
22    A.    It is close, man.  It feels like things are smoothing
23    out.  People love us.  L.O.L.
24    Q.    Why did you say people love us?
25    A.    We were getting a lot of really good feedback at the
```

```
 1    time.
 2    Q.    Let's talk now about order processing and we'll jump
 3    out of this exhibit.
 4           MR. GADD:  Can we look at Exhibit 14.40?
 5           I think I just gave you the wrong number.  I
 6    apologize.  It is 14.30.  Yes.  Thank you.  Wrong number.
 7    BY MR. GADD
 8    Q.    You can see that document on your screen, right?
 9    A.    Yes.
10    Q.    What is it we're looking at here?
11    A.    This was the day's orders for Xanax.
12    Q.    This is a little before your time, right?  What if we
13    went to page 500?  Did yours look about like this?
14    A.    Yes.
15           MR. GADD:  Let's take that second one in and if we
16    could zoom in on that one for a second.
17    BY MR. GADD
18    Q.    The top two rows, where did you get that information?
19    A.    That was in the listing, the sale for the listing.
20    Q.    Then the next two rows, where did you get that
21    information?
22    A.    The shipping information from the listing.
23    Q.    And then the final part, the shipped to and then the
24    name and the address, where did you get that?
25    A.    That was left at the bottom of the notes for the sale.
```

```
 1    That was usually decrypted.

 2    Q.    You didn't know this particular customer, right?

 3    A.    No.

 4    Q.    Connor Valentere.  Do you know that name?

 5    A.    No.

 6    Q.    Is that just a name on a page?

 7    A.    Yes.

 8    Q.    Do you know if he was a real person?

 9    A.    I don't.

10    Q.    Once this daily order sheet was created, is that what

11    you could encrypt and then e-mail over to the shippers?

12    A.    Yes.

13              MR. GADD:  Can we look at page 2,305?

14              Sorry.  I should have said 23.05, the exhibit.

15    BY MR. GADD

16    Q.    There are a lot of pages to that one.

17    A.    There is.

18    Q.    Do you recognize this?

19    A.    I do.

20    Q.    This is the document that you signed when you pleaded

21    guilty, right?

22    A.    Correct.

23              MR. GADD:  Could we zoom in on paragraph one?

24    Really that bottom half is fine.

25    BY MR. GADD
```

1    Q.   Starting at paragraph one, it reads as part of this

2    agreement with the United States I intend to plead guilty to

3    counts two and three of the superseding indictment.

4         That is in fact what you pled guilty to, right?

5    A.   That is correct.

6    Q.   Count two was conspiracy to distribute Fentanyl,

7    correct?

8    A.   Correct.

9    Q.   And count three was conspiracy to distribute

10   Alprazolam?

11   A.   Correct.

12   Q.   You pled guilty as charged to every crime you were

13   charged with, right?

14   A.   I did.

15   Q.   There were no counts dismissed or anything like that?

16   A.   No.

17   Q.   Did you want to plead guilty to every charge?  That is

18   probably a hard question.

19   A.   Yeah, I did.

20   Q.   Did you want to take full responsibility for your

21   actions?

22   A.   I did.

23   Q.   Could we look now at the addendum at the end, the last

24   two pages, if we could?

25        That is your signature, right?

```
1    A.   Yes, it is.

2    Q.   This is the addendum?

3    A.   Correct.

4    Q.   This is kind of like the deal between us, right?

5    A.   Yeah.

6    Q.   So if we could pick it up starting in the second

7    paragraph, you agree to testify truthfully and completely

8    for the United States in any subsequent court hearing or

9    trial relating to this case if called upon, correct?

10   A.   Correct.

11   Q.   You also agree to wait to be sentenced until all the

12   remaining defendants in the case have been sentenced,

13   correct?

14   A.   Correct.

15   Q.   If you testify truthfully and completely the United

16   States agreed that it would present your cooperation to the

17   Court for the Court's consideration at sentencing, correct?

18   A.   Correct.

19   Q.   By that we mean to Judge Kimball, right?

20   A.   Yes.

21   Q.   You understand that not long from now you're going to

22   be standing right here, correct?

23   A.   Yes.

24   Q.   And you're going to receive a sentence for your

25   conviction, correct?
```

```
 1   A.   Yes.

 2   Q.   You understand that you could go to prison?

 3   A.   Yes.

 4   Q.   I left off there saying we're going to present it

 5   pursuant to a sentencing guideline there, that U.S.S.G.

 6   sentencing guideline 5K1.1?

 7   A.   Yeah.

 8   Q.   Is it your understanding that that removes any minimum

 9   mandatory sentence you might otherwise face?

10   A.   It does.

11   Q.   It does not change the maximum possible sentence, does

12   it?

13   A.   It does not.

14   Q.   And then the United States also agrees to not charge

15   the defendant with death resulting violations of -- and then

16   if we zoom out it is going to be the code section.

17   A.   Correct.

18   Q.   Then go on to that next page.  -- that may arise out of

19   the continuing investigation into overdose deaths tied to

20   the Pharma-Master drug sales.

21        That was your understanding, right?

22   A.   Yes.

23   Q.   There are no other promises between us?

24   A.   No.

25   Q.   No one has told you what your sentence might be yet?
```

```
 1   A.   No.

 2   Q.   There is no sentencing deal or recommendation?

 3   A.   No.

 4   Q.   Do you understand that when you're sentenced we are

 5   going to tell Judge Kimball everything that you did wrong?

 6   A.   Yeah.

 7   Q.   And what you did to try to make it right?

 8   A.   Yeah.

 9   Q.   It says here that you won't be charged with counts that

10   may come up as part of the continuing investigation into

11   deaths, but that does not mean that Judge Kimball won't know

12   about it when you're sentenced, right?

13   A.   True.

14   Q.   It is relevant conduct.  That is one of the terms in

15   the agreement in fact, right?

16   A.   Yes.

17   Q.   He is going to know about all of it and he considers

18   it.  You understand that, right?

19   A.   Yeah.

20   Q.   You know that the sentence is 100 percent up to Judge

21   Kimball?

22   A.   I do.

23   Q.   Just a last couple of questions.

24        You knew that the organization was selling Fentanyl

25   just like in the sealed totes here, these blue pills,
```

1    Fentanyl, you knew that, right?

2    A.    I did.

3    Q.    Why did you help Aaron Shamo?

4    A.    That year was something else just coming into it.    I

5    didn't have a lot of self-worth.    I wanted to feel needed.

6    I came from a low-income family that could barely make ends

7    meet, so I wanted to make a little extra money.    I was

8    naive.    I had no idea how dangerous this stuff actually was.

9    I made one of the worst decisions I have ever made in my

10    life and I regret it to this day.

11    Q.    You met agents on November 22nd, 2016?

12    A.    I did.

13    Q.    They came to your work?

14    A.    Yes.

15    Q.    You were called up from the front desk, so to speak?

16    A.    Yes.

17    Q.    On your way there you deleted Telegram off your phone,

18    right?

19    A.    I did.

20    Q.    What we have been looking at, that was recovered off of

21    Mr. Shamo's phone, correct?

22    A.    Yeah.

23    Q.    But then you talked with the agents.    Were you honest

24    with them?

25    A.    I was.

1    Q.    Starting from that point, have you been honest with

2    them since?

3    A.    I have.

4    Q.    Have you been honest today?

5    A.    Yes.

6              MR. GADD:  If I could have just a moment?

7              THE COURT:  Yes.

8    BY MR. GADD

9    Q.    When you met with those agents that first time --

10   A.    I did.

11   Q.    -- was there a deal between you and I or the United

12   States and you?

13   A.    No.

14   Q.    But you were still honest?

15   A.    I was.

16   Q.    You still cooperated?

17   A.    I did.

18   Q.    Got online with them?

19   A.    I did.

20   Q.    Got them onto AlphaBay?

21   A.    Yeah.

22   Q.    Got them onto Pharma-Master?

23   A.    Yeah.  Copied and pasted listings for them.  Yeah.

24   Q.    Helped decrypt messages?

25   A.    Yeah.

```
 1    Q.    Took screen shots with them?

 2    A.    Yeah.

 3    Q.    No deal?

 4    A.    None.

 5               MR. GADD:  No further questions.

 6               THE COURT:  Thank you.

 7               How much time do you need for cross, do you think?

 8               MR. SAM:  Your Honor, I would guess about 20, 25

 9    minutes.

10               THE COURT:  We have a calendar at 2:30.  We

11    promised the jurors we would be out before 2:30 each day.

12               You can come back, I assume, in the morning?

13               THE WITNESS:  I can if I have to, yeah.

14               THE COURT:  I know you don't want to.

15               We'll be in recess on this matter until 8:30 in

16    the morning.

17               (WHEREUPON, the jury leaves the proceedings.)

18               (Proceedings adjourned.)

19

20

21

22

23

24

25
```



1          THE UNITED STATES DISTRICT COURT

2                DISTRICT OF UTAH

3                CENTRAL DIVISION

4

5   UNITED STATES OF AMERICA,        )

6            Plaintiff,              )

7   vs.                             )      Case No. 2:16-CR-631DAK

8   AARON MICHAEL SHAMO,            )

9            Defendant.              )

10   _____)

11

12

13        BEFORE THE HONORABLE DALE A. KIMBALL

14        ------------------------------------

15                August 19, 2019

16

17                 Jury Trial

18

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2

 3   For Plaintiff:           S. MICHAEL GADD
                              348 East South Temple
 4                            Salt Lake City, Utah

 5                            VERNON G. STEJSKAL
                              111 South Main Street
 6                            Suite 1800
                              Salt Lake City, Utah
 7
                              KENT A. BURGGRAAF
 8                            348 East South Temple
                              Salt Lake City, Utah
 9

10   For Defendant:           GREGORY G. SKORDAS
                              KATYLIN V. BECKETT
11                            560 South 300 East
                              Suite 225
12                            Salt Lake City, Utah

13                            DARYL P. SAM
                              5955 South Redwood Road
14                            Suite 102
                              Salt Lake City, Utah

15

16

17

18

19

20

21

     Court Reporter:          Ed Young
22                            351 South West Temple
                              Room 3.302
23                            Salt Lake City, Utah 84101-2180
                              801-328-3202
24                            ed_young@utd.uscourts.gov

25
```

```
 1                        I N D E X

 2
     Witness                Examination              Page
 3   -------                -----------              ----
     Andrea Brandon         Mr. Stejskal (Direct)       4
 4
     Emily Oblath           Mr. Stejskal (Direct)      13
 5   Emily Oblath           Mr. Sam (Cross)            54
     Emily Oblath           Mr. Stejskal (Redirect)    58
 6
     Danielle Farrell       Mr. Stejskal (Direct)      59
 7   Danielle Farrell       Ms. Beckett (Cross)        81
     Danielle Farrell       Mr. Stejskal (Redirect)    86
 8
     Keith Chan             Mr. Stejskal (Direct)      87
 9   Keith Chan             Mr. Sam (Cross)           114

10   Son Hoang              Mr. Stejskal (Direct)     118
     Son Hoang              Mr. Skordas (Cross)       127
11
     David Anthony Slagle   Mr. Burggraaff (Direct)   133
12

13

14

15   Exhibit                                     Received
     -------                                     --------
16
      (No witnesses received.)
17

18

19

20

21

22

23

24

25
```

```
 1   August 19, 2019                              8:30 a.m.

 2                    P R O C E E D I N G S

 3

 4           THE COURT:  Good morning.

 5           Are we ready to proceed?

 6           MR. STEJSKAL:  Yes, Your Honor.

 7           MR. SKORDAS:  Yes.

 8           THE COURT:  Go get the jury and we'll proceed.

 9           (WHEREUPON, the jury enters the proceedings.)

10           THE COURT:  Ladies and gentlemen of the jury,

11   thank you very much for your promptness and for your

12   attention.  We appreciate what you do.

13           The government may call its next witness.

14           MR. STEJSKAL:  Thank you, Your Honor.

15           The United States would next call Postal Inspector

16   Andrea Brandon.

17           THE COURT:  Come forward and be sworn, please.

18                      ANDREA BRANDON

19             Having been duly sworn, was examined

20                  and testified as follows:

21           THE WITNESS:  Andrea Brandon, A-n-d-r-e-a,

22   B-r-a-n-d-o-n.

23           THE COURT:  You may proceed, Mr. Stejskal.

24           MR. STEJSKAL:  Thank you, Your Honor.

25                    DIRECT EXAMINATION
```

```
 1    BY MR. STEJSKAL
 2    Q.    Your occupation?
 3    A.    Postal inspector.
 4    Q.    Where do you perform your duties?
 5    A.    In Phoenix, Arizona.
 6    Q.    And tell us a little bit more about yourself.
 7    A.    I have been a postal inspector for 13 and a half years.
 8    Prior to that I was a police officer with the Mesa Police
 9    Department in Arizona for about three years.
10    Q.    Tell us a little bit about what you do as a postal
11    inspector.
12    A.    Right now I am assigned to our narcotics unit, so I
13    work drugs in the mail.
14    Q.    Tell us about your training with regard to drug
15    investigations.
16    A.    I have been to several drug trainings with our agency
17    as well as other agencies.  I went through a three-month
18    academy with the Postal Inspection Service and another
19    three-month academy with the Mesa Police Department.
20    Q.    Did you have occasion to become a little bit involved
21    in this investigation of Mr. Aaron Shamo?
22    A.    Yes, sir.
23    Q.    In March of 2017, I think around March 20th of 2017,
24    did you receive information that Mr. Shamo had some money
25    down in the Arizona area?
```

1    A.    Yes, sir.

2    Q.    What information did you receive at that time?

3    A.    I received information that Mr. Shamo's parents had

4    some money that they wanted to turn over to our agency.

5    Q.    Where was that money located?

6    A.    At their residence.

7    Q.    What was the request by your supervisor?

8    A.    He said to respond to this residence.  You're going to

9    pick up a box of an unknown amount of currency.  He advised

10   that they were represented by an attorney so do not ask them

11   any questions.

12   Q.    So were you given a name and address and a place to go?

13   A.    Yes, sir.

14   Q.    Did you go out there then on March 20th of 2017?

15   A.    I did.

16   Q.    Is this in the Phoenix area?

17   A.    Yes, it is.

18   Q.    Describe what happened when you arrived at the

19   residence.

20   A.    So it was myself and another postal inspector and we

21   went to the door and I believe Mr. Shamo answered the door.

22   Mrs. Shamo was there as well.  They greeted us and they

23   asked us to provide our I.D. and our business cards and that

24   we did.

25   Q.    You have badges that indicate that you are in fact

```
1    postal inspectors?

2    A.   Yes, sir.

3    Q.   After they greeted you, were you invited in?

4    A.   Yes, we were.

5    Q.   Where did you kind of set up to have some conversation?

6    A.   It was in the living room right when you go through

7    their front door.

8    Q.   Based on your observations did they know you were

9    coming?

10   A.   Yes.

11   Q.   So you showed them your I.D. badges and you moved to

12   the living room area.  Describe the conversation that you

13   had.

14   A.   It was very pleasant.  It was small talk.  Then

15   Mrs. Shamo retrieved the box.  It was a brown box that was

16   lying on the floor near the living room and she brought the

17   money to us.

18   Q.   Was that box open or closed at that time?

19   A.   I can't recall.

20   Q.   But the box was brought in to where you guys were

21   talking?

22   A.   That is correct.

23   Q.   Did you have to go through some type of form with them

24   in order to follow postal inspector procedures in taking

25   money?
```

1    A.    Yes, we did.  We read them our disclaimer form, which

2    basically we read them a couple of statements where they are

3    agreeing that they have no interest in the property and they

4    are willing to turn it over to us.

5    Q.    In that form did they indicate where they had acquired

6    the property?

7    A.    They said that Aaron had hand delivered it to them.

8    Q.    Was there one item on the form that they had a little

9    bit of discussion about?

10    A.    Yes, sir.

11    Q.    What was that?

12    A.    I believe it was question number three where it reads

13    that the property being handed over may be submitted for

14    asset forfeiture due to the government having probable cause

15    that the proceeds may have been obtained illegally.  I know

16    Mrs. Shamo said, well, I don't agree with that.  I had to

17    just explain that that is what we believe, that it wasn't

18    what she thought.

19    Q.    Then Mr. and Mrs. Shamo ended up initialing the lines

20    on that disclaimer form?

21    A.    That is correct.

22    Q.    After reading and initialing the form was it also

23    signed?

24    A.    Yes, sir.

25    Q.    Then did Mrs. Shamo make a request with regard to that

1  form?

2  A.    Yes.  She asked if she could make a photocopy of the

3  form.

4  Q.    Did that take place?

5  A.    Yes, sir.

6  Q.    And you left that copy with her?

7  A.    I did.

8  Q.    Was there any inquiry about the box itself and what was

9  in there?

10  A.    No.

11  Q.    Did Mrs. Shamo indicate what was in there or want to

12  know what was in there?

13  A.    Well, it was common knowledge that there was U.S.

14  currency in the box, but she did request that we give her

15  the amount.  Once we counted the money, she requested that

16  we advise her of the amount.

17  Q.    Did you count the money there in front of her?

18  A.    No, we did not.

19  Q.    Why not?

20  A.    At that time we took it back to the office and my team

21  leader and an analyst of ours counted the money.

22  Q.    So you got some information from Mrs. Shamo that you

23  could indicate the amount once you figured out what that

24  was?

25  A.    That is correct.

1    Q.   So you drove it back to postal headquarters and turned

2    it over and was it processed there?

3    A.   Yes, it was.

4    Q.   How was it processed?

5    A.   We hand count all of the money and then we take it over

6    to the bank where they count it again and then a cashier's

7    check is issued.

8    Q.   What happened to that cashier's check?

9    A.   I sent that to Inspector Moore.

10   Q.   Here in Salt Lake as part of the investigation?

11   A.   That is correct.

12   Q.   Inspector Megan Moore?

13   A.   Yes.

14   Q.   Let's look at Exhibit 16.04.

15        Can you identify that for us, please?

16   A.   Yes.  That is the box we retrieved from the Shamo

17   residence.

18   Q.   Again, that was voluntarily given to you by Mr. and

19   Mrs. Shamo, Aaron's parents?

20   A.   Yes, sir.

21   Q.   Does that appear to be in the same condition as when

22   you first observed it?

23   A.   Yes, sir.

24   Q.   Let's look at the second photo.

25        Let's look at the third photo.

```
 1        Does that appear to be what was in the box?

 2   A.   Yes, sir.

 3   Q.   And the fourth photo.

 4        Now items are being removed from the box so we can see

 5   them better?

 6   A.   That is correct.

 7   Q.   The fifth photo.

 8        Sixth photo.

 9        Seventh photo.

10        Above the $100 bill there that is laying horizontally,

11   do you see that band?

12   A.   Yes, sir.

13   Q.   Did you guys put those on there or were those on there?

14   A.   Those would have been on there.

15   Q.   Do you see the date then on that band above the $100

16   bill?

17   A.   Yes, sir.

18   Q.   What is that date?

19   A.   July 13th, 2016.

20   Q.   So it was taken to the bank for an official count.  How

21   much money was in that box?

22   A.   Gosh.  Now I'm blanking out.  Was it 429,600?

23   Q.   That is what I have got.  Is that a question or an

24   answer?

25   A.   I believe that that was the end count, yes, sir.
```

```
 1    Q.    That was pretty much your involvement in this case?

 2    A.    That is correct.

 3    Q.    Thank you.

 4              MR. STEJSKAL:  Those are all of the questions that

 5    I have.

 6              THE COURT:  You may cross-examine.

 7              MR. SKORDAS:  Can we have just a minute, Your

 8    Honor?

 9              THE COURT:  Sure.

10              MS. BECKETT:  We have no questions for this

11    witness.

12              THE COURT:  Thank you.  You may step down and

13    you're excused.

14              You may call your next witness.

15              MR. STEJSKAL:  The United States would call Dr.

16    Emily Oblath.

17              THE COURT:  Come forward and be sworn, please.

18                          EMILY OBLATH

19              Having been duly sworn, was examined

20                  and testified as follows:

21              THE WITNESS:  Emily Oblath, E-m-i-l-y,

22    O-b-l-a-t-h.

23              THE COURT:  You may proceed, Mr. Stejskal.

24              MR. STEJSKAL:  Thank you, Your Honor.

25              I'm told that the monitors may have been having
```

```
1    some issues during that last witness where the picture was

2    flashing over there.

3              THE CLERK:  They were doing some checking this

4    morning so hopefully it will be okay.

5              You can't see it on your screen?  There is nothing

6    coming?

7              UNIDENTIFIED JUROR:  It is flashing.

8              THE CLERK:  I will have someone come and look at

9    it.

10             MR. STEJSKAL:  If at any time during the testimony

11   you're having problems and can't see something, raise your

12   hand and we'll figure out how to resolve the issue.

13             THE COURT:  Go ahead.

14             MR. STEJSKAL:  Thank you, Your Honor.

15                       DIRECT EXAMINATION

16   BY MR. STEJSKAL

17   Q.   Dr. Oblath, what is your occupation?

18   A.   I am a forensic chemist for the Drug Enforcement

19   Administration.

20   Q.   Where do you work?

21   A.   Pleasanton, California.

22   Q.   Which is where?

23   A.   Outside of San Francisco.

24   Q.   How long have you worked there?

25   A.   Approximately three years.
```

1    Q.   Describe for us your educational background.

2    A.   I have a bachelor's degree in chemistry and mathematics

3    from St. Mary's College of Maryland and a doctoral degree in

4    analytical chemistry from the University of North Carolina

5    at Chapel Hill.

6    Q.   What do you mean by analytical chemistry?

7    A.   Analytical chemistry is just the branch of chemistry

8    that deals with identifying substances or measuring

9    substances.

10          THE COURT:  Can you hear her all right?

11    BY MR. STEJSKAL

12    Q.   Lean into the microphone or move it as best you can.  I

13    think it slides around there if you want to pull it towards

14    you.  Thank you.

15    A.   Is that better?

16    Q.   Much.  Thank you.

17          How long does it take to get a doctorate in analytical

18    chemistry?

19    A.   It took me five years.

20    Q.   Including undergraduate or is that beyond

21    undergraduate?

22    A.   Beyond undergraduate.

23    Q.   Where did you get you doctorate degree?

24    A.   University of North Carolina at Chapel Hill.

25    Q.   Tell us about your work history.

```
 1    A.    I worked at the U.S. Department of Agriculture.  I was

 2    a researcher there at a lab in Peoria, Illinois.  And then I

 3    took this job with the Drug Enforcement Administration as a

 4    forensic chemist.

 5    Q.    Did your analytical chemistry also apply then to your

 6    U.S.D.A. assignment?

 7    A.    Yes.  That was also a position as an analytical

 8    chemist.

 9    Q.    Figuring out substances and --

10    A.    Yes.

11    Q.    Tell us about your training specific to drug analysis,

12    specific to your current assignment.

13    A.    I received four months of training at the D.E.A.

14    training academy in Quantico, Virginia on being a forensic

15    chemist, and then I received an additional two months of

16    on-the-job training when I got to Pleasanton, California,

17    including the analysis of ten training samples of known

18    compositions.

19    Q.    Have you also done some instructing on Fentanyl and

20    officer safety?

21    A.    Yes.  I taught a course for a local law enforcement --

22    gave a presentation to local law enforcement on Fentanyl

23    safety.

24    Q.    Your day-to-day assignment at the lab is what?

25    A.    I analyze evidence for the presence or absence of
```

```
 1    controlled substances, and then I write reports based on the
 2    results of my analysis.
 3    Q.   So you have now three years of experience in doing that
 4    with the D.E.A. lab?
 5    A.   Yes.
 6    Q.   And you have analyzed many substances?
 7    A.   Yes.
 8    Q.   What types of substances have you analyzed at the lab?
 9    A.   We get all different types of drug exhibits.
10    Methamphetamine is the most common that we see, but we also
11    get cocaine, heroin, Fentanyl and other types of tablets.
12    That is the bulk of what we do.
13    Q.   Are there procedures that the lab has so different
14    chemists analyze these substances in much the same way?
15    A.   Yes.
16    Q.   Tell us about that.
17    A.   We have methods that we use and it is up to the analyst
18    to decide which methods are appropriate for the evidence
19    that they are analyzing at that moment, but we all are
20    choosing from the same group of methods and techniques.
21    Q.   Do you have access to specialized equipment at the lab
22    that assists you in the performance of your duties?
23    A.   Yes.
24    Q.   Generally speaking, what types of equipment do you have
25    access to?
```

1   A.   We have several different types of analytical

2   instrumentation.  The most common is the gas chromatography

3   mass spectrometer, usually abbreviated as G.C.M.S.  We also

4   use infrared spectroscopy, which is usually abbreviated as

5   I.R.  We have liquid chromatography and nuclear magnetic

6   resonance, which are other techniques that we can use as

7   necessary.

8   Q.   Have you been trained in the use of all of those?

9   A.   Yes.

10  Q.   Do you have experience in using each one of those

11  pieces of equipment and techniques that you just described?

12  A.   Yes.

13  Q.   Let's then move to your association with this case.

14  Were you assigned to analyze some possible controlled

15  substance samples that were submitted to the lab?

16  A.   Yes.

17  Q.   And you happened to get what has been designated by the

18  D.E.A. as Exhibit 1?

19  A.   I believe so.  I would need to look at it to make sure

20  I'm talking about the same thing you are.

21  Q.   How did you get assigned to this case?

22  A.   My supervisor would have assigned me the exhibits.

23  Q.   Let's just walk through, before we get to the very

24  specific exhibits, what you do to get an exhibit, analyze it

25  and produce a report.  The item is assigned to you by the

1   lab supervisor.  What do you do?

2   A.   I mark it for pickup in our computer system and then I

3   go to the main vault and an evidence specialist or

4   supervisor will check the exhibit out to me.  At that point

5   it is in my possession.  Then when I am ready to start

6   analyzing it, I obtain a gross weight, which is the weight

7   of the entire package, including the evidence bag and

8   anything that is inside of it.  Then I would open it up and

9   determine the net weight of the substance and perform the

10  analysis to determine whether there are any controlled

11  substances in that exhibit.  Then determine the reserve

12  weight of the material left over after my analysis and close

13  it up and reseal the exhibit and then write a report based

14  on the results.

15  Q.   How long can that process take?

16  A.   It varies depending on the exhibit.  For some exhibits

17  it might take one day or two days and for others it might

18  take several weeks.

19  Q.   Describe the security features of the lab.

20  Specifically talk about checking it out from the evidence

21  specialist.  How is the item secured before you get it and

22  then once you do get it?

23  A.   Before I receive the item it is stored in the main

24  vault.  Then when I receive it, the supervisor or the

25  evidence specialist that is checking it out to me has to

1  type in their password.  I type in my password.  When the

2  evidence is in my possession it is kept locked in a lock

3  box, and then we also have lockers and a smaller in process

4  vault that the boxes are stored in nights and weekends when

5  we are not present at the lab working on the evidence.

6  Q.   And only you and your supervisor have access to the

7  materials that you are working on?

8  A.   Yes.  When I am working on it, I'm the only one that

9  has access to it.

10  Q.   So in this case you tested a number of exhibits that

11  related to this investigation, correct?

12  A.   Correct.

13  Q.   And some were powders and some were pills; is that

14  correct?

15  A.   Yes.

16  Q.   What kind of paperwork or documentation comes with the

17  physical drug exhibit when you get it?

18  A.   It comes with a form called the D.E.A. 7 that the agent

19  fills out to describe what evidence they are submitting to

20  the laboratory.

21  Q.   What, if anything, do you do with that D.E.A. 7 as far

22  as looking at it?

23  A.   I make sure that the case number and exhibit number

24  match between the paperwork and the physical exhibit.  I

25  also make sure that the description provided by the agent

1   matches the exhibit that is in front of me.

2   Q.   And there are times that that D.E.A. 7 indicates what

3   they think the drug might be; is that correct?

4   A.   Correct.

5   Q.   And specifically sometimes with Fentanyl, correct?

6   A.   Correct.

7   Q.   Are there any special precautions that you as a chemist

8   take if an item is suspected to be Fentanyl?

9   A.   If an item is suspected to be Fentanyl, I generally

10  would use two pairs of gloves instead of just one to make

11  sure I don't come into contact with any of the substance.

12  Instead of using just a simple respirator type mask, I might

13  use a full face respirator or half face respirator with

14  filters just to protect myself from breathing in any of the

15  powder accidently.

16       Generally I would be more careful.  I would let my

17  neighbors know that I have an exhibit that is suspected to

18  be Fentanyl.  I would make sure I keep Narcan at my bench so

19  that if I should become exposed to it, they can help me and

20  dose me with Narcan if necessary.

21  Q.   Tell us what Narcan is.

22  A.   It is just used in the case of an exposure to Fentanyl

23  to -- it is the medical treatment that would be used to

24  restore breathing and --

25  Q.   That needs to be done immediately upon Fentanyl

1    exposure, correct?

2    A.    Yes.  You would want to use it as soon as possible.

3    Q.    In addition to the two sets of gloves and the

4    respirator, does the lab also use vent hoods?

5    A.    Yes.  We use fume hoods during the processing of all

6    exhibits.

7    Q.    Tell us what that is.

8    A.    It is just general chemical safety to draw air away

9    from the chemist to the back of the hood so that you are not

10   exposed to any fumes or powders that you might be working

11   with.

12   Q.    Let's move specifically then to the exhibits that you

13   analyzed in this case.  Now, the powder exhibits were not

14   allowed to be brought to court.

15         Is that your understanding?

16   A.    Yes.

17   Q.    And why is that?

18   A.    We want to reduce the risk of exposure to those

19   powders.

20   Q.    And so did you and others at the lab take photographs

21   of those exhibits so that we could present them in court

22   without having the powders physically present?

23   A.    Yes.

24              MR. STEJSKAL:  Let's put on the screen Exhibit

25   1.00.

```
 1   BY MR. STEJSKAL

 2   Q.   Is that one of those pictures that we just talked about

 3   of powders?

 4   A.   Yes.

 5        MR. STEJSKAL:  I don't know if you can see that.

 6   Let's back up one here real quick.  Sorry.

 7   BY MR. STEJSKAL

 8   Q.   That yellow sticker in the upper left that says

 9   caution, what is that?

10   A.   Those are placed on exhibits either by agents or when

11   the exhibits are received at the vault.  If Fentanyl is

12   suspected or if I am analyzing an exhibit that I determine

13   to be Fentanyl and it does not have a sticker, I will add

14   one.

15   Q.   Why do you put those yellow stickers on there?

16   A.   Just to let anyone know who might handle the evidence

17   that it does contain Fentanyl.

18   Q.   There is also a yellow sticker in the upper right-hand

19   corner.

20        What is that?

21   A.   That is the label sticker that the lab puts on all of

22   the evidence as it is received, so it has our unique

23   identifier which is the lens case number and each exhibit

24   that is received by the lab gets a unique lens case number.

25   Q.   And that is how it is tracked while it is in the lab
```

1    when you say it is checked out from the evidence specialist?

2    A.   Yes.

3    Q.   Now let's look at that white sticker in the middle.

4         Tell us about this sticker and kind of the items that

5    are on that.

6    A.   At the top of the sticker it has the case number and

7    exhibit number and the other information that the agent

8    fills out before we receive the exhibit.  And then at the

9    bottom it has the date that I opened it and it has my

10   signature and the gross weight after the analysis and the

11   date that I resealed it after my analysis.

12   Q.   Okay.  Do you see the acquired by there, the first line

13   with writing on the top?

14   A.   Yes.

15   Q.   What does that say to the best of your ability to read

16   that?

17   A.   It looks like it says special agent -- I don't know if

18   I can make out the name.  I don't know if I am familiar with

19   the agent.

20   Q.   And the location?

21   A.   Long Beach, California.

22   Q.   Evidence has previously shown that this is the exhibit

23   seized by customs agents, the Ryan Jensen package.

24        So when you first received this package then what did

25   you do with it?

```
1    A.    The first thing that I would have done was to obtain a
2    gross weight.
3    Q.    How do you get a gross weight?
4    A.    I weigh the entire package as received from the vault.
5    Q.    That means bags or whatever container it is in plus
6    whatever the substance is inside?
7    A.    Correct.
8    Q.    What kind of equipment do you at the lab use to weigh
9    items?
10   A.    We have balances that we use.  They are electronic
11   scales.
12   Q.    Are those specialized equipment at the lab that are
13   like supersensitive and you can get really accurate weights?
14   A.    Yes.
15   Q.    Have you been trained in the use of those?
16   A.    Yes.
17   Q.    Are those regularly maintained by the lab and checked
18   to make sure that you are getting accurate weights?
19   A.    Yes.
20   Q.    So the first thing you did with Exhibit 1 here is get a
21   gross weight.
22         Let's switch to 1.01 then.
23         Do you create a report, then, of your findings in a
24   particular case?
25   A.    Yes, at the end of my analysis.
```

1    Q.   I have put this in front of you.  What was the gross

2    weight of Exhibit 1 in this case?

3    A.   207.4 grams.

4    Q.   And that is detailed there in the middle of your report

5    there?

6    A.   Yes.

7    Q.   After getting that gross weight, what do you do?

8    A.   I compare that gross weight to the gross weight listed

9    by the agent on the paperwork.  Again, just as a check to

10    make sure that the evidence is what the paperwork came in

11    with.  Then I would open the exhibit and begin my analysis.

12    Q.   So the gross weight is before you even open it?

13    A.   Yes.

14    Q.   Are there special procedures for opening and resealing

15    the bag?

16    A.   Yes.

17    Q.   What is that?

18    A.   We mark the bottom of the bag with the initials and

19    date and a unique identifier, and then cut open the bag

20    along the bottom, and then take out all of the packaging,

21    describe it, and open the innermost packaging to weigh the

22    substance and obtain the net weight.  Generally it is

23    transferred into a new bag at that point as well.

24    Q.   So once you open it then you do the net weight?

25    A.   Correct.

```
 1   Q.   What is the net weight as opposed to the gross weight?

 2   A.   The net weight is the weight of the actual substance,

 3   the evidence inside.

 4   Q.   And by evidence you mean not the packaging but just

 5   whatever the substance is?

 6   A.   Yes.  In this case it would have been the weight of the

 7   powder.

 8   Q.   How do you get that net weight?

 9   A.   I generally would weigh the bag that it comes in full,

10   then empty it into a new bag and weigh the original bag

11   empty and subtract that empty weight from the full weight.

12   Q.   What was the net weight in this case?

13   A.   The net weight was 98.7 grams.

14   Q.   After getting the net weight on Exhibit 1, what did you

15   do next?

16   A.   I then performed my analysis.  I removed two samplings

17   of that powder and I analyzed them using G.C.M.S. and I.R.

18   I then performed a composite.  I took 25 to 30 grams of that

19   material.  I ground it with a mortar and pestle and mixed it

20   thoroughly and passed it through a sieve to make sure it was

21   homogeneous and uniform.  I then took another sampling of

22   the composite and again tested it with G.C.M.S.

23   Q.   Let's slow down and take that in smaller bites.

24        You said the first thing you did was take two samples

25   from the overall total sample?
```

```
 1   A.    Yes.
 2   Q.    How did you do that and what size samples are we
 3   talking about?
 4   A.    The samples are about five milligrams, so just the tip
 5   of a small spatula.  They are randomly sampled out of the
 6   material as it is received, without any processing.
 7   Q.    There is a bulk amount of powder and you take two
 8   random samples from that amount to analyze it?
 9   A.    Yes.
10   Q.    And you analyzed those separately?
11   A.    Yes.
12   Q.    The two samples?
13   A.    Correct.
14   Q.    Why two?
15   A.    We take two samples.  It is part of our policy to take
16   two samplings and run two different tests.  Part of it is to
17   eliminate the chance that contamination is the source of our
18   results, because we take two separate samplings and tested
19   them separately, it would be unlikely for both to be
20   contaminated in the same way.
21   Q.    In reality it is unlikely for anything to become
22   contaminated?
23   A.    Yes.  We generally do not see any contamination.
24   Q.    Just a super precaution to make sure you take two to
25   back each other's tests?
```

1    A.   Yes.

2    Q.   You said you ran two tests on each of those two initial

3    samples?

4    A.   One test on each of the two samples, so two tests

5    total.

6    Q.   What was that test?

7    A.   One of the samplings was tested with G.C.M.S.  The

8    other was tested with I.R.

9    Q.   Let's talk about the G.C.M.S. first.  Tell us what that

10   stands for one more time.

11   A.   Gas chromatography and mass spectrometry.

12   Q.   What does that test involve?  Is it a big piece of

13   equipment?

14   A.   It is largish.  It sits on a bench in the lab.  The gas

15   chromatography portion of the test separates the different

16   components of the mixture.  Then those are detected by the

17   mass spectrometer which fragments the molecules that make up

18   each compound, and we can use the fragmentation pattern as a

19   unique identifier for the compound in question.

20   Q.   So each compound has a unique look or identifier that

21   you as a trained chemist can detect or see?

22   A.   Yes.

23   Q.   This G.C.M.S. equipment helps separate it out to enable

24   you to do that?

25   A.   Yes.

1    Q.    Am I saying that accurately?

2    A.    Yes.

3    Q.    You can probably say it better.

4          So you ran that first sample on the G.C.M.S. equipment.

5    Describe what you do then.  Does it create a printout?

6    A.    The data is stored on a computer.  We then print out

7    the data that shows the fragmentation pattern and the

8    separation from the G.C., but we manipulate the data using

9    computer software.

10   Q.    What do you mean by manipulate the data?

11   A.    We can look at the fragmentation patterns for the

12   different peaks, zoom in on the data, and we are able to

13   search a library for different fragmentation patterns and

14   compare our sample that is an unknown with a known standard

15   that we can also run on the same instrument.

16   Q.    So you ran that G.C.M.S. test on this first sample and

17   what did you determine?

18   A.    We determined that the sample contained Fentanyl.

19   Q.    Is Fentanyl a controlled substance?

20   A.    Yes.

21   Q.    So you have got that confirmation of the first sample

22   and then you said you ran the second sample through a

23   different test?

24   A.    Yes.  I used I.R.

25   Q.    Describe I.R. for us.

1  A.   I.R. is a technique that uses infrared radiation.  We

2  look at how much of the radiation at different wavelengths

3  is absorbed by the sample.  It also produces a unique

4  spectrum for different compounds.  So we can use the

5  spectrum to get structural information about the compound

6  and to identify what it is.

7  Q.   And you did that with regard to this second sample?

8  A.   Yes.

9  Q.   What did you determine?

10  A.   We determined that -- I determined that the sample was

11  Fentanyl hydrochloride.

12  Q.   What do you mean by hydrochloride?

13  A.   Hydrochloride is a salt form, so it is a salt that is

14  associated with the Fentanyl molecule.  One way to think

15  about it is if you have a truck, you can attach a trailer

16  and it still is a truck, and it is still Fentanyl, it just

17  also has that hydrochloride attached to it.

18  Q.   Slightly different then Fentanyl, but indicates --

19  A.   Yes.  It is still Fentanyl, it just also has

20  hydrochloride.

21  Q.   These two tests that you just described for us, the

22  G.C.M.S. test and the I.R. test, are those tests recognized

23  by the forensic community as suitable for the identification

24  of controlled substances?

25  A.   Yes.

1    Q.   Is that something that the lab routinely uses in

2    identifying controlled substances?

3    A.   Yes.

4    Q.   Are these tests also used outside of this lab or the

5    government community by other business and industry

6    organizations?

7    A.   Yes.

8    Q.   So just basically what analytical chemists use to

9    identify substances?

10    A.   Yes.  These are standard in all chemistry techniques.

11    Q.   And they have been using these tests as long as you

12    have been doing analytical chemistry?

13    A.   Yes.

14    Q.   And longer?

15    A.   Most likely, yes.

16    Q.   So you did these two initial tests from the two scoops

17    from the main sample and then you talked about a composite.

18    What do you mean by a composite?

19    A.   A composite is formed by taking portions of the bulk

20    sample on in this case 25 to 30 grams, and then grinding it

21    up and mixing it thoroughly and passing it through a sieve

22    to make sure it is homogeneous and uniform, that there is no

23    difference across the composite.

24    Q.   So grinding it up into an even finer powder?

25    A.   Yes.

1    Q.    Is that so the equipment can analyze it better?

2    A.    Not necessarily so that the equipment can analyze it

3    better, but to ensure that even though we are only taking a

4    small portion, that it is going to represent the entire

5    portion.

6    Q.    That it is a representative sample of the entire

7    exhibit that was submitted?

8    A.    Yes.

9    Q.    Are there lab protocols for how much you're supposed to

10   take and what you're supposed to examine in order to be able

11   to attribute it to the whole sample?

12   A.    Yes.

13   Q.    Did you do that in this case, take a sufficient amount

14   of samples to form your composite?

15   A.    Yes.

16   Q.    Once you got this composite, then tell me about the

17   tests you would run on that.

18   A.    In this case I ran a test to determine that I had

19   identified any components of the mixture that were present

20   at greater than a one-percent level.

21   Q.    What did you determine from that?

22   A.    Again, I determined the sample contained Fentanyl.

23   Q.    Greater than one percent?

24   A.    Yes.

25   Q.    Then what?

1   A.   I then determined the reserve weight of the exhibit, so

2   the amount of material left after my analysis was complete.

3   Then I resealed the package -- the evidence back into the

4   packaging.

5   Q.   So what test did you perform on this composite then?

6   A.   The G.C.M.S.

7   Q.   And you said the result was that that was Fentanyl?

8   A.   Yes.

9   Q.   So now there have been a total of three tests on

10  Exhibit 1 here, this sample?

11  A.   Correct.

12  Q.   And they have all indicated that the substance contains

13  Fentanyl, correct?

14  A.   Correct.

15  Q.   Now, you said that you then repackage it and reseal it,

16  correct?

17  A.   Correct.

18  Q.   Do you check your data at that point?

19  A.   Yes.   I would review my data and write the report.

20  Q.   What do you mean by review your data?

21  A.   Go over and make sure all of the data I am including in

22  my packet is complete, that I didn't forget to print

23  anything at the instrument, just a double-check to make sure

24  that it shows what I initially evaluated it as showing.

25  Q.   Then what do you do with that report once complete?

```
 1    A.   I submit it to my supervisor for review and approval.

 2    Q.   Did that happen in this case?

 3    A.   Yes.

 4         MR. STEJSKAL:  Let's zoom out.

 5    BY MR. STEJSKAL

 6    Q.   When did you submit this report?

 7    A.   So this report -- this is actually I think a

 8    supplemental or amended report which was submitted on

 9    April 4th, 2017.  If you go back up to the top of the

10    report, I --

11    Q.   Let's go to page 2.  Look at the date at the bottom of

12    this one.

13    A.   This is my original report and it was submitted on

14    November 16th, 2016.

15    Q.   Do you recall the purpose behind submitting the amended

16    report?

17    A.   I was asked to remove a sample for a special program,

18    so I reopened the exhibit to remove that sample.

19         MR. STEJSKAL:  Let's go back to page 1.

20    BY MR. STEJSKAL

21    Q.   There in the middle under remarks -- there are two

22    remarks there?

23    A.   Yes.

24    Q.   Explain those.

25    A.   I removed a five-gram sample for one special program
```

```
 1    and then a ten-gram sample was removed for another special

 2    program.

 3    Q.   What are those special programs?

 4    A.   I believe the five-gram sample was sent to the special

 5    testing and research laboratory in Virginia, and the

 6    ten-gram sample was a request for a sample to be sent to

 7    China.

 8    Q.   At this time Fentanyl was of interest to the lab?

 9    A.   Yes.

10    Q.   And they were doing some special testing to determine

11    sources and those kinds of things?

12    A.   Yes.

13              MR. STEJSKAL:  Zoom out, if you would.

14    BY MR. STEJSKAL

15    Q.   With regard to Exhibit 1, what is your expert opinion

16    as to what Exhibit 1 is, the substance and the weight?

17    A.   Exhibit 1 was 98.7 grams of Fentanyl hydrochloride.

18    Q.   On what do you base that opinion?

19    A.   Based on the results of my analysis from the G.C.M.S.

20    and I.R. tests.

21    Q.   Let's next move to Exhibit 2.00.

22         Tell us what that is.

23              MR. STEJSKAL:  Maybe zoom in on that white label,

24    if you would.

25              THE WITNESS:  This is the evidence I received for
```

1   Exhibit 2.

2   BY MR. STEJSKAL

3   Q.   This is Exhibit 2.  Prior testimony has shown that this

4   was the first Sean Gygi package, 11-15 of 2016.

5        What does this label indicate as far as your

6   involvement with Exhibit 2?

7   A.   I opened it on April 5th, 2017.  I resealed it on

8   April 10th.

9   Q.   Describe your process for your analysis of Exhibit 2.

10  A.   So my analysis would have been very similar to Exhibit

11  1.  I think there was a slight change in policy between

12  Exhibit 1 and Exhibit 2.  So for Exhibit 2, I immediately

13  formed the composite.  In this case it was a 15-gram

14  composite instead of 25 grams.  The composite was formed.  I

15  ground it and thoroughly mixed it and passed it through a

16  sieve and then I performed my analysis on that composite

17  material.

18  Q.   Let's look at 2.01.  You see this references Exhibit 2.

19  What tests did you perform on this item?

20  A.   I performed the G.C.M.S. and I.R.

21  Q.   Which you previously described?

22  A.   Yes.

23  Q.   And you performed those in the same manner?

24  A.   Yes.

25  Q.   With what results?

1    A.    In this case I identified Alprazolam.

2    Q.    What is Alprazolam or is there something that it is

3    better known as on the open market?

4    A.    It is the active ingredient in Xanax, if I remember

5    correctly.

6    Q.    And you have got a net weight there at the top, too.

7    What does that indicate?

8    A.    The net weight for this exhibit was 122.1 grams.

9    Q.    In your expert opinion what was this exhibit?

10   A.    Alprazolam.

11   Q.    In that weight?

12   A.    Yes.

13   Q.    Let's move to Exhibit 3.00.

14         Did you also receive this item for testing?

15   A.    Yes.

16   Q.    And this indicates a date of 11-16 of 2016 in Utah

17   County.  Is that what it says on top of that label?

18   A.    Yes.

19   Q.    Previous testimony has shown that this was the first

20   Mausai package.

21         What did you do upon receiving Exhibit 3?

22   A.    I analyzed it in the same way that I previously

23   described.  I obtained a gross weight and then a net weight

24   and then performed my analysis.

25   Q.    Let's look at 3.01.

1    Did you complete a report with regard to Exhibit 3?

2    A.   Yes.

3    Q.   Tell us about the test you ran on this then.

4    A.   For this exhibit I performed the G.C. test.  That is

5    the same as the first part of the gas chromatography mass

6    spectrometry test.  It has a different detector called a

7    flame ionization detector, generally abbreviated as F.I.D.,

8    which does not provide structural information like the mass

9    spectrometry does.  It only provides information about the

10   separation.  Then I also performed the G.C.M.S. and I.R.

11   tests.

12   Q.   How did you run that first G.S. test?

13   A.   In this case I was not able to conclusively identify

14   the Fentanyl from the infrared spectroscopy test, and so I

15   ran G.C. as a second test to identify the Fentanyl.

16   Q.   And it was identified as Fentanyl in that test?

17   A.   Yes.  I also performed a purity analysis quantitation

18   on this exhibit.

19   Q.   Tell us what that is and how you do that.

20   A.   That is where we determine how much of the exhibit is

21   pure Fentanyl.  In this case it was determined to be 80

22   percent.  To do that test we have a standard of known

23   concentration of Fentanyl that we analyze alongside a sample

24   from the exhibit that wouldn't have an unknown

25   concentration, and then by comparing the response between

1    the standard that we know the concentration of and the

2    unknown exhibit, we can determine the purity of the Fentanyl

3    in the exhibit.

4    Q.    So in your expert opinion, give us the complete

5    conclusion of what this exhibit was and the purity level.

6    A.    Exhibit 3 was identified as Fentanyl, 74.3 grams, with

7    80-percent purity calculated as Fentanyl hydrochloride.

8    Q.    Let's move to Exhibit 4.00.

9          What is the D.E.A. exhibit number on this?

10   A.    The D.E.A. exhibit number is Exhibit 166.

11   Q.    Previous testimony in the case has identified that as

12   the second Mausia package.  What was your involvement with

13   D.E.A. Exhibit 166?

14   A.    I analyzed this exhibit between April 19th, 2017 and

15   April 27th.

16   Q.    Let's look at 4.01.

17         Tell us about your analysis of Exhibit 166.

18   A.    This analysis was very similar to the previous

19   analysis.  I formed a composite.  I tested it using G.C.M.S.

20   and I.R.  I also did the purity determination for the

21   Fentanyl.

22   Q.    And this, again, was a powder exhibit as opposed to

23   pills, correct?

24   A.    Correct.

25   Q.    In your expert opinion, what was your conclusion with

1  regard to the analysis of this exhibit?

2  A.   Exhibit 166 was 102.9 grams containing Fentanyl

3  hydrochloride and the purity was 87 percent.

4  Q.   Let's next look at 4.03.

5       What is the D.E.A. exhibit number on this one?

6  A.   183.

7  Q.   Previous testimony has shown that this was a package

8  retrieved from a Jessica Gleave on 11-28 of 2016, which is

9  the date on that label, correct?

10  A.   That is the date on the label.

11  Q.   What did you do and when did you do it with regard to

12  Exhibit 183?

13  A.   I analyzed this exhibit between April 25th and May 3rd,

14  2017.

15  Q.   Describe your analysis of Exhibit 183.  Let's look at

16  4.04.

17  A.   Again, this was a powder exhibit.  I formed a

18  composite.  I tested the composite using G.C., G.C.M.S. and

19  I.R., and I identified Alprazolam.

20  Q.   Do you often see pure Alprazolam in powders like

21  Exhibit 183?

22  A.   Can you repeat the question?

23  Q.   Do you often see or at that time had you often seen

24  Alprazolam powders in this manner as opposed to pills?

25  A.   Not generally, no.

```
 1    Q.    This was kind of a unique exhibit to you at that time?

 2    A.    Yes.

 3    Q.    You said you ran three tests on this, correct?

 4    A.    Correct.

 5    Q.    What did those tests indicate?

 6    A.    It indicated that the exhibit contained Alprazolam.

 7    Q.    So in your expert opinion, give us the results of

 8    Exhibit 183.

 9    A.    150.9 grams of Alprazolam.

10    Q.    Thank you.  Let's next move to Exhibit 5.00.

11          What is the exhibit number, the D.E.A. exhibit number

12    on 5.00?

13    A.    Exhibit 12.

14    Q.    Previous testimony has established that is the second

15    Sean Gygi package.  It looks like the date acquired is 11 --

16    it is either a 14 or 17 of 2016.

17          Is that what it says on the label?

18    A.    That is what the date looks like on the label, yes.

19    Q.    When did you perform analysis on this item?

20    A.    From April 5th to April 10th, 2017.

21    Q.    Let's look at Exhibit 5.01.  Describe how you analyzed

22    Exhibit 12 in this case.

23    A.    So this exhibit was again a powder.  I formed a

24    composite and I tested the composite using G.C., G.C.M.S.

25    and I.R. and I identified Fentanyl hydrochloride.  I also
```

1    determined the purity of the Fentanyl.

2    Q.    How did you do the purity determination?

3    A.    The same way I have described before, by comparing this

4    exhibit with a known standard with a known concentration.

5    Q.    Based on your analysis what is your expert opinion with

6    regard to the contents and weight of Exhibit 12?

7    A.    Exhibit 12 was 99.4 grams of Fentanyl hydrochloride

8    with a purity of 88 percent.

9    Q.    Let's next go to Exhibit 7.03.  That is a physical

10   exhibit.  Thank you for pausing.

11        Let me hand you 7.03.  I am not seeing it here.

12        7.03 has been identified as D.E.A. Exhibit 14.  Do you

13   see D.E.A. Exhibit 14 in that sealed tote?

14   A.    Yes.

15   Q.    Let's pull up 7.83.  Exhibit 14 has previously been

16   identified from the November 18th packages that Mr. Gygi

17   retrieved from the Tonge-Bustin residence in Daybreak.

18        Looking at that photo on the screen, does that appear

19   to be the contents of Exhibit 14 that you analyzed?

20   A.    It looks like what was in Exhibit 14.

21   Q.    Exhibit 14 was pills rather than powder?

22   A.    Correct.

23   Q.    Can you see the label through that -- first tell us

24   about the tote.  That is a sealed tote containing exhibits.

25   Given the nature of what these are, why is the tote sealed?

1    A.    Just to, again, reduce the danger of having Fentanyl

2    out where someone could be exposed to it.

3    Q.    You can see the label and what is necessary to testify

4    to this exhibit in that tote?

5    A.    Yes.

6    Q.    Tell us about, then, D.E.A. Exhibit 14 and your receipt

7    and analysis of that item.

8    A.    I analyzed Exhibit 14 from January 13th to

9    January 27th, 2017.

10    Q.    Let's look at 7.04.  Is that your report as it relates

11    to D.E.A. Exhibit 14?

12    A.    Yes.

13    Q.    Tell us about your analysis of that exhibit.

14    A.    For this exhibit I determined the gross weight.  I

15    determined the net weight.  In this case because the exhibit

16    was in the form of tablets, I also determined and

17    extrapolated the total count of the number of tablets in the

18    exhibit.  To do that I weighed the entire net weight as I

19    previously described as I would for any other exhibit, and

20    then I also got the individual weights of nine units, and so

21    I weighed nine units one after the other, and then

22    determined the average weight of a single tablet and then

23    divided the total net weight by that average tablet weight

24    to get the total number of tablets.

25    Q.    So you individually weighed nine tablets one at a time?

1    A.    Yes.

2    Q.    And then used that in relation to the net weight to

3    determine the average weight of each tablet?

4    A.    I determined the average weight of each tablet -- I

5    used the net weight to determine the total tablet count.

6    Q.    Total tablet count.  Gotcha.  Okay.  If given a

7    calculator, could you tell us what the weight of an

8    individual pill was?

9    A.    Yes.

10           MR. STEJSKAL:  May I approach?

11           THE COURT:  You may.

12           THE WITNESS:  So I divided 2,138 grams by the

13   19,783 tablets to get an average tablet weight of

14   108 milligrams.

15   BY MR. STEJSKAL

16   Q.    Each tablet --

17   A.    So each tablet weighed approximately 108 milligrams.

18   Q.    Again, these are those little blue tablets that we saw

19   in that previous picture that had the appearance of

20   Oxycodone, correct?

21   A.    Correct.

22   Q.    You gave us the pill count and the weight.  Tell us

23   about your analysis of the substance contained in Exhibit

24   14.

25   A.    So after determining the net weight and the tablet

1    count, I analyzed 32 units separately.  So I took samplings

2    from -- two samplings from each of those tablets and tested

3    one of the samplings using G.C.M.S. and the other sampling

4    using the Marquis color test and I identified Fentanyl in

5    all 32 of those tablets.  I then formed a composite from the

6    32 tablets and tested that composite using G.C.

7    Q.   With what result on the composite?

8    A.   Again, Fentanyl was identified.

9    Q.   So if I understand you, you ran individual tests on the

10   32?

11   A.   Yes.

12   Q.   And then you ran a composite as well?

13   A.   Yes.

14   Q.   And all indications for all of those tests on the

15   equipment indicated Fentanyl?

16   A.   Yes.

17   Q.   Based on your expert opinion -- well, this one has got

18   the Marquis color test listed as one of the tests that you

19   performed; is that correct?

20   A.   Yes.

21   Q.   Is that different from the two tests you previously

22   described?

23   A.   Yes.

24   Q.   Tell us about this test.

25   A.   The color test, we take a sampling of the tablet or the

1    powder material and add it to a color test reagent and then

2    observe any color change which could indicate a controlled

3    substance or another substance.

4    Q.   You could tell that by what you visually observed in

5    the sample that is being tested?

6    A.   Yes.  In this case the color change was consistent with

7    Fentanyl.

8    Q.   Based on your analysis and training, what is your

9    expert opinion with regard to the weight and substance in

10   Exhibit 14?

11   A.   Exhibit 14 was 2,138 grams that contained Fentanyl.

12   Q.   Let's move next to Exhibit 7.25, which is D.E.A.

13   Exhibit 34 which is also contained in that tote.

14        Can you find the sticker indicating D.E.A. Exhibit 34?

15   A.   Yes.

16   Q.   Does that appear to be an exhibit that you analyzed?

17   A.   Yes.

18   Q.   Let's look on the screen at 7.83, photo 21.  That shows

19   Exhibit 34 on the screen.  Does that appear to match the

20   contents of what you analyzed in your work on Exhibit 34?

21   A.   As best I can tell, yes.

22   Q.   And in looking at this photo just to the right of the

23   silver packaging, do you see where it says small flat rate

24   box?

25   A.   Yes.

1    Q.   Prior testimony has shown that this was one of the

2    packages that Mr. Gygi had obtained from the Tonge-Bustin

3    residence on November 18th of 2016.  This one is the small

4    box.

5         Let's go to 7.26.  Is this a report containing the

6    results of your analysis as to D.E.A. Exhibit 34?

7    A.   Yes.

8    Q.   Looking at that and the label on Exhibit 34, tell us

9    when you analyzed this item.

10   A.   I analyzed this exhibit between January 13th and

11   January 30th, 2017.

12   Q.   Describe how you analyzed this item.

13   A.   I analyzed it much in the same way as the previous

14   exhibit.  I determined the net weight and the total unit

15   count for the tablets.  In this case I tested 29 tablets

16   using the G.C.M.S. and the Marquis color test.  I then

17   formed a composite from those 29 tablets and analyzed it

18   using gas chromatography.

19   Q.   What was the result of all of those tests that you

20   performed on this sample?

21   A.   Fentanyl was identified.

22   Q.   Based on your expert opinion and your analysis in this

23   case, what is Exhibit 34?

24   A.   225.2 grams of Fentanyl.

25   Q.   Let's next move to what is identified as D.E.A.

1    Exhibit 64 on the sticker on the tote and it would be

2    Exhibit 7.54 for court purposes.

3        Can you find Exhibit 64 in the tote?

4    A.    Yes.

5    Q.    Let's pull up 7.83, photo 47.  Does this appear to be

6    consistent with what you received as D.E.A. Exhibit 64?

7    A.    As far as I can tell, yes.

8    Q.    Prior testimony has shown that this was another

9    November 18th package that Mr. Gygi had retrieved from the

10   Tonge-Bustin residence and this is one of the priority

11   envelopes.

12       Let's look at 7.55.  Looking at that and the label of

13   D.E.A. 64 in that tote, when did you analyze this item?

14   A.    I analyzed this exhibit between January 17th and

15   January 30th of 2017.

16   Q.    Describe what you did to analyze this item.

17   A.    Again, I determined the net weight and the total number

18   of tablets.  I analyzed 28 of the tablets using G.C.M.S. and

19   the Marquis color test.  I formed a composite from those 28

20   tablets and tested it using G.C.

21   Q.    With what result?

22   A.    54.607 grams containing Fentanyl.

23   Q.    I am noticing that there are slight differences in the

24   number of units that you tested in each of these exhibits.

25   Explain for us the difference and how many units are tested.

1    A.    So we use a sampling plan based on a statistical model.

2    Depending on the total number of units in the exhibit, it

3    tells us how many of those units we need to test.

4    Q.    In order to be able to testify as to the contents of

5    the entire exhibit, correct?

6    A.    Yes.

7    Q.    Let's next go to Exhibit 8.31, which is D.E.A. Exhibit

8    123.  That would be in this other tote.

9          Do you see Exhibit 123?

10   A.    Yes.

11   Q.    If we could look at 8.02, photo 26.

12         Do you see 123 on the screen there?

13   A.    Yes.

14   Q.    Does that appear to be --

15   A.    As far as I can tell, yes.

16   Q.    -- the sample of what you analyzed in this case?

17   A.    Yes.

18   Q.    Let's look at 8.32 then.  This was a sample and

19   previous testimony has indicated that D.E.A. Exhibit 123 was

20   taken from the November 20th packages that Mr. Gygi

21   retrieved from the Tonge-Bustin residence.

22         Looking at 8.32, which is on the screen, does that

23   detail your analysis of Exhibit 123?

24   A.    Yes.

25   Q.    Looking at the sticker on the exhibit in the tote, when

```
1    did you analyze this item?
2    A.   This exhibit was analyzed between January 17th and
3    January 30th, 2017.
4    Q.   Describe your analysis as to D.E.A. Exhibit 123.
5    A.   So, again, for this exhibit I determined the net weight
6    and the total number of tablets.  I tested 27 tablets using
7    G.C.M.S. and the Marquis color test.  I then formed a
8    composite from those 27 tablets and tested it using G.C.
9    Q.   Based on your analysis, what is your expert opinion as
10   to the contents of Exhibit 123?
11   A.   Exhibit 123 was 22.786 grams containing Fentanyl.
12   Q.   Let's next look at Exhibit 9.01, which is D.E.A.
13   Exhibit 185.
14        Can you identify that item for us, please.
15   A.   This is Exhibit 185.
16   Q.   Let's look at 9.02, photo number two.
17        Does that photograph appear to be consistent with the
18   exhibit that you analyzed there that is in front of you?
19   A.   As far as I can tell, yes, although I did not ever see
20   this exhibit in its original packaging.
21   Q.   And previous testimony has indicated that D.E.A.
22   Exhibit 185 was from the November 22nd seizures that Postal
23   Inspector Lance Howell seized from the mail stream after Ms.
24   Tonge deposited them in the mail prior to the arrest.
25        Let's look at 9.02.  Let's look at the second page
```

```
 1   first.  Sorry.  There are two pages of 9.02, I believe.
 2        Tell us about your analysis of Exhibit 185.
 3   A.   This is the report from the original chemist's
 4   analysis.  I performed a reanalysis of the composite that
 5   was formed by the original chemist.
 6   Q.   Let's look at the first page then.  Sorry.
 7        This one has got your name at the bottom there,
 8   correct?
 9   A.   Correct.
10   Q.   Tell us about your analysis of 185.
11   A.   So for this exhibit I determined the net weight for the
12   entire exhibit.  I then took the composite that was formed
13   by the original chemist and I reground it and mixed it up
14   and passed it through a sieve again, and then I tested the
15   composite using G.C. and G.C.M.S.
16   Q.   And based on that analysis, what did you determine?
17   A.   I determined that the exhibit contained Alprazolam.
18   The net weight of the exhibit was 1,105.4 grams.
19   Q.   Let's next look at Exhibit 9.10, which is D.E.A.
20   Exhibit 193.
21        Do you see that exhibit there in the tote in front of
22   you?
23   A.   Yes.
24   Q.   Let's look at 9.20, photo ten.  Does that appear to
25   correspond to D.E.A. Exhibit 193 that you analyzed?
```

```
 1   A.   That looks like the exhibit I received, yes.

 2   Q.   Previous testimony has indicated that Exhibit 9.10,

 3   which is D.E.A. Exhibit 193, was another package from Postal

 4   Inspector Lance Howell that was seized from the mail stream

 5   after Ms. Tonge had put it in the mail stream.

 6        Let's look at Exhibit 9.11.  Looking at the exhibit in

 7   front of you, when did you analyze D.E.A. Exhibit 193?

 8   A.   I analyzed this exhibit from January 17th through

 9   January 30th, 2017.

10   Q.   Describe your analysis of Exhibit 193.

11   A.   I determined the net weight and the total number of

12   tablets.  I tested 29 tablets using G.C.M.S. and the Marquis

13   color test.  I then formed a composite from those 29 tablets

14   and tested it using G.C.

15   Q.   What were your results based on, your analysis and your

16   expert opinion?

17   A.   The results were that the exhibit was 239.2 grams

18   containing Fentanyl.

19   Q.   Let's next move to Court Exhibit 12.08, which is D.E.A.

20   Exhibit 175.  Prior testimony has indicated that this item

21   was seized from Mr. Shamo's house on the bookshelf in the

22   press room.

23        Can you tell us from the sticker your involvement with

24   this item?

25   A.   I analyzed this exhibit between April 25th and May 3rd,
```

```
 1    2017.

 2    Q.   Let's look at 12.09.  Outline for us your analysis of

 3    D.E.A. Exhibit 175.

 4    A.   This exhibit was a powder.  I determined the net weight

 5    of the powder and then formed a composite.  I tested the

 6    composite using G.C.M.S., I.R. and G.C.  I also determined

 7    the purity of the Fentanyl.

 8    Q.   And based on your analysis, what is your expert opinion

 9    as to the contents of Exhibit 175?

10    A.   Exhibit 175 was 87.1 grams containing Fentanyl with a

11    purity of 72 percent calculated as Fentanyl hydrochloride.

12    Q.   Thank you.

13         Each of these exhibits that you testified to this

14    morning, you performed an analysis in the D.E.A. lab in

15    Pleasanton, California, correct?

16    A.   Yes.

17    Q.   And on the dates you indicated?

18    A.   Yes.

19    Q.   And using the equipment that you indicated that the lab

20    keeps for the performance of these tests?

21    A.   Yes.

22    Q.   Did you receive any indication at any time that there

23    was anything wrong with this equipment?

24    A.   No.

25    Q.   Any indication that there was anything wrong with your
```

```
 1    analysis?

 2    A.    No.

 3    Q.    Based on your expert opinion, then, and your analysis

 4    of all of these items, what two items of controlled

 5    substances did you identify in the exhibits that you tested?

 6    A.    Fentanyl and Alprazolam.

 7    Q.    Thank you.

 8          MR. STEJSKAL:  That's all of the questions for

 9    this witness.

10          THE COURT:  Thank you.

11          The defense may cross-examine.  Mr. Sam.

12                    CROSS-EXAMINATION

13    BY MR. SAM

14    Q.    If you could identify that tote for me.  Is that

15    Exhibit 7?  Is that correct?

16    A.    I am not sure which marking I'm looking for.

17    Q.    It may be the yellow marking on the top.  I am not

18    sure.

19          MR. STEJSKAL:  Do you want her to have --

20          MR. SAM:  Is that the seven series?

21          MR. STEJSKAL:  Do you want her to have that?

22          MR. SAM:  I want to know what tote that is.

23          THE WITNESS:  I think it is the nine series.

24    BY MR. SAM

25    Q.    The nine series.
```

```
1              MR. SAM:  If I could just have a minute.

2              Pull up Exhibit 9.11.

3    BY MR. SAM

4    Q.   Was Exhibit 193, is that what was in the tote there

5    that you testified to?  Is that correct?

6    A.   Yes.

7    Q.   And there are other packages in that tote; is that

8    correct?

9    A.   Yes.

10   Q.   Did you test the other packages in that tote?

11   A.   Let me check.

12        No.

13   Q.   Okay.  So there are several bags in there and that, as

14   far as you know, is the one that you tested in that tote?

15   A.   Yes.  As far as I can tell, that is the only exhibit in

16   this tote that I analyzed.

17   Q.   All right.  Then on this Exhibit 911 that we have

18   pulled up here, in the sampling there it said 29 units were

19   tested out of the 2,277; is that correct?

20   A.   Correct.

21   Q.   I think you testified that there was some formula that

22   determined how many units would be tested; is that correct?

23   A.   Yes.  We have a sampling plan.

24   Q.   The sampling plan.  Was that something that you did or

25   somebody else would give you that number?
```

1    A.    The sampling plan is part of our policy and that is

2    based on accepted statistical models.

3    Q.    Okay.

4              MR. SAM:  If we could go to Exhibit 7.04.

5    BY MR. SAM

6    Q.    Look at the sampling at the bottom.  It says 32 units

7    were tested out of the 19,783 units received; is that

8    correct?

9    A.    Yes.

10   Q.    And that would have been according to the analysis or

11   the sampling protocol?

12   A.    Yes.  That was following the sampling plan.

13   Q.    What would be the difference between this one and the

14   last one we looked at where 29 units out of 2,200,

15   approximately, tablets were tested?

16   A.    This exhibit contained more units.  They were also

17   split across four bags, so the sampling plan determined that

18   I should test 32 of the tablets for this exhibit.

19   Q.    Total out of the 19,000 tablets that were in the

20   exhibit, correct?

21   A.    Yes.

22   Q.    Okay.  In that sampling down below it said that there

23   was received a 95-percent level of confidence that at least

24   90 percent of the population contains the substance; is that

25   correct?

```
 1    A.    Yes.

 2    Q.    And that 90-percent confidence, how does that relate to

 3    the net weight up there, the 2,138 grams?

 4    A.    So the 95-percent level of confidence that 90 percent

 5    of the population contains the substance is not related to

 6    the net weight.

 7    Q.    It is not related to the net weight?

 8    A.    It is related to the number of units that contain the

 9    substance identified.  The net weight has a different -- the

10    uncertainty is really to a different model.  That remark is

11    at the top of the report.  The net weight uncertainty value

12    represents an expanded uncertainty estimate at a 95 percent

13    level of confidence.

14    Q.    So 90 percent of the population, would that be related

15    to the number of tablets then?

16    A.    Yes.

17    Q.    So there is confidence that at least 90 percent of the

18    number of tablets had this substance in them?

19    A.    Yes.

20              MR. SAM:  Just one moment, Your Honor.

21              THE COURT:  Sure.

22              MR. SAM:  I have no further questions, Your Honor.

23              THE COURT:  Thank you, Mr. Sam.

24              Any redirect, Mr. Stejskal?

25              MR. STEJSKAL:  Briefly, Your Honor.
```

```
 1                      REDIRECT EXAMINATION

 2   BY MR. STEJSKAL:

 3   Q.    Looking at 7.04, 32 units were tested individually,

 4   correct?

 5   A.    Correct.

 6   Q.    And each one of those was found to contain Fentanyl,

 7   correct?

 8   A.    Correct.

 9   Q.    That is all the units that you tested in that Exhibit

10   14, correct?

11   A.    Correct.

12   Q.    Every unit that you tested contained Fentanyl, correct?

13   A.    Yes.

14   Q.    No unit you tested did not contain Fentanyl, correct?

15   A.    Correct.

16   Q.    And all of these items look the same?

17   A.    Correct.

18   Q.    So the sampling plan is something the lab has as a

19   statistical model to allow you to testify as to the entire

20   exhibit, correct?

21   A.    Yes.

22   Q.    Thank you.

23            MR. STEJSKAL:  That is all of my questions.

24            THE COURT:  Any recross?

25            MR. SAM:  No, Your Honor.
```

```
 1              THE COURT:  Thank you.  You may step down and you
 2     may be excused.
 3              You may call your next witness.
 4              MR. STEJSKAL:  The United States will next call
 5     Danielle Farrell.
 6              THE COURT:  Come forward and be sworn, please.
 7                       DANIELLE FARRELL
 8           Having been duly sworn, was examined
 9                and testified as follows:
10              THE WITNESS:  My name is Danielle Farrell.  The
11     first name is D-a-n-i-e-l-l-e, last name F-a-r-r-e-l-l.
12              THE COURT:  You may proceed, Mr. Stejskal.
13              MR. STEJSKAL:  Thank you, Your Honor.
14                       DIRECT EXAMINATION
15     BY MR. STEJSKAL
16     Q.   Your occupation, please.
17     A.   I am a senior forensic chemist -- excuse me -- as well
18     as our quality assurance specialist with the Drug
19     Enforcement Administration's Western Laboratory in
20     Pleasanton, California.
21     Q.   How long have you been employed by the D.E.A. lab?
22     A.   I have been there since August of 2009, so ten years.
23     Q.   Tell us about your educational experience and training.
24     A.   I have a bachelor's in chemistry from California State
25     University at Sacramento, as well as a minor in forensic
```

1    investigations.

2    Q.   Tell us about your prior professional experience.

3    A.   Prior to the D.E.A. I worked as a laboratory technician

4    for a pharmaceutical company also dealing in controlled

5    substances.

6    Q.   And tell us a little bit about your training with

7    regard to the analysis of controlled substances.

8    A.   When initially receiving the position with the D.E.A.,

9    I underwent an in-house five-month training program under a

10    senior forensic chemist.  I then spent four weeks in

11    Quantico, Virginia at the D.E.A. training academy and

12    received my clandestine laboratory certification while I was

13    there as well.

14    Q.   Have you had numerous updates and training since

15    joining the lab in various areas that pertain to your job?

16    A.   Yes.  Every year I have received at least 20 hours of

17    technical training, generally with regard to controlled

18    substances, trends, safety handling and instrumentation.

19    Q.   I am seeing some training by Agilent Technologies,

20    A-g-i-l-e-n-t.  What is that?

21    A.   Agilent is the manufacturer for several of the

22    instruments we use in our laboratory.

23    Q.   Specifically I see training with regard to controlled

24    substance analysis on gas chromatography mass spectrometry

25    technology.

1      Is that correct?

2  A.   That is correct.

3  Q.   Did I actually say that right?

4  A.   You did.

5  Q.   What was that training?

6  A.   That was an in-depth utilization of the G.C. mass spec,

7  that is how we abbreviate that one to make it easier to say,

8  and with special considerations with actually how we're

9  using it with the application of identifying controlled

10  substances utilizing that piece of instrumentation.

11  Q.   So kind of very in-depth training on that special piece

12  of equipment?

13  A.   Yes.

14  Q.   Is that the equipment, that G.C.M.S. something that you

15  commonly use in your analysis of substances?

16  A.   Yes, it is, very frequently.

17  Q.   Is that something that the lab maintains by use for you

18  and all of the other chemists?

19  A.   Yes.

20  Q.   I see you are also safety certified with level B and

21  level C protective equipment.  Describe that for us.  What

22  do you mean by protective equipment at those levels?

23  A.   So the initial certification was done, as I said, when

24  I went to the academy early on in my career.  It is a

25  one-week course learning how to use the self-contained

```
 1    breathing apparatuses and how to tape up the suit to ensure

 2    safety in high hazard clandestine laboratory situations.  We

 3    continue to do recertification with that training annually.

 4    Q.    What is the purpose for using, say, level B protective

 5    equipment?

 6    A.    Level B is more often utilized outside of the

 7    laboratory when we respond to operations in conjunction with

 8    the agents where there is some kind of high hazard

 9    associated with what we're seizing or sampling.

10    Q.    You have been employed by the D.E.A. lab as a forensic

11    chemist since 2009?

12    A.    Yes, I have.

13    Q.    Your job throughout that period has been to analyze

14    suspected controlled substances and provide results and

15    sometimes testimony on that?

16    A.    That is our primary duty.

17    Q.    Have you testified previously in court matters on the

18    identification of controlled substances?

19    A.    Yes, I have.

20    Q.    Approximately how often or how many times?

21    A.    I have testified on 21 previous occasions.

22    Q.    And qualified as an expert in the analysis of

23    controlled substances?

24    A.    Yes, sir.

25    Q.    Very generally speaking, over that time period from
```

```
 1    2009 to present, about how many substances or samples have
 2    you analyzed over that period?
 3    A.   I have tested over 3,000 samples.
 4    Q.   Have you ever been told by a court or a jury in those
 5    proceedings that your tests were inaccurate?
 6    A.   No, I have not.
 7    Q.   Let's move to your analysis of items specific to this
 8    case before us.  Did you have occasion to analyze several
 9    items with regard to this Shamo investigation?
10    A.   Yes, I did.
11    Q.   Let's first look at Exhibit 7.05 which I put out of
12    reach.
13         Can you reach that one?
14    A.   Yes.
15              MR. STEJSKAL:  On the screen if we could put 7.83,
16    photo two up.
17    BY MR. STEJSKAL
18    Q.   Looking at that in front of you, does it have a D.E.A.
19    exhibit number?
20    A.   Yes, it does.
21    Q.   What is the exhibit number?
22    A.   This is Exhibit 15.
23    Q.   Looking at the screen there is a 15 indicated on the
24    box and paper there.  Generally speaking, do those white
25    things at the bottom match with your D.E.A. Exhibit 15?
```

```
 1    A.    It appears they do.
 2    Q.    Let's look at 7.06.  First look at the exhibit in front
 3    of you and tell us when you received and analyzed that item.
 4    A.    On Exhibit 10 I have written with my initials and the
 5    date that I opened this package on December 18th of 2018.
 6    Q.    Tell us about the tests that you would have performed
 7    on this item.  Since this is your first item, why don't we
 8    walk through what you did from start to finish.
 9    A.    Okay.  After receiving this piece of evidence I would
10    first take a gross weight, which is the weight of the entire
11    packaging without having opened it.  I then will open the
12    package, describe all of its contents and take a net weight,
13    which is the weight of just the substance.
14    Q.    The lab has highly specialized weighing equipment so
15    you get very accurate weights of these items, correct?
16    A.    Correct.
17    Q.    After you get the weight, then what do you do?
18    A.    After I have all of my weights I will perform my
19    chemical tests.  In this case I performed gas chromatography
20    with flame ionization detection and gas chromatography with
21    mass spectrometry.
22    Q.    This was a retest of an item that had previously been
23    tested by a chemist at the lab who has since retired?
24    A.    That is correct.
25    Q.    What did you receive to test then?
```

```
 1   A.   In this case I tested the already composited baggy of
 2   powdered material.
 3   Q.   And the lab procedure to obtain a composite is what?
 4   A.   I took that material and first ground it and passed it
 5   through a 20-mesh sieve to ensure that it was homogeneous
 6   and the same throughout.
 7   Q.   Then what?
 8   A.   After that would be when I performed my chemical
 9   testing.
10   Q.   Tell us about the gas chromatography test.
11   A.   Gas chromatography is just a test to separate
12   components of a mixture.  Performing that test would allow
13   me to see if there were multiple components within that
14   powder material.
15   Q.   What result did you get from that test?
16   A.   I identified Alprazolam.
17   Q.   And then you performed additional testing?
18   A.   Yes, I did.
19   Q.   Why do you perform additional testing if you already
20   have a result that it is Alprazolam?
21   A.   Our results are going to be an accumulation of several
22   different tests to ensure that potentially with one sample
23   you didn't maybe hit a hot spot and that is not the same
24   throughout.  We want to perform multiple tests, the same
25   reason we do a composite, to ensure that it is
```

1    representative of the entire material.

2    Q.    That way you can testify as to the contents of the

3    entire exhibit as opposed to an individual pill, say?

4    A.    Correct.

5    Q.    What results were there then of the second testing on

6    the G.C.M.S.?

7    A.    I identified Alprazolam.

8    Q.    So based on your analysis and your expert opinion with

9    regard to Exhibit 15, what is your expert opinion as to the

10   contents?

11   A.    My opinion is that this substance contains Alprazolam.

12   Q.    In what weight?

13   A.    My net weight was 2,338.1 grams of the total exhibit.

14   Q.    Let's next look at Exhibit 7.43, which is D.E.A.

15   Exhibit 54.

16         Would you identify that for us, please.

17   A.    Yes.  This is marked as D.E.A. Exhibit 54.  I have my

18   initials and date on there, that I had opened this package

19   December 18th of 2018.

20   Q.    Let's look at 7.3, photo 38, which is on the screen.

21         Does that photograph on the screen appear to be the

22   same contents of Exhibit 54 that you have physically in

23   front of you?

24   A.    Yes, it does.

25   Q.    And this too was a retest of chemist Marsha Lee's

1    previous testing?

2    A.   Yes.

3    Q.   That is why you didn't test it until that particular

4    date?

5    A.   That is correct.

6    Q.   Let's look at 7.40.  D.E.A. Exhibit 54 previous

7    testimony has shown was from the 11-18 packages that

8    Mr. Gygi obtained from the Bustin-Tonge residence and gave

9    to investigators as was the previous exhibit, D.E.A. 15,

10   which is 17.05.  Those were both obtained from the mail

11   stream.

12        Tell us about your analysis of D.E.A. Exhibit 54.

13   A.   The analysis I performed in this case was identical to

14   what I described with the last exhibit.

15   Q.   What tests were performed?

16   A.   I used the gas chromatography with flame ionization

17   detection as well as gas chromatography with mass

18   spectormetry.

19   Q.   With what results?

20   A.   Both of those tests identified Alprazolam.

21   Q.   In looking at the exhibit in front of you, 7.43, which

22   is D.E.A. 54, I see pills and then I see a little vial.

23        What is that vial?

24   A.   The vial was the original composite formed by the

25   original analyst.  I then re-composited it and used it for

1    my analysis.  That is the powder material.

2    Q.    That is taken from the pills and ground up in order to

3    perform the analysis that you described?

4    A.    That is correct.

5    Q.    And then once you are done with that composite, you

6    reseal it and put it in there along with the pills that are

7    still in pill form?

8    A.    Yes.

9    Q.    Then you reseal the bag so the contents are the same as

10   when you last dealt with them, correct?

11   A.    Yes, they are.  My seal is along the bottom here with

12   my signature and date.

13   Q.    Let's next look at Exhibit 12.12, which is D.E.A.

14   Exhibit 178.  If we could look at 24.05 on the screen.

15        Do you see D.E.A. Exhibit 178 in there?

16   A.    Yes, I do.

17   Q.    On the screen can you identify what that looks like to

18   you or what that is?

19   A.    That appears to be a tablet die press.

20   Q.    Describe how that relates to D.E.A. Exhibit 178 that

21   you have in front of you.

22   A.    Exhibit 178 came to me as nine identical tableting dies

23   such as this one on the screen.

24   Q.    Prior testimony has shown that D.E.A. Exhibit 178 was

25   taken from Mr. Shamo's home when the dies were removed from

1   the tableting machines in the tableting room at this house.

2       Let's look at 12.13. There under remarks and the

3   second one that says other, do you see that one?

4   A.  Yes, I do.

5   Q.  What does that say?

6   A.  That is me describing how the exhibit came to me. So

7   originally it was one Ziploc plastic bag containing those

8   nine metal tableting dies.

9   Q.  Which are similar in appearance -- or that was one of

10  those that we just saw on the screen?

11  A.  Correct.

12  Q.  What did you do, then, when you received that item for

13  testing?

14  A.  This item was a residue, so there was not a weight

15  associated. So originally I do take a gross weight of the

16  entire packaging, but there is no net weight. It is a

17  residue and I actually swabbed the dies and performed my

18  testing on that swab.

19  Q.  That gross weight we actually see there in the middle,

20  that is actually the weight of those metal dies and that is

21  why it is so heavy?

22  A.  Correct.

23  Q.  You are not saying the substance on that was anywhere

24  near that weight, correct?

25  A.  That is correct.

1    Q.   Describe then -- you said you swabbed those dies.  Tell
2    us about that.
3    A.   So with a residue I perform a procedural blank first.
4    So I will take the solvent I'm going to use to dissolve my
5    sample, and initially rinse all of the glassware that I'm
6    going to use prior to my use to ensure that there is no
7    possible contamination.  I then take what you would imagine
8    as a cotton swab and dip it into that solvent and swab -- in
9    this case there were nine of the dies, so I ensured that I
10   swabbed each of them.  They were commingled within that
11   plastic bag, so I only formed one sample from all nine dies.
12   I dissolved that swab into that solvent material and I would
13   run that on our instrumentation.
14   Q.   On what instrumentation did you run that?
15   A.   In this case I used gas chromatography with mass
16   spectrometry.
17   Q.   Describe how you then tested that composite sample on
18   that machinery.
19   A.   So the swab -- again, I dissolve any material into a
20   solvent.  That solvent is then injected into the instrument.
21   Like I described previously, the gas chromatography will
22   separate components of a mixture.  If there were multiple
23   components I would have seen them individually.
24        Mass spectrometry then takes each of those components
25   individually and fragments them and will produce a unique

```
 1    pattern that I can compare to the pattern of known

 2    standards.

 3            THE COURT:  Pick a good stopping point for our

 4    first break.

 5            MR. STEJSKAL:  Okay.

 6    BY MR. STEJSKAL

 7    Q.   So you did that with regard to this sample?

 8    A.   Yes, I did.

 9    Q.   With what result?

10    A.   I identified Fentanyl.

11    Q.   You only ran the one test on the G.C.M.S. in this

12    particular sample, correct?

13    A.   Correct.

14    Q.   Why is it that you didn't perform a second examination?

15    A.   Because there is only a residue amount of material, and

16    sometimes that means there is not even a visible amount of

17    material, there is only enough to run the one test and that

18    is why I performed the procedural blank to ensure that that

19    one test is not contaminated and is accurate and reliable.

20    Q.   The fact that you ran the solvent to clean the

21    equipment, does that also factor into the fact that there is

22    only one test needed?

23    A.   Yes, it does.

24    Q.   So your result on this again based on your professional

25    opinion and your analysis?
```

```
 1    A.    I identified that this exhibit contained Fentanyl.

 2          MR. STEJSKAL:  I probably have seven more minutes

 3    of this.  Would that be fine?

 4          THE COURT:  We better take a break.

 5          We'll be back at about 25 to.  Thank you.

 6          (WHEREUPON, the jury leaves the proceedings.)

 7          THE COURT:  We'll be in recess until 25 to.

 8          Thank you.

 9          (Recess)

10          THE COURT:  We'll get the jury and proceed.

11          (WHEREUPON, the jury enters the proceedings.)

12          THE COURT:  You may proceed, Mr. Stejskal.

13          MR. STEJSKAL:  Thank you, Your Honor.

14    BY MR. STEJSKAL

15    Q.    When we went to break we were looking at Court Exhibit

16    12.12, which is D.E.A. Exhibit 178 in that tote, correct?

17    A.    Correct.

18    Q.    In looking at that physical exhibit there in that tote

19    I see vials; is that correct?

20    A.    Yes, that is correct.

21    Q.    Tell us what those are.

22    A.    Those are the vials that I created in doing my analysis

23    on the exhibit.

24    Q.    There are a number of them there, not just one.  Why

25    are there so many?
```

```
 1   A.   There are four vials.  When this was analyzed, the
 2   policy was to create the procedural blank as I did, to
 3   create the sample as I did and then split them into two more
 4   vials.  They are the exact same.  There are two procedural
 5   blanks and two samples in there.
 6   Q.   Those are preserved in case somebody wants to retest
 7   them or do something further with them?
 8   A.   That is correct.
 9   Q.   Which they appear to still be sealed with your name and
10   signature on there, so it is in the same condition as when
11   you analyzed it, correct?
12   A.   That is correct.
13   Q.   What happened to those dies, the nine dies that you
14   took the samples off of?
15   A.   In this exhibit there was a request to send those dies
16   to the F.D.A., so I separated those and put them into a new
17   evidence heat seal and those were presumably sent to the
18   F.D.A.
19   Q.   By F.D.A. you mean the Food and Drug Administration?
20   A.   Yes.
21   Q.   They had requested those for further testing on their
22   part, correct?
23   A.   I am not positive who the request came from, but there
24   was a request made.
25   Q.   They went to the F.D.A.  Okay.
```

```
1          Let's next look at Court Exhibit 12.14 which is D.E.A.

2     Exhibit 179.

3               MR. STEJSKAL:  If we could put 24.04 up on the

4     screen.

5     BY MR. STEJSKAL

6     Q.   I have handed you what has been marked as Court Exhibit

7     12.14.  Does that indicate the D.E.A. number on that?

8     A.   Yes.  This is D.E.A. Exhibit 179.

9     Q.   Prior testimony has indicated that Exhibit 179 was

10    taken from the other pill press at Mr. Shamo's house on

11    November 22nd of 2016.

12              MR. STEJSKAL:  Pull up 12.15.

13    BY MR. STEJSKAL

14    Q.   What did you receive at the lab as D.E.A. Exhibit 179?

15    A.   This exhibit as I received it was one Ziploc plastic

16    bag containing eight metal tableting dies.

17    Q.   To your recollection, similar in appearance to the

18    photo we just looked at?

19    A.   Yes, they were.

20    Q.   On the exhibit that you have got in front of you,

21    12.14, what date did you analyze this exhibit?

22    A.   I opened this exhibit and signed it here on January 6th

23    of 2017.

24    Q.   Describe then for the jury what you did to analyze

25    D.E.A. Exhibit 179.
```

```
 1   A.    I performed my analysis identically to that of the last

 2   exhibit.  This was also done as a residue on those metal

 3   dies.  I initially formed my procedural blank by rinsing all

 4   my glassware, and then I took that swab and swabbed all of

 5   the dies and formed my sample.

 6   Q.    Once you obtained the sample, what did you do with it?

 7   A.    I then used gas chromatography with mass spectormetry

 8   to make my identification.

 9   Q.    Is that in accordance with the lab procedures and

10   protocols for analyzing this type of item?

11   A.    Yes.

12   Q.    Based on your analysis and your expert opinion, what is

13   the result of your testing on D.E.A. Exhibit 179?

14   A.    In this exhibit I identified Alprazolam.

15   Q.    And looking physically at that exhibit in front of you,

16   D.E.A. Exhibit 179, I think we are seeing vials again?

17   A.    Yes.

18   Q.    The same thing as the last one?

19   A.    Yes.  There are four vials, the same as the last

20   exhibit for the same reasons.

21   Q.    What happened to the dies or punches that you took the

22   samples from with a swab?

23   A.    Again, a request was made to separate those and send

24   them to the F.D.A.

25   Q.    And under remarks it indicates that that happened,
```

1  correct?

2  A.  Yes, it does.

3  Q.  Let's next move to Exhibit 12.16, which is D.E.A.

4  Exhibit 180.

5        MR. STEJSKAL:  If we could look at photograph

6  13.09.

7        Wait.  I'm getting ahead of myself.

8  BY MR. STEJSKAL

9  Q.  Let's look at this one first.  Look at the sticker, if

10  we could.

11      Can you tell us what this is?

12  A.  This is the evidence label for D.E.A. Exhibit 180.

13  Right on there is my signature and the date I opened it as

14  well as the date I resealed this package.

15  Q.  Prior testimony indicates that this was seized from the

16  hopper on one of the pill presses in the press room of Aaron

17  Shamo's home.  Do you see the location acquired was

18  Cottonwood Heights, on the label, correct?

19  A.  Yes, that is what it says.

20  Q.  The date is 11-22 of '16, correct?

21  A.  Yes, sir.

22  Q.  Let's now look at 13.09, photo 17.

23      You have never seen that item, correct?

24  A.  I have not.

25  Q.  Let's next look at 12.17.

1      Describe how this item came to you for your analysis.

2  A.   This item came to me in a screw top glass jar inside

3  the self-sealed evidence envelope.

4  Q.   So when we see that gross weight there, what is that?

5  A.   That is the weight of all of the packaging as I

6  received it.

7  Q.   Which includes the glass jar which was heavy as

8  compared to plastic bags, correct?

9  A.   Correct.

10  Q.   Once you received that item then in that glass jar,

11  what did you do with it?

12  A.   I would open the package and get the net weight, which

13  would be the net weight of just the powder material.

14  Q.   Again, that was done on these certified, calibrated

15  D.E.A. lab scales?

16  A.   Yes, it was.

17  Q.   Then what?

18  A.   After getting all of my weights, I would ensure that

19  the sample was homogeneous, so I would form my composite

20  much like I did previously, grinding and sieving, and then I

21  would do my chemical testing.

22  Q.   What chemical test did you perform on this?

23  A.   On this item I performed gas chromatography with mass

24  spectormetry as well as infrared spectroscopy.

25  Q.   Based on that analysis and your expert opinion, what

1   was the result?

2   A.   I concluded that this exhibit contains Alprazolam.

3   Q.   And the net weight?

4   A.   The net weight was 11.746 grams.

5   Q.   And that is what was submitted to you by D.E.A. agents,

6   correct?

7   A.   Correct.

8   Q.   That does not appear to match that picture that we

9   looked at with that hopper full of a lot of powder, correct?

10  A.   Correct.

11  Q.   What you got was less than that, correct?

12  A.   Yes.

13  Q.   Let's next look at 12.18.

14       I see that yellow label on the top there first that

15  says caution, high risk.  Can you tell us what that is?

16  A.   Those are labels -- they can be put on by several

17  different people.  Potentially the agent may have affixed

18  that sample.  Potentially one of our evidence vault staff

19  affixed that or, in this case, that is my handwriting, so I

20  put that on there after I had identified a high hazard

21  material.

22  Q.   Once you confirmed this to be -- it looks like the

23  label says Fentanyl -- you put that sticker on there?

24  A.   Yes.

25  Q.   Why?

```
1    A.    To ensure that the exhibit is handled with caution by
2    anyone who may come in contact with it, most generally our
3    evidence staff.
4    Q.    Now let's look at that label there in the middle.  What
5    D.E.A. exhibit number is that?
6    A.    This is the label from D.E.A. Exhibit 181.
7    Q.    Prior testimony has established that D.E.A. Exhibit 181
8    was taken from the hopper on the other pill press contained
9    in the press room at Aaron Shamo's home.  The date indicates
10   on the label 11-22 of '16, correct?
11   A.    Yes.
12   Q.    On that label when did you analyze this item?
13   A.    I signed and dated that I opened this package on 5-24
14   of 2017.
15   Q.    Let's look at 13.09, photo 13.
16         Have you seen that item before?
17   A.    No, I have not.
18   Q.    What did you receive then at the lab as D.E.A. Exhibit
19   181?
20   A.    I received a screw top glass jar containing a white
21   powder material.
22   Q.    Let's look at 12.19.
23         Once you received that glass jar, which was Exhibit
24   181, what did you do?
25   A.    I would have weighed it for the gross weight and then
```

```
 1    obtained the net weight and then formed a composite much

 2    like I explained in the last exhibit, and gone on to perform

 3    my chemical tests.

 4    Q.   What chemical tests did you perform?

 5    A.   In this case I also did gas chromatography with mass

 6    spectormetry and also infrared spectroscopy.

 7    Q.   Based on your analysis and your training, what is your

 8    expert opinion as to the contents of D.E.A. Exhibit 181?

 9    A.   In this exhibit I identified Fentanyl.

10    Q.   What is the net weight of this exhibit?

11    A.   The net weight for this exhibit was 6.162 grams.

12    Q.   Again, that does not appear to be what we saw in that

13    photo as the full contents of that hopper, correct?

14    A.   Correct.

15    Q.   You analyzed what was given to you by the D.E.A.

16    agents?

17    A.   Yes, I did.

18    Q.   Did you test each of the items we have discussed today

19    in accordance with your training and the protocols at the

20    D.E.A. lab?

21    A.   Yes, I did.

22    Q.   Did your testing indicate those two substances that you

23    identified for us here in court?

24    A.   Yes.

25    Q.   What are those substances?
```

```
 1   A.   I identified Alprazolam in some exhibits and Fentanyl

 2   in others.

 3   Q.   And are those controlled substances based on federal

 4   law?

 5   A.   Yes, they are.

 6   Q.   Was there anything about any of the equipment that you

 7   used in this analysis that appeared to be faulty or in any

 8   way outside of the ordinary?

 9   A.   No.  That would have been reflected in my reports and

10   in this case there was none.

11   Q.   Anything about the specific testing or anything that

12   you observed that would indicate that these are not true and

13   accurate results?

14   A.   No.  Nothing.

15   Q.   Thank you.

16        MR. STEJSKAL:  That is all of the questions that I

17   have.

18             THE COURT:  Thank you.

19             The defense may cross-examine.  Ms. Beckett.

20                     CROSS EXAMINATION

21   BY MS. BECKETT

22   Q.   Ms. Farrell, what is the purpose of a reanalysis?

23   A.   A reanalysis is used if -- well, in this case the

24   chemist was not available to testify in court.

25   Q.   It looks like from your testimony that you performed a
```

```
 1    reanalysis on two of the exhibits we have gone over.  I

 2    believe that would be Exhibits 705 and 704.

 3         Does that sound correct?

 4    A.   I did a reanalysis on two exhibits.  I can't

 5    necessarily speak to the government's exhibit number.

 6    Q.   But you did conduct a reanalysis on two exhibits,

 7    correct?

 8    A.   Yes, that is correct.

 9    Q.   I believe that your testimony is that both of those

10    exhibits were powder form; is that correct?

11    A.   Yes.  I tested the powder form.  I did not test the

12    tablets.

13    Q.   Just the composite?

14    A.   Yes.

15    Q.   And that composite was made by another chemist,

16    correct?

17    A.   Yes, it was.

18    Q.   You didn't reexamine those pills, you just reexamined

19    the composite that was left there?

20    A.   That is correct.

21    Q.   Did you do that in conjunction with the chemist who had

22    actually initially examined the pills?

23    A.   No, I did not.

24    Q.   I believe during your testimony that you used the

25    phrase hot spot.  Clarify for the jury what a hot spot is.
```

```
1    A.    Sure.  Any time a mixture is made -- think of it like

2    Lucky Charm cereal.  There is the boring, regular cereal

3    part and then there is the marshmallows, right?  So if I

4    were to just pull one piece of cereal out, potentially I

5    would pull out the lovely, delicious marshmallow part or

6    potentially I would pull out just the boring, regular

7    cereal.  That is what we call a hot spot is potentially

8    you're pulling out something -- and that is why we form a

9    composite.  We would want to mash that cereal up and make

10   sure that it is the same throughout, so that when we do pull

11   our samples we are getting a little bit of everything.

12   Q.    Because a hot spot would not potentially be

13   representative of the sample as a whole, correct?

14   A.    That is correct.

15   Q.    That composite process is vital in determining what a

16   sample actually contains, correct?

17   A.    Correct.

18   Q.    I believe we looked at two exhibits, 24.05 and 24.04,

19   and I will represent for you that both of those were tablet

20   dies that I believe you withdrew residue from; is that

21   correct?

22   A.    That is correct.

23   Q.    If we could look specifically at your analysis of

24   those, and I can pull those numbers up, and that would be

25   Exhibit 12.13.  I believe under net weight here it says
```

1    residue.

2        Is that correct?

3    A.   That is correct.

4    Q.   And the reason it says residue is because there was

5    simply not enough real material to sort of weigh that,

6    correct?

7    A.   Correct.

8            MS. BECKETT:  If we could look at Exhibit 12.14.

9            MR. STEJSKAL:  Do you want the lab test?  12.15.

10           MS. BECKETT:  I apologize.  12.15.  I was so

11   close.

12   BY MS. BECKETT

13   Q.   The same here and I believe that net weight says

14   residue, correct?

15   A.   Correct, it does.

16   Q.   That is for the same reason that there is simply not

17   enough material there to sort of weigh it?

18   A.   Yes, that is correct.

19   Q.   That is why you used I believe you said the cotton

20   swabs to sort of pull that residue off in order to analyze

21   it, correct?

22   A.   Yes.

23           MS. BECKETT:  If we could look at Government

24   Exhibit 12.18.  I hope I'm right on that number.  If we

25   could just highlight that caution, high risk sticker really

1    quick.

2    BY MS. BECKETT

3    Q.    We have seen a couple of these before with the jury and

4    on a few of them they say Fentanyl.  This was says trace

5    Fentanyl.  Is there a reason you put trace Fentanyl as

6    opposed to Fentanyl on that?

7    A.    I was just trying to be more specific as to the hazard

8    associated with the exhibit.  There is no policy as to how

9    specific that label needs to be.  Oftentimes it is blank

10   just to tell people, hey, pay attention and wear the proper

11   protective gear, et cetera.

12   Q.    Would you say that the testing in this particular case

13   was kind of a top priority for your lab?

14   A.    I am not sure I understand that question.

15   Q.    Would you say that when the amount of -- I mean, you

16   see the exhibits here before us, correct?  A large portion

17   of these would have been analyzed at the lab you work at,

18   correct?

19   A.    Yes.

20   Q.    We have heard testimony from multiple witnesses that

21   these packages came over a very brief period of time.  Does

22   that sound correct?

23   A.    Yes.

24   Q.    Would you say that your lab was heavily involved in the

25   testing of these particular drugs, these particular pieces

1  of exhibits?

2  A.   Yes.

3  Q.   Would you say that would require a lot of individuals?

4  A.   Yes, it did.

5  Q.   Would you say that when these particular drugs were

6  tested or these exhibits were tested, that it was sort of a

7  all hands on deck scenario?

8  A.   It came and was divvied out to chemists in the same way

9  that any expedite request is.  Frequently we are told that

10 something is a rush and it needs to be within a time frame.

11 For controlled buys and for court purposes, yes, there was

12 an expedite associated with these exhibits, but that is

13 routine procedure at the laboratory.

14 Q.   So it was a rush?  That was your word, correct?

15 A.   That is just the colloquial term we use, expedite,

16 rush, anything with a due date.

17          MS. BECKETT:  Just one second, Your Honor.

18          That's all of the questions that I have, Your

19 Honor.

20          THE COURT:  Thank you, Ms. Beckett.

21          Any redirect?

22                    REDIRECT EXAMINATION

23 BY MR. STEJSKAL

24 Q.   The only thing I want to ask is with respect to those

25 dies where you took the sampling.  Does the amount of

```
 1   substance that you have change the result of what the actual
 2   substance is?
 3   A.   Absolutely not.
 4   Q.   Thank you.
 5           MR. STEJSKAL:  No further questions.
 6           THE COURT:  Any recross?
 7           MS. BECKETT:  No, Your Honor.
 8           THE COURT:  Thank you.
 9           You may step down and be excused if you want to
10   be.
11           You may call your next witness.
12           MR. STEJSKAL:  The United States would next call
13   chemist Keith Chan.
14           THE COURT:  Come forward and be sworn, please.
15                       KEITH CHAN
16           Having been duly sworn, was examined and
17                  testified as follows:
18           THE WITNESS:  My name is Keith Chan.  The first
19   name is K-e-i-t-h.  The last name is C-h-a-n.
20           THE COURT:  Go ahead, Mr. Stejskal.
21           MR. STEJSKAL:  Thank you, Your Honor.
22                   DIRECT EXAMINATION
23   BY MR. STEJSKAL
24   Q.   Your occupation, please.
25   A.   I am employed as a senior forensic chemist.
```

```
 1    Q.   For what organization or entity?

 2    A.   I am employed by the United States Department of

 3    Justice, Drug Enforcement Administration's Western

 4    Laboratory.

 5    Q.   How long have you been a chemist with the D.E.A.

 6    Western Lab?

 7    A.   I have been there for about 23 and a half years now.

 8    Q.   What are your duties generally with the D.E.A. lab?

 9    A.   My primary duty as a senior forensic chemist is to

10    analyze materials which are suspected of containing

11    controlled substances.  I also testify to those results and

12    I also provide training in regards to drug manufacturing as

13    well as drug identification.  I also perform I guess routine

14    maintenance on some of our analytical instrumentation.

15    Q.   So you have been doing drug analysis for 20 plus years?

16    A.   Yes, I have.

17    Q.   Tested a lot of things?

18    A.   I have tested a few things here and there.

19    Q.   About how many exhibits or submitted samples have you

20    tested over the course of that career?

21    A.   I have tested approximately 6,000 exhibits.

22    Q.   What types of substances have you identified in your

23    analysis?

24    A.   Being with the Drug Enforcement Administration, we test

25    controlled substances.  I guess the primary controlled
```

1    substance that passes through our laboratory is

2    methamphetamine.  I have also tested cocaine as well as

3    heroin and L.S.D.

4        There is a whole category of compounds of what we call

5    and refer to as synthetic cannabinoids.  There are also

6    numerous other compounds which are similar to

7    methamphetamine, such as M.D.M.A.  When I speak of as

8    similar, in the sense that it has the same structure.  I

9    have also tested many opiates and many opioids as well as

10   Fentanyl.

11   Q.   Tell us about your education.

12   A.   I have a bachelor of science decree that I received

13   form the University of California at Berkeley.

14   Q.   Have you also done some presentations for other either

15   law enforcement or people at the lab?

16   A.   Yes, I have.

17   Q.   Specifically I'm looking at as an instructor on level A

18   high hazard environments; is that correct?

19   A.   Yes.  Part of my duties as a senior forensic chemist is

20   to provide training, and I do provide instruction in regards

21   to clandestine laboratory safety as well as high hazard

22   clandestine laboratories, which is level A.

23   Q.   You have got several professional affiliations with

24   regard to Clandestine Laboratory Investigating Chemists?

25   A.   Yes.  I am a member of that organization.

```
 1    Q.    The Northwest Association of Forensic Scientists?

 2    A.    Yes, that one as well.

 3    Q.    The American Chemical Society?

 4    A.    Yes.  That one as well, too.

 5    Q.    Those are all professional organizations that chemists

 6    can be a part of and participate in?

 7    A.    Yes.  Those are the three that I participate in.

 8    Q.    Have you testified in court before with regard to

 9    chemical analysis of substances in the course of your duties

10    at the D.E.A. lab?

11    A.    Yes, I have.  In the past I have testified

12    approximately 40 times.

13    Q.    And qualified as an expert in the testing of these

14    substances?

15    A.    Out of those 40 times I have formally been qualified as

16    an expert witness approximately a third of the time.

17    Q.    And other times you're just testifying to what you did

18    or what you saw?

19    A.    Yes.  That is correct.  I believe I just wasn't

20    formally entered in as an expert witness.

21    Q.    In this case you're going to testify as to your

22    expertise in analyzing these substances, correct?

23    A.    Yes, that is correct.

24    Q.    Have you ever been told directly by a court or a jury

25    that your analysis was wrong?
```

```
 1   A.   No, I have not.

 2   Q.   Let's then talk specifically about your involvement in

 3   this case, which you participated in analyzing some exhibits

 4   submitted by D.E.A. agents?

 5   A.   Okay.

 6   Q.   Correct?

 7   A.   Yes, that is correct.

 8   Q.   Generally speaking, describe what you do with an

 9   exhibit once it is assigned to you in the lab.

10   A.   Well, once an exhibit is assigned to me, we then -- I

11   guess check it out from our evidence vault.  Once we

12   complete that transaction and it is in my possession, the

13   first thing I do in regards to the analysis is take what we

14   call a gross weight.  That is just weighing the intact

15   exhibit, the packaging as well as the evidence envelope.

16   That is what I refer to as intact.

17        Once I have taken that gross weight, I then open it and

18   proceed with my analysis.  The first thing I generally do is

19   obtain a net weight, which is just the weight of the

20   material, the suspected powder or whatever material is

21   suspected to contain the controlled substance.

22        Then depending on the type of exhibit, I then proceed

23   to obtain what we call a representative sampling.  Then from

24   that representative sampling, I then take samples and prep

25   those samples for my various either chemical or instrumental
```

1    tests.  Once my testing is complete, I then repackage that

2    and reseal it back into an evidence envelope or a box,

3    whatever is appropriate, and then that evidence is returned

4    back to our evidence vault.

5    Q.   All of that is tracked through signatures and stickers

6    on the exhibits?

7    A.   Yes.  In addition to signatures and dates on the

8    evidence envelope, we do have an electronic -- I guess

9    evidence inventory system and any type of transaction is

10   recorded in that evidence inventory system.

11   Q.   You use passwords to check things out specifically to

12   yourself?

13   A.   Yes, that is correct.

14   Q.   And then you check it back in when it is out of your

15   custody and back to the evidence specialist, correct?

16   A.   Right.  Again, that is done with passwords on my end as

17   well as the person who is receiving the evidence.

18   Q.   The D.E.A. maintains these tight controls to make sure

19   that the exhibit anytime it is touched there is some

20   accounting for that, correct?

21   A.   Right.  It all goes towards the chain of custody or

22   accountability of the evidence.

23   Q.   Specifically we're going to first look at Court Exhibit

24   8.04, which would be D.E.A. Exhibit Number 95.  Do you see a

25   sticker indicating D.E.A. Exhibit 95 in there?

1   A.   Yes, I do.

2   Q.   Let's look on the screen at 8.02, photo number two.

3   Based on your observation of the sticker on Exhibit 95 you

4   have got with you, does this generally look like what you

5   examined, meaning those blue pills, as part of D.E.A.

6   Exhibit 95?

7   A.   Yes, it does appear to be Exhibit 95.

8   Q.   Let's go to 8.05 then on the screen.  Prior testimony

9   has indicated that Exhibit 95 as we see on the screen was

10  taken from the November 20th packages that Mr. Gygi

11  retrieved from the Tonge-Bustin residence and turned over to

12  law enforcement on November 20th of 2016.

13       Let's look at 8.05.  Does that appear to be a report

14  detailing your analysis of D.E.A. Exhibit 95?

15  A.   Yes, it does.

16  Q.   So first looking at the physical exhibit, and I don't

17  know if you can see the sticker very well through there, but

18  can you see the date which you would have examined or

19  handled Exhibit 95?

20  A.   Yes.  I see my handwriting on that evidence label with

21  the dates.

22  Q.   What date?

23  A.   Excuse me.  On the exhibit label for Exhibit 95, my

24  signature and date are at the bottom portion of the label.

25  The date that this Exhibit 95 was opened was January 10th of

```
1    2017.
2    Q.   And then when you finish you also sign that sealing
3    sticker when you reseal the bag after you have completed
4    your analysis, correct?
5    A.   Yes, that is correct.
6    Q.   That appears to be intact on that exhibit as well,
7    correct?
8    A.   Yes.  As best I can tell, while it is in box it does
9    appear to be in a sealed condition.
10   Q.   Let's talk specifically then about D.E.A. Exhibit 95.
11   Walk us through when you first receive this from the
12   evidence specialist.
13   A.   Well, when I first received this from the evidence
14   specialist I did make sure that -- sorry -- that the writing
15   on the evidence label did match the information that was
16   provided to me in regards to -- there is actually a yellow
17   inventory sticker.  I did check that that matches.  I did
18   also check to make sure that that was the specific exhibit
19   that I was requested to be checked out to me.
20        Once that all checked out, I did proceed with the
21   transaction to transfer it into my custody.  The first thing
22   I did was take a gross weight.  Again, that is with the
23   exhibit as I received it.  There is no manipulation of it at
24   that point.  I just took the intact exhibit and basically
25   put it on the balance to obtain what we called a gross
```

```
 1   weight.
 2   Q.   That is the packaging and everything before you even
 3   opened it?
 4   A.   Yes, that is correct.
 5   Q.   After you get the gross weight, what do you do next?
 6   A.   After I took the gross weight, I then proceeded to open
 7   up the evidence packaging.  Initially this -- sorry.  There
 8   are actually two exhibits, one marked Exhibit 95, and then
 9   the second one that is actually marked Exhibit 95.02.
10        Originally everything was contained in the single
11   evidence bag.  This is the secondary packaging that I
12   provided or that I created.
13        The first thing that I did, once I obtain the gross
14   weight and saw that it was consistent with what was
15   originally submitted, I then proceeded to open up the
16   exhibit.  I then noticed that there were actually two
17   different types of tablets that were submitted in this one
18   evidence bag.  Because of that they were actually split into
19   two different exhibits.  There was a 95.01 and there is a
20   95.02.  That is just because there are two different types
21   of tablets.  What I mean by two different types of tablets
22   is there are actually two different logos or imprints on the
23   tablets.
24   Q.   So these were all those blue circular pills, correct?
25   A.   Yes, that is correct.
```

1    Q.   Some of them had that M-30 on them and others had that

2    A-215?

3    A.   Yes, that is also correct.

4    Q.   That is what you are talking about that you separated

5    out for separate analysis?

6    A.   Yes, that is correct.

7    Q.   After you made that separation, then describe what you

8    did.

9    A.   After I made that separation I then proceeded to take a

10   net weight.  Again, that is what I mentioned earlier in the

11   sense where I am just weighing just the contents.  In this

12   case they were contained in Ziploc bags, so a Ziploc bag

13   with the tablets was placed on the balance and that weight

14   was recorded.  Then the tablets were removed from that

15   Ziploc bag and now the empty Ziploc bag was weighed on the

16   balance and that is what we call a tare weight.  That tare

17   weight was subtracted from the original full weight and that

18   is actually how I determined just the weight of the tablets

19   themselves, the contents.

20   Q.   These scales are so accurate that you can get the

21   weight of a plastic bag?

22   A.   Yes, that is correct.

23   Q.   Down to, what, milligrams?

24   A.   It just depends on what type of balance that we use.

25   We do have balances in the lab that go down to -- actually

1   down to the tenth of a milligram level.  That is not a

2   balance that we routinely use, but we do have that

3   capability to weigh items that small in the laboratory.

4   Q.   Depending on what you are doing, you can be as precise

5   as you need be?

6   A.   Right, what is necessary for the exhibit.

7   Q.   So you got the net weight using that method.  Then

8   what?

9   A.   So once I proceed to get the net weight I also

10  determine the tablet count.  In this case because of the

11  quantity of tablets that were submitted, I actually had to

12  do an extrapolation.  In order to do the extrapolation, nine

13  tablets were randomly selected and each one was weighed

14  individually to obtain an average weight.  Then through a

15  calculation based on the net weight versus the average

16  weight, we are able to do a calculation to determine the

17  number of tablets that were actually submitted.  Based on

18  the number of tablets there were -- excuse me.  Based on

19  that number of tablets, tablets were randomly selected in

20  order to sort of do screen or presumptive testing.

21       Out of those tablets that were chosen for screening,

22  two tests were performed on each of those tablets.  Once it

23  was determined that they were similar and that the same

24  contents were contained in each tablet, then they were

25  combined in order to form what we call a composite.  From

 1    that composite additional testing was done on samples from

 2    that composite material.

 3    Q.   Let's talk specifically about 95.01 first, as you

 4    separated them into these two different samples.  What did

 5    you first do, then, with regard to sample one or Exhibit

 6    95.01?

 7    A.   In regards to my testing?

 8    Q.   Yes.  What test did you do first?

 9    A.   So in regards -- actually with both of these, 95.01 and

10    95.02 -- in the case of 95.01, 29 tablets were randomly

11    chosen and from each one of those tablets two samples were

12    taken.  One sample was used for a color test and another

13    sample was chosen for an instrumental test.  The instrument

14    that I used was the G.C.M.S.  Essentially each tablet was

15    subjected to two tests.

16         Once it was determined that each one of those tablets

17    contained the same components, those 29 tablets were

18    combined and they were ground up and mixed to form our

19    composite.  Then another sampling was removed to perform an

20    additional test using the G.C. F.I.D.

21    Q.   What is G.C. F.I.D.?

22    A.   G.C. F.I.D. stands for gas chromatography with a flame

23    ionization detector.

24    Q.   Are these tests that you referred to, both that one and

25    the G.C.M.S., recognized by the forensic community as

1    suitable for the identification for controlled substances?

2    A.    Yes, they are.

3    Q.    Have you been using this testing and this equipment

4    throughout your career with the D.E.A. lab?

5    A.    Yes, I have.

6    Q.    So this is commonly used and commonly accepted?

7    A.    Yes, it is.

8    Q.    Do I understand you correctly that you did what you

9    just described for both 95.01 and 95.02?

10   A.    Yes.  The only difference being that with Exhibit

11   95.02, 30 tablets were chosen as opposed to the 29 with the

12   first exhibit.

13   Q.    And that is based on the sampling protocols that the

14   lab provides, determined by the number of tablets that are

15   in the sample?

16   A.    Yes, that is correct.

17   Q.    Or in the exhibit I guess.

18   A.    Yes.

19   Q.    Okay.  You performed those tests on the individual

20   tablets and you're saying that you tested each of those 29

21   or 30 individually?

22   A.    Yes.  So essentially each one of those tablets was

23   tested sort of like its own exhibit.  So in the case of

24   95.01, I mentioned earlier that I chose 29 tablets, and in

25   regards to the testing I used a color test as well as the

1    G.C.M.S.  In the case of 95.01 there were 29 color tests

2    performed and there were also 29 tests with the G.C.M.S.

3    that were performed.

4    Q.    And similarly with 95.02, the same process?

5    A.    The same process.  So in that case with 30 tablets,

6    there were 30 color tests that were performed and there were

7    also 30 G.C.M.S. tests that were run as well.

8    Q.    Again, those tablets were randomly chosen from the

9    entire exhibit?

10   A.    Yes.  They were just randomly chosen from the various

11   bags that were submitted to me.

12   Q.    What result did you receive on those 29 and 30 samples?

13   A.    For D.E.A. Exhibit 95.01, it is positive for the

14   presence of Fentanyl with a net weight of 454.0 grams.

15   Q.    And with regard to 95.02?

16   A.    D.E.A. Exhibit 95.02 is also positive for Fentanyl, but

17   with a net weight of 1,512.2 grams.

18   Q.    You received the Fentanyl results based on the

19   individual testing of those items as described, correct?

20   A.    Yes, that is correct.

21   Q.    And then there was a composite after that, correct?

22   A.    That is correct also.

23   Q.    So you already had confirmation from this testing that

24   these were Fentanyl.  Why do you do more testing?

25   A.    We do additional testing just in the sense that now

1    we're forming a composite, so now we are taking all of the

2    tablets and we are combining them and now we are taking a

3    representative of all of the tablets all at once with this

4    one sampling.  Basically it is a check to make sure that we

5    did not miss anything with our initial screening or our

6    initial testing of the individual units or tablets.

7    Q.   So you formed a composite both of 95.01 and 95.02,

8    correct?

9    A.   Yes, that is correct.

10   Q.   What test did you run on the composite?

11   A.   Another instrumental test that I mentioned earlier, the

12   G.C. F.I.D.

13   Q.   The infrared?

14   A.   No.  No, this one is actually the gas chromatograph

15   with the flame ionization detector.

16   Q.   I knew that.

17   A.   That is what I thought you said, right?

18   Q.   Thank you for fixing me.

19        What were the results on the composites?

20   A.   With both of those exhibits, the composites were

21   consistent with the presence of Fentanyl.

22   Q.   So a confirmation of your previous analysis?

23   A.   Yes, that is correct.

24   Q.   In the second line from the top on 95.01 it has got

25   another substance identified in addition to Fentanyl?

```
 1    A.    Yes.  With Exhibit 95.01 there is another substance

 2    called A.N.P.P. which is also identified.  That was also

 3    identified in all 29 tablets as well as in the composite.

 4    Q.    What is that in the best way you can describe it to

 5    laypeople?

 6    A.    A.N.P.P. is actually an abbreviation for a compound

 7    which is actually a precursor in the manufacture of

 8    Fentanyl.  In certain cases it could actually be the result

 9    of Fentanyl degrading.  So generally when we see A.N.P.P.,

10    it is there as a precursor, and to us it is an indication of

11    how the Fentanyl was manufactured or how it was actually

12    synthetized.

13    Q.    So the finding of that substance does not detract at

14    all from your finding that there was Fentanyl in each of

15    these items, correct?

16    A.    No.  In this case it just leads me to the conclusion

17    of -- well, it kind of gives me an idea of the method that

18    the Fentanyl was actually synthesized.

19    Q.    So based on your analysis as you described and your

20    training, what is your expert opinion as to the contents of

21    D.E.A. Exhibits 95.01 and 95.02?

22    A.    D.E.A. Exhibits 95.01 and 95.02 are both positive for

23    Fentanyl.

24    Q.    In the net weights that you described?

25    A.    For D.E.A. Exhibit 95.01, that has a net weight of
```

```
1   454.0 grams.  D.E.A. Exhibit 95.02 has a net weight of
2   1,512.2 grams.
3   Q.   After you finished your analysis of these items what
4   did you do with it?
5   A.   After I completed my analysis the exhibits were placed
6   into new Ziploc bags and they were then sealed into the
7   evidence bags that I showed earlier and at that point they
8   were returned to the vault, to our evidence vault.
9   Q.   Under remarks on your report on the screen it talks
10  about a special program.  Are you familiar with those
11  remarks?
12  A.   Yes, that is correct.
13  Q.   What does that mean?
14  A.   So we actually have a testing research laboratory
15  relocated on the east coast and they do various programs,
16  and some of them entail looking at some of these samples in
17  much more detail than we have the capability of in our
18  laboratory.  So oftentimes we submit samples, basically
19  exemplar samples to that research laboratory just so they
20  can see what is actually in the field.
21       It is one thing for them to buy something -- excuse
22  me -- to buy a compound from a drug manufacturer and for
23  them to synthesize something and those results may be
24  slightly different than what they are actually seeing and
25  what we are actually encountering in the field at our
```

1  laboratory.  That is why they ask for examples from us to

2  provide to them so that they can do a comparison and also

3  see -- to aid in their research.

4      Another one of those special programs actually refers

5  to us submitting some samples to the F.D.A.

6  Q.   The Food and Drug Administration?

7  A.   Yes, that is correct.

8  Q.   At this time Fentanyl was particularly of interest to

9  the D.E.A. and the F.D.A. to figure out what it was and

10  where it was coming from and how it was manufactured, those

11  types of things?

12  A.   It still is too, to this day.

13  Q.   That is part of what the special program testing is?

14  A.   Yes, that is correct.

15  Q.   Let's next look at Exhibit 8.08, which is D.E.A.

16  Exhibit 97.

17      Can you identify that for us, please.

18  A.   Yes.  So Government's Exhibit 8 is D.E.A. Exhibit 97.

19  I do recognize it because it is similar to the evidence bags

20  that are in the bin.  My signature and initials and date are

21  written on the evidence label.  My signature and date is

22  also on the sealing label on the bottom as well.  The

23  contents on the inside all have my initials and date on all

24  of the inner packaging as well.

25  Q.   Let's look at 8.02, photo number four on the screen.

1  That shows a 97 on the paper in the box.  Does the white

2  item in the lower left corner, is that consistent with

3  D.E.A. Exhibit Number 97 that you have with you there?

4  A.    Yes.  It does appear to be consistent.

5  Q.    Previous testimony has identified D.E.A. Exhibit 97 as

6  taken from the November 20th, 2016 packages that Mr. Gygi

7  picked up from the Tonge-Bustin residence and then were

8  given to law enforcement in that encounter on November 20th.

9      Let's look at 8.07.  Does that appear to be your report

10  with regard to D.E.A. Exhibit 97?

11  A.    Yes, it is.

12  Q.    Tell us about your analysis of this item.

13  A.    This analysis was slightly different than the one I

14  performed on the previous exhibit in the sense that this was

15  actually what we call a reanalysis.  A chemist had

16  previously done a full analysis on the exhibit following all

17  of our standard analytical protocols.  However, I was asked

18  to do a reanalysis because she could not be here to testify

19  in this case.

20      I only identified -- excuse me.  I only analyzed the

21  material which consisted of her composite.  I did not

22  analyze all of the intact tablets.

23  Q.    What is the compositing protocol for the lab?

24  A.    In general to form a composite -- again, it depends on

25  the material.  In the case of tablets, based on the number

1   of tablets, we choose a specific number of tablets based on

2   our sampling plan.  We then perform two tests on those

3   tablets, like I mentioned earlier.  If they are all

4   consistent -- at one point our policy was to take those

5   tablets and just combine it and grind it up and mix it and

6   form our composite.  We have since actually had a policy

7   change in the sense that those initial tablets, which I

8   chose for my initial screening test, we no longer just use

9   those to form our composite.  Now we go back to the original

10  tablets.  Everything is all combined back.  Now we go in and

11  choose a new random set of tablets and per our new policy we

12  only choose 15 tablets to form the composite.

13  Q.   At this time it was a larger number than that depending

14  on the number of pills submitted?

15  A.   Yes, that is correct.

16  Q.   So in this case the composite was already made and you

17  analyzed the composite, correct?

18  A.   Yes, that is also correct.

19  Q.   Describe how you then did your analysis and what tests

20  you did.

21  A.   So in this case I did proceed to get a net weight of

22  all the material that was present.  Once I obtained the net

23  weight, as I mentioned earlier I only analyzed her

24  composite, which was this fine powder.  I apologize that it

25  is a little hard to see.  There is actually a small glass

1    jar in here that contains a fine white powder.  That was

2    actually the composite material that I analyzed.

3         That composite material, I did grind it up and mix it

4    up.  Two samples -- excuse me.  Two portions were taken.

5    Excuse me.  With one portion I performed a G.C. F.I.D. test

6    and with the second portion I performed a G.C.M.S. test.

7    Q.   With what result?

8    A.   With both of those tests they were positive for the

9    presence of Alprazolam.

10   Q.   And then after your testing you packaged it back up and

11   returned it to the evidence specialist, correct?

12   A.   Yes, that is correct.  After my testing everything was

13   returned back to the original packaging and everything was

14   sealed back in the original evidence envelope and then it

15   was returned to our evidence vault.

16   Q.   Based on your testing and your training, what is your

17   expert opinion as to the contents and weight of D.E.A.

18   Exhibit 97?

19   A.   So for D.E.A. Exhibit 97 it is positive for the

20   presence of Alprazolam with a net weight of 432.8 grams.

21   Q.   Let's next look at Court Exhibit 10.00, which is D.E.A.

22   Exhibit 139.

23        Can you identify that for us, please.

24   A.   Yes.  This is D.E.A. Exhibit 139 and I do recognize it.

25   Again, by that evidence label it does have my signature as

1    well as my date and initials on that evidence label.

2    Q.    We're going to look on the screen at Exhibit 11.00,

3    photos 10 and 49.  Do the photographs of those items appear

4    to be consistent with the items that you were given as

5    D.E.A. Exhibit 139 for your analysis?

6    A.    Yes, it does appear to be consistent.

7    Q.    Prior testimony has established that D.E.A. Exhibit 139

8    was seized from the Tonge-Bustin residence on November 22nd

9    of 2016 upon the execution of a search warrant.

10        Let's look at Exhibit 10.01.  Do you recognize that

11   item?

12   A.    Yes, I do.

13   Q.    What is that?

14   A.    That is a report that I generated with the results of

15   my analysis for D.E.A. Exhibit 139.

16   Q.    This is quite a sizeable exhibit in comparison,

17   correct?

18   A.    Yes, it is.

19   Q.    A lot of pills?

20   A.    Quite a few.

21   Q.    So you had to take a sampling from these as well based

22   on the lab protocol?

23   A.    Yes.

24   Q.    So describe how you processed this once it came into

25   your possession.

1   A.   This was actually processed the same as the very first

2   exhibit that I mentioned.  Again, all of the same procedures

3   were followed.  I checked to make sure everything was

4   labeled properly and that it matched the inventory label

5   before I accepted it.  I did see that the labeling matched,

6   that the handwriting matched and it was the exhibit I was

7   requesting.  At that point I took custody of the exhibit.

8        I then obtained a gross weight of the exhibit.  Again,

9   that is just the weight of the packaging intact.  I have not

10  manipulated it or opened up anything.  I just took a gross

11  weight.  After I obtained my gross weight, I then cut open

12  the exhibit.  I saw that there were, again, two different

13  types of tablets in this so I had to split it and that is

14  why we see 139.01 and 139.02.  Net weights were then

15  obtained of each exhibit, again, in the same manner that I

16  did with the original one, in the sense that all of the

17  packages were placed on the balance.  Excuse me.  All the

18  packages with the tablets, everything full was placed on the

19  balance and that weight was recorded.

20       The tablets were then removed from the packaging and

21  the empty packaging was now placed on the balance.  That

22  weight was also recorded.  They were subtracted and that is

23  how I obtained the net weight of the tablets.  At that point

24  I did have to do an extrapolation.  There are too many

25  tablets to count out directly.  So for each exhibit nine

```
1    tablets were randomly selected and each tablet was

2    individually weighed and an average was obtained.  Then

3    based on the net weight, I was able to obtain an overall

4    tablet count.  Based on that tablet count -- excuse me.

5    Based on that tablet count and our sampling plan, tablets

6    were randomly chosen for me to do my initial testing.

7         Again, similar to the first exhibit that I explained,

8    two samples were removed from each tablet, and in the case

9    of this exhibit, the same tests were performed on every

10   tablet that I selected, a color test as well as an

11   instrumental test utilizing the G.C.M.S.

12        Once I saw that those results were all consistent with

13   each other, so in the case of Exhibit 139.01, initially 29

14   tablets were selected and I did see that all 29 tablets were

15   consistent in what they contained, and they were returned to

16   the packaging and then a new set of 15 tablets was chosen,

17   and that is what differed from the first exhibit.

18        15 tablets were chosen at random and they were

19   combined, ground up and mixed, and those 15 tablets were

20   used to form a composite.  I basically followed that same

21   procedure with Exhibit 139.02.  29 tablets were chosen.  Two

22   tests were performed on each of those tablets.  They were

23   returned to their original packaging and then 15 tablets

24   were chosen at random.  They were combined, ground up and

25   mixed, and then additional testing was performed on that
```

1    composite as well.

2    Q.    What were the results as to the first testing on the

3    individual units?

4    A.    For Exhibit 139.01, I determined that all the tablets

5    contained Fentanyl.  Excuse me.  The 29 tablets that I had

6    tested were all positive for the presence of Fentanyl.  For

7    D.E.A. Exhibit 139.02, again, the 29 tablets that I

8    originally selected, I determined that they were all

9    positive for the presence of Fentanyl as well.

10   Q.    And then you obtained 15 additional tablets from the

11   overall exhibit to do the composite with?

12   A.    Yes, that is correct.

13   Q.    From each of 139.01 and 139.02?

14   A.    Yes, that is correct.

15   Q.    With what result on those tests?

16   A.    With both of those exhibits, that final test on the

17   composite, they were both positive for the presence of

18   Fentanyl as well.

19   Q.    After you completed your analysis, what did you do with

20   those items?

21   A.    All the tablets were placed into new Ziploc bags, they

22   were sealed into the original evidence bag, and then I

23   actually separated out a bulk portion and the bulk portion

24   was sealed into new evidence bags.  Once they were all

25   sealed, then they were returned to our evidence vault.

1    Q.   Now, let's make sure we all understand what we're

2    talking about when we talk about the extrapolation of the

3    tablet count.  So rather than individually, one, two, three,

4    four, counting out 70,000 tablets you do an extrapolation,

5    correct?

6    A.   Yes, that is correct.

7    Q.   That is based on the weight of some of the pills and

8    then that is a representative sample, correct?

9    A.   Yes, that is correct.  How we obtain our extrapolation

10   is nine tablets are chosen at random.  Again, each of the

11   nine tablets is weighed individually.  Then that way we are

12   able to determine an average weight for those nine tablets.

13   Once we obtain an average weight per tablet, we then

14   calculate it back into the original net weight to determine

15   our total tablet count.

16   Q.   I am not sure if I want to use the term approximation,

17   but that may not be the exact number of pills that are in

18   there?

19   A.   No.  Again, it is an extrapolation.

20   Q.   Let's contrast that to the weight.  You actually weigh

21   the whole sample to get a net weight?

22   A.   Yes.  The net weight was determined by actually

23   weighing the entire sample.  There was no extrapolation or

24   estimation.  The only I guess calculation involved is

25   subtracting out the weight of the packaging from the weight

1    of the full in order to get the weight of just the material

2    that is contained inside each of the bags.

3    Q.    Your testimony is that Fentanyl was contained in the

4    exhibit that is of that net weight, correct?

5    A.    Yes, that is correct.

6    Q.    We have heard from two other chemists here in addition

7    to yourself.  Is it consistent among the lab, among the

8    chemists to perform essentially the same testing?

9    A.    Do you mean the chemical testing, the analysis?

10   Q.    Yes, the analysis.

11   A.    We don't follow a strict protocol.  We are not told as

12   to which test we need to perform.  We do have guidelines in

13   the sense that we need to take two samples or two portions

14   and perform two tests.  Other than that, we do have some

15   leeway in which tests we can perform.  Obviously one of the

16   things that I guess dictates what test we use is the sample

17   itself, the nature of the exhibit, the nature of the

18   controlled substance that is present or suspected to be

19   present and that kind of dictates what test we use.

20        There is also some personal preference as to which

21   tests we can perform as well, but in the end I guess the

22   guideline is that we take two portions or two samples and

23   perform two tests.

24   Q.    One thing that seems to be absolutely consistent among

25   this testing is the use of the G.C.M.S. or gas

1    chromatography mass spectrometer.

2        Is that correct?

3    A.    Yes, that is correct.  That is actually I guess one of

4    the work horses in the lab.  That instrument actually gets a

5    lot of use.

6    Q.    And as chemists you guys share that equipment, correct?

7    A.    Yes, we do.

8    Q.    You have been trained in the same way to perform these

9    tests on the G.C.M.S.?

10   A.    Yes, that is correct.

11   Q.    Again, you have been using this equipment for all 20

12   plus years you have been at the lab?

13   A.    Yes, I have.

14   Q.    You have seen your colleagues use this same testing

15   method?

16   A.    Yes, that is correct also.

17   Q.    That is commonly accepted among the scientific

18   community as a way to determine what substances are?

19   A.    Yes, it is.

20   Q.    Thank you.

21            MR. STEJSKAL:  That's all of the questions that I

22   have for you.

23            THE COURT:  Thank you, Mr. Stejskal.

24            The defense may cross-examine.  Mr. Sam.

25                        CROSS-EXAMINATION

```
 1   BY MR. SAM
 2   Q.   I just have a couple of questions on Exhibit 10.01.
 3           MR. SAM:  Can we bring that up?
 4   BY MR. SAM
 5   Q.   The amount of tablets was a large amount; is that
 6   correct?
 7   A.   Yes.  That is quite a few.
 8   Q.   That all comes in and you said you had to split it, is
 9   that right, according to the markings on the tablets?
10   A.   Yes.  In this case, similar to the first exhibit, I did
11   notice that there were two different tablets present.
12   Again, there were some that were marked M-30 and then others
13   that were marked the A-215.  There were essentially two
14   different types of tablets.  The common practice is to go
15   ahead and split those and form two different exhibits out of
16   it.
17   Q.   You did that, is that right?  Did you split them
18   according to the markings or did somebody else do that?
19   A.   No, I did that.
20   Q.   So essentially you did look at each tablet basically to
21   split them?
22   A.   The tablets were actually contained in numerous Ziploc
23   bags.  I had observed that -- essentially the Ziploc bags
24   had -- they were not mixed.  The two types of tablets were
25   not mixed.  One Ziploc bag only contained -- each Ziploc bag
```

1    only contained one type of tablet.  I was able to -- I don't
2    want to say simply, but based on just observing the contents
3    of the Ziploc bags I was able to split the exhibit into two
4    separate exhibits.
5    Q.   So it was not like you were taking each one and
6    splitting them up.  They were divided in different bags
7    then?
8    A.   No.  Like I said, they were not mixed together.  The
9    different tablets were divided between different bags.
10   Q.   Okay.  And then there were several samples taken
11   initially to determine the weight of the pill and to
12   extrapolate how many units there were and you took a sample
13   of nine?
14   A.   Yes.
15   Q.   Is that correct?
16   A.   Yes.  In order to determine the tablet count I did pull
17   nine tablets at random from each of the two different
18   exhibits.
19   Q.   And then there was another sample taken of 29 and was
20   that separate from the nine?
21   A.   Yes, it was.  The nine tablets were chosen at random
22   specifically -- specifically for the tablet count
23   extrapolation.  The 29 tablets were sampled separate from
24   the previous nine, and those 29 were taken at the start of
25   my analysis.

1    Q.    And then there were an additional 15 that were taken

2    for a composite and those were a separate sampling; is that

3    correct?

4    A.    Essentially, yes.  With the original 29, once I

5    completed my testing with each of those 29 tablets they are

6    actually thrown back into their respective bags and then 15

7    tablets were chosen out again.  Again, it is a random

8    sampling.  If by chance one of those original 29 happened to

9    be chosen in the 15, that would just be a random chance, but

10   they are returned back so that, again, it is a randomized

11   sampling and so that it is pure chance, I guess almost a

12   lottery method to choose the samples.

13   Q.    Thank you.

14         I asked another expert earlier about this too, but they

15   said that there is at least a 90 percent -- it says in the

16   bottom there that there is at least a 95-percent confidence

17   level and at least 90 percent of the units in the population

18   contain this substance.  Does that relate to the net weight?

19   What is that 90-percent confidence level attributed to?

20   A.    The statement at the bottom under the section of the

21   exhibit analysis, that statement of the 95-percent level of

22   confidence that at least 90 percent of the units in the

23   population contain the substance, that refers to the

24   presence of Fentanyl.  That refers to the identification of

25   Fentanyl in the exhibit.  That has absolutely nothing to do

```
 1   with the net weight that is determined up at the top.

 2   Excuse me.  That is reported up at the top.

 3           MR. SAM:  I have no further questions, Your Honor.

 4           THE COURT:  Thank you, Mr. Sam.

 5           Do you have any redirect, Mr. Stejskal?

 6           MR. STEJSKAL:  None, Your Honor.

 7           THE COURT:  Thank you.

 8           You may step down and you can be excused.

 9           You may call your next witness.

10           MR. STEJSKAL:  The United States would next call

11   Son Hoang.

12           THE COURT:  Come forward and be sworn, please, at

13   the podium.

14                        SON HOANG

15             Having been duly sworn, was examined

16                  and testified as follows:

17           THE WITNESS:  My name is Son Hoang, S-o-n,

18   H-o-a-n-g.

19           THE COURT:  You may proceed, Mr. Stejskal.

20                   DIRECT EXAMINATION

21   BY MR. STEJSKAL

22   Q.   Good morning, Dr. Hoang.

23   A.   Good morning.

24   Q.   Your occupation, please.

25   A.   I am a forensic chemist with the D.E.A., Drug
```

1   Enforcement Administration.

2   Q.   Tell us about your educational background.

3   A.   I have a biochemistry degree from the University of

4   California Davis in Davis, California and a minor in

5   statistics.  I have a Ph.D. in pharmaceutical chemistry from

6   the University of the Pacific in Stockton, California, and I

7   have an M.B.A. from California State University at San

8   Francisco.

9   Q.   That is a lot of education.  Not a question though.

10       Tell us about your work background.

11  A.   I previously worked with the D.E.A. and I was a senior

12  chemist with the U.S. Department of Agriculture where I was

13  a senior chemist for development on-site and trained on-site

14  chemistry to test for meat, poultry and egg as a senior

15  chemist.

16  Q.   Did that involve analytical chemistry, in other words,

17  the identification of substances?

18  A.   Yes.  I was responsible for the development of the

19  method to identify in meat and poultry such as pesticides,

20  antibiotics and anesthetics and hormones that the animal

21  ate.

22  Q.   Did you train other chemists in the analysis of

23  substances and identifications?

24  A.   Yes, I trained other chemists on-site to use the method

25  I developed at the U.S.D.A., as well as to monitor and

```
 1   adjust or to validate all of the instruments which were used

 2   to test.

 3   Q.   Was the G.C.M.S. or gas chromatograph mass spectrometer

 4   an instrument that you used?

 5   A.   Yes.  G.C.M.S. or gas chromatography mass spectrometry

 6   is a major part of the equipment at the U.S.D.A.

 7   Q.   And then after you had that job, you then moved to the

 8   Drug Enforcement Administration as a forensic chemist there?

 9   A.   Yes.

10   Q.   How long have you worked as a forensic chemist at the

11   D.E.A. lab?

12   A.   With the D.E.A. lab I am in my third year.

13   Q.   Tell us about your training through D.E.A. in order to

14   become a chemist at their lab.

15   A.   Before I get my hands working with the evidence, any

16   evidence, I had an 18-week intensive training in Virgina --

17   Quantico, Virginia, where I had to train on theoretical and

18   hands-on experience with different types of drugs and

19   analyze them and the protocol related to it.

20        When I get to the Western Laboratory, there is a

21   supplement, seven-week further training to accommodate for

22   different types of techniques and other techniques to

23   analyze different substances.

24   Q.   So you trained under some of the chemists that are

25   already working at the D.E.A. lab there in California?
```

```
 1    A.    Yes.

 2    Q.    And they supervise your work and make sure you are

 3    doing things correctly?

 4    A.    Yes.

 5    Q.    You successfully completed that training obviously?

 6    A.    Yes.  All of the training -- at the end of the training

 7    we have a test exhibit that is a blindfold so we have to

 8    make an identification and pass in order to certify before

 9    working with all of the exhibits or evidence.

10    Q.    And then once you were through your training you went

11    on I guess active duty as a forensic chemist with the D.E.A.

12    lab?

13    A.    When I was approved and certified that I was able to

14    work on the bench, then I started working with the exhibits,

15    the actual exhibits.

16    Q.    You were given several exhibits in this case to analyze

17    as part of your work as a D.E.A. chemist, correct?

18    A.    Yes.

19    Q.    Let's first look at Court Exhibit 12.05, which is

20    D.E.A. Exhibit 173.

21          Does this appear to be D.E.A. Exhibit 173 based on your

22    observation of that item?

23    A.    So based on this, I recognize my handwriting and which

24    date I received it and my initials and date that I close are

25    at the bottom too.
```

1    Q.   That is your signature on that seal on the bottom.

2    That is what you're saying?

3    A.   Yes.

4    Q.   Let's look on the screen at Exhibit 13.09, photo 18.

5         Do you see some white items there in the middle that

6    look like pills, and then again at the bottom do you see

7    some more white items down there in the bag?

8    A.   Yes, I do.

9    Q.   Do those white items appear to be consistent with

10   D.E.A. Exhibit 173 that you have got in your possession

11   there?

12   A.   I saw similar pills, but the picture on the screen does

13   not zoom to look at the number that is printed on the

14   tablets.

15   Q.   You can't see the numbers but you can see they are

16   white oblong pills?

17   A.   Yes.

18   Q.   There has been previous testimony that D.E.A. Exhibit

19   173 was seized from Mr. Shamo's house from the hopper and

20   bag by the pill press in the pill press room.

21        Let's look at Exhibit 12.06.  Do you recognize that

22   document?

23   A.   Yes, I do.

24   Q.   Is that your report of your analysis of D.E.A. Exhibit

25   173?

```
1    A.    Can you scroll down to the bottom?

2          THE COURT:  Zoom back out so that he can see the

3    bottom, please.

4          THE WITNESS:  The bottom has my signature and the

5    date analyzed and the date on the right hand and my

6    supervisor's approval and the date when he approved it.

7    BY MR. STEJSKAL

8    Q.    This is December 19th of 2018, correct?

9    A.    Yes.

10   Q.    What was the request of you with regard to this

11   exhibit?  What were you asked to do?

12   A.    So the request for this is for the reanalysis of this

13   exhibit.

14   Q.    By reanalysis, a chemist had already examined this

15   exhibit, correct?

16   A.    That is correct.

17   Q.    And so specifically what were you asked to do?

18   A.    So I was asked to analyze the composite portion of it.

19   So within the exhibit there is a bag of intact tablets and

20   there is also a bag of powder.  I was asked to analyze the

21   bag of powder which is the composite previously formed.

22   Q.    Looking at that exhibit in front of you there we see a

23   bunch of pills.  Can you see the powder in there too?

24   A.    The powder is in the glass vial in here and the pills

25   are in the Ziploc bag separately.
```

1   Q.   The composite was made by a prior chemist, correct?

2   A.   That is correct.

3   Q.   That is what you tested is that composite, correct?

4   A.   That is correct.

5   Q.   Tell us about your procedure in testing that composite.

6   A.   Since I am testing on the composite only, my first step

7   -- to test it I remake the composite again.  I grind it and

8   pass it through a sieve to make sure that it is homogeneous

9   or in form.  Then I took two portions from this test and

10  performed two different tests with it.

11  Q.   What was the first test you performed?

12  A.   The first test I performed is called the G.C. F.I.D. or

13  gas chromatography flame ionization detector.  That is to

14  separate the components in there and group it into a group

15  and compare with a standard and match the retention time.

16       The second test I performed is the G.C.M.S., gas

17  chromatography mass spectrometry.  The second test is first

18  to separate all the components in there and the mass

19  spectrometry is to identify which is the component that is

20  being separated.  It is a fingerprint of getting a unique

21  pattern of all of these components in there.

22  Q.   So a specific substance has a unique look that you're

23  able to observe as a trained chemist?

24  A.   That is correct.  Each substance has its own unique

25  pattern.  When I analyzed all these components I separate it

```
 1    out and I look at the pattern and compare with my standard.

 2    Q.    What was the result of the G.C. F.I.D. test with regard

 3    to D.E.A. Exhibit 173?

 4    A.    The G.C. F.I.D. result identified Alprazolam.

 5    Q.    And then you next performed the G.C.M.S. test.  What

 6    was the result with regard to the sample?

 7    A.    The G.C.M.S. also identified Alprazolam.

 8    Q.    After you performed these tests, what did you do with

 9    D.E.A. Exhibit 173?

10    A.    So when I performed all my tests and make my

11    identification, I do a reserve weight.  The reserve weight

12    is all of the weight of the retained weight left after I had

13    done my analysis.  Then I seal everything back in the

14    original container and reweigh the whole container before I

15    return it to the vault.

16    Q.    And then you complete this report detailing the results

17    of your analysis?

18    A.    That is correct.

19    Q.    Based on your training and education and your analysis

20    in this case, what is your expert opinion as to the contents

21    of D.E.A. Exhibit 173?

22    A.    I identify Alprazolam in the sample.

23    Q.    We're going to next look at Exhibit 20.00, which is

24    D.E.A. Exhibit 210.

25          Can you identify that for us, please.
```

```
 1   A.   Yes.  Similarly I recognize my handwriting and whom I

 2   receive it from and the date I receive it from.  I also

 3   recognize my signature and the date that I close.

 4   Q.   Prior testimony has established that D.E.A. Exhibit

 5   210, which is Court Exhibit 20.00, is an item that a Ms.

 6   Tina Young gave to Postal Inspector Howell.

 7        Let's look at 20.01 on the screen.  Can you identify

 8   that document?

 9   A.   Yes, I do.  I recognize my name and the date approved.

10   Q.   And that date is November 16th of 2018?

11   A.   That is correct.

12   Q.   What were you asked to do with regard to D.E.A. Exhibit

13   210?

14   A.   I was requested to analyze what is called an arbitrary

15   sampling with this, so I select random like one tablet from

16   the whole container and I test that one tablet.

17   Q.   So that is different from the others where you form a

18   composite or a composite is formed of the entire contents of

19   the exhibit?  With this one you're just asked to test one

20   pill?

21   A.   I was asked to test one pill, but to form a composite

22   and that is a normal procedure even with one pill.  So with

23   one pill the procedure is to form a composite and it still

24   has to pass through the sieve to make sure it is

25   homogeneous.  That is the standard protocol to form a
```

```
 1    composite before testing.

 2    Q.   You did that with regard to this exhibit, D.E.A. 210?

 3    A.   That is correct.

 4    Q.   Then what test did you perform on this exhibit?

 5    A.   Similarly I performed a G.C. F.I.D. and a G.C.M.S. on

 6    this exhibit.

 7    Q.   Similar to what you testified as to the first exhibit

 8    that you looked at?

 9    A.   That is correct.

10    Q.   What were the results with regard to those tests?

11    A.   For both of the tests I identified Alprazolam in the

12    sample.

13             MR. STEJSKAL:  That's all of the questions that I

14    have.  Thank you.

15             THE COURT:  Thank you, Mr. Stejskal.

16             Mr. Skordas, you may cross-examine.

17             MR. SKORDAS:  Thank you.

18             Could we leave 20.0 up there, please.

19                        CROSS-EXAMINATION

20    BY MR. SKORDAS

21    Q.   Dr. Hoang, it is true, isn't it, that this is a retest,

22    this one here?

23    A.   For 210 this is not a retest.

24    Q.   What is it?

25    A.   Before is a no analysis request so there hasn't been
```

1    any test on it, so there is a request to analyze this.

2    Q.    And you received this it appears on November 9th of

3    2018?

4    A.    That is right.

5    Q.    It is your testimony today that no one had ever tested

6    it prior to that?

7    A.    According to what I see, no one had tested this exhibit

8    yet.

9    Q.    What you found in this test and what you took and what

10   you analyzed was a single pill that you weighed at about

11   two-tenths of a gram; is that correct?

12   A.    The single pill for this case is an average of other

13   pills that are in there.

14   Q.    And it weighed less than a quarter of a gram?

15   A.    That is correct.

16   Q.    And you didn't test any of the other pills in the

17   sample?

18   A.    No.  This is an arbitrary sampling which means I only

19   take one tablet of the whole bag.

20   Q.    It looks like on your notes down there that it says no

21   analysis as per Special Agent Ely.

22        Do you see that?

23   A.    Yes.

24   Q.    What does that mean to you?

25   A.    That means that is the protocol when we do a single

```
 1    analysis, a single arbitrary sampling, and the protocol is

 2    to split it into two exhibits.  In this case you see here is

 3    210.01, which is the sample aspect to analyze and then the

 4    rest, which I don't analyze, I split so that it would be

 5    clearer and easier to differentiate when you look at the

 6    report.

 7              MR. SKORDAS:  That is all that I have, Your Honor.

 8              THE COURT:  Thank you.

 9              Any redirect?

10              MR. STEJSKAL:  None, Your Honor.  Thank you.

11              THE COURT:  You may step down.  Thank you.  You

12    may be excused.

13              Do you want to start another witness or take the

14    break now?

15              MR. STEJSKAL:  That is all the chemists so this

16    might be an appropriate place for the break, if that fits

17    with the Court's --

18              THE COURT:  That is fine.

19              We'll be in recess until about 25 to 1:00.

20              (WHEREUPON, the jury leaves the proceedings.)

21              THE COURT:  About a half an hour.

22              (Recess)

23              THE COURT:  Are we ready?

24              MR. GADD:  Could I address the Court before we

25    bring in the jury?
```

```
 1              THE COURT:  Yes.

 2              MR. GADD:  Starting with our witnesses this

 3    morning, I think we have ten of our next 12 who are all out

 4    of town witnesses and we're moving faster then we

 5    anticipated, which I think everyone is pleases about, but we

 6    have rearranged flight schedules for the remaining out of

 7    town witnesses.  We have a good group of witnesses scheduled

 8    for each of the days this week and we think we will probably

 9    be able to rest our case Friday afternoon.  The only reason

10    I bring this up is to say -- well, possibly Monday morning,

11    depending on that last witness --

12              THE COURT:  Does that include Mr. Paz?

13              MR. GADD:  Yes, I think so.

14              MR. SKORDAS:  Are you going to call him?

15              MR. GADD:  I think so, yes.

16              MR. SKORDAS:  When will you be able to tell us?

17              MR. GADD:  Friday.

18              MR. BURGGRAAF:  Thursday afternoon.

19              MR. GADD:  The only reason I bring all this up is

20    to say we have got a good group of witnesses for each day,

21    but I have this nagging feeling inside like we may not make

22    it all the way to 2:00 on some of the days.  I just wanted

23    to let the Court know --

24              THE COURT:  That would be tragic.

25              I think we can live with that.  Do the best you
```

```
 1    can.

 2              MR. GADD:  I hope to be done Friday afternoon.

 3    Thank you.

 4              THE COURT:  By 2:00?

 5              MR. GADD:  Yes.

 6              THE CLERK:  Should I keep the jury in the dark on

 7    that?  I don't want to get their hopes up.

 8              MR. GADD:  On that last part, yeah.  I assume

 9    they'll have quite a bit of cross for Mr. Paz and that could

10    push us into Monday for our last witness.

11              THE COURT:  And, of course, that does not count

12    time for the defense case.

13              THE CLERK:  Right.

14              MR. GADD:  I'm happy to explain the timing and why

15    we might end a little early a few days this week because of

16    flight schedules and witnesses coming in for the next day,

17    to the jury, if the Court would like or if the Court is just

18    happy to tell them --

19              THE COURT:  I can tell them.  Let's see how it

20    goes.  Thank you.

21              MR. SKORDAS:  Your Honor, additionally something

22    has come up that we had not dealt with previously and that

23    is that we are getting our subpoenas out today.  The clerk

24    has required some sort of a written motion for subpoenas.  I

25    have never done that before.  I am not sure --
```

```
1              THE CLERK:  I have definitely seen that but it is

2    usually when they are sealed.  I don't --

3              THE COURT:  What do you want us to do?

4              MR. SKORDAS:  We just need some subpoenas issued.

5    We'll take care of the rest, but the clerk downstairs won't

6    give us any without a motion and order.

7              THE CLERK:  I can tell them to just issue them.

8              MR. SKORDAS:  I think she could handle the whole

9    thing.

10             THE CLERK:  I will just tell the people at the

11   front to issue them.

12             THE COURT:  If she can't, I will be happy to say

13   give him the subpoenas.

14             MR. SKORDAS:  Thank you, Judge.

15             THE COURT:  Did you try today?

16             MR. SKORDAS:  No, but I will go down.

17             THE CLERK:  I will let them know that you are

18   coming today.

19             THE COURT:  All right.

20             (WHEREUPON, the jury enters the proceedings.)

21             THE COURT:  You may call your next witness.

22             MR. BURGGRAAF:  The United States would call

23   Special Agent David Slagle.

24             THE COURT:  Come forward and be sworn, please.

25                       DAVID ANTHONY SLAGLE
```

```
 1              Having been duly sworn, was examined

 2                   and testified as follows:

 3          THE WITNESS:  David Anthony Slagle.  The last name

 4     is S-l-a-g-l-e.

 5          THE COURT:  You can proceed, Mr. Burggraaf.

 6                   DIRECT EXAMINATION

 7     BY MR. BURGGRAAF

 8     Q.   You seemed a little hesitant on that last name.  Are

 9     you certain that is how it is spelled?

10     A.   Yes.

11     Q.   Thank you.  Where are you currently employed?

12     A.   Homeland Security Investigations under the Department

13     of Homeland Security.

14     Q.   Is that commonly referred to as H.S.I.?

15     A.   It is.

16     Q.   What is your position with H.S.I.?

17     A.   I am a special agent with H.S.I., but I'm also a

18     computer forensic agent or examiner.

19     Q.   How long have you been with Homeland Security

20     Investigations?

21     A.   Since February of 2009.

22     Q.   In your role as an agent and as a computer forensic

23     agent or examiner, what are your job responsibilities?

24     A.   As an agent, like every other agent with our agency, I

25     conducted investigations into violations of federal statutes
```

1    that our agency covers.  In my role as a computer forensic

2    agent, I assist agents within my agency and officers, state

3    and local officers outside of my agency with the examination

4    of electronic evidence.

5    Q.   I want to focus in on that electronic evidence aspect.

6    What training and education or experience do you have

7    related to that position?

8    A.   I have attended the Department of Treasury's computer

9    forensic training course, also the advanced computer

10   forensic training course, the mobile device exam training

11   course, and I have also gone to a few other advanced courses

12   related to computer forensics and mobile forensics.

13   Q.   Throughout your time with H.S.I., do you have a

14   ballpark number of how many devices you have examined?

15   A.   I couldn't tell you.  It is just too many.

16   Q.   Would you say more than 100?

17   A.   Easily.

18   Q.   Do you always examine the contents on a device or is

19   your role sometimes more limited when you're called upon to

20   assist?

21   A.   It all depends on the case and the amount of devices

22   that need to be examined or processed.  A lot of times I may

23   have case agents that request my skills in obtaining the

24   evidence, as far as the image of the evidence where we image

25   it as a bit to bit copy, and then processing that image with

1    our forensic tools.  Then I will put it in a format that is

2    easy for the agent to read or interpret and allow them to

3    sort through the data, and if further analysis is needed,

4    they will bring back that evidence that they have marked for

5    me to conduct further analysis.

6    Q.    You referenced forensic tools.  I assume you're not

7    talking about tools you would use for analyzing for

8    fingerprints on an item.  What types of tools are you

9    referencing when you reference forensic tools?

10   A.    When I say forensic tools, it could be anything from a

11   variety -- it is generally software based tools.  A lot of

12   the data that comes off of these electronic devices is in an

13   unreadable format.  These tools help parse out that data and

14   put them in a readable format, which is very beneficial to

15   somebody like a case agent who does not have a lot of

16   experience in computer forensics, and it puts it in a

17   readable format.

18   Q.    When using these forensic tools, do you always use the

19   latest version of that tool?

20   A.    I try to unless there are issues that other forensic

21   examiners have noticed as far as bugs in the software.

22   Generally those would be ones like it may miss an artifact.

23   Q.    Do you receive specific training specific to each of

24   those forensic tools?

25   A.    Yes.  Well, we receive with my agency generalized

```
 1    training.  We train on the fundamentals of computer

 2    forensics.  The tool specific training is we're taught on

 3    the tools as well, but we really focus on the fundamentals

 4    of computer forensics, because if you know the fundamentals

 5    you know how to use every tool.

 6    Q.    Different but related, what type of training have you

 7    had related to cryptocurrency and the seizure of

 8    cryptocurrency?

 9    A.    I have had training as far as the seizure and recovery

10    of computer forensics, the ability to identify computer

11    forensic artifacts given to me from the cyber crime center

12    at my agency in D.C.

13    Q.    Have you trained others in relation to computer

14    forensics, forensic tools and also related to

15    cryptocurrency?

16    A.    Yes.  I was requested by my agency to help develop a

17    course that would go more in-depth into the artifacts

18    related to the dark web and cryptocurrency.

19    Q.    Focusing in on our testimony for today, how did you

20    prepare for your testimony today?

21    A.    I reviewed my reports and the report of investigation,

22    my notes, and just went over the details that I have written

23    down.

24    Q.    How did you become involved with the investigation of

25    Aaron Shamo?
```

1  A.  I was notified by an agent within my agency that they

2  needed assistance in looking at a computer of an individual

3  that is related to this case.  I provided assistance in that

4  case and that started my involvement.

5  Q.  Is it correct that you with other agents went to the

6  home of Mario Noble on the night of November 22nd of 2016 to

7  access his computer and review what he had access to on the

8  AlphaBay storefront for PharmaMaster?

9  A.  That is correct.

10  Q.  Setting that aspect of your involvement aside, did you

11  examine any electronic devices in this case?

12  A.  Yes, I did.

13  Q.  Let's talk about the devices that you examined in this

14  case.  Did you forensically examine any of the devices of

15  Mr. Shamo?

16  A.  I did.

17  Q.  Of those devices, which ones did you find evidence

18  related to this case?

19  A.  The ones that had specific evidence of interest would

20  be the iMac, the iPhone 6-S and the iPhone 7.

21  Q.  I would like to point out one exhibit to you and then

22  show you a couple of others.  The first one is Government's

23  Exhibit 13.04.  You can see the back of it here.  If you

24  can't recognize it, then I will lift it and carry it to you,

25  but I prefer if you happen to be able to recognize it -- do

1  you recognize that item?

2  A.   I do.

3  Q.   What is that?

4  A.   A 27-inch iMac.

5  Q.   Let me walk up and show you 13.05 and 13.06.

6  A.   Okay.

7  Q.   You have those exhibits before you.  Do you recognize

8  them?

9  A.   I do.  I recognize the seal with my initials on it.

10  Q.   So what are those two items?

11  A.   This one is an iPhone 6-S.  This one is an iPhone 7.

12  Q.   Are those the two devices that you referenced

13  previously that you examined and had evidence related to

14  this case?

15  A.   They are.

16  Q.   The jury has heard quite a bit of testimony and been

17  presented with numerous computer and cell phone related

18  exhibits such as e-mails, web data, text messages, text

19  documents and photos.  Did you find that type of content on

20  the three devices that have been referenced?

21  A.   Yes, I did.

22  Q.   Which device of those three did you examine first?

23  A.   That would be the iMac computer.

24  Q.   So when you examined the iMac computer, what did you

25  discover?

1    A.   I discovered that it contained two storage drives.  One

2    of them is a solid-state drive and the other one is a hard

3    drive, which is your standard drive with physical platters

4    in it that reads data.

5    Q.   Let's talk about each one of those separately.  In

6    relation to the solid-state drive, can you define what a

7    solid-state drive is?

8    A.   Unlike the hard drive which has the physical platters

9    which contain the data, a solid-state drive contains NAND

10   memory which is written to the memory and it is accessed

11   much faster than a physical hard drive because it does not

12   have to seek and look for that data on the disk.  It is

13   almost instantaneously reading that data like it does from

14   your computer memory.  It is just another method of storage

15   but significantly faster than a hard drive.

16   Q.   What type of user information, either in the registry

17   or otherwise, did you find on the solid-state drive?

18   A.   I found each one of the hard drives -- well, each

19   drive, the solid-state drive and the hard drive each

20   contained operating systems.  The solid-state drive

21   contained an active operating system, Windows 7 Home

22   Premium, and then the hard drive contained a Windows 7 Home

23   Premium operating system in addition to the Macintosh

24   operating system.

25   Q.   We have referenced this computer as an iMac.  In your

1   experience is it abnormal for an Apple branded computer to

2   be running a Windows operating system?

3   A.   Not at all.

4   Q.   Let's talk about the solid-state drive.  What user name

5   and/or password, if any, was required for that drive?

6   A.   That required a user name and password of -- Perfect

7   Person was the user name.  The user Perfect Person was a

8   member of the administrators group and he had a password on

9   the computer.

10  Q.   Do you recall what that password was?

11  A.   Yes.  It is A-A-r-o-n-1-2-3-!-!.

12  Q.   Were there any other current users or accounts on the

13  solid-state drive?

14  A.   There was a windows.old account and off the top of my

15  head it would be difficult to give you the specific details.

16  Q.   Did you document those details in your report or notes?

17  A.   I did.

18  Q.   Would it help to refresh your recollection to review

19  those?

20  A.   It would.

21  Q.   Agent Slagle, you have had a chance to refresh your

22  recollection.  Can you tell me what you recall in regards to

23  the windows.old file?

24  A.   The windows.old file contained a user.  The name of the

25  user was m-e-s-s-d.  So it reads m-e-h-s-s-d.  Sorry.

1   Q.   Did you have any other user accounts or passwords noted

2   in relation to this windows.old file?

3   A.   Not in this one.

4   Q.   Let's speak to the hard drive at this point.  What

5   operating system was the hard drive running?

6   A.   Windows 7 Home Premium.

7   Q.   What user accounts and/or passwords did you note or

8   find on that operating system?

9   A.   There was one windows.old registry and there was an

10  active user.

11  Q.   Now, you have noted windows.old twice now.  Can you

12  tell me what windows.old is referencing?

13  A.   Yes.  I'm actually going to -- it is basically a custom

14  install of the operating system.  When you have a

15  computer -- maybe it is acting slow and you need to

16  reinstall Windows on the computer.  Sometimes you can select

17  a custom install and install it and it creates a new user

18  account, because you go through and create it, but all of

19  your old files were put inside a sub folder in the drive

20  called windows.old.

21       It is convenient because although you have the new

22  version -- I shouldn't even say new version.  It may even be

23  the same version you had before, but you have a clean

24  install of your operating system, and you can always go back

25  and get those documents if you selected that in the

1    windows.old folder.

2    Q.   So in this case did the hard drive windows.old folder

3    contain any user accounts data?

4    A.   It did.

5    Q.   What information did you find in there?

6         Just for the record, it appears you're referencing

7    your --

8    A.   I am referencing my notes to give you the details

9    exactly.  The windows.old folder contained a user.  The

10   user's name is Shamo, S-h-a-m-o.  It is a local user who is

11   a member of the administrators group.  There was a password

12   required.

13   Q.   What was that password?

14   A.   The password is all lower case mollydog3,

15   m-o-l-l-y-d-o-g-3.

16   Q.   We have gone through that windows.old folder.  What

17   about the active operating system, what related information

18   did you find on the hard drive?

19   A.   There were two active operating systems, one being the

20   Mac O-S operating system and Windows.  The Windows user was

21   named Winner, W-i-n-n-e-r.

22   Q.   Was a password required for accessing the hard drive

23   through that user?

24   A.   Yes.

25   Q.   What was that password?

1    A.    It was the same password as Perfect Person on the

2    S.S.D.

3    Q.    Was that A-A-r-o-n-1-2-3-!-!?

4    A.    Correct.

5    Q.    You mentioned there were two users.  What was the other

6    user name?

7    A.    For the Macintosh operating system the user is Shamos

8    Mac.  It is lower case s-h-a-m-o-s, M-a-c, and it gives me a

9    full name of the user which is Aaron Shamo.

10   Q.    This Mac operating system, did you believe this to be

11   the original operating system?

12   A.    I would say that probably is the original operating

13   system.

14   Q.    When examining the iMac computer with both the

15   solid-state drive and the hard drive, did you look for user

16   attribution?

17   A.    I did.

18   Q.    Did you do the same thing when you examined the two

19   iPhones?

20   A.    I did.

21   Q.    Now, I have used the phrase user attribution.  What is

22   user attribution?

23   A.    User attribution is when you examine -- it gets a

24   little confusing because there may be sometimes multiple

25   users of a computer.  Let's say that I have a login and I go

```
 1    inside my log-in and my attributes are going to be my e-mail

 2    addresses, and they are going to be logins to accounts that

 3    would be significant, or they would be accounts that I would

 4    frequent, maybe messages.  All those items, pictures,

 5    videos, all of those items are what are considered user

 6    attributes.  You can say this is the individual that uses

 7    the computer.  This is the individual that uses this

 8    electronic device.

 9    Q.   In your experience with H.S.I., why is user attribution

10    usually relevant or important to identify?

11    A.   Because it makes it easier for us to have an

12    understanding of who is using the computer.  If there is

13    evidence found on the computer, it is easy to attribute that

14    evidence to an individual if there is user attributes.  That

15    is why it is a very important thing for us to look at.

16    Q.   A related question.  When you're assisting with an

17    investigation you're rarely ever sitting next to the actual

18    user of a device; is that right?

19    A.   Yes.  Unfortunately, we don't have the ability as it

20    stands right now to do that.

21    Q.   So you use user attribution to pinpoint who may have

22    actually owned or accessed or used the device; is that

23    right?

24    A.   That is correct.

25    Q.   On the iMac computer, where did you find user
```

1    attribution data in addition to what you have already

2    explained?

3    A.   It would be located in the registry hive.

4    Q.   Maybe I better ask for clarification.  What is the

5    registry hive?

6    A.   It is the information -- in layman's terms it is the

7    information that the operating system stores all the rules

8    and all of the -- basically it is the rules that tells the

9    operating system how to perform, you know, whose folders

10   belong to who, and all of these type of issues are kind of

11   stored within the registry hive.  It is the brains of the

12   operating system.

13   Q.   The information that you described previously about the

14   solid-state drive user accounts as well as the hard drive

15   user accounts, is that information that would be stored in

16   the registry?

17   A.   Yes, it would be.

18   Q.   In addition to the registry information, what other

19   user attribution data did you find on the iMac computer?

20   A.   Within the registry?

21   Q.   Outside of the registry did you find other user

22   attribution data?

23   A.   I found a lot of different things from logins within

24   web applications, but one thing that was the most

25   significant is I discovered data from the Chrome browser.

1    The user that had been using the computer was storing their

2    logins for the websites, their user names, their e-mail

3    addresses and, obviously, the websites they used with the

4    date and time.

5    Q.   I want to walk you through -- I think you may have

6    referenced that these are Chrome passwords.  If I can walk

7    you through the specifics that you found there --

8    A.   Okay.

9    Q.   Let's look at Government's Exhibit 14.33.  As you can

10   tell, this is a lot of information in a small space.  We'll

11   zoom in to some of it.

12   A.   Okay.

13   Q.   So having seen that full image, did you review that in

14   preparation for your testimony today?

15   A.   I did.

16   Q.   What is contained on this spreadsheet?

17   A.   I will start with the first line just to kind of

18   explain it.  The very first one is we see the U.R.L.   That

19   is the website that the individual went to.  This is just

20   indicating that on that page they have a user name field.

21   It has got the login and password field on that website

22   where that link would go to.  Inside the user name field the

23   user name would be airshamu4@hotmail.com.  The password is

24   going to be mollydog3, all lowercase.  The created date will

25   be the time and date that that entry was put into Chrome.

1      If any of you have used Chrome in the past, and when

2   you type into a website and you put your user name and you

3   put your password, Chrome always says, hey, do you want to

4   keep that?  Most of us just say, yeah.  That is pretty

5   convenient.  I am going to keep that.  This is the stuff

6   that Chrome keeps.

7   Q.   Let me back up just a little bit.  Where was all of

8   this data found?

9   A.   Within the Chrome browser.

10  Q.   How was it found?

11  A.   Using forensic tools to extract the data.

12  Q.   You mentioned that you reviewed this in preparation for

13  your testimony today.  Is the data represented in this

14  spreadsheet accurate as to what you found when you were

15  searching the iMac computer?

16  A.   Yes, it is.

17  Q.   Let's look at line number two.  It looks like it has an

18  action U.R.L.  Rather than read it letter for letter I am

19  going to reference it as www.tabletpressclub.com.

20      What is the user name and password for that website?

21  A.   That is going to be airshamu.  It is spelled

22  a-i-r-s-h-a-m-u, the number 4, @hotmail.com.  The password

23  is mollydog3, all lower case.

24  Q.   It appears that the next line down, the next two lines

25  down reference Google accounts at google.com.  What accounts

1    or user names do those reference and what are the passwords?

2    A.    The Google account user name is shamnations, so s-h-a-m

3    and then the word nations has the common spelling,

4    @gmail.com.

5    Q.    And the password for that account?

6    A.    That would be capital S, capital U, lowercase p,

7    lowercase e, lower case r, 1-2-3-!-!, bearing similarities

8    to the login for the Windows account, same length, same

9    capitalization of the first two characters and the 1-2-3 and

10   exclamation points at the end.

11   Q.    Going down about five lines it looks like there is a

12   Wells Fargo website listed.  What is the user name and

13   password for that website?

14   A.    That user name is ashamo4 and it is mollydog -- I'm

15   having a hard time reading that.  It looks like mollydog!3.

16   Q.    As I am looking at it could that be mollydog43?

17   A.    Okay.  It could be.  It is kind of tough to look at

18   that.

19   Q.    Would you routinely use bank information for

20   identifying a user on a device?

21   A.    I'm sorry.  Can you ask that again?

22   Q.    In your investigations would you routinely utilize bank

23   information user name and login for identifying a user?

24   A.    Yes, because who gives away their bank account login

25   information?  I know I don't.  It is just private

```
 1  information.  I wouldn't put a lot of credence in a Netflix
 2  login, but a bank login is generally very personal.
 3  Q.   I want to go down one more line and it looks like there
 4  are duplicate action U.R.L.s, blockchain.info, forward slash
 5  wallet, forward slash on several lines there, but if we
 6  could slightly scroll down to catch the lines that follow
 7  that as well.
 8       It looks like we might be missing it altogether.  I
 9  have asked a challenging thing because the type is so small.
10  They are locating that.
11       As you can see there on the screen, there are several
12  action U.R.L.s related to blockchain.info\wallet\.
13       Do you know what that website relates to?
14  A.   Yes.
15  Q.   What is that?
16  A.   It is access to -- well, that website is a
17  cryptocurrency wallet.
18  Q.   Walk me through what we see here as far as in the third
19  to the last column and the last column as far as user names
20  and passwords.
21  A.   The third to the last column in relation to the block
22  chain?
23  Q.   Yes.  Tell me about these user names that we see in
24  relation to the blockchain.info website.
25  A.   Well, there are the ones that just look like a jumble
```

1    of characters, letters and characters and those are private

2    keys to a Bitcoin address or a Bitcoin wallet.  The one

3    above it, the airshamu4@hotmail.com and the password

4    mollydogM with the number 3 and the exclamation point, those

5    are going to be the passwords to gain access.

6    Q.   It looks like for each of the blockchain.info logins,

7    it looks like the password is the same; is that correct?

8    A.   That is correct.

9    Q.   Let's look now at another Wells Fargo website that is a

10   few lines down from this.

11         MR. BURGGRAAF:  Yvette, if you want to just grab

12   like the next ten or so lines and we'll deal with the small

13   font.

14   BY MR. BURGGRAAF

15   Q.   So toward the very top of this where we zoomed in there

16   is connect.secure.wellsfargo.

17         MR. BURGGRAAF:  You just removed it.  Go right

18   back up to where we were.  I'm sorry.

19   BY MR. BURGGRAAF

20   Q.   Right where she is highlighting, do you see that

21   website?

22   A.   I do.

23   Q.   What is the login user name as well as the password for

24   that?

25   A.   Ashamu4.

1    Q.    Two lines down from that it looks like there is

2    e-services.libertymutual.com.  Do you know what Liberty

3    Mutual is?

4    A.    As far as I know it is an insurance company.

5    Q.    In your investigations is there any relevance to

6    finding the user name and password in relation to an

7    insurance website?

8    A.    There is.

9    Q.    What is that?

10   A.    For me as an investigator I would call that more of a

11   privacy based login, because generally people are not

12   logging in to pay your car insurance or home insurance.

13   This is something that is generally just the user using.

14   Q.    What is the user name and the password for this Liberty

15   Mutual website?

16   A.    Airshamu4@hotmail.com.

17   Q.    A few lines down from that there is a website of

18   localbitcoins.com\accounts\login\.

19         Do you see that there on your screen?

20   A.    I do.

21   Q.    What is the user name and password for that website?

22   A.    It is the same as the previous one,

23   airshamu4@hotmail.com.

24   Q.    We're going to scroll down about six or seven lines.

25              MR. BURGGRAAF:  Yvette, grab about the next ten

1   lines after that.

2   BY MR. BURGGRAAF

3   Q.   It is starting with a website entitled

4   passportalibaba.com.

5        Do you see that on your screen about four up from the

6   bottom?

7   A.   I do.

8   Q.   Do you know what that website is for?

9   A.   I do.  It is an online marketplace located in China

10  that is very similar to Amazon.  That is the best way to

11  describe it I think.

12  Q.   Let's go down quite a ways.  I'm going to skip over

13  another --

14       MR. BURGGRAAF:  Well, actually, if we can scroll

15  down to where we see secure.moneygram.com.

16  BY MR. BURGGRAAF

17  Q.   As you can see there, it is the second and third line

18  up from the bottom.  Do you know what the MoneyGram website

19  is used for?

20  A.   In my experience and the experience that has been

21  conveyed to me by other agents, MoneyGram is generally used

22  for international money transfers.

23  Q.   The third line from the bottom, which is one of the two

24  MoneyGram logins, can you tell me what the user name and

25  password are?

```
 1   A.   Airshamu4@hotmail.com.

 2        MR. BURGGRAAF:  Scroll down now about another

 3   eight or nine lines.

 4   BY MR. BURGGRAAF

 5   Q.   We're looking at a website us.etrade.com.  You can see

 6   it there second from the bottom, and as well as that we'll

 7   note both websites at the bottom, the other one being

 8   amazon.com.

 9        Do you know what etrade.com is?

10   A.   Yes.  That is where you conduct trades, financial

11   trades.

12   Q.   We have got Amazon below that as well.  What are the

13   user names and passwords for each of those?

14   A.   For eTrade it is AARONSHAMO, all caps.  For amazon.com

15   it is airshamu4@hotmail.com.

16   Q.   Let's scroll down about six more lines.  I am looking

17   for a website here.  It looks like Credit Karma.

18        Do you know what Credit Karma is used for?

19   A.   I do.

20   Q.   What type of website is that?

21   A.   It gives you your credit report and credit history.

22   Q.   Why would that be relevant in a case like this?

23   A.   Because up until this date I have never met a person

24   who wants to share their credit information with anybody

25   else.  That is generally very, very private.
```

1   Q.   On this list what is the user name and password for

2   Credit Karma?

3   A.   It is airshamu4@hotmail.com.

4   Q.   And the password?

5   A.   It is mollydog3.

6   Q.   At this point let's look at about the last ten lines of

7   this spreadsheet.  I am looking from PayPal all the way down

8   to the end.  You can see second from the top there is a

9   PayPal website.  What is the user name and the password for

10  that site?

11  A.   Airshamu4@hotmail.  The login again is going to be the

12  SUper, capital S, capital U, lowercase p, lowercase e,

13  lowercase r, 1-2-3-!-!.

14  Q.   It looks like Rocky Mountain Power is referenced twice

15  there.  Both seem to have the same user name of -- well,

16  maybe not the same user name.  Why don't you tell me, what

17  are the user names for each of those Rocky Mountain Power

18  websites?

19  A.   The first Rocky Mountain Power is ashamo4, and the

20  second line is air, a-i-r, shamu4.

21  Q.   For that second one what is the password?

22  A.   Mollydog3, all lower case.

23  Q.   It looks like T.D. Ameritrade is listed two lines below

24  that and two lines below that is www.uline.com.

25       Do you know what that website is for?

1   A.   I believe it is a shipping site.

2   Q.   What is the user name and login for that site?

3   A.   Airshamu4@hotmail.com.

4   Q.   And the password?

5   A.   Mollydog3.

6   Q.   Three from the bottom is westernunion.com.  Do you know

7   what that website is commonly used for?

8   A.   That one in my experience is also used for sending

9   money overseas.

10  Q.   What is the user name and password for that account?

11  A.   Airshamu4@hotmail.com.

12  Q.   It appears there is a little bit of repetition as far

13  as maybe the passwords being used.  What is the password for

14  that website?

15  A.   That would be capital M, Mollydog3!.

16  Q.   In reviewing all of the user names and passwords, did

17  you see a common theme as far as passwords that were being

18  used.

19  A.   Yes, I did.

20  Q.   What was that common theme?

21  A.   Well, the theme as far as the two Windows logins

22  followed the exact same pattern as the frequently used Gmail

23  password, which is SUper123!!, with both of the first two

24  letters capitalized.  Like the login both of those letters

25  were capitalized, the two As.  The words are the same

1    length, and then they both are followed by 1-2-3 with two

2    exclamation points.

3         Then mollydog, all lower case and number 3, was a very

4    frequent password, commonly used on many different logins,

5    along with Mollydog3! with a capital M.

6    Q.   Stepping aside from these many user names and

7    passwords, I want to focus in on other things searched for

8    on the iMac.  Did you find any apps or software that you

9    determined to be relevant in this case?

10   A.   I did.

11   Q.   What did you find?

12   A.   There were a couple of cryptocurrency programs that

13   dealt with Bitcoin and there was the T.O.R. browser.

14   Q.   Did you find the Notepad software?

15   A.   I did.  That is a default program in Windows, but I

16   found that software on there and it appeared to have been

17   frequently used.

18   Q.   What type of files are created by the Notepad software?

19   A.   They are known as text files, but their actual

20   extension is a period and txt.

21   Q.   Why did you find the T.O.R. browser and these

22   cryptocurrency wallets and Notepad software, why did you

23   find these to be relevant?

24   A.   I found those to be relevant because we discovered

25   quite a few text files that contained information that

1   appeared to be order numbers and information regarding

2   purchasers.

3   Q.   What about the T.O.R. browser and the cryptocurrency

4   wallets, why would those be relevant?

5   A.   Well, knowing what we knew that the method of payment

6   on AlphaBay market was Bitcoin, that was significant to us

7   because we knew at some point that the payment was in

8   Bitcoin.  So the wallets being on the computer were of

9   relevance and the T.O.R. browser -- that is a browser that

10  is used to gain access to sites like AlphaBay or other dark

11  web markets.

12  Q.   I want to ask you about a specific type of metadata

13  artifact, specifically link files, lnk.  What is a link

14  file?

15  A.   A link file is the computer creating metadata which --

16  I'll explain that.  Metadata is, for instance, if you take a

17  picture, and everybody has been taught about privacy and if

18  you take a picture you can turn off your location and all

19  that stuff on your cellular phone because that saves

20  metadata, which on a photo it is known as X.F. data.  That

21  is the metadata of that photo.  We like to call it the data

22  of data.  So you have got your picture, but the metadata is

23  the one that said you took it on this date at this location

24  and using this type of device to take it and this is the

25  serial number of that device.

```
 1        Link files are metadata and what they do is they say
 2   you clicked open this file on this computer at this time and
 3   it changed the modified date and it shows you all of the
 4   changes and it tells you what user profile opened that file,
 5   so it is the data that tells you that that file was opened.
 6   Q.   So what if any relevant link files did you find on the
 7   iMac?
 8   A.   I found link files of relevance -- I'm going to refer
 9   to my notes here.  Some of the most recent link files that I
10   saw was accessing the Bitcoin wallets and the T.O.R.
11   browser.  Those were some of the ones that stood out to me
12   as being significant in the case and they were frequented by
13   the user of the computer.
14   Q.   Did you find any link files related to text documents
15   where there was what appeared to be a month and day title to
16   them?
17   A.   Those were actually the most recent files, the text
18   files, which appeared to be accessing orders on those files.
19   Q.   So the jury has previously heard testimony related to
20   text files containing daily order sheets.  You mentioned
21   these text files.  Did you find more than one link file
22   showing such text files being opened?
23   A.   Yes, many of them.
24   Q.   According to the link files, what was the most recent
25   date in which that type of a document was opened?
```

1    A.    It was the day of the search warrant, early in the

2    morning. That was the most recent date.

3    Q.    Would that be November 22nd, 2016?

4    A.    That was.

5    Q.    Did the link files provide the date when the T.O.R.

6    browser was last accessed?

7    A.    It does, but I do not have that in front of me.

8    Q.    You reviewed your reports prior to testifying today; is

9    that right?

10    A.    Yes.

11    Q.    Do you recall if the date last accessed according to

12    these link files of the T.O.R. browser would have been

13    August 16th of 2016?

14    A.    Yes, that sounds correct.

15    Q.    So if the case involves someone who is operating a

16    storefront on the AlphaBay marketplace, but the last access

17    date is August of 2016, how would you explain that?

18    A.    Well, it is very common in these types of cases and we

19    call it that they go dark as far as their online activity.

20    What we're commonly seeing, and on the date that the search

21    warrant took place or this activity was happening, a lot of

22    talk on Reddit and in other forms are telling individuals to

23    move their operations to an incognito operating system known

24    as Tails.

25    Q.    Tell me what Tails is.

```
1    A.    Tails is an operating system that could be run on an
2    optical disk such as a D.V.D. or C.D., or if you want to
3    store user data within that operating system you can use it
4    on an U.S.B. drive or S.D. card.
5          The reason why this is so important is it is plugged
6    into the computer and you boot into it before you even go
7    into the Windows computer, so the registry of the computer
8    will never show the devices even being plugged in, because
9    by its nature it is designed to conceal that, because
10   instead of booting into Windows you're booting into the
11   Tails system, which is a Linux based system.  It is designed
12   primarily for access to dark web sites.  T.O.R. is the
13   default browser on it.  It has cryptocurrency wallets and
14   encrypted e-mail and the e-mail communications.
15   Q.    On the iMac computer did you find any sort of evidence
16   related to Tails?
17   A.    I did.
18   Q.    What did you find?
19   A.    Under the Perfect Person user name, I found multiple
20   peer-to-peer downloads of Tails.
21   Q.    What are peer-to-peer downloads?
22   A.    If anybody has heard of BitTorrent, that is a
23   peer-to-peer server or LimeWire.  I guess the easiest way to
24   think of peer-to-peer is the music sharing business that
25   they started out with.  I forget the name of it.  That was
```

1   peer-to-peer where they shared music amongst each other.

2   These are sharing files, like software files with everybody.

3   Q.   I want to focus in on some other artifacts that you may

4   have found on Mr. Shamo's iMac.  Did you find any artifacts

5   that would indicate to you that there had been visits made

6   to the AlphaBay marketplace?

7   A.   Yes.

8   Q.   What did you find?

9   A.   On the hard drive in the unallocated clusters I found

10  951 artifacts including visits to the AlphaBay market.

11  Q.   Did you find any other artifact related to --

12  A.   On the hard drive I found visits to -- or a visit to

13  Reddit and the sub Reddit was the AlphaBay market.  There

14  were comments and it was PharmaMaster underscore experiences

15  and that sub Reddit was visited on the hard drive.

16  Q.   Before you get too much further, maybe you better

17  define that for us.  What is Reddit?

18  A.   Reddit is like an online forum where people go to share

19  things.  Say if you like automotive stuff, and then there

20  would be a sub Reddit that goes into that you like Chevy

21  trucks, and so you're in the Chevy truck forum and talking

22  about it.  Well, this Reddit and sub Reddit were in relation

23  to the AlphaBay market.

24  Q.   How many text documents did you find that referenced

25  AlphaBay on the iMac computer?

1    A.    The actual text documents?

2    Q.    Yes.

3    A.    Let me refer to my report.

4          I found 25 text documents.

5    Q.    Did you locate or identify any bookmarks related to

6    AlphaBay?

7    A.    I did.  I found nine bookmarked pages in the Firefox

8    browser.  Three of them belonged to the Windows user Perfect

9    Person, and six bookmarks were associated with the

10   windows.old user m-e-h-s-s-d.

11   Q.    Now, we have been talking about Mr. Shamo's iMac

12   computer.  I want to bring into the discussion at this point

13   a discussion about what you did with the iPhone 6-S and the

14   iPhone 7.

15         You examined each of those phones as well; is that

16   right?

17   A.    I did.

18   Q.    When you examined those phones, what apps on the

19   iPhones did you identify as relevant to this case?

20   A.    There are a few of them so I need to refer to my report

21   to give you that information.  Okay.

22         The iPhone 6-S and the iPhone 7 shared pretty much all

23   the exact same account information, because the iPhone 7 was

24   the new phone that the user moved from the iPhone 6-S to, so

25   they brought over their Apple I.D. Gmail and all of the

1   other common things you have on your cell phone.

2       The number one thing when you set up your Apple phone

3   is your Apple I.D.  That Apple I.D. was

4   airshamu4@hotmail.com.

5   Q.   What other common accounts did you find amongst the

6   iPhone 6-S and the iPhone 7 that were also in common with

7   information that you found on the iMac?

8   A.   The gmail account on both iPhones was

9   shamnations@gmail.com.  The iCloud account was

10  airshamu4@hotmail.com.  The local Bitcoin account

11  information on both phones was airshamu4@hotmail.  The Wells

12  Fargo user name was ashamu4, just the same as the Chrome

13  browser.  Loginlive.com, which if you use Microsoft you're

14  familiar with it, and that is to get access to your Outlook

15  or hotmail.  That user name was airshamu4@hotmail.com.

16      There was a Snap Chat user name on both phones as

17  ashamu, shamu4.  Snap Chat e-mail was airshamu4@hotmail.com.

18  The Uber account was airshamu4@hotmail.  The Instagram user

19  name was shamothegreat.

20  Q.   Now, focusing in on the apps or applications on those

21  phones, what apps did you locate that you determined to be

22  relevant to this case?

23  A.   It would have been the actual cryptocurrency wallets

24  located on the devices, the Apple messages, the iMessages,

25  the Telegram messages and the Apple notes that are a default

```
 1   program within iPhones, Facebook and also, obviously, any
 2   videos and photos.
 3   Q.   Did you find the Venmo app on these phones?
 4   A.   I did.
 5   Q.   You have hinted at this but let's be clear.  Did you
 6   find common passwords on all three of these devices?
 7   A.   Yes.
 8   Q.   And were the common passwords that you noted earlier
 9   similar or the same as those that you found on the phones?
10   A.   Yes.
11   Q.   Did you review the photos on the iPhones?
12   A.   I did in a limited nature.  I did not exhaustively
13   review them.
14   Q.   Of the photos that you did review, did you find any of
15   them to be relevant?
16   A.   Yes.  On both phones I found multiple selfies.
17   Q.   Who was in each of those selfies?
18   A.   The defendant.
19   Q.   Did you find evidence on any of these three devices,
20   the iMac or either of the iPhones, that would indicate to
21   you that someone else was using any of the devices?
22   A.   Initially I did.  However, after additional information
23   was brought to my attention by another agent I work with, I
24   was able to rule that out.
25   Q.   So walk me through this.  Tell me what you found
```

```
 1    initially and then how you resolved that no one else had

 2    been using the device.

 3    A.    If you could put up the password sheet from Chrome

 4    again I will point out the count.

 5    Q.    14.33.

 6    A.    It is going to be under LegalZoom.

 7    Q.    So about two-thirds down the page?

 8    A.    Correct.

 9    Q.    On the screen here it looks like we have two accounts,

10    both of them for LegalZoom.  Walk me through what you found

11    and how you resolved the issue you may have had.

12    A.    Well, when I saw that there was another user that had

13    saved their information within the Chrome browser, it made

14    me think that there could have been another user on the

15    computer.  The user account was gabbynoriega11@gmail.com and

16    had a different password than what the defendant commonly

17    used on the computer.  But then when I discussed it with the

18    case agent, the case agent had been reviewing many of the

19    devices more exhaustively than I was able to do since I was

20    working on other devices, and he pointed out that on the

21    same date --

22            MR. SKORDAS:  I am going to object to whatever the

23    case agent pointed out.

24            THE COURT:  Hearsay?

25            MR. SKORDAS:  Yes.
```

```
 1              THE COURT:  Sustained.

 2              MR. BURGGRAAF:  If I may speak to that, Your

 3    Honor?  It is not offered for the truth of the matter

 4    asserted, but more as a basis for how our expert on the

 5    stand formed his opinion.

 6              MR. SKORDAS:  It is the same thing.

 7              MR. BURGGRAAF:  I would suggest that it could be

 8    conditionally admitted because the case agent will be taking

 9    the stand and can explain this as well.

10              THE COURT:  I am going to conditionally admit it.

11    It is not offered for the truth of the matter asserted?

12              MR. BURGGRAAF:  It is not at this time, Your

13    Honor.

14              THE COURT:  All right.

15              THE WITNESS:  I was told and I was shown those

16    messages which showed in an iMessage -- it showed Gabby

17    Noriega conversing with the defendant and he was talking

18    about having her set up a LegalZoom account for a business,

19    and he wanted the login password that she had created, the

20    login account details, and she had texted him that data.

21    That same day the login happened on the defendant's computer

22    after he received that data from Ms. Noriega.

23              That is why I was able to, with a pretty high

24    degree of certainty, believe that the defendant most likely

25    put that in.
```

```
 1    BY MR. BURGGRAAF
 2    Q.    After analyzing the user attribution data from all
 3    three of these devices, did you formulate an opinion about
 4    who had been using each of these three devices?
 5    A.    In computer forensics, like you mentioned earlier, we
 6    can't sit next to the person on the phone or the device.  It
 7    is just impossible.  We have to just look at the facts
 8    presented to us and come to a conclusion on what level of
 9    certainty we believe there is multiple users, and this
10    computer did not appear in my opinion to be used by another
11    user.  It was password protected.  That is a reason why a
12    lot of people that password protect generally want to keep
13    it private.
14         The accounts that we viewed stored in Chrome indicate a
15    very personal nature, ones that wouldn't generally even be
16    shared with girlfriends or maybe even spouses.  So in my
17    opinion I think that that is a pretty high degree of
18    probability that it was just the defendant using the
19    devices.
20    Q.    When you completed your analysis of these three
21    devices, what did you do with the digital content that you
22    had taken from them?
23    A.    I processed it and put it in a format that other agents
24    can examine and use their expertise on this case and do a
25    deeper dive into the data.
```

1    Q.   Did you forensically prepare or analyze any other

2    devices in this case?

3    A.   I did.

4    Q.   Did you forensically prepare the digital contents on

5    the computer turned over by Luke Paz?

6    A.   I processed it after an image was provided to me.

7    Q.   What did you do after you had processed it?

8    A.   I gave the data to the case agent for further analysis

9    and inspection, because at the time I didn't have time to

10   actually examine the evidence, so I only processed it and

11   gave it to him for examination.

12   Q.   I want to turn now to something that you referenced

13   earlier, the cryptocurrency wallets.  Were you involved in

14   the seizure of cryptocurrency of Mr. Shamo?

15   A.   I was.

16   Q.   When did you perform the seizure or assist in the

17   seizure of Mr. Shamo's cryptocurrency?

18   A.   It happened on a couple of dates.  The first one would

19   have been September 12th of 2017 and then September 13th of

20   2017.  The second one would have been October 11th of 2017.

21   Q.   What did you seize on the dates of September 12th and

22   13th of 2017?

23   A.   I seized 413.47 Bitcoins, and then the derivative

24   cryptocurrency of those Bitcoin called Bitcoin Cash and I

25   seized 413.80 of them.

```
1    Q.   Talk to me about how this cryptocurrency was
2    discovered.
3    A.   We discovered the majority of it via the Chrome
4    passwords list where we have private keys and logins that we
5    were able to identify amounts and we subsequently put in for
6    a seizure warrant and seized the Bitcoin.
7    Q.   Did you find any information relevant to these
8    cryptocurrency wallets on Mr. Shamo's devices?
9    A.   All of the information that we used to gain access to
10   all of the cryptocurrency accounts were found on those three
11   devices.
12   Q.   Prior to seizing Mr. Shamo's cryptocurrency, had you
13   ever performed this type of seizure before?
14   A.   Never.  It was kind of a new thing.  Everybody was
15   familiar with kind of what it was, but seizing an asset such
16   as cryptocurrency was very new at this time.  It was right
17   before it got really popular and mainstream.
18   Q.   So walk me through how you went about seizing the
19   cryptocurrency.  In doing so, I'm going to ask that we pull
20   up Government's Exhibit 16.00.  That should be 11 screen
21   shots and photos.
22        Did you use the same or similar process in September of
23   2017 that you used in October of 2017?
24   A.   There were a few changes.  Early on we played around
25   with a couple of different software wallets to see which one
```

1  would give us the best results where we can sweep the
2  private keys and move them to a different account, because
3  at that point we still had to obtain the Bitcoin Cash.  Even
4  though we get the Bitcoin, if we didn't do the seizure
5  correctly we would lose the Bitcoin Cash.  So we played
6  around with a couple of software tools and eventually
7  decided Electrum was the best wallet for us to conduct the
8  seizure from.
9  Q.   Walk me through then the process that you ultimately
10 relied on to seize the Bitcoin and the Bitcoin Cash, which I
11 understand to be different.
12 A.   So because we don't know the integrity of the software,
13 Electrum, and I don't know who wrote it and I don't know who
14 is behind it, we went through and we tried to just look and
15 see what kind of data was out there for us to play around
16 with.  It gave us the ability when we import the private
17 keys that we can actually pull down -- we can actually sweep
18 the keys when we are all done from Electrum, and then we can
19 import those into a different application called Electron
20 Cash.
21      Again, we don't know who developed it, but we knew that
22 it gave us the ability to pull the Bitcoin Cash if we had
23 the private keys.  At that point the only way that you can
24 get the derivative cryptocurrency was having it in the
25 wallet that supported it at the date of the hard fork.  We

1  had to jump through a bunch of extra steps to be able to

2  backtrack and get that.

3      Then when that was done, we moved the Bitcoin to a

4  government controlled hardware wallet that you see on the

5  screen.  It is called a Trezor wallet.  We moved the Bitcoin

6  to one of those hardware wallets.  It is like a U.S.B.

7  stick, something that you can plug in and move it there and

8  remove it.  We moved the Bitcoin Cash to another one to keep

9  them separated.

10 Q.  Let me unpack some of what you explained just a little

11 bit.  The jury has heard previously testimony about the use

12 of public and private keys in relation to Bitcoin and

13 cryptocurrency.  In seizing Mr. Shamo's cryptocurrency, did

14 you use public and private keys that you were able to locate

15 on his devices?

16 A.  We did.

17 Q.  You used those keys and imported them into a government

18 wallet in order to transfer the cryptocurrency?

19 A.  We actually used his private keys to import them into a

20 third-party software based wallet to give us access.

21     To kind of put it in layman's terms, this is the way I

22 would say it.  A public key is like your A.T.M. card.

23 Everybody can see the numbers on your A.T.M. card.  The

24 private key is what gives you access to those funds.  That

25 is your P.I.N. number.  So you need to have the P.I.N.

1    number to gain access.

2        When we put it into third-party software we were able

3    to gain access, so now we can pull the funds out and move

4    them to a different -- we have to transfer them to a

5    different wallet.  That is done electronically.  That is how

6    we use the private keys.  We put them into Electrum and then

7    move the money to the Trezor.

8    Q.   Just to clarify one other point, you mentioned that you

9    seized Bitcoin and Bitcoin Cash.  Is that as a result of the

10   Bitcoin Mr. Shamo had being subject to a hard fork that

11   created Bitcoin Cash?

12   A.   Yes.  It had a hard fork about a month or two prior to

13   us actually seizing the Bitcoin, and it had a hard fork

14   which in turn created another alternative cryptocurrency

15   called Bitcoin Cash.

16   Q.   Let's go through the exhibit here, 16.00.  On the right

17   side of the screen it looks like we have a web browser, and

18   you started speaking to this, but if we zoom in, just into

19   the browser itself and tell me what we see here on this

20   screen.

21       That is probably good right there.

22   A.   Well, it tells me that this is the Bitcoin Trezor.

23   Again, when I say a hardware wallet, it is actually a

24   physical thing, like it feels almost like a U.S.B. stick and

25   you plug it in there and you can unplug it.  We call that a

1    hardware wallet.  That is what a Trezor is.

2        It shows me that this is the one that contains Bitcoin.

3    It tells me what Bitcoin is in there and it tells me right

4    now I have got 413.47 Bitcoin in there.  That number to the

5    side is giving you what the value of those Bitcoins are on

6    that date that the screen shot was taken.  This was previous

7    to me seizing the additional other 99 Bitcoins.

8            MR. BURGGRAAF:  Zoom back out and zoom in on the

9    other side of the screen.

10   BY MR. BURGGRAAF

11   Q.   It looks like we have three windows open.  Tell me what

12   we have here.

13   A.   Okay.  I will start from the bottom.  It is labeled as

14   the Tonge MultiBit wallet.  That is just the type of wallet

15   that it was created in.  When you look on the date side of

16   that, you see these are transactions that have happened.  I

17   am not seeing any input of funds in this one.  I'm only

18   seeing funds being removed from this.  At the end you can

19   see that the balance is .57 Bitcoin.

20       We'll jump up to the middle one and that is the Shamo

21   MultiBit wallet.  Again, MultiBit is the program that this

22   wallet was created in originally.  We're looking at

23   transactions on this one and it shows just a little bit of

24   activity moving in and out of this wallet.  Although we are

25   carrying a pretty significant balance of 82 Bitcoin, and

1      that was significant on that date because of the value, but

2      we are not seeing large transactions in and out.

3          Then we move up to the Shamo Bread Wallet.  The Bread

4      Wallet is generally one that is used on a mobile device.  We

5      see more significant transactions going in and out of this

6      wallet.  If you look down at the transaction dates -- I

7      didn't capture all of it on this screen shot, but we're

8      looking at October 28th, 2016 to November 17th of 2016, so

9      in less than a month we're seeing a lot of transactions

10     going in and out.  Not as much leaving, but 286 Bitcoin

11     coming in on the 6th, and that is a significant amount of

12     money.  On the date of seizure that was a very significant

13     amount of money.

14         Then we see 90 leaving the wallet.  So, again, a

15     significant amount of Bitcoin.  We see another 209 leaving.

16     We see five and then we see 417 coming in.  We see 279

17     leaving and 163 leaving.  He added 16 giving him a positive

18     of 17 that was ultimately seized.  The amount of money

19     moving through that in Bitcoin is hard to comprehend unless

20     you know the values.  To us that was a significant amount.

21     Q.   Let's move to photo two of this exhibit.  What are we

22     looking at here?

23     A.   This is where I was taking the .57 from the Tonge

24     wallet and I was moving it to the government wallet.  Every

25     transaction requires a mining fee.  The bad part about

1    Bitcoin is it is kind of slow to move it, when you're moving
2    lots of money and it is not your money and it is kind of
3    nerve-racking.  You can see the fee is a sliding scale where
4    you can decide how much you're going to give the miners and
5    that determines how fast they will process it.
6        We found out that the optimal way is to move up the fee
7    a little bit and we won't wait a day for the transaction to
8    happen.  It will happen within an hour or so.  That is the
9    mining fee that you see on the bottom that is paid to the
10   miners to validate the transaction.
11   Q.   There is a pay to field.  Is that the government's
12   public key where the money is being transferred?
13   A.   No.  It is not the public key.  It is an address that
14   we created in the wallet to send money to.  In fact, I used
15   the same address many times.  They generally tell you not
16   to.  They like you, if you're making transactions, to create
17   new ones so it does not get compromised, but that is not the
18   public key.  That is an address that you can send money to.
19   Q.   Let's move to photo three.  What are we looking at
20   here?
21   A.   The same thing.  It is a different wallet and a
22   different amount.  We're moving 17.13 Bitcoin and that is
23   our mining fee that we are paying to move the money.
24   Q.   Let's go to the next photo.  What are we looking at
25   here?

```
1    A.   We're looking at, again, although the address has
2    changed, it is going to the same wallet, the government
3    controlled Trezor account, it is just that I selected and
4    said issue me a new address to send the money to.  I paste
5    that in there.  This is coming from this MultiBit wallet.
6    81.96, so almost a full 82 Bitcoins.  The mining fee -- as
7    you can see, it is more significant.  As we start moving
8    larger amounts, the numbers come much closer to the decimal.
9    The thing is, about Bitcoin, is we don't get to choose the
10   miners.  The system decides and we pay the fee.
11   Q.   Let's go to the next photo.  Tell me what we're looking
12   at here on this screen shot.
13   A.   You're looking at a Trezor account with two accounts on
14   it.  It has one Legacy account and one regular account.
15   Each one has got Bitcoin in them.  One of them has 99.677
16   Bitcoin.  One has 413.47 Bitcoin.  The numbers off to the
17   side are what the value is or what the rate is.  Actually
18   you can see the rate right there telling you what the rate
19   of one Bitoin is of 4,861.33.  That is what it is showing
20   for that account.  Then they take that rate and that is how
21   they get those numbers off to the side of the Bitcoin.
22   Q.   So this would have been the value, as we're looking at
23   the Legacy account one, the 484,000 value, that would have
24   been the value of 99 Bitcoin on the date of seizure; is that
25   correct?
```

```
 1    A.    That is correct.

 2    Q.    The B.T.C --

 3    A.    It is just an abbreviation for Bitcoin.

 4    Q.    Okay.  Let's move to the next screen.

 5          Unlike the other screens we looked at before, this

 6    looks more like a photo of the screen.  What are we looking

 7    at here?

 8    A.    That is a picture of the other Trezor account.  Like I

 9    informed you earlier, we had two of them.  We didn't want to

10    commingle the Bitcoin with the Bitcoin Cash, so we moved the

11    Bitcoin Cash, which the abbreviation for that is B.C.H. and

12    Bitcoin is B.T.C.  The Bitcoin was residing on one hardware

13    wallet and the Bitcoin Cash we put on the other one.  The

14    numbers are pretty close to being the same, because the

15    exact amount of Bitcoin you get is the amount of Bitcoin

16    Cash that you get, so that is why they look very similar,

17    although the fees are much lower to move the Bitcoin cash,

18    so you may see not a perfect, identical number beyond the

19    decimal point, but that is why the numbers look exactly the

20    same.

21    Q.    Now, it looks like there is a section there that says

22    transactions and then says unconfirmed.  Can you explain

23    what we're looking at there?

24    A.    Yes.  Those were the most recent transactions at the

25    time of me taking that picture, where it just shows that
```

1      they were not confirmed at that point.  Like I said earlier,

2      cryptocurrency is great in the fact that it can move but it

3      is slow to get these transactions confirmed and we

4      experienced that.  You have to just keep refreshing it until

5      it becomes a confirmed transaction.

6  Q.    Let's go to the next photo in Exhibit 16.00.

7          What are we looking at here?

8  A.    You're looking at the B.C.H. account.  That is the

9  Bitcoin.  That is the Bitcoin and -- I'm sorry.

10         The B.C.H. is now disconnected and we are now looking

11  at the Bitcoin account.  Although it says B.C.H. up there,

12  that is just showing that it was a disconnected device.  If

13  we jump down, you'll see the Shamo Trezor, which is the

14  Bitcoin Trezor and it is connected showing us both the

15  Bitcoin and the Legacy and the regular account coming to a

16  total of 513 or so Bitcoin.

17  Q.    Like a prior photo or exhibit it looks like there is a

18  transaction section and then a date of September 13, 2017.

19         What is that showing us there?

20  A.    Those are just showing the amount of Bitcoin that we

21  moved to the Trezor account from the Electrum software

22  wallet that we transferred from earlier.  Those are just

23  showing transactions.  You can copy transactions and paste

24  them and find specifics as to those transactions.  It is in

25  an open ledger that you can find all of this information.

1    Q.   Let's look at the next photo, photo eight.

2    A.   I'm sorry.  I misspoke as to that transaction I.D.

3    There are transaction I.D.s and that is not showing a

4    transaction I.D.  That is actually showing the address I had

5    it sent to.

6    Q.   Okay.  Let's make sure we are clear then.  Is this

7    photo taken on September 13th or some date after?

8    A.   I don't know which date that is taken.  I don't have

9    the data for that.

10   Q.   But it shows what transactions may have taken place or

11   what did take place as far as transferring the Bitcoin on

12   September 13th?

13   A.   Yes.  It just shows the activity.  What I'm seeing at

14   the top is from September 12th, 2017 to September 13th,

15   2017.  As I pointed out before, I stated that in error that

16   that was a transaction I.D.  That is actually the address I

17   sent those funds to.

18   Q.   Okay.  Is the address you sent those funds to a

19   government wallet?

20   A.   It is.

21   Q.   Let's move on to the next -- this looks very similar to

22   the very first screen shot we looked at.  What is the

23   difference here?  Maybe if we zoom in on the browser that

24   might help.

25   A.   Okay.  Like I talked about before, now we're back to

1    Bitcoin Cash.  Again, that was the derivative cryptocurrency

2    that you received when Bitcoin forked in 2017.  So this

3    B.C.H. is all Bitcoin -- Bitcoin Cash.  Right now you are

4    not seeing any amount in that government controlled wallet.

5    We have not moved any at that point.

6           MR. BURGGRAAF:  Let's zoom out and look at the

7    other side of this screen shot.

8    BY MR. BURGGRAAF

9    Q.   What are we looking at here?

10   A.   A different application.  If you look at the top left

11   hand you'll see it is no longer called an Electrum Bitcion

12   wallet.  It is called Electron Cash.  Although they look

13   similar, they are actually different developers.  We had a

14   lot of hesitation in putting our private keys out there to

15   try and seize the money, but back in the day when we did

16   this, it was kind of a new thing.

17          We are looking at transactions that have gone in and

18   gone out.  Those are just going to show Bitcoin

19   transactions, because up until this point, there is no

20   Bitcoin Cash transactions.  This only sees Bitcoin.  It says

21   that whoever owned these private keys owned that Bitcoin on

22   the date of the fork.  That is what this ledger now shows to

23   you.

24   Q.   Let's move to the next photo.

25          What are we looking at here?

1    A.    So when Bitcoin Cash came out, there were two

2    abbreviations for it.  They may still use two.  B.C.H. is

3    the most common but apparently this app uses B.C.C., Bitcoin

4    Cash.  Don't get confused.  They are both the same thing,

5    B.C.H. and B.C.C.

6        That is saying that I'm sending .57 Bitcoin Cash at

7    that mining fee to an address I have provided up top.

8    Q.    Let's move to the next screen.  Is this similar that it

9    is additional Bitcoin Cash connected to the Shamo Bread

10   Wallet that is being transferred?

11   A.    Yes.

12   Q.    Let's go to the next screen.

13       Is this showing us again that additional Bitcoin Cash

14   is being transferred with a description of the Shamo

15   MultiBit wallet?

16   A.    It is.  It is showing it is getting sent to our address

17   and it is saying that that is the amount of Bitcoin Cash

18   that we're sending and that is what the current U.S. dollar

19   value is to that.

20   Q.    Let's go to the last screen shot.  We should have one

21   more.

22       My mistake.  Some people know better than I do how many

23   photos we have.

24       The total Bitcoin seized in September and October was

25   approximately 513 Bitcoins, right?

```
 1    A.    Yes.

 2    Q.    Is the equivalent amount the Bitcoin Cash, the units of

 3    Bitcoin Cash that was also seized at that time?

 4    A.    Yes.  The Bitcoin Cash, yes, was also seized.

 5    Q.    Do you know the total approximate value of the 513

 6    Bitcoins and the equivalent of Bitcoin Cash, the value in

 7    dollars at the time of seizure?

 8    A.    If I am going off of the values on September 12th and

 9    September 13th, the value of Bitcoin on that day was

10    $1,605,090.  The Bitcoin Cash was $208,141.  The seizure

11    that happened on October 11th, the Bitcoin value on that day

12    of the total amount that was seized was 472,535.  The

13    Bitcoin cash value as of the date of October 11th was -- the

14    full amount that we seized was $31,120.  With those two

15    together it is just a little bit shy of 2.5 million.

16    Q.    When you were making that calculation of value, were

17    you basing that on the low value for those particular days

18    that you referenced?

19    A.    I used the low values on all of the numbers to

20    calculate it.

21    Q.    Okay.

22          MR. BURGGRAAF:  Just one moment, Your Honor.

23    BY MR. BURGGRAAF

24    Q.    You testified that you were able to acquire the

25    cryptocurrency wallet information through Mr. Shamo's
```

```
 1    computer.
 2         Is that correct?
 3    A.   His computers and phones.
 4    Q.   And phones.  Anyone who had access to his computers,
 5    his login information and, therefore, access to his computer
 6    and login information to his phones would have access to the
 7    Bitcoin and Bitcoin Cash.
 8         Is that right?
 9    A.   Yes.
10    Q.   So that is a lot of cryptocurrency that would be
11    accessible to an individual.  In your experience
12    investigating drug trafficking organizations, is it common
13    for a person with large sums of money to give open access to
14    the money to other members of the organization?
15    A.   That would be kind of unheard of for somebody to give
16    login information when they know they have potentially
17    millions of dollars worth of cryptocurrency and access to
18    trading sites and other things.  Generally that information
19    would not be shared.
20    Q.   Thank you.
21         MR. BURGGRAAF:  That's all of the questions that I
22    have.
23         THE COURT:  How long do you think your cross will
24    be?
25         MR. SKORDAS:  Probably 20 to 30 minutes, Your
```

1   Honor.

2          THE COURT:  We better take it up in the morning.

3   I have a 2:30 hearing starting and the jury has been here a

4   while.

5          Ladies and gentlemen of the jury, thank you again

6   for your work and don't communicate with anyone about the

7   case.  We'll see you at 8:30 in the morning.

8          (WHEREUPON, the jury leaves the proceedings.)

9          THE COURT:  Have you thought about what exhibits

10  are actually to go in with the jury when they deliberate?

11         MR. GADD:  We have all agreed no Fentanyl will go

12  back.

13         THE COURT:  That is probably a good idea.

14         MR. GADD:  Other than that I think our plan is

15  we're going to have all of our electronic exhibits on a

16  thumb drive that they can go through.  I'm happy to talk

17  through physical exhibits.  Most of it is pretty mobile.

18         THE COURT:  All right.  We'll be in recess.

19         Did you have something you wanted to say?

20         MR. SKORDAS:  That sounds fine.  Thank you.

21         THE COURT:  We'll be in recess on this matter

22  until 8:30 tomorrow morning.

23         MR. SKORDAS:  Thank you, Judge.

24         THE COURT:  Don't wait for me.  I have other

25  people coming in.



1 (Proceedings concluded.)

1            IN THE UNITED STATES DISTRICT COURT

2                   DISTRICT OF UTAH

3                   CENTRAL DIVISION

4

5   UNITED STATES OF AMERICA,     )

6            Plaintiff,           )

7   vs.                           )   Case No. 2:16-CR-631DAK

8   AARON MICHAEL SHAMO,          )

9            Defendant.           )

10  _____)

11

12

13        BEFORE THE HONORABLE DALE A. KIMBALL

14      ------------------------------------

15                 August 26, 2019

16

17                   Jury Trial

18

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2

 3    For Plaintiff:           S. MICHAEL GADD
                               348 East South Temple
 4    `                         Salt Lake City, Utah

 5                             VERNON G. STEJSKAL
                               111 South Main Street
 6                             Suite 1800
                               Salt Lake City, Utah
 7
                               KENT A. BURGGRAAF
 8                             348 East South Temple
                               Salt Lake City, Utah
 9

10    For Defendant:           GREGORY G. SKORDAS
                               KATYLIN V. BECKETT
11                             560 South 300 East
                               Suite 225
12                             Salt Lake City, Utah

13                             DARYL P. SAM
                               5955 South Redwood Road
14                             Suite 102
                               Salt Lake City, Utah

15

16

17

18

19

20

21
      Court Reporter:          Ed Young
22                             351 South West Temple
                               Room 3.302
23                             Salt Lake City, Utah 84101-2180
                               801-328-3202
24                             ed_young@utd.uscourts.gov

25
```

```
1

2                        I N D E X

3

     Witness                 Examination                  Page
4    -------                 -----------                  ----

5    Daniel Ashment          Mr. Gadd (Direct)               4
     Daniel Ashment          Mr. Skordas (Cross)            56
6    Daniel Ashment          Mr. Gadd (Redirect)           103

7

8

9

10

11

12

13

14

15

16   Exhibit                                           Received
     -------                                           --------

17

18

19

20

21

22

23

24

25
```

```
 1    August 26, 2019                                 8:30 a.m.

 2                         P R O C E E D I N G S

 3

 4              THE COURT:  Good morning.

 5              Are you ready to proceed?

 6              MR. SKORDAS:  Yes, Your Honor.

 7              THE COURT:  You may resume the stand.

 8              (WHEREUPON, the jury enters the proceedings.)

 9              THE COURT:  Welcome back, ladies and gentlemen of

10    the jury.  We appreciate your promptness and your work.  Let

11    me remind you that you're not to talk with anyone about the

12    case or permit anyone to speak to you about it.  We'll

13    proceed.

14              You may proceed, Mr. Gadd.

15              MR. GADD:  Thank you, sir.

16                         DANIEL ASHMENT

17          Having been previously sworn, was examined

18                   and testified as follows:

19                   DIRECT EXAMINATION (Cont.)

20    BY MR. GADD

21    Q.   Good morning.

22    A.   Good morning.

23    Q.   When we left off on Friday we were talking about the

24    individuals on the chart to your left, correct?

25    A.   Correct.
```

1    Q.   I am going to change gears now and talk about some

2    topics and ask you questions about what you found as you

3    looked through the defendant's devices.

4         Could we first start with drug income?  You worked with

5    Special Agent Slagle in this case, right?

6    A.   Yes.

7    Q.   You heard the evidence about seizing Bitcoin from

8    wallets found and accessed on the defendant's devices?

9    A.   I did, yes.

10   Q.   Did you find additional evidence of Mr. Shamo's income

11   from selling drugs as you looked through his electronic

12   devices?

13   A.   Yes.  There were numerous instances of income from

14   distributing and selling drugs, yes.

15   Q.   Let's look through a few of those exhibits.

16            MR. GADD:  Could we start with Exhibit 14.22?

17            THE COURT:  14?

18            MR. GADD:  Yes.  14.22.

19            (WHEREUPON, Exhibit 14.22 was played.)

20   BY MR. GADD

21   Q.   Should we try that one more time?

22   A.   It was not working on this monitor.  It is up there

23   now.

24            MR. GADD:  Could you folks see?

25            Let's try that one more time.

```
 1                  (WHEREUPON, Exhibit 14.22 was played.)

 2     BY MR. GADD

 3     Q.   How many money counters were found at the defendant's

 4     residence during the search?

 5     A.   We found two money counters during the search of his

 6     residence.

 7     Q.   Let's look at Exhibit 14.34.

 8          Do you recognize this?

 9     A.   I do, yes.

10     Q.   Was this found on his iMac computer?

11     A.   It was.

12     Q.   What are we looking at there?

13     A.   It is a price structure for different types of pills.

14     At the top you see the M box and then a quantity would be

15     times ten and then you see a pricing structure.  It would be

16     $110.  And then on the bottom row you would see the Roxy and

17     the pricing structure for that.  So as you go down this list

18     you'll see 100 -- X-100, so 100 pills would be $850.  Then

19     250 would be $2,400.  So as they would sell larger

20     quantities of the pills -- you get down to 10,000 in the M

21     box, which would be as little as $40,000 or $4 per pill.

22          Also, the same with the Roxy pills, starting out at 100

23     would be $859, and then down to 10,000 pills would be

24     $40,000 or $4 per pill.

25     Q.   Let's talk for a minute about an e-mail with his
```

```
 1    landlord.
 2              MR. GADD:  Could we look at 21.18?  Go to page 2.
 3    BY MR. GADD
 4    Q.   Do you recognize this?
 5    A.   I do, yes.
 6    Q.   This has come up previously in testimony, correct?
 7    A.   Correct.
 8    Q.   This is an e-mail from the defendant to his potential
 9    landlord, Mr. Lapin?
10    A.   It is.
11    Q.   In there he indicates that he has a wallet, correct?
12    A.   Yes.
13    Q.   Read the line where he says, hey, here is --
14    A.   Hey, here is our incoming Bitcoin wallet.  Any profits
15    made come here first and then distrusted to investors, my
16    two employees and myself.
17    Q.   What is the date that he sent that?
18    A.   November -- Friday, November the 13th of 2015.
19    Q.   Then there is a link that's shown in blue.  Is the last
20    part of that link that starts 1 H.M.O., is that his wallet
21    address?
22    A.   That is his wallet address, yes.
23    Q.   This was his main wallet, correct?
24    A.   Yes, it was.
25    Q.   Down below that link he writes it should come up.  Will
```

1    you read that?

2    A.    It should come up as U.S.D., U.S. dollars, but if not,

3    then it will say -- then it has the total received below

4    that.

5    Q.    What is the total there?

6    A.    1,443 Bitcoins plus some decimals.

7    Q.    You have looked at this wallet --

8    A.    I have.

9    Q.    -- a lot?

10   A.    A lot, yes.

11   Q.    So 1,443 Bitcoin as of November 13th, 2015?

12   A.    Yes.

13   Q.    Once Mr. Shamo was arrested no more Bitcoin went into

14   his main wallet, did it?

15   A.    No, they did not.

16   Q.    And he was arrested a year and -- so 53 weeks after

17   this, correct?

18   A.    Yes, he was.

19   Q.    Once he was arrested you were still able to see the

20   total amount of Bitcoin that had gone into his main wallet,

21   correct?

22   A.    That is correct, we were.

23   Q.    So 53 weeks after he sent this, was the total received

24   in that wallet approximately 4,459 Bitcoin?

25   A.    Yes.  That is my memory.  Over 3,000 additional

```
1    Bitcoins had come into the wallet.

2    Q.   In a one-year period?

3    A.   In a one-year period, yes.

4    Q.   Let's talk for a minute about gift cards.  Did you find

5    evidence that Mr. Shamo was using Bitcoin to buy gift cards

6    as a way to disguise his drug income?

7    A.   Yes.  We found evidence of gift cards all over the

8    place.  There were numerous gift cards on the computer.

9    Q.   We won't look at all of them, but let's look at just

10   one or two of the exhibits.  Let's look at Exhibit 21.12.

11   Then go to page 2.

12        Is this an example of a gift card?

13   A.   This is an example of one of the gift cards we found,

14   yeah.

15   Q.   If we could look -- how many of these do we do?  Do

16   pages 5, 8 and 11.

17        Another gift card?

18   A.   This is another gift card, yes.

19   Q.   Another?

20   A.   Another Amazon gift card for $500.

21   Q.   This keeps going and going, right?

22   A.   Yeah.  Numerous different types of gift cards

23   throughout, yes.

24   Q.   Let's do one more.

25             MR. GADD:  Could we look at Exhibit 21.13?  Then
```

```
1   if we could look at maybe page 2.  Thank you.

2   BY MR. GADD

3   Q.   Do you see that name at the top there?

4   A.   Yes.

5   Q.   Gyft with a y?

6   A.   Yes.

7   Q.   What is Gyft?

8   A.   It is a website you can go to to purchase different

9   types of gift cards.

10  Q.   If we could look at just a handful of these.  This is

11  page 2.  Could we look at page 6?  Page 10.

12  A.   Another Amazon gift card and an additional Amazon gift

13  cart.

14  Q.   Page 14.

15  A.   This is a BestBuy gift card for $500.

16  Q.   Did you see evidence of Mr. Shamo using gift cards in

17  his role as leader of the organization?

18  A.   Yes.  We saw evidence and also testimony from

19  individuals involved in the organization that they were paid

20  with gift cards that Mr. Shamo had purchased.

21  Q.   Can Bitcoin be traded directly for gift cards?

22  A.   Yes, it can.

23  Q.   Let's talk for just a minute about the silver bars.

24  Did you find evidence that the defendant was making

25  investments in hard currency?
```

```
 1    A.    Yes.

 2    Q.    Let's look at just one or two of those.  How about

 3    Exhibit 21.19, page 2.

 4          What is this we're looking at?

 5    A.    So this is a receipt from J.M. Bullion for one kilo

 6    silver bar.  The total for the bar was $680 plus shipping

 7    and handling.

 8    Q.    And then if we could look at Exhibit 21.41.

 9          This is the metadata, correct?

10    A.    Correct.

11    Q.    And then page 3 here --

12    A.    This is a receipt for an additional silver bar.  You

13    can see that the payment method used on that receipt was a

14    Bitcoin payment.  The total was $684.14 shipped to Mr. Shamo

15    at 7939 South Titian Street.

16    Q.    We jumped through the e-mails kind of fast.  It

17    probably makes sense to explain this.

18          MR. GADD:  Could we look at page 1 real fast?

19    BY MR. GADD

20    Q.    I said this is the metadata.  What does that mean?

21    A.    So the metadata is information that -- when our

22    computer forensic agents, when they create an image for a

23    file they give it to the case agents in that file and the

24    metadata is basically data about data.  So this is data

25    about the image that we found on that computer and it has
```

```
 1   several different things in it.  I am not the expert on
 2   that, but it has several different factors showing where
 3   this came from on the image that we have been given.
 4   Q.   And it would be like things you might expect in the
 5   header of an e-mail, right?
 6   A.   Correct.  Yes.
 7   Q.   The to and from and the date and the subject line?
 8   A.   Yes.
 9   Q.   That is all here?
10   A.   Yes.
11   Q.   And we get it in this format because of the software
12   system that is used to search?
13   A.   That is correct.
14   Q.   All of the e-mail exhibits have this, correct?
15   A.   Yes.
16   Q.   We are just skipping over it?
17   A.   Yes.
18   Q.   To be clear, all these e-mails came from the
19   defendant's e-mail account?
20   A.   Yes, they did.
21   Q.   Let's talk for a minute about his boat and his truck.
22   Did you find evidence that the defendant used drug proceeds
23   to purchase his truck?
24   A.   We did, yes.
25   Q.   Likewise, did you find evidence that the defendant used
```

1    drug proceeds to purchase his part of his boat?

2    A.   Yes, we did.

3    Q.   Let's look at those exhibits.  If we could start with

4    14.25.

5         Like on Friday, are the blue text bubbles, is that the

6    defendant?

7    A.   The blue would be the defendant, Mr. Shamo, yes.

8    Q.   And then if we could read those, and maybe we'll do

9    half and then half.

10        Could you read those?

11   A.   Yes.  Mr. Shamo says boats and ho's, within a moji.

12   Then the reply, yes, indeed.  I am pumped for the boat.  Mr.

13   Shamo says same here.  I did some damage to my wallet while

14   in Vegas, but I should be ready for it in a few days.

15        Okay.  Cool.  We just need to figure it out before

16   Friday or we'll lose that deposit.  Mr. Shamo replies, yeah,

17   I have the Bitcoins, it is just pulling it to cash is the

18   issue.  I might use Mile's 18K, and then I get 10K tomorrow

19   from a trade, so that alone should be okay.  I have it, but

20   need it in cash.  It's complicated, L.O.L.

21            MR. GADD:  Could we look at 14.23?

22   BY MR. GADD

23   Q.   It is upside down, but does that appear to be the boat?

24   A.   Yes, it does.

25   Q.   That is sent from the person with whom he is

1    communicating.  We ought to point out who that is.  Jump

2    away from this for a second.

3                MR. GADD:  Can we pull up 17.06?

4    BY MR. GADD

5    Q.    These text messages about the boat that we have been

6    reading, are they with Mr. Roy Stephens?

7    A.    Yes.  They are with Mr. Roy Stephens who is directly

8    underneath Paz on the bottom row there.

9    Q.    Were you able to determine what his role was in Mr.

10   Shamo's organization?

11   A.    Yes.  Mr. Stephens was recruited by Mr. Shamo and paid

12   by Mr. Shamo to be a package receiver for the drug

13   trafficking organization.

14   Q.    He was interviewed as well?

15   A.    He was.

16   Q.    In addition to receiving packages, was he also a friend

17   of Mr. Shamo?

18   A.    Yes, they were friends also.

19   Q.    They went in on this boat together?

20   A.    Went in on a boat and --

21               MR. GADD:  Let's pick up the last boat message.

22   Could we look at Exhibit 14.24?

23   BY MR. GADD

24   Q.    Then if you want to read that to us --

25   A.    Okay.  Mr. Stephens says it is going to be so fun.

```
 1    Want to come out at about 5:00?  Mr. Shamo replies I don't
 2    know if I will be able to make it out tonight, but I
 3    definitely want to see the boat soon, maybe in the next few
 4    days.  Mr. Stephens replies, okay, sounds good.  Mr. Shamo
 5    says, what is our boat, a 2015 Moomba?  Mr. Stephens
 6    replies, yup, Moomba Mojo.
 7    Q.   Let's talk for a minute about his truck.
 8             MR. GADD:  Could we look at Exhibit 14.26?
 9    BY MR. GADD
10    Q.   And then if you could read that top half and then the
11    bottom half to us.
12    A.   Mr. Stephens says that is what Miles sent me for the
13    truck.  Tell Shamo I need a check -- sorry.  It looks like
14    this one, the second one got sent before the first one.  It
15    should start out with the second text there.  Mr. Stephens
16    says tell Shamo I need a check for $25,582.  Then Mr.
17    Stephens says that is what Miles sent me for the truck.
18    Q.   Can I jump in?
19    A.   Go ahead.
20    Q.   Do you see this sometimes when someone forwards a text
21    from another person?
22    A.   Oftentimes you see it where when one shows up before
23    the other, yes.
24    Q.   And they are within three seconds?
25    A.   Yes.
```

1    Q.   Pick up with Mr. Shamo's response.

2    A.   Yes.  Then Mr. Shamo says, wait.  How much is the

3    truck?  I thought it was 32K.  Mr. Stephens replies, 40,

4    meaning 40,000.  Mr. Shamo says, okay.  I'll need two more

5    days to pull out more Bitcoin.  Mr. Stephens replies, okay,

6    no problem.

7    Q.   Let's talk for a minute about gambling.  There has been

8    some testimony that the defendant liked to gamble.  Did you

9    see evidence of that in his e-mails?

10   A.   Yes.  There were several e-mails indicative of gambling

11   in his e-mails.

12        MR. GADD:  Let's look at Exhibit 21.43.  If we

13   could look at page 2.

14   BY MR. GADD

15   Q.   What is this?

16   A.   This is an e-mail to Mr. Shamo from the website

17   wintrillions.com.  Wintrillions.com is a gambling website

18   that you can go to.  Something that I noted in this e-mail

19   is his login was airshamu4@hotmail.com, which is his e-mail

20   address.  And also the password, mollydog3 which, as Agent

21   Slagle indicated, was a common password that Mr. Shamo used.

22   Q.   He seemed to like variations on that one theme,

23   correct?

24   A.   Correct.

25   Q.   Some sort of molly dog and then a three and some other

```
1    numbers and sometimes an exclamation point?

2    A.   Several instances of that, yes.

3    Q.   Let's look at one more of these gambling e-mails.

4         MR. GADD:  Let's look at Exhibit 21.03.

5    BY MR. GADD

6    Q.   What is this?

7    A.   This is an e-mail to Mr. Shamo also regarding cloudbet.

8    Cloudbet is a website that you can go to to gamble

9    cryptocurrency and Bitcoin specifically.

10   Q.   Read just the top box to us.

11   A.   Sure.  Hi, airshamu4@hotmail.com.  Welcome.  And we

12   would personally like to thank you for choosing to open an

13   account with cloudbet.  At cloudbet we offer an array of

14   sporting events, live casino and online casino games

15   totaling to more than 200, making for a more exciting and

16   thrilling experience for our passionate Bitcoin players.

17   Q.   On this broader subject of drug income, let's talk for

18   just a minute about Mr. Shamo's clothing and other household

19   expenses.

20        Did you see the exhibit and hear testimony that the

21   defendant has had no legitimate income since the first

22   quarter of 2015?

23   A.   Yes, I did.

24   Q.   Did you find evidence in his e-mails of spending that

25   showed substantial disposable income?
```

```
 1    A.   Yes.

 2    Q.   Let's look at a few.

 3              MR. GADD:  Could we look at Exhibit 21.06?  Then

 4    if we could go to page 2.

 5    BY MR. GADD

 6    Q.   What is this?

 7    A.   This is a receipt to Mr. Shamo, and if you look it says

 8    Dear Mr. Shamo, your order has been acknowledged.  Then at

 9    the bottom it is for Diesel Buster, a pair of jeans that

10    were $278 jeans.

11    Q.   Do you own any jeans that cost 300?

12    A.   No, I do not.

13              MR. GADD:  Let's look at Exhibit 21.20.  Page 2.

14    BY MR. GADD

15    Q.   What is this?

16    A.   This is a communication from Molly Maid for cleaning

17    services at his residence.

18              MR. GADD:  Let's look at Exhibit 21.30.  I think

19    we might be zoomed in a hair, and if we could zoom out --

20    BY MR. GADD

21    Q.   Can you tell what that is?

22    A.   Yes.  This is a receipt from overstock.com for an

23    88-inch television.

24              MR. GADD:  Then, lastly, could we look at 21.32?

25    BY MR. GADD
```

```
 1    Q.    What is this?

 2    A.    This is a receipt from R.C. Willey for $2,200 --

 3    approximately $2,200 for a bedroom set that he purchased.

 4    Q.    This was purchased in approximately April of 2016?

 5    A.    Yes, purchased in April of 2016 and sent to his home on

 6    Titian Street.

 7    Q.    Let's change gears now and not talk about income so

 8    much, but could we talk about his oversight of the

 9    manufacturing process?

10    A.    Sure.

11    Q.    Did you find evidence on his devices that the defendant

12    kept a list of addresses of many of his package receivers?

13    A.    Yes, he did.

14    Q.    Let's take a look.

15          MR. GADD:  Could we go to 14.35, and then start

16    there at the bottom where it says Jessica Gleave.  Go on to

17    the second page.

18    BY MR. GADD

19    Q.    Do you recognize these names?

20    A.    I do, yes.  These names are part of the drug

21    trafficking organization.  They would be the package

22    receiver, drops, or in the case of Mr. Gygi, the courier for

23    the organization.

24    Q.    He started out as a drop, correct?

25    A.    He did, yes.
```

1    Q.   Was this list found on the defendant's iMac?

2    A.   It was.

3    Q.   Let's talk specifically about some efforts that the

4    defendant took to conceal his purchases.  Did you find

5    evidence in his e-mails that he was attempting to conceal

6    the nature of his payments when he would purchase

7    ingredients?

8    A.   Yes, we did.

9    Q.   Let's look at just a few of those.

10           MR. GADD:  Could we look at Exhibit 21.04?  Go to

11   page 3.

12   BY MR. GADD

13   Q.   On a lot of these e-mails, my hope is that we will read

14   them roughly chronologically.  So usually that means

15   starting at the end and working our way up.

16       Here on page 3 are you able to tell what he is doing?

17   A.   Yes.  So on page 3 you can see just up at the top it

18   says regards from coinsfer.com, c-o-i-n-s-f-e-r dot com, and

19   you can see the Tablet Press Club formula 5,000 for one

20   kilogram, so Coinsfer was a way that you can use Bitcoin to

21   have another person purchase products to conceal the true

22   identity of the buyer.

23   Q.   And Coinsfer provides a service for a fee?

24   A.   Yes.

25   Q.   Now, if we can go up to the bottom of page 2, which

 1  will give us the next part of that, and if you can read --

 2  maybe for all of our benefit, can you just summarize what

 3  Coinsfer is after here?

 4  A.   Sure.  On this one I believe Mr. Shamo had asked about

 5  pricing and Coinsfer had a limit that they were able to get

 6  to.  So they say as ludicrous as these laws and regulations

 7  are, we must make every effort to comply with them so as to

 8  avoid legal issues.  Then they talk to him about the amount

 9  of what he was purchasing, and it was going to be over the

10  $1,000 per day amount that they were able to use at that

11  time.

12            MR. GADD:  If we can zoom out -- and then if we

13  can go up just one e-mail, so the middle of this page now.

14  BY MR. GADD

15  Q.   This is going to be Mr. Shamo's response to their

16  clarifications, correct?

17  A.   Sure.

18  Q.   Would you read his response?

19  A.   Mr. Shamo says thank you for getting back to me so

20  fast.  Is there any way to receive a higher limit?  I notice

21  your website used it a few times and I hope I can use it

22  long term, but really want to make purchases higher than

23  $1,000 at a time.  This is a perfectly legal item that I'm

24  trying to purchase.  I am not trying to use it for a

25  legitimate purpose.  It will be used for my pre-workout

```
 1    company that I'm starting shortly so I am very excited to be
 2    working with you closely on this.  Please walk me through
 3    how we can make this happen.  I'm only confused on the part
 4    with the temp card.  Is this card just to use during
 5    checkout on the company's website?
 6        Also, why are you only allowed $1,000 per day?  I can
 7    transfer the full amount via Bitcoin to speed up the
 8    process.  Just provide a Bitcoin address and I can transfer
 9    immediately.  Thank you, Aaron.
10    Q.   This wasn't the only example of Mr. Shamo trying to use
11    a service like this to hide his purchases, correct?
12    A.   Correct.
13    Q.   Let's look at another one.  Let's look at 21.15.
14        Do you recognize this?
15    A.   I do, yes.
16    Q.   What is this?  What are we looking at?
17    A.   This is communications from All For B.T.C., and at the
18    bottom you can see there, and All For B.T.C. was a service
19    similar to Coinsfer where you could use Bitcoin to pay the
20    company and they would purchase products for you using their
21    credit card or some other means to conceal the identity of
22    who was purchasing those products.
23    Q.   This is addressed to Sean Gygi, correct?
24    A.   Correct.
25    Q.   But it is an e-mail that came to the defendant's
```

```
 1   account?

 2   A.   It was.

 3   Q.   Let's see if we can connect the dots.

 4          MR. GADD:  Can we look at 21.37?  Can we look at

 5   page 2?

 6   BY MR. GADD

 7   Q.   Is this a forward from All For Bitcoin?

 8   A.   It is, yes.

 9   Q.   I want to ask you a couple questions about that.  You

10   see who it is from.  It is an invoice, right?

11   A.   Correct.

12   Q.   From Press Club Nutrition?

13   A.   Yes.

14   Q.   Is that kind of the business behind

15   tabletpressclub.com?

16   A.   It is.  Tabletpressclub.com, yes.

17   Q.   Do you see payment info --

18   A.   Yes, I do.

19   Q.   -- whose credit card is listed?

20   A.   So it is listed as a Visa under the credit card and the

21   name is Martin Mischke, M-i-s-c-h-k-e.

22   Q.   Does that name mean anything to you?

23   A.   No, it does not.

24   Q.   I think you heard Special Agent Koeneman on his

25   cross-examination say something to the effect of we
```

```
 1    interviewed a lot of people.  Is that true?  Did you
 2    interview a lot of people?
 3    A.   We did interview a lot of people, yes.
 4    Q.   A lot of people?
 5    A.   Yes.
 6    Q.   This name never came up?
 7    A.   Martin Mischke never came up, no.
 8    Q.   Are you able to see the date on the invoice at the top?
 9    A.   Yes.  October 13th of 2016.
10    Q.   This is for that same Formula 5000 that he prefers
11    buying from Tablet Press Club, right?
12    A.   Correct.  At the bottom in the gray you can see the
13    item and what that was, Tablet Press Club, Formula 5000, one
14    kilogram, and then the quantity would be 40.
15    Q.   40 kilograms?
16    A.   40 kilograms of that, yes.
17    Q.   In structuring his purchases like this, did it help Mr.
18    Shamo to remain anonymous?
19    A.   It does, yes.
20    Q.   His name is nowhere on this invoice, correct?
21    A.   No.
22    Q.   But he still got all of the product?
23    A.   Correct.  It is not in the payment information.  It is
24    not in the shipping information, nowhere on here.
25    Q.   Let's talk for a minute about quality control under
```

1    this larger umbrella of his oversight of the manufacturing

2    process.  There was a time early on when a bad batch of

3    Alprazolam led to the defendant being banned from a

4    different dark net market, correct?

5    A.    Correct.

6    Q.    Did you see evidence that the defendant took steps to

7    try to ensure that his Alprazolam pills actually contained

8    Alprazolam?

9    A.    Yes, we did.  Alprazolam and other pills he attempted

10   to ensure that that is what it contained, yes.

11   Q.    Let's look at just two of those exhibits.  Let's look

12   at 21.05.

13        Do you recognize this?

14   A.    I do.

15             MR. GADD:  I guess we can highlight the whole

16   thing.

17   BY MR. GADD

18   Q.    The defendant is asked a question kind of in the middle

19   of the screen there, right?

20   A.    Yes.

21   Q.    What was it that he asked?

22   A.    He is asking this company if they do purity in drug

23   testing.

24   Q.    Will you read what he said?

25   A.    Sure.  It says, hey, do you guys do purity in drug

1    testing?  Nothing illegal, but I have a friend that gave me

2    a few Xanax pills, and I just wanted to see the purity and

3    see if they are what he says they are.  Is there a way to do

4    this?  Thanks.

5    Q.   And then their response is at the top.

6    A.   Their response and they reply, dear sir, we can only

7    accept controlled substances from D.E.A. registered

8    entities.  Our base cost for G.C.M.S. analysis is $350.

9    Q.   Let's look at one more.

10              MR. GADD:  Could we look at 21.11?  Go to the next

11   page.

12   BY MR. GADD

13   Q.   Do you recognize this?

14   A.   I do, yes.

15   Q.   What is this?

16   A.   This is a receipt for test kits for benzodiazepines and

17   Xanax is a type of benzodiazepine.

18   Q.   Specifically the Alprazolam, right?

19   A.   Correct.  Alprazolam.  It also has an ecstasy test kit

20   on here.

21   Q.   How did he pay for these test kits?

22   A.   Bitcoin, through Bitcoin.  You can see at the bottom,

23   the second line up, the payment method was Bitcoin.

24   Q.   Let's talk about punches and punch tips and dies and

25   things of that nature.

```
 1        Even though he employed Luke Paz to help him press, did
 2   you find evidence that Mr. Shamo maintained some control
 3   over buying parts and supplies for the pill presses?
 4   A.   Yes, we did.
 5   Q.   Let's look at just a few of those exhibits.
 6        MR. GADD:  Could we go to 21.21?  Then if we can
 7   start all the way at the end.
 8   BY MR. GADD
 9   Q.   We'll go through a number of them back and forth.  We
10   won't hit them all.  If we do this right, we will be
11   chronological.  Between you and me and Ms. Lauder, my hope
12   is that we'll be able to follow it.  Okay.
13        The e-mail you see on the screen there, the first
14   e-mail, what is happening here?
15   A.   So this e-mail is from a Chinese company who is
16   reaching out to Mr. Shamo and saying that they are able to
17   create replica dies or dies for Xanax -- Xanax dies and also
18   for A-215, which are a type of fake Oxycodone pills that the
19   drug trafficking organization was pressing.
20   Q.   And then they indicate kind of their prices for each?
21   A.   Correct.
22        MR. GADD:  If we can scroll up, so now we would be
23   at the bottom of the next page.
24   BY MR. GADD
25   Q.   Do you see there at the bottom, kind of the bottom main
```

```
 1   block, is that Mr. Shamo's response?

 2   A.    Yes.   Mr. Shamo replied to that e-mail from the Chinese

 3   company.

 4   Q.    Would you read what he wrote?

 5   A.    Yes.   So the Chinese company was named Cost Business as

 6   you can see in the line up above.   The subject is ZP-12

 7   rotary tablet press machine.   Mr. Shamo replied to that

 8   e-mail and he said sounds good.   I would like both dies

 9   made.   Do you accept Bitcoin as payment?   I would like you

10   to get started immediately, and the mold would be for a

11   Z-P-9-A mini rotary tablet press.

12   Q.    There are two things in that e-mail that will be themes

13   as we go throughout the rest of them, right?   Specifically,

14   payment and then whether or not their product will fit his

15   machine, right?

16   A.    Correct.   Throughout the series of e-mails you see both

17   of those, yes.

18   Q.    Now, you can see at the top of the page we're looking

19   at on the screen, and it scrolls up to the next one, and why

20   don't we actually scroll up.   Okay.

21         What is their response there?

22   A.    So their response is, hello, friend.   So sorry, friend.

23   The payment -- we can't accept Bitcoin.   We just accept

24   Western Union and T.T. payment.

25         Should I read the whole thing?
```

1   Q.   That is probably good.

2   A.   Okay.

3   Q.   They give him, if he wants to order, the name to wire

4   it to?

5   A.   How he is able to pay, yes.

6   Q.   Sure.

7   A.   They also give the Western Union information below, the

8   name and also the country for Western Union payment.

9   Q.   Why don't we keep scrolling up and we'll see his

10  response to whether or not he can send it Western Union.

11       Right there.

12  A.   Mr. Shamo said he couldn't do Western Union and asked

13  them if he could do MoneyGram.

14  Q.   Then did he indicate which of the molds he wanted?

15  A.   And that he would like to buy A-215 first and then the

16  Xanax mold.  Again, the A-215 is the fake Oxycodone where

17  they were using Fentanyl as the active ingredient.

18  Q.   Let's keep scrolling up and let's see what their

19  response is to his request to send it by MoneyGram.

20       Do you see that there?

21  A.   Yes.  Then Cost Business, the Chinese company, replied

22  that it is no problem to pay by MoneyGram.  Then they again

23  reiterate what he is purchasing, which would be the replica

24  dies or just the dies, giving the pricing structure and then

25  the name on MoneyGram that he can send it to.

```
 1    Q.   That name, the first name that is Q-i and the last name
 2    that is C-h-e-n, we're going to see that in a few minutes,
 3    right?
 4    A.   We will, yes.
 5    Q.   Let's keep going up.  The next one up is Mr. Shamo at
 6    the top there, right?
 7    A.   Correct.
 8    Q.   And he is sending them indications that he has sent the
 9    money?
10    A.   That he has paid for it, yes.
11    Q.   Let's keep going.
12         They have a question for him at the bottom of this
13    page, correct?
14    A.   Correct.
15    Q.   What is their question for him?
16    A.   Their question is that they want him to send the name
17    that he is using for MoneyGram so they are able to withdraw
18    that money.
19    Q.   And then if we go up -- he does not answer their
20    question initially, correct?
21    A.   There was a little bit of confusion.  He was
22    thinking -- well, he replied with the place he wanted it to
23    be sent.
24    Q.   That is one of his package receivers, right?
25    A.   Correct.  Julian Mausia is a package receiver for the
```

```
 1    drug trafficking organization.
 2    Q.    And then at the top of this page they ask their
 3    question a second time, correct?
 4    A.    Correct.
 5    Q.    They essentially want to know what name?
 6    A.    Yes.  They are just asking for the MoneyGram
 7    information rather than where it is to be sent.
 8          MR. GADD:  If we could scroll up one more, we'll
 9    see his response.
10    BY MR. GADD
11    Q.    This time he will answer their question, right?
12    A.    He answers the question this time for MoneyGram and
13    says the MoneyGram sender's name is Aaron Shamo and the
14    country is the United States.  Therefore, they could
15    withdraw that money.
16    Q.    Then he repeats what package receiver he wants this
17    sent to, right?
18    A.    Then he repeats that he wants it sent to Mr. Mausia,
19    and then he asks a question at the bottom and says how much
20    was the Xanax mold?  I'm ready to buy that.
21          MR. GADD:  Scroll up one more page.  Let's see
22    their response.  Perfect.
23    BY MR. GADD
24    Q.    What was it that they told him?
25    A.    So they said the bank is closed during the weekend, but
```

1  they will be able to get the payment after the weekend and
2  then they will start to work on his order for the two dies
3  as soon as they can.
4  Q.    And then if he wants to buy the additional mold they
5  are giving him the Xanax price and who to send the money to?
6  A.    Correct.  The total price for Xanax was going to be
7  $2,000.
8  Q.    So back in the beginning I mentioned there were the two
9  themes and you said, yes, payment was a theme and then
10  whether or not their parts would fit his machine.
11       We're going to get into that with this next one, I
12  believe, correct?
13  A.    Yes.
14       MR. GADD:  Scroll up and see what Mr. Shamo sent
15  to the business.  A little higher.  Go all the way to the
16  next line.  There you are.
17  BY MR. GADD
18  Q.    What did Mr. Shamo write to them?
19  A.    He replied that he could wait on the Xanax mold and he
20  was hitting his limits for MoneyGram.  MoneyGram has a
21  certain amount of money that you're able to send during
22  specific time periods and he said I hit my monthly sending
23  limits, but he wanted the A-215 die as quickly as possible.
24  Q.    And then in regard to whether or not their product fits
25  his machine, what did he --

1  A.   He sent a link to the pill press that he was requesting

2  the die for at the bottom as well as the picture that you

3  see there.

4  Q.   That is his pill press, right?

5  A.   It is.

6       MR. GADD:  If we can go up to the next page and

7  we'll go to the middle, to Mr. Shamo.  If we keep scrolling,

8  Mr. Shamo is going to ask for an update right here in the

9  middle.

10 BY MR. GADD

11 Q.   Are you able to see that?

12 A.   Correct.  Yes.

13 Q.   Is the date on this April 12, 2016?  So 2016, 4-12?

14 A.   Yes.

15 Q.   What was it that he asked for?

16 A.   He again asked for the status of the A-215 mold and

17 wanted it as quickly as he could get it.

18 Q.   And then they are going to respond at the top of this

19 page.

20      Do you see that there?

21 A.   Yes.

22 Q.   What is their response?

23 A.   They said they checked the status of it and they will

24 send the order on April 21st and they will send him

25 tracking.  As I was reviewing this e-mail, one thing that

```
1    stood out to me was that middle line and I will just read it
2    if that is okay?
3    Q.   Sure.
4    A.   Recently the United States Customs supervision of this
5    product is very strict.  Can you allow us to ship the goods
6    by E.M.S. delivery for you?  E.M.S. will be safe and easy to
7    pass the U.S. Customs delivery to your home.  As a Customs
8    agent this stood out to me very specifically.  We see this
9    all the time where international actors are trying to bypass
10   Customs and get illegal products through to the United
11   States.
12           MR. GADD:  Let's keep scrolling up.  We're going
13   to hit one of those metadata pages and we have to jump to
14   the top of 21 for our next e-mail.
15   BY MR. GADD
16   Q.   Right there at the top do you see hello, friend?
17   A.   Yes.
18   Q.   And then below that Mr. Shamo's response.  Let's start
19   with his response and then theirs.
20   A.   Mr. Shamo replied, yes, that works, whatever is the
21   safety --
22   Q.   Safest?
23   A.   Whatever is the safest.  Sorry.
24   Q.   You go ahead.
25   A.   Cost Business replied hello, friend.  Yes, the E.M.S.
```

```
 1    will be safe and easy than D.H.L. to pass the U.S. Customs
 2    delivery to your home.
 3    Q.   I don't mean to pick a scab, but he did get his dies
 4    and punches.  He got a whole crate full of them?
 5    A.   Yes, he did, that we recovered.
 6            MR. GADD:  Let's jump to the top of 18.  One more.
 7    There we are.
 8    BY MR. GADD
 9    Q.   In the middle there that is their response, correct?
10    A.   Correct.
11    Q.   Would you read that for us?
12    A.   Yes.  They reply hello, friend.  Today we sent your
13    order.  The E.M.S. tracking number is -- it gives the
14    number -- and you will receive it on next Friday.  Please
15    check it.  Thanks.  Any questions, please let us know.
16    Q.   Then they have one more follow-up e-mail above that one
17    and let's read that.
18    A.   The follow-up e-mail says hello, friend.  The parcel
19    has arrived your city.  Please make the phone to your local
20    post office to receive it A.S.A.P. when you receive our
21    message, because if you don't call back to your local post
22    office to receive the parcel before April 30th, the U.S.A.
23    U.S.P.S. company will return the parcel to sender.  We sent
24    the picture of shipping info for you.  Please check it.
25    Q.   That picture is in fact attached and we just scrolled
```

1    past it, right?

2    A.   Correct, we just scrolled past that.

3    Q.   Let's look very briefly at the bottom page there, 19.

4         They have sent him a screen shot of his tracking?

5    A.   Yes.

6    Q.   If we look at the bottom of that screen shot -- sorry.

7              MR. GADD:  I think we'll have to zoom out just a

8    hair to see where that is coming from.

9    BY MR. GADD

10   Q.   If we look at the bottom, are you able to see where the

11   package originated?

12   A.   Yes, it originated in China.

13             MR. GADD:  From here could we jump to the top of

14   page 9, the next in order?

15   BY MR. GADD

16   Q.   Do you see at the very top there, hello, my friend?

17   A.   Yes.

18   Q.   Can you read that one?

19   A.   Hello, my friend.  I'm happy you already received the

20   parcel.  Today our company pressed some Xanax pills by our

21   ZP-9 machine.  We took some picture.  They are all pressed

22   by our Xanax replica dies.  I'm very happy to share with

23   you.  Please see my attached photos.

24   Q.   And they sometimes have the habit of replying to old

25   e-mails, right?

1    A.   They do, yes.

2    Q.   That is why you get this other one below it?

3    A.   Yes.

4    Q.   Let's just look briefly at their attached photos.  This

5    is pages 11 through 16.  We can just kind of maybe one at a

6    time jump through them.

7        The e-mails go on from here, correct?

8    A.   They do, yes.

9    Q.   I think that that is probably enough.  Let's leave it

10   there.

11       Let's talk for a minute about wire transfers.  We saw

12   in that group of e-mails a name, the first and last name

13   that the Chinese company wanted money sent to.

14   A.   Yes.

15   Q.   Did you find other evidence besides just those e-mails

16   that the defendant was engaged in wiring money to China?

17   A.   Yes.  We found several instances of that.

18   Q.   Let's look at a few.  Let's look at 21.27.  Go to page

19   3.  This is MoneyGram, correct?

20   A.   Yes, this is MoneyGram.

21   Q.   To whom is the defendant sending money?

22   A.   On this the receiver information is about in the middle

23   of the page, and it is that same name that we had seen in

24   those e-mails.  Qi Chen is how I would pronounce it.

25   Q.   Q-i?

1    A.    Q-i, C-h-e-n.  Yes.

2    Q.    Then if we zoom out, how much money did he send?

3    A.    On this one it was approximately $1,495.

4    Q.    This is approximately March of 2016, correct?

5    A.    Yes.  Correct.

6    Q.    Let's look at a couple more.

7          MR. GADD:  Let's try 21.42.  Go to page 2 here.

8    BY MR. GADD

9    Q.    Is this a Western Union money transfer?

10   A.    Yes, it was.

11   Q.    Also going to China?

12   A.    Yes.

13   Q.    You can see the amount just at the bottom here,

14   correct?

15   A.    Correct.

16   Q.    It is $1,100?

17   A.    Yes, approximately.

18   Q.    Could we also look at page 10 on this exhibit?  This is

19   another transfer to China, correct?

20   A.    Yes, it was.

21   Q.    And then it goes on to page 11.  Then you can see the

22   amount there, right, $2,500?

23   A.    Yes, approximately $2,500.  On the previous page you

24   can see it was coming from Mr. Shamo.

25   Q.    These are relatively clear.  Let's see if we can muddy

```
1    things up now.
2            MR. GADD:  Can we look at Exhibit 14.45?  Okay.
3    BY MR. GADD
4    Q.   Have you seen this before?
5    A.   I have seen this before, yes.
6    Q.   Have you ever had that experience where you go to take
7    a picture with your cell phone and you accidentally hit
8    video?
9    A.   I have done that before, yes.
10   Q.   And you just take like a one-second video?
11   A.   Yes.
12   Q.   This is a one-second video --
13   A.   It is.
14   Q.   -- of a screen?
15   A.   Correct.
16   Q.   We have done our best to try and capture it here.  Is
17   this a Western Union payment to China?
18   A.   This is a Western Union payment to China.
19   Q.   For, I believe, roughly $2,100?
20   A.   Correct.  You have to squint just a little bit to see
21   that.  The video makes it a little more clear.
22   Q.   This screen shot is right as he is pulling away on the
23   video, right?
24   A.   Correct.
25   Q.   Up at the top, the second full line down, can you see
```

1    what he is ordering?

2    A.    Boy, with these screens it makes it worse.  Yeah, that

3    word right there is Fentanyl H.C.L.

4    Q.    Fentanyl.

5    A.    Fentanyl hydrochloride, yes.

6    Q.    From China?

7    A.    From China.

8    Q.    Let's move away from that one.

9          Let's talk for a minute about the defendant's -- Mr.

10   Shamo's drug education.  Did you see evidence on the

11   defendant's devices of his efforts to learn to tradecraft of

12   a dark net drug trafficker?

13   A.    As we reviewed Mr. Shamo's devices, we saw thousands of

14   references to perfecting the tradecraft associated with drug

15   distribution.

16   Q.    Did you find any instances that the defendant made

17   efforts to learn how to avoid law enforcement detection?

18   A.    Yes, we did.

19   Q.    Let's look through just a handful of the exhibits from

20   his devices starting with 14.31.

21         Do you recognize that?

22   A.    I do, yes.

23   Q.    What are we looking at?

24   A.    This is a chart that we compiled with just some of the

25   Reddit U.R.L.s that Mr. Shamo had looked up.

```
1    Q.   Will you just explain briefly what Reddit is?

2    A.   Yes.  Reddit is a discussion forum.  It is a website

3    you can go to for discussions and you can go to different

4    sub Reddits they call it, and each sub Reddit is devoted to

5    a different topic, and you can basically look up anything

6    that you want on Reddit.  If you like cars you can look at a

7    sub Reddit for that.

8         In this instance if you like the dark net, you can look

9    up and read about a sub Reddit devoted specifically to the

10   dark net and to distributing drugs.

11   Q.   Let's walk through maybe the first two rows and explain

12   what they mean and then we'll read kind of the topic or the

13   name of the sub Reddit article.

14   A.   Sure.

15   Q.   Will you just explain kind of this U.R.L. on the top.

16   A.   So the U.R.L. is reddit.com and then the sub Reddit

17   would be research chemicals, and then comments and the

18   comments would be regarding a snuff grinder on this one.

19   Q.   What is a snuff grinder?

20   A.   A snuff grinder would be something that you can grind

21   up different types of drugs for consumption.

22   Q.   Let's take one more.  Read the second one down for us.

23   A.   The second one again would be reddit.com.  All of these

24   are reddit.com, and the sub Reddit would be related to dark

25   net markets.  On this specific dark net market that we're
```

1    looking at, it is a vendor review for Xanax Prime, 500 hulk

2    Xanax bars.

3    Q.    And then if we could just focus on like the name of the

4    article, will you read down this chart of selected Reddit

5    U.R.L.s to tell us the types of thing he is reading?

6    A.    Sure.  Going third down, the type of article would be

7    here are some of the main methods that police use.  Buyers,

8    stop using your real name and e-mail.  Fentanyl Reagent

9    Test.  Cash out Bitcoin two months before buying a house.

10   TumbleBit versus Mimblewimble.

11   Q.    I probably should jump in for just a minute.  What are

12   those.

13   A.    TumbleBit?

14   Q.    Yes.

15   A.    TumbleBit is a way to tumble bit coins so that you make

16   it so it is difficult to trace where they came from, so you

17   receive -- for instance, you receive Bitcoins on the dark

18   net and they come to your wallet, and then you want to send

19   them out to someone else, but you don't want them to know

20   that it came from the dark net, so you send it to a tumbler,

21   and then that kind of basically spins around and makes it

22   confusing so that they can't trace where they came from.

23   Q.    Does that tumbler, does it kind of, in your example,

24   mix your Bitcoin with everybody else's Bitcoin and then

25   spits it out in small bits?

```
 1   A.   Yes, it does.

 2   Q.   There are two above that.  The Fentanyl test, what is

 3   that?

 4   A.   A Fentanyl Reagent Test would be to test for the

 5   presence and purity of Fentanyl.

 6   Q.   Kind of like a do-it-yourself at home type of a kit?

 7   A.   Yes.

 8   Q.   Keep going.

 9   A.   The next one after TumbleBit was AlphaBay account

10   frozen.  Below that don't let other people know what you did

11   last.  Is Bitcoin Blender safe to use still?  Stories of

12   people getting busted.  Let's learn from.  Then a super list

13   and then below that warning no configuration file found

14   using U.S.B.

15   Q.   So this is no longer in the dark net market sub Reddit.

16   This is a different sub Reddit?

17   A.   Correct.

18   Q.   What sub Reddit is it?

19   A.   This sub Reddit is different.  At the very bottom line,

20   this is the sub Reddit Tails.

21   Q.   Is Tails an operating system?

22   A.   It is.

23   Q.   How is it used?

24   A.   Tails is an operating system that you can plug into

25   your computer to make it so there are no tracks related to
```

1   what you're doing on your computer.  It uses a T.O.R.

2   browser and different encryptions to hide the things that

3   people are doing.

4   Q.   Is it typically on some sort of portable storage device

5   like a U.S.B. stick?

6   A.   Yes.

7   Q.   All right.  Let's look at some more.  Did you find

8   evidence that the defendant took steps to determine the

9   relative potency of Fentanyl?

10  A.   Yes, we did.

11  Q.   Let's go to 14.38.

12       What is it we're looking at here?

13  A.   This is an opioid potency comparison list and it shows

14  several different types of opioids, and then it is a chart

15  regarding dosages and how long it takes to affect --

16  Q.   We have heard some testimony from two medical doctors

17  about relative potency, correct?

18  A.   Yes, we have.

19  Q.   The defendant found this on the internet?

20  A.   Yes.

21  Q.   This was just on his iMac?

22  A.   Correct.

23  Q.   Specifically are there rows in the chart for both

24  oxycodone and Fentanyl?

25  A.   Yes, there are.  The oxycodone is the second row down

1    and Fentanyl on the fourth row down on the left-hand side.

2    Q.   Did you find evidence that the defendant took steps to

3    determine how best to avoid law enforcement detection of

4    drugs shipped through the United States mail?

5    A.   Yes, we did.

6    Q.   Let's look at that.

7         MR. GADD:  Could we go to 14.39?

8    BY MR. GADD

9    Q.   What is this?

10   A.   This is a manual on how to ship drugs.  Again, as a

11   Customs agent, I found this interesting.

12   Q.   This was found on his iMac?

13   A.   Yes.

14        MR. GADD:  Could we go to page 4 within this

15   manual?

16   BY MR. GADD

17   Q.   Do you see there near the top packaging tips for

18   senders?

19   A.   I do, yes.

20   Q.   How about just reading the first eight or so.

21   A.   Okay.  So it is talking about -- this is for how to

22   ship drugs through the mail.  Labeling.  Use a real return

23   address but make sure it has no connection to you.  Ensure

24   the zip code used is the same one of the drop box you plan

25   to send the package from.  A generally sound practice is to

1    use the legitimate address of an apartment complex but do

2    not specify an actual number.

3         Two.  Change return addresses, especially the name sent

4    from on a semi frequent basis.  The name used should be

5    generic but not overly common.

6         Three.  Keep the front of the package as clean as

7    possible.  It should have no markings other than a shipping

8    and return address.

9         Four.  Double-check to make sure all information is

10   correct.  Also ensure that all words are spelled correctly.

11        Five.  Both addresses should be typed and printed, not

12   handwritten.  Ensure the printer used has minimal connection

13   to you, paid for in cash from a friend and not used for

14   other things.

15        Six.  Exact postage should be applied neatly to the

16   package.

17        Seven.  Do not seal the package with tape.

18        Eight.  Use self-adhesive envelopes and stamps.

19   Q.   We are not necessarily trying to train anyone on how to

20   commit crime, but is this good advice?

21   A.   This is unfortunately very good advice, yes.

22   Q.   This is what the defendant's employees were doing,

23   right?

24   A.   Correct.

25   Q.   Changing the name on the return address, picking a real

1    address, verifying that all of the information is correct,

2    they were doing all of those things?

3    A.    Yes, they were.

4    Q.    This was found on the defendant's computer?

5    A.    It was.

6    Q.    Did you find evidence that the defendant took steps to

7    determine how best to launder his drug proceeds?

8    A.    Yes, we did.

9    Q.    Look at 14.42.  We won't go through all of this one,

10   but what is this document called?

11   A.    This is a document entitled 100-percent original money

12   laundering method.

13   Q.    Maybe if you just want to read the top two lines for

14   us.

15   A.    Sure.  This guide will anonymously and effectively

16   convert your dirty Bitcoins into clean cash.

17   Q.    That is good.

18        The defendant had a number of different ways he tried

19   to launder his drug proceeds, correct?

20   A.    Correct.

21   Q.    We have talked about some of the documents that you

22   found on the defendant's computer and his phones but mostly

23   the computer, but were you also able to look for evidence of

24   research he had done online to try to learn how to run his

25   criminal enterprise?

```
1    A.    Yes, we did.

2    Q.    Did you help create a chart that shows some of the many

3    websites that he visited?

4    A.    Yes, we did.

5          MR. GADD:  Let's pull up 14.32.

6    BY MR. GADD

7    Q.    This is just a small selection of the websites he

8    visited, right?

9    A.    Correct.

10   Q.    Will you walk us through what the websites are?

11   A.    Sure.  At the top line there you can see the Sigaint

12   website address.  Again, this was the encrypted e-mail that

13   they used to communicate with each other to facilitate the

14   drug trafficking.

15        The second line is blockchain.info access wallet.  That

16   would be the block chain which is related to the

17   cryptocurrency and to the Bitcoin wallets.  The next line

18   would be Uline.  Again, Uline is where shipping products and

19   different things of that nature were purchased.  Below that

20   we have AliExpress.  We have three U.R.L.s there related to

21   AliExpress, which were related to the purchasing of the pill

22   presses and the punches, dies and molds and things of that

23   nature.

24        Below that we have a drugs forum, just a forum that you

25   can go to to learn about illicit drugs and their effect and
```

1  a lot of things that you want to know and don't want to know

2  about drugs.  Below that would be stopoverdose.org, which is

3  a website related to preventing and stopping overdoses.

4  Q.   If someone had powder Fentanyl in their house and they

5  were using it in a machine that sometimes created dust in

6  the air, would that be a valuable website to look through?

7  A.   That would be very valuable, yes.

8  Q.   All right.  Please keep going.

9  A.   Below that, again, is AliExpress.  AliExpress is kind

10  of like an Amazon -- a Chinese Amazon website basically

11  where you can purchase many different types of things.

12      Below that we have a YouTube video.  There are two

13  YouTube videos on this chart.

14  Q.   What is the first one?  Did you go and look?

15  A.   So I believe the first one was related to -- let me

16  think for just one minute.

17  Q.   Was it the --

18  A.   It was a D.E.A. informational video that showed the

19  dangers of Fentanyl.  So the D.E.A. put out a video for law

20  enforcement and others to show the dangers associated with

21  Fentanyl.

22      That other YouTube video, which is below the AliExpress

23  pill press line, again, was a V.I.C.E. Video --

24  Q.   Sorry.  What is V.I.C.E.?

25  A.   So a V.I.C.E. Video is -- it is like a documentary.  It

1   is kind of like an informational video, and this one in

2   particular was related to Fentanyl and the dangers

3   associated with it.

4   Q.   Go ahead.

5   A.   And then we have Western Union, a way to transfer money

6   overseas.  Below that, the second line from the bottom is

7   Abraxas.  Abraxas was a dark net marketplace, one of the

8   original that they used.  Then, of course, the last line is

9   the AlphaBay dark net website.

10  Q.   My memory is that we go on to the next page, but I

11  think we can leave it here.

12  A.   Sure.

13  Q.   There has been testimony that organizing and running

14  the defendant's organization would not require the defendant

15  to be especially smart.  Do you recall more than one witness

16  explaining that a particular task or aspect of the

17  defendant's work could be learned simply by Googling it?

18  A.   I do, yes.

19  Q.   Did you find evidence that the defendant used Google

20  searches to guide his efforts to build his criminal

21  enterprise?

22  A.   Yes.  We found thousands of Google searches related to

23  this criminal enterprise.

24  Q.   Did you help create a chart showing just some of those

25  relevant search terms that he used?

```
 1    A.   We did, yes.
 2         MR. GADD:  Could we look at 14.44?
 3    BY MR. GADD
 4    Q.   It is hard to narrow down the number of search terms to
 5    put in one exhibit, correct?
 6    A.   Correct.
 7    Q.   Let's just go through the first six pages.  Here is
 8    kind of how I'm hoping it will work.  If Ms. Lauder will
 9    just take us kind of a row a second and move fairly quickly
10    through it, and as you see a search term that stands out,
11    will you just call it out and explain what it is?
12    A.   Sure.
13    Q.   Okay.
14    A.   On the first page you can see HideMyAssProxy, which is
15    a way to conceal your identity.  You can see numerous
16    searches related to Fentanyl, roxy pill, you can see
17    clonazepam, lorazepam, roxy, Fentanyl, and you can see a
18    Google search for Fentanyl marquee test.  You can see Google
19    searches for Bitcoin, Bitcoin assistance.  You can see
20    credit card searches.  You can see on this second page M-30
21    round pill.
22         Again, we had to cull out numerous instances of the
23    word Fentanyl.  This is not exhaustive.  This list is just a
24    sampling of the Google searches that we discovered on his
25    devices.
```

1    Mylar envelopes.  Remember, Mylar envelopes were the

2    envelopes that were used to -- that they felt couldn't be

3    x-rayed and to package the drugs in.  You can see references

4    to pounds to kilograms, to weighing different types of

5    drugs.  MultiBit Classic on the bottom left on this page,

6    and you can see a Google search for that.  MultiBit Classic

7    would be a type of Bitcoin wallet.

8        Again, there are numerous instances related to

9    clonazepam, and these are types of benzodiazepines that are

10   related to Alprazolam, which is one of the products being

11   pressed.

12   Q.   There was one there, D.H.L. tracking?

13   A.   D.H.L. tracking related to tracking different shipments

14   as they come into the country.

15   Q.   Would it be the heavier shipments that had to go

16   D.H.L.?

17   A.   Yes.  Most of the heavier shipments were related to

18   D.H.L. -- sorry, were shipped via D.H.L.

19       You can see dark market new, a search for that, and

20   just numerous searches related to dark net markets.

21   Q.   Let me ask you about the top one here on page 3, the

22   right side.  The Fentanyl marquee test.

23   A.   The Fentanyl marquee test, again, that is a test to

24   determine if it is truly Fentanyl.  Again, as the

25   organization had received bad Xanax or a bad batch before,

1    they wanted to ensure that they were receiving real Fentanyl

2    and the true product.

3    Q.   I mean, that could ruin months and months of his work,

4    right?

5    A.   Correct.  Yes.

6    Q.   He spent a lot of time and effort building up his trust

7    level and his feedback, and a bad batch of Fentanyl may have

8    ruined all of that?

9    A.   Yeah.  As Agent Gino testified, feedback is all

10   important on the dark net market.  It is people purchasing

11   illicit products and people selling illicit products, and

12   not a lot of trust in that community.  So the one way to

13   kind of make that work is through feedback of other

14   individuals who have had success purchasing those illegal

15   products.

16        As we continue to go down the list, again, additional

17   searches for Fentanyl, additional searches for online

18   wallets, import private key related to Bitcoin wallets,

19   Bitstamp.  As we learned, Bitstamp was an online currency

20   exchange for Bitcoin.  Adoral and roxy --

21   Q.   It just goes on and on?

22   A.   -- and copovidone, another ingredient in pills.

23   Q.   Maybe we don't need to go all the way to page 6.  You

24   have wore me out.

25   A.   Me too.

```
 1    Q.   This is an exhibit and it is in evidence and the jury

 2    will have all of it, correct?

 3    A.   Correct, they will.

 4    Q.   You searched his devices pretty thoroughly, correct?

 5    A.   Yes.

 6    Q.   What sense did you get regarding Mr. Shamo's efforts?

 7    A.   This was an individual who was devoted and tireless in

 8    learning and perfecting his skill in dark net markets and in

 9    distributing illicit substances.  Over and over and over

10    there were manuals, there was research done regarding how to

11    not get caught by law enforcement, how to create pills and

12    drugs, how to ship them through the mail and perfecting the

13    art of the dark net markets.  It was thousands and thousands

14    of searches related to that.

15    Q.   Let's take up a related topic.  Let's talk about his

16    distribution.

17         MR. GADD:  Could we look at Exhibit 17.05?

18    BY MR. GADD

19    Q.   What is this?

20    A.   This is a map that we created.  Each of those yellow

21    dots is a zip code that PharmaMaster shipped illicit drugs

22    to.  If you take those dots that are on the map and you

23    click on them, and we'll see this, but you can explode it

24    out to all of the different orders that were shipped to that

25    specific zip code.
```

```
 1    Q.   Let's show an example.  Go to page 2.

 2    A.   Can I just say --

 3    Q.   Yes.  Go ahead.

 4    A.   Of interest is that every state in the union has a

 5    yellow dot on it and multiple yellow dots on it.  These

 6    drugs were shipped to every state in the United States.

 7    Q.   Including the two we don't see here, right, Hawaii and

 8    Alaska?

 9    A.   Correct.  Yes.

10    Q.   Let's look at page 2.

11         What is this we're looking at?

12    A.   So this is one of those zip codes.  I believe this was

13    in --

14    Q.   It is Daly City?

15    A.   Daly City.  Yes, this is Daly City, California, and

16    this is one of those yellow dots that we have clicked on

17    showing each of the orders that was placed to Daly City,

18    California.

19    Q.   One of those orders would have been Rusian's order?

20    A.   Yes, it would have.

21    Q.   Can we look at page 3?  What is this?

22    A.   So this is a close-up of the eastern United States just

23    showing each of the packages shipped -- each of the zip

24    codes.  Sorry.  Each one of these yellow dots is just a zip

25    code that a drug package was shipped to.
```

```
1    Q.   And then if we could go to the next page, do you
2    recognize that?
3    A.   I do, yes.  This is Sparks, Nevada.  We just chose one
4    to show everybody.  This is just the shipments to just
5    Sparks, Nevada, those red dots.
6    Q.   And then if we can go to the last page, what are we
7    looking at here?
8    A.   This is just a close-up of the western United States.
9    You can see the dots follow population lines related to
10   areas such as San Francisco, San Diego, Salt Lake, along
11   interstates and things of that nature.  Phoenix.
12             MR. GADD:  If I could have just one moment?
13             I have no further questions.  Thank you.
14             THE COURT:  Do you want to take a break or do you
15   want to start?
16             MR. SKORDAS:  It is up to you, Your Honor.
17             THE COURT:  Let's begin.  Go ahead.
18             MR. SKORDAS:  Thank you.
19                       CROSS-EXAMINATION
20   BY MR. SKORDAS
21   Q.   Agent Ashment, you indicated at one point in your
22   direct examination that you had interviewed a lot of people.
23   Do you recall that?
24   A.   Yes, I do.
25   Q.   And you were probably the lead agent on a lot of these
```

1    interviews.  Is that fair?

2    A.   Yes.  We interviewed numerous individuals.

3    Q.   And some interviews that occurred back in November of

4    2016 with the two women that are to the left of

5    Mr. Crandall, correct?

6    A.   Yes.

7    Q.   Ms. Tonge and Ms. Bustin?

8    A.   Yes.

9    Q.   Do you recall that interview?

10   A.   I do.

11   Q.   Do you recall going to their home on November 22nd of

12   that year to interview them?

13   A.   I do recall that, yes.

14   Q.   You attended that interview with a couple of other

15   agents including Inspector Henderson from the United States

16   Postal Service, correct?

17   A.   That is correct, yes.  I interviewed Ms. Tonge and she

18   interviewed Ms. Bustin.

19   Q.   And during parts of those interviews you spoke with Ms.

20   Bustin as well.

21        Is that fair?

22   A.   Yes, I have spoken with Ms. Bustin also.

23   Q.   When you spoke with Ms. Tonge she gave you what is

24   called a consent to search, correct?

25   A.   That is correct, yes.

```
 1    Q.   And allowed you to look into her computer.  Do you
 2    recall that?
 3    A.   Yes.
 4    Q.   And when you looked at that computer you went into her
 5    dark web e-mail address that she utilized to communicate
 6    with Aaron Shamo, correct?
 7    A.   That is not correct.  No.
 8    Q.   What did you do?
 9    A.   Are you asking regarding the dark net e-mail?
10    Q.   Yes.
11    A.   So on the dark net e-mail she gave us a login and
12    password, and then I was able to use that login and password
13    to log in to the dark net, to that e-mail address, yes.
14    Q.   And what you found is that she had this e-mail address
15    called passthepeas@sigaint.org.
16         Do you recall that?
17    A.   I do recall that, yes.
18    Q.   She used that address to communicate with Shamo, Drew
19    Crandall and Mario Noble, correct?
20    A.   Yes, that is correct.
21    Q.   That is what you found, correct?  I can show you a
22    report if that would help.
23    A.   That would be great.  Yeah.
24              MR. SKORDAS:  May I, Your Honor?
25              THE COURT:  Yes.
```

```
1    BY MR. SKORDAS
2    Q.   I don't intend to offer these as exhibits, but if it
3    will help you refresh your recollection, the first report
4    there is a 50-page report.
5         Do you see that?
6    A.   I do, yes.
7    Q.   I'm on page 2 of 50, paragraph 3.
8    A.   Okay.
9    Q.   Do you see that?
10   A.   I do, yes.
11   Q.   And what you wrote there was that during the interview
12   Tonge agreed verbally and in writing -- in written form,
13   rather, sign an I.C.E. form called a consent to search.
14   That is what we have been talking about a little bit,
15   correct?
16   A.   Correct.
17   Q.   And that she used that to communicate with Aaron Shamo,
18   Drew Crandall and Mario Noble?
19   A.   Sorry.  Which paragraph are you looking at on that?
20   Q.   The same one, just kind of following along your
21   writing, the next sentence.
22   A.   Yes.  Correct.
23   Q.   What she told you was that Shamo retrieved drug orders
24   from the dark web, correct?
25   A.   Correct.
```

```
1    Q.    And decrypted the orders and sent them to her e-mail
2    address, this pass the peas, correct?
3    A.    That is correct.
4    Q.    And then she and Bustin would use that to figure out
5    what they were supposed to do, correct?
6    A.    Yes.
7    Q.    And then they would package and ship the orders that
8    Shamo had given them, correct?
9    A.    Yes.
10   Q.    She indicated to you that she had worked at eBay with a
11   number of the individuals who were on this exhibit to your
12   left, correct?
13   A.    That is correct, yes.
14   Q.    Including Mario Noble?
15   A.    Yes.
16   Q.    And she indicated that in terms of this organization,
17   Noble answered e-mails relating to the purchase of drugs
18   from AlphaBay for Shamo, correct?
19   A.    Sorry.  What was that question?
20   Q.    I'm looking at what would be the fourth paragraph there
21   and the last sentence.  Maybe you could just read that for
22   us starting with Bustin stated --
23   A.    Bustin stated that she knew an eBay employee, Noble,
24   who answered e-mails related to drug purchases on AlphaBay
25   for Shamo.
```

```
 1    Q.   And then in the next paragraph she said that she
 2    believed that the e-mail account was accessed using a T.O.R.
 3    browser.
 4         Do you see that?
 5    A.   Yes.  I recall that, yes.
 6    Q.   How did she indicate that she was made familiar with
 7    how to access that?
 8         Actually, why don't you just read the next sentence for
 9    us.
10    A.   That is the second sentence?
11    Q.   The last sentence of that paragraph.
12    A.   Okay.
13    Q.   Bustin stated --
14    A.   Bustin stated that Crandall showed Tonge how to access
15    that e-mail account, decrypt the order fulfillment list and
16    then print the information.
17    Q.   And then the next sentence, if you don't mind.
18    A.   Sure.  Bustin stated Shamo texted her and Tonge to
19    notify them that an e-mail had been sent, and Tonge would
20    then print that e-mail using the method shown by Crandall.
21    Q.   At this point in time Aaron Shamo was in custody,
22    correct?
23    A.   Yes.
24    Q.   And Drew Crandall was sort of nowhere to be found.  Is
25    that fair?
```

```
 1   A.   Correct.  Yeah.  I mean we had an idea, but yes.

 2   Q.   Were you also present during any of the interview with

 3   Ms. Noble?  Excuse me, Mr. Noble.

 4   A.   Yes.  Yes, I was.

 5   Q.   He indicated that he also utilized this T.O.R. browser

 6   to log in to the dark web to conduct business, correct?

 7   A.   That is correct, yes.

 8   Q.   And he utilized his personal computer to conduct

 9   business for this organization, correct?

10   A.   Correct.

11   Q.   You had a follow-up interview with Mr. Noble on

12   December 7th of 2016.

13        Do you recall that?

14   A.   I believe on -- I might need to refresh my memory, but

15   that would be with a different agent.

16   Q.   If you would look -- I'm on page 3 here.  If you would

17   look at what is the fifth full paragraph there starting with

18   Noble stated that he processed --

19   A.   Sure.

20   Q.   He told you that he processed 20 to 50 orders daily,

21   correct?

22   A.   Correct.

23   Q.   And that he would compile daily order sheets and

24   encrypt them and send it to a secure e-mail which is

25   basically Tonge and Bustin's e-mail address, correct?
```

1    A.   Correct.

2    Q.   Noble told you that his operation in terms of this was

3    to place these orders and he would receive an encrypted

4    order and decrypt it and using his private key, copy it and

5    paste it onto a notepad, correct?

6    A.   He did not say he placed the order, though, just for

7    clarification.

8    Q.   What did he say?

9    A.   The other that you said, so he would send it to the

10   shipping team via his secure e-mail and --

11   Q.   What did he do?  Just tell the jury what Noble did.

12   A.   He would process -- he was customer service.  He was

13   granted surrogate access or shared access to AlphaBay.  Mr.

14   Shamo allowed him to have basically the customer service end

15   of access to the PharmaMaster storefront.

16   Q.   Do you recall going into Mr. Noble's Sigaint account

17   there on the next page, page 450?

18   A.   Yes.

19   Q.   In fact, you copied quite a large number of his

20   unencrypted e-mails, correct?

21   A.   Correct.  Yes.

22   Q.   Those go on for probably 10 or 20 pages, correct?

23   A.   That is correct, yes.

24   Q.   You got all of those off of Mario Noble's computer,

25   right?

1    A.   Yes.  Off of the his drw99sigaint.org e-mail address.

2    Q.   And if you would go to the last one, which is on page

3    19 of 50, do you see that one?

4    A.   Hold on a second.

5    Q.   Page 19 of 50.

6    A.   Okay.  I'm there.

7    Q.   There was one sent on it looks like March 15th and I

8    think we're in 2016.

9         Do you see that?

10   A.   Yes.

11   Q.   Who did you decide was drw99?

12   A.   Drw99 is the e-mail address that Mario Noble was using,

13   the Sigaint e-mail address that Mario Noble was using.

14   Q.   That was an e-mail directly from Mario Noble to Tonge

15   and Bustin, correct?

16   A.   I don't recall specifically asking him about

17   this e-mail particularly, but he did use that e-mail

18   address, yes.

19   Q.   But this particular printout looks to be one such

20   e-mail, correct, from him to them, correct?

21   A.   It is from drw99@sigaint to passthepeas@sigaint, yes.

22   Q.   Do you recall an interview with Drew Crandall on

23   December 13th of 2017?

24   A.   I recall interviewing him.  The exact date -- I will

25   take your word for it.

1    Q.   Well, if it will help, it is on that same page toward

2    the middle.  I'm just using your report, sir.

3    A.   The interview is on this page right here?  Okay.

4    Q.   Do you see that?

5    A.   Yes.

6    Q.   In December of 2017 Crandall admitted that he

7    communicated with Shamo, Bustin and Tonge via this Sigaint

8    process to process orders through the dark web and AlphaBay,

9    correct?

10   A.   Yes.  That is correct.

11   Q.   Earlier that month you had gone through the dark web

12   e-mail account for Tonge and Bustin.

13        Do you recall that?

14   A.   Yes.  Several agents went through that e-mail account,

15   yes.  Including me, yes.

16   Q.   And you printed it looks like page after page after

17   page of those as well.

18        Do you see that?

19   A.   I do, yes.

20   Q.   In fact, it goes from page -- I think we were on 19 --

21   all the way to page -- to almost the end of your report.

22        Do you see that?

23   A.   Yes, I do.

24   Q.   Page 48?

25   A.   Yes.

1    Q.    I want you to turn to page 49 of that.

2    A.    Okay.

3    Q.    Do you see that last e-mail there toward the bottom?

4    It is pretty long.

5    A.    I do, yes.

6    Q.    What is that?

7    A.    This is an e-mail from passthepeas@sigaint.org to

8    passthepeas@sigaint.onion.

9    Q.    Actually this is some instructions that they got from

10   Drew Crandall, isn't it?  Take a minute and read it.

11   A.    Yes, that is correct.

12   Q.    Would you read to the jury the instructions that Drew

13   Crandall gave them on July 8th, 2015?

14   A.    Sure.  Here is the A.S.C. file attached to this.  Open

15   the G.P.G. key chain program from your applications folder.

16   Then at the top go to file import and choose this file you

17   have downloaded.  Now when you have a text file to send to

18   us, right click on the bottom of that menu and choose

19   services, G.P.G. encrypt file.  Then in the box that comes

20   up you should choose jean001 key in the top box to encrypt

21   the file with.  The bottom box is for signing your message,

22   which means Aaron can detect any evidence of tampering with

23   the encryption.  For now don't worry about that.  Delete

24   this after reading and importing this A.S.C. file.

25   Q.    When you interviewed Crandall in June of 2017 he, in

1   fact, admitted sending that, correct?

2   A.   Yes, to my recollection.

3   Q.   I want to go back for a minute and talk to you a little

4   bit more, and then I will move on from Tonge and Bustin,

5   about your interview with them.  I'm looking at the second

6   report there that you have got.  It is a much shorter one,

7   eight pages.

8   A.   Okay.

9   Q.   If I were to go to the first page of that or maybe the

10  second page, it looks like this is more of the interview

11  with Tonge and Bustin from November 22nd, 2016.

12  A.   Okay.

13  Q.   Do you see that?

14  A.   I do.  Is that the highlighted section?

15  Q.   Yes.

16  A.   Okay.

17  Q.   Did I highlight that?

18  A.   It looks like it.

19  Q.   I didn't mean to.  I'm sorry.

20  A.   That is all right.

21  Q.   Does that say page 3 of 8?

22  A.   Yes, it does.

23  Q.   Okay.  If you look at the top of page 3 of 8 there is

24  some indications as to your conversation with Ms. Tonge.

25       Do you see that?

1    A.    Yes, I do.

2    Q.    It starts out in the first paragraph, maybe the second

3    line down, and says approximately two years ago Shamo stated

4    that Bustin and Tonge could become a drop, where Shamo would

5    have packages sent via commercial courier services to their

6    house located in South Jordan.  Shamo and Crandall would pay

7    them approximately two to $300 for receiving each package.

8         Correct?

9    A.    That is what it states, yes.

10   Q.    That is what they told you?

11   A.    Correct.

12   Q.    And she further told you that she looked at some of

13   these packages and she felt that they were probably illegal,

14   and she noticed that they were coming from different

15   jurisdictions, from Florida, overseas, China and that type

16   of thing, correct?

17   A.    Yes.

18   Q.    And she indicated that -- at least Ms. Tonge indicated

19   that her mother was ill so she went to Shamo and Crandall to

20   try to see how she could make more money helping them,

21   correct?

22   A.    Yes, she did state that.

23   Q.    Then she stated that Shamo and Crandall allowed her to

24   become more involved, correct?

25   A.    Correct.

1    Q.   So that she could make more money?

2    A.   Yes.

3    Q.   In fact, they were sort of upgraded to more than just

4    shipping.  They were packaging, correct?

5    A.   Yes.  They would package the drugs, yes.

6    Q.   Who showed them how to package the drugs?

7    A.   In the beginning it was Mr. Crandall that came over and

8    showed them how to package the drugs.

9    Q.   In fact, according to your report he came over there

10   nightly and instructed them how to package the narcotics in

11   order to ship them out to customers from the dark web,

12   correct?

13   A.   Yes.  As I recall that was for a short period of time.

14   Q.   Nightly, correct?

15   A.   Yes.  In the beginning it was nightly for a few nights.

16   Q.   He also showed them how to wrap the packages, correct?

17   A.   Yes.

18   Q.   And taught them how to use the vacuum sealer and Mylar

19   bags that he told them would make the narcotics

20   undetectable, correct?

21   A.   Yes, he did help teach them how to do that.

22   Q.   She told you that part of the reason that she and Ms.

23   Bustin got involved was because Shamo's and Crandall's

24   respective girlfriends didn't want to get involved in this,

25   correct?

1   A.   I do recall both girlfriends.  Well, I recall Ms. Grant

2   saying that she did not want to get involved in this, yes.

3   Q.   When they first started packaging, according to your

4   notes, they used padded envelopes or priority mail with

5   regular stamps, but then Crandall had them do something a

6   little different, correct?

7   A.   They did use padded envelopes initially, yes.

8   Q.   In fact, Crandall brought them envelopes and stamps

9   that he preferred them to use, correct?

10  A.   Initially.  In the very beginning that is what

11  happened, yes.

12  Q.   And if they were shipping supplies on their own, they

13  were reimbursed by Crandall and Shamo, correct?

14  A.   Yes.  They did receive reimbursement for products that

15  they bought with their own money, yes.

16  Q.   I read this report pretty thoroughly and I don't see

17  anywhere on there where it says initially only.  I mean,

18  this looks like I am just reading your report, sir.

19  A.   This would be according to additional interviews, so

20  this is November 22nd, 2016, if I remember right, when this

21  interview occurred, and this would be according to

22  interviews that happened later and conversations later.  So

23  initially, yes, this is --

24  Q.   This is the information that you had when you

25  interviewed these two females?

1    A.    That is correct.  Yes, initially on November 22nd this

2    was the information that we had and we learned additional

3    information later.

4    Q.    And they told you that they would then sort of drop off

5    these packages in what I call a mailbox, but a blue box,

6    correct?

7    A.    Yes.

8    Q.    And that, in fact, Crandall instructed them to use

9    fictitious company names as the shippers on the packages,

10   correct?

11   A.    Yes.

12   Q.    Do you see that, that you wrote down on there?

13   A.    I recall that, yes.

14   Q.    It does not say initially, does it?

15   A.    On this report it does not say initially, no.

16   Q.    They told you about their involvement with a fellow

17   named Sean Gygi, correct?

18   A.    Yes, they did.

19   Q.    They told you that they sort of wanted to minimize

20   their involvement in this, so they wanted to have a runner

21   or somebody else that would help do part of the literal

22   legwork, correct?

23   A.    Yes.

24   Q.    That is what Mr. Gygi's initial role was?

25   A.    His initial role would be a package receiver for the

1    organization but, yes, he did progress to that.

2    Q.   In fact, they were setting up packages for Gygi as

3    recently as November 20th of that year, two days before you

4    interviewed them, correct?

5    A.   Correct.

6          MR. SKORDAS:  I just have a couple more on this

7    issue, Judge, and then we can take a break, but I have quite

8    a bit more.

9          THE COURT:  Finish this issue and then we'll take

10   a break.

11         MR. SKORDAS:  Okay.

12   BY MR. SKORDAS

13   Q.   Go to the bottom of page 5 of that report.

14        Are you with me?

15   A.   Yes.

16   Q.   The last paragraph.

17   A.   Yes.

18   Q.   Ms. Tonge told you guys that there were messages on her

19   phone on the Telegram app from Crandall, correct?

20   A.   Correct.

21   Q.   It does not say initially, does it?

22   A.   It does not say initially, no.

23   Q.   She stated that Crandall was in Laos with Sasha, and

24   that is his girlfriend, right?

25   A.   Correct.  We knew he was in Laos or we suspected it.

1   Q.   And that from there he was in fact sending them

2   messages on the dark web related to this, correct?

3   A.   Yes.  She says specifically like customer service on

4   the dark web related to narcotics orders.

5   Q.   She had the impression, didn't she, that in fact

6   Crandall was coming back to the United States in May of

7   2017.

8       Do you see that?

9   A.   A few paragraphs down?

10   Q.   The top of page 6.

11   A.   It is hard for me to recall directly just --

12   Q.   That is why I gave you the report.

13   A.   As the investigation proceeded we learned additional

14   information is why, so I'm just thinking back to this time

15   when we initially started this, yeah.

16   Q.   Well, I'm trying to help you here with your own report.

17   A.   Thank you.  Which paragraph?

18   Q.   Top of page 6.

19   A.   Okay.

20   Q.   She told you that Crandall had indicated or at least

21   she had the impression that he was coming back to the United

22   States in May of 2017?

23   A.   That is correct, yes.

24   Q.   They told you that in fact a fellow named Mario Noble

25   got involved with this organization as well, correct?

```
 1    A.   Yes, they did.

 2    Q.   And they told you Mario Noble's role, which was

 3    basically to sort of deal with customer complaints and take

 4    care of that type of thing?

 5    A.   Yes.  It seems, as I recall, that they had a limited

 6    knowledge of his role, but I do believe they did say

 7    customer service type issues, yes.

 8    Q.   They also told you a little about about Luke Paz.

 9         Do you recall that?

10    A.   I do recall his name being mentioned in this report,

11    yes.

12    Q.   And they told you that Luke Paz helped by pressing

13    pills at his home -- at Shamo's home on 7939 Titian Street

14    in Cottonwood Heights, correct?

15    A.   That is correct.

16    Q.   Paz had worked for Vivint and traveled -- at least he

17    told them that he was working for Vivint and traveled often,

18    but they thought it was strange that he was home so much and

19    in Shamo's house, correct?

20    A.   Correct.

21    Q.   They told you that Shamo, Crandall, Noble, Gygi, Sasha,

22    herself and Bustin -- and this is Ms. Tonge -- all met while

23    they were working at eBay?

24    A.   Yes.

25              MR. SKORDAS:  This is probably a good time for a
```

```
 1   break.
 2              THE COURT:  We'll take a break and be in recess
 3   until 10:30.
 4              (WHEREUPON, the jury leaves the proceedings.)
 5              THE COURT:  10:30.
 6              (Recess)
 7              THE COURT:  Let's get the jury and proceed.
 8              (WHEREUPON, the jury enters the proceedings.)
 9              THE COURT:  You may proceed, Mr. Skordas.
10              MR. SKORDAS:  Thank you, Your Honor.
11   BY MR. SKORDAS
12   Q.   Dan, I was just told that we're putting everybody to
13   sleep this morning, so I'm going to pick it up here a little
14   bit.
15   A.   Thank goodness.  No.
16   Q.   Yes.  I will try to do better.
17        I put some reports in front of you and they are much
18   shorter than the 50-pager that we just did.  I think they
19   are all about three or four pages.  What I tried to do is
20   put them in sequential order in terms of your interviews
21   with six other individuals, if I could just go through those
22   quickly with you.
23   A.   Okay.
24   Q.   The top one is a report of an interview that you had
25   with a woman named Sadie Gurley.
```

```
 1        Do you see that?
 2   A.   I do, yes.
 3   Q.   Who is Sadie Gurley?
 4   A.   Sadie Gurley is Luke Paz's wife now.
 5   Q.   At the time you interviewed her in December of 2016,
 6   she was his girlfriend, correct?
 7   A.   Yes.  At the time she was his girlfriend.
 8   Q.   She had indicated that they were looking for work or
 9   Paz was trying to get some employment in Texas, it looks
10   like from your interview down here?
11   A.   Yes.  I believe he was selling for his company, and I
12   believe it was Vivint or that company in Texas.
13   Q.   Where did this interview with Sadie Gurley take place?
14   A.   This was at Emily Mitchell's residence where Sadie
15   Gurley was staying.
16   Q.   Who interviewed her?
17   A.   I did.
18   Q.   With who else?
19   A.   With a task force officer, Vincent, a Homeland Security
20   investigations task force officer.
21   Q.   If I were to tell you, and I think I already have, that
22   it was December 13th of 2016, does that seem right?
23   A.   That does, yes.
24   Q.   She described Paz as Shamo's best friend, correct?
25   A.   She did, yes.  Well --
```

1    Q.   Go ahead.

2    A.   Yes.  I would believe that, yeah, as a good friend or

3    best friend.  Yeah.

4    Q.   I can show you, if it helps.

5    A.   That is great.

6    Q.   It is the bottom of page 2 there, the last line, last

7    sentence, last paragraph.

8    A.   She felt Paz was Shamo's best friend.  Perfect.

9    Q.   She was not, at least when you interviewed her,

10   claiming much knowledge as to what was going on here between

11   Paz and Shamo and everybody else, correct?

12   A.   No.  She didn't claim much knowledge.

13   Q.   And as you sit here today that is probably true, that

14   she was kept out of this in some part.  Is that fair?

15   A.   I think that is fair to say.

16   Q.   She was not indicted or anything that you know of?

17   A.   No.

18   Q.   Never spent a day in jail or anything like that?

19   A.   No.

20   Q.   She told you that she was dating Paz during the time

21   leading up to your interview with her?

22   A.   She did, yes.

23   Q.   And she said that Paz was usually at Shamo's residence

24   a few times a week, correct?

25   A.   Yes.

1   Q.   She allowed you to take a look at her cell phone during

2   that interview.

3        Do you recall that?

4   A.   I do recall that, yes.

5   Q.   Why were you interested in looking at her cell phone?

6   A.   Communications mostly.  We would be looking for

7   communications to see what knowledge she would have of what

8   was going on.

9   Q.   In fact, you found one communication that probably

10  didn't make you too happy, correct?

11  A.   Yes, we did.

12  Q.   She had told Mr. Paz that you guys were on your way

13  over to interview her or something to that effect, correct?

14  A.   Yes.  I recall that she sent a text message to Mr. Paz

15  saying law enforcement was there to interview --

16  Q.   You talked to her about Luke Paz's finances and how he

17  spent money.

18       Do you recall that?

19  A.   I do recall that, yes.

20  Q.   She told you that he was a big gambler, at least a

21  regular gambler, correct?

22  A.   Yes, she did.

23  Q.   And that he had lost more than $1,000 at a time

24  gambling.

25       Do you recall that?

1    A.   Yes.  When we pressed her on amounts of money, she did

2    say she had seen him lose upwards of $1,000 gambling.

3    Q.   She also described that he gave her money periodically

4    to help her out with her bills?

5    A.   She did say that also, yes.

6    Q.   You were interested in finding out Mr. Paz's finances,

7    if he was getting money from this organization, correct?

8    A.   Yes, we were.  We were very --

9    Q.   I'm sorry.

10   A.   We were very interested in that, yes.

11   Q.   In fact, you confirmed that, correct, through her?

12   A.   Confirmed?  Excuse me?

13   Q.   You confirmed that, that Paz collected a fair amount of

14   money?

15   A.   I don't believe during this interview she stated that

16   he had collected a fair amount of money.

17   Q.   She stated that he had blown a fair amount of money

18   gambling and whatnot, correct?

19   A.   Yes, that he had spent more than $1,000 gambling.  It

20   also goes on to say that she had seen Shamo spend

21   approximately $5,000 in Las Vegas also.

22   Q.   Right.  These guys were spending a fair amount of

23   money, correct?

24   A.   Correct.

25   Q.   I want to draw your attention to another interview you

```
 1    had with a person named Preston Mitchell on January 19th of

 2    2017.

 3        Do you see that?

 4    A.   I do.

 5    Q.   Do you recall that?

 6    A.   I do recall that, yes.

 7    Q.   Who is Preston Mitchell?

 8    A.   Lyle Preston Mitchell is Emily Mitchell's father.

 9    Q.   Who is Emily Mitchell?

10    A.   Emily Mitchell was -- so Lyle actually I believe owned

11    the home that they were staying in, and Emily is his

12    daughter and she lived there at the time also.

13    Q.   It was a home that you actually served a warrant at,

14    correct?

15    A.   It was, yes.

16    Q.   When you served that warrant, was that on or about the

17    same day that you interviewed him in January of 2017?

18    A.   No.  As I recall, Mr. Mitchell found out who I was

19    through other law enforcement officers and called me on the

20    phone at a later time, if I remember right.

21        No.  On January 19th -- sorry.  You are correct.  It

22    was a phone call.  It was not in person during the warrant.

23    Q.   I apologize.

24        He told you that during that summer, and that would

25    have been 2016, that he had seen five or six packages
```

1    delivered to Paz at that address, his Woodland address,

2    correct?

3    A.    That is correct, yes.  Well, yes, that is correct.

4    Q.    I am not trying to trick you.

5    A.    I know.

6    Q.    It is your report.

7    A.    I just want to be thorough and detailed.

8    Q.    I appreciate that.  I think everyone does.  Thank you.

9          He described a specific particular incident during the

10   summer of 2016, correct, involving a large package?

11   A.    Yes, he did.

12   Q.    He told you that the delivery driver showed up with a

13   large crate that was addressed to Luke Paz?

14   A.    Correct.

15   Q.    Do you recall that?

16   A.    Yes, I do.

17   Q.    And that it was big and that it was heavy?

18   A.    Correct.

19   Q.    He asked Luke Paz what it was?

20   A.    He did.

21   Q.    And Paz lied to him?

22   A.    Yes.

23   Q.    He told him it was a transmission?

24   A.    That is correct.

25   Q.    That the two of them loaded onto somebody's car or

```
 1    truck or something like that?
 2    A.   He did.  I also recall Mr. Paz telling me later that
 3    this was inaccurate what Mr. Mitchell had said, but --
 4    Q.   Well, he certainly didn't tell him it was a pill press,
 5    right?
 6    A.   No, he did not.
 7    Q.   He told you sort of similar to what Ms. Tonge said,
 8    which was that Luke Paz claimed to have employment through
 9    some solar company but he was sure home a lot, correct?
10    A.   Correct.
11    Q.   He thought that that was a little bit unusual?
12    A.   That is correct.
13    Q.   Later on in 2017 you finally had the opportunity to
14    interview Drew Crandall.
15         Do you recall that?
16    A.   I do, yes.
17    Q.   That would have been on May 5th of 2017?
18    A.   That is correct.
19    Q.   Where was that interview?
20    A.   That interview would have been in Hawaii.
21    Q.   Where?
22    A.   What island?
23    Q.   Yes.  Where were you?
24    A.   We were at the international airport in Hawaii.
25    Q.   And you were allowed to utilize a room or something
```

1   like that to do these interviews, correct?

2   A.   That is correct.  Yes, they have an interview room at

3   the airport.

4   Q.   And you interviewed both Crandall and his

5   girlfriend/fiancee, Ms. Grant?

6   A.   Yes, we did.  We interviewed both of them.

7   Q.   You learned that they were there to get married, right?

8   A.   Yes.

9   Q.   As far as you know that never occurred, did it?

10  A.   Not as far as I know.

11  Q.   Because Drew Crandall was hooked up sometime that day?

12  A.   He was arrested that day, yes.

13  Q.   And not allowed to attend his own wedding, so to speak?

14  A.   That is correct.

15  Q.   Mr. Crandall told you that he and Sasha had been living

16  overseas for about 18 months prior to that time, correct?

17  A.   Correct.  Yes.

18  Q.   That they had gone to New Zealand?

19  A.   Yes.

20  Q.   Later moved to Australia?

21  A.   Correct.  Through several Asian countries, yes.

22  Q.   And traveled through several Asian countries including

23  Thailand, Laos, Cambodia, Malaysia, Singapore and Indonesia?

24  A.   Yes, that is correct.

25  Q.   He told you some things, Mr. Crandall did, that you

```
1   later learned were not true.
2       Isn't that fair?
3   A.  That is fair to say, yes.
4   Q.  Not the least of which was that he claimed during this
5   interview in Hawaii that he was gainfully employed and tried
6   to make it -- I won't say what he was trying to do.  He
7   indicated to you that he had a better source of income than
8   you later learned he actually did, correct?
9   A.  He was employed overseas --
10  Q.  Right.
11  A.  -- at different jobs, yes.
12  Q.  But not at the rate of pay that he was claiming?
13  A.  I don't recall how much he claimed he made overseas,
14  but I do recall that he said that he had a job or different
15  jobs overseas, several different jobs overseas.
16  Q.  He talked to you about spending money, including the
17  costs of this very wedding that he was going to Hawaii for,
18  correct?
19  A.  Yes.  As I recall, he said his parents had given them
20  money and her parents had also given them money.
21  Q.  And he told you that that amounted to a portion of the
22  wedding costs and that he paid the balance, correct?
23  A.  Correct.  I believe they give him approximately 10,000,
24  if I remember correctly.
25  Q.  You chitchatted with him about his personal life and I
```

1    suppose sort of get to know you kinds of things.

2        Do you recall that?

3    A.    I do recall that, yes.

4    Q.    He told you that he was close to getting a degree in

5    mechanical engineering at the University of Utah?

6    A.    I believe he said that he was three years away, but he

7    had different obstacles in his path.  Yes.

8    Q.    At one point during your interview with him -- I take

9    it from your report that you must have become frustrated

10   that he was not being truthful with you?

11   A.    You know, as I testified earlier, it is very common for

12   defendants to not be truthful with law enforcement, when

13   they are confronted with crimes, with rationalization,

14   justifications, initially that is how it works.  Then we

15   eventually get to the truth most of the time.  We try our

16   best.

17   Q.    But you're certainly not justifying the initial lies,

18   are you?

19   A.    Oh, no.  No.  What I'm saying is that this is just --

20   this is common, every day.  One of the sayings amongst law

21   enforcement is how do you know someone is lying?  It is

22   because they are opening their mouth.  It happens regularly

23   is what I'm saying.

24   Q.    And it happened with Mr. Crandall?

25   A.    It did.

```
 1    Q.    Repeatedly?

 2    A.    There were lies told, yes.

 3    Q.    Specifically you were asking about finances and his

 4    money and where he kept money.

 5          Do you recall that?

 6    A.    I do recall that, yes.

 7    Q.    He told you that he had depleted all of his savings

 8    that he and Sasha had, and that he had a couple of bank

 9    accounts in both Australia and New Zealand.

10          Do you recall that?

11    A.    I do recall him saying that.

12    Q.    You asked him about Bitcoins.

13          Do you recall that?

14    A.    I do.

15    Q.    And he told you that he did not have and never had

16    owned digital or cryptocurrency.

17          Do you recall that?

18    A.    Yes.  Then he said that he owned one Bitcoin early on,

19    later on, yes.

20    Q.    Both of those were lies, correct?

21    A.    That is correct.  I mean, he did own one, but he owned

22    more than one.  Yes.

23    Q.    Good point.

24          He told you that he had one Bitcoin and that he had

25    spent $5 on it after you pressed him, correct?
```

```
1   A.   That is correct.  He said early on he had invested in
2   one Bitcoin and spent very little money, maybe -- I will
3   trust you if you say $5.
4   Q.   That was after he told you at first that he had no
5   Bitcoins?
6   A.   That is correct.
7   Q.   And then you pushed him and he said, okay, I have one
8   that cost me five bucks?
9   A.   Correct.
10  Q.   Something like that?
11  A.   Yes.
12  Q.   He told you that he didn't even know how Bitcoins
13  worked, correct?
14  A.   Let me turn to where you are --
15  Q.   Sure.
16  A.   Which paragraph are we on?
17  Q.   Page 4 of 5.
18  A.   Last paragraph?
19  Q.   Second to the last paragraph.
20  A.   Okay.
21  Q.   There is a line that begins he said that he didn't
22  know --
23  A.   He had had a coin or two like when it was worth $2,
24  yes.
25  Q.   And he said he didn't know exactly how Bitcoins worked?
```

```
 1    A.   That is correct.
 2    Q.   That was another lie, correct?
 3    A.   He didn't have a wallet address anymore and didn't have
 4    the ability to get to it.
 5    Q.   Well, my question was that he indicated that -- I'm
 6    looking at the second paragraph from the bottom on page 4.
 7    A.   Okay.
 8    Q.   He said that he didn't know exactly how Bitcoins
 9    worked.
10         Do you see that?
11    A.   Okay.  Yes, I do.
12    Q.   He told you that?
13    A.   But he knew you needed a unique wallet address that
14    stored your money, yes.
15    Q.   He knew how Bitcoins worked.  He had cashed them out?
16    A.   Correct.
17    Q.   And it wasn't just one $5 Bitcoin, correct?
18    A.   Correct.
19    Q.   You learned that?
20    A.   Yes.
21    Q.   He told you that he had not made money while he was
22    overseas in any other way than what he had described to you,
23    which was by working odd jobs and that type of thing,
24    correct?
25    A.   Correct.
```

```
 1    Q.   That was another lie, wasn't it?

 2    A.   Yes, that was a lie.

 3    Q.   He was getting paid through this organization much of

 4    the time he was overseas, wasn't he?

 5    A.   Yes, he was.

 6    Q.   He was getting paid in Bitcoins and other things,

 7    correct?

 8    A.   If I can clarify, I believe from the middle of 2016 he

 9    was getting paid through this organization after he

10    reentered it.

11    Q.   I'm asking you about an interview you had with him in

12    May of 2017.

13    A.   Yes.

14    Q.   At that point he was and had been for several months

15    getting money from this organization, correct?

16    A.   Yes.

17    Q.   Even though he is halfway across the planet?

18    A.   That is correct, yes.

19    Q.   How long did your interview with Drew Crandall go that

20    day?  Do you recall?

21    A.   It does not seem -- it was maybe a couple hours at

22    most, I would say.  It wasn't terribly long.

23    Q.   Is it safe to say that he sort of played dumb on the

24    whole -- that Aaron Shamo has been arrested for the last

25    couple of months?
```

1   A.   I would say it is safe to say that.  I would say it is

2   safe to say I played a little dumb, too, during that

3   interview.

4   Q.   Right.  But that is your job, correct?

5   A.   Depends on who you ask.

6   Q.   You're not dumb.  You're very bright.

7        His role in this interview isn't to lie to you?

8   A.   No.

9   Q.   Do you recall interviewing Sasha Grant at the same

10  time, during that same period of time?

11  A.   I didn't interview her, but she was interviewed during

12  that same period of time, yes.

13  Q.   You have seen that interview?

14  A.   Yes.  I have seen the report, yes.

15  Q.   If you look at the reports that say Grant at the top, I

16  think --

17  A.   Okay.

18  Q.   This was the same day, correct, May 5th?

19  A.   Correct.  Yes.

20  Q.   If you look at page 2 of that right in the middle it

21  says Special Agent Keys reported the following.

22  A.   Okay.

23  Q.   Do you see that?

24  A.   I do see that.

25  Q.   It makes it appear from at least Special Agent Keys

```
 1    that you, Dan Ashment, interviewed Sasha Grant.
 2    A.   Can I read it?
 3    Q.   Sure.  On the above date and time --
 4    Q.   Wait.  Wait.
 5    A.   Sorry.
 6         THE COURT:  If you are going to read it for the
 7    record, you need to slow down.  If you are going to read it
 8    to yourself --
 9         THE WITNESS:  Sorry.  Which should I do?  I will
10    read it to myself maybe.
11         MR. SKORDAS:  You are sort of torturing the
12    reporter here.  Read it to yourself.
13         THE COURT:  Read it to yourself as fast as you
14    want.
15         THE WITNESS:  Thank you, Your Honor.  Okay.
16    BY MR. SKORDAS
17    Q.   It appears at least from that portion that you were in
18    some part of some interview with Sasha Grant.
19         Do you recall that?
20    A.   Yes.  So as the case agent on this investigation, I
21    would have popped in and out of Ms. Grant's interview also.
22    Yes.
23    Q.   You knew that she and Drew Crandall had arrived in
24    Hawaii for a wedding?
25    A.   Yes.
```

1    Q.    And that they had arrived on or about the 5th, which

2    was the date of this interview of May of 2017?

3    A.    I did know that, yes.

4    Q.    And the wedding was like a week away on the 12th?

5    A.    That is correct.

6    Q.    And that the two of them were there and going to spend

7    a week sort of traipsing around Hawaii prior to their

8    wedding, correct?

9    A.    Yes, they were.

10   Q.    They were going to stay on Kauai and in Honolulu.

11         Do you recall that?

12   A.    I knew they were coming to Hawaii to get married and to

13   visit different places, yes.

14   Q.    She showed you her wedding ring, didn't she?

15   A.    I don't recall that specifically.

16   Q.    Okay.  I won't ask you anymore than this, but do you

17   see that whoever interviewed her and wrote this report made

18   some reference to the wedding ring at the bottom of page 2?

19   A.    Page 2.  Okay.  Yes, I do see the reference to that.

20   Q.    You were not personally aware of that wedding ring?

21   A.    I don't know that I recall or paid attention, honestly.

22   Q.    Somebody thought enough about the wedding ring to make

23   it part of their report, though, didn't they?

24   A.    Yes.

25   Q.    You knew that their plans after the wedding were to go

1    back to Australia.

2         Do you recall that?

3    A.   I do recall that, yes.

4    Q.   They were not planning to come here to Utah to live or

5    anything like that?

6    A.   Yes.  I remember that, yes.

7    Q.   In fact, they didn't even have tickets to Utah.  Their

8    flights were Australia to Hawaii and then back?

9    A.   Yes.  My understanding was that they were going to

10   return to Australia.

11   Q.   She also confirmed some of the things that Drew did,

12   which is that they had traveled to these various countries

13   in Asia.

14        Do you recall that?  I'm looking at page 3, the second

15   paragraph.

16   A.   Yes.

17   Q.   She had visited Thailand, Laos, Cambodia, Malaysia,

18   Singapore and Bali?

19   A.   Yes.

20   Q.   She indicated that she was pretty exhausted because

21   they had been to six countries in three months?

22   A.   That is correct.

23   Q.   And she even described some of the things that they did

24   while they were there at these various countries.

25        Do you see that?

1    A.   I do see that.

2    Q.   Events and festivals and parties and yoga and

3    restaurants?

4    A.   Yes.

5    Q.   All the things that cost money, correct?

6    A.   Yes, all those things would cost money.

7    Q.   If you go to page 5, and I don't know if you were part

8    of this conversation, but she told agents that Drew was,

9    quote, good with computers.

10        Do you see that?

11   A.   Which paragraph?

12   Q.   Page 5, the second paragraph, first line.

13   A.   Yes, I do see that.

14   Q.   She said that she is not very good with computers but

15   that Drew is.

16   A.   Correct.

17   Q.   In fact, she said he is really good with computers.  Do

18   you see that in the last sentence of that paragraph?

19   A.   Yes.  That is what it says.

20   Q.   She told you a little bit about her personal life and

21   she told you that she, in fact, had worked for the postal

22   service for a while.

23        Do you see that?

24   A.   Yes.  The fourth paragraph down, yes.  I do recall that

25   from the investigation.

1    Q.   In fact, she had been to China before to study abroad

2    and teaching English?

3    A.   The report does say that, yes.

4    Q.   In terms of her working and supporting themselves, she

5    also told you that there was at least one three-month period

6    while they were there when they were traveling so much that

7    neither of them was able to work.  That is the fifth

8    paragraph, second sentence.

9    A.   Correct.

10   Q.   If you go to page 5 there -- excuse me.  Page 6.  Do

11   you see that first paragraph that began on the prior page?

12   A.   Okay.

13   Q.   If you would read the sentence that begins Grant said,

14   that second line.

15   A.   Grant said before they left the U.S., Crandall was

16   working at Data2 Logistics.

17   Q.   Go ahead.  The next sentence, please.

18   A.   Data2 Logistics is a data shipment company and Crandall

19   had a case manager, account manager type position.

20   Q.   She was asked about Bitcoins also the same as Drew

21   Crandall.

22        Do you recall that?  I'm now on page 7.

23   A.   Okay.

24   Q.   Seven out of 8.  We're heading for home.

25        Do you see that?

1    A.   Yes, I do.

2    Q.   The fourth paragraph beginning with she said she has

3    not done Bitcoins but Crandall has.

4    A.   Yes.

5    Q.   And that she claimed that she didn't know anything

6    about Bitcoins, correct?

7    A.   Correct.  That is what the report says, yes.

8    Q.   This is while Drew Crandall is in the next room telling

9    you all that he does not have anything to do with Bitcoins,

10   correct?

11   A.   That is correct.

12   Q.   She said that Drew Crandall actually tried to explain

13   the Bitcoin process to her, but he would use technical words

14   and she didn't even understand what he was talking about.

15        Do you recall that?

16   A.   Yes, I can see that in the report.

17   Q.   He told her that he had been -- that he had had

18   Bitcoins for some time and in fact invested in them.

19        Right?

20   A.   Yes.  That is what the report says, yes.

21   Q.   And that he was sort of knowledgeable and sort of

22   treated Bitcoins like some of us might the stock market and

23   was sort of watching how they fluctuated almost like an

24   investment.

25        Do you see that?

1    A.   I do see that.

2    Q.   She said that Drew would cash in his Bitcoins for cash,

3    but he didn't tell her what he was doing with the cash.

4         Is that correct?

5    A.   Yes.

6    Q.   And in the last two sentences of that paragraph she

7    told you all that Crandall was able to use Bitcoin to help

8    them travel the world, sold a bunch of them, which she

9    thought was cool and travel money.

10        Do you see that?

11   A.   I do see that.

12   Q.   Is that your recollection of how your conversation with

13   the other agents went?

14   A.   Yes.  So, like I said, I was mainly focused on

15   interviewing Drew Crandall at the time, and she was being

16   interviewed simultaneously.  So I would have been in and out

17   depending on how things were going with the interviews at

18   that time.  From my recollection and from reading this

19   report and knowing the agent, yes.

20   Q.   Finally, she described Crandall as a nerdy guy who

21   enjoys playing video games and trading Bitcoin.  That is how

22   she described him, correct?

23   A.   Yes.

24   Q.   I want to draw your attention now to a search warrant

25   that you were part of the execution of in February of 2017

1    at the Titian Way residence.

2         Do you recall that?

3    A.   So I was part of the Open View Lane search warrant and

4    I was interviewing the girls at the time and going on

5    through additional interviews with Mario and package

6    receivers that night.

7    Q.   So you were not part of the search warrant where you

8    interviewed Mr. Lapin, the landlord to Mr. Shamo and Paz?

9    A.   That would have been other agents.

10   Q.   Okay.

11   A.   If I might clarify that, I am not sure if he was at the

12   second search warrant on Titian Way when Agent Keys did the

13   search warrant on the garage.

14   Q.   Right.

15   A.   So I was at that search warrant and was part of that

16   search warrant.  So just to clarify, the first -- the

17   initial search warrant on November 22nd I was at the other

18   residence, and then the second search warrant I did join in

19   that search warrant.

20   Q.   What was found during that search warrant?

21   A.   A crate.  I mean, we found numerous things, but a crate

22   was also found there.

23   Q.   The crate had an address label on it, correct?

24   A.   Correct.

25   Q.   Who was it addressed to?

1    A.   It was addressed to Mr. Paz.

2    Q.   At a different address?

3    A.   Correct.

4    Q.   But it was there in the house that he and Shamo had

5    rented or had some deal with Mr. Lapin on, correct?

6    A.   So as I recall from our interview with Mr. Lapin, Luke

7    had signed the lease, but all the other interviews have

8    indicated that he did not live at that residence.

9    Q.   If you would look at page 3 of 6 of that report, the

10   one that says Lapin on the top, it describes a bunch of

11   photographs that were taken.

12        Do you see that?

13   A.   I do, yes.

14   Q.   Did you observe any of the items that are depicted or

15   described here in these photographs?

16   A.   Yes.

17   Q.   Specifically if you would look at the top of page 4,

18   that is the door to the crate that you have just described,

19   correct?

20   A.   Correct.

21   Q.   And you already described this, that it was sent to

22   Luke Paz at a Woodland Avenue address?

23   A.   Correct.

24   Q.   It has a phone number.  Do you see that, 801-404-3235?

25   A.   I do, yes.

1  Q.  Did you ever find out whose phone number that was?

2  A.  Yes.  I would have to verify, but I believe that is

3  Mr. Paz's.

4  Q.  Down below image 0026, what is that?

5  A.  The description is a photograph of one shipping crate

6  wall which was inscribed with a black marker U.S.A. and

7  beneath that a phone number and under this was written Luke

8  Paz MB-2.  Then it goes on.

9  Q.  And images number 28 through 35, do you see that?

10  A.  I do.

11  Q.  It included a shipment or at least some packing

12  information addressed to a Jessica Gleave in Provo.

13  A.  Correct.

14  Q.  She was another drop, correct, that we have already

15  talked about?

16  A.  She was, yes.

17  Q.  Going further down there -- well, I will try to make

18  this quick.  There are about ten other packages and

19  photographs that you describe or at least that are described

20  here, starting with the third paragraph of page 5, FedEx

21  tracking number 810?

22  A.  Okay.

23  Q.  I will try to go through these quickly.

24  A.  Okay.

25  Q.  It is a shipment from Thailand on October 22nd to Luke

```
 1   Paz, correct?
 2   A.   China, I believe, rather than Thailand.  The shipment
 3   went to Luke Paz.
 4   Q.   Thailand Street.  The street is called Thailand or
 5   something like that.
 6        A 40-kilogram package?
 7   A.   Sorry.  I was looking at the next one down.  Yeah,
 8   Thailand Street from China, yes, 40 kilograms.  Yes.
 9   Q.   That was October 22nd of 2016, right?
10   A.   Yes.
11   Q.   And another one is dated November 3rd, 2016 in the next
12   paragraph?
13   A.   Yes.
14   Q.   Also a package delivered to Luke Paz, correct?
15   A.   Correct.
16   Q.   From China?
17   A.   Yes.  Correct.
18   Q.   265 kilograms?
19   A.   Yes.
20   Q.   That is a big item?
21   A.   Yes.  I mean, that is heavy.
22   Q.   A heavy item.  July 15th, 2016, the next paragraph --
23   A.   Yes.
24   Q.   Do you see that?
25   A.   I do see that, yes.
```

```
1   Q.   A 48-kilogram package delivered to Luke Paz?

2   A.   Yes, I do see that.

3   Q.   The next one down is April 6th, 2016.

4        Do you see that?

5   A.   Yes, I do see that.

6   Q.   A 45-kilogram package delivered to Luke Paz?

7   A.   Yes, I see that.

8   Q.   All of these are at 1500 Woodland Avenue, correct?

9   A.   Yes.

10  Q.   And coming from China?

11  A.   Correct.

12  Q.   The next one down is March 30th, 2016, a 96-kilogram

13  package to Luke Paz?

14  A.   I do see that, yes.

15  Q.   And the next one down is dated June 15th, 2016?

16  A.   Yes.

17  Q.   Another package to Luke Paz.

18       Do you see that?  At least it was to that same address

19  at 1500 Woodland Avenue.

20  A.   Okay.  To the same address, yes.

21  Q.   And then without going through each one, you found at

22  least three more, June of '16, a 265-kilogram package, and,

23  finally, in December of 2015 a large commercial pill press.

24       Do you see those?

25  A.   Can I clarify?
```

1   Q.   Sure.

2   A.   The large commercial pill press was seized by Customs

3   and border protection in Memphis at that time.

4   Q.   But it was a package --

5   A.   It was not to anyone in this organization.  It was a

6   clarification of types of packages seized at that point.

7   Q.   All right.  But the other ones were all addressed to

8   and ostensibly received by Luke Paz at 1500 Woodland Avenue,

9   correct?

10  A.   They were addressed to Luke Paz at that address.

11  Q.   You finally got to interview Luke Paz, right?

12  A.   Yes.

13  Q.   And when did that interview take place?

14  A.   Do I have a report?

15  Q.   Sure.

16  A.   If I remember right, it was -- so, yeah, July of 2018.

17  Q.   July of 2018, correct?

18  A.   That is correct, yes.

19  Q.   Is that in terms of your knowledge the first time he

20  was interviewed?

21  A.   Yes.

22          MR. SKORDAS:  May I have just a minute, Your

23  Honor?

24          THE COURT:  You may.

25          MR. SKORDAS:  That is all that I have, Your Honor.

```
 1              THE COURT:  Redirect.

 2                      REDIRECT EXAMINATION

 3  BY MR. GADD

 4  Q.    I won't show you any reports.

 5        From November of 2015 to November of 2016 someone's

 6  wallet received 3,000 Bitcoin from AlphaBay.  Whose wallet

 7  was it?

 8  A.    That was Mr. Shamo's wallet.

 9              MR. GADD:  That's all that I have.  Thank you.

10              THE COURT:  Any recross?

11              MR. SKORDAS:  No, Your Honor.

12              THE COURT:  Thank you.

13              You may step down.

14              MR. GADD:  Your Honor, the United States rests.

15              THE COURT:  Thank you.

16              (Proceedings continue.)

17

18

19

20

21

22

23

24

25
```

1

2          Mr. Skordas.

3          MR. SKORDAS:  Could we approach briefly --

4          THE COURT:  Yes.

5          MR. SKORDAS:  -- just to see how you want to

6   proceed from here?

7          THE COURT:  Come over here.

8          (WHEREUPON, a bench conference was begun.)

9          MR. SKORDAS:  So we knew that they were going

10  until Tuesday, and I'm not making excuses, and we do have at

11  least one witness ready, but I think all we could put on

12  today is one witness.  It is going to end a little bit

13  earlier.  I thought they would probably be resting tomorrow.

14         THE COURT:  And remember we're here until just

15  before noon tomorrow.

16         MR. SKORDAS:  Then we would probably rest some

17  time early Wednesday.  We are going to put SAR RAOE on

18  STAPBT would go awhile PWRAFPLT PWRAPLT with nets early?

19         THE COURT:  679 no.  So I don't TPOEU how.

20         THE COURT:  What do you want to do today?

21         MR. SKORDAS:  I am sort of asking everybody.  I

22  mean, I have got Becky Shamo prepared to testify.  I need to

23  formally make a motion at this point, but I guess we can

24  reserve that.

25         THE COURT:  You can.

```
 1                THE COURT:  And then --

 2                THE COURT:  Or you can make it.

 3                MR. SKORDAS:  Right.  I understand.

 4                MR. GADD:  I brought my response.  I'm ready.

 5                MR. SKORDAS:  I would assume so.

 6                THE COURT:  You're reserving on the motion?

 7                MR. SKORDAS:  Correct.

 8                THE COURT:  So do we want to take a break or are

 9   you ready to proceed?

10                THE COURT:  If we can have ten minutes I will

11   switch folders and be ready to go or we can go now.

12                THE COURT:  How long will she take?

13                MR. SKORDAS:  20, 30 minutes.  I prefer to do it

14   after a break.

15                THE COURT:  Elizabeth, lunch is probably not

16   ready, I don't think.  It is too early for their lunch.

17                When does lunch come up?

18                THE CLERK:  Noon.

19                MR. SKORDAS:  All right.  We may be done by then.

20                THE COURT:  Well, that is all right.

21                MR. SKORDAS:  Can we have a ten-minute break and

22   we'll try to finish by noon?

23                THE COURT:  We can do that.  If we take a

24   ten-minute break, which really means 11:30, do you think we

25   can complete her and cross by noon?
```

```
1              MR. GADD:  I won't have very much on cross.

2              MR. SKORDAS:  See will be short.  She will be

3    quick.

4              THE COURT:  And then you want to wait for the next

5    witness?

6              MR. SKORDAS:  Correct.

7              THE COURT:  They bring lunch a few minutes before

8    noon.  They would have to wait, I guess.  Are you saying end

9    for the day after that?

10             MR. GADD:  He is saying end for the day.

11             THE COURT:  They can still eat their lunch, of

12   course.

13             MR. GADD:  One last question.  We have agreed

14   previously that Mr. and Mrs. Shamo may stay in the courtroom

15   and then his sister came in and we said no problem and we

16   don't mind if she watches.  She is family.  Do you have a

17   problem if for the mom's testimony if we asked the sister to

18   just step outside?

19             THE COURT:  Is she going to testify?

20             MR. SKORDAS:  I don't mind.

21             THE COURT:  Just for that one --

22             MR. SKORDAS:  That is fine.

23             THE COURT:  Do you want the father?

24             MR. SKORDAS:  Correct.

25             MR. GADD:  We're happy to have him in.
```

```
 1              THE COURT:  Tomorrow you would go with the
 2   defendant or somebody else?
 3              MR. SKORDAS:  Yes.
 4              THE COURT:  Sounds like the sister will --
 5              MR. SKORDAS:  I missed the memo about quitting
 6   early.  I don't remember you saying that.
 7              MR. GADD:  We talked about that.
 8              THE COURT:  I was just wondering if I had been
 9   crazy.  Which of us is going --
10              MR. SKORDAS:  I am just --
11              THE COURT:  I have a judges meeting that I have to
12   go to.
13              MR. SKORDAS:  We'll try to make use of our time
14   better than we are today.  Maybe I can even get Aaron
15   started tomorrow.
16              MR. GADD:  And possibly the sister today?
17              MS. BECKETT:  She flew in after a 13 hour shift as
18   a nurse.  She could use some rest.
19              THE COURT:  We are way ahead of schedule.  We
20   don't need to hurry anything.  That is not an issue.
21              MR. SKORDAS:  We may close on Thursday.
22              MR. GADD:  I can't imagine that we'll have much.
23              THE COURT:  We have to settle on the instructions,
24   but we'll probably do those tomorrow I would think.
25              MR. GADD:  Okay.
```

```
 1              THE COURT:  You want ten minutes?

 2              MR. SKORDAS:  Right.

 3              THE COURT:  And then we'll call a witness.

 4              MR. SKORDAS:  Right.

 5              THE COURT:  And then you'll finish with that

 6    witness and finish for the day?

 7              MR. SKORDAS:  Correct.

 8              THE COURT:  Anything else you want to put on the

 9    record here?

10              MR. GADD:  No.  Thank you.

11              (WHEREUPON, the bench conference was concluded.)

12              THE COURT:  As you heard, the United States has

13    rested its case.  There is always some time necessary in

14    between, so what we're going to do is take a ten-minute

15    break and come back and the defense is going to put on one

16    witness day and that witness will be crossed and then you

17    can have lunch and then go home today.  Tomorrow we'll go

18    from 8:30 to noon.  I think we're going to get this to you

19    probably Thursday.

20              Is that what we're predicting?  Although Thursday,

21    if it is Thursday there would be instructions and closing

22    arguments and then you would start to deliberate.  The good

23    news is this isn't going to take four weeks, unless your

24    deliberations take a week or more.  All right.

25              Take ten minutes and get a drink and go to the
```

```
 1   bathroom and whatever you need to do and we'll start at
 2   11:30.
 3             (WHEREUPON, the jury leaves the proceedings.)
 4             THE COURT:  We'll proceed in ten minutes and
 5   you'll arrange the witnesses and all.
 6             (Recess)
 7             THE COURT:  Are we all back?
 8             Let's go get them.
 9             (WHEREUPON, the jury enters the proceedings.)
10             THE COURT:  The defense may call its first
11   witness.
12             MR. SKORDAS:  The defense calls Becky Shamo.
13             THE COURT:  Come forward and be sworn, please.
14                       REBECCA SHAMO
15            Having been duly sworn, was examined
16                  and testified as follows:
17             THE WITNESS:  Rebecco Shamo, R-e-b-e-c-c-a, Shamo,
18   S-h-a-m-o.
19             THE COURT:  You may proceed, Mr. Skordas.
20                    DIRECT EXAMINATION
21   BY MR. SKORDAS
22   Q.   May I call you Becky?
23   A.   You may.
24   Q.   Where do you currently live?
25   A.   Phoenix, Arizona.
```

```
 1   Q.   With who?

 2   A.   My husband.  We're empty nesters.

 3   Q.   Pardon me?

 4   A.   My husband --

 5   Q.   Empty nesters.  No kids at home.

 6   Q.   And your husband's name?

 7   A.   Michael Shamo.  Mike.

 8   Q.   He is sitting in the courtroom today?

 9   A.   He is.

10   Q.   And you have been able to sit through this entire

11   trial, correct?

12   A.   Yes.  Forced to, yes.  No.  I have been able to sit

13   through the entire trial, yes.

14   Q.   Meaning it was a nice gesture on the government's part

15   to allow you to stay in the trial --

16   A.   Extremely.

17   Q.   -- because witnesses typically are not allowed to watch

18   each other's testimony.

19   A.   True.

20   Q.   Well, before we get into that, would you just tell the

21   jury a little bit about yourself.  Sure.  I was actually

22   born in Texas, so I was the only one in my family that was a

23   pure blooded born and raised Texan, but I have very long

24   history with genealogy in the Salt Lake Valley.  14 out of

25   16 great grandparents crossed the plains into the Salt Lake
```

```
 1    Valley.  My great, great grandfather was the first mayor of
 2    Salt Lake City, Jedediah Morgan Grant, so I have a very long
 3    history there.  I still have a lot of family in the valley.
 4    My parents were here and raised four kids and moved to Texas
 5    and then they had me, the Texan.  My husband and I now live
 6    in Phoenix.  We have four children, three girls and then a
 7    boy, the last one being Aaron, and so that way I get to call
 8    Aaron -- I tell him he is my favorite son.  He says I'm your
 9    only son, so then I say, well, you're still my family son.
10    We live in Phoenix now.
11    Q.   Where was Aaron born?
12    A.   Aaron was actually born in when we lived in Kearns,
13    Utah.  We lived in Utah after we got married for about 13
14    years, part of it in Kearns and then the other part up in
15    Centerville, so Aaron was actually born in Kearns.
16    Q.   Was he raised in the Kearns or Davis County areas?
17    A.   Yes, in Davis County.  We moved shortly after he was
18    born out of Kearns and moved to Centerville.  We lived in
19    Centerville for four years and then San Antonio for three
20    and then Phoenix for the last 22 or so.
21    Q.   I may have asked you this, but how long have you and
22    Mike been married?
23    A.   I didn't say.  We have been married 40 years.
24    Q.   What kind of work do you do?
25    A.   I am a stay at home mom.  I have kind of that 40 years
```

```
 1    of stay-at-home mom experience.  I have always been at home,
 2    but I work very hard at home.  I am also an avid genealogist
 3    and seamstress.
 4    Q.   And Aaron is your baby?
 5    A.   He is.
 6    Q.   Would you describe to the jury Aaron's sort of
 7    upbringing just generally and don't use any medical terms.
 8    You can avoid that?
 9    A.   I will avoid that.  Aaron is a cute kid but he didn't
10    talk.  I had three girls, the oldest I taught to read at
11    then age of three.  The other two not so much.  They didn't
12    quite do that so well.  Aaron, on the other hand, didn't
13    talk until he was three years old.  We thought it was
14    because his sisters maybe talked for him, but at the age of
15    two I determined that this was not going well so I taught
16    him sign language.  So we started out with the Whitmore and
17    it would be do you want more water?  Do you want more milk?
18    Do you want more juice?  I don't know sign language, but we
19    kind of picked it up kind of along the way picked up the
20    words we wanted.  I don't understand -- are you done?  We
21    use that one with the grandkids now.  Are you done?  Are you
22    thirsty?  Are you hungry?  Yes.  No.  Stop.  That works
23    really work in church.  Sit down now.
24         Those were the words that I -- so because of that I was
25    able to communicate with him.  When he was three he started
```

 1   to talk more and he couldn't say the Rs in the middle of the
 2   word, world, girl.  It was really hard when you named your
 3   child Aaron, and so it always came out Awon.  He struggled
 4   with speaking.  As a result of that it was like in
 5   kindergarten, first, second, third grade he was in speech
 6   therapy classes and they would pull him out for speech
 7   therapy and then they would pull him out for tutoring.  We
 8   had a lot of tutoring.
 9       In fourth grade they actually called and said we want
10   to put him in speech therapy and I said no.  No more.  I'll
11   actually move to New York or Boston and he will fit right
12   in.  Eventually he got to say the pesky Rs and was able to
13   say those words.
14   Q.   Where did he go to elementary and junior high and high
15   school?
16   A.   In Phoenix.  Elementary actually started in San Antonio
17   where they really like to pull you out for individual
18   tutoring.  Then we moved to Phoenix.  He was in those
19   schools and always -- we struggled all the way through.  No
20   surprises there.  We struggled.  If you don't talk realy
21   early, we know now, if you don't talk real early you don't
22   learn to speak and then you fail to read and then you are
23   far behind and we would constantly -- you know, they would
24   send home spelling lists and I would look at them and go,
25   huh, that is great.  Second grade.  I remember looking at

1    spelling lists going, well, where are the three words that

2    we can do, because we were still working on sight words.  We

3    were still working on just basic words, and to have somebody

4    say here is the -- spell the word after and spell the word

5    world and spell the -- okay, the word the is there and we

6    can do the.  I just ignored the spelling words.  It was a

7    struggle.  You play catch up the whole way through school.

8    Q.    It sounds like you and Mike and your family moved a

9    little bit.  Why was that?

10   A.    Work.  Through work.  Mike changed jobs from San

11   Antonio Phoenix, but still in the medical industry and so it

12   was just work related.

13   Q.    What kind of work did Mike do or does he do?

14   A.    Currently he is a semiretired heart valve salesman.

15   Q.    He sales products for a company that assists doctors

16   with heart valves?

17   A.    Yes.

18   Q.    How long did Aaron live with you, until what age?

19   A.    Ah --

20   Q.    If you recall.

21   A.    Well, are you saying -- because he lived with us until

22   he was 16 and then he went to a residential program.

23         Is that what you're asking?

24   Q.    Yes.

25   A.    Okay.

1    Q.   At 15 we actually sent him to a wilderness program

2    called Anasazi based out of Phoenix.  That is a nine week

3    program.  It is not a residential program.  Then when he was

4    16 then we sent him to a residential program -- actually in

5    La Verkin, Utah.  It is no longer running or whatever, but

6    it was a really good, excellent program there.  He was gone

7    for 21 months in the residential program and then he

8    graduated that before he turned 18.  He came home for a bit

9    and then he would be in and out, went up to U.V.U., came

10   home for a couple of months, went back up, kind of in and

11   out and in and out.

12   Q.   Did you maintain pretty regular communication with him

13   during all this time?

14   A.   Not so much.  You know, it is a -- he is a boy and boys

15   don't communicate with the parents so much.  He was going to

16   college part of the time, and so once and awhile, mostly

17   holidays, you know --

18   Q.   How did he do in college?

19   A.   Well, I paid for a lot of classes that didn't get

20   finished and, you know, he did fairly well.  I'm not sure

21   how many we actually passed.  He didn't pass rock climbing.

22   Really?  He couldn't pass rock climbing.

23   Q.   Did there come a time prior to November of 2016 when

24   Aaron was arrested that he brought you some cash?

25   A.   Yes.

1   Q.   Describe that to the jury.

2   A.   We had been asking him to save your money, please save

3   your money.  He said I don't like banks.  I said, you know,

4   please save your money.  He said, well, if I bring you some

5   cash would you hold it for me?  We said sure.  Okay.  Good.

6   He is going to save some money.  So he brought us some money

7   in a bag and we threw it in the closet.  It was like --

8   Q.   Describe that.

9   A.   Describe?

10   Q.   I am sure it was green, but what was it?  Tell the jury

11   about the money.  Was it something that you could stick in

12   your pocket?

13   A.   No.  It was like -- you know those little shoe bag

14   things, tennis shoes -- I think it was like a shoe baggy

15   thing so we brought it home and threw it in the closet.

16   Q.   What did you do with it?

17   A.   Threw it in the closet.

18   Q.   After that?

19   A.   I didn't do anything with it.  It just sat there until

20   he was arrested and then we thought --

21   Q.   Then what did you do?

22   A.   I'm sorry.  Through our attorney we contacted the

23   government and said, you know, we have had this money, so

24   the offered to come and get it.  So we met with -- we had

25   already met with Jeff and Megan, Jeffrey Fletcher and Megan,

1    who is now Moore, but they were already gone, and so they

2    had two postal agents, and I saw them earlier, who came by

3    the house.  We had put it into one of those little small

4    boxes, Amazon Prime boxes, so we stuck it in that and we

5    gave it over to them.

6    Q.   A picture that I think the jury saw was of the box

7    being opened or a box opened and it had I think two rows of

8    cash and then some bubble pack above it.

9         Do you recall that?

10   A.   Yes, so it didn't roll around inside.

11   Q.   But you packed it that way?

12   A.   Yes.

13   Q.   It didn't come to you that way?

14   A.   No.  No, we packaged it that way.

15   Q.   Why?

16   A.   So we could seal it up and hand it off.

17   Q.   Okay.  What did you do with the money before you

18   packaged it that way?  Did you account for it in anyway?

19   A.   I did.

20   Q.   What did you do?

21   A.   I didn't quite -- we want to trust the government.  I

22   counted it.  I didn't change any of the -- because it

23   wrappings on it, but I didn't change any of that, and I

24   counted it so that I would know however much I had handed

25   over to the government actually made it to the government.

1   Q.   In fact, that is what happened?

2   A.   That is what happened.  So when they left I said please

3   give me an accounting so that I know how much we are handing

4   over to you.

5   Q.   And their number was the same as yours?

6   A.   It was the same, yes.

7   Q.   Let me ask you this.  After Aaron brought you the money

8   in the bag, did you and Mike use any of it?

9   A.   No.

10  Q.   Why not?

11  A.   It is not ours.

12  Q.   You assumed it was Aaron's?

13  A.   Well, of course it was Aaron's.  He gave it to us to

14  keep.

15  Q.   Not to have?

16  A.   No.

17  Q.   Was there another bit of money that he brought you?  We

18  have heard some discussion about a $10,000 transfer.

19  A.   You know, I actually don't remember that.

20  Q.   We have also seen some evidence that he mailed you some

21  wine.  Do you recall that?

22  A.   Yes.  It was one side or the other of when he was

23  arrested, and I can't remember which one, and we get this

24  box in the mail and it comes from a winery.  It is probably,

25  you know, like -- I don't know.  Maybe not quite that big.

```
 1    It is like this big.  It is like this is so random, and so
 2    we just put it off to the side because we didn't know what
 3    to the with it because we don't drink, and so then when he
 4    was arrested I actually opened it to see what was inside,
 5    and I kind of lifted everything out and everything does not
 6    go back in the way it is supposed to, so the lids are still
 7    kind of -- I have it upstairs under the desk.
 8    Q.    It is still there?
 9    A.    Yes.
10    Q.    In Arizona?
11    A.    In Arizona, yeah.  I figured that the government --
12    they had taken everything of Aaron's and either confiscated
13    or destroyed it and he didn't have any personal possessions
14    at all, and I figured they would come for that or they would
15    at least ask me what the box was so I didn't want to get rid
16    of it, so I kept it and I still have it.  If you would like
17    it I would be happy to give it to you.  I figured they would
18    come and get the wine because they had taken everything else
19    of Aaron's.
20    Q.    It ages, so hang onto it.
21    A.    I'm sorry?
22    Q.    It ages.
23    A.    It ages.  Hang onto the wine?
24    Q.    Yeah.
25    A.    No.  They never came for it.  They can.  I still have
```

1    it.  I don't even know what kind it is.  It just came from a

2    winery.  I don't know if it is any good or not.  Sorry.

3    Q.   You have been able to sit here I think for most or

4    maybe even all of the trial, correct, Becky?

5    A.   I have been here, yes.

6    Q.   And I assume you have learned some things that you

7    didn't know before?

8    A.   That is true.

9    Q.   I mean, I am just wondering in terms of Aaron and what

10   you know about him, what is your impression of what you have

11   heard over the last couple of weeks?

12   A.   You know, it is a hard thing.  As a parent you love

13   your child and you want the best for them.  You want to

14   strangle them at times, so it is hard to listen to this.  It

15   is really hard to listen to the characterization, because I

16   know that he struggled growing up and I know when he was a

17   pre-teen I found that if I said something to him I couldn't

18   get him to pay attention, maybe, maybe not, but I found --

19   this works actually, that if you touch them on their

20   shoulder or their arm, call them by name, that Aaron would

21   then look at me and I would know I had his attention.

22        I would say Aaron, and he would look at me and I could

23   get his attention.  I listen to this and I think, you

24   know -- it is hard to listen to, some of the

25   characterizations, because you can't stay focused on so many

1    things.  You know, he is very distracted Ted.  It is -- he

2    is my son.  I love him.  You know, I still want to strangle

3    him, but at the same time I know that some of the things

4    that -- he does not understand innuendo or suggestion or

5    sarcasm.  So if I would say, gee, it would be really good if

6    you cleaned your room he would think, yeah, it probably

7    would be but he didn't do it.  It wasn't a command.  It

8    wasn't a real suggestion.

9        I would have to say very direct that you have to do

10   this.  I had to tell his elementary school teachers, you

11   know, don't ask him if he understands, because he learned

12   early on that people want you to -- adults want you to nod

13   your head, so if they say do you understand and he would

14   go -- [nodding gesture] -- and he might not have understood.

15   So when they started actually asking him questions then they

16   realized he didn't get some of what was going on.  So we

17   learned that one early.  I had to say it straight.  You

18   can't -- innuendo, sarcasm, facetiousness does not work.

19   Say it straight.  If you expect something you just say it

20   straight and then he will understand.  So, you know, yes, I

21   differently learned some stuff here that I didn't know.

22   Actually plenty of stuff I didn't know.

23   Q.   Including the fact that Aaron did some incredibly dumb

24   and maybe bad things, correct?

25   A.   Incredibly dumb, incredibly bad, so many things that

```
 1    you think what were we thinking?  You know, why would you do
 2    that?  Why would you associate with these people?  He never
 3    was really good at choosing friends and eventually still
 4    isn't, you know, so --
 5    Q.   You have been able to maintain some level of
 6    communication with him in the last three years, correct?
 7    A.   Yes.  Yes.  Even though it costs you money every time
 8    you communicate with somebody in jail or do anything for
 9    them at jail, we have maintained money on our phones so he
10    can call us anytime.  Sometimes it is a couple times a week.
11    Most the time it is a couple times a week.  So he calls --
12    especially last year I was diagnosed with stage two breast
13    cancer, so he would call and see how I was doing.  He was
14    very concerned.
15    Q.   You have not been able to be physically with him for
16    almost three years?
17    A.   Right.  Up at Weber they have a really lousy system --
18    Q.   The Weber County Jail?
19    A.   Weber County Jail.  He was first in Weber County Jail.
20    I don't know which way I'm pointing.  It was Weber County
21    Jail and it is a video.  You are actually in the jail and it
22    is still a video.  It is a really lousy screen.  He got
23    moved down in probably January to Salt Lake County and it is
24    better.  So it is a barrier so we actually have barrier
25    visits which is really nice.  You can't touch them, but you
```

```
 1   have a barrier visit which is better than the video system

 2   up in Weber County.

 3   Q.    When was the last time you did touch him?

 4   A.    Let's see.  I don't know.  2016.  He was supposed to

 5   come down for Thanksgiving and he was picked up three days

 6   before Thanksgiving.  The Christmas before that maybe.

 7              MR. SKORDAS:  That is all that I have, Your Honor.

 8              THE COURT:  Thank you.

 9              Cross-examination.

10                      CROSS-EXAMINATION

11   BY MR. GADD

12   Q.    I'm sorry we're meeting again under these

13   circumstances.  I hope you don't blame yourself.  It is

14   clear that you love him and you would do anything for him.

15              THE COURT:  I can't hear you, Mr. Gadd.

16              MR. GADD:  Sorry.

17   BY MR. GADD

18   Q.    It is clear that you love him and you do and you have

19   said that.

20   A.    Yes, I have.

21   Q.    You tell him that in your phone calls?

22   A.    Yes, I do.

23   Q.    There is nothing that you wouldn't do for him?

24   A.    Do you mean as a mother?

25   Q.    Yes, as a mother.
```

```
1    A.   I would always stand by him.  He is my son.  I love
2    him.
3    Q.   Sure.  I don't want to ask you many questions.  Mr.
4    Skordas asked you about the money.
5    A.   Uh-huh.
6    Q.   When we met back in 2017 and when you talked with those
7    agents with your attorney present, you told them that Aaron
8    had brought you the money when you were on vacation in Utah?
9    A.   Uh-huh.  Yes.
10   Q.   The place outside of St. George.  I am blanking on the
11   name.  Pine Valley?
12   A.   Yes.
13   Q.   That was not 100 percent true though.
14   A.   Yes, it is.
15   Q.   Did you know your attorney called me afterward?  Did
16   you know he called to clarify that Aaron hadn't actually
17   given all the money just to you and Mike?  Did he tell you
18   he was calling me?
19   A.   I'm sorry?
20   Q.   Did Scott, your attorney, did he tell you he was going
21   to call and clarify that?
22   A.   I have no idea.
23   Q.   There was a phone call with you and Mr. Shamo, the
24   defendant, Aaron, and he was pretty mad at you for handing
25   over his money.
```

1      Do you remember him being mad?

2  A.   He was.

3  Q.   He told you that the money was in two places not just

4  one and then you said, well, that is not what we told them,

5  is it?

6  A.   I do not recall that.

7  Q.   You told the jury briefly about that annoying system

8  and that is something that you and I can agree on.  It is an

9  annoying system where you talk to the defendants in jail,

10 especially the one in Weber County, right?

11 A.   Yes.

12 Q.   And it says at the beginning that this is recorded.  On

13 April 6th, 2017, Mr. Shamo, the defendant, said to you,

14 like, you know, there are two occasions for what you gave

15 over, right?  You know that there is two pieces of that?

16 And then you reply, yes, I know, and we didn't say that,

17 though, did we?  He was still pretty mad at you at that

18 point.  So when the agents heard that they were a little

19 concerned and they called your attorney and he clarified it.

20 Do you want to tell everyone where the other part of the

21 money came from?

22 A.   Well, your question was what was the money that Aaron

23 gave to us so I answered that.

24 Q.   Sure.  I'm not looking to cause any problem, I really

25 am not, but was there somewhere else that he had the money?

```
1    A.    I believe there was an occasion that he -- that our

2    daughter Mary Ann had gone to visit him in Utah, and so he

3    said I have a backpack to send to mom and dad and she took

4    it and threw it in the car with her three children and they

5    went on vacation and drove it down, so, yes.

6    Q.    I am really not trying to cause you anymore pain.

7    Could it be that maybe that part of the story was left out

8    because you were just trying to shield your daughter from,

9    you know, all of this and the investigation and all of that?

10   A.    Well, the question was, sir -- the question was what

11   was the money that Aaron gave to us and that is the money

12   that he gave to us.  He did give some money to Mary,

13   although she didn't know what it was.  She actually gave it

14   over to us and didn't know what was in it.  She threw it in

15   the back with the kids and traveled down, and so through

16   her, if you want to be technical about it, then through her

17   we received a little bit of additional money there.

18   Q.    In fact, you talked for a minute about some of the

19   efforts that you went to to teach Aaron to read and things

20   like that and not to use sarcasm.  He grew up though, right?

21   A.    I don't believe I taught him not to do sarcasm.  I

22   don't know how you teach people not to do sarcasm.

23   Q.    For sure and that was probably just a bad question.

24   You remember just explaining that you tried not to use

25   sarcasm with him?
```

```
 1    A.   I found it didn't work.

 2    Q.   Right.

 3    A.   I tried.  It didn't work.

 4    Q.   And he grew up?

 5    A.   He did grow up.  Was there more to that question?

 6    Q.   Yes.  In another one of those jail calls that was

 7    recorded record you and he are talking and your husband is

 8    on the phone with you.  Would you sometimes call, you know,

 9    the two of you call Aaron together or vice versa?

10    A.   He only calls us.  That is the only way that works in

11    jail.

12    Q.   And you both talk to him?

13    A.   If we are both there at home.

14    Q.   You are talking about plans for once he gets out and

15    businesses and things that he wants to get involved in and

16    he says this to you, doesn't he?  He says I'm really good at

17    analyzing.  I don't know if I told you this, but I was even

18    looking at a little thing of ibuprofen.  Like here in the

19    jail they charge us for ibuprofen, a bottle of ibuprofen,

20    and I'm sitting there like, you know, analyzing, okay, so a

21    bottle you buy in bulk, it is like cutting it down to 10 to

22    30 cents, and the ibuprofen ingredients you have

23    microcrystaline cellulose and you have a binder and you a

24    have a mixer and you have basically all of this stuff and

25    the raw materials for the main ingredient in ibuprofen
```

```
 1   itself by the kilo you can buy it for like 30 bucks to 40

 2   bucks.  Cheap.  So then you're making ibuprofen extremely

 3   cheap and I could undercut the market just -- then he goes

 4   on.

 5       Do you remember having that conversation with him?

 6   A.   Vaguely.

 7   Q.   On May 7th, 2017?

 8   A.   That still does not mean I remember it.  We have a lot

 9   of conversations.

10           MR. GADD:  I have nothing further.  Thank you.

11           THE COURT:  Thank you.

12           Any redirect?

13           MR. SKORDAS:  Just one question.

14                     REDIRECT EXAMINATION

15   BY MR. SKORDAS

16   Q.   Becky, did you withhold any money or anything besides

17   the wine that Aaron gave you that may have been the proceeds

18   of this matter?

19   A.   No.

20           THE COURT:  Thank you.  You may step down.  Thank

21   you.

22           Did you want to call another witness?

23           THE COURT:  Yes.  It will be brief.  She is

24   outside.

25           THE COURT:  All right.
```

```
1              Come forward and be sworn, please.

2                    STEPHANIE SHAMO ARBELAEZ

3              Having been duly sworn, was examined

4                    and testified as follows:

5          THE WITNESS:  Stephanie Shamo Arbelaez.

6  Stephanie, S-t-e-p-h-a-n-i-e, Shamo, S-h-a-m-o, Arbelaez,

7  A-r-b-e-l-a-e-z.

8          THE COURT:  You may proceed, Ms. Beckett.

9                    DIRECT EXAMINATION

10 BY MS. BECKETT

11 Q.   Stephanie, thank you for being here.  I'm going to give

12 you a cautionary instruction, because you and I have the

13 same tendency to speak very fast, and so for our illustrious

14 court reporter if we could slow down between the two of us

15 this will go a lot better.

16 A.   I will definitely try.

17 Q.   Stephanie, how do you know Aaron Shamo?

18 A.   So Aaron is my baby brother.  Sorry.  I am eight years

19 older than him, so I used to carry him around on my hip when

20 he was born.

21 Q.   Is it safe to say you kind of helped raise him a little

22 bit?

23 A.   Yeah.  I used to drive him around.  I took him to

24 school.  I watched him get bullied all growing up and I have

25 watched it again in this courtroom.
```

1  Q.   I imagine being here is -- you are okay.  Take a deep

2  breath.

3       I imagine being here is not easy for you.

4  A.   I flew in this morning because everybody needs somebody

5  on their side.

6  Q.   Because of the age difference between you and Aaron,

7  you got to see him grow up --

8  A.   Yeah.

9  Q.   -- and got to see him through junior high and all those

10  awkward years that we all experience.  Tell the jury for me

11  what Aaron's junior high experience was like from your

12  perspective and how he made friends and what kind of kid he

13  was.

14  A.   Aaron -- he kind of struggled finding friends.  He was

15  a little heavier and so he played video games.  He did -- he

16  got bullied and he would come home and tell us -- there are

17  three of us older girls, and so we would get pretty

18  defensive when anybody kind of bullied him.  You know, I

19  don't have kids of my own, but like Aaron was like my

20  favorite.  I'm sorry.  I did not expect to cry.

21       He was dragged around to all of our soccer games and

22  all of our events and he always like -- I think what is

23  really hard about sitting up here is you always want to say

24  like that somebody is perfect and don't want to show that

25  they have any faults, and I think the hard thing is Aaron

1   would have done anything to have friends.  I watched that

2   and I watched him like try to fit in.  If he was told to

3   wear Hollister he would wear Hollister.  If his friends or

4   anybody he met was wearing black he would wear all black and

5   so I saw him evolve over the years.

6   Q.   Is it safe to describe him as a people pleaser?

7   A.   Oh, yeah.

8   Q.   I assume he did with this his older sisters, too?

9   A.   Oh, yeah.  It is hard to have three older sisters.  I

10  feel bad for him.

11  Q.   Would you describe Aaron as organized?

12  A.   No.

13  Q.   Agents interviewed last year?

14  A.   Uh-huh.  In my pajamas.  Yes, those two, they showed

15  up.  I work three nights a week pretty much and they showed

16  up and I was actually sleeping in my pajamas, but they came

17  knocking.  And, you know, it is funny, like, maybe I

18  shouldn't have talked to them but I wanted them to see Aaron

19  came from a good family.  I'm so sorry.  Oh, my gosh.

20  Q.   It is okay.  Take a deep breath and take a second if

21  you need it.

22       You have heard some things in this courtroom about your

23  baby brother that I imagine were difficult to hear?

24  A.   Yeah.

25  Q.   But you sit here today and would acknowledge that some

1      of the things -- some of the choices that he made were not
2      great?

3      A.    Yeah.

4      Q.    But you're here.  Why?

5      A.    I think one of the hardest things is I wanted this to
6      be fair.  I wanted a fair trial.  Not once did they
7      interview Aaron.  They didn't ever ask to talk to him
8      without a lawyer.  You want to believe in the legal system
9      and a family member who does not get a chance to actually
10     give their side -- I just wanted it to be far.  Whatever it
11     is I want it fair.

12     Q.    Stephanie, what do you do for a living?

13     A.    I am a nurse in a hospital in Reno.

14     Q.    So you take care of people for a living?

15     A.    I do.  I get to love people regardless of the decisions
16     they make.  I don't have to decide or find any fault.  I
17     just love them and help them get better.

18              MS. BECKETT:  If I could have just a minute, Your
19     Honor?

20              THE COURT:  Yes.

21     BY MS. BECKETT

22     Q.    Stephanie, we have heard some testimony throughout this
23     trial that Aaron and his friends and some of the individuals
24     took trips to Vegas and Tahoe.

25           Are you aware of some of those trips?

```
 1    A.    Yeah.  I lived in Vegas for eight years.  Aaron used to
 2    come and stay with me with his friends all the time.  In
 3    Tahoe he actually came and stayed and I went to Snow Globe.
 4    It is a music festival that I got us tickets for.  I got
 5    free tickets.  We went and went to Snow Globe together.  We
 6    would go to concerts together and I am able to spend time
 7    with my brother.  So on some of these trips I was surprised
 8    that he came and stayed with me.  He was at my house with
 9    his friends.  I know some of these guys that have been on
10    here, because they have come over several times.
11              MS. BECKETT:  I have no further questions, Your
12    Honor.
13              THE COURT:  Thank you, Ms. Beckett.
14              Cross-examination?
15              MR. BURGGRAAF:  No questions, Your Honor.
16              THE COURT:  Thank you.
17              Thank you.  You may step down.
18              Your next witness will start tomorrow, right?
19              MR. SKORDAS:  Yes.  I apologize, Your Honor.
20              THE COURT:  All right.  Ladies and gentlemen of
21    the jury, thank you again for your work and attention.  All
22    of the rules apply about talking and not talking and so on.
23    We'll see you at 8:30 in the morning.  Tomorrow, remember,
24    we will just go to noon tomorrow.
25              Thank you.
```

```
 1                (WHEREUPON, the jury leaves the proceedings.)

 2                THE COURT:  We'll be in recess on this matter

 3      until 8:30 tomorrow.

 4                (Proceedings adjourned.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

JOHN W. HUBER, United States Attorney (#7226)
MICHAEL GADD, Special Assistant United States Attorney (#13704)
KENT A. BURGGRAAF, Special Assistant United States Attorney (#13044)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: michael.gadd@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>AARON MICHAEL SHAMO,<br><br>Defendant. | Case No. 2:16-cr-00631-DAK<br><br>UNITED STATES' SENTENCING MEMORANDUM<br><br>Judge Dale A. Kimball |

The United States recommends that the Court adopt the presentence investigation report and impose the minimum mandatory sentence for Count 1—life imprisonment. The United States submits this memorandum to show an aspect of the nature and circumstances of the offense that was not covered at trial—customers who have died from overdoses—and to explain how other aspects the Court is required to consider under 18 U.S.C. § 3553(a) also support a sentence of life imprisonment.

### Table of Contents

1.  **Victims under the Crime Victims' Rights Act** ............................................................. 3

2.  **History and Characteristics of the Defendant** ........................................................... 4

    2.1  **Build an empire and become rich** ..................................................................... 4

2.2     Knew about the devastating effect of Fentanyl ................................................. 5

3.      Seriousness of the Offense ........................................................................... 6

4.      Promoting Respect for the Rule of Law ........................................................ 9

5.      Adequate Deterrence to Criminal Conduct ................................................... 9

6.      Protecting the Public from further Crimes by the Defendant ...................... 11

7.      Avoiding Unwarranted Sentencing Disparities ........................................... 11

8.      Nature and Circumstances of the Offense—Overdoses not Covered at Trial ...... 11

9.      Providing Just Punishment .......................................................................... 25

  9.1   Grief puts its arms around our lungs, mercilessly sucking our hope ........... 25

  9.2   Not a pain pill, but a death pill .................................................................... 26

  9.3   I discovered his lifeless body in his bedroom .............................................. 28

  9.4   The proof I never wanted to see ................................................................... 30

  9.5   A shrill scream mixed with a gurgle ............................................................ 32

10.     Conclusion ................................................................................................... 36

## SENTENCING DISCUSSION

The Court heard trial testimony from forty-seven witnesses and received into evidence hundreds of exhibits. The United States will not repeat in this memorandum what the Court saw and heard at trial. In the sections that follow, the United States will cover statutory factors the Court is required to consider prior to sentencing the defendant. *See* 18 U.S.C. § 3553(a).[1]

---

[1] As this Court is aware, all sentencing proceedings should begin with correctly calculated sentencing guidelines. *United States v. Rosales-Miranda*, 755 F.3d 1253, 1259 (10th Cir. 2014). The U.S. Probation Office has correctly calculated the sentencing guidelines in this case.

2673

## 1. Victims under the Crime Victims' Rights Act

The following victims were identified in the Second Superseding Indictment in Counts 1 and 6. The United States intends to file additional, restitution-related pleadings for these deceased victims.[2] Here are short paragraphs for each victim that show when each died from ingesting Pharma-Master's Fentanyl-laced fake oxycodone.

1.1     G.K. ordered sixty Fentanyl-laced pills from Pharma-Master. The last known order, for twenty pills, was placed on August 3, 2016. On the evening of August 12, 2016, G.K. went to party with friends, but became separated from his group. A passerby found him the following morning dead in the grass outside an apartment complex. Police officers found pills marked as if they were Oxycodone pills on G.K.'s person. G.K. died with Fentanyl, Alprazolam, and Ethanol in his system.

1.2     C.V. ordered fourteen Fentanyl-laced pills from Pharma-Master marked as Roxy-Oxycodone 30mg. The last known order was placed on March 3, 2016. C.V. overdosed and died on March 25, 2016, after using drugs with a friend in his apartment the prior evening. The friend found C.V. dead on the 25th. C.V. died with Cocaine, Fentanyl, and Alprazolam in his system.

1.3     E.B. ordered forty-four Fentanyl-laced pills from Pharma-Master marked as Roxy-Oxycodone 30mg on April 5-6, 2016. The pills were delivered on April 13, 2016. E.B. died April 24, 2016, inside his dorm room after a night of partying. His toxicology screening showed he had Ethanol, Cocaine, Diazepam, and Fentanyl in his system at the time of his death.

1.4     The Court, at trial, heard considerable evidence about the death of R.K., who, along with his friend, G.L., ordered ten Fentanyl-laced pills from Pharma-Master on June 6, 2016. The pills

---

[2] The Defendant's landlord is also a victim for whom the United States will seek restitution in future pleadings.

3

were delivered on June 11, 2016. R.K. snorted one of the crushed pills on the evening of June 12, 2016. R.K. was found dead by his friend G.L. on June 13, 2016, inside his bedroom. His toxicology screening showed he had Fentanyl, Ethyl Alcohol, Benzoylecgonine, Ecgonine Methyl Ester, Cocaethylene, and Levamisole in his system at the time of his death.

## 2. History and Characteristics of the Defendant

The defendant's history and characteristics support the imposition of a life sentence. The defendant dedicated himself to building his drug trafficking empire and becoming rich. The defendant also knew about the acute dangers of Fentanyl but continued to produce Fentanyl-laced fake oxycodone pills at an ever-increasing rate prior to his arrest.

## 2.1 Build an Empire and become Rich

Testimony at trial established that the defendant spent most of his wakeful hours in pursuit of his goals to build an empire and to become rich. The defendant made his goals clear in his journal writing, as seen in trial exhibit 14.19:

| Note |
|------|
| **Title:** Love you shamo, your such a great guy and everyone loves you lol…<br>**Summary:** Today is the first day of 2016, let's do it right.<br>**Source:** Notes<br>**Body:** Love you shamo, your such a great guy and everyone loves you lol<br><br>Today is the first day of 2016, let's do it right.<br>I will over achieve, I will overcome and i will be fucking rich<br><br>Every girl will love me, they will want me, they need me<br><br>Focus, every small detail matters<br>I want that girl from snow globe to like me; she will love me, she doesn't know it yet but she will be obsessed with me :)<br><br>Life is great, life is amazing, I honestly can't wait to live it. Gonna make 250k in the next few months easy. |

4

## 2.2 Knew about the Devastating Effect of Fentanyl

While the defendant at trial attempted to deny full understanding of the dangers of spiking his pills with Fentanyl, the defendant accessed two videos on his password-protected computer that show otherwise. The first is a short video produced by the DEA about the dangers Fentanyl posed to law enforcement officers:[3]



DEA Fentanyl Roll Call Video

In the video, officers are instructed that Fentanyl is more than forty times as powerful as heroin and that a small amount ingested or absorbed through skin can kill a person.

Shortly after watching the DEA-produced video, the defendant clicked on a 52-minute feature film about Fentanyl and the opioid crisis produced by the VICE Media Group.[4] The opening scene shows an addict crush and snort pills that appear to be oxycodone but really contain Fentanyl:

---

[3] https://www.youtube.com/watch?v=9Xi4A8S23Xo, last accessed February 20, 2020.
[4] https://www.youtube.com/watch?v=28rJqj-7pEY, last accessed February 24, 2020.

5



Fentanyl: The Drug Deadlier than Heroin

In the film, the deadly potency of Fentanyl is discussed at length by addicts and medical providers. The defendant knew the acute danger of Fentanyl but continued to produce and sell Fentanyl-laced fake oxycodone because of his goals to build an empire and become rich.

### 3. Seriousness of the Offense

The Defendant engaged in, and was convicted of, the most serious offense in the Controlled Substances Act. His Fentanyl pills were distributed to recipients in every state in the Union.

Our nation's opioid crisis was in full effect by the end of 2016, when Mr. Shamo was distributing his Fentanyl-laced fake oxycodone. In 2016, more than 63,000 people overdosed and died—more than 42,000 of those deaths involved an opioid; the rate at which victims died from

6

synthetic opioids, like Fentanyl, doubled between 2015 and 2016.[5] The CDC tracked and

mapped[6] drug overdoses in 2016; the color-key shows overdose deaths per 100,000 people:



_____

[5] Hedegaard H, Warner M, Miniño AM. Drug overdose deaths in the United States, 1999–2016. NCHS Data Brief, no 294. Hyattsville, MD: National Center for Health Statistics. 2017; accessed at https://www.cdc.gov/nchs/products/databriefs/db294.htm, last accessed September 30, 2019.

[6] https://www.cdc.gov/drugoverdose/data/statedeaths/drug-overdose-death-2016.html, which drew its data from Scholl L, Seth P, Kariisa M, Wilson N, Baldwin G. Drug and Opioid-Involved Overdose Deaths — United States, 2013–2017. MMWR Morb Mortal Wkly Rep 2019;67:1419–1427, last accessed September 30, 2019.

The true number of overdoses from Mr. Shamo's Fentanyl-laced fake oxycodone cannot be

ascertained—anytime he sent a large shipment to a redistributor, agents lost the ability to

research that redistributor's customers. However, the scope of his distribution—significantly

more than the 458,000 Fentanyl-laced fake oxycodone pills for which agents captured AlphaBay

feedback data—was shown at trial:



Mr. Shamo's prolific distribution of drugs led to incalculable loss and suffering.[7]

---

[7] While the vast majority of the harm Mr. Shamo inflicted came from his Fentanyl-laced fake
oxycodone pills, there is emerging research that illicit benzodiazepine use causes substantial
harm to addicts. See https://www.cnn.com/2019/10/04/health/benzodiazepines-this-is-life-with-
lisa-ling/index.html, last accessed October 28, 2019.

## 4. Promoting Respect for the Rule of Law

This case is an extreme example of the dangers inherent in narcotics trafficking and the tragic harm it causes. A sentence of life imprisonment promotes adequate respect for the law.

## 5. Adequate Deterrence to Criminal Conduct

Mr. Shamo's contemporaries—those who sell drugs on the dark net—have paid attention to Shamo's case from start to finish. Recently, his case was highlighted on a Reddit subreddit dedicated to dark net market busts, where more than six thousand members and anyone else who might be interested saw that Mr. Shamo—or Pharma-Master, as he was known to them—faced a mandatory-minimum life sentence.[8]



---

8

https://www.reddit.com/r/DNMBusts/comments/cxref2/pharmamaster_convicted_faces_a_potent ial/; last accessed September 30, 2019.

Traditional news media reported Mr. Shamo's case and verdict.[9] Two reporters from the Associated Press attended the trial and wrote an especially comprehensive, well-researched article about Mr. Shamo's case and the opioid epidemic. That article was picked up by news publications throughout the country and has been attached to this sentencing memorandum as Exhibit A.[10]

---

[9] https://www.washingtonpost.com/health/2019/09/18/face-opioid-epidemic-how-college-dropout-became-fentanyl-kingpin/; last accessed September 30, 2019.
https://www.washingtonpost.com/news/morning-mix/wp/2016/11/23/dea-raids-colossal-fentanyl-operation-in-one-of-the-largest-drug-busts-in-utah-history/; last accessed September 30, 2019.
https://www.nytimes.com/2017/06/10/business/dealbook/opioid-dark-web-drug-overdose.html; last accessed September 30, 2019.
https://www.deseret.com/utah/2019/8/26/20833760/aaron-shamo-accused-drug-kingpin-left-parents-holding-bag-of-cash-fentanyl; last accessed September 30, 2019.
https://www.deseret.com/utah/2019/8/27/20835297/aaron-shamo-utah-drug-trial-opioids-fentanyl; last accessed September 30, 2019.
https://www.deseret.com/utah/2019/8/27/20835400/aaron-shamo-trial-federal-court-utah-drug-trafficker; last accessed September 30, 2019.
https://www.deseret.com/utah/2019/8/30/20840745/aaron-shamo-verdict-utah-nationwide-opioid-trafficking-ring-man-found-guilty; last accessed September 30, 2019.
https://www.deseret.com/utah/2019/8/29/20837643/utah-aaron-shamo-trial-federal-prosecutors; last accessed September 30, 2019.
https://www.deseret.com/utah/2019/8/11/20803484/accused-utah-pillmaker-linked-to-fentanyl-death-goes-on-trial-in-federal-court; last accessed September 30, 2019.
https://www.deseret.com/utah/2019/8/15/20807204/ex-employee-takes-stand-in-trial-for-utahn-accused-of-leading-opioid-ring-aaron-shamo; last accessed September 30, 2019.
https://www.deseret.com/2017/6/22/20634427/from-mormon-kid-to-alleged-drug-kingpin-inside-the-rise-and-fall-of-aaron-shamo; last accessed September 30, 2019.
https://www.deseret.com/2019/8/12/20803502/prosecutors-portray-utahn-as-drug-kingpin-defense-says-shamo-wasn-t-at-top-of-trafficking-organizati; last accessed September 30, 2019.
https://www.deseret.com/2017/6/24/20614721/inside-the-newsroom-why-the-family-of-aaron-shamo-was-willing-to-talk; last accessed September 30, 2019.
https://www.deseret.com/2018/10/18/20656411/feds-link-overdose-death-to-accused-cottonwood-heights-pill-maker-in-new-charges; last accessed September 30, 2019.

[10] By Claire Galofaro and Lindsay Whitehurst, Associated Press, accessed at: https://www.apnews.com/4b1ab6957f63491086bbecdc58df13ec; last accessed September 30, 2019.

Dark net drug traffickers falsely operate under the assumption that they are anonymous and untouchable. Dark net drug traffickers see the immense profit potential for the highest-volume sellers of opioids online—sellers like Mr. Shamo. A life sentence would deter current and future dark net drug traffickers.

### 6. Protecting the Public from further Crimes by the Defendant

The minimum mandatory sentence faced by the defendant should prevent him from committing any crime other than those he can commit while in custody.

### 7. Avoiding Unwarranted Sentencing Disparities

Because Mr. Shamo will be sentenced prior to any of his co-defendants, the Court will not have to determine whether Mr. Shamo's sentence creates an unwarranted sentencing disparity.

### 8. Nature and Circumstances of the Offense—Overdoses not Covered at Trial

Due to the risk of unfair prejudice at trial, the United States agreed to not present evidence to the jury that more than ninety of the defendant's customers had died from subsequent overdoses. While it is true in many instances that the defendant's pills did not directly cause his customers' deaths, in those instances the defendant's pills fed his customers' addictions until death ultimately took them. And it will never be fully known what percentage of the defendant's customers knew the defendant substituted Fentanyl for oxycodone in his fake oxycodone pills.

Similarly, the true number of the defendant's victims cannot be calculated. When the defendant sold Fentanyl-laced fake oxycodone pills in bulk to redistributors, the end user of those pills cannot be found by investigators. The decedents listed below were largely users, not profit-seeking redistributors.

11

2682

As a memorial to those died, and to make a clear record of this central aspect to the
nature and circumstances of the defendant's crimes, the defendant's now-deceased customers
who were not mentioned at trial are discussed one-by-one below:[11]

8.5   E.A. ordered ten Alprazolam 3mg pills marked as Xanax on July 12, 2016. E.A. died on

November 25, 2016. His toxicology screening showed he had heroin and

methamphetamine in his system at the time of his death.

8.6   J.A. ordered five hundred Alprazolam 3mg pills marked as Xanax on August 29, 2016.

He died on December 15, 2016.

8.7   R.A. ordered twenty-one pills from Pharma-Master on February 17, 2016. His order

consisted of twenty Alprazolam 3mg pills marked as Xanax and one MDMA 135mg

tablet. R.A. died on January 30, 2017.

8.8   W.A. ordered three thousand three hundred Fentanyl-laced pills marked as M Box 30

Oxycodone 30mg from Pharma-Master. The last known order was placed on October 10,

2016, for one thousand pills. W.A. died on February 12, 2018.

The phrase *last known order* is used here and below because agents only captured order

data from two-thirds of Pharma-Master's drug sales. The remaining third did not generate

a feedback row on AlphaBay from which the agents could collect the sales data. There is

a real possibility that many of these now-deceased customers placed orders in addition to

the order(s) for which we have data.

---

[11] Five of the Defendant's now-deceased customers were discussed at trial. Four of those now-deceased customers are victims as defined by the Crime Victims' Rights Act (CVRA). The circumstances surrounding their deaths are discussed above in section 1. The numbering sequence begins at 8.5 to enable an easy count of the lives known to have been forever changed by the defendant's actions.

2683

8.9   E.B. ordered two Fentanyl-laced pills marked as Roxy-Oxycodone 30mg on April 19, 2016. E.B. died on October 21, 2016.

8.10  J.B. ordered seventy Alprazolam 3mg pills marked as Xanax in two orders. The last known order was placed on February 10, 2016. J.B. died on May 1, 2017.

8.11  E.B. ordered 43 pills from Pharma-Master. His orders consisted of Fentanyl-laced pills marked as M Box 30 Oxycodone 30mg pills, Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills, and Alprazolam 3mg pills marked as Xanax. The last known order was placed on August 3, 2016. E.B. died on November 29, 2016.

8.12  J.B. ordered six hundred thirty pills from Pharma-Master. His orders consisted of Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills, and Fentanyl-laced pills marked as M Box 30 Oxycodone 30mg pills. The last known order was placed on November 19, 2016. J.B. died on June 12, 2017.

8.13  S.B. ordered ten Alprazolam 3mg pills marked as Xanax on January 15, 2016. S.B. died on November 27, 2016.

8.14  C.B. ordered thirty Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills on April 19, 2016. C.B. died on October 29, 2017.

8.15  A.B. ordered one hundred twenty Alprazolam 3mg pills marked as Xanax. The last known order was placed on June 10, 2016. Police were called by A.B.'s father on July 13, 2016, as he was found unresponsive in his room. A.B. died on July 13, 2016, after numerous efforts to revive him were unsuccessful.

8.16  T.B. ordered ten Alprazolam 3mg pills marked as Xanax on June 24, 2016. T.B. died on July 6, 2018.

13

8.17    W.C. ordered one hundred twenty-two pills from Pharma-Master. His orders consisted of Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills, Alprazolam 3mg pills marked as Xanax, and a Mephedrone 1g pill. The last known order was placed on April 14, 2016. W.C. died on September 16, 2016.

8.18    V.C. ordered one Mephedrone 1g pill from Pharma-Master on March 13, 2016. Mephedrone is a synthetic cathinone. V.C. died on June 30, 2017.

8.19    B.C. ordered thirty-seven Fentanyl-laced pills marked as Roxy-Oxycodone 30mg from Pharma-Master. The last known order was placed on March 2, 2016. B.C. died on May 14, 2016. His toxicology screening showed he had Fentanyl and Alprazolam in his system at the time of his death.

8.20    D.C. ordered fifty Fentanyl-laced pills marked as M Box 30 Oxycodone 30mg pills from Pharma-Master. The last known order was placed on October 3, 2016. D.C. died on April 7, 2017. His toxicology screening showed he had Fentanyl, Oxycodone, and Methamphetamine in his system at the time of his death.

8.21    M.C. ordered two hundred twenty Fentanyl-laced pills marked as Roxy-Oxycodone 30mg from Pharma-Master. The last known order was placed on November 29, 2016, although an order was placed on November 19, 2016, prior to Shamo's indictment and arrest. M.C. died on April 6, 2017. His toxicology screening showed he had Fentanyl, Morphine, and Benzoylecgonine in his system at the time of his death.

8.22    N.C. ordered ten Fentanyl-laced pills marked as Roxy-Oxycodone 30mg from Pharma-Master on June 3, 2016. N.C. died on November 15, 2016. His toxicology screening showed he had Fentanyl, Alprazolam, and Methadone in his system at the time of his death.

14

2685

8.23 C.C. ordered nineteen Fentanyl-laced pills marked as Roxy-Oxycodone 30mg from Pharma-Master on July 4, 2016. C.C. died on February 26, 2017.

8.24 C.C. ordered thirty Fentanyl-laced pills marked as Roxy-Oxycodone 30mg from Pharma-Master on April 19, 2016. C.C. died on June 12, 2016. His toxicology screening showed he had Fentanyl, Diazepam, and Ecstasy in his system at the time of his death.

8.25 J.D. ordered two hundred forty Fentanyl-laced pills from Pharma-Master. His orders consisted of Fentanyl-laced pills marked as Roxy-Oxycodone 30mg, and Fentanyl-laced pills marked as M Box 30 Oxycodone 30mg. The last known order was placed on August 8, 2016. J.D. died on October 9, 2018.

8.26 E.D.F. ordered one hundred Alprazolam 3mg pills marked as Xanax on November 8, 2016. E.D.F. died on November 17, 2016. His toxicology screening showed he had Fentanyl, Heroin, and Cocaine in his system at the time of his death.

8.27 T.D. ordered thirteen pills from Pharma-Master. His order consisted of Fentanyl-laced pills marked as Roxy-Oxycodone 30mg, and Etizolam 3mg pills on February 10, 2016. T.D. died on September 14, 2016. His toxicology screening showed he had Fentanyl, alcohol, and Cotinine in his system at the time of his death.

8.28 A.D. ordered thirty Alprazolam 3mg pills marked as Xanax on June 15, 2016. A.D. died on January 7, 2017.

8.29 M.D. ordered one hundred ten pills from Pharma-Master. His orders consisted of Alprazolam 3mg pills marked as Xanax, and Etizolam 3mg pills. The last known order was placed on August 4, 2016. M.D. died on February 8, 2018.

8.30 T.D. ordered ten Alprazolam 3mg pills marked as Xanax from Pharma-Master on June 22, 2016. T.D. died on February 2, 2017.

15

2686

8.31   G.D. ordered ten Etizolam 3mg pills from Pharma-Master on April 11, 2016. G.D. died
       on December 31, 2016.

8.32   R.E. ordered eighty Alprazolam 3mg pills marked as Xanax from Pharma-Master. The
       last known order was placed on March 24, 2016. R.E. died on June 13, 2016.

8.33   A.F. ordered fifteen pills from Pharma-Master. These orders consisted of Fentanyl-laced
       pills marked as Roxy-Oxycodone 30mg pills, and Alprazolam 3mg pills marked as
       Xanax. The last known order was placed on April 12, 2016. A.F. died on April 1, 2017.

8.34   S.F. ordered ten Alprazolam 3mg pills marked as Xanax from Pharma-Master on
       February 16, 2016. S.F. died on March 12, 2016.

8.35   L.G. ordered one hundred ten pills from Pharma-Master. These orders consisted of
       Fentanyl-laced pills marked as Roxy-Oxycodone 30mg, and Alprazolam 3mg pills
       marked as Xanax. The last known order was placed on June 2, 2016. L.G. died on
       January 21, 2017. Her toxicology screening showed she had Fentanyl and Alprazolam in
       her system at the time of her death.

8.36   J.G. ordered ten Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills from
       Pharma-Master. The last known order was placed on March 3, 2016. J.G. died on January
       7, 2017. His toxicology screening showed he had Fentanyl and Hydromorphone in his
       system at the time of his death.

8.37   T. H. ordered twenty Alprazolam 3mg pills marked as Xanax from Pharma-Master on
       April 21, 2016. T. H. died on May 2, 2016.

8.38   B.H. ordered sixty-two pills from Pharma-Master. His orders consisted of Fentanyl-laced
       pills marked as Roxy-Oxycodone 30mg pills, Fentanyl-laced pills marked as M Box 30
       Oxycodone pills, and Alprazolam 3mg pills marked as Xanax. The last known order was

2687

placed on August 21, 2016. B.H. died on November 12, 2016. B.H. was a decorated

Marine who suffered from depression and PTSD after returning from his deployments to

the Middle East. His toxicology screening showed he had Alprazolam and U-47700 in his

system at the time of his death.

8.39  P.H. ordered twenty-seven Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills

from Pharma-Master. The last known order was placed on September 28, 2016. P.H. died

on December 28, 2016.

8.40  C.H. ordered three Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills from

Pharma-Master on May 9, 2016. C.H. died on May 28, 2016. His toxicology screening

showed he had Alprazolam in his system at the time of his death.

8.41  M.I. ordered ten Alprazolam 3mg pills marked as Xanax from Pharma-Master on

February 14, 2016. M.I. died on August 15, 2017.

8.42  J.J. ordered twenty Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills from

Pharma-Master. The last known order was placed on July 22, 2016. J.J. died on April 7,

2017. His toxicology screening showed he had Fentanyl in his system at the time of his

death.

8.43  R.A.J. ordered thirty Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills from

Pharma-Master. The last known order was placed on May 7, 2016. R.J. died on

December 5, 2016.

8.44  K.J. ordered four hundred forty Alprazolam 3mg pills marked as Xanax from Pharma-

Master. The last known order was placed on July 28, 2016. K.J. died on August 28, 2016.

8.45  M.J. ordered twenty-two pills from Pharma-Master on March 11, 2016. Those orders

consisted of Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills, and

17

Alprazolam 3mg pills marked as Xanax. M.J. died on March 18, 2016. His toxicology

screening showed he had Fentanyl and Alprazolam in his system at the time of his death.

8.46    J.K. ordered ten Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills from

Pharma-Master on April 10, 2016. J.K. died on April 12, 2016. His toxicology screening

showed he had Fentanyl, Cocaine, and Alprazolam in his system at the time of his death.

8.47    G.L. (with R.K.) ordered twenty-one Fentanyl-laced pills marked as Roxy-Oxycodone

30mg pills from Pharma-Master. The last known order was placed on June 6, 2016. G.L.

was the friend who found R.K. dead on June 13, 2016. G.L. died on March 3, 2017.

G.L.'s toxicology screening showed he had Fentanyl, Clonazepam, and Promethazine in

his system at the time of his death.

8.48    L.L. ordered one hundred ten pills from Pharma-Master. These orders consisted of

Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills, Diazepam (Valium) 10mg

pills, and Tadalafil (Cialis) 20mg pills. The last known order was placed on July 12,

2016. L.L. died on December 19, 2016. Her toxicology screening showed she had

Alprazolam, Amphetamine, and 7-Aminoclonazepam in her system at the time of her

death.

8.49    M.L. ordered thirty-five pills from Pharma-Master. These orders consisted of Fentanyl-

laced pills marked as Roxy-Oxycodone 30mg pills and Alprazolam 3mg pills marked as

Xanax. The last known order was placed on October 2, 2016. M.L. died on April 16,

2017.

8.50    M.M. ordered four Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills from

Pharma-Master on January 26, 2016. M.M. died on January 20, 2017. His toxicology

18

screening showed he had Morphine and 7-Aminoclonazepam in his system at the time of his death.

8.51    R.M. ordered twenty Alprazolam 3mg pills marked as Xanax from Pharma-Master on February 4, 2016. R.M. died on May 26, 2016.

8.52    A.M. ordered ten Alprazolam 3mg pills marked as Xanax from Pharma-Master on February 7, 2016. A.M. died on November 10, 2016.

8.53    M.M. ordered fourteen Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills from Pharma-Master on May 27, 2016. M.M. died on January 8, 2018.

8.54    D.M. ordered forty Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills from Pharma-Master. The last known order was placed on June 14, 2016. D.M. died on August 13, 2016. His toxicology screening showed he had Ethanol, Oxycodone, U-47700, Fentanyl, Promethazine, Citalopram, and Dextromethorphan in his system at the time of his death.

8.55    C.M. ordered twenty Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills from Pharma-Master on June 1, 2016. C.M. died on January 6, 2017.

8.56    J.M. ordered one hundred Alprazolam 3mg pills marked as Xanax from Pharma-Master on September 8, 2016. J.M. died on September 15, 2016.

8.57    M.M. ordered twenty Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills from Pharma-Master. The last known order was placed on June 24, 2016. M.M. died on July 16, 2018.

8.58    A.M. ordered ten Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills from Pharma-Master on September 6, 2016. A.M. died on April 2, 2017.

2690

8.59   C.N. ordered thirty Fentanyl-laced pills marked as M Box 30 Oxycodone 30mg pills from Pharma-Master on August 5, 2016. C.N. died on March 30, 2017, in Phnom Penh, Cambodia. His toxicology screening showed he had Morphine and Methamphetamine in his system at the time of his death.

8.60   M.O. ordered eighty Alprazolam 3mg pills marked as Xanax from Pharma-Master on April 22, 2016. M.O. died on March 6, 2017.

8.61   B.P. ordered thirty Alprazolam 3mg pills marked as Xanax from Pharma-Master. The last known order was placed on June 29, 2016. B.P. died on December 30, 2016.

8.62   K.P. ordered forty Fentanyl-laced pills marked as Roxy-Oxycodone 30mg from Pharma-Master. The last known order was placed on August 28, 2016. K.P. died on November 26, 2016. K.P.'s father found him unresponsive on the floor of his bedroom. Emergency medical services were called but all efforts to revive him were unsuccessful. His toxicology screening showed he had Ethanol, U-47700, Diazepam, Lorazepam, Hydroxyzine, and Citalopram/Escitalopram in his system at the time of his death.

8.63   S.P ordered two hundred ten pills from Pharma-Master on June 3, 2016. This order consisted of Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills, Alprazolam 3mg pills marked as Xanax, and Etizolam 3mg pills. S.P. died on November 6, 2016.

8.64   B.P. ordered one hundred forty-three pills from Pharma-Master. The orders consisted of Fentanyl-laced pills marked as Roxy-Oxycodone 30mg, and Alprazolam 3mg pills marked as Xanax. The last known order took place on February 19, 2016. B.P. died on November 2, 2016.

8.65   C.P. ordered ten Alprazolam 3mg pills marked as Xanax from Pharma-Master on June 3, 2016. C.P. died on December 24, 2016.

2691

8.66    G.R. ordered two Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills from
        Pharma-Master. The last known order was placed on April 5, 2016. G.R. died on
        September 25, 2016.

8.67    S.R. ordered six Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills from
        Pharma-Master on March 13, 2016. S.R. died on January 1, 2018.

8.68    D.R. ordered two hundred thirty pills from Pharma-Master. These orders consisted of
        Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills, Fentanyl-laced pills marked
        as M Box 30 Oxycodone 30mg pills, and Alprazolam 3mg pills marked as Xanax. The
        last known order was placed on August 6, 2016. D.R. died on July 12, 2017.

8.69    S.S. ordered ninety-six Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills from
        Pharma-Master. The last known order was placed on August 27, 2016. S.S. died on
        August 30, 2016.

8.70    K.S. ordered thirty pills from Pharma-Master. These orders consisted of Fentanyl-laced
        pills marked as Roxy-Oxycodone 30mg pills, and Alprazolam 3mg pills marked as
        Xanax. The last known order was placed on April 12, 2016. K.S. died on August 29,
        2016.

8.71    C.S. ordered three thousand one hundred ten pills from Pharma-Master. These orders
        consisted of Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills, Fentanyl-laced
        pills marked as M Box 30 Oxycodone 30mg pills, and Alprazolam 3mg pills marked as
        Xanax. The last known order was placed on August 5, 2016. C.S. died on August 9,
        2016.

8.72    M.S. ordered thirty Alprazolam 3mg pills marked as Xanax from Pharma-Master. The
        last known order was placed on June 9, 2016. M.S. died on July 4, 2016.

2692

8.73   J.S. ordered one Fentanyl-laced pill marked as a Roxy-Oxycodone 30mg pill from Pharma-Master on April 6, 2016. J.S. died on April 26, 2016.

8.74   M.S. ordered one hundred Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills from Pharma-Master. The last known order was placed on June 7, 2016. M.S. died on August 12, 2016.

8.75   C.S. ordered thirty Alprazolam 3mg pills marked as Xanax from Pharma-Master on June 24, 2016. C.S. died on May 4, 2017.

8.76   J.S. ordered thirty Alprazolam 3mg pills marked as Xanax from Pharma-Master. The last known order was placed on April 22, 2016. J.S. died on May 28, 2016.

8.77   J.T. ordered thirty Alprazolam 3mg pills marked as Xanax from Pharma-Master. The last known order was placed on June 28, 2016. J.T. died on September 18, 2016.

8.78   D.T. ordered one thousand one hundred forty Alprazolam 3mg pills marked as Xanax from Pharma-Master. The last known order was placed on August 24, 2016. D.T. died on May 13, 2017.

8.79   T.T. ordered sixty pills from Pharma-Master. These orders consisted of Alprazolam 3mg pills marked as Xanax, and Etizolam 3mg pills. The last known order was placed on February 4, 2016. T.T. died on November 18, 2016.

8.80   T.W. ordered fifteen pills from Pharma-Master. These orders consisted of Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills, and Alprazolam 3mg pills marked as Xanax. T.W. died on August 5, 2017. His toxicology screening showed he had Fentanyl, Mitragynine, Caffeine, and Cotinine in his system at the time of his death.

22

8.81   S.W. ordered thirty pills from Pharma-Master on January 5, 2016. These orders consisted of Alprazolam 3mg pills marked as Xanax, and Diazepam 10 mg pills marked as Valium. S.W. died on April 1, 2016.

8.82   A.W. ordered twenty pills from Pharma-Master. These orders consisted of Fentanyl-laced pills marked as M Box 30 Oxycodone 30mg pills, and Etizolam 3mg pills. The last known order was placed on August 10, 2016. A.W. died on January 27, 2017.

8.83   D.W. ordered one hundred ten Alprazolam 3mg pills marked as Xanax from Pharma-Master. The last known order was placed on August 25, 2016. D.W. died on September 10, 2016. His toxicology screening showed he had Alprazolam, 2-Fluorofentanyl, Amphetamine, Caffeine, Levamisole, and Nicotine in his system at the time of his death.

8.84   W.W. ordered one thousand one hundred ten Alprazolam 3mg pills marked as Xanax from Pharma-Master. The last known order was placed on August 9, 2016. W.W. died on October 31, 2016.

8.85   S.L. ordered fifty Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills from Pharma-Master. The last known order was placed on June 30, 2016. S.L. died on September 30, 2016.

8.86   L.S. ordered ten Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills from Pharma-Master on April 13, 2016. L.S. died on April 20, 2016.

8.87   M.K. obtained a Fentanyl-laced pill marked as a Roxy-Oxycodone 30mg pills with his friend, D.Y., from a local Utah source known to be supplied by Pharma-Master. M.H. crushed and snorted the pill and was found dead on June 9, 2016.

8.88   D.Y. obtained a Fentanyl-laced pill marked as Roxy-Oxycodone 30mg pills with his friend, M.K., from a local Utah source known to be supplied by Pharma-Master. D.Y.

23

crushed and snorted the pill and went into overdose on June 8, 2019. M.K. transported

D.Y. to the hospital where he received Narcan twice and came out of the overdose. D.Y.

went home to recuperate. D.Y. was notified of M.K.'s death the next day, June 9, 2016.

Out of guilt and feeling as if he was the cause of M.K.'s death, D.Y. committed suicide

on December 18, 2016.

8.89    K.B. obtained Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills from a local

Utah source known to be supplied by Pharma-Master. K.B. died on August 27, 2016.

8.90    N.L. obtained Fentanyl-laced pills marked as Roxy-Oxycodone 30mg pills from a local

Utah source known to be supplied by Pharma-Master. N.L. died on November 6, 2016.


These ninety now-deceased customers purchased a very small portion of the hundreds of

thousands of Fentanyl-laced fake oxycodone pills the defendant sold in 2016.

### 9.  Providing Just Punishment

Where so many families have lost a loved one, where so many more have struggled through the addiction brought on or furthered along by the defendant's pills, only a sentence like the mandatory-minimum sentence in this case can provide just punishment.  The United States has collected statements from the families of the defendant's now-deceased customers and submitted those, under seal, to the Court. Here are five representative samples taken from those statements, redacted to respect the privacy of the families and shared with permission.

### 9.1    Grief puts its arms around our lungs, mercilessly sucking our hope

[My brother] was more than my big brother, he was my best friend. I will never forget the day he passed. My father called me three times in the morning at 5:30am, when I picked up the phone, I heard noises I wish I could forget. The wailing of my mother sounded like a victim being tortured. My father told me to sit up tall and take a deep breath, my brother was no longer with us.

There isn't an emotion I could possibly explain, all I can tell you is my world crumbled. That day I lost a piece of me and my family lost its' will to live. I could tell you how I dropped to my knees, how I've developed a host of medical issues, how I thought my parents would kill themselves, how I would stay in my parents rooms and watch their chests rise and fall, how I would lose days hugging [my brother's] clothes, or how I had to call all his dearest friends and share the horrendous news. I could try to explain how I've reached a sadness so deep that silent tears roll down my face, from a level of despair I didn't know was possible or how I never knew when I was crying or asleep, as they blended. I could try to tell you how every holiday all is left is the silence of our tears striking [my brother's] favorite dish. I could try to explain how every life event is overshadowed with sadness, and how I never feel complete. I could tell you about

2696

the nieces and nephews [my brother] will never get to know or the empty chair at my wedding one day. But even if I explained this to you, how could you ever understand what this crime has done to me and my family?

Depression has overcome my entire family; we are angry, and we are not a family anymore. Everything that held us together has dissipated. Every day I wish I would wake up from this nightmare. I have avoided everything [my brother] and I did together and have lost myself. All I'm left with are memories and his ashes. I didn't get to say goodbye. How do you explain losing the closest person to you on this earth?

Our cries are a boiling kettle pot, screeching from our souls. Grief puts its arms around our lungs, mercilessly sucking our hope. Our memories are the flashing lights of the ambulance [my brother] never left. His past is the ticking of the clock we didn't hear. His future is a fairytale. My family's present is the paralysis of forever. What do we do with a shattered heart?

[My brother] always told me, "you are my little sister, but I look up to you." That's the only reason I'm writing this letter. [My brother] would want justice. He deserved more than 26 years of life. Our nation deserves more. No parents should be burdened with their child's death. Nothing can bring [my brother] back but maybe one other family can be saved.

## 9.2    Not a pain pill, but a death pill

My son died from a counterfeit drug laced with fentanyl. A pill deliberately manufactured and marketed to be something else, by someone with wanton disregard for the welfare and lives of others. He never sees the faces or knows the lives of his victims, but my husband and I would like the character and impact of at least one such life to be known.

[My son] was a winsome 23-year old young man, loved by and loyal to many friends. He was hard-working, gifted in athletics and in building or fixing anything, rising in the construction

26

company for which he worked as supervisor, overseeing four different renovation projects the morning he died. How do you measure the loss when someone in the launching time of life is suddenly cut off?

He left a devastated younger brother finishing his senior year of high school and who counted [my son as] his best friend. They had played soccer, hunted, and fished together, worked together, and had reached the stage of being able to talk man-to-man about life and its challenges. Left without her daddy was a daughter just shy of three years old, who already loved him gleefully. With blond, curly hair, personality and gifting much like his. There will be no dad there on her first day of kindergarten, or on her graduation day, or to give her away in marriage. He left his mom and dad, who heard frequently in the years following his adoption at 3 weeks of age "what a beautiful child," and who knew what gifts from God were his natural abilities, personality, and character. He left behind his birth parents, who would have met him very soon for the first time.

Why the sudden end to this incredibly valuable life? He took something for pain that was not what it was claimed to be. Not a pain pill, but a death pill. The indiscriminate murder of a deeply loved person whose star was on the rise, snuffed out by a death peddler. Irreplaceable and forever missed. Life here on earth will never be the same, for us and for all his family and close friends and for many of the 1200 people from our community who attended his untimely funeral. An immeasurably valuable life, as all lives are. Also immeasurable is the deep evil of someone who engages in heartless, reckless actions for the sake of enriching himself.

2698

### 9.3     I discovered his lifeless body in his bedroom

Thank you for the opportunity to provide a personal impact statement regarding our son, who died of a Fentanyl-related overdose at the age of 24.

As an adolescent our son developed Obsessive-Compulsive Disorder (OCD) and acute anxiety. He was treated by a psychiatrist with anti-anxiety medications, which did not help and likely contributed to subsequent drug-seeking behavior to alleviate his obsessive and intrusive thoughts. He later experienced relief from anxiety when he was prescribed an opioid pain medication following extraction of his wisdom teeth. Thereafter, as a college student he pursued illicit "street" opioids for the relief of his OCD and anxiety symptoms.

I am aware that he experienced at least three Fentanyl-related overdoses: The first episode was a horrible experience in July 2015, when he overdosed on Fentanyl after consuming alcohol with his friends. He was immobile on his apartment's bathroom floor for 16 hours, which resulted in rhabdomyolysis, acute renal failure, pneumonia, brain lesions, tissue necrosis, and life-threatening tachycardia. His life was miraculously spared by powerful prayer to God by family and friends and excellent medical care at [a nearby hospital]. He was in the ICU and hospital rehab for 24 days. We were at his side every day and night during this disruptive and disheartening season. His insurance company paid hundreds of thousands of dollars in medical claims…and [my wife] and I paid thousands. Then, upon return to our home, I spent the following five months helping him recover his ability to walk and to use his arm and hand. It was a horrible and heart-breaking season of life for him, us as parents, and his three siblings. It was then that we learned for the first time of [my son's] opioid dependence and addiction.

The second episode was a Fentanyl overdose in the spring of 2016 after relapsing. It occurred in a restaurant. He was revived by Narcan. He then tried Suboxone as a preventative of

28

2699

relapse.

The third Fentanyl-related episode claimed his life [the following year]. He had been "clean" for three months, during which time he confessed to God and me many of his dark troubles as an opioid addict. He told me that he had developed a high tolerance to opioids and had pursued high potency synthetic opioids (e.g., Fentanyl) on the Dark Web to prevent withdrawal symptoms. I know that he did obtain Fentanyl (and other opioids) by mail from at least one illicit source. He told me so.

After three opioid-free months and active participation in Narcotics Anonymous, he relapsed while physically ill and discouraged. I discovered his lifeless body in his bedroom in our basement. The toxicology report indicated Fentanyl, heroin, and prescription Tramadol in his body. It was devastating to our family and his friends. [My wife] and I cried every day for months thereafter. For him the outcome was final and binary, but for us the pain continues day-after-day.

As a father who is still mourning the loss of a precious, creative, and intelligent son, I have the following to say to those justly convicted in this case:

"May you know that your intentional and sociopathic actions motivated by greed and disregard for the value of human lives will mark you for your entire lives 'with blood on your hands.' You have very likely contributed to overdoses and manslaughter of vulnerable drug addicts, some of whom you may have created by your distribution of drugs. You cannot reverse that. The guilt and shame are real. You caused countless pain to many families and friends of your victims.

May you honestly confess your sins to the Almighty Father God, the God of Israel, Yahweh. As a father of a son who overdosed and died from Fentanyl, I am willing to forgive

29

you, as I am a man forgiven of my sins. May you come to know the love and forgiveness of

Jesus. My son would want you to know Him."

### 9.4     The proof I never wanted to see

[In November] 2016, at 8:01 pm I received a call that would forever change my life,

"He's gone. [Your Brother] is dead." I rushed over to my parent's house in less than ten minutes.

I remember the lights from all the EMS, Firetrucks, and police cars. Each emergency responder

had this look on their faces of deep sadness and pain. I knew each one them personally, invited to

their weddings, we went to school together, played as kids, however not one of them would look

me directly in my eyes. I don't remember running up the driveway or porch but suddenly I was

standing in the living room. There it was, the proof I never wanted to see. The proof that the

phone call was not a mistake. The proof the first responders were not at the wrong house. There

laid my perfectly healthy, fit, strong older brother dead on the couch. Television remote in hand,

shoes on, and his dinner on the coffee table.

The rest of the night moved in slow motion as I sat with him and watch as people came in

and out to collect evidence, analyze the scene, and eventual carry my only sibling out in a body

bag. Nothing was ever going to be normal again. We were forever changed.

[My brother] was 37 years old. He was a father of two beautiful children, son to my

parents, older brother to me, uncle, friend, and a trusted CPA to his clients. He was intelligent,

highly educated, volunteer in the community, kindhearted, and had the gentlest soul. He was a

caretaker to me my entire life. My protector, best friend, and someone I thought would always be

there for me. Everything changed that fateful fall night. My family was destroyed in ways I could

never imagine. His children now live in [another state] and we have very limited communication

2701

with them. It feels like we lost them that day also. I pray the relationship can heal and get better but only time will tell.

I was so overwhelmed with grief that I resigned from a very successful job that I worked years to get. My parents are not the same people. Our relationship is strained and will never be like it was before my brother died. For them after losing a child, life is unbearable. They no longer carry on social relationships with anyone, including me, their only surviving child or even their grandchildren. This loss broke them completely and devastatingly. I have become the caretaker for them and feel that this role reversal I live in is a permanent nightmare I cannot escape.

The home I grew up in and shared so many wonderful memories in now was marred with the image of my brother dead in the living room on the couch. We were forced to sell the home and all the belongings immediately after because my parents refused to ever walk back in. I took them in for the first two and half years. Raising my own children, I suddenly had to be responsible for my parents also. I didn't lose just my brother that night, I lost my parents, my nephew, my niece, my childhood home, my career, and so much more.

Trying to put into words just how much an impact the loss of [my brother] from our lives is seemingly impossible. The decision the defendants made all in the name of greed resulted in death for our family. Death is permanent and the pain felt after is a heartache that never heals. I wouldn't wish this pain or experience on my worst enemy. As a family we kindly ask that [my brother] be remembered as person, a soul that cared so deeply he literally would give people in need the shoes off his feet. His time on this Earth may have been short but he left a lasting impression with everyone that knew him.

31

2702

## 9.5 A shrill scream mixed with a gurgle

I woke up one night to a horrible noise. It was unlike anything I had ever heard in my life. It was like a shrill scream mixed with a gurgle. It was high pitched, and painful. I ran to the noise, and saw my husband laying on the couch. His skin was blue, and there was liquid coming out of his mouth. I remember rubbing my eyes and trying to process what was happening in front of me. I ran to [him]. I shook him, and began screaming, "Wake up! Wake up!"

When it became apparent that he wasn't moving, or breathing at a normal pace, I called 911. I don't remember much of the conversation. I just remember them walking me through CPR when our neighbor who also happens to be an EMT burst through my door. She later explained that she heard me crying on her scanner. She screamed, "Get back! I've got it." She checked his pulse and began working on him while I stood there shaking.

The next thing I remember is two police officers asking me to tell them what happened. All I could say was, "I don't know. I don't know. I was asleep. I don't know." More EMTs had arrived at this point, and they were taking [my husband] out on a stretcher. [An] officer asked me if I needed a ride to the hospital. I told him yes. We walked outside, he helped me into the car, and then he went to speak to the paramedics. He came back to the car, and said, "[Ma'am], I need to tell you something. They used Narcan on your husband. He is sitting up talking and has admitted to using illegal substances."

In that moment, my world went dark. I could not seem to process what the officer had just told me. My only response was, "Why would he do that?" The officer replied, "I'm sorry to be the one to tell you. I don't know." I called my parents on the way to the hospital and asked them to pick me up there before calling [my husband]'s mom to explain what had happened. I

32

2703

told her that I didn't want to stay with [my husband], and that all I wanted to do was be with our son.

The next three weeks were a whirlwind. My son and I moved into my grandmother's basement, and [my husband] stayed at our house. I couldn't stand the thought of being in our home, and as ashamed as I am to admit it now, I couldn't stand the thought of being around [my husband]. I felt so naive for not knowing what was going on right under my nose.

While we weren't living together after his overdose, I did allow him to see [our son] under my supervision. We met up at the park a couple of times, and I did let him come to my grandmother's for dinner once. Then one day, I needed to speak to him, and he wouldn't answer the phone. I didn't think much of it until [my husband]'s dad called me to see if I had spoken to [my husband]. When I told him I hadn't, I remember my dad saying he had a bad feeling, and that he was going to drive by the house. When he got there, my younger brother was running out of the house crying. He had walked in, and found [my husband] passed away on the couch.

When someone close to you passes away, you don't get much time to process anything. You have to pick out a casket, you have to choose a burial plot, you have to hug 300 people who mean well but don't know what to say… In my case, I had to watch our child, who was almost two at the time, walk up to the casket and say, "Mommy, daddy sleep?" I can't even begin to explain how that tortured my soul.

Over the next year, I developed night terrors, PTSD, panic attacks, and Generalized Anxiety Disorder. I couldn't sleep without seeing his face, or hearing the noise he made during the first overdose. One day, my grandmother's ice machine made a noise inside the freezer, and for some reason it reminded me of that noise. I just remember crying, and crying, and then crying some more. My seemingly perfect life had spiraled out of control in a matter of months, and I

33

was losing touch of the bubbly, sweet, carefree woman I had always been. It was absolutely the worst time of my life. As hard as all of this was for me. I was not the only one going through post-traumatic stress. My younger brother will have to be on anti-anxiety medication for the rest of his life because of what he saw that night. I felt so much guilt, and I knew there was nothing I could do to erase what he saw.

All of our lives have been changed forever, but my main concern has always been, and will always be for our son. I ask you to think about your child. If you're not a parent, I ask you to think about a child you love. Picture his or her face. Now, imagine telling that child that his or her father is never coming home again. Imagine all of the big things that child won't have his or her father present for. [My husband] has already missed our son's first day of school, his kindergarten graduation, his first basketball game, his first baseball game, his first soccer game… the list goes on and on. [My husband] won't be there when our son gets his driver's license, when he graduates from high school, when he graduates from college, or when he gets married.

Some may say that [my husband] made the choice to do drugs, that his death was an inevitable consequence of his actions. I agree that [my husband] had an addiction, a problem that we didn't know about, but I don't believe that what happened was his choice. I will always blame myself for being naive and unaware, and I'll always question if I could've done more to stop his passing. I will never ever condone or make excuses for [my husband]'s addiction. He made some very wrong choices, but Mr. Shamo, and his associates, stole any chance [my husband] had at recovery when they laced the substances [my husband] was using with fentanyl.

I often think about what I will say when my son asks me what happened to his dad. As hard as the past few years have been, I fear some of the worst is yet to come. How do you even

2705

begin to explain this to your child? How do you explain to your son that his father was a great person who had a bad problem? How do you explain to your son that while his father was committing a crime, he didn't know the full extent of what he was putting into his body because someone states away laced the substances? How do you even begin to explain to your son the danger of drugs, and how wrong they are, while not ruining his father's name? How do you find a balance between "your dad loved you very much" and "what he did was not okay"?

You see, [my husband] was nothing like a "typical drug user." When he died, he was holding his laptop finishing up his Bachelor's Degree. At time of his death, he was a computer technician for five schools [nearby]. My husband was far from the image most people think of when they picture an addict. He still had so much to live for, and I can't help but wonder what he would've done had he been given the chance to recover from his addiction.

Ephesians 4:32 says, "And be ye kind one to another, tenderhearted, forgiving one another, even as God for Christ's sake hath forgiven you." My God commands me to forgive Mr. Shamo, and I do. I have learned that forgiveness is for yourself, and in forgiveness you find peace, but I can never forget that while my child looked at his 28-year-old father laying in a casket, Mr. Shamo and his associates were probably playing video games, and living their lives to the fullest. That's just a really hard concept to grasp.

35

## 10.    Conclusion

The United States respectfully submits that the minimum-mandatory sentence for Count 1, Engaging in a Continuing Enterprise, is a sentence that will promote respect for the rule of law, provide just punishment, protect the public, deter others from committing similar offenses, and reflect the seriousness of the offense, as required by 18 U.S.C. 3553(a).

Respectfully submitted this 29th day of September, 2020.

JOHN W. HUBER
United States Attorney

/s/ *Michael Gadd*
MICHAEL GADD
Special Assistant United States Attorney

2707

# 'I am awesome': How a millennial built a fentanyl empire

By CLAIRE GALOFARO and LINDSAY WHITEHURST     September 14, 2019



SALT LAKE CITY (AP) — The pills arrived in thousands of mailboxes across the country, round and blue, with the markings of pharmaceutical-grade oxycodone stamped into the surface.

Prosecutors would later call them "poison" — counterfeits containing fentanyl, a potent synthetic opioid that has written a deadly chapter in the American opioid epidemic. They were shipped from the suburbs of Salt Lake city.

That's where a clean-cut, 29-year-old college dropout named Aaron Shamo made himself a millionaire building a fentanyl trafficking empire with not much more than his computer and a few friends.

——

This story was produced in partnership with the Pulitzer Center on Crisis Reporting.

——

For three weeks this summer, those suburban millennials climbed onto the witness stand at his federal trial and offered an unprecedented window into how fentanyl bought and sold online has transformed the global drug trade. There was no testimony of gangland murders or anything that a wall at the southern border might stop. Shamo called himself a "white-collar drug dealer," drew in co-workers from his time at eBay and peppered his messages to them with smiley-face emojis. His attorney called him a fool; his defense was that he isn't smart enough to be a kingpin.

How he and his friends managed to flood the country with a half-million fake oxycodone pills reveals the ease with which fentanyl now moves around the world, threatening to expand the epidemic beyond America's borders: Powder up to 100 times stronger than morphine was bought from a laboratory in China and arrived in Utah via international mail; it was shaped into perfect-looking replicas of oxycodone tablets in the press that thumped in Shamo's basement and resold online. Then it was routed it back into the postal system in thousands of packages addressed to homes across this country awash with prescription painkiller addiction.

The largest civil litigation in history is testing how the pharmaceutical industry should be held accountable for inundating the country with billions of addictive pain pills, spreading mass addiction that led to this. Purdue Pharma, maker of the blockbuster drug OxyContin, reached a tentative $12 billion settlement this week with about half the states and roughly 2,000 local governments. A trial of other pharmaceutical companies is scheduled for next month, in which communities will contend that their mass marketing of prescription painkillers sparked an epidemic.

The crisis began in the 1990s, as prescription opioids paved the road to heroin, which led to fentanyl. It has killed tens of thousands of Americans since it appeared on the streets in 2013. There are two sources of supply. Mexican cartels and packages shipped direct from China, where it is produced in a huge and under-regulated chemical sector. There are many upstart dealers like Shamo, officials say. Seizure data shows trafficking quickly expanding worldwide. In 2013, four countries reported fentanyl seizures. By 2016: 16 countries.

It is so potent, so easy to transport, large-scale traffickers no longer require sophisticated networks, said Mike Vigil, former chief of international operations for the Drug Enforcement Administration. All they need is a mailbox, internet access and people with an appetite for opioids. And consumption rates are rising from Asia to Europe to Latin America as pharmaceutical companies promote painkillers abroad.

The profit margins for illegal fentanyl are irresistible. The DEA estimates a kilogram synthesized for a few thousand dollars could make a dealer more than $1 million.

"Any moron can basically become a major drug kingpin by dealing in fentanyl," Vigil said. "You can have somebody with an IQ minus 100 who becomes an overnight multimillionaire."

By the time a seized package heading from China to Utah led investigators to Shamo, he

had already made at least 458,946 potentially poisonous pills, the government said. They found $1.2 million stuffed in his sock drawer and in a safe, plus more tied up in online cryptocurrencies.

Shamo built his drug-trafficking organization initially with his longtime friend Drew Crandall.

The pair began by selling Adderall, prescribed for attention deficit disorder, on the dark web — a wild, unregulated layer of the internet reached through a special browser. There are underground marketplaces where guns and drugs are traded and money is exchanged anonymously through cryptocurrencies. They expanded — peddling the club drug MDMA, magic mushrooms, date rape drugs, cocaine — all while barely having to leave the house. They bought a pill press and manufactured fake Xanax, the anti-anxiety medication.

Then a local drug dealer suggested to Shamo he'd make a fortune selling fake oxycodone made with fentanyl. Crandall left the country, and Shamo recruited another friend, Jonathan Luke Paz, to help him press oxycodone.

He sold pills both to individual users and drug dealers, who then sold the pills on the street. When police intercepted one single day's shipment, it contained 34,828 fentanyl pills destined for homes in 26 states. Some were advertised on the dark web as fentanyl, but others weren't, purporting instead to be 30 milligrams of oxycodone.

Federal prosecutors allege dozens of his customers died, though charged him only in connection with one death: 21-year-old Ruslan Klyuev, who died in his bedroom in Daly City, California, with the envelope that delivered the pills from Utah near his feet.

Shamo was convicted of 12 counts, including continuing criminal enterprise, the so-called "kingpin charge" that is typically reserved for drug lords like El Chapo and carries a

mandatory life sentence. The jury deadlocked, though on the 13th count, the death of Klyuev.

But experts warn the fentanyl trade is rapidly expanding.

The day Shamo was convicted, a single dark web marketplace had thousands listings claiming to be oxycodone. There was no way to tell whether they originated in a pharmacy or somebody's basement.

"Pharma-grade A++," one listings promise. "24-hour shipping!"

Gregory G. Skordas (#3865)
Gabriela Mena (#17087)
N. Michelle Phelps (#17096)
SKORDAS & CASTON, LLC
560 South 300 East, Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
Attorneys for Defendant
gskordas@schhlaw.com
gmena@schhlaw.com
mphelps@schhlaw.com

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. AARON MICHAEL SHAMO, Defendant. | **DEFENDANT'S SENTENCING MEMORANDUM** Case No. 2:16-CR-00631-001 Judge Dale A. Kimball |

The Defendant, Aaron Shamo, by and through counsel of record, Gregory G. Skordas, hereby provides his Sentencing Memorandum in advance of sentencing scheduled for October 15, 2020 at 10:00 a.m.

## PRELIMINARY STATEMENT

On November 22, 2016, Aaron Shamo (hereinafter "Shamo") was named in a Criminal Complaint which charged Possession of Fentanyl with Intent to Distribute, in violation of 21 U.S.C. §841(a)(1). On May 31, 2017, Shamo was named in a fifteen count Superseding Indictment. On October 18, 2018, Shamo was named in a thirteen count Second Superseding Indictment. The thirteen counts were as follows: Count 1 charged Continuing Criminal

Enterprise, in violation of 21 U.S.C. §848; Counts 2-4 charged Aiding and Abetting the Importation of a Controlled Substance, in violation of 21 U.S.C. § 952, 21 U.S.C. § 960(b)(2); Count 5 charged Possession of a Controlled Substance with Intent to Distribute, in violation of 21 U.S.C. § 814(a)(1), 21 U.S.C. § 841(b)(1)(A); Count 6 charged Aiding and Abetting the Distribution of Controlled Substance Resulting in Death, in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. §841(b)(1)(A); Count 7 charged Manufacture of a Controlled Substance, in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 841(b)(1)(A); Counts 8-9 charged Knowing and Intentional Adulteration of Drugs while Held for Sale, in violation of 21 U.S.C. § 331(k), 21 U.S.C. §333(b)(7); Count 10 charged Aiding and Abetting the Use of the U.S. Mail in Furtherance of a Drug Trafficking Offense, in violation of 21 U.S.C. § 843(b), 21 U.S.C. § 843(d); Count 11 charged Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h); Count 12 charged Money Laundering Promotion and Concealment, in violation of 18 U.S.C. § 1956(a)(1(A)(i); Count 13 charged Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, in violation of 18 U.S.C. § 1957(a).

On August 30, 2019, Shamo was found guilty by jury trial to twelve counts of the thirteen-count Superseding Indictment. The jury could not reach a verdict on Count 6, Aiding and Abetting the Distribution of Controlled Substance Resulting in Death, in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. §841(b)(1)(A). Shamo has been in continuous federal custody since his arrest on November 22, 2016.

## SENTENCING DISCUSSION

Although Shamo is facing the minimum mandatory sentence for Count 1- life imprisonment, Shamo submits this memorandum to cover statutory factors the Court is required to consider prior to sentencing under 18 U.S.C. §3553(a).

## The History and Characteristics of the Defendant

Shamo's background was summarized in the pre-sentence report. (See paragraphs 82-93 of the presentence report.) Shamo was born in Salt Lake City, Utah, the fourth child of married parents. Shamo was raised in Arizona. At the age of 13 Shamo began using marijuana with periodic binge alcohol drinking. Shamo's parents transferred him to a charter school hoping that would put him on a better path. Shamo's substance abuse increased which resulted in Shamo's parents transferring him to a boarding school. After receiving his high school diploma Shamo attended Utah Valley University in Provo, Utah beginning in September 2008. Shamo struggled academically and ultimately ended up dropping out of Utah Valley University. Shamo enrolled in classes at Salt Lake Community College from September 2012 to December 2012, where he continued to struggle academically. Shamo did not complete a degree.

In 2012 Shamo was diagnosed with Attention Deficit Hyperactivity Disorder. Shamo has also been diagnosed with situational anxiety, related to social situations. Despite the Government's description of Shamo as a person that wanted to build an empire and be rich, Shamo is a person who lacks confidence and wrote journal entries as affirmatives to boost his confidence.

Shamo met co-defendant Drew Crandall, (hereinafter "Crandall"), in his early adult life and as Shamo testified at trial, Crandall was somebody who he looked up to. Shamo explained how Crandall taught him many things ranging from how to wash clothes properly to technical skills. Crandall helped Shamo get a job at Teleperformance and later at eBay.

Other than this federal offense, Shamo only has one other adult criminal conviction; Misdemeanor Driving Under the Influence in 2015.

## The Nature and Circumstances of the Offenses

This case involved a Drug Trafficking Organization which manufactured controlled substances. The organization distributed these controlled substances throughout the United States on the Dark Net marketplace AlphaBay and by using the U.S. Mail.

Shamo was living paycheck to paycheck and Crandall too, was struggling financially. At one point Crandall and Shamo started mining BitCoins and the parties put together an online storefront to sell their prescribed Adderall. Crandall and Shamo then started to purchase Molly and MDMA using BitCoins, through the darknet. Crandall came up with the idea to sell Molly and MDMA in capsule form. These substances were advertised through the darknet marketplace. Shamo would get the order and pass it to Crandall, Crandall then would ship the controlled substances. Crandall came up with new and different ways of how to make the distributed substances undetectable through the mail.  Evolution to different drugs continued and resulted into a larger distribution operation.

Crandall came up with the idea of pressing pills and figured out the algorithm of ingredients to use to make Zanax and MDMA pills. As this operation evolved, more people started to get involved. There were many other co-defendants that helped with this operation. The essential co-defendant to the fentanyl distribution was Luke Paz (hereinafter "Paz").

Before Crandall left to travel the world with his then girlfriend, he trained Paz on how to run the pill press. When the idea of selling fentanyl was brought to the operation's attention by Christopher Kenny, Shamo reached out to Crandall to get his view. Crandall commented to Shamo that he should "follow the money". Paz worked on the formula for Fentanyl Roxy's until it was perfected. The demand rose and the distribution continued.

## Injustice in Sentencing When it Comes to Culpability

Whether Shamo is sentenced before or after his codefendants, it is very evident that there will no doubt be sentencing disparities. No other co-defendant was charged with the Continuing Criminal Enterprise count. The term of imprisonment is mandatory life without release for this charge. Shamo will be sentenced to life on October 15, 2020 while co-defendant's Paz and Crandall, who are equally culpable, were never charged with Continuing Criminal Enterprise and will certainly receive a much lighter sentence. Crandall entered into a plea agreement and pled guilty to the following: Conspiracy to Distribute Fentanyl, Conspiracy to Distribute Alprazolam, and Conspiracy to Commit Money Laundering. Crandall has the opportunity to serve less than a life sentence even though he started the organization and helped in its evolution. Crandall has served some jail time but was recently released and is awaiting sentencing. Paz entered into a plea agreement and pled guilty to the following: two counts of Knowing and Intentional Adulteration of Drugs While Held for Sale-Fentanyl and Conspiracy to Commit Money Laundering. Paz, will almost certainly, serve less than a life sentence. Paz has not yet spent a day in jail or prison for his conduct.

## Victims and Just Punishment

Even though the jury did not convict Shamo of distributing fentanyl resulting in the death of R. K. on June 13, 2016, the Government indicated in their sentencing memorandum that Shamo was responsible for R.K.'s death. The Government has listed ninety other individuals, apparently now deceased, who at some point bought from Pharma-Master. Most of these individuals had to search for and find Pharma-Master on the darknet in order to purchase drugs. The most unfair implication made by the Government after listing these ninety individuals is that Shamo was the one that sold to them. Shamo represents one of many individuals responsible for

how these individuals were sold drugs through the darknet. If it were not for the attributions from other co-defendants, mainly Crandall and Paz, those drugs may have never been sold to those ninety individuals. Without Crandall helping with a storefront on the dark net, formulating recipes for pills, and masterminding how to distribute the product through the mail, this drug distribution organization would not have been able to distribute the amount of drugs it did. Without the suggestion of Christopher Kenny and Paz's perfecting of a fentanyl recipe, fentanyl pills may have never been distributed by this drug distribution organization.

The drug problem that our country faces has two components. The first is the distribution of drugs and the second is the demand for drugs. All defendants in this matter contributed to the first component, but only Shamo was charged with a count that mandates a life term of imprisonment. Now that all defendants are soon to be sentenced, Shamo is the only defendant guaranteed a life sentence. That is not a just sentence. Regardless of the Government's theory that Shamo being sentenced to life will promote respect for the law, there will always be a person like Drew Crandall with the mindset to "follow the money". As long as there is a demand, there will be distribution.

## CONCLUSION

The Defendant respectfully submits that a life sentence for Count 1, Engaging in a Continuing Enterprise, is not just.

DATED this 9th day of October 2020.

SKORDAS & CASTON, LLC

*/s/ Gregory G. Skordas*
Gregory G. Skordas

## CERTIFICATE OF SERVICE

I hereby certify that on the 9 October 2020, I electronically filed a true and correct copy

of the foregoing **DEFENDANT'S SENTENCING MEMORANDUM**, with the Clerk of the

Court using CM/ECF system, which sent notification of such filing to the following:


John W. Huber
Michael Gadd
Kent A. Burggraaf
Vernon G. Stejskal
Attorneys United States Attorney
111 South Main St., #1800
Salt Lake City, UT 84111

*/s/ Stacey Dodier*
SKORDAS & CASTON, LLC

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

District of Utah

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| AARON MICHAEL SHAMO | Case Number:  2:16-CR-00631-001-DAK |
| | USM Number:  24911-081 |
| | Gregory G. Skordas |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   1ss-5ss, 7ss-13ss of the Second Superseding Indictment
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21 U.S.C. § 848 | Continuing Criminal Enterprise | 11/22/2016 | 1ss |
| 21 U.S.C. § 952 | Aiding and Abetting the Importation of a Controlled Substance | 11/22/2016 | 2ss and 4ss |

    The defendant is sentenced as provided in pages 2 through _____6_____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has not been found guilty on count(s)   6ss of the Second Superseding Indictment

☑ Count(s)  1, 1s, 4s-7s, 9s-15s   ☐ is  ☑ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

        10/15/2020
    Date of Imposition of Judgment

    _Dale A. Kimball_
    Signature of Judge

    Dale A. Kimball, U.S. District Judge
    Name and Title of Judge

        10/15/2020
    Date

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1A

Judgment—Page ___2___ of ___6___

DEFENDANT: AARON MICHAEL SHAMO
CASE NUMBER: 2:16-CR-00631-001-DAK

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21 U.S.C. § 960(b)(6) | Conspiracy to Distribute Alprazolam | 11/22/2016 | 3ss |
| 21 U.S.C. § 841(a)(1) | Possession of a Controlled Substance with Intent to Distribute | 11/22/2016 | 5ss |
| 21 U.S.C. § 960(b)(6)(1) | Manufacture of a Controlled Substance | 11/22/2016 | 7ss |
| 21 U.S.C. § 331(k) and 333(b)(7) | Knowing and Intentional Adulteration of Drugs while Held for Sale | 11/22/2016 | 8ss and 9ss |
| 21 U.S.C. § 843(b) | Aiding and Abetting the Use of the U.S. Mail in Furtherance of a Drug Trafficking Offense. | 11/22/2016 | 10ss |
| 18 U.S.C. § 1956(h) | Conspiracy to Commit Money Laundering | 11/22/2016 | 11ss |
| 18 U.S.C. § 1956(a)(1)(A)(i) & (a)(1)(B)(i) | Money Laundering Promotion and Concealment | 11/22/2016 | 12ss |
| 18 U.S.C. § 1957(a) | Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity | 11/22/2016 | 13ss |

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page 3 of 6

DEFENDANT: AARON MICHAEL SHAMO
CASE NUMBER: 2:16-CR-00631-001-DAK

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
Life

☑ The court makes the following recommendations to the Bureau of Prisons:
The court recommends that Defendant be placed at FCI Phoenix Arizona in order to facilitate family visitation.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ ☐ a.m. ☐ p.m. on _____ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on _____ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page    4    of    6

DEFENDANT: AARON MICHAEL SHAMO
CASE NUMBER: 2:16-CR-00631-001-DAK

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 1,200.00 | $ 0.00 | $ 0.00 | $ 0.00 | $ 0.00 |

☑ The determination of restitution is deferred until 11/19/20 ⊞ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| **TOTALS** | $          0.00 | $          0.00 | |

☐ Restitution amount ordered pursuant to plea agreement    $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the    ☐ fine    ☐ restitution.

    ☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___5___ of ___6___

DEFENDANT:  AARON MICHAEL SHAMO
CASE NUMBER:  2:16-CR-00631-001-DAK

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☑  Lump sum payment of $ ___1,200.00___  due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

**B**  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

**C**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

Case Number
Defendant and Co-Defendant Names              Joint and Several        Corresponding Payee,
(including defendant number)         Total Amount        Amount                if appropriate

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
The Order of Forfeiture (Docket No. 332) is adopted as the Judgment of the Court. Defendant shall forfeit the property listed on page 6 of this Judgment to the United States.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 6B — Schedule of Payments

DEFENDANT:  AARON MICHAEL SHAMO                           Judgment—Page  6  of  6
CASE NUMBER:  2:16-CR-00631-001-DAK

# ADDITIONAL FORFEITED PROPERTY

$5,357,950.38 in United States Currency, the proceeds of the sale of 513.15 Bitcoin;
$1,227,773.00 in U.S. Currency;
$671,030 in U.S. Currency;
$134,960 in U.S. Currency;
512. 9274588 Bitcoin Cash (BCH);
513. 1462015 Bitcoin Gold (BTG);
33.8211 Bitcoin (BTC);
$30,250 as a substitute res for a 2011 Ford F-350 pickup, VIN: 1FT8W3BT7BEC88017 sold pursuant to an interlocutory sale order;
$6,400 as a substitute res for a 2008 BMW 135i, VIN: WBAUC73508VF25535 sold pursuant to an interlocutory sale order;
Four 100-ounce silver bars;
Industrial large pill press and associated pill dyes;
The following holdings in Aaron Shamo's E-Trade Securities LLC account ending in 4068:
 - $14,564.57 in U.S. Currency
 - Shares of Stock: 272 shares of Molecular Templates, Inc., 100 shares of Marvell Technology Group LTD, 32 shares of HealthEquity, Inc., 100 shares of Nike, Inc., 7 shares of Amazon.com, Inc., 75 shares of Apple, Inc., and 6 shares of Alphabet, Inc.
 - Any dividends received into the cash account and related to Marvell Technology Group LTD, Nike, Inc, and/or Apple, Inc stocks after November 26, 2018
 - The entire balance of the Northern Stock Index Fund mutual fund

Gregory G. Skordas (#3865)
Gabriela Mena (#17087)
Michelle Phelps (#17096)
SKORDAS & CASTON, LLC
560 South 300 East, Suite 225
Salt Lake City, UT 84111
Telephone: (801) 531-7444
Facsimile: (801) 665-0128
gskordas@schhlaw.com
gmena@schhlaw.com
mphelps@schhlaw.com

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **NOTICE OF APPEAL** |
| Plaintiff, | |
| v. | Case No. 2:16-CR-00631-DAK |
| AARON MICHAEL SHAMO, et. al., | Judge Dale Kimball |
| Defendant. | |

Notice is hereby given that Defendant, Aaron Michael Shamo, hereby appeals to the United States Court of Appeals for the Tenth Circuit from the final judgment entered in this action on the 15th day of October, 2020.

DATED this 28th Day of October, 2020.

SKORDAS & CASTON, LLC


_/s/ Gregory G. Skordas_
Gregory G. Skordas
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2020, I filed a true and correct copy of the foregoing

**NOTICE OF APPEAL** with the Clerk of the Court using CM/ECF system, which sent

notification of such filing to the following:

S. Michael Gadd
mgadd@agutah.gov

Vernon G. Stejskal
Vernon.stejskal@usdoj.gov

Kent Burggraaf
kburggraaf@agutah.gov

/s/ Stacey Dodier-Legal Assistant
SKORDAS & CASTON, LLC