**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**June 10, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

AARON MICHAEL SHAMO,

      Defendant - Appellant.

No. 20-4116

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:16-CR-00631-DAK-JCB-1)**
_____

William D. Lunn, Tulsa, Oklahoma for Defendant-Appellant Aaron Michael Shamo.

Jennifer P. Williams, Assistant United States Attorney (Andrea T. Martinez, Acting United States Attorney, with her on the brief), Office of the United States Attorney, Salt Lake City, Utah, for Plaintiff-Appellee.
_____

Before **HARTZ**, **KELLY**, and **MURPHY**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Defendant Aaron Michael Shamo was convicted by a jury on 12 charges arising from his distribution of controlled substances, including fake oxycodone pills laced with fentanyl. He received a mandatory life sentence on his conviction of being a principal leader of a continuing criminal enterprise (CCE). *See* 21 U.S.C. § 848(b).

To secure that conviction the government had to prove that Defendant's criminal enterprise possessed for distribution at least 12 kilograms of fentanyl (satisfying the statutory requirement of 300 times the quantity of a substance described in 21 U.S.C. § 841(b)(1)(B)). *See* 21 U.S.C. § 848(b)(2)(A).

On appeal Defendant challenges the sufficiency of evidence of his guilt of the CCE charge because (a) the government failed to prove that the drug he was distributing was the chemical designated in the criminal statute and (b) the government failed to prove that he knew he was distributing a controlled substance. He also challenges the admissibility (a) of screenshots of his illicit online storefront to prove the quantity of drugs distributed and (b) of testimony by an expert witness who allegedly opined on the meaning of certain language in the CCE statute. And he complains of alleged prosecutorial misconduct in suggesting that he was responsible for uncharged overdose deaths and should be punished because of the social costs of unlawful narcotics. Finally, he challenges the constitutionality of his life sentence. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

Regarding the sufficiency of the evidence, Defendant waived at trial his present arguments regarding whether the "fentanyl" he was distributing was the chemical designated in the criminal statute, and there was overwhelming evidence that he knew he was distributing fentanyl. Any error in the admission at trial of the screenshot evidence was harmless because of the overwhelming evidence of the quantity of drugs he was distributing, and any improper expert testimony was harmless because it did not mislead the jury. We also hold that there was no

reversible prosecutorial misconduct and that his sentence was not unconstitutionally severe.

## I.     BACKGROUND

### A.     Events Leading Up to Defendant's Arrest and Trial

Defendant's drug dealing was not typical of what usually appears in this court. He bought fentanyl over the internet from China, prepared pills with his own press, took orders over the internet, and shipped to customers by mail. What brought about his downfall was a routine inspection by government authority.

In June 2016, while screening packages for illicit products at an international mail facility, United States Customs and Border Protection seized a package from China containing fentanyl that was addressed to Ryan Jensen in Midvale, Utah. On November 1 law-enforcement agents interviewed Jensen, who told them that Defendant had hired him for an arrangement in which packages from China would be delivered to him and he would then take them unopened to Defendant.

Later in November, with law enforcement on alert for related suspicious activity, United States Drug Enforcement Agency (DEA) agents seized a package—this one containing alprazolam, a Schedule IV controlled substance used to make Xanax—addressed to Sean Gygi, also in Midvale. The agents later seized a package containing fentanyl addressed to Gygi. After Gygi's residence was searched and he was interviewed by DEA agents, he agreed to cooperate with the investigation. He said that Defendant was paying him to pick up packages locally and take them to various post offices for shipment. At the request of DEA agents, he picked up

3

packages, as normal, from the residence of Alexandrya Tonge and Katherine Bustin—two individuals who received drug orders and pills from Defendant and processed them for shipment—and then brought the packages to the South Jordan Police Department for inspection. Gygi completed pickups on November 18 and 20. The packages from these pickups contained what appeared to be Xanax and oxycodone pills.

On November 22 law-enforcement agents executed search warrants at the Tonge-Bustin residence and Defendant's residence. At Defendant's residence the agents found pill presses, materials used to manufacture pills (such as dies that set the size and shape of the pill), powder found to contain fentanyl with a purity of 72%, and over $1.2 million in United States currency. At the Tonge-Bustin residence they discovered shipping materials, order forms for oxycodone, a significant volume of oxycodone-appearing pills, and $19,520 in cash. Upon being interviewed after the search began, Tonge told the agents that she had recently taken additional drug packages to the post office, and agents then seized those packages.

Defendant was indicted in the United States District Court for the District of Utah on 13 counts arising out of his drug-trafficking activities: one count of engaging in a CCE; three counts of importing controlled substances; one count of possessing fentanyl with intent to distribute; one count of distributing a controlled substance resulting in death; one count of manufacturing the controlled substance alprazolam; two counts of knowingly and intentionally adulterating drugs held for sale; one count

of using the United States mail in furtherance of a drug-trafficking offense; and three

counts of violating federal money-laundering statutes.

Two counts—the ones Defendant focused on at trial—carried the possibility of

life sentences. Count 1 alleged that Defendant knowingly and intentionally engaged

in a CCE between July 2015 and November 2016. Roughly speaking, a CCE is a

substantial business of six or more persons that engages in a continuing series of

felony violations of federal drug law.[1] The penalty for engaging in a CCE is generally

imprisonment of 20 years to life. *See* 21 U.S.C. § 848(a). But the penalty is a

mandatory life sentence if the violator:

> (1) . . . is the principal administrator, organizer, or leader of the enterprise or
> is one of several such principal administrators, organizers, or leaders; and
> (2) (A) the violation . . . involved at least 300 times the quantity of a
> substance described in [21 U.S.C. §] 841(b)(1)(B).

*Id.* § 848(b). The indictment charged that Defendant "was a principal administrator,

organizer, supervisor and leader of the criminal enterprise, which involved

possession with intent to distribute and distribution of more than 12,000 grams of a

---

[1] 21 U.S.C. § 848(c) states:
**(a) "Continuing criminal enterprise" defined**
   . . . [A] person is engaged in a continuing criminal enterprise if—
> (1) he violates any provision of this subchapter or subchapter II the
> punishment for which is a felony, and
> (2) such violation is part of a continuing series of violations of this
> subchapter or subchapter II—
>> (A) which are undertaken by such person in concert with five or
>> more other persons with respect to whom such person occupies
>> a position of organizer, a supervisory position, or any other
>> position of management, and
>> (B) from which such person obtains substantial income or resources.

mixture and substance containing a detectable amount of Fentanyl (N-phenyl-N- [ 1-( 2-phenylethyl ) -4-piperidinyl ] propanamide)." R., Vol. I at 94.

In addition, Count 6 alleged that Defendant distributed fentanyl, resulting in the death of a person with the initials R.K. on June 13, 2016, a charge that carried a potential life sentence and a mandatory minimum of 20 years. *See* 21 U.S.C. § 841(b)(1)(C).

### B.   Jury Trial

Before any witness took the stand at trial, the participants knew that the evidence of Defendant's drug dealing would be overwhelming. Defense counsel admitted as much in his opening statement. He conceded that "the evidence will support the notion that [Defendant is] guilty of many of these counts, that he was involved in this drug ring, that he participated in the drug ring, and that he should be held responsible for that." R., Vol. II at 316. By making this concession, counsel hoped to gain credibility with the jurors, so that he could focus on obtaining an acquittal on the two charges that carried a life sentence, telling them that "the evidence will not establish, members of the jury, that [Defendant] caused the death of another or that he was the organizer, leader, mastermind of this organization." *Id.* at 325. After hearing the evidence, defense counsel did not change his approach, saying in closing argument: "Importantly, as you can imagine, Count I, the continuing criminal enterprise, Count VI, substances resulting in death, are counts that we don't agree with. I suppose, equally importantly, we do agree that most of the other counts apply to [Defendant]." *Id.* at 1771.

6

The incontrovertible, and uncontroverted, evidence was the physical evidence—the drugs, shipping materials, pill press, and money seized by the government. In addition, seven of Defendant's confederates testified.

Drew Crandall, who was Defendant's initial business partner, testified to the origins and evolution of their drug-trafficking organization. In 2014 the two men started by selling their personal unused Adderall online. Defendant set up an account to sell the drugs on a dark-net marketplace[2] called Agora and began purchasing additional Adderall pills to resell. Defendant received two-thirds of the profit from the sales to Crandall's one-third. Defendant then began purchasing other drugs—including cocaine, ecstasy, LSD, and Xanax, which he had imported from India—which were also sold through the dark web. To import illicit drugs without drawing attention to themselves, Crandall and Defendant recruited others (all of whom had to be approved by Defendant) to receive drug packages. As the business grew, Defendant acquired a pill press[3] from China to start manufacturing (that is, pressing) fake Xanax pills. Before Crandall left the United States and largely withdrew from the drug operation in November 2015, Defendant started selling drugs through a new storefront called Pharma-Master on the dark-net marketplace AlphaBay.

---

[2] A government expert testified that "Dark Net markets . . . essentially are an online black market . . . and they are selling or brokering transactions involving drugs and other illicit goods." R., Vol. II at 872. These markets "can only be accessed with a specific browser software, configurations or authorizations." *Id.* at 871.

[3] Crandall described a pill press as "a machine that takes powders and presses it into a pill based on the mold you have." R., Vol. I at 2266.

Jonathan Luke Paz was recruited by Defendant in late 2015 to serve as Crandall's replacement. He was responsible for pressing the pills that Defendant sold through the Pharma-Master storefront. At first he pressed only Xanax pills, but Defendant's physical trainer Chris Kenny suggested also pressing fentanyl-laced pills. Defendant and Paz experimented to find a marketable product—fake oxycodone pills laced with fentanyl—and sales steadily increased. Paz testified that he may have pressed 20,000 to 40,000 pills, or even as much as 70,000, in a single week (he admitted to manufacturing 480,000 pills in total) with each pill weighing a bit over 100 milligrams.

Mario Noble testified that he was initially recruited by Defendant in early 2016 to open his own store on the dark web to sell Defendant's products. But after that effort stalled, Defendant asked him to help with responding to customer-service requests. Also, the government presented four witnesses—Jensen, Gygi, Tonge, and Bustin—who were recruited and paid by Defendant as package receivers and merchandise shippers. Both Tonge and Bustin identified Defendant as being in charge of the operation. Bustin testified that Defendant "did all of the communicating," "made the financial decisions," "started the account on the Dark Web," and "created this whole thing and taught others." *Id.* at 693–94.

Government agents testified about the seizure of the previously described currency, pills, and pill-pressing equipment, and about the weight and chemical composition of the drugs. They further testified about Defendant's website; wire transfers that he made to China, including one payment of about $2,100 for fentanyl

hydrochloride;[4] and his other financial transactions, including those involving his Bitcoin wallet, which bore the same address as the wallet used to receive payments for the Pharma-Master storefront on AlphaBay. An IRS special agent concluded that Defendant "controlled the money" generated by the Pharma-Master operation. *Id.* at 1200. The government also presented expert testimony about drug trafficking and dark-net markets.

Only three witnesses testified for the defense: Defendant's mother and sister— who testified about his childhood struggles and his personality—and Defendant himself. Defendant admitted his guilt as a drug dealer but minimized his role in the drug operation. He acknowledged that he resold Adderall that had been prescribed for his personal use and that he had purchased from a friend. He admitted that the operation expanded to buying other drugs—which had larger resale profit margins— through the dark-net market and reselling them online and to friends. He stated that he would "pass [orders] off" to Crandall for shipment. *Id.* at 1607. Defendant acknowledged that he recruited participants to work as package receivers and that the drug trafficking evolved to become a "huge operation." *Id.* at 1610.

Although Defendant attempted to shift some of the blame to others for how the drug operation evolved, his testimony ultimately confirmed that he had a major role in the transitions to manufacturing pills and later lacing pills with fentanyl. For instance, he said that Crandall had the idea to manufacture Xanax pills and that

---

[4] A DEA chemist explained that fentanyl hydrochloride "is still Fentanyl, it just also has hydrochloride." R., Vol. I at 2381.

Crandall was the one who "was able to make it work" despite various challenges in designing and creating the pill. *Id.* at 1612. But he admitted that he approved of the idea and that he purchased materials to facilitate the pill production. He also blamed physical trainer Kenny for coming up with the idea to produce fake oxycodone pills laced with fentanyl and described how Paz pressed him to adopt the proposal. Yet he admitted that he approved of manufacturing and selling fentanyl-laced pills and he set the plan in motion by ordering the necessary materials. He further admitted to experimenting with the amount of fentanyl that would be placed in the pills—starting with a "super low dose" and "walk[ing] up from that point"—and that ultimately "about a milligram" of fentanyl was being pressed into each fake oxycodone pill. *Id.* at 1648–49. And he testified to selling the fentanyl-laced pills, including significant quantities that he sold offline to Kenny. He also acknowledged that most of the revenue went to him: the $1.2 million found at his residence, nearly half a million dollars in an unopened bag in his parents' closet, and more than 500 Bitcoin seized from wallets in his sole control.

The evidence of Defendant's drug-trafficking activities was compelling. But the defense strategy to challenge only the two most serious counts was partially effective. Although he was convicted on 12 counts, the jury was unable to reach a verdict on the death-resulting count. He was, however, unable to escape a conviction on the CCE charge and the associated mandatory life sentence.

Defendant identifies six issues on appeal. We proceed to explain why we reject his arguments.

10

## II.    DISCUSSION

### A.    Sufficiency of the Evidence

Two of Defendant's issues concern the sufficiency of the evidence. Both derive from an inexplicable peculiarity in the Controlled Substances Act, 21 U.S.C. § 801 *et seq*. Although the statute refers to most illicit drugs by their common names—such as heroin, cocaine, marihuana, or methamphetamine—the relevant provision does not use the word *fentanyl*. Rather, it refers to that substance by its chemical name, N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, *see* 21 U.S.C. § 841(b)(1)(B)(vi), which a federal regulation says is "commonly known as fentanyl," 28 C.F.R. § 50.21(d)(4)(vi). No witness at trial, however, used the chemical name; the testimony referred only to "fentanyl." Defendant therefore argues that (1) there was insufficient evidence that he distributed the statutory chemical and (2) there was insufficient evidence that he knew that what he was distributing was the statutory chemical.

The government does not dispute that its witnesses never mentioned the chemical name for fentanyl. But it contends that such testimony was unnecessary because Defendant "deliberately waived" the argument he raises on appeal "through his affirmative acceptance that the term fentanyl as used by the witnesses throughout trial was synonymous with its chemical name." Aplee. Br. at 22. We agree.

Defendant effectively stipulated that fentanyl was the substance identified in the statute by proposing the following jury instruction:

DEFENDANT'S PROPOSED INSTRUCTION NO. 20

11

Fentanyl (also referred to as N-phenyl-N- [ 1- ( 2-phenylethyl ) -
4-piperidinyl ] propenamide) is a controlled substance within the
meaning of the law.
Likewise, Alprazolam is a controlled substance within the
meaning of the law.

R., Vol. I at 649. This was essentially the same as the instruction given to the jury:

JURY INSTRUCTION NO. 27

Several of the following instructions will refer to controlled
substances.
Fentanyl (also referred to as N-phenyl-N- [ 1- ( 2-phenylethyl ) -
4-piperidinyl ] propenamide) is a controlled substance within the
meaning of the law.
Likewise, Alprazolam is a controlled substance within the
meaning of the law.

*Id.* at 1078.[5] When the district court expressed some unease about the proposed

instruction during the jury-instruction conference, defense counsel asked, "Can't you

just say Fentanyl is a controlled substance within the meaning of the law?" R., Vol. II

at 1684. The government said that the chemical description should be left in the

instruction: "[W]e always pair it together so that we're putting defendants on notice,

especially in counts where we're seeking a mandatory minimum sentence." *Id.* When

the court said it would leave the instruction unchanged and asked defense counsel

whether they could "live with that," they both answered "yes." *Id.*

Defendant's stipulation was not the product of carelessness by defense counsel

in giving away a winning defense. Rather, this was part of a deliberate strategy: the

---

[5] We recognize that the jury instruction refers to *propenamide* as opposed to
the statutory term *propanamide*; this deviation from the statutory language appears to
have been introduced by Defendant and does not change our analysis of the issue.

defense's plea to the jury was that it "recognize honestly [Defendant's] role in this and . . . punish him honestly for his role in this." *Id.* at 1807. By conceding almost all the issues that could have been raised at trial (and which were likely lost causes anyway), the defense sought to focus the jury's attention on the two issues it vigorously pursued: that Defendant was not a principal leader of the drug-trafficking operation and that he was not responsible for an overdose death. Litigating over the chemical composition of the fentanyl that Defendant, by his own admission, placed in fake oxycodone pills would have been contrary to this strategy, perhaps undermining the credibility of the defense.

Waiver is the "intentional relinquishment or abandonment of a known right." *United States v. Cruz-Rodriguez*, 570 F.3d 1179, 1183 (10th Cir. 2009) (internal quotation marks omitted). We have held that a defendant waived an appellate argument by "intentionally adopt[ing] a litigation position that was fundamentally inconsistent with" that argument. *Id.* at 1184. That is certainly the case here. Defendant cannot successfully propose an instruction that equates *fentanyl* with the statutorily proscribed chemical and then contend on appeal that the two substances are different.

Defendant next argues that the government failed to prove that he knew that fentanyl was a controlled substance or that the N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide compound listed in the statute was fentanyl. He says that he did not knowingly distribute N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide since no one, "except possibly a trained chemist, would know just what

the compound was." Aplt. Br. at 35–36. He also contends that the district court erred in failing to instruct the jurors that they needed to find that he knew that the particular substance he dealt with was controlled. We reject these arguments as well, but for reasons other than waiver.

To engage in a CCE, a person must violate one of the federal drug laws. The CCE count in the indictment against Defendant references 21 U.S.C. § 841(a)(1), which makes it "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." The Supreme Court has identified two ways in which § 841(a)(1)'s knowledge requirement can be satisfied: (1) "by showing that the defendant knew he possessed a substance listed on the [federal drug] schedules, even if he did not know which substance it was" or (2) "by showing that the defendant knew the identity of the substance he possessed," even if he did not know it was listed. *McFadden v. United States*, 576 U.S. 186, 192 (2015). The Court provided the following illustration of how the second route could be satisfied:

> Take, for example, a defendant who knows he is distributing heroin but does not know that heroin is listed on the schedules. Because ignorance of the law is typically no defense to criminal prosecution, this defendant would also be guilty of knowingly distributing "a controlled substance."

*Id.* (citations omitted).

At trial Defendant acknowledged that "about a milligram" of fentanyl was being placed in each pill that was being sold. R., Vol. II at 1649. Although the word *fentanyl* does not appear in any applicable provision of the Controlled Substances

14

Act,[6] § 841(a)(1) speaks only in terms of "controlled substance[s]," which are defined and categorized in schedules published in the federal regulations,[7] and "Fentanyl" is listed as a Schedule II controlled substance, *see* 21 C.F.R. § 1308.12(c)(9). Under *McFadden* it was enough that Defendant knew that he was distributing fentanyl, regardless of whether he knew that it was a controlled substance.

We also reject Defendant's argument that Instruction 34 was erroneous. The statement in that instruction that "[t]he United States is not required to prove that the defendant knew the precise nature of the controlled substance," R., Vol. I at 1087, is wholly consistent with *McFadden*.

### B.    Admission of Screenshots

Defendant challenges the admission of screenshots of customer reviews left on his Pharma-Master website that were taken by Robin Biundo, an intelligence analyst with Homeland Security Investigations (HSI). Biundo became involved in Defendant's case through her investigation of a potential drug operation in Oregon.

---

[6] The term *fentanyl* appears twice in the Controlled Substances Act: the initial (and now superseded) controlled-substance schedules, *see* 21 U.S.C. § 812(c), Schedule II(b)(6), and a section on production and procurement quotas for controlled substances, *see id.* § 826(i).

[7] The initial controlled-substance schedules were established by statute. *See* 21 U.S.C. § 812(c). The Attorney General may by rule add substances to the schedules, remove them, or transfer them between schedules. *See id.* § 811(a). As permitted by statute, *see id.* § 871(a), the Attorney General has delegated this scheduling authority to the Drug Enforcement Administration, *see* 28 C.F.R. § 0.100(b); *see generally Touby v. United States*, 500 U.S. 160, 162–63, 169 (1991).

As part of this investigation, Biundo used an undercover account on AlphaBay to monitor drug transactions. Through AlphaBay, Biundo was able to view buyer feedback left for the Pharma-Master storefront controlled by Defendant and connect certain feedback to her target in Oregon.

Biundo took screenshots of 366 pages of feedback left on Pharma-Master's storefront. The screenshots capture what appear to be customer reviews for several thousand transactions involving Pharma-Master sales of fentanyl-laced fake oxycodone pills. Each review contains a Feedback column that lists comments in bold and product descriptions in regular type. For example, one review contained a positive comment and immediately below that a line of text that read: "Fentanyl - Roxy Oxycodone - 30mg X100." Aplt. App. at 85.

Biundo created a spreadsheet in which the type and quantity of the drug involved in each transaction (derived from the product description) were compiled and reported row by row. Biundo added the quantities of drugs that were purportedly sold in 3,491 transactions to calculate that 458,946 fake oxycodone pills were sold through the Pharma-Master storefront on AlphaBay. The prosecution pointed out on direct examination of Biundo the overwhelmingly positive feedback left on the storefront and then argued to the jury that the customer comments "about how good the[] pills were, that they in fact contained the Fentanyl, as advertised," R., Vol. II at 1747, supported a conclusion that the pills actually contained fentanyl. But Biundo did not verify that the orders reflected in the screenshots were shipped or received, or that they contained the substance mentioned in the listing.

16

Defendant claims that the district court erred in admitting the screenshots into evidence, over objection, on the grounds that they were not properly authenticated and constituted hearsay. Defendant's authentication argument is that it was insufficient that Biundo testified that she took the screenshots because the government needed to provide testimony from someone who had personal knowledge of the site, such as a webmaster, or who could otherwise verify the accuracy of the data. He also presents a cursory argument why the screenshots were inadmissible hearsay, merely asserting that they were and discussing one case where "the court rejected evidence of a chat not involving the defendant conducted on a Dark Web website as hearsay." Aplt. Br. at 45. He contends that the erroneous admission of the screenshots prejudiced him because "[a]lternative evidence did not exist to prove the quantities required for the continuing criminal enterprise count." Aplt. Reply Br. at 20.

We need not resolve whether the screenshots were erroneously admitted because any error was harmless in light of the compelling evidence establishing the minimum required quantity of fentanyl-containing drugs involved in Defendant's enterprise. *See United States v. Solomon*, 399 F.3d 1231, 1238 (10th Cir. 2005) ("A nonconstitutional harmless error is one that does not have a substantial influence on the outcome of the trial; nor does it leave one in grave doubt as to whether it had such effect. Thus, where there is an abundance of evidence regarding the defendant's guilt, the nonconstitutional error will be deemed harmless." (citations and internal quotation marks omitted)). To support the mandatory life sentence, the government

17

needed to prove that Defendant's CCE offense involved at least 12,000 grams of substances containing fentanyl. But about 12,825 grams of substances seized from Defendant's operation tested positive for fentanyl. The drugs seized from the Tonge-Bustin residence—where Defendant sent pills for packaging and shipping—and the outbound orders from just two days in November 2016 alone added up to more than 12,000 grams. The only reasonable inference was that significantly more fentanyl was involved in the criminal enterprise. To begin with, not all the drugs that were seized were tested. More importantly, Defendant himself admitted that he directly supplied trainer Kenny with fentanyl-laced pills (and Paz testified that thousands of pills (each weighing .1 gram) were given to the trainer in the course of a number of transactions). Also, Defendant had been selling large quantities of fentanyl-laced pills online for months before November 2016: Paz described how he pressed tens of thousands of pills in the summer and fall of 2016; Tonge said that she found it strange when she started handling orders of "1,000, 2,000, 5,000 pills," R., Vol. II at 613; and Defendant himself acknowledged that he was being "flooded with more orders" as business picked up in the months leading to November 2016, *id.* at 1628.[8]

## C.   Expert "Legal" Testimony

DEA financial investigator Jeff Bryan, who had a limited role in the investigation of Defendant—he testified that he "assisted sometimes with evidence

---

[8] Defendant concedes that "many pills were recovered" but maintains that "forensic tests showed they contained compounds" different from the substance listed in the statute. Aplt. Reply Br. at 20–21. But again, this argument ignores that he effectively stipulated at trial that fentanyl was the same substance.

processing and things like that," *id.* at 1223—was called as an expert witness by the government to help the jury understand "general concepts and trends in drug trafficking." *Id.* at 1222. Defendant complains that Bryan's testimony went beyond the proper bounds of expert testimony by expounding on the law for the jury.

Defendant challenges Bryan's testimony (1) that the leader or organizer of a drug-trafficking organization "receive[s] the bulk of the proceeds," *id.* at 1230; (2) that the leader or organizer of a CCE "would be the person in charge of the decisions, who gets hired, what the prices are, who rents the vehicles," *id.* at 1251; (3) that the five or more individuals who worked at the leader's direction "would be people that may purchase equipment in their names[,] . . . people that ship the drugs, or drive somewhere to deliver the drugs, or pick the drugs up," *id.*; (4) that one million dollars is "substantial income or resources" within the meaning of the CCE statute, *id.* at 1252; and (5) that sometimes a conspiracy "just starts happening" and that often "[i]t's very fluid and it just evolves into an organization and everybody has their role that's defined by someone," *id.* at 1254.

We agree with Defendant that the judge is the exclusive authority at trial on what the governing law is, and "testimony on ultimate questions of law is not favored." *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988) (en banc); *see id.* at 807 ("[I]t is axiomatic that the judge is the sole arbiter of the law and its applicability."). But we fail to see how two of the challenged statements were testimony on the law. The comment on the leader receiving the bulk of the proceeds was unlikely to be understood as an opinion on the meaning of the CCE statute when

it preceded by 19 transcript pages any mention of the CCE statute during Bryan's testimony. And the comment about conspiracies just happening has no apparent connection to any legal principle at issue. On the other hand, we agree with Defendant that Bryan's testimony crossed the line when he explained to the jury his "understanding of the [CCE] statute." R., Vol. II at 1251. Nevertheless, Defendant has failed to show how he was prejudiced by this testimony. He has not explained how any of the challenged testimony misstated the law or could have confused the jury. *See United States v. Messner*, 107 F.3d 1448, 1455 (10th Cir. 1997) ("To the extent that the expert accurately discussed the requirements of the law the defendant suffered no harm." (internal quotation marks and brackets omitted)). The notion that the leader (organizer, supervisor, or manager) of a CCE would be in charge of making decisions is both commonsensical and consistent with the court's instruction that "[a] relationship of supervision is created when one person gives orders or directions to another person who carries them out." R., Vol. I at 1081. Bryan's testimony regarding the kinds of activities that might be undertaken by subordinates in the drug operation did not misstate the law. *See United States v. Williams-Davis*, 90 F.3d 490, 509 (D.C. Cir. 1996) ("[T]he government points to . . . lieutenants, runners, packagers, [and] transporters, all of whom could be considered managees" under 21 U.S.C. § 848(c)(2)(A).). And certainly no one could contest that $1 million is a substantial amount of money under the jury instructions, which distinguished "substantial income or resources . . . from some relatively insignificant, insubstantial, or trivial amount." R., Vol. I at 1081.

Finally, we reject Defendant's overarching argument that Bryan "'displac[ed] the jury by connecting and combining all other testimony and physical evidence into a coherent, discernible, internally consistent picture of the defendant's guilt.'" Aplt. Br. at 48 (quoting *United States v. Mejia*, 545 F.3d 179, 190–91 (2d Cir. 2008)). The concern expressed by the Second Circuit in *Mejia* was that the government would use officer experts "whose expertise happens to be the defendant." *Mejia*, 545 F.3d at 191. The government did no such thing here. Bryan did not testify as an expert on Defendant's drug operation; he explained the nature and scope of drug-trafficking organizations more generally.

### D.    Prosecutorial Misconduct

Before trial, Defendant filed a motion in limine to prevent the government from "making references to overdose deaths other than the allegation made in the 'death resulting' count for which" he was on trial. R., Vol. I at 311. The government opposed Defendant's motion with respect to deceased customers who were specifically mentioned in the indictment, arguing that reference to their deaths was necessary to explain why they were not interviewed by law-enforcement officers and were unavailable to testify. Ultimately, the parties agreed that the government would not refer to the customers' deaths as *overdose* deaths. The district court's understanding of the agreement was included in a minute entry on its docket: "The government agrees that it won't tie deaths of unavailable witnesses to Defendant or say that the deaths resulted from overdoses." *Id.* at 21.

21

Defendant argues that despite this agreement, the prosecutors engaged in misconduct by attempting to tie uncharged overdose deaths to him. His opening brief does not explicitly identify what ruling by the district court he is appealing. As best we can tell, Defendant presents two prosecutorial-misconduct claims. First, he challenges the district court's denial of his motion for a mistrial, which stemmed from the circumstances surrounding a law-enforcement agent's testimony about victims of the Pharma-Master operation. Second, Defendant takes issue with a remark made by the prosecutor in closing argument regarding Defendant's role in the opioid epidemic. We conclude that there was no reversible prosecutorial misconduct.

1.      Denial of motion for mistrial

Defendant's motion for a mistrial arose out of the testimony of Virginia Keys, a special agent with the Food and Drug Administration Office of Criminal Investigations, who discussed her investigation into over 90 Pharma-Master small-order customers. She was asked about certain customers named in the indictment. The following exchange occurred during her direct examination:

Q.      Did you look into [G.K.]?
A.      I did. . . .
Q.      Did you speak to his family?
A.      I did.
Q.      They are here in the courtroom with us?
A.      They are.
Q.      Was [G.K.] a real person?
A.      He was.
Q.      Did you speak to [G.K.] to confirm that he ordered the Fentanyl-laced fake oxycodone from Pharma-Master?
A.      I did not.
Q.      Why not?
A.      He's dead.

22

R., Vol. II at 1039–40. Moments later, defense counsel asked to approach the bench and objected that the questioning was "very far over the line" as "they have a family out here crying in the courtroom, and it's clear that the indication is that he was an overdose death." *Id.* at 1042. The district court observed that the prosecution was "leaving more of an impression they died of an overdose and . . . trying to connect it to [Defendant]." *Id.* The prosecutor offered to clarify that Defendant was not charged with causing the deaths of the individuals being discussed and the court said that such a clarification was necessary. Agent Keys proceeded to testify that Defendant was not charged with causing the deaths of these individuals. Defendant later filed a motion for a mistrial based on the testimony and family responses, but the district court denied it.

The parties agree that we review for abuse of discretion the denial of Defendant's motion for a mistrial. *See United States v. Taylor*, 514 F.3d 1092, 1095 (10th Cir. 2008) (Gorsuch, J.) ("Where the defendant contemporaneously moves for a mistrial on the basis of prosecutorial misconduct, we review the denial of such a motion for abuse of discretion."). Defendant's argument on appeal is that the prosecution improperly "planted families of Pharma-Master customers who had overdosed . . . to break down crying" during the testimony of Agent Keys, and that it "paid travel expenses for several of these families," Aplt. Br. at 52–53, all in order "to emphasize, through courtroom spectators, that [Defendant] sold pills to other addicts who had overdosed," Aplt. Reply Br. at 26.

The record before us does not show that the district court abused its discretion in denying Defendant's motion for a mistrial. For one, Agent Keys's testimony was elicited for the permissible purpose of explaining why certain individuals named in the indictment could not appear in court. As for the notion that the government improperly planted victims' families in the courtroom, we quote at length from the district court's ruling, which reflects a thoughtful and intelligent exercise of discretion:

> As to the presence of G.K.'s family in the courtroom, customers' families had a right to attend the trial like any member of the public. Trials are public proceedings. They also had a right to be present under the Crime Victim[s'] Rights Act, 18 U.S.C. § 3771. Whether the victim coordinator at the U.S. Attorney's office assisted some of the families in being able to attend is irrelevant. The victim coordinator is only trying to comply with the Crime Victims' Rights Act. Counsel's reference to G.K.'s family's presence in the courtroom was not unfairly prejudicial. It merely confirmed that they were the family members the agent spoke with in her investigation. Counsel was not acting in bad faith and acknowledging the family was inconsequential given that Agent Keys clarified that Defendant was not charged with the death of G.K., he was mentioned only because he was one of Defendant's customers. Furthermore, the alleged crying by G.K.'s family in the gallery and Agent Keys while she was testifying were not so significant that they were a breach of the court's decorum standards. In fact, the United States' counsel and members of the court's staff did not notice the alleged crying. However, witnesses and spectators are only human and occasionally they show emotion. All of Defendant's witnesses cried on the stand more visibly and noticeably than Agent Keys or the families in the gallery. Defendant can receive a fair trial without perfectly whitewashing the facts and circumstances surrounding the investigation and the consequences of the drug distribution. None of these courtroom decorum issues rise to the level of justifying a mistrial.

R., Vol. I at 1047–48. We add that Defendant provides no case law or other authority

to suggest that the assistance provided to victims' families to attend trial was

improper.[9]

---

[9] Indeed, this kind of assistance appears to generally be appropriate. The Department of Justice's guidelines state: "The Department is not required to pay a victim's expenses to attend court. Department personnel may, however, help victims to identify resources to assist them with the financial burden of court attendance." U.S. Dep't of Just., *Attorney General Guidelines for Victim & Witness Assistance* at 39 (2011). Indeed, the Guidelines declare a "strong presumption . . . in favor of providing, rather than withholding, assistance and services to victims of crime." *Id.* at 3. This is in keeping with the statutory mandate that the Department designate officials who will "inform a victim of any restitution or *other relief* to which the victim may be entitled under this or any other applicable law and [the] manner in which such relief may be obtained." 34 U.S.C. § 20141(c)(1)(B) (emphasis added). As one guide explains:

> [T]he AG Guidelines instruct that this "other relief" specifically includes crime victims' compensation programs. Crime victim compensation programs . . . seek to compensate victims for certain financial expenses incurred as a result of their victimization. Every state has some type of compensation program, and these programs typically cover medical expenses, counseling, and funeral costs. Some programs cover court-related travel, emergency housing/security expenses, and even crime scene clean up. If the victim's expenses are not covered under the local program, or the victim is otherwise ineligible, *there are federal resources that may be available to assist crime victims with certain immediate needs and travel expenses to enable an out-of-state or out-of-country crime victim to attend court proceedings.*

Sarah McClellan, *What New AUSAs Need to Know About Victims' Rights & Working with Victims*, 68 DOJ J. Fed. L. & Prac. 73, 79 (2020) (emphasis added, footnotes omitted); *see also* 34 U.S.C. § 20103(a)(1) (providing for grants to crime-victim assistance programs); 28 C.F.R. § 94.119(e)(3) (permitting victim-assistance funds to be used to provide "[t]ransportation, meals, and lodging to allow a victim who is not a witness to participate in a proceeding").

25

2.    Closing argument

Defendant challenges the following portion of the prosecution's closing

argument:

> It's also important that you understand the scope of the crime, the
> gravity of the crime, the impact on the nation. . . . Aaron Shamo said: If
> I had known of the opioid epidemic, I wouldn't have gone down this
> road. That statement is simply not worthy of belief. He knew the nation
> was on fire with opioids, and he poured fuel on those flames over and
> over and over again, never getting burned himself, but causing pain and
> misery wherever his fire spread.

R., Vol. II at 1765–66. The government points out that the defense raised no

objection to these remarks at trial. Because there was no objection, we review for

plain error. *See United States v. Christy*, 916 F.3d 814, 826 (10th Cir. 2019). "Under

plain error review, reversal is warranted only when [1] the prosecutor's statement is

*plainly improper* and [2] the *defendant* demonstrates that the improper statement

affected his or her substantial rights." *Id.* at 826–27 (internal quotation marks

omitted). "An error affects substantial rights if there is a reasonable probability that

the error affected the outcome of the proceedings." *United States v. Koch*, 978 F.3d

719, 729 (10th Cir. 2020) (internal quotation marks omitted).

Although the government does not defend the propriety of the remarks,[10] *see*

*United States v. Rogers*, 556 F.3d 1130, 1143 (10th Cir. 2009) ("Prosecutors are not

---

[10] In a letter to the court after oral argument the government said that the
statement was improper and that the United States Attorney's Office for the District
of Utah "will be holding training for all its prosecutors on appropriate closing
arguments." Aplee. 28(j) Ltr. (Jan. 21, 2022).

26

permitted to incite the passions of the jury by suggesting they can act as the

community conscience to society's problems." (internal quotation marks omitted)),

we need not opine on the issue because Defendant has not satisfied his burden of

demonstrating that the prosecutor's remarks affected his substantial rights. For one

thing, as we have discussed, the evidence of Defendant's guilt was very strong, as

was the evidence pertaining to the scope of the operation and the type of drugs that

were distributed. *See United States v. Kravchuk*, 335 F.3d 1147, 1154 (10th Cir.

2003) (prosecutor's remarks, though "arguably improper," were harmless because the

evidence of the defendant's participation in the crime was overwhelming); *United

States v. Andújar-Basco*, 488 F.3d 549, 561 (1st Cir. 2007) (prosecutor's remarks in

closing, which the government conceded were improper, did not warrant reversal

given the "overwhelming evidence establishing [the defendant's] guilt"); *see also

Christy*, 916 F.3d at 840–42 (prosecutor's improper comments did not affect

defendant's substantial rights in large part because "the inculpatory evidence . . . was

overwhelming"). Although not independently dispositive, the failure of the jury to

convict Defendant on the one death-resulting count suggests that the verdict was

"based on reason, rather than emotion." *United States v. Archuleta*, 737 F.3d 1287,

1296 (10th Cir. 2013). And Defendant's own testimony pointed to the great danger

he had created. On direct examination he said that he "felt like [he] was doing

something positive" in selling the drugs but "afterwards the opioid epidemic hit" and

only then he realized "the gruesome effects of what happens." R., Vol. II at 1645.

And during cross-examination he admitted: "Of course I feel remorse. . . . [I]f we had

the media spree of [the] opioid epidemic, I would have ceased immediately." *Id.* at

1675.[11]

### E.     Eighth Amendment Challenge to Mandatory Life Sentence

Finally, Defendant raises an Eighth Amendment challenge to the mandatory

life sentence that was imposed under the CCE statute. He concedes that review is for

plain error because this argument was not presented to the district court.

But there was no error, plain or otherwise. In *Harmelin v. Michigan*, 501 U.S.

957 (1991), the Supreme Court upheld a mandatory life sentence for a first-time felon

---

[11] In addition to challenging statements by the prosecution, Defendant's
opening brief also references several witness statements. He argues that the
statements "reminded jurors of the national problem of overdose deaths." Aplt. Br. at
52. He did not object at trial to any of this testimony, nor does he claim that the
testimony was inadmissible, or even analyze whether the testimony lacked a proper
purpose. But we have considered the testimony as part of our review of the
prosecution's remarks "in the context of the entire trial." *United States v. Vann*, 776
F.3d 746, 760 (10th Cir. 2015) (internal quotation marks omitted). In our view the
testimony was not so inflammatory as to change our conclusion that there was no
reversible prosecutorial misconduct. Defendant's brief notes four witness statements:
Gygi acknowledged language in his plea agreement that he would not be charged "for
death resulting violations . . . that may arise out of the continuing investigation into
overdose deaths tied to the Pharma-Master drug sales." R., Vol. II at 388. HSI special
agent Guy Gino testified that his duties included "investigating overdoses to include
fatal and non-fatal, within the city limits of Portland, Oregon." *Id.* at 863. Former
Salt Lake City Police Officer Michael Hamideh testified that "[p]art of my
experience when it comes to the Fentanyl pills was related to overdose deaths" and
that he "was aware that it took only a fraction of a pill in some cases." *Id.* at 575. HSI
intelligence analyst Biundo testified that her reaction to the volume of pills involved
in the Pharma-Master operation (with some orders exceeding 10,000 pills), was that
there were "a lot of pills being distributed out in the street with the potential of
overdose and possibly overdose and dying." *Id.* at 964–65. The first two witness
statements seem routine. The last two perhaps unnecessarily mention the lethality of
the pills, but that was no secret to the jury since a toxicologist testified to that point
in support of the death-resulting count of the indictment.

guilty of possessing 650 grams or more of cocaine. *Id.* at 961, 994–96. Following *Harmelin* this court has upheld sentences of similar severity to Defendant's sentence for drug crimes of a lesser magnitude. *See, e.g.*, *United States v. Williams*, 576 F.3d 1149, 1165 (10th Cir. 2009) (affirming concurrent life sentences for two counts of possession with intent to distribute 50 grams or more of a cocaine base).

Defendant's characterization of his crime as nonviolent and therefore not serious enough to warrant a life sentence ignores the predictable consequences of his conduct. And although Defendant was relatively young at the time of the offense—25 or 26—he was not a juvenile, so *Graham v. Florida*, 560 U.S. 48, 82 (2010) ("The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide.") and *Miller v. Alabama*, 567 U.S. 460, 465 (2012) ("[M]andatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'") do not compel a different outcome.

## III.   CONCLUSION

We **AFFIRM** Defendant's convictions and sentence.

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert
Clerk of Court

Jane K. Castro
Chief Deputy Clerk

June 10, 2022

Mr. William D. Lunn Jr.
William D. Lunn, Attorney at Law
320 South Boston Avenue, Suite 1130
Tulsa, OK 74103

**RE:      20-4116, United States v. Shamo**
             Dist/Ag docket: 2:16-CR-00631-DAK-JCB-1

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(a)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

cc:      Elizabethanne Claire Stevens
         Jennifer Paisner Williams

CMW/mlb